IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                         )
NATURAL RESOURCES DEFENSE COUNCIL              )
1200 New York Avenue, NW, Suite 400            )
Washington, DC  20005,          *et al.*          )
                                                         )
        Plaintiffs,                           )        Civ. No.
                                                         )
               v.                              )
                                                         )
DIRK KEMPTHORNE, in his official capacity     )
As the Secretary of the United States          )
Department of the Interior                     )
1849 C Street, NW                              )
Washington, DC  20240,          *et al.*          )
                                                         )
        Defendants.                           )
_____)

**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

        Pursuant to Federal Rule of Civil Procedure Rule 65 and Local Civil Rule 65.1,

plaintiffs move this Court to issue a preliminary injunction to prevent imminent and

irreparable damage to outstanding public lands in the heart of Wyoming's Red Desert.

The Bureau of Land Management has unlawfully authorized two energy companies to

engage in intensive industrial coalbed methane production in the Atlantic Rim area.

Specifically, the Bureau has approved applications for permits to drill 90 new wells in the

Catalina and Sun Dog units of the Atlantic Rim project.  New well pads and new roads

are being constructed on the public's lands right now despite the Bureau of Land

Management's failure to comply with the several federal laws, including the National

Environmental Policy Act, the Federal Land Policy and Management Act, and the Clean Water Act.

This coalbed methane development threatens to irreparably damage habitats critical to numerous species including sage grouse and elk. The authorized and pending coalbed methane development will also destroy the serenity and beauty of the area and risks creating dangerous methane seeps, which threaten hikers, hunters and other visitors to the Red Desert area.

As discussed in Plaintiffs' Memorandum in Support of Their Motion for a Preliminary Injunction, plaintiffs satisfy the applicable test for obtaining this relief. Emergency relief is appropriate where plaintiffs demonstrate that: "(l) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will not substantially injure the other party; and (4) the public interest will be furthered by the injunction. *See Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1157 (D.C. Cir. 2007). Here, plaintiffs are likely to succeed on the merits, the irreparable harm suffered by plaintiffs in the absence of immediate relief far exceeds any harm to the defendants, and an injunction is in the public interest. Respectfully submitted,


_____/sb_____
Sharon Buccino (D.C. Bar #432073)
Aaron Bloom
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
(202) 289-6868


Dated: September 25, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
NATURAL RESOURCES DEFENSE COUNCIL                   )
1200 New York Avenue, NW, Suite 400                 )
Washington, DC  20005,            *et al.*          )
                                                    )
         Plaintiffs,                                )          Civ. No.
                                                    )
                  v.                                )
                                                    )
DIRK KEMPTHORNE, in his official capacity           )
As the Secretary of the United States              )
Department of the Interior                          )
1849 C Street, NW                                   )
Washington, DC  20240,            *et al.*          )
                                                    )
         Defendants.                                )
_____)


**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A
PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiffs seek an emergency injunction to halt and prevent the substantial and

irreparable environmental destruction to spectacular public lands in Wyoming's Red

Desert.  The Bureau of Land Management ("BLM") has unlawfully approved plans of

development for the Catalina and Sun Dog areas which open this extraordinary natural

area to intensive coalbed methane development.  Specifically, BLM has approved the

drilling of ninety new wells, as well as the extensive and intrusive construction of roads,

pipelines, compressor stations, produced-water injection facilities, and power generating

stations.  Pursuant to BLM's approval, two energy companies are destroying the area's

wild character right now.

These ninety wells are the first wave from BLM's massive Atlantic Rim Natural Gas Field Development Project, which will ultimately entail 1,800 coalbed methane and 200 natural gas wells, as well as the web of roads and pipelines that go with them. The Atlantic Rim project area covers a quarter million acres of mostly public land. *See* Map of Atlantic Rim Development Project, attached as Exh. 1 to the Declaration of Erik Molvar. The Molvar Declaration is attached as Exh. A to this memorandum. The project area is divided into units, two of which – the Catalina and Sun Dog units – are at issue here. BLM recently approved applications to drill in these two units. The drilling permits are grouped together in plans of development ("PODs") which provide for the development of new wells and the infrastructure to go with them. The Catalina and Sun Dog PODs approved by BLM authorize ninety new wells. In addition to these ninety approved wells, BLM has before it applications for permits to drill 243 additional wells and accompanying development in the Atlantic Rim area. BLM could approve the applications at any time.

Preliminary injunctive relief is warranted because the development of the Catalina or Sun Dog plans of development is presently and will continue to cause irreparable injury to plaintiffs' interests in these extraordinary lands and because plaintiffs are likely to prevail on the merits. The initial Catalina and Sun Dog development is causing damage to wildlife habitat for sage grouse, mule deer and numerous other species, and irreparable harm to the wild character of the area. Operation of coalbed methane facilities also risks creating dangerous methane seeps, which threaten hikers, hunters and other visitors to the beautiful Red Desert area. Without emergency relief, the continued implementation of the Catalina and Sun Dog developments will cause substantial and

irreparable harm to plaintiffs' interests before the Court has an opportunity to rule on the merits of plaintiffs' claims.

Plaintiffs are also likely to prevail on the merits. In its rush to open more public lands to oil and gas drilling, BLM approved the 90 wells at issue without satisfying fundamental requirements of the National Environmental Policy Act ("NEPA"), the Federal Land Policy and Management Act ("FLPMA"), and the Clean Water Act. In addition to failing to take the "hard look" at environmental impacts that NEPA requires, BLM failed to secure the public input that both NEPA and FLPMA require. Moreover, BLM failed to obtain the certification required by the Clean Water Act that the wells and accompanying development will comply with state water quality standards.

Consequently, this Court should issue preliminary injunctive relief prohibiting further ground-disturbing activity pursuant to the applications to drill the ninety Catalina and Sun Dog wells approved by BLM. In addition, the Court should prohibit BLM from approving additional applications for permits to drill related to the Atlantic Rim area until the agency corrects its violations of NEPA, FLPMA and the Clean Water Act.

## FACTUAL BACKGROUND

### The Atlantic Rim Area

The Atlantic Rim area of Wyoming's Red Desert, which BLM has targeted for coalbed methane development, is a place of stunning beauty with rolling hills, canyons, dune fields and diverse sagebrush communities. *See* Declaration of Erik Molvar, ¶ 3, attached as Exh. A. Two photographs of the area attached as Exhibits 6 and 7 to the Molvar Declaration provide a glimpse of the landscape, revealing gentle hillsides mantled

in sagebrush, verdant riparian areas along valley streambeds, and red sedimentary rock layers exposed along steeper hillsides and canyon walls.  It is a landscape of serene beauty that is used for hiking, hunting and recreation.

The wild and undisturbed Atlantic Rim area provides habitats critical to numerous species of fish and wildlife.  BLM identified 338 different species of wildlife in the Atlantic Rim area.  Exh. B (Atlantic Rim Natural Gas Field Development Project Final Environmental Impact Statement) (hereinafter "Atlantic Rim FEIS") at 3-84.[1]  The area contains critical habitat for sage grouse, Columbian sharp-tailed grouse, elk, mule deer, and pronghorn antelope.  *See, e.g.,* January 5, 2007 Letter from Wyoming Game and Fish Department to BLM, attached as Exh. C.  One of the reasons wildlife is so abundant is that habitats and migration routes have not been fragmented by development.  FEIS 4-72 to 4-75.  The abundance of sage grouse in the Atlantic Rim area compared with other parts of the West illustrates the remarkable wildlife value of the area.  While populations of sage grouse have been in decline elsewhere in the West, there are an impressive eighty-eight sage grouse leks – discrete areas used by sage grouse for breeding – in the Atlantic Rim area, indicating that the area is an important refuge for this species.  *See* Exh. D (map of sage grouse leks from FEIS);  Exh. E (USFWS memorandum warning BLM that cumulative harm to sage grouse habitat in Atlantic Rim could lead "to long-term decline in the population of sage grouse").

The Atlantic Rim area also includes key populations of rare native fish species. The portion of Muddy Creek in the Atlantic Rim area contains Wyoming's only assemblage of flannelmouth suckers, bluehead suckers, and roundtail chubs.  Exh. F

---

[1] Plaintiffs have attached excerpts from the Atlantic Rim FEIS hereto.  The complete document is available at http://www.blm.gov/wy/st/en/info/NEPA/rfodocs/atlantic_rim.html.

(Feb. 8, 2006 Letter from Wyoming Game and Fish Dep't to BLM at 5).  These fish species are listed as State and BLM sensitive fish species.  FEIS 3-112.

Wyoming's Red Desert, including the Atlantic Rim area, is also of extraordinary value to people who have visited it.  The value of the Atlantic Rim area is evident in the comments submitted to BLM on its proposal to develop coalbed methane.  For example, Chris Naumann, who had hunted grouse with his father and grandfather several years earlier, had this to say:  "I have never forgotten the truly unique natural resources of the Red Desert.  The grouse hunting was exceptional but, the highlight of the weekend was watching the herds of elk and wild horses.  I have hunted throughout Montana and I can honestly say that the Red Desert is the most unique and diverse environment that I have ever hunted."  Exh. G (comment on draft environmental impact statement for Atlantic Rim Development Project);  *see also* Exh. H (comment of Daniel L. Dale of Laramie, Wyoming describing the Atlantic Rim as "a fantastic wild area" where he and his family "have spent a lot of time").

**BLM's Rush To Develop Coalbed Methane in the Atlantic Rim**

On May 18, 2001, President Bush issued an Executive Order 13212 requiring BLM and other federal agencies to take "Actions to Expedite Energy-Related Projects."  The Executive Order set up a Task Force for Streamlining Energy Permitting.  66 Fed. Reg. 28357 (May 18, 2001).  In November 2001, BLM established a National Energy Office.  The BLM identified over forty tasks representing "opportunities to expedite or expand energy supplies" from public lands.  Exh. I (BLM Information Bulletin No. 2001-138 (August 15, 2001)).

In order to plan the uses and management of its lands, BLM creates Resource Management Plans ("RMPs") which govern the uses and management scheme on different parcels.  In 2002, BLM identified several resource management plans which required amendments that would allow accelerated and increased energy development on public lands.  These so-called "Time Sensitive Plans" included the Great Divide RMP which governs the Atlantic Rim project area.  Exh. J (BLM Instruction Memorandum No. 2002-081 (February 4, 2002)).

However, BLM did not wait for land management plans to be amended.  In 2004, BLM Headquarters directed land managers to proceed with leasing even while applicable land use plans were being revised, even if those plans were considering protecting the natural values of the same lands, and to require that any deferrals of leasing be supported by detailed explanations and documentation, submitted to the state and national directors of the BLM.  Exh. K (BLM, Instruction Memorandum 2004-110 (February 23, 2004)).  In 2005, BLM Headquarters directed all field offices to develop a NEPA alternative of higher well density and development beyond that actually proposed by an operator.  The directive advised BLM offices how to make the maximum number of projects fit into categorical exclusions to avoid NEPA altogether.  Exh. L  (BLM, Instruction Memorandum 2005-247 (September 30, 2005)).

In June 2005, the Government Accountability Office ("GAO") issued a report finding that the increased volume of applications for permits to drill and mandates to process them promptly, resulted in more BLM staff resources being devoted to issuing permits and less to monitoring and enforcing compliance with environmental standards.  GAO's report is available at:   http://www.gao.gov/new.items/d05418.pdf.  According to

GAO, the total number of oil and gas drilling permits approved by BLM more than

tripled, from 1,803 to 6,399 during fiscal years 1999-2004.  *Id.* at 17.  GAO explains that

this "dramatic increase in oil and gas development on federal lands over the past 6 years

has lessened BLM's ability to meet its environmental protection responsibilities."  *Id.* at

5.

       As noted, BLM identified the land use plan that governed the Atlantic Rim area –

the Great Divide RMP – for accelerated revision.  Yet, before BLM completed the Great

Divide Resource Management Plan revision, the agency began to authorize thousands of

new wells in the area.  BLM approved exploratory drilling in the Catalina and Sun Dog

units before it had completed any environmental analysis for area.  FEIS, Appendix A

(BLM Interim Drilling Policy).  On December 12, 2005, BLM issued a Draft EIS for the

Atlantic Rim Natural Gas Field Development Project ("Atlantic Rim Development

Project").  BLM Record of Decision, Atlantic Rim Development Project at 21 (available

at http://www.blm.gov/wy/st/en/info/NEPA/rfodocs/atlantic_rim.html.   The project

provided for 2,000 new wells.  FEIS ES-1 (Executive Summary).  The project area sits

within the Red Desert southwest of the town of Rawlins.  In addition to the new wells,

the project includes new access roads and pipelines, totaling approximately 1,000 miles.

FEIS 2-2.  On February 17, 2006, BCA and other plaintiffs submitted comments on the

Draft EIS.  On May 21, 2007, BLM issued the Record of Decision ("ROD") and

accompanying Final Environmental Impact Statement approving Atlantic Rim

Development Project with its 2,000 new wells.  *See* BLM, "Rawlins BLM Releases

Record of Decision:  Atlantic Rim Coalbed Natural Gas Development (available at

http://www.blm.gov/wy/st/en/info/news_room/2007/05/21rfo-atlanticrim.html.)

Importantly, the Atlantic Rim final environmental impact statement is a general document and does not evaluate any site-specific impacts of the project. As BLM reiterated frequently in its response to comments, the site-specific analysis commenters requested could not be provided in the project environmental impact statement because BLM did not know exactly where the proposed 2,000 coalbed methane wells or ancillary facilities would be located. *See e.g.* FEIS O-87; O-165; O-174; O-182; O-184; O-192 (response to comments). While BLM's final EIS and May 2007 record of decision for the Atlantic Rim Development Project authorized development of 2,000 wells and new infrastructure, energy companies could not proceed with ground disturbing activity until they obtained applications for permits to drill. Accordingly, BLM deferred analysis of site-specific impacts until these drilling permit applications were received.

It is several of these drilling permits that BLM has now approved for the Catalina and Sun Dog units of the project that plaintiffs challenge. On June 28, 2007, BLM approved plans of development submitted by Double Eagle Petroleum Company ("Double Eagle") in the Catalina unit for 39 new wells and the roads, pipelines and other infrastructure to go with them. Exh. M (Catalina Environmental Assessment). Fourteen of the wells were in Catalina Plan of Development ("POD") A and 25 were in POD B. BLM completed a cursory eleven page "form" environmental assessment ("EA") tiered to the Atlantic Rim Development Project FEIS. *Id.* In other words, BLM conducted little new environmental analysis, but instead relied on the analysis previously done when the agency approved the general project concept. Because of BLM's reliance on this previous FEIS in approving the Catalina plans of development, the adequacy of the

10

Atlantic Rim Development Project FEIS is relevant to the lawfulness of BLM's approval of the wells challenged herein.

Likewise, on August 16, 2007, BLM approved plans of development submitted by Anadarko E & P Petroleum ("Anadarko") in the Sun Dog unit for 51 new wells and the roads, pipelines and other infrastructure to go with them.  Exh. N (Sun Dog EA)[2]. Twenty-eight of the wells were in Sun Dog POD A and 23 were in POD B.  BLM conducted little new environmental analysis, but instead relied on the analysis previously done when the agency approved the general project concept.  *Id.*

BLM knew of the intense interest of the Biodiversity Conservation Alliance and other plaintiffs in the Atlantic Rim Development Project.  Yet, the agency did not make the Catalina and Sun Dog NEPA documents available to BCA or the other plaintiffs prior to approving the 90 new wells and associated new roads, pipelines and powerlines.  In fact, BLM still has not provided the applications for permits to drill that the agency approved or the complete NEPA documents to BCA despite a formal request to do so on September 14, 2007.  Molvar Decl. ¶¶ 16.  Moreover, BCA also requested notices of the 243 APDs and accompanying environmental analysis tied to the Atlantic Rim Development Project that are still pending before BLM.  Despite two visits to BLM's Rawlins office to review these documents, BCA's Executive Director was refused access to them.  Molvar Decl. ¶¶ 17, 19.

## ARGUMENT

### Standard of Review

---

[2] While BLM indicated the POD boundaries in the Catalina EA, the agency did not provide a similar map showing the POD boundaries as part of the Sun Dog EA.

In evaluating a motion for emergency injunctive relief, the court considers whether: "(l) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction." *Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1157 (D.C. Cir. 2007). "These factors interrelate on a sliding scale and must be balanced against each other." *Serona Labs, Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998). Accordingly, relief may be afforded with "either a high probability of success and some injury, or vice versa." *Cuomo* v. *United States Nuclear Regulatory Comm'n,* 772 F.2d 972, 974 (D.C. Cir. 1985). Here, plaintiffs satisfy each of the relevant criteria and accordingly a preliminary injunction is appropriate.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Under the Administrative Procedure Act ("APA"), a reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as well as agency action that was taken "without observance of procedure required by law." 5 U.S.C. § 706(2). As the U.S. Supreme Court has emphasized, normally agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view...." *Motor Vehicles Mfrs. Ass'n* v. *State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

When these standards are applied here, it is clear that plaintiffs have raised a serious substantial issue, as required to justify issuance of emergency injunctive relief. *See Washington Metropolitan Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841, 844 (D.C. Cir. 1977). Indeed, as demonstrated below, defendants have approved the applications for permits to drill at issue without complying with basic requirements of the the National Environmental Policy Act, the Federal Land Policy and Management Act, and the Clean Water Act. These violations include the following.

**A.     BLM Has Violated NEPA and Its Implementing Regulations.**

      1. *Failure to Meet Public Participation Obligations*

The fundamental objective of NEPA is to ensure that that an "agency will not act on incomplete information only to regret its decision after it is too late to correct." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1990) (citation omitted). An essential part of this information comes from the public. NEPA's implementing regulations explicitly provide that "public scrutiny [is] essential to implementing NEPA." 40 C.F.R. § 1500.1(b). Moreover, NEPA's implementing regulations require federal agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a). Yet, in this case, BLM approved numerous applications for permits to drill without taking reasonable steps to involve the public. The agency knew of the interests of BCA and other plaintiffs in applications for permits to drill in the Atlantic Rim area, but did not directly notify BCA or others of the applications even though they provided for entire pods of development comprising numerous wells. In addition, the process that BLM has established to approve APDs

does not make the applications or the accompanying NEPA analysis available to the public prior to approval of the APDs.

Instead of making diligent efforts to involve the public in implementing its NEPA procedures, BLM has turned a cold shoulder to the public. Biodiversity Conservation Alliance and other plaintiffs have had an intense interest in proposed energy development in the Atlantic Rim area for many years. In particular, BCA and others submitted comments to BLM on the Draft EIS for the Atlantic Rim Project in February 2007. Molvar Decl. ¶ 13. In these comments, BCA requested that the BLM include site-specific analysis of the proposed project's impacts. Rather than completing such analysis at the EIS stage, BLM committed to do it when it approved ground disturbing activity such as applications for permits to drill. Atlantic Rim FEIS, at O-165. BLM deferred a critical part of the NEPA analysis to the APD stage, but then when it came time to approve the APDs the agency moved ahead without sharing any site-specific analysis with the public. The fact that the EA decisions were "tiered" to the Atlantic Rim EIS in no way absolves BLM of its obligation to thoroughly analyze the site-specific impacts and to involve the public in that site-specific analysis. *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (rejecting claim that tiering to a programmatic EIS obviates the agency's obligation to conduct a thorough assessment of site-specific project impacts, including the requirement of preparing a site-specific EIS if necessary).

BLM's failure to circulate the environmental assessments at issue here or to provide any other opportunity for public review and comment on the site-specific proposals is particularly egregious because the agency decisions where not related to a

drilling permit for a single well, but involved the approval of entire development pods encompassing many wells and miles of new roads and other infrastructure that went with these new wells.  BLM's Rawlins office has circulated EAs for public comment when reviewing groups of wells in the past.  For example, BLM has posted for public comment the EA prepared for eight infill wells as part of the Hay Reservoir Coalbed Natural Gas Infill and Impoundments Project (August 2007).  *See* http://www.blm.gov/wy/st/en/info/ NEPA/Rfodocs/hayreser-infill-impound.html (August 2007).  The agency also circulated an EA for public comment concerning the Hanna Draw Coalbed Natural Gas Pilot Project in January 2007.  This project involved up to 15 wells.  As it did with these other EAs, BLM should have circulated for public comment the draft environmental assessments for the Catalina and Sun Dog pods before approving them.

Instead of circulating the EAs to BCA or any other plaintiff, BLM apparently posted notices of the APDs for 30 days in the agency's public room of the Rawlins office. Such posting of the APDs notices in the BLM's Rawlins office was insufficient to satisfy NEPA's public participation requirements.  These notices did not contain sufficient information to comment on the APDs.  The notices did not contain the applications themselves or any kind of analysis of the proposed drilling's impacts.  When BCA and others asked for copies of the APDs that had already been approved along with the complete accompanying NEPA documents, BLM informed BCA and others that they must submit a request under the Freedom of Information Act ("FOIA") to obtain such documents.  Molvar Decl. ¶ 16.  Typically, it has taken BLM months to provide documents under FOIA if they are provided at all.  Moreover, when BCA staff visited BLM's Rawlins office on two separate occasions, the Bureau refused to provide access to

the APDs and any accompanying NEPA documents that were still pending before the agency.  Molvar Decl. ¶¶ 17, 19.

Moreover, the NEPA register provided by the BLM's Wyoming office does not cure the insufficiencies of BLM's process for public involvement concerning the APDs at issue.  *See* http://www.wy.blm.gov/nepa/search.  First, this register does not provide access to the environmental documents.  Instead, the register simply provides notice that some environmental analysis is being prepared.  Second, BLM does not appear to have the resources necessary to keep this register up-to-date.  For example, the entry for the Environmental Assessment for the Catalina A & B PODs (WY-030-EA07-186) is still listed as "in process" on September 24, 2007, even though the agency had approved the EA/ FONSI on June 28, 2007.  *Id.*

BLM's approach to the challenged APD approvals flies in the face of NEPA's fundamental purpose to involve the public in decisions made by public servants affecting public resources.  *See, e.g., Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (NEPA guarantees that the public may "play a role in the decision-making process and the implementation of that decision");  40 C.F.R. § 1500.1(b) ("NEPA procedures must insure that environmental information is available to public officials and citizens *before* decisions are made and *before* actions are taken.") (emphasis added).  *See also*, *Fund for Animals*, 281 F.Supp.2d at 228-29 (court granted preliminary injunction where "the agency's efforts to ensure meaningful public involvement in the EA process were deficient, and appear to have been primarily *pro forma*.").  *Sierra Nevada Forest Protection Campaign v. Weingardt*, 376 F. Supp. 2d 984, 991 (E.D. Cal. 2005) (holding that agency failed to satisfy NEPA's public involvement obligations where Agency

circulated brief scoping notice for public comment and circulated final EA but did not

provide draft EA for comment or provide any other opportunity to review and comment

on agency's environmental analysis).  *Cf. TOMAC v. Norton*, 433 F.3d 852, 861 (D.C.

Cir. 2006) (court held that failure to circulate supplemental EA did not violate NEPA

where federal agency had circulated original draft EA).

Like the U.S. Fish & Wildlife Service in *Fund for Animals*, BLM here failed to

provide the public participation required by NEPA.  BLM's obligation under NEPA to

obtain public input prior to approving the 90 APDs at issue is reinforced by the

requirements of the Federal Land Policy and Management Act.  Section 309(f) of

FLPMA directs the Secretary to provide for public participation in "the preparation and

execution of plans and programs for, and the management of, the public lands."  43

U.S.C. § 1739(e).  Emphasizing the significance of the phrase "and the management of,"

this Court has held that BLM must provide public participation in individual management

decisions related to the public lands and not simply in the development of land use plans.

*NWF v. Burford*, 835 F.2d 305, 322 (D.C. Cir. 1987).  Given BLM's violation of NEPA's

and FLPMA's public participation requirements, the agency's approval of the 90 new

wells in the Catalina and Sun Dog areas is contrary to law and must be reversed and

remanded pursuant to the APA, 5 U.S.C. § 706(2)(a).

2. *Failure to Consider Alternative Mitigation Measures for Sage Grouse*

In addition to failing to involve the public as required by NEPA, BLM failed to

consider a reasonable range of alternatives when analyzing impacts on sage grouse of the

Atlantic Rim Development Project and the specific pods at issue here.  Despite evidence

presented to the agency, including comments from other federal agencies, demonstrating

the inadequacy of previous mitigation measures for sage grouse, BLM blindly relied on these same old mitigation measures without analyzing or considering other reasonable options presented to the agency.

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternate uses of available resources."  43 U.S.C. § 4332(E).  *See* 40 C.F.R. § 1502.14) ("[The alternatives analysis] is the heart of the environmental impact statement.");  *Sierra Club v. Watkins*, 808 F. Supp. 852, 870 (D.D.C. 1991) (An agency preparing an EA "must always consider alternatives to the proposed action."); *Southern Utah Wilderness Alliance v. Norton*, 237 F.Supp.2d 48, 51-52 (D.D.C. 2002) (court reversed and remanded BLM decision where the agency had failed to consider alternative of using existing roads rather than constructing new ones).  This Court will apply a "rule of reason" analysis to determine whether the BLM's EA or EIS sufficiently discussed a reasonable range of alternatives, including opposing viewpoints, to permit it to arrive at a well-considered, fully-informed and reasoned decision.  *See NRDC v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988).

NEPA and its implementing regulations also require that federal agencies discuss and take a hard look at measures to mitigate the adverse environmental impacts of any proposed action.  40 C.F.R. §§ 1502.14(f), 1502.16(h), 1505.2(c), 1508.25(b).  Further, the requirement that an agency consider a reasonable range of alternatives applies to consideration of the mitigation options.  *See O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225, 231 (5th Cir. 2007) (An EIS "must include a serious and thorough

evaluation of environmental mitigation options for a Project to allow its analysis to fulfill NEPA's process-oriented requirements.").

Here, BLM relied on mitigation measures for sage grouse that the agency's own studies and experience demonstrated were inadequate. BLM arbitrarily and capriciously approved the Catalina and Sun Dog development plans without considering evidence that both plaintiffs and other government agencies had offered regarding more effective, reasonable measures to protect sage grouse. BLM violated NEPA in failing, without explanation, to discuss several feasible and more protective alternative mitigation measures presented to it in comments by the U.S. Fish and Wildlife Service and other experts. *See Sierra Club*, 808 F.Supp. 852(finding NEPA requires agency provide an explanation if it opts not to consider certain reasonable alternatives); *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F.Supp.2d 30, 39 (D.D.C. 2000) (finding Army Corps violated NEPA when it failed to fully address, consider and discuss concerns raised by U.S. Fish and Wildlife Service).

The sage grouse has been designated a BLM "Sensitive Species" in Wyoming and is prevalent within the Atlantic Rim Project area. FEIS, 4-76; *see also* Exh. D (map of sage grouse leks). Potential sage grouse nesting habitat covers 92 percent of the Atlantic Rim Project area. AR FEIS, 4-76. The BLM acknowledges that the activities and infrastructure associated with the Atlantic Rim Project would significantly harm the sage grouse, leading to lower birth rates, a long-term loss of nesting habitat, and a long-term decline in population. FEIS, 4-76.

The brief environmental assessments and FONSIs for the Catalina and Sun Dog development plans do not discuss in detail mitigation measures to protect sage grouse,

but instead incorporate by reference the discussion of mitigation measures in the Atlantic Rim Project FEIS and the Record of Decision.[3]  The FEIS and ROD discuss only one mitigation option for sage grouse.  BLM's mitigation scheme limits the prohibition of all surface disturbing activities or occupancy to a ¼ mile of an occupied lek.  FEIS, at E-7.  BLM provides for an additional 2-mile seasonal buffer zone, but surface disturbing activities (*i.e.*, construction) are allowed for most of the year.  *Id.*

This mitigation scheme has been implemented by BLM for other oil and gas development projects and has been found to result in extreme drops in sage grouse populations.  Indeed, one study involving an oil and gas development project using these mitigation measures predicted the elimination of sage grouse within 19 years based on observed population trends.  Exh. O (Holloran, 2005).  Another study found an 85% decline in sage grouse population since the onset of coalbed methane development in the Powder River Basin, despite the use of these mitigation measures.  Exh. P (Naugle, 2006).  BLM itself acknowledges that its mitigation scheme is inadequate, noting that long term "habitat loss would continue outside the quarter-mile protected buffer around leks," and that the mitigation scheme does not  "address the displacement of animals/loss of critical habitat due to the presence and operation of wells, facilities, and roads after construction is complete." FEIS 4-69, 4-79.

Experts, including representatives of the U.S. Fish and Wildlife Service, informed the BLM during the EIS comment period for the Atlantic Rim Project that its mitigation measures were inadequate and recommended reasonable alternative measures that were more protective.  The U.S. Fish and Wildlife Service commented that it "does not support

---

[3] The EAs do include a chart listing which of the wells in each POD are subject to seasonal restrictions on disruptive activities to protect sage grouse.

a 0.25-mile protective buffer around sage grouse leks as a mitigation measure, nor do we support a 2-mile buffer to protect nesting habitat," but instead "strongly recommends" following guidelines written by a consortium of experts that mandate a 2 mile (3.2 kilometer) zone around leks in which no energy-related facilities could be located.  Exh. E;  *see also* Exh. Q (Connelly et al., 2000, at 978).   Another prominent expert has recommended a 3-mile buffer zone around leks in which no facilities should be located. Exh. R (Braun 2006).

Given these available reasonable alternative mitigation schemes, the BLM's exclusive discussion of a single, admittedly inadequate option is unreasonable and violates NEPA.   BLM offers little explanation in either the Atlantic Rim Development Project environmental impact statement or the EA/FONSIs prepared for the Catalina and Sun Dog pods for its failure to consider the reasonable alternatives presented to it. The BLM's only explanation for its choice of mitigation measures is that they "were developed from past measures identified for oil and gas developments in Wyoming." (ROD, B-15).

3. *Failure to Take a Hard Look at Environmental Impacts*

NEPA requires agencies to take a "hard look" at environmental consequences of proposed actions and to broadly disseminate relevant environmental information. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989);  *Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 341 (D.C. Cir. 2002).  Here, BLM failed to take the hard look required under NEPA at several environmental impacts from the Catalina and Sun Dog development plans the agency approved.  These impacts include the increased risk of methane seeps triggered by the new coalbed methane wells.  The agency also failed to

take a hard look at the cumulative impacts of plans it approved in the context of the other development planned for the region.

### a. Impacts of Methane Seeps

During coalbed methane production, coal is de-watered, causing a pressure to drop and methane to separate from the coal.  The released methane can then diffuse to the well bore or seep away from the well and vent up to the surface.  Methane venting can cause explosions, injury and death to plants, wildlife and humans.  *See* Exh. S (Merschat Declaration, IBLA Attachment 5, ¶¶ 12, 15, 17).   Further, methane is a global warming gas 12 to 20 times as potent as carbon dioxide, making methane venting a contributor to global climate.   In comments to the BLM, Biodiversity Conservation Alliance and other plaintiffs protested the absence of any analysis of the quantity and impact of methane venting in the Draft EIS for the Atlantic Rim Project and the Environmental Protection Agency noted that methane venting should be evaluated for contributions to greenhouse gases.

Despite these serious environmental impacts of methane seeps, which are known to be associated with coalbed methane drilling, BLM did not analyze the environmental consequences of potential methane seeps in the project-wide FEIS or in the Sun Dog and Catalina EAs.  The FEIS briefly notes the possibility of methane seeps occurring in the Mesaverde Group, which "could contaminate shallow groundwater and may cause the death of vegetation in limited areas," but it declines to attempt an assessment of the impact of these seeps, simply claiming their number and location is "impossible to predict." FEIS, 4-32.  The EIS briefly mentions and dismisses the possibility of spontaneous combustion of methane within coalbed wells, but fails to discuss the

potential for combustion, asphyxiation and other risks to humans and wildlife associated with methane seeping outside of wells.  FEIS, 3-8, 4-2.  The EIS also fails to discuss the contribution of methane venting to greenhouse gases, as requested by the EPA.

The Catalina and Sun Dog EAs contain no discussion of methane seeps.  By giving only perfunctory treatment to some impacts of methane seeping and failing altogether to consider other serious environmental consequences, BLM violated NEPA's "hard look" requirement.  *See Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1216 (11th Cir., 2002) ("The court will overturn an agency's decision as arbitrary and capricious under 'hard look' review if … the agency failed entirely to consider an important aspect of the problem.") (citing *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983));  *Hawaii Longline Ass'n. v. National Marine Fisheries Service*, 281 F.Supp.2d 1, 31 (D.D.C., 2003) (same proposition);  *see also Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1380 (9th Cir. 1998) ("General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided.").

Moreover, BLM failed to conduct supplemental analysis when new information regarding the dangerous potential for methane seeps was brought to its attention.   An agency's NEPA duties do not end when it completes its initial environmental analysis and approves a federal project.  Rather, an agency must supplement its EIS when significant new information relevant to environmental concerns is identified.  *See* 40 C.F.R. §1502.9(c)(ii).  As the U.S. Supreme Court explained in *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989), "[i]t would be incongruous with . . .  the

Act's manifest concern with preventing uninformed action, for the blinders to adverse

environmental effects, once unequivocally removed, to be restored prior to the

completion of agency action simply because the relevant proposal has received initial

approval." Thus,

> [i]f there remains "major federal action[n]" to occur, and if . . . new
> information is sufficient to show that the remaining action will "affect[t]
> the quality of the human environment" . . . to a significant extent not
> already considered, a supplemental EIS must be prepared.

*Id.* at 374.

After BLM impermissibly failed to address methane seeps in the EIS, Plaintiff

Wyoming Outdoor Council ("WOC") sent a letter to the Rawlins Field Office of the

BLM, conveying new information demonstrating the presence and significance of the

issue. *See* Exhibit T. In the letter, Steve Jones of WOC indicated that he had just

attended, on April 24, 2007, a meeting hosted by the Wyoming Department of

Environmental Quality regarding the recent appearance of "mud pots" with methane gas

escaping from them in the Atlantic Rim area. *Id.* A BLM representative was also in

attendance. The letter noted that the appearance of these methane-venting mud pots

coincided with pilot coalbed methane drilling projects in the area. These pilot projects

had begun de-watering coal seams and releasing methane gas, which could reach the

surface via abandoned gas wells or simply through the earth if the coal is near the

surface. *Id.* The letter concluded by requesting that the BLM initiate a supplemental

EIS process to address methane seeps. *Id.*

BLM responded to WOC's letter stating that it was studying the issue and that the

existing EIS already recognized the possibility of methane seeps. BLM has not initiated

a process to supplement the project EIS but, instead, has gone ahead and begun approving

permits to drill, namely the 90 Sun Dog and Catalina APDs.  The Catalina and Sun Dog

EAs contain no discussion of methane seeps.

### b.  Cumulative Impacts

NEPA requires that BLM evaluate the direct, indirect and cumulative impacts of

federal actions.  *See* 40 C.F.R. § 1508.25(c).  The implementing regulations define

cumulative impacts as "the impact on the environment which results from the incremental

impact of the action when added to other past, present, and reasonably foreseeable future

actions regardless of what agency (Federal or non-Federal) or person undertakes such

other actions.  Cumulative impacts can result from individually minor but collectively

significant actions taking place over a period of time."  40 C.F.R. § 1508.7.

The Environmental Assessments for the Sun Dog A and B and Catalina A and B

PODs refer the reader to the Atlantic Rim Project EIS for a cumulative impact analysis.

The cumulative impact analysis contained in the EIS, however, is inadequate in several

respects.   "A meaningful cumulative impact analysis must identify (1) the area in which

the effects of the proposed project will be felt; (2) the impacts that are expected in that

area from the proposed project; (3) other actions--past, present, and proposed, and

reasonably foreseeable-that have had or are expected to have impacts in the same area;

(4) the impacts or expected impacts from these other actions; and (5) the overall impact

that can be expected if the individual impacts are allowed to accumulate." *Grand

Canyon Trust v. F.A.A.*, 290 F.3d 339, 345 (D.C. Cir. 2002).  BLM's cumulative impact

analysis is inadequate because it fails to include two significant foreseeable oil and gas

developments in the region, excludes impacts from a pending proposed water treatment

facility within the project area, and fails to assess overall impacts on wildlife habitat and downstream water quality.

      **i.   The Cumulative Impact Analysis Fails to Include Impacts from Two Large Proposed Oil and Gas Developments.**

The cumulative impact analysis must include impacts from all reasonably foreseeable future actions that will have a synergistic or cumulative environmental impact on a region, including proposals concurrently pending before an agency.  *See* 40 C.F.R. § 1508.7; *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976).  However, the BLM's cumulative impacts analysis does not include impacts from thousands of additional wells in the proposals currently pending before the BLM for the Continental Divide/Creston natural gas project (8950 additional proposed wells) and the Hiawatha energy project (4207 additional proposed wells).  *See Notice of Intent To Prepare an Environmental Impact Statement for the Continental Divide--Creston Natural Gas Project*, 71 Fed. Reg. 10989-01 (March 3, 2006); *Notice of Intent (NOI) To Prepare an Environmental Impact Statement – Hiawatha Regional Energy Development Project*, 71 Fed. Reg. 52571-01 (Sept. 6, 2006); *see also* "Public Scoping Notice Continental Divide – Creston Natural Gas Development Project Environmental Impact Statement." (available at http://www.blm.gov/style/medialib/blm/wy/nepa/rfodocs/cd_creston.Par.34343.File.dat/scoping.pdf.)  The failure to even discuss any foreseeable impacts from these pending large scale projects makes the BLM's cumulative impact analysis inadequate.

      **ii.  The Cumulative Impact Analysis Fails to Assess Overall Impacts on Wildlife Habitat and Downstream Water Quality.**

As noted above, the cumulative impact analysis must identify "the overall impact that can be expected if the individual impacts are allowed to accumulate."  *Grand Canyon Trust*, 290 F.3d at 345.  BLM's cumulative impact analysis, however, fails to

identify overall impacts in several areas.  Big game, such as elk, antelope, pronghorn and mule deer, regularly migrate through the Atlantic Rim Project area and surrounding areas. The BLM acknowledges that elk, mule deer, and pronghorn are displaced up to 1.2, 0.75, and 0.5 miles, respectively, away from development activities.  FEIS at 4-74, 5-17.

Despite acknowledging that displacement far exceeds the actual area of surface disturbance, the EIS simply presents the total area of actual surface disturbance within each animal's seasonal range.  FEIS at 5-16.  BLM does not attempt any cumulative calculation of the effective loss of habitat for these species due to all of the development-related displacement in these animals' seasonal ranges from the proposed project and existing regional oil and gas developments, nor does it attempt to assess the consequences of this habitat loss on big game populations.   These consequences could be significant given that large portions of the winter and transition ranges for these animals lie within the boundaries of the Atlantic Rim Project and other regional oil and gas projects.  (EIS, 5-16 and 5-17).  Failing to discuss these consequences or to quantify the effective overall impact on big game habitat and migratory routes from regional development activities, the cumulative impact analysis is inadequate.  *See NRDC v. Hodel*, 865 F.2d at 297-300 (finding cumulative impact analysis inadequate where it failed to assess inter-regional impacts on whale and salmon migration).

The cumulative analysis also fails to assess the overall impact of salt loading into local watersheds by the Atlantic Rim Project and other activities.  While the FEIS does list various sources, including the Atlantic Rim Project and other projects, that may contribute salt to area drainages, it does not attempt to quantify the amount of salt that would be added.  Further, while the FEIS notes that the increased salt contributions

"would impact the Colorado River Basin with a portion contributing to the Little Snake River," it makes no attempt to actually assess these impacts on water quality and water uses, such as irrigation and habitat for fish and wildlife.  These failures make the cumulative impact analysis of water inadequate. *See Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005) (cumulative impact analysis "must be more than perfunctory" and must provide "some quantified or detailed information"; general statements about 'possible' effects and 'some risk' are inadequate) (citations omitted).

The Council on Environmental Quality has stressed the important role of cumulative impact analysis, noting that "[w]ithout incorporating cumulative effects into environmental planning and management, it will be impossible to move towards sustainable development."  CEQ, "Considering Cumulative Effects Under the National Environmental Policy Act," 3 (1997).[4]  That warning is especially pertinent here, where inadequately analyzed development activities are poised to permanently alter the area's landscape, wildlife, and resources for generations to come.

## B.    BLM Has Violated the Clean Water Act.

BLM approved permits for the 90 new wells at issue without obtaining the certification that the wells will comply with state water quality standards required by the Clean Water Act.  Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a); *see also S.D. Warren Co. v. Maine Bd. of Environmental Protection,* ___ U.S. ___, 126 S.Ct. 1843, 1852 (2006) (court upheld requirement of state certification for federal license of hydroelectric dam).  The Clean Water Act requires states to set water quality

[4] Available at http://ceq.eh.doe.gov/nepa/ccenepa/ccenepa.htm.  Last visited 9/23/07.

standards.  33 U.S.C. § 1313.  In order to help ensure compliance with these state water quality standards, the Act provides that "[n]o [federal] license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding section."  33 U.S.C. § 1341(a)(1).  The applications for permits to drill are covered within the plain language of this section, yet BLM has provided no evidence that the agency obtained either the certification or the waiver required by the Clean Water Act.

BLM's own environmental analysis acknowledges the significant impacts that the Atlantic Rim Development Project will have to surface waters in the area.  The project's final environmental impact statement cites a recent study finding "increased sediment production from well pad locations."  FEIS, at 4-26.  The study "confirmed that roads and well pads can provide conditions for focusing runoff and locally increasing erosion."  *Id.*  BLM acknowledges that "[c]hanges in upland runoff, hydrology, or increased sedimentation could reduce habitat for non-game fish, coldwater fish, and aquatic life, especially in the Muddy Creek Drainage."  *Id.*  Sections of Muddy Creek, in fact, already violate state water quality standards and as a result are listed as impaired by the State of Wyoming pursuant to Section 303(d) of the Clean Water Act.  *Id.* at 3-56.  The addition of more sediment and other pollutants will only result in more violations of state water quality standards.  *See id.* at 4-43 ("Increasing sediment delivery to watersheds above the 303d section of Muddy Creek would lead to habitat degradation in pools and riffles for fish in these waters, resulting in significant effects.").  Despite these impacts that BLM itself acknowledge, the agency apparently failed to take any steps to obtain the

certification of compliance with state water quality standards required by the Clean Water Act.

Likewise, there is no evidence that BLM obtained a waiver of the certification requirement. The Clean Water Act provides for a waiver of the certification requirement if such certification has been requested and the state has refused or failed to act. 33 U.S.C. § 1341(a)(1). Yet, there is no evidence that either the industry operators who submitted the applications for permits to drill at issue or BLM requested a certification from the state. Without evidence of such request having been made, the waiver provision cannot apply. *Id.*

## II.    THE EQUITIES FAVOR ISSUANCE OF A PRELIMINARY INJUNCTION.

### A.    Plaintiffs Will Suffer Irreparable Harm

The U.S. Supreme Court has stated that "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco Prod. Co.* v. *Village of Gambell, Alaska,* 480 U.S. 531, 545 (1987); *see also New Mexico v. Watkins,* 969 F.2d 1122, 1137 (D.C. Cir. 1992) (stating that aesthetic injury is not compensable in money damages and likewise concluding that non-trivial statutory violation required injunction). Here, plaintiffs face both procedural harm arising from a violation of NEPA and on-the-ground injury to their interest in the landscape and wildlife in Wyoming's Red Desert. "[P]rocedural harm" from a violation of NEPA "bolster[s] plaintiffs' case for a preliminary injunction." *Fund for Animals v. Clark,* 27 F. Supp. 2d 8, 14 (D.D.C. 1998). In this case, the irreparable

harm to wildlife, the area's wild character, and from creation of hazardous methane seeps is "sufficiently likely" to occur to warrant the issuance of a preliminary injunction.

If this Court does not immediately enjoin the BLM's decision authorizing the Sun Dog and Catalina Plans of Development, the two companies involved – Double Eagle Petroleum Company and Anadarko Petroleum Company – will continue destructive road building in undeveloped areas, intensive site preparation of well pads, drilling of additional wells, and commencement of coalbed methane operations at those wells. The effects of these actions on wildlife and the wilderness character of the area will be severe and irreparable. In addition, operation of coalbed methane facilities is expected to lead to increased methane seeps in the Red Desert area, risking serious injury to hunters, hikers and other visitors to the area.

Plaintiff organizations and their members will be irreparably harmed by these unnecessary environmental impacts, and an immediate injunction is necessary to preserve the *status quo* while the Court considers the merits of plaintiffs' claims. *See e.g.,* Molvar Decl. ¶¶ 9, 23. Moreover, as the D.C. Circuit has recognized, "ordinarily when an action is being undertaken in violation of NEPA, there is a presumption that injunctive relief should be granted against continuation of the action until the agency brings itself into compliance." *Realty Income Trust v. Eckerd,* 564 F.2d 447,456 (D.C. Cir. 1977); *see Natural Resources Defense Council v. Houston,* 146 F.3d 1118, 1129 (9th Cir. 1998) (observing that "the proper remedy for substantial procedural violations of NEPA and the ESA is an injunction" since "injunctions serve the purpose of preserving the decision maker's opportunity to choose among policy alternatives") (internal quotations and citations omitted). Plaintiffs demonstrated *supra* that the BLM violated NEPA, FLPMA

and the Clean Water Act when it approved the Catalina and Sun Dog coalbed methane

developments.  Without emergency relief, there will be no opportunity for defendants to

cure their flawed decisions before the environmental damage has been done.

   **1.  The Catalina and Sun Dog Coalbed Methane Developments Are
        Causing and Will Continue to Cause Irreparable Harm to
        Wildlife.**

   The Atlantic Rim area of the Wyoming's Red Desert contains some of

Wyoming's most important habitats for fish and wildlife species.  The area contains

critical habitat for sage grouse, elk, mule deer, pronghorn antelope, and Columbian sharp-

tailed grouse.  In addition, the section of Muddy Creek which flows through the area

includes Wyoming's only occurrence of a rare assemblage of certain State and BLM

sensitive fish species.  The coalbed methane development underway will destroy and

fragment critical habitats and worsen water quality for the important native species within

Muddy Creek.  Because soils in this arid landscape are poor and have a high erosion

hazard, re-establishment vegetation on areas affected will be very difficult or impossible,

making the effects virtually permanent.  FEIS 4-18.  In addition, introduction of roads

and industrial activity into the undisturbed area would affect wildlife far beyond the

footprint used for roads and drilling pads.  Construction and drilling noise cause elk, for

example, to avoid approaching between 0.6 and 1.2 miles from the disturbance,

depending on the season.  FEIS at 4-70.

   **a.  Irreparable Harm To Sage Grouse**

   The Atlantic Rim area is of great importance to sage grouse because of the "high

amount and diversity of suitable habitat, lack of habitat fragmentation, and the close

proximity of upland and riparian habitats."  FEIS 4-75.  Development of the Catalina and

Sun Dog A & B PODs, as well as the hundreds of additional coalbed methane wells and new roads currently pending before BLM, will destroy and fragment sage grouse habitat in the Atlantic Rim area.  While the species is not yet listed under the Endangered Species Act, sage-grouse are a BLM "Sensitive Species" and populations have recently experienced severe range-wide declines across the United States and in Wyoming.[5]

In correspondence with BLM, the United States Fish and Wildlife Service ("USFWS") warned BLM that coalbed methane development in the area would harm sage grouse and requested that BLM not to approve activities that would contribute to the sage grouse's continued decline and require listing under the Endangered Species Act:

> [T]he Service remain[s] concerned that Project impacts to greater sage-grouse and other sagebrush obligate species may be significant and possibly irreversible, especially in a landscape where these species currently thrive. Proposed development may alter the future size, distribution and existence of local populations.  The Service reiterates its recommendation that the Bureau not authorize an action that may exacerbate the decline of a fish and wildlife species   and possibly result in listing under the [Endangered Species] Act.

January 5, 2007 Letter from Brian T. Kelly, Field Supervisor, USFWS, to Mark Storzer, Field Manager, BLM.  *See also* Undated Letter from Kelly, USFWS to Mark Storzer, Exh. E at 4 (noting harm to sage grouse and stating "[*t*]*he Service reminds the Bureau of their commitment to conserve the greater sage-grouse and its habitat*") (emphasis in original).

As the USFWS recounted in its comments, BLM admitted that "direct and indirect effects from habitat fragmentation, dust, noise and long term loss of sagebrush habitat would be cumulatively significant leading to long-term decline in the population

---

[5] IBLA Appeal at 33; Connelly, J.W., and C.E. Braun. 1997. Long-term changes in sage grouse *Centrocercus urophasianus* populations in western North America; Christiansen, T. 2000. Sage grouse in Wyoming: What happened to all the sage grouse? *Wyoming Wildlife News* 9(5), Cheyenne: Wyoming Game and Fish Department.

of sage grouse." *Id.* The USFWS also criticized the mitigation measures selected by BLM as inadequate to protect sage grouse. "The Service does not support a 0.25-mile protective buffer around sage-grouse leks as a mitigation measure, nor do we support a 2-mile buffer to protect nesting habitat. . . . Lyon et al. (2003) found that disturbance can increase the distance from leks to nest sites and that the majority of hens from disturbed leks (as may be the case here), nested greater than 2-miles from the lek, while the majority of hens from undisturbed leks nested within 2-miles of the lek." *Id.* (Kelly to Storzer, comments on DEIS). Similarly, EPA pointed out to BLM "a recent study done at the University of Wyoming indicates decline in breeding males at leks located within 3 miles of drilling rigs in the Pinedale Anticline and Jonah natural gas fields in western Wyoming."

The ninety Catalina and Sun Dog coalbed methane wells and their accompanying roads and other infrastructure are currently and will continue to harm sage grouse habitat. Although the cursory Catalina and Sun Dog "form" EA's fail to provide any substantial discussion of sage grouse, this reflects the BLM's lack of analysis and not an absence of impacts. *See* Exh. N (Catalina EA) at 8 (recognizing presence of sage grouse leks – areas where sage grouse congregate during breeding – within two-miles of coalbed methane wells but failing to provide any detail); Sun Dog EA (no discussion of sage grouse). As BLM admits, ninety-two percent of the Atlantic Rim area contains sage grouse habitat and BLM provides no reason to believe that these projects fall within the remaining eight percent of the area. *See* Exh. D.

Accordingly, a preliminary injunction is needed to prevent imminent and irreparable harm to sage grouse and sage grouse habitats.

### b. **Irreparable Harm to Mule Deer and Other Big Game**

Mule deer, elk and pronghorn antelope face significant and irreparable harm from disturbance and loss of habitat due to coalbed methane development in the Atlantic Rim. The Atlantic Rim provides these species migration corridors as well as "critical winter range," which is defined as habitats necessary to the viability of the population at a certain size.  FEIS 3-85.  The Catalina Development EA indicates that the area includes mule deer critical winter range.  Coalbed methane development will harm mule deer, elk and pronghorn antelope by directly destroying sage brush habitats on which they rely and by causing disturbance that will lead these species to avoid areas well beyond the direct footprint of the development.  In addition, by reducing the amount of sagebrush available, the BLM itself admits that these species could forage more heavily on remaining areas of sagebrush, increasing plant mortality and further exacerbating the loss of habitat.  FEIS 4-54.  BLM has acknowledged that even after reclamation efforts have been made, the coalbed methane development it has proposed for the Atlantic Rim area will have still cause a "high impact" on antelope and mule deer and an "extreme impact" on elk.  FEIS 4-83.

### c. **Irreparable Harm to Rare and Imperiled Fish Species**

Coalbed methane development in the Atlantic Rim area will also cause irreparable harm to rare native fish species and imperiled fish species.  The undeveloped Atlantic Rim area is home to a rare assemblage of native fish species including bluehead suckers, roundtail chubs, and flannelmouth suckers.  These species are listed as Wyoming State Sensitive Species.[6]  FEIS 3-112.  As the Wyoming Game and Fish Department

---

[6] Sensitive Species are designated in cases where plants or wildlife are in danger of exitirpation from a state or a significant portion of their range in the foreseeable future, are undergoing significant downward trends,

commented to BLM, "the precise reach of Muddy Creek located within the boundaries of the [Atlantic Rim] Project area supports the only viable assemblage of [such native species] known to still exist in Wyoming." Exh. F, at 5. (Feb. 8, 2006 Letter from Wyoming Game and Fish Dep't to BLM). Coalbed methane development threatens "the future existence of these native fishes." *Id.* In addition, "[f]our federally endangered fish species may occur as downstream residents of the Colorado River system: Colorado pike minnow (*Ptychochelius lucius*), bonytail (*Gila elegans*), humpback chub (*Gila cypha*), and razorback sucker (*Xyrauchen texanus*)." FEIS 4-87. The primary threat to the rare native and federally listed fish species is increased erosion, resulting in increased sedimentation in streams. FEIS 4-88. Because the soils in the area have "high erosion hazard potentials," FEIS 4-18, it is guaranteed that coalbed methane development, with its attendant road construction, laying of pipelines, and well-site clearing, will cause significant sedimentation in area streams. Such sedimentation "can extend miles downstream of the construction site and persist in stream channels for years." FEIS 4-90.

### 2. Coalbed Methane Development Will Cause Irreparable Harm to the Wild Character of the Wyoming's Red Desert.

The Atlantic Rim area of Wyoming's Red Desert is an area of extraordinary natural beauty some portions of which have thus far retained its wilderness character. In 2002, the Biodiversity Conservation Alliance petitioned to designate portions of the Atlantic Rim as wilderness. As the photographs attached to the Declaration of Erik Molvar illustrate, the Atlantic Rim area is extraordinary. Reference Photos. The area is a

---

inhabit small or unique habitats, or have small populations. BLM Manual 6840.06(E). Once designated as Sensitive Species, they are managed the same as Candidate Species: "BLM shall carry out management, consistent with the principles of multiple use, for the conservation of candidate species and their habitats and shall ensure that actions authorized, funded, or carried out do not contribute to the need to list any of these species as threatened/endangered." BLM Manual 6840.06.

place of "stunning beauty with rolling hills, canyons, dune fields and diverse sagebrush communities." Molvar Decl. ¶ 5. Portions of the Atlantic Rim include "deep canyons incised into the sloping sagebrush steppes." Proposed Wilderness Designation for Wild Cow Creek. "[I]slands of aspen and serviceberry dot the sagebrush steppe" and "[w]ildflower displays in May and June are so outstanding that a neighboring drainage [also located within the project area] was named 'Garden Gulch.'" *Id.*

There is presently almost no development in the Atlantic Rim area. Cattle grazing and prior oil and gas exploration have affected some areas but the EIS admits that only 0.2 percent of the area has been disturbed by oil and gas exploration. FEIS 4-105. In understated terms, BLM admits that coalbed methane development in the Atlantic Rim area will "introduce[]" a "high" level of "visual contrast," even assuming that all attempted reclamation is successful. FEIS 4-111; *but see* EIS 4-18 (noting extraordinary difficulty of "establishing vegetation" on disturbed sites in the area due to poor soils, high erosion hazard, and extremely low rainfall). Wildlife ecologist Erik Molvar has visited the area more than twenty times to hike and lead public trips with BCA in the past and describes the effect of the ongoing work more bluntly. Coalbed methane development will:

> convert a previously undeveloped, unscarred landscape into an industrial landscape visually dominated by roads, wellsites, and heavy equipment. The large tracts of native vegetation are being fragmented severely into smaller patches of remaining vegetation in a matrix of roadways and other human intrusions. The predominantly natural scenery of the area is being replaced by a landscape where industrial intrusions are a dominant feature.

Molvar Decl. ¶ 9; *see also* FEIS at 4-102 (coalbed methane "would diminish wildlife presence, degrade scenery, and introduce traffic and noise. The natural setting would be converted to an industrialized setting by development of the Proposed Action."). The

effects that Erik Molvar describes are graphically illustrated by the photographs of ongoing work attached to his declaration. Molvar Decl. ¶ 3 (and Exhibits 6, 7 attached to declaration). These photographs show construction of roads, pipelines, power-lines and preparation of wellsites and demonstrate beyond refute that these activities are causing irreparable harm to the wilderness character of the area.

### 3.    Methane Seeps

Coalbed methane development causes methane gas to be released in the area of the development through hazardous methane seeps. Methane seeps are extremely hazardous because this odorless and colorless gas can be – and is currently being – released at "explosive" concentrations, meaning that an inadvertent spark could trigger a methane explosion. Exh. S, ¶ 6 (Declaration of Walter Merschat). Often the only way of identifying a methane gas seep is if it is emerging through a waterway as the methane bubbles are visible at the water surface; methane seeps on dry land are often invisible. *Id.* (Merschat Decl.) at ¶ 15.

In his declaration, Walter Merschat, a geologist with extensive experience conducting soil gas surveys, explains how the process of developing coalbed methane results in new or exacerbated methane seeps. Merschat Decl. ¶¶ 2, 12. In order extract coalbed methane, the "target coal seam is dewatered to reduce the head pressure. Once the pressure is reduced, the methane separates from the coal, much like bubbles in a soda bottle once the lid is popped and the pressure released. Once the methane separates from the coal, it is free to diffuse toward the well bore, or toward faults or cracks in the bedrock, or toward the outcrop."[7] *Id.* ¶ 12. Thus, it is the very process that allows

---

[7] The Wyoming Department of Environmental Quality (DEQ) has indicated that the increased rate of methane seeps are not caused by reinjection of produced water. *See* April 25, 2007 Letter from Steve

Double Eagle and Anadarko Petroleum to recover methane that also causes or exacerbates methane seeps.

Mr. Merschat visited eight methane seeps in the Atlantic Rim area and his tests revealed that four of these contained explosive concentrations of methane. *Id.* at ¶ 6. Moreover, Merschat concluded that the largest methane vent he observed was very recent in origin. *Id.* at ¶ 10. Merschat believes the most likely explanation for the appearance of this methane seep and for the large volume of methane currently escaping from other seeps is the dewatering of the "Almond coals" as part of the "exploratory" coalbed methane wells BLM authorized in 2002, while the Atlantic Rim EIS was still underway. *Id.* at ¶ 13.

Merschat predicts that the increase in coalbed methane development in the area will cause "existing methane seeps along the outcrop [to] increase in their volume and danger level beyond what is seen today, and that new seeps will form." *Id.* at 14. The methane seeps Merschat visited as well as harder-to-detect land-based methane seeps "potentially pose a serious threat to the health and safety of visitors, particularly hunters and other recreationists who might camp, build fires, or cook over small stoves in this area. A camper who pitched a tent over a methane seep could have the tent fill up with methane in the night, asphyxiating the victim or leading to an explosion if a spark or flame was lit."[8] *Id.* at ¶ 17. Accordingly, coalbed methane production risks creating irreparable harm by releasing methane gas which will emerge as hazardous methane seeps.

---

Jones, Wyoming Outdoor Council to David Simons, BLM. Exh. T. However, Wyoming DEQ did not comment at all on the role of dewatering in releasing methane otherwise contained in coal seams. *Id.*

[8] As Merschat also notes, "[m]ethane is also a global warming gas 12 to 20 times as potent as carbon dioxide, and thus causes significant impacts to global climate change independent of the health and safety threats to the public, to wildlife, and to vegetation." *Id.* at ¶ 18.

In sum, development of coalbed methane risks substantial irreparable harm to plaintiffs' interest in the extraordinary public lands and critical wildlife habitats.

### B.    The Balance of Hardships Favors Entry of a Temporary Restraining Order and a Preliminary Injunction.

In cases involving the preservation of the environment, the balance of harms usually favors granting an injunction.  *See Wilderness Soc'y v. Tyrrel,* 701 F. Supp. 1473, 1479 (E.D. Cal. 1988) (noting that "when environmental injury is 'sufficiently likely . . . , the balance of harms will usually favor the issuance of an injunction to protect the environment'") (citing *Village of Gambell,* 480 U.S. at 545); *see also Citizen's Alert Regarding the Envt. v. U.S. Dep't. of Justice,* 1995 WL 748246, *11 (D.D.C. 1995) (finding that concerns of planned prison and business development did not outweigh "permanent destruction of environmental values that, once lost, may never again be replicated"); *Fund for Animals v. Espy,* 814 F. Supp 142, 151-52 (D.D.C. 1993) (enjoining bison study).

In this case, the balance of harms weighs heavily in favor of granting an injunction.  Without such relief, the construction of roads, pipelines, powerlines and wellsites required for extensive coalbed methane development will transform an extraordinary natural area into "an industrialized setting," irreparably harm critical wildlife habitats, and risk creation and worsening of hazardous methane seeps.  EIS 4-102.  These effects on wildlife and the character of the area will be both immediate and long lasting due to the difficulty of revegetating affected areas.

On the other hand, BLM can not establish any harm that counterbalances the potential environmental damage that will occur here.  A preliminary injunction will simply halt on-the-ground activities until the merits of plaintiffs' arguments can be heard.

This small delay will not cause significant harm to BLM, Double Eagle Petroleum, or Anadardo Petroleum.  In fact, production of natural gas in Wyoming has been outstripping both local demand for natural gas and the pipeline capacity to transport natural gas to other parts of the country.  *See* Natural Gas Price Gap Widens, *Casper Star-Tribune* (available at

http://www.casperstartribune.net/articles/2007/09/18/news/wyoming/236f24071803ea6b8725735800211077.txt).  Currently, the oversupply of natural gas in Wyoming is such that "[s]ome coal-bed methane producers may face selling gas at a loss because shutting wells in is a difficult proposition."  *Id.*  While Double Eagle and Anadarko presumably believe that they will be able to profit from coalbed methane eventually, it is difficult to see why a short delay would cause significant harm given the current oversupply.

Furthermore, plaintiffs are willing to expedite the further resolution of this case through the filing of a motion for summary judgment once plaintiffs and the Court are provided with the Administrative Record that applies to plaintiffs' claims.[9]

### C.    Emergency Injunctive Relief is in the Public Interest

Because Plaintiffs seek to compel the defendants to follow federal laws designed to protect the environment, and because the issuance of an emergency injunction would in fact preserve the environment, the granting of this injunction would clearly serve the public interest.

As this Court has stated, an emergency injunction would "serve the public by protecting the environment from any threat of permanent damage. . . . .  While granting

---

[9] Because of the chilling effect on litigation to protect the environment and the public interest, federal courts often dispense with the security requirement for public interest environmental plaintiffs, or require only a nominal bond. *See e.g., Sierra Club* v. *Block,* 614 F. Supp. 488 (D.D.C. 1985) (requiring $20 bond).

the preliminary injunction would inconvenience defendants and those parties holding

specific interests in the lands at issue, denying the motion could ruin some of the

country's great environmental resources-and not just for now but for generations to

come." *National Wildlife Fed'n v. Burford,* 676 F. Supp. 271, 279 (D.D.C. 1985), *aff'd,*

835 F.2d 305 (D.C. Cir. 1987). *See also Citizen's Alert,* 1995 WL 748246 at * 11 ("By

maintaining the *status quo,* while additional environmental studies are performed, or

additional alternatives are considered, an injunction ensures that there will be at least a

'possibility' that the agency will change its plans in ways of benefit to the environment. It

is this possibility that courts should seek to preserve.") (citation omitted).

In this case, the public interest is best served by enjoining the proposed action,

therefore protecting the environment from unnecessary degradation and harm until the

merits of Plaintiffs claims can be fully addressed. *See State of Alaska* v. *Andrus,* 580 F.2d

480, 485 (D.C. Cir. 1978) ("in most cases, ... it is possible and reasonable for the courts to

insist on strict compliance with NEPA, and actions can, consistently with the public

interest, be enjoined until such compliance is forthcoming.") (citation omitted).

## CONCLUSION

For all of the foregoing reasons, plaintiffs respectfully request that the Court grant

their motion for a preliminary injunction.

Respectfully submitted.

_____/sb_____
Sharon Buccino (D.C. Bar # 432073)
Aaron Bloom
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
(202) 289-6868                                    Date: September 25, 2007

EXHIBIT LIST

Exhibit A     Declaration of Erik Molvar with Attachments

Exhibit B     Atlantic Rim Natural Gas Field Development Project Final Environmental

                 Impact Statement (excerpts)

Exhibit C     January 5, 2007 letter from Wyoming Game and Fish Department to

                 BLM

Exhibit D     Map of Sage Grouse Leks

Exhibit E     Undated USFWS memorandum warning BLM that cumulative harm to

                 sage grouse habitat in Atlantic Rim could lead "to long-term decline in the

                 population of sage grouse"

Exhibit F     February 8, 2006 letter from Wyoming Game and Fish Department to

                 BLM

Exhibit G     February 13, 2006 letter of Chris Naumann to David Simons at the

                 Rawlins Field Office of BLM

Exhibit H     January 28, 2006 comment of Daniel A. Dale of Laramie, Wyoming

Exhibit I      BLM Information Bulletin No. 2001-138 (August 15, 1001)

Exhibit J      BLM Instruction Memorandum No. 2002-081 (February 4, 2002)

Exhibit K     BLM Instruction Memorandum No. 2004-110 (February 23, 2004)

Exhibit L     BLM Instruction Memorandum No. 2005-247 (September 30, 2005)

Exhibit M    June 28, 2007 BLM approval of 36 coalbed methane wells as requested

                 by Double Eagle Petroleum Company (Sundog EA).

Exhibit N     August 16, 2007, BLM approval of 48 coalbed methane wells as requested

                 by Anadarko E & P Company (Catalina EA doc)

Exhibit O     Holloran, Matthew J. *Creater Sage-Grouse (Centrocercus urophasianus) Population Response to Natural Gas Field Development in Western Wyoming,* 2005 (excerpts)

Exhibit P     Naugle, David E., et al. *Sage-grouse Population Response to Coal-bed Natural Gas Development in the Powder River Basin,* 2006

Exhibit Q     Connelly, John W., et al., *Guidelines to manage sage grouse populations and their habitats,* 2000

Exhibit R     Braun, Clait E., *A Blueprint for Sage-grouse Conservation and Recovery,* 2006

Exhibit S     Declaration of Walter R. Merschat

Exhibit T     April 25, 2007 letter from Steve Jones, Wyoming Outdoor Council to David Simons, BLM

LIST OF ACRONYMS

APA                    Administrative Procedure Act

APD                    Application for Permit to Drill

BCA                    Biodiversity Conservation Alliance

BLM                    Bureau of Land Management

CWA                    Clean Water Act

CEQ                    Council on Environmental Quality

DR                     Decision Record

EA                     Environmental Assessment

EIS                    Environmental Impact Statement

FLPMA                  Federal Land Policy Management Act

FONSI                  Finding of No Significant Impact

GAO                    Government Accountability Office

IBLA                   Interior Board of Land Appeals

NEPA                   National Environmental Policy Act

NRDC                   Natural Resources Defense Council

POD                    Plan of Development

ROD                    Record of Decision

RMP                    Resource Management Plan

CERTIFICATE OF SERVICE

I, Craig Dylan Wyatt, hereby certify that on September 25th, 2007, I attempted

service of a summons and a copy of the complaint in this action by placing same in a

U.S. mailbox, with first-class, certified, return receipt requested, postage prepaid,

addressed to the following:


Peter Keisler, Acting US Attorney General
US Department of Justice
10th & Constitution Ave. NW
Washignton, DC  20530

Dirk Kempthorne, Secretary of the Interior
US Department of the Interior
1849 C Street, NW
Washington, DC  20240

Bureau of Land Management
US Department of the Interior
1849 C Street, NW
Washington, DC  20240

Jeffrey A. Taylor, US Attorney
Office of the US Attorney
Judiciary Center Building
555 -4[th] Street, NW
Washington, DC  20001

I also hereby certify that I provided courtesy copies of the complaint to the parties listed
below on September 25th, 2007.

The following was provided with a courtesy copy via courier:

Charles Findlay, Assistant Chief
Environment and Natural Resources Division
US Department of Justice
601 D Street, NW, Room 3006
Washington, DC  20044

Also, the following parties were provided a courtesy copy via overnight delivery:

Laura Lindley, Esq.
Robert C. Mathes, Esq.
Kathleen S. Corr, Esq.
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO  80202-3110
For Double Eagle Petroleum Co.

Natalie Eades, Esq.
Anadarko Petroleum Corporation
PO Box 1330
Houston, Tx  77251-1330
For Anadarko E&P Company LP and Warren Resources, Inc.

Patrick J. Crank, Esq.
Jay Jerde, Esq.
Ursula P. Schultz, Esq.
Office of the Attorney General
123 State Capitol
Cheyenne, WY  82002
For the state of Wyoming


                                        _____/cd_____
                                        Craig Dylan Wyatt


Dated:  ___9/25/07____

# Exhibit A

NRDC, et al. v. Kempthorne, et al.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATURAL RESOURCES DEFENSE COUNCIL )
1200 New York Avenue, NW, Suite 400 )
Washington, DC 20005,            *et al.* )
                                          )
        Plaintiffs,                       )        Civ. No.
                                          )
            v.                            )
                                          )
DIRK KEMPTHORNE, in his official capacity )
As the Secretary of the United States    )
Department of the Interior                )
1849 C Street, NW                         )
Washington, DC 20240,            *et al.* )
                                          )
        Defendants.                       )
                                          )

## DECLARATION OF ERIK MOLVAR

I, Erik Molvar, declare under penalty of perjury that:

1. My name is Erik Molvar. I am more than 18 years of age, am a citizen of the United States, and reside in Laramie, Wyoming at 552 North Fifth Street. I have resided in Wyoming for the last 7 years and have a deep interest in management of federal lands in the Atlantic Rim area, which includes the Atlantic Rim Natural Gas Field Development Project ("Atlantic Rim Project").

2. I am wildlife biologist and Executive Director of Biodiversity Conservation Alliance (BCA). I have been a member of BCA since May 2000, an employee of this organization since September 2000 and an officer of the corporation since October 2001. BCA is a nonprofit conservation organization founded in 1988 and dedicated to protecting wildlands and native wildlife in Wyoming and surrounding states. Our office is in Laramie, Wyoming. I also serve as President of the Board of Directors of the Wyoming Wilderness Association.

3. I first visited the Atlantic Rim Project area during the summer of 1999. Since 1999, I have visited the areas where the Catalina and Sun Dog PODs are now located, and the surrounding lands, more than 20 times. During these visits I saw a place of stunning beauty with rolling hills, canyons, dune fields and diverse sagebrush communities. Exhibits 6, 7. I have also taken aerial

DECLARATION OF ERIK MOLVAR

overflights of the Dry Fork Cow Creek valley where the Catalina and Sun Dog PODs are located on two occasions, most recently on July 12, 2007. This area in the north end of the Dry Cow Creek Valley had previously been undeveloped when I had observed it prior to my visit on September 12, 2007 via several aerial overflights, most recently in July of 2007.

4. I visited the Atlantic Rim project area on September 12, 2007. I went to this area to inspect it after learning from the Bureau of Land Management ("BLM") on September 7 that the agency had approved 90 new wells as part of the Catalina and Sun Dog Plans of Development ("PODs"). A map that I helped to prepare is attached as Exhibit 1 showing the project area and the area that I visited. I took all the photos attached to this declaration.

5. A network of new roads and drilling pads had been constructed to the north of previously existing coalbed methane exploratory pods by Double Eagle Petroleum. Most drilling pads also had the surface casing set for wells, indicating that at least some drilling activity had occurred on these pads. *See, e.g.*, Exhibit 2. Wellpads were also under construction in this area. Exhibit 3. Pipelines were being prepared for installation. Exhibit 4. A power line was in the process of being installed; power poles had been emplaced through the newly developed area and wire was being strung on the saddle to the northwest of the drilling activity. Exhibit 5.

6. Upon returning on September 12, 2007, to Dry Fork Cow Creek valley, I saw two new roads that had been built across stream channels by the use of road cuts that descended to the level of the streamcourse and crossed it without the aid of culverts or other means to reduce or mitigate erosion or the runoff of sediment or salts into the stream during rainfall events. Exhibit 8. Harmful sediment is likely to run off these roads causing irreparable damage to water quality in the nearby streams and aquatic habitat.

7. Vehicle traffic in and around the area of both developments associated with drilling, construction, and production activities was locally heavy. Exhibit 9. Vehicle traffic is known to drive away wildlife, eliminating the habitat effectiveness for wildlife as far as 1.2 miles from roads for elk and reducing the attendance of sage grouse at nearby leks, or traditional breeding grounds. In addition, vehicle traffic contributes to direct mortality of animals through collisions and causes major reductions in forage vegetation by coating the leaves with dust in the areas surrounding roads.

8. Construction and drilling activities by Anadarko Petroleum in previously undeveloped portions of the Southern Sun Dog pod were also in full swing as of my September 12, 2007 visit. Well pads were under construction in this area. Exhibit 10. New roads were being cleared across previously untouched areas. Exhibit 11. New wells were being drilled, with one rig actively working in this part of the area. Exhibit 12.

9. The overall effect of these industrial activities is to convert a previously undeveloped, unscarred landscape into an industrial landscape visually dominated by roads, wellsites, and heavy equipment. The large tracts of native vegetation are being fragmented severely into smaller patches of remaining vegetation in a matrix of roadways and other human intrusions. The

DECLARATION OF ERIK MOLVAR

predominantly natural scenery of the area is being replaced by a landscape where industrial intrusions are a dominant feature.

10. In particular, the viewshed from the county roads traveling along the southern and southeast sides of the newly developed area have been and continue to be degraded by industrial intrusions on driving tours of the area. As a result, the landscapes that I previously used for viewing wildlife, particularly birds of prey and pronghorn antelope, have been industrialized for the long term, and wildlife have been driven away from this area. As a result, my enjoyment of this landscape has been and continues to be irreparably harmed by project activities.

11. Based on my review of Wyoming Oil and Gas Conservation Commission records, Double Eagle and Anadarko are poised to do more drilling and road construction pursuant to the APDs that BLM has already approved. In addition, many more wells and new roads are imminent in the area. BLM is poised to approve over 200 more APDs tied to the Atlantic Rim project in the Catalina Unit alone. While at the Catalina pod on September 12, 2007, I observed a posted map illustrating the web of roads and wellpads planned for the area. In addition to the new roads and wellpads that I observed on September 12, 2007, Andarko is poised to construct many, many more miles new roads in the area. *See* Exhibit 13.

12. I visited methane seeps within the Atlantic Rim project area with Walter Merschat, a geochemist and expert in methane seeps, on March 27, 2007. I returned to view the methane seeps on May 26th, June 1st, July 10th, and September 12th of the same year. These methane seeps pose a significant safety hazard to visitors to the Atlantic Rim, and given BCA's history of leading public outings to this area and recommendation to members to visit key locations within the Atlantic Rim project area, new or increased methane seeps linked to coalbed methane production will significantly harm the interests of BCA and our members.

13. As Executive Director of BCA, I have written and submitted comments on proposals for BLM mineral and land management activities in the Atlantic Rim area (including the Atlantic Rim Project). In particular, I was involved in preparing BCA's comments on the Draft Environmental Impact Statement ("EIS") for the Atlantic Rim Project submitted to BLM on February 17, 2007. I also helped prepare an appeal of BLM's Record of Decision approving the Atlantic Rim Project and the Final EIS that accompanied it. This appeal was filed on behalf of BCA and others with the Interior Board of Land Appeals on June 20, 2007. BCA has conducted education and outreach to the public on the potential impacts of BLM mineral and land management activities in the Red Desert region in general and the Atlantic Rim area in particular, through generating media on the Wild Cow Creek wilderness unit, the Atlantic Rim Project, and wildlife values in the area.

14. Given my and BCA's interest in the Atlantic Rim Project, I have had regular contact over the past six months with staff in BLM's Rawlins office which is managing the Atlantic Rim Project. I requested notice and copies of applications for ground disturbing activity that BLM received related to the Atlantic Rim Project, including Applications for Permits to Drill ("APDs"). I also requested copies of any documents prepared by BLM under the National Environmental Policy Act ("NEPA") accompanying these APDs or otherwise related to the

DECLARATION OF ERIK MOLVAR

Atlantic Rim Project. I requested to receive these documents prior to BLM's approval of any APDs or other ground disturbing activities.

15. BLM has now approved APDs for 90 wells and the accompanying roads and other infrastructure in the Catalina and Sun Dog PODs of the Atlantic Rim Project. BLM did not provide me or BCA direct notice of these APDs prior to approving them. Furthermore, BLM did not provide me or BCA copies of the APDs or accompanying NEPA documents prior to the agency's approval of the 90 wells.

16. BLM has not yet provided BCA with copies of the APDs or the complete NEPA documents prepared for the 90 wells that the agency has approved. BLM informed BCA that it must submit a request for the documents under the Freedom of Information Act ("FOIA"). I worked with the Natural Resources Defense Council to submit a FOIA request for these documents on September 14, 2007. In the past, it has taken months, and sometimes years, for the BLM Rawlins office to respond to my FOIA requests.

17. On September 19, 2007, I traveled approximately two hours from my home in Laramie, WY, to BLM's office in Rawlins. I reviewed the book of pending APDs in the Rawlins office. I understand that BLM's Rawlins office posts a notice and map of APDs that it receives in its APD book in the public room for 30 days. This notice does not include the actual application for a permit to drill or any NEPA documents.

18. When I reviewed the book of pending APDs in the Rawlins office on September 19, 2007, I discovered APD notices for 27 new wells related to the Atlantic Rim Project. In addition, I understand that there are APDs for over 200 new wells related to the Atlantic Rim Project that are no longer in the APD book since BLM is poised to approve them any day. All of these new wells are in addition to the 90 wells that BLM already approved in the Catalina and Sun Dog PODs.

19. I returned to the Rawlins Field Office on September 21, 2007 to review APD notices and maps which were not posted in the APD register book, totaling 243 permits. BLM did not allow me to review any of these APD notices.

20. While in BLM's Rawlins office on September 19, 2007, I filed initial comments related to each of the 27 pending APDs within the Atlantic Rim project area. In my comments, I explicitly requested copies of the APDs and accompanying NEPA documents prior to BLM's approval of the APDs. Without copies of the APDs and accompanying NEPA documents, neither I nor anyone else is in a position to comment in a meaningful way on BLM's proposed action.

21. When I have requested APDs and accompanying NEPA documents in the past in order to comment on APDs prior to BLM approval of them, I have been denied such access to the information.

22. I do not expect to receive copies of the APDs and accompanying NEPA documents prior to BLM's approval of more APDs in the Atlantic Rim project area. It has been the regular practice

DECLARATION OF ERIK MOLVAR

of all BLM offices in Wyoming to approve APDs before giving affected members of the public access to the drilling applications or the accompanying NEPA analysis.

23. My interests – and the interests of BCA and WWA – have been injured by the BLM's failure to comply with the National Environmental Policy Act and the Federal Land Policy and Management Act.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, in accordance with 28 U.S.C. § 1746.

Signed this 21st day of September, 2007.

Erik Molvar

DECLARATION OF ERIK MOLVAR

# Exhibit 1
**Declaration of Erik Molvar**





# Catalina Unit PODs

# Exhibit 2
**Declaration of Erik Molvar**

Case 1:16-cv-01063-BJD   Document 209   Filed 09/26/2007   Page 1 of 1



# Exhibit 3
**Declaration of Erik Molvar**

# Exhibit 4
**Declaration of Erik Molvar**



# Exhibit 5
### Declaration of Erik Molvar





# Exhibit 6
### Declaration of Erik Molvar



**Exhibit 7**
**Declaration of Erik Molvar**



# Exhibit 8
**Declaration of Erik Molvar**



**Exhibit 9**
Declaration of Erik Molvar



# Exhibit 10
**Declaration of Erik Molvar**



# Exhibit 11
**Declaration of Erik Molvar**



# Exhibit 12

Declaration of Erik Molvar



# Exhibit B

NRDC, et al. v. Kempthorne, et al.

# Excerpts

# FINAL
# ENVIRONMENTAL IMPACT STATEMENT

# ATLANTIC RIM

# NATURAL GAS FIELD DEVELOPMENT PROJECT

Prepared by

Bureau of Land Management
Rawlins Field Office
Rawlins, Wyoming

November 2006

**Executive Summary**

# Executive Summary

The Department of the Interior (DOI), Bureau of Land Management (BLM) Rawlins Field Office (RFO) has received a proposal from Anadarko E & P Company, LP, as lead proponent for a group of companies including Warren Resources, Inc., Double Eagle Petroleum and Mining Company (Companies), and other natural gas operators (collectively known as the Operators) to develop and remove natural gas resources in south western Carbon County, Wyoming. Operations are proposed for the Atlantic Rim Project Area (ARPA) encompassing 270,080 acres of land located in Townships 13 North to 20 North and Range 89 West to 92 West, south and west of Rawlins, Wyoming. Life of project (LOP) is estimated to run from 30 to 50 years.

The DOI/BLM RFO has determined the proposed project would constitute a major federal action and, therefore, requires the preparation of an environmental impact statement (EIS) in accordance with the National Environmental Policy Act of 1969, as amended (NEPA). This Final EIS (FEIS) replaces the Draft EIS in its entirety and was prepared in accordance with NEPA to assess the environmental consequences of the Operator's proposed action and alternative courses of action. It is intended to provide the public and decision-makers with a complete and objective evaluation of impacts that might occur from the Proposed Action and reasonable alternatives.

The State of Wyoming is a cooperating agency in this EIS with active participation from many agencies including in part the State Planning Office, Wyoming Game and Fish Department, the State Historic Preservation Office, the Wyoming Department of Environmental Quality, and the Wyoming Department of Agriculture. Other cooperating agencies include the Saratoga Encampment Rawlins Conservation District and the Little Snake River Conservation District.

## Proposed Action

The Operators proposed to drill and develop up to 2,000 new natural gas wells. Approximately 1,800 wells would be drilled to coals within the Mesaverde Group to develop coalbed natural gas (CBNG) resources. An additional 200 wells would be drilled to access conventional natural gas found in other formations, generally expected to be deeper than the Mesaverde coals. The 2,000 proposed new natural gas wells would be in addition to the 116 ARPA exploration wells already drilled in the interim drilling period.

Proposed well spacing is eight wells per section (80-acre spacing) throughout the project area, but may reduce to four wells per sections (160-acre spacing) depending on the geology and ability of the operators to recover the gas resource. Development and drilling would begin in 2007 and continue for approximately 20 years, with a LOP of 30–50 years. Various drilling—and production—related facilities (e.g., roads, pipelines, water wells, disposal wells, compressor stations, and gas processing facilities) would also be constructed throughout the ARPA.

## Scoping

Public and agency scoping was conducted to determine issues relative to the Proposed Action. A scoping notice and informational materials were mailed to potentially interested parties beginning in 2001 under the title "Atlantic Rim Coalbed Methane Project." Subsequently, the

## EXECUTIVE SUMMARY

project was re-named the "Atlantic Rim Natural Gas Development Project" in view of the proponents' request to reduce the number of wells proposed and to develop a limited number of conventional gas wells. All issues identified during scoping and BLM and Interdisciplinary Team reviews were evaluated to identify key issues that drove development of alternatives and the impact analyses. 13 key issues were identified including: Increased traffic on existing county, state, and BLM roads, adverse socio-economic impacts to local communities, impacts to surface water hydrology including increased rates of delivery of sedimentation and salts to the Colorado River system, impacts to groundwater resources, impacts to sensitive soils, impacts to air quality, successful and timely reclamation of disturbed areas, conflicts with livestock management operations, impacts to cultural and historic values within the area including historic trails, impacts to wildlife habitats, impacts to threatened, endangered and sensitive plant and wildlife species, the cumulative effects of drilling and development activities, and potential conflicts between mineral development and recreational activities. Comments to the Draft EIS (DEIS) developed two additional key issues; directional drilling/well spacing, and phased development.

The three action alternatives summarized below meet the Purpose and Need of the proposal but vary in response to the key issues. An alternative considered in depth in the DEIS (Alternative B) has not been carried over to the FEIS. Other alternatives were considered but eliminated from detailed study.

## Alternatives

### Alternative A - No Action

NEPA regulations require that EIS alternative analyses "include the alternative of no action" [40 CFR 1502.14(d)]. For this analysis, "no action" means that the BLM would reject the Proponents proposal and the proposed activity would not take place. Development activities and operations approved under EAs during the interim drilling period would continue as approved.

### Alternative C

Under Alternative C the operators would be approved to develop natural gas resources from the desired target formations but operations would be subject to development protection measures (DPM) in those areas with sensitive or crucial resource values (as detailed in appendix L), likely resulting in fewer acres of disturbance and reduced road density on federal lands. Generally DPMs focus on surface disturbance limits, selection of facility locations, drilling, and construction practices and, in some cases, no surface occupancy. Examples of such areas where DPMs would be applied are wildlife and fish habitat and areas with sensitive soils. As an end product, geographic information system (GIS) layers would be available to operators for development of site-specific proposals for their planning of the annual program.

### Alternative D - BLM Preferred Alternative

The goal of this alternative is to minimize surface disturbance while optimizing natural gas recovery. Annual planning between the operators and the BLM would be a key component of this alternative. The annual planning would require the operators to submit to the BLM their proposed plan of operation for the forthcoming year. The BLM would then work with the operators at a site-specific level to minimize surface disturbance by applying the appropriate

# EXECUTIVE SUMMARY

lease stipulations, conditions of approval, best management practices, and any other measures deemed necessary to minimize surface disturbance and still allow for the recovery of natural gas.

Coalbed and conventional natural gas resources would be developed, while reclamation activities stabilize disturbed soils and vegetation communities. For the overall Atlantic Rim area, no more than 7,600 acres of the project area would be disturbed and unsuccessfully reclaimed at any time. For the overall Atlantic Rim area, there would be a 6.5 acres/wellpad short-term disturbance goal (2.8% of the ARPA). Those areas designated as "Category A" would have a short-term disturbance goal of less than 6.5 acres per well pad. Category A, as depicted on map M-7, includes areas with sensitive fish populations, and crucial wildlife habitats, and unique vegetation communities, and is about 72,200 acres in extent.

## Environmental Impacts

### Geology / Minerals / Paleontology

No significant effects are anticipated for these resources under any of the action alternatives (Proposed Action and Alternatives C and D). The purpose of this proposal is to remove and market natural gas resources. These resources would be permanently depleted.

### Air Quality

Air quality impacts from the project would occur from pollutants emitted during construction and production operations. The assessment of project potential impacts included both a near-field and a far-field analysis. The near-field analysis assessed direct project impacts in the immediate vicinity of project activities resulting from construction or production reflective of maximum emissions. The far-field analysis assessed potential impacts from field-wide project emissions at in-field locations within the ARPA and at far-field locations (i.e., sensitive Class I and Class II areas). The far-field analysis also assessed regional emission sources located with the model domain.

Near-field impacts from action alternatives emissions were shown to be below the applicable Wyoming Ambient Air Quality Standards (WAAQS) and National Ambient Air Quality Standards (NAAQS). For far-field effects direct visibility impacts from the action alternatives were predicted to be below the "just noticeable visibility change" (1.0 dv) at all sensitive wilderness areas using both the Federal Land Managers' Air Quality Related Values Workgroup (FLAG) and Interagency Monitoring of PROtected Visual Environments (IMPROVE) background visibility data. Project source emissions from the action alternatives would result in an acid neutralizing capacity (ANC) change less than the level of acceptable change (LAC) at analyzed acid-sensitive lakes. The predicted maximum S and N deposition potential impacts from all action alternatives are below the 0.005 kg/ha-yr DAT at all the sensitive PSD Class I and Class II areas. For potential in-field impacts all action alternatives are below applicable ambient air quality standards.

### Soils

The revegetation potential of disturbed soils is expected to be low to moderate under all the alternatives. While no biological crusts are mapped or known to exist within the ARPA, some crusts, if they do exist, may be damaged as a result of selecting any of the action alternatives.

# EXECUTIVE SUMMARY

## Water Resources

Impacts to waterbodies with impairment or threats of impairment to the State of Wyoming's 303d list (Muddy Creek) are expected from the Proposed Action and Alternative D. Impacts to Muddy Creek under Alternative C would not likely be significant.

Salinity loading in run-off would increase above background conditions for the Proposed Action and Alternative D. Under Alternative C salt loads would be measurably higher but are not expected to be significant.

Under the Proposed Action and Alternative D changes in hydrologic function in wetlands would occur and indirect impacts could be significant. Direct impacts are expected to occur but not be significant. For Alternative C, direct and indirect impacts are not likely to be significant. Changes in streamflow characteristics would occur under any of the action alternatives and indirect effects could be significant.

For Proposed Action and Alternative D changes in geomorphology due to increased surface run-off, erosion, and increased sediment loads would occur in localized areas and cumulative impacts would be significant. Impacts are not likely to be significant under Alternative C. The Standard for Healthy Rangelands for water resources would continue to fail in areas due to indirect impacts and would be significant for any of the action alternatives

## Groundwater

Under all of the action alternatives, impacts to wells, seeps and springs emanating from the upper Mesaverde Group are expected to be significant due to coalbed dewatering. In addition short-term reductions in flows to artesian wells are expected. Groundwater quality is not likely to be significantly diminished under any of the alternatives.

## Range and Other Land Uses

Significant impacts from changes in animal unit months (AUMs), livestock mortality, and disturbance of livestock grazing operations and facilities are expected under the Proposed Action and Alternative D. Under Alternative C, impacts are expected to be somewhat reduced due to reduced surface disturbance and implementation of development protection measures.

## Vegetation

Effects from increased erosion from roads on moderate to steep slopes and alkali sage communities prone to erosion would result in long-term loss of productivity with significant effects for the Proposed Action and Alternative D.

Indirect effects from erosion and altered run-off patterns from adjacent uplands would have significant impacts for riparian communities under the Proposed Action and Alternative D. Effects are not expected to be significant under Alternative C. Long-term loss of shrubs, including Wyoming and alkali sagebrush sites, is expected to have significant impacts under the Proposed Action and Alternative D. Reduced surface disturbance on federal lands and treatment of roads would result in lower impacts to vegetation and may not be significant if overall browse use rates remain at moderate levels under Alternative C.

# EXECUTIVE SUMMARY

For those aspen and mountain shrub communities that have failed Rangeland Health Standards, additional disturbance from development would exacerbate the failed standard, resulting in increased difficulty in meeting the Standard and corresponding significant effects.

The potential for the spread or new infestations of weeds on disturbed sites is high to very high, although impacts would not exceed the significance criteria for Alternative D and the Proposed Action. The possibility of reduced surface disturbance and utilization of development protection measures on federal lands could result in reduced spread and infestation of weeds under Alternative C.

## Wildlife

For the Proposed Action and Alternative D, impacts on shrub-dependant songbird nesting habitats would be significant. Under Alternative C, impacts are not expected to be significant. Impacts to greater sage-grouse and Columbian sharp-tailed grouse would be significant under all the action alternatives. For big game, including mule deer and elk, significant effects are expected under all the action alternatives.

Impacts to threatened and endangered, proposed and candidate species, other sensitive species (other than greater sage-grouse and sharp-tailed grouse), and raptors are not expected to be significant under any of the action alternatives. Impacts to threatened and endangered fishes occurring downstream of the ARPA are not expected to occur. Significant impacts to BLM sensitive fishes are expected under the Proposed Action and Alternative D in Muddy Creek. Under Alternative C significant impacts are not expected.

## Recreation

Under all the action alternatives displacement of wildlife and the loss of a naturally-appearing setting would make the ARPA less desirable for hunting or wildlife viewing. Visitors would be displaced and impacts would be significant. Impacts to scenery, noise, dust, and human activity would reduce the ARPA's desirability as a place to camp significantly under all the action alternatives.

## Visual Resources

For pleasure driving and mountain biking, impacts would be significant for the Proposed Action and Alternative D. Impacts would not be significant under Alternative C. Management objectives for Visual Resource Management (VRM) Class III viewsheds would be exceeded under Alternative D and the Proposed Action. Management objectives would not be exceeded under Alternative C.

## Cultural Resources

Impacts to cultural resources as a result of construction activities could impact an estimated 126 sites under all the action alternatives. Reduced visual impacts to settings, where they contribute to site eligibility for historic trails, is expected to be less under Alternative C compared to the Proposed Action and Alternative D.

# EXECUTIVE SUMMARY

## Socioeconomics

**Economic Effects.** Economic impacts of natural gas development and production would be largely positive under the action alternatives. Based on the assumptions used for this assessment, natural gas development would enhance regional economic conditions and generate substantial local, state and federal tax and royalty revenues. Economic benefits would be similar for the Proposed Action and Alternatives D. Alternative C would likely result in reduced income and revenue from the gas. Drilling expenditures could be higher for individual wells under Alternative C than the Proposed Action and Alternative D, based on the various development protection measures that might apply on federal lands. Comments to the DEIS from the proponents assert that Alternative C may not be economically feasible and would not result in full development and extraction of the natural gas resource. Economic benefits to leaseholders would be less under Alternative C.

Direct expenditures for drilling/field development are anticipated to be $981 million, although Alternative C costs would likely be higher, depending on development protection measures. Economic impacts from drilling/field development are expected to be $1.25 billion with lesser income for Alternative C. For the Proposed Action and Alternative D, 578 average annual jobs are predicted. Under Alternative C, fewer jobs could occur from a corresponding reduction in well numbers. A total of $6.4 billion in total economic impacts related to production are expected for Alternative D and the Proposed Action. Less revenue could be realized under Alternative C. Impacts to other economic activities within the ARPA include the potential for reductions in the grazing, recreation, and hunting income from the Proposed Action and Alternative D, although disturbance limits may reduce negative effects on grazing and recreation activities. Alternative C is similarly expected to have a reduced impact on these activities.

Peak year drilling and production employment is predicted at 1,490 jobs for the Proposed Action and Alternative D. Peak year population impacts are estimated at about 1,100 people and peak year housing demand at 440 units for both alternatives. For Alternative C, effects would be reduced if less wells are drilled due to development protection measures or if the alternative proves to be uneconomic or to not fully remove the natural gas resource.

Local government facility and service demands are expected to be generally the same for all three action alternatives. Most local government facilities have excess capacity, while some services may need to expand to accommodate growth. County and special district revenue should be adequate to address development needs, but may lag at the time that development—related demand occurs. Municipalities which do not receive royalties, depletions, or similar mineral extraction revenues may not receive direct project related income in sufficient amounts of offset the costs of needed expansion in some cases.

Specific amounts of revenue anticipated are detailed in chapter 4, section 12. For all the various revenue sources, the Proposed Action and Alternative D are expected to have similar effects. Revenues under Alternative C are expected to be less, depending on the effects of development protection measures on the number of wells drilled and gas extracted.

## Transportation

Specifics of increased traffic levels are detailed in chapter 4. Average annual daily travel levels would increase for Carbon County Road (CCR) 605N (20 Mile Road), CCR 608 (Wild Cow Road), CCR 501 (Cherry Grove Road), Interstate 80, WY 789, and WY 70 under the Proposed

# EXECUTIVE SUMMARY

Action and Alternative D. Increased traffic levels would be lower under Alternative C depending upon the impacts of development protection. Impacts to county roads would include additional maintenance costs, offset by increased property tax revenues from production, with the possibility of a lag time between the need for work and the realization of revenue. There is a history of cooperative action between the companies and the Carbon County Road and Bridge Department that may off-set this effect.

## Health and Safety

The risk of industrial injuries would occur under all three action alternatives. If less wells are drilled under Alternative C, there would be a correspondingly reduced risk of hazards. The potential for hazardous material spills/exposure would be the same for the Proposed Action and Alternative D, and somewhat reduced under Alternative C.

## Noise

For all alternatives, noise levels associated with drilling, field development, and operations activities may temporarily exceed the threshold USEPA average 24-hour noise level of 55 dBA at specific locations within the ARPA, but the lack of year-round occupied human residences and the low level of non project-related human occupation of the project area would result in minimal noise impacts to persons other than project employees. Although noise impacts associated with compression facilities would be long term in duration, these same factors, absence of human residences and low levels of human occupation, would result in minimal compression facility noise impacts. Noise levels would be similar for the Proposed Action and Alternatives C and D, except that noise disturbances would likely occur at fewer locations under Alternative C if resource protection measures resulted in fewer wells being drilled.

# Chapter 4

# Analysis of Environmental Consequences

# 4  Analysis of Environmental Consequences

The purpose of this chapter is to analyze and disclose the environmental effects for the Atlantic Rim project including the potential for significant impacts of the *federal action* on the *human environment*. The Council on Environmental Quality regulations for implementing NEPA states that the human environment shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment [40 CFR §1508.14]. The *federal action* in this case is the Proposed Action and the alternatives, which the BLM is reviewing and disclosing impacts in anticipation of issuing a ROD on this project.

Analysis of the alternatives focuses on identifying types of impacts and estimating their potential significance. Throughout this chapter the terms *impact* and *effect* are synonymous. While impacts may be perceived as positive (beneficial) or negative (adverse), those determinations are left for the reader of this document to decide.

Each resource area in this chapter is organized as follows, along with the content of each subsection:

- **Introduction**. In here, the type and range of potential impacts that could occur as a result of the project are described.

- **Impact Significance Criteria**. Significance criteria are developed to gauge the magnitude of an impact on the human environment. Applicable management objectives from the Great Divide RMP are transposed in these subsections as significance criteria. The BLM also took into consideration consistency with the significance criteria found in the Rawlins RMP Draft EIS. Where an anticipated effect is determined to exceed the Atlantic Rim significance criteria, significant impacts (significantly as described in 40 CFR 1508.27) are determined to exist.

- **Direct and Indirect Impacts**. This subsection indicates which impacts are significant relative to the impact significance criteria. It illustrates the impact assessment of the proposed action and alternatives. The following defines direct and indirect impacts:

  o  Direct Impacts are effects that are caused by the action and occur at the same time and place. Examples include the elimination of original land use due to the erection of a structure. Direct impacts may cause indirect impacts, such as ground disturbance resulting in resuspension of dust.

  o  Indirect Impacts are effects that are indirectly caused by the action. They occur later or are farther removed in distance, but are still reasonably foreseeable and related to the action by a chain of cause and effect. Indirect impacts may reach beyond the natural and physical environment (e.g., environmental impact) to include growth-inducing effects and other effects related to induced changes to resource users (e.g., non-environmental impact).

- **Impacts Summary**. These subsections include a narrative comparison of direct and indirect impacts that would occur under each alternative and between alternatives.

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

- **Additional Mitigation Measures.** Under these subsections, resource specialists identify additional mitigation measures that could be applied to avoid or reduce impacts above and beyond those listed in the appendices and applicant committed measures. The mitigation measures are in addition to any measures defined in the alternatives.

After assessing direct and indirect impacts in this chapter, cumulative impacts are analyzed in chapter 5. Cumulative impacts from the Proposed Action and the alternatives are analyzed in the context of other ongoing and recently approved activities, recently constructed projects and other past projects, and projects likely to be implemented in the near future reasonably foreseeable future activities (RFFAs) within the vicinity of the ARPA.

## 4.1  Geology, Mineral, and Paleontology Resources

### 4.1.1  Introduction

#### 4.1.1.1  Geology

Of the geological features described in section 3.1, the surface environment could be impacted by the Proposed Action and alternatives, which would subsequently affect the geology of the ARPA and cause the geological hazard, mass movement. Removing vegetation or soils, could lead to flooding as a result of decreased infiltration rates and increase overland flow rate. If unmitigated, accelerated erosion that could result may cause gullying in some areas and rapid deposition or siltation in other areas with associated erosion effects. Mass movements, including landslides could be triggered in areas that become oversteepened by erosional removal of slope-supporting material. Altering existing topography, particularly by steepening slopes, could also trigger mass movements and accelerated erosion.

The Proposed Action or its alternatives would not contribute to increased risks of earthquakes. Earthquakes could result in damage to above- ground structures although the likelihood of earthquakes is low as indicated by the absence of recorded epicenters in the ARPA. Buried structures would only be affected if shaking induces ground failure or subsurface rupture. Pyrophoricity and subsidence effects to the geologic (surface) environment have been discussed in chapter 3 and are not considered a concern.

The magnitude of impacts to the geology and geological hazards associated would be reduced by the implementation of mitigation measures for geology, soils, vegetation, and water described in appendix H and adherence to the Great Divide RMP. In addition, no additional mitigation measures would be needed for geology.

#### 4.1.1.2  Mineral Resources

Petroleum and CBNG reserves could be considerably depleted by implementation of the Proposed Action or alternatives within the ARPA. The Proposed Action and its alternatives would approve recovery of natural gas resources, which would cause a loss of reserves in the ground. This would generate private and public revenues if drilling leads to petroleum discovery and development.

No economical locatable mineral resources have been identified in the ARPA. Demand for local sand, gravel, and clinker (disposed of through the mineral materials program) for building

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

## 4.4   Water Resources

### 4.4.1  Introduction

The Clean Water Act of 1987, as amended (33 United States Code 1251) established objectives to restore and maintain the chemical, physical, and biological integrity of the nation's water. The act also requires permits for point source discharges to navigable waters of the United States and the protection of wetlands, and it includes monitoring and research provisions for protection of ambient water quality.  The State of Wyoming implements permitting and monitoring requirements for the Wyoming Pollutant Discharge Elimination System (WYPDES), operation of injection wells, groundwater protection requirements, prevention and response requirements for spills, and Water Quality Standards for Salinity in the Colorado River system as recommended by the Colorado River Basin Salinity Control Forum and adopted by WDEQ as a member of the forum.

Protection of Wetlands (EO 11990) requires federal agencies to take action to minimize the destruction, loss, or degradation of wetlands and to preserve and enhance the natural and beneficial values of wetlands. Floodplain Management (EO 11988) provides for the restoration and preservation of national and beneficial floodplain values, and enhancement of the natural and beneficial values of wetlands in carrying out programs affecting land use.  Potential project-related depletions to the Little Snake River are considered with regard to the Yampa River Basin Management Plan and the Upper Colorado River Endangered Fish Recovery Program (1999) for Colorado River native fish downstream from the project area (http://www.r6.fws.gov/crrip/).

Surface discharge, as a method of disposal, from Federal Mineral Leases is subject to BLM approval to the point of discharge. Once surface discharge is approved, the operations from the point of discharge downstream are under the jurisdiction of the State of Wyoming.

> All produced water from Federal/Indian leases must be disposed of by (1) injection into the subsurface; (2) into pits; or (3) other acceptable methods approved by the authorized officer, including surface discharge under NPDES permit.  Injection is generally the preferred method of disposal.  Operations from the point of origin to the point of discharge are under the jurisdiction of the BLM.  Operations from the point of discharge downstream are under the jurisdiction of EPA or the Primacy State. 43 CFR 3162.5-1(b)

Some of the regulations described above require that certain permits/authorizations be obtained from the State of Wyoming, the BLM or other Federal Agencies including WYPDES permits for surface discharge of produced water; Applications for Permits to Drill, Federal Lease Obligations, development of a surface runoff, erosion, and sedimentation control plans; injection well permitting; oil spill containment and contingency plans; as well as Clean Water Act (CWA) Section 404 permits in the Colorado River and North Platte River Drainage Basins.

For the purposes of this analysis, the Proposed Action and the alternatives assume adherence to these plans, permits, leases and regulations for the protection of water resources.  Many potential impacts associated with gas development are common to all alternatives and therefore are analyzed for general impacts in section 4.4.3.  As these impacts vary by alternative and can be expanded on they are discussed in relation to each alternative.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

### 4.4.1.1  Surface Water Impacts

Potential impacts that may occur to the surface water system due to the proposed project include increased surface water runoff, wind erosion, and off-site sedimentation due to soil disturbance associated with construction activities (section 4.3), water quality impairment of surface waters, and stream channel morphology changes due to road and pipeline crossings. The magnitude of the impacts to surface water resources would depend on the proximity of the disturbance to a drainage channel, slope aspect and gradient, degree and area of soil disturbance, soil character, and duration of time within which construction activities occur, and the timely implementation and success/failure of mitigation measures. Impacts would likely be greatest shortly after the start of construction activities and would likely decrease in time due to stabilization, reclamation, and revegetation efforts (See appendices B, H, and J). Changes in surface flow patterns from road construction would continue through the life of the project and may extend beyond the project life if these roads are left in place. Petroleum products and other chemicals could be accidentally spilled resulting in surface water contamination. If these spills occur, they would be addressed with the Hazardous Materials Management Plan (appendix C).

### 4.4.1.2  Groundwater Impacts

The primary effects on groundwater resources would be associated with the removal of groundwater contained in coal aquifers and the subsequent recharge of aquifers through injection of produced water. The removal of groundwater from the coal aquifer results in the reduction of the hydraulic pressure head. The lowering of hydraulic head in an aquifer is also referred to as drawdown. The effects would result in progressive drawdowns within nearby wells completed in the same coal bed aquifers or in other aquifers hydrologically connected to the coalbeds. Impacts may include the interruption of groundwater flow to existing nearby springs, seeps, and flowing artesian wells. Another impact of the proposed project on groundwater resources would be an increase in the hydraulic pressure head in the aquifers receiving the injected coal bed water.

### 4.4.1.3  Assumptions for Analysis

Under all alternatives, the following would be adhered to: applicant committed measures (described in appendix K), required BMPs (appendix H), and BMPs for Non-Point Source Pollution (appendix J) as applicable, as well as the regulation and plans described in section 4.4.1. As per NEPA guidance, this analysis will be based on the premise that standard operating procedures including these BMPs and regulations will be adhered to under each alternative. The ARPA contains several active gas fields. There are 205 (116 are CBNG) active producing natural gas wells with accompanying production-related facilities, roads, and pipelines (http://wogcc.state.wy.us/). There are also abandoned well sites that in some cases are not fully reclaimed, the number of which is difficult to estimate. While the ARPA environmental analysis was being prepared, 116 CBNG were drilled in six POD locations to determine the feasibility of full-field development.

Approximately 80 percent of the ARPA is within the Colorado River Basin, with 69 percent lying within the Muddy Creek drainage area, 17 percent within the Great Divide Basin, and 3 percent within the Missouri River Basin. Table 3-10 summarizes the data for soil factors of concern and their extent within the ARPA. Table 3-11 shows the five soil categories as they relate to each of the twenty-one, 6th-level HUCs. The HUC boundaries are shown on map M-10.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

The no action alternative (Alternative A) would deny the proposed action. The approved pods would continue to be developed and operated (See table 1-1) under the lease terms and conditions of approval attached to APDs, and in the manner and conditions described in each pod's Environmental Assessment (EA) and decision record. Impacts would be similar to those described in the environmental assessments for the pods. New proposals for developing gas leases in the project area would be considered as they are proposed. If impacts are determined to be significant for these proposals, a new EIS process may be initiated.

All action alternatives assume the construction of up to 2,000 wells and associated roads and pipelines based on the drilling schedule shown on figure 2-1. The specific location of these facilities has not been provided by the operator under any alternative.

The Atlantic Rim project area is 270,080 acres in extent. The proposed action is for 8 wells per section or 80-acre spacing. The ARPA divided by 80-acres equals 3,376 potential well sites for the project area. Only 2,000 wells are proposed by the operators and 116 have been developed during the interim drilling period. Future CBNG development could be at a maximum intensity of 80-acre spacing. This means that approximately 37 percent (1 - 2,116/3,376) of the ARPA, 110,800 acres may not experience concentrated development (i.e. 80-acre well spacing). The extent of the unused (or less used) portion of the project area will be defined by the suitability of production of natural gas and may or may not be continuous. These areas without concentrated well locations would potentially experience surface disturbance from roads and pipelines to access wells and could also include areas of less dense conventional well development. The operators have indicated that they will drill at wider spacings when geologic, permeability and other conditions allow, but such areas are unknown at this time. In addition, if drilling and production activities are developed at a wider spacing, more area within the project area could be effected (example: 200 wells at 80 acre spacing effects 1,600 acres while 200 wells at 100 acre spacing effects 2,000 acres).

Specific locations for well sites or areas of concentrated development have not been identified in the proposed action; therefore this analysis will consider impacts throughout the project area. Approximately 166 injection wells are anticipate for the project. Both injection and conventional wells could share pads with CBNG wells (appendix H), although specific locations cannot be predicted. A certain percentage of the conventional well locations will be unsuccessful, and be abandoned and reclaimed; this has been estimated as 35 percent for the Desolation Flats EIS. However, it can be assumed that all the CBNG well locations would be used through the life of the project. This is because CBNG wells that do not produce gas may still be used to remove water from the coalbeds and increase gas production in other wells.

Several regions in the project area may not be developed. For example, the far north pod of (map 3, Pod #1, no name pod) was not developed during the interim drilling period based on results of drilling on private estate. Because there is no information to predict where concentrated development may occur and proposed action does not specify regions that will be more intensively developed, development at 80-acre spacing throughout the project area will be analyzed, except where restricted by BLM alternative(s).

The maximum surface disturbance for the Proposed Action is anticipated to be 15,800 acres or about 6 percent of the project area. With successful reclamation, about 2.3 percent of the project area would be disturbed after reclamation and into the production phase (appendix K, table K-3). Of this disturbance about 66 percent of the development is on federal mineral lands (appendix K, table K-3).

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Produced water disposal will primarily occur via an estimated 166 injection wells. Impacts from any potential new disposal methods not currently occurring within the ARPA will be analyzed in separate project-specific NEPA documents to fully analyze potential impacts.

Wetlands/Riparian and Floodplain areas have been identified along intermittent and perennial waters as well as those associated with springs, seeps and/or wells (map M-16) from NWI, USGS Hydrography data, and site visits to evaluate PFC for range management. Most 100 year floodplain areas would occur within 500 ft. of perennial waters or 100 ft. of ephemeral drainages. These features would be identified during onsite investigations and would be avoided for the location of permanent features. As part of standard oil and gas mitigations, areas within 500 ft. (~1/10 mile) of surface waters, identified 100-yr floodplains, and wetlands are managed for controlled surface use, also called avoidance areas (see appendices J and H).

Alternative C would not allow pad sites in some areas of environmental concern and would institute development protection measures (appendix L) that are based on resource concerns identified using spatial data (GIS). Many of these protection measures are specifically designed to reduce impacts to surface and groundwater resources. Under all alternatives, development protection measures would not apply to private or state lands. Alternative D would limit the amount of unreclaimed disturbance area at any given time to no more than 7,600 acres (See section 2.2.4).

### Surface Water Assumptions

The analysis for surface water is based on the following specific assumptions:

- Disturbance to soil and vegetation, including compaction of soil, would increase water runoff and downstream sediment loads, and lower soil productivity thereby degrading water quality, channel structure, and overall watershed health in some locations.

- The degree of impact attributed to any one disturbance or series of disturbances is influenced by several factors including location within the watershed, time and degree of disturbance, existing vegetation, and precipitation.

- Increased pollutants in surface waters would degrade habitat used by aquatic life and would affect other uses (e.g., stock-watering, irrigation, and drinking water supplies).

- BLM would continue to develop and maintain water sources in upland area to reduce impacts on wetland/riparian areas, and provide a resource for livestock grazing.

- Access roads would follow standard construction practices. However, properly designed roads would still alter hillslope hydrology and concentrate overland flow increasing erosion in some areas. In areas with steep topography, roads are expected to be longer resulting in greater impacts to surface water resources.

- Fine-textured soils are more susceptible to water erosion and compaction when wet; whereas, coarse-textured soils are more susceptible to wind erosion (See section 4.3).

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

**Groundwater Assumptions**

For the purposes of this analysis, the no action alternative for groundwater would only consider the impacts of approved development within the project area. This would include 116 CBNG wells drilled during the Interim Drilling Policy (appendix A). The location of these wells would be in the originally approved POD boundaries and would include one injection well for every 12 CBNG wells (about 10 injection wells).

For the purposes of this analysis, potential locations of CBNG wells were estimated to build the groundwater model. Assumptions were made based on the geology and unit boundaries described by the operator early in the process. The groundwater modeling assumptions are discussed in section 4.4.3.

### 4.4.2  Impact Significance Criteria

The Great Divide RMP (USDI-BLM 1990) and state (WSLUC 1979) land use plans prescribe the following management objectives associated with water resources:

1. To meet or exceed established standards for quality of surface water and groundwater where water quality has been lowered by human-induced causes;

2. To reduce salt loading in watersheds that lie within the Colorado River Basin;

3. To maintain riparian areas in good or excellent condition and to improve riparian areas that are in fair or poor condition;

4. To control flood and sediment damage from natural or human-induced causes; and

5. To provide for physical and legal availability of water for use by the public and by federal, state, and, local agencies for fisheries and wildlife and for livestock, recreational, municipal, and industrial uses.

Significance criteria are developed to gauge the magnitude an impact would have on the human environment. An impact on water resources as a result of project actions would be considered potentially significant if its magnitude was such that special mitigation is warranted or it persists indefinitely.

The significance criteria listed in 40 CFR 1508.27 are not necessarily scientifically or factually determined. For example one significance criterion is "the degree to which the possible effects on the quality of the human environment are likely to be highly controversial." For this analysis, the approach to establishing significance criteria was based on legal issues (i.e., government regulatory standards), public perception, available scientific and environmental documentation, and professional judgment of resource specialists, as specified in 40 CFR 1508.27.

### 4.4.2.1  Surface Water Significance Criteria

Impacts to surface water resources would be considered significant if the following were to occur:

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

1. Degradation of water quality beyond the designated use of the receiving water body, or other violations of federal or state water quality standards or negatively impacting a water body listed on the State 303d list of Impaired or Threatened Waterbodies.

2. Project activities elevate salt loading to the Colorado River system above background conditions.

3. Unmitigated loss of wetlands or wetland function (EO 11990 and 11988).

4. Project-related activities that degrade wetland/riparian areas such that, as a minimum physical state, PFC Standards for Healthy Rangelands (USDI-BLM 1997) are not being maintained.

5. Streamflow characteristics of intermittent drainages or perennial streams are altered such that established uses are affected.

6. Alteration of stream channel geometry or gradient by accelerated runoff and erosion (e.g., undesirable aggradation, degradation, or side cutting) beyond what would be expected by natural processes.

### 4.4.2.2  Groundwater Significance Criteria

Impacts to groundwater resources or springs caused by project activities would be considered significant if the following were to occur:

1. The natural flow or level of groundwater to existing local springs, seeps, flowing artesian wells or permitted water supply wells is interrupted or reduced, regardless of use or non-use.

2. Groundwater quality in any aquifer is degraded such that it can no longer be classified for its current use(s).

3. Accidental spills of fuels, liquids, chemicals, or hazardous material affects the quality of groundwater.

### 4.4.3  Direct and Indirect Impacts

#### 4.4.3.1  Direct and Indirect Impacts Common to All Alternatives

There are 2,000 proposed new well pad locations (CBNG and Conventional) under all action alternatives. Under the action alternatives, impacts of individual well pads, roads, pipelines and other infrastructure would have the same individual impacts where mitigation is the same. Under Alternative C additional development protection measures will generally result in reduced effects.

All action alternatives would require the pumping of water from coalbeds in the upper Mesaverde Group from the Almond formation. This would result in lowering the hydrostatic pressure head, creating associated impacts to water resources. These impacts would occur in slightly different locations and at different times depending on the alternative assessed.

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

## Surface Water Impacts Common to All Action Alternatives

The main impacts to surface water resources are the removal of vegetation, increased soil surface exposure, mixing of soil horizons, soil compaction and decreased infiltration capacity, loss of topsoil productivity, and increased susceptibility of the soil to wind and water erosion. Therefore, the primary impact of the proposed project on surface water resources is increased surface runoff, erosion, and off-site sedimentation that would cause channel instability and degradation of surface water quality in some locations.

Martherne (2006) found increased sediment production from well pad locations and confirmed that roads and well pads can provide conditions for focusing runoff and locally increasing erosion. Based on field observations, the author found that roads on sideslopes facilitate the erosional process in three ways: (1) roads cut across and collect runoff from previously established drainages (2) roads, where they are cut into hillsides or into the land surface, provide focal points for the initiation of erosion; and (3) roads also provide conduits for sediment transport. Once mobilized, a portion of this sediment (resulting from each erosional processes) will move into channels in pulses that occur in relation to storm events. Some of this sediment will be temporarily stored in drainage bottoms and on the hillslope and a portion will be stabilized by vegetation and not travel to the drainage. The amount of sediment that will be added to specific drainages can only be estimated based on site-specific information available after annual planning and on-site inspections.

Changes in upland runoff, hydrology, or increased sedimentation could reduce habitat for non-game fish, coldwater fish, and aquatic life, especially in the Muddy Creek Drainage. Habitat for non-game species includes pools and riffles. With increased sediment loads, riffles can become silted in and pools can fill, degrading the habitat. Changes in upland runoff conditions can increase peak flow conditions and may reduce base flows critical for maintaining late season pool habitats.

Waters of the U.S. are managed in section 404 of the CWA and permits from U.S. Army Corps of Engineers (ACOE) may be required for dredge and fill activities. All notification and construction criteria will be adhered to and the ACOE will be consulted when questions about the permit use arise. The Great Divide Basin is unlikely to have any waters of the U.S. because it is internally drained and has no major water based recreation sites. Standard mitigation requiring avoidance of surface waters, riparian areas, and wetlands (See appendix H) will limit surface disturbance in these areas on public land to linear features such as road and pipeline crossings. Activities that modify the morphology of stream channels are also subject to regulation by the State of Wyoming. Permitting for construction activities in these areas would take place during the annual planning process and copies of notices or permits may be required of the operator before construction is approved (See appendix H). The effected environment in special aquatic sites and wetlands are discussed in greater detail in section 3.5.

## Surface Hydrology Related to Soils Data and Topography.

Soils with the potential for severe water erosion comprise about 96 percent of the ARPA (261,000 acres of slight/severe, moderate/severe, and severe/severe categories, see tables 3-10 and 3-11). Tables 3-10 and 3-11 summarize the data for the following five categories and their individual ranking criteria for the contiguous ARPA: water erosion, wind erosion, runoff potential, topsoil rating, and road rating. Because so much of the ARPA has the potential for severe water erosion, soil disturbance both during construction and during production can be expected to result in hillslope and channel erosion under each action alternative above background conditions. Erosion in areas with sensitive soils can be either catastrophic or simply chronic. Surface disturbance

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

combined with sensitive soils and highly variable precipitation would result in sudden and deeply incised erosion in the form of rilling and gullying, even in relatively gentle terrain. This would occur under all action alternatives in some locations.

Soil characteristics such as depth, permeability, runoff rate, water capacity, and susceptibility to erosion vary widely. The diversity of soil parameters would require a broad spectrum of reclamation techniques. In addition, low annual precipitation and wind and water erosion could make successful reclamation in the ARPA difficult to attain. Therefore, the overall potential for successfully stabilizing disturbed soils is poor to fair.

Because specific sites have not yet been identified for wells, pipelines, and roads, tables 3-10 and 3-11 indicate a likelihood of encountering soil limitations that would require special attention. For example, large portion of the ARPA would likely experience difficulties during revegetation due to the presence of excess salts in the soil or poor/fair topsoil rating (maps M-9 and M-13).

**Reclamation Success and Roads.** It is important to note that even successful reclamation (appendix B) does not necessarily return an area to its previous function for surface hydrology. For example, re-establishing 80 percent of pre-disturbance groundcover in five years would be considered successful. Background groundcover amounts can be estimated at 20-65 percent (groundcover would include rocks and litter in addition to vegetation, i.e. total cover). Perennial forbs, brush, and trees generally are more effective at reducing rain splash and can provide structure on the soil surface that can reduce surface runoff energy, but are generally not required for reclamation. Anderson (1975) in a study of 23 watersheds found that conversion of a steep forest and brush lands to a grassland had multiplied sediment yields by five times. Although this is an extreme case, it points out that not all vegetation is the same hydrologically. Where interim reclamation has been successful, sagebrush and other brush regeneration will occur within the project life; however, many areas would not return to pre-disturbance function until 30–50 years after final reclamation.

New access roads would be constructed for the purpose of natural gas field development. There are three types of roads identified for the project. Collector and local roads are to access multiple well pad locations and resource roads are to access individual well pads. As described in the applicant committed measures (appendix K), roads would be designed to BLM Manual 9113 standards to minimize disturbance, and all surface disturbance would be contained within the road right-of-way (ROW). Where drilling is non-productive, disturbed areas, including the well site and new access roads, would be reclaimed to the approximate landform that existed prior to construction. If drilling is productive, access roads to the well site would remain in place for well servicing activities. Partial reclamation would be completed on segments of the well pad and access road ROW that are no longer needed.

Under all alternatives road construction would modify the surface hydrology by intercepting and concentrating surface runoff, and in certain instances (e.g., a road cut into a hillside) intercept and alter groundwater flow. Road surfaces decrease infiltration and concentrate flows. Roads would also contribute sediment to downstream drainages from the road surface and from surface disturbance based on construction and road maintenance activities. Properly designed roads would be more able to shed water in a non-erosive manner and this would reduce impacts compared to roads that are improperly or inadequately designed. However, even with proper design using BLM Manual 9113 standards, there would be local impacts in terms of erosion and changes in hydrology. Where roads are in steep country or road densities are

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

great, these impacts can be expected to include accelerated erosion and increased runoff and could alter downstream channels.

During drilling and completion operations (according to appendix K, table K-2), roads could be used by about 13 heavy trucks per week for about 2 weeks, and about 5 to 10 small trucks per day. During production, resource roads would be used less often (maybe 1 small truck per day) and would occasionally accommodate heavy trucks for water disposal, reclamation activities, and well maintenance. This means that road design needs to allow for heavy truck traffic and at least one visit per day in all kinds of weather. This amount of road use would likely result in dust production from the road base and would increase wind-born erosion from the project area. Road design and maintenance is therefore critical to reduce impacts from the project.

Site erosion and off-site sedimentation from pad sites would be reduced by re-vegetating unused portions of the pad sites in the first appropriate season (fall or spring) after drilling, and providing surface water drainage controls, such as berms, sediment collection traps, diversion ditches and erosion stops as needed. These measures would be described in individual APDs.

Under all action alternatives, local impacts would include accelerated erosion and increased runoff leading to increased sedimentation and changes in hydrology from surface disturbance for the construction of pad sites, roads, and pipelines. Depending on the alternative considered, these impacts could be significant based on the criteria set forth in section 4.4.2.

**Surface Water Quality Impacts from Salinity Offsets.** Surface discharge at the Cow Creek Pod can be expected to continue through the life of the project under all alternatives according to the WYPDES permits #WY0042145 and #WY0035858, which allow for 1.34 tons/day of salt and 180,600 gallons/day of total discharge. As an offset for an oil well (as defined by the Colorado River Salinity Control Forum) the permit allows for the same volume of water and salt as was discharged by the plugged oil well (#1X-12).

Discharge is into a reservoir on a tributary to Dry Cow Creek; this reservoir would be improved and maintained according to this use. The discharge permit has been modified to allow for water releases from the reservoir in a similar manner as what occurred historically when #1X-12 was in operation; however, volume restrictions would still be in place. The permit would have a new point of compliance upstream of the confluence with Cow Creek. This point of compliance would be monitored for flow, and according to the permit it should only have water during storm events, that is, in response to natural precipitation and not a result of project discharges because Dry Cow Creek is ephemeral.

The Colorado River Salinity Forum established by the 1974 Colorado River Basin Salinity Control Act (Public Law 93-320) regulates the amount of salt load that can enter the Colorado drainage basin. Current loads approved by the state exceed the 1-ton-per-day limit because of the offset value of plugging #1X-12. Allowing for offsets with volume restrictions limited to historical levels with flowing wells is not expected to have any significant impacts, because project-related discharges would be almost identical to current conditions.

### Groundwater Impacts Common to All Alternatives

The primary effects on groundwater resources would be associated with the removal of groundwater contained in coal bed aquifers and the subsequent recharge of aquifers through injection of produced water. The removal of groundwater from the coal aquifer results in the reduction of the hydraulic pressure head. The lowering of hydraulic pressure head or water

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

levels in an aquifer is also referred to as drawdown. The effects of producing water from the Almond Coal Beds would result in progressive drawdowns within nearby wells completed in the same coal bed aquifers or the interruption of groundwater flow to existing nearby springs, seeps, and flowing artesian wells receiving groundwater from the same coal aquifer. Another impact of the proposed project on groundwater resources would be an increase in the hydraulic pressure head in the aquifers receiving the injected coal bed water.

A predicted total project volume of produced water in the best success scenario for the CBNG development would be 250,000 to 450,000 barrels of water per day (bwpd) for approximately six to eight years. However, it should be noted that these volumes are estimates. With the need to remove waters from sands adjacent to the targeted coalbeds, which appear to be in hydrologic connection (See section 3.4.5), these volumes could be higher. Produced water from this project would be disposed of through 166 injection wells completed in the Hatfield, Cherokee or Deep Creek sands in the Haystack Mountains Formation within the Lower Mesaverde Group and underlying the Allen Ridge Formation. Assuming the lowest estimate for injection well efficiency (5,000 bwpd), 166 injection wells should handle 830,000 bwpd (nearly two times the highest estimate of water disposal). The water would be injected into these wells for the life of the project. No cumulative impacts to the target members of the Lower Mesaverde Group would likely occur as a result of this project. If injection capacity is insufficient or water disposal needs are significantly greater than anticipated, additional injection wells or injection wells in other formations may need to be developed.

Groundwater could also be affected during drilling operations. If they were to occur, improper casing and cementing of wells, undetected spills, or leachate from produced water or mud pits could introduce contaminants into the groundwater. Chemicals used for production drilling could cause local contamination of soils and groundwater if not managed properly. Construction of drilling pads, proper disposal practices, proper well casing and cementing, and recycling of drilling fluids would be in accordance with BLM guidelines and should minimize effects on groundwater quality. If accidental spills occur, they would be addressed through implementation of the Hazardous Materials Management and Release Contingency Plans (appendix C) and Spill Prevention Control and Countermeasures (SPCC) plans developed in accordance with 40 CFR Part 112 (appendix K) for the Atlantic Rim project.

Drinking water sources near the ARPA include a groundwater well field for the town of Rawlins in the upper portion of the Sage Creek watershed, the Little Snake River for the towns of Baggs, Dixon, Savery and Slater, and shallow domestic groundwater wells for rural ranch houses. The loss of hydraulic head in aquifers feeding groundwater sources for domestic wells along the eastern boundary of the project area is the most likely potential impact to these resources; however no domestic water wells are listed in the SEO database along the eastern boundary of the project area. None of the known drinking water sources for municipalities are likely to be impacted from the project. Rawlins city wells located to the east of the Mesaverde Group outcrop and are likely completed in formations below the Steel Shale (a significant aquatard) which underlies the Mesaverde Group. Because only 3 percent of the ARPA is in the Savery drainage upstream of Baggs, Dixon, Savery, and Slater, it is unlikely that the project will impact the quality or quantity of water available for these towns.

Appropriate measures would be taken during project development to prevent impacts on existing groundwater quality during dewatering. Given the present state and federal regulations regarding general water quality, as well as salinity in the Colorado River Basin, surface discharge of produced water is not anticipated. Water would be used during construction,

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

drilling activities, and dust abatement subject to state permits. Most of this water would come from the CBNG wells; however, some may come from sources that could impact surface resources. Therefore, water to be used for construction and dust abatement was estimated and depletions consulted on with the US FWS in regard to the Upper Colorado Endangered Fish Recovery Program. Water produced from coalbeds is assumed to be unconnected to surface water based on isotopic analysis, groundwater modeling and water quality characteristics.

Accidental surface discharge could impact nearby surface water quality by increasing salinity levels. The extent of any impact would depend on the quality and quantity of the produced water and any fluids being released and would be addressed with the implementation of the Hazardous Materials Management and Release Contingency Plans (appendix C).

**Water Disposal Using Injection.** Produced water would be disposed of in underground injection wells, except in the case of the Cow Creek Pod that has a surface discharge WYPDES permit. The conditions of this permit allow for the same volume of salt and water to be discharged as would have occurred had not well #1X-12 been plugged. Produced water would also be used for drilling, construction, dust abatement, and other project-related water uses subject to approval from the State of Wyoming for this use. Water could also be used in closed-system stockwatering tanks. None of these uses would be for water disposal needs; primary water disposal would be through injection wells.

Underground disposal of produced water would be accomplished using an estimated 166 deep injection wells (appendix K). Depth of the injection wells is expected to range from 3,200 to 6,400 feet (e.g., Hatfield, Cherokee, or Deep Creek sands within the Haystack Mountain Formation). All injection wells would have permits prepared and submitted to the WOGCC. The only effect on the injection formations would consist of an increase in the hydraulic head emanating from the injection well, which would dissipate with distance away from the well bore.

Produced water would be collected in buried polyethylene pipelines for transport to an injection well. Centrifugal pumps, reciprocating pumps, filter systems, and tanks at the disposal facility would be used to remove solids from the water stream and to pump the water at pressures sufficient to allow downhole disposal. In the event that an injection well ceases to operate properly due to formation over-pressuring or mechanical failure, the operator must still remain in compliance with all applicable regulations governing the operation of the produced water disposal system. Compliance options available to the operator include curtailing or halting the rate of water production or routing the discharge to additional injection wells.

Each deep injection well would have an approximate minimum injection capacity of 5,000 barrels per day (bbls/day) and a maximum injection capacity of 15,000 bbls/day. A predicted volume of produced water in the best success scenario from the CBNG wells would be 250,000 to 450,000 bbls/day for approximately 6 to 8 years. The volume of water would consistently decline as the coalbeds are dewatered.

The deep injection wells would be drilled, cased, and cemented from total depth (approximately 50 feet below the base of the Hatfield, Cherokee, or Deep Creek sands) to the surface. These sandstone formations are isolated above by the Lewis Shale and below by the Baxter or Steel Shale, which are thick, competent marine shales that are effective barriers to groundwater flow. The deep sandstones would be tested to evaluate suitability for disposal before any water is injected. Maximum pressure requirements to prevent initiation and propagation of fractures through overlying strata to any zones of fresh water have also been determined and would be

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

regulated by the State of Wyoming and the BLM. The results of the open-hole log and injectivity test would be provided to the regulatory agencies. The injectivity tests would be used to determine the fracture pressure limits that would be imposed to ensure the overlying and underlying shale is not breached. The fracture gradient of the shale aquitards that overlie and underlie the injection horizons would not be exceeded based on injectivity tests and applicable permit limits. Thus, all injected water would be contained in the injection formations and would not migrate vertically.

**Groundwater Quality**. Well drilling and completion activities are not likely to impact existing groundwater quality if the project is in compliance with On-Shore Oil and Gas Order No. 2. These guidelines specify the following:

> ...proposed casing and cementing programs shall be conducted as approved to protect or isolate all usable water zones, potentially productive zones, lost circulation zones, abnormally pressured zones, and any prospectively valuable deposits of minerals. Any isolating medium other than cement shall receive approval prior to use.

However, poor drilling and completion techniques could result in degradation of groundwater quality due to the mixing of variable quality waters from different water-bearing strata that happen to be pierced by the borehole. The magnitude of mixing, if any, which would occur during the relatively short period of time during drilling, would be relatively small. In addition, due to the state-of-the-art drilling and well completion techniques, the possibility of degradation of groundwater quality in any aquifers is low.

Usable water is defined as groundwater with a TDS of 10,000 parts per million or less encountered at any depth. To comply with the order, wells must be completed such that either usable water is isolated from unusable water, or that unusable water is isolated from usable water through the use of cementing and other proven technologies. Assuming compliance with this order, no contamination of usable groundwater would likely occur. Well drilling and completion as proposed in chapter 2 appears to comply with the Onshore Order No. 2.

Injection of the CBNG-produced water is not expected to result in any deterioration in groundwater quality within the injection formations. The proposed injection formations have been water quality tested to evaluate suitability for disposal, and the results show that groundwater to be of lower quality (higher TDS) than the produced water from the coalbeds of the Almond Formation. Sandstone strata of the injection formations are isolated above and below by competent shale barriers that would likely prevent the infiltration of the injected water into any overlying fresh water zones. BMPs would be implemented to ensure surface spills of produced water do not occur. All water disposal plans would be permitted with the state agency that regulates the facilities, including but not limited to the WOGCC and WDEQ–WQD.

**Springs and Seeps**. The ARPA contains numerous springs and seeps which are important local water sources for livestock and wildlife. At least 70 active springs are contained within the ARPA. Prolonged drought in southern Wyoming has reduced the number of seeps, especially in the Sand Hills portion of the project area, but these groundwater resources are expected to recover with cessation of drought conditions.

Springs in the ARPA occur primarily at the contact between the Upper Cretaceous Mesaverde Group and the overlying Tertiary-age deposits of the Browns Park Formation. Springs also

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

occur within the outcrop area of the upper Mesaverde Group itself and at its western contact with the Lewis Shale.

Tertiary deposits in the ARPA near the surface are recharged by direct downward percolation of precipitation and snowmelt. Deep aquifers in the ARPA are recharged by these processes in outcrop and subcrop areas and from slow leakage from overlying and underlying aquifers. The extent of the Tertiary units (Browns Park and North Park Formations) that lie atop the eroded, dipping Cretaceous units indicates a probable recharge of the underlying Mesaverde Group. Should groundwater withdrawals from upper Mesaverde Group coalbeds in the ARPA result in water-level declines that propagate updip to their subcrop areas beneath the overlying Tertiary units, the Proposed Action could affect some of the Cretaceous/Tertiary contact seeps and springs. However, the predicted groundwater drawdown analysis for this project does not indicate groundwater level declines would extend updip to the coal seam subcrop areas. Therefore, it is unlikely that the proposed project would have a dewatering effect on the overlying Tertiary deposits, which would diminish flows from the contact springs and seeps.

Methane seeps could possibly develop in the outcrop region of the Mesaverde Group as a result of this project. These seeps could contaminate shallow groundwater sources and may also cause the death of vegetation in limited areas. The number or location of these seeps is impossible to predict, therefore monitoring would be established to evaluate this impact (See section 4.4.5). These seeps have been documented with CBNG development in the San Juan Basin along with other areas of CBNG development. In the San Juan Basin many of these seeps, even before production, occurred in the outcrop regions of the producing formations.

Groundwater monitoring wells indicate that the reduction of pressure or hydrostatic head within the upper Mesaverde Group will not be isolated to the coalbeds, but will likely extend to Mesaverde sandstones. Artesian conditions in the upper Mesaverde Group may be responsible for the surface expression of springs and seeps located along the Mesaverde and Lewis Shale contact, along faults, or within the Mesaverde Group itself. Impacts may include the loss or reduction of flow in these systems, and would depend on individual spring dynamics. Eventually the upper Mesaverde will recharge with precipitation and pressures will recover. Effected springs and seeps could take 50 years or more to recover. The Lower Mesaverde Group, (Haystack Formation) is the location of the injection zones and therefore could be impacted by increased pressure. Communication of these zones will dictate the feasibility of injection and will be determined by Wyoming injection well permitting.

As described in section 3.4.2.1 although there are numerous perennial springs that occur in the headwaters of Muddy Creek, these springs are not likely adding to the baseflow of Muddy Creek, due to evapotranspiration and conveyance losses. This is evident by the intermittent nature of flows in Muddy Creek. The discharge that makes it to the Little Snake River is primarily from snowmelt or individual precipitation events. Therefore even with loss of flow in springs and seeps, the reduction of pressures in the upper Mesaverde Group is unlikely to result in depletions to the Muddy Creek system.

**Flowing Wells.** There are at least 16 flowing wells in the project area have been developed to supply water to wetland areas and/or stock watering facilities and may be impacted by reducing flow volumes or changing water quality characteristics. The chemistry of water sampled from at least one of the flowing wells in the ARPA (Duck Flow 2 well, see table 3-29) indicates that the groundwater may be from the Almond Formation coalbeds. Many of these flowing wells are abandoned exploratory oil or gas wells drilled in the 1950s or 60s, that had some portion of the

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

casing fail adjacent to strata under artesian pressure. It is likely that some of these flowing wells have casing failures adjacent to Almond Formation coalbeds (many of the flowing wells produce methane gas along with water, methane is commonly associated with coalbeds). The Almond Formation coalbeds are targeted by this project for production and therefore these flowing wells may be impacted by reduced flow volumes. The groundwater model predicts a 3–30 percent decrease in flowing well volumes by 2050, with full recovery in the year 3000 (WWC 2006). Individual wells may respond very differently depending on the depth and extent of the casing leak or leaks for individual wells.

**Water Rights Related to Groundwater.** As discussed in chapter 3, the SEO records identify at least 90 active permitted, non-CBNG-associated groundwater rights in the ARPA. Of the 90 permitted wells and springs, 58 reported positive yields, many of these are developed within the Mesaverde Group and/or are associated with the Browns Park Formation. There are also productive wells developed in the Lewis Shale that may be the result of flows from the Mesaverde Group. Groundwater currently in use in the project area that is obtained from Tertiary-age units (i.e. contact springs from sources in the Browns Park Formation) should not be affected by groundwater level declines in the Mesaverde Group coalbeds. However, permitted water rights in the project area that obtain water from the Cretaceous-age coalbeds or other formations in the Mesaverde Group that are dewatered by the proposed project would likely be affected by the resulting groundwater level declines.

A numerical groundwater flow model was used to predict drawdown impacts to the groundwater system under the Proposed Action. Modeling was warranted because of the large extent of, variability in, and cumulative stresses imposed by development of CBNG on the coal bed aquifers of the upper Mesaverde Group. The assumptions used to support the predicted groundwater drawdown analysis, the computer model used in the analysis, and the predicted drawdown impacts for this project are described in detail in the Atlantic Rim EIS Ground-Water Modeling Technical Support Document (WWC 2006).

### Regional Groundwater Model Description and Findings

A numerical groundwater flow model was used to predict drawdown impacts to the groundwater system under the Proposed Action. Modeling was necessary because of the large extent of, variability in, and cumulative stresses imposed by development of CBNG on the coal bed aquifers of the upper Mesaverde Group. The assumptions used to support the predicted groundwater drawdown analysis, the computer model used in the analysis, and the predicted drawdown impacts for this project are described in detail in the Atlantic Rim EIS Ground-Water Modeling Technical Support Document (WWC 2006).

The modeling consisted of three separate tasks: calibration and verification, simulation and sensitivity analysis. After a steady state model was calibrated with the goal of matching a know potentiometric surface with modeled results. CBNG wells were then added to the model and calibrated with know pumping rates of CBNG wells. A sensitivity analysis was performed on five modeling parameters: drain conductance, global hydraulic conductivity, hydraulic conductivity within layers 2 and 4, recharge rates, and storage coefficients (WWC 2006).

The regional groundwater flow model for the ARPA is based on the geology and hydrogeology described in chapter 3. The groundwater model encompasses the western flank of the Sierra Madre and extends into the Washakie Basin roughly 30 miles west of the ARPA. This model cannot be used to predict results at a localized scale and any attempts to do so would require

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

additional data and additional modeling efforts. The Atlantic Rim Groundwater Model Technical Report (WWC 2006) includes a detailed discussion on calibration of the groundwater flow model. The hydrogeologic model code selected was the USGS Three Dimensional Finite Difference Modular Groundwater Flow Model, (MODFLOW) (MacDonald and Harbaugh 1988) and the pre/post processor, Groundwater Vistas (Rumbaugh and Rumbaugh 2002).

### Hydrogeologic Groups in the ARPA

Within the ARPA, the Mesaverde Group strata dip westward off the Sierra Madre uplift at about 22 degrees. The thickness of the Mesaverde Group ranges from 2,000 to 3,000 ft. The Mesaverde Group consists of four members, which in ascending order are the Haystack Mountains Formation, the Allen Ridge Formation, The Pine Ridge Formation, and the Almond Formation. The uppermost member, the Almond Formation, contains numerous carbonaceous shale intervals and coalbeds. The lateral continuity of these coal units is considered sufficient such that they act as a regional aquifer system. Although individual coalbeds may split and merge, there is sufficient hydraulic communication, on a regional scale, to allow movement of groundwater.

The coal-bearing Almond Formation ranges in thickness from 400 to 600 ft and occurs at depths of less than 100 ft in the center of the ARPA to about 1,800 ft below ground level along the western boundary. The Lewis Shale, which overlies the Almond Formation, reaches a thickness of 2,700 ft in the Washakie Basin and is consistently more than 2,000 ft thick in the ARPA except where it has been removed by erosion. The Lewis Shale is a low permeability unit considered to be a regional confining layer. Unconformably overlying the Cretaceous sediments is the Tertiary-age Browns Park Formation. Contact springs are relatively common at the base of the Browns Park Formation where it is in contact with the less permeable units of the Mesaverde Group. Due to the lack of contact between the Almond Formation and the Browns Park Formation, groundwater within the Browns Park could not be impacted by groundwater withdrawals from the Almond; therefore, the Browns Park Formation was not included in the model.

### Assumptions for Groundwater

For the purpose of the modeling study, the primary unit of interest is the coal-bearing Almond Formation and Pine Ridge Formation of the Mesaverde Group. Specifically, the coalbeds within the Almond Formation and the sands in the Pine Ridge Formation are the aquifers of interest. Overlying the Almond Formation is the Lewis Shale, a regional confining layer. Underlying the Almond Formation is the Pine Ridge Formation and beneath the Pine Ridge is the Allen Ridge Formation, which is also considered a confining unit. The Almond Formation and the underlying Pine Ridge Formation are primarily recharged from natural precipitation infiltration along their outcrop on the western flank of the Sierra Madre. The natural groundwater flow direction is generally westward, down dip toward the basin center. Groundwater within the Almond coals is unconfined near outcrop recharge areas, but rapidly becomes confined away from the outcrop. For modeling purposes, the overlying Lewis Shale and underlying Allen Ridge Formation are sufficiently impermeable to prevent leakage into or out of the Almond and Pine Ridge Formations. Infiltration of surface water that occurs in the small ephemeral and intermittent streams in the area can effectively be ignored in the model, as the streams are predominately located within the overlying Lewis Shale. Therefore, little if any recharge can be expected anywhere other than the outcrop area.

A number of flowing wells potentially completed within the Almond Formation are located throughout the ARPA. Potentiometric data, albeit sparse, was compiled for the Almond coals in

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

the ARPA and eastern Washakie Basin. A potentiometric surface map of the Almond Formation under current conditions is included in the Atlantic Rim groundwater model Technical Report (WWC 2006). Hydraulic gradients are steeper near the outcrop and become less steep into the basin. In addition to the potentiometry data, drill stem test data and age-dating Almond coal groundwater indicate that groundwater velocities under natural gradient are extremely low.

The primary physical groundwater flow boundary is the Mesaverde Group outcrop to the east. Near the center of the Washakie Basin, which would be along the western portion of the model domain, evidence suggests that there is little, if any, groundwater flow in the westward direction. Within the model, the western boundary is represented by a no flow boundary. The north and south boundaries are not marked by any natural geologic features, but are located far enough from the proposed production wells in the ARPA that their influence on the wells would be minimal. For this reason, the north and south edges of the model are artificial boundaries.

There is very little measured hydraulic conductivity data available for any of the five modeled layers within the ARPA. The hydraulic conductivities assigned to each layer were based on information that is presented in the Atlantic Rim groundwater model Technical Report (WWC 2006). To account for anisotropic conditions in the vertical direction, the vertical hydraulic conductivity would be 10 times less than the horizontal conductivity. Within the model, the hydraulic conductivity of the sand layers would vary based on the average hydraulic conductivity at burial depth. Like the sands within the Almond Formation, burial depth is assumed to affect hydraulic conductivity for the coals, with a lower value for the deeper coals and a higher value for the shallower coals. Coals would have slightly smaller hydraulic conductivity values than the sand units, but values would be varied with depth similar to the way hydraulic conductivity values for the sand units were varied. At this time, there is very little reliable storativity or specific yield data for the modeled layers; therefore, values were based on USGS estimates, which are based on the estimated thickness of the aquifers (WWC 2006).

The groundwater model necessarily simplifies the geology that is apparent in the Upper Mesaverde Group. For example, there are three monitoring wells in the ARPA that were established during the interim drilling period and will be maintained through the life of the project. These monitoring wells measure pressure in the producing coalbeds and sand stone aquifers directly above and below the coalbeds. Groundwater monitoring data appears to confirm that the coalbeds and sand layers in the upper Mesaverde Group are hydrologically connected. Locally, the hydraulic connection between the coal layers and sand layers could potentially be enhanced if the integrity of the confining layer is compromised (e.g., by poorly plugged exploratory drill holes). Leakage from the sands into the coal production layer appears to be occurring as water levels in the coalbeds are lowered as a result of dewatering. It is likely that many of the coalbeds are in juxtaposition with overlying and/or underlying sandstones, because much of this area is faulted. This means that the coalbeds within the upper Mesaverde Group are not isolated from sands in the Upper Mesaverde Group. There is hydrologic connection predicted between layers 1, 3 and 5; therefore the model construction allows for this complexity to some degree, but can not model the spatial variability in transmissivity between layers that most likely exists.

### Model Construction

The hydrogeologic model code selected was the USGS Three Dimensional Finite Difference Modular Groundwater Flow Model, MODFLOW (MacDonald and Harbaugh 1988) and the pre/post processor, Groundwater Vistas (Rumbaugh and Rumbaugh 2002). MODFLOW is a

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

model code widely used and accepted by regulatory agencies and the BLM. Seven MODFLOW packages were used in the Atlantic Rim groundwater model (WWC 2006).

The model grid is oriented parallel to the geologic strike of the Almond Formation outcrop, which is generally north-south. The model area encompasses some 2,866 square miles. The regional model consists of five layers. The top layer represents the Almond Formation sandstones, the second layer represents the clay and siltstone parting below the Almond sandstones, the third layer represents the production coalbeds within the Almond and Pine Ridge Formations, the fourth layer represents the clay and shale partings below the coalbeds, and the fifth layer represents the Pine Ridge Formation. As mentioned above, the monitoring wells indicate that there may be more hydraulic communication than represented by the model, between the producing formations and the upper Almond and Pine Ridge sandstones, modeled by layers 1 and 5. The Lewis Shale acts as a confining layer above the Almond Formation and the Steel Shale acts as a confining layer below the Pine Ridge Formation. The model area is bounded on the east by the outcrop of the Almond Formation, on the west by a no-flow boundary, and due to the lack of natural geologic boundaries, prescribed constant head cells bound the north and south portions of the model domain.

The hydraulic parameters within the groundwater model area include hydraulic conductivity, storage, and recharge. Hydraulic conductivity is largely unknown in the model area and values assigned within the model were based largely on information obtained from testing conducted in oil and gas fields outside of the model area by the oil and gas industry, limited testing on coals within the ARPA, and testing of coals within the Powder River Basin in Wyoming. Based on borehole logs within the ARPA, the bulk of the Almond Formation and Pine Ridge Formation is generally composed of sand, with the coals, siltstones, and shales making up a small portion of the formations. Within the model, the hydraulic conductivity of the sand layers would vary based on the burial depth (i.e., values decrease with depth). The hydraulic conductivity values assigned to the shales and siltstones were much lower than that of the sands and coals. Storage coefficients within the model were estimated based on the modeled thickness of each layer. Due to instabilities in the model based on the steep (22 degree) dip of the Mesaverde group, some of the modeled thicknesses do not correspond to actual thicknesses of formations. This decision is unlikely to impact the results of the model. To account for anisotropic conditions in the vertical direction, the vertical hydraulic conductivity was estimated to be 10 times less than the horizontal conductivity ($Ky = Kx = 10Kz$).

The principle source of recharge is natural precipitation infiltration at the Mesaverde Group outcrop on the western flank of the Sierra Madre. Within the model, recharge would occur within the upper portion of the Mesaverde Group containing the Almond Formation and Pine Ridge Formation and the total recharge would be 3–9 percent of the average annual precipitation.

Groundwater flow into the Washakie Basin is very sluggish, if it even occurs at all. Based on this assumption, it follows that there are no natural drains within the interior portion of the basin. The only natural drains to the system occur near the contact between the upper Mesaverde Group and the overlying Lewis Shale as springs. These contact springs were simulated in the model as drains inserted into the top layer. The only other drains within the model area are flowing wells completed in the Almond Formation. The flowing wells are discharging from the same coalbeds that are proposed to be produced; therefore, they were inserted into layer 3. The locations and elevations of the springs and flowing wells were determined from U.S.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Geological Survey mapping and Wyoming SEO records. Spring discharge rates were also determined from SEO records or assumed to be similar to that of nearby measured spring flows.

### Limitations of the Model

Many of the assumptions and limitations within the modeling software are the result of the inaccuracies inherent in modeling a natural system and are generally similar for all modeling software. Limitations and assumptions specific to this modeling effort are primarily due to the paucity of physical and hydraulic characteristics of the aquifers and confining units in the regional model area, as described in detail in the Atlantic Rim groundwater model Technical Report (WWC 2006).

### Simulation of the Projected Effects

The simulation portion of the model replicates the proposed development within the ARPA. Presently, the most severe development scenario projects that a maximum of 1,800 CBNG wells would be completed within the ARPA. Current production predictions estimate that the wells would produce water for 20 to 30 years, so the average life of water production for each well was 25 years and each drain simulating a well was left active for 25 years within the model. The development scenario assumes that wells within the interior portion of each unit would be developed first, with wells expanding concentrically from the center of the unit out to the edges of the ARPA boundary. After a drain was turned on, it was left on for 25 years. The modeled simulation period extends in 5-year increments from 2005 to 2050, with the last production well being turned off in 2050. Drawdown contours from the projections within the five modeled layers at the end of each 5-year period are shown in figures included in the Atlantic Rim Groundwater Model Technical Report (WWC 2006).

The results of the simulation show that the drawdowns within the coalbeds (layer 3) are large as compared to the drawdowns projected within the overlying and underlying sands (layers 1 and 5, respectively). The maximum drawdown and areal extent of drawdown within the Almond Formation coal (layer 3) is projected to occur in 2030. Drawdown contours projected to occur for layers 3 (coal package), 1 (overlying sandstone package), and 5 (underlying sandstone package), respectively, in year 2030 are depicted on maps M-35, M-36, and M-37. As shown, maximum cumulative drawdowns in the coal are greatest at the production well locations, although drawdowns do not propagate down dip to the west. In fact, no drawdowns in the produced coal are expected to occur beyond the western boundary of the ARPA. Coal drawdowns are projected to propagate somewhat more in the updip direction toward the Almond Formation's outcrop, although would not actually reach the outcrop. Based on the monitoring well data these impacts to layers 1 and 5 may be more significant then predicted by the model.

While the drawdowns within the coalbeds are large close to the producing wells, the water discharge rate decline for each well is not as rapid as expected. Table 4-6 presents the average per well discharge rate at the end of each 5-year period between 2010 and 2050. Table 4-7 depicts the modeled impacts to the various existing flowing wells within the ARPA, and as shown, impacts to the flowing wells are predicted to be minimal. Impacts to the contact springs are also predicted to be minimal. In year 2005, the modeled spring discharge was approximately 88,800 cubic feet per day for the entire model area. In year 2050, the modeled spring discharge was approximately 85,700 cubic feet per day for the entire model area.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Table 4-6.    Average per Well Discharge Rates in Five-Year Increments during the Simulation Period.

| Year | Number of Wells in Production | Average Discharge Per Well (gpm) |
|------|-------------------------------|----------------------------------|
| 2005 | 48 | 30.1 |
| 2010 | 989 | 32.4 |
| 2015 | 1368 | 34.2 |
| 2020 | 1651 | 33.7 |
| 2025 | 1720 | 32.9 |
| 2030 | 1682 | 32.9 |
| 2035 | 904 | 34.4 |
| 2040 | 422 | 33 |
| 2045 | 105 | 22.9 |
| 2050 | 8 | 7.8 |

Table 4-7.    Impacts to Flowing Wells in Year 2050.

| Latitude | Longitude | Row | Column | Year 2000 Modeled Flow Rate (gpm) | Year 2050 Modeled Flow Rate (gpm) |
|----------|-----------|-----|--------|-----------------------------------|-----------------------------------|
| 41.0894 | 107.4968 | 114 | 190 | 30 | 27.9 |
| 41.0725 | 107.5053 | 115 | 188 | 28 | 26 |
| 41.0887 | 107.4782 | 114 | 195 | 2 | 1.4 |
| 41.1985 | 107.5103 | 95 | 186 | 15 | 12.9 |
| 41.2613 | 107.5798 | 84 | 167 | 2 | 1.6 |
| 41.6022 | 107.4658 | 22 | 199 | 3 | 2.2 |
| 41.2263 | 107.5572 | 90 | 173 | 21 | 20.4 |
| 41.1946 | 107.5880 | 96 | 165 | 5 | 3.5 |
| 41.1902 | 107.5675 | 97 | 171 | 5 | 4.0 |
| 41.3024 | 107.6040 | 76 | 161 | 21 | 19 |
| 41.3240 | 107.6160 | 73 | 157 | 9 | 8 |
| 41.3493 | 107.6245 | 68 | 155 | 24 | 21.4 |
| 41.3495 | 107.5956 | 68 | 163 | 8 | 7.2 |
| 41.3815 | 107.5660 | 62 | 171 | 9 | 8.6 |

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Map M-35.    Drawdowns within Layer 3 for Year 2030.



## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Map M-36.    Drawdowns within Layer 1 for Year 2030.



## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Map M-37.     Drawdowns within Layer 5 for Year 2030.



# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

After water production starts to decline, recovery of water levels in the coals will begin. Based on the projected schedule of field development, all production is expected to end by 2050. In order to simulate recovery, all drains except for the ones simulating the contact springs were shut off by 2050. The model was then run for an additional 950 years to model the long-term effects of groundwater withdrawals. Recovery predictions for years 2100, 2500, and 3000 are included in the Atlantic Rim Groundwater Model Technical Report (WWC 2006). The model predicts that recovery in the coal would be slow; however, most of the recovery would have occurred by the year 3000.

The model also predicts that it takes a relatively long time for groundwater adjustments within the coal to have an effect on groundwater levels within the Almond Formation sands and Pine Ridge Formation. The timing of the maximum impacts to the Almond/Lewis Shale contact springs demonstrates this phenomenon. The most severe impacts to the springs were modeled in the year 3000, at which time the discharge rates start to increase. This recovery scenario assumes a constant recharge based on the recharge rates arrived at empirically during the steady-state calibration. This recharge rate, while arguably the best assumption that can be made, is nevertheless based on limited calibration experience and research information available at this time.

## 4.4.3.2  Proposed Action Impacts

### Proposed Action Impacts to Surface Waters

Under the Proposed Action, total construction phase surface disturbance would be 15,800 acres (approximately 6 percent of the ARPA). The construction disturbance would not be uniformly distributed across the project area, but rather, project facilities would be located where the efficiency and feasibility of extracting the natural gas would be the highest. Combined with the estimated existing disturbance of 600 acres, cumulative disturbance would be about 16,400 acres. Impacts to surface water are not directly related to surface disturbance. As described in section 4.4.3.1, roads and pads can impact surface hydrology beyond their initial disturbance. With successful reclamation during the life of the project (30–50 years), total disturbances would be reduced to about 6,200 acres (about 2.3 percent of the ARPA). As describe earlier most of the ARPA would be difficult to reclaim. Reclamation success is defined in the Reclamation Plan (appendix B). Where sagebrush, juniper or other vegetation was disturbed, the location would not return to pre-disturbance hydrologic function until 30–50 years after the end of the project in some locations as described in section 4.4.3.1.

The construction disturbance associated with the Proposed Action can also be distributed by watershed. As discussed in chapter 3, the entire ARPA is contained within three major drainage basins. One leg of the Continental Divide runs east and west across the upper portion of the project area. Drainage south of this divide flows south and west to the Little Snake River (HUC 14050003) in the Colorado River Basin. A second leg runs north and divides the northwest and northeast portions of the project area. Drainage west of this divide flows north to Separation Lake in the closed Great Divide Basin (HUC 14040200). Drainage east of the divide flows northeast to the North Platte River (HUC 10180002) in the Missouri River basin. The major drainage basins are depicted on map M-14. The Little Snake River flows east to west just south of the ARPA. Approximately 69 percent of the ARPA drains into the Little Snake River via Muddy Creek. Muddy Creek (HUC 14050004) originates in the Sierra Madre Range, east of the ARPA, and flows west and south to its confluence with the Little Snake River near Baggs. The primary Muddy Creek tributaries in the ARPA include, from upstream to downstream, McKinney Creek, Dry Cow Creek, Cow Creek, Wild Cow Creek, Cherokee Creek, and Deep Creek.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Increasing sediment delivery to watersheds above the 303d section of Muddy Creek (section 3.4) would lead to habitat degradation in pools and riffles for fish in these waters, resulting in significant effects. The primary watershed contributing to this segment is the Muddy Creek/Alamosa Gulch watershed (map M-10). The Proposed Action with eight wells per section in this watershed would lead to increases in surface runoff and sedimentation into this watershed and would result in significant impacts.

According to chapter 3.3, there are many topsoils that are saline or sodic in the ARPA. When eroded as a result of project activities, these soils can make salt available to surface waters. This would contribute to the non-point source of salt in the Colorado River Basin and can be expected to be a significant impact to this system because these rates would likely be above background conditions.

Many of the drainage channels in the ARPA may be classified as Waters of the United States. Crossings of these channels and any associated wetlands may require authorization from the ACOE through the CWA Section 404 permitting process. None of the drainages in the Great Divide area are likely to be considered Waters of the United States. Because road and pipeline construction across established channels could modify flow hydraulics, required BMPs would protect these channels from long-term changes in hydrologic function (appendix H). Channel crossing design (as outlined in the BMPs) will minimize changes to channel morphology and flow hydraulics and have suitable capacity to handle a minimum of a 25-year flood event. Guidance for designing crossings is given in appendix J; these would be required for drainages with the potential to support fish populations.

As described in appendix K, water would be required in most aspects of project construction including road construction, drill site construction, well drilling, and pipeline testing. Water for use in the project construction could be as high as 1,000 gallons per acre of disturbance, which would equate to a total of approximately 54 acre-feet of water. Water used in the well-drilling process could be as high as 125,400 gallons, or about 0.4 acre-feet of water per well, for a total of approximately 693 acre-feet (for 1,800 wells). Water used in the deeper, conventional well-drilling process averages 462,000 gallons (1.4 acre-feet) per well for a total of approximately 280 acre-feet (for 200 wells). The operators intend to use freshwater-based mud for the majority of their drilling operations. Water would also be used for hydrostatic testing of pipelines. Assuming one set of pipelines per well pad (single or multiple wells), and all pipelines associated with 2,000 well pads (7,920,000 feet of pipeline) would be hydrostatically tested at once and therefore water would not be reused, approximately 64 acre-feet of water (at 2.6 gallons/feet) would be required for hydrostatic testing of pipelines. Therefore, total water demand with hydrostatic testing for the Proposed Action would be approximately 1,100 acre-feet. This total quantity of water would not be used at one time; rather, this amount would be distributed over the construction phase that could extend over several years as discussed in appendix K.

Water used for construction and drilling may not come from CBNG wells, and therefore could possibly come from sources connected to surface waters in the Colorado River Basin. This volume of water is conservatively estimated as 10.3 acre-feet/year for the life of the project. The potential depletions were part of the consultation process with the USFWS and have been considered in regard with native fish recovery programs in the Colorado River Basin (section 4.8 and appendix G).

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Water would be obtained from SEO-approved local surface water sources or water wells completed in the coalbeds of the Mesaverde Group. As described in chapter 3, there are presently 90 active permitted groundwater rights filed in the project area, one of which is for a water well that supplies water for drilling deep oil and gas wells. Historically, water wells have been the primary source of supply for oil and gas drilling in this arid area; it is likely that water wells would supply the proposed project drilling needs. The total water demand identified above would not likely affect the existing surface water or groundwater rights in the project area administered by the Wyoming SEO.

Reclamation would occur on the barrow ditches for roads, portions of well pads, and pipeline ROWs, as described in appendix B. Even after successful reclamation these areas would form distinct vegetation boundaries that may or may not be better for reducing rain-splash erosion or decreasing surface runoff. They also may experience unauthorized travel from off-road vehicles leading to further erosional problems.

Discharge and use of hydrostatic test water would need to be accomplished in a manner that does not affect soils, stream channels, surface water, and groundwater quality. After testing operations are completed, the water would be pumped into water-hauling trucks and transported to drilling locations within the project area to be used in conjunction with drilling operations or reused for other aspects of the construction and production process. However, if such water is not reused, it must be disposed of in a manner where soil scouring and water quality impairment would not result. Hydrostatic test water is expected to be of relatively good quality; however, it should be evaluated for compliance with state water quality standards. No test water should be discharged unless such water meets these standards. Test water not needed for drilling operations that meets water quality standards would be disposed of onto undisturbed land having vegetative cover or into an established drainage channel in a manner as not to cause accelerated erosion. Further, use and disposal of hydrostatic test water must comply with the mandatory ROW stipulation for hydrostatic testing as well as the POD, the CWA and the WYPDES permit that would be required for the proposed project.

### Proposed Action Impacts to Groundwater

The proposed CBNG development in the ARPA is targeted principally at coalbeds in the Almond Formation member of the late Cretaceous Mesaverde Group. Drilling depths for the Mesaverde coals would range from approximately 1,200 to 6,000 feet. Groundwater would be removed from the coal bed aquifers. There is no current practical use for water in these coalbeds due to the high TDS concentrations, and the availability of higher quality water from other aquifers. The targeted coal bed aquifers that would be dewatered are classified as confined to semi-confined aquifers because they are bound by confining sedimentary layers of shale, siltstone, and claystone that are impervious to semi-pervious.

Effects from the development of CBNG to groundwater resources within and near the ARPA have also been evaluated in the South Baggs Area Natural Gas Development Project EIS (USDI-BLM 2000b), the Rawlins Draft RMP DEIS (USDI-BLM 2004c), and the following environmental assessments: Sun Dog Pod (USDI-BLM 2001b), Blue Sky Pod (USDI-BLM 2002b), Cow Creek Pod (USDI-BLM 2002c), Brown Cow Pod (USDI-BLM 2003d), Doty Mountain Pod (USDI-BLM 2003e), Red Rim Pod (USDI-BLM 2003f), Jolly Roger Pod (USDI-BLM 2004b).

Reserve pits would be used to contain drilling fluids, cuttings, and wastewater produced from the well drilling operations. In some cases, the reserve pits would be lined with an impermeable

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

liner to prevent seepage and possible contamination of surface and groundwater. Leakage of pit fluids would be minimal from lined reserve pits unless the liners were installed incorrectly or the liners were damaged during drilling operations.

### 4.4.3.3   Alternative A (No Action)

Under Alternative A, the impacts would not be significant because the Proposed Action or other action alternatives would not be implemented. For both ground and surface waters, impacts would continue as described in the environmental assessments developed for each pod during the interim drilling period. It can be expected that, as interim reclamation success improves, impacts to surface water resources would decrease. Final reclamation would disturb areas again initially, but long-term reclamation would reduce impacts to background levels within 30–50 years after final reclamation.

### 4.4.3.4   Alternative C

Under Alternative C the impacts to surface waters are not expected to be significant due to the implementation of development protection measures in addition to standard mitigation measures. These protection measures would only apply to Federal Mineral development, but with 64.3 percent of the project area Federal Lands and 66 percent Federal Minerals, these protection measures would apply to the majority of the project area.

The locations where these protections would apply also have unique conditions, such as poor soils or steep slopes, which may be responsible for a greater degree of impacts to water resources from surface disturbance, and thus would benefit more from having protection measures applied. For example, the blocked federal land in Townships 15N 90W and 16N 90W (map M-3) have soils with high runoff potential (map M-38) and a high percentage of steep slopes (map M-39). Under Alternative C, these areas would only be developed with four well sites and 20 acres of disturbance per section. In addition to fewer well sites and reduced disturbance in these sensitive areas, other protection measures in Alternative C would be applied, such as closing the reserve pit, reclaiming the first year after drilling, and low impact road design, among others. The combination of these protection measures in areas that benefit the most from their application would decrease impacts by reducing changes in peak flows from surface runoff and intercepted groundwater, result in less erosion and smaller increases in sediment loads, provide for improved reclamation success, and generally reduce impacts to water resources.

Mitigation in the Muddy Creek/Grizzly SMA would limit road densities to 3 miles/mi$^2$, would limit road construction and pad location on slopes greater than 8 percent and would require comprehensive planning that could remove the likely impacts to the 303d listed segment of Muddy Creek downstream from the project area. Current road densities in these areas are less than 2 miles/mi$^2$ (See section 3.4.4.2), but could increase to more than 3 miles/mi$^2$ under some development scenarios. Thus, these protection measures are likely to protect the 303d listed reach of Muddy Creek from habitat degradation resulting from this alternative.

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

**Map M-38.**    Soils with High Runoff Potential.



# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Map M-39.    Alternative C–Slopes Greater than 25%.



## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

In general, development protection measures proposed for Alternative C would have the effect of limiting surface disturbance in the areas of most concern for impacts to surface waters. Only 4 wells per section and less than 20 acres of disturbance would be allowed in the majority of public lands (see map M-38). As described in table 3-10, soils with a high runoff potential make up 41 percent of the project area. Wildlife restrictions would also limit the density of pads and the short-term disturbance on the majority of federal lands. In mixed land ownership areas, more disturbance could potentially occur on state and private lands (See table 2-1). However, with the better placement of facilities, protections measures, and fewer disturbances approved on public lands, this alternative would likely reduce impacts.

Road and pad placement at 4 wells per section as opposed to 8 wells per section provides more flexibility in the placement of pads and roads, and therefore reduces impacts. This ability to optimally place facilities within sections reduces impacts on the federal lands and for the project as a whole.

Surface water impacts for Alternative C are not likely to be significant due to the lower density of development, optimal placement of project facilities, and the mitigation required for resource areas that are of concern for impacts to water resources.

There should not be a significant difference between this alternative and the Proposed Action for groundwater resources.

### 4.4.3.5  Alternative D

Potential impacts for Alternative D would be similar to those described under the Proposed Action, but would be less due to a limit on the total unreclaimed disturbance for the project (7,600 acres). Less initial disturbance and incentives for better reclamation would allow for fewer impacts to water resources due to the maintenance of undisturbed vegetation, which is generally better to reduce rain splash erosion and reduce surface runoff.

The limitation on surface disturbance as part of Alternative D allows for the same number of pad locations as the Proposed Action and assumes successful reclamation, which is also assumed under the Proposed Action. According to the Reclamation Plan (appendix B), successful reclamation can be measured after initial efforts and require erosion features to be the same as surrounding undisturbed areas. As described in the surface water impacts common to all alternatives, disturbed areas that are converted from shrubland to grasslands may not respond the same hydrologically to storm events and roads, pads, and other long-term disturbances and will still modify the surface hydrology. The annual planning and reporting criteria assumed under this alternative could result in better reclamation efforts, due to better monitoring, tracking, and enforcement.

Potential impacts to surface water for Alternative D would likely be greater than those for Alternative C due to the lack of disturbance limits on federal lands (no more than 4 wells or 20 acres per section) under Alternative D. Development under Alternative D would occur at a density of 8 wells per section including areas with unique conditions, such as poor soils and steep slopes, which may contribute to a greater degree to surface water impacts from land disturbing activities. With the increased development density for wells and roads relative to Alternative C, Alternative D would be expected to result in a greater impact to surface water despite the limitation on unreclaimed surface disturbance.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Disturbance to Category A (map M-7, 72,200 acres or 27 percent of the ARPA) areas for this alternative would be reduced to below 6.5 acres per well. Because Muddy Creek SMA is near the center of the project area, it likely will be developed as described in the Proposed Action with the Cow Creek and Sand Hills SMAs receiving relatively less development. As stated in the assumptions much of what determines impacts for surface waters is the location of the disturbance. Due to development at a density of 8 wells per section within the Muddy Creek SMA significant impacts would be anticipated to the Muddy Creek reach below Highway 789, which is listed for 303d threats (See section 3.4 and map M-17).

Impacts under Alternative D are lower than under the Proposed Action (18 percent less surface disturbance), but indirect impacts would still be significant to water resources due to potential water quality changes, rainfall runoff relationships, increased salt loading from disturbed areas, and changes in surface hydrology from long-term disturbance.

### 4.4.4 Impacts Summary for all Action Alternatives

Impacts resulting from drill pad, access road, facility site, and pipeline ROW construction could include removal of vegetation, exposure of the soil, mixing of soil horizons, soil compaction, loss of topsoil productivity, and increased susceptibility of the soil to wind and water erosion. These impacts could increase runoff, erosion, and off-site sedimentation. In Wyoming's 2006 305(b) Water Quality Assessment Report WDEQ states, "... projected increases in CBNG development have the potential to lead to increased surface disturbance and possible increased erosion and sediment loading" (WDEQ 2006).

Groundwater impacts are expected to be significant due to the likely impacts to wells, seeps and springs emanating from the upper Mesaverde Group. Many of these wells are permitted by the SEO and the springs and seeps may have flows interrupted.

### 4.4.5 Additional Mitigation Measures

The Required BMPs (appendix H) would be followed on BLM lands or where a BLM approved action would impact BLM lands. A modification to a mitigation measure or design feature may be approved on a case-by-case basis when deemed appropriate by the BLM.

Applicant committed measures would be applied on privately owned surface and State of Wyoming lands unless otherwise specified by the involved private or state surface owners. The operators and the BLM, as discussed in chapter 2 and appendix K, would implement preconstruction planning and design activities.

Water quality in Muddy Creek will be measured at USGS Station #09258980 as funding allows. Currently, conductivity and flow are measured continuously and there are joint efforts with the State of Wyoming to measure water quality parameters into the future.

Impacts to groundwater resources have been identified and determined to be significant. The resources of primary concerns are wells completed in the Lewis Shale or upper Mesaverde Group and spring or seeps near the contact between the Lewis Shale and Mesaverde Group. Isotopic data would be collected project wide by the BLM to evaluate groundwater resources and additional monitoring wells in the upper Mesaverde Group would be established to evaluate and quantify impacts to these resources and to quantify potential impacts from methane seeps where the Mesaverde Group outcrops.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

A Local Meteoric Water Line (LMWL) would be established based on BLM collected isotopic water samples from surface sources to test assumptions in section 3.4.5.2 about the recharge characteristics of water in coal beds targeted for production base on isotopic analysis of samples from the producing formations.

The BLM would evaluate water levels from a few selected wells to establish baseline conditions in aquifers of interest and to measure potential impacts from the project.

## 4.5    Vegetation and Wetlands

### 4.5.1    Introduction

Direct impacts to existing native shrub/grassland communities in the ARPA resulting from project implementation include a short-term reduction of herbaceous vegetation and a long-term loss of shrub cover. Potential indirect impacts to the vegetation resource may occur as a result of:

- Damage to biological soil crusts,
- Soil compaction,
- Mixing of soil horizons,
- Loss of topsoil productivity,
- Increased soil surface exposure,
- Soil loss due to wind and water erosion,
- Increased potential for noxious/invasive weed invasion and establishment,
- Shifts in use patterns or amounts by livestock and wildlife, and
- Changes in visual aesthetics.

### 4.5.2    Impact Significance Criteria

The Great Divide RMP (USDI-BLM 1990) and state (WSLUC 1979) land use plans prescribe the following management objectives associated with vegetation and wetland resources:

- To provide habitat quality (food, cover, space, and water) adequate (1) to support a natural diversity of wildlife and fisheries including big game; upland game; waterfowl; non-game species; game fish; sensitive, threatened, and endangered species; and species of special management interest in Wyoming, and (2) to assist in meeting goals of recovery plans.

- To maintain or improve vegetation condition or avoid long-term disturbance in high priority standard habitat sites and fisheries areas.

- To maintain or improve overall ecological quality, thus providing good wildlife habitat, within the constraints of multiple-use management in moderate and low priority standard habitat sites.

Several criteria were used to determine the significance of impacts caused by the construction and operation of the proposed natural gas project on vegetation resources encompassed within the ARPA. These criteria were developed based on federal, state, and local agency rules, regulations, and management guidelines.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

The impact on vegetation would be considered significant if the following were to occur:

1. Non-attainment of short- or long-term reclamation standards and goals for disturbed sites specified by the Reclamation Plan (appendix B) or the BLM resulting in a loss/decrease of plant species density, diversity, and abundance, or where reclaimed areas do not attain adequate vegetation groundcover and species composition to stabilize the site within 5 years from disturbance;

2. An event or action that would remove a community's unique attributes or ability to support other resource values within the life of the project; and

3. Introduction or spread of noxious or invasive weeds that contributes to unsuccessful revegetation, the introduction of weeds into areas considered weed free, or an increase in noxious or invasive species where they already exist.

### 4.5.3  Direct and Indirect Impacts

#### 4.5.3.1  Direct and Indirect Impacts Common to All Alternatives

Direct impacts include the removal of native vegetation and topsoil during the construction phase and installation of permanent structures (e.g., compressor sites, roads, and well pads). Future climatic patterns, land use, and compliance with the Reclamation Plan and weed control efforts would be primary factors for successful life-of-project reclamation.    Established monitoring sites for documenting long-term trends of vegetation cover types would be avoided so that disturbance from permitted commercial activities would not occur.

Potential indirect impacts to the vegetation resource might occur as a result of:

- Soil compaction,

- Mixing of soil horizons,

- Loss of topsoil productivity,

- Increased soil surface exposure causing increased soil loss due to wind and water erosion, and

- Increased potential for noxious/invasive plant establishment.

Additional indirect impacts occur as a result of altered runoff hydrology due to roads, pads, and other facilities particularly on moderate to steep slopes.  Slopes greater than 8 percent require special engineering and are found on 35 percent of the project area.  Facilities located in these areas reduce natural runoff to downslope locations and increase channelization of flows and gullying, which results in desertification effects including lower productivity, cover, and species composition. Furthermore, dust from roads contributes to an additional indirect impact by settling on nearby vegetation resulting in reduced photosynthetic activity and plant growth. Indirect impacts due to dust from roads would be expected to affect vegetation adjacent to roads, resulting in an additional 15 to 30 percent of the development area (based on estimate of 300 feet width impacted along roads average distance impacted based on professional

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

judgment). However, application of BMPs in road construction and dust control would minimize this impact (appendix K, section K.1.3.7.2, specifically, Climate and Air Quality).

All alternatives would disturb Wyoming big sagebrush and alkali sagebrush plant communities. Due to the very long to unknown recovery rates for these two shrub species on dry, harsh sites, reclamation would primarily result in herbaceous plant recovery, replacing shrublands with grassland-type cover and structure.

The saltbush steppe vegetation cover type would have very low acreage affected by the proposed project. Badlands have sparse vegetation, occur on moderate to steep slopes, and are common in other areas. Therefore, impacts from disturbance to these vegetation cover types would not affect their overall abundance, health, or diversity across the region.

Thirty-one percent of the aspen, juniper woodland, serviceberry, and true mountain mahogany cover types occur on private and state lands and these sites would not be protected from disturbance by any development. Loss of these communities would increase wildlife use on remaining areas within these cover types. Development in these communities would be avoided on public lands. However, impacts from disturbance to this vegetation cover type may affect its overall abundance, health, and diversity within the region, exceeding the significance criteria.

The silver sagebrush/bitterbrush vegetation cover type occupies sand dunes in what is known as the Sand Hills. The uniqueness of this vegetation/soils complex within the entire State of Wyoming led to the designation of the Sand Hills as an ACEC. The actual ACEC is mostly excluded from the ARPA, but the north end of this unique plant community is in the checkerboard land pattern (map M-3) and a portion is included in the ARPA. The sand dunes, whether stabilized or not, are usually avoided due to the difficulties they pose for development and reclamation. The potential to increase wind erosion and destabilize the loose sand is very high. Therefore, impacts from disturbance to this vegetation cover type may affect its overall abundance, health, and diversity within the region, exceeding the significance criteria.

Due to the scarcity of riparian/wetlands in the ARPA and the existence of BMPs/COAs to protect them, the probability of well pads, roads, pipelines, and ancillary facilities being placed in these areas is very low. The RMP specifies that a 500-foot (minimum) buffer around riparian and other water resources and a 100-foot buffer from ephemeral drainages be maintained on public lands. This restriction not only protects riparian/wetland sites, but basin big sagebrush sites which are generally found adjacent to drainages. Protection of these sites on private and state lands may not occur, which could lead to alteration of vegetation adjacent to stream channels. The probability of removing wetland vegetation or disturbing any waters of the U.S. is low following compliance with mitigation procedures (see appendices B, H, and J). Existing water sources that dry up or have reduced flows due to water drawdown associated with gas field development would be mitigated to maintain wetlands/riparian site characteristics and vegetation, if it can be proved that development of coal bed methane is the cause. However, if pre-data does not exist for individual water sources or if it cannot be proved that drought is not the cause, these water sources would not be mitigated and wetland/riparian sites and vegetation would become drier and potentially convert to upland vegetation.

Although most natural gas would be collected as water is removed from the coal aquifers, some gases may move upslope through the formation and escape through the soil surface. Where this occurs the vegetation may die back, resulting in dominance of herbaceous species and

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

increased bare ground. These locations would generally be small and scattered along the outcrops of the coal formations, probably affecting less than 10 acres altogether.

Vegetation treatments would become more complex and costly as the density of field development increases. The opportunities to use prescribed burns as a management tool would become more limited, requiring increased use of chemical and mechanical forms of manipulation. These methods decrease the ratio of shrub versus herbaceous species, but primarily influence species already present compared to fire which creates openings for early succession species (especially forbs). Therefore, in areas where the objective is to increase forb composition and there are currently few forb species present in the community, it would be difficult and more expensive to reach this objective using chemical or mechanical forms of treatment.

Direct and indirect impacts to the vegetation resource would be reduced with implementation of and compliance with required best management practices stated in appendix H, applicant voluntarily committed measures (appendix K), the Reclamation Plan (appendix B), and the RMP. However, no measures currently address spreading concentrated runoff back over the land. Therefore, channelization and gullying leading to desertification would occur. Achieving final reclamation goals is dependant upon disturbed soil properties; developing seed sources for native forbs and shrubs; short- and long-term monitoring; future climatic conditions and land-use patterns; and, most importantly, operator commitment. However, the current lack of seed sources for desirable native forbs in the 7- to 9-inch precipitation zone makes any timeline questionable in terms of achieving successful reclamation with desired native species composition. In addition, non-native species, if used in reclamation on state and private lands could expand onto adjacent public lands, requiring some form of both monitoring and control.

The lack of adequate weed control efforts in the first few years of development under the Atlantic Rim pod EAs have already increased weeds and seed banks that would have to be controlled for several years at a minimum. Halogeton has been observed spreading outside areas of disturbance from CBNG development on all land ownerships. There are no applicant voluntarily committed measures to control weeds; therefore, the current trend of weed spread is likely to continue. These populations would continue to pose a threat of expansion onto public lands that would require long-term treatments.

### 4.5.3.2  Proposed Action

The Proposed Action would directly reduce the extent of existing vegetation cover types. Half of the overall, life-of-project disturbance from the Proposed Action would occur within the first 5 years. The 6,200-acre, life-of-project disturbance would hold true for reclamation of herbaceous species, but not for shrubs habitats to be returned to pre-existing conditions.

Indirect impacts due to dust from roads is expected to affect vegetation adjacent to roads, resulting in additional impacts across 15 to 30 percent of the ARPA. The primary effects expected are reduced photosynthetic capability for plants and reduced palatability of forage. For the purpose of this analysis, dust movement off roads was considered to be between 300 and 1,320 feet along with the estimated total miles or roads needed for gas development in the ARPA. Impacts vary considerably depending on wind speeds, season and duration of soil disturbing activities, and the timing of and amounts of rainfall to wash dust off the vegetation. Impacts to wildlife and livestock may vary depending on the season of use or other critical time

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

periods (i.e., migration) that may change due to annual climate, vegetation health, or management system.

Direct and indirect impacts to vegetation would affect specific plant communities to varying degrees depending on general abundance, browse use, topography, and difficulty of reclamation. The majority of development would occur in mountain and Wyoming big sagebrush vegetation cover types, since they occupy about 85 percent of the ARPA. However, long-term impacts to Wyoming big sagebrush would be much higher than to mountain big sagebrush.

Wyoming big sagebrush plant communities occur on sites with lower precipitation and poorer soils, which increases the difficulty in reclamation and the likelihood that only initial shrub reestablishment may occupy disturbed sites during the estimated 30–50 year life of project. This loss of shrub habitat from direct disturbance, coupled with minor increases in dust drifting off roads making nearby vegetation less usable, would result in up to a 10 percent reduction in available Wyoming big sagebrush habitat on state and private lands. Even though the majority of disturbance would not be in antelope and mule deer crucial winter range, it would be in adjacent transition range. With average browse rates on crucial winter range and adjacent transition range already at moderate levels (40 to 60 percent) during average winters and higher during severe winters, this reduction in usable habitat would lead to increased browse use levels that would result in plant mortality and continue the current downward trend in sagebrush cover and age-class structure.

For the most part, impacts described in this and sections below are primarily about CBNG wells, since the actual number and location of deep natural gas wells is unknown but limited to 200 at this point. However, development of deep natural gas wells in the Wyoming big sagebrush plant community would have the greatest impacts (versus other plant communities), because they would be compounding the impacts already described for CBNG development. In addition, approximately 8 percent of this cover type occurs on moderate to steep slopes that would be affected by increased gully erosion and desertification due to the influence of roads on overland hydrology.

In allotments where increased levels of grazing non-use are requested by the livestock permittees due to the rate and scale of field development, there would be effects to the vegetative resource. Plant material previously removed or trampled by livestock would be left largely ungrazed, resulting in increased litter, soil protection, and reduced runoff and erosion. Plant vigor may improve in some areas, but most allotments with rotational grazing already have good vigor of desired species. Reclamation efforts would benefit without being grazed by livestock. However, grasses would eventually out-compete forbs and shrubs in the absence of livestock grazing. In Wyoming big sagebrush transition and crucial winter range increased grass cover and vigor may, in combination with increased shrub browsing, reduce establishment of shrub seedlings. This would skew the age-class ratio and contribute to the long-term decline in Wyoming big sagebrush cover and density. Therefore, impacts from disturbance to this vegetation cover type would affect its abundance, health, and diversity across the region, exceeding the significance criteria.

Mountain big sagebrush sites occur in areas with higher precipitation and better soils, and should reclaim more easily than Wyoming big sagebrush sites if adequate reclamation techniques are employed. Whether these sites would return to pre-existing levels of sagebrush cover during the 30–50 year life of project is unknown. Following prescribed burns in this area

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

mountain big sagebrush has been documented recovering to original cover levels in 40 to 50 years. In field development, soil profiles and structure is altered, which will likely lengthen time needed for recovery of shrubs. The elevation this species occurs at also precludes it from receiving more than light browsing by big game species before it is protected by winter snow. Approximately one-fourth of this shrub type occurs on moderate to steep slopes, particularly in the vicinity of the Muddy Creek drainage, Muddy Mountain, and the Deep Gulch/Wild Cow area. These sites would be affected by increased gully erosion and desertification due to the influence of roads on overland hydrology. Therefore, impacts from disturbance to this vegetation cover type would affect its health and diversity on locations with moderate to steep slopes, exceeding the significance criteria in these areas. However, acreage loss from disturbance would not affect its overall abundance, health or diversity across the project area.

Alkali sagebrush is the third most common vegetation cover type within the ARPA, but is not common within this region or even within the State of Wyoming. The high clay content in the soils it grows upon has high runoff and severe water erosion potential once the protection of vegetation cover is removed, and increases the difficulty of reclamation. Although this species receives some browse use by wildlife and sheep, the use levels do not approach those documented for Wyoming big sagebrush. Therefore, impacts from disturbance to this vegetation cover type would reduce its overall abundance, and may affect its health and diversity across the region, exceeding the significance criteria.

Mountain big sagebrush/mountain shrub mix vegetation cover types occur on sandier sites around the Sand Hills and on steeper, north and east slopes where snowdrifts provide higher precipitation levels. The steeper slope sites would be avoided, so loss from project disturbance should be minimal. Sites around the Sand Hills contain high amounts of bitterbrush which is important to mule deer during the fall and winter and is not abundant elsewhere in the ARPA. Bitterbrush should be able to be reestablished on these sites, but not within the life of the project; therefore, impacts from disturbance to this vegetation cover type would affect its health and diversity in localized areas. However, acreage loss from disturbance would not affect its overall abundance, health or diversity across the project area.

The ability to reestablish native vegetation on sensitive soil types (i.e., clayey, sands, saline-sodic) is not well documented in this area, but may be in other locations. Although current technology exists to stabilize these areas and minimize soil erosion as revegetation is being carried out, there is currently a lack of local seed sources for native forb and shrub species, and the recovery rate to restore native shrubs (particularly Wyoming big sagebrush and alkali sagebrush) to their pre-existing condition is unknown. This would likely lead to a two-phased reclamation, initially grasses with weed control and 3–5 years later (or longer) interseed grasses with forbs and shrubs when native seed is available. Many of the potential impacts to the vegetation resource would be reduced assuming construction, maintenance, and operation of well pad sites and associated disturbances are in accordance with chapter 2 of this EIS, the Reclamation Plan (appendix B), the BMPs (appendix H), and RMP stipulations.

Surface disturbing activities would increase the potential for new infestation and spread of existing invasive plant species populations. On the other hand, prompt and successful reclamation would reduce the potential for these species to establish and spread. Assuming that existing weed populations on public lands would receive adequate treatments in the future, potential weed expansion onto public lands would not occur; therefore, weeds would not exceed the significance criteria.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

### 4.5.3.3  Alternative A (No Action)

Under the no action alternative, direct and indirect vegetation impacts would continue from the Atlantic Rim pods. The lack of adequate weed control efforts in the first few years of the interim drilling period has already increased seed sources for weeds that would have to be controlled for several years at a minimum. Halogeton has been observed spreading outside areas of disturbance from CBNG development. Reclamation and weed control during the interim drilling period is a concern to BLM based on the lack of success. BLM will focus on adaptive management to improve reclamation success to disturbed areas.

The lack of sufficient dust abatement with the Atlantic Rim pods has indirectly impacted vegetation. Based on observations, this has resulted in impacts to an additional 15 to 30 percent of the interim drilling period development areas. Under the no action alternative, indirect impacts from dust would continue to reduce photosynthetic activity and growth in vegetation due to lack of sufficient dust control efforts.

### 4.5.3.4  Alternative C

Alternative C would proceed with development similar to the Proposed Action, but would limit the acres of disturbance or recommend avoidance to protect sensitive values. Examples of sensitive values are areas with steep slopes, soils with high runoff potential, and big game crucial winter range. Since about 95 percent of the ARPA is affected by one or more restrictions for sensitive values (map M-40), the total acres disturbed on federal minerals would be reduced by about 68 percent, with impacts in different plant communities affected to varying degrees. With less disturbance on public lands, the disturbance on private and state lands would increase 100 percent compared to the proposed action. This would increase disturbance in the mountain sagebrush plant communities on those lands.

For instance, alkali sagebrush grows on clay soils with a high runoff potential, so this community would have less than half the disturbance than a comparable site supporting Wyoming big sagebrush. However, sagebrush sites within 2 miles of active leks that qualify as nesting habitat would also have limited disturbance. In addition, locations on moderate to steep slopes would have reduced surface disturbance compared to sites on gentle slopes; this would further reduce desertification impacts caused by alterations to runoff hydrology from roads. These benefits would affect all plant communities on moderate to steep slopes.

The additional mitigation measures would result in less acreage being disturbed, but some shrub species (Wyoming big sagebrush, Alkali sagebrush) still would not be replaced, removing the community's unique attributes or ability to support other resource values within the life of the project. Although disturbance would be greatly reduced, the allowed levels of disturbance in Wyoming big sagebrush coupled with existing impacts to this community, would continue the current downward trend in sagebrush cover and age-class structure, thereby exceeding the significance criteria.

The doubling of disturbance on private and state lands, where there are no operator committed measures to control weeds, address erosion issues, and meet reclamation standards would increase weed and erosion effects that would carry onto adjacent public sections. Mountain shrub communities important to wintering big game and other wildlife species would potentially be more affected through fragmentation or loss of habitat due to construction activities. This

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

would have effects to both upland and riparian plant communities, and lead to weeds exceeding the significance criteria on public lands.

This alternative would continue the likelihood of requests for total non-use of all grazing use by the livestock permittee due to the rate and scale of field development, but on a pasture or regional scale within allotments. Within these smaller development areas, the principle difference would be in reclamation success, as there would be no need for fencing of pads and other facilities to protect them from grazing until vegetation was sufficiently reestablished. Livestock grazing would not hinder reclamation success which would further reduce the potential for weed establishment.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

**Map M-40.    Alternative C–Resources with Limited Surface Disturbance Mitigation Measure.**



1 Resource
2 Overlapping Resources
3 Overlapping Resources
4 Overlapping Resources

Resources Protected with Limited Surface Disturbance
-Greater Sage-Grouse and Brood Rearing Habitat
-Elk Crucial Winter Range
-Mule Deer Crucial Winter Range
-Antelope Crucial Winter Range
-Soils with High Runoff Potential

No Warranty is made by the Bureau of Land
Management for use of the data for purposes not
intended by the BLM.

Atlantic Rim Natural Gas Project Final EIS

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

### 4.5.3.5  Alternative D

Alternative D would proceed with development similar to the Proposed Action, but would vary allowable disturbance within two categories and limit the acres of disturbance at any one time. Total disturbance acres would be 13,600 acres (13,000 new disturbance and approximated 600 acres of existing disturbance) or about 18 percent less than the Proposed Action. This alternative also has a goal of an average of 6.5 acres/well pad and a goal of less than 6.5 acres/well pad in Category A areas. Vegetation in avoidance areas would generally be protected, unless influenced by activities adjacent to these sites.

Shrub cover (Wyoming big sagebrush, Alkali sagebrush) still would not be replaced, removing the ability to support other resource values within the life of the project, thereby exceeding the significance criteria.

This alternative would continue the likelihood of requests for total nonuse of all grazing use by the livestock permittee due to the rate and scale of field development, but coordinated annually with permittees to allow them to plan around disturbance within allotments. Within these development areas, the principle difference may be in reclamation success. In locations with total nonuse, there would be no need for fencing of pads and other facilities to protect them from grazing until vegetation is sufficiently reestablished. Livestock grazing would not hinder reclamation success resulting in higher herbaceous cover on reclaimed sites. An increase in herbaceous cover would further reduce the potential for weed proliferation but may lower the establishment of shrub species. Therefore, impacts from disturbance to Wyoming big sagebrush and alkali sagebrush would affect its abundance, health, and diversity across the region, exceeding the significance criteria.

Surface disturbing activities would increase the potential for new infestation and spread of existing invasive plant species populations. On the other hand, prompt and successful reclamation would reduce the potential for these species to establish and spread. Assuming that existing weed populations on public lands would receive adequate treatments in the future, potential weed expansion onto public lands would not occur; therefore, weeds would not exceed the significance criteria.

### 4.5.4  Impacts Summary

Impacts from the Proposed Action would include direct removal of acreage of vegetation communities, and an indirect loss of usability from dust, thus decreasing abundance and redistributing use by livestock and wildlife that use these native species throughout the life of the project (or longer). Disturbance in Wyoming big sagebrush communities within mule deer and antelope transitional and crucial winter range would exacerbate the existing downward trend and add to the management issues that led to the failure of Rangeland Health Standards #3 (Upland Vegetation) and #4 (Wildlife Habitat). Sites located in the mountain big sagebrush cover type would recover with reclamation. In addition, the desertification of rangelands due to changes in overland hydrology on moderate and steep slopes would affect more than one-third of the ARPA. Project implementation would potentially reduce the amount and function of wetlands and other waters of the U.S due to accelerated erosion and sedimentation from adjacent moderate and steep slopes (appendix K, section K.1.3.7.2). Disturbance to most vegetation cover types would exceed the significance criteria and, with adequate control, weed presence would not exceed significance criteria.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Impacts for Alternative A would include disturbed land and associated loss of vegetation as described in the associated Atlantic Rim pod environmental assessment. However, the increase in presence and spread of weeds during the interim drilling period is a concern and must be addressed to achieve successful reclamation.

The additional mitigation measures for Alternative C would result in less acreage on public land being disturbed (but with the possibility of a corresponding increase in disturbance on private and state lands). Some shrub species (Wyoming big sagebrush, Alkali sagebrush) still would not be replaced, removing the ability to support other resource values within the life of the project, and mountain shrub communities and erosion effects to plant communities in the checkerboard land pattern would increase, thereby exceeding the significance criteria. Weed presence without operator commitment to treat weeds on private and state lands that would spread to public land would also exceed the significance criteria.

Alternative D would result in 18 percent less acreage being disturbed than the Proposed Action, and with less disturbance in Category A areas. However, in general, impacts would be the same as for the Proposed Action.

### 4.5.5  Additional Mitigation Measures

There would be no additional mitigation measures for the Proposed Action, Alternative A, or Alternative D.

Additional mitigation measures for Alternative C are detailed in appendix L "Resource Concerns and Associated Protection Measures Proposed under Alternative C".

## 4.6  Rangeland Resources

### 4.6.1  Introduction

Impacts to range resources would result with implementation of the Proposed Action or any of the action alternatives. Potential impacts would occur throughout the life of the project, due to vegetation and soil disturbance associated with construction activities, reclamation, weed control, road issues (i.e., dust and animal collisions), fence maintenance, water management, and increased recreational use by the public.

### 4.6.2  Impact Significance Criteria

The Great Divide RMP (USDI-BLM 1990) and state (WSLUC 1979) land use plans prescribe the following management objective associated with rangeland resources:

- To enhance livestock grazing while maintaining a balance between economic uses and the enhancement of wildlife habitat, watershed, and riparian areas, while maintaining range condition at, or improving range condition toward, the potential for the ecological site.

Impacts to rangeland resources would be potentially significant if:

1. Resource management actions result in greater than 10 percent permanent reduction in AUMs available for livestock grazing in a given allotment,

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

2. Resource management actions reduce or eliminate the opportunity to run the livestock of choice, and

3. Wyoming BLM standards for Health Rangelands are not met.

### 4.6.3   Direct and Indirect Impacts

#### 4.6.3.1   Direct and Indirect Impacts Common to All Alternatives

The ARPA includes lands that are located within 31 grazing allotments (described in section 3.6, table 3-31, and on map M-20). In many cases, the boundaries of these allotments extend beyond the boundaries of the ARPA; therefore, discussion of impacts will focus on the 20 allotments primarily affected. The remaining 11 allotments would have similar impacts, but very minor in scale. Under the Proposed Action and all alternatives, livestock grazing would continue throughout the duration of the project with stocking rate adjustments (and requests for temporary non-use) made annually by each livestock operation.

The primary impact to grazing resources would be short-term loss of available forage as a result of construction and production-related disturbance. Available forage would be reduced during drilling and field development and reclaimed as soon as feasible under direction of the Reclamation Plan (appendix B) and BLM. A permanent loss of forage would occur under any action approved for the construction of roads, portions of drill pads, and ancillary facilities that remain permanent during the life of the project. However, successful short-term reclamation of pipelines, portions of pads not necessary for long-term operations, and any other related disturbances should replace this short-term loss of forage. The potential exists for increased death loss of young livestock due to vehicle collisions following construction of new and higher speed roads.

The proposed project would result in increased traffic and increased speeds on the improved roads within the ARPA, particularly during the drilling and field development phase. The potential for livestock/vehicle collisions would be increased, especially during the calving/lambing season. Carbon County has already posted speed limits on the Twenty Mile road south of Rawlins. The potential also exists for disruptions to livestock management. Traffic along roads that pass through shipping pastures or by corrals when in use may interrupt or complicate this work, extending the time and increasing the cost to complete them. Herding of animals through areas being developed or moving around them would increase the complexity and time to accomplish these tasks. In some allotments, management flexibility may be sacrificed to avoid or to minimize these operational impacts. Benefits of better roads to livestock operations are varied and substantial in nature. They include improved access for viewing the allotment, facilities and animals, greater likelihood of observing and doctoring sick animals, and improved capability for trucking animals in or out of an allotment.

There is also potential for damage to BLM and livestock operator fences, gates, and cattle guards from the movement of heavy trucks, drilling equipment, and heavy construction equipment. The involved mineral companies would promote (if they don't already) a policy to report and correct damage to livestock facilities as quickly as possible, including contacting the permittee and the BLM. Closed gates that are left open or are damaged usually result in a scattering of livestock off the allotment and a considerable amount of time and expense for the livestock operator to roundup the loose livestock and return them to the pasture. This may

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

affect their breeding program, reduce weight gains of livestock, and reduce time available for other work.

Water resources would be affected by the proposed project. New water locations may be established in self-contained systems, similar to two water troughs and tanks already authorized on lands of Weber Ranch in the Doty Mountain allotment. These self-contained water systems help improve water distribution and provide water otherwise not available in dry years. Storage tanks and pipelines may be supplemented with water from CBNG development that may save in pumping costs during the life of the project. Existing water sources that dry up or have reduced flows due to water drawdown associated with gas field development may affect livestock operations in the short-term until alternative water sources are developed. If this does occur, mitigation would occur if it can be proven that the reduction in water is a result of CBM development, and would consist of either CBNG water of similar quality being substituted to replace the same volume of water no longer flowing or creating an alternate water source.

Disturbance of soils and increased vehicle activity would increase the potential for introduction, establishment, and spread of invasive non-native species. This can reduce forage availability and animal weight gains, in addition to affecting trail routes and animal health, particularly increasing death loss with sheep. Expansion of weeds and increased erosion from private and state lands without operator commitment to control them onto adjacent public lands would likely occur. Recently observed expansion of halogeton from disturbed sites into adjacent native rangelands demonstrates the concern that this problem can spread beyond sites of disturbance and affect thousands of acres. Prompt reclamation of disturbed sites would lessen the introduction and spread of weeds and would reduce the impact on livestock operations. However, lack of adequate weed control would lead to increases in invasive species. In the case of halogeton, this would likely eliminate the ability to graze sheep in this area. This would potentially lead to non-use of 1,588 AUMs and could result in one of two sheep operations going out of business due to lack of ability to graze and lamb sheep in other locations.

### 4.6.3.2  Proposed Action

The Proposed Action would result in an estimated initial disturbance of about 15,800 acres, which represents about 6 percent of the total land area of the combined 20 grazing allotments used by twelve livestock operations. This acreage of disturbance would result in the short-term loss of 2,026 AUMs. This development would happen incrementally, with reclamation of short-term disturbances probably making up for a portion of the forage lost. This is due to initial reclamation efforts being focused on site stability, with vegetation dominated by herbaceous (grass and forb) species. Since 91 percent of livestock AUMs are cattle, and cattle prefer grasses, reclamation should not just replace forage lost, but result in higher production of desired species. During the life of the project, this total amount of disturbance is estimated to decrease to about 6,200 acres, or between 2 and 3 percent of the combined land area of the allotments. This amount of forage affected is far less than the normal adjustments permittees have to make for market change or drought, for instance. Therefore, the loss of forage from disturbance from construction and production activities should be minimal in the short-term and may actually increase available forage in the long-term, and therefore benefit livestock operations. However, this may be more than offset by the lack of any commitment by the companies to control weeds on private and state lands.

Roads would contribute to increased dust that settles on vegetation resulting in lower palatability and shifting of use to other locations. Increased dust may also affect animal health by

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

increasing the likelihood of ailments such as dust pneumonia. These impacts could reduce weight gains or require lowering stocking rates in affected allotments. Application of measures to reduce dust, such as road construction and treatments, would reduce these impacts on public lands, but usable forage on state and private lands could be reduced by 15 to 30 percent, leading to more concentrated livestock use in dust-free locations. Roads on moderate to steep slopes that result in long-term changes in overland hydrology and desertification impacts below these locations could also lead to lower weight gains or require reduced stocking rates.

The greatest affect upon livestock operations will be the sum of the impacts described in section 4.6.3.1 and the paragraphs above, which is also dependent on the rate and extent of development and what amount of each operation it will impact. Although chapter 2 describes a 15- to 20-year development phase, approximately half of the projected 2,000 wells would be completed in the first 5 years. Based upon this information and where pods have been developed in the interim drilling period, impacts would be greatest (in descending order) upon five allotments: Doty Mountain, Cherokee, Fillmore, East Muddy, and Sixteen Mile allotments.

The Cherokee allotment is almost entirely within the ARPA and would have the next highest number of wells (approximately 300 in first 5 years) that affect seven different livestock operations. One operation consisting of 950 AUMs, uses this allotment for 6 months per year and would be most affected by disruptions due to development activities. The remaining six operations use the allotment more seasonally for about 2 months each and have other allotments where they could make some adjustments. Spring lambing occurs in May and June, which would receive some protection from disturbance due to their proximity to greater sage-grouse nesting habitat, as long as seasonal timing stipulations are required. This habitat used for spring lambing use, involving two operators (1,588 AUMs), would be difficult to replace in another location and is further complicated by the impact from weeds discussed above.

The Fillmore allotment would be the third most affected allotment with up to 200 wells in the first five years. This allotment is about two-thirds contained within the ARPA and has one livestock operation grazing cattle in the spring and summer. Impacts would be similar to Doty Mountain, with 3,374 BLM-permitted AUMs within this allotment. Since Fillmore is in the checkerboard, these AUM numbers will actually double, and the AUMs affected in Doty Mountain would increase about 50 percent also due to private lands.

Although well numbers would next be highest in East Muddy and Sixteen Mile allotments, the impacted acres and AUMs would likely only affect 10 percent or less of each livestock operation. Remaining allotments would be affected as long-term build-out from the pods occur, but development would not likely be as intense as those mentioned above. Knowledge gained in early field development would help reduce the impact upon outlying allotments.

### 4.6.3.3   Alternative A (No Action)

As explained in section 2.1.2, the no action alternative would allow the operators to only complete development of wells (200 maximum) already approved under the Atlantic Rim pod EAs and as guided by the IDP (appendix A). This affects the Doty Mountain, Cherokee, Fillmore, and Sixteen Mile allotments, listed in order by the number of wells in each (high to low). Due to this low number of wells spread across four good-sized allotments, there would be minor impacts in terms of forage lost or reduction in usability due to dust. This impact should be replaced by forage returning to use due to reclamation of short-term disturbances; however,

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

existing weeds and expansion with development under the interim drilling period where adequate treatment has not taken place will continue to pose problems for livestock operators.

Impacts of greater concern are those relating to death loss from vehicle collisions or poisonous plants and disruption of livestock management actions such as vehicular traffic through shipping pastures or altering sheep trailing routes to avoid facilities and halogeton. At this scale of development, these impacts should be negligible if coordination with permittees, field personnel awareness, and weed control measures occur. Whether existing water sources would be impacted due to water drawdown pumping is unknown. The potential for damage to livestock control structures would be minimal due to the level of development. Benefits to livestock operations from existing or new water sources and road infrastructure as a result of CBNG development would continue or be improved.

### 4.6.3.4   Alternative C

Alternative C would proceed with development across the ARPA similar to the Proposed Action alternative, but would limit the acres of disturbance on sensitive sites and to protect specific resource values and sites on public lands. Examples of some of these sites are steep slopes, soils with high runoff or erosion potential, big game crucial winter range, greater sage-grouse nesting habitat, and lambing areas. Since about 95 percent of the ARPA is affected by one or more restrictions for sensitive values (map M-40), the total acres disturbed on BLM-administered lands would be reduced by about 68 percent. Total acres disturbed on private and state lands would be similar to that described under the Proposed Action or could increase to compensate for lower disturbance limits on public lands. This would result in an estimated initial disturbance of about 13,286 acres, and would result in the short-term loss of 1,703 AUMs. In addition, field development would be planned on a pasture or regional basis within allotments with the livestock operators. This form of development would reduce impacts to livestock operations and allotments to varying degrees.

In general, allotments with more critical wildlife habitat may have lower limits on disturbance that would result in reduced forage lost or made unusable by dust. Allotments with soils sensitive to disturbance may require lower limits on disturbance or methods that would reduce erosion or speed up reclamation that would also lower impacts to livestock operations. However, even though the magnitude of disturbance is reduced, the number of wells and activities to develop them and associated facilities would still be the same as in the Proposed Action.

The discussion above would not change the most impacted allotments described in the Proposed Action section, which are Doty Mountain, Cherokee, Fillmore, East Muddy, and Sixteen Mile. Although impacts to vegetation, soils, and hydrology have all been reduced significantly on public lands, and these will benefit livestock operations, many factors associated with a fast rate of field development still exist. These include increased death loss due to vehicle collisions, unusable forage and shifts in distribution of use due to dust, disruptions to livestock management actions, and potential for damage to livestock control facilities. Planning field development by pastures or regions within allotments would allow livestock operators to plan and work around the disruptions associated with development, instead of having these occur across the whole allotment. This may still lead to reductions in livestock use through requests for temporary nonuse, but at a level where ranchers could still continue to graze a majority of their allotments.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

### 4.6.3.5  Alternative D

Alternative D would proceed with development across the ARPA similar to the Proposed Action alternative, but with two categories of disturbance goals and a limit of 7,600 acres of unreclaimed disturbance at any one time. In general, allotments with more resource values requiring avoidance or limited disturbance (Category A on map M-7) would result in reduced forage lost. However, even though the magnitude of disturbance is reduced, the number of wells and activities to develop them and associated facilities would still be the same as in the Proposed Action. This would result in an estimated initial disturbance of about 13,000 acres, and would result in the short-term loss of 1,667 AUMs.

The discussion above would not change the most impacted allotments described in the Proposed Action section, which include Doty Mountain, Cherokee, Fillmore, East Muddy, and Sixteen Mile. Factors associated with a fast rate of field development still exist which include increased death loss due to vehicle collisions and poisonous plants, unusable forage and shifts in distribution of use due to dust, disruptions to livestock management actions, and potential for damage to livestock control facilities. Annual coordination and planning meetings would help livestock operators plan and work around the disruptions associated with development. This may still lead to reductions in livestock use through requests for temporary nonuse, but at a level where ranchers could still continue to graze a majority of their allotments.

### 4.6.4  Impacts Summary

#### 4.6.4.1  The Proposed Action

Range impacts associated with the Proposed Action would include disturbed land and associated loss of available forage. Implementation of the Proposed Action would result in an initial loss of about 2,026 AUMs due to actual disturbance to forage during construction activities. During the life of the project, this total is estimated to be replaced and probably exceeded assuming reclamation efforts are successful. However, 1,588 sheep AUMs may not be usable due to poisonous plant expansion and lack of weed control on private and state lands that may spread to adjacent public lands. An additional 2,000 to 4,000 AUMs may also be unusable on an annual basis due to dust from roads. In allotments with the highest rates and extent of field development, there would likely be reductions in livestock use that could total 20,000 AUMs (both BLM and private) annually in increased requests for temporary nonuse by six or more livestock operations.

Based on the assumptions and estimates contained in this assessment and experiences with gas field development in adjacent areas, the Proposed Action would result in significant impacts to livestock operations due to increased death loss, unusable forage due to dust and expansion of non-native poisonous plants, declining rangeland health and forage productivity, and disruptions to livestock management actions. The potential would exist for damage to livestock control facilities and increased labor in corrective actions.

#### 4.6.4.2  Alternative A (No Action)

Range impacts associated with the no action alternative would include disturbed land and associated loss of available forage as described in the Atlantic Rim pod EAs and associated POD environmental assessment. This would amount to less than 10 percent of the forage loss described under the Proposed Action, or between 150 to 200 AUMs. Since this impact is

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

spread across four large allotments, the short-term impact should be minimal. During the life of the project, this total is estimated to be replaced or exceeded assuming reclamation efforts are successful.

Due to the small scale of development in this alternative, there would be minimal impacts in terms of unusable forage due to dust, declining rangeland health and forage productivity, potential for damage to livestock control structures, and disruptions to livestock management actions. The level of livestock death loss will be dependent on future weed control efforts to control existing and expanding weed populations.

### 4.6.4.3   Alternative C

Range impacts associated with Alternative C would include disturbed land and associated loss of available forage. Implementation of the Alternative C would result in an initial loss of about 1,703 AUMs. During the life of project, this total is estimated to be replaced or exceeded assuming reclamation efforts are successful. However, an additional 3,000 to 6,000 AUMs may be unusable on an annual basis due to dust from roads, once full-field development is completed. In allotments with the highest rates and extent of field development, there would likely be annual requests for temporary nonuse that could total 5–10,000 AUMs by six or more livestock operations. However, this would be reduced (depending on how each livestock operation is affected) by planning development on a pasture or regional basis within each allotment.

Based on the assumptions and estimates contained in this assessment and experiences with gas field development in adjacent areas, Alternative C would result in significant impacts to livestock operations due to increased death loss, unusable forage due to dust, declining rangeland health and forage productivity, and disruptions to livestock management actions. The potential would exist for damage to livestock control facilities and increased labor in corrective actions.

### 4.6.4.4   Alternative D

Range impacts associated with Alternative D would include disturbed land and associated loss of available forage. Implementation would result in an initial loss of about 1,667 AUMs, which is less than Alternative C. During the life of the project, this total is estimated to be replaced or exceeded assuming reclamation efforts are successful. However, 1,588 sheep AUMs may not be usable due to poisonous plant expansion and lack of weed control on private and state lands that may spread to adjacent public lands. An additional 2,000 to 4,000 AUMs may be unusable on an annual basis due to dust from roads, particularly on private and state lands, once full-field development is completed. In allotments with the highest rates and extent of field development, there would likely be reductions in livestock use that could total 20,000 AUMs (both BLM and private) annually in increased requests for temporary nonuse by six or more livestock operations.

Based on the assumptions and estimates contained in this assessment and experiences with gas field development in adjacent areas, Alternative D would result in significant impacts to livestock operations due to increased death loss, unusable forage due to dust, and expansion of non-native poisonous plants, declining rangeland health and forage productivity, and disruptions to livestock management actions. The potential would exist for damage to livestock control facilities and increased labor in corrective actions.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

### 4.6.5  Additional Mitigation Measures

#### 4.6.5.1  The Proposed Action

Speed limits would be enforced by companies advising and disciplining their employees and contractors as necessary to comply with speed limits.

The operators would coordinate annually or more often when necessary with affected livestock operators to discuss (1) problems encountered during the past grazing season, (2) agreed-upon corrective actions, and (3) planned energy development and operations during the next grazing season. This meeting needs to occur on a date early enough to allow grazing permittees sufficient time to make decisions and allocate their resources for the upcoming grazing season.

#### 4.6.5.2  Alternative A (No Action)

The operators would coordinate annually or more often when necessary with affected livestock operators to discuss (1) problems encountered during the past grazing season, (2) agreed-upon corrective actions, and (3) planned energy development and operations during the next grazing season. This meeting needs to occur on a date early enough to allow grazing permittees sufficient time to make decisions and allocate their resources for the upcoming grazing season.

#### 4.6.5.3  Alternative C

No additional mitigation measures are proposed for Alternative C over and above that detailed in appendix L "Resource Concerns and Associated Protection Measures Proposed Under Alternative C".

#### 4.6.5.4  Alternative D

Speed limits would be enforced by the companies advising and disciplining their employees and contractors as necessary to comply with speed limits.

The BLM would require that the operators establish speed limits in the project area and promote adherence to them, and erect signs in lambing/calving areas, shipping pastures, or adjacent to working corrals to warn vehicle operators.

The operators would coordinate annually or more often when necessary with affected livestock operators to discuss (1) problems encountered during the past grazing season, (2) agreed-upon corrective actions, and (3) planned energy development and operations during the next grazing season. This meeting needs to occur on a date early enough to allow grazing permittees sufficient time to make decisions and allocate their resources for the upcoming grazing season.

The operators would report damage to livestock and livestock facilities as quickly as possible to BLM and affected livestock operators.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

### 4.7  Wildlife

#### 4.7.1  Introduction

The principal wildlife impacts likely to be associated with the Proposed Action or action alternatives include (1) direct and indirect loss of wildlife habitats, (2) displacement of some wildlife species from increased human access and activity, (3) an increase in the potential for collisions between wildlife and motor vehicles, (4) an increase in stress to wildlife and (5) disruption of life history requirements of a species or population segment.

In addition, an analysis of potential wildlife concerns within each section of the ARPA was conducted so that operators could take the locations of these potential concerns into account when planning and selecting eventual well locations.  Mitigation measures that correspond to the respective types of wildlife impacts within any given section would be implemented.

The primary wildlife resource concerns known to be present within the ARPA include big game crucial winter/transitional ranges; big game migration routes; overlapping big game crucial winter range (multiple species); leks, nesting habitat, and severe winter relief habitat of greater sage-grouse leks and nesting habitat of Columbian sharp-tailed grouse; and raptor nests.

The wildlife map (map M-29) represents the currently known locations of wildlife resource concerns within the ARPA.  As more field data are gathered, additional areas that include wildlife resource concerns may be identified and mapped.  If development occurs in areas of overlapping wildlife resource concerns, mitigation measures for each individual resource would be implemented.  This approach provides the operators with information that can be used when developing gas well placement plans. Planned placement of disturbances may avoid individual wildlife resource concerns or overlapping concerns present within a section.

#### 4.7.2  Impact Significance Criteria

The Great Divide Resource Area RMP ROD (USDI-BLM 1990) and state (WSLUC 1979) land use plans prescribe the following management objectives associated with wildlife resources:

- To provide habitat quality (food, cover, space, and water) adequate to support a natural diversity of wildlife and fisheries including big game; upland game; waterfowl; non-game species; game fish; sensitive, threatened, and endangered species; and species of special management interest in Wyoming as well as to assist in meeting goals of recovery plans.

- To maintain or improve vegetation condition or avoid long-term disturbance in high priority standard habitat sites and fisheries areas.

- To maintain or improve overall ecological quality, thus providing good wildlife habitat, within the constraints of multiple-use management in moderate and low priority standard habitat sites.

The following criteria were considered in the assessment of impacts associated with the Proposed Action and alternatives and are the same as those contained in the Draft Rawlins RMP DEIS (USDI-BLM 2004c):

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

1. Substantial loss of habitat function or disruption of life history requirements of a species or population segment that would make them eligible for listing under the ESA.

2. Decreased viability or increased mortality of threatened and endangered, proposed, and candidate species or reduction or alteration of their critical habitats.

3. Management actions that result in substantial disruption or irreplaceable loss of vital and high value habitats as defined in the WGFD (2004c) Mitigation Policy.

4. Substantial loss of habitat function or disruption of life history requirements of special status species that would preclude improvement of their status. Habitat function means the arrangement of habitat features and the capability of those features to sustain species, populations, and diversity of wildlife over time (WGFD 2004c).

### 4.7.3  Direct and Indirect Impacts

#### 4.7.3.1  Direct and Indirect Impacts Common to All Alternatives

Applicant voluntarily committed measures (appendix K) and the BMPs (appendix H) would be implemented under all alternatives. The Wildlife Monitoring and Protection Plan (appendix E) would be followed to prevent, reduce, and detect impacts to wildlife and fish species throughout the life of the project. This plan serves two purposes. One is to describe the protocols to monitor wildlife responses, habitats, behavioral shifts, etc. The other is to provide protocols to protect wildlife species and track the effectiveness of the monitoring plan. BMPs implemented for other resource concerns may provide indirect protection for a variety of wildlife species.

Wildlife habitats directly affected by the proposed project include areas that are physically disturbed by the construction of pads, roads, pipelines, and production facilities; wildlife habitats indirectly disturbed include areas surrounding directly impacted habitats. Disturbance during construction and production, such as human presence, dust, and noise may displace or preclude wildlife use of disturbed areas. Wildlife sensitivity to these impacts varies considerably with each animal species.

Prohibiting construction, drilling, and other activities potentially disruptive to wildlife during sensitive time periods (i.e., winter, brood-rearing) would minimize the probability of displacement, nest abandonment, or reproductive failure during these critical times of the year. To reduce human presence, remote monitoring of project facilities, gating of roads, and noise reduction techniques should be used to the greatest extent possible during the production phase. However, habitat loss would still occur outside of this time period, as development would be allowed. In addition, it does not address the displacement of animals/loss of critical habitat due to the presence and operation of wells, facilities, and roads after construction is complete.

Displacement is unavoidable in the short term under all action alternatives, and this displacement has the potential to have the most significant effect on wildlife. Avoidance of disturbed areas would result in wildlife displacement from an area larger than the actual disturbed sites. The extent of displacement would be related to the duration, magnitude, and the visual prominence of the activity, as well as the extent of construction and operational noise

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

levels above existing background levels. Visual prominence of facilities is dependent upon surrounding topography.

Displacement would result in local reductions in wildlife populations if adjacent, undisturbed habitats are at carrying capacity. In this situation animals are either forced into less optimal habitats or they compete with other animals that already occupy unaffected habitats. Possible consequences of such displacement are lower survival, lower reproductive success, lower recruitment, and ultimately lower carrying capacity and reduced populations (WGFD 2004d).

Reaction of animals to noise and human presence varies depending on the intensity of the noise source and whether it is continuous or intermittent. Transient loud noises would provoke alarm responses; however, many animals learn to ignore more constant, lower-level noise sources that are not associated with negative experiences such as being chased or hunted (Busnel 1978).

The extent of wildlife displacement is impossible to predict for most species since the response severity varies from species to species and can even vary between different individuals of the same species. After initial avoidance, some wildlife species (usually certain birds and rodents and to a lesser extent deer and pronghorn) may acclimate to the activity and begin to reinvade areas previously avoided. This acclimation and reoccupation would be expected to occur following construction and drilling when the project moves into the production phases where less noise and human activity would take place.

Construction and drilling noise have the potential of affecting wildlife species at the project site as well as areas surrounding disturbance sites. Man-made construction such as well pads and roads can reduce use of surrounding habitat by wildlife. These impacted sites reduce foraging due to the direct loss of native vegetation from ground disturbance. In addition, there is an area surrounding these sites that tends not to be used due to the increased human activity. This zone can extend up to 0.625 mile from the developed area for pronghorn (Easterly et al. 1991) and from 0.6 to 1.2 miles for elk depending upon the season (Powell 2003). Consequently, development impacts to wildlife can extend farther off site than the actual amount of disturbed area. Although some individual animals can habituate to the increased infrastructure, it is generally assumed that, over all, the increased human footprint on a previously lightly developed area is detrimental to big game species. In addition to the avoidance response, increased human presence intensifies the potential for wildlife-human interactions ranging from the harassment of wildlife to poaching and increased legal hunting pressure. Also, increased traffic levels on new and existing roads could increase the potential for wildlife-vehicle collisions. Following drilling and well completion operations, noise levels would be reduced because well pumps would be powered by muffled generators. As a result, species might acclimate to the well pad production facilities and use habitats immediately adjacent to such sites. This has been observed at other natural gas production sites in Wyoming.

Direct habitat loss from construction would equal approximately 6 percent of the project area. In addition, dust would directly and indirectly impact 15–30 percent more acreage (section 4.5.3.1). These impacts would include habitat avoidance. Indirectly, this may increase inter- and intra-species competition for forage and thermal cover. In areas already fully occupied, density-dependant species would be further displaced, possibly outside of the project area. This may force animals to use lower quality habitats, which may lead to a reduction in reproduction rates or an increase in predation. The long-term loss/reduced usability of shrub habitat would lead to an increase in use on remaining shrub habitats. This increase of use would then lead to a

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

long-term reduction of shrub habitats outside the immediate project disturbances. A further reduction of shrub habitat from die-off caused by overuse would further reduce the habitat quantity and quality available in the long term, resulting in a significant impact.

Juniper/true mountain mahogany/serviceberry/silver sagebrush/bitterbrush plant communities would be avoided across the project area. This would aid in efforts to restore them to a more healthy condition to meet Rangeland Health Standard #3. These vegetation communities provide important habitat components for big game and grouse.

Habitat fragmentation and isolation are difficult to determine and vary species to species, but they could occur as a result of gas field developments, which are typically configured as point and linear disturbances scattered throughout broader areas. Although these types of disturbances do not usually create physical barriers to wildlife movement, the effective use of adjacent undisturbed habitats could diminish as densities of well pads, ancillary facilities, and roads increase.

Reclamation of disturbed areas along pipeline ROWs, road ROWs, and unused portions of well pads would result in re-establishment of vegetation in these areas over a relatively short time period. Revegetation would continue with the subsequent reclamation of abandoned well sites. Grasses and forbs are expected to become established within the first several years following reclamation; however, shrub re-establishment to pre-disturbance levels would not be achieved during the life of this project. Consequently, the total acres disturbed would constitute a long-term loss of shrubs and would not be usable by species dependant upon the shrub component for forage or shelter.

To protect breeding grounds and raptor nest sites, the BLM places a buffer around leks and nests where CSU is stipulated (USDI-BLM 1990). The buffer around the leks located within the project area covers 8,440 acres or 3.1 percent of the ARPA. The buffer around nests covers 17,846 acres or 6.6 percent of the project area. Therefore, most these areas would remain undisturbed for the life of the project.

### General Wildlife (Species Other than Described in Sections Below)

The disturbance of wildlife habitat would reduce habitat availability for a variety of small birds and mammals. The temporary disturbances that would occur during the 20-year construction period would tend to favor early succession wildlife species, such as ground squirrels and horned larks, and would have more impact on mid-to-late-succession species, such as sage sparrows, sage thrashers, and voles. The long-term disturbance acres would have a minor effect on wildlife species not dependant upon shrubs. In addition to the direct disturbance acreage, dust would directly and indirectly impact 15 to 30 percent more acreage (section 4.5.3.1). These impacts would include habitat avoidance by birds, mammals, and insects. Indirectly, this may increase inter- and intra-species competition for nesting and foraging areas. In areas already fully occupied, density-dependant species would be further displaced possibly outside of the project area. This may force animals to use lower quality habitats, which may lead to a reduction in reproduction rates or an increase in predation.

The primary songbirds (common and BLM-sensitive species) that may be displaced by the reduction in habitat are vesper sparrow, green-tailed towhee, lark sparrow, sage sparrow, sage thrasher, loggerhead shrike, and Brewer's sparrow. Although there is no way to accurately quantify these changes, the displacement would be long term. Birds are highly mobile and would disperse into surrounding areas and use suitable habitats to the extent that they are

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

available. The long-term loss/reduced usability of shrub habitat would lead to an increase in use by all species including big game (See big game section below) on remaining shrub habitats. This increase of use would then lead to a long-term reduction of shrub habitats outside the immediate project disturbances. A further reduction of shrub habitat from die-off caused by overuse would further reduce the habitat quantity and quality available for shrub-dependant birds. Standard mitigation measures would indirectly help songbirds during critical time periods; however, impacts on nesting and foraging habitats would be significant. The magnitude of habitat loss, and continued human presence during the production phase of the project, would exceed the significance criteria (criteria numbers 3 and 4).

The primary small mammals found on the project area include, but are not limited to, cottontail rabbits, deer mice, various vole species, pocket gophers, white-tailed jackrabbits, Richardson's ground squirrels, and white-tailed prairie dogs. The initial phases of surface disturbance would result in some direct mortality and displacement of small mammals from construction sites. Quantifying these changes is not possible because population data are lacking. However, the impact is likely to be minor, and the high reproductive potential of these small mammals would enable populations to quickly repopulate the area following interim reclamation. Most of these species would benefit from an increase in grass-dominated vegetation from reclamation.

Development of the project may result in some direct mortality of small birds and small mammals from vehicle collisions; however, this mortality is expected to be negligible and is not likely to significantly reduce populations within the ARPA.

**Big Game**

Impacts to big game species may include (1) the removal and modification of habitat, (2) displacement due to increased human activities, (3) increased potential for vehicular collisions due to increased traffic levels on existing highways, and (4) increased potential harvest success due to easier access. The magnitude of disturbance to big game species would depend upon the season the area is used by each species, the ability of a species to habituate to disturbance, the corresponding drilling schedule, and the density of well field development. In addition, some big game animals may not move to other habitats or other suitable habitats may not be available to them. Therefore, the inability to relocate would result in increased stress from competition for forage and cover.

The WGFD classifies big game crucial winter range as vital habitats and recommends that habitat function be maintained so that the location, essential features, and species supported by the habitat are unchanged (WGFD 2004c). The application of BLM seasonal restrictions to prevent drilling on crucial winter range between November 15 and April 30 reduces the displacement and disturbance of big game during the most critical season. During operations, mitigation measures such as remote monitoring and telemetry would be used to reduce, but not completely eliminate, impacts to big game.

Timely reclamation of well pads, pipelines, and ROWs would provide grass and forb forage within a few years, while sagebrush and other important shrub species would require longer for re-establishment to pre-disturbance levels. With average browse rates on crucial winter range and adjacent transition range already at moderate levels (40–60 percent) during average winters (Warren 2006) and higher during severe winters, this reduction in usable habitat would lead to increased browse use levels that would result in plant mortality. A 10-year clipping trial study conducted by Colorado State University indicated that repeated plant removal above 60 percent resulted in increased plant mortality of big sagebrush. Displacement of animals, due

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

to project-related activities onto either of these ranges for a longer time period would increase overall browse use levels on both transition and crucial winter range above 60 percent, which would result in plant mortality, lower vigor, and declining cover of remaining Wyoming big sagebrush plants.

**Pronghorn Antelope**

The 42,900 acres of pronghorn crucial winter/yearlong range are located along the western edge of the ARPA (map M-21). Approximately 43.5 percent (BLM GIS calculation) of the crucial winter/yearlong range in the Baggs pronghorn herd unit is within the ARPA. The remainder of the ARPA is classified as winter/yearlong or spring/summer/fall range.

Standard mitigations prohibiting construction, drilling, and other activities potentially disruptive to pronghorn within crucial winter range from November 15 to April 30 would reduce the probability of displacement during this critical time of the year. During the production phase, there is no equivalent mitigation and animals may be displaced up to 0.25 miles from the source (USDI-BLM 2004c). This would lead to increased stress/decreased condition or reproductive rates of the animals as they travel farther and may have to use lower-quality range. To reduce human presence, remote monitoring of project facilities would be used to the greatest extent possible during the production phase.

Several general pronghorn migration routes transverse the ARPA; it is unknown how critical these routes are. This project could alter or block pronghorn movements along existing migration routes.

In addition to the direct removal of habitat due to the development of pads and associated ancillary facilities, disturbances from drilling activities and traffic would affect use of the habitat adjacent to these areas. However, pronghorn have been found to habituate to increased traffic volumes and heavy machinery as long as the machines move in a predictable manner (Reeve 1984). Well development operations and deviation from ordinary activities may cause antelope displacement of up to 0.625 miles (Easterly et al. 1991), but they would likely habituate to activities along roads and continue using habitats in those areas (Reeve 1984). The magnitude of displacement would decrease over time as (1) the animals have more time to adjust to the circumstance and (2) the extent of the most intensive activities such as drilling and road building diminishes and more wells are put into production. By the time the field is under full production, construction activities would have ceased, and traffic and human activities would be reduced.

The perception of pronghorn use in and near oil and gas development projects is that some individuals may habituate to project construction and operational activities in both the short and long term. Over time, some individuals may habituate to certain disturbances, depending on the spatial relationship (i.e., distance) between these areas of disturbance to available forage, water, and thermal cover. However, this is true for only certain individuals within a population. Other individuals may exhibit a lower tolerance to human-related activity. Therefore, animals within a population may respond differently to construction and operational activity. BLM RFO biologists have noted anecdotally that antelope herd sizes are significantly smaller in impacted areas than in relatively pristine areas. Those animals that potentially acclimate seem to do so only in smaller herd sizes. In undisturbed areas, the herds are much larger and show flight responses at much greater distances than in disturbed zones. Minimizing human presence at well sites after they have been put into production and timely reclamation of well pads, pipelines, and ROWs would help reduce displacement of pronghorn from the well field.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

However, fences along Highway 789 create a migration barrier not allowing pronghorn to move from east to west across the highway. Pronghorn found east of this highway are restricted to crucial winter habitat found along Muddy Creek and against Highway 789, creating a trap to animal movement. The State of Wyoming has constructed a section of lay-down fence, unrelated to the ARPA, to help reduce this effect.

**Mule Deer**

The 74,492 acres of mule deer crucial winter and crucial winter/yearlong range are located within the ARPA (map M-23). Approximately 27 percent of the crucial winter and crucial winter/yearlong range in the Baggs mule deer herd unit is within the ARPA. Forty-two percent of this crucial winter range is on private and state land and is afforded no protection (section 3.7.2.2). Therefore, loss of this crucial winter range is likely during the life of project leading to increased use on public land crucial winter range. Construction activities remove crucial winter range vegetation and increase noise and human activity levels which displaces animals. The critical shrub component removed within crucial winter range would not be replaced (with potentially the exception of mountain sagebrush) to pre-development levels during the life of the project.

Prohibiting construction, drilling, and other activities potentially disruptive to mule deer within crucial winter range from November 15 to April 30 would reduce the probability of displacement during this critical time of the year. During the production phase, there is no equivalent mitigation and animals may be displaced up 0.75 miles from the source (USDI-BLM 2004c). This would lead to increased stress/decreased condition or reproductive rates of the animals as they travel farther and may have to use lower quality range. To reduce human presence, remote monitoring of project facilities would be used to the greatest extent possible during the production phase.

Several mule deer migration routes transverse the ARPA. A research project initiated by the BLM and WGFD in February 2005, funded by two of the operators, should help delineate the migration routes used by mule deer on the ARPA. When information is available from this research, additional mitigation would be placed on development for the protection of mule deer migration corridors. Meanwhile, this project could alter or block mule deer movements along existing migration routes.

In addition to the direct removal of habitat due to the development of pads and associated ancillary facilities, disturbances from drilling activities and traffic would affect the use of the habitat immediately adjacent to these areas. Mule deer, however, are adaptable and may adjust to non-threatening, predictable human activity (Irby et al. 1988 and Gusey 1986). However, the Sublette Mule Deer Study, which used Global Positioning System (GPS) collars, found that winter mule deer habitat selection and distribution patterns have been affected by development, specifically road networks and well pads. Sawyer found no evidence of acclimation behavior. During 3 years of study, mule deer had higher probability of use in areas farther away from well pads as development progressed. Predictive maps also suggest that some habitats considered "high probability of use" areas prior to development, changed to "low probability of use" areas as development progressed, and visa versa.

Indirect habitat loss can be substantially greater than the direct loss of habitat to roads and well pad construction. Reduction in winter range size and quality of available habitat may decrease the carrying capacity of the overall winter range (Sawyer et al. 2004). This suggests that within the ARPA, indirect impacts such as displacement from activities, dust from roads, and

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

competition for forage within the already poor condition crucial winter range habitat may lead to reduced mule deer numbers and die-offs from animals going onto crucial winter range in poorer health with reduced body reserves.

**Elk**

Approximately 41,000 acres or 20 percent of the crucial winter/yearlong range in the Sierra Madre elk herd unit is within the ARPA (map M-24). Several elk migration routes transverse the ARPA; however, it is unknown how critical these routes are. This project could alter or block elk movement along existing migration routes.

Construction activities remove crucial winter range vegetation and increase noise and human activity levels which displace animals. However, much of the crucial winter range is on steeper south- and west-facing slopes that would be avoided during development. The amount of vegetation disturbed is not as important as the noise and activity levels that would still occur and result in displacement of elk. In addition to the direct removal of habitat due to the development of pads and associated transportation facilities, disturbances from drilling activities and traffic would affect use of the habitat adjacent to these areas (Powell 2003). Elk are more sensitive to human activities than pronghorn or mule deer, and they may be displaced in construction areas from 0.6 to 1.2 miles for elk depending upon the season (Powell 2003). Displacement would be reduced in areas with topographic barriers (Edge and Marcum 1991). Elk would likely habituate to the physical presence of gas wells (Ward et al. 1973, Ward 1976, Hiatt and Baker 1981, Perry and Overly 1976). However, elk rarely adjust to continued human presence required during the production phase of the project (Thomas and Toweill 1982). With the increase in roads and potential recreational access to the area, displacement of elk is extremely likely during all phases of development. During the production phase, there is no equivalent mitigation and animals may be displaced up to 1 mile from the source (USDI-BLM 2004c). This would lead to increased stress/decreased condition or reproductive rates of the animals as they travel farther and may have to use lower-quality range. To reduce human presence, remote monitoring of project facilities would be used to the greatest extent possible during the production phase.

**Overlapping Big Game Crucial Winter Range**

Areas of overlapping big game crucial winter range are of greater importance because they provide crucial habitat for more than one species of big game. There are several areas of overlapping big game crucial winter range located within the ARPA (map M-25). The combinations of overlapping big game crucial winter range include the following: elk/mule deer, 3,038 acres and mule deer/antelope, 22,637 acres. Forty percent of this habitat is on private and state lands where there are no protections against disturbance of animals during crucial time periods.

Indirectly, this may increase inter- and intra-species competition for forage and thermal cover; in areas already at carrying capacity, density-dependant species would be further displaced. This may force animals to use lower-quality habitats, which may lead to a reduction in reproductive rates or an increase in predation.

**Upland Game Birds**

**Greater Sage-Grouse.** Greater sage-grouse are abundant within the ARPA, due to the high amount and diversity of suitable habitat, lack of habitat fragmentation, and the close proximity of upland and riparian habitats. In addition, all habitats needed to fulfill the life history requirements of this species are found adjacent to one another. Potential impacts to greater

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

sage-grouse include loss of nesting or early brood-rearing habitat, decreased population productivity caused by loss of nesting or early brood-rearing habitat, reduced utilization of suitable habitats due to indirect disturbance, loss of winter habitat, increased predation due to increased roosting sites for raptors on power poles and other structures, and displacement of birds into lower quality habitats.

Potential sources of direct impacts to greater sage-grouse include excessive noise levels proximal to occupied leks; disruptive human activities that occur during the daily time period in which courtship and breeding, nesting, brood-rearing, and foraging activities take place; and habitat loss from construction of project facilities. Noise levels interfere with bird communication during mating periods resulting in lower bird attendance at leks. Disruptive human activities alter normal bird behavior, increase nest abandonment, and may displace birds into less-desirable habitats. Construction of facilities and roads creates a long-term loss of greater sage-grouse habitat, increases fragmentation of remaining habitat. Increased predation due to facilities, such as well houses, compressor stations, and aboveground power lines serving as perches for raptors and corvid's can result in long term loss. Roads may also serve as travel corridors for some predators, such as foxes and coyotes. All of these impacts lead to lower productivity and long-term decline in the population of this species.

Of greater concern is the indirect loss of habitat resulting in bird displacement and fragmentation of nesting and early brood-rearing habitat. Sources of indirect impact primarily relate to dust settling on vegetation and loss of sagebrush habitat due to over-browsing by antelope and mule deer. Dust reduces the palatability and production of forbs and shrubs used by grouse. Over-browsing by big game on ranges shared with grouse would reduce quality and abundance of nesting, brood-rearing, winter habitats, and forage.

Potential greater sage-grouse nesting habitat covers 92 percent of the ARPA. In the long-term, recovery of shrubs to pre-disturbance levels would not occur during the life of the project. Therefore, there would be a long-term loss of nesting habitat.

Sage-grouse may repopulate an area following energy development, but may not attain population levels that occurred before development (Braun 1998). Most nests abandoned are directly or indirectly related to human activity. Likelihood of abandonment is higher when nests are disturbed early in the incubation period (Remington and Braun 1991).

Naugle et al. (2006) found that leks along the edge of CBNG development had higher lek attendance than leks within the developed area. The hypothesis that sage-grouse avoid developed areas is supported by the finding that active leks and leks with moderate to large numbers of males were often found adjacent to CBNG fields but rarely within CBNG. In contrast, inactive leks and leks with few males were often found within CBNG fields. One of the most striking patterns discovered was that, of leks counted in either 2004 or 2005, no medium or large-sized leks occurred within CBNG development; all remaining leks in CBNG have 20 or fewer males. Summary statistics for well and power line variables calculated from GIS layers around active and inactive leks indicate that active leks typically are twice as far from wells, one-half times as far from power lines, have one-third the density of wells, one-half the density of power lines, and generally have less development (wells and power lines) within 3.2 kilometers (km) of the lek complex. In addition, a significantly higher proportion of lek complexes are inactive in CBNG areas compared to areas on the edge of or outside CBNG (excluding lek complexes of unknown status and those destroyed by agriculture or mining).

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

**Columbian Sharp-Tailed Grouse.** Six occupied Columbian sharp-tailed grouse lek locations have been documented on or within 1 mile of the ARPA, which comprises 27 percent of the leks within the BLM RFO land management area (map M-27). Potential Columbian sharp-tailed grouse nesting habitat (habitat located within 1 mile of an occupied lek) covers 4,956 acres or 1.8 percent of the ARPA (section 3.7.3.2). Leks are not located on BLM lands; however, 785 acres of nesting and brood-rearing habitat are located on BLM lands. These leks represent the northernmost extent of the known distribution of Columbian sharp-tailed grouse, and may represent 27 percent of the leks known to occur in Wyoming. Wintering habitat for sharp-tailed grouse (serviceberry/mixed mountain shrub habitat) totals 287 acres, of which 278 acres are on BLM land.

Potential sources of impact to sharp-tailed grouse include excessive noise levels proximal to occupied leks, and disruptive human activities that occur during the daily time period in which courtship and breeding activities take place. As no leks are located on BLM-managed lands, the potential for disturbance during courtship and breeding periods is likely as there are no timing restrictions for surface disturbing or other disruptive activities. Also, in the long-term, recovery of shrubs to pre-disturbance levels would not occur during the life of the project for sharp-tailed grouse nesting and brood-rearing habitat.

The application of avoidance and mitigation measures on BLM lands would help to reduce stress to sharp-tailed grouse during nesting and brood-rearing periods. There are no measures to protect the habitat from being removed by project activities outside this spring period on BLM lands or at any time on private and state lands.

**Wintering Areas for Grouse.** Wintering areas (as they are mapped) would be protected from surface disturbing activities from November 15 to March 14. Activities would be allowed outside this timing period and habitat could be removed. This would result in habitat loss as well as potential displacement of wintering birds.

Approximately 200 acres of severe winter relief areas (SWR), of which 174 acres are on BLM land, have been identified and mapped so far. Mapped wintering habitat for sharp-tailed grouse (serviceberry/mixed mountain shrub habitat) totals 287 acres, of which 278 acres (97 percent) are on BLM land. Surface-disturbing activities would be prohibited in serviceberry/mixed mountain shrub habitat and SWR, which would also protect this wintering habitat for grouse.

## Raptors

The potential impacts that the project could have on raptors include nest abandonment and reproductive failure due to project activities or increased human disturbance, reductions in prey populations, mortality from vehicle collisions, loss of nesting habitat, decreased population recruitment, and reduced use of suitable habitats.

There are 357 raptor nests located within the ARPA, with an additional 185 raptor nests within 1 mile of the ARPA boundary (1 mile seasonal protection) totaling 542 nests. The total acreage around nests, buffered by 1 mile of seasonal protection, totals 173,483 acres or 64 percent of the ARPA.

Development of the project would disturb habitat for several prey species. The amount of short-term change in prey base populations created by construction is expected to be minimal in comparison to the overall level of small mammal populations. While prey populations on the project area would likely sustain some reduction during the development phase of the project,

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

most prey species would be expected to rebound to pre-disturbance levels following initial reclamation. Once reclaimed, these areas would likely promote an increased density and biomass of small mammals that is comparable to those of undisturbed areas (Hingtgen and Clark 1984). For these reasons, no measurable long-term reductions are anticipated to the prey base. However, prey populations may be displaced due to dust and habitat loss. In turn, those raptors (i.e., prairie falcon and burrowing owl) dependant on small birds and insects may be indirectly affected.

Some raptors feed on carrion on and along the roads, while others (owls) may attempt to capture small rodents and insects that are illuminated in headlights. These raptor behaviors put them in the path of oncoming vehicles where they are in danger of being struck and killed. The potential for such collisions can be reduced by requiring that drivers undergo training that describes the circumstances under which vehicular collisions are likely to occur and measures that can be taken to minimize them.

## Fish

Refer to section 4.8 for impacts to sensitive fish species.

## 4.7.3.2  Proposed Action

Development would alter or remove approximately 15,800 acres of wildlife habitat over the next 20 years. However, reclamation of disturbed habitats would commence immediately and continue throughout the 20-year construction period, resulting in a short-term recovery of grass-dominated habitat. This reclamation would reduce the area disturbed by 60 percent down to 6,240 acres. Long-term recovery of shrubs to pre-disturbance levels would not occur during the life of the project. On average, there would be 63.2 acres of pre- and 24.8 acres of post-reclamation disturbance with the maximum eight pad locations per section.

Impacts are the same as identified in section 4.7.3.1 above, except as discussed below.

## General Wildlife (Species Other than Those Described in Sections below)

The long-term disturbance would have a minor effect on wildlife species not dependant upon shrubs. Impacts to songbirds that are dependant upon shrub habitats for nesting and foraging would be significant. The magnitude of habitat loss, and continued human presence during the production phase of the project (as discussed in section 4.7.3.1, General Wildlife), would exceed the significance criteria (criteria numbers 3 and 4).

## Big Game

**Pronghorn Antelope.** The acreage disturbance and the actual number of pads per section would fall under a high impact post-reclamation. The direct loss/reduced usability of Wyoming big sagebrush would increase use on remaining shrubs, resulting in shrub health decline outside the immediate project disturbances. This would have the greatest impact to antelope due to their extreme reliance upon sagebrush (96 percent of their diet) during winter. This level of development within pronghorn crucial winter range, compounded by the current condition of the crucial winter habitat would exceed the significance criteria (criterion number 3).

**Mule Deer.** The acreage disturbance and the actual number of pads per section would fall under a high impact post-reclamation. This level of development within mule deer transitional

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

range and crucial winter range, compounded by the current poor condition of the crucial winter habitat, would exceed the significance criteria (criterion number 3).

**Elk.** Although actual acreage disturbance would fall under a "high" impact post-reclamation, there would be an "extreme" impact to elk based on the actual number of pads (eight pads per section) (WGFD 2004c). With this level of development, impacts to elk crucial winter range would exceed the significance criteria (criterion number 3).

### Upland Game Birds

**Greater Sage-Grouse.** Proposed Action habitat disturbances would equate to a maximum direct loss of 10 percent of the available nesting habitat (eight locations per section with associated roads and facilities). However, the acreage disturbed by this alternative would fall into the high impact category (WGFD 2004c).

Of greater concern is the indirect loss of habitat resulting in bird displacement and fragmentation of nesting and early brood-rearing habitat. At eight locations per section impact zones surrounding each well pad, facility and road corridor begin to overlap, thereby reducing habitat effectiveness over much larger, contiguous areas. Human, equipment, and vehicular activity and noise impacts are also more frequent and intensive (WGFD 2004c).

The application of avoidance and mitigation measures would help reduce the loss of habitat and stress to greater sage-grouse in proximity to leks on public lands. Based on research conducted in Wyoming, only 45 percent of nests would be afforded seasonal protection as they are within the 2-mile buffer of leks. Of the suitable nesting habitat, 21 percent is outside the 2-mile buffer and would be afforded no seasonal protection. Habitat loss would continue outside the quarter-mile-protected buffer around leks. However, the long-term loss of shrubs combined with the indirect impacts on the habitat, such as dust, noise, and continued human presence during the drilling and production phase, would result in habitat loss and disturbance levels exceeding the significance criteria (criterion number 4).

**Columbian Sharp-Tailed Grouse.** The application of avoidance and mitigation measures in this alternative would help to reduce stress to nesting and brood-rearing and wintering sharp-tailed grouse. However, because of the magnitude of habitat loss and continued human presence during the production phase of the project, impacts would exceed the significance criteria (criterion number 4).

**Wintering Areas for Grouse.** The timing stipulation prevents winter disturbance to greater sage-grouse, but does not prevent the direct loss of wintering areas outside of this time period. Loss of this habitat would lead to lower productivity and long-term decline in the population of these species.

### Raptors

With the application of avoidance and mitigation measures, impacts are not expected to exceed the significance criteria.

### Fish

Refer to section 4.8 for impacts to sensitive fish species.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

### 4.7.3.3  Alternative A (No Action)

Under Alternative A, drilling would continue for the approved Atlantic Rim pod EAs until they are completed. The remainder of the area would remain undeveloped.

### 4.7.3.4  Alternative C

Alternative C would proceed with development across the ARPA similar to the Proposed Action alternative, but would be constrained by crucial/sensitive resource concerns. These sites would have additional protective measures beyond what is already provided by applying standard mitigation stipulations (appendix E, appendix H, and appendix L). Examples of these sensitive sites are steep slopes, soils with high runoff potential, big game crucial winter range, and greater sage-grouse nesting and brood-rearing habitat. Because of these sensitive issues, there would be less surface disturbance allowed per section on BLM lands. This would reduce the surface disturbance on lands administered by the BLM by approximately 68 percent relative to the Proposed Action. There would be less than 20 acres of pre-reclamation and 5 acres of post-reclamation surface disturbance with a maximum of four pads per section in grouse nesting and brood-rearing habitat and crucial winter range on BLM lands. This would reduce impacts on different wildlife species to varying degrees.

The overall reduction in acres initially disturbed would reduce habitat fragmentation and indirectly increase potential recruitment of native species re-establishing disturbed sites. This would decrease the overall habitat loss and displacement effects to wildlife species, as well as reduce impediments within movement corridors. A reduction in disturbance of wildlife habitat on BLM lands by 68 percent would benefit all species and reduce the time required, long term, to return the functionality of the habitat in the project area. These benefits would be realized to the greatest extent in the central and southern portions where there is a preponderance of BLM lands. The extreme southern portion and the northern half would realize some benefit of these additional mitigations, but their effectiveness would be reduced due to the lack of equivalent mitigation on private and state lands.

### General Wildlife (Species Other than Those Described in Sections below)

Under this alternative, additional mitigation would be applied to minimize impacts to important crucial winter range, important winter habitat for grouse, and greater sage-grouse nesting and brood-rearing habitats. This mitigation to reduce total acres of disturbance would directly and indirectly benefit small birds and mammals. This would reduce disturbance in essential habitats during critical time periods for a diversity of wildlife species. This can include, but is not limited to nesting, brood-rearing, thermal cover and transitional habitat use for a diversity of small birds and mammals. Due to these factors, impacts would not exceed the significance criteria for small mammals and songbirds.

### Big Game

Although the exact locations are unknown, at least initially the placement of pads, roads, and other facilities within the ARPA would be focused on areas that are on and adjacent to the existing pods. As build-out occurs from the pods, the unaffected extent of big game crucial winter range acreage would be reduced. Below are the calculations of the percentage of crucial winter range to be impacted (by species of big game) and what percent of the project area would be affected by the additional mitigation. This does not take in to account the impacts to transitional range or migration corridors.

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

The following acreage figures are for direct habitat loss (conversion of habitat to pads, roads, compressor stations, etc.). There would be less than 20 acres of pre-reclamation and 5 acres of post-reclamation disturbance with the maximum four pads per section (resource roads and pads, not collector roads) on BLM lands within crucial winter range.

**Pronghorn Antelope**

The pronghorn herd units to be affected by the ARPA are the Bitter Creek and Baggs units. Out of 99,574 acres of crucial winter range habitat found within the Bitter Creek unit, 1,400 acres are located within the ARPA (1 percent). Out of 95,557 acres of crucial winter range habitat found within the Baggs unit, 41,500 acres are located within the ARPA (43 percent). As noted in section 4.7.3.1 (under Big Game), a total of 42,900 acres of pronghorn crucial winter range is located within the ARPA. Twenty-four percent of the crucial winter range is on private and state lands; additional mitigation would not be applied to those lands. Additional mitigation would occur on approximately 12 percent of the ARPA. Reduced acreage of habitat loss within crucial winter range would not help the downward trend in the health of crucial winter range.

**Mule Deer**

The mule deer herd unit to be affected by the ARPA is the Baggs unit. Out of 270,893 acres of crucial winter range habitat found within the unit, 73,270 acres are located within the ARPA (27 percent). Forty-two percent of the crucial winter range is on private and state lands; additional mitigation would not be applied to those lands. Additional mitigation would occur on approximately 16 percent of the ARPA. Reduced impacts to transition range would help maintain the health of crucial winter range.

**Elk**

The elk herd units to be affected by the ARPA are the Petition and Sierra Madre units. No crucial winter range for the Petition unit is found within the ARPA. Out of 178,697 acres of crucial winter range habitat found within the Sierra Madre unit, 40,840 acres are located within the ARPA (23 percent). Elk crucial winter range additional mitigation would be applied to approximately 15 percent of the ARPA. Fifteen percent of the crucial winter range is on private and state lands; additional mitigation would not be applied to those lands. Additional mitigation would occur on approximately 10 percent of the ARPA.

Under this alternative, the direct acreage disturbance and number of pads would result in significant impacts to pronghorn and mule deer crucial winter range. For elk crucial winter range, impacts would be reduced to the high category, which would still exceed the significance criteria (criterion number 3).

**Upland Game Birds**

There would be less than 20 acres of pre-reclamation and 5 acres of post-reclamation with the maximum four pads per section (resource roads and pads, not collector roads) within nesting and brood-rearing habitat.

**Greater Sage-Grouse.** Ninety-two percent of the project area contains brood-rearing and nesting habitat for greater sage-grouse (BLM-estimated by applying a 2-mile radius buffer around known sage-grouse leks). Direct disturbance would be reduced by 68 percent on public lands, reducing long-term loss of greater sage-grouse habitat to the moderate category. Short-term suspension of grazing use in some pastures would leave more residual grass cover and forbs on grouse habitat, which in turn would benefit those grouse nesting and brood-rearing in

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

these localized areas. However, the indirect impacts (displacement from construction and drilling noise, traffic, increased human activity) would still exceed the significance criteria (criterion number 4).

**Columbian Sharp-Tailed Grouse**. Columbian sharp-tailed grouse are found within the southern half of the ARPA. Soil mitigation, restricting surface disturbance on high runoff potential soils, would also indirectly protect nesting and brood-rearing habitat (4,956 acres located in the ARPA). Direct disturbance would be reduced by 68 percent on the 785 acres of nesting and brood-rearing habitat located on BLM lands (16 percent) of nesting and brood-rearing habitat located on BLM lands, reducing direct impacts to the moderate category (section 4.7.3.1, Upland Game Birds, specifically Columbian Sharp-tailed grouse). Disturbance could be the same or greater on the 4,171 acres (84 percent) of nesting and brood-rearing habitat located on private and state land, maintaining impacts in the high category. This combined with other indirect impacts would still exceed the significance criteria (criterion number 4).

### Raptors

Under this alternative, impacts would be reduced by minimizing the amount of surface disturbance within sensitive/critical resource areas. With the application of avoidance and mitigation measures, impacts are not expected to exceed the significance criteria.

### 4.7.3.5 Alternative D

Development would alter or remove approximately 13,600 acres (13,000 new acres and 600 existing acres of disturbance) of wildlife habitat over the next 20 years. At any one time, total unreclaimed disturbance would be capped at 2.8 percent of the entire ARPA or 7,600 acres. Those areas designated as "Category A" would be managed more intensively (utilizing appropriate lease stipulations, conditions of approval, and best management practices) to reduce the extent of surface disturbance below an average of 6.5 acres of disturbance per well constructed. A description of "Category A" areas can be found in section 2.1.4 Alternative D. Reclamation of disturbed habitats would commence immediately after completion of site disturbance activities and continue throughout the 20-year construction period, resulting in a short-term recovery of grass-dominated habitat. Long-term recovery of shrubs to pre-disturbance levels would not occur during the life of the project. On average, there would be 52 acres of pre- and 20 acres of post-reclamation disturbance with the maximum eight pad locations per section.

Impacts are the same as identified in section 4.7.3.1 above, unless discussed below.

### General Wildlife (Species Other than Those Described in Sections below)

The long-term disturbance would have a minor effect on wildlife species not dependant upon shrubs. Impacts to songbirds that are dependant upon shrub habitats for nesting and foraging would be significant. The magnitude of habitat loss, and continued human presence during the production phase of the project, would exceed the significance criteria (criterion number 4).

### Big Game

**Pronghorn Antelope**. The acreage disturbance and the actual number of pads per section would fall under a high impact post-reclamation. The direct loss/reduced usability of Wyoming big sagebrush would increase use on remaining shrubs, resulting in continued shrub health

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

decline outside the immediate project disturbances. This would have the greatest impact to antelope due to their extreme reliance upon sagebrush (96 percent of their diet) during winter. This level of development within pronghorn crucial winter range, compounded by the current condition of the crucial winter habitat, would exceed the significance criteria (criterion number 3).

**Mule Deer.** The acreage disturbance and the actual number of pads per section would fall under a high impact post-reclamation classification. This level of development within mule deer transitional range and crucial winter range, compounded by the current poor condition of the crucial winter habitat, would exceed the significance criteria (criterion number 3).

**Elk.** Although actual acreage disturbance would fall under a high impact post-reclamation, there would be an extreme impact to elk based on the actual number of pads (eight pads per section) (WGFD 2004c). With this level of development, impacts to elk crucial winter range would exceed the significance criteria (criterion number 3).

### Upland Game Birds

**Greater Sage-Grouse.** Alternative D habitat disturbances would equate to a maximum direct loss of 8.1 percent of the available nesting habitat (eight locations per section with associated roads and facilities). Under this alternative there is a goal of 20 percent reduction of such habitat disturbance. The extent acreage disturbed by this alternative would place it into the high impact category.

Of greater concern is the indirect loss of habitat resulting from bird displacement and fragmentation of nesting and early brood-rearing habitat. At eight locations per section, impact zones surrounding each well pad, facility, and road corridor begin to overlap, thereby reducing habitat effectiveness over much larger, contiguous areas. Human, equipment, and vehicular activity and noise impacts are also more frequent and intensive at this level of development (WGFD 2004c).

The application of avoidance and mitigation measures would help reduce the loss of habitat and stress to greater sage-grouse in proximity to leks on public lands. Based on research conducted in Wyoming, only 45 percent of nests would be afforded seasonal protection as they are within the 2-mile buffer of leks. Of the suitable nesting habitat, 21 percent is outside the 2-mile buffer and would be afforded no seasonal protection. Habitat loss would continue outside the quarter-mile-protected buffer around leks. However, the long-term loss of shrubs combined with the indirect impacts on the habitat, such as dust, noise, and continued human presence during the drilling and production phase, would result in habitat loss and disturbance levels exceeding the significance criteria (criterion number 4).

**Columbian Sharp-Tailed Grouse.** The application of avoidance and mitigation measures in this alternative would help to reduce stress to nesting and brood-rearing and wintering sharp-tailed grouse. However, because of the magnitude of habitat loss and continued human presence during the production phase of the project, impacts would exceed the significance criteria (criterion number 4).

### Raptors

With the application of avoidance and mitigation measures, impacts are not expected to exceed the significance criteria.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

**Fish**

Refer to section 4.8.3.2 for impacts to sensitive fish species.

### 4.7.4  Impacts Summary

#### 4.7.4.1  Proposed Action

Standard mitigation measures would indirectly help songbirds during critical time periods; however, impacts on nesting and foraging habitats would be significant.  The magnitude of habitat loss, and continued human presence during the production phase of the project, would exceed the significance criteria (criteria numbers 3 and 4).

The impact to small mammals is likely to be minor, and the high reproductive potential of these small mammals would enable populations to quickly repopulate the area following interim reclamation.  Most of these species would benefit from an increase in grass-dominated vegetation from reclamation.

This level of development within big game crucial winter and transition ranges, compounded by the current condition of these ranges, would exceed the significance criteria (criterion number 3).

The application of the winter timing stipulation would only protect grouse during this crucial time period.  This does not prevent the direct loss of wintering areas for grouse outside of this time period.  The long-term loss of shrubs combined with the indirect impacts on the habitat, such as dust, noise, and continued human presence during the drilling and production phases, would result in the proposed action activities exceeding the significance criteria for greater sage-grouse (criterion number 4).

With the application of avoidance and mitigation measures, impacts are not expected to exceed the significance criteria for raptors.

#### 4.7.4.2  Alternative C

Impacts would not exceed the significance criteria for small mammals and songbirds due to these animals' mobility and the additional mitigation measures included under this alternative. These measures would reduce the long term loss of shrubs, the indirect impacts on habitat, such as dust, noise, and continued human presence during the drilling and production phases. This mitigation would directly and indirectly benefit small birds and mammals by reducing disturbance in essential habitats during critical time periods.

Direct and indirect impacts to pronghorn crucial winter range would exceed the significance criteria.  Direct impacts to mule deer crucial winter range, combined with indirect impacts, would still exceed the significance criteria.  For elk crucial winter range, impacts would be reduced to the high category, which would still exceed the significance criteria (criterion number 3).

Long-term loss of habitat to greater sage-grouse and Columbian sharp-tailed grouse, combined with indirect impacts (See section 4.7.3.1 above) would still exceed the significance criteria (criterion number 4).

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

With the application of avoidance and mitigation measures, impacts are not expected to exceed the significance criteria for raptors.

### 4.7.4.3  Alternative D

Standard mitigation measures would indirectly help songbirds during critical time periods; however, impacts on nesting and foraging habitats would be significant.  The magnitude of habitat loss, and continued human presence during the production phase of the project, would exceed the significance criteria (criteria numbers 3 and 4).

The impact to small mammals is likely to be minor, and the high reproductive potential of these small mammals would enable populations to quickly repopulate the area following interim reclamation.  Most of these species would benefit from an increase in grass-dominated vegetation from reclamation.

This level of development within big game crucial winter and transition range, compounded by the current condition of these ranges, would exceed the significance criteria (criterion number 3).

The application of the winter timing stipulation would only protect grouse during this critical time period.  This does not prevent the direct loss of wintering areas for grouse outside of this time period.  The long-term loss of shrubs combined with the indirect impacts on the habitat, such as dust, noise, and continued human presence during the drilling and production phases would result in the Proposed Action activities exceeding the significance criteria for greater sage-grouse (criterion number 4).

With the application of avoidance and mitigation measures, impacts are not expected to exceed the significance criteria for raptors.

### 4.7.5  Additional Mitigation Measures

There are no additional measures proposed for the Proposed Action, Alternatives A and D. For Alternative C, additional mitigation measures are proposed over and above the requirements in appendices E, B, H, and J, and can be found as the development protection measures in appendix L.  Alternative D emphasizes reduced disturbance and monitors successful reclamation, putting a limit on disturbance if unreclaimed areas exceed 2.8 percent, or 7,600 acres, of the ARPA.  A goal of even further reduced disturbance is placed on Category A (map M-7) areas.  Those areas designated as "Category A" would be managed more intensively (utilizing appropriate lease stipulations, conditions of approval, and best management practices) to reduce the extent of surface disturbance below an average of 6.5 acres per well constructed. A description of "Category A" areas can be found in section 2.1.4 Alternative D.

The Proposed Action and Alternative D require that the operators submit annual planning reports to the BLM for their plan of operation for the upcoming year.  The BLM will work with the operators at a site-specific level to minimize surface disturbance by applying appropriate lease stipulations, conditions of approval, BMPs and any other measures deemed necessary to minimize surface disturbance and still allow for the maximum economic recovery of natural gas.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

## 4.8    Special Status Plant, Wildlife, and Fish Species

### 4.8.1    Introduction

The USFWS has determined that nine species, which are listed under the ESA as either threatened, endangered, proposed or candidate species, are potentially present within the BLM RFO management area (USDI-FWS 2004 and table 3-34). In addition, ten species found downstream of the BLM RFO management area in the Platte and Colorado River systems may potentially be impacted if water depletions occur. More detailed information on threatened, endangered, and proposed species is presented in the biological assessment for the Atlantic Rim Project (appendix G). A total of 36 species (7 plants, 6 mammals, 16 birds, 3 amphibians, and 4 fish) occur on the BLM Sensitive Species List in the RFO management area and may occur on or near the ARPA.

### 4.8.2    Impact Significance Criteria

The Great Divide RMP management objectives for special status wildlife and fish species are the same as presented for wildlife in section 4.7.2. The following criteria were considered in the assessment of impacts associated with the Proposed Action and the alternatives and are the same as those contained in the draft Rawlins RMP (USDI-BLM 2004c). Impacts to species of special concern including threatened, endangered, proposed, candidate, and sensitive species would be considered significant if any of the following was to occur:

1. Substantial loss of habitat function or disruption of life history requirements of a species or population segment that would make them eligible for listing under the ESA.

2. Decreased viability or increased mortality of threatened and endangered, proposed and candidate species, or reduction or alteration of their critical habitats.

3. Management actions that result in substantial disruption or irreplaceable loss of vital and high value habitats, as defined in the WGFD (2004c) Mitigation Policy.

4. Substantial loss of habitat function or disruption of life history requirements of special status species that would preclude improvement of their status.

5. Actions preclude attainment of conservation goals, as stated in conservation plans and strategies for special status species.

### 4.8.3    Direct and Indirect Impacts

#### 4.8.3.1    Direct and Indirect Impacts Common to All Alternatives

The Wildlife Monitoring and Protection Plan (appendix E) would be followed to prevent, reduce, and detect impacts to threatened, endangered, proposed, and candidate wildlife and fish species throughout the life of the project. The Wildlife Monitoring and Protection Plan serves two purposes. One is to describe the protocols to monitor wildlife responses, habitats, behavioral shifts, etc. The other is to provide protocols to protect wildlife species and track the effectiveness of these protections.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Wildlife habitats directly affected by the proposed project include areas that are physically disturbed by the construction of wells, roads, pipelines, and production facilities. Wildlife habitats indirectly impacted might not be physically disturbed, but the suitability of these habitats is affected by direct disturbances in nearby areas. Disturbance during construction and production phases of development, such as human presence, dust, and noise, may displace or preclude wildlife use of disturbed areas. Wildlife sensitivity to these impacts varies considerably with each animal species.

### 4.8.3.2 Proposed Action

The following threatened and endangered, proposed, or candidate species are not known to exist in the ARPA and would not be impacted by the project: Blowout penstemon, Colorado butterfly plant, Ute Ladies'-tresses, Canada lynx, Preble's meadow jumping mouse, yellow-billed cuckoo, whooping crane, interior least tern, piping plover, and Eskimo curlew, and Wyoming toad. In addition, there would be no water depletions in the North Platte Drainage so there would be no impacts to the western prairie fringed orchid. Species which may be affected, as well as fish species, are discussed below.

### Threatened and Endangered Wildlife Species

**Black-Footed Ferret.** Development of the Proposed Action would likely result in direct disturbance of some portions of the black-footed ferret's prey, prairie dogs. Surveys for black-footed ferrets would be required before ground disturbing activities within prairie dog colonies located in the Dad Complex. The remaining white-tailed prairie dog colonies within the ARPA are in the "block clearance" area, where surveys for black-footed ferrets are no longer warranted. Implementation of the Proposed Action may affect but is not likely to adversely affect the black-footed ferret.

**Bald Eagle.** Bald eagles have been observed within the project area primarily during December, January, and February (WGFD 2003a). The majority of bald eagle sightings are in the southern portion of the ARPA close to the Little Snake River. Bald eagles may use the project area for foraging during winter months because a large portion of the project area consists of winter range for antelope, mule deer, and elk.

The potential for vehicle-animal collisions would increase as a result of increased vehicular traffic associated with the project. Because bald eagles commonly feed on carrion, particularly during the winter months, the presence of road-killed wildlife on and adjacent to the access roads is an attractant. Eagles feeding on these carcasses are in danger of being struck by moving vehicles. Any increase in the death rate of bald eagles from vehicular collisions would constitute a significant impact. Because the potential for an increase in wildlife-vehicle-eagle encounters exists, the bald eagle may be affected, but is not likely to be adversely affected.

### Threatened and Endangered Fish Species

Four federally endangered fish species may occur as downstream residents of the Colorado River system: Colorado pikeminnow *(Ptychocheilus lucius)*, bonytail (*Gila elegans*), humpback chub (*Gila cypha*), and razorback sucker (*Xyrauchen texanus*) (USDI-FWS 2003). One federally endangered fish species, the pallid sturgeon (*Scaphirhynchus albus*), may occur as a downstream resident of the Platte River system in Nebraska.

Though they currently exist only downstream of the ARPA, water draining from the ARPA affects the downstream habitat for these species. Under the Upper Colorado River Basin

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Endangered Fish Recovery Program "any water depletions from tributary waters within the Colorado River drainage are considered as jeopardizing the continued existence of these fish." Tributary water is defined as water that contributes to instream flow habitat. Depletion is defined as water that would contribute to the river flow if not intercepted and removed from the system. The BLM retains discretionary authority over individual projects within the project area for the purpose of endangered species consultation. If the recovery program is unable to implement the Recovery Implementation Plan (RIP) in a timely manner or make sufficient progress in recovery of these endangered species, re-initiation of ESA section 7 consultation may be required so that new reasonable and prudent alternatives can be developed. The USFWS has determined that progress made under the RIP has been sufficient to merit a waiver of the mitigation fee for depletions of 100 acre-feet per year or less (USDI-FWS 1995). The Proposed Action would deplete approximately 10.3 acre-feet of water per year, and thus a mitigation fee waiver would be applicable.

Under the Proposed Action, the primary source of potential risks to these fish species is increases in suspended sediments and sedimentation from land disturbance from project activities. No produced water from the ARPA would be discharged to the Little Snake River drainage; therefore, produced water discharges do not pose a risk to these species. Accidental releases of produced waters or other materials could occur. However, these materials would become highly diluted before they would reach any downstream waters where these species occur; consequently, the potential risks from such occurrences are negligible.

**Colorado Pikeminnow, Bonytail, Humpback Chub, and Razorback Sucker.** Suitable habitat for these species does not exist on the ARPA. Suitable habitat does exist downstream of the ARPA in the Yampa and Green Rivers; however, the Proposed Action is not expected to affect this habitat provided that mitigation measures for water resources and soils outlined in this document are implemented.

**Pallid Sturgeon.** Suitable habitat for this species is not available on the ARPA. The pallid sturgeon is present in the Platte River, a tributary to the Missouri River, located downstream from a portion of the ARPA; however, the Proposed Action is not expected to affect this habitat provided that mitigation measures for water resources and soils outlined in this document are implemented.

### Sensitive Wildlife Species

The following sensitive species have the potential to occur on the project area; however, the species have not been found within the ARPA. If populations are found, mitigation would be applied to avoid disruption of habitat function or of life history requirements. These species should not be impacted by the project: Nelson's milkvetch, Gibben's beardstongue, pale blue-eyed grass, Cedar Rim thistle, long-eared myotis, fringed myotis, spotted bat, Townsend's big-eared bat, pygmy rabbit, swift fox, trumpeter swan, and the Yellow-billed cuckoo (east of Continental Divide). Species that may be affected are discussed below.

**White-Tailed Prairie Dog.** There are currently 295 white-tailed prairie dog colonies, covering 6,309 acres, mapped within the ARPA (section 3.8.2.2). The BLM requires that development avoid prairie dog colonies whenever possible. The intensity of development associated with implementation of the Proposed Action would likely result in direct disturbance of some portions of these prairie dog colonies. Direct impacts to prairie dogs, in the form of lost burrows and foraging habitat, would be avoided and are not expected to exceed the impact significance criteria.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

**Wyoming Pocket Gopher.** Based on the known distribution of the species and the availability of suitable habitat, Wyoming pocket-gophers likely occur in the ARPA. If populations are found, mitigation would be developed to protect them. Therefore, impacts are not expected to exceed the impact significance criteria.

**White-Faced Ibis.** White-faced ibis colonies are always associated with shallow water habitats (Erwin 1983). The Proposed Action is not expected to exceed the significance criteria because development would not occur within 500 feet of riparian and wetland habitats.

**Northern Goshawk.** In Wyoming, goshawks are found in lodgepole pine and aspen habitat (WGFD 1999). Northern goshawks are known to occur adjacent to the ARPA (WGFD 2003a). Two active goshawk nests were documented outside the eastern edge of the ARPA in the mid to late 1980s in addition to one nest located within the ARPA (See section 3.7.4). With the implementation of mitigation measures for raptor nests (appendix E), implementation of the Proposed Action would not significantly impact the northern goshawk.

**Ferruginous Hawk.** Ferruginous hawks are known to occur and nest on the ARPA. The primary potential impact to ferruginous hawks from project activities is disturbance during nesting, which could result in reproductive failure. This potential impact would be mitigated by implementing measures in appendix E. Development of the Proposed Action would not significantly impact the ferruginous hawk.

**Peregrine Falcon.** An available prey base of shorebirds, waterfowl, or small-to-medium-sized terrestrial birds usually occurs within 10 miles of the nest site. Peregrine falcons may migrate through the project area and have been observed on the ARPA (WGFD 2003a), but nesting on or near the project area is unlikely due to the lack of cliffs high enough to provide suitable nesting habitat. If nesting peregrine falcons are found on the ARPA, then all appropriate mitigation measures for raptors would be implemented to prevent or minimize impacts.

**Greater Sage-Grouse and Columbian Sharp-tailed Grouse.** See section 4.7.3.2.

**Mountain Plover.** A portion of the potential mountain plover nesting habitat may be disturbed with implementation of the Proposed Action. Impacts to mountain plovers would be minimized by avoiding construction activities in suitable plover nesting habitat during the nesting period from April 10–July 10. Mountain plover tend to use the same nesting areas from year to year, but the exact nest locations change. Mountain plovers often nest near roads, feed on or near roads, and use roads as travel corridors (USDI-FWS 1999), all of which make the species susceptible to being killed by vehicles. Thus, the operators would be required to inform employees about the potential for roadside and roadway use by this species. The BLM may also identify mountain plover "occupied habitat areas." If these areas were proposed for disturbance, additional mitigation measure(s) would be required to reduce impacts. Given the implementation of mitigation measures in appendix E, mountain plovers are not expected to be significantly impacted.

**Long-Billed Curlew.** In Wyoming, the long-billed curlew is an uncommon summer resident, but may be locally common in suitable habitat (WGFD 1999). The long-billed curlew is a BLM sensitive species throughout all of Wyoming. There have been three recorded observations of this species approximately 2 miles northeast of the ARPA and one recorded observation in the east-central portion of the ARPA (WGFD 2003a). The long-billed curlew is not expected to nest

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

on the project area due to lack of habitat, and no significant impacts to this species are expected with implementation of the Proposed Action.

**Burrowing Owl.** Burrowing owls are known to occur on the ARPA (WGFD 2003a). One active burrowing owl nest was located on the ARPA in 2002. Surveys for this species should be conducted before construction in prairie dog colonies during the owl breeding/nesting season. If nesting owls are found, the same measures used for other raptor species (appendix E) would be applied. Given these precautionary measures, no significant impacts to this species are expected to result from the implementation of the Proposed Action.

**Sagebrush-Obligate Song Birds.** The sage thrasher, loggerhead shrike, Brewer's sparrow, sage sparrow, and the Baird's sparrow are found in the ARPA (WGFD 2003a). The Proposed Action activities may displace birds to lower quality habitats, which may lead to a reduction in reproduction rates or an increase in predation. The magnitude of direct and indirect habitat loss (section 4.7.3), and continued human presence would exceed the significance criteria (criterion number 4).

**Northern Leopard Frog.** Sightings have been documented in all counties of Wyoming and this species has a high probability of occurring in areas of the ARPA having perennial water (WYNDD 2003). Provided that measures are taken to avoid disturbance and contamination of perennial water sources (See sections 4.3 and 4.4), no significant impacts to this species are expected from implementation of the Proposed Action.

### Sensitive Fish Species

Research conducted during the summer and fall of 2003 and 2004 within the upper Muddy Creek watershed, including the ARPA, found the two most consistent habitat associations among sub-adult and adult roundtail chubs, bluehead suckers, and flannelmouth suckers to be positive associations with both rock substrates and deep pools (as depicted on figures 4-1 and 4-2) (Bower 2005). Under the Proposed Action, the primary impacts to these two habitat features are (1) sedimentation from new construction and project-related land disturbance resulting in decreased availability of rock substrates and (2) alteration of local hydrologic conditions by new road construction that could lead to sedimentation and channel adjustments resulting in a loss of deep pool habitats. In addition, fragmentation of aquatic habitats, if any project-related road crossings of Muddy Creek are constructed, could limit access to required habitats or block fish migration. Though no discharges of produced water to the Little Snake River drainage are planned for the project, because of their limited distribution in Wyoming and range-wide, accidental releases of produced waters or other toxic materials to Muddy Creek would pose a potential risk to sensitive fish populations.

The impact of new roads and other facilities on fish habitats can be divided into three categories: construction, presence, and urbanization (Angermeyer et al. 2004). During the construction phase, before interim reclamation, erosion of soils exposed during earth-moving activities accelerates fine-sediment loading in stream channels. Though the biological effects of sedimentation include a variety of ecological interactions (Waters 1995), sedimentation can act to shift habitat structure such as channel depth, pool-to-riffle ratio, percent fines in substrates, and cover availability (Angermeyer et al. 2004). This sediment can extend miles downstream of the construction site and persist in stream channels for years (Angermeyer et al. 2004).

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Figure 4-1.     Relative abundance of two length groups of three species within the upper
Muddy Creek watershed as a function of the prevalence of rock substrates
at the reach scale from Bower (2005).   Plots were generated using the
averaged multi-model linear-regression function for both length groups of
the three species.





## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Figure 4-2.    Relative abundance of two length groups of three species within the upper
Muddy Creek watershed as a function of maximum channel unit depth from
Bower (2005). Plots were generated using the averaged multi-model linear-
regression function for both length groups of the three species above
minimum depth thresholds.



Atlantic Rim Natural Gas Project Final EIS

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

During the presence phase, impacts are primarily associated with the interception of shallow groundwater flow paths by roads. Water is frequently diverted along the roadway and routed to surface water drainage networks at drainage crossings. This can, in turn, alter the timing, routing, and magnitude of runoff, triggering geomorphic adjustments through erosion by channel incision, new gully or channel head formation, or slumping and debris flows (See figure 4-3 and review in Trombulak and Frissel 2000). Channel incision occurs when the base elevation of the stream channel adjusts to account for an alteration of geomorphic parameters, such as sediment supply, flow volume, or channel roughness (e.g., riparian vegetation). Channel incision has been shown to simplify channel geometry and result in the loss of pool habitats (Shields et al. 1994).

**Figure 4-3.    Example of Erosion Resulting from Concentration of Surface Runoff at Drainage Crossings.**



In the case of the Proposed Action, the effects of urbanization can include the detrimental effects of exotic species introductions and increased human presence within the ARPA. Roads provide dispersal mechanisms for a variety of exotic upland and riparian plant species. Of particular concern is the spread of tamarisk (*Tamarix*, also known as salt cedar) within the upper Muddy Creek watershed. This exotic species has been shown to displace native riparian vegetation while consuming a greater volume of water, resulting in reduced water tables and suitability of aquatic habitats (Graf 1978). Tamarisk is currently known to exist in portions of the ARPA and its dispsersal typically occurs via wind and water transport. Increased human uses of the area are also likely to increase the probability of unsanctioned, illegal, and unintentional introductions of exotic fishes and other aquatic organisms. These introductions have been cited as one of the major threats to freshwater biodiversity (Allen and Flecker 1993) and warrant careful consideration given the detrimental effects of exotic fishes on native Colorado River Basin fishes present within the upper Muddy Creek watershed.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Stream fishes require habitats for spawning, feeding, rearing, and refuge. The spatial heterogeneity and connectivity of the stream system can necessitate the movement of fishes among these habitats in order to complete their life cycles (Schlosser 1995). Interruption of movement among required habitats by road crossings can have demographic effects, decreasing population viability (Trombulak and Frissel 2000, Gibson et al. 2005). The distributions of the three target species during the summer and fall of 2003 suggest several potential implications of habitat fragmentation relating to access to refuge habitats and subsequent ability to recolonize adjacent reaches (Bower 2005). In addition, movements of the three species observed during 2005 suggest that required habitats exist in spatially distinct portions of the watershed, thus requiring movement of individuals in order to complete their life history requirements (Compton 2005).

Eighty-acre spacing of coal bed methane well locations under the proposed action would result in a road density of 7.1 miles/mile$^2$ within the upper Muddy Creek/Grizzly SMA. This includes new road construction (0.5 mile per well location) as well as 100 miles of existing road. In addition, crossings of Muddy Creek are anticipated as a result of the Proposed Action, though the number and specific location of these crossings has not yet been determined.

Research within the Little Robbers Gulch drainage (bordering the ARPA on its western edge) has demonstrated the effects of roads, natural gas drillpads, and pipelines on sediment production and runoff (Wollmer 1994). This work examined the effect of road densities of 2 mile/miles$^2$ including associated well pad and pipeline facilities on local sediment production and runoff. Wollmer (1994) observed an increase in local sediment production and runoff when compared to unaltered rangeland sites. While this study examined local erosion caused by roads, the study did not address the effects of flow interception which can lead to altered runoff timing, routes, and magnitudes. It is these hydrologic alterations compounded at the drainage scale that are most likely to result in geomorphic adjustments through erosion, causing sedimentation or loss of habitat features such as deep pools.

**Roundtail Chub, Bluehead Sucker, and Flannelmouth Sucker.** The Proposed Action would significantly impact the habitat of these species within the ARPA based on the impacts of new roads and other facilities on the habitat features found to be important to roundtail chubs within the upper Muddy Creek watershed as well as the effects of habitat fragmentation on the ability of roundtail chubs to access required habitats. In addition, the Proposed Action might preclude improvement of their status as prescribed in the Range-wide Conservation Agreement for Bluehead Suckers, Flannelmouth Suckers, and Roundtail Chubs (criterion 4) (UDNR 2004). The EIS contains many best management practices including detailed mitigation measures that will be used following site-specific reviews of the operator's annual planning proposals. The BLM IDT and cooperating agencies will work together to determine the most effective combination of COA's, best management practices and other necessary mitigations to minimize effects from the proposal.

**Colorado River Cutthroat Trout.** Given the absence of Colorado River cutthroat trout from the ARPA and portions of Muddy Creek downstream of the ARPA, the Proposed Action is not likely to impact the habitat of this species.

### 4.8.3.3  Alternative A (No Action)

There would be no additional disturbance as a result of this alternative.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

### 4.8.3.4  Alternative C

**Wildlife**

Alternative C would proceed with development across the ARPA similar to the Proposed Action, but would be constrained by critical/sensitive resource concerns. These sites would have additional protective measures beyond what is already provided by applying standard mitigation stipulations (appendix E, appendix H, appendix L, and BMPs). Examples of some of these sensitive sites are steep slopes, soils with high runoff potential, big game crucial winter range, and greater sage-grouse nesting and brood-rearing habitat. Because of these sensitive issues, there would be less surface disturbance allowed per section on BLM lands. This would reduce the surface disturbance on BLM lands by 68 percent relative to the Proposed Action. There would be less than 20 acres of pre-reclamation and 5 acres of post-reclamation surface disturbance with a maximum of four pads per section in sage-grouse nesting and brood-rearing habitat. The overall reduction in acres initially disturbed would reduce habitat fragmentation and indirectly increase potential recruitment of native species re-establishing disturbed sites. This would decrease the overall habitat loss and displacement effects to wildlife species, as well as reduce impediments within movement corridors. A reduction in disturbance of wildlife habitat on BLM lands by 68 percent would benefit all species and reduce the time required, long term, to return to the functionality of the habitat in the project area. These benefits would be realized to the greatest extent in the central and southern portions where there is a preponderance of BLM lands. The extreme southern portion and the northern half would realize some benefit of these additional mitigations, but their effectiveness would be reduced due to the lack of equivalent mitigation on private and state lands. Soil mitigation, restricting surface disturbance on high runoff potential soils, would also indirectly protect over half of the saltbush steppe habitat within the ARPA. This would benefit species such as white-tailed prairie dog, mountain plover, and burrowing owl. Direct disturbance would be reduced by 68 percent on BLM lands, reducing impacts to all BLM sensitive species. Impacts would not exceed the significance criteria for sagebrush-obligate species under this alternative.

**Fish**

Development protection measures within the upper Muddy Creek Watershed/Grizzly SMA would benefit sensitive fishes by limiting the alteration of local hydrologic conditions that create and maintain habitat features of importance to sensitive fishes. Two of these habitat features, rock substrates and deep pool habitats, have been shown to be of importance to sensitive fishes (Bower 2005) and are thought to be susceptible to loss or decreased suitability as a result of hydrologic alteration from road construction. Maintenance of existing road densities through the use of existing road paths, as well as incorporation of appropriate road designs (such as low-impact road designs on slopes of less than 8 percent), would result in a net decrease in erosion from the existing road network. Particularly problematic road paths that are causing accelerated erosion would be identified within transportation planning efforts. By reclaiming these problematic road paths, additional road lengths would be available for new road construction when lease holdings could not be accessed along existing paths, without resulting in a net increase in road density or erosion.

Additional special protective measures within the upper Muddy Creek Watershed/Grizzly SMA would preclude the fragmentation of fish habitats by road crossings, thus ensuring that access among the diverse habitats required by sensitive fishes is maintained. These measures would also limit the potential spread of exotic species that often have detrimental direct or indirect impacts on sensitive fishes and their habitats.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

**Roundtail Chub, Bluehead Sucker, and Flannelmouth Sucker.** Given the implementation of special protective measures identified for the upper Muddy Creek Watershed/Grizzly SMA, Alternative C would not significantly impact the habitat of these species within the ARPA.

**Colorado River Cutthroat Trout.** Given the absence of Colorado River cutthroat trout from the ARPA and portions of Muddy Creek downstream of the ARPA, Alternative C is not likely to impact the habitat of this species.

### 4.8.3.5 Alternative D

Under Alternative D, potential impacts are similar to those described with the Proposed Action (section 4.8.3.1) for the black-footed ferret, bald eagle, Colorado pikeminnow, bonytail, humpback chub, razorback sucker, and pallid sturgeon. Refer to the discussion in the Proposed Action for potential impacts for each species; they are the same for Alternative D. Impacts are also similar for BLM sensitive fish species.

Significant impacts to three sensitive fish species are possible. As described under the Proposed Action, roundtail chub, bluehead suckers, and flannelmouth suckers would be significantly impacted.

### 4.8.4 Impact Summary

#### 4.8.4.1 Proposed Action

#### Threatened and Endangered Species

Implementation of the Proposed Action would result in direct loss of habitat from surface disturbance associated with the construction of well sites, related facilities, access roads, and pipelines. In addition, some wildlife species would be indirectly impacted by displacement from habitats in the vicinity of the project area due to the presence of human activities associated with the construction and operation of wells. Small portions of potential black-footed ferret habitat may be disturbed. The potential for collisions between bald eagles and motor vehicles would also increase due to the construction of new roads and increased traffic levels on existing roads. The primary source of potential risks to the fish species is increases in suspended sediments and sedimentation from land disturbance from project activities. The intensity of these impacts may decrease with the completion of the construction phase and with the onset of reclamation efforts on disturbed areas.

None of the threatened and endangered species found downstream of the ARPA within the Colorado River system are known to occur in the ARPA; therefore, there would be no direct impacts to these species. However, water depletion as a result of project development, even though minimal, could indirectly impact these species. Implementation of all mitigation measures for water and soils would help reduce other potential impacts. No produced water from the ARPA would be discharged to the Little Snake River drainage; therefore, produced water discharges do not pose a risk to these species. Accidental releases of produced waters or other materials could occur. However, these materials would become highly diluted before they would reach any downstream waters where these species occur; consequently, the potential risks from such occurrences are negligible. Any water depletion within the Colorado River system results in a "may affect, likely to adversely affect" determination for threatened and endangered species found in and along this river. Therefore, BLM would initiate formal consultation with USFWS for those species. If any threatened or endangered fish species are

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

identified within the ARPA, the BLM would consult with the USFWS and develop a protection plan for the fish.

**Sensitive Species**

With the implementation of the Proposed Action, direct loss of habitat would result from surface disturbance associated with the construction of well sites and related access roads and pipelines. Small portions of potential habitat for several sensitive species may be disturbed. The intensity of these impacts would decrease with the completion of the construction phase and with the onset of reclamation efforts on many of the disturbed areas. The application of prescribed avoidance, monitoring (Wildlife Monitoring and Protection Plan, appendix E) and mitigation measures (appendix H) would reduce the impact potential. Impacts would still exceed the significance criteria for sagebrush-obligate species. Alteration of fish habitat suitability would result in significant impacts to sensitive fishes (criterion number 4).

### 4.8.4.2 Alternative C

Overall impacts to special status species would be very similar to the Proposed Action. Direct disturbance on BLM lands would be reduced by 68 percent reducing potential impacts to all special status species. Impacts would not exceed the significance criteria for sagebrush obligate species under this alternative. Development protection measures applied to the upper Muddy Creek Watershed/Grizzly SMA would help to maintain the suitability of habitats for sensitive fishes.

### 4.8.4.3 Alternative D

Overall impacts to special status species would be the same as those described under the Proposed Action. There is some potential for reduction of impacts due to the acreage limitation for disturbed and unreclaimed areas. In addition the disturbance reduction goal (approximately 20 percent) may result in reduced impacts due to reduced initial disturbance. Because the overall number of wells through the life of the project is unchanged, those species significantly impacted under the Proposed Action will remain so under Alternative D (criterion number 4).

## 4.8.5 Additional Mitigation Measures

There are no additional mitigation measures identified for threatened and endangered species or BLM sensitive species unless identified mountain-plover-occupied habitat areas are proposed to be disturbed. If this happens, the following additional mitigation measures are advised:

- Surface disturbance would occur outside identified occupied habitat for mountain plovers where feasible.

- Within a half-mile of the identified mountain-plover-occupied habitat area, speed limits would be posted at 25 mph on resource roads and 35 mph on local roads during the brood-rearing period (June 1–July 10). BLM anticipates that enforcement of speed limits will occur by the companies advising and disciplining their employees and contractors as necessary to comply with speed limits.

- Access roads would be realigned to avoid the identified mountain–plover-occupied habitat area.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

- To protect mountain plover in occupied habitat, traffic would be minimized from June 1–July 10 by car-pooling and organizing work activities to minimize trips on roads through the mountain-plover-occupied habitat area.

- To protect mountain plover in occupied habitat, fences, storage tanks, and other elevated structures would be either constructed as low as possible or would incorporate perch-inhibitors into their design.

- To minimize destruction of nests and disturbance to breeding mountain plovers, no ground-disturbing activities would occur from April 10–July 10 unless surveys consistent with the Plover Guidelines or other USFWS-approved method find that no plovers are nesting in the area.

- A plugged and abandoned well within a half mile of the identified mountain-plover-occupied habitat area would be identified with a marker 4 feet tall with a perch inhibitor on the top of the marker.

## 4.9  Recreation Resources

### 4.9.1  Introduction

This section addresses the potential impacts of the Proposed Action and alternatives to recreational resources in the ARPA. The analysis focuses on the principal form of recreation within the ARPA, which is big game hunting, and considers both direct and indirect impacts to recreation resources.

The ARPA contains no developed recreation sites. OHV use is limited to existing roads and two-tracks, except for retrieving downed game animals or accessing primitive campsites. These exceptions do allow the creation of new two-tracks which can further fragment habitat, cause erosion and sedimentation, and reduce vegetative cover. Dispersed recreation in the ARPA occurs primarily on BLM land and consists largely of hunting by residents and visitors from outside the region. Camping and OHV use within the ARPA occur most often in conjunction with hunting. There is some seasonal pleasure driving and snow machine use, which often incorporate wildlife viewing as a significant reason for visiting the area.

The ARPA contains two ACECs—Sand Hills ACEC and Jep Canyon ACEC—which merit intensive management of surface-disturbing activities for wildlife habitat (USDI-BLM 1990 and 2003b).

The health and abundance of wildlife populations directly affect the quality of hunting in the ARPA. When wildlife populations fluctuate, so do wildlife-based recreational opportunities. To determine impacts to hunting, the recreation analysis relies on the analysis of impacts to big game wildlife in the ARPA (section 4.7). The narrative and maps (M-21 through M-29) presented in section 3.7 were evaluated for their potential effect on hunting because of a loss of carrying capacity or the displacement of game.

Impacts to visual resources in the ARPA, identified in section 4.10, also were considered for effects on recreation. Visual resources influence the character of outdoor opportunities by affecting the recreation setting, as do other effects of gas development such as noise, dust, and traffic on recreational access routes.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

### 4.9.2 Impact Significance Criteria

The Great Divide RMP (USDI-BLM 1990) and state (WSLUC 1979) land use plans prescribe the following management objectives associated with recreation resources:

- To ensure the continued availability of outdoor recreational opportunities, to meet legal requirements for the health and safety of visitors, and to mitigate conflicts with other resource uses.

The main concern for the recreation analysis is displacement of existing recreational use by the Proposed Action and alternatives. Impacts to recreation would be significant if:

1. An action would cause displacement of hunting, wildlife viewing, and driving for pleasure from the ARPA when no other comparable area nearby could reasonably provide substitute opportunities.

### 4.9.3 Direct and Indirect Impacts

The Proposed Action and alternatives would potentially have both direct and indirect impacts to recreation. Direct impacts to recreation resources occur because of the physical disturbance and removal of vegetation from the construction of facilities; the visual impacts of facilities and activities; and from the noise, traffic, and visual distraction of human activity.

Examples of direct impacts include the removal of wildlife habitat that may affect game populations and the intrusion of gas facilities on a natural-appearing landscape. Indirect effects to recreation resources include changes to recreation use and experiences on lands near directly impacted recreation resources. Examples are disturbances of nearby recreation settings by traffic, noise, and landscape changes associated with gas facilities and related activity that would intensify visitation at other undeveloped areas nearby.

Most effects to recreation from the Proposed Action and alternatives would tend to decrease in the quality of recreation opportunities and the appeal of the setting for most recreationists. New roads associated with development may be considered useful in that they provide increased access for activities such as hunting, but roads fragment wildlife habitat and the associated increase in development activity would displace wildlife. Two-tracks that are lightly traveled during hunting season do not interfere with, and may be conducive to successful hunts, whereas industrial traffic on improved roads is not. Hence new improved roads do not benefit hunting. As development of the project progresses and game is displaced, success rates would be expected to decline along with the size of the herd remaining in the project area. The opportunity to pursue game on foot is diminished when an abundance of roads provide access to road hunters that could scare game from the area.

Indirect impacts to recreation can occur from population growth associated with the project's workforce. This factor was considered but not pursued further in the analysis of the Proposed Action and alternatives because the project is unlikely to cause significant long-term population effects, as described in section 4.12. Impacts to recreation from potential residential development in the future are also described in chapter 5.

The principal recreation impact likely to be associated with the Proposed Action and alternatives is the change in big game hunting opportunities because of habitat loss and wildlife

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

displacement. The underlying effects upon wildlife habitat and behavior were analyzed in section 4.7. Changes to the landscape, analyzed in section 4.10, also would affect hunters who value a natural setting as part of their experience and pleasure drivers who visit the ARPA to view the scenery and watch wildlife. These impacts would occur as the direct and indirect results of a higher density and wider distribution of gas development within the ARPA compared to existing conditions.

### 4.9.3.1  Proposed Action

As described in detail in chapter 2, a total of 2,000 new natural gas wells would be drilled and developed under this alternative during the next 20 years with an expected life of project of 30–50 years. Well placement within the ARPA is not known at this time, but it is assumed that development would likely be concentrated within or near existing pods, although some wells would also be drilled in outlying areas where development currently does not exist.

### Impacts to Hunting

The big game species potentially affected by the Proposed Action are mule deer, elk, and pronghorn antelope. The proposed level of development would disturb approximately 15,800 acres of wildlife habitat over 20 years, but interim reclamation, as intended by the operator (appendices B and K), would reduce long-term disturbance and direct loss of habitat to a total of 6,200 acres.

In addition to the direct loss of habitat due to construction of well pads and associated roads, pipelines and utilities, disturbance from human activity and traffic would lower the use of habitat immediately adjacent to developed areas and cause wildlife displacement from an area larger than the actual disturbed sites. As noted in section 4.7.3.1, this displacement effect has the potential to result in local reductions in wildlife. As also noted in section 4.7.3.1, despite acclimation and re-occupation, the increased human footprint over all on a previously lightly developed area is detrimental to big game species populations if adjacent, undisturbed habitats are at carrying capacity.

The extent of wildlife displacement is impossible to predict. Impacts to hunting would occur in the ARPA proportional to the displacement of big game in connection with the Proposed Action. If hunter success rates declined, use of the hunt areas would be likely to decline as well. The impact would be borne primarily by local and regional hunters, especially local hunters for whom the benefits of the ARPA would be diminished as a convenient and economical place to hunt. The impact would also be borne by commercial outfitters permitted to use the ARPA (See table 3-42). Increased development in the ARPA—with its potential to displace big game and its effect on the recreation setting—would reduce the appeal of the project area for a commercial clientele whose values include a successful harvest in an attractive recreational setting.

### Impacts to the Recreation Setting

For many hunters and other outdoor recreationists, a natural setting is critical to the quality of the recreation experience. In the ARPA, the Proposed Action and action alternatives would potentially affect the recreation setting due to traffic, dust and noise and by impacting visual resources.

As section 4.10 concludes, the Proposed Action and action alternatives would have a high, impact on the natural appearance of the landscape. This level of degradation of the scenery would potentially affect hunters and other recreation visitors to the ARPA.

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Research has found that hunters participate in this activity for many reasons. Though hunting success is the predominant reason, enjoyment of the outdoors and the environment has a key role for many hunters (Manning 1986). Therefore, the visual quality of the setting would likely be important to many hunters in the ARPA, and degradation of the scenery in the project area would diminish their enjoyment and the satisfaction of the hunt.

For pleasure drivers and wildlife viewers, natural scenery and productive wildlife habitats are an essential part of the recreational setting. These recreational visitors would likely be very sensitive to changes in visual quality, and impacts to visual quality in the project area would likely diminish their enjoyment of the outdoor experience.

For hunters, wildlife viewers, and pleasure drivers, industrial traffic on roads in the ARPA would potentially detract from the recreational character of the setting in the ARPA. The operator is committed to posting appropriate warning signs, implementing safety training for the operators of project vehicles and equipment, and requiring project vehicles to adhere to low speed limits (See appendix K). These project management practices would potentially limit conflicts between project activity and recreation use in the ARPA. However, some level of conflict with the expectations of recreationists is unavoidable, particularly during drilling and field development activities. The risk of traffic accidents is significantly increased by vehicles associated with development and production in the ARPA.

Noise levels associated with drilling, field development, and operations activities may temporarily exceed threshold EPA average noise levels at specific locations within the ARPA, as noted in section 4.15. This would directly detract from the relative silence of undisturbed country customarily sought by recreational visitors engaged in hunting, wildlife observation, and sightseeing. Noise impacts due to drilling, field development, and traffic may be unavoidable, at least during the drilling and development phases, after which much of the noise would abate. However, noise associated with compression and individual well pumps would be long term in duration and would potentially displace recreation to other areas.

Impacts to hydrologic systems and soil-stabilizing vegetation would impact the recreation experience by altering the undeveloped setting present in most of the ARPA. The proliferation of opportunistic weeds on disturbed soils would further alter the setting and inhibit the success of reclamation.

The duration of the effects would be for the life of the project—which may affect more than one generation of recreation user—but the intensity of the effects would be lower after drilling and construction ends. The Proposed Action would likely displace some dispersed recreation use from the ARPA to areas for hunting and wildlife viewing that are farther away and are themselves likely to be under increasing pressure for development.

As noted in chapter 3, there are no recreational visitation counts for the ARPA, but overall use is believed to be low, except during and just prior to hunting season, which occurs primarily in the fall (USDI-BLM 2000a). Low visitation during the rest of the year is due to low population densities in proximity to the area and the historically seasonal nature of the road network. Snowdrifts in winter and any rains the rest of the year have, in the past, made most of the roads intermittently impassable.

Visitation to the ARPA may increase in the future because of recent improvements in surfacing on BLM and county roads. New roads developed in the ARPA to support gas development may

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

also encourage use by opening access to new areas. With increased use over time, the impact of the Proposed Action may be higher. Another factor expected to promote visitation to the area is the stabilization and interpretation of the JO Ranch that was recently acquired by BLM near the Sand Hills. The Continental Divide National Scenic Trail is not likely to notably increase visitation to the project area, despite its being within 3 miles of the northeastern boundary of the ARPA.

In conclusion, the impacts to the predominant recreation activities in the ARPA—hunting, pleasure driving, and wildlife viewing—would be significant. The Proposed Action would diminish the wildlife presence, degrade scenery, and introduce traffic and noise. The natural setting would be converted to an industrialized setting by development of the Proposed Action. These effects would likely make recreating in the project area significantly less desirable.

### 4.9.3.2   Alternative A (No Action)

Under the no action alternative, the Proposed Action would not be approved. The ARPA's recreation experience would continue to be affected by existing facilities and interim drilling, but no new impacts to recreation and hunting would be introduced by the no action alternative.

### 4.9.3.3   Alternative C

Some of the development protection measures included in Alternative C would reduce impacts to recreation. The following limitations on surface disturbance would help retain the existing quality of recreation opportunities in the ARPA: in slopes over 8 percent, vegetation communities with high wildlife values, rare vegetation communities, proximity to water or wetlands, big game crucial winter range, grouse brood-rearing and nesting habitat, silver sagebrush/bitterbrush communities, and soils with high runoff potential. The following would also contribute to preservation of the recreational setting: road density limitations for grouse brood-rearing and nesting habitat and some SMAs along with requirements for prompt interim reclamation; low impact road designs; careful siting of well pads, roads, and facilities; and dust abatement techniques.

Data from the WGFD random surveys were used to identify the areas of concentration of deer and elk hunter success in the ARPA. These areas are illustrated on map M-41. As this figure shows, the hunter success is concentrated in five general areas, all of which fall within the boundaries of WGFD Hunt Area 82, one of the most heavily hunted areas in the state. The areas are generally known as the Sand Hills, Deep Gulch and Cow Creek, Wild Cow Creek, Cherokee Creek, and Wild Horse Creek. Development in or adjacent to these areas would be expected to displace big game, and thus big game hunting to other areas where development is not occurring.

Direct loss of habitat due to construction of well pads and associated roads and pipelines would lead to some wildlife displacement in these areas. Displacement due to habitat loss can be minimized but not avoided. This type of displacement would have impacts to hunting in the ARPA and would be disproportionate because of the importance of these areas to game herds and thus to hunting.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Map M-41.    Locations of Successful Hunts.



84 - Deer
108 - Elk

*Muddy Creek*

82 - Deer
21 - Elk

0    2.5    5    10 Miles

•    Harvest Location (sample data)

——    Project Boundary

━━    Hunt Area Boundary

Source: Wyoming Game and Fish Department (WGFD),
Chronic Wasting Disease Survey, 2003 - 2005.

Note: Data are locations reported voluntarily to WGFD
personnel upon request at check stations by successful
hunters and are not a random sample. Sample includes
all reported locations regardless of CWD status.

No Warranty is made by the Bureau of Land
Management for use of date for purposes not
intended by the BLM.

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

A second type of impact, the disturbance of individual game animals by human activity and traffic would have affects on hunting. The long-term displacement of game herds because of sustained activity and noise is addressed in section 4.7. Very short-term displacement of individual animals or small groups would also occur as an immediate, direct response to traffic, noise, and human activity. This type of disturbance, which can cause game to avoid an area for the better part of a day or so, is disruptive to hunting. Repeated disturbance of this kind could have an impact on the quality of an entire hunting season.

Because hunter success in the ARPA is concentrated in the areas described above, short-term disturbance of game by project activity occurring during hunting season would potentially have a disproportionate impact by reducing hunter success and the hunting experience. The impact to the areas of concentrated hunter success would potentially reflect on a reduced quality hunting experience in affected parts of the ARPA and, perhaps, in the game management unit as a whole.

The Cow Butte/Wild Cow and Sand Hills SMAs include some of the most heavily hunted portions of the ARPA. Development protection measures for these SMAs would include limitations to surface disturbance and road densities, and fence conversions to BLM standards for improved wildlife passage. These and other development protection measures particular to each SMA would help retain the quality of hunting, wildlife viewing, and recreation experiences in the ARPA.

The potential for up to a 68-percent reduction in surface disturbance and other development protection measures associated with Alternative C would reduce the project's impacts on recreation, but the overall network of facilities associated with 2,000 wells would still have a significant impact on recreation in the ARPA by displacing wildlife, and therefore hunters, wildlife viewers, and other recreationists.

## 4.9.3.4 Alternative D

Impacts to hunting and to the recreation setting under Alternative D would be similar to, but of a lesser magnitude than the impacts described under the Proposed Action (section 4.9.3.1 above). The acreage of the project area that would be disturbed at any one time under Alternative D (goal of 6.5 acres average disturbance per well site) would be approximately 20 percent less than the acreage anticipated under the Proposed Action (7.9 acres per well site). The pace of development analyzed under Alternative D is the same as for the Proposed Action.

Impacts to recreation in Category A areas would be less than in the Proposed Action due to the reduced surface disturbance and more careful mitigations, which would reduce visual impacts and loss of vegetation. Recreationists and wildlife would still be displaced by the equipment, human activity, noise, dust and industrial traffic during the development phase of the project. During the operation phase, visual impacts would remain, as would some human activity, habitat fragmentation, and the noise associated with working facilities, so even these areas would remain undesirable places to recreate until after final reclamation.

The impacts to hunting and to the recreation setting are similar under both the Proposed Action and Alternative D because reclamation success would not necessarily reduce the amount of disturbance in the short and long term under both alternatives even though the analyses of both alternatives assumed that operators' reclamation efforts would be successful.

Atlantic Rim Natural Gas Project Final EIS

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

### 4.9.4  Additional Mitigation Measures

The recreation analysis assumes the implementation of mitigations adopted as a result of the analysis of impacts to recreation, wildlife resources, and visual resources.  There are no relevant operator-committed mitigation measures. The operator may choose to include mitigations for habitat enhancements in nearby undeveloped areas to compensate for degradation of habitat in the ARPA; other measures, as discussed in section 4.7; and BMPs applied at the annual planning level. Minimizing activity during hunting season would not be an effective mitigation due to the disturbance of wildlife that normally occurs as a part of hunting activities.

No additional mitigation measures are necessary to specifically address impacts to recreation resources.

## 4.10  Visual Resources

### 4.10.1 Introduction

The landscape within the ARPA contains broad areas of grasslands, sagebrush, and tree cover, with the type of vegetative cover depending on variables, such as soils, aspect, elevation of the surface, and water availability. Existing disturbance from oil and gas development is about 600 acres.  This disturbance—about 0.2 percent of the 270,080 total acres in the ARPA—comprises unreclaimed areas from prior development of well pads, compressor stations, and containment ponds.  A small portion of the remainder of the ARPA has been modified by improved and unimproved roads, power lines, constructed ponds, and irrigated cropland.

The issues of concern for visual resources in the ARPA are (1) whether changes to the landscape from gas development would exceed BLM visual resource management objectives and (2) whether changes in the visual resources due to gas development would potentially affect other users of the ARPA.  The objective of VRM Management Class III is to partially retain the existing character of the landscape.  The level of change to the characteristic landscape should be moderate. Management activities may attract attention but *should not dominate the view of the casual observer*.  Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape.

The classification of ARPA lands by visual quality, as defined by the BLM in the RMP, was determined according to the visual resource inventory procedure that is prescribed in BLM's Visual Resource Inventory Manual 8410 (USDI-BLM 1980). The BLM's visual resource considerations during the siting of oil and gas facilities seek to minimize impacts to the extent possible and to avoid impacts that exceed allowable thresholds under existing VRM classifications.  During the siting of specific oil and gas facilities within the ARPA, opportunities will be sought to minimize the prominence of structures, minimize unavoidable open disturbance during operations, and align roads and other ROWs for reduced visibility and contrast with natural features.

The analysis assumes that measures presented in the Reclamation Plan (appendix B) would be implemented.  Because of the large geographic area covered by the project and the fact that the specific location of project facilities is unknown at this time, the reclamation measures were presented in the plan in a general, non-specific manner.  The final choice of measures to be applied at any given location would be identified by the BLM in coordination with the operators.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

In the Great Divide RMP, BLM classified 259,000 acres of the 270,000 acres in the ARPA (about 96 percent) as VRM Class III, placing it in the category that comprises about 75 percent of all land in Great Divide Resource Area. The rest of the land in the ARPA, located in the vicinity of Dad, is classified as VRM Class IV.

The management objective for VRM Class III is to allow only a moderate level of contrast between project features and the existing landscape. Moderate contrast means that project features should be selected, located, and designed so as to not become dominant in the landscape, though they may be evident to the viewer and may even attract the viewer's attention. VRM Class IV allows a strong visual contrast with the landscape, meaning project features may dominate views and even be the focus of viewer attention, though even in Class IV BLM may encourage the use of topography and vegetation to screen project features and reduce visual contrast.

### 4.10.2 Impact Significance Criteria

The Great Divide RMP (USDI-BLM 1990) and state (WSLUC 1979) land use plans prescribe the following management objective associated with visual resources:

1. To minimize effects on visual resources while maintaining the effectiveness of land-use allocations.

Visual impacts are considered significant if an activity or development in an area:

1. Is incompatible with the designated VRM class objective,
2. Becomes an unacceptable feature of the landscape or visual horizon, and
3. Has a "High" predicted visual contrast, as detailed in table 4-8.

**Table 4-8.   Criteria for Assigning Summary Assessment of Impacts to Visual Resources for the Development Alternatives.**

| Level of Impact | Criteria |
|---|---|
| High | Predicted visual contrast would be higher than the level of change to the characteristic landscape allowable by the visual resource management (VRM) classification.  For example, introduced facilities in VRM Class III that dominate the landscape by becoming the primary focus of and holding viewers' attention would be rated as a high impact. |
| Moderate | Predicted visual contrast would be equal to but not exceed the level of change to the characteristic landscape allowable by the VRM classification.  For example, introduced facilities in VRM Class III that are evident in the landscape and attract attention without dominating the view of the casual observer would be rated as moderate impact. |
| Low | Predicted visual contrast would be lower than the level of change allowable by the VRM classification.  For example, introduced facilities in VRM Class III that are evident to viewers but otherwise conform to the landscape's natural lines, forms, colors, and textures would be rated as a low impact. |

In determining the level of visual contrast to be expected from the alternatives, this analysis has followed guidance on visual contrast rating from the BLM Visual Contrast Rating Manual H-8431-1 (USDI-BLM 1999).  The degree to which a management activity affects the

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

visual quality of a landscape depends on the visual contrast created by the project and the existing landscape. Briefly, the visual contrast introduced to the landscape by features of the proposed project is rated as weak, moderate, or strong based on a comparison of the development's form, line, color, and texture to the same elements in the characteristic landscape.

To arrive at an impact rating, the analysis compares the highest visual contrast that the project would cause with the management objective for VRM Class III, which, as noted, comprises 96 percent of the ARPA. The impact rating to be attributed to the alternatives are assessed by applying criteria from table 4-8.

The VRM objectives for the ARPA were established by the RMP through the classification of all field office lands. The classifications are the sole determinant of the allowable level of visual impact. However, the RMP also includes guidance for management decisions in a multiple use context, such as where visual and mineral resources co-exist. The RMP includes an overall objective for visual resource management in the resource area as a whole that calls for minimizing the impacts to visual resources while maintaining the effectiveness of land-use allocations for activities based on other resources (USDI-BLM 1990). Similarly, the overall objective stated in the RMP for oil and gas resource management throughout the resource area calls for providing opportunities for development of mineral resources while protecting other resource values (USDI-BLM 1990).

The task of effects on visual resources while maintaining the effectiveness of land-use allocations is undertaken by BLM as a part of site-specific analyses of specific project proposals. These analyses are required once a site-specific proposal and additional resource information have been submitted to the BLM for approval. The site-specific analyses would occur after issuance of the ROD by BLM and before surface disturbance pursuant to an individual APD or ROW grant would be allowed to take place on federal surface or minerals.

The ARPA is a large area and the alternatives are general in describing how project features would be located within the ARPA. This analysis proceeds by considering the level of visual contrast that would result from seeing typical project features from selected roads within the ARPA. The selected roads considered by the analysis are the maintained roads that access the principal areas within the ARPA where gas development would occur and where other uses, such as recreation, occur as well.

### 4.10.3 Direct and Indirect Impacts

#### 4.10.3.1 Proposed Action

Features of the Proposed Action that would impact visual resources include structures (wellheads, tanks, generators, compressor units, etc.), structure sites (reclaimed to production size), roads with adjacent utility ROWs (reclaimed to the life-of-project travel surface), and unreclaimed surface areas. To mitigate visual impacts, facilities would be painted Shale Green or Brush Brown (or other non-reflective color approved by the BLM), sites would be cleaned up, and interim reclamation activities initiated. In general, interim reclamation would occur concurrently as sections of the project are completed. Revegetation realized through successful interim reclamation would potentially create continued contrast with the existing landscape throughout the life of the project. The period of time that this contrast would exist would be

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

variable, since it depends on the success of the reclamation measures and on the time needed for primary succession to return disturbed areas to pre-disturbance vegetation conditions.

The Proposed Action would potentially increase the amount of oil-and-gas-related disturbance in the ARPA approximately ten fold from current impacts from the Atlantic Rim pods. This would increase the likelihood of seeing a landscape in the ARPA that includes oil and gas structures, the bare soil of well pads, and other facility sites and roads. The appearance of gas development at 80-acre spacing would create unavoidable contrast with natural landscapes in the ARPA, especially in tracts of continuous vegetation. The highly contrasting and difficult-to-conceal elements of development that appear with greater frequency at the proposed density are the bare pads where well and other facilities are constructed and the network of access and service roads.

The greatest potential for seeing visual contrasts from the Proposed Action would be from the principal roads of the ARPA. These roads would likely be traveled by private property owners and recreationists, as well as by ranch and oil-and-gas-related personnel. Sensitivity to the level of visual contrast from oil and gas development would likely be highest among recreationists, who include hunters, sightseers, and wildlife observers.

Table 4-9 lists roads where users would potentially see foreground/middle ground views of oil and gas structures and related change. These are views where contrasting features would be less than 3 miles from the viewer, according to the Visual Resource Inventory Manual H-8410-1 definitions of distance zones for visual resources analysis. The roads in table 4-9 either access the northern or the southern part of the ARPA.

Approximately 65 percent of the VRM Class III lands in the ARPA are visible from one or more of the state, county or BLM roads in or adjacent to the project area (map M-6). Approximately 67 percent of the Class III federal lands are visible. Therefore seeing development with strong contrast to the natural landscape that dominates the view of sensitive observers is quite probable and most likely unavoidable under the Proposed Action.

Users of CCR 503 and 608, as well as BLM 3309, would also occasionally see panoramic views with the facilities, roads, and reclaimed areas of the Proposed Action in the background.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Table 4-9.   Roads in the ARPA Where Users Would Likely See Views of Oil and Gas Facilities under the Proposed Action.

| Northern Part of ARPA | | Southern Part of ARPA | |
|---|---|---|---|
| Number | Common Name | Number | Common Name |
| CCR 605 | Twenty Mile Road | CR 503 | Dixon Road |
| | Daley Road | CR 608 (west end) | Dad Road |
| | | CR 608 (east end) | Lone Butte Road |
| | | BLM 3305 | Willows Road |
| | | BLM 3308 | Cow Butte Road |
| | | BLM 3309 | Wild Horse Road |
| | | BLM 3320 | Muddy Mountain Road |

Notes:
CCR – Carbon County Road
CR – County Road
All roads would likely access foreground to middle ground views of facilities within 3 to 5 miles or less of the viewer.
The northern part of ARPA includes the Red Rim and Jolly Roger federal lease units.
The southern part of ARPA includes the Doty Mountain, Cow Creek, Sun Dog, Blue Sky, Brown Cow, Boulder Creek, and Burbank Draw federal lease units.

Some portions of the roads identified in table 4-9 already have views of wells developed in the interim drilling period. As these views indicate, gas development does contrast with the characteristic landscape, even when designed and sited specifically for the ARPA. Judging from these examples, the greatest level of visual contrast due to the Proposed Action would occur because of bare soils on well pads, production facilities and structures, and associated roads. Specifically, geometric lines associated with these activities would contrast strongly with the characteristic vegetation and topography of the ARPA.

The reclaimed surface disturbance introduced by the Proposed Action would contrast with the ARPA landscape to a lesser degree. Reclaimed areas would contrast with undisturbed cover for several years because vegetation is slow to recover in most of the ARPA. While the VRM Class III rating allows for development so long as it does not dominate the view of the casual observer, 80 acre spacing would clearly create visual impacts that would dominate the view unless the development was very well mitigated. Hunters, sightseers, and wildlife observers would likely be sensitive to the visual impacts of development because the visual quality of the setting is integral to the quality of the recreation experience. Livestock operators and oil and gas development personnel, who by definition are not casual observers, would also see the visual impacts in the ARPA, although they would likely be less sensitive to these impacts because they would be working in the area, not there to enjoy it.

Impacts to hydrologic systems and loss of vegetation would alter the character of the visual setting present in the ARPA. The proliferation of weeds on disturbed soils would further alter the setting and inhibit the success of reclamation.

In conclusion, the visual contrast introduced into the ARPA by the Proposed Action would be high. This level of contrast exceeds the maximum allowable in VRM Class III (96 percent of the ARPA) and is allowable in VRM Class IV (only 4 percent of the ARPA). Therefore, based on the criteria presented in table 4-8, the impact of the Proposed Action as a whole to visual resources of the ARPA would be high, and thus significant. Impacts to visual resources from the Proposed Action would be long term, beginning during development and lasting beyond the life of the project. In addition, the Proposed Action would potentially leave weak residual impacts in place

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

on the landscape even after final reclamation at the end of the life of the project because of the time it takes for reclaimed areas to return to pre-disturbance vegetative conditions.

### 4.10.3.2 Alternative A (No Action)

Under this no action alternative, the Proposed Action would not be approved. The ARPA's visual character would continue to be affected by existing facilities, but no new visual impacts would be introduced, nor would management objectives for VRM Class III be exceeded. The level of contrast introduced by the no action alternative would be low, therefore not significant.

### 4.10.3.3 Alternative C

Some of the development protection measures included in Alternative C, such as limitations on surface disturbance in slopes over 8 percent, vegetation communities with high wildlife values, rare vegetation communities, proximity to water or wetlands, big game crucial winter range, grouse brood-rearing and nesting habitat, silver sagebrush/bitterbrush communities, and soils with high runoff potential would reduce the visual impacts of development. Road density limitations for grouse brood-rearing and nesting habitat and some SMAs along with requirements for prompt interim reclamation, low impact road designs, careful siting of well pads, roads and facilities, and dust abatement techniques would also contribute to the preservation of the visual setting (See appendix L).

As noted in the introduction and in section 4.10.2, impacts to visual resources in the ARPA were determined by assessing the visual contrast that the project would create on the landscape of the VRM Class III rated lands which constitute 96 percent of the ARPA. 67 percent of the federal lands in the ARPA are visible from federal, state or county roads. Therefore seeing development with strong contrast to the natural landscape that dominates the view of sensitive observers is quite probable and most likely unavoidable.

Development protection measures for visual resources under Alternative C would further reduce the visual impact of the project. Low impact road designs would be used in visible VRM Class III areas with less than 5 percent slope (map M-42), which comprise over 26 percent of the federal surface in the ARPA. Other measures to reduce surface disturbance, prevent facility intrusion above the skyline, do reclamation promptly, and maximize pad distance from main roads would also contribute to preservation of the visual character of the area.

Facilities and roads constructed and visible in VRM Class III under Alternative C are expected to not quite dominate the landscape by becoming the primary focus of and holding viewers' attention as seen from the state, county or BLM roads, and would thus be rated as having a moderate level of impact. With an anticipated reduction in short-term surface disturbance of 68 percent, as compared to the Proposed Action, Alternative C is expected to remain within VRM Class III Management Objectives, and impacts are not expected to be significant.

### 4.10.3.4 Alternative D

Impacts to visual resources under Alternative D would be similar to the impacts described in the analysis of impacts under the Proposed Action (section 4.10.3.1 above). The acreage of the project area that would be disturbed under Alternative D would be less than the acreage anticipated under the Proposed Action, although the pace of development analyzed under Alternative D is the same as for the Proposed Action. The analyses of both alternatives assumed that operators' reclamation efforts would be successful.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

In conclusion, the visual contrast introduced into the ARPA by Alternative D would be high. This level of contrast exceeds the maximum allowable in VRM Class III (96 percent of the ARPA) and is allowable in VRM Class IV (only 4 percent of the ARPA). Therefore, based on the criteria presented in table 4-8, the impact of Alternative D as a whole to visual resources of the ARPA would be significant. Impacts to visual resources from Alternative D would be long term, beginning during development and lasting beyond the life of the project. In addition, Alternative D would potentially leave weak residual impacts on the landscape even after final reclamation at the end of the life of the project because of the time it takes for reclaimed areas to return to pre-disturbance vegetative conditions and because some improved roads would likely be left in place.

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Map M-42.    Areas Visible from Main Roads in VRM Class III with Slopes <5%.



## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

### 4.10.4 Summary of Impacts

Predicted change to the characteristic landscape for each action alternative is expected to be equal to or greater than the level acceptable under VRM Class III management objectives. The visual quality of the project area would be affected until successful final reclamation and repopulation of mature native shrub communities. The project area would potentially retain numerous improved project roads, which would create lasting linear features that detract from the existing character of the area.

### 4.10.5 Additional Monitoring and Mitigation Measures

No additional mitigation measures are necessary under the no action alternative.

BMPs are warranted in an attempt to keep impacts within the level allowable on VRM Class III lands. In addition, they may reduce conflict in the long run between continued expansion of mineral development and the interests of other users of the ARPA.    Shale green facility coloration would blend satisfactorily with the environment in most well locations (approximately 93 percent of the ARPA or 92 percent of the federal surface within the ARPA) as seen above. Areas that would instead require a brown coloration (approximately 7 percent of the ARPA or 8 percent of the federal surface within the ARPA) to blend with brown shrubbery and grasses are shown on map M-43).

**Figure 4-4.    Proper Coloration for Visual Resource Management Mitigation.**



VRM Class III comprises 94 percent of the federal surface in the project area. The operator-committed mitigation measures would not be sufficient to prevent any of the action alternatives from exceeding VRM Class III management objectives. Even BMPs would not be sufficient to keep development within VRM Class III management objectives, as prescribed in figures 4-5 and 4-6.

Alternative C is anticipated to have the maximum visual impact allowable under VRM Class III management objectives, assuming BMPs and additional protections afforded other programs prevent the project from dominating the viewshed. Thus Alternative C would have a moderate visual impact.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

**Map M-43.**    **Project Area Facility Coloration.**



Shale Green Coloration
Brush Brown Coloration

No Warranty is made by the Bureau of Land
Management for use of the data for purposes not
intended by the BLM.

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

The need for more effective mitigation on all wells is an emerging issue in the GDRA. Although visual sensitivity is not the highest priority for some residents and visitors, a heightened awareness of scenic values and of the existing scenic quality is occurring for some residents and visitors as increasing numbers of sightseers and persons seeking various types of recreational opportunities pass through GDRA lands, including the ARPA.

**Figure 4-5.    Excerpt from Land Use Planning Handbook.**

The Land Use Planning Handbook H-1601-1 (03/11/05) provides the following guidance:

I. Visual Resources

*Implementation Decisions.*  Manage resource uses and management activities consistent with the VRM objectives established in the land use plan. Design all BLM resource uses, management activities, and other implementation decisions to meet VRM objectives established in the land use plan. Utilize visual resource management techniques and best management practices to mitigate the potential for short- and long-term impacts. Contrast ratings are required for all major projects proposed on public lands that fall within VRM Class I, II, and III areas which have high sensitivity levels (see Handbook H-8341-1 for contrast rating procedures).

**Figure 4-6.    The Visual Contrast Rating Worksheet, Form 8400–4, for the Project would be filled out after an alternative is selected.**

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

## 4.11 Cultural Resources

### 4.11.1 Introduction

Cultural resources on public lands, including archaeological sites and historic properties, are protected by various laws and regulations, for example the National Historic Preservation Act of 1966 (NHPA) as amended, Governing Regulations, and 36 CFR 800. Laws and regulations concerning cultural resources stipulate that the federal government take into consideration the effects of an action on significant cultural resources. This requires that cultural resources within the proposed area of potential effect must be identified and evaluated. A determination of effect is made and measures are then formulated to mitigate or minimize any effects to those historic properties included in, or eligible for, the NRHP.

The ARPA database contains at least 423 cultural resource sites, as summarized in section 3.11. Site types include prehistoric camps including burial, habitation, ceramic/pottery, stone circles, rock shelters, petroglyphs, ground stone/milling activities, and quarries. The prehistoric lithic debris sites include debris scatters/procurements, ceramics, ground stone/milling activities, and quarries.

Historic sites include: trails, stage stations, inscriptions, cairns, debris/trash, ranches, irrigation ditches, ranching/herding/corrals, and a post office. Historic trails include: the Overland Trail, the Cherokee Trail, and the Rawlins to Baggs Road. The Washakie Station (listed on the NRHP) and the Sulphur Springs Stage Station were stops along the Overland Trail. The Sulphur Springs Station was also utilized by the Rawlins to Baggs Road. Other Stage Stations documented in the ARPA associated with the Rawlins to Baggs Road include Muddy Bridge Station and Willow Station. The JO Ranch is a prominent eligible property within the project area.

Prehistoric/historic sites are characterized as prehistoric camp/historic debris scatters or lithic scatters/historic debris scatters. Of the 423 sites recorded in the EIS analysis area to date, 32 percent are recommended eligible (n=135) for nomination to the NRHP, 34 percent are recommended not eligible (n=145), and 34 percent remain unevaluated (n=143). Before 2003, approximately 20 percent of the area had been inventoried at a Class III level and site density is projected to be 0.008 sites per acre. Certain topographic settings have greater archaeological sensitivity including eolian deposits (sand shadows and sand sheets) and, to a limited degree, colluvial deposits along lower slopes of ridges. Sensitive areas include drainages, such as Muddy Creek, Cherokee Creek, Wild Cow Creek, Sixteen Mile Draw, Cottonwood Creek, and Deep Creek along with their tributaries. The numerous springs in the area would likely be associated with cultural resources.

The BLM has designated a quarter-mile buffer surrounding the contributing segments of the historic trails and associated sites as highly sensitive and would result in the exclusion of disturbance of approximately a maximum of 20,583 acres in order to protect the physical remains. The number of acres excluded from development would possibly be less as contributing segments of the Cherokee Trail are determined upon final acceptance of the inventory. For management purposes, the BLM has established a two-mile analysis area around the trails for consideration of the elements of setting as defined as those elements of integrity of location, feeling, and association that contribute to the eligibility of the trails or associated sites. While two miles is the standard distance for consideration of setting, it does not preclude the consideration of a larger area, depending on the circumstances.

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

## 4.11.2 Impact Significance Criteria

The Great Divide RMP (USDI-BLM 1990) and State (WSLUC 1979) land use plans prescribe the following management objectives associated with cultural resources:

- To protect and preserve representative samples of the full array of cultural resources for the benefit of scientific and socio-cultural use by present and future generations;

- To ensure that cultural resources are given full consideration in all land-use planning and management decisions;

- To manage cultural resources so that scientific and socio-cultural values are not diminished, but rather are maintained and enhanced; and

- To ensure that the BLM's undertakings avoid inadvertent damage to cultural resources both federal and nonfederal.

Impacts are considered significant if management actions result in effects to properties listed or determined eligible for listing on the NRHP or considered important to Native American groups as measured by:

1. Destruction or alteration of all or part of a property;

2. Isolation of a cultural resource from, or alteration of, its surrounding environment;

3. Introduction of visual, audible, or atmospheric elements that are out of character with the property or alter its setting; and

4. Neglect and subsequent deterioration.

Significance, under NEPA, is detailed in 40 CFR 1508.27 and is distinct from archeological significance. Cultural resource significance is measured by four categories defined by the Code of Federal Regulations (36 CFR 60.4):

"...the quality of significance in American history, architecture, archaeology, and culture present in districts, sites, buildings, structures and objects of state and local importance that possess integrity of location, design setting, materials, workmanship, feeling, and association; and that:

A. Are associated with events that have made a significant contribution to the broad patterns of our history; or

B. Are associated with the lives of persons significant in our past; or

C. Embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or

D. Have yielded, or may be likely to yield information important in prehistory or history. (36 CFR 60.4)"

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

For cultural sites, both prehistoric and historic, significance is primarily judged either by the site's ability or potential to yield information important in prehistory or history (criterion D) or the site's association with events that have made a significant contribution to the broad patterns of our history (criterion A). Each site's importance, however, is determined individually, so the existence of sites eligible under criteria B or C must not be discounted.

The BLM meets its responsibilities under Section 106 of the NHPA through the implementation of a national Programmatic Agreement among the BLM, the Advisory Council on Historic Preservation (ACHP), the National Conference of State Historic Preservation Officers, and a state protocol with the Wyoming State Historic Preservation Office (SHPO) rather than by following the procedure set forth in the ACHP's regulations (36 CFR Part 800).

The preferred strategy of cultural resource management is avoidance of affect to those elements that contribute to the eligibility of a historic property. If this strategy cannot be implemented, mitigation of effects by project redesign, data recovery, project cancellation, or numerous other mitigation options should be implemented.

### 4.11.3 Direct and Indirect Impacts

#### 4.11.3.1 Proposed Action

At the Proposed Action's rate of disturbance, if the density of site types is predicted at 0.008 sites per acre, it is estimated 126 sites could be disturbed. Of those, 32 to 40 percent could be eligible for the NRHP. These calculations assume that the area-wide site density is equal across the ARPA and that the 20 percent area inventoried is a valid sample.

Direct impacts would primarily take the form of alteration or disturbance of previously unidentified sites. Physical disturbance of eligible sites could result from any disturbance activity. Indirect impacts could result from associated erosion resulting from the changes in surface hydrology. In turn, the loss of integrity of surface cultural material or the exposure and degradation of subsurface material and their contexts could be expected. Indirect impacts also would result from the removal of vegetation, which would serve to destabilize the soils and in turn cause additional erosion of site areas. In addition, as access to previously-isolated areas becomes more abundant, the frequency of human intrusion and the possibility of looting also increase.

Where the setting of the trails and associated sites contributes to NRHP eligibility, actions resulting in the introduction of visual elements that diminish the integrity of the property's significant historic features would be a factor.

#### 4.11.3.2 Alternative A (No Action)

Under the no action alternative, the Proposed Action would not be implemented and additional drilling would be allowed on federal lands; however, individual APDs would be approved on a case-by-case basis. No additional impacts to cultural resources could be expected beyond those analyzed in the previous environmental assessments for the Atlantic Rim pods.

#### 4.11.3.3 Alternative C

In general, constraints under Alternative C would focus on surface disturbance limitations: limited operating periods, modification of drilling and construction practices, and in some cases

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

no surface occupancy/disturbance. Under this alternative, sensitive cultural resource areas would be eliminated from development or be subject to extensive mitigation measures. Direct impacts of sites not visible during inventory (discovery situations) would be the same as with the Proposed Action. A by-product might be the reduction of indirect effects resulting from unauthorized collection of cultural material due to lower access into the area.

### 4.11.3.4 Alternative D

Direct and some indirect impacts to cultural resources could be expected to occur at a lower rate and intensity than the Proposed Action due to the reduced disturbance goal of 20 percent. Impacts to historic setting would be lessened in direct correlation to the success of vegetation reclamation/restoration.

### 4.11.4 Impacts Summary

Gauging the effect of any impact depends on the level of information available for that particular property provided by inventory or testing data. If cultural resources on or eligible to the National Register are to be adversely impacted by the proposed undertaking, the applicant, in consultation with the surface managing agency and the SHPO and with input from other interested parties per 36 CFR Part 800.6 and the Statewide Protocol Section VII, shall develop a mitigation plan designed to eliminate the adverse effects. Construction would not proceed until the terms of the mitigation plan are satisfied. Impacts to historic properties from projects occurring in the absence of a federal undertaking (federal authorization) would be beyond federal control.

### 4.11.5 Additional Mitigation Measures

The additional mitigation measures apply to all alternatives because the primary focus of effects to cultural resources is based on location and secondly the extent of the surface disturbance. None of the alternatives propose significant development modifications; therefore, impacts to cultural resources would be similar under all the alternatives.

Additional mitigation measures may include, but are not limited to, the following measures listed below. These measures will be incorporated into an agreement or agreements established under the Wyoming state cultural resources protocol. BLM will seek to establish a programmatic agreement between the BLM, SHPO, project proponents and interested parties that will address site-specific impacts and mitigation measures for all sites where setting contributes to NRHP eligibility.

**Common to All Alternatives:**

**Mitigation of Direct Impacts:**

- Construct smaller well pads,

- Construct narrower roads,

- Construct multiple well locations per pad to decrease the total acres of disturbance,

- Brush hog ROWs,

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

- Allow no surface disturbance within a quarter mile of contributing segments of historic trails or trail-associated sites, and

- Limit trail crossings to existing disturbance corridors or non-contributing segments, unless otherwise determined by BLM in consultation with SHPO.

**Mitigation of Impacts to Setting Where Contributory to Eligibility:**

- Begin reclamation at the time most optimal to regenerate the native species,

- Replace native shrubs to decrease visibility,

- Construct roads in minimally visible areas,

- Relocate project or hide disturbance, and

- Use matting on ROWs during construction to minimize surface disturbance and visibility.

## 4.12 Socioeconomics

### 4.12.1 Introduction

Implementation of any of the action alternatives or the no action alternative would result in both positive and adverse socioeconomic effects. Positive effects of the action alternatives would include increases in economic activity; income; employment; and local, state, and federal government tax and royalty revenues. Adverse effects of the action alternatives would include disruptions in activities and lifestyles of those who own private land or use public land within the ARPA, including ranchers, grazing operators, hunters, and other recreation visitors. These disruptions could result in effects on the grazing and recreation sectors of the Carbon County economy. Implementation of the no action alternative would avoid the disruption of activities and lifestyles associated with the action alternatives, but would also forego the employment and fiscal benefits associated with these alternatives.

### 4.12.2 Impact Significance Criteria

The following criteria were used to determine whether socioeconomic impacts of the Proposed Action and alternatives would be significant:

1. An increase in county or community population that would strain the ability of affected communities to provide housing and services or otherwise adapt to growth-related social and economic changes;

2. An aggregate change in revenue and expenditure flows likely to result in an inability on the part of affected units of government to maintain public services and facilities at established service levels;

3. Permanent displacement of residents or users of affected areas that would result from project-induced changes in or conflicts with existing uses or ways of life; or

# Exhibit C

NRDC, et al. v. Kempthorne, et al.

GOVERNOR
DAVE FREUDENTHAL

DIRECTOR
TERRY CLEVELAND

COMMISSIONERS
RON LOVERCHECK – President
BILL WILLIAMS, DVM – Vice President
LINDA FLEMING
CLARK ALLAN
JERRY GALLES
CLIFFORD KIRK
KERRY POWERS

## WYOMING GAME AND FISH DEPARTMENT

5400 Bishop Blvd. Cheyenne, WY 82006

Phone: (307) 777-4600 Fax: (307) 777-4610

Web site: http://gf.state.wy.us

January 5, 2007

WER 9678
Bureau of Land Management
Rawlins Field Office
Atlantic Rim Natural Gas Development Plan
Carbon County

David Simons
Bureau of Land Management
Rawlins Field Office
P.O. Box 2407
Rawlins, WY 82301

Dear Mr. Simons:

The Proposed Action and the BLM Preferred Alternative in the Atlantic Rim FEIS acknowledge significant impacts will occur in riparian areas, sagebrush communities prone to erosion, those areas not meeting Rangeland Health Standards, and to shrub-dependent songbirds, sage grouse, sharp-tailed grouse, deer, elk, sensitive fish in Muddy Creek, and recreation. These impacts need to be addressed in the ROD.

The plan is performance-based, which cannot be implemented properly or effectively without a description of:
   a.  Desired conditions that must be maintained during development,
   b.  Performance standards that help assure the desired conditions are being met,
   c.  Monitoring to indicate achievement of the performance standards, and
   d.  Potential mitigation options to deal with unavoidable impacts.

Following are points that we strongly recommend be included in the ROD to accomplish the needs of the plan, and are currently missing or not addressed adequately in the FEIS:

- Desired Conditions--These describe key landscape functions to be maintained during development and production.
   o  Maintain big game migration routes so that traditional year-round seasonal ranges continue to be used.
   o  Maintain big game distributions on or adjacent to current project area crucial big game winter habitats .
   o  Maintain landscape-scale sage or sharp-tailed grouse habitat and distribution similar to pre-development.

David Simons
January 5, 2007
WER 9678 – Page 2

- o   Maintain pre-development distribution of sensitive fish species in the Muddy
     Creek watershed (i.e., bluehead suckers, roundtail chubs, flannelmouth suckers,
     and Colorado River cutthroat trout).
- o   Maintain well-distributed occupied habitat for shrub-dependent songbirds.
- o   Maintain riparian habitat (including native vegetation) quantity and quality.

- • Performance Standards—These assure Desired Conditions are being met.
  - o   Migration Routes--Maintain functional migration routes through or around
       development areas (this will help maintain population objectives and associated
       recreation).
  - o   Crucial Winter Ranges--Provide an adequate amount of suitable undisturbed
       crucial winter range to maintain big game distribution at any point in time during
       development (this will help maintain population objectives and associated
       recreation).
  - o   Sage and Sharp-tailed Grouse--Provide key sage-grouse and sharp-tailed grouse
       breeding, nesting, brood-rearing, and winter habitat well dispersed over the
       project area.
  - o   Muddy Creek Sensitive Fish--Maintenance of water quantity, water quality,
       aquatic habitat components (including riparian areas), habitat connectivity, and
       distribution of sensitive fish.
  - o   Shrub-Dependent Birds--Assure occupied habitat for shrub-dependent songbirds
       is well-distributed throughout the project area.
  - o   Riparian--No net decrease in acres of native riparian habitat/vegetation.

- • Monitoring--These demonstrate Performance Standards are achieved. The following
  should be considered as required initial measures, and delineated in the ROD.
  - o   Big Game Migration Routes--use of collared animals to determine annual
       movement patterns and seasonal habitat use areas.
  - o   Big Game Crucial Winter Range--use of collared animals to determine winter
       area habitat use and changes in area of use.
  - o   Sage and Sharp-tailed Grouse--annual lek counts and lek searches using standard
       WGFD protocols; baseline survey of actual and potential winter use habitat in
       disturbed areas and areas to be disturbed within next year; annual surveys of
       suitable nesting/brood-rearing habitat in disturbed areas and areas to be disturbed
       within next year.
  - o   Muddy Creek Sensitive Fish--necessary monitoring will be as follows:
    - ▪   Water quantity--annual monitoring of Muddy Creek surface flows (there is
         currently only 1 USGS station that monitors flows); using monitoring
         wells, annual ground water monitoring for shallow aquifers that contribute
         water to Muddy Creek.
    - ▪   Water quality--annual monitoring of TSS, TDS, pH, temperature, and
         major ions (initially sodium, potassium, calcium, and magnesium) during
         annual low flow period (late summer). Sampling locations would be at
         springs, key unimpacted stream reaches, and below areas of impacts.

David Simons
January 5, 2007
WER 9678 – Page 3

> NOTE: If direct discharge of produced water were allowed at some point in the future, it needs to be specified that release of that water in Muddy Creek would be delayed until more extensive baseline water chemistry parameters could be gathered, if water is discharged into intermittent streams that feed Muddy Creek.

- Aquatic habitat components--annual monitoring of residual pools and their substrates (embeddedness) during low flow period (late summer).
- Fish movement barriers--annual monitoring of constructed stream crossings to determine if barriers have developed.
- Sensitive fish distribution--WGFD has baseline monitoring data, need to monitor immediately downstream of new disturbances for changes; spot monitoring every third year on watershed. NOTE: Because of sensitive nature of fish and potential for impacts from sampling itself, WGFD would want to do this monitoring, with financial support from industry.

o Shrub-Dependent Birds--baseline Breeding Bird Surveys of project area, with follow-up surveys every three years to determine habitat use within development areas. Use breeding bird routes in undisturbed areas and also some that transect development areas and include undisturbed habitat on either side to help determine habitat use.

o Riparian--baseline accounting of riparian acres, with annual tracking of disturbed acres.

- Mitigation—Neither the Proposed Action nor the BLM Preferred Alternative has any proposed mitigation measures beyond the standard protections. This is inadequate, as there will always be unavoidable impacts associated with natural gas development, and in this plan, significant impacts are acknowledged in the FEIS. Some specific mitigation measures are foreseeable and are listed, and these should be disclosed in the ROD as first measures to be considered. Additional measures may be needed, as noted, if monitoring indicates that impacts have become more severe:

o Big Game Migration Routes--Plan for avoidance of heavy disturbance along narrow migration corridors if monitoring shows significant avoidance or declines in animal use; implement habitat enhancements for adjacent undisturbed sites to provide alternate routes. For more severe impacts, may need to stage future development so that migrating animals always have a functional portion of the migration pathway remaining.

o Big Game Crucial Winter Range--Provide on-site or off-site habitat areas as alternatives to unusable crucial winter range through active forage enhancement or acquisition/change in management of adjacent areas. For more severe impacts, may need to stage development to avoid additional development in crucial winter range, if animal use declines and animals have little suitable alternative habitat, until animal use returns with increased reclaimed habitat quality (this is to avoid loss of entire winter concentration areas and severely impacting entire subpopulations and associated recreation).

o Sage and Sharp-tailed Grouse--Provide on-site and off-site habitat enhancements to provide known grouse habitat components (refer to Sage Grouse plans) within undeveloped parts of the project area, or off-site if necessary.

David Simons
January 5, 2007
WER 9678 – Page 4

- o Muddy Creek Sensitive Fish--Key mitigation will be avoidance of impacts to water quantity (including detrimental increases), quality, key habitat characteristics, necessary movements, and fish distribution.
    - Water quantity--avoidance of activities that decrease water quantity; removal of barriers to distribution such as removal of sheet pilings (and replacement with other structures that limit erosion and prevent headcuts); for undisturbed portions of Muddy Creek, removal of competing exotic fish species that would make more of the Muddy Creek system available for the sensitive native fish; replace ponds that provide water for livestock and wildlife but decrease runoff water from reaching Muddy Creek with wells and solar-powered windmills.
    - Water quality--avoidance of activities that decrease water quality; if non-point source erosion is an issue, enhancements of riparian vegetation to provide filter strips; enhance riparian vegetation to decrease water temperatures; for undisturbed portions of Muddy Creek, removal of competing exotic fish species that would make more of the Muddy Creek system available for the sensitive native fish.
    - Aquatic habitat components--vegetation treatments of riparian areas to stabilize streambanks and prevent sedimentation of pools; fencing of key pools to prevent streambank and water quality deterioration; avoidance of disturbance to sagebrush areas prone to erosion or areas not meeting Rangeland Health Standards to reduce non-point source erosion, or vegetation cover improvements to these areas; replace ponds that provide water for livestock and wildlife but decrease runoff water from reaching Muddy Creek with wells and solar-powered windmills.
    - Fish movement barriers--modification of stream crossing structures (e.g., improper culverts placement/sizing) causing impacts.
    - Sensitive fish distribution-- removal of competing exotic fish species that would make more of the Muddy Creek system available for the sensitive native fish.
- o Shrub-Dependent Birds--avoid development that would in total severely impact any single species within the project area through habitat destruction or disturbance; provide enhancements for unimpacted lands where habitat can be actively improved, or for those not meeting Rangeland Health Standards where grazing management can increase occupied habitat areas.
- o Riparian--avoid surface disturbance. For unavoidable impacts, provide riparian habitat enhancements such as elimination of tamarisk or other undesirable species, or planting native grasses, forbs, sedges and/or shrubs/willows.
- o For a more comprehensive list of potential mitigation options for dealing with other unforeseen impacts, the ROD should reference WGFD's "Recommendations for Development of Oil and Gas Resources within Crucial and Important Wildlife Habitats". As an alternative, the mitigation measures in the appendices of that document could be used as an addition to a current appendix (perhaps E or H) in the FEIS.

David Simons
January 5, 2007
WER 9678 – Page 5

- A described process for annual review of previous years' development and planning for the following year's development by a defined Review Team, which includes state cooperating agencies that have management authorities and roles in the project area. The review would include a summary of compliance and monitoring results. Additional communication within each year for specific technical matters will be part of the process.

- Initial monitoring measures (i.e., collection of baseline data) should be required at the onset of development under the ROD, and required to be continued until measures need to be changed or are deemed unnecessary for future planning of the development. This will be determined by BLM as a result of input from the Review Team.

    We look forward to discussing the inclusion of these items in the ROD at our upcoming January 10 meeting. Thank you for your consideration.

                        Sincerely,



                        JOHN EMMERICH
                        DEPUTY DIRECTOR

cc:        State Cooperators

# Exhibit D
**NRDC, et al. v. Kempthorne, et al.**

# ATLANTIC RIM FINAL EIS MAP
## Greater Sage-Grouse Leks



0    2.5    5    10 Miles

⊕    Greater Sage-Grouse Leks

▓    2-mile buffer of Greater Sage-Grouse Leks

—    Project Boundary

No Warranty is made by the Bureau of Land
Management for use of the data for purposes not
intended by the BLM.

Map M-26

# Exhibit E

**NRDC, et al. v. Kempthorne, et al.**



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE

**Ecological Services**
**4000 Airport Parkway**
**Cheyenne, Wyoming 82001**

In Reply Refer To:
ES-61411/W.02/WY10031

Memorandum

| | |
|---|---|
| To: | Mark Storzer, Field Manager, Bureau of Land Management, Rawlins Field Office, Rawlins, Wyoming |
| From: | Brian T. Kelly, Field Supervisor, U.S. Fish and Wildlife Service, Wyoming Field Office, Cheyenne, Wyoming |
| Subject: | Atlantic Rim Natural Gas Project Draft Environmental Impact Statement |

This is regarding the December 2005 Draft Environmental Impact Statement (DEIS), for the proposed Atlantic Rim Natural Gas Project located in T13-20N, R89-92W, in Carbon County, Wyoming. Anadarko Petroleum Corporation (proponent) proposes to drill 1800 coal bed natural gas wells and 200 deep conventional wells on 270,080 acres of combined federal, state and private lands. The wells are proposed at 80-acre spacing and will be developed over a 20-year period with an estimated life of project of 30 to 50 years. The U.S. Fish and Wildlife Service (Service) has reviewed the DEIS and we are providing you with the following comments.

## General Comments

The Service has responsibility, under a number of federal laws, treaties, Executive Orders, and memoranda of agreement, for the conservation and management of fish and wildlife resources. Some of these same authorities also require other federal agencies to consider, avoid, or prevent adverse impacts to fish, wildlife, and wetland resources. We provide comments on (1) threatened, endangered and candidate species, (2) migratory birds, (3) wetlands and riparian areas, and (4) sensitive species. The Service provides recommendations for protective measures for threatened and endangered species in accordance with the Endangered Species Act (Act) of 1973, as amended (16 U.S.C. 1531 *et seq*.). Protective measures for migratory birds are provided in accordance with the Migratory Bird Treaty Act (MBTA), 16 U.S.C. 703 and the Bald and Golden Eagle Protection Act (BGEPA), 16 U.S.C. 668. Wetlands are afforded protection under Executive Orders 11990 (wetland protection) and 11988 (floodplain management), as well as section 404 of the Clean Water Act. Other fish and wildlife resources are considered under the Fish and Wildlife Coordination Act, 48 Stat. 401, as amended, 16 U.S.C. 661 *et seq*, and the Fish and Wildlife Act of 1956, as amended, 70 Stat. 1119, 16 U.S.C. 742a-742j.

Attachment 19

The DEIS states that drilling is proposed on nine Plan of Development (POD) areas. However, six of the PODs are currently partially developed under an Interim Drilling Policy established by the Bureau of Land Management (Bureau) in January 2002. The Interim Drilling Policy allowed up to 200 exploration coal bed natural gas wells within the project area while the Environmental Impact Statement was being prepared. National Environmental Policy Act (NEPA) analysis of this interim development was documented in an individual Environmental Assessment (EA) for each POD.

The Service previously reviewed the six individual EAs and provided comments to the Bureau expressing our concern that the cumulative effects of full field development would not be adequately analyzed with individual EAs. We recommended that the Bureau complete the EIS before any drilling was permitted to ensure that decisions made by the Bureau considered the consequences of the full field development; however, to date, 116 wells have been drilled under the Interim Drilling Policy.

During our review, the DEIS indicates that the project area's vegetation composition consists of nearly 95 percent sagebrush species. It also states that the project may have significant effects on sagebrush obligates such as greater sage-grouse, pygmy rabbit, Baird's sparrow, sage thrasher, Brewer's sparrow, and sage sparrow. The Service is concerned that the effects to habitats important to the above species may be irreversible and no amount of mitigation can restore or replace what is lost. As several of these species are known to be in decline from loss of habitat, the Service recommends that the Bureau not authorize an action that may exacerbate their decline and possibly result in listing of one or more of these species under the Act.

## Specific Comments

1. Page 2-1, section 2.2.1, The Proposed Action, Bullets 5 & 6: The DEIS states that initial (short-term) disturbance will total approximately 15,800 but with reclamation the disturbance may be reduced by 9,500 acres for a total long term disturbance of 6,241 acres. *The Service is concerned that the long term disturbance figures may not reflect on-the-ground difficulties with reclamation as are discussed on page 3-48 of the DEIS (current POD conditions). The DEIS states that several of the PODs where drilling has taken place are experiencing hampered reclamation due to poor soils and poor vegetation, ineffective seeding due to wind erosion and lack of moisture, riling and gullying, excessive erosion due to inadequate road design, and well pads developed too close to drainages. Additionally, Appendix M (map 13) indicates that the soils within the project area have high run off potential which may further hinder reclamation. The Service recommends that the Bureau consider phasing in the completion of each POD based on the reclamation success of the previous POD. The Bureau should also work closely with the project proponent during the siting of well pads, roads and other facilities to minimize erosion problems.*

2. Page 3-72, Greater Sage-grouse Page 4-65, Upland Game Birds: Page 3-72 of the DEIS states that there are 88 lek locations in and within two miles of the project area. It also states that 85 percent of the project area consists of Wyoming and mountain big sagebrush habitat which sage-grouse are dependant on year-round. The DEIS goes on to state that the Bureau protects sage-grouse by requiring a 0.25-mile controlled surface use

buffer around identified leks as well as a 2-mile seasonal buffer around leks to protect nesting habitat. Page 4-65 states that sage-grouse are abundant within the project area with approximately 92 percent of the area consisting of nesting habitat. *The Service is very concerned that authorization of this project, as proposed, will significantly affect the population of greater sage-grouse that occurs in this area of Wyoming. Adverse affects to sage-grouse may occur through the long-term loss of sagebrush habitat, fragmentation of habitat, and noise associated with project activities. The Service does not support a 0.25-mile protective buffer around sage-grouse leks as a mitigation measure, nor do we support a 2-mile buffer to protect nesting habitat. As you know, Lyon et al. (2003) found that disturbance can increase the distance from leks to nest sites and that the majority of hens from disturbed leks (as may be the case here), nested greater than 2-miles from the lek, while the majority of hens from undisturbed leks nested within 2-miles of the lek.*

*Additionally, recent information from a doctoral dissertation on the impacts of oil and gas development to greater sage-grouse in the Pinedale Anticline found that as development increased, lek activity declined up to 100 percent (Holloran 2005). Negative impacts to active leks extended to a distance of 5 km from an active drilling rig. Similarly, juvenile male recruitment to impacted leks also fell. Nesting females also avoided areas with high well densities, although site fidelity to previous nesting locations may result in delayed population response to the habitat changes associated with development. While some birds were displaced by the disturbance, Holloran (2005) also found that many sage-grouse discontinued breeding attempts, and others died at a higher rate than birds from unaffected areas. His conclusions suggest that natural gas field development contributes to local sage-grouse extirpations. Additionally, Holloran concluded that stipulations placed on oil and gas development in the Pinedale Anticline, which are identical to those proposed for the Atlantic Rim development, were insufficient to maintain sage-grouse breeding populations in natural gas fields.*

*The Service strongly recommends minimum protection measures as described by Connelly et al. (2000). The Service also encourages the Bureau to use its authority and not grant exceptions to protection measures for sage-grouse.*

*Finally, the Service would like to remind the Bureau of the 2001 Memorandum of Understanding (MOU) that the U.S. Forest Service, the Bureau, and the Service signed on with the Western Association of Fish and Wildlife Agencies to conserve the greater sage-grouse and its habitat. This MOU outlined the participation of Federal and State wildlife agencies, including the Wyoming Game and Fish Department, in greater sage-grouse conservation, and these commitments should be considered in project planning in sage-grouse habitat.*

3.   <u>Page 3-83, Sensitive Wildlife Species, Page 4-61 and Page 4-68, General Wildlife Species, Page 4-73, Impacts Summary, Page 4-81, Sagebrush Obligate Songbirds, and Page 4-89, Sensitive Species</u>:  The pages of the DEIS listed above briefly discuss sagebrush obligate songbird species and state how impacts from this project would significantly affect nesting and foraging habitats <u>exceeding</u> the significance criteria as established in the Draft Resource Management Plan for the Rawlins Field Office. *The Service is concerned that the DEIS does not discuss the Bureau's obligation to protect*

*migratory birds under the MBTA. Although the DEIS states that the effects exceed the
established criteria threshold, it does not state what measures will be implemented to
directly protect migratory birds, especially Brewer's sparrow, sage sparrow, sage
thrasher and Baird's sparrow, all known to occur within the project area. To avoid
further decline of sagebrush obligate songbirds we recommend that the Bureau identify
habitats within the project area important to migratory birds and clearly identify
measures that will be implemented to reduce the effects so that they fall below the
Bureau's significant effects criteria.*

4.    <u>Page 4-77, Proposed Action:</u> The DEIS states that blowout penstemon and Ute ladies'-
tresses would not be impacted by the project. However, the biological assessment
(Appendix G) states that the project "may affect, but is not likely to adversely affect" both
species. *The Service recommends that the final EIS clarify whether these species may be
affected by the project. In the event that listed species may be affected, the Bureau should
initiate section 7 consultation under the Act and request Service concurrence their
determinations.*

5.    <u>Page 5-16, Greater Sage-grouse and Columbian Sharp-tailed Grouse:</u> The DEIS's
cumulative effects analysis for the greater sage-grouse states that direct and indirect
impacts from habitat fragmentation, dust, noise and long term loss of sagebrush habitat
would be cumulatively significant leading to long-term decline in the population of sage-
grouse. *Please see comment #2 above. The Service reminds the Bureau of their
commitment to conserve the greater sage-grouse and its habitat.*

We encourage the Bureau to ensure the conservation of endangered, threatened, and candidate
species, migratory birds and sensitive species. If you have further questions regarding our
comments or your responsibilities under the Act, please contact Kathleen Erwin of my staff at the
letterhead address or phone (307)772-2374, extension 28.

**References**

Connelly J.W., M.A. Schroeder, A.R. Sands, and C.E. Braun. 2000. Guidelines to manage sage
grouse populations and their habitats. Wildlife Society Bulletin 28(4): 967 - 985.

Holloran M.J. 2005. Greater sage-grouse (*Centrocercus urophasianus*) population response to
natural gas field development in western Wyoming. Ph.D. Dissertation, University of
Wyoming, Laramie, WY. 115 pp., plus appendices.

Lyon A.G., S.H. Anderson. 2003. Potential gas development impacts on sage grouse nest
initiation and movement. Wildlife Society Bulletin 31(2): 486-491.

cc:   BLM, State Office, State Director, Cheyenne (B. Bennett)
      FWS, Regional Office R6, Energy Coordinator, Lakewood, Colorado (B. Dach)
      WGFD, Statewide Habitat Protection Coordinator, Cheyenne (V. Stelter)
      WGFD, Non-Game Coordinator, Lander (B. Oakleaf)

# Exhibit F
**NRDC, et al. v. Kempthorne, et al.**



# WYOMING
# GAME AND FISH DEPARTMENT

Dave Freudenthal, Governor          Terry Cleveland, Director

*"Conserving Wildlife – Serving People"*

February 8, 2006

WER 9678.00
Bureau of Land Management
Rawlins Field Office
Draft Environmental Impact Statement
Atlantic Rim Natural Gas Development Project
Carbon County

David Simons
Bureau of Land Management
Rawlins Field Office
P.O. Box 2407
Rawlins, WY 82301

Dear Mr. Simons:

The staff of the Wyoming Game and Fish Department has reviewed the Federal Register regarding the Notice of Availability of Draft Environmental Impact Statement for the Atlantic Rim Natural Gas Development Project. We offer the following comments.

## Terrestrial Considerations:

### General Comments:

We previously submitted comments in a letter dated October 28, 2005, during the preliminary draft stage of this project and those concerns remain valid.

The Project area lies within the Baggs pronghorn and mule deer herds, and the Sierra Madre elk herd.

There are 88 sage-grouse leks in and adjacent to the project area, and Columbian sharp-tailed grouse use areas along the east and southeast boundary.

This project will impact wildlife in several ways:

- Direct loss of habitat from construction and production activities,
- Increased human disturbance from development activities and increased access,
- Increased public access within the project area, and
- Cumulative impacts with other projects in the region.

Mr. David Simons
February 8, 2006
Page 2 – WER 9678

We would like to see the project developed in such a way as to reduce impacts to the greatest extent possible. We believe this means mitigating loss of habitat as it occurs, and in cases where development has already occurred, there is backlog of mitigation to be done. We welcome opportunities to work with the operators on improving habitats within the project area and suggest you contact our local wildlife biologists, Tim Woolley (307 383-6082) in Savery, or Greg Hiatt (307 324-7927) in Sinclair, for additional information.

The document states that areas with silver sage and bitterbrush would have limited disturbance. We agree with this stated result since the Sand Hills have silver sage and bitterbrush, and is an important crucial winter and transition range for mule deer and elk. It is very important to protect this resource. However, we could not find where and how much was going to be protected.

We support the fewest numbers of wells as possible, and we would recommend that mitigation for wells drilled and consequent acres disturbed be addressed in the project. If the decision is made to permit more than four wells per section, the mitigation will need to be increased as well, and we would like to work with the companies to develop an effective mitigation plan for wildlife. Such items as reduced standards for roads, closing roads after they are built, and remote well monitoring would be beneficial in reducing disturbance to big game and sage grouse. We believe that an active and effective approach to mitigation will reduce the overall impacts to wildlife. We will utilize our *Recommendations for Development of Oil and Gas Resources within Crucial and Important Wildlife Habitats (December 6, 2004)* document for potential strategies for mitigation and avoidance of wildlife impacts, and we encourage the BLM to refer to it also.

The Wildlife Monitoring Plan, as designed, will not be effective at detecting changes to the various wildlife populations. Because mitigation is predicated on the monitoring plan, it is essential monitoring be done effectively. We recommend the BLM review and summarize their current wildlife monitoring data that have been collected to date in adjacent gas fields. This will demonstrate the impact to wildlife in these fields and what we may expect as a result of the current development proposal. At present, we do not know whether other wildlife monitoring and protection plans (e.g., Continental Divide/Wamsutter II) have been effective in determining and mitigating effects in the last five years.

<u>*Specific Comments:*</u>

<u>Page 3-49</u>  There are many descriptions of existing erosion and reclamation problems occurring on most PODs, as presented by the BLM. We recommend repairing these problems before additional sites are developed.

<u>Page 3-70</u>  In the big game table, mule deer Hunt Area 85 is listed. We removed Hunt Area 85 several years ago and incorporated it into Hunt Area 84.

Mr. David Simons
February 8, 2006
Page 3 – WER 9678

Page 3-73  It should be clarified that sage-grouse seasons were set at a later date to reduce the harvest of older, successful reproducing hens that were found with broods near water.  The later season decreased the harvest of hens, since the birds were scattered in all habitats.

Page 3-73  Under the section about sage-grouse severe winter relief, it would be helpful to include the report on sage-grouse severe winter relief by Hayden-Wing Associates.  Is this report completed?

Page 3-82  Under sensitive species, it is stated that no swift foxes were found near the project area.  However, a swift fox was observed by a consultant southeast of Wamsutter during a ferret clearance survey about six to seven years ago.  This was reported to us by the BLM.  This makes it at least likely that swift fox may be present in the area.

Page 4-47  We recommend the BLM develop an area-wide vegetation treatment plan if vegetation treatments are proposed.  An estimated 16,000 acres of vegetation will be removed through construction activities.  Vegetation management on the project area should be focused on weed control and reclamation, versus removal of shrubs, and on providing landscape-level vegetation needs for all native wildlife.  If shrub control is used, we encourage mechanical treatments as the main treatment option for shrub control.

Page 4-59  Under the "Impact Significance Criteria" section, some statements are made that if habitat function is lost, then substantial impacts will occur.  Habitat function should be defined in the document.  Also, mortality to T&E species is a criterion, but implementation of monitoring the mortality of T&E species needs to be addressed.

Page 4-63  This statement suggests that winter ranges are being moderately used by big game.  It needs to be explained how the level of use was determined.

Page 4-64  While free movements are difficult, we disagree that pronghorn are trapped within the herd unit during hard winters.  There is a section of lay down fence panel along Highway 789 at Peach Orchard Flat that can be used in severe winters.

Page 4-63  We disagree that pronghorn and deer will habituate to predictable traffic.  The project area has received a large amount of hunting pressure during pronghorn seasons in recent years, and because of this, pronghorn avoid any vehicle, and seem to remain wary most of the year.  In addition, recent studies of mule deer suggest that avoidance is a more common response than habituation.  If there are data that suggest these animals will acclimate, please reference these studies.

Page 4-65  There may be higher rates of predation on sage-grouse due to increases in perches for eagles (e.g., buildings, panels at well sites).

Page 4-66  Serviceberry stand areas are important winter habitats for sharp-tails and should be protected within the project area.

Page 4-67  Sage-grouse wintering areas should be mapped before too much development occurs.

Page 4-69  Not all animals may move onto adjacent habitats when development is clustered, but this development scenario is a good concept and would reduce the impacts of an "all at once" approach.  We support some type of clustered development as opposed to having concurrent activities that are scattered throughout the impact area.

Page 5-11  In the cumulative impacts section, there are no data (i.e., amount of disturbance, miles of roads) to list the cumulative amount of disturbance, or maps illustrating the impacts. We recommend that the reader should determine the severity by looking at the data.  The current approach does not adequately describe what is occurring on the ground.  For example, there are no acreages listed for the prescribed burns in the area, although it is important since this adds to the amount of shrub habitat that may already be out of production.  It also states that most of the shrubs are over-mature and need to be removed, however, there are no supporting data on amount of age classes and where they occur.  This is very important information for not only explaining impacts, but for planning vegetation enhancements for mitigation.

Page 5-13  In the Range Resources section, the cumulative impact is said to result in a "small net loss to annual forage."  Unless reclamation is correctly done, it could be a larger impact, especially if drought occurs in this 8-10 inch precipitation zone.  What if the disturbed areas result in undesirable weeds like halogeton?  With areas taken out of production, livestock will be crowded onto the remaining acres, resulting in increased grazing pressure.

Appendix B  Reclamation of well sites suggests using vegetation species useful for wildlife and livestock.  Protection of reclaimed areas until forage re-establishment should be addressed.

Appendix B  It may be beneficial to state how vegetation and soil inventories will be done.

Appendix D  Spotted and thirteen-lined ground squirrels have the same scientific names in this table.  The spotted ground squirrel should be S. spilosoma, (from Chapman and Feldhamer, 1982), and is usually found in shortgrass prairie habitats in southeast Wyoming.

Appendix E  We recommend monitoring sage-grouse and sharp-tail leks annually, using population estimation protocol for comparisons of disturbed versus undisturbed sites, (i.e., Wyoming Game and Fish sage-grouse count lek protocol to determine effects).  We recommend data be collected on our sage-grouse lek forms to be included in our statewide database.

Appendix E  What is going to be done with the raptor productivity data?  It would be beneficial to compare developed areas to undeveloped areas to learn more about productivity on, and away, from project areas.

Appendix E  We will periodically update big game winter ranges, which can change over time, especially after the habitat has been altered.

Mr. David Simons
February 8, 2006
Page 5 – WER 9678

Appendix E, 2.3.1.4  It should be explained what plover habitat is practical to protect.

Appendix H  If there is already a POD in a migration corridor, is there an adaptive management process to alter development to deal with it?

Appendix L  In the sage-grouse section within alternative C, this section is confusing.  Wildlife protection measures seem to only protect sage-grouse wintering areas.  Is this in addition to ¼-mile NSO's for leks?  The other protections are unclear.

Appendix M, Page M-34, Maps  The SMA map key does not match the map fill (i.e., difficult to discern the different areas).  Also on page M-38, please clarify the data source used for successful hunts.

**Aquatic Considerations:**

Issues of concern are impacts to water quality, impacts to surface hydrology, and impacts to soils especially in riparian areas.  Increased disturbances from roads, pipelines and pad development can affect the water quality and also impact the hydrology of these drainages.

Our comments dated October 28, 2005 establish the importance of the aquatic resources within the Muddy Creek drainage and our desire to see maximum protections put in place to protect these resources.

We are opposed to Alternatives A and B.  Furthermore, we are concerned that if the proposal is implemented as written, the vast areas of disturbance will negatively impact the aquatic resources in the area.  Roads, pads, pipelines and other infrastructure will change natural overland flow processes, rates, and quantities.  The resulting changes to hydrologic processes within the drainage will negatively alter natural instream processes, thereby altering the habitat necessary to support all life stages of the native aquatic communities within the Muddy Creek drainage.

We support alternative C, if in addition to implementing the stipulations and BMPs discussed in the document and in Appendix H, J, and L, adequate protective measures are implemented to further protect the aquatic resources in the project area.

At the present time, the precise reach of Muddy Creek located within the boundaries of the project area supports the only viable assemblage of bluehead suckers, roundtail chubs, and flannelmouth suckers known to still exist in Wyoming.  Not only does this reach of stream provide the preferred habitat components selected by these native fishes to complete their life cycle, but also the mobility of this fish assemblage is restricted from movement either up or down stream of this reach due to combinations of physical and water temperature barriers.  Therefore, any cumulative energy development activity that negatively affects the integrity of the watershed and overall stream system health may jeopardize the future existence of these native

fishes. For this reason, we recommend that specific stipulations be implemented to protect these species inside the project area between the Continental Divide north of Muddy Creek proper and the Muddy Creek/Dry Cow Creek hydrographic divide located south of Muddy Creek. At a minimum, no drilling or other field development activities should be allowed to occur within ¼ mile of any active stream channel in the upper Muddy Creek watershed.

Outside the area defined above, no drilling activity or disturbance should be permitted within 500 feet of a riparian area, wetland or stream channel. We recommend applying a standard NSO stipulation to all riparian zones and a 500-foot corridor extending from the outermost limit of the riparian habitat (WGFD 2004).

We support the proposal put forth by the operator for no surface disposal of produced waters. If surface discharge is considered in the future, we have the following concerns:

- Increased salt loading within the Colorado River basin.

- The reach of Muddy Creek in the project area provides the preferred habitat components selected by these native fishes to complete their life cycle. Altering the chemistry, suspended solids, water temperature, and/or natural hydrograph of the watershed through the discharge of CBNG production water to drainages within the Muddy Creek drainage could result in the elimination of the native fish assemblage, even if the water meets the revised TDS loading set by the Colorado River Basin Salinity Control Forum in 2002.

We recommend minimizing road development and in particular new road crossings of Muddy Creek proper. In particular, we suggest a transportation plan be developed for this project, and that Department personnel are consulted to minimize impacts to fish and wildlife resources. If a new road must cross Muddy Creek anywhere in the drainage, a bridge or bottomless culvert of sufficient size to fully span the active channel, including the primary floodplain, should be used. New crossings should not impact the ability of fish to move upstream/downstream, nor change the stream hydraulics up to a normal high flow event. Under no circumstances should round, corrugated culverts be placed in stream channels.

If reserve pits are used, we recommend designing drill pad sites to drain excess storm water and other fluids into a properly sized reserve pit. The pit should have adequate capacity to intercept and hold excess precipitation. We recommend lining all reserve pits, irrespective of soil types, with a suitable, impermeable barrier to eliminate possible contamination of soil and groundwater (WGFD 2004).

Staging, refueling, and storage areas should not be located in riparian zones or on flood plains. Keep all chemicals, solvents and fuels at least 500 feet away from streams and riparian areas (WGFD 2004).

Stripping riparian canopy or stream bank vegetation should be avoided whenever possible. It is preferable to crush or shear streamside woody vegetation rather than completely

remove it. Any locations from which vegetation is stripped during installation of stream crossing should be revegetated immediately after the crossing is completed (WGFD 2004).

We are concerned with how the formations identified for re-injection relate to the formations that produce the springs that create the stream in the Muddy Creek drainage.

Comments and recommendations specific to the Atlantic Rim DEIS follow:

Page 4-44, third bullet, "Drainage Crossings: – These would be designed for at the minimum for a 25 year storm event ........" Designing for 25-year events is not adequate and will result in blown out culverts and increased sediment in the receiving watersheds. We recommend, at a minimum, designing drainage crossings to pass 100 year events as recommended in Appendix J of this DEIS on Page J-11, 5th paragraph: "In general, crossings designed to pass 100 year design storms would in most cases allow for unrestricted passage of flow and sediment from smaller storms." We further recommend that road crossings of the tributaries in the Muddy Creek drainage be designed to allow fish passage at all flows. Types of crossing structures that minimize aquatic impacts, in descending order of effectiveness, are a) bridge spans with abutments on banks; b) bridge spans with center support; c) open bottomed box culverts; and d) round culverts with the bottom placed no less than one foot below the existing stream grade. Perched culverts block fish passage and are unacceptable in any stream that supports a fishery (WGFD 2004).

Page 4-47, 2nd paragraph: It is good that the BLM and operator recognize the scarcity of wetland and riparian sites within the project area. The RMP indicated minimum buffers are a good start toward protecting these valuable recourses. Given the scarcity of these resources the operator should commit to no well locations or ancillary facilities in wetland habitats. Pipelines and roads should only cross wetland habitats when unavoidable, and at a perpendicular.

Appendix B, page B-10, 1st Paragraph: "All drainage channel crossing structures should be designed to carry the 25 to 50 year discharge event as directed by the BLM." As pointed out earlier, we recommend, at a minimum, designing drainage crossings to pass 100 year events as recommended in Appendix J of this DEIS on Page J-11, 5th paragraph: "In general, crossings designed to pass 100 year design storms would in most cases allow for unrestricted passage of flow and sediment from smaller storms." We further recommend that road crossings of the tributaries in the Muddy Creek drainage be designed to allow fish passage at all flows. Types of crossing structures that minimize aquatic impacts, in descending order of effectiveness, are a) bridge spans with abutments on banks; b) bridge spans with center support; c) open bottomed box culverts; and d) round culverts with the bottom placed no less than one foot below the existing stream grade. Perched culverts block fish passage and are unacceptable in any stream that supports a fishery (WGFD 2004).

Appendix B, page B-18, 4th paragraph: "A designated official or responsible party should annually inspect and review the condition of all ......." Inspection intervals should be

Mr. David Simons
February 8, 2006
Page 8 – WER 9678

more frequents, especially early in the field development to issue compliance with all the BMPs, mitigation measures, and stipulations identified in this document.  A large amount of resource damage could occur during the 1-year intervals between proposed inspections.

Appendix B, page B-6, 4th and 5th paragraphs:  Both paragraphs discuss establishing staging areas at least 50 feet from drainages or wetlands and hazardous material and refueling areas at least 100 feet from similar areas.  We recommend combining the staging areas and hazardous material/ refueling areas into one location a specified distance from sensitive areas. Combining the two areas should result in a reduction in surface disturbance adjacent to sensitive habitats.  Furthermore, we recommend adopting the herbicide loading site recommendation from Appendix J, page J-3, third bullet: "Herbicide loading sites would be located at least 500 feet from live water, floodplains, riparian areas, and all special status plant locations".  We recommend establishing the staging, hazardous material, and refueling area a minimum of 500 feet from all drainage channel bottoms and wetland habitats.

Appendix H, page H-7, Water used for construction, maintenance, and drilling activities, #3:  We recommend hydrostatic water be re-injected following use.

Appendix J, page J-7, 4th paragraph: "Pits should be lined if there is not sufficient clay in the building material to prevent infiltration of fluids into shallow groundwater."  We recommend all pits be lined as an extra precaution against infiltration of fluids into shallow groundwater. Once a mistake is made and the groundwater is contaminated it is impossible to clean up.

Appendix J, page J-11, 3rd paragraph:  "All crossings should consider the failure of the crossing during flows beyond the design capacity."  Although we agree with the strategy of building in a relief valve to limit the damage caused if a drainage crossing is compromised, we contend it is a better strategy to avoid this problem by building the crossing with adequate dimensions to pass all expected flows, including the debris and sediments transported with the flows.  As commented previously, we do not believe designing the crossings for a 25 or a 50-year event is adequate.  At a minimum we recommend building all crossings for a minimum of 100 year events.  This recommendation applies to ephemeral, intermittent and perennial drainages.  The design should take into account the active channel and the flood plan.  The design should pass both the water in the active channel and drain the water on the flood plain.

Appendix K, page K-22, 3rd bullet:  This requirement is not adequate.  We recommend the following language, "Limit construction of drainage crossings to no-flow periods or low-flow periods.  Exceptions to this would be granted by the BLM based on an environmental analysis and site-specific mitigation plans."

Appendix K, page K-22, 7th bullet:  We recommend the addition of the following recommendations to provide additional environmental protections for the aquatic resources:

Mr. David Simmons
February 8, 2006
Page 9 – WER 9678

- All pipeline crossings of a watercourse should be protected against surface disturbances and damage to the pipeline (WGFD 2004).
- Any pipeline crossing of a perennial stream should be done by boring underneath the stream rather than trenching, especially main Muddy Creek and its primary tributaries (WGFD 2004).
- Pipeline crossings can be installed through ephemeral streams by trenching. Use appropriate size riprap to stabilize stream banks. Place riprap from the channel bottom to the top of the normal high water line on the bank at all stream crossings. We recommend double-ditching techniques to separate the top one-foot of stream bottom substrate from deeper soil layers. Reconstruct the original layers by replacing deeper substrate first (WGFD 2004).

Thank you for the opportunity to comment.


Sincerely,



BILL WICHERS
DEPUTY DIRECTOR

BW:VS:gbe
cc:    USFWS


Literature Cited

Wyoming Game and Fish Department. 2004. Recommendations for Development of Oil and Gas Resources within Crucial and Important Wildlife Habitats. Wyoming Game and Fish Department, Cheyenne.

# Exhibit G

NRDC, et al. v. Kempthorne, et al.



"LAURA M CHRIS NAUMANN
RYAN" <jcnlmr@msn.com>
02/13/2006 10:22 PM

To    Atlantic_Rim_EIS_WYMail@blm.gov

cc

bcc

Subject    Red Desert Comments

February 13, 2006

David Simons, Project Manager
Rawlins Field Office
Bureau of Land Management
P.O. Box 2407
Rawlins, WY 82301

Dear Mr. Simons,

I am writing in regards to the massive Atlantic Rim Project within the Red
Desert. Several years ago I spent several days sage grouse hunting with my
father (Laramie, WY) and grandfather (Columbia, MO) in the Jack Morrow area
of the Red Desert. Besides the memories of a three-generation hunt, I have
never forgotten the truly unique natural resources of the Red Desert. The
grouse hunting was exceptional but, the highlight of the weekend was
watching the herds of elk and wild horses. I have hunted throughout Montana
and I can honestly say that the Red Desert is the most unique and diverse
environment that I have ever hunted.

I recognize that the development of the oil and gas reserves held within the
Atlantic Rim Project is an unavoidable reality. But, I urge you to revise
your proposal to include responsible environmental protections to strike a
balance between resource extraction and the needs of public recreation,
clean air and water, and desert wildlife.

I understand that the extraction companies have proposed drilling over 2,000
wells involving 1,000 miles of new roads. Widely accepted studies have
shown time and time again that this scale of development will have a
tremendous negative impact on the sage grouse and elk populations. Of
particular concern is the density of the drilling sites. The Atlantic Rim
Project proposal involves constructing pads at double the usual density
found in similar types of developments.

I would also request that you impose strict protective requirements to
prevent the degradation of all streams, springs and seeps in the Red Desert.
These sources of water are critical to all wildlife species, but in
particular the sage grouse. Underground injection of drilling wastewater
would increase the salinity of these fresh water sources and negatively
impact all wildlife.

With all of these concerns in mind, I think it would be prudent to require
the project to employ directional drilling and concentrat well facilities
into cluster to ultimately minimize the footprint of drilling pads and
reduce the road mileage.

And finally, considering the enormous amount of land available to this
extraction project, I think that the Wild Cow Creek proposed wilderness must
continue to be treated as such and protected from any development.

As our economy demands that we seek new sources of energy, public land
managers such as yourself have the opportunity to assure that extractive
resource developments be carried out in an environmentally responsible
manner.

Thank you for the tremendous amount of time and energy that you have
invested in this project and thank you for considering my comments. I hope

to visit the Red Desert again in the future and have another unique
expereince.

Chris Naumann
603 South 10th Avenue
Bozeman  MT  59715

jcnlmr@msn.com

# Exhibit H

**NRDC, et al. v. Kempthorne, et al.**



Daniel A Dale
<ddale@uwyo.edu>
01/28/2006 10:58 AM

To  Atlantic_Rim_EIS_WYMail@blm.gov

cc

bcc

Subject  Cow Creek Roadless Area

To whom it may concern,

E7-1

As a hunter, angler, and general outdoor enthusiast, please do what you can to protect the Cow Creek Roadless Area. My family and I have spent a lot of time in the Red Desert, including an overnight trip in the Cow Creek Area. It is a fantastic wild area, and I hope it can be preserved for my daughters generation and longer. I ask you to please put the wildlife and watersheds ahead of the proposed CBM drilling.

Thank you for listening,
Danny Dale
Laramie, WY

# Exhibit I

**NRDC, et al. v. Kempthorne, et al.**

Case 1:07-cv-01709-RJL    Document 2-16    Filed 09/25/2007    Page 2 of 3

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240
August 15, 2001

In Reply Refer To:
1200 (300) P

EMS TRANSMISSION 08/21/2001
Information Bulletin No. 2001-138

To: All State Directors

From: Assistant Director, Minerals, Realty, and Resource Protection

Subject: Status of Bureau of Land Management's National Energy Policy Implementation
Plan

In May 2001, the President adopted a National Energy Policy which identified a major role
for the public lands and resources to meet our Nation's increasing energy needs. Early in
June, the BLM senior managers, resource specialists and technical staff met and developed a
series of initial actions, schedules and assignments outlining how the Bureau could
efficiently and effectively implement the President's Policy.

Over 40 of these initial short- and long-term tasks were adopted by the Department for
implementation. The task identifies opportunities to expedite or to expand energy supplies as
well as preserving the health our public lands. Another major component is close
coordination with other Federal agencies, State and Tribal governments, local communities,
industry and the public.

Attached for your information is a summary table depicting the various Bureau of Land
Management (BLM) tasks and the responsible offices. More explicit information on the
specific steps, deliverables and individual assignments will be transmitted in an Instruction
Memorandum. The tasks are organized into four categories: Category 1 - to be completed
within 3 to 6 months; Category 2 - administrative action expected to take more than 6
months to complete; Category 3 - requires regulatory action; and Category 4 - requires
legislative action. Please note that the task numbers are for tracking and do not reflect a
task's priority.

Successful implementation of the President's National Energy Policy will require the full
cooperation and close coordination of the entire BLM. I urge each of you to support this
effort in every way possible.

If you have any questions about the implementation plan, please feel free to contact Erick
Kaarlela directly at 202-452-0341.

Signed by:                          Authenticated by:
Robert (Bob) M. Anderson            Barbara J. Brown
Acting Assistant Director           Policy & Records Group, WO-560
Minerals, Realty and Resource Protection

1 Attachment
 1 - Bureau of Land Management Energy Policy Tasks (8 pp)

# Exhibit J
NRDC, et al. v. Kempthorne, et al.

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, DC 20240

February 4, 2002

In Reply Refer To:
1620 (210) P

EMS TRANSMISSION 02/04/02
Instruction Memorandum No. 2002-081
Expires: 9/30/2003

To: AD's and AFO's

From: Assistant Director, Renewable Resources and Planning

Subject: Time Sensitive Plans, National Planning Support Team and Action Plan for Time Sensitive Plans

**Program Area:** Land Use Planning.

**Purpose:** To identify the "Time Sensitive Plans" as a top Bureau of Land Management (BLM) priority, establish and define the roles of the National Planning Support Team and Planning Board of Directors, and transmit the Action Plan for Time Sensitive Plans.

**Background:** BLM received an additional $19,000,000 in FY 2001 and $7,085,000 in FY 2002 to begin updating and preparing new land use plans on public lands. The budget increases have enabled the BLM to continue or initiate more than 80 individual planning efforts during FY 2002, including new plans, revisions, amendments or assessments. This funding increase comes with significant expectations of the Congress, the Department of the Interior and BLM's partners.

Additionally, the BLM's National Energy Plan and National Fire Plan commit the BLM to significant on-the-ground accomplishments that will be facilitated by land use plans updates.

In May, 2001, a team of Washington Office (WO) representatives, field office managers and state planners met in the WO to discuss the primary findings of the WO reviews of more than 18 Preparation Plans completed for planning efforts scheduled to begin in FY 2001. This team recommended that the BLM identify high priority plans and take measures at all levels of the organization to support expedited completion of those plans.

In response to that recommendation, the BLM's Executive Leadership Team (ELT) has designated 21 land use plans as Time Sensitive Plans (TSP). These highest priority plans are

vital to fulfill Administration, Congressional, and BLM priorities and to resolve nationally significant legal issues. A National Planning Support Team (NPST) has been established in the Washington Office to support the Assistant Directors and the State Directors and facilitate the completion of the TSPs. A Planning Board of Directors has been designated to provide leadership and guidance to the NPST.

**Policy:**

*Time Sensitive Plans*

The 21 planning projects designated as Time Sensitive Plans are set forth in Attachment #1. These projects shall be the highest priority of the more than 80 individual planning efforts on-going during FY 2002 and 2003. A completion date has been established for each plan on the TSP list; all are scheduled for completion within the next 36 months. State Directors are expected to accomplish the TSPs within allocated budgets and the established time frames while maintaining quality control over all land use planning projects to ensure that LUP decisions are sustainable.

States with TSPs should implement a variety of actions to support TSPs, including monitoring and reporting progress on an on-going basis, implementing measures to streamline individual planning processes, and assisting the field offices with outreach, coordination and consultation. It may also be necessary to adjust planning workloads and shift available funding to support field offices that have a leadership role in the preparation of the TSPs.

All states are required to coordinate with the National Planning Support Team, primarily through the plan liaisons to be identified for each TSP (see Attachment #2), regarding all aspects of the planning process related to budget, timeliness or national level legal, regulatory or policy requirements.

*National Planning Support Team*

The National Planning Support Team (NPST) will consist of a core team and an extended team. The core team currently consists of Mike Mottice, Acting Project Manager (WO-200); Eli Ilano (WO-210); Jeff Jarvis (WO-170); and Alzata Ransom (WO-350). The core team will work together on a regular basis to provide ongoing support to the states and their planning teams over the next 2 to 3 years while facilitating the completion of the tasks in the Action Plan (Attachment #3). To ensure close coordination with the BLM's National Energy Plan, Debra Angolet (WO-300) will be working as needed with the core team.

The extended team will consist of a representative from IRM and Public Affairs; the Group Managers; and various program specialists. Representatives from the Department, Solicitors Office, U.S. Fish and Wildlife Service, Council on Environmental Quality, and other agencies will be consulted depending on the specific support needs. The extended team will prepare national level program and policy guidance, resolve national level policy conflicts, conduct coordinated policy reviews, and provide assistance with data and information

gathering to support timely completion of the time sensitive plans.

*Purpose, Roles and responsibilities of the NPST*

The primary goal of the NPST is to facilitate the timely completion of legally sustainable TSPs. The NPST will extend the planning and program expertise available to the states and enable the individual planning teams to more effectively reduce barriers and communicate to national level interest groups and agencies. In addition, the NPST serves as a focal point within the Washington Office to coordinate support efforts. For example, depending on the needs of the planning teams, the NPST could work with national interest groups during scoping and coordinate at the national level with federal agencies and the Department to resolve policy issues. The NPST will use the state office planning leads as the primary point of contact within the affected states.

The State Directors retain the responsibility and accountability for timely completion of LUPs and ensuring the quality of the planning documents to sustain land use plan decisions.

The NPST Project Manager will oversee the NPST and serve as BLM's primary point of contact regarding the TSPs to provide general briefings to the Department, Congress, the media and other agencies as needed. For problem solving or issue related briefings, the Assistant Director(s) and State(s) would be involved as appropriate.

*Planning Board of Directors*

The Planning Board of Directors will consist of Assistant Directors Henri Bisson (AD-200) and Pete Culp (AD-300); Office of National Landscape Conservation System Director Elaine Brong (WO-170); State Directors Fran Cherry (AK), Sally Wisely (UT), Elaine Zielinski (OR) and Al Pierson (WY); Office of Fire and Aviation Director Larry Hamilton; Associate State Director Carl Rountree (AZ), and Group Manager Ann Aldrich (WO-210). The Planning Board of Directors will serve as a liaison between the NPST and the ELT and will provide leadership and oversight to the NPST. The draft charter for the Planning Board of Directors (see Attachment #4) more fully describes the Board's role.

**Coordination:** This IM has been coordinated with WO-170, AD-200, AD-300, AD-500, AD-600 and the Planning Board of Directors.

**Contact:** Ann Aldrich, Group Manager, Planning, Assessment and Community Support (202) 452-7722.

Signed by:                                          Authenticated by:

Henri R. Bisson                                  Vincent C. Chapman, Jr.

Assistant Director                              Policy & Records Group,

WO-560

Renewable Resources and Planning Protection

4 Attachments:

1 - TSP List (2 pp)
2 - Plan Liaisons (1 p)
3 - Action Plan (6 pp)
4 - Planning Board of Directors Charter (2 pp)

# Exhibit K
**NRDC, et al. v. Kempthorne, et al.**

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240

February 23, 2004

In Reply Refer To:
3100/3200/1610 (210/310) P

EMS TRANSMISSION 02/26/2004
Instruction Memorandum No. 2004-110
Expires: 09/30/2005

To:       All WO and FO Officials

From:     Director

Subject:  Fluid Mineral Leasing and Related Planning and National Environmental
          Policy Act (NEPA) Processes

DD: 04/01/2004

**Program Area:** Fluid Minerals and Related Planning

**Purpose:** This Instruction Memorandum (IM) clarifies existing NEPA guidance in regard to case law concerning the implementation of land use allocation decisions and the processing of oil, gas and geothermal leasing decisions authorized under existing land use plans. This IM also clarifies and provides proper application of the Council of Environmental Quality (CEQ) regulations contained in 40 CFR 1506.1 on the implementation of existing Resource Management Plan (RMP) decisions during a planning process to amend or revise the RMP.

This IM replaces all discussion pertaining to oil and gas leasing (not APD or other permit processing) contained in IM No. 2001-191 - "Processing of Applications for Permit to Drill (APD), Site-Specific Permits, Sundry Notices, and Related Authorizations on Existing Leases and Issuing New Leases during Resource Management Plan (RMP) Development." The related IM previously issued, IM No. 2001-075 - "Bureau wide Implementation of Solicitor's Opinion on Jack Morrow Hills Coordinated Activity Plan" has expired and has been replaced a change in the Bureau of Land Management (BLM) manual handbook H-1601-1, page VII E, rel.1-1675 and by this memorandum.

**Background:** Field and State Offices have indicated the need for clearer policy direction in regard to implementing existing land use plan decisions, especially during in the process preparing a land use plan amendment or revision. In addition, further guidance has been

equested on how to proceed when new information is provided by the public regarding
ssues to be addressed in pending or upcoming planning efforts, or which may indicate a
need to supplement existing NEPA analyses. This has become an issue of concern in
regard to issuing oil, gas and geothermal leases.

There has also been confusion on the interpretation of the CEQ regulations contained in
40 CFR 1506.1(a) and (c) in regard to preserving alternatives in consideration during land
use plan amendment and/or revision.

**Policy/Action:** It is Bureau of Land Management (BLM) policy that the State Directors
follow current land use allocations and existing land use plan decisions for Fluid Minerals
and related energy actions when preparing land use plan amendments or revisions. This
policy is consistent with BLM handbook H-1624-1 "Planning for Fluid Mineral
Resources" chapter I B.2, rel.1-1583. In a related matter, nothing in the CEQ NEPA
regulations requires postponing or denying a proposed action that is covered by the
Environmental Impact Statement (EIS) for the existing land use plan to preserve
alternatives during the course of preparing a new land use plan and EIS (see 40 CFR
1506.1(c)(2)). Consequently, all Field Offices are expected to follow their respective
approved land use plans in offering for sale, parcels with expressions of interest.

The Associate Solicitors for both the Divisions of Land and Water Resources and Mineral
Resources have prepared a joint memorandum that addresses this issue in greater depth.
That memorandum is included in attachment 1.

Fluid mineral leasing allocation decisions are made at the planning stage. The EIS
associated with the RMP is intended to meet the NEPA requirements in support of leasing
decisions. A determination of adequacy of the NEPA document is required in
conformance with chapter III of the NEPA Handbook H-1790-1 and related NEPA
instruction memoranda. Preparation of another NEPA document, plan amendment or
additional activity planning is not normally required prior to issuance of an oil and gas or
a geothermal lease, except as discussed below.

Additional NEPA documentation would be needed prior to leasing if there is significant
new circumstances or information bearing on the environmental consequences of leasing
not within the broad scope analyzed previously in the RMP/EIS. Additional NEPA
analysis should be completed according to BLM manual handbooks H-1790-1, H-1601-1
(with revisions), and H-1624-1. Field Offices should also distinguish new information
bearing on the impacts of currently authorized actions in the land use plan (i.e., leasing)
from new land use allocation proposals that may be submitted by a member of the public.
Those proposals to add new land allocations or classifications should be analyzed in the
context of land use planning and its NEPA work, not in the context of current plan
implementation.

The next phase of Bureau NEPA analysis occurs when the lessee or the operator submits

an application for exploration or development. When permit applications are submitted, site-specific NEPA impact analyses, as appropriate, are conducted to provide another tier of environmental protection through the development of conditions of approval to be included in the approved permits. This phased process is consistent with current policy and regulations (e.g., H-1624-1 Planning for Fluid Mineral Resources, rel. 1-1583; chapter 1, B.2.Resource Management Planning Tier; 43 CFR 10.5-3(a); Onshore Order No.1, III.G.5; 43 CFR 3162.5-1(a)) and these longstanding Bureau practices remain unchanged.

It is Bureau policy that a decision to not implement oil and gas or geothermal leasing decisions, as contained in current RMPs/MFPs must be made by the State Director with appropriate input from the affected Field Manager. The State Director must provide a letter to those who submitted the expression of interest for the tract, stating the reasons for not offering the parcel(s), the factors considered in reaching that decision, and an approximate date when analysis of new information bearing on the leasing decision is anticipated to be complete and when a decision to lease (or amend the plan) is expected to be made. This would apply to tracts deferred for more than one lease sale. That notification should be provided as soon as practicable and shall be placed in the permanent file created for the lease tracts at issue.

The Assistant Director (WO-300) shall be notified in writing when a State Director decides to postpone a tract nominated for oil and gas leasing, that would delay offering the tract for a period of four quarterly sales or one year. You should provide the information in the following table. The first report is due April 1, 2004. One comprehensive table per state should be used regardless of the number of tracts and dates of delayed sales. This table is to be sent to the Assistant Director (WO-300) whenever there is a new tract added or when the sale is eventually held. Please note that a detailed justification must be given in the "Reason" column.

State: XXXXXXXXXXXXXXXX

| Date nomination submitted | Section, Township and Range | Acres | Reason Tract Postponed | Name of Land Use Plan | Proposed Leasing Decision Date | Tract Offered Date |
|---|---|---|---|---|---|---|
| 6-12-03 | 2, T13N; R15W | 640 | Significant Cultural Resources—full justification must be detailed here. | Oil Creek | 7-10-04 | |
| 9-1-03 | 6, T 2N;R26E | 80 | Sage grouse Study area—full | Hen Draw | 10-1-04 | |

| | | | justification must be detailed here. | | | |
|---|---|---|---|---|---|---|

There may be many administrative reasons for temporarily not offering a particular nominated parcel, but those reasons narrow with time.  Where existing NEPA documentation is sufficient to support continued implementation[1], a decision not to lease that extends beyond the one year could be considered a change in land use allocation outside of the planning process that effectively removes large parcels of land from mineral development without following appropriate planning procedures.  The Bureau planning regulations state very clearly in 43 CFR 1610.5-3(a), *"All future resource management authorizations . . . shall conform to the approved plan."*  Proposals for actions that do not conform to approved land use plans should be considered through the land use plan amendment process, 43 CFR 1610.5-5.  If a manager finds that a tract is more appropriately withheld from leasing in an area currently open to leasing under the RMP for periods longer than one year, the manager should strongly consider a plan amendment, with an appropriate range of alternatives, NEPA analysis and public participation.

1 - Documentation would be usually considered sufficient to support leasing when the State Director has determined there is adequate analysis of the impacts of the action detailed enough to identify types of stipulations to be attached to leases so as to retain BLM's full authority to protect or mitigate effects on other resources.

**Time frame:** This IM is in effect upon issuance.

**Budget Impact:** This IM may affect the planning schedules and scope of individual efforts and therefore may have budget implications for those projects.

**Manual/Handbook Sections Affected:** None.

**Coordination:**  Preparation of this IM was coordinated with WO-170, WO-210, WO-300, WO-310, WO-320, and the Interior's Office of the Solicitor prepared the attachment included below.

**Contact:** Kermit Witherbee, WO-310, (202) 452-0319 or Tom Hare (202) 452-5182.

Signed by:
Jim M. Hughes
Acting Director

Authenticated by:
Barbara J. Brown
Policy & Records Group, WO-560

1 Attachment
   1 - Implementation Actions During Land Use Planning (4 pp)

# Exhibit L

**NRDC, et al. v. Kempthorne, et al.**

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240

September 30, 2005

In Reply Refer To:
3160 (310), 1790 (210), 2800 (350) P

EMS TRANSMISSION 09/30/2005
Instruction Memorandum No. 2005-247
Expires: 09/30/2006

To:        All Field Officials

From:      Director

Subject:   National Environmental Policy Act (NEPA) Compliance for Oil, Gas, and Geothermal Development

**Program Areas:** Oil, Gas, and Geothermal Exploration and Operations; Lands and Realty (energy-related rights-of-way); Environmental Coordination.

**Purpose:** This Instruction Memorandum (IM) provides guidance for improved NEPA compliance in oil, gas, and geothermal exploration and development operations on public lands. It specifically provides instructions for developing a range of reasonable alternatives in environmental impact statements (EIS) for oil, gas, and geothermal development projects; interim guidance on the application and use of statutory NEPA categorical exclusions (CX), as granted in Section 390 of the Energy Policy Act of 2005, for oil and gas exploration and development; expanded use of multiple well environmental assessments (EA) and EISs; expanded use of the Documentation of NEPA Adequacy (DNA); and consideration and application of Best Management Practices (BMP).

**Background:** Section 390 of the Energy Policy Act of 2005 (the "Act") established five new statutory NEPA CXs. These exclusions are different in several respects from those historically used by the Bureau.

Additionally, the increasing number of approved and anticipated oil, gas, and geothermal projects on public lands, and the increase in the number, complexity, and controversy of EISs and other NEPA analyses associated with exploration and development of oil, gas, and geothermal resources, has prompted the need for additional national guidance.

**Policy/Action:** Field Offices are directed to incorporate the following NEPA procedures when analyzing and reviewing oil, gas, geothermal, and energy-related projects. This interim policy is in effect until Departmental Manuals, BLM Manuals, and/or BLM Handbooks are revised or additional guidance is issued.

Range of Alternatives

Departmental Manuals, guidance from the Council on Environmental Quality (CEQ), and BLM Handbooks contain guidance for developing a range of reasonable alternatives in NEPA documents. Additional guidance for developing a range of reasonable alternatives for oil, gas, and geothermal development EISs is contained in Attachment 1. The attached guidance applies to all EISs that have not as yet progressed beyond publication of a draft document, and strong consideration should be given to those documents in the final preparation stages (final EIS), but have not been approved for publication. Environmental Assessments are not addressed by the policy contained within Attachment 1.

Section 390 Categorical Exclusions (CX)

Section 390 of the Energy Policy Act of 2005 established five new statutory CXs that apply only to oil and gas exploration and development (the CXs do not apply to geothermal actions). These CXs are different in application from the CXs previously used by the BLM, and are further described in Attachment 2.

Until further guidance is issued, the guidance in Attachment 2 is to be carefully followed to assure accurate and consistent application of the new CXs.

Field Offices shall maintain a structured, multi- or interdisciplinary permit review and approval process, conduct onsite exams for 100 percent of proposed well and road locations, and shall apply appropriate mitigation and BMPs to all permitted actions, in accordance with existing land use plans, full field development EIS, and other pertinent NEPA documents, even when actions are approved through the use of Section 390 CXs.

Multiple Well EA/EIS

An EA or EIS prepared for development of two or more oil, gas, or geothermal wells provides substantial time savings over writing individual EAs or EISs for each well approval and generally results in improved impact analysis.

Effective immediately, all BLM Offices will address multiple proposed activities (e.g. multiple wells within a field) through a single NEPA action, whenever practical (Attachment 3 provides specific guidance).

<u>Documentation of NEPA Adequacy (DNA)</u>

The appropriate use of DNAs for oil, gas and geothermal operations is to be expanded in all Field Offices (Attachment 4 and WO IM 2001-162 provide detailed guidance).

<u>Tracking</u>

The use of Section 390 CXs is to be tracked and tabulated for Fiscal Year 2006 on the table in Attachment 5. If any Section 390 CXs were approved during Fiscal Year 2005, add them into the Fiscal Year 2006 table. Maintain the table in each Field Office as a reference for addressing future CX data calls.

**Timeframe:** Implement immediately.

**Budget Impact:** Full implementation of these policies is expected to provide substantial savings in staff time and budget associated with approval of APDs and related realty actions.

**Manual/Handbook Sections Affected:** NEPA Handbook H-1790-1.

**Coordination:** Coordination occurred among the Washington Office Fluid Minerals Group; Planning, Assessment and Community Support Group; Land and Realty Group; and Office of the Solicitor – Department of the Interior.

**Contact:** Please direct any questions to Tom Hare, Washington Office Fluid Minerals Group (WO-310), at (202) 452-5182 or tom_hare@blm.gov, Jordon Pope, Washington Office Planning, Assessment and Community Support Group (WO-210), at (202) 452-5048 or jordon_pope@blm.gov, Ron Montagna, Lands and Realty Group (WO-350), at (202) 452-7782 or ron_montagna@blm.gov .

Signed by:                                          Authenticated by:
<u>Kathleen Clarke</u>                              <u>Barbara J. Brown</u>
Director

5 Attachments
 <u>1</u> – Developing a Range of Reasonable Alternatives in Oil, Gas, and Geothermal Exploration and Development Environmental Impact Statements (EIS) (3 pp)
 <u>2</u> – Use of Section 390 Categorical Exclusions for Oil and Gas Development (5 pp)
 <u>3</u> – Use of Multiple Well Environmental Assessments (EA) or Environmental Impact Statements (EIS) for Oil and Gas Development (1 p)
 <u>4</u> – Use of Documentation of Land Use Plan Conformance and National Environmental Policy Act (NEPA) Adequacy (DNA) (1 p)
 <u>5</u> – Section 390 Categorical Exclusion Tracking Log (1 p)

# Exhibit M

**NRDC, et al. v. Kempthorne, et al.**



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE

JUNE 18, 2007

TIERED EA, FONSI, AND DR FORM

Tiered to & Referencing the Atlantic Rim Natural Gas Development Project Environmental Impact Statement



**ENVIRONMENTAL ASSESSMENT**                    **EA NUMBER:** WY-030-07-EA-186

**Lease Numbers:** WYC-079940, WYC-0081348, WYC-081348A, WYW-02846, WYW-003569

**Proposed Action:**

Catalina A & B PODs: Natural Gas Wells, Water Reinjection Wells, Access Roads, Pipeline/Utility Corridors, Water Transfer Station, Central Delivery Point, and Appurtenant Infrastructure

**Rawlins Field Office (RFO) Interdisciplinary Team (IDT)**

| IDT Member | Title |
| --- | --- |
| John Ahlbrandt | Natural Resource Specialist (Catalina A POD) |
| Travis Bargsten | Natural Resource Specialist (Catalina B POD) |
| Andy Stone | Hydrologist |
| Patrick Lionberger | Fisheries Biologist |
| TJ Murry | Rangeland Management Specialist |
| Paul Rau | Recreation Planner |
| Frank Blomquist | Wildlife Biologist |
| Bonni Bruce | Archaeologist |
| Mark Newman | Geologist |
| Susan Foley | Soil Scientist |
| Hillaire Peck | Engineer |

Prepared By:

_____                06/25/2007
Travis Bargsten, Natural Resource Specialist.            Date

_____                6/25/2007
John Ahlbrandt, Natural Resource Specialist              Date

**Location of Proposed Action (BLM-administered public lands):**

### Catalina Unit POD A

| Well # | T | R | Sec | Aliquot |
|--------|-----|-----|-----|---------|
| 44-11 | 16N | 92W | 11 | SESE |
| 24-12 | 16N | 92W | 12 | SESW |
| 13-12 | 16N | 92W | 12 | NWSW |
| 11-13 | 16N | 92W | 13 | NWNW |
| 42-13 | 16N | 92W | 13 | SENE |
| 31-13 | 16N | 92W | 13 | NWNE |
| 22-13 | 16N | 92W | 13 | SENW |
| 11-18 | 16N | 91W | 18 | NWNW |
| 22-18 | 16N | 91W | 18 | SENW |
| 31-18 | 16N | 91W | 18 | NWNE |
| 42-18 | 16N | 91W | 18 | SENE |
| 24-7 | 16N | 91W | 7 | SESW |
| 33-7 | 16N | 91W | 7 | NWSE |
| 44-7 | 16N | 91W | 7 | SESE |

### Catalina Unit POD B

| Well # | T | R | Sec | Aliquot |
|--------|-----|-----|-----|---------|
| 31-7 | 16N | 91W | 7 | NWNE |
| 42-7 | 16N | 91W | 7 | SENE |
| 13-31 | 17N | 91W | 31 | NWSW |
| 24-31 | 17N | 91W | 31 | SESW |
| 33-31 | 17N | 91W | 31 | NWSE |
| 44-31 | 17N | 91W | 31 | SESE |
| 13-32 | 17N | 91W | 32 | NWSW |
| 24-32 | 17N | 91W | 32 | SESW |
| 20-1 | 16N | 92W | 1 | Lot 11 |
| 22-1 | 16N | 92W | 1 | Lot 19 |
| 31-1 | 16N | 92W | 1 | Lot 15 |
| 33-1 | 16N | 92W | 1 | NWSE |
| 40-1 | 16N | 92W | 1 | Lot 9 |
| 42-1 | 16N | 92W | 1 | Lot 17 |
| 20-6 | 16N | 91W | 6 | NENW |
| 40-6 | 16N | 91W | 6 | NENE |
| 31-6 | 16N | 91W | 6 | SWNE |
| 11-6 | 16N | 91W | 6 | SWNW |
| 42-6 | 16N | 91W | 6 | Lot 22 |
| 22-6 | 16N | 91W | 6 | NESW |
| 33-6 | 16N | 91W | 6 | NWSE |
| 44-6 | 16N | 91W | 6 | SESE |
| 13-6 | 16N | 91W | 6 | NWSW |
| 1I | 16N | 92W | 1 | SESW |
| 31I | 17N | 91W | 31 | NWSW |
| 6I | 16N | 91W | 6 | SWNW |

See POD Master Surface Use Plan and project maps.

**Applicant/Proponent:** Double Eagle Petroleum Company (Double Eagle)

**Conformance with Land Use Plan**

This proposed action is in conformance with the Great Divide Resource Management Plan (RMP) that was approved on November 8, 1990. The RMP has been reviewed to determine if the proposed action conforms to the land use plan terms and conditions as required by 43 CFR 1610.5. Development of oil and gas reserves is in conformance with the RMP. On page 30, the RMP states."The entire planning area [Great Divide Resource Area] is open to oil and gas leasing".

The development of this project will not affect the achievement of the Wyoming Standards for Healthy Rangelands (August 1997).

Remarks:

The NOSs or APDs for the proposed action were posted for 30 days in the Rawlins Field Office Information Access Center (Public Room) for review. Notification of preparation of this EA was provided on the Wyoming BLM internet NEPA register (http://www.wy.blm.gov/nepa/search).

The Atlantic Rim Area Natural Gas Field Development Project Environmental Impact Statement (AREIS) was written to assess the potential foreseeable and cumulative effects of drilling operations and associated activities in the Project area. The Record of Decision (ROD) for this project was approved on March 23, 2007. The proposed action is in conformance with the AREIS.

The AREIS ROD provides for the drilling of natural gas wells and associated infrastructure, limiting total surface disturbance to 7,600 acres at any one time (not including surface disturbance that occurred prior to implementation of the Interim Drilling Policy). The ROD establishes a goal for per-well surface disturbance of 6.5 acres of short-term disturbance (less in "Category A" areas).

The surface disturbance cap is allocated to operators "...on a prorated mineral leasehold basis." (ROD at Page 2), and development is limited to no more than 8 well sites per 640-acre section. If, in the event an Operator reaches its surface disturbance cap allocation, than "...further disturbance on federal minerals will not be permitted." (ROD at Page 3). The RFO will monitor and track disturbance areas for future proposals, in order to ascertain whether the disturbance cap would be exceeded by future authorizations.

The APDs/Master Surface Use Plan/Master Drilling Plan/Water Management Plan (Master Plan Elements), with Conditions of Approval, contain a complete description of the proposed action. The Master Plan Elements, with Conditions of Approval, are considered an integral part of this Environmental Assessment and are incorporated by reference.

The project (both PODs A & B) is located entirely within a Federal Oil & Gas Unit. No additional rights-of-way are necessary for the proposed action.

## Purpose and Need for Proposed Action

Domestic natural gas production is an integral part of U.S. energy development and conservation plans due to its availability and the presence of existing market delivery infrastructure. Domestic production reduces immediate dependence upon foreign sources of energy, and maintains an adequate and stable supply of fuel to maintain economic well-being, industrial production, and national security. The environmental advantages of burning natural gas are emphasized in the Clean Air Act amendments of 1990.

In addition, the proposed action would allow Double Eagle, as leaseholder, to exercise lease rights to explore and develop oil & gas resources within the project lease areas.

For these particular wells, the production is primarily natural gas and produced water from the coal seams.

## Description of Proposed Action Alternative

The proposed action entails the construction and/or reconstruction of access roads and well pads for the purpose of drilling 37 CBNG wells (14 in POD A, 23 in POD B) and 3 produced water reinjection wells (all in POD B). In addition, the proposed action provides for the construction, use, and reclamation of appurtenant gas- & water-gathering pipelines and utility corridors, including such a corridor to a proposed well on State of Wyoming estate in Section 36 (T17N/R92W). Where feasible and appropriate, the pipeline/utility corridors were located adjacent and parallel to the proposed or existing access roads and existing pipeline disturbances. The maps and illustrations attached to the EA, APDs, and Master Surface Use Plan display the locations of the proposed wells, access roads, gas- & water-gathering pipelines, and utility (primarily electrical) corridors.

A fenced Central Delivery Point (CDP) facility is proposed in POD B. This 500' x 560' facility would contain the centrally-located facilities to pump & reinject produced water, compress gas, and provide storage and measurement components (see Figure 1).



Figure 1: Central Delivery Point (POD B)

The CDP for POD A wells is already constructed and in use, built during exploratory activities (2002). In order to transfer water across topographic rises, each POD will contain a single water transfer station, see Figures 2 and 3:



Figure 2

Figure 3

These stations will contain several components within their fenced areas, including water storage tanks, water pumping equipment, and an emergency pit for overflow. The pit would only be constructed and utilized should it be determined that the producing wells would flow water in the event power is lost and the well pumps cease pumping. The emergency pits will prevent the uncontrolled flow of water and subsequent surface release, should power be lost.

Water for drilling would be obtained from the pond located in NWSE of Section 12 (T16N/R92W), which collects flow from coalbed wells in the area under an approved WDEQ WYPDES permit. Water would be hauled by truck to each drill site over existing and proposed roads within the POD.

Onsite inspections of the PODs were conducted on February 22-23 and March 30, 2006. Potential impacts to resources were considered and alternate locations considered. As a result of this field inspection, several project components were moved to reduce potential impacts to soils, water resources, vegetation, and wildlife resources.

The location of the proposed development is approximately 28 miles northeast of Baggs, Wyoming, west of Highway 789. Access to the area will be from existing access roads off of 789. New roads will be constructed or reconstructed to access most well locations.

A discussion of the actions generally associated with drilling a well, including (1) a plan of operations, (2) construction of the access road and drilling pad, and (3) pipeline installation, can be located in the following portions of the AREIS or ROD:

- Chapter 2, *Proposed Action and Alternatives (AREIS)*
- Chapter 4, *Analysis of Environmental Consequences (AREIS)*
- Appendix A, *Project Reclamation Plan (ROD)*
- Appendix C, *Operator-Committed Practices (ROD)*

Mitigation and reclamation measures are described in Chapter 4 and Appendix B of the ROD (*Project Performance-Based Monitoring and Best Management Practices*). The following narratives summarize elements specific to the proposed action for this EA.

### Construction

Disturbance estimates for POD B include the well pad and access road/utility/pipeline corridor for the #44-36, a State of Wyoming estate well located in Section 36 (T17N/R92W). Portions of the pads unnecessary for production operations will be reclaimed after the production facilities are constructed. The well sites and access roads will be entirely reclaimed after the wells are plugged and abandoned. For the purpose of assessing potential cumulative effects, oil and gas development may be considered long-term as transitory in nature.

| POD A | Short-Term Disturbance Areas | | | | | |
|---|---|---|---|---|---|---|
| Well Name | Well Pad-Acres* | Road-Feet | Road-Acres** | Corridor-Feet | Corridor-Acres*** | SUM-Acres |
| 44-11[1] | 2.1 | 2,020 | 2.3 | 0 | 0.0 | 4.4 |
| 24-12 | 2.1 | 0 | 0.0 | 0 | 0.0 | 2.1 |
| 13-12[1] | 2.1 | 1,430 | 1.6 | 1,470 | 1.7 | 5.4 |
| 11-13 | 2.1 | 1,620 | 3.0 | 1,990 | 2.3 | 7.4 |
| 42-13 | 2.1 | 2,230 | 4.1 | 0 | 0.0 | 6.2 |
| 31-13 | 2.1 | 180 | 0.3 | 0 | 0.0 | 2.4 |
| 22-13 | 2.1 | 480 | 0.9 | 0 | 0.0 | 3.0 |
| 11-18 | 2.1 | 2,090 | 3.8 | 0 | 0.0 | 5.9 |
| 22-18 | 2.1 | 3,190 | 5.9 | 0 | 0.0 | 8.0 |
| 31-18 | 2.1 | 370 | 0.7 | 0 | 0.0 | 2.8 |
| 42-18 | 2.1 | 1,450 | 2.7 | 0 | 0.0 | 4.8 |
| 24-7 | 2.1 | 4,380 | 8.0 | 0 | 0.0 | 10.1 |
| 33-7 | 2.1 | 2,360 | 4.3 | 0 | 0.0 | 6.4 |
| 44-7 | 2.1 | 910 | 1.7 | 0 | 0.0 | 3.8 |
| Xfer Station | 0.7 | 0 | 0.0 | 0 | 0.0 | 0.7 |
| Total: | 30.1 | 22,710 | 39.3 | 3,460 | 4.0 | 73.4 |

| POD B | Short-Term Disturbance Areas | | | | | |
|---|---|---|---|---|---|---|
| Well Name | Well Pad-Acres* | Road-Feet | Road-Acres** | Corridor-Feet | Corridor-Acres*** | SUM-Acres |
| 31-7[1] | 2.1 | 1,010 | 1.2 | 2,030 | 2.3 | 5.6 |
| 42-7 | 2.1 | 1,370 | 2.5 | 0 | 0.0 | 4.6 |
| 13-31[2] | 3.2 | 2,730 | 5.0 | 0 | 0.0 | 8.2 |
| 24-31 | 2.1 | 0 | 0.0 | 0 | 0.0 | 2.1 |
| 33-31 | 2.1 | 1,680 | 3.1 | 0 | 0.0 | 5.2 |
| 44-31 | 2.1 | 2,100 | 3.9 | 0 | 0.0 | 6.0 |
| 13-32 | 2.1 | 2,010 | 3.7 | 0 | 0.0 | 5.8 |
| 24-32 | 2.1 | 1,660 | 3.0 | 0 | 0.0 | 5.1 |
| 20-1 | 2.1 | 2,900 | 5.3 | 0 | 0.0 | 7.4 |
| 22-1 | 2.1 | 2,600 | 4.8 | 0 | 0.0 | 6.9 |
| 31-1 | 2.1 | 380 | 0.7 | 0 | 0.0 | 2.8 |
| 33-1 | 2.1 | 1,340 | 2.5 | 0 | 0.0 | 4.6 |
| 40-1 | 2.1 | 3,140 | 5.8 | 2,730 | 3.1 | 11.0 |
| 42-1 | 2.1 | 1,900 | 3.5 | 0 | 0.0 | 5.6 |
| 20-6 | 2.1 | 1,540 | 2.8 | 0 | 0.0 | 4.9 |
| 40-6 | 2.1 | 2,010 | 3.7 | 0 | 0.0 | 5.8 |
| 31-6 | 2.1 | 1,880 | 3.4 | 0 | 0.0 | 5.5 |
| 11-6[2] | 3.2 | 2,780 | 5.1 | 0 | 0.0 | 8.3 |
| 42-6 | 2.1 | 1,260 | 2.3 | 0 | 0.0 | 4.4 |
| 22-6 | 2.1 | 260 | 0.5 | 0 | 0.0 | 2.6 |
| 33-6 | 2.1 | 3,190 | 5.9 | 0 | 0.0 | 8.0 |
| 44-6 | 2.1 | 740 | 1.4 | 700 | 0.8 | 4.3 |
| 13-6[1] | 2.1 | 1,930 | 2.2 | 0 | 0.0 | 4.3 |
| 11[1,3] | 0.0 | 1,390 | 1.6 | 1,820 | 2.1 | 3.7 |
| 311[2] | 0.0 | 0 | 0.0 | 0 | 0.0 | 0.0 |
| 61[2] | 0.0 | 0 | 0.0 | 0 | 0.0 | 0.0 |
| Xfer Station | 0.7 | 1,130 | 2.1 | 0 | 0.0 | 2.8 |
| CDP | 6.4 | 0 | 0.0 | 0 | 0.0 | 6.4 |
| 44-36 (WY) | 2.1 | 1,620 | 3.0 | 0 | 0.0 | 5.1 |
| Total: | 59.7 | 44,550 | 79.0 | 7,280 | 8.3 | 147.0 |

*Well pad disturbance areas are approximately equal to 300' x 300' (2.1 acres), including stockpiles and cut & fill slopes for all single-well locations. For wells co-located with injection wells (see [2], below), the disturbance areas are approximately equal to 400' x 350' (3.2 acres).

**Assumes new road disturbance and adjacent/parallel pipelines & utilities width equal to 80 feet, unless no adjacent pipeline is proposed (see [1], below).

***Assumes corridor disturbance width equal to 50 feet.

[1] No adjacent pipeline is proposed along this road segment, in which case the disturbance width is assumed to equal 50 feet

[2] Well is co-located with another proposed well (disturbance area accounted for in production wells, and so injection wells are assigned no additional disturbance)

[3] Well is located on an existing disturbed area

The proposed action will result in approximately 220.4 acres of short-term disturbance, comprised of new or reconstructed access roads and adjacent & parallel pipelines and utilities (118.3 acres), drill/well pads (82.0 acres), Central Delivery Point (6.4 acres), water transfer stations (1.4 acres), and non-adjacent pipeline/utility corridors (12.3 acres).

The average per-well disturbance for POD A is 5.2 acres (73.4 acres/14 CBM wells), and for POD B is 6.1 acres (147.0 acres/24 CBM wells). The proposed action is located outside of "Category A" area, and thus is subject to a "disturbance goal" of 6.5 acres per well. Both PODs, then, meet the disturbance goal provided in the AREIS ROD.

Access

The operator proposes to construct new access roads to access the well locations. The new roads will be constructed to BLM specifications for a "Resource Road", as specified in BLM Manual Section 9113.

Adequate drainage structures will be constructed or installed. The travelway will be at least 14 feet wide and will have an average right-of-way width of 50 feet (80 feet, including adjacent & parallel pipeline/utility corridors). The access roads would be reclaimed during production operations to the maintenance width, or to approximately 30 feet in width. Upon completion of the project, unnecessary access roads would be recontoured, ripped, seeded, and revegetated.

In order to construct the access road to POD B, an existing stock pond reservoir will be upgraded to serve as a channel crossing (west of the 11-6/6I location).

Well Site

Should the wells become productive, cut portions of the well site will be backfilled and the unused portions of the well site and soil stockpile sites will be stabilized and reseeded with native vegetation. The well size will be reduced to less than one-half acre for the duration of production operations. Reserve pits will be dried within 180 days. Upon completion of the project, the well pads would be recontoured, ripped, seeded, and revegetated.

Pipeline/Utility Corridors

The pipelines would be buried after construction and the disturbed area reclaimed as soon after construction as reasonable. Upon completion of the project, the pipelines would be evacuated and abandoned in-place. Several pipeline crossings of ephemeral or intermittent channels are proposed (see POD maps).

Produced Water Disposal

Produced water from the proposed action would be gathered to existing water injection facilities within the unitized area. Produced water would be disposed of into the Trout Creek, Cherokee Creek, Deep Creek and Nugget formations.

The existing Water Management Plan also indicates that "The pending water-treatment facility and WPDES permit will also provide an important water management option." This is referring to a proposal under consideration by the RFO ("Catalina Unit CBNG Produced Water Disposal Project EA", WY-030-07-EA-001), and being analyzed under separate NEPA analysis. The proposed action for this EA does not consider surface disposal of produced water under WYPDES #WY0054038. The only means of produced water disposal considered in this action would be by reinjection using disposal wells permitted by the BLM and State of Wyoming.

**No Action Alternative**

NEPA regulations require that alternative analyses in NEPA documents "include the alternative of no action" (40 CFR 1502.14(d)). For this analysis, "no action" means that the BLM would reject the proponent's proposal and "the proposed activity would not take place."

**Potential Environmental Impacts- Proposed Action Alternative**

| Critical Element | Affected Yes | No | Critical Element | Affected Yes | No |
|---|---|---|---|---|---|
| Air Quality | X | | T & E Species | | X |
| ACEC's | | X | Wastes, Hazardous/Solid | X | |
| Cultural Resources | X | | Water Quality | | X |
| Prime/Unique Farmlands | | X | Wetlands/Riparian Zones | X | |
| Floodplains | | X | Wild & Scenic Rivers | | X |
| Native Amer. Rel. Concerns | | X | Wilderness | | X |
| Environmental Justice | | X | Invasive, Nonnative Species | X | |

In addition to the critical elements referenced above, reviews of potential effects upon paleontological-, recreational-, soil-, vegetation-, visual-, and wildlife-resources were conducted. See maps in Figures 4 – 6.

The affected environment and analysis of environmental impacts are discussed in the AREIS to which this EA is tiered.

Air quality impacts are disclosed and analyzed in the AREIS.

Class III cultural resources inventory were conducted for the project areas. Archaeological resources identified will be avoided or, as necessary, a monitor will review construction to ensure no cultural artifacts are disturbed. Both PODs are located outside of the two-mile buffer to contributing segments of historic trails. As such, no additional SHPO consultation is necessary, nor is a visibility analysis required.

Halogeton and other noxious weeds are a significant concern for this project area. COAs have been added to control the spread, establishment, and plant community changes associated with weed infestation.

Portions of the proposed action are located within crucial winter range for mule deer, and within protection buffers of nesting raptors. Two sage grouse leks are known to exist within two miles of the project area. One of the APDs in POD B (#20-6) is located within the ¼-mile buffer of the lek perimeter, and can not be situated to adequately mitigate the potential effects to grouse at the adjacent lek. As a result, authorization of this APD will be deferred until additional mitigation measures have been developed to re-consider the proposal. No mountain plover habitat was identified as being affected within the project area. Seasonal restrictions have been added to the APD authorizations, as appropriate:

### Catalina Unit POD A Wildlife Stips

| Well Name | Raptor[1] | CWR[2] | Grouse[3] |
|---|---|---|---|
| 44-11 | X | X | X |
| 24-12 | X | X | X |
| 13-12 | X | X | X |
| 11-13 | X | X | X |
| 42-13 | X | | X |
| 31-13 | X | | X |
| 22-13 | X | | X |
| 11-18 | X | | X |
| 22-18 | X | | X |
| 31-18 | X | | X |
| 42-18 | X | | X |
| 24-7 | X | | X |
| 33-7 | X | | X |
| 44-7 | X | | X |
| Xfer Station | X | | |

### Catalina Unit POD B Wildlife Stips

| Well Name | Raptor[1] | CWR[2] | Grouse[3] |
|---|---|---|---|
| 31-7 | X | | X |
| 42-7 | X | | X |
| 13-31/31I | X | X | X |
| 24-31 | X | X | X |
| 33-31 | X | | X |
| 44-31 | X | | X |
| 13-32 | X | | X |
| 24-32 | X | | X |
| 20-1 | X | X | X |
| 22-1 | X | X | X |
| 31-1 | X | X | X |
| 33-1 | X | X | X |
| 40-1 | X | | X |
| 42-1 | X | | X |
| 40-6 | X | | X |
| 31-6 | X | | X |
| 11-6/6I | X | | X |
| 42-6 | X | | X |
| 22-6 | X | | X |
| 33-6 | X | | X |
| 44-6 | X | | X |
| 13-6 | X | | X |
| 1I | X | X | X |
| Xfer Station | X | | X |
| CDP | X | | X |
| 44-36 (WY) | X | | X |

[1]Construction, drilling and other activities potentially disruptive to nesting raptors are prohibited during the period of February 1 to July 31 for the protection of raptor nesting areas.

[2] Construction, drilling and other activities potentially disruptive to wintering wildlife are prohibited during the period of November 15 to April 30 for the protection of big game crucial winter habitat.

[3] Construction, drilling, reclamation and other potentially disruptive activities are prohibited during the period of March 1 to July 15 for the protection of sage grouse.

In some instances, the proponent may request consideration of a temporary exception to wildlife seasonal restrictions. Such an exception may be granted if a determination is made that the wildlife resource will not be adversely impacted.

Two pipeline crossings of an ephemeral/intermittent channel are proposed in POD B (from the #44-6 and #31-7 to the water transfer station). These crossings will comply with current BLM policies and mitigation measures appropriate to the crossings (see "Hydraulic Considerations for Pipelines Crossing Stream Channels," BLM Technical Note 423, April 2007).

Site-specific findings by the interdisciplinary review team are provided on the attached review documents.

Description of Impacts:

A discussion of the actions generally associated with drilling projects and their associated impacts may be found in the Atlantic Rim Environmental Impact Statement and Record of Decision.

Hazardous Materials

Double Eagle has indicated that some hazardous materials could be used during drilling, completion, and production of their proposed wells. The term "hazardous material" as used here means: 1) any substance, pollutant, or contaminant (regardless of quantity) listed as hazardous under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, as amended, 42 U.S.C. 9601 et seq., and the regulations issued under CERCLA, 2) any hazardous waste as defined in the Resource Conservation and Recovery Act (RCRA) of 1976, as amended, and 3) any nuclear or nuclear byproduct as defined by the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 et seq.

It is possible that wastes created or transported during implementation of the proposed action (i.e., waste motor oils, drilling/completion additives) could be accidentally released to the environment. The operator will be required to comply with the Hazardous Materials Management Plan provided in Appendix C of the AREIS. Numerous State and Federal rules and regulations also apply that govern the handling, storage, and disposal of hazardous substances.

Double Eagle or any contracted company working for Double Eagle will have Material Data Safety Sheets available for all chemicals, compounds, or substances which are used during the course of construction, drilling, completion, and production operations for this project. Additionally, all chemicals will be handled in an appropriate manner to minimize the potential for leaks or spills to the environment.

Impacts to soils, surface and groundwater resources, wildlife, vegetation, and human health could result from the accidental exposure of hazardous materials. However, since the project operations will strictly comply with all applicable federal and state laws concerning hazardous materials, the Hazardous Materials Management Plan for this project, and the operator's Spill Prevention Control and Countermeasure Plan, no significant impacts are anticipated.

Reclamation

Reclamation typically commences within 6 months of drilling completion. The drill pads will be reduced to a less than ½-acre production well site at each location. Total reclamation of all new disturbances will take place as the wells and facilities are no longer productive or needed and are plugged and abandoned. Appendix A of the ROD contains the reclamation success criteria by which the reclamation status will be judged. The approved Master Surface Use Plan and Conditions of Approval also contain reclamation measures pertaining to reclamation standards.

Description of Mitigation Measures and Residual Impacts:

Mitigation of potential effects is part of the proposed action, and specific mitigation details can be found in the Master Plan Elements including the Conditions of Approval. Residual impacts resulting from the proposed action would include permanent loss of oil and/or gas reserves should the wells become productive. In addition, the well pads, production equipment, and the access roads could remain in place for 30 years or more (until plugging and abandonment, final reclamation).

**Potential Environmental Impacts- No Action Alternative**

Under the No-Action Alternative, the proposed action would not be authorized. The 40 wells would not be constructed or drilled, and gas production from the proponent's lease would not occur. Existing development would continue to occupy the project area, along with impacts associated from the existing development.

**Residual Impacts/Cumulative Impacts:**

The potential residual and cumulative impacts are discussed in the AREIS, Chapter 5, *Cumulative Impacts Analysis.* The proposed action entails the addition of 40 CBNG wells and appurtenant facilities.

Standard mitigation guidelines are addressed in the ROD's Appendix A, *Project Reclamation Plan.* Additional mitigation measures are also provided in Appendix B, *Performance-Based Monitoring and Best Management Practices,* and Appendix C, *Operator-Committed Practices.* All needed mitigation, for that portion of the proposed action on public land, is part of the proposed action.

The access roads and well/production pads may remain visible for a period of approximately 20 to 30 years after they are abandoned and reclaimed. The oil and gas resource will be permanently lost. All needed mitigation is part of the proposed action.

## FINDING OF NO SIGNIFICANT IMPACT/DECISION RECORD.

### Decision

I have reviewed this environmental assessment including the explanation and resolution of any potentially significant environmental impacts. I have selected the proposed action alternative with the mitigation measures described below for authorization and implementation. I have determined that the proposed project is in conformance with the approved land use plan. It is my decision to implement the project with the mitigation measures identified below.

### Finding of No Significant Impact

Based upon the analysis of potential environmental impacts contained in the EA, I have determined that the impacts are not expected to be significant, and that an EIS is not required.

### Rationale for Decision

Compared to the No Action Alternative, the Proposed Action Alternative best meets the Purpose & Need and guiding laws, regulations, and directives, including the Federal Land Policy and Management Act (FLPMA, 43 USC 35). The proposed action is in conformance with the Great Divide Resource Management Plan (RMP) and the Atlantic Rim Natural Gas Field Development Project EIS.

### Mitigation Measures/Remarks:

All needed mitigation is part of the proposed action and can be found in the Master Plan Elements and Conditions of Approval. The decision to authorize/deny the APD for the #20-6 (POD B) will be deferred until a new proposal to mitigate potential effects to sage grouse is submitted by the operator, the APD is moved to a satisfactory location, or withdrawn. A total of 39 APDs, then, are authorized under this decision, along with appurtenant access roads, pipelines, utility corridors, water transfer stations, a CDP, and access road/pipeline/utility corridor over BLM-administered public lands to the State well #44-36.

### Monitoring and Compliance

Designated BLM personnel will monitor operations under authorizations for the proposed action as needed to ensure compliance with the Master Plan Elements and Conditions of Approval.

Authorized Official:

JUN 2 8 2007

Field Manager                                           Date
Rawlins Field Office

### Appeal

Under BLM regulation this decision is subject to appeal. Under BLM regulation, this decision is subject to administrative review in accordance with 43 CFR 3165. Any request for administrative review of this decision must include information required under 43 CFR 3165.3(b) (State Director Review), including all supporting documentation. Such a request must be filed in writing with the State Director, Bureau of Land Management, P.O. Box 1828, Cheyenne, Wyoming 82003 within 20 business days of the date this Decision Record is received or considered to have been received.







# Exhibit N
**NRDC, et al. v. Kempthorne, et al.**



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE

AUGUST 13, 2007

TIERED EA, FONSI, AND DR FORM



Tiered to & Referencing the Atlantic Rim Natural Gas Development Project Environmental Impact Statement

**ENVIRONMENTAL ASSESSMENT**                    **EA NUMBER:** WY-030-07-EA-222

**Lease Numbers:** WYW-116679, WYW-126439, WYW-131778, WYW-141280, WYW-141281, WYW-WYW-147856, WYW-148482, ST-99-357 (State Wells on Federal Surface)

**Proposed Action:**

Sun Dog A & B PODs; Natural Gas Wells, Water Reinjection Wells, Access Roads, Pipeline/Utility Corridors, Water Transfer Station, and associated Infrastructure

**Rawlins Field Office (RFO) Interdisciplinary Team (IDT)**

| IDT Member | Title |
|---|---|
| John Ahlbrandt | Natural Resource Specialist |
| Andy Stone | Hydrologist |
| Patrick Lionberger | Fisheries Biologist |
| Andy Warren | Rangeland Management Specialist |
| Paul Rau | Recreation Planner |
| Frank Blomquist | Wildlife Biologist |
| Nina Trapp | Archaeologist |
| Mark Newman | Geologist |
| Susan Foley | Soil Scientist |
| Hilaire Peck | Civil Engineer |

Prepared By:

_John P. Ahlbrandt_ (signature)          08/15/07

John Ahlbrandt, Natural Resource Specialist;          Date
Pod ID Team Lead

## Location of Proposed Action (BLM-administered public lands):

**Sun Dog Unit POD A**

| Well # * | T | R | Sec | Aliquot |
|---|---|---|---|---|
| 2-8 | 16N | 91W | 8 | NWNE |
| 4-8 | 16N | 91W | 8 | NWNW |
| 6-8 | 16N | 91W | 8 | SENW |
| 8-8 | 16N | 91W | 8 | SENE |
| 4-9 | 16N | 91W | 9 | NWNW |
| 12-9 | 16N | 91W | 9 | NWSW |
| 14-9 | 16N | 91W | 9 | SESW |
| 4-17 | 16N | 91W | 17 | NWNW |
| 12-17 | 16N | 91W | 17 | NWSW |
| 12-17I | 16N | 91W | 17 | NWSW |
| 2-19 | 16N | 91W | 19 | NWNE |
| 8-19 | 16N | 91W | 19 | SENE |
| 2-20 | 16N | 91W | 20 | NWNE |
| 14-18 | 16N | 91W | 18 | SESW |
| 4-19 | 16N | 91W | 19 | NWNW |
| 6-19 | 16N | 91W | 19 | SENW |
| 10-19 | 16N | 91W | 19 | NWSE |
| 12-19 | 16N | 91W | 19 | NWSW |
| 4-20 | 16N | 91W | 20 | NWNW |
| 6-20 | 16N | 91W | 20 | SENW |
| 14-20 | 16N | 91W | 20 | SESW |
| 14-20I | 16N | 91W | 20 | SESW |
| 4-21 | 16N | 91W | 21 | NWNW |
| 12-18 | 16N | 91W | 18 | NWSW |
| 10-18 | 16N | 91W | 18 | NWSE |
| 16-18 | 16N | 91W | 18 | SESE |
| (ST)6-16 | 16N | 91W | 16 | SENW |
| (ST)14-16 | 16N | 91W | 16 | SESW |

**Sun Dog Unit POD B**

| Well # * | T | R | Sec | Aliquot |
|---|---|---|---|---|
| 12-4 | 16N | 91W | 4 | NWSW |
| 12-4I | 16N | 91W | 4 | NWSW |
| 14-4 | 16N | 91W | 4 | SESW |
| 10-5 | 16N | 91W | 5 | NWSE |
| 14-5 | 16N | 91W | 5 | SESW |
| 16-5 | 16N | 91W | 5 | SESE |
| 2-9 | 16N | 91W | 9 | NWNE |
| 6-9 | 16N | 91W | 9 | SENE |
| 10-9 | 16N | 91W | 9 | NWSE |
| 16-9 | 16N | 91W | 9 | SESE |
| 8-20 | 16N | 91W | 20 | SENE |
| 10-20 | 16N | 91W | 20 | NWSE |
| 10-4 | 16N | 91W | 4 | NWSE |
| 12-5 | 16N | 91W | 5 | NWSW |
| 12-20 | 16N | 91W | 20 | NWSW |
| 2-21 | 16N | 91W | 21 | NWNE |
| 6-21 | 16N | 91W | 21 | SENW |
| 8-21 | 16N | 91W | 21 | SENE |
| 12-21 | 16N | 91W | 21 | NWSW |
| (ST)2-16 | 16N | 91W | 16 | NWNE |
| (ST)8-16 | 16N | 91W | 16 | SENE |
| (ST)10-16 | 16N | 91W | 16 | NWSE |
| (ST)16-16 | 16N | 91W | 16 | SESE |

\* Wells are organized by Lease #

(ST) indicates a State well (State minerals) underlying Federal (BLM) Surface. However, these wells are within the Sun Dog Federal Unit, and therefore will be authorized with this POD package, and not as separate Right(s)-of-Way.

Also see POD Master Surface Use Plan and project maps.

**Applicant/Proponent:** Anadarko E & P Company  (Anadarko)

**Conformance with Land Use Plan**

This proposed action is in conformance with the Great Divide Resource Management Plan (RMP) that was approved on November 8, 1990.  The RMP has been reviewed to determine if the proposed action conforms to the land use plan terms and conditions as required by 43 CFR 1610.5.  Development of oil and gas reserves is in conformance with the RMP.  On page 30, the RMP states "The entire planning area [Great Divide Resource Area] is open to oil and gas leasing".

The development of this project will not affect the achievement of the Wyoming Standards for Healthy Rangelands (August 1997).

Remarks:

The NOSs or APDs for the proposed action were posted for 30 days in the Rawlins Field Office Information Access Center (Public Room) for review. Notification of preparation of this EA was provided on the Wyoming BLM internet NEPA register (http://www.wy.blm.gov/nepa/search).

The Atlantic Rim Area Natural Gas Field Development Project Environmental Impact Statement (AREIS) was written to assess the potential foreseeable and cumulative effects of drilling operations and associated activities in the Project area. The Record of Decision (ROD) for this project was approved on March 23, 2007. The proposed action is in conformance with the AREIS.

The AREIS ROD provides for the drilling of natural gas wells and associated infrastructure, limiting total surface disturbance to 7,600 acres at any one time (not including surface disturbance that occurred prior to implementation of the Interim Drilling Policy). The ROD establishes a goal for per-well surface disturbance of 6.5 acres of short-term disturbance (less in "Category A" areas).

The surface disturbance cap is allocated to operators "...on a prorated mineral leasehold basis." (ROD at Page 2), and development is limited to no more than 8 well sites per 640-acre section. If, in the event an Operator reaches its surface disturbance cap allocation, than "...further disturbance on federal minerals will not be permitted." (ROD at Page 3). The RFO will monitor and track disturbance areas for future proposals, in order to ascertain whether the disturbance cap would be exceeded by future authorizations.

The APDs/Master Surface Use Plan/Master Drilling Plan/Water Management Plan (Master Plan Elements), with Conditions of Approval, contain a complete description of the proposed action. The Master Plan Elements, with Conditions of Approval, are considered an integral part of this Environmental Assessment and are incorporated by reference.

The project (both PODs A & B) is located entirely within a Federal Oil & Gas Unit. No additional rights-of-way are necessary for the proposed action.

## Purpose and Need for Proposed Action

Domestic natural gas production is an integral part of U.S. energy development and conservation plans due to its availability and the presence of existing market delivery infrastructure. Domestic production reduces immediate dependence upon foreign sources of energy, and maintains an adequate and stable supply of fuel to maintain economic well-being, industrial production, and national security. The environmental advantages of burning natural gas are emphasized in the Clean Air Act amendments of 1990.

In addition, the proposed action would allow Anadarko, as leaseholder, to exercise lease rights to explore and develop oil & gas resources within the project lease areas.

For these particular wells, the production is primarily natural gas and produced water from the coal seams.

## Description of Proposed Action Alternative

The proposed action entails the construction and/or reconstruction of access roads and well pads for the purpose of drilling 48 CBNG wells (26 in POD A, 22 in POD B) and 3 produced water re-injection wells (2 in POD A, and 1 in POD B). In addition, the proposed action provides for the construction, use, and reclamation of appurtenant gas & water-gathering pipelines and utility corridors, including such corridors to 6 proposed State wells underlying federal (BLM administered) surface in Section 16 (T16N/R91W). Where feasible and appropriate (and in most cases), the pipeline/utility corridors were located adjacent and parallel to the proposed or existing access roads and existing pipeline disturbances. The maps and illustrations attached to the EA, APDs, and Master Surface Use Plan display the locations of the proposed wells, access roads, gas & water-gathering pipelines, and utility (primarily electrical) corridors.

The CDP (compressor) for POD A and Pod B wells is already constructed and in use, built during exploratory activities (2001). Likewise, no new water transfer facilities are proposed for these pods at this time. If additional water transfer stations are later determined to be necessary, they would be proposed and applied for via a Sundry Notice.

Water for drilling each well would be obtained from existing wells completed in the coal seams of the Mesa Verde Group within the Sun Dog Unit. Water would be hauled by truck to each drill site over existing and proposed roads within the POD. Any changes in the water source or method of transportation would first require written approval by the BLM. To protect any shallow, fresh water aquifers or sources, drilling of surface casing for each well would use either air drilling techniques, or use non-produced (fresh) water from a State permitted local source (Baggs Pond.)

Onsite inspections of the PODs were conducted on October 11-13 and December 15, 2006. Potential impacts to resources were considered and alternate locations considered. As a result of this field inspection, several project components were moved to reduce potential impacts to soils, water resources, vegetation, and wildlife resources.

The location of the proposed development is approximately 28 miles northeast of Baggs, Wyoming, west of Highway 789. Access to the area will be from existing access roads off of 789. New roads will be constructed or reconstructed to access most well locations.

A discussion of the actions generally associated with drilling a well, including (1) a plan of operations, (2) construction of the access road and drilling pad, and (3) pipeline installation, can be located in the following portions of the AREIS or ROD:

- Chapter 2, *Proposed Action and Alternatives (AREIS)*
- Chapter 4, *Analysis of Environmental Consequences (AREIS)*
- Appendix A, *Project Reclamation Plan (ROD)*
- Appendix C, *Operator-Committed Practices (ROD)*

Mitigation and reclamation measures are described in Chapter 4 and Appendix B of the ROD (*Project Performance-Based Monitoring and Best Management Practices*). The following narratives summarize elements specific to the proposed action for this EA.

Construction

Disturbance estimates include the well pad and access road/utility/pipeline corridors for 6 State of Wyoming estate wells located in Section 36 (T17N/R92W) which are located on federal (BLM administered) surface. Portions of the pads unnecessary for production operations will be reclaimed after the production facilities are constructed. The well sites and access roads will be entirely reclaimed after the wells are plugged and abandoned. For the purpose of assessing potential cumulative effects, oil and gas development may be considered long-term as transitory in nature.

POD A

| Well # | Well Pad-Acres* | Road-L. Feet | Road-Acres** | Corridor-Acres*** | SUM-Acres |
|--------|-----------------|--------------|--------------|-------------------|-----------|
| 2-8    | 2.2             | 2383         | 1.6          | 4.4               | 6.6       |
| 4-8    | 2.2             | 2948         | 2.0          | 5.4               | 7.6       |
| 6-8    | 2.2             | 151          | 0.1          | 0.3               | 2.5       |
| 8-8    | 2.2             | 1823         | 1.3          | 3.4               | 5.6       |
| 4-9    | 2.2             | 853          | 0.6          | 1.6               | 3.8       |
| 12-9   | 2.2             | 418          | 0.3          | 0.8               | 3.0       |
| 14-9   | 2.2             | 1270         | 0.9          | 2.3               | 4.5       |
| 4-17   | 2.2             | 2488         | 1.7          | 4.6               | 6.8       |
| 12-17  | 2.2             | 1502         | 1.0          | 2.8               | 5.0       |
| 12-17I | 0.0             | 0            | 0.0          | 0.0               | 0.0       |
| 2-19   | 2.2             | 56           | 0.0          | 0.1               | 2.3       |
| 8-19   | 2.2             | 0            | 0.0          | 0.0               | 0.0       |
| 2-20   | 2.2             | 395          | 0.3          | 0.7               | 2.9       |
| 14-18  | 2.2             | 994          | 0.7          | 1.8               | 4.0       |
| 4-19   | 2.2             | 1878         | 1.3          | 3.5               | 5.7       |
| 6-19   | 2.2             | 279          | 0.2          | 0.5               | 2.7       |
| 10-19  | 2.2             | 3882         | 2.7          | 7.1               | 9.3       |
| 12-19  | 2.2             | 4138         | 2.8          | 7.6               | 9.8       |
| 4-20   | 2.2             | 1324         | 0.9          | 2.4               | 4.6       |
| 6-20   | 2.2             | 178          | 0.1          | 0.3               | 2.5       |

| 14-20 | 2.2 | 742 | 0.5 | 1.4 | 3.6 |
|---|---|---|---|---|---|
| 14-20I | 0.0 | 0 | 0.0 | 0.0 | 0.0 |
| 4-21 | 2.2 | 1691 | 1.2 | 3.1 | 5.3 |
| 12-18 | 2.2 | 3371 | 2.3 | 6.2 | 8.4 |
| 10-18 | 2.2 | 1650 | 1.1 | 3.0 | 5.2 |
| 16-18 | 2.2 | 401 | 0.3 | 0.7 | 2.9 |
| (ST) 6-16 | 2.2 | 273 | 0.2 | 0.5 | 2.7 |
| (ST) 14-16 | 2.2 | 1060 | 0.7 | 2.0 | 4.2 |
| Total: | 52.0 | 36,148 | 24.8 | 66.5 | 118.5 |

*Average well pad disturbance areas are approximately equal to 300' x 320' (2.2 acres), including stockpiles and cut & fill slopes for all single-well locations. No additional disturbance is associated with injection wells, since they are co-located on the same pad with the respective producing well(s).
**Assumes 30' roadway disturbance.
***Assumes 80' overall corridor disturbance (road plus utilities) for all wells.

POD B

| Well # | Well Pad Acres* | Road-L. Feet | Road-Acres** | Corridor-Acres*** | SUM-Acres |
|---|---|---|---|---|---|
| 12-4 | 2.2 | 542 | 0.4 | 1.0 | 3.2 |
| 12-4I | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 14-4 | 2.2 | 1051 | 0.7 | 1.9 | 4.1 |
| 10-5 | 2.2 | 3928 | 2.7 | 7.2 | 9.4 |
| 14-5 | 2.2 | 2273 | 1.6 | 4.1 | 6.3 |
| 16-5 | 2.2 | 174 | 0.1 | 0.3 | 2.5 |
| 2-9 | 2.2 | 467 | 0.3 | 0.9 | 3.1 |
| 6-9 | 2.2 | 1744 | 1.2 | 3.2 | 5.4 |
| 10-9 | 2.2 | 676 | 0.5 | 1.2 | 3.4 |
| 16-9 | 2.2 | 663 | 0.5 | 1.2 | 3.4 |
| 8-20 | 2.2 | 1922 | 1.3 | 3.5 | 5.7 |
| 10-20 | 2.2 | 1418 | 1.0 | 2.6 | 4.8 |
| 10-4 | 2.2 | 4829 | 3.3 | 8.9 | 11.1 |
| 12-5 | 2.2 | 603 | 0.4 | 1.1 | 3.3 |
| 12-20 | 2.2 | 764 | 0.5 | 1.4 | 3.6 |
| 2-21 | 2.2 | 858 | 0.6 | 1.6 | 3.8 |
| 6-21 | 2.2 | 1973 | 1.4 | 3.6 | 5.8 |
| 8-21 | 2.2 | 19 | 0.0 | 0.0 | 2.2 |
| 12-21 | 2.2 | 1417 | 1.0 | 2.6 | 4.8 |
| (ST) 2-16 | 2.2 | 148 | 0.1 | 0.3 | 2.5 |
| (ST) 8-16 | 2.2 | 1839 | 1.3 | 3.4 | 5.6 |
| (ST) 10-16 | 2.2 | 219 | 0.2 | 0.4 | 2.6 |
| (ST) 16-16 | 2.2 | 697 | 0.5 | 1.3 | 3.5 |
| Total: | 48.4 | 28,224 | 19.6 | 51.7 | 100.1 |

*Average well pad disturbance areas are approximately equal to 300' x 320' (2.2 acres), including stockpiles and cut & fill slopes for all single-well locations. No additional disturbance is associated with injection wells, since they are co-located on the same pad with the respective producing well(s).
**Assumes 30' roadway disturbance.
***Assumes 80' overall corridor disturbance (road plus utilities) for all wells.

The proposed action (for both POD A and Pod B) will result in approximately 218.6 acres of short-term disturbance, comprised of new or reconstructed access roads and adjacent & parallel pipelines and utilities, as detailed above.

The average per-well disturbance for POD A is 4.2 acres (118.5 acres/28 CBM wells), and similarly, for POD B is 4.4 acres (100.1 acres/23 CBM wells). The proposed action is located outside of "Category A" area, and thus is subject to a "disturbance goal" of 6.5 acres per well. Both PODs, then, meet the disturbance goal provided in the AREIS ROD.

## Access

The operator proposes to construct new access roads to access the well locations. The new roads will be constructed to BLM specifications for a "Resource Road", as specified in BLM Manual Section 9113. Adequate drainage structures will be constructed or installed. The travelway will be at least 14 feet wide and will have an average right-of-way width of 50 feet (80 feet, including adjacent & parallel pipeline/utility corridors). The access roads would be reclaimed during production operations to the maintenance width, or to approximately 30 feet in width. Upon completion of the project, unnecessary access roads would be recontoured, ripped, seeded, and revegetated.

## Well Site

Should the wells become productive, cut portions of the well site will be backfilled and the unused portions of the well site and soil stockpile sites will be stabilized and reseeded with native vegetation. The well size will be reduced to less than one-half acre for the duration of production operations. Reserve pits will be dried within 180 days. Upon completion of the project, the well pads would be recontoured, ripped, seeded, and revegetated.

## Pipeline/Utility Corridors

The pipelines would be buried after construction and the disturbed area reclaimed as soon after construction as reasonable. Upon completion of the project, the pipelines would be evacuated and abandoned in-place.

## Produced Water Disposal

The only means of produced water disposal considered in this action would be by re-injection using disposal wells permitted by the BLM and State of Wyoming, and would be disposed of into the Haystack Mountain Formation of the Mesaverde Group.

Produced water from the proposed action would be gathered to existing and/or new water injection facilities within the unitized area.

At new injection facilities, it is anticipated that subsurface water sumps will be constructed in lie of above ground storage tanks. Any modifications to this proposal will be submitted via a Sundry Notice for review prior to approval.

## Monitoring wells

As described and detailed in Appendix B of the Atlantic Rim ROD and the Sun Dog Water Management Plan, the Unit Operator shall be responsible for drilling, completing, and equipping one set of three shallow groundwater-monitoring wells completed in water-bearing sandstone units stratigraphically above the principle producing coal beds in the upper Mesaverde Group prior to production of any of the wells in the two PODs.

## No Action Alternative

NEPA regulations require that alternative analyses in NEPA documents "include the alternative of no action" (40 CFR 1502.14(d)). For this analysis, "no action" means that the BLM would reject the proponent's proposal and "the proposed activity would not take place."

## Potential Environmental Impacts- Proposed Action Alternative

| Critical Element | Affected Yes | No | Critical Element | Affected Yes | No |
|---|---|---|---|---|---|
| Air Quality | X | | T & E Species | | X |
| ACEC's | | X | Wastes, Hazardous/Solid | X | |
| Cultural Resources | X | | Water Quality | | X |
| Prime/Unique Farmlands | | X | Wetlands/Riparian Zones | X | |
| Floodplains | | X | Wild & Scenic Rivers | | X |
| Native Amer. Rel. Concerns | | X | Wilderness | | X |
| Environmental Justice | | X | Invasive, Nonnative Species | X | |

In addition to the critical elements referenced above, reviews of potential effects upon paleontological-, recreational-, soil-, vegetation-, visual-, and wildlife-resources were conducted.

The affected environment and analysis of environmental impacts are discussed in the AREIS to which this EA is tiered.

Air quality impacts are disclosed and analyzed in the AREIS.

Halogeton and other noxious weeds are a significant concern for this project area. COAs have been added to control the spread, establishment, and plant community changes associated with weed infestation.

Cultural:
Class III cultural resources inventory were conducted for the project areas. Archaeological resources identified will be avoided or, as necessary, a monitor will review construction to ensure no cultural artifacts are disturbed. Both PODs have wells and infrastructure located inside of the two-mile buffer of contributing segments of a historic trail ("Rawlins to Baggs Road"). As a result, SHPO consultation was necessary and a visibility analysis required on those well locations and related infrastructure. The AREIS also required a "Programmatic Agreement" or "Memorandum of Agreement" between the affected parties, i.e. landowner (BLM), operator and SHPO to address the necessary mitigation to minimize impact to the trail view-shed from these wells and associated disturbances. As a result, restrictions or stipulations in the form of COA were added to the MSUP APD authorizations as appropriate. Those stipulations are summarized below:

For all wells and associated infrastructure in POD A and B:
1) Standard cultural stip (under general permitting requirements)
2) All surface facilities will be painted a color compatible with the local environment.
3) The access road will be surfaced with material compatible with the local environment.
4) The Operator shall select and use a seed mix most applicable to each disturbed location, with the goal of restoring individual sites to closely resemble the pre-disturbance native plant communities, as provided in Appendix A of the ROD, "Project Reclamation Plan."

Additional mitigation measures are stipulated for individual wells and/or infrastructure within two-miles of the Rawlins-Baggs Road which have viewshed or visibility concerns, which include:
POD A wells: 2-8; 4-8; 4-9; 14-9; 14-16; 4-17; 16-18; 6-19; 8-19; 10-19; 12-19; 2-20; 4-20; 6-20; 14-20; 14-20I; 4-21
POD B wells: 10-4; 12-4; 12-4I; 16-5; 6-9; 10-9; 16-9; 2-16; 8-16; 10-16; 16-16; 8-20; 10-20; 12-20; 2-21; 6-21; 8-21; 12-21.

These additional mitigation measures include:
1) Unless otherwise authorized, the pipelines/utilities will be plowed or ripped into the un-bladed surface (using technology that does not require trenching). If such techniques are infeasible due to terrain or geology, the surface will be brush-hogged and the utilities will be placed no farther than the outside edge of the ditch slope.
2) No blading will be allowed outside the staked well location for placement or removal of the topsoil stockpile.

Other, site-specific Conditions of Approval (such as archaeological monitor, barrier fencing, etc.), are also applied, as applicable.

Wildlife:
Summarized in the tables below are the seasonal wildlife timing stipulations which will be applied to the subject wells.

### Sun Dog Unit POD A Wildlife Stipulations

| Well # | Raptor[1] | Grouse[2] | Mt.Plover[3] | CWR[4] |
|--------|-----------|-----------|--------------|--------|
| 2-8    | X         | X         |              |        |
| 4-8    | X         | X         |              |        |
| 6-8    | X         | X         |              |        |
| 8-8    | X         | X         | X            |        |
| 4-9    | X         | X         | X            |        |
| 12-9   |           | X         | X            |        |
| 14-9   |           | X         | X            |        |
| 4-17   | X         |           |              |        |

| Well # | Raptor | Grouse | Mt.Plover | CWR |
|---|---|---|---|---|
| 12-17 | X | X | | |
| 12-17I | X | X | | |
| 2-19* | X | X | | |
| 8-19 | X | X | | |
| 2-20 | | X | | |
| 14-18 | X | X | | |
| 4-19 | X | X | | |
| 6-19 | X | X | | |
| 10-19 | X | X | | |
| 12-19 | X | X | | X |
| 4-20 | X | X | X | |
| 6-20 | X | X | | |
| 14-20 | X | X | | |
| 14-20I | X | X | | |
| 4-21 | | X | | |
| 12-18 | X | X | | |
| 10-18 | X | X | X | |
| 16-18 | X | X | | |
| 6-16* | | X | X | |
| 14-16 | | X | | |

### Sun Dog Unit POD B Wildlife Stipulations

| Well # | Raptor[1] | Grouse[2] | Mt.Plover[3] | CWR[4] |
|---|---|---|---|---|
| 12-4 | X | X | | |
| 12-4I | X | X | | |
| 14-4 | X | X | | |
| 10-5 | X | X | | |
| 14-5 | X | X | | |
| 16-5 | X | X | | |
| 2-9 | | X | | |
| 6-9 | | X | X | |
| 10-9 | | X | X | |
| 16-9 | | X | X | |
| 8-20 | | X | | |
| 10-20 | X | X | X | |
| 10-4 | X | X | | |
| 12-5 | X | X | | |
| 12-20 | X | X | X | |
| 2-21 | X | X | X | |
| 6-21 | | X | | |
| 8-21 | X | X | | |
| 12-21 | | X | X | |
| 2-16 | | X | X | |
| 8-16* | X | X | X | |
| 10-16 | X | X | | |
| 16-16 | X | X | X | |

* Black-footed ferret surveys were conducted for these locations and/or access roads.

[1]Construction, drilling and other activities potentially disruptive to nesting raptors are prohibited during the period of February 1 to July 31 for the protection of raptor nesting areas.

[2]Construction, drilling, reclamation and other potentially disruptive activities are prohibited during the period of March 1 to July 15 for the protection of sage grouse.

[3]Construction, drilling, and other activities are prohibited during the reproductive period of April 10 to July 10 for the protection of nesting plover.

[4]Construction, drilling and other activities potentially disruptive to wintering wildlife are prohibited during the period of November 15 to April 30 for the protection of big game crucial winter habitat.

In some instances, the proponent may request consideration of a temporary exception to wildlife seasonal restrictions. Such an exception may be granted if a determination is made that the wildlife resource will not be adversely impacted.

Black-footed ferret surveys were conducted for the 2-19, 6-16, and 8-16 locations and/or access roads. These individual sites fell within areas where white-tailed prairie dog towns (within the Dad BFF non-block cleared area) could not be avoided. The results of the BFF surveys were negative, and the USFWS has subsequently concurred with our "may affect, not likely to adversely affect" determination, thereby allowing the project to proceed as proposed.

Site-specific findings by the interdisciplinary review team are provided on the attached review documents, and are incorporated into Conditions of Approval, as applicable.

Description of Impacts:

A discussion of the actions generally associated with drilling projects and their associated impacts may be found in the Atlantic Rim Environmental Impact Statement and Record of Decision.

Hazardous Materials

Anadarko has indicated that some hazardous materials could be used during drilling, completion, and production of their proposed wells. The term "hazardous material" as used here means: 1) any substance, pollutant, or contaminant (regardless of quantity) listed as hazardous under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, as amended, 42 U.S.C. 9601 et seq., and the regulations issued under CERCLA, 2) any hazardous waste as defined in the Resource Conservation and Recovery Act (RCRA) of 1976, as amended, and 3) any nuclear or nuclear byproduct as defined by the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 et seq.

It is possible that wastes created or transported during implementation of the proposed action (i.e., waste motor oils, drilling/completion additives) could be accidentally released to the environment. The operator will be required to comply with the Hazardous Materials Management Plan provided in Appendix C of the AREIS. Numerous State and Federal rules and regulations also apply that govern the handling, storage, and disposal of hazardous substances.

Anadarko or any contracted company working for Anadarko will have Material Data Safety Sheets available for all chemicals, compounds, or substances which are used during the course of construction, drilling, completion, and production operations for this project. Additionally, all chemicals will be handled in an appropriate manner to minimize the potential for leaks or spills to the environment.

Impacts to soils, surface and groundwater resources, wildlife, vegetation, and human health could result from the accidental exposure of hazardous materials. However, since the project operations will strictly comply with all applicable federal and state laws concerning hazardous materials, the Hazardous Materials Management Plan for this project, and the operator's Spill Prevention Control and Countermeasure Plan, no significant impacts are anticipated.

Reclamation

Reclamation typically commences within 6 months of drilling completion. The drill pads will be reduced to a less than ½-acre production well site at each location. Total reclamation of all new disturbances will take place as the wells and facilities are no longer productive or needed and are plugged and abandoned. Appendix A of the ROD contains the reclamation success criteria by which the reclamation status will be judged. The approved Master Surface Use Plan and Conditions of Approval also contain reclamation measures pertaining to reclamation standards.

Description of Mitigation Measures and Residual Impacts:

Mitigation of potential effects is part of the proposed action, and specific mitigation details can be found in the Master Plan Elements including the Conditions of Approval. Residual impacts resulting from the proposed action would include permanent loss of oil and/or gas reserves should the wells become productive. In addition, the well pads, production equipment, and the access roads could remain in place for 30 years or more (until plugging and abandonment, final reclamation).

**Potential Environmental Impacts- No Action Alternative**

Under the No-Action Alternative, the proposed action would not be authorized. The 51 wells would not be constructed or drilled, and gas production from the proponent's lease would not occur. Existing development would continue to occupy the project area, along with impacts associated from the existing development.

## Residual Impacts/Cumulative Impacts:

The potential residual and cumulative impacts are discussed in the AREIS, Chapter 5, *Cumulative Impacts Analysis*. The proposed action entails the addition of 51 CBNG wells (including 3 injection wells, and 6 State CBNG wells on Federal Surface) and appurtenant facilities.

Standard mitigation guidelines are addressed in the ROD's Appendix A, *Project Reclamation Plan*. Additional mitigation measures are also provided in Appendix B, *Performance-Based Monitoring and Best Management Practices*, and Appendix C, *Operator-Committed Practices*. All needed mitigation, for that portion of the proposed action on public land, is part of the proposed action.

The access roads and well/production pads may remain visible for a period of approximately 20 to 30 years after they are abandoned and reclaimed. The oil and gas resource will be permanently lost. All needed mitigation is part of the proposed action.

## FINDING OF NO SIGNIFICANT IMPACT/DECISION RECORD

### Decision

I have reviewed this environmental assessment including the explanation and resolution of any potentially significant environmental impacts. I have selected the proposed action alternative with the mitigation measures described below for authorization and implementation. I have determined that the proposed project is in conformance with the approved land use plan. It is my decision to implement the project with the mitigation measures identified below.

### Finding of No Significant Impact

Based upon the analysis of potential environmental impacts contained in the EA, I have determined that the impacts are not expected to be significant, and that an EIS is not required.

### Rationale for Decision

Compared to the No Action Alternative, the Proposed Action Alternative best meets the Purpose & Need and guiding laws, regulations, and directives, including the Federal Land Policy and Management Act (FLPMA, 43 USC 35). The proposed action is in conformance with the Great Divide Resource Management Plan (RMP) and the Atlantic Rim Natural Gas Field Development Project EIS.

### Mitigation Measures/Remarks:

All needed mitigation is part of the proposed action and can be found in the Master Plan Elements and Conditions of Approval. A total of 45 federal APDs/wells (including three injection wells), as well as 6 State wells underlying BLM-administered surface (all within the Sun Dog Federal Unit), are authorized under this decision, along with appurtenant access roads, pipelines, utility corridors, and other described infrastructure.

Approval of Sun Dog PODs A and B only authorizes the Sun Dog Water Management Plan (WMP) to the extent of, and as applicable to, the wells within these two PODs. It does not approve the WMP in its entirety for the remaining Sun Dog PODs (C, D, and E).

### Monitoring and Compliance

Designated BLM personnel will monitor operations under authorizations for the proposed action as needed to ensure compliance with the Master Plan Elements and Conditions of Approval.

Authorized Official:

_Deborah K. Johnson_                    _Aug. 16, 2007_

Field Manager                              Date
Rawlins Field Office

### Appeal

Under BLM regulation this decision is subject to appeal. Under BLM regulation, this decision is subject to administrative review in accordance with 43 CFR 3165. Any request for administrative review of this decision must include information required under 43 CFR 3165.3(b) (State Director Review), including all supporting documentation. Such a request must be filed in writing with the State Director, Bureau of Land Management, P.O. Box 1828, Cheyenne, Wyoming 82003 within 20 business days of the date this Decision Record is received or considered to have been received.

# Exhibit O
**NRDC, et al. v. Kempthorne, et al.**

GREATER SAGE-GROUSE (*Centrocercus urophasianus*) POPULATION RESPONSE TO
NATURAL GAS FIELD DEVELOPMENT IN WESTERN WYOMING

by
Matthew J. Holloran

A dissertation submitted to the Department of Zoology and Physiology
and The Graduate School of The University of Wyoming
in partial fulfillment of the requirements
for the degree of

DOCTOR OF PHILOSOPHY
in
ZOOLOGY AND PHYSIOLOGY

I-5

Laramie, Wyoming
December, 2005

Attachment 14

## PREFACE

According to the U.S. Department of Energy (www.doe.gov), natural gas consumption in North America is projected to increase by 1.5% annually between 2002 and 2025. The American Gas Association (AGA; www.aga.org) reports that domestic natural gas production is expected to account for at least 60% of the total U.S. supply through 2025. Much of the onshore natural gas in the 48 contiguous states is in the Uinta-Piceance Basin of Colorado and Utah, the Green River Basin of southwestern Wyoming, the San Juan Basin of New Mexico and Colorado, the Montana Thrust Belt, and the Powder River Basin of Wyoming and Montana (Connelly et al. 2004). Most of these Intermountain West reserves are under Bureau of Land Management (BLM) jurisdiction (Connelly et al. 2004) and in sagebrush dominated landscapes (Knick et al. 2003). The Federal Land Policy and Management Act of 1976 established the BLM's multiple-use mandate to serve present and future generations. Multiple-use includes natural resource conservation, recreation, livestock grazing, and resource extraction (www.blm.gov).

The Energy Policy Act of 2005 was signed into law by President George W. Bush in August of 2005, and represents the first major energy legislation passed by Congress since the original Energy Policy Act of 1992. One of the primary focuses of the new law is to increase production of domestic fossil fuels (natural gas, oil and coal). According to the AGA, the law will result in increased domestic oil and gas production on non-park federal lands by increasing leasing, expediting the permitting process in the Intermountain West, and removing stipulations on exploration and development operations.

Currently, Wyoming's economy depends heavily upon natural resource industries, with mining (including oil and gas extraction) generating approximately 23% of the state's gross state product for 2001 (Federal Deposit Insurance Corporation; www.fdic.gov). According to the Petroleum Association of Wyoming (www.pawyo.org), in fiscal year 2004 Wyoming's petroleum industry directly employed 18,000 people with an annual payroll of $730 million, and oil and gas production contributed $1.27 billion to state and local governments. However, natural gas, oil, and coal are non-renewable natural resources. Although the Wyoming state government is attempting to ensure that the current petroleum-based "boom" is not followed by a "bust" as has been historically experienced by the state, this type of cycle is inevitable given the non-renewable nature of fossil fuels.

Quantifying the monetary value of Wyoming's wildlife and open spaces is difficult, but these natural resources are vital for long-term sustainable state revenue. The Wyoming state office of travel and tourism (www.wyomingbusiness.org) estimated that in 2004 tourists spent $2 billion in Wyoming, and the tourism industry employed over 28,600 people with an annual payroll of $540 million. Of the

1

marketable overnight stays, between 51 and 73% of those visiting the state were interested in outdoor type experiences including wildlife, natural environments, and wilderness areas. Additionally, the Wyoming Game and Fish Department estimated that over 230,000 hunting and fishing licenses were sold, hunting accounted for 3.36 million recreation days, and hunters spent $380 million in license fees and expenditures in Wyoming in 2004 (2005 Annual Report; Wyoming Game and Fish Department, Cheyenne, WY, USA).

Sagebrush ecosystems dominate much of Wyoming, and they are critical to the survival of many of the state's most charismatic wildlife. Approximately 100 bird species and 70 mammal species rely on sagebrush-dominated habitats during at least portions of their life-cycle (Braun et al. 1976, Paige and Ritter 1999). Many of the state's big game herds (including elk [*Cervus canadensis*], mule deer [*Odocoileus hemionus*], and pronghorn [*Antilocapra americana*]) depend on sagebrush habitats during the winter. Additionally, several species of concern within the state are sagebrush obligates (including greater sage-grouse [*Centrocercus urophasianus*] and pygmy rabbits [*Brachylagus idahoensis*]) and rely on sagebrush habitats throughout all life stages.

The magnitude of energy development impacts on wildlife resources throughout North America is relatively unknown. Generally, gregarious species are more severely affected by disturbances than are solitary species, and hunted species will exhibit a greater avoidance of road-related disturbances than will their unhunted conspecifics (PRISM Environmental Management Consultants 1982). Sagebrush-obligate bird species may be important indicators of the health of an ecosystem, and changes in their population levels may be symptomatic of long-term regional habitat condition (Knick et al. 2003, Crawford et al. 2004). Given that the health of sagebrush-dominated ecosystems is paramount to maintaining viable populations of many species of wildlife, the reaction of greater sage-grouse populations to habitat alterations caused by energy development could imply reactions of a wide array of wildlife species.

## Goals and Objectives

This study investigating the potential impacts of natural gas development to greater sage-grouse was initiated by the U.S. Department of Energy and the Bureau of Land Management in 1998. The goal was to determine if and how the development of natural gas resources was influencing greater sage-grouse populations in the upper Green River Basin of western Wyoming. The study was designed to compare differences between areas where natural gas disturbance potentially influenced greater sage-grouse behavior (i.e., treatment areas) and areas where there was no gas related disturbance (i.e., control areas). The assumption was made that the behavior of birds in control areas mimicked that of birds in a

2

natural setting with natural variation, thus the study could identify changes in behavior resulting from gas development regardless of annual variations in habitat conditions, weather, grazing, or other factors. Each question and hypothesis was centered on control versus treatment comparisons, thereby isolating the measured effects of the potential impacts of natural gas field development on greater sage-grouse.

I organized the objectives based on several increasingly specific questions: Are breeding greater sage-grouse populations impacted by natural gas development? What aspects of a developing field are influencing breeding populations? Are individuals dispersing from natural gas development or are population sizes declining?

Objective 1: Determine if breeding populations of greater sage-grouse are negatively influenced by the development of a natural gas field.

Objective 2: Determine responses of breeding populations to three independent components of natural gas field development: (1) drilling rigs, (2) producing wells, and (3) main haul roads. To determine if specific characteristics of each component influenced breeding populations, I investigated the influence of distance, density (i.e., well density, total length of main haul road), visibility, and direction of these natural-gas-field developments. I also investigated the influence of traffic levels on main haul roads.

Objective 3: Determine if breeding season habitat selection, survival, and lek tenacity of individual male greater sage-grouse are influenced by natural gas field development.

Objective 4: Determine if nesting and early brood-rearing habitat selection of individual female greater sage-grouse are influenced by natural gas field development.

Objective 5: Determine if growth of female greater sage-grouse populations is influenced by natural gas field development.

Objective 6: Assess the adequacy of BLM-imposed development stipulations.

I used variation in the maximum number of males occupying leks to address objectives 1 and 2, and collected data from radio-equipped individuals to address objectives 3 through 5.

## Dissertation Organization

The objectives outlined above are addressed in chapters 1 through 3 of the dissertation. I included as appendices manuscripts written with non-gas field related information collected during the study to support methods used in chapters 2 and 3. Throughout the dissertation, I used "greater sage-grouse" or "Gunnison sage-grouse" (*Centrocercus minimus*) when reporting information from other

3

studies or results from this study that were specific to the species, and used "sage-grouse" to suggest both species in general.

Chapter 1 was written in conjunction with a presentation given at the 70th North American Wildlife and Natural Resource Conference, and is to be published in the transactions from that conference (Wildlife Management Institute, Washington DC, USA). I included this manuscript because it introduces the overriding question plaguing those dealing with the impacts of natural resource extraction: Are sage-grouse dispersing from anthropogenic disturbances or are regional population levels negatively influenced? The manuscript also introduces potential mitigation options not presented elsewhere in the dissertation. Chapter 1 is presented verbatim to the manuscript submitted for publication; this chapter could be altered slightly in published form per the editor's final comments.

I present the bulk of the information on the impacts of natural gas development in Chapter 2. This chapter is organized the same as the objectives, and progresses from the question "are breeding populations influenced?" to "what specific aspects or components of a developing field appear to be influencing populations?" and concludes with "how are individual birds and populations responding to development (i.e., dispersal or population size influences?)". The management implications section of Chapter 2 addresses the adequacy of currently imposed stipulations (objective 6). The chapter is written in *Journal of Wildlife Management* (The Wildlife Society, Bethesda, MD, USA) format.

I include a summary of information on natural gas impacts as Chapter 3. This chapter is formatted as an executive summary, and includes introductory material as well as a summary of Chapters 1 and 2. It also includs sections on potential mitigation options and future research needs.

Three appendices that represent supporting or non-natural gas field related analyses are included. These appendices are included as separate documents, thus page numbering for each is unique. Appendix A presents and investigation of the spatial distribution of greater sage-grouse nests relative to lek location using data collected from throughout Wyoming since 1994. The manuscript is to be published in *The Condor* (Cooper Ornithological Society, Bend, OR, USA; Condor 107:742-752), and is presented here verbatim to the published manuscript. I used the results presented in this manuscript to establish the spatial area of interest for investigating female greater sage-grouse nesting and early brood-rearing habitat selection relative to natural gas field development (discussed in Chapter 2).

Appendix B is an investigation of habitat selection during the early brood-rearing period in terms of vegetative and invertebrate conditions. The analyses used data collected from throughout southwestern Wyoming from 1999 to 2003. Kristin M. Thompson was the primary author of the manuscript, which is to be published in the *Western North American Naturalist* (Brigham Young

4

University, Provo, UT, USA). The appendix is verbatim to the submitted manuscript, and could be altered slightly in published form per the editor's final comments.

Appendix C summarizes eight completed and two ongoing projects related to greater sage-grouse conducted by the Wyoming Cooperative Fish and Wildlife Research Unit since 1994. I included this appendix so that land and wildlife managers in Wyoming had relatively easy access to the major results from the separate studies. The chapter is formatted as a report for ease of reproduction, and includes a title page and table of contents.

## LITERATURE CITED

Braun, C. E., M. F. Baker, R. L. Eng, J. S. Gashwiler, and M. A. Schroeder. 1976. Conservation committee report on effects of alteration of sagebrush communities on the associated avifauna. Wilson Bulleting 88:165-171.

Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. J. Stiver. 2004. Conservation assessment of greater sage-grouse and sagebrush habitats. Western Association of Fish and Wildlife Agencies. Unpublished Report. Cheyenne, WY, USA.

Crawford, J. A., R. A. Olson, N. E. West, J. C. Mosley, M. A. Schroeder, T. D. Whitson, R. F. Miller, M. A. Gregg, and C. S. Boyd. 2004. Ecology and management of sage-grouse and sage-grouse habitat. Journal Range Management 57:2-19.

Knick, S. T., D. S. Dobkin, J. T. Rotenberry, M. A. Schroeder, W. M. Vander Haegen, and C. Van Riper III. 2003. Teetering on the edge or too late? Conservation and research issues for avifauna of sagebrush habitats. Condor 105:611-634.

Paige, C., and S. A. Ritter. 1999. Birds in a sagebrush sea: managing sagebrush habitats for bird communities. Partners in Flight Western Working Group, Boise, ID, USA.

PRISM Environmental Management Consultants. 1982. A review of petroleum industry operations and other land use activities affecting wildlife. The Canadian Petroleum Association, Calgary, Alberta, Canada.

# Exhibit P

**NRDC, et al. v. Kempthorne, et al.**

Sage-grouse Population Response to Coal-bed Natural Gas Development
in the Powder River Basin:
Interim Progress Report on Region-wide Lek-count Analyses

May 26, 2006

Dr. David E. Naugle, Brett L. Walker, and Kevin E. Doherty

Wildlife Biology Program, College of Forestry and Conservation, University of Montana

**Synopsis**

In this interim progress report, we report preliminary results from an analysis of region-wide lek-count data for greater sage-grouse from the Powder River Basin (PRB) in relation to coal-bed natural gas (CBNG) development. We have completed the first of four separate, but related analyses of these data. Preliminary results support previous findings that region-wide populations declined severely in 1990-1995, followed by stable trends around a lower population equilibrium from 1995-2005. However, leks with extensive CBNG development (>40% developed within 3.2 km) showed substantially lower population trends than leks with minimal CBNG or no development, even after controlling for known impacts of West Nile virus. Leks in areas adjacent to CBNG fields (10-40% developed within 3.2 km) also showed higher population trends than leks further away, suggesting that sage-grouse may be avoiding developed areas and moving into adjacent undeveloped habitat. The avoidance hypothesis is supported by the finding that, by 2005, active leks, and large and medium-sized leks, were more often found outside or adjacent to CBNG fields than within CBNG. Expansion of agriculture and surface mining also appears to have played a role in regional population changes in the PRB.

**Introduction**

Large-scale modification of sagebrush habitats associated with energy development may have important impacts on habitat use or vital rates of sagebrush-dependent wildlife species. Habitat use may change in response to energy development if animals avoid, or are attracted to, specific features of development such as roads, power lines, wells, or ponds. Species that avoid development are forced to move into adjacent areas that may or may not provide suitable habitat. Avoidance of development typically is detrimental because it increases density-dependent sources of mortality, decreases survival and reproduction, and leaves wildlife populations with little capacity to respond to new population stressors. Energy development may also impact wildlife by directly or indirectly affecting population vital rates (i.e., survival and reproduction), which in turn influences population growth rate, size, and persistence. Direct mortality of adults caused by collisions with infrastructure and destruction or abandonment of breeding areas or nests caused by construction activities may influence a population's annual survival or productivity. Energy development often leads to shifts in vegetation structure or composition that influence habitat suitability or shifts in the abundance or distribution of predators, prey, parasites, or disease.

Attachment 15

Coal-bed natural gas (CBNG) development in the Powder River Basin (PRB) of northeastern Wyoming and southeastern Montana is a concern for conservation of greater sage-grouse populations. The PRB supports an important regional sage-grouse population, with 516 leks documented over the past 25 years. Sage-grouse populations in this region have declined over the long-term due a combination of habitat loss, drought, and other unknown population stressors (Connelly et al. 2005) and new threats, such as West Nile virus, are emerging (Naugle et al. 2004, 2005, Walker et al. 2004). Since 1990, the PRB has also experienced widespread coal-bed natural gas (CBNG) development. Expansion of roads, power lines, pipelines, compressor stations, and ponds associated with CBNG development may influence habitat use, survival or reproduction of sage-grouse. Recent research from Alberta and Wyoming indicate that energy development may have substantial negative impacts on sage-grouse populations (Aldridge 2005, Holloran 2005). To test whether CBNG development influences trends in the status and size of sage-grouse populations, we analyzed lek-count data from 516 leks in the Powder River Basin in areas with and without CBNG development. Although CBNG is different than other types of mineral development, several features of CBNG are known to negatively affect sage-grouse populations, including loss of sagebrush habitat, expansion of roads and power lines, increased human activity, and the spread of invasive plants (Gelbard and Belknap 2003) and West Nile virus (Walker et al. 2004).

### Objectives

To test whether CBNG development influences counts of breeding male sage-grouse in the Powder River Basin, we analyzed historical lek-count data in relation to CBNG development. This project consists of four separate, but related analyses:

1. Comparison of lek-complex status (i.e., active or inactive) in 2005, lek complex size in 2005, and trends in population indices in areas inside, adjacent to, and outside CBNG development over the entire Powder River Basin.
2. Comparison of trends in population indices at leks categorized as inside, adjacent to, or outside CBNG development on a year-by-year basis over the entire Powder River Basin.
3. Comparison of linear models predicting lek-complex status (i.e., active or inactive) and population growth rate in relation to extent of CBNG development, habitat loss, roads, and power lines. This analysis will be conducted in a competing model framework and will incorporate anthropogenic landscape variables from GIS layers and habitat variables derived from classification of SPOT-5 remote-sensing imagery.
4. Comparison of population trends at leks that have sufficient data for meaningful analysis (>10 counts between 1988-2005) inside and outside CBNG development. Approximately 40 lek complexes have sufficient data for trend analysis.

Here we present results of the first analysis. Results of subsequent analyses will be included in future reports.

### Methods – Analysis I

We used public lek-count databases provided by Wyoming Game and Fish Department and Montana Fish Wildlife and Parks as the foundation of our analysis. We checked for and corrected errors in the data after consultation with database managers and regional biologists for

each state. We augmented the database with lek-count data from environmental consultants (John Barry and Thunderbird Wildlife Consulting, Inc.) and BLM biologists for leks in Montana that were known to be missing data. We excluded data with obvious errors, leks without supporting count data, and duplicate leks from the database. We restricted our analysis to an area within the Tongue River and Powder River drainages northeastern Wyoming and southeastern Montana in Big Horn and Powder River counties in Montana, and Campbell, Crook, Converse, Johnson, Natrona, Niobara, Sheridan, and Weston counties in Wyoming.

For the analysis of population indices, we used a dissolved 350 m buffer around wells to estimate the proportion of area around each lek and lek complex with development. Well density is highly correlated with other features of development, such as road and power line density, and represents a suitable index for the extent of development. We defined each lek as being inside CBNG development if >40% of an area within 3.2 km was developed, or if >25% was developed and development overlapped the lek center. A lek was considered to be on the edge of CBNG if 10-40% of the area within 3.2 km was developed and development did not overlap the lek center. Leks with <10% development were considered outside CBNG. We calculated population growth rates for each year-to-year transition from 1988-2005 by combining count data from multiple leks counted in consecutive years following the method of Connelly et al. (2004).

To describe landscapes surrounding lek complexes, we calculated summary statistics for six landscape variables for active and inactive lek complexes. We followed the definition of a lek complex of Connelly et al. (2004) as one or more leks that fall within 2.5 km of each other. To avoid problems with lek complexes shifting as new leks are discovered and as new leks form in response to changes in the landscape, we defined a set of original lek complexes based on leks discovered, or with data reported, prior to 1990. Leks discovered in subsequent years were considered new lek complexes regardless of distance from existing complexes. Leks newly discovered in the same year that fell within 2.5 km of each other were considered to be in the same lek complex.

## Results

Region-wide populations appeared to decline severely from 1990-1995, followed by stable trends around a lower population equilibrium from 1995-2005 (Figure 1). The total population size of greater sage-grouse in the PRB as of 2005 is approximately 16% of the original population size in 1988. These data closely match those presented for the NE WY/SE MT regional subpopulation in the range-wide conservation assessment by Connelly et al. (2004). Examination of the population growth rate (?) for all leks combined suggest that 1990-1995 was a period of severe population decline followed by moderate population increases in the late 1990's, another decline in 2000-2002, and extremely high population growth between 2004 and 2005 (Figure 2).

Data for year-to-year transitions were available for a relatively small proportion of leks with CBNG and along the edge of CBNG fields prior to 2000 (Table 1). For this reason, population indices prior to 2000 for areas within CBNG are not included.

Data from 2000-2005 suggest that leks within CBNG development showed substantially lower population indices than leks outside CBNG development (Figure 3). This result does not change even after removing data from leks in the Spotted Horse region where West Nile virus largely extirpated sage-grouse populations between 2003 and 2004 (Walker et al. 2004) (data not

shown). It appears that leks within CBNG did not benefit from the same increases between 2004 and 2005 as leks outside development.

Table 1. No. sage-grouse leks with sufficient data for calculating year-to-year transitions in the Powder River Basin, 1988-2005.

| | 88-89 | 89-90 | 90-91 | 91-92 | 92-93 | 93-94 | 94-95 | 95-96 | 96-97 | 97-98 | 98-99 | 99-00 | 00-01 | 01-02 | 02-03 | 03-04 | 04-05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CBNG[1] | | 3 | 3 | 5 | 3 | 4 | 4 | 5 | 4 | 4 | 6 | 13 | 17 | 18 | 23 | 30 | |
| Outside[2] | 27 | 23 | 27 | 20 | 21 | 28 | 27 | 34 | 38 | 39 | 48 | 62 | 84 | 100 | 105 | 110 | 146 |
| Edge[3] | 8 | 7 | 11 | 9 | 7 | 6 | 4 | 8 | 9 | 7 | 6 | 10 | 14 | 23 | 21 | 22 | 41 |

[1] No. of leks within CBNG development.
[2] No. of leks entirely outside CBNG development.
[3] No. of leks on the edge of CBNG development.



Fig. 1. Change in the population index for all leks in the Powder River Basin, 1988-2005. Data indicate a severe region-wide population decline between 1990 and 1995.



Fig. 4. Change in the population index from leks within CBNG (red triangles), entirely outside CBNG development (black squares), and on the edge of CBNG (blue diamonds), 2000-2005. Data for leks in CBNG prior to 2000 were too sparse to be included. See text for definition of lek categories.

To test the hypothesis that sage-grouse avoid CBNG development, we examined trends in population indices at leks adjacent to CBNG development. We predicted that such leks should show increased population size relative to leks entirely outside of development because males from areas with development would move into adjacent undeveloped habitat and attend leks in those areas. As predicted, leks along the edge of CBNG development showed higher population indices than leks further away (Figure 4).

The hypothesis that sage-grouse avoid developed areas is supported by the finding that active leks and leks with moderate to large numbers of males were often found adjacent to CBNG fields but rarely within CBNG (Figure 5). In contrast, inactive leks and leks with few males were often found within CBNG fields (Figure 5). One of the most striking patterns we discovered was that, of leks counted in either 2004 or 2005, no medium or large-sized leks occurred within CBNG development; all remaining leks in CBNG have 20 or fewer males (Figure 5).

Summary statistics for well and power line variables calculated from GIS layers around active and inactive leks indicate that active leks typically are twice as far from wells, 1.5 times as far from power lines, have one-third the density of wells, one-half the density of power lines, and generally have less development (wells and power lines) within 3.2 km of the lek complex (Table 2). In addition, a significantly higher proportion of lek complexes are inactive in CBNG areas compared to areas on the edge of or outside CBNG (excluding lek complexes of unknown status and those destroyed by agriculture or mining). Several leks have been destroyed or are considered abandoned due to expansion of agriculture and surface mining, primarily in the area north of Gillette.



Fig. 2. Change in the population growth rate (?) for all leks in the Powder River Basin, 1988-2005. A growth rate of ? > 1 indicates an increasing population, whereas ? < 1 indicates a decreasing population.



Fig. 3. Change in the population index from leks within CBNG and outside CBNG development, 2000-2005. Data for leks in CBNG were too sparse prior to 2000 to warrant inclusion in the analysis. "Not in CBNG" includes leks both outside and on the edge of development.

Table 2.  Descriptive statistics for active and inactive sage-grouse lek complexes in the Powder River Basin.
Density and area calculations are based on a 2-mile (3.2 km) buffer around each lek complex.

| Lek Complex Status | Distance to Nearest Well (m) | Distance to Nearest Power Line (m) | Well Density (wells/km²) | Well Spacing (acres/well) | Power Line Density (km/km²) | Prop. of surrounding area within 350m of a well | Prop. of surrounding area within 350m of a Power Line |
|---|---|---|---|---|---|---|---|
| ACTIVE | 14.04±1.34 | 2.34±0.16 | 0.32±0.06 | 774 | 0.22±0.02 | 0.07±0.01 | 0.14±0.01 |
| n = | 221 | 186 | 207 | 207 | 207 | 207 | 207 |
| | | | | | | | |
| INACTIVE | 7.38±1.47 | 1.64±0.23 | 1.03±0.18 | 250 | 0.41±0.04 | 0.21±0.03 | 0.25±0.02 |
| n = | 96 | 92 | 95 | 95 | 95 | 95 | 95 |

All means significantly different between active and inactive leks (one-tailed t-test, all p<0.01).

Table 3. Proportions of active and inactive lek complexes by CBNG category (CBNG, outside, edge) (n=431 total
complexes, of which 324 are of known status and were not destroyed).

| Lek Complex Status | CBNG | Edge | Outside CBM |
|---|---|---|---|
| Active | 12 (27.9%) | 43 (82.7%) | 166 (72.5%) |
| Inactive/Abandoned | 28 (65.1%) | 8 (15.4%) | 61 (26.6%) |
| Unknown | 2 | 1 | 95 |
| Destroyed | 1 | 2 | 6 |
| Total (excl. leks of unknown status and destroyed leks) | 43 | 52 | 229 |



Fig. 5. Final lek status and final lek size for 390 leks of known status in 2004 or 2005 in the Powder River Basin in relation to coal-bed natural gas wells (blue dots) in the ground as of February 2005. Black dots = inactive leks (n=128). Red dots = active leks (n=238). Dot size for active leks is proportional to maximum number of males counted in the last year the lek was surveyed (either 2004 or 2005) (minimum lek size = 1, maximum lek size = 70). Gray dots = leks destroyed by surface mining or agricultural conversion (n=18). The final status of 126 leks was unknown; these leks are not shown.

**Discussion**

    Our analyses suggest that CBNG is having negative impacts on sage-grouse populations over and above long-term declines seen across the entire region.  First, our findings are consistent with the hypothesis that male sage-grouse avoid areas with CBNG development.  Trends in population indices for leks on the edge of development are higher than those of leks outside of CBNG development or leks within CBNG.  Remaining leks within CBNG are either

small (<20 males) or inactive, whereas leks along the edge of development and outside development have larger counts of males on average (i.e., >20 males). Second, inactive leks tend to fall closer to CBNG wells and to power lines, have significantly higher well and power line densities, and more surrounding area within 350 m of a well or a power line.

This analysis is the first of several currently underway. The current analysis does not rule out the possibility that reduced population indices and apparent avoidance of developed areas by sage-grouse are driven by habitat loss instead. Habitat loss is widely recognized as the most significant threat to sage-grouse populations throughout their range (Connelly et al. 2004). Because CBNG development and power line corridors typically occur in low-lying areas that also are subject to agricultural development, habitat loss and CBNG development may be confounded as predictors of sage-grouse population declines. Additional analyses will address this issue by examining the relative roles of habitat loss, CBNG, and power lines in a competing model framework.

## Literature Cited

Aldridge, C.L. 2005. Habitats for Persistence of Greater Sage-Grouse (*Centrocercus urophasianus*) in Alberta, Canada. Ph.D. Dissertation, University of Alberta, Edmonton, Alberta, Canada. 250 pp.

Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. J. Stiver. 2004. Conservation assessment of greater sage-grouse and sagebrush habitats. Western Association of Fish and Wildlife Agencies, Unpublished Report, Cheyenne, Wyoming, USA.

Gelbard, J. L. and J. Belknap. 2003. Roads as conduits for exotic plant invasions in a semiarid landscape. Conservation Biology 17: 420-427.

Holloran, M. J. 2005. Greater sage-grouse (*Centrocercus urophasianus*) population response to natural gas field development in western Wyoming. Ph.D. Dissertation, University of Wyoming, Laramie, Wyoming. 223 pp.

Naugle, D. E., C. L. Aldridge, B. L. Walker, T. E. Cornish, B. J. Moynahan, M. J. Holloran, K. Brown, G. D. Johnson, E. T. Schmidtman, R. T. Mayer, C. Y. Kato, M. R. Matchett, T. J. Christiansen, W. E. Cook, T. Creekmore, R. D. Falise, E. T. Rinkes, and

M. S. Boyce. 2004. West Nile virus: pending crisis for greater sage-grouse. Ecology Letters 7:704–713.

Naugle, D. E., C. A. Aldridge, B. L. Walker, K. E. Doherty, M. R. Matchett, J. McIntosh, T. E. Cornish, and M. S. Boyce. 2005. West Nile virus and sage-grouse: What more have we learned? Wildlife Society Bulletin 33:616–623.

Walker, B. L., D. E. Naugle, K. E. Doherty, and T. E. Cornish. 2004. From the Field: Outbreak of West Nile virus in greater sage-grouse and guidelines for monitoring, handling, and submitting dead birds. Wildlife Society Bulletin 32:1000–1006.

**Exhibit Q**
NRDC, et al. v. Kempthorne, et al.



# Guidelines to manage sage grouse populations and their habitats

*John W. Connelly, Michael A. Schroeder, Alan R. Sands, and Clait E. Braun*

Abstract    The status of sage grouse populations and habitats has been a concern to sportsmen and biologists for >80 years. Despite management and research efforts that date to the 1930s, breeding populations of this species have declined throughout much of its range. In May 1999, the western sage grouse (C. urophasianus phaios) in Washington was petitioned for listing under the Endangered Species Act because of population and habitat declines (C. Warren, United States Fish and Wildlife Service, personal communication). Sage grouse populations are allied closely with sagebrush (Artemisia spp.). Despite the well-known importance of this habitat to sage grouse and other sagebrush obligates, the quality and quantity of sagebrush habitats have declined for at least the last 50 years. Braun et al. (1977) provided guidelines for maintenance of sage grouse habitats. Since publication of those guidelines, much more information has been obtained on sage grouse. Because of continued concern about sage grouse and their habitats and a significant amount of new information, the Western States Sage and Columbian Sharp-tailed Grouse Technical Committee, under the direction of the Western Association of Fish and Wildlife Agencies, requested a revision and expansion of the guidelines originally published by Braun et al. (1977). This paper summarizes the current knowledge of the ecology of sage grouse and, based on this information, provides guidelines to manage sage grouse populations and their habitats.

Key words    Artemisia, Centrocercus urophasianus, guidelines, habitat, management, populations, sage grouse, sagebrush

The status of sage grouse populations and habitats has been a concern to sportsmen and biologists for >80 years (Hornaday 1916, Patterson 1952, Autenrieth 1981). Despite management and research efforts that date to the 1930s (Girard 1937), breeding populations of this species have declined by at least 17–47% throughout much of its range (Connelly and Braun 1997). In May 1999, the western sage grouse (*C. urophasianus phaios*) in Washington was petitioned for listing under the

Endangered Species Act because of population and habitat declines (C. Warren, United States Fish and Wildlife Service, personal communication).

Sage grouse populations are allied closely with sagebrush (*Artemisia* spp.) (Patterson 1952, Braun et al. 1977, Braun 1987). The dependence of sage grouse on sagebrush for winter habitat has been well documented (Eng and Schladweiler 1972, Beck 1975, Beck 1977, Robertson 1991). Similarly, the relationship between sagebrush

Address for John W. Connelly: Idaho Department of Fish and Game, 1345 Barton Road, Pocatello, ID 83204, USA; Address for Michael A. Schroeder: Washington Department of Fish and Wildlife, P.O. Box 1077, Bridgeport, WA 98813, USA. Address for Alan R. Sands: Bureau of Land Management, 1387 S. Vinnell Way, Boise, ID 83709-1657, USA; present address: The Nature Conservancy, 2404 Bank Drive, Suite 314, Boise, ID 83705, USA. Address for Clait E. Braun: Colorado Division of Wildlife, Wildlife Research Center, 317 W. Prospect Road, Fort Collins, CO 80526, USA; present address: Grouse Inc., 5572 North Ventana Vista Road, Tucson, AZ 85750-7204, USA.



Sage grouse on winter range. Note the relatively sparse cover; without snow, the canopy cover of sagebrush in this area exceeds 20%.

be defined: 1) nonmigratory, grouse do not make long-distance movements (i.e., >10 km one way) between or among seasonal ranges; 2) one-stage migratory, grouse move between 2 distinct seasonal ranges; and 3) 2-stage migratory, grouse move among 3 distinct seasonal ranges. Within a given geographic area, especially summer range, there may be birds that belong to more than one of these types of populations.

On an annual basis, migratory sage grouse populations may occupy areas that exceed 2,700 km² (Hulet 1983, Leonard et al. 2000). During winter, Robertson (1991) reported that migratory sage grouse in southeastern Idaho made mean daily movements of 752 m and occupied an area ≥140 km². For a nonmigratory population in Montana, Wallestad (1975) reported that winter home range size ranged from 11 to 31 km². During summer, migratory sage grouse in Idaho occupied home ranges of 3 to 7 km² (Connelly and Markham 1983, Gates 1983).

Despite large annual movements, sage grouse have high fidelity to seasonal ranges (Keister and Willis 1986, Fischer et al. 1993). Females return to the same area to nest each year (Fischer et al. 1993) and may nest within 200 m of their previous year's nest (Gates 1983, Lyon 2000).

## Survival

Wallestad (1975) reported that annual survival rates for yearling and adult female sage grouse were 35 and 40%, respectively, for poncho-tagged birds. However, Zablan (1993) reported that survival rates for banded yearling and adult females in Colorado were similar and averaged 55%; survival rates for yearling and adult males differed, averaging 52 and 38%, respectively. In Idaho, annual survival of male sage grouse ranged from 46 to 54% and female survival from 68 to 85% (Connelly et al. 1994). Lower survival rates for males may be related to physiological demands because of sexual dimorphism and greater predation rates (Swenson 1986).

## Reproduction

Bergerud (1988) suggested that most female tetraonids nest as yearlings. Although essentially all female sage grouse nested in Washington (Schroeder 1997), Connelly et al. (1993) reported that in Idaho up to 45% of yearling and 22% of adult female sage grouse do not nest each year. Gregg (1991) indicated that, of 119 females monitored through the breeding season in eastern Oregon, 26 (22%) did not nest. However, Coggins (1998) reported a 99% nest initiation rate for 3 years for the same population in Oregon. The differences may be related to improved range condition that resulted in better nutritional status of pre-laying hens (Barnett and Crawford 1994).

Estimates of sage grouse nest success throughout the species' range vary from 12 to 86% (Trueblood 1954, Gregg 1991, Schroeder et al. 1999). Nest success also may vary on an annual basis (Schroeder 1997, Sveum et al. 1998a). Wallestad and Pyrah (1974) observed greater nest success by adults than yearlings. However, significant differences in nest success between age groups have not been reported in other studies (Connelly et al. 1993, Schroeder 1997).

Clutch size of sage grouse is extremely variable and relatively low compared to other species of gamebirds (Edminster 1954, Schroeder 1997). Average clutch size for first nests varies from 6.0 to

Sage grouse nest. Photo by Jena Hickey.



Sage grouse on a nest with good shrub and herbaceous cover. The nest was successful.

habitats and sage grouse nest success has been described thoroughly (Klebenow 1969, Wallestad and Pyrah 1974, Wakkinen 1990, Connelly et al. 1991, Gregg et al. 1994). Despite the well-known importance of this habitat to sage grouse and other sagebrush obligates (Braun et al. 1976, Saab and Rich 1997), the quality and quantity of sagebrush habitats have declined for at least the last 50 years (Braun et al. 1976, Braun 1987, Swenson et al. 1987, Connelly and Braun 1997).

Braun et al. (1977) provided guidelines for maintenance of sage grouse habitats. Since publication of those guidelines, much more information has been obtained on relative size of sagebrush habitats used by these grouse (Connelly 1982, Connelly et al. 1988, Wakkinen et al. 1992), seasonal use of sagebrush habitats (Benson et al. 1991, Connelly et al. 1991), effects of insecticides on sage grouse (Blus et al. 1989), importance of herbaceous cover in breeding habitat (Wakkinen 1990, Connelly et al. 1991, Gregg 1991, Barnett and Crawford 1994, Drut et al. 1994a, Gregg et al. 1994), and effects of fire on their habitat (Hulet 1983; Benson et al. 1991;

Robertson 1991; Fischer 1994; Fischer et al. 1996a, 1997; Pyle and Crawford 1996; Connelly et al. 2000b). Because of continued concern about sage grouse and their habitats and a significant amount of new information, the Western States Sage and Columbian Sharp-tailed Grouse Technical Committee, under the direction of the Western Association of Fish and Wildlife Agencies, requested a revision and expansion of the guidelines originally published by Braun et al. (1977). This paper summarizes the current knowledge of the ecology of sage grouse and, based on this information, provides guidelines to manage sage grouse populations and their habitats.

## Population biology

### Seasonal movements and home range

Sage grouse display a variety of annual migratory patterns (Beck 1975, Wallestad 1975, Hulet 1983, Berry and Eng 1985, Connelly et al. 1988, Wakkinen 1990, Fischer 1994). Populations may have: 1) distinct winter, breeding, and summer areas; 2) distinct summer areas and integrated winter and breeding areas; 3) distinct winter areas and integrated breeding and summer areas; or 4) well-integrated seasonal habitats (nonmigratory populations). Seasonal movements between distinct seasonal ranges may exceed 75 km (Dalke et al. 1963, Connelly et al. 1988), which complicates attempts to define populations. Thus, Connelly et al. (1988) suggested that sage grouse populations be defined on a temporal and geographic basis. Because of differences in seasonal movements among populations (Dalke et al. 1963, Wallestad 1975, Connelly et al. 1988, Wakkinen 1990), 3 types of sage grouse populations can



Sage grouse on a nest with poor shrub and herbaceous cover. This nest was unsuccessful. Photo by Jena Hickey.

970   Wildlife Society Bulletin 2000, 28(4):967–985

9.5 throughout the species' range (Sveum 1995, Schroeder 1997). Greatest and least average clutch sizes have been reported in Washington (Sveum 1995, Schroeder 1997).

Renesting by sage grouse varies regionally from <20% (Patterson 1952, Eng 1963, Hulet 1983, Connelly et al. 1993) to >80% (Schroeder 1997). Despite regional variation, differences in renesting rates due to age have not been documented (Connelly et al. 1993, Schroeder 1997). Because of variation in nest initiation, success, and renesting rates, the proportion of females successfully hatching a brood varies between 15 and 70% (Wallestad and Pyrah 1974, Gregg et al. 1994). Despite this variation, sage grouse generally have low reproductive rates and high annual survival compared to most gallinaceous species (Zablan 1993, Connelly et al. 1994, Connelly and Braun 1997, Schroeder 1997, Schroeder et al. 1999).

Little information has been published on mortality of juvenile sage grouse or the level of production necessary to maintain a stable population. Among western states, long-term ratios have varied from 1.40 to 2.96 juveniles/hen in the fall; since 1985 these ratios have ranged from 1.21 to 2.19 (Connelly and Braun 1997). Available data suggest that a ratio $\geq$2.25 juveniles/hen in the fall should result in stable to increasing sage grouse populations (Connelly and Braun 1997, Edelmann et al. 1998).

## Habitat requirements

### Breeding habitats

Leks, or breeding display sites, typically occur in open areas surrounded by sagebrush (Patterson 1952, Gill 1965); these sites include, but are not limited to, landing strips, old lakebeds, low sagebrush flats and ridge tops, roads, cropland, and burned areas (Connelly et al. 1981, Gates 1985). Sage grouse males appear to form leks opportunistically at sites within or adjacent to potential nest-

ing habitat. Although the lek may be an approximate center of annual ranges for nonmigratory populations (Eng and Schladweiler 1972, Wallestad and Pyrah 1974, Wallestad and Schladweiler 1974), this may not be the case for migratory populations (Connelly et al. 1988, Wakkinen et al. 1992). Average distances between nests and nearest leks vary from 1.1 to 6.2 km, but distance from lek of female capture to nest may be >20 km (Autenrieth 1981, Wakkinen et al. 1992, Fischer 1994, Hanf et al. 1994, Lyon 2000). Nests are placed independent of lek location (Bradbury et al. 1989, Wakkinen et al. 1992).

Habitats used by pre-laying hens also are part of the breeding habitat. These areas should provide a diversity of forbs high in calcium, phosphorus, and protein; the condition of these areas may greatly affect nest initiation rate, clutch size, and subsequent reproductive success (Barnett and Crawford 1994, Coggins 1998).

Most sage grouse nests occur under sagebrush (Patterson 1952, Gill 1965, Gray 1967, Wallestad and Pyrah 1974), but sage grouse will nest under other plant species (Klebenow 1969, Connelly et al. 1991, Gregg 1991, Sveum et al. 1998a). However, grouse nesting under sagebrush experience greater nest success (53%) than those nesting under other plant species (22%, Connelly et al. 1991).

Table 1. Habitat characteristics associated with sage grouse nest sites.

| State | Sagebrush | | Grass | | Reference |
|---|---|---|---|---|---|
| | Height[a](cm) | Coverage (%)[b] | Height(cm) | Coverage(%)[c] | |
| Colo. | 52 | | | | Petersen 1980 |
| Id. | | 15 | | 4 | Klebenow 1969 |
| Id. | 58–79 | 23–38 | | | Autenrieth 1981 |
| Id. | 71 | 22 | 18 | 3–10 | Wakkinen 1990 |
| Id. | | | 19–23 | 7–9 | Connelly et al. 1991 |
| Id. | 61 | | 22 | 30 | Fischer 1994 |
| Id. | | 15–32 | 15–30 | | Klott et al. 1993 |
| Id. | 69 | 19 | 34 | 15 | Apa 1998 |
| Mont. | 40 | 27 | | | Wallestad 1975 |
| Oreg. | 80 | 20 | | | Keister and Willis 1986 |
| Oreg. | | 24 | 14 | 9–32 | Gregg 1991 |
| Wash. | | 20 | | 51 | Schroeder 1995 |
| Wash. | | 19 | | 32 | Sveum et al. 1998a |
| Wyo. | 36 | | | | Patterson 1952 |
| Wyo. | 29. | 24 | 15 | 9 | Heath et al. 1997 |
| Wyo. | 31 | 25 | 18 | 5 | Holloran 1999 |
| Wyo. | 33 | 26 | 21 | 11 | Lyon 2000 |

[a] Mean height of nest bush.
[b] Mean canopy coverage of the sagebrush surrounding the nest.
[c] Some coverage estimates may include both grasses and forbs.

Mean height of sagebrush most commonly used by nesting grouse ranges from 29 to 80 cm (Table 1), and nests tend to be under the tallest sagebrush within a stand (Keister and Willis 1986, Wakkinen 1990, Apa 1998). In general, sage grouse nests are placed under shrubs having larger canopies and more ground and lateral cover as well as in stands with more shrub canopy cover than at random sites (Wakkinen 1990, Fischer 1994, Heath et al. 1997, Sveum et al. 1998a, Holloran 1999). Sagebrush cover near the nest site was greater around successful nests than unsuccessful nests in Montana (Wallestad and Pyrah 1974) and Oregon (Gregg 1991). Wallestad and Pyrah (1974) also indicated that successful nests were in sagebrush stands with greater average canopy coverage (27%) than those of unsuccessful nests (20%). Gregg (1991) reported that sage grouse nest success varied by cover type. The greatest nest success occurred in a mountain big sagebrush (*A. t. tridentata vaseyana*) cover type where shrubs 40–80 cm in height had greater canopy cover at the site of successful nests than at unsuccessful nests (Gregg 1991). These observations were consistent with the results of an artificial nest study showing greater coverage of medium-height shrubs improved success of artificial nests (DeLong 1993, DeLong et al. 1995).

Grass height and cover also are important components of sage grouse nest sites (Table 1). Grass associated with nest sites and with the stand of vegetation containing the nest was taller and denser than grass at random sites (Wakkinen 1990, Gregg 1991, Sveum et al. 1998a). Grass height at nests under non-sagebrush plants was greater (*P* < 0.01) than that associated with nests under sagebrush, further suggesting that grass height is an important habitat component for nesting sage grouse (Connelly et al. 1991). Moreover, in Oregon, grass cover was greater at successful nests than at unsuccessful nests (Gregg 1991). Grass >18 cm in height occurring in stands of sagebrush 40–80 cm tall resulted in lesser nest predation rates than in stands with lesser grass heights (Gregg et al. 1994). Herbaceous cover associated with nest sites may provide scent, visual, and physical barriers to potential predators (DeLong et al. 1995).

Early brood-rearing areas occur in upland sagebrush habitats relatively close to nest sites, but movements of individual broods may vary (Connelly 1982, Gates 1983). Within 2 days of hatching, one brood moved 3.1 km (Gates 1983). Early brood-rearing habitats may be relatively open


Radiotelemetry and a pointing dog are used to capture sage grouse chicks for a research project in southeastern Idaho.

(about 14% canopy cover) stands of sagebrush (Martin 1970, Wallestad 1971) with ≥15% canopy cover of grasses and forbs (Sveum et al. 1998b, Lyon 2000). Great plant species richness with abundant forbs and insects characterize brood areas (Dunn and Braun 1986, Klott and Lindzey 1990, Drut et al. 1994a, Apa 1998). In Oregon, diets of sage grouse chicks included 34 genera of forbs and 41 families of invertebrates (Drut et al. 1994b). Insects, especially ants (Hymenoptera) and beetles (Coleoptera), are an important component of early brood-rearing habitat (Drut et al. 1994b, Fischer et al. 1996a). Ants and beetles occurred more frequently (*P*=0.02) at brood-activity centers compared to nonbrood sites (Fischer et al. 1996a).

### Summer–late brood-rearing habitats

As sagebrush habitats desiccate, grouse usually move to more mesic sites during June and July (Gill 1965, Klebenow 1969, Savage 1969, Connelly and Markham 1983, Gates 1983, Connelly et al. 1988, Fischer et al. 1996b). Sage grouse broods occupy a variety of habitats during summer, including sagebrush (Martin 1970), relatively small burned areas within sagebrush (Pyle and Crawford 1996), wet meadows (Savage 1969), farmland, and other irrigated areas adjacent to sagebrush habitats (Connelly and Markham 1983, Gates 1983, Connelly et al. 1988). Apa (1998) reported that sites used by grouse broods had twice as much forb cover as independent sites.

### Fall habitats

Sage grouse use a variety of habitats during fall. Patterson (1952) reported that grouse move from summer to winter range in October, but during

mild weather in late fall, some birds may still use summer range. Similarly, Connelly and Markham (1983) observed that most sage grouse had abandoned summering areas by the first week of October. Fall movements to winter range are slow and meandering and occur from late August to December (Connelly et al. 1988). Wallestad (1975) documented a shift in feeding habits from September, when grouse were consuming a large amount of forbs, to December, when birds were feeding only on sagebrush.

### Winter habitats

Characteristics of sage grouse winter habitats are relatively similar throughout most of the species' range (Table 2). Eng and Schladweiler (1972) and Wallestad (1975) indicated that most observations of radiomarked sage grouse during winter in Montana occurred in sagebrush habitats with >20% canopy cover. However, Robertson (1991) indicated that sage grouse used sagebrush habitats that had average canopy coverage of 15% and average height of 46 cm during 3 winters in southeastern Idaho. In Idaho, sage grouse selected areas with greater canopy cover of Wyoming big sagebrush (*A. t. wyomingensis*) in stands containing taller shrubs when compared to random sites (Robertson 1991).

In Colorado, sage grouse may be restricted to <10% of the sagebrush habitat because of variation in topography and snow depth (Beck 1977, Hupp and Braun 1989). Such restricted areas of use may not occur throughout the species' range because in southeastern Idaho, severe winter weather did not result in the grouse population greatly reducing its seasonal range (Robertson 1991).

During winter, sage grouse feed almost exclusively on leaves of sagebrush (Patterson 1952, Wallestad et al. 1975). Although big sagebrush dominates the diet in most portions of the range (Patterson 1952; Wallested et al. 1975; Remington and Braun 1985; Welch et al. 1988, 1991), low sagebrush (*A. arbuscula*), black sagebrush (*A. nova*, Dalke et al. 1963, Beck 1977), fringed sagebrush (*A. frigida*, Wallestad et al. 1975), and silver sagebrush (*A. cana*, Aldridge 1998) are consumed in many areas depending on availability. Sage grouse in some areas apparently prefer Wyoming big sagebrush (Remington and Braun 1985, Myers 1992) and in other areas mountain big sagebrush (Welch et al. 1988, 1991). Some of the differences in selection may be due to preferences for greater levels of protein and the amount of volatile oils (Remington and Braun 1985, Welch et al. 1988).

## Effects of habitat alteration

### Range management treatments

*Breeding habitat.* Until the early 1980s, herbicide treatment (primarily with 2,4-D) was the most common method to reduce sagebrush on large tracts of rangeland (Braun 1987). Klebenow (1970) reported cessation of nesting in newly sprayed areas with <5% live sagebrush canopy cover. Nesting also was nearly nonexistent in older sprayed areas containing about 5% live sagebrush cover (Klebenow 1970). In virtually all documented cases, herbicide application to blocks of sagebrush rangeland resulted in major declines in sage grouse breeding populations (Enyeart 1956, Higby 1969, Peterson 1970, Wallestad 1975). Effects of this treatment on sage grouse populations seemed more severe if the treated area was subsequently seeded to crested wheatgrass (*Agropyron cristatum*, Enyeart 1956).

Using fire to reduce sagebrush has become more common since most uses of 2,4-D on public lands were prohibited (Braun 1987). Klebenow (1972) and Sime (1991) suggested that fire may benefit sage grouse populations. Neither Gates (1983),

Table 2. Characteristics of sagebrush at sage grouse winter-use sites.

| State | Canopy Coverage[a] (%) | Canopy Height[a] (cm) | Reference |
|---|---|---|---|
| Colo. | | 24–36[bd] | Beck 1977 |
| Colo. | | 20–30[cd] | Beck 1977 |
| Colo. | 43[b] | 34[b] | Schoenberg 1982 |
| Colo. | 37[c] | 26[c] | Schoenberg 1982 |
| Colo. | 30–38[de] | 41–54[de] | Hupp 1987 |
| Id. | 38[e] | 56[e] | Autenrieth 1981 |
| Id. | 26[b] | 29[b] | Connelly 1982 |
| Id. | 25[c] | 26[c] | Connelly 1982 |
| Id. | 15 | 46 | Robertson 1991 |
| Mont. | 27 | 25 | Eng and Schladweiler 1972 |
| Mont. | >20 | | Wallestad 1975 |
| Oreg. | 12–17[d] | | Hanf et al. 1994 |

[a] Mean canopy coverage or height of sagebrush above snow.
[b] Males
[c] Females
[d] Ranges are given when data were provided for more than one year or area.
[e] No snow present when measurements were made or total height of plant was measured.

Martin (1990), nor Bensen et al. (1991) reported adverse effects of fire on breeding populations of sage grouse. In contrast, following a 9-year study, Connelly et al. (1994, 2000b) indicated that prescribed burning of Wyoming big sagebrush during a drought period resulted in a large decline (>80%) of a sage grouse breeding population in southeastern Idaho. Additionally, Hulet (1983) documented loss of leks from fire and Nelle et al. (2000) reported that burning mountain big sagebrush stands had long-term negative impacts on sage grouse nesting and brood-rearing habitats. Canopy cover in mountain big sagebrush did not provide appropriate nesting habitat 14 years after burning (Nelle et al. 2000). The impact of fire on sage grouse populations using habitats dominated by silver sagebrush (which may resprout following fire) is unknown.

Cheatgrass (*Bromus tectrorum*) will often occupy sites following disturbance, especially burning (Valentine 1989). Repeated burning or burning in late summer favors cheatgrass invasion and may be a major cause of the expansion of this species (Vallentine 1989). The ultimate result may be a loss of the sage grouse population because of long-term conversion of sagebrush habitat to rangeland dominated by an annual exotic grass. However, this situation largely appears confined to the western portion of the species' range and does not commonly occur in Wyoming (J. Lawson, Wyoming Department of Game and Fish, personal communication).

Mechanical methods of sagebrush control have often been applied to smaller areas than those treated by herbicides or fire, especially to convert rangeland to cropland. However, adverse effects of this type of treatment on sage grouse breeding populations also have been documented. In Montana, Swenson et al. (1987) indicated that the number of breeding males declined by 73% after 16% of their study area was plowed.

*Brood-rearing habitats.* Martin (1970) reported that sage grouse seldom used areas treated with herbicides to remove sagebrush in southwestern Montana. In Colorado, Rogers (1964) indicated that an entire population of sage grouse appeared to emigrate from an area that was subjected to several years of herbicide application to remove sagebrush. Similarly, Klebenow (1970) reported that herbicide spraying reduced the brood-carrying capacity of an area in southeastern Idaho. However, application of herbicides in early spring to reduce sagebrush cover may enhance some brood-rearing habitats by increasing the amount of herbaceous plants used for food (Autenrieth 1981).

Fire may improve sage grouse brood-rearing habitat (Klebenow 1972, Gates 1983, Sime 1991), but until recently, experimental evidence was not available to support or refute these contentions (Braun 1987). Pyle and Crawford (1996) suggested that fire may enhance brood-rearing habitat in montane settings but cautioned that its usefulness requires further investigation. A 9-year study of the effects of fire on sage grouse did not support that prescribed fire, conducted during late summer in a Wyoming big sagebrush habitat, improved brood-rearing habitat for sage grouse (Connelly et al. 1994, Fischer et al. 1996a). Prescribed burning of sage grouse habitat did not increase amount of forbs in burned areas compared to unburned areas (Fischer et al. 1996a, Nelle et al. 2000) and resulted in decreased insect populations in the treated area compared to the unburned area. Thus, fire may negatively affect sage grouse brood-rearing habitat rather than improve it in Wyoming big sagebrush habitats (Connelly and Braun 1997), but its effect on grouse habitats in mountain big sagebrush communities requires further investigation (Pyle and Crawford 1996, Nelle et al. 2000).

Sage grouse often use agricultural areas for brood-rearing habitat (Patterson 1952, Wallestad 1975, Gates 1983, Connelly et al. 1988, Blus et al. 1989). Grouse use of these areas may result in mortality because of exposure to insecticides. Blus et al. (1989) reported die-offs of sage grouse that were exposed to methamidiphos used in potato fields and dimethoate used in alfalfa fields. Dimethoate is used commonly for alfalfa, and 20 of 31 radio-marked grouse (65%) died following direct exposure to this insecticide (Blus et al. 1989).

*Winter habitat.* Reduction in sage grouse use of an area treated by herbicide was proportional to the severity (i.e., amount of damage to sagebrush) of the treatment (Pyrah 1972). In sage grouse winter range, strip partial kill, block partial kill, and total kill of sagebrush were increasingly detrimental to sage grouse in Montana (Pyrah 1972) and Wyoming (Higby 1969).

In Idaho, Robertson (1991) reported that a 2,000-ha prescribed burn that removed 57% of the sagebrush cover in sage grouse winter habitat minimally impacted the sage grouse population. Although sage grouse use of the burned area declined following the fire, grouse adapted to this disturbance by moving 1 to 10 km outside of the burn to areas

with greater sagebrush cover (Robertson 1991) than was available in the burned area.

## Land use

*Mining–energy development.* Effects of mining, oil, and gas developments on sage grouse populations are not well known (Braun 1998). These activities negatively impact grouse habitat and populations over the short term (Braun 1998), but research suggests some recovery of populations following initial development and subsequent reclamation of the affected sites (Eng et al. 1979, Tate et al. 1979, Braun 1986). In Colorado, sage grouse were displaced by oil development and coal-mining activities, but numbers returned to pre-disturbance levels once the activities ceased (Braun 1987, Remington and Braun 1991). At least 6 leks in Alberta were disturbed by energy development and 4 were abandoned (Aldridge 1998). In Wyoming, female sage grouse captured on leks disturbed by natural gas development had lower nest-initiation rates, longer movements to nest sites, and different nesting habitats than hens captured on undisturbed leks (Lyon 2000). Sage grouse may repopulate an area following energy development but may not attain population levels that occurred prior to development (Braun 1998). Thus, short-term and long-term habitat loss appears to result from energy development and mining (Braun 1998).

*Grazing.* Domestic livestock have grazed over most areas used by sage grouse and this use is generally repetitive with annual or biennial grazing periods of varying timing and length (Braun 1998). Grazing patterns and use of habitats are often dependent on weather conditions (Valentine 1990). Historic and scientific evidence indicates that livestock grazing did not increase the distribution of sagebrush (Peterson 1995) but markedly reduced the herbaceous understory over relatively large areas and increased sagebrush density in some areas (Vale 1975, Tisdale and Hironaka 1981). Within the intermountain region, some vegetation changes from livestock grazing likely occurred because sagebrush steppe in this area did not evolve with intensive grazing by wild herbivores, as did the grassland prairies of central North America (Mack and Thompson 1982). Grazing by wild ungulates may reduce sagebrush cover (McArthur et al. 1988, Peterson 1995), and livestock grazing may result in high trampling mortality of sagebrush seedlings (Owens and Norton 1992). In Wyoming big sagebrush habitats, resting areas from livestock grazing may improve understory production as well as decrease sagebrush cover (Wambolt and Payne 1986).

There is little direct experimental evidence linking grazing practices to sage grouse population levels (Braun 1987, Connelly and Braun 1997). However, grass height and cover affect sage grouse nest site selection and success (Wakkinen 1990, Gregg 1991, Gregg et al. 1994, Delong et al. 1995, Sveum et al. 1998*a*). Thus, indirect evidence suggests grazing by livestock or wild herbivores that significantly reduces the herbaceous understory in breeding habitat may have negative impacts on sage grouse populations (Braun 1987, Dobkin 1995).

*Miscellaneous activities.* Construction of roads, powerlines, fences, reservoirs, ranches, farms, and housing developments has resulted in sage grouse habitat loss and fragmentation (Braun 1998). Between 1962 and 1997, >51,000 km of fence were constructed on land administered by the Bureau of Land Management in states supporting sage grouse populations (T. D. Rich, United States Bureau of Land Management, personal communication). Structures such as powerlines and fences pose hazards to sage grouse because they provide additional perch sites for raptors and because sage grouse may be injured or killed when they fly into these structures (Call and Maser 1985).

## Weather

Prolonged drought during the 1930s and mid-1980s to early 1990s coincided with declining sage grouse populations throughout much of the species' range (Patterson 1952, Fischer 1994, Hanf et al. 1994). Drought may affect sage grouse populations by reducing herbaceous cover at nests and the quantity and quality of food available for hens and chicks during spring (Hanf et al. 1994, Fischer et al. 1996*a*).

Spring weather may influence sage grouse production. Relatively wet springs may result in increased production (Wallestad 1975, Autenrieth 1981). However, heavy rainfall during egg-laying or unseasonably cold temperatures with precipitation during hatching may decrease production (Wallestad 1975).

There is no evidence that severe winter weather affects sage grouse populations unless sagebrush cover has been greatly reduced or eliminated (Wallestad 1975, Beck 1977, Robertson 1991).

## Predation

Over the last 25 years, numerous studies have used radiotelemetry to address sage grouse survival and nest success (Wallestad 1975; Hulet 1983; Gregg 1991; Robertson 1991; Connelly et al. 1993, 1994; Gregg et al. 1994; Schroeder 1997). Only Gregg (1991) and Gregg et al. (1994) indicated that predation was limiting sage grouse numbers, and their research suggested that low nest success from predation was related to poor nesting habitat. Most reported nest-success rates are >40%, suggesting that nest predation is not a widespread problem. Similarly, high survival rates of adult (Connelly et al. 1993, Zablan 1993) and older (>10 weeks of age) juvenile sage grouse indicate that population declines are not generally related to high levels of predation. Thus, except for an early study in Oregon (Batterson and Morse 1948), predation has not been identified as a major limiting factor for sage grouse (Connelly and Braun 1997).

Constructing ranches, farms, and housing developments has resulted in the addition of nonnative predators to sage grouse habitats, including dogs, cats, and red foxes (*Vulpes vulpes*; J. W. Connelly, Idaho Department of Fish and Game, unpublished data; B. L. Welch, United States Forest Service, personal communication) and may be responsible for increases in abundance of the common raven (*Corvus corax*, Sauer et al. 1997). Relatively high raven populations may decrease sage grouse nest success (Batterson and Morse 1948, Autenrieth 1981), but rigorous field studies using radiotelemetry do not support this hypothesis. Current work in Strawberry Valley, Utah, suggests that red foxes are taking a relatively high proportion of the population (Flinders 1999). This may become a greater problem if red foxes become well established throughout sage grouse breeding habitat.

## Recommended guidelines

Sage grouse populations occupy relatively large areas on a year-round basis (Berry and Eng 1985, Connelly et al. 1988, Wakkinen 1990, Leonard et al. 2000), invariably involving a mix of ownership and jurisdictions. Thus, state and federal natural resource agencies and private landowners must coordinate efforts over at least an entire seasonal range to successfully implement these guidelines. Based on current knowledge of sage grouse population and habitat trends, these guidelines have been developed to help agencies and landowners

effectively assess and manage populations, protect and manage remaining habitats, and restore damaged habitat. Because of gaps in our knowledge and regional variation in habitat characteristics (Tisdale and Hironaka 1981), the judgment of local biologists and quantitative data from population and habitat monitoring are necessary to implement the guidelines correctly. Further, we urge agencies to use an adaptive management approach (Macnab 1983, Gratson et al. 1993), using monitoring and evaluation to assess the success of implementing these guidelines to manage sage grouse populations.

Activities responsible for the loss or degradation of sagebrush habitats also may be used to restore these habitats. These activities include prescribed fire, grazing, herbicides, and mechanical treatments. Decisions on land treatments using these tools should be based on quantitative knowledge of vegetative conditions over an entire population's seasonal range. Generally, the treatment selected should be that which is least disruptive to the vegetation community and has the most rapid recovery time. This selection should not be based solely on economic cost.

## Definitions

For the purpose of these guidelines, we define an occupied lek as a traditional display area in or adjacent to sagebrush-dominated habitats that has been attended by $\geq 2$ male sage grouse in $\geq 2$ of the previous 5 years. We define a breeding population as a group of birds associated with 1 or more occupied leks in the same geographic area separated from other leks by >20 km. This definition is somewhat arbitrary but generally based on maximum distances females move to nest.

## Population management

1) Before making management decisions, agencies should cooperate to first identify lek locations and determine whether a population is migratory or nonmigratory. In the case of migratory populations, migration routes and seasonal habitats must be identified to allow for meaningful and correct management decisions.

2) Breeding populations should be assessed by either lek counts (census number of males attending leks) or lek surveys (classify known leks as active or inactive) each year (Autenrieth et al. 1982). Depending on number of counts each spring (Jenni and Hartzler 1978, Emmons and Braun

1984) and weather conditions when the counts were made, lek counts may not provide an accurate assessment of sage grouse populations (Beck and Braun 1980) and the data should be viewed with caution. Despite these shortcomings, lek counts provide the best index to breeding population levels and many long-term data sets are available for trend analysis (Connelly and Braun 1997).

3) Production or recruitment should be monitored by brood counts or wing surveys (Autenrieth et al. 1982). Brood counts are labor-intensive and usually result in inadequate sample size. Where adequate samples of wings can be obtained, we recommend using wing surveys to obtain estimates of sage grouse nesting success and juvenile:adult hen (including yearlings) ratios.

4) Routine population monitoring should be used to assess trends and identify problems for all hunted and nonhunted populations. Check stations, wing collections, and questionnaires can be used to obtain harvest information. Breeding population and production data (above) can be used to monitor nonhunted populations.

5) The genetic variation of relatively small, isolated populations should be documented to better understand threats to these populations and implement appropriate management actions (Young 1994, Oyler-McCance et al. 1999).

6) Hunting seasons for sage grouse should be based on careful assessments of population size and trends. Harvest should not be based on the observations of Allen (1954:43), who stated, "Our populations of small animals operate under a 1-year plan of decimation and replacement; and Nature habitually maintains a wide margin of overproduction. She kills off a huge surplus of animals whether we take our harvest or not." To the contrary, sage grouse tend to have relatively long lives with low annual turnover (Zablan 1993, Connelly et al. 1994) and a low reproductive rate (Gregg 1991, Connelly et al. 1993). Consequently, hunting may be additive to other causes of mortality for sage grouse (Johnson and Braun 1999, Connelly et al. 2000a). However, most populations appear able to sustain hunting if managed carefully (Connelly et al. 2000a).

7) If populations occur over relatively large geographic areas and are stable to increasing, seasons and bag limits can be relatively liberal (2- to 4-bird daily bag limit and a 2- to 5-week season) for hunting seasons allowing firearms (Braun and Beck 1985).

8) If populations are declining (for 3 or more consecutive years) or trends are unknown, seasons and bag limits should be generally conservative (1- or 2-bird daily bag limit and a 1-to 4-week season) for hunting seasons allowing firearms, or suspended (for all types of hunting, including falconry and Native American subsistence hunting) because of this species' population characteristics (Braun 1998, Connelly et al. 2000a).

9) Where populations are hunted, harvest rates should be 10% or less of the estimated fall population to minimize negative effects on the subsequent year's breeding population (Connelly et al. 2000a).

10) Populations should not be hunted where ≤300 birds comprise the breeding population (i.e., ≤100 males are counted on leks [C. E. Braun, Colorado Division of Wildlife, unpublished report]).

11) Spring hunting of sage grouse on leks should be discouraged or, if unavoidable, confined to males only during the early portion of the breeding season. Spring hunting is considered an important tradition for some Native American tribes. However, in Idaho, 80% of the leks hunted during spring in the early 1990s (n=5) had become inactive by 1994 (Connelly et al. 1994).

12) Viewing sage grouse on leks (and censusing leks) should be conducted so that disturbance to birds is minimized or preferably eliminated (Call and Maser 1986). Agencies should generally not provide all lek locations to individuals simply interested in viewing birds. Instead, 1 to 3 lek locations should be identified as public viewing leks, and if demand is great enough, agencies should consider erecting 2–3 seasonal blinds at these leks for public use. Camping in the center of or on active leks should be vigorously discouraged.

13) Discourage establishment of red fox and other nonnative predator populations in sage grouse habitats.

14) For small, isolated populations and declining populations, assess the impact of predation on survival and production. Predator control programs are expensive and often ineffective. In some cases, these programs may provide temporary help while habitat is recovering. Predator management programs also could be considered in areas where seasonal habitats are in good condition but their extent has been reduced greatly. However, predator management should be implemented only if the available data (e.g., nest success <25%, annual survival of adult hens <45%) support the action.

## General habitat management

The following guidelines pertain to all seasonal habitats used by sage grouse:

1) Monitor habitat conditions and propose treatments only if warranted by range condition (i.e., the area no longer supports habitat conditions described in the following guidelines under habitat protection). Do not base land treatments on schedules, targets, or quotas.

2) Use appropriate vegetation treatment techniques (e.g., mechanical methods, fire) to remove junipers and other conifers that have invaded sage grouse habitat (Commons et al. 1999). Whenever possible, use vegetation control techniques that are least disruptive to the stand of sagebrush, if this stand meets the needs of sage grouse (Table 3).

3) Increase the visibility of fences and other structures occurring within 1 km of seasonal ranges by flagging or similar means if these structures appear hazardous to flying grouse (e.g., birds have been observed hitting or narrowly missing these structures or grouse remains have been found next to these structures).

4) Avoid building powerlines and other tall structures that provide perch sites for raptors within 3 km of seasonal habitats. If these structures must be built, or presently exist, the lines should be buried or poles modified to prevent their use as raptor perch sites.

## Breeding habitat management

For migratory and nonmigratory populations, lek attendance, nesting, and early brood rearing occur in breeding habitats. These habitats are sagebrush-dominated rangelands with a healthy herbaceous understory and are critical for survival of sage grouse populations. Mechanical disturbance, prescribed fire, and herbicides can be used to restore sage grouse habitats to those conditions identified as appropriate in the following sections on habitat protection. Local biologists and range ecologists should select the appropriate technique on a case-

Table 3. Characteristics of sagebrush rangeland needed for productive sage grouse habitat.

| | Breeding | | Brood-rearing | | Winter [e] | |
|---|---|---|---|---|---|---|
| | Height (cm) | Canopy (%) | Height (cm) | Canopy (%) | Height (cm) | Canopy (%) |
| Mesic sites[a] | | | | | | |
| Sagebrush | 40–80 | 15–25 | 40–80 | 10–25 | 25–35 | 10–30 |
| Grass-forb | >18[c] | ≥25[d] | variable | >15 | N/A | N/A |
| Arid sites[a] | | | | | | |
| Sagebrush | 30–80 | 15–25 | 40–80 | 10–25 | 25–35 | 10–30 |
| Grass/forb | >18[c] | ≥15 | variable | >15 | N/A | N/A |
| Area[b] | | >80 | | >40 | | >80 |

[a] Mesic and arid sites should be defined on a local basis; annual precipitation, herbaceous understory, and soils should be considered (Tisdale and Hironaka 1981, Hironaka et al. 1983).

[b] Percentage of seasonal habitat needed with indicated conditions.

[c] Measured as "droop height"; the highest naturally growing portion of the plant.

[d] Coverage should exceed 15% for perennial grasses and 10% for forbs; values should be substantially greater if most sagebrush has a growth form that provides little lateral cover (Schroeder 1995)

[e] Values for height and canopy coverage are for shrubs exposed above snow.1

by-case basis. Generally, fire should not be used in breeding habitats dominated by Wyoming big sagebrush if these areas support sage grouse. Fire can be difficult to control and tends to burn the best remaining nesting and early brood-rearing habitats (i.e., those areas with the best remaining understory), while leaving areas with poor understory. Further, we recommend against using fire in habitats dominated by xeric mountain big sagebrush (*A. t. xericensis*) because annual grasses commonly invade these habitats and much of the original habitat has been altered by fire (Bunting et al. 1987).

Although mining and energy development are common activities throughout the range of sage grouse, quantitative data on the long-term effects of these activities on sage grouse are limited. However, some negative impacts have been documented (Braun 1998, Lyon 2000). Thus, these activities should be discouraged in breeding habitats, but when they are unavoidable, restoration efforts should follow procedures outlined in these guidelines.

### Habitat protection

1) Manage breeding habitats to support 15–25% canopy cover of sagebrush, perennial herbaceous cover averaging ≥18 cm in height with ≥15% canopy cover for grasses and ≥10% for forbs and a diversity of forbs (Barnett and Crawford 1994, Drut et al. 1994a, Apa 1998) during spring (Table 3). Habitats meeting these conditions should have a high priority for wildfire suppression and should

not be considered for sagebrush control programs. Sagebrush and herbaceous cover should provide overhead and lateral concealment from predators. If average sagebrush height is >75 cm, herbaceous cover may need to be substantially greater than 18 cm to provide this protection. There is much variability among sagebrush-dominated habitats (Tisdale and Hironaka 1981, Hironaka et al. 1983), and some Wyoming sagebrush and low sagebrush breeding habitats may not support 25% herbaceous cover. In these areas, total herbaceous cover should be ≥15 % (Table 3). Further, the herbaceous height requirement may not be possible in habitats dominated by grasses that are relatively short when mature. In all of these cases, local biologists and range ecologists should develop height and cover requirements that are reasonable and ecologically defensible. Leks tend to be relatively open, thus cover on leks should not meet these requirements.



Sage grouse just leaving a nest in good-condition breeding habitat in southwestern Idaho. Note the height of grass and herbaceous cover.

2) For nonmigratory grouse occupying habitats that are distributed uniformly (i.e., habitats have the characteristics described in guideline 1 and are generally distributed around the leks), protect (i.e., do not manipulate) sagebrush and herbaceous understory within 3.2 km of all occupied leks. For nonmigratory populations, consider leks the center of year-round activity and use them as focal points for management efforts (Braun et al. 1977).

3) For nonmigratory populations where sagebrush is not distributed uniformly (i.e., habitats have the characteristics described in guideline 1 but distributed irregularly with respect to leks), protect suitable habitats for ≤5 km from all occupied leks. Use radiotelemetry, repeated surveys for grouse use, or habitat mapping to identify nesting and early brood-rearing habitats.

4) For migratory populations, identify and protect breeding habitats within 18 km of leks in a manner similar to that described for nonmigratory sage grouse. For migratory sage grouse, leks generally are associated with nesting habitats but migratory birds may move >18 km from leks to nest sites. Thus, protection of habitat within 3.2 km of leks may not protect most of the important nesting areas (Wakkinen et al. 1992, Lyon 2000).

5) In areas of large-scale habitat loss (≥40% of original breeding habitat), protect all remaining habitats from additional loss or degradation. If remaining habitats are degraded, follow guidelines for habitat restoration listed below.

6) During drought periods (≥2 consecutive years), reduce stocking rates or change manage-

ment practices for livestock, wild horses, and wild ungulates if cover requirements during the nesting and brood-rearing periods are not met. Grazing pressure from domestic livestock and wild ungulates should be managed in a manner that at all times addresses the possibility of drought.

7) Suppress wildfires in all breeding habitats. In the event of multiple fires, land management agencies should have all breeding habitats identified and prioritized for suppression, giving the greatest priority to those that have become fragmented or reduced by >40% in the last 30 years.

8) Adjust timing of energy exploration, development, and construction activity to minimize disturbance of sage grouse breeding activities. Energy-related facilities should be located >3.2 km from active leks whenever possible. Human activities within view of or <0.5 km from leks should be minimized during the early morning and late evening when birds are near or on leks.

*Habitat restoration*

1) Before initiating vegetation treatments, quantitatively evaluate the area proposed for treatment to ensure that it does not have sagebrush and herbaceous cover suitable for breeding habitat (Table 3). Treatments should not be undertaken within sage grouse habitats until the limiting vegetation factor(s) has been identified, the proposed treatment is known to provide the desired vegetation response, and land-use activities can be managed after treatment to ensure that vegetation objectives are met.

2) Restore degraded rangelands to a condition that again provides suitable breeding habitat for sage grouse by including sagebrush, native forbs

(especially legumes), and native grasses in reseeding efforts (Apa 1998). If native forbs and grasses are unavailable, use species that are functional equivalents and provide habitat characteristics similar to those of native species.

3) Where the sagebrush overstory is intact but the understory has been degraded severely and quality of nesting habitat has declined (Table 3), use appropriate techniques (e.g., brush beating in strips or patches and interseed with native grasses and forbs) that retain some sagebrush but open shrub canopy to encourage forb and grass growth.

4) Do not use fire in sage grouse habitats prone to invasion by cheatgrass and other invasive weed species unless adequate measures are included in restoration plans to replace the cheatgrass understory with perennial species using approved reseeding strategies. These strategies could include, but are not limited to, use of pre-emergent herbicides (e.g., Oust®, Plateau®) to retard cheatgrass germination until perennial herbaceous species become established.

5) When restoring habitats dominated by Wyoming big sagebrush, regardless of the techniques used (e.g., prescribed fire, herbicides), do not treat >20% of the breeding habitat (including areas burned by wildfire) within a 30-year period (Bunting et al. 1987). The 30-year period represents the approximate recovery time for a stand of Wyoming big sagebrush. Additional treatments should be deferred until the previously treated area again provides suitable breeding habitat (Table 3). In some cases, this may take <30 years and in other cases >30 years. If 2,4-D or similar herbicides are used, they should be applied in strips such that their effect on forbs is minimized. Because fire generally burns the best remaining sage grouse habitats



This breeding habitat is in poor condition because of a lack of understory.

(i.e., those with the best understory) and leaves areas with sparse understory, use fire for habitat restoration only when it can be convincingly demonstrated to be in the best interest of sage grouse.

6) When restoring habitats dominated by mountain big sagebrush, regardless of the techniques used (e.g., fire, herbicides), treat ≤20% of the breeding habitat (including areas burned by wildfire) within a 20-year period (Bunting et al. 1987). The 20-year period represents the approximate recovery time for a stand of mountain big sagebrush. Additional treatments should be deferred until the previously treated area again provides suitable breeding habitat (Table 3). In some cases, this may take <20 years and in other cases >20 years. If 2,4-D or similar herbicides are used, they should be applied in strips such that their effect on forbs is minimized.

7) All wildfires and prescribed burns should be evaluated as soon as possible to determine whether reseeding is necessary to achieve habitat management objectives. If needed, reseed with sagebrush, native bunchgrasses, and forbs whenever possible.

8) Until research unequivocally demonstrates that using tebuthiuron and similar-acting herbicides to control sagebrush has no long-lasting negative impacts on sage grouse habitat, use these herbicides only on an experimental basis and over a sufficiently small area that any long-term negative impacts are negligible. Because these herbicides have the potential of reducing but not eliminating sagebrush cover within grouse breeding habitats, thus stimulating herbaceous development, their use as sage grouse habitat management tools should be examined closely.



Nest habitat is measured in Owyhee County, southwestern Idaho.



John Crawford explains Oregon's sage grouse research program to field-trip attendees during a meeting of the Western States Sage and Columbian sharp-tailed Grouse Technical Committee.

### Summer-late brood-rearing habitat management

Sage grouse may use a variety of habitats, including meadows, farmland, dry lakebeds, sagebrush, and riparian zones from late June to early November (Patterson 1952, Wallestad 1975, Connelly 1982, Hanf et al. 1994). Generally, these habitats are characterized by relatively moist conditions and many succulent forbs in or adjacent to sagebrush cover.

#### Habitat protection

1) Avoid land-use practices that reduce soil moisture effectiveness, increase erosion, cause invasion of exotic plants, and reduce abundance and diversity of forbs.

2) Avoid removing sagebrush within 300 m of sage grouse foraging areas along riparian zones, meadows, lakebeds, and farmland, unless such removal is necessary to achieve habitat management objectives (e.g., meadow restoration, treatment of conifer encroachment).

3) Discourage use of very toxic organophosphorus and carbamate insecticides in sage grouse brood-rearing habitats. Sage grouse using agricultural areas may be adversely affected by pesticide applications (Blus et al. 1989). Less toxic agrichemicals or biological control may provide suitable alternatives in these areas.

4) Avoid developing springs for livestock water, but if water from a spring will be used in a pipeline or trough, design the project to maintain free water and wet meadows at the spring. Capturing water from springs using pipelines and troughs may adversely affect wet meadows used by grouse for foraging.

#### Habitat restoration

1) Use brush beating or other mechanical treatments in strips 4–8 m wide in areas with relatively high shrub-canopy cover (≥35% total shrub cover) to improve late brood-rearing habitats. Brush beating can be used to effectively create different age classes of sagebrush in large areas with little age diversity.

2) If brush beating is impractical, use fire or herbicides to create a mosaic of openings in mountain big sagebrush and mixed-shrub communities used as late brood-rearing habitats where total shrub cover is ≥35%. Generally, 10–20% canopy cover of sagebrush and ≤25% total shrub cover will provide adequate habitat for sage grouse during summer.

3) Construct water developments for sage grouse only in or adjacent to known summer-use areas and provide escape ramps suitable for all avian species and other small animals. Water developments and "guzzlers" may improve sage grouse summer habitats (Autenrieth et al. 1982, Hanf et al. 1994). However, sage grouse used these developments infrequently in southeastern Idaho because most were constructed in sage grouse winter and breeding habitat rather than summer range (Connelly and Doughty 1989).

4) Whenever possible, modify developed springs and other water sources to restore natural free-flowing water and wet meadow habitats.

### Winter habitat management

Sagebrush is the essential component of winter habitat. Sage grouse select winter-use sites based on snow depth and topography, and snowfall can affect the amount and height of sagebrush available to grouse (Connelly 1982, Hupp and Braun 1989, Robertson 1991). Thus, on a landscape scale, sage grouse winter habitats should allow grouse access to sagebrush under all snow conditions (Table 3).

#### Habitat protection

1) Maintain sagebrush communities on a landscape scale, allowing sage grouse access to sagebrush stands with canopy cover of 10–30% and heights of at least 25–35 cm regardless of snow cover. These areas should be high priority for wildfire suppression and sagebrush control should be avoided.

2) Protect patches of sagebrush within burned areas from disturbance and manipulation. These areas may provide the only winter habitat for sage grouse and their loss could result in the extirpation of the grouse population. They also are important

seed sources for sagebrush re-establishment in the burned areas. During fire-suppression activities do not remove or burn any remaining patches of sagebrush within the fire perimeter.

3) In areas of large-scale habitat loss ($\geq$40% of original winter habitat), protect all remaining sagebrush habitats.

*Habitat restoration*

1) Reseed former winter range with the appropriate subspecies of sagebrush and herbaceous species unless the species are recolonizing the area in a density that would allow recovery (Table 3) within 15 years.

2) Discourage prescribed burns >50 ha, and do not burn >20% of an area used by sage grouse during winter within any 20-30-year interval (depending on estimated recovery time for the sagebrush habitat).

## Conservation strategies

We recommend that each state and province develop and implement conservation plans for sage grouse. These plans should use local working groups comprised of representatives of all interested agencies, organizations, and individuals to identify and solve regional issues (Anonymous 1997). Within the context of these plans, natural resource agencies should cooperate to document the amount and condition of sagebrush rangeland remaining in the state or province. Local and regional plans should summarize common problems to conserve sage grouse and general conditions (Table 3) needed to maintain healthy sage grouse populations. Local differences in conditions that affect sage grouse populations may occur and should be considered in conservation plans. Natural resource agencies should identify remaining breeding and winter ranges in Wyoming big sagebrush habitats and establish these areas as high priority for wildfire suppression. Prescribed burning in habitats that are in good ecological condition should be avoided. Protection and restoration of sage grouse habitats also will likely benefit many other sagebrush obligate species (Saab and Rich 1997) and enhance efforts to conserve and restore sagebrush steppe.

Although translocating sage grouse to historical range has been done on numerous occasions, few attempts have been successful (Musil et al. 1993, Reese and Connelly 1997). Thus, we agree with Reese and Connelly (1997) that translocation

efforts should be viewed as only experimental at this time and not as a viable management strategy.

More information is needed on characteristics of healthy sagebrush ecosystems and the relationship of grazing to sage grouse production. Field experiments should be implemented to evaluate the relationship of grazing pressure (i.e., disturbance and removal of herbaceous cover) to sage grouse nest success and juvenile survival (Connelly and Braun 1997). The overall quality of existing sage grouse habitat will become increasingly important as quantity of these habitats decrease. Sage grouse populations appear relatively secure in some portions of their range and at risk in other portions. However, populations that have thus far survived extensive habitat loss may still face extinction because of a time lag between habitat loss and ultimate population collapse (Cowlishaw 1999).

*Acknowledgments.* This is a contribution from Colorado Federal Aid in Wildlife Restoration Project W-167-R, Idaho Federal Aid in Wildlife Restoration Project W-160-R, and Washington Federal Aid in Wildlife Restoration Project W-96-R. We thank state and federal representatives to the Western States Sage and Columbian Sharp-tailed Grouse Technical Committee for providing comments on earlier drafts. We are very grateful to A. D. Apa, J. A. Crawford, J.T. Flinders, T. P. Hemker, M. Pellant, and T. D. Rich for their contributions to the development of these guidelines. We also thank K. P. Reese and an anonymous reviewer for helpful comments on this manuscript. Finally, we greatly appreciate the thoughts and suggestions provided by many other individuals interested in conservation and management of sage grouse.

## Literature cited

ALDRIDGE, C. L. 1998. Status of the sage grouse (*Centrocercus urophasianus urophasianus*) in Alberta. Alberta Environmental Protection, Wildlife Management Division, and Alberta Conservation Association, Wildlife Status Report 13, Edmonton, Canada.

ALLEN, D. L. 1954. Our wildlife legacy. Funk and Wagnalls, New York, New York, USA.

ANONYMOUS. 1997. Gunnison sage grouse conservation plan, Gunnison Basin, Colorado. Colorado Division of Wildlife, Fort Collins, USA.

APA, A. D. 1998. Habitat use and movements of sympatric sage and Columbian sharp-tailed grouse in southeastern Idaho. Dissertation, University of Idaho, Moscow, USA.

AUTENRIETH, R. E. 1981. Sage grouse management in Idaho. Idaho Department of Fish and Game, Wildlife Bulletin 9, Boise, Idaho, USA.

AUTENRIETH, R. E., W. MOLINI, AND C. E. BRAUN. 1982. Sage grouse management practices. Western States Sage Grouse Committee, Technical Bulletin 1, Twin Falls, Idaho, USA.

BARNETT, J. F., AND J. A. CRAWFORD. 1994. Pre-laying nutrition of sage grouse hens in Oregon. Journal of Range Management 47: 114–118.

BATTERSON, W. M., AND W. B. MORSE. 1948. Oregon sage grouse. Oregon Game Commission Fauna Series 1, Portland, USA.

BECK, T. D. I. 1975. Attributes of a wintering population of sage grouse, North Park, Colorado. Thesis, Colorado State University, Fort Collins, USA.

BECK, T. D. I. 1977. Sage grouse flock characteristics and habitat selection during winter. Journal of Wildlife Management 41: 18–26.

BECK, T. D. I., AND C. E. BRAUN. 1980. The strutting ground count: variation, traditionalism, management needs. Proceedings of the Western Association of Fish and Wildlife Agencies 60: 558–566.

BENSON, L. A., C. E. BRAUN, AND W. C. LEININGER. 1991. Sage grouse response to burning in the big sagebrush type. Proceedings, issues and technology in the management of impacted western wildlife. Thorne Ecological Institute 5:97–104.

BERGERUD, A. T. 1988. Population ecology of North American grouse. Pages 578–648 in A. T. Bergerud and M. W. Gratson, editors. Adaptive strategies and population ecology of northern grouse. University of Minnesota, Minneapolis, USA.

BERRY, J. D., AND R. L. ENG. 1985. Interseasonal movements and fidelity to seasonal use areas by female sage grouse. Journal of Wildlife Management 49:237–240.

BLUS, L. J., C. S. Staley, C. J. Henny, G. W. Pendleton, T. H. Craig, E. H. Craig, and D. K. HALFORD. 1989. Effects of organophosphorus insecticides on sage grouse in southeastern Idaho. Journal of Wildlife Management 53:1139–1146.

BRADBURY, J. W., R. M. GIBSON, C. E. McCARTHY, AND S. L. VEHRENCAMP. 1989. Dispersion of displaying male sage grouse. II. The role of female dispersion. Behavioral Ecology and Sociobiology 24:15–24.

BRAUN, C. E. 1986. Changes in sage grouse lek counts with advent of surface coal mining. Proceedings, issues and technology in the management of impacted western wildlife. Thorne Ecological Institute 2:227–231.

BRAUN, C. E. 1987. Current issues in sage grouse management. Proceedings of the Western Association of Fish and Wildlife Agencies 67:134–144.

BRAUN, C. E. 1998. Sage grouse declines in western North America: what are the problems? Proceedings of the Western Association of State Fish and Wildlife Agencies 78:139–156.

BRAUN, C. E., AND T. D. I BECK. 1985. Effects of changes in hunting regulations on sage grouse harvest and populations. Pages 335–344 in S. L. Beasom and S. F. Roberson, editors. Game harvest management. Caesar Kleberg Wildlife Research Institute, Kingsville, Texas, USA.

BRAUN, C. E., T. BRITT, AND R. O. WALLESTAD. 1977. Guidelines for maintenance of sage grouse habitats. Wildlife Society Bulletin 5:99–106.

BRAUN, C. E., M. F. BAKER, R. L. ENG, J. W. GASHWILER, AND M. H. SCHROEDER. 1976. Conservation committee report on effects of alteration of sagebrush communities on the associated avifauna. Wilson Bulletin 88: 165–171.

BUNTING, S. C., B. M. KILGORE, AND C. L. BUSHEY. 1987. Guidelines for prescribed burning sagebrush-grass rangelands in the northern great basin. United States Department of Agriculture, Forest Service, General Technical Report INT-231, Ogden, Utah, USA.

CALL, M. W., AND C. MASER. 1985. Wildlife habitats in managed rangelands—the great basin of southeastern Oregon. Sage grouse. United States Department of Agriculture, Forest Service, General Technical Report PNW-187, Portland, Oregon, USA.

COGGINS, K. A. 1998. Sage grouse habitat use during the breeding season on Hart Mountain National Antelope Refuge. Thesis, Oregon State University, Corvallis, USA.

COMMONS, M. L., R. K. BAYDACK, AND C. E. BRAUN. 1999. Sage grouse response to pinyon-juniper management. Pages 238–239 in S. B. Monson and R. Stevens, compilers. Proceedings: ecology and management of pinyon-juniper communities. United States Department of Agriculture, Forest Service, RMRS-P9, Fort Collins, Colorado, USA.

CONNELLY, J. W., JR. 1982. An ecological study of sage grouse in southeastern Idaho. Dissertation, Washington State University, Pullman, USA.

CONNELLY, J. W., W. J. ARTHUR, AND O. D. MARKHAM. 1981. Sage grouse leks on recently disturbed sites. Journal of Range Management 52: 153–154.

Connelly, J. W., A. D. Apa, R. B. Smith, and K. P. Reese. 2000a. Effects of predation and hunting on adult sage grouse Centrocercus urophasianus in Idaho. Wildlife Biology 6: in press.

CONNELLY, J. W., AND C. E. BRAUN. 1997. Long-term changes in sage grouse Centrocercus urophasianus populations in western North America. Wildlife Biology 3/4:123–128.

CONNELLY, J. W., H. W. BROWERS, AND R. J. GATES. 1988. Seasonal movements of sage grouse in southeastern Idaho. Journal of Wildlife Management 52: 116–122.

CONNELLY, J. W., AND L. A. DOUGHTY. 1989. Sage grouse use of wildlife water developments in southeastern Idaho. Pages 167–173 in S. Stiver and G. Tsukomoto, editors. Symposium on wildlife water developments. Nevada Department of Fish and Game, Reno, USA.

CONNELLY, J. W., R. A. FISCHER, A. D. APA, K. P. REESE, AND W. L. WAKKINEN. 1993. Renesting of sage grouse in southeastern Idaho. Condor 95:1041–1043.

CONNELLY, J. W., AND O. D. MARKHAM. 1983. Movements and radionuclide concentrations of sage grouse in southeastern Idaho. Journal of Wildlife Management 47:169–177.

CONNELLY, J. W., K. P. REESE, R. A. FISCHER, AND W. L. WAKKINEN. 2000b. Response of sage grouse breeding population to fire in southeastern Idaho. Wildlife Society Bulletin 28:90–96.

CONNELLY, J. W., K. P. REESE, W. L. WAKKINEN, M. D. ROBERTSON, AND R. A. FISCHER. 1994. Sage grouse ecology report. Idaho Department of Fish and Game, Job Completion Report W-160-R-19, Subproject 9, Boise, Idaho, USA.

CONNELLY, J. W., W. L. WAKKINEN, A. D. APA, AND K. P. REESE. 1991. Sage grouse use of nest sites in southeastern Idaho. Journal of Wildlife Management 55:521–524.

COWLISHAW, G. 1999. Predicting the pattern of decline of African primate diversity: an extinction debt from historical deforestation. Conservation Biology 13:1183–1193.

DALKE, P. D., D. B. PYRAH, D. C. STANTON, J. E. CRAWFORD, AND E. F. SCHLATTERER. 1963. Ecology, productivity, and management of sage grouse in Idaho. Journal of Wildlife Management 27: 810–841.

DELONG, A. K. 1993. Relationships between vegetative structure and predation rates of artificial sage grouse nests. Thesis,

Oregon State University, Corvallis, USA.

DeLong, A. K., J. A. Crawford, and D. C. DeLong, Jr. 1995. Relationships between vegetational structure and predation of artificial sage grouse nests. Journal of Wildlife Management 59:88–92.

Dobkin, D. S. 1995. Management and conservation of sage grouse, denominative species for the ecological health of shrubsteppe ecosystems. United States Department of Interior, Bureau of Land Management, Portland, Oregon, USA.

Drut, M. S., J. A. Crawford, and M. A. Gregg. 1994a. Brood habitat use by sage grouse in Oregon. Great Basin Naturalist 54: 170–176.

Drut, M. S., W. H. Pyle, and J. A. Crawford. 1994b. Diets and food selection of sage grouse chicks in Oregon. Journal of Range Management 47:90–93.

Dunn, P. O., and C. E. Braun. 1986. Summer habitat use by adult female and juvenile sage grouse. Journal of Wildlife Management 50:228–235.

Edelmann, F. B., M. J. Ulliman, M. J. Wisdom, K. P. Reese, and J. W. Connelly. 1998. Assessing habitat quality using population fitness parameters: a remote sensing–GIS-based habitat-explicit population model for sage grouse (Centrocercus urophasianus). Idaho Forest, Wildlife and Range Experiment Station, Technical Report 25, Moscow, USA.

Edminster, F. C. 1954. American game birds of field and forest. Charles Scribner's Sons, New York, New York, USA.

Emmons, S. R., and C. E. Braun. 1984. Lek attendance of male sage grouse. Journal of Wildlife Management 48:1023–1028.

Eng, R. L. 1963. Observations on the breeding biology of male sage grouse. Journal of Wildlife Management 27:841–846.

Eng, R. L., and P. Schladweiler. 1972. Sage grouse winter movements and habitat use in central Montana. Journal of Wildlife Management 36:141–146.

Eng, R. L., E. J. Pitcher, S. J. Scott, and R. J. Greene. 1979. Minimizing the effect of surface coal mining on a sage grouse population by a directed shift of breeding activities. Pages 464–468 in G. A. Swanson, technical coordinator. The mitigation symposium: a national workshop on mitigating losses of fish and wildlife habitats. United States Department of Agriculture, Forest Service, General Technical Report RM-65, Fort Collins, Colorado, USA.

Enyeart, G. 1956. Responses of sage grouse to grass reseeding in the Pines area, Garfield County, Utah. Thesis, Utah State Agricultural College, Logan, USA.

Fischer, R. A. 1994. The effects of prescribed fire on the ecology of migratory sage grouse in southeastern Idaho. Dissertation, University of Idaho, Moscow, USA.

Fischer, R. A., A. D. Apa, W. L. Wakkinen, K. P. Reese, and J. W. Connelly. 1993. Nesting-area fidelity of sage grouse in southeastern Idaho. Condor 95:1038–1041.

Fischer, R. A., K. P. Reese, and J. W. Connelly. 1996a. An investigation on fire effects within xeric sage grouse brood habitat. Journal of Range Management 49:194–198.

Fischer, R. A., K. P. Reese, and J. W. Connelly. 1996b. Influence of vegetal moisture content and nest fate on timing of female sage grouse migration. Condor 98:868–872.

Fischer, R. A., K. P. Reese, and J. W. Connelly. 1997. Effects of prescribed fire on movements of female sage grouse from breeding to summer ranges. Wilson Bulletin 109:82–91.

Flinders, J. T. 1999. Restoration of sage grouse in Strawberry Valley, Utah, 1998–99 report. Utah Reclamation Mitigation and Conservation Commission, Progress Report. Brigham Young University, Provo, Utah, USA.

Gates, R. J. 1983. Sage grouse, lagomorph, and pronghorn use of a sagebrush grassland burn site on the Idaho National Engineering Laboratory. Thesis, Montana State University, Bozeman, USA.

Gates, R. J. 1985. Observations of the formation of a sage grouse lek. Wilson Bulletin 97:219–221.

Gill, R. B. 1965. Distribution and abundance of a population of sage grouse in North Park, Colorado. Thesis, Colorado State University, Fort Collins, USA.

Girard, G. L. 1937. Life history, habits, and food of the sage grouse, Centrocercus urophasianus Bonaparte. University of Wyoming, Publication 3, Laramie, USA.

Gratson, M. W., J. W. Unsworth, P. Zager, and L. Kuck. 1993. Initial experiences with adaptive resource management for determining appropriate antlerless elk harvest rates in Idaho. Transactions of the North American Wildlife and Natural Resources Conference 58:610–619.

Gray, G. M. 1967. An ecological study of sage grouse broods with reference to nesting, movements, food habits and sagebrush strip spraying in the Medicine Lodge drainage, Clark County, Idaho. Thesis, University of Idaho, Moscow, USA.

Gregg, M. A. 1991. Use and selection of nesting habitat by sage grouse in Oregon. Thesis, Oregon State University, Corvallis, USA.

Gregg, M. A., J. A. Crawford, M. S. Drut, and A. K. DeLong. 1994. Vegetational cover and predation of sage grouse nests in Oregon. Journal of Wildlife Management 58:162–166.

Hanf, J. M., P. A. Schmidt, and E. B. Groshens. 1994. Sage grouse in the high desert of central Oregon: results of a study, 1988–1993. United States Department of Interior, Bureau of Land Management, Series P-SG-01, Prineville, Oregon, USA.

Heath, B. J., R. Straw, S. H. Anderson, and J. Lawson. 1997. Sage grouse productivity, survival, and seasonal habitat use near Farson, Wyoming. Wyoming Game and Fish Department, Project Completion Report, Laramie, USA.

Higby, L. W. 1969. A summary of the Longs Creek sagebrush control project. Proceedings, Biennial Western States Sage Grouse Workshop 6:164–168.

Hironaka, M., M. A. Fosberg, and A. H. Winward. 1983. Sagebrush-grass habitat types of southern Idaho. Idaho Forest, Wildlife and Range Experiment Station, Bulletin 35, Moscow, Idaho, USA.

Holloran, M. J. 1999. Sage grouse (Centrocercus urophasianus) seasonal habitat use near Casper, Wyoming. Thesis, University of Wyoming, Laramie, USA.

Hornaday, W. T. 1916. Save the sage grouse from extinction, a demand from civilization to the western states. New York Zoological Park Bulletin 5:179–219.

Hulet, B. V. 1983. Selected responses of sage grouse to prescribed fire, predation, and grazing by domestic sheep in southeastern Idaho. Thesis, Brigham Young University, Provo, Utah, USA.

Hupp, J. W. 1987. Sage grouse resource exploitation and endogenous reserves in Colorado. Dissertation, Colorado State University, Fort Collins, USA.

Hupp, J. W., and C. E. Braun. 1989. Topographic distribution of sage grouse foraging in winter. Journal of Wildlife Management 53:823–829.

Jenni, D. A., and J. E. Hartzler. 1978. Attendance at a sage grouse lek: implications for spring censuses. Journal of Wildlife Management 42:46–52.

JOHNSON, K. H., AND C. E. BRAUN. 1999. Viability and conservation of an exploited sage grouse population. Conservation Biology 13:77–84.

KEISTER, G.P., AND M.J. WILLIS. 1986. Habitat selection and success of sage grouse hens while nesting and brooding. Oregon Department of Fish and Wildlife, Progress Report W-87-R-2, Sub-project 285, Portland, Oregon, USA.

KLEBENOW, D. A. 1969. Sage grouse nesting and brood habitat in Idaho. Journal of Wildlife Management 33:649–661.

KLEBENOW, D. A. 1970. Sage grouse versus sagebrush control in Idaho. Journal of Range Management 23:396–400.

KLEBENOW, D. A. 1972. The habitat requirements of sage grouse and the role of fire in management. Tall Timbers Fire Ecology Conference 12:305–315.

KLOTT, J. H., AND F. G. LINDZEY. 1990. Brood habitats of sympatric sage grouse and Columbian sharp-tailed grouse in Wyoming. Journal of Wildlife Management 54:84–88.

KLOTT, J. H., R. B. SMITH, AND C. VULLO. 1993. Sage grouse habitat use in the Brown's Bench area of south-central Idaho. United States Department of Interior, Bureau of Land Management, Idaho State Office, Technical Bulletin 93–4, Boise, Idaho, USA.

LYON, A. G. 2000. The potential effects of natural gas development on sage grouse (Centrocercus urophasianus) near Pinedale, Wyoming. Thesis, University of Wyoming, Laramie, USA.

LEONARD, K. M., K. P. REESE, AND J. W. CONNELLY. 2000. Distribution, movements, and habitats of sage grouse Centrocercus urophasianus on the Upper Snake River Plain of Idaho: changes from the 1950's to the 1990's. Wildlife Biology 6: in press.

MACK, R. N., AND J. N. THOMPSON. 1982. Evolution in steppe with few large, hooved mammals. American Naturalist 119: 757–773.

MACNAB, J. 1983. Wildlife management as scientific experimentation. Wildlife Society Bulletin 11:397–401.

MARTIN, N. S. 1970. Sagebrush control related to habitat and sage grouse occurrence. Journal of Wildlife Management 34: 313–320.

MARTIN, R. C. 1990. Sage grouse responses to wildfire in spring and summer habitats. Thesis, University of Idaho, Moscow, USA.

MCARTHUR, E. D., A. C. BLAUER, AND S. C. SANDERSON. 1988. Mule deer-induced mortality of mountain big sagebrush. Journal of Range Management 41:114–117.

MUSIL, D. D., J. W. CONNELLY, AND K. P. REESE. 1993. Movements, survival, and reproduction of sage grouse translocated into central Idaho. Journal of Wildlife Management 57:85–91.

MYERS, O. B. 1992. Sage grouse habitat enhancement: effects of sagebrush fertilization. Dissertation, Colorado State University, Fort Collins, USA.

NELLE, P. J., K. P. REESE, AND J. W. CONNELLY. 2000. The long-term effect of fire on sage grouse nesting and brood-rearing habitats on the Upper Snake River Plain. Journal of Range Management 53:586–591.

OWENS, M. K., AND B. E. NORTON. 1992. Interactions of grazing and plant protection on basin big sagebrush (Artemisia tridentata spp. tridentata) seedling survival. Journal of Range Management 45:257–262.

OYLER-MCCANCE, S. J., N. W. KAHN, K. P. BURNHAM, C. E. BRAUN, AND T. W. QUINN. 1999. A population genetic comparison of large and small-bodied sage grouse in Colorado using microsatellite and mitochondrial DNA markers. Molecular Ecology, 8: 1457–1465.

PATTERSON, R. L. 1952. The sage grouse in Wyoming. Sage Books, Denver, Colorado, USA.

PETERSEN, B. E. 1980. Breeding and nesting ecology of female sage grouse in North Park, Colorado. Thesis, Colorado State University, Fort Collins, USA.

PETERSON, J. G. 1970. The food habits and summer distribution of juvenile sage grouse in central Montana. Journal of Wildlife Management 34:147–155.

PETERSON, J. G. 1995. Ecological implications of sagebrush manipulation: a literature review. Montana Fish, Wildlife, and Parks, Helena, USA.

PYLE, W. H., AND J. A. CRAWFORD. 1996. Availability of foods of sage grouse chicks following prescribed fire in sagebrush–bitterbrush. Journal of Range Management 49:320–324.

PYRAH, D. B. 1972. Effects of chemical and mechanical sagebrush control on sage grouse. Montana Fish and Game Department, Job Completion Report W-105-R-6, Helena, USA.

REESE, K. P., AND J. W. CONNELLY. 1997. Translocations of sage grouse Centrocercus urophasianus in North America. Wildlife Biology 3/4:235–241.

REMINGTON, T. E., AND C. E. BRAUN. 1985. Sage grouse food selection in winter, North Park, Colorado. Journal of Wildlife Management 49:1055–1061.

REMINGTON, T. E., AND C. E. BRAUN. 1991. How surface coal mining affects sage grouse, North Park, Colorado. Proceedings, Issues and Technology in the Management of Impacted Western Wildlife. Thorne Ecological Institute 5:128–132.

ROBERTSON, M. D. 1991. Winter ecology of migratory sage grouse and associated effects of prescribed fire in southeastern Idaho. Thesis, University of Idaho, Moscow, USA.

ROGERS, G. E. 1964. Sage grouse investigations in Colorado. Colorado Game, Fish, and Parks Department, Technical Publication 16, Denver, Colorado, USA.

SAAB, V. A., AND T. D. RICH. 1997. Large-scale conservation assessment for neotropical migratory land birds in the interior Columbia River Basin. United States Department of Agriculture, Forest Service, General Technical Report PNW-GTR-399, Portland, Oregon, USA.

SAUER, J. R., J. E. HINES, J. FALLON AND G. GOUGH. 1997. The North American breeding bird survey, results and analysis 1996–98. Version 98.1. United States Geological Survey, Patuxent Wildlife Research Center, Laurel, Maryland, USA.

SAVAGE, D. E. 1969. Relation of sage grouse to upland meadows in Nevada. Nevada Fish and Game Commission, Job Completion Report, Project W-39-R-9, Job 12, Reno, Nevada, USA.

SCHOENBERG, T. J. 1982. Sage grouse movements and habitat selection in North Park, Colorado. Thesis, Colorado State University, Fort Collins, USA.

SCHROEDER, M. A. 1995. Productivity and habitat use of sage grouse in north-central Washington. Washington Department of Fish and Wildlife, Job Progress Report Project W-96-R, Olympia, USA.

SCHROEDER, M. A. 1997. Unusually high reproductive effort by sage grouse in a fragmented habitat in north-central Washington. Condor 99:933–941.

SCHROEDER, M. A., J. R. YOUNG, AND C. E. BRAUN. 1999. Sage grouse (Centrocercus urophasianus). Pages 1–28 in A. Poole and F. Gill, editors. The birds of North America, No. 425. The Birds of North America, Philadelphia, Pennsylvania, USA.

SIME, C. A. 1991. Sage grouse use of burned, non-burned, and seeded vegetation communities on the Idaho National

Engineering Laboratory, Idaho. Thesis, Montana State University, Bozeman, USA.

SVEUM, C. M. 1995. Habitat selection by sage grouse hens during the breeding season in south-central Washington. Thesis, Oregon State University, Corvallis, USA.

SVEUM, C. M., W. D. EDGE, AND J. A. CRAWFORD. 1998a. Nesting habitat selection by sage grouse in south-central Washington. Journal of Range Management 51:265-269.

SVEUM, C. M., J. A. CRAWFORD, AND W. D. EDGE. 1998b. Use and selection of brood-rearing habitat by sage grouse in south-central Washington. Great Basin Naturalist 58:344-351.

SWENSON, J. E. 1986. Differential survival by sex in juvenile sage grouse and gray partridge. Ornis Scandinavica 17:14-17.

SWENSON, J. E., C. A. SIMMONS, AND C. D. EUSTACE. 1987. Decrease of sage grouse Centrocercus urophasianus after plowing of sagebrush steppe. Biological Conservation 41:125-132.

TATE, J., JR., M. S. BOYCE, AND T. R. SMITH. 1979. Response of sage grouse to artificially created display ground. Pages 464-468 in G. A. Swanson, technical coordinator. The mitigation symposium: a national workshop on mitigating losses of fish and wildlife habitats. United States Department of Agriculture, Forest Service, General Technical Report RM-65, Fort Collins, Colorado, USA.

TISDALE, E. W., AND M. HIRONAKA. 1981. The sagebrush-grass region: a review of the ecological literature. Idaho Forest, Wildlife, and Range Experiment Station, Bulletin 33, Moscow, USA.

TRUEBLOOD, R. W. 1954. The effect of grass reseeding in sagebrush lands on sage grouse populations. Thesis, Utah State Agricultural College, Logan, USA.

VALE, T. R. 1975. Presettlement vegetation in the sagebrush-grass area of the Intermountain West. Journal of Range Management 28:32-36.

VALLENTINE, J. F. 1989. Range development and improvements. Third edition. Academic, San Diego, California, USA.

VALLENTINE, J. F. 1990. Grazing management. Academic, San Diego, California, USA.

WAKKINEN, W. L. 1990. Nest site characteristics and spring-summer movements of migratory sage grouse in southeastern Idaho. Thesis, University of Idaho, Moscow, USA.

WAKKINEN, W. L., K. P. REESE, AND J. W. CONNELLY. 1992. Sage grouse nest locations in relation to leks. Journal of Wildlife Management 56:381-383.

WALLESTAD, R. O. 1971. Summer movements and habitat use by sage grouse broods in central Montana. Journal of Wildlife Management 35:129-136.

WALLESTAD, R. O. 1975. Life history and habitat requirements of sage grouse in central Montana. Montana Fish and Game Department, Technical Bulletin, Helena, USA.

WALLESTAD, R. O., AND D. B. PYRAH. 1974. Movement and nesting of sage grouse hens in central Montana. Journal of Wildlife Management 38:630-633.

WALLESTAD, R. O., AND P. SCHLADWEILLER. 1974. Breeding season movements and habitat selection of male sage grouse. Journal of Wildlife Management 38:634-637.

WALLESTAD, R. O., J. G. PETERSON, AND R. L. ENG. 1975. Foods of adult sage grouse in central Montana. Journal of Wildlife Management 39:628-630.

WAMBOLT, C. L., AND G. F. PAYNE. 1986. An 18-year comparison of control methods for Wyoming big sagebrush in southwestern Montana. Journal of Range Management 39:314-319.

WELCH, B. L., J. C. PEDERSON, AND R. L. RODRIQUEZ. 1988. Selection of big sagebrush by sage grouse. Great Basin Naturalist 48: 274-279.

WELCH, B. L., F. J. WAGSTAFF, AND J. A. ROBERSON. 1991. Preference of wintering sage grouse for big sagebrush. Journal of Range Management 44:462-465.

YOUNG, J. R. 1994. The influence of sexual selection on phenotypic and genetic divergence among sage grouse populations. Dissertation, Purdue University, West Lafayette, Indiana, USA.

ZABLAN, M. A. 1993. Evaluation of sage grouse banding program in North Park, Colorado. Thesis, Colorado State University, Fort Collins, USA.



John W. (Jack) Connelly (left) is a wildlife research biologist with the Idaho Department of Fish and Game. He received his B.S. in fish and wildlife resources from the University of Idaho and M.S. in wildlife biology and Ph.D. in zoology from Washington State University. He has been a member of The Wildlife Society for 25 years and is past-president of the Idaho Chapter and current president of the Northwest Section. He has been involved with research on sage grouse since 1977. Michael A. (Mike) Schroeder (right) is the upland bird research biologist for the Washington Department of Fish and Wildlife. He received his B.S. in wildlife ecology from Texas A&M University, M.S. in zoology from the University of Alberta, and Ph.D. in wildlife biology from Colorado State University. He has been a member of The Wildlife Society for 21 years. He has been studying Washington populations of sage grouse, sharp-tailed grouse, and spruce grouse since 1992. Alan R. Sands retired after 21 years as a wildlife biologist for the Bureau of Land Management and is now employed by The Nature Conservancy as a field representative for southwestern Idaho. He received his B.A. in math and science from San Diego State University and M.S. in wildlife management from Humboldt State University. He has been a member of The Wildlife Society for 25 years and is past vice-president of the Idaho Chapter. Clait E. Braun (center) recently retired from the Colorado Division of Wildlife. He received his B.S. in soil science from Kansas State University, M.S. from the University of Montana in forest wildlife management, and Ph.D. from Colorado State University in wildlife biology. He has been a member of The Wildlife Society for 39 years and is past-editor of The Journal of Wildlife Management, past-president of the Central Mountain and Plains Section, past Council Member, and past-president of The Wildlife Society.

# Exhibit R

**NRDC, et al. v. Kempthorne, et al.**

# A Blueprint for Sage-grouse Conservation and Recovery

Prepared by

Clait E. Braun, Ph.D.

Grouse Inc.
Tucson, Arizona

**May 2006**

# TABLE OF CONTENTS

| | Page | |
|---|---|---|
| Abstract | | 3 |
| Introduction | | 3 |
| Statement of Problem | | 3 |
| Goals | | 4 |
| Habitat Needs Overview | | 4 |
| Management of Development | | 5 |
|     Noise | | 5 |
|     Physical Disturbance | | 5 |
| Management of Fire | | 6 |
|     Prescribed Fire | | 6 |
|     Wild Fire | | 6 |
| Management of Grazing | | 7 |
|     Livestock | | 7 |
|     Wildlife | | 8 |
| Management of Habitat Fragmentation | | 8 |
| Management of Invasive Species | | 9 |
|     Cheatgrass | | 9 |
|     Pinyon/Juniper | | 9 |
| Management of Rangeland Seedings | | 9 |
| Management of Roads | | 10 |
| Management of Structures | | 11 |
| Management of Vegetation | | 12 |
| Management of Water | | 13 |
| Where Should Management Focus Be Placed? | | 13 |
| How Should Success Be Measured? | | 14 |
| Conclusions | | 14 |
| Recommendations | | 15 |
| Literature Cited | | 16 |
| About the Author | | 20 |
| Appendix | | 21 |

*Abstract:* The distribution of greater sage-grouse (*Centrocercus urophasianus*) has declined by at least 44% while overall abundance has decreased by up to 93% from presumed historic levels. These decreases are the result of habitat loss, fragmentation, and degradation. Federal and state public land management agencies currently are responsible for about 70% of the remaining sagebrush (*Artemisia* spp.) steppe, with the Bureau of Land Management and U.S. Forest Service managing most of these lands for multiple uses. The goals of strategies outlined here are to improve sagebrush habitats to increase greater sage-grouse abundance by at least 33% by 2015, and overall distribution of greater sage-grouse by at least 20% by 2030. The abundance goal is achievable following recommendations presented in this document while the distribution goal will be more difficult to obtain. Federal land management agencies are key to achieving both goals, as they are responsible for managing public lands, which support most of the remaining populations of greater sage-grouse. Improved vegetation management to restore degraded habitat (from domestic livestock grazing and development, such as from mining and gas/oil extraction) followed by reduction of habitat fragmentation has the greatest potential for maintaining and enhancing viable populations of greater sage-grouse. While the habitat management strategies and recommendations in this report focus on greater sage-grouse, they are also applicable to Gunnison sage-grouse (*Centrocercus minimus*).

## Introduction

Sage-grouse (*Centrocercus urophasianus, C. minimus*) are dependent upon sagebrush (*Artemisia* spp.) and were historically widespread and at least locally abundant (Patterson 1952, Schroeder et al. 2004). Concern about the decrease in the abundance of sage-grouse is not only recent (Connelly and Braun 1997, Braun 1998, Connelly et al. 2004) but also long-term (Hornaday 1916, Patterson 1952). Sagebrush was also historically widely distributed in western North America (Küchler 1964, Vale 1975, Miller and Eddleman 2001, Schroeder et al. 2004). In the United States, about 70% of the remaining sagebrush steppe and distribution of sage-grouse is on public land, with most (~50% of all publicly owned sagebrush steppe) managed by the U. S. Department of Interior, Bureau of Land Management (BLM) (Connelly et al. 2004). Thus, the BLM and the U.S. Forest Service (USFS) (U.S. Department of Agriculture) have the greatest potential to positively impact sage-grouse abundance and distribution provided effective policies and conservation actions are implemented that will benefit sagebrush steppe habitats. Overall, the "responsibility for maintaining sagebrush habitats and [sage-grouse] populations rests squarely on public land management agencies because most [of the] species' [home] range [is] owned publicly and managed by state or federal agencies" (Knick et al. 2003:627, Connelly et al. 2004).

## Statement of Problem

The abundance and distribution of greater sage-grouse (*Centrocercus urophasianus*) have declined. Sage-grouse historically occupied at least 1,247,004 km² in western North America of which at least 1,200,483 km² were occupied by greater sage-grouse (Schroeder et al. 2004). Greater sage-grouse now occupy about 668,412 km² of

their estimated historical distribution and have been extirpated from 1 state (Nebraska) and 1 Canadian province (British Columbia) (Braun 1998). There are no data on historical numbers (pre-European settlement) but estimates range from at least 2 to 10 million birds (C. E. Braun, illustrated presentation to the Western Association of Fish and Wildlife Agencies, Jackson Hole, Wyoming, July 1998). Braun (1998) further presented estimated breeding population levels by state and province based on counts of male sage-grouse in spring 1998 as reported by state and provincial biologists. The total was presented as ~142,000 sage grouse (Braun 1998:141). This suggests a decrease of ~93% in overall abundance if the minimum historical estimate of 2 million sage grouse is used. Braun (1998) generally classified reasons for the apparent decrease in sage-grouse abundance as the result of habitat loss, habitat fragmentation, and habitat degradation. More recently, Connelly et al. (2004:13-4) indicated that of 41 populations defined for their analysis, 5 populations have been extirpated or have numbers too small to monitor, and 14 additional populations face a high risk of extinction. The vast majority of remaining sage-grouse are in only 8 populations. Additionally, Connelly et al. (2004: 6-67) reported that an examination of all trend data from the 1940s to 2003 "suggest a substantial decline in the overall sage-grouse population in North America." Sage-grouse populations declined at an overall rate of 2.0% per year from 1965 to 2003 (Connelly et al. 2004). These authors (2004:6-71) concluded, "Continued loss and degradation of habitat and other factors…do not provide causes for optimism."

## Goals

With respect to conservation of sage-grouse and the species' habitats as well as other sagebrush obligate species, the overall goal of management of public lands should be to (1) maintain the present abundance and distribution of greater sage-grouse and (2) enhance the population viability of the species through habitat management that results in increased abundance and distribution. While it is necessary to understand past changes in abundance and distribution of greater sage-grouse, it is also important to understand the present status of the species and to work towards a goal of no net loss of sagebrush steppe presently or potentially useful to sage-grouse, no further loss of populations or subpopulations, and enhancement of sage-grouse numbers by one-third (33%) and overall distribution by one-fifth (20%) (from ~668,412 km² to 835,000 km²). The abundance goal can likely be achieved by 2015 while the enhanced distribution goal is longer term (2030). Both desired increases (33% in abundance, 20% in distribution) were selected (by C. E. Braun) because they should be achievable, detectable, and measurable using current technology. A 20% increase in distribution was selected, as it should be detectable. Smaller increases in distribution are not likely to be detectable or measurable.

## Habitat Needs Overview

The habitat needs of greater sage-grouse are reasonably well understood based on knowledge of what has been described as "used" by sage-grouse (extensive literature summarized in Braun et al. 1977, Connelly et al. 2000*b*, Braun et al. 2005). The basic seasonal periods relating to sage-grouse habitat needs have been described as winter (early to mid-December to early to mid-March), spring (early to mid-March to early to

mid-June), summer (early to mid-June to late September), and fall (late September to early to mid-December) depending upon elevation and weather conditions (Braun et al. 2005). A summary (Braun et al. 2005) of the existing literature is attached as an appendix.

## Management of Development

Development of sagebrush steppe could include agricultural uses (usually permanent loss), which includes converting sagebrush habitats to cropland, placement of ranch/farm buildings, or the replacement of native sagebrush habitats with seeded pasture lands. Development may also refer to permanent conversion of sagebrush habitats to urban, suburban, and exurban uses (housing), and related infrastructure. "Development" as used in this section refers primarily to energy development, which includes mining (coal, gold, trona, and other mineral deposits) and extraction of natural gas (including coal bed methane) and oil. The following are minimum recommendations for development in sage-grouse habitats as it has been documented that some populations of greater sage-grouse require larger areas for breeding, brood-rearing, winter-use, and security depending upon whether they are migratory or non-migratory (Connelly et al. 2000b).

### Noise

Sage-grouse are known to select display sites (leks) that are highly visible and which have good acoustic properties (Patterson 1952, Connelly et al. 2000b, Lyon 2000, Braun et al. 2002). Sage-grouse numbers on leks within 1.6 km (1 mile) of coal bed methane (CBM) compressor stations in Campbell County, Wyoming, were consistently lower than on leks not affected by this disturbance (Braun et al. 2002). Holloran and Anderson (2005) reported that lek activity by sage-grouse decreased downwind of drilling activities, suggesting that noise had measurable negative impacts on sage-grouse. Roads also generate noise and Connelly et al. (2004) indicated there were no active sage-grouse leks within 2 km of Interstate 80 (I-80) across southern Wyoming and only 9 leks were known to occur between 2 and 4 km of I-80. Lyon and Anderson (2003) reported that oil and gas development influenced the rate of nest initiation of sage-grouse in excess of 3 km of construction activities. Clearly, the amount and (likely) frequency of noise associated with development has major negative effects on greater sage-grouse.

Consequently, all drilling activities for gas and oil development should be prohibited within 5.5 km (3.3 miles) of active leks and their associated nesting areas (Holloran 2005). Further, all existing and new compressor stations should add noise abatement devices (mufflers) to reduce audible noise within 5.5 km of active leks. The actual level of noise (measured in decibels) that would not negatively affect greater sage-grouse breeding and nesting activities is presently unknown.

### Physical Disturbance

Greater sage-grouse are known to be negatively impacted by activities associated with mining, and oil and gas development (Remington and Braun 1991, Aldridge 1998, Lyon and Anderson 2003, Holloran and Anderson 2005). Besides the actual physical disturbance to the landscape caused by mining and oil and gas development activities, the

impacts of roads are also negative for sage-grouse (Connelly et al. 2004). There are numerous examples of active leks being abandoned once road use associated with mining and gas/oil development increased in close proximity (< 1 km) to leks and nesting habitat (Braun 1986).

All surface activity should be prohibited within 5.5 km (Holloran and Anderson 2004, 2005) of active sage-grouse leks. No surface occupancy is preferred to simply limiting use of areas to specific periods, as the latter does not appear to benefit sage-grouse. Roads should not be placed within 5.5 km (3.3 miles) of active leks. If roads are present, they should be seasonally closed during the sage-grouse breeding season from 1 March to 20 June.

## Management of Fire

### Prescribed Fire

Fire has been demonstrated to be negative for greater sage-grouse (Hulet 1983; Connelly et al. 2000*a*, *b*; Nelle et al. 2000) as it destroys winter and nesting habitats. Use of fire has been promoted by public land management agencies (both BLM and USFS) to reduce sagebrush cover and increase forbs. However, the only presumed value of this practice is to improve brood-use areas or remove encroaching conifers. The problems with use of prescribed fire relate to control of the fire (escapement is frequent), what is actually burned versus what was desired to be burned, and size of the planned burn. Too often, what is burned is nesting or winter-use areas and burned areas are too large (> 20 ha).

Prescribed fire should not be used in areas where invasion of cheatgrass (*Bromus tectorum*) or other exotic species is likely. Burned areas should be smaller than 20 ha in size and no more than 20% of the landscape (128 ac per section [640 ac]) should be burned over a 30-year interval in taller sagebrush types. Burning should not be permitted in low sagebrush habitat types (i.e., *Artemisia arbuscula, A. longiloba, A. nova*). Burning that benefits sage-grouse will most likely be that which affects brood habitat. There should be a demonstrated need for additional brood habitat before use of prescribed fire is considered. The goal is to not exceed 20% fire coverage (128 ac per section [640 ac]) over a 30-year period regardless of the total area planned to be burned. Reseeding should not be necessary for prescribed burns, as areas should be sufficiently small so that surrounding sagebrush habitat can reseed the areas naturally.

### Wild Fire

All wild fires should be vigorously suppressed except in areas where juniper (*Juniperus* spp.) or pinyon pine (*Pinus edulis*) has invaded (>20 trees/ha). Most wild fires are negative for sage-grouse in the short-term. If wild fires occur, grazing by domestic livestock should be immediately suspended and should not be reinstated for a minimum of 3 years. The present 2-year rest period from grazing that is often prescribed on public lands following wild fires is not based on data. Replicated studies are needed across the gradient of moisture regimes and habitat types to learn if 3 years or more are adequate for ecosystem renewal following wild fire. Most areas burned by wild fire do not require reseeding, as disking and other forms of site preparation can be harmful to site restoration. These are practices that promote livestock grazing, not habitat restoration. If

reseeding must be done to reduce soil erosion, it should occur in linear strips perpendicular to the prevailing wind except on steeper (>30%) slopes. Strips should be planted with dryland alfalfa, biennial sweet clover, native bunch grasses, and sagebrush seed in a ratio of 1 strip (10 m width) per 50 m. Areas closest to a potential fire source (roads or railroads) should be planted with a 20-m wide strip of fire resistant vegetation.

## Management of Grazing

Sound grazing management in sagebrush steppe should promote light use of herbaceous forage while having a neutral or positive impact on plant vigor. Further, proper livestock grazing should maintain or enhance desirable plant communities, improve vegetation palatability, increase native plant diversity, and promote residual vegetative cover. Extreme caution should be exercised in grazing sagebrush steppe until scientific evidence is obtained through replicated studies that demonstrate grazing improves, restores, or maintains the ecosystem. It is questionable if grazing of sagebrush-dominated rangelands that produce less than 448 kg per ha (400 lbs/ac) per year of herbaceous forage should be permitted. Domestic livestock grazing should not be permitted of any sagebrush steppe habitats that produce less than 224 kg per ha (200 lbs/ac) of herbaceous vegetation per year if successful sage-grouse nesting and brood rearing is an objective. Unfortunately, there are no replicated long-term studies of the effects of stocking rates for cattle in sagebrush grasslands (Holechek et al. 1999:12).

### Livestock

Grazing by domestic cattle can negatively impact nesting success of ground-nesting birds (Walsberg 2005). Several studies have demonstrated that greater sage-grouse nest success is higher where grass height and density is greater than at random sites (Wakkinen 1990, Gregg 1991). Thus, livestock grazing that reduces herbaceous cover in sagebrush steppe may negatively affect nest success of sage-grouse. Sites used by sage-grouse broods are characterized by higher species richness (Dunn and Braun 1986, Klott and Lindzey 1990, and others) with strong grass and forb components (Sveum et al. 1998). Excessive livestock use may damage these important areas.

Livestock stocking rates are most important in affecting forage use and residual herbaceous cover followed by timing of grazing and length of the grazing season. The most common prescription used by public land management agencies on public lands is that of 'moderate use'. Holechek et al. (1999:12) equated 'moderate use' to removal of an average of 43% (their Table 2) of the primary forage species. These authors found that moderate use resulted in rangeland deterioration in semi-arid grasslands. Holechek et al. (1999:15) recommended that no more than 30-35% use of annual herbaceous production would be necessary for improvement in rangeland vegetation versus the common recommendation of 50% use by the Natural Resources Conservation Service.

My recommendation, if livestock grazing is permitted on public rangelands, is to not exceed 25-30% utilization of herbaceous forage each year. Grazing should not be allowed until after 20 June and all livestock should be removed by 1 August with a goal of leaving at least 70% of the herbaceous production each year to form residual cover to benefit sage-grouse nesting the following spring. Twice-over grazing systems, where livestock pass through an area twice in a grazing season, should be avoided, and full

rotation of each subdivision of an allotment or at least on a pasture basis should occur once every 4 years. Winter grazing is generally less negative for herbaceous vegetation and sage-grouse than grazing during the growing season. Care should be used in calculating stocking rates to ensure that no more than 25-30% forage utilization is achieved. Winter grazing should not be initiated until plant growth has ceased for the year and should generally occur in the 15 November to 1 March interval. Larger pastures with fewer fences are better than smaller pastures. Water and salt should be placed near fences or fence corners, as these areas (fences and fence corners) tend to 'naturally' attract livestock. The goal should be to reduce livestock impacts in the centers of pastures or allotments. Because fences are generally negative for sage-grouse (Connelly et al. 2004), placement of water and salt near fences can be used to concentrate livestock impacts in areas removed from the more valuable habitats for sage-grouse.

## Wildlife

Native wildlife, primarily elk (*Cervus elaphus*), but also deer (*Odocoileus* spp.), pronghorn (*Antilocapra americana*), and hares (*Lepus* spp.), graze sagebrush steppe. Except in limited situations, such as within fenced pastures (to benefit domestic sheep which may prevent pronghorn movement), severe winter conditions, or unique situations (especially with hares), grazing by native wildlife species of particular sites is non-repetitive (unlike with domestic livestock). Hunting regulations by state and provincial agencies should keep populations of game animals within herd objectives. Management of elk can be difficult in achieving adequate harvests. State and provincial wildlife agencies should rigorously seek to manage elk within stated herd objectives or to reduce their numbers when sage-grouse habitat objectives are at risk. In areas where herd objectives cannot be met through legal hunting, reintroduction of native large predators should be considered.

'Wild' horses and burros also occupy some public lands and can cause habitat deterioration in areas important to sage-grouse. Efforts should be made to reduce or eliminate undocumented or permitted horses and burros on public lands important to sage-grouse where habitat deterioration is occurring.

## Management of Habitat Fragmentation

Fragmentation of habitats useful for greater sage-grouse is not of recent origin, but only recently has it been accorded proper recognition (Braun 1998, Connelly et al. 2004). There are many factors that can fragment habitats from conversion of habitat type (agriculture adjacent to sagebrush steppe), to fences, power lines, roads, reservoirs, wild fire, and prescribed burns. Essentially, any land use, development, or treatment that subdivides blocks of intact sagebrush causes fragmentation. Management of sagebrush steppe should focus on maintaining large (>1 cadastral section [2.59 km² or 1 mi²]) blocks of sagebrush steppe and preferably in excess of 20 cadastral sections [51.8 km² or 20 mi²] in size. These blocks should conserve habitat at the landscape scale with at least 1 large block per Township (36 cadastral sections [93.2 km² or 36 mi²]) throughout the sagebrush steppe. This recommendation is based on personal observations as well on published literature (Toepfer et al. 1990).

Continuity among habitat patches is desirable. Dispersal corridors should be preserved between and among blocks of habitats useful to greater sage-grouse. These corridors should be at least 1.6 km (1 mi) in width to reduce predator concentrations. Corridors should not contain roads, power lines, oil and gas developments, fences, or buildings.

## Management of Invasive Plant Species

Invasive plant species are becoming more widespread throughout public lands as a result of disturbance from livestock grazing, livestock feeding operations, roads, development, and other land uses. While there are numerous invasive species that may occur across the sagebrush steppe, those most important over large areas include cheatgrass, juniper and pinyon pine (both native species), as well as other exotic species. Control or elimination of exotic species should have the highest priority.

### Cheatgrass

Livestock management practices, fire, plowing/chaining, various types of development, and other practices have facilitated the spread of cheatgrass. Cheatgrass is palatable to livestock for only a short period during early growth in spring. It is a highly proficient seed producer and cannot be easily controlled by disking, plowing, grazing, or herbicides during the growing period or when mature. However, several pre-emergent herbicides have been demonstrated to reduce germination of cheatgrass (Connelly et al. 2000*b*). Reseeding cheatgrass-dominated areas with dryland alfalfa and native bunch grasses in strips (20 m width with every other strip being alfalfa/bunch grasses/biennial sweet clover/sagebrush) would appear to be effective in reducing cheatgrass abundance and may be more economical than use of herbicides.

### Pinyon/Juniper

Management of pinyon pine or juniper invasion can be achieved through cutting and burning (either or both) individual trees as well as use of prescribed fire over larger landscapes. Treatment of individual trees is most effective (but more expensive), as the live sagebrush and grass/forb understory is not burned (Commons et al. 1999).

## Management of Rangeland Seedings

Hundreds of thousands of hectares of former sagebrush steppe have been seeded with non-native forage species following plowing (to benefit livestock) or wild fire. Much of this area was reseeded with crested wheatgrass (*Agropyron cristatum*). Unfortunately, crested wheatgrass is of little use to sage-grouse as it provides poor cover and no food value. Sage-grouse seasonally consume forbs, insects, and sagebrush and do not eat grass seeds or leaves. Further, crested wheatgrass is a prolific seed producer with the ability to remain dominant on the landscape for periods exceeding 40 years. Crested wheatgrass is preferred forage for livestock and wild ungulates, especially during the growing period. It is capable of withstanding substantial grazing pressure and, once established, crested wheatgrass is difficult to replace with native bunchgrasses and sagebrush (due to competition and lack of seed sources).

Benign neglect has allowed portions (primarily the edges) of many seedings on public lands to revert in part to sage-grouse habitat. This is the result of sagebrush regeneration from seeds of live sagebrush in adjacent areas. Sage-grouse use these areas as density of sagebrush seedlings and canopy cover increases. Unfortunately, forb abundance in most crested wheatgrass seedings is very low (<3-5% cover) and sage-grouse use is mostly confined to foraging on young sagebrush plants. Crested wheatgrass seedings with less than 5% sagebrush canopy cover should be disked and reseeded in strips perpendicular to the prevailing wind to aid restoration of native habitats. Strips should be no more than 20 m in width in a ratio of 1 strip every 100 m. Strips should be planted with a mixture of dryland alfalfa, biennial sweet clover, native bunch grasses, and taller sagebrush (either mountain big sagebrush [*Artemisia tridentata vaseyana*] or Wyoming big sagebrush [*A. t. wyomingensis*] depending upon the site).

Biological control of crested wheatgrass seedings through manipulation of grazing intensity is possible but is negative to overall rangeland health as it results in severe overgrazing of all areas including adjacent native sagebrush steppe. This practice should not be promoted, as it will fail to control or eliminate crested wheatgrass. Chemical control of crested wheatgrass seedings also has little chance of success because of the abundant but dormant seed in the upper levels of the soil profile that are not affected by herbicides. Mechanical control through plowing or disking of the entire seeding followed by reseeding with desirable plant species also has little merit as it is expensive and exposes large expanses to wind erosion and exotic weeds. Plowing or disking (with or without reseeding) also has little chance of success because of the abundant amount of crested wheatgrass seed in the upper soil profile. Thus, the best scenario is to disk strips into crested wheatgrass seedings horizontal to the prevailing wind and replant desired vegetation (in strips) while protecting all larger sagebrush plants that may be present to serve as seed sources. Additional strips should be disked and reseeded at 3-5 year intervals depending upon site and results from the initial strips (adaptive management).

### Management of Roads

Roads are known to reduce the value of potential breeding habitats for greater sage-grouse (Connelly et al. 2004), cause lek abandonment (Braun 1986), and lead to death (from collisions). Road densities are increasing within occupied sage-grouse habitats. A recent study in the Upper Green River Valley, Wyoming found that all remaining greater sage-grouse leks were within 5 km (3.1 miles) of a road and that 95% of the Jonah gas field had road densities greater than 3.2 km per 2.59 km² (2 miles/mile²) (Thomson et al. 2005). Distinction should be made among primary roads (usually paved), secondary roads (mostly gravel), and trails (usually dirt, commonly expressed as 2-tracks). Primary roads are most negative for greater sage-grouse because of vehicle frequency, speed, and noise. Secondary roads can also be very negative depending again upon vehicle frequency, speed, and noise. Generally, trails are used seasonally and receive light vehicle use. Consequently, they are least problematic for sage-grouse.

Public land management agencies should have transportation plans for each forest, district, and resource area. Both permanent and seasonal road/trail closures are appropriate to reduce disturbance to sage-grouse during breeding activities and winter.

Most trails within occupied sage-grouse habitat should be closed during the breeding period and winter. Some secondary roads within 5 km of active leks should be closed during the 1 March-20 June period as well as during winter (December-February). All secondary roads and trails that traverse important sage-grouse areas should be reviewed and considered for permanent closure and revegetation.

Off-road vehicles (ORVs) should be prohibited except on designated trails and roads where sage-grouse use does not occur.

### Management of Structures

Greater sage-grouse did not evolve with structures. Sage-grouse commonly collide with fences, and power lines have been demonstrated to be negative as they may result in collisions resulting in injury to or death of birds (Connelly et al. 2004). Structures can also provide perch locations for raptors, especially golden eagles (*Aquila chrysaetos*), which prey upon sage-grouse during all seasons of the year, and corvids that prey on nests. Prior to the advent of human-made structures, raptors and corvids in sagebrush steppe used elevated natural sites from which to hunt. The addition of power line poles, fences, hay equipment and stacks, and abandoned buildings have greatly expanded the number of suitable perches for raptors in a landscape that is mostly devoid of trees (Connelly et al. 2004). Historically, there were large expanses of suitable habitat for sage-grouse with few elevated perch sites.

Utility companies should be required to fit all potential perch sites (poles, towers) for golden eagles with devices to deter perching (including power poles associated with oil and gas development). All unused power poles (and towers) should be removed and consideration should be given to elimination (and removal) of unnecessary power lines that traverse sage-grouse habitats. Existing power lines should be placed in corridors that follow road systems, especially those that are paved, to minimize impacts on the landscape. First priority for fitting power poles with raptor guards and or for removal of power lines should be given to areas within 5.5 km (3.3 miles) of active leks (at least line of sight). Second priority should be given to known sage-grouse winter-use areas, especially along windswept ridges and near large expanses of sagebrush that are not typically covered by snow in winter. Raptor predation during summer and early fall is usually a local problem and more a product of habitat quality (i.e., sage-grouse are limited to few areas of suitable habitat) than at other times of the year.

Metal fence posts are preferable to wooden posts for fencing as the former better discourage raptors from using them as perches. Fencing within 2 km of active leks should be discouraged as sage-grouse are more likely to collide with them as they fly to and from leks, frequently at low levels and in low light. Fences designed to prevent domestic sheep from escaping pastures should be eliminated as walking sage-grouse frequently will follow and not readily fly over them. Fences in sage-grouse areas should be of no more than 3-strands of wire with both the top and bottom wires being barbless. All unnecessary fences should be removed (wire and posts). If fences known to result in sage-grouse mortality cannot be removed, the top wire should be marked with permanent visual flagging.

## Management of Vegetation

Native sagebrush steppe vegetation should be given highest priority for management. Management should revolve around proper livestock grazing practices and not use of chemical or mechanical treatments. Grazing should be managed to ensure that sagebrush-dominated rangelands have the opportunity to recover from past management practices. The goal is to have healthy, self-sustaining native vegetation in which sagebrush comprises 10 to 25% of the vegetative canopy cover, grasses comprise 30-40%, and forbs comprise 15 to 20% of the ground cover. Holechek et al. (1999:15) indicate that livestock grazing, if the intent is to improve rangeland vegetative condition, should remove no more than 30-35% of the annual herbaceous growth. Some areas may require complete removal of livestock grazing for 3-5 years before grazing at lower stocking rates can resume. Improved management of grazing is the least expensive practice to restore degraded sagebrush steppe and should have the highest priority.

Chemicals such as 2,4-D and tebuthiuron have been widely used in attempts to eliminate or reduce sagebrush to increase livestock forage on public rangelands (Braun 1987, 1998). Use of 2,4-D has mostly been phased out for a variety of human health and environmental reasons (Braun 1998). Tebuthiuron is now favored for controlling sagebrush, especially to 'thin' sagebrush stands. Unfortunately, the effectiveness of this chemical is site dependent and is greatly affected by soil characteristics (Braun 1998) and continued livestock grazing. Application rates are critical and use of high rates or any chemical use on inappropriate soils can lead to total kill of sagebrush and forbs. For this reason, use of chemicals to 'thin' or control sagebrush is usually inappropriate for winter and breeding habitat.

Mechanical methods to manage sagebrush date to the 1930's and have involved brush beating, disking, chaining, and railing (Pechanic et al. 1954). These methods are relatively expensive and have mostly been used on small scales. They have the advantage of being able to be tailored to specific sites and will not 'escape' or 'drift' when compared to fire or use of chemicals. Of the available mechanical methods, use of brush beating is most appropriate as the desired results in terms of vegetation can reasonably be predicted. Brush beating or any other type of mechanical method to manage sagebrush should only be considered for 'better' range sites where vegetation response can be expected. These are normally areas where sagebrush canopy cover is >30%. Brush beating should be done in strips (usually 10-20 m in width) not to exceed one-quarter (25%) of the width of untreated strips. Strips should conform to the terrain and should not be straight lines but should be perpendicular to the prevailing wind. The design should result in a mosaic of sagebrush types with no more than 20-30% of the area being treated every 10-15 years (depending upon site). The goal is to set back sagebrush height (causing resprouting) and not death of all sagebrush plants. This can be accomplished by adjustment of the height of the mower blades. More recent advances such as the 'Dixie Harrow' and 'Lawson Aerator' may have merit but more scientific analysis of the results of using these devices is needed. Management of livestock grazing (reduction in or elimination of use for at least 2 years) is normally needed following brush beating or any mechanical treatment.

Use of fire to manage sagebrush steppe vegetation is usually inappropriate as it is difficult to control and frequently burns primarily winter and nesting habitats (Connelly et al. 2000a). Fire should generally be avoided or, at the least, restricted to small (<20 ha) sites where a lack of brood habitat has been documented to limit increases in sage-grouse populations.

### Management of Water

Greater sage-grouse have been documented to use open water, especially during dry seasons. They readily eat snow in winter and forage during summer and fall on succulent vegetation in mesic sites. This vegetation may be adjacent to agricultural areas, riparian habitats, or where water is allowed to flow over land at springs and ponds. The need for so-called wildlife "guzzlers" is questionable, as studies have failed to demonstrate increases in sage-grouse density in areas with guzzlers (Connelly and Doughty 1989). Surface water flow in summer is important as it promotes growth of succulent forbs, which are attractive to greater sage-grouse. Pipes and tanks (for livestock) have no value for sage-grouse unless water is available at ground level or is allowed to spill onto the ground. There should be no emphasis placed on improving water distribution for livestock as this negatively affects sage-grouse habitats in most cases outside of ponds. All seeps and springs, and associated mesic sites should be fenced to exclude large grazing animals including domestic sheep, cattle, horses, and burros. Livestock grazing has also impacted water tables by increasing sagebrush density and increasing soil erosion by reducing surface litter that slows runoff. Techniques useful to increasing water table levels include reduction of livestock grazing, sagebrush mowing, filling eroded drainages with (certified weed-free) straw bales, and creating check dams. These techniques are also useful in creating brood habitat for sage-grouse.

### Where Should Management Focus Be Placed?

Areas with existing sage-grouse populations should have the highest priority for conservation. The best scenario for improved sage-grouse abundance and distribution is to conserve habitats with existing populations and then work outward from those core areas to improve habitats in more peripheral areas. GIS (Geographic Information Systems) derived maps of present vegetation and soil potential should be used with overlays of past and planned treatments to prevent too much area from being treated in a 10-15+ year period. The goal should be to increase sage-grouse abundance and distribution. Increases in abundance will be easier to achieve.

Areas contiguous to existing populations which do not presently have sage-grouse or which have very small populations (100-300 birds) should have second priority for management. Review of GIS maps of vegetation and soil potential will frequently identify factors that are depressing sage-grouse populations when compared to similar maps where sage-grouse still persist in some number. Treatments to improve abundance and distribution of populations will vary from area to area. Grazing practices and development are the most obvious factors depressing sage-grouse populations followed by fragmentation caused by vegetation treatments, including fire.

## How Should Success Be Measured?

Changes in abundance of greater sage-grouse are best measured by monitoring the number of active leks in a discrete area (leks/10 km²) over a 3-5 year period. Total number of males counted in a given area over a 3-5 year period can also be used. Changes in estimated nest success and percent young based on wing surveys of hunter-harvested birds (where appropriate) may also provide useful data (Autenrieth et al. 1982, Connelly et al. 2003). Changes in the proportion of young to adult (and yearling) hens in the harvest can also be used to detect improvement in sage-grouse production.

Changes in distribution of greater sage-grouse can be derived from intensive searches for active leks in areas (based on GIS derived maps of potential habitat) where sage-grouse were not present in the previous 3-5 years. Random transects to assess seasonal changes in distribution of sage-grouse fecal pellets can also be used to assess changes in distribution. Even presence or absence line transect counts of either sage-grouse or their sign (pellets) can be useful. These surveys should be made at 3-5 year intervals.

Changes in vegetation such as % bare ground, % forb coverage, % grass coverage, % sagebrush cover, as well as height of residual herbaceous material can be used to assess changes in vegetative composition and quality of habitats. However, vegetation surveys are labor intensive, costly, and may be affected by weather conditions, rodents, insects, and grazing animals. It is highly unlikely that short-term changes can be detected without standardized plots, which are marked and uniformly evaluated. This is not likely to be done on a consistent basis over large areas of western North America. It will be difficult to measure success in vegetation improvement except over time in very localized sites.

## Conclusions

Habitat conservation strategies to improve the abundance and distribution of greater sage-grouse have not been scientifically tested because of the reluctance of public land management agencies to invest in replicated management experiments over sufficiently large areas to be able to detect responses. However, sufficient information is available to make management recommendations given that negative responses of sage-grouse (decreases in abundance and distribution) are measurable. Habitat loss is certainly measurable as are fragmentation and degradation of habitats. The most notable changes in the sagebrush steppe since European settlement are associated with repetitive grazing by domestic livestock and developments (no matter how 'development' is defined). It is logical to expect improvement in sage-grouse abundance, at the least, with changes in policies, regulations, and practices involving grazing of domestic livestock and development. Both of these factors are managed by the key public land management agencies (BLM and USFS) that together control in excess of 60% of the remaining sagebrush steppe occupied by greater sage-grouse. Improvement in distribution will be more difficult as restoration of useful sagebrush habitats in areas that have been burned or plowed and seeded to exotic grasses will be exceedingly slow.

Management practices that significantly reduce wild fire, reduce grazing intensity and forage utilization, and reduce or eliminate the spread of introduced annuals have the

best chance to positively impact abundance of greater sage-grouse. They will be the least expensive to implement. Development practices such as gas and oil exploration and production including surface infrastructure, which are obviously negatively affecting sage-grouse abundance and distribution, will be more expensive to change, but collectively changes in these practices could equal the gains expected to result from changes in livestock grazing practices.

Sufficient knowledge is available to begin implementing recommended practices that will positively affect greater sage-grouse. The key is to develop public support and the resolve within federal agencies to make the necessary changes.

### Recommendations

-First priority for habitat management should be areas where larger sage-grouse populations are still present. Management practices chosen should maintain the present abundance and distribution of sage-grouse.

-The second priority for habitat management is for areas where sage-grouse populations are small (<300 birds or 100 males counted on a 3-year moving average). Management practices should enhance sage-grouse abundance and distribution.

-A third priority should be to improve habitats in areas adjacent to existing populations.

-Sagebrush steppe management should focus on maintaining large (>1 cadastral section and preferably >20 cadastral sections in size) blocks of sagebrush habitat per Township (36 cadastral sections).

-No surface occupancy should be allowed within 5.5 km of all active sage-grouse leks.

-No roads should be constructed within 5.5 km of active sage-grouse leks.

-Existing roads within 5.5 km of active sage-grouse leks should have seasonal closures (1 March-20 June).

-Prescribed fires should be no larger than 20 ha with no more that 40% of each cadastral section being burned over a 15-year period.

-Wild fires in sagebrush steppe should be vigorously suppressed except in areas with >20 invasive conifer trees per ha.

-Livestock grazing should be deferred for 3 years following fires for recovery of herbaceous native vegetation.

-Livestock grazing should not remove more than 25-30% of the annual growth of herbaceous vegetation with grazing delayed until after 20 June. True rest rotation systems should be used and winter grazing is preferred.

-Where wildlife (deer and elk) herd objectives cannot be achieved through legal hunting, reintroduction and expansion of populations of large predators should be encouraged.

-Rangeland seedings of exotic grasses should be converted using reseeded strips of native bunchgrasses, adapted subspecies or species of sagebrush, and dryland alfalfa.

-Power lines should be placed only into existing road/utility corridors.

-Power poles and other existing human structures should either be removed, if not used, or fitted with raptor-deterrence devices.

-Fences in sage-grouse use areas should be no more than 3 strands with the top and bottom wires being barbless. Unused fences should be removed.

-Use of chemicals to 'manage' sagebrush should not be permitted. If sagebrush is to be managed to reduce density or to enhance vigor, mechanical methods are preferred.

-Sage-grouse have not been shown to need open water. However, water should be allowed to flow (seep) over the ground to encourage growth of succulent forbs.

-Active leks per unit of area and total number of male sage-grouse counted at proscribed (4 counts per breeding period spaced at 7-10 day intervals) should be used as the measure of success of management treatments followed by changes in % bare ground, % forb coverage, % grass cover, % sagebrush canopy cover, and height of residual herbaceous vegetation.

-Sage-grouse pellet transects should be used to measure expansion of birds into vacant or former habitat.

## Literature Cited

Aldridge, C. L. 1998. Status of the sage grouse (*Centrocercus urophasianus urophasianus*) in Alberta. Wildlife Status Report 13. Wildlife Management Division, Alberta Environmental Protection and Alberta Conservation Association, Edmonton, Canada.

Autenrieth, R. E., W. Molini, and C. E. Braun 1982. Sage grouse management practices. Technical Bulletin 1. Western States Sage Grouse Committee, Twin Falls, Idaho, USA.

Braun. C. E. 1986. Changes in sage grouse lek counts with advent of surface coal mining. Thorne Ecological Institute. Proceedings, Issues and Technology in The Management of Impacted Western Wildlife 2:227-231.

Braun, C. E. 1987. Current issues in sage grouse management. Proceedings of the Western Association of Fish and Wildlife Agencies 67:134-144.

Braun, C. E. 1998. Sage grouse declines in western North America: what are the problems. Proceedings of the Western Association of Fish and Wildlife Agencies 78:139-156.

Braun, C. E., T. Britt, and R. O. Wallestad. 1977. Guidelines for maintenance of sage grouse habitats. Wildlife Society Bulletin 5:99-106.

Braun, C. E., O. O. Oedekoven, and C. L. Aldridge. 2002. Oil and gas development in western North America: effects on sagebrush steppe avifauna with particular emphasis on sage grouse. Transactions of the North American Wildlife and Natural Resources Conference 67:337-349.

Braun, C. E., J. W. Connelly, and M. A. Schroeder. 2005.  Seasonal habitat requirements for sage-grouse: spring, summer, fall, and winter. Pages 38-42 *in* N. L. Shaw, M. Pellant, and S. B. Monsen, compilers. Sage-grouse habitat restoration symposium proceedings, 4-7 June 2001, Boise, Idaho, USA. U. S. Department of Agriculture, Forest Service, RMRS-P-38.

Commons, M.L., R. K. Baydack, and C. E. Braun. 1999. Sage grouse response to pinyon-juniper management. Pages 238-239 *in* S. B. Monsen and R. Stevens, compilers. Proceedings: ecology and management of pinyon-juniper communities within the Interior West. U. S. Department of Agriculture, Forest Service, RMRS-P-9.

Connelly, J. W., and C. E. Braun. 1997. Long-term changes in sage grouse *Centrocercus urophasianus* populations in western North America. Wildlife Biology 3:229-234.

Connelly, J. W., and L. A. Doughty. 1989. Sage grouse use of wildlife water developments in southeastern Idaho. Pages 167-173 *in* S. Stiver and G. Tsukomoto, editors. Symposium on wildlife water developments. Nevada Department of Fish and Game, Reno, USA.

Connelly, J. W., K. P. Reese, and M. A. Schroeder. 2003. Monitoring of greater sage-grouse habitats and populations. College of Natural Resources Experiment Station Bulletin 80. University of Idaho, Moscow, USA.

Connelly, J. W., K. P. Reese, R. A. Fischer, and W. L. Wakkinen. 2000*a*. Response of a sage grouse breeding population to fire in southeastern Idaho. Wildlife Society Bulletin 28:90-96.

Connelly, J. W., M. A. Schroeder, A. R. Sands, and C. E. Braun. 2000*b*. Guidelines to manage sage grouse populations and their habitats. Wildlife Society Bulletin 28:967-985.

Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. J. Stiver. 2004. Conservation assessment of greater sage-grouse and sagebrush habitats. Unpublished Report. Western Association of Fish and Wildlife Agencies, Cheyenne, Wyoming, USA.

Dunn, P. O., and C. E. Braun. 1986. Summer habitat use by adult female and juvenile sage grouse. Journal of Wildlife Management 50:228-235.

Gregg, M. A. 1991. Use and selection of nesting habitat by sage grouse in Oregon. Thesis. Oregon State University, Corvallis, USA.

Holechek, J. L., H. Gomez, F. Molinar, and D. Galt. 1999. Grazing studies: what we've learned. Rangelands 21(2): 12-16.

Holloran, M. J. 2005. Greater sage-grouse (*Centrocercus urophasianus*) population response to natural gas field development in western Wyoming. Dissertation. University of Wyoming, Laramie, USA.

Holloran, M. J., and S. H. Anderson. 2004. Sage-grouse response to natural gas field development in northwestern Wyoming. Proceedings of the Western Agencies Sage and Columbian sharp-tailed grouse Technical Committee 24:16.

Holloran, M. J., and S. H. Anderson. 2005. Greater sage-grouse population response to natural gas field development in western Wyoming: are regional populations affected by relatively localized disturbance? Transactions of the North American Wildlife and Natural Resources Conference 70:In Press.

Hornaday, W. T. 1916. Save the sage grouse from extinction, a demand from civilization to the western states. New York Zoological Park Bulletin 5:179-219.

Hulet, B. V. 1983. Selected responses of sage grouse to prescribed fire, predation, and grazing by domestic sheep in southeastern Idaho. Thesis. Brigham Young University, Provo, Utah, USA.

Klott, J. H., and F. G. Lindzey. 1990. Brood habitats of sympatric sage grouse and Columbian sharp-tailed grouse in Wyoming. Journal of Wildlife Management 54:84-88.

Knick, S. T., D. S. Dobkin, J. T. Rotenberry, M. A. Schroeder, W. M. Vander Haegen, and C. van Riper III. 2003. Teetering on the edge or too late? Conservation and research issues for avifauna of sagebrush habitats. Condor 105:611-634.

Küchler, A. W. 1964. Potential natural vegetation of the conterminous United States (map and manual). Special Publication 36. American Geographical Society, New York, USA.

Lyon, A. G. 2000. The potential effects of natural gas development on sage grouse (*Centrocercus urophasianus*) near Pinedale, Wyoming. Thesis. University of Wyoming, Laramie, USA.

Lyon, A. G., and S. H. Anderson. 2003. Potential gas development impacts on sage-

grouse nest initiation and movement. Wildlife Society Bulletin 31:486-491.

Miller, R. F., and L. E. Eddleman. 2001. Spatial and temporal changes of sage grouse habitat in the sagebrush biome. Agricultural Experiment Station Technical Bulletin 151. Oregon State University, Corvallis, USA.

Nelle, P. J., K. P. Reese, and J. W. Connelly. 2000. The long-term effect of fire on sage grouse nesting and brood-rearing habitats on the Upper Snake River Plain. Journal of Range Management 53:586-591.

Patterson, R. L. 1952. The sage grouse in Wyoming. Sage Books, Denver, Colorado, USA.

Pechanic, J. F., G. Stewart, A. P. Plummer, J. H. Roberson, and A. C. Hull. 1954. Controlling sagebrush on rangelands. Farmer's Bulletin 2072. U. S. Department of Agriculture, Washington, D.C., USA.

Remington, T. E., and C. E. Braun. 1991. How surface coal mining affects sage grouse, North Park, Colorado. Thorne Ecological Institute. Proceedings, Issues and Technology in the Management of Impacted Western Wildlife 5: 128-132.

Schroeder, M. A., C. L. Aldridge, A. D. Apa, J. R. Bohne, C. E. Braun, S. D. Bunnell, J. W. Connelly, P. A. Deibert, S. C. Gardner, M. A. Hilliard, G. D. Kobriger, S. M. McAdam, C. W. McCarthy, J. J. McCarthy, D. L. Mitchell, E. V. Rickerson, and S. J. Stiver. 2004. Distribution of sage-grouse in North America. Condor 106:363-376.

Sveum, C. M., J. A. Crawford, and W. D. Edge. 1998. Use and selection of brood-rearing habitat by sage grouse in south-central Washington. Great Basin Naturalist 58:344-351.

Thomson, J. L., T. S. Schaub, N. W. Culver, and P. C. Aengst. 2005. Wildlife at a crossroads: energy development in western Wyoming. Effects of roads on habitat in the Upper Green River Valley. The Wilderness Society, Washington, D.C., USA.

Toepfer, J. E., R. L. Eng, and R. K. Anderson. 1990. Translocating prairie grouse: what have we learned? Transactions of the North American Wildlife and Natural Resources Conference 55:569-579.

Vale, T. R. 1975. Presettlement vegetation in the sagebrush grass area of the Intermountain West. Journal of Range Management 28: 32-36.

Wakkinen, W. L. 1990. Nest site characteristics and spring-summer movements of migratory sage grouse in southeastern Idaho. Thesis. University of Idaho,

Moscow, USA.

Walsberg, G. E. 2005. Cattle grazing in a national forest greatly reduces nesting success in a ground-nesting sparrow. Condor 107:714-716.

---

## About The Author

Clait E. Braun has worked with sage-grouse as a researcher (1973-99) and consultant (2000-06), and has been a leader in publishing research and management articles on sage-grouse. Dr. Braun is a Certified Wildlife Biologist and has either worked in or extensively visited all states and provinces with current populations of sage-grouse. He retired from the Colorado Division of Wildlife where he was responsible for sage-grouse research from 1973 into 1999 and now operates Grouse Inc. providing professional guidance and reviews on sage-grouse and their habitats. This 'Blueprint' represents his professional experience and selected literature based on 30+ years of work with sage-grouse.

# Appendix

## Seasonal Habitat Requirements for Sage-grouse:

## Spring, Summer, Fall, and Winter[1]

(Citation: Braun, C. E., J. W. Connelly, and M. A. Schroeder. 2005. Pages 38-42 *in* N. L. Shaw, M. Pellant, and S. B. Monsen, compilers. Sage-grouse habitat restoration symposium proceedings, 4-7 June 2001, Boise, Idaho, USA. U. S. Department of Agriculture, Forest Service, RMRS-P-38.)

[1]The contents of this 'Blueprint' document have not been reviewed or approved by either of the 2 coauthors of the published paper referenced in the Appendix.

# Seasonal Habitat Requirements for Sage-Grouse: Spring, Summer, Fall, and Winter

Clait E. Braun
John W. Connelly
Michael A. Schroeder

**Abstract**—Sage-grouse (*Centrocercus minimus, C. urophasianus*) are dependent upon live sagebrush (*Artemisia* spp.) for all life processes across their entire range. This paper describes habitats used by sage-grouse as documented in the scientific literature. The leaves of sagebrush are eaten by sage-grouse throughout the entire year and comprise 99 percent of their winter diets. Spring (late March through May) habitats are those with intermixed areas of taller (40 to 80 cm) sagebrush with canopy cover of 15 to 25 percent and taller (>18 cm) grass/forb cover of at least 15 percent. Sites used for display have shorter vegetation, frequently few or only short sagebrush plants, but with taller, more robust sagebrush within 100 to 200 m that is used for escape cover. Nesting cover mimics that used overall during spring but with clumps of tall (>50 cm), dense (about 25 percent) live sagebrush and abundant forbs (>10 or 12 percent cover). Early brood rearing areas are those within 200 m (initial 3 to 7 days posthatch) to 1 km (up to 3 to 4 weeks posthatch) of nest sites. Forbs and taller (>18 cm) grasses are important for broods; forbs provide succulent foods, grasses provide hiding cover, and the grass/forb mixture supports insects used by chicks. Summer use areas are those with abundant succulent forbs with live, taller (>40 cm), and robust (10 to 25 percent canopy cover) sagebrush useful for cover. These areas continue to be used into fall when sage-grouse move to higher benches/ridges where they forage on remaining succulent forbs such as buckwheat (*Eriogonum* spp.) and switch to more use of sagebrush leaves. Winter (early December to mid-March) use areas are often on windswept ridges, and south to southwest aspect slopes as well as draws with tall, robust live sagebrush. Height (25 to 35 cm) of sagebrush above the surface of the snow in areas used in winter is important, as is canopy cover (10 to 30 percent). Management of habitats used by sage-grouse should initially focus on maintaining all present use areas. Practices to enhance sagebrush habitats to benefit sage-grouse are reviewed, as is the need to annually monitor sage-grouse numbers along with systematic monitoring of the health of sagebrush ecosystems.

Clait E. Braun is retired from the Colorado Division of Wildlife and operates Grouse, Inc., 5572 North Ventana Vista Road, Tucson, AZ 85750 U.S.A., FAX: (520) 529-0365; e-mail: sg-wtp@juno.com. John W. Connelly is Research Biologist, Idaho Department of Fish and Game. 1345 Barton Road, Pocatello, ID 83204 U.S.A.; e-mail: JCsagegrouse@aol.com. Michael A. Schroeder is Upland Bird Research Biologist, Washington Department of Fish and Wildlife, P.O. Box 1077, Bridgeport, WA 98813 U.S.A.; e-mail: schromas@dfw.wa.gov

In: Shaw, Nancy L.; Pellant, Mike; Monsen, Stephen B., comps. 2005. Sage-grouse habitat restoration symposium proceedings; 2001 June 4–7; Boise, ID. Proceedings RMRS-P-38. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

## Introduction

Sage-grouse (*Centrocercus minimus, C. urophasianus*) historically occurred in at least 16 States and three Canadian Provinces (Aldrich 1963; American Ornithologists' Union 1957; Johnsgard 1973). They have been extirpated in five States and one Canadian Province (Braun 1998; Connelly and Braun 1997) and their overall distribution has become discontinuous (fig. 1). The changes in sage-grouse distribution have been attributed to loss, fragmentation, and degradation of habitats (Braun 1995, 1998; Connelly and Braun 1997), and it is probable that at least one-half of the original occupied area can no longer support sage-grouse (Braun 1998). Because of the reduced amount of available habitat, sage-grouse abundance has also markedly decreased with reported declines of 10 to 51 percent (Connelly and Braun 1997) and as much as 45 to 82 percent since 1980 (Braun 1998). The known decreases in distribution and abundance have led to concern about stability of sage-grouse populations and the health of sagebrush ecosystems upon which they depend. Petitions to list sage-grouse under the Federal Endangered Species Act have been filed for northern sage-grouse (*C. urophasianus*) and for Gunnison sage-grouse (*C. minimus*).

Sage-grouse are dependent upon ecosystems with vast and relatively continuous expanses of live, robust, taller sagebrushes (*Artemisia* spp.) with a strong grass and forb component. This dependency upon sagebrush, especially the subspecies of big sagebrush (*A. tridentata vaseyana, A. t. wyomingensis, A. t. tridentata*), low sagebrush (*A. arbuscula*), black sagebrush (*A. nova*), silver sagebrush (*A. cana*), and three-tip sagebrush (*A. tripartita*), as well as a variety of less apparent and abundant species, has been well documented (Patterson 1952; reviews by Braun and others 1977 and Connelly and others 2000a). Since the early 1960s, the sage-grouse/sagebrush relationship has focused attention by Western States and Provinces on the need to maintain healthy sagebrush-steppe communities over large expanses. Guidelines for maintenance of sage-grouse habitats were developed from the scientific literature (Braun and others 1977, completely revised by Connelly and others 2000a) and promoted by the Western States Sage-Grouse Technical Committee. The purpose of this paper is to present an overview of the habitat needs of sage-grouse based on the scientific literature, identify the issues that affect maintenance of useful habitats for sage-grouse, and discuss management strategies to maintain, enhance, and restore habitats



**Figure 1**—Historic and current distribution of sage-grouse (map prepared by M. A. Schroeder).

for sage-grouse. This paper draws extensively on the published *Guidelines to Manage Sage Grouse Populations and Their Habitats* (Connelly and others 2000a).

## Habitat Overview

### Spring

Timing of spring breeding activities of sage-grouse is dependent on elevation and amount of persistent snow cover. Attendance at leks may start in early to mid-March or, at higher elevations, in early April. Males may attend and display at leks until late May but most display and mating activities are greatly reduced by mid-May. Amount and depth of snow cover greatly influence sage-grouse breeding activities; thus, snow-free areas are important components of spring habitat. Habitats used by sage-grouse during the breeding period are those associated with foraging, leks, escape, and nesting. Depending upon moisture regimes, height of sagebrush in used habitats varies from 30 to 80 cm with canopy cover from 15 to 25 percent (Connelly and others 2000a). Lek sites typically have low amounts of sagebrush and appear relatively bare, but they may have extensive

cover of low grasses and forbs. Taller, robust live sagebrush used as escape cover is normally within 100 to 200 m of active leks. The average distance from a nest to the nearest lek varies from 1.1 to 6.2 km, and the actual size of the breeding habitat appears largely dependent on the migratory characteristics of the sage-grouse population as well as distribution of sagebrush cover with respect to lek location (Connelly and others 2000a). Habitats selected for nesting are those with abundant (15 to 30 percent canopy cover) live, taller (30 to 80 cm) sagebrush plants within a community with >15 percent ground cover of taller (40 to 80 cm) grasses and forbs (Connelly and others 2000a). Early brood-rearing habitats (fig. 2) are normally those within 100 m to 1 km of nesting sites, especially areas with high plant species richness, moisture, and taller grasses and forbs (Connelly and others 2000a). Adult sage-grouse, while still foraging extensively on leaves of live sagebrush, eat leaves and flower parts of forbs during spring, as do chicks (Apa 1998; Drut and others 1994; Dunn and Braun 1986; Klott and Lindzey 1990).

### Summer

Habitats used by sage-grouse in summer (early to mid-June to mid to late September) are those that provide



Figure 2—Sage-grouse brood hen in good quality Wyoming big sagebrush habitat, North Park, Colorado (photograph by C. E. Braun).

into larger flocks frequently segregated by gender. Some birds may continue to use lower riparian or hayfield habitats, but there is movement onto higher, frequently north-aspect slopes where succulent native forbs, such as buckwheats, provide green forage. Use of sagebrush leaves for food becomes more common as does use of extensive stands (>20 percent canopy cover) of taller (>25 cm), live sagebrush (Connelly and others 2000a). Movements can be slow but there is a general shift toward traditional winter use areas (Connelly and others 1988).

## Winter

Flocks of sage-grouse are somewhat nomadic in early winter but may remain within chosen areas for periods of several weeks or more depending upon extent of snow cover and depth (Beck 1977; Hupp and Braun 1989b). Sagebrush height (>20 cm, but usually >30 cm, above the surface of the snow) is important as is the robust (>10 to 30 percent canopy cover) structure of live sagebrush (Connelly and others 2000a). Sage-grouse use a variety of sites in winter including windswept ridges with open (10 to 20 percent canopy cover) (fig. 4) stands of sagebrush to draws with dense (>25 percent canopy cover) stands. Quality of the snow can be important because sage-grouse are known to use snow roosts and burrows (Back and others 1987). Aspect is also important with south and southwest slopes most used in hilly terrain (Hupp and Braun 1989b). Leaves of live, vigorous sagebrush plants provide >99 percent of the foods eaten during the winter period (early December until early to mid-March) (Patterson 1952; Remington and Braun 1985; Wallestad and others 1975). Generally, winter is a time of body mass gain (Beck and Braun 1978), although severe winter conditions over prolonged intervals can reduce the amount of area available for foraging and cover (Beck 1977) and thus affect body condition (Hupp and Braun 1989a). Overall movement during winter may be extensive and home ranges can be large (Connelly and others 2000a). As winter wanes, flocks of sage-grouse move toward breeding areas that may be immediately adjacent to or far distant from winter use areas (Connelly and others 2000a).

adequate forage, especially succulent forbs, and cover useful for escape. These habitats may include those used for agriculture, especially for native and cultivated hay production, edges of bean and potato fields, as well as more typical sagebrush uplands and moist drainages. Taller (>40 cm) and robust (10 to 25 percent canopy cover) sagebrush is needed for loafing and escape cover as well as a source of food. Grass and forb ground cover can exceed 60 percent (hayfields). Provided moisture is available through water catchments or from succulent foliage, sage-grouse may be widely dispersed over a variety of habitats during this period (Connelly and others 2000a). As late summer approaches, there is movement from lower sites to benches and ridges (fig. 3) where sage-grouse forage extensively on leaves of sagebrush.

## Fall

Fall (late September into early December) is a time of change for sage-grouse from being in groups of hens with chicks or males and unsuccessful brood hens to separation



Figure 3—Radio-tracking sage-grouse in high-elevation summer range with a stand of mountain big sagebrush in the background (photograph by J. W. Connelly).



Figure 4—Sage-grouse winter range in Wyoming big sagebrush habitat in North Park, Colorado (photograph by C. E. Braun).

# Issues

Decreases in distribution and abundance of sage-grouse have been ascribed to a complexity of factors (Braun 1987, 1998; Connelly and Braun 1997). The three major causes, (1) habitat loss (mostly permanent), (2) fragmentation (frequently permanent but reversible at times), and (3) degradation (usually can be corrected), are generally accepted but the latter two are poorly recognized and understood. Examples of permanent habitat loss include conversion of sagebrush rangelands to agricultural crops, town and subdivision developments, placement of power plants or surface mines, and reservoir construction. Fragmentation of habitats occurs with power lines, paved and other high-speed road development (including maintenance and improvement of farm roads), habitat-type conversion projects, fire, or any permanent development that reduces the size of existing habitat patches. Less understood are the impacts of fences, seasonal use trails, oil and gas wells with active pipelines, noise, and so on. Some of these impacts can be resolved and sage-grouse will reoccupy some formerly disturbed areas (Braun 1987).

Distribution of habitat types useful to sage-grouse is also important, as this species are habitat specialists using a variety of areas within a larger landscape mosaic. Thus, not only is the quantity of sagebrush habitats important, but also the juxtaposition and quality of those habitats. All sagebrush habitats are not equal in their acceptability to sage-grouse, and location of areas used may affect sage-grouse distribution. Size of habitat patches is important and larger (>30 km$^2$) is better than smaller, although the spatial relationships of habitats for sage-grouse are not well understood. Sage-grouse use a mosaic of habitats that is normally present in sagebrush-steppe because of differences in soils, moisture, topography, aspect, insect defoliation, wildfires, and other factors. Sagebrush naturally regenerates as overmature plants die and seedlings become established. Use of the term "decadent" for sagebrush is generally inappropriate because it implies that sagebrush communities are not dynamic with a variety of age classes from seedlings to overmature. Since most sagebrush communities are resilient and represent a continuum of age classes within a mosaic of habitats, creation of "edge" to benefit sage-grouse is rarely needed. Because of human activities, the presence of too much edge (especially in straight lines) is more common than too little edge and results in degradation of sage-grouse habitats.

Sagebrush ecosystems have been managed through a variety of treatments from domestic livestock grazing, mechanical and chemical clearing or thinning, to use of prescribed fire (Braun 1998). Fire was a natural event in more mesic sagebrush communities but was infrequent as demonstrated by the lack of resprouting of big sagebrush, black sagebrush, and low sagebrush. Fire was more common in areas with three-tip sagebrush and silver sagebrush because both species resprout. Recent research suggests there is little gain in forage production of grasses and forbs after fire, because it can take longer than 30 years to return to preburn conditions (Wambolt and others 2001).

Treatments of sagebrush communities have primarily been conducted to benefit another treatment (livestock grazing). Use of some treatments has led to plantings of exotic grasses, invasion of areas by exotic plants, conifer invasion of sagebrush habitats, and increased fire frequency. Many, if not most, of these treatments have been applied to improve rangelands for domestic livestock but have had negative impacts on sagebrush communities and animals dependent on them (Braun and others 1976). Further, successive treatments have been applied to landscapes with little understanding of the cumulative effects that may impact both sagebrush-dependent animals, such as sage-grouse, and the overall health of the plant community. The impacts of natural events such as periodic drought are further exacerbated by human treatments of sagebrush communities. All of these issues emphasize the need for active protection of habitats presently used by sage-grouse as well as restoration of habitats that formerly supported sage-grouse populations.

# Sage-Grouse Habitat Management Strategies

The objectives of habitat management to benefit sage-grouse, in order of importance, should be (1) to protect and maintain existing occupied habitats, (2) enhance existing occupied habitats, (3) restore degraded habitats that still receive some sage-grouse use, and (4) rehabilitate significantly altered habitats that no longer support sage-grouse. Strategies to accomplish these objectives should include:

- Vigorous suppression of wildfire.
- Reconsideration of any use of prescribed fire.
- Proper livestock management (including reconsideration of time of grazing, stocking rates, season of use, and frequency of use).
- Use of nitrogen fertilizer, except in areas infested by annual weeds.
- Mechanical chopping of sagebrush.
- Fence type and placement.
- Water management.
- Rehabilitation and restoration techniques discussed in these proceedings.

At times, manipulation of some occupied sage-grouse habitat may be necessary to enhance the overall quality of a seasonal range. An example would be removing or reducing some sagebrush canopy cover in known breeding habitat to enhance a depleted understory. Removal of 57 percent of sagebrush cover resulted in a significant decline in a sage-grouse breeding population (Connelly and others 2000b) and degradation of early brood-rearing habitat (Fischer and others 1996). More recently, a wildfire that removed about 30 percent of the sagebrush cover in a breeding habitat resulted in a 60 percent decline in sage-grouse nest success (Connelly, unpublished data, 1998). Because of this information and the fact that wildfires, drought, and insect infestations cannot be predicted, any sagebrush removal efforts should affect a relatively small portion of the occupied habitat. Connelly and others (2000a) suggested that >80 percent of breeding and winter habitat with vegetative characteristics necessary for productive sage-grouse habitat should remain intact to adequately provide for the needs of sage-grouse. However, an even greater percentage should be protected if sage-grouse populations are declining or the population status is unknown. All proposed habitat

manipulations should carefully consider the current condition of habitat, status of the sage-grouse population, and likely outcome of the vegetation treatment, including recovery time necessary for the area to again provide adequate habitat for sage-grouse nesting and early brood rearing.

# Acknowledgments

We thank S. B. Monsen for inviting our participation in the symposium that led to these proceedings. We further thank all managers and researchers who have contributed to the scientific literature and our understanding of sage-grouse and their use of habitats. Much of our knowledge was gained through research supported through Colorado (CEB), Idaho (JWC), and Washington (MAS) Federal Aid to Wildlife Restoration Projects. This is a contribution from the Western States/Provinces Sage and Columbian Sharp-Tailed Grouse Technical Committee.

# References

Aldrich, J. W. 1963. Geographic orientation of American Tetraonidae. Journal of Wildlife Management. 27: 529–545.

American Ornithologists' Union. 1957. Check-list of North American birds. 5th ed. Baltimore, MD: Lord Baltimore Press. 691 p.

Apa, A. D. 1998. Habitat use and movements of sympatric sage and Columbian sharp-tailed grouse in southeastern Idaho. Moscow, ID: University of Idaho. 199 p. Dissertation.

Back, G. N.; Barrington, M. R.; McAdoo, J. K. 1987. Sage grouse use of snowburrows in northeastern Nevada. Wilson Bulletin. 99: 488–490.

Beck, T. D. I. 1977. Sage grouse flock characteristics and habitat selection in winter. Journal of Wildlife Management. 41: 18–26.

Beck, T. D. I.; Braun, C. E. 1978. Weights of Colorado sage grouse. Condor. 80: 241–243.

Braun, C. E. 1987. Current issues in sage grouse management. Proceedings of the Western Association of State Fish and Wildlife Agencies. 67: 134–144.

Braun, C. E. 1995. Distribution and status of sage grouse in Colorado. Prairie Naturalist. 27: 1–9.

Braun, C. E. 1998. Sage grouse declines in western North America: what are the problems? Proceedings of the Western Association of State Fish and Wildlife Agencies. 78: 139–156.

Braun, C. E.; Baker, M. F.; Eng, R. L.; Gashwiler, J. S.; Schroeder, M. H. 1976. Conservation Committee report on the effects of alteration of sagebrush communities on the associated avifauna. Wilson Bulletin. 88: 165–171.

Braun, C. E.; Britt, T.; Wallestad, R. O. 1977. Guidelines for maintenance of sage grouse habitats. Wildlife Society Bulletin. 5: 99–106.

Connelly, J. W. 1998. Unpublished data on file at: Idaho Department of Fish and Game, Pocatello, ID.

Connelly, J. W.; Braun, C. E. 1997. Long-term changes in sage grouse *Centrocercus urophasianus* populations in western North America. Wildlife Biology. 3: 229–234.

Connelly, J. W.; Browers, H. W.; Gates, R. J. 1988. Seasonal movements of sage grouse in southeastern Idaho. Journal of Wildlife Management. 52: 116–122.

Connelly, J. W.; Reese, K. P.; Fischer, R. A.; Wakkinen, W. L. 2000b. Response of a sage grouse breeding population to fire in southeastern Idaho. Wildlife Society Bulletin. 28: 90–96.

Connelly, J. W.; Schroeder, M. A.; Sands, A. R.; Braun C. E. 2000a. Guidelines to manage sage grouse populations and their habitats. Wildlife Society Bulletin. 28: 967–985.

Drut, M. S.; Crawford, J. A.; Gregg, M. A. 1994. Brood habitat use by sage grouse in Oregon. Great Basin Naturalist. 54: 170–176.

Dunn, P. O.; Braun, C. E. 1986. Summer habitat use by adult female and juvenile sage grouse. Journal of Wildlife Management. 50: 228–235.

Fischer, R. A.; Reese, K. P.; Connelly, J. W. 1996. An investigation on fire effects within xeric sage grouse brood habitat. Journal of Range Management. 49: 194–198.

Hupp, J. W.; Braun, C. E. 1989a. Endogenous reserves of adult male sage grouse during courtship. Condor. 91: 266–271.

Hupp, J. W.; Braun, C. E. 1989b. Topographic distribution of sage grouse foraging in winter. Journal of Wildlife Management. 53: 823–829.

Johnsgard, P. A. 1973. Grouse and quails of North America. Lincoln, NE: University of Nebraska Press. 553 p.

Klott, J. H.; Lindzey, F. G. 1990. Brood habitats of sympatric sage and sharp-tailed grouse in Wyoming. Journal of Wildlife Management. 54: 84–88.

Patterson, R. L. 1952. The sage grouse in Wyoming. Denver, CO: Sage Books, Inc. 341 p.

Remington, T. E.; Braun, C. E. 1985. Sage grouse food selection in winter, North Park, Colorado. Journal of Wildlife Management. 49: 1055–1061.

Wallestad, R. O.; Peterson, J. G.; Eng, R. L. 1975. Foods of adult sage grouse in central Montana. Journal of Wildlife Management. 39: 628–630.

Wambolt, C. L.; Walhof, K. S.; Frisina, M. R. 2001. Recovery of big sagebrush communities after burning in south-western Montana. Journal of Environmental Management. 61: 243–252.



*Fernleaf biscuitroot*

# Exhibit S

**NRDC, et al. v. Kempthorne, et al.**

# DECLARATION OF WALTER R. MERSCHAT

I, Walter Merschat, declare under penalty of perjury that:

1.   I live at 6670 Coates Road in Casper, Wyoming where I have lived since 1994. Prior to that I lived at 732 South Grant Street, Casper, Wyoming since 1976.

2.   I am a geologist specializing in geochemistry and president of Scientific Geochemical Services, a consulting firm which that does both exploration and environmental geochemistry world wide. I have conducted soil gas surveys over many parts of the United States as well as internationally including Panama, Mexico, Argentina, Chile, Egypt, Yemen, Ethiopia, Namibia, Oman, for major oil companies.

3.   I earned a B.S. and M.S. degree in Geology from Ohio University, Athens, Ohio.

4.   From 1976 through 1984, I worked for Gulf Oil Research Department locating buried deposits of oil and gas by seeking out light hydrocarbon vapor seeps including methane at the near surface. Through these methods, I was able to direct Gulf Oil Company towards areas favorable for hydrocarbon accumulations and further exploration efforts

5.   I visited a number of methane seeps on March 27, 2007 together with geologist Dr. Jay Lillegraven and Erik Molvar of Biodiversity Conservation Alliance. During this trip, we visited methane seeps along Cow Creek, Deep Gulch, and Wild Cow Creek Global Positioning System locations for each seep are provided in attached Table 1.

6.   At each methane seep, gas levels above the seep were measured with an ITX four-gas monitor to measure the Lower Explosive Limit (LEL) for any hydrocarbons escaping. LEL levels are expressed in percentage of gas concentration needed to sustain explosive levels, so an LEL of 100 would be the lower limit where explosive conditions would occur. LEL levels are provided in Table 1; four of the eight methane seeps measured showed LEL levels in excess of 100, indicating that explosive conditions existed at the time of measurement.

7.   At selected methane seeps, water samples were also taken using specially prepared 120ml glass serum bottles. The water samples were analyzed at Exploration Technologies, Inc. laboratory in Houston, Texas. Proper sampling methodology and appropriate Chain of Custody documentation was followed. Based on these data, gases emitted at seeps were virtually pure methane, with trace quantities of other hydrocarbons. Methane concentrations in water samples ranged from 7 to 100,918 parts per million, and volume of methane as a percentage of the total sample ranged from trace to 17.1%.

Attachment 5

8.  Some of the methane seeps along Deep Gulch and Wild Cow Creek take the form of mud volcanoes, with a buildup of terraces from sediment, indicating that they may have been present for many years. While very little water issued from these features, some of these mud volcanoes were discharging a large volume of gases, measurable in hundreds if not thousands of cubic feet per minute. Some of these mud volcanoes are among the largest-volume methane seeps I have ever seen in the world.

9.  Because no baseline data exists for methane volumes at pre-existing mud volcanoes prior to the onset coalbed methane exploratory operations, one can only speculate whether current volumes of methane output reflect historical volumes or have increased due to coalbed methane production activities nearby.

10.  At least one major methane seep, in the bed of Cow Creek about 20 meters downstream of its confluence with Deep Gulch, over steepened banks indicate that this methane seep is very recent in origin (within the past year or two, in my professional judgment). This methane seep is among the largest I've ever seen measuring approximately 8 feet in diameter and showed evidence of three major vents.

11.  Geologically, each of the seeps occurred in the Lewis shale, very close to its lower contact with the Almond sandstones and coals, the target for dewatering and coalbed methane production at exploratory pods of the Atlantic Rim coalbed methane project located approximately 3 miles to the west.

12.  During coalbed methane production, the target coal seam is dewatered to reduce the head pressure. Once the pressure is reduced, the methane separates from the coal, much like bubbles in a soda bottle once the lid is popped and the pressure released. Once the methane separates from the coal, it is free to diffuse toward the well bore, or toward faults or cracks in the bedrock, or toward the outcrop.

13.  The most likely explanation for the large volume of methane bubbling up at previously established mud volcanoes and for the formation of major new methane seeps is that the dewatering of the Almond coals at the nearby Atlantic Rim exploratory coalbed methane pods is releasing large quantities of methane gas which is escaping at or near the outcrop, possibly with the aid of mapped joints or faults in the bedrock that are present in the vicinity of the seeps.

14.  With the planned expansion of coalbed methane drilling in the immediate vicinity from a few score wells to 1,800, with the accompanying increase in large-scale dewatering of the Almond coals, it is likely that existing methane seeps along the outcrop will increase in their volume and danger level beyond what is seen today, and that new seeps will form.

15.  Methane is colorless, odorless, and tasteless. The only reason that the methane seeps were detected was that the large boils of bubbles indicated the escaping gas. On land, methane seeps of similar size are possible, but would not be

detectable visually. Such land-based seeps would only be detectable through intensive field survey with gas detecting equipment, or if vegetation was killed by the seep.

16. We also detected a methane seep on dry land approximately 20 m west from the seep described in paragraph 11. This demonstrates that at least some methane is seeping upward through the soil.

17. Methane seeps of this type potentially pose a serious threat to the health and safety of visitors, particularly hunters and other recreationists who might camp, build fires, or cook over small stoves in this area. A camper who pitched a tent over a methane seep could have the tent fill up with methane in the night, asphyxiating the victim or leading to an explosion if a spark or flame was lit.

18. Methane is also a global warming gas 12 to 20 times as potent as carbon dioxide, and thus causes significant impacts to global climate change independent of the health and safety threats to the public, to wildlife, and to vegetation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed on June 19, 2007, in Casper, Wyoming.

Walter Merschat



**Figure 1 (Above):** Newly formed methane seep near confluence of Deep Gulch and Cow Creek. **Figure 2 (Below):** Mud volcano of older origins along Deep Gulch.





Mud volcano at Wild Cow Creek; note nominal amount of water outflow (above); scale approx. 15 feet in diameter (below)



| | | | | Table 1 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 07-2829B | Merschat - Atlantic Rim | | | | | | | | | |
| Sample | Lat/Long | High LEL level | File name | Methane | Ethane | Ethylene | Propane | Propylene | i-Butane | n-Butane | Methane % | CO2 % | Ethene % | Ethane % |
| 1 | 41°19.528 107°37.373 | 24 | 154116 | 56616.863 | 4.831 | 0.024 | 0.064 | 0.003 | 0.037 | 0.082 | 6.022 | 0.31 | | |
| 2 | 41°19.488 107°37.543 | 25 | 154118 | 7.235 | 0.037 | 0.008 | 0.05 | 0.029 | 0.038 | 0.084 | 0 | 0.27 | | |
| 3 | 41°19.426 107°37.555 | 47 | 154119 | 20031.418 | 0.272 | 0.014 | 0.052 | 0.045 | 0.14 | 0.268 | 1.276 | 0.93 | | |
| 4 | 41°19.495 107°37.388 | 108 | | | | | | | | | | | | |
| 5 | 41°19.426 107°37.224 | no data | | | | | | | | | | | | |
| 6 | location unrecorded | 119 | 155088 MUD | | | | | | | | | | | |
| 7 | 41°19.417 107°37.195 | 3 | | | | | | | | | | | | |
| 7a | 41°19.416 107°37.208 | 174 | | | | | | | | | | | | |
| 8 | 41°19.372 107°37.214 | 268 | | | | | | | | | | | | |
| 9 | 41°16.456 107°37.205 | 44 | 155089 | 100918.25 | 0.008 | 0.004 | 0.012 | 0.002 | 0.013 | 0.05 | 17.101 | 0.24 | | |

Z:\vicki_temp\
07-2829B_data.xls

# Exhibit T

**NRDC, et al. v. Kempthorne, et al.**

# WYOMING
# OUTDOOR
# COUNCIL

262 Lincoln Street, Lander, Wyoming 82520
ph. (307) 332-7031 ~ fax (307) 332-6899

April 25, 2007

David Simons
Atlantic Rim Project Lead
BLM
Rawlins Field Office
P. O. Box 2407
Rawlins, WY 82301

Dear Mr. Simons:

I am writing on behalf of Wyoming Outdoor Council with regard to the Atlantic Rim
Project, for which the Environmental Impact Statement is complete, but for which your
office has not yet issued a Record of Decision.

Yesterday I attended meeting hosted by the Wyoming Department of Environmental
Quality, in Rawlins, concerning the recent appearance of mud pots in the Atlantic Rim
area. In attendance were representatives of the Department of Environmental Quality, the
Wyoming Oil and Gas Conservation Commission, Anadarko, and the Bureau of Land
Management. I believe it was Debbie Johnson representing the Bureau of Land
Management.

As you know, there has been increasing concern about reports that new and unexplained
mud pots have been occurring in the Atlantic Rim area, within the last year or two. This
coincides with the drilling and development of coal bed methane wells in this area, due to
a pilot project that the BLM approved. The drillers are Anadarko and Double Eagle
Petroleum. The report are that new mud pots, which have been tested to have methane
gas escaping from them, (also referred to as "methane springs") are appearing in this
area, and their location is in relatively close proximity to the CBM wells.

While we believe that the Department of Environmental Quality made a good case that
the appearance of these mud pots is not due to the reinjection of produced water (a
produced water disposal method being employed by Anadarko and Double Eagle), this
does not solve the mystery of the mud pots. While there was some claim by the DEQ
that these new mud pots could be simply naturally occurring phenomena, this is not the
most likely explanation, given the rapid and substantial increase in these methane springs
since the CBM drilling has started in the area.

*Protecting Wyoming's Natural Resources and Environment Since 1967*
100% Recycled Post-Consumer ◊ Acid Free ◊ Groundwood Free

Attachment 31

The evidence suggests that coal seam dewatering is causing this increase in mud pot activity in the area. The methane is appearing at the surface because it is being liberated by the dewatering of the coal seams that is occurring as part of the CBM development already taking place and being conducted by Double Eagle and Anadarko Petroleum. The most likely source that DEQ offered for these mud pots (at the meeting yesterday) are "near surface coals and/or abandoned gas wells that penetrate the coals." This is really two sides of the same coin. As explained at the meeting, there are many abandoned oil, gas and other wells in the area that may not be properly abandoned and plugged, and as such they are serving as conduits for the escaping methane gas that is leaving the coal seams (due to the dewatering of the seams). This is a very serious problem and, we believe, something that merits further investigation and analysis before the BLM can go forward with its Atlantic Rim proposal at this time.

As you know, the BLM is required to give a "hard look" to environmental impacts in any EIS in order to comply with NEPA. NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 553 (1978). Given what you now know about these mud pots, and their likely connection to the CBM drilling that has already been allowed as part of the pilot project, this problem cannot be ignored or postponed to be addressed after the project has already begun, through adaptive management. It is a very real impact and should be addressed and analyzed as part of the EIS before you allow this project to proceed.

Where "new circumstances present a seriously different picture of the environmental impact of the proposed project from what was previously envisioned," a supplemental EIS is necessary. Sierra Club v. Froehlke, 816 F.2d 205, 210 (5th Cir. 1987) (emphasis in original). In numerous cases where new information or new circumstances regarding the environmental impact of a project have come to light, courts have ordered agencies to perform a supplemental environmental review. See, e. g. Louisiana Wildlife Federation v. York, 761 F.2d 1044, 1051 (5th Cir. 1985) (holding agency failed to consider adequately supplemental information that raised "new concerns of sufficient gravity").

These mud pots, or methane springs, phenomena are (at least quite possibly) a major and disturbing impact of CBM drilling in the Atlantic Rim area. They are a serious concern and are of sufficient gravity, such that a supplemental EIS to analyze and address this issue is warranted. What impact will they have if you permit 2000 additional wells, and the number of mud pots and methane springs grows exponentially as well? Can the surface lands really stand this kind of impact? Will additional mud pots and methane springs result in hazards to wildlife, and people? Will damage be caused to plant production in the area? Will they be, especially cumulatively, a human health hazard that must be addressed and mitigated? These are all questions that need to be addressed as part of your Environmental Impact Statement before you issue a Record of Decision. To ignore such a looming impact would be a significant mistake. It is like driving with your eyes closed.

At the hearing, Tom Clayson, representing Anadarko, mentioned that there might be a way to mitigate this damage, by installing wells near these mud pots that would create a "sink" to draw down the methane away from the mud pots and into the wells. There may be ways to mitigate the impacts of these mud pots so that the project can go forward. But it would not be a small adjustment, i. e. something that the BLM could handle through adaptive management. It is, or at least has the potential to be, a major impact and needs to be addressed by the BLM through a supplemental EIS process. This is something that the BLM should formally analyze and consider, as a mitigation effort, to reduce or eliminate these mud pot formations.

Wyoming Outdoor Council is very concerned about BLM going forward with and approving the Atlantic Rim project, involving 2000 wells, considering the lack of knowledge that currently exists about these mud pots. There is enough evidence to suggest the increased mud pot and methane spring activity occurring in the area could be caused by the newly drilled CBM wells. It warrants BLM taking a further look at the impacts of this drilling before BLM approves this project.

The BLM should not issue a Record of Decision in this matter until the mud pot / methane spring issue has been analyzed and addressed as part of the EIS process. The information about these mud pots is new and, given the increasing rate of occurrence of these mud pots, alarming, and must be addressed in a supplemental EIS. We respectfully ask that BLM thoroughly analyze this problem and supplement its findings set forth in the EIS already completed for the Atlantic Rim Project, before it proceeds with the issuance of any Record of Decision in this matter.

Thank you very much for your careful attention to this matter.

Sincerely,

Steve Jones
Watershed Protection Program Attorney
Wyoming Outdoor Council

cc: Robert Bennett