# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Avenue, NW, Suite 400
Washington, DC 20005,

BIODIVERSITY CONSERVATION ALLIANCE
Post Office Box 1512
Laramie, WY 82073,

WYOMING OUTDOOR COUNCIL
232 Lincoln Street
Lander, WY 82520,

WESTERN WATERSHEDS PROJECT
Post Office Box 1160
Pinedale, WY 82940,

WYOMING WILDERNESS ASSN.
Post Office Box 6588
Sheridan WY,

     Plaintiffs,

        v.

DIRK KEMPTHORNE, in his official capacity
As the Secretary of the United States
Department of the Interior
1849 C Street, NW
Washington, DC 20240,

U.S. DEPARTMENT OF THE INTERIOR
1849 C Street, NW, Room 406-LS
Washington, DC 20240,

U.S. BUREAU OF LAND MANAGEMENT
1849 C Street, NW, Room 406-LS
Washington, DC 20240,

     Defendants.

ANADARKO PETROLEUM CORPORATION
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

Civ. No. 1:07-cv-01709-RJL

DOUBLE EAGLE PETROLEUM CO.,
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

      Movant-Intervenors.

## MOTION OF ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC. AND DOUBLE EAGLE PETROLEUM CO. TO INTERVENE

Pursuant to Rule 7(j) of the Local Rules of this Court, Rule 24 of the Federal Rules of Civil Procedure, and this Court's instructions in the October 1, 2007 status conference in this matter, Anadarko Petroleum Corporation ("Anadarko"), Warren Resources, Inc. ("Warren"), and Double Eagle Petroleum Co. ("Double Eagle") (collectively referred to as "Movants") respectfully move for leave to intervene as Defendants in *Natural Resources Defense Council, et al. v. Kempthorne, et al.,* Case Number 1:07-cv-01709-RJL.

In support of this motion, Movants state as follows:

1.    This action was initiated by Plaintiffs Natural Resources Defense Council, Biodiversity Conservation Alliance, Wyoming Outdoor Council, Western Watersheds Project, and Wyoming Wilderness Association ("Plaintiffs") on September 25, 2007 against Dirk Kempthorne, in his official capacity as the Secretary of the U.S. Department of the Interior, the U.S. Department of the Interior, and the U.S. Bureau of Land Management ("BLM") ("collectively referred to as the "Federal Defendants") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f and its implementing regulations, the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1785 and its implementing regulations, the Clean Water Act, 33 U.S.C. §§ 1251-1387 and its implementing regulations, the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559 and 701-706.  To date, no answer has been filed.  Under Federal Rule of

Civil Procedure 12(a)(3), the Federal Defendants have 60 days from the date of service of the complaint to file a response and, thus, such answer would be due on or about November 25, 2007.

2.    At the October 1, 2007 status conference, the Court directed Movants to refer to the Motion to Intervene and Memorandum in Support of the Motion to Intervene in the related case, *Theodore Roosevelt Conservation Partnership v. Kempthorne, et al.,* Case Number 1:07-cv-01486-RJL, filed on August 17, 2007, for the substance of this motion.  Movants incorporate by reference, as if fully stated herein, paragraphs 2-11 of the Motion of Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co. to Intervene, the entirety of the Memorandum in Support of Motion to Intervene and the accompanying affidavits filed in that case.

3.    Anadarko, Warren and Double Eagle are oil and gas exploration and production companies with extensive operations throughout Colorado, Utah and Wyoming.  Anadarko, through Anadarko E & P Company LP, Warren, and Double Eagle have been granted oil and gas leaseholds throughout the Atlantic Rim Project Area and are proponents of the Atlantic Rim Natural Gas Field Development Project.  Anadarko and Double Eagle also hold the applications for a permit to drill for the specific projects—Catalina Unit, Plans of Development A and B, and Sun Dog Unit, Plans of Development A and B—that are at issue in this case.  A decision in this case overturning the BLM action would significantly affect Anadarko's, Warren's and Double Eagle's.

4.    Pursuant to Local Rule 7(m), Counsel for Movants contacted Counsel for Plaintiff and Counsel for Federal Defendants.  Plaintiffs do not oppose this motion.  The Federal Defendants take no position on this motion.

5.    With the Motion to Intervene, Movants are submitting an Answer (attached hereto as Exhibit A) and an Opposition to Plaintiffs' Motion for a Preliminary Injunction (attached hereto as Exhibit B).

**WHEREFORE**, Anadarko Petroleum Corporation, Warren Resources, Inc., and Double Eagle Petroleum Co. respectfully request that this Court grant their Motion to Intervene and permit Movants to file the Answer and Opposition.

Respectfully submitted,

/s/    Michael B. Wigmore

Michael B. Wigmore (DC Bar # 436114)
Sandra P. Franco (DC Bar # 467091)
Bingham McCutchen LLP
2020 K St., NW
Washington, DC 20006-1806
202.373.6000
202.373.6001 (facsimile)

*Counsel for Anadarko Petroleum*
*Corporation, Warren Resources, Inc., and*
*Double Eagle Petroleum Co.*

Robert C. Mathes (DC Bar # 484255)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
303.892.1400
303.892.1401 (facsimile)

*Counsel for Double Eagle Petroleum Co.*

Dated:  October 5, 2007

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY THAT on this 5th day of October, 2007, a true and correct copy of

the Motion of Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle

Petroleum Co. to Intervene and accompanying papers, including their Answer and Opposition to

Plaintiffs' Motion for a Preliminary Injunction, was served via first class mail, postage prepaid,

on the following:

> Sharon Buccino
> NATURAL RESOURCES DEFENSE COUNCIL
> 1200 New York Avenue, NW
> Suite 400
> Washington, DC 20005
> (202) 289-6868
> Fax: (202) 289-1060
> Email: sbuccino@nrdc.org
> *Attorney for Plaintiffs*
>
> Lori Caramanian
> U.S. DEPARTMENT OF JUSTICE
> 1961 Stout St.
> 8th Floor
> Denver, CO 80294
> (303) 312-7393
> Fax: (303) 844-1499
> Email: lori.caramanian@usdoj.gov
> *Attorney for Defendants*

Courtesy copies were also provided to the counsel listed above by electronic mail on October 5,

2007.

>       /s/ Sandra P. Franco
> Sandra P. Franco (DC Bar # 467091

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Avenue, NW, Suite 400
Washington, DC 20005,

BIODIVERSITY CONSERVATION ALLIANCE
Post Office Box 1512
Laramie, WY 82073,

WYOMING OUTDOOR COUNCIL
232 Lincoln Street
Lander, WY 82520,

WESTERN WATERSHEDS PROJECT
Post Office Box 1160
Pinedale, WY 82940,

WYOMING WILDERNESS ASSN.
Post Office Box 6588
Sheridan WY,

     Plaintiffs,

         v.

DIRK KEMPTHORNE, in his official capacity
As the Secretary of the United States
Department of the Interior
1849 C Street, NW
Washington, DC 20240,

U.S. DEPARTMENT OF THE INTERIOR
1849 C Street, NW, Room 406-LS
Washington, DC 20240,

U.S. BUREAU OF LAND MANAGEMENT
1849 C Street, NW, Room 406-LS
Washington, DC 20240,

     Defendants.

Civ. No. 1:07-cv-01709-RJL

ANADARKO PETROLEUM CORPORATION
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

DOUBLE EAGLE PETROLEUM CO.,
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

      Movant-Intervenors.

## CERTIFICATE REQUIRED BY LCvR 7.1 OF THE LOCAL RULES OF
## THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

I, the undersigned, counsel for Anadarko Petroleum Corporation, Warren Resources, Inc.,

and Double Eagle Petroleum Co. certify that to the best of my knowledge and belief, the

following are the parent companies, subsidiaries or affiliates of each party which have any

outstanding securities in the hands of the public:

      Anadarko Petroleum Corporation

None.

      Warren Resources, Inc.

None.

      Double Eagle Petroleum Co.

None.

These representations are made in order that judges of this court may determine the need

for recusal.

      Attorney of Record for Anadarko Petroleum Corporation,
      Warren Resources, Inc. and Double Eagle Petroleum Co.

      /s/     Michael B. Wigmore
      _____
      Michael B. Wigmore (DC Bar # 436114)

**EXHIBIT A**

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL<br>1200 New York Avenue, NW, Suite 400<br>Washington, DC 20005,<br><br>BIODIVERSITY CONSERVATION ALLIANCE<br>Post Office Box 1512<br>Laramie, WY 82073,<br><br>WYOMING OUTDOOR COUNCIL<br>232 Lincoln Street<br>Lander, WY 82520,<br><br>WESTERN WATERSHEDS PROJECT<br>Post Office Box 1160<br>Pinedale, WY 82940,<br><br>WYOMING WILDERNESS ASSOCIATION<br>Post Office Box 6588<br>Sheridan WY,<br><br>          Plaintiffs,<br><br>  v.<br><br>DIRK KEMPTHORNE, in his official capacity as the<br>Secretary of the United States<br>Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240,<br><br>U.S. DEPARTMENT OF THE INTERIOR<br>1849 C Street, NW, Room 406-LS<br>Washington, DC 20240,<br><br>U.S. BUREAU OF LAND MANAGEMENT<br>1849 C Street, NW, Room 406-LS<br>Washington, DC 20240,<br><br>        Defendants. | Civ. No. 1:07-cv-01709-RJL |

ANADARKO PETROLEUM CORPORATION,
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.,
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

DOUBLE EAGLE PETROLEUM CO.,
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

Defendant-Intervenors.

## ANSWER OF ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC. AND DOUBLE EAGLE PETROLEUM CO.

Defendant-Intervenors Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co. (collectively referred to as "Defendant-Intervenors") for their Answer in response to the Complaint for Declaratory and Injunctive Relief (the "Complaint") filed by Plaintiffs Natural Resources Defense Council, Biodiversity Conservation Alliance, Wyoming Outdoor Council, Western Watersheds Project, and Wyoming Wilderness Association (the "Plaintiffs") in this matter state as follows:

1.      The allegations in Paragraph 1 of the Complaint consist of Plaintiffs' characterization of the nature of the case and require no response.  To the extent a response is deemed required, Defendant-Intervenors deny the allegations.

2.      The allegations in Paragraph 2 of the Complaint consist of Plaintiffs' characterization of the nature of the case and require no response.  To the extent a response is deemed required, Defendant-Intervenors deny the allegations.

3.      Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 3 of the Complaint and therefore deny same.

4.      The allegations in Paragraph 4 of the Complaint consist of Plaintiffs' characterization of the nature of the case and require no response.  To the extent a response is deemed required, Defendant-Intervenors deny the allegations.

5.      The allegations in the third sentence in Paragraph 5 of the Complaint consist of Plaintiffs' characterization of the nature of the case and require no response.  To the extent a response is deemed required, Defendant-Intervenors deny the allegations.  Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in the remainder of this paragraph and therefore deny same.

6.      The allegations in Paragraph 6 of the Complaint consist of Plaintiffs' characterization of the nature of the case and require no response.  To the extent a response is deemed required, Defendant-Intervenors deny the allegations.

7.      Defendant-Intervenors admit that the Bureau of Land Management (the "BLM") approved 39 wells as part of Catalina Plans of Development ("PODs") A and B and 51 wells as part of Sun Dog PODs A and B.  Defendant-Intervenors deny the allegations in the remainder of Paragraph 7 of the Complaint.

## JURISDICTION AND VENUE

8.      Defendant-Intervenors admit that 28 U.S.C. § 1331 provides this Court with subject matter jurisdiction over the first four claims set forth in the Complaint, in the absence of any other jurisdictional defect.  Defendant-Intervenors deny that this Court has jurisdiction over Plaintiffs' fifth cause of action because Plaintiffs failed to satisfy the notice requirements of 33 U.S.C. § 1365(b).  The allegations in the last sentence of Paragraph 8 of the Complaint constitute legal conclusions that require no response.  To the extent a response is deemed required, Defendant-Intervenors deny the allegations in that sentence.  Defendant-Intervenors deny the remainder of the allegations in Paragraph 8 of the Complaint.

9.      Defendant-Intervenors deny the allegations in Paragraph 9 of the Complaint.

10.     Defendant-Intervenors admit that venue is proper in this Court pursuant to 28 U.S.C. § 1391(e), because defendants are located in Washington, D.C.  Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in the remainder of Paragraph 10 of the Complaint and therefore deny same.

## PARTIES

11.     Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 11 of the Complaint and therefore deny same.

12.     Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 12 of the Complaint and therefore deny same.

13.     Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 13 of the Complaint and therefore deny same.

14.     Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 14 of the Complaint and therefore deny same.

15.     Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 15 of the Complaint and therefore deny same.

16.     Defendant-Intervenors admit the allegations in Paragraph 16 of the Complaint.

17.     Defendant-Intervenors admit that the United States Department of the Interior is a federal agency responsible for managing federal public lands.  Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in the remainder of the first sentence of Paragraph 17 of the Complaint and therefore deny same.  The allegations in the last sentence of Paragraph 17 of the Complaint constitute a characterization of the law that requires no response.  To the extent that these allegations require a response, they are denied.

18.     Defendant-Intervenors admit that the Bureau of Land Management is the agency within the U.S. Department of the Interior responsible for managing oil and gas exploration, leasing, and development on federal lands.  The allegations in the remainder of the first sentence of Paragraph 18 of the Complaint constitute a characterization of the law that requires no response.  To the extent that these allegations require a response, they are denied.  Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in the last sentence of Paragraph 18 of the Complaint and therefore deny same.

## STATUTORY AND REGULATORY FRAMEWORK

### National Environmental Policy Act

19.     The allegations in Paragraph 19 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

20.     The allegations in Paragraph 20 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

21.     The allegations in Paragraph 21 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

22.     The allegations in Paragraph 22 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its

entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

23.    The allegations in Paragraph 23 of the Complaint constitute a characterization of law that requires no response. To the extent that these allegations require a response, they are denied.

24.    The allegations in Paragraph 23 of the Complaint constitute a characterization of law that requires no response. The allegations in Paragraph 24 of the Complaint constitute a characterization of law that requires no response. To the extent that these allegations require a response, they are denied.

25.    The allegations in Paragraph 25 of the Complaint constitute a characterization of law that requires no response. Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

26.    The allegations in Paragraph 26 of the Complaint constitute a characterization of law that requires no response. Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

27.    The allegations in Paragraph 27 of the Complaint constitute a characterization of law that requires no response. Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

28.    The allegations in Paragraph 28 of the Complaint constitute a characterization of law that requires no response. Defendant-Intervenors specifically refer to the cited source in its

entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

## The Clean Water Act

29.     The allegations in Paragraph 29 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

30.     The allegations in Paragraph 30 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

31.     Defendant-Intervenors deny the allegations in the second sentence of Paragraph 31 of the Complaint.  The allegations in the remainder of Paragraph 31 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

## The Federal Land Policy and Management Act

32.     The allegations in Paragraph 32 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

33.     The allegations in Paragraph 33 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its

entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

34.    The allegations in Paragraph 34 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

**Oil and Gas Drilling**

35.    Defendant-Intervenors deny the allegations in Paragraph 35 of the Complaint.

36.    The allegations in Paragraph 36 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

37.    The allegations in Paragraph 37 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

**FACTUAL BACKGROUND**

38.    Defendant-Intervenors deny the allegations in the first sentence of Paragraph 38 of the Complaint.  In response to the remainder of the allegations in Paragraph 38, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

39.     Defendant-Intervenors admit that in November 2001, the BLM established a National Energy Office.  In response to the remainder of the allegations in Paragraph 39 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

40.     Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 40 of the Complaint and therefore deny same. Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof.

41.     In response to the allegations in Paragraph 41 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

42.     In response to the allegations in Paragraph 42 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

43.     In response to the allegations in Paragraph 43 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

44.     Defendant-Intervenors deny the allegations in the third sentence of Paragraph 44 of the Complaint.  Defendant-Intervenors do not have sufficient information or knowledge to

form a belief as to the truth of the averments in the remainder of Paragraph 44 of the Complaint and therefore deny same.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof.

45.     Defendant-Intervenors admit that in February 2002, BLM issued a call for data for the revision of the Great Divide Resource Management Plan ("RMP").  Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in the last sentence of Paragraph 45 of the Complaint and therefore deny same.

46.     Defendant-Intervenors admit that on January 31, 2003, the BLM issued a scoping notice to identify issues to be addressed in the Environmental Impact Statement ("EIS") for the revision of the Great Divide RMP, to become the Rawlins RMP.  Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in the remainder of Paragraph 46 of the Complaint and therefore deny same.

47.     Defendant-Intervenors admit that on December 17, 2004, the BLM released a Draft EIS for the Rawlins RMP.  Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in the remainder of Paragraph 47 of the Complaint and therefore deny same.

48.     Defendant-Intervenors admit the allegations in Paragraph 48 of the Complaint.

49.     The allegations in Paragraph 49 of the Complaint constitute Plaintiffs' characterization of the nature of the case and require no response.  To the extent a response is deemed required, Defendant-Intervenors deny the allegations.

50.     Defendant-Intervenors admit that on December 12, 2005, BLM issued a Draft EIS for the proposed Atlantic Rim Natural Gas Field Development Project ("Atlantic Rim Development Project").  Defendant-Intervenors admit that the proposed action in the Draft EIS

for the Atlantic Rim Development Project was to develop the natural gas resource by drilling approximately 2,000 new natural gas wells. Defendant-Intervenors admit that the Atlantic Rim Development Project sits within the Red Desert southwest of the town of Rawlins. Defendant-Intervenors admit that the proposed action in the Draft EIS for the Atlantic Rim Development Project included new roads and pipelines. In response to the remainder of the allegations in Paragraph 50 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that they require a response, they are denied.

51.     Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 51 of the Complaint and therefore deny same.

52.     Defendant-Intervenors admit that in late 2006, BLM released a Final EIS ("FEIS") for the proposed Atlantic Rim Development Project.

53.     Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 53 of the Complaint and therefore deny same.

54.     Defendant-Intervenors admit that on May 21, 2007, the BLM issued a Record of Decision ("ROD") outlining a management plan for the Atlantic Rim Development Project. In the ROD, the BLM stated that it will conduct the appropriate level of environmental review prior to authorizing applications for permits to drill, right-of-way grants, sundry notices, and applications for special use permits associated with the project. Defendant-Intervenors deny the remainder of the allegations in Paragraph 54 of the Complaint.

55.     Defendant-Intervenors admit the allegations in Paragraph 55 of the Complaint.

56.     Defendant-Intervenors admit the allegations in Paragraph 56 of the Complaint.

57.     Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in the first sentence of Paragraph 57 of the Complaint and therefore deny same.  The second sentence in Paragraph 57 of the Complaint constitutes a characterization of the law that requires no response.  To the extent that these allegations are deemed to require a response, they are denied.

58.     Defendant-Intervenors admit the allegations in the first three sentences of Paragraph 58 of the Complaint.  Defendant-Intervenors deny the allegations in the last sentence of Paragraph 58 of the Complaint.

59.     Defendant-Intervenors deny the allegations in the first sentence of Paragraph 59 of the Complaint.  Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in the second sentence of Paragraph 59 of the Complaint and therefore deny same.

60.     Defendant-Intervenors admit the allegations in Paragraph 60 of the Complaint.

61.     Defendant-Intervenors deny the allegations in Paragraph 61 of the Complaint.

62.     Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 62 of the Complaint and therefore deny same.

63.     Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 63 of the Complaint and therefore deny same.

64.     Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 64 of the Complaint and therefore deny same.

### FIRST CAUSE OF ACTION

65.     Defendant-Intervenors restate and incorporate by reference their responses in Paragraphs 1 through 64 as if fully set forth herein.

66.     The allegations in Paragraph 66 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

67.     The allegations in Paragraph 67 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

68.     Defendant-Intervenors deny the allegations in Paragraph 68 of the Complaint.

69.     Defendant-Intervenors admit that in the ROD for the Atlantic Rim Development Project, BLM stated that it will conduct the appropriate level of environmental review prior to authorizing applications for permits to drill, right-of-way grants, sundry notices, and applications for special use permits associated with the project.  Defendant-Intervenors deny the remainder of the allegations in Paragraph 69 of the Complaint.

70.     Defendant-Intervenors deny the allegations in Paragraph 70 of the Complaint.

71.     Defendant-Intervenors deny the allegations in Paragraph 71 of the Complaint.

**SECOND CAUSE OF ACTION**

72.     Defendant-Intervenors restate and incorporate by reference their responses in Paragraphs 1 through 71 as if fully set forth herein.

73.     The allegations in Paragraph 73 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

74.     Defendant-Intervenors deny the allegations in Paragraph 74 of the Complaint.

75.     Defendant-Intervenors deny the allegations in Paragraph 75 of the Complaint.

76.     Defendant-Intervenors deny the allegations in Paragraph 76 of the Complaint.

## THIRD CAUSE OF ACTION

77.     Defendant-Intervenors restate and incorporate by reference their responses in Paragraphs 1 through 76 as if fully set forth herein.

78.     The allegations in Paragraph 78 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

79.     Defendant-Intervenors deny the allegations in Paragraph 79 of the Complaint.

80.     Defendant-Intervenors deny the allegations in Paragraph 80 of the Complaint.

81.     Defendant-Intervenors deny the allegations in Paragraph 81 of the Complaint.

82.     Defendant-Intervenors deny the allegations in Paragraph 82 of the Complaint.

## FOURTH CAUSE OF ACTION

83.     Defendant-Intervenors restate and incorporate by reference their responses in Paragraphs 1 through 82 as if fully set forth herein.

84.     The allegations in Paragraph 84 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

85.     The allegations in the first sentence of Paragraph 85 of the Complaint constitute a characterization of law that requires no response.  To the extent that these allegations require a

response, they are denied.  Defendant-Intervenors admit that the BLM has begun, but not completed a revision to the Great Divide RMP.

      86.     Defendant-Intervenors deny the allegations in Paragraph 86 of the Complaint.

      87.     Defendant-Intervenors deny the allegations in Paragraph 87 of the Complaint.

### FIFTH CAUSE OF ACTION

      88.     Defendant-Intervenors restate and incorporate by reference their responses in Paragraphs 1 through 87 as if fully set forth herein.

      89.     The allegations in Paragraph 89 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

      90.     The allegations in Paragraph 90 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

      91.     The allegations in Paragraph 91 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

      92.     Defendant-Intervenors deny the allegations in Paragraph 92 of the Complaint.

      93.     Defendant-Intervenors deny each and every allegation of the Complaint not previously admitted, explained, qualified, or denied.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

The Complaint should be dismissed in whole or in part because Plaintiffs failed to exhaust administrative remedies and/or on the grounds of primary jurisdiction.

## THIRD AFFIRMATIVE DEFENSE

Plaintiffs' fifth cause of action should be dismissed because Plaintiffs failed to satisfy the notice requirements of the Clean Water Act and this court lacks subject matter jurisdiction over that claim. *See* 33 U.S.C. § 1365(b).

## PRAYER FOR RELIEF

WHEREFORE, Defendant-Intervenors Anadarko Petroleum Corporation, Warren Resources, Inc., and Double Eagle Petroleum Co. pray for judgment as follows:

1.    To the extent that the Complaint seeks declaratory judgment that the defendants have violated the National Environmental Policy Act ("NEPA"), the Federal Land Policy and Management Act ("FLPMA"), and the Clean Water Act ("CWA"), and applicable implementing regulations, it is denied;

2.    To the extent that the Complaint seeks injunctive relief directing defendants to rescind the applications for permits to drill approved for Catalina A & B PODs and Sun Dog A & B PODs until the BLM corrects the alleged violations of NEPA, FLPMA and the CWA, it is denied;

3.    To the extent that the Complaint seeks injunctive relief prohibiting defendants from approving any further applications to drill, or other ground-disturbing activity, tied to the

Atlantic Rim Development Project EIS until the BLM corrects the alleged violations of NEPA,

FLPMA, and the CWA, it is denied;

      4.      To the extent that the Complaint seeks litigation expenses of the Defendants, it is

denied;

      5.      Judgment on the merits in favor of Defendants and against the Plaintiffs; and

      6.      For such other relief that this Court may deem just and proper.

Respectfully submitted,

/s/     Michael B. Wigmore

Michael B. Wigmore (DC Bar # 436114)
Sandra P. Franco (DC Bar # 467091)
Bingham McCutchen LLP
2020 K St., NW
Washington, DC 20006-1806
202.373.6000
202.373.6001 (facsimile)

*Counsel for Anadarko Petroleum
Corporation, Warren Resources, Inc., and
Double Eagle Petroleum Co.*

Robert C. Mathes (DC Bar # 484255)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
303.892.1400
303.892.1401 (facsimile)

Dated:  October 5, 2007

**EXHIBIT B**

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Avenue, NW, Suite 400
Washington, DC 20005,

BIODIVERSITY CONSERVATION ALLIANCE
Post Office Box 1512
Laramie, WY 82073,

WYOMING OUTDOOR COUNCIL
232 Lincoln Street
Lander, WY 82520,

WESTERN WATERSHEDS PROJECT
Post Office Box 1160
Pinedale, WY 82940,

WYOMING WILDERNESS ASSN.
Post Office Box 6588
Sheridan, WY,

       Plaintiffs,

          v.

DIRK KEMPTHORNE, in his official capacity
As the Secretary of the United States
Department of the Interior
1849 C Street, NW
Washington, DC 20240,

U.S. DEPARTMENT OF THE INTERIOR
1849 C Street, NW, Room 406-LS
Washington, DC 20240,

U.S. BUREAU OF LAND MANAGEMENT
1849 C Street, NW, Room 406-LS
Washington, DC 20240,

       Defendants.

ANADARKO PETROLEUM CORPORATION
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

Civ. No. 1:07-cv-01709-RJL

DOUBLE EAGLE PETROLEUM CO.
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

       Defendant-Intervenors.

**OPPOSITION TO PLAINTIFFS' MOTION**
**FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

LIST OF EXHIBITS ....................................................................................... iii

TABLE OF AUTHORITIES ........................................................................... iv

INTRODUCTION ............................................................................................1

STATEMENT OF FACTS ...............................................................................2

    1.    The Atlantic Rim Proposal - Environmental Impact Statement .................2

    2.    BLM Decision..........................................................................................6

    3.    Administrative Appeal - Denial of Application of Stay ............................8

    4.    Subsequent Permit Proceedings...............................................................11

    5.    Public Access to Documents for Permit Proceedings...............................13

ARGUMENT ..................................................................................................14

    I.    PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF
        SUCCESS ON THE MERITS ................................................................14

        A.    BLM Complied with NEPA by Allowing Public
            Participation Before Making Site-Specific Decisions for
            the Atlantic Rim Project.................................................................14

        B.    BLM Considered the Environmental Effects of the
            Proposed Project. ..........................................................................20

            1.    BLM evaluated a reasonable range of alternatives
                and mitigation measures. ..................................................21

            2.    BLM took a hard look at environmental impacts. .............26

                a.    BLM adequately considered the potential
                    impacts of methane seeps.......................................26

                b.    BLM analyzed the cumulative impacts of
                    the project................................................................28

            3.    Plaintiffs' assertion that the EAs lack adequate
                discussion is meritless.......................................................34

      C.      Plaintiffs Are Not Likely to Succeed on their Clean
Water Act Claim. ................................................................................35

            1.      The Court lacks jurisdiction over Plaintiffs' CWA
claim..............................................................................................35

            2.      BLM did not violate the CWA by approving the
APDs. .............................................................................................36

II.      THE BALANCE OF EQUITIES DOES NOT FAVOR A
PRELIMINARY INJUNCTION. ..................................................................38

      A.      Injunctive Relief Would Not Avoid Plaintiffs' Alleged
"Irreparable Injuries." ......................................................................38

      B.      An Injunction Will Substantially Harm the Interests of
Defendant-Intervenors, the United States, and the State of
Wyoming............................................................................................40

            1.      Harm to Defendant-Intervenors ..........................................40

            2.      Harm to the United States and the State of
Wyoming...............................................................................42

      C.      A Preliminary Injunction Would Harm the Public
Interest...............................................................................................43

CONCLUSION..............................................................................................................45

## LIST OF EXHIBITS

Exhibit 1        Excerpts from the U.S. Department of the Interior's November 1990 Great Divide Resource Area Record of Decision and Approved Resource Management Plan

Exhibit 2        Excerpts from the Bureau of Land Management's November 2006 Final Environmental Impact Statement Atlantic Rim Natural Gas Field Development Project ("FEIS")

Exhibit 3        BLM Record of Decision for the Atlantic Rim Project ("ROD")

Exhibit 4        U.S. Department of Interior's Board of Land Appeals, Sept. 5, 2007 Decision Denying Stay ("IBLA Decision")

Exhibit 5        Clayson Declaration

Exhibit 6        Beserra Declaration

Exhibit 7        Reservoir Management Group's June 16, 2005 Report on Economic Development of Coalbed Natural Gas Pertaining to Space and Directional Drilling in the Atlantic Rim Natural Gas Area ("RMG Report")

Exhibit 8        Degenfelder Declaration

Exhibit 9        Sun Dog PODs A&B Conditions of Approval

Exhibit 10       Catalina PODs A&B Conditions of Approval

Exhibit 11       Wyoming Department of Environmental Quality April 23, 2007 Methane Springs Presentation

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allegheny Cty. Sanitary Authority v. EPA*, 732 F.2d 1167 (3rd Cir. 1984)......................36

*Alliance to Protect Nantucket Sound, Inc. v. U.S. Department of the Army*,
     398 F.3d 105 (1st Cir. 2005).......................................................................18

*Appalachian Power Co. v. Train*, 545 F.2d 1351 (4th Cir. 1976) ....................................37

*Arkansas Wildlife Federation v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096
     (8th Cir. 2005)...................................................................................14

*Basel Action Network v. Maritime Admin.*, 370 F. Supp. 2d 57 (D.D.C. 2005)...............36

*Biodiversity Conservation Alliance v. BLM*, 404 F. Supp. 2d 212 (D.D.C. 2005)............17

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ........18

*Cady v. Morton*, 527 F.2d 786 (9th Cir. 1975) ..................................................27

*Caldwell v. Gurley Refining Co.*, 533 F. Supp. 252 (E.D. Ark. 1982) ............................36

*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) ....................25

*Citizens' Committee to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012
     (10th Cir. 2002)................................................................................25

*Clinch Coalition v. Damon*, 316 F. Supp. 2d 364 (W.D. Va. 2004).................................30

*Cronin v. U.S. Department of Agriculture*, 919 F.2d 439 (7th Cir. 1990)..................14, 19

*Department of Transport v. Public Citizen*, 541 U.S. 752 (2004) ....................................27

*Fund for Animals v. Frizzell*, 530 F.2d 982 (D.C. Cir. 1975)......................................38, 39

*Fund for Animals v. Hall*, 448 F. Supp. 2d 127 (D.D.C. 2006).........................................34

*Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002)........................................29

*Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257 (10th Cir. 2004)..........................18

*Gulf Restoration Network v. U.S. Department of Transport*, 452 F.3d 362
     (5th Cir. 2006)..................................................................................33

*Half Moon Bay Fishermans' Marketing Association v. Carlucci*, 857 F.2d 505
     (9th Cir. 1988)..................................................................................41

*Hallstrom v. Tillamook Cty.*, 492 U.S. 20 (1989) ............................................................36

*Hayes v. Whitman*, 264 F.3d 1017 (10th Cir. 2001) ........................................................36

*Inland Steel Co. v. EPA*, 901 F.2d 1419 (7th Cir. 1990) .................................................38

*Kingman Park Civic Association v. U.S. Environmental Prot. Agency*,
    84 F. Supp. 2d 1 (D.D.C. 1999) .............................................................................36

*Macht v. Skinner*, 715 F. Supp. 1131 (D.D.C. 1989) .......................................................41

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989) ..........................24, 26

*Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983) .........28

*Morongo Band of Mission Indians v. FAA*, 161 F.3d 569 (9th Cir. 1998) ...........21, 24, 34

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999)..................29

*N. Plains Resources Council v. Lujan*, 874 F.2d 661 (9th Cir. 1989) ..............................34

*NRDC v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988)...............................................................29

*N. Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980) ...........................................20

*National Environmental Foundation v. ABC Rail Corp.*, 926 F.2d 1096
    (11th Cir. 1991)......................................................................................................36

*National Wildlife Federation v. Burford*, 835 F.2d 305 (D.C. Cir. 1987) ........................18

*Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059 (9th Cir. 2002) ..................34

*Nevada v. Department of Energy*, 457 F.3d 78 (D.C. Cir. 2006) ......................................14

*Northern Alaska Environmental Center v. Kempthorne*, 457 F.3d 969
    (9th Cir. 2006)..................................................................................................15, 23

*Oregon Natural Desert Association v. Dombeck*, 172 F.3d 1092 (9th Cir. 1998).....35, 37

*Park County Resources Council v. BLM*, 638 F. Supp. 842 (D. Wyo. 1986)...................42

*Rapanos v. United States*, 126 S. Ct. 2208 (2006)...........................................................36

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)..................17, 20, 21

*S. Utah Wilderness Alliance v. Norton*, 237 F. Supp. 2d 48 (D.D.C. 2002).....................20

*S. Utah Wilderness Alliance v. Norton*, 326 F. Supp. 2d 102 (D.D.C. 2004)....................33

*Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209 (11th Cir. 2002).....................26

*Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772 (10th Cir. 2006) .............24

*TOMAC v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) ...............................................................18

*Valley Community Preservation Commission v. Mineta*, 373 F.3d 1078
    (10th Cir. 2004)...............................................................................................................40

*\*Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978) .........................17

*W. Branch Valley Flood Protection Association v. Stone*, 820 F. Supp. 1
    (D.D.C. 1993) ...................................................................................................................26

*Webb v. Gorsuch*, 699 F.2d 157 (4th Cir. 1983)...................................................................24

*Wright v. Inman*, 923 F. Supp. 1295 (D. Nev. 1996)...........................................21, 22, 23

## DOCKETED CASES

*Idaho Conservation League v. Caswell,* No. CV 95-394-S-MHW, 1996 WL
    938215 (D. Idaho Aug. 12, 1996) ..................................................................................37

*TRCP v. Kempthorne*, Case No. 1:07-cv-1486-RJL (filed Aug. 17, 2007) ......................38

## FEDERAL STATUTES

28 U.S.C. § 1331.....................................................................................................................36

30 U.S.C. § 226(f).......................................................................................................13, 15, 16

33 U.S.C. § 1341(a)(1)) ....................................................................................................35, 36

33 U.S.C. § 1362(7)..........................................................................................................36, 37

\*33 U.S.C. § 1365(a) & (b).....................................................................................................35

## FEDERAL ADMINISTRATIVE AND EXECUTIVE MATERIALS

40 C.F.R. § 1500.1(b) ............................................................................................................16

40 C.F.R. § 1501.4(e)(2)........................................................................................................17

40 C.F.R. § 1502.20................................................................................................................12, 14

40 C.F.R. § 1502.22 .................................................................................30, 32

40 C.F.R. § 1502.9(c)(1) ..................................................................................26

40 C.F.R. § 1506.6(b)(1) ..................................................................................16

40 C.F.R. § 1508.7 .......................................................................................29, 30

40 C.F.R. § 1508.8(a) .......................................................................................27

40 C.F.R. § 1508.9(a) .......................................................................................34

43 C.F.R. § 3162.3-1(d) ..........................................................................13, 15, 16

66 Fed. Reg. 33,975 (June 26, 2001) ..............................................................2, 3

70 Fed. Reg. 73,481, 73,482 (Dec. 12, 2005) ....................................................3

71 Fed. Reg. 1767 (Jan. 11, 2006) .....................................................................3

71 Fed. Reg. 10,989, 10,989 (Mar. 3, 2006) ....................................................32

71 Fed. Reg. 25,571, 25,572 (Sept. 6, 2006) ...................................................33

71 Fed. Reg. 69,582 (Dec. 1, 2006) ........................................................3, 4, 5, 7

72 Fed. Reg. 11,092, 11,183 (Mar. 12, 2007) ..................................................38

Exec. Order No. 13,212, 66 Fed. Reg. 28,357 (May 22, 2001) ...............1, 2, 44

## STATE STATUTES

Wyo. Stat. Ann. §§ 39-14-211 ...........................................................................43

## MISCELLANEOUS

BLM, *Hiawatha Regional Energy Development Project Environmental Impact
    Statement Scoping Report and Summary of Public Scoping Comments, Rock
    Springs Field Office, Wyoming Little Snake Field Office, Colorado,* Nov.
    2006, *available at* http://www.blm.gov/wy/st/en/info/
    NEPA/rsfodocs/hiawatha.html. ..............................................................33

WDEQ Letter, Mar. 20, 2007, at 3, available at
    https://www.nwo.usace.army.mil/html/od-rwy/wdeq32007.pdf. ...............38

WGFD, *Recommendations for Development of Oil and Gas Resources within
    Crucial and Important Wildlife Habitats* (Dec. 6, 2004)............................23

**INTRODUCTION**

In May, 2001, the President issued an Executive Order on Energy Policy, directing federal agencies to expedite energy-related projects in order to "increase[] production and transmission of energy in a safe and environmentally sound manner." Exec. Order No. 13,212, 66 Fed. Reg. 28,357 (May 22, 2001). On May 21, 2007, after six years of environmental studies, public meetings, and numerous public comment and scoping periods, the Bureau of Land Management ("BLM") issued the Record of Decision ("ROD") for the Atlantic Rim Natural Gas Field Development Project ("Atlantic Rim Project"), which authorizes the development of natural gas wells and associated facilities in the Atlantic Rim Project Area ("ARPA") in Carbon County, Wyoming. Plaintiffs now complain about the BLM's "rush" to develop natural gas from the public lands and seek a preliminary injunction to prevent further implementation of permits issued by BLM in the summer of 2007.

In their ongoing administrative appeal before the Interior Board of Land Appeals ("IBLA"), a number of these same plaintiffs likewise sought a stay of BLM's decision to allow natural gas development in the ARPA. The IBLA denied plaintiffs' request for a stay, finding that plaintiffs could not show a likelihood of success on the merits. Similarly, this Court should reject plaintiffs' request because the record demonstrates that the BLM thoroughly considered the potential environmental aspects of the project, in full compliance with the National Environmental Policy Act of 1969 ("NEPA"), the Federal Land Policy and Management Act of 1976 ("FLPMA"), and the Federal Water Pollution Control Act (more commonly known as the Clean Water Act or "CWA").

**STATEMENT OF FACTS**

**1.      The Atlantic Rim Proposal - Environmental Impact Statement**

In November 1990, BLM issued the Great Divide Resource Area Record of Decision and

Approved Resource Management Plan ("Great Divide RMP").[1]  The RMP was issued in

compliance with FLPMA and NEPA, including the preparation of an Environmental Impact

Statement ("EIS").  Ex. 1 (Great Divide RMP) at 1.  The RMP provides for the "sustained

multiple use management" of approximately 4 million acres of public land surface and 5 million

acres of federal mineral estate administered by BLM in the Great Divide Resource Area -- an

area that includes the 270,000 acre ARPA involved in this case.  *Id.* at 3.  The RMP opened the

entire Great Divide area to oil and gas leasing.  *Id.* at 30.  Pursuant to its authority under the

RMP, BLM leased federal minerals within the entire ARPA.  Ex. 2 (FEIS) at 1-8.[2]

BLM's approval of natural gas development in the ARPA is the culmination of an

extensive public environmental analysis process that began in June of 2001, when BLM issued a

Notice of Intent to Prepare an Environmental Impact Statement for the Atlantic Rim Natural Gas

Development Project ("NOI") pursuant to NEPA.  66 Fed. Reg. 33,975 (June 26, 2001).  The

NOI stated that the EIS would assess the potential environmental impacts of the proposed

project, including the cumulative impacts of other oil and gas projects in the vicinity of the

ARPA.  *Id.* at 33,976.  The project proponents, which now include Anadarko Petroleum

Corporation ("Anadarko"), Warren Resources, Inc. ("Warren"), and Double Eagle Petroleum

("Double Eagle"), originally proposed to drill 3,880 coalbed natural gas ("CBNG" or coalbed

methane ("CBM")) wells and associated facilities within approximately 310,335 acres of federal,

---

[1]      The Great Divide RMP is available at http://www.blm.gov/rmp/WY/GreatDivide/rpm.pdf.  Excerpts are attached as Ex. 1.

[2]      The FEIS for the Atlantic Rim project is available at http://www.blm.gov/wy/st/en/info/NEPA/rfodocs/atlantic_rim.html.  Excerpts are attached as Ex. 2.

2

state and private lands throughout the ARPA.  *Id.* at 33,975-76.  A scoping notice and

information materials regarding the proposed project were mailed to potentially interested parties

beginning in 2001.  Ex. 2 (FEIS) at ES-1.  The BLM held two public scoping meetings in July

2001 in Baggs and Rawlins, Wyoming.  *Id.* at 1-14.  Fifty-seven comments were received, and

were used to determine key issues, resource conflicts and concerns, alternatives, and the scope of

BLM's analysis.  *Id.* at 1-14 to 1-20.

     The BLM then spent more than four years preparing a draft EIS, which was released in

December, 2005.  Ex. 2 (FEIS) at 1-14.  The draft EIS included a revised proposal, referred to as

the Atlantic Rim Natural Gas Development Project, for drilling up to 2,000 wells—1800 to coal

formations (CBNG) and 200 to other geologic targets for natural gas.  70 Fed. Reg. 73,481,

73,482 (Dec. 12, 2005).[3]  The revised proposal covers 270,080 acres within the ARPA.  *Id.*

There was a 60-day public comment period, resulting in over 59,000 e-mailed responses and 300

hard copy comments.  Ex. 2 (FEIS) at 1-14.  The Final EIS ("FEIS") was noticed in the Federal

Register, on December 1, 2006.  71 Fed. Reg. 69,582 (Dec. 1, 2006).  BLM provided for public

comment on the FEIS through January 4, 2007, during which 85 additional public comments

(including some by plaintiffs) were submitted.  Ex. 3 (ROD) at 22.

     The FEIS is a five-volume, comprehensive document.  In the FEIS, BLM identified the

purpose of and need for the project, finding that "[e]xploration and development of federal oil

and gas leases by private industry are an integral part of the BLM's oil and gas leasing program."

Ex. 2 (FEIS) at 1-8.  BLM recognized that natural gas, including CBNG, is "an integral part of

the United States' energy future due to its availability and the presence of the existing market

delivery infrastructure," that Congress emphasized the development of domestic natural gas

---

[3]    BLM issued a Corrected Notice of Availability for the Atlantic Rim Project on January 11, 2006.  71 Fed. Reg. 1767 (Jan. 11, 2006).

reserves for supply and economic stability in the Energy Policy Acts of 2001 and 2005, and that "environmental advantages of burning natural gas, rather than oil or coal, were emphasized by the U.S. Congress and by the President when the Clean Air Act Amendments of 1990 were signed into law." *Id.* Noting the growing demand for electricity, BLM found: "Production from the proposed Atlantic Rim Natural Gas Project could help meet this demand." *Id.* at 1-9. Thus, "[t]he purpose of, and need for, this proposed natural gas development is to develop, produce, and market natural gas products. This natural gas is needed to meet the national domestic energy demand. This proposal is consistent with the National Energy Act of 2005 and the National Energy Policy (President's Plan)." *Id.*

In the FEIS, BLM identified "a range of alternatives based on issues, concerns, and opportunities raised in public comments to project scoping and the Draft EIS, interdisciplinary interaction between resource professionals, and collaboration with cooperating and interested agencies." Ex. 2 (FEIS) at 2-1. BLM found two action alternatives met the purpose and need of the proposal (Alternatives C and D). *Id.* at ES-2. Alternative C would have required specific development protection measures and would have resulted in fewer acres of disturbance on federal lands than other alternatives examined. *Id.* BLM also considered a no-action alternative (Alternative A). *Id.* Additional alternatives, including the initial 2001 proposal and Alternative B (phased development), were considered and eliminated from detailed study. *Id.* at 2-1.

The BLM chose Alternative D as the Preferred Alternative in the FEIS following public comment and in response to nine of the fifteen key issues identified by BLM during the scoping process. Ex. 2 (FEIS) at 1-20. The goal of Alternative D is to minimize surface disturbance while optimizing natural gas recovery. *Id.* at ES-2. Under Alternative D, no more than 7,600 acres (2.8% of the ARPA) would be disturbed at any one time. *Id.* at ES-3. There would be a

short-term disturbance goal of 6.5 acres per wellpad, including roads and pipelines.  *Id.* at 2-8.

In more sensitive areas, identified as "Category A" areas (management areas with sensitive fish

populations and crucial wildlife habitats), BLM and operators would minimize potential impacts

and surface disturbance.  *Id.*  Alternative D requires annual planning between BLM and the

operators, and the application of site-specific mitigation measures to minimize surface

disturbance through appropriate conditions of approval ("COAs"), best management practices

("BMPs"), and other measures deemed necessary.  *Id.* at ES-2 to ES-3, 2-7 to 2-8.

      The Atlantic Rim Project EIS reviewed potential impacts to geology/ minerals/

paleontology, air quality, soils, water resources (impacts to Muddy Creek, salinity loading, etc.),

groundwater (impacts to wells, seeps, and springs emanating from upper Mesaverde Group, etc.),

range and other land uses, vegetation (impacts from erosion and runoff, long-term loss of shrubs,

etc.), wildlife (impacts to greater sage-grouse, big game, threatened and endangered fishes, etc.),

recreation, visual resources, cultural resources, socioeconomics, transportation, health and safety,

and noise.  *See generally* Ex. 2 (FEIS) at ES-3 to ES-7.  As part of this review, BLM also

prepared:  (a) a Biological Assessment to review the potential effects of the proposed project on

threatened, endangered and proposed species under the Endangered Species Act, including BLM

sensitive species (FEIS, App. G); (b) an Air Quality Technical Support Document (FEIS, App.

F), which analyzed impacts on air quality resulting from air emissions from project sources

within Atlantic Rim, as well as reasonably foreseeable non-project future sources within the

study domain; and (c) a Hazardous Materials Management Plan (FEIS, App. C), which describes

hazardous materials utilized by the proposed project.

      For mitigation measures, BLM developed mandatory BMPs where the proposed action

conflicted with identified resources, including, but not limited to, vegetation resources, visual

resources, water and soil management, and wildlife (FEIS, App. H), and reviewed numerous other mitigation measures, including: (a) voluntary measures proposed by the project proponents to mitigate surface disturbance and environmental impacts (FEIS, App. K); (b) a Reclamation Plan that gives guidelines for completing reclamation of disturbed areas (FEIS, App. B); (c) a Wildlife Monitoring and Protection Plan, which outlines proposed inventory, monitoring and protection measures (FEIS, App. E); (d) a program to inventory, evaluate, and manage cultural resources (FEIS, App. I); (e) BMPs for reducing non-point source pollution (FEIS, App. J); and (f) protection measures proposed for Alternative C (FEIS, App. L).

EPA commended BLM for its work, noting that BLM "properly analyzed and disclosed to the public the potential environmental impacts of the project, which are significantly greater with the Proposed Action versus BLM's Preferred Alternative." Ex. 2 (FEIS), App. N, EPA comment letter.

**2.    BLM Decision**

BLM's ROD for the Atlantic Rim Project, released on May 21, 2007, adopted Alternative D, the FEIS' Preferred Alternative, which authorized the development of approximately 2,000 natural gas wells in the ARPA subject to strict surface disturbance limitations and reclamation requirements and additional performance-based objectives developed in response to public and cooperating agency comments on the FEIS. Ex. 3.

The restrictions in the ROD were designed to minimize surface disturbance while optimizing natural gas recovery. Ex. 3 (ROD) at 4. BLM recognized that "[t]he proposed development ... require[s] surface-disturbing activities that are likely to result in major adverse impacts to certain resource values, as outlined in the FEIS," but concluded, considering the imposition of mitigation measures, that, "[w]hile the development is expected to adversely

impact certain resource values and limit opportunities for other uses in the short-term, the long-term goal is to return these lands to a condition approximate to that which existed before [the proposed] developments ... were implemented." *Id*. BLM found that "[i]mplementation of this decision will result in production of nationally significant natural gas resources consistent with The National Energy Policy (May 2001) and the National Energy Policy Act of 2005." *Id*.

BLM's decision imposes significant spatial restrictions on land-disturbing activities. The ARPA encompasses 270,080 acres. Ex. 3 (ROD) at 1; Ex. 4 (IBLA Decision) at 2. The ROD provides that no more than 7,600 acres may disturbed at any one time (2.8% of the total area). Ex. 3 (ROD) at 1. Once a site has been disturbed, it stays within the 7,600 acre disturbance cap until it has been successfully reclaimed. *Id.* at 3, 18. Successful reclamation is defined as having achieved 80 percent of predisturbance ground cover, with 90 percent dominant species; no noxious weeds present in the seeding, and "[e]rosion features equal to or less than the surrounding area." *Id.*, App. A, at A-6 ("Criteria for Reclamation Success").

The ROD itself does not authorize drilling or other surface-disturbing activity, which require separate permits. Ex. 3 (ROD) at 3; Ex. 4 (IBLA Decision) at 8. Appendix C of the ROD imposes measures that are mandatory for all permit holders. Ex. 3 (ROD) at 21 (Appendix C practices are "mandatory requirements"). These practices contain 38 specific items, including such requirements as prohibition of off-road vehicle activity; location of buried pipelines close to roads to minimize area of disturbance; requirements for run-off and erosion control; compliance with federal and state regulations for well casings to protect aquifers; non-reflective paint for all structures to blend with landscape (except where OSHA requires safety coloration); and requirements for reserve pits to prevent leakage and overflow. Ex. 3 (ROD), App. C, at C-3 to C-7. Drilling permits for wells within the ARPA must prohibit any activity within two miles of

sage-grouse mating areas (called "leks") during mating season and include other restrictions in areas where sage-grouse are known to concentrate during the winter.  Clayson Decl. ¶3 (attached as Ex. 5); Ex. 3 (ROD), at B-16.  Appendix C also notes that operators must comply with CWA permit requirements, combined state/federal requirements for Storm Water Pollution Prevention Plans, federal requirements for Spill Prevention Control and Countermeasures Plans, federal requirements for threatened, endangered and candidate plant species, and federal, state and local regulations for hazardous materials.  Ex. 3 (ROD) at C-5 to C-7.

In addition to these mandatory measures, Appendix B of the ROD establishes a "performance-based, adaptive management process," under which operators must comply with Performance Goals and an extensive array of best management practices, COAs and protective measures.  Ex. 3 (ROD) at 16-21.  Operators must engage in monitoring "to measure the degree of success the performance requirements have in achieving Performance Goals."  *Id.* at B-2.  Operators must also adopt additional mitigation or adaptive techniques to achieve the Performance Goals where needed.  *Id.*; *see also* Ex. 4 (IBLA Decision) at 9-11.

3.    **Administrative Appeal -- Denial of Application of Stay**

Several environmental groups, including some of the plaintiffs before this Court, filed an administrative appeal of the FEIS and ROD for the Atlantic Rim Project to the IBLA and asked for a stay pending appeal.  On September 5, 2007, the IBLA denied the stay.  A copy of its decision is attached as Ex. 4.[4]

The IBLA denied the request for a stay on the ground that the appellants had not shown a likelihood of success on appeal.  Ex. 4 (IBLA Decision) at 11.  The IBLA rejected the contention that the BLM failed to consider site-specific impacts, concluding it was legitimate for BLM to

---

[4]    Three other administrative appeals were filed with the IBLA, including one by Theodore Roosevelt Conservation Partnership ("TRCP") (IBLA No. 2007-208).  Following the denial of the stay, TRCP withdrew its administrative appeal.  The three other administrative appeals remain pending, including plaintiffs' appeal.

defer such consideration until specific permit applications were filed. *Id.* at 13-14. The IBLA

further determined that appellants were not likely to succeed on their claims that BLM failed to

adequately analyze potential mitigation measures, including mitigation measures to protect sage-

grouse, or that BLM's decision not to adopt mitigation measures advocated by the appellants

constituted a NEPA violation. *Id.* at 20-21.

  The IBLA also rejected the contention that BLM had not adequately considered the likely

cumulative impacts on fish and wildlife associated with other projects that were under review or

already approved. *Id.* at 14-15. The IBLA reasoned, "[i]n order to demonstrate a deficiency in

BLM's cumulative impacts analysis, 'it is not sufficient merely to note the existence of other gas

fields and gas development projects ... without concretely identifying the adverse impacts caused

by such other fields and projects to which the action being scrutinized will add.'" *Id.* at 15

(quoting *Nat'l Wildlife Fed'n*, 150 IBLA 385, 399 (1999)). "Nor is it sufficient," the IBLA

added, "to merely refer to geographic proximity or some other factor likely to give rise to a

cumulative impact." *Id.* Accordingly, the IBLA concluded that "TRCP and BCA have failed to

show that they are likely to succeed in establishing that BLM failed to give adequate

consideration to the likely cumulative impacts of the Project." *Id.*

  The IBLA also rejected the contention that BLM failed to adequately consider the

potential impact of methane seeps. *Id.* at 17-18. Noting that one appellant offered the

declaration of a geochemist that methane seeps in the ARPA were the likely result of nearby

wells,[5] the IBLA pointed out that "[a]ccording to [the Wyoming Department of Environmental

Quality], methane seeps are a natural phenomenon that predates oil and gas development in the

region and the seeps are not geologically connected to the producing CBM formations or to the

---

[5] Plaintiffs have attached the same declaration to its preliminary injunction motion—Declaration of Walter R.
Merschat, Pls. Ex. S.

formation into which produced water is being disposed." *Id.* at 18. The IBLA also noted that "the number and location of such seeps was impossible to predict, but that operators would be required to monitor for methane seep detection purposes." *Id.* (citing FEIS at 4-32 and 4-49; ROD at B-10 to B-11). Finally, the IBLA noted that "BLM is working in cooperation with the University of Wyoming, the Wyoming State Geological Survey, and the Wyoming Oil and Gas Conservation Commission to inventory and model methane seeps." *Id.*

The IBLA also rejected the claim that BLM violated NEPA by failing to consider alternative proposals that would either delay development for another 7 to 14 years, or would result in substantially less natural gas recovery. *Id.* at 18-20. The IBLA concluded that BLM need not consider alternatives that would not serve the purpose of the proposed action, "which was to permit the operators and the United States to realize the benefit of existing Federal leases, by developing, producing, and marketing natural gas." *Id.* at 19.

Finally, the IBLA rejected the assertion that BLM's use of "adaptive management" as a mitigation measure "is, by its nature, violative of section 102(2)(C) of NEPA, because it is not discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Id.* at 20. The IBLA concluded that "in 'cases involving unknown future impacts of a proposed action,' ... section 102(2)(C) of NEPA permits adoption of a mitigation plan 'in which BLM identified the type of mitigation but rendered implementation contingent on assessment of whether and to what extent that mitigation was warranted, given the uncertain results of possible future activity.'" *Id.* (quoting *Colo. Envtl. Coal.*, 169 IBLA 137, 143 (2006)). "When the impacts that will be mitigated are uncertain, and will only become known by monitoring the effects of the Project, the particular mitigation to be applied will necessarily be uncertain." *Id.* The IBLA concluded that the "adaptive management" approach adopted by the

BLM here is a reasonable method to deal with this uncertainty and comports with NEPA.  *Id.*

Simply stated, the IBLA specifically considered the plaintiffs' objections raised in this case, and numerous other arguments not advanced by the plaintiffs here, and determined the plaintiffs were not likely to succeed on their claims.

## 4.    Subsequent Permit Proceedings

Although BLM's ROD, based on the FEIS, was issued May 21, 2007, energy companies could not proceed with ground disturbing activity until they obtained permits to drill.  Ex. 3 (ROD) at 3; Ex. 4 (IBLA Decision) at 14.  To obtain this authority, operators are required to submit an application for a permit to drill ("APD"), which contains detailed proposals for on-the-ground operations.  These APDs are only approved by BLM and the Wyoming Oil and Gas Conservation Commission after site-specific reviews and additional NEPA documentation.

In response to several APDs, on June 28, 2007, BLM approved plans of development ("PODs") in the Catalina Unit for 39 new wells (36 development wells and 3 produced water injection wells) and associated infrastructure.  Pls. Ex. M (Catalina EA).  On August 16, 2007, BLM approved PODs in the Sun Dog Unit for 51 new wells (48 development wells and 3 injection wells) and associated infrastructure.  Pls. Ex. N (Sun Dog EA).  Given the 6.5-acre cap per well on land disturbance imposed by the BLM, these 90 wells could have involved a maximum of 585 acres of land disturbance -- less than a square mile in total, and 0.2% of the 270,080 total acreage of the ARPA.  In fact, the 90 approved wells involve a total of only 439 disturbed acres.  Pls. Ex. M (Catalina EA) at 5; Pls. Ex. N (Sun Dog EA) at 5.[6]  That amounts to 0.16% of the total area in the ARPA.

Each approval was accompanied by an Environmental Assessment ("EA") prepared

---

[6]    The average short-term disturbances for these two projects ranged from 4.2 and 4.4 acres for Sun Dog PODs A & B and 5.2 and 6.1 acres for Catalina PODs A & B.  Pls. Ex. M (Catalina EA) at 6; Pls. Ex. N (Sun Dog EA) at 5.

pursuant to NEPA, which was tiered to the Atlantic Rim EIS.  40 C.F.R. § 1502.20.  The EAs

concluded "the impacts are not expected to be significant, and that an EIS is not required."  Pls.

Ex. M (Catalina EA) at 11; Pls. Ex. N (Sun Dog EA) at 11.  Each of the EAs addresses, among

other things, environmental mitigation measures for the particular sites.  For the Catalina Unit,

all the well permits include seasonal restrictions from February 1 to July 31 to protect raptors,

and 12 of the permits prohibit construction, drilling and other activities potentially disruptive to

wintering wildlife between November 15 and April 15.  Pls. Ex. M (Catalina EA) at 8-9.  All but

two of the permits contain a ban on construction, drilling, reclamation and other potentially

disruptive activities between March 1 and July 15 to protect sage-grouse.  *Id.*  BLM determined

that one of the proposed wells in the Catalina Unit was to be located within the 1/4 mile buffer

zone for a sage grouse lek (breeding area) and "cannot be situated to adequately mitigate the

potential effects to grouse at the adjacent lek." *Id.* at 8.  "As a result, authorization of this APD

will be deferred until additional mitigation measures have been developed to reconsider the

proposal."  *Id.*  BLM also determined that "[n]o mountain plover habitat was identified as being

affected within the project area."  *Id.*

   The Sun Dog Unit has different restrictions specific to it.  Forty-one of the 51 permits

contain seasonal raptor restrictions and 17 permits prohibit construction, drilling, and other

activities "during the reproductive period of April 10 to July 10 for the protection of nesting

plover."  Pls. Ex. N (Sun Dog EA) at 7-8.  One of the permits includes a seasonal restriction to

protect big game crucial winter habitat.  *Id.*  Because of the potential presence of prairie dogs in

the Sun Dog Unit, a survey for black-footed ferrets was conducted.  *Id.* at 9.  However, the

survey results were negative, and the U.S. Fish & Wildlife Service ("FWS") concurred with

BLM's determination that black-footed ferrets were not likely to be adversely affected.  *Id.*

5.     **Public Access to Documents for Permit Proceedings**

BLM regulations require that an APD "shall be initiated at least 30 days before commencement of operations is desired."  43 C.F.R. § 3162.3-1(d).  Upon receipt of an APD, the BLM office is required to post certain information concerning the application (*although not the application itself*) for public inspection.  30 U.S.C. § 226(f); 43 C.F.R. § 3162.3-1(g).  Within 5 days after the end of the 30-day posting period, the BLM must either approve the application, return it and advise the applicant of the reasons for disapproval, or advise the applicant in writing why final action on the application will be delayed.  *Id.* § 3162.3-1(h).

The Catalina and Sun Dog EAs state that "The NOSs[7] or APDs for the proposed action were posted for 30 days in the Rawlins Field Office Information Access Center (Public Room) for review.  Notification of preparation of this EA was provided on the Wyoming BLM internet NEPA register."  Pls. Ex. M (Catalina EA) at 3; Pls. Ex. N (Sun Dog EA) at 3.

In a declaration attached to the motion for a preliminary injunction, the Executive Director of one of the plaintiffs states that he visited the Rawlins, Wyoming BLM field office on September 21, 2007, Pls. Ex. A (Molvar Decl.) ¶¶18-20, well past the 30-day notice period for the Catalina and Sun Dog permits.  He also states that "BLM's Rawlins office posts a notice and map of APDs that it receives in its APD book in the public room for 30 days," but that "[t]his notice does not include the actual application for a permit to drill or any NEPA documents."  *Id.* ¶ 17.  He asked for "copies of the APDs and accompanying NEPA documents prior to BLM's approval" of 27 pending APDs.  *Id.* ¶ 20.  (As previously noted, the BLM regulation requires only posting of certain information concerning the APD, not the APD or any other documents.)

---

[7]     NOS refers to a Notice of Staking, which allows the operator to request an on-site inspection prior to filing an application for permit to drill ("APD").

## ARGUMENT

I.    **PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS.**

   A.    **BLM Complied with NEPA by Allowing Public Participation Before Making Site-Specific Decisions for the Atlantic Rim Project.**

BLM's consideration of the environmental consequences of the Atlantic Rim Project complied with NEPA and applicable regulations. BLM prepared a programmatic EIS for the entire project, which fully explored the environmental issues pertaining to the project as a whole and left to individual permit decisions (and environmental assessments prepared in connection with those decisions) consideration of the site-specific environmental consequences. That approach follows the Council on Environmental Quality ("CEQ") regulations that encourage agencies to adopt a "tiering" approach, under which an EIS is prepared for a broad project and subsequent environmental assessments for particular actions taken as part of the project "shall concentrate on the issues specific to the subsequent action." 40 C.F.R. § 1502.20. Numerous judicial decisions have approved this "tiering" approach. *Nevada v. Dep't of Energy*, 457 F.3d 78, 91-92 (D.C. Cir. 2006) ("The decision whether to prepare a programmatic EIS is committed to the agency's discretion."); *Arkansas Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1101-2 (8th Cir. 2005) ("tiering" approach was adequate to consider cumulative impacts); *Cronin v. U.S. Dep't of Agriculture*, 919 F.2d 439, 447 (7th Cir. 1990) (once an EIS has been issued for a Forest Plan, Forest Service generally is not required to prepare additional EISs for every site-specific project authorized under the Forest Plan).

The ROD for the Atlantic Rim Project imposed numerous, specific environmental restrictions that apply across the board to all future development activities. But, consistent with the "tiering" approach, BLM left some decisions concerning site-specific environmental

measures to an "adaptive management process" developed after actual site-specific operations

were proposed.  Under that process, some decisions concerning mitigation were to be left to

individual permit decisions, and after permit issuance to the evaluation of the results of

subsequent environmental monitoring.  Ex. 3 (ROD) at 16-21; Ex. 4 (IBLA Decision) at 13.

This is unquestionably a valid approach.  The Ninth Circuit approved this approach in

*Northern Alaska Environmental Center v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006), where the

BLM approved a plan to offer long-term oil and gas leases in a portion of northwest Alaska.  The

BLM "developed stipulations and [Required Operating Procedures] to avoid or minimize

environmental harms from the oil program," but also deferred consideration of "additional

protective measures" until "subsequent permit authorizations."  *Id.* at 979.  The Ninth Circuit

upheld that approach, concluding that "BLM development of more specific mitigating measures

cannot be required at this stage."  *Id.*

Plaintiffs argue, however, that because BLM deferred some environmental decisions, the

extensive public notice and comment procedures for its approval of the overall project were not

sufficient, and that each permitting decision also required a special public notice and comment

period in addition to the 30-day public posting and comment period provided by the Mineral

Leasing Act of 1920 and BLM's implementing regulations.  30 U.S.C. § 226(f); 43 C.F.R. §

3162.3-1(g).  The law does not impose such a requirement.  Indeed, imposing such a requirement

could only serve to cripple the natural gas development in the project area.

There is no statutory or regulatory basis for plaintiffs' contention that each implementing

decision requires prior public notice and comment.  They rely primarily on a CEQ regulation

stating generally that "NEPA procedures must insure that environmental information is available

to public officials and citizens before decisions are made and before actions are taken."

40 C.F.R. § 1500.1(b). But where, as here, the agency made a finding of no significant impact with respect to an individual permitting decision, the CEQ regulations only require that the agency provide notice to interested parties. BLM did this through posting notice of the APDs on its web site and in its public room. *Id.* §§ 1501.4(e)(1), 1506.6; Pls. Ex. M (Catalina EA) at 3; Pls. Ex. N (Sun Dog EA), at 3. Only "in certain limited circumstances" not relevant here is the agency required to make its finding of no significant impact available for public review before it takes action. *Id.* § 1501.4(e)(2). These circumstances are: (i) "The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement," or (ii) "[t]he nature of the proposed action is one without precedent." *Id.* Plaintiffs have not even attempted to show that the individual permitting decisions in this case meet those criteria, nor could they.

The CEQ regulations also provide that "the agency shall mail notice to those who have requested it on an individual action." 40 C.F.R. § 1506.6(b)(1). Plaintiffs' declarant asserts that he has requested "notice and copies of applications" as well as accompanying NEPA documents "prior to BLM's approval of any APDs or other ground disturbing activities," and has been refused. Pls. Ex. A (Molvar Decl.) ¶¶14, 15. But the CEQ regulations require only notice; they do not require what plaintiffs are seeking -- *i.e.*, notice and copies of all relevant documents *prior to the agency taking action.*

Nor is there anything in the BLM regulations requiring it to make available to the public, before its permitting decision, the permit applications and related NEPA documents. The only requirement of the BLM regulation is that certain information concerning the permit application (but not the permit application itself) be made available for 30 days before the permit decision. 30 U.S.C. § 226(f); 43 C.F.R. § 3162.3-1(g). Nothing in the regulation requires public

availability, before permit issuance, of the APD and underlying NEPA documents, which is what

plaintiffs are demanding.  Pls. Ex. A (Molvar Decl.) ¶¶14, 20.  Plaintiffs could have submitted

comments or requested the subject APDs during the 30-day public posting period, but did not do

so.  In short, plaintiffs want the Court to impose on BLM a special comment period, in addition

to the 30-day period, that is not required by statute or regulation.  That is plainly barred by

*Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 525 (1978), where the Court

"caution[ed] reviewing courts against engrafting their own notions of proper procedures" upon

administrative agencies.

Nor is plaintiffs' position supported by other case law.  In *Biodiversity Conservation*

*Alliance v. BLM*, 404 F. Supp. 2d 212 (D.D.C. 2005), this Court rejected the contention that

BLM was required to notify the public and take comment on a draft environmental assessment

before allowing a 69-square-mile expansion of a previously approved project for oil and gas

exploration (for which an environmental impact statement had been prepared).  The Court

concluded that "[a] plain reading of the CEQ regulations reveals that an agency is *not* expressly

required to circulate a draft EA for public comment before adopting its final decision, except in

limited circumstances that do not apply here."  *Id.* at 220 (emphasis in original) (citing 40 C.F.R.

§ 1501.4(e)(2)).

The cases plaintiffs cite do not support their position.  The Supreme Court's dictum in

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) states that the

information provided in an environmental impact statement for a major federal action

significantly affecting the environment will be available "to the larger audience that may also

play a role in ... the implementation of [the] decision."  The Court did not require that every step

in the implementation of a programmatic decision made pursuant to an EIS must also be

17

accompanied by public notice and comment procedures.  Indeed, the D.C. Circuit has noted that

"two of our sister Circuits have found that public input during the EA process is not required."

*TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006) (citing *Alliance to Protect Nantucket*

*Sound, Inc. v. U.S. Dep't of the Army*, 398 F.3d 105, 115 (1st Cir. 2005); *Greater Yellowstone*

*Coal. v. Flowers*, 359 F.3d 1257, 1279 (10th Cir. 2004)).  The D.C. Circuit also concluded that,

"[a]t a minimum, [the CEQ regulations] suggest that the agency has significant discretion in

determining when public comment is required with respect to EAs."  *Id.* at 861.

Plaintiffs also rely on *National Wildlife Federation v. Burford*, 835 F.2d 305 (D.C. Cir.

1987), which upheld a determination that plaintiffs' showed that BLM violated FLPMA by

failing to observe that Act's requirements for public participation before it "lifted protective

restrictions pertaining to almost 180 million acres of federal land located in seventeen states."

*Id.* at 307, 323.  The D.C. Circuit concluded that the "total absence of public input into sweeping

policy decisions affecting vast tracts of public land effectively frustrates the public participation

requirement [of FLPMA]."  *Id.* at 323.  The present case—involving individual permit decisions

affecting a maximum of 6.5 acres per drilling site—is not even remotely similar to *National*

*Wildlife Federation*.[8]

Plaintiffs argue that BLM is not making individualized assessments of the site-specific

impact of each well, but instead is relying on the analysis previously done when the agency

approved the overall project.  Pls. Mem. in Support of Mot. for Prelim. Inj. ("Pls. Mem.") at 10,

11.  The EAs refute this assertion.  For example, at the Catalina Unit one proposed well permit

---

[8]    Plaintiffs also cite *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998), holding that "the existence of a programmatic EIS for a forest plan obviates the need for any future project-specific EIS, *without regard to the nature or magnitude of a project.*"  (emphasis added).  In that case, the Ninth Circuit held that the Forest Service had not adequately evaluated whether a logging sale on thousands of acres of public land had a significant impact on the environment, requiring an EIS.  *Id.* at 1210, 1215-16.  Here, plaintiffs do not challenge BLM's decision that the Catalina and Sun Dog APDs do not involve sufficiently significant impacts to require an EIS.

was not approved because it was located within the buffer zone for sage grouse breeding areas, and components were moved after an on-site inspection to avoid impacts. Pls. Ex. M (Catalina EA) at 8. In order to impose appropriate seasonal restrictions at both Units, BLM also surveyed proposed well and road locations and determined their proximity to raptor nests, plover habitat, and crucial winter range. *Id.* at 8-9; Pls. Ex. N (Sun Dog EA) at 7-8. At the Sun Dog Unit, 17 sites (out of 51) were identified as needing restrictions to protect the mountain plover. Pls. Ex. N (Sun Dog EA) at 7-8. There was also a site-by-site evaluation and determination of those wellsites, requiring raptor restrictions, and they were imposed on 37 of the 51 sites. *Id.* Because of the presence of prairie dog colonies within the Sun Dog Unit, a survey for black-footed ferrets was performed but turned up negative. *Id.* at 9. Contrary to Plaintiffs' allegations, the record clearly demonstrates BLM conducted individualized, site-specific assessments of potential environmental impacts and imposed appropriate mitigation measures, as the ROD requires.

BLM posted notice of the APDs as required by its regulations. Its decision not to have a special public notice and comment period prior to the issuance of the Decision Record and Finding of No Significant Impact ("FONSI/DR") was eminently reasonable. The "adaptive management process" adopted by BLM involves individualized site-specific assessments not only at the permit stage, but also subsequently as the results of various monitoring projects are received and evaluated. If public notice and comment is necessary before any site-specific assessment is made, further development of the Atlantic Rim Project would grind to a halt. "[T]he project could never be completed."[9] Nothing in NEPA requires such a result.

---

[9] "As a general rule ..., once an environmental impact statement has been issued for a project, the project can be carried out without the agency's having to issue a new statement for every stage of the project. ... Otherwise the project could never be completed. It would be the application to law of Zeno's Paradox (how can one cross even a finite interval in a finite amount of time, when any interval can be divided into an infinite number of segments each of which must be crossed in turn in order to traverse the entire interval?)." *Cronin*, 919 F.2d at 447 (citations omitted).

**B.    BLM Considered the Environmental Effects of the Proposed Project.**

NEPA's requirements are "essentially procedural": "As long as the agency's decision is 'fully informed' and 'well-considered,' it is entitled to judicial deference, and a court must not substitute its own policy judgment for that of the agency." *S. Utah Wilderness Alliance v. Norton*, 237 F. Supp. 2d 48, 52 (D.D.C. 2002) (quoting *N. Slope Borough v. Andrus*, 642  F.2d 589, 599 (D.C. Cir. 1980)).  "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350.  Here, BLM's decision was "fully informed" and "well considered."

Indeed, BLM engaged in a more than six-year process to review the potential impacts of coalbed and conventional natural gas development in the ARPA.  In the Atlantic Rim EIS, BLM identified the critical environmental elements and then analyzed whether they would be potentially affected by the proposed project.  *See generally* Ex. 2 (FEIS) at 3-1.  BLM reviewed these effects in light of each proposed alternative, as well as the cumulative effects of the proposed project.  In the end, BLM selected an alternative designed to reduce the potential environmental impacts to the extent practicable, while still allowing energy development.

In sum, BLM took the required "hard look" and adequately considered the environmental impacts of the project.  BLM recognized that the project required "surface-disturbing activities that are likely to result in major adverse impacts to certain resource values, as outlined in the FEIS." Ex. 3 (ROD) at 4.  However, BLM concluded, its decision "will result in production of nationally significant natural gas resources consistent with The National Energy Policy (May 2001) and the National Energy Policy Act of 2005." *Id.*

20

BLM fulfilled its responsibilities under NEPA by considering the potential adverse environmental effects, adopting appropriate measures, concluding that adverse effects would still occur to some degree, but deciding on balance that its decision was necessary to further national energy policy. That is perfectly consistent with NEPA. Plaintiffs merely disagree with BLM's final decision. However, BLM is entitled to substantial deference, and the record shows that BLM did more than NEPA requires.

### 1. BLM evaluated a reasonable range of alternatives and mitigation measures.

Plaintiffs assert that BLM failed to consider a reasonable range of alternatives when analyzing impacts on sage grouse and the specific PODs at issue here. Pls. Mem. at 17. An agency is "entitled to identify *some* parameters and criteria – related to Plan standards – for generating alternatives to which it would devote serious consideration. Without such criteria, an agency could generate countless alternatives." *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 575 (9th Cir. 1998). "An agency is required to examine only those alternatives necessary to permit a reasoned choice." *Id.* at 576 (citation omitted). Contrary to plaintiffs' claims, BLM did consider numerous alternative mitigation measures for the greater sage-grouse. Moreover, NEPA does not require agencies to mitigate adverse effects and does not require a detailed explanation of the mitigation measures that will actually be employed. *See, e.g., Robertson*, 490 U.S. at 353.

First, the record as a whole reflects that BLM considered numerous mitigation measures related to the greater sage-grouse. BLM considered alternatives to the proposed action by developing its preferred alternative (Alternative D), which resulted in mitigation measures not included in the proposed project. *See Wright v. Inman*, 923 F. Supp. 1295, 1304 (D. Nev. 1996) (agency looked at reasonable range of alternatives where the "selected alternative ensures greater

21

environmental protections than the proposal advanced by [the project proponent]").  BLM found

that Alternative D would reduce direct habitat loss as compared to the Proposed Action by 20%

(8.1% of available nesting habitat as compared to 10%).  Ex. 2 (FEIS) at 4-83.  While

recognizing the potential for indirect adverse effects on habitat, BLM found that the mitigation

measures were intended to address the indirect loss of habitat and reduce the stress to greater

sage-grouse in proximity to leks on public lands.  *Id.*

Plaintiffs erroneously assert that BLM only considered the measures outlined in BLM's

Wildlife Monitoring and Protection Plan, limiting surface disturbances within 1/4 mile of "the

perimeter of occupied leks" and a two-mile buffer from March 1 to July 15.  Ex. 2 (FEIS), App.

E, at E-7, cited in Pls. Mem. at 20.  But, plaintiffs fail to note additional measures BLM

considered and imposed as necessary based on site-specific conditions, including (a) the

prohibition of *any human activity* within 1/4 mile of occupied leks from 6 p.m. to 9 a.m. from

March 1 to May 20; (b) limits on the construction of permanent and high-profile structures

within 0.25 to 1 mile of the perimeter of leks; (c) prohibition of surface disturbances within 1

mile of an occupied Columbian sharp-tailed grouse lek or in nesting and early brood-rearing

habitat associated with individual leks from March 1 to July 15; (d) prohibition of surface

disturbances between November 15 and March 14 in delineated winter concentration areas; and

(e) noise reduction techniques, including using hospital style mufflers on compressor stations

and generators.  *Id.*  Plaintiffs also ignore the required annual inventory and monitoring for the

sage-grouse.  *Id.* at E-4.

The specific EAs for the PODs at issue implement the mitigation measures identified in

the FEIS.  *See* Pl. Ex. M (Catalina EA) at 8-9 (prohibiting construction, drilling, reclamation and

other potentially disruptive activities from March 1 to July 15 for the protection of sage grouse);

Pl. Ex. N (Sun Dog EA) at 7-8 (same).  These measures are also incorporated in the 18 pages of

COAs for the Sun Dog Unit and 12 pages of COAs for the Catalina Unit A and B PODs.  Ex. 9

(Sun Dog PODs A&B COA); Ex. 10 (Catalina PODs A&B).  These measures were developed by

BLM after on-site inspections.[10]  Clayson Decl. ¶4; Bessera Decl. ¶7 (attached as Ex. 6).

In addition, contrary to plaintiffs' assertion, BLM considered more stringent measures

cited by plaintiffs under its Alternative C in the FEIS.  For example, Alternative C would have

imposed a limitation of surface disturbance of no more than 20 acres and no more than 4 well

pads per 640 acres for the protection of wildlife, including the sage grouse.  Ex. 2 (FEIS) at 2-4.

This Alternative was developed based on recommendations of the Wyoming Game and Fish

Department ("WGFD"), which were based, in part, on the Connelly report relied on by plaintiffs

(Pl. Ex. Q).  *See* WGFD, *Recommendations for Development of Oil and Gas Resources within*

*Crucial and Important Wildlife Habitats*, at 19, 97 (Dec. 6, 2004), *available at*

http://gf.state.wy.us/downloads/pdf/org.pdf.  The ROD notes that WGFD recommendations will

be considered for potential mitigation within the process of wildlife monitoring and mitigation.

Ex. 3 (ROD) at App. E (throughout).  BLM further analyzed the potential impacts to the sage-

grouse, including the results of the Holloran and Naugle studies cited by Plaintiffs, and discussed

the potential impacts beyond the 2-mile buffer zone.  Ex. 2 (FEIS) at 3-94 to 3-96, 4-75 to 4-76.

Thus, BLM considered numerous mitigation measures, including those preferred by Plaintiffs.[11]

---

[10]    BLM considered additional mitigation measures, such as establishing a variety of forage species that are useful to resident herbivores by specifying the seed mixes during reclamation and discouraging unnecessary off-site activities of operational personnel in the vicinity of the drill sites. Ex. 2 (FEIS) App. K, at K-24.  BLM also considered BMPs for the greater sage-grouse and Columbian sharp-tailed grouse, such as using directional drilling, seasonal restrictions of public vehicular access, noise reduction techniques and designs, burying of power lines, and transportation planning. Ex. 2 (FEIS) App. H, at H-13.

[11]    NEPA "'requires only that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated.' … The [agency] went beyond merely satisfying the procedural requirements of NEPA and adopted numerous mitigation measures to avoid or minimize the adverse environmental effects of the [project]." Wright, 923 F. Supp. at 1304 (citation omitted).  In addition, NEPA does not require BLM to analyze the effectiveness of the mitigation measures. *See N. Alaska Envtl. Ctr.*, 457 F.3d at 979 (rejecting claim

Second, plaintiffs' disagreement with BLM's choice of mitigation measures does not render BLM's analysis insufficient. "[O]nce environmental concerns are adequately identified and evaluated by the agency, NEPA places no further constraint on agency actions." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006) (citation omitted). BLM found that "[l]iterature reviews show that requirements for no surface disturbance (NSD) from a lek generally run in the quarter-mile to 2-mile range. The quarter-mile NSD is generally a minimum distance." Ex. 2 (FEIS), App. O, at O-393. The real dispute plaintiffs have is over the specific measures adopted. However, nothing in NEPA requires BLM to have chosen one measure over another, or, in this case, the maximum value cited in literature. NEPA is a procedural statute—it does not require the imposition of particular mitigation measures. Disagreement over recommended mitigation measures does not render BLM's analysis inadequate, especially when BLM was specifically aware of the mitigation measures and studies advocated by the plaintiffs. *See, e.g., Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Morongo Band of Mission Indians*, 161 F.3d at 577 (same); *Webb v. Gorsuch*, 699 F.2d 157, 160 (4th Cir. 1983) (same).

Moreover, BLM noted how more stringent restrictions were "likely not economically feasible nor capable of maximizing recovery of the natural gas resource." Ex. 2 (FEIS) at 1-20, App. O, at O-323; *see also id.*, App. O, at O-324 ("The BLM will not apply measures that are in conflict with resource goals of the Great Divide Resource Management Plan. BLM will not apply measures that are not feasible."). BLM's geological and petroleum experts in the

---

that agency violated NEPA by only listing "general mitigation measures" and not analyzing effectiveness of each measure).

Reservoir Management Group ("RMG") determined that the ARPA could not be developed on 160-acre well spacing.  Ex. 7 (RMG Report, June 2005) at 3-4.  The Wyoming Oil and Gas Conservation Commission similarly approved well density patterns in the area of 8 wells per 640 acres (80-acre spacing).  Ex. 2 (FEIS) at 1-8.  Moreover, BLM was not required to further analyze measures it already found infeasible.  *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196-99 (D.C. Cir. 1991) (finding an agency is obligated to keep needs and goals of project applicant in mind when considering alternatives); *see also Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1031 (10th Cir. 2002) ("Alternatives that 'do not accomplish the purpose of an action are not reasonable' and need not be studied in detail by the agency.") (citation omitted).

In fact, BLM's map outlining the known leks in the project area and the 2-mile buffer (Ex 2 (FEIS), Map M-26) illustrates the unreasonableness of plaintiffs' proposal.  Sage-grouse nesting habitat covers 92 percent of the ARPA.  Ex. 2 (FEIS) at 4-76.  Restricting activity beyond the 2-mile buffer would virtually eliminate any drilling at all.  This would be contrary to the purposes and need of the project.  As the IBLA found, "BLM considered a panoply of mitigation measures in connection with the proposed Project and alternatives thereto, in an effort to avoid or mitigate the significant impacts of the Project.  It was not required, however, to adopt particular measures in order to avoid or minimize significant impacts."  Ex. 4 (IBLA Decision) at 20 (citation omitted).

The record demonstrates BLM adequately considered potential mitigation measures for the sage-grouse, and incorporated appropriate mitigation measures.  Plaintiffs are not likely to succeed on their claims that BLM failed to analyze mitigation measures for the sage-grouse.

2.    **BLM took a hard look at environmental impacts.**

Plaintiffs contend that BLM failed to consider several environmental impacts from the Catalina and Sun Dog PODs, including alleged increased risk of methane seeps and other development planned for the region.  Again, plaintiffs merely disagree with BLM's conclusions. In the administrative appeal, the IBLA considered and rejected these assertions, finding that the plaintiffs there "failed to show a likelihood of success on [the] argument that BLM failed to give adequate consideration to likely impacts related to methane seeps or that new information on methane seeps requires completion of a supplemental EIS" and that they "have failed to show that they are likely to succeed in establishing that BLM failed to give adequate consideration to the likely cumulative impacts of the Project."  Ex. 4 (IBLA Decision) at 18, 15.

a.    BLM adequately considered the potential impacts of methane seeps.

Plaintiffs' claim that "new information" required BLM to supplement the EIS is meritless.  "[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized.  To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."  *Marsh*, 490 U.S. at 373.  A supplemental EIS is required only when the agency "makes substantial changes in the proposed action" or there are "significant new circumstances or information."  40 C.F.R. § 1502.9(c)(1).  A supplement is necessary if the changes will have a significant impact on the environment "that has not previously been covered by the [original] EIS."  *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002) (citations omitted); *see also W. Branch Valley Flood Protection Ass'n v. Stone*, 820 F. Supp. 1, 6 (D.D.C. 1993) ("The supplementation process is triggered when new information presents a '*seriously* different picture of the environmental landscape' such that another in-depth

26

look at the environment is necessary.") (emphasis in original) (citation omitted).  Such is not the case here.

BLM specifically analyzed and disclosed the potential for methane seeps in the Atlantic Rim EIS.  In particular, BLM stated:

> Methane seeps could possibly develop in the outcrop region of the Mesaverde Group as a result of this project.  These seeps could contaminate shallow groundwater sources and may also cause the death of vegetation in limited areas.  The number or location of these seeps is impossible to predict, therefore monitoring would be established to evaluate this impact.

Ex. 2 (FEIS) at 4-32.[12]  BLM required the installation of three groundwater monitoring wells to obtain additional information to assist in the evaluation of the methane springs.  Ex. 3 (ROD) at B-10.  BLM also required the collection of isotopic data "to quantify potential impacts from methane seeps where the Mesaverde Group outcrops."  Ex. 2 (FEIS) at 4-49.  NEPA does not, however, require BLM to wait until these studies are completed to begin approving projects under the FEIS.  *See Cady v. Morton*, 527 F.2d 786, 796 (9th Cir. 1975) ("If we were to impose a requirement that an impact statement can never be prepared until all relevant environmental effects were known, it is doubtful that any project could ever be initiated.").

Moreover, NEPA requires analysis of the direct and indirect impacts *caused by* the proposed project.  Direct impacts are those that are "*caused by the action* and occur at the same time and place."  40 C.F.R. § 1508.8(a) (emphasis added).  "Indirect impacts" are defined as those impacts that "*are caused by the action* and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Id.* (emphasis added).  "NEPA requires a 'reasonably close causal relationship' between the environmental effect and the alleged cause."  *Dep't of Transp. v.*

---

[12]    BLM also analyzed the potential impacts of pyrophoricity (spontaneous combustion) in dewatered coal formations and determined, based on existing studies, that spontaneous combustion of coal beds during CBNG development is unlikely because insufficient oxygen is present for oxidation and combustion.  Ex. 2 (FEIS) at 3-8.

*Public Citizen*, 541 U.S. 752, 767 (2004) (quoting *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983)).  There is no credible evidence of a causal relationship between oil and gas operations in the ARPA and the methane seeps.

The "new information" cited by plaintiffs, in fact, demonstrates that the proposed drilling is not the cause of the seeps.  The presentation identified by plaintiffs (Pls. Mem. at 24) recognized that the methane seeps have been documented in the Atlantic Rim area since the late 1800s.  Ex. 11 (Presentation); *see also* Beserra Decl. ¶12.  BLM noted this fact in response to plaintiff Wyoming Outdoor Council's letter (Pls. Ex. T), stating that methane seeps in the Atlantic Rim area "have been in existence since before the interim drilling occurred in the Atlantic Rim area."  Ex. 1 to Bessera Decl. (BLM Letter) at 1.  BLM also noted that Wyoming Department of Environmental Quality ("WDEQ") has found that the methane seeps are not related to the re-injection of produced water and are most likely the result of natural seepage of methane gas from nearby surface coals or abandoned wells.  *Id.*  Nonetheless, BLM is continuing to study this issue to ensure against potential future impacts.  Beserra Decl. ¶13.  Thus, plaintiffs point to no "new information" that BLM did not already consider.  Further, the potential impacts of methane seeps are being further studied by operators and numerous state and local agencies.[13]

b.     BLM analyzed the cumulative impacts of the project.

Plaintiffs claim that BLM's analysis of cumulative impacts was inadequate by failing to address cumulative impacts to wildlife habitat and downstream water quality and failing to include impacts from two other proposed developments.  Plaintiffs ignore the history of the environmental review in this case.

---

[13]    In passing, plaintiffs claim that the FEIS was required to address potential greenhouse gas emissions resulting from the methane seeps.  Plaintiffs provide no support for such claim.  As noted, BLM found that the methane seeps were not caused by the proposed action.  The air quality impact analysis further found that, while "Methane gas may be flared or vented during the testing period at natural gas wells; no gas would be flared or vented at coalbed methane wells."  Ex. 2 (FEIS) App. F, at 5.  Further, evidence in the record shows the benefits of CBM with respect to reducing greenhouse gas emissions over the use of coal.  Ex. 2 (FEIS) App. N, Warren Comments, at 2.

Under NEPA regulations, the "EIS must analyze the combined effects of the actions in sufficient detail to be 'useful to the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 810 (9th Cir. 1999). The cumulative impact analysis is intended to ensure that the environmental concern is not treated "in a vacuum." *Grand Canyon Trust v. FAA*, 290 F.3d 339, 346 (D.C. Cir. 2002). The purpose of the requirement "is to prevent agencies from dividing one project into multiple individual actions 'each of which individually has insignificant environmental impact, but which collectively have a substantial impact.'" *NRDC v. Hodel*, 865 F.2d 288, 297-98 (D.C. Cir. 1988) (citations omitted). This was not done here.

BLM's entire approach in this case facilitated consideration of cumulative impacts. BLM considered the potential impacts of development in the ARPA, and the specific PODs at issue in this case, in connection with other reasonably foreseeable projects. The Great Divide RMP analyzed the potential impacts of opening the entire Great Divide Resource Area for oil and gas leasing. The Atlantic Rim Project EIS was tiered to this analysis. Ex. 2 (FEIS), App. O, at O-165. In the FEIS, BLM also considered past, existing, and "reasonably foreseeable future actions," 40 C.F.R. § 1508.7, including those located in (a) the ARPA, (b) the Southeastern Sweetwater County/southwestern Carbon County cumulative impact analysis ("CIA") area, (c) the Watershed CIA area, and (d) the Regional CIA area. Ex. 2 (FEIS) at 5-1. The Southeastern Sweetwater County/Southwestern Carbon County CIA area considered several oil and gas activities, including over 3,500 natural gas wells (such as those approved in the Continental Divide/Wamsutter II and Creston/Blue Gap projects) in an area encompassing over 1.7 million acres of land. *Id.* at 5-2 to 5-3. *See also id.* at 1-10, 1-11 (map of other development projects). The Watershed CIA area reviewed resources related to the relevant watersheds and encompassed

approximately 6.9 million acres, including the Continental Divide/Wamsutter II and Creston/Blue Gap projects. *Id.* at 5-3 to 5-4. The Regional CIA area, primarily used for air quality and socioeconomic review, included the southern half of Wyoming, northern Colorado, and northeast Utah. *Id.* at 5-4.

The cumulative impacts considered by BLM included, but were not limited to, water resources, fish, and big game wildlife. *See* Ex. 2 (FEIS) at 5-1 to 5-26. The analysis of the Watershed CIA area considered regional surface water quality, including the contributions of salt loading into the Colorado River system from activities unrelated to the ARPA, the only surface discharges identified with respect to the ARPA (related to the Cow Creek POD which are subject to Wyoming Clean Water Act permits), and combined impacts from other oil and gas projects on Muddy Creek due to potential surface runoff.[14] *Id.* at 5-10 to 5-11. BLM did estimate the salt loading associated with the Cow Creek POD, and, in considering salinity loading, BLM found that conditions under the proposed action would be similar to current conditions. Ex. 2 (FEIS) at 4-28. Additional discharges of pollutants would be subject to federal and state permitting requirements, and may be subject to NEPA. Ex. 2 (FEIS) at 3-59.

BLM also looked at the cumulative impacts to fish species, including those found upstream in Muddy Creek. Ex. 2 (FEIS) at 5-19. BLM found "no known additional proposals to analyze or assess" at this time. *Id.* Nonetheless, with respect to the fish species located in the Colorado River Basin cited by the plaintiffs (Pls. Mem. at 27-28), BLM conducted a biological assessment to review, among other things, the potential impacts on Colorado River fish species,

---

[14]    BLM was not required to quantify the potential amount of salt-loading, nor do plaintiffs indicate whether such analysis is possible. *See* 40 C.F.R. § 1502.22 ("When an agency is evaluating reasonably foreseeable significant adverse effects … and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking."). *See also Clinch Coalition v. Damon*, 316 F. Supp. 2d 364, 387 (W.D. Va. 2004) (rejecting plaintiff's claim that agency was required to quantify cumulative impacts, relying on CEQ guidance that notes "qualitative evaluation procedures can be used"). Further, mitigation measures considered "will go a long way to reduce these impacts." Ex. 2 (FEIS), App. O, at O-84.

which included 4 species that were endangered, threatened, or potential candidates under the

Endangered Species Act.  Ex. 2 (FEIS), App. G., at G-13 to G-14.  BLM found produced water

discharges associated with the only surface water discharges in the project (other developments

will deep well inject produced water) do not pose a risk to these species, and mitigation measures

would prevent potential downstream sedimentation and contamination caused by construction

activities.  *Id.* at G-18 to G-19.  "Therefore, water quality in the Colorado River system is not

expected to be impacted by the Proposed Action."  *Id.* at G-19.  While noting that water

depletions "might" impact the four Colorado River species, BLM also found that the FWS has

found the recovery program for these fish has made sufficient progress and that depletions of 100

acre-feet or less (such as those associated with the Atlantic Rim project) are not likely to

jeopardize the species.  *Id.*; *see also id.* at G-20 (noting cumulative impacts are likely to be less

than 100-acre feet per year from the project).  Thus, BLM sufficiently addressed cumulative

impacts to these species.

  Plaintiffs also contend that BLM failed to "quantify the effective overall impact on big

game habitat and migratory routes."  Pls. Mem. at 27.  Again, Plaintiffs misconstrue the record.

As an initial matter, as previously noted (*supra* note 16), BLM is not required to quantify the

potential impacts.  Nonetheless, here BLM did attempt to quantify the total disturbance caused

by the Atlantic Rim project and other developments in its cumulative impact analysis.  In the

ARPA, for example, BLM found that 20-35% of vegetation in the region could be impacted by

dust and desertification due to roads associated with existing and proposed oil and gas

development.  Ex. 2 (FEIS) at 5-12.

  Contrary to plaintiffs' contentions, BLM disclosed estimates of potential surface

disturbance for each alternative in the Atlantic Rim EIS in relation to the cumulative surface

disturbance from oil and gas activities in the CIA for big game.  *See id.* at 5-16 (Table 5-2).

Table 5-2 specifically discloses surface disturbance for each big game species, by unit, includes

estimates for initial and life-of-project disturbance, as well as existing and potential future

cumulative surface disturbance.  *Id.*  With respect to wildlife habitat specifically, BLM also

noted that "it was not possible to specifically determine where future impacts would occur within

CIA [([defined above)] area," and "estimates of total disturbance were made based upon the

location of past, present, and known future projects within the CIA areas and the expected

amount of disturbance associated with each project."  Ex. 2 (FEIS) at 5-14.  In particular, BLM

estimated big game habitat disturbances for the ARPA and adjacent oil and gas project EIS

boundaries.  *Id.* at 5-14 to 5-17.  Although BLM did analyze potential migration routes, BLM

found the cumulative effects on migration routes were unknown.  *Id.*; *see also id.*, App. O, at O-

265.  As previously noted above, BLM is not restricted from issuing its EIS when such

information is not available.  *See* 40 C.F.R. § 1502.22.

        Finally, plaintiffs contend the Atlantic Rim EIS did not specifically address two

additional proposed projects that are located in Wyoming—the Continental Divide/Creston and

Hiawatha natural gas development projects.  The Continental Divide/Creston project involves a

proposal to develop up to 7,700 natural gas wells in the Continental Divide/Wamsutter II area,

which was combined with a proposal for 1,250 natural gas wells proposed in the Creston/Blue

Gap II Natural Gas Project area for purposes of the NEPA review.  71 Fed. Reg. 10,989, 10,989

(Mar. 3, 2006).  The FEIS recognized the pending review of the Continental Divide/Creston,

which was an outgrowth of the Continental Divide/Wamsutter II and Creston/Blue Gap projects

(both of which were included in the Atlantic Rim EIS review).  Ex. 2 (FEIS) at 1-10, 1-11, Map

M-5 (Mineral Development Projects in the Vicinity).  The Hiawatha project is also a natural gas

development project located southwest of the Atlantic Rim project, but not adjacent to the ARPA.  The proposal is for up to 4,207 wells.[15]  71 Fed. Reg. 25,571, 25,572 (Sept. 6, 2006).  Both reviews remain pending, and BLM has not issued a draft EIS for either project.

Because these projects were only in their nascent stages, BLM was not required to consider the proposed extension of the Continental Divide and Creston projects or the Hiawatha project in the Atlantic Rim EIS.  Because natural gas continues to be developed in the Region, under plaintiffs' view of the law, no single EIS could ever be completed.  For example, the Fifth Circuit rejected a similar argument, upholding the agency's decision to consider only those projects for which "an approved public Draft NEPA document [was] available for review at the time of the Draft EIS" for the challenged federal action.  *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368-69, 371 (5th Cir. 2006).  The Fifth Circuit affirmed the agency's determination that such analysis would involve too many uncertainties as to whether the projects would be approved or the conditions that may be imposed.  *Id.*  As evidenced in this case, where the proposed Atlantic Rim project dropped from 3,880 proposed wells to approximately 2,000, the result of the NEPA review for these two other project could result in substantial changes.  Thus, there were no reasonably foreseeable impacts requiring BLM review in this EIS.  The FEIS, to which the EAs are tiered, devoted a substantial amount of time to analysis of the cumulative impacts of the Atlantic Rim Project, including the amount of disturbance in the area.  Simply because plaintiffs "would have done more" does not render BLM's reasoned analysis of cumulative impacts arbitrary.  *S. Utah Wilderness Alliance v. Norton*, 326 F. Supp. 2d 102, 117

---

[15]    The Scoping Report for the Hiawatha project was only issued in November 2006, the same month that the FEIS for the Atlantic Rim Project was completed.  *See* BLM, *Hiawatha Regional Energy Development Project Environmental Impact Statement Scoping Report and Summary of Public Scoping Comments, Rock Springs Field Office, Wyoming Little Snake Field Office, Colorado,* Nov. 2006, *available at* http://www.blm.gov/wy/st/en/info/ NEPA/rsfodocs/hiawatha.html.  In the scoping report, public comments noted both the Continental Divide-Creston and Atlantic Rim projects as being in the Washakie Basin for consideration in the EIS.

(D.D.C. 2004).

"Because the NEPA process 'involves an almost endless series of judgment calls … [t]he line drawing decisions … are vested in the agencies, not the courts.' … Therefore, the 'role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" *Fund for Animals v. Hall*, 448 F. Supp. 2d 127, 132 (D.D.C. 2006). *See also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002) ("[u]nder NEPA we defer to an agency's determination of the scope of its cumulative effects review.") (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 413-14 (1976)).  In this case, BLM properly concluded that these early-stage projects need not be considered in the cumulative impacts analysis in the Atlantic Rim EIS.

### 3.  Plaintiffs' assertion that the EAs lack adequate discussion is meritless.

Plaintiffs also take issue with the detail of discussion in the EAs for the specific PODs at issue in this case.  However, an EA is a "concise public document" that "include[s] brief discussions of the need for the proposal, of alternatives …, of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  40 C.F.R. § 1508.9(a), (b).  The EAs are tiered to and incorporate by reference the FEIS, which, as described above, more than adequately addresses the issues raised by plaintiffs.  *See also Morongo Band of Mission Indians*, 161 F.3d at 581 (finding EAs adequately addressed cumulative impacts by incorporating analysis in other documents); *N. Plains Res. Council v. Lujan*, 874 F.2d 661, 666 (9th Cir. 1989) ("The EA analyzing the exchange must be read together with the [broader project's] draft and final EIS reports, and all supporting documentation taken as a whole.").

Moreover, the EAs were not boilerplate.  They exhibit individualized consideration of the particular projects.  Each EA identifies the potentially affected environmental resources.  Pls. Ex.

N (Sun Dog EA), at 6-7; Pls. Ex. M (Catalina EA), at 7-8.  The EAs quantify the surface

disturbance associated with the projects, which met the disturbance goals of the ROD, and note

that several project components were moved to reduce potential impacts to soils, water

resources, vegetation and wildlife resources based on an on-site inspection.  Pls. Ex. N (Sun Dog

EA), at 4-5; Pls. Ex. M (Catalina EA), at 5-6.  Each EA, and documents incorporated by

reference (such as the Conditions of Approval and the Water Management Plan), also outline the

mitigation measures required.  Pls. Ex. N (Sun Dog EA), at 6-10; Pls. Ex. M (Catalina EA), at 8-

10.  BLM was clearly justified in finding no significant impact, given BLM's previous analysis

in the Atlantic Rim EIS, the small acreage involved, and all the mitigation measures imposed by

BLM.

### C.     Plaintiffs Are Not Likely to Succeed on their Clean Water Act Claim.

#### 1.     The Court lacks jurisdiction over Plaintiffs' CWA claim.

Plaintiffs assert that BLM violated section 401(a)(1) of the CWA (33 U.S.C.

§ 1341(a)(1)) because it did not receive a water quality certification from the State of Wyoming

prior to approving the APDs.  Pls. Mem. at 26-28.  Plaintiffs, however, failed to satisfy the

CWA's citizen suit notice requirement, and the Court lacks jurisdiction over their claim.

The citizen suit provision of the CWA requires that any citizen seeking to enforce an

"effluent standard or limitation under this chapter," must first provide a sixty-day notice.  33

U.S.C. § 1365(a) & (b).  An "effluent standard or limitation under this chapter" includes

"certification under section 1341 of this title."  *Id*. at § 1365(f).  Thus, Plaintiffs' claim requires

prior notice to BLM.  *See Or. Natural Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1095 (9th Cir.

1998) (finding claim under section 401 against federal agency to fall within CWA's citizen suit

provision).  Because Plaintiffs have not provided the required sixty-day notice to BLM, this

Court lacks jurisdiction, and Plaintiffs' CWA section 401 claim must be dismissed.[16]  *See*

*Hallstrom v. Tillamook Cty.*, 492 U.S. 20, 31-33 (1989) (holding failure to comply with sixty-day

notice provision mandated dismissal in construing analogous sixty-day notice requirement under

Resource Conservation and Recovery Act); *Nat'l Envtl. Found. v. ABC Rail Corp.*, 926 F.2d

1096, 1097-98 (11th Cir. 1991) (following *Hallstrom* in dismissing CWA citizen suit for failure

to comply with sixty-day notice requirement); *Basel Action Network v. Maritime Admin.*, 370 F.

Supp. 2d 57, 76 (D.D.C. 2005) (dismissing claim for failure to comply with analogous notice

requirements of Toxic Substances Control Act).

## 2.    BLM did not violate the CWA by approving the APDs.

In addition to being jurisdictionally barred, Plaintiffs' CWA claim fails because section

401(a)(1) does not require a state water quality certification in this instance.

Section 401 requires a water quality certification before a federal agency approves a

permit or license *only* where the underlying activity "may result in any discharge into the

navigable waters."  33 U.S.C. § 1341(a)(1).  Thus, a state water quality certification is not

required where the underlying activity approved by the federal permit will not result in a

"discharge into the navigable waters" of the United States.[17]

In interpreting the term "discharge" in a similar challenge, the Ninth Circuit held that a

---

[16]    This jurisdictional requirement cannot be avoided by claiming jurisdiction under the APA or 28 U.S.C. § 1331. *See Hayes v. Whitman*, 264 F.3d 1017, 1025 (10th Cir. 2001) (holding APA review not available where CWA citizen suit provision provides specifically for judicial review); *Allegheny Cty. Sanitary Auth. v. EPA*, 732 F.2d 1167, 1177 (3rd Cir. 1984) (same); *Kingman Park Civic Ass'n v. U.S. Envtl. Prot. Agency*, 84 F. Supp. 2d 1, 9 (D.D.C. 1999) (same).  Moreover, the Plaintiffs cannot assert that 28 U.S.C. § 1331 (federal question jurisdiction) provides the Court with jurisdiction to hear their section 401 claim independently of the citizen suit provision's notice requirements.  *See Caldwell v. Gurley Refining Co.*, 533 F. Supp. 252, 257 (E.D. Ark. 1982) (finding that the "requirements of 33 U.S.C. § 1365 must be met and that 28 U.S.C. § 1331 does not give the plaintiff an alternative procedure for conferring jurisdiction").

[17]    As an initial matter, in light of the decision in *Rapanos v. United States*, 126 S. Ct. 2208 (2006), plaintiffs have not shown that the project area contains any "navigable waters."  The phrase "navigable waters" is defined in the CWA to mean the "waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  The Supreme Court recently addressed the definition of "navigable waters" in *Rapanos*, 126 S. Ct. at 2225.  Notably, BLM's analysis indicates the "Great Divide Basin [in which the project area is located] is unlikely to have any waters of the U.S."  Ex. 2 (FEIS) at 4-26.

section 401 water quality certification is not required for federal permits that allow activity that

may only result in "runoff." *Or. Natural Desert Ass'n*, 172 F.3d at 1098.  The Ninth Circuit held

that the term "discharge" as used in section 401 is "limited to discharges from point sources."

*Id.* at 1097.[18]  In turn, "'runoff' describes pollution flowing from nonpoint sources" and,

therefore, is not a "discharge" that requires a section 401 certification.  *Id.* at 1098.  *See also*

*Appalachian Power Co. v. Train*, 545 F.2d 1351, 1373 (4th Cir. 1976) (runoff from a property

that is "unchanneled and uncollected" is not a discharge from a point source); *Idaho*

*Conservation League v. Caswell*, No. CV 95-394-S-MHW, 1996 WL 938215, at *9 (D. Idaho

Aug. 12, 1996) (finding road through Forest Service lands did not require a section 401

certification under CWA section 401).

      Plaintiffs fail to identify any discharge to navigable waters from a point source that will

occur as a result of the drilling activities approved in the APDs, nor can they.  While the Atlantic

Rim EIS suggests that drilling activities in the ARPA generally may result in increased

sedimentation and erosion from runoff and drainage (Pls. Mem. at 29), plaintiffs do not identify

any specific point source discharges to navigable waters that are authorized by these APDs or

will occur as a result of the drilling activities in the Sun Dog and Catalina PODs.  Hence, their

claim that BLM violated section 401 of the CWA must fail.

      In fact, the record shows that the approved drilling activities in the Sun Dog and Catalina

PODs will not result in any point source discharge to navigable waters.  Water produced in the

drilling process for the Sun Dog and Catalina PODs will not be discharged to any surface waters

or waterways.  Such "produced water" will be re-injected into the ground through "disposal

wells permitted by the BLM and the State of Wyoming."  Pls. Ex. N (Sun Dog EA) at 6; Pls. Ex.

---

[18]  A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

M (Catalina EA) at 7.  Thus, there will be no discharge of produced water to navigable waters.

*See Inland Steel Co. v. EPA*, 901 F.2d 1419, 1422 (7th Cir. 1990) (noting that injecting

discharges into underground wells is not "discharging … into navigable waters").  In addition,

among the mitigation measures identified by BLM is "[a]void[ing] construction of well sites,

access roads, and pipelines within 500 feet of surface water and/or riparian areas."  Ex. 3 (ROD)

App. C, at C-4.  With such distances between the PODs and any surface waters, no discharges at

all are likely to occur.[19]

Thus, Plaintiffs' argument that BLM could not approve the APDs in this case absent a

section 401 water quality certification will not succeed on the merits.

## II.     THE BALANCE OF EQUITIES DOES NOT FAVOR A PRELIMINARY INJUNCTION.

### A.     Injunctive Relief Would Not Avoid Plaintiffs' Alleged "Irreparable Injuries."

Plaintiffs have claimed that this case challenges the two specific projects—the Catalina

and Sun Dog A & B PODs.[20]  Plaintiffs assert an injunction is necessary to "preserve the *status*

*quo*."  Pls. Mem. at 31.  However, the alleged harms related to the specific PODs at issue have

largely already occurred.  Hence, an injunction with respect to these two projects "would be all

but futile at this time."  *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987-88 (D.C. Cir. 1975).

Double Eagle received approval from BLM for the Catalina A&B PODs on June 28,

---

[19]     Moreover, for approvals for which a state water quality certification under section 401 is required, the certification has been obtained.  For example, the State of Wyoming has previously issued a state-wide section 401 water quality certification for the use of Nationwide Permit No. 14 for "Linear Transportation Projects," which governs road crossings of "waters of the United States."  72 Fed. Reg. 11,092, 11,183 (Mar. 12, 2007); WDEQ Letter, Mar. 20, 2007, at 3, available at https://www.nwo.usace.army.mil/html/od-rwy/wdeq32007.pdf.  There are no road crossings that have been constructed or will be constructed across any Class 1 waters in association with the Sun Dog and Catalina PODs.  (*See* List of Class 1 waters in WDEQ Letter, Mar. 20, 2007, at 4-5).

[20]     In its claim for relief, however, plaintiffs seek an injunction against all activities tied to the Atlantic Rim EIS. Compl. at 19.  That claim for relief would only be proper in a challenge to the Atlantic Rim EIS, which is the subject of *TRCP v. Kempthorne*, Case No. 1:07-cv-1486-RJL (filed Aug. 17, 2007).  Plaintiffs here, however, have stated the *TRCP* case is unrelated.  Plaintiffs have not explained their apparent inconsistency, nor explained how this broad relief could be imposed in a challenge to two specific projects.

2007.  Degenfelder Decl. ¶7 (attached as Ex. 8).  Because of administrative appeals and petitions

for stay filed by groups opposed to the projects, including several of the named plaintiffs in this

case, Double Eagle voluntarily delayed the start of its operations for 45 days, until August 6,

2007.  *Id.* ¶9.  Since August 6, 2007, Double Eagle has drilled and cased fifteen CBNG wells

within the Catalina A&B PODs, which are currently awaiting completion and pipeline hookup.

*Id.* ¶10.  Additionally, Double Eagle has spudded another eighteen CBNG wells within the

Catalina A&B PODs and is in the process of drilling one produced water reinjection well.  *Id.*

Double Eagle also has constructed roads to all well site locations, the pad for the central delivery

point, and the pads for two water transfer stations.  *Id.*  Approximately ninety-five percent of the

disturbance anticipated to occur in the Catalina EA has occurred, though short-term disturbances

have been even less than authorized under the FONSI/ER.  *Id.* ¶¶11-12.  This is in addition to the

14 producing wells previously approved by BLM for the Cow Creek Unit, which is surrounded

by the Catalina Unit.  *Id.* ¶15.

     Likewise, there are currently twelve (12) producing wells within the Sun Dog Unit,

which were authorized by the BLM in October 2000 and December 2001, after BLM found no

significant impacts associated with the wells.[21]  Beserra Decl. ¶6.  BLM issued  the Sun Dog A

& B PODs FONSI/DR on August 16, 2007, approving an additional 48 wells (including 3

injection wells), along with the appurtenant access roads, pipelines, utility corridors, and other

described infrastructure.  Beserra Decl. ¶7.  To date, roads and well pads sites have been

constructed for all of the 48 wells analyzed in the EA.  Beserra Decl. ¶9.

     To the extent plaintiffs are now seeking an injunction for further development in the

ARPA, they have not alleged deficiencies in the Atlantic Rim EIS to warrant such an injunction.

---

[21]    BLM previously allowed limited drilling in the ARPA pursuant to BLM's Interim Drilling Policy, which
plaintiffs do not challenge.

With respect to future development within the ARPA, BLM has provided for mitigation measures that address the harms with which the plaintiffs are concerned may be caused by any particular project.  As outlined above, the Atlantic Rim ROD includes numerous mitigation measures for the greater sage-grouse, big game wintering habitat, potential impact of surface runoff on fish species, visual resources, and many other resource concerns.  *See, e.g.,* Ex. 3 (ROD) at App. B.  *See also* Clayson Decl. ¶3; Pls. Ex. M (Catalina EA) at 8-9; Ex. 2 (FEIS), App. E, at E-6 to E-10.  Any future projects will be inspected by BLM to determine the proper measures to impose based on site-specific conditions, just as the on-site inspections and BLM's analysis in the Sun Dog and Catalina EAs at issue here resulted in changes to the projects to reduce potential impacts.  Pls. Ex. N (Sun Dog EA), at 4-5; Pls. Ex. M (Catalina EA), at 5-6.

Finally, as described above, there is no evidence that the projects at issue, or the Atlantic Rim project as a whole, are the cause of any methane seeps in the area.  Beserra Decl. ¶12.  Thus, an injunction would not prevent the harms alleged in the Merschat Declaration.

BLM has taken every precaution to minimize environmental impacts, and an injunction at this point would largely not address the harms alleged by the plaintiffs.

**B.    An Injunction Will Substantially Harm the Interests of Defendant-Intervenors, the United States, and the State of Wyoming.**

**1.    Harm to Defendant-Intervenors**

As a result of plaintiffs' having waited until months after the start of construction to bring their motion, a preliminary injunction now would cost Defendant-Intervenors millions of dollars, delay project completion, and cause harm to the natural gas reservoir.  Additional project costs imposed by delay have often tipped the balance of equities toward project proponents where opponents of a project have delayed seeking an injunction.  *See, e.g., Valley Cmty. Preservation Comm'n v. Mineta,* 373 F.3d 1078, 1086-87 (10th Cir. 2004) (balancing equities where highway

administration had already invested $52 million into project and suspension of construction would cost $144,000 per day, or $4,320,000 per month); *Macht v. Skinner,* 715 F. Supp. 1131, 1137 (D.D.C. 1989) (finding harm to others where suspending contracts for six months would cost state $14.5 million).

To date, Defendant-Intervenors have spent tens of millions of dollars acquiring and developing rights in the project area, and have completed significant construction since the BLM granted final approval for the APDs at issue. *See* Degenfelder Decl. ¶19; Beserra Decl. ¶¶10, 16. An order prohibiting further activities in the project area would prevent the Defendant-Intervenors from realizing their return on these investments. *See id. See also Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,* 857 F.2d 505, 513 (9th Cir. 1988) (finding equities favored defendants where granting injunction would cost defendants over $50 million already invested and would affect $130 million of planned investments).

To date, Double Eagle has expended significant funds on operations in the project area. Degenfelder Decl. ¶19. As described above, Double Eagle has completed substantial work pursuant to BLM's approval of the APDs, including, among other things, drilling fifteen wells and constructing necessary roads. Degenfelder Decl. ¶10. Similarly, Anadarko and Warren have spent approximately $18 million constructing well locations and associated facilities, drilling wells, and installing pipelines for natural gas and water for the Sun Dog PODs. Beserra Decl. at ¶10. Since BLM approved the APDs, Anadarko and Warren have constructed roads and well pad sites for all forty-eight wells in the Sun Dog A & B PODs. Beserra Decl. ¶9.

The Wyoming Oil and Gas Conservation Commission prohibits Defendant-Intervenors from ceasing drilling without either setting casing or plugging and abandoning the wells. *See* Degenfelder Decl. ¶19; Beserra Decl. ¶16. If required to halt the pipeline installation for the Sun

Dog A & B PODs, Anadarko will incur a penalty of approximately $5 million. Beserra Decl. ¶16. *See Park County Res. Council v. BLM,* 638 F. Supp. 842, 846 (D. Wyo. 1986) (finding that any harm to plaintiffs was "substantially outweighed" by harm to defendants who would lose $7,000-$13,000 per day and whose funding would terminate if injunction were issued).

The wildlife stipulations that are conditions of BLM's approval effectively limit construction and extraction activities in the project area to August through November 15 or February 1. These stipulations are designed to protect the wildlife resources of concern to plaintiffs.[22] Pls. Ex. M (Catalina EA) at 8-9; Pls. Ex. N (Sun Dog EA) at 7-8; Clayson Decl. ¶¶3-4. An injunction entered now, preventing work during that short window for activity, would severely disrupt the construction schedule and possibly cause Defendant-Intervenors to breach contracts with third parties.[23]

## 2.    Harm to United States and the State of Wyoming

The preliminary injunction requested by plaintiffs would cost the United States and the State of Wyoming millions of dollars in taxes and royalties. The BLM estimates that federal mineral royalties from the Atlantic Rim Project will generate an average of $10 million annually, $5 million of which will be distributed to the State of Wyoming. Ex. 2 (FEIS) at 4-137 (Table 4-17). The project is expected to generate $264,000 annually in Wyoming state mineral royalties and $6.8 million in Wyoming severance taxes. *Id*. Carbon County is expected to receive approximately $11 million annually in property taxes from the project and $7.9 million a year for local schools. *Id*. at 4-135, 4-136. Thus, each month of delay will cost the United States and the

---

[22]    Stipulations imposed on operations within the ARPA include no construction or drilling activities from February 1 to July 31 to protect raptors, no construction or drilling activities from November 15 to April 30 to protect big game species, and limitations on virtually all activities from March 1 to July 15 to protect sage-grouse.

[23]    Although, as noted above, it appears outside the scope of this challenge, Plaintiffs' request to prohibit the BLM from approving future APDs in the ARPA would prevent Defendant-Intervenors from utilizing their rights under other federal oil and gas leases they hold within the project area where future development is planned, and would cause substantial harm to Defendant-Intervenors. *See* Degenfelder Decl. ¶20; Beserra Decl. ¶11.

State of Wyoming approximately $2.3 million.  This estimate excludes the additional thousands of dollars the project is expected to generate in state and county sales and use taxes.  *See id.* at 4-137 to 4-138.  The State of Wyoming would distribute these taxes to its school districts, general fund, water development accounts, highway fund, road construction funds, and cities, counties, and towns.  *Id.* at 4-135 to 4-136 (Tables 4-15 and 4-16); WYO. STAT. ANN. §§ 39-14-211 and 39-14-801.

Additionally, delay would cause economic and job losses for the State.  Every well drilled in the ARPA costs approximately $1,012,000.  Ex. 2 (FEIS) at 4-122.  Annual average direct expenditures of $49 million for development activities will result in annual economic impact of about $62 million in southwest Wyoming, "or a total economic impact of almost [$]1.2 billion over the 20-year drilling cycle." *Id.* at 4-123.  Estimated annual employee earnings attributable to the Atlantic Rim Project would average almost $22 million and would support an average of 578 annual job equivalents.  *Id.*  Even a one-year delay would significantly impact the local economy, particularly in an area of decreased earnings, increased inflation, and increased underemployment in recent years.  *Id.* at 3-134 to 3-135.

## C.    A Preliminary Injunction Would Harm the Public Interest.

Issuance of a preliminary injunction would be contrary to the public interest.  Enjoining new, properly permitted CBNG production in the Catalina and Sun Dog Units of the Atlantic Rim project would deny the American people greatly needed domestic natural gas resources, retarding efforts to increase the domestic energy supply and fortify the nation's security through environmentally-friendly means.

Enjoining natural gas extraction at the ARPA will cause greater reliance on foreign sources of natural gas, contrary to the goals stated in the National Energy Policy Act of 2005.

*See* Ex. 2 (FEIS) at 1-8 (stating that "by developing domestic reserves of clean-burning natural gas, the U.S. would reduce dependence on foreign energy").  Natural gas development in the ARPA is expected to produce nearly 1,350 billion cubic feet of natural gas, enough to heat 19.3 million homes for one year.  *See* Ex. 3 (ROD) at 1.  If enjoined, other sources of energy would need to cover this loss.

Growth of domestic energy production is one of our country's most important goals. Executive Order 13,212 instructed federal agencies to expedite energy-related projects in order to "increase[] production and transmission of energy in a safe and environmentally sound manner [because it] is essential to the well-being of the American people."  Exec. Order No. 13,212, 66 Fed. Reg. 28,357 (May 22, 2001).  The National Energy Policy specifically noted the "long-term challenges relating to natural gas…[and] whether adequate supplies can be provided to meet sharply increased projected demand at reasonable prices."  National Energy Policy, National Energy Policy Development Group, 1-8 (May 2001), *available at* http://whitehouse.gov/energy/National-Energy-Policy.pdf.  "To meet this long-term challenge, the United States … needs to boost production."  *Id*. at 1-8.  Specifically, "total wells drilled annually will need to double the 1999 level by 2020."  *Id.* at 5-10.

The Atlantic Rim project "is consistent with the President's National Energy Policy and the Energy Policy Act of 2005 by increasing domestic energy supply and helping to reduce the country's dependence on foreign sources of oil and gas."  Ex. 3 (ROD) at 1.  Given the significant energy, national security, economic, employment, and environmental benefits of the coalbed methane development at issue, the public interest strongly favors denial of the motion for preliminary injunction.

## CONCLUSION

Plaintiffs have not satisfied their burden of demonstrating a likelihood of success on the merits, and the balance of equities weighs strongly against an injunction in this case. The motion for a preliminary injunction, therefore, should be denied.

Respectfully submitted,

/s/     Michael B. Wigmore

Michael B. Wigmore (DC Bar # 436114)
Sandra P. Franco (DC Bar # 467091)
Bingham McCutchen LLP
2020 K St., NW
Washington, DC 20006-1806
202.373.6000
202.373.6001 (facsimile)

*Counsel for Anadarko Petroleum Corporation, Warren Resources, Inc., and Double Eagle Petroleum Co.*

Robert C. Mathes (DC Bar # 484255)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
303.892.1400
303.892.1401 (facsimile)

Dated:  October 5, 2007

Westlaw.

Not Reported in F.Supp.                                                                                              Page 1
Not Reported in F.Supp., 1996 WL 938215 (D.Idaho)
**(Cite as: 1996 WL 938215 (D.Idaho))**

🅒

Only the Westlaw citation is currently available.

United States District Court, D. Idaho.
IDAHO CONSERVATION LEAGUE, a non-profit
corporation, Plaintiff,
v.
James E. CASWELL, et al., Defendants,
and
Plum Creek Timber Company, a limited partnership,
Defendant/Intervenor.
**No. CV 95-394-S-MHW.**

Aug. 12, 1996.

Laird Lucas, Boise, ID, Deborah A Sivas, Palo Alto,
CA, Deborah Hill, Assistant United States Attorney,
Boise, ID, John Hempelmann, Janet Garrow, Seattle,
WA.

**ORDER**

WILLIAMS, Magistrate J.

**\*1** Currently pending before the Court are the
following motions:
(1) Plaintiff Idaho Conservation League's Motion
for Partial Summary Judgment (Dkt.# 35) filed
February 26, 1996;
(2) Defendant Forest Service's Motion for
Summary Judgment re: claim One (Dkt.# 67) filed
May 10, 1996;
(3) Defendant Forest Service's Motion for
Judgment on the Pleadings (Dkt. # 69-1) filed May
10, 1996;
(4) Defendant Forest Service's Motion for
Summary Judgment (Dkt.# 69-2) filed May 10,
1996;
(5) Intervenor Plum Creek Timber Co.'s Motion for
Summary Judgment re: claim One (Dkt.# 73) filed
May 13, 1996;
(6) Intervenor Plum Creek Timber Co.'s Motion for
Summary Judgment re: claim Two and claim
Three (Dkt.# 77) filed May 13, 1996;
(7) Plaintiff Idaho Conservation League's Motion
to Strike the Extra Record Declaration filed by
Defendants in support of their Motions for
Summary Judgment (Dkt.# 88-1) filed May, 30,
1996.
(8) Plaintiff Idaho Conservation League's Renewed
Motion to Limit Review to Agency Record (Dkt.#

88-2) filed May 30, 1996;
(9) Intervenor Plum Creek Timber Co.'s Motion to
Strike Portions of the Second Amended Complaint
(Dkt.# 96) filed June 10, 1996;
(10) Intervenor Plum Creek Timber Co.'s Motion
to Shorten Time for Hearing on the Motion to
Strike (Dkt.# 104) filed June 10, 1996.

**I.**
**BACKGROUND**
The Amended Complaint in the instant case was
filed by the Idaho Conservation League ("ICL") on
October 30, 1995, seeking declaratory relief and
injunctive relief against James Caswell, Supervisor of
the Clearwater National Forest, and the United States
Forest Service ("the Forest Service Defendants").
The parties agreed that Plum Creek Timber
Company's ("Plum Creek") interests were significant
enough for it to become involved in the case as a
Defendant-Intervenor.    An additional party, the
Intermountain Forest Industry Association ("IFIA")
sought to establish itself as a second intervenor, but
its request was denied on January 19, 1996.

ICL challenges the Goat Roost Roads Proposal
Decision ("Proposal") signed by Clearwater National
Forest Supervisor James Caswell on April 6, 1995.
Among other things, the Goat Roost Proposal allows
Plum Creek to build two roads within the Clearwater
National Forest near Walton Creek in order to gain
access to property owned by Plum Creek that it
intends to log.    ICL alleges that the Proposal will
significantly impact Walton Creek in that the road
construction could cause significant discharge of
sediment and other pollutants into the Creek, that it
would violate the Stipulation of Dismissal in the case
of *The Wilderness Society v. Robertson,* Case No. CV
93-0043-S-HLR, and that it would exacerbate
violations of water quality standards already in
existence.

The Proposal also amended an existing agreement
between the Forest Service Defendants and Plum
Creek providing for joint funding of the design,
construction, and maintenance of one of the roads.
The proposed roads run parallel to and on either side
of Walton Creek.    The Creek is said to contain
important habitat for several imperiled species of
fish, including steelhead trout, bullhead trout and
cutthroat trout.    In addition, the stream is claimed to
have other beneficial uses such as salmonid spawning

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                           Page 2
Not Reported in F.Supp., 1996 WL 938215 (D.Idaho)
**(Cite as: 1996 WL 938215 (D.Idaho))**

and is home to a spring chinook salmon hatchery.

**\*2** ICL alleges that past logging efforts and road construction in the Walton Creek drainage has generated substantial sediment and runoff resulting in an accumulation of surplus sediment over natural background levels in Walton Creek. Hence, ICL contends that sediment deposition degrades fish habitat and impairs beneficial uses. ICL further alleges that past degradation of the stream has brought parts of it out of compliance with the Clearwater National Forest Plan, which requires that the stream be managed as a "high fishable stream," meaning that it must be maintained in a condition that provides for a minimum of 80 percent of biological potential.

ICL also challenges the Proposal as not being in compliance with the Antidegradation Policy that the State of Idaho adopted pursuant to the Clean Water Act ("CWA"). 33 U.S.C. § 1251, *et seq.* This Policy requires that existing in-stream water uses and the level of water quality necessary to protect existing uses shall be maintained and protected. *See* IDAPA 16.01.02051, 01. In 1992, the Clearwater National Forest identified Walton Creek as exceeding Forest Plan Standards for fisheries in its Watershed Condition Summary. In October 1994, based on this information, Walton Creek was subsequently identified as a "water quality limited segment" ("WQLS") pursuant to § 303(d) of the CWA, 33 U.S.C. § 1313(d), by the State of Idaho and the Federal Environmental Protection Agency. Once a WQLS determination is made, site-specific pollution control measures are required to be implemented, called "total maximum daily loads" ("TMDLs"), for the purpose of bringing the area back into acceptable levels in compliance with the Forest Plan Standards. 33 U.S.C. § 1313(d)(1)(C). TMDLs are to be established at "a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C). At the time this litigation was commenced, TMDLs had not yet been adopted for Walton Creek.

In September, 1993, a number of conservation groups, including ICL, entered into a Stipulation of Dismissal in the *TWS v. Robertson* case which, *inter alia,* provided that the Forest Service Defendants agreed to proceed "only with those projects that would result in no measurable increase in sediment production in drainage currently not meeting Forest

Plan Standards." Stipulation of Dismissal, *TWS v. Robertson,* Paragraph II.2.d. ICL's concern here is that by allowing the Goat Roost Roads Proposal to be implemented, substantial sediment discharge would occur and would be in violation of the prior Stipulation of Dismissal.

The Amended Complaint, filed on October 30, 1995, brings three causes of action. The first cause of action alleges breach of contract based on the Stipulation of Dismissal in the *Robertson* case. The second and third causes of action both allege violations of the Administrative Procedure Act. The alleged violation raised by the second cause of action is of the Clean Water Act (CWA) and the alleged violation raised by the third cause of action is of the National Forest Management Act (NFMA) and the Clearwater Forest Plan (CFP).

## II.
### DISCUSSION AND ANALYSIS
**\*3** The ten motions presently before the Court can be grouped into two categories: (1) the respective motions for summary judgment and judgment on the pleadings; and (2) the respective motions to strike. The Court will address each category in turn.

### A.
### Summary Judgment
Plaintiff, Idaho Conservation League, has moved for partial summary judgment relating to their first cause of action, namely, that Defendant's approval of the Goat Roost Roads Proposal constitutes a breach of the Stipulation of Dismissal resulting from the determination of *TWS v. Robertson,* No. 93-0043- S-HLR (D.Idaho). As such, ICL seeks to permanently enjoin the Forest Service Defendants from continuing with the Goat Roost Roads Proposal. The Forest Service Defendants and Plum Creek have also moved for summary judgment on ICL's first cause of action. In addition, the Forest Service Defendants and Plum Creek have moved for summary judgment as to ICL's second and third causes of action relating to violations of the Administrative Procedure Act for failure to comply with the Clean Water Act, the National Forest Management Act and the Clearwater Forest Plan ..

### 1. Summary Judgment Standard
Motions for summary judgment are governed by Fed.R.Civ.P. 56. Rule 56 provides in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 938215 (D.Idaho)
**(Cite as: 1996 WL 938215 (D.Idaho))**

Page 3

material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

 The United States Supreme Court has made it clear that under Rule 56, summary judgment is required if the nonmoving party fails to make a showing sufficient to establish the existence of an element which is essential to his case and upon which he/she will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the nonmoving party fails to make such a showing on any essential element of his case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. [FN1]

> FN1. *See also* Rule 56(e), which provides in part:
> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.
> U.S.S.C. Court Rules, Rules of Civil Procedure, Rule 56(e) (Law.Co-op.1987 & Supp.1991).

 Under Rule 56 it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue is "genuine" when there is "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial," *Hahn v. Sargent,* 523 F.2d 461, 463 (1st Cir.1975) (quoting *First Nat'l Bank v. Cities Serv. Co., Inc.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976) or when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986). The Ninth Circuit cases are in accord. *See British Motor Car Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund,* 882 F.2d 371 (9th Cir.1989).

 **\*4** In ruling on summary judgment motions, the court does not resolve conflicting evidence with respect to disputed material facts, nor does it make credibility determinations. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n,* 809 F.2d 626 (9th Cir.1987). Moreover, all inferences must be drawn in the light most favorable to the nonmoving party. *Id.* at 631. As the Ninth Circuit Court of Appeals has stated, "[p]ut another way, if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *Id.*

 In order to withstand a motion for summary judgment, the Ninth Circuit has held nonmoving party:

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the nonmoving party's claim implausible.

*British Motor Car Distributors,* 882 F.2d at 374 (citation omitted). Moreover, the Ninth Circuit has held that where the moving party meets its initial burden of demonstrating the absence of any genuine issue of material fact, the nonmoving party must "produce 'specific facts showing that there remains a genuine factual issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed." *Steckl v. Motorola, Inc.,* 703 F.2d 392, 393 (9th Cir.1983) (citing *Ruffin v. County of Los Angeles,* 607 F.2d 1276, 1280 (9th Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980)).

 The Ninth Circuit Court of Appeals has acknowledged that in recent years the Supreme Court, "by clarifying what the nonmoving party must do to withstand a motion for summary judgment, has increased the utility of summary judgment." *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied,* 484 U.S. 1006 (1988). As the Ninth Circuit has expressly stated: "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id.*

 In addressing the application of the "Summary Judgment Test," the Ninth Circuit has specifically

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                                      Page 4
Not Reported in F.Supp., 1996 WL 938215 (D.Idaho)
**(Cite as: 1996 WL 938215 (D.Idaho))**

explained that:

> A "material" fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the *substantive law* governing the claim or defense. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *T.W. Electrical Serv., Inc., 809 F.2d at 630* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)*) (emphasis added).

### 2. Summary Judgment re: Claim One

Both Plaintiff and Defendants move for summary judgment regarding claim One of the complaint. ICL's main argument derives from what they describe as "a binding, enforceable and unambiguous written contract between [themselves] and the U.S. Forest Service." They assert that the *Robertson* Stipulation is subject to ordinary principles of contract law of which summary judgment is appropriate "when the terms of the agreement are clear and unambiguous, even if the parties disagree as to their meaning." *United Bhd. of Carpenters and Joiners of Am. Cathers Local 42-L v. United Bhd. of Carpenters and Joiners of Am. So. Cal. Dist. Council, 73 F.3d 958, 961 (9th Cir.1996)* (citing *U.S. King Features Entertainment, Inc., 843 F.2d 394, 398 (9th Cir.1988)*).

**\*5** ICL characterizes the Stipulation as an unconditional contractual obligation on the Forest Service to refrain from taking any actions that will degrade streams within the Clearwater Forest Plan. In the Stipulation, ICL agreed to dismiss their claims if the Forest Service agreed to abide by the existing Forest Plan, as supplemented by additional interim provisions. ICL points to the provision that the Forest Service is to "proceed only with those projects that would result in no measurable increase in sediment production in drainages currently not meeting Forest Plan Standards." Stipulation of Dismissal, *TWS v. Robertson,* Paragraph II.2.d.

ICL argues that Walton Creek was not under compliance with the Forest Plan Standards at the time the Stipulation was entered into and therefore, the Forest Service cannot authorize any new management activity that would produce a measurable increase in sediment. In sum, ICL contends that the approval of the Goat Roost Roads Proposal constitutes a direct breach of the Stipulation of Dismissal.

The Forest Service Defendants counter ICL's assertions with two main arguments. First, they claim they are under a federal statutory obligation arising from the Alaska National Interest Lands Conservation Act ("ANILCA") to provide access to private lands. *16 U.S.C. § 3210(a)*. As such, ANILCA governs what actions the Forest Service can take and in any event would preempt an agreement such as the Stipulation. Under ANILCA, the Forest Service contends they are required to grant access to private land upon the request of the property owner, in this case, Plum Creek Timber Company. *Montana Wilderness Ass'n v. U.S. Forest Service, 655 F.2d 951, 957 (9th Cir.1981); Northwest Forest Resource Council v. Glickman, 82 F.3d 825 (9th Cir.1996).*

The Forest Service's second argument stems from a plain reading of the Stipulation. They contend that ICL's interpretation of the disputed paragraph is not consistent with either the Forest Service's interpretation or the plain meaning of the Stipulation. In support of their interpretation, the Forest Service asserts the following: (1) The Goat Roost Roads Proposal was not a Forest Service proposal, but an ANILCA access proposal of which they could not deny: (2) At the time of the signing of the Stipulation, Walton Creek was in compliance with the Forest Plan Standards, thus removing that Proposal from the express language of the Stipulation. That is, the Forest Service only agreed to cease Forest Service proposals, not ANILCA proposals, in those areas where the drainages did not currently meet Forest Plan Standards; and (3) The Goat Roost Roads Proposal will not result in a measurable increase in sediment production to Walton Creek, thus, complying with the Stipulation. As such, the Forest Service maintains that the Goat Roost Roads Proposal is not a project within the parameters of the Stipulation.

In support of its motion for summary judgment, Plum Creek argues that it is not bound by the Stipulation as it was not a party to the *Robertson* action. Further, it asserts that reasonable access to its lands may not be proscribed by the Stipulation under ANILCA. Finally, Plum Creek maintains that even if the Stipulation is binding on them and even if ANILCA does not preempt the Stipulation, the Goat Roost environmental analysis conclusively shows that there will not be a measurable increase in sediment to Walton Creek, thus removing the Proposal from the scope of the Stipulation.

**\*6** The Court finds that summary judgment for the Forest Service Defendants and Plum Creek on claim

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                    Page 5
Not Reported in F.Supp., 1996 WL 938215 (D.Idaho)
**(Cite as: 1996 WL 938215 (D.Idaho))**

One of the complaint is proper.   The Forest Service is under a federally mandated duty to provide access to nonfederally owned land. Section 1323(a) of ANILCA provides:

> Notwithstanding any other provision of law and subject to such terms and conditions as the Secretary of Agriculture may prescribe, the Secretary shall provide access to nonfederally owned land within the boundaries of the National Forest System as the Secretary deems adequate to secure the owner the reasonable use and enjoyment thereof.

16 U.S.C. §  1323(a).

Thus, it is clear that the Forest Service is obliged to provide Plum Creek access to its land, but may condition that access to minimize any adverse impact on Federal resources.  *See, Adams v. United States,* 3 F.3d 1254 (9th Cir.1993) (ANILCA commands the Secretary of Agriculture to provide access to secure the owner's reasonable use and enjoyment, but the owner must comply with reasonable Forest Service rules and regulations).

In this case, the Forest Service has placed extensive conditions on Plum Creek's access to its property.   In fact, Plum Creek has been required to significantly change its original access proposal first submitted in 1989.   In addition, the Forest Service has required Plum Creek's proposal to include, *inter alia,* road design standards, road location review by a Forest Service hydrologist, soil scientist and engineer, aggregate surfacing to reduce the risk of erosion, and stream monitoring.  *See,* Goat Roost EA. Clearly, the Forest Service has placed adequate and reasonable conditions on Plum Creek's access to ensure that the water quality standard of Walton Creek will not decrease due to the Proposal.

Further, the Court finds that the Goat Roost Proposal does not and will not violate the *Robertson* Stipulation of Dismissal.   There, the Forest Service agreed to "proceed only with those projects that would result in no measurable increase in sediment production in drainages currently not meeting Forest Plan Standards."    *TWS v. Robertson,* Paragraph II.2.d. The Court concludes that the plain language of the Stipulation requires the Forest Service to evaluate the projects at the time they are to be commenced. Thus, the Court rejects ICL's contention that the Forest Service can only proceed with projects which met Forest Service Standards at the time the Stipulation was executed (*i.e.,* in 1993).     To conclude otherwise would ignore the obviously plain language of the Stipulation.

Forest Service experts have conclusively demonstrated that the Goat Roost Proposal will not result in a measurable increase in sediment production in Walton Creek.   The Court accords great deference to the Forest Service testimony and evidence.    It is readily apparent that the Forest Service has required Plum Creek ensure that Walton Creek will maintain its current condition.   Not only has Plum Creek been required to put its access on hold since 1989, it has been required to submit numerous proposals in order to satisfy Forest Service conditions.

**\*7** Therefore, since the Forest Service is under a mandatory obligation to provide access under ANILCA and since the express terms of the Stipulation do not encompass the Goat Roost Proposal, the Court concludes that the Forest Service Defendants and Plum Creek are entitled to summary judgment as a matter of law regarding claim One of ICL's complaint.

**3. Summary Judgment re:  Claim Two and Three**
**a. Claim Two:  Failure to Comply with the Clean**
**Water Act**

The Forest Service Defendants and Plum Creek also move for summary judgment on claims Two and Three--for violation of the Administrative Procedure Act for failure to comply with the Clean Water Act (CWA) and for failure to comply with the National Forest Management Act (NFMA) and the Clearwater Forest Plan (CFP).

The Forest Service Defendants argue for dismissal of Plaintiff's second claim under Rule 12(b)(6), failure to state a claim upon which relief may be granted. The standard for dismissal is that the complaint will be dismissed "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."    *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).    Claim Two of the complaint asserts that the Forest Service failed to comply with all federal and state water quality standards under the CWA.   In response, the Forest Service contends that the claim is unclear which statutes or regulations are being cited for failure of compliance.

Assuming that ICL stated a valid claim, the Forest Service Defendants alternatively move for summary judgment regarding Claim two.   In support of its motion, the Forest Service asserts they have fully complied with all state and federal water quality

Not Reported in F.Supp.                                                                 Page 6
Not Reported in F.Supp., 1996 WL 938215 (D.Idaho)
**(Cite as: 1996 WL 938215 (D.Idaho))**

standards. Specifically, the Forest Service maintains that they have complied with the CWA and that the Goat Roost Proposal does not violate any provisions within that Act.

In the Second Amended Complaint dated April 11, 1996, (C.R.62) Plaintiff specifically raised for the first time a Section 401 allegation. Section 401 of the Clean Water Act provides that Congressional permission is required before construction may be commenced "of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States." 33 U.S.C.S. 401. The Forest Service strongly argues that Section 401 of the CWA does not apply to the facts of this dispute, namely, construction of a forest logging road.

The parties have fully briefed Section 401 and its applicability to the facts of this controversy. ICL contends that Section 401 applies to the facts of this case and that the claim was properly preserved on administrative appeal. The Forest Service Defendants and Plum Creek both argue that ICL's Section 401 allegation was not properly preserved in the administrative record and therefore, should be stricken on procedural grounds. However, they also argue that the Section 401 claim could be dismissed on substantive grounds in that Section 401 does not apply to construction of a forest logging road.

**\*8** ICL contends that prior to the approval of the Goat Roost Roads Proposal, the Forest Service was required to certify the proposal under Section 401 of the CWA. ICL argues that the Forest Service failure to obtain state approval for the Goat Roost Proposal created the Section 401 claim and that this claim has been presented through all versions of its complaint. In addition, ICL maintains it expressed concern at the administrative level that the appropriate state agencies must certify compliance with the project in order to meet water quality standards.

Although it is undisputed that ICL raised a claim pertaining to the Clean Water Act in both its original and first amended complaint, it is not equally clear that ICL consistently alleged a Section 401 violation. In January 1996, the Forest Service moved for a more definite statement with respect to the CWA claim. In its second amended complaint, Plaintiff formally alleged violations of sections 313(a) and 401(a)(1), 33 U.S.C. § 1323(a) and 1341(a).

Both the Forest Service Defendants and Plum Creek assert ICL unnecessarily and impermissibly broadens

the scope of the action by specifically asserting a Section 401 claim. ICL responds that they failed to object to the Section 401 claim in its answer to the second amended complaint and therefore, cannot now be heard to complain.

The Court concludes that even assuming ICL validly preserved the Section 401 claim, this section of the CWA does not apply to the Goat Roost Proposal. Section 401(a) was initially adopted by Congress as Section 21(b) of the Water Quality Improvement Act ("WQIA") of 1970. Section 401(a), now codified at 33 U.S.C. § 1341(a) provides in relevant part:

> Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title....
>
> 33 U.S.C. § 1341(a).

Although Section 401(a) refers to "any" discharge, the WQIA did not define the term "discharge." However, when the Act was amended in 1972, Congress included a definition of the term "discharge" as follows:

> The term "discharge" when used without qualification includes a discharge of a pollutant, and a discharge of pollutants. 33 U.S.C. § 1362(16).
>
> The term "discharge of a pollutant" and the term "discharge of pollutants" each mean (a) any addition of any pollutant to navigable waters *from any point source,* (b) any addition of any pollutant to the waters of the contiguous zone or the ocean *from any point source* other than a vessel or other floating craft. 33 U .S.C. § 1362(12) (emphasis added).
>
> **\*9** The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include return flows from irrigated agriculture. 33 U.S.C. § 1362(14).

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                          Page 7
Not Reported in F.Supp., 1996 WL 938215 (D.Idaho)
**(Cite as: 1996 WL 938215 (D.Idaho))**

Thus, it is evident that Section 401 only intended to encompass those projects which resulted in a "point source discharge." ICL's sole argument relies on their statutory interpretation that Section 401 applies to and includes a forest logging road. The parties have not cited any authority directly on point that a logging road may be considered as a point source discharge. Further, the parties have not cited any authority for the proposition that a logging road must obtain Section 401(a)(1) certification. Finally, the parties have failed to cite authority whereby a federal or state agency administering the Clean Water Act has required section 401(a)(1) certification for a logging road. This Court has not discovered any cases directly on point and thus, this issue appears to be a case of first impression.

The CWA clearly demonstrates that Congress devised distinct approaches for dealing with point sources and nonpoint sources, the two sources of water pollution. It is obvious upon a plain reading of the statute that Congress intended activities such as the construction of forest roads to fall within the nonpoint source category. 33 U.S.C. § § 1288 (point source management) and 1329 (nonpoint source management). In addition, Idaho's water quality statute and regulations implementing the CWA clearly provide that silvicultural activities, [FN2] such as the construction of forest roads, constitute a nonpoint source activity. [FN3] I.C. § 39-3602(14), (22). Thus, the Goat Roost Proposal is undeniably a nonpoint source activity and therefore, is not subject to the certification requirement of Section 401.

> FN2. Silviculture means those activities associated with the regeneration, growing and harvesting of trees and timber including ... road construction and road maintenance ...

> FN3. Nonpoint source activities include ... silviculture ... construction ... and other activities not subject to regulation under the federal national pollutant discharge elimination system.

Again in 1987, Congress amended the CWA and included Section 319. 33 U.S.C. § 1328. This section required the states to develop and "submit for federal approval nonpoint sources reports and management programs by August 1988, identifying specific nonpoint sources of pollution and setting forth a plan for implementing the 'best management practices' to control such sources by 1992." Id. at 1318. Pursuant to Section 319, the State of Idaho,

the Forest Service, and other state agencies entered into a "Memorandum of Understanding Implementing the Nonpoint Source Water Quality Program in the State of Idaho" related to forest practices. Under this Memorandum, the Forest Service agreed, *inter alia*, to comply with Idaho's Forest Practice Act rules and regulations pertaining to water quality, the Idaho Forest Practices Water Quality Management Plan, and the forest sections of the Idaho Nonpoint Source Management Plan Program. Memorandum at p. 2.

**\*10** The Environmental Analysis performed in conjunction with the Goat Roost Proposal specifically references the Forest Service's obligation under the Memorandum and requires Plum Creek to abide by the state regulations. Thus, it is evident to this Court that since the forest road project is a nonpoint source activity and since the Forest Service has complied with the requisite federal and state requirements regarding the CWA, Section 401 certification is not required. Further, the Court concludes that the Forest Service has not violated any of the CWA provisions cited by ICL in the amended complaint.

ICL seeks to rely on the United States Supreme Court decision of *PUD No. 1 v. Washington,* 511 U.S. 700, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994). However, that decision is clearly distinguishable. There, the parties agreed that the hydroelectric power plant project was required to obtain Section 401 certification. In addition, it was undisputed that the project would result in the discharge of pollutants, both the release of dreg and fill during construction and the discharge of water at the end of the tailrace after being used for electricity. Thus, *PUD No. 1* does not stand for the proposition that all nonpoint sources are subject to Section 401 certification.

The Court concludes for the foregoing reasons that Section 401 certification was not and is not required for the Goat Roost Proposal. Further, the Forest Service Defendants and Plum Creek are entitled to judgment as a matter of law as to ICL's second cause of action.

**b. Claim Three: Failure to Comply with the National Forest Management Act and the Clearwater Forest Plan.**

Both the Forest Service Defendants and Plum Creek move for summary judgment regarding ICL's allegation that the Forest Service violated stream protection provisions of the National Forest

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                 Page 8
Not Reported in F.Supp., 1996 WL 938215 (D.Idaho)
**(Cite as: 1996 WL 938215 (D.Idaho))**

Management Act ("NFMA") and the Clearwater Forest Plan ("CFP"). The Defendants assert that the Goat Roost Roads Proposal fully complies with management requirements and thus, are entitled to summary judgment.

ICL alleges that the Proposal violates the stream protection provisions of NFMA, 16 U.S.C. § 1604(g)(3)(E)(iii) and regulations 36 C.F.R. § 219.19 and 36 C.F.R. § 219.23. In addition, ICL alleges that the Proposal violates certain standards contained in the CFP.

The NFMA requires that regulations be adopted to specify forest planning guidelines. 16 U.S.C. § 1604(g)(3). These guidelines are to ensure that:

> [T]imber will be harvested from National Forest System lands only where ... (iii) protection is provided for streams, streambanks, shorelines, lakes, wetlands, and other bodies of water from detrimental changes in water temperatures, blockages of water courses, and deposits of sediment, where harvests are likely to seriously and adversely affect water conditions or fish habitat.
> 16 U.S.C. 1604(g)(3)(E)(iii).

In keeping with the Congressional mandate, the United States Forest Service promulgated regulations designed to accomplish the purposes of the NFMA. 36 C.F.R. § § 219.14 - 219.26. As such, to avoid summary judgment ICL must show that the Proposal violates existing management regulations. ICL has failed to create a genuine issue of material fact upon which a reasonable jury could conclude that the Forest Service violated either the NFMA or the CFP. The Court concludes from the affidavits of the Forest Service experts that the Goat Roost Proposal will not adversely affect either water quality or sediment content. This Court will defer to the agency in charge of implementing and monitoring the Proposal that it currently meets all rules and regulations and will do so in the future [FN4].

> FN4. A court is required to give substantial deference to an agency's interpretation of the statutes, rules and regulations that it administers. *See, Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986); *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842-45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**\*11** The Forest Service has provided competent evidence, including WATBAL and the EA that the

Goat Roost Proposal will not result in an increase in sedimentation in Walton Creek. *See,* AR 394. Therefore, the Court finds that the Forest Service has fully complied with NFMA requirements and its implementing regulations.

Finally, ICL alleges that the Proposal violates the Clearwater Forest Plan Standards. These Standards require the Forest Service to manage water quality to ensure that National Forest management activities do not cause permanent or long-term damage to existing or specified beneficial uses. *Forest Plan Standards,* 8.e; to manage the Walton Creek watershed to meet the "high fishable" standard as shown in Appendix K of the Forest Plan. *Id.;* to design and implement management practices that will maintain water quality and stream conditions that are not likely to cause sustained damage to the biological potential to the fish habitat. *Id.* at 8.g(1); to design and implement management practices that will not reduce fish habitat productivity in the short-term below assigned standards. *Id.* at 8.g(2); and to design and implement management practices that will maintain water quality in a condition that is not likely to inhibit recovery of the fish habitat for more than the stated duration as shown in Appendix K. *Id.* at 8.g(3).

The Court concludes that the Goat Roost Proposal meets the foregoing Forest Plan Standards. Based on expert evidence supplied by the Forest Service, the Court finds that the Proposal will create no long-term or permanent damage and that an increase in sediment accumulation will not occur. *See,* A.R. 394 at IV-10 and IV-11. In addition, the Proposal meets the "high fishable" standard. *Id* . at IV-5-11. Finally, the Environmental Assessment concludes that the water quality in Walton Creek will not be diminished by the Proposal. EA p. IV-5. The EA is a document upon which the Court is entitled to rely and upon which the Court grants deference. The EA concludes that there will be little, if any, sediment delivery into Walton Creek that would adversely affect water quality. *Id.*

Therefore, for the foregoing reasons, the Court concludes that the Forest Service Defendants and Plum Creek are entitled to summary judgment as to ICL's third cause of action.

**B.**
**Motions to Strike**
**1. ICL's Motion to Strike**

ICL moves to strike the extra-record declarations (Dkt.# 88-1) filed by the Forest Service Defendants

Not Reported in F.Supp.                                                                                    Page 9
Not Reported in F.Supp., 1996 WL 938215 (D.Idaho)
**(Cite as: 1996 WL 938215 (D.Idaho))**

and Plum Creek and to limit review to the agency record (Dkt.# 88-2). Defendant-Intervenor moves to strike portions of the second amended complaint (Dkt.# 96-1). Those motions will be taken in turn.

 On February 19, 1996, ICL moved for a protective order against discovery propounded by Plum Creek on the ground that the factual evidence in this case is limited to the administrative record prepared by the Forest Service. On March 11, 1996, ICL further moved to limit the scope of this case to the agency record in response to announced intentions of Plum Creek and the Forest Service to notice depositions and propound additional written discovery. On April 1, 1996, the Court held that the parties were limited to 4 depositions regarding Claim One. These depositions were to be completed by the end of April. In addition, discovery relating to Claims Two and Three were limited to the agency record.

 **\*12** Following the permitted depositions, the Forest Service and Plum Creek both filed motions for summary judgment regarding all three of ICL's claims. In support of these motions, Plum Creek filed declarations by its expert, Dale McGreer and its in-house hydrologist Brian Sugden. Additionally, the Forest Service filed declarations by hydrologist Richard Jones, forest planner Douglas Gochnour, engineer John Blom, and biologist Nicholas Hetrick. The declarations at issue relate to factual findings in the administrative record and allegedly expand upon that record. ICL claims that these declarations violate the rule prohibiting extra-record evidence and the intent of the Court's April 1 order. As such, ICL requests that these declarations be stricken and the case limited to the administrative record.

 The Forest Service Defendants and Plum Creek argue that review under the APA of a challenge to agency action, such as the Forest Service's decision to authorize the Goat Roost, is limited to the administrative record, with any necessary explanation of the agency's decision process to be provided by affidavit testimony of an agency official. *See, e.g., Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The Ninth Circuit also permits an "explanation" of the agency's decision-making process. *Kunaknana v. Clark,* 742 F.2d 1145, 1149 (9th Cir.1980).

 They further also argues that resolution of Claim One cannot be limited to the Administrative record for the following reasons: (1) the *Robertson* Stipulation of Dismissal is ambiguous and the Administrative Record provides no guidance or

clarity; (2) Plaintiff has gone beyond the Administrative Record by using the deposition of Kate Poole (plaintiff's attorney in *Robertson* ) and therefore, Defendant should not be restricted to the Administrative Record; (3) the declarations at issue do not contradict the Administrative Record, but support it; and (4) addition information not contained in the Administrative Record is necessary to understand the respective parties meaning of the *Robertson* Stipulation of Dismissal.

 The Court previously addressed the merits of Claim One and concluded that not only is the Forest Service required to grant reasonable access to Plum Creek under ANILCA, but that the Stipulation, but its terms, does not apply to the Goat Roost Proposal. Therefore, ICL's motion to strike is moot and the motion will be denied. In addition, ICL's motion to limit review to the agency record is similarly obviated by the Court's conclusions and will also be denied.

 In an attempt to resolve the Section 401 issue on procedural grounds, Plum Creek moved to strike portions of the second amended complaint which contained the Section 401 allegations. Because the Court assumed for purposes of the legal analysis that the Section 401 claim was properly preserved, Plum Creek's motion (and the related motion to shorten time for hearing) will be denied.

### III.
### CONCLUSION
### ORDER

 **\*13** Based upon the foregoing, the Court having been fully informed in the premises, IT IS HEREBY ORDERED that:
 (1) Plaintiff's Motion for Partial Summary Judgment (Dkt.# 35) is DENIED;
 (2) Defendant's Motion for Summary Judgment re: Claim One (Dkt.# 67) is GRANTED;
 (3) Defendant's Motion for Judgment on the Pleadings (Dkt.# 69-1) is DENIED;
 (4) Defendant's Motion for Summary Judgment (Dkt.# 69-2) is GRANTED;
 (5) Intervenor's Motion for Summary Judgment (Dkt.# 73) is GRANTED;
 (6) Intervenor's Motion for Summary Judgment re: Claims Two and Three (Dkt. # 77) is GRANTED;
 (7) Plaintiff's Motion to Strike (Dkt.# 88-1) is DENIED;
 (8) Plaintiff's Motion to Limit Review to Agency Record (Dkt.# 88-2) is DENIED;
 (9) Intervenor's Motion to Strike (Dkt.# 96-1) is DENIED;

Not Reported in F.Supp.                                                                                                Page 10
Not Reported in F.Supp., 1996 WL 938215 (D.Idaho)
**(Cite as: 1996 WL 938215 (D.Idaho))**


   (10) Intervenor's Motion to Shorten Time (Dkt.# 104) is DENIED.


 Not Reported in F.Supp., 1996 WL 938215 (D.Idaho)

END OF DOCUMENT

©  2007 Thomson/West. No Claim to Orig. US Gov. Works.

**Exhibit 1 to Defendant-Intervenors' Opposition To
Plaintiffs' Motion For A Preliminary Injunction**

**Excerpts From The U.S. Department of the Interior's
November 1990 Great Divide Resource Area
Record of Decision and Approved Resource
Management Plan**



United States Department of the Interior
Bureau of Land Management
Rawlins District Office

Great Divide Resource Area                November 1990

# Great Divide Resource Area
# Record of Decision and
# Approved Resource Management Plan



# RECORD OF DECISION

## and

## APPROVED RESOURCE MANAGEMENT PLAN

### for the

## GREAT DIVIDE RESOURCE AREA

Prepared by:
**U.S. Department of the Interior**
**Bureau of Land Management**
**Great Divide Resource Area**
**Rawlins District**
**Rawlins, Wyoming**

**November 1990**

_____     _____
Wyoming State Director                                              Date

# RECORD OF DECISION

This document records the decision made by the Bureau of Land Management for managing approximately 4 million acres of public land surface and 5 million acres of federal mineral estate administered by the Bureau of Land Management (BLM) in the Great Divide Resource Area.

## DECISION

The decision is to approve the attached resource management plan (RMP) for the Great Divide Resource Area. The approved RMP (hereafter called the Great Divide RMP) was prepared under the regulations for implementing the Federal Land Policy and Management Act of 1976 (FLPMA) (43 CFR 1600). An environmental impact statement (EIS) was prepared for this plan in compliance with the National Environmental Policy Act of 1969 (NEPA). The Great Divide RMP supersedes all previous land-use planning decisions for the Great Divide Resource Area.

During the 30-day protest period on the Great Divide proposed RMP/final EIS, one protest was received. Mr. Thomas Lustig, Mr. Paul Zogg, Mr. Thomas Doughtery, and Mr. John Zelazny, submitted a protest on behalf of the National Wildlife Federation and the Wyoming Wildlife Federation. Their protest related to the following:

Adequacy of cumulative impact analysis on wildlife in the RMP/EIS

Adequacy of addressing wildlife and livestock grazing conflicts

Adequacy of addressing antelope and fencing conflicts

Adequacy of addressing impacts to bald eagles

Adequacy of protection for the Shamrock Hills Raptor Concentration Area of Critical Environmental Concern; and

The failure of the RMP to designate multiple big game overlapping critical winter ranges as ACECs.

In resolving the protest, it was not necessary to make any changes in the proposed RMP/final EIS.

The selection and approval of the Great Divide RMP is based on the proposed RMP described in the final EIS.

## WILDERNESS STUDY AREAS

The BLM's recommendations to the Secretary of the Interior on the Encampment River Canyon, Prospect Mountain, Bennett Mountains, Adobe Town, and Ferris Mountains wilderness study areas (WSAs) will be made in the appropriate Wilderness EISs. Wilderness decisions are not part of this Record of Decision or the Great Divide RMP. The decisions regarding wilderness are ultimately made by Congress and will be incorporated into the Great Divide RMP. Until Congress makes decisions on the WSAs in the Great Divide Resource Area, they will be managed under the interim wilderness management guidelines.

## SPECIAL MANAGEMENT AREA DESIGNATIONS

The following areas are designated as Areas of Critical Environmental Concern (ACECs).

Jep Canyon (approximately 13,320 acres)

Como Bluff (approximately 1760 acres)

Shamrock Hills Raptor Concentration Area (approximately 17,280 acres)

Sand Hills (approximately 8,300 acres)

Further information regarding these ACEC and other special management area designations is contained in the Great Divide RMP.

## ALTERNATIVES CONSIDERED IN DETAIL

Four alternative plans were considered in detail in the Great Divide RMP/EIS. All alternatives are multiple-use oriented. Each alternative provides for resource production and environmental protection.

Alternative A is the continuation of current management practices (or the "no action" alternative) on the basis of existing land use plans.

Alternative B restricts activities that are causing problems with other resources. Resource conflicts occurring under existing management are resolved through increased restriction of surface-disturbing activities.

RECORD OF DECISION

Alternative C provides for intensive management of all resources. Surface disturbance impacts would be mitigated or resources would be enhanced while maintaining other resource values.

Alternative D, BLM's preferred alternative and the environmentally preferred alternative, emphasizes a balance between the use of restrictions and the application of intensive management activities.

## MANAGEMENT CONSIDERATIONS

The Great Divide RMP represents the best mix of management actions that provide for sustained multiple use management and environmental protection, while allowing reasonable levels of commodity use.

## MITIGATION

The Great Divide RMP has been designed to avoid or minimize environmental harm where practicable. Specific mitigation measures are included in the plan.

## MONITORING

Required monitoring standards and intervals are identified and established in the Great Divide RMP.

## PUBLIC PARTICIPATION

A public participation plan was prepared and followed to insure that the public would have numerous opportunities to be actively involved in the planning and environmental process. Both formal and informal input have been encouraged and used.

A detailed description of the public involvement in the planning process is part of the planning record and is available at the Great Divide Resource Area Office.

## CONSISTENCY

The Great Divide RMP is consistent with the plans, programs, and policies of other federal agencies, the state of Wyoming, and local governments within the planning area.

## PUBLIC AVAILABILITY OF THIS DOCUMENT

Copies of the Great Divide RMP are available on request at the Great Divide Resource Area Office:

Area Manager, Bureau of Land Management
Box 670
Rawlins, Wyoming 82301
Telephone: (307) 324-4841

Ray Brubaker
Wyoming State Director
Bureau of Land Management

11-8-90
Date

# RESOURCE MANAGEMENT PLAN FOR THE GREAT DIVIDE RESOURCE AREA

## INTRODUCTION

This Resource Management Plan (RMP) provides the management direction for approximately 4 million acres of public land surface and 5 million acres of federal mineral estate administered by the Bureau of Land Management (BLM) in the Great Divide Resource Area. This Great Divide RMP supersedes all previous planning decisions for the Great Divide Resource Area.

The resource area administrative boundary includes parts of four counties in south central Wyoming (see map 1). The RMP planning area includes the larger communities of Rawlins, Cheyenne, Laramie, and Saratoga. Smaller communities within the area are Arlington, Baggs, Bairoil, Dixon, Elk Mountain, Encampment, Hanna, McFadden, Medicine Bow, Riverside, Rock River, Savery, Sinclair, and Wamsutter.

There are about 12.5 million acres within the general administrative boundary of the Great Divide Resource Area. Of this, about four million acres of both federal surface and federal mineral estate and another one million acres of only federal mineral estate (i.e., federal minerals under state and privately owned land surface) are administered by BLM and covered by this RMP.

The remaining 7.5 million acres within the resource area boundary are not covered by this RMP. On approximately one million of these 7.5 million acres, the federal mineral estate is administered by BLM, while the surface acreage is administered by other federal agencies, primarily the Forest Service. These acres are not addressed because the plans of those other agencies provide the basis for BLM's administration of those minerals resources. The remaining 6.5 million acres of surface and mineral estate are privately owned or owned by the State of Wyoming.

The Great Divide RMP represents a selection of management actions which resolve the planning issues and provide for sustained multiple use management of the public lands and resources.

All resource uses in the planning area must conform with the decisions, terms, and conditions of use described in this plan. Detailed decisions for the implementation of specific projects will be made through activity planning and environmental review that will be completed prior to the implementation of the project. Likewise, the authorization of specific uses will be based on conformance with planning decisions and completion of environmental review.

## Planning and Management Decisions for Areas of Critical Environmental Concern (ACEC)

These decisions apply only to the BLM-administered public lands within the boundaries of the ACECs.

The general management direction for each designated ACEC is described in this section. The only management actions presented here are for the specific resource management programs that directly pertain to the issues for each ACEC. Management actions for other programs in the ACECs will be guided by the general RMP decisions found in the other sections of the RMP. Management actions for ACECs include appropriate application of "The Wyoming BLM Standard Mitigation Guidelines for Surface Disturbing Activities (Appendix I)" and resource program-specific guidelines.

More specific and detailed management prescriptions and monitoring requirements will be identified when activity plans are prepared for each ACEC.

### Como Bluff

#### Designation and Management Objectives

The Como Bluff area (1,760 acres of public land) is designated an ACEC (see Map 2).

The objectives for management of the Como Bluff ACEC are to manage it in a manner that will maintain the integrity of the Como Bluff National Register District/National Natural Landmark, to preserve historically significant sites, and to allow for mineral development. The National Natural Landmark (NNL) will be managed for its paleontological resource and historical values.

#### Management Actions

An activity plan will be prepared to provide detailed guidance for management of the Como Bluff ACEC.

# RESOURCE MANAGEMENT PLAN

## TABLE 2

## MINIMUM MONITORING STANDARDS

| ELEMENT | CATEGORY | | | |
|---|---|---|---|---|
| | I | | M | C |
| | HIGH | LOW | | |
| Actual Use | Annually | Annually | —[1] | — |
| Climate | Annually | Annually | (Allotment supervision visit 1 year in 5) | (Allotment supervision visit as manpower allows) |
| Utilization | Annually (Includes allotment map of utilization) | 1 year in 5 (Includes allotment map of utilization) | | |
| Trend (Permanent Photo-Point) | Yes | Yes | Optional | — |
| Trend (Other) | Discretion of Area Manager | — | — | — |
| Allotment Management Plan | Draft AMP by end of 5 years | — | — | — |

[1] A dash (—) signifies no minimum standard.

multiple-use values. Private investment will be encouraged and authorized when consistent with the multiple-use objectives for the allotment.

Grazing use in "C" allotments will continue at present levels. Proposals for changes in use will be reviewed and allowed if they do not conflict with other values. Private investment in range improvements will be allowed when it does not conflict with multiple-use of the public land in the allotment.

### Management Actions Specific to the Medicine Bow Grazing EIS Area

Livestock grazing will continue to be excluded from the Pennock Mountain Wildlife Habitat Area (6,285 acres), the Wick Wildlife Habitat Area (320 acres), the Laramie Peak Wildlife Habitat Area (2,858 acres), and the Sybille Wildlife Research Unit (680 acres). A grazing agreement has been negotiated in the Split Rock/Duck Creek Agreement Area (1760 acres) which accommodates the special needs of the Bighorn Sheep using the area for lambing.

A projected 1,725 acres of riparian habitat will be the object for development of grazing treatments. Special riparian needs will be the primary consideration in the location and design of range improvements and grazing systems in these areas. If necessary, livestock use will be excluded from riparian areas until they improve sufficiently to support limited seasonal grazing.

Special attention will be given to maintenance of wildlife habitat on 13,140 acres that contain crucial winter range for big game and other important habitat. These areas will also receive special attention in the development and implementation of AMPs and other activity plans (see Maps 16, 17, and 18).

## Minerals Management Decisions

### Leasable Minerals

#### Coal

**Management Objectives** To provide for both short- and long-range development of federal coal in an orderly and timely manner, consistent with the policies of the federal coal management program, environmental integrity, national energy needs, and related demands; to protect important resources by specifying whether federal coal can be leased for surface, subsurface, or in situ mining methods; and to allow analysis of alternative areas in consideration of future leasing activities.

**Management Actions** The federal coal areas with potential for coal development are shown on

26



Livestock grazing could occur on both areas with special attention for maintenance of wildlife habitat.

Map 16
IMPORTANT WILDLIFE HABITATS IDENTIFIED
FOR SPECIAL LIVESTOCK GRAZING MANAGEMENT
BENNETT PEAK AND PROSPECT MOUNTAIN
Great Divide Resource Management Plan
November, 1990



Livestock grazing could occur on this area with
special attention for maintenance of wildlife habitat.

Map 17
IMPORTANT WILDLIFE HABITATS IDENTIFIED
FOR SPECIAL LIVESTOCK GRAZING MANAGEMENT
MIRACLE MILE
Great Divide Resource Management Plan
November, 1990



 Livestock grazing could occur on both areas with
special attention for maintenance of wildlife habitat.

**Map 18**
**IMPORTANT WILDLIFE HABITATS IDENTIFIED**
**FOR SPECIAL LIVESTOCK GRAZING MANAGEMENT**
**ENCAMPMENT RIVER CANYON**
Great Divide Resource Management Plan
November, 1990

# RESOURCE MANAGEMENT PLAN

Map 19. Those areas acceptable for further consideration for leasing (through lease applications or coal activity planning) are listed below. The mitigative measures developed in the coal screening process will be applied in these areas as described in Appendix II. All other federal coal areas within the planning area are unavailable for leasing consideration.

Federal coal areas acceptable for further leasing consideration:

**Hanna Basin**—About 29,280 acres of public land and 760 acres of split estate lands containing about 190.6 million tons of Federal coal.

**North Indian Springs**—About 3,840 acres of public land containing about 25.0 million tons of Federal coal (acceptable for leasing consideration only for in situ coal development).

**Indian Springs**—About 2,500 acres of public land containing about 25.0 million tons of Federal coal (acceptable for leasing consideration only for in situ coal development).

**Red Rim**—About 9,720 acres of public land containing about 40.6 million tons of Federal coal.

**China Butte**—About 6,240 acres of public land containing about 73.9 million tons of Federal coal.

**Atlantic Rim**—About 2,850 acres of public land and 800 acres of split estate lands containing about 79.1 million tons of Federal coal.

Development Sequence:

A north-to-south coal development sequence will be followed in the entire area west of Rawlins and south of I-80 as needs are identified.

The BLM will process all applications for leasing in areas identified as acceptable for further consideration for coal leasing. For each application, BLM will conduct a site-specific environmental analysis and will consider the development sequence described above and other environmental and socioeconomic factors (see Appendix II).

Savery Preference Right (coal) Lease Applications (PRLAs)—Serial Numbers WYW-0324034, 35, 36, 38, 41, 42

Development of the federal coal in the Savery PRLA area will not be allowed and no further consideration will be given to federal coal leasing in the area.

While the Great Divide proposed RMP/Final EIS was being printed (August 1988), the final showing for the Savery PRLAs, submitted by the applicant, was determined by BLM to be inadequate and the applications were rejected. Lacking any contest of this action by the applicant, the Sav-

ery PRLA case files (the only PRLAs in the Great Divide planning area) were closed. Thus, there is no longer any potential for PRLAs to influence the above decided north-to-south coal development sequence in the planning area.

In considering the Savery PRLA area for inclusion in the competitive federal coal leasing process, it was determined that the federal coal in the area has no development potential. The reasons for lacking development potential are the same as those explained in Appendix II (i.e., under the Coal Planning Process, Step 1: Identification of Development Potential Coal). In addition, the Record of Decision for the Savery Coal EIS (BLM, 1985) adopted the no (coal) development alternative for the Savery PRLA area because the significant resource impacts and land use conflicts that would result could not be acceptably mitigated. That situation has not changed and the no development decision is still appropriate for the foreseeable future.

## Oil and Gas

**Management Objective** To provide opportunity for leasing, exploration, and development of oil and gas while protecting other resource values.

**Management Actions** The entire planning area is open to oil and gas leasing. Leases will be issued with needed restrictions to protect the resources listed in Table 3.

Surface-disturbing activities will be restricted and intensively managed to maintain important resource values in the ACECs, the Baggs Elk Crucial Winter Range, and in overlapping crucial winter ranges for the various big game species. (See the individual ACEC and wildlife sections.)

All lands that are open to oil and gas leasing are also open to geophysical exploration.

In cases where Federal oil and gas leases are or have been issued (1) without stipulated restrictions or requirements that are later found to be necessary; or (2) with stipulated restrictions or requirements that are later found to be insufficient; the needed restrictions or requirements may be included in approving subsequent exploration and development activities. These restrictions or requirements may only be included as reasonable measures or as conditions of approval (COA) in authorizing applications for permit to drill (APD), sundry notices, or plans of development (POD).

Conversely, in cases where leases are or have been issued with stipulated restrictions or require-

**Exhibit 2 to Defendant-Intervenors' Opposition To
Plaintiffs' Motion For A Preliminary Injunction**

**Excerpts From The Bureau of Land Management's
November 2006 Final Environmental Impact Statement
Atlantic Rim Natural Gas Field Development Project
(FEIS for the Atlantic Rim Project)**

FINAL
ENVIRONMENTAL IMPACT STATEMENT


ATLANTIC RIM

NATURAL GAS FIELD DEVELOPMENT PROJECT


Prepared by

Bureau of Land Management
Rawlins Field Office
Rawlins, Wyoming


November 2006

# Atlantic Rim EIS Volume Contents

| Volume 1 | | Executive Summary |
|---|---|---|
| | | Main EIS text |
| | | |
| Volume 2 | Appendix A | Interim Drilling Policy |
| | Appendix B | Reclamation Plan |
| | Appendix C | Hazardous Materials Management Plan |
| | Appendix D | Wildlife and Fish Species Lists |
| | Appendix E | Wildlife Monitoring and Protection Plan |
| | Appendix F | Air Quality Technical Support Document, Atlantic Rim Natural Gas Project and the Seminoe Road Gas Development Project, Wyoming |
| | | |
| Volume 3 | Appendix G | Biological Assessment |
| | Appendix H | Required Best Management Practices |
| | Appendix I | Cultural Resources Management |
| | Appendix J | Best Management Practices for Reducing Non-Point Source Pollution |
| | Appendix K | Plan of Development / Detailed Proposed Action |
| | Appendix L | Resource Concerns and Associated Protection Measures Proposed Under Alternative C |
| | Appendix M | Maps |
| | | |
| Volume 4 | Appendix N | Draft EIS Comment Letters |
| | | |
| Volume 5 | Appendix O | BLM Responses to Comments |

**Executive Summary**

# Executive Summary

The Department of the Interior (DOI), Bureau of Land Management (BLM) Rawlins Field Office (RFO) has received a proposal from Anadarko E & P Company, LP, as lead proponent for a group of companies including Warren Resources, Inc., Double Eagle Petroleum and Mining Company (Companies), and other natural gas operators (collectively known as the Operators) to develop and remove natural gas resources in south western Carbon County, Wyoming. Operations are proposed for the Atlantic Rim Project Area (ARPA) encompassing 270,080 acres of land located in Townships 13 North to 20 North and Range 89 West to 92 West, south and west of Rawlins, Wyoming. Life of project (LOP) is estimated to run from 30 to 50 years.

The DOI/BLM RFO has determined the proposed project would constitute a major federal action and, therefore, requires the preparation of an environmental impact statement (EIS) in accordance with the National Environmental Policy Act of 1969, as amended (NEPA). This Final EIS (FEIS) replaces the Draft EIS in its entirety and was prepared in accordance with NEPA to assess the environmental consequences of the Operator's proposed action and alternative courses of action. It is intended to provide the public and decision-makers with a complete and objective evaluation of impacts that might occur from the Proposed Action and reasonable alternatives.

The State of Wyoming is a cooperating agency in this EIS with active participation from many agencies including in part the State Planning Office, Wyoming Game and Fish Department, the State Historic Preservation Office, the Wyoming Department of Environmental Quality, and the Wyoming Department of Agriculture. Other cooperating agencies include the Saratoga Encampment Rawlins Conservation District and the Little Snake River Conservation District.

## Proposed Action

The Operators proposed to drill and develop up to 2,000 new natural gas wells. Approximately 1,800 wells would be drilled to coals within the Mesaverde Group to develop coalbed natural gas (CBNG) resources. An additional 200 wells would be drilled to access conventional natural gas found in other formations, generally expected to be deeper than the Mesaverde coals. The 2,000 proposed new natural gas wells would be in addition to the 116 ARPA exploration wells already drilled in the interim drilling period.

Proposed well spacing is eight wells per section (80-acre spacing) throughout the project area, but may reduce to four wells per sections (160-acre spacing) depending on the geology and ability of the operators to recover the gas resource. Development and drilling would begin in 2007 and continue for approximately 20 years, with a LOP of 30–50 years. Various drilling— and production—related facilities (e.g., roads, pipelines, water wells, disposal wells, compressor stations, and gas processing facilities) would also be constructed throughout the ARPA.

## Scoping

Public and agency scoping was conducted to determine issues relative to the Proposed Action. A scoping notice and informational materials were mailed to potentially interested parties beginning in 2001 under the title "Atlantic Rim Coalbed Methane Project." Subsequently, the

# EXECUTIVE SUMMARY

project was re-named the "Atlantic Rim Natural Gas Development Project" in view of the proponents' request to reduce the number of wells proposed and to develop a limited number of conventional gas wells. All issues identified during scoping and BLM and Interdisciplinary Team reviews were evaluated to identify key issues that drove development of alternatives and the impact analyses. 13 key issues were identified including: Increased traffic on existing county, state, and BLM roads, adverse socio-economic impacts to local communities, impacts to surface water hydrology including increased rates of delivery of sedimentation and salts to the Colorado River system, impacts to groundwater resources, impacts to sensitive soils, impacts to air quality, successful and timely reclamation of disturbed areas, conflicts with livestock management operations, impacts to cultural and historic values within the area including historic trails, impacts to wildlife habitats, impacts to threatened, endangered and sensitive plant and wildlife species, the cumulative effects of drilling and development activities, and potential conflicts between mineral development and recreational activities. Comments to the Draft EIS (DEIS) developed two additional key issues; directional drilling/well spacing, and phased development.

The three action alternatives summarized below meet the Purpose and Need of the proposal but vary in response to the key issues. An alternative considered in depth in the DEIS (Alternative B) has not been carried over to the FEIS. Other alternatives were considered but eliminated from detailed study.

## Alternatives

### Alternative A - No Action

NEPA regulations require that EIS alternative analyses "include the alternative of no action" [40 CFR 1502.14(d)]. For this analysis, "no action" means that the BLM would reject the Proponents proposal and the proposed activity would not take place. Development activities and operations approved under EAs during the interim drilling period would continue as approved.

### Alternative C

Under Alternative C the operators would be approved to develop natural gas resources from the desired target formations but operations would be subject to development protection measures (DPM) in those areas with sensitive or crucial resource values (as detailed in appendix L), likely resulting in fewer acres of disturbance and reduced road density on federal lands. Generally DPMs focus on surface disturbance limits, selection of facility locations, drilling, and construction practices and, in some cases, no surface occupancy. Examples of such areas where DPMs would be applied are wildlife and fish habitat and areas with sensitive soils. As an end product, geographic information system (GIS) layers would be available to operators for development of site-specific proposals for their planning of the annual program.

### Alternative D - BLM Preferred Alternative

The goal of this alternative is to minimize surface disturbance while optimizing natural gas recovery. Annual planning between the operators and the BLM would be a key component of this alternative. The annual planning would require the operators to submit to the BLM their proposed plan of operation for the forthcoming year. The BLM would then work with the operators at a site-specific level to minimize surface disturbance by applying the appropriate

# EXECUTIVE SUMMARY

lease stipulations, conditions of approval, best management practices, and any other measures deemed necessary to minimize surface disturbance and still allow for the recovery of natural gas.

Coalbed and conventional natural gas resources would be developed, while reclamation activities stabilize disturbed soils and vegetation communities. For the overall Atlantic Rim area, no more than 7,600 acres of the project area would be disturbed and unsuccessfully reclaimed at any time. For the overall Atlantic Rim area, there would be a 6.5 acres/wellpad short-term disturbance goal (2.8% of the ARPA). Those areas designated as "Category A" would have a short-term disturbance goal of less than 6.5 acres per well pad. Category A, as depicted on map M-7, includes areas with sensitive fish populations, and crucial wildlife habitats, and unique vegetation communities, and is about 72,200 acres in extent.

## Environmental Impacts

### Geology / Minerals / Paleontology

No significant effects are anticipated for these resources under any of the action alternatives (Proposed Action and Alternatives C and D). The purpose of this proposal is to remove and market natural gas resources. These resources would be permanently depleted.

### Air Quality

Air quality impacts from the project would occur from pollutants emitted during construction and production operations. The assessment of project potential impacts included both a near-field and a far-field analysis. The near-field analysis assessed direct project impacts in the immediate vicinity of project activities resulting from construction or production reflective of maximum emissions. The far-field analysis assessed potential impacts from field-wide project emissions at in-field locations within the ARPA and at far-field locations (i.e., sensitive Class I and Class II areas). The far-field analysis also assessed regional emission sources located with the model domain.

Near-field impacts from action alternatives emissions were shown to be below the applicable Wyoming Ambient Air Quality Standards (WAAQS) and National Ambient Air Quality Standards (NAAQS). For far-field effects direct visibility impacts from the action alternatives were predicted to be below the "just noticeable visibility change" (1.0 dv) at all sensitive wilderness areas using both the Federal Land Managers' Air Quality Related Values Workgroup (FLAG) and Interagency Monitoring of PROtected Visual Environments (IMPROVE) background visibility data. Project source emissions from the action alternatives would result in an acid neutralizing capacity (ANC) change less than the level of acceptable change (LAC) at analyzed acid-sensitive lakes. The predicted maximum S and N deposition potential impacts from all action alternatives are below the 0.005 kg/ha-yr DAT at all the sensitive PSD Class I and Class II areas. For potential in-field impacts all action alternatives are below applicable ambient air quality standards.

### Soils

The revegetation potential of disturbed soils is expected to be low to moderate under all the alternatives. While no biological crusts are mapped or known to exist within the ARPA, some crusts, if they do exist, may be damaged as a result of selecting any of the action alternatives.

# EXECUTIVE SUMMARY

## Water Resources

Impacts to waterbodies with impairment or threats of impairment to the State of Wyoming's 303d list (Muddy Creek) are expected from the Proposed Action and Alternative D. Impacts to Muddy Creek under Alternative C would not likely be significant.

Salinity loading in run-off would increase above background conditions for the Proposed Action and Alternative D. Under Alternative C salt loads would be measurably higher but are not expected to be significant.

Under the Proposed Action and Alternative D changes in hydrologic function in wetlands would occur and indirect impacts could be significant. Direct impacts are expected to occur but not be significant. For Alternative C, direct and indirect impacts are not likely to be significant. Changes in streamflow characteristics would occur under any of the action alternatives and indirect effects could be significant.

For Proposed Action and Alternative D changes in geomorphology due to increased surface run-off, erosion, and increased sediment loads would occur in localized areas and cumulative impacts would be significant. Impacts are not likely to be significant under Alternative C. The Standard for Healthy Rangelands for water resources would continue to fail in areas due to indirect impacts and would be significant for any of the action alternatives

## Groundwater

Under all of the action alternatives, impacts to wells, seeps and springs emanating from the upper Mesaverde Group are expected to be significant due to coalbed dewatering. In addition short-term reductions in flows to artesian wells are expected. Groundwater quality is not likely to be significantly diminished under any of the alternatives.

## Range and Other Land Uses

Significant impacts from changes in animal unit months (AUMs), livestock mortality, and disturbance of livestock grazing operations and facilities are expected under the Proposed Action and Alternative D. Under Alternative C, impacts are expected to be somewhat reduced due to reduced surface disturbance and implementation of development protection measures.

## Vegetation

Effects from increased erosion from roads on moderate to steep slopes and alkali sage communities prone to erosion would result in long-term loss of productivity with significant effects for the Proposed Action and Alternative D.

Indirect effects from erosion and altered run-off patterns from adjacent uplands would have significant impacts for riparian communities under the Proposed Action and Alternative D. Effects are not expected to be significant under Alternative C. Long-term loss of shrubs, including Wyoming and alkali sagebrush sites, is expected to have significant impacts under the Proposed Action and Alternative D. Reduced surface disturbance on federal lands and treatment of roads would result in lower impacts to vegetation and may not be significant if overall browse use rates remain at moderate levels under Alternative C.

# EXECUTIVE SUMMARY

For those aspen and mountain shrub communities that have failed Rangeland Health Standards, additional disturbance from development would exacerbate the failed standard, resulting in increased difficulty in meeting the Standard and corresponding significant effects.

The potential for the spread or new infestations of weeds on disturbed sites is high to very high, although impacts would not exceed the significance criteria for Alternative D and the Proposed Action. The possibility of reduced surface disturbance and utilization of development protection measures on federal lands could result in reduced spread and infestation of weeds under Alternative C.

## Wildlife

For the Proposed Action and Alternative D, impacts on shrub-dependant songbird nesting habitats would be significant. Under Alternative C, impacts are not expected to be significant. Impacts to greater sage-grouse and Columbian sharp-tailed grouse would be significant under all the action alternatives. For big game, including mule deer and elk, significant effects are expected under all the action alternatives.

Impacts to threatened and endangered, proposed and candidate species, other sensitive species (other than greater sage-grouse and sharp-tailed grouse), and raptors are not expected to be significant under any of the action alternatives. Impacts to threatened and endangered fishes occurring downstream of the ARPA are not expected to occur. Significant impacts to BLM sensitive fishes are expected under the Proposed Action and Alternative D in Muddy Creek. Under Alternative C significant impacts are not expected.

## Recreation

Under all the action alternatives displacement of wildlife and the loss of a naturally-appearing setting would make the ARPA less desirable for hunting or wildlife viewing. Visitors would be displaced and impacts would be significant. Impacts to scenery, noise, dust, and human activity would reduce the ARPA's desirability as a place to camp significantly under all the action alternatives.

## Visual Resources

For pleasure driving and mountain biking, impacts would be significant for the Proposed Action and Alternative D. Impacts would not be significant under Alternative C. Management objectives for Visual Resource Management (VRM) Class III viewsheds would be exceeded under Alternative D and the Proposed Action. Management objectives would not be exceeded under Alternative C.

## Cultural Resources

Impacts to cultural resources as a result of construction activities could impact an estimated 126 sites under all the action alternatives. Reduced visual impacts to settings, where they contribute to site eligibility for historic trails, is expected to be less under Alternative C compared to the Proposed Action and Alternative D.

# EXECUTIVE SUMMARY

## Socioeconomics

**Economic Effects.**  Economic impacts of natural gas development and production would be largely positive under the action alternatives.  Based on the assumptions used for this assessment, natural gas development would enhance regional economic conditions and generate substantial local, state and federal tax and royalty revenues.  Economic benefits would be similar for the Proposed Action and Alternatives D.  Alternative C would likely result in reduced income and revenue from the gas.  Drilling expenditures could be higher for individual wells under Alternative C than the Proposed Action and Alternative D, based on the various development protection measures that might apply on federal lands.  Comments to the DEIS from the proponents assert that Alternative C may not be economically feasible and would not result in full development and extraction of the natural gas resource.  Economic benefits to leaseholders would be less under Alternative C.

Direct expenditures for drilling/field development are anticipated to be $981 million, although Alternative C costs would likely be higher, depending on development protection measures. Economic impacts from drilling/field development are expected to be $1.25 billion with lesser income for Alternative C.  For the Proposed Action and Alternative D, 578 average annual jobs are predicted.  Under Alternative C, fewer jobs could occur from a corresponding reduction in well numbers.  A total of $6.4 billion in total economic impacts related to production are expected for Alternative D and the Proposed Action.  Less revenue could be realized under Alternative C.  Impacts to other economic activities within the ARPA include the potential for reductions in the grazing, recreation, and hunting income from the Proposed Action and Alternative D, although disturbance limits may reduce negative effects on grazing and recreation activities.  Alternative C is similarly expected to have a reduced impact on these activities.

Peak year drilling and production employment is predicted at 1,490 jobs for the Proposed Action and Alternative D.  Peak year population impacts are estimated at about 1,100 people and peak year housing demand at 440 units for both alternatives.  For Alternative C, effects would be reduced if less wells are drilled due to development protection measures or if the alternative proves to be uneconomic or to not fully remove the natural gas resource.

Local government facility and service demands are expected to be generally the same for all three action alternatives.  Most local government facilities have excess capacity, while some services may need to expand to accommodate growth.  County and special district revenue should be adequate to address development needs, but may lag at the time that development—related demand occurs.  Municipalities which do not receive royalties, depletions, or similar mineral extraction revenues may not receive direct project related income in sufficient amounts of offset the costs of needed expansion in some cases.

Specific amounts of revenue anticipated are detailed in chapter 4, section 12.  For all the various revenue sources, the Proposed Action and Alternative D are expected to have similar effects.  Revenues under Alternative C are expected to be less, depending on the effects of development protection measures on the number of wells drilled and gas extracted.

## Transportation

Specifics of increased traffic levels are detailed in chapter 4.  Average annual daily travel levels would increase for Carbon County Road (CCR) 605N (20 Mile Road), CCR 608 (Wild Cow Road), CCR 501 (Cherry Grove Road), Interstate 80, WY 789, and WY 70 under the Proposed

# EXECUTIVE SUMMARY

Action and Alternative D. Increased traffic levels would be lower under Alternative C depending upon the impacts of development protection. Impacts to county roads would include additional maintenance costs, offset by increased property tax revenues from production, with the possibility of a lag time between the need for work and the realization of revenue. There is a history of cooperative action between the companies and the Carbon County Road and Bridge Department that may off-set this effect.

## Health and Safety

The risk of industrial injuries would occur under all three action alternatives. If less wells are drilled under Alternative C, there would be a correspondingly reduced risk of hazards. The potential for hazardous material spills/exposure would be the same for the Proposed Action and Alternative D, and somewhat reduced under Alternative C.

## Noise

For all alternatives, noise levels associated with drilling, field development, and operations activities may temporarily exceed the threshold USEPA average 24-hour noise level of 55 dBA at specific locations within the ARPA, but the lack of year-round occupied human residences and the low level of non project-related human occupation of the project area would result in minimal noise impacts to persons other than project employees. Although noise impacts associated with compression facilities would be long term in duration, these same factors, absence of human residences and low levels of human occupation, would result in minimal compression facility noise impacts. Noise levels would be similar for the Proposed Action and Alternatives C and D, except that noise disturbances would likely occur at fewer locations under Alternative C if resource protection measures resulted in fewer wells being drilled.

**Chapter 1**

**Purpose and Need**

## CHAPTER 1.  PURPOSE AND NEED

approved producing well spacing density for the Mesaverde Group of 8 wells per 640 acres (township section).  The operators estimate this spacing should be adequate for the most economic recovery of the gas resource.  Drilling is expected to occur over approximately 20 years, with an estimated life-of-project of 30–50 years.

As summarized in section 1.2.1, interim exploration drilling has taken place within the ARPA with BLM approval.  Table 1-4 describes IDP Pods and well status.

**Table 1-4.    Status of Well Development within PODs.**

| POD# | Name | Acres | Wells Approved | | | | Project Status |
|------|------|-------|-----|-----------|---------|-------|----------------|
|      |      |       | Gas | Injection | Monitor | Total |                |
| 1 | Not Planned | -x-x- | 0 | | | | Dropped by Proponent |
| 2 | Red Rim | Pending | 16 | 2 | | 18 | Approved 4/30/04 |
| 4 | Jolly Roger Alpha | 5,120 | 26 | 2 | 1 | 29[1] | Approved 12/14/04 |
| 3 | Jolly Roger Beta | -x-x- | 0 | | | | Not Proposed to Date |
| 5 | Doty Mountain[2] | 1,920 | 24 | 2 | | 26 | Completed |
| 7 | Blue Sky | 1,921 | 23 | 2 | 1 | 25 | In-fill Drilling in Progress |
| 6 | Sun Dog | 1,000 | 10 | 1 | | 11 | Completed |
| 6 | Cow Creek | 2,050 | 14 | 1 | 1 | 16 | Completed |
| 8 | Brown Cow | 800 | 24 | 2 | | 26 | Completion Expected Fall 2006 |
| 9 | Muddy Mtn. | | | | | | On Hold—Environmental Concerns |

**Notes:**
[1] Number may decrease.
[2] Doty Mountain Fee not included, BLM approval was for right-of-way access only.

## 1.3  Purpose of and Need for Action

Exploration and development of federal oil and gas leases by private industry are an integral part of the BLM's oil and gas leasing program under authority of the Mineral Leasing Act of 1920 as amended, the Mining and Minerals Policy Act of 1970, the Federal Land Policy and Management Act of 1976 (FLPMA), the National Materials and Minerals Policy, Research and Development Act of 1980, and the Federal Onshore Oil and Gas Leasing Reform Act of 1987. Under its authority to issue oil and gas leases and consistent with the RMP, the RFO has leased federal minerals within the entire ARPA.

The BLM oil and gas leasing program encourages development of domestic oil and gas reserves.  Natural gas (including CBNG) is an integral part of the United States' energy future due to its availability and the presence of the existing market delivery infrastructure.  By developing domestic reserves of clean-burning natural gas, the U.S. would reduce dependence on foreign energy, such as natural gas from Mexico and Canada.  The environmental advantages of burning natural gas, rather than oil or coal, were emphasized by the U.S. Congress and by the President when the Clean Air Act Amendments of 1990 were signed into law.  In addition, the Energy Policy acts of 2001 and 2005 emphasize the development of domestic natural gas reserves for supply and economic stability.

# CHAPTER 1.  PURPOSE AND NEED

To meet the growing demand for energy, the National Petroleum Council projects that U.S. domestic gas production will increase from the 2002 level of 18 trillion cubic feet (TCF) to 21 TCF in 2025.  Any shortfall in domestic supply will be met by imports of foreign natural gas, primarily from Canada.  A portion of the increase in domestic supply is projected to be met by growth in production from nonconventional sources, including CBNG, from the Rocky Mountain region.  Nonconventional production in the Rocky Mountain region (including Wyoming) is projected to increase to 3.8 TCF in 2020 from the 2000 level of 3.1 TCF (EIA 2001).  In addition, the Report of the National Energy Policy Development Group states that 90 percent of electric power generation capacity additions between 1999 and 2020 are projected to be natural-gas-fueled.  The quantity of natural gas consumed for power generation is expected to triple from 1999 to 2020 (NEP 2001).  Production from the proposed Atlantic Rim Natural Gas Project could help meet this demand.

The purpose of, and need for, this proposed natural gas development is to develop, produce, and market natural gas products.  This natural gas is needed to meet the national domestic energy demand.  This proposal is consistent with the National Energy Act of 2005 and the National Energy Policy (President's Plan).

## 1.4  Relationship to Policies, Plans, and Programs

When analyzing environmental impacts, other policies, plans, and programs were considered.  For this EIS, the Great Divide Resource Management Plan (RMP) and other EISs within the immediate vicinity of the ARPA were considered, as explained below.

### 1.4.1  Conformance with the Great Divide Resource Area Management Plan EIS and Record of Decision

The BLM's Great Divide RMP and its Record of Decision (ROD) (USDI-BLM 1990) directs management of the federal lands within the project area.  The Great Divide RMP reviewed all public lands in the resource area and deemed them suitable for oil and gas leasing and development, subject to certain stipulations.  The proposed project is in conformance with management objectives and actions provided for in the ROD, and as detailed on pages 30–32 of the Record of Decision and Approved Resource Management Plan for the Great Divide Resource Area.  The Great Divide RMP is currently undergoing revision as the Rawlins RMP.

#### 1.4.1.1  Management Objectives

Management objectives identified in the Great Divide RMP that are applicable to the Proposed Action and alternatives include the following:

- To provide opportunity for leasing, exploration, and development of oil and gas while protecting other resource values.

#### 1.4.1.2  Management Actions

Management actions identified in the Great Divide RMP that are applicable to the proposed action and alternatives include:

- The entire planning area is open to oil and gas leasing, subject to stipulations needed to protect resources.  This action is in conformance with the Great Divide RMP.

## CHAPTER 1. PURPOSE AND NEED

### 1.4.2  Relationship to Other Plans and Documents

Other environmental analyses and plans completed or planned for completion in the immediate vicinity of the ARPA (map M-5) include the following documents:

**Little Snake River Conservation District (LSRCD) Watershed Management Plan**.  The Proposed Action is located within the LSRCD. The LSRCD is a subdivision of the State of Wyoming that receives its statutory authority from Title 11, Chapter 16 of the Wyoming Statutes (WS).  Statutory authorities and responsibilities of conservation districts include the development of comprehensive plans for range improvement and stabilization; soil and water conservation; flood control; and the development of ordinances, rules, and regulations to implement conservation plans.  Conservation is defined as "...development, improvement, maintenance, preservation, protection and use of natural resources, and the control and prevention of flood water and sediment damages, and the disposal of excess waters" (WS 11-16-102 [iv]).  The District is participating in this EIS process as a cooperating agency.

**Continental Divide—Creston Natural Gas Field Development Project Environmental Impact Statement**.  This natural gas development project area is generally located in Townships 14 through 24 North and Ranges 91 through 98 West in Carbon and Sweetwater counties.  The total project area includes approximately 1.1 million acres. The proposal includes drilling and developing up to 8,950 wells with 40–acre downhole well spacing per section in limited areas. Associated facilities include additional roads, gas and water collection pipelines, compressor stations, and any electrical/power system development.

This oil and gas development proposal partially overlays earlier field development EIS's that analyzed natural gas development at a less intense level.  The Continental Divide / Wamsutter II project approved 2,130 wells and was issued in May, 2000.  The combined project area is generally located in Townships 15 through 23 North, Ranges 91 through 99 West, in Sweetwater and Carbon Counties, Wyoming.  The total combined area encompasses approximately 1,061,200 acres and is still drilling wells under the original proposal.

The Creston Blue Gap EIS was approved on October 4, 1994, and provided an assessment of the environmental consequences of a natural gas development located immediately west of the Atlantic Rim area.  The BLM's decision allowed a maximum of 275 wells on 250 locations on a 160-acre spacing pattern.

## CHAPTER 1.  PURPOSE AND NEED

Map M-5.    Mineral Development Projects in the Vicinity.



## CHAPTER 1.  PURPOSE AND NEED

**Table 1-5.    Federal, State, and County Authorizing Actions.**

| Agency | Nature of Action |
|---|---|
| **Wyoming Oil and Gas Commission** | |
| | Acts as primary authority for drilling on state and privately held mineral resources, and secondary authority for drilling on federal lands |
| | Holds authority to allow or prohibit flaring or venting of gas on privately or state-owned minerals |
| | Regulates drilling and plugging of wells on privately or state-owned minerals |
| | Issues Aquifer Exemption Permits |
| | Approves directional drilling |
| | Administers rules and regulations governing drilling units |
| | Issues water injection well permits |
| | Grants gas injection well permits |
| | Administers drainage protection and protection of correlative rights on private/state mineral estates |

## 1.6  Public Participation

Scoping for the Atlantic Rim Natural Gas project was initiated on June 26, 2001.  The State of Wyoming; federal agencies; state and local government representatives; municipalities; Native American Tribes; grazing permittees; lease and right-of-way holders; landowners within the ARPA; local media; and other agencies, industry representatives, individuals, and organizations were sent a scoping notice and other information by mail.  Two public meetings were held during scoping at Baggs and Rawlins Wyoming.  Fifty-seven comments were received in the form of letters, emails, and faxes from the public including citizens; interested federal, state, and local agencies; advocacy groups; and various corporations.  These comments were used to determine key issues, resource conflicts and concerns, alternatives, and the scope of the analysis. Key issues and concerns are listed in table 1-6 in section 1.7. Interested agencies were invited to participate as cooperating agencies.  The State of Wyoming, Little Snake Conservation District, and Carbon County Commissioners requested and received Cooperating Agency status.

The Draft Atlantic Rim EIS was released in December 2005.  The 60-day comment period resulted in over 59,400 individual comments including approximately 59,100 emails and 300 hardcopy comments.  Comments were received from state, federal, and local agencies; environmental advocacy groups; landowners; leaseholders; oil and gas companies; and the public.  Comments received were reviewed and substantive comments responded to.  Those letters and emails with substantive comments are provided as appendix N, with comment responses provided as appendix O.

Comments were used to develop Alternative D and to modify, clarify, and correct the Final EIS, as appropriate.

## CHAPTER 1.  PURPOSE AND NEED

### 1.7  Issues and Concerns

During the scoping period for the Atlantic Rim Natural Gas Project, thirteen issues and concerns were brought up by the stakeholders referenced in section 1.6. These issues and concerns are summarized below in table 1-6, along with a reference to the section in this EIS where they are addressed.  Comments to the Draft EIS developed two additional key issues, directional drilling / well spacing and phased development.

**Table 1-6.  Key Issues and Concerns Identified during the Scoping Period**

| Issue | Description of Issue | Where Is Issue Addressed? |
|---|---|---|
| 1. Increased traffic | Increased traffic on existing county, state, and BLM roads can result in:<br><br>▪ Increased traffic hazards,<br>▪ Higher maintenance costs,<br>▪ The need to upgrade roads, and<br>▪ More intensive transportation planning. | Section 4.13 |
| 2. Adverse socioeconomic impacts to local communities | Impacts to local communities include:<br><br>▪ Demand for housing that might exceed local capabilities,<br><br>▪ Demand for local services—such as medical, retail, and civic—beyond the capacity of the community to deliver, and<br><br>▪ The need to expand local government services and presence without corresponding revenue/compensation from increased development. | Section 4.12 |

## CHAPTER 1.  PURPOSE AND NEED

**Table 1-6.  Key Issues and Concerns Identified during the Scoping Period**

| Issue | Description of Issue | Where Is Issue Addressed? |
|---|---|---|
| 3. Impacts to surface water hydrology and groundwater resources. | The following could impact surface water:<br><br>■ Production of large amounts of water from coal formations with corresponding discharges into the Colorado River system would affect water quality and local and non-local government agreements.<br><br>■ The project might also cause changes in water quality and the presence of sensitive fish species within Muddy Creek.<br><br>■ Continuous surface water discharges into ephemeral and intermittent stream courses could increase erosion.<br><br>The following could impact surface hydrology:<br><br>■ Increased road density could cause higher overland flows.<br><br>■ Higher overland flows could increase erosion and correspondingly increase salt and sediment delivery within the Colorado River system.<br><br>■ Increased erosion from higher overland flows could adversely impact water quality.<br><br>Impacts to groundwater resources include:<br><br>■ Sedimentation/excess salts to the Colorado River system,<br><br>■ Potential changes in groundwater aquifers due to the reduction of hydrostatic pressure in the coal seams and re-injection,<br><br>■ Decrease or elimination of water, which can have a serious adverse effect on habitats and dependent populations of plants and wildlife who use the local wells, springs, and seeps. | Sections 4.4 and 4.8, and Alternatives C and D |
| 4. Impacts to sensitive soils | Impacts to sensitive soils would need to be mitigated by maintaining and preserving sensitive soils that have:<br><br>■ Difficult reclamation potential,<br>■ High runoff potential, and<br>■ Excess salt. | Sections 4.3 and 4.5 and Alternatives C and D |

## CHAPTER 1.  PURPOSE AND NEED

**Table 1-6.  Key Issues and Concerns Identified during the Scoping Period**

| Issue | Description of Issue | Where Is Issue Addressed? |
|---|---|---|
| 5. Impacts to air quality | Drill rig emissions and production activities could cause the following impacts to air quality:<br><br>• Regional haze and<br>• Increased dust and emissions levels, particularly within Class I airsheds associated with nearby wilderness areas. | Sections 4.2 and 4.4 |
| 6. Viability of reclamation | The following reclamation should be ensured:<br><br>• Successful and timely reclamation,<br>• Control of noxious weed invasions,<br>• Immediate soil stabilization,<br>• Interim reclamation within the first growing season, and<br>• Monitoring of reclamation success with adaptive management in difficult areas. | Sections 4.4 & 4.5<br><br>Appendix B<br><br>BMP H-4 in appendix H<br><br>Alternatives C and D |
| 7. Potential conflicts with livestock management operations | Potential conflicts with livestock management operations could include:<br><br>• Reduced forage availability,<br>• Increased livestock disturbance and harassment,<br>• Reduced viability of range improvement projects, and<br>• Compromised range/vegetation quality. | Sections 4.3, 4.5, and 4.6, and Alternatives C and D |
| 8. Impacts to cultural resources | Impacts to cultural resources and resulting risks to significance criteria established by the National Historic Preservation Act could include:<br><br>• Historic trails and<br>• Sites eligible for inclusion in the National Register of Historic Places. | Section 4.11 and Alternative C |

# CHAPTER 1. PURPOSE AND NEED

**Table 1-6. Key Issues and Concerns Identified during the Scoping Period**

| Issue | Description of Issue | Where Is Issue Addressed? |
|---|---|---|
| 9. Impacts to wildlife habitats | To mitigate impacts to wildlife habitats—including those supporting big game, greater sage-grouse, and raptors—the following needs were identified:<br><br>• Protecting and maintaining crucial winter range for big game, critical winter habitat, and nesting/brood-rearing habitats for sage-grouse;<br><br>• Maintaining the viability of leks for sage-grouse;<br><br>• Maintaining raptor populations using timing and disturbance restrictions;<br><br>• Collecting further information on big game migration corridors; and<br><br>• Maintaining migration corridors as viable routes for big game. | Section 4.7 and Alternatives C and D |
| 10. Potential impacts to listed or proposed-for-listing threatened and endangered plant and animal species | Impacts to these species include:<br><br>• Potential depletions to the Colorado River;<br><br>• Effects on downstream listed, threatened, and endangered species;<br><br>• Critical habitats, which must be maintained; and<br><br>• Compliance with Endangered Species Act. | Section 4.8 and Alternatives C and D |
| 11. Potential impacts to sensitive plant and wildlife species | To mitigate impacts to sensitive species—including bluehead sucker, roundtail chub, and flannelmouth sucker—the following needs were identified:<br><br>• Supporting habitat for sensitive fish species within Muddy Creek and<br><br>• Preserving or improving supporting habitats including water flows and quality. | Section 4.8 and Alternatives C and D |
| 12. Cumulative effects of project when combined with neighboring projects | Cumulative impacts from drilling and development activities were identified as a concern when combined with other ongoing and proposed developments on lands adjacent to the Atlantic Rim Project Area including:<br><br>• The area covered by the RFO,<br>• The Red Desert, and<br>• The Greater Green River Basin. | Section 5.2 and Alternatives C and D |

# CHAPTER 1.  PURPOSE AND NEED

**Table 1-6.  Key Issues and Concerns Identified during the Scoping Period**

| Issue | Description of Issue | Where Is Issue Addressed? |
|---|---|---|
| 13. Potential conflicts between mineral development and recreation | The following potential conflicts between mineral development and recreation were identified: <br><br>▪ Presence of local, regional, and nationally important big game populations; <br><br>▪ Traditional use of land for recreational hunting and wildlife viewing; <br><br>▪ Visual resources; and <br><br>▪ Risk of decreased recreational opportunities due to the impacts of big game and wildlife populations. | Sections 4.7, 4.9, 4.10, and 4.12 and Alternative C |
| 14.Well spacing and directional drilling (developed from comments to the Draft EIS) | The following conflicts were identified for well spacing and directional drilling: <br><br>Directional drilling would reduce the surface impact of the proposed action by reducing the number of well pads but allowing for maximum recovery of the gas resource. <br><br>Directional drilling is not feasible within the project area due to the geology and shallow depth of the target coals ; <br><br>Wellpad spacing must be 80 acres / wellpad to allow for maximum economic recovery of the resource; <br><br>160 acre / wellpad spacing is not close enough to release the natural gas; <br><br>More than four wellpads / section in portions of the ARPA exceeds the recommendations of the Wyoming Game and Fish Department for oil and gas development. | Alternative D |
| 15.  Phased development (developed from comments to the Draft EIS) | The following conflicts were identified for phased development: <br><br>Phased development as presented in the Draft EIS as Alternative B conflicts with the BLM's policy of allowing reasonable access to private lands across federal lands; <br><br>Phased development would unreasonably restrict the right of leaseholders by preventing development of some leases for periods ranging from 7 to 14 years. | Alternative B is moved into the section "Alternatives Considered and Eliminated From Detailed Study." |

## CHAPTER 1.  PURPOSE AND NEED

## 1.8  Issues that Drive Alternative Development

The BLM identified a range of alternatives based on issues, concerns, and opportunities identified from public comments to project scoping and the Draft EIS, interdisciplinary interaction between resource professionals, and collaboration with cooperating and interested agencies. These issues are detailed in section 1.7 "Issues and Concerns".

Alternative B was responsive to Issue 9, impacts to wildlife habitat and Issue 13, conflicts between mineral development and recreational activities.  This alternative proposed that natural gas development activities would be restricted to one of three zones within the ARPA boundary at any one time.  Each zone would be open to construction and development of natural gas processing facilities for 7 years at which time construction and development activities would cease.  Gas extraction and processing would continue, while construction and development activities would move to another zone.  The intent of the alternative was to focus disturbance activities into a smaller area while the remainder of the project area would be less disturbed and less impacted at any one time than under the Proposed Action.  Alternative B was analyzed in the Draft EIS and subsequently moved to "Alternatives Considered and Eliminated from Detailed Study", section 2.3.

Alternative C was developed to be responsive to Issue 3, impacts to surface water hydrology and groundwater resources; Issue 4, impacts to sensitive soils; Issue 6 successful reclamation; Issue 7 conflicts with livestock management; Issue 8, impacts to cultural resources; Issue 9 impacts to wildlife and habitat; Issue 10 impacts to listed or proposed-for-listing threatened and endangered plant and animal species; Issue 11 impacts to sensitive plant and wildlife species; Issue 12 cumulative effects of project when combined with neighboring projects; and Issue 13, potential conflicts between mineral development and recreational opportunities.  It proposed to develop natural gas resources while aggressively mitigating impacts to sensitive resource values using additional development protection measures.  Comments received to the Draft EIS indicated that due to the stringent nature of the restrictions and the reduced number of surface locations for drilling the alternative was likely not economically feasible nor capable of maximizing the recovery of the natural gas resource.

Alternative D was developed following the Draft EIS and is responsive to Issue 3, impacts to surface water hydrology and groundwater resources; Issue 4, impacts to sensitive soils; Issue 6 successful reclamation; Issue 7 conflicts with livestock management; Issue 9 impacts to wildlife habitat; Issue 10 impacts to listed or proposed-for-listing threatened and endangered plant and animal species; Issue 11 impacts to sensitive plant and wildlife species; Issue 12 cumulative effects of project when combined with neighboring projects; and Issue 14 well spacing and directional drilling.  BLM recognized that these impacts can be reduced by limiting the amount of initial disturbance combined with timely reclamation.  BLM's evaluation of IDP development activities determined that average initial and long term disturbance could be reduced by approximately 18% from the Proposed Action (e.g. 60 ft. wide roads vs. 80 ft. width).  Alternative D addresses these issues by establishing an unreclaimed surface disturbance cap of 7,600 acres with the goal of averaging 6.5 acres disturbance per well pad within the project area overall and less than 6.5 acres disturbance per well pad in sensitive resource areas.

**Chapter 2**

**Alternatives Including the Proposed Action**

# 2   Alternatives Including the Proposed Action

The BLM identified a range of alternatives based on issues, concerns, and opportunities raised in public comments to project scoping and the Draft EIS, interdisciplinary interaction between resource professionals, and collaboration with cooperating and interested agencies. The alternatives range from no action to the Proposed Action plus intensive reclamation. The Proposed Action and the alternatives are described in this section.

All possible activities associated with each alternative including the no action alternative are assumed to apply to BLM-administered lands only. All activities authorized for the Atlantic Rim Natural Gas Project must comply with the applicable RMP. The applicable RMP at this time is the Great Divide RMP (USDI-BLM 1990). Currently the BLM RFO is revising its RMP and, to date, has issued a Draft EIS in support of the RMP revision. Any future activity that may be authorized based on this EIS must conform to the RMP in effect at the time authorization is requested.

## 2.1  Introduction

The BLM developed alternatives to the proposed action based on the issues developed during the scoping period and comments to the Draft EIS (chapter 1, parts 1.7 and 1.8), Interdisciplinary team review, input from cooperating agency, and comments to the Draft EIS.

## 2.2  Alternatives Description

While numerous alternatives and specific actions were considered, four alternatives are studied in detail in this EIS: the Proposed Action, no action (Alternative A), and two additional action alternatives (Alternatives C and D). Alternative B from the Draft EIS has been dropped from further consideration in the Final EIS.

### 2.2.1  The Proposed Action

The goal for the proposed action is to maximize the economic recovery of gas resources while using best management practices (BMP) and mitigation to reduce effects upon the environment. The operators have submitted a detailed plan of development for the Atlantic Rim project, which is included in this document as appendix K. The following summarizes their proposal:

- The Proposed Action consists of drilling and developing approximately 2,000 new natural gas wells. Approximately 1,800 would be drilled to coal formations in the Mesaverde Group to develop CBNG resources. Up to 8 wells on 8 well pads per section (80 acre spacing) would occur. An additional 200 wells would be drilled to access conventional natural gas resources, generally expected to be located deeper than the coal formations in the Mesaverde Group. These wells would be co-located on CBNG pads within CBNG developed areas and spacing would be up to 4 well pads/section.

- The 2,000 proposed, new natural gas wells would be in addition to the approximately 116 existing exploration wells (as of the fall of 2005) developed under the Interim Drilling Policy.

## CHAPTER 2.  ALTERNATIVES INCLUDING THE PROPOSED ACTION

- Proposed well spacing for the ARPA is eight wells per section (80-acre spacing). However, this may be reduced to four wells per section (160-acre spacing) depending on the geology and ability of the operators to remove the water and lower the pressure sufficiently to recover gas.

- Development and drilling would begin in 2007 within the ARPA and continue for approximately 20 years, with a life-of-project of 30–50 years. Various drilling and production-related facilities (e.g., roads, pipelines, water wells, disposal wells, compressor stations, and gas processing facilities) would also be constructed throughout the ARPA. The pace of drilling over the life of the project is illustrated on figure 2-1. The majority of the wells expected to be drilled is within the first 6 to 8 years following approval of the project.

- There would be approximately 4,500 acres of new short-term (initial or less than 3 years) surface disturbance from well pads; 1,000 miles (approximately 9,850 acres) of new roads, upgrades of existing roads, and pipeline construction; and 1,480 acres of ancillary facilities. The total new short-term (initial) disturbance resulting from the Proposed Action would be about 15,800 acres or 7.9 acres per well on average.

- Long-term (life-of-project) disturbances following interim reclamation would cover approximately 2,320 acres for wells pads, 3,636 acres for roads and utilities, and 285 acres for ancillary facilities for a total of 6,241 acres (3.1 acres per well on average). Interim reclamation would reduce the total acres of disturbance by about 9,600 acres.

- Produced water from individual wells would be gathered and routed to centralized water handling and storage sites, which would serve as central injection facilities. Produced water would be disposed of through re-injection with two exceptions.

  1. One exception could occur when a proposal comes forward from a land owner or an agency with surface management responsibilities for water for livestock/ wildlife watering sites. This could result in the use of closed watering systems for stock and wildlife. These systems will be designed with no discharge of water onto the surface, will have appropriate state permits, and will not be a significant portion of the water disposal needs for the project.

  2. The second exception could occur when landowners or an agency with surface management responsibilities comes forward with a request for water to offset for the loss of current artesian water sources. De-watering of the coal seams has the possibility of drying up artesian water sources as detailed in chapter 4.

- The project proponents have voluntarily committed to a set of mitigation measures as part of the Proposed Action to avoid or reduce impacts from the proposed project. These are presented in appendix K, pages K-20 through K-24.

# CHAPTER 2.  ALTERNATIVES INCLUDING THE PROPOSED ACTION

**Figure 2-1.    Proposed Action Annual Drilling Assumptions by Well Type.**



**Sources:** AEPC 2004 and IMPLAN model outputs
**Prepared by:** Blankenship Consulting LLC (BCLLC)

## 2.2.2  Alternative A (No Action)

NEPA regulations require that EIS alternative analyses "include the alternative of no action" (40 Code of Federal Regulations [CFR] 1502.14(d)).  For this analysis, *no action* means that the BLM would reject the operators' proposal and the activities would not be approved or authorized.  This alternative does not meet the purpose and need of the project which is to promote the development of natural gas resources on federal lands.

Due to the intermingling of federal, state, and private lands within the ARPA, rejection of the operators' proposal would not mean all oil and gas development in the project area would cease.  It is reasonable to assume that subsequent development proposals could be received for access to state and private lands for mineral development, as the BLM does not approve or control development proposals upon these lands. Proposals for access across federal lands for oil and gas development and production-related activities could be received, processed, and approved (as appropriate) by the BLM at any time.

Individual proposals for exploration or development including rights-of-way and access across federal lands would be subject to site-specific analysis prior to approval or authorization.

## 2.2.3  Alternative C

The goal for Alternative C is to protect wildlife and other natural resources while allowing for the extraction of natural gas resources.  Under Alternative C the operators would be approved to develop natural gas resource from the desired target formations, however all activities would be subject to resource development and protection measures intended to maintain or enhance

# CHAPTER 2.  ALTERNATIVES INCLUDING THE PROPOSED ACTION

resource values.  Approximately 95 percent of the federal lands within the project area would be assigned one or more resource protection measures to be applied to natural gas development activities.  Resource protection measures would be applied based on the site-specific locations of the activity such as well development or construction of ancillary production facilities. Resource data, in the form of geographic information system (GIS) layers coupled with on-site reviews, would be used to identify specific areas of resource concern at the site-specific level. Examples of such resource concerns are sensitive wildlife and fish habitat and areas with sensitive soils.  These resources are sufficiently unique to require additional protective measures beyond what is already provided by applying required BMPs (appendices H and J), lease stipulations, and conditions of approval (COA).  As an end product, GIS layers would be available to operators for development of site-specific proposals for their annual work program during the Application for Permit to Drill (APD) process.

Below is a summary of development protection measures that would be implemented in some locations based on the presence of resources.  A detailed description of protection measures is provided in appendix L, including references to maps (appendix M) depicting areas where the measures might be applicable and the rationale for the measure or resource concern that the measure would address or resolve.

- **Water and Soil Management**. In order to reduce salt and sediment loading in the Colorado River Basin, a resource management concern since the 1930s, no pad, compressor, or water transfer sites would be located in areas with steep slopes (>25%) or close to (within 500 feet) perennial waters or wetlands.  Interim reclamation would be completed within 1 year of the spud date in areas with soils with excess salts and poor top soils, since these areas are more difficult to reclaim. Low-impact road design would be implemented in areas where soils have excess salts, high runoff potential, and severe road rating.  Specifications for road construction and annual maintenance to reduce dust would be implemented in areas that have soils with excess salts and in areas with a severe road rating because these areas would generally have a higher clay or salt content in the soils and hence be more prone to dust problems.  Special measures would be implemented in areas with high runoff potential to reduce surface water concentration, increase infiltration, and achieve reclamation success.  Areas with high runoff potential would also have reduced surface disturbance (less than 20 acres and four well locations per section).

- **Vegetation Resources**.  In difficult to reclaim vegetation communities with greater than 8-percent slopes, surface disturbance would be limited. Surface disturbance of more than 20 acres in size would not be allowed, and no more than 4 well pads per 640 acre section would be approved.  In vegetation communities with high wildlife values or rare vegetation communities, no surface disturbance would be allowed. Silver sagebrush/bitterbrush communities would have limited areal extent of surface disturbance.  All these communities within crucial winter range failed the Upper Colorado River Basin Standards and Guidelines Assessment (USDI-BLM 2002e). These areas would continue to fail standards without additional development protection measures.

- **Range Resources**. To protect range resources, operators would be required to ensure that their employees and subcontractors abide by speed limits and erect signs warning drivers of livestock concentration areas, such as lambing grounds and shipping pastures.  Annual planning efforts would provide data to enable livestock

## CHAPTER 2.  ALTERNATIVES INCLUDING THE PROPOSED ACTION

planning specific to pastures or allotment boundaries.  Construction specifications would be put in place to reduce dust.

- **Wildlife Resource Management**. In grouse brood-rearing or nesting habitat and big game crucial winter range, the BLM would approve at the site-specific review level limited surface disturbance (less than 20 acres and four well locations per section) and roads would be limited to less than 3 miles/mile$^2$.  No surface disturbance would be allowed in severe winter relief habitats for greater sage-grouse; these areas serve as refuges, which are small patches of high sagebrush that generally will not drift during severe winters.  No surface disturbance would be allowed in identified wintering areas (serviceberry patches) for Columbian sharp-tailed grouse.

- **Visual Resources**. In Visual Resource Management (VRM) Class III areas visible from state, county, or BLM roads (map M-6):

  o Drilling pads would not be located on ridgelines;

  o Resource roads would not be located directly off roads assessable to the public, unless they are shown to be visibly less obtrusive than creating a new collector road;

  o Low-impact road design would be used in topography with less than 5 percent slope (See appendix L for a description of low-impact road design);

  o Pad sizes would be minimized by using pitless, shared pit, or closed-system drilling; and

  o Where topography or other conditions would allow, the operators would be required to reclaim pits and pads on an interim basis within one year of the date well drilling was initiated.

The Proposed Action predicts an overall maximum surface disturbance of 15,800 acres based on a disturbance rate of 7.9 acres per well (appendix K, table K-1).  Alternative C would limit disturbance to 20 acres and a maximum of four wells per section on the majority of federal lands within the ARPA.  Where Alternative C restrictions would be applied, there would be a 68.4-percent reduction in surface disturbance on federal lands compared to the Proposed Action.  Disturbance is broken down as follows:

- Proposed Action disturbance per section:
  o 8 wells per section x 7.9 acres per well = 63.2 acres disturbance

- Alternative C disturbance per section:
  o Maximum disturbance = 20 acres

- Reduced disturbance:
  o Alternative C/Proposed Action = 20 acres/63.2 acres = 31.6 percent
  o 31.6 percent disturbance = a **68.4-percent disturbance reduction on federal lands**

# CHAPTER 2.  ALTERNATIVES INCLUDING THE PROPOSED ACTION

This reduction in surface disturbance is based on a section-by-section comparison where Alternative C restrictions are applied rather than requirements under the Proposed Action.  In terms of effects at a larger scale, this percentage would decrease based on the amount of lands not affected by Alternative C requirements in the assessment area.  Alternative C surface disturbance limitations would not apply on privately and state-owned lands.  As a result, this percentage reduction would be the highest on blocked federal lands and vary greatly where interspersed federal and private lands coexist, especially in the checkerboard ownership pattern (map M-3).

The percentage of overall reduction in surface disturbance due to Alternative C restrictions is not predictable for the ARPA.  Due to the variables inherent in a field development, it is not possible to predict specifically where optimal gas development will occur within the ARPA. Important variables in this percentage estimate are the number of wells proposed for siting in areas affected by development protection measures, the number of wells proposed on federal lands as opposed to private and state lands, and the amount of disturbance relocated to private lands to reduce effects on federal lands.  Based on these uncertainties, total surface disturbance for the project could be similar under Alternative C as with the Proposed Action. Alternative C may shift disturbance from more sensitive resource areas to less sensitive areas. For the purposes of the EIS impact analysis, BLM developed an estimate of surface disturbance for Alternative C based on the following assumptions regarding potential development in the ARPA:

- All lands within the ARPA have an equal likelihood of producing natural gas.

- Development would be maximized on state and fee minerals by drilling 8 wells per section on all state and fee sections within the ARPA.  Surface disturbance on these lands would average 7.9 acres/well (per the Detailed Proposed Action in appendix K).

- Development of the remainder of the 2,000 wells would occur on federal minerals at a density of 4 wells per section and 20 acres of disturbance per section.  BLM assumed all federal minerals would be subject to the 4 well per section spacing requirement.

Based on these assumptions BLM estimated a maximum surface disturbance under Alternative C of 13,286 acres (table 2-1).

Under Alternative C, when annual site-specific development proposals are received, they will be reviewed on site by a team of IDT specialists.  Based on the conditions found at the individual sites, development protection measures, BMPs, and COAs will be added to APDs before their approval.

## 2.2.4   Alternative D–the BLM's Preferred Alternative

The objective of this alternative is to minimize surface disturbance while optimizing natural gas recovery.  Annual planning (as in the Proposed Action) between the operators and the BLM will be a key component of this alternative.  Annual planning would require that each operator submit to the BLM their proposed plan of operation for the forthcoming year.  The annual planning process would be used to discuss current and multi-year development plans with the intent of reducing disturbance within the ARPA.  The BLM will then work with the operators and

## CHAPTER 2.  ALTERNATIVES INCLUDING THE PROPOSED ACTION

interested agencies at a site specific level to minimize surface disturbance by applying the appropriate lease stipulations, COAs, BMPs, and any other measures deemed necessary to minimize surface disturbance and still allow for the full recovery of natural gas.  The pace of development analyzed is the same as the Proposed Action (figure 2-1 of the Final EIS).

This alternative will limit initial site disturbance from all oil and gas development activities (resource roads, well sites, gas gathering pipelines, compressor stations, etc.) by establishing an average short term disturbance goal of 6.5 acres per well constructed.  Limited disturbance per well would require less reclamation be completed by the operators and less land taken out of productivity.  Natural gas development would be limited to 8 well sites per section, which includes CBNG, conventional, and injection wells.  Operators could install multiple well bores (e.g. CBNG, conventional or injection) on a well site.

Total surface disturbance under Alternative D would be approximately 13,600 acres (2,000 wells x 6.5 acres/well, plus approximately 600 acres existing disturbance under the Interim Drilling Policy). For the overall Atlantic Rim area, no more than 7,600 acres (2.8% of the project area) would be disturbed and unreclaimed at any time.  If the disturbance limit should be reached, further disturbance activities would be halted pending successful reclamation.  Upon reclamation success further natural gas development proposals would be considered and approved without exceeding the disturbance limit.  The standard for "reclamation success" is defined in the Final EIS Reclamation Plan (appendix B) under "Criteria for Reclamation Success".

A map of the existing disturbance associated with activities authorized as part of the interim drilling policy would be prepared.  This map will serve as the baseline level of disturbance and would be updated annually.  The BLM would track both the planned versus actual disturbance on an annual basis as well as the cumulative, un-reclaimed surface disturbance.

Within Atlantic Rim those areas designated as "Category A" would be managed more intensely (utilizing appropriate lease stipulations, COAs and BMPs) to reduce the extent of disturbance below an average of 6.5 acres / well.  Reduced disturbance below 6.5 acres / well, coupled with successful reclamation within Category A will be considered when evaluating development proposals outside the area.  Category A, as depicted on map M-7, includes management areas with sensitive fish populations, and crucial wildlife habitats, including areas of critical environmental concern, special management areas (SMA), elk crucial winter range and silver sage/bitterbrush communities.  Category A is about 72,200 acres in extent.

Disturbance levels would be determined through geo-spatial information regarding areas actually disturbed provided annually by the operators in conjunction with the Final EIS Reclamation Plan (appendix B).  Reclamation would be reviewed, at a minimum, annually.  For those areas needing further work, adaptive management using appropriate BMPs would be implemented to ensure subsequent reclamation success.  Developers would propose and implement reclamation measures that would be used for both areas with reclamation problems and newly disturbed areas.

# Chapter 3

# Affected Environment

# 3   Affected Environment

This chapter discusses environmental, social, and economic factors as they currently exist within the ARPA. The material presented here has been guided by management issues identified by the BLM RFO, public scoping, and by IDT analysis of the area.

The Proposed Action could potentially affect critical elements of the human environment as listed in BLM's NEPA Handbook H-1790-1 (USDI-BLM 1988).  The critical elements of the human environment, their status in the ARPA and their potential to be affected by the proposed project are listed in table 3-1.

**Table 3-1.    Critical Elements of the Human Environment[1].**

|  |  |  |
|---|---|---|
| Air quality | Potentially affected | Yes |
| Areas of critical environmental concern | Potentially affected | Yes |
| Cultural resources | Potentially affected | Yes |
| Environmental justice | Potentially affected | Yes |
| Prime or unique farmlands | None present | No |
| Floodplains | Potentially affected | Yes |
| Native American religious concerns | Potentially affected | Yes |
| Noxious weeds | Potentially affected | Yes |
| Threatened and endangered species | Potentially affected | Yes |
| Hazardous or solid wastes | Potentially affected | Yes |
| Water quality (surface and ground water) | Potentially affected | Yes |
| Wild and scenic rivers | None present | No |
| Wetlands/riparian zones | Potentially affected | Yes |
| Wilderness | None present | No |

**Note:**
[1] As listed in BLM *National Environmental Policy Act Handbook H-1790-1* (USDI-BLM 1988) and subsequent Executive Order

In addition to the critical elements, this EIS discusses potential effects of the project on geology, paleontology, and minerals; soils; water resources; vegetation; wildlife; special status species; noise; visual resources; recreation; and socioeconomic considerations.

## CHAPTER 3. AFFECTED ENVIRONMENT

unconformably overlain by much younger Miocene rocks of the Browns Park Formation. The group consists of 1,125 to 2,000 feet (343 to 610 meters) of massive beach and shelf sandstones, interbedded with minor amounts of shale, carbonaceous shale, mudstone, and coal.  The upper part of the group is dominated by sandstones, which are relatively resistant to erosion, and form prominent dip slopes that dip westward forming the eastern boundary of the ARPA.  Atlantic Rim, from which the project name is derived, is a series of these dip-slope sandstones developed in the northeastern part of the area.

In the ARPA region, the Mesaverde Group is subdivided into three formations, from top to bottom: the Almond Formation, the Ericson (aka, Pine Ridge) Sandstone, and the Rock Springs (aka, Allen Ridge) Formation (Roehler 1993).  All of these units inter-tongue to the east and north with the Steele Shale.  The Ericson Sandstone and Rock Springs Formation are the lateral equivalents of the Williams Fork Formation and Iles Formation, respectively, in the Sand Wash Basin of Colorado, which contain important coal and potentially important CBNG resources. The terminology *Williams Fork* and *Iles* formations have been extended into Wyoming by authors describing subsurface coal deposits.

### 3.1.1.3  Geologic Hazards

Of known naturally occurring geologic hazards—fault-generated earthquakes, floods, landslides, or other mass movements—the most likely to affect the project area are mass movements that could be initiated on steep slopes.  There are no known faults with evidence of Quaternary movement or earthquake epicenters mapped within the area (NEIC 2003, WGS 2003). A 4.3-Richter magnitude earthquake occurred on April 4, 1999, a few miles northwest of the western boundary of the ARPA.  The epicenter of this earthquake was located near Baldy Butte in T17N:R92W (41.45˚N, 107.74˚W).  No other earthquake epicenters have been recorded in or immediately adjacent to the area in the past 100 years, indicating that this quake was probably an unusual event and that the area is not likely seismically active.

#### Pyrophoricity

Pyrophoricity (spontaneous combustion) has been cited as a potential hazard of coal gas development.  Spontaneous combustion of coal has long been a concern for mankind and shallow coal mine fires in areas of abandoned mines are today still an environmental concern throughout the world (Lyman and Volkmer 2001).

Spontaneous combustion of coal is unlikely to occur in naturally exposed outcrops because, by the time coal is exposed by erosion, it has already degassed and cannot ignite spontaneously (Coates and Heffern 1999). However, the presence of naturally occurring outcrops of clinker and baked shale show that it has happened in the past in the ARPA.  Studies of *in-situ* coal gasification conducted during the 1970s in Wyoming suggest that even under extreme efforts to maintain combustion (by injecting air into the burn zones) in underground coals ignited in boreholes, coal burning away from the ignition area cannot be sustained. Loss of permeability associated with plugging of fissures by tar and combustion products resulted in the fires burning themselves out rather quickly.  In their study of Powder River Basin CBNG wells, Lyman and Volkmer (2001) found that spontaneous combustion of coalbeds during CBNG production is unlikely because the configuration of the well keeps air necessary for combustion out of the system.  "Even where the coal has been completely dewatered, insufficient oxygen is present for oxidation to be carried forward" (Lyman and Volkmer 2001). After coal gas extraction is complete, CBNG wells leave no underground voids susceptible to subsidence and associated coal ignition as seen in abandoned underground mines, which are susceptible to spontaneous ignition.

## CHAPTER 3.  AFFECTED ENVIRONMENT

weed infestations.  It is important to keep in mind that the current pod conditions are expected to improve and that this is part of the existing environment.

### 3.4.4.5  Surface Discharge of Produced Water at the Cow Creek Pod

This project does not propose any surface discharge of produced water from non-federal leases into facilities on private land. It is therefore assumed that all water produced from the coal formation would be re-injected with the exception of offset uses for flowing wells, as described for Cow Creek.  Surface discharge at the Cow Creek Pod can be expected to continue through the life of the project according to the WYPDES permits #WY0042145 and #WY0035858, which allow for 1.34 tons/day of salt and 180,600 gallons/day of total discharge (under both permits).

The surface discharge at the Cow Creek Pod is approved as an offset for an oil well (as defined by the Colorado River Salinity Control Forum) and the permit allows for the same volume of water and salt as was discharged by the oil well, prior to being plugged, (well number: 1x-12) into a reservoir on Dry Cow Creek.  The discharge permit is currently being modified to allow water releases from the reservoir in a manner similar to historical operations from well 1x-12; however, volume restrictions would still be in place.  The permit would have a new point of compliance upstream of the confluence with Cow Creek.  This point of compliance would be monitored for flow.  According to the permit, Cow Creek should only have water during storm events, that is, in response to natural precipitation and not as a result of project discharges.

### 3.4.5    Groundwater

The ARPA is located in the Colorado and Wyoming Basin groundwater regions described by Heath (1984), the Upper Colorado River Basin groundwater region described by Freethey (1987), or Washakie Basin described by Collentine et al. (1981) and Welder and McGreevy (1966).  Groundwater resources include deep and shallow, confined and unconfined aquifers.  Site-specific groundwater data for the ARPA are limited.  Existing information comes primarily from oil and gas well records from the Wyoming Oil and Gas Conservation Commission, water-well records from the Wyoming SEO, from the USGS (Weigel 1987), from existing CBNG-producing wells, and from three monitoring wells drilled to monitor pressures in producing coals and sandstone zones above and below the target coals.

Regional aquifer systems pertinent to the ARPA are discussed by Heath (1984), Freethey (1987), and Driver et al. (1984).  Basin-wide evaluations of hydrogeology specific to the ARPA have been investigated by Collentine et al. (1981). The most relevant hydrogeologic study specific to the ARPA is by Welder and McGreevy (1966).

### 3.4.5.1  Groundwater Location and Quantity

Groundwater in the Washakie Basin is generally found in deep artesian aquifers; in unconfined Tertiary deposits; alluvial deposits; and locally, where saturated rocks are near the surface (Welder and McGreevy 1966).  Table 3-22 summarizes the water-bearing characteristics of the geologic formations present in the vicinity of the project.  Of the geologic units listed in the table, Welder and McGreevy (1966) suggest that those capable of producing the greatest quantity of water include the following: Quaternary alluvium; Tertiary deposits in the North Park, Browns Park, Wasatch, and Fort Union Formations; Cretaceous formations, including Mesaverde, Frontier, and Cloverly; the Sundance-Nugget Sandstone of the Jurassic Age; and the Tensleep and Madison Formations of the Paleozoic Era.

## CHAPTER 3. AFFECTED ENVIRONMENT

### 3.7.1.3  Upland Game Birds

The WGFD manages upland game birds within upland game management areas. The greater sage-grouse (*Centrocercus urophasianus*) and the Columbian sharp-tailed grouse (*Tympanuchus pahianellus columbianus*) are the main upland game bird species known to occur in the ARPA. The ARPA lies within the Sierra Madre Upland Game Management Area (UGMA #25) and includes a very small portion of the Bitter Creek Upland Game Management Area (UGMA #10).

### Greater Sage-Grouse

Wyoming is one of the last strongholds for greater sage-grouse in the western United States, and contains more grouse than all other states combined. Greater sage-grouse are common throughout Wyoming because their habitat remains relatively intact compared to other states. In south-central Wyoming, this is even more accentuated due to the harsh climate that has limited past habitat loss or conversion to settlements and agricultural development along river bottoms. In the past, disturbance to upland habitats was restricted to livestock grazing and vegetation treatments (primarily at higher elevations). More recent disturbance to grouse habitat has come with development of energy resources.

Greater sage-grouse lek locations were obtained from the WGFD and the BLM RFO. There are 88 leks located in and within 2 miles of the ARPA (map M-26). Leks are often in grassy areas or in more open canopy sagebrush/grass habitat. Greater sage-grouse are dependent on sagebrush environments for their year-round survival, and in particular on ATVII and ATW, which occupy an estimated 85 percent of the ARPA. This dependency includes using sagebrush as forage, nesting, brood-rearing habitat, and winter thermal cover. In addition, grouse require a variety of sagebrush habitat types to meet their life history requirements. The sagebrush habitat types in the ARPA are diverse and provide a high quality environment for greater sage-grouse that is reflected in their abundance in this area. Riparian habitats are also important for brood-rearing habitat during the summer and fall months. The proximity of these two habitats to each other increases their value.

In response to petitions to list the greater sage-grouse under the Endangered Species Act (ESA), the USFWS conducted a status review of this species throughout its range and on January 7, 2005 determined that it did not warrant protection under the ESA. However, USFWS Director Steve Williams stated that, "At the same time, the status review clearly illustrates the need for continued efforts to conserve sage-grouse and sagebrush habitats on a long-term basis." Greater sage-grouse populations in Wyoming have stabilized in recent years. Because of continuing modifications of sagebrush habitats from fire, chemical, and mechanical treatments and development, the need exists to minimize such losses and to conserve-and improve sage-grouse habitats through careful management practices. The greater sage-grouse is included on the Wyoming Sensitive Species List of the BLM State Director (USDI-BLM 2002a).

# CHAPTER 3. AFFECTED ENVIRONMENT

**Map M-26.**     **Greater Sage-Grouse Leks.**



# CHAPTER 3. AFFECTED ENVIRONMENT

The State of Wyoming contends that hunter harvest primarily consists of young birds that have a high mortality rate regardless of hunting. However, grouse harvest numbers have been reduced by shortening and moving back the hunting season dates and lowering the bag limits. These seasons were set at a later date to reduce the harvest of older, successful reproducing hens that were found with broods near water. The later season decreased the harvest of hens because the birds were scattered in all habitats. In addition, shorter seasons primarily reduce the number of hunters, since many big game seasons were underway and there is less interest in hunting sage-grouse later in September.

In order to protect greater sage-grouse breeding grounds, the BLM places a quarter-mile buffer around the edge of leks where controlled surface use (CSU) is stipulated (USDI-BLM 1990). The quarter-mile buffer around the edge of occupied or unknown status leks located on or within a quarter mile of the ARPA covers 8,124 acres or 3 percent of the ARPA. Twenty of the 88 leks in the ARPA are located on private and state lands, which are not protected in any way from disturbance. In addition, the BLM places a 2-mile lek buffer in a seasonal stipulation preventing disturbance to protect nesting and early brood-rearing habitat. Potential greater sage-grouse nesting habitat (habitat associated with 88 leks) covers 191,017 acres or 71 percent of the ARPA. Of this acreage, 36 percent is on private and state lands.

According to Call (1974), Braun et al. (1977), Hayden-Wing et al. (1986), and others, approximately 50 percent of nests are usually located within a 2-mile radius of the strutting grounds. Using data collected at seven sites across Wyoming between 1994 and 2003, Holloran et al. (2005) documented 45 percent of nests occur within a 3-kilometer (approximately 2-mile) buffer and 64 percent of the nests occurred within a 5-kilometer (approximately a 3-mile) buffer. In addition, he also reported a correlation between nest distance from lek and success probability, suggesting increased success rates for nests greater than 8.5 kilometers from a lek (61 percent success greater than 8.5 kilometers, 44 percent success less than 8.5 kilometers). All research indicates that greater sage-grouse nest in suitable habitat beyond the 2-mile buffer. It is likely that hens from the active leks use most of the project area for nesting and brood-rearing, which in terms of suitable habitat amounts to 92 percent of the ARPA. Greater sage-grouse leks and associated nesting habitats on the project area occur mostly within the big sagebrush vegetation types. Areas with medium height sagebrush and tall residual cover of bunchgrasses provide nesting habitat (Crawford et al. 2004). Suitable brood-rearing habitat consists of various height sagebrush communities and riparian areas that provide abundant forbs, insects, and succulent mesic vegetation (Crawford et al. 2004).

Winter concentration areas have not been identified and mapped yet. Although winter conditions generally have little effect on greater sage-grouse populations (Call and Maser 1985, Beck and Braun 1978), if any winter concentration areas are identified in the future, there would be a timing restriction applied to surface disturbances and other disruptive activities to reduce stress to wintering birds from November 15 to March 14.

Severe winter relief habitat is used during the worst of winters. Severe winter relief habitat locations were located in the ARPA, covering a total of 200 acres. Twenty-six of these acres are on private lands and are not protected. Details of the protocol used in locating and describing the severe winter relief areas and results of the study are contained in a report submitted to the BLM in 2004 (HWA 2004). This study is on-going and the results will be used to identify physical and vegetative characteristics of severe winter relief habitat patches.

## CHAPTER 3.  AFFECTED ENVIRONMENT

mining sector losses over the past decade and the volatility in total employment are attributed to the shutdown of the Rosebud and Seminoe #2 mines (USDI-BLM 1999) and more recently the closure of the RAG Shoshone mine near Hanna (Rawlins Daily Times 2000).    Although the number of direct mining jobs in Carbon County is relatively low, mining still generates a substantial number of indirect jobs in the construction, transportation, and service sectors, and additional induced jobs in all sectors of the economy.

Some economic sectors gained jobs between 1990 and 2000.  Among the largest gainers were agricultural services and forestry, which increased from 106 to 260 jobs, a 145 percent increase; however, that sector fell to 143 jobs by 2002, a 45 percent loss in just 2 years, reflecting the closure of the Louisiana Pacific mill in Saratoga.  Other gaining sectors were construction and services. Construction increased from 595 to 693 jobs between 1990 and 2000, a 16-percent gain, and then remained relatively stable between 2000 and 2002. Services increased by 16 percent from 1,848 to 2,141 jobs during the period.

Unemployment rates in Carbon County have varied considerably in recent years. Although slightly higher, unemployment generally tracks with the unemployment rate for the State of Wyoming as a whole. Between 1990 and 2002, the county's average annual unemployment rate ranged from a low of 4 percent in 2000 to a high of 6.1 percent in 1993 (figure 3-5).  In 2003, the unemployment rate averaged 5.6 percent, or 451 unemployed persons in a total labor force of 8,121 (Blodgett 2003).  This increase in unemployment was due in large part to the closure of the Louisiana Pacific mill.  The size of the Carbon County labor force (people working or actively looking for work) decreased 9 percent between 1990 and 2003 (WDE 2004).

**Figure 3-5.    Average Annual Unemployment Rates: 1990–2003.**



**Source:**  WDE 2004

Although in the recent past there have been a substantial number of under-employed persons in Carbon County (PFResources 2000), there have been few experienced workers available for oil and gas drilling and completion jobs in recent years.  Most drilling and completion companies bring crews with them and hire some entry-level workers locally and many gas field service companies bring workers from other states who relocate to Carbon or Sweetwater counties on a temporary, seasonal basis.  However, there are qualified local contractors and employees available for gas field construction and service work (Blodgett 2003, 2004).

## CHAPTER 3.  AFFECTED ENVIRONMENT

Between 1990 and 2002, total earnings associated with jobs located in Carbon County increased 20 percent, from $215 million to $259 million (figure 3-6). However, when adjusted for inflation, real Carbon County earnings decreased by 12.5 percent during the 12 years ending in 2002. For the same period, inflation-adjusted earnings increased 38 percent for the State of Wyoming as a whole (figure 3-7, WDAI 2003b).  This general economic contraction reflects both a loss of jobs and a shift in jobs from higher paying mining jobs to generally lower paying agricultural and service jobs.

**Figure 3-6.    Total Carbon County Earnings by Place of Work:  1990–2002.**



Source:  WDAI 2003b

**Figure 3-7.    Change in Inflation-Adjusted Carbon County Earnings Contrasted with Wyoming & US:  1990–2002.**



Source:  WDAI 2003b

**Exhibit 2 Part 2 to Defendant-Intervenors'
Opposition To Plaintiffs' Motion For
A Preliminary Injunction**

**Excerpts From The Bureau of Land Management's
November 2006 Final Environmental Impact Statement
Atlantic Rim Natural Gas Field Development Project
(FEIS for the Atlantic Rim Project)**

**Chapter 4**

**Analysis of Environmental Consequences**

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

**Surface Water Impacts Common to All Action Alternatives**

The main impacts to surface water resources are the removal of vegetation, increased soil surface exposure, mixing of soil horizons, soil compaction and decreased infiltration capacity, loss of topsoil productivity, and increased susceptibility of the soil to wind and water erosion. Therefore, the primary impact of the proposed project on surface water resources is increased surface runoff, erosion, and off-site sedimentation that would cause channel instability and degradation of surface water quality in some locations.

Martherne (2006) found increased sediment production from well pad locations and confirmed that roads and well pads can provide conditions for focusing runoff and locally increasing erosion. Based on field observations, the author found that roads on sideslopes facilitate the erosional process in three ways: (1) roads cut across and collect runoff from previously established drainages (2) roads, where they are cut into hillsides or into the land surface, provide focal points for the initiation of erosion; and (3) roads also provide conduits for sediment transport. Once mobilized, a portion of this sediment (resulting from these erosional processes) will move into channels in pulses that occur in relation to storm events. Some of this sediment will be temporarily stored in drainage bottoms and on the hillslope and a portion will be stabilized by vegetation and not travel to the drainage. The amount of sediment that will be added to specific drainages can only be estimated based on site-specific information available after annual planning and on-site inspections.

Changes in upland runoff, hydrology, or increased sedimentation could reduce habitat for non-game fish, coldwater fish, and aquatic life, especially in the Muddy Creek Drainage. Habitat for non-game species includes pools and riffles. With increased sediment loads, riffles can become silted in and pools can fill, degrading the habitat. Changes in upland runoff conditions can increase peak flow conditions and may reduce base flows critical for maintaining late season pool habitats.

Waters of the U.S. are managed in section 404 of the CWA and permits from U.S. Army Corps of Engineers (ACOE) may be required for dredge and fill activities. All notification and construction criteria will be adhered to and the ACOE will be consulted when questions about the permit use arise. The Great Divide Basin is unlikely to have any waters of the U.S. because it is internally drained and has no major water based recreation sites. Standard mitigation requiring avoidance of surface waters, riparian areas, and wetlands (See appendix H) will limit surface disturbance in these areas on public land to linear features such as road and pipeline crossings. Activities that modify the morphology of stream channels are also subject to regulation by the State of Wyoming. Permitting for construction activities in these areas would take place during the annual planning process and copies of notices or permits may be required of the operator before construction is approved (See appendix H). The effected environment in special aquatic sites and wetlands are discussed in greater detail in section 3.5.

**Surface Hydrology Related to Soils Data and Topography**. Soils with the potential for severe water erosion comprise about 96 percent of the ARPA (261,000 acres of slight/severe, moderate/severe, and severe/severe categories, see tables 3-10 and 3-11). Tables 3-10 and 3-11 summarize the data for the following five categories and their individual ranking criteria for the contiguous ARPA: water erosion, wind erosion, runoff potential, topsoil rating, and road rating. Because so much of the ARPA has the potential for severe water erosion, soil disturbance both during construction and during production can be expected to result in hillslope and channel erosion under each action alternative above background conditions. Erosion in areas with sensitive soils can be either catastrophic or simply chronic. Surface disturbance

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

great, these impacts can be expected to include accelerated erosion and increased runoff and could alter downstream channels.

During drilling and completion operations (according to appendix K, table K-2), roads could be used by about 13 heavy trucks per week for about 2 weeks, and about 5 to 10 small trucks per day. During production, resource roads would be used less often (maybe 1 small truck per day) and would occasionally accommodate heavy trucks for water disposal, reclamation activities, and well maintenance. This means that road design needs to allow for heavy truck traffic and at least one visit per day in all kinds of weather. This amount of road use would likely result in dust production from the road base and would increase wind-born erosion from the project area. Road design and maintenance is therefore critical to reduce impacts from the project.

Site erosion and off-site sedimentation from pad sites would be reduced by re-vegetating unused portions of the pad sites in the first appropriate season (fall or spring) after drilling, and providing surface water drainage controls, such as berms, sediment collection traps, diversion ditches and erosion stops as needed. These measures would be described in individual APDs.

Under all action alternatives, local impacts would include accelerated erosion and increased runoff leading to increased sedimentation and changes in hydrology from surface disturbance for the construction of pad sites, roads, and pipelines. Depending on the alternative considered, these impacts could be significant based on the criteria set forth in section 4.4.2.

**Surface Water Quality Impacts from Salinity Offsets**. Surface discharge at the Cow Creek Pod can be expected to continue through the life of the project under all alternatives according to the WYPDES permits #WY0042145 and #WY0035858, which allow for 1.34 tons/day of salt and 180,600 gallons/day of total discharge. As an offset for an oil well (as defined by the Colorado River Salinity Control Forum) the permit allows for the same volume of water and salt as was discharged by the plugged oil well (#1X-12).

Discharge is into a reservoir on a tributary to Dry Cow Creek; this reservoir would be improved and maintained according to this use. The discharge permit has been modified to allow for water releases from the reservoir in a similar manner as what occurred historically when #1X-12 was in operation; however, volume restrictions would still be in place. The permit would have a new point of compliance upstream of the confluence with Cow Creek. This point of compliance would be monitored for flow, and according to the permit it should only have water during storm events, that is, in response to natural precipitation and not a result of project discharges because Dry Cow Creek is ephemeral.

The Colorado River Salinity Forum established by the 1974 Colorado River Basin Salinity Control Act (Public Law 93-320) regulates the amount of salt load that can enter the Colorado drainage basin. Current loads approved by the state exceed the 1-ton-per-day limit because of the offset value of plugging #1X-12. Allowing for offsets with volume restrictions limited to historical levels with flowing wells is not expected to have any significant impacts, because project-related discharges would be almost identical to current conditions.

### Groundwater Impacts Common to All Alternatives

The primary effects on groundwater resources would be associated with the removal of groundwater contained in coal bed aquifers and the subsequent recharge of aquifers through injection of produced water. The removal of groundwater from the coal aquifer results in the reduction of the hydraulic pressure head. The lowering of hydraulic pressure head or water

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

occur within the outcrop area of the upper Mesaverde Group itself and at its western contact with the Lewis Shale.

Tertiary deposits in the ARPA near the surface are recharged by direct downward percolation of precipitation and snowmelt. Deep aquifers in the ARPA are recharged by these processes in outcrop and subcrop areas and from slow leakage from overlying and underlying aquifers. The extent of the Tertiary units (Browns Park and North Park Formations) that lie atop the eroded, dipping Cretaceous units indicates a probable recharge of the underlying Mesaverde Group. Should groundwater withdrawals from upper Mesaverde Group coalbeds in the ARPA result in water-level declines that propagate updip to their subcrop areas beneath the overlying Tertiary units, the Proposed Action could affect some of the Cretaceous/Tertiary contact seeps and springs. However, the predicted groundwater drawdown analysis for this project does not indicate groundwater level declines that would extend updip to the coal seam subcrop areas. Therefore, it is unlikely that the proposed project would have a dewatering effect on the overlying Tertiary deposits, which would diminish flows from the contact springs and seeps.

Methane seeps could possibly develop in the outcrop region of the Mesaverde Group as a result of this project. These seeps could contaminate shallow groundwater sources and may also cause the death of vegetation in limited areas. The number or location of these seeps is impossible to predict, therefore monitoring would be established to evaluate this impact (See section 4.4.5). These seeps have been documented with CBNG development in the San Juan Basin along with other areas of CBNG development. In the San Juan Basin many of these seeps, even before production, occurred in the outcrop regions of the producing formations.

Groundwater monitoring wells indicate that the reduction of pressure or hydrostatic head within the upper Mesaverde Group will not be isolated to the coalbeds, but will likely extend to Mesaverde sandstones. Artesian conditions in the upper Mesaverde Group may be responsible for the surface expression of springs and seeps located along the Mesaverde and Lewis Shale contact, along faults, or within the Mesaverde Group itself. Impacts may include the loss or reduction of flow in these systems, and would depend on individual spring dynamics. Eventually the upper Mesaverde will recharge with precipitation and pressures will recover. Effected springs and seeps could take 50 years or more to recover. The Lower Mesaverde Group, (Haystack Formation) is the location of the injection zones and therefore could be impacted by increased pressure. Communication of these zones will dictate the feasibility of injection and will be determined by Wyoming injection well permitting.

As described in section 3.4.2.1 although there are numerous perennial springs that occur in the headwaters of Muddy Creek, these springs are not likely adding to the baseflow of Muddy Creek, due to evapotranspiration and conveyance losses. This is evident by the intermittent nature of flows in Muddy Creek. The discharge that makes it to the Little Snake River is primarily from snowmelt or individual precipitation events. Therefore even with loss of flow in springs and seeps, the reduction of pressures in the upper Mesaverde Group is unlikely to result in depletions to the Muddy Creek system.

**Flowing Wells**. There are at least 16 flowing wells in the project area have been developed to supply water to wetland areas and/or stock watering facilities and may be impacted by reducing flow volumes or changing water quality characteristics. The chemistry of water sampled from at least one of the flowing wells in the ARPA (Duck Flow 2 well, see table 3-29) indicates that the groundwater may be from the Almond Formation coalbeds. Many of these flowing wells are abandoned exploratory oil or gas wells drilled in the 1950s or 60s, that had some portion of the

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Disturbance to Category A (map M-7, 72,200 acres or 27 percent of the ARPA) areas for this alternative would be reduced to below 6.5 acres per well. Because Muddy Creek SMA is near the center of the project area, it likely will be developed as described in the Proposed Action with the Cow Creek and Sand Hills SMAs receiving relatively less development. As stated in the assumptions much of what determines impacts for surface waters is the location of the disturbance. Due to development at a density of 8 wells per section within the Muddy Creek SMA significant impacts would be anticipated to the Muddy Creek reach below Highway 789, which is listed for 303d threats (See section 3.4 and map M-17).

Impacts under Alternative D are lower than under the Proposed Action (18 percent less surface disturbance), but indirect impacts would still be significant to water resources due to potential water quality changes, rainfall runoff relationships, increased salt loading from disturbed areas, and changes in surface hydrology from long-term disturbance.

## 4.4.4  Impacts Summary for all Action Alternatives

Impacts resulting from drill pad, access road, facility site, and pipeline ROW construction could include removal of vegetation, exposure of the soil, mixing of soil horizons, soil compaction, loss of topsoil productivity, and increased susceptibility of the soil to wind and water erosion. These impacts could increase runoff, erosion, and off-site sedimentation. in Wyoming's 2006 305(b) Water Quality Assessment Report WDEQ states, "… projected increases in CBNG development have the potential to lead to increased surface disturbance and possible increased erosion and sediment loading" (WDEQ 2006).

Groundwater impacts are expected to be significant due to the likely impacts to wells, seeps and springs emanating from the upper Mesaverde Group. Many of these wells are permitted by the SEO and the springs and seeps may have flows interrupted.

## 4.4.5  Additional Mitigation Measures

The Required BMPs (appendix H) would be followed on BLM lands or where a BLM approved action would impact BLM lands. A modification to a mitigation measure or design feature may be approved on a case-by-case basis when deemed appropriate by the BLM.

Applicant committed measures would be applied on privately owned surface and State of Wyoming lands unless otherwise specified by the involved private or state surface owners. The operators and the BLM, as discussed in chapter 2 and appendix K, would implement preconstruction planning and design activities.

Water quality in Muddy Creek will be measured at USGS Station #09258980 as funding allows. Currently, conductivity and flow are measured continuously and there are joint efforts with the State of Wyoming to measure water quality parameters into the future.

Impacts to groundwater resources have been identified and determined to be significant. The resources of primary concerns are wells completed in the Lewis Shale or upper Mesaverde Group and spring or seeps near the contact between the Lewis Shale and Mesaverde Group. Isotopic data would be collected project wide by the BLM to evaluate groundwater resources and additional monitoring wells in the upper Mesaverde Group would be established to evaluate and quantify impacts to these resources and to quantify potential impacts from methane seeps where the Mesaverde Group outcrops.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

competition for forage within the already poor condition crucial winter range habitat may lead to reduced mule deer numbers and die-offs from animals going onto crucial winter range in poorer health with reduced body reserves.

**Elk**

Approximately 41,000 acres or 20 percent of the crucial winter/yearlong range in the Sierra Madre elk herd unit is within the ARPA (map M-24). Several elk migration routes transverse the ARPA; however, it is unknown how critical these routes are. This project could alter or block elk movement along existing migration routes.

Construction activities remove crucial winter range vegetation and increase noise and human activity levels which displace animals. However, much of the crucial winter range is on steeper south- and west-facing slopes that would be avoided during development. The amount of vegetation disturbed is not as important as the noise and activity levels that would still occur and result in displacement of elk. In addition to the direct removal of habitat due to the development of pads and associated transportation facilities, disturbances from drilling activities and traffic would affect use of the habitat adjacent to these areas (Powell 2003). Elk are more sensitive to human activities than pronghorn or mule deer, and they may be displaced in construction areas from 0.6 to 1.2 miles for elk depending upon the season (Powell 2003). Displacement would be reduced in areas with topographic barriers (Edge and Marcum 1991). Elk would likely habituate to the physical presence of gas wells (Ward et al. 1973, Ward 1976, Hiatt and Baker 1981, Perry and Overly 1976). However, elk rarely adjust to continued human presence required during the production phase of the project (Thomas and Toweill 1982). With the increase in roads and potential recreational access to the area, displacement of elk is extremely likely during all phases of development. During the production phase, there is no equivalent mitigation and animals may be displaced up to 1 mile from the source (USDI-BLM 2004c). This would lead to increased stress/decreased condition or reproductive rates of the animals as they travel farther and may have to use lower-quality range. To reduce human presence, remote monitoring of project facilities would be used to the greatest extent possible during the production phase.

**Overlapping Big Game Crucial Winter Range**

Areas of overlapping big game crucial winter range are of greater importance because they provide crucial habitat for more than one species of big game. There are several areas of overlapping big game crucial winter range located within the ARPA (map M-25). The combinations of overlapping big game crucial winter range include the following: elk/mule deer, 3,038 acres and mule deer/antelope, 22,637 acres. Forty percent of this habitat is on private and state lands where there are no protections against disturbance of animals during crucial time periods.

Indirectly, this may increase inter- and intra-species competition for forage and thermal cover; in areas already at carrying capacity, density-dependant species would be further displaced. This may force animals to use lower-quality habitats, which may lead to a reduction in reproductive rates or an increase in predation.

**Upland Game Birds**

**Greater Sage-Grouse.** Greater sage-grouse are abundant within the ARPA, due to the high amount and diversity of suitable habitat, lack of habitat fragmentation, and the close proximity of upland and riparian habitats. In addition, all habitats needed to fulfill the life history requirements of this species are found adjacent to one another. Potential impacts to greater

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

sage-grouse include loss of nesting or early brood-rearing habitat, decreased population productivity caused by loss of nesting or early brood-rearing habitat, reduced utilization of suitable habitats due to indirect disturbance, loss of winter habitat, increased predation due to increased roosting sites for raptors on power poles and other structures, and displacement of birds into lower quality habitats.

Potential sources of direct impacts to greater sage-grouse include excessive noise levels proximal to occupied leks; disruptive human activities that occur during the daily time period in which courtship and breeding, nesting, brood-rearing, and foraging activities take place; and habitat loss from construction of project facilities. Noise levels interfere with bird communication during mating periods resulting in lower bird attendance at leks. Disruptive human activities alter normal bird behavior, increase nest abandonment, and may displace birds into less-desirable habitats. Construction of facilities and roads creates a long-term loss of greater sage-grouse habitat, increases fragmentation of remaining habitat. Increased predation due to facilities, such as well houses, compressor stations, and aboveground power lines serving as perches for raptors and corvid's can result in long term loss. Roads may also serve as travel corridors for some predators, such as foxes and coyotes. All of these impacts lead to lower productivity and long-term decline in the population of this species.

Of greater concern is the indirect loss of habitat resulting in bird displacement and fragmentation of nesting and early brood-rearing habitat. Sources of indirect impact primarily relate to dust settling on vegetation and loss of sagebrush habitat due to over-browsing by antelope and mule deer. Dust reduces the palatability and production of forbs and shrubs used by grouse. Over-browsing by big game on ranges shared with grouse would reduce quality and abundance of nesting, brood-rearing, winter habitats, and forage.

Potential greater sage-grouse nesting habitat covers 92 percent of the ARPA. In the long-term, recovery of shrubs to pre-disturbance levels would not occur during the life of the project. Therefore, there would be a long-term loss of nesting habitat.

Sage-grouse may repopulate an area following energy development, but may not attain population levels that occurred before development (Braun 1998). Most nests abandoned are directly or indirectly related to human activity. Likelihood of abandonment is higher when nests are disturbed early in the incubation period (Remington and Braun 1991).

Naugle et al. (2006) found that leks along the edge of CBNG development had higher lek attendance than leks within the developed area. The hypothesis that sage-grouse avoid developed areas is supported by the finding that active leks and leks with moderate to large numbers of males were often found adjacent to CBNG fields but rarely within CBNG. In contrast, inactive leks and leks with few males were often found within CBNG fields. One of the most striking patterns discovered was that, of leks counted in either 2004 or 2005, no medium or large-sized leks occurred within CBNG development; all remaining leks in CBNG have 20 or fewer males. Summary statistics for well and power line variables calculated from GIS layers around active and inactive leks indicate that active leks typically are twice as far from wells, one-half times as far from power lines, have one-third the density of wells, one-half the density of power lines, and generally have less development (wells and power lines) within 3.2 kilometers (km) of the lek complex. In addition, a significantly higher proportion of lek complexes are inactive in CBNG areas compared to areas on the edge of or outside CBNG (excluding lek complexes of unknown status and those destroyed by agriculture or mining).

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

decline outside the immediate project disturbances. This would have the greatest impact to antelope due to their extreme reliance upon sagebrush (96 percent of their diet) during winter. This level of development within pronghorn crucial winter range, compounded by the current condition of the crucial winter habitat, would exceed the significance criteria (criterion number 3).

**Mule Deer**. The acreage disturbance and the actual number of pads per section would fall under a high impact post-reclamation classification. This level of development within mule deer transitional range and crucial winter range, compounded by the current poor condition of the crucial winter habitat, would exceed the significance criteria (criterion number 3).

**Elk**. Although actual acreage disturbance would fall under a high impact post-reclamation, there would be an extreme impact to elk based on the actual number of pads (eight pads per section) (WGFD 2004c). With this level of development, impacts to elk crucial winter range would exceed the significance criteria (criterion number 3).

### Upland Game Birds

**Greater Sage-Grouse**. Alternative D habitat disturbances would equate to a maximum direct loss of 8.1 percent of the available nesting habitat (eight locations per section with associated roads and facilities). Under this alternative there is a goal of 20 percent reduction of such habitat disturbance. The extent acreage disturbed by this alternative would place it into the high impact category.

Of greater concern is the indirect loss of habitat resulting from bird displacement and fragmentation of nesting and early brood-rearing habitat. At eight locations per section, impact zones surrounding each well pad, facility, and road corridor begin to overlap, thereby reducing habitat effectiveness over much larger, contiguous areas. Human, equipment, and vehicular activity and noise impacts are also more frequent and intensive at this level of development (WGFD 2004c).

The application of avoidance and mitigation measures would help reduce the loss of habitat and stress to greater sage-grouse in proximity to leks on public lands. Based on research conducted in Wyoming, only 45 percent of nests would be afforded seasonal protection as they are within the 2-mile buffer of leks. Of the suitable nesting habitat, 21 percent is outside the 2-mile buffer and would be afforded no seasonal protection. Habitat loss would continue outside the quarter-mile-protected buffer around leks. However, the long-term loss of shrubs combined with the indirect impacts on the habitat, such as dust, noise, and continued human presence during the drilling and production phase, would result in habitat loss and disturbance levels exceeding the significance criteria (criterion number 4).

**Columbian Sharp-Tailed Grouse**. The application of avoidance and mitigation measures in this alternative would help to reduce stress to nesting and brood-rearing and wintering sharp-tailed grouse. However, because of the magnitude of habitat loss and continued human presence during the production phase of the project, impacts would exceed the significance criteria (criterion number 4).

### Raptors

With the application of avoidance and mitigation measures, impacts are not expected to exceed the significance criteria.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

IMPLAN is a static model that assumes that current relationships between sectors will remain similar in the future. The model does not consider changes in other sectors of the economy unless they are also specified as inputs. For this assessment, only the economic activity associated with the Proposed Action was considered in the IMPLAN modeling process. As noted, the activities associated with the Proposed Action have the potential to affect other economic activities, such as reduced grazing and outdoor recreation within the ARPA. These potential effects are not addressed within the IMPLAN modeling process but are discussed below in the following subsection.

The model calibration and other elements of this assessment are based on the following assumptions:

- Drilling and field development in the ARPA would occur over 20 years (figure 2-1), during which a total of 1,800 CBNG wells would be drilled, in addition to the 116 wells drilled during the interim drilling period (The model assumes a success rate of 100 percent). For the purposes of this assessment, it is assumed that 200 conventional wells would also be drilled, also with a success rate of 100 percent.

- The operators estimate that each CBNG well would produce about 750,000 thousand cubic feet (MCF) of natural gas over 13 years (figure 4-7). Under the Proposed Action, some wells would be drilled late in the 20-year assessment period; therefore, production could continue for 13 years after the 20-year drilling and field-development period ends.

- Although there are existing conventional gas wells within the ARPA, the operators have not estimated production associated with the conventional wells included in this assessment. Omitting production estimates for conventional wells may understate long-term economic, employment, and fiscal benefits of production if drilling efforts in conventional formations meet with substantial success. However, because the employment and population effects of production would be substantially lower than employment and population effects of drilling and field development, which are included, the assessment would not understate socioeconomic effects.

- Each CBNG well would require an average of $633,000 to drill and complete; an additional per well average of $379,000 would be spent on gathering and electrical systems, gas line laterals, compressor stations, and injection facilities. Wells drilled to deeper conventional targets would be drilled with essentially the same equipment although completion and production techniques would differ. Consequently, conventional well costs are assumed to be approximately 50 percent higher than CBNG well costs.

- For the purpose of the assessment, wells would be drilled according to the schedule presented in figure 2-1.

- Only a portion of the expenditures in each category would occur within southwest Wyoming; other materials and labor purchases would occur elsewhere in Wyoming or out of state. Estimates of local and non-local expenditures have been developed for each drilling and field development category (e.g., rig costs, labor costs, fuel costs, and pipe costs) based on actual AEPC expenditures during the interim drilling period.

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

- Revenues, expenditures, and economic effects are expressed in terms of constant 2004 dollars.

- Annual average wellhead gas prices are based on the $4.25 per MCF estimate for gas prices beyond 2005 contained in the October 2004 Wyoming Consensus Revenue Estimating Group Wyoming State Government Revenue Forecast (CREG 2004). These are likely conservative estimates. Note that CREG increased wellhead price estimates for natural gas to $6 per MCF for 2006 and beyond in October 2005. Spot prices at Wyoming hubs were over $10 per MCF during the fall of 2005 as a result of hurricanes Katrina and Rita.

**Figure 4-7.     Estimated Project–Related Coal Bed Natural Gas Production.**



**Note:**
Excludes production from the Interim Drilling Program.
**Source**: AEPC 2004.

Use of the foregoing assumptions and the IMPLAN model allow a reasonable but conservative assessment of the economic impacts of the Proposed Action; however, economic effects of all action alternatives would be different than those forecast by the model if actual conditions vary substantially from these assumptions.

Estimated economic effects of Proposed Action drilling and field development are displayed in table 4-10. Based on the foregoing inputs and assumptions, an estimated annual average direct regional expenditure of about $49 million would result in an annual economic impact of about $62 million in southwest Wyoming, or a total economic impact of almost $1.2 billion over the 20-year drilling cycle.

Estimated annual drilling and field development employee earnings in southwest Wyoming would average almost $22 million or about $434 million total over 20 years. These earnings would support an average of 578 annual job equivalents (AJEs). AJEs reflect an aggregation of all employees (existing and new) whose employment would be supported in whole or in part by Atlantic Rim project spending. The term AJE is used to emphasize that these are not all

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Longer-term housing availability is currently tight in both Wamsutter and the Little Snake River Valley. The longer tenure of the relatively small increment of housing demand would allow time for local housing markets to respond to demand for rental or owner-occupied housing units. But it may be that some Proposed-Action-related workers would initially seek housing resources in mobile home parks in Rawlins and either wait for housing to become available in the Little Snake River Valley or Wamsutter or contract for development of new housing.

**Effects on Community Services**

As discussed in section 3.12, most community facilities in Carbon County and the communities near the ARPA were developed for a substantially larger population than currently exists. As a result, the population increase associated with the Proposed Action could be readily accommodated by most existing community facilities and schools. The enrollment increment in Rawlins could strain the elementary school capacity if Proposed-Action-related enrollment was concentrated in the lower grades. However, enrollment would be adequate if evenly distributed due to the excess capacity in the middle and high schools. In addition, Rawlins should have a new elementary school and should have completed remodeling of the middle school by the time the peak year occurs.

The additional water supply that the recently completed High Savery reservoir provides to Baggs, Wyoming, would accommodate the relatively small population increment projected for that community. A new Carbon County jail has recently been completed, which should alleviate inmate overcrowding, at least for the near term. Some project-related tax revenues associated with the Atlantic Rim pods would be available to offset increased service demand. However, there would be a several-year lag before substantial Proposed-Action-related revenues flow because ad valorem property taxes would provide the largest source of project-related revenue. Given recent increases in natural gas production from other fields and elevated natural gas prices, Carbon County and affected special districts may have substantial revenues to address the increase in service demand associated with the Proposed Action until production-related revenues begin to flow.

Law enforcement, emergency response (fire suppression and ambulance), and county roads are the local government services most likely to be affected during the annual 6-month drilling and field development season. As demonstrated below under Fiscal Effects, Carbon County would receive substantial revenues to help support increased demand for these services over the life of the project.

Although demands on local government facilities and services in Rawlins is anticipated to be moderate and demands in smaller municipalities, minimal, communities would receive few direct revenues from Proposed-Action-related development or production. Therefore impacts that result in demand for new infrastructure or services are unlikely to be offset by Proposed-Action-related revenues. Wamsutter is located in Sweetwater County and would therefore receive no project-related tax revenues, except a small portion of severance tax revenues distributed to local governments throughout the state.

**Fiscal Effects**

The Proposed Action would generate substantial tax revenues including:

- Local ad valorem property taxes on production and certain field facilities;
- Sales and uses taxes on materials, supplies, and equipment;

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

- Federal and state mineral royalty payments; and
- Wyoming state severance taxes.

**Ad Valorem Property Taxes**. The Proposed Action would generate ad valorem property tax to Carbon County, the Wyoming School Foundation Fund, Carbon County School District #1, and a number of special taxing districts. Direct ad valorem property taxes would be generated from two sources: (1) the value of natural gas produced and sold and (2) the value of certain well field and production facilities (underground facilities associated with wells are exempt). Indirect ad valorem tax revenues may be generated by the infrastructure investments made by gas service companies and vendors that expand facilities as a result of the incremental economic activity. Long-term employees of gas companies and vendors may purchase new properties or improve existing properties generating additional property taxes. Potential indirect revenues have not been estimated for this assessment.

Constant 2003 mill levies were used to prepare property tax estimates. The Wyoming School Foundation Program and shared county school mill levies are set by statute. Other mill levies are set each year by the county commissioners and officials of the various taxing districts within limits imposed by the state legislature; some change each year. Mill levies reflect the revenue needs of the taxing entity and estimates of assessed valuation within the entity. Natural gas is assessed based on the previous year's production. Well field facilities are depreciated after the first year of production.

Figure 4-13 displays annual Proposed-Action-related ad valorem property tax estimates based on the assumptions outlined earlier and assuming a constant total mill levy of 62.85 mills. Table 4-15 displays estimated ad valorem property tax revenues to major property taxing entities in Carbon County. Under the inputs and assumptions used for this assessment, ad valorem property tax revenues from production and facilities would total $349 million over the 32-year life of the project or an annual average of almost $11 million.

**Figure 4-13.   Proposed Action-Related Ad Valorem Property Tax Estimates.**



Prepared by:  BCLLC

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Carbon County and certain special districts would receive approximately $96 million over 32 years under the assumptions used for this assessment. Note that some affected special districts only cover part of the ARPA; therefore an average of special district levies has been used for the assessment.

**Table 4-15.    Estimated Proposed Action-Related Ad Valorem Property Tax Revenues: Carbon County and Affected Special Districts.**

|  | County (12 mill) | Weed & Pest (1 mill) | Recreation (1mill) | Conservation Districts (1 mill) | Avg. Total Special Districts (2.35 mill) | Total County & Special Districts |
|---|---|---|---|---|---|---|
| **Total (32 year)** | $66.6 million | $5.6 million | $5.6 million | $5.6 million | $13 million | $96 million |
| **Average Annual** | $2.1 million | $173,000 | $173,000 | $173,000 | $408,000 | $3 million |

Note:
Table does not break out all special districts. Columns may not sum due to rounding.
**Prepared by:** BCLLC

Table 4-16 displays Proposed-Action-related revenues that would accrue to local schools and to the Wyoming School Foundation Fund. A portion of the revenue collected under the School District U-1 26.5 mill levy would accrue to the Wyoming School Foundation Fund because the district is a "recapture" district under the provisions of the School Foundation Program. Recapture means that revenues above a certain level are collected by the state for redistribution to other school districts (See chapter 3). District U-1's budget could increase as a result of student enrollment increases associated with Proposed-Action-related, longer-term population.

**Table 4-16.    Estimated Proposed Action-Related Ad Valorem Property Tax Revenues: Carbon County School District #1 and Other School Entities.**

|  | School Dist. U1 (26.5 mill)* | State School Foundation Fund (12 mill) | County School (6 mill) | BOCES (1 mill) | Total Schools |
|---|---|---|---|---|---|
| **Total (32 year)** | $147 million | $66.6 million | $33.3 million | $5.6 million | $252.6 million |
| **Average Annual** | $4.6 million | $2.1 million | $1 million | $173,000 | $7.9 million |

Notes:
*Much of the revenue associated with District U1 levy is likely to accrue to the Wyoming School Foundation Fund.
Columns may not sum due to rounding.
**Prepared by:** BCLLC

It should be noted that mill levies that produce revenues in excess of expenditures are frequently reduced. The potential for reduced mill levies in Carbon County is high given anticipated increases in both production and gas prices. Reduced mill levies would result in reduced taxes for property owners and other commercial and industrial interests in the county.

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

**Federal and State Mineral Royalties and Wyoming Severance Taxes**. The federal government collects a 12.5-percent royalty on the fair market value of gas produced from federal leases, less production and transportation costs. Half of the mineral royalty revenues are returned to the state where the minerals were produced. In Wyoming, a portion of the state's share is distributed to local governments and to the Wyoming School Foundation Fund. It is difficult to predict with certainty where all CBNG wells within the ARPA would be located. For this assessment, it is assumed that 64 percent of the CBNG associated with the Proposed Action would be produced from federally owned minerals, 31 percent would be produced from privately owned minerals, and 5 percent would be produced from state-owned minerals. As noted above, production associated with conventional wells has not been estimated for this assessment.

The State of Wyoming collects either a 16.67 percent or a 12.5 percent royalty on natural gas produced from state-owned minerals, depending on the circumstances of the lease. For this assessment, state mineral royalties were assumed to be 12.5 percent.

The State of Wyoming collects a 6-percent severance tax on the fair market value of natural gas produced within the state. Federal mineral royalty payments and production and transportation costs are exempt from this tax. The state distributes revenues from this fund to a variety of accounts including the General Fund, Water Development Fund, Mineral Trust Fund, and Budget Reserve. It also distributes a fixed 1 percent of the revenues to counties and municipalities.

Estimated mineral royalty and severance tax revenues are displayed in table 4-17. Actual mineral royalty and severance tax revenues would vary based on production levels, well locations, gas sales prices, and actual production and transportation costs. Actual severance tax revenues may be less than these estimates if a portion of the gas is used for production purposes.

**Table 4-17.    Federal Mineral Royalty and Wyoming Severance Tax Estimates.**

|  | **40-Year Total** | **Average Annual** |
|---|---|---|
| **Federal Mineral Royalties** | $320 million | $10 million |
| **Wyoming Share of Federal Mineral Royalties** | $160 million | $5 million |
| **Wyoming State Mineral Royalties** | $8.4 million | $264,000 |
| **Wyoming Severance Taxes** | $271 million | $6.8 million |

**Note:**
Columns may not sum due to rounding.
**Prepared by:** BCLLC

**Sales and Use Tax**. Wyoming collects a 4-percent sales and use tax on the gross receipts of sales of tangible goods and certain services (drilling services are exempt). The state returns 31 percent of the revenue (less administrative costs) to the county where the taxes were collected. Counties distribute the revenues to incorporated municipalities based on population. As a local option, Carbon County also collects a 1-percent, general-purpose sales and use tax,

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

which is distributed to the county and its municipalities, and a 1-percent dedicated sales and use tax for capital facilities.

Table 4-18 displays the estimated state and local revenues that would flow from expenditures made during the drilling and field development phase of the Proposed Action, assuming that all sales and use tax payments are appropriately credited to Carbon County. Total sales and use tax revenues over the 20-year drilling cycle would be $17.2 million dollars. Of the total, an estimated $9.5 million would be distributed to the State of Wyoming and $7.7 million to Carbon County and its municipalities. In addition, the Proposed Action would contribute 1 percent of taxable sales until the current local option facilities tax expires (these revenues have not been estimated).

**Table 4-18.    Estimated Sales and Use Tax Revenues and Distributions.**

| State of Wyoming | | | | | | |
|---|---|---|---|---|---|---|
| **Total** | $5.4 million | | | | | |
| **Average Annual** | $271,000 | | | | | |
| | **Carbon County Total** | **County Share** | **Rawlins** | **Baggs** | **Dixon** | **All Other Towns** |
| **Total** | $4.4 million[1] | $623,000 | $2.5 million | $98,000 | $22,000 | $1.1 million |
| **Average Annual** | $220,000 | $31,000 | $127,000 | $4,900 | $1,100 | $56,000 |

Notes:
Columns may not sum due to rounding.
[1]Excludes proceeds from 1 percent local option facilities tax.
**Prepared by:** BCLLC

**Total Revenues**. Figure 4-14 summarizes the estimates of the main tax and royalty revenues attributable to the Proposed Action. The revenues are based on production, gas sales prices, tax rates, and exemption estimates, all of which are subject to change as development proceeds. In addition to these revenues, other revenues would be associated with the Proposed Action including sales and use tax payments for ongoing operations of the project and from employee and vendor spending, Oil and Gas Conservation charges, and federal income tax payments by the proponent and its employees. These revenues have not been estimated for this assessment.

### Local Attitudes, Opinions, and Lifestyles

The Proposed Action has the potential to affect local attitudes, opinions, and lifestyles in two ways. Affected communities would experience change related to the increase in economic activity, employment, and population growth associated with natural gas development. The Proposed Action also has the potential to affect ranchers, who own land in the ARPA, and users of the project area, such as grazing operators, outfitters, hunters, and other recreationists.

**Chapter 5**

**Cumulative Impacts Analysis**

# 5  Cumulative Impacts Analysis

NEPA requires an assessment of potential cumulative impacts.  Federal regulations (40 CFR 1500–1508) define cumulative impacts as:

> ...the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

Potential cumulative impacts are assessed at the resource level.  The area of the cumulative impact analysis (CIA) area for past, existing, and RFFAs that may generate cumulative impacts varies depending on the resource under consideration.  For example, the CIA area for air quality effects is regional in nature; therefore, the scope of activities considered is necessarily broad. In contrast, the CIA area for geology and minerals considers the project area associated with the proposed action and alternatives; therefore, the scope of potential cumulative activities considered is much narrower.

This discussion of potential cumulative impacts assumes the successful implementation of the environmental protection and mitigation measures discussed in the various appendices and chapter 4 of this EIS, as well as compliance with the Great Divide RMP and all applicable federal, state, and local regulations and permit requirements.  The analysis of cumulative impacts addresses both potential negative and positive impacts.

## 5.1  Past, Existing, and Reasonably Foreseeable Future Activity

Past, existing, and RFFAs are organized by CIA area and include the following:

- ARPA,
- Southeastern Sweetwater County/southwestern Carbon County CIA area,
- Watershed CIA area, and
- Regional CIA area.

### 5.1.1  Atlantic Rim Project Area

Historic and existing activities in the ARPA include livestock grazing; dispersed recreation; and oil and gas exploration, development, and production. RFFAs within the ARPA are the action alternatives and the no action alternative.

While additional natural gas proposals are possible, this analysis incorporates all reasonably foreseeable natural gas development activity within the project area based on current knowledge of the area's geology and natural gas drilling and development technology.  Other potential developments are also possible, such as coal mining, wind power development, and hydropower.  Such activities have not been proposed and therefore are not reasonably foreseeable.  If these factors change and additional proposals are submitted, assessment under NEPA would likely be required.

Existing disturbance from oil and gas development within the ARPA is approximately 600 acres, for a total existing disturbance of around 0.22 percent of the 270,080 acres comprising the

## CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

project area.  During the construction phase, the Proposed Action alternative would disturb up to 15,800 acres.  Under Alternative A (No-Action), no additional surface disturbance would occur. Alternative C could shift some disturbance on federal minerals from higher sensitivity areas to lower sensitivity areas through the use of protection measures, with maximum disturbance of 13,286 acres.  Alternative D would cap unreclaimed disturbance at 7,600 acres or 2.8 percent of ARPA.  Disturbance areas within the ARPA would be reduced upon reclamation of pipeline ROWs and unused portions of drill pad and ancillary facility disturbances during the production phase for each alternative.  Under the Proposed Action and Alternative C reclamation would reduce impacts to 6,200 acres for a cumulative impact of 6,800 acres or 2.5 percent of the ARPA.  Reclamation would reduce impacts to 5,000 acres under Alternative D.  There would be no impacts to reduce under Alternative A (No Action).

### 5.1.2    Southeastern Sweetwater County/Southwestern Carbon County CIA Area

Past and historic activities occurring in the area surrounding the proposed project include oil and gas exploration, development, and production; dispersed recreation; ranching and grazing; and residential, commercial, and industrial development in the communities of Rawlins, Wamsutter, and Baggs.

RFFAs in adjacent areas primarily involve natural gas development (map M-5).  The Proposed Action is located in a region of extensive natural gas development.  The projects and the NEPA documents from which potential cumulative impacts were obtained are listed below.

- **The Desolation Flats Natural Gas Field Development Project Environmental Impact Statement (USDI-BLM 2004a)** provided analysis associated with a maximum development of 385 natural gas wells at 361 locations, along with associated access roads, pipelines, and other ancillary facilities.  The Desolation Flats Project Area encompasses 233,542 acres, located about 20 miles west of the ARPA.  The Desolation Flats project area included two other EIS project areas with RODs in effect, namely Mulligan Draw and Dripping Rock.  These two areas were included in the Desolation Flats project area EIS to analyze the potential for increased well density.

- **The Greater Wamsutter Area II Natural Gas Development Project Environmental Impact Statement (USDI-BLM 1995)** provided an analysis of impacts associated with a maximum development pattern of 750 new production wells at 300 locations within this area and associated access roads, pipelines, and other ancillary facilities.  This analysis area is located to the northwest of the ARPA and includes approximately 334,191 acres.

  Development within this area reached the levels analyzed in the EIS for that project (300 well locations).  Directional drilling proved to be technically impractical or uneconomical in many areas within the Greater Wamsutter II project area, and additional well locations beyond those analyzed in the EIS were required to develop the anticipated 750 production wells.  The expansion of development in this project area and development in the Continental Divide area were combined in one analysis to make NEPA compliance more efficient and to facilitate the analysis of cumulative impacts.

## CHAPTER 5. CUMULATIVE IMPACTS ANALYSIS

- **The Continental Divide/Wamsutter II Natural Gas Development Environmental Impact Statement and ROD (USDI-BLM 2000a)** includes the Continental Divide area combined with the Greater Wamsutter II project area. The combined project area is generally located in Townships 15 through 23 North, Ranges 91 through 99 West, in Sweetwater and Carbon Counties, Wyoming. The total combined area encompasses approximately 1,061,200 acres. This project is located west of the ARPA.

  The EIS for this combined area provides an assessment of environmental impacts associated with development of 3,000 natural gas wells. Based on that assessment, the BLM approved development of up to 2,130 wells in 1999, 50 percent of which are on federal lands within the project area. The project is to continue for approximately 20 years with a project life of 30 to 50 years. Various associated facilities (e.g., roads, pipelines, power lines, water wells, disposal wells, evaporation ponds, and compressor stations) would also be constructed.

- **Creston/Blue Gap Natural Gas Project Environmental Impact Statement (USDI-BLM 1994)** was approved on October 4, 1994, and provides an assessment of the environmental consequences of a proposed natural gas development project located immediately west of the ARPA. The BLM's decision allowed a maximum of 275 wells on 250 locations on a 160-acre spacing pattern. This natural gas development overlaps slightly on the ARPA's western edge.

- **The Hay Reservoir Unit Natural Gas Infill Development Environmental Assessment (USDI-BLM 2004d)** involved a natural gas production area located northwest of the ARPA and the Greater Wamsutter II project area. It analyzed impacts of an increase of up to 25 additional wells over 3 years over the existing 44 wells.

- **The South Baggs Area Natural Gas Development Project EIS (USDI-BLM 2000b)** analyzed potential impacts of drilling 50 additional natural gas wells in the South Baggs area which is located south of the ARPA.

- **The Vermillion Basin Natural Gas Exploration and Development Project Environmental Assessment (USDI-BLM 2002f)** analyzed potential impacts of drilling up to 56 wells in the 92,490-acre Vermillion Basin Project Area, located approximately 55 miles southwest of the ARPA.

### 5.1.3   Watershed CIA Area

Cumulative analysis of natural resources that relate to watershed function and stability should occur at the watershed level. Thus, the CIA area for soils, water resources, vegetation, and wetlands includes two components: (1) an analysis of potential cumulative impacts within the ARPA and (2) an analysis of potential cumulative impacts within watersheds that contain the ARPA.

The watershed area (map M-14) considered in the CIA was based on the USGS-delineated watershed boundaries that are contained in or are adjacent to the ARPA. The ARPA falls predominantly within the Little Snake River drainage basin and the Great Divide drainage basin; however, a very small portion of the ARPA drains into Little Sage and Sugar Creeks, tributaries of the North Platte River. The total CIA area is approximately 6,913,600 acres in size. The CIA

## CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

area includes the Creston/Blue Gap, Continental Divide/Wamsutter II, and South Baggs EIS study areas that fall entirely within the Little Snake River drainage and Great Divide basins.

Cumulative disturbance within the watershed CIA area includes estimated disturbance associated with the Atlantic Rim project and existing and future disturbance associated with those portions of the Creston/Blue Gap, Continental Divide/Wamsutter II, and South Baggs projects located within the Little Snake River and Great Divide drainage areas.  No other permitted projects or RFFAs within the CIA area are reasonably foreseeable at this time.

### 5.1.4    Regional CIA Area

The regional perspective is useful primarily for the analysis of air quality and socioeconomic impacts.  The south half of Wyoming, northern Colorado, and northeast Utah region includes extensive oil and gas development; grazing and ranching; recreational development and dispersed recreation use; coal and trona mining; soda ash, fertilizer, and electric power production; and other residential, commercial, and industrial development.  There are also several highways, and major railroad and Interstate 80, which must be considered in the analysis of cumulative air quality impacts.

## 5.2  Potential Cumulative Impacts by Resource

### 5.2.1    Geology/Minerals/Paleontology

With the exception of petroleum resources, the geology and mineral resources within the ARPA have not been significantly affected by present and existing activities and are not anticipated to be notably affected by the Proposed Action or the alternatives if mitigation measures specific to resources are adopted.  Therefore no cumulative impacts are anticipated for geology or mineral resources other than oil and gas and potentially construction materials.  As discussed in section 4.1, successful oil and gas and CBNG development would result in natural gas production and depletion which is the purpose of this proposal and not considered an adverse impact.  In addition, as discussed in that same section, construction-grade materials are likely to be used from local sources for surfacing materials (gravel) for petroleum and CBNG facilities in the ARPA and other areas.  If development is extensive, known accumulations of local materials may become depleted and additional sources would need to be identified and used.

Potential cumulative impacts to paleontology include cumulative loss of scientifically significant resources at both known and as-yet undiscovered fossil localities.  Fossil localities producing scientifically significant vertebrate fossils are rare and unevenly distributed through rocks that occur in the ARPA and adjacent areas of southern Wyoming.  Those that yield fossils of great scientific importance are extremely rare.  Several such localities are known from the ARPA and others may exist that have yet to be discovered within the ARPA as well as adjacent parts of southern Wyoming.  These localities may preserve rare and scientifically significant fossils including remains of species not yet known to science or more complete specimens of known species.

The magnitude of the potential impact increases as additional oil and gas development projects are permitted in southwestern Wyoming on federal, state, and private lands that have not been evaluated for paleontology.  Once a fossil locality that produces significant resources is lost by excavation or buried it is effectively removed from the possibility of scientific study and that information is lost.

# CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

Cumulative beneficial consequences, including the recovery of scientifically significant fossil resources at known and as-yet undiscovered fossil localities, could occur anywhere in the project area.  To be most beneficial, a site-specific mitigation plan for recovery and curation of newly discovered specimens and recording associated geologic data should be adopted.

## 5.2.2    Climate and Air Quality

The CALPUFF model was used to estimate the cumulative air quality impacts of $NO_x$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ resulting from project sources, state-permitted sources, reasonably foreseeable developments (RFDs), and RFFAs located within the model domain (map M-44).  Project source emissions are described and quantified in section 4.2.  State-permitted sources include $NO_x$, $SO_2$, or $PM_{10}/PM_{2.5}$ sources that began operation after January 1, 2001, and were permitted before March 31, 2004.  Sources permitted within 18 months before January 1, 2001, but not yet operating, were included as RFFAs.  RFD was defined as the undeveloped portion of (1) an authorized NEPA project or (2) a proposed NEPA project for which quantified air emissions data were available at the time of the analysis.  RFD projects included in the CIA are listed in table 5-1.  State-permitted RFFA, and RFD emission rates modeled in the CIA are shown in section 4.2.

**Table 5-1.     RFD Projects Included in the Cumulative Analysis.**

| | |
|---|---|
| Big Piney-LaBarge | Little Greys River - MA 31 |
| BTA Bravo | Lower Bush Creek CBM (Kennedy Oil) |
| Burley | Lower Greys River - MA 32 |
| Burlington Little Monument | Moxa Arch |
| Cave Gulch | Mulligan Draw |
| Cliff Creek - USFS Management Area (MA) 22 | Pacific Rim |
| Compressor Station, Pipeline- Williams | Pinedale Anticline Project |
| Continental Divide/Wamsutter II EIS | Piney Creeks - MA 26 |
| Cooper Reservoir (1998) | Pioneer Gas Plant |
| Copper Ridge Shallow Gas Proj. | Powder River Basin |
| Cottonwood Creek - MA 25 | Riley Ridge |
| Creston-Blue Gap | Road Hollow |
| Cutthroat Gas Processing Plant | Seminoe Road |
| Desolation Flats | Sierra Madre |
| Eighth Granger Gas Plant Expansion | Soda Unit |
| Fontenelle Natural Gas Infill Drilling | South Baggs |
| Ham's Fork Pipeline | South Piney |
| Hickey Mountain-Table Mountain | Stage Coach |
| Horse Creek - MA 24 | Upper Hoback - MA 23 |
| Horse Trap | Vermillion Basin |
| Jack Morrow Hills | Willow Creek - MA 49 |
| Jonah Infill Drilling Project | Wind River (Bureau of Indian Affairs lead |
| LaBarge Creek – MA 12 | agency) |

# CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

**Map M-44.     Far-Field Modeling Domain and NEPA RFD Project Areas.**



Atlantic Rim Natural Gas Project Final EIS

## CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

While there may be additional gas processing or transmission requirements due to the development of this and other natural gas projects regionally and nationally, the potential effects of these developments are not quantified herein since these developments are speculative and would likely require additional WDEQ-AQD permitting if they eventually are proposed.  A portion of the Powder River Basin Oil and Gas Development Project (PRBP), located approximately 68 miles east-northeast of the ARPA, is located within the far-field modeling domain.  A ratio of total PRBP field development equal to the geographical portion within the ARPA far-field modeling domain was included as an RFD in this analysis.  The PRBP identified significant project-specific and cumulative potential impacts in the Bridger Wilderness and other sensitive areas also analyzed for this project.  Further information on potential air quality impacts associated with the PRBP may be found in the PRBP EIS Technical Support Document prepared by BLM (USDI-BLM 2002d).

Cumulative potential impacts were analyzed at each of the nine Class I and sensitive Class II areas listed and at in-field locations within the ARPA.  Ambient concentrations were estimated at each Class I and sensitive Class II area and at locations within the ARPA, and were compared to applicable ambient air quality standards and PSD increments.  Atmospheric deposition calculations were performed for each Class I and sensitive Class II area and at acid-sensitive lakes within these areas.  Cumulative deposition was used to compute ANC change, which was compared to applicable LACs for each of the analyzed acid sensitive lakes.  Total deposition impacts (cumulative impacts plus background) at Class I and sensitive Class II areas were compared to USDI-FS levels of concern, 5 kg/ha-yr for sulfur and 3 kg/ha-yr for nitrogen.  Visibility (regional haze) potential impacts were computed for each Class I and sensitive Class II area.  Potential changes in regional haze were estimated using CALPUF-modeled impacts and two sets of background visibility conditions, FLAG and IMPROVE, as described in section 4.2.  Potential changes to regional haze were compared to a 1.0 dv threshold.

### 5.2.2.1   Proposed Action Far-Field Cumulative Impacts

Maximum potential cumulative impacts of $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ were estimated for each of the analyzed PSD Class I and sensitive PSD Class II areas.  These potential impacts were added to ambient background pollutant concentrations for comparison to the WAAQS, CAAQS, and NAAQS.  The predicted potential cumulative impacts are below applicable ambient air quality standards and PSD increments.

Potential visibility impacts are predicted to be above the "just noticeable visibility change" (1.0 dv) threshold at the Bridger Wilderness Area and Popo Agie Wilderness Area using the FLAG background visibility data and at Bridger Wilderness Area, Popo Agie Wilderness Area, and Wind River Roadless Area using the IMPROVE background visibility data.  Potential visibility impacts at all other sensitive areas were predicted to be below the "just noticeable visibility change" threshold for all days.

 The maximum potential visibility impacts are primarily a result of the cumulative "non-project" regional source emissions.  The maximum direct project potential visibility impacts (0.2 dv), as described in section 4.2, were estimated to be less than the 1.0 dv threshold.  In addition, as defined in the FLAG report, a 0.4-percent change in extinction (0.04 dv) is considered a project-specific significance level for cumulative visibility analyses.  Specifically, if the direct project contribution to a cumulative potential visibility impact of 1.0 dv or greater is less than 0.04 dv, the project is regarded as having an insignificant contribution to the cumulative visibility impact.  Additional analyses were performed following the FLAG report criteria for visibility significance

## CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

determination.  The results of this analysis indicated that for all days where the cumulative (project and regional sources) potential visibility impact was 1.0 dv or greater, the direct project potential impacts were below the 0.04 dv significance threshold.  Based on these results, the Atlantic Rim project emissions would not cause or contribute to any significant visibility degradation at any of the Class I and sensitive Class II areas.

Potential cumulative atmospheric deposition impacts at the fourteen sensitive lakes are below the ANC LACs.  In addition, cumulative total nitrogen and sulfur depositions are well below the 5-kg/ha-yr (for sulfur) and 3-kg/ha-yr (for nitrogen) LOCs.

### 5.2.2.2  Proposed Action In-Field Cumulative Impacts

Model-predicted concentrations of $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ at locations within the ARPA resulting from Proposed Action and regional source emissions were added to monitored background concentrations and compared to ambient air quality standards.  The estimated potential cumulative impacts from project and regional sources were below applicable ambient air quality standards.

### 5.2.2.3  Alternative A (No Action) Far-Field Cumulative Impacts

The CALPUFF modeling performed and reported in the Technical Support Document for Alternative A assumed no field development within the ARPA beyond levels currently authorized.  Far-field CALPUFF modeling performed for the Proposed Action, which included emissions from project sources and from inventoried regional sources within the model study domain, indicated that while project sources contributed insignificantly to total far-field impacts, regional sources were the primary contributors to far-field impacts.

### 5.2.2.4  Alternatives C and D Far-Field Cumulative Impacts

The cumulative analysis performed for the Proposed Action modeled ARPA sources under a worst-case scenario, assuming one full year of construction in conjunction with nearly full-field development.  Alternative C and D air emissions would be equal to or less than those which would occur under the maximum scenario analyzed for the Proposed Action.  Furthermore, all other state-permitted sources, RFDs, and RFFAs would be identical to those analyzed for the Proposed Action and shown on map M-44.    Model results from the Proposed Action indicated that while project sources contributed insignificantly to total far-field impacts, regional sources were the primary contributors to far-field impacts.

Cumulative impacts of $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ from Proposed Action sources and inventoried regional sources within the model study domain, when added to ambient background pollutant concentrations, would be below applicable ambient air quality standards and PSD increments.  Potential cumulative visibility impacts analyzed for the Proposed Action are predicted to be above the "just noticeable visibility change" (1.0 dv) threshold at the Bridger Wilderness Area and Popo Agie Wilderness Area using FLAG background visibility data, and at the Bridger Wilderness Area, Popo Agie Wilderness Area, and Wind River Roadless Area using IMPROVE background visibility data.  Potential cumulative visibility impacts from the Proposed Action at all other sensitive areas were predicted to be below the "just noticeable visibility change" threshold for all days.  Potential cumulative atmospheric deposition impacts from the Proposed Action at the fourteen sensitive lakes would be below the ANC LACs.  In addition, cumulative total nitrogen and sulfur deposition would be below the 5 kg/ha-yr (for sulfur) and 3 kg/ha-yr (for nitrogen) LOCs.

## CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

### 5.2.2.5  Unavoidable Adverse Impacts

Some increase in air pollutant emissions would occur as a result of the Proposed Action and regional source emissions.  Near-field potential impacts from these emissions are predicted to be below applicable significance thresholds.  However, there is a potential for cumulative visibility potential impacts to exceed visibility thresholds within PSD Class I Bridger Wilderness Area, Popo Agie Wilderness Area, and Wind River Roadless Area.  The Proposed Action is regarded as having an insignificant contribution to the cumulative visibility impact.

### 5.2.3    Soils

Existing and cumulative disturbances within the ARPA are described in section 5.1.1 for the various alternatives.  For all alternatives, the cumulative post-reclamation disturbances are relatively low, and the successful implementation of erosion, runoff, and sediment controls and revegetation measures described in section 4.3 and the Reclamation Plan (appendix B) would reduce the contribution of the Proposed Action or the alternatives to cumulative impacts on soil resources.  These would not remove the impact.  Locally, there would still be areas exceeding the significance criteria, which would be combined with those areas outside this project area that are also exceeding the significance criteria.  New development adjacent to this project area would also contribute to the increased erosion and sedimentation within the watersheds.  The action alternatives could add to the cumulative removal of biological soil crusts within the area. The cumulative impact on soil crusts cannot be fully predicted due to the lack of inventory data. Initial reconnaissance has shown them to be scattered and mostly not well developed.

The ARPA contains such a small portion of the North Platte River drainage that even cumulative impacts are insignificant.  Erosion within the Great Divide Basin is generally low and site-specific due to terrain. Also, because there are no drainage outlets, erosion does not affect any other watersheds.  The upper Colorado River drainage has listed both salinity and sediment as significant factors for many years.  Water quality sampling in the 1980s documented the Muddy Creek drainage as the principle source of sediment for the upper Little Snake River. Conservation efforts over the past 20 years have achieved success in improving watershed cover and riparian health while reducing soil erosion, in part using 319 Clean Water funding from the USEPA.  These efforts have focused for the most part on livestock management; however, watershed assessments identified increased sedimentation due to oil and gas development (primarily due to runoff from roads).  This project, along with other adjacent oil and gas development, would only lead to increased and accelerated erosion, and exacerbate sedimentation (and salinity) issues within the upper Colorado River drainage.

### 5.2.4    Water Resources

Cumulative impacts include water resource impacts from ongoing activities, RPDs, and RFFAs. Cumulative impacts are assessed for the ARPA and the watershed CIA area that includes the Little Snake River, the Great Divide, and a very small part of the North Platte River drainage areas.

### 5.2.4.1  ARPA Cumulative Impact Analysis Area

Existing and cumulative surface disturbances within the ARPA are described in section 5.1 for all the alternatives.

# CHAPTER 5. CUMULATIVE IMPACTS ANALYSIS

Ranch management, grazing activities, and other resource uses within the EIS analysis area would be required to meet Standards for Healthy Rangelands (USDI-BLM 1997) and therefore are not expected to have measurable effects to surface water resources. Because livestock tend to concentrate around stock ponds and in drainage areas in search of water, there would be localized effects to surface waters, which could lead to greater erosion where surface disturbance occurs and livestock concentration areas coincide.

Recreational activities, such as fishing, hunting, and camping, would continue to have minimal effects on surface water, but could be more pronounced in localized areas due to off-road travel and potential additional access provided by the project. Off-road travel in drainage areas will cause local effects to surface waters, but these effects would be limited in the EIS analysis area given restricted travel through the checkerboard federal and private ownership of many of the lands. Where there is continuous federal land and the project improves or creates new access, these impacts could be significant depending on the alternative selected.

No serious groundwater pollution problems have been detected in the watershed CIA area. Current oil and gas exploration and development activities must comply with federal and state environmental quality laws; thus, serious water quality and quantity impacts are not expected on a cumulative scale.

## 5.2.4.2  Watershed Cumulative Impact Analysis Area

Downstream demands for water in the Little Snake River drainage would continue to influence water management in the basin. Additional reservoir construction and associated irrigation systems would most likely be constructed with regard to the Yampa River Basin Management Plan and the recovery program for Colorado River native fish downstream (http://www.r6.fws.gov/crrip/). In addition, regional surface water quality would continue to be influenced by local and regional land use trends and activities, which include ranching and farming, oil and gas exploration and development, coal mining (none currently planned), and recreational use. Irrigation activities and municipal water systems below the ARPA would contribute additional salt loading into the Colorado River system.

Surface discharge using the offsets at the Cow Creek Pod can be expected to continue through the life of the project according to the WYPDES permits #WY0042145 and #WY0035858, which allow for 1.34 tons/day of salts and 180,600 gallons/day of total discharge under both permits. As described in chapters 3 and 4, this is an offset for an oil well (as defined by the Colorado River Salinity Control Forum), and the permit allows for the same volume of water and salt as was discharged by the oil well plugged (#1X-12). This discharge is into a reservoir on a tributary of Dry Cow Creek. This reservoir will be improved and maintained according to this use. The discharge permit is currently being revised to allow for water releases from the reservoir in a similar manner as what occurred historically when #1X-12 was in operation. The permit has a point of compliance upstream of the confluence with Cow Creek that should not allow water from the project to enter Cow Creek.

The proposed action did not propose any surface discharge of produced water from non-federal leases into facilities on private land. It is therefore assumed that all water produced from the coal formation would be re-injected with the exception of off-set uses for flowing wells as described for Cow Creek. Therefore, the WDEQ permit #WY0048437 for the Doty Mountain Pod would not be used.

# CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

A recently approved WYPDES permit for treated surface discharge of water (WDEQ permit #WY0054038) can be described as a pilot project.  This discharge was permitted under the freshwater waiver conditions for the Colorado River Salinity Forum and would require treatment of the water to below 500 mg/L.  BLM is considering this discharge under a separate analysis to determine significance.  If the proposal is determined to be significant, a separate EIS will be required.  If surface discharge of water becomes a significant method for produced water disposal in the ARPA, separate analysis may be needed that would consider the entire ARPA. This EIS does not consider any method of disposal besides injection and the offsets described above.

This project allows for closed system livestock or wildlife watering facilities under all alternatives subject to state permitting.  Water from CBNG wells can be used for construction and drilling activities, subject to state permits.  Owners of any state-permitted water wells documented to be impacted by the project would be offered a well water agreement to mitigate any drawdown impacts (See appendix H).

Additional oil and gas exploration and development will occur in the areas within and surrounding the EIS analysis area.  Cumulative post-reclamation disturbances would be a significant impact to surface water as discussed under section 4.4.  Combined impacts from the Creston Blue Gap area combined with the Atlantic Rim project can be expected to change the surface runoff characteristics above background levels and would likely be detrimental to the Muddy Creek section west of WY 789 listed as having threats on the State of Wyoming 303d list.  Furthermore, salt and sediment contributions to Muddy Creek from these projects can be expected to increase above background levels due to surface disturbance. This increase would impact the Colorado River Basin with a portion contributing to the Little Snake River, as more conservative salts move downstream and sediments are stored in local channels.

Current water usage in the general area of the ARPA from all combined surface water and groundwater sources is estimated to be approximately 90,000 acre-feet per year (Collentine et al. 1981).  This estimate includes uses outside the watershed CIA.  Using this estimate as an environmentally conservative indication of total existing water usage, the Atlantic Rim project under the Proposed Action would use approximately 1,100 acre-feet of water. Because the Creston/Blue Gap, Continental Divide/Wamsutter II, and South Baggs project areas fall entirely within the Little Snake River and Great Divide Basins, 100 percent of the total water usage from these projects within the watershed CIA (approximately 2,700 acre-feet, 7,000 acre-feet, and 150 acre-feet, respectively) could be as much as 11,000 acre-feet over the life of the projects.  If the total water usage from the Desolation Flats project (approximately 900 acre-feet) is included, even though it falls outside the watershed CIA, the total water usage for the general area could be as much as 12,000 acre-feet or approximately 13 percent of the current water usage in the general area.  This cumulative water usage estimate is relatively small because it would be distributed over the lives of these projects. Also, much of the water use for the ARPA will be from coal formations.

## 5.2.5     Vegetation and Wetlands

### 5.2.5.1  ARPA Area

All the action alternatives would add to the cumulative removal of vegetation within the area. Because of the widespread distribution and abundance of the mountain and Wyoming big sagebrush cover types in the project area and south-central Wyoming, minor reductions in these

## CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

upland cover types would not be a significant impact following successful reclamation and the long-term reestablishment and establishment of native shrubs.  Vegetation cover types such as alkali sagebrush and silver sagebrush/bitterbrush could be significantly impacted by disturbance due to their low abundance across the region.

Wildfires in this area occur infrequently and are usually of such small size that they add about 100 acres annually to the total amount of disturbed vegetation.  There has only been one large wildfire in the general area within the last 30 years, occurring in 1993 in the Sand Hills, which burned 2,900 acres.  These areas recover quickly with herbaceous species, but more slowly with shrubs and trees.  Prescribed burns have primarily occurred in mountain big sagebrush sites.  In limited cases, prescribed burns have occurred in aspen, mountain big sagebrush/mountain shrub mix, and basin big sagebrush cover types.  The timing and conditions at the time these treatments are executed are beneficial in terms of stimulating species to improve their health, or in the case of sagebrush helping to reoccupy these habitats within 20 to 30 years instead of a longer time span.  Future prescribed burns would need to factor other developments into both long-term objectives and the size and management of treatments, and would likely lead to more chemical and mechanical treatments.

The combination of activities that require reclamation and vegetation treatments increase the amount of acreage dominated by herbaceous vegetation versus those dominated by shrubs.  In general, this would affect 5 to 10 percent of the overall landscape.  Recovery of habitat functionality for shrubs in treatments generally occurs within 30–50 years; whereas, recovery of shrubs in reclamation tends to take longer.  Because the majority of shrubland and woodland cover types consist of mature to overmature woody plants, which increases the amount of early succession, it is desirable to include younger-aged stands to diversify cover and age-class structures.  Currently, there is a lack of native seed sources for forbs (and some grasses and shrubs) to use in reclamation, particularly in the 7- to 9-inch precipitation zone. This lack of seeds will continue to prevent meeting long-term species composition objectives.

Indirect effects from the action alternatives would come from road issues of dust and desertification that increase in a cumulative manner with adjacent existing and proposed oil and gas development.  Dust accumulation on vegetation, reduced photosynthetic activity and growth, and lower palatability for herbivores would result in long-term alteration of species composition, cover, and productivity.  If not mitigated, these impacts could affect 20–35 percent of the region and include all vegetation cover types.  Desertification impacts from road modification of upland hydrology would also increase on a cumulative basis, but in more site-specific areas.  In generally flat to gently rolling terrain, these impacts would be minimal, but in the Flattops, Powder Rim, and Willow Creek areas, these impacts would be similar to the ARPA with one-third or more of the area affected.

The invasion and establishment of invasive weed species has already resulted in an increase to the local and regional cumulative effects of undesirable plant species in native ecosystems. This project would contribute cumulatively to the local and regional invasive weed populations.  An aggressive and constant-monitoring program by all involved parties (federal, state, county, and private) would be mandatory to contain or prevent this threat.   Operators would coordinate and support county weed and pest districts to help control the introduction and spread of weeds resulting from the operator's activities.

## CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

### 5.2.5.2  Watershed CIA Area

On the broader scale of watersheds, there would be negligible impacts to vegetation within the North Platte River drainage and minimal impacts to vegetation in the Great Divide Basin. Cumulative impacts in the upper Colorado River drainage would be low to moderate due to dust and desertification from roads and their influence on overland hydrology.  These alterations would affect 5 to 10 percent of the drainage within the upper Little Snake River and relate to long-term reduction of vegetative cover, species diversity, and productivity, primarily in the Wyoming big sagebrush cover type.  However, due to the wide range of this species, overall impacts would be low.  The acreage of vegetation disturbance due to permitted activities and naturally occurring events would be less than 2 percent of the overall landscape.

Cumulative impacts also include wild horses in the Adobe Town HMA.  Although not in the ARPA, this management area overlaps the southern portion of oil and gas field development west of WY 789.  Lack of funding for roundups led to population increases through 2002 and 2003 resulting in forage consumption by wild horses equal to that normally consumed by wild horses and livestock combined.  Because of concurrent drought conditions, species composition decreased, vegetation cover decreased, and plant spacing increased, which will require years for recovery.  Roundups in 2003 and 2005 have returned wild horse numbers to desired levels, but if allowed to expand to the high numbers recently observed, it would have negative affects on reclamation, weeds, and erosion, in addition to the affects already described above.

### 5.2.6    Range Resources

### 5.2.6.1  ARPA Area

In the long-term, cumulative impacts to the grazing resource would likely result in a small net loss in total annual forage production.  This small decrease in quantity, assuming successful revegetation occurs, would be offset by an increase in quality that would be provided by a younger and more nutritious herbaceous cover.  Although native shrubs would re-establish in the long-term, dominance of herbaceous vegetation would benefit livestock operations that currently run 90 percent cattle, whose diets are primarily grasses.  Dust impacts to vegetation would lower palatability.  Lowered palatability would cause health and weight gain issues like dust pneumonia, which are larger issues than direct loss of vegetation.  On a cumulative basis, these impacts would increase, but the actual affect to each operation would depend on the operation size and how much of the operation was included within a development area.  These impacts would occur in both the development and production phases of oil and gas development.

The more important impacts to grazing relate to disruptions to livestock management, damage to facilities, and death loss of animals to collisions and poisonous plants.  The first two relate more to the development phase and can be minimized with adequate consultation. Unfortunately, the scope of this impact is not well understood by people or documented in terms of actual impact.  For instance, in 2005, one operator had to roundup cattle three times rather than once from a 60,000 acre allotment and neighboring allotments due to pipeline construction and open fences.  In 2006, this same allotment had fifteen fence locations cut by new pipelines and roads that were not adequately rebuilt to contain cattle when the grazing season started. These types of problems increase labor costs, reduce weight gains, increase potential disease transmission, and reduce time available for other planned work.  Animal death loss can occur at anytime, but can also be minimized with adherence to standard compliance stipulations.

## CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

However, improved roads often just lead to greater vehicle speeds and potential for collisions with animals.  The weeds issue is more serious for sheep producers due to the death loss from halogeton.  This invasive species has not been adequately controlled and is expanding with new disturbances, increasing sheep death loss and reducing the grazing land available that is free of halogeton.  Whether this issue alone would eliminate economic sheep operations in this area is unknown, but currently this issue is the greatest threat to these operations.

In summary, impacts to livestock operations include the above factors, but the level of impact will be dependent on the rate and extent of development upon each ranch.  Development at a slower pace allows operators to keep up with what is happening and deal with problems as they arise.  Development in one pasture or one allotment at a time still allows operators to work around development to minimize disruptions.  However, the pace of development tends to be faster rather than slower, and 80 percent of the grazing operators run entirely within oil and gas development areas, limiting options for grazing operations.  Under this scenario, there is likely to be both reduced grazing use and in some cases requests for total non-use by the operator for up to 5 years during the development phase.  Once field development is completed and the production phase begins, livestock grazing would likely return to initial levels of use.

### 5.2.6.2  Watershed CIA Area

Expanding the area for cumulative analysis of impacts to livestock operations does little to change the analysis above.  If operators reduce their animal numbers or duration of use or if they request total non-use due to oil and gas development, some additional grazing use could occur in areas not affected by this development.  This could be in watersheds within the CIA area or in others further distant.  However, this would likely only be during the next 5 to 10 years and not continue once gas field operations became primarily production orientated.

As described above under section 5.2.5, the population of wild horses in the Adobe Town HMA could affect livestock operations under cumulative impacts with oil and gas development.  If populations of wild horses are allowed to expand beyond desired population levels, flexibility of livestock operations to adjust to impacts from oil and gas development would be reduced.  In the case of the 2003 and 2004 grazing seasons, nearly all livestock use (24,000 AUMs) was eliminated due to impacts from wild horses and the 2002 drought.  If this situation reoccurs in conjunction with responding to management disruptions related to oil and gas development, additional reductions in livestock use may be required.

### 5.2.7    Wildlife

The CIA areas for wildlife resources differ with respect to species.  This analysis examines the proportion of the wildlife habitat within respective CIA areas that may be disturbed from all past, present, and RFFAs.  In assessing cumulative impacts, it was not possible to specifically determine where future impacts would occur within CIA areas.  Therefore, estimates of total disturbance were made based upon the location of past, present, and known future projects within the CIA areas and the expected amount of disturbance associated with each project.  The proportion of the estimated total disturbance within the CIA areas was used to estimate the cumulative area of wildlife habitats that may be disturbed by past, present, and RFFAs.

The combination of the individual projects is resulting in a large area of increased fragmentation, disturbance of wildlife and their habitats, and the loss of refuge areas.  Additional effects are

# CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

expected upon wildlife dispersal, the reduction of non-fragmented habitats, competition with livestock, and inter- and intra-specific competition with other wildlife species.  The generalized increase of human presence and associated disturbance across such a broad scale are a concern.  Remaining ranges with increased competition for forage leading to reduced carrying capacity and juvenile survival can also be expected.  Mitigations, COAs, and other BMPs will reduce the impacts of these developments, but not eliminate them.  Reduced populations and population viability can be expected.

Cumulative indirect effects from the Proposed Action or alternatives to all wildlife species in general would come from roads and traffic noise.  As roads are developed within and adjacent to the project area, habitat is fragmented.  Roads can serve as barriers to some animal movement.  The displacement of species away from roadsides can be reasonably predicted.  Insects, birds, and amphibians all avoid dust and noise from roads, which compounds impacts to adjacent habitats throughout the CIA area. Sagebrush-obligate species would be affected by the cumulative removal of habitat (reduction or fragmentation of patch size or vertical habitat structure) throughout the area.

## 5.2.7.1  Big Game

Construction such as building well pads and roads can reduce use of surrounding habitat by wildlife.  Although this construction reduces forage due to the direct loss of native vegetation, there is an area surrounding these sites that tends not to be used due to increased human activity.  This "zone" can extend up to 0.625 miles from the developed area for pronghorn (Easterly et al. 1991) and from 0.6 to 1.2 miles for elk depending upon the season (Powell 2003).  Consequently, disturbance to wildlife can extend further off site than the actual disturbed area.  Some individual animals can habituate to the increased infrastructure; however, it is generally assumed that, overall, the increased human presence in an area is detrimental to big game species.  Dust accumulation on vegetation lowers the palatability for big game. This, along with the physical removal of vegetation, reduces the availability of forage.  The significance of this forage reduction is greater in big game crucial winter range, especially as development cumulatively and concurrently occurs outside the project area in adjacent oil and gas development areas.

Big game populations are managed within herd units designated for each species and cumulative impacts are discussed in the context of these areas.  Cumulative big game habitat losses for pronghorn, mule deer, and elk herds resulting from development of the ARPA, and adjacent EIS areas (section 5.1) are presented in table 5-2.  Implementation of the proposed project would affect crucial winter/yearlong and winter/yearlong range for all three big game species.  The specific locations of future disturbances within the ARPA and the remainder of the herd units are unknown; therefore, the area of each type of seasonal big game ranges that may be impacted is unknown.  The potential impacts to big game habitats are estimated for the portions of each herd unit that contain designated big game seasonal ranges.  The cumulative disturbance to big game seasonal ranges expected to result from development activities from the combination of existing, proposed, and RFFA disturbances for each of the three big game species are listed in table 5-2. Cumulative impacts to big game would include permanent, short-term, and long-term loss of habitat.  It would also include increased stress due to human/wildlife encounters, potential reductions in birth/survival rates, and possible alterations of migration routes.

# CHAPTER 5. CUMULATIVE IMPACTS ANALYSIS

**Table 5-2.   Estimated Cumulative Surface Disturbance (acres) within Big Game Seasonal Ranges, Included within the ARPA.**

| | Acreage Available | Project Related Development | | Cumulative Development[1,2] | | Total Disturbance |
|---|---|---|---|---|---|---|
| | | Initial | LOP | Existing | Potential Future | Acres |
| **Pronghorn** – Baggs Herd Unit | | | | | | |
| Proposed Action | 890,743 | 15,800 | 6,241 | 5,804 | 743 | 12,788 |
| No Action (A) | 890,743 | 0 | 0 | 5,804 | 743 | 6,547 |
| Alternative C | 890,743 | 15,800 | 6,241 | 5,804 | 743 | 12,788 |
| Alternative D | 890,743 | 13,000 | 5,000 | 5,804 | 743 | 11,547 |
| **Mule Deer** – Baggs Herd Unit | | | | | | |
| Proposed Action | 1,843,543 | 15,800 | 6,241 | 23,536 | 17,751 | 47,528 |
| No Action (A) | 1,843,543 | 0 | 0 | 23,536 | 17,751 | 41,287 |
| Alternative C | 1,843,543 | 15,800 | 6,241 | 23,536 | 17,751 | 47,528 |
| Alternative D | 1,843,543 | 13,000 | 5,000 | 23,536 | 17,751 | 46,287 |
| **Elk** – Sierra Madre Herd Unit | | | | | | |
| Proposed Action | 1,525,644 | 15,800 | 6,241 | 883 | 0 | 7,124 |
| No Action (A) | 1,525,644 | 0 | 0 | 883 | 0 | 883 |
| Alternative C | 1,525,644 | 15,800 | 6,241 | 883 | 0 | 7,124 |
| Alternative D | 1,525,644 | 13,000 | 5,000 | 883 | 0 | 5,883 |

**Notes:**
[1]  Sources: Creston/Blue Gap EIS (USDI-BLM 1994), Continental Divide/Wamsutter II (CD/WII) EIS (USDI-BLM 2000a), Desolation Flats EIS (USDI-BLM 2003g); these numbers do not reflect acreage disturbed within the ARPA from existing natural gas development or the Interim Drilling Policy.

[2]  Numbers reflect reclaimed acreage, not total shrub habitat loss as a result of the projects, therefore, the numbers are conservative.

**Pronghorn.** The cumulative impact analysis area for pronghorn is the herd units impacted by the project. Cumulative impacts upon pronghorn migration routes are unknown at this time; however, the current fencing along WY 789 creates a barrier to pronghorn attempting to migrate across this highway. Wyoming Game and Fish Department has constructed a lay down fence along a portion of this area.

It is assumed that most, if not all, of the Baggs herd transition range is located within the ARPA. The Baggs Herd Unit has 43.5 percent of its crucial winter range located within the ARPA (map M-21). An additional 39.6 percent of this herd unit's crucial winter range lies within other oil and gas project EIS boundaries adjacent to the ARPA. Therefore, 83.1 percent of the Baggs pronghorn crucial winter range may lie within one or more of several oil and gas project boundaries.

# CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

**Mule Deer.**  The cumulative impact analysis area for mule deer is the herd units impacted by the project.  Cumulative impacts upon mule deer migration routes within the Baggs Herd Unit are unknown.  Currently, an industry sponsored mule deer study is ongoing.  Completion of the first phase of the study has provided BLM and WGFD better information on migration routes.  It is assumed that most, if not all, of this herd's transition range is located within the ARPA.  The Baggs Herd Unit has 27 percent of its crucial winter range located within the ARPA.  An additional 23.3 percent of this herd unit's crucial winter range lies within other oil and gas project EIS boundaries adjacent to the ARPA.  Therefore, 50.3 percent of the Baggs mule deer crucial winter range might lie within one or more of several oil and gas project boundaries.

**Elk.** The cumulative impact analysis area for elk is the herd units impacted by the project.  The Sierra Madre Herd Unit has 25 percent of its crucial winter range located within the ARPA (map M-24).  No additional acreage of this herd unit's crucial winter range lies within other oil and gas project EIS boundaries adjacent to the ARPA.  It is assumed that a portion of this herd's transition range is located along the eastern third of the ARPA.  Current collaring studies within the ARPA by the WGFD show more movement of elk in a north-south direction along the eastern third of the ARPA than was originally suspected. However, elk movement may not always be the most direct route from winter to summer range. It is likely that project activities will disturb elk to a degree that they may move to new areas outside the ARPA.  Elk are more sensitive to human activities than Mule Deer or Pronghorn Antelope, and may be displaced up to 1.2 miles, depending on the season (Powell 2003).  This displacement could have consequences for livestock operators and other wildlife habitat.

## 5.2.7.2  Greater Sage-Grouse and Columbian Sharp-Tailed Grouse

Greater sage-grouse inhabit the ARPA and surrounding area year-round and require a wide range of seasonal habitats.  The ARPA is located primarily within the Sierra Madre Upland Game Bird Management Area (UGBMA), but a small section is also located in the Bitter Creek UGBMA.  These two areas were used as the CIA area for greater sage-grouse breeding and nesting habitats.

There are a total of 185 greater sage-grouse leks (150 occupied, 14 unoccupied, and 21 with unknown status) within the Bitter Creek and Sierra Madre UGBMAs.  The area of potential nesting habitat consists of a 2-mile buffer placed around all occupied and unknown status leks within the Bitter Creek and Sierra Madre UGBMA.  This area encompasses an additional 662,080 acres outside the ARPA, which is within EIS boundaries that have current, and could receive future, oil and gas development.

There are 145 greater sage-grouse leks within a 2-mile buffer of all current EIS project boundaries for oil and gas development including the ARPA.  This project would cumulatively increase the leks potentially impacted by 88 leks.  Furthermore, within the boundaries of the South Central Conservation Area (SCCA), 45 percent of this area's grouse are found within a 2-mile buffer of these same EIS boundaries and 28 percent are found within a 2-mile buffer of the ARPA.  Data collected at seven sites in Wyoming documented that 45 percent of nests occur within 2 miles of a lek and that 64 percent of nests occur with 3 miles of a lek.  In addition, nest success probability suggests increased nesting success rates beyond 5 miles of a lek (Holloran 2005).  Until all existing and suitable habitat is mapped within the ARPA beyond the 2-mile lek buffer, there is a potential to have a significant direct and indirect impact to grouse.

## CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

Within Wyoming nearly half of the leks found within the SCCA are within oil and gas fields being developed.  Development might cause bird displacement and nest abandonment from direct and indirect impacts, such as habitat fragmentation, dust, noise, human activities, and long term loss of sagebrush habitat. These direct and indirect impacts would be cumulatively significant and would lead to lower productivity and a long-term decline in the population of this species.

Columbian sharp-tailed grouse inhabit the ARPA along the eastern edge and southern portions. The only populations found within Wyoming are within and adjacent to the ARPA.  Wyoming's populations are a northern extension of those found within northwestern Colorado (133 leks). Currently, there are 27 leks in Wyoming, all of which occur on or within 16 miles of the east ARPA boundary. Only seven of these leks are afforded protection (BLM or USDI-FS); the remaining 20 leks are found on state or private lands. Cumulative impacts to sharp-tailed grouse may occur from current and future county land use planning and community development, loss of Conservation Reserve Program (CRP) lands, mining and energy development in Colorado (Hoffman 2001).  This development may cause bird displacement and nest abandonment from direct and indirect impacts, such as habitat fragmentation, dust, noise, human activities, and long term loss of mixed shrub habitat. These direct and indirect impacts would be cumulatively significant and would lead to lower productivity and long-term decline in the population of this species.

### 5.2.7.3  Raptors

The CIA area for raptors includes the ARPA plus a 1-mile buffer.  This area covers approximately 400,000 acres, all of which would be considered raptor foraging habitat. Approximately 290,000 acres of this area were located within 1 mile of a known raptor nest and are considered to be potential raptor nesting habitat.

Cumulative impacts from the creation of additional nesting sites (artificial nesting structures and tanks) are unknown from other conventional oil and gas EIS projects in the vicinity of the ARPA. In the Continental Divide/Wamsutter II EIS area, raptor nesting success is static to improving. In addition, raptor fledgling numbers increase from three per natural nest to four per artificial nest.  Additional research is needed to evaluate impacts on raptors and their prey by creating additional nesting structures in areas that previously were limited by natural nesting substrates.

### 5.2.8    Special Status Plant, Wildlife, and Fish Species

Potential impacts to threatened, endangered, proposed, and sensitive species in this area of Wyoming are likely to be primarily associated with minerals development.

### 5.2.8.1  Plants

The area of influence assessed for special status plants includes the area described in section 5.1.2, southeastern Sweetwater County and southwestern Carbon County. Indirect concerns across the assessment area includes the possibility of a general reduction or loss of pollinators, invasion of weeds from adjacent development into occupied habitats, and increased risk of habitat disturbance from increased human presence.

Given the BLM policy of avoiding disturbance activities within identified special status plant habitats, direct cumulative effects upon these species should be avoided.  While no special status plant populations are known to exist within the ARPA, site-specific surveys will be

# CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

conducted for each disturbance proposal to identify any unknown populations at risk from development.  Standard mitigation and BMPs will allow for avoidance of impacts if such a population(s) should be found.

## 5.2.8.2  Wildlife

The area of influence assessed for special status wildlife includes the area described in section 5.1.2, southeastern Sweetwater County and southwestern Carbon County.  As detailed in that section, several large oil and gas development projects are occurring within the area, and others are expected.  None of the projects, other than Atlantic Rim, predict significant effects upon wildlife individually or cumulatively.  Atlantic Rim predicts significant effects upon big game, greater sage-grouse, and sagebrush obligates.

The combination of the individual projects is resulting in a large area of increased fragmentation, disturbance of wildlife and their habitats, and the loss of refuge areas.  Additional effects are expected upon wildlife dispersal, the reduction of non-fragmented habitats, competition with livestock, and inter- and intra-specific competition with other wildlife species.  The generalized increase of human presence and associated disturbance across such a broad scale are a concern.  It can also be expected that competition for forage will increase in the remaining ranges leading to reduced carrying capacity and juvenile survival.  Mitigations, COAs, and other BMPs will reduce the impacts of these developments, but not eliminate them.  Reduced populations and population viability can be expected.

## 5.2.8.3  Fish

Cumulative impacts to fish species include the effects of the Atlantic Rim project and those found upstream in Muddy Creek from the ARPA.  Of primary concern would be water depletions resulting in changed water conditions including salinity, volume, and temperature.  At this time there are no known additional proposals to analyze or assess.

Sensitive fish, described in section 4.8, would be significantly impacted by the project.  Impoundments downstream of the ARPA may be blocking sensitive fish movement into Muddy Creek, but are not attributable to the ARPA.  As detailed in chapter 4, additional impoundments and alterations to natural flow characteristics (such as crossings) within Muddy Creek could have serious additional impacts to fish populations.  Alteration of hydrology from roads, culverts, and other disturbances that result in re-channeling of overland flows into new channels or increasing the intensity/volume of flows within existing channels can affect sensitive fish.  Blockage of fish migration within the ARPA from channel crossings would seriously impact the viability of fish populations if it should occur.

Under Alternative C, development protection measures would be applied to the Muddy Creek SMA and would effectively protect these fish populations within the ARPA.

## 5.2.9     Recreation Resources

The CIA area for recreation resources includes the ARPA plus parts of southwestern Carbon County and southeastern Sweetwater County that generally lie in the area bounded by Rawlins, Creston Junction, Savery, and Baggs, Wyoming.  Existing mineral activities in this area include historical, ongoing, proposed, and reasonably foreseeable future oil and gas development.

# CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

Cumulative impacts to hunting, the main recreation activity in the CIA, would occur because of the extensive impacts of natural gas development on wildlife.  The increased road density, traffic, noise, and dust of development displace big game species (See section 5.2.7).  When big game species leave an area, hunters soon leave as well, because hunting success declines.  Wildlife and hunters have already been displaced by existing development in portions of the CIA.  Displacement of game and hunters would occur in areas as they are developed.  As development spreads, so does displacement.  This could have a serious financial effect on commercial big game outfitters that rely on wildlife and knowledge of the CIA for successful hunts.  It would also tend to concentrate game and hunters in undeveloped adjacent areas, which would impact the quality and quantity of forage, and therefore the health of the animals.  There would also be an increase in the probability of hunting accidents due to increased hunter density in these adjacent undeveloped areas.

Relatively undisturbed scenery is an integral part of the recreation experience for many recreationists.  The visual impacts of development would make the area increasingly undesirable for many hunters as development progresses.  Activities such as wildlife viewing and mountain biking also tend to be scenery-dependent.  Thus incremental increases in development have corresponding decreases in the desirability of the recreational setting.

Cumulative impacts would be greatest during the development phase in the ARPA, with its associated drill rigs, vehicles, human presence, noise, and dust.  Even after field development and interim reclamation are completed, the day to day maintenance of production operations would continue to displace much of the wildlife with noise, traffic, dust, and habitat fragmentation (section 3.7).  The area would still be undesirable for non-consumptive visitors such as sightseers, wildlife viewers, and mountain bikers because of the poor scenery cluttered with facilities and their associated network of roads.  These visitors would be forced to travel elsewhere to find natural-appearing landscapes with the aesthetics they desire.

The re-establishment of mature vegetation after final reclamation would take 30 years in some parts of the ARPA.  Localized areas may not successfully revegetate for much longer.  The life of the project may be up to 50 years, so the ARPA is not likely to return to its predisturbance wildlife habitat conditions for 70–80 years.  Long-term cumulative impacts in the CIA would be likely to affect at least two generations by making the area less desirable for hunters, wildlife viewers, and other recreationists.

## 5.2.10  Visual Resources

The CIA area for visual resources includes the ARPA and parts of southwestern Carbon County and southeastern Sweetwater County that generally lie within the area bounded by Rawlins, Creston Junction, Savery, and Baggs, Wyoming.  Existing mineral activities in this area include historic, ongoing, proposed, and reasonably foreseeable future oil and gas development.

The action alternatives would increase the amount of visual resources in the CIA affected by historical, ongoing, and reasonably foreseeable oil and gas development.  Sixty-eight percent of the ARPA is visible from the interstate, state, county, or BLM roads, so development of the ARPA would have a high visual impact on the CIA (section 4.10).  Incremental increases in development have corresponding decreases in the quality of visual resources in proximity to the development.

## CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

Cumulative impacts would be significant because development in the CIA would exceed VRM Class III management objectives by dominating the view of the casual observer.  The establishment of mature vegetation after final reclamation would take 30 years in some parts of the CIA.  Localized areas may not successfully revegetate for much longer.  The life of the project may be up to 50 years, so the CIA is not likely to return to its predisturbance character for up to 80 years.

### 5.2.11   Cultural Resources

The CIA area for cultural resources is the project area and adjacent areas in southeastern Sweetwater County and southwestern Carbon County (map M-45).  Table 5-3 summarizes contributing and non-contributing trail segments within the CIA, and contributing segments (only) within the ARPA.   In examining the CIA, which incorporates previous EIS areas west of the ARPA within the BLM RFO boundary, approximately 130 total miles of historic trails (Overland, Cherokee and Rawlins-Baggs Road) have been subjected to potential impacts from gas development.  The ARPA includes approximately 47 miles of contributing historic trail segments.

**Table 5-3.    Cumulative Impacts to Historic Trails**

| Trails Eligible for the NRHP | Total Acres (Miles) of Trails in CIA* | Total Acres (Miles) of Contributing Trails in ARPA* |
|---|---|---|
| Cherokee Trail | 15,360 (48) | 3,840 (12)** |
| Overland Trail | 11,520 (36) | 3,520 (11) |
| Rawlins-Baggs Road | 14,720 (46) | 7,680 (24) |
| Total | 41,600 (130) | 15,040 (47) |

**Note**:
*Calculations based on ¼ mile buffer either side of trails (i.e. ½ mile corridor) or 320 acres per trail mile.
** 100% of the Cherokee Trail is considered contributing to the trail eligibility pending receipt and
   acceptance of the historic trail study report.

The ARPA involves about 12 contributing miles of the Cherokee Trail, 11 contributing miles of the Overland Trail, and 24 contributing miles of the Rawlins-Baggs Road.  All but about 7 miles of the total length of the Rawlins-Baggs Road is included within the ARPA.

### 5.2.12   Socioeconomic Resources

The CIA area for socioeconomic resources includes western Carbon and eastern Sweetwater Counties and the communities of Rawlins, Baggs, Dixon, and Wamsutter, Wyoming.  Although Carbon and Sweetwater Counties contain an abundance of oil, coal, uranium, trona, and other resources, the current potential for cumulative socioeconomic effects in the CIA is associated with the pace and timing of natural gas resources and the projects listed in section 5.1.  The pace of gas development depends in large part on national and global factors, such as demand, supply, prices, and production disruptions, as well as local factors, such as transmission capacity, productivity of specific fields, rig and worker availability, and individual company development strategies.

# CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

**Map M-45.**    **Cumulative Impacts Historic Trails.**



## CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

One of the key findings of a 2003 National Petroleum Council energy policy study was that "There has been a fundamental shift in the natural gas supply/demand balance that has resulted in higher prices and volatility in recent years.  This situation is expected to continue, but can be moderated" (NPC 2003).

As a result of this volatility, predicting the pace of natural gas development in the CIA is difficult to do with certainty.  The U.S. Department of Energy's Energy Information Administration prepares an Annual Energy Outlook that forecasts supply, demand, and prices for a variety of energy commodities, as well as analyzes the underlying trends for these forecasts.  The 2005 Annual Energy Outlook includes forecasts for natural gas. The national average wellhead prices increase from the 2004 level of $4.98/MCF to $5.30/MCF in 2005, and fall to $3.64/MCF by 2010 (all estimates in 2003).  The January 2005 CREG Wyoming State Government Revenue Forecast assumed that Wyoming natural gas average annual prices would fall from the 2004 level of $5.05/MCF to $4.75/MCF in 2005 and to $4.25/MCF beyond 2005.  During late fall and early summer of 2005, however, increased global demand and the effects of hurricanes Katrina and Rita drove natural gas prices at Wyoming hubs above $10/MCF.  As a result, in October 2005 CREG issued new gas price forecasts of $7.00/MCF for 2005 and $6.00/MCF for 2006 and beyond.

Based on anticipated gas demand and resultant high prices, the pace of drilling and field development in western Carbon County and eastern Sweetwater County is likely to increase. Local governments within the Atlantic Rim study area have experienced previous energy booms and some state and local officials believe that southwestern Wyoming is on the leading edge of another sustained energy boom (Rawlins Daily Times 2006).   In anticipation of that possibility, the State of Wyoming and Carbon County have mechanisms in place to assess the capabilities of community infrastructure, services, and housing and to fund and develop needed facilities. Carbon County has initiated a Community Impact Forum to examine impact issues and explore solutions.

At the state level, the 2006 Wyoming legislature funded a $105 million energy impact assistance grant program for communities experiencing energy impacts.   In June 2006, the Carbon County Commissioners approved $19.5 million in requests for energy impact assistance funds to improve public facilities.

The rate of employment and population increase in the study area, at least in the near term, is likely to be constrained by the availability of drilling rigs and qualified workers.  However, sustained high gas prices would encourage construction of new rigs and attract workers to the drilling and field development trades.  The time required for buildup of drilling and field development activity would provide an opportunity for development of housing resources and expansion of local government services.  The overall increase in production-related tax revenues both at the state and local levels would also provide resources to expand local government services.

Two interstate pipelines are being constructed through western Carbon County and eastern Sweetwater County; one is scheduled to be completed before the activity associated with the Atlantic Rim project would begin, but a portion of the compressor station construction phase for the Entrega pipeline may coincide with initiation of drilling and field development for the Atlantic Rim project.  Completion of these pipelines could provide transportation to additional markets for locally produced gas and possibly further accelerate the pace of development.

## CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

Assuming continued increases in drilling and field development activities over the next several years, potential cumulative impacts on area socioeconomic conditions would include:

- Positive effects on local economic conditions;

- Increased employment opportunities associated with the Atlantic Rim project and the projects listed in section 5.1;

- Increased demand for temporary and long-term housing resources and community services from in-migrating employees associated with the projects; and

- Increased federal, state, and local tax and royalty revenues generated from gas development and production.

The increased employment opportunities in the relatively higher paying energy industry would result in competition for workers to the detriment of existing businesses and government who could lose existing employees and experience difficulty in recruiting new employees.  On the other hand, workers would benefit from the increased wages that would result from this competition.

Increased demand for housing and local government services from cumulative natural gas development would impact affected communities differently. Both temporary and longer-term housing demand from substantial overall increases in drilling activity would likely exceed current housing resources in all communities in the assessment area during drilling and field development seasons.  In Rawlins, vacant spaces in mobile home parks and available motel rooms could be absorbed although some currently dormant motels might be reopened, which would provide additional resources.  In communities in the Little Snake River Valley and in Wamsutter, temporary housing resources are typically full during the annual drilling and field development seasons, although there is some turnover from time to time.  Cumulative increases in demand for temporary housing resources would likely exceed current availability in these communities on a seasonal basis.

Deficits in temporary housing resources could be mitigated by the development of drilling and construction camps.  One 80-person drilling camp with capacity to expand to 150 persons has been developed along WY 789 north of Dad. Also, BP intends to develop a 400-person housing facility near Wamsutter.   There are preliminary plans to develop other drilling camps in the area and to expand a mobile home/RV park in Wamsutter.

The pace of construction of new housing units in Rawlins, the Little Snake River Valley, and Wamsutter would need to increase substantially over current levels to accommodate cumulative demand for longer-term housing units. However, the development of substantial numbers of rig camp or construction camp units could free up spaces in mobile home parks, providing a resource for longer-term demand until the conventional housing market is able to respond.

Demands on most public facilities and services would be seasonal. Given the excess capacity in critical public facilities (water and sewer) in most communities, demands would be within capacity constraints.  Because a large percentage of the workforce would be temporary, school enrollment would not be anticipated to increase substantially and could likely be accommodated with the existing capacity of area schools, although Rawlins might need to add modular units at the elementary school until the new school is completed.   Community services, such as law

# CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

enforcement, emergency response, social services and road and bridge departments, are all currently experiencing increased development-related demand for services. These services would experience even higher demand, particularly during drilling and field development seasons.  However, given the levels of drilling that have occurred in recent years, county general funds and services funded by special district mill levies should see substantial increase in natural gas production-related revenues. These revenues could be used to offset the costs of increases in service. In contrast, municipalities would receive few direct revenues from natural gas development and would likely face challenges in funding needed service increases to meet cumulative demand.

Cumulative development within the CIA also holds potential to affect local attitudes, opinions, and lifestyles, which are likely to be mixed.  Natural gas development in Carbon and Sweetwater Counties would result in economic growth and increased employment opportunities in relatively high-paying jobs.  Therefore the financial status of many residents of these counties is likely to improve, which would correspondingly increase support for cumulative development activities.  On the other hand, those residents whose economic activities or recreation activities occupy the same areas as natural gas activities, such as ranchers, grazing operators, outfitters, hunters, and other recreationists, are among those most likely to be dissatisfied.  Moreover, if area residents perceive that wildlife habitat and other resources are being degraded by gas development, levels of dissatisfaction could become greater and more widespread.

Although state officials are predicting a sustained energy boom (Rawlins Daily Times 2006), it is possible that energy prices could fall dramatically resulting in sudden "bust" conditions. Businesses that have expanded or been developed to accommodate drilling and field development activities would suffer economic shock under a rapid bust situation. As a consequence, communities would likely experience some out-migration of population.  In the near term, a bust would be moderated by the fact that much of the drilling and field development workforce relocates to the study area in single status and stays in rig camps or construction camps.  Consequently, communities near the study area would be unlikely to have substantial unoccupied conventional housing if a slowdown in drilling were to occur. Similarly, the use of energy impact assistance grants to finance needed community infrastructure should help communities avoid substantial debt that would be difficult to service under a bust scenario.

As with the Atlantic Rim project, drilling forecasts for the socioeconomic CIA typically average 10 to 20 years.  Annual drilling rates are likely to be high in the early years for most fields, tapering off as drilling is completed. This forecasted gradual reduction in drilling activity should help avoid a sudden bust as these fields transition from drilling/field development to production, which has substantially lower employment requirements.   As gas production gradually diminishes, production employment will correspondingly diminish. However, this gradual reduction in production employment is currently anticipated to occur over a 30- to 50-year period, which should help avoid a precipitous post-gas-development bust.

It is possible that substantial shortages of natural gas could result in accelerated rates of drilling beyond those contemplated in this assessment, with resultant energy boom-related socioeconomic impacts greater than those described above.  However, such circumstances would apply to gas-producing regions throughout the country, and the lead time required to build rigs and train drilling and field development workers should correspondingly allow time for communities, companies, and state and federal governments to plan for the boom.

## CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

### 5.2.13   Transportation

The CIA for transportation includes the ARPA and the county, state, and federal road that provide access to the site. This area is the same as that analyzed in section 4.13; therefore, cumulative impacts are the same as summarized in section 4.13.

### 5.2.14   Health and Safety

The area of analysis for potential cumulative impacts to health and safety is the ARPA.  The Proposed Action and other action alternatives are the only RFFAs anticipated for the project area other than the existing grazing and recreation activities. Therefore cumulative impacts to health and safety conditions are anticipated to be similar to those described for the direct and indirect impacts of the Proposed Action or other action alternatives in section 4.14.

### 5.2.15   Noise

The area for potential cumulative noise impacts is the ARPA.  Existing sound disturbances within the ARPA are limited to those associated with grazing activities, dispersed recreation, aircraft flights, and traffic on area roads and highways.  The Proposed Action and other action alternatives are the only RFFAs anticipated for the ARPA that would create additional sound disturbance.  Therefore, cumulative noise impacts would be similar to those associated with the Proposed Action and other action alternatives in section 4.15.

**Exhibit 2 Part 3 to Defendant-Intervenors'
Opposition To Plaintiffs' Motion For
A Preliminary Injunction**

**Excerpts From The Bureau of Land Management's
November 2006 Final Environmental Impact Statement
Atlantic Rim Natural Gas Field Development Project
(FEIS for the Atlantic Rim Project)**

**Appendix E**

**Wildlife Monitoring and Protection Plan**

APPENDIX E


WILDLIFE MONITORING AND PROTECTION PLAN
ATLANTIC RIM NATURAL GAS EIS


U.S. Bureau of Land Management
Rawlins Field Office
Rawlins, Wyoming


August 2006

# APPENDIX E.  WILDLIFE MONITORING AND PROTECTION PLAN

## TABLE OF CONTENTS

1    Introduction ............................................................................................................. E-1
2    Implementation Protocol ......................................................................................... E-1
    2.1    Annual Reports and Meetings.......................................................................... E-1
        2.1.1    Reports ................................................................................................ E-1
        2.1.2    Meetings .............................................................................................. E-2
    2.2    Annual Inventory and Monitoring ..................................................................... E-2
        2.2.1    Threatened, Endangered, Candidate, and Other Species of Concern  E-3
        2.2.2    Raptors ................................................................................................ E-5
        2.2.3    Big Game Crucial Winter Range .......................................................... E-6
        2.2.4    Other Inventory and Monitoring Measures .......................................... E-6
        2.2.5    General Wildlife ................................................................................... E-6
    2.3    Protection Measures ....................................................................................... E-6
        2.3.1    TEC&SC .............................................................................................. E-6
        2.3.2    Raptors ................................................................................................ E-8
        2.3.3    Big Game Species ............................................................................... E-9
        2.3.4    General Wildlife ................................................................................. E-10
3    Literature Cited ..................................................................................................... E-11

## LIST OF TABLES

Table E-1.    Summary of General Wildlife Reporting, Inventory, and Monitoring................ E-13

Table E-2.    Summary of General APD/ROW Application Stage Survey/Protection
             Measures ...................................................................................................... E-14

APPENDIX E.  WILDLIFE MONITORING AND PROTECTION PLAN

# 1   Introduction

This wildlife monitoring/protection plan was prepared in conjunction with the Environmental Impact Statement (EIS) for the Atlantic Rim Project Area (ARPA).  The goal of the plan is to avoid and/or minimize adverse impacts to wildlife present on project-affected areas by monitoring wildlife population trends on the ARNG during the course of project development and operations and by developing appropriate mitigation actions.  Implementation of the plan will allow land managers and project personnel opportunities to achieve and maintain desired levels of wildlife productivity and populations on the ARNG (e.g., at pre-project levels) by minimizing and/or avoiding potential adverse impacts to wildlife species.  In addition, the implementation of this plan will facilitate the maintenance of a diverse assemblage of wildlife populations on the ARNG simultaneously with development of natural gas reserves.

Proposed inventory, monitoring, and protection measures will be implemented under each potential development scenario.  Implementation of the plan will begin in 2006, and is estimated to continue for the life of the EIS.  At the completion of the drilling phase, the plan will be reviewed by a Review Team.  If evidence exists that wildlife populations and habitat have been successfully protected, the Review Team may make a recommendation to terminate the plan at that time.  The plan will receive a major review for effectiveness every 5 to 6 years or as determined by the Review Team.

# 2   Implementation Protocol

This section provides preliminary wildlife inventory, monitoring, and protection protocol.  A summary of primary protocol components is provided in table E-1.  Standard protocol for Application for Permit to Drill (APD) and right-of-way (ROW) application field reviews are provided in table E-2.  Alternative protocols likely will be developed in the future in response to specific needs identified in annual reports (section 2.1.1).  Methods are provided for each wildlife species/category, and additional species/categories may be added based on needs identified in annual reports.  The wildlife species/categories for which specific inventory, monitoring, and protection procedures will be applied were developed based on management agency (Bureau of Land Management [BLM], U.S. Fish and Wildlife Service [USFWS], Wyoming Game and Fish Department [WGFD]) and individual concerns identified during the preparation of the EIS.

Considerable efforts will be required by agency and operator personnel for plan implementation.  Many of the annually proposed agency data collection activities are consistent with current agency requirements.  Additionally, during annual planning (section 2.1.2) and throughout project implementation, all efforts will be made to accommodate agency personnel schedules and responsibilities, and further agency cost-sharing approaches will be considered such that public demands and statutory directives are achieved.

## 2.1   Annual Reports and Meetings

### 2.1.1   Reports

During project development, operators will provide an updated inventory and description of all existing project features (i.e., location, size, and associated level of human activity at each feature), as well as those tentatively proposed for development during the next 12 months in a format that is compatible with a Geographic Information System (GIS).  This inventory will be

submitted to the BLM by operators no later than October 15 of each calendar year.  These data will be coupled with annual wildlife inventory, monitoring, and protection data obtained for the previous year and included in annual reports.  Annual reports will be prepared by the operators' third party contractor with BLM oversight.  Annual wildlife inventory, monitoring and protection data gathered in conjunction with the project will be provided to the BLM by October 15 of each calendar year.

Annual reports will summarize annual wildlife inventory and monitoring results, note any trends across years, identify and assess protection measures implemented during past years, specify monitoring and protection measures proposed for the upcoming year, recommend modifications to the existing wildlife monitoring/protection plan based on the successes and/or failures of past years and identify additional species/categories to be monitored.  Where possible, the data presented in reports will be used to identify potential correlations between development and wildlife productivity and/or abundance, as well as, sources of potential disturbance to wildlife.  A GIS will be used for information storage, retrieval, planning, and annual GIS data updates will be conducted. Raw data collected each year also will be provided to other management agencies, at the request of the agencies.

Annual reports will be completed in draft and submitted to the BLM, operators and other interested parties by November 15 of each year.  A final annual report will be issued to all potentially affected individuals and groups by early February of each year.  Additional reports may be prepared in any year, as necessary, to comply with other relevant wildlife laws, rules, and regulations.

### 2.1.2  Meetings

A one day meeting will be organized by the BLM and held in December (or as determined by the Review Team) of each year to discuss and modify, as necessary, proposed wildlife inventory, monitoring and protection protocol for the subsequent year.  Decisions regarding annual operator-specific financing and personnel requirements will be made at these meetings. A protocol regarding how to accommodate previously unidentified development sites will also be determined during the annual meeting.  Final decisions will be made by the BLM based on the input of all affected parties.

Additional meetings may be held in any given year to inform and update cooperators on the findings of additional reports, as necessary.

## 2.2  Annual Inventory and Monitoring

Inventory and monitoring protocols will be as identified below for each wildlife species/category. These protocols will be unchanged across development alternatives, except as authorized by the BLM or specified in this plan.  Additional wildlife species/categories and associated surveys may be added or wildlife species/categories and surveys may be omitted in future years, pending results presented in the coordinated review of annual reports.  Opportunistic wildlife observations may be made throughout the year by agency and operator personnel present in the project area.

The frequency of inventory and monitoring will be dependent upon the level of development in the project area.  In general, inventory and monitoring frequency will increase with increased levels of development.   Inventory and monitoring results may lead to further, currently unidentifiable, scientific studies specifically designed to determine cause and effect.   The

# APPENDIX E.  WILDLIFE MONITORING AND PROTECTION PLAN

Review Team and/or BLM will identify the level of effort required by this wildlife plan subject to the standard listed below.  Site- and species-specific surveys will be conducted in association with APD and ROW application field reviews.

## 2.2.1  Threatened, Endangered, Candidate, and Other Species of Concern

The level of inventory/monitoring required for threatened, endangered, candidate, and other species of concern (TEC&SC) will be commensurate with established protocols for the potentially affected species.  All surveys will be conducted in coordination with the BLM.  Methodologies and results of these surveys will be included in annual reports and provided in separate supplemental reports.  A preliminary list of TEC&SC species proposed for management and known from or potentially occurring in the vicinity of the project area is shown in chapter 3.  As TEC&SC species are added to or withdrawn from USFWS, BLM, and/or WGFD lists, appropriate modifications will be incorporated to this plan and specified in annual reports.

TEC&SC data collected during surveys and described below will be provided only as necessary to those requiring the data for specific management and/or project development needs.  Site-and species-specific TEC&SC surveys will be conducted as necessary in association with all APD and ROW application field reviews.

### 2.2.1.1  Black-footed Ferret

The USFWS, in coordination with the WGFD, has developed a list of habitat blocks that are not likely to be inhabited by black-footed ferrets (block cleared).  In these areas, take of individual ferrets and effects to a wild population are not an issue and surveys for ferrets are no longer recommended.  Although ferret surveys are not required in these areas, the area may still maintain value for the survival and recovery of the species in the future.  Additionally, areas remain that require ferret surveys (non-block cleared) in potential habitat.  A portion of the project area coincides with the Dad complex, which is a non-block cleared area, requiring ferret surveys in areas that would likely result in the take of a ferret during project implementation.

BLM biologists will determine the presence/absence of prairie dog colonies at each proposed development site during APD and ROW application field reviews.  Prairie dog colonies in the project area will be mapped and burrow densities determined by a BLM-approved operator-financed biologist, as necessary and in association with proposed development plans.  Colonies that meet USFWS criteria as potential black-footed ferret habitat (USFWS 1989), in non-block cleared areas, will be surveyed for black-footed ferrets by an USFWS-certified operator-financed surveyor prior to BLM authorizing disturbance of these colonies.  Surveys will be conducted as deemed necessary, during consultation with the BLM and/or USFWS.  Black-footed ferret surveys will be conducted in accordance with USFWS guidelines (USFWS 1989) and approved by BLM and USFWS.

### 2.2.1.2  Bald Eagle, Peregrine Falcon, and Ferruginous Hawk

Inventory and monitoring protocol for bald eagle, peregrine falcon, and ferruginous hawk will be as described for raptors (section 2.2.1).

# APPENDIX E.  WILDLIFE MONITORING AND PROTECTION PLAN

### 2.2.1.3  Greater Sage-Grouse & Columbian Sharp-Tailed Grouse

Greater sage-grouse/Columbian sharp-tailed grouse lek inventories will be conducted by the BLM and WGFD on the project area and a two mile/one mile buffer to determine lek locations every 5 years, or as deemed appropriate by the BLM.  Surveys may be conducted aerially, with operator-provided financial assistance for aircraft rental, or on the ground, in order to determine lek locations.

Selected leks within two miles/one mile of existing and proposed disturbance areas will be monitored annually to determine lek attendance by the BLM or a BLM-approved operator-financed biologist, between March 1 and May 15, such that all leks on these areas are monitored at least once every 3 years.  Monitoring efforts will be implemented at all leks present on affected sections, two mile buffers, and selected undeveloped comparison areas.  The BLM will direct lek monitoring efforts such that efforts are made to have the same individuals monitor the same leks within and across years.  Data collected during these surveys will be provided on a standardized form.  Standard site- and species-specific grouse lek surveys will be conducted as necessary in association with all APD and ROW application field reviews.

### 2.2.1.4  Mountain Plover

Mountain plover breeding habitat includes short-grass prairie and shrub-steppe landscapes, dryland, cultivated farms, and prairie dog towns.  Plovers usually nest on sites where vegetation is sparse or absent, conditions that can be created by herbivores, including domestic livestock and prairie dogs.  Vegetation in shortgrass prairie sites is typically less than 4 inches tall.  Nest sites within the shrub-steppe landscape are also confined to areas with little to no vegetation, although surrounded by areas visually dominated by shrubs.  Commonly, nest sites within shrub-steppe areas are on active prairie dog towns.  Nests are commonly located near a manure pile or rock.  In addition to areas disturbed by prairie dogs or livestock, nests have also been found on bare ground created by oil and gas development activities and on dryland, cultivated agriculture in the southern part of their breeding range.  Mountain plovers are rarely found near water.  Positive indicators for mountain plovers therefore include level terrain, prairie dogs, bare ground, Opuntia pads, cattle widely spaced plants, and horned larks.  It would be unusual to find mountain plovers on sites characterized by irregular or rolling terrain, dense, matted vegetation, grass taller than 4 inches, wet soils, or the presence of killdeer.

Mountain plover habitat will be mapped within proposed disturbance areas (as identified in annual reports) prior to development of these areas by the BLM or a BLM-approved operator-financed biologist.  In addition, these areas will be surveyed annually by the BLM or a BLM-approved operator-financed biologist to detect the presence of plovers.  Surveys will be conducted during the period of May 1 through June 30.  Data collected during these surveys will be provided on mountain plover route survey forms.  Standard site-specific habitat surveys will be conducted as necessary in association with all APD and ROW application field reviews.

### 2.2.1.5  Western Burrowing Owl

Prairie dog colonies and other suitable burrowing owl nesting areas on and within 0.75 miles of existing and proposed disturbance areas will be searched for western burrowing owls by the BLM or a during June through August to determine the presence or absence of nesting owls.  If burrowing owls are found, attempts will be made to determine reproductive success.  Standard site-specific surveys will be conducted in association with all APD and ROW application field reviews.

# APPENDIX E.  WILDLIFE MONITORING AND PROTECTION PLAN

### 2.2.1.6  Other TEC&SC Species

Surveys for other TEC&SC species will be conducted by the BLM or a BLM-approved operator-financed biologist in areas of potential habitat within one-half mile of proposed disturbance sites prior to disturbance.  These surveys may be implemented in conjunction with surveys for other species or as components of APD and/or ROW application processes.  If any TEC&SC species are observed, the observations will be noted on appropriate data forms and efforts will be made to determine their activities (e.g., breeding, nesting, foraging, hunting, etc.).  If any management agency identifies a potential for concern regarding any of these species, additional inventory and monitoring and mitigation may be implemented as specified in annual reports.

## 2.2.2  Raptors

Raptor inventories will be conducted by the BLM, at least every five years or prior to development of proposed disturbance areas (as identified in annual reports), to determine the location of raptor nests.  Raptor nest monitoring will be conducted by the BLM or a BLM approved operator-financed biologist, annually, at known nest locations, between April and July, in order to ascertain nest activity status.  These surveys may be implemented aerially, via helicopter, or from the ground.  Operators may provide financial assistance for aircraft rental.

Nest productivity monitoring will be conducted by the BLM at active nests, for selected species, to determine nesting success.  Monitoring generally will be conducted from the ground, and attempts will be made to determine the cause of any documented nest failure.  Operators may provide financial assistance for aircraft rental, as necessary.  Site- and species-specific raptor nest inventories will be conducted as necessary in association with all APD and ROW application field reviews.

All raptor nest/productivity surveys will be conducted using procedures that minimize potential adverse effects to nesting raptors.  Specific survey measures for reducing detrimental effects are listed in Grier and Fyfe (1987) and Call (1978) and include the following.

- Nest visits will be delayed for as long as possible in the nesting season.

- Nests will be approached cautiously, and their status (i.e., number of nestlings/fledglings) will be determined from a distance with binoculars or a spotting scope.

- Nests will be approached tangentially and in an obvious manner to avoid startling adults.

- Nests will not be visited during adverse weather conditions (e.g., extreme cold, precipitation events, windy periods, and hottest part of the day).

- Visits will be kept as brief as possible.

- All inventories will be coordinated by the BLM.

- The number of nest visits in any year will be kept to a minimum.

- All raptor nest location data will be considered confidential.

# APPENDIX E.  WILDLIFE MONITORING AND PROTECTION PLAN

### 2.2.3  Big Game Crucial Winter Range

Data on big game use of crucial winter ranges on the project area and an adjacent one mile buffer will be requested annually by the BLM from the WGFD, as deemed necessary by the BLM.  This information will be used to assess the effectiveness of protection measures implemented for the project.  In the event that BLM, in consultation with WGFD and other interested parties, determines that additional data should be collected for big game, these issues will be discussed at the annual meeting (See section 2.1.2, Meetings) and monitoring plans modified as agreed to by the parties.

### 2.2.4  Other Inventory and Monitoring Measures

Additional inventory and monitoring measures may be applied for other species as specified in annual reports.  Surveys will be conducted in adherence with protocol to be established by the BLM, other agencies and operators.  Operators may provide financial assistance for these investigations.

### 2.2.5  General Wildlife

BLM staff will be responsible for maintaining records of selected wildlife species observed during the course of their activities on the project area.  Operator personnel may also provide data on wildlife observations.  The information provided will include observations of wildlife species, their numbers, location, activity, and other pertinent data as applicable and identified on the General Wildlife Observation Data Sheet.  Where operators are uncertain of the United States Geological Survey (USGS) coordinates for an observation, a general description of the location may be provided and in instances where species or sex information is questionable, operators will identify the observation as such.

## 2.3  Protection Measures

The wildlife protection measures proposed herein have been developed from past measures identified for oil and gas developments in Wyoming.  Additional measures may be included and/or existing measures may be modified in any given year as allowable and as deemed appropriate by BLM in consultation with other agencies, operators and interested parties.  These measures will be specified in annual reports.  Protection measures will be implemented by operators with assistance from and/or in consultation with the BLM.  In addition, these measures may be modified on a site-specific basis as deemed appropriate by the BLM after completion of APD and ROW application field reviews.

The principal protection measure for most wildlife will be species- and project-specific measures as well as general wildlife protection measures (section 2.3.4).  Implementation of these measures may benefit other wildlife species found on and adjacent to the project area.  Sensitive/crucial habitats should be avoided where possible.

### 2.3.1  TEC&SC

USFWS and WGFD consultation and coordination will be conducted for all protection activities relating to TEC&SC species and their habitats.  Where possible, these actions will be specified in advance in the annual reports.

## APPENDIX E.  WILDLIFE MONITORING AND PROTECTION PLAN

### 2.3.1.1  Black-footed Ferret

In general, all prairie dog colonies on the project area will be avoided, where practical.  If prairie dog colonies, in non-block cleared areas, of sufficient size and burrow density for black-footed ferrets are scheduled to be disturbed, black-footed ferret surveys of these colonies will be conducted pursuant to BLM and/or USFWS decisions made during informal consultations. Survey protocol will adhere to USFWS guidelines as established in USFWS (1989) and will be conducted by a USFWS-qualified biologist a maximum of one year in advance of the proposed disturbance.  Reports identifying survey methods and results will be prepared and submitted to the USFWS and BLM in accordance with section 7 of the *Endangered Species Act of 1973*, as amended, and the Interagency Cooperation Regulations.  Surveys will be financed by the operators.

If black-footed ferrets are found on the project area, the USFWS will be notified immediately and formal consultations will be initiated to develop strategies that ensure no adverse effects to the species.    Before  ground-disturbing  activities  are  initiated  in  black-footed  ferret  habitat, authorizations to proceed must be received from the BLM, in consultation with the USFWS.

### 2.3.1.2  Bald Eagle, Peregrine Falcon, and Ferruginous Hawk

Protection protocol will be as described for raptors (See section 2.3.1).  Additional measures will be applied on a species- or site-specific basis, as deemed appropriate by the BLM and/or USFWS, and specified in annual reports.

### 2.3.1.3  Greater Sage-Grouse & Columbian Sharp-Tailed Grouse

Surface disturbance or occupancy will be prohibited with one-quarter mile of the perimeter of occupied leks; Human activity would be avoided between 6:00 p.m. and 9:00 a.m. from March 1 to May 20 within one-quarter mile of the perimeter of occupied leks; Surface disturbance and other actions that create permanent and high-profile structures such as buildings, storage tanks and overhead power lines, will not be constructed within 0.25 to 1.0 mile of the perimeter of leks, as determined on a case-by-case basis; Surface disturbing and disruptive activities will not be allowed within two miles of an occupied greater sage-grouse lek or in nesting and early brood-rearing habitat associated with individual leks (when identified and delineated), from March 1 to July 15; Surface disturbing and disruptive activities will not be allowed within one mile of an occupied Columbian sharp-tailed grouse lek or in nesting and early brood-rearing habitat associated with individual leks (when identified and delineated), from March 1 to July 15; Surface disturbing and disruptive activities will not be allowed between November 15 and March 14 in delineated winter concentration areas; and, in order to minimize noise disturbances to strutting or dancing grouse, compressor stations and generators will be muffled with hospital style mufflers.  Other techniques and/or equipment can be utilized, when it is demonstrated that they result in similar or increased noise reduction.  Additional noise reduction techniques may be required if research shows that current techniques are not adequate.

### 2.3.1.4  Mountain Plover

Mountain plover habitat will be avoided where practical due to the presence of alternative well and road development sites.  Where these habitats will be disturbed, reclamation will utilize procedures designed to reestablish suitable plover habitat.  The primary protection measure for mountain plover on the project area will be avoidance plover habitat during the breeding season.  All surface-disturbing activities will be restricted from April 10 to July 10 in mountain

# APPENDIX E.  WILDLIFE MONITORING AND PROTECTION PLAN

plover habitat.  Additional protection measures, as shown below, may be implemented in identified mountain plover occupied habitat (i.e., areas where broods and/or adults have been observed in the current year or documented in at least 2 of the past 3 years).  Surface disturbance would occur outside identified occupied habitat for mountain plovers where feasible.

- Within one-half mile of the identified mountain plover occupied habitat area; speed limits would be posted at 25 miles per hour (mph) on resource roads and 35 mph on local roads during the brood rearing period (June 1–July 10).

- The access road would be realigned to avoid the identified mountain plover occupied habitat area.

- To protect mountain plover in occupied habitat, traffic would be minimized from June 1–July 10 by car-pooling and organizing work activities to minimize trips on roads through the mountain plover occupied habitat area.

- To protect mountain plover in occupied habitat, fences, storage tanks, and other elevated structures would be either constructed as low as possible and/or would incorporate perch-inhibitors into their design.

- To minimize destruction of nests and disturbance to breeding mountain plovers, no ground-disturbing activities would occur from April 10–July 10 unless surveys consistent with the Plover Guidelines or other FWS approved method find that no plovers are nesting in the area.

- A plugged and abandoned well within one-half mile of the identified mountain plover occupied habitat area would be identified with a marker 4 feet tall with a perch inhibitor on the top of the marker.

## 2.3.1.5  Western Burrowing Owl

Protection protocol will be as described for raptors (section 2.3.1) as well as avoidance of prairie dog colonies, where practical (section 2.3.2.1).

## 2.3.1.6  Other TEC&SC Species

If crucial features for any TEC&SC species are found during surveys of areas within one-half mile of proposed disturbance sites, avoidance of these features will be accomplished in consultation and coordination with the BLM, USFWS, and WGFD.  Construction activities in these areas will be curtailed until there is concurrence between BLM, USFWS, and WGFD on what activities can be authorized.  Activities will, in most cases, be delayed until such time that no adverse effects will occur.

It is assumed that the protocol specified in section 2.3.4 for general wildlife will likely benefit TEC&SC species as well.  If any management agency identifies a potential for impacts to any TEC&SC species, additional measures may be implemented as specified in annual reports.

## 2.3.2  Raptors

The primary protection measure for raptor species on the project area will be avoidance of nest locations during the breeding season.  All surface-disturbing activities will be restricted from

## APPENDIX E.  WILDLIFE MONITORING AND PROTECTION PLAN

February 1 through July 31 within a 0.75 to 1.0 mile radius of raptor nests, depending upon species.  In addition, well locations, roads, ancillary facilities, and other surface structures requiring a repeated human presence will not be constructed within 825 feet of raptor nests, except ferruginous hawk, where the restriction will be 1,200 feet (restrictions will generally exclude surface disturbance).

Operators will notify the BLM immediately if raptors are found nesting on or within 1,200 feet of project facilities, and operators will assist the BLM as necessary in erecting artificial nesting structures (ANSs), as appropriate.  The use of ANSs will be considered as a last resort for raptor protection.  If nest manipulation or a situation requiring a "taking" of a raptor nest becomes necessary, a special permit will be obtained from the Denver USFWS Office, Permit Section, and will be initiated with sufficient lead time to allow for development of mitigation. Required corresponding permits will be obtained from the WGFD in Cheyenne.  Consultation and coordination with the USFWS and WGFD will be conducted for all protection activities relating to raptors.

If it is found that project activities could potentially affect raptor nesting on or adjacent to the project area, as determined from decreased raptor productivity or nesting, or documented nest abandonment or failure, ANSs may be constructed at a rate of up to two ANSs for one impacted nest. Existing degraded raptor nests may be upgraded or reinforced to minimize potential impacts.  ANSs will be located within the nesting territory of potentially affected raptor pairs, outside of the line-of-sight or nest buffer of actively nesting pairs, where possible.  Operators will be responsible for the annual maintenance of ANSs throughout the life-of-project (LOP).  Annual ANS maintenance activities will be completed after August 15 and prior to October 15 each year, as necessary.  All ANSs on public lands will become the property of the BLM upon completion of the project.  Pertinent data regarding ANSs or nests proposed for upgrading will be identified in annual reports.

In cases where existing project features are located within the nest buffers of active raptor nests, no prolonged maintenance activities will be allowed during critical periods.  The exact dates of exclusion will be determined by the BLM and will likely vary between nests and from year to year, depending on the species present and variations in weather, nesting chronology, and other factors.

Any power line construction will follow the recommendations of the Avian Power Line Interaction Committee (APLIC) (1994, 1996) and Olendorff et al. (1981) to avoid collisions and/or electrocution of raptors.

### 2.3.3  Big Game Species

No construction activities or prolonged maintenance actions will be conducted within big game crucial winter range during the crucial winter periods of November 15–April 30.  If right-of-way fencing is required, it will be kept to a minimum, and the fences will meet BLM/WGFD approval for facilitating wildlife movement.  Wildlife-proof fencing will be used only to enclose areas that are potentially hazardous to wildlife species, or reclaimed areas where it is determined that wildlife species are impeding successful vegetation establishment.  Snow fences, if used, will be limited to segments of one-quarter mile or less.  Project personnel will also be advised to minimize stopping and exiting their vehicles in big game winter habitat during crucial winter periods.  In addition, escape openings will be provided along roads in big game crucial winter ranges, as designated by the BLM, to facilitate exit of big game animals from snowplowed roads.  The use of gates on roads within development areas would also preclude or limit

# APPENDIX E.  WILDLIFE MONITORING AND PROTECTION PLAN

motorized public access in sensitive wildlife areas.  Additional habitat protection/improvement measures may also be applied in any given year as directed by the BLM, in consultation with operators and other agencies, and specified in annual reports.

## 2.3.4  General Wildlife

Unless otherwise indicated, the following protection measures will be applied for all wildlife species. Additional measures primarily designed to minimize impacts to other resources (e.g., vegetation and surface water resources, including wetlands, steep slopes, etc.) are identified in the EIS in chapter 4, and these measures may provide additional protection for wildlife.  Additional actions may be applied in any given year to further minimize potential impacts to wildlife.  These actions will be specified in annual reports.

All roads on and adjacent to the project area that are required for the proposed project will be appropriately constructed, improved, maintained, and signed to minimize potential wildlife/vehicle collisions and facilitate wildlife (most notably big game) movement through the project area.  Appropriate speed limits will be adhered to on all project roads, and operators will advise employees and contractors regarding these speed limits.  Some existing roads on the project area and surrounding transportation planning area may be reclaimed if they become redundant, or closed (gated and locked, year-round or seasonally) to deny unnecessary access.

To protect important habitat in portions of the project area (i.e., ephemeral draws dominated by basin big sagebrush) areas with sagebrush greater than three feet tall will be avoided where possible.

Additional non-species-specific wildlife mitigations include the following.

- Reserve, work-over, and flare pits and other locations potentially hazardous to wildlife will be adequately protected by netting and/or fencing as directed by the BLM to prohibit wildlife access.

- If dead or injured raptors, big game, migratory birds, or unusual wildlife are observed on the project area, operator personnel will contact the appropriate BLM and WGFD offices. Under no circumstances will dead or injured wildlife be approached or handled by operator personnel.

- Employee and contractor education will be conducted regarding wildlife laws.  If violations are discovered on the project area, operators will immediately notify the appropriate agency.  If the violation is committed by an employee or contractor, said employee or contractor will be disciplined and may be dismissed by the operator and/or prosecuted by the WGFD and/or USFWS.

- Operators will implement policies designed to control off-site activities of operational personnel and littering, and will notify all employees (contract and company) that conviction of a violation can result in disciplinary action, including dismissal.

Additional project- and site-specific mitigation measures may be added in future years, as specified in annual reports.

**APPENDIX E.  WILDLIFE MONITORING AND PROTECTION PLAN**

# 3   Literature Cited

APLIC  1994.  *Mitigating Bird Collisions with Power Lines:  The State of the Art in 1994.*  Avian Power Line Interaction Committee.  Edison Electric Institute, Washington, D.C. 78 pp. + appendices.

APLIC  1996. *Suggested Practices for Raptor Protection on Power Lines:  The State of the Art in 1996.*  Avian Power Line Interaction Committee.  Edison Electric Institute/Raptor Research Foundation, Washington, D.C.  125 pp. + appendices.

Baxter, G.T., and M.D. Stone.  1980.  *Amphibians and Reptiles of Wyoming.*  Wyoming Game and Fish Department, Bulletin No. 16.  137 pp.

Call, M.W.  1978.  *Nesting Habitats and Surveying Techniques for Common Western Raptors.*  U.S. Department of the Interior, Bureau of Land Management, Technical Note No. 316.  115 pp.

Dorn, J.L., and R.D. Dorn.  1990.  *Wyoming Birds.*  Cheyenne, Wyoming: Mountain West Publishing.  138 pp.

Grier, J.W., and R.W. Fyfe  1987.  "Preventing Research and Management Disturbance."  pages 173-182 in B.A.G. Pendleton, B.A. Milsap, K.W. Cline, and D.M. Bird, editors.  *Raptor Management Techniques.*  Institute of Wildlife Research, National Wildlife Federation, Scientific and Technical Series No. 10.  420 pp.

Olendorff, R.R., A.D. Miller, and R.M. Lehman 1981.  *Suggested Practices for Raptor Protection on Power Lines: The State of the Art in 1981.*

*Raptor Research Report No. 4.* St. Paul, MN: Raptor Research Foundation, Inc., University of Minnesota.  111 pp.

USFWS  1989.  *Black-footed Ferret Survey Guidelines for Compliance with the Endangered Species Act.*  Denver, Colorado, and Albuquerque, New Mexico:U.S. Fish and Wildlife Service.  April 1989.  10 pp. + appendices.

WGFD  1992.  *Wyoming Bird and Mammal Atlas.*  Wyoming Game and Fish Department.  170 pp.

WGFD  1996.  *Wyoming Observation System Records.*  Cheyenne, Wyoming: Wyoming Game and Fish Department, Biological Services.

WGFD. 1997. *Atlas of Birds, Mammals, Reptiles and Amphibians in Wyoming.*  Lander, Wyoming: Wyoming Game and Fish Department, Wildlife Division, Biological Services Station, Nongame Program.  192 pp.

WYNDD  1995.  *Wyoming Vertebrate Species of Concern List.*  Compiled by C. Garber for the Nature Conservancy, Wyoming Natural Diversity Database.  21 pp. + appendices

# APPENDIX E.  WILDLIFE MONITORING AND PROTECTION PLAN

**Table E-1.    Summary of General Wildlife Reporting, Inventory, and Monitoring.**

| ACTION | DATES | RESPONSIBLE ENTITY |
|---|---|---|
| Annual tentative plan of development | By October 15, annually | Operator |
| Annual inventory, monitoring and protection data | By October 15, annually | |
| Annual reports | Annually: Draft–early November Final–early January | Operator |
| Annual meeting | December and as necessary | BLM with participation by other agencies and operators |
| **INVENTORY/MONITORING** | | |
| Raptor nest inventory | At least every five years, prior to development | BLM or BLM approved operator financed biologist with operator provided financial assistance for aircraft rental, as necessary |
| Raptor monitoring | Annually from April to July | BLM or BLM approved operator financed biologist with operator provided financial assistance for aircraft rental, as necessary |
| Greater sage-grouse & Columbian sharp-tailed grouse lek inventory | At least every five years | BLM or BLM approved operator financed biologist with operator provided financial assistance for aircraft rental, as necessary |
| Greater sage-grouse & Columbian sharp-tailed grouse lek monitoring | Annually from March to mid-May | BLM or BLM approved operator financed biologist |
| Big game crucial winter range use/monitoring | As available | BLM will request data from WGFD |
| Mountain Plover surveys | Annually from May to June | BLM or BLM approved operator financed biologist |

## APPENDIX E.  WILDLIFE MONITORING AND PROTECTION PLAN

**Table E-2.    Summary of General APD/ROW Application Stage Survey/Protection Measures.**

| PROTECTION MEASURE | DATES | RESPONSIBLE ENTITY |
|---|---|---|
| Raptor nest survey/inventory within 0.75 to 1.0 miles of proposed disturbance | Yearlong | BLM, operator |
| Raptor nest season avoidance within 0.75 to 1.0 miles | February 1 to July 31 | BLM, operator |
| Raptor nest avoidance with 825 feet (1200 feet for ferruginous hawk nests) | Yearlong | BLM, operator |
| TEC&SC surveys | Yearlong, as necessary | BLM, operator |
| TEC&SC avoidance | Yearlong, as necessary | BLM, operator |
| Prairie dog colony mapping | Yearlong, as necessary | BLM, operator |
| Prairie dog colony avoidance | Yearlong, where practical | BLM, operator |
| Black-footed ferret surveys | As appropriate in accordance with USFWS guidelines | Operator financed USFWS-approved biologist |
| Mountain Plover habitat surveys | Yearlong | BLM, operator |
| Mountain plover nest/brood avoidance | April 10 to July 10 | BLM, operator |
| Greater sage-grouse lek/nesting habitat avoidance within 2.0 miles of proposed disturbance; Columbian sharp-tailed grouse lek/nesting habitat avoidance within 1.0 mile of proposed disturbance | March 1 to July 15 | BLM, operator |
| Greater sage-grouse and Columbian sharp-tailed grouse lek avoidance within 0.25 miles of proposed disturbance | Yearlong | BLM, operator |
| Big game crucial winter range avoidance | November 15 to April 30 | BLM, operator |
| General wildlife avoidance/protection | As necessary | BLM, other agencies, operator |

**Note:**
TEC&SC - threatened, endangered, candidate, and other species of concern

**Appendix F**

**Air Quality Technical Support Document,
Atlantic Rim Natural Gas Project and the
Seminoe Road Gas Development Project, Wyoming**

Wyoming.  The total project area encompasses approximately 310,335 acres, of which 199,558 acres are federal surface, 16,156 acres are State of Wyoming surface/mineral estate, and 94,621 acres are private surface.

The Proposed Action for this project involves the development of 2,000 new wells, including 1,800 coalbed methane wells and 200 natural gas wells, on 1,800 new surface locations.  No alternatives besides the No Action Alternative are planned to be proposed at this time.

## 1.1.1  Well Development

Drilling operations are expected to last from approximately 6 to 10 years, with a life-of-project (LOP) of 20-30 years.  Each drill site location would be approximately 200 feet by 200 feet in size, with surface disturbance at each wellsite approximately 1 acre.  Temporary mud pits 15 feet by 35 feet would be constructed and reclaimed following completion operations.  Drilling of the natural gas and coalbed methane wells, or water injection wells to be used in support of coalbed methane production operations, would utilize wither a conventional or truck-mounted drilling rig.  Additional equipment and materials needed for drilling operations would be trucked to the wellsite.  Each producing coalbed methane well would be drilled to a depth of 2,700 feet to 3,800 feet or deeper, depending upon the depth of the coal seam.  Approximately 26 days would be required to develop each gas well (4 days to construct the well pad and access road, 2 days for rig-up,  10 days for drilling, 2-5 days for completion, 2 days for rig-down, and 3 days for pipeline construction).  Methane gas may be flared or vented during the testing period at natural gas wells; no gas would be flared or vented at coalbed methane wells.

Drilling water injection wells would utilize gas well drilling equipment and personnel.  The injection well depth is expected to range from 3,200 to 4,000 feet, and injection well drilling and completion is expected to require 7-14 days plus an additional 14 days to install surface equipment.

**Appendix G**

**Biological Assessment**

above the upper known elevation of occurrence (6,800 feet) for this species (Fertig 2000a) and the species is not known to occur within the ARPA.  However, some areas along the eastern portion of the ARPA may contain marginal habitats for the Ute ladies'-tresses.

### 3.1.9  Colorado Butterfly Plant

The Colorado butterfly plant is a short-lived perennial herb that typically occurs on sub-irrigated soils on level or slightly sloping floodplains and drainage bottoms at elevations of 5,000–6,400 feet (Fertig 2000b). The species is often found a short distance from meandering stream channels.  This species is known to occur in Laramie County in southeastern Wyoming, in southwestern Nebraska, and in northeastern Colorado.  This species is not known and is not expected to occur within or near the ARPA and is therefore not discussed further in this document.

## 3.2  Colorado River Species

Within the ARPA, a total of approximately 284 miles of intermittent, ephemeral, and perennial streams occur. Perennial surface water is relatively scarce within the ARPA due to limited precipitation (5.8–24.3 inches/year). The majority of drainages within the ARPA are ephemeral drainages. Ephemeral waters are those in which the water table is always below the stream channel and only flow in direct response to precipitation or snow melt. Ephemeral waters only support very limited aquatic communities for the short periods when surface flow is present. However, Muddy Creek, its tributaries McKinney Creek and Littlefield Creek, and Savery Creek are perennial streams. The Wyoming Department of Environmental Quality classifies these streams as Class 2 and 3, which support game and non-game species. These streams are considered to be locally to regionally important trout fisheries by the WGFD (1991 and 1998).

About 15 reservoirs and ponds (0.5–20 acres) are present within the Colorado River watershed portion of the ARPA. Some of the ponds and reservoirs that currently exist within the ARPA are fed by waters recovered from wells drilled at upstream locations, while others are impoundments on small drainages. These man-made impoundments are generally designed to supply water for livestock and wildlife use.

Four federally endangered fish species may occur as downstream residents of the Colorado River system: Colorado pikeminnow (*Ptychocheilus lucius*), bonytail (*Gila elegans*), humpback chub (*Gila cypha*), and razorback sucker (*Xyrauchen texanus*) (USDI-FWS 2004a). The Colorado pikeminnow, bonytail, and humpback chub are all members of the minnow family. The razorback sucker is a member of the sucker family.  All four of these fish species share similar habitat requirements and historically occupied the same river systems.

The last sighting of any of these fish species in the Little Snake River was of a single Colorado pikeminnow in 1990. Because habitat for these species is not present within the ARPA, these fish species are not likely to be found in tributaries to the Little Snake River within the ARPA, and critical habitat for these species has not been designated in Wyoming (Upper Colorado River Endangered Fish Recovery Program 1999). However, the potential for project-related reductions in water quantity or quality to these tributaries to the Colorado River warrant their inclusion in this document.

# APPENDIX G.  BIOLOGICAL ASSESSMENT

### 3.2.1  Colorado Pikeminnow

The Colorado pikeminnow is the largest member of the minnow family and occurs in the swift, warm waters of Colorado Basin rivers.  The species was once abundant in the main stem of the Colorado River and most of its major tributaries throughout Wyoming, Colorado, Utah, New Mexico, Arizona, Nevada, California, and Mexico.  It was known to occur historically in the Green River of Wyoming at least as far north as the city of Green River.  In 1990, one adult was collected from the Little Snake River in Carbon County, Wyoming (Baxter and Stone 1995).  Subsequent survey attempts to collect Colorado pikeminnow from this area of the Little Snake River by WGFD personnel failed to yield any other specimens.

### 3.2.2  Bonytail

Habitat of the bonytail is primarily limited to narrow, deep, canyon-bound rivers with swift currents and white water areas (Valdez and Clemmer 1982, Archer et al. 1985, and Upper Colorado River Endangered Fish Recovery Program 1999). With no known reproducing populations in the wild today, the bonytail is thought to be the rarest of the endangered fishes in the Colorado River system.

The bonytail historically inhabited portions of the upper and lower Colorado River Basin.  Today, in the upper Colorado River Basin, only small, disjunct populations of bonytail are thought to exist in the Yampa River in Dinosaur National Monument, in the Green River at Desolation and Gray Canyons, in the Colorado River at the Colorado/Utah border, and in Cataract Canyon (Upper Colorado River Endangered Fish Recovery Program 1999).

### 3.2.3  Humpback Chub

Habitat of the humpback chub is also limited to narrow, deep, canyon-bound rivers with swift currents and white water areas (Valdez and Clemmer 1982, Archer et al. 1985, and Upper Colorado River Endangered Fish Recovery Program 1999).  The humpback chub was historically found throughout the Colorado River system and its tributaries, which are used for spawning (Valdez et al. 2000).  It is estimated that the humpback chub currently occupies 68 percent of its original distribution in five independent populations that are thought to be stable (Valdez et al. 2000).

### 3.2.4  Razorback Sucker

The razorback sucker is an omnivorous bottom feeder and is one of the largest fishes in the sucker family. Adult razorback sucker habitat use varies depending on season and location. This species was once widespread throughout most of the Colorado River Basin from Wyoming to Mexico. Today, in the Colorado River Basin, populations of razorback suckers are only found in the upper Green River in Utah, the lower Yampa River in Colorado, and occasionally in the Colorado River near Grand Junction (Upper Colorado River Endangered Fish Recovery Program 1999).

## 3.3  Platte River Species

A small portion of the ARPA drains into the Platte River system and, according to the USFWS (USDI-FWS 2004a), water depletions in the Platte River system may contribute to the destruction or adverse modification of designated critical habitat for the following species.  None

## APPENDIX G.  BIOLOGICAL ASSESSMENT

2. Operations personnel shall be prohibited from unnecessary off-site activities and all project employees shall be informed of applicable wildlife laws and penalties associated with unlawful take and harassment of bald eagles.

3. Vehicle-killed carcasses shall be removed from the right-of-ways of access roads within the project area to eliminate the exposure of carrion-feeding eagles to the threat of being struck by vehicles.

4. Operators shall internally enforce existing drug, alcohol, and firearm policies.

Given the implementation of these measures, the bald eagle might be affected, but is not likely to be adversely affected.

### 4.1.3  Blowout Penstemon

Blowout penstemon is known to occur in certain habitats south of the Ferris Mountains in the northern part of Carbon County.  The plant has the potential to occur within the project area (Fertig 2001 and USDI-FWS 2002) only in the Sand Hills area where a few active sand dunes are known to exist (Warren 2002).  However, the species was not found during field surveys of this area by WYNDD personnel in June 2000 (Fertig 2001).  Given the presence of potential habitat within the ARPA, implementation of the proposed project's alternatives might directly impact some individual plants of this species.  If this species is found within the ARPA, the specific sites where it is found shall be avoided to prevent any potential impacts.

### 4.1.4  Ute Ladies'-Tresses

The known locations of Ute ladies'-tresses in Wyoming include Converse, Goshen, Laramie, and Niobrara Counties.  Potentially suitable habitats for this species are very limited within the ARPA.  This species is not known to occur within the ARPA and the likelihood of it occurring in the ARPA is low due to the following reasons: 1) much of the ARPA is very arid and there are few perennial streams, 2) the elevation of the project area is near the upper limit for the species, 3) very few moist riparian area meadows are present, 4) the transition from stream margins to upland vegetation is abrupt, and 5) the species has only been located in eastern and southeastern Wyoming (Fertig 2000a). Given the presence of potential habitat within the ARPA, there is a slight chance of impacts due to the low likelihood of it occurring.  If this species is found within the ARPA in the future, the specific sites where it is found shall be avoided to prevent any potential impacts.

## 4.2  Colorado River Species

Four federally endangered fish species might occur as downstream residents of the Colorado River system: Colorado pikeminnow, bonytail, humpback chub, and razorback sucker (USDI-FWS 2004a).  All four of these fish species share similar habitat requirements and historically occupied the same river systems.  Declines in populations of these species are mainly attributed to impacts of water development (e.g., dams and reservoirs) on natural temperature and flow regimes, creation of migration barriers, habitat fragmentation, the introduction of competitive and predatory non-native fishes, and the loss of inundated bottom lands and backwater areas (Minckley and Deacon 1991 and USDI-FWS 1993).

Under the Proposed Action and the proposed alternatives, no produced water will be discharged to the Colorado River system; therefore, produced water discharges do not pose a risk to these

## APPENDIX G.  BIOLOGICAL ASSESSMENT

species.  Implementation of all appropriate mitigation measures for water resources and soils identified in the ARPA would prevent potential downstream sedimentation and contamination caused by construction activities.  Therefore, water quality in the Colorado River system is not expected to be impacted by the Proposed Action.

Limited water depletions within the Colorado River system are expected from drilling activities within the ARPA.  Water depletion from the Colorado River system as a result of road/pad construction and dust abatement would be approximately 10.3 acre-feet per year for the entire project area.  Water depletions to the Colorado River system as a result of this project might adversely affect these four fish species.  This determination is based on the Recovery and Implementation Program for Endangered Fish Species in the Upper Colorado River Basin, which was initiated on January 22, 1988.

The recovery program was intended to be the reasonable and prudent alternative that avoided jeopardy to the endangered fish by depletions from the upper Colorado River.  The recovery program required that a depletion fee be paid to help support the recovery program if a project results in depletion.  On July 5, 1994, the USFWS issued a biological opinion determining that the fee for depletions of 100 acre-feet or less would no longer be required.  This opinion was based on the premise that the recovery program has made sufficient progress as the reasonable and prudent alternative and therefore avoided the likelihood of jeopardy to the endangered fishes and destruction or adverse modification of their critical habitat by depletions of 100 acre-feet or less.

Because water depletion due to this project is less than 100 acre-feet per year, a mitigation fee would not be applicable.

## 4.3  Platte River Species

The whooping crane, interior least tern, piping plover, Eskimo curlew, pallid sturgeon, and western prairie fringed orchid are all found downstream of the ARPA along the Platte River.  No habitat for any of these species occurs on the ARPA and they are not likely to occur there.  Under the Proposed Action and the proposed alternatives, no produced water will be discharged to the Platte River system; therefore, produced water discharges do not pose a risk to these species.  Implementation of all appropriate mitigation measures for water resources and soils identified in the ARPA would prevent potential downstream sedimentation and contamination caused by construction activities.  Therefore, water quality in the Platte River system is not expected to be impacted under the Proposed Action and the proposed alternatives.  No water depletion from the Platte River system will occur as a result of the proposed project.

# 5  Cumulative Impacts

The cumulative impact analysis (CIA) approach is used to evaluate the influences of recent, past, present, and reasonably foreseeable future human developments on the local wildlife biological resources.  This approach examines impacts associated with a proposed project in context with all other past and future developments, whether or not they are related.  It also allows the wildlife manager and land management agency to evaluate impacts on a broader scale.  The BLM recommends evaluating cumulative impacts on a watershed basis for natural resources related to watershed function and stability.

## APPENDIX G. BIOLOGICAL ASSESSMENT

Existing disturbance within the ARPA is approximately 763 acres or around 0.28 percent of the 270,080 acres of the project area. During the construction phase, the Proposed Action would disturb up to 15,800 acres or 5.9 percent of the overall project area, Alternative A (no action) would not disturb any acreage, Alternative C is estimated to disturb approximately 13,286 acres (4.9 percent of the ARPA), and Alternative D would disturb up to 13,000 acres (4.8 percent of the ARPA) with a cap of 7,600 acres of unreclaimed disturbance at any one time. Disturbance areas within the ARPA would be reduced upon reclamation of pipeline right-of-ways, unused portions of the drill pad, portions of roads, and ancillary facility disturbances during the production phase for each alternative, resulting in long-term disturbance of about 6,200 acres under the Proposed Action and Alternative C, no additional acreage under Alternative A, and 5,000 acres under Alternative D.

## 5.1 Black-Footed Ferret

Provided that avoidance measures outlined in this document are followed, the potential for an incremental increase in cumulative impacts due to the implementation of the Proposed Action or Alternatives C or D might affect the black-footed ferret, but is not likely to adversely affect the black-footed ferret.

## 5.2 Bald Eagle

Bald eagles are not known to nest on the ARPA, but might use portions of the project area especially during winter months when carrion is available. Provided that avoidance measures outlined in this BA are followed, the potential for an incremental increase in cumulative impacts due to the implementation of the action alternatives (Proposed Action and Alternatives C and D) or Alternative A (No Action) might affect, but is not likely to adversely affect the bald eagle.

## 5.3 Blowout Penstemon

Implementation of the Proposed Action and any of the alternatives is not expected to contribute cumulative impacts upon blowout penstemon due to a lack of confirmed occurrences of the species within the ARPA. Should surveys identify populations of blowout penstemon, such populations and associated habitats will be avoided.

## 5.4 Ute Ladies'-Tresses

Implementation of the Proposed Action and any of the alternatives is not expected to contribute to cumulative impacts upon Ute ladies'-tresses due to a lack of confirmed occurrences of the species within the ARPA. Should surveys identify populations of Ute ladies'-tresses, such populations and associated habitats would be avoided.

## 5.5 Colorado River Species

On July 5, 1994, the USFWS issued a biological opinion determining that the fee for depletions of 100 acre-feet or less would no longer be required. Cumulative impacts to the endangered fish species that are downstream of the ARPA in the Colorado River are expected to be less than 100 acre-feet per year from the project, under all of the alternatives.

**Appendix H**

**Required Best Management Practices**

## APPENDIX H.  REQUIRED BEST MANAGEMENT PRACTICES

| Data Source<br>Resource Concern | Protection Measure | Justification<br>Assumptions for<br>Analysis/Comments |
|---|---|---|
| | **Wildlife** | |
| Appendix F Wildlife Monitoring/Protection Plan Wildlife Monitoring/Protection | For complete list of wildlife protection measures (See appendix E) | |
| Big Game Crucial Winter Range | 1) Directional drilling<br>2) Drill multiple wells from a single pad<br>3) Remote well monitoring<br>4) Transportation planning (to reduce road density and traffic volumes)<br>5) Cluster development<br>6) Compensation mitigation<br>7) Seasonal restriction of public vehicular access. | BMP's |
| Greater Sage-Grouse and Columbian Sharp-Tailed Grouse Habitat | 1) Directional drilling<br>2) Drilling of multiple wells from a single pad<br>3) Seasonal restriction of public vehicular access<br>4) Noise reduction techniques and designs<br>5) Use of low profile well facilities and tanks<br>6) Burying of power lines to avoid use of poles and other tall structures<br>7) Transportation planning to align roads out of sight and sound of leks, and to schedule traffic to avoid greater sage-grouse and Columbian sharp-tailed grouse activity periods<br>8) Design of roads to minimum safe standard for intended use<br>9) Partial reclamation of resource roads needed for project construction to lower standards necessary for maintenance operations | BMP's |
| Wildlife Habitat | 1) Seasonal restriction of public vehicular access<br>2) Implementation of the Wyoming Bird Conservation Plan from Wyoming Partners in Flight. | BMP's |

**Appendix K**

**Plan of Development /
Detailed Proposed Action**

# APPENDIX K.  PLAN OF DEVELOPMENT/
# DETAILED PROPOSED ACTION

**Range Resources and Other Land Uses**

- The Operators would coordinate with the affected livestock operators to ensure that livestock control structures remain functional during drilling and production operations.

**Wildlife**

- During reclamation, establish a variety of forage species that are useful to resident herbivores by specifying the seed mixes in the approved APD, ROW or surface landowner requirements.

- Discourage unnecessary off-site activities of operational personnel in the vicinity of the drill sites.

**Visual Resources**

- Paint all structures with non-reflective colors that blend with the adjacent landscape, except for structures that require safety coloration in accordance with Occupational Safety and Health Administration (OSHA) requirements.

**Cultural Resources**

- If a site is considered eligible for, or is already on the National Register of Historic Places (NRHP), avoidance is the preferred method for mitigating adverse effects to that property.

**Socioeconomics**

- Coordinate project activities with ranching operations to minimize conflicts involving livestock movement or other ranch operations.  This would include scheduling of project activities to minimize potential disturbance of large-scale livestock movements. Establish effective and frequent communication with affected ranchers to monitor and correct problems and coordinate scheduling.

**Health and Safety**

- The operators will establish and maintain an appropriate safety program for the intended work which will comply with all applicable Federal, State and local regulations, including but not limited to, RCRA, SPCC, SARA, Hazardous Substance Management.

**Appendix M**

**Maps**

# ATLANTIC RIM FINAL EIS MAP
## Mineral Development Projects in the Vicinity



# ATLANTIC RIM FINAL EIS MAP
## Greater Sage-Grouse Leks



⊕ Greater Sage-Grouse Leks

◼ 2-mile buffer of Greater Sage-Grouse Leks

— Project Boundary

0    2.5    5    10 Miles

N

No Warranty is made by the Bureau of Land
Management for use of the data for purposes not
intended by the BLM.

Map M-26

**Appendix N**

**Draft EIS Comment Letters**



# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## REGION 8
999 18TH STREET - SUITE 300
DENVER, CO 80202-2466
Phone 800-227-8917
http://www.epa.gov/region08

4.006



Ref: **8EPR-N**

David Simons, Project Lead
Bureau of Land Management
Rawlins Field Office
P.O. Box 2407
Rawlins, Wyoming 82301-2407

RE: Atlantic Rim Natural Gas Field Development Project
Draft Environmental Impact Statement CEQ# 20050518

Dear Mr. Simons:

In accordance with our responsibilities under the National Environmental Policy Act (NEPA), 42 U.S.C. Section 4321, et. seq., and Section 309 of the Clean Air Act, 42 U.S.C. Section 7609, the Region 8 office of the Environmental Protection Agency (EPA) has reviewed the referenced Draft Environmental Impact Statement (DEIS) for the Bureau of Land Management's (BLM) proposed coalbed and conventional natural gas development and operation known as the Atlantic Rim Natural Gas Field Development (Atlantic Rim) Project.

The area under consideration in the Atlantic Rim DEIS is located approximately twenty (20) miles southwest of the city of Rawlins, in Carbon County, Wyoming. Anadarko Petroleum Corporation of Houston, Texas, is the lead project proponent of a group that includes Resources, Inc., and Double Eagle Petroleum and Mining Company (Operators). The project includes the drilling and development of 1,800 coalbed natural gas wells, and 200 conventional natural gas wells. The 270,080 acre project area is comprised of approximately 173,672 acres of federal surface, 14,060 acres belonging to the State of Wyoming, and 82,348 acres of private lands. Corresponding mineral ownership is 179,438 federal, 12,384 State, and 78,258 private. Associated facilities would include access roads, gas and produced water collection systems and pipelines, produced water injection facilities, compressor stations, several power generating stations, and an electric power distribution system. The anticipated life of the project is thirty (30) to fifty (50) years, with the drilling phase occurring in the first twenty (20) years.

The current land use in the Atlantic Rim project area (ARPA) is primarily rangeland for cattle and sheep operations and wildlife habitat. The area also includes recreation activities related to fishing and big game hunting, and there has been historic oil and gas development and production in the ARPA. We understand that this project has the potential to significantly impact surface waters through sediment in storm water runoff as eighty-five percent (85%) of the ARPA contains soils with the potential for severe water erosion. There are also concerns related to project impacts on vegetation and wildlife. Nineteen (19) species listed under the Endangered

*Printed on Recycled Paper*

Species Act (ESA) as either threatened or endangered or as proposed or candidate species are potentially present within or in the vicinity of the ARPA. Some thirty-six (36) species (7 plants, 6 mammals, 16 birds, 3 amphibians, and 4 fish) found on the BLM Sensitive Species List may occur on or near the ARPA. Finally, there are concerns associated with impacts to big game crucial winter range, as well as recreational fishing and hunting.

The Atlantic Rim DEIS analyzed four alternatives. These are: the Proposed Action, a "No Action" alternative (Alternative A), and two action alternatives, Alternative B and Alternative C. The Proposed Action is for the drilling and development of approximately 2,000 wells. Approximately 1,800 wells would be drilled to Mesaverde formations to develop coalbed natural gas resources, and 200 wells would be drilled to deeper formations to access conventional natural gas deposits. The proposed well pad spacing is one well pad site every eighty (80) acres. The Proposed Action will create an initial disturbance of 15,800 acres (5.9 percent of the project area), and an eventual operational disturbance area of 6,241 acres (2.3 percent of the project area). Alternative B proposes the same number and spacing of wells as the Proposed Action, but the drilling and development would occur in three phases. The phases would be separated geographically and temporally. The project area would be divided into three sections (central, northern and southern), to be developed in that order for six (6) to seven (7) years each. Alternative C involves the same mode of development as the Proposed Action, but the development would be conditioned with the implementation of Development Protection Measures (DPMs) applicable to those areas with sensitive or crucial resource values (as defined in Appendix L of the DEIS).

Both short and long-term surface disturbance will be similar for the Proposed Action and Alternative B, and the final well build-out will be similar for all three action alternatives. However, surface disturbance may be up to sixty-four percent (64%) less with Alternative C, and well spacing in some areas could increase to one well pad site every 160 acres. While wildlife, vegetation, and other environmental impacts will be similar and significant for the Proposed Action and Alternative B, the impacts may be slightly reduced with Alternative B due to the geographic phasing allowing nearby "safe havens" for some impacted wildlife, and potentially more rapid reclamation of some vegetation. Environmental impacts would be greatly reduced with Alternative C due to DPM restrictions. For all action alternatives, the majority of the water produced from the drilling and production operations would be re-injected into underground aquifers via an estimated 66 injection wells. A small portion of the produced water would be used in a closed system with limited use of livestock and wildlife watering systems, and a small amount of surface discharge under existing State water discharge permits.

The BLM's Preferred Alternative is a combination of Alternatives B and C. This would combine the three phase development approach of B with the DPM conditioning requirements of C. The phased approach of Alternative B may provide some nearby "safe haven" relief for some of the area habitat, and allow feed back in the form of surface water monitoring data to help better plan future development in the next phases. Additionally, the design and development of all wells, roads, pipelines and associated facilities at the same time in one phase, may result in better planning and reduced acreage of vegetation disturbance. A phased approach to development would allow BLM to monitor current conditions and technologies, and allow the

use of less intrusive methods of gas extraction as such methods are developed by industry. Experience and knowledge gained from each development phase will be used to better plan and implement the subsequent phases. The application of required DPMs with Alternative C focuses on surface disturbance limits, modification of drilling and construction practices and locations, enhanced Best Management Practices (BMPs), limited operating periods, and, in some cases, no surface occupancy. Important resources protected by the DPMs include crucial winter range, sage grouse nest and brood rearing habitat, and areas of sensitive visual and cultural resources. The Preferred Alternative provides significant reductions in environmental effects compared to the Proposed Action, while potentially still allowing oil and gas resource development near or equal to the Proposed Action. Some costs may be incurred by the Operators associated with the increased environmental protection (though positive economic effects could be realized for area recreational resources), but the result should create/maintain conditions conducive to helping people and nature exist in productive harmony. The EPA commends the BLM for their well considered and progressive approach to this goal of the NEPA process. Additionally, with this DEIS, the Bureau of Land Management (BLM) properly analyzed and disclosed to the public the potential environmental impacts of the project, which are significantly greater with the Proposed Action versus BLM's Preferred Alternative.

Overall, EPA favors BLM's Preferred Alternative combination. In our opinion, it would provide the best balance between protecting environmental resources while allowing extraction of natural gas, a needed energy resource. We do recommend that BLM sequentially and individually review all engineering/development plans for each phase, including performing site-specific environmental reviews that conform to NEPA regulations and guidelines. We also recommend that at each yearly review and planning activity, the issues of site specific directional drilling (see detailed comments) and the potential of full build-out electrification utilizing the power grid be considered. Finally, monitoring of operations and mitigation activities from initial drilling through post project monitoring of reclamation effectiveness, with accountability, is critical, and additional disclosure is suggested. Based on the procedures EPA uses to evaluate the potential effects of proposed actions and the adequacy of the information in the DEIS, the Preferred Alternative identified by the BLM for the Atlantic Rim project has been rated EC-2. The EPA review has identified environmental impacts that could be analyzed and potentially avoided, and plans that require the presentation of further details, in order to protect the environment. The enclosed detailed comments discuss impacts associated with air discharges, wildlife area fragmentation, and other issues. We believe that some impacts may be reduced by requiring, and/or modifying, the mitigation measures identified in the analysis. I have enclosed a copy of the EPA Rating System for Draft Environmental Impact Statements for additional information.

We are available to work with you on all areas of the Atlantic DEIS, including the evaluation of the future specific engineering/development plans for each phase of the project



development. BLM has done a good job with this EIS analysis to reduce the environmental impact of the project, and we can assist BLM in addressing further environmental impact reductions, where practicable. Please call Steven Pratt of my staff at (303) 312-6575, or me at (303) 312-6004 with any questions you may have concerning these comments.

Sincerely,

Larry Spoboda
Director, NEPA Program
Ecosystems Protection and Remediation

Enclosures

FEB 2 1 2006

## Atlantic Rim Natural Gas Field Development Project DEIS Detailed Comments

**Phased Development and Review of Development Plans.** The BLM's Preferred Alternative is a combination of Alternatives B and C. The phased approach of Alternative B is combined with the application of required DPMs of Alternative C. EPA agrees with the suggested phased approach. Phasing may provide some nearby "safe haven" relief for some of the area habitat, and allow feed-back in the form of surface water monitoring data to help better plan future development in the next phases. Additionally, the design and development of all wells, roads, pipelines and associated facilities at the same time in one phase, may result in better planning and reduced acreage of vegetation disturbance. A phased approach to development would also allow BLM to monitor current conditions and technologies, and allow the gas industry to develop less intrusive methods of gas extraction, especially in the more sensitive areas. Experience and knowledge gained from each development phase will be used to better plan and implement the subsequent phases. We recommend that BLM sequentially and individually review all engineering/development plans for each phase, including performing site-specific environmental reviews that conform to NEPA regulations and guidelines. This review should be performed in conjunction with the yearly review and planning activity planned by the BLM on this project (the Operators have proposed annual work plans for each developing or operational POD), and should include on-site inspection of operations to date. Issues for consideration in the evaluations include: advancement in drilling techniques; engine technologies providing lower emissions; the development of improved BMPs that may be applicable to this project; the need for altering development approaches to prevent apparent impacts not anticipated earlier; performance of mitigation efforts to date; and, changes in development plans in other areas that adversely impact the current or cumulative effects. We also recommend that BLM provide public disclosure of each phase review. EPA extends an offer to assist BLM in the evaluation of the future specific engineering/development plans for this project.

**Directional Drilling.** The DEIS Preferred Alternative combination does not, nor do any of the three action alternatives, explicitly include directional drilling as an option to further reduce surface impacts. Many of the surface disturbance impacts may be reduced by employing directional drilling to consolidate production facilities above what is suggested in the DEIS. Chapter 2, Section 2.5.2 addresses directional drilling. Discussed is a June 2005 memorandum from the Wyoming BLM's Reservoir Management Group, stating "... extensive directional drilling does not appear to be a viable technical or economic alternative for natural gas extraction in the Atlantic Rim EIS area." The discussion concludes that "Requiring the operators to use directional drilling for all wells regardless of surface conditions, topography, or subsurface geology would not be reasonable. Using such a technique without regard for local conditions may deter or preclude an operator from maximizing the recovery of the gas resource in the most economical and efficient manner." Recognizing these considerations, directional drilling may still be reasonable for some applications. We recommend that directional drilling be considered on a case-by-case basis for specific drilling locations during each yearly review and planning activity planned by the BLM on this project. Experience and knowledge will be gained from each development phase, and there will be continued advancements in this technology. The information gained may enable better planning and implementation of subsequent phases, and

Page 1 of 8

665-2-1

665-2

665-2-2

665-3

665-3-1

FEB 2 1 2006

665-3-2
665-3
665-4-1
665-4
665-5-1
665-5
665-5-2
665-6

may indicate that directional drilling is appropriate in some of the more sensitive areas. We suggest revising the DEIS to include commitments for evaluation of directional drilling at the development of each phase, or at each yearly review and planning activity.

**Electric Power.** Currently, electric power for field development and operation is proposed to be provided by natural gas or propane fueled generators located at each compressor station, delivered to the users via buried lines. Section 2.5.4 indicates that centralization, and presumably utilization of the existing grid, would not be practical or economically feasible at this time. Sited was the lack of knowledge of exactly what lines and facilities would be needed and the "exorbitant cost of construction of the infrastructure (powerlines, substations, etc.) to centralize facilities …" As a result, the alternative was eliminated from detailed study. This is also addressed in Appendix K. Understanding that this may be true at this time, we suggest that the potential of full build-out electrification utilizing the power grid be considered at the development of each phase, or at each yearly review and planning activity. As the project is implemented, details on what lines and facilities are required will come into focus. This knowledge, coupled with the potential for rising natural gas costs, may make such centralization, potentially utilizing the existing grid, feasible. Commitments to periodic re-evaluation of this issue could be made in the Final EIS (FEIS).

**Drilling Operations.** The DEIS states that conventional drilling equipment will be utilized, and the air quality modeling was performed assuming diesel engines. We suggest that the proponent reconsider the use of diesel engines for the drilling of wells, or utilize diesel engine systems with Tier II equivalent emissions. Such utilization will reduce particulate, VOC and other toxic emissions. Please utilize the engines with the lowest emissions for these applications, and provide the data supporting the lower emissions in the FEIS. The project includes a good approach towards saving valuable water resources by employing water hauling trucks to allow reusing test waters in conjunction with other drilling, construction and/or production operations. To potentially further reduce water use impacts, we suggest adding a component to the phased approach that specifies coordination during annual work plan reviews with the U.S. Fish and Wildlife Service, and other appropriate entities, on the source of water for construction and drilling.

**Road Construction/Transportation.** The Preferred Alternative contains a number of procedures and mitigations applicable to road construction and transportation, including low impact road design and special dust control requirements, as part of its development protection measures (DPMs). EPA agrees that the low impact road construction techniques such as 95% base compaction prior to placement of gravel, culverts for water drainage, steep slope construction measures to prevent erosion, and appropriate dust control methods (such as placement of a non-chlorine based dust abatement chemical treatment), are an important component of the Preferred Alternative, and a significant improvement over the Proposed Action. Dust particulates from construction, and ongoing operation of roadways are important concerns, and entities and citizens have often complained of dust problems resulting from the construction and use of oil & gas project roads. The airborne dust may not only be a visual nuisance, but can be potentially dangerous to asthma sufferers. The additional dust control

FEB 21 2006

665-6-1
665-6

measures of the Preferred Alternative are important. The EIS should provide detailed road construction drawings for the low-impact design. Additional measures should be addressed ensuring that other road/transportation related mitigations are put in place. These include: road location and design approval by BLM prior to construction; discouraging small and short road loops to reduce fragmentation and other wildlife impacts; and, travel management and enforcement aspects (such as the use of fencing, signage and locked gates to minimize public use of project roads). Proper implementation and management of road construction and maintenance BMPs will be important to prevent degradation of wildlife habitat from run-off of sediments. This is especially important in the protection of Muddy Creek, which may be the habitat of some rare native fish species, and because soils with the potential for severe water erosion reportedly comprise about 85% of the ARPA. Studies show that new roads can become a pathway for the spread of invasive plants; therefore, we suggest that the EIS address control of such plant intrusions via the new roads during the yearly review and planning activity. This would include evaluation of effectiveness to date. Finally, it is suggested that a trade-off for new road construction, providing reclamation of existing roads (including two-track) at a two-to-one ratio, be included in the project requirements. See EPA comment titled "Management, Mitigation and Monitoring" for further relevant comments.

665-6-2

665-6-3

665-6-4

665-7-1
665-7

**Wildlife.** The DEIS indicates that reserve pits or other project-related impoundments will be fenced to prevent wildlife access. These features should also be netted to further ensure protection of migratory birds and other wildlife. Further details should be provided on how inspections will be conducted and netting or other BMPs be maintained. Also, the Preferred Alternative provides a number of mitigation requirements to lesson environmental impact to wildlife through the DPMs. As implementation of these mitigation requirements will be critical, please see our comment below titled "Management, Mitigation and Monitoring." Concerning the Greater Sage-grouse, please detail the project's adherence to BLM's "National Sage-Grouse Habitat Conservation Strategy" - November 2004, and the State's own criteria. As a minimum, the mitigation plans detailed in the DEIS should be in compliance with those requirements. Additionally, please add a component to the phased approach that specifies coordination with the U.S. Fish and Wildlife Service on migratory bird management at each specific phase review, or during annual work plan reviews. Finally, a number of the DPMs address areas where no disturbance is allowed (e.g., severe winter relief habitats for greater sage-grouse). To effectively lessen impact to some wildlife, it may be necessary to provide additional "buffer zones" around the specific critical areas. For example, a recent study done at University of Wyoming indicates decline in breeding males at leks located within approximately 3 miles of drilling rigs in the Pinedale Anticline and Jonah natural gas fields in western Wyoming. Please provide additional information on how much buffer zone will be provided, as applicable.

665-7-2

665-7-3

665-7-4

665-8

**Soils.** In Section 4.3 it is stated that a large portion of the project area would be difficult to re-vegetate due to high erosion potentials and poor topsoil, and that soils with the potential for severe water erosion reportedly comprise about 85% of the ARPA. The Preferred Alternative with its associated DPMs will reportedly greatly decrease surface disturbance by up to 64% short-term (and 77% long-term), and has a number of other mitigation measures such as development restrictions, mulch enhancements, soil enhancements, and rapid timeframes for

FEB 21 2006

beginning reclamation activities. However, the section also states that the reclaimed areas within the interim drilling PODs have not shown much success to date, and that many disturbed areas currently show increased erosion, weed infestations, and low native vegetation cover. This indicates that current mitigations are perhaps not sufficient, implemented, and/or monitored well. While the Preferred Alternative indicates the implementation of these and other improved requirements to the project, it can be seen that management, mitigation, and monitoring aspects will be very important to successful environmental protection. These aspects must be properly implemented and accountability needs to exist. Detailed comments addressing these issues are provided in the comment titled "Management, Mitigation and Monitoring."

**Fragmentation of Wildlife Habitat.** The Atlantic Rim project is proposed on land that contains many critical ecologies and habitats. Some fragmentation of wildlife habitat will occur, and the actual extent/effect of the fragmentation can be difficult to ascertain. We commend the general commitments expressed in the DEIS to protect a number of big game, waterfowl, birds, and other flora/fauna and associated habitats, specifically sensitive wildlife including the Greater Sage-grouse. However, the DEIS details the drilling and development of 2,000 gas wells, throughout a 270,080 acre area, with an initial disturbance of 15,800 acres (5.9 percent of the project area), and an eventual operational disturbance area of 6,241 acres (2.3 percent of the project area. Nineteen (19) species listed under the Endangered Species Act (ESA) as either threatened or endangered, or as proposed or candidate species, are potentially present within or in the vicinity of the ARPA. Some thirty-six (36) species (7 plants, 6 mammals, 16 birds, 3 amphibians, and 4 fish) found on the BLM Sensitive Species List may occur on or near the ARPA. There are also concerns associated with impacts to big game crucial winter range, as well as recreational fishing and hunting, and several migration routes (e.g., pronghorn antelope, mule deer, and elk) are known or suspected to traverse the ARPA. Studies have indicated that due to infrastructure effect zones (e.g., a particular animal may not come closer that a quarter mile of a road), transecting of migratory routes, elimination of sufficiently large habitat core areas, and other effects, the "actual" effect of disturbing 5.9 percent of an area can be to eliminate 20%, 40% or more of the area to some wildlife. We recommend the consideration of the following suggestions to address some of these concerns for this project:

- Fragmentation models are available which could be utilized to evaluate potential fragmentation of habitat effects, or at least scenarios, for this project. Such evaluation could be critical to decisions on well, facility, and road placement.
- There are already a number of development protection measures (DMPs) discussed in the DEIS for consideration in making decisions on this project. These include surface disturbance limits, modification of drilling and construction practices, and in some cases , no surface occupancy, and are tied to specific areas of sensitive wildlife and fish habitat, and areas with sensitive soils. It is intended that this information be supplied to the Operators as geographic information system (GIS) layers to help them develop site specific proposals for planning of the annual program of work. This is an excellent approach to enhancing environmental protection, and EPA applauds BLMs efforts. This approach can be taken further with the inclusion of buffer zones of avoidance for wildlife and water bodies. Additionally, they can be coupled with ARPA and surrounding vicinity data representing wildlife habitat and migration routes, locations of wetlands and

FEB 2 1 2006

sensitive soils, protected areas, areas sensitive to visual impairment, recreation areas, proposed road and facility locations, effectiveness of BMP types, and other metrics important to specific cases. Fragmentation layers (related to the fragmentation models discussed above) could also be included. This data, provided as GIS layers, could be incorporated in an enhanced GIS data analysis program (a "GIS Tool") able to process the data to generate maps indicating ideal locations (or areas of less impact) for roads, wells, facilities, etc. The "Tool" could potentially couple the layer data with weighting values for the relative importance of the different metrics, and allow the input of data specific to the areas being evaluated (e.g., different sizes of avoidance buffer zones or drill pad sizes). As the project matures, information on gas production and location, and technological advancements in development/production, may also represent additional layers for the "Tool," potentially enabling a productivity component to assist operators.

• A combination of reclamation of existing roads at a two-to-one ratio for new road construction, reuse of appropriate existing roads, and discouraging small and short road loops, may lessen fragmentation increases.

The above suggestions can be implemented prior to the review of the first phase of development, then updated and used on a continuous basis for each of the remaining stages. This may maximize environmental protection, as well as the productivity of the development and production activities within the environmental constraints. In any case, EPA recommends close coordination with the U.S. Fish and Wildlife Service on these and all other wildlife related issues.

**Wetland and Riparian Vegetation.** As discussed in the DEIS, impact to wetland and riparian areas will potentially occur for this project. Executive Order 11990, "Protection of Wetlands," signed in 1978 and amended in 1988, addresses potential long and short-term adverse impacts associated with the destruction or modification of wetlands. In accordance with the intent of this order, EPA suggests a mitigation commitment that indirect draining of, or direct disturbance of, wetland areas will be avoided if possible, and a commitment to replace in kind such unavoidably impacted wetlands. As studies indicate that traditional mitigation is generally not successful in fully restoring wetland function, it is suggested that the BLM require a two-to-one mitigation of wetland disturbance. We understand that the intent of this project is to reclaim disturbed wetlands at the end of the project. Due to the time it can take to adequately reclaim some disturbed wetlands, and the potential 50 year life of this project, it is suggested that BLM require mitigation of wetland disturbance *during* the project operating time, and that mitigation for any particular wetland or riparian area begin concurrent with the disturbance. EPA also suggests that the BLM require complete avoidance of disturbance to any fen wetland (a Category I resource).

**Visual Resources.** The DEIS discusses the scale and type of impacts to visual resources, and the Preferred Alternative requires specific approaches to help limit the impacts. EPA suggests requiring all mitigation/planning of structures, roads, etc., to be reviewed and approved by BLM on a case-by-case basis at each yearly review and planning activity and associated environmental review. Any applicable mitigation should be initiated concurrent with each development phase as opposed to at the end of the project life. The EIS should also address the issue of light pollution. Poorly designed lighting can waste energy and impact the view of the night sky.

665-9-3

665-9

665-9-4

665-9-5

665-10-1

665-10

665-10-2

665-10-3

665-11-1

665-11

665-11-2

FEB 2 1 2006

665-11-2 665-11

These problems can be addressed with efficient lighting systems designed to illuminate the ground or work area for safety and utility without causing glare, upward shine, or wasting energy. EPA suggests that the EIS address these issues and detail mitigation requirements, consistent with OSHA or other applicable safety requirements, for implementation by the proponent.

665-12-1 665-12 665-12-3 665-12-2 665-12-4

**Water Quality Protection & Accidents and Spills.** In Appendix C – Hazardous Materials Management Plan - of the DEIS it is stated that prior to project start-up, the Operators will prepare detailed plans, including: spill prevention and control countermeasure plans; stormwater pollution prevention plans; liquid hydrocarbon spill response plans; inventories of hazardous chemical categories; and, emergency response plans. EPA suggests ensuring that plans for development areas with the potential to impact waterways leading to potential drinking water sources, be evaluated for compatibility with the State's Source water Protection plans. This also applies for potential impacts to watersheds that currently, or in the future, may lead to drinking water supplies. BMPs that are utilized for drilling, pumping, compression, injection, and associated facilities, should address all potential runoff from these areas, including storm water, to preclude unmonitored or contaminated runoff from entering these waterways. Please ensure that the preparation of these and related plans are coordinated with the BLM. It is also suggested that the plans be coordinated with the WDEQ (especially for Source Water Protection requirements). The above precautions may be important in protecting the Colorado River watershed. For example, under the Colorado River Salinity Pact, water discharged within the watershed must not add more than one ton per day of salts to the Colorado River system. In addition, we suggest that the plans be updated for each phase and specifically address uniqueness of each site or area, where applicable. In more sensitive areas (i.e., for source water and wildlife habitats protection) it may be appropriate for additional site specific protection requirements (that may be outside of the general plan requirements) to be addressed and implemented.

665-13-1 665-13

**Greenhouse gas emissions.** The Atlantic Rim project will generate greenhouse gases, including methane and CO2. The EIS should include an evaluation of project greenhouse emissions and their potential control technologies to provide public disclosure of this environmental impact. Analysis of the CO2 emissions is consistent with the Administration's policies to reduce U.S. greenhouse gas emissions over the next 10 years without sacrificing economic growth. (See the Council on Environmental Quality's Climate VISION web site). An analysis of this reduction of CO2 emissions, covering the expected design life of the project, would seem appropriate. Addressing CO2 emissions in proposed federal actions subject to NEPA is consistent with the 2005 decision from the 8th Circuit Court of Appeals on the proposed DM&E Railroad as analyzed in the Final EIS prepared by the Surface Transportation Board (Mid States Coalition For Progress, et al. v. Surface Transportation Board, 345 F.3d 520 (8th Cir. 2003)).

665-14-1 665-14 665-14-2

**Air Quality Impacts.** Table 3-6 (on page 3-18) presents background air monitoring data, but does not explain the data presented. For example, it would be helpful to know whether the 24-hour $PM_{10}$ and $PM_{2.5}$ concentrations are maximum daily averages or second-highest concentrations and whether the eight-hour ozone average is a maximum or the fourth highest daily average observed during the reporting period. Please explain the data in more detail. Table 3-7 (page 3-19) shows standard visual range in kilometers for four locations. The data generally

FEB 2 1 2006

665-14-2 | 665-14

fall within the ranges given for the same locations in BLM's recent Preliminary Draft EIS for the Black Butte Pit 14 project in the Rock Springs planning area. However, the standard visual ranges given for Brooklyn Lake are slightly lower than the corresponding data in the Black Butte Document, both in the average and in the twentieth percentile of days with the best visibility. The document refers to CIRA 2004 as the source of the data; however, the References Cited section omits this reference. Please add this reference to the document.

**Air Quality Impacts - Technical Support Document and its Appendices.** The remaining comments related to air quality address the technical support document (TSD) and its appendix F. The TSD is dated October 2005 but some errors remain from the October 2004 version. We concentrate these comments on the Atlantic Rim project; however, we recommend revising errors consistent with the comments of EPA and other reviewers submitted in November 2004.

665-15-1 | 665-15-2 | 665-15-3 | 665-15

- The last line of table 3.3 of the TSD shows the impacts of $PM_{2.5}$ from the Atlantic Rim project for the modeling period (annual). The values of the background and total predicted concentrations (six and five $\mu g/m^3$) are reversed; please revise the table.

- The beginning of section 3.5.2 of the TSD is missing, leaving only a portion of the section dealing with the $SO_2$ assessment on page 54. In preparing the FEIS, please restore the missing text to the TSD.

- In appendix F1, Atlantic Rim Far-Field Modeling Results, tables displaying predicted impacts at Class I and sensitive Class II areas have inverted concentrations of short-term standards and long term standards. For example, table F1.2.1 shows the annual NAAQS for $SO_2$ as 1,300 $\mu g/m^3$, which is actually the three-hour standard, and it shows the three-hour standard as 80 $\mu g/m^3$, which is actually the annual standard. Please check and edit the following tables: F1.2.1, F1.2.2, F1.2.3, F1.3.1, F1.3.2, F1.3.3, F1.4.1, F1.4.2, and F1.4.3. Similar errors remain in appendix F2, Seminoe Road Far-Field Modeling Results.

665-16 | 665-16-1 | 665-16-2

**Management, Mitigation and Monitoring.** Throughout the DEIS there are many activities requiring management, mitigation, and monitoring of construction and operational project impacts, as well as reclamation status and effectiveness. BMPs are used during construction and operation, water quality is monitored, road access control methods and devices are utilized and monitored, weeding and seeding operations are performed and monitored, drill pad and facility maintenance and decommissioning activities occur, livestock grazing management is performed, and other activities important to environmental protection are implemented. Appendix J – BMPs for reducing Non-point Source Pollution – provides a good listing of basic BMP requirements for the project, and the DPMs are a vital component of the Preferred Alternative. The DEIS specifically mentions the importance of proper BMP and DPM implementation and maintenance, and that various impacts can be minimized, or there will be no adverse effects, "assuming" mitigation measures are properly implemented. However, details will be required for accomplishing these activities in each annual work plan, and it is important to specifically designate what entity (e.g., BLM, the Operators, resource organizations, or some combination) will be in charge of which activities, and who will have specific enforceable accountability. In addition, the BMPs, DPMs and other related activities will require inspection, documentation and record keeping. A "paper" documentation trail must exist to determine what was monitored, inspected, maintained, and completed. All management, mitigation, and monitoring should be

665-16-2

665-16

verifiable, and an agency/entity needs to be held accountable for perfoi_lance oversight, both throughout the project life and after the project has been decommissioned. Please provide additional detail on the issues discussed above in the FEIS. It may be appropriate to have commitment for these activities placed in the ROD.

665-17

**General.** The second paragraph on page 2-9 is a repeat of the previous paragraph. Suggest specifying the map page number when referencing the map in the DEIS text.





**Warren E & P Inc.**
123 W 1st Ste 505
Casper, Wyoming 82601

February 17, 2006

Mr. David Simons, Project Lead
Bureau of Land Management
Rawlins Field Office
P.O. Box 2407
Rawlins, Wyoming 82301

Re:    Warren E&P, Inc. Comments on Atlantic Rim Natural Gas Development    Project    Draft
Environmental Impact Statement

Dear Mr. Simons:

Warren E&P, Inc. welcomes the opportunity to comment on the draft of the Environmental
Impact Statement (DEIS) for the proposed Atlantic Rim Natural Gas Development Project
(Project). As you know, our company has been involved in the Project since its inception over
seven years ago. The preliminary technical data we have obtained suggests that the Project has a
high chance of success. Warren is a small growing company and the Project is paramount to
achieving the goals of the company, both in the short term and for many years ahead. Warren
looks forward to working with the Bureau of Land Management (BLM) Rawlins Field Office
(RFO) to complete the required environmental work in a timely fashion. Warren is also looking
forward to working with the RFO to assure the ultimate success of the Project.

The DEIS presented very little information regarding the value of the CBNG resources in and
under the Project and the relationship of those resources to the "human environment". According
to the Energy Information Administration findings in its 2001 Residential Energy Consumption
Survey: Household Energy Consumption and Expenditures Tables, 56.5% of the homes in the
country are heated by natural gas. The average home in the United States consumes 43,900 cubic
feet of gas for heating purposes on an annual basis. Recoverable natural gas reserves from the
Project are estimated to be approximately 1.5 trillion cubic feet. This indicates that produced
natural gas from the Project would be sufficient to heat 1,000,000 homes in the United States for
over 34 years.

Electricity is the second most common energy source used to heat homes in the country.
Approximately 41% of the total homes are heated by electricity. If one assumes electricity is
consumed in the absence of the natural gas,  the affect on air quality is astonishing. The majority
of electricity and electrical power in the United States is generated by burning coal. The table
below illustrates the additional pollutants that would be emitted into the earth's atmosphere by

1

burning coal, as to opposed to natural gas from the Project. The mitigation totals are based on a comparison of the energy from the total estimated recoverable reserves from the project of 1.5 TCF of natural gas to the equivalent energy from coal. The table reflects this comparison with both Western Coals and Eastern Coals. Success of the Project would result in a total reduction of 194.3 million tons of air pollutants being placed into the atmosphere when compared to consuming Western Coal.

*Estimated Emissions Mitigation From Using Atlantic Rim Natural Gas vs. Coal for Power Generation*
**(Notes: Assumes 1GWh = 3.4095x10^9 BTU = 3100 Mcf; Atlantic Rim Reserves = 1.5 Tcf)**

|  | SO2 | NOx | PM10 | CO2 | VOCs |  |
|---|---|---|---|---|---|---|
| Western Coal | 0.810 | 2.20 | 0.06 | 1,039 | 0.09 | Tons per Gigawatthour |
| Gas | 0.003 | 0.57 | 0.02 | 640 | 0.05 | Tons per Gigawatthour |
| Difference | 0.807 | 1.63 | 0.04 | 399 | 0.04 | Tons per Gigawatthour |
| **Mitigation** | **390,484** | **788,710** | **19,355** | **193,064,516** | **19,355** | **Tons** |

|  | SO2 | NOx | PM10 | CO2 | VOCs |  |
|---|---|---|---|---|---|---|
| Eastern Coal | 1.740 | 2.90 | 0.10 | 1,000 | 0.06 | Tons per Gigawatthour |
| Gas | 0.003 | 0.57 | 0.02 | 640 | 0.05 | Tons per Gigawatthour |
| Difference | 1.737 | 2.33 | 0.08 | 360 | 0.01 | Tons per Gigawatthour |
| **Mitigation** | **840,484** | **1,127,419** | **38,710** | **174,193,548** | **4,839** | **Tons** |

Info based on EIA Feature Article "Environmental Externalities in Electric Power Markets: Acid Rain, Urban Ozone, and Climate Change" by John Carlin, 1995

The effect of high energy prices on consumers, especially those on fixed incomes and that are impoverished, should be taken into account. According to the Natural Gas Factors Affecting Prices and Potential Impacts on Consumers, published by the General Accounting Office dated February 13, 2006: "The effect of high natural gas prices has already been especially severe on low-income individuals". The GAO goes on to state that: "Because energy costs account for a relatively large share of overall costs for some consumers … any price increases can present significant difficulties. In particular, low-income residential consumers appear likely to encounter the greatest impact." This clearly suggests that the failure to develop natural gas bearing areas like the Atlantic Rim in a timely fashion is significantly impacting the country's population, with low-income consumers feeling the brunt of the force.

Warren concludes that Alternative B analyzed by the DEIS is unacceptable, primarily due to questionable legality issues that would occur if it were to be implemented. Warren also concludes that Alternative C is not a legitimate alternative, but rather a list of mitigation measures which could be applied to any of the action alternatives. The surface disturbance restrictions proposed in Alternative C take no notice of the data acquired by the interim drilling program or the recommendations provided by the BLM Reservoir Management Group (RMG). The RMG recommendations on both spacing and directional drilling are based on sound science and are irrefutable. The RMG recommendations should have been presented in the DEIS in their entirety as they were presented to the RFO. The omission of this document leaves the DEIS lacking in available science and reasoning.

E123-1

2

**Appendix O**

**BLM Responses to Comments**

# Appendix O.  BLM Responses to Comments

**Table O-2.    Substantive Comments and BLM Responses.**

**Comment Number**        607-69-6

**Comment**

The Colorado Salinity Control Forum (2002) recommended no change in the numeric salinity standards below Hoover Dam (723 mg/l). In Anadarko's opinion, BLM should be employing this standard to determine significance and not its proposed measure of determining salt loading above background levels. Utilizing the numeric limit set by law is consistent with other criteria BLM has adopted, such as violations of federal or state water quality standards.

**Response**

Please refer to our response to comment 607-69-5.

**Comment Number**        607-70-1

**Comment**

4.4.2.2 Ground Water Significance Criteria  In this section, BLM sets for the following criterion, which if met or exceeded, would indicate a significant impact: "The natural flow of groundwater to existing local springs, seeps and flowing artesian wells is interrupted, regardless of use or non-use." Anadarko does not agree with this criterion. As set forth here, an interruption, no matter how small and of what duration, would constitute a significant impact. Such a standard is unsupportable factually or scientifically, in part because it fails to take into consideration the fact that such flows are often interrupted due to natural events, such as droughts. Recommendation: BLM needs to eliminate this from its list of significance criteria.

**Response**

All significant criteria are established to evaluate impacts from the project.  These are intended to look at project activities that could produce these potential impacts.

**Comment Number**        607-70-2

**Comment**

4.4.3.1 Direct and Indirect Impacts Common to All Alternatives  The first paragraph in this section contains the same confusing language as found in Section 4.4.1.3. The same concerns noted above apply to its inclusion here. Recommendation: Clarify this language consistent with noted revisions to Section 4.4.1.3.

**Response**

Please refer to our response to comment 607-67-1.

**Comment Number**        607-71-1

**Comment**

4.4.3.1.1 Surface Water Impacts Common to All  The second sentence in this paragraph reads as follows: "Therefore, the primary impact of the proposed project on surface water resources is increased surface runoff, erosion and off-site sedimentation that would cause channel instability and degradation of surface water quality in some locations." BLM has failed to provide any supporting factual basis for this statement. We agree that surface disturbance has the potential to increase runoff, erosion and offsite sedimentation; however, BLM fails to quantify these potential effects with respect to background conditions.

**Response**

It is not possible to quantify these impacts because the locations of wells, roads and related facilities are not known at this time.  The successful application of BMPs will go a long way to reduce these impacts, and they depend so much on local conditions, such as soil type and topography.

# Appendix O.  BLM Responses to Comments

**Table O-2.    Substantive Comments and BLM Responses.**

<u>Hard Copy File 4</u>

**Comment Number**    671-1-1

**Comment**

Overall, the Draft EIS suffers from a crippling flaw: The BLM has not planned the project, laying out the location of where the wells, pipelines, roads, and powerlines will be sited. Without planning the locations of these facilities, their direct impacts cannot be measured.

**Response**

The Atlantic Rim EIS is a field development EIS and is tiered to the Great Divide Resource Management Plan.  As such, BLM addresses the overall environmental impacts of the Project, based on the general locations of wells and associated facilities in the Project area.  Consistent with its regulations, once annual work plans,  APDs or other applications for specific site activities are submitted, BLM will conduct more site-specific analysis of potential environmental impacts, tiered to the Project-level EIS.  Prior to issuing any permit or authorization to implement these activities on the BLM-administered lands, the BLM must analyze each component of the action proposed on a site-specific basis and subject to NEPA.

**Comment Number**    671-2-1

**Comment**

However, the current action alternatives each fail to provide adequate protection for wildlife, fisheries, recreation, vegetation, scenic resources, and special landscapes like ACECs and the Wild Cow Creek citizens' proposed wilderness.

**Response**

Conservation and Protection measures for the various resources you mention can be found in appendix E, "Wildlife Monitoring and Protection Plan", and  in the "Conservation Measures to Avoid or Reduce Adverse Impacts" section of appendix G, Biological Assessment.  Mitigations to protect  resources can be found in appendices K, B, E, and J as detailed on page 1 of appendix H. Required best management practices are detailed in appendix H, and further mitigations can be found in the "Additional Mitigation Measures" section for each resource analyzed in chapter 4.  The BLM believes requirements separately and in combination provide adequate protection for those resources under the Federal Land Policy and Management Act; however significant effects on the environment are possible under any of the "action" alternatives as discussed in chapter 4 and chapter 2.  Creation or consideration of a "Wild Cow citizens proposed wilderness" is outside the scope of this analysis.

**Comment Number**    671-2-2

**Comment**

Because each current alternative would turn the ARPA into a single-use industrial zone and would destroy sensitive and critically important resources such as sage grouse lek concentration areas, important big game seasonal ranges, and wilderness resources, the only Alternative that the BLM should implement at this point is Alternative A, the No Action Alternative.

**Response**

Alternative A is under consideration along with the Proposed Action and other alternatives, including a new alternative developed by BLM for inclusion in the final EIS.  Each, or portions of each of these alternatives can be selected by the Deciding Official for implementation in the Record of Decision.

**Comment Number**    671-2-3

**Comment**

In the meantime, we recommend that the BLM go back to the drawing board and prepare at least one action alternative that provides responsible management of coalbed methane and natural gas drilling, sound stewardship of the land and its wildlife, and a mix of development and protection that allows for multiple use of these lands.

**Response**

BLM developed an additional alternative (Alternative D) for inclusion in the final EIS.  This additional alternative is being considered along with the proposed action and other alternatives for selection by the Deciding Official for implementation in the Record of Decision.

# Appendix O.  BLM Responses to Comments

**Table O-2.     Substantive Comments and BLM Responses.**

**Comment Number**     682-12-7

**Comment**

Impacts such as fragmentation and barriers to movement and migration can be effectively analyzed only when the actual location of well pads, facilities, and roads are known.

**Response**

BLM agrees with this assertion.  The Atlantic Rim EIS is a field development EIS and is tiered to the Great Divide Resource Management Plan.  As such, BLM addresses the overall environmental impacts of the Project, based on general locations, wells, and associated facilities in the Project area.  Consistent with its regulations, once annual work plans,  APDs, or other applications for specific site activities are submitted, BLM will conduct  more site-specific analysis of potential environmental impacts, tiered to the Project-level EIS.  Prior to issuing any permit or authorization to implement these activities on the BLM-administered lands, the BLM must analyze each component of the proposed action on a site-specific basis which is subject to NEPA.  Also see our response to comment 671-11-1.

**Comment Number**     682-12-8

**Comment**

Despite the recognition that impacts to big game crucial winter range would be anywhere from "high" to "extreme," due to insufficient location information, the BLM has failed to realistically evaluate the extent of impact and the adequacy and likely success of mitigation measures offered under the no action alternatives.

**Response**

Please refer to our response to comment 682-12-7.

**Comment Number**     682-12-9

**Comment**

Additionally, an assessment and portrayal of impact within crucial winter habitat would be more accurate if analyzed based on vegetation type.

**Response**

Please refer to our responses to letter 666.  Vegetation types and the extent of disturbance are not yet known.  Please refer to our response to comment 682-12-7.

**Comment Number**     682-12-10

**Comment**

The BLM notes that "[t]he value of ATW as an important winter browse species cannot be over emphasized," however, despite its importance, no mitigation measures have been considered to protect this vegetation species, and there is no further analysis of the impact of its decimation on big game. DEIS at 3-60.

**Response**

Mitigation measures available in Wyoming Big Sagebrush habitat are generally the same measures available to any other habitat, and are detailed in several places within the EIS, most notably appendix H.

# Appendix O.  BLM Responses to Comments

**Table O-2.     Substantive Comments and BLM Responses.**

**Comment Number**     E123-23-1

**Comment**
Need to add "C" so it will read Alternative C.

**Response**
The text has been corrected.


**Comment Number**     E123-23-2

**Comment**
Alternative C is not an alternative, but a list of additional mitigation measures; many of which could be applied to all of the action alternatives.

**Response**
Alternative C is an alternative that in conjunction with an analysis of sensitive resource values would restrict disturbance in areas of sensitive resource values.


**Comment Number**     E123-24-1

**Comment**
Results from the interim drilling program clearly demonstrates that 160 acre spacing of wells does not produce economic success in the project. The data from the interim drilling program also demonstrates that 80 acre spacing does produce economic results in the area.

**Response**
The BLM agrees that interim drilling has demonstrated that 80 acre spacing can work in some areas.  BLM does not believe it has been proven necessary in all areas under all conditions, but that future development and experience will continue to improve our knowledge in this area.


**Comment Number**     E123-24-2

**Comment**
With respect to spacing, this production data has been entirely ignored and omitted from the DEIS.

**Response**
Please refer to our response to comment E123-24-1.


**Comment Number**     E123-24-3

**Comment**
The data from the interim drilling program also clearly demonstrates that directional drilling is not technically feasible. These specific issues are addressed in detail below.

**Response**
As detailed in "Alternatives Considered and Eliminated From Detailed Study", mandated directional drilling is not feasible at Atlantic Rim.  However, directional drilling is an option for the proponents to consider at the site-specific level, if reservoir conditions make it a possibility.  It is one alternative among many for the companies to consider when planning development of the ARPA.


**Comment Number**     E123-24-4

**Comment**
The proposed surface disturbance limits are restrictive to the point that they would prevent development and economic success of the project.

**Response**
The BLM believes the "less than 20 acre" standard, while restrictive is responsive to the purpose and need for the project.

# Appendix O.  BLM Responses to Comments

**Table O-2.     Substantive Comments and BLM Responses.**

**Comment Number**     E123-24-5

**Comment**
Directional drilling has been eliminated as a viable option for the project.

**Response**
Please refer to our response to comment E123-24-3.


**Comment Number**     E123-24-6

**Comment**
BLM has a multi-use responsibility to manage, among other things, leasing, exploration, and development of oil and gas. Although it may be appropriate to consider recommendations from the Game and Fish Department, it is not appropriate to apply recommended measures that are in conflict with management goals of the Resource Management Plan, nor is it appropriate to apply recommended measures that are not geographically, technically or economically feasible.

**Response**
The BLM will not apply measures that are in conflict with resource goals of the Great Divide Resource Management Plan.  BLM will not apply measures that are not feasible.


**Comment Number**     E123-24-7

**Comment**
The DEIS selected the lowest level of impact even though moderate numbers were available.

**Response**
The BLM is unaware of what "moderate numbers" are referenced in this comment.


**Comment Number**     E123-24-8

**Comment**
The Wyoming Game and Fish recommendation and the DEIS fail to take into account differences in oil and gas development projects.  An example of this difference is a deep gas development project that would require months to drill and complete each well. In the Atlantic Rim project, drilling and completion time is closer to two weeks per well.

**Response**
Thank you for your comment.


**Comment Number**     E123-24-9

**Comment**
The DEIS has misapplied the Game and Fish recommendations by attempting to utilize them without regard to the specific project details involved.

**Response**
Specific project details will arise at the site specific APD level.  BLM will be able to relate Game and Fish recommendations to oil and gas development proposals when making its decision on mitigations and approval.


**Comment Number**     E123-24-10

**Comment**
Implementation of these restrictions would render the project technically unfeasible since directional drilling is not an acceptable alternative (BLM RMG 2005) and 80 acre spacing is needed for economic production.

**Response**
Please refer to our response to comment E123-24-3.

# Appendix O.  BLM Responses to Comments

**Table O-2.    Substantive Comments and BLM Responses.**

<u>**Type A Form Email File 7**</u>

**Comment Number**    TA1-1

**Comment**

Keep roads and drilling pads safe distances away from sage grouse breeding and nesting areas (with a 3-mile buffer),

**Response**

The Great Divide Resource Management Plan (RMP) in appendix I lists sage-grouse in several areas of the Wildlife Mitigation Guidelines including 2b and 2c.  2c provides for the prohibition of surface activities or use within important habitat areas for the purpose of protecting sage-grouse breeding grounds and or habitat where timing stipulations are not appropriate.  The purpose of the Guidelines are (1) to reserve for the BLM the right to modify the operations of all surface and other human presence disturbance activities as part of the statutory requirements for environmental protection, and (2) to inform a potential lessee, permittee, or operator of the requirements that must be met when using BLM-administered lands.  The Guidelines in the RMP are not specific as to the distance an action must be moved to mitigate impacts of a proposal on sage-grouse.   Literature reviews show that requirements for no surface disturbance (NSD) from a lek generally run in the quarter-mile to 2-mile range.  The quarter-mile NSD mitigation is generally a minimum distance.  Additionally, another mitigation listed in appendix E, page E-6 states that no surface disturbance would be allowed within identified patches of greater sage-grouse severe winter relief habitat.

**Comment Number**    TA1-2

**Comment**

sharp-tailed grouse breeding and nesting areas (1 mile),

**Response**

Please refer to our response to letter TA1.

**Comment Number**    TA1-3

**Comment**

ferruginous hawk nests (2 miles), other raptor nests (1 mile), mountain plover nesting areas,

**Response**

Please refer to our response to letter TA1.  The RMP Surface Disturbance Guidelines also address raptor nesting areas.

**Comment Number**    TA1-4

**Comment**

100-year floodplains,

**Response**

Section 2.a.1 of Executive Order 11988 requires all federal agencies to evaluate the potential effects of any actions it may take in a floodplain.  Section 2.a.2 of EO 11988 states that …"If an agency has determined to, or proposes to, conduct, support, or allow an action to be located in a floodplain, the agency shall consider alternatives to avoid adverse effects and incompatible development in the floodplains. If the head of the agency finds that the only practicable alternative consistent with the law and with the policy set forth in this Order requires siting in a floodplain, the agency shall, prior to taking action, (i) design or modify its action in order to minimize potential harm to or within the floodplain, consistent with regulations issued in accord with Section 2(d) of this Order, and (ii) prepare and circulate a notice containing an explanation of why the action is proposed to be located in the floodplain."  If the Operators propose to locate well pads or ancillary facilities with a 100-year flood plain, the proposal will be evaluated during the site-specific environmental assessment process.

**Comment Number**    TA1-5

**Comment**

prairie dog colonies.

**Response**

Sections 2.3.1.1 and 2.3.1.5 of appendix E (Wildlife Monitoring and Protection Plan) provide protection for prairie dogs.

**Exhibit 3 to Defendant-Intervenors' Opposition To
Plaintiffs' Motion For A Preliminary Injunction**

**BLM Record of Decision ("ROD") for the Atlantic Rim Project**

# RECORD OF DECISION
# Environmental Impact Statement for the Atlantic Rim Natural Gas Field Development Project
## Carbon County, Wyoming

Rawlins Field Office



**March 2007**

MISSION STATEMENT
It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.

**BLM/WY/PL-07/011+1310**

RECORD OF DECISION

ENVIRONMENTAL IMPACT STATEMENT FOR THE

ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT

CARBON COUNTY, WYOMING

**U.S. Department of the Interior**
**Bureau of Land Management**
**Wyoming State Office**
**Cheyenne, Wyoming**

**March 2007**

# RECORD OF DECISION

# ENVIRONMENTAL IMPACT STATEMENT FOR THE

# ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT

# CARBON COUNTY, WYOMING

## Table of Contents

SUMMARY ........................................................................................................... 1

DECISION ........................................................................................................... 1

REASONS FOR THE DECISION .......................................................................... 4

SUMMARY OF PROPOSED ACTION AND ALTERNATIVES ..................................... 11

    Alternatives Considered in Detail .................................................................. 11

    Proposed Action .......................................................................................... 11

    Alternative A:  No Action .............................................................................. 12

    Alternative C:  Special Protection of Sensitive Resources ........................... 12

    Alternative D:  Natural Gas Development with Disturbance Limitations (Agency Preferred Alternative) ................................................................................... 12

ALTERNATIVES CONSIDERED AND ELIMINATED FROM DETAILED ANALYSIS ... 14

    DEIS Alternatives Not Carried Forward for Final Analysis ........................... 14

OTHER ALTERNATIVES CONSIDERED AND ELIMINATED FROM DETAILED ANALYSIS ......................................................................................................... 14

    3,880 Natural Gas Wells from 3,880 Well Locations .................................... 14

    Directional Drilling ....................................................................................... 14

    Produced Water Disposal and Treatment Options ........................................ 15

ENVIRONMENTALLY PREFERRED ALTERNATIVE ................................................ 16

PLAN, REVIEW, AND APPROVAL PROCESS ....................................................... 16

PERFORMANCE REQUIREMENTS ....................................................................... 21

PUBLIC INVOLVEMENT ....................................................................................... 21

APPEAL PROCESS ............................................................................................. 22

ERRATA ............................................................................................................. 23

**RECORD OF DECISION**

# List of Figures

1. Atlantic Rim Project Location, Carbon County, Wyoming ........................................................2

2. Category A Mitigation Areas ................................................................................................13

3. Atlantic Rim Oil and Gas Development Proposal Submittal—Approval—Implementation
   Process .................................................................................................................................17

# List of Appendices

A. Atlantic Rim Natural Gas Project Reclamation Plan

B. Atlantic Rim Natural Gas Project Performance-Based Monitoring and Best Management
   Practices

C. Operator-Committed Practices

D. Formal and Informal Consultation for the Atlantic Rim Natural Gas Field Development
   Project

E. Summary of Public Comments on the Atlantic Rim Natural Gas Project Final Environmental
   Impact Statement

# RECORD OF DECISION

## Environmental Impact Statement for the
## Atlantic Rim Natural Gas Field Development Project
## Carbon County, Wyoming

## SUMMARY

This Record of Decision (ROD) documents the Wyoming State Director's decision to approve the preferred alternative as described in the Atlantic Rim Natural Gas Field Development Project (ARNG) Final Environmental Impact Statement (FEIS). The ARNG FEIS analyzes various options for oil and gas recovery and resource mitigation. The decision emphasizes limiting surface disturbance and performing interim reclamation, cooperative air quality monitoring with the state of Wyoming, and continued resource monitoring and consultation with federal and state agencies. The ROD provides the plan for future management of the federal surface and mineral estate in the Atlantic Rim Project Area (ARPA). The ARPA comprises approximately 270,080 acres, of which 173,672 acres are federal surface estate (64 percent of the ARPA), 14,060 acres are state surface estate (5 percent), and 82,348 acres are private surface estate (31 percent). The Bureau of Land Management (BLM) Rawlins Field Office (RFO) manages more mineral estate than surface estate within the ARPA: 179,438 acres federal mineral estate (66 percent), 12,384 acres state mineral estate (5 percent), and 78,258 private mineral estates (29 percent).  Figure 1 shows the location of the ARPA. The findings in the ARNG FEIS and decisions of this ROD are based upon an open and collaborative public process. The state of Wyoming, Carbon County, individuals, stakeholders, and institutions shared their knowledge and insights about the proposed oil and gas field development with the BLM. Public involvement was solicited, and the BLM's analysis of major issues from public comments on the FEIS is presented in appendix E.

The ARNG project is consistent with the President's National Energy Policy and the Energy Policy Act of 2005 by increasing domestic energy supply and helping to reduce the country's dependence on foreign sources of oil and gas. The proposed project is expected to produce nearly 1,350 billion cubic feet (BCF) of natural gas, providing enough natural gas to heat 19.3 million homes for one year and generating approximately $958 million in total taxes and royalties.

## DECISION

The BLM selects Alternative D the agency's Preferred Alternative with modifications for the development of natural gas resources in the ARPA, as described in the FEIS.  Modifications to Alternative D include use of Performance Goals as described elsewhere in this Decision, and the option to consider protective measures described in Alternative C that are not in conflict with this Decision.  Alternative D involves drilling of approximately 2,000 gas wells within the ARPA to recover energy resources, while limiting total new surface disturbance from the drilling program across the ARPA (federal, state and fee minerals) to a maximum of 7,600 acres, at any given time, and a 6.5-acre/well site short-term (less than 6 years) disturbance goal. The estimated number of gas wells is not a cap or limitation, but an approximation to help establish

**Figure 1.  Atlantic Rim Project Location, Carbon County, Wyoming, 2006.**



the surface disturbance limit.  The 7,600-acre disturbance cap will be allocated to Operators on a prorated mineral leasehold basis.  Natural gas development is limited to eight well sites per 640-acre section, which includes coalbed natural gas (CBNG), conventional, and injection wells. Operators may install multiple wellbores (e.g., CBNG, conventional, or injection) on a well site.

# RECORD OF DECISION

Operators will be required to initiate reclamation after completion of the drilling activities and before the next growing season. During the life of the project (30–50 years), total disturbance from natural gas development activities in the ARPA is estimated to be 13,600 acres. This includes acres of disturbance from existing wells and infrastructure added to the proposed new activities.

Disturbance acreage will be monitored using geospatial tracking methods. As detailed in appendix B, Operators are required to provide the BLM, within 30 days of approval of this ROD, a map of existing disturbance associated with activities authorized during the period of time when the interim drilling policy was in effect. In addition, "as-built" disturbance will be measured and reported and subsequent reclamation efforts will be monitored, documented, and provided annually to the BLM RFO Authorized Officer (AO). Adaptive management techniques will be used to correct any deficiencies and modify reclamation criteria as is necessary (Reclamation Plan, appendix A). When a site attains the interim reclamation vegetation cover and soil stability standards detailed in "Criteria for Reclamation Success" in the Reclamation Plan (appendix A), the reclaimed acreage will be deducted from an Operator's disturbance cap allocation and additional disturbance on federal lands leased for oil and gas development in the ARPA will be permitted by BLM. In the event an Operator reaches its disturbance cap allocation, further disturbance on federal minerals will not be permitted.

Drilling development and reclamation activities in the ARPA will be managed through a performance-based, adaptive management process as described in appendix B. The process includes a requirement for Operators to submit an annual operating plan to the BLM RFO AO. The overall purpose of this process is to meet resource management objectives and ensure Performance Goals are achieved to the greatest extent possible. A monitoring and mitigation process will be required, and its development will begin within 30 days of the effective date of the ROD. This process will be developed by the Review Team (BLM, cooperating and interested agencies, and Operators) and will provide quantifiable criteria to identify trends associated with the Performance Goals. The process will include the types of mitigation responses that will be considered in the event that monitoring data indicate a downward trend relative to the Performance Goals. Throughout the life of the project, monitoring data will be reviewed to determine if mitigation measures are effective and leading to the achievement of reclamation and Performance Goals. The monitoring data will be evaluated on a regular basis (at least annually) and best management practices (BMPs), conditions of approval (COAs), protective measures, reclamation criteria, and mitigation measures may be modified, as appropriate, based on the monitoring results. Target dates for annual plans and reclamation reporting may vary as needed and approved by the RFO AO.

Operators are responsible for demonstrating successful achievement of Performance Goals. Early efforts are to be made to collect or consolidate resource data to form a baseline against which future monitoring efforts and data would be compared to indicate trends. In the absence of sufficient data illustrating Operator achievement of Performance Goals, the BLM will use a conservative approach when considering additional approvals.

This decision is not the final review or approval for actions associated with ARNG development. The AO will review and consider each component of the project that involves federal lands or minerals on a site-specific basis. Other reviews or decision points include, but are not limited to, the review of annual or multi-year development plans (including transportation plans), Applications for Permit to Drill (APD), right-of-way (ROW) grants, Sundry Notices, or applications for Special Use Permits. To avoid duplicative installations, the transportation plan is required to include the location and size of power lines. All distribution power lines 12.5 kV or

lower will be buried. The appropriate level of environmental review would be conducted prior to authorizing any of these applications or permits.

Consistent with 43 CFR Part 3160, this decision will be in full force and effect commencing with the date it is signed by the AO.

# REASONS FOR THE DECISION

The ARNG EIS was prepared in response to leaseholders' requests to exercise the terms and conditions of their respective oil and gas leases in the project area. The environmental impacts of this decision are fully disclosed in the FEIS for the project. The decision to approve natural gas development as described by Alternative D with modifications is in conformance with the Great Divide Resource Management Plan for the Rawlins Field Office.

The Performance Goals and Requirements included in this ROD are designed to minimize surface disturbance while optimizing natural gas recovery. A performance-based management approach is being employed to ensure Performance Goals are achieved to the greatest extent possible. These Performance Goals and Requirements, in conjunction with the monitoring and mitigation process, will further assure that the intent of the performance-based management approach is achieved, and also allow flexibility to achieve these goals at a site-specific level. Implementation of this decision will result in production of nationally significant natural gas resources consistent with The National Energy Policy (May 2001) and the National Energy Policy Act of 2005. The proposed development and activities in Alternative D require surface-disturbing activities that are likely to result in major adverse impacts to certain resource values, as outlined in the FEIS. While the development is expected to adversely impact certain resource values and limit opportunities for other uses in the short-term, the long-term goal is to return these lands to a condition approximate to that which existed before developments proposed in Alternative D were implemented.

In reaching this decision, the following key issues, impacts as described in the FEIS, and the concerns and comments submitted during the EIS process were considered. Rationale for mitigation and actions to address each issue and reduce effects are presented below.

## Surface Disturbance

The total area and distribution of surface disturbance associated with further development of the ARPA affects many resources (e.g., soils, vegetation, wildlife and wildlife habitat, and cultural resources). The extent and duration of surface disturbance can adversely affect management of these resources.

- Alternative D limits new, unreclaimed surface disturbance within the ARPA to 7,600 acres at any time to minimize resource impacts from surface disturbance. Disturbance limits encourage development and implementation of state-of-the-art technologies for both operational and reclamation activities.

- Alternative D was developed in response to comments received on the Draft EIS (DEIS). The BLM recognized that resource impacts can be reduced by limiting the amount of initial disturbance (goal of 6.5 acres/well site) combined with timely reclamation. The BLM's evaluation of exploratory activities that have occurred over the past 5 years determined that average initial and long-term disturbance could be reduced by approximately 18 percent from the Proposed Action (e.g., 60- vs.

# RECORD OF DECISION

80-foot-wide roads) if Alternative D were implemented. While a conservative analysis of Alternative D and the Proposed Action indicates similar levels of impacts, the reduced initial surface disturbance, reduced disturbance at any time, and lower long-term disturbance outlined in Alternative D (See summary table below) provides the most practical alternative for mitigating environmental impacts while maximizing natural gas recovery (Purpose and Need for the Project).

- Managing the amount of allowable surface disturbance on a field-wide basis and requiring successful interim reclamation in exchange for allowing additional disturbance provides a strong incentive for Operators to employ new development and reclamation technologies while still reaching their total oil and gas resource recovery objectives. Reducing the operational footprint creates less overall disturbance, and accelerated reclamation would ensure vegetation is reestablished in the shortest time possible. The disturbance management philosophy of limiting the number of roads by transportation planning, smaller operational footprints, and accelerated reclamation efforts also benefits wildlife by limiting habitat fragmentation, reducing habitat loss, and returning habitat function in the shortest possible time.

| Issue | Proposed Action | Alternative C | Alternative D |
|---|---|---|---|
| **Disturbance** | | | |
| Total acres of surface disturbance | 16,400 | 13,886 | 13,600 |
| Total acres disturbance at any given time | 16,400 | 13,886 | 7,600 |
| New long-term surface disturbance | 6,200 | 6,200 | 5,000 |
| **Livestock Management** | | | |
| Initial loss - animal unit months (AUMs) | 2,026 | 1,703 | 1,667 |
| Loss from dust and weeds (AUMs) | 3,588–5,588 | 3,000–6,000 | 3,588–5,588 |
| Temporary non-use permits (AUMs) | 20,000 | 5–10,000 | 20,000 |
| **Mineral Resource Recovery** | | | |
| Natural gas (BCF) | 1,350 | 87 / 850 / 1,100[1, 2, 3] | 1,350 |

1. Alternative C assumes successful development on federal minerals at 160-acre spacing. IDP data and evaluations by petroleum reservoir professionals indicate that economic gas volumes may not be recoverable at 160-acre spacing and that 80-acre spacing at the reservoir level is required.

2. For comparison purposes, gas recovery under Alternative C assumes 670 CBNG wells on federal minerals at 160-acre spacing with 50 percent of the recovered gas volume compared to 80-acre spacing. Also see Note #1 (Max. state/fee minerals: 141 sections x 8 wells per 640-acre section = 1,130 wells; 1,800 CBNG wells– 1,130 state/fee = 670 CBNG well on federal minerals).

3. Alternative C recovery, tax, and royalties estimates include (1) IDP production only, (2) development on state/fee minerals only (1,130 well or 63 percent of the 1,800 CBNG wells included in the Proposed Action), and (3) 1,130 wells on state/fee minerals at 80-acre spacing and 670 CBNG wells on federal minerals at 160-acre spacing.

- The environmental analysis of Alternative D presented in the FEIS and the decisions made in this ROD are based on these disturbance limits applied across the ARPA. The BLM has approval authority over actions on federal minerals and lands. When evaluating development applications for affected federal minerals and lands, the

BLM will consider impacts and surface disturbance that occur on private and/or state lands relative to an Operator's disturbance cap allocation.

- The review and approval process prior to allowing a federal leaseholder to extract federal minerals will be subject to further environmental review. In some instances, further National Environmental Policy Act (NEPA) documentation will be prepared. In other instances, where certain criteria are met, the action may be categorically excluded from the requirements of NEPA and will be approved under the provisions of Section 390 of the Energy Policy Act of 2005. In all cases, the action will be subject to on-site investigation, cultural reviews, T&E consultation, and environmental reviews. In cases where development to access privately owned minerals is proposed on private or state lands, and access across public lands is requested, the BLM will conduct the appropriate level of NEPA analysis prior to granting a ROW. Environmental documents prepared under NEPA will consider cumulative impacts that may result from the private actions within the ARPA. Prior to approval of all oil-and-gas-related activities in the ARPA, the BLM will consider surface-disturbing activities associated with natural gas development that occur on private lands and include that information when estimating the acreage towards the 7,600 acres cap.

- Surface-disturbance impacts on cultural resources are mitigated through avoidance. Where avoidance is not possible, recovery of the cultural resource prior to allowing disturbance activities to occur will be considered on a site-specific basis (FEIS, appendix I).

## Socioeconomic Effects

Another issue of concern is the influx of transient workers (those workers not maintaining permanent residence) and the ability of local government agencies to address infrastructure shortfalls, such as community support facilities, hospitals, medical clinics, emergency services, housing, and roads. Gas field employees express the desire to maintain permanent residence in the area, but are concerned about continued employment opportunities in the ARPA. Both the project proponents and local government agencies have identified potential revenues from taxes, royalties, higher employment and increased economic activity, and benefits associated with the proposed project to state, county, and local communities.

- The FEIS contains extensive analysis of potential socioeconomic impacts. To assist local government agencies in planning, BLM will provide relevant portions of the Operator's current and multi-year development plans to local government agencies to use in their community, county, and state planning efforts.

## Air Quality

Concerns over potential adverse impacts to air quality from natural gas development and production operations were expressed during the EIS process. Specific interest in potential emissions from drilling rigs, ozone production, and the amount of dust and other particulate matter that might be generated by increased vehicle traffic and other surface-disturbing activities was identified.

Air quality continues to be of concern to Wyoming residents, cooperating agencies, and other interested parties. To address these concerns, the BLM, in cooperation with the United States

**RECORD OF DECISION**

Environmental Protection Agency (USEPA), Wyoming Department of Environmental Quality–Air Quality Division (WDEQ–AQD), and United States Department of Agriculture-Forest Service (USDA-FS), conducted extensive analyses and reached conclusions as described below. Alternative D best addresses air quality concerns by including performance goals and mitigation measures. Diligent monitoring of several components that contribute to determining the quality of the air is essential. Because monitoring activities are integral to Alternative D, this alternative is most likely to ensure that Performance Goals will be met and the effectiveness of mitigation and BMPs measured.

When considered in the context of the state of Wyoming and its other natural gas fields where oil and gas development and production activities are more concentrated geographically and geologically, adverse impacts associated with implementation of Alternative D are expected to be short-term and minor. Any long-term change in air quality or visibility impairment is not likely to be significant.

The following is a summary of air quality analysis efforts and conclusions:

- Modeling predicts no significant impacts to public health for the air quality pollutants modeled. Worker health falls within the purview of the Occupational Safety and Health Administration.

- Potential air quality impacts from the Atlantic Rim project were estimated to be below applicable air quality standards. Potential $O_3$ concentrations were estimated by the Scheffe method, which was considered by the inter-agency air quality team to be a reasonable tool and an acceptable ozone estimation method at the time the air quality analysis was conducted.

- WDEQ established an air quality monitoring station near Wamsutter, Wyoming, in March 2006 to monitor concentrations of NOx, $O_3$, $PM_{10}$, and $SO_2$. In cooperation with WDEQ, the Operators will finance and operate additional air quality concentration monitoring, including $O_3$ monitoring, in the Rawlins Field Office (RFO) management area. The BLM will work cooperatively with WDEQ, USEPA, and the Operators to maintain and enhance concentration monitoring in the RFO management area, including monitoring required to represent impacts due to emissions from the Atlantic Rim field.

- If, in the future, air monitoring were to show $O_3$ exceedences that were attributable at least in part to sources in the Atlantic Rim field, the BLM would consult with WDEQ and USEPA to determine whether adaptive management is needed to mitigate impacts.

## Wildlife

Issues focused on three areas: (1) potential impacts to sensitive wildlife species including fish, (2) potential impacts to listed threatened and endangered plant and wildlife species and those proposed for listing, and (3) impacts to wildlife habitat including big game crucial winter range and sage-grouse nesting and brood rearing habitat. Based on the significance criteria identified in section 4 of the FEIS, implementation of the ARNG project may result in adverse effects to pronghorn antelope, mule deer, elk, sage-grouse, Columbian sharp-tailed grouse, sagebrush-obligate songbirds, roundtail chub, bluehead suckers, and flannelmouth suckers. The overall wildlife mitigation strategy for the ARNG project is discussed below.

**RECORD OF DECISION**

- The Wyoming Game and Fish Department (WGFD) "Recommendations for Development of Oil and Gas Resources within Crucial and Important Wildlife Habitats" (December 6, 2004) makes some prediction of effects to wildlife populations from oil and gas development in Wyoming and provides some mitigation measures WGFD believes could reduce these effects. The BLM considered the WGFD report and recommendations during development of the FEIS and ROD.

- To address impacts within the ARPA, this decision implements four strategies as evaluated for Alternative D: (1) reduce the initial disturbance footprint as much as possible, (2) restore habitat function in the shortest time possible, (3) perform timely site reclamation and limit unreclaimed surface disturbance, and (4) institute a monitoring and adaptive management process to ensure reclamation and mitigation measures are effective and initiate corrective action when it is not.

- To restore habitat function as soon as possible, this decision implements a performance-based management approach that provides an incentive for rapid on-site interim and final reclamation while simultaneously allowing maximum flexibility in field development. As detailed in the Reclamation Plan (appendix A), the Operators will monitor and evaluate reclamation effectiveness and provide annual adaptive management recommendations as appropriate to the BLM for consideration.

## Threatened and Endangered Species

Implementation of Alternative D would result in direct loss of habitat from surface disturbance associated with the construction of well sites, related facilities, access roads, and pipelines. In addition, some wildlife species would be indirectly impacted by displacement from habitats in the vicinity of the project area due to the presence of human activities associated with the construction and operation of wells. Small portions of potential black-footed ferret habitat may be disturbed. The potential for collisions between bald eagles and motor vehicles would also increase due to the construction of new roads and increased traffic levels on existing roads. The primary source of potential risks to the fish species is an increase in suspended sediments and sedimentation from land disturbance associated with project activities.

- The intensity of these impacts may decrease with the completion of the construction phase and with the onset of reclamation efforts on disturbed areas.

- None of the threatened and endangered species found downstream of the ARPA within the Colorado River system are known to occur in the ARPA; therefore, there would be no direct impacts to these species. Implementation of all mitigation measures for water and soils may reduce potential adverse impacts. No produced water from the ARPA would be discharged to the Little Snake River drainage; therefore, produced water discharges do not pose a risk to the species there.

- Any water depletion within the Colorado River system results in a "may affect, likely to adversely affect" determination for threatened and endangered species found in and along this river. Therefore, the BLM would initiate formal consultation with the United States Department of the Interior, Fish and Wildlife Service (USDI-FWS) for those species when an applicable proposal is received, and prior to approval.

**RECORD OF DECISION**

- If any threatened or endangered fish species are identified within the ARPA, the BLM would consult with the USDI-FWS and develop a protection plan for the fish when an applicable proposal is received, and prior to approval.

## Big Game Crucial Winter Range

Areas of overlapping big game crucial winter range are important because they provide crucial habitat for more than one species of big game. There are several areas of overlapping big game crucial winter range located within the ARPA. The combinations of overlapping big game crucial winter range include the following: elk/mule deer, 3,038 acres and mule deer/antelope, 22,637 acres. Forty percent of this habitat occurs on private and state lands where there are no protections against disturbance of animals during crucial time periods (See Surface Disturbance discussion for a description of surface disturbance management practices that may mitigate the impact to this habitat and BLM-sensitive species).

## Wildlife Habitat

Implementation of the ARPA project would have adverse impact to suitable habitat for many wildlife species (e.g., BLM-sensitive species and sagebrush-obligate songbirds). Habitat loss was attributed to direct loss through surface disturbance, indirect loss through animal avoidance of areas near developments, and habitat fragmentation when habitat is no longer suitable for species dependent on intact habitat patches larger than what would be remaining if the project were constructed.

- The FEIS acknowledged that habitat impacts (big game crucial winter range and general wildlife habitat) would be significant due to ARPA field development. The mitigation strategy for limiting the allowable surface disturbance, accelerated reclamation by the Operators, remote monitoring (telemetry), timing stipulations, and other BMPs will reduce direct and indirect disturbance to wildlife, facilitating the long-term return of habitat function.

## Rangeland and Grazing

Issues regarding rangeland and grazing that were identified by cooperators, grazing permit holders, and other respondents included: direct loss of livestock forage; the potential for a reduction in permitted livestock numbers; water quality impairment at existing livestock watering sources; livestock movement restrictions/alterations due to pipeline trenches, roads, and fences; livestock management problems associated with the inability to access required area two-track routes from project-developed roads; vehicle collisions; entrapment in pipeline trenches; and the increase in fugitive dust emissions potentially causing dust-induced pneumonia in livestock. Alternative D best resolves these issues for the following reasons:

- Though the project results in the loss of available livestock forage, any loss of animal unit months (AUMs) will be determined through rangeland monitoring and, if necessary, addressed through the adaptive management process. As discussed in the FEIS, other potential impacts (e.g., traffic, roads, and open trenches) on grazing operations can be predicted but not accurately quantified at this level of evaluation. The BLM assumes that some conflicts may continue to occur or may not be completely resolved or mitigated. Solutions to and mitigation of such conflicts will be addressed as they arise.

**RECORD OF DECISION**

- The selected alternative has the lowest level of initial and long-term disturbance and corresponding lowest initial loss of AUMs (See table above).

- The Operators must coordinate annually, or more often as necessary, with affected livestock operators to discuss: (1) problems encountered during the past grazing season, (2) agreed-upon corrective actions, and (3) planned energy development and operations during the next grazing season. The BLM and Wyoming Department of Agriculture will participate as appropriate.

## Cultural

Once implemented, some specific development and operation activities associated with Alternative D are likely to result in an adverse effect determination from the Wyoming State Historic Preservation Officer (SHPO). The potential for adverse impacts to historic properties, such as the Overland Trail and their settings, was identified in the FEIS and considered by the BLM. To mitigate these potential adverse effects, the BLM has worked closely with SHPO to develop protocols, as described below, to be followed over the course of the project.

- As prescribed in the Wyoming State Protocol between the Wyoming BLM and the SHPO, Memoranda of Agreements (MOAs) are required between SHPO, BLM, the proponent, and interested parties as part of the Section 106 of the National Historic Preservation Act (NHPA) consultation process when there are anticipated adverse effects to historic properties. Given the number of site-specific projects needed to implement Alternative D, handling the Section 106 consultation process through one programmatic agreement (PA) is preferable to multiple, individual MOAs when adverse effect situations are anticipated or multiple consultations when no adverse effect situations are expected.

- The Wyoming State Protocol provides the direction by which BLM will meet its responsibilities under Sections 106, 110 (f) and 111 (a) of the NHPA, rather than following the procedure set forth in the Advisory Council on Historic Preservation (ACHP) regulations (36 CFR part 800). Therefore, the BLM will pursue a programmatic agreement for this project prior to commencement of site-specific development activities that may result in "adverse" or "no adverse effects" determinations.

## Maximize Natural Gas Recovery

Alternatives in the FEIS were developed to analyze a balance between development well spacing to effectively recover natural gas resources and protecting other resource values.

- To ensure effective recovery of natural gas and maximize protection of other resource values, natural gas development, as described for Alternative D with modifications, is limited to eight well sites per 640-acre section, which includes CBNG, conventional, and injection wells. Operators may install multiple wellbores (e.g., CBNG, conventional, or injection) on a well site. No more than 7,600 acres (2.8 percent) of the project area will be disturbed by oil and gas development at any time. For the overall Atlantic Rim area, there is a 6.5-acre/well site short-term disturbance goal. The BLM believes Alternative D provides a good balance between oil and gas recovery and resource protection and provides for long-term reclamation and re-establishment of native vegetation and wildlife communities.

**RECORD OF DECISION**

- Alternative C was prepared to evaluate natural gas resource development while aggressively mitigating impacts to sensitive resource values using additional development protection measures (DPMs). Public comments received on the DEIS, results of interim exploration, and technical evaluations by the BLM Reservoir Management Group all indicated drilling on 160-acre spacing would not achieve maximum recovery of natural gas resources, was likely not economically feasible, and was likely an inefficient recovery of the natural gas resource in the ARPA. In addition, displacement of disturbance from federal lands to state and fee lands due to these aggressive protective measures may result in higher initial disturbance, disturbance at any time, and long-term disturbance compared to Alternative D (See summary table above), with uneconomical and inefficient natural gas recovery.

Alternative D increases domestic energy supplies and reduces the United States' dependence on foreign sources of energy, one of the primary goals of the President's National Energy Policy and the National Energy Policy Act of 2005. Development of these federal resources satisfies requirements of FLPMA and the Mineral Leasing Act. The leasing and subsequent production of federal oil and gas resources provides the United States, the state of Wyoming, and affected local counties with income in the form of lease royalty payments. Alternative D best meets the goals of the National Energy Policy and achieves the objectives of the federal oil and gas leasing program managed by the BLM. The State of Wyoming is satisfied that Alternative D meets its goals and objectives for oil and gas development and that it would best contribute to the state and local economies. The project will provide 1,350 BCF of natural gas for the country, sufficient to heat 19.3 million homes for a year.

This decision is made in full consideration of the public, local, state, and other federal agency input. No substantial issues raised by government agencies, industry, groups, or individuals within the scope of this proposal and FEIS remain unresolved.

# SUMMARY OF PROPOSED ACTION AND ALTERNATIVES

## Alternatives Considered in Detail

The ARNG Project FEIS analyzed four alternatives. They were:

1. Proposed Action

2. Alternative A:   No Action

3. Alternative C:   Special Protection of Sensitive Resources

4. Alternative D:   Natural Gas Development with Disturbance Limitations
                    (BLM Preferred Alternative)

## Proposed Action

The Operators proposed to drill and develop up to 2,000 new natural gas wells. Approximately 1,800 wells would be drilled to coals within the Mesaverde Group to develop CBNG resources. An additional 200 wells would be drilled to access conventional natural gas found in other formations, generally expected to be deeper than the Mesaverde coals. The 2,000 proposed

new natural gas wells would be in addition to the 116 ARPA interim exploration wells already drilled during the interim drilling period.

Proposed well spacing would be 8 well sites per 640-acre section (80-acre spacing) throughout the project area, but may be reduced to four well sites per 640-acre section (160-acre spacing) depending on the geology and ability of the Operators to recover the gas resource. Development and drilling would begin in 2007 and continue for approximately 20 years, with a life of project of 30–50 years. Various drilling and production related facilities (e.g., roads, pipelines, water wells, disposal wells, compressor stations, and gas processing facilities) would also be constructed within the ARPA.

## Alternative A: No Action

NEPA regulations require that EIS alternative analyses "include the alternative of no action" (40 CFR 1502.14(d)). For this analysis, "no action" means that the BLM would reject the proponents' proposal and the proposed activity would not take place. Development activities and operations approved under EAs during the interim drilling period would continue as approved.

## Alternative C: Special Protection of Sensitive Resources

Under Alternative C the Operators would be approved to develop natural gas resources from the desired target formations but operations would be subject to DPMs in those areas with sensitive or crucial resource values (as detailed in FEIS appendix L), likely resulting in fewer acres of disturbance and reduced road density on federal lands. Generally DPMs focus on surface disturbance limits; selection of facility locations; drilling; construction practices; and, in some cases, no surface occupancy. Examples of such areas where DPMs would be applied are wildlife and fish habitat and areas with sensitive soils. Geographic information system (GIS) layers would be available to Operators for development of site-specific proposals for their planning of the annual program.

## Alternative D: Natural Gas Development with Disturbance Limitations (Agency Preferred Alternative)

The goal of this alternative is to minimize surface disturbance while optimizing natural gas recovery. Annual planning between the Operators and the BLM would be a key component of this alternative. The annual planning would require the Operators to submit to the BLM their proposed plan of operation for the forthcoming year. The BLM would then work with the Operators at a site-specific level to minimize surface disturbance by applying the appropriate lease stipulations, conditions of approval, BMPs, and any other measures deemed necessary to minimize surface disturbance and still allow for the recovery of natural gas.

Coalbed and conventional natural gas resources would be developed, while reclamation activities would stabilize disturbed soils and vegetation communities. For the overall ARPA, no more than 7,600 acres (2.8 percent) of the project area would be disturbed by oil and gas development activities approved under this ROD and unsuccessfully reclaimed at any time. For the overall ARPA, there would be a 6.5-acre/well site short-term disturbance goal. Those areas designated as "Category A" in the FEIS would have a short-term disturbance goal of less than 6.5 acres per well pad. Category A, as depicted on figure 2, includes areas with sensitive fish populations, crucial wildlife habitats, and unique vegetation communities, and is about 72,200 acres in extent.

# RECORD OF DECISION

**Figure 2.  Category A Mitigation Areas.**



# ALTERNATIVES CONSIDERED AND ELIMINATED FROM DETAILED ANALYSIS

## DEIS Alternatives Not Carried Forward for Final Analysis

In the DEIS, Alternative B proposed that natural gas development activities would be restricted to one of three zones within the ARPA boundary at any one time. Each zone would be open to construction and development of natural gas removal and processing facilities for seven years, at which time construction and development activities would cease. Gas extraction and processing would continue (i.e., operational activities), while construction and development activities would move to another zone. The intent of the alternative was to focus disturbance activities into a smaller area while the remainder of the project area would be less disturbed and less impacted than under the proposed action.

Major adverse effects were expected under this alternative upon several resources including wildlife, soils, and range. Comments received from the companies objected to the extended delay on their ability to develop their leases in those areas not open to development activities for 7 to 14 years. In addition, comments pointed out the implication that BLM would not approve ROW proposals for the development of private and state oil and gas development within the closed areas. Such an action conflicts with BLM policy (BLM Manual, Part 2800.06 "Policy" (D)) to allow owners of non-federal lands surrounded by public lands reasonable access to their holdings. A large portion of the project area is located in a so-called "checkerboard" ownership pattern of alternating federal and private/state lands where access to such lands requires federal ROW approval.

Alternative B was eliminated from further detailed study in the FEIS based on comments received on the DEIS, the effects of long delays to allowable oil and gas development on leaseholders and mineral rights, and the policy that the BLM will allow reasonable access across federal lands for mineral development on private and state lands.

# OTHER ALTERNATIVES CONSIDERED AND ELIMINATED FROM DETAILED ANALYSIS

Three alternatives were considered and eliminated from detailed study. The alternatives and the reasons for eliminating them are described below.

## 3,880 Natural Gas Wells from 3,880 Well Locations

During the scoping process, the Operators estimated that a maximum of 3,880 gas wells from 3,880 well locations would be required to fully develop the ARPA. Based on the exploration and development activities permitted between 2001 and 2006, the Operators have revised their original estimate of needing 3,880 gas wells to maximize the economic recovery of the natural gas resource to the current proposed number of wells.

## Directional Drilling

Mandatory use of directional drilling was suggested in comments during the scoping process as a way to reduce habitat loss and wildlife disturbance by reducing the numbers of well pads and corresponding roads, pipelines, and infrastructure. In memoranda dated June 2005 and August 2006, the Reservoir Management Group of the Wyoming BLM stated that extensive

**RECORD OF DECISION**

directional drilling did not appear to be a viable technical or economic alternative for natural gas extraction in the ARPA.

Requiring the Operators to use directional drilling for all wells regardless of surface conditions, topography, or subsurface geology would not be reasonable. Using such a technique without regard for local conditions may deter or preclude an Operator from maximizing the recovery of the gas resource in the most economical and efficient manner. However, directional drilling is an option that can be considered by the BLM and the Operators where surface conditions and resource constraints make it reasonable to consider.

## Produced Water Disposal and Treatment Options

The Operators proposed re-injecting wastewater produced during development and operation of each gas well. Some of the produced water would be discharged in regulated tanks for use by wildlife and livestock. Several alternatives to re-injecting water were considered:

- Water treatment with discharge onto land surface,

- Surface discharge without treatment,

- Storage in evaporation/infiltration ponds, and

- Transmission of produced water by pipeline from the Colorado River watershed to either the Great Divide Basin or North Platte River watershed with discharge onto land surfaces.

Produced wastewater has varying concentrations of minerals and salts, and usually needs treatment to make it usable or to meet water quality standards. For example, under a policy adopted on October 30, 2002, by the Colorado River Basin Salinity Control Forum, entitled "Policy for Implementation of Colorado River Salinity Standards through the NPDES Permit Program 1," water discharged within the watershed must not add more than 1 ton per day or 366 tons per year of salts to the Colorado River system. The preferred method of disposal would be re-injecting the produced water back into other geologic formations adjacent to or near the producing formation in places where the local geology lends itself to this method. Other methods of disposal, especially when the wastewater must be treated, transported, or both, tend to be more costly and might have inherent logistical and engineering problems. For these reasons, other wastewater disposal alternatives were eliminated from detailed study.

The Proposed Action includes re-injection of produced water, with the exception of limited closed water discharge into regulated troughs or tanks for livestock and wildlife drinking water, and a limited surface discharge under existing state of Wyoming permits. Re-injection of produced water removes the water from coal seams and places it into geologic formations as permitted by the state of Wyoming. Re-injection avoids surface impacts from the produced water including erosion, changes to vegetation communities, and salinity issues relating to water release within the Colorado River Basin. Additional uses of ARPA-produced water, while not identified or proposed at this time, may develop or arise in the future. When and if such proposals are made, state of Wyoming approval under the state's various permitting authorities would be required. In addition, the BLM would review and approve or disapprove any such proposal based on the specifics of the proposal and the BLM's authorities and responsibilities under NEPA and FLPMA.

# ENVIRONMENTALLY PREFERRED ALTERNATIVE

In accordance with Council on Environmental Quality (CEQ) regulations (40 CFR 1505.2(b)), the environmentally preferred alternative must be identified in the ROD. BLM considers the environmentally preferred alternative for the ARNG Development Project to be the No Action Alternative, Alternative A. This alternative would result in the least amount of impact to a majority of resources within the ARPA. However, the No Action Alternative would also fail to effectively recover known oil and gas resources.

Comments from gas development companies suggest that the effect of Alternative C was the same as the No Action Alternative. The goal for Alternative C is to protect wildlife and other natural resources while allowing for the extraction of natural gas resources. Under Alternative C, the Operators' activities would be subject to resource development and protection measures intended to maintain or enhance resource values. Approximately 95 percent of the federal lands within the project area would be assigned one or more resource protection measures to be applied based on the site-specific locations of the activity. Comments from gas development companies highlighted the cost of implementing resource protection measures and the infeasibility of recovering natural gas resources at four well sites per section. Comments received from the BLM's Reservoir Management Group indicated that maximum recovery of natural gas resources was not feasible under Alternative C, resulting in the alternative not being responsive to the Purpose and Need for Action for this project. In addition, Alternative C predicted significant effects on natural resources within the ARPA including big game, greater sage-grouse, and recreation. Due in part to the adverse effects to natural resources from Alternative C, the BLM's Environmentally Preferred Alternative is the No Action Alternative. However, the No Action Alternative would also fail to effectively recover known oil and gas resources. Therefore, the Agency Preferred Alternative was selected.

# PLAN, REVIEW, AND APPROVAL PROCESS

The planning, review, and approval process for project implementation is described below. This process will typically be initiated by the Operators through an annual planning meeting with the Rawlins Field Office Manager, where they will outline detailed development plans for the upcoming year and a conceptual multi-year plan. The BLM (including interdisciplinary team members), cooperating and interested agencies, and the Operators will make up a Review Team to evaluate annual and site-specific development proposals and monitoring reports. The review and approval process will include a site-specific visit by the Review Team, applicable environmental review and establishing required BMPs, conditions of approval, or other protective measures to mitigate potential environmental impacts. The review and approval process is illustrated on figure 3.

## The Annual Planning Process

The April 1st date, as proposed by the Operators is open to modification based on results observed and problems encountered. Changes to the date may be proposed by any party, reviewed and commented upon by the companies and cooperators, and approved by the AO. Any date changes will not be effective until approved in writing by the AO. While described as an "annual" planning process, this concept is adaptive and open for modification and improvement, including more frequent planning meetings if necessary. The intent of the process is to have future, site-specific development plans for Atlantic Rim be

# RECORD OF DECISION

**Figure 3.    Atlantic Rim Oil and Gas Development Proposal Submittal—Approval—Implementation Process.**



## RECORD OF DECISION

submitted to the BLM for review in a manner that will allow the BLM to capture economies of scale in planning, processing, approving, and involving other cooperating agencies. By receiving development proposals in groups, the Review Team will be able to develop a more holistic view of future development and reclamation progress and success, and more effectively apply mitigations and BMPs to reduce development effects. Proposals should span several years or stages of development and must include the entire proposal including well sites, compressor stations, utility and pipeline corridors, roads, status and success of reclamation efforts for a specific area, and any other disturbances planned and their timing.

This decision includes an unreclaimed disturbance cap of 7,600 acres at any time. All Operators must submit to the BLM within 30 days of the effective date of this decision a summary of their lease holdings and associated mineral acreage. The 7,600-acre disturbance cap will be allocated to Operators on a prorated, mineral leasehold basis. Existing surface disturbance from activities approved under the IDP will count against each Operator's disturbance cap allocation. Past oil and gas development surface disturbance within the ARPA will not count against the disturbance cap. Only new disturbance proposed by the ARPA lease holders or disturbance under the IDP would be eligible for disturbance cap allocation. Only successfully reclaimed acreage (See ROD appendix A, Criteria for Reclamation Success) that was disturbed during the implementation of activities associated with this decision or the IDP will be allocated back to the Operator based on their prorated disturbance cap. Regardless of the number of Operators within the ARPA, the total of all prorated disturbance cap allocations may not exceed 7,600 acres.

## Cooperating Agencies and Interested Stakeholders

The Review Team members will be invited to participate in the annual planning process and site-specific review process based on their interest, time, and availability. Review Team member participation would be in addition to their separate and independent permitting and approval responsibilities under any other authorities. The BLM is the final decision authority and will set the schedule for meetings, site visits, review periods, etc. When appropriate, Memoranda of Understanding (MOUs) or other applicable inter-agency agreements may be prepared and utilized between the parties to document the extent of participation in the annual planning and site-specific review processes.

## Site-Specific Reviews with Interagency and Operator Participation

Once the development plan is received, the BLM will schedule an "on-site" visit to review the areas included in the proposal for development. The purpose of the review is to familiarize the Review Team with the proposal; the location of disturbance; and the extent, timing, and other relevant factors. Generally there would be one team visit that may be followed up with individual reviews by team members, as necessary. Based on the site conditions found in the area, the BLM, in collaboration with cooperating agencies, will determine the necessary mitigation measures, BMPs, and conditions of approval necessary for processing the proposal. During its review of the proposal, BLM, in consultation with the Operator making the proposal, may require the submittal of additional information to address application deficiencies, application of BMPs and mitigation, site relocation, and other changes in the proposal. Modifications to a proposal will be based on site-specific factors, such as lek locations, raptor nests, crucial winter range, or any other relevant issues.

**RECORD OF DECISION**

## NEPA Review, Categorical Exclusion and Proposal Approval Process

The approval process will be conducted consistent with NEPA. When appropriate, environmental documents prepared under NEPA may be processed by the BLM, or a third-party contractor funded by the Operator may assist the BLM in meeting its NEPA requirements. The AO, in consultation with Operators, will determine the manner in which the BLM meets its NEPA obligations including determining whether a categorical exclusion pursuant to Section 390 of the Energy Policy Act of 2005 applies. The environmental document and its related decision document will specify required BMPs, COAs, or other protective measures as detailed in the paragraph above to be included in the authorization.

The BLM will use a performance-based management approach as part of the adaptive management process, which includes four primary elements.

1. Performance Goals: describes the conditions that the BLM and Operators will attempt to achieve (See Performance Goals in the following section).

2. Performance Requirements: an extensive array of BMPs (ROD, appendix B), COAs, and protective measures used to help achieve the Performance Goals.

3. Performance-Based Monitoring: monitoring efforts to measure the degree of success the Performance Requirements have in achieving Performance Goals (See Monitoring, Reporting and Adaptive Management).

4. Adaptive Management: additional mitigation or adaptive techniques to help achieve Performance Goals.

### Performance Goals

The BLM will attempt to achieve the following Performance Goals in collaboration with other state and other federal agencies:

| Item | Performance Goal |
|------|------------------|
| Migration Routes | maintain functional migration routes through or around development areas |
| Big Game Crucial Winter Range | provide an adequate amount of suitable, undisturbed crucial winter range for big game animals |
| Sage and Sharp-Tailed Grouse | provide well-dispersed sage-grouse breeding, nesting, brood rearing, and winter habitat |
| Muddy Creek Sensitive Fish | maintain adequate water quality, water quantity, species distribution, and aquatic habitat components |
| Shrub-Dependent Song Birds | assure occupied habitat for shrub-dependent song birds is well distributed throughout the project area |
| Riparian | ensure no net loss of native riparian habitat/vegetation |
| Grazing | maintain adequate and sustainable food and habitat for domestic animals |
| Range Condition | maintain range condition or improve range condition towards potential for the ecological site |
| Livestock Safety | minimize deaths and injuries of livestock due to development and operational activities |

| Item | Performance Goal |
|---|---|
| Range Improvements | minimize damage to range improvements, gates, cattle guards, water sources, and other livestock grazing management improvements |
| Standards and Guidelines | manage to meet Wyoming Healthy Rangeland Standards |
| Sites | maintain viable, site-stabilizing native plant growth |
| Species Composition | maintain a range of species composition, diversity, cover, and production equal to pre-disturbance levels |
| Weeds | maintain weed-free sites |

Operators are responsible for demonstrating successful achievement of Performance Goals. Early efforts are to be made to collect or consolidate resource data to form a baseline against which future monitoring efforts and data would be compared to indicate trends. In the absence of sufficient data illustrating Operator achievement of Performance Goals, the BLM will use a conservative approach when considering additional approvals.

## Monitoring, Reporting, and Adaptive Management

The monitoring, reporting, and adaptive management processes made part of this decision are its key components. As part of the annual planning process, a monitoring and mitigation process will be required, and its development will begin within 30 days of the effective date of the ROD. This information should be reviewed at least annually with development plans modified based on trends. The purpose of monitoring is to assess the status of the Performance Goals, measure and detect trends, or detect any other undesired effects. Monitoring will also be used to assess the effectiveness of reclamation efforts and any approved mitigation measures.

The adaptive management process is iterative and can be summarized as:

- Disturbance Action
    - o monitoring for trend and effectiveness
    - o identification of areas requiring modification
    - o implementation of adapted techniques and/or mitigation
    - o repeat process

In most cases, monitoring must occur for several years to detect trends and establish that successful mitigation has occurred. Identification of areas requiring additional work can occur anytime during the monitoring and mitigation process. To ensure success, any change in or addition of mitigation measures should be adapted to address the conditions or resolve problems observed during monitoring. If additional mitigation measures do not produce the desired effects or conditions, continued monitoring and data collection may be used to further identify or clarify the problem. As a result, further adaptation of mitigation techniques would be tested and monitored for success.

Funding for wildlife and habitat monitoring may be obtained from BLM appropriations, in collaboration with cooperating or interested agencies, from the voluntary participation of the Operators, or from outside sources that may have an interest or desire to participate or contribute, or from a combination of these sources. As noted above in Monitoring, Reporting, and Adaptive Management, Operators are responsible for demonstrating successful

**RECORD OF DECISION**

achievement of Performance Goals.  The Review Team, the BLM, or both, will identify the level of effort required for performance-based monitoring and develop associated monitoring plans.

The Operators are responsible for reclamation monitoring and reporting costs.

# PERFORMANCE REQUIREMENTS

The FEIS lists an extensive array of possible BMPs and protective measures that may be required by the BLM to mitigate the effects of a proposal.  Protective measures summarized in appendix L of the FEIS will be considered based on site-specific conditions, where such measures are not in conflict with this decision.  Consistent with its responsibilities under FLPMA and with the authority found in the mineral lease, including stipulations, the BLM will, as necessary and appropriate, work with the Operators and cooperating or interested agencies to determine any actions that need to be taken to approve the proposal.  The formulation and application of mitigation measures and BMPs will be based on the site-specific conditions found at the areas for which disturbance is proposed at the time the proposal is submitted or authorization requested and the rationale for their application clearly disclosed.

Appendix B of this decision presents performance-based requirements and monitoring that will be considered during site-specific, environmental review.  Operator-committed practices, which become mandatory requirements with publication of this decision, are included in appendix C.

This decision incorporates a requirement for Operators to prepare development plans as outlined in the Reclamation Plan (appendix A).  These development plans must include a Transportation Plan, Reclamation Plan, and a Hazardous Materials Management Summary.  Monitoring to evaluate compliance with Performance Requirements and achieving Performance Goals will be as outlined above.

# PUBLIC INVOLVEMENT

The BLM announced its intent to prepare an EIS for this project in the *Federal Register* on June 26, 2001, and initiated scoping.  The state of Wyoming, federal agencies, state and local government representatives, municipalities, Native American Tribes, grazing permittees, lease and ROW holders, landowners within the ARPA, local media, and other agencies, industry representatives, individuals, and organizations were sent a scoping notice and other information by mail.  Two public meetings were held in July 2001 at Baggs and Rawlins, Wyoming.  Fifty-seven comments were received in the form of letters, emails, and faxes from the public including citizens; interested federal, state, and local agencies; advocacy groups; and various corporations.  These comments were used to identify key issues, potential resource conflicts and concerns, possible alternatives, and the scope of the analysis.  Interested agencies were invited to participate as cooperating agencies.  The state of Wyoming, Little Snake Conservation District, and the Carbon County Commissioners requested and received Cooperating Agency status.

The Draft Atlantic Rim EIS was released in December 2005.  The 60-day comment period resulted in over 59,400 individual responses, including approximately 59,100 electronic messages and 300 hard copy comments.  Comments were received from state, federal, and local agencies; environmental advocacy groups; landowners; leaseholders; oil and gas companies; and the general public.  All responses were reviewed for content.  The BLM identified substantive comments and developed responses.  A detailed description of the

comments made on the DEIS and the process by which they were analyzed by BLM is included with the FEIS.

Comments were used to develop Alternative D and to modify, clarify, and correct the FEIS, as appropriate.

The FEIS was released to the public and a Notice of Availability (NOA) published in the *Federal Register* on November 30, 2006. Comments were accepted on the FEIS through January 4, 2007. Approximately 85 responses, including those from cooperating agencies and interested parties, were received by BLM. Some comments on the ARPA FEIS raised specific concerns regarding use of mitigation measures; avoidance of cultural sites; groundwater and wildlife impact analysis; wildlife, habitat and reclamation monitoring; rationale for selection of the preferred alternative; opportunities for future public input; surface disturbance reclamation; air quality analysis; and paleontological condition and classification. A summary of these concerns and comments and BLM's responses are contained in appendix E of this ROD.

# APPEAL PROCESS

This decision may be appealed to the Interior Board of Land Appeals, Office of the Secretary, in accordance with the regulations contained in 43 CFR 3165.4. If an appeal is filed, your notice of appeal must be filed in this office (Bureau of Land Management, State Director, P.O. Box 1828, Cheyenne, Wyoming 82003) within 30 days of the date BLM publishes its notice of the decision in the *Federal Register.* The appellant has the burden of showing that the decision appealed from is in error.

If you wish to file a petition pursuant to 43 CFR 3165.4(c) for a stay (suspension) of the effectiveness of this decision during the time that your appeal is being reviewed by the Board, the petition for a stay must accompany your notice of appeal. A petition for a stay is required to show sufficient justification based on the standards listed in 43 CFR 3165.4(c). If you request a stay, you have the burden of proof to demonstrate that a stay should be granted. Copies of the notice of appeal and petition for a stay must also be submitted to the Interior Board of Land Appeals and to the Rocky Mountain Regional Office of the Solicitor at the same time the original documents are filed with this office.

AUTHORIZED OFFICER:

_____                    _9/23/07_

Robert A. Bennett                                   Date
Wyoming State Director

## RECORD OF DECISION

# ERRATA

### Modifications and Corrections to the
### Final Environmental Impact Statement for the
### Atlantic Rim Natural Gas Field Development Project

The section describes changes to the FEIS to correct errors or omissions and identify modifications.

### <u>Modifications</u>

1. Appendix H, title, delete the word "Required" from the title of appendix H. The revised title is ~~Required~~ "Best Management Practices".

2. Appendix H, page 1, first paragraph, the words "as appropriate" have been added and the text now states, "These Best Management Practices (BMPs) will be applied, <u>as appropriate</u>, under all alternatives as Conditions of Approval where proposals result in conflicts with identified resources".

3. Appendix H, page 1, insert the following text as a fifth bullet under "Additional mitigation measures are also identified in:".

   - <u>"The most current version of Onshore Oil and Gas Operations Orders 1 – 7 (Code of Federal Regulations 43 CFR 3160)."</u>

4. Appendix H, page H-4, Reducing Impacts from Fluid Mineral Construction, Operation, and Reclamation; delete items #1 and #2 ~~(1) Directional Drilling; (2) Drill multiple wells from a single pad)~~.  These items are deleted to reflect that these measures are not required Best Management Practices.  However, these measures can be used at the discretion of the Operators with BLM approval.

5. Appendix H, page H-6, under Protection Measure, numbers two and three, the word "primary" has been deleted and replaced with state, county or BLM".  The revised text states,

   "2.) Avoid locating pads in areas visible from ~~primary~~ <u>state, county or BLM</u> roads." and

   "3.) Avoid locating facilities on or near ridgelines – use subsurface or low-profile facilities to prevent protrusion above horizon line when viewed from any ~~primary~~ <u>state, county or BLM</u> roads."

6. Appendix H, page H-6, under Protection Measure, item numbers ten and eleven have been deleted.  The revised Protection Measure has thirteen items.  The deleted items were;

   ~~"10.) Design and construct all new roads to a safe and appropriate standard, "no higher than necessary" to accommodate their intended use." and~~

# RECORD OF DECISION

"11.) Locate roads far enough off the back of ridgelines so they aren't visible from ~~state, county or BLM roads."~~

7. Appendix H, page H-7, Avoidance Areas, under Protection Measure, number one, second bullet, the word "water" has been added and the text now states, "Areas within 500—feet from perennial waters, springs, <u>water</u> wells and wetland riparian areas; and,".

8. Appendix H, page H-12, Water Used for Construction, Maintenance, and Drilling Activities, under Protection Measure, number one, the revised text states "1) All water used for drilling, completion and testing activities will <u>be free of hydrocarbons and</u> come from ~~existing~~ CBNG wells<u>,</u> ~~or~~ <u>be</u> re-used from other drilling sites, <u>and/or come from sources approved by the BLM and</u>~~,~~ subject to state permitting <u>requirements.  Only fresh water would be allowed for drilling to surface casing setting depth.  New water sources would be considered for potential depletions to the Platte or Colorado River Basins as necessary</u>."  The modified text is necessary to conform to drilling regulations.

9. Appendix O, page O-243, response to comment #671-73-1; delete the following phrase from the response:  "~~None are known to outcrop in the ARPA.~~"  This correction is made to remove a statement erroneously included in the FEIS.

**Appendix A**

**Atlantic Rim Natural Gas Project
Reclamation Plan**

# APPENDIX A

# ATLANTIC RIM NATURAL GAS PROJECT RECLAMATION PLAN

## TABLE OF CONTENTS

1    Reclamation ............................................................................................... A-1
    1.1    Management of Soil for Restoration .................................................. A-2
    1.2    Seed Mixtures ................................................................................. A-2
    1.3    Reclamation Standards and Principles ............................................. A-3
        1.3.1  At Any Time ............................................................................ A-3
        1.3.2  First Growing Season ............................................................. A-4
    1.4    Monitoring and Reporting Disturbed Sites ........................................ A-5
2    Criteria for Reclamation Success ............................................................. A-6
3    References Cited ...................................................................................... A-8

## LIST OF TABLES

Table A-1.  Reclamation Monitoring Reporting Data ............................................... A-7

## LIST OF ATTACHMENTS

Attachment A-1.  Standard Seed Mixtures ............................................................ A-9

# APPENDIX A
# ATLANTIC RIM NATURAL GAS PROJECT
# RECLAMATION PLAN

This appendix presents a programmatic reclamation plan for the Atlantic Rim Natural Gas Project Area (ARPA).  It gives general guidelines for completing reclamation in lieu of specific actions to take at each disturbance.   Current Bureau of Land Management (BLM) policy recognizes that there might be more than one correct way to achieve successful reclamation.  A variety of methods may be appropriate to varying circumstances. BLM will continue to encourage Operators to use their expertise in recommending and implementing reclamation projects.  However, the Operators are responsible for attaining final reclamation standards of performance as outlined in the USDI-BLM (1990a) reclamation policy.   All reclamation must conform to BLM reclamation policy (USDI-BLM 1990a).   Further guidance for reclamation can be found in the BLM/Forest Service "Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development" (Gold Book) found at:

http://www.blm.gov/bmp/gold%20book/FinalGoldBook%20-%202006%20Edition.pdf

# 1   Reclamation

BLM reclamation goals emphasize ecosystem reconstruction, which means returning the land to a condition approximate to or better than that which existed before it was disturbed.  Final reclamation measures are used to achieve this goal. BLM reclamation goals also include the short-term goal of quickly stabilizing disturbed areas to protect both disturbed and adjacent undisturbed areas from unnecessary degradation. Interim reclamation measures are used to achieve this short-term goal.  As such, two types of reclamation are envisioned at the ARPA:

1. **Interim Reclamation.** Stabilization of soil by revegetation on sites that will likely be further disturbed in the future.  This includes sites where re-contouring is needed where periodic disturbance may occur due to operation and maintenance activities.

2. **Final Reclamation.** Reclamation of an area that is not planned for further disturbance including re-contouring, stabilization of soil by revegetation, and restoring the ecosystem function originally found at the site.

Among items to be emphasized in achieving these goals are:

- Stabilization of disturbed soils until the first growing season;

- Soil stabilization through establishment of a vegetative ground cover on disturbed sites during the first growing season following disturbance;

- Restoration of the native plant community disturbed or removed, or restoration of an alternate vegetative regime in consultation with and approval by the BLM's Rawlins Field Office (RFO);

- Minimal disturbance of the existing environment and avoidance of riparian areas;

# APPENDIX A.
# ATLANTIC RIM NATURAL GAS PROJECT RECLAMATION PLAN

- Annual monitoring and control of invasive and noxious weeds beginning the first season of disturbance;

- Monitoring and management of reclamation sites to evaluate weed populations, reclamation success, and to plan and report on the program annually; and

- Affirmative efforts to resist the spread of weeds including refraining from cleaning out equipment including filters on the site, and power washing machinery and equipment between work sites consistent with the Rawlins Weed Prevention Plan (USDI-BLM 1999).

## 1.1  Management of Soil for Restoration

Topsoil should be handled separately from subsoil materials.  At all construction sites, topsoil should be stripped to provide for sufficient quantities to be re-spread to a depth of at least 4 to 6 inches over the disturbed areas during reclamation.  In areas where deep soils exist (such as floodplains and drainage channel terraces), at least 12 inches of topsoil should be salvaged. Where soils are shallow or where subsoil is stony, as much topsoil should be salvaged as possible.

Topsoil should be stockpiled separately from subsoil materials.  Topsoil salvaged from drill sites and stored for more than 1 year should be bladed to a specified location, seeded with a prescribed seed mixture, and covered with mulch for protection from wind and water erosion and to discourage the invasion of weeds.  Topsoil stockpiles anticipated to be stored for more than 1 year will be re-spread so as not to exceed a depth of 2 feet.  Topsoil should be stockpiled separately from other earth materials to preclude contamination or mixing, marked with signs, and identified on construction and design plans.  Runoff should be diverted around topsoil stockpiles to minimize erosion of topsoil materials.

In most cases, disturbances will be reclaimed within 1 year. Therefore, it is unlikely that topsoil stockpiling for more than 1 year will be required.  Salvaged topsoil from roads and drill sites will be respread over cut-and-fill surfaces not actively used during the production phase.  Upon final reclamation, topsoil spread on these surfaces will be used for the overall reclamation effort.

## 1.2  Seed Mixtures

On all areas to be reclaimed, seed mixtures are required to be free of noxious weeds, composed of the same native species as were disturbed, and required to include species-promoting soil stability. A predisturbance species composition list must be developed for each site if the project encompasses an area where there are several different plant communities present. Livestock palatability and wildlife habitat needs must be considered in seed mix formulation. Variation of seed mixtures can be proposed and approved based on availability, climatic conditions, or variables.  BLM guidance for native seed use is the BLM Manual 1745 (USDI-BLM 1992) and Executive Order 13112 (Invasive Species, 64 Federal Register 6183).

**Alternate Seed Mixtures.**  The seed mixtures identified in attachment A-1 may vary on a site-specific basis.  Variations may be proposed and approved by the BLM before final reclamation.  An example for the ARPA would be the addition of green needlegrass

# APPENDIX A.
# ATLANTIC RIM NATURAL GAS PROJECT RECLAMATION PLAN

(*Stipa viridula* var. *Lodorm*) on clayey sites associated with the southern portion of the ARPA (e.g., Muddy Mountain area).

**Temporary Seed Mixtures.**  Depending on BLM authorization, the following seed mixtures may be considered for erosion and weed control on sites that will be disturbed again before final reclamation. Seed mixtures contain annual cereal grasses that are not suitable for establishing a reclaimed vegetative community, but offer a temporary option to prevent halogeton invasion and establishment.

Seed should be broadcast at a rate necessary to reestablish vegetation equivalent to the surrounding areas.  Another viable option is the use of a sterile triticale hybrid such as Quickguard® (Granite Seed) to stabilize the disturbed area.  The use of a non-sterile plant species such as wheat is not recommended as a cover crop because of its ability to reseed itself.

During reclamation within areas of important wildlife habitat (crucial winter range, sage-grouse nesting habitat, etc.), consideration shall be given for the restoration of native shrubs and forb species.  Follow-up seeding or corrective erosion control measures will be required on areas of surface disturbance that fail to meet reclamation success standards.

Any mulch used must be certified free from mold, fungi, or noxious or invasive weed seeds. Mulch may include hay, small-grain straw, wood fiber, live mulch, cotton, jute, or synthetic netting. Straw mulch should contain fibers long enough to facilitate crimping and provide the greatest cover.

## 1.3  Reclamation Standards and Principles

One of the most important principles for successful restoration is to <u>limit initial disturbance through the use of planning, construction control, and adaptive management</u>.  Restoration planning should start before disturbance and be an integral part of the operational plan. Consideration of the processes necessary for successful reclamation is important.  Pre-disturbance surveys, site stabilization, weed control, and maintenance of healthy soils are important considerations.  Revegetation that considers vegetative succession to pre-disturbance vegetative conditions, with annual monitoring and reporting, will allow tracking of success and adaptive management of problem areas.  Annual monitoring and reporting, will allow tracking of success and adaptive management of problem areas.

### 1.3.1   At Any Time

For each discrete site where ground-disturbing activities are planned or occur under the Operators' activities, a site-specific reclamation plan shall be prepared, submitted, and approved by the BLM before the Operators disturb the environment.  Guidance and requirements for this plan can be found in program-specific direction (USDI-BLM 1983).  A project-wide reclamation plan may be considered if it addresses discrete site disturbances individually.  The collection of photo reference points is essential.

With the exception of active work areas, disturbed areas anticipated to be left bare and exposed will be stabilized to prevent soil erosion.  In addition, mulch, silt fencing, waddles, hay bales, and other erosion control devices will be used on areas at risk to soil movement away from disturbed

# APPENDIX A.
# ATLANTIC RIM NATURAL GAS PROJECT RECLAMATION PLAN

areas including fill slopes. Variation and use of the cover percentage and the use of other stabilizing materials can be proposed and used with BLM approval consistent with the relevant site-specific reclamation plan. For areas anticipated for further disturbance, use of the seed mixtures detailed in Temporary Seed Mixes on page A-3 would be acceptable in the interim.

## 1.3.2 First Growing Season

Reclamation actions will be implemented before the first growing season following disturbance with the goal of returning the land to a condition approximate to or more productive than that which existed before disturbance or to a stable and productive condition compatible with that described in the land use plan (USDI-BLM 1990b). One strategy could include consideration of using all grasses for the first seeding so that it survives any weed-controls used. Subsequent seeding will be required to promote the establishment of desired shrubs and forbs.

Consistent with the reclamation plan, the operator will ensure the following during the first growing season:

1. Prior to the beginning of the growing season,

   - Stabilize disturbed site soils until they are revegetated with no hindrance to germination and growth of seed and

   - Properly prepare the site by

     o Recontouring for permanent reclamation;

     o Completing soil preparation activities, such as ripping and straw crimping/seedbed preparation for planting including drilling and broadcast methods;

     o Planting the approved seedling/seed mixtures using site-specific methods for successful revegetation with locally adapted species; and

     o Ensuring that weed treatments are compatible with seed mixtures and plantings.

2. Starting the first growing season,

   - Monitor germination and growth of plants in the area being reclaimed;

   - Work with the BLM and surface leasees to detect and control weeds in all areas;

   - Use adaptive management to correct establishment and growth problems;

   - Put up temporary fencing to avoid adverse effects to reclamation;

   - Build snow fencing, if requested, to increase the capture of precipitation and aid in the re-establishment of vegetation and control wind scour.

# APPENDIX A.
# ATLANTIC RIM NATURAL GAS PROJECT RECLAMATION PLAN

3. Following each growing season,

- Review and complete a site-specific vegetation monitoring report for areas being reclaimed (table A-1) and

- As necessary, prepare a written, site-specific prescription for actions to be implemented, which might include:

  o Reseeding areas not attaining reclamation success,
  o Soil stabilization,
  o Weed control needs, and
  o Mulching/fertilization or other practices prescribed for the following season.

If the treatment area is found to be successfully reclaimed, the site will be checked for reclamation success at least annually for at least five seasons. The site will also be checked for additional management needs including weed infestations and control needs.

If the treatment area is not successfully reclaimed or otherwise requires further management activities, the actions prescribed will be implemented as planned and further monitoring will occur as detailed beginning with item 1 above.

## 1.4  Monitoring and Reporting Disturbed Sites

The operator will provide the BLM with an annual report before December 1st for all sites disturbed. The report will include:

- Copies of the completed individual site review forms or a BLM-approved electronic report.

- A summary of monitoring data and results that include:

  o Identification of monitoring by year;

  o Individual site reclamation monitoring reporting data (table A-1);

  o Identification of sites successfully reclaimed by reclamation years (starting with the first growing season);

  o Identification of sites needing additional work/more reclamation activities;

  o Sites proposed for the end of monitoring, i.e., sites that were successfully reclaimed.

- A BLM-useable shapefile(s) or Geographic Information System (GIS) layer(s) that details location, name, type, and extent of:

  o New disturbances,

  o Unreclaimed disturbances,

# APPENDIX A.
# ATLANTIC RIM NATURAL GAS PROJECT RECLAMATION PLAN

   o New reclamation,

   o Failed or unsuccessful reclamation,

   o Locations of noxious/invasive weed infestation, and

   o Further vegetation treatments planned (e.g., mulching, matting, and weed control).

On these shapefiles or GIS layers, *location* shall be given as the legal location and geo-referenced location of the site; *name*, as the BLM Application for Permit to Drill (APD), lease, or other BLM file name for the site; and *extent*, as the amount of area and location of the item.

# 2 Criteria for Reclamation Success

Reclamation will be considered successful if the following Interim Reclamation criteria are met.

- 80 percent of predisturbance ground cover,
- 90 percent dominant species*,
- No noxious weeds present in the seeding, and
- Erosion features equal to or less than the surrounding area.

*The vegetation will consist of species included in the seed mix and/or occurring in the surrounding natural vegetation or as deemed desirable by the BLM in review and approval of the reclamation plan.  The goal is no single species will account for more than 30 percent total vegetative composition.  Vegetation canopy cover production and species diversity shall approximate the surrounding undisturbed area.

Section 1.3.1 of this appendix indicates that reclamation success will be tracked by each discrete site for which an individual reclamation plan was prepared.  A site can be nominated for successful reclamation status by the Operators or the BLM any time it meets the criteria for reclamation success as outlined above.  A site will be considered reclaimed and the Atlantic Rim disturbance acreage count reduced by the extent of the reclaimed acreage when a BLM authorized officer accepts the written nomination.  Partially reclaimed discrete sites will not have any reclaimed acreage subtracted from the disturbance acreage count.  The Atlantic Rim disturbance cap is 7,600 acres at any one time.

The BLM RFO will maintain a running count of the extent of surface disturbance acres based on the "as built" geo-spatial monitoring data submitted by the companies annually for the preceding year in December after construction.  An annual summary report of the disturbance acreage count will be available to the companies and the public upon written request.  For a project-wide-type reclamation plan (per section 1.3.1 of this appendix), each individual site disturbance included in the plan will be managed as a discrete site and disturbance acreage will be tracked as detailed above.

When determining the extent of successful reclamation, a site covered under an individual reclamation plan will be evaluated as follows.  If, for example a site is determined to have 4.2 acres of total disturbance based on the "As-Built" survey, the disturbance acreage count for that discrete site will be 4.2 acres.  However, if one-half acre remains disturbed in the long-term

# APPENDIX A.
# ATLANTIC RIM NATURAL GAS PROJECT RECLAMATION PLAN

(e.g., roadway) then the disturbance count for that site would be reduced by 3.7 acres when accepted as successfully reclaimed by the BLM. It should be noted that "partial credit" would not be given until all of the 3.7-acre portion is successfully reclaimed and accepted.

## Table A-1. Reclamation Monitoring Reporting Data.

| General | WYW# (Oil & Gas Lease or Right-of-Way) |
|---|---|
| | Project Name |
| | Project Type (Well, Access Road, Pipeline, Facility, etc.) |
| | Qtr/Qtr Sec, T, R, County, State |
| Disturbance | Disturbance Dates |
| | Start-End |
| Reclamation | Reclamation Type (Interim/Final) |
| | Earthwork Contractor Name |
| | Earthwork & Topsoil Completion Date |
| | Soil Preparation Ripping Depth |
| | Area (Acres or Square Feet (Sq. Ft.)) |
| Seeding | Seeding Contractor Name |
| | Seeding Date |
| | Seedbed Preparation Methods (Disc, Harrow, Depths) |
| | Seeding Method (Drill, Broadcast, Depths) |
| | Copy of Seed Tag (Species%, Purity%, Germination%) |
| | Actual Seeding Rate Lbs/Acre |
| | Area Seeded (Acres or Sq Ft) |
| Other | Soil Amendments Used (Describe) |
| | Mulching/Erosion Netting/Tackifier |
| | Fenced Location |
| | Snow Fencing |
| Weeds | Type(s) of Weeds Treated |
| | Weed Contractor Name |
| | Contractor License # |
| | Weed Treatment Date |
| | Weed Treatment Type (Chemical, Mechanical) |
| | Chemicals Used and Rates Applied |
| | Area Treated (Acres or Sq Ft) (GIS Extent and Location) |
| Inspection | Inspector's name, Company, ID |
| | Inspection Date |
| | Time after Seeding |
| | Seedlings/Sq. Ft Growing |
| | % and Extent of Bare Soil |
| | % Ground Cover (Describe) |
| | % Desirable Species (Describe) |
| | % Noxious/Invasive Weeds (Describe) |
| | Erosion Features Present? (Describe) |
| | Evidence of Livestock Grazing (Describe) |
| | Reclamation Successful (Yes/No) |
| Reporting | Completed Spreadsheet or Database |
| | GIS Layer with Attribute Table with Site Data as Detailed |
| | Detail Disturbance Extent and Location |
| Monitoring | Permanent Reference Point |
| | Reference Photos |
| | Close-up Photos |

# APPENDIX A.
# ATLANTIC RIM NATURAL GAS PROJECT RECLAMATION PLAN

**Table A-1.  Reclamation Monitoring Reporting Data.**

| Future Management Prescription | Reseeding |
|---|---|
| | Weed Control Needed |
| | Erosion Control Needed |
| | Grazing / Predation Issues |
| | Other Cultural or Mechanical Needs |

# 3  References Cited

USDI-BLM  1983.  *Onshore Oil and Gas Order No. 1: Approval of Operations on Onshore Federal and Indian Oil and Gas Leases, Section III(G)(10).* 43 CFR 3160. United States Department of Interior, Bureau of Land Management. October 1983.

USDI-BLM  1990a.  *Wyoming Policy on Reclamation.*  Cheyenne, Wyoming: United States Department of Interior, Bureau of Land Management, Wyoming State Office. Instruction Memorandum No. WY-90-231. February 1990.

USDI-BLM  1990b.  *Great Divide Resource Area Record of Decision and Approved Resource Management Plan.*  Rawlins, Wyoming: United States Department of the Interior, Bureau of Land Management, Rawlins District Office, Great Divide Resource Area.  74 pp.

USDI-BLM   1992. *Introduction, Transplant, Augmentation, and Reestablishment of Fish, Wildlife, and Plants, BLM Manual 1745.* United States Department of the Interior, Bureau of Land Management.  March 1992.

USDI-BLM  1999.  *Rawlins Field Office Noxious Week Prevention Plan, Rawlins, WY.* United States Department of the Interior, Bureau of Land Management.  April 1999.

# APPENDIX A.
# ATLANTIC RIM NATURAL GAS PROJECT RECLAMATION PLAN

## ATTACHMENT A-1

### STANDARD SEED MIXTURES
### RAWLINS FIELD OFFICE

The following list contains seed mixes recommended by resource specialists with years of local knowledge.  Care and planning must be taken to choose mixes and amounts that will benefit under site-specific conditions.  Planning and thought must also go into selecting successful planting and site preparation techniques.  All sites must be planted with a diverse mix of grasses, forbs, and shrubs to be considered successful.  Industry is ultimately responsible for successful restoration of disturbed sites.  Alternate seed mixes can be proposed by industry to the BLM for approval prior to use.  The final goal is to restore disturbed sites so that they closely resemble pre-disturbance native plant communities.

**DRY LOAMY/CLAY SITES** - *characterized as a sagebrush/wheatgrass community with less than 10 inches precipitation*

| Species of Seed | Variety | Lbs. PLS* |
|---|---|---|
| **Grasses** | | |
| Streambank wheatgrass (*Elymus lanceolatus*) | Sodar | 1 |
| Thickspike wheatgrass (*Elymus macrourus*)) | Critana (Bannock) | 1 |
| Western wheatgrass (*Agropyron smithii*) | Rosana | 1 |
| Indian ricegrass (*Oryzopsis hymenoides*) | Rimrock (Nez Par) | 2 |
| Bottlebrush squirreltail (*Elymus elymoides*) | Sand Hollow | 2 |
| Slender wheatgrass (*Elymus trachycaulus*) | Pyror (San Luis) | 4 |
| Little bluegrass "Sandbergh" (Poa secunda) | High plains | 0.5 |
| *Bluebunch wheatgrass (*Pseudoroegneria spicata*) | Secor | 2 |
| **Shrubs** | | |
| *Big sagebrush (*Artemisia tridentata wyomingensis*) | | 0.5 |
| *Gardner's saltbush (*Atriplex gardneri*) | | 1 |
| *Fourwing saltbush (*Atriplex canescens*) | Wytana | 1 |
| * Shadescale (*Atriplex confertifolia*) | | 0.5 |
| *Rubber rabbitbrush (*Ericameria nauseosas*) "green" | Chrysothamnus viscidiflorus "Gray" | 1 |
| *Winterfat (*Krascheninnikovia lanata*) | Open Range | 0.5 |
| **Forbs** | | |
| *Scarlet globemallow (*Sphaeralcea coccinea*) | | 0.5+ |
| *Lewis' flax (*Linum lewsii*) | Appar | 0.5+ |
| *Rocky Mountain beeplant (*Cleome serrulata*) | | 0.5+ |
| *Western yarrow (*Achillea millefolium* L. var. *occidentalis*) | Yakima | 0.5 |
| **Firecracker Penstemon (*Penstemon eatonii*)** | Richfield | 1 |

**DRY SANDY SITES** - *characterized as a sagebrush/bunchgrass community with less than 10 inches precipitation*

| Species of Seed | Variety | Lbs. PLS* |
|---|---|---|
| **Grasses** | | |
| Indian ricegrass (*Achnatherum hymenoides*) | Rimrock (Nez Par) | 3 |
| Needleandthread needlegrass (*Stipa comata*) | | 4 |
| Slender wheatgrass (*Agropyron trachycaulum*) | Prior | 4 |
| *Sandhill muhly (*Muhlenbergia pungens*) | | 0.5 |
| Western wheatgrass (*Agropyron smithii*) | Rosana | 1 |
| *Threadleaf sedge  (*Carex filafolia*) | | 2 |

# APPENDIX A.
# ATLANTIC RIM NATURAL GAS PROJECT RECLAMATION PLAN

| Species of Seed | Variety | Lbs. PLS* |
|---|---|---|
| **Shrubs** | | |
| *Rubber rabbitbrush (*Ericamerica nauseosas*) "green" | Chrysothamnus viscidiflorus "Gray" | 1 |
| *Wyoming Big sagebrush (*Artemisia tridentata wyomingensis*) | | 0.5 |
| *Spiny hopsage (*Atriplex spinosa*) | | 1 |
| *Fourwing saltbush (*Atriplex canescens*) | Wytana | 1 |
| *Winterfat (*Krascheninnikovia lanata*) | Open Range | 0.5 |
| **Forbs** | | |
| *Scarlet globemallow (*Sphaeralcea coccinea*) | | 0.5+ |
| *Lewis' flax (*Linum lewsii*) | Appar | 0.5+ |
| *Rocky Mountain beeplant (*Cleome serrulata*) | | 0.5+ |

**LOAMY/CLAY-LOAM SITES** - *characterized as a sagebrush/wheatgrass community with 10 inches or greater precipitation*

| Species of Seed | Variety | Lbs. PLS* |
|---|---|---|
| **Grasses** | | |
| Western wheatgrass (*Agropyron smithii*) | Rosana | 1 |
| Thickspike wheatgrass (*Elymus macrourus*) | Critana | 1 |
| Indian ricegrass (*Oryzopsis hymenoides*) | Rimrock (Nez Par) | 1 |
| Green needlegrass (*Stipa viridula*) | Lordon | 3 |
| Prairie Junegrass (Koeleria cristata) | | 1 |
| Bottlebrush squirreltail (*Sitanion hystrix*) | Sand Hollow | 1 |
| Mutton bluegrass (Poa fendleriana) | | 0.5 |
| Streambank wheatgrass (*Elymus lanceolatus*) | Sodar | 1 |
| Bluebunch wheatgrass (*Pseudoroegneria spicata*) | Secor | 2 |
| Basin wildrye | Trailhead | 2 |
| **Shrubs** | | |
| *Big sagebrush (*Artemisia tridentata wyomingensis*) | | 0.5 |
| *Big sagebrush (*Artemisia tridentata vaseyana*) at sites above 7,000' | | 0.5 |
| *Fourwing saltbush (*Atriplex canescens*) | Wytana | 1 |
| *Antelope bitterbrush (*Purshia tridentata*) | Maybell | 1 |
| *Snowberry (*Symphoricarpos oreophilus*) and/or (*Sym. Albus*) | | 1 |
| *Winterfat (*Krascheninnikovia lanata*) | Open Range | 0.5 |
| **Forbs** | | |
| *Lewis' flax (*Linum lewsii*) | Appar | 0.5+ |
| *Scarlet globemallow (*Sphaeralcea coccinea*) | | 0.5+ |
| *American vetch (*Vicia americana*) | | 0.5+ |
| *Lupine (*Lupinus sericeus*) | | 0.5+ |
| *Blanketflower (*Gaillardia aristata*) | | 0.5+ |
| *Western yarrow *(Achillea millefolium* L. var. *occidentalis*). | Yakima | 0.5+ |
| **Firecracker Penstemon** (*Penstemon eatonii*) | Richfield | 0.5+ |
| *White sage atrtemesia ludiciciana | | 0.5 |

**SANDY SITES** - *characterized as a sagebrush/bunchgrass community with 10 inches or greater precipitation.*

| Species of Seed | Variety | Lbs. PLS* |
|---|---|---|
| **Grasses** | | |
| Western wheatgrass (*Agropyron smithii*) | Rosana | 1 |
| Indian ricegrass (*Oryzopsis hymenoides*) | Rimrock (Nez Par) | 2 |
| Green needlegrass (*Stipa viridula*) | | 3 |
| Needleandthread (*Stipa comata*) | | 2 |
| Slender wheatgrass (*Agropyron trachycaulum*) | Prior (Revenue) | 2 |

# APPENDIX A.
# ATLANTIC RIM NATURAL GAS PROJECT RECLAMATION PLAN

| Species of Seed | Variety | Lbs. PLS* |
|---|---|---|
| *Grasses (cont. from previous page)* | | |
| Mutton bluegrass (*Poa fendleriana*) | | 0.5 |
| Sand dropseed (*Sporobolus cryptandrus*) | Borden County | 0.5 |
| Canby Bluegrass (*Poa Secunda*) | Canbar | 0.5 |
| | | |
| *Shrubs* | | |
| *Silver sagebrush (*Artemisia cana*) | | 0.5 |
| *Fourwing saltbush (*Atriplex canescens*) | | 1 |
| *Antelope bitterbrush (*Purshia tridentata*) | | 1 |
| *Winterfat (*Krascheninnikovia lanata*) | Open Range | 0.5 |
| *White sage (*atrtemesia ludiciciana*) | | 0.5 |
| | | |
| *Forbs* | | |
| *Firecracker Penstemon (*Penstemon eatonii*) | | |
| *Lewis' flax (*Linum lewsii*) | Appar | 0.5+ |
| *Rocky Mountain beeplant (*Cleome serrulata*) | | 0.5+ |
| * Western yarrow (*Achillea millefolium* L. var. *occidentalis* DC.) | | 0.5+ |

**WET ALKALINE/SALINE SITES** - *characterized as a greasewood community in a lowland location*

| Species of seed | Variety | Lbs. PLS** |
|---|---|---|
| *Grasses* | | |
| Western wheatgrass (*Agropyron smithii*) | Rosana | 3 |
| Slender wheatgrass (*Agropyron trachycaulum*) | Pryor (Revenue) | 4 |
| Alkali sacaton (*Sporobolus airoides*) | | 0.5 |
| Inland saltgrass (*Distichlis spicata*) | | 2 |
| Basin wildrye (*Leymus cinereus*) | Trailhead | 2 |
| | | |
| *Shrubs* | | |
| *Fourwing saltbush (*Atriplex canescens*) | Wytana | 1 |
| **Greasewood (***Sarcobatus vermiculatus***) | | *0.5* |

**MOUNTAIN SHRUB SITES** - *characterized as shrub community with deep loamy soils and <u>greater</u> than 14 inches of precipitation*

| Species of Seed | Variety | Lbs. PLS** |
|---|---|---|
| *Grasses* | | |
| Idaho fescue (*Festuca idahoensis*) | | 2 |
| Green needlegrass (*Stipa viridula*) | | 4 |
| Mountain brome (*Bromus carinatus*) | Garnet | 2 |
| *Oniongrass (*Melica bulbosa*) | | 2 |
| Basin wildrye (*Leymus cinereus*) | Trailhead | 2 |
| Bluebunch wheatgrass (*Pseudoroegneria spicata*) | Goldar, Secor | 2 |
| | | |
| *Shrubs* | | |
| *Wyoming Big sagebrush (*Artemisia tridentata wyomingensis*) | | 0.5 |
| * Mountain Big sagebrush (*Artemisia tridentata vaseyana*) at sites above 7,000' | | 0.5 |
| * Silver sage (*Artemisia cana*) | | 0.5 |
| *Antelope bitterbrush (*Purshia tridentata*) | Maybell | 1 |
| *Serviceberry (*Amelanchier alnifolia*) | | 1 |
| *Chokecherry (*Prunus virginianna*) | | 1 |
| *Winterfat (*Krascheninnikovia lanata*) | Open Range | 0.5 |
| | | |
| *Forbs* | | |
| *Arrowleaf balsamroot (*Balsamhoriza sagittata*) | | |
| *Lewis' flax (*Linum lewsii*) | Appar | 0.5+ |
| *Scarlet globemallow (*Sphaeralcea coccinea*) | | 0.5+ |
| *American vetch (*Vicia americana*) | | 0.5+ |

# APPENDIX A.
# ATLANTIC RIM NATURAL GAS PROJECT RECLAMATION PLAN

| Species of Seed | Variety | Lbs. PLS** |
|---|---|---|
| *Forbs (cont. from previous page)* | | |
| *Lupine (*Lupinus sericeus*) | | 0.5+ |
| *Blanketflower (*Gaillardia aristata*) | | 0.5+ |
| * Western yarrow (*Achillea millefolium* L. var. *occidentalis*). | Yakima | 0.5+ |
| **Firecracker Penstemon (***Penstemon eatonii*) | Richfield | 0.5+ |

**Notes:**

**Total Lbs. PLS** - Seed mixtures should total approximately 12-14 lbs. of pure live seed.

** Pure Live Seed, drill seeded. For broadcast seeding, double the above rates.

* These species can be used as alternatives to fulfill shrub and forb requirements, site-specific choices, or species required to fulfill a particular value (e.g., critical wildlife habitat).

**Appendix B**

**Atlantic Rim Natural Gas Project
Performance-Based Monitoring
and Best Management Practices**

# APPENDIX B.
# PERFORMANCE-BASED MONITORING
# AND BEST MANAGEMENT PRACTICES

This appendix to the Atlantic Rim Record of Decision (ROD) lists the requirements that will be imposed, as appropriate, by the Bureau of Land Management (BLM), Rawlins Field Office (RFO) on all oil and gas development actions approved on federal lands and minerals within the Atlantic Rim Project Area (ARPA). These requirements include mitigation identified in specific resource mitigation subsections of chapter 4 of the Final Environmental Impact Statement (FEIS) for the ARPA. Other conditional requirements may also be imposed by the BLM pending site-specific review and may include Conditions of Approval (COAs), administrative requirements, and mitigation requirements found in the following appendices in the FEIS for the ARPA:

- Appendix B    Reclamation Plan

- Appendix C    Hazardous Materials Management Plan

- Appendix E    Wildlife Monitoring and Protection Plan

- Appendix H    Best Management Practices

- Appendix I    Cultural Resources Management

- Appendix J    Best Management Practices for Reducing Non-Point Source Pollution

- Appendix K    Plan of Development / Detailed Proposed Action (See section K.1.3.7, Applicant Voluntarily Committed Measures)

These appendices to the FEIS contain the tools available to the BLM for mitigating impacts of the development in the ARPA. These tools will be applied, as appropriate, upon approval of Applications for Permits to Drill (APDs) and based on site-specific review. Protective measures summarized in appendix L of the FEIS will be considered based on site-specific conditions, where such measures are not otherwise in conflict with this ROD. The remainder of this appendix to the ROD contains those requirements that will be imposed on APDs on federal lands and minerals within the ARPA.

## Authorizing Actions

ARPA Operators are responsible for adhering to all applicable federal, state, and local laws and regulations and for obtaining all necessary federal, state, and county permits. Absent specific revisions in this ROD, Operators will comply with the management objectives, COAs, and mitigation measures identified in the BLM Great Divide Resource Management Plan (RMP) ROD (USDI-BLM 1990) to the extent feasible and practicable.

## Performance-Based Management

The Atlantic Rim project will use a performance-based management approach that includes four primary elements, as outlined below:

# APPENDIX B. PERFORMANCE-BASED MONITORING AND BEST MANAGEMENT PRACTICES

1. Performance Goals:  describes the conditions that the BLM and Operators will attempt to achieve.

2. Performance Requirements:  an extensive array of best management practices (BMPs), COAs and protective measures that may be used to achieve the Performance Goals.

3. Performance-Based Monitoring:  monitoring efforts to measure the degree of success the performance requirements have in achieving Performance Goals.

4. Adaptive Management:  application of additional mitigation or adaptive techniques to help achieve Performance Goals where needed.

Implementation of the performance-based approach is described below.  The BLM will attempt to achieve the following Performance Goals in collaboration with other state and federal agencies:

| Item | Performance Goal |
|------|------------------|
| Migration Routes | maintain functional migration routes through or around development areas |
| Big Game Crucial Winter Range | provide an adequate amount of suitable undisturbed crucial winter range for big game animals |
| Sage and Sharp-Tailed Grouse | provide well-dispersed sage-grouse breeding, nesting, brood rearing, and winter habitat |
| Muddy Creek Sensitive Fish | maintain adequate water quality, water quantity, species distribution, and aquatic habitat components |
| Shrub-Dependent Song Birds | assure occupied habitat for shrub-dependent song birds is well-distributed throughout the project area |
| Riparian | ensure no net loss of native riparian habitat/vegetation |
| Grazing | maintain adequate and sustainable food and habitat for domestic animals |
| Range Condition | maintain range condition or improve range condition towards potential for the ecological site |
| Livestock Safety | minimize deaths and injuries of livestock due to development and operational activities |
| Range Improvements | minimize damage to range improvements, gates, cattle guards, water sources, and other livestock grazing management improvements |
| Standards and Guidelines | manage to meet Wyoming Healthy Rangeland Standards |
| Sites | maintain viable site-stabilizing native plant growth |
| Species Composition | maintain a range of species composition, diversity, cover, and production equal to pre-disturbance levels |
| Weeds | maintain weed-free sites |

# Adaptive Management

The BLM will implement a performance-based, adaptive management process for the ARPA whereby incremental adjustments will be made to mitigation and management restrictions

# APPENDIX B. PERFORMANCE-BASED MONITORING AND BEST MANAGEMENT PRACTICES

based upon how the environment responds to future development and performance requirements.  The potential value of adaptive management to the National Environmental Policy Act (NEPA) process is discussed by Carpenter (1997) and is strongly supported by a number of agencies at the national level, including BLM, United States Environmental Protection Agency (USEPA), and United States Department of Agriculture-Forest Service (USDA-FS). Carpenter summarized, "It is increasingly recognized that human interventions into natural systems seldom proceed as originally planned. Scientific uncertainties prevent environmental impacts from being reliably or precisely predicted. Thus, the style of management must provide for monitoring to guide mid-course corrections in adapting to inevitable surprises." Council on Environmental Quality (CEQ) NEPA regulations require continual monitoring.

Throughout the life of the project, monitoring data will be reviewed to determine if mitigation is leading to the achievement of reclamation and performance goals.  The adaptive management process will use this data to enable the development of management changes.  Following submission of development plans (APDs, Sundry notices, etc.) specific COAs, BMPs, and other mitigations will be determined and applied for each specific site during on-site reviews.  These on-the-ground reviews offer BLM resource specialists the opportunity to anticipate the potential effects of development and apply those measures judged necessary to reduce the adverse effects of development at the site.  The specific measures (COAs, BMPs, etc.) that are best suited for reducing adverse effects will vary by site, based on conditions found at the specific site, such as the presence of sensitive soils, wildlife issues, aspect, slope, nature of the specific action proposed, and many other factors.

While the activities planned for the ARPA, including most mitigation measures, are common and their effects generally well known, variations in site and climatic conditions, unknown conditions, and other factors can result in variations in reclamation success.  Therefore, new techniques and technology to reduce oil and gas development impacts can and will be implemented as they become available.  For those sites where known mitigations are not as effective as desired, monitoring and application of adaptive management will be used to change the mitigation approach using different or new techniques that provide the BLM with a mechanism to increase the success of reclamation in the ARPA.

As information is gained about how area resources are reacting to reclamation activities and mitigations, the adaptive management process allows for changes in management without further NEPA analysis, unless development thresholds, such as the number of wells and disturbance limits, are reached.  The process enables managers to rapidly adjust mitigation and management restrictions for unanticipated impacts or reclamation successes.  The adaptive management framework has several continuous, looping steps:

- Implement the decision;

- Monitor impacts;

- Evaluate monitoring data;

- Recommend modifications to mitigations or management restrictions based on monitoring data;

- Develop and implement adaptive management decision;

# APPENDIX B. PERFORMANCE-BASED MONITORING AND BEST MANAGEMENT PRACTICES

- Monitor impacts of adaptive management decision and further evaluate monitoring data, etc.

The overall purpose of this adaptive management process is to ensure that impacts of development and production are monitored, and the information from that monitoring is evaluated and incorporated, on a regular basis, into future mitigation and management decisions.  Specific performance-based monitoring requirements and BMPs are summarized by discipline in the following sections.

# Land Use/Surface Disturbance

1. Surface disturbance in the ARPA is limited to 7,600 acres (2.8 percent of the project area) at any given time. Total surface disturbance through the life of the project is estimated to be 13,600 acres.  Initial site disturbance from oil and gas development activities (resource roads, well sites, gas gathering pipelines, compressor stations, etc.) will be limited to a short-term disturbance goal of 6.5 acres per well site.  In Category A areas (ROD, figure 2) initial site disturbance will be further limited to less that 6.5 acres per well site (FEIS, section 2.2.4).  Well sites are defined as the relatively flat, contiguous work area containing equipment and facilities used to drill one or more wells used in oil and gas production.

2. Once the surface disturbance limit is reached, further development will cease until disturbed land has been reclaimed according to the reclamation standards established by the BLM for the ARPA (appendix A, Reclamation Plan).

3. Natural gas development is limited to eight well sites per 640-acre section. Operators can install multiple well-bores (e.g., coalbed natural gas (CBNG), conventional, or injection) on a single well site (FEIS, section 2.2.4).

4. Operators will track surface disturbance acreage (including total disturbance and successful interim reclamation) and provide BLM with Federal Geographic Data Committee (FGDC)-compliant metadata and geographic information system/global positioning system (GIS)/(GPS) showing the "as-built" location data for all newly developed facilities and reclaimed areas annually no later than December of each year based upon successful reclamation (appendix A, Reclamation Plan).

5. Within 30 days of approval of this ROD, Operators will provide BLM with a map of the existing disturbance associated with activities authorized as part of the interim drilling policy.  This map will serve as the baseline level of disturbance and will be updated annually.

6. By April 1 of each year, Operators will provide the BLM RFO annual operating plans for the following year that include the following information:

    a. All previous year activity to include number of wells drilled; total new surface disturbance by well pads, roads, and pipelines; and current status of all reclamation activity and

# APPENDIX B. PERFORMANCE-BASED MONITORING
# AND BEST MANAGEMENT PRACTICES

    b.  Plan of Development for the upcoming year, along with conceptual, multi-year development plans to include planned number of wells to be drilled and an estimate of new surface disturbance and reclamation activity.

7.  Operators will remove/vacuum fluids from reserve pits and complete backfill and reclamation within 180 days from well completion or they must notify the BLM's Authorized Officer.  In all cases, fluids will be removed as soon as practical.

## Paleontological Values

1.  Each proposed facility located in areas with known and/or potentially significant paleontological resources (Paleontology Condition 1 and 2 areas and Probable Fossil Yield Class 4 and 5 areas) will be surveyed by a BLM-approved paleontologist prior to surface disturbance (FEIS appendix H).

2.  Any significant fossils or localities previously known or discovered during the survey will be avoided by the permitted activity, or fully mitigated prior to allowing the activity to proceed (FEIS appendix H).

3.  If paleontological resources are discovered at any time during construction, all construction activities will halt and BLM personnel will be immediately notified.  Work will not proceed until paleontological materials are properly evaluated by a qualified paleontologist.  In addition, the site will be protected from further damage or looting (FEIS appendix H).

## Air Quality/Dust

1.  In cooperation with Wyoming Department of Environmental Quality, Air Quality Division (WDEQ-AQD), Operators will finance and operate air quality monitoring in the RFO area including NOx, $O_3$, $PM_{10}$ and $SO_2$ (FEIS, chapter 4).

2.  The BLM will work cooperatively with state and other federal agencies, and with industry, to track emissions in the BLM RFO area (FEIS, chapter 4).

3.  If future air monitoring shows ozone exceedances attributable at least in part to sources in the ARPA, BLM will consult with WDEQ-AQD, USEPA, USDA-FS, and NPS to determine whether adaptive management will be needed to mitigate impacts (FEIS, chapter 4).

4.  Operators may use any and all approved, practical, and effective methods to control fugitive dust.  This may include, but is not limited to:

    • Operators may use water or chemicals to control dust in the demolition of structures, in construction operations, grading of roads, or clearing of land (FEIS appendix J).

    • Operators may use water for dust abatement on a case-by-case basis.  The water should meet state standards for this use and be permitted by the state of Wyoming.  Only the water needed for abating dust should be applied; this

# APPENDIX B. PERFORMANCE-BASED MONITORING
## AND BEST MANAGEMENT PRACTICES

method will not be used as a water disposal option under any circumstances. There will be no traces of oil or solvents in water used for dust abatement (FEIS appendix J).

- Operators will use all-weather surfacing on roads (gravel or asphalt paving) and will apply water or suitable chemicals to keep dust in place on roads or material stockpiles (FEIS appendix J).

- Operators will use appropriate road design including shape, drainage, and surface material to protect road bed from being eroded (FEIS appendix J).

- When an air quality, soil loss, or safety problem is identified as a result of fugitive dust, Operators will initiate immediate abatement (FEIS appendix K).

## Soils/Water

1. The Atlantic Rim operator responsible for new development around existing pods will submit a Water Management Plan as part of the Annual Work Plan submittal in April. This plan will have the following information (FEIS appendix H):

- 12-digit hydrologic unit code (HUC) number and name;

- All GIS—compatible information included in the Annual Work Plan (FEIS appendix K);

- Surface water assessment of the current road network in the area including future plans for maintenance;

- Average daily water production per well at current pod wells;

- Average daily injection volumes of current injection wells, by well;

- Unused injection well capacity;

- Estimated water production from proposed wells;

- Location, name, and estimated capacity of new injection wells;

- Special Protection Measure for each well location, if applicable;

- Any water quality sampling results; and

- Anticipated permit requirements, and copies of existing permits for water-related activities required from Army Corps of Engineers (ACOE), other federal agencies, and/or the state of Wyoming.

# APPENDIX B. PERFORMANCE-BASED MONITORING AND BEST MANAGEMENT PRACTICES

2. Plans should be submitted and approved by BLM for surface disturbance in areas with slopes greater than 25 percent. Only those areas that cannot be avoided could be approved (FEIS appendix H).

3. Culverts or low-water crossings will be installed for all ephemeral and intermittent drainage crossings.  All drainage crossing structures and culverts will be designed to pass, at a minimum, the 25-year discharge events, or as otherwise directed by the BLM.  Downstream armoring will be installed when necessary (FEIS appendix H).

4. The design of channel crossings will minimize changes in channel geometry and subsequent changes in flow hydraulics.  Disturbed channel beds will be regraded to the original geometric configuration with the same or very similar bed material. Downstream armoring will be installed when necessary (FEIS appendix H).

5. Construction of drainage crossings will be limited to no-flow periods or low-flow periods (FEIS appendix H).

6. Channel crossings for buried pipelines will be constructed using trenching techniques such that the pipe is buried a minimum of 4 feet below the channel bottom.  To stabilize stream banks, appropriate—sized riprap will be placed from the channel bottom to the top of the normal high water line at all stream crossings.  When excavating the crossing, separate the top 1-foot of stream bottom substrate from deeper soil layers and reconstruct the original layers by replacing deeper substrate first (FEIS appendix H).

7. Adequate drainage control devices and measures will be included in the road design and maintenance (e.g., road berms and drainage ditches, diversion ditches, cross drains, culverts, out-sloping, and energy dissipaters) at sufficient intervals and intensities to adequately control and direct surface runoff above, below, and within the road environment to avoid concentrated flows (FEIS appendix H).

8. Locations for these features will be proposed in Annual APD approval master plans submitted by the operator and will be identified specifically in construction plans after BLM on-site inspections (FEIS appendix H).

9. Erosion control devices will also be used in conjunction with the surface runoff and drainage control devices, such as temporary barriers, ditch blocks, erosion stops, mattes, mulches, and vegetative covers.  A revegetation program will be implemented as soon as possible to re-establish the soil protection afforded by a vegetal cover (FEIS appendix H).

10. When an existing road, improved for travel, will reduce environmental impacts compared with a new route, it will be used and identified during annual planning and on-site inspections (FEIS appendix H).

11. Culverts should be installed in road crossings for small ephemeral channels.  All drainage and erosion mitigation should be designed for at least the 25-year discharge events, and should use, at a minimum, 18-inch culverts (with armored entrances and exits as necessary).  Waterbars, waddles or haybales, and silt fences

# APPENDIX B. PERFORMANCE-BASED MONITORING
# AND BEST MANAGEMENT PRACTICES

can be used as needed to reduce surface runoff velocity and deposit sediment in the uplands to protect riparian areas, wetlands, and surface waters (FEIS appendix H).

12. All potentially affected landowners having properly permitted water wells with the Wyoming State Engineer's Office (SEO) within each proposed well's circle of influence (one-half mile radius) were offered a water well agreement. If a water well agreement is not reached with the landowner, the responsible Atlantic Rim Operator will mitigate the impacts in accordance with state of Wyoming water laws. Some examples of mitigation will be drilling an additional supply well or provide CBNG water as an offset (FEIS appendix H).

13. Completely reclaim all disturbed areas not needed for production activities including (FEIS appendix H):

- Pipeline right-of-way (ROW),
- Portion of road ROW not needed in the function of the road, and
- The portion of the drill pad not needed during production.

Reclamation of disturbed areas is specified in the Reclamation Plan presented in appendix A. Reclamation may generally include (FEIS appendix H):

- Completing cleanup of the disturbed areas;

- Restoring of topographic contours that existed prior to construction;

- Ripping disturbed areas to a depth of 12 to 18 inches;

- Replacing of topsoil or suitable plant growth material over all disturbed surfaces;

- Seeding reclaimed areas with the seed mixture prescribed in the Surface Use Plan or Plan of Development for the proposed development; and

- Mulching or adding soil amendments, if considered necessary by the BLM officer.

14. All water used for drilling, completion, and testing activities will be free of hydrocarbons and come from CBNG wells, be re-used from other drilling sites, and/or come from sources approved by the BLM and subject to state permitting requirements. Only fresh water would be allowed for drilling to surface casing setting depth. New water sources would be considered for potential depletions to the Platte or Colorado River Basins as necessary (FEIS appendix H).

15. All water used for construction, dust abatement, or hydrostatic testing will come from CBNG wells or sources with sufficient quantities and through appropriation permits approved by the State of Wyoming. Surface water and shallow groundwater sources for these uses and located in the Colorado River Basin and has been consulted on with the Fish and Wildlife Service (See FEIS, appendix G). Under no circumstances are these methods to be used for water disposal, only volumes appropriate for the use will be approved (FEIS appendix H).

# APPENDIX B. PERFORMANCE-BASED MONITORING AND BEST MANAGEMENT PRACTICES

16. Hydrostatic test water will be discharged in a controlled manner onto an energy dissipater and within existing ROWs.  The water is to be discharged onto undisturbed land that has vegetative cover and with energy dissipation such as using a rock armored apron or gated pipe.  Prior to discharge, water should be tested and treated or filtered if necessary to reduce pollutant levels or to settle out suspended particles if necessary.  Operators will coordinate all discharge of test water with the SEO, WDEQ, and the BLM (FEIS appendix H).

17. Avoidance areas for surface-disturbing and disruptive activities and linear crossings include the following (FEIS appendix H):

    - Identified 100-year floodplains;

    - Areas within 500 feet from perennial waters, springs, water wells, and wetland riparian areas, and

    - Areas 100 feet from the inner gorge of ephemeral channels.

18. To minimize long-term surface disturbances within the vegetated sand dunes or other sensitive soils, options such as directional drilling, smaller well pads, and surface lines should be considered.  To enhance reclamation success through surface stability, techniques to reduce wind erosion should be considered. These methods could include snow fences, soil tackifiers, and erosion control matting (FEIS appendix J).

19. Identification of critical erosion condition areas during site-specific project analysis, and activity plan development for the purpose of avoidance and special management (FEIS appendix J).

20. Temporary disturbances which do not require major excavation (e.g., small pipelines and communication lines) may be stripped of vegetation to ground level using mechanical treatment, leaving topsoil intact and root mass relatively undisturbed (FEIS appendix J).

21. The Operators will minimize construction activities in areas of steep slopes and other sensitive soils, and apply special slope stabilizing structures if construction cannot be avoided in these areas (FEIS appendix K).

22. Design cut slopes in a manner that will allow retention of topsoil, surface treatment such as mulch, and subsequent revegetation (FEIS appendix K).

23. Selectively strip and salvage topsoil or the best suitable medium for plant growth from all disturbed areas on all well pads (FEIS appendix K).

24. Include adequate drainage control devices and measures in the road design (e.g., road berms and drainage ditches, diversion ditches, cross drains, culverts, out-sloping, and energy dissipaters) at sufficient intervals and intensities to adequately control and direct surface runoff above, below, and within the road environment to avoid erosive concentrated flows.  In conjunction with surface runoff

# APPENDIX B. PERFORMANCE-BASED MONITORING
# AND BEST MANAGEMENT PRACTICES

or drainage control measures, use erosion control devices and measures such as temporary barriers, ditch blocks, erosion stops, mattes, mulches, and vegetative covers. Implement a revegetation program as soon as possible to re-establish the soil protection afforded by a vegetal cover (FEIS appendix K).

25. Upon completion of construction activities, restore topography to near pre-existing contours at the well sites, along access roads and pipelines, and other facilities sites. Replace topsoil or suitable plant growth material over all disturbed surfaces, and apply fertilizer as needed, and seed (FEIS appendix K).

26. In accordance with the monitoring requirements for rangeland heath, depletions to the Colorado River Basin, and methane seep detection (section 4.4.5), the following shall be required in addition to initial drilling obligations and before any CBNG wells can be drilled in the unit/POD. The Unit Operator shall be responsible for drilling, completing, and equipping one set of three shallow groundwater-monitoring wells completed in water-bearing sandstone units stratigraphically above the principle producing coal beds in the upper Mesaverde Group. Specific surface locations, depths, and completion zones for each of the three groundwater monitoring wells in the set shall be determined in consultation with the RFO AO, and may only be drilled at a location where the oil and gas mineral estate is owned by the Federal Government. The groundwater monitoring well requirements are summarized as follows:

   a. Each well in the three well set will be completed in a stratigraphically different water-bearing sandstone. The sandstone strata should be a minimum of 10 feet thick.

   b. For each well in the three well set, the sandstone strata in which it is completed will typically be above the principal coal-bearing strata of the upper Mesaverde (e.g., typically above the coal-bearing strata of the Pine Ridge Sandstone).

   c. Completion interval(s) in the water-bearing sandstone units for each well will be identified by the RFO Authorized Officer (AO) in consultation with the Unit Operator from wireline logs for each well in the set.

   d. The minimum acceptable wire-line log suite for this purpose shall consist of calibrated and properly scaled (according to industry standards) high-resolution resistivity with spontaneous potential, gamma-ray curves, a high-resolution neutron density with photoelectric, and caliper curves. The density curve logging speed through the coals shall be no greater than 30 feet per minute. Digital las format logs shall be submitted to the WSO-RMG and the RFO; paper copies shall be submitted to the RFO.

   e. Each groundwater monitoring well shall be drilled, cased, and completed in accordance to BLM RFO specifications.

   f. Because the pressure gradient may be greater than 0.433 psia per foot and the rocks penetrated may contain natural gas, the Unit Operator shall drill the groundwater monitoring wells in accordance to Onshore Order #2 and all applicable regulations in a manner to prevent the possibility of a blowout.

## APPENDIX B. PERFORMANCE-BASED MONITORING
## AND BEST MANAGEMENT PRACTICES

g. The groundwater monitoring wells shall be equipped with the appropriate monitoring equipment and shelters approved by the RFO's AO in consultation with the Unit Operator before any CBNG wells can be produced in the unit/POD.

h. Additional information regarding the drilling and completion of the groundwater monitoring wells, the standard equipment required for the completed groundwater monitoring wells, and information on additional requirements for the groundwater monitoring wells can be obtained from the AO, Rawlins Field Office, Rawlins, Wyoming.

# Reclamation

BLM reclamation goals emphasize eventual ecosystem reconstruction, which means returning the land to a condition approximate to or better than that which existed before it was disturbed. Final reclamation measures are used to achieve this goal. Interim reclamation measures are used to achieve the short-term goal of quickly stabilizing disturbed areas to protect both disturbed and adjacent undisturbed areas from unnecessary degradation. Specific guidance on reclamation within the ARPA is presented in appendix A. The following sections summarize the key goals and requirements for reclamation activity within the ARPA:

1. One of the most important principles for successful restoration is to limit initial disturbance. Restoration planning should start before disturbance and be an integral part of the operational plan. Consideration of the processes necessary for successful reclamation is important. Pre-disturbance surveys, site stabilization, weed control, and maintenance and health of soils are important considerations. Revegetation that considers vegetative succession to pre-disturbance vegetative conditions, with annual monitoring and reporting, will allow tracking of success and adaptive management of problem areas (appendix A). The Operators are responsible for reclamation monitoring and reporting costs.

2. For each discrete site where ground-disturbing activities are planned or occur under the Operators, a site-specific reclamation plan shall be prepared, submitted, and approved by the BLM before the Operators disturb the environment. Guidance and requirements for this plan can be found in program-specific direction (USDI-BLM 1983). A project-wide reclamation plan may be considered if it addresses discrete site disturbances individually (appendix A).

3. With the exception of active work areas, disturbed areas anticipated to be left bare and exposed will be stabilized to prevent soil erosion. In addition to mulch, silt fencing, waddles, hay bales, and other erosion control devices will be used on areas at risk to soil movement away from disturbed areas including fill slopes (appendix A).

4. Reclamation actions will be implemented before the first growing season following disturbance with the goal of returning the land to a condition approximate to or more productive than that which existed before disturbance or to a stable and productive condition compatible with that described in the land use plan. During subsequent seeding for final vegetation reclamation, the project shall consider using desired shrubs and forbs. The reclamation plan will specify steps to be taken by the

# APPENDIX B. PERFORMANCE-BASED MONITORING
# AND BEST MANAGEMENT PRACTICES

Operators prior to the beginning of the growing season, during the first growing season, and following each growing season (appendix A).

- If the treatment area is found to be successfully reclaimed, the site will be checked for reclamation success at least annually after the growing season for at least five seasons. The site will also be checked for additional management needs including weed infestations/control needs.

- If the reclamation area is not successfully reclaimed or otherwise requires further management activities to establish vegetation, the actions prescribed above will be implemented with appropriate modifications and further monitoring will occur until reclamation is found to be successful.

5. The Operators will provide BLM with an annual report before January 31st for all sites disturbed which will include copies of the completed individual site review forms or a BLM-approved electronic report, a summary of monitoring data and results, a BLM useable shapefile(s) or GIS layer(s) that details location, name, type, and extent of (appendix A):

- New disturbances,
- Unreclaimed disturbance,
- New reclamation,
- Failed or unsuccessful reclamation,
- Locations of noxious/invasive weed infestation, and
- Further vegetation treatments planned (e.g., mulching, matting, and weed control).

6. Reclamation will be considered successful if the following Interim Reclamation criteria are met (appendix A):

- 80 percent of predisturbance ground cover,
- 90 percent dominant species*,
- No noxious weeds present in the seeding, and
- Erosion features equal to or less than surrounding area.

*The vegetation will consist of species included in the seed mix, and/or occurring in the surrounding natural vegetation or as deemed desirable by the BLM in review and approval of the reclamation plan.  The goal is no single species will account for more than 30 percent total vegetative composition.  Vegetation canopy cover production and species diversity shall approximate the surrounding undisturbed area.

# Livestock Grazing/Range Management

1. Operators and their contractors will observe and promote adherence to speed limits in the project area, and erect signs in lambing/calving areas, shipping pastures, or adjacent to working corrals to warn vehicle Operators (FEIS, section 4.6.5.4).

2. The Operators will coordinate annually or more often when necessary with affected livestock operators to discuss (1) problems encountered during the past grazing

## APPENDIX B. PERFORMANCE-BASED MONITORING
## AND BEST MANAGEMENT PRACTICES

season, (2) agreed-upon corrective actions, and (3) planned energy development and operations during the next grazing season.  This meeting needs to occur on a date early enough to allow grazing permittees sufficient time to make decisions and allocate their resources for the upcoming grazing season (FEIS, section 4.6.5.4).

3.  The Operators will report damage to livestock and livestock facilities as quickly as possible to BLM and affected livestock operators (FEIS, section 4.6.5.4).

4.  Operators will develop and employ prevention measures to avoid damaging fences, gates, and cattleguards (FEIS appendix H).

5.  Operators will report and correct any damage that occurs to rangeland improvement projects (FEIS appendix H).

6.  Prior to drilling, Operators will upgrade cattleguard gate width and load-bearing requirements to meet BLM Road Standards (BLM Manual 9113) (FEIS appendix H).

7.  For the protection of livestock, all pits and open cellars shall be fenced.  Fencing shall be in accordance with BLM specifications (BLM Handbook 1741-1) (FEIS appendix H).

# Wildlife

The Review Team (defined in the ROD as comprised of BLM (including interdisciplinary team members), cooperating and interested agencies, and the Operators) or BLM will identify the level of effort required for performance-based monitoring and develop a wildlife monitoring and protection plan (FEIS appendix E) for development in the ARPA.  The goal of the plan is to avoid and/or minimize adverse impacts to wildlife by monitoring wildlife population trends and developing appropriate mitigation during the course of project development and operation. Implementation of the plan will allow land managers and project personnel opportunities to achieve and maintain desired levels of wildlife productivity and populations in the ARPA (e.g., at pre-project levels) by minimizing and/or avoiding potential adverse impacts to wildlife species. In addition, the implementation of this plan will facilitate the maintenance of a diverse assemblage of wildlife populations in the ARPA simultaneously with development of natural gas reserves.

Funding for wildlife and habitat monitoring may be obtained from BLM internal sources, in collaboration with cooperating / interested agencies, from the voluntary participation of the Operators, or from outside sources that may have an interest or desire to participate and/or contribute, or from a combination of these sources.  Operators are responsible for demonstrating successful achievement of Performance Goals.  Early efforts are to be made to collect or consolidate resource data to form a baseline against which future monitoring efforts and data would be used to indicate trends.  In the absence of sufficient data illustrating operator achievement of performance-based goals, the BLM will use a conservative approach when considering additional approvals.  The following sections summarize the key requirements to monitor and protect wildlife in the ARPA from FEIS appendix E:

1.  In part to meet their responsibility to demonstrate achievement of Performance Goals, Operators will compile all resource data collected under the wildlife monitoring and protection plan (FEIS appendix E) and submit this data to the Review Team by October 15 of each calendar year.

## APPENDIX B. PERFORMANCE-BASED MONITORING
## AND BEST MANAGEMENT PRACTICES

2. Operators will complete draft annual reports for submittal to the Review Team by November 15 of each year. Annual reports will summarize annual wildlife inventory and monitoring results, note any trends across years, identify and assess protection measures implemented during past years, specify monitoring and protection measures proposed for the upcoming year, recommend modifications to the existing wildlife monitoring/protection plan based on the successes and/or failures of past years, and identify additional species/categories to be monitored.

3. Operators will issue a final annual report to all potentially affected individuals and groups by early February of each year.

4. A one day meeting will be organized by the Review Team and held in December (or as determined by the Review Team) of each year to discuss and modify, as necessary, proposed wildlife inventory, monitoring, and protection protocol for the subsequent year.

# Inventory & Monitoring

Inventory and monitoring for wildlife and plant species within the ARPA will be conducted at a frequency dependent upon the level of development activity with increased frequency generally associated with increased levels of development. The following species or categories of species will be inventoried and monitored in the ARPA (FEIS appendix E):

1. **Black-Footed Ferret:** BLM biologists will determine the presence/absence of prairie dog colonies at each proposed development site during APD and ROW application field reviews. Prairie dog colonies in the project area will be mapped and burrow densities determined by a BLM-approved, operator-financed biologist, as necessary and in association with proposed development plans. Colonies that meet the United States Department of the Interior, Fish and Wildlife Service (USDI-FWS) criteria as potential black-footed ferret habitat (USDI-FWS 1989) in non-block cleared areas will be surveyed for black-footed ferrets by a USDI-FWS-certified, operator-financed surveyor prior to BLM authorizing disturbance of these colonies.

2. **Bald Eagle, Peregrine Falcon, and Ferruginous Hawk:** Inventory and monitoring protocol for bald eagle, peregrine falcon, and ferruginous hawk will be as described for raptors.

3. **Greater Sage-Grouse & Columbian Sharp-Tailed Grouse:** Greater sage-grouse/Columbian sharp-tailed grouse lek inventories will be conducted by the BLM and Wyoming Game and Fish Department (WGFD) or by a BLM-approved operator-financed biologist on the project area and a two mile/one mile buffer to determine lek locations every 5 years, or as deemed appropriate by the BLM.

4. **Mountain Plover:** Mountain plover habitat will be mapped within proposed disturbance areas (as identified in annual reports) prior to development of these areas by the BLM or a BLM-approved operator-financed biologist. In addition, these areas will be surveyed annually by the BLM or a BLM-approved operator-financed biologist to detect the presence of plovers.

# APPENDIX B. PERFORMANCE-BASED MONITORING
## AND BEST MANAGEMENT PRACTICES

5. **Western Burrowing Owl:** Prairie dog colonies and other suitable burrowing owl nesting areas on and within 0.75 miles of existing and proposed disturbance areas will be searched for western burrowing owls by the BLM or a BLM-approved, operator-financed biologist or during June through August to determine the presence or absence of nesting owls.

6. **Other TEC&SC Species:** Surveys for other threatened, endangered, candidate, and other species of concern (TEC&SC) species will be conducted by the BLM or a BLM-approved, operator-financed biologist/botanist in areas of potential habitat within one-half mile of proposed disturbance sites prior to disturbance.

7. **Raptors:** Raptor inventories will be conducted by the BLM or a BLM-approved, operator-financed biologist at least every five years or prior to development of proposed disturbance areas (as identified in annual reports) to determine the location of raptor nests. Raptor nest monitoring will be conducted by the BLM or a BLM-approved, operator-financed biologist annually at known nest locations between April and July in order to ascertain nest activity status.

8. **Big Game Crucial Winter Range:** Data on big game use of crucial winter ranges on the project area and an adjacent one-mile buffer will be requested annually by the BLM from the WGFD, as deemed necessary by the BLM.

9. **Other Inventory and Monitoring Measures:** Additional inventory and monitoring measures may be applied for other wildlife and plant species as specified in annual reports. Surveys will be conducted in adherence with protocols to be established by the BLM, other agencies, and Operators. Operators may provide financial assistance for these investigations.

10. **General Wildlife:** BLM staff will be responsible for maintaining records of selected wildlife species observed during the course of their activities on the project area.

# Wildlife Protection Measures

Wildlife protection measures were developed from past measures identified for oil and gas developments in Wyoming. Additional measures may be included and/or existing measures may be modified in any given year as allowable and as deemed appropriate by BLM in consultation with other agencies, Operators, and interested parties (FEIS appendix E).

1. **Black-Footed Ferret:** In general, all prairie dog colonies on the project area will be avoided, where practical. If prairie dog colonies, in non-block-cleared areas of sufficient size and burrow density for black-footed ferrets are scheduled to be disturbed, black-footed ferret surveys of these colonies will be conducted pursuant to BLM and/or USDI-FWS decisions made during informal consultations.

   - If black-footed ferrets are found on the project area, the USDI-FWS will be notified immediately and formal consultations will be initiated to develop strategies that ensure no adverse effects to the species.

# APPENDIX B. PERFORMANCE-BASED MONITORING AND BEST MANAGEMENT PRACTICES

- Before ground-disturbing activities are initiated in black-footed ferret habitat, authorizations to proceed must be received from the BLM, in consultation with the USDI-FWS.

2. **Bald Eagle, Peregrine Falcon, and Ferruginous Hawk:** Protection protocol for these species will be the same as described for raptors.

3. **Greater Sage-Grouse & Columbian Sharp-Tailed Grouse**:

   - Surface disturbance or occupancy will be prohibited within one-quarter mile of the perimeter of occupied leks;

   - Human activity will be avoided between 6:00 p.m. and 9:00 a.m. from March 1 to May 20 within one-quarter mile of the perimeter of occupied leks;

   - Surface disturbance and other actions that create permanent and high-profile structures, such as buildings, storage tanks, and overhead power lines, will not be constructed within 0.25 to 1.0 mile of the perimeter of leks, as determined on a case-by-case basis;

   - Surface disturbing and disruptive activities will not be allowed within two miles of an occupied greater sage-grouse lek or in nesting and early brood-rearing habitat associated with individual leks (when identified and delineated) from March 1 to July 15;

   - Surface disturbing and disruptive activities will not be allowed within one mile of an occupied Columbian sharp-tailed grouse lek or in nesting and early brood-rearing habitat associated with individual leks (when identified and delineated), from March 1 to July 15;

   - Surface disturbing and disruptive activities will not be allowed between November 15 and March 14 in delineated winter concentration areas. In order to minimize noise disturbances to strutting or dancing grouse, compressor stations and generators will be muffled with hospital-style mufflers.

4. **Mountain Plover:**

   - Mountain plover habitat will be avoided where practical.

   - All surface-disturbing activities will be restricted from April 10 to July 10 in mountain plover habitat.

5. **Western Burrowing Owl:** Protection protocol for this species will be as described for raptors as well as avoidance of prairie dog colonies, where practical.

6. **TEC&SC Species:** If crucial features for any TEC&SC species are found during surveys of areas within one-half mile of proposed disturbance sites, avoidance of these features will be accomplished in consultation and coordination with the BLM, USDI-FWS, and WGFD.

## APPENDIX B. PERFORMANCE-BASED MONITORING
## AND BEST MANAGEMENT PRACTICES

7. **Raptors:** The primary protection measure for raptor species on the project area will be avoidance of nest locations during the breeding season.

- All surface-disturbing activities will be restricted from February 1 through July 31 within a 0.75 to 1.0 mile radius of raptor nests, depending upon the species. In addition, well locations, roads, ancillary facilities, and other surface structures requiring a repeated human presence will not be constructed within 825 feet of raptor nests, except ferruginous hawk, where the restriction will be 1,200 feet (restrictions will generally exclude surface disturbance).

- Operators will notify the BLM immediately if raptors are found nesting on or within 1,200 feet of project facilities and assist the BLM as necessary in erecting artificial nesting structures (ANSs), as appropriate. The use of ANSs will be considered as a last resort for raptor protection. If nest manipulation or a situation requiring a "taking" of a raptor nest becomes necessary, a special permit will be obtained from the Denver USDI-FWS Office, Permit Section, and will be initiated with sufficient lead time to allow for development of mitigation. Required corresponding permits will be obtained from the WGFD in Cheyenne. Consultation and coordination with the USDI-FWS and WGFD will be conducted for all protection activities relating to raptors.

- Any power line construction will follow the recommendations of the Avian Power Line Interaction Committee (APLIC 1994; 1996) and Olendorff et al. (1981) to avoid collisions and electrocution of raptors.

8. **Big Game Species**:

- No construction activities or prolonged maintenance actions will be conducted within big game crucial winter range during the crucial winter periods of November 15–April 30.

- If ROW fencing is required, it will be kept to a minimum, and the fences will meet BLM/WGFD approval for facilitating wildlife movement. Wildlife-proof fencing will be used only to enclose areas that are potentially hazardous to wildlife species or reclaimed areas where it is determined that wildlife species are impeding successful vegetation establishment.

- Snow fences, if used, will be limited to segments of one-quarter mile or less. In addition, escape openings will be provided along roads in big game crucial winter ranges, as designated by the BLM, to facilitate exit of big game animals from snowplowed roads.

9. **General Wildlife:** Unless otherwise indicated, the following protection measures will be applied for all wildlife species:

- All roads on and adjacent to the project area that are required for the proposed project will be appropriately constructed, improved, maintained, and signed to minimize potential wildlife/vehicle collisions and facilitate wildlife (most notably big game) movement through the project area.

# APPENDIX B. PERFORMANCE-BASED MONITORING
# AND BEST MANAGEMENT PRACTICES

- Appropriate speed limits will be adhered to on all project roads, and Operators will advise employees and contractors regarding these speed limits.

- To protect important habitat in portions of the project area (i.e., ephemeral draws dominated by basin big sagebrush) areas with sagebrush greater than 3 feet tall will be avoided where possible.

10. Additional non-species-specific wildlife mitigations include the following:

- Reserve, work-over, flare pits, and other locations potentially hazardous to wildlife will be adequately protected by netting or fencing, as directed by the BLM, to prohibit wildlife access.

- If dead or injured raptors, big game, migratory birds, or unusual wildlife are observed on the project area, operator personnel will contact the appropriate BLM and WGFD offices. Under no circumstances will dead or injured wildlife be approached or handled by operator personnel.

- Employee and contractor education will be conducted regarding wildlife laws. If violations are discovered on the project area, Operators will immediately notify the appropriate agency. If the violation is committed by an employee or contractor, said employee or contractor will be disciplined and may be dismissed by the operator or prosecuted by the WGFD or USDI-FWS.

Operators will implement policies designed to control off-site activities of operational personnel and littering, and will notify all employees (contract and company) that conviction of a violation can result in disciplinary action including dismissal.

# Visual Resource Management

For areas within the ARPA that are visible from state, county, and BLM roads (Visual Resource Management (VRM) Class III) the following protection measures (FEIS appendix H) will be applied, as appropriate:

1. Gravel road surfacing shall be similar in color to adjacent dominant soil colors.

2. Avoid locating pads in areas visible from state, county or BLM roads.

3. Avoid locating facilities on or near ridgelines - use subsurface or low-profile facilities to prevent protrusion above horizon line when viewed from any state, county or BLM road.

4. Avoid routing well access roads directly from state, county, or BLM roads.

5. Co-locate wells when possible.

6. Locate facilities far enough from the cut and fill slopes to facilitate re-contouring for interim reclamation.

## APPENDIX B. PERFORMANCE-BASED MONITORING
## AND BEST MANAGEMENT PRACTICES

7. Do not locate wells adjacent to prominent features such as rock outcrops.

8. Repeat elements of form, line, color, and texture to blend facilities and access roads with the surrounding landscape.

9. Complete annual transportation plan for the entire area before beginning construction— make layout that will minimize disturbance and visual impact.

10. Use remote monitoring to reduce traffic and road requirements.

11. Remove unused equipment, trash, and junk immediately.

12. Reclaim unnecessary access roads as soon as possible.

13. All above-ground structures, production equipment, tanks, transformers, and insulators not subject to safety requirements shall be painted to blend with the natural color of the landscape (except for structures that require safety coloration in accordance with Occupational Safety and Health Administration (OSHA) requirements (FEIS appendix K)). The paint used shall be a non-reflective "Standard Environmental Color" approved by the BLM VRM specialist.

14. Do not create unnecessary cut and fill. Design and construct all new roads to a safe and appropriate standard "no higher than necessary" to accommodate their intended use.

# Cultural/Historic Resources Protection

The following mitigation measures will be incorporated into an agreement or agreements to be established under the Wyoming state cultural resources protocol between the BLM, the State Historic Preservation Office (SHPO), project proponents, and interested parties to address site-specific impacts and mitigation measures for all sites where setting contributes to National Register of Historic Places (NRHP) eligibility:

1. Brush hog all ROWs (FEIS chapter 4 and appendix H).

2. Allow no surface disturbance within a quarter mile of contributing segments of historic trails or trail-associated sites (FEIS chapter 4 and appendix H).

3. Limit trail crossings to existing disturbance corridors or non-contributing segments, unless otherwise determined by BLM in consultation with SHPO (FEIS chapter 4 and appendix H).

4. Use matting on ROWs during construction to minimize surface disturbance and visibility (FEIS chapter 4 and appendix H).

5. If a site is considered eligible for, or is already on the NRHP, avoidance is the preferred method for mitigating adverse effects to that property (FEIS appendix K).

# APPENDIX B. PERFORMANCE-BASED MONITORING
# AND BEST MANAGEMENT PRACTICES

FEIS appendix I, Cultural Resources Management, describes BLM's program to inventory, evaluate, and manage cultural resources on BLM-administered public land and other areas of BLM responsibility.  This appendix also includes further discussion of standard protective measures, BMPs, and mitigation for cultural resources sites.  BLM's program includes a specific requirement to conduct cultural resource inventories for actions with federal responsibility to identify cultural resources prior to any ground disturbing activity.

## Socioeconomic

1. Coordinate project activities with ranching operations to minimize conflicts involving livestock movement or other ranch operations.  This would include scheduling project activities to minimize potential disturbance of large-scale livestock movements. Establish effective and frequent communication with affected ranchers to monitor and correct problems and coordinate scheduling (FEIS appendix K).

2. As part of the annual planning process, Operators will provide multi-year field development forecasts to the BLM. These forecasts will be made available to local government agencies to assist in local community/county/state planning efforts (FEIS section 2.2.4).

## Transportation

A coordinated transportation plan will be developed for the ARPA as part of the annual planning process to minimize construction of new roads, foster proper sizing of roads, and assign road maintenance responsibilities.  Transportation planning would continue to occur on an annual basis.

1. Operator responsibilities for preventive and corrective maintenance of roads in the ARPA would extend throughout the duration of the project and include blading; cleaning ditches and drainage facilities; dust abatement; control of noxious and invasive species; maintenance of fences, gates, and cattle guards; and other requirements as directed by the BLM, Wyoming Department of Transportation (WYDOT), Carbon County, and private landowners (FEIS chapter 4).

## Noise

1. In any area of operations where noise levels may exceed federal OSHA safe limits, the Operators and their contractors would provide and require the use of proper personnel protective equipment by employees (FEIS chapter 4).

## APPENDIX B. PERFORMANCE-BASED MONITORING
## AND BEST MANAGEMENT PRACTICES

# References

APLIC 1994. *Mitigating Bird Collisions with Power Lines: The State of the Art in 1994.* Avian Power Line Interaction Committee. Edison Electric Institute, Washington, D.C. 78 pp. + appendices.

APLIC 1996. *Suggested Practices for Raptor Protection on Power Lines: The State of the Art in 1996.* Avian Power Line Interaction Committee. Edison Electric Institute/Raptor Research Foundation, Washington, D.C. 125 pp. + appendices.

Carpenter, R.A. 1997. "The Case for Continuous Monitoring and Adaptive Management Under NEPA." In *Environmental Policy and NEPA.* R. Clark and L. Canter, eds. Boca Raton, FL: St. Lucie Press.

Olendorff, R.R., A.D. Miller, and R.M. Lehman 1981. *Suggested Practices for Raptor Protection on Power Lines: The State of the Art in 1981.*

USDI-BLM 1983. *Onshore Oil and Gas Order No. 1: Approval of Operations on Onshore Federal and Indian Oil and Gas Leases, Section III(G)(10).* 43 CFR 3160. United States Department of Interior, Bureau of Land Management. October 1983.

USDI-BLM 1990. *Great Divide Resource Area Record of Decision and Approved Resource Management Plan.* Rawlins, Wyoming: U.S. Department of the Interior, Bureau of Land Management, Rawlins District Office, Great Divide Resource Area. 74pp.

USDI-BLM 2006. Final Environmental Impact Statement for the Atlantic Rim Natural Gas Development Project, Carbon County, Wyoming. U.S. Department of the Interior, Bureau of Land Management, Rawlins Field Office. November 2006.

USDI-FWS 1989. *Black-footed Ferret Survey Guidelines for Compliance with the Endangered Species Act.* Denver, Colorado, and Albuquerque, New Mexico:U.S. Fish and Wildlife Service. April 1989. 10 pp. + appendices.

**Appendix C**

**Operator-Committed Practices**

## APPENDIX C. OPERATOR-COMMITTED PRACTICES

The Final EIS for the Atlantic Rim Natural Gas Project (ARNG) contains best management practices and other environmental protection measures that would be implemented to protect the environment during the development and operation of the Atlantic Rim Project Area (ARPA). Many of these environmental protection measures would be included as Conditions of Approval (COAs) in this ROD. However, by additionally including them as Operator-committed practices, the various Operators have made a commitment to implement them throughout the life-of-project (LOP), and the impact analyses provided in the Final EIS take into consideration the implementation of these measures based on this commitment.

In addition to Operator-committed environmental protection practices, the various ARPA leases often contain one or more stipulations that obligate the leaseholder. These lease stipulations are mandatory and address a number of issues, and may include but not be limited to seasonal and area restrictions for raptor nests, greater sage-grouse leks and nesting habitat, unstable soils, steep slopes, and controlled surface occupancy. These lease-specific stipulations may be duplicated by the more general measures listed below.

To assure compliance with the Operator-committed practices stipulated in the FEIS, this ROD, and in site-specific APDs and ROWs, each Operator will provide qualified individuals to oversee construction and drilling operations and to consult with the BLM on a case-by-case basis, as necessary, during field development. Development activities on all lands would be conducted in accordance with all appropriate federal, state, and county laws, rules, and regulations.

## PRECONSTRUCTION PLANNING AND SITE LAYOUT

Development activities proposed on fee and State of Wyoming surface lands would be approved by the Wyoming Oil & Gas Conservation Commission (WOGCC). The WOGCC permitting procedures require filing an APD with the WOGCC and obtaining an ROW from the surface owner.

The Operators would follow the procedures outlined below to gain approval for proposed activities on BLM-administered lands or minerals within the ARPA. The procedures described below are applicable to CBNG drilling and production activities (1,800-well program) and the deeper conventional natural gas drilling and production activities (200-well program) unless otherwise noted.

- Annual work plans for each developing or operational POD will be used instead of piecemeal individual APD filings. Each year on April 1, the Operators will submit to the BLM Rawlins Field Office comprehensive annual work plans for the following year, including APD packages and other appropriate permit application materials for the construction and development activities. The BLM, in conjunction with the Operators, will perform the usual on-site reviews and perform the other tasks necessary to prepare the program of work for site specific analysis under NEPA and permitting approval prior to the next drilling season. This procedure will allow for economies of scale with the NEPA process and provide a more comprehensive appraisal of the proposed action and their effects on the environment. This program should also reduce processing time for APDs. The Operators and the BLM will also assess and decide the method of analysis, including how the NEPA related work will

## APPENDIX C. OPERATOR-COMMITTED PRACTICES

be performed (either in-house or through third party contractors). Otherwise unplanned construction needs that arise during the course of the year and outside of the annual plan may be brought forward and proposed by operators and will be dealt with by the BLM appropriately, however the intent is to normally avoid individual APD submission and consideration.

Annual work or site specific plans for developing or operational PODs will include geo-referenced information compatible with ArcMap that details pad and well locations; pipeline routes; water transfer stations; road locations (resource, collector or local); road construction techniques (including gravel type and source); wing ditch, water bar and culvert placement, any closed system livestock watering facilities, any potential fence modification or cattle guard installations, injection well locations; and any existing infrastructure (wells, roads, pipelines etc.) in the townships receiving new development.

• The proposed facilities would be staked by the Operators and inspected by an interdisciplinary team and/or an official from the BLM to ensure consistency with the approved RMP and oil and gas lease stipulations.

• More detailed descriptions of the proposed activity or construction plans would be submitted to the BLM by the Operators when required for the proposed development. The plans would address concerns that may exist concerning construction standards, required mitigation, etc. Negotiation of these plans between the Operators and the BLM, if necessary to resolve differences, would be based on field inspection findings and would take place either during or after the BLM onsite inspection. Submissions of maps will include the associated GIS geo-referenced information.

• The Operators and/or their contractors would revise APD/ROWs, as necessary, per negotiations with the BLM. The BLM would complete a project-specific environmental analysis that incorporates agreed upon construction and mitigation standards as detailed above. The BLM would then approve the annual proposal and attach the Conditions of Approval to the permit. The Operators must then commence the proposed activity within one year.

## APPLICANT VOLUNTARY COMMITTED MEASURES

Following are applicant committed measures to avoid or mitigate resource or other land use impacts. An exception to a mitigation measure and/or design feature may be approved on a case-by-case basis when deemed appropriate by the BLM or in conjunction with the surface owner. An exception would be approved only after a thorough, site-specific analysis determined that the resource or land use for which the measure was put in place is not present or would not be significantly impacted. The Operators committed to implementing resource-specific mitigation measures on all lands within the ARPA including federal, State and private (fee) surface ownership.

### PRECONSTRUCTION PLANNING AND DESIGN MEASURES

The Operators and the BLM would make on-site Interdisciplinary (ID) reviews of each proposed and staked facility site (e.g., well sites), new access road, access road

## APPENDIX C. OPERATOR-COMMITTED PRACTICES

reconstruction, and pipeline alignment projects so that site-specific recommendations and mitigation measures can be developed.

- New road construction and maintenance of existing roads in the ARPA would be accomplished in accordance with BLM Manual 9113 standards unless private landowners or the State of Wyoming specify otherwise on their lands.

- Consistent with the annual work planning described in FEIS section K.1.1, The Operators would prepare and submit an APD for each drill site on federal leases to the BLM for approval prior to initiation of construction. Also prior to construction, the Operators or their contractors would submit a Sundry Notice and/or ROW application for each pipeline and access road segment on federal leases. The APD would include a Surface Use Plan that would show the layout of the drill pad over the existing topography, dimensions of the pad, volumes and cross sections of cut and fill, location and dimensions of reserve pit, and access road egress and ingress. The APD, Sundry Notice, and/or ROW application plan would also itemize project administration, time frame, and responsible parties. In addition, a reclamation plan would be developed by the operators for each facility in consultation with the BLM. APD packages would be submitted annually on April 1, including GIS data specified in FEIS section K.1.1, for planning and analysis for the upcoming work year.

## RESOURCE-SPECIFIC REQUIREMENTS

GEOLOGY / MINERALS

Mitigation measures presented in the Soils and Water Resources sections would avoid or minimize many of the potential impacts to the surface mineral resources. Protection of subsurface mineral resources from adverse impacts would be provided by the BLM and/or WOGCC casing and cementing policy.

AIR QUALITY

- The Operators would not burn garbage or refuse at the drill sites or other facilities.

- When an air quality, soil loss, or safety problem is identified as a result of fugitive dust, immediate abatement would be initiated.

SOILS and WATER RESOURCES

- Reduce the area of disturbance to the absolute minimum necessary for construction and production operations while providing for the safety of personnel. The Operators would prohibit off-road vehicle activity.

- Generally, buried pipelines would be located immediately adjacent to roads to avoid creating separate areas of disturbance and in order to reduce the total area of disturbance.

## APPENDIX C. OPERATOR-COMMITTED PRACTICES

- The operators would avoid using frozen or saturated soils as construction material.

- The operators would minimize construction activities in areas of steep slopes and other sensitive soils, and apply special slope stabilizing structures if construction cannot be avoided in these areas.

- Design cut slopes in a manner that would allow retention of topsoil, surface treatment such as mulch, and subsequent revegetation.

- Selectively strip and salvage topsoil or the best suitable medium for plant growth from all disturbed areas on all well pads.

- Where possible, minimize disturbance to vegetated cuts and fills on existing roads that are improved.

- Install runoff and erosion control measures such as water bars, berms, and interceptor ditches if needed.

- Implement minor routing variations during access road layout to avoid steep slopes adjacent to ephemeral or intermittent drainage channels.  Maintain a buffer strip of natural vegetation where possible (not including wetland vegetation) between all construction activities and ephemeral and intermittent drainage channels.

- Include adequate drainage control devices and measures in the road design (e.g., road berms and drainage ditches, diversion ditches, cross drains, culverts, out-sloping, and energy dissipaters) at sufficient intervals and intensities to adequately control and direct surface runoff above, below, and within the road environment to avoid erosive concentrated flows.  In conjunction with surface runoff or drainage control measures, use erosion control devices and measures such as temporary barriers, ditch blocks, erosion stops, mattes, mulches, and vegetative covers.  Implement a revegetation program as soon as possible to re-establish the soil protection afforded by a vegetal cover.

- Upon completion of construction activities, restore topography to near pre-existing contours at the well sites, along access roads and pipelines, and other facilities sites.  Replace topsoil or suitable plant growth material over all disturbed surfaces, and apply fertilizer as needed, and seed.

- When feasible, limit construction of drainage crossings to no-flow periods or low-flow periods.

- Minimize the area of disturbance within ephemeral and intermittent drainage channel environments.

- Avoid construction of well sites, access roads, and pipelines within 500 feet of surface water and/or riparian areas.  Exceptions to this would be granted by the BLM based on an environmental analysis and site-specific mitigation plans.

## APPENDIX C. OPERATOR-COMMITTED PRACTICES

- Design channel crossings to minimize changes in channel geometry and subsequent changes in flow hydraulics.

- Construct channel crossings for buried pipelines such that the pipe is buried a minimum of four feet below the channel bottom.

- Regrade disturbed channel beds to the original geometric configuration with the same or very similar bed material.

- Case wells during drilling, and case and cement all wells in accordance with State, and/or Federal regulations to protect accessible high quality aquifers. High quality aquifers are aquifers with known water quality of 10,000 ppm TDS or less. Include well casing and welding of sufficient integrity to contain all fluids under high pressure during drilling and well completion. Further, wells would adhere to the appropriate BLM or WOGCC cementing policy.

- Reserve pits would be constructed so that a minimum of one-half of the total depth is below the original ground surface on the lowest point within the pit. To prevent seepage of fluids, drilling mud gel or poly liners would be used as needed to line reserve pits in areas where subsurface material would not contain fluids. Liners would be of sufficient strength and thickness to withstand normal installation and use. The liner would be impermeable (i.e., having a permeability of less than $10^{-7}$ cm/sec) and chemically compatible with all substances which may be put in the pit.

- Maintain 2 feet of freeboard on all reserve pits to ensure the reserve pits are not in danger of overflowing. Shut down drilling operations until the problem is corrected if leakage is found outside the pit.

- Extract hydrostatic test water used in conjunction with pipeline testing and all water used during construction activities from sources with sufficient quantities and through appropriation permits approved by the State of Wyoming.

- Discharge hydrostatic test water in a controlled manner onto an energy dissipator. The water is to be discharged onto undisturbed land that has vegetative cover, if possible, or into an established drainage channel. Prior to discharge, treat or filter the water to reduce pollutant levels or to settle out suspended particles if necessary. If discharged into an established drainage channel, the rate of discharge would not exceed the capacity of the channel to safely convey the increased flow. Coordinate all discharge to test water with the SEO and the BLM.

- Develop and implement a Storm Water Pollution Prevention Plan (SWPPP) for storm water runoff at drill sites as required per WDEQ storm water NPDES permit requirements.

- The Operators must coordinate with the Corps of Engineers (COE) to determine the specific Clean Water Act (CWA) Section 404 Permit requirements and conditions (including the potential requirement of compensatory mitigation) for

## APPENDIX C. OPERATOR-COMMITTED PRACTICES

each facility that occurs in Waters of the U.S. to prevent the occurrence of significant impact to such waters.

- Exercise precautions against pipeline breaks and other potential accidental discharges of toxic chemicals into adjacent streams. If liquid petroleum products storage capacity exceeds criteria contained in 40 CFR Part 112, a Spill Prevention Control and Countermeasures (SPCC) plan would be developed in accordance with 40 CFR Part 112.

- The project must comply with all applicable requirements of the CWA, including the requirement to obtain an WYPDES permit.

VEGETATION and WETLANDS

- Seed and stabilize disturbed areas with mixtures and treatment guidelines prescribed in the approved APD, ROW, or surface landowner requirements.

- Evaluate all project facility sites for occurrence and distribution of waters of the U.S., special aquatic sites, and jurisdictional wetlands. All project facilities would be located out of these sensitive areas. If complete avoidance is not possible, minimize impacts through modification and minor relocations. Coordinate activities that involve dredge or fill into wetlands with the COE.

- Conduct site-specific surveys for federally listed threatened and endangered (T&E) and candidate plant species prior to any surface disturbance in accordance with the Endangered Species Act.

RANGE RESOURCES AND OTHER LAND USES

- The Operators would coordinate with the affected livestock operators to ensure that livestock control structures remain functional during drilling and production operations.

WILDLIFE

- During reclamation, establish a variety of forage species that are useful to resident herbivores by specifying the seed mixes in the approved APD, ROW or surface landowner requirements.

- Discourage unnecessary off-site activities of operational personnel in the vicinity of the drill sites.

VISUAL RESOURCES

- Paint all structures with non-reflective colors that blend with the adjacent landscape, except for structures that require safety coloration in accordance with Occupational Safety and Health Administration (OSHA) requirements.

## APPENDIX C. OPERATOR-COMMITTED PRACTICES

CULTURAL RESOURCES

- If a site is considered eligible for, or is already on the National Register of Historic Places (NRHP), avoidance is the preferred method for mitigating adverse effects to that property.

SOCIOECONOMICS

- Coordinate project activities with ranching operations to minimize conflicts involving livestock movement or other ranch operations.  This would include scheduling of project activities to minimize potential disturbance of large-scale livestock movements.   Establish effective and frequent communication with affected ranchers to monitor and correct problems and coordinate scheduling.

HEALTH AND SAFETY/HAZARDOUS MATERIALS

The operators will establish and maintain an appropriate safety program for the intended work which will comply with all applicable Federal, State and local regulations, including but not limited to, RCRA, SPCC, SARA, Hazardous Substance Management.

**Appendix D**

**Formal and Informal Consultation for the
Atlantic Rim Natural Gas Field Development Project**



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE

Ecological Services
5353 Yellowstone Road, Suite 308A
Cheyenne, Wyoming 82009

AUG 0 9 2006

In Reply Refer To:
ES-61411/W.02/WY06F0204

Memorandum

To:        Mark Storzer, Field Manager, Bureau of Land Management, Rawlins Field
           Office, Rawlins, Wyoming

From:      Brian T. Kelly, Field Supervisor, U.S. Fish and Wildlife Service, Wyoming
           Field Office, Cheyenne, Wyoming 

Subject:   Formal and Informal Consultation for the Atlantic Rim Natural Gas Field
           Development Project

Thank you for your letter of July 24, 2006, received in our office on July 25, with the biological
assessment (BA) for the Final Environmental Impact Statement for the Atlantic Rim Natural Gas
Field Development Project located in T13-20N, R89-92W, in Carbon County, Wyoming
(Atlantic Rim FEIS). You requested consultation with the U.S. Fish and Wildlife Service
(Service) pursuant to section 7(a)(2) of the Endangered Species Act of 1973, as amended (Act)
(16 U.S.C. 1531 *et seq.*) for your determinations of effects to listed species in the BA.

The letter and BA state that the preferred alternative for the Atlantic Rim FEIS consists of
Anadarko Petroleum Corporation (APC) and other operators drilling 1800 coal bed natural gas
(CBNG) wells and 200 deep conventional gas wells on approximately 270,000 acres of
combined federal, state and private lands. The wells are proposed at eight wells per section (80-
acre spacing) and will be developed over a 20-year period beginning in 2007 with an estimated
life of project of 30 to 50 years. Well spacing may be reduced, where appropriate. Various
drilling and production related facilities (*i.e.,* roads, pipelines, water wells, disposal wells,
compressor stations, and gas processing facilities) will also be constructed throughout the project
area.

In the BA, the Bureau of Land Management (Bureau) determined that project-related water
depletions to the Colorado River system are "likely to adversely affect" Colorado River fish
species. The Bureau also issued "not likely to adversely affect" determinations for the project's
potential effects to the bald eagle (*Haliaeetus leucocephalus*), black-footed ferret (*Mustela
nigripes*), blowout penstemon (*Penstemon haydenii*), and Ute-ladies' tresses (*Spiranthes
diluvialis*).

The Service concurs with the Bureau's effects determination for the bald eagle because adverse effects are extremely unlikely to occur based on the Bureau's commitment to implement the conservation measures and the limited use of the area by bald eagles. Conservation measures include (1) not installing overhead electric power lines, (2) training drivers how to minimize vehicle collisions with raptors, and (3) removing vehicle-killed carcasses from road areas to limit attraction of raptors.

The Service concurs with the Bureau's effects determination for the black-footed ferret because white-tailed prairie dog colonies that are not included in the block clearance will be surveyed for black-footed ferrets adhering to the *Black-Footed Ferret Survey Guidelines* (USFWS 1989). If the species is found, the Service will be notified within 24 hours and no project-related disturbance will occur within the prairie dog complex. Based on implementation of these commitments, adverse effects to the black-footed ferret are expected to be discountable.

The Service concurs with the Bureau's effects determinations for the blowout penstemon and Ute-ladies' tresses because (1) both species have low probabilities of being present in the action area and (2) surveys and avoidance measures will be implemented to protect the species. Frank Blomquist, Bureau biologist, clarified, on August 9, 2006, that very little of the Sand Hills habitat for blowout penstemon is included within the proposed project area, and any area with potential habitat will be surveyed prior to development. He also clarified that the probability of Ute-ladies' tresses being present in the project area is extremely low based on clayey soils and elevation (Pers. Comm. 2006). Based on these considerations, effects of the proposed action on these two species are discountable.

To clarify water use for this project, the Service contacted Bob Lange and Frank Blomquist, of your office, on August 8, 2006. They stated that the Bureau determined that the produced water within the action area is not connected to the Colorado River system so that specific action would have no effect to Colorado River fish species. Service concurrence for no effect determinations is not required under the Act. They also clarified that the proposed action will cause an average annual depletion of 10.3 acre-feet from the Colorado River system due to surface water use for dust abatement and road/pad construction (Pers. Comm. 2006). A Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin (Recovery Program) was initiated on January 22, 1988. The Recovery program was intended to be the reasonable and prudent alternative to avoid jeopardy to the endangered fish by depletions from the Upper Colorado River.

In order to further define and clarify the process in the Recovery Program, a section 7 agreement was implemented on October 15, 1993, by the Recovery Program participants. Incorporated into this agreement is a Recovery Implementation Program Recovery Action Plan (Plan) which identifies actions currently believed to be required to recover the endangered fish in the most expeditious manner in the Upper Colorado River Basin.

A part of the Recovery Program was the requirement that if a project was going to result in a depletion, a depletion fee would be paid to help support the Recovery Program. On July 5, 1994, the Service issued a biological opinion determining that the fee for depletions of 100 acre-feet or less would no longer be required. This was based on the premise that the Recovery Program has made sufficient progress to be considered the reasonable and prudent alternative avoiding the likelihood of jeopardy to the endangered fishes and avoiding destruction or adverse modification

of their critical habitat by depletions of 100 acre-feet or less. Therefore, **the depletion fee for this project is waived**.

Permits or other documents authorizing specific projects, which result in depletions, should state that the Bureau retains discretionary authority over each project for the purpose of endangered species consultation. If the Recovery Program is unable to implement the Plan in a timely manner, reinitiation of section 7 consultation may be required so that a new reasonable and prudent alternative can be developed by the Service.

This concludes consultation pursuant to the regulations implementing the Act, 50 C.F.R. § 402.14 and § 402.13. This project should be re-analyzed if new information reveals effects of the action that may affect listed species or designated or proposed critical habitat (1) in a manner or to an extent not considered in this letter, (2) if the action is subsequently modified in a manner that causes an effect to a listed species or designated or proposed critical habitat that was not considered in this consultation, and (3) if a new species is listed or critical habitat is designated that may be affected by this project.

The Bureau made "no effect" determinations for the Canada lynx (*Lynx candensis*), Preble's meadow jumping mouse (*Zapua hudsonius preblei*), Wyoming toad (*Bufo baxteri*), Colorado butterfly plant (*Gaura neomexicans spp. coloradensis*), and Platte River species. Service concurrence for no effect determinations is not required under the Act; however, we do appreciate receiving information as to the status of these species in the project area.

If you have further questions regarding your responsibilities under the Act, please contact Dan Blake of my staff at 1300 N. Third St., Rawlins, WY 82301 or phone (307) 328-4333.


cc:     FWS, Fish and Wildlife Biologist, Rawlins Field Office, Rawlins, WY (D. Blake)
        WGFD, Statewide Habitat Protection Coordinator, Cheyenne, WY (V. Stelter)
        WGFD, Non-Game Coordinator, Lander, WY (B. Oakleaf)


**References**

*Pers. Comm.* 2006. Phone calls between Blomquist, F. and B. Lange, Bureau of Land Management, Rawlins Field Office and K. Erwin and D. Blake, U.S. Fish and Wildlife Service, Ecological Services, Wyoming.

U.S. Fish and Wildlife Service. 1989. Black-footed ferret survey guidelines for compliance with the Endangered Species Act, April 1989. U. S. Fish and Wildlife Service, Denver, Colorado and Albuquerque, New Mexico. 15pp.

3

**Appendix E**

**Summary of Public Comments on the
Atlantic Rim Natural Gas Project
Final Environmental Impact Statement**

**APPENDIX E.**
**SUMMARY OF PUBLIC COMMENTS ON THE ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT FINAL EIS AND BLM'S RESPONSES**

The Final Environmental Impact Statement (FEIS) for the Atlantic Rim Natural Gas Project (ARNG) was released for public review on December 1, 2006. The comment period closed on January 4, 2007. Organization and individuals who submitted comments on the ARNG FEIS during this time are identified in table E-1.

# Issue Summary

Comments on the Atlantic Rim Project Area (ARPA) FEIS raised a variety of issues including use of mitigation measures, avoidance of cultural sites, the groundwater and wildlife impact analysis, wildlife, habitat and reclamation monitoring, rationale for selection of the preferred alternative, future public input, surface disturbance reclamation, air quality analysis and palentological condition and classification. A summary of significant comments and Bureau of Land Management (BLM) responses categorized by issue are summarized below.

## Mitigation Measures - Best Management Practices and Protective Measures

*Comment Summary:* Several comments suggested the need for additional, modified or fewer Best Management Practices (BMPs) and protective measures to mitigate resource impacts and to help direct development practices. Comments also suggested involvement of state and federal wildlife agencies in the project planning process.

*Response:* Drilling, development, and reclamation activities in the ARPA will be managed through a performance-based, adaptive management process as described in appendix B (Performance-Based Monitoring and Best Management Practices). The process includes a requirement for Operators to submit an annual operating plan to the BLM RFO AO. The overall purpose of this process is to meet resource management objectives and ensure that the Performance Goals are achieved to the greatest extent possible. A mitigation and monitoring process will be required, and its development will begin within 30 days of the effective date of the Record of Decision (ROD). This process will be developed by the Review Team (BLM, cooperating and interested agencies and Operators) and will provide quantifiable criteria to identify trends associated with the Performance Goals. The process will include the types of mitigation responses that will be considered in the event that monitoring data indicates a downward trend relative to the Performance Goals. Throughout the life of the project, monitoring data will be reviewed to determine if mitigation is effective and leading to the achievement of reclamation and Performance Goals. The monitoring data will be evaluated on a regular basis (at least annually) and BMPs, conditions of approval (COAs), protective measures, reclamation criteria, and mitigation measures may be modified, as appropriate, based on the monitoring results.

While described as an "annual" planning process, this concept is adaptive and open for modification and improvement, including more frequent planning meetings if necessary. The intent of the process is to have future, site-specific development plans for Atlantic Rim be submitted to the BLM for review in a manner that will allow the BLM to capture economies of scale in planning, processing, approving, and involving other cooperating agencies. The BLM (including interdisciplinary team members), cooperating and interested agencies, and the Operators will make up a Review Team to evaluate annual

## APPENDIX E.
## SUMMARY OF PUBLIC COMMENTS ON THE ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT FINAL EIS AND BLM'S RESPONSES

and site-specific development proposals and monitoring reports. By receiving development proposals in groups, the Review Team will be able to develop a more holistic view of future development and reclamation progress and success, and more effectively apply mitigations and BMPs to reduce development effects. Proposals should span several years or stages of development and must include the entire proposal including well sites, compressor stations, utility and pipeline corridors, roads, status and success of reclamation efforts for a specific area, and any other disturbances planned and their timing. The review and approval process will include a site specific visit by the Review Team, NEPA or Categorical Exclusion (pursuant to section 390 of the Energy Policy Act of 2005) evaluation, as appropriate, and establishing required BMPs, COAs or other protective measures to mitigate environmental impacts. (See ARNG ROD: *Plan, Review and Approval Process*; and *Mitigation Measures*)

## Cultural

*Comment Summary:* Some comments suggested that BLM should consider avoidance of cultural areas as a first course of action prior to use of a mitigation plan.

*Response:* The FEIS states in appendix I, Cultural Resource Management, "Avoidance, through modification of the proposed undertaking, is the primary and preferred measure used to protect cultural resources. This can be accomplished at the project planning stage." Surface-disturbance impacts on cultural resource are mitigated through avoidance. Where avoidance is not possible, recovery of the cultural resource prior to allowing disturbance activities to occur will be considered on a site-specific basis.

## Impact Analysis

Groundwater Impacts

*Comment Summary:* Several comments questioned the efficacy of produced water reinjection, especially given reports of mud pots and geysers associated with current operations.

*Response:* BLM is looking into reports of mud pots and geysers and how they may be related to current operations. Given that produced water is injected into geologic formations below the coal seams being dewatered, BLM currently speculates that the mud pots and geysers are not likely related to injection of produced water.

Wildlife Impacts

*Comment Summary:* Several comments asked that BLM include current data from other studies (specifically, the Baggs Mule Deer Study) into the ROD. One comment suggested referencing the WGFD recommendations for oil and gas development as potential mitigation measures to be used in the ARPA.

*Response:* Data collected from wildlife studies in areas near the ARPA may prove useful in determining mitigation needs for the ARPA. This information will be evaluated and incorporated, as appropriate, into the wildlife monitoring and mitigation process described in appendix E of the FEIS.

The WGFD recommendations for oil and gas development will be considered for potential mitigation in the ARPA within the process of wildlife monitoring and mitigation

## APPENDIX E.
## SUMMARY OF PUBLIC COMMENTS ON THE ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT FINAL EIS AND BLM'S RESPONSES

described in appendix E of the FEIS, where such measures are not in conflict with this ROD.

# Monitoring

Roles and Responsibilities, Annual Planning and Review Team

*Comment Summary:*   Many comments indicated the importance of identifying who has responsibility for reclamation, wildlife, and habitat monitoring and inspection, and that state agencies need to be part of a Review Team to evaluate monitoring results and development plans.  Some comments stated that the Rawlins Field Office (RFO) needs to take an active role in monitoring, inspection and compliance.

*Response:*   As stated above, the BLM, cooperating and interested agencies and the Operators will make up a Review Team to evaluate annual and site specific development proposals and monitoring reports.  Review Team members will be invited to participate in the annual planning process and site-specific review process based on their interest, time, and availability.  Review Team member participation would be in addition to their separate and independent permitting and approval responsibilities under any other authorities.  The BLM is the final decision authority and will set the schedule for meetings, site visits, review periods, etc.  When appropriate, Memoranda of Understanding (MOUs) or other applicable inter-agency agreements may be prepared and utilized between the parties to document the extent of participation in the annual planning and site-specific review processes.

The initial monitoring plan will be based on the Wildlife Monitoring and Protection Plan (FEIS appendix E) but may be modified annually, as necessary, based monitoring results.  A mitigation plan will be developed with the state cooperators (e.g., the Review Team) with the intent of monitoring the Performance Goals.  This information should be reviewed at least annually with development plans modified based on trends.  The purpose of monitoring is to assess the status of the Performance Goals, measure and detect trends, or detect any other undesired effects.  Monitoring will also be used to assess the effectiveness of reclamation efforts and any approved mitigation measures.

Funding for wildlife and habitat monitoring may be obtained from BLM appropriations, in collaboration with cooperating or interested agencies, from the voluntary participation of the Operators, or from outside sources that may have an interest or desire to participate or contribute, or from a combination of these sources.  Operators are responsible for demonstrating successful achievement of Performance Goals.  Early efforts are to be made to collect or consolidate resource data to form a baseline against which future monitoring efforts and data would be compared to indicate trends.  In the absence of sufficient data illustrating Operator achievement of Performance Goals, the BLM will use a conservative approach when considering additional approvals.  The Review Team, or the BLM, or both, will identify the level of effort required for Performance-Based Monitoring and develop associated monitoring plans.

## APPENDIX E.
## SUMMARY OF PUBLIC COMMENTS ON THE ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT FINAL EIS AND BLM'S RESPONSES

## Preferred Alternative

Rationale

*Comment Summary:*  Some comments questioned BLM's selection of the Preferred Alternative (Alternative D) over Alternative C and the Proposed Action.

> *Response:*  Alternative D was developed in response to comments received on the Draft EIS (DEIS).  The BLM recognized that resource impacts can be reduced by limiting the amount of initial disturbance (goal of 6.5 acres/well site) combined with timely reclamation.  The BLM's evaluation of exploratory activities that have occurred over the past five years determined that average initial and long-term disturbance could be reduced by approximately 18 percent from the Proposed Action (e.g., 60-ft. wide roads vs. 80-ft. width) if Alternative D were implemented.  While a conservative analysis of Alternative D and the Proposed Action indicates similar levels of impacts, the reduced initial surface disturbance, reduced disturbance at any time, and lower long-term disturbance outlined in Alternative D provides the most practical alternative for mitigating environmental impacts while maximizing natural gas recovery (Purpose and Need for the Project).

> Alternative C was prepared to evaluate natural gas resource development while aggressively mitigating impacts to sensitive resource values using additional development protection measures.  Public comments received on the DEIS, results of interim exploration, and technical evaluations by the BLM Reservoir Management Group, all indicated drilling on 160-acre spacing would not achieve maximum recovery of natural gas resources, was likely not economically feasible, and was likely an inefficient recovery of the natural gas resource in the ARPA.  Additionally, displacement of disturbance from federal lands to state and fee lands due to these aggressive protective measures may result in higher initial disturbance, disturbance at any time, and long-term disturbance compared to Alternative D, with uneconomical and inefficient natural gas recovery.  Protective measures used in Alternative C (FEIS, appendix L) will be considered based on site-specific conditions, where such measures are not otherwise in conflict with the ROD.

Public Input

*Comment Summary:*  Several comments noted that the process for review and approval of annual development plans defers important decisions on field development to a process that does not provide for meaningful public input.  The use of APDs or Categorical Exclusions for approval of specific development activities does not provide for a sufficient level of site-specific NEPA analysis.  Others questioned BLM's authority under the annual planning process to actually reduce surface disturbance in the ARPA.

> *Response:*  As noted in the ROD, the annual review and planning process will include cooperating agencies as well as the BLM (See Review Team discussion under Mitigation Measures, above).  Public input will be provided through the NEPA evaluation process for site specific proposals, unless Categorical Exclusions (pursuant to Section 390 of the Energy Policy Act of 2005) are used, if appropriate, for the approval of site-specific development activities.  APDs will be posted in the RFO and available for public review.  This ROD gives BLM the authority to make decisions that limit surface disturbance in the ARPA.

## APPENDIX E.
## SUMMARY OF PUBLIC COMMENTS ON THE ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT FINAL EIS AND BLM'S RESPONSES

## Reclamation

Bank Process

*Comment Summary:*   Several comments requested a description of the disturbance cap "banking process", including how disturbance will be allocated among Operators and how reclaimed acreage will return to the bank, and flexibility in the disturbance cap due to unforeseen circumstances.   Some comments questioned BLM's authority to impose the disturbance cap on state and fee lands.   Another comment suggested an alternative standard for linear disturbance features, such as pipelines, to facilitate reclamation success.   Comments included an inquiry about the use, and process, of waivers and exceptions.

*Response:*  This decision includes an unreclaimed disturbance cap of 7,600 acres at any time.   Disturbance acreage will be monitored using geospatial tracking methods. Operators are required to provide the BLM a map of existing disturbance associated with activities authorized during the period of time when the interim drilling policy was in effect.  The 7,600-acre disturbance cap will be allocated to Operators on a prorated, mineral leasehold basis.  Existing surface disturbance from activities approved under the Interim Drilling Policy (IDP) will count against each Operators disturbance cap allocation. Past oil and gas development will not count against the disturbance cap, and those lease holdings are not eligible for disturbance cap allocation.  In addition, "as built" disturbance will be measured and reported and subsequent reclamation efforts will be monitored, documented, and provided annually to the BLM RFO AO.   Adaptive management techniques will be used to correct any deficiencies and modify reclamation criteria as is necessary (Reclamation Plan, appendix A).

The 7,600-acre disturbance cap will be allocated to Operators on a prorated, mineral leasehold basis.   Only successfully-reclaimed acreage (See ROD appendix A, Criteria for Reclamation Success) that was disturbed during the implementation of activities associated with this decision or the IDP will be allocated back to the Operator based on their prorated disturbance cap.  Regardless of the number of Operators within the ARPA, the total of all prorated disturbance cap allocations may not exceed 7,600 acres.

When a site attains the interim reclamation vegetation cover and soil stability standards detailed in "Criteria for Reclamation Success" in the Reclamation Plan (appendix A), the reclaimed acreage will be deducted from an Operators disturbance cap allocation and additional disturbance on federal lands leased for oil and gas development in the ARPA will be permitted by BLM.   In the event an Operator reaches their disturbance cap allocation, further disturbance on federal minerals will not be permitted.   When successful interim reclamation by an Operator reduces disturbance on their leases to below their disturbance cap allocation across the ARPA, additional activities on federal lands may be approved.

The environmental analysis of Alternative D presented in the FEIS and the decisions made in this ROD are based on these disturbance limits applied across the ARPA.  The BLM has approval authority over actions on federal minerals and lands.   When evaluating development applications for affected federal minerals and lands, the BLM will consider impacts and surface disturbance that occur on private or state lands, relative to an Operator's disturbance cap allocation.

## APPENDIX E.
## SUMMARY OF PUBLIC COMMENTS ON THE ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT FINAL EIS AND BLM'S RESPONSES

Appropriate seed mixtures should be selected based on site-specific needs (soil type, linear disturbance, etc.). Operators should propose in their reclamation plan for a site/area the most appropriate seed mixture and include their rationale for selecting that mix.

Exceptions, waivers or modifications of requirements must be based upon environmental analysis of proposals (e.g., activity plans, plan of development, plans of operations, applications for permit to drill, etc.) and, if necessary, must allow for other mitigation to be applied on a site-specific basis.

Disturbance Cap

*Comment Summary:* Comments requested that BLM explain the basis for the 6.5 acre per well site goal, and 7,600 acre disturbance cap. Operator comments question BLM's authority to impose the disturbance cap on state and fee land. One Operator noted that the air monitoring station required by WDEQ should not count against the disturbance cap. Another Operator noted that disturbance associated with existing conventional fields (e.g., Cherokee Creek in the Category A area) should not be included in the disturbance cap.

*Response:* BLM used multiple lines of data to establish a 6.5 acre well site goal. These lines of data included the proponents Proposed Action (FEIS, appendix K), information provided by Anadarko E&P Company, LP (AEPC) during a presentation on May 11, 2006, and field observations by BLM staff.

The Proposed Action included an estimated average disturbance per well site of 7.9 acres (well pad, resource roads, utilities, pipelines and ancillary facilities), composed of 4.8 acres per well site in short-term (reclaimable) disturbance and 3.1 acres of long-term disturbance.

The May 11, 2006 presentation by AEPC to BLM and cooperators of the Doty Mountain project was to provide "an example of how (AEPC) can address environmental issues at the APD level". Total surface disturbance at Doty Mountain was estimated to be 5.7 acres per well site, with 3.8 acres of reclaimable acreage and 1.9 acres of long-term disturbance. While these estimates did not include the entire infrastructure assumed in the Proposed Action, there is a significant reduction in disturbance from key construction elements such as buried utilities under roadways and 25 percent narrower roadways. BLM recognizes the Doty Mountain example may be an aggressive estimation to use across the ARPA due to conversion of two-track trails to resource roads, but it does indicate that it is reasonable and achievable to reduce surface disturbance below levels recommended in the Proposed Action. Based on field observations, Proponent input (Proposed Action and Doty Mountain overview) and professional judgment BLM established an **average goal** (not a cap) of 6.5 acres per well site (2.5 acres per well site long-term disturbance) across the ARPA.

BLM established a surface disturbance cap for the ARPA to encourage reduced initial disturbance and timely reclamation, resulting in reduced environmental impacts on resources. The 7,600 acre disturbance cap was derived using the following assumptions.

### APPENDIX E.
### SUMMARY OF PUBLIC COMMENTS ON THE ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT FINAL EIS AND BLM'S RESPONSES

- 2.5 acres per well site long-term disturbance

- Initiate reclamation (e.g., grading, seeding, etc.) - year 1 after disturbance

- Reclamation success per year: 0% – 0% – 0% – 40% – 60% (five growing seasons after initial seeding)

Peak disturbance at any time occurs after six years, at approximately 7,600 acres (includes existing estimated disturbance from the interim drilling policy), as shown in Alternative D – Acreage Disturbance Profile below.

**Figure 1.     Atlantic Rim Gas Project Location, Carbon County, Wyoming 2006.**



The environmental analysis of Alternative D presented in the FEIS and the decisions made in this ROD are based on these disturbance limits applied across the ARPA. The BLM has approval authority over actions on federal minerals and lands. When evaluating development applications for affected federal minerals and lands, the BLM will consider impacts and surface disturbance that occur on private or state lands, relative to an Operator's disturbance cap allocation.

Many of the subsequent actions in the ARPA project may be eligible for categorical exclusion under the Energy Policy Act of 2005. The review and approval process prior to allowing a federal leaseholder to extract federal minerals will be subject to further environmental review. In some instances, further NEPA documentation will be prepared. In other instances, where certain criteria are met, the action may be categorically excluded from the requirements of NEPA and will be approved under the provisions of section 390 of the Energy Policy Act of 2005. In all cases, the action will be subject to onsite investigation, cultural reviews, T&E consultation, and environmental reviews. In cases where development to access privately-owned minerals is proposed on private or

## APPENDIX E.
## SUMMARY OF PUBLIC COMMENTS ON THE ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT FINAL EIS AND BLM'S RESPONSES

state lands, and access across public lands is requested, the BLM will conduct the appropriate level of NEPA analysis prior to granting a right-of-way. Environmental documents prepared under NEPA will consider cumulative impacts that may result from the private actions within the ARPA. Prior to approval of all oil-and-gas-related activities in the ARPA, the BLM will consider surface-disturbing activities associated with natural gas development that occur on private lands and include that information when estimating the acreage towards the 7,600 acres "cap."

Surface disturbance associated with the air monitoring station is anticipated to be minimal, and will not count against the ARPA disturbance cap.

Future disturbance on federal minerals subsequent to the date the ARPA ROD is approved is subject to the disturbance cap. Operators are required to submit a summary of their mineral lease holdings to BLM to receive their disturbance cap allocation. Past oil and gas development (approval prior to the IDP) will not count against the disturbance cap, and those lease holdings are not eligible for disturbance cap allocation.

Performance Standards

*Comment Summary:* A number of comments observed that the ROD should include desired conditions, monitoring methods, potential mitigation considerations, and a clear identification of who is responsible for monitoring and reporting. Some reviewers commented that the reclamation standards should be achievable, with flexibility to adapt to unforeseen circumstances, while others noted that the reclamation standards were appropriate and should be adhered to strictly. Still others noted that the reclamation criteria were not consistent and requested clarification, particularly for the interim reclamation criteria which will be used to return disturbed land into the "disturbance bank." Several commenter's suggested that a working group be convened to deal with unforeseen reclamation issues.

*Response:* As noted in the ROD, drilling, development, and reclamation activities in the ARPA will be managed through a performance-based, adaptive management process as described in appendix B (Performance-Based Monitoring and Best Management Practices). A mitigation and monitoring process will be developed by the Review Team (BLM, cooperating and interested agencies, and Operators) and will provide quantifiable criteria to identify trends associated with the Performance Goals. The process will include the types of mitigation responses that will be considered in the event that monitoring data indicates a downward trend relative to the Performance Goals. Throughout the life of the project, monitoring data will be reviewed to determine if mitigation is effective and leading to the achievement of reclamation and Performance Goals. The monitoring data will be evaluated on a regular basis (at least annually) and BMPs, COAs, protective measures, reclamation criteria, and mitigation measures may be modified, as appropriate, based on the monitoring results.

Please refer to appendix A of this ROD for a revised version of the ARPA Reclamation Plan. This plan has been revised to clarify the difference in reclamation success criteria for interim versus final reclamation.

BLM considers the Reclamation Plan to be an "evergreen document" that will be revised as necessary and appropriate through an adaptive management process. For instance,

**APPENDIX E.**
**SUMMARY OF PUBLIC COMMENTS ON THE ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT FINAL EIS AND BLM'S RESPONSES**

monitoring of reclamation efforts may reveal a need to adjust reclamation criteria, thereby providing flexibility in the reclamation approval and disturbance banking process.

The Review Team described in the ROD, consisting of BLM, cooperating and interested agencies, and the Operators is responsible for evaluating monitoring plans and reports, including reclamation, and can serve as a working group to manage unforeseen reclamation issues.

## Air Quality

*Comment Summary:* One comment noted that use of the Scheffe method to predict ozone impacts is not scientifically valid. Another comment noted a discrepancy in background concentrations for ozone between the affected environment section (table 3-6) and the impact analysis section (table 4-2). In addition, table 4-1 has some negative numbers which are confusing. Still another comment noted that BLM should consider and abide by critical nitrogen deposition loads recently developed for Rocky Mountain National Park. And finally, one comment notes that BLM should recognize the recent change in the particulate standard for PM 2.5 from 65 ug/m3 to 35 ug/m3.

*Response:* BLM recognizes that the Scheffe method for estimating ozone impacts is no longer used for the intended purpose, and BLM is no longer using the method for projects currently undergoing analysis of air impacts. However, as noted on page 4-15 of the FEIS, the Scheffe method was considered by the inter-agency air quality team to be a reasonable tool for estimating ozone impacts at the time the air quality analysis was conducted.

The background ozone concentrations presented in table 3-6 are maximum 8-hour values (specifically, the fourth highest daily 8-hour value), whereas the ozone concentrations presented in table 4-2 are average hourly values. Hence, the average numbers are lower than the maximum values.

The values in table 4-1 represent the change in emissions over the period for which the regional emissions inventory was conducted (January 1, 2001 through March 31, 2004). The negative values represent a reduction in emissions over the inventory period.

Nitrogen deposition impacts on PSD Class I and Sensitive PSD Class II areas, including Rocky Mountain National Park, were estimated for the proposed Atlantic Rim project and for other regional sources. The estimated nitrogen deposition impacts were below levels of concern established at the time the analysis was conducted.

The BLM anticipated the change in the PM 2.5 standard by inserting text in the FEIS recognizing the change and how the change does not change the analysis in the document. Please refer to text on page 3-19 of the FEIS for a description of the change in the standard, and to text on page 4-12 for a statement that the predicted impact is below the new standard.

## APPENDIX E.
## SUMMARY OF PUBLIC COMMENTS ON THE ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT FINAL EIS AND BLM'S RESPONSES

## Paleontology

*Comment Summary:*  One comment noted BLM's assertion (response to DEIS comments) that there are no known occurrences of localities meeting the Condition 1 determination is incorrect. Another noted that the FEIS does not contain definitions of "paleontological condition" or "probable fossil yield classification" or a reference to BLM's original documents containing at least the paleontological condition definitions.  Finally, the FEIS does not contain reliable quantitative estimates of probable fossil yield classification (PFYC).

*Response:*  As stated in FEIS appendix H, Best Management Practices, paleontological category 1 and category 2 areas will be managed in the same manner; therefore, identification of specific localities or quantification of PFYC is not necessary.  Please refer to the errata section of this ROD for a correction to our response to DEIS comment 671-73-1.

Definitions for "paleontological condition" and "probable fossil yield classification" may be found in the two following sources:

1) BLM Handbook H-8270-1 (GENERAL PROCEDURAL GUIDANCE FOR PALEONTOLOGICAL RESOURCE MANAGEMENT)

2) BLM Draft Policy for Paleontological Resource Management

## APPENDIX E.
## SUMMARY OF PUBLIC COMMENTS ON THE ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT FINAL EIS AND BLM'S RESPONSES

**Table E1.    Individuals and Organizations Submitting Comments on the Atlantic Rim Natural Gas Development Project Final EIS**

| Date Received | Individual, Agency or Organization |
|---|---|
| | **Hard Copy** |
| 12/11/2006 | Andrew Blair |
| 12/26/2006 | John and Clara Blair |
| 12/26/2006 | Kathy Morarty, PhD |
| 12/26/2006 | Brian A. Rutledge, Audubon Wyoming |
| 12/27/2006 | Heath Van Eaton, Heartland BioComposites, LLC |
| 12/28/2006 | Larry Svoboda, USEPA, Region 8 |
| 12/28/2006 | Shelley and John Ellis |
| 1/3/2007 | Mike Zancanella |
| 1/3/2007 | Barbara Parsons |
| 1/3/2007 | Tom Clayson, Anadarko E&P Company, LP |
| 1/3/2007 | Bruce Pendery, Wyoming Outdoor Council;<br>Nada Culver, The Wildnerness Society;<br>Joy Owens, Friends of the Red Desert |
| 1/3/2007 | Scott Hedlund, Warren E&P, Inc. |
| 1/4/2007 | Jason Begger, Petroleum Association of Wyoming |
| 1/4/2007 | Tyler H. Vanderhoer, Gene R. George & Associates |
| 1/4/2007 | Linda Guthrie, Devon Energy Corporation |
| 1/4/2007 | Chuck Mollica |
| 1/5/2007 | Erik Molvar, Biodiversity Conservation Alliance, et al. |
| 1/5/2007 | Vern Stelter for John Emmerich, State of Wyoming,<br>Wyoming Game and Fish Department |
| 1/5/2007 | John Etchepare, State of Wyoming, Department of Agriculture |
| 1/5/2007 | Richard L. Currit, State Historic Preservation Office, Wyoming State Parks and Cultural Resources, |
| 1/5/2007 | D. Steven Degenfelder, Double Eagle Petroleum and Mining Company |
| 1/8/2007 | Todd Parfitt, State of Wyoming, Department of Environmental Quality |
| 1/8/2007 | Dave Freudenthal, State of Wyoming, Office of the Governor |
| 1/8/2007 | Martha Christensen |
| 1/8/2007 | Lisa Eadens for Michael A. Saul and Mark Winland, Wyoming Wildlife Federation |
| 12/30/2006 | Scott Hedlund, Warren E&P, Inc. |
| 1/4/2007 | Eileen Caryl |
| 1/4/2007 | D. Steven Degenfelder, Double Eagle Petroleum and Mining Company |
| 1/4/2007 | Todd Parfitt, State of Wyoming, Department of Environmental Quality |
| 1/5/2007 | Jason A. Lillegraven |
| 1/5/2007 | Richard M. Garrett, Jr. |
| 1/5/2007 | Tom Ritter |
| 1/5/2007 | Teresa Davidson |
| 1/5/2007 | Alexis Dale |
| 1/5/2007 | Patrick W. Gonzales, Rawlins-Carbon County Chamber of Commerce |
| 1/9/2007 | Asa S. Nielson, Environmental Preservation Foundation |
| 1/8/2007 | Brian T. Kelly, USFWS, Wyoming Field Office |

## APPENDIX E.
## SUMMARY OF PUBLIC COMMENTS ON THE ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT FINAL EIS AND BLM'S RESPONSES

**Table E1.    Individuals and Organizations Submitting Comments on the Atlantic Rim Natural Gas Development Project Final EIS cont.**

| Date Received | Individual, Agency or Organization |
|---|---|
| | **Email** |
| 12/7/2006 | Bob Laybourn |
| 12/17/2006 | Jean Public |
| 12/17/2006 | Carol Rothrock |
| 12/18/2006 | Asa Nielson, Environmental Preservation Foundation |
| 12/20/2006 | Lowell Wade, Flying X Ranch |
| 12/20/2006 | Dinda Evans |
| 12/20/2006 | Dinda Evans |
| 12/21/2006 | Bart Geerts |
| 12/21/2006 | Jana Weber |
| 12/22/2006 | Robert Anthony |
| 12/23/2006 | Jane Warren |
| 12/23/2006 | Lydia Garvey |
| 12/24/2006 | Sidney Peters |
| 12/26/2006 | Mike Evans |
| 12/26/2006 | Lynne Berg |
| 12/28/2006 | Mark Jenkins |
| 12/29/2006 | Jan Leopold |
| 12/29/2006 | Tom Clayson, Anadarko E&P Company, LP |
| 12/30/2006 | Scott Hedlund, Warren E&P, Inc. |
| 12/31/2006 | Alyson Hagy |
| 1/1/2007 | Paul Moss |
| 1/1/2007 | Paul Taylor |
| 1/2/2007 | Chuck Mollica |
| 1/2/2007 | Jason Begger, Petroleum Association of Wyoming |
| 1/2/2007 | Daniel Dale |
| 1/2/2007 | Aaron McCallister |
| 1/2/2007 | Robyn Morrison |
| 1/2/2007 | Richard Spotts |
| 1/3/2007 | Christian Rudolph |
| 1/3/2007 | Sigrid Mayer |
| 1/3/2007 | Richard M. Garrett |
| 1/3/2007 | Hannah Griscom |
| 1/3/2007 | Linda Guthrie, Devon Energy Corporation |
| 1/3/2007 | Jerry Goodbody |
| 1/3/2007 | Charlie Wymer |
| 1/3/2007 | Debbie Ritter |
| 1/3/2007 | Bobby Johnson |
| 1/3/2007 | Dave Roberts |
| 1/3/2007 | Jason A. Lillegraven, |

## APPENDIX E.
## SUMMARY OF PUBLIC COMMENTS ON THE ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT FINAL EIS AND BLM'S RESPONSES

**Table E1.    Individuals and Organizations Submitting Comments on the Atlantic Rim Natural Gas Development Project Final EIS cont.**

| Date Received | Individual, Agency or Organization |
|---|---|
| | **Email cont.** |
| 1/4/2007 | Dani Sullivan, DSULLI1@state.wy.us |
| 1/4/2007 | Lisa Eadens, PLIntern@nwf.org |
| 1/4/2007 | George R. Salisbury submitted via Sharon O'Toole, sharonsotoole@gmail.com |
| 1/4/2007 | Sharon O'Toole, sharonsotoole@gmail.com |
| 1/4/2007 | Steve Belinda, sbelinda@trcp.org |
| 1/4/2007 | John D. Adamson, info@geopinion.com |
| 1/4/2007 | Asa Nielson, acenielson@gmail.com |
| 1/4/2007 | Erik Molvar, erik@voiceforthewild.org |
| 1/5/2007 | Patrick O'Toole, h2otoole@hotmail.com |
| 12/30/2006 | Michael Ockinga, ockinga48@msn.com |
| 1/5/2007 | Vern Stelter, Wyoming Game & Fish Department, Vern.Stelter@wgf.state.wy.us |
| 1/9/2007 | Don Christianson, Department of Agriculture, DCHRIS@state.wy.us |

**Exhibit 4 to Defendant-Intervenors' Opposition To
Plaintiffs' Motion For A Preliminary Injunction**

**U.S. Department of the Interior's Board of Land Appeals,
Sept. 5, 2007 Decision Denying Stay
(IBLA Decision)**

Case 1:07-cv-01709-RJL    Document 10-10    Filed 10/05/2007    Page 2 of 26



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
Interior Board of Land Appeals
801 N. Quincy St.  Suite 300
Arlington, VA  22203

703 235 3750                    703 235 8349 (fax)

September 5, 2007

| | | |
|---|---|---|
| IBLA 2007-208, *et al.* | ) | BLM/WY/PL-07/011+1310 |
| | ) | |
| THEODORE ROOSEVELT | ) | Atlantic Rim Natural Gas Field |
| CONSERVATION PARTNERSHIP, | ) | Development Project |
| *ET AL.* | ) | |
| | ) | |
| | ) | |
| | ) | Motions to Intervene Granted; |
| | ) | Motions to Dismiss IBLA 2007-208 |
| | ) | For Lack of Standing Denied; |
| | ) | Motions to Dismiss IBLA 2007-226 |
| | ) | For Lack of Standing Granted in |
| | ) | Part; |
| | ) | Motion to Dismiss IBLA 2007-226 as |
| | ) | Untimely Denied; |
| | ) | Petitions for Stay Denied |

## ORDER

The Theodore Roosevelt Conservation Partnership (TRCP) and others have appealed from a March 23, 2007, Record of Decision (ROD) of the Wyoming State Director, Bureau of Land Management (BLM), approving the Atlantic Rim Natural Gas Field Development Project (ARP or Project).  BLM published notice of the availability of the ROD in the *Federal Register* on May 21, 2007 (72 Fed. Reg. 28518).[1]

Four appeals were filed from the ROD, and docketed as follows: IBLA 2007-208 (TRCP); IBLA 2007-210 (Biodiversity Conservation Alliance, Wyoming Outdoor Council, Center for Native Ecosystems, Western Watersheds

---

[1] In December 2006, BLM offered to the public for comment the ARP Final Environmental Impact Statement (FEIS), which had been prepared in accordance with section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C) (2000), to analyze the potential significant environmental impacts of oil and gas drilling and associated activity in the Project area, under the proposed action and alternatives thereto.

IBLA 2007-208, *et al.*

Project, Colorado Environmental Coalition, The Wilderness Society, and Wyoming Wilderness Association (collectively, BCA)); IBLA 2007-226 (Environmental Preservation Foundation (Foundation) and Habitat for Wildlife (HFW) (collectively, EPF)); and IBLA 2007-227 (National Wildlife Federation and Wyoming Wildlife Federation (collectively, NWF)).[2]

The Project currently authorizes the drilling of 2,000 natural gas wells, including 1,800 coalbed methane (CBM) and 200 conventional gas wells, within the Atlantic Rim Project Area (ARPA or Project area). The Project area encompasses 270,080-acres of Federal, State, and private lands in Ts. 18 through 20 N., R. 89 W., Ts. 13 through 20 N., R. 90 W., Ts. 13 through 19, R. 91 W., and Ts. 15 through 17, R. 92 W., Sixth Principal Meridian, Carbon County, Wyoming. All of the public lands in the Project area are subject to existing Federal oil and gas leases, within the administrative jurisdiction of BLM's Rawlins Field Office. All of the wells will be drilled at 80-acre spacing, or a maximum of 8 wells per 640-acre section. The CBM wells will be drilled in the Mesaverde Group, which consists of the Almond, Ericson, Rock Springs, and Blair formations, and the conventional gas wells will generally be drilled in deeper formations.[3]

No more than 7,600 acres of Federal, State, and private lands will be disturbed at any one time, and the total cumulative surface disturbance will not exceed 13,600 acres over the life of the Project. Short-term disturbance will be limited to 6.5 acres per well site. Wastewater produced by CBM extraction will be reinjected into subsurface formations. Reclamation of disturbed areas will begin after the completion of drilling activities, and conclude once the well sites are no longer needed for any operations or production. New access roads and natural gas

---

[2] By three orders dated June 28, and July 26, 2007, we granted motions by the following proponents of the Project to intervene in the respective pending appeals: Anadarko E&P Company LP and Warren Resources, Inc. (collectively, Anadarko) (IBLA 2007-208, 2007-210, and 2007-227); and Double Eagle Petroleum Co. (Double Eagle) (IBLA 2007-208 and 2007-210). We hereby grant their motions to intervene in the remaining pending appeals: Anadarko (IBLA 2007-226); and Double Eagle (IBLA 2007-226 and 2007-227). In addition, by order dated July 18, 2007, we granted motions by the State of Wyoming to intervene in all four appeals.

[3] Under a 2001 Interim Drilling Policy (IDP), BLM approved, following the completion of environmental assessments and issuance of decision records/findings of no significant impact, the drilling of CBM wells and related activity in several Plan of Development (POD) areas within the ARPA in order to test the feasibility of development therein and to gather data for further environmental analysis. A total of 132 CBM wells had been drilled under the IDP at the time of issuance of the ARP FEIS.

pipelines, each totaling close to 1,000 miles, as well as compressors and other facilities, will be constructed in connection with the drilling and development activities. The overall life of the Project is expected to be from 30 to 50 years, although most drilling and related roadbuilding and facility construction will occur in the first 6 to 8 years.

TRCP and BCA each petitioned the Board to stay the effect of the ROD during the pendency of their appeals. The stay petitions are opposed by BLM and all of the intervenors. No stay petition was filed by EPF or NWF, although EPF filed a document styled "Concurrence and Joinder in Petition for Stay," stating that it was joining in the petition for stay earlier filed by BCA.

In this order, we first address motions to dismiss. We deny the motions to dismiss IBLA 2007-208 for lack of standing to appeal and grant the motions to dismiss IBLA 2007-226 for lack of standing to appeal only as to HFW. BLM's motion to dismiss IBLA 2007-226 as untimely is denied.

### I. *Standing to Appeal in IBLA 2007-208 (TRCP) and IBLA 2007-226 (EPF)*

Anadarko, Double Eagle, the State, and BLM move to dismiss IBLA 2007-208 and IBLA 2007-226, alleging that none of the appellants has demonstrated standing to appeal, in accordance with 43 C.F.R. § 4.410(a).

In order to have standing under 43 C.F.R. § 4.410(a) to appeal from a BLM decision, an appellant must demonstrate that it is both a "party to a case" and "adversely affected" by the decision within the meaning of 43 C.F.R. § 4.410(b) and (d). As we said in *Southern Utah Wilderness Alliance*, 140 IBLA 341, 346 (1997) (*quoting Mark S. Altman*, 93 IBLA 265, 266 (1986)): "If either element is lacking, an appeal must be dismissed." Further, it is the responsibility of the appellant to demonstrate the requisite elements of standing. *Colorado Open Space Council*, 109 IBLA 274, 280 (1989).

First, under 43 C.F.R. § 4.410(b), an appellant is considered to be a "party to a case," when it is "one who has taken action that is the subject of the decision on appeal, is the object of that decision, or has otherwise participated in the process leading to the decision under appeal, *e.g.,* . . . by commenting on an environmental document, or by filing a protest to a proposed action." *See The Coalition of Concerned National Park [Service] Retirees*, 165 IBLA 79, 81-82 (2005), and cases cited.

Second, under 43 C.F.R. § 4.410(d), a party to a case is "adversely affected" by a BLM decision, "when that party has a legally cognizable interest, and the decision on appeal has caused or is substantially likely to cause injury to that

interest." *See The Coalition of Concerned National Park [Service] Retirees*, 165 IBLA at 81-82, and cases cited. When an appellant is a membership organization, it must demonstrate that one or more of its members has a legally cognizable interest, which is germane to the purposes of the organization as a whole, and which is or may be adversely affected by the decision being appealed. *Id.* at 86.

### A. IBLA 2007-208

Anadarko, Double Eagle, the State, and BLM do not question whether TRCP is a "party to a case;" rather they assert that TRCP is not "adversely affected" by the ROD. Initially, although TRCP claimed that its members visited Project area lands for aesthetic and recreational pursuits, lived and worked in neighboring communities, enjoyed the wildlife found there, and/or made their living on public lands in the vicinity of Project area lands, TRCP did not identify any such members or provide any declarations or other statements of any members attesting to such activities or the likely effect of the Project on such activities.

In response to the motions to dismiss, TRCP filed affidavits of two members, Steven R. Belinda and Rollin D. Sparrowe, who attest to the fact that TRCP is "a non-profit organization representing outdoor enthusiasts who engage in hunting, fishing and outdoor recreation;" that its "mission is to preserve hunting and fishing by conserving fish and wildlife and the habitats necessary to sustain them for its members and for the public;" that they personally have hunted elk, mule deer, and/or sage grouse within the Project area; and that, given the negative impacts to such species, such activity would be harmed by allowing the Project to go forward. TRCP Consolidated Response to Motions to Dismiss at 4 (citing attached Ex. A (Affidavit of Belinda, dated July 18, 2007) and Ex. B (Affidavit of Sparrowe, dated July 20, 2007)).

Based on the affidavits of TRCP's members, we conclude that TRCP has offered specific facts demonstrating that its members have a legally cognizable interest in the Project area, which is germane to the purposes of the organization, and which may be adversely affected by BLM's decision to go forward with drilling and development in the Project area. Therefore, we deny the motions to dismiss TRCP's appeal (IBLA 2007-208) for lack of standing to appeal.

### B. IBLA 2007-226

Turning to the motions to dismiss EPF's appeal, we note that HFW has not taken action that is the subject of the decision on appeal, and HFW is not the object of that decision. While the Foundation participated in the public scoping and comment process, HFW did not. *See* ROD, Appendix E, at E-11 to E-13;

IBLA 2007-208, *et al.*

FEIS, Appendix N (Draft EIS Comment Letters), at N-12 to N-15. In a consolidated response to the motions to dismiss, EPF asserts at page 1 that "[t]he intent was that comments were to represent both" the Foundation and HFW. While in hindsight that may have been the intent, there is no independent evidence in the record that HFW participated, at any point, in the NEPA review or decisionmaking process that led to the ROD. We conclude that HFW cannot be considered a "party to a case," and, for this reason alone, lacks standing to appeal. *See Edwin H. Marston,* 103 IBLA 40, 42 (1988).

Although both the Foundation and HFW claim that their members, who recreate, observe wildlife, and hunt in the Project area, will be negatively impacted by drilling and development, only the Foundation provides the declaration of a member in support of those assertions, the August 9, 2007, declaration of Asa S. Nielson, the Chairman of the Foundation. Through that declaration the Foundation has offered specific facts establishing that Nielson has a legally cognizable interest in the Project area, which is germane to the purposes of the Foundation, and which may be adversely affected by BLM's approval of the Project. Thus, the Foundation has established that it has standing to appeal the ROD.

Accordingly, we grant the motions to dismiss IBLA 2007-226 for lack of standing to appeal only as to HFW.[4]

## II. Timeliness of Appeal in IBLA 2007-226

BLM requests that the Board dismiss EPF's appeal as untimely. It states that EPF made two attempts at filing a notice of appeal, one filed initially with the Field Office and forwarded to the State Office, and the other filed directly with the State Office. BLM asserts that neither notice of appeal satisfies the filing requirements of 43 C.F.R. § 4.411(a), or can take advantage of the waiver provision of 43 C.F.R. § 4.401(a).

Both assertions hinge on the fact that a notice of appeal had to be filed, as provided by 43 C.F.R. § 4.411(a), 30 days after the May 21, 2007, date of publication of notice of the availability of the ROD in the *Federal Register, i.e.,* on or before June 20, 2007, "in the office of the officer who made the decision."

EPF initially filed a notice of appeal with the Rawlins Field Office on June 20, 2007, the deadline for filing. However, BLM correctly notes that the filing did not comport with 43 C.F.R. § 4.411(a), because it was not filed "in the office of the

---

[4] Hereinafter, references to EPF will be solely to the Environmental Preservation Foundation and not to that organization and HFW collectively.

officer who made the decision," within the 30-day appeal period. In the present case,
that "office" was the Wyoming State Office of the Wyoming State Director, who
issued the ROD.[5] Filing with the Rawlins Field Office did not satisfy the regulation.
*See William R. Smith*, 149 IBLA 358, 362 (1999).

BLM also correctly observes that this notice of appeal was forwarded to the
Wyoming State Office, and received there on June 26, 2007. Therefore, the proper
BLM office received the notice of appeal within the 10-day grace period provided by
43 C.F.R. § 4.401(a). That regulation states that a failure to file a document in the
proper office within the required time period

> will be waived if the document is filed not later than 10 days after it
> was required to be filed *and* it is determined that the document was
> transmitted or probably transmitted to the office in which the filing is
> required before the end of the period in which it was required to be
> filed. [Emphasis added.]

*See, e.g., Southern California Sunbelt Developers, Inc.*, 154 IBLA 115, 116-17 (2001).[6]

BLM argues that, although the notice of appeal was transmitted to BLM on
June 19, 2007, before the filing deadline, and was received by the proper BLM office
on June 26, 2007, within the 10-day grace period, it was not "transmitted or
probably transmitted to the office in which the filing is required" before the end of
the 30-day appeal period, since the office to which it was initially transmitted was not
the proper BLM office. It concludes that EPF's failure to comply with 43 C.F.R.
§ 4.411(a) cannot be waived under 43 C.F.R. § 4.401(a).

We have long held that, if a notice of appeal is misdirected to the incorrect
BLM office, and then forwarded to the correct BLM office, the notice will be
considered, for purposes of 43 C.F.R. § 4.401(a), to have been "transmitted or
probably transmitted to the office in which the filing is required" on the date the
notice was forwarded to the correct BLM office. *Ida Mae Rose*, 73 IBLA 97, 99
(1983). In the present case, while we know that the original notice of appeal was

---

[5] The ROD expressly stated at page 22: "If an appeal is filed, your notice of appeal
must be filed in this office (Bureau of Land Management, State Director, P.O.
Box 1828, Cheyenne, Wyoming 82003) within 30 days of the date BLM publishes its
notice of decision in the *Federal Register*."

[6] The copy of the notice of appeal filed directly with the Wyoming State Office is
untimely. It was transmitted on June 29, 2007, after the expiration of the appeal
period, and received on July 2, 2007. The waiver provision of 43 C.F.R. § 4.401(a)
does not apply to that filing.

IBLA 2007-208, *et al.*

received by the State Office on June 26, 2007, we do not know when it was forwarded to that office, but it is possible that it was forwarded on June 20, 2007, before the end of the 30-day appeal period.[7]  Therefore, we must conclude that the requirements for invoking the waiver provision of 43 C.F.R. § 4.401(a) were satisfied, and we consider the appeal to have been timely filed.  BLM's motion to dismiss IBLA 2007-226 as untimely is denied.

### III.  *Factual Background*

BLM based its ROD on a December 12, 2005, Draft EIS (DEIS) and the FEIS, which were prepared to address the proposed action and alternatives thereto.[8]  BLM tiered those documents to the June 1988 Medicine Bow-Divide EIS prepared in conjunction with promulgation of the applicable land use plan, the November 1990 Great Divide Resource Management Plan (RMP).  BLM incorporated in the DEIS and the FEIS a Draft Air Quality Technical Support Document (AQTSD) and a Final AQTSD (FEIS, Appendix F).  BLM also consulted with the Fish and Wildlife Service (FWS), U.S. Department of the Interior, concerning the potential adverse effects of the proposed Project to listed and candidate threatened and endangered (T&E) species, protected by the Endangered Species Act of 1973 (ESA), *as amended,* 16 U.S.C. §§ 1531-1543 (2000).

In the DEIS, BLM considered the Proposed Action,[9] a No Action Alternative (Alternative A), a Phased Development Alternative (Alternative B), and a Special Protection for Crucial or Sensitive Resources Alternative (Alternative C).  Alternative B was eliminated from further study in the FEIS due to comments received on the

---

[7]  While the case record contains a copy of a fax transmission from the Rawlins Field Office to the Wyoming State Office, dated June 22, 2007, showing that a copy of the notice of appeal was transmitted to the State Office on that date, there is no evidence in the case record of the date on which the Rawlins Field Office transmitted the original notice of appeal.

[8]  The FEIS is a 2-volume document, consisting of the FEIS itself (Volume 1) and 15 appendices (Volume 2).  Since the FEIS and each of the appendices contains distinctive pagination, citations will use the title of the basic document and the relevant page.

[9]  Under the Proposed Action, 2,000 (1,800 CBM and 200 conventional) gas wells would be drilled at 80-acre spacing (but potentially 160-acre spacing, if suitable for the recovery of natural gas).  No limit was placed on surface disturbance, but it was expected to be a total of 16,400 acres (or 7.9 acres per well) in the short term, falling to a total of 6,200 acres, after interim reclamation, for the remainder of the life of the Project.

DEIS. In its FEIS, BLM also considered a Natural Gas Development with Surface Disturbance Limitations Alternative (Alternative D), which was BLM's preferred alternative: "The objective of this alternative is to minimize surface disturbance while optimizing natural gas recovery."[10] FEIS at 2-7.

In his ROD, the State Director approved a modified preferred alternative (Alternative D) for the Project, subject to a performance-based, adaptive management process, and "the option to consider protective measures described in Alternative C that are not in conflict with this Decision."[11] ROD at 1; *see id.* at 19. He concluded that the approved drilling and development conformed with BLM's applicable land use plan, which had opened public lands in the Rawlins Resource Area to oil and gas leasing and development, and also adequately protected other resources: "Alternative D [with modifications] provides a good balance between oil and gas recovery and resource protection and provides for long-term reclamation and re-establishment of native vegetation and wildlife communities." ROD at 10.

BLM's approval of the Project did not authorize drilling or other surface-disturbing activity. ROD at 3-4. A Review Team, composed of representatives of BLM, other Federal and State agencies, and the operators, will evaluate annual and site-specific development proposals and establish required best management practices (BMPs), conditions of approval (COAs), or other protective measures to mitigate potential environmental impacts. *Id.* at 16.

---

[10] Alternative D limited total surface disturbance at any one time to 7,600 acres, with a cumulative limit of 13,600 acres ("2,000 wells x 6.5 acres/well, plus approximately 600 acres existing disturbance under the Interim Drilling Policy"): "If the disturbance limit [applicable during the Project] should be reached, further disturbance activities would be halted pending successful reclamation." FEIS at 2-8. In addition, BLM would designate "Category 'A' Mitigation Areas," containing a total of approximately 72,200 acres, which "would be managed more intensely . . . to reduce the extent of disturbance below an average of 6.5 acres/well." *Id.* at 2-8, 2-9. Such areas would include areas "with sensitive fish populations, and crucial wildlife habitats, including areas of critical environmental concern, special management areas (SMA), elk crucial winter range and silver sage/bitterbrush communities." *Id.* at 2-8.

[11] Alternative C encompassed the same number of wells as the Proposed Action, but imposed additional measures outlined in Appendix L (Resource Concerns and Associated Protection Measures Proposed under Alternative C), to protect crucial or sensitive resources: "Generally, constraints would focus on surface disturbance limits, limited operating periods, modification of drilling and construction practices, and, in some cases, no surface occupancy." DEIS at 2-4.

IBLA 2007-208, *et al.*

BLM recognized that Project approval would convert the "natural setting" of the Project area "to an industrialized setting," significantly impacting the environment by degrading the scenery, introducing traffic and noise, and otherwise adversely affecting wildlife and wildlife habitat, and associated recreational use, in the form of hunting and sightseeing. FEIS at 4-102. However, despite surface-disturbing activities that were likely to result in major adverse impacts to certain resource values in the short term, BLM's long-term goal is to return Project area lands to a condition approximate to that which existed before developments proposed in Alternative D were implemented. ROD at 4.

In approving a modified Alternative D, BLM adopted various measures, set forth in Appendix B (Performance-Based Monitoring and Best Management Practices) and Appendix C (Operator-Committed Practices) of the ROD. Appendix C practices became "mandatory requirements" upon issuance of the ROD. ROD at 21. On the other hand, Appendix B requirements "will be considered during site-specific, environmental review." *Id.*

In Appendix B, at B-2, BLM described the "performance-based, adaptive management process" as consisting of four primary elements: (1) the Project would proceed subject to an extensive list of BMPs, COAs, and protective measures (termed "Performance Requirements"); (2) the environmental effects of the Project would be monitored (termed "Performance-Based Monitoring"); (3) monitoring results would be assessed to determine whether resource management objectives (termed "Performance Goals") were being met; and (4) where necessary, "additional" mitigation measures or techniques (termed "Adaptive Management") would be adopted, in conjunction with the approval of specific surface-disturbing activity to ensure achievement of the Performance Goals.[12] BLM stated that "Operators are responsible for demonstrating successful achievement of Performance Goals," which would bear on BLM's approval of future Project activities. ROD at 20.

For wildlife, BLM expected that Project activities would significantly adversely affect big game, such as pronghorn antelope, elk, and mule deer, and upland game birds, such as Greater sage-grouse, and Columbian sharp-tailed grouse, by displacing them and eliminating and fragmenting their habitat, particularly big game crucial winter range and grouse nesting and brood-rearing habitat. ROD at 7, 9; FEIS at 4-69 to 4-77, 4-82 to 4-83, 4-85. BLM provided for implementing "four strategies" for minimizing significant adverse impacts:

---

[12] "The specific measures . . . that are best suited for reducing adverse effects will vary by site, based on conditions found at the specific site, such as the presence of sensitive soils, wildlife issues, aspect, slope, nature of the specific action proposed, and many other factors." *Id.* at B-3.

IBLA 2007-208, *et al.*

(1) reduce the initial disturbance footprint as much as possible,
(2) restore habitat function in the shortest time possible,
(3) perform timely site reclamation and limit unreclaimed surface
disturbance, and
(4) institute a monitoring and adaptive management process to ensure
reclamation and mitigation measures are effective and initiate
corrective action when it is not.

ROD at 8.

In addition to limiting surface disturbance and providing for interim
reclamation, BLM provided for adopting a Wildlife Monitoring and Protection Plan,
as outlined at Appendix E of the FEIS, the goal of which is to avoid and/or minimize
adverse impacts to wildlife by monitoring wildlife population trends and developing
appropriate mitigation during the course of Project development and operation.
ROD, Appendix B, at B-13. Under the plan, BLM and/or the Wyoming Game and
Fish Department (WGFD) would monitor the impacts of Project activities on Greater
sage-grouse and Columbian sharp-tailed grouse leks, big game crucial winter range,
and other important wildlife areas, and specified mitigation measures would be
adopted in connection with the approval of applications for permit to drill (APDs),
rights-of-way (ROWs), and other land-use authorizations. ROD, Appendix B, at B-14,
B-15; FEIS, Appendix E, at E-4, E-6, E-12. These measures include spatial and/or
temporal restrictions on drilling and other activity. ROD, Appendix B, at B-16, B-17;
FEIS, Appendix E, at E-7, E-9 to E-10. BLM stated that "these measures may be
modified on a site-specific basis as deemed appropriate by the BLM after completion
of APD and ROW application field reviews." FEIS, Appendix E, at E-6.

BLM also provided for assessing the need for additional mitigation measures or
techniques, based on the success in achieving Performance Goals related to wildlife.
These Goals include providing an adequate amount of suitable undisturbed crucial
winter range and maintaining functional migration routes for big game through the
Project area, and providing well-dispersed breeding, nesting, brood-rearing, and
winter habitat for upland game birds. ROD at 19; ROD, Appendix B, at B-2.

For air quality, BLM expected that Project emissions would not exceed
National Ambient Air Quality Standards (NAAQS) or Wyoming Ambient Air Quality
Standards (WAAQS), or violate Prevention of Significant Deterioration (PSD)
requirements. ROD at 7; FEIS at 4-12 to 4-15. BLM also noted that, before
undertaking any Project activities, the operators were required to obtain the
appropriate air quality permits for drilling and other activity from the applicable State
agency (Wyoming Department of Environmental Quality (WDEQ)), and thereafter
comply with all Federal and State air quality laws. FEIS at 1-12 to 1-13, 3-19, 4-6.

10

IBLA 2007-208, *et al.*

BLM stated that air quality would be monitored following Project approval, and appropriate regulatory action would be taken by WDEQ to resolve any subsequent violations of air quality standards by Project activities. ROD at 7; FEIS at 4-6, 4-15; FEIS, Appendix B, at B-5. The impacts of Project emissions on air quality, specifically concentrations of nitrogen dioxide ($NO_2$), carbon monoxide, (CO), ozone ($O_3$), sulfur dioxide ($SO_2$), and particulate matter less than 2.5 and 10 micrograms in diameter ($PM_{2.5}$ and $PM_{10}$), in the Project and surrounding areas would be monitored by the operators, as well as BLM, WDEQ, and the Environmental Protection Agency (EPA).

### IV. Petitions for Stay in IBLA 2007-208 and IBLA 2007-210

The regulation at 43 C.F.R. § 3165.4(c) provides that a decision of a BLM State Director concerning onshore oil and gas operations shall remain effective pending appeal, unless the Board determines otherwise, and that an appellant who petitions for a stay of the effect of such a BLM decision pending a determination by the Board of the merits of its appeal bears the burden of demonstrating sufficient justification for the stay, based on the following four standards: (1) the relative harm to the parties if the stay is granted or denied; (2) the likelihood of the appellant's success on the merits; (3) the likelihood of irreparable harm to the appellant or resources if the stay is not granted; and (4) whether the public interest favors granting the stay. *See Colorado Environmental Coalition*, 135 IBLA 356, 357-58 (1996), *aff'd, Colorado Environmental Coalition v. BLM*, 932 F. Supp. 1247 (D. Colo. 1996).

TRCP and BCA contend that they are likely to succeed on the merits of their appeals and satisfy the other requirements for a stay.[13]

Based on a preliminary review of the case record, the petitions for stay filed by TRCP and BCA, and their subsequent pleadings, as well as the responsive pleadings of BLM, Anadarko, Double Eagle, and the State, we conclude that TRCP and BCA have failed to justify staying the effect of the ROD because they have failed to show a likelihood of success on the merits of their arguments that BLM erred in issuing the ROD. For the following reasons, the Board denies their petitions for stay.

---

[13] TRCP's arguments that it is likely to succeed on the merits of its appeal are set forth on less than two pages of its NA/Petition. More importantly, such arguments are conclusory in nature, and fail to carry its burden to demonstrate a likelihood of success. Nevertheless, TRCP has since filed a statement of reasons (SOR), which we consider in determining whether it has carried that burden. BCA filed a 107-page NA/Petition, adopting the 89-page discussion regarding their likelihood of success as their SOR.

IBLA 2007-208, *et al.*

## A. *Analysis*

TRCP and BCA contend that the ROD is violative of the environmental review requirements of section 102(2)(C) of NEPA and the multiple-use management and land use plan conformance requirements of section 302(a) of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1732(a) (2000). We turn first to their arguments that BLM violated section 102(2)(C) of NEPA.

### 1. *National Environmental Policy Act of 1969*

When BLM considers the likely environmental impacts of approving large-scale natural gas drilling and related activity in an EIS, the adequacy of the EIS, under section 102(2)(C) of NEPA, must be judged by whether it constituted a detailed statement, which took a hard look at all of the potential significant environmental consequences of the proposed action and reasonable alternatives thereto, considering all relevant matters of environmental concern. *Center for Biological Diversity*, 162 IBLA 268, 275 (2004), and cases cited. In deciding whether an EIS promotes informed decisionmaking, we have held that a "rule of reason" will be employed. *Forest Guardians*, 170 IBLA 80, 95 (2006); *see, e.g., Utahns for Better Transportation v. U.S. Department of Transportation*, 305 F.3d 1152, 1163 (10th Cir. 2002) ("We apply a rule of reason standard . . . in deciding whether claimed deficiencies in a[n] FEIS are merely flyspecks, or are significant enough to defeat the goals of informed decisionmaking and informed public comment"). Thus, an EIS will be upheld when it has set forth sufficient information to allow the decision maker to consider fully the environmental effects involved and to make a reasoned choice among alternatives after balancing the risks of harm to the environment against the benefits of the proposed action. *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1375 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064 (1978).

"[W]hether BLM is able to know and quantify precisely the 'ultimate effects' of development . . . is a very different question from whether BLM adequately considered and made a reasoned assessment of environmental impacts." *National Wildlife Federation*, 150 IBLA 385, 396 (1999).

An appellant challenging a BLM decision to approve oil and gas development, following preparation of an EIS, must carry its burden to demonstrate by a preponderance of the evidence, with objective proof, that BLM failed to give adequate consideration to a substantial environmental question of material significance to the proposed action, or otherwise failed to abide by section 102(2)(C) of NEPA. *Colorado Environmental Coalition*, 142 IBLA 49, 52 (1997). "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the

IBLA 2007-208, *et al.*

environmental costs," in deciding to go forward with the proposed action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).[14] Section 102(2)(C) of NEPA does not require BLM to take any particular action in a given set of circumstances, and it does not prohibit action when environmental degradation will inevitably result. "Rather, it merely mandates that whatever action BLM decides upon be initiated only after a full consideration of the environmental impact of such action." *Oregon Natural Resources Council*, 116 IBLA 355, 361 n.6 (1990).

In assessing significant impacts, when BLM relies on the professional opinion of its technical experts concerning matters within the realm of their expertise, and that reliance is reasonable and supported by record evidence, an appellant challenging such reliance must demonstrate, by a preponderance of the evidence, error in the data, methodology, analysis, or conclusion of the expert. *Salinas Ramblers Motorcycle Club*, 171 IBLA 396, 400 (2007); *Fred E. Payne*, 159 IBLA 69, 77-78 (2003). A mere difference of opinion, even of expert opinion, will not suffice to show that BLM failed to fully comprehend the nature or scope of the significant impacts. 170 IBLA at 400; 159 IBLA at 78.

### a. *Failure to Identify Site-Specific Impacts*

BCA contends that BLM failed to consider the likely impacts of the Project because it did not specify the situs of the wells, roads, and pipelines, asserting that the location of impacts is the key determinant of their impact. NA/Petition at 58.

BLM may properly defer consideration of the site-specific impacts of such development until it has concrete proposals for APDs, ROWs, and other land use authorizations. *See Biodiversity Conservation Alliance*, 171 IBLA 218, 231-32 (2007); *Fred E. Payne*, 159 IBLA at 81. BLM is unable to evaluate impacts at specific well sites because the operators have not yet identified specific well locations. According to BLM, specific impacts will be evaluated based on site-specific proposals before any drilling is approved. FEIS at 1-1; *see also* ROD at 3-4; FEIS, Appendix O, at O-165, O-174.

---

[14] An EIS should contain "a reasonably complete discussion of possible mitigation measures," which means that such measures must be "discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated[.]" *Robertson v. Methow Valley Citizens Council*, 490 U.S. at 352. However, "NEPA imposes no substantive requirement that mitigation measures actually be taken," or that they be completely "formulated and adopted[.]" *Id.* at 352, 353 n.16.

IBLA 2007-208, *et al.*

Such a system of evaluation is not violative of section 102(2)(C) of NEPA, because the project-level of environmental analysis is entirely commensurate with the nature of the activity that is being considered for approval. *See Blue Mountains Biodiversity Project*, 139 IBLA 258, 266 (1997); *Southern Utah Wilderness Alliance*, 123 IBLA 302, 305-07 (1992). There is no impermissible irreversible or irretrievable commitment of resources at this project-level stage, since the basic decision to permit drilling and development was made, consistent with the Great Divide RMP, at the time of lease issuance. Further, no surface-disturbing activity will occur at all until a decision is made to authorize that activity, after required site-specific environmental review, at which time BLM has "the authority to impose reasonable measures to minimize adverse impacts on other resource values," including restricting "the siting or timing of lease activities." *National Wildlife Federation*, 169 IBLA 146, 164 (2006).

While BCA believes that BLM will give "short shrift" to site-specific impacts when, or if, it undertakes environmental review of proposals for specific wells, roads, and pipelines (NA/Petition at 58), such a concern is speculative at this point and does not support BCA's argument that site-specific impacts must be considered in the FEIS.[15]

BCA has failed to show that it has a likelihood of success in prevailing on the merits of its argument regarding site-specific impacts.

b. *Failure to Give Adequate Consideration to the Likely Cumulative Impacts to Fish and Wildlife*

TRCP and BCA argue that BLM failed to consider the likely cumulative impacts of the Project on resident native populations of Bluehead sucker, Flannelmouth sucker, and Roundtail chub in Muddy Creek and/or on elk, mule deer, and pronghorn antelope throughout the Project and surrounding areas. TRCP SOR at

---

[15] BCA notes that BLM stated that "'[m]any of the subsequent actions in the ARPA . . . may be eligible for categorical exclusion [CX] under [section 390 of] the Energy Policy Act of 2005,'" 42 U.S.C.A. § 15942 (Supp. 2007), which, BCA asserts, would mean the absence of any site-specific environmental analysis at the APD, ROW, or other specific land-use authorization stage. NA/Petition at 62-63 (*quoting* ROD, Appendix E, at E-7). However, the next sentence in Appendix E, at E-7, after that quoted by BCA is: "In all cases, the action will be subject to onsite investigation, cultural reviews, T&E consultation and environmental reviews." Moreover, a CX is only applicable where there is no need for site-specific environmental analysis. 40 C.F.R. § 1508.4; *Vulcan Power Co.*, 143 IBLA 10, 18 (1998). Further, "site-specific approvals and review" are still required, as a matter of BLM policy, for APDs. BLM Opposition (IBLA 2007-210) at 22.

IBLA 2007-208, *et al.*

18-19; BCA NA/Petition at 74-82. They refer to the cumulative impacts likely to be associated with several approved or pending major oil and gas projects, particularly the Continental Divide/Creston (8,950 wells) and Hiawatha (4,207 wells), which are currently undergoing NEPA review, and the Continental Divide/Wamsutter II (2,130 wells), South Baggs (50 wells), and Desolation Flats (385 wells), which are already approved. BCA NA/Petition at 78, 80.

BLM considered the cumulative impacts of the Project and other oil and gas development projects in the region, including the Continental Divide/Wamsutter II, Creston/Blue Gap, South Baggs, and Desolation Flats, to soils, vegetation, water resources, fish, and big game wildlife. FEIS at 5-2 to 5-4, 5-9 to 5-19; BLM Opposition (IBLA 2007-210) at 31. It recognized the existence of other projects, including the Continental Divide/Creston, which was an outgrowth of the Continental Divide/Wamsutter II and Creston/Blue Gap. *See* FEIS at 1-10, 1-11 (Map M-5 (Mineral Development Projects in the Vicinity)). BLM's decision not to include the proposed Continental Divide/Creston and Hiawatha projects is properly explained by the fact that they were not approved or fully defined, and were still undergoing NEPA review, which will take into account the cumulative impacts of those projects, as well as the ARP. *See Wyoming Outdoor Council,* 151 IBLA 260, 270 (1999); BLM Opposition (IBLA 2007-210) at 31-32.

In order to demonstrate a deficiency in BLM's cumulative impacts analysis, "it is not sufficient merely to note the existence of other gas fields and gas development projects . . . without concretely identifying the adverse impacts caused by such other fields and projects to which the action being scrutinized will add." *National Wildlife Federation,* 150 IBLA at 399. Nor is it sufficient to merely refer to geographic proximity or some other factor likely to give rise to a cumulative impact. *Wyoming Outdoor Council,* 159 IBLA 388, 406-07 (2003). Therefore, BCA cannot simply state that the Project area and other project areas cover parts of the same watershed or are traversed by the same big game wildlife herds. *See* BCA NA/Petition at 79-81; BCA Reply at 24-26.

TRCP and BCA have failed to show that they are likely to succeed in establishing that BLM failed to give adequate consideration to the likely cumulative impacts of the Project.[16]

_____

[16] The EIS contains baseline information regarding the water quality of representative perennial, intermittent, and ephemeral surface waters (FEIS at 3-48 to 3-52), mule deer (*id.* at 3-86, 3-89 to 3-90), Greater sage-grouse and Columbian sharp-tailed grouse (*id.* at 3-94 to 3-97, 3-99), raptors (*id.* at 3-97 to 3-98, 3-100), sensitive wildlife species (*id.* at 3-110 to 3-112), and roads (*id.* at 3-58, 3-146

(continued...)

IBLA 2007-208, *et al.*

### c. *Failure to Give Adequate Consideration to the Likely Impacts to Air Quality*

BCA argues that BLM failed to give adequate consideration to the likelihood that Project emissions will cause ozone concentrations in the Project area, which are already at $147\mu g/m^3$, averaged over an 8-hour period, to exceed the NAAQS of $157\mu g/m^3$, averaged over an 8-hour period.[17]  It asserts that BLM has misjudged the background levels of ozone and used the "scientifically discredited 'Scheffe method'" to assess the effects of Project emissions on future ozone levels in the Project area.[18]  NA/Petition at 68.

Arguments similar to those raised by BCA were advanced by several organizations in support of their petition to stay the effect of a March 14, 2006, ROD of the Wyoming State Director, approving the Jonah Infill Drilling Project in southwestern Wyoming.  We considered these arguments in the June 28, 2006, order in *Wyoming Outdoor Council*, IBLA 2006-155, denying the stay petition, and a March 30, 2007, order, denying reconsideration of that order.  We concluded that the appellants had failed to show a likelihood of success on their arguments.  *See* Order, dated June 28, 2006, at 17-21, 23-24; Order, dated Mar. 30, 2007, at 2-7.  We find no reason to deviate from that conclusion at this stage of review in this case, especially since the circumstances are essentially the same regarding the ARP and the Jonah Infill Drilling Project.[19]  *See* BCA Reply at 15-19.  Moreover, BLM developed

---

[16] (...continued)
to 3-148).  Additional information is being or will be gathered, and will be incorporated in the design and analysis of specific proposed surface-disturbing activities.  *See* FEIS at 4-74 (mule deer migration patterns); ROD, Appendix B, at B-14 to B-15 (upland game bird, raptor, and sensitive wildlife species inventories).

[17] NAAQS are violated only when the 3-year average of the fourth highest maximum daily concentration of ozone exceeds the NAAQS 8-hour standard for ozone.  *See* 40 C.F.R. § 50.10(b); 40 C.F.R. Part 50, Appendix I, 2.3.

[18] As we stated at page 17, n.18, of our June 28, 2006, order in *Wyoming Outdoor Council*, IBLA 2006-155, "the Scheffe method was developed by an EPA employee (Richard D. Scheffe), and was published by EPA in a September 1988 document entitled 'VOC/$NO_x$ Point Source Screening Tables' (Scheffe Paper)[.]"  The method "utilizes $NO_x$ and VOC emissions ratios to estimate $O_3$ concentrations," since ozone is formed as a result of a chemical reaction in the atmosphere between the two emissions, triggered by sunlight.  FEIS, Appendix F, at 43; *see* FEIS at 4-9.

[19] While BLM determined in the December 2006 Draft Supplemental EIS for the Pinedale Anticline Oil and Gas Exploration and Development Project at 4-62 that the
(continued...)

IBLA 2007-208, *et al.*

and implemented a mitigation and monitoring program for ozone in the ARPA, and the operators have agreed to operate additional air quality monitoring in the area, including ozone monitoring. *See* Double Eagle Opposition, Ex. 1; ROD, Appendix B, at B-5. If the air quality monitoring were to show elevated ozone concentrations that are attributable at least in part to Project activities, agencies will confer to determine the propriety of additional mitigation measures, and, if necessary, enforcement action will be taken. *See* BLM Opposition (IBLA 2007-210) at 29; State Opposition (IBLA 2007-210) at 21; Double Eagle Opposition (IBLA 2007-210) at 42.

BCA has failed to show a likelihood of success on the merits of its argument that BLM failed to give adequate consideration to air quality impacts of approval of the Project.

*d. Failure to Give Adequate Consideration to Likely Impacts Related to Methane Seeps*

BCA argues that BLM failed to give adequate consideration to the likelihood that coalbed dewatering associated with the drilling of CBM wells would exacerbate dangerous seeps of methane gas, which can kill plants, wildlife, and even people visiting the Project area, and that new information regarding the likely increase in the number and severity of methane seeps requires BLM to now supplement the EIS.[20] It asserts that, when new circumstances present a seriously different picture of a

---

[19] (...continued)
CALGRID model, rather than the Scheffe method, was the most appropriate method for estimating ozone impact for that project, Double Eagle states that such a determination does not demonstrate that the methodology used for the ARPA was inappropriate because the Atlantic Rim and Pinedale Anticline Projects are "very different." Opposition (IBLA 2007-210) at 38. It states that the Pinedale Anticline Project involves more wells (4,399 wells), all directionally drilled, much denser spacing (10-acre spacing), far deeper (14,000 feet) formations, and longer drilling periods (50 days per well) as opposed to 2,000 wells vertically drilled for 7 to 10 days per well at 80-acre spacing to shallower (6,000 feet) formations, resulting in "greater air quality impacts" for the Pinedale Anticline Project. *Id.* at 39.

[20] BCA offers a June 19, 2007, Declaration of Walter R. Merschat (Attachment 5 to NA/Petition), a private geochemist working for the oil and gas industry, who visited a total of eight methane seeps along Cow Creek, Deep Gulch, and Wild Cow Creek, within the Project area, on Mar. 27, 2007. Merschat Declaration at 1, ¶5. In Merschat's opinion these seeps are "likely the result" of nearby CBM wells, which were approved as part of the interim drilling effort in the Project area, and that increased CBM activity will likely result in increased volume from existing methane seeps and creation of new ones. Merschat Declaration at 2, ¶¶8, 14.

IBLA 2007-208, *et al.*

proposed action than originally envisioned, a supplemental EIS must be prepared. NA/Petition at 15, 67.

The Merschat Declaration presents an opinion that is not shared by WDEQ. According to WDEQ, methane seeps are a natural phenomenon that predates oil and gas development in the region and the seeps are not geologically connected to the producing CBM formations or to the formations into which produced water is being disposed. Double Eagle Opposition, IBLA 2007-210, Ex. 6. Nevertheless, in the FEIS, BLM acknowledged that methane seeps could possibly develop in the outcrop region of the Mesaverde Group as a result of the Project, and that those seeps could potentially contaminate shallow groundwater sources and could cause the death of vegetation in limited areas. FEIS at 4-32. BLM noted that the number and location of such seeps was impossible to predict, but that operators would be required to monitor for methane seep detection purposes. *Id.* at 4-32, 4-49; ROD, Appendix B, at B-10 to B-11. In addition, BLM is working in cooperation with the University of Wyoming, the Wyoming State Geological Survey, and the Wyoming Oil and Gas Conservation Commission to inventory and model methane seeps.

BCA has failed to show a likelihood of success on its argument that BLM failed to give adequate consideration to likely impacts related to methane seeps or that new information on methane seeps requires completion of a supplemental EIS.

### e. *Failure to Consider a Full Range of Reasonable Alternatives*

BCA argues that BLM violated section 102(2)(C) of NEPA because it failed to consider a full range of reasonable alternatives to the proposed Project, noting that, since all of the action alternatives provided for drilling a total of 2,000 wells in the Project area, BLM did not consider any alternatives which would limit or reduce the environmental consequences of the proposed Project. NA/Petition at 3. BCA asserts that BLM should have considered "a true phased development alternative," under which one section of the Project area would be drilled, produced, and reclaimed before drilling in the next section could be initiated, and an alternative that provides for natural gas development across a smaller area. *Id.* at 24.

TRCP challenges BLM's consideration of reasonable alternatives solely on the basis that BLM improperly rejected Alternative B because of the operators' concerns that it would delay lease development.

BLM is required by section 102(2)(C) of NEPA and its implementing regulations to rigorously explore and objectively evaluate, in an EIS, all *reasonable* alternatives to the proposed action, which will accomplish its intended purpose, are

IBLA 2007-208, *et al.*

technically and economically feasible, and yet have a lesser or no impact.[21]  42 U.S.C.
§ 4332(2)(C) (2000); 40 C.F.R. §§ 1500.2, 1501.2, 1502.1, and 1502.14; *City of
Carmel-by-the-Sea v. U.S. Department of Transportation,* 123 F.3d 1142, 1155
(9th Cir. 1997); *Dubois v. U.S. Department of Agriculture,* 102 F.3d 1273, 1286-87
(1st Cir. 1996), *cert. denied,* 521 U.S. 1119 (1997); *Southern Utah Wilderness
Alliance,* 163 IBLA 142, 159 (2004).  Consideration of all reasonable alternatives
ensures that the decisionmaker "has before him and takes into proper account all
possible approaches to a particular project."  *Calvert Cliffs' Coordinating Committee,
Inc. v. United States Atomic Energy Commission,* 449 F.2d 1109, 1114 (D.C. Cir.
1971).

       BLM declined to afford Alternative B detailed study because it would not
accomplish the purpose of the Proposed Action, which was to permit the operators
and the United States to realize the benefit of existing Federal leases, by developing,
producing, and marketing natural gas.  *See* FEIS at 1-8 to 1-9, 2-12 to 2-13; ROD
at 14; BLM Opposition (IBLA 2007-210) at 9.  While TRCP finds nothing in
Alternative B contrary to that purpose, delay in lease development for 7 to 14 years,
which was contemplated under Alternative B, conflicts with the purpose of the
Proposed Action to permit such development.  *See Northern Alaska Environmental
Center v. Kempthorne,* 457 F.3d 969, 978 (9th Cir. 2006) ("An agency need not . . .
discuss . . . alternatives which are 'infeasible, ineffective, or inconsistent with the
basic policy objectives for the management of the area,'" *quoting Headwaters, Inc. v.
BLM,* 914 F.2d 1174, 1180-81 (9th Cir. 1990)).

       The "true phased development alternative" offered by BCA does not satisfy the
purpose of the proposed Project, which is to promote lease development.  *See* FEIS
at 1-8 to 1-9.  Indeed, it would prevent development of a substantial part of the
Project area for a considerable portion, perhaps even all, of the 30- to 50-year life of
the Project.

       BCA also argues that BLM should have considered an alternative providing for
less natural gas development.  NA/Petition at 27, 28.  BLM responds that it
considered an alternative (Alternative C) which provided for less surface disturbance
at any one time than the Proposed Action, but that alternative provided for drilling at
160-acre spacing, which was determined by BLM's Reservoir Management Group,
based on the results of the exploratory drilling, not to promote the maximum
recovery of natural gas from the Project area, and, as such, it would not serve the

---

[21]  Alternatives that fail to accomplish the purpose of an action are not reasonable
and need not be studied in detail by the agency.  *Citizens' Comm. to Save Our
Canyons v. United States Forest Service,* 297 F.3d 1012, 1030 (10th Cir. 2002);
*Northern Alaska Environmental Center,* 153 IBLA 253, 256 (2000).

purpose of the Proposed Action. Opposition (IBLA 2007-210) at 11 (citing ROD at 16). BLM concludes that any alternative which provides for less natural gas development, based on comparable or greater well spacing, would not serve the purpose of the Proposed Action.

BCA and TRCP have failed to show a likelihood of succeeding on the merits of their arguments that BLM failed to consider a full range of reasonable alternatives to the proposed Project.

### f. Failure to Give Adequate Consideration to Mitigation Measures

In conjunction with its basic argument that BLM failed to consider a full range of reasonable alternatives, BCA repeatedly asserts that BLM failed to consider reasonable alternatives to mitigate or avoid significant impacts. TRCP challenges BLM's use of adaptive management as a mitigation measure, arguing that such mitigation is, by its nature, violative of section 102(2)(C) of NEPA, because it is not discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated.

BLM considered a panoply of mitigation measures in connection with the proposed Project and alternatives thereto, in an effort to avoid or mitigate the significant impacts of the Project. It was not required, however, to adopt particular measures in order to avoid or minimize significant impacts. *See Western Exploration Inc.*, 169 IBLA 388, 398-99 (2006). As we said in *Legal & Safety Employer Research Inc.*, 154 IBLA 167, 185 (2001): "The fact that Appellant . . . prefers that BLM take another course of action does not establish that BLM violated the procedural requirements of NEPA. *See San Juan Citizens Alliance*, 129 IBLA 1, 14 (1994)." BLM considered the prospect of mitigating significant adverse impacts in sufficient detail to ensure that it fairly evaluated the environmental consequences of the Project.

We have long held, in "cases involving unknown future impacts of a proposed action," that section 102(2)(C) of NEPA permits adoption of a mitigation plan "in which BLM identified the type of mitigation but rendered implementation contingent on assessment of whether and to what extent that mitigation was warranted, given the uncertain results of possible future activity." *Colorado Environmental Coalition*, 169 IBLA 137, 143 (2006); *see Great Basin Mine Watch*, 159 IBLA 324, 354 (2003); *Powder River Basin Resource Council*, 144 IBLA 319, 323-24 (1998). Adaptive management is consistent with that approach. When the impacts that will be mitigated are uncertain, and will only become known by monitoring the effects of the Project, the particular mitigation to be applied will necessarily be uncertain. Such a process comports with section 102(2)(C) of NEPA. *See Northern Alaska*

IBLA 2007-208, *et al.*

*Environmental Center v. Kempthorne,* 457 F.3d at 979; *Biodiversity Conservation Alliance,* 169 IBLA 321, 341-43 (2006).

BCA and TRCP have failed to show a likelihood of success on their argument that BLM did not give adequate consideration to mitigation measures.

We next turn to TRCP's and BCA's arguments that BLM violated section 302(a) of FLPMA, 43 U.S.C. § 1732(a) (2000).

### 2. Section 302(a) of the Federal Land Policy and Management Act of 1976

#### a. Failure to Comply with the Multiple-Use Mandate

TRCP argues that BLM's approval of the Project violates the multiple-use mandate of section 302(a) of FLPMA, because BLM failed to engage in a reasoned and informed decision making process, which balanced competing resource values in the ARPA to best meet the present and future needs of the American people. SOR at 2 (citing *National Wildlife Federation v. BLM,* 140 IBLA 85, 101 (1997)). It asserts that BLM's decision to convert the natural setting of the Project area to an industrialized setting, which results in significant adverse impacts to hunting, sightseeing, and other recreational use of the Project area for more than one generation of recreational users, by diminishing the presence of wildlife, degrading scenery, and introducing traffic and noise, violates FLPMA's multiple-use mandate. SOR at 35.

In managing the public lands, BLM must strike a balance among the many competing uses to which the land may be put. *Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 58 (2004). BLM analyzes appropriate uses of the public lands during its land use planning process and makes decisions thereon. In this case, BLM determined in the Great Divide RMP to allow oil and gas leasing in the entire Rawlins Resource Area, thereby providing the opportunity for oil and gas exploration and development "while protecting other resource values." FEIS at 1-9 (*quoting* ROD and Approved RMP for the Great Divide Resource Area, dated Nov. 8, 1990 (RMP ROD), at 30). BLM required the protection of specified resources, including sage grouse leks and big game crucial winter range, recognizing that its authority was unlimited in the case of new leases, but limited in the case of existing leases: "These restrictions or requirements may only be included as reasonable measures or as conditions of approval (COA) in authorizing applications for permit to drill (APD), sundry notices, or plans of development." RMP ROD at 30. BLM was also permitted to authorize exploration and development, subject to whatever restrictions BLM deemed appropriate to render such activity compatible with recreation and other competing uses of the public lands.

IBLA 2007-208, *et al.*

Selection of one use of the public lands over another competing use, even when the selected use will adversely affect a competing use, is not a violation of BLM's FLPMA mutiple-use mandate. *See Native Ecosystems Council,* 139 IBLA 209, 212 (1997); *Friends of the Bow,* 139 IBLA 141, 143-44 (1997).

TRCP has not shown a likelihood of success on its argument that BLM violated the multiple-use mandate of section 302(a) of FLPMA.

b.  *Failure to Conform to the Reasonably Foreseeable Development Scenario of the RMP*

TRCP and BCA argue that BLM's approval of the Project violates the land use plan conformance requirement of section 302(a) of FLPMA by authorizing the drilling and development of wells and related surface disturbance, which together with activity already approved, greatly exceeds the Reasonably Foreseeable Development (RFD) scenario set forth in the Great Divide RMP.

In *Wyoming Outdoor Council,* 164 IBLA 84, 99 (2004), we disagreed with the argument that the RFD scenario establishes a point past which further exploration and development is prohibited. *See Southern Utah Wilderness Alliance,* 159 IBLA 220, 234 (2003). The RFD scenario is utilized for identifying the potential direct, indirect, and cumulative impacts of oil and gas development. *Id.* In this case, BLM does not deny that the RFD scenario will be exceeded by the Project activities approved in the ROD. However, BLM states that the fact that the total number of wells projected in an RFD scenario may be exceeded "does not automatically mean that . . . a revision or amendment to the RMP is necessary." BLM Opposition (IBLA 2007-210) at 38 (citing Instruction Memorandum (IM) No. 2004-089, dated Jan. 16, 2004).

We have stated that the question, which must be addressed on a case-by-case basis, is "whether . . . [the] exceeded RFD scenario demonstrates that further environmental analysis is required[.]" *Wyoming Outdoor Council,* 164 IBLA at 102. In this case, further environmental analysis was completed in the DEIS and FEIS.

TRCP and BCA have failed to show a likelihood of success on their argument that BLM's approval of the Project violates the land use plan conformance requirement of section 302(a) of FLPMA.

3. *BLM Policy*

a.  *Failure to Adhere to Sensitive Species Management Policy*

BCA argues that BLM's decision to approve the Project violates the policy directive, set forth in BLM Manual § 6840.06 (Rel. 6-121 (1/19/01)), that actions

22

IBLA 2007-208, *et al.*

approved by BLM not contribute to the need to designate a sensitive species as a T&E species under the ESA. NA/Petition at 92-93. It refers to the Greater sage-grouse, Columbian sharp-tailed grouse, Bluehead sucker, Flannelmouth sucker, and Roundtail chub as such species.

While not binding on the Board, since it does not have the force and effect of law, the Board has stated that it will nevertheless consider whether BLM abided by its own Manual. *Native Ecosystems Council*, 139 IBLA at 219. It is true that BLM concluded that the Project is likely to significantly impact the Greater sage-grouse and Columbian sharp-tailed grouse and the Bluehead sucker, Flannelmouth sucker, and Roundtail chub. FEIS at 4-83, 4-85, 4-94, 4-96, 4-97. BLM attributed the significant impacts to the substantial loss of habitat function or disruption of life history requirements that would *preclude improvement* of the status of the special status species. *Id.* at 4-69, 4-86. Such a significant impact does not necessarily mean that any of the upland game birds and sensitive fish species is likely to be designated as a T&E species, or that BLM has otherwise failed in its duty to avoid contributing to the need to designate a species as a T&E species. As Double Eagle points out: "Such a position would necessarily lead to the absurd result that every time the BLM determines to prepare an EIS . . ., the BLM is violating its Manual." Double Eagle Opposition (IBLA 2007-210) at 57.

While BCA cites statements from FWS and WGFD in support of its argument that the Project is likely to contribute to the need to list a species as a T&E species (*see* BCA NA/Petition at 92-99; BCA Reply at 27-300), those statements merely caution that BLM should not authorize activity that might exacerbate the decline of a species. BLM states that, through consultation, it considered concerns expressed by FWS and WGFD, including their "preference" for BLM's adoption of Alternative C, as well as the incorporation of protective measures from Appendix L of the FEIS, and decided that it would consider adopting protective measures taken from Appendix L at the time of approval of APDs, ROWs, and other surface-disturbing activity. Opposition (IBLA 2007-210) at 39.

BLM also states that it adopted a Wildlife Monitoring and Protection Plan, which will be implemented, with the assistance of FWS and WGFD, "with the specific goal of avoiding or minimizing potential impacts to wildlife." Opposition (IBLA 2007-210) at 39; *see* FEIS, Appendix E, at E-1 to E-3, E-12, E-13; FEIS, Appendix O, at O-14; ROD, Appendix B, at B-13 to B-15.

BCA has failed to show a likelihood of success on the merits of its argument that Project approval violates BLM's sensitive species management policy.

IBLA 2007-208, *et al.*

To the extent TRCP and BCA raise other substantive arguments, they have failed to show a likelihood of success on the merits of those arguments, and therefore, those arguments do not support granting a stay.

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, motions to intervene are granted as discussed *supra.* Anadarko's, Double Eagle's, the State's, and BLM's motions to dismiss IBLA 2007-208 for lack of standing to appeal are denied. Anadarko's, Double Eagle's, the State's, and BLM's motions to dismiss IBLA 2007-226 are granted in part as to HFW. BLM's motion to dismiss IBLA 2007-226 as untimely is denied. TRCP's and BCA's stay petitions are denied.

Bruce R. Harris
Deputy Chief Administrative Judge

APPEARANCES:

Thomas R. Wilmoth, Esq.                 **FAX: 402-458-1510**
Donald G. Blankenau, Esq.
Theresa D. Koller, Esq.
Blackwell Sanders LLP
206 South 13th Street, Suite 1400
Lincoln, NE 68508-2019
For Theodore Roosevelt Conservation Partnership

Suzanne H. Lewis, Esq.                  **FAX: 307-742-7989**
Biodiversity Conservation Alliance
P.O. Box 1512
Laramie, WY 82073
For Biodiversity Conservation Alliance, *et al.*

E. Craig Smay, Esq.                     **FAX: 801-539-8544**
E. Craig Smay, P.C.
174 East South Temple
Salt Lake City, UT 84111-1102
For Environmental Preservation Foundation and Habitat for Wildlife

IBLA 2007-208, *et al.*

Michael A. Saul, Esq.                    FAX: 303-786-8911
National Wildlife Federation
Rocky Mountain Natural Resource Center
2260 Baseline Road, Suite 100
Boulder, CO 80302
For National Wildlife Federation and Wyoming Wildlife Federation

Laura Lindley, Esq.                      FAX: 303-892-1401
Robert C. Mathes, Esq.
Kathleen S. Corr, Esq.
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202-3110
For Double Eagle Petroleum Co.

Natalie Eades, Esq.                      FAX: 832-636-8034
Anadarko Petroleum Corporation
P.O. Box 1330
Houston, TX 77251-1330
For Anadarko E&P Company LP and Warren Resources, Inc.

Patrick J. Crank, Esq.                   FAX: 307-777-3542
Jay Jerde, Esq.
Ursula P. Schultz, Esq.
Office of the Attorney General
123 State Capitol
Cheyenne, WY 82002
For the State of Wyoming

Arthur R. Kleven, Esq.                   FAX: 303-231-5363
Office of the Regional Solicitor
U.S. Department of the Interior
755 Parfet Street, Suite 151
Lakewood, CO 80215
For the Bureau of Land Management

**Exhibit 5 to Defendant-Intervenors' Opposition To Plaintiffs' Motion For A Preliminary Injunction**

**Clayson Declaration**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATURAL RESOURCES<br>DEFENSE COUNCIL<br>1200 New York Avenue, Suite 400<br>Washington, DC 20005,                   *et al.* | )<br>)<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | CASE NO. 1:07-cv-1709-RJL |
| DIRK KEMPTHORNE, in his official<br>capacity as the Secretary of the United States<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240,                   *et al.* | )<br>)<br>)<br>)<br>)<br>) | DECLARATION OF<br>TOM CLAYSON |
| Defendants. | )<br>)<br>) | |
| ANADARKO PETROLEUM CORPORATION,<br>P.O. Box 1330<br>Houston, TX 77251-1330, | )<br>)<br>)<br>) | |
| WARREN RESOURCES, INC.,<br>489 Fifth Avenue, 32nd Floor<br>New York, NY 10017, | )<br>)<br>)<br>) | |
| DOUBLE EAGLE PETROLEUM CO.,<br>777 Overland Trail, Suite 208<br>P.O. Box 766<br>Casper, WY 82602-0766, | )<br>)<br>)<br>)<br>) | |
| Movant-Intervenors. | )<br>) | |

I, Tom Clayson, swear and affirm under the penalties of perjury that I am over 18 years of age and otherwise competent to testify as to the matters herein, which are based on my personal knowledge.

1.      I am the Senior Staff Regulatory and Environmental Affairs Analyst for Anadarko Petroleum Corporation ("Anadarko"). I am familiar with Anadarko's oil and gas operations, especially the Atlantic Rim Natural Gas Project in Carbon County, Wyoming. I have represented Anadarko on various committees that address conservation issues involving the Greater Sage-grouse including, participation in drafting Wyoming's South-Central Local Sage-grouse Conservation Group's Conservation Plan

(http://gf.state.wy.us/wildlife/wildlife_management/sagegrouse/SouthCentral/South%20Central %20Conservation%20Plan%20Final.pdf) and the Western Association of Fish and Wildlife Agencies' (WAFWA) Greater Sage-grouse Range Wide Issues Forum . Finally, I am familiar with the Record of Decision (ROD) for the Atlantic Rim Natural Gas Field Development Project and the Decision Record (DR) for the Sun Dog A & B and Catalina PODs.

2.      Anadarko is an independent oil and gas exploration and production company. In addition to the Atlantic Rim Natural Gas Project, Anadarko's operations include exploration, development (both conventional and coalbed natural gas), and enhanced oil recovery ("EOR") projects that also occur within Greater Sage-grouse habitats in Colorado, Utah and Wyoming. Hence, Anadarko's participation in and understanding of management issues associated with Greater Sage-grouse and their habitats.

3.      The Atlantic Rim Natural Gas Project Final Environmental Impact Statement and ROD, in addition to identifying prohibitions on surface disturbing activities within ¼ mile of a lek and seasonal restrictions on surface disturbing  and disruptive activities March 1 to July 15

1

within two miles of an identified and delineated lek as Greater Sage-grouse conservation measures, contained the following additional measures that may be applied depending on site specific conditions (ROD at B-16):

    a.  Human activity will be avoided between 6:00 p.m. and 9:00 a.m. from March 1 to May 20 within one-quarter mile of the perimeter of occupied leks to protect the sage-grouse who strut and breed during this period of time;

    b.  Surface disturbance and other actions that create permanent and high-profile structures, such as buildings, storage tanks and overhead power lines, will not be constructed within 0.25 to 1.0 mile of the perimeter of leks, as determined on a case-by-case basis; and

    c.  Surface disturbing and disruptive activities will not be allowed between November 15 and March 14 in delineated winter concentration areas. In order to minimize noise disturbances to strutting or dancing grouse, compressor stations and generators will be muffled with hospital-style mufflers. To date, it is my understanding that BLM has not yet delineated any winter concentration areas within the Sun Dog A & B PODs.

4.    The potential effects of oil and gas activities on Greater Sage-Grouse habitat were reviewed by the Bureau of Land Management, Rawlins Field Office in making its determination to issue a ROD for the Atlantic Rim Natural Gas Project under the National Environmental Policy Act (NEPA) and the subsequent Decision Records for the Sun Dog and Catalina projects reflect analysis of site specific conditions and application of appropriate mitigation measures identified in the ROD. BLM conducted on-site inspections of the proposed locations for the Sun Dog POD on October 11-13 and December 15, 2006 for the expressed purpose of considering

2

potential impacts to other resources (Sun Dog A & B EA Page-4). Subsequent to those on-site inspections, BLM made the determination to encumber approval of the Sun Dog A & B POD for protection of Greater Sage-grouse immediate habitat needs solely with seasonal restriction for limiting surface disturbing activities between March 15 and July 1 within 2 miles of a lek (i.e. nesting and brood rearing activities). Other mitigation measures, and in particular delineated winter concentration (November 15 to March 14) areas, were not applied, because the BLM has yet to identify any winter concentration areas.

5.    As of September 26, 2007 surface disturbing activities associated with the construction of 48 well locations and attendant access roads approved in the Decision Record have been completed at the Sun Dog A and B PODs. Drilling and well completion activities will not occur during the March 15 to July 1 seasonal restriction for surface disturbing activities.

6.    In accordance, with the record of decision, Anadarko is participating with the Bureau of Land Management, Rawlins Field Office and the Wyoming Game and Fish Department to better understand habitat use by Greater Sage Grouse in the Atlantic Rim Natural Gas Project Area. To that end, Anadarko has funded placement of radio telemetry tracking collars on 100 Greater Sage-grouse captured within the Project area.

Subscribed and sworn to before me
this _3ʳᵈ_ day of October, 2006

3

**Exhibit 6 to Defendant-Intervenors' Opposition To
Plaintiffs' Motion For A Preliminary Injunction**

**Beserra Declaration**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATURAL RESOURCES<br>DEFENSE COUNCIL<br>1200 New York Avenue, Suite 400<br>Washington, DC 20005,        *et al.* | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | CASE NO. 1:07-cv-1709-RJL |
| DIRK KEMPTHORNE, in his official<br>capacity as the Secretary of the United States<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240,        *et al.* | ) ) ) ) ) | DECLARATION OF<br>TROY B. BESERRA |
| Defendants. | ) ) ) | |
| ANADARKO PETROLEUM CORPORATION,<br>P.O. Box 1330<br>Houston, TX 77251-1330, | ) ) ) ) | |
| WARREN RESOURCES, INC.,<br>489 Fifth Avenue, 32nd Floor<br>New York, NY 10017, | ) ) ) ) | |
| DOUBLE EAGLE PETROLEUM CO.,<br>777 Overland Trail, Suite 208<br>P.O. Box 766<br>Casper, WY 82602-0766, | ) ) ) ) ) | |
| Movant-Intervenors. | ) ) | |

I, Troy B. Beserra, swear and affirm under the penalties of perjury that I am over 18 years of age

and otherwise competent to testify as to the matters herein, which are based on my personal

knowledge.

    1.     I am the Geological & Geophysics Manager for coalbed methane operations in the

Northern Rockies Region for Anadarko Petroleum Corporation ("Anadarko"). I am the team

leader for Anadarko E&P Company LP's ("Anadarko E & P") Atlantic Rim Natural Gas Field

Development Project in Carbon County, Wyoming ("Atlantic Rim Project") and as such am

responsible for directing the overall operations for the Atlantic Rim Project, including operations

at the Sun Dog A and B Plans of Development (PODs). I am familiar with the Record of

Decision ("ROD") and Environmental Impact Statement ("EIS") issued by the Bureau of Land

Management ("BLM") for the Atlantic Rim Project. I am also familiar with the Environmental

Assessment ("EA"), EA WY-030-07-EA-222, and the Finding of No Significant

Impact/Decision Record ("FONSI/DR") issued by the BLM for the Sun Dog A & B PODs that is

at issue in this case.

2.       Anadarko is an independent oil and gas exploration and production company.

Anadarko's operations include exploration, conventional and coalbed natural gas development,

and enhanced oil recovery projects.

3.       Anadarko owns oil and gas leases in the Atlantic Rim Project Area. It owns or

controls, either by itself or with its partner, Warren Resources, Inc. ("Warren"), approximately

64% of the lands within the Atlantic Rim Project area. Anadarko is the operator of the Sun Dog

A & B PODs. These two PODs are within the Sun Dog Unit, which is located within the

Atlantic Rim Natural Gas Project area.

4.       The Atlantic Rim Project Area comprises approximately 270,080 acres. *See* ROD

and EIS for the Atlantic Rim Project at 1. In 2001, Anadarko, through its wholly-owned

subsidiary, Anadarko E & P, and with its partner, Warren, submitted a proposal to the BLM for

development of its leasehold interests in the Atlantic Rim Project area. The proposed project

included up to 3,880 coalbed methane wells and associated facilities. *See* 66 Fed. Reg. 33,975

(June 26, 2001). The anticipated life of the proposed project is 20 to 30 years. *Id.*

5.     In December of 2005, BLM issued a draft EIS. In December of 2006, BLM issued the final EIS, which analyzed various options for oil and gas recovery and resource mitigation. BLM issued its ROD for the Atlantic Rim Project in March of 2007. The ROD outlined a management plan for development of the Atlantic Rim Area, including 2,000 gas wells and associated facilities. The ROD also limited total new surface disturbance from drilling (on federal, state and fee minerals) to a maximum of 7,600 acres, at any given time. *See* ROD at 1.

6.     There are currently twelve (12) producing wells within the Sun Dog Unit, which were authorized by the BLM in October of 2000 and December 2001 pursuant to a FONSI/DR. These wells produce approximately 4,600 MCF/D of natural gas and approximately 12,000 barrels of water per day. All of the produced water is injected into the subsurface through two existing injection wells into the Haystack Mountain formation, which is deeper than the formation from which the coalbed natural gas is produced.

7.     BLM issued the FONSI/DR for the Sun Dog A & B PODs on August 16, 2007. The FONSI/DR approved applications for permit to drill ("APDs) 48 wells (including 3 injection wells), along with the appurtenant access roads, pipelines, utility corridors, and other described infrastructure. BLM conducted on-site inspections of the Sun Dog A & B PODs on October 11 – 13, 2006 and December 15, 2006. As a result of these inspections, project components including 37 well locations were moved or rerouted during onsite inspection to reduce potential impacts to natural resources, including wildlife. *See EA at 4.*

8.     The EA for the Sun Dog A & B PODs analyzed the potential environmental impacts from the proposed development, including 6 wells that will be drilled on lands owned by the State of Wyoming. The BLM determined the proposed action would result in approximately

218.6 acres of short-term disturbance with an average per well disturbance of 4.2 acres. *See EA at 5.* In its FONSI/DR based on the EA, the BLM concluded that the proposed development would not result in significant impacts, and therefore an environmental impact statement would not be required. *See* FONSI/DR at 1.

9.    To date, roads and well pads sites have been constructed for all of the 48 locations analyzed in the EA. In order to complete this construction, Anadarko E & P had to hire a firm out of South Carolina, due to the lack of available crews locally. Anadarko E & P currently has one drilling rig, brought in from Colorado due to the lack of locally available rigs, which has begun drilling a third well. Anadarko anticipates bringing a second drilling rig in from Casper, Wyoming on or before November 15, 2007.

10.    To date, Anadarko E & P and its partner Warren, have spent approximately $18,000,000 on operations in the Sun Dog A & B PODs to construct the well locations and associated facilities, drill the wells and install pipelines, including gas and water gathering lines.

11.    Anadarko E & P has pending before the BLM, APDs for the drilling of 49 wells and associated facilities (including roads) in Sun Dog PODs C, D, and E. Upon completion of drilling all wells, roads and associated facilities, in the Sun Dog A, B,C, D and E PODs, Anadarko E & P anticipates it will have spent approximately $ 47,000,000.

12.    On April 23, 2007, the Wyoming Oil and Gas Conservation Commission, the Bureau of Land Management, the Wyoming State Geological Survey, the Wyoming Department of Environmental Quality and Anadarko held a public meeting to discuss methane seeps within the Atlantic Rim Project Area. The presentation and discussion included a history of the methane springs, which were first noted by BLM staff in the Atlantic Rim Project area in the mid 1980's in the Wild Cow Creek area, which is south of the Sun Dog Unit, pictures of some of the

existing seeps, along with an explanation of the likely cause of the seeps. The relevant state and federal agencies concluded that the re-injection of produced water derived from the coalbed methane wells within the Atlantic Rim Project area is not the likely cause of the methane seeps, and they are instead likely the result of natural seepage from either the near surface coals or previously abandoned wells. *See also*, Letter from BLM to Steve Jones, of the Wyoming Outdoor Council attached as Exhibit 1. I

13.    In order to monitor seeps of methane gas, under the ROD, BLM has required the installation of three groundwater monitoring wells to obtain additional information to assist in the evaluation of the methane springs. ROD at B-10 ("The Unit Operator shall be responsible for drilling, completing, and equipping one set of three shallow groundwater-monitoring wells completed in water-bearing sandstone units…"). It is planned for these wells to be drilled and equipped in November, 2007 prior to production of wells drilled in 2007.

14.    On June 20, 2007, several of the named plaintiffs in this case filed an appeal and request for a stay with the Interior Board of Land Appeals (IBLA 2007-210) challenging BLM's ROD and EIS for the Atlantic Rim Project. Because of its strong interests in the outcome of the appeal, Anadarko and Warren, sought and were granted, intervention in the administrative appeal. The Interior Board of Land Appeals (IBLA) issued an order denying the request for a stay on September 5, 2007. The substantive administrative appeal is still pending before the IBLA.

15.    On August 17, 2007, the Theordore Roosevelt Conservation Partnership ("TRCP") filed an action in the United States District Court for the District of Columbia (No. 1:07-cv-01486-RJL), challenging the BLM's ROD and EIS for the Atlantic Rim Project. Due to their extensive interest in the Atlantic Rim Project area, Anadarko E & P, Warren and Double

Eagle Petroleum Company moved to intervene in the action on September 14, 2007. The court has not yet issued a ruling.

16.    In the present case, Plaintiff seeks an order prohibiting any further ground disturbing activities in the Sun Dog A & B PODs and an order prohibiting BLM from approving any further APDs in the Atlantic Rim Project area. Any decision prohibiting further ground disturbing activities in Sun Dog PODs A & B prohibiting approval of any future APDs would cause significant harm to Anadarko E & P's economic and leasehold interests. With respect to the wells already drilled, Anadarko E & P cannot cease operations without incurring potential loss of future reserves. Anadarko E & P will incur a penalty of approximately $5,000,000 if it is required to halt installation of the pipelines authorized by the FONSI/DR for the Sun Dog A & B PODs. As noted above, Anadarko E & P has expended significant funds to construct the drill pads, roads and associated facilities.

17.    Because of the potential impacts on its operations and property interests, Anadarko has a significant interest in upholding the Sun Dog A & B PODs and the EIS and ROD for the Atlantic Rim Natural Gas Project – the subject matter of this case.

*Troy Beserra*

ACKNOWLEDGMENT

STATE OF COLORADO }
                   } ss
COUNTY OF DENVER }

    Before me, the undersigned, a Notary Public, in and for said County and State, on this **3rd** day of **October, 2007,** personally appeared **Troy Beserra** as **Geological & Geophysics Manager,** and executed the foregoing instrument on behalf of **Anadarko Petroleum Corporation a Delaware** corporation.

My Commission Expires:
September 11, 2011

Notary Public: Gretchen M. Darnay

GRETCHEN M DARNAY
Notary Public
State of Colo...



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Rawlins Field Office
P.O. Box 2407 (1300 North Third Street)
Rawlins, Wyoming 82301-2407




**MAY 2 4** 2007

In Reply Refer To:
1793 (030)

RECEIVED
MAY 2 5 2007
WYOMING OUTDOOR COUNCIL

Mr. Steve Jones
Watershed Protection Program Attorney
Wyoming Outdoor Council
262 Lincoln Street
Lander, Wyoming  82520-2848

Dear Mr. Jones:

Thank you for your letter, dated April 25, and received by us on April 30, 2007.  We are
providing the following response to your concerns.  Although there is recent interest in the
occurrence of methane springs in the Atlantic Rim project area, most of these features are not
new.  Many of the methane springs have been in existence since before the interim drilling
occurred in the Atlantic Rim area.  Fluctuation in the amount of gas coming from the methane
springs has also varied over the years, including prior to drilling.  As stated by the Wyoming
Department of Environmental Quality (DEQ), the methane springs do not appear to be associated
with the re-injection of produced water.  They are most likely the result of natural seepage of
methane gas from nearby surface coals via subsurface faulting, and/or through the soil surface,
and/or through abandoned wells that penetrate through the coals.

With regard to your concern whether methane springs were adequately addressed in the Final
Environmental Impact Statement for the Atlantic Rim Natural Gas Field Development Project
(EIS), impacts to surface water hydrology and groundwater resources were identified as issues.
The EIS disclosed that there would be significant impacts to these resources.  Further discussion
in the EIS, specifically on page 4-32, states:  "Methane seeps could possibly develop in the
outcrop region of the Mesaverde Group as a result of this project.  These seeps could
contaminate shallow groundwater sources and may also cause death of vegetation in limited
areas.  The number and location of these seeps is impossible to predict, therefore monitoring
would be established to evaluate this impact."  As part of the monitoring described in the EIS
(page 4-49), "Isotopic data would be collected project wide by the BLM to evaluate groundwater
resources and additional monitoring wells in the upper Mesaverde Group would be established to
evaluate and quantify impacts to these resources and to quantify impacts from methane seeps
where the Mesaverde Group outcrops."  The BLM is currently working with the University of
Wyoming and the Wyoming State Geological Survey on collecting and evaluating the isotopic

Attachment 32

2

data and completing a water conductivity study. The BLM is also working with the Wyoming Oil and Gas Conservation Commission on locating all methane springs and surface water resources; conducting an inventory of abandoned wells and plugged coal cores; conducting a field reconnaissance of fault traces; and collecting and analyzing water samples from springs, methane springs, water wells, coal bed natural gas(CBNG) wells, and perennial drainages located in the Atlantic Rim project area as part of the monitoring prescribed in the Atlantic Rim EIS and Record of Decision (ROD).

There are also several other references in the EIS with regard to impacts to surface water hydrology and groundwater resources, including methane springs.

Again thank you for your letter. If you have any questions or need any additional information, please contact David Simons, Project Lead, at the address shown above or phone (307) 328-4328.

Sincerely,

Mark Storzer

Field Manager

cc: State Director, WSO (910)

**Exhibit 7 to Defendant-Intervenors' Opposition To
Plaintiffs' Motion For A Preliminary Injunction**

**Reservoir Management Group's June 16, 2005 Report on the
Economic Development of Coalbed Natural Gas,
Pertaining to Space and Directional Drilling in the
Atlantic Rim Natural Gas Area
(RMG Report)**

Memorandum

To:         Field Manager, Rawlins Field Office

From:       Chief, Reservoir Management Group, Wyoming State Office

Subject:    Economic Development of Coalbed Natural Gas,
            Pertaining to Spacing and Directional Drilling in the
            Atlantic Rim Natural Gas Development Area

The Reservoir Management Group, Wyoming State Office, has prepared the attached report addressing the economic issues regarding coalbed natural gas well spacing and directional drilling in the Atlantic Rim Coal Bed Natural Gas Development area.

If you have any questions, please call Lee Almasy (307) 261-7628 of this office.

Attachments

cc:    Alan Rabinoff (WSO-920) w/report

# Economic Development of Coalbed Natural Gas, Pertaining to Spacing and Directional Drilling in the Atlantic Rim Natural Gas Development Area

## Summary and Conclusions:

Rawlins Field Office has asked that the Reservoir Management Group (RMG) answer the following questions.

**Q1: Can the coalbed natural gas (CBNG) resources in the modified study area be economically developed with 160-acre spacing?**

160-acre well spacing for CBNG development in the Atlantic Rim Area (AR Area) is possible only under very special geologic conditions. As a general rule, existing production data suggests that 80-acre well spacing is the best standard well spacing. It is the local geologic setting that must be considered.

**Q2: If the project area requires 80-acre spacing, can the project be developed economically utilizing directional drilling techniques?**

Directional drilling does not appear to be a viable technical or economic alternative. Directional Drilling would require a severe deviation angle (49 degrees) and this presents both drilling difficulties and operational difficulties. In addition to these difficulties, the range and variation in estimated ultimate recoveries (EUR) in this area would make directional drilling (when considering the extra cost associated with it) an economic burden that would jeopardize many of the proposed wells' economics.

1

# Table of Contents

## Discussions

**Q1:** Can the coalbed natural gas (CBNG) resources in the modified study area be economically developed with 160-acre spacing?

**Q2:** If the project area requires 80-acre spacing, can the project be developed economically utilizing directional drilling techniques?

## Technical Analyses:

1) Geologic Concerns Regarding the Meseverde Coal and CBNG Development
2) CBNG Well Drainage Areas (and recommendations for well spacing)
    A) Ability of a CBNG well to de-water the coal seams
    B) What is the drainage area of the existing wells?
        1. The 'Cumulative Produced Water' Approach;
        2. The 'Gas Content Approach';
    C) The Role of Vertical Water Influx in Reducing a Well's Drainage Areas
       - Localized Assessments (examples) of Vertical Water Influx
3) The Role of Well Locations in the Dewatering:
4) CBNG Well Types
5) Original Gas In Place, (OGIP):
6) The Economics of CBNG Wells in the AR Area:
    a) Drill and completion costs for a 1,600 foot directional CBNG well
    b) Viability of directional wells in the Atlantic Rim
    c) Cash flows for a vertical and directional well

## Background of Existing Units in the AR Area:

7) Cow Creek Unit
8) Sun Dog Unit
9) Blue Sky Unit
10) Doty Mountain Unit
11) Brown Cow Unit

## Attachments:

No.1 - Atlantic Rim Type Well Log (Federal 1691-16-8,)
No.2 - 'Z-Pinnate' drilling system discussion
No.3 - Diagrams of Directional Well's deviation angles and bottom-hole departure

## References:

## Discussions

### Q1: Can the coalbed natural gas (CBNG) resources in the modified study area be economically developed with 160-acre spacing?

Issues regarding the geology of the target coal seams need to be addressed. Specifically, the Mesaverde Group of coals in the Atlantic Rim (AR) Area are thin and discontinuous and thus, the probability of 'missing' a coal seam with a well borehole increases with larger well spacings. A well spacing area of 160-acres may be too large and may compromise the full exploitation of the CBNG resources in the AR Area.

A CBNG well has to have the ability to de-water a coal seam. The physical ability of a well to drain an area involves several factors which includes having sufficient permeability in the coal seam to permit the pumping of water from the coal's natural fracture system (de-watering). The de-watering process is responsible for the initiation of the gas desorption process from the coal seam's matrix. The area of gas desorption that is associated with a CBNG well's gas production is the 'drainage area'. The value of the well spacing area should be sized to be equal to the drainage area in order to fully exploit the CBNG resources for the developed area.

The drainage area of the existing wells in the Cow Creek Unit is estimated to be 60 to 112 acres. Drainage areas were estimated using two approaches, the 'Cumulative Produced Water' approach and the 'Gas Content' approach. Both approaches use a generalized mass balance in which broad assumptions regarding reservoir parameters are made. These simple calculations regarding drainage areas do not take into account unexpected water influx sources such as 'vertical water influx' from adjacent over-laying or under-laying formations. The effect of 'vertical water influx' in CBNG production reduces the effective drainage area by limiting and/or reducing the effect of pressure reduction in the coal that the de-watering process creates. There are four wells assessed in this report where we considered localized assessments of 'vertical water influx', two of which show the lack of 'vertical water influx' when 40-acre well spacing is used and two other wells where the presence of 'vertical water influx' appears to be curtailing gas production. Whenever large well spacings (160-acres) are used, the probability of 'vertical water influx' increases. As a result, 80-acre spacing is recommended as a 'standard well spacing' for the AR Area.

Other factors influencing a well's de-watering effort is the well placement in the development area. If a CBNG well is isolated (i.e. not part of a developed CBNG area) or is located on the boundary of a development area (a boundary well), then that well's de-watering effort may never result in a significant gas desorption area. The influx of water from outside the developed area may overwhelm the well's ability to produce the influx of water. This would result in an insufficient pressure reduction in the coal and hence no (or very little) gas desorption would occur. CBNG wells located in the interior portion of a developed area will benefit from the boundary wells interception of the influx water and will have more effective de-watering ability and associated drainage areas. At this time, the AR Area CBNG development is young and without large development areas. Therefore, the existing wells do not benefit from the boundary wells to the extent that CBNG wells in developed areas enjoy

3

such as CBNG wells in the eastern portion of the Powder River Basin (PRB). Should CBNG well counts in the existing units increase (and thus ratio of boundary wells-to-interior wells decreases), then well spacings of 160-acres might be possible in the interior of unit. But at this time, 80-acre spacing is again recommended as a standard value of well spacing.

## Q2: If the project area requires 80-acre spacing, can the project be developed economically utilizing directional drilling techniques?

A directional well for this purpose means a well drilled where the bottom-hole location has been directed to be displaced from the surface location such that there is a horizontal displacement of hundreds (or thousands) of feet and a deviation angle less than 75 degrees. The deviation angle is the angle between the trajectory of a vertical borehole and the directional portion of the borehole (which begins at the kick-off point, from the vertical borehole). Typically deviation angles are less than 30 degrees for directional wells. Directional wells are not the same as horizontal wells. A horizontal well's borehole penetrates a target formation such as to be situated parallel and located within the target formation. Horizontal CBNG wells do have dramatically improved productivity and reserves but the thin and discontinuous nature of the Meseverde Coals when combined with the dramatically higher drilling and completion (D&C) costs of horizontal wells prevent their application in the AR Area doubtful. Directional wells are not advisable because of the higher D&C costs, the lower gas recovery efficiencies (ref.1), and operational difficulties involved with de-watering the well using artificial lift (i.e. high tubing failure rate).

Estimations for original gas in place (OGIP) ranges for a 80-acre tract having a thickness of 20.5 feet (the average coal thickness for a Cow Creek well), having a gas content of 143.5 scf /ton is 0.4098 BCF. Cow Creek wells produce from the Almond Coal of the Meseverde Group of coals. Gas content values for the Almond range from 21 to 266 scf/ton (ref.2)and the 143.5 scf/ton value used here represents an average of this range. If a 70 % 'typical' recovery factor is assumed, then an estimated ultimate recovery (EUR) of 0.2869 BCF is calculated for an 80-acre spacing unit (or tract). This is an average value based upon limited data. It is possible the range of EURs may be from 0.1 to 1.0 BCF.

The economics of AR Area CBNG wells involves D&C costs and infrastructure investments. The CBNG wells in the AR Area cost approximately $900,000 for a directional well. This includes a $700,000 D&C cost and a $200,000 infrastructure cost. The infrastructure costs include the purchase and operation of electrical generation equipment and the costs associated with drilling water disposal/injection wells and associated injection pumps costs. The AR Area infrastructure is not well developed and accounts for extremely high development costs and operating costs when compared with the PRB.

It is estimated that a economic 'break-even' gas recovery for a vertical well is 0.23 BCF and for a directional well is 0.30 BCF. Recall that the estimation for average EURs for an 80-acre tract is 0.2869 BCF so, drilling of directional wells is not economic.

4

# Technical Analysis

## 1) Geologic Concerns:

Currently, there is CBNG production from the Mesaverde Group of coals (mainly the Almond and Allen Ridge Formations). Structurally, the Mesaverde outcrops on its eastern flank and dips down to the west (8 to18 degrees). The discontinuous nature of these coals would suggest that the probability of a borehole 'missing' a coal seam increases with larger well spacing (e.g. 160 acre spacing). Attachment No.1 is a 'type log' for the AR Area.

## 2-A) The Ability of a CBNG Well to Dewater a Coal Seam:

The physical ability of an economic CBNG well to drain an area involves several factors. A coal seam must have sufficient permeability to permit the pumping of water from the coal's natural fracture system (de-watering). The de-watering process reduces the pressure in the coal's fractures which initiates gas desorption process from the coal matrix. The rate of de-watering (and resulting drainage area) is constrained by the coal permeability and the degree of 'vertical water influx' from possible adjacent overlying aquifers. The Mesaverde coals have good permeability (estimated to be 100 milliDarcies) and good gas content (21 to 295 scf/ton (ref.2)). These coals in general are gas saturated and will thus produce gas from beginning of production and will result in a short (or no) de-watering period for these wells. This will help the operators economically by eliminating the wait for a positive cash flow.

## 2-B) What is the Drainage Area of the Existing Wells?

Two approaches will be used here to estimate drainage areas. One approach will be based upon the produced cumulative water volume (the 'cumulative produced water' approach) and the other method will use gas contents of the coal and gas EUR (the 'gas content').

## 2-B.1) The 'Cumulative Produced Water' Approach:

In the 'cumulative produced water' approach it is assumed that the pore volume is represented by the volume of the coal's natural fracture cleat system. This pore volume is assumed to be 100% saturated with water and 75% of this water will be produced by the CBNG well. The 75% water recovery factor assumes that there will be some irreducible water saturation. The following equation will be solved for area (A), the area which is required to hold the produced amount of water for a given coal thickness and porosity.

$$Wp = 7758 \times A \times H \times Porosity \times 0.75, \quad (75\% \text{ of the initial water in place is produced})$$

where:  $Wp$ = cumulative water production, bbls
  $A$ = area, acres
  $H$ = coal thickness, feet
  Porosity = coal porosity (= cleat volume / bulk volume)

5

The following chart is a graph of estimated current drainage areas as a function of coal thicknesses for various coal porosities (and assumes a cumulative produced water of 573,000 barrels of water which is the average cumulative produced water for a Cow Creek Unit well.



The porosity of the Mesaverde coals is not known. Typically CBM porosities range from 0.1 to 2.0 %. For the Powder River Basin (PRB) coals, estimations for coal porosity values range from 1 % to 5 %. The average perforated thickness for wells in the Cow Creek Unit is 20.5 feet. To get an idea what the drainage are might be for a average Cow Creek Unit well, using this graph and porosity values of 1 % to 5 %, a net coal thickness of 20.5 feet and a cumulative 573,000 bbls, then a range of 'average' drainage area estimates is calculated to be from 99 to 492 acres. Although, these drainage areas are quite large, we must consider other factors. They do not represent the final drainage areas for the AR area. This approach uses the 'cumulative produced water' to calculate the drainage area.

If reservoir simulation models were constructed and 'history matches' were to suggest higher porosity values (i.e. > 2 %), then this would indicate that a portion of the produced water may be coming from other sources (e.g. 'vertical water influx'). Porosity values of the Mesaverde coals need to be determined using pressure transient testing and reservoir simulation in order to improve the accuracy of these estimates.

## 2-B.2) The 'Gas Content Approach':

For estimations of an average Cow Creek Unit well's drainage areas based upon the 'gas content approach, we use the following equation and the results are in the following graph.



EUR = 0.70 x area x Thickness x 1,741 tons coal/acre-ft x Gas Content scf/ton



This approach calculates the drainage area based upon 'gas content' of the coal, net coal thickness, and a recovery factor. Limited core samples have been gathered for Cow Creek Unit wells and the gas content ranges from 21 to 266 scf/ton for the Almond Coal (all wells in the Cow Creek Unit are producing from only the Almond Coal). Using the above graph, drainage areas of 60 acre is estimated (assuming a gas content of 266 scf/ ton) or 112 acres (assuming a gas content of 143.5 scf/ton which is the average of the gas content range for the core sample from the Almond Coal).

The Original-Gas-In-Place (OGIP) for a 40-acre tract having a thickness of 20.5 feet and a gas content of 143.5 scf /ton is 0.2049 BCF and 0.3797 BCF if a gas content of 266 scf/ton is assumed. Using the optimistic estimate of OGIP (0.3797 BCF) and multiplying it by 0.7 (a 'typical' recovery factor) then an optimistic gas reserve of 0.2659 BCF is calculated for a 40-acre tract. The average EUR for a Cow Creek Unit well has been estimated to be 0.4 BCF. Clearly the average range of drainage areas for the Cow Creek Unit shows that more than 40-acres is being drained.

In comparing the drainage areas calculated using the 'cumulative produced water' and 'gas content' approaches, there is a significant difference. From a cylindrical void point of view, the 'gas content' approach's estimation of the gas drainage area is probably more accurate (112 acres). The cylinder void method yields drainage areas that are conservative. This approach assumes the gas content in the gas drained area is at an abandonment 'gas content' value then abruptly jumps up to the initial gas content, at the boundary between the drained and un-drained gas region.

The 112 acre drainage area value would be a conservative estimate from a real reservoir point of view. If the drainage area value of 112 acres is our best interpretation and this value is compared with the drainage area calculated from the 'cumulative produced water' approach (which has a value in excess of 200 acres when a coal porosity of 1.5 % is assumed), then it is safe to say that there is a significant portion of the cumulative (83%) produced water originating from outside the 40-acre well spacing area. It is plausible that 160-acre spacing could be implemented if the local geology permitted (i.e. if there is no 'vertical water influx' from adjacent overlying aquifers). Without this kind of specific localized geologic knowledge, it is suggested here that the 80-acre well spacing is a standard well spacing.

## 2-C) The Role of 'Vertical Water Influx' in Reducing Drainage Areas

Vertical water influx has been a limiting factor in some of the well spacing of CBNG wells in the PRB and has resulted in well spacing as low as 40-acres. If the total water influx is greater than a de-watering CBNG well's water production rate, then the diffusion of gas from the coal's matrix will not occur and gas production will cease.

'Vertical water influx' may be inferred from the rate-time production histories of water and gas (ref.3). In a well that is not experiencing vertical water influx, the water production rate should decline and the gas production rate should be increasing 'ramping up'. The production histories on the following three graphs are not mature. There is no gas production rate decline history to conclude (or exclude) the possibility that vertical water influx is occurring at this time, on a 'unit wide basis'. There are a few well histories where it may be possible to quantify the existence of localized vertical water influx and they will be discussed later in this report.

8

The following graph indicates the production in the Cow Creek Unit is still young and is 'ramping up'.



Production in the Sun Dog and Blue Sky Units and is also 'ramping up' (following two graphs).





## 2-C.1) Localized Assessments of Vertical Water Influx:

Of the individual wells production histories, the following production histories for two wells in the Blue Sky Unit were selected because they show some signs of vertical water influx (declining gas rates, steady water production and low peak gas rate, (ref. 3)). The current well spacing for this unit is 80-acre. CBNG recovery from the Blue Sky Unit recovery may be influenced by 'vertical water influx' in which case recovery will be significantly reduced. This statement assumes that the initial gas content for the individual wells was good (e.g.143.5 scf/ton or greater). Switching to 40–acre spacing in this particular unit would increase gas recovery. The following two graphs suggest the possibility of 'vertical water influx' for two Blue Sky Unit wells.



Blue Sky Unit Well: AR FEDERAL (1691-5) MESAVERDE COAL 8 15N 91W SW SW NW



11

Blue Sky Unit: AR FEDERAL (1681-7) MESAVERDE COAL 6 15N 91W NE SW NE



In comparison, the following two production history graphs for two Cow Creek Unit wells suggest that there is little or no 'vertical water influx' occurring (gas production is increasing and the water production is decreasing with time, (ref. 3)). This unit is spaced at 40-acres.

12

COW CREEK UNIT (COPY) - COW CREEK COW CREEK UNIT (COPY) (13-7) MESAVERDE COAL 7 16N 91W 5W



COW CREEK (COPY) (43-13) MESAVERDE COAL 13 16N 92W SW SE NE



13

The majority of the Cow Creek Unit wells are still producing water (at rates in excess 1,000 bpd) and hence the 'current average' drainage area will continue to grow. Permeability in the Almond and Allen Ridge coals appear to be high and thus will permit coal seam de-watering at rates in excess of 1,000 bpd.

## 3) The Role of Well Locations in the Dewatering:

The 'drainage area' estimations are simple volumetric calculations and do not include the effects of any 'vertical water influx' (if any) or the geologic effect of well locations. The location of a well within CBNG development affects its ability to produce gas. If a CBNG well were located within the inner boundary of a developed area and vertical water influx was not occurring, then the simple volumetric approach used here would apply. If a well were located on the 'boundary' of a developed area (i.e. a 'boundary well'), then the water influx from outside the developed area would likely continue and the efficacy of the 'de-watering' of the 'boundary well' would be reduced significantly. If 'vertical water influx' is not a problem, then 160-acre spacing is plausible. Local geology must be evaluated for the presence of over-laying aquifers. The key issues associated with well spacing is the ability of a well to de-water the coal seam and EUR values.

## 4) CBNG Well Types:

An economic analysis was conducted which assumed that two wells are drilled per 160 acres, one well vertical and one well directionally, both situated on the same drill pad. Directional wells in CBNG plays have historically (in the San Juan Basin) been shown to have lower productions rates and recoveries when compared to conventional vertical wells (ref.1). A directional well for this purpose means a well drilled where the bottom-hole location has been directed to be displaced from the surface location such that there is a horizontal displacement of hundreds (or thousands) of feet and a deviation angle less than 75 degrees. The deviation angle is the angle between the trajectory of a vertical borehole and the directional portion of the borehole (which begins at the kick-off point, from the vertical borehole). Typically deviation angles are less than 30 degrees for directional wells. Horizontal wells are not the same as directional wells. Unlike directional wells, a horizontal well's borehole penetrates a target formation such as to be situated parallel and located within the target formation. Horizontal CBNG wells do have dramatically improved productivity and reserves (ref.1), but is still a young technology. The drilling costs associated with horizontal wells are four times the cost of a vertical well. There is an environmentally favored drilling development plan called 'Z-Pinnate'. 'Z-Pinnate' system consists of drilling a central vertical well with a system of multiple lateral horizontal boreholes drilled from it (Attachment No.2). 'Z-Pinnate' system may drain as much as 1,200 acres from one central vertical borehole. At this point in time, the 'Z-Pinnate' system would not be considered to be an alternative.

14

## 5) Original Gas In Place; (OGIP):

The following is a graph of volumetric estimates of OGIP for an average gas content of 143.5scf/ton and various coal thicknesses. Coal thicknesses and gas contents will vary. The following graph may be used to estimate gas drainage areas for various thicknesses.



The following is a graph of volumetric estimates of OGIP for a gas content of 266 scf/ton (upper limit) and various coal thicknesses.



15

## 6) The Economics of CBNG Wells in the Atlantic Rim:

### 6-A) Drill and completion costs for a 1,600 foot directional CBNG well

According to Double Eagle Petroleum, the typical cost to drill and complete a 1,600 foot vertical CBNG well in the Cow Creek Unit is approximately $450,000. Addition cost to directionally drill adds approximately $250,000 to the D&C costs. As a result the D&C costs for a directional well is $700,000. In addition, these wells require compression, electrical generation equipment, and re-injection of the produced water. This adds at least an additional $200,000 per well and brings the total cost for a vertical well (including production equipment) is $650,000. The total estimated drill and completion costs for a 1,600 foot directional CBNG well including production equipment is $900,000. The infrastructure costs include the purchase and operation of electrical generation equipment and the D&C costs associated with water disposal/injection and associated injection pumps. The AR Area infrastructure is not well developed and this results in extremely high development costs and operating costs.

### 6-B) Viability of Directional Wells in the AR Area

An extreme departure angle of 49 degrees would be required for a 1,600 feet deep borehole to obtain a 1,866 feet horizontal departure (figures in Attachment No.3) for a well to be drilled to an offset 80-acre tract. CBNG development in this area is relatively young (development beginning in 2001). To date, there have been no CBNG wells drilled directionally in the AR Area.

There are several issues regarding the viability of directional wells in this area. One issue is the deviation angle. The CBNG wells need to utilize artificial lift to produce the water. The use of rod pumping units is required. Submersible pumps and other artificial lift methods can not be used because problem of coal fines. Highly deviated boreholes can not utilize rod pumping because the there would be a high rate of tubing failure associated caused by the rods rubbing against the tubing. Operators in the San Juan Basin report drilling difficulties when the deviation angle exceeds 30 to 35 degrees (ref.1).

Studies of directional CBNG wells in the San Juan Basin (ref. 1) suggest that directional wells have lower productivity and EURs than conventional vertical CBNG wells located in adjacent leases.

The Meseverde coals in this area are thin and discontinuous and thus higher well densities (i.e.80-acre well spacing) will be required. The Meseverde coals' depths range from 1,000 to 3,000 feet and the distance between these thin coals is considerable (hundreds of feet) and thus it may necessary to perform multiple completions.

16

## 6-C) Cash flows for Vertical and Directional Wells:

In order to get an idea of the economic viability of future CBNG wells economic analyses were conducted and estimates of 'break-even' EURs were calculated. In these analyses a 1,600 foot deep well was assumed and a drill and completion costs of $650,000 (for a vertical well) and $900,000 (for a directional well). It was estimated that an economic 'break-even' gas recovery volume is 0.23 BCF for a vertical well and 0.30 BCF for a directional well. The average EUR of all AR Area CBNG wells is about 0.250 BCF (for the 36 wells where EURs are estimations are possible). Drilling of directional wells does not appear to be profitable. It is not likely that directional wells in the AR Area would be viable as a result of the extra drilling expenses, drilling difficulties, and severe operational difficulties associated with rod pumping a highly deviated CBNG well.

## Background of Existing Units:

The Atlantic Rim Coal Bed Methane development area is located in southwest Wyoming and is approximately 5 miles wide (R89W to R92W) and is 50 miles long (T13N to T20N, north-south). Currently, there is CBNG production from the Almond and Allen Ridge Formations of the Mesaverde group of coals.

Atlantic Rim CBNG development is relatively young, with gas production beginning in the year 2001. Of the producing units in the AR Area, only the Cow Creek and Sun Dog Units have enough production history for the purpose of estimating economic viability. These units' production histories were used for assessing the potential average estimated ultimate recovery (EUR) for an Atlantic Rim CBNG well. There are not any well defined production rate-time decline curves available for the Cow Creek or Sun Dog Units. The majority of these wells are in the ramp-up stage of production. The following figure illustrates the 'ramp up' gas production rate trends in the Sun Dog Unit utilizes all the individual well gas production curves.

17



Production data for the Sun Dog and Cow Creek units were gathered and rough estimates of EURs were made and used in our analysis. Both the Sun Dog and Cow Creek units have good average values for EUR and current cumulative gas production.

7) **Cow Creek Unit** is located T16N, R91-92W and targets the Almond Formation which has a depth range of 1,180 to 1,800 feet (average well depth 1,301 feet). There are 14 producing wells. CBNG is being developed on 40-acre spacing. This unit is located on a localized structural trap and hence the EURs in of these wells may be optimistic if used as a metric for estimating an average EUR for a typical Atlantic Rim CBNG well. The following table summarizes the production for an average well in the Cow Creek Unit.

| Cow Creek Unit | | | | | |
|---|---|---|---|---|---|
| Wells in Averages | Average Date of 1st Production | Average EUR, Mscf | Avg Cumulative Gas, Mscf | Avg Days Producing | Average Cumulative Water, Bbls |
| 14 | 1/2/2003 | 413,051 | 184,503 | 875 | 573,026 |

The following table summarizes individual well productions for Cow Creek Unit.

| Cow Creek | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| API Number | 1st Prod Date | T | R | S | EUR, Mscf | Cum Gas, Mscf | Days Producing | Cum Water, Bbls |
| 49007223960000 | 4/1/2004 | 16 | 92 | 1 | 35,166 | 20,227 | 421 | 151,839 |
| 49007223680000 | 4/1/2004 | 16 | 92 | 12 | 36,220 | 22,824 | 421 | 138,866 |
| 49007223970000 | 4/1/2004 | 16 | 92 | 12 | 147,751 | 44,615 | 421 | 220,386 |
| 49007219200000 | 1/1/2002 | 16 | 92 | 12 | 184,072 | 136,112 | 1242 | 849,934 |
| 49007050940001 | 8/1/2000 | 16 | 92 | 12 | 205,620 | 91,385 | 1760 | 1,580,681 |
| 49007219210000 | 11/1/2001 | 16 | 92 | 12 | 254,171 | 193,318 | 1303 | 468,696 |
| 49007223230000 | 11/1/2002 | 16 | 91 | 7 | 316,339 | 142,519 | 938 | 558,357 |
| 49007221570000 | 4/1/2004 | 16 | 91 | 7 | 360,981 | 85,465 | 421 | 164,431 |
| 49007219190000 | 12/1/2001 | 16 | 92 | 12 | 423,187 | 308,670 | 1273 | 667,794 |
| 49007223950000 | 4/1/2004 | 16 | 92 | 12 | 485,826 | 99,360 | 421 | 257,358 |
| 49007223210000 | 8/1/2003 | 16 | 91 | 6 | 501,506 | 207,832 | 665 | 911,357 |
| 49007219180000 | 2/1/2002 | 16 | 92 | 12 | 610,632 | 263,936 | 1211 | 547,399 |
| 49007223220000 | 11/1/2002 | 16 | 91 | 7 | 1,100,045 | 475,198 | 938 | 1,071,791 |
| 49007221560000 | 3/1/2003 | 16 | 91 | 7 | 1,107,201 | 491,588 | 818 | 433,487 |

8) **Sun Dog Unit** is located in T16N, R91W and targets the Almond and some Allen Ridge Formations which have a depth range of 800 to 1,000 feet. This unit has 10 producing wells and the cumulative production is 1.726 BCF and 7.49 millions barrels of water since production began in 2003. The estimated ultimate recovery (EUR) for these 10 wells is 0.389 BCF per well. Both water and gas production began at the same time which suggests these coals are saturated with gas. CBNG is being developed on 40-acre spacing. The following table summarizes the production for an average well in the Sun Dog Unit.

| Sun Dog Unit | | | | | |
|---|---|---|---|---|---|
| Wells in Averages | Average Date of 1st Production | Average EUR, Mscf | AvgCumulative Gas, Mscf | Avg Days Producing | Average Cumulative Water, bbls |
| 10 | 6/4/2002 | 389,474 | 189,650 | 1088 | 807,742 |

The following table summarizes individual well productions for Sun Dog Unit.

| Sun Dog Unit | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| API Number | 1st Prod Date | T | R | S | EUR, Mscf | Cum Gas, Mscf | Days Producing | Cum Water, Bbls |
| 49007219350000 | 6/1/2002 | 16 | 91 | 8 | 116,026 | 57,860 | 1091 | 545,034 |
| 49007221920000 | 6/1/2002 | 16 | 91 | 17 | 151,001 | 115,555 | 1091 | 1,597,412 |
| 49007219370000 | 6/1/2002 | 16 | 91 | 8 | 161,205 | 91,982 | 1091 | 425,870 |
| 49007221910000 | 6/1/2002 | 16 | 91 | 17 | 253,354 | 163,300 | 1091 | 829,073 |
| 49007221930000 | 6/1/2002 | 16 | 91 | 17 | 382,034 | 201,097 | 1091 | 922,960 |
| 49007221890000 | 6/1/2002 | 16 | 91 | 17 | 385,507 | 215,255 | 1091 | 973,253 |
| 49007221880000 | 6/1/2002 | 16 | 91 | 17 | 400,923 | 178,184 | 1091 | 415,267 |
| 49007219360000 | 7/1/2002 | 16 | 91 | 8 | 437,653 | 195,772 | 1061 | 824,802 |
| 49007219380000 | 6/1/2002 | 16 | 91 | 8 | 444,394 | 138,897 | 1091 | 393,179 |
| 49007221900000 | 6/1/2002 | 16 | 91 | 17 | 1,162,641 | 538,606 | 1091 | 1,150,574 |

9) **Blue Sky Unit** is located in T15N, R91W and has 10 wells and the gas production is disappointing. Production began in mid 2003. The Blue Sky Unit wells have an average EUR of 0.074 BCF. The following table summarizes the production for an average well in the Blue Sky Unit.

| Blue Sky Summary | | | | | |
|---|---|---|---|---|---|
| Wells Used in Averages | Average Date of 1st Production | Average EUR, Mscf | AvgCumulative Gas, Mscf | Avg Days Producing | Average Cumulative Water, bbls |
| 12 | 8/3/2003 | 7,430 | 4,742 | 663 | 486,976 |

The following table summarizes individual well productions for Blue Sky Unit.

| Blue Sky Unit | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| API No. | 1st Prod Date | T | R | S | EUR, Mscf | Cum Gas, Mscf | Days Producing | Cum Water, Bbls |
| 49007221850000 | 11/1/2003 | 15 | 91 | 9 | 236 | 203 | 573 | 858,597 |
| 49007221780000 | 10/1/2003 | 15 | 91 | 9 | 276 | 263 | 604 | 617,347 |
| 49007221860000 | 9/1/2003 | 15 | 91 | 9 | 612 | 606 | 634 | 425,745 |
| 49007222490000 | 9/1/2003 | 15 | 91 | 16 | 2,229 | 2,223 | 634 | 391,627 |
| 49007222160000 | 9/1/2003 | 15 | 91 | 16 | 2,296 | 2,288 | 634 | 706,852 |
| 49007221820000 | 7/1/2003 | 15 | 91 | 8 | 2,652 | 2,624 | 696 | 182,317 |
| 49007221800000 | 7/1/2003 | 15 | 91 | 8 | 2,789 | 2,694 | 696 | 238,994 |
| 49007221740000 | 7/1/2003 | 15 | 91 | 5 | 3,688 | 3,566 | 696 | 367,437 |
| 49007221730000 | 7/1/2003 | 15 | 91 | 5 | 4,194 | 4,053 | 696 | 513,067 |
| 49007221830000 | 7/1/2003 | 15 | 91 | 8 | 8,857 | 7,640 | 696 | 427,167 |
| 49007221700000 | 7/1/2003 | 15 | 91 | 5 | 17,603 | 11,607 | 696 | 419,729 |

20

| 49007221690000 | 7/1/2003 | 15 | 91 | 5 | 43,741 | 19,148 | 696 | 694,838 |
|---|---|---|---|---|---|---|---|---|

**10) Doty Mountain Unit** is located T17N, R91W and targets the Almond and Allen Ridge Formations. There are currently 24 wells and they have an average depth of 2,189 feet. These wells were completed late in the year 2004 and are just beginning to produce gas, and hence decline curve is not possible at his time. All of these wells began to produce gas after 1 to 2 months of de-watering and this suggests that these coals are (or nearly) gas saturated. CBNG is being developed on 80-acre spacing.

**11) Brown Cow Unit** is located in T14N, R91W and targets the Almond and some Allen Ridge Formations which have a depth range of 1,425 to 1,825 feet. There is currently only water production from five wells. CBNG is being developed on 80-acre spacing.

### References

1. Malkewicz Hueni Associates, 'Evaluation of Coalbed Methane Well Types in the San Juan Basin', March 2004, Appendix D, pages 4 and 7-11.

2. Robert A. Lamarre and Stephen K. Ruhl ,'Atlantic Rim Coalbed Methane Play: The Newest Successful CBM Play in the Rockies', Rocky Mountain Section AAPG Meeting, August 9, page 1.

3. P.R.Onsager and D.O. Cox, 'Aquifer Controls on Coalbed Methane Development in the Powder River Basin, Wyoming', paper SPE 63090, October 2000, pages 3 and 4.

## Z-Pinnate Drilling System

'Z-Pinnate' is an environmentally favored drilling development plan (developed by and patented by CDX Gas, LLC. 'Z-Pinnate' system consists of drilling a central vertical borehole (8 5/8' diameter) to the coal seam's depth. Then a branched herringbone pattern of uncased 4 ¼ inch diameter horizontal boreholes are drilled horizontally from the central borehole, to form a 'Pinnate' pattern (similar to a shape of a leaf). Four pinnate patterns (each oriented 90 degrees from each other) can be drilled from the central well and the resulting drainage area could encompass 1200 acres. The 'Z-Pinnate' system increase ultimate gas recovery and rates. A down-hole separation of gas and water is achieved by a pipe located in the center of the borehole where the water is pumped and gas flows in the annulus space. This down-hole separation eliminates the de-watering time. 'Z-Pinnate' drilling has been used in Appalachia but has not yet been used in the AR Area and would likely require a learning curve for its implementation. President of CDX Gas (Doug Wight) has expressed interest in implementing a 'Z-Pinnate' system in the Powder River Basin (Wyoming) coals this year. Costs for a 'Z-Pinnate' system are contingent on many variables. Historically costs have been approximately 1.5 million dollars per 1200 acre system. Simulation studies suggest a recovery of 80-90 % of the gas in place. The 'Z-Pinnate' system at this time in Wyoming must be considered to be a new technology and will no doubt need to be refined for the local conditions in Wyoming.

This diagram represents the horizontal boreholes' pinnate pattern. The square boundary may represent a 1200 acres drainage area.



Z-PINNATE[SM] System Pattern

## Attachment No.2 – 'Z-Pinnate' System





**Attachment No.3** - Diagrams of Directional Well's deviation angles and
bottom-hole departure.

## Annual CashFlow Report

Lease Name: COW CREEK UNIT - 'Type Well' (43-12)
County, ST: CARBON, WY    Operator: DOUBLE EAGLE PETROLEUM & MINING COMPANY
Location: 12 16N 92W NW NE SE

| Date | Well Count | Gross Production Oil (Bbl) | Gas (Mcf) | Net Production Oil (Bbl) | Gas (Mcf) | Average Prices Oil ($/Bbl) | Gas ($/Mcf) | Sales Total ($) |
|---|---|---|---|---|---|---|---|---|
| 12/2005 | 1 | 0 | 67,058 | 0 | 58,676 | 0.00 | 5.58 | 327,409 |
| 12/2006 | 1 | 0 | 95,120 | 0 | 83,230 | 0.00 | 5.58 | 464,424 |
| 12/2007 | 1 | 0 | 112,029 | 0 | 98,025 | 0.00 | 5.58 | 546,982 |
| 12/2008 | 1 | 0 | 78,278 | 0 | 68,493 | 0.00 | 5.58 | 382,192 |
| 12/2009 | 1 | 0 | 36,404 | 0 | 31,853 | 0.00 | 5.58 | 177,742 |
| 09/2010 | 1 | 0 | 13,825 | 0 | 12,097 | 0.00 | 5.58 | 67,502 |
| Grand Total: | | 0 | 402,714 | 0 | 352,375 | 0.00 | 5.58 | 1,966,251 |

| Date | Operating Expenses ($) | Taxes ($) | Operating Income ($) | Other Costs ($) | Periodic Cash Flow ($) | Cumulative Cash Flow ($) | 5% Cash Flow ($) |
|---|---|---|---|---|---|---|---|
| 12/2005 | 60,000 | 38,110 | 229,299 | 900,000 | -670,701 | -670,701 | -673,496 |
| 12/2006 | 60,000 | 54,059 | 350,365 | 0 | 350,365 | -320,337 | 323,946 |
| 12/2007 | 60,000 | 63,669 | 423,313 | 0 | 423,313 | 102,976 | 373,980 |
| 12/2008 | 60,000 | 44,487 | 277,705 | 0 | 277,705 | 380,682 | 234,529 |
| 12/2009 | 60,000 | 20,689 | 97,053 | 0 | 97,053 | 477,735 | 78,156 |
| 09/2010 | 45,000 | 7,857 | 14,645 | 0 | 14,645 | 492,379 | 11,323 |
| Grand Total: | 345,000 | 228,872 | 1,192,379 | 900,000 | 492,379 | 492,379 | 348,439 |

Discount Present Worth:
0.00 %    492,379
5.00 %    348,439

Economic Dates:
Effective Date    01/2005
Calculated Limit  09/2010
Economic Life  69 Months
              5 Years 9 Months

Economics Summary:
              Bbl Oil        Mcf Gas
Remaining Gross    0        402,714

Economics Information:
Net Payout Date:  10/2007
Rate of Return:  22.97 %
Return on Investment:1.55
Disc Return on Invest:1.39

Initial Division of Interest:                NRI         ORI
              WI: 100.000000    Oil: 87.500000   0.000000
                                Gas: 87.500000   0.000000

# Attachment No.4 - Cash Flow Statement - vertical CBNG well
## with 0.4 BCF reserves

**Exhibit 8 to Defendant-Intervenors' Opposition To Plaintiffs' Motion For A Preliminary Injunction**

**Degenfelder Declaration**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATURAL RESOURCES<br>DEFENSE COUNCIL<br>1200 New York Avenue, Suite 400<br>Washington, DC 20005,    *et al.* | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | CASE NO. 07-cv-1709 |
| DIRK KEMPTHORNE, in his official<br>capacity as the Secretary of the United States<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240,    *et al.* | ) ) ) ) ) ) | DECLARATION OF<br>D. STEVEN DEGENFELDER |
| Defendants. | ) ) | |
| ANADARKO PETROLEUM CORPORATION,<br>P.O. Box 1330<br>Houston, TX 77251-1330, | ) ) ) ) ) | |
| WARREN RESOURCES, INC.,<br>489 Fifth Avenue, 32nd Floor<br>New York, NY 10017, | ) ) ) ) | |
| DOUBLE EAGLE PETROLEUM CO.,<br>777 Overland Trail, Suite 208<br>P.O. Box 766<br>Casper, WY 82602-0766, | ) ) ) ) ) | |
| Movant-Intervenors. | ) ) | |

I, D. Steven Degenfelder, swear and affirm under the penalties of perjury that I am over
18 years of age and otherwise competent to testify as to the matters herein, which are based on
my personal knowledge.

1.      I am the Vice President of Land of Double Eagle Petroleum Company ("Double Eagle") and as such am responsible for directing many of the overall operations for Double Eagle in the Atlantic Rim Project Area and Catalina A&B Plans of Development ("PODs"). Therefore, I am familiar with Double Eagle's oil and gas operations in the Catalina A&B PODs and in the Atlantic Rim Project Area. I am familiar with the Record of Decision ("ROD") and Environmental Impact Statement ("EIS") for the Atlantic Rim Natural Gas Project issued by the Bureau of Land Management ("BLM") that is at issue in this case. I am also familiar with the Environmental Assessment ("EA"), EA WY-030-07-EA-186, and Finding of No Significant Impact/Decision Record ("FONSI/DR") for the Catalina A&B PODs issued by the BLM that are at issue in this case.

2.      Double Eagle is an oil and gas exploration and development company with over thirty years of experience in the Rocky Mountain Basins of the western United States. The company's two main producing/development projects are its core areas of Wyoming's Atlantic Rim Coal Bed Methane fairway and the tight sands of the Pinedale Anticline, both in the Greater Green River Basin.

3.      The Atlantic Rim Project Area comprises approximately 270,080 acres of land located in Carbon County, Wyoming, that are covered by a combination of federal, state and private oil and gas leases. Double Eagle is a proponent of the Atlantic Rim Natural Gas Development Project.

4.      Double Eagle is the operator of, and holds a working interest in, the Catalina Unit, a federal exploratory oil and gas unit located in the Atlantic Rim Natural Gas Development Project Area. The Catalina A&B PODs are within the Catalina Unit.

5.      BLM's Record of Decision, issued March 2007, outlined a management plan for

the development of the Atlantic Rim Project Area. The ROD included approximately 2,000 gas

wells within the Atlantic Rim Project Area to recover energy resources, while limiting total new

surface disturbance from the drilling program (federal, state and fee minerals) to a maximum of

7,600 acres, at any given time, and a 6.5-acre/well site short-term (less than 6 years) disturbance

goal. *See* ROD at 1. Additional environmental review is anticipated with respect to applications

for permits to drill, right-of-way grants, sundry notices, or applications for special use permits

associated with the project. *See* ROD at 3.

6.      According to the BLM, natural gas development in the Atlantic Rim Project Area

is expected to produce nearly 1,350 billion cubic feet of natural gas, providing enough natural

gas to heat 19.3 million homes for one year, and generating approximately $985 million dollars

in total taxes and royalties for Carbon County, the State of Wyoming, and the federal

government. *See* Atlantic Rim ROD, pg. 1. The BLM determined that 10 million dollars in

federal mineral royalties will be generated annually from the Atlantic Rim Project, 5 million

dollars of which will be returned to the State of Wyoming. The BLM also concluded that State

of Wyoming will collect 6.8 million dollars in severance taxes annually from the project. *See*

Atlantic Rim FEIS, pg. 4-137 (Table 4-17). The BLM estimated that Carbon County would

receive an annual average of 11 million dollars in ad valorem property taxes. *See id.*, pg. 4-135.

Furthermore, the BLM estimated the State of Wyoming, Carbon County, and other local city

governments will gain thousands of dollars annually in sales and use taxes. *Id.* at pgs. 4-137 – 4-

138.

7.      On June 28, 2007, BLM issued the FONSI/DR for the Catalina A&B PODs,

which approved applications for permits to drill (APDs) 36 coalbed natural gas wells and 3

produced water reinjection wells. The FONSI/DR also authorized construction of appurtenant access roads, pipelines, utility corridors, water transfer stations, a central delivery point, and access road/pipeline/utility corridor over BLM-administered public lands to the State well #1792-44-36. *See* FONSI/DR at 1.

8.      The EA for the Catalina A&B PODs analyzed the potential environmental impacts resulting from the proposed development in the Catalina A&B PODs. The BLM anticipated that the proposed development would result in approximately 220.4 acres of short-term disturbances, *see* EA, pg. 6, and this figure was revised to 230 acres due to the addition of a water pipeline and the reduction of one well due to its proximity to a sage-grouse lek. When analyzing anticipated environmental impacts of the Catalina A&B PODs in the EA, the BLM tiered to the analysis set forth in the Atlantic Rim Natural Gas Development Project EIS. *See, e.g.*, EA at 9. In the FONSI/DR accompanying the Catalina A&B PODs EA, the BLM concluded that it did not expect the impacts described in the EA to be significant and therefore that an EIS would not be required. *See* FONSI/DR at 1.

9.      Double Eagle received approval from BLM for the APDs in the Catalina A&B PODs on June 28, 2007; however, because of administrative appeals and petitions for stay filed by groups opposed to this drilling, including several of the named plaintiffs in this case, Double Eagle voluntarily delayed the start of its operations until August 6, 2007, to give the Interior Board of Land Appeals sufficient time to consider the petitions for stay.

10.     Double Eagle has budgeted $34 million for operations in the Catalina A&B PODs and has expended $5 million of its budgeted funds to date. Since August 6, 2007, Double Eagle has drilled and cased fifteen coalbed natural gas wells within the Catalina A&B PODs, which are currently awaiting completion and pipeline hookup. Additionally, Double Eagle has spudded

another eighteen coalbed natural gas wells within the Catalina A&B PODs and is in the process of drilling one produced water reinjection well.   Furthermore, Double Eagle has constructed roads to all well site locations, the pad for the central delivery point, and the pads for two water transfer stations. Double Eagle currently employs three drilling rigs and two completion rigs for the wells in the Catalina A&B PODs. Drilling of all wells is expected to be completed November 1, 2007.

11.     To date, Double Eagle has completed approximately 95 percent of the disturbance analyzed by the EA and authorized by the FONSI/DR for the Catalina A&B PODs. The only surface disturbance remaining is the installation of utility lines where they are not co-located with roads.

12.     The short-term surface disturbance in the Catalina A&B PODs to date has been less than the short-term surface disturbance analyzed in the EA and authorized by the FONSI/DR for the project. The BLM inspected the construction disturbance on September 20, 2007, and found well site disturbance to be approximately 33 percent less than the amount analyzed in the EA.

13.     Double Eagle has applied for and obtained all required permits from the Wyoming Oil and Gas Conservation Commission, the Wyoming Department of Environmental Quality, the BLM, and the Wyoming State Engineer's Office for development of the Catalina A&B PODs.

14.     The FONSI/DR did not authorize surface discharges or disturbances or impacts to waters of the United States resulting from the Catalina A&B PODs.

15.     The Catalina Unit contains existing producing wells that Double Eagle drilled as part of the Cow Creek POD. Since 1963, natural gas has been produced from the 1,562-acre

Cow Creek Unit, which is surrounded by the 21,725-acre Catalina Unit. Production of coalbed natural gas ("CBNG") began in August 2000. In a FONSI/DR dated June 26, 2002, the BLM authorized the development of eight exploratory CBNG wells in the Cow Creek POD. Prior to June 26, 2002, Double Eagle had already constructed 6 CBNG wells, injection wells, and a compressor station in the Cow Creek Unit. Prior to the Catalina A&B POD decision, Double Eagle has completed 14 producing CBNG wells and drilled 3 conventional natural gas wells in the Cow Creek Unit. To date, a total of 178.63 acres of disturbance has occurred in the Cow Creek POD by two oil and gas operators and two pipeline companies.

16.    On April 23, 2007, the Wyoming Oil and Gas Conservation Commission, the Bureau of Land Management, the Wyoming State Geological Survey, and the Wyoming Department of Environmental Quality held a public meeting to discuss methane seeps within the Atlantic Rim Project Area. The presentation and discussion included a history of the methane springs, which were first noted in the Atlantic Rim Project area in the mid 1890's in the Wild Cow Creek area, approximately four miles southeast of the Catalina A&B PODs. The presentation also included pictures of some of the existing seeps, along with an explanation of the likely cause of the seeps. The relevant state and federal agencies concluded that the re-injection of produced water derived from the coalbed methane wells within the Atlantic Rim Project area is not the likely cause of the methane seeps, and they are instead likely the result of natural seepage from either the near surface coals or previously abandoned wells.

17.    On June 20, 2007, several of the named plaintiffs in this case filed an appeal and a request for stay with the Interior Board of Land Appeals (IBLA) (IBLA-2007-210), challenging BLM's ROD and EIS for the Atlantic Rim Project. The IBLA issued an order denying the request for a stay on September 5, 2007. The substantive appeal is still pending before the

IBLA, together with two other administrative appeals that were also filed by Environmental Preservation Foundation and Habitat for Wildlife, IBLA 2007-226, and National Wildlife Federation, IBLA No. 2007-277.

18.    On August 17, 2007, the Theodore Roosevelt Conservation Partnership ("TRCP") filed an action in the United States District Court for the District of Columbia (No. 1:07-cv-01486-RJL), challenging BLM's ROD and the accompanying EIS for the Atlantic Rim Project.

19.    In the present case, Plaintiff seeks an order prohibiting any further ground disturbing activities in the Catalina A&B PODs. A decision rescinding the APDs would result in significant harm to Double Eagle. As noted above, Double Eagle has expended significant funds planning and constructing drill pads, roads, and associated facilities for the development authorized by the BLM's FONSI/DR. Rescinding the APDs would prevent Double Eagle from realizing its return on its significant investments. Furthermore, for those wells Double Eagle is currently drilling, the Wyoming Oil and Gas Conservation Commission will not allow Double Eagle to cease drilling without either setting casing or plugging and abandoning the wells.

20.    The Plaintiff also seeks to prohibit the BLM from approving future APDs in the Atlantic Rim Project Area. As noted above, Double Eagle has federal leases within the Atlantic Rim Project Area for which it has planned future development. Double Eagle may not be able to utilize the rights that have been granted under its oil and gas leases, or may be subject to additional restrictions on its proposed operations.

21.    Because of the potential impacts on its operations and property interests, Double

Eagle would be substantially injured by the plaintiffs' requested relief.

D. Steven Degenfelder
Vice President of Land, Double Eagle Petroleum
Company

ACKNOWLEDGMENT

STATE OF WYOMING        §
                        §
COUNTY OF NATRONA       §

    The foregoing instrument was acknowledged before me by D. Steven Degenfelder, Vice
President of Land for Double Eagle Petroleum Company on this 3rd day of October, 2007.

Witness my hand and official seal.

Notary Public

My Commission Expires: 4/9/2009

NOTARY PUBLIC
CAROL A. OSBORNE
STATE OF WYOMING
COUNTY OF NATRONA
My Commission Expires Apr 9, 2009

**Exhibit 9 to Defendant-Intervenors' Opposition To
Plaintiffs' Motion For A Preliminary Injunction**

**Sun Dog PODs A&B Conditions of Approval**

*JPA 8/16/07*
*OK-OPD 8/16/07*

# CONDITIONS OF APPROVAL
## APPLICATION FOR PERMIT TO DRILL

| | | | |
|---|---|---|---|
| 'erator | **Anadarko E and P Company, L.P.** | Well Name/No | **Sun Dog Pods A & B** |
| ase No. | **WYW-116679, WYW-126439, WYW-131778, WYW-141278, WYW-141279, WYW-141280, WYW-141281, WYW-147856, WYW-148482, ST-99-357** | Legal Descripti on | Various Sections -<br>**T 16 N, R 91 W** |

## GOVERNMENT ADDRESS

| USDI, BUREAU OF LAND MANAGEMENT | FIELD OFFICE ADDRESS | Rawlins<br>1300 North Third Street<br>P.O. Box 2407<br>Rawlins, WY 82301 |
|---|---|---|
| | OFFICE PHONE | (307) 328-4200 |
| | OFFICE HOURS | 7:45 a.m. to 4:30 p.m. (Monday - Friday) |

## ACTIONS REQUIRING BLM NOTIFICATION

For construction, reclamation, and spud notices, submit via the internet at:

**www.blm.gov/wy/st/en/field_offices/Rawlins/oil_and_gas.html**

For running casing, cementing, BOPE tests, drill stem tests or other notices, call the following number 24 hours in advance of commencing operations and leave voice message with call back number.

**(307) 328-4276 (voice mail)**

## AUTHORIZED OFFICER REPRESENTATIVE CONTACTS

you seek immediate approval or emergency assistance on any action that is related to the APD **Surface Use** in, contact the Natural Resource Specialist listed below.

If you seek immediate approval or emergency assistance on any action that is related to the APD **Drilling Plan** or other down hole issues, you should contact the Petroleum Engineer listed below.

| | | |
|---|---|---|
| Natural Resource Specialist | **John Ahlbrandt** | |
| | **Work Phone** | **(307) 328-4223** |
| Petroleum Engineer (Primary Contact) | **Jerry Dickinson** | |
| | **Work Phone** | **(307) 328-4243** |
| | Home Phone | (307) 327-~~5272~~ *5572* |
| | Cell Phone | (307) 329-7887 |

In the event the Petroleum Engineer named above is unavailable, please contact **one** of the following:

| | | |
|---|---|---|
| Petroleum Engineer (Second Contact) | **Jon Dull** | |
| | **Work Phone** | **(307) 328-4227** |
| | Cell/Home Phone | (307) 321-1687 |
| Petroleum Engineer (Third Contact) | Stuart Cerovski | |
| | Work Phone | (307) 332-8426 |
| | Home Phone | (307) 332-2408 |

*A COMPLETE COPY OF THE APPLICATION FOR PERMIT TO DRILL, THE CONDITIONS OF APPROVAL, and APPLICABLE MAPS MUST BE FURNISHED TO YOUR FIELD REPRESENTATIVE AND BE AVAILABLE ON SITE DURING CONSTRUCTION AND DRILLING ACTIVITIES.*

1

**GENERAL**

1. Approval of this Application for Permit to Drill (APD) does not warrant that any party holds equitable or legal title.

   All lease exploration, development, construction, production, operations, and reclamation activity shall be conducted in a manner which conforms to all applicable federal, state, and local laws and regulations.

3. All lease operations are subject to the terms of the lease and its stipulations, the regulations of 43 CFR Part 3100, Onshore Oil and Gas Orders, Notices to Lessees (NTL's), the approved APD, and any written instructions or Orders of the Bureau of Land Management (BLM) AO (AO).

4. The approval of this APD does not grant authority to use off-lease federal lands.

5. This permit is valid for a period of two years from the date of approval or until lease expiration or termination, whichever is sooner.  If the permit terminates, any surface disturbance created under the application shall be reclaimed in accordance with the approved reclamation plan found herein.

6. The Operator shall submit a Sundry Notice (Form 3160-5) to the AO for approval prior to beginning any new surface-disturbing activities or operations that are not specifically addressed and approved by this APD.

7. The Operator may submit to the AO written requests (including documentation, supporting analysis and an acceptable plan for mitigation of anticipated impacts) for exception, waiver, or modification to this approved APD, associated Conditions of Approval (COA), or other requirements. Such written approval shall be obtained prior to commencement of operations that cause any deviation from the approved APD and associated limitations.  Emergency approval may be obtained orally, but such approval does not waive the written reporting requirement.

8. The Operator shall contact the AO's Representative (Natural Resource Specialist) as described above, at least **48-hours prior to** beginning operations including: any APD related construction and/or the initiation of any reclamation work and seeding.

9. All construction of the well pad, flare pit, reserve pit, roads, flowlines, production facilities, and all associated infrastructure on federal lands shall be monitored onsite by a licensed professional engineer OR designated qualified inspector (to be named at the time of construction notification) who will serve as the Operator's Compliance Coordinator to ensure construction meets the BLM-approved plans.

10. The spud date shall be reported to the AO's representative within **24 hours** of spudding.  A follow-up report on Form 3160-5 confirming the date of spud shall be promptly submitted to this office within 5 working days from date of spud.

11. Verbal notification shall be given to the AO's representative **at least 24 hours in advance** of BOP tests, running and cementing casing (other than conductor casing), pluggings, DST's and/or other formation tests, and drilling over lease expiration dates.

12. A site security plan and site facility diagram shall be filed no later than 60 calendar days following first production.

Upon request, Operator must be prepared to provide copies of applications for, and approved copies of, federal, state, and local operating permits.

All survey monuments found in the area of operations shall be protected. Survey monuments include, but are not limited to: General Land Office and BLM Cadastral Survey Corners, reference corners, witness points, U.S. Coastal and Geodetic benchmarks and triangulation stations, military control monuments, and recognizable civil (both public and private) survey monuments. In the event of obliteration or disturbance of any of the above, the Operator shall immediately report the incident, in writing, to the AO and the respective installing authority if known. Where General Land Office or BLM Right-of-Way monuments or references are obliterated during operations, the Operator shall secure the services of a registered land surveyor or a BLM cadastral surveyor to restore the disturbed monuments and references using surveying procedures found in the "Manual of Surveying Instructions for the Survey of the Public Lands in the United States," latest edition. The Operator shall record such survey in the appropriate county and send a copy to the AO. If the Bureau cadastral surveyors or other federal surveyors are used to restore the disturbed survey monument, the Operator shall be responsible for the survey cost.

2. If any cultural values [sites, artifacts, human remains] are observed during operation of this lease/permit/right-of-way, they will be left intact and the AO notified. The AO will conduct an evaluation of the cultural values to establish appropriate mitigation, salvage or treatment. The Operator is responsible for informing all persons in the area who are associated with this project that they will be subject to prosecution for knowingly disturbing historic or archaeological sites, or for collecting artifacts. If historic or archaeological materials are uncovered during construction, the Operator is to immediately stop work that might further disturb such materials, and contact the AO. Within five working days, the AO will inform the Operator as to: whether the materials appear eligible for the National Register of Historic Places; the mitigation measures the Operator will likely have to undertake before the site can be used (assuming in situ preservation is not necessary); and, a time-frame for the AO to complete an expedited review under 36 CFR 800.11 to confirm, through the State Historic Preservation Officer, that the findings of the AO are correct and that mitigation is appropriate. The AO will provide technical and procedural guidelines for the conduct of mitigation. Upon verification from the AO that the required mitigation has been completed, the Operator will then be allowed to resume construction measures.

The Operator shall be responsible for informing all persons associated with this project that they shall be subject to prosecution for damaging, altering, excavating or removing any archaeological, historical, or vertebrate fossil objects or site. If archaeological, historical, or vertebrate fossil materials are discovered, the Operator shall suspend all operations that further disturb such materials and immediately contact the AO. Operations shall not resume until written authorization to proceed is issued by the AO.

The Operator shall be responsible for the cost of any mitigation required by the AO. The AO will provide technical and procedural guidelines for the conduct of mitigation. Upon verification from the AO that the required mitigation has been completed, the Operator shall be allowed to resume operations.

3. If paleontological resources, either large or conspicuous, and/or of a significant scientific value are discovered during construction, the find will be reported to the AO immediately. Construction will be suspended within 250 feet of said find. An evaluation of the paleontological discovery will be made by a BLM-approved professional paleontologist within five (5) working days, weather permitting, to determine the appropriate action(s) to prevent the potential loss of any significant paleontological values. Operations within 250 feet of such a discovery will not be resumed until written authorization to proceed is issued by the AO. The Operator will bear the cost of any required paleontological appraisals, surface collection of

fossils, or salvage of any large conspicuous fossils of significant scientific interest discovered during the operation.

Case 1:07-cv-01709-RJL   Document 10-15   Filed 10/05/2007   Page 5 of 27

The Operator shall be responsible for informing all persons associated with this project that they shall be subject to prosecution for damaging, altering, excavating or removing any archaeological, historical, or vertebrate fossil objects or site. If archaeological, historical, or vertebrate fossil materials are discovered, the Operator shall suspend all operations that further disturb such materials and immediately contact the AO. Operations shall not resume until written authorization to proceed is issued by the AO.

Within five (5) working days, the AO will evaluate the discovery and inform the Operator of actions that will be necessary to prevent loss of significant cultural or scientific values.

The Operator shall be responsible for the cost of any mitigation required by the AO. The AO will provide technical and procedural guidelines for the conduct of mitigation. Upon verification from the AO that the required mitigation has been completed, the Operator shall be allowed to resume operations.

4. If any dead or injured threatened, endangered, proposed, or candidate animal species is located during construction or operation, the U.S. Fish and Wildlife Service's Wyoming Field Office (307-772-2374), its law enforcement office (307-261-6365), and the BLM Rawlins Field Office (307-328-4200) shall be notified within 24 hours. If any dead or injured sensitive species is located during construction or operation, the Rawlins Field Office shall also be notified within 24 hours.

5. Operators and Operator's sub-contracted personnel shall not intentionally harm or harass wild horses, other wildlife, or domestic livestock.

6. Weeds shall be controlled on project-disturbed areas and native areas infested as a direct result of the project. The control methods shall be in accordance with guidelines established by the EPA, BLM, state and local authorities. Prior to the use of pesticides, the Operator will obtain written approval from the AO - meaning an approved Pesticide Use Proposal form - showing the type and quantity of material(s) to be used, pest(s) to be controlled, method of application, etc.

7. The Operator shall be responsible for the prevention and suppression of fires on public lands caused by its employees, contractors, or its subcontractors. During conditions of extreme fire danger, surface use operations may be either limited or suspended in specific areas, or additional measures may be required by the AO.

8. Emissions of particulate matter from well pad, road, and other facility construction, operation, and reclamation activities will be minimized by application of water or other dust suppressants. Dust inhibitors (surfacing materials, dust suppressants, and water) will be used as necessary on locations that present a fugitive dust problem. The use of chemical dust suppressants on public surface will require prior approval from the AO.

9. If groundwater or permeable/porous subsoil or bedrock is encountered upon construction of the pad or pits, or upon drilling and completing shallow holes for surface conductor, rat/mouse holes, or water supply well, the Operator must immediately notify the AO before proceeding.

10. The Operator shall comply with the Hazardous Materials Management Plan/Summary in the EIS, including requirements to transport, store, utilize, and dispose of hazardous substances. The Operator shall maintain a hazardous substances release contingency plan that shall include, among other things, provision to notify the AO in the event of any release of hazardous substances associated with project operations.

'11. If a portable sewage treatment facility is moved onto location, the well/lease Operator shall provide the BLM AO a copy of the facility Operator's notification letter to the Wyoming Department of Environmental Quality. Facility operations shall comply with BLM requirements, including unauthorized discharge notification and reclamation of disturbed surfaces.

12. Only those hazardous wastes that qualify as **exempt,** under the Resource Conservation and Recovery Act (RCRA), Oil and Gas Exemption, may be disposed of in the reserve pit. *Generally, oil or gas wastes are exempt if they 1) have been sent down hole and then returned to the surface during oil/gas operations involving exploration, development, or production, or 2) have been generated during the removal of produced water or other contaminants from the oil/gas production stream.* The term hazardous waste, as referred to above, is defined as a listed (40 CFR 261.31-33) or characteristic (40 CFR 261.20-24) hazardous waste under RCRA.

## DRILLING PLAN

The drilling operations for this well will be conducted in accordance with the Onshore Oil and Gas Order No. 2 as provided for in 43 CFR 3164.1. This includes the well control equipment and its testing, the mud system and associated equipment, and the casing and cementing.

### BOPE:

1. All BOPE shall meet or exceed the requirements of a **2M** system as set forth in Onshore Oil and Gas Order No. 2.

2. All choke lines from the drilling spool forward, shall be straight steel lines flanged at both ends, unless turns use tee blocks or are targeted with running tees and shall be anchored to prevent whip and reduce vibration. All choke lines shall have the same pressure rating as the BOP stack and choke manifold. The diameter of this line shall be a minimum of 2 inches for a 2M BOP system and a minimum of 3 inches for a 3M and greater BOP system. The use of "flex hose" is prohibited unless a variance is first obtained in writing from the BLM AO.

3. A Form 3160-5 (Subsequent Report Sundry Notice) shall be submitted to the AO's representative within five (5) working days following the test reporting the test results. The results reported will be a copy of the third party BOP test report including time and pressure charts, accumulator tests, notes/results made while performing the test, and recordation of any repair of BOP equipment made.

### Casing and Cementing:

1. The surface casing shall in all cases be cemented back to surface. In the event cement does not circulate to surface or fall back of the cement column occurs, remedial cementing shall be done to cement the casing back to surface. The surface casing shall have a minimum of 1 centralizer per joint on the bottom three (3) joints of the casing starting with the shoe joint (four minimum).

2. The production casing shall in all cases be cemented back to surface. In the event cement does not circulate to surface or fall back of the cement column occurs, remedial cementing shall be done to cement the casing back to surface.

3. Pea Gravel or other material shall not be used to fill up around the surface casing in the event cement fall back occurs.

4. A Form 3160-5 (Subsequent Report Sundry Notice), along with a copy of the service company's materials ticket and job log shall be submitted to this office within 5 working days following the running and cementing of all casing strings.

5. All casing strings shall be tested, prior to drilling out the casing shoe, to 0.22 psi/ft of casing string length or 1500 psi, whichever is greater, but not to exceed 70% of the internal yield pressure of the casing. If pressure declines more than 10 percent in 30 minutes, corrective action shall be taken.

6. Any change in the casing and cement design will be approved by the AO prior to the running of the casing string and/or cementing.

7. No freshly hard-banded rough carbide pipe/collars will be rotated in the surface casing.

**Mud Program:**

1. Sufficient quantities of mud materials shall be maintained at the well site, at all times, for the purpose of assuring well control, including during air drilling operations.

2. Visual mud monitoring equipment shall be in place to detect volume changes indicating loss or gain of circulating fluid volume.

3. Drilling of the surface casing will occur with fresh water only or air as described in the Master Drilling Plans.

4. **For those locations that are multi-well location (injection/producing/sump wells), the reserve pit will be 160' x 50' x 12' with a 1.5:1 maximum sidewall and endwall slope. If it is necessary to increase the dimensions of the spoil pile from those shown in the individual well site layout (associated with the increased pit dimensions), the spoil piles will be elongated (not widened) so as to not increase the disturbance area any more than necessary.**

5. If a temporary surface pipeline is used to transport drilling water, the pipeline shall be laid and removed when the ground surface is dry so as to minimize surface disturbance. No blading or other alteration of the ground surface shall be allowed.

**Other:**

1. In the event down hole operations threaten to or cause fluid levels in the reserve pit to encroach on the required 2-foot freeboard, immediate notification shall be provided to the AO with concurrent steps taken to minimize the introduction of additional fluids until alternative containment methods can be approved.

2. Rat and mouse holes (or any sub-grade excavations for drilling operations) shall be filled and compacted, with appropriate native materials, immediately upon release of the drilling rig from the location.

3. Any permanent plug placed in the well during drilling and/or completion operations must have **prior** approval of the AO.

4. As provided in NTL-4A, gas produced from this well may not be vented or flared beyond an initial test period, 30 days or 50 MMcf, whichever first occurs, without approval of the AO.

5. Prior to commencing production from a well, Anadarko will file for approval by Sundry Notice Form 3160-5, a description of its measurement facility to be utilized. The description will include details of the measurement device(s) to be installed, placement of the measurement with relation to the well and the final sales meter(s), and any other necessary information. Any variance requested from Onshore Oil & Gas Order Number 5; Measurement of Gas, will only be considered upon receipt of a complete Sundry Notice.

6. Drill Stem Tests shall meet or exceed the requirements set forth in Onshore Oil and Gas Order No. 2.

7. All usable water, hydrocarbon and other mineral zones must be protected.

8. Pursuant to Onshore Oil and Gas Order No. 2.III.B.1.e. and the Rules and Regulations of the Wyoming Oil and Gas Conservation Commission (Chapter 3, Section 22.(a) (i)), the Operator shall report all fresh water flows encountered while drilling to the AO (Petroleum Engineer) prior to the running the next string of casing. The reported information shall include a) well name, number and location, b) the date the water flow was encountered, c) depth at which the water flow was encountered, and d) estimated water flow rate into the well bore. The Operator shall file a Form 3160-5 (Subsequent Report Sundry Notice) of this same information within 30 days of releasing the drilling rig.

9. Open hole logs consisting of deep, medium and shallow resistivity curves, a porosity log and gamma-ray and SP curves shall be run at TD to at least 50' above any zone which may be considered to be productive of hydrocarbons.

10. **Completion Report:** In accordance with 43 CFR 3160, Form 3160-4 (Well Completion or Re-completion Report and Log) must be submitted to the AO within 30 days after completion of the well or after completion of operations being performed, whether the well is completed as a dry hole or as a producer. Copies of all open hole and cased hole logs, core descriptions, core analyses, well test data, geologic summaries, sample descriptions, daily drilling reports, daily completion reports, formation test reports, stimulation reports, directional survey (if applicable), and all other surveys or data obtained and compiled during the drilling, completion, and/or work over operations, shall be included with Form 3160-4. **Copies of all logs, as noted above, shall be submitted to this office on a compact disc in a ".las" digital file format and shall have a precision readout increment of 0.5 feet. Any Mud Log copy submitted to this office shall be in a ".tif" format.**

11. **Well Abandonment:** In the event abandonment of the hole is desired, oral approval may be granted by our AO (Petroleum Engineer), but must be followed within 5 days with a **Form 3160-5 (Sundry Notice of Intent to Abandon)** which will give the complete plan of operation that will be utilized in the plugging. Unless the plugging is to take place immediately upon receipt of the oral approval, the AO (Petroleum Engineer) must be notified at least 24 hours in advance of the plugging of the well in order that this office can witness the plugging operation. Failure to obtain approval prior to commencement of abandonment operations shall result in immediate assessment under 43 CFR 3163.1(b)(3). The following will occur if the well is abandoned:

   a) In order to reduce the visual impact of the reclaimed well site, the casing shall be cut-off at the base of the cellar or 3 feet below the final restored ground level (whichever is deeper). The well bore shall then be covered with a metal plate at least 1/4 inch thick and welded in place. On the metal plate shall the following information be permanently inscribed: i) company/Operator name, ii) lease

7

number, unit well name/number, and unit well location description to the nearest quarter-quarter section (40 acres).

b) A GPS re-verification and certification of the abandoned well location shall be made for coordinates of degrees latitude and longitude with accuracy to the sixth decimal place. This well location re-verification shall be noted on the Subsequent Report Sundry Notice of Abandonment.

c) A temporary steel fence post with an attached placard indicating the well name/number and location shall be placed adjacent to the well bore until final well site reclamation has been performed and the Final Abandonment Notice (FAN) is approved.

d) Within 30 days following completion of the well abandonment, you shall file with this office, a Subsequent Report of Abandonment (Form 3160-5). To be included with this report is where the plugs were placed, volumes of cement used, well bore schematic as plugged, along with copies of all service company job log and service tickets.

**The Operator shall promptly plug and abandon each newly completed, re-completed or producing well which is not capable of producing in paying quantities.** No well may be temporarily abandoned for more than 30 days without prior approval of the AO. When justified by the Operator, the AO may authorize additional delays, no one of which may exceed an additional 12 months. Upon removal of drilling or producing equipment from the site of a well which is to be permanently abandoned, the surface of the lands disturbed shall be reclaimed in accordance with a plan first approved or prescribed by the AO or per the reclamation conditions of approval stated herein.

# SURFACE USE PLAN OF OPERATIONS

## SITE SPECIFIC

1. The Operator is subject to the mandatory monitoring & reporting requirements and annual planning participation as provided for in the Atlantic Rim (AR) EIS Record of Decision (ROD), including (but not limited to) those contained in Appendix A of the ROD.

2. Project surface disturbance shall be limited to that established and estimated in the approved POD MSUP including surface use disturbance tables and calculations, narratives, project maps and layouts, and shall be subject to the surface disturbance cap and goals identified in the AR ROD.

3. The Operator shall select and use a seed mix most applicable to each disturbed location, with the goal of restoring individual disturbed sites to closely resemble the pre-disturbance native plant communities, as provided in Appendix A of the ROD, "Project Reclamation Plan."

4. For all wells, other than the exceptions (*) listed in the following table, all above-ground structures, production equipment, tanks, transformers, and insulators not subject to coloring requirements for safety shall be painted the color of "Shale Green" (5Y 4/2).

8

| Well # | Pod | Color |
|--------|-----|-------|
| 10-5 | B | Beetle (19-0312 TPX) |
| 12-5 | B | Covert Green (18-0617 TPX) |
| 14-5 | B | Military Olive (19-0622 TPX) |
| 6-9 | B | Covert Green (18-0617 TPX) |
| 16-9 | B | Covert Green (18-0617 TPX) |
| 2-21 | B | Covert Green (18-0617 TPX) |
| 6-21 | B | Covert Green (18-0617 TPX) |
| 2-16 | B | Covert Green (18-0617 TPX) |

5.  The Unit Operator shall be responsible for drilling, completing, and equipping one set of three shallow groundwater-monitoring wells completed in water-bearing sandstone units stratigraphically above the principle producing coal beds in the upper Mesaverde Group **prior** to production of any of the wells in the two PODs.

6.  Approval of Sun Dog PODs A and B only authorizes the Sun Dog Water Management Plan (WMP) to the extent of, and as applicable to, the wells within these two PODs.  It does not approve the WMP in its entirety for the remaining Sun Dog PODs (C, D, and E).

7.  A well drilled within ½ mile radius of an existing SEO permitted water well will require a water well agreement with the land owner, or the Operator will otherwise mitigate the impacts in accordance with the state of Wyoming water laws. (Atlantic Rim Record of Decision, Appendix B, p.B-8, 12.).

8.  Fencing shall comply with BLM requirements to prevent entry by livestock and wildlife and shall include at a minimum 16 feet wide cattle-guards with16 feet wide tubular by-pass gates at all road and fence crossings, or the use of the tubular gates if approved as alternative.

9.  Pipeline crossings of watercourse channels shall be completed so that the pipelines are buried a minimum of four feet below the channel bottom.  Appropriately-sized riprap will be placed from the channel bottom to the top of the normal high water line at all stream crossings.  When excavating the crossing, separate the top 1-foot of stream bottom substrate from deeper soil layers and reconstruct the original layers by replacing deeper substrate first.

10. Drainage crossings by pipelines shall be constructed to prevent any blocking, diversion, or restriction of the existing channel, and shall seek to leave a channel alignment and geometry similar to what existed prior to disturbance.

11. Wildlife protection measures (in the form of seasonal restrictions) apply to the following well locations, and also apply to associated access road, gas-gathering pipeline, water-gathering pipeline, and utility corridor segments.

**Sun Dog Unit POD A Wildlife Stips ***

| Well # | Raptor[1] | Grouse[2] | Mt.Plover[3] | CWR[4] |
|--------|-----------|-----------|--------------|--------|
| 2-8 | X | X | | |
| 4-8 | X | X | | |
| 6-8 | X | X | | |
| 8-8 | X | X | X | |
| 4-9 | X | X | X | |
| 12-9 | | X | X | |
| 14-9 | | X | X | |
| 4-17 | X | | | |
| 12-17 | X | X | | |
| 12-17I | X | X | | |

9

| Well # | Raptor | Grouse | Mt.Plover | CWR |
|---|---|---|---|---|
| 8-19 | X | X | | |
| 2-20 | | X | | |
| 14-18 | X | X | | |
| 4-19 | X | X | | |
| 6-19 | X | X | | |
| 10-19 | X | X | | |
| 12-19 | X | X | | X |
| 4-20 | X | X | X | |
| 6-20 | X | X | | |
| 14-20 | X | X | | |
| 14-20I | X | X | | |
| 4-21 | | X | | |
| 12-18 | X | X | | |
| 10-18 | X | X | X | |
| 16-18 | X | X | | |
| 6-16 | | X | X | |
| 14-16 | | X | | |

### Sun Dog Unit POD B Wildlife Stips *

| Well # | Raptor[1] | Grouse[2] | Mt.Plover[3] | CWR[4] |
|---|---|---|---|---|
| 12-4 | X | X | | |
| 12-4I | X | X | | |
| 14-4 | X | X | | |
| 10-5 | X | X | | |
| 14-5 | X | X | | |
| 16-5 | X | X | | |
| 2-9 | | X | | |
| 6-9 | | X | X | |
| 10-9 | | X | X | |
| 16-9 | | X | X | |
| 8-20 | | X | | |
| 10-20 | X | X | X | |
| 10-4 | X | X | | |
| 12-5 | X | X | | |
| 12-20 | X | X | X | |
| 2-21 | X | X | X | |
| 6-21 | | X | | |
| 8-21 | X | X | | |
| 12-21 | | X | X | |
| 2-16 | | X | X | |
| 8-16 | X | X | X | |
| 10-16 | X | X | | |
| 16-16 | X | X | X | |

[1]Construction, drilling and other activities potentially disruptive to nesting raptors are prohibited during the period of February 1 to July 31 for the protection of raptor nesting areas.

[2]Construction, drilling, reclamation and other potentially disruptive activities are prohibited during the period of March 1 to July 15 for the protection of sage grouse.

[3]Construction, drilling, and other activities are prohibited during the reproductive period of April 10 to July 10 for the protection of nesting plover.

[4]Construction, drilling and other activities potentially disruptive to wintering wildlife are prohibited during the period of November 15 to April 30 for the protection of big game crucial winter habitat.

- Please be advised that due to limits on the available time of qualified personnel, the unpredictability of wildlife, and future weather conditions, requests for exceptions to wildlife stipulations will only be considered in the event of extraordinary and unavoidable occurrences over which the company has little or no control. Additionally, wells must be spud in a time frame which would allow for reasonably normal drilling and completion of the well prior to the beginning date of wildlife protection stipulations.

12. Cultural/historical protection and preservation or mitigation measures apply to the following well locations, and/or associated access roads, pipelines, and utility corridors:

For **all** wells and associated infrastructure in POD A and B:

1) The access road will be surfaced with material compatible with the local environment.
2) The Operator shall select and use a seed mix most applicable to each disturbed location, with the goal of restoring individual sites to closely resemble the pre-disturbance native plant communities, as provided in Appendix A of the ROD, "Project Reclamation Plan."

**Additional stipulations** (listed below) apply to the **following wells**:
POD A wells: **2-8; 4-8; 4-9; 14-9; 14-16; 4-17; 16-18; 6-19; 8-19; 10-19; 12-19; 2-20; 4-20; 6-20; 14-20; 14-20I; 4-21**
POD B wells: **10-4; 12-4; 12-4I; 16-5; 6-9; 10-9; 16-9; 2-16; 8-16; 10-16; 16-16; 8-20; 10-20; 12-20; 2-21; 6-21; 8-21; 12-21**

1) Unless otherwise authorized, the pipelines/utilities will be plowed or ripped into the un-bladed surface (using technology that does not require trenching). If such techniques are infeasible due to terrain or geology, the surface will be brush-hogged and the utilities will be placed no farther than the outside edge of the ditch slope.
2) No blading will be allowed outside the staked well location for placement or removal of the topsoil stockpile.

**Other well-specific cultural stipulations:**

POD A:
- 4-8:     a) An archaeologist with a current BLM permit will monitor construction of the access road to ensure avoidance of known cultural sites.
            b) A construction barrier fence will be placed along the southeastern edge of the well location prior to construction (see attached map.) Fence placement will be monitored by a BLM permitted archaeologist, and the fence will remain in place until final reclamation is complete.
- 14-16:   An archaeologist with a current BLM permit will monitor construction of the access road due to site density in the local area in accordance with the approved Discovery Plan.
- 4-17:     a) An archaeologist with a current BLM permit will monitor construction of the access road to ensure avoidance of known cultural sites.
            b) A construction barrier fence will be placed along the southeastern edge of the well location prior to construction (see attached map.) Fence placement will be monitored by a BLM permitted archaeologist, and the fence will remain in place until final reclamation is complete.
- 10-18:   An archaeologist with a current BLM permit will monitor construction of the access road due to site density in the local area.
- 6-19:    An archaeologist with a current BLM permit will monitor construction of the well location and access road due to site density in the local area.
- 8-19:     An archaeologist with a current BLM permit will monitor construction of the well location and access road due to site density in the local area.
- 12-19:   A construction barrier fence will be placed along the southeastern edge of the well location prior to construction (see attached map.) Fence placement will be monitored by a BLM permitted archaeologist, and the fence will remain in place until final reclamation is complete.
- 4-20:    An archaeologist with a current BLM permit will monitor construction of the access road to ensure avoidance of known cultural sites.

12-17: An archaeologist with a current BLM permit will monitor construction of the access road to ensure avoidance of known cultural sites.

**POD B:**

- **10-4:** a) An archaeologist with a current BLM permit will monitor construction of the well location and access road due to culturally sensitive soils in accordance with the approved Discovery Plan.

  b) A construction barrier fence will be placed along the north end of the western edge of the well location prior to construction (see attached map.) Fence placement will be monitored by a BLM permitted archaeologist, and the fence will remain in place until final reclamation is complete.

- **12-5:** a) An archaeologist with a current BLM permit will monitor construction of the well location and access road due to culturally sensitive soils in accordance with the approved Discovery Plan.

  b) A construction barrier fence will be placed around the northwestern edge of the well location prior to construction (see attached map.) Fence placement will be monitored by a BLM permitted archaeologist, and the fence will remain in place until final reclamation is complete.

- **14-5:** a) An archaeologist with a current BLM permit will monitor construction of the well location, access road, and pipeline/utilities due to culturally sensitive soils in accordance with the approved Discovery Plan.

  b) A construction barrier fence will be placed around the southeast corner of the well location and along the northern edge of the access road/pipeline/water line/electric line corridor prior to construction (see attached map.) Fence placement will be monitored by a BLM permitted archaeologist, and the fence will remain in place until final reclamation is complete.

- **2-16:** An archaeologist with a current BLM permit will monitor construction of the well location and access road due to culturally sensitive soils in accordance with the approved Discovery Plan.

- **10-16:** A construction barrier fence will be placed along the north end of the western edge of the well location prior to construction (see attached map.) Fence placement will be monitored by a BLM permitted archaeologist, and the fence will remain in place until final reclamation is complete.

13. <u>Construction/culverts</u>. In addition to the culverts proposed and identified in the individual APD (Exhibit 4) and POD maps, the Operator shall install the following <u>additional</u> culverts and/or crossings, for the following access roads. Any additional culverts are to be 18" in diameter unless otherwise specified. (Other site-specific well pad or road construction stipulations are also included here, as noted.)

**POD A:**

- **4-17:** The Operator shall construct the road crossing of Dry Cow Creek (which provides access to the 12-17 and other wells) according to the engineering documents (Job # 11519) signed by Michael C. Lock of DR Griffin & Associates, Inc., dated 7/20/07.

- **12-18:** Two additional culverts are required along the portion of road adjacent to and parallel to the existing pipeline.

- **12-19:** A 24" culvert is required in the main drainage, as well two additional culverts between this 24" culvert and the approximate midpoint of the road going to the 6-19.

- **14-16:** One additional culvert is required just east of the westernmost culvert indicated in the APD.

- 10-4: A minimum of two additional culverts will be required at the eastern end of the access road, from approximately the point that the road begins to curve to the south. This will include one 36" and one 24" culvert in the two respective large drainages (from west to east.) Armoring of drainages downstream of culverts will be required in these areas.
- 10-5: A 24" culvert is required in larger drainage along fence (2nd culvert from pad.)
- 14-5: The northern corners of the well pad will be rounded off (i.e. minimize cut/fill) as much as possible to reduce encroachment towards an archaeological site.
- 6-9: A silt fence will be installed on the downhill side of the construction area. Ample cross drainages (relief culverts) are required where road comes down side-slope.
- 16-9: One additional culvert is required approximately midway along access road. Keep edge of well pad at least 30' from edge of allotment fence.
- 8-20: Two 24" culverts are required in this access road, one in each of the larger two drainages (in the northwest half of the access road), with armoring on the discharge (downhill) side.
- 10-20: The east half of this road needs to be built up (raised) 1-2 feet above the surrounding topography, with at least 3 culverts thorough the built-up portion. No culvert is needed at main road take-off, but an additional culvert is needed approximately midway along road.
- 12-20: Only one culvert is required, approximately midway between well pad and the existing road.
- 2-21: A 24" culvert is required in the larger drainage.

## CONSTRUCTION

1. All facilities on location that have the potential to leak/spill oil, glycol, methanol, produced water, condensate, or other fluids which may constitute a hazard to the environment, public health or safety (including, but not limited to, drain sumps, sludge holdings, and chemical containers), shall be within secondary containment, impervious to those fluids, exclusive of wildlife and livestock, with animal/bird escape capability, and able to contain a minimum of 110% of the volume of the largest storage vessel, respective to content, or 100% with at least one foot of freeboard, whichever is greater, so that any spill or leakage would not drain, infiltrate, or otherwise escape to ground water, surface water, or navigable waters before cleanup can be completed (within 72 hours).

2. Construction over and/or immediately adjacent to existing pipelines shall be coordinated, and in accordance with, the relevant pipeline companies' policy.

3. Fencing shall be installed around produced water, oil, and condensate tank batteries in order to help maintain the integrity of the surrounding containment structure and to prevent livestock and wildlife from entering the area in case of a leak or spill.

4. All open vent stack equipment shall be designed and constructed to prevent entry by birds and bats and to discourage perching.

5. The immediate repair/replacement (to BLM standards) of any range infrastructure breached, altered, or damaged by construction, drilling, or operation activities related to this APD shall be the responsibility of the Operator. All fence relocations will be in accordance with BLM approval.

6. Construction, maintenance, and reclamation operations with frozen material or during periods when the soil material is saturated is expressly prohibited. If equipment, including licensed highway vehicles, creates ruts

13

in excess of four (4) inches deep, the soil shall be deemed too wet to adequately support maintenance and/or heavy equipment.

7. Accumulated snow present on the ground at the outset of construction, maintenance, or reclamation activities shall be removed before the soil is disturbed and piled downhill from the disturbed area. Equipment used for any non-construction snow removal operations will be equipped with 6" shoes to ensure blades do not remove topsoil or vegetation and written approval must be obtained before snow removal related to a federal action but outside of designated disturbance areas is undertaken.

8. Remove, and clearly segregate from all other spoil, all available topsoil from constructed locations including areas of cut and fill, and stockpile at the site for use in reclamation on all other areas of surface disturbance (roads, pipelines, etc.).

9. Plugs or embankments providing wildlife with access out of and across open pipeline trenches shall be installed, at minimum, every 1320 linear feet along open pipeline trenches.

10. No construction shall block or change the natural course of any drainage, nor shall topsoil, waste, or fill material will be deposited below high water lines in riparian areas, flood plains, or in natural drainage ways; and the lower edge of soil or other material stockpiles will be located outside active floodplains. All spoils will be placed where they can be retrieved without creating additional surface disturbance and where they do not impede and/or contribute sediment to watershed and drainage flows.

11. Drainage and runoff shall be diverted away from all new construction. All drainage structures shall simulate topographic contour lines, have a grade no greater than .5 - 1 percent, and shall release water onto undisturbed ground without causing additional and/or accelerated erosion.

12. If temporary surface lines are used to transport drilling water, lines shall be placed/removed when the ground surface is dry; no surface blading is allowed. The surface pipelines must be removed within 30 days after completion (or determination of inactivity) of the well.

13. Construction control stakes shall be placed as necessary to ensure construction of the well pad, topsoil stockpile, spoil pile, and outer limits of the area to be disturbed in accordance with the specifications outlined in the APD. The Operator shall assume full responsibility for protecting all stakes and offsetting any additional stakes or grades which may be necessary.

14. Cathodic protection wells shall be drilled on the existing well pad, placed so as not to interfere with re-contouring of cut and fill slopes during interim reclamation, designed and constructed to prevent commingling and contamination of water aquifers. The AO shall be notified of any water flows at surface and the problem will be resolved promptly.

## ROADS

1. All vehicles shall use only authorized travel routes and shall not use any other access route, such as two-track roads, trails, and pipeline rights-of-way to the drill/well pad and any ancillary facilities.

2. Two-track roads shall not be cut-off as a direct result of construction, maintenance, or reclamation of the well access road or associated well facilities.

3. All access roads and drainage control structures, whether existing or newly-constructed, shall be both constructed to resource road standards and regularly maintained in a safe and usable condition as outlined in

BLM Manual, Section 9113: A regular maintenance program may include, but is not limited to, blading, ditching, culvert installation, dust control, and gravel surfacing or other activities as specified by the AO. The Lessee and/or Operator shall enter into a maintenance agreement with all other "authorized users" of the common access road(s) to the well site. The costs of road maintenance in dollars, equipment, materials, labor, and other related expenses shall be shared proportionally among the "authorized users." Upon request, the AO shall be provided copies of any maintenance agreement or agreements.

4.  Prior to construction, road(s) shall be surveyed and staked with construction control stakes set continuously along the centerline at maximum 100-foot intervals (less where needed to be inter-visible) and at all tangent and curve control points, fence or utility crossings, and culverts.  In addition to centerline stakes, slope stakes shall be placed at the top of the cut and the bottom of the fill for those portions of the road that are engineered.

5.  Before proposed road construction activities begin, the topsoil must be bladed to the side of the road and stockpiled.  The topsoil stockpile shall be contoured so as to prevent water ponding or flow concentration. Once the barrow ditch and the cut slopes are constructed, cleared vegetative material and topsoil that is windrowed shall be spread back onto the cut/fill slopes of the road, removing any windrows or berms remaining at the edge of the road.

6.  The minimum travel-way width of the immediate access road will be 14 feet with turnouts at least 10 feet in width.  No structure will be allowed to narrow the road top.  The inside slope will be 4:1.  The bottom of the ditch will be a smooth V with no vertical cut in the bottom.  The outside slope will be 2:1 or shallower. After the road is crowned and ditched with a .3 - .5 ft/ft crown the topsoil and windrowed vegetative material shall be pulled back down on the cut slope so there is no berm left at the top of the cut slope. Turnouts will be spaced at a maximum distance of 1000 feet and will be intervisible.  If the access road crosses a floodplain, the ditch shall be flat-bottomed so as to provide material to raise the road.

If soils along the access road route are dry during road construction, use, and/or maintenance, fresh water shall be applied to the road surface to facilitate soil compaction and minimize soil loss as a result of wind erosion.

8.  Construction and surfacing of the new access road shall be complete prior to moving drilling equipment onto the well pad and the presence of heavy vehicular traffic. Compact the top foot of sub-grade to a 95% maximum density as determined by AASHTO T-99.  Surface with an appropriate grade of gravel to a minimum depth of four (compacted) inches.

9.  All cattle guards will be designed and maintained consistent with BLM standards and shall be a minimum of 15 feet wide and 8 feet long; set on either timber, pre-cast concrete, or cast-in-place concrete bases at right angles to the roadway; have an adjacent 16 foot wide bypass gate; not narrow the road surface; and have fence and end panels on either side constructed using 3 posts with braces.

10. Culverts shall have a minimum of 12" of fill or 1/2 the pipe diameter, whichever is greater, placed on top of the culvert, and shall be of length sufficient to allow at least 24" of culvert to extend from the fill slope face. The inlet and outlet shall be set on grade.  No rocks shall be used in the bed material and no rocks greater than 2" in diameter will be immediately adjacent to the culvert.  The entire length of pipe shall be bedded on native material before backfilling, which shall be completed using unfrozen material and rocks no larger than two inches in diameter; compact the backfill evenly in 6" lifts on both sides of the culvert.  A permanent marker shall be installed at both ends of the culvert to help prevent traffic from damaging the culvert.  Additional culverts will be placed in the new access road as the need arises or as directed by AO.

11. Wing-ditches shall be staked and constructed at a slope of .5 to 1.0 percent down slope, unless otherwise approved by the AO. In no case shall wing-ditches discharge adjacent to a channel bank.

12. All drainage ditches and culverts shall be kept clear and free-flowing, and shall also be maintained in accordance with the original construction standards.

13. Low water crossings will be constructed at original streambed elevation in a manner that will prevent any blockage or restriction of the existing channel. Material removed will be stockpiled for use in reclamation of the crossings.

## PITS

1. All oil and gas pits containing fracture/stimulation fluids are required to be lined with an impermeable (12 mil minimum with a permeability less than or equal to 1 X 10-7 cm/sec) liner. The liner shall be physically and chemically-compatible with all substances which it may contact and shall be of sufficient strength and thickness to withstand normal installation and use, and installed so that it will not leak. The liner shall be installed over a smooth sub-grade, matting, or fill materials (e.g. sifted dirt, sand, or bentonite) free of pockets, loose rocks, and other objects that could damage the liner.

   The only fluids/waste materials which are authorized to go into reserve pits are RCRA exempt exploration and production wastes.

   Any evidence of RCRA non-exempt wastes being put into the reserve pit may result in the BLM AO requiring specific testing and closure requirements

2. Flaring of gas into the reserve or completion pits will not be allowed without prior approval from the AO.

3. All pits shall be kept free of trash and liquid hydrocarbons.

4. Pits are to be dried within six (6) months from the date that total depth was reached and prior to any backfilling. Trenching or squeezing is prohibited. Pits, once dry, shall be backfilled and compacted with a minimum cover of five (5) feet of soil, void of any topsoil, vegetation, large stones, rocks or foreign objects. The pit area shall be mounded to allow for settling and to promote positive surface drainage away from the pit. Before backfilling synthetically lined reserve pits, those liner portions remaining above the "mud line" shall be cut off as close to the top of the mud surface as possible and disposed of at an approved solid waste disposal facility. The pit bottom and remaining liner shall not be trenched, cut, punctured, or perforated. Installation and operation of any sprinklers, pumps, and related equipment shall ensure that water spray or mist does not drift outside of pit boundaries.

5. All pits are required to maintain 2 feet of freeboard. If operations cause fluid levels in pits to rise above the required freeboard, immediate notification shall be provided to the AO with concurrent steps taken to cease the introduction of additional fluids, until alternative containment methods can be approved.

6. For the protection of livestock and wildlife, all pits and open cellars shall be fenced on all sides, with corner bracing, immediately upon construction. Reserve, flare, completion, and production pits will be adequately fenced during and after drilling operations until pits are reclaimed so as to effectively keep out wildlife and livestock. Approved netting (mesh diameter no larger than one inch) is required over any pit that contains or is identified as containing hydrocarbons or hazardous substances (per RCRA 40 CFR Part 261 or CERCLA Section 101(14) (E)).

1. Reclamation earthwork shall consist of: 1) backfilling pits, 2) re-contouring and stabilizing the well site, access road, drainage channels, utility and pipeline corridors, and all other disturbed areas, to approximately the original contour, shape, and configuration that existed before construction (any compacted backfilling activities shall ensure proper settling and stabilization), 3) surface ripping, prior to topsoil placement, to a depth of 18-24 inches deep on 18-24 inch centers to reduce compaction, 4) final grading and replacement of all topsoil so that no topsoil remains in the stockpile, 5) surface-roughening and other techniques such as snow fencing to increase soil moisture retention and reduce compaction (all surface soil material shall be pitted or roughened such that the entire reclamation area will be uniformly covered with depressions constructed perpendicular to the natural flow of water and/or prevailing wind), and 6) seeding in accordance with reclamation portions of the APD and these COAs. Unless conditions prevent effective seeding operations, seeding shall preferably be done after September 15 and before April 15.

2. Interim reclamation of all disturbed areas not needed for production operations, including unnecessary access roads and pipeline right(s)-of-way, shall commence and be completed within six (6) months from date of reaching total depth or determination of inactivity. All fill and stockpiled soils shall be distributed on disturbed areas and the production pad shall be as small as possible to allow for safe and prudent production operations.

3. Temporary fencing of the reclaimed well/facilities locations for the first two growing seasons after either interim or final seeding may be required to exclude livestock and wildlife and to help ensure better re-vegetation success. Similarly, off-road vehicle prevention measures shall be employed on reclaimed locations.

4. Any subsequent re-disturbance of interim reclamation shall be reclaimed within six (6) months by the same means described herein.

. The Operator shall submit, in accordance with relevant EIS or AO determined dates, an annual report detailing the status of interim or final reclamation work and associated action for this APD during the previous calendar year.

6. A Notice of Intent to Abandon, on Form 3160-5, must be submitted prior to any abandonment activities. A joint inspection of the disturbed areas may be required and attended by the BLM and the Operator (or Operator's Designee), the primary purpose of which is to review and agree to the existing (or a new) abandonment and/or final reclamation plan. Earthwork must commence and be completed within six (6) months from the date of plugging and abandonment and seeding no later than the next season after the completion of earthwork, with final reclamation completed within two years of the plugging/abandonment date.

7. The Operator shall submit a Final Abandonment Notice (FAN), using Form 3160-5, to the AO when adequate reclamation of surface-disturbed areas has been completed. This FAN indicates that the location is considered ready for final inspection, with adequate vegetation cover and species diversity. Upon receipt of the FAN, the BLM will conduct a field inspection prior to releasing the bond liability for this location.

8. Re-vegetation shall consist of species included in the approved seed mix and/or occurring in the surrounding natural vegetation or as deemed desirable by the BLM or private surface owner in review and approval of the reclamation plan. Interseeding, secondary seeding, or staggered seeding may be required to accomplish re-vegetation objectives. The seed mixture(s) shall be planted in the amounts specified in pounds of pure live seed (PLS)/acre. There shall be no primary or secondary noxious weed seed in the seed mixture. Seed

17

shall be tested and the viability testing of seed shall be done in accordance with State law(s) and within 9 months prior to purchase. Commercial seed shall be either certified or registered seed. The seed mixture container shall be tagged in accordance with State law(s) and available for inspection by the AO. Since seeds are of different sizes and require different planting depths, the Operator shall use the appropriate equipment to ensure that the seed mixture is correctly and uniformly planted over the disturbed area. Seed shall be broadcast if drilling is not possible. When broadcasting the seed, the pounds per acre are to be doubled. The seeding will be repeated until a satisfactory stand is established as determined by the AO. Evaluation of growth will not be made before completion of the second growing season after seeding.

9.  All practicable measures will be utilized to minimize erosion and stabilize disturbed soils. Should the use or storage of hay, straw, or mulch be necessary, the Operator is required to use certified weed-free hay, straw, and mulch on BLM lands.

10. Any topsoil to be stockpiled for longer than six (6) months shall be spread in layers of 2 feet maximum thickness, signed, and stabilized with a suitable cover crop (immediately post-construction and until successful) as approved of by the AO.

## WATER

1.  All disposal and management of produced water must be in accordance with Onshore Oil and Gas Order No. 7.

2.  Any changes to water sources/supplies, fate of drilling/completion fluids, routes and means of fluid transportation, and location or method of produced water disposal must first have written approval from the AO.



ANADARKO E & P
AR Federal 1691 4-8

**Legend**    1:1,000    N

☐ Proposed Well

▬ Fence

— Proposed Access/Utilities

ANADARKO E & P
AR Federal 1691 4-17



**Legend**
**U.S.G.S. Quad:  Blue Gap, Wyo., 7.5'**
**T. 16N, R. 91W Section 17**

N

—— Proposed Access          1:1,000
☐ Proposed Well
—— fence

No warranty is made by the Bureau of Land Management
for data purposes not intended by the BLM.

ANADARKO E & P
AR Federal 1691 12-19

**Legend**    1:1,000

☐ Proposed Well

▬ Fence

— Proposed Access/Utilities



APPROXIMATE AREA OF DISTURBANCE: 2.0± ACRES
DRAINS TO DRY COW CREEK

CONSTRUCT DIVERSION DITCH

INSTALL CMP

ACCESS ROAD

RESERVE PIT
100' X 35' X10'
3,384 bbls.

EXCESS SPOIL

TOPSOIL PILE

BOILER
FUEL
LIGHT PLANT
MUD PUMP
WATER DOG HOUSE
RIG
SHALE SHAKER
PIPE RACKS
PIPE TUB
CAT WALK
PIPE TUB

EXHIBIT 2

NOTE: THE EARTH QUANTITIES ON
THIS DRAWING ARE ESTIMATED
AND THE USE OF IS AT THE
RESPONSIBILITY OF THE USER.
BEFORE DIGGING
CALL FOR
UTILITY LINE LOCATION

SCALE FEET
50    0    50

**D̄RḠRIFFIN & ASSOCIATES, INC.**

1414 ELK ST., SUITE 202
ROCK SPRINGS, WY 82901
(307) 362-5028

SCALE: 1" = 50'
JOB No. 11709
REVISED: 10/27/05

**ANADARKO E&P CO., LP**
**AR FEDERAL 1691 10-4**
*ESTIMATED EARTHWORK*

6" TOPSOIL: 1111 CY
PAD CUT: 4542 CY
FILL: 4219 CY
PIT: 704 CY

UNGRADED ELEVATION: 6747.1'
FINISHED ELEVATION: 6744.1'







APPROXIMATE AREA OF DISTURBANCE    1.8± ACRES
DRAINS TO DRY COW CREEK

TOPSOIL PILE

RESERVE PIT
100' X 35' X 10'
3,384 bbls.

BOILER
FUEL
LIGHT PLANT
MUD PUMP
WATER DOG HOUSE
RIG
SHALE SHAKER
PIPE TUB
CAT WALK
PIPE TUB
PIPE RACKS

EXCESS SPOIL

Approximate Fence location

Approx. Fence location

ACCESS ROAD

ACCESS ROAD

UNGRADED ELEVATION: 3'
FINISHED ELEVATION: 66oz.1'

S 13°45'02" E    150'    150'

F 1.7    100'    C 2.9    100'    C 6.0
F 2.2
F 1.7    6662    100'    F 0.1    100'    C 6.1

150'    150'

C 4.0

6656 6658 6660 6662 6664 6666 6668 6670
6656 6658 6660    6660    6662 6664 6666 6668
6659 6660    6662

SCALE FEET
50    0    50

NOTE: THE EARTH QUANTITIES ON
THIS DRAWING ARE ESTIMATED
AND THE USE OF IS AT THE
RESPONSIBILITY OF THE USER.
BEFORE DIGGING
CALL FOR
UTILITY LINE LOCATION

**DRG RIFFIN & ASSOCIATES, INC.**

1414 ELK ST., SUITE 202
ROCK SPRINGS, WY 82901
(307) 362-5028

SCALE: 1" = 50'
JOB No. 13889
REVISED: 1/8/07

**Anadarko** Petroleum Corporation
**AR FEDERAL 1691 14-5**
ESTIMATED EARTHWORK

| ITEM | CUT | FILL | TOPSOIL | EXCESS |
|---|---|---|---|---|
| PAD | 3443 CY | 932 CY | 1111 CY | 1400 CY |
| PIT | 704 CY | | | 704 CY |
| TOTALS | 4147 CY | 932 CY | 1111 CY | 2104 CY |



APPROXIMATE AREA OF DISTURBANCE: 1.6± ACRES
DRAINS TO DRY COW CREEK

UNGRADED ELEVATION: 6701.1'
FINISHED ELEVATION: 6699.9'

RESERVE PIT
100' X 35' X 10'
3,384 bbls.

EXCESS SPOIL

TOPSOIL PILE

NOTE: THE EARTH QUANTITIES ON
THIS DRAWING ARE ESTIMATED
AND THE USE OF IS AT THE
RESPONSIBILITY OF THE USER.
BEFORE DIGGING
CALL FOR
UTILITY LINE LOCATION

SCALE FEET
50   0   50

## GRIFFIN & ASSOCIATES, INC.

1414 ELK ST., SUITE 202
ROCK SPRINGS, WY 82901
(307) 362-5028

SCALE: 1" = 50'
JOB No. 13879
REVISED: 6/19/06

Anadarko
Petroleum Corporation

### AR STATE 1691 10-16
#### ESTIMATED EARTHWORK

| ITEM | CUT | FILL | TOPSOIL | EXCESS |
|------|-----|------|---------|--------|
| PAD | 2341 CY | 1149 CY | 1110 CY | 82 CY |
| PIT | 704 CY | | | 704 CY |
| TOTALS | 3045 CY | 1149 CY | 1110 CY | 786 CY |

**Exhibit 10 to Defendant-Intervenors' Opposition To
Plaintiffs' Motion For A Preliminary Injunction**

**Catalina PODs A&B Conditions of Approval**

# CONDITIONS OF APPROVAL
## APPLICATION FOR PERMIT TO DRILL

*JJS  06/26/2007*
*JA  6/26/2007*
*DAD  6/26/07*

| | | |
|---|---|---|
| erator | **Double Eagle Corporation** | Well Name/No. |
| Lease No. | WYC-075344A, WYC-075345A WYW-48861, WYW-131275, WYW-136955, WYW-155530, WYW-161910 | Legal Description |

Well Name/No.  **Catalina Pods A & B**

Legal Description  **Various Sections –**
  T 16 N, R 91 W
  T 17 N, R 91 W
  T 16 N, R 92 W

### GOVERNMENT ADDRESS

USDI, BUREAU OF LAND MANAGEMENT

| | |
|---|---|
| FIELD OFFICE | Rawlins |
| ADDRESS | 1300 North Third Street, P.O. Box 2407 Rawlins, WY 82301 |
| OFFICE PHONE | (307) 328-4200 |
| OFFICE HOURS | 7:45 a.m. to 4:30 p.m. (Monday - Friday) |

### ACTIONS REQUIRING BLM NOTIFICATION

For construction, reclamation, and spud notices, submit via the internet at:

**www.blm.gov/wy/st/en/field_offices/Rawlins/oil_and_gas.html**

For running casing, cementing, BOPE tests, drill stem tests or other notices, call the following number 24 hours in advance of commencing operations and leave voice message with call back number.

**(307) 328-4276 (voice mail)**

### AUTHORIZED OFFICER REPRESENTATIVE CONTACTS

If you seek immediate approval or emergency assistance on any action that is related to the APD **Surface Use ˜an,** contact the Natural Resource Specialist listed below.

If you seek immediate approval or emergency assistance on any action that is related to the APD **Drilling Plan** or other down hole issues, you should contact the Petroleum Engineer listed below.

| | | |
|---|---|---|
| Natural Resource Specialist | **John Ahlbrandt – Pod A** | |
| | **Work Phone** | **(307) 328-4223** |
| | **Travis Bargsten – Pod B** | |
| | **Work Phone** | **(307) 328-4387** |
| Petroleum Engineer (Primary Contact) | **Jerry Dickinson** | |
| | **Work Phone** | **(307) 328-4243** |
| | Home Phone | (307) 327-5272 |
| | Cell Phone | (307) 329-7887 |

In the event the Petroleum Engineer named above is unavailable, please contact one of the following:

| | | |
|---|---|---|
| Petroleum Engineer (Second Contact) | **Jon Dull** | |
| | **Work Phone** | **(307) 328-4227** |
| | Cell/Home Phone | (307) 321-1687 |
| Petroleum Engineer (Third Contact) | Stuart Cerovski | |
| | Work Phone | (307) 332-8426 |
| | Home Phone | (307) 332-2408 |

---

*A COMPLETE COPY OF THE APPLICATION FOR PERMIT TO DRILL, THE CONDITIONS OF APPROVAL, and APPLICABLE MAPS MUST BE FURNISHED TO YOUR FIELD REPRESENTATIVE AND BE AVAILABLE ON SITE DURING CONSTRUCTION AND DRILLING ACTIVITIES.*

## :NERAL

1. Approval of this Application for Permit to Drill (APD) does not warrant that any party holds equitable or legal title.

2. All lease exploration, development, construction, production, operations, and reclamation activity shall be conducted in a manner which conforms to all applicable federal, state, and local laws and regulations.

3. All lease operations are subject to the terms of the lease and its stipulations, the regulations of 43 CFR Part 3100, Onshore Oil and Gas Orders, Notices to Lessees (NTL's), the approved APD, and any written instructions or Orders of the Bureau of Land Management (BLM) Authorized Officer (AO).

4. The approval of this APD does not grant authority to use off-lease federal lands.

5. This permit is valid for a period of two years from the date of approval or until lease expiration or termination, whichever is sooner. If the permit terminates, any surface disturbance created under the application shall be reclaimed in accordance with the approved reclamation plan found herein.

6. The Operator shall submit a Sundry Notice (Form 3160-5) to the AO for approval prior to beginning any new surface-disturbing activities or operations that are not specifically addressed and approved by this APD.

7. The Operator may submit to the AO written requests (including documentation, supporting analysis and an acceptable plan for mitigation of anticipated impacts) for exception, waiver, or modification to this approved APD, associated Conditions of Approval (COA), or other requirements. Such written approval shall be obtained prior to commencement of operations that cause any deviation from the approved APD and associated limitations. Emergency approval may be obtained orally, but such approval does not waive the written reporting requirement.

8. The Operator shall contact the AO's Representative (Natural Resource Specialist) as described above, at least **48-hours prior to** beginning operations including: any APD related construction and/or the initiation of any reclamation work and seeding.

9. All construction of the well pad, flare pit, reserve pit, roads, flowlines, production facilities, and all associated infrastructure on federal lands shall be monitored onsite by a licensed professional engineer OR designated qualified inspector (to be named at the time of construction notification) who will serve as the Operator's Compliance Coordinator to ensure construction meets the BLM-approved plans.

10. The spud date shall be reported to the AO's representative within **24 hours** of spudding. A follow-up report on Form 3160-5 confirming the date of spud shall be promptly submitted to this office within 5 working days from date of spud.

11. Verbal notification shall be given to the AO's representative **at least 24 hours in advance** of BOP tests, running and cementing casing (other than conductor casing), pluggings, DST's and/or other formation tests, and drilling over lease expiration dates.

12. A site security plan and site facility diagram shall be filed no later than 60 calendar days following first production.

# OPERATIONS

Upon request, Operator must be prepared to provide copies of applications for, and approved copies of, federal, state, and local operating permits.

1. All survey monuments found in the area of operations shall be protected. Survey monuments include, but are not limited to: General Land Office and BLM Cadastral Survey Corners, reference corners, witness points, U.S. Coastal and Geodetic benchmarks and triangulation stations, military control monuments, and recognizable civil (both public and private) survey monuments. In the event of obliteration or disturbance of any of the above, the Operator shall immediately report the incident, in writing, to the AO and the respective installing authority if known. Where General Land Office or BLM Right-of-Way monuments or references are obliterated during operations, the Operator shall secure the services of a registered land surveyor or a BLM cadastral surveyor to restore the disturbed monuments and references using surveying procedures found in the "Manual of Surveying Instructions for the Survey of the Public Lands in the United States," latest edition. The Operator shall record such survey in the appropriate county and send a copy to the AO. If the Bureau cadastral surveyors or other federal surveyors are used to restore the disturbed survey monument, the Operator shall be responsible for the survey cost.

2. If any cultural values [sites, artifacts, human remains] are observed during operation of this lease/permit/right-of-way, they will be left intact and the AO notified. The AO will conduct an evaluation of the cultural values to establish appropriate mitigation, salvage or treatment. The Operator is responsible for informing all persons in the area who are associated with this project that they will be subject to prosecution for knowingly disturbing historic or archaeological sites, or for collecting artifacts. If historic or archaeological materials are uncovered during construction, the Operator is to immediately stop work that might further disturb such materials, and contact the AO. Within five working days, the AO will inform the Operator as to: whether the materials appear eligible for the National Register of Historic Places; the mitigation measures the Operator will likely have to undertake before the site can be used (assuming in situ preservation is not necessary); and, a time-frame for the AO to complete an expedited review under 36 CFR 800.11 to confirm, through the State Historic Preservation Officer, that the findings of the AO are correct and that mitigation is appropriate. The AO will provide technical and procedural guidelines for the conduct of mitigation. Upon verification from the AO that the required mitigation has been completed, the Operator will then be allowed to resume construction measures.

   The Operator shall be responsible for informing all persons associated with this project that they shall be subject to prosecution for damaging, altering, excavating or removing any archaeological, historical, or vertebrate fossil objects or site. If archaeological, historical, or vertebrate fossil materials are discovered, the Operator shall suspend all operations that further disturb such materials and immediately contact the AO. Operations shall not resume until written authorization to proceed is issued by the AO.

   The Operator shall be responsible for the cost of any mitigation required by the AO. The AO will provide technical and procedural guidelines for the conduct of mitigation. Upon verification from the AO that the required mitigation has been completed, the Operator shall be allowed to resume operations.

3. If paleontological resources, either large or conspicuous, and/or of a significant scientific value are discovered during construction, the find will be reported to the AO immediately. Construction will be suspended within 250 feet of said find. An evaluation of the paleontological discovery will be made by a BLM-approved professional paleontologist within five (5) working days, weather permitting, to determine

the appropriate action(s) to prevent the potential loss of any significant paleontological values. Operations within 250 feet of such a discovery will not be resumed until written authorization to proceed is issued by the AO. The Operator will bear the cost of any required paleontological appraisals, surface collection of fossils, or salvage of any large conspicuous fossils of significant scientific interest discovered during the operation.

The Operator shall be responsible for informing all persons associated with this project that they shall be subject to prosecution for damaging, altering, excavating or removing any archaeological, historical, or vertebrate fossil objects or site. If archaeological, historical, or vertebrate fossil materials are discovered, the Operator shall suspend all operations that further disturb such materials and immediately contact the AO. Operations shall not resume until written authorization to proceed is issued by the AO.

Within five (5) working days, the AO will evaluate the discovery and inform the Operator of actions that will be necessary to prevent loss of significant cultural or scientific values.

The Operator shall be responsible for the cost of any mitigation required by the AO. The AO will provide technical and procedural guidelines for the conduct of mitigation. Upon verification from the AO that the required mitigation has been completed, the Operator shall be allowed to resume operations.

4. If any dead or injured threatened, endangered, proposed, or candidate animal species is located during construction or operation, the U.S. Fish and Wildlife Service's Wyoming Field Office (307-772-2374), its law enforcement office (307-261-6365), and the BLM Rawlins Field Office (307-328-4200) shall be notified within 24 hours. If any dead or injured sensitive species is located during construction or operation, the Rawlins Field Office shall also be notified within 24 hours.

5. Operators and Operator's sub-contracted personnel shall not intentionally harm or harass wild horses, other wildlife, or domestic livestock.

6. Weeds shall be controlled on project-disturbed areas and native areas infested as a direct result of the project. The control methods shall be in accordance with guidelines established by the EPA, BLM, state and local authorities. Prior to the use of pesticides, the Operator will obtain written approval from the AO - meaning an approved Pesticide Use Proposal form - showing the type and quantity of material(s) to be used, pest(s) to be controlled, method of application, etc.

7. The Operator shall be responsible for the prevention and suppression of fires on public lands caused by its employees, contractors, or its subcontractors. During conditions of extreme fire danger, surface use operations may be either limited or suspended in specific areas, or additional measures may be required by the AO.

8. Emissions of particulate matter from well pad, road, and other facility construction, operation, and reclamation activities will be minimized by application of water or other dust suppressants. Dust inhibitors (surfacing materials, dust suppressants, and water) will be used as necessary on locations that present a fugitive dust problem. The use of chemical dust suppressants on public surface will require prior approval from the AO.

9. If groundwater or permeable/porous subsoil or bedrock is encountered upon construction of the pad or pits, or upon drilling and completing shallow holes for surface conductor, rat/mouse holes, or water supply well, the Operator must immediately notify the AO before proceeding.

4

10. The Operator shall comply with the Hazardous Materials Management Plan/Summary in the EIS, including requirements to transport, store, utilize, and dispose of hazardous substances. The Operator shall maintain a hazardous substances release contingency plan that shall include, among other things, provision to notify the AO in the event of any release of hazardous substances associated with project operations.

... Only those hazardous wastes that qualify as **exempt,** under the Resource Conservation and Recovery Act (RCRA), Oil and Gas Exemption, may be disposed of in the reserve pit. *Generally, oil or gas wastes are exempt if they 1) have been sent down hole and then returned to the surface during oil/gas operations involving exploration, development, or production, or 2) have been generated during the removal of produced water or other contaminants from the oil/gas production stream.* The term hazardous waste, as referred to above, is defined as a <u>listed</u> (40 CFR 261.31-33) or <u>characteristic</u> (40 CFR 261.20-24) hazardous waste under RCRA.

## DRILLING PLAN

No additional drilling plan Conditions of Approval are made. All conditions of the Master Drilling Plan for the Catalina Unit as submitted by Double Eagle Petroleum Company should be followed.

## SURFACE USE PLAN OF OPERATIONS

### SITE SPECIFIC

1. The Operator is subject to the mandatory monitoring & reporting requirements and annual planning participation as provided for in the Atlantic Rim EIS Record of Decision (ROD), including (but not limited to) those contained in Appendix A of the ROD.

2. The Operator shall select and use a seed mix most applicable to each disturbed location, and as provided in Appendix A of the ROD, "Project Reclamation Plan."

3. All above-ground structures, production equipment, tanks, transformers, and insulators not subject to coloring requirements for safety shall be painted the color of "Shale Green" (5Y 4/2).

4. Fencing shall be installed, maintained, and monitored around the Central Delivery Point (POD B) and Water Transfer Station facilities. Fencing shall comply with BLM requirements to prevent entry by livestock and wildlife. Road egress from facilities shall be provided by installation of a cattleguard.

5. Construction of the emergency pit at the water transfer station shall only begin after it is demonstrated that wells flowing to the station would continue to flow in the event power is lost and pumping is stopped.

6. Pipeline crossings of watercourse channels shall be completed so that the pipelines are buried a minimum of four feet below the channel bottom. Appropriately-sized riprap will be placed from the channel bottom to the top of the normal high water line at all stream crossings. When excavating the crossing, separate the top 1-foot of stream bottom substrate from deeper soil layers and reconstruct the original layers by replacing deeper substrate first.

7. Drainage crossings by pipelines shall be constructed to prevent any blocking, diversion, or restriction of the existing channel, and shall seek to leave a channel alignment and geometry similar to what existed prior to disturbance.

8. Please be advised that due to limits on the available time of qualified personnel, the unpredictability of wildlife, and future weather conditions, requests for exceptions to wildlife stipulations will only be considered in the event of extraordinary and unavoidable occurrences over which the company has little or no control. Additionally, wells must be spud in a time frame which would allow for reasonably normal drilling and completion of the well prior to the beginning date of wildlife protection stipulations.

## Catalina POD A

1. Wildlife protection measures apply to the following well locations, and also apply to appurtenant access road, gas-gathering pipeline, water-gathering pipeline, and utility corridor segments, as displayed on the attached map:

| Well Name | Raptor[1] | CWR[2] | Grouse[3] |
|---|---|---|---|
| 44-11 | X | X | X |
| 24-12 | X | X | X |
| 13-12 | X | X | X |
| 11-13 | X | X | X |
| 42-13 | X | | X |
| 31-13 | X | | X |
| 22-13 | X | | X |
| 11-18 | X | | X |
| 22-18 | X | | X |
| 31-18 | X | | X |
| 42-18 | X | | X |
| 24-7 | X | | X |
| 33-7 | X | | X |
| 44-7 | X | | |
| Xfer Station | X | | |

[1]Construction, drilling and other activities potentially disruptive to nesting raptors are prohibited during the period of February 1 to July 31 for the protection of raptor nesting areas.

[2]Construction, drilling and other activities potentially disruptive to wintering wildlife are prohibited during the period of November 15 to April 30 for the protection of big game crucial winter habitat.

[3]Construction, drilling, reclamation and other potentially disruptive activities are prohibited during the period of March 1 to July 15 for the protection of sage grouse.

2. The edges of the well pad for the 24-12 shall stay at least 50 feet from the existing buried pipelines

3. In addition to the culverts proposed in the POD, the Operator shall install and size (as necessary) culverts for the following access roads:

   - #44-11: the CMP between the 13-12 and 44-11 (in the larger drainage) shall be 24" in diameter
   - #31-13: one 18" CMP shall be installed in the new access road at the junction of the existing road
   - #42-13: five additional 18" CMPs are required
   - #11-18: three 18" CMPs are required
   - #42-18: three 18" CMPs are required

**Catalina POD B**

1. In addition to the culverts proposed in the POD, the Operator shall install culverts as displayed on the attached map for POD B.

2. Wildlife protection measures apply to the following well locations, and also apply to appurtenant access road, gas-gathering pipeline, water-gathering pipeline, and utility corridor segments, as displayed on the attached map:

| Well Name | Raptor[1] | CWR[2] | Grouse[3] |
|---|---|---|---|
| 31-7 | X | | X |
| 42-7 | X | | X |
| 13-31/31I | X | X | X |
| 24-31 | X | X | X |
| 33-31 | X | | X |
| 44-31 | X | | X |
| 13-32 | X | | X |
| 24-32 | X | | X |
| 20-1 | X | X | X |
| 22-1 | X | X | X |
| 31-1 | X | X | X |
| 33-1 | X | X | X |
| 40-1 | X | | X |
| 42-1 | X | | X |
| 40-6 | X | | X |
| 31-6 | X | | X |
| 11-6/6I | X | | X |
| 42-6 | X | | X |
| 22-6 | X | | X |
| 33-6 | X | | X |
| 44-6 | X | | X |
| 13-6 | X | | X |
| 1I | X | X | X |
| Xfer Station | X | | X |
| CDP | X | | X |
| 44-36 (WY) | X | X | X |

[1]Construction, drilling and other activities potentially disruptive to nesting raptors are prohibited during the period of February 1 to July 31 for the protection of raptor nesting areas.

[2]Construction, drilling and other activities potentially disruptive to wintering wildlife are prohibited during the period of November 15 to April 30 for the protection of big game crucial winter habitat.

[3]Construction, drilling, reclamation and other potentially disruptive activities are prohibited during the period of March 1 to July 15 for the protection of sage grouse.

3. The Operator shall have a BLM-approved archaeologist on-site to monitor the construction of the access road/pipeline/utility corridor segments listed below:

   - From #42-1 to #22-1
   - From midpoint of above segment to #33-1

The Archaeologist must then submit a report to the BLM Authorized Officer detailing the location of any historical or archaeological resources discovered during the course of operations. If any such

resources are discovered, operations shall cease until avoidance measures can be agreed upon and written permission (with appropriate conditions) to proceed is granted by the BLM Authorized Officer.

4. The Operator shall construct the access road in the NW¼ of Section 6 (west of the 11-6/6I) as shown on engineering documents stamped by John H. Hibsman on 04/05/2006 with the additional specification that the rip-rap at the outlet of the 36-inch culvert will be 6-18 inches in size.

5. The Operator shall construct the access road to the #44-6 as shown on engineering documents stamped by John H. Hibsman on 03/16/2006.

6. The Operator shall construct the access road to the #42-6 as shown on engineering documents stamped by John H. Hibsman on 04/05/2006 with the following changes:

   - An 18-inch corrugated metal pipe culvert shall be installed at Station 11+30
   - Wing ditches shall be constructed at Stations 1+50, 3+50, 8+75, and 9+85. The proposed wing ditches at Stations 2+50 and 9+50 are not required.

## CONSTRUCTION

When referring to "the APD" or "this APD" below, these Conditions shall be applied to all APDs authorized in these PODs.

1. All facilities on location that have the potential to release oil, glycol, methanol, produced water, condensate, or other fluids which may constitute a hazard to the environment or public health shall be within secondary containment. The containment shall be impervious to those substances, exclusive of wildlife and livestock, and able to contain a minimum of 110% of the volume of the largest storage vessel so that any spill or leakage would not drain, infiltrate, or otherwise escape to ground water, surface water, or navigable waters before cleanup can be completed.

2. All open vent stack equipment shall be designed and constructed to prevent entry by birds and bats and to discourage perching.

3. The Operator shall immediately repair/replace (to BLM standards) any range infrastructure breached, altered, or damaged by construction, drilling, or operation activities related to this APD.

4. Construction and/or other operations with frozen material or during periods when the soil material is saturated is expressly prohibited. If equipment, including licensed highway vehicles, create ruts in excess of four (4) inches deep, the soil shall be deemed too wet to adequately support maintenance and/or heavy equipment.

5. If accumulated snow is present on the ground at the outset of construction or reclamation activities, the snow shall be removed before the soil is disturbed and piled downhill from the disturbed area. Equipment used for any non-construction snow removal operations will be equipped with 6" shoes to ensure blades do not remove topsoil or vegetation.

6. Remove, and clearly segregate from all other spoil, all available topsoil from constructed locations including areas of cut and fill. The top soil shall be stockpiled at the site for use in reclamation on all other areas of surface disturbance (roads, pipelines, etc.).

7. Plugs or embankments providing wildlife with access out of and across open pipeline trenches shall be installed, at minimum, every 1320 linear feet along open pipeline trenches.

8. No construction shall block or change the natural course of any drainage, nor shall topsoil, waste, or fill material will be deposited below high water lines in riparian areas, flood plains, or in natural drainage ways. All spoils will be placed where they can be retrieved without creating additional surface disturbance and where they do not impede and/or contribute sediment to watershed and drainage flows.

9. Drainage and runoff shall be diverted away from all new construction. All drainage structures shall simulate topographic contour lines, have a grade no greater than ½ - 1 percent, and shall release water onto undisturbed ground without causing additional and/or accelerated erosion.

10. Construction control stakes shall be placed as necessary to ensure construction of the well pad, topsoil stockpile, spoil pile, and outer limits of the area to be disturbed in accordance with the specifications outlined in the APD. The Operator shall assume full responsibility for protecting all stakes and offsetting any additional stakes or grades which may be necessary.

## ROADS

1. All vehicles shall use only authorized travel routes and shall not use any other access route, such as two-track roads, trails, and pipeline rights-of-way to the drill/well pad and any ancillary facilities.

2. Currently used two-track roads shall not be cut-off as a direct result of construction of the new well access road.

3. All access roads and drainage control structures, whether existing or newly-constructed, shall be both constructed to resource road standards and regularly maintained in a safe and usable condition as outlined in BLM Manual, Section 9113. The Lessee and/or Operator shall enter into a maintenance agreement with all other authorized users of the common access road(s). The costs of road maintenance in dollars, equipment, materials, labor, and other related expenses shall be shared proportionally among the authorized users. Upon request, the AO shall be provided copies of any maintenance agreement or agreements.

4. At the time of construction, road(s) shall be staked with construction control stakes set continuously along the centerline at maximum 100-foot intervals (less where needed to be inter-visible) and at all tangent and curve control points, fence or utility crossings, and culverts. In addition to centerline stakes, slope stakes shall be placed at the top of the cut and the bottom of the fill for those portions of the road that are engineered.

5. Before proposed road construction activities begin, the topsoil must be bladed to the side of the road and stockpiled. The topsoil stockpile shall be contoured so as to prevent water ponding or flow concentration. Once the barrow ditch and the cut slopes are constructed, cleared vegetative material and topsoil that is windrowed shall be spread back onto the cut/fill slopes of the road, removing any windrows or berms remaining at the edge of the road.

6. The minimum travel-way width of the immediate access road will be 14 feet with turnouts at least 10 feet in width. No structure will be allowed to narrow the road top. The inside slope will be 4:1. The bottom of the ditch will be a smooth V with no vertical cut in the bottom. The outside slope will be 2:1 or shallower. After the road is crowned and ditched with a 0.3 - 0.5 ft/ft crown the topsoil and windrowed vegetative material shall be pulled back down on the cut slope so there is no berm left at the top of the cut slope. Turnouts will be spaced at a maximum distance of 1000 feet and will be intervisible.

7. If soils along the access road route are dry during road construction or use & maintenance, water shall be applied to the road surface to facilitate soil compaction and minimize soil loss as a result of wind erosion.

   Construction and surfacing of the new access road shall be complete prior to moving drilling equipment onto the well pad and the presence of heavy vehicular traffic. Compact the top foot of sub-grade to a 95% maximum density as determined by AASHTO T-99. Surface with an appropriate grade of gravel to a minimum depth of four (compacted) inches. Proponent shall use gravel, sufficiently well-graded and to include plastic fines, that remains in place and does not easily form washboards. Gravel that matches the color and texture of the surrounding soils and terrain shall be used

9. All cattle guards will be designed and maintained consistent with BLM standards and shall be a minimum of 15 feet wide and 8 feet long; set on either timber, pre-cast concrete, or cast-in-place concrete bases at right angles to the roadway; have an adjacent 16 foot wide bypass gate; not narrow the road surface; and have fence and end panels on either side constructed using 3 posts with braces.

10. Culverts shall have a minimum of 12" of fill or 1/2 the pipe diameter, whichever is greater, placed on top of the culvert, and shall be of length sufficient to allow at least 24" of culvert to extend from the fill slope face. The inlet and outlet shall be set on grade. No rocks shall be used in the bed material and no rocks greater than 2" in diameter will be immediately adjacent to the culvert. The entire length of pipe shall be bedded on native material before backfilling, which shall be completed using unfrozen material and rocks no larger than two inches in diameter; compact the backfill evenly in 6" lifts on both sides of the culvert. A permanent marker shall be installed at both ends of the culvert to help prevent traffic from damaging the culvert. Additional culverts will be placed in the new access road as the need arises or as directed by AO.

11. Wing-ditches shall be staked and constructed at a slope of 1/2 to 1 percent down slope unless otherwise approved by the AO. In no case shall wing-ditches discharge adjacent to a channel bank.

12. All drainage ditches and culverts shall be kept clear and free-flowing, and shall also be maintained in accordance with the original construction standards.

## PITS

1. Flaring of gas into the reserve or completion pits will not be allowed without prior approval from the AO.

2. All pits shall be kept free of trash and accumulations of liquid hydrocarbons. Any evidence of RCRA non-exempt wastes present in the reserve pit will result in the AO requiring specific testing and closure procedures.

3. Pits are to be dried and reclaimed within 180 days from the date that total depth was reached and prior to any backfilling. Trenching or squeezing is prohibited. Pits, once dry, shall be backfilled with dry and unfrozen soil, and compacted with a minimum cover of five (5) feet of soil, void of any topsoil, vegetation, large stones, rocks or foreign objects. The pit area shall be mounded to allow for settling and to promote positive surface drainage away from the pit. Before backfilling synthetically lined reserve pits, those liner portions remaining above the "mud line" shall be cut off as close to the top of the mud surface as possible and disposed of at an approved solid waste disposal facility. The pit bottom and remaining liner shall not be trenched, cut, punctured, or perforated. Installation and operation of any sprinklers, pumps, and related equipment shall ensure that water spray or mist does not drift outside of pit boundaries.

4. All pits are required to maintain 2 feet of freeboard. If operations cause fluid levels in pits to rise above the required freeboard, immediate notification shall be provided to the AO with concurrent steps taken to cease the introduction of additional fluids, until alternative containment methods can be approved.

For the protection of livestock and wildlife, all pits and open cellars shall be fenced on all sides, with corner bracing, immediately upon construction. Reserve pits will be adequately fenced during and after drilling operations until pits are reclaimed so as to effectively exclude wildlife and livestock. Approved netting (mesh diameter no larger than one inch) is required over any pit that contains or is identified as containing hydrocarbons or hazardous substances (per RCRA 40 CFR Part 261 or CERCLA Section 101(14)).

## RECLAMATION

1. Reclamation earthwork shall consist of: 1) backfilling pits, 2) re-contouring and stabilizing the well site, access road, drainage channels, utility and pipeline corridors, and all other disturbed areas, to approximately the original contour, shape, and configuration that existed before construction, and 3) final grading and replacement of all topsoil so that no topsoil remains in the stockpile. Any compacted backfilling activities shall ensure proper settling and stabilization.

2. Prior to topsoil placement, the entire surface to be reclaimed shall be ripped to a depth of 18-24 inches deep on 18-24 inch centers to reduce compaction. After ripping, topsoil placement shall occur, and all surface soil material shall be pitted or roughened such that the entire reclamation area will be uniformly covered with depressions constructed perpendicular to the natural flow of water and/or prevailing wind.

3. Interim reclamation of all disturbed areas not needed for production operations, including unnecessary access roads and pipeline right(s)-of-way, shall commence and be completed within six (6) months from date of reaching total depth or end of construction for each facility. All fill and stockpiled soils shall be distributed on disturbed areas and the production pad shall be as small as possible to allow for safe and prudent production operations.

4. Temporary fencing of the reclaimed well/facilities locations for the first two growing seasons after either interim or final seeding may be required to exclude livestock and wildlife and to help ensure better re-vegetation success. Similarly, off-road vehicle prevention measures shall be employed on reclaimed locations.

5. Any subsequent re-disturbance of interim reclamation shall be reclaimed within 180 days by the same means described herein.

6. A Notice of Intent to Abandon, on Form 3160-5, must be submitted prior to any abandonment activities. A joint inspection of the disturbed areas may be required and attended by the BLM and the Operator (or Operator's Designee), the primary purpose of which is to review and agree to the existing (or a new) abandonment and/or final reclamation plan. Earthwork must commence and be completed within six (6) months from the date of plugging and abandonment and seeding no later than the next season after the completion of earthwork, with final reclamation completed within two years of the plugging/abandonment date.

7. The Operator shall submit a Final Abandonment Notice (FAN), using Form 3160-5, to the AO when adequate reclamation of surface-disturbed areas has been completed. This FAN indicates that the location is considered ready for final inspection, with adequate vegetation cover and species diversity. Upon receipt of the FAN, the BLM will conduct a field inspection prior to releasing the bond liability for this location.

8. There shall be no primary or secondary noxious weed seed in the seed mixture. Seed shall be tested and the viability testing of seed shall be done in accordance with State law(s) and within 9 months prior to purchase. Commercial seed shall be either certified or registered seed. The seed mixture container shall be tagged in accordance with State law(s) and available for inspection by the AO. The seeding will be repeated until a satisfactory stand is established as determined by the AO.

9. All practicable measures will be utilized to minimize erosion and stabilize disturbed soils. Should the use or storage of hay, straw, or mulch be necessary, the Operator is required to use certified weed-free hay, straw, and mulch.

10. Any topsoil to be stockpiled for longer than six (6) months shall be spread in layers of 2 feet maximum thickness, signed, and stabilized with a suitable cover crop (immediately post-construction and until successful) as approved of by the AO.

## WATER

1. All disposal and management of produced water must be in accordance with Onshore Oil and Gas Order No. 7. The Water Management Plan currently proposes disposal by re-injection, and is hereby authorized. Surface disposal of produced water must be approved under a separate authorization prior to surface discharge.

2. Any changes to water sources/supplies, fate of drilling/completion fluids, routes and means of fluid transportation, and location or method of produced water disposal must first have written approval from the AO.



# Double Eagle Catalina Pod B Culverts



**Exhibit 11 to Defendant-Intervenors' Opposition To
Plaintiffs' Motion For A Preliminary Injunction**

**Wyoming Department of Environmental Quality
April 23, 2007 Methane Springs Presentation**



# AGENDA
# Methane Springs
# April 23, 2007

- Why are we here?
- Panel introduction
- Presentation
- Questions and Answers
- Next Steps

# Why are we here?

- ## Current Concern About Observed Methane Springs in Atlantic Rim Area.

    - Talk about where we are with our evaluation

    - Provide what we know so far

    - Discuss next steps



Wild Cow Creek Methane Spring





Near Baggs
Savery Creek methane on fire



# Panel

- Participants
  - Wyoming Oil and Gas Conservation Commission – Janie Nelson, Environmental Program Supervisor
  - Bureau Land Management – Debbie Johnson, geologist
  - Wyoming State Geological Survey – Fred McLaughlin, geologist
  - Anadarko Petroleum Company – Tom Clayson, Senior Staff Regulatory Coordinator
  - Wyoming Department of Environmental Quality – Glenn Breed, geologist



# Presentation
# Atlantic Rim Project Area









# History of Methane Springs

- Features first described in 1879 near Chain Lakes, Hayden

- WGA Field Conference Guidebook, 1955

- United States Geological Survey noted springs in 1963 and again in air photos of Deep Gulch methane springs in the 1975.

- BLM staff documented the methane springs in Wild Cow Creek area in the early to mid 1980's.

- Air photos 1994 and 2002; 1995-96 and recent.



Deep Gulch Mudpots.

1994 DOQQ

2002 CIR

It appears that the mudpot exists in both sets of photos, however the ammount of activity at this location cannot be determined

**Exhibit 11 Part 2 to Defendant-Intervenors'
Opposition To Plaintiffs' Motion For
A Preliminary Injunction**

**Wyoming Department of Environmental Quality
April 23, 2007 Methane Springs Presentation**



Wild Cow Creek Mudpot.

1994 DOQQ

2002 CIR

It appears that the mudpot exists in both sets of photos, however the ammount of activity at this location cannot be determined



1995-1996

Cherokee Creek Water Well with Gas 23-15-91-1

Gas activity ebbs and flows

January 5, 2007

1995-1996

January 5, 2007



# Coal Bed Methane Produced Water Injection Is **Not** Cause of Methane Springs

- Small volume of water emanating from the springs
- Seal on top and bottom of water injected container
- Pre-existing methane springs – photos & documents
- First coal bed methane produced water injection started in 2001
- Bubbling is caused by methane gas mixing with water and soil
- Possible source(s) of methane gas at surface
  - Near surface coals and/or
  - Abandoned gas wells that penetrate the coals



# Efforts to Date

- WDEQ visited the methane springs
- Three meetings held with WOGCC, WSGS, BLM, Anadarko and WDEQ
- Evaluated available data
- Concluded injection of produced water is not related to methane springs
- Public meeting today



# Continued Efforts

- BLM water connectivity study will inventory water resource features such as springs, groundwater wells, methane springs, and perennial drainages (e.g. Muddy Creek).

- Baseline inventory will enable future monitoring and will help determine how these water resources might be affected by coal bed methane (CBM) development.

- Collection and analysis of water samples from springs, methane springs, water wells, CBM wells, and perennial drainages.

- Inventory and evaluation of abandoned wells and plugged coal core holes.



# Continued Efforts

- Geology and hydrology
- Evaluate new data as available
- WDEQ permits all injection wells
- Feedback from meeting today
- Inform stakeholders as appropriate





# Conclusions

- Many of the methane springs have been active and present for some time.

- Injection of produced water is not causing the methane springs.

- Potential source(s) of methane
  - Near surface coals
  - Abandoned wells that penetrate the coals



# Questions and Answers



# Next Steps

- ## Feedback from audience
  - – Item 1, etc.

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Avenue, NW, Suite 400
Washington, DC 20005,

BIODIVERSITY CONSERVATION ALLIANCE
Post Office Box 1512
Laramie, WY 82073,

WYOMING OUTDOOR COUNCIL
232 Lincoln Street
Lander, WY 82520,

WESTERN WATERSHEDS PROJECT
Post Office Box 1160
Pinedale, WY 82940,

WYOMING WILDERNESS ASSOCIATION
Post Office Box 6588
Sheridan WY,

    Plaintiffs,

  v.

DIRK KEMPTHORNE, in his official capacity as the
Secretary of the United States
Department of the Interior
1849 C Street, NW
Washington, DC 20240,

U.S. DEPARTMENT OF THE INTERIOR
1849 C Street, NW, Room 406-LS
Washington, DC 20240,

U.S. BUREAU OF LAND MANAGEMENT
1849 C Street, NW, Room 406-LS
Washington, DC 20240,

  Defendants.

_____

ANADARKO PETROLEUM CORPORATION,
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.,
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

Civ. No. 1:07-cv-01709-RJL

[PROPOSED] ORDER

DOUBLE EAGLE PETROLEUM CO.,
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

Defendant-Intervenors.

      UPON CONSIDERATION of the Motion of Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co. to Intervene as defendants in this case pursuant to Federal Rule of Civil Procedure 24, and for good cause shown, it is hereby

      ORDERED that the Motion of Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co. to Intervene is GRANTED, and that Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co. are hereby accorded party status as defendants in this case; and

      ORDERED that the Answer of Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co. and their Opposition to Plaintiffs' Motion for a Preliminary Injunction be deemed filed.

Dated this____ day of _____, 2007.

                                          _____
                                          United States District Court Judge