IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ )
                                                )
NATURAL RESOURCES DEFENSE COUNCIL               )
1200 New York Avenue, NW, Suite 400             )
Washington, DC  20005,            *et al.*      )
                                                )
        Plaintiffs,                             )    Civ. No. 07-1709 (RJL)
                                                )
            v.                                  )
                                                )
DIRK KEMPTHORNE, in his official capacity       )
As the Secretary of the United States           )
Department of the Interior                      )
1849 C Street, NW                               )
Washington, DC  20240,           *et al.*       )
                                                )
        Defendants.                             )
_____)

**PLAINTIFFS' REPLY TO OPPOSITION
TO MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

This case challenges the flawed process that the Bureau of Land Management

("BLM") established to approve specific natural gas wells and the construction of miles

of new roads, pipelines and power lines to go with them.  BLM claims that the

"emergency" is of the plaintiffs' making, yet plaintiffs' delay in coming to court was the

result of BLM's failure to inform the public of the activities the agency was approving on

the public's lands.  BLM starts its clock against plaintiffs on the day the agency approved

the Catalina and Sun Dog Plans of Development ("PODs").  The agency, however, never

provided any public notice of its approval.

BLM made two critical mistakes in its process for approving drilling permits within the Atlantic Rim project.[1]  First, BLM deferred site-specific review under the National Environmental Policy Act ("NEPA") until the agency approved specific drilling permits, but excluded the public from this later review.  Once BLM chose to defer part of the NEPA analysis the agency had a legal obligation under NEPA to involve the public when it completed the analysis.  BLM failed to do so.  Second, BLM failed to fulfill its legal obligation under the Clean Water Act to get a certification of compliance with state water quality standards or an explicit certification waiver prior to issuing the challenged drilling permits.  As a result of the agency's failures, irreparable harm on the ground in the Atlantic Rim area is occurring.[2]

Plaintiffs seek injunctive relief in order to preserve the status quo while the court has time to resolve the merits of plaintiffs' claims.  NEPA's public participation requirements and the Clean Water Act's certification requirements are intended to inform agency decisions.  Here, BLM proceeded without the public input and information required by law and as a result the agency's decisions are causing more harm than they might have otherwise.   Consequently, this court should enjoin further action under the drilling permits approved for the Catalina A & B PODs and the Sun Dog A & B PODs.  Rather than enjoin all activity pursuant to the POD approvals, the court may be able to tailor relief to focus on the actions that pose the greatest harm to the environment and the least harm to the industry intervenors.  In addition, plaintiffs request that this court enjoin

---

[1] *See* Exh. U attached hereto providing maps of project area and the four PODs at issue.
[2] For purposes of their motion for preliminary injunction, plaintiffs have chosen to focus on BLM's procedural violations of NEPA and the Clean Water Act.  While plaintiffs do not concede their claims addressing the adequacy of the environmental analysis related to the Atlantic Rim project, the most straightforward issues in the case at this point in time concern the process that BLM has established for the approval of drilling permits within the Atlantic Rim project area.  It is the unlawfulness of this process on which plaintiffs wish to focus the Court's attention.

further approval of drilling permits within the Atlantic Rim project area until resolution of this case.

## I. Plaintiffs are Likely to Succeed on the Merits.

### A. BLM's Process Violates NEPA.

Defendants misunderstand plaintiffs' argument. Plaintiffs do not argue that federal NEPA regulations require agencies to circulate an environmental assessment under all circumstances. The regulations, however, do require that BLM circulate the challenged EAs under the circumstances involved here. BLM did not complete the analysis required by NEPA when it prepared the environmental impact statement for the Atlantic Rim Development Project. The agency chose to defer part of the NEPA analysis until later. Record of Decision at 18-20 (attached as Exh. 3 to BLM Br.); Final Environmental Impact Statement ("FEIS") at 4-26, 4-107 (attached as Exh. 8 to BLM Br.). By making this choice, BLM incurred the obligation to involve the public when it conducted the site-specific NEPA analysis later. BLM's failure to do so violates the public participation requirements of NEPA.

This Court has recognized that "[a]ll three statutory and regulatory schemes implicated" here – the Federal Land Policy and Management Act, NEPA and the CEQ regulations – "require the BLM to involve the public in its decision-making process." *Biodiversity Conservation Alliance v. BLM*, 404 F.Supp.2d 212, 219 (D.D.C. 2005) (citations omitted). Plaintiffs concede that "whether the public was adequately involved is a fact-intensive inquiry made on a case-by-case basis." *Id.* at 220. In *Biodiversity Conservation Alliance*, the Court found that the facts showed that BLM provided the required public participation. Here, the facts show that BLM has not.

The public participation provided in *Biodiversity Conservation Alliance* was quite different from that provided here.  In *Biodiversity Conservation Alliance*, BLM did in fact provide an opportunity to comment on the environmental assessment.  *Id.* *Biodiversity Conservation Alliance* involved a challenge to a seismic testing project by Veritas DGC Land Incorporated ("Veritas").  In that case, "BLM advised the public of Veritas's proposal, allowed a thirty-day public comment period, and *did not issue the DR/FONSI until after considering the issues raised during that period*."  *Id.*  (emphasis added).  This Court did not authorize approval of an environmental assessment without public comment.  Instead, the Court held that a "slight increase" in the project size did not require a supplemental EA and further opportunity for public comment.  *Id.*

Unlike *Biodiversity Conservation Alliance*, BLM here did not circulate the two environmental assessments at issue before approving the Catalina and Sun Dog development plans.  The notice that BLM provided does not constitute an opportunity to comment before a decision is made.  BLM argues that it "provided an opportunity for public involvement by posting notices of the APDs for 30 days in the agency's public room of the Rawlins office."  BLM Br. at 24.  The agency fails to mention the date on which these APD notices were posted.   As it turns out, the notices of the APDs for the Catalina A & B PODs appear to have been posted in September 2005.  Plaintiffs' Exh, V attached hereto.  Likewise, it appears that BLM posted the notices of the APDs for Sun Dog A & B PODs in May and August 2006, respectively.  *Id.*  This posting was months before BLM issued its Record of Decision ("ROD") approving the Atlantic Rim Development Project on May 21, 2007.  BLM Br. at 6.  Plaintiffs certainly had no reason to look for drilling permit applications in the Atlantic Rim project area before BLM had

even approved the project area.  Posting the APD notices for 30 days before the public has any reason to look for such notices certainly cannot constitute the meaningful public participation that NEPA requires.

Moreover, even if plaintiffs had seen the APD notices while they were posted, these notices would not have provided the opportunity to comment on the environmental analysis required by NEPA.  The APD notices that are posted do not include the agency's environmental analysis.  The notices do not even include the actual application for the permit to drill.  Exh. V attached hereto.  The process BLM has set up does not provide the environmental assessment for public comment before BLM makes its decision approving the drilling permits at issue.

In the past, when Biodiversity Conservation Alliance has requested a copy of an environmental assessment it has not received the analysis before BLM has approved the drilling permits at issue.  The very example that defendants provide attached as Exh. H to the Declaration of Travis Bargsten confirms the failure of BLM's process to provide meaningful public participation.[3]  Mr. Bargsten asserts that "the APD postings and online NEPA register has been utilized by members of the public, including BCA, to provide comment on pending APDs."  Bargsten Decl., ¶ 8(d).  The opportunity, however, that BLM has provided is rather meaningless since it does not provide the public the relevant documents until after BLM makes its decision.  As indicated in Federal Defendants' own exhibit, the environmental assessment for the Lookout Wash Unit of Desolation Flats was provided to Biodiveristy Conservation Alliance on June 16, 2005.  Bargsten Decl., Exh H, at 10.  Yet, BLM approved the well and accompanying environmental analysis on June 9, 2005.  *Id.* at 7.

---

[3] The Bargsten Decl. is attached as Exh. 11 to BLM's Br. (Oct. 5, 2007).

Similarly, as plaintiffs pointed out in their opening brief, the NEPA register provided by the BLM's Wyoming office does not cure the insufficiencies of BLM's process for public involvement concerning the APDs at issue. This register does not provide access to the environmental documents. Even when BCA has requested copies of the environmental documents referred to, BLM has not provided them before making its decision. Thus, the process that BLM has set up here for approval of drilling permits in the Atlantic Rim Development Project is very different from what this Court found sufficient in the earlier *Biodiversity Conservation Alliance* case. Using a process that gives the public an environmental assessment *after* the agency's decision has already been made is very different than providing the public the environmental assessment *before* the agency's decision is made as BLM did in *Biodiversity Conservation Alliance*. *See* 404 F.Supp.2d at 220.

The facts in *TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006) are also quite different than the facts here. Unlike BLM in this case, the Bureau of Indian Affairs in *TOMAC did* seek comment on the original draft environmental assessment. *Id.* Plaintiffs in *TOMAC* argued that an *additional* round of comment was necessary when the agency supplemented the EA. *Id.* Here, there is no supplemental EA at issue. What plaintiffs challenge is BLM's failure to circulate an *original* draft EA for public comment before the agency approved the challenged Catalina and Sun Dog drilling permits.

Defendants note, in their briefs, that there was a significant opportunity for public comment on the project-wide Atlantic Rim EIS (BLM Br. at 6-7, Interv. Br. at 2-3). Plaintiffs do not dispute this, and indeed, plaintiffs took advantage of this opportunity to provide comments on the project as a whole. However, BLM indicated, both in the EIS

and in response to several of plaintiffs' comments, that some issues would not be analyzed until specific drilling proposals were on hand and site-specific analyses were performed. *See e.g.* FEIS 4-26; 4-107; O-165; O-174; O-182; O-184; O-192.[4] The public comment period for the project-wide EIS, therefore, does not cure BLM's failures to involve the public in approving the APDs at issue here.

In sum, this Court should declare that the process BLM used in approving the challenged drilling permits violates NEPA. BLM exaggerates what plaintiffs ask for when the agency says that "[p]laintiffs seek to create a standard that is not 'practicable.'" BLM Br. at 25. Plaintiffs do not ask this Court to hold that NEPA regulations mandate public comment on EAs in every circumstance. What plaintiffs ask is that the Court find that under the circumstances of this case, where BLM chose to postpone part of the NEPA analysis, the agency must give the public the opportunity to comment at that later date when the agency chooses to complete the analysis. Here, the analysis was completed at the APD stage and BLM unlawfully excluded the public from commenting on the site-specific analysis before BLM approved the drilling permits.

**B. BLM's Process Violates the Clean Water Act.**

BLM has violated the plain language of the Clean Water Act. Section 401 of the Act provides that "[n]o [federal] license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding section." 33 U.S.C. § 1341(a)(1). In its brief, BLM does not claim that it obtained the required certification or waiver. Instead, BLM argues that Section 401 does not apply to the drilling permits at issue because the permitted activity does not involve

---

[4] FEIS Chapter 4 was attached as Exh. 8 to BLM Br. The referenced pages from Appendix O (responses to comments) were attached as part of Exh. B to Pls. Opening Br.

point source discharges.  BLM Br. at 42-43.  BLM's own evidence, however,

demonstrates that there are point source discharges involved.

### 1. Activities Approved for Catalina and Sun Dog PODs Involve Point Sources.

The construction of new roads and well pads authorized by BLM's drilling

permits for the Catalina and Sun Dog PODs creates culverts, ditches and other channels

through which stormwater is collected and discharged into the nation's waters.  *See e.g.,*

Bargsten Decl., Exh. D (Photo 3) (photo of Catalina road culvert);  Ahlbrandt Decl., Exh.

C (photo of more road culverts built pursuant to the challenged drilling permits).[5]  Such

culverts and other channels fall within the plain language of the Clean Water Act's

definition of "point source."  *See* 33 U.S.C. § 1362(14) ("The term 'point source' means

any discernible, confined and discrete conveyance, including but not limited to any pipe,

ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock,

concentrated animal feeding operation, or vessel or other floating craft, from which

pollutants are or may be discharged.").  Given the miles of new roads authorized and the

number of streams in the area of the Catalina and Sun Dog PODs (see attached Exh. W),

Anadarko and Double Eagle have inevitably constructed numerous culverts like the ones

in BLM's photos.

Case law supports including culverts such as those shown in BLM's photos within

the definition of "point source."  *See e.g.*, *South Fla. Water Management Dist. v.*

*Miccosukee Tribe,* 541 U.S. 95, 105, 124 S.Ct. 1537, 158 L.Ed.2d 264 (2004) (the Act

"makes plain that a point source need not be the original source of the pollutant; it need

only convey the pollutant to navigable waters.").  The Clean Water Act "embrac[es] the

broadest possible definition of any identifiable conveyance from which pollutants might

---

[5] The Ahlbrandt Declaration is attached as Exhibit 12 to BLM's opposition brief.

enter waters of the United States." *Dague v. City of Burlington*, 935 F.2d 1343, 1354-55 (2d Cir. 1991), *rev'd in part on other grounds*, 505 U.S. 557 (1992) (court held that railroad culvert is a point source).

In addition to culverts, the road and well pad construction by oil and gas companies create channels that convey sediment and other pollutants into nearby streams. The roads are designed to direct water off their surface. Because of the roads, the water collects and flows through channels into waters covered by the Clean Water Act. The Molvar Declaration provides testimony to this effect. Mr. Molvar observed "two new roads that had been built across stream channels by the use of road cuts." Molvar Decl., ¶ 6, and photo attached as Exh. 8 to the declaration.[6] Even though the stream channels are dry at times, during rain or snow events they serve to convey water and pollutants into nearby streams.

The U.S. Environmental Protection Agency has explicitly addressed the pollution that is produced from point sources at oil and gas activities such as those involved here. *National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges*, 55 Fed. Reg. 47990 (Nov. 16, 1990) ("Oil, gas and mining facilities are among those industrial sites that are likely to discharge storm water runoff that is contaminated by process wastes, toxic pollutants, hazardous substances, or oil and grease. Such contamination can include disturbed soils and process wastes containing heavy metals or suspended or dissolved solids, salts, surfactants, or solvents used or produced in oil and gas operations."). *See also*, *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1009 (11th Cir. 2004) ("erosion gullies leading downhill to the stream"

---

[6] The Molvar Declaration is Exh. A to Pls' Opening Br.

identified in plaintiff's photographs constituted point sources). Thus, BLM is simply incorrect when it says that there are no point source discharges at issue.

Likewise, intervenors are incorrect when they assert that "the record shows that the approved drilling activities in the Sun Dog and Catalina PODs will not result in any point source discharge to navigable waters." Interv. Br. at 37. Intervenors rely on the fact that water produced in the drilling process will be re-injected rather than discharged to any surface waters or waterways. *Id.* While discharges of produced water are one type of point source associated with the oil and gas activities involved here, they are not the only type of point source involved. As explained above, culverts like those shown in BLM's own photos and channels created as a result of runoff from well pads and roads are point sources as well. Storage pits for drilling fluids or other wastes may also be point sources. *See United States v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir. 1979) (storage pits for mining waste found to be point source where snow melt caused pits to overflow); *Beartooth Alliance v. Crown Butte Mines*, 904 F.Supp. 1168 (D.Mt. 1995) (acid drainage from mine is point source). The drilling activities approved by BLM in the challenged decisions routinely involve storage pits for waste drilling fluids and muds. At least one such waste storage pit appears to be present in the Catalina and Sun Dog PODs. Molvar Decl., Exh. 2 (photo of storage pit).

### 2. Sixty-Day Notice was Not Required.

Given that point sources are involved with the oil and gas activities approved by the challenged BLM permits, BLM was required to obtain the State of Wyoming's certification or waiver of compliance with state water quality standards before it issued the permits. Based on the Act's language, it is unclear whether plaintiffs could bring a

citizen suit under the Clean Water Act against BLM in the D.C. courts for failure to obtain the certification or waiver required by Section 401. Intervenors point to *Oregon Natural Desert Ass'n v. Dombeck*, 172 F.3d 1092 (9th Cir 1998) for the proposition that claims under Section 401 fall within the scope of the Clean Water Act's citizen suit provision. (Interv. Br. at 35). However, no court in the D.C. circuit has so held and this Court should not follow its reasoning.

Since an action of the EPA Administrator is not involved here, to come within the scope of the citizen suit provision plaintiffs would have to allege that BLM is in violation of an "effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a). While the Act provides that 401 certifications are included in the definition of "effluent standard or limitation," this is most reasonably understood to refer to the terms of the certification itself, which would include such standards or limitations. This case does not involve an attempt to enforce the terms of a 401 certification or any other effluent standard or limitation and therefore does not fall within the scope of the Clean Water Act's citizen suit provision. *See* 33 U.S.C. § 1365(f).

This case addresses the process by which BLM approved drilling permits, rather than the substance of any particular 401 certifications or compliance with the certifications' terms. Given this distinction, plaintiffs did not believe they could bring a citizen suit under the Clean Water Act and therefore brought their claims against BLM under the Administrative Procedure Act alleging that the agency had failed to act in accordance with the law. The certification requirement under Section 401 of the Clean Water Act was one of the laws BLM failed to obey when approving the drilling permits at issue.

If a citizen suit was appropriate in this case, plaintiffs could have sought civil penalties against BLM. Such action makes sense against a company holding a federal permit or against BLM if the agency was the permit holder. Here, however, BLM is the permit *issuer.* BLM's unlawful action was its failure to ensure 401 certification, as required by the Clean Water Act, prior to approving applications for permission to drill, making its decision to approve those APDs violative of the Administrative Procedure Act. *See Alabama Rivers Alliance v. FERC*, 325 F.3d 290 (D.C. Cir. 2003) (analyzing FERC's failure to require a 401 certification for turbine generator replacement as a Commission licensing decision, reviewable under the Federal Power Act, not the CWA).

Even if this Court decides that the 401 certification claim could have been brought pursuant to the citizen suit provision of the Clean Water Act, it should not allow the lack of 60-day notice of this claim to prevent the Court from addressing it on this preliminary injunction motion. Plaintiffs moved for a preliminary injunction to prevent imminent irreparable harm. Defendants admit that development activities on the ground at the Catalina and Sun Dog PODs are well underway and argue that plaintiffs should have brought their claims sooner. Requiring a 60-day delay in filing the 401 certification claims would present plaintiffs with the unfair choice of either entirely foregoing their chance to forestall the imminent harm from the ongoing activities at the Catalina and Sun Dog PODs or bringing their claims with respect to these PODs in a piecemeal fashion. *See Dague*, 935 F.2d at 1351-53 (holding that 60-day statutory notice period for CWA claim is unnecessary for "hybrid" complaint involving some claims that may, and should, be brought immediately). Neither of these choices serve the interests of justice or judicial economy.

Further, requiring a 60-day delay here would not serve the purposes of the 60-day notice provision, which is to allow the government an opportunity to resolve a problem prior to litigation. *See Dague*, 935 F.2d at 1351; *Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 703 (D.C. Cir. 1974). Here, the government has firmly indicated its position that no certification is needed; thus, awaiting agency action would be futile. *See NRDC v. Train*, 510 F.2d at 703 (Considering the purpose of the notice requirement, "the court may promptly proceed to the merits of the action when it is confident or becomes confident that agency recourse is futile, as where the agency's position is firm.") Affording preliminary injunctive relief in this case would preserve plaintiffs' right to avoid irreparable harm and would not prevent the government from changing its mind and obtaining proof of compliance with the certification requirement.. *See Id.* at 703 and n.59 ("Even where the court stays its hand as to a determination of the merits, it may grant relief *pendente lite* to safeguard plaintiff's rights from irreparable injury during the pendency of administrative review.").

While federal defendants have not argued that plaintiffs could have brought a citizen suit under the Clean Water Act against BLM and therefore were required to give 60 days notice prior to filing suit, BLM does suggest that plaintiffs cannot bring their Clean Water Act claim because they failed to raise it in the administrative proceedings below. BLM Br. at 41. The problem with this argument is that BLM did not provide plaintiffs the opportunity to raise the issue below. Section 401's certification with water quality standards is arguably only triggered at the drilling permit stage. Since there was no federal "permit" or "license" involved when BLM completed its Record of Decision

and accompanying environmental impact statement on the Atlantic Rim Development

Project, plaintiffs had no reason to raise the certification issue then.

Furthermore, as discussed above, plaintiffs did not have the opportunity to raise

the issue when BLM posted the notices for the drilling permits at issue. BLM apparently

posted the APD notices in their public room months before the agency had approved the

May 21, 2007 Record of Decision on the overall project. This notice cannot count as an

adequate opportunity to participate in the administrative process since plaintiffs clearly

had no reason to look for individual drilling permits in the Atlantic Rim project area

before the project area had even been approved.[7]

## II. BALANCE OF THE EQUITIES FAVORS ISSUANCE OF AN INJUNCTION PREVENTING FURTHER HARM.

### A. It Was BLM's Failure To Provide Any Notice of Its Approval of The Drilling, Not Plaintiffs' Delay, That Allowed Significant Work To Occur Before Plaintiffs Could Move For a Preliminary Injunction.

BLM and Intervenors contend that plaintiffs "created the 'emergency'" by waiting

to request a preliminary injunction. BLM Br. at 11; *see also* Interv. Br. at 40. To the

contrary, plaintiffs moved quickly to seek a preliminary injunction after learning in early

September that the Catalina and Sun Dog PODs had been approved and ground

disturbing activity was occurring pursuant to these approvals.

BLM opens its brief by reciting the "eighty-nine days" that had passed between

when BLM signed its decision record approving the Catalina pods and when plaintiffs

moved for a preliminary injunction. BLM Br. at 1. BLM accuses plaintiffs of waiting

---

[7] In a final attempt to defeat plaintiffs' Clean Water Act claim, intervenors argue that BLM in fact obtained the required certification. Interv. Br. at 38 n. 19. Once again intervenors are sloppy with the facts. The certification that intervenors cite is for permits issued by the U.S. Army Corps of Engineers. These permits are issued under Section 404 of the Clean Water Act and authorize dredging and filling of the nation's waters. While this certification may take care of the Army Corps' certification obligation when it issues dredge and fill permits, it does nothing to satisfy BLM's certification obligation when it issues drilling permits.

that entire period to move for a preliminary injunction.  *Id.* at 1, 11.  BLM's argument appears to suggest that BLM informed plaintiffs that it had approved the EA and APDs or at the very least posted notice of such approval.  However, plaintiffs never received any notice.  Molvar Decl. ¶ 15.  Moreover, in BLM's recitation of the facts, BLM never indicates that it posted any notice of its approval of the decisions or otherwise informed plaintiffs.  BLM Br. at 13.

Rather, BLM only indicates that it provided an internet notice that the agency was commencing a NEPA analysis on June 6, 2007 for the Catalina project.  *Id.*  BLM then signed the decision on June 28, 2007, just twenty-two days later.  *Id.*  Similarly, it posted a notice of commencement of a NEPA analysis for Sun Dog on July 9, 2007 and signed the decision on August 16, 2007.  *Id.*  Thus, although BLM explains that the notice of commencement was posted on the internet, it does not claim that its *decisions* were also posted on the internet.  BLM fails to explain how, based only on a posting concerning the start of a NEPA process, it is reasonable to contend that plaintiffs could have known when these decisions were made.  Furthermore, BLM's decision to approve the EAs so quickly and without any opportunity for public involvement runs counter to its own past practice:  As plaintiffs discussed in their opening brief, BLM has in the past circulated EAs for comment when, as is the case here, the EAs concerned applications to drill a number of wells at the same time.  Pls. Opening Br. at 14-15.

BLM also suggests plaintiffs should have known about the decisions because BLM posted the notices of the Application for Permit to Drill in the public reading room for the required 30-day period.  *Id.*  However, BLM fails to indicate that these 30-day postings were made as far back as September 2005 and May 2006.  *See* Exh. V attached

hereto.  Again, there is nothing about these postings that provides plaintiffs any

information about when BLM would reach a decision on the APDs.

In sum, BLM's contention that plaintiffs "slept on their rights by waiting 89 days

to challenge the Catalina POD and 40 days to challenge the Sun Dog POD" grossly

misconstrues the facts.  BLM Br. at 12.  To the contrary, the reason that plaintiffs were

not able to seek a preliminary injunction more quickly is due to the fact that BLM did not

provide notice of its decision to approve the Catalina and Sun Dog PODs.  BLM's failure

to provide notice to plaintiffs is particularly troubling because BLM knew of plaintiffs'

interest through at least two avenues:  First, BLM knew of plaintiffs' interest because

plaintiffs had filed a motion for stay of the Record of Decision for the Atlantic Rim

Coalbed Methane Project.  Second, prior to the approval of any APDs, Erik Molvar had

requested notice and copies of applications for ground disturbing activities as well as any

documents BLM prepared under NEPA related to the Atlantic Rim Project.  Molvar Decl.

¶ 14.  However, BLM never provided any notice and Erik Molvar first learned that that

the Catalina and Sun Dog PODs had been approved when he inquired with BLM on

September 7, 2007.  Molvar Dec. ¶ 4.  Importantly, BLM has still provided no guarantee

in response to plaintiffs' request that the agency will provide any notice of future

decisions and therefore the present situation in which plaintiffs only learn that drilling

and coalbed development projects have been approved after significant work has already

occurred could be repeated.  *See* Letter from Sharon Buccino to Lori Caramanian

(October 1, 2007), Exh. X attached hereto.

     **B.**     **The Balance of the Equities Supports Issuance of an Injunction
Preventing Additional Harm.**

Plaintiffs recognize that unfortunately a substantial portion of the ground disturbing activity at the Catalina and Sun Dog coalbed methane development projects has already occurred. However, BLM and Intervenors admit that some ground disturbing work has not yet occurred. According to intervenors' declarations, as of October 3, 2007, Anadarko had drilled only three of the fifty-one wells approved in the Sun Dog PODs and Double Eagle had drilled fifteen of the forty wells approved in the Catalina PODs. Beseera Decl. ¶ 9 (attached as Exh. 6 to Interv. Br.); Degenfelder Decl. ¶ 10 (attached as Exh. 8 to Interv Br.). In addition, the operation of the coalbed methane wells involves ongoing disturbance and risks the creation of new methane seeps. Accordingly, there is still additional harm that can be avoided through issuance of a preliminary injunction.

On the other side of the balance, intervenors overstate the harm they would suffer because they appear to assume that any preliminary injunction would be sweeping and long-lasting. However, a preliminary injunction would be of limited duration and could be tailored to prevent additional harm to the environment without causing significant harm to Intervenors. Likewise, a short delay or reduction in production of coalbed methane will not affect national energy supplies.

Intervenors admit that Double Eagle and Anadarko Petroleum are presently continuing to develop the wells in the Catalina and Sun Dog PODs. Specifically, these companies are continuing to drill wells and lay utility lines. Beserra Decl. ¶ 9; Degenfelder Decl. ¶¶ 10,11. As of October 3, 2007, Anardarko had drilled on three of the fifty-one wells approved in the Sun Dog PODs and Double Eagle had drilled fifteen of the forty wells approved in the Catalina PODs. Beserra Decl. ¶ 9; Degenfelder Decl. ¶ 10. As demonstrated in plaintiffs' opening brief, development of coalbed methane risks

significant harm to important fish and wildlife species and will indelibly alter the character of the area.[8]  Pl. Opening Br. at 32-39.   While much of the harm has already occurred due to the work that occurred before and shortly after plaintiffs learned of the PODs' approval, the additional work will entail additional harm.  Moreover, BLM is poised to approve additional plans of development that will disturb more relatively undisturbed areas.

Intervenors inflate the harm to them by failing to recognize that a preliminary injunction is of limited duration and could be narrowly tailored.  For example, D. Steven Degenfelder states that a "decision *rescinding* the APDs would result in significant harm to Double Eagle."  Degenfelder Decl. ¶19 (emphasis added).  A preliminary injunction would not "rescind" the APDs.  Similarly, Mr. Bessera indicates that Anadarko will "incur a penalty of approximately $5,000,000 if it is required to halt installation of the pipelines authorized by the FONSI/DR for the Sun Dog A & B PODs."  Bessera Decl. ¶ 16.  Mr. Bessera does not explain whether such a "penalty" would be imposed automatically and regardless of the duration of the delay.  He also fails to give any statutory, regulatory or contractual source for this "penalty."

More importantly, much of the harm that intervenors discuss could likely be avoided through issuance of a tailored injunction.  Plaintiffs are not requesting that the court issue an order that leaves wells half-drilled and without casings or plugs, or that allows substantial quantities of methane to escape into the atmosphere.  *See* Degenfelder

---

[8] Intervenors argue that Wyoming Department of Environmental Quality determined that coalbed methane production does not lead to methane seeps.  Interv. Br. at 28.  However, the Wyoming presentation only states that *reinjection* of produced water does not contribute to methane seeps.  Exh. 11, Pt. 2, at 3  to Interv. Br.  As geologist Walter R. Merchat explains in his declaration, it is the dewatering process that occurs during coalbed methane production – not the reinjection of water – that leads to more and exacerbated methane seeps.  Merschat Decl. ¶ 12 (attached as Exh. S to Pls. Opening Brief).  As more wells are drilled and more water is pumped out of the ground through these wells to release the gas, the risk of methane seeps increases.

Decl. ¶ 19 (noting Wyoming Oil and Gas Conservation Commission regulations concerning abandonment of wells); Beserra Decl. ¶ 16 (discussing potential loss of reserves). However, BLM and intervenors have not provided sufficiently detailed information concerning the status of the PODs to permit plaintiffs to provide a specific recommendation for how preliminary injunction relief should be tailored. *See National Wildlife Federation v. National Marine Fisheries Serv.*, 422 F.3d 782, 199-800 (9th Cir. 2005) (remanding for district court to consider narrowly tailored preliminary relief).

Finally, BLM has before it applications for more than two hundred additional wells in the Atlantic Rim Project and is working on EAs in connection with these applications. Molvar Decl. ¶ 18. As with the Catalina and Sun Dog EAs, BLM has thus far failed to provide any meaningful opportunity for public comment or involvement on any of the additional Atlantic Rim EAs that it is preparing. As plaintiffs have demonstrated, BLM's failure to provide any opportunity for public involvement or comment violates NEPA and CEQ regulations. Plaintiffs request that the Court issue an order that will prevent the current situation from being repeated. BLM should not be permitted to again fail to provide for public involvement or neglect to provide notice that it has signed a new EA/decision record. It would be a disservice to the Court for the parties to repeat the time-consuming fire-drill of moving for a preliminary injunction if BLM approves a new set of APDs after repeating the same unlawful course of action. Accordingly, plaintiffs urge the Court to enjoin BLM from approving drilling permits in the Atlantic Rim project area pending resolution of this case. *See Lockyer v. U.S. Dept. of Agriculture*, 468 F.Supp.2d 1140, 1143-46 (N.D. Cal. 2006) (holding that the court's

equitable power permitted an injunction governing prospective oil and gas leases that violated the roadless rule).

In sum, the balance of the equities favors plaintiffs because a tailored injunction barring additional activity that goes beyond the area already disturbed and barring further approval of APDs pending resolution of this case will prevent significant additional harm and will not cause significant harm to the Double Eagle and Anadarko petroleum companies.

## CONCLUSION

For the reasons stated herein and in their opening brief, plaintiffs request that this Court grant a preliminary injunction that (1) enjoins further ground disturbing activity pursuant to the challenged drilling permits;  and (2) enjoins further approvals of drilling permits in the Atlantic Rim project area pending resolution of this case.


Respectfully submitted.


  __/s Sharon Buccino_____
Sharon Buccino (D.C. Bar # 432073)
Aaron Bloom
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
(202) 289-6868

Attorneys for Plaintiffs

Date: October 12, 2007

EXHIBIT LIST

Atlantic Rim Project Map with Satellite Image Map....................................Exhibit U

APD Posting Notices  ...................................................................................Exhibit V

Atlantic Rim Final EIS Map: Watershed Basins ..........................................Exhibit W

NRDC Request Letter dated October 1, 2007 ..............................................Exhibit X





Atlantic Rim Project EIS Boundary

Sun Dog Pod B

Catalina Pod B

Sun Dog Pod A

Catalina Pod A

789

Data Sources: (1) Google Earth; (2) Atlantic Rim Final EIS Map, Project Area Map; (3) Declaration of Frank Blomquist, Case 1:07-cv-01709-RJL, Document 9-20, pg. 3.

Form 3160-3
(August 1999)

FORM APPROVED
OMB NO. 1004-0136
Expires: November 30, 2000

# UNITED STATES
## DEPARTMENT OF THE INTERIOR
### BUREAU OF LAND MANAGEMENT
## APPLICATION FOR PERMIT TO DRILL OR REENTER

5. Lease Serial No.

W-131275

6. If Indian, Allottee or Tribe Name

| | |
|---|---|
| 1a. Type of Work [X] DRILL    CBNG    REENTER | 7. If Unit or CA Agreement, Name and No. Catalina Unit 30dA |
| 1b. Type of Well [ ] Oil Well [X] Gas Well [ ] Other [ ] Single Zone [ ] Multiple Zone | 8. Lease Name and Well No. 1691-33-7 |
| 2. Name of Operator Double Eagle Petroleum Company | 9. API Well No. |
| 3a. Address P.O. Box 766, Casper, Wyoming 82602 | 3b. Phone No. (include area code) 307-237-9330 BUREAU OF LAND MANAGEMENT LIS FIELD OFFICE | 10. Field and Pool, or Exploratory |

*POSTED SEP 2 6 2005*

| 4. Location of well (Report location clearly and in accordance with any State requirements.) | 11. Sec., T., R., M., or Blk. And Survey or Area |
|---|---|
| At surface | |
| At proposed prod. zone | NW¼SE¼ of Sec. 7, T. 16 N. -R. 91 W. |

| 14. DISTANCE IN MILES AND DIRECTION FROM NEAREST TOWN OR POST OFFICE* | 12. County or Parish | 13. State |
|---|---|---|
| 28 (Baggs, WY) | Carbon | Wyoming |

| 15. Distance from proposed* location to nearest property or lease line, ft. (Also to nearest drlg unit line, if any) 660' +/- | 16. No. of Acres in lease 1,270.24 | 17. Spacing Unit dedicated to this well |
|---|---|---|
| 18. Distance from proposed location* to nearest well, drilling, completed, applied for, on this lease, ft. 1500'+/- | 19. Proposed Depth | 20. BLM/ BIA Bond No. on file WY-3323 |

| 21. Elevations (Show whether DF, RT, GR, etc.) 6660' Ground | 22. Approximate date work will start* 1-Jul-06 | 23. Estimated Duration |
|---|---|---|

24. Attachments

The following, completed in accordance with the requirements of Onshore Oil and Gas Order No. 1 shall be attached to this form:

1. Well plat, certified by a registered surveyor.
2. A Drilling Plan.
3. A Surface Use Plan ( if the location is on National Forest System Lands, the SUPO shall be filed with the appropriate Forest Service Office).
4. Bond to cover the operations unless covered by existing bond on file(see item 20 above).
5. Operator certification.
6. Such other site specific information and/ or plans as may be required by the authorized officer.

| 25. Signature *Steph H Hollis* | Name (Printed/ Typed) Stephen H. Hollis | Date 8/1/2005 |
|---|---|---|
| Title President | | |
| Approved By (Signature) | Name (Printed/ Typed) | Date *REPLACED FEB 1 4 2007* |
| Title | Office | |

Application approval does not warrant or certify that the applicant holds legal or equitable title to those rights in the subject lease which would entitle the applicant to conduct operations thereon.
Conditions of approval, if any, are attached.

Title 18 U.S.C. Section 1001 and Title 43 U.S.C. Section 1212, make it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

* (Instructions on reverse)

*SEP 2 6 2005*



Form 3160-3
(August 1999)

FORM APPROVED
OMB NO. 1004-0136
Expires: November 30, 2000

# UNITED STATES
## DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
## APPLICATION FOR PERMIT TO DRILL OR REENTER

5. Lease Serial No.

W-131275

6. If Indian, Allottee or Tribe Name

| 1a. Type of Work | [X] DRILL | [ ] REENTER |
| --- | --- | --- |

CBNG

7. If Unit or CA Agreement, Name and No.

Catalina Unit Pod B

| 1b. Type of Well | [ ] Oil Well | [X] Gas Well | [ ] Other | [ ] Single Zone | [ ] Multiple Zone |
| --- | --- | --- | --- | --- | --- |

8. Lease Name and Well No.

1691-11-6

2. Name of Operator

Double Eagle Petroleum Company

9. API Well No.

3a. Address

P.O. Box 766, Casper, Wyoming 82602

3b. Phone No. (include area code)

307-237-9330

10. Field and Pool, or Exploratory

Cow Creek

4. Location of well (Report location clearly and in accordance with any State requirements.*)

At surface

At proposed prod. zone                 Same

11. Sec., T., R., M., or Blk. And Survey or Area

Lot 18 of Sec. 6, T. 16 N-R. 91 W.

14. DISTANCE IN MILES AND DIRECTION FROM NEAREST TOWN OR POST OFFICE*

28 (Baggs, WY)

| 12. County or Parish | 13. State |
| --- | --- |
| Carbon | Wyoming |

15. Distance from proposed* location to nearest property or lease line, ft. (Also to nearest drlg unit line, if any)     660' +/-

16. No. of Acres in lease     1,270.24

17. Spacing Unit dedicated to this well

18. Distance from proposed location* to nearest well, drilling, completed, applied for, on this lease, ft.     1300'+/-

19. Proposed Depth

20. BLM/ BIA Bond No. on file     WY-3323

21. Elevations (Show whether DF, RT, GR, etc.)     6684.0' Ground

22. Aproximate date work will start*     1-Jul-06

23. Estimated Duration

24. Attachments

The following, completed in accordance with the requirements of Onshore Oil and Gas Order No. 1 shall be attached to this form:

1. Well plat certified by a registered surveyor.
2. A Drilling Plan.
3. A Surface Use Plan ( if the location is on National Forest System Lands, the SUPO shall be filed with the appropriate Forest Service Office).

4. Bond to cover the operations unless covered by existing bond on file(see item 20 above).
5. Operator certification.
6. Such other site specific information and/ or plans as may be required by the authorized officer.

25. Signature
*Stephen H. Hollis*

Name (Printed/ Typed)
Stephen H. Hollis

Date
8/1/2005

Title
President

Approved By (Signature)

Name (Printed/ Typed)

Date
FEB 1 4 2007

Title

Office

Application approval does not warrant or certify that the applicant holds legal or equitable title to those rights in the subject lease which would entitle the applicant to conduct operations thereon.

Conditions of approval, if any, are attached.

Title 18 U.S.C. Section 1001 and Title 43 U.S.C. Section 1212, make it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

* (Instructions on reverse)

POSTED SEP 2 6 2005 BUREAU OF LAND MANAGEMENT RAWLINS FIELD OFFICE

REPLACED

RECEIVED SEP 2 6 2005 BUREAU OF LAND MANAGEMENT RAWLINS FIELD OFFICE



**Double Eagle Petroleum Company**
**Catalina Unit - Pod "B"**

**Sections 6 & 7 (16N-91W)**
**Section 1 (16N-92W)**
**Sections 31 & 32 (17N-91W)**
**Section 36 (17N-92W)**
**Carbon County, Wyoming**

Form 3160-3
(April 2004)

**POSTED**
AUG - 2 2006
BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE

FORM APPROVED
OMB NO. 1004-0137
Expires: March 31, 2007

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**APPLICATION FOR PERMIT TO DRILL OR REENTER**

5. Lease Serial No.
WYW-116679

6. If Indian, Allottee or Tribe Name

| | | |
|---|---|---|
| 1a. Type of Work: | [X] DRILL | [ ] REENTER |

7. If Unit or CA Agreement, Name and No.
Sun Dog (CBM)          152954X

1b. Type of Well:  [ ] Oil Well  [X] Gas Well  [ ] Other   [X] Single Zone   [ ] Multiple Zone

8. Lease Name and Well No.
AR Federal 1691          6-9

2. Name of Operator

Anadarko E&P Co., LP

9. API Well No.

3a. Address
2515 Foothill Blvd.
Rock Springs, WY 82901

3b. Phone No. *(include area code)*
(307) 352-3328

10. Field and Pool, or Exploratory
Atlantic Rim - Mesa Verde Coal

4. Location of well *(Report location clearly and In accordance with any State requirements.*)*
   At surface

   At proposed prod. zone

11. Sec., T., R., M., or  Blk. and  Survey  or  Area

9          T16N          R91W

14. Distance in miles and direction from the nearest town or post office*
25 miles Northeast of Baggs, WY

12. County or Parish
Carbon

13. State
Wyoming

15. Distance from proposed*
location to nearest
property or lease line, ft.
(Also to nearest drlg. unit line, if any)          1728'

16. No. of acres in lease

17. Spacing Unit dedicated to this well

18. Distance from proposed location*
to nearest well, drilling, completed,
applied for, on this lease, ft.          1512'

19. Proposed Depth

20. BLM/BIA Bond No. on file
WYB-000269  291

21. Elevations (Show whether DF, RT, GR, etc.)

6656.6'          GR          6669'          KB

22. Approximate date work will start*
3rd quarter 2007

23. Estimated duration

24. Attachments

The following, completed in accordance with the requirements of Onshore Oil and Gas Order No. 1 shall be attached to this form:

1. Well plat certified by a registered surveyor.
2. A Drilling Plan.
3. A Surface Use Plan ( if the location is on National Forest System Lands, the SUPO shall be filed with the appropriate Forest Service Office).

4. Bond to cover the operations unless covered by existing bond on file(see item 20 above).
5. Operator certification.
6. Such other site specific information and/ or plans as may be required by the authorized officer.

25. Signature *(Gary Sundberg)*

Name *(Printed/ Typed)*   Gary Sundberg

Date   3/8/06

Title   Permit Agent for Anadarko E&P Co., LP

Approved By *(Signature)*  */S/ Deborah K. Johnson*

Name *(Printed/ Typed)*   /S/ Deborah K. Johnson

Date   AUG 16 2007

Title   ACTING Rawlins Field Manager

Office   RAWLINS FIELD OFFICE

Application approval does not warrant or certify that the applicant holds legal or equitable title to those rights in the subject lease which would entitle the applicant to conduct operations thereon.

Conditions of approval, if any, are attached.

Title 18 U.S.C. Section 1001 and Title 43 U.S.C. Section 1212, make it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

REVISED
AUG - 2 2006
BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE

* *(Instructions on page 2)*

**"See Conditions of Approval"**



QUADRANGLES:
  BLUE GAP
  DOTY MOUNTAIN
  SULPHUR SPRINGS
  GARDEN GULCH

ROAD DISTURBANCE = 2.0 ACRES±

INSTALL CMP: c

**DRG GRIFFIN & ASSOCIATES, INC.**

**PROPOSED ROAD FOR
ANADARKO E&P CO., LP
AR FEDERAL 1691 6-9**

1414 ELK ST., SUITE 202
ROCK SPRINGS, WY 82901
(307) 362-5028

| SCALE: 1" = 2000' | TOTAL PROPOSED LENGTH: 1744'± | |
|---|---|---|
| JOB No. 13883 | | |
| DATE: 3/21/06 | EXISTING ROAD ———————— | EXHIBIT |
| | PROPOSED ROAD – – – – – – | 4 |

Form 3160-3
(April 2004)

**P O S T E D**
MAY 2 2006

FORM APPROVED
OMB NO. 1004-0137
Expires: March 31, 2007

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

BUREAU OF LAND MANAGEMENT RAWLINS FIELD OFFICE

**APPLICATION FOR PERMIT TO DRILL OR REENTER**

5. Lease Serial No.
WYW-116679

6. If Indian, Allottee or Tribe Name

7. If Unit or CA Agreement, Name and No.
Sun Dog (CBM)          152954X

| 1a. Type of Work: | X DRILL | | REENTER |
|---|---|---|---|

| 1b. Type of Well: | Oil Well | X Gas Well | Other | X Single Zone | Multiple Zone |
|---|---|---|---|---|---|

8. Lease Name and Well No. Sun Dog Unit
AR Federal 1691          2-8  Pod A

2. Name of Operator
Anadarko E&P Co., LP

9. API Well No.
49-007-23034

3a. Address
2515 Foothill Blvd.
Rock Springs, WY 82901

3b. Phone No. *(include area code)*
(307) 352-3328

10. Field and Pool, or Exploratory
Atlantic Rim - Mesa Verde Coal

4. Location of well *(Report location clearly and In accordance with any State requirements.*)*
At surface

At proposed prod. zone

11. Sec., T., R., M., or   Blk and   Survey   or   Area

8          T16N          R91W

14. Distance in miles and direction from the nearest town or post office*
25 miles Northeast of Baggs, WY

12. County or Parish
Carbon

13. State
Wyoming

| 15. Distance from proposed* location to nearest property or lease line, ft. (Also to nearest drlg. unit line, if any) | 660' | 16. No. of acres in lease | 17. Spacing Unit dedicated to this well |
|---|---|---|---|

| 18. Distance from proposed location* to nearest well, drilling, completed, applied for, on this lease, ft. | 1900' | 19. Proposed Depth | 20. BLM/ BIA Bond No. on file WYB-000269-291 |
|---|---|---|---|

| 21. Elevations (Show whether DF, RT, GR, etc.) 6672'     GR.          KB | 22. Aproximate date work will start* 4th quarter 2006 | 23. Estimated duration |
|---|---|---|

24. Attachments

The following, completed in accordance with the requirements of Onshore Oil and Gas Order No. 1 shall be attached to this form:

1. Well plat certified by a registered surveyor.
2. A Drilling Plan.
3. A Surface Use Plan (if the location is on National Forest System Lands, the SUPO shall be filed with the appropriate Forest Service Office).
4. Bond to cover the operations unless covered by existing bond on file (see item 20 above).
5. Operator certification.
6. Such other site specific information and/or plans as may be required by the authorized officer.

| 25. Signature *Gary Sundberg* | Name *(Printed/ Typed)*     Gary Sundberg | Date 5/02/06 |
|---|---|---|
| Title     Permit Agent for Anadarko E&P Co., LP | | |

| Approved By *(Signature)* *Deborah K Johnson* | Name *(Printed/ Typed)*  S/ Deborah K. Johnson | Date AUG 1 6 2007 |
|---|---|---|
| Title     ACTING Rawlins Field Manager | Office     RAWLINS FIELD OFFICE | |

Application approval does not warrant or certify that the applicant holds legal or equitable title to those rights in the subject lease which would entitle the applicant to conduct operations thereon.

Conditions of approval, if any, are attached.

Title 18 U.S.C. Section 1001 and Title 43 U.S.C. Section 1212, make it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

* *(Instructions on page 2)*

**"See Conditions of Approval"**

MAY - 2 2006
BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE



QUADRANGLES
BLUE GAP
DOTY MOUNTAIN

ROAD DISTURBANCE = 2.7 ACRES±

PROPOSED ROAD FOR
ANADARKO E&P CO., LP
AR FEDERAL 1691 2-8

**DAG** RIFFIN & ASSOCIATES, INC.

1414 ELK ST., SUITE 202
ROCK SPRINGS, WY 82901
(307) 362-5028

| SCALE: 1" = 2000' | TOTAL PROPOSED LENGTH: 2383± | |
| JOB No. 11512 | EXISTING ROAD ————————— | EXHIBIT |
| REVISED: 10/27/05 | PROPOSED ROAD — — — — — | 4 |

# ATLANTIC RIM FINAL EIS MAP
## Watershed Basins





**NRDC**
THE EARTH'S BEST DEFENSE

NATURAL RESOURCES DEFENSE COUNCIL

VIA EMAIL HARD COPY TO FOLLOW FIRST CLASS MAIL

October 1, 2007

Ms. Lori Caramanian
United States Department of Justice
Environment & Natural Resources Division
1961 Stout Street, 8th Floor
Denver, CO 80294

Re: *NRDC v. Kempthorne*, 07-1709 (RJL)

Dear Ms. Caramanian:

On behalf of NRDC and the other plaintiffs in the above-captioned case, I write to request that your client the Bureau of Land Management (BLM) provide me copies of the environmental assessments and accompanying documents prior to the approval of any new applications for permits to drill (APD) tied to the Atlantic Rim Natural Gas Field Development Project. My understanding is that the only APDs approved to date are those for Plans of Development (PODs) A & B in the Catalina Unit and PODs A & B in the Sun Dog Unit. I also understand that there are an additional 243 APDs related to the Atlantic Rim project that are pending before BLM. As you know, plaintiffs believe that the National Environmental Policy Act (NEPA) mandates that BLM provide these documents and the opportunity to comment on them before the agency approves APDs in the Atlantic Rim project area.

In the event that BLM refuses to provide such opportunity to comment prior to its approval of any APD in the Atlantic Rim project area, I request that the agency provide notice of its approval of any such APD on the day the approval is given. We request notification by email to the two parties listed below as the most efficient and least costly method. Please attach the applicable EA/FONSI/Decision Record to the email.

Thank you for your assistance in this matter.

Sincerely,

Sharon Buccino                          Erik Molvar
Natural Resources Defense Council        Biodiversity Conservation Alliance
Attorney for Plaintiffs                  erik@voiceforthewild.org
sbuccino@nrdc.org

www.nrdc.org     1200 New York Avenue, NW, Suite 400
Washington, DC 20005
TEL 202 289-6868 FAX 202 289-1060

NEW YORK · LOS ANGELES · SAN FRANCISCO

*100% Postconsumer Recycled Paper*

