IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
NATURAL RESOURCES DEFENSE COUNCIL                   )
1200 New York Avenue, NW, Suite 400                 )
Washington, DC  20005,            *et al.*          )
                                                    )
        Plaintiffs,                                 )   Civ. No. 07-1709 (RJL)
                                                    )
                v.                                  )
                                                    )
DIRK KEMPTHORNE, in his official capacity           )
As the Secretary of the United States              )
Department of the Interior                          )
1849 C Street, NW                                   )
Washington, DC  20240,            *et al.*          )
                                                    )
        Defendants.                                 )
_____)

**FIRST AMENDED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.    This lawsuit challenges actions by the Department of the Interior and the Bureau

of Land Management ("BLM") to approve the Environmental Impact Statement ("EIS")

and Record of Decision ("ROD") for the Atlantic Rim Natural Gas Field Development

Project in Wyoming's Red Desert as well as four Environmental Assessments ("EAs")

and Findings of No Significant Impact/Decision Records ("FONSI/DRs") authorizing on-

the-ground activities.  These activities include drilling new wells, as well as blazing new

roads across previously untouched areas southwest of Rawlins, Wyoming.  This drilling

and road construction is occurring now.

2.    The EIS BLM prepared violates the National Environmental Policy Act

("NEPA") because it fails to take a hard look at the environmental effects of the 2,000-

well Atlantic Rim project and fails to analyze an appropriate range of alternatives or mitigation measures to protect critical species such as the sage grouse.  BLM has also violated the Federal Land Policy and Management Act ("FLPMA") because the Atlantic Rim project is inconsistent with the governing Resource Management Plan.  In addition, BLM violated the Clean Water Act by failing to certify that the coalbed methane projects would comply with state water quality standards.

3.     The Atlantic Rim project area is divided into different units.  The first units in which BLM has approved work are the Catalina and Sun Dog Units.  Before NRDC filed the original complaint in this case on September 25, 2007, BLM had prepared two EAs and Decision Records approving 90 new coalbed methane and reinjection wells in the project area without providing the public participation or the analysis required by the NEPA.  These 90 wells were approved as part of four plans of development ("PODs") – Catalina PODs A and B and Sun Dog PODs A and B.  The agency did not provide the opportunity for public comment on either a draft or final environmental assessment.

4.     After the filing of NRDC's original complaint, BLM approved an additional forty-three coalbed methane wells and five produced water reinjection wells based on two additional EAs and Decision Records.  One EA approved fourteen wells in Sun Dog POD C and the second EA approved twenty-three wells in Sun Dog POD D and eleven wells in Sun Dog POD E.  In response to NRDC's litigation, BLM provided NRDC a copy of the EAs on October 16, 2007, and indicated that BLM would make a decision on the project by Monday, October 22, 2007, just three business days later.  The three-day comment period BLM provided does not constitute a meaningful opportunity to comment and therefore fails to meet NEPA's public participation requirement.

5.    In addition to the wells that BLM has already approved, at least 195 more applications for permits to drill are pending before the agency.  BLM could approve the applications for many of these additional wells at any time.

6.    The proposed project area is a place of stunning beauty with rolling hills, canyons, dune fields and diverse sagebrush communities.  With consistent water resources, the Atlantic Rim contains some of Wyoming's best wildlife habitat for species such as elk, pronghorn antelope, and sage grouse.

7.    Thousands of citizens across America value the proposed project area for hiking, backpacking, hunting, fishing – a place of solitude to reflect and recharge.  BLM is well aware of this widespread interest in the lands at issue.  Yet, the agency has proceeded full steam ahead with rapid energy development that has and will continue to harm other valuable uses of the affected lands.  BLM has acknowledged that the approved project will convert the "natural setting" of the area "to an industrialized setting."

8.    BLM has moved ahead with the approval of the 138 wells in six different PODs within the Atlantic Rim project area without providing the opportunity for public comment required by NEPA and the Federal Land Policy and Management Act ("FLPMA").

9.    In addition to failing to provide the required opportunity for public comment, the environmental analysis completed by BLM prior to approving the 138 wells fails to provide the site-specific and cumulative impact analysis required by NEPA.  Finally, BLM has violated the Clean Water Act's requirement to certify compliance with state water quality standards.

## JURISDICTION AND VENUE

10.  This court has jurisdiction over this action pursuant to the National

Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* and its implementing

regulations;  Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et

seq.* and its implementing regulations;  the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*

and its implementing regulations;  the Declaratory Judgment Act, 28 U.S.C. § 2201;  the

Administrative Procedure Act ("APA"), 5 U.S.C. §§551 *et seq.*;  and 28 U.S.C. § 1331

(federal question).  BLM's decisions approving the Atlantic Rim ROD and 138 wells in

the Catalina A and B PODs and Sundog A, B, C, D and E PODs constitute "final agency

action" for purposes of APA review.

11.  Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil

Procedure.

12.  Venue is proper in the United States District Court for the District of Columbia

pursuant to 28 U.S.C. § 1391(e), because the United States Department of the Interior and

its agency, the Bureau of Land Management, are headquartered in Washington D.C.

Plaintiff Natural Resources Defense Council resides in Washington, D.C.

## PARTIES

13.  Plaintiff NATURAL RESOURCES DEFENSE COUNCIL ("NRDC") is a non-

profit environmental membership organization with more than 400,000 members

throughout the United States.  NRDC members use and enjoy public lands in Wyoming,

including the specific lands at issue, for a variety of purposes, including: recreation,

solitude, scientific study, and aesthetic appreciation.  NRDC has had a longstanding and

active interest in the protection of public lands in Wyoming.  NRDC filed comments on

both the draft and final environmental impact statements for the Atlantic Rim
Development Project.  Recently, NRDC submitted a letter to BLM's State Director in
Wyoming requesting that that the agency add a quantitative analysis to the air quality
analysis contained in several draft Resource Management Plans covering parts of
Wyoming.  Over the years, NRDC has participated in a number of court cases involving
resource development issues, including NEPA compliance, throughout the American
West.  NRDC brings this action on its own behalf and on behalf of its members.

14.  Plaintiff BIODIVERSITY CONSERVATION ALLIANCE ("BCA") is a
nonprofit conservation organization located in Laramie, Wyoming, dedicated to
protecting wildlife and wildlands in Wyoming and surrounding states.   BCA has
hundreds of members in Wyoming and neighboring states, who have an interest in
recreating on and preserving the public lands found in Wyoming's Red Desert, including
the lands covered by the Atlantic Rim project.  BCA brings this action on its own behalf
and on behalf of its members.

15.  Plaintiff WYOMING OUTDOOR COUNCIL ("WOC") is a non-profit
conservation organization with over 1,000 members in Wyoming, other states and
abroad.  WOC is dedicated to the protection and enhancement of Wyoming's
environment, communities and quality of life.  WOC's members live in and near the
Atlantic Rim project area.  WOC is based in Lander, Wyoming, approximately 90 miles
from the project area.  WOC brings this action on its own behalf and on behalf of its
members.

16.  Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is an Idaho not-for-
profit conservation organization with over 1,600 members who live in Wyoming, Idaho

and other states across the United States. WWP has offices and staff in Hailey and Boise, Idaho; Pinedale, Wyoming; Tehachapi, California and Mendon, Utah. WWP's Wyoming Office is headquartered in Pinedale, Wyoming and is staffed by WWP's Wyoming Director Jonathan Ratner. WWP, and its staff and members, have actively participated in agency proceedings and other advocacy efforts concerning management of public lands in Wyoming, including actions by BLM's Rawlins Field Office. WWP brings this action on its own behalf and on behalf of its members.

17.  Plaintiff WYOMING WILDERNESS ASSOCIATION ("WWA") is a nonprofit group dedicated to ensuring the preservation for future generations the benefits, known and unforeseen, of Wyoming's naturally functioning wild land ecosystems. In order to provide for the greatest range of values, including haven for wildlife and fish, watershed protection, pools of genetic diversity, and dispersed types of non-motorized recreation, scientific inquiry, and spiritual fulfillment, the Association is committed to the considered selection and protection of these areas. WWA has more than a hundred members in Wyoming and neighboring states, who have an interest in recreating on and preserving the public lands found in Wyoming's Red Desert. WWA brings this action on its own behalf and on behalf of its members.

18.  Defendant DIRK KEMPTHORNE is sued in his official capacity as Secretary of the Department of the Interior. In that capacity he is responsible for ensuring that the Department and the agencies within the Department, including the Bureau of Land Management, comply with all applicable laws and regulations, including NEPA.

19.  Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is the federal agency responsible for managing just under 500 million acres of federal public

lands for a variety of competing resources, including oil and gas development, as well as for the protection of the natural and human environment.  The Department of the Interior is required to comply with NEPA and to evaluate, analyze, and disclose the impacts of federal undertakings to the public.

20.    Defendant BUREAU OF LAND MANAGEMENT is the agency within the U.S. Department of the Interior directly responsible for carrying out the Department's obligations under statutes and regulations governing oil and gas exploration, leasing, and development, and for complying with NEPA.  The BLM manages approximately 18 million acres in Wyoming.

## STATUTORY AND REGULATORY FRAMEWORK

### National Environmental Policy Act

21.    The National Environmental Policy Act is our nation's basic charter for the protection of the environment and it "contains 'action forcing' provisions to make sure that federal agencies act according to the letter and spirit of the Act."  40 C.F.R. § 1500.1. NEPA also ensures the public that it is given a role in the management of public resources including the public lands managed by the Bureau of Land Management.  40 C.F.R. § 1500.1(b) ("public scrutiny [is] essential to implementing NEPA").

22.    The Council on Environmental Quality ("CEQ") was created under NEPA to promulgate regulations "to tell federal agencies what they must do to comply with the procedures and achieve the goals" of NEPA.  42 U.S.C. § 4342.

23.    NEPA requires each federal agency to prepare and circulate for public review and comment a detailed environmental impact statement ("EIS") prior to any major

federal action that may have a significant effect on the environment.  42 U.S.C. §

4332(2)(C); *see* 40 C.F.R. §§ 1502.5 and 1508.3.

24.    When a federal agency is not certain whether an EIS is required, it must prepare

an environmental assessment ("EA").  40 C.F.R. §§ 1501.3, 1501.4, and 1508.9.  If the

EA concludes that the proposed project will have no significant impact on the human

environment, the agency may issue a finding of no significant impact ("FONSI"), and

proceed with the proposed action.  If the agency concludes that there may be significant

impacts, then it must prepare an EIS.  40 C.F.R. § 1501.4.  Congress intended that

requiring agencies to prepare these NEPA documents would help prevent or eliminate

damage to the environment by focusing government and public attention on the

environmental effects of proposed agency action.

25.    NEPA and its implementing regulations require that, when preparing an EA,

agencies take a hard look at the potential impacts of a project, and ensure that, prior to

issuing a FONSI, the EA convincingly concludes that no significant impacts will occur in

order to forego preparation of an EIS.  An agency must supply a convincing statement of

reasons why potential effects are insignificant.

26.    Likewise, agencies must take a hard look at the potential environmental impact

of a project when preparing an EIS.

27.    NEPA's implementing regulations require federal agencies to supplement

their EISs or EAs if "there are new circumstances or information relevant to

environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. §

1502.9(c)(ii).

28.   In preparing either an EIS or an EA, federal agencies must consider a reasonable range of alternatives including appropriate mitigation measures.  42 U.S.C. § 4332(E); 40 C.F.R. § 1502.14.

29.   NEPA regulations require federal agencies like BLM to "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected."  40 C.F.R. § 1506.6(b)(1).  This requirement applies to all NEPA-related documents including EISs, EAs, and FONSIs.

30.   Moreover, NEPA regulations require BLM to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures."  40 C.F.R. § 1506.6(a).  Again, this requirement is not limited to EISs, but applies equally to EAs and FONSIs.

## The Clean Water Act

31.   The purpose of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

32.   To achieve this purpose the Clean Water Act provides for the establishment of state water quality standards.  33 U.S.C. § 1313.  These standards, such as limits on the sediment discharged into streams from construction, are set to protect designated uses of the waters of the United States.  The State of Wyoming has designated waters in the Atlantic Rim project area for a variety of uses including for drinking water, fish and other aquatic life, recreation, wildlife and scenic value.

33.   The Clean Water Act imposes an affirmative duty on federal agencies to ensure that any permits or licenses that they issue comply with state water quality standards.  33

U.S.C. § 1341(a)(1).  Prior to approving the applications for permits to drill here, BLM

had a duty under the Clean Water Act to obtain a certification by the State of Wyoming

that the APDs complied with state water quality standards.  A waiver of the certification

requirement is possible, but such waiver still requires a specific request for the

certification to the State of Wyoming.  *Id.*

### The Federal Land Policy and Management Act

34.   FLPMA directs the Secretary of the Interior and BLM to manage public lands

"under principles of multiple use and sustained yield."  43 U.S.C. § 1732(a);  *see also* 43

U.S.C. § 1701(a)(8) (listing purposes and values that should be considered in the

management of public lands).  FLPMA further requires that "[i]n managing the public

lands the Secretary shall, by regulation or otherwise, take any action to prevent

unnecessary or undue degradation of the lands."  43 U.S.C. § 1732(b).

35.   To assist in the management of public lands, FLPMA requires BLM to "develop,

maintain, and, when appropriate, revise land use plans."  43 U.S.C. § 1712(a).  These

land use plans, also known as resource management plans ("RMPs") project both the

present and future use of the land.  43 U.S.C. § 1701(a)(2).  FLPMA prohibits BLM from

taking actions inconsistent with the provisions of its RMPs.  43 U.S.C. § 1732(a) ("The

Secretary shall manage the public lands . . . in accordance with the land use plans

developed by him . . . .");  43 C.F.R. § 1610.5-3 ("All future resource management

authorizations and actions . . . shall conform to the approved plan.").

36.   When necessary, RMPs may be amended, 43 C.F.R. § 1610.5-5.  To do so, BLM

must prepare appropriate NEPA documentation, and submit the proposed amendment to

public notice and comment in the same way as when the plan was originally being prepared.  43 C.F.R. § 1610.2.

### Oil and Gas Drilling

37.    Resource Management Plans and their accompanying environmental impact statements establish Reasonably Foreseeable Development scenarios that set the level of oil and gas development for the area governed by the plan.

38.    After a land use plan is in place for an area, BLM will issue oil and gas leases consistent with the plan.  *See*  42 U.S.C. § 1732(a) ("The Secretary shall manage the public lands . . . in accordance with the land use plans developed by him . . . ."); 43 C.F.R. § 1610.5-3 ("All future resource management authorizations and actions . . . shall conform to the approved plan.").  Each BLM state office is required to conduct a competitive oil and gas lease sale at least four times a year if public lands are available for leasing.  43 C.F.R. § 3120.1-2.

39.    After obtaining a lease, a company wishing to drill for oil or gas must submit an Application for Permit to Drill ("APD") and have it approved.  43 C.F.R. § 3162.3-1(c). A company may submit a single application for a permit to drill a single well or submit applications for several wells to be considered as part of a Plan of Development ("POD"). 43 C.F.R. § 3162-1(e).  Upon receipt of an application for permit to drill, BLM shall post information related to the APD for public inspection at least 30 days before action to approve the APD.  43 C.F.R. § 3162.3-1(g).  Within five working days of the conclusion of the 30-day notice period, BLM must approve the application, return it to the applicant stating the reasons for disapproval, or advise the applicant of reasons why final action will be delayed along with the date such final action can be expected.  43 C.F.R. §

3162.3-1(h).  With an APD in hand, a company may immediately move forward with ground-disturbing activities.

## FACTS GIVING RISE TO PLAINTIFFS' CAUSES OF ACTION

### *BLM's Energy Development Policies*

40.  Recently, BLM policies and actions have promoted energy development on public lands at the expense of their many other valuable uses such as for recreation and conservation.  On May 18, 2001, President Bush issued an Executive Order 13212 requiring BLM and other federal agencies to take "Actions to Expedite Energy-Related Projects."  The Executive Order set up a Task Force for Streamlining Energy Permitting. 66 Fed. Reg. 28357 (May 18, 2001).

41.  In November 2001, BLM established a National Energy Office.  BLM identified over 40 tasks representing "opportunities to expedite or expand energy supplies" from public lands.  BLM Information Bulletin No. 2001-138 (August 15, 2001).  BLM Information Bulletins and Memoranda are available at http://www.blm.gov/nhp/efoia/wo/woerr.html.

42.  BLM also identified several Resource Management Plans ("RMP") to accelerate and increase energy development on public lands.  These so-called "Time Sensitive Plans" included the Great Divide RMP which governs the Atlantic Rim project area. BLM Instruction Memorandum No. 2002-081 (February 4, 2002).

43.  In 2004, BLM Headquarters directed land managers to proceed with leasing even while applicable land use plans were being revised, even if those plans were considering protecting the natural values of the same lands, and to require that any deferrals of leasing be supported by detailed explanations and documentation, submitted to the state and

national directors of the BLM.  BLM, Instruction Memorandum 2004-110 (February 23, 2004).

44.  In 2005, BLM Headquarters directed all field offices to develop a NEPA alternative of higher well density and development beyond that actually proposed by an operator.  The directive advised BLM offices how to make the maximum number of projects fit into categorical exclusions to avoid NEPA altogether.  BLM, Instruction Memorandum 2005-247 (September 30, 2005).

45.  In June 2005, the Government Accountability Office ("GAO") issued a report finding that the increased volume of APDs and mandates to process them promptly resulted in more BLM staff resources being devoted to issuing permits and less to monitoring and enforcing compliance with environmental standards.  GAO, *Oil and Gas Development – Increased Permitting Activity Has Lessened BLM's Ability to Meet its Environmental Protection Responsibilities* (GAO-05-418).  According to GAO, the total number of oil and gas drilling permits approved by BLM more than tripled, from 1,803 to 6,399, during fiscal years 1999-2004.  GAO 17.  GAO explains that this "dramatic increase in oil and gas development on federal lands over the past 6 years has lessened BLM's ability to meet its environmental protection responsibilities."  GAO 5.

   *Rawlins Resource Management Plan*

46.  As stated above, BLM identified the land use plan that governed the Atlantic Rim – the Great Divide RMP – for accelerated revision.  The existing Great Divide RMP provided for 1,440 oil and gas wells being drilled between about 1987 and 2007.  Industry plans for the area dramatically exceeded this amount.  BLM wanted to act

quickly to allow for greater energy development in the area.  BLM Instruction

Memorandum No. 2002-081 (February 4, 2002).

47.  On February 6, 2002, BLM issued a call for data for the revision of the Great

Divide RMP.  Biodiversity Conservation Alliance and other plaintiffs submitted

information to BLM in response to this request.

48.  On January 31, 2003, BLM issued a scoping notice to identify issues to be

addressed in the Environmental Impact Statement for the revision of the Great Divide

RMP, to become the Rawlins RMP.  Biodiversity Conservation Alliance and other

plaintiffs submitted comments.

49.  On December 17, 2004, BLM released a Draft EIS for the Rawlins RMP.

Biodiversity Conservation Alliance and other plaintiffs submitted comments.

50.  BLM has not yet released a Final EIS nor a Proposed Rawlins RMP to complete

the revision of the Great Divide Resource Management Plan.

*Atlantic Rim Natural Gas Field Development Project Record of Decision*

51.  Despite not having completed the revision to the RMP governing the Atlantic

Rim area, BLM has moved forward to authorize extensive new coalbed methane

development in the area.

52.  On December 12, 2005, BLM issued a Draft EIS for the Atlantic Rim Natural

Gas Field Development Project ("Atlantic Rim Development Project").  The project

provided for 2,000 new wells.  The project area sits within the Red Desert southwest of

the town of Rawlins.  In addition to the new wells, the project includes new access roads

and pipelines, totaling approximately 1,000 miles.

53.  On February 17, 2006, BCA and other plaintiffs submitted comments on the Draft EIS.

54.  In November 2006, BLM released a Final EIS ("FEIS") for the Atlantic Rim Development Project.

55.  On January 4, 2007, BCA and other plaintiffs submitted comments on the FEIS.

56.  On May 21, 2007, BLM issued a Record of Decision ("ROD") approving Atlantic Rim Development Project with its 2,000 new wells.  BLM deferred evaluation of site-specific impacts of the project until site-specific proposals such as Applications for Permits to Drill were received.

57.  BCA and other plaintiffs filed an appeal of BLM's ROD and accompanying EIS before the Interior Board of Land Appeals ("IBLA") on June 20, 2007.  The appeal requested a stay of BLM's decision.

58.  The IBLA denied the stay request on September 5, 2007.

*BLM Approval of Applications for Permits to Drill within Atlantic Rim Project*

59.  Meanwhile, BLM had received numerous applications for permits to drill in the Atlantic Rim Development Project area.  No company could conduct surface disturbing activities within the project area prior to BLM approval of an APD for the activity.

60.  On June 28, 2007, BLM approved thirty-six coalbed methane natural gas wells as requested by Double Eagle Petroleum Company ("Double Eagle").  Fourteen of the wells were in Catalina Plan of Development ("POD") A and twenty-two were in POD B. BLM completed a Tiered EA, FONSI/ Decision Record ("DR") Form covering these wells along with 3 produced water reinjection wells (all in POD B), plus the construction and/ or reconstruction of access roads for the purpose of drilling the proposed wells.

Rather than conducting significant new analysis, BLM referred to the earlier analysis that had been done as part of the Atlantic Rim Development Project EIS.

61.  BLM did not make the Catalina NEPA and decision documents available to the public nor give any notice to the public of the availability of the documents prior to the agency's approval of the Catalina A and B PODs.

62.  In fact, as of September 24, 2007, BLM's Wyoming NEPA register indicated that the analysis was still "In Process."

63.  On August 16, 2007, BLM approved forty-eight coalbed methane natural gas wells as requested by Anadarko E & P Company ("Anadarko").  Twenty-six of the wells were in Sun Dog POD A and twenty-two were in POD B.  BLM completed a Tiered EA, FONSI/ DR Form covering these wells along with three produced water reinjection wells (2 in POD A and 1 in POD B), plus the construction and/ or reconstruction of access roads for the purpose of drilling the proposed wells.

64.  BLM did not make the Sun Dog A and B NEPA and decision documents available to the public prior to the agency's approval of the Sun Dog A and B PODs. BLM did not notify BCA of the availability of the completed documents despite the fact that BLM knew of BCA's intense interest in actions within the Atlantic Rim project area.

65.  BCA and other plaintiffs first became aware of the APD approvals on September 7, 2007, after hearing reports of ground disturbing activities occurring within the Atlantic Rim project area.

66.  BCA made a request to BLM's Rawlins office for the approved APDs in the Catalina and Sun Dog PODs, as well as the accompanying NEPA documents, on

September 7, 2007.  BLM provided part of the NEPA documents on September 10, 2007.

BLM has not yet provided the complete set of documents.

67.  Moreover, BCA and NRDC requested copies of all pending APDs tied to the

Atlantic Rim Project ROD and EIS.  BCA and NRDC also requested the accompanying

NEPA documents.   BLM told BCA on September 7, 2007, that there were 243 such

APDs pending in addition to the 90 that had already been approved in the Catalina and

Sun Dog PODs.

68.  Late in the day on October 16, 2007, BLM sent Plaintiffs copies of the EAs for

the Sun Dog C POD and Sun Dog D and E PODs.  BLM indicated it was providing

copies of the EAs as "a courtesy and for your convenience."  BLM further indicated that

it would review comments from Plaintiffs if those comments were received "within

expected project processing timelines."  BLM then stated that it "expect[ed] to make a

decision on the Projects by Monday, October 22, 2007."   BLM thus provided Plaintiffs

three business days in which to provide comments.

69.  On October 19, 2007, NRDC and BCA submitted comments to BLM on the

information provided regarding Sun Dog PODs C, D, and E.

70.  On October 23, 2007, BLM approved fourteen new wells in Sun Dog POD C and

thirty-four new wells in Sun Dog PODs D and E.  These approvals authorize Anadarko to

begin drilling and road construction immediately.  BLM informed NRDC and BCA of its

decision on October 24, 2007.

## FIRST CAUSE OF ACTION
*Failure to Provide Public Participation as Required by NEPA*

71.   Plaintiffs incorporate herein by reference paragraphs 1-70 above.

72.    NEPA requires federal agencies to "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected."  40 C.F.R. § 1506.6(b)(1).

73.    NEPA further directs federal agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures."  40 C.F.R. § 1506.6(a). Federal NEPA regulations mandate that "public scrutiny [is] essential to implementing NEPA."  40 C.F.R. § 1500.1(b);  *see also* 40 C.F.R. § 1500.2(d) (federal agencies must "encourage and facilitate public involvement").  Federal regulations explicitly require federal agencies to include in all EAs a list of the agencies and persons consulted in preparing the document.  40 C.F.R. § 1508.9(b).

74.  BLM did not provide the public participation required by NEPA before approving the APDs for the Catalina A and B PODs and the Sun Dog A, B, C, D and E PODs.

75.    When BLM completed the Environmental Impact Statement for the Atlantic Rim Development Project, the agency explicitly deferred analysis of site-specific impacts of the project until site-specific proposals such as applications for permits to drill were received.

76.  While BLM deferred part of the analysis required by NEPA until making APD decisions, the agency then did not involve the public when it approved the drilling permits.

77.  BLM prepared and approved EAs/ FONSIs for Catalina A and B PODs and Sun Dog A, B, PODs without providing the documents to the public to comment.

78.   Based on these EAs/ FONSIs, BLM approved APDs for 39 new wells in the Catalina PODs and 51 new wells in the Sun Dog PODs without any input for the interested public at all.  As a result, new wells are being drilled and new roads constructed now in the Catalina A and B PODs and Sun Dog A and B PODs.

79.   In the past, BLM has provided an opportunity for public comment on EAs that evaluate plans of development for multiple coalbed methane wells.

80.   When BLM provides an opportunity for public comment on an EA, BLM ordinarily provides the public a thirty-day period in which to submit comments.

81.   On October 16, 2007, there was no emergency circumstance requiring that BLM immediately approve Sun Dog C, D, and E PODs or preventing BLM from providing a thirty-day comment period.

82.   BLM prepared and approved EAs/FONSIs for Sun Dog C, D and E PODs without providing documents to the public at large and without providing Plaintiffs a meaningful opportunity to comment on the EAs.  Based on these EAs/FONSIs BLM approved APDs for 48 new wells in Sun Dog C, D and E PODs.

83.   As set forth above, BLM failed to provide the public participation required by NEPA before approving the applications for permits to drill 138 new wells and accompanying roads and pipelines in the Catalina and Sun Dog PODs.  Accordingly, the BLM has violated NEPA and its implementing regulations, 40 C.F.R. Part 1500, and has acted arbitrarily and capriciously and contrary to law in violation of the APA, 5 U.S.C. § 706(2)(a).

**SECOND CAUSE OF ACTION**

*Failure to Consider a Reasonable Range of Alternatives*

84.  Plaintiffs incorporate herein by reference paragraphs 1-83 above.

85.  NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternate uses of available resources."  42 U.S.C. § 4332(E). NEPA's implementing regulations specifically require consideration of mitigation measures in the alternatives analysis.  40 C.F.R. § 1508.25(b), 1502.14(f), and 1505.2(c).

86.  The greater sage grouse ("sage grouse") is a BLM sensitive species.  Sensitive species are those which are close to being threatened or endangered.  BLM policy prohibits actions that will contribute to the decline of sensitive species.

87.  Sage grouse populations across the United States, including in Wyoming, have recently experienced severe range-wide declines.

88.  These declines are attributable, in large part, to habitat loss and fragmentation due to energy development and its associated infrastructure.

89.  The Atlantic Rim project area includes important habitat for sage grouse because of the high amount and diversity of suitable habitat, lack of fragmentation, and the proximity of uplands and riparian habitats.

90.  The Atlantic Rim Development Project will harm sage grouse by disturbing the species directly and by destroying and fragmenting sage grouse habitat.

91.  Numerous scientific studies have documented the harm to sage grouse resulting from oil and gas drilling.

92.    Wells and the accompanying roads and other infrastructure disturb the nesting and breeding of sage grouse.

93.    All the "action" alternatives considered by BLM provided for the same mitigation measures for sage grouse.

94.    These mitigation measures, when implemented in other BLM-approved projects, have proven ineffective at preventing significant population loss and decreased breeding productivity.

95.    Each of the "action" (as opposed to "no action") alternatives considered by BLM was expected to result in harm to sage grouse that exceed BLM "significance criteria" for harm to wildlife, even after the application of the mitigation measures proposed by BLM.

96.    The United States Fish and Wildlife Service ("USFWS") and plaintiffs proposed alternatives with mitigation measures that were more protective than the alternatives and mitigation measures considered by BLM.  This alternatives presented by the USFWS and plaintiffs, but not considered by BLM, would protect sage grouse from significant harm.

97.    Because BLM did not analyze an alternative that provided effective and reasonably available mitigation measures for sage grouse, the agency has violated NEPA and its implementing regulations, 40 C.F.R. Part 1500.  Consequently, the agency's approval of the Atlantic Rim Record of Decision in May 2007, as well as its recent approvals of Plans of Development for Catalina A and B and Sun Dog A, B, C, D and E was arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706(2)(a).

**THIRD CAUSE OF ACTION**
*Failure to take a "Hard Look" at Environmental Impacts*

98.   Plaintiffs incorporate herein by reference paragraphs 1-97 above.

99.   When preparing an EA, federal agencies must "provide sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact (FONSI)."  40 C.F.R. § 1508.9(a).

100. None of the four EA/FONSI/DRs recently approved by BLM nor the previous Atlantic Rim Development Project EIS adequately discussed, analyzed, and evaluated several serious environmental consequences from the proposed action.  These consequences include the increased risk of methane seeps triggered by the new coalbed methane wells in the area, impacts to big game habitat, impacts to BLM sensitive species, impacts to water quality, and impacts to the air quality.

101.  In addition, BLM failed to adequately analyze the cumulative impacts of the agency's actions when added to other past, present, and reasonably foreseeable future actions.  *See* 40 C.F.R. § 1508.25(c).

102. Finally, BLM failed to conduct the site-specific analysis required by NEPA.  The agency did not conduct site-specific analysis when it completed the environmental impact statement for the Atlantic Rim Development Project.  BLM also did not complete adequate site-specific analysis before it approved the applications for permits to drill for the Catalina A & B and Sun Dog A, B, C, D & E PODs.

103. Because BLM did not take the hard look at environmental impacts NEPA requires, the agency has violated NEPA and its implementing regulations, 40 C.F.R. Part 1500, and the agency's approval of the Atlantic Rim Record of Decision in May 2007, as well as its recent approvals of Plans of Development for Catalina A and B and Sun Dog

A, B, C, D and E, was arbitrary, capricious, and contrary to law in violation of the APA,

5 U.S.C. § 706(2)(a).

## FOURTH CAUSE OF ACTION
*Failure to Comply with Resource Management Plan as Required by FLPMA*

104. Plaintiffs incorporate herein by reference paragraphs 1-103 above.

105. The Federal Land Policy and Management Act prohibits BLM from taking

actions inconsistent with the provisions of its Resource Management Plans.  42 U.S.C. §

1732(a);  43 C.F.R. § 1610.5-3.

106. The Atlantic Rim Development Project is governed by the Great Divide

Resource Management Plan approved in 1990.  BLM has begun, but not completed, a

revision to this RMP.

107. BLM's decisions approving the 2000-well Atlantic Rim Development Project

and the 138 wells in the Catalina and Sun Dog PODs is inconsistent with the amount of

wells approved for the area in the Great Divide RMP.  BLM's decisions are also

inconsistent with the wildlife management objectives of the Great Divide RMP.

108. Because BLM's actions are inconsistent with the applicable Resource

Management Plan, the agency's actions violated FLPMA and its implementing

regulations and as such are arbitrary, capricious, and contrary to law in violation of the

APA, 5 U.S.C. § 706(2)(a).

## FIFTH CAUSE OF ACTION
*Violation of the Clean Water Act*

109. Plaintiffs incorporate herein by reference paragraphs 1-108 above.

110. Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

111. In order to secure clean waters for the Nation, the Clean Water Act requires states to set water quality standards.  33 U.S.C. § 1313.

112. The Clean Water Act prohibits federal agencies from issuing permits or licenses, such as the applications for permits to drill challenged here, without a certification that the permit complies with state water quality standards.  33 U.S.C. § 1341(a)(1).

113. BLM has provided no evidence that any steps were taken to comply with the Clean Water Act's certification requirements.  By issuing 138 APDs for the Sun Dog and Catalina areas without ensuring their compliance with state water quality standards, BLM violated the Clean Water Act and therefore the agency's action is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706(2)(a).

## PRAYER FOR RELIEF

Wherefore, plaintiffs respectfully pray that this Court enter judgment in their favor and against defendants Dirk Kempthorne, the Department of the Interior and the Bureau of Land Management and that the Court:

(1)    Declare that defendants have violated NEPA, FLPMA, and the Clean Water Act, and applicable implementing regulations as set forth above; and

(2)    Award injunctive relief directing defendants to rescind the applications for permits to drill approved for Catalina A and B plans of development and the Sun Dog A, B, C, D and E plans of development until the defendant agency BLM corrects its violations of NEPA, FLPMA and the Clean Water Act; and

(3)     Award injunctive relief prohibiting defendants from approving any further

applications for permits to drill, or other ground-disturbing activity, tied to the Atlantic

Rim Development Project EIS until the defendant agency BLM corrects its violations of

NEPA, FLPMA and the Clean Water Act; and

(4)     Retain jurisdiction of this action to ensure compliance with its decree; and

(5)     Award plaintiffs the costs they have incurred in pursuing this action,

including attorneys' fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. §

2412(d), and other applicable provisions; and

(6)     Grant such other and further relief as is proper.

Respectfully submitted,

__s/Sharon Buccino_____
Sharon Buccino (D.C. Bar # 432073)
Aaron Bloom
Natural Resources Defense Council
1200 New York Ave., NW. Suite 400
Washington, D.C. 20005
(202) 289-6868

Attorneys for Plaintiffs


Date: October 26, 2007