**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Avenue, NW, Suite 400
Washington, DC 20005, *et al.,*

       Plaintiffs,

          v.

DIRK KEMPTHORNE, in his official capacity
As the Secretary of the United States
Department of the Interior
1849 C Street, NW
Washington, DC 20240, *et al.,*

       Defendants.

Civ. Action No. 1:07-cv-01709-RJL

ANADARKO PETROLEUM CORPORATION
P.O. Box 1330
Houston, TX 77251-1330, *et al.,*

       Defendant-Intervenors.

**DEFENDANT-INTERVENORS' SUPPLEMENTAL BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to this Court's ruling from the bench on October 18, 2007, allowing for

supplemental briefing, Defendant-Intervenors Anadarko Petroleum Corporation, Warren

Resources, Inc., and Double Eagle Petroleum Co. (collective referred to as "Def.-Intervenors")

respectfully submit this Supplemental Brief in Opposition to Plaintiffs' Motion for Preliminary

Injunction.

As was the case with their reply brief, Plaintiffs focused their arguments at the hearing on

claims (1) that BLM violated the public participation requirements of the National

Environmental Policy Act ("NEPA"), (2) that BLM violated Section 401 of the Clean Water Act,

and (3) of alleged irreparable injury if an injunction is not issued.  The Plaintiffs did not dispute

any of the remaining arguments related to the adequacy of BLM's NEPA review raised by Def.-Intervenors in their opposition to Plaintiffs' motion.

## ARGUMENT

**I.     PLAINTIFFS' NEW ARGUMENT RAISED AT THE HEARING TO SUPPORT THEIR CLAIM THAT BLM VIOLATED NEPA'S PUBLIC PARTICIPATION REQUIREMENTS IS NOT LIKELY TO SUCCEED ON THE MERITS.**

Apparently recognizing that this Court expressly held, in *Biodiversity Conservation Alliance v. BLM*, 404 F. Supp. 2d 212 (D.D.C. 2005), that NEPA does not require an agency to circulate an EA for public comment, Plaintiffs instead argued that they should be entitled to a 30-day public comment period on each *final* environmental assessment ("EA") prior to BLM's making a final decision. In support of this argument, Plaintiffs referenced specific situations where BLM purportedly circulated EAs prior to the issuance of a decision record. None of those cases, however, related to an EA that was tiered to a programmatic environmental impact statement ("EIS"), and they are all therefore inapposite. Indeed, Plaintiffs cannot cite to any statutory provision, regulation, or case that requires more public participation than was provided by BLM here.

     A.    *Biodiversity Conservation Alliance* Does Not Require Circulation of a Final Environmental Assessment Prior to Issuance of a Final Decision.

Plaintiffs attempt to create a distinction between circulating a draft EA for public comment, which this Court has expressly held was not required by NEPA, and circulating a final EA for comment prior to an agency making a final decision. The same reasoning this Court applied with respect to draft EAs, however, applies equally to final EAs. As this Court recognized, NEPA and Council on Environmental Quality's ("CEQ") regulations do not require an agency to circulate a draft EA except in limited circumstances that do not apply here. *Biodiversity Conservation Alliance*, 404 F. Supp. 2d at 220 (citations omitted). The regulations

do not distinguish between a draft EA or a final EA, 40 C.F.R. §§ 1501.4(b), 1501.4(e)(2), and this Court should reject Plaintiffs' attempt to create such a distinction.

Rather, as this Court noted, NEPA regulations require BLM "to involve the public in its decision-making process" and "[d]etermining whether the public was adequately involved is a fact-intensive inquiry made on a case-by-case basis." *Biodiversity Conservation Alliance*, 404 F. Supp. 2d at 219-20. Plaintiffs concede that "the Court found that the facts [in *Biodiversity Conservation Alliance*] showed that BLM provided the required public participation." Pls. Reply Br. at 3. At the hearing, however, the Plaintiffs attempted to distinguish this case from the public participation found sufficient in *Biodiversity Conservation Alliance*, and to support their new argument, by claiming that the final EA was circulated for comment prior to the final decision in *Biodiversity Conservation Alliance*. Plaintiffs have again misinterpreted the facts in that case.

Although the Court correctly noted in *Biodiversity Conservation Alliance*, 404 F. Supp. 2d at 220, (as Plaintiffs quoted) that BLM "allowed a thirty-day public comment period, and did not issue the DR/FONSI until after considering the issues raised during that period," the 30-day public comment period referenced in that case was based on a BLM press release notifying the public of the intent to prepare an EA. *See* Ex. 12 (BLM Decision Record, Finding of No Significant Impact and Environmental Assessment for the Hay Reservoir 3D Geophysical Project), Transmittal Letter ("The environmental assessment was prepared after a 30-day public comment period."), DR-3 ("BLM issued a news release on April 30, 2002, allowing a 30-day public comment period."), DR-11 ("The BLM received 7 comment letters during public scoping."). The EA itself was issued the same time as the Decision Record and Finding of No Significant Impacts ("DR/FONSI").

That is essentially what happened in this case.  Here, BLM provided notice of the preparation of EA for the Catalina Plans of Development ("PODs") A & B on June 6, 2007 (BLM Ex. 11a (Bargsten Decl.) at 3) and for the Sun Dog Plans of Development ("PODs") A & B on July 9, 2007 (BLM Ex. 12 (Ahlbrandt Decl.) at ¶7).  These notices were provided before the projects were approved in June and August of 2007.  The notice provided by the BLM on the website is analogous to the press release issued in the *Biodiversity Conservation Alliance* case.  Plaintiffs here simply failed to take advantage of the public comment period.

In fact, more public participation was provided in this case than in the *Biodiversity Conservation Alliance*.  In that case, unlike here, there was no programmatic EIS outlining the potential impacts of the overall project, which included numerous opportunities for public participation.[1]  Indeed, under Plaintiffs' arguments, a 30-day public comment period on an EA apparently would be required any time an agency tiered an EA to a programmatic EIS.  NEPA, the CEQ regulations, and case law impose no such rule.  The CEQ regulations only require an EA to be circulated for comment in "certain limited circumstances," none of which apply here.[2] 40 C.F.R. § 1501.4(e)(2).  *See* Def.-Intervenors Opp'n at 16.  This Court should reject Plaintiffs' arguments here to impose additional procedural requirements not mandated by NEPA.  *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 525 (1978).

---

[1]  Given the ample opportunities to comment on the Atlantic Rim Project Area EIS, which Plaintiffs took advantage of here, the fact that there was less than the additional 30 days Plaintiffs seek for more comment time after notice of preparation of the EAs for the Catalina PODs A & B and Sun Dog PODs A & B is of little consequence.  Twenty-two days were provided for the Catalina PODs (BLM Ex. 11a (Bargsten Decl.) at 3) and thirty-eight days for the Sun Dog PODs (BLM Ex. 12 (Ahlbrandt Decl.) at ¶7).

[2]  Courts have similarly rejected the argument that an agency is required to circulate an EA or FONSI outside those situations outlined in the agency's or CEQ's regulations.  *See, e.g., Save Our Cumberland Mountains v. Kempthorne,* 453 F.3d 334, 350-51 (6th Cir. 2006); *Pogliani v. U.S. Army Corps of Eng'rs*, 306 F.3d 1235, 1238-40 (2d Cir. 2002).

4

B.    Cases Where BLM Did Circulate Environmental Assessments Prior to Issuing its
      Decision Are Inapposite.

In their reply brief and at oral argument, Plaintiffs referred to two specific situations in

which BLM elected to circulate EAs for comment in an effort to support their claim that BLM

should have also done so in this case.  The two cases cited by Plaintiffs, however, are inapposite.

Plaintiffs point to the Hay Reservoir Coalbed Natural Gas Infill and Impoundments

Project Environmental Assessment, for which BLM did provide a 30-day public comment period

prior to issuing the Decision Record.  *See* Ex. 13 (BLM Dear Reader Letter).  This project was a

pilot project to determine whether coalbed natural gas development was feasible and whether

full-field development could occur.  Ex. 13 (Hay Reservoir EA) at 2.  Plaintiffs also point to the

Hanna Draw Coalbed Natural Gas Pilot Project Environmental Assessment, which is over 200

pages long and similarly was circulated for a 30-day public comment period prior to issuing the

Decision Record.  *See* Ex. 14 (BLM Dear Reader Letter).  Again, this project was a pilot project

proposed by Anadarko to explore and potentially develop coalbed natural gas resources in the

Hanna Draw Project Area.  Ex. 14 (Hanna Draw EA) at 1-1.  Because both of these cases

involved pilot projects, there was no prior programmatic EIS to which these EAs were tiered, as

there was in this case.  Consequently, while it was reasonable for BLM to determine a public

comment period on the EAs was warranted in those cases, it does not mean BLM must do so in

every case.

Moreover, contrary to Plaintiffs' claims, BLM has acted consistently in this case.  Like

the two EAs cited by Plaintiffs, here BLM also allowed for a 30-day public review of each EA

prepared under the interim drilling policy for the Atlantic Rim Project Area, which include the

wells previously approved, and currently existing, at the Catalina (Cow Creek POD) and Sun

Dog Units.  Ex 15 (FEIS), App. A at A-3; Ex. 16 (BLM Transmittal Letter - Cow Creek POD);

Ex. 17 (BLM Transmittal Letter - Sun Dog POD).

In the end, NEPA provides BLM flexibility to decide when additional opportunity for

public comment is warranted, and BLM's procedures in one case need not be replicated in all

cases.  NEPA's public involvement requirements "are not as well defined when an agency

prepares only an EA and not an EIS."  *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257,

1279 (10th Cir. 2004) (citations omitted) (rejecting claim that agency acted arbitrarily in failing

to provide description of alternatives in scoping notice, even where EA was not made available

to public before agency issued its decision).  In the case of an EA tiered to a detailed and

comprehensive EIS, the public is given more than sufficient environmental information to be

given an opportunity to "weigh in on the significant decisions that the agency will make in

preparing the EA."  *Montrose Parkway Alternatives Coal. v. U.S. Army Corps of Eng'rs*, 405 F.

Supp. 2d 587, 597 (D. Md. 2005) (quoting *Sierra Nevada Forest Prot. Campaign v. Weingardt*,

376 F. Supp. 2d 984, 991 (E.D. Cal. 2005)).  Plaintiffs recognized that these opportunities were

provided on the Atlantic Rim Project Area EIS, participated fully in the EIS process, and

conceded that BLM complied with the public participation requirements with respect to the EIS.

That is all NEPA requires.  *See, e.g., Missouri v. U.S. Army Corps of Eng'rs*, No. 06-1616, 2006

WL 3147736, at *5 (D. Minn. Nov. 2, 2006) (rejecting claim that Army Corps was required to

circulate EA that was tiered to EIS where Army Corps "provided for extensive public

participation, in which [plaintiff] was thoroughly involved"); *Colorado Envtl. Coal. v. BLM*, 932

F. Supp. 1247, 1254-55 (D. Colo. 1996) (noting incorporation by reference "is encouraged" by

NEPA regulations and rejecting claim that "public was not permitted to comment and participate

in the process" where an EA was tiered to an EIS that provided for public comment).

Plaintiffs' statements at the hearing that they needed additional opportunity to comment on the "deferred site-specific" analysis ring hollow.[3]  Plaintiffs, in their arguments in support of a preliminary injunction, only point to alleged environmental impacts that they were able to, and in fact did, comment on with respect to the overall Atlantic Rim Project Area EIS:  (a) alternative mitigation measure for the sage grouse (Def.-Intervenors Opp'n at 23); (b) the impacts of methane seeps (Pls. Ex. T; Def.-Intervenors Opp'n at 9-10); and (c) cumulative impacts of other projects.  Indeed, at the hearing, Plaintiffs only noted that the comments on the site-specific EA would address the mitigation measures actually imposed for that particular site.  As outlined in Def.-Intervenors' Opposition brief (at 21-26), however, BLM fully analyzed, and provided an opportunity for public comment on, numerous mitigation measures it was going to employ at each site and those it may employ at each site.[4]  Thus, Plaintiffs' had more than ample opportunity to express their concerns over the potential environmental impacts of the proposed projects.  Nothing more is required.

C.     Plaintiffs' Request For A Broader Injunction Cannot Be Supported.

Plaintiffs, at the hearing, also clarified that they request a broad injunction to halt not only the ongoing (and almost complete) construction of the two specific projects before the Court, but to halt any further approvals by BLM within the Atlantic Rim Project Area.  The only argument Plaintiffs make for a broader injunction is a procedural argument—that NEPA requires an opportunity to comment on the relevant EAs.  For the same reasons this Court should reject

---

[3]  This is particularly true where Plaintiffs were also able to comment on site-specific issues related to the EAs for the pilot projects within these same project areas.  Ex. 16 (BLM Transmittal Letter - Cow Creek POD); Ex. 17 (BLM Transmittal Letter - Sun Dog POD); Ex. 18 (Cow Creek Decision Record) at B-16 to B-26.

[4]  *See Nat'l Mitigation Banking Ass'n v. U.S. Army Corps of Eng'rs*, No. 06-cv-2820, 2007 WL 495245, at *23 (N.D. Ill. Feb. 14, 2007) ("A change in the mitigation plan is not something that would significantly affect the quality of the environment in a way not previously considered.").

those claims with respect to the Catalina and Sun Dog PODs A & B, the Court should reject the

claims regarding subsequent approvals on applications for permits to drill.

BLM has provided more than sufficient public participation, and this Court should not

impose additional public participation requirements not required by NEPA.[5]

## II.    PLAINTIFFS CONTINUE TO FAIL TO PROVIDE EVIDENCE OF A DISCHARGE TO WATERS OF THE UNITED STATES THAT WOULD REQUIRE A 401 CERTIFICATION UNDER THE CLEAN WATER ACT.

Despite being directly asked at the hearing, Plaintiffs continued to fail to provide any

evidence of a discharge into "waters of the United States."  Instead, Plaintiffs showed a map of

watersheds in Northern Colorado and Southern Wyoming (Def.-Intervenors Ex. 2, Part 3 (FEIS)

Map M-14), apparently claiming that the mere presence of streams or waters in the general

location of the project sites is sufficient to invoke Clean Water Act jurisdiction.  As the Supreme

Court made clear in *Rapanos v. United States,* 126 S. Ct. 2208 (2006), determining whether

particular waters constitute "waters of the United States" for purposes of the Clean Water Act is

a difficult and complex endeavor when dealing with other than traditionally navigable waters.

To support their claim for injunctive relief, Plaintiffs bear the burden of demonstrating

particular waters are "waters of the United States" under the Clean Water Act.  33 U.S.C.

§ 1362(7).  *See also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C.

Cir. 2006) (moving party has burden of showing "substantial likelihood of success on the

merits").  The evidence provided here is woefully insufficient to determine whether these waters

are in fact "waters of the United States."

---

[5]  Plaintiffs themselves conceded at the hearing that, in fact, BLM is being responsive to requests to review EAs and provided time for public comment on the EAs for the Sun Dog Plans of Development C, D and E.  Contrary to Plaintiffs' arguments, the record evidence demonstrates BLM's willingness to provide Plaintiffs an opportunity to comment when they timely seek to do so.  *See* BLM Ex. 11a (e-mails attached to Bargsten Decl.).

Plaintiffs have only referred to watercourses within the two specific project areas that are, under post-*Rapanos* guidance, generally considered *not* to be waters of the United States.[6] Plaintiffs attempt to claim Clean Water Act jurisdiction based on culverts, ditches and other channels in the Catalina and Sun Dog Units (which Plaintiffs also refer to as "point sources"). Pls. Reply Br. at 8.  At the hearing, Plaintiffs conceded that the waters associated with these culverts flowed only in the event of rain or snow.  *See also* Pls. Reply Br. at 9 ("Even though the stream channels are dry at times, during rain or snow events they serve to convey water and pollutants into nearby streams.").  In post-*Rapanos* guidance, dated June 2007, EPA and the U.S. Army Corps of Engineers ("Army Corps") indicated that they "generally will not assert jurisdiction over … [s]wales or erosional features (e.g., gullies, small washes characterized by low volume, infrequent, or short duration flow) [or] [d]itches (including roadside ditches) excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water."[7]  Ex. 19 (*Rapanos* Guidance) at 1; *see also id.* at 7.

Moreover, the guidance states that "'relatively permanent' waters do not include ephemeral tributaries which flow only in response to precipitation and intermittent streams which do not typically flow year-round or have continuous flow at least seasonally."  *Id.* at 6.  In such situations, the agencies will apply the "significant nexus" test, based on the Supreme Court's decision in *Rapanos.  Id.* at 1, 6, 7.  This is not a simple analysis that can be assumed away by

---

[6]  Plaintiffs cite to only materials and decisions issued prior to *Rapanos*, and, thus, they are of limited value in the circumstances presented here.

[7]  Justice Scalia, in his opinion in *Rapanos*, noted:  "The restriction of 'the waters of the United States' to exclude channels containing merely intermittent or ephemeral flow also accords with the commonsense understanding of the term.  In applying the definition to 'ephemeral streams,' 'wet meadows,' storm sewers and culverts, 'directional sheet flow during storm events,' drain tiles, man-made drainage ditches, and dry arroyos in the middle of the desert, the Corps has stretched the term 'waters of the United States' beyond parody.  The plain language of the statute simply does not authorize this 'Land Is Waters' approach to federal jurisdiction."  126 S. Ct. at 2222.

the Plaintiffs, but includes consideration of various hydrologic factors and ecologic factors to determine whether the waters have a significant nexus to a traditional navigable water.[8] *Id.* at 7-11.  Plaintiffs have provided no evidence whatsoever of discharges into waters of the United States to support their Clean Water Act claim.

Second, even if the Plaintiffs could identify a water of the United States in the area of the two projects, the applications for permits to drill ("APDs") in this case do not authorize discharges into those waters.  Although the FEIS does not identify any waters of the United States in the project area,[9] BLM recognized that waters of the United States are managed by the Army Corps, and that notices of any required permits may be required prior to approval of construction activities.  Ex. 15  (FEIS) at 4-26.  The FEIS also notes that wetlands and floodplains would be identified during on-site investigations and would be avoided for the location of permanent features.  *Id.* at 3-33, 4-23.  Appendix C of the Record of Decision ("ROD") for the Atlantic Rim Project Area requires operators to work with the Army Corps for facilities that occur in waters of the United States.  Def.-Intervenors Ex. 3 (ROD) at C-5 to C-6; *see also id.* at 21 (stating that operator-committed practices in Appendix C "become mandatory requirements with publication of this decision").  BLM also requires compliance with all requirements of the Clean Water Act.  *Id.* at C-6.  The EAs for the Sun Dog and Catalina PODs

---

[8]  Plaintiffs have not even stated that any of the streams in the area are navigable.  The nearest waters in the area of the Catalina and Sun Dog Units are ephemeral tributaries to Muddy Creek and their tributaries.  *See* Ex. 15 (FEIS) at 3-33, 3-41 (noting tributaries to Muddy Creek are "predominantly ephemeral and flow only in response to snowmelt and rainfall").  Muddy Creek is an intermittent tributary of Little Snake River, which is outside the Atlantic Rim Project Area.  *Id.* at 3-33.

[9]  At the preliminary injunction hearing, counsel for Def.-Intervenors erroneously stated that the two projects at issue in this case (Sun Dog and Catalina) were in the Great Divide Basin.  However, these two projects are south of this Basin.  Def.-Intervenors Ex. 2, Part 3 (FEIS) Map M-14.  The entire Atlantic Rim Project Area is located within three major drainage basins:  the Colorado River Basin, the Missouri River Basin, and the Great Divide Basin.  Ex. 15 (FEIS) at 3-33.  The two projects at issue in this case are in the Colorado River Basin.

A & B reference the ROD's Appendix C.  Pls. Ex. M (Catalina EA) at 5; Pls. Ex. N (Sun Dog EA) at 4.  *See also* Def.-Intervenors Ex. 9 (Sun Dog COA) at 2 and Def.-Intervenors Ex. 10 (Catalina COA) at 2 (requiring activities be conducted in conformance with all applicable federal, state, and local laws and regulations).  Thus, BLM's authorizations do not allow the operators here to discharge into waters of the United States without complying with the Clean Water Act requirements, including any permits required by the Army Corps.

Furthermore, while there is a complete lack of evidence on this point, even if one assumes that there may be "waters of the United States" in the two project areas, Plaintiffs' identified discharges associated with the culverts and stream crossings by roads would be covered by Nationwide Permits 12 and 14 issued by the Army Corps.  72 Fed. Reg. 11,092 (Mar. 12, 2007).  Nationwide permits are general permits that cover a wide range of activities the Army Corps has already determined would not significantly affect the environment, as long as the conditions of the general permits are met.  *Id.*  Nationwide Permit 12, Utility Lines, "authorizes the construction, maintenance, or repair of utility lines, including outfall and intake structures, and the associated excavation, backfill, or bedding for the utility lines, in all waters of the United States, provided there is no change in pre-construction contours."  *Id.* at 11,182.  A "utility line" includes any "pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose, and any cable, line, or wire for the transmission for any purpose of electrical energy, telephone, and telegraph messages, and radio and television communication," as well as "pipes conveying drainage from another area."  *Id.*  Nationwide Permit 14, Linear Transportation Projects, covers "[a]ctivities required for the construction, expansion, modification, or improvement of linear transportation projects (e.g., roads, highways, railways, trails, airport runways, and taxiways) in waters of the United States."  *Id.* at 11,183.  Plaintiffs do

not allege violations of Army Corps permit requirements under Section 404 of the Clean Water

Act, only of the state certification requirement under Section 401.  However, Wyoming has

already issued a general water quality certification under Section 401 for these Nationwide

Permits for all waters except Wyoming Class I waters (none of which are located in the project

area).  Ex. 20 (WDEQ Letter) at 3-4.  Thus, even if one assumes there would be discharges into

waters of the United States associated with these projects, the 401 certification has already been

provided for the permit granting this authorization.[10]  Plaintiffs, therefore, are not likely to

succeed on the merits of the Clean Water Act claim.

### III.    BLM HAS PROVIDED NUMEROUS SAFEGUARDS TO ADDRESS PLAINTIFFS ALLEGED IRREPARABLE INJURIES.

At the hearing, Plaintiffs cited the potential effects of surface disturbances associated

with the entire Atlantic Rim Project Area in order to support their claim of irreparable injuries

with respect to the two projects at issue in this case.  As noted in Def.-Intervenors' Opposition

brief and at oral argument, the vast majority of the surface disturbing activities for the two

projects at issue here has been completed.  Def.-Intervenors' Opp'n at 39.

Although additional drilling of the wells within these PODs will continue to occur, BLM

provides for numerous measures to minimize the potential impacts of the actual drilling, as it did

with the surface disturbing activities.  For example, BLM regulations require that the operator of

an oil and gas project exercise "due care and diligence to assure that leasehold operations do not

result in undue damage to surface or subsurface resources or surface improvements."  43 C.F.R.

§ 3162.5-1(b).  The operator also must comply with other pertinent health and safety

requirements under applicable laws or regulations.  *Id.* § 3162.5-3.

---

[10]  Contrary to Plaintiffs' characterization in their reply brief, at 14 n.7, Def.-Intervenors are not being "sloppy" and have never contended that BLM obtained a Section 401 certification. Plaintiffs misstate Def.-Intervenors' arguments.  Def.-Intervenors have consistently noted that the Section 401 certification requirement is not applicable to the APDs at issue here.

BLM has also imposed numerous, specific mitigation measures on drilling operations at the Catalina and Sun Dog PODs A & B.  For example, particulate matter emissions must be minimized.[11]  Def.-Intervenors Ex. 9 (Sun Dog COA) at 4; Def.-Intervenors Ex. 10 (Catalina COA) at 4.  A hazardous substances release contingency plan is required for both projects, and facilities that have the potential to release fluids which may constitute a hazard to the environment or public health must be in secondary containment.  Def.-Intervenors Ex. 9 (Sun Dog COA) at 4, 13; Def.-Intervenors Ex. 10 (Catalina COA) at 5, 8.  Disposal and management of produced water must be done in compliance with Onshore Oil and Gas Order No. 7,[12] which imposes requirements for the protection of surface and subsurface resources.[13]  Def.-Intervenors Ex. 9 (Sun Dog COA) at 18; Def.-Intervenors Ex. 10 (Catalina COA) at 12.  These are only a few of the many requirements imposed on the two projects to minimize the potential environmental impacts of the drilling operations.

In addition, Plaintiffs conceded at the hearing that reclamation is required throughout the Atlantic Rim Project Area to address the potential impacts to the environment.  Reclamation activities are required with respect to the Catalina PODs A & B and Sun Dog PODs A & B within six months of drilling completion, and full reclamation when the wells are no longer productive.  Pls. Ex. M (Catalina EA) at 5, 9; Pls. Ex. N (Sun Dog EA) at 4, 9; Def.-Intervenors

---

[11]  As noted in Def.-Intervenors' Opposition brief (at 28 n.13), methane emissions from the drilling and operation of the wells are unlikely to occur.  BLM also found total air quality impacts from the entire Atlantic Rim Project Area to be below background concentration for all criteria pollutants considered except $NO_2$.  BLM Ex. 8, Part 1 (FEIS) at 4-12 to 4-13.  For hazardous air pollutants, the entire project's estimated impacts were all less than the health-based standards.  *Id.* at 4-14.

[12]  Onshore Oil and Gas Order No. 7 is *available at* http://www.blm.gov/wy/st/en/programs/ energy/Oil_and_Gas/docs/onshore_order_7.html.  *See also* 43 C.F.R. § 3164.1; 58 Fed. Reg. 47,354 (Sept. 8, 1993).

[13]  Here, produced water from the Sun Dog and Catalina PODs are to be re-injected to the ground.  Def.-Intervenors' Opp'n at 37-38.

Ex. 9 (Sun Dog COA) at 17-18; Def.-Intervenors Ex. 10 (Catalina COA) at 11-12.  The

reclamation includes, but is not limited to, revegetation and utilization of "[a]ll practicable

measures" to minimize erosion and stabilize disturbed soils.  Def.-Intervenors Ex. 9 (Sun Dog

COA) at 17-18; Def.-Intervenors Ex. 10 (Catalina COA) at 11-12.  Final reclamation will restore

"the ecosystem function originally as found at the site."  Def.-Intervenors Ex. 3 (ROD), App. A

(Reclamation Plan), at A-1.

Plaintiffs at the hearing alleged that the reclamation potential is considered fair to poor

throughout the entire Atlantic Rim Project Area, implying that reclamation was not possible.

However, even though reclamation may be difficult, this does not mean that reclamation will not

be successful.  Under BLM Wyoming's Interim Reclamation Policy (*available at*

www.blm.gov/nhp/efoia/wy/2007im/wy2007-009atch2.pdf), for example, areas having "Low

Reclamation Potential" (*i.e.,* areas "characterized by highly erosive soils, soils or sites which

have physical, biological and/or chemical limitations, low precipitation rates, or areas which

have characteristics that make traditional reclamation practices impractical or unfeasible")

require a much more detailed site analysis and reclamation plan.  This does not mean that no

reclamation is possible, only that more detailed or significant measures may be required to bring

the area back to its pre-disturbance condition.  Moreover, reclamation will be considered

successful within the Atlantic Rim Project Area only if 80 percent of predisturbance ground

cover is reclaimed and erosion features are equal to or less than the surrounding area.  Def.-

Intervenors Ex. 3 (ROD), App. A, at A-6.

As a final note, Plaintiffs asserted at the hearing that the Sun Dog PODs A & B and

Catalina PODs A & B would impact a 100-year floodplain, relying on a picture that Plaintiffs

alleged showed a waterway.  This assertion is meritless.  There is no evidence the projects are

within a mapped 100-year floodplain (the list of which are maintained by the Federal Emergency

Management Agency).  Moreover, BLM found in both EAs at issue in this case that floodplains

are not affected by the projects.  Pls. Ex. M (Catalina EA) at 7; Pls. Ex. N (Sun Dog EA) at 6.

Plaintiffs' general concerns with respect to the overall project, which BLM addressed at

length in the EIS, cannot be used to support a preliminary injunction with respect to the two

particular (and almost completed) projects at issue in this case.

## CONCLUSION

For the reasons stated above and in Def.-Intervenors' Opposition, no preliminary

injunction is warranted in this case because Plaintiffs are not likely to success on the merits and

the balance of equities does not substantially weigh in favor of granting an injunction.  Plaintiffs'

motion, therefore, must be denied.

Dated:  October 29, 2007                    Respectfully Submitted,

                                                        /s/ Michael B. Wigmore

                                            _____
                                            Michael B. Wigmore (DC Bar # 436114)
                                            Sandra P. Franco (DC Bar # 467091)
                                            Bingham McCutchen LLP
                                            2020 K Street, NW
                                            Washington, DC 20006-1806
                                            (202) 373-6000
                                            (202) 373-6001 (facsimile)

                                            *Counsel for Anadarko Petroleum Corporation,
                                            Warren Resources, Inc., and Double Eagle
                                            Petroleum Co.*

                                            Robert C. Mathes (DC Bar # 484255)
                                            Bjork Lindley Little PC
                                            1600 Stout Street, Suite 1400
                                            Denver, CO 80202
                                            (303) 892-1400
                                            (303) 892-1401 (facsimile)

                                            *Counsel for Double Eagle Petroleum Co.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 29th day of October, 2007, I caused to be filed

Defendant-Intervenors Supplemental Brief in Opposition to Plaintiffs' Motion for Preliminary

Injunction electronically through the CM/ECF system, which caused the following parties or

counsel to be served by electronic means, as more fully reflected on the Notice of Electronic

Filing:

Sharon Buccino
NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Avenue, NW
Suite 400
Washington, DC 20005
(202) 289-6868
Fax: (202) 289-1060
Email: sbuccino@nrdc.org
*Attorney for Plaintiffs*

Lori Caramanian
U.S. DEPARTMENT OF JUSTICE
1961 Stout St.
8th Floor
Denver, CO 80294
(303) 312-7393
Fax: (303) 844-1499
Email: lori.caramanian@usdoj.gov
*Attorney for Defendants*

/s/ Michael B. Wigmore
Michael B. Wigmore

A/72288282.1

16

**Docketed Cases**

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 3147736 (D.Minn.)
**(Cite as: 2006 WL 3147736 (D.Minn.))**

C

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.
STATE OF MISSOURI, Plaintiff,
v.
UNITED STATES ARMY CORPS OF
ENGINEERS; Francis J. Harvey, Secretary of the
Army, United States Department of Defense; and
Brigadier General Gregg F.
Martin, Defendants.
**Civil No. 06-1616 (PAM).**

Nov. 2, 2006.

H. Todd Iveson, Joseph P. Bindbeutel, William J.
Bryan, Attorney General's Office, Jefferson City,
MO, for Plaintiff.

Devon Lehman McCune, U.S. Dept. of Justice,
Denver, CO, Fred R. Disheroon, James A.
Maysonett, U.S. Dept. of Justice, Washington, DC,
David D. Cookson, Nebraska Atty. General's Office,
Jaron J. Bromm, Thomas R. Wilmoth, Donald G.
Blankenau, Blackwell Sanders Peper Martin LLP,
Lincoln, NE, for Defendants.

### MEMORANDUM AND ORDER

PAUL A. MAGNUSON, District Judge.

**\*1** This matter is before the Court on cross-Motions
for Summary Judgment. For the reasons set forth
below, the Court grants Defendants' Motion and
denies Plaintiff's Motion.

### BACKGROUND

In this lawsuit, the State of Missouri ("Missouri") is
challenging the March 2006 Revisions ("Revisions")
to the Missouri River Mainstem Reservoir System
Master Water Control Manual ("Master Manual").
[FN1] Missouri alleges two basic claims. First, it
contends that the Army Corps of Engineers ("Corps")
violated the National Environmental Policy Act
(NEPA) by preparing an environmental assessment
(EA) instead of a supplemental environmental impact
statement (SEIS). Second, Missouri claims that the
Corps violated NEPA by not considering a full range
of alternatives to the Revisions.

FN1. The Master Manual is a guide used by
the Army Corps of Engineers to operate the
system of six dams on the Missouri River
reservoir system.

### A. The Revisions to the Master Manual

In March 2004, pursuant to this Court's Order, the
Corps issued a Final Environmental Impact
Statement (FEIS) for the review and update of the
Master Manual. A Record of Decision (ROD)
followed, which revised the Master Manual. The
ROD directed the Corps to formulate a spring pulse
plan that complied with the provisions of the 2003
Amended BiOp completed by the Fish and Wildlife
Service (FWS). [FN2] The Corps and the FWS
enlisted the aid of the United States Institute for
Environmental Conflict Resolution (USIECR), a
federal agency specializing in dispute resolution.
USIECR invited basin state, tribal, and basin
stakeholder representatives to participate in a
collaborative spring pulse plan identification process.
USIECR and the participants selected a professional
facilitator to assist in developing technical criteria for
a bimodal spring pulse release plan. This process led
to the formation of a "Plenary Group" comprised of
more than fifty members including Missouri. The
Plenary Group met four times between June and
August 2005 and received input from four technical
working groups. Despite this collaboration, the
Plenary Group did not reach a consensus on a spring
pulse plan, but the Corps used the information
generated by the Plenary Group to develop a draft
Annual Operating Plan (AOP) for 2006 and to
formulate draft water control criteria for the spring
rise.

FN2. The 2003 Amended BiOp in part
called for bimodal spring pulse releases to
benefit the endangered pallid sturgeon.

On October 24, 2005, the Corps released for public
review and comment the Draft 2005-2006 AOP and
the Draft Spring Pulse Water Control Plan Technical
Criteria for spring pulses from Gavins Point Dam.
The Corps conducted public meetings and received
written comments until December 16, 2005. After
this process was concluded, the Corps performed an
EA to address the purpose of and need for bimodal
spring pulse releases and to determine whether a

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3147736 (D.Minn.)
**(Cite as: 2006 WL 3147736 (D.Minn.))**

SEIS was warranted for the proposed bimodal spring rise. The EA compared the environmental impacts of a bimodal spring pulse release plan with a range of alternative spring pulse proposals, which had been previously analyzed by the Corps. The EA also compared the flow regime resulting from the bimodal spring pulse technical criteria with the flow regime since regulation of the river system began. Based on these comparisons, the EA concluded that the environmental impacts of a bimodal spring pulse release plan were within the range of impacts of the previously considered alternatives. In addition, the Corps's assessment of the resulting flows showed that the flows would be within the range of historical operations. The EA concluded there were no new significant environmental impacts of the proposed action that had not already been evaluated in the FEIS. The Corps consequently determined that an EA was sufficient, and accordingly, supplementation of the FEIS was not required.

**\*2** The technical criteria defining the spring pulse releases are included in the Master Manual at Appendix I. The Revisions establish a bimodal spring rise: one in March and another in May of each year. The March pulse may not exceed 5,000 cubic feet per second (cfs), and the May pulse may not exceed 20,000 cfs. Each pulse has a two-day peak duration. The Corps also evaluated the potential effects of the bimodal spring rise and concluded that the plan would not significantly increase the risk of flooding or drainage problems. This conclusion was based on several factors. First, the magnitude of the May spring pulse release will be constrained by the downstream flow limits. Second, the Corps already has in place a monitoring plan for the spring pulse releases, which addresses the effects of the spring pulse on interior drainage and groundwater, the biological impacts on the pallid sturgeon and its habitat, and the potential impacts to historic and cultural properties.

In February 2006, the FWS informed the Corps that the technical criteria for the bimodal spring pulse releases from Gavins Point Dam met the requirements of the 2003 Amended BiOp. Following this, the Corps completed the EA, and Defendant Brigadier General Gregg F. Martin, the Corps's Division Engineer for the Northwestern Division, signed a Memorandum of Decision approving the Revisions.

**B. The 2006 Spring Rise**

No March rise occurred in 2006 because the system storage on March 1, 2006, was less than 36.5 million acre-feet (MAF). On May 1, 2006, however, the system storage exceeded 36.5 MAF, and the May rise began on May 12, 2006. This date was within the May 1 to May 19 timeframe for the beginning of the rise to occur. The May rise increased the flow to the full magnitude of the release: 9,000 cfs per day above the 16,000 cfs that was provided to support minimum navigation. At that point, the flow rate of 25,000 cfs was maintained for two days. According to Missouri, fourteen plover nests with thirty-four eggs were lost because of the May rise.

**DISCUSSION**

**A. The Administrative Procedures Act**

A NEPA challenge is brought pursuant to the Administrative Procedures Act (APA). *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 375-76 (1989). Thus, the Court must determine whether the Corps's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, the Court's review is narrow, evaluating whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment. *Marsh,* 490 U.S. at 378. The Court may not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971).

**B. Standing**

Defendants first seek summary judgment on the issue of standing, arguing that Missouri has not shown any injury to itself from the Revisions to the Master Manual. The jurisdiction of the federal courts is limited to actual cases and controversies. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559 (1992). Among other requirements, a "case or controversy" requires a plaintiff to have standing to litigate the action. To establish standing, a plaintiff must show (1) an injury in fact, (2) a causal connection between the injury and the conduct, and (3) a likelihood of redressability. *Id* .

**\*3** Missouri has satisfied this test. In *South Dakota v. Ubbelohde,* the Eighth Circuit Court of Appeals held that the State of Nebraska had standing to intervene in litigation involving the Master Manual because "the Missouri River runs through the State of Nebraska" and Nebraska would be harmed by a reduction in flow. 330 F.3d 1014, 1024 (8th Cir.2003); *accord Alabama v. U.S. Army Corps of*

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 3147736 (D.Minn.)
**(Cite as: 2006 WL 3147736 (D.Minn.))**

*Eng'rs,* 424 F.3d 1117, 1130 (11th Cir.2005) ("Corps management of Lake Lanier that violates federal law may adversely impact the environment and economy downstream ... thereby injuring Alabama and Florida. A favorable decision in this case could provide redress for that injury. Thus, we readily conclude that Florida and Alabama have standing to pursue this action."). In this case, Missouri claims that it will be harmed by the Revisions because of reduced flood protection and diminished water supply. Striking the Revisions could redress these harms. Accordingly, Missouri has satisfied the *Lujan* factors. [FN3]

> FN3. The Court notes additionally that the Corps never challenged Missouri's standing in the multidistrict litigation regarding the Master Manual.

**C. The EA Claim**

Missouri contends that the Corps should have formally supplemented the FEIS rather than rely on the EA to revise the Master Manual. Defendants argue that the Corps fully complied with NEPA in revising the Master Manual.

In determining whether a decision not to supplement an environmental impact statement (EIS) was arbitrary and capricious, "courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance--or lack of significance--of the new information." *Marsh,* 490 U.S. at 378. However, supplementation of an EIS is not required "every time new information comes to light after the EIS is finalized." *Id.* at 373. "To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Id.* Rather, an agency must prepare a SEIS if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns" or if "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c); *see also Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs,* 431 F.3d 1096, 1102 (8th Cir.2005). Section 1502.9(c) "is interpreted to require a SEIS 'if the changed plans or circumstances will affect the quality of the human environment in a significant manner ... not already contemplated by the federal agency.' " *Ark. Wildlife Fed'n,* 431 F.3d at 1102 (quoting *Airport Impact Relief, Inc. v. Wykle,*

192 F.3d 197, 204 (1st Cir.1999)).

Here, the Corps considered the environmental impacts of revising the Master Manual to include bimodal spring pulse releases. The EA was tiered and linked to the 2004 FEIS and incorporated its analysis. The EA compared the environmental impacts of the proposed technical criteria with a range of alternative spring pulse proposals. The EA also compared the flow regime resulting from the bimodal spring pulse technical criteria with the flow regime since regulation of the system began. Based on these comparisons, the EA concluded that the environmental impacts of bimodal spring pulse releases were within the range of impacts of previously considered alternatives. Indeed, the March pulse is relatively small, not to exceed 5,000 cfs. This is not a significant departure from normal fluctuations under the current water control plan. The May pulse is also similar to rises previously studied in the FEIS, which examined a total of eleven spring pulse alternatives, all occurring in May, with peak rises ranging from 15,000 to 30,000 cfs over navigation flows, and with a two-week peak period. The May spring pulse in the EA consisted of a release between 9,000 and 20,000 cfs above navigation flows for a two-day peak duration. Thus, the EA provides for both a smaller release and a shorter duration than previous alternatives. This supports the Corps's conclusion that the smaller, shorter spring pulses will not present environmental impacts substantially different from the alternatives previously analyzed. Further, the resulting flows will be within the range of historical operations. The EA concluded that there were no new significant environmental impacts of the proposed action that had not been evaluated in the FEIS. The Court finds no misstep in the Corps's arrival at this conclusion.

**\*4** Missouri faults the Corps for considering only the environmental impacts of a bimodal spring rise, rather than studying the alternative itself. Missouri depicts the bimodal spring pulse release plan as a substantial change from previously considered alternatives, thereby requiring a SEIS. Missouri's argument lacks merit. The implementation of a bimodal, rather than a single, rise was not a substantial change so as to warrant supplementation of the FEIS. A change is "substantial" when "it presents a 'seriously different picture of the environmental impact.' " *Ark. Wildlife Fed'n,* 431 F.3d at 1102 (quoting *S. Trenton Residents Against 29 v. Fed. Highway Admin.,* 176 F.3d 658, 663 (3d Cir.1999)). "To determine whether a change is substantial we look at the possible environmental

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

consequences not previously considered." *Id.* (citing *Marsh,* 490 U.S. at 374). Here, the bimodal spring rise alternative did not present a significantly different picture of the environmental consequences. In fact, the Revisions actually reduce the environmental impacts because the rises will be of smaller magnitude and duration than a single rise. "Although we do not hold that a reduction in the environmental impact can never trigger the requirement to prepare a SEIS, 'a reduction in the environmental impact is less likely to be considered a substantial change relevant to environmental concerns than would be an increase in the environmental impact.' " *Id.* at 1103 (quoting *Friends of the Bow v. Thompson,* 124 F.3d 1210, 1218-19 (10th Cir.1997)).

Missouri's attempt to distinguish the present case from *Arkansas Wildlife Federation* is unavailing. The case is directly on point, dealing with both changes to an agency's original plan and with new information. 431 F.3d at 1099-1100. On the other hand, *Dubois v. U.S. Dep't of Agric.,* 102 F.3d 1273 (1st Cir.1996), on which Missouri relies, is unpersuasive. *See Ark. Wildlife Fed'n,* 431 F.3d at 1103 (distinguishing *Dubois* ). The change in this case was one of frequency, not the adoption of an entirely new alternative. *See id.*

Missouri next contends that the Corps acted arbitrarily and capriciously by using the EA to determine that a SEIS was not required. To the contrary, the Court finds that the Corps's use of the EA in this regard was permissible. *Cf. Marsh,* 490 U.S. at 378 (upholding the Corps's use of a supplemental information report to conclude that no SEIS was necessary). Title 33 C.F.R. § 230.10(a) provides that an EA is used to determine whether an EIS is required, and it stands to reason that an EA may also be used to determine whether to supplement an EIS. Missouri has no authority that the Corps improperly used the EA, and NEPA does not require the use of any particular document to analyze whether to supplement an EIS.

Similarly, the Corps was not required to issue a finding of no significant impact (FONSI) before declining to prepare a SEIS. The Corps may base its decision to forgo a SEIS merely on the fact that a revision does not provide a seriously different result than what was previously considered. *See Wisconsin v. Weinberger,* 745 F.2d 412, 418 (7th Cir.1984). In the present case, the Corps determined that the Revisions would result in significant environmental impacts, but also that those impacts had been previously analyzed. Although an agency must issue a FONSI before declining to issue an initial EIS, *see* 33 C.F.R. § 230.11; 40 C.F.R. § 1508.13, there is no authority that a FONSI must be prepared every time an agency opts not to supplement an EIS.

**\*5** Finally, Missouri faults the Corps for not circulating the EA for public comment and for not soliciting public involvement in its decision not to prepare a SEIS. However, neither of these actions was required. *See* 40 C.F.R. § 1501.4(e)(2); *Alliance To Protect Nantucket Sound, Inc. v. U.S. Dep't of Army,* 398 F.3d 105, 115 (1st Cir.2005); *Friends of the Clearwater v. Dombeck,* 222 F .3d 552, 560 (9th Cir.2000). Moreover, the Corps provided for extensive public participation, in which Missouri was thoroughly involved.

The Court has carefully reviewed the administrative record and is satisfied that the Corps made a sound decision not to supplement the FEIS. The Corps did not make substantial changes in the proposed action relevant to environmental concerns, nor was there significant new information bearing on the proposed action. Thus, the Corps did not act arbitrarily or capriciously in this regard. Likewise, the Corps did not act arbitrarily or capriciously in relying on the EA to revise the Master Manual, in declining to prepare a FONSI, and by not circulating the EA for public comment before deciding not to prepare a SEIS.

### D. The Range of Alternatives Claim

Missouri claims that the Corps did not adequately consider a range of alternatives to the Revisions. NEPA requires agencies to consider reasonable, feasible alternatives to proposed action. *See* 42 U.S.C. § 4332(2)(C)(3); 40 C.F.R. § 1502.14(a); *Mo. Mining, Inc. v. ICC,* 33 F.3d 980, 984 (8th Cir.1994); *Robinson v. Knebel,* 550 F.2d 422, 425 (8th Cir.1977).

The Court finds that in revising the Master Manual, the Corps considered numerous alternatives both in the EA itself and by tiering and linking the EA to the FEIS. In the FEIS, the Corps analyzed eleven alternatives for a spring pulse plan, all with a peak magnitude from 15,000 to 30,000 cfs over navigation flows. In addition, the eleven alternatives considered pulses in the May timeframe over a four-week period. These analyses were incorporated into the EA. The EA also examined a number of other alternatives: the Initial Starting Point Plan, a No Action Alternative, and the Preferred Alternative, which was ultimately selected. Thus, the Corps analyzed a total of fourteen

Not Reported in F.Supp.2d                                                                                        Page 5
Not Reported in F.Supp.2d, 2006 WL 3147736 (D.Minn.)
**(Cite as: 2006 WL 3147736 (D.Minn.))**

alternatives in considering the impacts of a spring pulse plan. The Corps concedes that it limited its analysis of alternatives to those complying with the FWS's recommendation in the 2003 Amended BiOp, but it did so in order to safeguard the endangered pallid sturgeon. If the Corps had ignored the recommendation, it risked substantial penalties for taking an endangered species. *See Bennett v. Spear, 520 U.S. 154, 170 (1997).* The Corps did not err by limiting its analysis of alternatives to those complying with the FWS recommendations in the 2003 Amended BiOp.

The EA also compared the impacts of the bimodal spring pulse technical criteria with the impacts of the spring pulse alternatives evaluated in the FEIS. Specifically, the EA looked at the impacts of the alternatives on the normal operating range, flood control, hydropower, water supply, recreation, navigation, total national economic development, young-of-year fish production, reservoir coldwater fish habitat, coldwater river fish habitat, river warmwater fish habitat, riverine native fish physical habitat, riverine tern and plover habitat, wetland habitat, riparian habitat, and historic and cultural properties. The EA further compared the flow regime of a bimodal rise with that of the flow regime since regulation of the river system began.

**\*6** Based on these considerations, the Court finds that the Corps did not act arbitrarily or capriciously in considering reasonable, feasible alternatives to the bimodal spring pulse release plan. Defendants are entitled to summary judgment on this point.

**CONCLUSION**

The Corps did not violate NEPA by preparing an EA rather than supplementing the FEIS when it implemented the Revisions to the Master Manual. The Corps also complied with NEPA in its consideration of a range of alternatives to the Revisions. The Corps fully analyzed the environmental impacts of the Revisions and adhered to all administrative and regulatory requirements. Therefore, the Revisions to the Master Manual were not made arbitrarily, capriciously, or contrary to law, and Defendants are awarded summary judgment on both of Missouri's claims. [FN4] Accordingly, **IT IS HEREBY ORDERED** that:

> FN4. Because Missouri's Motion for Summary Judgment is denied, its request for injunctive relief is denied as moot.

1. Defendants' Motion for Summary Judgment (Docket No. 15) is **GRANTED;** and
2. Plaintiff's Motion for Summary Judgment (Docket No. 18) is **DENIED.**
 **LET  JUDGMENT  BE  ENTERED ACCORDINGLY.**

 Not Reported in F.Supp.2d, 2006 WL 3147736 (D.Minn.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



C

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
NATIONAL MITIGATION BANKING
ASSOCIATION; Land and Water Resources, Inc.;
Wetlands Mitigation of Illinois, L.L.C; and Wetlands
Research, Inc.,
Plaintiffs,
v.
UNITED STATES ARMY CORPS OF
ENGINEERS; Col. Gary E. Johnston, in his official
capacity as District Engineer of the Chicago District;
and Mitchell A. Isoe, in
his official capacity as Chief of the Regulatory
Branch of the Chicago
District, Defendants.
No. 06-cv-2820.

Feb. 14, 2007.

Jan M. Michaels, John A. Lee, Michaels & May,
P.C., Chicago, IL, Margaret N. Strand, Venable,
LLP, Washington, DC, Michael R. Fitzpatrick,
Brennan, Steil, Basting & MacDougall, Janesville,
WI, for Plaintiffs.

Kurt N. Lindland, AUSA, United States Attorney's
Office, Chicago, IL, Alan D. Greenberg, United
States Department of Justice, Denver, CO, Caroline
Meredith Blanco, U.S. Department of Justice,
Washington, DC, for Defendants.

### MEMORANDUM OPINION AND ORDER

JOAN HUMPHREY LEFKOW, United States
District Judge.

### I. Introduction

**\*1** The City of Chicago ("the City") has a plan to
address the ubiquitous delays that plague O'Hare
International Airport. [FN1] This plan, the O'Hare
Modernization Program (the "OMP"), involves filling
wetlands within airport grounds. On December 19,
2005, the United States Army Corps of Engineers
(the "Corps" or "USACE") issued a permit to the City
under Section 404 of the Clean Water Act allowing it
to fill 97.1 acres of wetlands in furtherance of the

OMP. As a condition of the permit, the Corps
required the City to satisfy certain requirements to
mitigate the environmental damage. The first
requirement was that the City pay approximately $4.5
millon to a mitigation bank provider in exchange for
62 acres' worth of mitigation credits, and the second
was that the City pay a $26 million fee to an in-lieu
fee provider that agreed to undertake an additional
280 credits of mitigation.

> FN1. See *Suburban O'Hare Comm'n v.
> Dole,* 787 F.2d 186, 187-191 (7th Cir.1986),
> for a history of O'Hare Airport and litigation
> surrounding its development.

 Plaintiffs are three Illinois companies: Wetlands
Research, Inc. ("WRI"); Land and Water Resources,
Inc. ("LAWR"); and Wetlands Mitigation of Illinois,
L.L.C. ("WMI") and a national membership
association to which they belong, the National
Mitigation Banking Association ("NMBA")
(collectively, "plaintiffs"). Defendant United States
Army Corps of Engineers ("the Corps") is a federal
agency; defendant Colonel Gary E. Johnston
("Johnston") was District Engineer of the Chicago
District of the Corps at the time the Section 404
permit was issued to the City; and defendant Mitchell
A. Isoe ("Isoe") is Chief of the Regulatory Branch of
the Chicago District of the Corps (collectively, they
are referred to as "defendants" or "the Corps").
Plaintiffs claim that in issuing this permit, the Corps
violated its duties under the National Environmental
Policy Act ("NEPA") and the Clean Water Act (the
"CWA"). They filed their complaint in this case
exactly five months after the permit was issued (on
May 19, 2006). Complaint, Dkt. No. 1.

 This court has jurisdiction under 28 U.S.C. § 1331.
The parties' cross-motions for summary judgment
were fully briefed on October 17, 2006. On
November 9, 2006, the parties filed a joint motion for
a hearing and also requested a resolution of the case
as quickly as possible based on the possibility of
disbursement of funds by the in-lieu fee provider.
Dkt. No. 43. Oral argument was held on November
30, 2006. After a thorough review of the parties'
materials and the administrative record, the court
now denies plaintiffs' motion for summary judgment
[# 19] and grants defendants' cross-motion [# 25].

### II. Facts

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                              Page 2
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

A. Background

O'Hare International Airport ("O'Hare") is one of the busiest airports in the world. Administrative Record ("AR"), at 11010; 103393-94. It plays a vital role in our National Airspace System as an airline hub, a large mid-continent market, and a key international gateway. *Id.* O'Hare is also a major contributor to delays. *Id.* In 2003, it experienced more delays than any other airport in the country: a total of 3,840,493 minutes. AR-11010. Every day, an average of 189 planes were "significantly delayed," meaning delayed by more than 15 minutes. *Id.* Due to the significant role that O'Hare plays for connecting traffic, this level of delay affects many other airports and causes further inefficiencies throughout the National Airspace System and, literally, the whole world. AR-103402. The Federal Aviation Administration (the "FAA") has determined that one major cause for this is inadequate all-weather airfield capacity afforded by the airport's current configuration. AR-103394. The FAA forecasts that demand at O'Hare will continue to grow and that by 2018 it will serve approximately 50 million passengers per year. AR-103393-94.

**\*2** On June 29, 2001, the City's Mayor, Richard M. Daley, announced a plan to enhance the capacity and efficiency of O'Hare, which eventually evolved into the the OMP. AR-103392. The City proposed to enhance capacity and reduce delay by modernizing O'Hare's runway system and constructing multiple parallel runways to replace O'Hare's triangular runway layout. Defendants' Br., at 10 (citing AR-103392); AR-10547. The City requested FAA approval of this proposal in 2002, which triggered the need to prepare an environmental impact statement for the project pursuant to NEPA. Defendants' Br., at 10. In addition, because the project involved the filling of wetlands, the City needed to obtain a Section 404 individual permit from the Corps pursuant to the CWA. *Id.*

O'Hare is located within the Des Plaines River watershed, which is an area encompassing more than 300,000 acres, 15 sub-watersheds, and parts of Illinois and Wisconsin. Defendants' Statement, at ¶ 3. The wetlands that would be affected by the OMP are mostly small, isolated sites on O'Hare property that have low functional value for water quality and wildlife habitat. AR-11044; 13562-65. They reflect the urban stresses associated with an international airport that is surrounded by residential, commercial, and industrial land use. AR-13564-65. The O'Hare

wetlands are not open to the public. AR-18959. Furthermore, the U.S. Department of Agriculture maintains a staff at O'Hare to deter birds and animals from using the undeveloped land because of the danger that the wildlife poses to airplanes in the surrounding airspace. AR-13513. Some of the undeveloped land, however, is still used as a wildlife habitat. AR-13512.

Plaintiffs share a common interest in creating, restoring, enhancing, and preserving Chicago-area wetlands, and in promoting wetland science and education in general. Affidavit of Donald Hey, Ex. 2 to Plaintiffs' Reply ("Hey Aff."), at ¶¶ 3, 6, 7; Affidavit of John Ryan, Ex. 3 to Plaintiffs' Reply ("Ryan Aff") at ¶¶ 3-4; Defendants' Statement, at ¶ 1. WRI, LAWR, and WMI have pursued this interest through developing mitigation banks in and around the Des Plaines River watershed. Hey Aff., at ¶ 5; Ryan Aff., at ¶¶ 3, 4, 8, 27; Affidavit of David T. Urban, Ex. 1 to Plaintiffs' Reply ("Urban Aff."), at ¶ 10; Affidavit of Steve Weller, Ex. 4 to Plaintiffs' Reply ("Weller Aff."), at ¶ 7. Plaintiffs proposed several of their mitigation sites as potential mitigation for the OMP's wetland impacts, but only one was approved. Hey Aff., at ¶¶ 27, 28; Ryan Aff., at ¶ 19; AR-23394; 20677; Defendants' Br. at 12. [FN2]

> FN2. More detailed information regarding the plaintiffs can be found in the standing section of this opinion.

The City started searching for potential mitigation bank sites for its Section 404 permit in the middle of 2002, more than two years before it filed its application with the Corps and three years before the Corps issued the permit. Plaintiffs' Statement, at ¶ 13; AR-18963. The City contracted for an assessment of available offsite mitigation, which resulted in a March 2003 report entitled "O'Hare Modernization Project: Wetland Mitigation Options." *Id.* At a meeting with the Corps and others on September 17, 2003, the City presented the results of this study, and the City's consultant reported that "many potential sites are available." *Id.* at ¶ 14. A PowerPoint presentation at that meeting showed a schedule that had the City selecting the mitigation sites first and filing its permit application thereafter (this schedule was a part of the City's "conceptual" plan, however, and the cited document did not state that the timing arrangement was mandatory). Plaintiffs' Statement, at ¶ 15.

**\*3** In the Spring of 2004, the City issued a request for proposals ("RFP") to mitigation providers for

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
(Cite as: 2007 WL 495245 (N.D.Ill.))

potential mitigation bank sites. The RFP generated at least 14 responses. Plaintiffs' Statement, at ¶ 16; Defendants' Statement, at ¶ 14. When the City finally filed its Section 404 permit application in November of 2004, it included information regarding these sites along with a description of its conceptual mitigation plan. Plaintiffs' Statement, at ¶ 17; AR-18963-77. In meetings held at the same time that the application was filed, the proposed mitigation plan was explained, and the City provided a draft timetable that had mitigation site selection and approval predating permit issuance. Plaintiffs' Statement, at ¶ 18. There was no statement in the timetable that this sequence of events was mandatory. AR-23573.

The City's Section 404 permit application stated that the OMP would impact 153 acres of wetlands and "Waters of the United States." AR-18965. This included 92.7 [FN3] acres of wetlands within the jurisdiction of the Corps. *Id.* Approximately 414 mitigation bank credits were proposed to mitigate for the loss. AR-18969. The Section 404 permit application itself is a four-volume document that is hundreds of pages long. It contains detailed information regarding the background of the OMP, a description of the project, the history of the O'Hare wetlands, potential damage that the OMP would do to the ecosystem, a discussion of the alternatives to the OMP that were considered, details regarding the proposed conceptual mitigation plan, [FN4] and a discussion of methods for minimizing damage to the area. AR-18894 *et seq.* The application adopts and incorporates by reference the FAA's Environmental Impact Statement ("EIS") and its discussion of purpose and need, alternatives, and environmental consequences, and states that "[e]xtensive coordination has occurred with the [Corps], [the FAA], DuPage County Department of Economic Development and Planning (DEDP), OMP, Cook County, and others to plan for the required mitigation of [ ] resources." AR-18939-40.

FN3. It was eventually determined that approximately 97.1 acres instead of 92.7 would be affected. Plaintiffs' Statement, at ¶ 2.

FN4. The City anticipated selecting the wetland developers and mitigation sites by no later than Spring of 2005, so that construction of the sites could begin concurrently with OMP site preparation activities. AR-18973.

The Corps, the FAA, and the Illinois Environmental Protection Agency ("IEPA") entered into an Interagency Coordination Agreement (an "ICA") for preparing the OMP EIS. Defendants' Statement, at ¶ 5. Under this ICA, the Corps and the FAA agreed to hold joint Public Interest Review and Draft EIS Public Hearings and Public Notices in accordance with both agencies' obligations under NEPA. Defendants' Statement, at ¶ 5. The ICA stated its purpose as "to establish a framework under which the implementation of the Corps' [*sic* ], FAA's, and IEPA's respective responsibilities under [various laws including NEPA and the CWA] associated with aviation projects may be coordinated, streamlined, and made more efficient." AR-20563. The Corps's responsibilities were described:

> When and as requested by FAA, the Corps will attend and participate in O'Hare Modernization EIS meetings, particularly as related to project purpose and need, project alternatives, environmental consequences (with special reference to wetlands and other Waters of the U.S.), response to comments, and public hearing preparation.... The Corps will identify, pursue, and, in cooperation with FAA, implement opportunities to integrate its Public Interest Regulatory process with FAA's NEPA/EIS process, with the goal in mind of reaching a decision on the issuance of a Section 404 permit contemporaneously with FAA's decision on the O'Hare Modernization EIS, as contained in a Record of Decision. The Corps shall maintain its independent review responsibilities in accordance with Section 401 of the Clean Water [Act] ... [and] will retain fully all its rights and responsibilities to approve, disapprove, or enforce all permits and permit conditions required by the O'Hare Modernization Project.

**\*4** AR-20564-66.

On January 14, 2005, the FAA issued a notice of availability of the Draft Environmental Impact Statement ("the DEIS") and a notice of intent to hold public hearings on it, at which the Corps would also be present. Defendants' Statement, at ¶ 6. At the same time, the Corps issued a Joint Public Notice with IEPA of the City's Section 404 permit application. *Id.* One week later, the Corps issued a Supplemental Public Notice, reporting that a mitigation review team had reviewed the City's proposed mitigation sites and made a preliminary selection of six of them, which it was planning to review more extensively. [FN5] AR-20583. The Supplemental Public Notice also noted that in the Corps's preliminary review of the Section 404 permit application, it had determined that an EIS was

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

required and "is the FAA's DEIS for O'Hare Modernization.... The FAA intends to host public hearings on the DEIS with the USACE and IEPA, who are cooperating agencies on the DEIS." Defendants' Statement, at ¶ 7; AR-20585. All three of these documents solicited public comment on the proposed actions. AR-20572; 20576; 20582. [FN6] During the public hearings on the FAA DEIS, conducted by the FAA, the Corps, and the IEPA on February 22, 23, and 24, 2005, the FAA provided information on the progress of the DEIS as well as the proposed mitigation for the Section 404 permit that included maps, photographs, and information about the potential mitigation bank sites then under consideration. Plaintiffs' Statement, at ¶ 21; AR-21737; 21779-81.

> FN5. By letter of February 2, 2005, the Corps advised OMP of its preliminary acceptance of six sites: Neal Marsh, Stockbridge, Heron Creek (2 sites), Buffalo Creek, and Manhattan Creek. Plaintiffs' Statement, at ¶ 22. The other six were rejected, and the Corps provided specific reasons for rejecting each site. *Id; see also* Defendants' Statement, at ¶ 15. The Corps recommended that the City consider revisiting the mitigation sites that had been presented to the Corps in 2003 by the City's consultants, and referred the City to a document where those were discussed. AR-22668.

> FN6. Comments on the Corps's First Supplemental Public Notice included the following: the United States Fish and Wildlife Service ("FWS") commented that the applicant needed to provide "all pertinent site information such as site concepts, wetland delineations, areas proposed to be created, restored, and/or enhanced, proposed mitigation ratios, etc." for review. The Environmental Protection Agency's comments stated the following: "[i]n order to fully compensate for the impacts to wetlands and other WUS, the City needs to find additional mitigation sites.... We request that a permit not be issued for this project until the mitigation issue is resolved." Plaintiffs' Statement, at ¶ 24.

 The Corps assembled a Mitigation Review Team ("MRT") to review the City's proposed mitigation bank sites. Defendants' Statement, at ¶ 15. The team included representatives from the Corps's Chicago District, the IEPA, the federal Environmental Protection Agency (the "EPA"), and the United States Fish and Wildlife Service ("FWS"). *Id.* The MRT conducted field evaluations of the potentially suitable sites. Defendants' Statement, at ¶ 17. As a result of these visits, the team further narrowed the number of suitable sites to three. *Id.* [FN7] By letter of April 6, 2005, the Corps advised the City that it was short of mitigation credits. Plaintiffs' Statement, at ¶ 25. It said

> FN7. The Stockbridge site was deemed unsuitable because the riparian corridor restoration was not needed and the restoration would not offset the type of damage occurring at O'Hare. Defendants' Statement, at ¶ 17. The Buffalo Creek site was eliminated because it was part of a pilot study for the Corps's Upper Des Plaines Phase II Project. *Id.* Plaintiff LAWR, the developer of the Manhattan Creek site, withdrew that site from consideration due to difficulties associated with a land annexation approval process. *Id.*

We will make the suggestion that you seriously consider engaging an organization that has expertise in real estate transactions, planning, and executing wetland restoration programs to assist you in developing a potentially acceptable set of projects, if you are still interested in trying to meet your proposed schedule. One such organization well known for their work in this area in the Chicago region is Corporation for Open Lands (CorLands), an affiliate of the Open Lands Project.... We have worked with CorLands on a number of programs over the past ten years, both having them as an administrator for a restoration program as well as a developer of a large wetland restoration program.... We have found them quite effective in identifying good projects and moving projects through from site identification and planning to full project execution. I have discussed this concept with the other members of the MRT and they believe the concept to have merit, provided that appropriate safeguards, assurances, and oversight are built into such an effort.

 **\*5** AR-22709-10. Finally, the Corps stated that the City could proceed in any fashion it chose to develop an acceptable mitigation plan but that a final permit decision would not be made until OMP's mitigation program was fully defined and balanced against anticipated project impacts. Defendants' Statement, at ¶ 19. Comments received by the Corps from other

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

agencies and the public asked the Corps to consider other available [FN8] sites. Plaintiffs' Statement, at ¶ 30.

> FN8. The Corps points out in its filings that sites are not truly "available" to be used for mitigation until it has deemed them acceptable. The sites referenced in these comments had not been accepted.

B. The Environmental Impact Statement

After receiving, considering, and addressing comments on the DEIS, the FAA released the Final Environmental Impact Statement ("the FEIS") on July 27, 2005. [FN9] Plaintiffs' Statement, at ¶ 32; Defendants' Statement, at ¶ 12. The Notice of Availability was published on August 5, 2005, with a public comment period to close on September 6, 2005. *Id.* The FAA issued a Record of Decision ("ROD") approving the OMP on September 29, 2005. Plaintiffs' Statement, at ¶ 32; Defendants' Statement, at ¶ 12.

> FN9. The FEIS is a voluminous and detailed document. It is organized into eight chapters, plus an Executive Summary and Appendices A-N. The excerpted version filed with the court easily surpasses 1,000 pages.

After determining that the purpose and need for the OMP is to "[a]ddress the projected needs of the Chicago region by reducing delays at O'Hare, and thereby enhancing capacity of the National Airspace System[, and to] ensure that existing and future terminal facilities and supporting infrastructure ... can efficiently accommodate airport users," the FAA considered a broad range of alternatives to the City's proposed OMP, including fifteen alternatives in three categories: (1) no action, (2) non-airfield alternatives, [FN10] and (3) airport development alternatives. AR-10616. [FN11] The FAA also considered a "blended alternative," which it created as a combination of elements of non-airfield alternatives along with limited development at O'Hare. AR-10654. This included a limited airfield improvement alternative, other modes of transportation and communication, use of other airports, new air traffic control and navigation technologies, and congestion management. *Id.*

> FN10. The non-airfield alternatives included (1) use of other modes of transportation and/or communication; (2) use of other

airports; (3) congestion management; (4) airspace improvements; and (5) new air traffic control and navigation technologies. AR-10618-20.

> FN11. As examples of the broad range of alternatives that were included in the analysis, the FAA considered the potential for advances in telecommunications to alleviate the demand for air travel as well as the potential for new air traffic control and navigation technologies to enhance the capabilities and capacity of the existing infrastructure. AR-10618-19.

The FAA conducted a two-tiered reasonableness screening process for evaluation of potential project alternatives to determine which would be retained for detailed consideration (including environmental impact analysis). It first issued which of the alternatives might meet the purpose and need of the OMP and then evaluated those that potentially could satisfy the purpose and need in terms of their feasibility and their prudence to determine which of them could be reasonable. Defendants' Statement, at ¶ 9; AR-10615-16; 10657-60. In that second tier, the FAA examined factors such as environmental and social factors, operational efficiency factors, economic factors, and national policy factors. *Id.* The FAA stated that in applying its second tier of review, it was keeping the CWA "practicable alternatives" standard in mind. AR-10657-58. Alternatives that passed both of the first two tiers were retained for detailed consideration (including environmental impact analysis). AR-10615-16.

**\*6** The FAA determined that the non-airfield alternatives on their own did not have the potential to meet the purpose and need of the OMP. AR-10632-35; 10647-52. While the blended alternative was created and retained for secondary consideration, the FAA ultimately eliminated it too because it consisted of several speculative technological and infrastructure developments combined with a fundamental restructuring of current marketplace aviation demand, which is not within the control of the City or the FAA to implement. Plaintiffs' Statement, at ¶ 63; AR-10663-64. Additionally, the FAA concluded that the blended alternative would yield the least delay reduction, would not serve the forecast demand at O'Hare, and would have environmental impacts substantially equal to the other on-site alternatives. *Id.* After the elimination of the non-airfield alternatives and the blended alternative, as well as some of the airport

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

development alternatives, four development alternatives were retained for detailed consideration: Alternatives C (the OMP), D, and G, in addition to a no-action alternative, [FN12] Alternative A. AR-10666.

> FN12. The NEPA regulations require that a no-action alternative be retained for detailed analysis for comparison purposes. 40 C.F.R. § 1502.14.

The FEIS includes more than 500 pages of scientific studies, predictions, and analyses of the environmental consequences of the OMP and the other alternatives that were retained for detailed consideration, including 16 pages specifically devoted to wetlands, plus a 17-page wetlands appendix. AR-11528- AR-11543; N-40-N-56. This section notes and applies the CWA's practicable alternatives standard and states that the Corps was extensively consulted in the preparation of the FEIS. *Id.* The O'Hare wetlands are described as being mostly hydrologically isolated, providing few beneficial wetland functions and values, and as having been adversely affected by human activities. AR-11532. Among the three on-site alternatives, Alternatives C and G would result in the filling of 154.2 acres of wetlands and Waters of the United States, while Alternative D would have temporarily spared 7.65 of those acres. AR-11535. The 7.65 acres would have been expected to dry up over time anyhow, however, so the three on-site alternatives were ultimately determined to have identical impacts to wetlands. AR-11535.

A section was included in the FEIS regarding mitigation for damage to wetlands. AR-10824 *et seq.* This section described the City's then-current conceptual mitigation plan, which had been revised since the filing of the City's Section 404 permit application but did not yet include any information about the possibility of using an in-lieu fee arrangement. *Id.* It said that "[m]itigation will be described in the USACE Section 404 Individual Permit when issued. Adequate wetland mitigation is available." AR-10828.

It is evident that the Corps participated in the preparation of the FEIS. The FEIS explicitly stated its intention to satisfy the requirements of the CWA: "Because the proposed action involved the application for a permit from the U.S. Army Corps of Engineers to fill Waters of the U.S., issuance of the 401 Water Quality Certification from the Illinois EPA, and required FAA findings regarding wetlands

and floodplains, the FAA must also comply with the alternative analysis of the Clean Water Act, requiring a finding that no practicable alternative exists that would avoid or further minimize impacts to the resources at issue." AR-10657. Additionally, it noted that the Corps "is reviewing and processing a Section 404 permit application ... [and] will use the information developed during this EIS process to reach decisions on project alternatives." AR-10824. In the Executive Summary, the FEIS states, "The FAA acknowledges and appreciates the significant role played by the following agencies in this EIS process by serving as cooperating agencies: ... United States Army Corps of Engineers." AR-11005. *See also* AR-10504; 10804.

C. The In-Lieu Fee Arrangement

**\*7** By September 12, 2005, the Corps issued a Second Supplemental Public Notice in which it provided the public with information on the City's revised mitigation proposal, including the in-lieu fee. Plaintiffs' Statement, at ¶ 33; Defendants' Statement, at ¶ 26. This Notice provided a description of the new mitigation proposal that the City had submitted to the Corps. Defendants' Statement, at ¶ 28. It solicited public comment during a 30-day period (which was later extended to October 24, 2005), Defendants' Statement, at ¶ 26, and said that comments would be used in the preparation of an Environmental Assessment and/or Environmental Impact Statement pursuant to NEPA. Defendants' Statement, at ¶ 27. The Notice said that "[a] Final Environmental Impact Statement was published on July 28, 2005 and is available at http:// www.agl.faa.gov/OMP/FEIS.htm." Defendants' Statement, at ¶ 27. The Notice described the City's proposal as involving purchasing credits from the new Lily Cache Creek Wetland Mitigation Bank ("Lily Cache") and establishing an in-lieu fee program whereby the City would pay a mitigation fee to the non-profit corporation, CorLands. *Id.* The Notice indicated that "[a] formal In-Lieu-Fee agreement would be established between [another] MRT and CorLands for the establishment and operation of multiple mitigation sites" and listed the potential contents of such an agreement. [FN13] *Id.* (citing AR-20592); Defendants' Statement, at ¶ 29. The Notice also described the role that a new MRT (the Corps, the FAA, the EPA, the IEPA, and the FWS) would play in reviewing and approving appropriate mitigation projects from the mitigation proposals that CorLands would make. *Id.*

> FN13. These potential contents were (1) a

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
(Cite as: 2007 WL 495245 (N.D.Ill.))

description of the sponsor's experience and qualifications with respect to providing compensatory mitigation; (2) potential site locations, baseline conditions at the sites, and general plans that indicate the type of wetland compensation to be provided (e.g., wetland type, restoration or other activity, proposed time line, etc.); (3) geographic service area; (4) accounting procedures; (5) methods for determining fees and credits; (6) a schedule for conducting the activities that will provide compensatory mitigation or a requirement that projects will be started within a specified time after impacts occur; (7) performance standards for determining ecological success of mitigation sites; (8) reporting protocols and monitoring plans; (9) financial, technical, and legal provisions for long-term management and maintenance of the sites (e.g., a trust); and (11) a provision that clearly states that the legal responsibility for ensuring mitigation terms are fully satisfied rests with CorLands. Defendants' Statement, at ¶ 29.

The comments that the Corps received in response to the Second Supplemental Public Notice were mixed. The Sierra Club commented, "We were surprised and dismayed at the recent zigzag taken by the Corps and the [OMP] regarding the 153 acres of destroyed wetlands planned for the airport expansion.... We are not sure what went on behind the scenes that led to this flawed solution." Plaintiffs' Statement, at ¶ 34. Many comments (including some from plaintiffs) emphasized their opinion that an impact of 97.1 acres was too large for an in-lieu fee, Plaintiffs' Statement, at ¶ 37, and the Headquarters of the Corps advised the Chicago Corps District that use of an in-lieu fee for the OMP's impacts would be unusual. Plaintiffs' Statement, at ¶ 36. On the other hand, the FWS wrote a letter saying that "we recognize the significance of this important transportation improvement project and believe an in-lieu fee approach can be developed with appropriate controls to ensure that adequate mitigation is identified and implemented within a reasonable timeframe." Defendants' Response to Plaintiffs' Statement, at ¶ 35. USEPA expressed the need to establish a "comprehensive mitigation plan," and an "interagency agreement that outlines an interagency approval process that is consistent with the federal banking guidance." *Id.* It noted that "[t]he approach outlined in the public notice is a good start to the development of such a plan." *Id.*

*8 On December 19, 2005, the Corps issued Permit 200301000 under Section 404 of the CWA, 33 U.S.C. § 1344, authorizing the City to fill 97.1 acres of wetlands under the jurisdiction of the CWA. Plaintiffs' Statement, at ¶ 2. As mitigation, the permit requires the City to (1) pay a flat fee of $26,466,429.00 to CorLands as an in-lieu fee provider responsible for 280.14 acres of off-site mitigation, and (2) purchase 62.26 acres of mitigation credits from Lily Cache for $4,544,980.00. *Id.* The permit also describes, but imposes no requirements for, the mitigation for impacts to the approximately 56 acres of wetlands and streams that will be filled but are not under federal jurisdiction. *Id.*

In conjunction with the issuance of the permit, the Corps prepared a Permit Evaluation and Decision Document, which contained an Environmental Assessment (an "EA") and a finding of no significant impact (a "FONSI") pursuant to NEPA. Plaintiffs' Statement, at ¶¶ 3, 66. Plaintiffs' Statement, at ¶ 66. This EA referenced the FAA's FEIS and quoted directly from several portions of it. AR-20601 *et seq.* The Corps stated that it was a cooperating agency in the review of the DEIS, and that it "agreed to adopt and incorporate the [FEIS] into our decision making process with respect to key issues such as the [Section] 404(b)(1) guidelines, purpose and need, alternatives analysis, [and] public interest review factors." AR-20602; *see also* Plaintiffs' Statement, at ¶ 60. The Corps summarized and responded to the concerns that were raised regarding the proposed in-lieu fee in the comments to its Second Supplemental Public Notice, but ultimately adopted the in-lieu fee and the purchase of credits from Lily Cache as the required mitigation for the OMP. AR-20607-13; 20618-20. The Corps also reviewed the potential alternatives to the project as discussed in the FEIS and concluded that there were no practicable alternatives to the OMP. AR-20628.

The in-lieu fee arrangement is governed by no less than four separate but related documents. First, there is an August 26, 2005 agreement between the City and CorLands entitled "Agreement Concerning In-Lieu Mitigation Fee for the Chicago-O'Hare International Airport O'Hare Modernization Program Between City of Chicago and Corporation for Open Lands." AR-21244. Second, there is the "O'Hare Modernization Program Prospectus for Providing Wetland Mitigation," prepared by CorLands and AR-20659; 21108. Third, there is an Interagency Coordination Agreement (an "ICA") between CorLands and the Corps, the FAA, the FWS, the EPA, and IEPA (the MRT), executed on December

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

13, 2005, which establishes procedures to be followed in the administration of the O'Hare Modernization Mitigation Account (the "OMMA") (the fund for the OMP in-lieu fee arrangement). AR-20633. This ICA attaches the agreement and the prospectus as appendices. AR-20635-36; 20644-74. And finally, the Section 404 permit issued by the Corps requires that the City "adhere to all requirements and obligations as set forth in the [agreement] and [the ICA]." AR-20677. The parties agree that the in-lieu fee arrangement was not approved as a mitigation bank. Plaintiffs' Statement, at ¶ 54. It lacks the detailed site-specific mitigation plans required of a mitigation bank. *Id.*

**\*9** Through the interaction of these documents, CorLands and the MRT are bound to detailed standards for the execution of the in-lieu fee arrangement and the management of the OMMA. The agreement between the City and CorLands says that CorLands will use the fee to (1) identify and assess mitigation opportunities in the Des Plaines River watershed within the Chicago District of the Corps for the purpose of generating mitigation credits; (2) implement practical plans to protect, purchase, enhance, restore, and monitor the projects; (3) pay costs and expenses of administering the funds in the OMMA; and (4) establish financial, technical, and legal mechanisms to work towards the long term success of the projects in consultation with the Corps. AR-21245. Under this agreement, CorLands obtains significant, immediate financial benefits which are not applied to actual wetland mitigation. The agreement specifically includes the following:

. A provision that the City will pay CorLands an in-lieu fee of $25,947,479.00 and an administrative fee of $518,950.00;

. A provision that CorLands may leverage the in-lieu fee with funds from other sources to further enhance the mitigation projects;

. A provision that CorLands will place the in-lieu fee with a financial institution and use the earnings in a manner consistent with the agreement; [FN14]

FN14. The in-lieu fee is held by CorLands, rather than an independent, bonded escrow agent. Plaintiffs' Statement, at ¶ 52.

. A requirement that Corlands provide financial reports for the OMMA account to each member of the MRT; [FN15]

FN15. CorLands must provide to each member of the MRT and the City an annual financial report for the OMMA. Defendants'

Response to Plaintiffs' Statement, at ¶ 52. Furthermore, CorLands must provide to the MRT and the City as well as the public an annual report showing expenditures on a project-by-project basis for prior years and the report year, a description and status of work conducted on each Mitigation Project during the report year, and any additional information required in individual project plans. *Id.* Furthermore, in the Prospectus, CorLands said that it would secure an independent audit of the OMMA every year and provide that audit report to the City and the Corps along with its annual report. AR-21108-09.

. A provision that all books and records in connection with the in-lieu credits will be open to inspection by the City;

. An agreement by CorLands to be solely responsible for providing the City with 280.14 credits, and for satisfying the mitigation requirements of the OMP permit with respect to those credits; and

. An acknowledgement by CorLands that the Corps may use the agreement to document CorLands' commitment to furnish the in-lieu credits to the City.

21244-21257.

CorLands' prospectus describes the overall goal of the OMMA and includes the following initial provisions:

. CorLands is able to purchase mitigation credits from approved and permitted wetland mitigation banks within the watershed;

. An individual project prospectus will be submitted for each project proposed for funding, which will include specific information addressing site selection criteria, technical feasibility, method of credit generation, buffers, performance criteria, goals and objectives, baseline conditions, management, monitoring and reporting protocols, contingency plans and responsibilities, financial assurances, compensation ratios, and long-term protection and management; and

. All projects considered for funding under the OMMA will be reviewed by the MRT, with the Corps having final responsibility for the approval of projects.

AR-21108-12.

The Inter-Agency Coordination Agreement includes the following:

. A requirement that the mitigation be established

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                Page 9
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

in accordance with applicable authorities (including the 1997 Interagency Coordination Agreement on Wetland Mitigation Banking within the Regulatory Boundaries of the Chicago District, Corps of Engineers);

**\*10** . Eleven site selection criteria;

. Information that must be included in each individual site prospectus;

. Ten items that must be included in each project proposal prepared by CorLands;

. Nine items that must be included in each site development plan;

. A provision that the Corps retains final authority for the final approval of projects;

. Performance standards;

. Requirements for the MRT to conduct a technical review, to conduct a site visit if warranted, to issue a public notice identifying each potential project and seeking comments, to review long term management strategies, and to generally comply with the 1995 Federal Guidance on Mitigation Banking; and

. A provision that "CorLands will be fully accountable for satisfying the mitigation requirements defined by their agreement with the City of Chicago and this agreement."

AR-20633-41.

### III. Standing

To seek judicial review of the Corps's permit decision under NEPA and the CWA, plaintiffs must show that they have been "adversely affected or aggrieved by agency action within the meaning of the relevant statute." *Am. Fed'n of Gov't Employees, Local 2119 v. Cohen*, 171 F.3d 460, 465 (7th Cir.1999) (citing Administrative Procedure Act, 5 U.S.C. § 702). This requires establishing both constitutional and prudential standing; both an "injury in fact" and an interest falling within the "zone of interests" protected by the relevant statutes. *Id.* (citing *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). The party invoking federal jurisdiction bears the burden to prove standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

Constitutional standing requires three things. First, the plaintiff must have suffered an "injury in fact," meaning an "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted). Second, that injury in fact must have

been caused by the conduct of the defendant that the plaintiff is complaining about; "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id* . "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.*

Prudential standing is an additional limitation on access to the courts, designed to determine whether "a particular plaintiff should be heard to complain of a particular agency action." *Cohen*, 171 F.3d at 469 (citing *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399-400, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987)). It requires a potential plaintiff to "establish that the injury he complains of falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Cohen*, 171 F.3d at 468 (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). The Supreme Court has suggested that lower courts first look at what interests are arguably to be protected by the statute at issue, and then inquire whether the plaintiff's interests are among them. *National Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 492, 118 S.Ct. 927, 935, 140 L.Ed.2d 1 (1998). For a plaintiff's interests to be within the "zone," there does not have to be an "indication of congressional purpose to benefit the would-be plaintiff." *Id. at 492* (citations omitted). But "[i]n cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399-400.

**\*11** Furthermore, the plaintiffs must establish that they have standing to bring each of their claims. *Cohen*, 171 F.3d at 463, 475 (holding that plaintiffs had standing to bring a claim under the Arsenal Act and could pursue it, but that they did not have standing under other statutes and therefore could not pursue claims that the government violated those statutes. As long as at least one plaintiff can show this, the case can go forward. *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, --- U.S. ----, ---- n. 2164, 126 S.Ct. 1297, 1303 n. 2, 164 L.Ed.2d 156 (2006) (noting that it is not necessary to determine whether all named plaintiffs have standing because "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

requirement"); *Cetacean Community v. Bush*, 386 F.3d 1169, 1174 (9th Cir.2004).

A. Plaintiffs' alleged injuries

Plaintiffs allege various theories regarding their injuries, including (1) physical injury to the wetlands in which they have an ownership interest; (2) injury to their scientific and educational interests in wetlands in the Chicago region; (3) injury to their economic interests in that they lost money developing proposals for mitigation that were not chosen; (4) injury to their informational and procedural interests under NEPA; and (5) injury to their employees' interests in enjoying wetlands that would be affected by the OMP. While the Corps denies the viability of each of these standing theories, it focuses its opposition to plaintiffs' standing on the elements of causation and redressability, arguing that any injury incurred by plaintiffs was not caused by its permit decision and is not redressable by this court in this case. Defendants' Br., at 24.

Plaintiffs allege that their injuries are caused by (1) the Corps's failure to comply with NEPA by preparing an EA and a mitigated FONSI instead of an EIS; (2) the Corps's failure to comply with the procedural requirements for an EA under NEPA; (3) the Corps's failure to independently assess the environmental impacts of the OMP under NEPA; (4) the Corps's failure to provide sufficient information about mitigation under NEPA; (5) the Corps's failure to consider all practicable alternatives to the OMP under the CWA; and (6) the Corps's violation of the CWA through its approval of the in-lieu fee arrangement. They do not specify which injuries were caused by which actions, so the court has considered all possible matches. Based on this review, the plaintiffs do have standing to bring both their NEPA and their CWA claims.

1. Physical injury to plaintiffs' mitigation banks

Three of the plaintiffs, WRI, LAWR, and WMI, have interests in wetland mitigation banks in the Des Plaines River watershed near O'Hare. They allege that allowing the OMP to fill those wetlands would directly and physically affect their banks.

Plaintiff WRI owns and manages three wetland mitigation banks, including two that are located within its Des Plaines River Wetland Demonstration Project ("the Demonstration Project"), a "living laboratory" established in the Lake County Forest Preserve District to provide a place to study wetlands.

Hey Aff., at ¶¶ 3, 4, 5, 7. The Demonstration Project is located within the Des Plaines River Trail and Greenway, an interconnected system of parks and natural preserves situated along the length of the Des Plaines River. Hey Aff., at ¶ 11. The Trail and Greenway connects to the Cook County Des Plaines Trail System, which runs alongside O'Hare airport. *Id.* The Demonstration Project is 35 miles upstream of the O'Hare wetlands. Hey Aff., at ¶ 23. Hey argues that the alteration of hydrology that would occur with filling the O'Hare wetlands could negatively affect the aquatic habitat at the Demonstration Project by impacting the needs of organisms such as fish that move both up- and downstream, or reduce available habitat for birds that migrate around the area and use the Demonstration Project, which would in turn affect the health of the Demonstration Project wetlands. Hey Aff., at ¶¶ 24, 25, 26.

**\*12** Plaintiff LAWR has constructed nine wetland mitigation projects in the Des Plaines River watershed, at least three of which are banks that are downstream of O'Hare. Urban Aff., at ¶ 10; Ryan Aff., at ¶¶ 3, 27. According to Urban, "absent appropriate mitigation for the 153 acres of wetlands and stream destruction at O'Hare ... the wetlands functions at these sites could be diminished." Urban Aff., at ¶ 10. Urban opines that if the O'Hare wetland impacts are not properly mitigated adverse consequences will befall wetlands in the Des Plaines River watershed, which has the potential to damage LAWR's mitigation sites. Urban Aff., at ¶ 12.

LAWR owns 60% of plaintiff WMI. WMI has developed three wetland mitigation banks in the Des Plaines River watershed. Ryan Aff., at ¶ 4. These include the Lily Cache wetland bank, which is to be used for mitigation at O'Hare. Ryan Aff., at ¶ 8g.

2. Competitive injury

Plaintiff WRI invested money and other resources to develop several wetland sites to be potential mitigation options for OMP. Hey Aff., at ¶ 27. One of these was the Neal Marsh site, which the City selected and proposed in its Section 404 permit application. AR-18972; Hey Aff., at ¶ 27. WRI also submitted three other potential mitigation sites, including Indian Creek, Heron Creek, and Buffalo Creek. AR-18972. LAWR too applied its own resources to develop specific wetland mitigation sites as potential wetland mitigation options for OMP. Ryan Aff., at ¶ 19. The work entailed planning, negotiations with land owners at the sites, attending

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 11
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

meetings with the public agencies involved, and preparing materials to submit to the City. Ryan Aff., at ¶ 19. LAWR proposed several potential mitigation sites to the City: Cedar Creek, Heron Creek Forest Preserve, Lily Cache, Long View Meadow, Manhattan Creek, Reed Turner Nature Preserve and Stockbridge. Ryan Aff., at ¶ 19; AR-18972. Of the twelve initial proposals that the City received in response to its April 23, 2004 RFP, ten were from either LAWR or WRI. AR-23394; Defendants' Br. At 12.

The MRT (comprised of representatives from the Corps, the EPA, the FWS, and the IEPA) preliminarily accepted five of the plaintiffs' proposed mitigation sites in February of 2005. AR-22666. The MRT selected Neal Marsh, Stockbridge, Heron Creek, Buffalo Creek, and Manhattan Creek. *Id.* at 22666-67. The other five were rejected at that time. *Id.* Two of the initially selected sites were later rejected by the MRT, and LAWR withdrew Manhattan Creek, leaving Neal Marsh and Heron Creek. AR-22709. The Corps noted that these sites left the OMP "seriously short of adequate compensatory mitigation" and suggested that it consider working with CorLands to develop an acceptable set of projects. AR-22709. Ultimately, the Lily Cache mitigation bank, which was initially rejected, was revised, chosen and approved by the Corps along with the CorLands in-lieu fee, but Neal Marsh and Heron Creek were not. AR-20677.

B. Standing under NEPA

**\*13** The potential physical injury to plaintiffs' mitigation banks is sufficient to support their claims under NEPA and their claim that the Corps failed to require the City to show that there were no practicable alternatives to the OMP. These are allegations that the Corps violated the plaintiffs' procedural rights, for which the standing requirements of imminence of injury and redressability are relaxed. *Lujan,* 504 U.S. at 573 n. 7. An individual may enforce procedural rights granted to them by statutes "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Id.* at 573 n. 8. For example, courts have found the existence of standing to enforce procedural rights in cases where, for example, citizens who lived near bodies of water challenged the CWA's failure to provide a public hearing on a permit, despite their inability to show the immediacy of any injury from activities allowed under that permit, *Texas Independent Producers & Royalty Owners Ass'n v.*

*Environmental Protection Agency,* 410 F.3d 964, 976-77 ("*TIPRO*" ); farmers who feared a potential reduction in their water supply alleged that federal agencies violated NEPA by providing an inadequate EIS for a proposed water management plan, even though the farmers could not prove imminent injury or that an adequate EIS would have led to a different outcome, *Laub v. U.S. Dep't of the Interior,* 342 F.3d 1080, 1086-87 (9th Cir.2003); and where a plaintiff alleged that the Bureau of Land Management violated NEPA by providing an inadequate EA for a construction project that he feared would exacerbate his respiratory problems, even though he could not prove that it would do so. *Hall v. Norton,* 266 F.3d 969, 976-77 (9th Cir.2001).

NEPA is a procedural statute. Its policy goals of protecting and promoting environmental quality are realized through a set of actions forcing procedures that require the agencies take a "hard look" at environmental consequences and provide the public with relevant environmental information. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). Allegations that the Corps's EA was insufficient and that the Corps failed to properly assess alternatives are procedural rights.

Plaintiffs have underlying concrete interests in the health and viability of their mitigation projects that support their ability to allege these procedural rights: they are alleging that filling the wetlands at O'Hare may have an adverse effect on their mitigation banks downstream (and perhaps upstream as well). [FN16] Wetlands are inherently interconnected, and in this case, the proposed action is major and within the same river watershed as the plaintiffs' property. Therefore, the fact that plaintiffs' injuries are potential, but not immediate or inevitable, does not defeat their standing under NEPA. Defendants quote from *TIPRO,* saying that a "plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it," *TIPRO,* 410 F.3d 964, 972, is not persuasive. That statement was not made in the context of the court's discussion of procedural rights. The court later said that "even though the [plaintiffs] cannot establish the immediacy of an injury from construction activities operating under the General Permit, the [plaintiffs] nonetheless ha [ve] standing to challenge the EPA's [alleged procedural violations]." 410 F.3d at 977.

FN16. The Ninth Circuit explained in *Ashley Creek Phosphate Co. v. Norton* that "[f]or

Not Reported in F.Supp.2d                                                                                                                  Page 12
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

claims brought under NEPA, we have described this 'concrete interest' test as requiring a 'geographic nexus' between the individual asserting the claim and the location suffering an environmental impact.... Accordingly, plaintiffs who use the area threatened by a proposed action or who own land near the site of a proposed action have little difficulty establishing a concrete interest." 420 F.3d at 938 (internal quotation marks and citations omitted).

**\*14** Defendants do not challenge plaintiffs' prudential standing under NEPA, and plaintiffs address it only in a footnote. Pls.' Reply, at 9 n. 10. Nevertheless, it is clear that their alleged injuries to the physical well-being of their mitigation banks are within NEPA's zone of interests. NEPA's goal is to protect the environment, *Robertson*, 490 U.S. at 350, and plaintiffs are claiming potential damage to the environment. Plaintiffs have both constitutional and prudential standing to bring their NEPA claims.

C. Standing under the CWA

Plaintiffs' claim that the Corps failed to require the City to clearly demonstrate that no practicable alternatives to the OMP existed, as it was required to do under the CWA regulations, is again a claim of violation of their procedural rights. For the reasons discussed above regarding NEPA standing, plaintiffs have standing to bring this claim. Their challenge to the Corps's approval of the in-lieu fee arrangement, on the other hand, attacks the substance of the permit and not the Corps's compliance with the CWA procedures. *See TIPRO*, 410 F.3d 971-77. The potential injuries to the plaintiffs' mitigation banks are insufficient to support standing for this claim, because they lack the imminence that is required outside of the procedural rights realm. Nevertheless, plaintiffs have still shown standing to challenge the substance of the CWA permit through their allegations of economic and competitive injuries. An allegation of competitive injury due to an agency decision can be sufficient to support a third party's standing, assuming all other standing requirements are met. *Simmons v. Interstate Commerce Commission*, 900 F.2d 1023, 1026 (7th Cir.1990).

The Corps assumes that the plaintiffs can allege an injury to their competitive interests, and focuses its challenge on their inability to show causation and redressability. Defendants' Br., at 24. Defendants state that "Chicago chose, for reasons of its own, not to pursue additional credits at other sites identified by

its consultants, notwithstanding suggestions by the [C]orps that it do so." Defendants' Br., at 25. They further argue that a favorable decision from this court will not necessarily redress plaintiffs' injuries, because if the permit is found unlawful, the matter will be remanded to the Corps for a new permit proceeding and the City will be required to present a new package of mitigation that may or may not include plaintiffs' proposals. *Id.* at 25-26. They liken this case to *Simmons*, where the court held that the plaintiffs lacked standing to challenge an agency's regulation of a third party because although the court could vacate the agency's decision, there was no evidence that the regulated third party would take actions that were necessary to address the plaintiffs' injuries (and in fact the evidence indicated that the third party would probably not take that action). *900 F.2d at 1026*.

An injury in fact must be "fairly traceable" to the challenged agency action and likely to be redressed by a decision of the court in plaintiff's favor. *TIPRO*, 410 F.3d 964, 972 (7th Cir.2005). The plaintiff must link its alleged injury to the conduct at issue, such that a remedy of that conduct will provide a remedy of the plaintiff's grievance. *Id.* In cases such as this one, where the plaintiffs' asserted injury "arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed" to establish causation and redressability. *Id.* at 971 (quoting *Lujan*, 504 U.S. at 562) (emphasis in original). In such situations, causation and redressability ordinarily hinge on the response of the regulated third party and, thus, plaintiffs must adduce facts showing that that response was caused by the agency's action. *Id.*

**\*15** Speculation regarding causation and redressability is insufficient to confer standing on a plaintiff. *Wisconsin v. FERC*, 192 F.3d 642, 646 (7th Cir.1999). On the other hand, plaintiffs need not show that a favorable decision from the court is sure to redress their injuries; a probability is enough to satisfy Article III's requirements. *Cohen*, 171 F.3d at 467 (holding that a plaintiff challenging the award of a government contract had standing because if the court were to issue a favorable decision, it "[stood] a good chance of gaining some of [the] work"). The *Cohen* court distinguished its holding from cases where "redressability is not satisfied where relief depends on the voluntary actions of a third party not joined in the suit," such as *Burton v. Central Interstate Low-Level Radioactive Waste Compact Comm'n*, 23 F.3d 208, 209-10 (8th Cir.1994). *171 F.3d at 467*.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 13
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

This case is more similar to those involving agency regulation of third parties where courts have found standing than it is to cases where courts have denied standing. Courts deny standing where there is no evidence that reversing the agency's decision would address the plaintiffs' grievances. For example, in *Burton,* 23 F.3d at 210, the plaintiffs were challenging the government's imposition of taxes on utility companies, arguing that their utility bills increased as a result of the taxes. The court found a lack of redressability because there was no evidence that the utilities would reduce their rates if the taxes were dropped. *Id.* Similarly, in *Simmons v. Interstate Commerce Commission,* a company that owned a stretch of railroad had not maintained it in years and sought permission from a federal agency to abandon it. 900 F.2d at 1024. The plaintiffs challenged the allowance, arguing that they would be competitively disadvantaged by not having access to a rail line, but the court said that even if the abandonment decision were denied, there was no evidence in the record or even any allegation that the company would fix the damage. *Id.* at 1026. In fact, it appears from the discussion in the case that the company was very unlikely to fix the damage, since the rail line had been idle and damaged for years before the proceeding. *Id.* at 1024-1026. Finally, although not involving a third party, the plaintiff in *Ash Creek Mining Co. v. Lujan,* 969 F.2d 868, 871 (10th Cir.1992), challenged the government's decision to exchange a tract of land that the plaintiff would have liked to purchase through a competitive leasing program. The court found that the plaintiff lacked standing because the court could not require the government to offer the competitive leasing program, and even if it could, there was no showing of a likelihood that the plaintiff would win. *Id.* at 872, 874.

This case is distinguishable from *Burton, Simmons,* and *Ash Creek,* because although there is a third party involved (the City), there is substantial evidence here that if the court reversed the Corps's permit decision on the basis that approving the in-lieu fee was arbitrary and capricious and that the Corps should have required the City to pursue mitigation bank options, the plaintiffs' economic and competitive injuries would be redressed. Defendants' argument that the City chose the in-lieu fee "for reasons of its own" is disingenuous. In the City's application for a Section 404 permit, it proposed a long list of potential mitigation bank sites, and the vast majority of those were submitted by plaintiffs. AR-18972. Over the course of the Corps's review, it rejected

almost all of these sites, and ultimately informed the City that it was "seriously short of adequate compensatory mitigation" and suggested that the City consider using an in-lieu fee. AR-22709. Until that time, the City appears to have been intending to fulfill its mitigation obligations by purchasing mitigation bank credits. And due to the dominance of plaintiffs in the mitigation banking industry in the Des Plaines River watershed, the City was highly likely to select one of plaintiffs' sites. Furthermore, the regulations and guidance governing mitigation favor mitigation banks over in-lieu fees, further showing that the City would have reason to choose plaintiffs' mitigation banking proposals if the OMP permit were to be remanded to the Corps. 65 Fed.Reg. 66914, at § III(B) (2).

**\*16** Because of this set of facts, this case is more like *Cohen,* where the Seventh Circuit ruled that the plaintiffs did have standing. In *Cohen,* the plaintiffs challenged the Army's decision to award a production contract to a private bidder without allowing the plaintiffs, employees of a government-owned arsenal, to bid. 171 F.3d at 463-64. Plaintiffs alleged that this was in violation of the Arsenal Act, 10 U.S.C. § 4532, which required the Army to have needed supplies made in federal arsenals as long as the arsenals could make them on an economical basis. *Id.* at 473. Therefore, the causation and redressability requirements were satisfied, because if the plaintiffs were correct, on remand the Army would be required to allow them to bid on the project. *Id.* At 466-67.

With regard to prudential standing, plaintiffs' CWA claims are only slightly more complicated. The purpose of the CWA, as stated by Congress, is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251; *South Florida Water Management Dist. v. Miccosukee Tribe of Indians,* 541 U.S. 95, 102, 124 S.Ct. 1537, 1541, 158 L.Ed.2d 264 (2004). The economic interests of mitigation banks are very closely aligned with this objective, and are therefore at least "arguably" within the zone of interests to be protected by the CWA. This is not a case where the plaintiffs are asserting "purely" economic interests, as was the case in *Ashley Creek Phosphate Co. v. Norton,* 420 F.3d 934, 940 (9th Cir.2005), where the plaintiff invoked NEPA to challenge an EIS on the basis of their loss of an opportunity to sell phosphate. The economic interests of mitigation banks are necessarily related to the underlying objective of the banks, which is the same as that of the CWA: to restore and maintain the waters of the United States. Plaintiffs have both constitutional and prudential

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                          Page 14
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

standing to bring their CWA claims. [FN17]

> FN17. Because the court has concluded that
> plaintiffs have standing based on their
> procedural injuries, potential physical
> injuries to their mitigation banks, and their
> competitive injuries, it is not necessary to
> consider their other alleged bases for
> standing, such as injury to their vocational
> and scientific interests or injury to their
> employees' interests in enjoying certain
> wetlands. Additionally, because the court
> has determined that plaintiffs WRI, LAWR,
> and WMI have standing, it is not necessary
> to determine if plaintiff NMBA has
> associational standing or if it has any other
> independent bases for standing. *Rumsfeld,*
> *126 S.Ct. at 1303 n. 2.*

IV. Statutory Background

  A. National Environmental Policy Act

 NEPA promotes its purpose of protecting the
environment by requiring federal agencies to take a
"hard look" at the environmental effects of their
proposals before going forward with them: to look
before they leap. 42 U.S.C. § § 4321, 4331-32;
*Robertson v. Methow Valley Citizens Council,* 490
U.S. 332, 347, 109 S.Ct. 1835, 1844-45, 104 L.Ed.2d
351 (1989). NEPA is a procedural statute, in that it
does not require agencies to make the decision that is
best for the environment, but only prescribes the
process that they must follow in making their
decisions. *Highway J Citizens Group v. Mineta,* 349
F.3d 938, 953 (7th Cir.2003) (citing *Robertson,* 490
U.S. at 349). By forcing agencies to pay attention to
the environmental consequences of their potential
actions, NEPA ensures that important effects will not
be overlooked only to be discovered when it is too
late. *Marsh v. Oregon Natural Resources Council,*
490 U.S. 360, 371, 109 S.Ct. 1851, 1858, 104
L.Ed.2d 377 (1989) (citation omitted). NEPA also
guarantees that the public will be informed of
potential agency decisions in time to meaningfully
participate in the decisionmaking process. *Id.*

 **\*17** NEPA created the Council on Environmental
Quality (the "CEQ") and vested it with the power to
develop and provide advice and recommendations to
the executive branch on environmental matters. 42
U.S.C. § 4342. The CEQ promulgated regulations
implementing the statute that are binding on all
federal agencies. 40 C.F.R. § 1507.1. Additionally,
the Corps has promulgated its own regulations

providing guidance for the implementation of NEPA.
33 C.F.R. § 230 *et seq.; Simmons v. Army Corps of*
*Eng'rs,* 1996 WL 1323088 (S.D.Ill.Dec.18, 1996).

 One process required under NEPA is that all federal
agencies must prepare an EIS for "major Federal
actions significantly affecting the quality of the
human environment." [FN18] 42 U.S.C. § 4332;
*Highway J,* 349 F.3d at 953. To determine whether
an action "significantly" affects the quality of the
environment, CEQ regulations instruct that the
agency consider the context of the action and the
intensity of the effect. 40 C.F.R. § 1508.27(a)-(b);
*Highway J,* 349 F.3d at 953. These considerations
can be fleshed out in an environmental assessment
(an "EA"), which is a more brief version of an EIS
that is prepared when the proposed action is neither
one that clearly requires an EIS nor one that would be
categorically excluded from the EIS process.
*Highway J,* 349 F.3d at 953 (citations omitted). There
are two possible results of an EA: a determination
that an EIS is necessary, or a finding of no significant
environmental impact (a "FONSI"). *Sierra Club v.*
*U.S. Army Corps of Eng'rs,* 295 F.Supp. 1209, 1215
(11th Cir.2002); 40 C.F.R. § 1501.3(c)- (e).

> FN18. An EIS must address the following:
> (1) the environmental impact of the
> proposed action; (2) any adverse
> environmental effects which cannot be
> avoided should the proposal be
> implemented; (3) alternatives to the
> proposed action; (4) the relationship
> between local short-term uses of man's
> environment and the maintenance and
> enhancement of long-term productivity; and
> (5) any irreversible and irretrievable
> commitments of resources which would be
> involved in the proposed action should it be
> implemented. 42 U.S.C. § 4332.

 NEPA also requires consideration of reasonable
alternatives to the proposed action. 40 C.F.R. §
1502.14 (describing the evaluation of alternatives as
"the heart of the environmental impact statement").
An agency should address three questions in
considering alternatives: (1) what is the purpose of
the proposed action; (2) given that purpose, what are
the reasonable alternatives to the project; and (3) to
what extent should the agency explore each particular
reasonable alternative? *Highway J,* 349 F.3d at 960-
961 (citing *Simmons v. U.S. Army Corps of Eng'rs,*
120 F.3d 664, 668 (7th Cir.1997)). The context in
which the alternatives are considered is a factor in
determining which are "reasonable." *Id. at 960.*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 15
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

Ultimately, courts have found that their only role in reviewing an agency's actions under NEPA is to confirm that the agency took a "hard look" at the environmental impacts of a proposed action. *Envtl Law & Policy Ctr. v. U.S. Nuclear Regulatory Comm'n, 470 F.3d 676, 682 (7th Cir.2006); Highway J, 349 F.3d at 953* (citation omitted); *Sierra Club v. U.S. Army Corps of Eng'rs, 295 F.3d 1209, 1216 (11th Cir.2002)* (citation omitted); *Arkansas Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 431 F.3d 1096, 1101 (8th Cir.2005).*

B. Clean Water Act

The purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the nation's waters." *Highway J Citizens Group v. U.S. Dep't of Transp., 2005 WL 1076071, at \*3 (E.D.Wis. April 27, 2005)* (citing *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians, 541 U.S. 95, 102, 124 S.Ct. 1537, 158 L.Ed.2d 264 (2004))* ("*Highway J II*"). To serve this purpose, the Act prohibits the filling of wetlands without a permit issued by the Corps under Section 404 of the CWA. *33 U.S.C. § 1344* (codifying § 404 of the CWA); *Highway J II, at \*3; Alliance for Legal Action v. U.S. Army Corps of Eng'rs, 314 F.Supp.2d 534, 542-43 (M.D.N.C.2004); Town of Norfolk v. U.S. Army Corps of Eng'rs, 968 F.2d 1438, 1445 (1st Cir.1992).* The permit decisionmaking process is governed by regulations issued by the EPA and the Corps. *33 U.S.C. § 1344(b);* 40 C.F.R. § 230; 33 C.F.R. § 320. The Corps can deny a permit altogether. *33 U.S.C. § 1344(c).*

**\*18** The CWA distinguishes an individual permit from a "general" permit, whereby the Corps can issue a permit on a state, regional, or national basis for a category of activities involving discharges of dredged or fill material if the activities are similar, have minimal effects on the environment, and also have minimal cumulative effects. *33 U.S.C. 1344(e).* People can then apply to make a discharge under the authority of a previously issued general permit.

Under the Section 404 regulations, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." *40 C.F .R. § 230.10(a).* The regulation goes on to define what is "practicable": if it is "available and capable of being done after taking

into consideration cost, existing technology, and logistics in light of overall project purposes." *40 C.F.R. § 230.10(a)(2).* If the proposed activity does not need to be located on an aquatic site in order to fulfill its purpose, practicable alternatives are presumed to exist. *40 C.F.R. § 230.10(a)(3).* In this case, the Corps may not issue a permit unless the applicant provides clear and convincing evidence that there are no practicable alternatives. *Highway J II, 2005 WL 1076071, at \*11* (citation omitted). This burden lies with the permit applicant; the role of the Corps is only to determine whether the applicant has borne its burden. Plaintiffs' Br., at 30 n. 29.

The "reasonable alternatives" analysis under NEPA usually provides enough information to perform the CWA's "practicable alternatives" test: "[f]or actions subject to NEPA, where the Corps of Engineers is the permitting agency, the analysis of alternatives required for NEPA environmental documents, including supplemental Corps NEPA documents, will in most cases provide the information for the evaluation of alternatives under these Guidelines. On occasion, these NEPA documents may address a broader range of alternatives than required to be considered under this paragraph or may not have considered the alternatives in sufficient detail to respond to the requirements of these Guidelines." *40 C.F .R. § 230.10(4).*

In cases where the Corps permits the filling of wetlands, the applicant must mitigate the damage. *40 C.F.R. § 230.10(d).* Mitigation includes "avoiding, minimizing, rectifying, reducing, and compensating for resource losses. Losses will be avoided to the extent practicable. Compensation may occur on-site or at an off-site location." *33 C.F.R. § 320.4(r).* The Corps determines what mitigation requirements must be included in Section 404 permits, following standards in its own regulations as well as in non-binding guidance that it has jointly issued along with other federal agencies regarding two particular types of mitigation arrangements: mitigation banks and in-lieu fee arrangements. [FN19] *60 Fed.Reg. 58,605 (Nov. 28, 1995); 65 Fed.Reg. 66,914 (Nov. 7, 2000).*

FN19. This guidance is not intended to create any rights enforceable by any party in litigation with the United States. *60 Fed.Reg. 58,605- 02; Cf. Sierra Club v. Flowers, 423 F.Supp.2d 1273, 1285 (D.C.Cir.2006)* (citations omitted) (holding that deference to an agency's decision is not required if the agency has failed to follow its own binding regulations; such conduct is

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 16
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
(Cite as: 2007 WL 495245 (N.D.Ill.))

inherently arbitrary and capricious).

 **\*19** Generally, there are three options for mitigation: the permit applicant can undertake a project itself, it can purchase credits from a mitigation bank, or it can enter into an in-lieu fee agreement. A mitigation bank is a site where wetland restoration, creation, enhancement, or preservation has been undertaken especially for the purpose of selling "credits" for units of restored, created, enhanced, or preserved wetlands to a permit applicant who needs to "debit" those units in order to mitigate for damage that it intends to cause to other wetlands. 60 Fed.Reg. 58,605-02. An in-lieu fee is an arrangement whereby a permit applicant provides funds to a third party (usually a natural resource management entity) who agrees to undertake the mitigation in the future, instead of completing the mitigation itself or purchasing mitigation bank credits. 65 Fed.Reg. 66,914.

 C. Vision 100--Century of Aviation Reauthorization Act

 The recent enactment of the Vision 100--Century of Aviation Reauthorization Act ("Vision 100") both complicates and simplifies the court's analysis of the obligations of the Corps under NEPA and the CWA. Section 47171 of Vision 100 includes several provisions that are relevant to this case:
  § 47171(a) **Aviation project review process.** The Secretary of Transportation shall develop and implement an expedited and coordinated environmental review process for airport capacity enhancement projects at congested airports, aviation safety projects, and aviation security projects that--

* * *

  (2) provides that all environmental reviews, analysis, opinions, permits, licenses, and approvals that must be made by a Federal agency or airport sponsor for such a project will be conducted concurrently, to the maximum extent practicable; and
  (3) provides that any environmental review, analysis, opinion, permit, license, or approval that must be issued or made by a Federal agency or airport sponsor for such a project *will be completed within a time period established by the Secretary,* in cooperation with the agencies identified under subsection (d) with respect to the project.

* * *

  (c) **High priority of and agency participation in**

coordinated reviews.
  (1) **High priority for environmental reviews.** Each Federal agency with jurisdiction over an environmental review, analysis, opinion, permit, license, or approval shall accord any such review, analysis, opinion, permit, license, or approval involving an airport capacity enhancement project at a congested airport ... the highest possible priority and conduct the review, analysis, opinion, permit, license, or approval expeditiously.

* * *

  (h) **Lead agency responsibility.** The Federal Aviation Administration shall be the lead agency for ... airport capacity enhancement projects at congested airports and shall be responsible for defining the scope and content of the environmental impact statement, consistent with regulations issued by the Council on Environmental Quality. Any other Federal agency or State agency that is participating in a coordinated environmental review process under this section *shall give substantial deference, to the extent consistent with applicable law and policy, to the aviation expertise of the Federal Aviation Administration.*

* * *

  **\*20** (j) **Purpose and need.** For any environmental review, analysis, opinion, permit, license, or approval that must be issued or made by a Federal or State agency that is participating in a coordinated review process under this section and that requires an analysis of purpose and need for the project, the agency, notwithstanding any other provision of law, *shall be bound by the project purpose and need as defined by the Secretary.*
  (k) **Alternatives analysis.** The Secretary shall determine the reasonable alternatives to an airport capacity enhancement project at a congested airport ... Any other Federal agency, or State agency that is participating in a coordinated review process under this section with respect to the project, *shall consider only those alternatives to the project that the Secretary has determined are reasonable.*
  49 U.S.C. § 47171 (emphasis added). [FN20] Although these provisions have been in effect for a few years now, according to the court's research, they have never been cited or interpreted in a previous case. Therefore, Section 47171's impact on the Corps's obligations under NEPA and the CWA is an issue of first impression for this court.

FN20. The session law, Pub.L. No. 108-176,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 17
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

Title III, § 308, 117 Stat. 2539 (Dec. 12, 2003), provided that: "Nothing in this subtitle ... shall preempt or interfere with ... any obligation to comply with the provisions of [NEPA] and the regulations issued by the Council on Environmental Quality to carry out such Act."

V. Standard of Review

A. Administrative Procedure Act

The court is allowed only a narrow scope of review in evaluating the Corps's actions, findings and conclusions under NEPA and the CWA. 5 U.S.C. § 706(2); Highway J, 349 F.3d at 952-53; Highway J II, 2005 WL 1076071, at *4-*5 (citing Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1268 (10th Cir.2004). [FN21] The Corps's decisions may be set aside only if the court finds them to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D). Under this standard, the court's review is " 'searching and careful,' [FN22] but 'the ultimate standard of review is a narrow one.' " Highway J, 349 F.3d at 952-53 (citing Marsh, 490 U.S. at 378). The court can only ask " 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " Id. Any such substantive or procedural error must be substantial in order to warrant vacating the agency's decision. Hoosier Envtl. Council, Inc., v. U.S. Army Corps of Eng'rs, 105 F.Supp.2d 953, 998 (S.D.Ind.2000) (citing Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)). The court cannot overturn the Corps based on disagreement with the Corps's ultimate decision. Baltimore Gas, 462 U.S. at 97. In this way, the district court acts like a reviewing court, without taking new evidence or having an evidentiary hearing, and considers only matters within the administrative record. Highway J II, 2005 WL 1076071, at *5 (citing Cronin v. U.S. Dep't of Agric., 919 F.2d 439, 443-44 (7th Cir.1990); 5 U.S.C. § 706; Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)). [FN23]

FN21. See also Village of Bensenville v. Federal Aviation Administration, 457 F.3d 52, 70 (D.C.Cir.2006) (citation omitted) ("A party seeking to have a court declare an agency action to be arbitrary and capricious

carries a heavy burden indeed.").

FN22. Indeed, some courts have described the court's duty to "immerse" itself in the administrative record before making a decision. Sierra Club v. Flowers, 423 F.Supp.2d 1273, 1284 (S.D.Fla.2006).

FN23. There are various disputes regarding whether certain documents that are not in the administrative record can be considered here. Because the court finds that even if these documents are considered, that summary judgment must still be granted to the Corps, the disputes are not addressed in this opinion.

B. Summary Judgment

**\*21** Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To determine whether any genuine issue of fact exists, the court must look beyond the pleadings and assess the proof as presented in the record. Fed.R.Civ.P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the burden of proving that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); RuffinThompkins v. Experian Info. Solutions, Inc., 422 F.3d 603, 607 (7th Cir.2005). A material fact must be outcome determinative under the governing law. Insolia v. Philip Morris, Inc., 216 F.3d 596, 598-99 (7th Cir.2000).

The court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); Abdullahi v. City of Madison, 423 F.3d 763, 773 (7th Cir.2005). This obligation is carefully balanced against the competing obligation to give deference to the Corps's expertise. Highway J, 349 F.3d at 953.

VI. Discussion

A. NEPA

1. The adequacy of the Corps's Environmental Assessment and Mitigated Finding of No Significant Impact

Plaintiffs' first argument is that it was unlawful for the Corps to rely on its EA and mitigated FONSI because the OMP is a major federal action with significant impacts to wetlands, and therefore the Corps had to prepare an EIS. Plaintiffs' Br., at 23. While conceding that the Corps "might have been able to rely on the FAA EIS," they contend that it only adopted the FAA EIS" with respect to key issues," and failed to explicitly adopt it to satisfy its own obligations under NEPA. *Id.* at 23-24. Additionally, plaintiffs argue that the Corps was not a joint preparer of the FAA EIS and that it failed to independently assess the environmental impacts of the OMP. *Id.* at 23-25 (citing, *inter alia,* 40 C.F.R. § 1506.3; 33 C.F.R. § 325 App. B, at 8(c)).

Taking the easiest question first, there is no question that the Corps was a cooperating agency in the preparation of the FEIS. The Corps entered into an agreement to work with the FAA on the FEIS, which included a breakdown of responsibilities among the agencies. Defendants' Statement, at ¶ 5; AR-20563; 14451. The agencies recognized the fact that they did in fact work together on the project. AR-10504; 10824; 11005; 11528; 18939. In Appendix T of the FEIS, which describes agency coordination, the FAA catalogued the Corps's extensive involvement in preparing the FEIS. AR-14454-82. The FEIS says "several meetings between the FAA and USACE were held throughout the development of the EIS. Topics for these meetings included review of purpose and need as well as project alternatives, potential overall impacts of development at O'Hare, review of overall wetland and Waters of the U.S. (WUS) impact analyses, coordination on Section 404 permit application, [and][d]iscussion of mitigation concepts associated with obtaining a Section 404 permit ... [Additionally,] [e]xtensive coordination with the USACE was required for handling wetland mitigation." AR-14454. At least 28 inter-agency meetings are documented in the FEIS. AR-14478. *See also* Defendants' Br., at 33-34. This evidence, taken together with the Corps's own statements, [FN24] conclusively establish that the Corps was a cooperating agency in preparing the FEIS. It also supports the Corps's assertion that it did independently assess the environmental impacts of the OMP. [FN25]

FN24. *See, e.g.,* AR-22672.

FN25. The court also notes that plaintiffs have not pointed to any information that the Corps failed to consider. *See Simmons,* 1996 WL 1323088 at *10.

*22 Regardless of the specific terminology that it used, the Corps unequivocally adopted the FEIS. In its EA, the Corps said "[a]s a cooperating agency in the review of the Draft Environmental Impact Statement (DEIS) for the project, the U.S. Army Corps of Engineers (USACE) has agreed to adopt and incorporate the Final Environmental Impact Statement (FEIS) and the Record of Decision (ROD) into our decisionmaking process with respect to key issues such as the [Section] 404(b)(1) Guidelines, purpose and need, alternatives analysis, [and] public interest review factors. Refer to the FEIS and ROD for a detailed analysis describing the Corps's final determinations presented in this decision document." AR-20602. *See also* AR-20585; 20594. The Section 404(b)(1) guidelines refer to the Corps's responsibilities regarding the Section 404 permit, which was its principal role in evaluating the OMP. The purpose and need, alternatives analysis, and public interest review factors sections are the heart of the FEIS. The Corps's explicit adoption of these sections, and its implicit adoption of the FEIS in general, made sufficiently clear that the Corps was adopting all relevant portions of the FEIS.

The Corps was not required to start from scratch and prepare another EIS regarding the entire OMP. The FAA, in cooperation with the Corps, already did that, and its FEIS is an extremely long, comprehensive document that obviously required a monumental amount of work. Duplicating that effort would be wasteful and contrary to both the Vision 100 Act and the CEQ regulations. "Agencies are not required to duplicate the work done by another federal agency which also has jurisdiction over a project." *Sierra Club,* 295 F.3d at 1215. Where multiple agencies are involved, a lead agency prepares an EIS, and a cooperating agency can adopt that EIS if it independently reviews the EIS and is satisfied that its comments and suggestions are satisfied. 40 C.F.R. § § 1501.5, 1501.6, 1506.3(c). As noted above, that procedure was followed here.

Similarly, agencies are "encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of the environmental review." 40 C.F.R. § 1502.20 (citing 40 C.F.R. § 1502.28); *see also* 40 C.F.R. § § 1502.21 ("[a]gencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action."); 1506.4 (allowing an agency to combine another

Not Reported in F.Supp.2d                                                                                                  Page 19
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

NEPA document with its own to reduce duplication of efforts). Whenever an agency has prepared a broad EIS, and a subsequent statement or EA is then prepared regarding a component of the larger project, the subsequent EA need only summarize the issues discussed in the broader statement and incorporate discussions from that statement by reference, concentrating instead on matters specific to the subsequent action. *Sierra Club,* 295 F.3d at 1215; 40 C.F.R. § 1502.20. Putting the tiering regulations together with the cooperating agency regulations, if a cooperating agency adopts the EIS of a lead agency, it can presumably treat that EIS as its own and tier off of that EIS in a subsequent EA or a supplemental EIS. *Sierra Club,* 395 F.3d at 1220. That is what happened in this case: the Corps is a cooperating agency with the FAA, adopted the FEIS regarding the OMP as a whole, and then tiered off of the FEIS in an EA regarding the issues specific to the Section 404 permit, which is a component of the larger OMP project.

**\*23** Plaintiffs' position may be construed as an argument that the Corps should have prepared a supplemental EIS. Agencies are required to prepare a supplemental EIS (an "SEIS") if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1). The decision whether to prepare an SEIS is similar to the decision whether to prepare an EIS in the first place: if the new action will "significantly affect the quality of the human environment" in a significant manner or to a significant extent not already considered, an SEIS must be prepared. *Marsh,* 490 U.S. at 374. The determination of whether a change is significant is left to the discretion of the Corps. *Arkansas Wildlife,* 431 F.3d at 1104.

When the Corps prepared its EA, there was no significant change in the OMP project other than the mitigation plan. AR-20603-04. The new plan was thoroughly evaluated in the EA, where the Corps summarized and provided substantive responses to the comments on the revised plan. AR-20606-13. A change in the mitigation plan is not something that would significantly affect the quality of the environment in a way not previously considered. *Sierra Club,* 295 F.3d at 1221-22; *Arkansas Wildlife,* 431 F.3d at 1103. Ultimately, the effects of changing the mitigation plan were appropriately considered by the Corps in its EA, and requiring it to prepare a

document with a different title would be pointless.

Plaintiffs also object conceptually to the fact that the Corps found in its EA that the OMP will have a significant effect on wetlands, but ultimately issued a Finding of No Significant Impact; that the Corps issued a "mitigated FONSI." Plaintiffs' Br., at 23. Plaintiffs argue that the finding of significant impacts necessitated the preparation of an EIS. First, this argument disregards the Corps's reliance on the FEIS that was already prepared. Here, the EA and mitigated FONSI do not have to stand on their own; the FEIS has already acknowledged and addressed the environmental impacts of the OMP as a whole. The EA and mitigated FONSI only needed to address the change in the mitigation plan. Second, there is precedent that an EA and a mitigated FONSI can be sufficient even for an entire project. *Ware v. U.S. Federal Highway Admin.,* 2006 WL 696551, at \*23 (S.D.Tex. March 15, 2006) (approving the issuance of an EA with a mitigated FONSI where impacts from a highway development project that might otherwise have been significant were rendered insignificant through the recommendation of mitigation measures, despite the fact that the plaintiffs contested the effectiveness of those measures); *Spiller v. White,* 352 F.3d 235, 240-241 (5th Cir.2004) ("we find nothing objectionable about the fact that the issuance of the FONSI was predicated on [the permit applicant] agreeing to certain mitigation measures"); *see also C.A.R.E. Now v. Federal Aviation Admin.,* 844 F.2d 1569, 1572 n. 3 (11th Cir.1988) (citing cases); *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 683 (D.C.Cir.1982). [FN26] Here, the Corps noted the mitigation that would be required from the City in exchange for the Section 404 permit and issued a FONSI only after noting those mitigation requirements. AR-20618-20; 20628.

FN26. Plaintiffs attempt to distinguish these cases on the basis that they dealt with situations in which all environmental impacts of a project were completely mitigated, whereas here the mitigation only applied to OMP's impacts to wetlands, and not the other environmental effects of the project. This argument is not persuasive because the other significant environmental impacts of the OMP were considered in the FEIS and were outside of the scope of the Corps's jurisdiction, which was to consider the City's application for a Section 404 permit to fill wetlands.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 20
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

**\*24** The Plaintiffs' argument has some rhetorical force, in that it could be said that the agency is substituting its conclusion for its analysis, but this is not a case where that point is persuasive. Additionally, to the extent that plaintiffs are objecting to the fact that the Corps checked a box on its EA finding that there was "no appreciable effect on any special aquatic sites," AR-20622, this is inconsequential given the recognition of the significant effect on wetlands in the FAA's FEIS.

Finally, plaintiffs argue that the FONSI did not comply with procedural requirements because it did not summarize the EA and note any other environmental documents related to it, citing 40 C.F.R. § 1501.7(a)(5). The Corps correctly points out that this regulation is inapplicable, and that the right regulation is § 1508.13, which provides that a FONSI must include the EA or a summary of it and note any related environmental documents. The FONSI was an integrated part of the EA, and the EA cited from the FAA's FEIS. Therefore, the applicable regulation was satisfied. Plaintiffs also argue that the Corps's failure to provide 30 days for public notice and comment on the EA violated CEQ regulations. The cited regulation, § 1501.4(e)(2), applies only where the action is one that would normally require an EIS, and therefore does not apply here. Even if it did apply, however, the Corps provided more than 30 days for public notice and comment on the revised mitigation plan, which was the only significant change in the OMP since the issuance of the FEIS. In any event, neither of these procedural objections, even if well-taken, would show substantial noncompliance with NEPA, and therefore they cannot provide a basis to vacate the Corps's decision. *Hoosier,* 105 F.Supp.2d at 998; *Highway J,* 349 F.3d at 960.

**2. The adequacy of the Corps's analysis of alternatives**

Plaintiffs challenge the Corps's adoption of the FAA's alternatives analysis because they disapprove of the FAA's decision to eliminate the off-site and blended alternatives from detailed environmental analysis. Plaintiffs' Br., at 28-30. As noted above, the FAA conducted a multi-tiered screening process for evaluation of potential project alternatives. Defendants' Statement, at ¶ 9; AR-10615-16. Those that passed both tiers of reasonableness review were retained for detailed consideration (including environmental impact analysis). AR-10615-16. A blended alternative (involving some construction at O'Hare and some off-site elements) was created and

retained for the second tier of the purpose and need analysis, but the FAA ultimately eliminated all alternatives that did not involve constructing new runways at O'Hare ("on-site alternatives") before conducting its detailed environmental analysis. Plaintiffs' Statement, at ¶ 63; AR-10663.

Although couched in terms of the Corps's failure to assure that the FAA's NEPA information is sufficient for its purposes, Plaintiffs' challenge is a disagreement with the substantive decision made by the FAA. This challenge is foreclosed by the Vision 100 Act. 49 U.S.C. § 47171(k)'s mandate is that "[t]he Secretary shall determine the reasonable alternatives to an airport capacity enhancement project at a congested airport .... Any other Federal agency, or State agency that is participating in a coordinated review process under this section with respect to the project *shall consider only those alternatives to the project that the Secretary has determined are reasonable."* 49 U.S.C. § 47171(k) (emphasis added). Requiring the Corps to consider other alternatives would only waste the Corps's time, because alternatives rejected by the FAA could never be selected.

**\*25** Even regardless of this mandate, and of the requirement in 49 U.S.C. § 47171(h) that the Corps give deference to the FAA, the Corps's adoption of the FAA's alternatives analysis was appropriate, because the FAA reasonably eliminated all off-site alternatives and the blended alternative as unreasonable. The NEPA regulations require that an EIS "briefly discuss" the reasons why alternatives are eliminated, 40 C.F.R. § 1502.14, and the FEIS did so. The FEIS stated that the off-site alternatives were eliminated based on their inability to reduce delays at O'Hare and accommodate or alleviate increasing air travel demand, as well as the City's inability to effectuate the alternatives. AR-10632-35; 10647-52. Alternatives that do not meet the purpose and need of the project are *per se* unreasonable. *City of Bridgeton v. FAA,* 212 F.3d 448, 456 (8th Cir.2000). The blended alternative was eliminated because, among other problems, it consists of speculative technological and infrastructure developments combined with a fundamental restructuring of the aviation marketplace, which is outside of the control of the government and the City. AR-10663-64.

The decisions that the FAA made here are consistent with cases in which the courts have upheld the FAA's alternatives analyses for airport expansion projects. *See, e.g., City of Bridgeton,* 212 F.3d at 459 (finding that the FAA's tiered analysis of alternatives and

Not Reported in F.Supp.2d                                                        Page 21
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

elimination of those that did not satisfy the purpose and need for the project from detailed environmental analysis was reasonable); *Airport Neighbors Alliance, Inc., v. U.S.,* 90 F.3d 426 (10th Cir.1996); *Suburban O'Hare Comm'n v. Dole,* 787 F.2d 186, 196 (7th Cir.1986) (holding that it was not unreasonable for the FAA to disregard alternatives that were outside of the City of Chicago's control). Finally, the court notes that the FAA's actions in preparing the FEIS for this project have already been evaluated by the District of Columbia Circuit, and that Court found that the FAA "acted with great care in conducting its analysis for the EIS and ROD." *Village of Bensenville, 457 F.3d at 72.* By extension, it was not arbitrary or capricious for the Corps to rely on the conclusions in the FEIS regarding which alternatives were reasonable under NEPA.

 3. The adequacy of information provided regarding mitigation

 Plaintiffs' final challenge to the Corps's compliance with NEPA is their argument that the Corps failed to provide public notice of the mitigation plan that it ultimately authorized, and that the FEIS did not contain sufficient information about the final mitigation plan. Plaintiffs' Br., at 26-28. Because the conceptual mitigation plan that was described in the DEIS, the FEIS, and the public hearings regarding those documents was different from the mitigation plan ultimately approved in the Section 404 permit, the plaintiffs complain that they were "misled about the mitigation," and that the "Corps failed to provide any public notice of the significantly changed mitigation plan it actually authorized." Plaintiffs' Br., at 26-27.

 **\*26** It is correct that information regarding mitigation of environmental impacts must be included in an EIS. 40 C.F.R. § § 1502 .14(f); 1502.16(h); 1505.2(c); 1508.25(b)(3)); *Robertson, 490 U.S. at 351-52.* Plaintiffs concede, though, that an EIS need not contain the final mitigation plan. Plaintiffs' Br., at 26; *Robertson, 490 U.S. at 352-53* ("it would be inconsistent with NEPA's reliance on procedural mechanisms--as opposed to substantive, result-based standards--to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act."). It is apparent in this case that the conceptual mitigation plan that was included in the DEIS and FEIS was the City and the Corps's current plan at the time that those documents were published. There is no evidence that the Corps intentionally misled the public. Instead, the Corps continued to review the City's proposed mitigation

plan, and finding some of the proposed sites to be unacceptable, required the City to revise its proposal. Defendants' Statement, at ¶ 17.

 Regarding the plaintiffs' second point, it is disingenuous to argue that the Corps provided no public notice of the final mitigation plan. The entire subject of the Corps's Second Supplemental Public Notice was the revised plan. Defendants' Statement, at ¶ 28. The Notice described the City's proposal as involving purchasing credits from the new Lily Cache bank and establishing an in-lieu fee arrangement with CorLands. *Id.* The Notice also described the role that the Mitigation Review Team would play in reviewing and approving appropriate mitigation projects from the mitigation proposals that CorLands would make. *Id.* It solicited public comment during a 30 day period (which was later extended to October 24, 2005), and plaintiffs themselves submitted comments. Defendants' Statement, at ¶ 26; AR-20813; 20822. These comments were noted and addressed in the Corps's EA. AR-20606-13.

 In summary, the court concludes that there is no genuine issue of material fact that the Corps did take a hard look at the environmental impact of the OMP, and that it did not act arbitrarily or capriciously in complying with its NEPA obligations in connection with granting the Section 404 permit.

 B. CWA

 1. Did the Corps require the City to "clearly demonstrate" that no practical alternatives existed?

 Plaintiffs object to the fact that the Corps incorporated the reasonable alternatives analysis from the FAA FEIS to satisfy its CWA responsibility to require the City to "clearly demonstrate" that there were no less environmentally damaging "practicable alternatives" to the OMP. They complain that off-site alternatives or the blended alternative might have had less environmental impact, but that the FAA did not provide much environmental information about them, and that the record did not provide enough information for the Corps to decide whether those alternatives were practicable. Additionally, plaintiffs argue that because the "blended alternative" was found to have the potential to meet the project's purpose and need and to potentially cost less than the other alternatives, that it was therefore "practicable."

 **\*27** As noted above, to be "practicable" under the CWA, an alternative must be "available and capable

of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). In comparison, the definition of "reasonable" that the FAA used in conducting the second tier of its alternatives analysis was "those that are practical or feasible from the technical and economic standpoint and using common sense." AR-10616. These definitions are substantively the same, and the FAA noted that in its review: "Because the concepts of reasonableness [and] practicality ... are so similar, it would make little sense to conduct separate sets of analyses for these retained alternatives under each of the [applicable] statutes.... Therefore, the FAA has integrated into the secondary screening a common-sense understanding of these similar concepts." AR-10658.

 This case is like most, in which the NEPA analysis of alternatives provides the information necessary for the practicable alternatives evaluation, 40 C.F.R. § 230.10(a)(4). Plaintiffs concede that the FAA was owed deference in determining which alternatives could meet the purpose and need of the OMP in the initial tier of review of alternatives. Plaintiffs' Reply, at 33. The FAA provided specific and logical reasons why the blended alternative was not reasonable or practicable, including that it would require a fundamental restructuring of the marketplace for aviation demand which is obviously not within the control of the City or the FAA. The Corps was justified in relying on that conclusion in the CWA context just as it was in the NEPA context discussed above. See *Hoosier,* 105 F.Supp.2d at 1001; *Town of Norfolk v. U.S. Army Corps of Eng'rs,* 968 F.2d 1438, 1448 (1st Cir.1992)* ("Under the practicable alternatives test, the Corps is not required to conduct an independent feasability evaluation of each alternative site merely because a party disagrees with its ultimate conclusion."). Contrary to plaintiffs' suggestion, the fact that the blended alternative had the potential to satisfy the purpose and need of the OMP and that it cost less than other alternatives is not sufficient to make it "practicable." It had to also be capable of being done after taking into consideration existing technology, and the FAA reasonably found that it was not.

 The Vision 100 Act makes the Corps's conclusion unassailable. Plaintiffs contend that 49 U.S.C. § 47171(k) applies only to the Corps's duties under NEPA. Plaintiffs' Br., at 32 n. 33. This appears to be an issue of first impression, as the court has found no case citing § 47171(k). The language of the statute is not ambiguous here, however, as § 47171(k) clearly

applies to the Corps's CWA duties. Section 47171(k) says that "[a]ny other Federal agency ... that is participating in a coordinated review process under this section with respect to the project *shall consider only those alternatives to the project that the Secretary has determined are reasonable."* 49 U.S.C. § 47171(k) (emphasis added). This does not distinguish between an agency's duties under NEPA versus any other statute. In fact, the section makes reference several times to its applicability to all environmental "reviews, analyses, opinions, permits, licenses, and approvals" that are required for airport capacity enhancement projects at congested airports, which unambiguously would include a Section 404 permit. 49 U.S.C. §§ 47171(a), 47171(c), 47171(i), 47171(j). The fact that this list was not included in § 47171(k) does not convince the court that Congress wanted § 47171(k) to have more limited applicability, because § 47171(k) is generally applicable to all situations by its own terms, even without the list. The Corps was a federal agency participating in a coordinated review process for a capacity enhancement project for a congested airport, AR-11528, and was bound by § 47171(k)'s admonition in its evaluation of the Section 404 permit application. Because the FAA found the off-site and blended alternatives to be unreasonable, the Corps was prohibited from considering them in further detail and was not arbitrary or capricious in declining to do so.

 2. Was approval of the in-lieu fee arbitrary and capricious?

 **\*28** Plaintiffs' belief that the Corps's approval of the in-lieu fee was arbitrary and capricious is the heart of their entire case. Without this, they likely would not have challenged the Corps's decision to grant the permit at all. Transcript of Oral Argument at 4-5, *Nat'l Mitigation Banking Ass'n v. U.S. Army Corps of Eng'rs,* Case No. 06-2820 (November 30, 2006) ("[My clients] never thought we'd be here because the permit started out on the right foot. Everybody knew that to expand the O'Hare Airport would involve impacts to wetlands and streams.... [T]he crux of our complaint here [ ] is that authorizing the mitigation for this--for this quantity of impacts [with] an in-lieu fee arrangement was inappropriate under the law, not reasonable, and arbitrary and capricious.").

 As mitigation for the OMP's impact on the wetlands at O'Hare, the Section 404 permit for the OMP requires the City to (1) pay a flat fee of $26,466,429.00 to CorLands as an in-lieu fee provider responsible for 280.14 acres of off-site

Not Reported in F.Supp.2d                                                      Page 23
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
(Cite as: 2007 WL 495245 (N.D.Ill.))

mitigation, and (2) purchase 62.26 acres of mitigation credits from Lily Cache for $4,544,980.00. *Id.* The in-lieu fee is governed by the prospectus, the agreement between the City and CorLands, the ICA, and the permit itself.

The Corps justifies the mitigation plan on the basis of the interaction of § III(A) of the In-Lieu Fee Guidance, which allows for the use of an in-lieu fee to compensate for impacts authorized by individual permit if the arrangement is developed, reviewed, and approved using the process established for mitigation banks in the Banking Guidance, and § II(C) of the Banking Guidance, which provides the procedure to be used in the establishment of mitigation banks. 65 Fed.Reg. 66,914, at III(A); 60 Fed.Reg. 58,605, at II(C). The Corps also cites § II(C)(2) of the Banking Guidance, which provides for "umbrella" instruments for "regional banking programs sponsored by a single entity ... for the establishment and operation of multiple bank sites." 60 Fed.Reg. 58,605, at II(C)(2); *see also* 65 Fed.Reg. 65,914, at IV(B) (providing for in-lieu fee umbrella arrangements). "In such circumstances, the need for supplemental site-specific information (e.g., individual site plans) should be addressed in the banking instrument." 60 Fed.Reg. 58,605, at II(C)(2).

The Corps has discretion to set mitigation terms, Plaintiffs' Br., at 33, and its internal guidance is not binding regulation. *U.S. v. Alameda Gateway Ltd.,* 213 F.3d 1161, 1168 (9th Cir.2000); 60 Fed.Reg. 58,605-02. In some circumstances, however, an agency's noncompliance with its own guidance can be a basis to find its actions arbitrary and capricious. *Rhodes v. Johnson,* 153 F.3d 785; *cf Alliance for Legal Action,* 314 F.Supp.2d at 552-555. In this case, plaintiffs have argued that the Corps did not comply with the Banking Guidance and the In-Lieu Fee Guidance to such a great extent that its approval of the mitigation plan was rendered arbitrary and capricious. Oral Argument, at 22.

a. Did the Corps follow the procedures required for mitigation banks?

**\*29** Plaintiffs' first specific basis for arguing that the Corps's approval of the in-lieu fee was arbitrary and capricious is that the in-lieu fee was not approved using the process required for approving a mitigation bank, as is required by the In-Lieu Fee Guidance. [FN27] Section III(A) of the In-Lieu Fee guidance provides as follows: "Impacts Authorized under Invididual Permit: In-lieuefee agreements may be used to compensate for impacts authorized by individual

permit if the in-lieu fee arrangement is developed [ ], reviewed, and approved using the process established for mitigation banks in the Banking Guidance. 65 Fed.Reg. 66,914, at III(A). Both parties agree that the required process is "submission of a prospectus, establishment of a banking instrument, identification of [a] mitigation review team, public notice and comment." Plaintiffs' Reply, at 22. Their points of disagreement are whether the Corps followed this process in approving the in-lieu fee, and whether the prospectus and the instrument must contain the same substantive information as would be required of a mitigation bank.

> FN27. In their opening brief, plaintiffs argued that the in-lieu fee needed to be approved as a mitigation bank. Plaintiffs' Br., at 35. After defendants pointed out the distinction between a fee being approved "as a mitigation bank" and "using the process established for mitigation banks," Defendants' Br., at 41, plaintiffs conceded their error.

As noted above, CorLands submitted a detailed prospectus to the City on August 31, 2005, AR-21108-12, and the banking instrument is the ICA for the O'Hare Modernization Mitigation Account signed by the new MRT in December of 2005. The prospectus, along with the agreement between CorLands and the City, and the ICA also provide a specific process for the preparation of a prospectus and site development plan for each individual project that will be funded by the OMMA. An MRT was established by the ICA. AR-20636. Public notice of the in-lieu fee arrangement was provided in the Corps's Second Supplemental Public Notice in September of 2005, which allowed for a comment period. AR-20590. [FN28] Therefore, there is no dispute that the Corps completed each of the procedural steps for establishing a mitigation bank. Additionally, the same procedural steps will be followed for each individual project undertaken by CorLands, thereby satisfying the procedural requirements of the Banking Guidance again and again for each project.

> FN28. Plaintiffs' citation to § II(C)(5) of the Banking Guidance to argue that the Corps was required to provide the prospectus itself for public comment is not valid, because the portion cited refers to proposals that do not require an individual Section 404 permit.

Plaintiffs argue that the prospectus and the ICA

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                Page 24
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

needed to contain the substantive elements required of such documents in the Banking Guidance. Plaintiffs' Reply, at 22-23. This argument is illogical and disregards the fact that there is a difference between an in-lieu fee and a mitigation bank. Plaintiffs concede that if an in-lieu fee plan were required to follow the procedure required for a mitigation bank and also have the substance required for a mitigation bank, there would be no difference between a fee and a bank. Plaintiffs' Reply, at 23. Therefore, the Corps's interpretation of its guidance not to require such substance is reasonable and certainly entitled to deference. Furthermore, the ICA provides that the substantive requirements for prospectuses and banking instruments will be complied with in the documents prepared for individual projects undertaken under the OMMA. [FN29]

> FN29. The Banking Guidance recommends the following items be included "as appropriate" in a banking instrument: goals and objectives; ownership of bank lands; bank size and classes of wetlands and/or other aquatic resources proposed for inclusion in the bank, including a site plan and specifications; description of baseline conditions at the bank site; geographic service area; wetland classes or other aquatic resource impacts suitable for compensation; methods for determining credits and debits; accounting procedures; performance standards for determining credit availability and bank success; reporting protocols and monitoring plan; contingency and remedial actions and responsibilities; financial assurances; compensation ratios; and provisions for long-term management and maintenance. The prospectus and the ICA require the majority of these elements to be included in the banking instruments that will be created for the individual sites. AR-21112; 20638.

**b. Was the manner in which CorLands was chosen and its fee set arbitrary and capricious?**

**\*30** Plaintiffs alternatively argue that the substantive requirements for in-lieu fees were applicable to the in-lieu fee agreement approved here. Their main points are that the Corps did not include information in the record regarding CorLands' qualifications, and that the Corps did not ensure that the funds collected are based on a reasonable cost estimate of all funds needed to compensate for the impacts to wetlands.

Defendants counter that these requirements are only applicable to fees that are used to mitigate for general permits, and are a mutually exclusive alternative to § III(A) of the February 7, 2007 In-Lieu Fee Guidance, which applies here. Regardless of this dispute, the court finds it prudent to examine the merits of these two points.

The Corps recommended CorLands to the City in its letter of April 6, 2005, in which it informed the City that it was rejecting three of the remaining six mitigation bank proposals and that the City was therefore short of mitigation bank credits. AR-22709. In response to a comment to its Second Supplemental Public Notice, the Corps said "CorLands has had many years experience in the management of lands, and the administration of funds and activities relating to wetland enhancement and restoration. CorLands has experience with in-lieu fee programs, having run a successful program for two years within the Chicago District jurisdiction. A review of the government studies put forth by the General Accounting Office and the National Academy of Sciences showed that this fund did well in light of other in-lieu fee programs across the nation." AR-20611.

Plaintiffs further argue that the Corps was arbitrary in approving the in-lieu fee amount to be paid to CorLands because it did not independently evaluate the fee level or make sure that the funds would be adequate to compensate for the impacts. Plaintiffs note that the fee may be "too low, too high, or just right, but there is no basis on which to conclude that the Corps did its job to make that assessment." Plaintiffs' Br., at 38. In response to a similar comment to its Second Supplemental Public Notice, the Corps said "[t]he goal of the in-lieu fee instrument is to successfully implement a minimum of 280.14 acres of wetland mitigation. The amount of monies advanced by the OMP for compensation was calculated by CorLands based on the cost of acquisition, development, and implementation of mitigation sites. The monies provided by the OMP to CorLands will be used for replacing wetland functions and values as required by the guidance (Section IV(A)(7) In-Lieu Fee Guidance)." AR-20611. The Corps also argues that it knows the market rate for mitigation credits, and that the the $25 million figure is reasonable because its cost per mitigation credit is $92,623, which is near the average for the proposals that the City received in response to its request for proposals. Defendants' Br., at 42-43; Defendants' Reply, at 19-20.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                     Page 25
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

While the court notes that the Corps would have been well-advised to include more information regarding the way that the in-lieu fee was set in the record, these matters involve issues that are particularly suited to stay within the discretion of the Corps. There is no basis in the record to hold that the Corps considered inappropriate factors in making these decisions, or that it made a clear error of judgment, as would be required to overturn the decision. [FN30]

> FN30. Plaintiffs also argue that the lack of financial assurances for the fee renders the approval invalid, but the court finds that the various audits and financial reports required by the prospectus and the ICA sufficiently answer that concern.

c. Did the Corps have alternative mitigation available that should have been selected?

**\*31** The final argument [FN31] to be addressed is plaintiffs' claim that there was alternative, adequate, available mitigation that the Corps should have selected, in the form of various mitigation banks (some of which are sponsored by plaintiffs). This claim is strongly refuted by the record, which shows that the City looked for mitigation bank options for more than three years and proposed more than a dozen potential sites to the Corps. The Corps investigated all of these sites and visited many of them, but ultimately rejected all but three, for well-supported reasons that are documented in the record. *See, e.g.,* Plaintiffs' Statement, at ¶ ¶ 22, 25; Defendants' Statement, at ¶ ¶ 15, 17. Plaintiffs' citation to a few specific sites that allegedly should have been selected is undermined by the Corps's specific reasons why those sites were not appropriate. *See* Defendants' Br., at 49.

> FN31. Any other arguments made by plaintiffs that were not specifically addressed here were considered and have been rejected.

VII. Conclusion

Plaintiffs' brief is essentially an attack on the use of in-lieu fees for any individual permit. The theme of their arguments is that in-lieu fee mitigation is not mitigation at all. In-lieu fees are legal, however, and it is not the court's place to play legislature and declare that the approval of an in-lieu fee is inherently arbitrary and capricious. [FN32] The parties agree that mitigation banks are preferable over

in-lieu fees. They also agree that the key to successful mitigation rests on appropriate site selection and approval of specific mitigation plans. Defendants' Br., at 40 (citing Plaintiffs' Br., at 31). The Corps received and considered many comments expressing negative views of in-lieu fees in general, AR-20607-13, and was aware of reports that made negative findings about the performance of some in-lieu fees. AR-21820. The Headquarters of the Corps was also drafting a proposed mitigation rule during 2005, which *if approved* would phase out the use of in-lieu fees as mitigation for Section 404 permits over five years. Plaintiffs' Statement, at ¶ ¶ 12, 36. It is apparent to the court that the Corps gave due consideration to these concerns, and that the in-lieu fee agreement in this case was approved only after the City and the Corps had spent years looking for mitigation banks with enough credits to mitigate for all of the damage to wetlands that the OMP would cause, and had not been able to find any.

> FN32. Defendants are correct when they point out that the proper forum for plaintiffs' arguments that in-lieu fees are generally ineffective is the consideration of the newly proposed mitigation rule.

This is definitely an unusual mitigation plan, but the OMP is no ordinary project. The Corps fulfilled its responsibilities under the CWA while still meeting the FAA mandated deadline that it was statutorily obligated to respect. It does not appear that the issuance of the permit was predetermined, as the court felt that the permit was in *Sierra Club v. Flowers,* 423 F.Supp.2d 1273, 1287 (S.D.Fla.2006). In fact, many of the documents that plaintiffs cite explicitly recognize the possibility that the Corps could still deny the permit altogether. AR-22710 ("While we are certainly sensitive to internal project schedules and desires on the part of the OMP, please understand that a final permit decision on our part will not be made until your mitigation program is fully defined and balanced against anticipated project impacts.")

**\*32** Given all of these factors and the importance of the OMP, the court will not overturn the considered judgment of the Corps, or assume that the carefully crafted in-lieu fee will fail. The Corps is due significant deference in its judgment regarding an appropriate mitigation plan. *Airport Communities Coalition v. Graves,* 280 F.Supp.2d 1207, 1227 (W.D.Wash.2003); *Alliance for Legal Action,* 314 F.Supp.2d at 553-554 ("[d]etermining the proper mitigation for a Section 404 permit is a task within

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                      Page 26
Not Reported in F.Supp.2d, 2007 WL 495245 (N.D.Ill.)
**(Cite as: 2007 WL 495245 (N.D.Ill.))**

the Corps's expertise and discretion.... The record
shows that the final wetland mitigation plan was not a
rubber stamp, but a two-and-a-half-year process in
which the Corps repeatedly criticized [the applicant's]
submissions."). The court finds that there is no
genuine issue of material fact that the Corps acted
carefully and reasonably, not arbitrarily or
capriciously, in approving the mitigation plan for the
OMP.

 VIII. Order

 For the reasons stated above, the motion for
summary judgment of the plaintiffs [# 19] is denied.
Defendants' cross-motion for summary judgment [#
25] is granted. This case is terminated.

 Not Reported in F.Supp.2d, 2007 WL 495245
(N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**Exhibit 12 to Defendant-Intervenors'
Supplemental Brief in Opposition to
Plaintiffs' Motion for a Preliminary Injunction
Excerpts From BLM Decision Record,
Finding of  No Significant Impact and
Environmental Assessment for the
Hay Reservoir 3D Geophysical Project**





**U.S. Department of the Interior**
Bureau of Land Management
Wyoming State Office

Rock Springs Field Office                                    December 2003

# DECISION RECORD, FINDING OF NO SIGNIFICANT IMPACT and ENVIRONMENTAL ASSESSMENT for the Hay Reservoir 3D Geophysical Project

---

MISSION STATEMENT

It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.

---

**BLM/WY/PL-04/006+1310**

WY-040-EA02-133

 United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Rock Springs Field Office
280 Highway 191 North
Rock Springs, Wyoming 82901-3447

1792/1310 (040)
Hay Reservoir
3D Geophysical Project

December 9, 2003

Dear Reader:

Attached you will find the Decision Record, Finding of No Significant Impact, and Environmental Assessment for Veritas DGC Land Incorporated's Hay Reservoir 3D Geophysical Project located generally in Townships 22 through 25 North and Ranges 96 through 98 West, 6th Principal Meridian, Sweetwater County, Wyoming

The environmental assessment was prepared after a 30-day public comment period. All issues raised during the comment period have been considered.

BLM appreciates the public's participation during preparation of the environmental analysis. The documents can be found on the Rock Springs Field Office's website. The address for Rock Springs' website is http://www.wy.blm.gov/rsfo/index.htm.   Copies are also available at the Rock Springs Field Office in Rock Springs. If you have questions about this action, please call George Schoenfeld at 307-352-0271 or Shelly Devoss at 307-352-0213.

Sincerely,

Ted A. Murphy
Assistant Field Manager
Lands and Minerals

**VERITAS DGC LAND INC.**
**HAY RESERVOIR 3D GEOPHYSICAL PROJECT**

**DECISION RECORD**
**AND**
**FINDING OF NO SIGNIFICANT IMPACT**

### Introduction

Veritas DGC Land Incorporated (Veritas) filed a Notice of Intent in December 2001, to conduct a 3D seismic operation on public lands in the Rock Springs and Rawlins Field Offices. The project boundary was revised several times with the last revision in October 2003 (see Appendix A of the attached environmental assessment [EA] for specifics). The revised project area covers 279 square miles. The project is approximately 24 miles by 19 miles and covers approximately 178,560 acres. Of the total acreage in the project area, 164,352 acres are BLM-administered public land, 9,728 acres are state-owned land, and 4,300 acres are private land. About 70% of the prospect falls within the Rawlins Field Office. The remaining lands are within the jurisdiction of the Rock Springs Field Office.

Actual surface use by the proposed project would be restricted to 100-foot corridors along the source lines and small staging and survey base station areas. A map showing the exact proposed locations of source and receiver points is on file at the BLM Rock Springs Field Office (RSFO). Portions of the project occurring on state and private lands are not subject to BLM authorization. All lands affected by the proposed project include:

T22N R96W Sections 2-6
T22N R97W Sections 1-5

T23N R95W Sections 5, 6
T23N R96W Sections 1-12, 14-23, 26-35
T23N R97W Sections 1-7, 9-16, 19-30, 32-36
T23N R98W Sections 1-5, 8-11

T24N R95W Sections 2-36
T24N R96W Sections All
T24N R97W Sections All
T24N R98W Sections All
T24N R99W Sections 1, 12

T25N R95W Sections 29-34
T25N R96W Sections 2-11, 13-36
T25N R97W Sections 11-16, 19-36
T25N R98W Sections 25, 26, 34-36

Sixth Principal Meridian, Sweetwater County, Wyoming

**Project Map**



**Alternatives Considered in the Analysis**

The attached analysis considered two alternatives, the proposed action and the no action alternative. Both are described in detail under Section 2.0 of the attached EA.

**Alternatives Considered but Eliminated from Detailed Study**

Several alternatives were considered but eliminated from detailed study. These alternatives include man-portable drilling, heliportable drilling, and poulter shot methods of conducting seismic activity. These alternatives were found to be economically unfeasible to meet the purpose of the proposal. The rationale for eliminating these alternatives can be found in Section 2.3 of the attached analysis.

**Decision**

Based on the analysis contained in the attached EA, it is my decision to approve the proposed action and authorize geophysical exploration as described in Section 2.1 of the attached EA. Veritas may proceed with the Hay Reservoir 3D vibroseis project once the Notice of Intent is approved and all necessary clearances are completed. Geophysical operations will be subject to the measures identified in Appendix A of this decision in addition to the standard conditions contained in the approved Notice of Intent.

**Rationale for Decision**

My decision to approve this action is based upon the following:

- The proposed action is in conformance with the land use plans for the Rock Springs and Rawlins Field Offices which allow geophysical operations including 3D vibroseis.
- The proposed action would avoid unnecessary and undue impacts to resource values addressed in the attached EA (see Sections 3.0 and 4.0).
- Public participation, consultation, and coordination have occurred. BLM issued a news release on April 30, 2002, allowing a 30-day comment period. All issues brought forth during scoping have been considered. Public comment letters and BLM's response can be found in Appendix B of this decision.
- No listed, proposed for listing, or candidate species are affected by the proposed action. U.S. Fish and Wildlife Service has determined that mountain plover does not warrant listing under the Endangered Species Act and is considered a BLM sensitive species. All BLM-identified sensitive species have been given consideration and adequate protection.
- This decision is consistent with all federal, state, and county authorizing actions required to implement the Proposed Action. All pertinent statutory requirements applicable to this proposal were considered. Compliance with Section 106 of the Historic Preservation Act will be completed prior to seismic operations.

**Finding of No Significant Impact**

Based on the analysis of potential environmental impacts contained in the attached EA, I have determined that impacts are not expected to be significant and therefore, an environmental impact statement is not required.

**Appeal**

This decision is effective upon the date the decision or approval by the authorized officer. The decision or approval may be appealed to the appropriate office of the Interior Board of Land Appeals in accordance with regulations contained in 43 CFR 3150.2. If an appeal is filed, a copy of the notice of appeal must be filed in this office (Rock Springs Field Office, 280 Highway 191 North, Rock Springs, Wyoming 82901) within 30 days of receipt of the decision. Allowing 7 days mailing time, the appeal period ends 37 days from the date of this decision. The appellant has the burden of showing the decision or approval appealed from is in error. If you wish to file a petition for stay pursuant to 43 CFR 3150.2(b), the petition for stay should accompany your notice of appeal and shall show sufficient justification based on the following standards:

1. The relative harm to the parties if the stay is granted or denied,
2. The likelihood of the appellant's success on the merits,
3. The likelihood of irreparable harm to the appellant or resources if the stay is not granted, and
4. Whether the public interest favors granting a stay.

Each adverse party to an appeal must be provided copies of all documentation. The adverse party for this action is:

Rick Tervino
Ventas DGC Land Incorporated
10300 Town Park
Houston, TX 77072

Assistant Field Manager
Lands and Minerals

_12 9-03_
Date

APPENDIX A
## SPECIAL TERMS AND CONDITIONS

### Rock Springs Field Office
### Rawlins Field Office

### Veritas DGC Geophysical, Inc.
### Hay Reservoir 3D Geophysical Project

### WY-040-EA02-133

The following measures are in addition to those incorporated into the Notice of Intent to conduct this project.

**Authorization**

The Plan of Operations submitted with the Notice of Intent to Conduct Geophysical Exploration is considered an integral part of the project proposal and must be followed during the execution of the project.

**Existing Roads and Structures**

1. Any damage to existing roads, water diversion structures, cattle guards, and fences caused by the activities shall be repaired to the same or better condition as existed before the activities were initiated. To help prevent watershed damage and erosion, cross country vehicular travel across BLM-administered land will not be conducted during periods when the surface soils are wet and saturated. Surveying paint shall not be applied to any existing structures or objects (i.e., buildings, fences, signs, rocks, etc.).

**Cultural Resources**

1. Impacts to cultural resources will be mitigated by following the procedures specified in 36 CFR 800. A file search and a Class III archaeological inventory will be conducted for the source lines, helicopter staging areas *(only if staging area are to be located on non-disturbed ground or in areas that have not had a Class III cultural inventory)*, and drive-around routes to the receiver/source lines. Any cultural sites recommended as avoidance areas will be appropriately designated by flagging the entire periphery of the site location or designating a drive-around route.

2. All avoidance areas identified by the archaeological consultant and the BLM will be followed. Maps indicating the drive-around routes shall be carried by personnel in the field. If the situation arises where project personnel cannot determine the appropriate drive-around routes, Veritas DGC must request assistance from either the consultant or contact a BLM archaeologist.

3. Any cultural resources discovered during operations will be reported immediately to BLM. Work will be halted in an area large enough to maintain integrity of the site and the site will be evaluated for significance. Evaluation may consist of, but not limited to, avoidance, testing, excavations, mapping, and/or further archival documentation. All evaluation efforts will be developed in cooperation or concurrence with the BLM and SHPO.

4.      Buggy-vibe traffic on BLM-administered land shall be confined to a single pass within a corridor 100 feet wide (50 feet either side of the flagged centerline) along off-road routes and roads and trails which have been inventoried for cultural resources and which are free of significant or unevaluated cultural resources.

## Native American Religious Concerns

1.      If any sites of potential Native American concern (e.g., rock art, vision quest structures, herb gathering areas, human burial sites, prehistoric cairns, stone circles, etc.) are identified by Veritas or BLM personnel or subcontractors within the project boundary outside the cultural resource inventory (vibe line) corridors, the Native American Tribes and BLM Rock Springs Field Office Archeologist shall be promptly notified.

2.      Regardless of surface ownership, all identified sites containing prehistoric cairns or stone circles will be avoided by a distance of 300 feet or more. Regardless of surface ownership, all known sites containing rock art or unusual rock alignments such as altars or medicine wheels shall be avoided by a distance of 0.25 miles or more. All Native American burial sites shall be avoided by a distance of 1 mile or more. Exceptions to these avoidance distances may be granted by the BLM Authorized Officer, following consultation with Native American Tribal representatives. All decisions about protective or mitigative measures will be made by the Rock Springs Field Manager after completion of consultations with appropriate Native American Tribes (BLM Manual H-8160-1).

## Paleontology

1.      If paleontological materials are found during the project, all activities within a 100-foot radius of the site will cease immediately, and the BLM's Authorized Officer will be notified to ensure proper handling of the discovery.

2.      Mitigation measures for paleontology will require: (a) avoidance of known localities, (b) worker education of the significance of fossil remains and the restriction on collection of paleontologic resources without a permit, and (c) provision for accidental discovery of fossil remains will reduce potential significant impacts.

3.      The proponent is responsible for informing all persons associated with this project that they shall be subject to prosecution for damaging, altering, excavating or removing any vertebrate fossil objects on site. If vertebrate fossil materials are discovered, the operator is to suspend all operations that further disturb such materials and immediately contact the Authorized Officer. Operations are not to resume until written authorization to proceed is issued by the Authorized Officer.

4.      Within five (5) working days, the Authorized Officer will evaluate the discovery and inform the operator of actions that will be necessary to prevent loss of significant paleontologic resources.

5.      The operator is responsible for the cost of any mitigation required by the Authorized Officer. The Authorized Officer will provide technical and procedural guidelines for the conduct of mitigation. Upon verification from the Authorized Officer that the required mitigation has been completed, the operator will be allowed to resume operations.

## Soils

1.  Soil compaction will be reduced by avoiding the constant use of the same access routes. Highly erodible soils locations, particularly steep slopes, dunal areas, or drainages, should be avoided.

2.  Veritas DGC will not conduct any vehicle operations during periods of saturated ground conditions when surface rutting could occur. Surface ruts deeper than 3 inches will be cause for the operations to cease. Veritas DGC's project supervisor or designated representative will be responsible for insuring that damage to soils is avoided or minimized. If it is determined by the BLM Authorized Officer that excessive surface damage has taken place, activities will be suspended until revised or additional terms and conditions are stipulated.

3.  Damaged areas will be promptly stabilized by seeding with native plant species and utilizing temporary erosion control devices such as mulch and jute netting if warranted. Specific measures and locations for use will be determined during field investigations by personnel from Veritas DGC and the BLM.

**Surface Water**

1.  No vibroseis source points are permitted within 300 feet of springs, seeps, or riparian areas (BLM H-3150-1 Handbook).

2.  No vehicle traffic is allowed in wetland or riparian areas; traffic must remain on dry ground.

3.  Vehicular traffic across / through dry drainage channels is limited to sloping drainage sides or to vertical banks of less than 2 feet. Crossing routes should be aligned perpendicular to the stream channel, to the extent practicable.

**Waste, Hazardous Materials, Safety Issues**

1.  Veritas shall prepare an "Emergency Response and Contingency Plan" addressing spills and fire, and submit it to the BLM Authorized Officer for review at least two weeks prior to any project field operations.

2.  Veritas will place all tanks holding bulk liquids in lined and bermed areas. Capacity of the bermed area shall be 110 percent of the largest tank. Bulk liquids contained in tanker semi-trailers shall be parked in a safe location on the staging area.

3.  Veritas shall clean up all oil, diesel or hydraulic fuel spills, including removal of all contaminated soils. All spill-related materials must be hauled to a Wyoming DEQ approved disposal site. Spills resulting from ruptured pipelines or well casings shall be cleaned up immediately as directed by DEQ and the facility owner/operator.

4.  Veritas shall coordinate with the nearest paramedic providers to establish Landing Zones across the project. (Contact Casper or Salt Lake for Life Flight, and Rock Springs, Wamsutter or Rawlins for ambulance service.) These zones will be used in case of serious injury to workers needing immediate evacuation.

5.  Hazardous materials, other than those identified in Veritas DGC's Plan of Operations, will not be stored for any length of time on BLM administered land. Additionally, no hazardous waste will be disposed of on federal land. The term hazardous material means:

*DR - 7*

1) any substance, pollutant, or contaminant that is listed as hazardous under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, as amended, 42 U.S.C. 9601 et seq., and the regulations issued under CERCLA, 2) any hazardous waste as defined in the Resource Conservation and Recovery Act (RCRA) of 1976, as amended, and 3) any nuclear or nuclear byproduct as defined by the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 et seq.

6. Veritas DGC will be responsible for clean up of any diesel or hydraulic fluid spills, including contaminated soils. All spill-related material shall be hauled to a Wyoming Department of Environmental Quality (DEQ) approved disposal site.

## Wilderness

1. The Sand Dunes WSA will not be driven over or impacted. There will not be any activity within the WSA. The road which defines the WSA will be used for access but no geophones will be placed within it.

## Geology/Fluid Minerals

1. Vibroseis source points shall be located a minimum of 300 feet from all oil and gas wells and standing structures, unless written permission to encroach closer has been given by the owner/operator (BLM H-3150-1 Handbook).

## Livestock / Range

1. Veritas shall make every effort to avoid disturbing or altering fences. Gates shall be used when possible. Gates must be closed immediately after passing through them. If a fence must be crossed, it shall be let down, crossed, and immediately put back up. The wires shall be stretched to the original tension from the nearest brace or gate panel. If the fence is to be cut, a brace panel will be constructed on either side of the cut before the cut is made. The cut will be repaired with wire of the same type wire with no new gates established.

2. Vibroseis source points shall be located a minimum of 300 feet from all water wells and reservoirs (BLM H-3150-1 Handbook Illustration 10, p.1).

3. Any and all facilities damaged, destroyed or removed in connection with this geophysical exploration operation shall be immediately restored to original condition or replaced with a similar facility or equal or better condition.

## Vegetation

1. Disturbance of vegetation will be kept to a minimum by limiting the number of times the vehicles travel over their designated routes. Steep slopes, dunal areas, or ephemeral drainage areas will be avoided where possible. If required, damaged areas will be seeded with native plant species recommended by the BLM Authorized Officer.

## Noxious / Invasive Plants

1. To prevent the introduction of new weeds, Veritas shall thoroughly power-wash all field vehicles (buggy vibes, pick-ups, ATVs, etc.) before transporting them to the project area.

2. Veritas shall reclaim and reseed, according to BLM standard seed mix, any areas where their operations have caused surface rutting or have otherwise removed surface vegetation, as directed by the Authorized Officer.

**Wild Horses**

1. Veritas will avoid aerial operations during the peak foaling period of April 1 to July 15.

**Recreation**

1. To prevent resource damage, off road vehicles (ORV)/all terrain vehicle (ATV) is limited to:

   - Project-related necessary tasks; recreational use is not permitted.

   - The single pass (no overlapping tire tracks) of ATVs in conformance with BLM Manual 3150, part 3.1.B.5.

   - Slopes less than 25 percent (15 degrees).

   - Dry ground surfaces so that rutting in excess of three inches will not occur.

**Wildlife/Special Status Species**

1. No activity is allowed 0.75 mile (1.0 mile for ferruginous hawks and eagles) of an active raptor nest during the mating/nesting season (March 1 through July 31) unless approved by BLM[1].

2. No activity is allowed within greater sage-grouse nesting habitat (suitable habitat within 2.0 mile of an active lek) during the breeding and nesting season of March 1 - June 30, or on important wintering areas as determined by BLM.

   3. If a black-footed ferret or its sign is found, all action potentially affecting the colony or complex shall cease, and any further action will be subject to U.S. Fish and Wildlife Service guidance and/or restrictions (formal consultation).

   4. March 1 through June 30, no project-related vehicles are permitted off-road within a two-mile radius of active greater sage grouse leks. Written exception to this stipulation may be granted by the BLM Authorized Officer.

**Project Cleanup**

1. As directed by the Authorized Officer, Veritas DGC shall be responsible to clean up the lines used for the geophysical operations on public lands managed by BLM. All trash, flagging, lath, etc. will be removed and disposed of in an authorized location.

---

[1] Due to limits on the available time of qualified personnel, the unpredictability of wildlife, and future weather conditions, requests for exceptions to impending wildlife stipulations will only be considered in the event of extraordinary and unavoidable occurrences over which the company has little or no control. Additionally, projects must be initiated in a time frame which would allow for completion of the project prior to the beginning date of wildlife protection stipulations.

2.     No open burning of garbage or refuse is allowed in association with seismic activities.

**Compliance**

1.     Operations can be suspended during any portion of the project when in the judgment of the BLM Authorized Officer, Veritas DGC or any contractor hired by Veritas DGC have not complied with <u>any</u> terms or conditions described in the approved NOI and attached Special Terms and Conditions.

Accepted by _____Date_____

               **Veritas DGC Land**

# APPENDIX B

The BLM received 7 comment letters during public scoping. Below you will find public comments and BLM's response to the comment. BLM responses are in italics.

## Biodiversity Conservation Alliance

We neglected to mention the importance of proposed wilderness lands and the effects of the Hay Reservoir seismic project on these lands. Although we recognize that the project area has specifically been designed by BLM to avoid all surface disturbances to the Red Lake WSA, we are concerned that seismograph exploration may be allowed to proceed on citizens' proposed wilderness lands outside the WSA, lands which total an additional 10,500 acres. These lands include Red Lake itself and parts of the Luman Rim, as well as unprotected wilderness-quality stretches of the Killpecker Sand Dunes. The wilderness qualities of this citizens' proposed wilderness have been documented in the 1994 submission "Wilderness at Risk," and as yet BLM has made no effort to evaluate wilderness qualities on these lands or grant them the protection they deserve under Section 202 of FLPMA. In the interest of avoiding confusion, we have attached a map of the citizens' proposed wilderness as it currently stands.

> *Thank you for your comments. Procedures for considering wilderness proposals were eliminated via Instruction Memorandum 2003-195. No actions are proposed within the Red Lake WSA. Effects to WSA users have been considered in the analysis.*

## Petroleum Association of Wyoming

The Petroleum Association of Wyoming (PAW) would like to thank BLM for the opportunity to comment on the referenced document. PAW is Wyoming's largest and oldest oil and gas trade association, the members of which account for over ninety percent of the natural gas and over eighty percent of the crude oil produced in the State. This project will directly affect members of PAW.

PAW has the following comments regarding the Notice of Intent for the above referenced project:

1. The Applicant is bound by the Resource Management Plan (RMP), which allows for geophysical activity in the proposed project area. The activity will create minimal surface disturbance and the mandatory mitigation in effect through the RMP's is more than adequate to protect resources for this proposed action and additional concerns can and will be analyzed in the Environmental Assessment (EA) and the site-specific analysis. Currently there is nothing present to indicate that an Environmental Impact Statement is necessary; therefore, the EA should be expedited for this environmentally sound project.

2. The detailed image of the subsurface that 3-D seismic, allows the operator to target the most promising areas while avoiding areas that would otherwise require exploratory drilling. This procedure is much less intrusive than exploratory drilling, which must be analyzed as an alternative to seismic activity. This technology is a short term, temporary disturbance and it does not require the construction of surface facilities or roads. The impact to vegetation and soils is temporary and will be eliminated after one growing season. The short term and dispersed nature of 3-D seismic and its minimal need for vehicles will not create a significant disturbance to other resources (i.e. wildlife, cultural, etc.) and the EA should be prepared and the project approved without delay.

3. An analysis should be included in the EA addressing socio-economics and the positive effects the project will have on the surrounding communities. PAW recognizes that this proposed action may not stimulate tremendous growth in the economy immediately, but the residents of Wyoming and the participating counties will benefit by directly creating new jobs and additional revenue particularly if further development is determined to be economically feasible after the project is completed.

4. Seismic technology provides the necessary information that can significantly reduce the number of unsuccessful exploration and development of wells drilled; thereby, significantly minimizing surface disturbance. Geophysical activity is consistent with the President's National Energy Policy and the Secretary of Interior's "4C's" philosophy to promote conservation practices with energy development and should be encouraged by BLM. BLM must consider and provide adequate access to areas in order to obtain the valuable information that seismic activity provides.

*Thank you for your comments; they have been considered in the analysis.*

**Shoshone-Bannock Tribes**

The Tribes are concerned about how this project could affect cultural properties in the vicinity. If a cultural resource survey has been done on the project area, this office would like to request a copy of the report along with a map of the project area. The project lies within the aboriginal use areas of the Shoeshone and Bannock people. Another concern is whether or not the project would affect traditional plants and wildlife, particularly burrowing animals.

A plan to address inadvertent discoveries need to be developed as well as government-to-government consultation. Keep in mind that federal statutes such as NAGPRA, State Burial Law, ARPA, etc. may come into effect should there be a discovery.

The purpose of this letter is to provide technical input and not intended as government-to-government consultation.

*Thank you for your comments; they have been considered in the analysis. Once the cultural inventory is complete, the BLM will consult with your Tribes. Additional stipulations could be required based on consultation.*

**State of Wyoming, Office of Federal Land Policy**

The Office of Federal Land Policy has reviewed the referenced scoping statement on behalf of the State of Wyoming. This Office also distributed the referenced document to affected state agencies for their review, in accordance with State Clearinghouse procedures. Attached are comments from the Wyoming Game and Fish Department and the Office of State Lands and Investments. While the State defers to its agencies' technical expertise in developing the State's position, the responsibility to articulate balanced official, unified State policies and positions lies with the Governor or the Office of Federal Land Policy.

We ask that the terrestrial and aquatic concerns, provided by the Game and Fish Department in their attached comment letter, receive your favorable consideration. Please continue to provide this office with either three hard copies or electronic copy (submit to OFLP@state.wy.us) of continued information for review and distribution to interested agencies. Thank you for the opportunity to comment

*Thank you for your comments.*

DR - 12

**Office of State Lands and Investments**

The Office of State Lands and Investments has reviewed the referenced scoping statement. Our comments regarding the proposed action are specific to this agency's statutory mission within State government which is to provide timely. accurate and cost effective service to the Board of Land Commissioners, the State Loan and Investment Board, policymakers and the citizens of Wyoming to facilitate wise and reasonably analytical decision making that will maximize the State's assets and resources in accordance with mandated authorities. In that regard, these comments are meant to, in association with all other agency comments, assist in defining the Official State Position. These comments defer to and are subordinate to the Official State Position.

Although at this time our office has no objection to the proposed action, we would like to point out that in accordance with Chapter 4, Section 13 of the rules of the Board of Land Commissioners, the Board of Land Commissioners require that Veritas DOC Land, Inc. secure the necessary authority prior to conducting operations on any state land within the designated area.

> *Thank you for your comments. Veritas will obtain all state and local permits necessary to conduct geophysical activities over state land.*

**Wyoming Game and Fish Department**

These comments regarding the scoping statement for the Veritas DGC Land Inc., to conduct the Hay Reservoir 3D geophysical operation have been approved by the Director and are specific to this agency's statutory mission within State government which is "Conserving Wildlife, Serving People". With that regard, these comments are meant to, in association with all other agency comments, assist in defining the Official State Position. These comments defer to and are subordinate to the Official State Position.

Terrestrial Considerations:
The proposal is for seismic exploration in the vicinity of Hay Reservoir, northwest of Wamsutter. The proposed geophysical operation would consist of 3D surveys conducted using vibroseis buggies, ATVs and helicopters, encompassing roughly 210 square miles. Most of the project area is BLM-administered lands. The project area provides a variety of seasonal habitats for terrestrial wildlife. Big game habitats include spring/summer/fall and winter/yearlong range for the Red Desert antelope herd (Hunt Area 60).

> *The project boundary has been modified. The size of the project has increased slightly and has been analyzed.*

The area provides nesting and brood-rearing habitats for sage grouse. There are at least eleven documented sage grouse strutting grounds potentially affected by this proposal, two of which, East Luman and Horseshoe Bend, are omitted from the project map provided by the BLM. This map also identifies one lek, near Bush Creek Reservoir, that is not in our records.

We would appreciate the BLM or the company providing the documentation they have for this lek. Leks that are known to occur in the project area by our records are:

| Lek | Section | Township | Range |
|---|---|---|---|
| Horseshoe Bend | 9 | 22 | 96 |

| East Luman | 6 | 23 | 96 |
| Bastard Butte | 10 | 25 | 97 |
| Scotty Lake | 17 | 26 | 97 |
| Basin Well | 16 | 24 | 98 |
| Luman Rim | 25 | 24 | 98 |
| Buffalo Hump Lake | 8 | 24 | 98 |
| Buffalo Hump South | 9 | 24 | 98 |
| Bear Creek | 11 | 25 | 98 |
| Buffalo Hump West | 34 | 25 | 98 |
| West Kinch McKinney | 34 | 26 | 98 |

The area also provides seasonal habitats for numerous species of upland game, small game, furbearers, raptors, waterfowl, predators, nongame mammals, neotropical songbirds, and resident songbirds. Much of the project area is nesting and brood-rearing habitat for mountain plovers, Since large acreages of important wildlife habitat will potentially be affected by this project, we request the Bureau of Land Management to consider and evaluate the following in the environmental document.

Buggy vibrators should be used only in specific locations where steep terrain and ground cover prohibit the use of vibrator trucks. If used, drills should be transported using a helicopter, as well as all recording cables and seismophones. Unless following existing trails, recording crews should set cables and seismophones using all-terrain vehicles and on foot. Existing roads and trails should be used where possible and off-highway vehicle operations should employ a staggered spread pattern in order to avoid excessive compaction of vegetation and soils. Vibrators should be equipped with all-terrain, low-pressure rubber tires to minimize soil impressions and impacts.

Timing and location of the proposed seismic work may conflict with important wildlife during certain times of year. Seismic exploration within all crucial habitats should be evaluated for the following seasonal restrictions:
    a.) Pronghorn, mule deer, and elk crucial winter ranges: November 15 -April 30.
    b.) Elk winter range: November 15 -April 30.
    c.) Elk parturition areas: May 1 -June 15.
    d.) Raptor nest sites: February 1 -July 31.
    e.) Sage grouse leks and two-mile buffer: March 1 -May 20.

No surface disturbance should occur within 1/4-mile of sage grouse leks.

If any activities are to occur during breeding and brood-rearing periods for mountain plovers (roughly 10 April- July), steps should be implemented according to USFWS guidelines to prevent the disturbance of breeding activities or loss of eggs or young.

To minimize conflicts with recreationists, the company should consider suspending operations during the big game rifle seasons. In this area, big game seasons normally run from mid-September through October.

Winter helicopter flights should avoid all occupied crucial habitats to minimize harassment of wildlife.

Existing roads and trails should be used to access seismic lines to the extent possible. All off-road travel should be avoided during wet or muddy conditions.

*DR* - 14

Drill holes should be reclaimed promptly, re-vegetated with native plants, and all cuttings removed from the surface.

Firearms should be prohibited on all job sites during exploration activities.

*Thank you for your comments; they have been considered in the attached analysis.*

Aquatic Considerations:

The Bureau of Land Management should consider actions necessary to minimize erosion potential throughout the project area. The soils in this part of the state are fairly fragile and healing takes a commensurately long time.

*Your comments have been considered in the attached analysis.*

**Fish and Wildlife Service**

In accordance with section 7(c) of the Endangered Species Act of 1973, as amended (Act), my staff has determined that the following threatened or endangered species, or species proposed for listing under the Act, may be present in the project area.

| Listed and Proposed for Listing Species | Status | Expected Occurrence |
|---|---|---|
| Black-footed ferret *(Mustela nigripes)* | Endangered | Endangered Potential resident in prairie dog *(Cynomys* sp.) colonies. |
| Bald eagle. *(Haliaeetus leucocephalus)* | Threatened | Nesting. Winter resident. Migrant |
| Mountain plover*(Charadrius montanus)* | Proposed | Grasslands statewide |
| Blowout Penstemon *(Penstemon haydenii)* | Endangered | Sand Dunes south of Ferris Mountain |
| Ute ladies'-tresses*(Spiranthes diluvialis)* | Threatened | Seasonally moist soils and wet meadows of drainages below *7000 feet elevation.* |
| Platte River Species | Endangered | Downstream riverine habitat of the Platte River in Nebraska |

*Black footed ferret*
Black-footed ferret may be affected if prairie dog colonies are impacted. If white-tailed prairie dog *(Cynomys leucurus)* colonies or complexes greater than 200 acres will be disturbed, surveys for ferrets should be conducted even if only a portion of the colony or complex will be disturbed. A white-tailed prairie dog town or complex consists of two or more neighboring prairie dog towns each less than 7 kilometers (4.34 miles) from each other (Black-footed Ferret Survey Guidelines, USFWS, 1989). If a field check indicates that prairie dog towns may be affected, you should contact this office for guidance on ferret surveys.

### Bald eagle

Work that may affect these birds, their young, eggs, or nests should be coordinated with our office before any actions are taken in order to determine if consultation under the Act may be necessary. The U.S. Fish and Wildlife Service (Service) recommends the project area be surveyed for nesting eagles and roost areas. If any active nests or roost areas are identified within 1 mile of the proposed project, we recommend avoiding work in the area between February 15 and August 15 and avoiding impacts to any nests and roost areas. If timing and/or location of the work cannot be modified to avoid possible impacts you should contact this office to discuss consultation requirements pursuant to the Act.

### Mountain plover

Mountain plover breeding and wintering habitats are known to include grasslands, mixed grassland areas and short-grass prairie, shrub-steppe, plains, alkali flats, agricultural lands, cultivated lands, sod farms, and prairie dog towns. Plovers may nest on sites where vegetation is sparse or absent, or near closely cropped areas, manure piles or rocky areas. Mountain plovers are rarely found near water and show a preference for previously disturbed areas or modified habitat. They may be found on heavily grazed pastures throughout their breeding range and may selectively nest in or near prairie dog towns.

As this project area provides suitable habitat for nesting plovers, surveys should be conducted prior to implementing the proposed project. Additionally, nesting areas should be avoided to minimize impact to plovers in the project area. While the Service believes that plover surveys, avoidance of nesting and brood rearing areas, and timing restrictions (avoidance of important areas during nesting) will lessen the chance of direct impacts to and mortality of individual mountain plovers in the area, these restrictions do nothing to mitigate indirect effects, including changes in habitat suitability and habitat loss. Surveys are, however, a necessary starting point.

### Ute ladies'-tresses

Ute ladies'-tresses is a perennial, terrestrial orchid endemic to moist soils near wetland meadows, springs, lakes, and perennial streams. It occurs generally in alluvial substrates along riparian edges, gravel bars, old oxbows, and wet meadows at elevations from 4,200 to 7,000 feet. The orchid colonizes early successional riparian habitats such as point bars, sand bars, and low lying gravelly, sandy, or cobbly edges, persisting in those areas where the hydrology provides continual dampness in the root zone through the growing season. Ute ladies'-tresses seems generally intolerant of shade and is found primarily in open grass and forb-dominated sites where vegetation is relatively open and not dense or overgrown. The plants usually occur as small, scattered groups. Surveys conducted at other times of the year area not reliable and are therefore not acceptable to the Service for purposes of clearance under section 7 of the Act. Surveys should be conducted by knowledgeable botanists trained in conducting rare plant surveys. The Service does not maintain a list of "qualified" surveyors but can refer those wishing to become familiar with the orchid to experts who can provide training/services.

### Platte River Species

Water depletions to the Platte River system may affect the endangered whooping crane *(Grus americana)*, endangered interior least tern *(Sterna antillarum)*, threatened piping plover *(Charadrius melodus)*, and endangered pallid sturgeon *(Scaphirhynchus albus)*, the threatened bald eagle *(Haliaeetus leucocephalus)*, the endangered Eskimo curlew *(Numenius borealis)* and threatened western prairie fringed orchid *(Platanthera praeclara)*. Depletions include evaporative losses and/or consumptive use, often characterized as diversions from the Platte River or its tributaries less return flows. Project elements that could be associated with depletions to the Platte River system include, but are not limited to, water used for dust suppression or diversion structures. Any actions that may result in a water depletion to the Platte River system should be

identified. The document should also include an estimate of the amount and timing (by month) of average annual water depletion (both existing and new depletions), and describe methods of arriving at such estimates.

## Consultation

Section 7(c) of the Act requires that a biological assessment be prepared for any Federal action that is a major construction activity to determine the effects of the proposed action on listed and proposed species. If a biological assessment is not required (i.e., all other actions), the Bureau of Land Management (Bureau) is responsible for review of proposed activities to determine whether listed species will be affected. We would appreciate the opportunity to review any such determination document. If it is determined that the proposed activities may affect a listed species, you should contact this office to discuss consultation requirements. If it is determined that any Federal agency program or project "is likely to adversely affect" any listed species, formal consultation should be initiated with this office. Alternatively. informal consultation can be continued so we can work together to determine how the project could be modified to reduce impacts to listed species to the "not likely to adversely affect" threshold. If it is concluded that the project "is not likely to adversely affect" listed species, we should be asked to review the assessment and concur with the determination of not likely to adversely affect.

Section 7(d) of the Act requires that the Bureau and permit or license applicant shall not make any irreversible or irretrievable commitment of resources which would preclude the formulation of reasonable and prudent alternatives until consultation on listed species is completed.

Regarding species proposed for listing, the Bureau agencies must determine whether any of their proposed activities are likely to jeopardize the continued existence of the species. If jeopardy is likely, that agency must confer with the Fish and Wildlife Service.

We will work with your agency in the section 7 consultation process. The analysis of project impacts must assess direct impacts of the project, as well as those impacts that are interrelated to or interdependent with the proposed action. Impacts to listed species on non-Federal lands must be evaluated along with such impacts on Federal lands. Any measures that are ultimately required to avoid or reduce impacts to listed species will apply to Federal as well as non-Federal lands.

## Wetlands/Riparian Areas

The Service recommends measures be taken to avoid any wetland losses in accordance with Section 404 of the Clean Water Act, Executive Order 11990 (wetland protection) and Executive Order 11988 (floodplain management) as well as the goal of "no net loss of wetlands." If wetlands may be destroyed or degraded by the proposed action, those (wetlands) in the project area should be inventoried and fully described in terms of functions and values. Acreage of wetlands, by type, should be disclosed and specific actions outlined to minimize impacts and compensate for all unavoidable wetland impacts. All riparian crossings should be conducted at a right angles to the area to minimize resource impacts form vibroseis buggies and other associated equipment.

Riparian, or streamside areas and ephemeral draws are a valuable natural resource and impacts to these areas should be avoided whenever possible. Riparian areas are the single most productive wildlife habitat type in North America. They support a greater variety of wildlife than any other habitat. Riparian vegetation plays an important role in protecting streams, reducing erosion and sedimentation as well as improving water quality, maintaining the water table, controlling flooding, and providing shade and cover. In view of their importance and relative scarcity,

impacts to riparian areas should be avoided. Any potential, unavoidable encroachment into these areas should be minimized and quantitatively assessed in terms of functions and values, areas and vegetation type lost, potential effects on wildlife, and streams (bank stability and water quality). Measures to compensate for unavoidable losses of riparian areas should be developed and implemented as part of the project.

Plans for mitigating unavoidable impacts to wetland and riparian areas should include mitigation goals and objectives, methodologies, time frames for implementation, success criteria, and monitoring to determine if the mitigation is successful. The mitigation plan should also include a contingency plan to be implemented should the mitigation not be successful.

## Migratory Birds/Raptor Surveys

Work that could lead to the take of a migratory bird or eagle, their young, eggs, or nests (for example, if you are going to explore in the vicinity of a nest), should be coordinated with our office before any actions are taken. Removal or destruction of such nests, or causing abandonment of a nest could constitute a violation of the Migratory Bird Treaty Act, 16 U.S.C. 703. To avoid direct take of ground nesting raptors (e.g. ferruginous hawk), and indirect take via nest disturbance of all raptor species, we recommend conducting surveys for raptor nests and roost areas if work will take place during the nesting season. Removal of nests or nest trees is prohibited. Permits for nest manipulation including removal or relocation may, under certain circumstances, be issued for specific types of projects. If nest manipulation is proposed for this project, the project proponent should contact the Services' migratory Bird Office in Denver at 303-236-8171 to see if a permit can be issued for this project. No nest manipulation is allowed without a permit. If a permit cannot be issued, the project may need to be modified to ensure take of a migratory bird or eagle, their young, eggs or nest will not occur. Timing is a significant consideration and you need to allow for this in your project planning.

## Other Wildlife Resources

The Wyoming Game and Fish Department has informed us that the project area is an important greater sage-grouse nesting and brood rearing area. Sage grouse are declining throughout their range, and concern for this species has led us to believe we will receive a listing petition for listing sage grouse pursuant to the Endangered Species Act in the near future. The cause of sage grouse decline is not known, and may be a combination of several factors which affect habitat and reproductive abilities. However, anecdotal information from several sources in Wyoming, suggests that sage grouse populations are negatively affected by the activities associated with oil and gas development, even when mitigative measures are implemented. We encourage the Bureau to take all necessary measures allowable to protect sage grouse in the project area to ensure this project does not exacerbate factors contributing to sage grouse decline and thus give support to a listing petition.

Please keep this office informed of any developments or decisions concerning this project. If you have any questions please contact Pat Deibert of my staff at the letterhead address or phone (307) 772-2374, extension 26.

*Thank you for your comments; they have been considered in the analysis.*

.

# VERITAS DGC LAND

# HAY RESERVOIR 3D GEOPHYSICAL PROJECT

# ENVIRONMENTAL ASSESSMENT

**Bureau of Land Management**
**Rock Springs Field Office**
**Rawlins Field Office**

**December 2003**

**WY-040-EA02-133**

**BLM Case No.: WY-040-OG02-04          WOGCC Case No.: 3702005G**

**Exhibit 13 to Defendant-Intervenors'
Supplemental Brief in Opposition to
Plaintiffs' Motion for a Preliminary Injunction
Excerpts From Environmental Assessment
for the Hay Reservoir CBNG Infill and
Impoundments Project - Aug. 2007**

# ENVIRONMENTAL ASSESSMENT for the Hay Reservoir CBNG Infill and Impoundments Project
## Sweetwater County, Wyoming



**August 2007**

MISSION STATEMENT

It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.

**BLM/WY/PL-07/032+1310**



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Rawlins Field Office
P.O. Box 2407 (1300 North Third Street)
Rawlins, Wyoming  82301-2407



August 13, 2007

In Reply Refer To:
1790 (030)

Re:     Environmental Assessment for the Hay
        Reservoir CBNG Infill and Impoundments
        Project

Dear Reader:

This is to inform you of the availability of the Hay Reservoir Coalbed Natural Gas (CBNG) Infill and Impoundments Project (Project) Environmental Assessment (EA) at the Wyoming Bureau of Land Management's (BLM) website:

    http://www.blm.gov/wy/st/en/info/NEPA/documents/nepadocs07.html

In order to satisfy the requirements of the National Environmental Policy Act, this EA was prepared to analyze impacts associated with the drilling of eight additional CBNG wells and the construction and operation of produced water disposal impoundments, north of Wamsutter, Wyoming.

It is expected that this EA can be viewed at our website beginning August 13, 2007.  This will begin the 30-day public review/comment period for the document.  We will review all comments and will address substantive comments in the Decision Record.  A substantive comment is one that would alter conclusions drawn from the analysis based on:  1) new information, 2) why or how the analysis is flawed, 3) evidence of flawed assumptions, 4) evidence of error in data presented, and 5) requests for clarification that bear on conclusions presented in the analysis.

Your comments should be as specific as possible.  Comments on the alternatives presented and on the adequacy of the impact analysis will be accepted by the BLM until September 12, 2007.

Comments may be submitted via regular mail to:

Travis Bargsten, Project Manager
Bureau of Land Management
Rawlins Field Office
P.O. Box 2407
Rawlins, Wyoming 82301

2

or may be submitted electronically at the address shown below (please refer to the Hay Reservoir CBNG Infill and Impoundments Project):

e-mail: rawlins_wymail@blm.gov

Please note that comments, including names, e-mail addresses, and street addresses of respondents, will be available for public review and disclosure at the above address during regular business hours (7:45 a.m. to 4:30 p.m.), Monday through Friday, except holidays. Individual respondents may request confidentiality. If you wish to withhold your name, e-mail address, or street address from public review or from disclosure under the Freedom of Information Act, you must state this plainly at the beginning of your written comment. Such requests will be honored to the extent allowed by law. All submissions from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be made available for public inspection in their entirety.

The EA may also be reviewed at the following locations:

Bureau of Land Management          Bureau of Land Management
Wyoming State Office               Rawlins Field Office
5353 Yellowstone Road              1300 N. Third Street
Cheyenne, Wyoming 82009            Rawlins, Wyoming 82301

If you require additional information regarding this project, please contact Travis Bargsten, Project Manger, at the Rawlins address or phone (307) 328-4387.

Sincerely,

*Mark Storyer*

Field Manager

Enclosure



**U.S. Department of the Interior**
**Bureau of Land Management**



**August 6, 2007**

**ENVIRONMENTAL ASSESSMENT TITLE PAGE**
**Rawlins Field Office**

EA No. WY-030-07-EA-115

Name or Title of Action: Hay Reservoir CBNG Infill and Produced Water Impoundment Project

Proponent: Pinnacle Gas Resources, Inc.

File Name, Number, and Location: Oil and Gas Leases WYW-153188, WYW-153193

Location (BLM Surface, Fed Minerals): T.23N., R.97W., 6th P.M., Sec 26, Sec 35
Location (BLM Surface, WY Minerals): T.23N., R.97W., 6th P.M., Sec 36
Sweetwater County, Wyoming

Field Office: Rawlins Field Office (RFO)

**Rawlins Field Office (RFO) Interdisciplinary Team (IDT)**

| IDT Member | Title |
| --- | --- |
| Travis Bargsten | Natural Resource Specialist, Project Lead |
| David Simons | Environmental Coordinator |
| Andy Stone | Hydrologist |
| Mike Calton | Rangeland Management Specialist |
| Paul Rau | Recreation Planner |
| Heath Cline | Wildlife Biologist |
| Bonni Bruce | Archaeologist |
| Mark Newman | Geologist |
| Susan Foley | Soil Scientist |
| Jon Dull | Petroleum Engineer |
| Hilaire Peck | Engineer |
| Heather Nino | Realty Specialist |

Activity Code:    1310

Appendices:    A (Master Drilling Plan)
B (Master Surface Use Plan and Integrated Pest Management Plan)
C (Water Management Plan and Addenda)

## INTRODUCTION

**PURPOSE AND NEED FOR THE PROPOSED ACTION**

The Proposed Action as described in this Environmental Assessment (EA) is necessary for the proponent to exercise lease rights and develop domestic natural gas resources. In Coalbed Natural Gas (CBNG) operations, water is removed from coal formations allowing for desorption of natural gas, principally methane, for production and eventual sale. Disposal of this produced water is then necessary to allow for continued natural gas production. Down-sizing of well spacing (to 80-acre spacing) has been deemed necessary by the Proponent in order to adequately test the feasibility of commercial gas production from the subject oil and gas leases. The purpose and need for this project are to allow for the Proponent to determine if coalbed natural gas production is feasible from the target formation in this geographic area, in order to provide natural gas for eventual sale and consumption. As a pilot project, eventual full-field development could occur should coalbed natural gas production prove feasible. A corollary purpose of this project is to evaluate techniques of gas and produced water production, and to provide information for potential analysis of subsequent full-field development.

**CONFORMANCE WITH LAND USE PLAN**

Oil and gas development is covered on pages 30-32 in the Great Divide Resource Management Plan (RMP), which was approved on November 8, 1990. Development of oil and gas reserves as described in the Proposed Action is in conformance with the RMP decisions which state that the Management Objective is to provide opportunity for leasing, exploration, and development of oil and gas while protecting other resource values.

The development of this project would not affect the achievement of the Wyoming Standards for Healthy Rangelands (August 1997).

**RELATIONSHIP TO STATUTES, REGULATIONS, POLICY, PERMITS OR OTHER PLANS**

In 2003, the RFO prepared an EA for a right-of-way (ROW) application by Kennedy Oil to allow for the construction of 4 well locations in Section 36 (in T23N/R97W hereafter, unless otherwise specified). Surface estate in this Section is public land administered by the BLM, and the mineral estate is owned by the State of Wyoming. As a result, the RFO considered the impacts from construction and associated activities. Subsequently, a Decision Record and Finding of No Significant Impact (DR/FONSI) was released allowing for the ROW authorization. Kennedy subsequently drilled the CBNG wells and converted a wellbore to a produced water disposal (reinjection) well. Kennedy Oil then decided to expand the pilot project to better test the feasibility of commercial gas production by proposing the drilling of 8 additional CBNG wells adjacent to Section 36, in Sections 26 and 35.

In September of 2005, the RFO released an EA for the Hay Reservoir Coalbed Natural Gas (CBNG) Pilot Project ("Hay Reservoir CBNG Pilot") for public review. In October of 2005, the RFO issued a Decision Record/Finding of No Significant Impact for the Hay Reservoir CBNG Pilot. This decision provided for the authorization of 8 CBNG well Applications for Permit to Drill (APDs) and a single produced water disposal well APD, along with appurtenant access roads and pipeline- and utility-corridors in Sections 26 and 35. The 8 CBNG wells were proposed by the original proponent, Kennedy Oil, to be located at 160-acre spacing (4 wells per section).

In October of 2006, Pinnacle Gas Resources, Inc. (Proponent) submitted APDs for infill drilling and included a proposal to dispose of produced water in surface impoundments. Pinnacle has obtained the lease rights to explore and develop natural gas within these leases from Kennedy Oil.

In July of 2006, Pinnacle submitted a ROW application for the infill drilling of 4 additional locations in Section 36. An EA was prepared, a DR/FONSI produced, and the ROW was subsequently authorized.

**Exhibit 14 to Defendant-Intervenors'
Supplemental Brief in Opposition to
Plaintiffs' Motion for a Preliminary Injunction
Excerpts From Environmental Assessment
for the Hanna Draw Coalbed Natural Gas
Pilot Project - Jan. 2007**

# ENVIRONMENTAL ASSESSMENT for the Hanna Draw Coalbed Natural Gas Pilot Project

## Carbon County, Wyoming



**January 2007**

> **MISSION STATEMENT**
> It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.

**BLM/WY/PL-07/009+1310**

WY-030-07-EA-083



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Rawlins Field Office
P.O. Box 2407 (1300 North Third Street)
Rawlins, Wyoming  82301-2407



January 29, 2007

In Reply Refer To:
1790 (030)

Re:    Environmental Assessment for the
       Hanna Draw CBNG Pilot Project

Dear Reader:

This is to inform you of the availability of the Hanna Draw Coalbed Natural Gas (CBNG) Pilot Project (Project) Environmental Assessment (EA) at the Wyoming Bureau of Land Management's (BLM) website:

www.wy.blm.gov/rfo/nepa.htm

In order to satisfy the requirements of the National Environmental Policy Act, this EA was prepared to analyze impacts associated with the construction, drilling, production, maintenance, and reclamation of coalbed natural gas wells north of Hanna, Wyoming.

It is expected that this EA can be viewed at our website beginning January 29, 2007.  This will begin the 30-day public review/comment period for the document.  We will review all comments and will address substantive comments in the Decision Record.  A substantive comment is one that would alter conclusions drawn from the analysis based on:  1) new information, 2) why or how the analysis is flawed, 3) evidence of flawed assumptions, 4) evidence of error in data presented, and 5) requests for clarification that bear on conclusions presented in the analysis.

Your comments should be as specific as possible.  Comments on the alternatives presented and on the adequacy of the impact analysis will be accepted by the BLM until February 28, 2007.

Comments may be submitted via regular mail to:

Travis Bargsten, Project Manager
Bureau of Land Management
Rawlins Field Office
P.0. Box 2407
Rawlins, Wyoming 82301

2

or may be submitted electronically at the address shown below (please refer to the Hanna Draw CBNG Pilot Project):

e-mail:  rawlins_wymail@blm.gov

Please note that comments, including names, e-mail addresses, and street addresses of respondents, will be available for public review and disclosure at the above address during regular business hours (7:45 a.m. to 4:30 p.m.) Monday through Friday, except holidays. Individual respondents may request confidentiality.  If you wish to withhold your name, e-mail address, or street address from public review or from disclosure under the Freedom of Information Act, you must state this plainly at the beginning of your written comment.  Such requests will be honored to the extent allowed by law.  All submissions from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be made available for public inspection in their entirety.

The EA may also be reviewed at the following locations:

Bureau of Land Management             Bureau of Land Management
Wyoming State Office                  Rawlins Field Office
5353 Yellowstone Road                 1300 N. Third Street
Cheyenne, Wyoming 82009               Rawlins, Wyoming 82301

If you require additional information regarding this project, please contact Travis Bargsten, Project Manger, at the Rawlins address or phone (307) 328-4387.

Sincerely,

*Mark Stoyer*

Field Manager

Enclosure

# CHAPTER 1

# PURPOSE AND NEED

## 1.1   INTRODUCTION

Anadarko Petroleum Corporation (APC) proposes to explore and potentially develop coalbed natural gas (CBNG) wells near Hanna Draw, which is located within the administrative boundaries of the Rawlins Field Office (FO) of the Bureau of Land Management (BLM).  The proposed well sites for the Hanna Draw Coalbed Natural Gas Pilot Project (Pilot Project) are located in Township 23 North, Range 81 West, Section 2, in Carbon County, Wyoming.  The project area is located approximately 10 miles northeast of Hanna, Wyoming (Figure 1-1) on BLM-administered federal surface and mineral estate.  Access to the project area is provided by Carbon County Road 291 from Hanna.

The Pilot Project would entail the construction, drilling, completion, and production of up to a maximum of 15 CBNG wells in the project area and the construction, utilization, and maintenance of appurtenant access roads, pipelines, and production facilities.  The Pilot Project would be production tested for a period of 12 to 18 months.  If economically viable, the total life-of-project (LOP) is estimated at 10 to 20 years.

If the Pilot Project wells produce marketable quantities of gas, APC would complete construction of a CBNG interconnect pipeline.  If this Pilot Project demonstrates CBNG production in the project area is economically feasible, then additional development of this resource may be proposed.  Any additional development would require further environmental analysis under the National Environmental Policy Act (NEPA).

APC drilled one test well in the Pilot Project area (Hanna Draw Federal 2-2), along with construction of an access road and water disposal pipeline.  NEPA analysis for the test well and associated road and pipeline was completed by BLM (2005a).  The purpose of the test well is to provide data that will be used to refine the Pilot Project.  The well also will provide produced water for additional testing, particularly Whole Effluent Toxicity (WET) tests.

## 1.2   PURPOSE AND NEED

### 1.2.1   Purpose of and Need for the Proposed Development

Exploration and development of federal mineral resources by private entities is an integral part of the BLM's national energy policy.  BLM is authorized to lease the federal lands for oil and gas development under authority of the Mineral Leasing Act of 1920, as amended; the Mining and Minerals Policy Act of 1970; the Federal Land Policy and Management Act of 1976; the National Materials and Minerals Policy, Research and Development Act of 1980; and the Federal Onshore Oil and Gas Leasing Reform Act of 1987.

The purpose of the Proposed Action is to determine whether, given current technology, the coalbeds in the project area can be economically developed.  If it is determined that such resources were suitable for commercial extraction, additional oil and gas resources would be evaluated and developed.

**Exhibit 15 to Defendant-Intervenors'
Supplemental Brief in Opposition to
Plaintiffs' Motion for a Preliminary Injunction
Excerpts From The Bureau of Land Management's
November 2006 Final Environmental Impact Statement
Atlantic Rim Natural Gas Field Development Project
(FEIS for the Atlantic Rim Project)**

**Chapter 3**

**Affected Environment**

**CHAPTER 3.  AFFECTED ENVIRONMENT**

### 3.3.3    Existing Soil Disturbances

Briefly, existing project-related disturbances to soil resources includes about 600 acres or 0.2 percent of the total land surface area of the ARPA.  The majority of this total is 315 acres attributed to 210 gas well sites (116 IDP wells).  Existing roads account for about 247 acres; compressor stations, 13 acres; transfer pumping stations, 1.0 acre; containment ponds, 25 acres; and deep injection well sites, 4 acres.

## 3.4    Water Resources

Surface waters include resources in three major drainage basins: the Colorado River Basin, the Missouri River Basin, and the Great Divide Basin.  The project area is predominantly within the Colorado River Basin (80 percent of the ARPA) and drained by the intermittent Muddy Creek (69 percent of the ARPA), a tributary of the Little Snake River (map M-14).  Within the ARPA, Muddy Creek's named ephemeral tributaries include Deep Creek, Cherokee Creek, Wild Cow Creek, and Cow Creek (and its named tributaries Dry Cow Creek and Deep Gulch); it also has multiple unnamed ephemeral tributaries.  Some minor unnamed and named ephemeral tributaries of the Little Snake River (i.e., Cottonwood Creek and Dutch Joe Creek) drain the southern-most portion of the ARPA.  A portion of the project area is also drained into the Savery Creek drainage, a main tributary to the Little Snake.  A small part of the northeastern portion of the ARPA is in the upper portion of Sugar Creek an ephemeral stream within the Missouri River Basin.  Separation Creek, a named ephemeral stream within the Great Divide Basin, and Filmore Creek drain the northwestern portion of the ARPA (map M-14).

There are a number of named and unnamed seeps and springs, as well as numerous man-made ephemeral and intermittent livestock reservoirs, wells and ponds.  The perennial Little Snake River is the most important surface water resource in the general vicinity and falls immediately outside of the southern boundary of the project area.  The Little Snake River is part of the Yampa-White River system within the Colorado River Basin (map M-14). Muddy Creek joins the Little Snake just above Baggs, Wyoming.  The Yampa-White River system is important for native fish recovery programs for the humpback chub, bonytail, Colorado pikeminnow, and razorback sucker.  The Colorado River is probably one of the most utilized river systems in the west with innumerable municipal, industrial, recreational, and agricultural uses.

Wetlands/Riparian and Floodplain areas have been identified along intermittent and perennial waters as well as those associated with springs, seeps and/or wells (map M-15) from National Wetland Inventory (NWI), USGS Hydrography data, and site visits to evaluate Proper Functioning Condition (PFC) for range management.  Most 100 year floodplain areas would occur within 500 ft. of perennial waters or 100 ft. of ephemeral drainages, those features not shown on map M-15, would be identified during onsite investigations and will be avoided for the location of permanent features.  As part of standard oil and gas mitigations, areas within 500 ft. (~1/10 mile) of surface waters, identified 100-yr floodplains, and wetlands are managed for controlled surface use, also called avoidance areas (See appendices J and H).

# CHAPTER 3.  AFFECTED ENVIRONMENT

In 2004, the BLM RFO sponsored USGS surface water gauging station 09258980 at Muddy Creek below Young Draw near Baggs, Wyoming.  This station is located immediately upstream of the discontinued USGS station 09259000 at Muddy Creek (period of record 1987–1991).  The gauge was moved in an effort to compensate for increased irrigation return-flow occurring between the two sites and to reinitiate water quality and quantity monitoring of Muddy Creek.  The new surface water monitoring station on Muddy Creek currently records streamflow and conductivity.  The streamflow monitoring results from these two stations are comparable.  Beginning in 2006, the USGS and BLM began collecting water quality samples periodically at station 09258980 in an effort to develop a relationship between specific conductance and concentrations of total dissolved solids (TDS). The gauge would most likely be maintained throughout the life of the Atlantic Rim project.

## 3.4.2.1  Colorado River Basin

The ARPA is predominantly drained by Muddy Creek, a tributary of the Little Snake River.  The Little Snake River flows from the Sierra Madres to the southeast into Colorado and its channel is located just south of the project area (map M-14).  The Little Snake River drains the largest basin in the Yampa River Basin (Driver et al. 1984) in northwest Colorado (map M-14).  The Yampa River flows southwest to its confluence with the Green River in Colorado.  The Green River drains to the Colorado River, which ultimately drains into the Pacific Ocean.

Approximately 69 percent of the ARPA is drained by Muddy Creek.  Muddy Creek (HUC 14050004 on map M-10) flows from east to west and then south across the project area to its confluence with the Little Snake River near Baggs, Wyoming.  The primary Muddy Creek ephemeral tributaries within the ARPA include, from upstream to downstream, Cow Creek (and its tributaries Dry Cow Creek and Deep Gulch), Wild Cow Creek, Cherokee Creek, and Deep Creek (map M-10).  Similar to Muddy Creek, these four tributaries experience intermittent streamflow in portions due to the presence of springs, seeps, and flowing wells in their headwater areas, but are predominantly ephemeral and flow only in response to snowmelt and rainfall.  There are also numerous unnamed, ephemeral tributaries to Muddy Creek within the project area.

The extreme southeast margin of the ARPA drains to the Little Snake River via Savery Creek.  The main channel of Savery Creek flows north to south immediately east of the ARPA.  The headwaters of two named ephemeral tributaries to Savery Creek—Negro Creek and Loco Creek—originate in the ARPA.

Muddy Creek is described as a high-elevation, cold-desert stream.  Muddy Creek originates in the Sierra Madre Range, which is located immediately east of the ARPA, and extends to the Red Desert, immediately west of the ARPA.  The watershed encompasses approximately 1,000 square miles and ranges in elevation from about 6,300 to about 8,200 feet amsl.

Beatty (2005) divided Muddy Creek into two major segments, upper Muddy Creek and lower Muddy Creek.  The upper segment is identified as that portion of the watershed upstream of a large headcut stabilization structure that is located in T17N: R92W. This structure is located just downstream of where Muddy Creek crosses the ARPA boundary and just upstream of where Muddy Creek crosses Highway 789 (map M-16).  The four primary tributaries mentioned above are within the lower segment, which extends from the large headcut stabilization structure to the Little Snake River confluence.  Lower Muddy Creek is highly erosional and has abundant channel incisions (Beatty 2005).  Channel substrates consist predominantly of very fine-grained

**Chapter 4**

**Analysis of Environmental Consequences**

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Produced water disposal will primarily occur via an estimated 166 injection wells. Impacts from any potential new disposal methods not currently occurring within the ARPA will be analyzed in separate project-specific NEPA documents to fully analyze potential impacts.

Wetlands/Riparian and Floodplain areas have been identified along intermittent and perennial waters as well as those associated with springs, seeps and/or wells (map M-16) from NWI, USGS Hydrography data, and site visits to evaluate PFC for range management. Most 100 year floodplain areas would occur within 500 ft. of perennial waters or 100 ft. of ephemeral drainages. These features would be identified during onsite investigations and would be avoided for the location of permanent features. As part of standard oil and gas mitigations, areas within 500 ft. (~1/10 mile) of surface waters, identified 100-yr floodplains, and wetlands are managed for controlled surface use, also called avoidance areas (see appendices J and H).

Alternative C would not allow pad sites in some areas of environmental concern and would institute development protection measures (appendix L) that are based on resource concerns identified using spatial data (GIS). Many of these protection measures are specifically designed to reduce impacts to surface and groundwater resources. Under all alternatives, development protection measures would not apply to private or state lands. Alternative D would limit the amount of unreclaimed disturbance area at any given time to no more than 7,600 acres (See section 2.2.4).

### Surface Water Assumptions

The analysis for surface water is based on the following specific assumptions:

- Disturbance to soil and vegetation, including compaction of soil, would increase water runoff and downstream sediment loads, and lower soil productivity thereby degrading water quality, channel structure, and overall watershed health in some locations.

- The degree of impact attributed to any one disturbance or series of disturbances is influenced by several factors including location within the watershed, time and degree of disturbance, existing vegetation, and precipitation.

- Increased pollutants in surface waters would degrade habitat used by aquatic life and would affect other uses (e.g., stock-watering, irrigation, and drinking water supplies).

- BLM would continue to develop and maintain water sources in upland area to reduce impacts on wetland/riparian areas, and provide a resource for livestock grazing.

- Access roads would follow standard construction practices. However, properly designed roads would still alter hillslope hydrology and concentrate overland flow increasing erosion in some areas. In areas with steep topography, roads are expected to be longer resulting in greater impacts to surface water resources.

- Fine-textured soils are more susceptible to water erosion and compaction when wet; whereas, coarse-textured soils are more susceptible to wind erosion (See section 4.3).

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

**Surface Water Impacts Common to All Action Alternatives**

The main impacts to surface water resources are the removal of vegetation, increased soil surface exposure, mixing of soil horizons, soil compaction and decreased infiltration capacity, loss of topsoil productivity, and increased susceptibility of the soil to wind and water erosion. Therefore, the primary impact of the proposed project on surface water resources is increased surface runoff, erosion, and off-site sedimentation that would cause channel instability and degradation of surface water quality in some locations.

Martherne (2006) found increased sediment production from well pad locations and confirmed that roads and well pads can provide conditions for focusing runoff and locally increasing erosion. Based on field observations, the author found that roads on sideslopes facilitate the erosional process in three ways: (1) roads cut across and collect runoff from previously established drainages (2) roads, where they are cut into hillsides or into the land surface, provide focal points for the initiation of erosion; and (3) roads also provide conduits for sediment transport. Once mobilized, a portion of this sediment (resulting from these erosional processes) will move into channels in pulses that occur in relation to storm events. Some of this sediment will be temporarily stored in drainage bottoms and on the hillslope and a portion will be stabilized by vegetation and not travel to the drainage. The amount of sediment that will be added to specific drainages can only be estimated based on site-specific information available after annual planning and on-site inspections.

Changes in upland runoff, hydrology, or increased sedimentation could reduce habitat for non-game fish, coldwater fish, and aquatic life, especially in the Muddy Creek Drainage. Habitat for non-game species includes pools and riffles. With increased sediment loads, riffles can become silted in and pools can fill, degrading the habitat. Changes in upland runoff conditions can increase peak flow conditions and may reduce base flows critical for maintaining late season pool habitats.

Waters of the U.S. are managed in section 404 of the CWA and permits from U.S. Army Corps of Engineers (ACOE) may be required for dredge and fill activities. All notification and construction criteria will be adhered to and the ACOE will be consulted when questions about the permit use arise. The Great Divide Basin is unlikely to have any waters of the U.S. because it is internally drained and has no major water based recreation sites. Standard mitigation requiring avoidance of surface waters, riparian areas, and wetlands (See appendix H) will limit surface disturbance in these areas on public land to linear features such as road and pipeline crossings. Activities that modify the morphology of stream channels are also subject to regulation by the State of Wyoming. Permitting for construction activities in these areas would take place during the annual planning process and copies of notices or permits may be required of the operator before construction is approved (See appendix H). The effected environment in special aquatic sites and wetlands are discussed in greater detail in section 3.5.

**Surface Hydrology Related to Soils Data and Topography**. Soils with the potential for severe water erosion comprise about 96 percent of the ARPA (261,000 acres of slight/severe, moderate/severe, and severe/severe categories, see tables 3-10 and 3-11). Tables 3-10 and 3-11 summarize the data for the following five categories and their individual ranking criteria for the contiguous ARPA: water erosion, wind erosion, runoff potential, topsoil rating, and road rating. Because so much of the ARPA has the potential for severe water erosion, soil disturbance both during construction and during production can be expected to result in hillslope and channel erosion under each action alternative above background conditions. Erosion in areas with sensitive soils can be either catastrophic or simply chronic. Surface disturbance

# Appendix A

## Interim Drilling Policy

# APPENDIX A.  INTERIM DRILLING POLICY

or private access road) prior to approval of the interim drilling plan, may be developed as deemed appropriate by the operator/lessee.  However, these wells will count toward the total number of wells allowed to be drilled under this interim drilling policy.

**THE FOLLOWING CRITERIA AND CONDITIONS APPLY TO INTERIM DRILLING OPERATIONS**

1. A detailed Plan of Development/Surface Use Plan (POD/SUP) and Master Drilling Plan for each individual pod, using guidance provided by the BLM RFO, will be submitted and approved prior to surface disturbing activities.

2. The operator(s) agree to supply the geologic, coal, and water data information discussed in attachment 1 of this document.

3. Prior to initiating interim drilling, an environmental assessment (EA), including a detailed Water Management Plan will be prepared and approved for each individual pod.  Because of the current BLM workload, and in order to expedite the completion of the EAs, it is recommended that these documents be prepared by a third-party contractor.

4. All pod EA's will be submitted to the BLM in PDF format and each document will be placed on the BLM Wyoming web page.  A 30-day public review of each document will occur from the date the document is placed on the site.   BLM will be responsible for writing the decision record for each EA.

5. A 1/4 mile buffer is required between surface disturbing activities and the Overland Trail.

6. Block surveys for cultural resources will be required for each pod.

7. No interim drilling will be allowed in the Sand Hills Area of Critical Environmental Concern as described in the Great Divide Resource Management Plan Record of Decision (USDI-BLM 1990).

8. The Great Divide RMP states the BLM will include intensive land-use practices to mitigate salt and sediment loading caused by surface disturbing activities within the Muddy Creek watershed.  The Muddy Creek Coordinated Resource Management (CRM) group was established as an advisory group to address this issue.  Because this area overlaps with the Muddy Creek CRM effort, and since road use contributes the most in increasing the amount of sediment in the Muddy Creek drainage, the POD/SUP will be reviewed by the Muddy Creek CRM Road Committee and recommendations of the group will be considered by BLM.   Changes to the POD/SUP will be made prior to initiating work on the pod EA.

9. Surface discharge as a method of disposal for produced coal bed methane waters will be considered for each individual pod during interim drilling activities within the Great Divide Basin.  This is subject to the approval of the Water Management Plan and upon obtaining all required federal, state and local permits.

**Exhibit 16 to Defendant-Intervenors'
Supplemental Brief in Opposition to
Plaintiffs' Motion for a Preliminary Injunction
BLM Transmittal Letter - Cow Creek POD
Environmental Assessment**



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Rawlins Field Office
1300 North Third Street
P.O. Box 2407
Rawlins, Wyoming 82301-2407

In Reply Refer To:

1790

                    Re:    Cow Creek Pod Environmental
                           Assessment

Dear Reader:

Enclosed for your review and comment is the Environmental Assessment (EA) for
Double Eagle Petroleum and Mining's Cow Creek Pod coalbed methane (CBM)
exploration project.  The project is located in one of nine areas proposed for
exploration drilling for the purpose of providing information for use in the
preparation of the Atlantic Rim CBM Methane Project Environmental Impact
Statement.  In order to satisfy the requirements of the National Environmental
Policy Act, this EA was prepared to analyze impacts associated with the
exploration of CBM resources northeast of Baggs, in Carbon County, Wyoming.

Analysis of the environmental consequences has led to the determination that
this proposed project, with the appropriate mitigating measures, will not have
a significant effect on the human environment.  Therefore, an Environmental
Impact Statement will not be required.  Pending the results of a public review
of this document, the Bureau of Land Management (BLM) will prepare a formal
Decision Record.

Your comments should be as specific as possible.  Comments on the alternatives
presented and on the adequacy of the impact analysis will be accepted by BLM
until March 25, 2002.

Comments may be submitted via regular mail to:

                 Brenda Vosika Neuman, Project Manager
                     Bureau of Land Management
                        Rawlins Field Office
                           P.O. Box 2407
                        1300 North Third Street
                       Rawlins, Wyoming 82301

In the past, the BLM Rawlins Field Office allowed comments to be submitted via
electronic mail.  However, at this time we are unable to receive e-mail and
are uncertain as to when it may become available.  **To ensure that your
comments are considered, we asked that you do not send responses to the Cow
Creek Pod CBM Exploration Project EA electronically.**

2

Because the BLM website is currently unavailable to the public, a temporary website has been set up specifically for the Atlantic Rim CBM exploration projects at www.arcbm-ea.org.  If problems arise with the placement of the document on this temporary website, comments will be taken for a full 30-day period after the document is available on the web.

Please note that comments, including names, e-mail addresses, and street addresses of the respondents, will be available for public review and disclosure at the above address during regular business hours (7:45 a.m. to 4:30 p.m.), Monday through Friday, except holidays. Individual respondents may request confidentially.  If you wish to withhold your name, e-mail address, or street address from public review or from disclosure under the Freedom of Information Act, you must state this plainly at the beginning of your written comment.  Such requests will be honored to the extent allowed by law.  All submissions from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be made available for public inspection in their entirety.

Please retain this EA for future reference.  Hard copies of the EA may also be reviewed at the following locations:

    Bureau of Land Management            Bureau of Land Management
    Wyoming State Office                 Rawlins District Office
    5353 Yellowstone Road                1300 N. Third Street
    Cheyenne, Wyoming  82009             Rawlins, Wyoming  82301

If you require additional information regarding this project, please contact Brenda Vosika Neuman, Project Manager, at address shown above or phone (307) 328-4389.

                        Sincerely,

        ACTING  J. Clare Lisle

                        Field Manager

Enclosure

**Exhibit 17 to Defendant-Intervenors'
Supplemental Brief in Opposition to
Plaintiffs' Motion for a Preliminary Injunction
BLM Transmittal Letter - Sun Dog POD
Environmental Assessment**



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Rawlins Field Office
1300 North Third Street                                    In Reply Refer To:
P.O. Box 2407
Rawlins, Wyoming 82301-2407        1790


September 21, 2001


Re:   Sun Dog Pod Environmental Assessment


Dear Reader:

Enclosed, for your review and comment, is the Environmental Assessment (EA) for Petroleum Development Corporation's Sun Dog Pod coalbed methane exploration project. The project is located in one of nine areas proposed for interim drilling to provide information for use in the preparation of the Atlantic Rim Coalbed Methane Project Environmental Impact Statement. In order to satisfy the requirements of the National Environmental Policy Act, this EA was prepared to analyze impacts associated with the exploration of coalbed methane resources northeast of Baggs, in Carbon County, Wyoming.

Analysis of the environmental consequences has led to the determination that this proposed project, with the appropriate mitigating measures, will not have a significant effect on the human environment. Therefore, an Environmental Impact Statement will not be required. Pending the results of a public review of this document, the Bureau of Land Management (BLM) will prepare a formal Decision Record.

Your comments should be as specific as possible. Comments on the alternatives presented and on the adequacy of the impact analysis will be accepted by BLM until October 22, 2001. If problems arise with the placement of the document on the Wyoming BLM website, comments will be taken for a full 30-day period after the document is available on the web.

Comments may be submitted via regular mail to:

Brenda Vosika Neuman, Project Manager
Bureau of Land Management
Rawlins Field Office
P.O. Box 2407
1300 North Third Street
Rawlins, Wyoming 82301

or be submitted electronically (please refer to the Sun Dog Pod CBM Project) at:

e-mail:  rawlins_wymail@blm.gov

Please note that comments, including names, e-mail addresses, and street addresses of the respondents, will be available for public review and disclosure at the above address during regular business hours (7:45 a.m. to 4:30 p.m.), Monday through Friday, except holidays. Individual respondents may request confidentially. If you wish to withhold your name, e-mail address, or

2

street address from public review or from disclosure under the Freedom of Information Act, you must state this plainly at the beginning of your written comment.  Such requests will be honored to the extent allowed by law.  All submissions from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be made available for public inspection in their entirety.

Please retain this EA for future reference.  A copy of the EA has been sent to affected government agencies and to those who responded to scoping or otherwise indicated that they wished to receive a copy of the EA.  The EA may also be reviewed at the following locations:

      Bureau of Land Management      Bureau of Land Management
      Wyoming State Office      Rawlins District Office
      5353 Yellowstone Road      1300 N. Third Street
      Cheyenne, Wyoming  82009      Rawlins, Wyoming  82301

The document can also be viewed at Wyoming Bureau of Land Management homepage at www.wy.blm.gov.

If you require additional information regarding this project, please contact Brenda Vosika Neuman, Project Lead, at the above e-mail, street address, or by phoning (307) 328-4389.

      Sincerely,

      Field Manager

Enclosure

**Exhibit 18 to Defendant-Intervenors'**
**Supplemental Brief in Opposition to**
**Plaintiffs' Motion for a Preliminary Injunction**
**Excerpts From Decision Record and**
**Finding Of No Significant Impact for the**
**Atlantic Rim Coalbed Methane Project**
**Cow Creek Pod Environmental Assessment**



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Rawlins Field Office
1300 North Third Street
P.O. Box 2407
Rawlins, Wyoming 82301-2407

In Reply Refer To:

1790

June 26, 2002

Re:   Cow Creek Pod Coalbed Methane
Project

Dear Reader:

We are providing you a copy of the enclosed Decision Record for your
information and use.  This document identifies our decision regarding the
Cow Creek Pod Project and explains the rationale for reaching the decision.
Included with this document are the applicant-committed environmental
practices and protection measures and additional mitigation requirements for
the implementation of this project.

On February 15, 2002, we released the *Environmental Assessment for the
Atlantic Rim Coalbed Methane Project, Cow Creek Pod.*  The environmental
assessment was prepared in order to satisfy the requirements of the National
Environmental Policy Act, other regulations, and statutes to fully disclose
the potential environmental impacts of the alternatives (Proposed Action and
No Action) and to solicit public comment on them.  The assessment also
identified additional mitigation measures to further reduce potential impacts.

A copy of this decision has been sent to governmental entities, individuals,
and organizations who commented on this project.  We wish to thank individuals
and organizations who provided input throughout this analysis.

If you have any questions regarding this decision or need additional
information, please contact Brenda Vosika Neuman, Project Lead, at the address
shown above or phone (307) 328-4389.

Sincerely,

Kent Q. Kotter

Field Manager

Enclosure

# DECISION RECORD AND
## FINDING OF NO SIGNIFICANT IMPACT
## FOR THE
## ATLANTIC RIM COALBED METHANE PROJECT
## COW CREEK POD ENVIRONMENTAL ASSESSMENT

### INTRODUCTION

Double Eagle Petroleum and Mining Company (Double Eagle) of Casper, Wyoming, has notified the Bureau of Land Management (BLM), Rawlins Field Office, that the company proposes to explore and potentially develop coalbed methane (CBM) wells in the Cow Creek Project Area (CCPA) of the Atlantic Rim Project Area (ARPA) of southcentral Wyoming. The Cow Creek proposal is part of exploration drilling activities under consideration for the acquisition of data necessary to prepare the full-field Environmental Impact Statement (EIS) within the ARPA.

Because of the length of time necessary to complete the EIS, the operators asked the BLM to consider allowing some exploration drilling within the ARPA. On June 1, 2001, an Interim Drilling Policy (IDP) was sent to all operators participating in the proposal to develop CBM resources in the ARPA. The IDP was prepared by the Rawlins Field Office EIS Interdisciplinary Team, with recommendations from the BLM's Reservoir Management Group. The IDP was developed as a way to manage interim activities concurrently with EIS preparation. Prior to the development of any exploration activity, the IDP states that an environmental assessment will be prepared for all pods developed on federal acreage. Interim drilling activities will be monitored by the BLM to ensure that such activities do not significantly affect the environment, or prejudice decisions to be made as a result of the analysis to be conducted in the ARPA EIS.

This interim development project consists of drilling, completing, and producing a total of 14 exploratory CBM wells, 2 injection wells, access roads, a compressor station, and other related production and water disposal facilities in the project area. Four of these wells were previously analyzed in an environmental assessment (EA) completed by the Rawlins Field Office staff on December 14, 2000, and two existing oil and gas wells were approved for recompletion as CBM wells in 1997 and 1999 respectively. The Proposed Action of this EA consists of drilling, completing, and operating eight new productive CBM wells and related production and water disposal facilities. Initial operations are proposed to begin in spring/summer 2002. The total life of the project (LOP) is estimated at 10 to 15 years.

The CCPA is located in Township 16 North, Ranges 91-92 West, Carbon County, Wyoming. Access to the CCPA is provided by the two-lane paved Wyoming State Highway 789 (SH 789) north from Baggs, Wyoming, for approximately 22 miles to the intersection of Carbon County Road 608. The distance from SH 789 to the CCPA is approximately three miles. The CCPA encompasses approximately 2,050 acres, all of which are federal surface and federal mineral.

*Decision Record and FONSI - Atlantic Rim Coalbed Methane Project - Cow Creek Pod*

## ALTERNATIVES CONSIDERED

The *Environmental Assessment* (EA) *for the Atlantic Rim CBM Project, Cow Creek Pod*, analyzed two alternatives. Under the Proposed Action, eight wells would be drilled on federal lands administered by the BLM. The proposed CBM development is based on a Wyoming Oil and Gas Conservation Commission (WOGCC) approved 40-acre well spacing pattern. In addition to well sites, other facilities, such as access roads, gas gathering and water disposal pipelines, electrical utilities, and compressors, would be developed to facilitate natural gas (methane) production in the well fields. The interim project would develop over a 6 to 12 month period. The productive life of the project is estimated between 10 and 15 years.

Under the No Action Alternative, The BLM analyzed the impacts associated with the existing Little Snake River Conservation District (LSRCD) reservoir, two recompleted oil and gas wells, the four recently approved CBM wells, and an existing compressor station. This alternative provides a benchmark, enabling the decision-maker to compare the magnitude of environmental effects of the alternatives.

No other alternatives were considered because, in order to prevent significant impacts to the environment, the IDP limits the placement of CBM exploratory activities to areas where sensitive resources do not exist. Exploration activity was centered where the best geologic and hydrologic information could be obtained outside of these sensitive resource areas.

## DECISION

Based upon the analysis of the potential environmental impacts described in the *Environmental Assessment* (EA) *for the Atlantic Rim Coalbed Methane Project, Cow Creek Pod,* and in consideration of the public, industry, and governmental agency comments received during the environmental analysis process, the BLM approves the Proposed Action as described in Chapter 2 of the EA and associated errata (see Appendix A) for the drilling and construction of eight CBM wells and associated facilities within the CCPA. The decision incorporates the Project-Wide Mitigation Measures and Procedures identified in Appendix C, as modified, and the Conditions of Approval described in Appendices D and E.

## APPROVED PROJECT COMPONENTS

The decision authorizes the initiation of permit approvals for the following project components on BLM-administered federal lands and/or minerals within the project area, subject to the requirements identified in Appendices C, D and E.

- Development of 8 CBM wells located on federal lands within the project area with an initial total disturbance of 6.6 acres and a life-of-project disturbance of less than 0.04 acres.

- Construction of new access roads and facilities associated with CBM development including gas gathering pipelines, water discharge lines, and power lines that will be buried parallel to road rights-of-way. Estimated initial disturbance is 11.0 acres with a LOP disturbance of 5.52 acres.

- Construction of a new off-channel reservoir with an initial disturbance of 2.6 acres and a LOP disturbance of 2.6 acres.

*Decision Record and FONSI - Atlantic Rim Coalbed Methane Project - Cow Creek Pod*

**APPROVAL OF THE PROPOSED ACTION IS CONDITIONAL UPON THE FOLLOWING:**

- Implementation of the applicant-committed environmental practices and protection measures as described in Appendix C.

- Adherence to the Conditions of Approval described in Appendices D and E.

- Adherence to oil and gas lease and right-of-way grant stipulations.

**RATIONALE FOR THE DECISION**

The decision to approve the operator's proposed development was based on the following factors: 1) consistency with the land use and resource management plans; 2) national policy; 3) agency statutory requirements; 4) relevant resource and economic considerations; 5) application of measures to avoid or minimize environmental harm; 6) finding of no significant impact; and 7) public comments.

1.      **Consistency with Land Use and Resource Management Plans**

The Proposed Action is in conformance with the overall planning direction for the area. The objective for oil and gas management decisions described in the Great Divide Resource Management Plan, 1990, is to "provide opportunity for leasing, exploration, and development of oil and gas while protecting other resource values." The project also meets the objectives of the Lands Program which is to "support the goals and objectives of other resource programs for managing the BLM-administered public lands and respond to public demand for land use authorizations."

2.      **National Policy**

Private exploration and development of federal oil and gas leases is an integral part of the BLM oil and gas leasing program under the authority of the *Mineral Leasing Act of 1920* and the *Federal Land Policy and Management Act of 1976.* The United States continues to rely heavily on foreign energy sources. Oil and gas leasing is needed to encourage development of domestic oil and gas reserves to reduce the United States' dependence on foreign energy supplies. Therefore, the decision is consistent with national policy.

3.      **Agency Statutory Requirements**

The decision is consistent with all federal, state, and county authorizing actions required to implement the Proposed Action. All pertinent statutory requirements applicable to this proposal were considered, including informal consultation and formal conferencing with the U.S. Fish and Wildlife Service (USFWS).

4.      **Relevant Resource and Economic Considerations**

Environmental impacts from the pilot project to resources identified in the EA are minor and all deemed acceptable. The economic benefit is important due to the tax revenues generated from the development of natural gas.

*Decision Record and FONSI - Atlantic Rim Coalbed Methane Project - Cow Creek Pod*

5.      **Application of Measures to Avoid or Minimize Environmental Harm**

Federal environmental protection laws such as the *Clean Air Act,* the *Clean Water Act,* and the *Historic Preservation Act* apply to all lands and are included as part of the standard oil and gas lease terms. The adoption of the mitigation and monitoring measures identified in Chapters 2.0 of the project EA and contained in this Decision Record in Appendix C, and the Conditions of Approval found in Appendices D and E, represent practicable means to avoid or minimize environmental impacts.

6.      **Finding of No Significant Impact**

Based upon the review of the EA, the BLM has determined that the Proposed Action, with implementation of the protective measures identified in Appendices C, D and E, herein, would not cause a significant impact to the quality of the human, natural and physical environment. Therefore, an environmental impact statement is not necessary.

7.      **Public Comments**

Thirteen comment letters were received on the EA during the 30-day comment period that ended March 25, 2002. The following is a list of those responding to the request for public comment.

Office of Federal Land Policy
        Wyoming State Engineer's Office
        Wyoming Game and Fish Department
Oregon-California Trails Association
Petroleum Association of Wyoming
United States Fish and Wildlife Service
Forest Service
National Wildlife Federation
Biodiversity Associates
Tom Crull
Inter-Mountain Pipe Company
Harold Kemp
Double Eagle

The substantive comments are summarized and BLM's responses are found in Appendix B.

**APPEAL**

This decision is subject to appeal. Under BLM regulation, this decision is subject to administrative review in accordance with 43 CFR 3165. Any request for administrative review of this decision must include information required under 43 CFR 3165.3(b)(State Director Review), including all supporting documentation. Such a request must be filed in writing with the State Director, Bureau of Land Management, P.O. Box 1828, Cheyenne, WY, 82003 within 20 business days of the date this Decision Record is received or considered to have been received.

_____        June 26, 2002_____
Field Manager                                                                    Date

**APPENDIX B**

**SUMMARY OF EA COMMENTS AND
BLM RESPONSES**

*Decision Record and FONSI - Atlantic Rim Coalbed Methane Project - Cow Creek Pod*

# APPENDIX B
# SUMMARY OF EA COMMENTS AND BLM RESPONSES

The EA was released for a 30-day public review period on February 15, 2002. Thirteen comment letters were received on the EA. The letters have been reviewed to determine whether the information they provided would warrant a determination other than a Finding of No Significant Impact (FONSI). Substantive comments with responses are summarized below (in italics) with BLM responses to each immediately following the comment. The BLM would like to thank all commentors for taking time to review the EA and providing comments.

1.    **Wyoming Game and Fish Department**

   a.    *In regard to the Affected Environment section, Porter (1999) found that nearly all elk collared in the winter on Powder Rim moved to the Elkhead Mountains in Colorado during the summer. Only a few elk locations in Porter's study were recorded on Wyoming spring and fall ranges near Muddy Mountain and Brown's Hill.*

   This information has been added to the text, please see Appendix A of this Decision Record.

   b.    *Although we have not done specific studies to document mule deer migration routes in the project area, Porter (1999) presents data suggesting deer move through or near the project area. We have also recorded spring concentrations of deer that appear to move from across the main road between the project area and Highway 789, so increased traffic could have an effect on this probable migration area.*

   Based on current information, major mule deer migration routes are not known to pass through the Cow Creek Pod project area (page 3-21 of the EA). However, it is likely that mule deer utilize areas in and surrounding the project area, and crucial winter range for mule deer is identified on the west side of the project. Porter's study indicates that mule deer migration corridors may potentially occur in the area in or surrounding the Cow Creek pod. However, the study is not specific enough to determine exact locations of these corridors, and further studies need to be done to refine these areas.

   The most significant increase in traffic would occur during the construction phase of the project. Construction activities will be prohibited (unless an exception is granted) from November 15 through April 15, which will reduce the amount of traffic to the project area and, therefore, minimize impacts to wintering and migrating deer. Maintenance of the site would be allowed during this time, but the EA states that this would be limited to a visit to the well site every other day. This is not expected to increase traffic to levels beyond that which currently exists in the project area.

   c.    *The wildlife section states that big game species will not be impacted in the long-term since they will eventually habituate after the drilling stage is completed. While the well sites themselves are not an issue for the big game animals, the activities related to well maintenance activities could disturb big game species.*

   Studies referenced in the *Draft Continental Divide/Wamsutter II EIS* (CD/WII DEIS) concluded that pronghorn in the Rattlesnake Hills area of Wyoming avoided areas within 0.6 miles of drilling or well maintenance operations. Studies in Texas and New Mexico found this distance to be 0.5 miles. However, other studies cited in the document indicated

*Decision Record and FONSI - Atlantic Rim Coalbed Methane Project - Cow Creek Pod*

9.    **Biodiversity Associates**

a.    *Produced water will deplete aquifers and compromise the ability of aquifers and water table to recharge.  The EA notes that a complete aquifer drawdown analysis will be completed for the Atlantic Rim CBM EIS.  The failure to provide a complete analysis of aquifer drawdown in the Cow Creek EA constitutes a violation of NEPA.*

The Almond Formation coal seams, which are targeted for production, are classified as confined to semiconfined aquifers because they are bound by impervious to semipervious layers of shale and siltstone.  CBM test wells completed in the Almond Formation coal seams exhibited shut-in hydrostatic pressures indicative of flowing artesian conditions. Based on existing hydrogeologic information, groundwater in the Almond coal seams at the completion depths in the existing CBM wells is hydraulically isolated from shallow groundwater and surface water resources (page 3-14 of the EA).  This information was further confirmed by the water testing completed to satisfy the requirement of the USFWS that CBM produced water is not contributing to flows in the Colorado River system.  The USFWS has reviewed this information and, in a letter dated December 14, 2001, determined that, based on the isotopic analysis, the Sun Dog and Cow Creek Pods, if constructed as proposed, are not expected to result in a water depletion to the Colorado River basin.

The analysis presented in the EA concludes that lowering of the hydraulic pressure head in the coal seam may induce a slight leakage of water through semipervious shale layers; this leakage would be minimal and drawdown effects  would only become apparent after a significant period of time (page 4-8 of the EA).  Because drawdown is anticipated to be nonexistent to minimal during the life of this exploration project, no aquifer drawdown analysis will be completed; however, any information gathered through the monitoring required for the interim exploration project will be included in an aquifer drawdown analysis should full field development occur.

Also note that the proposed project is looking at methods that would enhance the recharge of shallow aquifers.  The aquifer recharge well will recharge the Lewis sands, at approximately 400 feet in depth.  In addition, some infiltration is expected from the existing LSRCD reservoir and the off-channel reservoir that could provide a shallow, beneficial water supply within the project area.

b.    *If the Cow Creek Pod project is implemented, it would violate NEPA (40 CFR 1506.1) because the Interim Drilling Policy and associated activities will significantly adversely affect the environment, and are inseparably linked to the Atlantic Rim CBM project, and would prejudice outcomes and alternatives of the subsequent EIS.  For example, the No Action alternative for the subsequent Atlantic Rim project EIS would be unavailable if these wells are already drilled.  Moreover, the implementation of this project violates NEPA because the BLM is segmenting the proposed projects.*

Implementation of this project, as well as all of the other exploration pods proposed in the Interim Drilling Policy, would still allow a No Action Alternative to be considered in the Atlantic Rim Coalbed Methane EIS.  The No Action Alternative does not mean no development.  The No Action Alternative means that a particular project would not take place.  It is highly unlikely that any type of development EIS would even be considered without first conducting exploration activities to obtain information to evaluate the potential for full development of the gas resource.  This approach is being taken in the Hanna Basin

*Decision Record and FONSI - Atlantic Rim Coalbed Methane Project - Cow Creek Pod*

(Hanna Draw and Seminoe Road projects). If exploration activities in both basins indicate that CBM is economically producible, a "No Action Alternative" does not mean no development. A No Action Alternative would be a denial of the proposal as described in the Proposed Action.

The purpose of preparing the Cow Creek Pod EA is to allow for exploration drilling and to gather data for the preparation of the Atlantic Rim Coalbed Methane EIS. This project, as well as others proposed, will help determine if and where commercial quantities of gas exist within the 310,335-acre project area. At this time, the proposal to develop a 3,880-well field is not reasonably foreseeable. No data are available to confirm that CBM resources can be economically developed in the Atlantic Rim Coalbed Methane Project Area. To develop an EIS and go forward with full field development without some exploration drilling in an area that is data poor would be very risky at best. Several responses received during scoping stated that full field CBM development should not go forward until some more information could be gathered. By allowing some exploratory wells to be drilled, the company will be able to confirm where and if methane gas exists in economic quantities and if production is economically feasible. This information will help in the development of alternatives as well as help in determining any mitigation that could be applied to reduce impacts should full field development become feasible. The 3,880 well number was used for the purpose of scoping and was derived solely by dividing 80 acre spacing into the total number of acres in the project area. Companies involved with this project stated during the scoping meetings that this well number is not reasonably foreseeable. Given the variability in the geologic setting and the fact that CBM is an unproven commodity in this area, developing 3,880 wells is not reasonably foreseeable. Should economic quantities of methane exist, the EIS will fully disclose impacts associated with the development of the Atlantic Rim Coalbed Methane Project.

c.   *The project violates FLPMA because it is outside the reasonably foreseeable development scenario of the RMP, which does not authorize such actions. The EA states that the BLM considers existing RMP oil and gas decisions to be adequate for CBM; however, the impacts associated with CBM development and production are dissimilar to conventional drilling.*

The RMP states the entire planning area is open to oil and gas leasing and does not make a distinction whether oil and gas development is "conventional" or otherwise. The minerals management program policy and goals described in the RMP are to provide the opportunity for leasing, exploration, and development of oil and gas while protecting other resource values. CBM-related activity is not unanticipated just because the RMP does not use the specific words "coalbed methane." "Methane" and "natural gas" are used interchangeably regardless of the source. No specific formation, bed, or seam was identified in the RMP as being suitable or unsuitable for oil and gas development. Natural gas production operations are very similar, and CBM development is no exception. The Development and production sequence described in the Oil and Gas Appendix in the Draft Environmental Impact Statement for the Medicine Bow-Divide Resource Management Plan (later the Great Divide RMP) describes typical development operations, even to the point that water may need to be removed during natural gas production. Therefore, even if CBM development has not been specifically mentioned, the activity is clearly consistent with the terms, conditions, and decisions of the approved plan or plan amendment [43 CFR 1601.0-5(b)].

d.   *The Atlantic Rim CBM area contains undeveloped lands of roadless and undeveloped qualities; however, the BLM has never performed an adequate wilderness inventory. By*

*failing to maintain an up-to-date inventory of resources, including potential wilderness areas, the Rawlins Field Office has violated FLPMA and other laws and regulations. The BLM must conduct an adequate inventory of the entire area before this project can be considered.*

The BLM wilderness review program stems from Section 603 of FLPMA. The BLM was directed to prepare an inventory of public lands and their resources, including the identification of areas having wilderness characteristics. Per Section 2(c) of the Wilderness Act of 1964, the BLM Rawlins District inventoried areas of at least 5,000 acres of land for potential wilderness character. Within the Atlantic Rim Coalbed Methane Project Area, the northern portion dropped out because of the existence of the checkerboard land pattern, because to be considered for a wilderness inventory unit the area must contain 5,000 acres of contiguous public lands. South of this checkerboard to an existing road north of Muddy Mountain in Township 13 was included in the Wild Horse Basin Initial Wilderness Inventory Unit. The conclusion from this inventory was that human activity and permanent manmade improvements throughout the area precluded it from having wilderness quality. The land pattern changes to the south of this road, and although some federal lands exist, the majority of the land is privately or state owned.

e.    *The Interim Drilling Policy is a violation of the Administrative Procedures Act. The policy constitutes a rule under 5 USC 551(4). The agency has the obligation to not only notify the public in the Federal Register of the a proposal to create a rule such as the Interim Drilling Policy, but also to solicit public comment under NEPA on the proposed rule.*

The definition of a rule according to the Administrative Procedures Act means, "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements, of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, cost, or accounting, or practices bearing on any of the foregoing."

We do not feel that the Interim Drilling Policy meets any part of this definition. The Interim Drilling Policy was developed to provide guidance in managing exploration activities while the environmental impact statement is being prepared.

f.    *The EA violated NEPA by failing to evaluate a reasonable range of alternatives. NEPA requires the BLM to "rigorously explore and objectively evaluate" all reasonable alternatives to proposed federal actions. The EA at page 2-22 states that, "Only alternatives addressing allowable actions specified in the Interim Drilling Policy are considered in this analysis, outside the Atlantic Rim EIS analysis. All other alternatives would only be considered in the Atlantic Rim (sic) EIS analysis. As a result, no alternatives to the project, other than the No Action Alternative, were considered in this analysis." Using the IDP as a means to restrict alternatives is invalid because the IDP itself is legally invalid. Even if the IDP were valid, it would not supersede the NEPA requirement to explore and evaluate a range of alternatives.*

The IDP is very important for providing guidance to the operators regarding exploration activities. The IDP identifies protective measures to comply with 40 CFR 1506.1, but other authorities, rules, regulations, and mitigation in the RMP, in addition to the IDP, played a role in determining where and what exploration activities could occur within the CCPA.

*Decision Record and FONSI - Atlantic Rim Coalbed Methane Project - Cow Creek Pod*

According to the H-1790-1, BLM NEPA Handbook, Chapter IV, Preparing Environmental Assessments, page IV-3, alternatives to the proposed action must consider and assess whenever there are unresolved conflicts involving alternative uses of available resources. "Public controversy or concern about a proposed action does not necessarily mean that alternatives must be analyzed." The Handbook raises the question whether there are reasonable alternatives for satisfying the need for the proposed action and will these alternatives have meaningful differences in environmental effects.

If there were other significant alternatives that the BLM did not consider, the public could have identified these in its comments. However, only one alternative was mentioned and that was the use of directional drilling to minimize the amount of surface disturbance. The rationale for not considering directional drilling in the Cow Creek Pod Project is outlined below in response 9z.

g.   *While the EA does address the cumulative impacts of all 200 interim wells, it does not address impacts from existing CBM development in the area or the impacts of the proposed Atlantic Rim Coalbed Methane Project. By failing to consider the effects of the Cow Creek Pod in conjunction with the effects of other proposed coalbed methane projects that are reasonably foreseeable, the BLM has violated NEPA.*

The matrix on page 4-32 of the EA, provided in the cumulative impact discussion, presents the cumulative impact areas for each resource impacted by the Cow Creek Pod Project. In general, two main factors determine whether other actions should be included as part of the cumulative impact analysis and they are location and timing of actions. The cumulative impact analysis must take into account the past, present, and future actions that overlap in time and location with the proposed action. So, in the case of the Cow Creek Pod Project, the project area does not contain, and no project component would disturb, any crucial winter range for elk; therefore, a cumulative impact discussion for this resource is not required. We agree that development of the pods in the 200-well program may impact the elk crucial winter range, but impacts on crucial winter range for elk will not be addressed until development of a proposed pod impacts this range. Table 4-3, page 4-32 of the EA, takes this approach by breaking down what resources may be cumulatively-affected by the implementation of the Cow Creek Pod Project. For example, the Laramie Air Basin is impacted by this project and is common to all pods, while water resources impacted by the Cow Creek Pod Project would occur only in the Muddy Creek watershed, in Pods 5, 7, and 8.

At this point, the proposal to develop a 3,880-well field is not reasonably foreseeable. At this time, there is no data available to confirm that CBM resources can be developed and produced in the Atlantic Rim CBM area. Implementation of the 200-well interim drilling program was designed to identify where CBM drilling may be economic and the number of wells at which the program becomes economic. The response to CBM drilling is likely to be much different throughout the 310,335-acre project area. It could be that only a small number of wells would be needed for full field development, that additional wells over and above the 3,880-well proposal would be required to economically develop the area or that much of the area cannot be economically developed. The only reasonably foreseeable activity at this time other than conventional uses, such as oil and gas drilling and ranching, is the 200-well proposal.

*Decision Record and FONSI - Atlantic Rim Coalbed Methane Project - Cow Creek Pod*

h.   *In a related matter, on page 4-11 of the EA, the BLM admits that, "in addition to the direct loss of habitat due to construction...disturbances from human activity and traffic would lower wildlife utilization of habitat immediately adjacent to these areas." The BLM admits that species that are sensitive to human disturbance would be impacted the most by construction activities.*

The analysis concludes that human activity would lower wildlife utilization of the project area during construction activities, but concludes that no long-term impacts are anticipated. Page 4-11 of the analysis states, "Construction, operation, and maintenance of the proposed CBM wells and associated facilities are expected to have minimal short-term effects on wildlife in the project area." It goes on to say, "Extensive suitable habitat for many species exist on lands adjacent to the Project Area and would support any individuals that may be temporarily displaced." It also states that only a very small proportion of the available wildlife habitat within the project area would be affected. After the construction phase is completed, the analysis on 4-11 states, "Many animals may become accustomed to equipment and facilities in the gas field and may once again use habitats adjacent to disturbance areas."

i.   *The EA, at page 4-15, recognizes that "greater sage-grouse can be impacted by other activities associated with CBM development including increased human activity, increased traffic disturbance, and pumping noise." The stipulation, described in the EA at page 2-23 to "restrict construction activity" during the nesting period, is vague and does not do anything to reduce or eliminate pump noise during this critical period. However, the EA, on page 4-15 states that impacts to greater sage-grouse is expected to be minimal. Any impact to the individuals should be considered an impact to a population and, therefore, must be considered unacceptable. Stipulations under the Proposed Action would protect lands within ¼-mile of a greater sage-grouse lek, but the habitat located next to the lek contains most of the nesting habitat. A two-mile buffer must be maintained around greater sage-grouse leks, within which surface-disturbing activities must not be allowed.*

Current policy is to protect the nesting activities of greater sage-grouse from February 1 to June 30, including strutting grounds and nesting habitat. The timing stipulation is applied to the area within a two-mile radius of an active lek. There are no plans to enforce a no surface occupancy stipulation within the two-mile radius of a greater sage-grouse lek.

j.   *No population data was collected on burrowing owls and Wyoming pocket gophers. Without accurate information on populations within the project area, the EA cannot determined that the proposed level of development would not impact the burrowing owl and the pocket gopher. A complete Biological Assessment including a systematic inventory for these species and supplemental NEPA documentation is required.*

Wyoming pocket gophers are found in meadows with loose soil. The type of vegetation in this pod is dominated by sagebrush and saltbush. Therefore, there is no potential habitat located within the pod, even though the EA mentions the possibility of occurrence. Burrowing owls do have the potential to occur within the project area; however, during prairie dog mapping, no burrowing owls were observed. The BLM raptor timing stipulations would also protect areas where burrowing owls are observed. At this time, the USFWS has not indicated that a Biological Assessment (BA) for the Cow Creek Pod project is required.

*Decision Record and FONSI - Atlantic Rim Coalbed Methane Project - Cow Creek Pod*

k.     *The CCPA includes a white-tailed prairie dog colony.  This species is declining throughout the West and may soon be added to the endangered species list.  The EA does not evaluate impacts of the proposed project on the white-tailed prairie dogs.  There are no estimates of size or trend of the colonies, nor are there mitigation measures to reduce impact to the species.*

Although the white-tailed prairie dog is on the BLM Sensitive Species list, it is not proposed for listing as a threatened and endangered species (T&E) and is not afforded any special protection through the Endangered Species Act.  Because it is on the BLM's Sensitive Species List, impacts to the white-tailed prairie dog are usually minimized by asking the operator to move the well, road, or other facility 50 meters from a prairie dog town.  This was done in the Cow Creek Pod project area when the access road to well site number 44-7 (section 7, T. 16 N., R. 91 W.) was moved 50 meters from a prairie dog town identified during on-site inspections.

l.     *The project area includes important winter range for elk, mule deer, and antelope.  Elk and mule deer are particularly sensitive to disturbance during winter.  Special provisions should be made to close roads and cease all activities associated with the project between November 15 and April 30.*

The only activities allowed in the area during this time period are maintenance related.  Again these are generally casual use type of activities which are similar to those conducted by hunters and other recreationists and are not anticipated to result in an increase in impacts from those of current users.

m.     *The EA states that produced water will be discharged into intermittent streams above existing collection reservoirs and into evaporation ponds.  The EA notes that infiltration from the LSRCD Reservoir and the off-channel reservoir would provide recharge to shallow aquifers.  The EA at page 4-7 categorizes this as a beneficial impact.  If the water is saline and alkaline, impacts to fish, amphibians, and invertebrates could be massive.  Several threatened and endangered fish species are present downstream from the Cow Creek Pod project.  A high level of clarity regarding potential impacts to T&E species is needed to determine if the Proposed Action would violate the Endangered Species Act and BLM's Sensitive Species policy.*

The EA, on page 4-16, states that no downstream flow is planned, but limited seepage from the dam does occur creating a wetted channel, which is a pre-existing, localized condition.  If there is measurable discharge occurring at this dam, it must be reported and a water sample taken.  All water reaching this point of compliance (POC) must meet the standards set by the State of Wyoming in the NPDES permit.  In addition, the WDEQ is requiring the POC standards to be protective of the quality standards of Class 2 or 3 waters and are calculated as 20 percent of the water quality standard.  All produced water will be discharged in a manner that it will be contained within the project area (C3-7 of the EA).  Overall, the project is not expected to impact T&E and fish species of concern downstream from the project area.

n.    *We would like to point out that in our previous comments we stated that the bonytail chub is found in Muddy Creek itself according to Deputy Director of the Wyoming Game and Fish Department Bill Wichers (in the April 22, 2001, Casper Star Tribune). The possibility of the existence of this species was blatantly ignored by the BLM in preparing this EA. In addition, the BLM procrastinates by stating that if T&E species are detected downstream, the Fish and Wildlife Service will be consulted and a protection plan will be developed at some later date. To meet its legal obligations under NEPA, the BLM must inventory for sensitive and T&E species downstream before the Decision Record is issued. Moreover, no specific plan for monitoring or surveying Muddy Creek or Little Snake is proposed.*

This question was asked in regard to the Sun Dog Pod and was answered in the Decision Record for that project issued December 21, 2002. The information presented in the newspaper was a misquote and the species does not exist in the Muddy Creek drainage. Because this species is not present, no discussion was presented in the Cow Creek Pod project EA.

o.    *Using the same sources as the BLM, we obtained a list of species of special concern. Upon comparing it to Appendix D in the EA, we noticed that the northern many-lined skink, the milk snake, Hooker wild buckwheat, and western phaecelia were wrongfully excluded. In addition, the plant species of concern and the reptile species of concern which the BLM determined may occur in the Cow Creek Pod project area were not addressed in the body of the EA.*

The concerns you brought up regarding sensitive species you feel should be on, but not shown on the BLM sensitive species list, are outside of the scope of this project.

p.    *Disturbance estimates presented in the EA are misleading. The total acreage disturbed is actually much greater because roads and pipelines are crisscrossed throughout the pod. The total effects of fragmentation and other indirect effects of this road/pipeline system must be included in the disturbance estimates. In particular, the effects of roads on wintering ungulates have been understated. Researchers have found that effects of roads on elk in similar habitats extend 2.5 km from each road.*

Our estimates are based on actual disturbance to the surface of the land from the project components. The EA describes, on page 4-13, how the project will result in some direct loss of habitat and forage and that disturbance of big game species during the parturition period and on winter range can increase stress and may influence species distribution. The actual acreage of big game habitat that becomes unusable as a result of this project can only be determined after site-specific research has been conducted over a period of several years. These types of wildlife studies would be part of the subsequent NEPA analysis should full-field development prove feasible. Impacts to elk from roads associated with the Cow Creek Pod project are expected to be minimal given the small amount of disturbance (0.004% of that range type in the Sierra Madre Herd Unit) and the available undisturbed habitats. In addition, the EA, at page 4-14, states some studies have also found "elk do become easily conditioned to patterned human activity."

q.    *The EA should include all possible measures to prevent adverse environmental impacts. For example, all reserve pits should be lined, regardless of soil permeability, and no construction should take place within 500 feet of surface water or riparian areas.*

*Decision Record and FONSI - Atlantic Rim Coalbed Methane Project - Cow Creek Pod*

Whether or not to line a reserve pit is determined on a case-by-case basis. If soils are gravelly or sandy the pit will likely be lined; however, in clayey soils, pit lining may not be required. Soils in the CCPA tend to be clayey, and no recommendation was made to line these pits.

The requirement you cite to limit construction activities within 500 feet of surface water or riparian areas is found in Appendix A, Standard Mitigation Guidelines for Surface Disturbing Activities, Great Divide RMP. However, the BLM realizes that some linear project components, such as roads and pipelines, may not be able to avoid all of these surface water features. Within the Cow Creek Pod project area, the access road through the project area will cross two ephemeral streams. The Conditions of Approval for the Cow Creek Pod project explain the culvert design that will be required for these crossings in order to protect stream values.

r.    *The EA does not provide adequate analysis of the possibility of subsidence and earthquakes due to ground water drawdown and degasification at the coal seam.*

Due to the lack of active faults, it is highly unlikely that a CBM program would result in enough change to trigger the tectonic stresses required to create an earthquake. In CBM, the seam is not totally dewatered; the water is removed enough to reduce the pressures in the coal to allow gas to flow. Complete aquifer dewatering, not simply a reduction in the static water level, would be necessary to allow enough aquifer media compression to create subsidence.

s.    *The EA does not disclose the extent of hydraulic fracturing inherent to the project, nor the effects of toxic fracturing fluids on groundwater or other resources. It is well-known that fracturing is a common practice in CBM extraction and that the fracturing fluids include a number of highly toxic substances.*

Hydraulic fracturing is a process in which sand within a viscous fluid is injected into a reservoir in order to improve the reservoir productivity. The viscosity is required to carry the sand and to limit leak-off into the formation permeability. Enzymes reduce the viscosity in the formation to that of water and the fluid is easily produced back. The primary fluid used for the hydraulic process is water and, in the case of a single-phase or water-saturated system like coal, essentially all of the fracturing water is produced back during the initial dewatering phase. Therefore, there is a very low probability of any impact due to hydraulic fracturing. This conclusion is further verified by the Ground Water Protection Council's survey of 10,000 coalbed methane wells and the State of Alabama and the EPA analysis of the well in the LEAF vs EPA lawsuit that showed no contamination (Testimony of the Independent Petroleum Association of America and the National Stripper Well Association before the Environmental Protection Agency regarding Underground Injection Control, August 25, 2000).

t.    *It is imperative that reclamation requirements include stipulations that clearly mandate the use of native species for reseeding purposes. Exotic species such as crested wheat grass and kosha are especially deleterious and must be excluded from reseeded lands.*

Disturbed areas would be seeded and stabilized in accordance with BLM-approved reclamation guidelines (page 2-23 of the EA). The reclamation plan for the Cow Creek area is described in the Master Surface Use Plan, Appendix D, which shows the seed mix and COAs that must be met for construction and reclamation of this project.

u.    *The effects of the project on biological soil crusts have not been examined. These soil crusts, consisting of bryophytes, cyanobacteria, fungi, lichens, and mosses, fulfill an important role in desert ecosystems, effectively increasing soil temperature and rainfall absorption while preventing runoff and attendant erosion. Even after reclamation efforts, biological soil crusts will take decades to recolonize disturbed sites.*

The EA, on page 4-4, recognizes that stripping of the topsoil during construction activities associated with the Cow Creek Pod project would result in loss of soil structure, mixing of various textures, and the solution of surface organic matter and subsequently soil biota. Because the project will only disturb 20.2 acres and, with the use of proper construction and reclamation techniques and implementation of mitigation described in Chapter 2 of the EA, the analysis concludes that impacts to soil resources in the project area would be minimal.

v.    *The EA mentions that a 500-foot buffer of vegetation will be maintained between surface disturbances and drainage channels "where possible." It is always possible to maintain such a buffer; the BLM should eliminate all ambiguity and make this stipulation an ironclad requirement.*

This is a standard operating procedure that is evaluated and implemented at the time of construction by the BLM on a case-by-case basis. While the BLM will attempt to implement this mitigation measure, in some cases there might be an advantage to constructing a road inside of the 500-foot buffer where locating the road outside of 500 feet may result in greater impacts to other resources that may be present (e.g., T&E habitat, cultural resources).

w.    *Any reserve pit must always be lined with impermeable fabric because they will contain hazardous chemicals. It is not sufficient to assume that some soils and bedrock will prevent leakage from reserve pits; the BLM has no way of guaranteeing that no leakage will occur.*

Page 2-22 of the EA states that subsoil material of the pit will be inspected to assess soil stability and permeability and based on the results of this analysis, reinforcement or a lining may be required. The reserve pits will be constructed according to WOGCC and BLM requirements.

x.    *Muddy Creek already has unacceptably high levels of sodium and sediment due to human activities such as grazing, road building, and oil and gas development. The presence of sensitive warm water fisheries in this stream militates against any action that will increase the alkalinity and turbidity of the stream.*

The components of this project reflect Management Objectives described in the RMP to reduce salt loading in watersheds that lie within the Colorado River Basin. Although Double Eagle is allowed to surface discharge water resulting from CBM production in the Cow Creek Pod, it was the one exception. In addition, the amount of sodium that Double Eagle is allowed to discharge is restricted under its approved NPDES permit, and all water discharge is to be contained within the project area. The requirement to inject produced water for all other projects proposed by CBM operators located in the Colorado River Basin System will reduce salt and sediment loading caused by the development of this exploration project that might have occurred if surface disposal was allowed.

*Decision Record and FONSI - Atlantic Rim Coalbed Methane Project - Cow Creek Pod*

The Muddy Creek Coordinated Resource Management Group has worked since 1990 to improve the Muddy Creek watershed using a variety of techniques including changes in season of use, pasture rotation, placement of in-stream structures, changes in road use, and planting along riparian corridors, to improve water quality, reduce erosion and sedimentation, restore riparian habitats, and improve critical ranges for antelope, deer, and elk.

y.      *The EA has noted that most of the soils in the project area have a poor to fair potential for revegetation. Thus, it is crucial that surface disturbance be minimized in this area, resulting in the No Action Alternative as preferable.*

As stated in the Master Surface Use Plan, revegetation efforts will comply with BLM specifications. The seed mixture, fertilizer and mulching requirements, seeding depth, and seed drilling specifications will be developed in consultation with the BLM. The Master Surface Use Plan states that the soils have good reclamation potential provided the hydrologic hazard of water erosion is mitigated through use of water breaks and drainage structures in recontoured areas (Appendix D, page 12).

z.      *The BLM needs to evaluate a minimum footprint alternative that would require wells to be clustered and employ directional drilling techniques to minimize the creation of new roads, well pads, and other surface disturbances. Ecological advantages of clustered horizontal wells are well-documented. By requiring cluster development, the BLM can minimize the environmental damage that will occur if coalbed methane development is allowed to proceed. The economic feasibility of directional drilling is also well documented.*

There are several reasons why horizontal/direction drilling would be difficult in the CCPA.

First we need to look at the seams that will be produced. There are three major groups of coal being targeted for methane production in the project area. The Garden Gulch coals are quite thin and discontinuous. These consist of 8 to 12 coal seams per well ranging in thickness of 1 to 4 feet. These seams do not correlate over long distances. The Almond coals are made up of three subgroups of coals, with 8 to 12 seams ranging in thickness from 1 to 10 feet. Some Almond coal seams correlated between wells over long distances, but there are still a high number of seams or riders that do no correlate from well to well. Finally, the Allen Ridge coals are quite thin and discontinuous, with 6 to 10 seams per well, averaging 2 feet in thickness. Thin or discontinuous target zones are poor prospects for horizontal drilling.

In addition, horizontal drilling technology requires precise control of target locations in all three dimensions. Even the thickest coal seams in the project area are below the vertical resolution of current seismic technology and, therefore, yield no target control for lateral drilling. This being the case, without the knowledge of where the coal seams pinch out or end, horizontal drilling would not produce the desired results. In addition, it would be impossible to stay in coal seams during lateral drilling due to the limited control and limited thickness of the coal seams.

It would not be economical to drill laterals in thinner seam coals. Potentially up to 24 coal seams would have to be developed per well; i.e., 24 laterals would need to be drilled to develop all seams. Also, horizontal laterals would not be economical in thin seams, even if adequate control was available, as the cost of each lateral would exceed the return on ultimate gas recovery. Thin, uneconomic zones would not be produced if horizontal

*Decision Record and FONSI - Atlantic Rim Coalbed Methane Project - Cow Creek Pod*

techniques were required; this could lead to economic failure of the entire project because of the gas contribution available in the thin seams. In conventional drilling, these seams would contribute to overall production, therefore maximizing the recovery of the gas resource.

The coal seams are quite shallow in most of this project area, and this would limit the distance that could be drilled from the surface location. Also, there would not be adequate forces in a shallow well to drill the necessary lateral distance to gain desired advantage of increased drainage area. Short horizontal laterals would not significantly increase the drainage area compared to vertical well bores; horizontal drainage patterns would be on the order of only a quarter section or so.

The only economic horizontal coal programs currently active are used to vent methane in front of coal mining operations where it is required to drain coal seams of significant thickness (greater than six feet) as quickly as possible for the safety of miners.

The advantages in using vertical wells include maximizing the production of gas resources from all coal seams present in the well bore, regardless of the thickness or seam discontinuity of the coals. Vertical well bores may ultimately have the same drainage areas due to the true vertical depth of the coal seams.

## 10.    NATIONAL WILDLIFE FEDERATION

a.    *The Environmental Assessment for the Cow Creek Pod CBM Project violates the National Environmental Policy Act because it relies on the BLM's Interim Drilling Policy. Under BLM Rules, the Interim Drilling Policy should have been subject to NEPA.*

The Council on Environmental Quality (CEQ) regulations at 40 CFR 1506.1 discuss the requirements that must be met to allow limited activities during the preparation of an EIS. The Interim Drilling Policy (IDP) was prepared to guide exploratory oil and gas activities and to notify the operators what requirements would be necessary to keep activities at a reasonable level during the preparation of the EIS while allowing the gathering of data necessary for the completion of the environmental analysis. The IDP is neither a decision nor an action. The IDP requires that no surface-disturbing activity will be allowed until a NEPA document has been completed and a Finding of No Significant Impact is made.

The IDP is a policy to guide activity while collecting data to conduct an environmental analysis. Sporadic CBM drilling had occurred on the lands in the project area, but no real beneficial information had come from these wells.

The IDP describes the "conditions and criteria" that will determine what and where exploration activities may be considered. Those exploration activities constitute "the action" and are subject to NEPA analysis. The IDP itself states, "Prior to initiating interim drilling, an Environmental Assessment, including a detailed Water Management Plan will be prepared and approved for each individual pod."

**Exhibit 19 to Defendant-Intervenors'**
**Supplemental Brief in Opposition to**
**Plaintiffs' Motion for a Preliminary Injunction**
**U.S. EPA and U.S. Army Corps of Engineers**
**Jun. 2007 Guidance Memorandum Implementing the**
**Supreme Court's Decision in the Consolidated Cases**
***Rapanos v. United States*** **and** ***Carabell v. United States***
**("*Rapanos* Guidance")**





# Clean Water Act Jurisdiction
## Following the U.S. Supreme Court's Decision
## in
## Rapanos v. United States & Carabell v. United States

This memorandum provides guidance to EPA regions and U.S. Army Corps of Engineers ["Corps"] districts implementing the Supreme Court's decision in the consolidated cases <u>Rapanos v. United States</u> and <u>Carabell v. United States</u>[1] (herein referred to simply as "<u>Rapanos</u>") which address the jurisdiction over waters of the United States under the Clean Water Act.[2]  The chart below summarizes the key points contained in this memorandum. This reference tool is not a substitute for the more complete discussion of issues and guidance furnished throughout the memorandum.

---

### Summary of Key Points

**The agencies will assert jurisdiction over the following waters:**
- **Traditional navigable waters**
- **Wetlands adjacent to traditional navigable waters**
- **Non-navigable tributaries of traditional navigable waters that are relatively permanent where the tributaries typically flow year-round or have continuous flow at least seasonally (e.g., typically three months)**
- **Wetlands that directly abut such tributaries**

**The agencies will decide jurisdiction over the following waters based on a fact-specific analysis to determine whether they have a significant nexus with a traditional navigable water:**
- **Non-navigable tributaries that are not relatively permanent**
- **Wetlands adjacent to non-navigable tributaries that are not relatively permanent**
- **Wetlands adjacent to but that do not directly abut a relatively permanent non-navigable tributary**

**The agencies generally will not assert jurisdiction over the following features:**
- **Swales or erosional features (e.g., gullies, small washes characterized by low volume, infrequent, or short duration flow)**
- **Ditches (including roadside ditches) excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water**

**The agencies will apply the significant nexus standard as follows:**
- **A significant nexus analysis will assess the flow characteristics and functions of the tributary itself and the functions performed by all wetlands adjacent to the tributary to determine if they significantly affect the chemical, physical and biological integrity of downstream traditional navigable waters**
- **Significant nexus includes consideration of hydrologic and ecologic factors**

---

[1]  126 S. Ct. 2208 (2006).
[2]  33 U.S.C. §1251 <u>et seq</u>.

<u>Background</u>

Congress enacted the Clean Water Act ("CWA" or "the Act") "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[3]  One of the mechanisms adopted by Congress to achieve that purpose is a prohibition on the discharge of any pollutants, including dredged or fill material, into "navigable waters" except in compliance with other specified sections of the Act.[4]  In most cases, this means compliance with a permit issued pursuant to CWA §402 or §404.  The Act defines the term "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source[,]"[5] and provides that "[t]he term 'navigable waters' means the waters of the United States, including the territorial seas." [6]

In <u>Rapanos</u>, the Supreme Court addressed where the Federal government can apply the Clean Water Act, specifically by determining whether a wetland or tributary is a "water of the United States."  The justices issued five separate opinions in <u>Rapanos</u> (one plurality opinion, two concurring opinions, and two dissenting opinions), with no single opinion commanding a majority of the Court.

<u>The Rapanos Decision</u>

Four justices, in a plurality opinion authored by Justice Scalia, rejected the argument that the term "waters of the United States" is limited to only those waters that are navigable in the traditional sense and their abutting wetlands.[7]  However, the plurality concluded that the agencies' regulatory authority should extend only to "relatively permanent, standing or continuously flowing bodies of water" connected to traditional navigable waters, and to "wetlands with a continuous surface connection to" such relatively permanent waters.[8]

Justice Kennedy did not join the plurality's opinion but instead authored an opinion concurring in the judgment vacating and remanding the cases to the Sixth Circuit Court of Appeals.[9]  Justice Kennedy agreed with the plurality that the statutory term "waters of the United States" extends beyond water bodies that are traditionally considered navigable.[10]  Justice Kennedy, however, found the plurality's interpretation of the scope of the CWA to be "inconsistent with the Act's text, structure, and purpose[,]" and he instead presented a different standard for evaluating CWA jurisdiction over

---

[3]   33 U.S.C. § 1251(a).

[4]   33 U.S.C. § 1311(a), §1362(12)(A).

[5]   33 U.S.C. § 1362(12)(A).

[6]   33 U.S.C. § 1362(7).  <u>See</u> <u>also</u> 33 C.F.R. § 328.3(a) and 40 C.F.R. § 230.3(s).

[7]   <u>Id</u>. at 2220.

[8]   <u>Id</u>. at 2225-27.

[9]   <u>Id</u>. at 2236-52.  While Justice Kennedy concurred in the Court's decision to vacate and remand the cases to the Sixth Circuit, his basis for remand was limited to the question of "whether the specific wetlands at issue possess a significant nexus with navigable waters."  126 S. Ct. at 2252.  In contrast, the plurality remanded the cases to determine both "whether the ditches and drains near each wetland are 'waters,'" <u>and</u> "whether the wetlands in question are 'adjacent' to these 'waters' in the sense of possessing a continuous surface connection…."  <u>Id</u>. at 2235.

[10]  <u>Id</u>. at 2241.

wetlands and other water bodies.[11]  Justice Kennedy concluded that wetlands are "waters of the United States" "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'  When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'"[12]

Four justices, in a dissenting opinion authored by Justice Stevens, concluded that EPA's and the Corps' interpretation of "waters of the United States" was a reasonable interpretation of the Clean Water Act.[13]

When there is no majority opinion in a Supreme Court case, controlling legal principles may be derived from those principles espoused by five or more justices.[14] Thus, regulatory jurisdiction under the CWA exists over a water body if either the plurality's or Justice Kennedy's standard is satisfied.[15]  Since Rapanos, the United States has filed pleadings in a number of cases interpreting the decision in this manner.

The agencies are issuing this memorandum in recognition of the fact that EPA regions and Corps districts need guidance to ensure that jurisdictional determinations, permitting actions, and other relevant actions are consistent with the decision and supported by the administrative record.  Therefore, the agencies have evaluated the Rapanos opinions to identify those waters that are subject to CWA jurisdiction under the reasoning of a majority of the justices. This approach is appropriate for a guidance document. The agencies intend to more broadly consider jurisdictional issues, including clarification and definition of key terminology, through rulemaking or other appropriate policy process.

---

[11] Id. at 2246.

[12] Id. at 2248.  Chief Justice Roberts wrote a separate concurring opinion explaining his agreement with the plurality.  See 126 S. Ct. at 2235-36.

[13] Id. at 2252-65.  Justice Breyer wrote a separate dissenting opinion explaining his agreement with Justice Stevens' dissent.  See 126 S. Ct. at 2266.

[14] See Marks v. United States, 430 U.S. 188, 193-94 (1977); Waters v. Churchill, 511 U.S. 661, 685 (1994) (Souter, J., concurring) (analyzing the points of agreement between plurality, concurring, and dissenting opinions to identify the legal "test … that lower courts should apply," under Marks, as the holding of the Court); cf. League of United Latin American Citizens v. Perry, 126 S. Ct. 2594, 2607 (2006) (analyzing concurring and dissenting opinions in a prior case to identify a legal conclusion of a majority of the Court); Alexander v. Sandoval, 532 U.S. 275, 281-282 (2001) (same).

[15] 126 S. Ct. at 2265 (Stevens, J., dissenting) ("Given that all four justices who have joined this opinion would uphold the Corps' jurisdiction in both of these cases – and in all other cases in which either the plurality's or Justice Kennedy's test is satisfied – on remand each of the judgments should be reinstated if either of those tests is met.") (emphasis in original).

<u>Agency Guidance</u>[16]

To ensure that jurisdictional determinations, administrative enforcement actions, and other relevant agency actions are consistent with the <u>Rapanos</u> decision, the agencies in this guidance address which waters are subject to CWA § 404 jurisdiction.[17] Specifically, this guidance identifies those waters over which the agencies will assert jurisdiction categorically and on a case-by-case basis, based on the reasoning of the <u>Rapanos</u> opinions.[18]   EPA and the Corps will continually assess and review the application of this guidance to ensure nationwide consistency, reliability, and predictability in our administration of the statute.

## *1. Traditional Navigable Waters (i.e., "(a)(1) Waters") and Their Adjacent Wetlands*

---

**Key Points**

- **The agencies will assert jurisdiction over traditional navigable waters, which includes all the waters described in 33 C.F.R. § 328.3(a)(1), and 40 C.F.R. § 230.3 (s)(1).**
- **The agencies will assert jurisdiction over wetlands adjacent to traditional navigable waters, including over adjacent wetlands that do not have a continuous surface connection to traditional navigable waters.**

---

EPA and the Corps will continue to assert jurisdiction over "[a]ll waters which are currently used, or were used in the past, or may be susceptible to use in interstate or

---

[16]  The CWA provisions and regulations described in this document contain legally binding requirements. This guidance does not substitute for those provisions or regulations, nor is it a regulation itself.  It does not impose legally binding requirements on EPA, the Corps, or the regulated community, and may not apply to a particular situation depending on the circumstances.  Any decisions regarding a particular water will be based on the applicable statutes, regulations, and case law.  Therefore, interested persons are free to raise questions about the appropriateness of the application of this guidance to a particular situation, and EPA and/or the Corps will consider whether or not the recommendations or interpretations of this guidance are appropriate in that situation based on the statutes, regulations, and case law.

[17]  This guidance focuses only on those provisions of the agencies' regulations at issue in <u>Rapanos</u> -- 33 C.F.R. §§ 328.3(a)(1), (a)(5), and (a)(7); 40 C.F.R. §§ 230.3(s)(1), (s)(5), and (s)(7).  This guidance does not address or affect other subparts of the agencies' regulations, or response authorities, relevant to the scope of jurisdiction under the CWA.  In addition, because this guidance is issued by both the Corps and EPA, which jointly administer CWA § 404, it does not discuss other provisions of the CWA, including §§ 311 and 402, that differ in certain respects from § 404 but share the definition of "waters of the United States."  Indeed, the plurality opinion in <u>Rapanos</u> noted that "… there is no reason to suppose that our construction today significantly affects the enforcement of §1342 … The Act does not forbid the 'addition of any pollutant *directly* to navigable waters from any point source,' but rather the 'addition of any pollutant *to* navigable waters.'" (emphasis in original) 126 S. Ct. 2208, 2227.  EPA is considering whether to provide additional guidance on these and other provisions of the CWA that may be affected by the <u>Rapanos</u> decision.

[18]  In 2001, the Supreme Court held that use of "isolated" non-navigable intrastate waters by migratory birds was not by itself a sufficient basis for the exercise of federal regulatory jurisdiction under the CWA. <u>See</u> <u>Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of Engineers</u>, 531 U.S. 159 (2001).  This guidance does not address <u>SWANCC</u>, nor does it affect the Joint Memorandum regarding that decision issued by the General Counsels of EPA and the Department of the Army on January 10, 2003.  <u>See</u> 68 Fed. Reg. 1991, 1995 (Jan. 15, 2003).

foreign commerce, including all waters which are subject to the ebb and flow of the tide."[19] These waters are referred to in this guidance as traditional navigable waters.

The agencies will also continue to assert jurisdiction over wetlands "adjacent" to traditional navigable waters as defined in the agencies' regulations. Under EPA and Corps regulations and as used in this guidance, "adjacent" means "bordering, contiguous, or neighboring." Finding a continuous surface connection is not required to establish adjacency under this definition. The Rapanos decision does not affect the scope of jurisdiction over wetlands that are adjacent to traditional navigable waters because at least five justices agreed that such wetlands are "waters of the United States."[20]

## 2. Relatively Permanent Non-navigable Tributaries of Traditional Navigable Waters and Wetlands with a Continuous Surface Connection with Such Tributaries

---

**Key Points**

- **The agencies will assert jurisdiction over non-navigable tributaries of traditional navigable waters that are relatively permanent where the tributaries typically flow year-round or have continuous flow at least seasonally (e.g., typically three months).**
- **The agencies will assert jurisdiction over those adjacent wetlands that have a continuous surface connection to such tributaries (e.g., they are not separated by uplands, a berm, dike, or similar feature.)**

---

A non-navigable tributary[21]of a traditional navigable water is a non-navigable water body whose waters flow into a traditional navigable water either directly or indirectly by means of other tributaries. Both the plurality opinion and the dissent would uphold CWA jurisdiction over non-navigable tributaries that are "relatively permanent" – waters that typically (e.g., except due to drought) flow year-round or waters that have a

---

[19]   33 C.F.R. § 328.3(a)(1); 40 C.F.R. § 230.3(s)(1). The "(a)(1)" waters include all of the "navigable waters of the United States," defined in 33 C.F.R. Part 329 and by numerous decisions of the federal courts, plus all other waters that are navigable-in-fact (e.g., the Great Salt Lake, UT and Lake Minnetonka, MN).

[20]   Id. at 2248 (Justice Kennedy, concurring) ("As applied to wetlands adjacent to navigable-in-fact waters, the Corps' conclusive standard for jurisdiction rests upon a reasonable inference of ecologic interconnection, and the assertion of jurisdiction for those wetlands is sustainable under the Act by showing adjacency alone.").

[21] A tributary includes natural, man-altered, or man-made water bodies that carry flow directly or indirectly into a traditional navigable water. Furthermore, a tributary, for the purposes of this guidance, is the entire reach of the stream that is of the same order (i.e., from the point of confluence, where two lower order streams meet to form the tributary, downstream to the point such tributary enters a higher order stream). The flow characteristics of a particular tributary will be evaluated at the farthest downstream limit of such tributary (i.e., the point the tributary enters a higher order stream). It is reasonable for the agencies to treat the stream reach as a whole in light of the Supreme Court's observation that the phrase "navigable waters" generally refers to "rivers, streams, and other hydrographic features." 126 S. Ct. at 2222 (Justice Scalia, quoting Riverside Bayview, 474 U.S. at 131). The entire reach of a stream is a reasonably identifiable hydrographic feature. The agencies will also use this characterization of tributary when applying the significant nexus standard under Section 3 of this guidance.

---

continuous flow at least seasonally (e.g., typically three months).[22]    Justice Scalia emphasizes that relatively permanent waters do not include tributaries "whose flow is 'coming and going at intervals ... broken, fitful.'"[23]    Therefore, "relatively permanent" waters do not include ephemeral tributaries which flow only in response to precipitation and intermittent streams which do not typically flow year-round or have continuous flow at least seasonally. However, CWA jurisdiction over these waters will be evaluated under the significant nexus standard described below.  The agencies will assert jurisdiction over relatively permanent non-navigable tributaries of traditional navigable waters without a legal obligation to make a significant nexus finding.

In addition, the agencies will assert jurisdiction over those adjacent wetlands that have a continuous surface connection with a relatively permanent, non-navigable tributary, without the legal obligation to make a significant nexus finding.  As explained above, the plurality opinion and the dissent agree that such wetlands are jurisdictional.[24] The plurality opinion indicates that "continuous surface connection" is a "physical connection requirement."[25]    Therefore, a continuous surface connection exists between a wetland and a relatively permanent tributary where the wetland directly abuts the tributary (e.g., they are not separated by uplands, a berm, dike, or similar feature).[26]

---

[22]    See 126 S. Ct. at 2221 n. 5 (Justice Scalia, plurality opinion) (explaining that "relatively permanent" does not necessarily exclude waters "that might dry up in extraordinary circumstances such as drought" or "seasonal rivers, which contain continuous flow during some months of the year but no flow during dry months").

[23]    Id. (internal citations omitted).

[24]    Id. at 2226-27 (Justice Scalia, plurality opinion).

[25]    Id. at 2232 n.13 (referring to "our physical-connection requirement" and later stating that Riverside Bayview does not reject "the physical-connection requirement") and 2234 ("Wetlands are 'waters of the United States' if they bear the 'significant nexus' of physical connection, which makes them as a practical matter *indistinguishable* from waters of the United States.") (emphasis in original).  See also 126 S. Ct. at 2230 ("adjacent" means "physically abutting") and 2229 (citing to Riverside Bayview as "confirm[ing] that the scope of ambiguity of 'the waters of the United States' is determined by a wetland's *physical connection* to covered waters…") (emphasis in original). A continuous surface connection does not require surface water to be continuously present between the wetland and the tributary.  33 C.F.R. § 328.3(b) and 40 C.F.R. § 232.2 (defining wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support … a prevalence of vegetation typically adapted for life in saturated soil conditions").

[26]    While all wetlands that meet the agencies' definitions are considered adjacent wetlands, only those adjacent wetlands that have a continuous surface connection because they directly abut the tributary (e.g., they are not separated by uplands, a berm, dike, or similar feature) are considered jurisdictional under the plurality standard.

### 3. Certain Adjacent Wetlands and Non-navigable Tributaries That Are Not Relatively Permanent

---

**Key Points**

- The agencies will assert jurisdiction over non-navigable, not relatively permanent tributaries and their adjacent wetlands where such tributaries and wetlands have a significant nexus to a traditional navigable water.
- A significant nexus analysis will assess the flow characteristics and functions of the tributary itself and the functions performed by any wetlands adjacent to the tributary to determine if they significantly affect the chemical, physical and biological integrity of downstream traditional navigable waters.
- "Similarly situated" wetlands include all wetlands adjacent to the same tributary.
- Significant nexus includes consideration of hydrologic factors including the following:
  - volume, duration, and frequency of flow, including consideration of certain physical characteristics of the tributary
  - proximity to the traditional navigable water
  - size of the watershed
  - average annual rainfall
  - average annual winter snow pack
- Significant nexus also includes consideration of ecologic factors including the following:
  - potential of tributaries to carry pollutants and flood waters to traditional navigable waters
  - provision of aquatic habitat that supports a traditional navigable water
  - potential of wetlands to trap and filter pollutants or store flood waters
  - maintenance of water quality in traditional navigable waters
- The following geographic features generally are not jurisdictional waters:
  - swales or erosional features (e.g. gullies, small washes characterized by low volume, infrequent, or short duration flow)
  - ditches (including roadside ditches) excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water

---

The agencies will assert jurisdiction over the following types of waters when they have a significant nexus with a traditional navigable water: (1) non-navigable tributaries that are not relatively permanent,[27] (2) wetlands adjacent to non-navigable tributaries that are not relatively permanent, and (3) wetlands adjacent to, but not directly abutting, a relatively permanent tributary (e.g., separated from it by uplands, a berm, dike or similar feature).[28] As described below, the agencies will assess the flow characteristics and functions of the tributary itself, together with the functions performed by any wetlands adjacent to that tributary, to determine whether collectively they have a significant nexus with traditional navigable waters.

The agencies' assertion of jurisdiction over non-navigable tributaries and adjacent wetlands that have a significant nexus to traditional navigable waters is supported by five

---

[27] For simplicity, the term "tributary" when used alone in this section refers to non-navigable tributaries that are not relatively permanent.

[28] As described in Section 2 of this guidance, the agencies will assert jurisdiction, without the need for a significant nexus finding, over all wetlands that are both adjacent and have a continuous surface connection to relatively permanent tributaries. See pp. 6-7, supra.

justices. Justice Kennedy applied the significant nexus standard to the wetlands at issue in <u>Rapanos</u> and <u>Carabell</u>: "[W]etlands possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"[29] While Justice Kennedy's opinion discusses the significant nexus standard primarily in the context of wetlands adjacent to non-navigable tributaries,[30] his opinion also addresses Clean Water Act jurisdiction over tributaries themselves. Justice Kennedy states that, based on the Supreme Court's decisions in <u>Riverside Bayview</u> and <u>SWANCC</u>, "the connection between a non-navigable <u>water or wetland</u> may be so close, or potentially so close, that the Corps may deem the water or wetland a 'navigable water' under the Act. … Absent a significant nexus, jurisdiction under the Act is lacking."[31]  Thus, Justice Kennedy would limit jurisdiction to those waters that have a significant nexus with traditional navigable waters, although his opinion focuses on the specific factors and functions the agencies should consider in evaluating significant nexus for adjacent wetlands, rather than for tributaries.

In considering how to apply the significant nexus standard, the agencies have focused on the integral relationship between the ecological characteristics of tributaries and those of their adjacent wetlands, which determines in part their contribution to restoring and maintaining the chemical, physical and biological integrity of the Nation's traditional navigable waters.  The ecological relationship between tributaries and their adjacent wetlands is well documented in the scientific literature and reflects their physical proximity as well as shared hydrological and biological characteristics. The flow parameters and ecological functions that Justice Kennedy describes as most relevant to an evaluation of significant nexus result from the ecological inter-relationship between tributaries and their adjacent wetlands.  For example, the duration, frequency, and volume of flow in a tributary, and subsequently the flow in downstream navigable waters, is directly affected by the presence of adjacent wetlands that hold floodwaters, intercept sheet flow from uplands, and then release waters to tributaries in a more even and constant manner.  Wetlands may also help to maintain more consistent water temperature in tributaries, which is important for some aquatic species.  Adjacent wetlands trap and hold pollutants that may otherwise reach tributaries (and downstream navigable waters) including sediments, chemicals, and other pollutants.   Tributaries and their adjacent wetlands provide habitat (e.g., feeding, nesting, spawning, or rearing young) for many aquatic species that also live in traditional navigable waters.

---

[29]  <u>Id</u>. at 2248.  When applying the significant nexus standard to tributaries and wetlands, it is important to apply it within the limits of jurisdiction articulated in <u>SWANCC</u>.  Justice Kennedy cites <u>SWANCC</u> with approval and asserts that the significant nexus standard, rather than being articulated for the first time in <u>Rapanos</u>, was established in <u>SWANCC</u>.  126 S. Ct. at 2246 (describing <u>SWANCC</u> as "interpreting the Act to require a significant nexus with navigable waters").   It is clear, therefore, that Justice Kennedy did not intend for the significant nexus standard to be applied in a manner that would result in assertion of jurisdiction over waters that he and the other justices determined were not jurisdictional in <u>SWANCC</u>. Nothing in this guidance should be interpreted as providing authority to assert jurisdiction over waters deemed non-jurisdictional by <u>SWANCC</u>.

[30]  126 S. Ct. at 2247-50.

[31]  <u>Id</u>. at 2241 (emphasis added).

When performing a significant nexus analysis,[32] the first step is to determine if the tributary has any adjacent wetlands. Where a tributary has no adjacent wetlands, the agencies will consider the flow characteristics and functions of only the tributary itself in determining whether such tributary has a significant effect on the chemical, physical and biological integrity of downstream traditional navigable waters. A tributary, as characterized in Section 2 above, is the entire reach of the stream that is of the same order (i.e., from the point of confluence, where two lower order streams meet to form the tributary, downstream to the point such tributary enters a higher order stream). For purposes of demonstrating a connection to traditional navigable waters, it is appropriate and reasonable to assess the flow characteristics of the tributary at the point at which water is in fact being contributed to a higher order tributary or to a traditional navigable water. If the tributary has adjacent wetlands, the significant nexus evaluation needs to recognize the ecological relationship between tributaries and their adjacent wetlands, and their closely linked role in protecting the chemical, physical, and biological integrity of downstream traditional navigable waters.

Therefore, the agencies will consider the flow and functions of the tributary together with the functions performed by all the wetlands adjacent to that tributary in evaluating whether a significant nexus is present. Similarly, where evaluating significant nexus for an adjacent wetland, the agencies will consider the flow characteristics and functions performed by the tributary to which the wetland is adjacent along with the functions performed by the wetland and all other wetlands adjacent to that tributary. This approach reflects the agencies' interpretation of Justice Kennedy's term "similarly situated" to include all wetlands adjacent to the same tributary. Where it is determined that a tributary and its adjacent wetlands collectively have a significant nexus with traditional navigable waters, the tributary and all of its adjacent wetlands are jurisdictional. Application of the significant nexus standard in this way is reasonable because of its strong scientific foundation – that is, the integral ecological relationship between a tributary and its adjacent wetlands. Interpreting the phrase "similarly situated" to include all wetlands adjacent to the same tributary is reasonable because such wetlands are physically located in a like manner (i.e., lying adjacent to the same tributary).

Principal considerations when evaluating significant nexus include the volume, duration, and frequency of the flow of water in the tributary and the proximity of the tributary to a traditional navigable water. In addition to any available hydrologic information (e.g., gauge data, flood predictions, historic records of water flow, statistical data, personal observations/records, etc.), the agencies may reasonably consider certain physical characteristics of the tributary to characterize its flow, and thus help to inform the determination of whether or not a significant nexus is present between the tributary and downstream traditional navigable waters. Physical indicators of flow may include the presence and characteristics of a reliable ordinary high water mark (OHWM) with a

---

[32]  In discussing the significant nexus standard, Justice Kennedy stated: "The required nexus must be assessed in terms of the statute's goals and purposes. Congress enacted the [CWA] to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters' …" 126 S. Ct. at 2248. Consistent with Justice Kennedy's instruction, EPA and the Corps will apply the significant nexus standard in a manner that restores and maintains any of these three attributes of traditional navigable waters.

channel defined by bed and banks.[33] Other physical indicators of flow may include shelving, wracking, water staining, sediment sorting, and scour.[34] Consideration will also be given to certain relevant contextual factors that directly influence the hydrology of tributaries including the size of the tributary's watershed, average annual rainfall, average annual winter snow pack, slope, and channel dimensions.

In addition, the agencies will consider other relevant factors, including the functions performed by the tributary together with the functions performed by any adjacent wetlands. One such factor is the extent to which the tributary and adjacent wetlands have the capacity to carry pollutants (e.g., petroleum wastes, toxic wastes, sediment) or flood waters to traditional navigable waters, or to reduce the amount of pollutants or flood waters that would otherwise enter traditional navigable waters.[35] The agencies will also evaluate ecological functions performed by the tributary and any adjacent wetlands which affect downstream traditional navigable waters, such as the capacity to transfer nutrients and organic carbon vital to support downstream foodwebs (e.g., macroinvertebrates present in headwater streams convert carbon in leaf litter making it available to species downstream), habitat services such as providing spawning areas for recreationally or commercially important species in downstream waters, and the extent to which the tributary and adjacent wetlands perform functions related to maintenance of downstream water quality such as sediment trapping.

After assessing the flow characteristics and functions of the tributary and its adjacent wetlands, the agencies will evaluate whether the tributary and its adjacent wetlands are likely to have an effect that is more than speculative or insubstantial on the chemical, physical, and biological integrity of a traditional navigable water. As the distance from the tributary to the navigable water increases, it will become increasingly important to document whether the tributary and its adjacent wetlands have a significant nexus rather than a speculative or insubstantial nexus with a traditional navigable water.

Accordingly, Corps districts and EPA regions shall document in the administrative record the available information regarding whether a tributary and its adjacent wetlands have a significant nexus with a traditional navigable water, including the physical indicators of flow in a particular case and available information regarding the functions of the tributary and any adjacent wetlands. The agencies will explain their basis for concluding whether or not the tributary and its adjacent wetlands, when considered together, have a more than speculative or insubstantial effect on the chemical, physical, and biological integrity of a traditional navigable water.

---

[33]  See 33 C.F.R. § 328.3(e). The OHWM also serves to define the lateral limit of jurisdiction in a non-navigable tributary where there are no adjacent wetlands. See 33 C.F.R. § 328.4(c). While EPA regions and Corps districts must exercise judgment to identify the OHWM on a case-by-case basis, the Corps' regulations identify the factors to be applied. These regulations have recently been further explained in Regulatory Guidance Letter (RGL) 05-05 (Dec. 7, 2005). The agencies will apply the regulations and the RGL and take other steps as needed to ensure that the OHWM identification factors are applied consistently nationwide.

[34]  See Justice Kennedy's discussion of "physical characteristics," 126 S. Ct. at 2248-2249.

[35]  See, generally, 126 S. Ct. at 2248-53; see also 126 S. Ct. at 2249 ("Just as control over the non-navigable parts of a river may be essential or desirable in the interests of the navigable portions, so may the key to flood control on a navigable stream be found in whole or in part in flood control on its tributaries….") (citing to Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 524-25(1941)).

Swales or erosional features (e.g., gullies, small washes characterized by low volume, infrequent, or short duration flow) are generally not waters of the United States because they are not tributaries or they do not have a significant nexus to downstream traditional navigable waters. In addition, ditches (including roadside ditches) excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water are generally not waters of the United States because they are not tributaries or they do not have a significant nexus to downstream traditional navigable waters.[36]   Even when not jurisdictional waters subject to CWA §404, these geographic features (e.g., swales, ditches) may still contribute to a surface hydrologic connection between an adjacent wetland and a traditional navigable water. In addition, these geographic features may function as point sources (i.e., "discernible, confined, and discrete conveyances"), such that discharges of pollutants to other waters through these features could be subject to other CWA regulations (e.g., CWA §§ 311 and 402).[37]

Certain ephemeral waters in the arid west are distinguishable from the geographic features described above where such ephemeral waters are tributaries and they have a significant nexus to downstream traditional navigable waters. For example, in some cases these ephemeral tributaries may serve as a transitional area between the upland environment and the traditional navigable waters. During and following precipitation events, ephemeral tributaries collect and transport water and sometimes sediment from the upper reaches of the landscape downstream to the traditional navigable waters. These ephemeral tributaries may provide habitat for wildlife and aquatic organisms in downstream traditional navigable waters. These biological and physical processes may further support nutrient cycling, sediment retention and transport, pollutant trapping and filtration, and improvement of water quality, functions that may significantly affect the chemical, physical, and biological integrity of downstream traditional navigable waters.

<u>Documentation</u>

As described above, the agencies will assert CWA jurisdiction over the following waters without the legal obligation to make a significant nexus determination: traditional navigable waters and wetlands adjacent thereto, non-navigable tributaries that are relatively permanent waters, and wetlands with a continuous surface connection with such tributaries. The agencies will also decide CWA jurisdiction over other non-navigable tributaries and over other wetlands adjacent to non-navigable tributaries based on a fact-specific analysis to determine whether they have a significant nexus with traditional navigable waters. For purposes of CWA §404 determinations by the Corps, the Corps and EPA are developing a revised form to be used by field regulators for documenting the assertion or declination of CWA jurisdiction.

Corps districts and EPA regions will ensure that the information in the record adequately supports any jurisdictional determination. The record shall, to the maximum extent practicable, explain the rationale for the determination, disclose the data and information relied upon, and, if applicable, explain what data or information received greater or lesser weight, and what professional judgment or assumptions were used in

---

[36]   <u>See</u> 51 Fed. Reg. 41206, 41217 (Nov. 13, 1986).
[37]   33 U.S.C. § 1362(14).

reaching the determination. The Corps districts and EPA regions will also demonstrate and document in the record that a particular water either fits within a class identified above as not requiring a significant nexus determination, or that the water has a significant nexus with a traditional navigable water. As a matter of policy, Corps districts and EPA regions will include in the record any available information that documents the existence of a significant nexus between a relatively permanent tributary that is not perennial (and its adjacent wetlands if any) and a traditional navigable water, even though a significant nexus finding is not required as a matter of law.

All pertinent documentation and analyses for a given jurisdictional determination (including the revised form) shall be adequately reflected in the record and clearly demonstrate the basis for asserting or declining CWA jurisdiction.[38] Maps, aerial photography, soil surveys, watershed studies, local development plans, literature citations, and references from studies pertinent to the parameters being reviewed are examples of information that will assist staff in completing accurate jurisdictional determinations. The level of documentation may vary among projects. For example, jurisdictional determinations for complex projects may require additional documentation by the project manager.


Benjamin H. Grumbles
Assistant Administrator for Water
U.S. Environmental Protection Agency

John Paul Woodley, Jr.
Assistant Secretary of the Army
(Civil Works)
Department of the Army

---

[38] For jurisdictional determinations and permitting decisions, such information shall be posted on the appropriate Corps website for public and interagency information.

**Exhibit 20 to Defendant-Intervenors'
Supplemental Brief in Opposition to
Plaintiffs' Motion for a Preliminary Injunction
Mar. 2007  Wyoming DEQ Letter Regarding
Sec. 401 Cert. of Nationwide Permits in Wyoming
("WDEQ Letter")**



# Department of Environmental Quality

To protect, conserve and enhance the quality of Wyoming's
environment for the benefit of current and future generations.

Dave Freudenthal, Governor                                                              John Corra, Director

March 20, 2007

Mr. Matt Bilodeau
US Army Corps of Engineers
Wyoming Regulatory Office
2232 Del Range Blvd., Suite 210
Cheyenne, WY 82009

RE:    Section 401 Certification of Nationwide permits in Wyoming

Dear Mr. Bilodeau:

In accordance with the provisions of the state certification program for activities requiring
dredge and fill permits from the U.S. Army Corps of Engineers, this office has reviewed the
proposed nationwide program and has made the following determinations:

In view of the current state water quality standards and regulations, we have found that
some of the nationwide permits are acceptable as written, some require additional
conditions to assure compliance with our standards and a few must be denied certification.
There are also a number of nationwide permits for which we are waiving certification either
because they do not involve discharges to waters of the state or have little or no
applicability in Wyoming.

## WAIVER OF 401 CERTIFICATION

Nationwide permits 1, 2, 4, 8, 9, 10, 11, 15, 19, 22, 24, 28, 34, 35 and 48 are determined
by this department to either not involve discharges or have little or no application in this
state and, therefore, certification is waived.

---

**Herschler Building • 122 West 25th Street • Cheyenne, WY 82002 • http://deq.state.wy.us**

| ADMIN/OUTREACH | ABANDONED MINES | AIR QUALITY | INDUSTRIAL SITING | LAND QUALITY | SOLID & HAZ. WASTE | WATER QUALITY |
|---|---|---|---|---|---|---|
| (307) 777-7937 | (307) 777-6145 | (307) 777-7391 | (307) 777-7369 | (307) 777-7756 | (307) 777-7752 | (307) 777-7781 |
| FAX 777-3610 | FAX 777-6462 | FAX 777-5616 | FAX 777-5973 | FAX 777-5864 | FAX 777-5973 | FAX 777-5973 |



Mr. Bilodeau
3/20/2007
Page 2

## DENIAL OF 401 CERTIFICATION - ALL WATERS

401 certification of the following nationwide permits is denied on all waters in the state:

**NWP 16**     Return Water From Upland Contained Disposal Areas. Making water quality determinations on these return flows requires a site specific analysis. Very often these effluents will require a discharge permit from the State of Wyoming. The only way that proper state review can occur is by blanket denial of certification. Therefore, certification of NWP 16 is denied.

**NWP 17**     Hydropower Projects. The Federal Energy Regulatory Commission does not have an office in the state, nor does this department have an MOU or any other agreement with FERC on permit processing. Because we have a poor understanding of their procedures and we are certain that they have little understanding of our standards and regulations, we cannot issue a blanket certification of FERC licensed activities. Therefore, certification of NWP 17 is denied.

**NWP 23**     Approved Categorical Exclusions. This nationwide permit has been used almost exclusively on Federal Highway Administration projects and can be used to authorize activities which may have significant adverse affects on water quality. Furthermore, we believe that the proposed nationwide program coupled with existing regional general permits adequately covers most instances where use of this permit would be appropriate. Therefore, certification of NWP 23 is denied.

**NWP 27**     Wetland and Riparian Restoration and Creation Activities. This nationwide permit authorizes a great variety of activities which are not limited by scale or size. Projects authorized may involve a considerable amount of construction in existing waterbodies. Though this NWP may provide a less burdensome permit process for wetland creation and restoration projects, it cannot provide assurance that these projects will be constructed in compliance with water quality standards. We believe that it is necessary to evaluate each project individually and add specific conditions relative to water quality protection as needed. Therefore, certification of NWP 27 is denied.

**NWP 31**     Maintenance of Existing Flood Control Facilities. This new nationwide permit may have significant effects on water quality depending upon the scale of the project and site specific circumstances. This is especially true when used for the dredging of detention basins where there may be an accumulation of toxic substances or nutrients. Because we are unsure of

Mr. Bilodeau
3/20/2007
Page 3

exactly how this permit may be applied, we believe it is prudent to evaluate each project individually and add specific conditions relative to water quality protection as needed. Therefore, certification of NWP 27 is denied.

**NWP 40**  Farm Buildings.  This NWP has never been used in Wyoming and we are not sure what its actual applicability is.  We believe, however, that it is necessary to individually review each proposal to make an appropriate certification decision. Therefore, certification of NWP 40 is denied.

**NWP 43**  Storm Water Management Facilities.  This NWP may have significant effect on water quality depending on the scale and location of project. Depending on the source of storm water runoff, it is conceivable that significant concentrations of metals, turbidity, substances with high biological oxygen demand (BOD), oil and grease or other contaminants may be introduced into state waters. Because we are unsure of exactly what consequences to water quality may result from application of this permit, we believe it is prudent to evaluate each proposed project individually and add specific conditions relative to the protection of water quality. Therefore, certification of NWP 43 is denied.

**NWP 44**  Mining Activities.  This NWP authorizes aggregate and hard rock/mineral mining and in and adjacent to specific water bodies.  Beneficiation activities for hard rock/mineral mining are authorized within 200 feet of an "ordinary high water mark: of any open water body.  The activities authorized by this NWP may have considerable , deleterious effects on water quality. Because of the potential impacts to water quality, we believe that it is necessary to review each proposed activity and add any conditions necessary to protect water quality. Therefore, certification of NWP 44 is denied.


## DENIAL OF CERTIFICATION ON CLASS 1 WATERS

Class 1 waters are defined by the state water quality regulations as those in which no further water quality degradation by point source discharges other than from dams will be allowed.  Nonpoint source discharges will be controlled by the implementation of best management practices designed to maintain existing water quality.  Because of the high level of protection afforded to these waters by the regulations, authorization of the activities covered by the above NWPs without individual departmental review is inappropriate.

Therefore, 401 certification for NWPs 3, 5, 6, 7, 12, 13, 14, 18, 25, 26, 29, 30, 32, 33, 36, 37, 39, 41, 42, 45, 46 and 47 is denied on Wyoming Class 1 waters.  These nationwide permits are certified for use on Wyoming class 2, 3, and 4 waters *(all other waters)*

Mr. Bilodeau
3/20/2007
Page 4

provided that the general conditions, management practices, and other provisions of the nationwide program are strictly followed.

The following is a listing of current class 1 waters in Wyoming:

1.    All surface waters located within the boundaries of national parks and congressionally designated wilderness areas as of January 1, 1999;

2.    The main stem of the Snake River through its entire length above the U.S. Highway 22 Bridge (Wilson Bridge);

3.    The main stem of the Green River, including the Green River Lakes from the mouth of the New Fork River upstream to the wilderness boundary;

4.    The Main Stem of the Wind River from the Wedding of the Waters upstream to Boysen Dam;

5.    The main stem of the North Platte River from the mouth of Sage Creek (approximately 15 stream miles downstream of Saratoga, Wyoming) upstream to the Colorado state line;

6.    The main stem of the North Platte River from the headwaters of Pathfinder Reservoir upstream to Kortes Dam (Miracle Mile segment);

7.    The main stem of the North Platte River from the Natrona County Road 309 bridge (Goose Egg bridge) upstream to Alcova Reservoir;

8.    The main stem of Sand Creek above the U.S. Highway 14 bridge;

9.    The main stem of the Middle Fork of the Powder River through its entire length above the mouth of Buffalo Creek;

10.    The main stem of the Tongue River, the main stem of the North Fork of the Tongue River, and the main stem of the South Fork of the Tongue River above the U.S. Forest Service Boundary;

11.    The main stem of the Sweetwater River above the mouth of Alkali Creek;

12.    The main stem of the Encampment River from the northern U.S. Forest Service boundary upstream to the Colorado state line;

13.    The main stem of the Clarks Fork River from the U.S. Forest Service boundary upstream to the Montana state line;

Mr. Bilodeau
3/20/2007
Page 5

14.   All waters within the Fish Creek (near Wilson, Wyoming) drainage;

15.   The main stem of Granite Creek (tributary of the Hoback River) through its entire length;

16.   Fremont Lake;

17.   Wetlands adjacent to the above listed Class 1 waters.

## APPROVED 401 CERTIFICATION

Nationwide permits 20, 21, 38, 49 and 50 are acceptable as written on all waters in the state so long as the general conditions, management practices, and other provisions of the nationwide program are strictly followed.

## ADDITIONAL CONDITIONS ON ALL NWPS.

Every authorization by the Corps for any activity which is not subject to an individual 401 certification must include the following language:

> *The Wyoming Department of Environmental Quality has certified that the use of this nationwide permit for the proposed activity is acceptable provided that all of the terms and conditions of the nationwide permit are followed and that construction is conducted in a manner which does not result in a violation of any applicable water quality standard. This authorization in no way relieves any person from compliance with water quality standards or any other federal, state, or local laws or regulations, nor does it provide exemption from legal action by private citizens for damage to property which the activity may cause.*

The following conditions apply when operating equipment or otherwise undertaking construction in a water of the state:

a.   Construction equipment should not be operated below the existing water surface except as follows:

Fording the stream at one location is acceptable, however, vehicles and equipment should not push or pull material along the streambed below the existing water level. Work below the water which is essential for preparation of culvert bedding or footing installations is acceptable to the extent that it

Mr. Bilodeau
3/20/2007
Page 6

does not create turbidity in excess of the Chapter 1 Surface Water Standards or unnecessary stream channel disturbance. Frequent fording should not occur in areas where extensive turbidity will be created. In all cold water fisheries and drinking water supplies (Classes 1, 2AB, 2A and 2B) in stream activities associated with this permit shall not increase turbidity by more than 10 nephelometric turbidity units (NTUs). In all warmwater or non-game fisheries (Classes 1, 2AB, 2A, 2B and 2C) in stream activities associated with this permit shall not increase turbidity by more than 15 NTUs.

In accordance with Section 23(c)(2) of the Chapter 1 Surface Water Standards, the administrator of the Water Quality Division may authorize temporary increases in turbidity above the numeric criteria in Section 23 (a) and (b) of the Standards in response to an individual application for a specific activity. An application must be submitted and a variance approved by the administrator before any temporary increase in turbidity above the numeric limits takes place.

b.  Any temporary crossings, bridge supports, cofferdams, or other structures that will be needed during the period of construction should be designed to handle high flows that could be anticipated during the construction period. All structures should be completely removed from the stream channel at the conclusion of construction and the area restored to a natural appearance.

c.  Care should be taken to cause only the minimum necessary disturbance. Streambank vegetation should be protected except where its removal is absolutely necessary for completion of the work.

Any vegetation, debris, or other material removed during construction must be disposed of at some location out of the stream channel or adjacent wetland areas where it cannot reenter the channel during high stream flow or runoff events.

All cut and fill slopes that will not be protected with riprap should be revegetated with appropriate species to prevent erosion.

d.  All fill material should be placed and compacted and subsequently protected from erosion. Areas to be filled should be cleared of all vegetation, debris and other materials that would be objectional to the fill.

e.  The period and timing of construction should be adjusted as necessary to minimize conflicts with fish migration and spawning.

Mr. Bilodeau
3/20/2007
Page 7

    f.       Care must be taken to prevent any petroleum products, chemicals, or other deleterious materials from entering the water. A spill contingency should be developed for all projects where a large amount of petroleum products or solvents will be stored on the project site, and must be prepared when storage of these materials exceeds the federal limits.

The Wyoming Department of Environmental Quality certifies that these permits are acceptable as described above, provided the procedures described in the application for state certification are followed and reasonable care is taken to ensure that all disturbed areas are protected from erosion. The Department also reserves the right to amend, modify, suspend or revoke this certification or any of its terms or conditions as may be appropriate or necessary to protect water quality and associated beneficial uses. Upon adoption of updated standards, this certification may be revoked and modified appropriately.

Please be aware that this letter constitutes state certification of this permit as required by Section 401 of the federal Clean Water Act. It does not provide an exemption from any other federal, state or local laws or regulations, nor does it provide exemption from legal action by private citizens for damage to property which the activity may cause.

If you have any questions or would like to discuss any part of this certification, please feel free to contact Jeremy Lyon of my staff at (307) 777-7588.

Sincerely,

John V. Corra
Director
Department of Environmental Quality

JVC/JFW/JML/rm/7-0224

cc:    John Emmerich, Wyoming Game and Fish, Cheyenne
        Toney Ott, US EPA Region 8, 1595 Wynkoop Street, Denver, CO 80202-1129
        Brian Kelly, US FWS, 5353 Yellowstone Road, Suite 308, Cheyenne, WY 82009
        Rick Chancellor, LQD

C:\mystuff\D\NPS\Nation_2007.wpd