**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————— )
                                              )
NATURAL RESOURCES DEFENSE COUNCIL,   )
                                              )
       Plaintiffs,                          )
                                              )
       v.                                  )      07-cv-01709-RJL
                                              )
DIRK A. KEMPTHORNE, in his official capacity,  )
THE UNITED STATES DEPARTMENT OF THE   )
INTERIOR, and                                 )
THE BUREAU OF LAND MANAGEMENT,        )
                                              )
       Defendants.                         )
———————————————————— )

**FEDERAL DEFENDANTS' SUPPLEMENTAL PRELIMINARY INJUNCTION BRIEF**

---

**INTRODUCTION**

On October 18, 2007, this Court held a hearing to consider Plaintiffs' motion for a preliminary injunction. In accordance with this Court's instruction, Federal Defendants submit this brief to more fully address arguments raised at the hearing. What the hearing made even more plain is that Plaintiffs have not met their heavy burden of showing that an injunction is necessary to prevent irreparable harm and that they have not shown a likelihood of success on the merits. Plaintiffs conceded several key points at the hearing which compel denial of their motion: (1) they admit that their allegations of harm rely almost entirely on the description of impacts in the Final Environmental Impact Statement (FEIS), which occur over the 30-50 year life of the 2000-well project, and that only "some" of the impacts will be generated by the 90 wells authorized by the Catalina and Sun Dog decision records; (2) they admit that most of those impacts have already

1

occurred; (3) they do not dispute the accuracy of the declarations of Travis Bargsten, John Ahlbrandt, and Frank Blomquist, which explain that the incremental impacts are only a small percentage of the impacts of the overall project; (4) they concede that BLM published notice on its website that it was preparing environmental assessments for the Catalina and Sun Dog Projects well before their complaint was filed; and (5) they admit that they had actual notice that implementation of the two projects would begin at least as early as June 20, 2007, when they filed a motion for stay before the Interior Board of Land Appeals (IBLA), in part to prevent Double Eagle from beginning development of the Catalina project.

With regard to the question of whether the Bureau of Land Management (BLM) provided sufficient opportunity for public involvement, Plaintiffs' attempts to distinguish this Court's prior decision in <u>Biodiversity Conservation Alliance v. United States Bureau of Land Management</u>, 404 F. Supp. 2d 212 (D.D.C. 2005) (<u>BCA</u>) are unavailing because the decision is directly on point. The record shows that Plaintiffs had ample opportunity to participate in the public process, and they simply failed to take advantage of it. Finally, while Plaintiffs' counsel suggested at the hearing that the merits of the decision are not at issue, that contention is plainly contrary to law. While Plaintiffs chose to focus on BLM's alleged failure to provide an opportunity for public participation, they alleged in detail in their opening brief that BLM violated NEPA by failing to take a hard look at the impacts of the Catalina and Sun Dog projects. The Court should treat their failure to respond to Defendants' explanations that BLM complied with NEPA, either in their response brief, or at oral argument, as a concession that they are not likely to succeed on the merits of those allegations.

Ultimately, what Plaintiffs' argument at the hearing made plain is that they simply object to the choices BLM made in managing public lands under the principles of multiple use pursuant to the Federal Land Policy and Management Act (FLPMA). 43 U.S.C. §§ 1701(a)(12), 1702(c). But,

as the Tenth Circuit cogently explained in <u>Rocky Mountain Oil and Gas Ass'n v. Watt</u>, 696 F.2d

734, 738 (10th Cir. 1982), multiple use management means that "BLM need not permit all resource

uses on a given parcel of land."  The court further observed that

> "If all the competing demands reflected in FLPMA were focused on one particular piece of
> public land, in many instances only one set of demands could be satisfied.  A parcel of land
> cannot both be preserved in its natural character and mined.  Thus, it would be impossible
> for BLM to carry out the purposes of the Act if each particular management decision were
> evaluated separately.  It is only by looking at the overall use of the public lands that one can
> accurately assess whether or not BLM is carrying out the broad purposes of the statute."

<u>Id.</u> at 738-39, n.4, quoting <u>Utah v. Andrus</u>, 486 F. Supp. 995, 1003 (D. Utah 1979); <u>see also</u> <u>Norton</u>

<u>v. Southern Utah Wilderness Alliance</u>, 542 U.S. 55, 58 (2004) ("'Multiple use management'" is a

deceptively simple term that describes the enormously complicated task of striking a balance among

the many competing uses to which land can be put . . .").   While Plaintiffs may disagree, the record

shows that BLM achieved its objective in adopting the Record of Decision for the Atlantic Rim

Project and in approving site-specific decisions for the Catalina and Sun Dog Plans of Development

(PODs) of striking "a good balance between oil and gas recovery and resource protection and

provid[ing] for a long-term reclamation and re-establishment of native vegetation and wildlife

communities."  ROD at 10 (Exhibit 2 to Federal Def. PI Br.).  Plaintiffs failed to show in their briefs

or at the hearing that there is an imminent threat of irreparable harm, that an injunction is in the

public interest, or that they have a likelihood of success on the merits.  The Court should deny the

requested relief.

## ARGUMENT

**A.    Plaintiffs Failed to Demonstrate the Need for the Extraordinary Remedy of a
Preliminary Injunction.**

Plaintiffs argued at the hearing that the Catalina and Sun Dog projects would cause

irreparable harm stemming from impacts on the supposed wild character of the area and generically

from development.[1]  Plaintiffs claimed that the wild character of the area would be irrevocably altered based on Exhibit A to the Ahlbrandt declaration, a map that Plaintiffs maintained was evidence that the Catalina and Sun Dog projects would be expanding into previously undeveloped areas.  But, as the Court observed, the map showed the opposite.  The map showed that the Sun Dog and Catalina PODs are in the middle of a cluster of wells within five miles to the north and south and that there is another cluster of existing wells directly to the east of the Sun Dog PODs.  Ahlbrandt decl. at Exhibit A (Ex. 12 to Federal Def. PI Br.).  We also showed that Walter Merschat's claims that methane seeps pose a serious threat to the health or safety of recreational users were contrary to BLM's experience with coalbed natural gas development in other parts of Wyoming.  See Federal Defendants' Preliminary Injunction Br. at 19-21.  Plaintiffs offered no rebuttal, and the Court should conclude that Merschat's speculative allegations are not based on credible evidence.

Further, Plaintiffs conceded at oral argument that their allegations of harm are based primarily on the analysis in the FEIS.  They also admitted that the analysis in the FEIS characterized potential impacts over the life of the project, which is 30-50 years.  ROD at 3.  Significantly, they also agreed that most of the ground disturbing activity has already occurred.  Although Plaintiffs' counsel contended at oral argument that "some" of the impacts analyzed in the FEIS would result from the Sun Dog and Catalina PODs, Plaintiffs made no effort to support their generic allegations, and therefore failed to satisfy the standard for obtaining injunctive relief.  With regard to the Court's question about the impacts of drilling wells, the primary impacts would be to air quality (exhaust

---

[1] They also raised a new claim alleging that ground disturbance was occurring in the hundred-year floodplain, but provided no evidence supporting the allegation.  Plaintiffs' counsel referred to a picture that Plaintiffs claimed showed development in a floodplain, but the picture was not authenticated.

from drilling rigs and dust from vehicle traffic), noise, and water (surface water depletions for drilling). FEIS at 4-8; 4-69; 4-43 (Ex. 8 to Fed. Def. PI Br., parts 1, 3 and 2). However, none of these impacts threaten irreparable harm. FLPMA and the Clean Air Act prohibit BLM from authorizing any activity that would threaten federal, state or local air quality standards. Id. at 4-8. Noise and dust during the drilling phase may indirectly affect wildlife by causing animals to avoid the drilling sites, which is why BLM has prohibited construction, drilling and other activities during sensitive time periods. FEIS at 4-69-70 (Ex. 8, part 3). And, as the FEIS explains, potential air quality impacts from the entire project will be below applicable air quality standards. Id. at 4-15 (Ex. 8, part 1). The FEIS also explains that water depletion impacts as a result of project development would be "minimal." FEIS at 4-96 (Ex. 8, part 3).

Importantly, Plaintiffs did not dispute that the Court of Appeals' decision in Fund for Animals v. Frizzell, 530 F.2d 982 (D.C. Cir. 1975), applies. That authority provides that the party moving for the extraordinary remedy of a preliminary injunction may not rely simply on "nonspecific claims of the 'destruction and loss of wildlife.'" Id. at 987. Rather, in order to show irreparable injury, the moving party must show jeopardy to the well-being of the species. Id. Plaintiffs' "nonspecific" allegations of harm, based on the analysis of impacts described in the FEIS, fail to satisfy that standard. To the contrary, it was undisputed that, as we showed at the hearing, there are large herds of big game in the project area. See Ex. 1, attached hereto, FEIS at 3-90 (19,500 pronghorn; 21,000 mule deer; 11,500 elk). Likewise, "greater sage-grouse are common throughout Wyoming," including south-central Wyoming where the Atlantic Rim project is located. Id. at 3-94. It was also undisputed that the State of Wyoming provides a hunting season for all four species. Id. at 3-90, 3-96; see also 4-103 (Ex. 8, part 4) (map showing locations of successful hunts). Plaintiffs made no claim that the incremental impact of the Catalina and Sun Dog PODs threatened

to jeopardize these species.

Plaintiffs also failed to show that their delay in seeking emergency relief was excusable. While Plaintiffs argued that BLM violated NEPA by failing to provide them with sufficient information so that they could meaningfully comment on the draft EAs when it posted notice on its website (which we address in detail below), the website posting also put them on notice that BLM was in the process of making decisions for each project.  As of June 6, 2007 and July 9, 2007, Plaintiffs should have been aware that preparation of the environmental assessments for the Catalina and Sun Dog were underway and that decisions would be forthcoming.  Bargsten decl. at ¶ 7 (Ex. 11 to Fed. Def. PI Br.); Ahlbrandt decl. at ¶ 7.  In fact, the record shows that Plaintiffs knew on May 21, 2007, when the Record of Decision for the Atlantic Rim project took effect, that BLM would begin analyzing and approving site-specific projects.  As we showed at the hearing, they themselves argued to the IBLA on June 20, 2007 that it should issue a stay to prevent harm they alleged was "imminent, as Double Eagle Petroleum plans to begin the drilling of 268 wells in the Catalina Unit, a subset of the Atlantic Rim project, in July of 2007."  Ex. 2 attached hereto at 6, 16 (excerpts of Biodiversity Conservation Alliance IBLA Brief and Double Eagle press release attached thereto stating that Double Eagle expected to commence work on July 15, 2007 and that Anadarko Petroleum Corp. had announced it planned to drill an additional 70 wells in the Sun Dog Unit in 2007).  Despite having both constructive knowledge via the website as well as actual knowledge of Double Eagle and Anadarko's plans, Plaintiffs never explained why they failed to move for emergency injunctive relief until September 25, 2007.

It is also telling that Plaintiffs have never disputed that the first time Erik Molvar contacted BLM was, according to Molvar, September 7, 2007.  Molvar decl. at ¶ 4 (Ex. A to Plfs. Opening PI Br.).  Bargsten confirms that "the first request from the public that I received for records pertaining

to these PODs was on September 5, 2007. Bargsten decl. at ¶ 8(a). Bargsten and Ahlbrandt stated in their declarations that between the time notice was posted on the BLM website and the date of the decisions, BLM did "not receive any request for records about these proposed PODs from the public." Bargsten decl. at ¶ 7; Albrandt decl. at ¶ 7. Plaintiffs' failure to contact BLM is even more inexplicable given that Erik Molvar himself alleges that he has "a deep interest in management of federal lands in the Atlantic Rim area, which includes the Atlantic Rim Natural Gas Development Project." Molvar decl. at ¶ 1.

Finally, although separate from the NEPA process, BLM's regulations provide that "[a]ny adversely affected party that contests a . . . decision of the authorized officer issued under the regulations in this part, may request an administrative review, before the State Director, either with or without oral presentation." 43 C.F.R. § 3165.3(b). The regulations require the State Director to act on the request and to issue a final decision. Id. at § 3165.3(d). Plaintiffs' failure to take advantage of that opportunity again illustrates that they had opportunities to provide their input, but they did not take advantage of them. In sum, Plaintiffs' attempt to shift the blame for their delay in seeking emergency relief to BLM simply does not jibe with the undisputed facts. The Court should find that Plaintiffs' delay in seeking a preliminary injunction weighs in favor of denying the motion.

**B.    Plaintiffs Have Not Shown A Likelihood of Success on the Merits of Their NEPA Claims.**

While Plaintiffs suggested at the hearing that the merits are not at issue in this proceeding, their argument is plainly wrong. They have a burden of demonstrating a likelihood of success on the merits, particularly where, as here, they failed to meet their burden of showing irreparable harm. Judicial Watch v. U.S. Dep't of Homeland Security, __ F. Supp. 2d __, 2007 WL 2791371, *1 (D.D.C. 2007). Thus, the Court should take into account that Plaintiffs argued strenuously in their

opening brief that BLM violated NEPA by failing to take a "hard look" at the environmental impacts of the proposed actions, and failed entirely to respond to Federal Defendants' explanation showing they were wrong. Plaintiffs therefore have not met their burden of showing a likelihood of success on the merits.

As to their argument that BLM failed to provide an opportunity for public comment, Plaintiffs apparently agree that, as set forth in BCA, 404 F. Supp.2d at 220, NEPA regulations addressing public involvement in the environmental assessment process require only that the agency involve the public to the extent "practicable," although Plaintiffs cannot seem to settle on a definition of what practicable means. It became clear at oral argument that Plaintiffs' claims on this issue are a moving target. In their reply brief, Plaintiffs stated that what they "challenge is BLM's failure to circulate an *original* draft EA for public comment before the agency approved the challenged Catalina and Sun Dog drilling permits." Plfs. Reply at 6 (emphasis Plaintiffs'). But, at oral argument, Plaintiffs claimed that BLM was required to circulate the *final* EAs prior to issuing a decision. Neither argument finds support in the law.

Plaintiffs' changing arguments are undoubtedly an effort to evade the preclusive effect of this Court's decision in BCA. As we showed at oral argument, the case is directly on point. Plaintiffs' shifting arguments do not change the outcome. The key facts in BCA were that BLM advised the public of the proposal by issuing a press release and that the press release generally described the project, indicating the project area would encompass about 210 square miles. 404 F. Supp. 2d at 215. BLM did not provide a public opportunity to comment on a draft EA. Id. at 220. Nevertheless, Biodiversity Conservation Alliance submitted comments on the proposed action. Id. at 219 n.5. While Plaintiffs continued to insist at oral argument in this case that BCA is distinguishable because in that case BLM *did* circulate a draft EA prior to its decision, the decision--

and BCA's own brief in the case--show that the Court upheld BLM's decision even though it did not provide an opportunity to comment on the EA.  Id. at 220, Ex. 3 at 3 (Excerpts of BCA's Summary Judgment Br., Docket #10, 04-cv-822 (RJL)).

With regard to Plaintiffs' new allegation that BLM was required to circulate the final EA prior to making a decision, it is telling that Plaintiffs cited no case law supporting that claim, which would create a new standard.  In fact, this new argument is virtually identical to the argument Plaintiffs made in BCA, where they asserted that BLM was required to "provide the public with the opportunity to review and critique the actual EA before the DR/FONSI was signed."  Id. at 3.  As they do here, Biodiversity Conservation Alliance hedged its bets in the prior case by also arguing that BLM was required to circulate a draft EA for public comment.  Id. at 37.  In either case, this Court's conclusion that "[d]etermining whether the public was adequately involved is a fact-intensive inquiry made on a case-by-case basis" controls.  BCA, 404 F. Supp. 2d at 222.  Not only is this Court's decision still good law, but the Court's "case-by-case" factual inquiry approach was subsequently confirmed by the Court of Appeals for the D.C. Circuit in TOMAC v. Norton, 433 F.3d 852 (D.C. Cir. 2006).  The appellate court concluded that "the agency has significant discretion in determining when public comment is required with respect to EAs."  Id. at 861.  Plaintiffs have not shown in this case that BLM improperly exercised its discretion by not circulating draft EAs for public comment.

The facts here are very similar to BCA.  It is undisputed that, as in that case, BLM published notice that it was preparing a NEPA analysis, here by posting it on its website prior to making a decision.  It is also undisputed that the notice generally described what the proposed action was, the lease numbers and the county where the action would occur.  BLM NEPA Log, see Ex. 4 attached hereto.  The NEPA Log shows the document number assigned to the EA in the first column, the date

9

number was assigned in the second column, a description of the proposed action in the fourth column, the leases at issue in the fifth column and the county where the action will occur in the sixth column.  Thus, for example, the attached NEPA Log shows in column one that the NEPA number for the Sun Dog POD is "WY-0303-EA07-222," and that it was published on the website on "07/09/2007" (column two).   Id. at 2, see also Ahlbrandt decl. at ¶ 7.  The Log briefly describes what the project entails, "Natural gas wells, well pads, access roads, and pipelines Sun Dog Pods A and B." (column 4).  Ex. 4 at 2.  Column 5 shows the lease numbers that the proposed action would occur on, and column six shows that the action will occur in Carbon County.  Id..  Clicking on the link in the first column provides additional detail as to the section, township and range location of the action.  Id. at 5.

We also showed, as set forth above--and Plaintiffs did not dispute--that they had actual notice that BLM was preparing environmental assessments.  Notwithstanding the fact that they had both constructive and actual notice, at the hearing, Plaintiffs continued to blame BLM for their failure to comment based on BLM's supposed unresponsiveness to requests for information.  But, as counsel for intervenors pointed out, the Bargsten declaration shows that once Plaintiffs finally contacted BLM, the agency made every efforts to provide documents as quickly as possible.  Bargsten decl. at ¶ 8 and Exhibit F attached to decl.

Likewise, while Plaintiffs complained in their reply brief, and at the hearing, that BLM has a history of excluding the public from participating in the process, the evidence they cited shows exactly the opposite.  Plaintiffs pointed to Exhibit H of the Bargsten declaration, an EA for the Lookout Wash Unit, as proof that BLM previously excluded them from the public process.  See Plfs. Reply at 5, citing Bargsten decl. at Ex. H (arguing that the opportunity for public comment BLM previously provided for other projects, such as the Lookout Wash Unit of the Desolation Flats

project, is "meaningless since it does not provide the public the relevant documents until after BLM makes its decision."). However, Bargsten explained that "[i]n the past, the APD postings and online NEPA register has been utilized by members of the public, including BCA, to provide comments on pending APDs." Bargsten decl. at ¶ 8(d). Exhibit H to Bargsten's declaration, the EA for the Lookout Wash Unit, shows that even though BLM did not circulate the draft or final EA, Plaintiffs still had enough information to meaningfully comment, and that BLM considered and responded to those comments. Ex. H at 5-6.

At the hearing, Plaintiffs also referred to an October 16, 2007 email from BLM to Plaintiffs transmitting the final EAs for Sun Dog PODs C, D, and E as evidence that BLM was continuing to shut them out of the public process, but, like the other evidence Plaintiffs cite, the email supports BLM's argument, not Plaintiffs. The email shows that the Sun Dog C, D, and E PODs were "initiated," i.e., posted on the Internet, on or about July 19, 2007, over a month before Plaintiffs filed this action. Ex. 5 at 2. It also re-iterates BLM's policy for providing public input, which is to "determine, on a case-by-case basis, if an EA should be made available for public review," and explains that "upon request, interested parties can receive specific project information, and, if available, completed NEPA documents." Id. As with the Catalina POD and the Sun Dog A and B PODs, where Plaintiffs failed entirely to provide comment on the project, the record establishes that Plaintiffs again waited until the last minute, long after the July 19, 2007 publication on the internet, to take advantage of their opportunity to participate in the process.

The Court should not penalize BLM because Plaintiffs slept on their rights. As in BCA, BLM published notice that it was preparing environmental analysis on its website that provided adequate information for Plaintiffs to meaningfully comment. It is telling that Plaintiffs did not argue at the hearing, when questioned by the Court, that the site-specific issues for particular

authorizations are likely to be significantly different from the issues and impacts identified in the programmatic EIS. The programmatic EIS, together with the APDs and the information posted on BLM's NEPA register, provided a "practicable" opportunity for Plaintiffs to provide input.

**C.    Plaintiffs' Clean Water Act Claim Is Properly Brought Pursuant to the Administrative Procedure Act, Though It Should Be Barred Due to Plaintiffs' Failure to Raise the Issue to BLM During the Administrative Proceedings Below**.

As noted during the preliminary injunction hearing, the government disagrees with the Intervenors' argument (see Intervenor PI Br. at 35-36) that Plaintiffs were required to bring their Clean Water Act (CWA) claim as a citizen suit pursuant to 33 U.S.C. § 1365(a)(1), rather than as a more traditional claim for judicial review under the Administrative Procedure Act (APA), 5 U.S.C. §§ 551, et. seq. The D.C. Circuit has expressly confirmed that most challenges to Clean Water Act permits are properly brought in district courts pursuant to the APA. See National Ass'n of Home Builders v. Corps of Engineers, 440 F.3d 459, 463 n.3 (D.C. Cir 2006).[2] The same should also apply to CWA-based challenges to the BLM permits at issue here, since these permits also constitute "final agency action" reviewable under the APA. See 5 U.S.C. § 704.

While it is true that judicial review under the APA is not available where another statute already provides an "adequate remedy in a court," id., the CWA citizen suit provision does not provide such a remedy here. That provision authorizes citizen suits, inter alia, against a person who violates the substantive terms of a state water quality certification issued pursuant to section 401 of the CWA, 33 U.S.C. § 1341. See id. §§ 1365(a)(1), 1365(f)(5). However, this case does not involve an alleged violation of a certification, but rather involves a claim that BLM allegedly acted

---

[2] The one category of exceptions noted by the D.C. Circuit is for CWA permit decisions or other CWA agency actions that must be brought originally in the courts of appeals rather than district courts pursuant to 33 U.S.C. § 1369(b). No such actions are involved in this case.

"arbitar[ily], capricious[ly] . . . or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), by

issuing the disputed permits without *any* section 401 certification. Accordingly, this case is properly

brought as an APA challenge rather than a CWA citizen suit. See Bennett v. Spear, 520 U.S. 154,

173-74 (1997) (holding that similar citizen suit provision in Endangered Species Act, allowing suits

against persons alleged to be "in violation" of the Act, did not authorize challenge to agency

decision alleged to be contrary to statutory requirements).[3]  To the extent a different result is

suggested by portions of Oregon Natural Desert Ass'n v. Dombeck, 172 F.3d 1092 (9th Cir. 1998),

see Intervenor PI Br. at 37, BLM respectfully suggests that the Ninth Circuit's discussion of this

narrow jurisdictional point is incorrect, not binding in this Circuit, and should not be followed by

this Court.[4]

Finally, we stress that notwithstanding the foregoing, Plaintiffs' Clean Water Act claims are

barred by their failure to raise their concerns about the potential application of CWA section 401

certification requirements to the Sun Dog and Catalina permits at issue here during the

administrative proceedings below. See Fed. Def. PI Br. at 41. At the preliminary injunction

hearing, Plaintiffs' only argument on waiver was that they did not have enough information to raise

this issue at the EIS stage. However, this argument is belied by the fact that Plaintiffs based their

---

[3] For the record, however, BLM notes that the Plaintiffs are wrong in contending (see Plaintiffs'
Reply Br. at 12-13) that if they *were* required to bring their CWA claim as a citizen suit, then the
Court could somehow excuse their failure to comply with the 60 day pre-filing notice requirements
set forth in section 505(b)(1) of the Act, 33 U.S.C. § 1365(b)(1). See Hallstrom v. Tillamook
County, 493 U.S. 2031 (1989) (holding that requirements of similar 60 day notice of citizen suit
provision in Resource Conservation and Recovery Act constitute "mandatory conditions precedent
to commencing suit" that district courts do not have discretion to disregard).

[4] As discussed in Defendant's principal brief, see Fed. Def. PI Br. at 5, 42-43, other portions of the
Oregon Natural Desert Association case regarding the relationship between nonpoint source runoff
and the requirements of section 401 were correctly decided and are not contested by any party here.

CWA argument in their opening brief entirely on information from the EIS that was not specific to the APDs at issue here.  See Plaintiffs' PI Br. at 27.  Obviously, if Plaintiffs truly felt this information was sufficient to impose an obligation on BLM to make sure section 401 certification was secured for the Catalina and Sun Dog APDs, there is no reason they could not have so commented at the time.  Moreover, as discussed by BLM elsewhere, Plaintiffs had more than ample opportunity to comment on the APDs themselves, even though they did not take advantage of this opportunity.

## CONCLUSION

The Court should deny Plaintiffs' motion for preliminary injunction.

Respectfully submitted this 29th day of October, 2007.

RONALD J. TENPAS
Acting Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

Jon M. Lipshultz
United States Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
PO Box 23986
Washington, DC 20026-3986
Phone: (202) 514-2191
Fax: (202) 353-7763
D.C. Bar #416165


   s/ Lori Caramanian
Lori Caramanian
United States Department of Justice
Environment and Natural Resources Division
Environment & Natural Resources Division
1961 Stout Street, 8th Floor
Denver, CO 80294
Phone: (303) 844-1499
Fax: (303) 844-1350

E-mail: lori.caramanian@usdoj.gov

Attorneys for Federal Defendants

Exhibit List

| Exh. No. | Description |
| --- | --- |
| 1. | Excerpts from Chapter 3 of the November 2006 Final Environmental Impact Statement |
| 2. | Excerpts of Biodiversity Conservation Alliance June 20, 2007 IBLA brief |
| 3. | Excerpts from Biodiversity Conservation Alliance Dec. 4, 2004 memorandum in support of motion for summary judgment, docket 10, 04-cv-0822 (RJL) |
| 4. | BLM NEPA log |
| 5. | Oct. 16, 2007 e-mail from Dennis Carpenter to Sharon Buccino |

## CERTIFICATE OF SERVICE

I hereby certify that on this 29h day of October, 2007, I  electronically filed the foregoing **FEDERAL DEFENDANTS' SUPPLEMENTAL PRELIMINARY INJUNCTION BRIEF** through the CM/ECF system, which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Sharon Buccino   sbuccino@nrdc.org, cwyatt@nrdc.org

Robert Charles Mathes     rmathes@bjorklindley.com, lvanderveer@bjorklindley.com

Michael B. Wigmore     michael.wigmore@bingham.com


__ s/ *Lori Caramanian* _____
LORI CARAMANIAN

# CHAPTER 3. AFFECTED ENVIRONMENT

Table 3-32. Population Parameters for Big Game Herd Units within the ARPA.

| Species | Herd Unit | Unit No. | Hunt Area(s) | Size (mi²) | Population Estimate (2004)[3] | Population Objective | Density Estimate Objective[1] | Fawn: Doe Ratio |
|---|---|---|---|---|---|---|---|---|
| Pronghorn | Baggs | 438 | 53, 55 | 1,394 | 9,300 | 9,000 | 6.46 | 43:100[2] |
| Pronghorn | Bitter Creek | 414 | 57,58 | 2,915 | 10,200 | 25,000 | 8.58 | 36:100[2] |
| Mule Deer | Baggs | 427 | 82,84, 100 | 3,440 | 21,000 | 18,700 | 5.44 | 44:100[3] |
| Elk | Sierra Madre | 425 | 13,14,15, 21,108 | 2,425 | 11,200 | 4,200 | 1.73 | 45:100[3] |
| Elk | Petition | 430 | 124 | 2,915 | 300 | 300 | 0.10 | 44:100[3] |

Notes:
[1] No. Animals (WGFD Population Objective) per Square Mile of Occupied Habitat
[2] Prehunt Classification
[3] Posthunt Classification

The ARPA is located within Hunt Areas 82, 84, and 100. Hunt Area 82 remains the most popular in the herd unit and sustains the highest levels of hunter use (WGFD 2003b). Mule deer migrate from the eastern portion of the Baggs Herd Unit to lower elevation crucial winter ranges that are located in the southern and central portions of the ARPA. Some mule deer that spend the summer near the Sandhills may migrate to winter range in the southwestern portion of the Baggs Herd Unit near Powder Rim (Porter 1999). Of particular importance is the crucial winter range located south and west of Muddy Mountain within the ARPA. Although many mule deer migrate to other locations, this area becomes a concentration area for mule deer during severe winter conditions.

Mule deer did not meet Standard #4 (Wildlife Habitat Health) in the Upper Colorado River Basin Standards and Guidelines Assessment (USDI-BLM 2002e). Of the three commonly found big game species in this watershed, deer habitat, and particularly crucial winter range, is of the highest concern. The principal area that did not meet Standard #4 is the mule deer crucial winter range located between Horse Mountain and Poison Basin and north from Baggs, Wyoming, along Muddy Creek through the Wild Horse and Dad juniper woodlands. This area encompasses about 40,000 acres of public land. Adjacent to this area and to the north and west are areas in better condition that are used in mild winters, but act more as transition habitat in severe winters. Also, a much higher percentage of mule deer crucial winter range is on private lands compared to antelope and elk crucial winter range. There are 73,270 acres of mule deer crucial winter range (table 3-33), of which 42 percent is on private and state lands where there are no protections against disturbance of animals during critical time periods (map M-22). Therefore, this should be taken into account (when possible) when actions are implemented on lands adjacent to public lands because actions taken on public lands would only affect approximately 20 percent of the most heavily used areas within the crucial winter range.

Observed habitat concerns in the mule deer crucial winter range include single species dominance by Utah juniper and big sagebrush species, mature-to-decadent-aged shrub communities, poor vigor, and heavy-to-severe use of desired shrub species, dense stands of shrubs that inhibit use and movement, and low composition of forbs on deer ranges used first in the spring.

# CHAPTER 3.  AFFECTED ENVIRONMENT

### 3.7.1.3  Upland Game Birds

The WGFD manages upland game birds within upland game management areas.  The greater sage-grouse (*Centrocercus urophasianus*) and the Columbian sharp-tailed grouse (*Tympanuchus pahianellus columbianus*) are the main upland game bird species known to occur in the ARPA. The ARPA lies within the Sierra Madre Upland Game Management Area (UGMA #25) and includes a very small portion of the Bitter Creek Upland Game Management Area (UGMA #10).

**Greater Sage-Grouse**

Wyoming is one of the last strongholds for greater sage-grouse in the western United States, and contains more grouse than all other states combined.  Greater sage-grouse are common throughout Wyoming because their habitat remains relatively intact compared to other states.  In south-central Wyoming, this is even more accentuated due to the harsh climate that has limited past habitat loss or conversion to settlements and agricultural development along river bottoms.  In the past, disturbance to upland habitats was restricted to livestock grazing and vegetation treatments (primarily at higher elevations).  More recent disturbance to grouse habitat has come with development of energy resources.

Greater sage-grouse lek locations were obtained from the WGFD and the BLM RFO.  There are 88 leks located in and within 2 miles of the ARPA (map M-26).  Leks are often in grassy areas or in more open canopy sagebrush/grass habitat.  Greater sage-grouse are dependent on sagebrush environments for their year-round survival, and in particular on ATVII and ATW, which occupy an estimated 85 percent of the ARPA.  This dependency includes using sagebrush as forage, nesting, brood-rearing habitat, and winter thermal cover.  In addition, grouse require a variety of sagebrush habitat types to meet their life history requirements.  The sagebrush habitat types in the ARPA are diverse and provide a high quality environment for greater sage-grouse that is reflected in their abundance in this area.  Riparian habitats are also important for brood-rearing habitat during the summer and fall months.  The proximity of these two habitats to each other increases their value.

In response to petitions to list the greater sage-grouse under the Endangered Species Act (ESA), the USFWS conducted a status review of this species throughout its range and on January 7, 2005 determined that it did not warrant protection under the ESA.  However, USFWS Director Steve Williams stated that, "At the same time, the status review clearly illustrates the need for continued efforts to conserve sage-grouse and sagebrush habitats on a long-term basis."  Greater sage-grouse populations in Wyoming have stabilized in recent years.  Because of continuing modifications of sagebrush habitats from fire, chemical, and mechanical treatments and development, the need exists to minimize such losses and to conserve and improve sage-grouse habitats through careful management practices.  The greater sage-grouse is included on the Wyoming Sensitive Species List of the BLM State Director (USDI-BLM 2002a).

**Exhibit 1 - Page 2 of 3**

# CHAPTER 3.  AFFECTED ENVIRONMENT

The State of Wyoming contends that hunter harvest primarily consists of young birds that have a high mortality rate regardless of hunting. However, grouse harvest numbers have been reduced by shortening and moving back the hunting season dates and lowering the bag limits. These seasons were set at a later date to reduce the harvest of older, successful reproducing hens that were found with broods near water. The later season decreased the harvest of hens because the birds were scattered in all habitats. In addition, shorter seasons primarily reduce the number of hunters, since many big game seasons were underway and there is less interest in hunting sage-grouse later in September.

In order to protect greater sage-grouse breeding grounds, the BLM places a quarter-mile buffer around the edge of leks where controlled surface use (CSU) is stipulated (USDI-BLM 1990). The quarter-mile buffer around the edge of occupied or unknown status leks located on or within a quarter mile of the ARPA covers 8,124 acres or 3 percent of the ARPA. Twenty of the 88 leks in the ARPA are located on private and state lands, which are not protected in any way from disturbance. In addition, the BLM places a 2-mile lek buffer in a seasonal stipulation preventing disturbance to protect nesting and early brood-rearing habitat. Potential greater sage-grouse nesting habitat (habitat associated with 88 leks) covers 191,017 acres or 71 percent of the ARPA. Of this acreage, 36 percent is on private and state lands.

According to Call (1974), Braun et al. (1977), Hayden-Wing et al. (1986), and others, approximately 50 percent of nests are usually located within a 2-mile radius of the strutting grounds. Using data collected at seven sites across Wyoming between 1994 and 2003, Holloran et al. (2005) documented 45 percent of nests occur within a 3-kilometer (approximately 2-mile) buffer and 64 percent of the nests occurred within a 5-kilometer (approximately a 3-mile) buffer. In addition, he also reported a correlation between nest distance from lek and success probability, suggesting increased success rates for nests greater than 8.5 kilometers from a lek (61 percent success greater than 8.5 kilometers, 44 percent success less than 8.5 kilometers). All research indicates that greater sage-grouse nest in suitable habitat beyond the 2-mile buffer. It is likely that hens from the active leks use most of the project area for nesting and brood-rearing, which in terms of suitable habitat amounts to 92 percent of the ARPA. Greater sage-grouse leks and associated nesting habitats on the project area occur mostly within the big sagebrush vegetation types. Areas with medium height sagebrush and tall residual cover of bunchgrasses provide nesting habitat (Crawford et al. 2004). Suitable brood-rearing habitat consists of various height sagebrush communities and riparian areas that provide abundant forbs, insects, and succulent mesic vegetation (Crawford et al. 2004).

Winter concentration areas have not been identified and mapped yet. Although winter conditions generally have little effect on greater sage-grouse populations (Call and Maser 1985, Beck and Braun 1978), if any winter concentration areas are identified in the future, there would be a timing restriction applied to surface disturbances and other disruptive activities to reduce stress to wintering birds from November 15 to March 14.

Severe winter relief habitat is used during the worst of winters. Severe winter relief habitat locations were located in the ARPA, covering a total of 200 acres. Twenty-six of these acres are on private lands and are not protected. Details of the protocol used in locating and describing the severe winter relief areas and results of the study are contained in a report submitted to the BLM in 2004 (HWA 2004). This study is on-going and the results will be used to identify physical and vegetative characteristics of severe winter relief habitat patches.

BEFORE THE INTERIOR BOARD OF LAND APPEALS
801 NORTH QUINCY STREET, SUITE 300
ARLINGTON, VIRGINIA 22203

BIODIVERSITY CONSERVATION )
  ALLIANCE )
Post Office Box 1512 )
Laramie, Wyoming 82073 )
307-742-7978, )
  )
WYOMING OUTDOOR COUNCIL )          IBLA Appeal No.:
232 Lincoln Street )
Lander, Wyoming 82520, )
  )
CENTER FOR NATIVE ECOSYSTEMS )     Appeal from the
1536 Wynkoop Street, Suite 301 )   Record of Decision by
Denver, Colorado 80202, )          the Wyoming State Director, BLM
  )                                dated March 23, 2007,
WESTERN WATERSHEDS PROJECT )       ATLANTIC RIM NATURAL GAS
PO Box 1160 )                      FIELD DEVELOPMENT PROJECT
Pinedale, WY 82941, )
  )
COLORADO ENVIRONMENTAL )
  COALITION )
1536 Wynkoop Street, #5C )
Denver, Colorado 80202, )
  )
THE WILDERNESS SOCIETY )
1660 Wynkoop Street, Suite 850 )
Denver, Colorado 80202, )
  )
  and )
  )
WYOMING WILDERNESS ASSN. )
Post Office Box 6588 )
Sheridan, WY 82801 )
307-672-2751, )
  )
  Appellants, )
  )
  v. )
  )
ROBERT A. BENNETT, State Director )
U.S. Bureau of Land Management )
Wyoming State Office )
Post Office Box 1828 )
Cheyenne, Wyoming 82003 )
307-352-6328, )
  )
  Respondent. )

JUN 2 0 2007

Hand-delivered at the Front Desk.

Exhibit 2 - Page 1 of 5

# NOTICE OF APPEAL

Pursuant to 5 U.S.C. § 555(e) and 43 C.F.R. § 4, Biodiversity Conservation Alliance, Wyoming Outdoor Council, Wyoming Wilderness Association, Center for Native Ecosystems, Western Watersheds Project, Colorado Evironmental Coalition, and The Wilderness Society (henceforth "Appellants") hereby file their Notice of Appeal on the following adverse decision:

The March 23, 2007 decision of Robert Bennett, Wyoming State Director of the Bureau of Land Management, to approve the Atlantic Rim Natural Gas Field Development Project. This decision is documented in a Record of Decision of the same date.

A Statement of Reasons for this Appeal will be provided within 30 days in accordance with 43 C.F.R. § 4.

_June 20, 2007_
Date

_Suzanne H. Lewis_
Suzanne H. Lewis
Biodiversity Conservation Alliance
P. O. Box 1512
Laramie, WY 82073
Phone: 307-742-7978
Fax: 307-742-7989
*Attorney for Appellants*

2

**Exhibit 2 - Page 2 of 5**

> dewatering of the Almond coals, it is likely that existing methane seeps along the outcrop will increase in their volume and danger level beyond what is seen today, and that new seeps will form.

Attachment 5 at ¶ 14. Thus, the danger to human life and safety, and to the well-being of native wildlife and vegetation, will increase markedly if this project is allowed to move forward. This constitutes a major environmental harm.

Specifically, the values and resources that BLM is obligated to protect — including roadless characteristics, wildlife and wildlife habitat — will be compromised without the required analysis or mitigation of significant adverse impacts. This harm is indeed imminent, as Double Eagle Petroleum plans to begin the drilling of its 268 wells in the Catalina Unit, a subset of the Atlantic Rim project, in July of 2007. *See* Attachment 6. A Stay is warranted because allowing development activities to proceed in this context will result in irreparable harm. *See Davis v. Mineta, supra.*

III. **The public interest favors granting the stay because it is best served by ensuring that BLM complies with applicable law.**

The stay request is in the public interest. BLM failed to comply with NEPA and FLPMA. "The policies underlying NEPA 'weight the scales in favor of those seeking the suspension of all action until the Act's requirements are met. . .'" *Save our Ecosystems v. Clark*, 747 F.2d 1240, 1250 (9th Cir. 1984) (citation omitted). Preservation of the environment against unnecessary and undue degradation, as required by FLPMA, is clearly in the public interest.

> The preliminary injunction would serve the public by protecting the environment from any threat of permanent damage. … While granting the preliminary injunction would inconvenience defendants and those parties holding specific interests in the lands at issue, denying the motion could ruin some of the country's great environmental resources—and not just for now but for generations to come.

16

Exhibit 2 - Page 3 of 5

company snapshot    print    e-mail    link          RSS    Technorati    Blog Search    bookmark it    blog it

## Double Eagle Petroleum Announces July Commencement of Atlantic Rim Development Drilling

EIS Record of Decision Published May 21, 2007

CASPER, Wyo., May 21 /PRNewswire-FirstCall/ -- Double Eagle Petroleum Co. (Nasdaq: DBLE) reported today that the record of decision on the Atlantic Rim Environmental Impact Statement was published in the Federal Register on Monday, May 21, 2007. This will allow Double Eagle to begin a development drilling program of up to 268 wells in the Catalina Unit, for which it is operator. During 2002 and 2003, the Company drilled 14 successful coal bed natural gas wells, which were producing 5.1 MMcf per day as of May 21, 2007, in the Catalina Unit.

Two drilling rigs have been contracted, and work on the first development well is expected to commence July 15. We anticipate drilling 34 development wells and three injection wells in 2007. Winter grazing will shut down a minor amount of the work beginning November 15, but it is anticipated that ten wells will be brought on line in the fall and we hope to have the additional 24 wells on line in February 2008. Double Eagle currently has a 100% working interest in the 14 previously drilled producing wells. As additional wells are drilled in the Catalina Unit on acreage partly or wholly owned by other parties, Double Eagle's interest in the Unit will change. Upon completion of the 34 wells expected to be drilled in 2007, Double Eagle's working interest will be approximately 72.8 % in the entire Catalina Unit.

It is anticipated that the Rocky Mountain Express Pipeline will have its second leg completed about the time we bring the 34 Catalina Unit wells on line. Double Eagle's access to the second leg of this pipeline is expected to significantly increase the price for natural gas that Double Eagle will realize in Wyoming.

With the finalization of the EIS, Anadarko Petroleum Corporation and Warren Resources, Inc. have announced that in 2007 they plan to drill an additional 70 coal bed methane wells in the Sun Dog Unit, which is adjacent to and east of the Catalina Unit, and in which there are currently 12 producing wells. The drilling of these wells will result in our working interest in the Sun Dog Unit increasing from approximately 4.54% to approximately 8.32%. Anadarko and Warren also operate the Doty Mountain Unit, a coal bed methane project located six miles northeast of the Catalina Unit. Doty Mountain has 24 producing wells and an additional 22 wells awaiting hook-up. Double Eagle owns a 20.55% working interest in those wells.

Stephen H. Hollis, CEO of Double Eagle commented: "For quite some time, we have been looking forward to being able to develop this very prolific natural gas field that we discovered in 1999. The development of this resource play will keep us busy for three to five years. If the wells produce as well as the existing 14 wells have, we will increase our production significantly. The equipment has been purchased, rigs have been contracted, electric power is being brought in and all the ancillary pipe people have been prepared to hit the ground running in July. This should be a very exciting year for Double Eagle and its shareholders."

About Double Eagle

Founded in 1972, Double Eagle Petroleum Co. explores for, develops, and

sells natural gas and crude oil, with natural gas constituting more than 90% of its production and reserves. The Company's current development activities are in its Atlantic Rim coal bed methane play and in the Pinedale Anticline in Wyoming. Its current exploration activities involve the Cow Creek Unit Deep and South Fillmore prospects in southwestern Wyoming, as well as the Christmas Meadows Prospect in northeastern Utah.

This release may contain forward-looking statements regarding Double Eagle Petroleum Co.'s future and expected performance based on assumptions that the Company believes are reasonable. No assurances can be given that these statements will prove to be accurate. A number of risks and uncertainties could cause actual results to differ materially from these statements, including, without limitation, decreases in prices for natural gas and crude oil, unexpected decreases in gas and oil production, the timeliness, costs and results of development and exploration activities, unanticipated delays and costs resulting from regulatory compliance, and other risk factors described from time to time in the Company's Forms 10-K and 10-Q and other reports filed with the Securities and Exchange Commission. Double Eagle undertakes no obligation to publicly update these forward-looking statements.

    Company Contact:
    John Campbell                    Steve Hollis, President
    (303) 794-8445                   (307) 237-9330
    http://www.dble.us

SOURCE Double Eagle Petroleum Co.



⊕ back to top

Related links:
• http://www.dble.us

 POWERED BY
Technorati    ○ Blogs Discussing This News Release

Issuers of news releases and not PR Newswire are solely responsible for the accuracy of the content.
Terms and conditions, including restrictions on redistribution, apply.
Copyright © 1996- 2007 PR Newswire Association LLC. All Rights Reserved.
A United Business Media company.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BIODIVERSITY CONSERVATION      )
ALLIANCE, WYOMING WILDERNESS   )       **Civil No. 04-00822 (RJL)**
ASSOCIATION, and the WYOMING   )
CHAPTER OF THE SIERRA CLUB,    )
                               )
    Plaintiffs,               )
                               )
    v.                        )
                               )
UNITED STATES BUREAU OF LAND   )
MANAGEMENT, a bureau within the )
Department of the Interior; GALE A. )
NORTON, in her official capacity as the )
Secretary of the Interior; and TED A. )
MURPHY, in his official capacity as the )
Assistant Field Manager, Lands & Minerals, )
Bureau of Land Management,      )
                               )
    Defendants.               )
_____ )

---

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND INJUNCTIVE RELIEF

---

Erik Schlenker-Goodrich (NM Bar # 17875), *Pro Hac Vice*
Western Environmental Law Center

Counsel for Plaintiffs

Matt Kenna (Bar #CO0028)
Kenna & Hickcox, P.C.

Local Counsel for Plaintiffs

**Exhibit 3 - page 1 of 3**

whether prescribed project design and mitigation measures reduce impacts to acceptable levels or

whether a more comprehensive Environmental Impact Statement ("EIS") is required.  BLM's

failure to adequately address cumulative impacts results in the agency's inability to provide a

convincing justification for its FONSI.

Additionally, BLM failed to consider a reasonable range of alternatives for the proposed

action.  BLM refused to consider a reasonable alternative fairly presented to it by the Plaintiffs

involving the use of less-intrusive 'buggy-supported shot-hole' technology, providing no

explanation as to why that proposed alternative was completely ignored.  *Id.* at ¶¶ 7-8 (noting

considered and rejected alternatives).  BLM also took an 'all or nothing' approach to its

alternatives, failing to consider a 'hybrid' alternative to address the concerns of Veritas, BLM,

and public.  BLM's inability to seek solutions to land management problems and fixation on

meeting Veritas' desires runs afoul of the basic purpose behind NEPA's alternatives requirement:

to sharply define the issues and present a clear basis for choice.

Finally, BLM failed to provide for adequate public participation.  Both FLPMA and

NEPA evidence an indisputable mandate to involve the public in federal agency decisions.  Such

involvement allows the public to identify concerns and assist agencies in reaching fully-informed

and well-considered decisions.  Here, however, BLM, while initially affording the public a

limited voice, did not provide the public with the opportunity to provide comment after the

agency increased the size of the project by 44,000 acres.  *Id.* at ¶¶ 3-4.  Nor did BLM provide the

public with the opportunity to review and critique the actual EA before the DR/FONSI was

signed.  BLM's half-hearted attempt to afford the public a voice resulted in a legally deficient

decision-making process more akin to an 'echo chamber' than the transparent, open, and

PLFS. MEM. POINTS & AUTH.: CV 04-00822 (RJL)                          Page 3 of 39

Exhibit 3 - page 2 of 3

extent of public involvement without a valid and articulated justification.  40 C.F.R.§ 1501.4(b).

As the Ninth Circuit has summarized:

> Although we have not established a minimum level of public comment and
> participation required by the regulations governing the EA and FONSI process,
> we clearly have held that the regulations at issue must mean something.  *Cf. Hart
> v. McLucas*, 535 F.2d 516, 519 (9th Cir. 1976) ("[I]n the construction of
> administrative regulations ..., it is presumed that every phrase serves a legitimate
> purpose....").  It is evident, therefore, that a complete failure to involve or even
> inform the public about an agency's preparation of an EA and a FONSI, as was
> the case here, violates these regulations.

*Citizens For Better Forestry v. U.S. Department of Agriculture*, 341 F.3d 961, 970 (9th Cir.

2003).  Notably, *Citizens for Better Forestry* does not set the threshold as a "complete failure" to

involve and inform the public; the Ninth Circuit simply held that a "complete failure" constituted

a *per se* NEPA violation.  *Id.*  Accordingly, in the absence of a "complete failure" to involve the

public, the legality of BLM's efforts necessitate a fact-intensive inquiry.

Here, the record does not demonstrate a justification for excluding the public from either

commenting on the expanded scope of the project, or reviewing and commenting on the draft

EA.  BLM provided no justification for its refusal to allow additional comments on the 44,000

acre expansion of the project, stating only that they perceived the project as having only

"increased slightly."  AR, Doc. 32, DR/FONSI at 13.  However, as a result of the HR3D

Project's expansion, the entire citizen-proposed Red Lake Dunes Wilderness was impacted as

compared to less than half being impacted as per the boundaries identified in the BLM's initial

scoping notice.  Statement of Material Facts ¶ 22.  In this context, such an increase, irrespective

of the significance of an additional 44,000 acres – which is itself difficult to characterize as

"slight" – is quite significant.

**Exhibit 3 - page 3 of 3**

BLM Wyoming

<< Back to NEPA Home

Advanced Search

U.S. DEPARTMENT OF THE INTERIOR   **BUREAU OF LAND MANAGEMENT**
**Wyoming NEPA Register**

NEPA Documents

Abbreviations used in the Register

| Fiscal Year |
| All |
| 2008 |
| **2007** |
| 2006 |

| Field Office |
| All |
| Buffalo - 070 |
| Casper - 060 |
| Cody - 020 |
| Kemmerer - 090 |

| Program |
| AML |
| CBNG |
| Cultural |
| Forestry |
| Fuels |

| County |
| Albany |
| Big Horn |
| Campbell |
| Carbon |
| Converse |

Search NEPA Records

Narrow your search by using the above fields. The following conditions apply: If nothing is selected, the results default to the 2005 register for all field offices. If a Field Office is selected, all counties are returned for that Field Office, regardless of which counties are selected. Only the current fiscal year's data is available for certain Field Offices. Results are returned in descending order by fiscal year, field office number and document number. (To select multiple options, or to de-select an option, hold down Command on the Mac, or Ctrl on Windows.)

| Document # | Start Date | Program | Project | Case No. | County | Final Action | End Date |
|---|---|---|---|---|---|---|---|
| WY-030-EA07-239 | 07/26/2007 | Minerals | Natural gas wells, well pads, and access roads Five Mile Ditch 15-30 and 16-32 | WYW-145716 | Sweetwater | DR | 08/08/2007 |
| WY-030-EA07-237 | 07/25/2007 | Minerals | Well, well pad, access road, and possible pipeline Joltin Joe Federal Com #4 | WYW-158549 | Sweetwater | In Process | |
| WY-030-EA07-232 | 07/19/2007 | Minerals | Natural gas wells, well pads, access roads, pipelines, and power lines Sun Dog Unit Pods D and E | WYW-116679, -139142, -141278, -148482, -161910; WYW-161909, -161910, -161914 | Carbon | In Process | |

**Exhibit 4 - page 1 of 5**

BLM Wyoming

| ID | Date | Program | Description | Serial Numbers | County | Status | Date |
|---|---|---|---|---|---|---|---|
| WY-030-EA07-231 | 07/19/2007 | Minerals | Natural gas wells, well pads, access roads, pipelines, and powerlines Sun Dog Unit Pod C | WYW-128664, -131778, -133656, -141279, -141280, -141281, -163348 | Carbon | In Process | |
| WY-030-CX07-230 | 07/18/2007 | Minerals | Well pad extension West Wamsutter 11-26 | WYW-115911 | Sweetwater | In Process | |
| WY-030-EA07-229 | 07/18/2007 | Minerals | Natural gas well and access road Wertz Dome 123R | WYC-029520A | Carbon | DR | 08/09/2007 |
| WY-030-EA07-226 | 07/12/2007 | Minerals | Well, well pad, access road, and pipeline Zeolite Federal #6 | WYW-135006, WYW-166834 | Sweetwater | In Process | |
| WY-030-EA07-225 | 07/12/2007 | Minerals | Natural gas well, well pad, access road, and pipeline Red Desert 3-18 | WYW-17125 | Sweetwater | DR | 07/13/2007 |
| WY-030-EA07-222 | 07/09/2007 | Minerals | Natural gas wells, well pads, access roads, and pipelines Sun Dog Pods A and B | WYW-116679, -126439, -131778, -141280, -141281, -147856, -148482, -141278, -141279 | Carbon | DR | 08/16/2007 |
| WY-030-EA07-219 | 07/09/2007 | Minerals | Well, well pad, and access road Wilson #13 | WYW-056175A | Albany | DR | 08/08/2007 |
| WY-030-CX07-209 | 06/25/2007 | Minerals | 3D Seismic Survey | WYW-166994 | Carbon | DR | 09/24/2007 |
| WY-030-EA07-208 | 06/25/2007 | Minerals | Natural gas wells, well pads, access roads, and pipelines West Wamsutter 7-34, 9A-34, 11-34, and 14-34 | WYW-66784, WYW-93012 | Sweetwater | DR | 07/31/2007 |
| WY-030-EA07-207 | 06/25/2007 | Minerals | Natural gas wells, well pads, access roads, and pipelines Siberia Ridge 8-26 | WYW-133707 | Sweetwater | DR | 06/28/2007 |

BLM Wyoming

| WY-030-EA07-203 | 06/21/2007 | Minerals | and 16-26 | WYW-37184 | Sweetwater | In Process | |
| WY-030-EA07-202 | 06/21/2007 | Minerals | Natural gas wells, well pad, access road, and pipeline NE Echo Springs 20-2 and 20-3 | WYW-51985 | Sweetwater | DR | 07/03/2007 |
| WY-030-EA07-196 | 06/12/2007 | Minerals | Natural gas well and well pad Tierney II Unit 28-40, 28-120 | WYW-158549 | Sweetwater | In Process | |
| WY-030-EA07-192 | 06/08/2007 | Minerals | Well, well pad, access road, and pipeline Joltin Joe Federal Com. #4 | WYW-51985 | Sweetwater | DR | 06/20/2007 |
| WY-030-EA07-191 | 06/08/2007 | Minerals | Natural gas well and well pad Tierney II Unit 28-5 | WYW-7667 | Sweetwater | DR | 06/20/2007 |
| WY-030-EA07-188 | 06/07/2007 | Minerals | Natural gas well and well pad Tierney II Unit 26-60 | WYW-035311 | Carbon | In Process | |
| WY-030-EA07-186 | 06/05/2007 | Minerals | Natural gas wells and well pad Coal Gulch F 5D, 7D, 8D, 9D, 10D, 11D, 20D, 15D | WYC-075344A, -075345A; WYW-48861, -131275, -136955, 155530, 161910 | Carbon | DR | 06/28/2007 |
| WY-030-CX07-183 | 05/29/2007 | Minerals | Catalina Pods A&B (AREIS) | WYW-144602 | Sweetwater | In Process | |
| WY-030-CX07-182 | 05/29/2007 | Minerals | Produced water disposal Nickel Unit #8 | WYW-66955 | Sweetwater | In Process | |
| WY-030-CX07-181 | 05/29/2007 | Minerals | Produced water disposal Nickel Unit #7 | WYW-66955 | Sweetwater | In Process | |
| | | | Produced water disposal Nickel Unit #6 | | | | |
| | | | Produced water | | | | |

U.S. DEPARTMENT OF THE INTERIOR   **BUREAU OF LAND MANA**
**Wyoming NEPA**

# NEPA LOG Details

|  |  |
|---:|:---|
| **Document #:** | WY-030-EA07-186 |
| **Start Date:** | 06/05/2007 |
| **Program:** | Minerals |
| **Applicant:** | Double Eagle Petroleum Company |
| **Project Description:** | Catalina Pods A&B (AREIS) |
| **Final Action:** | DR |
| **End Date:** | 06/28/2007 |
| **Section:** | 6, 7 18; 31, 32; 1, 11, 12, 13 |
| **Township:** | 16N; 17N; 16N |
| **Range:** | 91W; 91W; 92W |
| **County:** | Carbon |
| **Case File Number:** | WYC-075344A, -075345A; WYW-48861, -131275, -136955, 155530, 161910 |
| **Field Office:** | Rawlins - 030 |

Back to the search page

USA Gov  |  No Fear Act  |  DOI  |  Disclaimer  |  About BLM  |  Notices  |  Get Adobe Reader®
Privacy Policy  |  FOIA  |  Kids Policy  |  Contact Us  |  Accessibility  |  Site Map  |  Home

**Exhibit 4 - page 4 of 5**

U.S. DEPARTMENT OF THE INTERIOR  **BUREAU OF LAND MANA**
**Wyoming NEPA**

# NEPA LOG Details

|  |  |
|---|---|
| **Document #:** | WY-030-EA07-222 |
| **Start Date:** | 07/09/2007 |
| **Program:** | Minerals |
| **Applicant:** | Anadarko Exploration and Production Company LP |
| **Project Description:** | Natural gas wells, well pads, access roads, and pipelines Sun Dog Pods A and B |
| **Final Action:** | DR |
| **End Date:** | 08/16/2007 |
| **Section:** | Various |
| **Township:** | 16N |
| **Range:** | 91W |
| **County:** | Carbon |
| **Case File Number:** | WYW-116679, -126439, -131778, -141280, -141281, -147856, -148482, -141278, -141279 |
| **Field Office:** | Rawlins - 030 |

Back to the search page

Buccino, Sharon

From:            Dennis_Carpenter@blm.gov
Sent:            Tuesday, October 16, 2007 5:48 PM
To:              Buccino, Sharon; Erik Molvar; Dwayne M. Meadows; and "Mary Mondragon
Subject:         Sun Dog EAs

Attachments:     Sun Dog Unit POD C_Tiered EA_Final.pdf; SUN DOG Pod C - FINAL COAs; 10-15-07.pdf;
                 Sun Dog Unit POD D&E_Tiered EA_Final.pdf; SUN DOG Pod D & E FINAL COAs.pdf

      

Sun Dog Unit POD    SUN DOG Pod C -    Sun Dog Unit POD  UN DOG Pod D & E
C_Tiered EA_F...    FINAL COAs, 10...    D&E_Tiered EA...    FINAL COAs.p...

Sharon, Erik, Dwayne, and Mary:

Per your recent requests to the Rawlins Field Office (RFO), we know you
have an interest in obtaining information on future approvals in the
Atlantic Rim project area (ARPA). Currently, the Sun Dog C, D, and E
Plans of Development (PODs) are pending a decision; this office has
completed related environmental assessments (EA). As a courtesy and for
your convenience, we are attaching a copy of the Sun Dog C and Sun Dog D
& E EAs.

While the Council on Environmental Quality (CEQ) regulations do not
specifically require agencies to provide opportunity for public
review/comment on an EA prior to issuing a Finding of No Significant
Impact (FONSI) and/or Decision Record (DR), the Wyoming BLM webpage does
post notice regarding projects for which environmental documents are
being prepared. Agency policy states the manager responsible for
authorizing the action has the discretion to determine, on a
case-by-case basis, if an EA should be made available for public review
before releasing a decision on the proposed activity. However, upon
request, interested parties can receive specific project information,
and, if available, completed NEPA documents. Comments will be considered
if received within expected project processing timelines, which will
vary based upon the complexity of the project. However, actively
disseminating pre-decisional documents to all interested publics is not
feasible nor practicable and would be unduly burdensome. The Rawlins
Field Office (RFO) is not capable of fulfilling such open-ended
requests.

Again, as we have previously advised, you may review our NEPA register
which can be found at www.blm.gov.wy. This information was previously
and is also still available manually at individual BLM Field Offices.
The register provides information to the public on types of BLM
projects, their general geographical location, date the NEPA document
preparation was initiated and dates of related decisions. The Sun Dog
C, D, and E PODs were initiated on July 19, 2007.

In addition to the NEPA register, and in accordance with BLM oil and gas
regulations at 43 CFR 3162.3-1(g), Applications for Permit to Drill
(APD) or Notices of Staking (NOS) must be publically posted for a
minimum of 30 days. At the RFO, these are posted in our public room and
are available for viewing by all interested publics during regular
business hours. You are welcome to visit the office and free to call
ahead with specific questions you may have; similarly, requesting
specific project information/documents early in the process is
suggested.

Again, please see attached. I expect to make a decision on the Projects
by Monday October 22, 2007. Please feel free to call Laura Gianakos at

**Exhibit 5 - page 1 of 2**

(See attached file: Sun Dog Unit POD C_Tiered EA_Final.pdf)(See attached file: SUN DOG Pod C - FINAL COAs, 10-15-07.pdf)(See attached file: Sun Dog Unit POD D&E_Tiered EA_Final.pdf)(See attached file: SUN DOG Pod D & E FINAL COAs.pdf)

*******************************************************
Dennis J. Carpenter
Interim Field Manager
Assistant Field Manager, Rawlins Support Center Rawlins Field Office P. O. Box 2407 1300
N. 3rd Street Rawlins, WY  82301
307-328-4209
307-328-4224 (Fax)
307-320-5319 (Cell)
*******************************************************

Exhibit 5 - page 2 of 2