IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL )<br>1200 New York Avenue, NW, Suite 400 )<br>Washington, DC  20005,            *et al.* )<br>                                                      )<br>            Plaintiffs,                              )<br>                                                      )<br>                        v.                          )<br>                                                      )<br>DIRK KEMPTHORNE, in his official capacity )<br>As the Secretary of the United States )<br>Department of the Interior )<br>1849 C Street, NW )<br>Washington, DC  20240,            *et al.* )<br>                                                      )<br>            Defendants.                          )<br>_____) | Civ. No. 07-1709 (RJL) |

**PLAINTIFFS' SUPPLEMENTAL BRIEFING IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

New well pads and the infrastructure to go with them are being built *right now* in

an area prized by many for its recreational and natural values.  This drilling is occurring

pursuant to final decisions made by the Bureau of Land Management ("BLM") to

approve several plans of development ("PODs") within the Atlantic Rim project area in

Wyoming's Red Desert.  At the same time BLM argues to this Court that most of the

ground-disturbing activity is already done, the agency has gone ahead and approved three

new PODs containing 48 new wells, along with miles of new roads and pipelines.  *See* Pl.

Exh. Y (Decision Record approving Sun Dog POD C dated October 23, 2007) and Pl.

Exh. Z (Decision Record approving Sun Dog PODs D & E dated October 23, 2007).  It is

as if BLM has dared this Court to act.  BLM's action requires immediate issuance of a

preliminary injunction by this Court to prevent irreparable harm while the merits of Plaintiffs' claims are resolved.[1]

Plaintiffs address herein four points in response to arguments made at the October 18, 2007, hearing before this Court in opposition to Plaintiffs' Motion for Preliminary Injunction.

## 1.      BLM Has Now Approved Activity in Areas that were Previously Shielded from Drilling Impacts.

BLM ignores the fact that prime recreational areas were previously unaffected by development and now they are.  Photographs taken of Sun Dog C, D, and E PODs on Monday, October 22, 2007, prior to BLM's approval of new wells in the area help demonstrate what is at stake.  Declaration of Duane Short attached as Pl. Exh. AA. While some exploratory drilling had previously occurred in both the Catalina and Sun Dog Units, the impacts of this prior drilling had been limited and were hidden from the primary routes of access by intervening topography.  BLM's own maps show that the new wells (blue dots labeled "other wells") are expanding into areas where no wells previously existed.  Pl. Exh. Y, at 10.  The new wells that have been approved go right up to the main county roads, thus degrading the experience of those coming to any part of the project area.

The activity that BLM has approved in the seven recent PODs brings development into areas to which the public and wildlife had previously escaped.[2]   BLM

---

[1] Plaintiffs have filed an amended complaint to include the October 23, 2007 approval by BLM of the three new PODs, (Sun Dog C, D and E).  This Court can act now without further briefing or hearings since the scope of relief requested by plaintiffs in the Motion for Preliminary Injunction dated September 25, 2007, will address the recent approvals.  In their motion, plaintiffs asked the Court to enjoin all surface disturbing activity under PODs already approved by BLM and to enjoin future approvals of drilling permits within the Atlantic Rim project area.
[2] The Court is correct that folks do not go pitch their tents next to oil and gas wells.  *See* Transcript of Preliminary Injunction Hearing (October 18, 2007) (hereafter "PI Hearing Transcript"), at 36.  Yet, there is

itself acknowledges in the project environmental impact statement that the "natural

setting" will be lost. BLM Exh. 8 at 4-102. (FEIS) (Coalbed methane development will

"diminish wildlife presence, degrade scenery, and introduce traffic and noise. The

natural setting would be converted to an industrialized setting by development of the

Proposed Action."). With the approval of seven different plans of development in the

Catalina and Sun Dog Units, this industrialization has clearly begun.

Moreover, BLM has only given the Court part of the picture. Over one-quarter of

a million acres are at stake in the Atlantic Rim project area. While some exploratory

wells have been drilled in a few parts of the project area, much of the area remains

essentially untouched by development. Biodiversity Conservation Alliance and others

have regularly conducted outings into the Atlantic Rim project area. Pl. Exh. BB. In

fact, the project area includes a proposed wilderness area. Pl. Opening Br. at 36-37. In

addition to the Catalina and Sun Dog PODs, BLM has many more PODs planned for the

project area. Pl. Exh. CC (map showing units within Atlantic Rim project area from

Wyoming Department of Environmental Quality Methane Springs Presentation (April 23,

2007)). Many of these PODs are located in areas where there has been little or no

previous drilling.

Plaintiffs seek to limit the harm from drilling to the project area as much as

possible. Yet, plaintiffs have been denied their lawful right to do so by BLM's failure to

---

plenty of land that people have gone to pitch their tents in the project area. The risk from methane seeps is
not limited to the location of well pads. Instead, the methane seeps can occur at a distance from the well
pads where visitors may in fact be camping. BLM Exh. 12 at 4 (Albrandt Decl.). While Defendants'
counsel highlights the absence of any deaths to date from methane explosions, it seems that the risk of
death is worth guarding against as much as possible. Industry committed to drilling methane monitoring
wells before drilling any production wells. Interv. Exh. 9 at 9 (par. 5). The danger of methane seeps comes
not so much from the drilling of the wells, but from the extraction of the gas on a daily basis from the
wells. Pl. Exh. S. Although several production wells have been drilled, the applications for the monitoring
wells still appear to be pending before BLM.

provide the public participation and complete environmental analysis that NEPA, the

Federal Land Policy and Management Act ("FLPMA") and the Clean Water Act require.

Plaintiffs are not arguing that no development should occur in the area.  Instead, plaintiffs

seek the ability to influence where specific wells are located and what specific mitigation

measures are adopted to prevent harm to specific wildlife populations and nearby waters.

Yet, BLM has unlawfully denied plaintiffs this opportunity and lost the benefit of the

public's input.  BLM's flawed environmental analysis and flawed process affects the

entire project area.

>        **2.       Finding of Failure to Take Hard Look is Not Necessary to Grant
>                   Relief Plaintiffs Request.**

Plaintiffs acknowledge that assessing the adequacy of BLM's environmental

analysis involves digging through a lot of paper.  Given the procedural errors that BLM

has committed in approving the drilling permits at issue, however, the Court does not

need to resolve the issue of whether the agency took a hard look at environmental

impacts that NEPA requires to grant plaintiffs the preliminary injunctive relief that they

request.[3]

BLM itself has said that the project will cause significant environmental impacts

*even with the mitigation measures that the agency has required.*  For example, BLM

acknowledged that the project would significantly harm sage grouse.  BLM Exh. 8  at 4-

76 (FEIS) (BLM states in final environmental impact statement that activities and

infrastructure associated with the Atlantic Rim project would significantly harm the sage

grouse, leading to lower birth rates, a long-term loss of nesting habitat, and a long-term

---

[3] Plaintiffs do not waive any issues raised in their complaint as amended on October 26, 2007.  Plaintiffs
have chosen to focus on certain issues for purposes of the preliminary injunction motion.  The Court need
not find that Plaintiffs are likely to prevail on all the issues raised in order to grant the emergency relief
requested.

decline in population.).[4]  The agency is free to take a hard look and proceed even under

NEPA if it finds significant impacts.  But that is not the question at issue here.

Regardless of whether the agency took a hard enough look at the impacts, what the

agency did find and document in its environmental analysis demonstrates the irreparable

harm that is occurring and will continue to occur if this Court does not act now to enjoin

drilling within the Atlantic Rim project area.[5]  BLM's arguments about the

reasonableness of its actions do nothing to refute the agency's own statements in the

project's environmental impact statement that significant impacts will occur.

        BLM suggests that plaintiffs are unreasonable in what they ask.  The agency seeks

to defend their action by pointing to all the analysis that was done.  This analysis at the

programmatic level when evaluating the project as a whole without knowing the specific

well locations is only part of what is required under NEPA.  Plaintiffs recognize that a lot

of time and effort went into preparing the programmatic environmental impact statement.

But BLM did not finish the job.  The agency explicitly deferred key sections of the

analysis which the agency itself acknowledges that NEPA requires until later in the

process when it was approving ground-disturbing activities such as applications for

permits to drill.  *See, e.g.,* BLM Exh. 3, at 18-20 (Atlantic Rim Record of Decision (May

21, 2007));  BLM Exh. 8, at 4-26, 4-107 (FEIS);  Pl. Exh. DD, at O-179 (FEIS --

Response to Comment Number 671-16-2) ("Site-specific decisions will be tiered to the

Atlantic Rim EIS and Record of Decision and will be separate from the EIS process.").

---

[4] Defendants' counsel herself acknowledged this harm to sage grouse from the approved development.  PI
Hearing Transcript at 41 ("Well, the whole area is  pretty much sage grouse habitat.  92 percent of the area
is sage grouse habitat.  So, basically, if you are going to have  development, you are going to have habitat
affected, and that's acknowledged in the EIS.").

[5] Plaintiffs are prepared to move forward expeditiously with a Motion for Summary Judgment to limit the
time that the preliminary injunction is in effect.

Yet, when this later time came, BLM did not complete the site-specific analysis required nor provide the public the opportunity to comment as required.

### 3.    The Public Has Useful Additional Information to Provide BLM Once the Well Locations are Known.

At the preliminary injunction hearing, the Court wisely asked what kind of comments plaintiffs would have on the drilling permits that they did not already make previously on the programmatic environmental impact statement.  PI Hearing Transcript at 23.  Once the well-site locations are known, the public can provide comments that are more specific and useful to BLM than comments provided earlier on the programmatic environmental impact statement prepared for the project area.  For example, members of the public could provide BLM information about specific springs and riparian habitats that are used by wildlife and suggest modifications to proposed well locations to limit the damage to these areas.  Members of the public could also provide BLM information about habitat for certain BLM Sensitive Species, such as the pygmy rabbit and Wyoming pocket gopher.  The public could help BLM assess and alter well and road locations to limit the impact on these sensitive species and avoid having to list them as threatened or endangered.  Likewise, members of the public could provide BLM with information about valued hunting and fishing areas affected by the proposed Catalina and Sun Dog PODs and help the agency locate well pads and roads away from these areas.

The opportunity to comment on the programmatic Atlantic Rim Environmental Impact Statement does not substitute for a chance to comment once the well and road locations are identified.  BLM identified many types of analysis that the agency could not do until applications for permits to drill at specific locations were considered.  For example, BLM stated that it could not fully address impacts to ecologically sensitive

habitats until specific well locations were known.  FEIS at O-174 (hard copy provided to

Court by BLM).  Similarly, BLM stated that it could not fully address the impacts of

roads, pipelines, or wellpads on steep or unstable slopes until the specific locations of

these facilities were identified.  *Id.* at O-176.  In addition, BLM stated that it could not

fully address impacts to surface water resources until specific well pad and road locations

were known.  *Id.* at O-179.  The public's ability to comment was limited at the prior

programmatic stage of analysis in the same way that the agency was limited at this earlier

stage.

Like the enhanced ability of the agency to analyze the impacts once specific well

locations and accompanying infrastructure is considered, the public has more to offer

once when specific plans of development are considered than it did earlier in the process.

By denying the public the opportunity to comment on a company's specific proposal to

drill and the agency's environmental analysis of that proposal, BLM has excluded the

public at the most critical stage of analysis.  BLM has lost the information that NEPA is

designed to ensure that the agency consider.  Moreover, the public has been denied the

right to participate in decisions affecting their public lands at the time when BLM is

deciding what specific ground-disturbing activities will occur.  While the decision has

already been made to drill, critical issues regarding exactly where to drill and how to drill

have not been made until the agency approves the drilling permits.  NEPA and FLPMA

give the public the right to participate in a meaningful way at the drilling permit stage.

BLM has unlawfully denied the public this right here.

Specifically, here BLM should have provided a 30-day public comment period on

the proposed plans of development and accompanying environmental analysis *before* the

agency approved the PODs.  BLM provided such 30-day comment period in the previous

Biodiversity Conservation Alliance case dealing with the Veritas seismic project.

*Biodiversity Conservation Alliance v. BLM*, 404 F.Supp.2d 212, 220 (D.D.C. 2005)

("BLM advised the public of Veritas's proposal, allowed a thirty-day public comment

period, and did not issue the DR/FONSI until after considering the issues raised during

that period.").  BLM has also provided such 30-day comment periods for plans of

development previously.  Pl. Opening Br. at 15.[6]

     Here, BLM never provided to the public the drilling permit applications or

accompanying environmental analysis related to Catalina A & B or Sun Dog A & B

PODs.  BLM provided plaintiffs a three-day comment period on Sun Dog C, D & E

PODs.  The agency did not provide any of the specialist reports that were part of the draft

environmental analysis.  This does not satisfy NEPA's requirement to include the public

"to the extent practicable."  40 C.F.R. § 1501.4(b).  This Court has noted that NEPA

regulations require agencies to "[m]ake diligent efforts to involve the public in preparing

and implementing their NEPA procedures."  *Biodiversity Conservation Alliance*, 404

F.Supp.2d at 219 (citing 40 C.F.R. § 1506.6).   BLM has offered no compelling

explanation why providing a 30-day comment period was not practicable in this case.

**4.      Waters Protected by the Clean Water Act are at Issue.**

     BLM and intervenors argued at the preliminary injunction hearing that state water

quality certifications pursuant to 33 U.S.C. § 1341 (§ 401 of the Clean Water Act

("CWA")) ("401 certifications") are not required because the approved projects would

---

[6] Plaintiffs are not arguing for the opportunity to comment on the final environmental assessment.  What plaintiffs argue is that NEPA provides them the right under the circumstances of this case to comment on the proposed drilling applications and environmental analysis before BLM finalizes its decision.  In the previous BCA case, BLM provided a 30-day comment period on the project before making its decision. Here, BLM provided no meaningful opportunity to comment at all.

not create discharges to "waters of the United States."[7]  Neither the facts nor the law support their position.

Intervenors argue, incredibly, that the Atlantic Rim project final environmental impact statement "made a determination that there are no waters of the United States" in the entire project area.  PI Hearing Transcript at 62.  Intervenors alleged support for this argument is a statement in the project environmental impact statement that "[t]he Great Divide Basin is unlikely to have any waters of the U.S. because it is internally drained and has no major water based recreation sites."  *Id. citing* FEIS 4-26.  However, the Sun Dog and Catalina PODs do not lie within the Great Divide Basin, but within the Yampa Watershed of the Colorado River Basin.  *See* Pl. Exh. W (Watershed Basin Map, FEIS, M-14, showing that only a small part of the project area is located in the Great Basin).  Intervenors' argument is simply factually incorrect.

BLM acknowledges that discharges of sediment and other pollutants will enter waters of the United States from the approved project activities.  In his affidavit, BLM employee Travis Bargsten states, "Drainage from the PODs travels to an unnamed tributary of Dry Cow Creek, thence to Dry Cow Creek, thence to Cow Creek, thence to Muddy Creek."  BLM Exh. 11, at ¶ 9.  *See also* Pl. Exh. W (Watershed Basin Map, FEIS, M-14).  A photograph from the Sun Dog PODs shows some of the water resources of the area.  Exh. 5 to Pl. Exh. Z (Short Decl.).   BLM's final environmental impact statement states that "[a]pproximately 69% of the [entire project area] is drained by Muddy Creek."  BLM Exh. 5 at 3-41.  In addition to the named ephemeral tributaries including Dry Cow Creek, "there are also numerous unnamed, ephemeral tributaries to Muddy Creek within the project area."  *Id.*  Muddy Creek drains into the Little Snake River which, ultimately,

[7] The CWA defines "navigable waters" broadly as "the waters of the United States."  33 U.S.C. § 1362(7).

drains into the Colorado River.  *Id.*  Defendants' counsel argued at the hearing that "[t]here has been no showing that that [discharges into waters of the United States] is occurring with any of the instances that Plaintiffs have identified."  PI Hearing Transcript at 57.  Yet, BLM's own evidence establishes that there is.

Given BLM's own evidence, there can be no doubt that waters of the United States are affected by the project and thus the Clean Water Act's 401 certification requirement applies.  The case law has clearly established that discharges requiring permits under § 402 of the CWA, 33 U.S.C. § 1342, do not need to be made directly into a navigable water, but can be carried by a channel such as an ephemeral tributary to a navigable water.  *See*, *Rapanos v. United States*, 126 S.Ct. 2208, 2227 (2006) (noting that the language of § 1342 ("addition of any pollutant to navigable waters") does not require discharges *directly* into navigable waters and acknowledging that § 1342 has always been held to cover "the discharge into intermittent channels of any pollutant *that naturally washes downstream* … even if the pollutants discharged from a point source do not emit directly into covered waters, but pass through conveyances in between.") (emphasis in original;  internal quotation marks and citations omitted)).  Like § 1342, the language of § 1341 ("*may result* in any discharge into navigable waters") also makes clear that discharges *directly* into navigable waters are not required.

In a similar vein, the intermittent channels that convey the discharges downstream to the river need not themselves be "navigable waters," but can be considered part of the point source.  *See Id.,* quoting *South Fla. Water Management Dist. V. Miccosukee Tribe*, 541 U.S. 95, 105 (2004) ("the Act 'makes plain that a point source need not be the original source of the pollutant; it need only convey the pollutant to navigable waters'");

*see also* 33 U.S.C. § 1362(14) (defining "point source" as "any pipe, ditch, channel, tunnel, conduit … from which pollutants are or may be discharged").

Moreover, discharges from development in the challenged PODs will emit directly into intermittent channels that qualify as "navigable waters" under *Rapanos*. Justice Kennedy's concurrence provides the controlling definition of "navigable waters" from *Rapanos*. *See U.S. v. Johnson*, 467 F.3d 56 (1st Cir. 2006) (summarizing circuit courts' interpretations of *Rapanos*). Justice Kennedy's test, based on *Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers*, 531 U.S. 159, 167 (2001) (*SWANCC*)), asks whether there is a "significant nexus" between a "wetland" at issue and waters "navigable" in the traditional sense. *Rapanos,* 126 S.Ct. at 2248 (Kennedy, J., concurring). More specifically, the "significant nexus" test turns on whether "the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.*

Based on BLM's own statements above, the intermittent channels into which the well pads, roads and other facilities in the approved PODs discharge are hydrologically connected to streams flowing year round. BLM has also admitted that project-related activities and infrastructure will significantly impact the integrity of waters such as Muddy Creek and the Colorado River. *See* BLM Exh. 5, at 4-26 and 5-11; BLM Resp. Br. at 37 (describing project-related water impacts including increased salinity, sedimentation, erosion and channel instability). The channels into which the POD-related discharges emit satisfy the "significant nexus" test and are "navigable waters."

Regarding the requirement for 60-day notice, defendants support plaintiffs' position that such notice was not required to bring their claim for failure to provide the certification required by the Clean Water Act. PI Hearing Transcript at 58. BLM's bases its defense based on plaintiffs' failure to raise the issue with the agency. This argument fails, however, since BLM did not give plaintiffs any opportunity to raise this issue by excluding the public from its decision process. *See* Pl. Reply Br. at 13-14.

## CONCLUSION

Immediate injunctive relief is needed now from this Court to prevent irreparable harm from the new wells, roads, pipelines and infrastructure that BLM has approved. Having chosen to move forward to approve more drilling permits, BLM has removed any question regarding whether all the harm has already occurred. The agency should not be allowed to delay injunctive relief further by requesting further briefing. If further briefing is granted, Anadarko will be free to drill new wells and bull-doze new roads while BLM is preparing further briefing. Intervenors' counsel has indicated that Anadarko will move forward immediately with the drilling and other construction authorized by the new approvals. For the reasons stated herein, in plaintiffs prior briefs and at the October 18, 2007, hearing, plaintiffs respectfully request this Court to grant their Motion for a Preliminary Injunction.

Respectfully submitted.

    /s Sharon Buccino
Sharon Buccino (D.C. Bar # 432073)
Aaron Bloom
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
(202) 289-6868
         Attorneys for Plaintiffs                              Dated: October 29, 2007

EXHIBIT LIST

Sun Dog POD C Decision Record (October 23, 2007) ...............................Exhibit Y

Sun Dog PODs D & E Decision Record (October 23, 2007) .......................Exhibit Z

Declaration of Duane Short ........................................................................Exhibit AA

Biodiversity Conservation Alliance Red Desert Outings announcement,
Spring/ Summer (2007) ...............................................................................Exhibit BB

Map showing units within Atlantic Rim project area from Wyoming Department of
Environmental Quality Methane Springs Presentation (April 23, 2007).......Exhibit CC

Final Environmental Impact Statement App. O (excerpts) ..........................Exhibit DD

CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of October, 2007, I electronically filed the foregoing **PLAINTIFFS' SUPPLEMENTAL BRIEFING IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** through the CM/ECF system, which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Lori Caramanian      Lori.caramanian@usdoj.gov, jon.lipshultz@usdoj.gov,
                     lori.montano@usdoj.gov, susan.middagh@usdoj.gov

Robert Charles Mathes  rmathes@bjorklindley.com, lvanderveer@bjorklindley.com

Michael B. Wigmore  Michael.wigmore@bingham.com


                              _____s/ Sharon Buccino_____
                              SHARON BUCCINO



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE



TIERED EA, FONSI, AND DR FORM

Tiered to and Referencing the Atlantic Rim Natural Gas Development Project Environmental Impact Statement

---

**ENVIRONMENTAL ASSESSMENT**                    **EA NUMBER**: <u>WY-030-07-EA-231</u>

**Lease Numbers**:  WYW-128664, 131778, 133656, 141279, 141280, 141281, and 163348

**Proposed Action**:

Sun Dog Unit C Plan of Development (POD), which includes: 13 Coal Bed Methane Natural Gas Wells and 1 Water Re-injection Well with Access Roads, Pipeline/Utility Corridors, and related infrastructure.

**Applicant/Proponent**: Anadarko E & P Company

**<u>BLM Rawlins Field Office (RFO) Interdisciplinary (Review) Team (IDT)</u>**

| POD IDT Members | Title |
|---|---|
| Ben Toole | Wildlife Biologist |
| Pam Murdock | Archaeologist |
| Andy Stone | Hydrologist |
| Hillaire Peck | Civil Engineer |
| TJ Murry | Rangeland Management Specialist |
| Gary McDonald | Natural Resource Specialist |

Prepared By

_Laura Gianakos for_

Gary McDonald, Sun Dog D/E POD IDT Lead

<u>October 23, 2007</u>
Date

**Location of Wells and Proposed Action (BLM-administered public lands)**:

**Sun Dog Unit POD "C"**

|   | Well # | Aliquot | Sec | T | R |
|---|--------|---------|-----|---|---|
| 1 | 4-15 | NWNW | 15 | 16N | 91W |
| 2 | 12-15 | NWSW | 15 | 16N | 91W |
| 3 | 16-19 | SESE | 19 | 16N | 91W |
| 4 | 16-20 | SESE | 20 | 16N | 91W |
| 5 | 10-21 | NWSE | 21 | 16N | 91W |
| 6 | 14-21 | SESW | 21 | 16N | 91W |
| 7 | 14-21i | SESW | 21 | 16N | 91W |
| 8 | 4-22 | NWNW | 22 | 16N | 91W |
| 9 | 12-22 | NWSW | 22 | 16N | 91W |
| 10 | 4-28 | NWNW | 28 | 16N | 91W |
| 11 | 2-29 | NENE | 29 | 16N | 91W |
| 12 | 4-29 | NWNW | 29 | 16N | 91W |
| 13 | 6-29 | SENW | 29 | 16N | 91W |
| 14 | 8-29 | SENE | 29 | 16N | 91W |

## Conformance with Land Use Plan

This proposed action is in conformance with the Great Divide Resource Management Plan (RMP) that was approved on November 8, 1990. The RMP has been reviewed to determine if the proposed action conforms to the land use plan terms and conditions as required by 43 CFR 1610.5. Development of oil and gas reserves is in conformance with the RMP. On page 30, the RMP states "The entire planning area [Great Divide Resource Area] is open to oil and gas leasing".

The development of this project will not affect the achievement of the Wyoming Standards for Healthy Rangelands (August 1997).

## Remarks:

The NOS or APD for the proposed action were posted for 30 days (beginning 04/06/2007) in the Rawlins Field Office Information Access Center (Public Room) for review. Notification of preparation of this EA was provided on the Wyoming BLM internet NEPA register (http://www.wy.blm.gov/nepa/search).

The Atlantic Rim Area Natural Gas Field Development Project Environmental Impact Statement (AREIS) was written to assess the potential foreseeable and cumulative effects of drilling operations and associated activities in the Project area. The Record of Decision (ROD) for this project was approved on March 23, 2007. The proposed action is in conformance with the AREIS.

The AREIS ROD provides for the drilling of natural gas wells and associated infrastructure, limiting total surface disturbance to 7,600 acres at any one time (not including surface disturbance that occurred prior to implementation of the Interim Drilling Policy). The ROD establishes a goal for per-well surface disturbance of 6.5 acres of short-term disturbance (less in "Category A" areas).

The surface disturbance cap is allocated to operators "…on a prorated mineral leasehold basis." (AR ROD, Page 2), and development is limited to no more than 8 well sites per 640-acre section. If in the event an Operator reaches the surface disturbance cap allocation, then "…further disturbance on federal minerals will not be permitted." (AR ROD, Page 3). The RFO will monitor and track disturbance areas for future proposals, in order to ascertain whether the disturbance cap would be exceeded by any future authorizations.

The APD's, Master Drilling Plan and Master Surface Use Plan with Water Management Plan and Conditions of Approval, contain a complete description of the proposed action. The Master Drilling and Surface Use Plans with associated documents and the Conditions of Approval are considered an integral part of this Environmental Assessment and are incorporated by reference.

Modifications, or alternatives, to the original proposal received from the operator were identified as the

result of the pre-approval onsite inspections.  At the on-sites, all areas of proposed surface disturbance were inspected to ensure that potential impacts to resources would be reduced.  In some cases, access roads were re-routed, and well locations, pipelines, and other water management control structures were moved, modified, or dropped from further consideration to alleviate or reduce environmental impacts.  In addition, site specific mitigation and/or Conditions of Approval have been applied to alleviate or reduce environmental effects of the operator's proposal.  Onsite changes, implementation of committed mitigation measures contained in the Master Surface Use Plan, Drilling Program and Water Management Plan, and site specific and Standard COAs are incorporated and analyzed in the Proposed Action Alternative.

All POD C wells are located entirely within a Federal Oil and Gas Unit, the Sun Dog Unit, and as  result no additional rights-of-way are required as part of the proposed action.

## Purpose and Need for Proposed Action

Domestic natural gas production is an integral part of U.S. energy development and conservation plans due to its availability and the presence of existing market delivery infrastructure.  Domestic production reduces immediate dependence upon foreign sources of energy, and maintains an adequate and stable supply of fuel to maintain economic well-being, industrial production, and national security.  The environmental advantages of burning natural gas are emphasized in the Clean Air Act amendments of 1990.

In addition, the proposed action would allow Anadarko, as leaseholder, to exercise lease rights to explore and develop oil and gas resources within the project lease areas.

For these particular wells, the production is primarily natural gas and produced water from coal seams.

## Development of Alternatives

In reviewing the proponent's submitted proposal (APDs, Master Surface Use Plan, Master Drilling Plan, Water Management Plan, etc.), the BLM conducted onsite reviews and considered known and potentially-occurring resources and conditions in the project area.  As a result of this review, project components were moved, added, or eliminated in order to reduce potential environmental impacts, and in accordance with BLM policy and accepted Best Management Practices (BMPs).  This resulted in the alteration of the proponent's submitted proposal to yield the Proposed Action, which incorporates the changes from the onsite inspections, BLM review, and mandated BLM mitigations (Conditions of Approval).  The Proposed Action, then, differs from the original proposal submitted by the proponent.  Since the proponent has agreed, by re-submission of the applications and POD plans, to the changes agreed upon as a result of the onsite inspections and BLM review, the Proposed Action represents a *de facto* alternative to the original submittal.

The EIS considered several alternatives to development of the oil & gas resources in the project area (see DEIS, Pages S2-S3 and FEIS Page 1-20).

The BLM interdisciplinary team, in review of this Proposed Action (as modified during onsite inspections and subsequent review), identified no unresolved resource conflicts that would necessitate development of additional alternatives.

## Description of Proposed Action Alternative

The proposed action includes the construction and/or reconstruction of access roads and the construction of well pads for the purpose of drilling 13 CBNG wells and 1 produced water re-injection well. In addition, the proposed action also includes the construction, operation and reclamation of associated underground gas gathering/sales pipelines, produced water-gathering pipelines and power-lines and utility corridors. The majority of pipeline/utility corridors are located adjacent and parallel to the proposed or existing access roads and existing pipeline disturbances, except where not feasible and appropriate and surface disturbance would be increased.  The maps and illustrations attached to the APDs and Master Surface Use Plan display the locations of the proposed wells, access roads, gas and water-gathering pipelines, power-line (electrical) and other utility (gas and water) corridors.

Any additional facilities later determined to be necessary would be proposed and applied for via a Sundry Notice.

Water for drilling each well would be obtained from existing wells completed in the coal seams of the Mesa Verde Group within the Sun Dog Unit. Water would be hauled by truck to each drill site over existing and proposed roads within the POD. Any changes in the water source or method of transportation would first require written approval by the BLM. To protect any shallow, fresh water aquifers or sources, drilling of surface casing for each well would use either air drilling techniques, or use non-produced (fresh) water from a State permitted local source.

Onsite inspections of the POD wells, well pads, access roads and pipeline/utility corridors were conducted on May 1, 2, 3 and 23, 2007. Potential impacts to resources from the location of the well pads, access roads and corridors were reviewed and assessed. As a result, numerous pads, roads and corridors were relocated to reduce potential impacts to soils, vegetation, water, wildlife (including fisheries), cultural and recreational resources.

The location of the proposed development is approximately 22 miles north/northeast of Baggs, Wyoming, east of Highway 789. Access to the area will be from existing County Road 608 to the east off of Highway 789. Some existing roads will be reconstructed and new roads will be constructed to access well locations.

A discussion of the actions generally associated with drilling a well, including (1) a plan of operations, (2) construction of the access road and drilling pad, and (3) pipeline installation, can be located in the following portions of the AREIS or ROD:

- Chapter 2, Proposed Action and Alternatives (AREIS)
- Chapter 4, Analysis of Environmental Consequences (AREIS)
- Appendix A, Project Reclamation Plan (ROD)
- Appendix C, Operator-Committed Practices (ROD)

Mitigation and reclamation measures are described in Chapter 4 and Appendix B of the ROD (Project Performance-Based Monitoring and Best Management Practices). The following narratives summarize elements specific to the proposed action for this EA.

Construction

Well access roads, drill pads and pipeline/utility corridors must be constructed and or re-constructed in order to drill and complete operating and producing coal bed natural gas wells. This is considered a short-term disturbance. Upon completion of a well as a producer and placing into production (gas sales), portions of the well (drill) pad not needed for production operations will be reclaimed to a production pad. Upon the completion of installation of the pipelines/utilities the pipeline/utility corridors will be finally reclaimed. Upon the successful interim reclamation of the areas of the well pad and access/utility corridors not needed for production operations, the remaining surface disturbance is considered as long-term. The entire well pad, access road and pipeline/utility corridor will be totally reclaimed subsequent to well plugging and abandonment under final reclamation.

Surface disturbance estimates for C POD including the well pads and access road/utility/pipeline corridors and are presented in the Table below:

| Sun Dog C | Short Term Disturbance Areas | | | | |
|---|---|---|---|---|---|
| Well # | Well Pad-Acres* | Road-L. Feet | Corridor-Acres** | Road-Acres*** | SUM- Acres |
| 4-15 | 2.2 | 984 | 0.68 | 1.13 | 4.01 |
| 12-15 | 2.2 | 244 | 0.17 | 0.28 | 2.65 |
| 16-19 | 2.2 | 1219 | 0.84 | 1.40 | 4.44 |
| 16-20 | 2.2 | 1155 | 0.80 | 1.33 | 4.33 |
| 14-21i | 0 | 0 | 0.00 | 0.00 | 0.00 |
| 10-21 | 2.2 | 255 | 0.18 | 0.29 | 2.67 |
| 14-21 | 2.2 | 280 | 0.19 | 0.32 | 2.71 |
| 4-22 | 2.2 | 25 | 0.02 | 0.03 | 2.25 |

| 12-22 | 2.2 | 1376 | 0.95 | 1.58 | 4.73 |
| 4-28 | 2.2 | 318 | 0.22 | 0.37 | 2.79 |
| 2-29 | 2.2 | 1107 | 0.76 | 1.27 | 4.23 |
| 4-29 | 2.2 | 610 | 0.42 | 0.70 | 3.32 |
| 6-29 | 2.2 | 39 | 0.03 | 0.04 | 2.27 |
| 8-29 | 2.2 | 278 | 0.19 | 0.32 | 2.71 |
| Total | 28.6 | 7890 | 5.4 | 9.1 | 43.1 |

* Well pad surface disturbance areas are approximately 2.2 acres, including spoil piles and cut/fill slopes. Injection wells (i) are co-located on same pad with production wells representing no additional surface disturbance.
** This assumes a corridor surface disturbance with widths equal to 30 feet.
***.This assumes new road surface disturbance with widths equal to 50 feet.

The proposed action will result in approximately 43 acres of short-term disturbance, comprised of new or reconstructed access roads and adjacent and parallel pipelines and utilities, as detailed above.

The average short-term per-well disturbance for POD C is 3.5 acres  The proposed action is located outside of "Category A" area, and thus is subject to a "disturbance goal" of 6.5 acres per well.  This POD, then, meets the disturbance goal provided in the AREIS ROD.

Access

The operator proposes to construct new or reconstruct existing access roads to the proposed well locations. The new constructed or reconstructed roads will be constructed to meet BLM specifications for a "Resource Road", as specified in BLM Manual Section 9113.  Proper drainage structures will be constructed/installed along the access roads.  The width of the access road travel-way (travel surface) will be a minimum of 14 feet within an average right-of-way width of 40 to 50 feet. Unless prohibited by terrain and or excessive surface disturbance or other such circumstances the access road right-of-way will be combined with the pipeline/utility right-of-way into a road/utility corridor that will be a total of 80 feet in width.  In addition, some local connector or collector roads between multiple well locations will be constructed to a minimum 16-20 feet wide travel width within the 80 feet wide corridor.

The access roads including utility corridors would be reclaimed during production operations to the maintenance width of approximately 30 to 40 feet. Utility corridors upon completion of pipeline/power-line installation along with any unneeded access road would be recontoured, ripped, seeded, and revegetated.

Well Sites

In order to drill and complete the wells an approximate 220 by 300 or 220 by 350 feet 1.8 or 2.0 acre drill pad will be constructed for each well location. Some well locations will also include an additional produced water injection well, identified by an "i" at the end of the well number. In the event the wells become producers, cut and fill portions of the well site will be brought back to grade and reclaimed along with any other unneeded portions of the well site. Soil stockpiles will be re-spread or stabilized, and reseeded with native vegetation. The well pad will be reduced to less than one-half acre for the duration of production operations.  Unless otherwise authorized and in conjunction with interim pad reclamation, the reserve pits will have been dried and backfilled within 180 days of well completion or plugging and abandonment.  The entire well pad will be recontoured, ripped, seeded, and revegetated during final reclamation upon final plugging and abandonment.

Pipeline/Utility Corridors

The produced water and gas sales and gathering pipelines and power-lines would be buried upon completion of construction and installation, and the surface disturbed areas reclaimed soon thereafter. Upon well plugging and abandonment and or pipeline/power-line abandonment, the pipelines/power-lines would be properly abandoned in accordance with BLM procedures for abandonment and the right-of-ways and corridors adequately reclaimed.  Major crossings of drainages have been engineered to insure design/construction adequacy and erosion protection. All channel crossings will comply with current BLM policies and mitigation

measures appropriate to the crossings (see "Hydraulic Considerations for Pipelines Crossing Stream Channels," BLM Technical Note 423, April 2007).

Produced Water Disposal

Produced water from the proposed wells would be gathered and transported via buried water pipelines to existing and proposed water re-injection wells within the POD and the Sun Dog Unit. Produced water collection, transport and disposal, is addressed in detail in the MSUP and appended Sun Dog Unit Water Management Plan (WMP).

The only method of produced water disposal considered and analyzed under the "proposed action" and this EA is subsurface re-injection using underground injection disposal wells permitted by the State of Wyoming and approved by BLM.

At new injection facilities, it is anticipated that subsurface water sumps will be constructed in lieu of above ground storage tanks. Any modifications to this proposal will be submitted via a Sundry Notice for review prior to approval.

Monitoring wells

As described and detailed in Appendix B of the Atlantic Rim ROD and the Sun Dog Water Management Plan, the Unit Operator shall be responsible for drilling, completing, and equipping one set of three shallow groundwater-monitoring wells completed in water-bearing sandstone units stratigraphically above the principle producing coal beds in the upper Mesaverde Group prior to production of any of the wells in the two PODs.

**No Action Alternative**

NEPA regulations require that alternative analyses in NEPA documents "include the alternative of no action" (40 CFR 1502.14(d)). For this analysis, "no action" means that the BLM would reject the proponent's proposal and "the proposed activity would not take place."

**Potential Environmental Impacts of the "Proposed Action" Alternative**

| Critical Element | Affected | | Critical Element | Affected | |
|---|---|---|---|---|---|
| | Yes | No | | Yes | No |
| Air Quality | X | | T / E Species | | X |
| ACEC's | | X | Wastes, Hazardous/Solid | X | |
| Cultural Resources | X | | Water Quality | | X |
| Prime/Unique Farmlands | | X | Wetlands/Riparian Zones | X | |
| Floodplains | | X | Wild and Scenic Rivers | | X |
| Native Amer. Rel. Concerns | | X | Wilderness | | X |
| Environmental Justice | | X | Invasive, Nonnative Species | X | |

In addition to the critical elements referenced above, reviews of potential effects upon paleontological, visual and recreational, soil, vegetation, and wildlife resources were conducted.

The affected environment and analysis of environmental impacts are discussed in the AREIS to which this EA is tiered. Air quality impacts are also disclosed and analyzed in the AREIS. A map showing the known wildlife resources in the project vicinity is attached.

Halogeton and other invasive and/or noxious weeds are a significant concern for this project area. COAs have been added to control the spread, establishment, and plant community changes associated with weed infestation.

Cultural:

Class III cultural resources inventory were conducted for the project areas. Archaeological resources identified will be avoided or, as necessary, a monitor will review construction to ensure no cultural artifacts are disturbed. Both PODs have wells and infrastructure located inside of the two-mile buffer of contributing segments of a historic trail ("Rawlins to Baggs Road"). As a result, SHPO consultation was necessary and a visibility analysis required on those well locations and related infrastructure. The AREIS also required a "Programmatic Agreement" or "Memorandum of Agreement" between the affected parties, i.e. landowner (BLM), operator and SHPO to address the necessary mitigation to minimize impact to the trail view-shed from these wells and associated disturbances. As a result, restrictions or stipulations in the form of COAs were added to the MSUP APD authorizations as appropriate. Those stipulations are summarized below:

For all wells and associated infrastructure in POD C:
1) Standard cultural stip (under general permitting requirements)
2) All surface facilities will be painted a color compatible with the local environment.
3) The access road will be surfaced with material compatible with the local environment.
4) The Operator shall select and use a seed mix most applicable to each disturbed location, with the goal of restoring individual sites to closely resemble the pre-disturbance native plant communities, as provided in Appendix A of the ROD, "Project Reclamation Plan."

Additional mitigation measures are stipulated for individual wells and/or infrastructure within two-miles of the Rawlins-Baggs Road which have viewshed or visibility concerns, which include:

POD C wells: 4-15, 12-15, 16-19, 16-20, 10-21, 14-21, 4-22, 12-22, 4-28, 2-29, 6-29, 8-29

These additional mitigation measures include:

1) Unless otherwise authorized, the pipelines/utilities will be plowed or ripped into the un-bladed surface (using technology that does not require trenching). If such techniques are infeasible due to terrain or geology, the surface will be brush-hogged and the utilities will be placed no farther than the outside edge of the ditch slope.
2) No blading will be allowed outside the staked well location for placement or removal of the topsoil stockpile.

Other, site-specific Conditions of Approval (such as archaeological monitor, barrier fencing, etc.), are also applied, as applicable.

Portions of the proposed actions (wells, pads, access roads and pipeline/power-line right-of ways/corridors) are located within two mile (protective buffer) of sage grouse leks, within one mile (protective buffer) of nesting raptors (ferruginous hawks) and within crucial winter range for mule deer. Numerous well locations, roads and corridors were relocated outside these areas or buffer zones where practical, and several were relocated on the outside or edge of "No Surface Occupancy" (NSO) or "Controlled Surface Use" (CSU) areas or zones for these wildlife resources. The NSO or CSU is a one mile radius from the lek perimeter for sage-grouse and one-quarter mile from the nest for ferruginous hawks. Mountain plover habitat was identified for a few locations. As a result of the above, seasonal restrictions or stipulations in the form of COAs were added to the MSUP APD authorizations as appropriate. Those stipulations are summarized below:

### Sun Dog Unit POD "C" Wildlife Stipulations

| Well Name | Raptor[1] | Grouse[2] |
|---|---|---|
| 4-15 | 1 | 2 |
| 12-15 | 1 | 2 |
| 16-19 | 1 | 2 |
| 16-20 | NA | 2 |
| 10-21 | NA | 2 |
| 14-21 | NA | 2 |
| 14-21i | NA | 2 |
| 4-22 | 1 | 2 |
| 12-22 | 1 | 2 |
| 4-28 | NA | 2 |
| 2-29 | 1 | 2 |
| 4-29 | 1 | 2 |

| 6-29 | 1 | 2 |
| 8-29 | NA | 2 |

1 <u>Raptor Stipulations</u>: Construction, drilling and other activities potentially disruptive to nesting raptors are prohibited during the period of February 1 to July 31 for the protection of raptor nesting areas.

2 <u>Grouse Stipulations</u>: Construction, drilling, reclamation and other potentially disruptive activities are prohibited during the period of March 1 to July 15 for the protection of sage grouse.

<u>Exceptions to Stipulations</u>: In some instances, the operator may request consideration of a temporary exception to wildlife seasonal restrictions or stipulations. Such exceptions may be granted on a limited individual case by case basis if a determination is made by a BLM wildlife biologist that the wildlife resource will not be adversely impacted.

The fisheries biologist attended onsite inspections and considered potential impacts to Muddy Creek's 6840 BLM Sensitive fish species and determined that no additional mitigation or monitoring requirements for the proposed action were necessary.

Other site-specific findings by the interdisciplinary review team are provided in the review documents that accompany the POD MSUP and well APD and this EA in the BLM RFO lease/well and POD/Unit files.

<u>Description of Impacts:</u>

A discussion of the actions generally associated with drilling projects and their associated impacts may be found in the Atlantic Rim Environmental Impact Statement and Record of Decision.

<u>Hazardous Materials</u>

Anadarko has indicated that some hazardous materials could be used during drilling, completion, and production of their proposed wells. The term "hazardous material" as used here means: 1) any substance, pollutant, or contaminant (regardless of quantity) listed as hazardous under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, as amended, 42 U.S.C. 9601 et seq., and the regulations issued under CERCLA, 2) any hazardous waste as defined in the Resource Conservation and Recovery Act (RCRA) of 1976, as amended, and 3) any nuclear or nuclear byproduct as defined by the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 et seq.

It is possible that wastes created or transported during implementation of the proposed action (i.e., waste motor oils, drilling/completion additives) could be accidentally released to the environment. The operator will be required to comply with the Hazardous Materials Management Plan provided in Appendix C of the AREIS. Numerous State and Federal rules and regulations also apply that govern the handling, storage, and disposal of hazardous substances.

Anadarko or any contracted company working for Anadarko will have Material Data Safety Sheets available for all chemicals, compounds, or substances which are used during the course of construction, drilling, completion, and production operations for this project. Additionally, all chemicals will be handled in an appropriate manner to minimize the potential for leaks or spills to the environment.

Impacts to soils, surface and groundwater resources, wildlife, vegetation, and human health could result from the accidental exposure of hazardous materials. However, since the project operations will strictly comply with all applicable federal and state laws concerning hazardous materials, the Hazardous Materials Management Plan for this project, and the operator's Spill Prevention Control and Countermeasure Plan, no significant impacts are anticipated.

<u>Reclamation</u>

Interim reclamation is typically initiated and completed within 6 months of drilling completion. The drill pads will be reduced to a less than one-half acre production well site at each location. Total reclamation of all new disturbances will take place as the wells and facilities are no longer productive or needed and are plugged and abandoned. Appendix A of the ROD contains the reclamation success criteria by which the reclamation status

will be judged. The approved Master Surface Use Plan and Conditions of Approval also contain reclamation measures pertaining to reclamation standards.

Description of Mitigation Measures and Residual Impacts:

Mitigation of potential effects is part of the proposed action, and specific mitigation details can be found in the Master Plan Elements including the Conditions of Approval. Residual impacts resulting from the proposed action would include permanent loss of oil and/or gas reserves should the wells become productive. In addition, the well pads, production equipment, and the access roads could remain in place for 30 years or more (until plugging and abandonment, final reclamation).

**Potential Environmental Impacts- No Action Alternative**

Under the No-Action Alternative, the proposed action would not be authorized. The 14 wells would not be constructed or drilled, and gas production from the proponent's lease would not occur. Existing development would continue to occupy the project area, along with impacts associated from the existing development and development on nearby private (fee) and or state leases.

**Residual Impacts/Cumulative Impacts:**

The potential residual and cumulative impacts are discussed in the AREIS, Chapter 5, and Cumulative Impacts Analysis. The proposed action entails the addition of 13 CBNG wells, 1 produced water re-injection well, and appurtenant facilities.

Standard mitigation guidelines are addressed in the ROD's Appendix A, Project Reclamation Plan. Additional mitigation measures are also provided in Appendix B, Performance-Based Monitoring and Best Management Practices, and Appendix C, Operator-Committed Practices. All needed mitigation, for that portion of the proposed action on public land, is part of the proposed action.

The access roads and well/production pads may remain visible for a period of approximately 20 to 30 years after they are abandoned and reclaimed. The oil and gas resource will be permanently lost. All needed mitigation is part of the proposed action.

Additional mitigation measures are addressed in the AREIS, under; Appendix A: Reclamation Plan; Appendix C Hazardous Materials, and; Appendix D Wildlife Protection Plan. All recommended mitigation for that portion of the proposed action on public land, is part of the proposed action and plan of operation found in the well POD MSUP with COA and APD.

**Persons/Agencies Contacted and or Consulted:**

| | | |
|---|---|---|
| Mary Mondragon | Regulatory Analyst | Anadarko E&P Company |
| Cathy Flansburg | Regulatory Analyst | Anadarko E&P Company |
| Gary Sundberg | Permitting Consultant | Anadarko E&P Company |
| Andy Stone | Hydrologist | BLM, Rawlins Field Office |
| Ben Toole | Wildlife Biologist | BLM, Rawlins Field Office |
| Hillaire Peck | Civil Engineer | BLM, Rawlins Field Office |
| Bonni Bruce/Nina Trapp | Archaeologist | BLM, Rawlins Field Office |
| Janelle Wrigley | Realty Specialist | BLM, Rawlins Field Office |
| TJ Murry | Rangeland Specialist | BLM, Rawlins Field Office |
| Mark Newman | Geologist | BLM, Rawlins Field Office |
| Jerry Dickinson | Petroleum Engineer | BLM, Rawlins Field Office |
| Patrick Lionberger | Fisheries Biologist | BLM, Rawlins Field Office |
| Paul Rau | Recreation Planner | BLM, Rawlins Field Office |
| Skip Stonesifer | Reclamation Specialist | BLM, Rawlins Field Office |
| Andy Warren | Rangeland Supervisor | BLM, Rawlins Field Office |
| Mary Read | Wildlife Biologist | BLM, Rawlins Field Office |



**Sun Dog C/D/E PODs**

N

T17N
T16N

R92W
R91W

SunDogE

SunDogD

SunDogC

**Legend**

| | |
|---|---|
| ▢ | GSG Lek Perimeter |

**Raptor Nest**

| | |
|---|---|
| ▲ | Active |
| ⚠ | Historical |
| ◉ | Sage Grouse Lek |
| ▨ | Pronghorn CWR |
| ▨ | Elk CWR |
| ▨ | Mule Deer CWR |
| ▭ | Atlantic Rim EIS Area |
| ▭ | Bureau of Land Management |
| ▭ | Private |
| ▭ | State |

**WOGCC Well Data (06/2007)-CA**

| | |
|---|---|
| • | All Other |
| ⤵ | Injection Well |
| ✳ | Flowing Well |
| ⌖ | Plugged & Abandoned |
| ✳ | Producing Gas Well |
| ● | Producing Oil Well |
| ⊝ | Shut-In |
| ◇ | Spud |

Miles

0    1    2    3

1 inch equals 5,000 feet
1:60,000

Drafted By: TDB 10/23/2007

The BLM can not guarantee the accuracy of these data.

U.S. Department of the Interior
Bureau of Land Management
Rawlins, Wyoming

**FINDING OF NO SIGNIFICANT IMPACT/DECISION RECORD.**

**Decision**

I have reviewed this environmental assessment including the explanation and resolution of any potentially significant environmental impacts, public comments, and errata to this EA (see Appendix A to this Decision Record, "Errata"). I have selected the proposed action alternative with the mitigation measures described below for authorization and implementation. I have determined that the proposed project is in conformance with the approved land use plan. It is my decision to implement the project with the mitigation measures identified below.

**Finding of No Significant Impact**

Based upon the analysis of potential environmental impacts contained in the EA, I have determined that the impacts are not expected to be significant, and that an EIS is not required.

**Rationale for Decision**

Compared to the No Action Alternative, the Proposed Action Alternative best meets the Purpose and Need and guiding laws, regulations, and directives, including the Federal Land Policy and Management Act (FLPMA, 43 USC 35). The proposed action is in conformance with the Great Divide Resource Management Plan (RMP) and the Atlantic Rim Natural Gas Field Development Project EIS.

**Public Comments/BLM Responses**

Appendix B to this Decision Record contains a summary of substantive public comments received for this action, and corresponding BLM responses.

**Mitigation Measures/Remarks:**

All needed mitigation is a part of the proposed action and is found in the Master Surface Plan, and accompanying attachments and appendices, with the Conditions of Approval for the MSUP and APD's. A total of 14 well APDs, unless specified otherwise in the COA, are authorized under this decision, along with associated well pads, access roads, pipelines, power-lines and utility corridors.

**Monitoring and Compliance**

Designated BLM personnel will monitor operations under authorizations for the proposed action as needed to ensure compliance with the Master Surface Plan and Conditions of Approval.

Authorized Official:

_____        October 23, 2007_____
Field Manager                                                        Date
Rawlins Field Office

**Appeal**

Under BLM regulation this decision is subject to appeal. Under BLM regulation, this decision is subject to administrative review in accordance with 43 CFR 3165. Any request for administrative review of this decision must include information required under 43 CFR 3165.3(b) (State Director Review), including all supporting documentation. Such a request must be filed in writing with the State Director, Bureau of Land Management, P.O. Box 1828, Cheyenne, Wyoming 82003 within 20 business days of the date this Decision Record is received or considered to have been received.

Appendix A to the Decision Record

ERRATA

Modifications and Corrections To The
Sun Dog Unit C Plan of Development (POD)
Environmental Assessment

To clarify the BLM consideration of alternatives for this project, additional discussion was added (Page 8):

### *Development of Alternatives*

*In reviewing the proponent's submitted proposal (APDs, Master Surface Use Plan, Master Drilling Plan, Water Management Plan, etc.), the BLM conducted onsite reviews and considered known and potentially-occurring resources and conditions in the project area. As a result of this review, project components were moved, added, or eliminated in order to reduce potential environmental impacts, and in accordance with BLM policy and accepted Best Management Practices (BMPs). This resulted in the alteration of the proponent's submitted proposal to yield the Proposed Action, which incorporates the changes from the onsite inspections, BLM review, and mandated BLM mitigations (Conditions of Approval). The Proposed Action, then, differs from the original proposal submitted by the proponent. Since the proponent has agreed, by re-submission of the applications and POD plans, to the changes agreed upon as a result of the onsite inspections and BLM review, the Proposed Action represents a de facto alternative to the original submittal.*

*The EIS considered several alternatives to development of the oil & gas resources in the project area (see DEIS, Pages S2-S3 and FEIS Page 1-20).*

*The BLM interdisciplinary team, in review of this Proposed Action (as modified during onsite inspections and subsequent review), identified no unresolved resource conflicts that would necessitate development of additional alternatives.*

### Potential Environmental Impacts of the "Proposed Action" Alternative

A map was added to the EA to display known wildlife resources in the project vicinity. Add map and:

*A map showing the known wildlife resources in the project vicinity is attached.*

Change:

*Numerous well locations, roads and corridors were relocated outside these areas or buffer zones where practical, and several were relocated on the outside or edge of "No Surface Occupancy" (NSO) or "Controlled Surface Use" (CSU) areas or zones for these wildlife resources. The NSO or CSU is a one mile radius from the lek perimeter for sage-grouse and one-quarter mile from the nest for ferruginous hawks. Mountain plover habitat was identified for a few locations. Mountain plover habitat was identified for a few locations.*

To:

*Numerous well locations, roads and corridors were relocated outside these areas or buffer zones where practical, and several were relocated on the outside or edge of "Controlled Surface Use" (CSU) areas or zones for these wildlife resources. The CSU is a one-quarter mile radius from the lek perimeter for sage-grouse and is variable depending upon raptor species.*

Add reference: *Sawyer, Hal. 2006. Progress Report for the Atlantic Rim Mule Deer Study.*

*End Errata*

Appendix B to the Decision Record

Summary of EA Comments and BLM Responses

A total of two comment letters were received.  The letters have been reviewed to determine whether the information they provided would warrant a determination other than a Finding of No Significant Impact (FONSI).  Substantive comments are summarized below, with BLM responses to the comments in italics.  The RFO would like to thank all who commented for taking the time to review the EA.

As noted in the EA (Page 2), information about the proposal was posted in the RFO public room for a 30-day period upon submittal by the proponent.  In addition, the BLM online NEPA register provides notice of actions for which NEPA documentation is prepared, including the proposal considered under this EA.

In reviewing the comments received, there were some instances where substantial comments were made but we could find no project-specific comments or any description of (1) new information, (2) why or how the analysis is flawed, (3) evidence of flawed assumptions, (4) evidence of error in data presented, or (5) requests for clarification that bear on conclusions presented in the analysis.  This was the standard used to identify substantive comments for the following responses.

**1.  Theodore Roosevelt Conservation Partnership**

a. "The EAs and FONSIs are inconsistent with the EIS from which they allegedly tier.  Neither the ROD, nor the EIS… contemplates an exclusion from seasonal drilling restrictions."

*As provided on page 1-9 of the Atlantic Rim FEIS, "the BLM's Great Divide RMP and its Record of Decision (ROD) (USDI-BLM 1990) directs management of the federal lands within the project area.  The proposed project is in conformance with management objectives and actions provided for in the ROD..."  The RMP provides direction applicable to BLM consideration of requests for exceptions to seasonal wildlife restrictions: "…Exception, waiver, or modification of this [wildlife] limitation in any year may be approved in writing, including documented supporting analysis, by the Authorized Officer"… (page 48-49, Appendix I, Great Divide Resource Area Record of Decision and Approved Resource Management Plan).  As such, case-by-case consideration of exceptions to seasonal restrictions is in compliance with the decisions and analysis to which the EA is tiered.*

b. "The EAs consider only two alternatives: "no action" and the proponent's proposed development. This is not the reasonable range of alternatives NEPA demands be analyzed."

*Modifications, or alternatives, to the original proposal received from the operator were identified as the result of the pre-approval onsite inspections.  Clarification that the proposal was modified and subsequently analyzed as a de facto alternative has been added (see "Errata").*

**2.  Biodiversity Conservation Alliance**

a. "…the EA makes no representations about the potential impacts of this POD on any other species, including BLM Sensitive Species. A full analysis of site-specific impacts to wildlife is needed."

*The BLMs analysis of the proposed action included site-specific review of potential impacts to sensitive species, using the experience and expertise of the BLM biologists as well as data and knowledge collected by the BLM, Wyoming Department of Game and Fish, U.S. Fish & Wildlife Service, and other organizations. This analysis is referred to in the EA on page 8 ("Other site specific findings by the interdisciplinary review team are provided in the review documents that accompany… …this EA in the BLM RFO lease/well and POD/Unit files.").  Potential site-specific impacts to wildlife are addressed in the EA (see Pages 7-8).*

b.  "Using lower-standard jeep trails for all access purposes could dramatically reduce these impacts, but does not appear to have been considered."

*As provided for in the fourth edition of the BLM Gold Book (containing BLM guidance for consideration of oil & gas activities on BLM-administered public lands), "The appropriateness of primitive roads or routes is both site-specific and use specific and is typically based on many factors…." Nonconstructed roads were not mandated for this POD due to a lack of unresolved resource conflicts. Should the BLM determine that alternate road designs are appropriate or necessary, the BLM could mandate the use of a reviewed and approved alternate design. In this instance, such a design was not determined to be necessary.*

c.  "BLM needs to provide a site specific cumulative impacts analysis of the impacts of these operations on the affected migration corridors, their permeability to mule deer, and the ultimate impact on the population dynamics of the herd."

*In our review, we considered recently obtained data (Sawyer, 2006. Progress Report for the Atlantic Rim Mule Deer Study) regarding mule deer migration routes in the project area. At this time, no migration corridors have been identified within the POD boundaries. This Report has been added as a reference to the EA (see "Errata").*

d.  "In Sun Dog C, nesting habitat for mountain plover (a BLM Sensitive Species) was identified at several well locations."

*There is no identified mountain plover habitat in this POD. This error has been corrected; see Errata, Appendix A to this Decision Record. Where potential mountain plover habitat has been identified (i.e., Sun Dog POD D), seasonal restrictions have been applied to protect mountain plover.*

e.  "For raptor nests and sage grouse leks, BLM indicates that 'The NSO or CSU is a one mile radius from the lek perimeter for sage-grouse and one-quarter mile from the nest for ferruginous hawks'… Which is it[?]"

*The buffer descriptions and distances were in error and have been corrected; see Errata.*

f.  "It has been definitively demonstrated that mere seasonal moratoria on construction and drilling activities is insufficient to prevent major [sage grouse] population declines."

*Potential impacts to sage grouse from activities such as those in the proposed action have been discussed in the programmatic EIS (see FEIS at Page 4-76). Site-specific mitigation measures have been applied to the proposed action (see Conditions of Approval and EA at Page 7) to reduce potential impacts to sage grouse as the result of the site-specific analysis. You provided no data or substantiation for your opinion that seasonal restrictions are insufficient, and so we can not judge your conclusion. The seasonal restrictions applied are supported by programmatic BLM decisions (such as the Great Divide RMP and Atlantic Rim ROD, among others), and are consistent with BLM policies developed in consultation with agencies such as the Wyoming Department of Game and Fish.*

g.  "The EAs do not mention in any way the potential impacts of the projects on the [pygmy rabbit, Wyoming pocket gopher, & White-tailed prairie dogs]… BLM Sensitive Species."

*See above response to #2(a).*

h.  "These viewsheds, which formerly were unimpaired by human intrusions… will be badly degraded by the cumulative impacts of these three new PODs if usual road and wellpad construction techniques are used."

*The EA acknowledges that the proposal would result in impacts to the visual setting of the project area (see EA at Page 9). Mitigations to protect visual resources consistent with its Visual Resource Management (VRM) setting have been applied (see Conditions of Approval). See also #2(b).*

i. "We are concerned that the proposed activities, when occurring on highly saline, erodible, or unstable soils will contribute to significant impacts to the watershed, and in particular to downstream native fishes."

*The EA addresses BLM specialist conclusions regarding potential impacts to sensitive fisheries ("...no additional mitigation or monitoring requirements for the proposed action were necessary." EA at Page 8). In addition, the mitigation measures voluntarily committed to by the proponent, compliance with other requirements including State water quality regulations, and mitigation applied by the BLM as Conditions of Approval, will reduce potential impacts from erosion and sedimentation. No impacts to sensitive fisheries are anticipated.*

j. "...BLM must require that the project proponents have acquired certifications (or a waiver of such certifications) [under Section 401 of the Clean Water Act] from the State of Wyoming..."

*The proponent has certified that they "will comply with all laws, standards, and criteria set forth by all appropriate Federal, State, and Local authorities..." (Master Surface Use Plan). This is also a requirement of the BLM's Conditions of Approval.*

k. "The Rawlins to Baggs Wagon Road is known to be affected by a number of wells in these PODs..."

*The impacts to cultural resources from the proposal are discussed on Pages 6-7 of the EA, including impacts to the Rawlins-Baggs Road. Additional mitigation measures have been applied to reduce potential impacts to this feature. No Section 106 consultation for this proposal was deemed necessary; the BLM has entered into a programmatic agreement with the State Historic Preservation Office (SHPO) regarding the protection of cultural resources.*

l. "BLM's proposed methodology to allow the operators to report archaeological and paleontological resources passively if they happen to notice them is unacceptable."

*The BLM conducted a site-specific review of the potential for archaeological and paleontological resources. In this review, it was determined that potential impacts to resources would be avoided or mitigated (cultural) or that impacts were unlikely due to absence of significant resources (paleontological). Operator-reporting of potential archaeological or paleontological resources encountered is provided as a standard Condition of Approval by the BLM out of an abundance of caution.*



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE



### TIERED EA, FONSI, AND DR FORM

Tiered to and Referencing the Atlantic Rim Natural Gas Development Project Environmental Impact Statement

---

**ENVIRONMENTAL ASSESSMENT**                          **EA NUMBER**: <u>WY-030-07-EA-232</u>

**Lease Numbers**:  WYW-116679, 139142, 141278, 148482, 161909, 161910, and 161914

**Proposed Action**:

Sun Dog Unit D and E Plans of Development (PODs), which include; 30 Coalbed Natural Gas Wells and 4 Water Re-injection Wells,  Access Roads, Pipeline/Utility Corridors, and related infrastructure.

**Applicant/Proponent**: Anadarko E & P Company

**<u>BLM Rawlins Field Office (RFO) Interdisciplinary (Review) Team (IDT)</u>**

| POD IDT Members | Title |
| --- | --- |
| Ben Toole | Wildlife Biologist |
| Nina Trapp | Archaeologist |
| Andy Stone | Hydrologist |
| Hillaire Peck | Civil Engineer |
| TJ Murry | Rangeland Management Specialist |
| Gary McDonald | Natural Resource Specialist |

Prepared By

*Laura Gianakos for*

Gary McDonald, Sun Dog D/E POD IDT Lead

<u>October 23, 2007</u>
Date

**Location of Wells and Proposed Action (BLM-administered public lands)**:

**Sun Dog Unit POD "D"**

|    | Well # | Aliquot | Sec | T | R |
|----|--------|---------|-----|------|------|
| 1 | 2-3 | NWNE | 3 | 16N | 91W |
| 2 | 4-3 | NWNW | 3 | 16N | 91W |
| 3 | 6-3 | SENW | 3 | 16N | 91W |
| 4 | 10-3 | NWSE | 3 | 16N | 91W |
| 5 | 10-3i | NWSE | 3 | 16N | 91W |
| 6 | 12-3 | NWSW | 3 | 16N | 91W |
| 7 | 2-4 | NWNE | 4 | 16N | 91W |
| 8 | 4-4 | NWNW | 4 | 16N | 91W |
| 9 | 6-4 | SENW | 4 | 16N | 91W |
| 10 | 8-4 | Not approved at this time | | | |
| 11 | 16-4 | SESE | 4 | 16N | 91W |
| 12 | 2-5 | NWNE | 5 | 16N | 91W |
| 13 | 4-5 | NWNW | 5 | 16N | 91W |
| 14 | 4-5i | NWNW | 5 | 16N | 91W |
| 15 | 6-5 | SENW | 5 | 16N | 91W |
| 16 | 8-5 | SENE | 5 | 16N | 91W |
| 17 | 8-9 | SENE | 9 | 16N | 91W |
| 18 | 4-10 | NWNW | 10 | 16N | 91W |
| 19 | 12-10 | NWSW | 10 | 16N | 91W |
| 20 | 10-34 | NWSE | 34 | 17N | 91W |
| 21 | 12-34 | NWSW | 34 | 17N | 91W |
| 22 | 12-34i | NWSW | 34 | 17N | 91W |
| 23 | 14-34 | SESW | 34 | 17N | 91W |
| 24 | 16-34 | SESE | 34 | 17 | 91W |

**Sun Dog Unit POD "E"**

|    | Well # | Aliquot | Sec | T | R |
|----|--------|---------|-----|------|------|
| 1 | 12-26 | NWSW | 26 | 17N | 91W |
| 2 | 14-26 | SESW | 26 | 17N | 91W |
| 3 | 2-34 | NWNE | 34 | 17N | 91W |
| 4 | 8-34 | SENE | 34 | 17N | 91W |
| 5 | 2-35 | NWNE | 35 | 17N | 91W |
| 6 | 4-35 | NWNW | 35 | 17N | 91W |
| 7 | 6-35 | SENW | 35 | 17N | 91W |
| 8 | 10-35 | NWSE | 35 | 17N | 91W |
| 9 | 12-35 | NWSW | 35 | 17N | 91W |
| 10 | 12-35i | NWSW | 35 | 17N | 91W |
| 11 | 14-35 | SESW | 35 | 17N | 91W |

## Conformance with Land Use Plan

This proposed action is in conformance with the Great Divide Resource Management Plan (RMP) that was approved on November 8, 1990. The RMP has been reviewed to determine if the proposed action conforms to the land use plan terms and conditions as required by 43 CFR 1610.5. Development of oil and gas reserves is in conformance with the RMP. On page 30, the RMP states "The entire planning area [Great Divide Resource Area] is open to oil and gas leasing".

The development of this project will not affect the achievement of the Wyoming Standards for Healthy Rangelands (August 1997).

Remarks:

The NOS or APD for the proposed action were posted for 30 days (beginning on 10/26/2006 for POD D and 11/03/2006 for POD E) in the Rawlins Field Office Information Access Center (Public Room) for review. Notification of preparation of this EA was provided on the Wyoming BLM internet NEPA register (http://www.wy.blm.gov/nepa/search).

The Atlantic Rim Area Natural Gas Field Development Project Environmental Impact Statement (AREIS) was written to assess the potential foreseeable and cumulative effects of drilling operations and associated activities in the Project area.  The Record of Decision (ROD) for this project was approved on March 23, 2007. The proposed action is in conformance with the AREIS.

The AREIS ROD provides for the drilling of natural gas wells and associated infrastructure, limiting total surface disturbance to 7,600 acres at any one time (not including surface disturbance that occurred prior to implementation of the Interim Drilling Policy).  The ROD establishes a goal for per-well surface disturbance of 6.5 acres of short-term disturbance (less in "Category A" areas).

The surface disturbance cap is allocated to operators "…on a prorated mineral leasehold basis." (AR ROD, Page 2), and development is limited to no more than 8 well sites per 640-acre section.  In the event an Operator reaches the surface disturbance cap allocation, then "…further disturbance on federal minerals will not be permitted." (AR ROD, Page 3).  The RFO will monitor and track disturbance areas for future proposals, in order to ascertain whether the disturbance cap would be exceeded by any future authorizations.

The APD's, Master Drilling Plan and Master Surface Use Plan with Water Management Plan and Conditions of Approval, contain a complete description of the proposed action.  The Master Drilling and Surface Use Plans with associated documents and the Conditions of Approval are considered an integral part of this Environmental Assessment and are incorporated by reference.

Modifications, or alternatives, to the original proposal received from the operator were identified as the result of the pre-approval onsite inspections.  At the on-sites, all areas of proposed surface disturbance were inspected to ensure that potential impacts to resources would be minimized.  In some cases, access roads were re-routed, and well locations, pipelines, and other water management control structures were moved, modified, or dropped from further consideration to alleviate or minimize environmental impacts.  In addition, site specific mitigation and/or Conditions of Approval have been applied to alleviate or reduce environmental effects of the operator's proposal.  Onsite changes, implementation of committed mitigation measures contained in the Master Surface Use Plan, Drilling Program and Water Management Plan, and site specific and Standard COAs are incorporated and analyzed in the Proposed Action Alternative.

All D and E POD wells are located entirely within a Federal Oil and Gas Unit, the Sun Dog Unit, and as a result no additional rights-of-way are required as part of the proposed action.

## Purpose and Need for Proposed Action

Domestic natural gas production is an integral part of U.S. energy development and conservation plans due to its availability and the presence of existing market delivery infrastructure.  Domestic production reduces immediate dependence upon foreign sources of energy, and maintains an adequate and stable supply of fuel to maintain economic well-being, industrial production, and national security.  The environmental advantages of burning natural gas are emphasized in the Clean Air Act amendments of 1990.

In addition, the proposed action would allow Anadarko, as leaseholder, to exercise lease rights to explore and develop oil and gas resources within the project lease areas.

For these particular wells, the production is primarily natural gas and produced water from coal seams.

## Development of Alternatives

In reviewing the proponent's submitted proposal (APDs, Master Surface Use Plan, Master Drilling Plan, Water Management Plan, etc.), the BLM conducted onsite reviews and considered known and potentially-occurring resources and conditions in the project area.  As a result of this review, project components were moved, added, or eliminated in order to reduce potential environmental impacts, and in accordance with BLM policy

and accepted Best Management Practices (BMPs). This resulted in the alteration of the proponent's submitted proposal to yield the Proposed Action, which incorporates the changes from the onsite inspections, BLM review, and mandated BLM mitigations (Conditions of Approval). The Proposed Action, then, differs from the original proposal submitted by the proponent. Since the proponent has agreed, by re-submission of the applications and POD plans, to the changes agreed upon as a result of the onsite inspections and BLM review, the Proposed Action represents a *de facto* alternative to the original submittal.

The EIS considered several alternatives to development of the oil & gas resources in the project area (see DEIS, Pages S2-S3 and FEIS Page 1-20).

The BLM interdisciplinary team, in review of this Proposed Action (as modified during onsite inspections and subsequent review), identified no unresolved resource conflicts that would necessitate development of additional alternatives.

### Description of Proposed Action Alternative

The proposed action includes the construction and/or reconstruction of access roads and the construction of well pads for the purpose of drilling 30 CBNG wells (20 in POD D and 10 in POD E) and 4 produced water re-injection wells (3 in POD D and 1 in POD E). An additional well, the 8-4, was originally proposed but is not being included in this analysis due to unresolved archaeological resource concerns. In addition, the proposed action also includes the construction, operation and reclamation of associated underground gas gathering/sales pipelines, produced water-gathering pipelines and power-lines and utility corridors. The majority of pipeline/utility corridors are located adjacent and parallel to the proposed or existing access roads and existing pipeline disturbances, except where not feasible and appropriate and surface disturbance would be increased. The maps and illustrations attached to the APDs and Master Surface Use Plan display the locations of the proposed wells, access roads, gas and water-gathering pipelines, power-line (electrical) and other utility (gas and water) corridors.

Any additional facilities later determined to be necessary would be proposed and applied for via a Sundry Notice.

Water for drilling each well would be obtained from existing wells completed in the coal seams of the Mesa Verde Group within the Sun Dog Unit. Water would be hauled by truck to each drill site over existing and proposed roads within the POD. Any changes in the water source or method of transportation would first require written approval by the BLM. To protect any shallow, fresh water aquifers or sources, drilling of surface casing for each well would use either air drilling techniques, or use non-produced (fresh) water from a State permitted local source.

Onsite inspections of the POD wells, well pads, access roads and pipeline/utility corridors were conducted on May 1, 2, 3 and 23, 2007. Potential impacts to resources from the location of the well pads, access roads and corridors were reviewed and assessed. As a result, numerous pads, roads and corridors were relocated to reduce potential impacts to soils, vegetation, water, wildlife (including fisheries), cultural and recreational resources.

The location of the proposed development is approximately 22 miles north/northeast of Baggs, Wyoming, east of Highway 789. Access to the area will be from existing County Road 608 to the east off of Highway 789. Some existing roads will be reconstructed and new roads will be constructed to access well locations.

A discussion of the actions generally associated with drilling a well, including (1) a plan of operations, (2) construction of the access road and drilling pad, and (3) pipeline installation, can be located in the following portions of the AREIS or ROD:

- Chapter 2, Proposed Action and Alternatives (AREIS)
- Chapter 4, Analysis of Environmental Consequences (AREIS)
- Appendix A, Project Reclamation Plan (ROD)
- Appendix C, Operator-Committed Practices (ROD)

Mitigation and reclamation measures are described in Chapter 4 and Appendix B of the ROD (Project Performance-Based Monitoring and Best Management Practices). The following narratives summarize elements specific to the proposed action for this EA.

<u>Construction</u>

Well access roads, drill pads and pipeline/utility corridors must be constructed and or re-constructed in order to drill and complete operating and producing coal bed natural gas wells. This is considered a short-term disturbance. Upon completion of a well as a producer and placing into production (gas sales), portions of the well (drill) pad not needed for production operations will be reclaimed to a production pad. Upon the completion of installation of the pipelines/utilities, the pipeline/utility corridors will be finally reclaimed. Upon the successful interim reclamation of the areas of the well pad and access/utility corridors not needed for production operations, the remaining surface disturbance is considered as long-term. The entire well pad, access road and pipeline/utility corridor will be totally reclaimed subsequent to well plugging and abandonment under final reclamation.

Surface disturbance estimates for POD D and E including the well pads and access road/utility/pipeline corridors and are presented in the Tables below:

| Sun Dog D | Short Term Disturbance Areas | | | | |
|---|---|---|---|---|---|
| Well # | Well Pad-Acres* | Road-L. Feet | Corridor-Acres** | Road-Acres*** | SUM-Acres |
| 8-9 | 2.2 | 3088 | 2.1 | 3.5 | 7.8 |
| 12-10 | 2.2 | 2565 | 1.8 | 2.9 | 6.9 |
| 2-3 | 2.2 | 102 | 0.1 | 0.1 | 2.4 |
| 10-3 | 2.2 | 355 | 0.2 | 0.4 | 2.8 |
| 10-3i | 0 | | 0 | 0 | 0 |
| 2-4 | 2.2 | 1471 | 1 | 1.7 | 4.9 |
| 2-5 | 2.2 | 170 | 0.1 | 0.2 | 2.5 |
| 4-3 | 2.2 | 2498 | 1.7 | 2.9 | 6.8 |
| 4-4 | 2.2 | 2235 | 1.5 | 2.6 | 6.3 |
| 4-5 | 2.2 | 2325 | 1.6 | 2.7 | 6.5 |
| 4-5i | 0 | | 0 | 0 | 0 |
| 6-3 | 2.2 | 505 | 0.3 | 0.6 | 3.1 |
| 6-4 | 2.2 | 2194 | 1.5 | 2.5 | 6.2 |
| 6-5 | 2.2 | 161 | 0.1 | 0.2 | 2.5 |
| 8-4 | Not approved at this time | | | | |
| 8-5 | 2.2 | 5393 | 3.7 | 6.2 | 12.1 |
| 12-3 | 2.2 | 167 | 0.1 | 0.2 | 2.5 |
| 16-4 | 2.2 | 0 | 0 | 0 | 2.2 |
| 4-10 | 2.2 | 5334 | 3.7 | 6.1 | 12 |
| 10-34 | 2.2 | 217 | 0.1 | 0.2 | 2.5 |
| 12-34 | 2.2 | 3534 | 2.4 | 4.1 | 8.7 |
| 12-34i | 0 | 0 | 0 | 0 | 0 |
| 14-34 | 2.2 | 408 | 0.3 | 0.5 | 3.0 |
| 16-34 | 2.2 | 258 | 0.2 | 0.3 | 2.7 |
| Total | 44 | 32980 | 22.5 | 37.9 | 104.5 |

| Sun Dog E | Short Term Disturbance Areas | | | | |
|---|---|---|---|---|---|
| Well # | Well Pad- Acres* | Road-L. Feet | Corridor-Acres** | Road-Acres*** | SUM-Acres |
| 12-26 | 2.2 | 111 | 0.1 | 0.1 | 2.4 |
| 14-26 | 2.2 | 116 | 0.1 | 0.1 | 2.4 |
| 2-34 | 2.2 | 3169 | 2.2 | 3.6 | 8 |
| 8-34 | 2.2 | 1186 | 0.8 | 1.4 | 4.4 |
| 2-35 | 2.2 | 3821 | 2.6 | 4.4 | 9.2 |
| 4-35 | 2.2 | 1065 | 0.7 | 1.2 | 4.1 |
| 6-35 | 2.2 | 138 | 0.1 | 0.2 | 2.5 |
| 10-35 | 2.2 | 991 | 0.7 | 1.1 | 4 |
| 12-35 | 2.2 | 189 | 0.1 | 0.2 | 2.5 |
| 14-35 | 2.2 | 337 | 0.2 | 0.4 | 2.8 |
| 12-35i | 0 | 0 | 0 | 0 | 0 |
| **Total** | **22** | **11123** | **7.6** | **12.7** | **42.3** |

* Well pad surface disturbance areas are approximately 2.2 acres, including spoil piles and cut/fill slopes. Injection wells (i) are co-located on same pad with production wells representing no additional surface disturbance.
** This assumes a corridor surface disturbance with widths equal to 30 feet. .
*** This assumes new road surface disturbance with widths equal to 50 feet.

The proposed action (for both POD D and Pod E) will result in approximately 147 acres of short-term disturbance, comprised of new or reconstructed access roads and adjacent & parallel pipelines and utilities, as detailed above.

The average short-term per-well disturbance for POD D is 5.2 acres for Sun Dog D (again, assuming no additional disturbance for the injection wells) and 4.2 acres for POD E. The proposed action is located outside of "Category A" area, and thus is subject to a "disturbance goal" of 6.5 acres per well. Both PODs, then, meet the disturbance goal provided in the AREIS ROD.

Access

The operator proposes to construct new or reconstruct existing access roads to the proposed well locations. The new constructed or reconstructed roads will be constructed to meet BLM specifications for a "Resource Road", as specified in BLM Manual Section 9113. Proper drainage structures will be constructed/installed along the access roads. The width of the access road travel-way (travel surface) will be a minimum of 14 feet within an average right-of-way width of 40 to 50 feet. Unless prohibited by terrain and or excessive surface disturbance or other such circumstances the access road right-of-way will be combined with the pipeline/utility right-of-way into a road/utility corridor that will be a total of 80 feet in width. In addition, some local connector or collector roads between multiple well locations will be constructed to a minimum 16-20 feet wide travel width within the 80 feet wide corridor.

The access roads including utility corridors would be reclaimed during production operations to the maintenance width of approximately 30 to 40 feet. Utility corridors upon completion of pipeline/power-line installation along with any unneeded access road would be recontoured, ripped, seeded, and revegetated.

Well Sites

In order to drill and complete the wells an approximate 220 by 300 or 220 by 350 feet 1.8 or 2.0 acre drill pad will be constructed for each well location. Some well locations will also include an additional produced water injection well, identified by an "i" at the end of the well number. In the event the wells become producers, cut and fill portions of the well site will be brought back to grade and reclaimed along with any other unneeded portions of the well site. Soil stockpiles will be re-spread or stabilized, and reseeded with native vegetation.

The well pad will be reduced to less than one-half acre for the duration of production operations.  Unless otherwise authorized and in conjunction with interim pad reclamation, the reserve pits will have been dried and backfilled within 180 days of well completion or plugging and abandonment.  The entire well pad will be recontoured, ripped, seeded, and revegetated during final reclamation upon final plugging and abandonment.

Pipeline/Utility Corridors

The produced water and gas sales and gathering pipelines and power-lines would be buried upon completion of construction and installation, and the surface disturbed areas reclaimed soon thereafter. Upon well plugging and abandonment and or pipeline/power-line abandonment, the pipelines/power-lines would be properly abandoned in accordance with BLM procedures for abandonment and the right-of-ways and corridors adequately reclaimed.  Major crossings of drainages have been engineered to insure design/construction adequacy and erosion protection. All channel crossings will comply with current BLM policies and mitigation measures appropriate to the crossings (see "Hydraulic Considerations for Pipelines Crossing Stream Channels," BLM Technical Note 423, April 2007).

Produced Water Disposal

Produced water from the proposed wells would be gathered and transported via buried water pipelines to existing and proposed water re-injection wells within the PODs and the Sun Dog Unit. Produced water collection, transport and disposal, is addressed in detail in the MSUP and appended Sun Dog Unit Water Management Plan (WMP).

The only method of produced water disposal considered and analyzed under the "proposed action" and this EA is subsurface re-injection using underground injection disposal wells permitted by the State of Wyoming and approved by BLM.

At new injection facilities, it is anticipated that subsurface water sumps will be constructed in lie of above ground storage tanks.  Any modifications to this proposal will be submitted via a Sundry Notice for review prior to approval.

Monitoring wells

As described and detailed in Appendix B of the Atlantic Rim ROD and the Sun Dog Water Management Plan, the Unit Operator shall be responsible for drilling, completing, and equipping one set of three shallow groundwater-monitoring wells completed in water-bearing sandstone units stratigraphically above the principle producing coal beds in the upper Mesaverde Group prior to production of any of the wells in the two PODs.

**No Action Alternative**

NEPA regulations require that alternative analyses in NEPA documents "include the alternative of no action" (40 CFR 1502.14(d)). For this analysis, "no action" means that the BLM would reject the proponent's proposal and "the proposed activity would not take place."

**Potential Environmental Impacts of the "Proposed Action" Alternative**

| Critical Element | Affected | | Critical Element | Affected | |
|---|---|---|---|---|---|
| | Yes | No | | Yes | No |
| Air Quality | X | | T / E Species | | X |
| ACEC's | | X | Wastes, Hazardous/Solid | X | |
| Cultural Resources | X | | Water Quality | | X |
| Prime/Unique Farmlands | | X | Wetlands/Riparian Zones | X | |
| Floodplains | | X | Wild and Scenic Rivers | | X |
| Native Amer. Rel. Concerns | | X | Wilderness | | X |
| Environmental Justice | | X | Invasive, Nonnative Species | X | |

In addition to the critical elements referenced above, reviews of potential effects upon paleontological, visual and recreational, soil, vegetation, and wildlife resources were conducted.

The affected environment and analysis of environmental impacts are discussed in the AREIS to which this EA is tiered. Air quality impacts are also disclosed and analyzed in the AREIS. A map showing the known wildlife resources in the project vicinity is attached.

Halogeton and other invasive and/or noxious weeds are a significant concern for this project area. COAs have been added to control the spread, establishment, and plant community changes associated with weed infestation.

Cultural:

Class III cultural resources inventory were conducted for the project areas. Archaeological resources identified will be avoided or, as necessary, a monitor will review construction to ensure no cultural artifacts are disturbed. Both PODs have wells and infrastructure located inside of the two-mile buffer of contributing segments of a historic trail ("Rawlins to Baggs Road"). As a result, SHPO consultation was necessary and a visibility analysis required on those well locations and related infrastructure. The AREIS also required a "Programmatic Agreement" or "Memorandum of Agreement" between the affected parties, i.e. landowner (BLM), operator and SHPO to address the necessary mitigation to minimize impact to the trail view-shed from these wells and associated disturbances. As a result, restrictions or stipulations in the form of COA were added to the MSUP APD authorizations as appropriate. Those stipulations are summarized below:

For all wells and associated infrastructure in POD D and E:
*1) Standard cultural stip (under general permitting requirements)*
*2) All surface facilities will be painted a color compatible with the local environment.*
*3) The access road will be surfaced with material compatible with the local environment.*
*4) The Operator shall select and use a seed mix most applicable to each disturbed location, with the goal of restoring individual sites to closely resemble the pre-disturbance native plant communities, as provided in Appendix A of the ROD, "Project Reclamation Plan."*

Additional mitigation measures are stipulated for individual wells and/or infrastructure within two-miles of the Rawlins-Baggs Road which have viewshed or visibility concerns, which include:

POD E wells: 2-35, 10-35, 2-34, 8-34, 12-26, 4-35, 6-35, 12-35, and 14-35
POD D wells: 12-10 (1 only), 2-4, 4-3 (1 only), 6-4 (1 only), 12-3 (1 only), 10-34 (2 only), 12-34 and 12-34i (1 only), and 14-34

These additional mitigation measures include:

*1) Unless otherwise authorized, the pipelines/utilities will be plowed or ripped into the un-bladed surface (using technology that does not require trenching). If such techniques are infeasible due to terrain or geology, the surface will be brush-hogged and the utilities will be placed no farther than the outside edge of the ditch slope.*
*2) No blading will be allowed outside the staked well location for placement or removal of the topsoil stockpile.*

Other, site-specific Conditions of Approval (such as archaeological monitor, barrier fencing, etc.), are also applied, as applicable.

Portions of the proposed actions (wells, pads, access roads and pipeline/power-line right-of ways/corridors) are located within two mile (protective buffer) of sage grouse leks, within one mile (protective buffer) of nesting raptors (ferruginous hawks) and within crucial winter range for mule deer. Numerous well locations, roads and corridors were relocated outside these areas or buffer zones where practical, and several were relocated on the outside or edge of "No Surface Occupancy" (NSO) or "Controlled Surface Use" (CSU) areas or zones for these wildlife resources. The NSO or CSU is a one mile radius from the lek perimeter for sage-grouse and one-quarter mile from the nest for ferruginous hawks. Mountain plover habitat was identified for a few locations. As a result of the above, seasonal restrictions or stipulations in the form of COA were added to the MSUP APD authorizations as appropriate. Those stipulations are summarized below:

**Sun Dog Unit POD "D" Wildlife Stipulations**

| Well Name | Raptor [1] | Grouse [2] | Plover [3] |
|-----------|-----------|-----------|-----------|
| 2-3 | NA | 2 | NA |
| 4-3 | 1 | 2 | NA |
| 6-3 | NA | 2 | NA |
| 10-3 | NA | 2 | NA |
| 10-3i | NA | 2 | NA |
| 12-3 | NA | 2 | NA |
| 2-4 | 1 | 2 | NA |
| 4-4 | 1 | 2 | NA |
| 6-4 | 1 | 2 | NA |
| 16-4 | NA | 2 | NA |
| 2-5 | 1 | 2 | NA |
| 4-5 | 1 | 2 | NA |
| 4-5i | 1 | 2 | NA |
| 6-5 | 1 | 2 | NA |
| 8-5 | 1 | 2 | NA |
| 8-9 | NA | 2 | NA |
| 4-10 | NA | 2 | NA |
| 12-10 | NA | 2 | NA |
| 10-34 | 1 | 2 | NA |
| 12-34 | 1 | 2 | NA |
| 12-34i | 1 | 2 | NA |
| 14-34 | 1 | 2 | 3 |
| 16-34 | 1 | 2 | NA |

**Sun Dog Unit POD "E" Wildlife Stipulations**

| Well Name | Raptor[1] | Grouse[2] | Plover[3] |
|-----------|-----------|-----------|-----------|
| 12-26 | 1 | 2 | NA |
| 14-26 | NA | 2 | NA |
| 2-34 | 1 | 2 | NA |
| 8-34 | 1 | 2 | NA |
| 2-35 | NA | 2 | NA |
| 4-35 | 1 | 2 | NA |
| 6-35 | NA | 2 | NA |
| 10-35 | NA | 2 | NA |
| 12-35 | NA | 2 | NA |
| 12-35i | NA | 2 | NA |
| 14-35 | NA | 2 | NA |

1 Raptor Stipulations: Construction, drilling and other activities potentially disruptive to nesting raptors are prohibited during the period of February 1 to July 31 for the protection of raptor nesting areas.

2 Grouse Stipulations: Construction, drilling, reclamation and other potentially disruptive activities are prohibited during the period of March 1 to July 15 for the protection of sage grouse.

3 Plover Stipulations: Construction, drilling and other activities potentially disruptive to breeding and nesting plover are prohibited during the period of April 10 to July 10 for the protection of nesting plover/habitat.

Exceptions to Stipulations: In some instances, the operator may request consideration of a temporary exception to wildlife seasonal restrictions or stipulations.  Such exceptions may be granted on a limited individual case by case basis if a determination is made by a BLM wildlife biologist that the wildlife resource will not be adversely impacted.

The fisheries biologist attended onsite inspections and considered potential impacts to Muddy Creek's  6840

BLM Sensitive fish species and determined that no additional mitigation or monitoring requirements for the proposed action were necessary.

Other site-specific findings by the interdisciplinary review team are provided in the review documents that accompany the POD MSUP and well APDs and this EA in the BLM RFO lease/well and POD/Unit files.

Description of Impacts:

A discussion of the actions generally associated with drilling projects and their associated impacts may be found in the Atlantic Rim Environmental Impact Statement and Record of Decision.

Hazardous Materials

Anadarko has indicated that some hazardous materials could be used during drilling, completion, and production of their proposed wells. The term "hazardous material" as used here means: 1) any substance, pollutant, or contaminant (regardless of quantity) listed as hazardous under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, as amended, 42 U.S.C. 9601 et seq., and the regulations issued under CERCLA, 2) any hazardous waste as defined in the Resource Conservation and Recovery Act (RCRA) of 1976, as amended, and 3) any nuclear or nuclear byproduct as defined by the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 et seq.

It is possible that wastes created or transported during implementation of the proposed action (i.e., waste motor oils, drilling/completion additives) could be accidentally released to the environment. The operator will be required to comply with the Hazardous Materials Management Plan provided in Appendix C of the AREIS. Numerous State and Federal rules and regulations also apply that govern the handling, storage, and disposal of hazardous substances.

Anadarko or any contracted company working for Anadarko will have Material Data Safety Sheets available for all chemicals, compounds, or substances which are used during the course of construction, drilling, completion, and production operations for this project. Additionally, all chemicals will be handled in an appropriate manner to minimize the potential for leaks or spills to the environment.

Impacts to soils, surface and groundwater resources, wildlife, vegetation, and human health could result from the accidental exposure of hazardous materials. However, since the project operations will strictly comply with all applicable federal and state laws concerning hazardous materials, the Hazardous Materials Management Plan for this project, and the operator's Spill Prevention Control and Countermeasure Plan, no significant impacts are anticipated.

Reclamation

Interim reclamation is typically initiated and completed within 6 months of drilling completion. The drill pads will be reduced to a less than one-half acre production well site at each location. Total reclamation of all new disturbances will take place as the wells and facilities are no longer productive or needed and are plugged and abandoned. Appendix A of the ROD contains the reclamation success criteria by which the reclamation status will be judged. The approved Master Surface Use Plan and Conditions of Approval also contain reclamation measures pertaining to reclamation standards.

Description of Mitigation Measures and Residual Impacts:

Mitigation of potential effects is part of the proposed action, and specific mitigation details can be found in the Master Plan Elements including the Conditions of Approval. Residual impacts resulting from the proposed action would include permanent loss of oil and/or gas reserves should the wells become productive. In addition, the well pads, production equipment, and the access roads could remain in place for 30 years or more (until plugging and abandonment, final reclamation).

**Potential Environmental Impacts- No Action Alternative**

Under the No-Action Alternative, the proposed action would not be authorized. The 35 wells would not be constructed or drilled, and gas production from the proponent's lease would not occur. Existing development

would continue to occupy the project area, along with impacts associated from the existing development and development on nearby private (fee) and or state leases.

**Residual Impacts/Cumulative Impacts:**

The potential residual and cumulative impacts are discussed in the AREIS, Chapter 5, and Cumulative Impacts Analysis. The proposed action entails the addition of 30 CBNG wells (20 in POD D and 10 in POD E) and 4 produced water re-injection wells (3 in POD D and 1 in POD E).

Standard mitigation guidelines are addressed in the ROD's Appendix A, Project Reclamation Plan. Additional mitigation measures are also provided in Appendix B, Performance-Based Monitoring and Best Management Practices, and Appendix C, Operator-Committed Practices. All needed mitigation, for that portion of the proposed action on public land, is part of the proposed action.

The access roads and well/production pads may remain visible for a period of approximately 20 to 30 years after they are abandoned and reclaimed. The oil and gas resource will be permanently lost. All needed mitigation is part of the proposed action.

Additional mitigation measures are addressed in the AREIS, under; Appendix A: Reclamation Plan; Appendix C Hazardous Materials, and; Appendix D Wildlife Protection Plan. All recommended mitigation for that portion of the proposed action on public land, is part of the proposed action and plan of operation found in the well POD MSUP with COA and APDs.

**Persons/Agencies Contacted and or Consulted:**

| | | |
|---|---|---|
| Mary Mondragon | Regulatory Analyst | Anadarko E&P Company |
| Cathy Flansburg | Regulatory Analyst | Anadarko E&P Company |
| Gary Sundberg | Permitting Consultant | Anadarko E&P Company |
| Andy Stone | Hydrologist | BLM, Rawlins Field Office |
| Ben Toole | Wildlife Biologist | BLM, Rawlins Field Office |
| Hillaire Peck | Civil Engineer | BLM, Rawlins Field Office |
| Bonni Bruce/Nina Trapp | Archaeologist | BLM, Rawlins Field Office |
| Janelle Wrigley | Realty Specialist | BLM, Rawlins Field Office |
| TJ Murry | Rangeland Specialist | BLM, Rawlins Field Office |
| Mark Newman | Geologist | BLM, Rawlins Field Office |
| Jerry Dickinson | Petroleum Engineer | BLM, Rawlins Field Office |
| Patrick Lionberger | Fisheries Biologist | BLM, Rawlins Field Office |
| Paul Rau | Recreation Planner | BLM, Rawlins Field Office |
| Skip Stonesifer | Reclamation Specialist | BLM, Rawlins Field Office |
| Andy Warren | Rangeland Supervisor | BLM, Rawlins Field Office |
| Mary Read | Wildlife Biologist | BLM, Rawlins Field Office |



**Sun Dog C/D/E PODs**

SunDogE

SunDogD

SunDogC

T17N
T16N

R92W
R91W

**Legend**

| | GSG Lek Perimeter |
|---|---|
| **Raptor Nest** | |
| ▲ | Active |
| ⚠ | Historical |
| ⦿ | Sage Grouse Lek |
| ▨ | Pronghorn CWR |
| ▨ | Elk CWR |
| ▨ | Mule Deer CWR |
| ▢ | Atlantic Rim EIS Area |
| | Bureau of Land Management |
| | Private |
| | State |

WOGCC Well Data (06/2007)-CA

| | |
|---|---|
| • | All Other |
| ⚲ | Injection Well |
| ✳ | Flowing Well |
| ⊗ | Plugged & Abandoned |
| ✴ | Producing Gas Well |
| ● | Producing Oil Well |
| ⊖ | Shut-In |
| ◇ | Spud |

1 inch equals 5,000 feet
1:60,000

0    1    2    3    Miles

U.S. Department of the Interior
Bureau of Land Management
Rawlins, Wyoming

Drafted By: TDB 10/23/2007

The BLM can not guarantee the accuracy of these data.

## FINDING OF NO SIGNIFICANT IMPACT/DECISION RECORD.

**Decision**

I have reviewed this environmental assessment including the explanation and resolution of any potentially significant environmental impacts, public comments, and errata to this EA (see Appendix A to this Decision Record, "Errata").    I have selected the proposed action alternative with the mitigation measures described below for authorization and implementation.  I have determined that the proposed project is in conformance with the approved land use plan.  It is my decision to implement the project with the mitigation measures identified below.

**Finding of No Significant Impact**

Based upon the analysis of potential environmental impacts contained in the EA, I have determined that the impacts are not expected to be significant, and that an EIS is not required.

**Rationale for Decision**

Compared to the No Action Alternative, the Proposed Action Alternative best meets the Purpose and Need and guiding laws, regulations, and directives, including the Federal Land Policy and Management Act (FLPMA, 43 USC 35).  The proposed action is in conformance with the Great Divide Resource Management Plan (RMP) and the Atlantic Rim Natural Gas Field Development Project EIS.

**Public Comments/BLM Responses**

Appendix B to this Decision Record contains a summary of public comments received for this action, and corresponding BLM responses.

**Mitigation Measures/Remarks:**

All needed mitigation is a part of the proposed action and is found in the Master Surface Plan, and accompanying attachments and appendices, with the Conditions of Approval for the MSUP and APD's.  A total of 34 well APDs, unless specified otherwise in the COA, are authorized under this decision, along with associated well pads, access roads, pipelines, power-lines and utility corridors.  Please note: The Sun Dog D 8-4, due to unresolved archaeological issues, is not being approved at this time.

**Monitoring and Compliance**

Designated BLM personnel will monitor operations under authorizations for the proposed action as needed to ensure compliance with the Master Plan Elements and Conditions of Approval.

Authorized Official:

_____                    October 23, 2007_____

Field Manager                                                        Date
Rawlins Field Office

**Appeal**

Under BLM regulation this decision is subject to appeal. Under BLM regulation, this decision is subject to administrative review in accordance with 43 CFR 3165. Any request for administrative review of this decision must include information required under 43 CFR 3165.3(b) (State Director Review), including all supporting documentation. Such a request must be filed in writing with the State Director, Bureau of Land Management, P.O. Box 1828, Cheyenne, Wyoming 82003 within 20 business days of the date this Decision Record is received or considered to have been received.

Appendix A to the Decision Record

ERRATA

Modifications and Corrections To The
Sun Dog Unit D & E Plan of Development (POD)
Environmental Assessment

To clarify the BLM consideration of alternatives for this project, additional discussion was added (Page 3):

### *Development of Alternatives*

*In reviewing the proponent's submitted proposal (APDs, Master Surface Use Plan, Master Drilling Plan, Water Management Plan, etc.), the BLM conducted onsite reviews and considered known and potentially-occurring resources and conditions in the project area. As a result of this review, project components were moved, added, or eliminated in order to reduce potential environmental impacts, and in accordance with BLM policy and accepted Best Management Practices (BMPs). This resulted in the alteration of the proponent's submitted proposal to yield the Proposed Action, which incorporates the changes from the onsite inspections, BLM review, and mandated BLM mitigations (Conditions of Approval). The Proposed Action, then, differs from the original proposal submitted by the proponent. Since the proponent has agreed, by re-submission of the applications and POD plans, to the changes agreed upon as a result of the onsite inspections and BLM review, the Proposed Action represents a de facto alternative to the original submittal.*

*The EIS considered several alternatives to development of the oil & gas resources in the project area (see DEIS, Pages S2-S3 and FEIS Page 1-20).*

*The BLM interdisciplinary team, in review of this Proposed Action (as modified during onsite inspections and subsequent review), identified no unresolved resource conflicts that would necessitate development of additional alternatives.*

### Potential Environmental Impacts of the "Proposed Action" Alternative

A map was added to the EA to display known wildlife resources in the project vicinity. Add map and:

*A map showing the known wildlife resources in the project vicinity is attached.*

Change:

*Numerous well locations, roads and corridors were relocated outside these areas or buffer zones where practical, and several were relocated on the outside or edge of "No Surface Occupancy" (NSO) or "Controlled Surface Use" (CSU) areas or zones for these wildlife resources. The NSO or CSU is a one mile radius from the lek perimeter for sage-grouse and one-quarter mile from the nest for ferruginous hawks.*

To:

*Numerous well locations, roads and corridors were relocated outside these areas or buffer zones where practical, and several were relocated on the outside or edge of "Controlled Surface Use" (CSU) areas or zones for these wildlife resources. The CSU is a one-quarter mile radius from the lek perimeter for sage-grouse and is variable depending upon raptor species.*

Seasonal restrictions for raptors were mistakenly applied to several wells in the PODs. These have been corrected (see table, Page 9).

Add reference: *Sawyer, Hal. 2006. Progress Report for the Atlantic Rim Mule Deer Study.*

*End Errata*

Sun Dog Unit D & E POD CBNG Wells
EA #: WY-030-07-EA-232
Page 14 of 17

Appendix B to the Decision Record

Summary of EA Comments and BLM Responses

A total of two comment letters were received. The letters have been reviewed to determine whether the information they provided would warrant a determination other than a Finding of No Significant Impact (FONSI). Substantive comments are summarized below, with BLM responses to the comments in italics. The RFO would like to thank all who commented for taking the time to review the EA.

As noted in the EA (Page 3), information about the proposal was posted in the RFO public room for a 30-day period upon submittal by the proponent. In addition, the BLM online NEPA register provides notice of actions for which NEPA documentation is prepared, including the proposal considered under this EA.

In reviewing the comments received, there were some instances where substantial comments were made but we could find no project-specific comments or any description of (1) new information, (2) why or how the analysis is flawed, (3) evidence of flawed assumptions, (4) evidence of error in data presented, or (5) requests for clarification that bear on conclusions presented in the analysis. This was the standard used to identify substantive comments for the following responses.

1.  **Theodore Roosevelt Conservation Partnership**

    a.  "The EAs and FONSIs are inconsistent with the EIS from which they allegedly tier. Neither the ROD, nor the EIS… contemplates an exclusion from seasonal drilling restrictions."

        *As provided on page 1-9 of the Atlantic Rim FEIS, "the BLM's Great Divide RMP and its Record of Decision (ROD) (USDI-BLM 1990) directs management of the federal lands within the project area. The proposed project is in conformance with management objectives and actions provided for in the ROD..." The RMP provides direction applicable to BLM consideration of requests for exceptions to seasonal wildlife restrictions: "…Exception, waiver, or modification of this [wildlife] limitation in any year may be approved in writing, including documented supporting analysis, by the Authorized Officer"… (page 48-49, Appendix I, Great Divide Resource Area Record of Decision and Approved Resource Management Plan). As such, case-by-case consideration of exceptions to seasonal restrictions is in compliance with the decisions and analysis to which the EA is tiered.*

    b.  "The EAs consider only two alternatives: "no action" and the proponent's proposed development. This is not the reasonable range of alternatives NEPA demands be analyzed."

        *Modifications, or alternatives, to the original proposal received from the operator were identified as the result of the pre-approval onsite inspections. Clarification that the proposal was modified and subsequently analyzed as a* de facto *alternative has been added (see "Errata").*

2.  **Biodiversity Conservation Alliance**

    a.  "…the EA makes no representations about the potential impacts of this POD on any other species, including BLM Sensitive Species. A full analysis of site-specific impacts to wildlife is needed."

        *The BLMs analysis of the proposed action included site-specific review of potential impacts to sensitive species, using the experience and expertise of the BLM biologists as well as data and knowledge collected by the BLM, Wyoming Department of Game and Fish, U.S. Fish & Wildlife Service, and other organizations. This analysis is referred to in the EA on page 8-9 ("Other site specific findings by the interdisciplinary review team are provided in the review documents that accompany… …this EA in the BLM RFO lease/well and POD/Unit files."). Potential site-specific*

*impacts to wildlife are addressed in the EA (see Pages 8-9).*

b. "Using lower-standard jeep trails for all access purposes could dramatically reduce these impacts, but does not appear to have been considered."

*As provided for in the fourth edition of the BLM Gold Book (containing BLM guidance for consideration of oil & gas activities on BLM-administered public lands), "The appropriateness of primitive roads or routes is both site-specific and use specific and is typically based on many factors…." Nonconstructed roads were not mandated for this POD due to a lack of unresolved resource conflicts. Should the BLM determine that alternate road designs are appropriate or necessary, the BLM could mandate the use of a reviewed and approved alternate design. In this instance, such a design was not determined to be necessary.*

c. "BLM needs to provide a site specific cumulative impacts analysis of the impacts of these operations on the affected migration corridors, their permeability to mule deer, and the ultimate impact on the population dynamics of the herd."

*In our review, we considered recently obtained data (Sawyer, 2006. Progress Report for the Atlantic Rim Mule Deer Study) regarding mule deer migration routes in the project area. At this time, no migration corridors have been identified within the POD boundaries. This Report has been added as a reference to the EA (see "Errata").*

d. "In Sun Dog C, nesting habitat for mountain plover (a BLM Sensitive Species) was identified at several well locations."

*There is no identified mountain plover habitat in POD C. This error has been corrected; see Errata, Appendix A to this Decision Record. Where potential mountain plover habitat has been identified (i.e., Sun Dog POD D), seasonal restrictions have been applied to protect mountain plover.*

e. "For raptor nests and sage grouse leks, BLM indicates that 'The NSO or CSU is a one mile radius from the lek perimeter for sage-grouse and one-quarter mile from the nest for ferruginous hawks'… Which is it[?]"

*The buffer descriptions and distances were in error and have been corrected; see Errata.*

f. "It has been definitively demonstrated that mere seasonal moratoria on construction and drilling activities is insufficient to prevent major [sage grouse] population declines."

*Potential impacts to sage grouse from activities such as those in the proposed action have been discussed in the programmatic EIS (see FEIS at Page 4-76). Site-specific mitigation measures have been applied to the proposed action (see Conditions of Approval and EA at Page 8) to reduce potential impacts to sage grouse as the result of the site-specific analysis. You provided no data or substantiation for your opinion that seasonal restrictions are insufficient, and so we can not judge your conclusion. The seasonal restrictions applied are supported by programmatic BLM decisions (such as the Great Divide RMP and Atlantic Rim ROD, among others), and are consistent with BLM policies developed in consultation with agencies such as the Wyoming Department of Game and Fish.*

g. "The EAs do not mention in any way the potential impacts of the projects on the [pygmy rabbit, Wyoming pocket gopher, & White-tailed prairie dogs]… BLM Sensitive Species."

*See above response to #2(a).*

h. "These viewsheds, which formerly were unimpaired by human intrusions… will be badly degraded by the cumulative impacts of these three new PODs if usual road and wellpad construction techniques are used."

*The EA acknowledges that the proposal would result in impacts to the visual setting of the project area (see EA at Page 11). Mitigations to protect visual resources consistent with its Visual Resource Management (VRM) setting have been applied (see Conditions of Approval). See also #2(b).*

i.   "We are concerned that the proposed activities, when occurring on highly saline, erodible, or unstable soils will contribute to significant impacts to the watershed, and in particular to downstream native fishes."

*The EA addresses BLM specialist conclusions regarding potential impacts to sensitive fisheries ("…no additional mitigation or monitoring requirements for the proposed action were necessary." EA at Page 9). In addition, the mitigation measures voluntarily committed to by the proponent, compliance with other requirements including State water quality regulations, and mitigation applied by the BLM as Conditions of Approval, will reduce potential impacts from erosion and sedimentation. No impacts to sensitive fisheries are anticipated.*

j.   "…BLM must require that the project proponents have acquired certifications (or a waiver of such certifications) [under Section 401 of the Clean Water Act] from the State of Wyoming…"

*The proponent has certified that they "will comply with all laws, standards, and criteria set forth by all appropriate Federal, State, and Local authorities…" (Master Surface Use Plan). This is also a requirement of the BLM's Conditions of Approval.*

k.   "The Rawlins to Baggs Wagon Road is known to be affected by a number of wells in these PODs…"

*The impacts to cultural resources from the proposal are discussed on Pages 8 of the EA, including impacts to the Rawlins-Baggs Road. Additional mitigation measures have been applied to reduce potential impacts to this feature. No Section 106 consultation for this proposal was deemed necessary; the BLM has entered into a programmatic agreement with the State Historic Preservation Office (SHPO) regarding the protection of cultural resources.*

l.   "BLM's proposed methodology to allow the operators to report archaeological and paleontological resources passively if they happen to notice them is unacceptable."

*The BLM conducted a site-specific review of the potential for archaeological and paleontological resources. In this review, it was determined that potential impacts to resources would be avoided or mitigated (cultural) or that impacts were unlikely due to absence of significant resources (paleontological). Operator-reporting of potential archaeological or paleontological resources encountered is provided as a standard Condition of Approval by the BLM out of an abundance of caution.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, 1200 New York Ave., N.W., Suite 400, Washington, D.C. 20005, et al. | ) ) ) ) | |
| Plaintiffs, | ) ) | Civ. No. 07-1709 (RJL) |
| v. | ) ) | |
| DIRK KEMPTHORNE, in his official capacity As the Secretary of the United States Department of the Interior 1849 C. St. N.W., Washington, D.C. 20240 (202) 208-3100, et al. | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## DECLARATION OF DUANE SHORT

I, Duane Short, declare under penalty of perjury that:

1.  My name is Duane Short. I am more than 18 years of age, am a citizen of the United States, and reside in Laramie, Wyoming at 4810 Sherman Hill Road, Unit B.

2.  I am the Wild Species Program Director of the Biodiversity Conservation Alliance (BCA). I have been a member of BCA since November 2006 and an employee of this organization since November 2006.

3.  I visited the areas covered by the Sun Dog C and D plans of development (PODs) in the Atlantic Rim project area on October 22, 2007. I was not able to find road access to the Sun Dog E POD. I went to this area to inspect and photograph it after BCA Executive Director Erik Molvar informed me that a decision with regard to approval of the Sun Dog C, D, and E PODs was expected by October 22, 2007.

4.  Attached as Exhibit 1 is a map titled "Sun Dog C/D/E PODs" which is taken from BLM's environmental assessments for Sun Dog C, D and E. I have indicated on the map the exact areas from which I took the attached photographs that are described below.

1

DECLARATION OF DUANE SHORT

5. Attached as Exhibits 2 - 7 are just a few examples of the photographs that I took on October 22, 2007 when visiting the areas covered by the Sun Dog C and D PODs. Each of these photos accurately represents what I saw when I visited the area on October 22, 2007. Each photo's stated directional viewpoint is based on my reasonably accurate ability to establish north, according to position of the sun and coordinated with topographical maps, when necessary.

6. As shown in the photographs, the vast majority of the area covered by Sun Dog C and D PODs bears essentially no sign of development. The attached photographs are representative of the area covered by the Sun Dog C, D, and E PODs in terms of the level of existing development. Although I could not find road access to Sun Dog E POD, I could see portions of Sun Dog E in the distance and the land appeared to be development-free wide-open sagebrush country similar to that shown in the attached photographs. This is country that I and others hike in and would return to if the new drilling pads and roads did not harm it. There are a few BLM and service roads in the area, and one can see in the distance, from some vantage points, existing drilling pads outside of the Sun Dog C, D, and E PODs. However, as the photographs and descriptions indicate, the vast majority of the Sun Dog C, D and E area is open sagebrush country. Many of the attached photographs show views extending to areas surrounding the Sun Dog C, D and E PODs, showing that even this surrounding area is largely wide-open sagebrush land.

7. Exhibit 2, DSCO2025, is a photograph taken on October 22, 2007 from BLM Road 3305 at GPS coordinates T13 0278217, UTM 4579159 looking E, which shows a portion of the Sun Dog C POD. The approximate location from which I shot this picture is indicated on the map with the letter "A." Shown is wide open sagebrush country with light snow cover.

8. Exhibit 3, DSCO2067, is a photograph taken on October 22, 2007 from near BLM Road 3305 at GPS coordinates T13 0279945, UTM 4581251 looking E-SE, which shows a portion of the Sun Dog C & D PODs. The approximate location from which I shot this picture is indicated on the map with the letter "B." Shown is a vast open valley and wide open sagebrush country with light snow cover and, in the foreground, 4 antelope.

9. Exhibit 4, DSCO2071, is a photograph taken on October 22, 2007 from BLM Road 3305 at GPS coordinates T13 0279480, UTM 4580357 looking S, which shows a portion of the Sun Dog C POD. The approximate location from which I shot this picture is indicated on the map with the letter "C." Shown is a sagebrush rise with the vanishing wingtips of a golden eagle rising just above the hillcrest.

10. Exhibit 5, DSCO2084, is a photograph taken on October 22, 2007 from near BLM Road 3305 at GPS coordinates T13 0280280, UTM 4580541 looking N-NE, which shows area at or near the eastern border of the Sun Dog C POD. The approximate location from which I shot this picture is indicated on the map with the letter "D." Shown is the middle part of a pristine-appearing wetland with snow-covered mountains in the background.

2

DECLARATION OF DUANE SHORT

11. Exhibit 6, DSCO2052, is a photograph taken on October 22, 2007 from near BLM Road 3305 at GPS coordinates T13 0279246, UTM 4582926 looking N-NE, which shows a portion of the Sun Dog C & D PODs. The approximate location from which I shot this picture is indicated on the map with the letter "E." Shown is open sagebrush country with valley between mountains and foreground.

12. Exhibit 7, DSCO2060, is a photograph taken on October 22, 2007 from near BLM Road 3305 at GPS coordinates T13 0279246, UTM 4582926 looking N-NE, which shows a portion of the Sun Dog D POD. The approximate location from which I shot this picture is indicated on the map with the letter "F." Shown is the vast expanse of open sagebrush common to the Sun Dog C, D & E PODs.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, in accordance with 28 U.S.C. § 1746.

Signed this 29th day of October, 2007.

_____

Duane Short

DECLARATION OF DUANE SHORT

3





Exhibit 2 to Short Declaration
Looking east showing Sun Dog POD C



Exhibit 3 to Short Declaration
Looking E-SE showing portion of Sun Dog PODs C & D



Exhibit 4 to Short Declaration
Looking South showing portion of Sun Dog POD C with
Vanishing Wingtips of Golden Eagle



Exhibit 5 to Short Declaration
Looking N-NE showing area at or near eastern border of Sun Dog POD C



Exhibit 6 to Short Declaration
Looking N-NE showing portion of Sun Dog PODs C & D



Exhibit 7 to Short Declaration
Looking N-NE showing vast expanse of open sagebrush in Sun Dog POD D

# 2007 RED DESERT OUTINGS

**May 19th – Boar's Tusk**
Visit the White Mountain Petroglyphs, Boar's Tusk and Killpecker Sand Dunes on this day trip to lands within the proposed Northern Red Desert National Conservation Area. An auto tour with light day hiking.

**May 26-28 – Southern Red Desert Caravan**
A three-day auto safari with lots of wildlife and wild horses, visiting southern Red Desert highlights like the Atlantic Rim, Adobe Town, and Powder Rim. An auto tour with car camping and light to moderate day hikes.

**June 2-3 – Tour of the Jack Morrow Hills**
A two-day auto tour of the proposed Northern Red Desert National Conservation Area. Visit prominent landmarks like the Boar's Tusk and Dunes, The Pinnacles, Honeycomb Buttes, with great opportunities to spot wild horses and desert elk. An auto tour with car camping and light to moderate day hikes.

**June 9-10 – Wild Cow Creek Backpack**
A moderately strenuous overnighter through rugged country representing the best wilderness lands along the Atlantic Rim. Visit this hidden gem before it is overtaken by a massive coalbed methane project.

**June 16-17– Powder Rim Backpack**
A moderately strenuous overnight jaunt along the historic Cherokee Trail, through juniper woodlands harboring some of the most diverse and sensitive wildlife in the Red Desert.

**June 16-17 – Red Desert Bird Watching Tour**
Join birding enthusiast Tim Banks for a day of identifying and learning about the bird life of the Atlantic Rim, Flattop Mountain, and Powder Rim. Auto tour with light day hikes.

**June 23-24 – Adobe Town**
A two-day tour of Adobe Town, the crown jewel of Wyoming's desert wilderness. Car camping and light to moderate day hikes along the spectacular rims and through the forests of eroded pinnacles.

**Space is limited! Contact Maggie Schafer at (307) 742-7978 or maggie@voiceforthewild.org to sign up.**



Biodiversity Conservation Alliance

**PO Box 1512
Laramie, WY 82073**

**NONPROFIT ORG.
US POSTAGE PAID
LARAMIE, WY
PERMIT NO 123**



# Presentation
# Atlantic Rim Project Area



# Appendix O.  BLM Responses to Comments

**Table O-2.     Substantive Comments and BLM Responses.**

**Comment Number**     671-9-2

**Comment**

As there are mitigation measures and/or alternative wellfield management options (outlined below) that fully meet the Purpose and Need for this project and would reduce impacts to the aforementioned resources (as well as others which BLM has erroneously concluded would not incur significant impacts under the various alternatives), such alternatives must specifically be analyzed and considered by BLM because they represent alternatives that minimize the impacts of the project to the human environment.

**Response**

The sage-grouse is a BLM sensitive species, listed as such on 04/09/2001.  Because of this status no actions that might jeopardize the future existence or viability of this species may occur.  The Great Divide Resource Management Plan (RMP) in appendix I lists sage-grouse in several areas of the Wildlife Mitigation Guidelines including 2b and 2c.  2c provides for the prohibition of surface activities or use within important habitat areas for the purpose of protecting sage-grouse breeding grounds and or habitat where timing stipulations are not appropriate.  The purpose of the Guidelines are (1) to reserve for the BLM the right to modify the operations of all surface and other human presence disturbance activities as part of the statutory requirements for environmental protection, and (2) to inform a potential lessee, permittee, or operator of the requirements that must be met when using BLM-administered lands.  The Guidelines in the RMP are not specific as to the distance an action must be moved to mitigate impacts of a proposal on sage-grouse.  Literature reviews show that requirements for no surface disturbance (NSD) from a lek generally run in the  quarter-mile to 2-mile range.  The quarter-mile NSD mitigation is generally a minimum distance.

**Comment Number**     671-10-1

**Comment**

BLM should provide and analyze at least one action alternative that excludes the Wild Cow Creek citizens' proposed wilderness from the project. This would be eminently reasonable, as water drawdown modeling maps for the project indicate that most (if not all) of the CBM extraction will take place west of the unit.

**Response**

The Wild Cow Creek citizen's proposal is not an approved land management decision in the Great Divide Resource Management Plan.  To the extent any special management status may be proposed, analyzed, and approved under the Rawlins Resource Management Plan, Atlantic Rim activities will be consistent with that decision.  Inclusion of this proposal is outside the scope of the ARPA EIS.

**Comment Number**     671-11-1

**Comment**

it is impossible for BLM to provide a meaningful analysis of impact severity without first determining where the wells and roads will be located, specifically, and what relationship they will have spatially with ecologically important habitats.

**Response**

At this time the location of all future well sites and other disturbance cannot be determined with 100% accuracy by any process the proponents or BLM are aware of.  "Setting in stone" road, facility, and well locations in the EIS would require predicting well locations with information in hand, and ignoring the fact that each well provides additional information that is utilized to help determine future actions, including the number of wells, well site locations, roads and other facilities.  Currently, generalized areas of interest are being explored through the interim drilling process to further develop our knowledge of the geology and potential of the ARPA.  Adaptive management of oil and gas resource development is very much a reality in that new information produces more effective drilling programs with correspondingly reduced effects upon the environment.  The number of wells, well locations, timing of drilling, and construction is controlled in part by the location of gas and oil resources as they are found and developed, within the context of BLM's responsibility to ensure surface disturbance is managed in accordance with both the law and sound resource management.  The Atlantic Rim EIS is a field development EIS and is tiered to the Great Divide Resource Management Plan.  As such, BLM addresses the overall environmental impacts of the Project, based on the general locations wells and associated facilities in the Project area.  Consistent with its regulations, once annual work plans,  APDs or other applications for specific site activities are submitted, BLM will conduct more site-specific analysis of potential environmental impacts, tiered to the Project-level EIS.  Prior to issuing any permit or authorization to implement these activities on the BLM-administered lands, the BLM must analyze each component of the action proposed on a site-specific basis and subject to NEPA.

# Appendix O.  BLM Responses to Comments

## Table O-2.    Substantive Comments and BLM Responses.

**Comment Number**    671-11-2

**Comment**

With the exception of the No Action Alternative, the BLM has failed to provide sufficient information about the proposed action and other action alternatives to support a reasonably thorough impacts analysis as required by NEPA.

**Response**

Please refer to our response to comment 671-11-1.


**Comment Number**    671-11-3

**Comment**

The BLM noted that the project will entail 1,000 miles of new roads, road construction, and pipelines. DEIS at 2-2. These three categories have substantially different impacts; how many miles of new roads will be required? How many miles of pipelines? How many miles of road upgrades or reconstruction, and are these upgrades of two-track jeep trails or upgrades of existing constructed and maintained gravel roads?

**Response**

Please refer to our response to comment 671-11-1.


**Comment Number**    671-11-4

**Comment**

In addition, compressor stations and gas processing facilities may be required. DEIS at 2-2. These facilities have major impacts above and beyond the impacts of individual well facilities. How many compressor stations will be required, and exactly where will the high-noise-pollution facilities occur in relation to sage grouse leks and other sensitive wildlife habitats? How many gas plants will be needed, and where will these be sited?

**Response**

Please refer to our response to comment 671-11-1.  In addition, the proposed action is detailed in chapter 2, 2.2.1 "Proposed Action".  Further detail is also provided in appendix K, "Plan of Development / Detailed Proposed Action".  Additional information on sage- grouse protective measures can be found in appendix E "Wildlife Monitoring and Protection Plan".


**Comment Number**    671-11-5

**Comment**

Dividing the project area by eight wells per square mile yields 3,420 well sites. DEIS at 4-22. There are 210 wells extant and an additional 200 wells that could be approved under the interim drilling program. Added to the 2,000 wells of the Atlantic Rim project, there would be a maximum of 2,410 wells drilled, covering roughly 213 of the planning area at maximum density. In other words, approximately 1,000 potential well locations would not be emplaced. Id This could leave a little less than 113 of the planning area undeveloped.

**Response**

Dividing the project area by 640 acres / section ( 270,080/ 640) yields 422 square miles.  8 times 422 yields 3,376 potential locations.  Errors in this calculation will be corrected in the final EIS.  Following this reasoning at least 1,376 potential well sites will not be impacted under any alternative.  1,376 times 80 yields 110,080 acres.  110,080 divided by 270,080 yields 41%.  Under this line of reasoning 41% of the project area would not be disturbed.


**Comment Number**    671-11-6

**Comment**

Where will the full-field development occur under this project, and which lands will remain undeveloped? This information is an absolutely essential (and missing) prerequisite to a sound impacts analysis.

**Response**

Please refer to our response to comment 671-11-1.

# Appendix O.  BLM Responses to Comments

**Table O-2.    Substantive Comments and BLM Responses.**

**Comment Number**    671-12-1

**Comment**

For each alternative, how many miles of road and how many wellpads would be constructed in geologically unstable areas?

**Response**

Please refer to our response to comment 671-11-1.


**Comment Number**    671-12-2

**Comment**

While the BLM notes that direct and indirect impacts associated with landslides and erosion would occur under the Proposed Action (DEIS at 4-4), the agency makes no effort to quantify the magnitude, level, or likelihood of impacts, or where they would most likely occur and what the environmental consequences would be.

**Response**

Please refer to our response to comment 671-11-1.


**Comment Number**    671-12-3

**Comment**

This is a clear violation of NEPA's "hard look" requirement. And because the agency has failed to map the locations of roads, pipelines, and wellpads for this project, it cannot examine how many wells or miles of roads or pipelines will fall on steep and/or unstable slopes.

**Response**

Please refer to our response to comment 671-11-1.


**Comment Number**    671-12-4

**Comment**

And without this information, it is impossible for BLM to analyze the level of impact for geological hazards. This deficiency must be corrected before the project can be approved.

**Response**

Please refer to our response to comment 671-11-1.


**Comment Number**    671-13-1

**Comment**

The BLM's impacts analysis is deficient inasmuch as it does not include a quantification or estimate of how much CBM will travel along coal seams to outcrops, and what the impacts of such venting might be.

**Response**

Please refer to our response to comment 671-3-4.


**Comment Number**    671-14-1

**Comment**

The BLM concludes that under the Proposed Action, "many areas would exceed the impact significance criteria for soils," but fails to disclose which of the five criteria will be exceeded, where each criterion would be exceeded, for how many wellpads, or miles of road or pipeline, these criteria will be exceeded.

**Response**

Please refer to our response to comment 671-11-1.

# Appendix O.  BLM Responses to Comments

## Table O-2.     Substantive Comments and BLM Responses.

**Comment Number**     671-14-2

**Comment**

Essentially, although the BLM has made an acreage categorization of the ARPA by soil type, with some inferred risks (see Table 3-10), it has made no attempt to analyze the magnitude of impacts under any of the alternatives. In order to thoroughly study the magnitude and geographic distribution of impacts, BLM must map the specific locations of roads, pipelines, and wellpads under each alternative, provide the magnitude of impact projected by soil type and slope, and calculate the acreage of land where reclamation is expected to be unsuccessful, the tonnage of soil that is eroded in each watershed, the stream reaches where water resources criteria are not met, the acreage where vegetation significance criteria are surpassed, and the acreage where soil productivity is reduced beyond the ability of vegetation to recover to pre-disturbance levels.

**Response**

Please refer to our response to comment 671-11-1.

**Comment Number**     671-14-3

**Comment**

At one point, the EIS alludes to a figure of 36% of the sensitive soils in the ARPA would be disturbed, but it is unclear whether this figure is meant to apply to Alternative C or the Proposed Action. DEIS at 4-19.

**Response**

Text found on page 4-19, section 4.3.3.4 Alternative C of the Draft EIS states: "These would reduce the total acres disturbed by 64 percent compared to the proposed action."  This text has been revised in the final EIS to indicate that disturbance would be reduced by 68 percent on lands underlain by federal minerals.  Also please refer to our response to comment 607-30-3.

**Comment Number**     671-14-4

**Comment**

The Draft EIS currently provides essentially no information or analysis to support the conclusions that are reached for each alternative, and these conclusions are so vague that the public (and the decision makers) have no way to evaluate the magnitude of the ecological disaster that will result from the implementation of this project.

**Response**

The effects of the proposed action and alternatives are disclosed and discussed in chapter 4 of the Draft EIS.

**Comment Number**     671-14-5

**Comment**

The Atlantic Rim DEIS fails to take the "hard look" at impacts to biological soil crusts required by NEPA. BLM asserts that "no biological soil crusts are mapped or known to occur within the ARPA." DEIS at S-4. This assertion is factually incorrect. Photographs of biological soil crusts from within the ARPA were submitted to the Rawlins BLM by Dr. Jack States, and his comments identified biological soil crusts within the ARPA. We incorporate Dr. States' comments into these comments by reference.  Appendix I to Dr. States' comments, titled "Location of BSC inventory sites within the Great Divide Resource Area," maps biological soil crust inventory sites within the ARPA. In addition, photographs numbered EMM68-13, EMM68- 14, and EMM68-7 attached as Appendix V to Dr. States' scoping comments, show biological soil crusts with precise GPS locations that place them within the ARPA.

**Response**

BLM acknowledges receipt of Dr. Jack States' scoping comments suggesting that biological soil crusts are located within the ARPA. BLM agrees that biological soil crusts likely occur on soils within the ARPA; however, we do not inventory these crusts and have not confirmed the information provided by Dr. States. The text in section for Soils within the Executive Summary of the EIS has been revised to reflect this information.  Biological soil crusts are broken by anything disturbing the soil surface—an antelope walking around or lying down, vehicles or people traversing off road, wild horses going to water, building anything with/on the soil, etc. Soil crusts cannot be picked up and replaced. They are natural and cannot be re-seeded. Current reclamation measures address revegetation, soil stabilization, and conservation which would help these crusts re-develop over the long term. Measures to minimize off road travel will help protect and maintain the crusts.  The EIS discloses the potential for impacts to soil crusts in the Executive Summary as well as in section 4.3, Soils.

# Appendix O.  BLM Responses to Comments

**Table O-2.     Substantive Comments and BLM Responses.**

**Comment Number**     671-14-6

**Comment**

The fact that BLM asserts that there are no known biological soil crust occurrences within the ARPA indicates not only that BLM has failed to take a hard look at the resources on the ground, but that it has failed to even take a hard look at the information that the agency possesses in its own files.

**Response**

The BLM has clarified the EIS text to state that the Bureau has not inventoried biological soil crusts within the ARPA but believes these resources likely are present.  Also, please refer to our response to comment 671-14-5.

**Comment Number**     671-14-7

**Comment**

In order to fulfill the baseline information requirements of NEPA, which provide the starting point for the legally required "hard look" at impacts to biological soil crusts, the BLM must undertake field sampling and surveying at representative points within the project area. The agency must then provide maps of the areal distribution of soil crusts, along with their state, so that the agency can undertake a meaningful analysis of the impacts of the various alternatives on biological soil crusts.

**Response**

Please refer to our response to comment 671-14-5.

**Comment Number**     671-14-8

**Comment**

And because the BLM erroneously assumed that biological soil crusts were absent from the ARPA, it provided no impact analysis on the effects of the project on soil crusts. See DEIS at 4-16. This failure to take a "hard look" at soil crusts must be remedied through field surveys before the project may legally be allowed to go forward.

**Response**

A general discussion of the possible occurrence of biological soil crusts is presented in section 3.3.4 which states, among other things, that "soil crusts are poorly developed or absent" in the ARPA.  Also, please refer to our response to comment 671-14-5.

**Comment Number**     671-15-1

**Comment**

The BLM's requirement that almost all of the wastewater from this project be injected underground is a measure that must be retained and strengthened by requiring surface disposal at the Cow Creek Pod to be converted to underground injection.

**Response**

Surface disposal at the Cow Creek Pod has been reviewed and approved under a separate EA and Record of Decision.  This decision is not open for further review under the ARPA EIS.

**Comment Number**     671-15-2

**Comment**

BLM notes that there might be some opportunity to enhance riparian function by artificially maintaining flows in dry years (Id), but this purported benefit is undercut by the fact, also noted by BLM, that salinity from wastewater would have major negative impacts on riparian vegetation. As a result, there would likely be no valuable riparian habitat left to enhance with increased water flows. Thus, under any circumstance, the requirement to inject wastewater for this project must be maintained, and is one of the few bright spots in an otherwise bleak NEPA document.

**Response**

Re-injection of produced water is a portion of the proposed action, and is not at this time a "requirement".  No other forms of produced water disposal other than re-injection are analyzed under the proposed action or any alternative.

# Appendix O.  BLM Responses to Comments

## Table O-2.    Substantive Comments and BLM Responses.

**Comment Number**    671-15-3

**Comment**

One assumption for the impacts analysis for water resources is that "The degree of impact attributed to any one disturbance or series of disturbances is influenced by several factors including location within the watershed, time and degree of disturbance, existing vegetation, and precipitation." DEIS at 4-23. This assumption points out the need to define the precise location of roads, wells, and pipelines in order to measure impacts to water resources. The Draft EIS does not contain this critical information, which is a prerequisite to a sound "hard look" at impacts to water resources according to BLM's own assumptions.

**Response**

Please refer to our response to comment 671-11-1

**Comment Number**    671-15-4

**Comment**

This problem of failing to know where impacts will occur geographically is particularly egregious with regard to sedimentation to specific waterways and impacts to springs and seeps. BLM demurs that "the locations of these new pad locations can not be determined definitively under any of the action alternatives..." DEIS at 4-23. This statement is arbitrary and capricious; in the Draft EIS for the Seminoe Road CBM project (1,240 wells), the locations of roads and wellpads are presented in full. Seminoe Road DEIS, Figure 4. So obviously, a project of this magnitude can (and should) be planned and laid out in advance, by alternative, allowing a full and legally sufficient impacts analysis to be done.

**Response**

Please refer to our response to comment 671-11-1.  A careful review of the Seminoe Road Draft EIS "figures" appendix will show that the map displaying well locations notes the following: "Notes: 3) This map illustrates tentative and conceptual road and wellpad locations.  The proponents would submit actual plans to BLM for each phase for final approval."

**Comment Number**    671-15-5

**Comment**

It is incumbent on the BLM to gather this data, plus proposed road alignments, compressor station and gas plant locations, pipeline alignments.

**Response**

Please refer to our response to comment 671-11-1.

**Comment Number**    671-16-1

**Comment**

Due to the lack of a thorough analysis, BLM has reached the erroneous conclusion that impacts will not reach the level of significance under all three action alternatives for noxious weeds, small mammals, raptors, BLM Sensitive Species, and Threatened and Endangered fishes living downstream of the ARPA. See DEIS at 2-10.

**Response**

A thorough and detailed discussion of the various resources analyzed for Atlantic Rim can be found in chapter 4 and chapter 5 of the EIS.

**Comment Number**    671-16-2

**Comment**

A legally sufficient impact analysis for the Atlantic Rim project would map the locations of wells, roads and pipelines, then buffer them by 100m to determine how much area would lose its habitat function for these species.

**Response**

As new roads, pipelines and well site locations are proposed by the operators, the BLM review the proposals under NEPA with site specific EA's tiered to the Atlantic Rim Record of Decision and in turn issue a Record of Decision and apply mitigations for those proposals.  That, coupled with the environmental analysis in the Atlantic Rim analysis and decision will be sufficient to satisfy NEPA requirements.  Site specific decisions will be tiered to the Atlantic Rim EISs and Record of Decision and will be separate from the EIS process.  Please refer to our response to comment 671-11-1.