IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, et al.<br>1200 New York Avenue, NW, Suite 400<br>Washington, DC 20005,<br><br>Plaintiffs<br><br>v.<br><br>DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States, et al.<br>Department of Interior<br>1849 C Street, NW<br>Washington, DC 20240,<br><br>Defendants<br><br>STATE OF WYOMING<br>123 Capitol Building<br>Cheyenne, WY 82002<br><br>Movant-Intervenor | Civ. No. 07-cv-01709-RJL |

## MOTION OF STATE OF WYOMING TO INTERVENE

The State of Wyoming ("State"), by and through the Office of the Attorney General, hereby moves for leave to intervene as a party defendant in the above captioned action as a matter of right pursuant to Rule 7(j) of the Local Rules of this Court and Rule 24(a)(2) of the Federal Rules of Civil Procedure. In the alternative, the State respectfully requests that this Court grant it permissive intervention pursuant to Fed. R. Civ. P. 24(b). In support of its motion,

the State respectfully refers this Court to its memorandum in support together with its proposed answer filed herewith.

Undersigned counsel contacted counsel for Plaintiffs, counsel for Federal Defendants, and counsel for Industry Defendant-Intervenors to confer with them concerning the State's proposed intervention. Counsel was informed by respective counsel for the parties that Plaintiffs do not oppose the State's motion to intervene, Industry Defendant-Intervenors do not oppose the State's motion to intervene and the Federal Defendants take no position at this time with respect to the State's motion to intervene.

Respectfully submitted this 27th day of November, 2007.

FOR THE STATE WYOMING

/s/ Jay Jerde
Jay Jerde
Deputy Attorney General

/s/ Kristen A. Dolan
Kristen A. Dolan
Senior Assistant Attorney General
Wyoming Attorney General's Office
123 Capitol Building
Cheyenne, WY 82002
(307) 777-6946
(307) 777-3542 Fax
kdolan@state.wy.us

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing MOTION OF STATE OF WYOMING TO INTERVENE was served by placing the same in the United States mail, postage prepaid, this 27th day of November, 2007, to the following:

Sharon Buccino
Natural Resources Defense Council
1200 New York Avenue, NW
Suite 400
Washington, D.C. 20005

Aaron Bloom
Natural Resource Defense Counsel
40 West 20th Street
New York, NY 10011

Michael B. Wigmore
Bingham McCutchen LLP
2020 K Street, NW
Washington, DC 20006

Robert Charles Mathes
Bjork Lindley Little, PC
1600 Stout Street, Suite 1400
Denver, CO 80202-3110

Lori Caramanian
United States Department of Justice
Environmental & Natural Resource Division
1961 Stout Street, 8th Floor
Denver, CO 80294

/s/ Kristen A. Dolan
Kristen A. Dolan
Senior Assistant Attorney General
Wyoming Attorney General's Office
123 Capitol Building
Cheyenne, WY 82002
(307) 777-6946 Telephone
(307) 777-3542 Facsimile
kdolan@state.wy.us

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, et al.<br>1200 New York Avenue, NW, Suite 400<br>Washington, DC  20005,<br><br>             Plaintiffs<br><br>      v.<br><br>DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States, et al.<br>Department of Interior<br>1849 C Street, NW<br>Washington, DC  20240,<br><br>             Defendants<br><br>STATE OF WYOMING<br>123 Capitol Building<br>Cheyenne, WY  82002<br><br>             Movant-Intervenor | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civ. No. 07-cv-01709-RJL |

**MEMORANDUM IN SUPPORT OF THE MOTION
OF STATE OF WYOMING TO INTERVENE**

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS............................................................................i

TABLE OF AUTHORITIES.....................................................................ii

INTRODUCTION...................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND.....................................3

ARGUMENT.........................................................................................7

    I.    STANDARD OF REVIEW...........................................................7

    II.   THE STATE SATISFIES THE REQUIREMENTS FOR INTERVENTION AS A MATTER OF RIGHT...............................................................8

        A.    THE INTERVENTION IS TIMELY FILED.................................8

        B.    THE STATE HAS STANDING TO INTERVENE IN THIS CASE...........................................................................9

        C.    THE STATE HAS INTERESTS THAT MAY BE IMPAIRED BY THE OUTCOME OF THE CASE.............................................13

        D.    THE STATE'S INTEREST CANNOT BE ADEQUATELY REPRESENTED BY THE EXISTING PARTIES..........................14

    III.  THE STATE MEETS THE REQUIREMENTS FOR PERMISSIVE INTERVENTION...................................................................17

        A.    FEDERAL QUESTION CREATES JURISDICTION.....................17

        B.    THE STATE'S MOTION TO INTERVENE IS TIMELY.................17

        C.    THE STATE WILL ADDRESS SIMILAR ISSUES OF LAW AND FACT.........................................................................18

CONCLUSION......................................................................................18

CERTIFICATE OF SERVICE..................................................................19

# TABLE OF AUTHORITIES

**CASES**                                                                PAGE

*Amer. Horse Prot. Ass'n, Inc. v. Veneman,*
  200 F.R.D. 153 (D.D.C. 2001)......................................................10, 13, 14, 16

*Appleton v. Food & Drug Admin.,*
  310 F.Supp.2d 194 (D.D.C. 2004).....................................................7, 9, 17

*Associated Builders & Contractors, Inc. v. Herman,*
  166 F.3d 1248 (D.C. Cir. 1999).................................................................8

*County of San Miguel, Colo. v. MacDonald,*
  __ F. Supp. 2d __, *Civil Action No. 06-1946 (RBW),* 2007 WL 2367759 (D.D.C.
  August 21, 2007).......................................................................8, 13

*E.E.O.C. v. Nat'l Children's Ctr., Inc.,*
  146 F.3d 1042 (D.C. Cir. 1998)..............................................................17

*Environmental Defense v. Leavitt,*
  329 F. Supp. 2d 55 (D.D.C. 2004)...........................................................17

*Forest Conservation Council v. U.S. Forest Serv.,*
  66 F.3d 1489 (9th Cir. 1995)..............................................................11, 16

*Friends of Animals v. Kempthorne,*
  452 F.Supp.2d 64 (D.D.C. 2006)..........................................................8, 16

*Fund for Animals, Inc. v. Norton,*
  322 F.3d 728 (D.C. Cir. 2003)..........................................................8, 9, 15, 16

*Jones v. Prince George's County, Md.,*
  348 F.3d 1014 (D.C. Cir. 2003)...............................................................10

*Kleissler v. U. S. Forest Serv.,*
  157 F.3d 964 (3d Cir. 1998).................................................................12, 13

*Natural Res. Def. Council v. Costle,*
  561 F.2d 904 (D.C. Cir. 1977) ...............................................................15

*Natural Res. Def. Council v. Norton,*
  D.C. No. CV-05-00690-CW, 2006 WL 1050147 (9th Cir. Apr. 19, 2006)............15

*Nuesse v. Camp,*
  385 F.2d 694 (D.C. Cir. 1976)..................................................................7

*Roeder v. Islamic Republic of Iran,*
    333 F.3d 228 (D.C. Cir. 2003)..................................................................10

*S. Utah Wilderness Alliance v. Norton,*
    No. Civ. A. 01-2518 (CKK), 2002 WL 32617198 (D.D.C. June 29, 2002)............7, 8, 9

*Sierra Club v. City of San Antonio,*
    115 F.3d 311 (5th Cir. 1997)....................................................................10

*Sierra Club v. Robertson,*
    960 F.2d 83 (8th Cir. 1992)......................................................................12

*Smoke v. Norton,*
    252 F.3d 468 (D.C. Cir. 2001)..................................................................7, 8

*Trbovich v. United Mine Workers of Am.,*
    404 U.S. 528 (1972)...........................................................................14

*United States v. AT&T,*
    642 F.2d 1285 (D.C. Cir. 1980)..................................................................8

*Utahns for Better Transp. v. U. S. Dep't of Transp.*
    295 F.3d 1111 (10th Cir. 2002)..................................................................15

**STATUTES**

5 U.S.C. §§ 551-559.........................................................................................1

28 U.S.C. § 1331.......................................................................................1, 17

28 U.S.C. § 2201.........................................................................................1

30 U.S.C. § 191(a)......................................................................................13

33 U.S.C. § 1251-1377....................................................................................1

42 U.S.C. §§ 4321-4370( f).................................................................................1

43 U.S.C. §§ 1701-1785...................................................................................1

**CODE OF FEDERAL REGULATIONS**

40 C.F.R § 1502.20.......................................................................................6

**FEDERAL REGISTER NOTICES**

66 Fed. Reg. 33975-02 (June 26, 2001)..................................................................4

70 Fed. Reg. 73481-02 (December 12, 2005).........................................................4

71 Fed. Reg. 69582-01 (December 1, 2006).........................................................4

**FEDERAL RULES OF CIVIL PROCEDURE**

FED. R CIV. P.12(a)(3)...................................................................................9

FED. R CIV. P. 24(a)(2)..........................................................................7, 10

FED. R CIV. P. 24(b)(2)................................................................................17

**WYOMING STATUTES**

WYO. STAT. ANN. §§ 23-1-101 to 23-6-304 (2007)...................................11

WYO. STAT. ANN. §§ 30-5-101 to 410 (2007).........................................11

WYO. STAT. ANN. §§ 35-11-101 to 1802 (2007).....................................11

WYO. STAT. ANN. §§ 35-11-101 to 1904 (2007).....................................11

WYO. STAT. ANN. § 35-11-102 (2007).....................................................11

WYO. STAT. ANN. §§ 36-2-101 to 210 (2007).........................................11

WYO. STAT. ANN. §§ 36-3-101 to 111 (2007).........................................11

WYO. STAT. ANN. §§ 36-4-101 to 123 (2007).........................................11

WYO. STAT. ANN. §§ 36-6-101 to 302 (2007).........................................3

WYO. STAT. ANN. § 39-14-204(a) (2007)................................................13

WYO. STAT. ANN. § 39-14-211 (2007).....................................................13

WYO. STAT. ANN. §§ 41-3-101 to 1014 (2007).......................................11

**SECONDARY SOURCES**

7C Charles A. Wright, Arthur R. Miller, & Mary Kay Kane,
        Federal Practice and Procedure § 1904 (2d ed. 1986)………………………………...17

In support of the State of Wyoming's ("State") motion to intervene and pursuant to Local Rule 7(a) of this Court, the State submits the following memorandum of law.

## INTRODUCTION

Plaintiffs Natural Resources Defense Council, Biodiversity Conservation Alliance, Wyoming Outdoor Council, Western Watersheds Project and Wyoming Wilderness Association (collectively referred to as "Plaintiffs") initiated this lawsuit on September 25, 2007 against Dirk Kempthorne, in his official capacity as the Secretary of the United States Department of Interior ("DOI") and the United States Bureau of Land Management ("BLM") (collectively referred to as "Federal Defendants"). On October 5, 2007, Anadarko Energy Corporation, Double Eagle Petroleum Co. and Warren Resources, Inc. (collectively referred to as "Industry Defendant-Intervenors") filed a motion to intervene seeking to protect their interests as independent oil and gas exploration and production companies. This Court granted that motion to intervene on October 17, 2007.[1] Plaintiffs then filed an Amended Complaint on October 26, 2007.

Plaintiffs filed both their initial Complaint and their First Amended Complaint under the following federal laws: 1) the National Environmental Policy Act, ("NEPA"), 42 U.S.C. §§ 4321 - 4370(f) and its implementing regulations; 2) the Federal Water Pollution Control Act ("Clean Water Act"), 33 U.S.C. § 1251 – 1377 and its implementing regulations; 3) the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 – 1785 and its implementing regulations; 4) the Declaratory Judgment Act, 28 U.S.C. § 2201; 5) the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 -559; and 6) 28 U.S.C. § 1331.[2]

---

[1] On October 24, 2007, this Court granted Industry Defendant-Intervenors' motion to intervene in related case Civ. No. 07-cv-1486-RJL, *Theodore Roosevelt Conservation Partnership v. Kempthorne, et al.*

[2] Plaintiffs also filed a motion for preliminary injunction on September 25, 2007, seeking to prevent further implementation of permits issued by BLM in the Summer and Fall of 2007.

In their First Amended Complaint, Plaintiffs contest the Federal Defendants approval of the Final Environmental Impact Statement ("FEIS") and the Wyoming State Office, BLM Record of Decision, Environmental Impact Statement for the Atlantic Rim Natural Gas Field Development Project ("ARP"), Carbon County, Wyoming ("ROD") dated March 23, 2007. Plaintiffs seek to overturn the ROD's approval of the development of approximately 2,000 additional oil and gas wells within the Atlantic Rim project area ("ARPA"), and the plan of future management of the federal surface and mineral estates in the ARPA.  Stelter Decl. ¶ 3 (*citing* to ROD, Mar. 2001, at p. 1).

In addition to challenging the environmental analyses of the proposal to develop coal bed natural gas ("CBNG") in the Atlantic Rim area, Plaintiffs also challenge four Environmental Assessments ("EAs") and Findings of No Significant Impact/Decision Records ("FONSI/DRs"). Specifically, in their initial complaint, Plaintiffs protested the BLM's two EAs and DRs approving the development of 39 wells in the Catalina A and B plans of development ("Catalina POD") and 51 wells in the Sun Dog A and B plans of development ("Sun Dog POD"), both located in the ARPA.  *See* Plaintiffs' Complaint for Declaratory and Injunctive Relief, p. 3.  In their Amended Complaint, Plaintiffs contested a third EA approving 14 wells in Sun Dog POD C, and a fourth EA approving 23 wells in Sun Dog POD D and 11 in Sun Dog POD E, all of which are also located in the ARPA.  *See* Plaintiffs' First Amended Complaint for Declaratory Judgment and Injunctive Relief, p. 2.

The State seeks to intervene as a party in this action to protect its sovereign interests over the control of the development of coalbed methane resources within the State, its interests in the protection of its land, air, water, wildlife, rangeland, grazing and cultural resources, and its

---

Plaintiffs, Federal Defendants and Industry Defendant-Intervenors provided thorough briefing regarding Plaintiffs' Motion for Preliminary Injunction, which is still pending before this Court.

interest in the revenue generated by coalbed methane production in the State. The State's

extensive regulatory and permitting authority over the lands subject to the ARP ROD, including

state lands and minerals that comprise a portion of the ARP, gives the State unique expertise,

insight and perspective for this action.[3]

## FACTUAL AND PROCEDURAL BACKGROUND

The ARP ROD authorizes natural gas development within the Atlantic Rim in Carbon

County in south central Wyoming. The ARP is expected to produce 1,350 billion cubic feet of

natural gas, enough to heat 19.3 million homes for one year, and generate approximately $958

million in total taxes and royalties. Stelter Decl. ¶ 5 (*citing* ROD at p. 1).

The Project area comprises approximately 270,080 acres, of which 173,672 acres are

federal surface estate (64% of ARPA), 14,060 acres are state surface estate (5%), and 82,348

acres are private surface estate (31%). Stelter Decl. ¶ 4 (*citing* ROD at p. 1). The BLM's

Rawlins Field Office manages more mineral estate than surface estate within the ARPA:

179,438 acres of federal mineral estate (66%), 12,384 acres of state mineral estate (5%), and

78,258 acres of private mineral estate (29%). *Id.* The State's lands and mineral estates are

managed by the Wyoming Board of Land Commissioners and the Wyoming Office of State

Lands and Investments. *See* WYO. STAT. ANN. §§ 36-6-101 to 302 (2007).

Operators (including the Industry Defendant-Intervenors and other companies) proposed

the ARP. Stelter Decl. ¶ 6 (*citing* FEIS, Wyo. State Office, BLM, Cover Ltr., Nov. 27, 2006, p.

1). Scoping for the ARP was initiated in 2001 as the "Atlantic Rim Coalbed Methane Project."

*Id.* The proponents subsequently modified their proposal to reduce the number of coalbed

---

[3] On October 18, 2007, this Court granted the State's motion to intervene in related case Civ. No. 07-cv-1486-RJL, *Theodore Roosevelt Conservation Partnership v. Kempthorne, et al.*

natural gas wells and develop a limited number of conventional gas wells. *Id.* The project was re-named the "Atlantic Rim Natural Gas Field Development Project" in 2003. *Id.*

In June 2001, the BLM issued a Notice of Intent to prepare an environmental impact statement and conduct scoping for the ARP. *See* 66 Fed. Reg. 33975-02 (June 26, 2001). The BLM released the ARP Draft EIS ("DEIS") for public comment on December 12, 2005. *See* 70 Fed. Reg. 73481-02 (Dec. 12, 2005). On December 1, 2006, the BLM released the FEIS for public comment. *See* 71 Fed. Reg. 69582-01 (Dec. 1, 2006). On March 23, 2007, Wyoming BLM State Director, Robert A. Bennett signed the ROD. Stelter Decl. ¶ 7 (*citing* ROD at p. 22).

The ROD adopted the BLM's Preferred Alternative (Alternative D) as described in the FEIS, with modifications for the development of natural gas resources in the ARPA. Stelter Decl. ¶ 9 (*citing* ROD at p. 1). Modifications to Alternative D included the use of Performance Goals and the option to consider protective measures described in Alternative C. *Id.* (*citing* ROD at pp. 1, 19-20). The selected alternative allows drilling of approximately 2,000 gas wells while limiting total surface disturbance to a maximum of 7,600 acres (2.8% of the project area) at any given time and imposes a 6.5 acre per well site short-term (less than six years) disturbance goal. *Id.* (*citing* ROD at p. 1). Development is limited to eight well sites per 640 acre section, which includes coalbed natural gas, conventional and injection wells. *Id.* (*citing* ROD at p. 2). Operators, including the Industry Defendant-Intervenors, must initiate reclamation of disturbed land after completion of drilling activities. Stelter Decl. ¶ 10 (*citing* ROD at p. 3, App. A). Development and reclamation will be managed through a performance-based adaptive management process to ensure management objectives are met and Performance Goals are achieved. *Id.* (*citing* ROD at p. 3, App. B). Monitoring will be used to determine if best management practices, conditions of approval, protective measures, reclamation criteria and

mitigation measures need to be modified. *Id.* Additionally, the ROD created a Review Team comprised of personnel from the BLM, cooperating and interested agencies and the Industry Defendant-Intervenors to develop the performance based, adaptive management process and provide quantifiable criteria to identify trends associated with the Performance Goals. *Id.*

Operators, including the Industry Defendant-Intervenors, will finance and operate air quality equipment to monitor NOx, O3, PM10 and SO$_2$ in the Rawlins Field office management area. Stelter Decl. ¶ 11 (*citing* ROD at p. 7, App. B, p. B-5). The BLM, the Wyoming Department of Environmental Quality ("WDEQ"), the U.S. Environmental Protection Agency and the operators will cooperate to maintain and enhance concentration monitoring in the Rawlins Field Office management area. *Id.* Operators, including the Industry Defendant-Intervenors, may voluntarily contribute to wildlife and habitat monitoring and the Industry Defendant-Intervenors are responsible for reclamation monitoring and reporting costs. *Id.* (*citing* ROD at pp. 20-21).

The State and the operators have committed to work cooperatively to monitor and protect the State's land use, paleontological values, air quality, soils, water, livestock, ranges, wildlife, plant species, visual, cultural and historic resources. Stelter Decl. ¶ 12 (*citing* ROD at App. B). Additionally, the BLM will pursue a programmatic agreement for the ARP with Wyoming's State Historic Preservation Office ("WSHPO") to develop protocols to be followed over the course of the ARP to mitigate potential adverse effects to historic properties, such as the Overland Trail, and their settings. *Id.* (*citing* ROD at p. 10).

A comprehensive set of mandatory operator-committed practices, set forth at Appendix C of the ROD, adds another layer of environmental protection. These include annual work plans for operational plans of development rather than piecemeal individual Applications for

Permission to Drill ("APD"), staking/inspecting proposed facilities to ensure consistency with the Great Divide Resource Management Plan ("RMP") and oil and gas lease provisions, submission of more detailed construction plans, and project-wide rather than individual APD's. Stelter Decl. ¶ 13 (*citing* ROD, App. C, at pp. C-1, C-2).

Following the issuance of the ROD, and before any ground disturbing activity could proceed, operators were required to submit an APD containing a detailed proposal for on-the-ground operations to the BLM and the Wyoming Oil and Gas Conservation Commission. Stelter Decl. ¶ 19 (*citing* ROD at p. 3). Following the submission of several APDs, the BLM relied on the first challenged EA and approved PODs in the Catalina Unit for 39 wells and associated infrastructure on June 28, 2007. Stelter Decl. ¶ 20 (*citing* Catalina A & B PODs EA at p. 11). On August 16, 2007, the BLM approved PODs in the Sun Dog Unit for 51 wells (48 development wells and 3 injection wells) and associated infrastructure based on a second EA. Stelter Decl. ¶ 20 (*citing* Sun Dog A & B PODs EA at p. 11). On October 23, 2007, the BLM relied on a third EA in approving an additional 14 wells in Sun Dog POD C. Stelter Decl. ¶ 20 (*citing* Sun Dog C POD EA at p. 11). Further, the BLM then relied on a fourth EA in approving an additional 34 wells in Sun Dog POD D and E on October 23, 2007. Stelter Decl. ¶ 20 (*citing* Sun Dog D & E PODs EA at p. 12). These approvals were accompanied by EAs prepared in accordance with NEPA, which were tiered to the Atlantic Rim EIS. 40 C.F.R. § 1502.20. The EAs concluded that "the impacts are not expected to be significant, and that an EIS is not required." Stelter Decl. ¶ 21 (*citing* Catalina A & B PODs EA at 11; Sun Dog A & B PODs EA at p. 11; Sun Dog C POD EA at p. 11; Sun Dog D & E PODs EA at p. 12).

**ARGUMENT**

I.    **STANDARD OF REVIEW**

The State of Wyoming is entitled to intervene as a matter of right in this action because its

interests are directly affected by this pending litigation and the State's interests cannot be

adequately represented by the Plaintiffs, the Federal Defendants or the Industry Defendant-

Intervenors in this case. FED. R CIV. P. 24(a)(2) sets forth the parameters for intervention as

a matter of right and provides in relevant part:

> Upon timely application anyone shall be permitted to
> intervene in an action: . . .(2) when the applicant claims an
> interest relating to the property or transaction which is the
> subject of the action and the applicant is so situated that the
> disposition of the action may as a practical matter impair or
> impede the applicant's ability to protect that interest, unless
> the applicant's interest is adequately represented by existing
> parties.

This Court requires an applicant seeking to intervene as a matter of right to show:  (1)

timeliness; (2) a cognizable interest; (3) impairment of that interest; and (4) the existing

parties may not adequately represent the applicant's interest. *Appleton v. Food & Drug

Admin.*, 310 F. Supp. 2d 194, 196 (D.D.C. 2004); *S. Utah Wilderness Alliance v. Norton*, No.

Civ. A. 01-2518 (CKK), 2002 WL 32617198, at *5 (D.D.C. June 29, 2002); *Smoke v. Norton*,

252 F.3d 468, 470 (D.C. Cir.  2001).

In evaluating whether these requirements are met, courts are guided primarily by practical

equitable considerations.  The "interests" test for Rule 24(a)(2) is "primarily a practical guide to

disposing of lawsuits by involving as many apparently concerned persons as is compatible with

efficiency and due process." *S. Utah Wilderness Alliance*, 2002 WL 32617198, at *5, *quoting

Nuesse v.Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967).   The District of Columbia Circuit describes

its approach to intervention as liberal, stating that intervenors of right "need only an 'interest' in

the litigation." *Friends of Animals v. Kempthorne*, 452 F.Supp.2d 64, 69 (D.D.C. 2006) (identifying difference between restricted view of Ninth Circuit and District of Columbia Circuit); *S. Utah Wilderness Alliance*, 2002 WL 32617198, at *5. An applicant for intervention as a matter of right must also demonstrate standing under Article III of the United States Constitution. *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731-32 (D.C. Cir. 2003); *County of San Miguel, Colo. v. MacDonald*, __ F. Supp. 2d __, Civil Action No. 06-1946 (RBW), 2007 WL 2367759, at *6 (D.D.C. Aug. 21, 2007).

## II.    THE STATE SATISFIES THE REQUIREMENTS FOR INTERVENTION AS A MATTER OF RIGHT

Applying the four part analysis for intervention as a matter of right, the State will show that:  1) the motion was timely filed;  2) it has standing;  3) it has significant protectable interests which may be impaired if relief is granted to the Plaintiffs; and, 4) the parties cannot adequately represent the State's sovereign interests.  Thus, the State is entitled to intervention as a matter of right because it clearly satisfies each of the four requirements.

### A.    THE INTERVENTION IS TIMELY FILED

The State's intervention is timely filed because it will not delay the case or add to the burden of either party to this action.  The Court determines timeliness from the circumstances of the case pursuant to its sound discretion.  *Associated Builders & Contractors, Inc. v. Herman*, 166 F.3d 1248, 1257 (D.C. Cir. 1999).  Relevant considerations include:  1) the stage of proceedings;  2) the purpose for the applicant seeking the intervention;  3) the need for intervention to preserve the applicant's rights; and 4) whether the motion will result in prejudice to original parties.  *Smoke*, 252 F.3d at 471, *citing United States v. AT&T*, 642 F.2d 1285, 1295 (D.C. Cir. 1980).

Because of the early stage of this proceeding, the State's intervention causes no delay. Existing parties are not prejudiced and there is no delay when motions to intervene are filed within two months of notification of a pending suit. *See Appleton*, 310 F.Supp.2d at 197 (determining that no prejudicial delay occurred and motion to intervene was timely when filed sixty days after Complaint); *S. Utah Wilderness Alliance*, 2002 WL 32617198, at *5 (recognizing that timeliness requirement was met when motion to intervene was filed sixty days after Complaint). In this case, Plaintiffs filed their initial Complaint on September 25, 2007. Plaintiffs then filed their First Amended Complaint on October 26, 2007. The Federal Defendants filed an answer on November 26, 2007. Thus, the State's motion to intervene will be filed nearly contemporaneous with the Federal Defendants' answer under FED. R CIV. P. 12(a)(3). Further, this Court has yet to set a briefing schedule or a trial date related to this action.[4] The Court has not made any jurisdictional or merits rulings in this case. Under these circumstances, there has been no undue delay, and the parties will suffer no prejudice by permitting the State to intervene to protect its substantial state interests. The State's motion to intervene is therefore timely.

**B.    THE STATE HAS STANDING TO INTERVENE IN THIS CASE**

The State satisfies the requirements for standing in this action. A prospective intervenor must satisfy the following elements of standing: 1) injury-in-fact; 2) causation; and 3) redressability. *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 732-33 (D.C. Cir. 2003). An applicant seeking intervention as a defendant to uphold a government agency's action must show "that it will be injured in fact by the setting aside of the government's action it seeks to defend, that this injury will have been caused by that invalidation, and the injury would be prevented if

---

[4] This Court issued a Case Management Order for this action on October 5, 2007.

the government action is upheld." *Amer. Horse Prot. Ass'n, Inc. v. Veneman*, 200 F.R.D. 153, 156 (D.D.C. 2001). Furthermore, when a proposed intervenor satisfies the constitutional standing requirements for intervention, the second requirement of Rule 24(a)(2) (the existence of a legally protected interest) is met. *Jones v. Prince George's County, Md.*, 348 F.3d 1014, 1018-19 (D.C. Cir. 2003); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003); *Amer. Horse Prot. Ass'n, Inc.*, 200 F.R.D. at 157. The State meets the standing requirements based on: 1) its participation in the NEPA process; 2) its sovereign permitting and regulatory authority; and 3) its substantial interest in the socio-economic benefits associated with the ARP, including the site specific approvals challenged by Plaintiffs.

First, the State participated in the process leading to the ROD, which Plaintiffs challenge in this action. The State was a cooperating agency throughout the NEPA process. Stelter Decl. ¶ 14 (*citing* FEIS, p. ES-1). Included among the State agencies actively participating were the State Planning Office, the Wyoming Game and Fish Department ("WGFD"), WSHPO, WDEQ and Department of Agriculture ("WDOA"). *Id.* The Wyoming Office of the Governor ("WOG"), WDOA, Office of State Lands and Investments, Wyoming State Engineer's Office ("WSEO"), WDEQ, and WGFD participated on behalf of the State by commenting on the DEIS. *Id.* (*citing* FEIS, App. N, document numbers 681, 678, 674, 664, 466, 413 (comments of agencies, respectively)). In addition, the WOG, WDOA, WDEQ, WGFD and the WSHPO commented on the FEIS. *Id.* (*citing* ROD, App. E, p. E-11).

Second, underscoring the State's participation as a cooperating agency is its sovereign regulatory and permitting authority over activities in the ARPA. State sovereigns have a legally protected interest in litigation affecting management of natural resources under their control. *See Sierra Club v. City of San Antonio*, 115 F.3d 311, 315 (5th Cir. 1997) (recognizing Texas'

sovereign interest in aquifer management sufficient to warrant intervention); *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1495 (9th Cir. 1995) (recognizing Arizona's sovereign duty to manage state lands, which are adjacent to United States Forest Service lands).

The regulatory interests of the State's agencies in oil and gas development within its boundaries extend to a wide array of potential impacts including: socioeconomic impacts, impacts on land, air and water quality; impacts on wildlife and habitat; impacts on threatened and endangered species; impacts on rangeland and grazing; and impacts on cultural resources. The State's regulatory jurisdiction is exercised in relevant part by its WDEQ (WYO. STAT. ANN. §§ 35-11-101 to 1802 (2007)), WSHPO and the Wyoming Parks and Cultural Resources Commission (WYO. STAT. ANN. §§ 36-4-101 to 123), State Engineer's Office (WYO. STAT. ANN. §§ 41-3-101 to 1014), Oil and Gas Conservation Commission (WYO. STAT. ANN. §§ 30-5-101 to 410), Board of Land Commissioners (WYO. STAT. ANN. §§ 36-2-101 to 210), Office of State Lands and Investments (WYO. STAT. ANN. §§ 36-3-101 to 111) and the WGFD (WYO. STAT. ANN. §§ 23-1-101 to 23-6-304), most of which submitted comments in the NEPA process.

Further, the State legislature emphasized the importance of the State's sovereignty over its natural resources in the policy statement of the Wyoming Environmental Quality Act. WYO. STAT. ANN. §§ 35-11-102; *see generally* WYO. STAT. ANN. §§ 35-11-101 to 1904. The State has the legal right to regulate oil and gas development activities and a significant interest to ensure that the ARP ROD and underlying EIS are consistent with and give due deference to the State's own regulatory scheme. In this case, if Plaintiffs succeed in invalidating the ROD and/or the four EAs, the State will suffer injury-in-fact because several self governing and regulatory

interests of the State will be directly and adversely impacted.  Such injury is preventable if the
ROD as well as the four EAs and FONSI/DRs are upheld.

Third, the State has an interest in the substantial positive socio-economic impacts from
the coalbed methane development that will take place in the State under the ROD and four EAs.
Non-federal governmental entities can have a sufficient economic interest in federal natural
resource management decisions to warrant intervention.  *Kleissler v. U. S. Forest Serv.*, 157 F.3d
964, 973 (3d Cir. 1998); *see also Sierra Club v. Robertson*, 960 F.2d 83, 86 (8th Cir. 1992)
(state's economic interest in promoting economy and securing tax revenue sufficient to warrant
intervention in suit challenging forest plan).  The combined economic impact of drilling, field
development and production phases of the ARP is estimated at $7.6 billion dollars over the 40-
year life of the project.  Stelter Decl. ¶ 15 (*citing* FEIS at p. 4-124).  If Plaintiffs succeed in
barring the ROD and any activities in ARPA, the revenues that benefit the State and its citizens
will decline or fail to exist.  Such an injury is traceable to Plaintiffs' requested relief in this
action.  In this case, a decision favorable to keeping the ROD as well as the four EAs would
prevent such injury from occurring.

Therefore, if Plaintiffs succeed in invalidating the Atlantic Rim ROD and/or the BLM's
decision to approve site specific development in the Catalina POD or the Sun Dog POD, both
located in the ARPA, the State will suffer injury-in-fact because of its participation in the NEPA
process and the regulatory and economic interests of the State will be directly and adversely
impacted.  Such injury is preventable if both the BLM's decision to approve the ROD and site
specific development in the Catalina POD and the Sun Dog POD is upheld.

## C.    THE STATE HAS INTERESTS THAT MAY BE IMPAIRED BY THE OUTCOME OF THE CASE

The State's interests would be impaired if Plaintiffs obtain the requested relief.  In determining whether an applicant meets the impaired interest prong, this Circuit looks to the "practical consequences" the applicant will suffer if intervention is denied.  *Amer. Horse Prot. Ass'n, Inc.*, 200 F.R.D. at 158.  The bar for satisfying "practical impairment" requires only that the applicant show that the disposition of the action may impair its legally protectable interest.  *County of San Miguel,* 2007 WL 2367759, at *9.

In this case, a decision that is adverse to the Atlantic Rim ROD or delays implementing development in the Catalina POD, the Sun Dog POD or the ARPA significantly impacts the State, its economy and its citizens as a result of lost and delayed revenue and diminished capability to provide important services, such as well-funded educational programs.  In *Kleissler,* the Third Circuit held that the economic interest of local school districts in timber cutting proceeds, which could be impacted by the remedy sought by environmental groups challenging the associated EIS, were "direct, substantial and of adequate public interest as to justify intervention." 157 F.3d at 973.  The same rationale applies in this case concerning the State's interest in mineral royalty revenues and severance taxes.  The State receives one-half of the federal mineral royalty and assesses a six percent severance tax on all non-exempt oil and gas recovered within its boundaries.  30 U.S.C. § 191(a); WYO. STAT. ANN. § 39-14-204(a).  The State's share of the federal royalty funds are distributed to the University of Wyoming, the School Foundation fund, the Highway fund, the Legislative Royalty Impact Account, and cities, towns and counties throughout the State.  Stelter Decl. ¶ 17 (*citing* FEIS at p. 3-143); WYO. STAT. ANN. § 39-14-204(a); WYO. STAT. ANN. § 39-14-211.  Without intervention, the State will be unable to defend its economic and regulatory interests.

13

Furthermore, if the BLM's decision to approve site specific development within the ARPA or the ROD itself is set aside, it would negate all of the State's efforts in the development process leading up to the ROD. In *American Horse*, the applicant satisfied the impairment element when it participated in the decision making process and was then subject to a resultant agency program, which directly impacted its obligations. *Amer. Horse Prot. Ass'n, Inc.*, 200 F.R.D. at 158. The Court determined that the resolution Plaintiff sought would "eviscerate the HIO's efforts in creating the Plan at issue." *Id.* Here, the State participated as a cooperating agency in the development of the ARP FEIS, which formed the basis of the ROD. Stelter Decl. ¶ 14. The State has a legal right to regulate oil and gas development activities and a significant interest to ensure that the ARP ROD and underlying EIS are consistent with and give due deference to the State's own regulatory scheme. Thus, the ROD directly relates to the State's duties and responsibilities regarding its agencies and regulation of the activities taking place within its borders. Without intervention, the State may not be able to rely on the current ROD and would have to participate in developing an alternative plan. The State satisfies the practical impairment element under Rule 24(a) because Plaintiffs' requested relief would unravel the State's efforts and result in burdens and uncertainties.

## D. THE STATE'S INTERESTS CANNOT BE ADEQUATELY REPRESENTED BY THE EXISTING PARTIES

None of the parties to this action can adequately represent the State's sovereign interests. As the District of Columbia Circuit has observed, a showing of inadequate representation is not onerous in light of the United States Supreme Court conclusion that the inadequacy prong is satisfied "if the applicant shows that representation of [its] interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n. 10 (1972).

14

By contesting the decision in the ARP ROD as well as the four EAs and FONSI/DRs, Plaintiffs have taken a position in opposition to that of the State. Plaintiffs also do not share the same property, economic or sovereign interests as the State. The Federal Defendants cannot adequately represent the interests of the State, as the Federal Defendants must manage public lands and mineral rights pursuant to federal laws and regulations. Although both the State and the Federal Defendants have an interest in asserting the legality of the ROD and the four EAs and FONSI/DRs, this Court has recognized that "a shared general agreement ... does not necessarily ensure agreement in all particular respects." *Fund for Animals*, 322 F.3d at 737, *quoting Natural Res. Def. Council v. Costle*, 561 F.2d 904, 912 (D.C. Cir. 1977) (internal quotation marks omitted). Further, the Industry Defendant-Intervenors cannot adequately represent Wyoming as they are regulated by the State and naturally have private interests at stake rather than the public interests pertinent to the State of Wyoming.

Only the State can adequately represent its sovereign interest in its natural resources. Because of the separate sovereign interests possessed by individual states, it is "on its face impossible" that the other parties will adequately represent the interest of the State. *Utahns for Better Transp. v. U. S. Dep't of Transp.* 295 F.3d 1111, 1117 (10th Cir. 2002). The State's extensive regulatory and permitting authority over the lands subject to the ARP ROD, including state lands and minerals that comprise a portion of the ARP, gives the State unique expertise, insight and perspective for this case. While the Federal Defendants may have an interest in defending the ROD, their obligations to broader interests may mean that they would not protect the State's interests. *Natural Res. Def. Council v. Norton*, D.C. No. CV-05-00690-CW, 2006 WL 1050147, at *2 (9th Cir. Apr. 19, 2006); *see Fund for Animals*, 322 F.3d at 736 (recognizing that federal agency cannot give primacy to concerns of private organization because it has an

obligation to American people, even when the concerns overlap). The State's expertise may prove useful and necessary to any settlement discussions and it may present arguments in this case which the other parties might not raise. *Cf. Fund for Animals*, 322 F.3d at 736 (stating that interests of federal agency and private organization might diverge during course of litigation).

Only the State can represent its economic interests in collecting royalty and tax revenues in this action. The Federal Defendants represent the broad public interest of the American people, not the economic interests of the State. *See Amer. Horse Prot. Ass'n, Inc.*, 200 F.R.D. at 159; *Friends of Animals*, 452 F.Supp.2d at 70. For example, in *Forest Conservation Council*, the State of Arizona moved to intervene as of right in a NEPA action asserting that the issuance of an order preventing logging on national forest lands adjacent to state lands would economically impact the state. *Forest Conservation Council*, 66 F.3d at 491-92. Intervention as a matter of right was granted by the Ninth Circuit because the federal government could not adequately represent Arizona's economic interests. *Id.* at 1499.

Here, it is estimated that the State will receive $160 million dollars for its share of federal mineral royalties, $8.4 million dollars from state mineral royalties, and $271 million dollars in state severance taxes for a total of over $439 million dollars over the 40-year life of the project. Stelter Decl. ¶ 16 (*citing* FEIS, p. 4-137). In addition, ad valorem property taxes are estimated at $349 million dollars over the life of the project and sales and use taxes based on a 20-year drilling cycle are estimated at $17.2 million dollars. *Id.* (*citing* FEIS, pp. 4-135, 4-138). Given the immeasurable impacts on a myriad of activities all across the State, only the State can adequately represent its sovereign interest in its natural resources and the collection of royalty and tax revenues.

## III.  THE STATE MEETS THE REQUIREMENTS FOR PERMISSIVE INTERVENTION

In the event this Court does not grant intervention as of right, the State should be permitted to intervene in this matter pursuant to FED. R CIV. P. 24(b)(2), which provides in part:

> Upon timely application anyone may be permitted to intervene in an action: . . . (2) when an applicant's claim or defense and the main action have a question of law or fact in common . . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Permissive intervention should be allowed on a showing of the following:  (1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the applicant's claim or defense and the main action.  *Environmental Defense v. Leavitt*, 329 F. Supp. 2d 55, 66 (D.D.C. 2004); *Appleton*, 310 F. Supp. 2d at 196.  The case law on intervention "compels a flexible reading of Rule 24(b)."  *E.E.O.C.  v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998).  Permissive intervention should be granted liberally.  7C Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1904 (2d ed. 1986).

### A.  FEDERAL QUESTION CREATES JURISDICTION

The State meets the requirements for permissive intervention.  The first requirement, independent jurisdiction is satisfied in this instance.  This is a review of a federal administrative action reviewing federal law under NEPA and FLPMA and as such diversity of the parties and the requirement for independent jurisdiction is not controlling.  28 U.S.C. § 1331.

### B.  THE STATE'S MOTION TO INTERVENE IS TIMELY

As set forth in the argument above, the State's motion is timely and will not delay these proceedings.  (See section I at A).  This Court has not made any merits rulings in this matter and

the parties cannot be prejudiced by the State's intervention. Further, the State has tendered its proposed answer with this motion and memorandum.

## C.     THE STATE WILL ADDRESS SIMILAR ISSUES OF LAW AND FACT

The defenses the State asserts in its proposed answer are necessarily the same issues of law the Federal Defendants will raise, namely that the ROD as well as the four EAs and FONSI/DRs under NEPA are not arbitrary and capricious and are otherwise in accordance with law. (See State of Wyoming's Proposed Answer).

The criteria for permissive intervention are met in this instance and the State requests this Court to grant intervention in order for the State to represent its interests in this action.

## CONCLUSION

For the foregoing reasons, the State requests that this Court grant its unopposed motion to intervene as a matter of right. In the alternative, the State requests that this Court grant its alternative request for permissive intervention.

DATED this 27th day of November, 2007

/s/ Jay Jerde
Jay Jerde
Deputy Attorney General


/s/ Kristen A. Dolan
Kristen A. Dolan
Senior Assistant Attorney General
Wyoming Attorney General's Office
123 Capitol Building
Cheyenne, WY 82002
(307) 777-6946 Telephone
(307) 777-3542 Facsimile
kdolan@state.wy.us

UNREPORTED CASES

Westlaw.

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2367759 (D.D.C.)
(Cite as: --- F.R.D. ----)

Page 1

County of San Miguel, Colo. v. MacDonald
D.D.C.,2007.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
COUNTY OF SAN MIGUEL, COLORADO, et al.,
Plaintiffs,
v.
MACDONALD, et al., Defendants,
andColorado Cattlemen's Association, Partnership
for the West, and Western Conservation Coalition,
Intervenor-Applicants.
**Civil Action No. 06-1946 (RBW).**

Aug. 21, 2007.

**Background:** In action challenging decision of the
United States Fish and Wildlife Service (FWS) not
to list the Gunnison sage-grouse as an endangered
or threatened species under the Endangered Species
Act (ESA), trade association and others moved to
intervene.

**Holdings:** The District Court, Walton, J., held that:

(1) movants had standing to intervene;

(2) movants who satisfied standing requirements
thus demonstrated the required legally protected in-
terest in the subject matter of the case;

(3) allegations that the interests of movants and
their members would be affected by the type of re-
lief sought demonstrated the required threat to im-
pair a legally protected interest; and

(4) interests of movants and their members would
not be adequately represented by FWS.

Motion granted.

**[1] Federal Civil Procedure 170A €==314.1**

170A Federal Civil Procedure
    170AII Parties
        170AII(H) Intervention

            170AII(H)1 In General
                170Ak314 Grounds
                    170Ak314.1 k. In General. Most
Cited Cases
Permissive intervention may be granted if the pro-
spective intervenor presents: (1) an independent
ground for subject matter jurisdiction; (2) a timely
motion; and (3) a claim or defense that has a ques-
tion of law or fact in common with the main action.
Fed.Rules Civ.Proc.Rule 24(b), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A €==311**

170A Federal Civil Procedure
    170AII Parties
        170AII(H) Intervention
            170AII(H)1 In General
                170Ak311 k. In General. Most Cited
Cases
A prospective intervenor must demonstrate that it
has Article III constitutional standing to intervene
by showing (1) injury-in-fact, (2) causation, and (3)
redressability. U.S.C.A. Const. Art. 3, § 2, cl. 1;
Fed.Rules Civ.Proc.Rule 24(a), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A €==103.2**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases
For standing purposes, the injury a party claims
must be distinct and palpable, and not abstract or
conjectural or hypothetical. U.S.C.A. Const. Art. 3,
§ 2, cl. 1.

**[4] Federal Civil Procedure 170A €==103.2**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Although the fact that harm or injury may occur in the future is not necessarily fatal to a claim of standing, such circumstances can lessen the concreteness of the controversy and thus weigh against a recognition of standing, and therefore, when a party alleges future injury alone, the party must demonstrate a realistic danger of sustaining a direct injury. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[5] Federal Civil Procedure 170A €⟲331**

170A Federal Civil Procedure
   170AII Parties
      170AII(H) Intervention
         170AII(H)2 Particular Intervenors
            170Ak331 k. In General. Most Cited Cases
Movants had standing to intervene as of right in action challenging decision of the Fish and Wildlife Service (FWS) not to list the Gunnison sage-grouse as an endangered or threatened species under the Endangered Species Act (ESA); allegations of expected increases in regulatory restrictions on the use of public and private lands by movants' members demonstrated a real likelihood they would sustain a direct injury to property used for their livelihoods and business operations if plaintiffs obtained any of the relief requested. U.S.C.A. Const. Art. 3, § 2, cl. 1; Endangered Species Act of 1973, § 2 et seq., 16 U.S.C.A. § 1531 et seq.; Fed.Rules Civ.Proc.Rule 24(a), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A €⟲331**

170A Federal Civil Procedure
   170AII Parties
      170AII(H) Intervention
         170AII(H)2 Particular Intervenors
            170Ak331 k. In General. Most Cited Cases
Movants who satisfied standing requirements in action challenging decision of the Fish and Wildlife Service (FWS) not to list the Gunnison sage-grouse as an endangered or threatened species under the Endangered Species Act (ESA), thus demonstrated the required legally protected interest in the subject matter of the case, as required in their motion to in-

tervene as of right; allegations of expected increases in regulatory restrictions on the use of public and private lands by movants' members demonstrated a real likelihood they would sustain a direct injury to property used for their livelihoods and business operations if plaintiffs obtained any of the relief requested. Endangered Species Act of 1973, § 2 et seq., 16 U.S.C.A. § 1531 et seq.; Fed.Rules Civ.Proc.Rule 24(a), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A €⟲331**

170A Federal Civil Procedure
   170AII Parties
      170AII(H) Intervention
         170AII(H)2 Particular Intervenors
            170Ak331 k. In General. Most Cited Cases
Allegations that the interests of movants and their members would be affected by the type of relief sought in action challenging decision of the Fish and Wildlife Service (FWS) not to list the Gunnison sage-grouse as an endangered or threatened species under the Endangered Species Act (ESA), demonstrated the required threat to impair a legally protected interest, as required to support motion to intervene as of right; process of regaining the prior determination would be difficult and burdensome, and movants faced an imminent threat of lost earnings if the requested emergency listing of the species were granted. Endangered Species Act of 1973, § 2 et seq., 16 U.S.C.A. § 1531 et seq.; Fed.Rules Civ.Proc.Rule 24(a), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A €⟲331**

170A Federal Civil Procedure
   170AII Parties
      170AII(H) Intervention
         170AII(H)2 Particular Intervenors
            170Ak331 k. In General. Most Cited Cases
For purposes of motion to intervene as of right in action challenging decision of the Fish and Wildlife Service (FWS) not to list the Gunnison sage-grouse as an endangered or threatened species under the Endangered Species Act (ESA), interests of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2367759 (D.D.C.)
(Cite as: --- F.R.D. ----)

movants and their members would not be adequately represented by FWS, even though movants supported upholding FWS's prior determination; movants' interests included protecting their members' livelihoods and business occupations. Endangered Species Act of 1973, § 2 et seq., 16 U.S.C.A. § 1531 et seq.; Fed.Rules Civ.Proc.Rule 24(a), 28 U.S.C.A.

Amy R. Atwood, Eugene, OR, Geoff Hickcox, Durango, CO, Rebekah S. King, Assistant Attorney for San Miguel County, Telluride, CO, for Plaintiffs.
Courtney O. Taylor, James A. Maysonett, U.S. Department of Justice, Washington, DC, for Defendants.
Anurag Varma, Conlon, Frantz, Phelan & Varma, LLP, Washington, DC, for Movants.

WALTON, District Judge.
**\*1** On November 14, 2006, the plaintiffs, the County of San Miguel, Colorado and nine conservation, birding, and governmental-accountability organizations, mostly non-profit, filed a complaint pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g)(1)(C) (2000) and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706 (2000), challenging the defendants'[FN1] (Julie Mac-Donald,[FN2] Dick Kempthorne,[FN2] and H. Dale Hall[FN3]) determination that listing the Gunnison sage-grouse as "endangered" or "threatened" under the ESA is "not warranted."[FN4] ("Compl.") ¶ 1; *see generally* Final Listing Determination for the Gunnison Sage-Grouse as Endangered or Threatened, 71 Fed.Reg. 19954-01 (Apr. 18, 2006) (to be codified at 50 C.F.R. pt. 17) ("Final Determination"). The plaintiffs seek declaratory relief that sets aside the United States Fish and Wildlife Service's ("FWS") "not warranted" finding and requires the issuance of an emergency rule listing the Gunnison sage-grouse as "endangered" under the ESA until normal listing procedures are completed pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(C), and the judicial review provisions of the APA, 5 U.S.C. §§ 702, 706.[FN5] Compl. ¶¶ 2-3 and C, E at 23.

[1] Currently before this Court is a motion to inter-

vene as defendants filed by intervenor-applicants Colorado Cattlemen's Association ("Cattlemen"), Partnership for the West ("Partnership"), and Western Conservation Coalition ("Western") pursuant to Federal Rule of Civil Procedure 24(a).[FN6] Intervenor-Applicants Colorado Cattlemen's Association, Partnership for the West, and Western Conservation Coalition's Motion for Leave to Intervene as Defendants ("Intervenor-Applicants' Mot.").[FN7] The motion is unopposed by the current defendants, Intervenor-Applicants' Mem. at 18, but is opposed by the plaintiffs, *see* Pls.' Opp'n.

For the reasons set forth below, the intervenor-applicants' motion is granted.

## I. Factual Background

### A. The Endangered Species Act

The ESA, 16 U.S.C. §§ 1531 *et seq.* (2000), is intended, *inter alia,* "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The Supreme Court has stated that "[t]he plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 184, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

The ESA protects species listed under the Act as "endangered" or "threatened" in several ways. The Act: (1) requires the FWS to develop and implement a recovery plan for listed species, 16 U.S.C. § 1533(f); (2) requires all federal agencies to carry out their programs for the conservation of the listed species and not jeopardize the continued existence of listed species, 16 U.S.C. § 1536(a)(1), (a)(2); and (3) forbids anyone from "taking" listed species by any means, except where authorized, 16 U.S.C. §§ 1538, 1539, 1532(19); 50 C.F.R. § 17.31.

**\*2** The ESA charges the Secretary of the United States Department of the Interior ("Secretary") with determining whether a species is "endangered" or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2367759 (D.D.C.)
(Cite as: --- F.R.D. ----)

Page 4

"threatened," and when such a determination is made, to designate its "critical habitat." 16 U.S.C. § 1533. The Secretary has delegated the responsibility of these determinations to the FWS. 50 C.F.R. § 402.01(b).

Protection of a species does not commence under the ESA until the species is listed as either endangered or threatened. *See* 16 U.S.C. § 1533(f) (requiring the development of a recovery plan for listed species). Under the ESA, a species is endangered if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is threatened if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). Once one of these designations is made, the ESA requires all federal agencies to verify that any action they authorize, fund, or perform "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary ... to be critical." 16 U.S.C. § 1536(a)(2).

A species may be classified as endangered or threatened by the Secretary's own initiative or by a petition to list a species submitted by the public to the Secretary. 16 U.S.C. § 1533(a) & (b). When the FWS receives a petition to list a species submitted by the public, within 90 days of receiving the petition, "to the maximum extent practicable," the FWS must determine "whether the petition presents substantial scientific or commercial information indicating that ... [a listing] may be warranted." 16 U.S.C. § 1533(b)(3)(A). If the FWS determines that listing based upon a petition "may be warranted," the FWS must start a review of the status of the species, *id.*, which must include (1) publication of the "may be warranted" determination in the Federal Register, *id.* § 1533(b)(3)(B)(ii), and (2) an opportunity for public review and comments on new or revised recovery plans[FN8], *id.* § 1533(f)(4). At the conclusion of the review period, the FWS must determine whether the petition for the listing of a species is (1) "not warranted," *id.* §

1533(b)(3)(B)(I), (2) "warranted," *id.* § 1533(b)(3)(B)(ii), or (3) "warranted ... but ... precluded" because of, *inter alia*, other "pending proposals to determine whether any species is an endangered or a threatened species ...." *id.* § 1533(b)(3)(B)(iii). If the listing is warranted, the FWS must (1) promptly publish a proposed regulation in the Federal Register, 16 U.S.C. § 1533(b)(3)(B)(ii), and (2) within one year publish a final regulation or withdraw the proposed regulation, *id.* § 1533(b)(6)(A)(I). The designation of the critical habitat of an endangered or threatened species must be made at the same time.[FN9] *Id.* § 1533(b)(6)(A)(ii). If the FWS determines that listing is "not warranted," it must also publish that determination in the Federal Register *Id.* § 1533(b)(3)(B)(I). The FWS's "not warranted" determination is subject to judicial review. *Id.* § 1533(b)(3)(C)(ii).

### B. The Gunnison Sage-grouse

*3 "The sage-grouse is a brownish-gray bird known for its unique mating ritual and the colorful ... features on the male birds," Compl. ¶ 25, which is a "distinct species" from a bird with a smaller wing span known as the Gunnison sage-grouse, *id.* ¶ 26. This distinct sub-species of the Gunnison sage-grouse is currently found primarily in the Gunnison Basin in southwestern Colorado. *Id.* ¶¶ 26, 31. The Gunnison sage-grouse relies upon sagebrush habitats "throughout the year" for "food, shelter, and cover." *Id.* ¶¶ 28-29.

According to the FWS, "[t]he current range of [the] Gunnison sage-grouse is about 8.5 percent of its historic range."[FN10] *Id.* ¶ 30, *see id.* ¶ 68. In 2004, the Colorado Division of Wildlife "estimated that the rangewide Gunnison sage-grouse population declined between 42 and 90 percent over the last 50 years." *Id.* ¶ 31. The plaintiffs represent that factors contributing to the decline of the species include "habitat loss, fragmentation, and degradation from numerous human activities" such as domestic livestock grazing. *Id.* ¶ 32. The National Audubon Society has identified the Gunnison sage-grouse as one of the country's ten most endangered birds. *Id.* ¶ 33.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2367759 (D.D.C.)
(Cite as: --- F.R.D. ----)

Page 5

### C. Listing of the Gunnison Sage-grouse

On January 25, 2000, the plaintiffs submitted a petition to the Secretary to list the Gunnison sage-grouse as endangered under the ESA. *Id.* Approximately a month later, the plaintiffs received a written response from Ralph Morgenweck, Regional Director of the FWS Mountain-Prairie Region, stating that the FWS had internally designated the Gunnison sage-grouse as a candidate species a week before the FWS-Mountain Prairie Region received the petition "by relying on provisions in the agency's 'Petition Management Guidance' ('PMG') Policy."[FN11] *Id.* ¶¶ 46-47.

The defendants' review of the Gunnison sage-grouse's classification status has already been the subject of several court actions claiming that the FWS was not following the mandate of the ESA.[FN12] On November 14, 2005, in one of those actions, *Norton II,* "the parties filed a stipulated settlement agreement with the Court that required [the] defendants to publish a listing determination for [the] Gunnison sage-grouse on or before March 31, 2006." Compl. ¶ 63. However, the plaintiffs allege that "[i]n December 2005, after several drafts of a proposed rule had been prepared," the FWS "drastically reversed course and began to draft a 'not warranted' listing determination." Compl. ¶ 64.

On April 18, 2006, the defendants published the "not warranted" listing that is at issue in this case. *Id.* ¶ 66; see Final Determination at 19954. The plaintiffs contest this listing determination primarily on the grounds that the FWS did not "rely solely on the best scientific and commercial data available," as required by 16 U.S.C. § 1533(b)(1)(A). Compl. ¶¶ 72-73. As noted above, the plaintiffs seek relief in several forms, including a request that this Court set aside the FWS's final determination that listing the Gunnison sage-grouse as threatened or endangered under the ESA is "not warranted." *Id.* ¶ C at 23-24.

### D. The Intervenor-Applicants

*4 Intervenor-applicant Cattlemen "is a non-profit trade organization representing the social, economic and educational interests of more than 12,000 beef producers throughout the State of Colorado." Intervenor-Applicants Mot., Declaration of Terry Fankhauser in Support of Motion to Intervene of Colorado Cattlemen's Association ("Fankhauser Decl.") ¶ 3. Members of Cattlemen are farmers and ranchers who depend upon farming and ranching for their livelihoods and who use land within the range of the Gunnison sage-grouse. *Id.* ¶¶ 3-4. Members use private lands, as well as federally-managed lands to conduct their businesses. *Id.* Cattlemen asserts that its members' interests will be impaired by withdrawal of the FWS determination and listing of the Gunnison sage-grouse as "not warranted" for several reasons. First, Cattlemen contends that a listing of the Gunnison sage-grouse as threatened or endangered under the ESA would negatively impact members by imposing restrictions on the use of their own land, thereby potentially limiting their ability to raise cattle and produce hay. Intervenor-Applicants' Mem. at 3, 4. Second, its members will purportedly be significantly impacted because "ESA compliance may restrict the ability to use water rights held by Cattlemen's members that originate on federal lands," thereby limiting their water supplies for irrigation, *Id.* at 3. Third, Cattlemen alleges that compliance with the ESA may "reduce the number of cattle that [the government] will permit to graze upon the national forests or federal lands or the amount of time that the cattle may graze." *Id.* Finally, the FWS's listing of the Gunnison sage-grouse as threatened or endangered will purportedly "reduce profitability and further lower profit margins and, ultimately, the financial viability of Cattlemen's members." *Id.* Therefore, Cattlemen contends that alternatives, other than setting aside the FWS's listing determination, "exist that satisfy the needs of [the] species without impacting land use and the rights of [its] members." Fankhauser Decl. ¶¶ 6, 8.

Intervenor-applicant Partnership "is a non-profit organization ... with more than 600 companies, associations, coalitions and individuals who collectively employ or represent more than one million citizens across America" in the following sectors: farming and ranching, coal, timber and wood products, util-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ities, hard rock mining, oil and gas, sportsmen and hunters, and small businesses. Intervenor-Applicants Mot. at 4 (quoting Declaration of Paul Poister in Support of Motion to Intervene of the Partnership of the West ("Poister Decl.") ¶ 3). The organization "seek[s] to restore a common sense balance between economic growth and environmental conservation."Poister Decl. ¶ 3. Many Partnership members, including but not limited to, members who operate mining, oil and gas, utility, agricultural and timber harvesting operations on public lands, hold or need federal permits and authorizations from federal agencies that manage land and mineral resources in the range of the Gunnison sage-grouse. *Id.* ¶ 4. The Partnership claims that an ESA listing of the Gunnison sage-grouse as threatened or endangered would negatively impact the Partnership by (1) "impairing existing conservation efforts, of which the Partnership's members are a part,"*id.* ¶ 5, and (2)"increas[ing] regulatory restrictions on agriculture, oil and gas, utilities, mining, timber harvests, recreation, and other activities on federal lands," resulting in significant delays in processing permits to conduct business on private or public land due to regional consultations with the FWS over the needed permits, thereby, in turn, resulting in financial hardship on the Partnership's members, *id.* ¶ 6, and (3) requiring the amendment of federal management plans in ways that would restrict access to federal lands and impair the Partnership members' ability to conduct their businesses, *id.*

**\*5** Intervenor-applicant Western "is a non-profit organization dedicated to wildlife conservation through local and state conservation efforts while maintaining the highest scientific standards, private property rights, agriculture and a strong economy."Intervenor-Applicants Mot., Declaration of Pam Paris in Support of Motion to Intervene of the Western Conservation Coalition ("Paris Decl.") ¶ 3. Western's members include "landowners, realtors, agricultural producers, trade organizations, contractors, and other businesses in the southwestern Colorado range of the Gunnison sage[-]grouse."*Id.* ¶ 4. Western supports local and state conservation efforts for the Gunnison sage-grouse as opposed to seeking federal listing under the ESA. *See id.*

("Western believes a federal listing will hinder such local efforts as well as adversely impact the interests of Western's members."); *see also* Intervenor-Applicants' Mot., Letter to U.S. Rep. John Salazar and Letter to FWS Director Dale Hale (letters urging Congress and the FWS to support existing state and local conservation efforts rather than pursuing an unnecessarily restrictive federal listing of the Gunnison sage-grouse). According to Western, listing the Gunnison sage-grouse as threatened or endangered would result in additional regulatory requirements under the ESA, causing significant delays and hardship to its members, including, for example, construction project delays and additional costs to remove snow at construction sites due to reduced time during the summer months to conduct construction activities. Paris Decl. ¶ 4.

## II. Standard of Review

Federal Rule of Civil Procedure 24(a) sets forth the requirements for intervention as of right and provides that:
[u]pon timely application anyone shall be permitted to intervene in an action ... when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. Rule 24(a)(2). In evaluating motions for intervention as of right, this Court must considerthe following four factors: (1) the timeliness of the motion; (2) whether the applicant claims an interest relating to the property or transaction which is the subject of the action; (3) whether the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) whether the applicant's interest is adequately represented by the existing parties.

[2]*Fund for Animals,* 322 F.3d at 731 (quoting *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060,

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2367759 (D.D.C.)
(Cite as: --- F.R.D. ----)

1074 (D.C.Cir.1998)) (internal quotation marks omitted); *see also SEC v. Prudential Sec., Inc.,* 136 F.3d 153, 156 (D.C.Cir.1998); *Environmental Defense v. Leavitt,* 329 F.Supp.2d 55, 65-66 (D.D.C.2004). Further, a prospective intervenor must demonstrate that it has Article III constitutional standing to intervene by showing "(1) injury-in-fact, (2) causation, and (3) redressability."*Fund for Animals,* 322 F.3d at 733 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)) (additional citation omitted); *see also Environmental Defense,* 329 F.Supp.2d at 66.

### III. Legal Analysis

*6 As noted above, a party seeking to intervene as of right must demonstrate that it has standing under Article III of the United States Constitution. *See Military Toxics Project v. EPA,* 146 F.3d 948, 953 (D.C.Cir.1998); *Mova Pharm. Corp.,* 140 F.3d at 1074."[B]ecause a Rule 24 intervenor seeks to participate on an equal footing with the original parties to the suit, [it] must satisfy the standing requirements imposed on those parties."*Fund for Animals,* 322 F.3d at 732 (quoting *City of Cleveland v. NRC,* 17 F.3d 1515, 1517 (D.C.Cir.1994)). Since a prospective intervenor's Article III standing presents a material question as to this Court's jurisdiction, *Sierra Club v. EPA,* 292 F.3d 895, 898 (D.C.Cir.2002), the Court must address the prospective intervenors' standing in this action before considering the factors for evaluating their intervention as of right.[FN13]

#### A. Standing

The intervenor-applicants assert that they have standing as associations to intervene in this action because (1) their "members have standing to sue in their own right; (2) the interests at stake [in this litigation] are germane to the organizations' purposes; and (3) neither the claim asserted nor the relief sought requires [their] members to participate directly in [this] lawsuit."Intervenor-Applicants Mem. at 14. In opposition, the plaintiffs respond that the intervenor-applicants fail to satisfy Rule 24(a)'s

Article III standing requirement of injury-in-fact, having failed to show that their "asserted injuries-i.e., of 'significant delay' and 'financial hardship', ... are ... 'fairly traceable' to the 'not warranted' listing decision but rather to speculative events that will be caused in the future if at all, by yet-to-be-published regulations."Pls' Opp'n at 17. For the reasons set forth below, the Court finds that the intervenor-applicants have constitutional standing.

Under Article III of the United States Constitution, an association ... has standing to sue on behalf of its members only if (1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit.

*Sierra Club,* 292 F.3d at 898;*see Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 342-43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). And, "[t]he 'irreducible constitutional minimum of standing contains three elements': (1) injury-in-fact, (2) causation, and (3) redressability."*Sierra Club,* 292 F.3d at 898 (quoting *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130).[FN14]

[3][4] Despite the plaintiffs' challenge to the adequacy of the intervenor-applicants' injury-in-fact claims, the Court finds that the intervenor-applicants have satisfied the constitutional minimum requirements of standing. Their allegations of expected increase in regulatory restrictions on their members' use of public and private land, including their members' access to federal lands, impairment of their members' existing and future conservation efforts, and a reduction in the profitability of their members' business concerns, constitute concrete and imminent injuries. For standing purposes, the injury a party claims must be "distinct and palpable, ... and not abstract or conjectural or hypothetical."*Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (internal quotation marks and citations omitted)."Although the fact that harm or injury may occur in the future is not neces-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sarily fatal to a claim of standing[,] ... [such circumstances can] lessen the concreteness of the controversy and thus mitigate [sic] against a recognition of standing."*United Transp. Union v. I.C.C.,* 891 F.2d 908, 913 (D.C.Cir.1989) (quoting *Harrington v. Bush,* 553 F.2d 190, 208 (D.C.Cir.1977)) (internal quotation marks omitted). Thus, when a party alleges future injury alone, the party "must demonstrate a realistic danger of sustaining a direct injury...."*Id.*(quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (citation omitted).

*7 [5] Here, the intervenor-applicants have demonstrated that there is a real likelihood they will sustain a direct injury if the plaintiffs prevail in obtaining any of the relief they are requesting. The Gunnison sage-grouse is the subject of the conservatory regulations sought by the plaintiffs, and the intervenor-applicants benefit from the FWS's current "not warranted" determination because their land use is unfettered by regulations designed to protect the habitat of the Gunnison sage-grouse. Moreover, if the Court were to grant the relief the plaintiffs seek, the threat of greater regulation of the lands the intervenor-applicants' members use and rely upon would be imminent and result in concrete injury. As stated in *Sierra Club v. EPA,*"if the complainant is 'an object of the action (or forgone action) at issue'-as is the case usually in review of a rulemaking and nearly always in review of an adjudication-there should be 'little question that the action or inaction has caused him injury, and that a judgment preventing or requiring action will redress it.'"292 F.3d at 900 (quoting *Defenders of Wildlife,* 504 U.S. at 561-62, 112 S.Ct. 2130). While the intervenor-applicants are not themselves the topic of the challenged agency action, the Gunnison sage-grouse and its habitat are integral components of the environmental make-up of their members' property or the public property they utilize for their livelihoods and business operations. Intervenor-Applicants' Mem. at 2-3. The Circuit Court has found that it sees "no meaningful distinction between a regulation that directly regulates a party and one that directly regulates the disposition of a party's property."*Fund for Animals,* 322 F.3d at

734 (footnote omitted); *see Horsehead Res. Dev. Co. v. Browner,* 16 F.3d 1246, 1259 (D.C.Cir.1994) (finding that environmental organizations with members living in the affected areas "clearly do have standing"). Hence, the injuries-in-fact that the intervenor-applicants' members claim they will suffer are fairly traceable to the judicial intervention (setting aside the FWS's "not warranted" finding for listing the Gunnison sage-grouse as an endangered or threatened species) and the regulatory relief (the issuance of an emergency rule by the FWS listing the Gunnison sage-grouse as "endangered" or "threatened" under the ESA) that the plaintiffs seek in this action. Further, it is likely that a decision favorable to the intervenor-applicants would prevent their members from incurring the injuries they fear, including, but not limited to, increased regulatory restrictions, impairment to existing and future conservation efforts of their members, and a reduction in the profitability of their members' businesses.

This case is similar to *Fund for Animals.*There, the District of Columbia Circuit considered a similar set of circumstances when evaluating the District Court's denial of the National Resources Department of the Ministry of Nature and Environment of Mongolia's ("NRD") motion to intervene in an action alleging violations of the ESA and APA. *Fund for Animals,* 322 F.3d at 731.The plaintiffs, the Fund for Animals and other organizations dedicated to wildlife conservation, challenged the Secretary of the Interior and the Director of the FWS for "failing to list the argali sheep as an endangered species in Mongolia, Kyrgyzstan, and Tajikistan, and by issuing hundreds of permits for sport hunters to import killed argali into the United States as 'trophies.' "*Id.* at 730.In *Fund for Animals,*"[t]he plaintiffs asked the court, *interalia,* to direct the defendants to list the argali as an endangered species in those countries, to declare unlawful all outstanding permits for the import of argali sheep, and to enjoin the defendants from issuing additional permits."*Id.* The NRD, an agency of the Mongolian government responsible for "implementing the policy and decision of the Government on rational utilization of natural resources, rehabilitation, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2367759 (D.D.C.)
(Cite as: --- F.R.D. ----)

Page 9

protection, including the country's 'tourist hunting program,' "*id.* at 731, sought intervention, asserting that it satisfied the requirements for standing under Article III"because fees paid by sport hunters are the primary source of funding for its argali conservation program,"*id.* at 733.Therefore, the NRD argued that if the Court ruled in favor of the plaintiffs in that case and barred American hunters from bringing the argali sheep they killed home as trophies, "some hunters [would] not travel to Mongolia to hunt the argali, and the revenues that support the conservation program [would] decline."*Id.* In reversing the District Court, the Circuit found the NRD's argument persuasive and ruled that "[t]he threatened loss of tourist dollars, and the consequent reduction in funding for Mongolia's conservation program, constitute[d] a concrete and imminent injury ... [that] is fairly traceable to the regulatory action ... [and therefore, it was] likely that a decision favorable to the NRD would prevent that loss from occurring."*Id.* at 733.

*8 Here, as previously noted, like in *Fund for Animals,* the Gunnison sage-grouse is the subject of the sought-after regulation and the intervenor-applicants' members benefit from the FWS's current "not warranted" determination. If the Court grants the relief that the plaintiffs seek, the threat of greater regulation of the lands the intervenor-applicants' members use and rely upon for their livelihoods and business operations would be imminent and would result in concrete injury to their members. Hence, the intervenor-applicants' members' economic status would be threatened. Therefore, the Court finds that the record in this case at this point in the proceedings adequately demonstrates that the intervenor-applicants have constitutional standing.FN15

*B. Elements of Test for Intervention As of Right*

*(1) Timeliness*

The intervenor-applicants timely filed their application for intervention on March 2, 2007, see Intervenor-Applicants' Mot. (Docket Entry No. 14), and the plaintiffs concede that the application was

timely filed, Pls' Opp'n at 4. Therefore, timeliness of the intervenor-applicants' application for intervention is not at issue in this case.

*(2) Legally Protected Interests*

[6] The intervenor-applicants claim an interest in the subject matter of this case because a listing or reversal of the "not warranted" determination "would subject [the applicants' members] to the requirements of the ESA including section 7 consultations with the FWS, reinitiation of consultation, increased restrictions on the use of public lands, potential denial of permit renewals, significant delays in the conduct of their businesses and financial hardship."Intervenor-Applicants Mem. at 11-12. In opposition, the plaintiffs respond that the intervenor-applicants' broadly asserted interests do not support intervention as of right because those "interests do not relate to *defendants'* liability under the ESA...." Pls' Opp'n at 6. In their reply, the intervenor-applicants contend that their members' interests in the land that would be impacted by a decision to list the Gunnison sage-grouse, and the resulting economic consequences in an ESA case fall within the "zone of interests" test, making their intervention appropriate. Intervenor-Applicants' Reply at 8-10. For the reasons set forth below, the Court agrees with the intervenor-applicants.

The District of Columbia Circuit has held that by satisfying the requirements of standing a party can demonstrate that a legally protected interest exists. *See Jones,* 348 F.3d at 1018-19 (reasoning that "because [the intervenor-applicant] ha[d] suffered a cognizable injury sufficient to establish Article III standing, she also ha[d] the requisite interest under Rule 24(a)(2)") (citations omitted); *see also Mova Pharm.,* 140 F.3d at 1076 (explaining that the party seeking intervention "need not show anything more than that it has standing to sue in order to demonstrate the existence of a legally protected interest for purposes of Rule 24(a)") (citations omitted). This Court having determined already that the intervenor-applicants have constitutional standing, and the District of Columbia Circuit having found that standing alone is sufficient to establish that they

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

have "an interest relating to the property or transaction which is the subject of th[is] action,"Fed.R.Civ.P. 24(a)(2); *see Jones,* 348 F.3d at 1018-19;*Mova Pharm.,* 140 F.3d at 1076, the intervenor-applicants have satisfied the second requirement for intervention as of right. The property at issue in this case being public and private lands within the range of the Gunnison sage-grouse and this action being a challenge to the FWS's listing decision for the Gunnison sage-grouse as "not warranted" under the ESA clearly vest the intervenor-applicants with the requisite interest in this litigation for Rule 24(a) intervention. *See Foster v. Gueory,* 655 F.2d 1319, 1324 (D.C.Cir.1981) ("An intervenor's interest is obvious when he asserts a claim to property that is the subject matter of the suit ....") (citation omitted). Accordingly, the Court concludes that the intervenor-applicants have legally protected interests in the instant case.

### (3) Threat to Impair the Legally Protected Interests

\*9 The intervenor-applicants contend that their interests and the interests of their members will be adversely affected by the type of relief the plaintiffs are seeking because listing the Gunnison sage-grouse as threatened or endangered would "impose section 7 consultation and section 9 take prohibitions."Intervenor-Applicants Mem. at 13-14. The intervenor-applicants further claim that success of the plaintiffs in having the Gunnison sage-grouse listed as they demand "could also reinitiate consultation on existing permits ... and other authorizations held by the [i]ntervenor-[a]pplicants."*Id.* at 14.In opposition, the plaintiffs argue that lawsuits such as this one do not result in an order compelling the defendants to actually list the subject species, Pls' Opp'n at 7, and any proposed rule would be followed by a 60-day public comment period during which the intervenor-applicants could participate, *id.* at 9-10.Further, the plaintiffs contend that "the chain of events that [the] applicants rely on here ... is attenuated and speculative, and cannot support intervention."*Id.* at 11.Replying to the plaintiffs' argument, the intervenor-applicants assert that "[e]ven if [the Court simply] revers[es] and remand[s] ... the FWS's determination," their mem-

bers will still be harmed by the expenditure of "additional time and resources they would ordinarily devote to their businesses."Intervenor-Applicants' Reply at 7. The Court agrees with the intervenor-applicants.

[7] The intervenor-applicants are "so situated that the disposition of the action may as a practical matter impair or impede [their] ability to protect [their] interest."Fed.R.Civ.P. 24(a)(2). Despite the plaintiffs' argument that the intervenor-applicants would have an opportunity to weigh in during the review period of a proposed rule to classify the Gunnison sage-grouse as either endangered or threatened or to file suit upon issuance of a new final adoption of a rule, it is clear that the process of regaining a "not warranted" determination, should the plaintiffs succeed in the instant case, would be "difficult and burdensome." *Fund for Animals,* 322 F.3d at 735 (citation omitted). For instance, if the FWS's determination is set aside and it has to conduct the year-long review period, including the 60-day public comment period, the intervenor-applicants would have to file a separate action if the FWS then concludes that listing the Gunnison sage-grouse as threatened or endangered is warranted. The positions of the parties, including those of the intervenor-applicants, in such a proceeding would likely be duplicative of their current positions. Moreover, "[i]t is not enough to deny intervention under [Rule] 24(a)(2) because the applicants may vindicate their interests in some later, albeit more burdensome, litigation."*Natural Res. Def. Council v. Costle,* 561 F.2d 904, 910 (D.C.Cir.1977). Also, as the intervenor-applicants further argue, the imminent threat of lost earnings if this Court orders the FWS to issue an emergency rule listing immediately the Gunnison sage-grouse as "endangered," pending remand of the challenged determination, would immediately impair the intervenor-applicants' members economic interests.[FN16]

### (4) Adequate Representation of the Applicants' Interests

\*10 The Court must finally determine whether the intervenor-applicants' interests are "adequately rep-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

resented by existing parties." Fed.R.Civ.P. 24(a)(2). The intervenor-applicants assert that their interests are inadequately represented because (1) the plaintiffs seek the reversal of the FWS's "not warranted" determination and an emergency listing of the Gunnison sage-grouse under the ESA while the intervenor-applicants request that this Court uphold the FWS's "not warranted" determination and (2) the intervenor-applicants' interests consist of pursuing their economic livelihoods on private and public lands, whereas, the primary interests of the FWS are the protection and conservation of species, including the Gunnison sage-grouse, as mandated by the ESA. Intervenor-Applicants' Mem. at 16. Further, the intervenor-applicants note that they take views different than the FWS on what activities may impact the Gunnison sage-grouse or its habitat. *Id.* In opposition, the plaintiffs argue the intervenor-applicants fail to meet their burden of proving inadequate representation. Pls' Opp'n at 14. The plaintiffs claim that the intervenor-applicants have proven no more than a "slight difference" in interests between them and the current defendants, especially considering that both parties have the same interest in upholding the "not warranted" determination. *Id.* at 14-15.In their reply, the intervenor-applicants contend that the plaintiffs bear the burden of proving the adequacy of representation and allege that they have not done so. Reply at 11. Further, the intervenor-applicants argue that the FWS cannot adequately represent the intervenor-applicants' economic interests at the same time they also seek to represent the general public's interest. *Id.* For the following reasons, the Court finds that the intervenor-applicants have satisfied the final factor for intervention as of right.

[8] The Supreme Court has held that inadequacy of representation is satisfied "if the applicant shows that representation of [its] interest 'may be' inadequate; and the burden of making that showing should be treated as minimal."*Trbovich v. United Mine Workers of Am.,* 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972) (citation omitted); *see Dimond v. District of Columbia,* 792 F.2d 179, 192 (D.C.Cir.1986) (stating that under *Trbovich* the requirement of showing inadequate

representations "is not onerous"). The District of Columbia Circuit has "often concluded that government entities do not adequately represent the interests of aspiring intervenors."*Fund for Animals,* 322 F.3d at 736 (footnote omitted). The Circuit Court has reached this conclusion because government entities are usually charged with "represent[ing] the interests of the American people," whereas aspiring intervenors, like the intervenor-applicants here, are dedicated to representing their personal interests or the interests of their members or members' businesses. *Id.; see, e.g., Costle,* 561 F.2d at 912-13;*Smuck v. Hobson,* 408 F.2d 175, 181 (D.C.Cir.1969); *Friends of Animals v. Kempthorne,* 452 F.Supp.2d 64, 70 (D.D.C.2006). Clearly, both the defendants and the intervenor-applicants agree that the FWS's decision that a listing of the Gunnison sage-grouse as endangered or threatened is "not warranted" under the ESA should be upheld. However, the FWS's obligation is to represent the interests of the general public in protecting and conserving species covered by the ESA, while the intervenor-applicants' interests are those of its members, which include, but are not limited to, protecting their members' livelihoods and business operations, along with advancing local and state conservation measures. Thus, although the FWS and the intervenor-applicants share a common interest-upholding the FWS's listing determination-that shared interest does not guarantee adequate representation of the intervenor-applicants' interests and those of their members. As the Circuit Court has recognized, even "a shared general agreement does not necessarily ensure agreement in all particular respects."*Fund for Animals,* 322 F.3d at 737 (quoting *Natural Res. Def. Council,* 561 F.2d at 912) (internal quotation marks omitted). Considering the minimal showing that must be made to demonstrate inadequate representation, the Court concludes that the intervenor-applicants have satisfied the final requirement for intervention as of right under Federal Rule of Civil Procedure 24(a).FN17

### IV. Conclusion

*11 Based on the foregoing analysis, the interven-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2367759 (D.D.C.)
(Cite as: --- F.R.D. ----)

Page 12

or-applicants' motion to intervene as defendants pursuant to Federal Rule of Civil Procedure 24(a) is **GRANTED.**

**SO ORDERED.**[FN18]

FN1. Julie MacDonald is being sued in her official capacity as Deputy Assistant Secretary for Fish & Wildlife and Parks Service in the United States Department of the Interior. Complaint ("Compl.") ¶ 22.

FN2. Dick Kempthorne is being sued in his official capacity as Secretary of the Department of the Interior. *Id.* ¶ 23.

FN3. H. Dale Hall is being sued in his official capacity as Director of the United States Fish and Wildlife Service, a component of the Department of the Interior. *Id.* ¶ 24.

FN4. The nine conservation, birding, and government accountability organizations that have joined the County of San Miguel, Colorado in this action are Sagebrush Sea Campaign, Center for Native Ecosystems, Forest Guardians, The Larch Company, Sinapu, Center for Biological Diversity, Public Employees for Environmental Responsibility, Black Canyon Audubon Society, and Sheep Mountain Alliance. *See id.* ¶¶ 10-18.These organizations, *inter alia,* are committed to the conservation and recovery of the Gunnison sage-grouse. *See id.*

FN5. Specifically, the plaintiffs request that the Court find that the FWS's determination that listing the Gunnison sage-grouse as threatened or endangered was "not warranted" (1) violates Section 4(b)(3)(A) of the ESA and (2) is arbitrary, capricious, an abuse of discretion, and constitutes agency action unlawfully withheld under Section 706 of the APA. Compl. ¶¶ C, E at 23; *see*16 U.S.C. § 1533(b)(3)(A)(2000); 5 U.S.C. § 706.

FN6. Alternatively, the intervenor-applicants request intervention under Rule 24(b), which allows permissive intervention "when an applicant's claim or defense and the main action have a question of law or fact in common."Fed.R.Civ.P. 24(b). However, "[i]n exercising its discretion the [C]ourt shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."*Id.* Permissive intervention, therefore, may be granted if the prospective intervenor presents "(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action."*Equal Employment Opportunity Comm'n v. Nat'l Children's Ctr., Inc.,* 146 F.3d 1042, 1046 (D.C.Cir.1998) (citation omitted). The Court enjoys considerable discretion in deciding whether intervention should be permitted. *Id.* at 1048.However, the Court need not analyze the intervenor-applicants' motion under this theory because it concludes that the intervenor-applicants may intervene as a matter of right. *See Fund for Animals, Inc. v. Norton,* 322 F.3d 728, 731 (D.C.Cir.2003) ("Because we conclude that the NRD is entitled to intervene as of right, we need not address the issue of permissive intervention.") (citation omitted).

FN7. The following papers have been submitted in connection with this motion: (1) Memorandum of Points and Authorities in Support of Intervenor-Applicants Colorado Cattlemen's Association, Partnership for the West, and Western Conservation Coalition's Motion for Leave to Intervene as Defendants ("Intervenor-Applicants' Mem."), (2) Plaintiffs' Memorandum in Opposition to Motion of Colorado Cattlemen, et al., to Intervene ("Pls.' Opp'n") and (3) Intervenor-Applicants Colorado Cattlemen's Association, Partnership for the West, and Western Conservation Coalition's Reply

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2367759 (D.D.C.)
(Cite as: --- F.R.D. ----)

Memorandum in Support of Motion for Leave to Intervene as Defendants ("Intervenor-Applicants' Reply").

FN8. A recovery plan is a plan developed and implemented by the Secretary "for the conservation and survival of endangered species and threatened species listed pursuant to [16 U.S.C. § 1533]...."16 U.S.C. § 1533(f)(1).

FN9. The ESA defines "critical habitat" as a habitat that is "essential to the conservation of the species,"16 U.S.C. §§ 1532(5)(A)(I), (A)(ii), with "conservation" defined as the use of methods necessary "to bring any [listed species] to the point at which the measures provided pursuant to this chapter are no longer necessary,"*id.* § 1532(3).

FN10. According to the plaintiffs, "the historic range of the Gunnison sage-grouse likely included southwestern Colorado, southwestern Kansas, northwestern Oklahoma, northern New Mexico, northern Arizona, and southeastern Utah."*Id.* ¶ 27.

FN11. The PMG Policy was subsequently declared invalid, and the defendants in an earlier action were enjoined by this Court from applying the policy. See June 2, 2004 Order at 6-7, *American Lands Alliance v. Norton* ("*Norton I*"), No. 00-2339, 2004 WL 3246687 (D.D.C.2004) (RBW).

FN12. The Court will not discuss in detail the factual background of the prior litigation or the listings made by the FWS for the Gunnison sage-grouse because those facts are not directly relevant in resolving the current motion before the Court. Those prior cases are the following: *Norton I,* No. 00-2339, 2004 WL 3246687 (D.D.C.2004) (RBW) (challenging the FWS's failure to issue a 90-day finding in response to a petition to list the Gunnison sage-grouse pursuant to the ESA), and *American Lands Al-*

*liance v. Norton* (" *NortonII*"), No. 04-0434 (D.D.C.2005) (RBW) (challenging the "warranted but precluded" finding of the FWS for the Gunnison sage-grouse pursuant to the ESA and the APA).

FN13. As discussed in *Environmental Defense,*"the requirements for Rule 24(a) and [for Article III] standing are not co-extensive" in this Circuit. 329 F.Supp.2d at 66 n. 7. As the District of Columbia Circuit has stated, satisfying Rule 24(a) also satisfies Article III standing. *Roeder v. Islamic Republic ofIran,* 333 F.3d 228, 233 (D.C.Cir.2003). On the other hand, however, a person who has constitutional standing fulfills only the second of the four requirements for intervention as of right under Rule 24(a).*See Jones v. Prince George's Co., Md.,* 348 F.3d 1014, 1018-19 (D.C.Cir.2003) (assessing existence of impairment of interest and adequacy of representation after concluding that constitutional standing had been satisfied).

FN14. The intervenor-applicants' argument that the *Defenders of Wildlife* requirements are irrelevant to this motion, *see* Intervenor-Applicants' Reply at 13 (claiming *Defenders of Wildlife*"does not relate to intervention at all"), is incorrect. As explained by the District of Columbia Circuit, "because a Rule 24 intervenor seeks to participate on an equal footing with the original parties to the suit, he must satisfy the standing requirements imposed on those parties."*Fund for Animals,* 322 F.3d at 732 (quoting *City of Cleveland v. NRC,* 17 F.3d 1515, 1517 (D.C.Cir.1994)).*Fund for Animals,* which the intervenor-applicants cite in their filing, *see* Intervenor-Applicants' Reply at 12, does in fact analyze the standing of the party seeking to intervene as a defendant under the *Defenders of Wildlife* requirements. See *Fund for Animals,* 322 F.3d at 732-33.And, this Court is bound by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this Circuit precedent.

FN15. The District of Columbia Circuit has explained that under the Supreme Court's ruling in *Defenders of Wildlife*,
the burden of production a[n] [intervenor-applicant] must bear in order to show that it has standing ... varies with the procedural context of the case. At the pleading stage, [which is the current procedural posture of this case,] general factual allegations of injury resulting from the [relief the plaintiff is seeking] may suffice, and the [C]ourt [must] presum[e] that general allegations embrace the specific facts that are necessary to support the claim.
*Sierra Club*, 292 F.3d at 898 (quoting *Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. 2130);*see c.f. Fund for Animals*, 322 F.3d at 733-34 (concluding that identical standing analysis for "any party" equally applies to "prospective intervenor[s]," but declining to decide "whether ... [a] motion to intervene is closer to a motion for summary judgment or to a pleading" because the case involved a challenge to administrative action, and standing "in many if not most [such] cases [,] ... is self evident") (citation omitted).

FN16. In their opposition, the plaintiffs acknowledges that "lawsuits such as this one usually [do not] result in ... an Order compelling defendants to actually list the species in question" and cite many cases in which this jurisdiction has vacated and remanded an agency determination concerning various species. Pls.' Opp'n at 7. As the intervenor-applicants point out, however, the plaintiffs chose to seek relief in the form of an order requiring the FWS to issue an emergency listing of the Gunnison sage-grouse. Intervenor-Applicants' Reply at 4; *see* Compl. ¶ E at 24. The Court, therefore, must consider whether such a result would harm the interests of the intervenor-applicants.

FN17. Although they oppose the motion to intervene, the plaintiffs request that if the Court should grant intervention to the intervenor-applicants that the Court limit the scope of the intervention in the following ways: (1) order the intervenors "not to assert claims outside the scope of the Complaint;" (2) prohibit the intervenors "from filing any motions independently, or in which the Secretary does not join;" (3) prohibit the intervenors "from seeking any discovery not sought by the Secretary;" (4) require the intervenors and the Secretary to each reduce by one-half the standard page limits authorized by the Local Rules for all Court filings; and (5) restrict "intervention to the remedial phase of this case."Pls' Opp'n at 20-22. In the intervenor-applicants' reply, they opposed such restrictions as arbitrary and contrary to the purpose of intervention, considering the applicants' "commitment" to follow scheduling orders issued by the Court, and the applicants' and defendants' varied interests. Intervenor-Applicants' Reply at 14. Further, the intervenor-applicants contend that they do not seek to alter dramatically the scope of the case as it exists in its current posture. *Id.* As noted in Advisory Committee Notes to the Federal Rules of Civil Procedure, intervention of right "may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings."Fed. R.Civ. P. 24 advisory committee's note; *see Smuck*, 408 F.2d at 180 (stating that after requirements for intervention are met, consideration of "the nature of [the intervenor-applicant's] 'interest' may play a role in determining the sort of intervention which should be allowed") (footnote omitted). For reasons of judicial economy and the purpose for which intervention is being permitted, the Court agrees with the plaintiffs that intervention must be limited to claims within the scope of the Com-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.R.D. ----
--- F.R.D. ----, 2007 WL 2367759 (D.D.C.)
(Cite as: --- F.R.D. ----)

plaint. Otherwise, the Court declines to limit the applicants' intervention as requested by the plaintiffs.

FN18. An order consistent with this Court's Memorandum Opinion shall be filed contemporaneously herewith.

D.D.C.,2007.
County of San Miguel, Colo. v. MacDonald
--- F.R.D. ----, 2007 WL 2367759 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                 Page 1
Slip Copy, 2006 WL 1050147 (C.A.9 (Cal.))
(Cite as: Slip Copy)

Natural Resources Defense Council v. Norton
C.A.9 (Cal.),2006.
Only the Westlaw citation is currently avail-
able.This case was not selected for publication in
the Federal Reporter.Please use FIND to look at the
applicable circuit court rule before citing this opin-
ion. (FIND CTA9 Rule 36-3.)
United States Court of Appeals,Ninth Circuit.
NATURAL RESOURCES DEFENSE COUNCIL;
California Trout; Baykeeper & Its Deltakeeper
Chapter; Friends of the River; The Bay Institute, all
non-profit organizations, Plaintiffs-Appellees,
State Water Contractors, Intervenor-Appellant,
v.
Gale A. NORTON, in her official capacity as Sec-
retary of the Interior; Steven A. Williams, in his of-
ficial capacity as Director, U.S. Fish & Wildlife
Service, Defendants.
No. 05-16581.
D.C. No. CV-05-00690-CW.

Argued and Submitted April 4, 2006.
Decided April 19, 2006.

Deborah R. Reames, Laura M. Robb, Andrea
Treece, Oakland, CA, Katherine S. Poole, Snyder
Miller & Orton, LLP, Hamilton Candee, Esq., Nat-
ural Resources Defense Council, Trent W. Orr, San
Francisco, CA, for Plaintiffs-Appellees.
Gregory K. Wilkinson, Esq., Best Best & Krieger,
LLP, Riverside, CA, for Intervenor-Appellant.
James A. Maysonett, Esq., Jason T. Cohen, Esq.,
U.S. Department of Justice Environment & Natural
Resources Division, Washington, DC, for Defend-
ants.

Appeal from the United States District Court for the
Northern District of California, Claudia Wilken,
District Judge, Presiding.

Before FERGUSON, TROTT, and KLEINFELD,
Circuit Judges.

MEMORANDUM

FN* This disposition is not appropriate for
publication and may not be cited to or by
the courts of this circuit except as provided
by Ninth Circuit Rule 36-3.

*1 State Water Contractors ("Contractors") moved
to intervene as a matter of right pursuant to Federal
Rule of Civil Procedure 24(a) in a lawsuit filed by
Natural Resources Defense Council, California
Trout, Baykeeper and its Deltakeeper Chapter,
Friends of the River and The Bay Institute, challen-
ging the issuance of a biological opinion addressing
proposed changes in the operation of state and fed-
eral water storage and diversion projects. The dis-
trict court denied the motion. The Contractors ap-
peal.

The denial of a motion for intervention as a matter
of right is reviewed de novo. *United States v. Alisal
Water Corp.,* 370 F.3d 915, 918-19 (9th Cir.2004).
Thus, we must consider the matter anew, the same
as if it had not been heard before, and as if no de-
cision previously had been rendered. *Ness v.
Comm'r,* 954 F.2d 1495, 1497 (9th Cir.1992). Con-
sequently, given the standard of review, the district
court order, no matter how well-reasoned and well-
written, cannot be given deference; we consider the
matter independent of the district court's order.
*SeeAgyeman v. INS,* 296 F.3d 871, 876 (9th
Cir.2002).

Federal Rule of Civil Procedure 24(a) allows for a
party to intervene as a matter of right when the ap-
plicant claims an interest relating to the property or
transaction which is the subject of the action and
the applicant is so situated that the disposition of
the action may as a practical matter impair or im-
pede the applicant's ability to protect that interest,
unless the applicant's interest is adequately repres-
ented by existing parties. The rule is to be con-
strued liberally in favor of the party seeking inter-
vention. *Sw. Ctr. For Biological Diversity v. Berg,*
268 F.3d 810, 818 (9th Cir.2001).

The Ninth Circuit has adopted a four part test to de-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1050147 (C.A.9 (Cal.))
(Cite as: Slip Copy)

termine whether an applicant meets the requirements of Rule 24(a).*Id.* at 817.There is no dispute regarding the Contractors' ability to meet the first three requirements. Resolution depends on the fourth factor-whether the Contractors' interest is adequately represented by existing parties. *Seeid.*Here, although close, looking at the matter anew, we conclude that the Contractors' interests are not adequately represented, and as a consequence, that the Contractors should be allowed to intervene.

First, given the Contractors' members' exclusive interest in a majority of the water contracts issued from the State Water Project and Contractors' unique interest in defending the South Delta Improvement Program, there is no assurance that all of the Contractors' arguments will be addressed if they are not included as parties to this action. Moreover, as a result of its exclusive interest in the State Water Project and the South Delta Improvement Program, there are serious doubts that the existing parties would protect those interests to the same extent, particularly if the parties were to enter into settlement discussions. Thus, because the "burden in showing inadequate representation is minimal," we conclude that the Contractors should be allowed to intervene. *SeeForest Conservation Council v. United States Forest Serv.,* 66 F.3d 1489, 1498 (9th Cir.1995).

*2 The judgement as to the motion to intervene as a matter of right is, therefore, REVERSED.

C.A.9 (Cal.),2006.
Natural Resources Defense Council v. Norton
Slip Copy, 2006 WL 1050147 (C.A.9 (Cal.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32617198 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

Southern Utah Wilderness v. Norton
D.D.C.,2002.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
SOUTHERN UTAH WILDERNESS Alliance, et
al. Plaintiffs,
v.
Gale NORTON, et al. Defendants.
**No. Civ.A. 01-2518(CKK).**

June 28, 2002.

Sharon Buccino, Natural Resources Defense Council, Washington, DC, for Plaintiffs.
Ann D. Navaro, United States Department of Justice, Washington, DC, for Defendants.
William P. Horn, Birch, Horton, Bittner & Cherot, Washington, DC, for Movant.

MEMORANDUM OPINION
KOLLAR-KOTELLY, J.
*1 Presently before this Court is Defendants' Motion to Transfer Venue to the United States District Court for the District of Utah pursuant to 28 U.S.C. § 1404(a). Also pending before the Court is Yates Petroleum Corporation's ("Yates Petroleum") unopposed Motion to Intervene as a Defendant, and Notice of Support for Federal Defendants' Motion to Transfer Venue. Plaintiffs, the Southern Utah Wilderness Alliance ("SUWA") and the National Resources Defense Council ("NRDC") (collectively "Plaintiffs"), brought the present action in order to challenge the sale and issuance of mineral leases for twelve parcels of public land located in southern Utah. Defendants, Gale Norton, the United States Department of the Interior ("DOI"), and the Bureau of Land Management ("BLM") (collectively "Defendants") argue that the action is more appropriately brought in the District of Utah and, accordingly, request that the case be transferred pursuant to § 1404(a). Yates Petroleum is a company that was awarded two of the challenged leases issued by the Utah BLM and joins in Defendants' request for transfer. Upon consideration of Defendants' motion

to transfer venue, memorandum of law, Yates Petroleum's notice of support, Plaintiffs' Opposition thereto, Defendants' reply, and the relevant law, the Court shall grant Defendants' motion to transfer and shall grant Yates Petroleum's motion to intervene.

I. BACKGROUND

The facts of this case are set out briefly below. Plaintiffs filed the instant action to challenge the sale and issuance of certain oil and gas leases granted by the Utah Bureau of Land Management ("Utah BLM"). On September 5, 2001, the Utah BLM sold oil and gas leases for sixty-eight parcels of land located in southern Utah. Plaintiffs argue that, in allowing the sales related to twelve of those parcels, the Utah BLM failed to comply with the National Environmental Policy Act ("NEPA"),[FN1] 42 U.S.C. §§ 4332, et seq. and the National Historic Preservation Act ("NHPA"),[FN2] 16 U.S.C. §§ 470, et seq. Plaintiffs also allege that the sale and issuance of the challenged leases was arbitrary and capricious, in violation of § 706 of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706. Plaintiffs seek a remedy of both declaratory and injunctive relief. See generally Plaintiffs' Complaint.

> FN1. NEPA requires a federal agency to prepare an Environmental Impact Statement if the agency proposes to undertake a "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

> FN2. NHPA directs federal agencies to consider historic resources in carrying out their discretionary activities. 16 U.S.C. §§ 470, et seq

The United States Bureau of Land Management ("BLM") delegates the authority to determine the propriety of all oil and gas lease sales in Utah to the Utah State Director of the Utah BLM. See Declaration of Robert Lopez ("Lopez Decl.") ¶¶ 4-5, 9, dated January 16, 2002. Utah BLM offered the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 2
Not Reported in F.Supp.2d, 2002 WL 32617198 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

twelve parcels of public land at issue in this action as part of a quarterly oil and gas lease sale. *See* 30 U.S.C. § 226(b)(1) (requiring BLM state offices to conduct quarterly oil and gas lease sales of available public lands). On July 6, 2001, the Utah BLM posted a Notice of Competitive Lease Sale for sixty-eight parcels of public land, including the twelve at issue here. Utah BLM determined that the lease sales fell within the existing NEPA analyses and were proper under local land use plans. Def. Mem. at 4. SUWA objected to the proposed sales and filed a protest with Utah BLM on August 20, 2001. The lease sales occurred on September 6, 2001, and Utah BLM formally denied SUWA's protest on September 17, 2001. Lopez Decl. ¶ 7, Attachment A (September 17, 2001 Decision). Defendants assert that "the BLM Washington, D.C. Office did not assist BLM Utah in reviewing SUWA's protest of the September 6, 2001, lease sale, in deciding to deny SUWA's protest, or in conducting the lease sale and issuing the leases. These decisions were made and actions were taken entirely by the Utah BLM." *Id.* ¶ 9. The twelve parcels of land in question are administered by the Utah BLM's Price, Moab and Monticello Field Offices. *Id.* ¶ 6.

*2 Defendants argue that transfer is appropriate in this action to the District Court for the District of Utah because 1) the specific lands at issue are located in Utah, 2) the leasing process at issue was undertaken solely in Utah, 3) leasing actions relating to land in Utah are of most direct interest to and most significantly affect the residents of that state, and 4) the convenience of the parties, counsel, and witnesses, should any be required, support transfer of the case. Def. Reply at 2. Plaintiffs contend that this Court should defer to their choice of forum because the issues related to the lands in Southern Utah are of "national interest," Pl. Opp'n at 2-3, and because the Washington, D.C. BLM headquarters "played a major role in determining the fate of Utah's public lands, including those at issue here...." Pl. Opp'n at 5.

## II. DISCUSSION

28 U.S.C. § 1404(a) states that "for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).[FN3] The Court is afforded broad discretion to determine whether transfer from one jurisdiction to another is proper. *Securities & Exchange Commission v. Savoy Indus. Inc.,* 587 F.2d 1149, 1154 (D.C.Cir.1978). The decision to transfer is made pursuant to an "individualized, case by case consideration of convenience and fairness." *Stewart Organization v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988). In determining whether transfer is appropriate the Court takes into consideration and balances a number of case specific factors relating to the private interests of the parties and the public interests of the courts. *Id.* at 30. The private interest considerations include: (1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the availability of witnesses; and (6) the ease of access to sources of proof. *See Trout Unlimited v. U.S. Dep't of Agric.,* 944 F.Supp. 13, 16 (D.D.C.1996); *see also Hawksbill Sea Turtle v. Federal Emergency Management Agency,* 939 F.Supp. 1, 3 (D.D.C.1996). The public interest considerations include: (1) the degree to which the courts in both venues are familiar with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home. *Trout Unlimited,* 944 F.Supp. at 16. The party moving for transfer of venue bears the burden of demonstrating that these factors weigh in favor of transfer pursuant to § 1404(a). *See Shapiro, Lifschitz & Schram, P.C. v. Hazard,* 24 F.Supp.2d 66, 71 (D.D.C.1998). The Court will consider each factor in turn.

> FN3. Whether an action "might have been brought" in a particular jurisdiction is determined by the venue provisions contained in 28 U.S.C. § 1391. It is undisputed that in this case venue is also proper

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 3
Not Reported in F.Supp.2d, 2002 WL 32617198 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

in the United States District Court for the District of Utah pursuant to 28 U.S.C. § 1391(e)(2) because a substantial part of the events in dispute took place in that state and the property in question is located in that state. 28 U.S.C. § 1391(e)(2) states in relevant part "[a] civil action in which a defendant is an officer or employee of the United States or any agency thereof ... or an agency of the United States ... may be brought in any judicial district in which ... a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated."

### A. Private Interest Factors

The first of the private interest factors, the plaintiff's choice of forum, "is due substantial deference and, unless the balance of convenience is strongly in favor of the defendants, should rarely be disturbed"*International Brotherhood of Painters & Allied Trades Union v. Best Painting and Sandblasting Co., Inc.,* 621 F.Supp. 906, 907 (D.D.C.1985). A case should not be transferred "from a plaintiff's chosen forum simply because another plaintiff, in the court's view, may be superior to that chosen by the plaintiff."*Pain v. United Technologies Corp.,* 637 F.2d 775, 783 (D.C.Cir.1980). However, the deference afforded to a plaintiff's choice of forum is diminished where "that forum has no meaningful ties to the controversy and no particular interest in the parties or subject matter."*Islamic Republic of Iran v. Boeing* Co., 477 F.Supp. 142, 144 (D.D.C.1979); *see also Hawksbill Sea Turtle v. FEMA,* 939 F.Supp. 1, 3 (D.D.C.1996) (noting that a plaintiff's choice of forum is entitled to less deference when there is "an insubstantial factual nexus with the plaintiff's choice.").

*3 In the present case, Plaintiffs have failed to demonstrate a substantial link between their choice of forum, the District of Columbia, and the facts of the controversy. The relationship between the challenged agency action-the sale and issuance of twelve oil and gas leases granted by the Utah Bur-

eau of Land Management-and this District is attenuated at best. In contrast, Utah has a substantial connection to the controversy. The authority to determine the propriety of such leases is vested in the Utah BLM State Director. The administrative decision of the Utah BLM to deny SUWA's protest was made without assistance from the BLM Washington, D.C. office and the lease sales took place at the direction of and under the auspices of the Utah BLM. Lopez Decl. ¶ 9. In addition, the land at issue in this action is located entirely within Southeast Utah and the twelve protested parcels of land are administered by the Utah BLM's Price, Moab and Monticello Field Offices. *Id.* ¶ 6. Moreover, any decision regarding the Utah lands will have an impact most directly on the citizens of Utah.

Plaintiffs attempt to argue that the fate of these parcels of land is of "national interest" and that, therefore, there is a sufficient connection with this District. Plaintiffs further contend that the Washington, D.C. BLM office had a hand in influencing the decision of the Utah BLM. Plaintiffs rely primarily on *The Wilderness Soc'y v. Babbitt,* 104 F.Supp.2d 10 (D.D.C.2000), in which the court found that transfer was inappropriate. In *Wilderness Soc'y* the plaintiffs challenged the Department of Interior's Final Integrated Activity Plan/Environmental Impact Statement ("FEIS") and alleged that the DOI failed to properly address the environmental impact of oil and gas development in the National Petroleum Reserve planning area in Alaska ("NPR-A").*Wilderness Soc'y,* 104 F.Supp.2d at 11. In concluding that transfer was inappropriate the court found that there was a sufficient connection between the challenged conduct and the District of Columbia. Specifically, the court noted that the DOI had held a public meeting in Washington, D.C. to solicit comments on the draft FEIS, that former Secretary Babbitt was substantially involved in the DOI's review of the impact of oil and gas leasing on the environment in the NPR-A, and that Secretary Babbitt personally made the final challenged decision regarding the FEIS. *Id.* at 14;*see also Greater Yellowstone Coalition v. Bosworth,* 180 F.Supp.2d 124 (D.D.C.2001) (finding that where federal government officials in the District of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32617198 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

Columbia were involved in the decision to issue grazing permits, the case had national significance and transfer was inappropriate). In addition, the *Wilderness Soc'y* court determined that the NPR-A related to the oil supply that would be used nationwide and therefore, impacted more than just the local residents of Alaska. No similar claim can be made here. Plaintiffs have not pointed to significant action taken in Washington, D.C. such as the public hearing held in *Wilderness Soc'y* and has not demonstrated the type of substantial personalized involvement by a member of the Washington, D.C. BLM that supports a finding of "meaningful ties" to this District. Additionally, Robert Lopez, Chief, Branch of Minerals Adjudication, BLM Utah State Office affirmed that the "decisions [at issue] were made and actions were taken entirely by the Utah BLM." Lopez Decl. ¶ 9.

**\*4** Turning to the second factor, the Court finds that the Defendants and Yates Petroleum's preference for having this case heard in the District Court in Utah is justified and must be given some weight. The District of Columbia's connection to this case is limited at best. The decision-making process and the decision itself occurred entirely within Utah and the administrative record and agency decisionmakers reside in Utah. The third factor to consider, whether the claim arose elsewhere, also weighs in favor of transfer. As discussed above, the complained of action, the lease sale of twelve parcels of public land, occurred in Utah and Plaintiffs have not pointed to actions arising in Washington, D.C. that support a finding that the claim arose in this District. The fourth factor, the convenience of the parties is balanced between the parties. Plaintiff, SUWA, is headquartered in Utah and cannot claim inconvenience. Plaintiff NRDC, maintains an office in San Francisco, California, as well as in Washington D.C. Yates Petroleum maintains that Utah is a more convenient location for it as its headquarters are located in Artesia, New Mexico. Yates Petroleum's Notice of Support at 9. Defendants' counsel is located in Washington, D.C., however, "any inconvenience to [Defendants' counsel] is offset by the fact that they represent the party requesting transfer."*Northwest Forest Resource Council v.*

*Babbitt,* 1994 WL 908586, \*3 n. 6 (D.D.C., April 13, 1994).

The fifth and sixth private interest factors to consider, the availability and convenience of witnesses, and the ease of access to sources of proof may be considered together. The parties agree that the agency's challenged action will likely require no witnesses and will therefore, be decided on the administrative record. *See* Pl. Opp'n at 13; Def. Mem. at 10. In a case such as this one, "[t]he convenience of witnesses ... has less relevance because this case involves judicial review of an administrative decision."*Trout Unlimited,* 944 F.Supp. at 17. Moreover, if witnesses are necessary it appears that any relevant witnesses regarding the agency's decision and actions reside in Utah. The administrative record in this case was generated by the Utah BLM and is currently maintained in "either BLM's Utah State Office or the relevant field offices."Lopez Decl. ¶ 10. Therefore, the Court finds that the availability and the convenience of the witnesses do not weigh in favor of either party and that the ease of access to sources of proof weighs in favor of transfer.

### 2. *Public Interest Factors*

The Court now turns to the three public interest factors. The first two factors, the degree to which the courts in both venues are familiar with the governing laws and the relative congestion of the calendars of the potential transferee and transferor courts weigh in favor of neither Plaintiffs nor Defendants. Both the District of Columbia and Utah Federal Courts are equally capable of determining issues of compliance with federal law under the NEPA, NHPA and APA. It is not apparent that transfer to the District of Utah will lead to any unnecessary delay due to docket congestion. Transfer to Utah would not lead to delay as this Court has not dealt with any issue in this suit other than the ones present here and has not become familiar with the underlying merits of the case. *See Trout,* 944 F.Supp. at 19 (finding that where the case was "in its earliest stages," no delay would be associated with the transferee court's having to familiarize it-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32617198 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

self with the case).

*5 The third, and arguably most important of the public interest factors, the local interest in deciding local controversies at home, weighs in favor of transfer. It is undisputed that "[t]here is a local interest in having localized controversies decided at home."*Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 509, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *see also Hawksbill Sea Turtle* at 3 n. 5 ("The Court also notes the importance of allowing local citizens to attend and observe the proceedings of the case" due to the local nature of the action). As the dispute in this instance will have the greatest impact on the citizens of Utah the Court finds that the third public interest factor weighs in favor of transfer.

*Yates Petroleum's Motion to Intervene*

Yates Petroleum proposes to intervene in this action as a defendant pursuant to Federal Rule of Civil Procedure 24(a)(2).[FN4] Neither Plaintiffs nor Defendants in this action oppose Yates Petroleum's intervention. This Circuit recognizes four requirements for intervention of right: (1) timeliness; (2) a cognizable interest; (3) impairment of that interest; and (4) lack of adequate representation by existing parties. *See Williams & Humbert, Ltd. v. W & H. Trade Marks, Ltd.,* 840 F.2d 72, 74 (D.C.Cir.1988); *see also Dimond v. District of Columbia,* 792 F.2d 179, 192 (D.C.Cir.1986). The Court of Appeals has described the interest test under Rule 24(a)(2) as "primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process."*Nuesse v. Camp,* 385 F.2d 694, 700 (D.C.Cir.1967); *see also Huron Environmental Activist League v. EPA,* 917 F.Supp. 34 (D.D.C.1996). Applying this liberal approach to the case at bar this Court will grant Yates Petroleum's motion.

> FN4.Federal Rule of Civil Procedure 24(a) states in relevant part "upon timely application anyone shall be permitted to intervene in an action ... (2) when an applicant claims an interest relating to the property or transaction which is the subject of the

action and applicant is so situated that the disposition of the action may as a practical matter impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

The first requirement of timeliness has been satisfied. Plaintiffs filed their Complaint on December 6, 2001. Yates Petroleum filed its motion to intervene sixty days after the Complaint on February 12, 2002. The Court finds that there has been no prejudicial delay in Yates Petroleum's filing of its motion. Yates Petroleum must also demonstrate a "cognizable interest" in the present action. Yates Petroleum, as the lessee of two of the challenged leases has a "direct, substantial, and legally protectable" interest in the subject matter of this litigation. *Stewart v. Rubin,* 948 F.Supp. 1077, 1105 (D.D.C.1996). Should Plaintiffs prevail in this action Yates Petroleum's interest in the leases will be significantly impaired. Plaintiff requests injunctive relief requiring the recision of the twelve challenged leases until Defendants comply with the requirements of NEPA and NHPA. Thus, Yates Petroleum has demonstrated compliance with the third requirement necessary for intervention. Finally, Yates Petroleum must demonstrate that its interests will not adequately be represented if it is not allowed to intervene. This requirement requires only a "minimal" showing and is satisfied if the applicant "shows that representation of his interest 'may be' inadequate."*Trbovich v. United Mine Workers of America,* 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972). Yates Petroleum contends that Defendants in this action are required to represent the "broad public interest as owners of the public lands and as lessors under the Leases."Yates Petroleum Mem. at 4. Yates Petroleum maintains that as a lessee, it has expended substantial funds in its pursuit of the leases and that Defendants "will not adequately represent the specific interests or economic concerns of Yates Petroleum, a private entity."*Id.* The Court finds that Yates Petroleum has met its minimal burden of demonstrating that its interests may not be satisfactorily represented by Defendants in this action. Accordingly, this Court will grant Yates Petroleum's motion to intervene.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 6
Not Reported in F.Supp.2d, 2002 WL 32617198 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

### III. CONCLUSION

*6 Having consider the arguments of all parties for and against transfer, the Court finds that transfer in appropriate. Plaintiffs have failed to demonstrate that this District has meaningful ties to the controversy. The Court concludes that the public and private interest factors weigh in favor of transfer to the District of Utah. Accordingly, this Court will grant Defendants' motion to transfer the action to the District Court of the District of Utah. In addition, the Court shall grant Yates Petroleum's Motion to Intervene pursuant to Federal Rule of Procedure 24(a)(2). An appropriate Order accompanies this Memorandum Opinion.

D.D.C.,2002.
Southern Utah Wilderness v. Norton
Not Reported in F.Supp.2d, 2002 WL 32617198 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing MEMORANDUM IN SUPPORT OF THE MOTION OF STATE OF WYOMING TO INTERNVENE was served by placing the same in the United States mail, postage prepaid this 27th day of November, 2007 to the following:

Sharon Buccino
Natural Resources Defense Council
1200 New York Avenue, NW
Suite 400
Washington, D.C. 20005

Michael B. Wigmore
Bingham McCutchen LLP
2020 K Street, NW
Washington, DC 20006

Lori Caramanian
United States Department of Justice
Environmental & Natural Resource Division
1961 Stout Street, 8th Floor
Denver, CO 80294

Aaron Bloom
Natural Resource Defense Counsel
40 West 20th Street
New York, NY 10011

Robert Charles Mathes
Bjork Lindley Little, PC
1600 Stout Street, Suite 1400
Denver, CO 80202-3110

/s/ Kristen A. Dolan
Kristen A. Dolan
Assistant Attorney General
Wyoming Attorney General's Office
123 Capitol Building
Cheyenne, WY 82002
(307) 777-6946
(307) 777-3542 facsimile
kdolan@state.wy.us

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL<br>1200 New York Avenue, NW, Suite 400<br>Washington, DC  20005,            et al.<br><br>               Plaintiff,<br><br>     v.<br><br>DIRK KEMPTHORNE, in his official<br>Capacity as the Secretary of the United States<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC  20240<br><br><br><br>STATE OF WYOMING<br>123 Capitol Building<br>Cheyenne, WY  82002<br><br>               Movant-Intervenor | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE No. 1:07-cv-01709-RJL |

## DECLARATION OF VERN STELTER

I, Vern Stelter, swear and affirm under the penalties of perjury that I am over 18 years of age and otherwise competent to testify as to the matters herein, which are based on my personal knowledge.

1.      I am the Habitat Protection Program Supervisor for the State of Wyoming Game and Fish Department ("WGFD"), Office of the Director.  As such, I am responsible for overseeing the involvement with the Atlantic Rim Natural Gas Development Project ("ARP") in Carbon County, Wyoming on behalf of the WGFD.  I am familiar with the Record of Decision ("ROD") and the Environmental Impact Statement ("EIS") issued by the Bureau of Land Management ("BLM") that is at issue in this case.

2.      Wyoming has a sovereign interest over the control of the development of coalbed methane resources within Wyoming, its interests in the protection of its land, air, water, wildlife, rangeland, grazing and cultural resources, and its interest in the revenue generated by coalbed methane production in Wyoming.  Wyoming has extensive regulatory and permitting authority over the lands subject to the ARP ROD, including state lands and minerals that comprise a portion of the ARP.

3.      Plaintiff contests the Wyoming State Office, BLM Record of Decision ("ROD") dated March 23, 2007, for the ARP Final Environmental Impact Statement ("FEIS").  Plaintiff seeks to overturn the ROD's approval of the development of approximately 2,000 additional oil and gas wells within the Atlantic Rim project area ("ARPA"), and the plan of future management of the federal surface and mineral estates in the ARPA.  *See* Record of Decision, Environmental Impact Statement for the Atlantic Rim Natural Gas Field Development Project, Carbon County, Wyoming ("ROD"), Mar. 2001, p. 1.

4.     The Project area comprises approximately 270,080 acres, of which 173,672 acres are federal surface estate (64% of ARPA), 14,060 acres are state surface estate (5%), and 82,348 acres are private surface estate (31%). *See* ROD at p. 1. The BLM's Rawlins Field Office manages more mineral estate than surface estate within the ARPA: 179,438 acres of federal mineral estate (66%), 12,384 acres of state mineral estate (5%), and 78,258 acres of private mineral estate (29%). *Id.*

5.     The ARP is expected to produce 1,350 billion cubic feet of natural gas, enough to heat 19.3 million homes for one year, and generate approximately $958 million in total taxes and royalties. *Id.*

6.     Anadarko Energy and Petroleum Company, LP, Double Eagle Petroleum and Mining Company, Warren Resources, Inc., and other companies (collectively referred to as "Operators") proposed the ARP. *See* FEIS, Wyo. State Office, BLM, Cover Ltr., Nov. 27, 2006, p. 1. Scoping for the ARP was initiated in 2001 as the "Atlantic Rim Coalbed Methane Project." *Id.* The proponents subsequently modified their proposal to reduce the number of coalbed natural gas wells and develop a limited number of conventional gas wells. The project was re-named the "Atlantic Rim Natural Gas Field Development Project" in 2003. *Id.*

7.     In June 2001, the BLM issued a Notice of Intent to prepare an environmental impact statement and conduct scoping for the ARP. *See* 66 Fed. Reg. 33,975 (June 26, 2001). The BLM released the ARP Draft EIS ("DEIS") for public comment on December 12, 2005. *See* 70 Fed. Reg. 73481 (Dec. 12, 2005). On December 1, 2006, the BLM released the FEIS for public comment. *See* 71 Fed. Reg. 69582-01 (Dec. 1, 2006). On March 23, 2007, Wyoming BLM State Director, Robert A. Bennett signed the ROD. *See* ROD at p. 22.

8.     Plaintiff filed an administrative appeal and a request for stay with the Interior Board of Land Appeals ("Board") (IBLA-2007-208), challenging BLM's FEIS and ROD for the ARP.  In addition, Environmental Preservation Foundation and Habitat for Wildlife (IBLA 2007-226), Biodiversity Conservation Alliance, et al. (IBLA-2007-210), and National Wildlife Federation (IBLA 2007-277) each filed separate administrative appeals before the Board.  On July 18, 2007, the Board recognized Wyoming's interests and granted its motion to intervene in IBLA-2007-208.  On September 5, 2007, the Board denied Plaintiff's request for a stay. Following Plaintiff's request, the Board dismissed IBLA-2007-208 on September 12, 2007.

9.     The ROD adopted the BLM's Preferred Alternative (Alternative D) as described in the FEIS, with modifications for the development of natural gas resources in the ARPA.  *See* ROD at p. 1.  Modifications to Alternative D include the use of Performance Goals and the option to consider protective measures described in Alternative C.  *Id.* at pp. 1, 19-20.  The selected alternative allows drilling of approximately 2,000 gas wells while limiting total surface disturbance to a maximum of 7,600 acres (2.8% of the project area) at any given time and imposes a 6.5 acre per well site short-term (less than six years) disturbance goal.  *Id.* at p. 1. Development is limited to eight well sites per 640 acre section, which includes coalbed natural gas, conventional and injection wells.  *Id.* at p. 2.

10.     Operators must initiate reclamation of disturbed land after completion of drilling activities.  *Id.* at p. 3, App. A.  Development and reclamation will be managed through a performance-based adaptive management process to ensure management objectives are met and Performance Goals are achieved.  *Id.* at p. 3, App. B.  Monitoring will be used to determine if best management practices, conditions of approval, protective measures, reclamation criteria and mitigation measures need to be modified.  *Id.*  Additionally, the ROD created a Review Team

4

comprised of personnel from the BLM, cooperating and interested agencies and the Operators to develop the performance based, adaptive management process and provide quantifiable criteria to identify trends associated with the Performance Goals. *Id.*

11.     The Operators will finance and operate air quality equipment to monitor $NO_x$, $O_3$, $PM_{10}$ and $SO_2$ in the Rawlins Field office management area. *Id.* at p. 7, App. B, p. B-5. The BLM, the Wyoming Department of Environmental Quality ("WDEQ"), the U.S. Environmental Protection Agency and the Operators will cooperate to maintain and enhance concentration monitoring in the Rawlins Field Office management area. *Id.* The Operators may voluntarily contribute to wildlife and habitat monitoring and the Operators are responsible for reclamation monitoring and reporting costs. *Id.* at pp. 20-21.

12.     The State and the Operators have committed to work cooperatively to monitor and protect the State's land use, paleontological values, air quality, soils, water, livestock, ranges, wildlife, plant species, visual, cultural and historic resources. *Id.* at App. B. Additionally, the BLM will pursue a programmatic agreement for the ARP with Wyoming's State Historic Preservation Office ("WSHPO") to develop protocols to be followed over the course of the ARP to mitigate potential adverse effects to historic properties, such as the Overland Trail, and their settings. *Id.* at p. 10.

13.     A comprehensive set of mandatory Operator-committed practices, set forth at App. C of the ROD, adds another layer of environmental protection. These include annual work plans for operational plans of development rather than piecemeal individual Applications for Permission to Drill ("APD"), staking/inspecting proposed facilities to ensure consistency with the Great Divide Resource Management Plan ("RMP") and oil and gas lease provisions,

submission of more detailed construction plans, and project-wide rather than individual APD's. *See* ROD, App. C, at pp. C-1, C-2.

14.    Wyoming was a cooperating agency throughout the NEPA process. *See* FEIS, p. ES-1. Included among the Wyoming state agencies actively participating were the State Planning Office, WGFD, WSHPO, WDEQ and Department of Agriculture ("WDOA"). *Id.* The Wyoming Office of the Governor ("WOG"), WDOA, Office of State Lands and Investments, State Engineer's Office ("WSEO"), WDEQ, and WGFD participated on behalf of the State by commenting on the DEIS. *Id.* at App. N, document numbers 681, 678, 674, 664, 466, 413 (agencies comments, respectively). In addition, the WOG, WDOA, WDEQ, WGFD and the WSHPO commented on the FEIS. *See* ROD, App. E, at p. E-11.

15.    The combined economic impact of drilling, field development and production phases of the ARP is estimated at $7.6 billion dollars over the 40-year life of the project. *See* FEIS at p. 4-124.

16.    It is estimated that the State will receive $160 million dollars for its share of federal mineral royalties, $8.4 million dollars from state mineral royalties, and $271 million dollars in state severance taxes for a total of over $439 million dollars over the 40-year life of the project. *See* FEIS, at p. 4-137. In addition, ad valorem property taxes are estimated at $349 million dollars over the life of the project and sales and use taxes based on a 20-year drilling cycle are estimated at $17.2 million dollars. *See* FEIS, at pp. 4-135, 4-138.

17.    Wyoming's share of the federal royalty funds are distributed to the University of Wyoming, the School Foundation fund, the Highway fund, the Legislative Royalty Impact Account, and cities, towns and counties throughout Wyoming. *See* FEIS at p. 3-143.

18.    Wyoming has a significant interest in upholding the BLM's EIS and ROD because a decision that is adverse to or delays implementing the ROD significantly impacts Wyoming, its economy and its citizens as a result of lost and delayed revenue and diminished capability to provide important services.

19.    Following the issuance of the ROD, and before any ground disturbing activity could proceed, operators were required to submit an application for permit to drill ("APD") containing a detailed proposal for on-the-ground operations to the BLM and the Wyoming Oil and Gas Conservation Commission. *See* ROD at p. 3.

20.    Following the submission of several APDs, the BLM relied on the first challenged EA and approved plans PODs in the Catalina Unit for 39 wells and associated infrastructure on June 28, 2007. *See* Catalina A & B PODs EA at p. 11. On August 16, 2007, the BLM approved PODs in the Sun Dog Unit for 51 wells (48 development wells and 3 injection wells) and associated infrastructure based on a second EA. *See* Sun Dog A & B PODs EA at p. 11. On October 23, 2007, the BLM relied on a third EA in approving an additional 14 wells in Sun Dog POD C. *See* Sun Dog C POD EA at p. 11. Further, the BLM then relied on a fourth EA in approving an additional 34wells in Sun Dog POD D and E on October 23, 2007. *See* Sun Dog D &E PODs EA at p. 12.

21.    The EAs concluded "the impacts are not expected to be significant, and that an EIS is not required." *See* Catalina A & B PODs EA at 11; Sun Dog A & B PODs EA at p. 11; Sun Dog C POD at p. 11; Sun Dog D & E PODs EA at p. 12.

_Vern Stelter_
Vern Stelter

## ACKNOWLEDGMENT

STATE OF WYOMING )
)
COUNTY OF NATRONA )

The foregoing instrument was acknowledged before me by Vern Stelter, as Habitat Protection Program Supervisor, Wyoming Game and Fish Department on this 26th day of ~~October,~~ 2007.
November (js

Witness my hand and official seal.

_Connie J. Schepp_
Notary Public

My Commission Expires MAR. 31, 2009

CONNIE J. SCHEPP - NOTARY PUBLIC
COUNTY OF LARAMIE      STATE OF WYOMING
MY COMMISSION EXPIRES MAR. 31, 2009

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, et al.<br>1200 New York Avenue, NW, Suite 400<br>Washington, D.C. 20005,<br><br>        Plaintiffs<br><br>        v.<br><br>DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States, et al.<br>Department of Interior<br>1849 C Street, NW<br>Washington, D.C. 20240,<br><br>        Defendants<br><br>STATE OF WYOMING<br>123 Capitol Building<br>Cheyenne, WY 82002<br><br>        Movant-Intervenor | Civ. No. 07-cv-01709-RJL<br><br><br><br><br>[PROPOSED] ANSWER |

## ANSWER OF THE STATE OF WYOMING TO PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendant-Intervenor State of Wyoming ("State") for its Answer in response to the First Amended Complaint for Declaratory and Injunctive Relief ("Amended Complaint") filed by the Plaintiffs Natural Resources Defense Council, Biodiversity Conservation Alliance, Wyoming Outdoor Council, Western Watersheds Project, and Wyoming Wilderness Association ("Plaintiffs") in the above-captioned matter states as follows:

1.     The allegations in Paragraph 1 of the Amended Complaint consist of Plaintiffs' description of the nature of this action and thus require no response. To the extent a response is required, Defendant-Intervenor denies the allegations.

2.     The allegations in Paragraph 2 of the Amended Complaint consist of Plaintiffs' description of the nature of this action and thus require no response. To the extent a response is deemed required, Defendant-Intervenor denies the allegations.

3.     Defendant-Intervenor admits that the Catalina and Sun Dog federal oil and gas units exist within the Atlantic Rim Natural Gas Field Development Project ("ARP"). Defendant-Intervenor admits that prior to the Plaintiffs filing the initial complaint in this action on September 25, 2007, the Bureau of Land Management ("BLM") prepared two Environmental Assessments ("EAs") and Decision Records ("DRs") approving 90 new wells in the ARP. Defendant-Intervenor admits that BLM approved those 90 wells as part of four Plans of Development ("PODS"). Defendant-Intervenor denies the remaining allegations in Paragraph 3 of the Amended Complaint.

4.     Defendant-Intervenor admits the allegations in the first and second sentences in Paragraph 4 of the Amended Complaint. Defendant-Intervenor denies the remaining allegations in this paragraph.

5.     Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 5 of the Amended Complaint and therefore denies same.

6.     The allegations in Paragraph 6 of the Amended Complaint consist of Plaintiffs' characterization of the nature of the action and thus require no response. To the extent a response is deemed required, Defendant-Intervenor denies the allegations.

7.    Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 7 of the Amended Complaint and therefore denies same.

8.    Defendant-Intervenor denies the allegations in Paragraph 8 of the Amended Complaint.

9.    Defendant-Intervenor denies the allegations in Paragraph 9 of the Amended Complaint.

## JURISDICTION AND VENUE

10.    Defendant-Intervenor admits that 28 U.S.C. § 1331 provides this Court with subject matter jurisdiction over the first four claims set forth in the Amended Complaint, in the absence of any other jurisdictional defect.  Defendant-Intervenor denies that this Court has jurisdiction over Plaintiffs' fifth cause of action because Plaintiffs failed to satisfy the notice requirements of 33 U.S.C. § 1365(b).  The allegations in the last sentence of Paragraph 10 of the Amended Complaint constitute legal conclusions that require no response.  To the extent a response is deemed required, Defendant-Intervenor denies the allegations.  Defendant-Intervenor denies the remainder of the allegations in Paragraph 10 of the Amended Complaint.

11.    Defendant-Intervenor denies the allegations in Paragraph 11 of the Amended Complaint.

12.    Defendant-Intervenor admits that venue is proper in this Court pursuant to 28 U.S.C. § 1391(e), because Defendants are located in Washington, D.C.  Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in the remainder of Paragraph 12 of the Amended Complaint and therefore denies same.

## PARTIES

13.     Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 13 of the Amended Complaint and therefore denies same.

14.     Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 14 of the Amended Complaint and therefore denies same.

15.     Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 15 of the Amended Complaint and therefore denies same.

16.     Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 16 of the Amended Complaint and therefore denies same.

17.     Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 17 of the Amended Complaint and therefore denies same.

18.     Defendant-Intervenor admits the allegations in Paragraph 18 of the Amended Complaint.

19.     Defendant-Intervenor admits that the United States Department of the Interior is a federal agency responsible for managing federal public lands.  Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in the remainder of the first sentence of Paragraph 19 of the Amended Complaint and therefore denies same.  The allegations in the last sentence of Paragraph 19 of the Amended Complaint contain a

characterization of the law that requires no response.  To the extent that these allegations are deemed to require a response, they are denied.

20.     Defendant-Intervenor admits that the Bureau of Land Management is the agency with the U.S. Department of the Interior responsible for managing oil and gas exploration, leasing, and development on federal lands.  The remaining allegations in the first sentence of Paragraph 20 of the Amended Complaint constitute a characterization of the law that requires no response.  To the extent that these allegations are deemed to require a response, they are denied. Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in the last sentence of Paragraph 20 of the Amended Complaint and therefore denies same.

## STATUTORY AND REGULATORY FRAMEWORK

### National Environmental Policy Act

21.     The allegations in Paragraph 21 of the Amended Complaint set out a depiction of the law that requires no response.  Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations are deemed to require a response, they are denied.

22.     The allegations in Paragraph 22 of the Amended Complaint set out a depiction of the law that requires no response.  Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations are deemed to require a response, they are denied.

23.     The allegations in Paragraph 23 of the Amended Complaint set out a depiction of the law that requires no response.  Defendant-Intervenor specifically refers to the cited source in

its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations are deemed to require a response, they are denied.

24.    The allegations in Paragraph 24 of the Amended Complaint set out a depiction of the law that requires no response. Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations are deemed to require a response, they are denied.

25.    The allegations in Paragraph 25 of the Amended Complaint set out a depiction of the law that requires no response. To the extent that these allegations are deemed to require a response, they are denied.

26.    The allegations in Paragraph 26 of the Amended Complaint set out a depiction of the law that requires no response. To the extent that these allegations are deemed to require a response, they are denied.

27.    The allegations in Paragraph 27 of the Amended Complaint set out a depiction of the law that requires no response. Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations are deemed to require a response, they are denied.

28.    The allegations in Paragraph 28 of the Amended Complaint set out a depiction of the law that requires no response. Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations are deemed to require a response, they are denied.

29.    The allegations in Paragraph 29 of the Amended Complaint set out a depiction of the law that requires no response. Defendant-Intervenor specifically refers to the cited source in

its entirety for its words, substance, meaning, content or context thereof, and, to the extent that

these allegations are deemed to require a response, they are denied.

30.     The allegations in Paragraph 30 of the Amended Complaint set out a depiction of

the law that requires no response. Defendant-Intervenor specifically refers to the cited source in

its entirety for its words, substance, meaning, content or context thereof, and, to the extent that

these allegations are deemed to require a response, they are denied.

**The Clean Water Act**

31.     The allegations in Paragraph 31 of the Amended Complaint set out a depiction of

the law that requires no response. Defendant-Intervenor specifically refers to the cited source in

its entirety for its words, substance, meaning, content or context thereof, and, to the extent that

these allegations are deemed to require a response, they are denied.

32.     In response to the first sentence of Paragraph 32 of the Amended Complaint,

Defendant-Intervenor specifically refers to the cited source in its entirety for its words,

substance, meaning, content or context thereof, and, to the extent that these allegations are

deemed to require a response, they are denied. In response to the third sentence of Paragraph 32

of the Amended Complaint, Defendant-Intervenor admits that the Final Environmental Impact

Statement ("FEIS") for the Atlantic Rim Development Project area identified surface waters in

or near the ARPA that are classified by the State for certain designated uses, include drinking

water, fish and other aquatic life, recreation, wildlife and scenic value. The remaining

allegations in Paragraph 32 of the Amended Complaint set out a depiction of the law that

requires no response.

33.     Defendant-Intervenor denies the allegations in the second sentence of Paragraph

33 of the Amended Complaint. The allegations in the remainder of Paragraph 33 of the

Amended Complaint constitute a characterization of law that requires no response. Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

### The Federal Land Policy and Management Act

34.    The allegations in Paragraph 34 of the Amended Complaint set out a depiction of the law that requires no response. Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations are deemed to require a response, they are denied.

35.    The allegations in Paragraph 35 of the Amended Complaint set out a depiction of the law that requires no response. Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations are deemed to require a response, they are denied.

36.    The allegations in Paragraph 36 of the Amended Complaint set out a depiction of the law that requires no response. Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations are deemed to require a response, they are denied.

### Oil and Gas Drilling

37.    Defendant-Intervenor denies the allegations in Paragraph 37 of the Amended Complaint. Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof.

38.    The allegations in Paragraph 38 of the Amended Complaint set out a depiction of the law that requires no response. Defendant-Intervenor specifically refers to the cited source in

its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations are deemed to require a response, they are denied.

39.    Defendant-Intervenor denies the last sentence of Paragraph 39 of the Amended Complaint. The remaining allegations in Paragraph 39 of the Amended Complaint set out a depiction of the law and/or a characterization of this action that requires no response. Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations are deemed to require a response, they are denied.

### FACTUAL BACKGROUND

40.    Defendant-Intervenor denies the allegations in the first sentence of Paragraph 40 of the Amended Complaint. In response to the remaining allegations in Paragraph 40, Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations are deemed to require a response, they are denied.

41.    In response to the allegations in Paragraph 41 of the Amended Complaint, Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

42.    Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 42 of the Amended Complaint and therefore denies same. Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

43.     In response to the allegations in Paragraph 43 of the Amended Complaint, Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations are deemed to require a response, they are denied.

44.     In response to the allegations in Paragraph 44 of the Amended Complaint, Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations are deemed to require a response, they are denied.

45.     In response to the allegations in Paragraph 45 of the Amended Complaint, Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations are deemed to require a response, they are denied.

46.     Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 46 of the Amended Complaint and therefore denies same.  Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations are deemed to require a response, they are denied.

47.     Defendant-Intervenor admits that in February 2002, BLM issued a call for data for the revision of the Great Divide Resource Management Plan ("RMP").  Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in the last sentence of Paragraph 47 of the Amended Complaint and therefore denies same.

48.     Defendant-Intervenor admits that on January 31, 2003, the BLM issued a scoping notice to identify issues to be addressed in the Environmental Impact Statement ("EIS") for the revision of the Great Divide RMP, to become the Rawlins RMP.  Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in the remainder of Paragraph 48 of the Amended Complaint and therefore denies same.

49.     Defendant-Intervenor admits that on December 17, 2004, BLM released a Draft EIS for the Rawlins RMP.  Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in the remainder of Paragraph 49 of the Amended Complaint and therefore denies same.

50.     Defendant-Intervenor admits that allegations in Paragraph 50 of the Amended Complaint.

51.     The allegations in Paragraph 51of the Amended Complaint set out a depiction of the nature of this action that requires no response.  To the extent a response is deemed required, Defendant-Intervenor denies the allegations.

52.     Defendant-Intervenor admits that on December 12, 2005, the BLM issued a Draft EIS for the proposed Atlantic Rim Natural Gas Field Development Project ("ARP").  Defendant-Intervenor admits that the proposed action in the Draft EIS for the ARP was to develop the natural gas resource by drilling approximately 2,000 new natural gas wells.  Defendant-Intervenor admits that the ARP sits within the Red Desert southwest of the town of Rawlins.  Defendant-Intervenor admits that the proposed action in the Draft EIS for the ARP included new roads and pipelines.  In response to the remainder of the allegations in Paragraph 52 of the Amended Complaint, Defendant-Intervenor specifically refers to the cited source in its entirety

for its words, substance, meaning, content or context thereof, and, to the extent that they are deemed to require a response, they are denied.

53. Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 53 of the Amended Complaint and therefore denies same.

54. Defendant-Intervenor admits that in late 2006, BLM released a Final EIS ("FEIS") for the proposed ARP.

55. Defendant-Intervenor admits the allegations in Paragraph 55 of the Amended Complaint and therefore denies same.

56. Defendant-Intervenor admits that on May 21, 2007, the BLM issued a Record of Decision ("ROD") outlining a management plan for the ARP. In the ROD, the BLM stated that it will conduct the appropriate level of environmental review prior to authorizing applications for permits to drill, right-of-way grants, sundry notices and applications for special use permits associated with the project. Defendant-Intervenor denies the remainder of the allegations in Paragraph 56 of the Amended Complaint.

57. Defendant-Intervenor admits the allegations in Paragraph 57 of the Amended Complaint.

58. Defendant-Intervenor admits the allegations in Paragraph 58 of the Amended Complaint.

59. Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of the averments in the first sentence of Paragraph 59 of the Amended Complaint and therefore denies same. The allegations in the second sentence of Paragraph 59 of

the Amended Complaint set out a characterization of the law that requires no response. To the extent that these allegations are deemed to require a response, they are denied.

60.    Defendant-Intervenor admits the allegations in the first three sentences of Paragraph 60 of the Amended Complaint. Defendant-Intervenor denies the allegations in the last sentence of Paragraph 60 of the Amended Complaint.

61.    Defendant-Intervenor denies the allegations in Paragraph 61 of the Amended Complaint.

62.    Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of averments in Paragraph 62 of the Amended Complaint and therefore denies same.

63.    Defendant-Intervenor admits the allegations in Paragraph 63 of the Amended Complaint.

64.    Defendant-Intervenor denies the allegations in Paragraph 64 of the Amended Complaint.

65.    Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of averments in Paragraph 65 of the Amended Complaint and therefore denies same.

66.    Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of averments in Paragraph 66 of the Amended Complaint and therefore denies same.

67.    Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of averments in Paragraph 67 of the Amended Complaint and therefore denies same.

68.    Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of averments in Paragraph 68 of the Amended Complaint and therefore denies same.

69.    Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of averments in Paragraph 69 of the Amended Complaint and therefore denies same.

70.    Defendant-Intervenor admits the allegations in the first sentence of Paragraph 70 of the Amended Complaint.  Defendant-Intervenor denies the allegations in the second sentence of Paragraph 70.  Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of averments in the last sentence of Paragraph 70 of the Amended Complaint and therefore denies same.

### FIRST CAUSE OF ACTION

71.    Defendant-Intervenor restates and incorporates by reference its responses in Paragraphs 1 through 70 as if fully set forth herein.

72.    The allegations in Paragraph 72 of the Amended Complaint set out a depiction of the law that requires no response.  Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent these allegations require a response, they are denied.

73.    The allegations in Paragraph 73 of the Amended Complaint set out a depiction of the law that requires no response.  Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent these allegations require a response, they are denied.

74.     Defendant-Intervenor denies the allegations in Paragraph 74 of the Amended Complaint.

75.     Defendant-Intervenor admits that in the ROD for the ARP, BLM stated that it will conduct the appropriate level of environmental review prior to authorizing applications for permits to drill, right-of-way grants, sundry notices, and applications for special use permits associated with the project.

76.     Defendant-Intervenor denies the allegations in Paragraph 76 of the Amended Complaint.

77.     Defendant-Intervenor denies the allegations in Paragraph 77 of the Amended Complaint.

78.     Defendant-Intervenor denies the allegations in Paragraph 78 of the Amended Complaint.

79.     Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of averments in Paragraph 79 of the Amended Complaint and therefore denies same.

80.     Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of averments in Paragraph 80 of the Amended Complaint and therefore denies same.

81.     Defendant-Intervenor admits that BLM did not attribute its decision to approve Sun Dog C, D, and E PODs to an emergency circumstance.  Defendant-Intervenor denies the remainder of the allegations in Paragraph 81 of the Amended Complaint.

82.     Defendant-Intervenor admits that BLM prepared and approved Environmental Assessments/Findings of No Significant Impact ("EA/FONSIs") for the Sun Dog C, D, and E

PODs. Defendant-Intervenor admits that BLM approved Applications for Permits to Drill ("APDs") for 48 new wells in Sun Dog C, D, and E PODs. Defendant-Intervenors deny the remainder of the allegations in Paragraph 82 of the Amended Complaint.

83.    Defendant-Intervenor denies the allegations in Paragraph 83 of the Amended Complaint.

SECOND CAUSE OF ACTION

84.    Defendant-Intervenor restates and incorporates by reference its responses in Paragraphs 1 through 83 as if fully set forth herein.

85.    The allegations in Paragraph 85 of the Amended Complaint set out a depiction of the law that requires no response. Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

86.    Defendant-Intervenor admits that the greater sage grouse is a BLM Wyoming sensitive species. Defendant-Intervenor denies the remainder of the allegations in Paragraph 86 of the Amended Complaint.

87.    Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of averments in Paragraph 87 of the Amended Complaint and therefore denies same.

88.    Defendant-Intervenor denies the allegations in Paragraph 88 of the Amended Complaint.

89.    Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of averments in Paragraph 89 of the Amended Complaint and therefore denies same.

90.    Defendant-Intervenor denies the allegations in Paragraph 90 of the Amended Complaint.

91.    Defendant-Intervenor does not have sufficient information or knowledge to form a belief as to the truth of averments in Paragraph 91 of the Amended Complaint and therefore denies same.

92.    Defendant-Intervenor denies the allegations in Paragraph 92 of the Amended Complaint.

93.    Defendant-Intervenor denies the allegations in Paragraph 93 of the Amended Complaint.

94.    Defendant-Intervenor denies the allegations in Paragraph 94 of the Amended Complaint.

95.    Defendant-Intervenor admits that, in the FEIS for the ARP, BLM determined that the Proposed Action and Alternatives C and D were expected to result in impacts to the greater sage grouse that exceed the "significance criteria" identified in the ARP FEIS. Defendant-Intervenor denies the remainder of the allegations in Paragraph 95 of the Amended Complaint.

96.    Defendant-Intervenor denies the allegations in Paragraph 96 of the Amended Complaint.

97.    Defendant-Intervenor denies the allegations in Paragraph 97 of the Amended Complaint.

### THIRD CAUSE OF ACTION

98.    Defendant-Intervenor restates and incorporates by reference their responses in Paragraphs 1 through 97 as if fully set forth herein.

99.    The allegations in Paragraph 99 of the Amended Complaint set out a depiction of the law that requires no response. Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

100.    Defendant-Intervenor denies the allegations in Paragraph 100 of the Amended Complaint.

101.    Defendant-Intervenor denies the allegations in Paragraph 101 of the Amended Complaint.

102.    Defendant-Intervenor denies the allegations in Paragraph 102 of the Amended Complaint.

103.    Defendant-Intervenor denies the allegations in Paragraph 103 of the Amended Complaint.

### FOURTH CAUSE OF ACTION

104.    Defendant-Intervenor restates and incorporates by reference their responses in Paragraphs 1 through 103 as if fully set forth herein.

105.    The allegations in Paragraph 105 of the Amended Complaint constitute a characterization of law that requires no response. Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

106.    The allegations in the first sentence of Paragraph 106 of the Amended Complaint constitute a characterization of law that requires no response. To the extent that these allegations are deemed to require a response, they are denied. Defendant-Intervenor admits the allegations in the last sentence of Paragraph 106 of the Amended Complaint.

107.    Defendant-Intervenor denies the allegations in Paragraph 107 of the Amended Complaint.

108.    Defendant-Intervenor denies the allegations in Paragraph 108 of the Amended Complaint.

## FIFTH CAUSE OF ACTION

109.    Defendant-Intervenor restates and incorporates by reference their responses in Paragraphs 1 through 108 as if fully set forth herein.

110.    The allegations in Paragraph 110 of the Amended Complaint constitute a characterization of law that requires no response. Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

111.    The allegations in Paragraph 111 of the Amended Complaint constitute a characterization of law that requires no response. Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

112.    The allegations in Paragraph 112 of the Amended Complaint constitute a characterization of law that requires no response. Defendant-Intervenor specifically refers to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

113.    Defendant-Intervenor denies the allegations in Paragraph 114 of the Amended Complaint.

114.    Defendant-Intervenor denies each and every allegation of the Amended Complaint not previously admitted, explained, qualified, or denied.

**FIRST AFFIRMATIVE DEFENSE**

The Amended Complaint fails to state a claim upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE**

The Amended Complaint should be dismissed in whole or in part because Plaintiffs failed to exhaust administrative remedies and/or on the grounds of primary jurisdiction.

**THIRD AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred for lack of subject matter jurisdiction.

**FOURTH AFFIRMATIVE DEFENSE**

The Defendants did not violate any provisions of National Environmental Policy Act, the Clean Water Act, the Federal Land Policy and Management Act or the Administrative Procedure Act or act arbitrarily or capriciously in the development of the EIS, the ROD and the four EAs and FONSI/DRs challenged by Plaintiffs.

**FIFTH AFFIRMATIVE DEFENSE**

Plaintiffs have not presented the requisite facts or evidence to warrant the remedy it seeks.

**SIXTH AFFIRMATIVE DEFENSE**

Plaintiffs' fifth cause of action should be dismissed because Plaintiffs failed to satisfy the notice requirements of the Clean Water Act and this Court lacks subject matter jurisdiction over that claim. *See* 33 U.S.C. §1365(b).

The State reserves the right to assert additional defenses as they become known between the time of filing this Answer and trial.

## PRAYER FOR RELIEF

WHEREFORE, Defendant-Intervenor, State of Wyoming, prays for judgment as follows:

1.     To the extent that the Amended Complaint seeks declaratory judgment that the Defendants have violated the National Environmental Policy Act ("NEPA"), the Federal Land Policy and Management Act ("FLPMA"), the Clean Water Act ("CWA") or the Administrative Procedure Act ("APA"), and applicable implementing regulations, it is denied:

2.     To the extent that the Amended Complaint seeks injunctive relief directing Defendants to rescind the applications for permits to drill approved for Catalina A & B PODs and Sun Dog A, B, C, D and E PODs until the BLM corrects the alleged violations of NEPA, FLPMA, CWA, or the APA, it is denied;

3.     To the extent that the Amended Complaint seeks Injunctive relief prohibiting Defendants from approving any further applications to drill, or other ground-disturbing activity, tied to the ARP EIS until the BLM corrects the alleged violations of NEPA, FLPMA, CWA and the APA, it is denied;

4.     To the extent that the Amended Complaint seeks litigation expenses of the Defendants, it is denied;

5.     Judgment on the merits in favor of Defendants and Defendant-Intervenors and against the Plaintiffs; and

6.     For such other relief that this Court may deem just and proper.

Dated this 27th day of November, 2007

FOR THE STATE OF WYOMING

/s/ Jay Jerde
Jay Jerde
Deputy Attorney General

/s/ Kristen A. Dolan
Kristen A. Dolan
Senior Assistant Attorney General
Wyoming Attorney General's Office
123 Capitol Building
Cheyenne, WY 82002
(307) 777-6946
(307) 777-3542 Facsimile
kdolan@state.wy.us

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing ANSWER OF THE STATE OF WYOMING TO PLAINTIFFS' FIRST AMENDED COMPLAINT was served by placing the same in the United States mail, postage prepaid this 26th day of November, 2007 to the following:

Sharon Buccino
Natural Resources Defense Council
1200 New York Avenue, NW
Suite 400
Washington, D.C. 20005

Lori Caramanian
U.S. Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80294

Michael B. Wigmore
Bingham McCutchen, LLP
2020 K Street, NW
Washington, D.C. 20006

Aaron Bloom
Natural Resources Defense Counsel
40 West 20th Street
New York, NY 10011

Robert Charles Mathes
Bjork Lindley Little, PC
1600 Stout Street, Suite 1400
Denver, CO 80202-3110

/s/ Kristen A. Dolan
Kristen A. Dolan
Assistant Attorney General
Wyoming Attorney General's Office
123 Capitol Building
Cheyenne, WY 82002
(307) 777-6946
(307) 777-3542 facsimile
kdolan@state.wy.us

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATURAL RESOURCES DEFENSE )
COUNCIL, et al. )
1200 New York Avenue, NW, Suite 400 )
Washington, DC 20005, )
)
          Plaintiffs )
)
     vs. )      CASE NO.  07-cv-01709-RJL
)
DIRK KEMPTHORNE, in his official )
capacity as the Secretary of the United States )     [PROPOSED] ORDER
Department of the Interior )
1849 C. Street, N.W. )
Washington, DC  20240, )
)
      and )
)
UNITED STATES BUREAU OF LAND )
MANAGEMENT )
1849 C Street, N.W., Room 406-LS )
Washington, DC  20240, )
)
      Defendants )
)
_____ )
)
STATE OF WYOMING )
123 Capitol Building )
Cheyenne, WY  82002 )
)
     Defendant-Intervenor )
_____ )

UPON CONSIDERATION of the Motion of the State of Wyoming to Intervene as defendants in the above action pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure, and for good cause shown, it is hereby

ORDERED that the Motion of the State of Wyoming to Intervene is GRANTED, and that the State of Wyoming is hereby accorded party status as defendants as of right in this case; and

ORDERED that the Answer of the State of Wyoming be deemed filed.

Dated this __ day of _____, 2007

_____
United State District Court Judge