FILED

NOV 3 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATURAL RESOURCES DEFENSE** ) | |
| **COUNCIL**, *et al.,* ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civ. Action No. 07cv1709 (RJL)** |
| **v.** ) | |
| ) | |
| **DIRK KEMPTHORNE**, *et al.,* ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM OPINION**
(November **30** , 2007)[#2]

Plaintiffs Natural Resources Defense Council, Biodiversity Conservation Alliance,

Wyoming Outdoor Council, Western Watershed Project and Wyoming Wilderness

Association have sued Dirk Kempthorne, the Secretary of the Department of the Interior,

the Department of the Interior and the Bureau of Land Management ("BLM"), alleging

that the BLM's approval of approximately 90 applications for permits to drill ("APDs" or

"drilling permits") in the Atlantic Rim Project Area ("ARPA" or "Atlantic Rim area")

violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.,* the National

Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.,* the Federal Land Policy

Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.,* and the Clean Water Act

("CWA"), 33 U.S.C. §§ 1251 *et seq..*[1] Currently before the Court is the plaintiffs' motion

---

[1] On October 17, 2007 the Court granted the motion to intervene by Anadarko Petroleum, Warren Resources and Double Eagle Petroleum.



for a preliminary injunction seeking to enjoin certain ground disturbing activity pursuant

to the drilling permits already approved and to prohibit BLM from approving additional

applications to drill in the Atlantic Rim area.  After consideration of the parties'

submissions, the relevant caselaw, oral arguments of counsel and the entire record herein,

plaintiffs' motion is DENIED.

## I. BACKGROUND

The Atlantic Rim Project Area comprises more than 270,000 acres of BLM

managed land in south-central Wyoming.[2]  Final Environmental Impact Statement for the

Atlantic Rim Natural Gas Field Development Project ("FEIS"), p. 1-1 to 1-6.  Rich in oil

and natural gas deposits, this area of the state has been under development since the

1950s and now provides more than 5% of Wyoming's total gas production.  Record of

Decision, Environmental Impact Statement for the Atlantic Rim Natural Gas Field

Development Project ("ROD"), p. 7.

In May 2001, a consortium of oil and gas companies which ultimately included

Anadarko Petroleum ("Anadarko"), Warren Resources ("Warren") and Double Eagle

Petroleum ("Double Eagle"), submitted a proposal to the BLM to drill more than 3,880

---

[2]  Nationwide, the BLM is responsible for managing 258 million acres of public lands and associated mineral estates.  Defendant's Opposition to the Motion for a Preliminary Injunction ("Def.'s Opp."), p. 5.  ARPA falls within the Great Divide Resource Area, which comprises 4 million acres of public land surface and 5 million acres of federal mineral estate. Intervenors' Opposition to the Motion for a Preliminary Injunction ("Intervenor's Opp."), p. 2. In November 1990, BLM issued the Great Divide Resource Management Plan ("Great Divide RMP"), which called for the "sustained multiple use management" of the entire area.  Pursuant to this directive, BLM opened the entire Great Divide to oil and gas leasing.  *Id.*

natural gas wells in the Atlantic Rim area. Intervenors' Opposition to the Motion for a

Preliminary Injunction ("Intervenors' Opp."), p. 2. In December 2005, after four years of

study, BLM released a draft environmental impact statement ("EIS") for the project.[3] *Id*

at p. 3. After an opportunity for public notice and comment, BLM released its final

environmental impact statement ("FEIS") in December 2006. Compl. at 49-53. In

accordance with NEPA regulations, the FEIS identified the purpose and need of the

project, identified a range of alternative plans and analyzed their respective environmental

impacts.[4] FEIS, p. ES-1 to ES-7. Pursuant to its stated goal of optimizing natural gas

recovery while minimizing surface disturbance, BLM ultimately selected as its preferred

alternative, a plan to drill approximately 2,000 wells in the Atlantic Rim area but limit

development at any one time to no more than 7,600 acres (2.8% of the total project area).

*Id* at ES-2 to ES-3. After further notice and comment, BLM released its ROD approving

the plan on May 26, 2007. ROD, p. 1. Designated the Atlantic Rim Natural Gas

Development Project (the "Atlantic Rim Project" or "the project"), the project is expected

to produce 1,350 billion cubic feet of natural gas over its 30-50 year life-span, enough gas

to heat 19.3 million homes for one year. *Id* at p. 11.

---

[3] The National Environmental Protection Act ("NEPA"), requires all federal agencies to prepare and circulate for public review and comment an Environmental Impact Statement ("EIS") for any major federal action that will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C).

[4] Importantly, the final EIS deferred evaluation of site-specific environmental impacts until site-specific proposals were received. Complaint at ¶ 13.

Plaintiff Biodiversity Conservation Alliance, among others, appealed the ROD and
FEIS to the Interior Board of Land Appeals ("BLA"). Complaint at ¶ 55. That appeal
was denied on September 5, 2007. *Id* at ¶ 56.

In the meantime, on June 28, 2007, BLM approved Double Eagle's drilling
permits in the Catalina area of ARPA.[5] Catalina Environmental Assessment/Decision
Record ("Catalina EA"), p. 11. Anadarko's applications to drill in the Sun Dog area were
approved on August 16, 2007. Sun Dog Environmental Assessment/Decision Record
("Sun Dog EA"), p. 11. Before approving either proposal, BLM conducted site specific
environmental assessments ("EAs")[6] and concluded that "the [environmental] impacts
[were] not expected to be significant", and, therefore, that EISs were not required (a

---

[5] A company seeking permission to drill for oil or gas is required to submit an
application for permit to drill ("APD"). 43 C.F.R. § 3162.3-1(c). No drilling or surface
disturbance may occur prior to approval of the APD. *Id.* An APD must be submitted to the
authorized officer of BLM "at least 30 days before commencement of operations is desired." 43
C.F.R. § 3162.3-1(d). For APD on federal lands, the authorized officer is required to post
'information for public inspection at least 30 days before each action to approve the [APD]." 43
C.F.R. § 3162.3-1(g). This posting must be "in the office of the authorized officer." *Id.* This
posting is "for information purposes only" and a decision approving an APD cannot be appealed.
*Id.* Within 5 days after the 30-day period concludes, the BLM must either approve the
application, return it with reasons for dismissal, or explain why it cannot make a decision. 43
C.F.R. § 3162.3-1(h). After an APD is approved, a company may begin its drilling activities
immediately.

[6] In order to determine whether an EIS is required for a particular project, NEPA requires
the agency to conduct an environmental assessment ("EA"). 40 C.F.R. § 1501.4(b). The EA is a
"concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for
determining whether to prepare an [EIS]." 40 C.F.R. § 1508.9(a). If, upon conducting the EA,
the agency concludes that the proposed environmental impact will not be "significant," the
agency must issue a "finding of no significant impact" ("FONSI"), 40 C.F.R. § 1501.4(e), which
"briefly present[s] the reasons why an action ... will not have a significant effect on the human
environment," 40 C.F.R. § 1508.13.

finding of no significant impact ("FONSI")).  Development of the well sites and supporting infrastructure began soon after and (according to the defendants), is now largely complete.

Having lost their appeal before the BLA and hoping to halt further development, plaintiffs filed suit in this Court on September 28, 2007, claiming that BLM failed to comply with NEPA, the FLMPA and the CWA when it approved the Catalina and Sun Dog drilling permits.  Plaintiffs subsequently moved for a preliminary injunction to enjoin further development of the 90 sites already approved for drilling and to bar the BLM from considering other APDs currently pending.

## II. ANALYSIS

To prevail on a motion for a preliminary injunction, a plaintiff "must demonstrate: (1) a substantial likelihood of success on the merits; (2) that [they] would suffer irreparable injury if the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction." *Katz v. Georgetown Univ.*, 246 F.3d 685, 687-88 (D.C.Cir.2001) (internal quotations omitted).  These factors interrelate on a sliding scale and must be balanced against each other. *Davenport v. International Brotherhood of Teamsters, AFL-CIO*, 166 F.3d 356, 361 (D.C.Cir. 1999); *Dodd v. Fleming*, 223 F.Supp.2d 15, 19 (D.D.C. 2002).  However, "[i]f the plaintiff makes a particularly weak showing on one factor...the other factors may not be enough to compensate." *Dodd*, 223

F.Supp.2d at 20 (citing *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507 (D.C.Cir.

1995), amended on other grounds, 66 F.3d 1226 (D.C.Cir.1995)).  Indeed, courts in our

Circuit have held that "if a party makes no showing of irreparable injury, the court may

deny the motion for injunctive relief without considering the other factors." *Id.* at 20

(citing *City Fed Financial Corp. v. OTS*, 58 F.3d 738, 747 (D.C.Cir. 1995)).

Additionally, our Circuit mandates that a preliminary injunction cannot be issued unless a

movant can "demonstrate at least 'some injury'" to warrant the granting of an injunction,

and, if he fails to do so, the court need not consider the remaining factors for issuance of a

preliminary injunction. *City Fed. Fin. Corp.,* 58 F.3d at 747.  For the following reasons,

the Court concludes that the plaintiffs have not demonstrated a combination of these

factors that would warrant this extraordinary relief.

## A.  LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs have sued BLM pursuant to the APA claiming that BLM's approval of

the 90 drilling permits in the Catalina and Sun Dog areas violated, *inter alia*, NEPA and

the CWA.[7]  To succeed, plaintiffs must demonstrate that the BLM's decision to approve

these drilling permits was "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law." 5 U.S.C. § 706(2)(A).  In order to reach that conclusion this

Court must "consider whether the decision was based on a consideration of the relevant

---

[7]  Although plaintiffs have sued alleging that BLM violated the FLMPA in approving the Catalina and Sun Dog APDs, their FLMPA claim is not addressed in their motion for a preliminary injunction.  Accordingly, the Court will not consider this claim for the purposes of the motion for a preliminary injunction.

factors and whether there has been a clear error of judgment." *Citizens to Preserve*

*Overton Park v. Volpe*, 401 U.S. 402, 415-16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). At a

minimum, the agency must have weighed the relevant data and articulated an explanation

that establishes a "rational connection between the facts found and the choice made."

*Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986). In

the final analysis, however, an agency action is "entitled to a presumption of regularity."

*Volpe*, 401 U.S. at 415-16, 91 S.Ct. 814 (noting the court cannot substitute its judgment

for that of the agency). Plaintiffs have failed to demonstrate a violation of either NEPA

or the CWA by the BLM. How so?

## 1. Plaintiffs Have Not Demonstrated a Violation of NEPA

Here, plaintiffs contend that BLM violated NEPA when it: (1) failed to allow for

public participation in the APD approval process; (2) failed to consider a reasonable

range of mitigation measures for wildlife threatened by the proposed development; and

(3) failed to take a "hard look" at the environmental impact of the proposal. Defendants

argue, in essence, that the BLM decision should be upheld because the agency provided

for public participation to the extent required by NEPA and considered the impacts of the

project and measures to mitigate those impacts. I agree.

### a. The BLM Provided Adequate Public Participation

NEPA requires federal agencies to "[m]ake diligent efforts to involve the public in

preparing and implementing their NEPA procedures" and to "provide public notice of

NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected." 40 C.F.R. § 1506.6(b). Accordingly, federal agencies must post certain information relating to a pending APD (i.e. the operator's name, the well name and its location) for public inspection, 43 C.F.R. § 3162.3-1, and must involve the public "to the extent practicable" in the preparation of the EA. 40 C.F.R. § 1501.4(b). What constitutes "to the extent practicable," however, is not easily discernable. As this Court has held, "determining whether the public was adequately involved is a fact-intensive inquiry made on a case-by-case basis." *Biodiversity Conservation Alliance v. Bureau of Land Mgmt.*, 404 F. Supp. 2d 212, 220 (D.D.C. 2005).

Here, the Catalina and Sun Dog drilling permit applications were posted in the public reading room of the BLM's regional office in September 2005 and August 2006, respectively and notice that BLM was preparing EAs for both sites was posted on the BLM's website on June 6, 2007 (Catalina) and July 9, 2007 (Sun Dog). Pl.'s Ex. M (Catalina EA) at 3; Pl.'s Ex. N (Sun Dog EA), at 3; Bargsten Decl., ¶ 7. Given that BLM did not approve the Catalina drilling permit applications until June 28, 2007, nor the Sun Dog drilling permit applications until August 16, 2007, plaintiffs clearly had a substantial opportunity to comment on the proposals before they were approved.

Finally, plaintiffs' contend that BLM *should* have circulated the draft EAs for public comment because BLM deferred evaluating the site-specific environmental

impacts of the project until proposals for development of specific well sites were

submitted.  This argument is also to no avail because neither the applicable regulations,

nor relevant caselaw, require such notice and comment.  *Biodiversity Conservation*

*Alliance,* 404 F.Supp.2d at 220; *see also TOMAC v. Norton,* 433 F.3d 852 (holding that

agencies have significant discretion in determining when public comment is needed).

Thus, having shown no clear error in judgment by the BLM, the Court cannot conclude

that the plaintiffs are likely to prevail on the merits of their case.

### b. BLM Adequately Considered Alternative Mitigation Measures

Plaintiffs next argue that the BLM violated NEPA when it failed to adequately

analyze a reasonable range of alternative mitigation measures to protect sage-grouse (an

indigenous upland game-bird) in the Atlantic Rim area.  Defendants argue in response

that alternative measures were analyzed and considered and that mitigation measures

were adopted to minimize the project's impact on the grouse population.  Again, the

Court agrees with the defendants.  Why so?

Under NEPA regulations, an environmental impact statement must contain a

comparison of "the environmental impacts of the proposal and the alternatives," and

"sharply defin[e] the issues" in order to provide "a clear basis for choice among options

by the decision maker and the public."  40 C.F.R. § 1501.14.  In addition to "rigorously

explor[ing]...all reasonable alternatives" and "devot[ing] substantial treatment to each

alternative," the agency must include in the EIS "appropriate mitigation measure not

9

already included in the proposal or alternatives." *Id.* However, as our Circuit has observed, "NEPA....does not require agencies to discuss any particular mitigation plans that they may put in place" nor does it "require agencies-or third parties-to effect any." *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 206 (D.C. Cir. 1991); *Southern Utah Wilderness Alliance v. Norton,* 237 F.Supp.2d 48, 54 (D.D.C. 2002)("NEPA does not require agencies to mitigate the adverse effects and does not require a detailed explanation of the mitigation measures that will actually be employed.")

Here, the record reflects that the BLM considered several alternatives which offered varying degrees of protection to the sage-grouse population in the Atlantic Rim area. Indeed, in addition to the proposal ultimately endorsed, the BLM considered: (1) the intervenors original plan, which offered little to no protection for the grouse population; (2) a no-action plan that would bar development in the Atlantic Rim area; and (3) a limited development plan (based, in part, on recommendations from the Wyoming Game and Fish Department) that would allow for fewer wells and would provide strict protections for sage-grouse breeding grounds and winter habitat. FEIS, p. 2-1 to 2-9.

Moreover, the plan ultimately adopted by the BLM includes various mitigation measures designed to minimize the impact of the project on local wildlife. In addition to limiting the total amount of surface disturbance to 2.8% of the total area at any one time, BLM has: (1) prohibited surface disturbance or occupancy within one-quarter mile of the perimeter of occupied leks (sage-grouse breeding grounds) and within two miles of

10

occupied leks between March 1 and July 15; (2) barred all human activity within one-quarter mile of the leks between 6:00 p.m. and 9:00 a.m. from March 1 to May 20; (3) limited construction of permanent, high-profile structures within one-quarter to one mile of leks; (4) prohibited surface disturbances between November 15 and March 14 in delineated winter concentration areas; and (5) required muffling of generator noise in order to minimize disturbance of dancing and strutting grouse (apparently an integral component of the sage-grouse mating ritual). FEIS, p. 2-8, E-7. Therefore, although the plaintiffs are dissatisfied with the level of protection provided under the current mitigation plan, the record clearly reflects that BLM analyzed and considered various alternatives and put in place measures far more stringent than those included in the original proposal. As a result, plaintiffs have not come close to demonstrating that the BLM's decision should be overturned. Accordingly, the Court sees no reasonable likelihood of success based on this argument.

### c. BLM Did Take a "Hard Look" at Potential Impacts

Plaintiffs final basis to seek a reversal of the BLA's decision is that defendants failed to adequately discuss, analyze and evaluate the environmental impact of: (1) a possible increase of methane seeps; and (2) the cumulative effect of the project on wildlife habitat and water quality. In response, the BLM argues that it not only identified these dangers, but adequately analyzed their potential impact. I agree.

While NEPA requires agencies to take a "hard look" at the environmental

11

consequences of the actions before it, *Robertson v. Methow Valley Citizens Council*, 490

U.S. 332, 350 (1989), our Circuit Court has held that it is not required to consider "every

conceivable possibility," but only those effects that are "reasonably foreseeable."

*Hammond v. Norton*, 370 F.Supp.2d 226, 245-46 (D.C.Cir. 2005) *quoting  Potomac*

*Alliance v. United States Nuclear Regulatory Comm'n*, 682 F.2d 1030, 1035

(D.C.Cir.1982).  Moreover, "NEPA itself does not mandate particular results, but simply

prescribes the necessary process.... If the adverse environmental effects of the proposed

action are adequately identified and evaluated, the agency is not constrained by NEPA

from deciding that other values outweigh the environmental costs."  *Id.*

Here, BLM noted that the project *could* increase the risk of methane seeps that

might contaminate groundwater and destroy vegetation.  FEIS at 4-32.  As a result, BLM

required the installation of groundwater monitoring wells and the collection of isotopic

data on a project-wide basis.  ROD at B-10; FEIS at 4-49.  Although plaintiffs point out

that BLM failed to consider the danger that the methane released could spontaneously

combust (and seriously injure hunters or hikers in the Atlantic Rim area), there is no

evidence in the record that such explosions are anything other than a mere "possibility."

As NEPA requires consideration of only the "reasonably foreseeable environmental

effects of the action," rather than every conceivable possibility, *Hammond*, 370 F.Supp.2d

at 245-46, plaintiff cannot demonstrate that methane seeps are *likely* to cause injury and

plaintiffs are unable to demonstrate that the BLM erred by not studying the potential of

combusting seeps more closely.

Similarly, it would appear from the record that BLM adequately considered the cumulative impact of the proposed project in the Atlantic Rim and surrounding areas.[8] Indeed, BLM considered 45 past, present and future projects and assessed their impact on, *inter alia*, the region's wildlife, air and water quality. FEIS at 5-1 to 5-26. Although plaintiffs argue that BLM failed to consider two specific pending development proposals (the Continental Divide/Creston and Hiawatha projects), these projects had only begun to work their way through the NEPA approval process when the FEIS was compiled. As our Circuit has held, the NEPA process "involves an almost endless series of judgment calls" and the line-drawing decisions "are vested in the agencies, not the courts." *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C.Cir.1987). As a result, absent some evidence that the ultimate extent of these projects, as well as their ultimate approval, was reasonably foreseeable, this Court will not overturn the BLM's decision to exclude them from its cumulative impact analysis.

Moreover, plaintiffs' claims that BLM failed to consider the cumulative impacts of the project on the Atlantic Rim area's wildlife and water-quality have little merit. BLM calculated the likely cumulative habitat loss to pronghorns, mule deers and elk (calculated

---

[8] NEPA requires agencies to evaluate the direct, indirect and cumulative environmental impacts of proposed action. 40 C.F.R. § 1508.25. NEPA regulations define "cumulative impacts"as: "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.

by total surface disturbance, a methodology which the plaintiffs consider too limited) and

concluded that the project will likely have the effect of displacing some animals, reducing

birth/survival rates and altering migration routes. FEIS at 5-14 to 5-17. Likewise, the

FEIS analyzed the impact of the project on downstream water quality, concluding that

water-reinjection would minimize the impact of wastewater, but that the surface

disturbance in the area could be expected to increase salt and sediment contributions to

the Colorado River Basin. FEIS at 5-11. Accordingly, it is clear that BLM did evaluate

the cumulative impacts of the project. Although plaintiffs may object to these impacts,

NEPA does not constrain an agency from deciding that certain values outweigh the

environmental costs as long as these costs are identified and evaluated. As a result, the

Court concludes that plaintiffs have not demonstrated a sufficient legal basis to warrant

overturning the BLM's decision.

**2. Plaintiffs Have Not Demonstrated a Violation of the Clean Water Act**

Plaintiff further claims that BLM violated the CWA when it approved drilling in

the Atlantic Rim area without ensuring that the project complied with state water quality

standards.[9] In response, defendants contend that plaintiffs' CWA claims are barred by

their failure to raise the issue during the earlier administrative proceedings even though

---

[9] Pursuant to Section 401 of the CWA:
> [a]ny applicant for a Federal license or permit to conduct any activity...which may
> result in any discharge into the navigable waters, shall provide the licensing or
> permitting agency a certification from the State in which the discharge
> originates... that any such discharge will comply with the applicable provisions of
> sections 1311, 1312, 1313, 1316, and 1317 of this title. 33 U.S.C. § 1341(a).

14

state certification for drilling in the Sun Dog and Catalina areas was not required.[10]    I

agree.

As defendants correctly note, there is no indication that plaintiffs raised the issue

of CWA certification at any point prior to filing suit.  Ordinarily, such a failure would bar

a plaintiff from pressing such claims.  As our Circuit Court has held, "issues not raised in

comments before the agency are waived" and will not be considered.  *National Wildlife*

*Federation v. E.P.A.*, 286 F.3d 554 (D.C. Cir. 2002).  Although plaintiffs argue that they

were not provided an opportunity to comment on the pending drilling permit applications

and, therefore, did not waive their claims, as noted earlier, plaintiffs had a substantial

opportunity to do so prior to their approval.[11]

_____

[10]  The intervenors argue that plaintiffs' claims should have been brought pursuant to the
citizen suit provision of the CWA and, therefore, should have provided BLM 60 days notice.
Because plaintiffs failed to do so, intervenors argue, plaintiffs' claim must be dismissed.  For the
purposes of the motion for a preliminary injunction, the Court concludes, *arguendo,* that
plaintiffs have correctly brought suit pursuant to the APA.

[11]  Moreover, even assuming, *arguendo*, that plaintiffs did not waive their claims, their
likelihood of success on the merits is far from certain.  Under the CWA, state certification is
required only when the proposed activity will result in discharge into "navigable waters."  33
U.S.C. § 1341(a).  "Navigable waters," in turn, are defined as "waters of the United States," 33
U.S.C. § 1362(7), which the Supreme Court has defined as: "only those relatively permanent,
standing or continuously flowing bodies of water."  *Rapanos v. U.S.,* 126 S.Ct. 2208, 2225
(2006).  According to the Supreme Court, these waters do not, "include channels through which
water flows intermittently or ephemerally, or channels that periodically provide drainage for
rainfall."  *Id.*
    Here, it is unclear whether the Sun Dog and Catalina projects will result in discharge into
waters regulated by the CWA.  Plaintiffs argue that discharge from the Catalina and Sun Dog
wells will ultimately drain into the Colorado River (a navigable water).  Defendants argue that
the 90 wells at issue here will effect only intermittent or ephemeral watercourses rather than
"permanent, standing or continuously flowing bodies."  Whether the channels effected by
development of the Catalina and Sun Dog wells are permanent or intermittent is a factual issue

## B. IRREPARABLE HARM

In addition to likelihood of success on the merits, plaintiffs have failed to

demonstrate that they will suffer irreparable harm if a preliminary injunction is not issued.

Although they argue that development in the Sun Dog and Catalina areas threatens the

wildlife and wild character of the Atlantic Rim area and will increase the risk of

catastrophic methane seeps, the Court finds, for the following reasons, that the risk of

these harms materializing is quite limited. Moreover, insofar as ground disturbing

activities in the Atlantic Rim area are largely complete, the issuance of a preliminary

injunction would have little, if any, practical effect.

The concept of irreparable harm, of course, does not readily lend itself to

definition. Courts, however, "have developed several well known and indisputable

principles to guide them in the determination of whether this requirement has been met."

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985) *see also Chaplaincy of*

*Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C.Cir. 2006). First, the injury

must be both "certain and great" and "actual not theoretical." *Wisconsin Gas,* 758 F.2d at

674; *see also Equal Rights Center v. Post Properties, Inc.,* Slip Op., 2007 WL 2128232

(D.D.C. 2007); *Carabillo v. ULLICO Inc. Pension Plan and Trust*, 355 F.Supp.2d 49

(D.D.C. 2004). Indeed, injunctive relief will not be granted "against something merely

---

the Court declines to decide at this time. However, given the nature of the dispute, the Court
cannot conclude that plaintiffs are *likely* to succeed on the merits of their CWA claim, even
assuming that the claim was not waived below.

feared as liable to occur at some indefinite time in the future." *Carabillo*, 355 F.Supp.2d

at 54 (D.D.C. 2004)(quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674, 51 S.Ct.

286, 75 L.Ed. 602 (1931)).  Thus, the movant must demonstrate that the injury is of such

"imminence" that there is a clear and present need for equitable relief to prevent

irreparable harm. *Wisconsin Gas*, 758 F.2d at 674.

Here, with respect to the threat posed to wildlife in the Sun Dog and Catalina

areas, plaintiffs' arguments are based primarily on the BLM's conclusion that the Atlantic

Rim Project (as a whole) would likely result in wildlife displacement and declines of

wildlife birth rates.  These projections, however, are based on assessments of the impact

of the Atlantic Rim Project *as a whole* and over its entire life-span.  Importantly,

plaintiffs have offered no evidence that the specific drilling at issue here poses an

immediate threat to the survival of the local wildlife populations.  Indeed, it would appear

that the impact of this drilling on wildlife will be limited (given the relatively small size

of the area effected) and that the mitigation measures put in place by BLM will minimize

this impact.[12]  Bargsten Decl., ¶ 9,11; Sun Dog EA, Catalina EA.  Accordingly, the Court

cannot conclude that completing the development of the Catalina and Sun Dog areas

poses a grave danger to the survivability of local wildlife species in the short-term.

---

[12]  According to the BLM, there are no wells within the quarter-mile buffer established
around occupied sage grouse leks and that the wells encroach, only slightly on the winter range
of the mule deer and pronghorn herds. Blomquist Decl, Ex. A, B.  Additionally, migration
corridors have been established adjacent to the Sun Dog and Catalina units to minimize the
impact on migratory routes. *Id.*

Likewise, the Court finds the danger of irreparable harm to the "wild character" of the Sun Dog and Catalina areas to be limited, at most. As defendants point out, areas adjacent to the Atlantic Rim area have already been extensively developed. FEIS at 5-1 to 5-2; Map M-5. Moreover, there were already 12 producing gas wells and associated infrastructure in the Sun Dog area and several more in the Catalina area *prior* to the recent approval of the drilling applications. Bessera Decl., ¶ 6; Bargsten Decl., ¶ 4, Ex. A; Ahlbrandt Decl., Ex. A. As John Ahlbrandt, a Natural Resource Specialist at BLM averred, "there was pre-existing and ongoing activities in the [Sun Dog] area which have altered the natural environmental setting." Ahlbrandt Decl., ¶ 4. Likewise, Travis Bargsten, another Natural Resource Specialist at BLM, observed that drilling for oil and gas in the Catalina area has occurred for some time that has similarly resulted in "alteration of the environmental setting." Bargsten Decl., ¶ 4. Given this prior development, and the proximity of these new wells to ongoing oil and gas production, the Court cannot conclude there is an imminent danger to the "wild character" of the area posed by these additional wells.

As to the danger of potentially hazardous methane seeps, the Court similarly finds no evidence of imminent and irreparable harm. Plaintiffs have offered the testimony of Walter Merschat, a geologist who has visited the area, and has opined that the expansion of drilling in the area from "a few score wells to 1800" is likely to increase "the volume and danger level" of existing seeps. Merschat Decl., ¶ 14. Mr. Merschat's conclusion,

however, is based on his assessment of the impact of the Atlantic Rim Project *as a whole*, rather than the 90 wells in the Sun Dog and Catalina areas. Plaintiffs have offered no evidence that the Sun Dog and Catalina wells will result in new seeps, nor that these wells will have a direct impact on existing seeps in the area.[13] Ahlbrandt Decl., ¶ 9; Bargsten Decl., ¶ 10. Indeed, plaintiffs have offered no evidence that the Sun Dog and Catalina wells will have any direct effect on methane seeps anywhere in the Atlantic Rim area.

Moreover, even assuming that the proposed development increases the volume of gas released, there is no evidence that the injuries plaintiffs predict (i.e asphyxiated or incinerated campers) are likely. Indeed, despite the region's history of extensive gas drilling, there is no evidence that methane seeps have ever injured hikers or campers in the past. Simply stated, the chance that a visitor to this 270,000 acre area will pitch his tent over an active methane seep is, at best, astronomical. As a result, the Court cannot conclude, based on the evidence in the record, that the approval of the Sun Dog and Catalina APDs poses the great and immediate danger of catastrophic methane seeps that would be necessary to warrant this extraordinary relief.

Finally, and perhaps most importantly, the Court notes that the development at issue is largely complete. As of early October, Double Eagle had already drilled 15 wells in the Catalina area, constructed connecting roads and completed pads for the central

---

[13] In fact, the Court notes that there are no seeps in the immediate vicinity of the proposed wells, although there is an *existing* seep just outside the eastern edge of the proposed Sun Dog wells. Ahlbrandt Decl., ¶ 9.

delivery point and two water transfer stations. Degenfelder Decl., ¶ 10. Overall, Double

Eagle estimates that 95% of the surface disturbance anticipated for the project has already

occurred. *Id* at ¶ 11. Likewise, Anadarko had already drilled three wells, completed all

roads and well pads and was in the process of installing connecting pipelines. Beserra

Decl., ¶ 9-10.[14]

Given these developments, it is clear that development of the Catalina and Sun

Dog areas is already well advanced and that much of the expected damage to the local

environment has already occurred. Accordingly, the Court cannot agree that plaintiffs

face imminent irreparable harm, nor that the grant of a preliminary injunction would have

any appreciable effect.

## C. INJURY TO OTHER INTERESTED PARTIES AND THE PUBLIC INTEREST

Finally, the Court concludes that granting plaintiffs request for a preliminary

injunction would impose a significant hardship on the defendants and other interested

parties and would be contrary to the public interest. For example, Anadarko claims that it

has entered into a $5 million fixed-bid contract for the installation of gathering lines in

the Sun Dog area and that $4 million of that contract will be lost if a preliminary

injunction is imposed. Transcript of Preliminary Injunction Hearing ("Transcript"),

66:17-67:7; Bessera Decl., ¶ 16. Additionally, both Anadarko and Double Eagle have

---

[14] Defendants point out that much of the infrastructure for the Sun Dog project, including roads, a water transfer station and an injection well, was in place prior to the approval of the APDs. Ahlbrandt Decl., ¶ 5.

already contracted rigs to drill the wells and that ordering these rigs (which are already on-site) to sit idle will cost the companies $63,000 per rig, per day.  65:6-13.  Finally, intervenors argue that because environmental restrictions bar construction in the Catalina and Sun Dog areas from fall to summer,[15] issuing a preliminary injunction today would effectively block development of the sites until the summer of 2008, regardless of when the injunction is lifted.  Catalina EA at 8-9, Sun Dog EA at 7-8.  As a result, the intervenors argue, the delay caused by granting the preliminary injunction will not be temporary (with the resulting cost of delay borne by the intervenors).

In addition to the harm to the intervenors, enjoining development in the Atlantic Rim area would delay receipt by the United States, Wyoming and Carbon County, of millions of dollars in revenue generated by mining royalties and state and local taxes. Indeed, the project as a whole is projected to generate $10 million in royalties for the federal government, an additional $7 million in royalties and taxes to Wyoming, and almost $11 million in taxes to Carbon County.  FEIS at 4-136-137.  Although the cost of enjoining the development of just the Catalina and Sun Dog areas is unclear, granting the preliminary injunction would, without doubt, delay receipt of significant revenue by the federal, state and local governments.  Given this loss, and the cost, that would be sustained by the intervenors if development was halted, the Court concludes that granting

---

[15]  Construction, drilling and other disruptive activities potentially disruptive to raptors are prohibited from February 1 to July 31; activities potentially disruptive to wintering wildlife are prohibited from November 15 to April 30; and activities potentially disruptive to sage-grouse are prohibited from March 1 to July 15.  Catalina EA at 8-9, Sun Dog EA at 7-8.

the preliminary injunction would impose considerable hardship on the defendants and other interested parties.

Moreover, in addition to these reasons, the Court is not convinced that granting the preliminary injunction is in the public interest. The development of domestic energy resources is of paramount public interest and will be harmed (at least to some extent) if that development is delayed. Additionally, as noted above, the Atlantic Rim project will generate millions of dollars in revenue for the United States, Wyoming and Carbon County, a result clearly in the public interest. As such, granting a preliminary injunction, when the plaintiffs have failed to demonstrate the requisite irreparable harm and likelihood of success on the merits, would not further the public interest either in Wyoming or the Nation.

### III. CONCLUSION

Therefore, upon review of the relevant caselaw and the entire record herein, the Court finds that plaintiffs have failed to demonstrate that they are likely to succeed on the merits of their claims or that they face irreparable harm if the Court declines to grant a preliminary injunction. Moreover, the Court concludes that the imposition of an injunction would impose a significant hardship on the defendants and does not further

the public interest in either Wyoming or the Nation.  Accordingly, the Court DENIES

plaintiffs' motion for a preliminary injunction.

RICHARD J. LEON
United States District Judge