IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL | ) | |
| 1200 New York Avenue, NW, Suite 400 | ) | |
| Washington, DC  20005,            *et al.* | ) | |
|  | ) | |
| Plaintiffs, | ) | Civ. No. 07-1709 (RJL) |
|  | ) | |
| v. | ) | |
|  | ) | |
| DIRK KEMPTHORNE, in his official capacity | ) | |
| As the Secretary of the United States | ) | |
| Department of the Interior | ) | |
| 1849 C Street, NW | ) | |
| Washington, DC  20240,            *et al.* | ) | |
|  | ) | |
| Defendants. | ) | |

_____

|  |  |
|---|---|
| ANADARKO PETROLEUM CORPORATION, | ) |
| WARREN RESOURCES, INC., and DOUBLE | ) |
| EAGLE PETROLEUM CO., | ) |
|  | ) |
| Defendant-Intervenors, | ) |
|  | ) |
| STATE OF WYOMING, | ) |
|  | ) |
| Defendant-Intervenor. | ) |

_____

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ...................................................................................1

PRIOR PROCEEDINGS .........................................................................................4

STANDARD OF REVIEW ......................................................................................4

ARGUMENT ...........................................................................................................5

I.      BLM Failed to Take a Hard Look at Environmental Impacts Prior to Approving Applications for Permits to Drill in the Atlantic Rim Project Area....................................................................................................................5

      A.      BLM Failed to Take a Hard Look at Air Quality Impacts...............6

            1.  The Discredited Scheffe Method ................................................8

            2.  Invalid Background Ozone Level ............................................16

            3.  Implications of BLM's Flawed Ozone Analysis ......................18

      B.      BLM Failed to Take a Hard Look at Methane Leak Impacts ........19

      C.      BLM Failed to Take a Hard Look at Sage Grouse Impacts...........28

            1.  BLM's Discussion of Impacts to Sage Grouse in the FEIS......29

            2.  BLM Failed to Adequately Respond to the Fish and Wildlife Service's Concerns that the Project May Lead to the Need to List Sage Grouse as Threatened or Endangered..........30

            3.  BLM's Discussion of its Sage Grouse Mitigation Measures is Not Supported by the Record .................................................33

            4.  BLM Does Not Provide a Detailed or Reasonably Complete Discussion of Mitigation Measures for Sage Grouse ...............36

II.     BLM Failed to Adequately Assess Cumulative Impacts to Big Game ......37

III.    BLM Failed to Meet its Public Participation Obligations ..........................40

      A.      Notice of Drilling Permit Applications Did Not Provide Information about Environmental Impacts .....................................41

B.    Opportunity to Comment on Project EIS Does Not Satisfy
      BLM's Obligation to Involve Public in Assessment of Site-
      Specific Environmental Impacts Prior to Approving
      Drilling Permits..................................................................................43

CONCLUSION.....................................................................................................44

# TABLE OF AUTHORITIES

**Federal Cases**

American Bird Conservancy v. F.C.C., 516 F.3d 1027 (D.C. Cir. 2008) ...............2

Baltimore Gas & Electric Company v. NRDC, 462 U.S. 87 (1993) .................4, 26

Biodiversity Conservation Alliance v. BLM, 404 F.Supp.2d 212
(D.D.C. 2005) ...........................................................................................11, 40, 41

Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,
508 F.3d 508 (9th Cir. 2007) .................................................................27

Citizens Against Burlington v. Busey, 938 F.2d 190 (D.C. Cir. 1991) .................37

City of Williams v. Dombeck, 151 F.Supp.2d 9 (D.D.C. 2001)............................18

Columbia Falls Aluminum Co. v. E.P.A., 139 F.3d 914
(D.C. Cir. 1998) .................................................................................6, 10, 16, 35

Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121 (D.D.C. 2001) .................27

Earth Island Inst. V. United States Forest Service, 442 F.3d 1147
(9th Cir. 2006)..........................................................................................................5

Environmental Defense v. U.S. Army Corps of Engineers, 515 F.Supp.2d 69
(D.D.C. 2007) .............................................................5, 10, 16, 18, 28, 35, 36, 37

Friends of the Earth v. Laidlaw Envtl. Servs., 528 U.S. 167 (2000) .................1, 2

Friends of the Earth v. U.S. Army Corps of Engineers, 109 F. Supp. 2d. 30
(D.D.C. 2000) ..........................................................................................................31

Grand Canyon Trust v. F.A.A., 290 F.3d 339 (D.C. Cir. 2002) ..................5, 11, 39

Greater Boston Tel. Corp. v. FCC, 444 F.3d 841, 852 (D.C. Cir. 1970)..............32

Kern v. U.S. Bureau of Land Management, 284 F.3d 1062
(9th Cir. 2002) ......................................................................................................14

Kleppe v. Sierra Club, 427 U.S. 390 (1976).........................................................38

League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren,
309 F.3d 1181 (9th Cir. 2002) ...............................................................................37

Marsh v. Oregon Natural Resources Council, 490 U.S. 360
(1990).............................................................................................5, 6, 16, 28, 40

Melong v. Micronesian Claims Commission, 643 F.2d 10 (D.C. Cir. 1980)..........7

Mid States Coalition For Progress v. Surface Transp. Bd., 345 F.3d 520
(8th Cir. 2003) ....................................................................................27, 37

Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,
463 U.S. 29 (1983).......................................................................4, 28, 36

NRDC v. Daley, 209 F.3d 747 (D.C. Cir. 2000) ....................................................10

NRDC v. E.P.A, 489 F.3d 1364 (D.C. Cir. 2007) ...............................................1, 2

NRDC v. Hodel, 865 F.2d 288 (D.C. Cir. 1988) .......................................26, 30, 35

Nevada v. Department of Energy, 457 F.3d 78 (D.C. Cir. 2006) ...........................4

Ocean Mammal Institute v. Gates, Slip Copy, 2008 WL 564664
(D.Hawai'i, Feb 29, 2008) ..................................................................................42

Robertson v. Methow Valley Citizens Council, 490 U.S. 332
(1989)................................................................................. 5, 14, 20, 28, 36, 37

TOMAC v. Norton, 433 F.3d 852 (D.C. Cir. 2006) ..............................................42

Western Watersheds Project v. Fish and Wildlife Service, 535 F. Supp. 2d 1173
(D. Idaho 2007) ..........................................................................................28, 33

**Federal Regulations**

40 C.F.R. § 50.10 (2007) .....................................................................................17

40 C.F.R. Part 51, App. W, as revised, .............................................................11

40 C.F.R. § 1500.1 ................................................................................18, 39

40 C.F.R. § 1502.24 .................................................................6, 10, 28, 35

40 C.F.R. § 1506.6(a) ..........................................................................................39

40 C.F.R. § 1508.7 ...............................................................................37, 39

40 C.F.R. § 1508.28...............................................................................13

43 C.F.R. § 3162.3-1 ........................................................................41

Fed. Rules Evid. 201(b) .................................................................7

**Federal Statutes**

16 U.S.C. §§ 1536, 1538..................................................................31

42 U.S.C. § 4332(2)(C) ...................................................................15

42 U.S.C. § 7409(b) ..........................................................................7

42 U.S.C. § 7475(e)(3)(D) ..............................................................11

42 U.S.C. § 7620 ............................................................................ 11

**Federal Register Notices**

62 Fed. Reg. 38856 (July 18, 1997) ...............................................16

69 Fed. Reg. 21484, 21485 (Apr. 21, 2004) ..............................28, 32

70 Fed. Reg. 68218 (Nov. 9, 2005) ................................................11

71 Fed. Reg. 10989-01 ....................................................................38

71 Fed. Reg. 52571-01 (Sept. 6, 2006) ..........................................39

72 Fed. Reg. 28518 (May 21, 2007) .................................................2

73 Fed. Reg. 16436 (March 27, 2008) ..............................................7

**Other**

Bell, M.L.; McDermott, A; Zeger, S.L.; Samet, J.M.; Dominici, F. (2004) Ozone and Short-term Mortality in 95 US Urban Communities, 1987-2000.  J.American Medical Association, 292:2372-2378 .................................................7

Gryparis, A. et al. (2004) Acute Effects of Ozone on Mortality from the "Air Pollution and Health a European Approach" Project. Am.J.Respir.Crit.CareMed. 170: 1080-1087 ...............................................................................7

Lipsher, Steve, "Wyoming Ozone Alert Stirs Debate," Denver Post (February 28, 2008) ............................................................................18

USEPA, Fact Sheet: Ground-Level Ozone Health and Environment (hereafter "USEPA Ozone Fact Sheet"), available at

http://www.epa.gov/air/ozonepollution/health.html .................................................6

Western Association of Fish and Wildlife Agencies (WAFWA) Guidelines for
Management of Sage-grouse Populations and Habitats .......................................33

Wyoming Department of Environmental Quality health advisories, available at
http://deq.state.wy.us/out/outreachpressrelease.htm. ............................................18

## LIST OF ACRONYMS

| APD | Application for Permit to Drill |
|---|---|
| AQTSD | Air Quality Technical Support Document |
| BCA | Biodiversity Conservation Alliance |
| BLM | Bureau of Land Management |
| CAMx | Comprehensive Air Quality Model |
| CBNG | Coal Bed Natural Gas |
| CEQ | Council on Environmental Quality |
| CMAQ | Community Multiscale Air Quality |
| DEIS | Draft Environmental Impact Statement |
| DEQ | Department of Environmental Quality |
| DOE | Department of Energy |
| DR | Decision Record |
| EA | Environmental Assessment |
| EPA/USEPA | United States Environmental Protection Agency |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| GAO | Government Accountability Office |
| IBLA | Interior Board of Land Appeals |
| MOU | Memorandum of Understanding |
| NAAQS | National Ambient Air Quality Standard |

| | |
|---|---|
| NEPA | National Environmental Policy Act |
| NOx | Nitrogen Oxide |
| NRDC | Natural Resources Defense Council |
| PAPA | Pinedale Anticline Project Area |
| POD | Plan of Development |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| ROW | Right-of-way |
| SEIS | Supplemental Environmental Impact Statement |
| TCLP | Toxicity Characteristic Leaching Procedure |
| TSD | Technical Support Document |
| USFWS | United States Fish and Wildlife Service |
| VOC | Volatile Organic Compound |
| WAFWA | Western Association of Fish and Wildlife Agencies |
| WEDQ-AQD | Wyoming Department of Environmental Quality-Air Quality Division |
| WOC | Wyoming Outdoor Council |

**Exhibit List**

| | |
|---|---|
| Exhibit 1 | Second Declaration of Erik Molvar (with Attachments A, B, C, & D) |
| Exhibit 2 | Declaration of Jim States (with Attachment A) |
| Exhibit 3 | Declaration of Andrew Carson (with Attachments A & B) |
| Exhibit 4 | Declaration of Jonathan Ratner (with Attachment A) |
| Exhibit 5 | Declaration of Bonnie Hofbauer |
| Exhibit 6 | Declaration of Linda Lopez |
| Exhibit 7 | FEIS excerpts |
| Exhibit 8 | BCA comment excerpts |
| Exhibit 9 | Scheffe letter (July 28, 2006) |
| Exhibit 10 | BLM information memorandum for State Director (August 31, 2006) |
| Exhibit 11 | BLM's notes to EPA re: "Ozone What's Next?" (September 8, 2006) |
| Exhibit 12 | EA for Catalina A & B PODs |
| Exhibit 13 | BLM, Draft Supplemental Environmental Impact Statement for the Pinedale Anticline Oil and Gas Exploration and Development Project (Sublette County, Wyoming) (December 2006) excerpts |
| Exhibit 14 | Lipsher, Steve, "Wyoming Ozone Alert Stirs Debate," Denver Post (February 28, 2008) |
| Exhibit 15 | Jon N. Dull memorandum re: methane gas seeps in the Atlantic Rim area |

x

Exhibit 16                    Wyoming Outdoor Council letter to BLM dated
                              April, 2007

Exhibit 17                    Declaration of Walter R. Merschat

Exhibit 18                    BLM's Decision Memorandum for the State Director

Exhibit 19                    Bob Lange cover email re: methane seeps

Exhibit 20                    Jan. 26, 2006 Fish and Wildlife Service Comment Letter

Exhibit 21                    Jan. 5, 2007 Fish and Wildlife Service Comment Letter

Exhibit 22                    Map of Seasonal Elk Ranges and Migration Routes

Exhibit 23                    Map of Seasonal Pronghorn Ranges and Migration Routes

Exhibit 24                    Map of Seasonal Mule Deer Ranges and Migration Routes

Exhibit 25                    APD Posting Notice (September 25, 2005)

## INTRODUCTION

Plaintiffs challenge the decision of the Bureau of Land Management ("BLM") to approve hundreds of new gas wells in the Atlantic Rim area of Wyoming's Red Desert. In its rush to open the public lands to gas drilling, the agency failed to complete the analysis and seek out the public involvement that the National Environmental Policy Act ("NEPA") requires.  BLM ignored the advice of its own experts to update agency analysis of impacts on ozone pollution and leakage of harmful methane gas.  Moreover, the agency failed to adequately assess impacts on sage grouse or to account for the impacts on big game of hundreds of additional wells that BLM was considering at the same time as it was evaluating the Atlantic Rim project.  Plaintiffs do not seek to stop all drilling on the public's lands, but instead to ensure that the health and environmental consequences are fully analyzed as required by federal law.  For the reasons explained below, this Court should vacate BLM's decisions approving the Atlantic Rim drilling permits and enjoin approval of further surface disturbing activities until the agency completes the analysis that NEPA requires.

## FACTUAL BACKGROUND

The Atlantic Rim area of Wyoming's Red Desert is a place of stunning beauty with rolling hills, canyons, dune fields and diverse sagebrush communities.  Local residents and others across the country value the area for hiking, hunting, wildlife habitat, and clean air and water.[1]  While other parts of Wyoming have seen extensive oil and gas

---

[1] Plaintiffs have standing in this matter because of the interests of the members of plaintiff organizations and the interests of the organizations themselves.  See Friends of the Earth v. Laidlaw Envtl. Servs., 528 U.S. 167, 180-85 (2000); NRDC v. E.P.A., 489 F.3d 1364, 1370-71 (D.C. Cir. 2007).  Plaintiffs have attached the following declarations to this brief to support their standing: Second Declaration of Erik Molvar; Declaration of Jim States; Declaration of Andrew Carson;  Declaration of Jonathan Ratner;

development, the Atlantic Rim area has remained relatively undeveloped. Second Molvar Decl., at ¶ 10 (attached as Exh. 1). The large area, unfragmented by development has provided critical habitat and migration routes for numerous wildlife species, including sage grouse, elk, mule deer, and pronghorn antelope. See, e.g., AR 2391-2394; 10322-10327.

In May 2001, a consortium of oil and gas companies which ultimately included Anadarko Petroleum ("Andarko"), Warren Resources ("Warren") and Double Eagle Petroleum ("Double Eagle") submitted a proposal to drill hundreds of new natural gas wells in the Atlantic Rim area. In December 2005, BLM released a Draft Environmental Impact Statement ("Draft EIS") for the Atlantic Rim Natural Gas Field Development Project ("Atlantic Rim project"). AR 4816. The project provided for 2,000 new wells. AR 2088. The project area sits within the Red Desert, southwest of the town of Rawlins, Wyoming. In addition to the new wells, the project includes new access roads and pipelines, totaling approximately 1,000 miles. AR 2150. On February 17, 2006, Biodiversity Conservation Alliance ("BCA") and other plaintiffs submitted comments on the Draft EIS. On May 21, 2007, BLM issued the Record of Decision ("ROD") and accompanying Final Environmental Impact Statement ("Final EIS" or "FEIS") approving the Atlantic Rim project with its 2,000 new wells. 72 Fed. Reg. 28518 (May 21, 2007).

---

Declaration of Bonnie Hofbauer; and Declaration of Linda Lopez. The actions challenged in this case have caused and will continue to cause air quality degradation, increased methane seepage, significant harm to wildlife (including sage grouse and elk), and the transformation of a natural setting into an industrial one in areas where plaintiffs' members hike, hunt, camp, watch wildlife, go to seek peace and quiet, and enjoy other recreational activities. Plaintiffs' members intend to return to this area to engage in these activities. Defendants' challenged actions will limit their ability to do so and their enjoyment of those activities. These are cognizable injuries. Laidlaw, 528 U.S. at 181-85; American Bird Conservancy v. F.C.C., 516 F.3d 1027, 1031 (D.C. Cir. 2008); NRDC v. E.P.A., 489 F.3d at 1370-71. Plaintiffs' injuries will be redressed by a decision rescinding the drilling permits approved by Defendants and prohibiting defendants from approving any further surface disturbing activity until defendants correct their violations of NEPA.

While significant work went into preparation of the project FEIS, BLM itself acknowledged that it had not finished the environmental analysis required under NEPA. AR 4798.  BLM did not know the exact locations of the proposed 2,000 wells or accompanying infrastructure.  Consequently, the agency did not include site-specific analysis of the wells in the project EIS.  AR 4483, 4561, 4570, 4578, 4580, 4588.  Energy companies could not proceed with ground disturbing activity until they obtained approvals of applications for permits to drill.  Accordingly, BLM deferred analysis of site-specific impacts until these drilling permit applications were received.  Id.

BLM began to approve drilling permits in the summer of 2007.  On June 28, 2007, BLM approved the first plans of development submitted by Double Eagle in the Catalina unit for 39 new wells and the roads, pipelines and other infrastructure to go with them.  AR 73502.  Fourteen of the wells were in Catalina plan of development ("POD") A and 25 were in POD B.  AR 73492.  On August 16, 2007, BLM approved plans of development submitted by Anadarko in the Sun Dog unit for 51 new wells and the roads, pipelines and other infrastructure to go with them. AR 74073.  Twenty-eight of the wells were in Sun Dog POD A and 23 were in POD B.  AR 74063   In each case, BLM conducted little new environmental analysis, but instead relied on the analysis previously done when the agency approved the general project concept.  Although BLM knew of the intense interest of the BCA and other plaintiffs in the Atlantic Rim Development Project, the agency did not involve BCA or the public in the environmental review process for either of the PODs that BLM approved in June 2007.  Second Molvar Decl., at ¶¶ 20, 21.

On October 23, 2007, BLM approved three additional plans of development (C, D, and E) in the Sun Dog unit.  AR 75029, 75185.  These PODs contained 48 new wells.

AR 75019, 75173.  Thus, seven different plans of development and 138 total wells are part of this litigation.[2]

## PRIOR PROCEEDINGS

Plaintiffs filed their original complaint and a motion for preliminary injunction on September 25, 2007.  As the administrative record was not yet available, plaintiffs supported their preliminary injunction motion with the documents available at that point. On November 30, 2007, the Court issued an order denying plaintiffs' motion.  Plaintiffs now fully present their argument – supported by the record – that BLM has failed to comply with the National Environmental Policy Act.  Plaintiffs have not pursued and hereby waive claims under the Clean Water Act and the Federal Land Policy Management Act ("FLPMA").

## STANDARD OF REVIEW

When reviewing agency action for compliance with NEPA, courts must confirm "that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  Nevada v. Department of Energy, 457 F.3d 78, 87-88 (D.C. Cir. 2006), citing Baltimore Gas & Electric Company v. NRDC, 462 U.S. 87, 97-98 (1993).  Agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view. . . ."  Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983).

---

[2] Plaintiffs amended their complaint on October 26, 2007, to include the Sun Dog C, D & E PODs.  On April 3, 2008, BLM approved three more PODs.  While plaintiffs did not amend their complaint to include these most recent POD approvals, similar issues are involved as with the earlier BLM actions.

"NEPA review is . . . not toothless." <u>Environmental Defense v. U.S. Army Corps of Engineers</u>, 515 F.Supp.2d 69, 76 (D.D.C. 2007).  "Reviewing courts must independently evaluate the record to confirm that the agency made a reasoned decision based on its analysis of the evidence before it." <u>Id</u>. <u>citing</u> <u>Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360, 371 (1990).  If it did not, a court "may properly conclude that the agency has acted arbitrarily and capriciously." <u>Id</u>. <u>quoting</u> <u>Earth Island Inst. v. United States Forest Service</u>, 442 F.3d 1147, 1160 (9th Cir. 2006).

## ARGUMENT

I.    **BLM Failed to Take a Hard Look at Environmental Impacts Prior to Approving Applications for Permits to Drill in the Atlantic Rim Project Area.**

NEPA requires agencies to take a "hard look" at environmental consequences of proposed actions and to broadly disseminate relevant environmental information. <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 350 (1989);  <u>Grand Canyon Trust v. F.A.A.</u>, 290 F.3d 339, 341 (D.C. Cir. 2002).  Here, BLM failed to take the hard look required under NEPA at several environmental impacts from the Catalina and Sun Dog development plans the agency approved.  The analysis that BLM provided in the Atlantic Rim project FEIS was insufficient to satisfy NEPA's requirements.  The agency ignored the advice of its own experts regarding air quality impacts and methane leaks.  In addition, the agency ignored the advice of experts from its sister agency the U.S. Fish and Wildlife Service and relied on sage grouse mitigation measures that evidence in the record demonstrated did not achieve the results BLM concluded that they would.  BLM did not cure these inadequacies in the environmental assessments ("EAs") issued to

accompany BLM's approval of the 138 new wells in the Catalina and Sun Dog development plans.

### A. BLM Failed to Take a Hard Look at Air Quality Impacts.

The fundamental objective of NEPA is to ensure that an "agency will not act on incomplete information only to regret its decision after it is too late to correct." Marsh v. Oregon Natural Resources Council, 490 U.S. at 371 (citation omitted). NEPA's implementing regulations impose an affirmative duty on federal agencies to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." 40 C.F.R. § 1502.24. An agency cannot rely on a model that "bears no rational relationship to the reality it purports to represent." Columbia Falls Aluminum Co. v. E.P.A., 139 F.3d 914, 923 (D.C. Cir. 1998). Here, BLM approved the Catalina and Sun Dog plans of developments based on air quality analysis that the agency itself acknowledged was out-dated and insufficient.

While normally associated with urban areas, ozone pollution is becoming a growing problem in Wyoming as the number of oil and gas drilling rigs and compressors and the amount of diesel truck traffic dramatically increases. AR 8667 (monitoring has shown exceedances of the ozone standard in and near the Jonah field). BLM estimated that existing background ozone levels in the Atlantic Rim project area were already at 94 percent of federal air quality standards for an 8-hour averaging period. AR 2181 (excerpts of FEIS attached as Exh. 7). Ozone forms through the chemical reaction of nitrogen oxides ("NOx") and volatile organic compound ("VOC") emissions in the presence of sunlight. AR 2328. Breathing ground level ozone can cause a variety of health problems including chest pain, coughing, throat irritation, and congestion. It can

worsen bronchitis, emphysema, and asthma.[3]  Epidemiologic studies in the United States and Europe have linked total mortality, cardiovascular mortality and respiratory mortality to short term increases in ozone levels.[4]

Ground level ozone also damages plants and ecosystems.  Increased levels of ozone can damage the leaves of trees and other plants, degrading the appearance of vegetation in recreation areas.[5]  As required by the Clean Air Act, USEPA has set National Ambient Air Quality Standards ("NAAQS") for ozone to protect public health and welfare.  42 U.S.C. § 7409(b).  The 8-hour NAAQS for ozone is 157 ug/m3.  AR 2181.[6]  The State of Wyoming's air quality standard for ozone is the same.  Id.

A variety of activities approved by BLM as part of the Atlantic Rim project produce NOx and VOC emissions.  AR 2327.  During well construction, drilling rigs and vehicle engine exhaust would produce NOx and VOC emissions.  Id.  BLM documents estimate that construction of a single well would produce 1.086 tons of NOx and 4.899 tons of VOCs.  AR 2660.  During production, compressor stations, dehydrator heaters, dehydrator gas processing operations, and diesel combustion in haul trucks would produce NOx and VOC emissions.  AR 2661.  Combining production and construction

---

[3] USEPA, Fact Sheet: Ground-Level Ozone Health and Environment (hereafter "USEPA Ozone Fact Sheet"), available at http://www.epa.gov/air/ozonepollution/health.html.  This court may take judicial notice off scientific facts that are "ascertainable with certainty without resort to cumbersome methods of proof."  See e.g., Melong v. Micronesian Claims Commission, 643 F.2d 10, 12 (D.C. Cir. 1980), citing Fed. Rules Evid. 201(b).  Plaintiffs request that the Court take judicial notice of the health impacts of ground level ozone pollution as articulated in the USEPA fact sheets and peer-reviewed scientific articles cited herein.

[4] Bell, M.L.; McDermott, A; Zeger, S.L.; Samet, J.M.; Dominici, F. (2004) Ozone and Short-term Mortality in 95 US Urban Communities, 1987-2000.  J.American Medical Association, 292:2372-2378;  Gryparis, A. et al. (2004) Acute Effects of Ozone on Mortality from the "Air Pollution and Health a European Approach" Project. Am.J.Respir.Crit.CareMed. 170: 1080-1087.

[5] USEPA Ozone Fact Sheet, supra, note 3.

[6] USEPA recently finalized revisions to the ozone standard lowering the standard from 157 ug/m3 to 147 ug/m3.  73 Fed. Reg. 16436 (March 27, 2008).  Plaintiffs' analysis is based on the standard that existed at the time BLM made its decisions to approve the Atlantic Rim ROD/ FEIS and the Catalina and Sun Dog PODs challenged herein.

emissions, BLM estimates that the Atlantic Rim project would produce 674.88 tons per year of NOx and 5,869.44 tons per year of VOCs.  AR 2663.

In assessing the ozone impacts of the Catalina and Sun Dog plans of development, BLM made two fundamental errors.  First, the agency relied on a 1988 method that BLM itself acknowledged was insufficient – the "Scheffe method" – to determine the levels of ozone resulting from the project development.  Second, BLM used an invalid background ozone level to justify the agency's conclusion that the project development would not violate the ozone NAAQS.

### 1.    The Discredited Scheffe Method

As the Rawlins Field Office began to develop the Environmental Impact Statement for the Atlantic Rim project, Wyoming BLM was facing increasing questions about the adequacy of its air quality analysis.  Plaintiff BCA raised concerns related to impacts on ozone concentrations in its comments on the Atlantic Rim Draft EIS on February 17, 2006.  AR 70538, 70599 (excerpts of BCA comments attached as Exh. 8).  BCA's comments referred to and explicitly incorporated by reference comments identifying problems with the air quality analysis for several other projects under consideration by Wyoming BLM.  AR 70598.  These projects and decisions pending at the time the Atlantic Rim Draft Environmental Impact Statement was being prepared included:  (1) the Jack Morrow Hills Supplemental Draft Environmental Impact Statement; (2) the Jonah Infill Drilling project Draft Environmental Impact Statement; (3) the Seminoe Road Natural Gas Development Project Draft Environmental Impact Statement; and (4) the Rawlins Resource Management Plan Draft Environmental Impact Statement.  AR 70598.

In commenting on the Jonah Infill Project Draft Environmental Impact Statement air quality supplement on September 26, 2005, plaintiff Wyoming Outdoor Council ("WOC") criticized BLM's reliance on the 1988 Scheffe model developed as "very out-of-date, compared to the state of the science."  AR 86223.  WOC's comments criticized the Scheffe model for failing to incorporate "[a]dvances in understanding ozone photochemistry that have occurred since the late 1980's."  AR 86224.  As WOC told BLM, Reactive Plume Models such as the Scheffe model "do not adequately treat the influence of emissions, transport and chemistry going on outside the 'plume.'"  AR 86224.  WOC urged BLM to change how it was analyzing ozone impacts so the agency could get a more accurate picture of the problems increased drilling was causing.  WOC's comments state:

> The preferred method for estimating ozone production from a particular source is to use a "plume-in-grid" treatment.  In this approach, chemistry and transport in the plume from a point source is modeled as it disperses and mixes with the surrounding air, while the emissions, chemistry and transport going on in the background air are simultaneously modeled using an Eulerian grid framework.  Models that are currently widely used and recommended for predicting ozone impacts for regulatory purposes, including the Comprehensive Air Quality Model (CAMx) and the Community Multiscale Air Quality model (CMAQ) have this capability.  And, unlike the Scheffe (1988) approach, these models can account for the interacting suite of variables that actually determine how much ozone would be produced from a new source of emissions.

AR 86224 (citations omitted).

Dr. Scheffe himself – still a Senior Science Advisor at USEPA – has acknowledged that his method developed in 1988 lacks scientific validity.  In a July 28, 2006 letter, Dr. Scheffe noted that his method "was deemed 'not adequate' in 1989 [and is] even less adequate today."  AR 9881 (attached as Exh. 9).  Dr. Scheffe attests that the

tables he developed in 1988 "never achieved a level of EPA certification associated with

EPA guideline models and consequently were not endorsed by the Agency." <u>Id</u>.

The Scheffe model does not meet the standards for scientific integrity that NEPA

requires. "[A]gencies are under an affirmative mandate to 'insure the professional

integrity, including scientific integrity, of the discussions and analyses in environmental

impact statements." <u>Environmental Defense</u>, 515 F.Supp.2d at 78, quoting 40 C.F.R. §

1502.24. Courts will reject scientific judgments made by an agency that are unsupported

by the record. <u>See, e.g.</u>, <u>NRDC v. Daley</u>, 209 F.3d 747, 755 (D.C. Cir. 2000) (court

struck down judgment by National Marine Fisheries Service that fishing quota was

sufficient to meet statutory conservation goals). The record must demonstrate that an

agency's model accurately represents reality and is based on accurate assumptions.

<u>Columbia Falls Aluminum Co.</u>, 139 F.3d at 923. In <u>Columbia Falls</u>, the D.C. Circuit

rejected EPA's use of a model applicable to the disposal of hazardous waste where the

agency persisted in using the model despite its acknowledgement that "it is now apparent

that the TCLP is not a good model for disposal conditions." <u>Id</u>. at 922-23. BLM has

acted in exactly the same arbitrary way here. The agency has persisted in using a method

to assess impacts on air quality that BLM itself acknowledged was inadequate.

BLM knew at the time that it was preparing the Atlantic Rim EIS that the Scheffe

model lacked the scientific integrity that NEPA requires. AR 8666 (BLM information

memorandum for State Director, dated August 31, 2006, states that "BLM's use of the

Scheffe method now deemed obsolete") (attached as Exh 10). Another document in the

record containing BLM's notes to EPA regarding "Ozone: What's Next?" states that the

Scheffe method was not appropriate for the purpose of "estimate[ing] potential ozone

impacts from proposed projects." AR 8667 attached as Exh 11. This document is dated

September 8, 2006 – over eight months before BLM issued the Final Environmental

Impact Statement and Record of Decision approving the Atlantic Rim project. No

compelling reason exists in the record to justify BLM's failure to update its ozone

modeling before approving extensive development in the Atlantic Rim area.

BLM arbitrarily relied on the Scheffe method despite the fact that it does not meet

the regulatory standards established by EPA for air quality modeling.[7] EPA has issued

regulations establishing a "Guideline on Air Quality Models" that specifies the models to

be used for various applications. 40 C.F.R. Part 51, App. W, as revised (70 Fed. Reg.

68,218 (Nov. 9, 2005)) [hereafter "EPA Guideline"]. EPA explains that the models

authorized in the Guideline are intended to be applied by federal land management

agencies, such as BLM, as well as state and federal air management agencies:

> a. The Guideline recommends air quality modeling techniques that should
> be applied . . . to new source reviews (NSR), including prevention of
> significant deterioration (PSD). . . . The guidance is appropriate for use by
> other Federal agencies and by State agencies with air quality and land
> management responsibilities. The Guideline serves to identify, for all
> interested parties, those techniques and data bases EPA considers
> acceptable.

EPA Guideline ¶ 1.0.a. "In all cases, the model applied to a given situation should be one

that provides the most accurate representation of atmospheric transport, dispersion, and

chemical transformations in the area of interest." Id., ¶ 1.0.e.

---

[7] This court owes no deference to BLM regarding interpretation of EPA's air quality modeling criteria. See Grand Canyon Trust, 290 F.3d at 342 ("the court owes no deference to the FAA's interpretation of NEPA or the CEQ regulations because NEPA is addressed to all federal agencies and Congress did not entrust administration of NEPA to the FAA alone"). Just as the FAA had no special NEPA expertise, BLM has no particular expertise related to air quality modeling. See also Biodiversity Conservation Alliance v. BLM, 404 F.Supp.2d 212, 217 (D.D.C. 2005). Congress specifically directed EPA – not BLM – to promulgate regulations that "shall specify with reasonable particularity each air quality model or models to be used under specified sets of conditions." 42 U.S.C. § 7475(e)(3)(D); see also 42 U.S.C. § 7620.

For ozone, the EPA Guideline authorizes models for two different types of applications – multi-source and single source applications.  Id., ¶ 5.2.1.a. and c.  In the Atlantic Rim project area where the primary ozone precursors – VOC and NOx – will be emitted from operation of many drill rigs, well pads, compressor stations, and diesel truck engines, the single source models are not appropriate.  Instead, for applications, such as the Atlantic Rim project, involving multiple sources of ozone precursor chemicals, EPA recommends a photochemical grid model, the Community Multiscale Air Quality model ("CMAQ").  Id., ¶ 5.2.1.a.

BLM, however, did not apply this EPA-authorized multi-source model to determine expected ozone concentrations in areas affected by emissions from the Atlantic Rim project.  Nor, apparently, did BLM obtain formal EPA approval to use an alternative model for this purpose.  EPA's Guideline provides for the selection of an alternative model that is not identified by EPA in the Guideline only upon a showing that:  (1) "the model produces concentration estimates equivalent to the estimates obtained using a preferred model";  (2) "a statistical performance evaluation has been conducted using measured air quality data and the results of that evaluation indicate the alternative model performs better for the given application than a comparable model in Appendix A";  or (3) there is no preferred model for the application.  Id., ¶ 3.2.2.b.  In the latter case, when no model has been approved, a proposed model cannot be used unless it has been peer-reviewed and satisfies numerous performance criteria prescribed by the Guideline ¶ 3.2.2.e.  In short, the use of an alternative model is only permissible if it can be demonstrated that the model is both reliable and particularly well-suited to its proposed application.

Here, BLM used the Scheffe method rather than EPA's preferred CMAQ model without making any attempt to demonstrate that the Scheffe method complies with the Guideline. AR 2328, AR 2687, AR 2703. BLM undertook no investigation to demonstrate that the Scheffe method would perform as well as one of the EPA-preferred models, producing "concentration estimates equivalent to the estimates obtained using [EPA's] preferred" CMAQ model. EPA Guideline ¶ 3.2.2.b. BLM undertook no "performance evaluation" using measured air quality data to show that the Scheffe method performs better than the CMAQ model for multi-source applications such as the Atlantic Rim project. Thus, BLM cannot establish that use of the Scheffe method was proper under the EPA Guideline.

Moreover, even if BLM had requested EPA approval to use an alternative model – which nothing in the record indicates that BLM did – the Scheffe method could never pass muster under the Guideline's provisions governing selection of an alternative model. EPA Guideline ¶ 3.2.2.e. The Scheffe method has not been scientifically peer-reviewed. AR 9881.

In approving the Catalina and Sun Dog plans of development beginning in June 2007, BLM cannot rely on or "tier to" NEPA analysis that is inadequate.[8] Plaintiffs do not take issue with BLM's use of a tiered approach per se. The problem is that BLM did not complete adequate air quality analysis either when it prepared the FEIS or in the environmental assessments completed for the challenged drilling permit approvals.[9] See,

---

[8] "'Tiering' refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared." 40 C.F.R. § 1508.28.

[9] The EAs prepared by BLM for the Catalina and Sun Dog plans of development do not include any air quality analysis. Instead, these EAs simply refer back to the project FEIS. See, e.g, AR 73498 (EA for

e.g., Kern v. U.S. Bureau of Land Management, 284 F.3d 1062, 1078 (9th Cir. 2002).  In

Kern, the court found BLM's NEPA analysis inadequate to support a timber sale where

the EA completed for the sale did not include a discussion of cumulative impacts

concerning the spread of a damaging fungus and the EIS for the Resource Management

Plan covering the area did not include such cumulative impacts discussion either.  Id.

BLM's analysis suffers the same fatal flaw here.

 BLM ignored the fundamental purpose of NEPA to ensure that federal agencies

collect and consider information about environmental impacts before they act.  See

Robertson, 490 U.S. at 349.  BLM knew that the Scheffe model did not provide an

accurate representation of ozone impacts, yet blindly plowed ahead and approved the

drilling permits nonetheless.  Such knowing ignorance is exactly what NEPA is designed

to prevent.  This is not a case where the concerns were raised at the eleventh hour.  Public

comments on the Draft EIS for the Atlantic Rim project criticized BLM's use of the

Scheffe model as early as February 21, 2006 – well over a year before BLM issued the

Atlantic Rim project Record of Decision and FEIS on May 21, 2007.  AR 70538, 70598.

 Moreover, BLM's own documents dated August 2006 acknowledged that the

Scheffe method was no longer scientifically valid.  AR 8666 ("BLM's use of the Scheffe

method now deemed obsolete"); see also, BLM, Draft Supplemental Environmental

Impact Statement for the Pinedale Anticline Oil and Gas Exploration and Development

Project ("Pinedale DSEIS") (Sublette County, Wyoming) (December 2006), available at

http://www.blm.gov/wy/st/en/info/NEPA/pfodocs/anticline/seis.html (excerpts attached

---

Catalina A & B PODs) ("Air quality impacts are disclosed and analyzed in AREIS.") attached as Exh. 12;
see also AR 74063 (EA for Sun Dog A & B PODs);  AR 75019 (EA for Sun Dog C & D PODs); AR 75173
(EA for Sun Dog E POD).

as Exh. 13).[10]  In the Pinedale DSEIS – issued six months before the Atlantic Rim

Record of Decision/ FEIS – BLM states:

> The EPA screening methodology (Scheffe, 1998)[11] for ozone analysis was
> planned for inclusion in this Draft SEIS.  However, BLM, with the
> agreement of the Air Quality Stakeholder Group, has determined that the
> CALGRID model for ozone impact analysis is the most appropriate
> method for estimating ozone impact from the PAPA [Pinedale Anticline
> Project Area].  Results from the CALGRID modeling analysis will be
> released as a supplement to the Air Quality TSD for this Draft SEIS.

Id.  A similar supplement could have – and should have – been done for Atlantic Rim

project.

Even if the Court finds that the project EIS was too far along to require BLM to

supplement it with new modeling, BLM has no excuse for failing to complete accurate

modeling before approving the Catalina and Sun Dog drilling permits.  NEPA's

obligations apply anew to BLM's decisions approving the development of the Catalina

and Sun Dog PODs – each of these approvals is a major federal action under NEPA.  See

42 U.S.C. § 4332(2)(C);  see also AR 4798 ("This decision is not the final review or

approval for actions associated with ARNG development.  The AO will review and

consider each component of the project that involves federal lands or minerals on a site-

specific basis.  Other reviews or decision points include, but are not limited to, the review

of annual or multi-year development plans (including transportation plans), Applications

for Permit to Drill (APD), right-of-way (ROW) grants, Sundry Notices, or applications

for Special Use Permits.").  BLM knew as it undertook the environmental review process

for the Catalina and Sun Dog PODs that the existing air quality modeling did not provide

---

[10] Plaintiffs request that the court take judicial notice of this BLM document available on the internet and whose accuracy is not disputed.  See supra note 3.
[11] BLM identifies the Scheffe method as dated 1998.  In fact, the methodology was developed by Dr. Richard Scheffe over two decades ago in 1988.  AR 9881.

an accurate picture of reality.  Nevertheless, the agency persisted in relying on a model that it knew was no good, just as EPA did in <u>Columbia Falls</u>.  As the D.C. Circuit did in <u>Columbia Falls</u>, this Court should reject BLM's attempt to remain in the dark, ignoring the true consequences of its actions.

### 2.    *Invalid Background Ozone Level*

Even assuming for the sake of argument that the Scheffe method was an appropriate method for the required ozone air quality analysis, BLM's analysis suffers a second fatal flaw.  An agency's decision under NEPA must involve a reasoned analysis of the evidence before the agency.  <u>Environmental Defense</u>, 515 F.Supp.2d at 76, <u>citing Marsh</u>, 490 U.S. at 371.  Here, BLM failed to incorporate the background ozone level the agency itself identified in determining the impact on ozone concentrations when the predicted project emissions were added.

BLM's determination of "total predicted impacts" related to ozone concentrations cannot survive even minimal scrutiny.  Once the modeling is complete, the calculation to determine impacts on ozone levels is one of simple addition.  As BLM stated in its FEIS, "[b]ackground air quality concentrations are combined with modeled project-related air quality impacts <u>of the same averaging time periods</u>, and the total predicted impacts are compared to applicable air quality standards."  AR 2183 (emphasis added).  Table 3-6 of the FEIS identifies the measured background concentration.  The background level measured for ozone according to the 8-hour standard is listed as 147 ug/m3.  AR 2181.  Although a background level is also listed for ozone based on a 1-hour standard, the NAAQS has been based only on an 8-hour standard, not a 1-hour standard, since 1997.  <u>See</u> 62 Fed. Reg. 38856 (July 18, 1997) (EPA revision to ozone standard replaced the

16

then existing primary 1-hour average standard with only an 8-hour average ozone standard).  See also, 40 C.F.R. § 50.10 (2007).[12]  The NAAQS is now specifically based on an 8-hour standard because exposure to high ozone concentrations for short periods (8 hours or less) is associated with serious health effects.  Id.  EPA's regulations specify that 8-hour concentration levels are determined by the annual fourth-highest daily maximum eight-hour average.  40 C.F.R. § 50.10(b) (2007).  As the FEIS indicates, 147 ug/m3 was the fourth-highest daily 8-hour value measured.  AR 2181.

According to the methodology that BLM itself set out, the agency should have added the background value of 147 ug/m3 to the predicted project emissions to estimate ozone concentrations from the development.  BLM's modeled "Maximum Predicted" ozone level is 16.1 ug/m3.  AR 2332.  These predicted emissions are based on the current 8-hour averaging period.  Id.  Simple math, adding 147 to 16.1, produces an ozone concentration of 163.1 ug/m3.  This level exceeds the NAAQS of 157 ug/m3.

But BLM did not do this.  Instead, the agency hunted up a more convenient background concentration level of ozone that would not lead to a predicted violation of the NAAQS.  The new, substituted background concentration is 75.2 ug/m3.  AR 2331. This number is based on an hourly average rather than an 8-hour average.  Id.  ("O3 [ozone] maximum predicted concentrations were added to the average hourly background O3 conditions monitored as part of the Green River Basin Visibility Study").  BLM failed to follow the methodology that the agency itself identified – to use "the same averaging time periods."  AR 2183 (emphasis added).  BLM added 75.2 ug/m3 (an hourly average)

---

[12] BLM acknowledges the inapplicability of the 1-hour standard in its FEIS for Atlantic Rim. The FEIS provides:  "EPA published a final rule on August 3, 2005 revoking the 1-hour ozone standard for all areas of Wyoming effective June 15, 2005.  The WDEQ-AQD then completed the process of removing the 1-hour standard from Wyoming Air Quality Standards & Regulations effective January 30, 2006.  As a result, there is no federal or state 1-hour ozone standard that applies to Wyoming."  AR 2183.

to 16.1 ug/m3 (an 8-hr average) to get a "total predicted impact" of 91.3 ug/m3.  AR

2332.  Conveniently, this total is well below the NAAQS.[13]  BLM has failed elementary

school math.  The agency is adding apples to oranges.  Plaintiff BCA criticized BLM's

fuzzy math in its comments on Atlantic Rim's Draft Environmental Impact Statement.

AR 70599.  Yet, BLM persisted in its error.

### 3. Implications of BLM's Flawed Ozone Analysis

The relief that plaintiffs seek – a complete air quality analysis – is not simply a

paper exercise.  Ground-level ozone pollution is becoming a pressing concern in

Wyoming, including the Atlantic Rim area.  While usually a summertime air pollutant in

urban areas, Wyoming officials have issued several health alerts in rural gas-drilling

areas due to a substantial buildup of ozone.  Lipsher, Steve, "Wyoming Ozone Alert Stirs

Debate," Denver Post (February 28, 2008), attached as Exh. 14;  see also Wyoming

Department of Environmental Quality health advisories, available at

http://deq.state.wy.us/out/outreachpressrelease.htm.  BLM must have complete and

accurate information to make the informed decisions that NEPA requires regarding the

appropriate amount of drilling and appropriate pollution controls.  See City of Williams

v. Dombeck, 151 F.Supp.2d 9, 17 (D.D.C. 2001) (NEPA was enacted  "to help public

officials make decisions that are based on an understanding of environmental

consequences, and take actions that protect, restore, and enhance the environment."),

citing 40 C.F.R. § 1500.1(c);  Environmental Defense, 515 F.Supp.2d at 78.

---

[13] BLM concluded in the FEIS that "[t]he predicted potential cumulative impacts are below applicable
ambient air quality standards and PSD [prevention of significant deterioration] increments."  AR 2489.
Neither the FEIS or any the the Environmental Assessments accompanying the Catalina and Sun Dog
approvals discuss the damage to health and environment caused by ground-level ozone.

By relying on an out-dated methodology and an incorrect background number, BLM failed to require readily available emission controls for drilling rigs and other gas exploration and production equipment. The FEIS does not contain any controls to limit the project's impact on ozone concentrations. AR 2335; see also, AR 4839. BLM did not conduct any additional air quality analysis when preparing the Environmental Assessments to accompany the agency's approvals of the Catalina and Sun Dog plans of development. See, e.g., AR 73498 (Catalina EA) ("Air quality impacts are disclosed and analyzed in the AREIS."). The Conditions of Approval for the Catalina and Sun Dog plans of development also do not contain mitigation measures to limit the impacts of the approved exploration and production on ozone concentrations. See e.g., AR 73506-19 (Conditions of Approval for Catalina PODs A & B).

Yet, means to limit emissions of NOx and VOCs that form harmful ground level ozone are readily available. In fact, BLM has required such measures elsewhere in Wyoming. In the Pinedale area, for example, BLM proposed to require 80 percent emission reductions. BLM, Pinedale Anticline Draft SEIS (December 2006), at 4-74, attached as Exh. 13. The Pinedale Draft SEIS prepared by BLM identifies several measures that can be taken to reduce emissions that cause air quality impacts including the use of natural gas-fired drilling rig engines, Tier 2 diesel drilling rigs and centralization of gathering facilities to reduce truck traffic. Id. at 4-75.[14]

## B. BLM Failed to Take a Hard Look at Methane Leak Impacts.

The Atlantic Rim FEIS fails to adequately disclose the potential environmental harms that the project will trigger by causing methane gas to be released through dry

_____

[14] Although the analysis in the Pinedale Draft SEIS is focused on visibility impacts, NOx emissions contributing to reductions in visibility also contribute to increased ozone concentrations.

seeps and as part of springs.  This failure is especially egregious because the

administrative record shows that BLM's <u>own scientists</u> identified the risk of harm from

methane releases but BLM still failed to disclose this information in the FEIS.  As a BLM

scientist stated in an internal BLM document, "there exist some fairly severe safety and

environmental concerns" due to the increases in methane emissions that the project will

cause.  AR 8805.  However, the few sentences in the FEIS on the topic of methane

discharges utterly fail to disclose the environmental effects that BLM's own scientist

predicted.  Accordingly, the FEIS fails to adequately disclose this important effect of the

project.  <u>See</u> <u>Robertson</u>, 490 U.S. at 350 (agency must assure that "the adverse

environmental effects of the proposed action are adequately identified and evaluated").

In the administrative record, internal BLM scientific analysis and comments by

the United States Environmental Protection Agency (EPA) and plaintiffs documented that

the development of the Atlantic Rim coal bed methane project would result in releases of

methane and that those releases would have serious environmental effects.  These effects

include both the risk of local harm from the high concentrations of methane and

contributions to global warming due to the potent heat-trapping capacity of methane.  AR

8803.  In contrast, the FEIS contains only a few sentences on the general topic of

methane springs, no discussion of the evidence that the interim drilling had already

caused an increase in methane seeps, and no discussion of global warming.  AR 2351,

AR 4547.

In a BLM document dated February 6, 2007, a BLM Petroleum Engineer, Jon N.

Dull, evaluated known methane gas seeps in the Atlantic Rim area.  AR 8799-8808,

attached as Exh. 15.  Dull noted that there appeared to have been a significant increase in

the amount of methane escaping from seeps "since the commencement of [the interim] CBNG [coal bed natural gas] development," and that this increase was probably the result of that development.  AR 8803.  Dull concluded that "it is likely that future CBNG development may cause increased quantities of gas to be emitted from the known seeps. It is also possible that there exist other seeps within the ARPA that are yet to be discovered."  AR 8805.

As Dull explained, this increase in methane seeps is a predictable result of coal bed methane production because the same process that releases methane for capture in production wells also allows it to escape to the atmosphere through innumerable fractures, springs and old, improperly closed wells.  AR 8802.  Specifically, gas companies  produce methane from coal seams "through a dewatering process where the hydrostatic head (pressure) is reduced, within the coal beds. . . ."  Id.  The reduction in pressure within the coal seams allows methane gas that is otherwise trapped in the coal seam to be released.  Id.  The gas companies capture a portion of the released methane through their wells but, once it has been released from the coal bed, the methane also migrates to the atmosphere through other routes.  AR 8802-03

BLM's engineer Dull identified the following "fairly severe safety and environmental concerns" (AR 8805) from the increase in methane gas seeps:

(1) Potential damage to the atmosphere by elevated emission of coal bed gases.  All the constituents of the coal bed gases are considered to be greenhouse gases and incompatible with the well being of the earth's atmosphere.

(2) Potential damage to human and animal safety:

- Accidental ignition by an unaware tourist/hunter could result in someone being seriously burned.  Natural ignition via lightening or spontaneous combustion of exposed coal bed [gases] could cause wild fires that would be a danger to human life, wildlife and vegetation.

- Some of the potential constituents of coal gases like hydrogen sulfide and carbon dioxide are poisonous to humans and wildlife. They are also heavier than air and can settle in low lying basin areas and can create potential traps for the unknowing and unwary.

(3) Potential damage to vegetation: Some of the coal gas constituents like methane and hydrogen sulfide are incompatible with plant life and can result in vegetation die off in the adjacent vicinity of the seeps. In the San Juan Basin of Colorado there have been extensive vegetation kills adjacent to gas seeps associated with the coal bed outcrops that are being developed for CBNG.

AR 8803.

Although neither EPA nor plaintiffs had the benefit of Dull's analysis, comments from each echoed his concerns. EPA explained that the project will "generate greenhouse gases, including methane and $CO_2$" and urged that "[t]he EIS should include an evaluation of project greenhouse gas emissions and their potential control technologies to provide public disclosure of this environmental impact." AR 3481; see also AR 9941. Likewise, plaintiffs urged that methane impacts on global warming be evaluated, pointing out that methane "is a global warming gas 20 times more potent than carbon dioxide."[15] AR 9954.

Like Dull, plaintiffs and other public commenters also linked the recent increase in methane spring activity to the interim coal bed methane production BLM had approved. In March of 2007, local rancher Sharon O'Toole met with Bob Bennett of BLM and provided photos of active methane springs. Ms. O'Toole's email stated that she had spoken "with Venable Barclay, a geologist who has done a lot of work in this area [and who] confirmed that this is new activity." AR 9432. In April, 2007, Wyoming Outdoor Council ("WOC") submitted a letter to BLM describing "new and unexplained" methane springs that "have been occurring in the Atlantic Rim area," "coincid[ent] with

---

[15] This means that each molecule of methane released to the atmosphere will contribute twenty times the amount of warming as a molecule of carbon dioxide.

the drilling and development of coal bed methane wells in the area, due to the pilot

project that the BLM approved." [16]  AR 8840, attached as Exh. 16.  WOC's letter

explained that the Wyoming Department of Environmental Quality (DEQ) had recently

held a meeting about the new methane seeps and had explained that these new methane

emissions were "not due to the <u>reinjection</u> of produced water."  <u>Id.</u>  However, WOC

pointed out that Wyoming DEQ did not address the <u>withdrawal</u> of water and WOC

explained – consistent with Dull's explanation – that the evidence "suggests that coal

seam dewatering is causing" the "rapid and substantial increase in methane springs."  AR

8840-8841.

     The record also shows that Barbara Parsons, a member of a BLM advisory group,

forwarded to BLM an April 27, 2007 Biodiversity Conservation Alliance press release

concerning the methane springs.  AR 9447.  The release contained the results of testing

conducted by Walt Merschat, a geochemist who Parsons described as "a very credible

professional geologist with experience in" coal bed methane.  AR 9447; <u>see also</u> AR

79100 (Declaration of Walter R. Merschat), attached as Exh. 17.  Merschat had tested the

concentration of gases in new and previously existing methane springs and found

"exceptionally high methane concentrations."  AR 9450.  Merschat also pointed out that

in addition to the bubbling methane seeps associated with springs, methane was invisibly

"seeping out of dry cracks in the ground."  <u>Id.</u>  The BCA news release urged BLM to

supplement the FEIS with an evaluation of the methane impacts.  <u>Id.</u>

     BLM recognized that it must respond to plaintiffs' letter and release because

"until the ROD is released to the public," the administrative record "is still open for this

---

[16] The WOC letter alternatively refers to methane springs and "mud pots," which such springs are called
because methane appears to boil up out of the mud.

kind of information." AR 9452. However, the record shows that BLM never seriously considered the information submitted but instead simply tried to find a way to approve the project as quickly as possible. AR 9453. As articulated in its own memorandum, BLM chose a "do nothing" approach. AR 9467, attached as Exh. 18. The agency recognized that such an approach "keeps project on track without any additional work" but that doing nothing "does not acknowledge public comment received during NEPA process, does not match the administrative record, increases risk of appeal by WOC and diminishes the defensibility of NEPA process and the 'hard look.'" Id. Rather than revising its Record of Decision, BLM issued it without any errata discussing the methane concerns that the public had brought to the agency's attention. AR 4817-4819.

Neither the ROD nor the FEIS nor the Environmental Assessments prepared for the Catalina and Sundog development plans contain any reference to the report Dull drafted. Dull himself does not appear to have been included in any meetings or email correspondence regarding how the agency should respond to plaintiffs' concerns about methane. Thus, it appears that BLM never consulted its own expert's analysis of the issue. The correspondence also shows that BLM's discussion focused on whether the reinjection of water was causing the problem, when in fact plaintiffs' comments explicitly stated that the withdrawal of water, rather than reinjection, had caused the increase in methane seeps. AR 9453 (BLM discussion of reinjection); 8840-8841 (WOC letter).

Rather than analyzing the issue presented, BLM simply assembled the few instances in which the FEIS mentioned methane seeps. BLM's hydrologist, Bob Lange compiled the FEIS's references to methane and implicitly admitted in his cover email that

the analysis was not sufficient: "If I were to write this analysis today, I would have gone

into more detail about gas migration and made the point that project activities and

drought can cause this phenomenon." AR 9460 attached as Exh. 19. Notwithstanding

this admission, BLM's assistant field manager concluded – mistakenly – that BLM had

adequately "addressed methane springs in the FEIS." AR 9460.

In fact, the discussion of methane seeps in the FEIS is woefully inadequate. The

discussion is limited to two general paragraphs. The groundwater section included the

following:

> Methane seeps could possibly develop in the outcrop region of the
> Mesaverde Group as a result of this project. These seeps could
> contaminate shallow groundwater resources and may also cause the death
> of vegetation in limited areas. The number or location of these seeps is
> impossible to predict, therefore monitoring would be established to
> evaluate this impact. These seeps have been documented within CBNG
> development in the San Juan Basin along with other areas of CBNG
> development. In the San Juan Basin many of these seeps, even before
> production, occurred in the outcrop regions of the producing formations.

AR 2351. The vegetation impact section stated:

> Although most natural gas would be collected as water is removed from
> the coal aquifers, some gases may move upslope through the formation
> and escape through the soil surface. Where this occurs the vegetation may
> die back, resulting in dominance of herbaceous species and increased bare
> ground. These locations would generally be small and scattered along the
> outcrops of the coal formations, probably affecting less than 10 acres
> altogether.

AR 2371.[17] Finally, BLM proposes to include monitoring wells to "quantify potential

impacts from methane seeps where the Mesaverde Group outcrops." AR 2368. The only

mention of the effects of methane on global warming is BLM's statement, made in

---

[17] In the response to comments included in the ROD, BLM also acknowledged "reports of mud pots and
geysers" that "may be related to current operations." AR 4868-4881. However, BLM only disclosed that
these features are "not likely related to injection of produced water," and failed to acknowledge that its
expert believed they were connected to the dewatering process. Id.

response to EPA's comments, that "[e]ffects from greenhouse gases are outside the scope of" the EIS.  AR 4547.

This discussion fails to disclose or analyze the "fairly severe safety and environmental concerns" identified by BLM's Dull, EPA and plaintiffs' scientists. Accordingly, it violates NEPA's requirement that the EIS must analyze and disclose "the adverse environmental effects of the proposed action." <u>Robertson</u>, 490 U.S. at 350.  First, the FEIS fails to acknowledge that the interim drilling had likely already resulted in increased methane seeps.  Second, the FEIS fails to provide any discussion of the amount of methane that might escape from seeps.  BLM should have tested the methane seeps to determine the quantity of methane escaping or, at the very least, it should have reported the results of Walt Merschat's tests, which revealed very high levels of methane.  Third, despite the concerns of its own scientist and the fact that plaintiffs pointed out that methane is a far more potent greenhouse gas than $CO_2$, BLM fails to even mention the global warming impact of increased methane emissions.  AR 4547.  Fourth, the FEIS also makes no mention of the "potential danger to human and animal safety" that Dull and plaintiffs identified.

Importantly, this case is not simply one in which there is a disagreement between BLM's experts and plaintiffs' experts.  Here, BLM failed to disclose in the FEIS the analysis conducted by the agency's <u>own</u> engineer.  BLM's failure to disclose its own engineer's analysis plainly demonstrates that the FEIS is deficient and does not adequately "disclose the environmental impact of [BLM's] actions." <u>Balt. Gas & Elec. Co. v. NRDC</u>, 462 U.S. at 97-98.  The "few sentences" which purport to address methane fail to provide the required analysis of the issue.  <u>See</u> <u>NRDC v. Hodel</u>, 865 F.2d 288, 299

(D.C. Cir. 1988) (rejecting as inadequate discussion consisting of a few "snippets [that] do not constitute real analysis"); see also Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 138 (D.D.C. 2001) (rejecting analysis consisting of only a few "conclusory remarks") (internal citations omitted).

 BLM's failure to evaluate the effect of the project on global warming is particularly surprising because EPA, in its comments, even cited a recent Eight Circuit decision requiring the analysis of impacts on global warming for a railroad project.  AR 3481; Mid States Coalition For Progress v. Surface Transp. Bd., 345 F.3d 520, 550 (8th Cir. 2003) (rejecting EIS which failed to evaluate effects on global warming from construction of new rail route that would reduce the cost of coal); see also Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 508 F.3d 508, 550 (9th Cir. 2007) (rejecting EIS for failure to evaluate cumulative impact of greenhouse gas emissions from new fuel economy standards).  As the Eighth Circuit held, contributions to global warming are not too speculative; an EIS must discuss effects whose "nature . . . is reasonable foreseeable" even if "its extent is not."  Mid States Coalition, 345 F.3d at 550.  BLM's claim that global warming impacts are "beyond the scope of this EIS" is inconsistent with the Mid States Coalition decision as well as the Ninth Circuit's Center for Biological Diversity case.

 In sum, the FEIS fails to provide a sufficient analysis of the potential impacts from methane seeps.  Accordingly, the Court should enjoin further activity and remand the matter to BLM for completion of an adequate EIS.

## C.  BLM Failed to Take a Hard Look at Sage Grouse Impacts.

NEPA "does not mandate particular results, but simply prescribes the necessary process." (Nov. 30, 2007 "Memorandum Opinion," at 12).  As noted above, however, "NEPA review is . . . not toothless."  <u>Environmental Defense</u>, 515 F.Supp.2d at 76.  NEPA requires that the agency take a "hard look" at the environmental consequences of the proposed action.  <u>Robertson</u>, 490 U.S. at 350.  To satisfy the "arbitrary and capricious" standard of review, that "hard look" must involve a reasoned analysis of the evidence before the agency.  <u>Environmental Defense</u>, 515 F.Supp.2d at 76 (<u>citing</u> <u>Marsh</u>, 490 U.S. at 371).  As the Supreme Court has stated, "the agency must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made."  <u>Motor Vehicles</u>, 463 U.S. at 43.  That explanation must consider all important aspects of the problem and not "run[] counter to the evidence before the agency."  <u>Id.</u>

Here, BLM's conclusion that "no actions that might jeopardize the future existence or viability of this species [sage grouse] may occur," AR 4405, conflicts with the evidence in the record.  BLM has failed to provide the "detailed" and "reasonably complete" discussion of measures to mitigate the environmental consequences of a proposed action that NEPA requires.  <u>See</u> <u>Robertson</u>, 409 U.S. at 351, 352.  Finally, BLM has failed to meet its obligation under NEPA regulations to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements."  40 C.F.R. § 1502.24.

28

### 1. BLM's Discussion of Impacts to Sage Grouse in the EIS

The greater sage grouse is the largest species of grouse in North America. 69 Fed. Reg. 21484, 21485 (Apr. 21, 2004). While once prevalent throughout western North America, population estimates now range between 100,000 and 500,000, representing a 69-99% decline from original populations. Id. at 21486. Recognizing the decline of the species, BLM has listed the sage grouse as a "Sensitive Species." AR 4405; Western Watersheds Project v. Fish and Wildlife Service, 535 F. Supp. 2d 1173, 1175-76 (D. Idaho 2007). Because nearly half of all sage grouse habitat exists on BLM-administered federal land, BLM has affirmed that it has a special responsibility for the welfare of the species. AR 5497, 79130.

BLM acknowledges in the Atlantic Rim FEIS that sage grouse will be significantly harmed by this project. AR 2092. Sage grouse are prevalent throughout the Atlantic Rim project area. AR 2394. Prior to the initiation of drilling, suitable sage grouse habitat covered 92% of the project area. AR 2395. Much of that habitat will be either permanently or temporarily lost due to the Atlantic Rim project. AR 2395, AR 2402. The FEIS notes that potential project impacts include long-term loss and fragmentation of habitat, decreased population productivity (lower birth rates), and increased predation, all of which lead to a predicted "long-term decline in the population of this species." AR 2395, AR 2500.

BLM proposed in its Draft EIS and later adopted in the ROD/ FEIS a set of measures to mitigate harm to sage grouse.[18] These measures included a 0.25-mile no surface disturbance zone around sage grouse leks along with seasonal restrictions on surface disturbing activities within two miles of a lek (to protect nesting habitat). AR

---

[18] The mitigation measures are summarized in this Court's Nov. 30, 2007 opinion, at 11 and AR 2626.

2626.  Even with the application of these measures, however, BLM predicted that

impacts to sage grouse would exceed the "significance" criteria.  AR 2404.

### 2. BLM Failed to Adequately Respond to the Fish and Wildlife Service's Concerns that the Project May Lead to the Need to List Sage Grouse as Threatened or Endangered.

In its January 26, 2006 comments on the Draft EIS, the United States Fish and

Wildlife Service ("the Service") raised a serious concern regarding the discussion of

impacts to sage grouse – namely, that the anticipated impacts might lead to the need to

list sage grouse as endangered or threatened under the Endangered Species Act ("ESA").

Noting BLM's prediction in the Draft EIS of significant effects on sage grouse and other

sagebrush-dependent species (sagebrush obligates), the Service stated:

> The Service is concerned that the effects to habitats important to the above species [including sage grouse] may be irreversible and no amount of mitigation can restore or replace what is lost.  As several of these species are in decline from loss of habitat, the Service recommends that the Bureau not authorize an action that may exacerbate their decline and possibly result in listing of one or more of these species under the [Endangered Species] Act.

AR 3255 (Jan. 26, 2006 Fish and Wildlife Service Comment Letter, at 2, attached as Exh.

20) (emphasis added).

The Service's legitimate and serious concern about the extent of the impact of the

project on sage grouse warranted a direct response and reasoned analysis based on

evidence.  Instead, BLM provided only "conclusory remarks, statements that do not equip

a decisionmaker to make an informed decision about alternative courses of action or a

court to review the [decisionmaker's] reasoning."  NRDC v. Hodel, 865 F.2d at 298.

BLM's failure to provide the requisite response and analysis violates NEPA's hard look

requirement.  See Id. at 298-300 (finding cumulative impact analysis in EIS inadequate

where it did not include the "requisite analysis" and did not "address the issue raised by

the EPA"; and suggesting that agency reference scientific studies and other materials in its analysis on remand); Friends of the Earth v. U.S. Army Corps of Engineers, 109 F. Supp. 2d. 30, 38-42 (D.D.C. 2000) (finding corps' failure to address certain issues raised in comments of sister agencies and "lack of analysis" of others did not satisfy NEPA's "hard look" requirement).

In its response to the Service's comments, BLM stated:  "The sage-grouse is a BLM sensitive species, listed as such on 04/09/2001. Because of this status no actions that might jeopardize the future existence or viability of this species may occur."  AR 4405.  The record, however, lacks any evidence or analysis of the crucial question raised in the Fish and Wildlife Service's comments:  Will the proposed action lead to a need to list sage grouse as endangered or threatened under the ESA?  Indeed, in comments on the Final EIS, the Service reiterated:

> We remain concerned that Project impacts to greater sage-grouse and other sagebrush obligate species may be significant and possibly irreversible, especially in a landscape where these species currently thrive. Proposed development may alter the future size, distribution and existence of local populations.  The Service reiterates its recommendation that the Bureau not authorize an action that may exacerbate the decline of fish and wildlife species and possibly result in listing under the Act.

AR 10134-10135 (Jan. 5, 2007 Fish and Wildlife Service Comment Letter, attached as Exh. 21).

Despite acknowledging its obligation to prevent actions that "might jeopardize the future existence or viability" of the greater sage grouse, AR 4405, BLM never addresses – much less analyzes – whether or not the proposed (now approved and ongoing) action will possibly lead to a need to list sage grouse under the Endangered Species Act.  This omission is particularly striking given BLM's written policy that BLM-authorized actions may not "contribute to the need for [a sensitive] species to become listed as a threatened

31

or endangered species." AR 5237-38 (BLM's Manual 6840 - Special Status Species Management). In addition, the 1990 Great Divide Resource Management Plan ("RMP"), which covers the Atlantic Rim project area, states that "[s]age grouse and sharp-tailed grouse strutting/dancing grounds [leks] and nesting habitat will be protected." Finally, a 2000 Memorandum of Understanding ("MOU") between BLM and the Western Association of Fish and Wildlife Agencies, U.S. Forest Service, and U.S. Fish and Wildlife Service commits BLM to "provide for habitat protection, conservation and restoration, as appropriate, consistent with all other applicable laws, regulations, directives and policies." AR 86104. BLM's contravention of its own Special Status Species policy, as well as the RMP and MOU, without any analysis or explanation is another reason that the BLM's decision-making process was arbitrary and capricious. Motor Vehicles, 463 U.S. at 41-42; Greater Boston Tel. Corp. v. FCC, 444 F.3d 841, 852 (D.C. Cir. 1970) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored….").

The Service's concern that the project may have irreversible effects that could lead to the need to list sage grouse as an endangered species is neither idle nor inconsequential. Listing under the ESA triggers a host of potentially costly legal protections, including prohibitions on actions that will harm a listed species and the need for consultations and biological opinions for actions that "may affect" listed species. 16 U.S.C. §§ 1536, 1538. And the potential that the proposed action could lead to the need to list sage grouse is real and significant. Indeed, in 2004, after groups petitioned the Service to list the sage grouse under the Endangered Species Act, the Service issued a

"90-day" finding that sage grouse may warrant listing as threatened or endangered under the ESA. See Western Watersheds, 535 F. Supp. 2d 1177; 69 Fed. Reg. 21484.

The decision as to whether a listing is warranted is still pending. See Western Watersheds, 535 F. Supp. 2d at 1189. Yet, it is clear that energy development on BLM-managed land, and especially in the Atlantic Rim, has a particularly strong potential to impact the need for listing. Nearly half all sage grouse habitat is on BLM-managed land. Id. at 1187; AR 5497. Sage grouse are prevalent in the Atlantic Rim project area and 92% of the area is suitable sage grouse habitat. AR 2394-95. However, a recent study by Matthew Holloran involving another Wyoming BLM-authorized natural gas development project with very similar sage grouse mitigation measures to those approved in this project, predicted the complete extinction of the studied sage grouse population within 19 years. AR 7131.

### 3.    BLM's Discussion of its Sage Grouse Mitigation Measures is Not Supported By the Record.

In its January 26, 2006 letter, the Service also questioned the scientific validity of BLM's proposed mitigation measures for sage grouse. The Service stated: "The Service does not support a 0.25 mile protective buffer around sage-grouse leks as a mitigation measure, nor do we support a 2-mile [seasonal] buffer to protect nesting habitat." AR 3256 (Exhibit 20, at 3). The letter cited the recent study by Matthew Holloran, mentioned above, which concluded that these mitigation measures applied by BLM in a nearby energy development project were inadequate to maintain breeding populations and estimated the "mean extinction time for the population of birds that was present before gas field development" to be 19 years. AR 7131.

Instead of mitigation measures that have been demonstrated to be ineffective, the Service stated that it "strongly recommends minimum protection measures as described by Connelly et al. (2000)." AR 3256 (Exh. 20, at 3). The Connelly paper cited by the Service, also known as the "Western Association of Fish and Wildlife Agencies (WAFWA) Guidelines for Management of Sage-grouse Populations and Habitats"[19] (the "Connelly guidelines") recommends that no energy-related facilities be located within 3.2 kilometers (two miles) of an active lek.[20] AR 86094. Despite referencing "literature reviews," BLM's response to the Service's critique failed to point to any studies, or to provide any evidence or analyses, that support its contention that the quarter-mile "no surface disturbance" zone around leks is a scientifically-accepted mitigation measure. AR 4405.

Not only did BLM fail to support its proposed mitigation measures with evidence or analysis, but it failed to even discuss the studies presented by the Service that undermined the validity of those measures. BLM was clearly aware of the Holloran study, citing it for other propositions in the FEIS. AR 2260, AR 2499. However, BLM failed to discuss the implications of this study on the scientific viability of its mitigation measures. Similarly, BLM was aware of the Connelly guidelines. Indeed, in the 2000 MOU between BLM, the Forest Service, the Fish and Wildlife Service and WAFWA, the BLM committed specifically to consider the Connelly guidelines in its planning process.

---

[19] See e.g. AR 5520, AR 5527 (referring to Connelly guidelines as "WAFWA Guidelines for Management of Sage-grouse Populations and Habitats")
[20] BCA also cited this study in its comments. See AR 70559, 70561.

AR 86104.[21]  Nevertheless, the FEIS, ROD, and site-specific EAs all fail to discuss the

Connelly guidelines or indicate why they are not being followed.

BLM's failure to provide a reasoned and evidence-based analysis of its proposed

mitigation measures, in the face of substantial criticism and contrary evidence, violates

NEPA's "hard look" requirement.  NEPA requires that an EIS "contain[] sufficient

discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to

take a 'hard look' at environmental factors, and to make a reasoned decision."  NRDC v.

Hodel, 865 F.2d at 294.  Here, the opposing viewpoint of the Service and others, which

was supported by evidence, was dismissed with a pat, conclusory response asserting that

the proposed measures represented the "minimum" of an acceptable range.  AR 4405.

The response, along with the rest of the EIS and other NEPA documents, failed to cite

any evidence or analyze the issue.  Such treatment is patently inadequate under NEPA.

See Id. at 298-300 (finding "conclusory remarks" regarding impacts of project, without

any analysis, to be inadequate, and recommending, on remand, that agency present an

analysis supported "with references to scientific studies and other materials so that a

decisionmaker would have ready access to the information underlying the Secretary's

findings and conclusions."); Environmental Defense, 515 F. Supp. 2d at 81 (D.D.C.

2007) (finding agency's discussion of mitigation inadequate where it "failed to identify

evidence supporting its determination"); Columbia Falls, 139 F.3d at 923 (holding that an

agency must provide a "full analytical defense" when its analytic model is challenged and

that it "retains a duty to examine key assumptions as part of its affirmative burden of

promulgating and explaining a non-arbitrary, non-capricious rule.").

---

[21] Further, BLM's "National Sage Grouse Habitat Conservation Strategy" identifies the Connelly paper
cited by the Service as a "a good starting point in developing local management . . . guidelines."  AR 5497,
at 5543.

Furthermore, BLM's assertion that its mitigation measures represent an acceptable minimum runs counter to the evidence in the record, which overwhelmingly indicates that these measures don't work.  See Motor Vehicles, 463 U.S. at 43 (stating that agency action would be arbitrary and capricious if it "offered an explanation for its decision that runs counter to the evidence before the agency").

Relatedly, BLM's unsupported discussion of mitigation measures – and indeed, its aforementioned unsupported discussion of the extent and severity of the project's impacts on sage grouse – violates NEPA's scientific integrity requirement.  NEPA requires that agencies "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements."  40 C.F.R. § 1502.24. Here, by failing to provide any evidence or analysis in support of its conclusion (or lack thereof) regarding the extent of the projects' impacts on sage grouse or in support of its proposed mitigation measures, the efficacy of which was controverted by record evidence, BLM violated NEPA's scientific integrity requirement.  See Environmental Defense, 515 F. Supp. 2d at 81 (finding violation of scientific integrity requirement where agency failed to incorporate into its mitigation analysis known problems with its plan and failed to identify evidence supporting its conclusions).

### 4.     *BLM Does Not Provide a Detailed or Reasonably Complete Discussion of Mitigation Measures for Sage Grouse.*

NEPA's requirement that an agency disclose the potential environmental consequences of proposed actions incorporates a "requirement that an EIS contain a detailed discussion of possible mitigation measures."  Robertson, 490 U.S. at 351.  The Court in Robertson underscored the importance of a "reasonably complete" discussion of mitigation:

> [O]mission of a reasonably complete discussion of possible mitigation measures would undermine the "action-forcing" function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects.

Id. at 352; see Citizens Against Burlington v. Busey, 938 F.2d 190 (D.C. Cir. 1991) (EIS must contain "a reasonably complete discussion of possible mitigation measures") (quoting Robertson, 490 U.S. at 352).

Here, BLM's discussion of possible mitigation measures lacks any detail, analysis or evidentiary support, failing to satisfy the "reasonably complete discussion" requirement. See Environmental Defense, 515 F. Supp. 2d at 81 (finding agency's discussion of mitigation inadequate where it "failed to identify evidence supporting its determination"); League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren, 309 F.3d 1181, 1192 (9th Cir. 2002) (finding "hard look" failure where discussion of mitigation measures failed to provide analysis or rationale to support chosen measures that were contradicted by the recommendation of a sister agency, and noting that a "'mere listing' of mitigation measures, without supporting analytical data" does not constitute a reasonably complete discussion of mitigation (citation omitted)); Mid States Coalition, 345 F.3d 558 (Heaney, J., concurring) ("It is not enough to put forth . . . [measures] as appropriate mitigation without revealing the reasoning behind such a finding, or detailing the impact the proposed mitigation will have . . . .  Instead, the [agency] is required to explain fully its course of inquiry, analysis and reasoning." (quotation marks and citation omitted)).

## II.    BLM Failed to Adequately Assess Cumulative Impacts to Big Game.

BLM's own statements in the record expose the inadequacy of the agency's cumulative impact analysis.  The cumulative impact analysis must include impacts from

all reasonably foreseeable future actions that will have a synergistic or cumulative environmental impact on a region, including proposals concurrently pending before an agency. 40 C.F.R. § 1508.7; Kleppe v. Sierra Club, 427 U.S. 390, 410 (1976). Here, BLM sole reliance on a calculation of surface acres disturbed to determine cumulative impacts conflicts with the agency's own acknowledgment that displacement of big game, such as elk, far exceeds the actual area of surface disturbance. Even assuming that relying on surface acres disturbed is sufficient, BLM's numbers for the acres disturbed are wrong. BLM failed to include impacts from thousands of additional wells in two proposals pending before the BLM at the time the agency was working on the environmental analysis to support the Atlantic Rim project.

BLM unreasonably limited its cumulative impact analysis to a calculation of surface acres disturbed. The agency estimates that the cumulative impact from the proposed action is disturbance of 7,124 total acres of the Sierra Madre elk herd's seasonal range. AR 2498 (see Exh. 7). Looking at the surface disturbance alone fails to provide a complete picture of the cumulative impacts on the Sierra Madre elk herd. BLM itself acknowledges, "Construction and drilling noise have the potential of affecting wildlife species at the project site as well as areas surrounding disturbance sites." AR 2389. Specifically, a zone from 0.6 to 1.2 miles surrounding an area of surface disturbance such as a well pad tends not to be used by elk due to human activity. Id. BLM needed to look at the actual acres of seasonal range from which the elk were displaced, rather than simply the surface disturbance that the projects caused.[22]

---

[22] BLM's cumulative impact analysis completely leaves out the Petition elk herd which the agency itself acknowledged would be affected by the project. AR 2400, 2498.

Even more significantly, BLM did not accurately count the number of acres of disturbed surface. BLM failed to include two projects with thousands of new wells that the agency was planning for at the same time it was preparing the Atlantic Rim EIS. BLM issued a Notice of Intent to Prepare an Environmental Impact Statement for the Continental Divide-Creston Natural Gas Project on March 3, 2006 – months before BLM even issued its Draft Atlantic Rim EIS. 71 Fed. Reg. 10989-01.[23] Almost 9,000 new wells were proposed as part of this project. Id. BLM did not consider the impacts of these proposed wells despite the requests of BCA and the Wyoming Game and Fish Department to do so. AR 4590, (BLM Resp. to Comments); AR 70570 (BCA Comments); AR 9762-63 (WGFD Comments). BLM concluded that the project was "not reasonably foreseeable" (AR 9772) even though the agency itself included the project on its map of "Rawlins Field Office – Minerals and Lands Projects," dated June 9, 2006. AR 86298 (Exh. 22). The agency clearly had time to include the impact of these wells before it issued the Atlantic Rim Final EIS in May 2007.

Likewise, BLM failed to include the impacts of the 4,208 proposed new wells in the Hiawatha energy project even though the agency was preparing the environmental analysis for this project at the same time that it was preparing the Atlantic Rim EIS. See Notice of Intent to Prepare an Environmental Impact Statement – Hiawatha Regional Energy Development Project, 71 Fed. Reg. 52571-01 (Sept. 6, 2006).[24] NEPA explicitly requires agencies to evaluate the impacts of "reasonably foreseeable future actions." 40 C.F.R. § 1508.7; Grand Canyon Trust, 290 F.3d at 345. Both these projects when

---

[23] The Continental Divide-Creston project is located directly east and extending north of the Atlantic Rim project area. AR 86298, attached as Exh. 22. See Rawlins Field Office, Continental Divide – Creston Natural Gas Project, http://www.blm.gov/wy/st/en/info/NEPA/rfodocs/cd_creston.html.

[24] The Hiawatha project is located southwest of the Atlantic Rim project. Rock Springs Field Office, Hiawatha Regional Energy Project, http://www.blm.gov/wy/st/en/info/NEPA/rsfodocs/hiawatha.html.

combined with Atlantic Rim project would have dramatic consequences on elk,
pronghorn and mule deer. See Maps of Seasonal Ranges. AR 3189, attached as Exh. 22
(elk)(M-24); AR 3186, attached as Exh. 23 (pronghorn) (M-21); AR 3188, attached as
Exh. 24)(mule deer)(M-23). Yet, BLM chose to ignore them.

The record here simply does not support BLM's conclusion that the Continental
Divide-Creston and Hiawatha projects were not reasonably foreseeable. Even if these
projects were not reasonably foreseeable at the time BLM completed the project EIS, the
projects certainly were foreseeable at the time BLM was conducting the environmental
analysis to support approving the Catalina and Sun Dog PODs.

### III.   BLM Failed to Meet its Public Participation Obligations.

The fundamental objective of NEPA is to ensure that that an "agency will not act
on incomplete information only to regret its decision after it is too late to correct."
Marsh, 490 U.S. at 371 (citation omitted). An essential part of this information comes
from the public. NEPA's implementing regulations explicitly provide that "public
scrutiny [is] essential to implementing NEPA." 40 C.F.R. § 1500.1(b). Moreover,
NEPA's implementing regulations require federal agencies to "[m]ake diligent efforts to
involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. §
1506.6(a). Yet, in this case, BLM approved numerous applications for permits to drill
without taking reasonable steps to involve the public.

Plaintiffs do not argue that federal NEPA regulations require agencies to circulate
an environmental assessment under all circumstances. The regulations, however, do
require that BLM circulate the challenged EAs under the circumstances involved here.
This Court has recognized that "[a]ll three statutory and regulatory schemes implicated"

here – the Federal Land Policy and Management Act, NEPA and the CEQ regulations – "require the BLM to involve the public in its decision-making process." Biodiversity Conservation Alliance v. BLM, 404 F.Supp.2d 212, 219 (D.D.C. 2005) (citations omitted). Plaintiffs concede that "whether the public was adequately involved is a fact-intensive inquiry made on a case-by-case basis." Id. at 220. In Biodiversity Conservation Alliance, the Court found that the facts showed that BLM provided the required public participation. Here, the facts show that BLM has not.

### A. Notice of Drilling Permit Applications Did Not Provide Information about Environmental Impacts.

The notice that BLM provided that drilling permit applications had been filed did not provide information about the project's environmental impacts. BLM did not post the actual applications that it had received. See Exh. 25 (APD Posting Notice dated September 26, 2005), attached as Exh. V to Plaintiffs' Reply to Opposition to Motion for Preliminary Injunction.[25]   BLM regulations require operators to submit the following information as part of a drilling permit application:

> (1) A drilling plan, which may already be on file, containing information required by paragraph (e) of this section and appropriate orders and notices.

> (2) A surface use plan of operations containing information required by paragraph (f) of this section and appropriate orders and notices.

> (3) Evidence of bond coverage as required by the Department of the Interior regulations, and

> (4) Such other information as may be required by applicable orders and notices.

---

[25] Upon receipt of an application for permit to drill, BLM shall post information related to the APD for public inspection at least 30 days before action to approve the APD. 43 C.F.R. § 3162.3-1(g).

43 C.F.R. § 3162.3-1(d).  None of this information was provided to the public by BLM.
See Exh. 25.

Moreover, BLM's regulations require that "[e]ach drilling plan shall contain the
information specified in applicable notices or orders, including a description of the
drilling program, the surface and projected completion zone location, pertinent geologic
data, expected hazards, and proposed mitigation measures to address such hazards."  43
C.F.R. § 3162.3-1(e).  While the operators seeking the Catalina and Sun Dog drilling
permits presumably provided this information to BLM, it was not provided to the public.
See Exh. 25.

Information related to the site-specific environmental impacts of the APDs and
the conditions of approval to address the impacts were made available to the public for
the first time in BLM's Environmental Assessments that accompanied each plan of
development approval.[26]  See, e.g., AR 73492-73501;  Exh. 12, at 22.   None of this
information was provided at any time to the public before BLM approved the Catalina A
& B PODs.  See, e.g., Declaration of Erik Molvar (September 21, 2007), at ¶ 15, attached
as Exh. A to Plaintiffs' Motion for Preliminary Injunction.  The same is true for the Sun
Dog A & B PODs.  Id.

Thus, the facts in this case are very different from the facts in Biodiversity
Conservation Alliance, 404 F.Supp.2d 212.  Biodiversity Conservation Alliance involved
a challenge to a seismic testing project by Veritas DGC Land Incorporated ("Veritas").
In that case, "BLM advised the public of Veritas's proposal, allowed a thirty-day public

---

[26] Each plan of development (or POD) approval included a group of wells.  In other words, BLM approved
several APDs in each POD approval.  For example, the FONSI/Decision Record for Catalina PODs A & B
approved 39 wells.  AR 73502.

comment period, and <u>did not issue the DR/FONSI until after considering the issues raised during that period.</u>" <u>Id</u>. (emphasis added).

The facts in <u>TOMAC v. Norton</u>, 433 F.3d 852, 861 (D.C. Cir. 2006) are also quite different from the facts here.  Unlike BLM in this case, the Bureau of Indian Affairs in <u>TOMAC</u> <u>did</u> seek comment on the original draft environmental assessment.  <u>Id</u>. Plaintiffs in <u>TOMAC</u> argued that an <u>additional</u> round of comment was necessary when the agency supplemented the EA.  <u>Id.</u>  Here, there is no supplemental EA at issue.  What plaintiffs challenge is BLM's failure to circulate an <u>original</u> draft EA for public comment before the agency approved the challenged Catalina and Sun Dog drilling permits.  <u>See also</u>, <u>Ocean Mammal Institute v. Gates</u>. Slip Copy, 2008 WL 564664 (D.Hawai'i, Feb. 29, 2008) ("While there is no minimum level of public comment and participation required, a complete failure to involve or even inform the public about an agency's preparation of an EA and a FONSI violates NEPA.  In short, agencies should provide adequate "pre-decisional opportunities for informed public involvement in the environmental review process.") (citations omitted).  Here, BLM did not provide the public the information necessary to allow for informed public participation in the agency's decisions to approve the Catalina and Sun Dog A & B plans of development.

**B.  Opportunity to Comment on Project EIS Does Not Satisfy BLM's Obligation to Involve Public in Assessment of Site-Specific Environmental Impacts Prior to Approving Drilling Permits.**

Plaintiffs do not dispute that BLM provided significant opportunity for public comment on the project-wide Atlantic Rim EIS.  However, BLM explicitly put off part of the necessary analysis under NEPA until later when the agency knew where the operators proposed to locate the wells.  BLM indicated, both in the FEIS and in response to several

43

of plaintiffs' comments, that some issues would not be analyzed until specific drilling

proposals were on hand and site-specific analyses were performed.  See e.g., AR 2345,

AR 2426;  AR 4561, AR 4570, AR 4578, AR 4580, AR 4588.  The agency cannot have it

both ways.  If BLM finished the environmental analysis required under NEPA in the

FEIS, then public comment on that document would be sufficient.  When the agency puts

off part of the required analysis, however, as BLM did here, it cannot shut the public out

of this later stage.

CONCLUSION

For the reasons stated herein, plaintiffs respectfully request that this Court declare

that BLM has violated the National Environmental Policy Act, vacate BLM's approval of

the drilling permits issued for the Atlantic Rim project area, and enjoin further approvals.


Respectfully submitted,

                                          /s/  Sharon Buccino
                                        Sharon Buccino (DC Bar # 432073)
                                        Ben Longstreth (DC Bar # 974015)
                                        Aaron Bloom
                                        Natural Resources Defense Council
                                        1200 New York Ave., NW, Suite 400
                                        Washington, DC  20005
                                        T:  202-289-6868
                                        F:  202-289-1060
                                        sbuccino@nrdc.org

                                        *Counsel for Plaintiffs*

Dated:  April 28, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL<br>1200 New York Avenue, NW, Suite 400<br>Washington, DC 20005,          *et al.*<br><br>          Plaintiffs,<br><br>                    v.<br><br>DIRK KEMPTHORNE, in his official capacity<br>As the Secretary of the United States<br>Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240,          *et al.*<br><br>          Defendants. | Civ. No. 07-1709 (RJL) |
| ANADARKO PETROLEUM CORPORATION,<br>WARREN RESOURCES, INC., DOUBLE  EAGLE<br>PETROLEUM CO., and STATE OF WYOMING<br><br>Defendant-Intervenors, | |

## <u>SECOND DECLARATION OF ERIK MOLVAR</u>

I, Erik Molvar, declare under penalty of perjury that:

1.  I am wildlife biologist and Executive Director of Biodiversity Conservation Alliance (BCA). I have been a member of BCA since May 2000, an employee of this organization since September 2000 and served as an officer of the corporation from October 2001 to May 2006.

2.  BCA is a nonprofit conservation organization founded in 1988 and organized under the laws of the State of Wyoming.  BCA is dedicated to protecting wildlands and native wildlife in Wyoming and surrounding states.  Our office is in Laramie, Wyoming.  BCA members live in Wyoming and several other states.

3.  I am also a member of the Board of Directors of the Wyoming Wilderness Association (WWA), and have been on the Board of this organization since its rebirth in September 2002. I served in the capacity of President of the Board from September 2005 through December 2007.

DECLARATION OF ERIK MOLVAR

4.  WWA is a nonprofit organization, organized under the laws of the State of Wyoming. WWA is dedicated to ensuring the preservation for future generations of the benefits, known and unforeseen, of Wyoming's naturally functioning ecosystems. WWA members live in Wyoming and several other states.

5.  I live in Laramie, Wyoming, at 552 North Fifth Street. I have resided in Wyoming for the last 7 years and have a deep interest in management of federal lands in the Atlantic Rim area, which includes the Atlantic Rim Natural Gas Field Development Project.

6.  I have reviewed the attached map (Attachment A) of the Atlantic Rim Natural Gas Field Development Project Area ("Atlantic Rim project area" or the "project area") and I am very familiar with this area, having first visited the area in 1999 and having regularly visited this area over the last four years.

7.  I have reviewed the attached maps (Attachment B, C, and D) of Sun Dog Plans of Development (PODs) A, B, C, D, and E, and Catalina PODs A and B. I am familiar with these areas, having regularly visited them several times a year beginning in 2003.

8.  BCA and WWA have vital interests in the management of BLM lands and mineral development in the Atlantic Rim project area. These organizations work to ensure that wilderness-quality lands are not impacted by industrial projects, to protect rare and sensitive species of native wildlife and plants from destruction, to ensure that sensitive landscapes and habitats are not degraded, and to limit the impact to the environment of oil and gas practices in the Red Desert and elsewhere.

9.  BCA and WWA are concerned about the impacts of the Atlantic Rim project to the lands and wildlife of the project area, including but not limited to the industrialization of roadless lands through full-field development as proposed in the Atlantic Rim project and degradation of wilderness-quality lands in the Wild Cow Creek unit, which is a citizens' proposed wilderness. BCA has conducted education and outreach to the public on the potential impacts of BLM mineral and land management activities in the Red Desert region in general and the Atlantic Rim area in particular.

10. I first visited the Atlantic Rim project area during the summer of 1999, researching the book, *Wild Wyoming*. I visited the Atlantic Rim project area again in 2001 during the course of wilderness inventories of the Wild Cow Creek unit. Over the past four years, I have led at least two touring or backpacking outings to the Atlantic Rim area during early summer, and have visited the project area on numerous other occasions. I have visited the areas where the Catalina and Sun Dog PODs are now located, and the surrounding lands, more than 20 times, most recently on September 12, 2007. I have also taken aerial overflights of the Dry Fork Cow Creek valley, where these PODs are located, on two occasions, most recently on July 12, 2007. During these visits, I have enjoyed the vistas of unspoiled desert landscape - a place of stunning beauty with rolling hills, canyons, dune fields and diverse sagebrush communities. I have engaged in photography and wildlife viewing, hiking and backpacking, and have benefited through the spiritual renewal that can be gained through experiencing

DECLARATION OF ERIK MOLVAR

unspoiled landscapes. Prior to my visit on September 12, 2007, the north end of the Dry Cow Creek Valley, where the Sun Dog and Catalina PODs are located, had been undeveloped.

11. I plan to return to the Atlantic Rim area with my family to enjoy scenery, wildlife viewing, and potentially to hunt for mule deer. My enjoyment of this area would be severely curtailed if 2,000 gas wells and the associated infrastructure, as proposed under the Atlantic Rim project, were to be built on these lands, driving out the majority of the wildlife and destroying the scenic integrity of the area.

12. During a September 12, 2007 visit to the Sun Dog and Catalina PODs and surrounding area I saw two new roads that had been built across stream channels by the use of road cuts that descended to the level of the streamcourse and crossed it without the aid of culverts or other means to reduce or mitigate erosion or the runoff of sediment or salts into the stream during rainfall events. Harmful sediment is likely to run off these roads causing irreparable damage to water quality in the nearby streams and aquatic habitat.

13. Vehicle traffic in and around the area of both developments associated with drilling, construction, and production activities was locally heavy. Vehicle traffic is known to drive away wildlife, eliminating the habitat effectiveness for wildlife as far as 1.2 miles from roads for elk and reducing the attendance of sage grouse at nearby leks, or traditional breeding grounds. In addition, vehicle traffic contributes to direct mortality of animals through collisions and causes major reductions in forage vegetation by coating the leaves with dust in the areas surrounding roads.

14. Construction and drilling activities by Anadarko Petroleum in previously undeveloped portions of the Southern Sun Dog pod were also in full swing as of my September 12, 2007 visit. Well pads were under construction in this area. New roads were being cleared across previously untouched areas. New wells were being drilled, with one rig actively working in this part of the area.

15. The overall effect of these industrial activities is to convert a previously undeveloped, unscarred landscape into an industrial landscape visually dominated by roads, wellsites, and heavy equipment. The large tracts of native vegetation are being fragmented severely into smaller patches of remaining vegetation in a matrix of roadways and other human intrusions. The predominantly natural scenery of the area is being replaced by a landscape where industrial intrusions are a dominant feature.

16. In particular, the viewshed from the county roads traveling along the southern and southeast sides of the newly developed area have been and continue to be degraded by industrial intrusions on driving tours of the area. As a result, the landscapes that I previously used for viewing wildlife, particularly birds of prey and pronghorn antelope, have been industrialized for the long term, and wildlife have been driven away from this area. As a result, my enjoyment of this landscape has been and continues to be irreparably harmed by project activities.

DECLARATION OF ERIK MOLVAR

17. Based on my review of Wyoming Oil and Gas Conservation Commission records, Double Eagle and Anadarko are poised to do more drilling and road construction pursuant to the applications for permits to drill (APDs) that BLM has already approved. In addition, many more wells and new roads are imminent in the area. BLM is poised to approve over 200 more APDs tied to the Atlantic Rim project in the Catalina Unit alone. While at the Catalina POD on September 12, 2007, I observed a posted map illustrating the web of roads and wellpads planned for the area. In addition to the new roads and wellpads that I observed on September 12, 2007, Andarko is poised to construct many, many more miles new roads in the area.

18. I visited methane seeps within the Atlantic Rim project area with Walter Merschat, a geochemist and expert in methane seeps, on March 27, 2007. I returned to view the methane seeps on May 26, June 1, July 10, and September 12 of the same year. These methane seeps pose a significant safety hazard to visitors to the Atlantic Rim, and given my and BCA's history of leading public outings to this area and recommendation to members to visit key locations within the Atlantic Rim project area, new or increased methane seeps linked to coalbed methane production will significantly harm my interests and the interests of BCA and our members. These methane seeps also contribute to global warming, which will also significantly harm my interests and the interests of BCA and our members.

19. As Executive Director of BCA, I have written and submitted comments on proposals for BLM mineral and land management activities in the Atlantic Rim area (including the Atlantic Rim Project). In particular, I was involved in preparing BCA's comments on the Draft Environmental Impact Statement ("EIS") for the Atlantic Rim Project submitted to BLM on February 17, 2006.

20. Given my and BCA's interest in the Atlantic Rim Project, I have had regular contact over the past year with staff in BLM's Rawlins office which is managing the Atlantic Rim Project. I requested notice and copies of applications for ground disturbing activity that BLM received related to the Atlantic Rim Project, including Applications for Permits to Drill (APDs). I also requested copies of any documents prepared by BLM under the National Environmental Policy Act ("NEPA") accompanying these APDs or otherwise related to the Atlantic Rim Project. I requested to receive these documents prior to BLM's approval of any APDs or other ground disturbing activities.

21. BLM has now approved APDs for 91 wells and the accompanying roads and other infrastructure in the Catalina A & B PODs and Sun Dog A & B PODs of the Atlantic Rim Project. BLM did not provide me or BCA direct notice of these APDs prior to approving them. Furthermore, BLM did not provide me or BCA copies of the APDs or accompanying NEPA documents prior to the agency's approval of the 91 wells.

22. My interests – and the interests of BCA and WWA – have been and will continue to be injured by the BLM's failure to comply with the National Environmental Policy Act and the Federal Land Policy and Management Act in moving forward with the Atlantic Rim project.

DECLARATION OF ERIK MOLVAR

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, in accordance with 28 U.S.C. § 1746.

Dated: 4/21/08

Erik Molvar

DECLARATION OF ERIK MOLVAR

# ATLANTIC RIM FINAL EIS MAP
## Project Area Map



0    20    40        80 Miles

Cities
Interstate Highways
Highways
Counties
Atlantic Rim Project Area

No Warranty is made by the Bureau of Land Management for use of data for purposes not intended by the BLM. Map M-1







Exhibit A

T17N
T16N

Catalina B POD

Seismic Exploration Trail

Collector Natural Gas Pipeline

Stock Pond

Disturbance from historic drilling activity

Catalina A POD

LSRCD Reservoir

Carbon County Road 608

R92W
R91W

2006 NAIP Aerial Photos

N

U.S. Department of the Interior
Bureau of Land Management
Rawlins, Wyoming

0    3,000    6,000    9,000    Feet

1 inch equals 3,000 feet
1:36,000

Drafted By: TDB 10/02/2007

The BLM can not guarantee the accuracy of these data.

**Legend**
WOGCC Well Data (06/2007)-CA

- • All Other
- ⌀ Injection Well
- ✳ Flowing Well
- ✕ Plugged & Abandoned
- ✳ Producing Gas Well
- ● Producing Oil Well
- ─○─ Shut-In
- ◇ Spud

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL<br>1200 New York Avenue, NW, Suite 400<br>Washington, DC  20005,          *et al.*<br><br>      Plaintiffs,<br><br>          v.<br><br>DIRK KEMPTHORNE, in his official capacity<br>As the Secretary of the United States<br>Department of the Interior<br>1849 C Street, NW<br>Washington, DC  20240,          *et al.*<br><br>      Defendants.<br><br>ANADARKO PETROLEUM CORPORATION,<br>WARREN RESOURCES, INC., DOUBLE  EAGLE<br>PETROLEUM CO., and STATE OF WYOMING<br><br>Defendant-Intervenors, | Civ. No. 07-1709 (RJL) |

**DECLARATION OF JIM STATES**

1. I am on the Board of the Wyoming Outdoor Council ("WOC").  I have been on the Board since September, 2001.  I have been a member of WOC since August, 2001.

2. I am a member of the Natural Resources Defense Council.  I have been a member since 2002.

3. I have a Ph.D. in Environmental Science and have been an environmental consultant for over 35 years.  My former clients include private companies (oil and gas pipeline companies, electrical utilities, and energy developers) and governmental agencies (particularly the U. S. Department of Energy, Environmental Protection Agency, and Army Corps of Engineers). I am currently Program Manager for the only U. S. Government-owned oilfield, the Teapot Dome oilfield north of Casper, Wyoming.

4. I live with my wife, Carol, in Saratoga, Wyoming, just east of the Atlantic Rim.  I live in the home in which my family has lived since 1949 and in which I grew up from the age of 8 to 18.  I earned a Bachelor's degree, with honors, at the University of Wyoming in 1964; taught high school science in Sheridan, Wyoming in 1964 and 1965; and returned to UW to earn a

Master's degree in Plant Ecology in 1968. Between then and 1994, I lived in the west and northwest, including Alaska, returning to the family home in Saratoga each year to visit my parents who continued to live there. I moved back to Wyoming (Laramie) in 1994 and then moved backed to the family home in Saratoga in 2000.

5. I have reviewed the attached map of the Atlantic Rim Natural Gas Field Development Project Area ("Atlantic Rim Project area" or the "project area"). I am familiar with this area, having regularly spent time in it for over 50 years.

6. Our home in Saratoga is about a half-hour drive from the Atlantic Rim Project area.

7. When I was growing up, my family and I periodically camped and fished in the Sierra Madre mountains and traveled down onto the Atlantic Rim from there to enjoy the remoteness and beauty of that area. With our fishing rods, we explored the extent of distribution of an unusual cutthroat trout (which turned out to be the currently-threatened only native trout of the area, the Colorado River cutthroat), including the upper reaches of Muddy Creek, now flowing through the proposed project area. In the fall, the Atlantic Rim was one of several areas we hunted for sage grouse, antelope, deer, and elk, depending on when winter set in and the resulting migration patterns of those species.

8. After I left Wyoming, I still returned to that area, including the Atlantic Rim Project area, whenever I could. It was one of the few places we could go and count on a truly remote experience. As an ecologist, I was able to study patterns of vegetation and wildlife almost unaffected by human activity.

9. Since moving back to Wyoming in 1994, I continue to use the project area for hunting, picnicking, hiking, and sightseeing. I mostly hunt big game now, having stopped hunting sage grouse because their numbers are so few elsewhere in the region. The Atlantic Rim, including the project area, is now the only area, out of the many I used to hunt, where I can usually count on seeing sage grouse if I really look.

10. The area of the Red Desert covered by the Atlantic Rim Project area has many unique and beautiful features. From high points, on clear days, you can see 20 to 40 miles out into the Red Desert. The habitat and the vegetation are much more lush in that area, with a much greater diversity than is found over in the Platte Valley, where I live, because of the upslope condition caused by the air rising out of the Red Desert and dropping more moisture on those west-facing slopes. On our most recent visit, my wife and I took my 88 year-old mother over from Saratoga, traveling across the rim and through the proposed project area to visit the new Savery Creek Reservoir and reminiscing about our family's history in the area. It was to be her last time there.

11. I am aware of the plans to develop the Atlantic Rim Project area for coal-bed methane gas extraction and have even visited some of the sites of exploratory wells, particularly in the areas of Catalina A Pod and Sun Dog A Pod, just after they had been staked and later after the facilities had been built. Even though I thought I was prepared, having witnessed coal-bed methane development in the Powder River Basin, the contrast was shocking, particularly

2

from those same high vantage points where we could once look for miles without seeing any sign of human habitation.

12. Despite the exploratory development that has taken place in certain pockets, the project area is still, in large part, pristine and beautiful. I still enjoy hunting, hiking and sightseeing in the area and plan to continue doing so, so long as the area does not become a sacrifice zone, like the ones I have witnessed in the Powder River Basin and in the Jonah Field in Green River Basin.

13. I know that significant, additional development is being proposed for the area as part of the Atlantic Rim Project. I have the following specific concerns that I believe must be adequately addressed prior to any further development:

    a. <u>Further Damage to Sage Grouse in One of Their Last Places of Refuge</u>. Over the last 50 years, I have watched sage grouse populations decrease from abundant in many areas to practically non-existent in most of the open sagebrush areas that I visit. Now, I know that increased human activity, particularly the building of roads and power-lines, is directly related to these decreases. Too late, I have learned that the resulting habitat fragmentation may cause sage grouse to quit an area. Moreover, it doesn't take an ecologist to know that when you populate a sagebrush steppe with high perches, like power poles, that were never there historically, you have created an advantage for birds of prey like hawks and eagles that could lead to elimination of their sage grouse prey.

    b. <u>Disruption of Big-Game Migration to Critical Winter Range</u>. For years I have watched (and tried to predict) the patterns of migration for big game animals like deer and elk as the onset of winter causes them to move north and east from the Sierra Madre Mountains onto the Atlantic Rim habitat that historically has sustained them through the winter. The fact that some animals can be observed in oil and gas fields during the winter has been used for years by developers as "proof" that the animals are not being impacted. And yet, as development has been allowed to extend into the winter season on the Pinedale Anticline, I have witnessed one of the nation's largest deer herds being reduced by one-half of pre-development levels, even during a period of mild winters. Continuous satellite observation of radio-tagged animals has shown, for both deer and antelope, that the animals hurry through developed areas, making little use of the forage that is there. Elk typically avoid such areas entirely.

In the winter of 2004, in the northern part of the proposed development, the single largest die-off of big game animals in the history of Wyoming was documented in the Red Rim wildlife habitat management area south of Rawlins, Wyoming. The Wyoming Game and Fish Department determined that an estimated 300 free ranging elk out of an approximately 800 member herd occupying this 40 – 50 square mile winter reserve died of unknown and mysterious causes. This was also one of the first years of coal-bed methane development in the area.

    c. <u>Inadequate Investigation of Unplanned Methane Releases to the Atmosphere</u>. One of the primary differences between coal-bed methane development on the Atlantic Rim and

development in other places, like the Powder River Basin, is that the coal-bearing strata are steeply tilted. When water is removed and the methane gas in coal is released in the Powder River Basin, there are overlying impervious layers of rock preventing the gas from escaping to the surface. Instead, it migrates to low pressure zones around gas wells where it can be removed in a controlled manner. On the Atlantic Rim, I have found that the gas has an alternate way of escaping by migrating upward through the coal and/or along contact zones between the coal and adjacent layers of rock to where those strata contact the earth's surface. The first hint of this was the forming of bubbling mud pots where the gas emerges along the few stream beds and marshes in the region.

In our most recent trip into the area, my wife and I witnessed these spontaneous gas releases first hand, amounting to millions of cubic feet per day of this most dangerous of greenhouse gases releasing directly into the atmosphere. Even worse, we learned that these releases may be occurring all along where the coal seam contacts the earth's surface, and it may become worse as development progresses. One of the conservation organizations with which I work brought out a gas "sniffer" and found that the gas was escaping in other places along the coal seam outcrop, well away from the mud pots where the releases were first observed. Development should be halted while this phenomenon is investigated. Otherwise huge percentages of the gas resource could be lost to the atmosphere, earning no revenues and contributing significantly to global warming.

14. Aside from the issues listed above, continued development will have a serious and negative impact on my desire to use and ability to enjoy the proposed project area. On a very basic level, it will eliminate my and my family's primary reason for visiting the project area – to enjoy a wild area with a unique and beautiful landscape and an unusually diverse assortment of wildlife in their natural habitat. I grew up and returned to this area because I had experienced the joy of having large portions of the landscape to myself. The Atlantic Rim area, including the project area, is one of the last remaining places where my family and I can go to have such experiences.

15. Most of all, I am concerned that the public agency charged with protecting these public lands as a legacy of all the people, is serving only a small segment of our society, the energy developers. They come in from outside of our state, derive for themselves and their companies billions of dollars in exchange for a small percentage in oil and gas revenues, and leave having damaged and even destroyed the long-term resource values (identified above) for us and our descendants for many generations. There is a rush to develop the non-renewable resource at the expense of these long-term values that is inexplicable (except in terms of greed).  It is being allowed without even truly evaluating the possible extent of the damage and, therefore, with no idea how to prevent or minimize the damage. How can this kind of development be right or fair to future generations of Americans?

I declare under penalty of perjury that the foregoing is true and correct.  Executed this fourth day of February, 2008.

_Jim B. States_
Jim B. States, Ph. D.

ATTACHMENT A

# ATLANTIC RIM FINAL EIS MAP
## Project Area Map



0    20    40         80  Miles

| | | | |
|---|---|---|---|
| ○ | Cities | | |
| | Interstate Highways | | |
| | Highways | | |
| | Counties | | |
| | Atlantic Rim Project Area | | |

No Warranty is made by the Bureau of Land Management for use of data for purposes not intended by the BLM.

Map M-1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL<br>1200 New York Avenue, NW, Suite 400<br>Washington, DC 20005, *et al.*<br><br>     Plaintiffs,<br><br>       v.<br><br>DIRK KEMPTHORNE, in his official capacity<br>As the Secretary of the United States<br>Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240, *et al.*<br><br>     Defendants.<br>_____<br>ANADARKO PETROLEUM CORPORATION,<br>WARREN RESOURCES, INC., DOUBLE EAGLE<br>PETROLEUM CO., and STATE OF WYOMING<br><br>Defendant-Intervenors, | )<br>)<br>)<br>)<br>)<br>)  Civ. No. 07-1709 (RJL)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF ANDREW CARSON

1. I am a member of the Natural Resources Defense Council. I have been a member since 2002.

2. I live with my wife Nancy in Wilson, Wyoming, an unincorporated town in Jackson Hole, just outside of Jackson. I have lived here for over 40 years.

3. I am primarily a mountaineer and climbing guide, teaching technical climbing skills and proper use of equipment, and leading peak ascents. I have been doing this for 42 years.

4. I have reviewed the attached maps (Attachments A and B) of the Atlantic Rim Natural Gas Field Development Project Area ("Atlantic Rim Project area" or the "area"). I am familiar with this area, which is part of the Red Desert, having regularly spent time there, on my own and with friends and family, for over 20 years.

Declaration of Andrew Carson

5.  Although I live several hours away, I visit the part of the Red Desert covered by the Atlantic Rim Project area on average one to two times a year. My most recent visit to the area was this past spring.

6.  I visit the area in order to hunt, hike, appreciate the wildlife, get a change of pace and to generally enjoy being outdoors in a beautiful setting, especially when winter cabin fever sets in. After many months which require skis for outdoor travel, it is a great feeling to step out of the car in simple footwear and to strike out for a distant landmark, unimpeded by snow, ice, and the like. At any time of year I am overwhelmed by the endless vistas, the vault of sky, and the surprising intimacy of small things, flowers, windblown sage, odd rock fragments, and ancient signs of human passage.

7.  Once, in late spring, perhaps early May, I stopped in the area on my way to a meeting in Colorado to stretch my legs, maybe a few miles east of Wyoming Highway 789. I was startled by the sudden appearance of a loose herd of hundreds of pronghorns, quite spread out, on their annual migration north. They had been hidden from view down in the swale of a drainage, which I think was Cow Creek, and so I had approached unseen. The herd bolted upon seeing me and fled past me on both sides at top speed. It was an unforgettable sight and experience.

8.  This area has a very unique landscape and extremely interesting geology. From the road the land looks stark and barren. But once you walk away from the road, the land reveals an unexpected amount of life, such as the encounter I mention above. In the spring the buttercups can be astonishing in their sheer numbers, the antelope are a curious and engaging animal, and birds of every size seem to either pass through or make a living in this harsh environment. I am no geologist but am always on the alert for interesting rocks and shards, and colorful bits abound. I even found a bison skull embedded in a stream bank, recently exposed by high spring waters.

9.  I particularly enjoy observing sage grouse. I used to see lots of sage grouse in the area and was familiar with some of the leks. It was almost a guarantee that you would see sage grouse during the breeding season. The recent proliferation of roads and off-road-vehicle use has erased most of the ones I knew first-hand, however.

10. The area has also been great pronghorn country and in the past, I have hunted them there. In recent years, pronghorn populations have declined, and I have kept closer to home in my hunting, but if pronghorn populations stabilize and perhaps rebound, I would certainly want to hunt in the area again.

11. In recent years, the level of human activity in the area of the Red Desert covered by the Atlantic Rim Project has increased. I have observed new roads put in for exploratory drilling wells in the area. These roads and the increased industrial activity have diminished my enjoyment of the area. When I used to visit the area, I would often not bring water along, but would simply drink from the creeks and streams in the area. Now I generally avoid drinking the water. It is also harder and harder to escape the noises of trucks, cars, and other vehicles; new signs of rough vehicular passage increase from one visit to the next. Visibility, once

Declaration of Andrew Carson

seemingly unblemished, is dimmed by the dust of traffic and emissions from vehicles and from the new industrial activities in the region. Further increases in roads and human activity would only continue to negatively impact my enjoyment of the area

12. Besides harming the wildlife and my visual enjoyment of the area, I know that oil and gas development, like that planned for the Atlantic Rim Project literally stinks. Indeed, I recently visited this part of the Red Desert, east of Highway 789, again on my way to Colorado. I had expected minimal industrial intrusion in this area, but instead passed many trucks which I surmised were supporting the burgeoning exploratory development activities for coalbed methane. The air was thick with the smell of petrochemicals, something I'd never encountered here. Though from my quick stop and hike I could not see any wells or other infrastructure, they could not have been too far away.

13. There are many reasons why I chose to make Wyoming my home, and some of them are its vast open spaces, its wildlife, and its remarkable variety of landscape. The entire Red Desert, including the area covered by the Atlantic Rim project, present one of the state's most undervalued and least appreciated regions, a fact that initially drew me to stop for a few minutes, so many years ago. Over decades, I've found private moments, inner peace, and a chance to meet the natural world on its own terms in this years. Over the years it has been with resignation that I have witnessed the steady development of the state's extractive resources, though I have appreciated the fact that, until recently, that trend has been gradual and respectful of other uses and values. Now, the pace has quickened and the results are alarming. Should development continue in this vein, as the Atlantic Rim project proposes to ensure, it seems inevitable that the qualities that make the area special to me and many others will be destroyed. Silence will be an historical memory, wildlife will be displaced and either move away or be greatly diminished, the air and sky will be fouled, and human activity will be paramount. Thus, it will become just like so many parts of the Rocky Mountain west that have been hit by the energy boom and the reasons for my visits to area will be destroyed.

14. As a state, Wyoming has been extremely affected by energy development, especially in the past several years. Many previously wild and open spaces have been given over to energy development activities. This part of the Red Desert is one of the few remaining places where one can go to enjoy wildlife and natural beauty and be away from the development.

15. Despite the increase in roads and human activity, and despite the fears I mentioned above, I do plan to continue regularly visiting the area of the Red Desert covered by the Atlantic Rim Project. The area is still uniquely beautiful. Spring and autumn are generally my favorite times to visit, partly because it is nice to get away from the snow, and also because, at those times of the year, the animals are on the move and are prolific. Most springs and falls I take an overnight trip to the area with a friend, mostly for a change of pace from the high mountains, but also to renew a bond and to share the experience with others. I plan to do so this year, and for years to come, as long as it remains an enjoyable experience.

Declaration of Andrew Carson

16. I sincerely hope that this area will remain a bastion of natural beauty in Wyoming and that my family, friends and I will be able to continue enjoying this remarkable area in the future.

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct. Executed in Wilson, Wyoming, on _____Dec. 28, 2007._____

Andrew Carson.

4

# ATTACHMENT A

# ATLANTIC RIM FINAL EIS MAP
## Project Area Map



0    20    40         80  Miles

Cities ○

Interstate Highways

Highways

Counties

Atlantic Rim Project Area

No Warranty is made by the Bureau of Land
Management for use of data for purposes not
intended by the BLM.  Map M-1

ATTACHMENT B

# ATLANTIC RIM FINAL EIS MAP
## 2005 Proposed Action Project Area



Rawlins

Creston Junction

80

789

Red Rim

POD #1

Jolly Roger Beta

Jolly Roger Alpha

N

0     2.5     5     10  Miles

Doty Mountain

Cow Creek

Sun Dog

Blue Sky

Brown Cow

Muddy Mountain

— BLM, County, and State Roads

— 2005 Current Proposed
  Action Boundary

**Interim Drilling PODs**

- Blue Sky
- Brown Cow
- Cow Creek
- POD #1
- Doty Mountain
- Jolly Roger Alpha
- Jolly Roger Beta
- Muddy Mountain
- Red Rim
- Sun Dog

Baggs

Dixon

70

No Warranty is made by the Bureau of Land
Management for use for data for purposes not
intended by the BLM.

Map M-4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL<br>1200 New York Avenue, NW, Suite 400<br>Washington, DC 20005,        *et al.*<br><br>        Plaintiffs,<br><br>        v.<br><br>DIRK KEMPTHORNE, in his official capacity<br>As the Secretary of the United States<br>Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240,        *et al.*<br><br>        Defendants.<br><br>ANADARKO PETROLEUM CORPORATION,<br>WARREN RESOURCES, INC., DOUBLE EAGLE<br>PETROLEUM CO., and STATE OF WYOMING<br><br>Defendant-Intervenors, | Civ. No. 07-1709 (RJL) |

## DECLARATION OF JONATHAN RATNER

1. I am the Wyoming Director of the Western Watersheds Project ("WWP"). I have been the Wyoming Director of WWP since 2003. I have been a member of WWP since 2001.

2. Prior to my taking the position of Director of WWP's Wyoming Office, I was a biologist doing research for the USDA Forest Service, the BLM, the Interagency Grizzly Bear Study Team and others. My focus was forest carnivores including grizzly bears, lynx, wolverine and marten.

3. WWP is a not-for-profit conservation membership organization incorporated under the laws of the State of Idaho. It is recognized as a not-for-profit corporation under Section 501(c)(3) of the United States Internal Revenue Code.

4. WWP's mission is to protect and restore western watersheds and wildlife through education, public policy initiatives and litigation. WWP uses the tools of on-the-ground science and data collection with strong advocacy and litigation to help insure that our public lands are managed in accordance with federal regulations and statutes.

5. WWP has offices and staff in Hailey, Salmon, McCall and Boise, Idaho; Pinedale, Wyoming;

Declaration of Jonathan Ratner

Reseda, California; Tucson, Arizona and Mendon, Utah. WWP's Wyoming Office is headquartered near Pinedale, Wyoming and is staffed by myself.

6. WWP has over 1,600 members who live in Wyoming, Idaho, Utah, Colorado and other states across the United States.

7. I live near Pinedale, Wyoming. I have lived here since 2003. I have lived in Wyoming on and off since 1976.

8. I have reviewed the attached map of the Atlantic Rim Natural Gas Field Development Project Area ("Atlantic Rim Project area" or the "project area"). I am familiar with this area, having regularly spent time in and around it for 3 years.

9. I have visited the project area to monitor management within the public lands portions of the project area. I like hiking in it and going to observe the wildlife including sage grouse and elk.

10. The project area contains sensitive Areas of Critical Environmental Concern (ACEC's) and Special Management Areas (SMA's). Nearly the entire area is primary sage grouse habitat as well as crucial winter range and year-long range for elk, mule deer and antelope. The area also has currently occupied pygmy rabbit habitat. The project area contains many current and extirpated Colorado River Cutthroat trout streams, a BLM Sensitive Species.

11. Streams within the project area, some of which formerly supported Colorado River Cutthroat trout are currently listed on Wyoming's 303d list for habitat degradation and other factors.

12. From my work in and around the project area as well as many other oil and gas fields in Wyoming such as the Pinedale Anticline, Jonah, Moxa Arch and the Powder River Basin, it is extremely clear to me that for every field I have reviewed, the analyses and assumptions made during the NEPA process were flawed and with very few exception severely underestimated the level of impacts that actually occur. This has proven true for many issues such as

      a. Societal and economic impacts
      b. Air quality impacts
      c. Sage grouse impacts
      d. Big game impacts
      e. Ground water contamination impacts
      f. Surface water impacts including flow and hydrology alterations as well as contamination
      g. Reclamation failures

The Atlantic Rim project NEPA analysis suffers from all the same flawed assumptions and analyses that other large projects throughout Wyoming have proven out. Without correcting these flaws, the results will be what we see in most of the other fields in the state, unnecessary and undue degradation, pushing species closer to being listed under the Endangered Species Act (ESA), degradation of air and water quality, loss of hunting, fishing

Declaration of Jonathan Ratner

and recreating opportunities and other irreversible impacts.

13. WWP strives to protect our public lands and the wildlife that depends on them in order that these lands are managed in the long-term best interests of our members as well as the American people as a whole. The Atlantic Rim project will harm the interests of our members by further degrading and fragmenting the habitat of a number of BLM Sensitive Species, thereby pushing them closer to listing under the ESA. It will also complete the transformation of this area from mostly open country to an industrialized wasteland, thus permanently destroying a wide range of other uses of these lands.

14. I plan to continue regularly visiting the area of the Red Desert covered by the Atlantic Rim Project in order to observe wildlife and enjoy the natural character of the area. My enjoyment of these visits will be seriously diminished if the Atlantic Rim project continues on its projected course, causing the project area to lose its natural character, sage grouse and other sensitive species to become less prevalent, and the water and air to become increasingly polluted.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of April, 2008.

_____
Jonathan Ratner

# ATLANTIC RIM FINAL EIS MAP
## Project Area Map



Map M-1

No Warranty is made by the Bureau of Land Management for use of data for purposes not intended by the BLM.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL<br>1200 New York Avenue, NW, Suite 400<br>Washington, DC 20005,          *et al.*<br><br>          Plaintiffs,<br><br>                    v.<br><br>DIRK KEMPTHORNE, in his official capacity<br>As the Secretary of the United States<br>Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240,          *et al.*<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civ. No. 07-1709 (RJL) |
| ANADARKO PETROLEUM CORPORATION,<br>WARREN RESOURCES, INC., DOUBLE EAGLE<br>PETROLEUM CO., and STATE OF WYOMING<br><br>Defendant-Intervenors, | )<br>)<br>)<br>)<br>)<br>) |

**Declaration of Bonnie Hofbauer**

I, Bonnie Hofbauer, declare as follows:

1.    I supervise membership record keeping and perform other related administrative duties for the Wyoming Outdoor Council ("WOC"). I have supervised membership record keeping for WOC for 17 years.

2.    My duties include supervising the preparation and of materials that WOC distributes to members and prospective members. Those materials describe WOC and identify its mission.

3.    WOC is a membership organization incorporated under the laws of the State of Wyoming.  It is recognized as a not-for-profit corporation under Section 501(c)(3) of the United States Internal Revenue Code.

4.    WOC's mission statement declares that its mission is to "protect Wyoming's environment and quality of life for future generations."  WOC's mission includes the prevention and mitigation of environmental harms caused by oil and natural gas development.

5.    When an individual becomes a member of WOC, his or her current residential address is recorded in WOC's membership database.  When a member renews his or her membership or otherwise makes a contribution to WOC, the database entry reflecting the member's residential address is verified or updated.

6.    Based on these records, WOC currently has more than 1246 members statewide in Wyoming, throughout the U.S. and internationally.  Approximately 760 WOC members reside in Wyoming and approximately 4 members reside in the District of Columbia.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:    Lander, Wyoming
April 10, 2008

Bonnie Hofbauer
Bonnie Hofbauer

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL<br>1200 New York Avenue, NW, Suite 400<br>Washington, DC  20005,            *et al.*<br><br>                    Plaintiffs,<br><br>                         v.<br><br>DIRK KEMPTHORNE, in his official capacity<br>As the Secretary of the United States<br>Department of the Interior<br>1849 C Street, NW<br>Washington, DC  20240,            *et al.*<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)   Civ. No. 07-1709 (RJL)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| ANADARKO PETROLEUM CORPORATION,<br>WARREN RESOURCES, INC., DOUBLE  EAGLE<br>PETROLEUM CO., and STATE OF WYOMING<br><br>Defendant-Intervenors, | )<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF LINDA LOPEZ

I, Linda Lopez, declare as follows:

1.  I am the director of membership and public education at the Natural Resources Defense Council, Inc. ("NRDC"). I have been the director of membership and public education for 21 years.

2.  My duties include supervising the preparation of materials that NRDC distributes to members and prospective members. Those materials describe NRDC and identify its mission.

3.  NRDC is a membership organization incorporated under the laws of the State of New York. It is recognized as a not-for-profit corporation under Section 501(c)(3) of the United

States Internal Revenue Code.

4.   NRDC's mission statement declares that "The Natural Resources Defense Council's purpose is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends." The mission statement goes on to declare that NRDC works "to restore the integrity of the elements that sustain life – air, land, and water – and to defend endangered natural places." NRDC's mission includes the prevention and mitigation of air and water pollution, harm to wildlife, and wildlife habitat destruction in order to protect and maintain NRDC's members' use and enjoyment of natural resources threatened by such pollution and habitat destruction.  NRDC has been working to protect the lands, wildlife, air and water of the Rocky Mountain region, including Wyoming, for over 25 years.

5.   When an individual becomes a member of NRDC, his or her current residential address is recorded in NRDC's membership database. When a member renews his or her membership or otherwise makes a contribution to NRDC, the database entry reflecting the member's residential address is verified or updated.

6.   NRDC currently has 421,550 members nationwide. There are NRDC members residing in each of the fifty United States and in the District of Columbia.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: __4/15/08__
New York, NY

_____
Linda Lopez

BLM

# Final
# Environmental Impact Statement for the
# Atlantic Rim Natural Gas Field
# Development Project
# Carbon County, Wyoming

## Volume 1 of 2

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**November 2006**

002080

## CHAPTER 3.  AFFECTED ENVIRONMENT

### 3.2.2    Air Quality

The Wyoming Ambient Air Quality Standards (WAAQS) and National Ambient Air Quality Standards (NAAQS) are health-based criteria for the maximum acceptable concentrations of air pollutants at all locations to which the public has access.   Although specific air quality monitoring has not been conducted within the project area, regional air quality monitoring has been conducted within the cumulative study area (See the Air Quality Technical Support Document, appendix F, map 1.2 and map M-8 of this EIS).   Air pollutants measured in the region for which ambient air quality standards exist include carbon monoxide, nitrogen dioxide, ozone, particulate matter less than 10 microns in effective diameter ($PM_{10}$), particulate matter less than 2.5 microns in effective diameter ($PM_{2.5}$), and sulfur dioxide.   Background pollutant concentrations for these pollutants are compared to the WAAQS and NAAQS in table 3-6.

**Table 3-6.    Air Pollutant Background Concentrations, Wyoming and National Ambient Air Quality Standards and Prevention of Significant Deterioration Increments.**

| Pollutant/Averaging Time | Measured Background Concentration | Wyoming and National Ambient Air Quality Standards | Incremental Increase Above Legal Baseline | |
|---|---|---|---|---|
| | | | PSD Class I | PSD Class II |
| | | ($\mu g/m^3$) | | |
| Carbon Monoxide (CO) [1] | | | | |
| 1-hour | 3,336 | 40,000 | n/a | n/a |
| 8-hour | 1,381 | 10,000 | n/a | n/a |
| Nitrogen dioxide ($NO_2$) [2] | | | | |
| Annual | 3.4 | 100 | 2.5 | 25 |
| Ozone [3] | | | | |
| 1-hour | 169 | 235 | n/a | n/a |
| 8-hour | 147 | 157 | | |
| Particulate Matter ($PM_{10}$) [4] | | | | |
| 24-hour | 33 | 150 | 8 | 30 |
| Annual | 16 | 50 | 4 | 17 |
| Particulate Matter ($PM_{2.5}$) [4] | | | | |
| 24-hour | 13 | 65 | n/a | n/a |
| Annual | 6 | 15 | n/a | n/a |
| Sulfur dioxide ($SO_2$) [5] | | | | |
| 3-hour (National) | 132 | 1,300 | 25 | 512 |
| 24-hour (National) | 43 | 365 | 5 | 91 |
| 24-hour (Wyoming) | 43 | 260 | 5 | 91 |
| Annual (National) | 9 | 80 | 2 | 20 |
| Annual (Wyoming) | 9 | 60 | 2 | 20 |

**Notes:**

[1]  Background data collected by Amoco at Ryckman Creek for an 8-month period during 1978–1979, summarized in the Riley Ridge EIS Air Resources Technical Report (USDI-BLM 1983).

[2]  Background data collected at Green River Basin Visibility Study site, Green River, Wyoming, during period January–December 2001 (ARS 2002).

[3]  Background data collected at Green River Basin Visibility Study site, Green River, Wyoming, during period June 10, 1998, through December 31, 2001 (ARS 2002) (second highest 1-hour value and 4th highest daily 8-hour value).

[4]  Background data collected by WDEQ-AQD at Emerson Building, Cheyenne, Wyoming, Year 2001. These data have been determined by WDEQ-AQD to be the most representative collocated $PM_{10}$ and $PM_{2.5}$ data available (second highest 24-hour values).

[5]  Background data collected at LaBarge Study Area for the Northwest Pipeline Craven Creek Site 1982–1983.

## CHAPTER 3. AFFECTED ENVIRONMENT

Map M-8. PSD Class I and Class II Sensitive Areas and Sensitive Lakes.



# CHAPTER 3.  AFFECTED ENVIRONMENT

As shown in table 3-6, regional background values are below established standards, and all areas within the cumulative study area are designated as attainment for all criteria pollutants. Background air quality concentrations are combined with modeled project-related air quality impacts of the same averaging time periods, and the total predicted impacts are compared to applicable air quality standards.  EPA published a final rule on August 3, 2005 revoking the 1-hour ozone standard for all areas of Wyoming effective June 15, 2005. The WDEQ-AQD then completed the process of removing the 1-hour standard from Wyoming Air Quality Standards & Regulations effective January 30, 2006.  As a result, there is no federal or state 1-hour ozone standard that applies to Wyoming.

EPA published final revisions to the National Ambient Air Quality Standards for particulate matter in the Federal Register on October 17, 2006 which take effect on December 18, 2006. The revision strengthens the 24-hour PM2.5 standard from 65 to 35 ug/m3 and revokes the annual PM10 standard of 50 ug/m3.  EPA retained the existing annual PM2.5 standard of 15 ug/m3 and the 24-hour PM10 standard of 150 ug/m3. After the final rule becomes effective, the State of Wyoming will enter into rulemaking to revise the Wyoming Ambient Air Quality Standards.

Federal air quality regulations adopted and enforced by the Wyoming Department of Environmental Quality-Air Quality Division (WDEQ-AQD) limit incremental emissions increases to specific levels defined by the classification of air quality in an area.  The Prevention of Significant Deterioration (PSD) Program is designed to limit the incremental increase of specific air pollutant concentrations above a legally defined baseline level.  The incremental increase depends upon the area's classification.  Four PSD Class I areas are identified as sensitive areas within the cumulative study area: the Bridger, Fitzpatrick, Mount Zirkel, and Rawah Wilderness Areas (map M-8).  Strict limitations on the additional amount of air pollution allowed from major emitting facilities in PSD Class I areas are applied.  These limitations are quantified as Class I PSD Increments, which are compared to impacts from cumulative regional sources, and Proposed Class I PSD Significance Levels, which are compared to impacts from individual emission sources to determine their singular significance.  The remainder of the cumulative impact study area is classified PSD Class II, where similar but less stringent incremental air quality limits apply.  The Popo Agie and Savage Run Wilderness Areas, Dinosaur National Monument, and the Wind River Roadless Area are PSD Class II areas, which have been identified as sensitive areas within the cumulative study area.  PSD Class I and Class II Areas are shown on map M-8.  Regional background pollutant concentrations, as well as NAAQS, WAAQS, and PSD Classes I and II Increments, are presented in table 3-6.

All NEPA analysis comparisons to the PSD Class I and II increments are intended to evaluate a threshold of concern, and do not represent a regulatory PSD Increment Consumption Analysis. The determination of PSD increment consumption is an air quality regulatory agency responsibility.  Such an analysis would be conducted as part of the New Source Review process for a major source, as would an evaluation of potential impacts to Air Quality Related Values (AQRV) such as visibility, aquatic ecosystems, flora, and fauna performed under the direction of WDEQ-AQD in consultation with federal land managers or would be conducted to determine minor source increment consumption.

There are two types of visibility impairments caused by emission sources, plume impairment and regional haze.  Plume impairment occurs when a section of the atmosphere becomes visible due to the contrast or color difference between a discrete pollutant plume and a viewed background such as a landscape feature. Regional haze occurs when pollutants from more diffuse emission sources become well mixed in the atmosphere causing a general alteration in

# CHAPTER 3. AFFECTED ENVIRONMENT

### 3.7.1.3 Upland Game Birds

The WGFD manages upland game birds within upland game management areas. The greater sage-grouse (*Centrocercus urophasianus*) and the Columbian sharp-tailed grouse (*Tympanuchus pahianellus columbianus*) are the main upland game bird species known to occur in the ARPA. The ARPA lies within the Sierra Madre Upland Game Management Area (UGMA #25) and includes a very small portion of the Bitter Creek Upland Game Management Area (UGMA #10).

### Greater Sage-Grouse

Wyoming is one of the last strongholds for greater sage-grouse in the western United States, and contains more grouse than all other states combined. Greater sage-grouse are common throughout Wyoming because their habitat remains relatively intact compared to other states. In south-central Wyoming, this is even more accentuated due to the harsh climate that has limited past habitat loss or conversion to settlements and agricultural development along river bottoms. In the past, disturbance to upland habitats was restricted to livestock grazing and vegetation treatments (primarily at higher elevations). More recent disturbance to grouse habitat has come with development of energy resources.

Greater sage-grouse lek locations were obtained from the WGFD and the BLM RFO. There are 88 leks located in and within 2 miles of the ARPA (map M-26). Leks are often in grassy areas or in more open canopy sagebrush/grass habitat. Greater sage-grouse are dependent on sagebrush environments for their year-round survival, and in particular on ATVII and ATW, which occupy an estimated 85 percent of the ARPA. This dependency includes using sagebrush as forage, nesting, brood-rearing habitat, and winter thermal cover. In addition, grouse require a variety of sagebrush habitat types to meet their life history requirements. The sagebrush habitat types in the ARPA are diverse and provide a high quality environment for greater sage-grouse that is reflected in their abundance in this area. Riparian habitats are also important for brood-rearing habitat during the summer and fall months. The proximity of these two habitats to each other increases their value.

In response to petitions to list the greater sage-grouse under the Endangered Species Act (ESA), the USFWS conducted a status review of this species throughout its range and on January 7, 2005 determined that it did not warrant protection under the ESA. However, USFWS Director Steve Williams stated that, "At the same time, the status review clearly illustrates the need for continued efforts to conserve sage-grouse and sagebrush habitats on a long-term basis." Greater sage-grouse populations in Wyoming have stabilized in recent years. Because of continuing modifications of sagebrush habitats from fire, chemical, and mechanical treatments and development, the need exists to minimize such losses and to conserve and improve sage-grouse habitats through careful management practices. The greater sage-grouse is included on the Wyoming Sensitive Species List of the BLM State Director (USDI-BLM 2002a).

002258

## CHAPTER 3. AFFECTED ENVIRONMENT

**Map M-26.**    **Greater Sage-Grouse Leks.**



002259

# CHAPTER 3.  AFFECTED ENVIRONMENT

The State of Wyoming contends that hunter harvest primarily consists of young birds that have a high mortality rate regardless of hunting.  However, grouse harvest numbers have been reduced by shortening and moving back the hunting season dates and lowering the bag limits. These seasons were set at a later date to reduce the harvest of older, successful reproducing hens that were found with broods near water. The later season decreased the harvest of hens because the birds were scattered in all habitats.  In addition, shorter seasons primarily reduce the number of hunters, since many big game seasons were underway and there is less interest in hunting sage-grouse later in September.

In order to protect greater sage-grouse breeding grounds, the BLM places a quarter-mile buffer around the edge of leks where controlled surface use (CSU) is stipulated (USDI-BLM 1990). The quarter-mile buffer around the edge of occupied or unknown status leks located on or within a quarter-mile of the ARPA covers 8,124 acres or 3 percent of the ARPA.  Twenty of the 88 leks in the ARPA are located on private and state lands, which are not protected in any way from disturbance.  In addition, the BLM places a 2-mile lek buffer in a seasonal stipulation preventing disturbance to protect nesting and early brood-rearing habitat.  Potential greater sage-grouse nesting habitat (habitat associated with 88 leks) covers 191,017 acres or 71 percent of the ARPA.  Of this acreage, 36 percent is on private and state lands.

According to Call (1974), Braun et al. (1977), Hayden-Wing et al. (1986), and others, approximately 50 percent of nests are usually located within a 2-mile radius of the strutting grounds.  Using data collected at seven sites across Wyoming between 1994 and 2003, Holloran et al. (2005) documented 45 percent of nests occur within a 3-kilometer (approximately 2-mile) buffer and 64 percent of the nests occurred within a 5-kilometer (approximately a 3-mile) buffer.  In addition, he also reported a correlation between nest distance from lek and success probability, suggesting increased success rates for nests greater than 8.5 kilometers from a lek (61 percent success greater than 8.5 kilometers, 44 percent success less than 8.5 kilometers). All research indicates that greater sage-grouse nest in suitable habitat beyond the 2-mile buffer. It is likely that hens from the active leks use most of the project area for nesting and brood-rearing, which in terms of suitable habitat amounts to 92 percent of the ARPA.  Greater sage-grouse leks and associated nesting habitats on the project area occur mostly within the big sagebrush vegetation types.  Areas with medium height sagebrush and tall residual cover of bunchgrasses provide nesting habitat (Crawford et al. 2004).  Suitable brood-rearing habitat consists of various height sagebrush communities and riparian areas that provide abundant forbs, insects, and succulent mesic vegetation (Crawford et al. 2004).

Winter concentration areas have not been identified and mapped yet.  Although winter conditions generally have little effect on greater sage-grouse populations (Call and Maser 1985, Beck and Braun 1978), if any winter concentration areas are identified in the future, there would be a timing restriction applied to surface disturbances and other disruptive activities to reduce stress to wintering birds from November 15 to March 14.

Severe winter relief habitat is used during the worst of winters.  Severe winter relief habitat locations were located in the ARPA, covering a total of 200 acres.  Twenty-six of these acres are on private lands and are not protected.  Details of the protocol used in locating and describing the severe winter relief areas and results of the study are contained in a report submitted to the BLM in 2004 (HWA 2004). This study is on-going and the results will be used to identify physical and vegetative characteristics of severe winter relief habitat patches.

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Mountain Region has also developed a screening method (USDA-FS 2000) that identifies a LAC in lake chemistry. The LACs are (1) no more than a 10-percent change in ANC for lakes with an existing ANC of 25 µeq/L or greater and (2) no more than a 1-µeq/l change for extremely acid sensitive lakes where the existing ANC is below 25 µeq/L. Of the fourteen lakes identified by the USDA-FS as acid sensitive, Upper Frozen and Lazy Boy lakes are considered extremely acid sensitive.

## 4.2.2.2 Proposed Action

### Near-Field Impacts

The single phase of construction or production proposed as part of the Proposed Action that would produce maximum emissions was identified by pollutant and analyzed. The maximum emissions configurations representative of the Proposed Action modeled were $PM_{10}$ and $PM_{2.5}$ during construction of a well pad; $SO_2$ from drilling activities; and $NO_2$, CO, and HAP from production wells and compressor stations.

The predicted impacts of $NO_2$, CO, $SO_2$, $PM_{10}$, $PM_{2.5}$, and $O_3$ are presented in table 4-2 for comparison to the NAAQS and WAAQS. As discussed in section 3.2.2, as of June 15, 2005 there is no federal or state 1-hour ozone standard that applies to Wyoming, and as of December 18, 2006 the 24-hour $PM_{2.5}$ standard will be lowered to 35 micrograms per cubic meter (ug/m3). In addition, the number of allowable exceedances for the 24-hour $PM_{2.5}$ standard will increase from one to seven (on average over three years). Therefore, BLM will now compare the eighth maximum predicted 24-hour $PM_{2.5}$ impact to the NAAQS as a "threshold of significance." The second maximum predicted 24-hour $PM_{2.5}$ impact is shown on table 4-2 and is below the new standard to be applied this December.

Maximum predicted concentrations of $NO_2$, CO, $SO_2$, $PM_{10}$ and $PM_{2.5}$ were added to the ambient background pollutant concentrations, provided in table 3-6, for comparison to ambient standards. $O_3$ maximum predicted concentrations were added to the average hourly background $O_3$ conditions monitored as part of the Green River Basin Visibility Study (ARS 2002) versus second high maximum values as presented in table 3-6. The average value (75.2 µg/m³) is consistent with (slightly higher than) the background ozone concentration of 62.6 µg/m³ that was used in the RPM modeling to derive the Scheffe nomograph. In addition, the Scheffe method is a screening level modeling tool, and as such, it is overly conservative to add highest, second highest measured concentrations to screening level estimates.

**Table 4-2.     Maximum Predicted Near–Field Impacts from Project Sources–Comparison to Ambient Air Quality Standards, Atlantic Rim Natural Gas Project.**

| Pollutant | Averaging Period | Maximum Predicted Impact of All Phases (µg/m³) | Background Concentration (µg/m³) | Total Predicted Impact (µg/m³) | NAAQS/ WAAQS (µg/m³) | Percent of NAAQS/ WAAQS |
|---|---|---|---|---|---|---|
| $NO_2$ | Annual | 11.5 | 3.4 | 14.9 | 100 | 15 |
| $PM_{10}$ | 24-Hour | 20.8 | 33 | 53.8 | 150 | 36 |
| | Annual | 3.7 | 16 | 19.7 | 50 | 39 |
| $PM_{2.5}$ | 24-Hour | 7.0 | 13 | 20.0 | 65 | 31 |
| | Annual | 1.0 | 6 | 5.0 | 15 | 33 |
| CO | 1-Hour | 222.6 | 3,336 | 3,559 | 40,000 | 9 |
| | 8-Hour | 85.9 | 1,381 | 1,467 | 10,000 | 15 |

002331

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Table 4-2.     Maximum Predicted Near–Field Impacts from Project Sources–Comparison to Ambient Air Quality Standards, Atlantic Rim Natural Gas Project.

| Pollutant | Averaging Period | Maximum Predicted Impact of All Phases ($\mu g/m^3$) | Background Concentration ($\mu g/m^3$) | Total Predicted Impact ($\mu g/m^3$) | NAAQS/ WAAQS ($\mu g/m^3$) | Percent of NAAQS/ WAAQS |
|---|---|---|---|---|---|---|
| SO$_2$ | 3-Hour | 20.2 | 132 | 152.2 | 1,300 | 12 |
| | 24-Hour | 9.7 | 43 | 52.7 | 365 / 260 | 14 / 20 |
| | Annual | 3.2 | 9 | 12.2 | 80 / 60 | 15 / 20 |
| O$_3$ | 1-Hour | 23.0 | 75.2 | 98.2 | 235 | 42 |
| | 8-Hour | 16.1 | 75.2 | 91.3 | 157 | 58 |

Predicted impacts from Proposed Action source emissions were shown to be below the applicable WAAQS and NAAQS. Table 4-3 presents a comparison of maximum predicted NO$_2$ impacts to the PSD Class II increment for NO$_2$. All NEPA analysis comparisons to the PSD Class II increments are intended to evaluate a threshold of concern, and do not represent a regulatory PSD increment consumption analysis.

Table 4-3.     Maximum Predicted Near-Field Impacts from Project Sources—Comparison to PSD Increments.

| Pollutant | Averaging Period | Maximum Predicted Impact of All Phases ($\mu g/m^3$) | PSD Class II Increment ($\mu g/m^3$) |
|---|---|---|---|
| NO$_2$ | Annual | 11.5 | 25 |

When reviewing the predicted near-field impacts, it is important to understand that the results reported reflect the maximum pollutant emission rates calculated for the field and that the resulting concentrations are combined with monitored background ambient pollutant concentrations. Monitored background air pollutant concentrations were assumed to occur throughout the life-of-project at all locations year-round. In addition, the maximum predicted air quality impacts from ARPA emission sources would occur in the vicinity of the ARPA because potential impacts typically lessen with distance from an emissions source; potential impacts at locations more distant from the ARPA would be less than the predicted maximum concentrations. Finally, total air pollutant concentrations were assumed to be the sum of the maximum modeled concentration and the background concentration. This methodology is used for both long-term and short-term averaging periods. For short-term averaging periods, these maximum concentrations may occur under very different meteorological conditions and may not occur simultaneously.

Table 4-4 summarizes modeled HAP impacts based on emissions representative of the Proposed Action. All modeled acute and chronic impacts are below applicable health-based guidelines for the non-cancer compounds. Calculated cancer risk from formaldehyde and benzene are shown in table 4-5. Both the incremental risk from benzene and formaldehyde and the combined risk are less than the level of acceptable cancer risk of $1 \times 10^{-6}$ for both the MLE and MEI scenarios.

002332

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

**Far-Field Impacts**

Impacts from the Proposed Action maximum emissions scenario, which includes the last year of field construction, and nearly the full field in production, were modeled with CALPUFF. The emissions modeled are provided in table 4-1. The maximum predicted concentrations, when added to ambient background pollutant concentrations, are below all applicable WAAQS, California Ambient Air Quality Standards (CAAQS), NAAQS, and PSD increments.

Direct visibility potential impacts from Proposed Action sources were predicted to be below the "just noticeable visibility change" (1.0 dv) at all sensitive wilderness areas using both the FLAG and IMPROVE background visibility data. The maximum predicted visibility change (0.2 dv) was predicted to occur at both the Savage Run Wilderness Area (both FLAG and IMPROVE background data) and Dinosaur National Monument (IMPROVE data only).

Direct project source emissions from the Proposed Action would result in an ANC change less than the LAC at analyzed acid-sensitive lakes. The predicted maximum sulfur and nitrogen deposition potential impacts from Proposed Action sources are below the 0.005 kg/ha-yr DAT at all the sensitive PSD Class I and Class II areas.

**Table 4-4.    Maximum Modeled HAP Impacts from Project Sources.**

| Hazardous Air Pollutant | Averaging Period | Maximum Modeled Impact ($\mu g/m^3$) | Health Based Standards (Acute RELs and RfCs) ($\mu g/m^3$) |
|---|---|---|---|
| Benzene | 1-Hour | 926 | 1,300 |
| | Annual | 0.02 | 30 |
| Toluene | 1-Hour | 1,414 | 37,000 |
| | Annual | 0.03 | 400 |
| Ethylbenzene | 1-Hour | 154 | 35,000 |
| | Annual | 0.003 | 1,000 |
| Xylenes | 1-Hour | 823 | 22,000 |
| | Annual | 0.02 | 430 |
| n-Hexane | 1-Hour | 3832 | 39,000 |
| | Annual | 0.08 | 200 |
| Formaldehyde | 1-Hour | 11 | 94 |
| | Annual | 0.003 | 9.8 |

**Notes:**
RELs – Reference Exposure Limits
RfCs – Reference concentrations for chronic inhalation

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

Table 4-5.    Long-term MLE and MEI Cancer Risk Analyses.

| Analysis | HAP Constituent | Modeled Concentration ($\mu$g/m$^3$) | Unit Risk Factor 1/($\mu$g/m$^3$) | Exposure Adjustment Factor | Cancer Risk |
|---|---|---|---|---|---|
| MLE | Benzene | 0.019 | $7.8 \times 10^{-6}$ | 0.0949 | 1.39E-08 |
| | Formaldehyde | 0.0030 | $1.3 \times 10^{-5}$ | 0.0949 | 3.66E-09 |
| Total Combined Risk | | | | | $1.8 \times 10^{-8}$ |
| MEI | Benzene | 0.019 | $7.8 \times 10^{-6}$ | 0.71 | 1.04E-07 |
| | Formaldehyde | 0.0030 | $1.3 \times 10^{-5}$ | 0.71 | 2.74E-08 |
| Total Combined Risk | | | | | $1.3 \times 10^{-7}$ |

**In-Field Impacts**

The CALPUFF model was also used to predict maximum air quality impacts from field-wide emissions sources at locations within and adjacent to the ARPA. The model-predicted concentrations of $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ at locations within and nearby the ARPA were added to monitored background concentrations and compared to applicable ambient air quality standards. The estimated project-related potential impacts are below applicable ambient air quality standards.

## 4.2.2.3  Alternatives A, C, and D

Air quality impacts in the ARPA would continue under the No Action Alternative (Alternative A) from previously approved natural gas development activities and could potentially occur under Alternatives C or D in the future. However, air impacts from each of these three alternatives would be less than or equivalent to the Proposed Action. Thus, none of the impacts would exceed the significance criteria in section 4.2.1.

## 4.2.3  Air Quality Monitoring and Mitigation

Potential air quality impacts from the Atlantic Rim project were estimated to be below applicable air quality standards (table 4-2). Potential $O_3$ concentrations were estimated by the Scheffe method, which was considered by the inter-agency air quality team to be a reasonable tool and an acceptable ozone method at the time the air quality analyses was conducted.

### 4.2.3.1  Monitoring

WDEQ established an air quality monitoring station on land owned by Anadarko Petroleum near Wamsutter, Wyoming in March of 2006 to monitor concentrations of $NO_x$, $O_3$, $PM_{10}$ and $SO_2$. In cooperation with WDEQ, the Operators would finance and operate additional air quality concentration monitoring, including $O_3$, in the RFO area. BLM would work cooperatively with WDEQ, EPA and the operators to maintain and enhance concentration monitoring in the RFO area, including monitoring required to represent impacts due to emissions from the Atlantic Rim field.

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

### 4.2.3.2 Mitigation

If in the future air monitoring were to show $O_3$ exceedances that were attributable at least in part to sources in the Atlantic Rim field, BLM would consult with WDEQ and EPA to determine whether adaptive management would be needed to mitigate impacts.

## 4.3 Soils

### 4.3.1 Introduction

Potential impacts resulting from construction/installation of drill pads, pipelines, ancillary facilities, and access roads would include:

- Loss/reduction of vegetation cover and biological soil crusts,
- Exposure of vulnerable sub-surface soil profiles,
- Loss/reduction of sub-surface biological components (i.e., earthworms, nematodes),
- Undesirable mixing of soil horizons,
- Soil compaction, and
- Loss of topsoil productivity.

These impacts, singly or in combination, would increase the potential for valuable soil loss due to increased water and wind erosion, invasive/noxious/poisonous plant spread, invasion and establishment, and increased sedimentation and salt loads to the watershed system.

### 4.3.2 Impact Significance Criteria

The Great Divide RMP (USDI-BLM 1990) and state land use plans (WSLUC 1979) prescribe the following management objectives associated with soil resources:

- To maintain soil cover and productivity where they are adequate and to increase soil cover and productivity where they are in a downward trend and

- To maintain or improve soil stability, within the potential of the ecological site, to insure adequate water infiltration, optimal plant growth, and minimal surface runoff.

The following criteria serve as a basis to assess the intensity, duration, and magnitude of potential soil impacts associated with implementation of the Proposed Action and action alternatives. Soil impacts would be significant given the following:

1. Soil loss greater than 2 tons per acre per year above base levels in areas attributed to surface disturbance after reclamation,

2. Interim reclamation is unsuccessful within 5 years of implementation, or

3. Soil productivity is reduced to a level that prevents the disturbed area from recovering to pre-disturbance soil/vegetation productivity levels.

002335

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

## 4.7  Wildlife

### 4.7.1  Introduction

The principal wildlife impacts likely to be associated with the Proposed Action or action alternatives include (1) direct and indirect loss of wildlife habitats, (2) displacement of some wildlife species from increased human access and activity, (3) an increase in the potential for collisions between wildlife and motor vehicles, (4) an increase in stress to wildlife and (5) disruption of life history requirements of a species or population segment.

In addition, an analysis of potential wildlife concerns within each section of the ARPA was conducted so that operators could take the locations of these potential concerns into account when planning and selecting eventual well locations. Mitigation measures that correspond to the respective types of wildlife impacts within any given section would be implemented.

The primary wildlife resource concerns known to be present within the ARPA include big game crucial winter/transitional ranges; big game migration routes; overlapping big game crucial winter range (multiple species); leks, nesting habitat, and severe winter relief habitat of greater sage-grouse leks and nesting habitat of Columbian sharp-tailed grouse; and raptor nests.

The wildlife map (map M-29) represents the currently known locations of wildlife resource concerns within the ARPA. As more field data are gathered, additional areas that include wildlife resource concerns may be identified and mapped. If development occurs in areas of overlapping wildlife resource concerns, mitigation measures for each individual resource would be implemented. This approach provides the operators with information that can be used when developing gas well placement plans. Planned placement of disturbances may avoid individual wildlife resource concerns or overlapping concerns present within a section.

### 4.7.2  Impact Significance Criteria

The Great Divide Resource Area RMP ROD (USDI-BLM 1990) and state (WSLUC 1979) land use plans prescribe the following management objectives associated with wildlife resources:

- To provide habitat quality (food, cover, space, and water) adequate to support a natural diversity of wildlife and fisheries including big game; upland game; waterfowl; non-game species; game fish; sensitive, threatened, and endangered species; and species of special management interest in Wyoming as well as to assist in meeting goals of recovery plans.

- To maintain or improve vegetation condition or avoid long-term disturbance in high priority standard habitat sites and fisheries areas.

- To maintain or improve overall ecological quality, thus providing good wildlife habitat, within the constraints of multiple-use management in moderate and low priority standard habitat sites.

The following criteria were considered in the assessment of impacts associated with the Proposed Action and alternatives and are the same as those contained in the Draft Rawlins RMP DEIS (USDI-BLM 2004c):

002387

## Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

levels above existing background levels. Visual prominence of facilities is dependent upon surrounding topography.

Displacement would result in local reductions in wildlife populations if adjacent, undisturbed habitats are at carrying capacity. In this situation animals are either forced into less optimal habitats or they compete with other animals that already occupy unaffected habitats. Possible consequences of such displacement are lower survival, lower reproductive success, lower recruitment, and ultimately lower carrying capacity and reduced populations (WGFD 2004d).

Reaction of animals to noise and human presence varies depending on the intensity of the noise source and whether it is continuous or intermittent. Transient loud noises would provoke alarm responses; however, many animals learn to ignore more constant, lower-level noise sources that are not associated with negative experiences such as being chased or hunted (Busnel 1978).

The extent of wildlife displacement is impossible to predict for most species since the response severity varies from species to species and can even vary between different individuals of the same species. After initial avoidance, some wildlife species (usually certain birds and rodents and to a lesser extent deer and pronghorn) may acclimate to the activity and begin to reinvade areas previously avoided. This acclimation and reoccupation would be expected to occur following construction and drilling when the project moves into the production phases where less noise and human activity would take place.

Construction and drilling noise have the potential of affecting wildlife species at the project site as well as areas surrounding disturbance sites. Man-made construction such as well pads and roads can reduce use of surrounding habitat by wildlife. These impacted sites reduce foraging due to the direct loss of native vegetation from ground disturbance. In addition, there is an area surrounding these sites that tends not to be used due to the increased human activity. This zone can extend up to 0.625 mile from the developed area for pronghorn (Easterly et al. 1991) and from 0.6 to 1.2 miles for elk depending upon the season (Powell 2003). Consequently, development impacts to wildlife can extend farther off site than the actual amount of disturbed area. Although some individual animals can habituate to the increased infrastructure, it is generally assumed that, over all, the increased human footprint on a previously lightly developed area is detrimental to big game species. In addition to the avoidance response, increased human presence intensifies the potential for wildlife-human interactions ranging from the harassment of wildlife to poaching and increased legal hunting pressure. Also, increased traffic levels on new and existing roads could increase the potential for wildlife-vehicle collisions. Following drilling and well completion operations, noise levels would be reduced because well pumps would be powered by muffled generators. As a result, species might acclimate to the well pad production facilities and use habitats immediately adjacent to such sites. This has been observed at other natural gas production sites in Wyoming.

Direct habitat loss from construction would equal approximately 6 percent of the project area. In addition, dust would directly and indirectly impact 15–30 percent more acreage (section 4.5.3.1). These impacts would include habitat avoidance. Indirectly, this may increase inter- and intra-species competition for forage and thermal cover. In areas already fully occupied, density-dependant species would be further displaced, possibly outside of the project area. This may force animals to use lower quality habitats, which may lead to a reduction in reproduction rates or an increase in predation. The long-term loss/reduced usability of shrub habitat would lead to an increase in use on remaining shrub habitats. This increase of use would then lead to a

002389

# Chapter 4. ANALYSIS OF ENVIRONMENTAL CONSEQUENCES

The following acreage figures are for direct habitat loss (conversion of habitat to pads, roads, compressor stations, etc.). There would be less than 20 acres of pre-reclamation and 5 acres of post-reclamation disturbance with the maximum four pads per section (resource roads and pads, not collector roads) on BLM lands within crucial winter range.

## Pronghorn Antelope

The pronghorn herd units to be affected by the ARPA are the Bitter Creek and Baggs units. Out of 99,574 acres of crucial winter range habitat found within the Bitter Creek unit, 1,400 acres are located within the ARPA (1 percent). Out of 95,557 acres of crucial winter range habitat found within the Baggs unit, 41,500 acres are located within the ARPA (43 percent). As noted in section 4.7.3.1 (under Big Game), a total of 42,900 acres of pronghorn crucial winter range is located within the ARPA. Twenty-four percent of the crucial winter range is on private and state lands; additional mitigation would not be applied to those lands. Additional mitigation would occur on approximately 12 percent of the ARPA. Reduced acreage of habitat loss within crucial winter range would not help the downward trend in the health of crucial winter range.

## Mule Deer

The mule deer herd unit to be affected by the ARPA is the Baggs unit. Out of 270,893 acres of crucial winter range habitat found within the unit, 73,270 acres are located within the ARPA (27 percent). Forty-two percent of the crucial winter range is on private and state lands; additional mitigation would not be applied to those lands. Additional mitigation would occur on approximately 16 percent of the ARPA. Reduced impacts to transition range would help maintain the health of crucial winter range.

## Elk

The elk herd units to be affected by the ARPA are the Petition and Sierra Madre units. No crucial winter range for the Petition unit is found within the ARPA. Out of 178,697 acres of crucial winter range habitat found within the Sierra Madre unit, 40,840 acres are located within the ARPA (23 percent). Elk crucial winter range additional mitigation would be applied to approximately 15 percent of the ARPA. Fifteen percent of the crucial winter range is on private and state lands; additional mitigation would not be applied to those lands. Additional mitigation would occur on approximately 10 percent of the ARPA.

Under this alternative, the direct acreage disturbance and number of pads would result in significant impacts to pronghorn and mule deer crucial winter range. For elk crucial winter range, impacts would be reduced to the high category, which would still exceed the significance criteria (criterion number 3).

## Upland Game Birds

There would be less than 20 acres of pre-reclamation and 5 acres of post-reclamation with the maximum four pads per section (resource roads and pads, not collector roads) within nesting and brood-rearing habitat.

**Greater Sage-Grouse**. Ninety-two percent of the project area contains brood-rearing and nesting habitat for greater sage-grouse (BLM-estimated by applying a 2-mile radius buffer around known sage-grouse leks). Direct disturbance would be reduced by 68 percent on public lands, reducing long-term loss of greater sage-grouse habitat to the moderate category. Short-term suspension of grazing use in some pastures would leave more residual grass cover and forbs on grouse habitat, which in turn would benefit those grouse nesting and brood-rearing in

002400

# CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

**Table 5-2.    Estimated Cumulative Surface Disturbance (acres) within Big Game Seasonal Ranges, Included within the ARPA.**

|  | Acreage Available | Project Related Development | | Cumulative Development[1,2] | | Total Disturbance |
|---|---|---|---|---|---|---|
|  |  | Initial | LOP | Existing | Potential Future | Acres |
| **Pronghorn – Baggs Herd Unit** | | | | | | |
| Proposed Action | 890,743 | 15,800 | 6,241 | 5,804 | 743 | 12,788 |
| No Action (A) | 890,743 | 0 | 0 | 5,804 | 743 | 6,547 |
| Alternative C | 890,743 | 15,800 | 6,241 | 5,804 | 743 | 12,788 |
| Alternative D | 890,743 | 13,000 | 5,000 | 5,804 | 743 | 11,547 |
| **Mule Deer – Baggs Herd Unit** | | | | | | |
| Proposed Action | 1,843,543 | 15,800 | 6,241 | 23,536 | 17,751 | 47,528 |
| No Action (A) | 1,843,543 | 0 | 0 | 23,536 | 17,751 | 41,287 |
| Alternative C | 1,843,543 | 15,800 | 6,241 | 23,536 | 17,751 | 47,528 |
| Alternative D | 1,843,543 | 13,000 | 5,000 | 23,536 | 17,751 | 46,287 |
| **Elk – Sierra Madre Herd Unit** | | | | | | |
| Proposed Action | 1,525,644 | 15,800 | 6,241 | 883 | 0 | 7,124 |
| No Action (A) | 1,525,644 | 0 | 0 | 883 | 0 | 883 |
| Alternative C | 1,525,644 | 15,800 | 6,241 | 883 | 0 | 7,124 |
| Alternative D | 1,525,644 | 13,000 | 5,000 | 883 | 0 | 5,883 |

**Notes:**

[1]  Sources: Creston/Blue Gap EIS (USDI-BLM 1994), Continental Divide/Wamsutter II (CD/WII) EIS (USDI-BLM 2000a), Desolation Flats EIS (USDI-BLM 2003g); these numbers do not reflect acreage disturbed within the ARPA from existing natural gas development or the Interim Drilling Policy.

[2]  Numbers reflect reclaimed acreage, not total shrub habitat loss as a result of the projects, therefore, the numbers are conservative.

**Pronghorn.** The cumulative impact analysis area for pronghorn is the herd units impacted by the project.  Cumulative impacts upon pronghorn migration routes are unknown at this time; however, the current fencing along WY 789 creates a barrier to pronghorn attempting to migrate across this highway.  Wyoming Game and Fish Department has constructed a lay down fence along a portion of this area.

It is assumed that most, if not all, of the Baggs herd transition range is located within the ARPA. The Baggs Herd Unit has 43.5 percent of its crucial winter range located within the ARPA (map M-21).  An additional 39.6 percent of this herd unit's crucial winter range lies within other oil and gas project EIS boundaries adjacent to the ARPA.  Therefore, 83.1 percent of the Baggs pronghorn crucial winter range may lie within one or more of several oil and gas project boundaries.

002498

# CHAPTER 5. CUMULATIVE IMPACTS ANALYSIS

**Mule Deer.** The cumulative impact analysis area for mule deer is the herd units impacted by the project. Cumulative impacts upon mule deer migration routes within the Baggs Herd Unit are unknown. Currently, an industry sponsored mule deer study is ongoing. Completion of the first phase of the study has provided BLM and WGFD better information on migration routes. It is assumed that most, if not all, of this herd's transition range is located within the ARPA. The Baggs Herd Unit has 27 percent of its crucial winter range located within the ARPA. An additional 23.3 percent of this herd unit's crucial winter range lies within other oil and gas project EIS boundaries adjacent to the ARPA. Therefore, 50.3 percent of the Baggs mule deer crucial winter range might lie within one or more of several oil and gas project boundaries.

**Elk.** The cumulative impact analysis area for elk is the herd units impacted by the project. The Sierra Madre Herd Unit has 25 percent of its crucial winter range located within the ARPA (map M-24). No additional acreage of this herd unit's crucial winter range lies within other oil and gas project EIS boundaries adjacent to the ARPA. It is assumed that a portion of this herd's transition range is located along the eastern third of the ARPA. Current collaring studies within the ARPA by the WGFD show more movement of elk in a north-south direction along the eastern third of the ARPA than was originally suspected. However, elk movement may not always be the most direct route from winter to summer range. It is likely that project activities will disturb elk to a degree that they may move to new areas outside the ARPA. Elk are more sensitive to human activities than Mule Deer or Pronghorn Antelope, and may be displaced up to 1.2 miles, depending on the season (Powell 2003). This displacement could have consequences for livestock operators and other wildlife habitat.

## 5.2.7.2 Greater Sage-Grouse and Columbian Sharp-Tailed Grouse

Greater sage-grouse inhabit the ARPA and surrounding area year-round and require a wide range of seasonal habitats. The ARPA is located primarily within the Sierra Madre Upland Game Bird Management Area (UGBMA), but a small section is also located in the Bitter Creek UGBMA. These two areas were used as the CIA area for greater sage-grouse breeding and nesting habitats.

There are a total of 185 greater sage-grouse leks (150 occupied, 14 unoccupied, and 21 with unknown status) within the Bitter Creek and Sierra Madre UGBMAs. The area of potential nesting habitat consists of a 2-mile buffer placed around all occupied and unknown status leks within the Bitter Creek and Sierra Madre UGBMA. This area encompasses an additional 662,080 acres outside the ARPA, which is within EIS boundaries that have current, and could receive future, oil and gas development.

There are 145 greater sage-grouse leks within a 2-mile buffer of all current EIS project boundaries for oil and gas development including the ARPA. This project would cumulatively increase the leks potentially impacted by 88 leks. Furthermore, within the boundaries of the South Central Conservation Area (SCCA), 45 percent of this area's grouse are found within a 2-mile buffer of these same EIS boundaries and 28 percent are found within a 2-mile buffer of the ARPA. Data collected at seven sites in Wyoming documented that 45 percent of nests occur within 2 miles of a lek and that 64 percent of nests occur with 3 miles of a lek. In addition, nest success probability suggests increased nesting success rates beyond 5 miles of a lek (Holloran 2005). Until all existing and suitable habitat is mapped within the ARPA beyond the 2-mile lek buffer, there is a potential to have a significant direct and indirect impact to grouse.

002499

# CHAPTER 5.  CUMULATIVE IMPACTS ANALYSIS

Within Wyoming nearly half of the leks found within the SCCA are within oil and gas fields being developed.  Development might cause bird displacement and nest abandonment from direct and indirect impacts, such as habitat fragmentation, dust, noise, human activities, and long term loss of sagebrush habitat. These direct and indirect impacts would be cumulatively significant and would lead to lower productivity and a long-term decline in the population of this species.

Columbian sharp-tailed grouse inhabit the ARPA along the eastern edge and southern portions. The only populations found within Wyoming are within and adjacent to the ARPA.  Wyoming's populations are a northern extension of those found within northwestern Colorado (133 leks). Currently, there are 27 leks in Wyoming, all of which occur on or within 16 miles of the east ARPA boundary. Only seven of these leks are afforded protection (BLM or USDI-FS); the remaining 20 leks are found on state or private lands. Cumulative impacts to sharp-tailed grouse may occur from current and future county land use planning and community development, loss of Conservation Reserve Program (CRP) lands, mining and energy development in Colorado (Hoffman 2001).  This development may cause bird displacement and nest abandonment from direct and indirect impacts, such as habitat fragmentation, dust, noise, human activities, and long term loss of mixed shrub habitat. These direct and indirect impacts would be cumulatively significant and would lead to lower productivity and long-term decline in the population of this species.

## 5.2.7.3  Raptors

The CIA area for raptors includes the ARPA plus a 1-mile buffer.  This area covers approximately 400,000 acres, all of which would be considered raptor foraging habitat. Approximately 290,000 acres of this area were located within 1 mile of a known raptor nest and are considered to be potential raptor nesting habitat.

Cumulative impacts from the creation of additional nesting sites (artificial nesting structures and tanks) are unknown from other conventional oil and gas EIS projects in the vicinity of the ARPA. In the Continental Divide/Wamsutter II EIS area, raptor nesting success is static to improving. In addition, raptor fledgling numbers increase from three per natural nest to four per artificial nest.  Additional research is needed to evaluate impacts on raptors and their prey by creating additional nesting structures in areas that previously were limited by natural nesting substrates.

## 5.2.8    Special Status Plant, Wildlife, and Fish Species

Potential impacts to threatened, endangered, proposed, and sensitive species in this area of Wyoming are likely to be primarily associated with minerals development.

### 5.2.8.1  Plants

The area of influence assessed for special status plants includes the area described in section 5.1.2, southeastern Sweetwater County and southwestern Carbon County. Indirect concerns across the assessment area includes the possibility of a general reduction or loss of pollinators, invasion of weeds from adjacent development into occupied habitats, and increased risk of habitat disturbance from increased human presence.

Given the BLM policy of avoiding disturbance activities within identified special status plant habitats, direct cumulative effects upon these species should be avoided.  While no special status plant populations are known to exist within the ARPA, site-specific surveys will be

002500



6 71



*Working to Protect Native Species and Their Habitats*

P O Box 1512, Laramie, WY 82073     (307) 742-7978  fax 742-7989

February 17, 2006

David Simons
Rawlins BLM
P.O. Box 2407
Rawlins, WY 82301

RECEIVED

FEB 2 1 2006

BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE

**Comments on the Atlantic Rim CBM Project Draft EIS**

Dear Mr. Simons:

The following are the comments of Biodiversity Conservation Alliance, The Wilderness Society, Center for Native Ecosystems, Californians for Western Wilderness, Sagebrush Sea Campaign, Southern Rockies Ecosystem Project, Western Watersheds Project, Wyoming Outdoor Council, Wyoming Wilderness Association, Friends of the Red Desert, High Country Citizens' Alliance, the Upper Green River Valley Coalition, Sierra Club, Rocky Mountain Recreation Initiative, and Natural Resources Defense Council on the Atlantic Rim Coalbed Methane Project Draft EIS.

Overall, the Draft EIS suffers from a crippling flaw: The BLM has not planned the project, laying out the location of where the wells, pipelines, roads, and powerlines will be sited. Without planning the locations of these facilities, their direct impacts cannot be measured. We have noted numerous other shortcomings in the Draft EIS analysis, which should be remedied before a final decision is made.

We believe that there is potential to develop an alternative that allows all of the gas and CBM to be developed, while providing some level of protection for other multiple-use resources in the Atlantic Rim Project Area (ARPA). However, the current action alternatives each fail to provide adequate protection for wildlife, fisheries, recreation, vegetation, scenic resources, and special landscapes like ACECs and the Wild Cow Creek citizens' proposed wilderness. Because each current alternative would turn the ARPA into a single-use industrial zone and would destroy sensitive and critically important resources such as sage grouse lek concentration areas, important big game seasonal ranges, and wilderness resources, the only Alternative that the BLM should implement at this point is Alternative A, the No Action Alternative. In the meantime, we recommend that the BLM go back to the drawing board and prepare at least one action alternative that provides responsible management of coalbed methane and natural gas drilling, sound stewardship of the land and its wildlife, and a mix of development and protection that allows for multiple use of these lands. If the Atlantic Rim project is to move forward, the BLM must approve it under a plan of action that meets these criteria.

671-1-1
671-1

671-2-1
671-2-2
671-2
671-2-3

**Page 1**

070538

671-50-6

671-50-7    671-50

671-51

roads and subsequent ORV use, and the ecological footprint of oil and gas exploration and drilling.

➢ We formally request that the agency analyze and compare the fiscal cost of each alternative with reasonable expectations about agency budgets – based on an analysis of historic budgets. Rather than presenting the maximum production potential of public lands unconstrained by budgets, the agency should consider presenting the public with a more accurate picture of what can actually be accomplished given expected appropriations.

AIR QUALITY

The Wyoming Outdoor Council and other groups have recently submitted a number of comments regarding air quality for a number of BLM NEPA documents/ projects. Sometimes those comments were prepared directly by the Outdoor Council and sometimes they were prepared by attorney Robert Yuhnke or engineer Vicki Stamper, who were under contract to the Outdoor Council and/or other groups. The documents that we have submitted to BLM are the following:

- Comments of Robert Yuhnke on the Rawlins Resource Management Plan draft environmental impact statement.
- Comments of Vicki Stamper on the Rawlins Resource Management Plan draft environmental impact statement.
- Comments of Robert Yuhnke on the Jack Morrow Hills supplemental draft environmental impact statement.
- Protest of the Jack Morrow Hills final environmental impact statement prepared by Robert Yuhnke.
- Comments of the Wyoming Outdoor Council et al. on the Jonah Infill Project draft environmental impact statement.
- Comments of Robert Yuhnke on the Jonah Infill Project draft environmental impact statement air quality supplement.
- Comments of Vicki Stamper on the Jonah Infill Project draft environmental impact statement air quality supplement.
- Comments of the Wyoming Outdoor Council et al. on the Jonah Infill Project draft environmental impact statement air quality supplement.
- Comments of the Wyoming Outdoor Council et al. on the Jonah Infill Drilling Project final environmental impact statement, dated February 13, 2006

All of these documents were submitted to the BLM in the comments submitted by the Wyoming Outdoor Council and Environmental Defense dated January 31, 2006 on the Seminoe Road Natural Gas Development Project draft EIS, with the exception of the last document referenced, the comments on the Jonah Infill Drilling Project final EIS. The comments on the Jonah Infill Drilling Project final EIS are included herewith. See Attachment 8. Consequently, the BLM's Rawlins Field Office has all of these documents in its possession. All of these documents are incorporated into these comments by this reference and we ask that BLM consider them fully.

**Page 61**

070598

These comments have relevance to the Atlantic Rim DEIS because the methodologies used to estimate air quality impacts do not differ between the projects and the assumptions used in preparing the air quality analyses are the same among projects. So, for example, the concern expressed in a number of the comments regarding the appropriateness of using background concentrations of pollutants as a measure of the effects of existing pollution sources on air quality, particularly relative to consumption of allowable increment in Class I and Class II areas, is just as relevant here as it was in the comments on the prior projects. Moreover, some if not all, of these other air quality analyses were prepared by the same consultant that prepared the air quality analysis for the Atlantic Rim DEIS—TRC Environmental Consultants and Compliance Partners, Inc----so all the documents have a _very_ similar layout, presentation, wording etc., in addition to using the same methodologies, assumptions, etc. About all that changes between the various analyses are the "outputs"—the number of days with increase haze in Class I areas, for example. Thus, these comments have relevance to the Atlantic Rim DEIS air quality analysis.

In fact, these documents contain at least one commonality that is of great relevance. The modeling domain that is used is exactly the same for some or all of these projects. See, e.g., Jonah Infill Drilling Project Final Environmental Impact Statement at 3-7; Air Quality Technical Support Document, Atlantic Rim Natural Gas Project and Seminoe Road Gas Development Project at 2 (showing these projects have _exactly_ the same modeling domain). The consequences of this are great. It means that for analytical purposes BLM has defined all of these projects as being one project, and thus their impacts must be considered together, as one project. It means, for example, that non-project source emissions for far-field analyses should have the same emissions estimates. But they are not the same. See, e.g., Jonah Infill Drilling Project Final Environmental Impact Statement at J-9 (Table J-9), Atlantic Rim Draft Environmental Impact Statement at 4-10 (Table 4-1) (presenting widely diverging estimates of non-project emissions despite using the same modeling domain).' BLM must correct or at least explain these greatly diverging estimates that are being applied to the same modeling domain during much the same time frame.

The Atlantic Rim DEIS shows that the NAAQS for 8-hour ozone concentrations is coming perilously close to being violated. Atlantic Rim DEIS at 3-18 (showing the measured back ground concentration of ozone is 147 $\mu g/m^3$, ninety-four percent of the ozone 8-hour NAAQS). It is not "well below" the NAAQS, as claimed. _Id._ at 3-17. Despite the heightened importance of this criteria pollutant due to the near-violation of the standard, the ozone analysis in the Atlantic RIM DEIS is deficient. The DEIS predicts that the concentration of ozone that will result with the construction of the Atlantic Rim project will be 91.3 $\mu g/m^3$, arriving at this figure by eliminating the stated background concentration (147 $\mu g/m^3$) and replacing it with a much lesser background concentration of 75.2 $\mu g/m^3$. See Atlantic Rim DEIS at 4-14 (Table 4-2). If

---

[8] It should also be noted that the defined time frame for making these estimates does not differ much. For the Jonah Infill Project this time frame was January 1,2001 through June 30,2003. Final Air Quality Technical Support Document for the Jonah Infill Drilling Project Environmental Impact Statement (Volume 1) at 16. For the Atlantic Rim project this time frame was January 1,2001 through March 31,2001, a ten month difference. Air Quality Technical Support Document, Atlantic Rim Natural Gas Project and Seminoe Road Gas Development Project at 27. Thus, any differences must be explained by an increase in emission during this short period. BLM should provide that explanation.

**Page 62**

070599

671-51-3

the stated background concentration of 147 μg/m³ were used, the ozone concentration resulting from the Atlantic Rim project would be 163.1 μg/m³, a violation of the ozone 8-hour NAAQS of 157 μg/m³.  See Id. at 3-18, 4-14.  The inappropriateness of this approach was also raised and discussed in much more detail in the Wyoming Outdoor Council et al.'s various comments on the Jonah Infill Drilling Project environmental impact statement that were referenced above.

671-51-4

BLM is substituting a long-term average of background ozone concentrations for an 8-hour estimate, which is clearly inappropriate for making an estimate of the 8-hour background concentrations. To quote just one point regarding the ozone analyses made in our various comments on the Jonah Infill Project (these being from the February 13, 2006 comments):

671-51

> Likewise, our earlier comments discussed the fact that in its near-field ozone analysis, BLM incorrectly added a long-term average ozone concentration from the Green River Basin Visibility Study to the ozone concentration it estimated with the Scheffe model to derive total ozone concentrations for comparison to the NAAQS and WAAQS.  BLM has failed to correct this error, again using a long-term average background concentration for comparison with the standards. FEIS at J-3 (Table J-6). As discussed in our previous comments, the ozone standards are short-term standards, based on 8-hour and 1-hour average concentrations, respectively.  The background concentrations used to estimate total concentrations for comparison to the standards must therefore reflect the same averaging times. The January 2006 Final Support Document states that it would be "overly conservative" to add background concentrations that reflect short-term averaging times to results from the Scheffe screening model, presumably because BLM believes the screening model overestimates ozone concentrations. However, BLM has not provided any support for the suggestion that the screening model is biased in this direction, let alone any estimate of the magnitude of the bias.  BLM must use an adequate model in the first place, and not arbitrarily adjust the background concentration downward in hopes of correcting for some purported bias in the model.

671-51-5

As has been noted in great detail in a number of the above-referenced comments we have previously submitted to BLM, the Atlantic Rim DEIS uses an inappropriate "cutoff" date of March 31, 2004 for is purported "regional emissions inventory." Air Quality Technical Support Document, Atlantic Rim Natural Gas Project and Seminoe Road Gas Development Project at 27. This is full year-and-half or more before the Atlantic Rim DEIS was released and will be essentially two years before the comment period ends on the DEIS.  It will be well beyond two years prior to the release of the FEIS.  As discussed in many of the comments mentioned above

671-51-6

671-51-7

and submitted herewith, this sort of cutoff dated is inappropriate because, among other things, it eliminates the consideration of many emissions sources and does not comply with the requirements regarding analysis of the consumption of increment in prevention of significant deterioration areas.  It is also deficient because there is no analysis of whether these background values are even remotely representative of background levels in the Atlantic Rim project area (particularly for background levels assumed from far-away and/or long-ago monitoring).  The background values seem to have more to do with what was easily available or already in hand

than with ensuring that the data used were relevant. That fails to meet the requirements of NEPA. See 40 C.F.R. §§ 1502.22, 1502.24

Table 5-1 on page 5-6 of the Atlantic Rim DEIS presents "projects included in cumulative analysis." There appear to be a number of underestimates of the magnitude of these projects, which was likely carried into the air quality analysis. In particular it is not clear that a number of "infill" projects that are currently being pursued by BLM were considered. Creston-Blue Gap, a project in the immediate vicinity of the Atlantic Rim project, is referenced but it is not clear it includes the Creston/Blue Gap II infill project that BLM is currently in the process of approving. The Creston Blue Gap project allowed for 200 wells; BLM's recent scoping notice for the Creston/Blue Gap II project states 1,250 infill wells will be drilled. The Moxa Areh project is referenced, but it is not clear that it includes the Moxa Arch Infill project that BLM is currently analyzing. BLM's scoping notice for the Moxa Arch Infill project states that there are currently 1,400 wells in production and an additional 1,226 are proposed in the "core" area alone in the infill proposal. Under any standard, it is unreasonable for BLM to not consider the air quality impact of these and other projects by adopting unreasonable cutoff dates that are literally years removed from current conditions.

BLM claims that there are no relevant standards relative to visibility. This is incorrect. For one, the Clean Air Act itself establishes that the national goal is the "prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution." 42 U.S.C. § 7491(a)(1). "Reasonable progress" toward this goal must be "assure[d]" *Id.* § 7491(a)(4). Furthermore, EPA's regional haze rule requires that state implementation plans must "provide for an improvement in visibility for the most impaired days . . . and ensure no degradation of visibility for the least impaired days . . . ." 40 C.F.R. § 51.308(d)(1). BLM estimates that the Atlantic Rim project will degrade visibility in Class I areas, at least on a cumulative basis. Specifically, cumulatively there will be 4 days of increased haze in the Bridger Wilderness Area when visibility is reduced by 1 dv or more (10 days if the 0.5 dv standard is used). Air Quality Technical Support Document, Atlantic Rim Natural Gas Project and Seminoe Road Gas Development Project at Appendix A Table F1.8.2 . BLM should acknowledge that the Atlantic Rim project will contribute to a lack of progress toward the national goal and will make it more difficult or impossible for the State of Wyoming to submit an approvable regional haze state implementation plan to EPA.[9] The BLM should also acknowledge that it is making policy decisions regarding what type of development is most important and when and where this development will occur, taking options for making these decisions away from the State. BLM has decided that oil and gas development should have primacy in the industrial development that will be permissible under the Clean Air Act. Once BLM acknowledges that its actions will be contrary to the national goal and make it more difficult or impossible for the State to abide by EPA regional haze rule requirements, it should state what it will do to prevent these problems (see below).

The Seminoe Road Project and the Atlantic Rim Project were subject to a joint far-field (cumulative) air quality impact assessment. See Air Quality Technical Support Document,

---

[9] The State of Wyoming's regional haze state implementation plan is due to EPA on December 17, 2007.

**Page 64**

070601

Atlantic Rim Natural Gas Project and Seminoe Road Gas Development Project. Yet the impacts of these projects are presented separately and are not considered together. Using visibility as an example of the implications of this approach, BLM claims that the Atlantic Rim project standing alone will contribute less than four percent (0.04 dv) to the visibility degradation on the four days in which visibility will degraded by 1 dv or more in the Bridger Wilderness Area, allowing BLM to claim "the Atlantic Rim project emissions would not cause or contribute to any visibility degradation at any of the Class I and sensitive Class II areas." DEIS at 5-7. See also _Id._ at 5-8 to -9. But this is the wrong way to frame the question. The question is whether the impacts of the Seminoe Road Project and the Atlantic Rim Project together will exceed the 0.04 dv standard that BLM has accepted as showing significant impacts. The impacts of the Seminoe Road Project must be added to the impacts of the Atlantic Rim Project to determine whether the 0.04 dv standard has been exceeded. Furthermore, at a minimum, they must also be added to the impacts of the very nearby Desolation Flats project because it has almost exactly the same modeling domain as the Atlantic Rim and Seminoe Road projects. See Air Quality Technical Support Document, Atlantic Rim Natural Gas Project and Seminoe Road Gas Development Project at 2; Desolation Flats Natural Gas Exploration and Development Project, Technical Support Documents for the Ambient Air Quality Impact Analysis at 2 (Figure 1-1) (showing these projects have nearly exactly the same modeling domain).

When this is done, it is clear there will be significant impacts to Class I areas due to these projects. The direct impacts to the Bridger Wilderness Area will be 0.02 dv due to the Atlantic Rim Project.[10] Air Quality Technical Support Document, Atlantic Rim Natural Gas Project and Seminoe Road Gas Development Project at Appendix F1, Table F1.8.1. The impacts due to the Seminoe Road project will be 0.01 dv in the Bridger Wilderness Area. _Id._ at F2.8.1. The direct impacts due to the Desolation Flats project are 0.079 dv in the Bridger Wilderness Area. Desolation Flats Natural Gas Exploration and Development Project, Technical Support Documents, Near and Far Field Analysis Technical Report at 100 (Table 6-9). When these impacts are added, as they must be, the total direct impact is 0.11 dv, far in excess of the 0.04 dv standard for a project's contribution to cumulative impacts that BLM considers significant.[11] It was BLM's choice to determine that these projects should be analyzed jointly--explicitly with regards to Atlantic Rim and Seminoe Road, and implicitly due to the way the modeling domain was defined for Desolation Flats—so it must adhere to that decision. If BLM fails to do this, it will be violating the NEPA regulations by not considering cumulative, connected, and/or similar actions together, as it must.

Despite the fact that this project at a minimum will contribute to significant impacts to air quality in Class I areas and potentially cause an exceedance of the NAAQS for ozone, BLM does not propose to do any air quality monitoring in the Atlantic Rim field or provide for any mitigation of air quality impacts. As will be shown below, additional adverse impacts from this project are expected, including exceedance of significance levels and deposition analysis thresholds

---

[10] This is based on the more favorable results from the IMPROVE modeling. If the FLAG modeling were used, the impact would be 0.03 dv.

[11] The impacts may be more severe than this. On page 5-6 of the DEIS it is stated that the Atlantic Rim project will cause 0.2 dv of impacts, not 0.02 dv.

Page 65

070602

("DAT"). The failure to discuss how these impacts can be mitigated fails to meet NEPA requirements. An EIS must discuss "steps that can be taken to mitigate adverse environmental consequences." Robertson v. Methow Valley Citizens Council, 109 S.Ct. 1835, 1989). "Implicit in NEPA's demand that an agency prepared a detailed statement on "any adverse environmental effects which cannot be avoided should the proposed be implemented," 42 U.S.C. § 4332(C)(ii), is an understanding that the EIS will discuss the extent to which adverse impacts can be avoided." Id. at 1846-47. "[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the "action-forcing" function of NEPA." Id. at 1847. See also 40 C.F.R. §§ 1500.2(f) (BLM must use "all practicable means" to prevent environmental impacts), 1502.14(f) (alternatives presented in an EIS "shall" include appropriate mitigation measures), 1502.16(h)(means to mitigate impacts must be discussed in the environmental consequences section of an EIS). Recently EPA demanded that BLM must reduce emissions from the Jonah Infill project by at least 80 percent, and BLM in a letter dated October 5, 2005 stated that the 80 percent reductions alternative was now the BLM's preferred alternative. Having established this level of emissions reductions as reasonable and practical, not to mention necessary to ensure that air quality standards are not violated, BLM must continue to abide by this agreement in all oil and gas development projects. This is particularly true since the Atlantic Rim/Seminoe Road and Jonah Infill Project modeling domains are exactly the same. Both the Atlantic Rim and Seminoe Road projects will contribute to significant impacts to visibility in Class I areas, so BLM must seek to mitigate those impacts. At a minimum, BLM should require the use of Tier II technology and flareless completions to the maximum extent possible, as it is purporting to do in the Jonah field. Moreover, it must ensure that there is adequate air quality monitoring in place, including in the Atlantic Rim field. Absent any monitoring, the air quality impacts of this project will remain undocumented, the kind of blindness NEPA specifically prohibits. See 40 C.F.R. § 1502.22 (requiring the collection of complete information), 1502.24 (requiring that professional integrity and scientific accuracy be assured).

The conclusion in the Seminoe Road EIS that there will be four days of cumulative impacts to visibility in the Bridger Wilderness Area that exceed 1 dv is demonstrably wrong. The Desolation Flats project will contribute to five days of cumulative impacts exceeding the 1 dv standard. Desolation Flats Natural Gas Exploration and Development Project, Technical Support Documents, Near and Far Field Analysis Technical Report at 102 (Table 6-10). Thus, with the addition of the 2000 wells proposed here (not to mention the 1,240 wells from the Seminoe Road project that are supposedly part of a joint cumulative air impacts analysis), the level of cumulative impacts affecting the Bridger Wilderness must exceed four days. The Atlantic Rim DEIS should be corrected so that the proper cumulative impact is presented, or at a minimum an explanation must be provided as to why the Desolation Flats project, which has far fewer wells (385), has greater cumulative impacts than does the Atlantic Rim project. Should the cumulative impacts from the two projects be added together? Moreover, an explanation should be provided as to why the much smaller Desolation Flats project will have cumulative impacts on a number of other Class I areas while the Seminoe Road project will not. See Id. (showing impacts from the Desolation Flats project to the Fitzpatrick Wilderness Area, and a number of other sensitive areas). Additionally, the Jonah Infill Project final EIS shows that that project will have six days of significant cumulative impacts (and 3 days of direct project impacts) to visibility in the

070603

Bridger Wilderness Area.[12]  Similarly, the Powder River Basin Coalbed Methane EIS showed that that project would contribute to eight to twelve days of significant cumulative visibility impacts in the Bridger Wilderness (with four days of direct project impacts).  Final Environmental Impact Statement and Proposed Plan Amendment for the Powder River Basin Oil and Gas Project at 4-391, Appendix F.  Again, should the impacts of the Jonah and Powder River Basin projects be added to the Atlantic Rim project impacts?  Why or why not?  Certainly, at a minimum, the direct project impacts of these projects must be added to the cumulative impacts of the Atlantic Rim project.  If the Seminoe Road, Atlantic Rim, Desolation Flats, Jonah, and Powder River Basin projects are considered together—as they must be in order to do a proper cumulative impacts analysis—the significant cumulative visibility impacts in the Bridger Wilderness Area would appear to be on the order of about two to three weeks per year, at a minimum.  At a minimum BLM must provide an explanation of how the impacts analyses from these (and other) projects relate to each other and to what degree the impacts are additive or not, and why.

With respect to air quality impacts resulting from the Atlantic Rim project, BLM has little more to say than this:  "Potential visibility impacts are predicted to be above the "just noticeable visibility change (1.0 dv) threshold at the Bridger Wilderness Area and Popo Agie Wilderness Area using FLAG background visibility data and at Bridger Wilderness Area, Popo Agie Wilderness Area, and Wind River Roadless Area using IMPROVE background visibility data."  DEIS at 5-6.  But a review of the information in the Air Quality Technical Support Document, Atlantic Rim Natural Gas Project and Seminoe Road Gas Development Project ("Support Document") shows that there will be additional impacts, and the DEIS fails to provide an adequate analysis of these impacts.

Table F1.1.3 shows that the cumulative impacts of this project would be extraordinarily close to the $NO_2$ significance level in the Bridger Wilderness Area.  Support Document at Table F1.1.3.  Certainly there is no where near enough confidence in the data input into these models to claim that a 0.0936 $\mu g/m^3$ level differs statistically from a 0.1 $\mu g/m^3$ significance level (i.e., the data are too variable for the confidence interval for the 0.0936 level to not include, overlap with, 0.1).  BLM should acknowledge the near-exceedance of this standard and discuss its importance.  If BLM is claiming that a 0.0936 concentration differs statistically from a 0.10 level it must provide support for that claim.  The 24-hour cumulative $PM_{10}$ levels do exceed the significance level in the Bridger Wilderness area; 0.481 $\mu g/m^3$ are predicted and the significance level is 0.30 $\mu g/m^3$.  *Id.* at Table F1.3.3.  On a cumulative basis, the DAT for nitrogen is exceeded in a number of Class I areas.  *Id.* at Table F1.6.1.  And of course, the significance level relative to cumulative visibility impacts is exceeded, although the DEIS is notable for providing no explanation of to what degree impacts are occurring.  In fact, there will be four days of cumulative significant impacts to visibility in the Bridger Wilderness Area Class I area (10 days if the 0.5 dv standard is used), and visibility could be reduced by over twenty percent (2.08 dv) on those days.  *Id.* at Table F1.8.3.  The DEIS must acknowledge, discuss, and seek to mitigate these various impacts.

---

[12] Early Project Development Stage impacts will be much greater.  **See** Final **Air** Quality Technical Supplement Document for the Jonah Infill Drilling Project Environmental Impact Statement (Volume 2 of 2) at G-ix.

**Page 67**

070604

In addition to the above comments regarding air quality, we have several other comments:

- The Atlantic Rim DEIS ignores air quality impacts and issues in sections of the DEIS where they should at least be mentioned and/or acknowledged. These include pages S-4 to -7 (Executive Summary), 2-4 to -6 (air is not treated as a unique and important resource under Alternative C), 2-10 to -23 (air is not mentioned in this environmental consequences table).

- The Jonah Infill Project EIS has established the need to engage in "early project development stage" modeling so that air quality impacts can be adequately considered before Tier II and other air pollution control technologies become widely available. The Atlantic Rim DEIS should provide similar modeling so that a full understanding of air quality impacts can be had.

- The only modeling that was done was of the Proposed Action and No Action Alternatives. See DEIS at 4-9. The No Action alternative modeling was apparently not even reflective of the true state of affairs under the no action scenario because it did not reflect the 720 wells that will be drilled on state and private lands. DEIS at 5-7. This fails to meet BLM's obligations to provide an analysis that is useful for decision-making in an environmentally informed manner.[13] Furthermore, since BLM is pursuing a combination of Alternatives B and C as its Preferred Alternative, it should have modeled that scenario so that an estimation of impacts from what BLM actually plans to do could be made and consideration given to the significance of those impacts. That is not possible with the analysis presented. The failure to analyze the impacts of the Preferred Alternative, a plan of action that differs substantially from the Proposed Action, fails to meet the underlying requirements, policies, and purposes of NEPA. See, e.g., 40 C.F.R. §§ 1500.1, 1500.2, 1501.2, 1502.1.

- DEIS at 4-14 (Table 4-3). No conclusions can be reached regarding whether the $NO_2$ increment will be exceeded without an estimate of how much increment has already been consumed. No indication of how much increment has been consumed is provided in the DEIS. Thus, any conclusions regarding exceedance of the $NO_2$ Class I or Class II increment (or the increment for any other criteria pollutant) have no basis.

**INFRASTRUCTURE**

---

[13] BLM's attempt to explain away this oversight is unavailing. DEIS at 5-7. BLM weakly asserts that "[t]otal far field impacts would be slightly less than those analyzed for the Proposed Action given the reduced number of wells developed." Does this mean 1 percent less? Five percent? Fifteen percent? The DEIS provides no basis for making this comparison. This "analysis" fails to meet the requirements of NEPA. BLM can only avoid providing a valid No Action impact analysis if it can show the costs of correcting its mistakes are exorbitant. 40 C.F.R. § 1502.22. It has not done so. In fact the alternatives section is the "heart" of the NEPA process, and analysis of the No Action Alternative is central to that. Id. § 1502.14. Thus, BLM must provide and analyze a valid No Action alternative and circulate it for public review.

**Page 68**

070605

Basin, see DEIS at 3-43). And while the soil classification percentages for these streams is presented, these data are useless for analysis purposes because the failure to gather baseline data on water quality for these streams prevents the legally required "hard look" at siltation and salt loading impacts of the proposed project for these watersheds.

*Baseline Information on Road Density and Type*
BLM reports for impaired watersheds of Muddy Creek and McKinney Creek, that road densities are currently less that 2 miles per square mile, and only "a small amount of sedimentation" is contributed by these roads. However, the agency fails to define what it considers a "road." Are two-track jeep trails lumped into this 2 mi./square mile figure? Certainly, two-track jeep trails contribute very little sedimentation in comparison to engineered, crown-and-ditch gravel roadways of the type proposed for the Atlantic Rim Project.

It is critically important that an accurate accounting of present road density, by road type, is presented in the EIS for each watershed HUC as baseline information, so that present levels of road-based siltation and salinification can be compared to road density levels in the three alternatives. This has not been done.

*Baseline Information on Sage Grouse and Sharp-Tailed Grouse Populations*
The Draft EIS states that 88 sage grouse leks in or within two miles and 6 Colwnbian sharp-tailed grouse leks in or within one mile of the ARPA. DEIS at 3-73, 74. However, the BLM has provided no population estimates for these species. How many of the leks are currently active, how many inactive, and how many historic? What are the lek count data at each lek? (WGFD lek count data should be readily available). What proportion of the Wyoming populations of these species are represented by the ARPA populations? What are the lek attendance trends for each lek, and what current human activities are affecting these trends? What are the hunter success/bag count data, and what do these data say about grouse population trends within the ARPA? These absences of baseline data render the Draft EIS noncompliant with NEPA.

*Baseline Information on Raptors and Important Nesting Areas*
While the BLM's Affected Environment section lists 542 known raptor nests within a mile of the ARPA (and thereby likely to be impacted by the project) and categorizes the 357 that occur within the boundary by species, crucially important baseline information is missing. See DEIS at 3-74. For each species, which nest sites are active and which are inactive? What is the overall population of nesting raptors in the ARPA vicinity? What is the current population trend for each species? What are the fledging data for each species within the ARPA, and how has this metric changed in recent years? What other habitat attributes and/or human activities in the ARPA are currently impacting population size and trend, and in what way? These data will be needed in order for the BLM to undertake a "hard look" at impacts to raptors (which it has not done to date).

## THE BLM'S CUMULATIVE IMPACTS ANALYSIS IS DEEPLY FLAWED
Impacts can be direct, indirect, or cumulative. *See* 40 C.F.R. § 1508.8(a) and (b). Cumulative impacts result "fi-om the incremental impact of the action when added to other past, present, and reasonable foreseeable future actions[. . . .] Cumulative impacts can result from individually

*Margin labels:* 671-24-1, 671-24-2, 671-24-3, 671-24, 671-24-4, 671-24-5, 671-25

**Page 32**

070569

minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. Because of the importance of cumulative impacts, "the consistent position of the case law is that ... the agency's EA must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum." Grand Canyon Trust, 290 F.3d 339, 342 (citations omitted). To satisfy NEPA's hard look requirement, the cumulative impacts assessment must do two things. First, BLM must catalogue the past, present and reasonably foreseeable projects in the area that might impact the environment. Muckleshoot Indian Tribe v. USFS, 177 F.3d 800, 809-810 (9th Cir. 1999). Second, BLM must analyze these impacts in light of the proposed action. Id. If BLM determines that certain actions are not relevant to the cumulative impacts analysis, it must "demonstrat[e] the scientific basis for this assertion." Sierra Club v. Bosworth, 199 F.Supp.2d 971, 983 (N.D. Ca. 2002). In Wyoming Outdoor Council v. U.S. Army Corps of Engineers, the court ruled,

> The Court cannot defer to an EA/FONSI which has neglected, by its own terms, to even attempt to assess the extent of cumulative impacts that might be attributed to the agency action....The Corps must assess cumulative impacts to such a degree as to assure this Court that its issuance of a FONSI was not arbitrary and capricious.

351 F.Supp.2d 1232, 1243 (D. Wyoming 2005). The legal standard for an Environmental Impact Statement is even higher

The BLM's framing of cumulative impacts contains important omissions. The agency has failed to acknowledge or study the impacts of an additional 2,000-3,000 natural gas wells called for by BP in the Continental Divide – Wamsutter field, or the additional 1,250 wells proposed under the Creston – Blue Gap II project, which has been scoped for the lands immediately adjacent to the ARPA. Both of these developments are so reasonably foreseeable that BLM has already begun planning for them. The agency has also failed to study the impacts of development south of the Colorado border. This is a critical error, because the Baggs Elk Herd is known to use lands on both sides of the state line, and will be impacted in a cumulative way by the Atlantic Rim project as well as neighboring projects in both Wyoming and Colorado.

In addition, the BLM has artificially constrained the Cumulative Impacts Area for raptors to the ARPA plus a one-mile buffer. DEIS at 5-17. To get a handle on cumulative impacts to raptors on a population level, BLM must analyze a much larger area, because these species are typified by large home ranges. It would not be unreasonable to expect BLM to analyze cumulative impacts in summer habitats (including the ARPA) as well as wintering grounds for migratory species. How big is the area containing interbreeding populations of birds for each raptor species? What is the biologically meaningful unit of measure? Certainly it is not limited to the ARPA plus a one-mile buffer.

The BLM notes that for pronghorn, some 83.1% of the crucial winter range for the Baggs pronghorn herd lies within the ARPA or another area slated for full-field development (presumably the Creston – Blue Gap project area). DEIS at 5-15. Based on the fact that pronghorns avoid heavily developed areas (Berger et al. 2006), it can safely be assumed that these areas will have limited or no habitat value for pronghorn when the initial build-out is

Page 33

070570

complete. See Attachment 7. And yet the Draft EIS make no effort to analyze or estimate what effects that this development of sensitive ranges will have on the population of the Baggs pronghorn herd, in violation of NEPA. Furthermore, there is also no analysis of cumulative impacts of these projects on pronghorn migrations; BLM states that these are "unknown at this time." DEIS at 5-15. The BLM must make some effort at quantifying the cumulative impacts of the project together with other neighboring impacts on pronghorn migrations and overall population levels.

The BLM notes that for mule deer, some 50.3% of the crucial winter range for the Baggs mule deer herd lies within the ARPA or another area slated for full-field development (presumably the Creston – Blue Gap project area). DEIS at 5-15. Based on the fact that pronghorns avoid heavily developed areas (Sawyer et al. 2005), it can safely be assumed that these areas will have limited or no habitat value for pronghorn when the initial build-out is complete. And yet the Draft EIS make no effort to analyze or estimate what effects that this development of sensitive ranges will have on the population of the Baggs mule deer herd, in violation of NEPA. Furthermore, there is also no analysis of cumulative impacts of these projects on mule deer migrations; BLM states that these are "unknown at this time." DEIS at 5-15. The BLM must make some effort at quantifying the cumulative impacts of the project together with other neighboring impacts on mule deer migrations and overall population levels.

For sage grouse, 145 of the 185 sage grouse leks (78.4%) in the Bitter Creek and Sierra Madre Upland Game Bird Management Areas will be inside or within 2 miles of a full-field development project. DEIS at 5-17. Impacts of oil and gas development on grouse are severe (Holloran 2005). The BLM recognizes that the ARPA is part of an important sage grouse stronghold (DEIS at 5-17), yet fails to analyze the cumulative effects of development (presumably severe) on the two sage grouse populations in question. BLM notes "lower productivity and a long-term decline" as outcomes, but neglects to analyze how severe these impacts are likely to be. A mere listing of impact categories does not satisfy NEPA.

Similarly, BLM notes that Columbian sharp-tailed grouse populations are an extension of a population that is centered in northwest Colorado. DEIS at 5-17. Yet the agency fails to analyze the cumulative effects of the Atlantic Rim project together with other projects and activities occurring in Colorado. It also fails to forecast the long-term impacts on population and productivity of the sharp-tailed grouse population from cumulative impacts.

For the four species of Endangered fishes living immediately downstream of the ARPA, BLM recognizes that increased salt and sediment inputs from the ARPA pose a threat to the habitat and survival of these fishes. DEIS at 4-79. But the BLM states that "these materials would become highly diluted before they would reach any downstream waters where these species occur; consequently, the potential risks from such occurrences are negligible." *Id.* First off, in order to support this statement, BLM must provide estimates of the turbidity and salinity loads of the Little Snake and Yampa Rivers, together with estimates of how turbidity and salt concentrations would change throughout the year (impacts from the same ARPA salt and sediment discharge would be much different during spring runoff than during the low flows of September). The BLM has failed to conduct this analysis for any of its alternatives. Secondly, the "solution to

Page 34

070571

pollution is dilution" approach to water pollution is an outdated and discredited approach because it contributed to major water pollution problems throughout the first three-quarters of the 20th Century. The BLM should be ashamed of espousing such a reckless and short-sighted approach. Thirdly, if BLM is counting on dilution to water down salts, turbidity, and trace minerals to levels safe for these Endangered fishes, then it needs to undertake a comprehensive analysis of reasonably foreseeable additional inputs of salt and sediment into the Little Snake and Yampa systems, on a watershed-wide basis, for the projected 30-50 year life of the Atlantic Rim CBM project. The agency has failed to present such an analysis.

The Cumulative Impact Analysis on Water Resources would be expected to make quantitative estimates of inputs of salts, sediment, and other pollutants into the Little Snake and Yampa River systems, both for the Atlantic Rim project and other activities that contribute impacts to these waterways; it does not. See DEIS at 5-10. BLM lists various types of activities (e.g., irrigation, coal mines, ranching and farming, etc.) but makes not effort to present their current inputs or projected inputs throughout the life of the project. These inputs could be gathered today; data are available from such sources as the Conservation Districts, State departments of environmental quality, the U.S. Corps of Engineers, and perhaps also the USGS. But the agency has made no effort to gather data on the baseline conditions or gather the data needed to effectively model the cumulative impacts in these two watersheds. It has not even modeled the known and projected oil and gas developments in Wyoming and their projected inputs (i.e., Creston-Blue Gap, Continetal Divide-Wamsutter, Desolation Flats, Pacific Rim) to these two sensitive watersheds. Indeed, BLM's cumulative impacts analysis for fishes and watersheds makes a mockery of the NEPA process.

The cumulative impact analysis contains many other significant errors as well. It lists coal mining as "none currently planned" despite the fact that there are several large and active open-pit coal mines within the Yampa watershed that will likely continue to operate, and continue to contribute impacts to the Yampa River system (which has the four species of Endangered fishes) in the foreseeable future. It omits the reasonably foreseeable increase in gas development under the Little Snake RMP revision, which is currently underway. If BLM has talked with its sister offices in Colorado and Utah, it could get an estimate of the number of wells planned for at least the next 10-15 years, use that as an index for future development, and make some educated estimates about salt and sediment loading that might occur as a result of oil and gas projects in those areas. The BLM has also failed to consider the cumulative impacts of oil shale development, which is surprising since the agency recently finished taking comments on its Oil Shale Leasing Programmatic EIS, which shows major oil shale deposits throughout the Little Snake and Yampa watersheds. Furthermore, the cumulative impacts analysis for Endangered fishes in particular is not only deficient; there is no analysis or even mention of these species in the Cumulative Impacts Analysis. DEIS at 5-17, 5-18.

SOCIOECONOMIC ISSUES

In making land use decisions, federal agencies have an obligation under the National Environmental Policy Act (NEPA) to take a "hard look" at the environmental consequences of a proposed action, and the requisite analysis "must be appropriate to the action in question." These comments present a framework and indicators to be used in analyzing the impact of coalbed

**Page 35**

070572



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
RESEARCH TRIANGLE PARK, NC 27711

JUL 28 2006

Ms. Abigail Dillen
209 South Willson Avenue
Bozeman, Montana 59715

OFFICE OF
AIR QUALITY PLANNING
AND STANDARDS

Dear Ms. Dillen:

This letter is in response to your inquiry regarding applicability of the Scheffe Point Source Screening Tables.

I developed the screening tables in 1988 as a screening test to estimate the contribution to ambient ozone associated with increased non-methane organic carbon (NMOC) emissions arising from new or modified point sources. The tables never achieved a level of EPA certification associated with EPA guideline models and consequently were not endorsed by the Agency. After publication (non peer reviewed literature) of the tables in 1989, the American Petroleum Institute enlisted renowned atmospheric modeling experts, Drs. John Seinfeld and Panos Georgopoulous of the California Institute of Technology, to review the technique. Based on their input and our own analysis, the EPA decided at that time that the tables did not adhere to an adequate level of scientific credibility to be recommended for their intended purpose.

Ozone science has advanced markedly since 1988 with substantial improvements in the characterization of emissions, meteorological, and atmospheric chemistry processes, paralleling an equivalent improvement in computational processing capability, all of which constitute the principal features of a modeling framework. As a result, the Scheffe method, which was deemed "not adequate" in 1989, would be even less adequate today.

Please do not hesitate to contact me (919-477-7955) regarding any further questions.

Sincerely,

Richard D. Scheffe, PhD
Senior Science Advisor
OAQPS, EPA

cc:    Richard Long, Region 8
       Tom Curran
       Valerie Broadwell

Exhibit 1

**009881**

**August 31, 2006**

**INFORMATION MEMORANDUM FOR State Director**
**FROM: Marty Griffith, DSD**
**SUBJECT: Ozone Issue and BLM-WY response**

I.      **SUMMARY:** WOC thru request to IBLA for reconsideration alleging that an air quality model used to estimate effects of the pollutant ozone production by Jonah Infill Drilling Project activities was obsolete.   After consultation with the affected Field Offices for several projects in NEPA process, and with cooperators, a strategic plan for addressing the ozone issue has been developed.

II.     **DISCUSSION:**
- State Office staff and managers (BLM only) met August 24 to discuss how to address the ozone analysis and prepare a strategy for ensuring that air quality analyses would be addressed in compliance with NEPA. EPA & WYDEQ-AQ represented at 2nd meeting, same day.
- In addition to preparing a response to the specific complaints about the BLM's use of the Sheffe model now deemed obsolete, for the JIDPA FEIS/ROD the following EISs in progress were considered: Atlantic Rim, PAPA SEIS, Seminoe Road, Moxa Arch, Continental Divide-Creston, Hiawatha Field.

III.    **MESSAGES AND ANSWERS**

| Project | FO | Status | Response |
|---------|-----|--------|----------|
| JONAH INFILL | PFO | NEPA completed | Decision based on analyses conducted using best scientific method at the time. |
| ATLANTIC RIM | RFO | Sheffe based; p.FEIS review completed; release date: early November | Acknowledge new information/ozone issue; use Sheffe based ozone affects; stay on agreed upon timeline. |
| PAPA SEIS | PFO | Sheffe based; p.SEIS in preparation; estimated SEIS release March 2007; ROD w/in 30 days. | Conduct analysis of ozone impacts using an acceptable method that can be conducted in 3 months. Give public opportunity to review & comment AQ ozone analysis |
| SEMINOE ROAD | RFO | Sheffe based; DEIS issued 11/2005; target FEIS release date: | Acknowledge new information/ozone issue; use Sheffe based ozone affects; stay on agreed upon timeline. |
| MOXA ARCH INFILL | KFO | AQ protocol completed recently; DEIS release date | Work with AQ stakeholders group to determine the appropriate model for estimating ozone changes/impacts. |
| CDC | RFO | First round of AQ protocol discussion completed | Work with AQ stakeholders group to determine the appropriate model for estimating ozone changes/impacts. |
| HIAWATHA FIELD | RSFO | Notice of Intent publication pending; still in WO review process | Work with AQ stakeholders group to determine appropriate model for estimating ozone changes/impacts |

**PREPARED BY:** _Susan Caplan and Janet Kurman  **DATE:** August 30, 2006

BLM to EPA - Notes
Ozone:  What's Next?
08 September 2006
Pre-Decisional

**Topic**:  Ozone methodology to be used in pending and new BLM NEPA

**Background & Context**:  BLM met with EPA and WDEQ on 24 August 2006 to discuss new concerns regarding the methods to estimate potential ozone impacts associated with proposed energy development.

> **Ozone monitoring and modelling**:  BLM has traditionally used the "Scheffe method", a screening procedure, to estimate potential ozone impacts from proposed projects.
> - Ozone impacts have been generally understood to occur in urban areas during the summer.  Monitoring in and near the Jonah field has shown exceedances of the ozone standard during the winter.
> - Dr. Richard Scheffe, a scientist with the EPA and the author of the Scheffe method, recently wrote the Scheffe method was not appropriate for this purpose.
> - WOC filed a petition for reconsideration of stay based on the ozone analysis, based on the Scheffe method, for the Jonah Infill EIS

**BLM Proposed Project Status**:  Projects potentially affected by new ozone information include projects that are complete (Jonah Infill), projects that are immediately pending (Atlantic Rim, Seminoe Road, Pinedale SEIS), and projects that are new  (Moxa Arch, Continental Divide/Creston, Hiawatha).

**BLM Decisions to be made**
- Complete and pending projects:  BLM should state that the Scheffe method was the best available ozone method at the time.
    - Jonah:  BLM will rely on the decision of the inter-agency AQ Team to use Scheffe method
    - Atlantic Rim:  BLM would publish the FEIS's with the Scheffe method
        - AQ analysis would present potential ozone concentrations as estimated by Scheffe method
        - WDEQ and operators would work together to install regulatory ozone monitoring in and/or near the Atlantic Rim field
        - DEIS: February 05;  FEIS:  November 06
    - Seminoe Road:  BLM would publish the FEIS with modelled potential ozone
        - Operators are working on a modified proposed action
        - AQ analysis would present potential ozone concentrations as estimated by method chosen by BLM in consultation with the AQ Team
        - FEIS:  spring 07
    - Pinedale SEIS:  BLM will publish the pSEIS with the Scheffe method, and provide potential ozone concentrations as estimated by CalGrid in the fSEIS about 3 months later

- pSEIS: the preliminary SEIS in an internal BLM document that will be distributed to the AQ Team, and not to the public
- fSEIS: the final SEIS is the final SEIS that will be available to the public. The AQ Team will review the CalGrid ozone concentrations before the fSEIS is finalized
- New projects: BLM will convene the inter-agency AQ Team to consider how to estimate potential ozone. Possible methods include (but are not limited to):
  - CalGrid
  - RPM
  - Develop a modified box model (like SASEM):
  - Grid models: WDEQ might take the lead in running a regulatory application, or State of the Atmosphere might use a low resolution/screening configuration



008669



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE

AUGUST 13, 2007



**TIERED EA, FONSI, AND DR FORM**

Tiered to & Referencing the Atlantic Rim Natural Gas Development Project Environmental Impact Statement

---

**ENVIRONMENTAL ASSESSMENT**                    **EA NUMBER**:  WY-030-07-EA-222

**Lease Numbers**:  WYW-116679, WYW-126439, WYW-131778, WYW-141280, WYW-141281, WYW-WYW-147856, WYW-148482, ST-99-357 (State Wells on Federal Surface)

**Proposed Action**:

Sun Dog A & B PODs: Natural Gas Wells, Water Reinjection Wells, Access Roads, Pipeline/Utility Corridors, Water Transfer Station, and associated Infrastructure

**Rawlins Field Office (RFO) Interdisciplinary Team (IDT)**

| IDT Member | Title |
| --- | --- |
| John Ahlbrandt | Natural Resource Specialist |
| Andy Stone | Hydrologist |
| Patrick Lionberger | Fisheries Biologist |
| Andy Warren | Rangeland Management Specialist |
| Paul Rau | Recreation Planner |
| Frank Blomquist | Wildlife Biologist |
| Nina Trapp | Archaeologist |
| Mark Newman | Geologist |
| Susan Foley | Soil Scientist |
| Hilaire Peck | Civil Engineer |

Prepared By:

*[signature]*                                     *08/15/07*

John Ahlbrandt, Natural Resource Specialist;              Date
Pod ID Team Lead

074063

**Location of Proposed Action (BLM-administered public lands):**

**Sun Dog Unit POD A**

| Well # * | T | R | Sec | Aliquot |
|---|---|---|---|---|
| 2-8 | 16N | 91W | 8 | NWNE |
| 4-8 | 16N | 91W | 8 | NWNW |
| 6-8 | 16N | 91W | 8 | SENW |
| 8-8 | 16N | 91W | 8 | SENE |
| 4-9 | 16N | 91W | 9 | NWNW |
| 12-9 | 16N | 91W | 9 | NWSW |
| 14-9 | 16N | 91W | 9 | SESW |
| 4-17 | 16N | 91W | 17 | NWNW |
| 12-17 | 16N | 91W | 17 | NWSW |
| 12-17I | 16N | 91W | 17 | NWSW |
| 2-19 | 16N | 91W | 19 | NWNE |
| 8-19 | 16N | 91W | 19 | SENE |
| 2-20 | 16N | 91W | 20 | NWNE |
| 14-18 | 16N | 91W | 18 | SESW |
| 4-19 | 16N | 91W | 19 | NWNW |
| 6-19 | 16N | 91W | 19 | SENW |
| 10-19 | 16N | 91W | 19 | NWSE |
| 12-19 | 16N | 91W | 19 | NWSW |
| 4-20 | 16N | 91W | 20 | NWNW |
| 6-20 | 16N | 91W | 20 | SENW |
| 14-20 | 16N | 91W | 20 | SESW |
| 14-20I | 16N | 91W | 20 | SESW |
| 4-21 | 16N | 91W | 21 | NWNW |
| 12-18 | 16N | 91W | 18 | NWSW |
| 10-18 | 16N | 91W | 18 | NWSE |
| 16-18 | 16N | 91W | 18 | SESE |
| (ST)6-16 | 16N | 91W | 16 | SENW |
| (ST)14-16 | 16N | 91W | 16 | SESW |

**Sun Dog Unit POD B**

| Well # * | T | R | Sec | Aliquot |
|---|---|---|---|---|
| 12-4 | 16N | 91W | 4 | NWSW |
| 12-4I | 16N | 91W | 4 | NWSW |
| 14-4 | 16N | 91W | 4 | SESW |
| 10-5 | 16N | 91W | 5 | NWSE |
| 14-5 | 16N | 91W | 5 | SESW |
| 16-5 | 16N | 91W | 5 | SESE |
| 2-9 | 16N | 91W | 9 | NWNE |
| 6-9 | 16N | 91W | 9 | SENE |
| 10-9 | 16N | 91W | 9 | NWSE |
| 16-9 | 16N | 91W | 9 | SESE |
| 8-20 | 16N | 91W | 20 | SENE |
| 10-20 | 16N | 91W | 20 | NWSE |
| 10-4 | 16N | 91W | 4 | NWSE |
| 12-5 | 16N | 91W | 5 | NWSW |
| 12-20 | 16N | 91W | 20 | NWSW |
| 2-21 | 16N | 91W | 21 | NWNE |
| 6-21 | 16N | 91W | 21 | SENW |
| 8-21 | 16N | 91W | 21 | SENE |
| 12-21 | 16N | 91W | 21 | NWSW |
| (ST)2-16 | 16N | 91W | 16 | NWNE |
| (ST)8-16 | 16N | 91W | 16 | SENE |
| (ST)10-16 | 16N | 91W | 16 | NWSE |
| (ST)16-16 | 16N | 91W | 16 | SESE |

\* Wells are organized by Lease #

(ST) indicates a State well (State minerals) underlying Federal (BLM) Surface. However, these wells are within the Sun Dog Federal Unit, and therefore will be authorized with this POD package, and not as separate Right(s)-of-Way.

Also see POD Master Surface Use Plan and project maps.

**Applicant/Proponent:** Anadarko E & P Company  (Anadarko)

**Conformance with Land Use Plan**

This proposed action is in conformance with the Great Divide Resource Management Plan (RMP) that was approved on November 8, 1990.  The RMP has been reviewed to determine if the proposed action conforms to the land use plan terms and conditions as required by 43 CFR 1610.5.  Development of oil and gas reserves is in conformance with the RMP.  On page 30, the RMP states "The entire planning area [Great Divide Resource Area] is open to oil and gas leasing".

The development of this project will not affect the achievement of the Wyoming Standards for Healthy Rangelands (August 1997).

074064

Remarks:

The NOSs or APDs for the proposed action were posted for 30 days in the Rawlins Field Office Information Access Center (Public Room) for review.  Notification of preparation of this EA was provided on the Wyoming BLM internet NEPA register (http://www.wy.blm.gov/nepa/search).

The Atlantic Rim Area Natural Gas Field Development Project Environmental Impact Statement (AREIS) was written to assess the potential foreseeable and cumulative effects of drilling operations and associated activities in the Project area.  The Record of Decision (ROD) for this project was approved on March 23, 2007.  The proposed action is in conformance with the AREIS.

The AREIS ROD provides for the drilling of natural gas wells and associated infrastructure, limiting total surface disturbance to 7,600 acres at any one time (not including surface disturbance that occurred prior to implementation of the Interim Drilling Policy).  The ROD establishes a goal for per-well surface disturbance of 6.5 acres of short-term disturbance (less in "Category A" areas).

The surface disturbance cap is allocated to operators "...on a prorated mineral leasehold basis." (ROD at Page 2), and development is limited to no more than 8 well sites per 640-acre section. If, in the event an Operator reaches its surface disturbance cap allocation, than "...further disturbance on federal minerals will not be permitted." (ROD at Page 3).  The RFO will monitor and track disturbance areas for future proposals, in order to ascertain whether the disturbance cap would be exceeded by future authorizations.

The APDs/Master Surface Use Plan/Master Drilling Plan/Water Management Plan (Master Plan Elements), with Conditions of Approval, contain a complete description of the proposed action.  The Master Plan Elements, with Conditions of Approval, are considered an integral part of this Environmental Assessment and are incorporated by reference.

The project (both PODs A & B) is located entirely within a Federal Oil & Gas Unit.  No additional rights-of-way are necessary for the proposed action.

## Purpose and Need for Proposed Action

Domestic natural gas production is an integral part of U.S. energy development and conservation plans due to its availability and the presence of existing market delivery infrastructure.  Domestic production reduces immediate dependence upon foreign sources of energy, and maintains an adequate and stable supply of fuel to maintain economic well-being, industrial production, and national security.  The environmental advantages of burning natural gas are emphasized in the Clean Air Act amendments of 1990.

In addition, the proposed action would allow Anadarko, as leaseholder, to exercise lease rights to explore and develop oil & gas resources within the project lease areas.

For these particular wells, the production is primarily natural gas and produced water from the coal seams.

## Description of Proposed Action Alternative

The proposed action entails the construction and/or reconstruction of access roads and well pads for the purpose of drilling 48 CBNG wells (26 in POD A, 22 in POD B) and 3 produced water re-injection wells (2 in POD A, and 1 in POD B).  In addition, the proposed action provides for the construction, use, and reclamation of appurtenant gas & water-gathering pipelines and utility corridors, including such corridors to 6 proposed State wells underlying federal (BLM administered) surface in Section 16 (T16N/R91W).  Where feasible and appropriate (and in most cases), the pipeline/utility corridors were located adjacent and parallel to the proposed or existing access roads and existing pipeline disturbances.  The maps and illustrations attached to the EA, APDs, and Master Surface Use Plan display the locations of the proposed wells, access roads, gas & water-gathering pipelines, and utility (primarily electrical) corridors.

The CDP (compressor) for POD A and Pod B wells is already constructed and in use, built during exploratory activities (2001).  Likewise, no new water transfer facilities are proposed for these pods at this time.  If additional water transfer stations are later determined to be necessary, they would be proposed and applied for via a Sundry Notice.

074065

Water for drilling each well would be obtained from existing wells completed in the coal seams of the Mesa Verde Group within the Sun Dog Unit. Water would be hauled by truck to each drill site over existing and proposed roads within the POD. Any changes in the water source or method of transportation would first require written approval by the BLM. To protect any shallow, fresh water aquifers or sources, drilling of surface casing for each well would use either air drilling techniques, or use non-produced (fresh) water from a State permitted local source (Baggs Pond.)

Onsite inspections of the PODs were conducted on October 11-13 and December 15, 2006. Potential impacts to resources were considered and alternate locations considered. As a result of this field inspection, several project components were moved to reduce potential impacts to soils, water resources, vegetation, and wildlife resources.

The location of the proposed development is approximately 28 miles northeast of Baggs, Wyoming, west of Highway 789. Access to the area will be from existing access roads off of 789. New roads will be constructed or reconstructed to access most well locations.

A discussion of the actions generally associated with drilling a well, including (1) a plan of operations, (2) construction of the access road and drilling pad, and (3) pipeline installation, can be located in the following portions of the AREIS or ROD:

- Chapter 2, *Proposed Action and Alternatives (AREIS)*
- Chapter 4, *Analysis of Environmental Consequences (AREIS)*
- Appendix A, *Project Reclamation Plan (ROD)*
- Appendix C, *Operator-Committed Practices (ROD)*

Mitigation and reclamation measures are described in Chapter 4 and Appendix B of the ROD (*Project Performance-Based Monitoring and Best Management Practices*). The following narratives summarize elements specific to the proposed action for this EA.

Construction

Disturbance estimates include the well pad and access road/utility/pipeline corridors for 6 State of Wyoming estate wells located in Section 36 (T17N/R92W) which are located on federal (BLM administered) surface. Portions of the pads unnecessary for production operations will be reclaimed after the production facilities are constructed. The well sites and access roads will be entirely reclaimed after the wells are plugged and abandoned. For the purpose of assessing potential cumulative effects, oil and gas development may be considered long-term as transitory in nature.

| | | POD A | | | |
|---|---|---|---|---|---|
| Well # | Well Pad-Acres* | Road-L. Feet | Road-Acres** | Corridor-Acres*** | SUM-Acres |
| 2-8 | 2.2 | 2383 | 1.6 | 4.4 | 6.6 |
| 4-8 | 2.2 | 2948 | 2.0 | 5.4 | 7.6 |
| 6-8 | 2.2 | 151 | 0.1 | 0.3 | 2.5 |
| 8-8 | 2.2 | 1823 | 1.3 | 3.4 | 5.6 |
| 4-9 | 2.2 | 853 | 0.6 | 1.6 | 3.8 |
| 12-9 | 2.2 | 418 | 0.3 | 0.8 | 3.0 |
| 14-9 | 2.2 | 1270 | 0.9 | 2.3 | 4.5 |
| 4-17 | 2.2 | 2488 | 1.7 | 4.6 | 6.8 |
| 12-17 | 2.2 | 1502 | 1.0 | 2.8 | 5.0 |
| 12-17I | 0.0 | 0 | 0.0 | 0.0 | 0.0 |
| 2-19 | 2.2 | 56 | 0.0 | 0.1 | 2.3 |
| 8-19 | 2.2 | 0 | 0.0 | 0.0 | 0.0 |
| 2-20 | 2.2 | 395 | 0.3 | 0.7 | 2.9 |
| 14-18 | 2.2 | 994 | 0.7 | 1.8 | 4.0 |
| 4-19 | 2.2 | 1878 | 1.3 | 3.5 | 5.7 |
| 6-19 | 2.2 | 279 | 0.2 | 0.5 | 2.7 |
| 10-19 | 2.2 | 3882 | 2.7 | 7.1 | 9.3 |
| 12-19 | 2.2 | 4138 | 2.8 | 7.6 | 9.8 |
| 4-20 | 2.2 | 1324 | 0.9 | 2.4 | 4.6 |
| 6-20 | 2.2 | 178 | 0.1 | 0.3 | 2.5 |

074066

| | | | | |
|---|---|---|---|---|
| 14-20 | 2.2 | 742 | 0.5 | 1.4 | 3.6 |
| 14-20I | 0.0 | 0 | 0.0 | 0.0 | 0.0 |
| 4-21 | 2.2 | 1691 | 1.2 | 3.1 | 5.3 |
| 12-18 | 2.2 | 3371 | 2.3 | 6.2 | 8.4 |
| 10-18 | 2.2 | 1650 | 1.1 | 3.0 | 5.2 |
| 16-18 | 2.2 | 401 | 0.3 | 0.7 | 2.9 |
| (ST) 6-16 | 2.2 | 273 | 0.2 | 0.5 | 2.7 |
| (ST) 14-16 | 2.2 | 1060 | 0.7 | 2.0 | 4.2 |
| Total: | 52.0 | 36,148 | 24.8 | 66.5 | 118.5 |

*Average well pad disturbance areas are approximately equal to 300' x 320' (2.2 acres), including stockpiles and cut & fill slopes for all single-well locations. No additional disturbance is associated with injection wells, since they are co-located on the same pad with the respective producing well(s).
**Assumes 30' roadway disturbance.
***Assumes 80' overall corridor disturbance (road plus utilities) for all wells.

POD B

| Well # | Well Pad- Acres* | Road- L. Feet | Road- Acres** | Corridor- Acres*** | SUM- Acres |
|---|---|---|---|---|---|
| 12-4 | 2.2 | 542 | 0.4 | 1.0 | 3.2 |
| 12-4I | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 14-4 | 2.2 | 1051 | 0.7 | 1.9 | 4.1 |
| 10-5 | 2.2 | 3928 | 2.7 | 7.2 | 9.4 |
| 14-5 | 2.2 | 2273 | 1.6 | 4.1 | 6.3 |
| 16-5 | 2.2 | 174 | 0.1 | 0.3 | 2.5 |
| 2-9 | 2.2 | 467 | 0.3 | 0.9 | 3.1 |
| 6-9 | 2.2 | 1744 | 1.2 | 3.2 | 5.4 |
| 10-9 | 2.2 | 676 | 0.5 | 1.2 | 3.4 |
| 16-9 | 2.2 | 663 | 0.5 | 1.2 | 3.4 |
| 8-20 | 2.2 | 1922 | 1.3 | 3.5 | 5.7 |
| 10-20 | 2.2 | 1418 | 1.0 | 2.6 | 4.8 |
| 10-4 | 2.2 | 4829 | 3.3 | 8.9 | 11.1 |
| 12-5 | 2.2 | 603 | 0.4 | 1.1 | 3.3 |
| 12-20 | 2.2 | 764 | 0.5 | 1.4 | 3.6 |
| 2-21 | 2.2 | 858 | 0.6 | 1.6 | 3.8 |
| 6-21 | 2.2 | 1973 | 1.4 | 3.6 | 5.8 |
| 8-21 | 2.2 | 19 | 0.0 | 0.0 | 2.2 |
| 12-21 | 2.2 | 1417 | 1.0 | 2.6 | 4.8 |
| (ST) 2-16 | 2.2 | 148 | 0.1 | 0.3 | 2.5 |
| (ST) 8-16 | 2.2 | 1839 | 1.3 | 3.4 | 5.6 |
| (ST) 10-16 | 2.2 | 219 | 0.2 | 0.4 | 2.6 |
| (ST) 16-16 | 2.2 | 697 | 0.5 | 1.3 | 3.5 |
| Total: | 48.4 | 28,224 | 19.6 | 51.7 | 100.1 |

*Average well pad disturbance areas are approximately equal to 300' x 320' (2.2 acres), including stockpiles and cut & fill slopes for all single-well locations. No additional disturbance is associated with injection wells, since they are co-located on the same pad with the respective producing well(s).
**Assumes 30' roadway disturbance.
***Assumes 80' overall corridor disturbance (road plus utilities) for all wells.

The proposed action (for both POD A and Pod B) will result in approximately 218.6 acres of short-term disturbance, comprised of new or reconstructed access roads and adjacent & parallel pipelines and utilities, as detailed above.

The average per-well disturbance for POD A is 4.2 acres (118.5 acres/28 CBM wells), and similarly, for POD B is 4.4 acres (100.1 acres/23 CBM wells). The proposed action is located outside of "Category A" area, and thus is subject to a "disturbance goal" of 6.5 acres per well. Both PODs, then, meet the disturbance goal provided in the AREIS ROD.

**074067**

Access

The operator proposes to construct new access roads to access the well locations. The new roads will be constructed to BLM specifications for a "Resource Road", as specified in BLM Manual Section 9113. Adequate drainage structures will be constructed or installed. The travelway will be at least 14 feet wide and will have an average right-of-way width of 50 feet (80 feet, including adjacent & parallel pipeline/utility corridors). The access roads would be reclaimed during production operations to the maintenance width, or to approximately 30 feet in width. Upon completion of the project, unnecessary access roads would be recontoured, ripped, seeded, and revegetated.

Well Site

Should the wells become productive, cut portions of the well site will be backfilled and the unused portions of the well site and soil stockpile sites will be stabilized and reseeded with native vegetation. The well size will be reduced to less than one-half acre for the duration of production operations. Reserve pits will be dried within 180 days. Upon completion of the project, the well pads would be recontoured, ripped, seeded, and revegetated.

Pipeline/Utility Corridors

The pipelines would be buried after construction and the disturbed area reclaimed as soon after construction as reasonable. Upon completion of the project, the pipelines would be evacuated and abandoned in-place.

Produced Water Disposal

The only means of produced water disposal considered in this action would be by re-injection using disposal wells permitted by the BLM and State of Wyoming, and would be disposed of into the Haystack Mountain Formation of the Mesaverde Group.

Produced water from the proposed action would be gathered to existing and/or new water injection facilities within the unitized area.

At new injection facilities, it is anticipated that subsurface water sumps will be constructed in lie of above ground storage tanks. Any modifications to this proposal will be submitted via a Sundry Notice for review prior to approval.

Monitoring wells

As described and detailed in Appendix B of the Atlantic Rim ROD and the Sun Dog Water Management Plan, the Unit Operator shall be responsible for drilling, completing, and equipping one set of three shallow groundwater-monitoring wells completed in water-bearing sandstone units stratigraphically above the principle producing coal beds in the upper Mesaverde Group prior to production of any of the wells in the two PODs.

**No Action Alternative**

NEPA regulations require that alternative analyses in NEPA documents "include the alternative of no action" (40 CFR 1502.14(d)). For this analysis, "no action" means that the BLM would reject the proponent's proposal and "the proposed activity would not take place."

**Potential Environmental Impacts- Proposed Action Alternative**

| Critical Element | Affected Yes | No | Critical Element | Affected Yes | No |
|---|---|---|---|---|---|
| Air Quality | X | | T & E Species | | X |
| ACEC's | | X | Wastes, Hazardous/Solid | X | |
| Cultural Resources | X | | Water Quality | | X |
| Prime/Unique Farmlands | | X | Wetlands/Riparian Zones | X | |
| Floodplains | | X | Wild & Scenic Rivers | | X |
| Native Amer. Rel. Concerns | | X | Wilderness | | X |
| Environmental Justice | | X | Invasive, Nonnative Species | X | |

In addition to the critical elements referenced above, reviews of potential effects upon paleontological-, recreational-, soil-, vegetation-, visual-, and wildlife-resources were conducted.

The affected environment and analysis of environmental impacts are discussed in the AREIS to which this EA is tiered.

Air quality impacts are disclosed and analyzed in the AREIS.

Halogeton and other noxious weeds are a significant concern for this project area. COAs have been added to control the spread, establishment, and plant community changes associated with weed infestation.

Cultural:
Class III cultural resources inventory were conducted for the project areas. Archaeological resources identified will be avoided or, as necessary, a monitor will review construction to ensure no cultural artifacts are disturbed. Both PODs have wells and infrastructure located inside of the two-mile buffer of contributing segments of a historic trail ("Rawlins to Baggs Road"). As a result, SHPO consultation was necessary and a visibility analysis required on those well locations and related infrastructure. The AREIS also required a "Programmatic Agreement" or "Memorandum of Agreement" between the affected parties, i.e. landowner (BLM), operator and SHPO to address the necessary mitigation to minimize impact to the trail view-shed from these wells and associated disturbances. As a result, restrictions or stipulations in the form of COA were added to the MSUP APD authorizations as appropriate. Those stipulations are summarized below:

For all wells and associated infrastructure in POD A and B:
1) *Standard cultural stip (under general permitting requirements)*
2) *All surface facilities will be painted a color compatible with the local environment.*
3) *The access road will be surfaced with material compatible with the local environment.*
4) *The Operator shall select and use a seed mix most applicable to each disturbed location, with the goal of restoring individual sites to closely resemble the pre-disturbance native plant communities, as provided in Appendix A of the ROD, "Project Reclamation Plan."*

Additional mitigation measures are stipulated for individual wells and/or infrastructure within two-miles of the Rawlins-Baggs Road which have viewshed or visibility concerns, which include:
POD A wells: 2-8; 4-8; 4-9; 14-9; 14-16; 4-17; 16-18; 6-19; 8-19; 10-19; 12-19; 2-20; 4-20; 6-20; 14-20; 14-20I; 4-21
POD B wells: 10-4; 12-4; 12-4I; 16-5; 6-9; 10-9; 16-9; 2-16; 8-16; 10-16; 16-16; 8-20; 10-20; 12-20; 2-21; 6-21; 8-21; 12-21.

These additional mitigation measures include:
1) *Unless otherwise authorized, the pipelines/utilities will be plowed or ripped into the un-bladed surface (using technology that does not require trenching). If such techniques are infeasible due to terrain or geology, the surface will be brush-hogged and the utilities will be placed no farther than the outside edge of the ditch slope.*
2) *No blading will be allowed outside the staked well location for placement or removal of the topsoil stockpile.*

Other, site-specific Conditions of Approval (such as archaeological monitor, barrier fencing, etc.), are also applied, as applicable.

Wildlife:
Summarized in the tables below are the seasonal wildlife timing stipulations which will be applied to the subject wells.

### Sun Dog Unit POD A Wildlife Stipulations

| Well # | Raptor[1] | Grouse[2] | Mt.Plover[3] | CWR[4] |
|--------|-----------|-----------|--------------|--------|
| 2-8    | X         | X         |              |        |
| 4-8    | X         | X         |              |        |
| 6-8    | X         | X         |              |        |
| 8-8    | X         | X         | X            |        |
| 4-9    | X         | X         | X            |        |
| 12-9   |           | X         | X            |        |
| 14-9   |           | X         | X            |        |
| 4-17   | X         |           |              |        |

074069

| Well # | X | X | | |
|--------|---|---|---|---|
| 12-17 | X | X | | |
| 12-17I | X | X | | |
| 2-19* | X | X | | |
| 8-19 | X | X | | |
| 2-20 | | X | | |
| 14-18 | X | X | | |
| 4-19 | X | X | | |
| 6-19 | X | X | | |
| 10-19 | X | X | | |
| 12-19 | X | X | | X |
| 4-20 | X | X | X | |
| 6-20 | X | X | | |
| 14-20 | X | X | | |
| 14-20I | X | X | | |
| 4-21 | | X | | |
| 12-18 | X | X | | |
| 10-18 | X | X | X | |
| 16-18 | X | X | | |
| 6-16* | | X | X | |
| 14-16 | | X | | |

### Sun Dog Unit POD B Wildlife Stipulations

| Well # | Raptor[1] | Grouse[2] | Mt.Plover[3] | CWR[4] |
|--------|-----------|-----------|--------------|--------|
| 12-4 | X | X | | |
| 12-4I | X | X | | |
| 14-4 | X | X | | |
| 10-5 | X | X | | |
| 14-5 | X | X | | |
| 16-5 | X | X | | |
| 2-9 | | X | | |
| 6-9 | | X | X | |
| 10-9 | | X | X | |
| 16-9 | | X | X | |
| 8-20 | | X | | |
| 10-20 | X | X | X | |
| 10-4 | X | X | | |
| 12-5 | X | X | | |
| 12-20 | X | X | X | |
| 2-21 | X | X | X | |
| 6-21 | | X | | |
| 8-21 | X | X | | |
| 12-21 | | X | X | |
| 2-16 | | X | X | |
| 8-16* | X | X | X | |
| 10-16 | X | X | | |
| 16-16 | X | X | X | |

* Black-footed ferret surveys were conducted for these locations and/or access roads.

[1]Construction, drilling and other activities potentially disruptive to nesting raptors are prohibited during the period of February 1 to July 31 for the protection of raptor nesting areas.

[2]Construction, drilling, reclamation and other potentially disruptive activities are prohibited during the period of March 1 to July 15 for the protection of sage grouse.

[3]Construction, drilling, and other activities are prohibited during the reproductive period of April 10 to July 10 for the protection of nesting plover.

[4]Construction, drilling and other activities potentially disruptive to wintering wildlife are prohibited during the period of November 15 to April 30 for the protection of big game crucial winter habitat.

074070

In some instances, the proponent may request consideration of a temporary exception to wildlife seasonal restrictions. Such an exception may be granted if a determination is made that the wildlife resource will not be adversely impacted.

Black-footed ferret surveys were conducted for the 2-19, 6-16, and 8-16 locations and/or access roads. These individual sites fell within areas where white-tailed prairie dog towns (within the Dad BFF non-block cleared area) could not be avoided. The results of the BFF surveys were negative, and the USFWS has subsequently concurred with our "may affect, not likely to adversely affect" determination, thereby allowing the project to proceed as proposed.

Site-specific findings by the interdisciplinary review team are provided on the attached review documents, and are incorporated into Conditions of Approval, as applicable.

Description of Impacts:

A discussion of the actions generally associated with drilling projects and their associated impacts may be found in the Atlantic Rim Environmental Impact Statement and Record of Decision.

Hazardous Materials

Anadarko has indicated that some hazardous materials could be used during drilling, completion, and production of their proposed wells. The term "hazardous material" as used here means: 1) any substance, pollutant, or contaminant (regardless of quantity) listed as hazardous under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, as amended, 42 U.S.C. 9601 et seq., and the regulations issued under CERCLA, 2) any hazardous waste as defined in the Resource Conservation and Recovery Act (RCRA) of 1976, as amended, and 3) any nuclear or nuclear byproduct as defined by the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 et seq.

It is possible that wastes created or transported during implementation of the proposed action (i.e., waste motor oils, drilling/completion additives) could be accidentally released to the environment. The operator will be required to comply with the Hazardous Materials Management Plan provided in Appendix C of the AREIS. Numerous State and Federal rules and regulations also apply that govern the handling, storage, and disposal of hazardous substances.

Anadarko or any contracted company working for Anadarko will have Material Data Safety Sheets available for all chemicals, compounds, or substances which are used during the course of construction, drilling, completion, and production operations for this project. Additionally, all chemicals will be handled in an appropriate manner to minimize the potential for leaks or spills to the environment.

Impacts to soils, surface and groundwater resources, wildlife, vegetation, and human health could result from the accidental exposure of hazardous materials. However, since the project operations will strictly comply with all applicable federal and state laws concerning hazardous materials, the Hazardous Materials Management Plan for this project, and the operator's Spill Prevention Control and Countermeasure Plan, no significant impacts are anticipated.

Reclamation

Reclamation typically commences within 6 months of drilling completion. The drill pads will be reduced to a less than ½-acre production well site at each location. Total reclamation of all new disturbances will take place as the wells and facilities are no longer productive or needed and are plugged and abandoned. Appendix A of the ROD contains the reclamation success criteria by which the reclamation status will be judged. The approved Master Surface Use Plan and Conditions of Approval also contain reclamation measures pertaining to reclamation standards.

Description of Mitigation Measures and Residual Impacts:

Mitigation of potential effects is part of the proposed action, and specific mitigation details can be found in the Master Plan Elements including the Conditions of Approval. Residual impacts resulting from the proposed action would include permanent loss of oil and/or gas reserves should the wells become productive. In addition, the well pads, production equipment, and the access roads could remain in place for 30 years or more (until plugging and abandonment, final reclamation).

**Potential Environmental Impacts- No Action Alternative**

074071

Under the No-Action Alternative, the proposed action would not be authorized. The 51 wells would not be constructed or drilled, and gas production from the proponent's lease would not occur. Existing development would continue to occupy the project area, along with impacts associated from the existing development.

**Residual Impacts/Cumulative Impacts:**

The potential residual and cumulative impacts are discussed in the AREIS, Chapter 5, *Cumulative Impacts Analysis*. The proposed action entails the addition of 51 CBNG wells (including 3 injection wells, and 6 State CBNG wells on Federal Surface) and appurtenant facilities.

Standard mitigation guidelines are addressed in the ROD's Appendix A, *Project Reclamation Plan*. Additional mitigation measures are also provided in Appendix B, *Performance-Based Monitoring and Best Management Practices*, and Appendix C, *Operator-Committed Practices*. All needed mitigation, for that portion of the proposed action on public land, is part of the proposed action.

The access roads and well/production pads may remain visible for a period of approximately 20 to 30 years after they are abandoned and reclaimed. The oil and gas resource will be permanently lost. All needed mitigation is part of the proposed action.

074072

# DRAFT
# Supplemental Environmental Impact Statement for the Pinedale Anticline Oil and Gas Exploration and Development Project
## Sublette County, Wyoming



Pinedale Field Office

Volume 1 of 2

December 2006

Pollutants emitted from these activities include $NO_x$, CO, $SO_2$, $PM_{10}$, and $PM_{2.5}$, VOCs, and HAPs.

Ozone may develop from $NO_x$ and VOC emissions. The EPA screening methodology (Scheffe, 1998) for ozone analysis was planned for inclusion in this Draft SEIS. However, BLM, with the agreement of the Air Quality Stakeholder Group, has determined that the CALGRID model for ozone impact analysis is the most appropriate method for estimating ozone impact from the PAPA. Results from the CALGRID modeling analysis will be released as a supplement to the Air Quality TSD for this Draft SEIS.

In the PAPA, greenhouse gases are emitted from three main sources: internal combustion engines, combustion of fuel or waste gases, and vented gases. Carbon dioxide is the main emission from internal combustion engines (diesel, gasoline, natural gas), the combustion of fuel gas in various production process burners/heaters, and the combustion of waste gases for safety or WDEQ-AQD requirements. Currently, WDEQ-AQD does not have specific rules regulating greenhouse gas emissions, and although greenhouse gas emissions are a concern they were not analyzed in this Draft SEIS.

This air quality impact assessment is based on the operations and engineering data and assumptions available at the time of the analysis, the best available meteorology data, and currently accepted dispersion modeling procedures, as well as professional and scientific judgment. Assumptions representing most likely operating conditions were incorporated into the analysis whenever possible. For example, compression in the field was assumed to operate at 90 percent of fully permitted capacity, and drilling rig engines were assumed to operate at an average of 42 percent of maximum capacity. In cases where operating projections were not provided by the Operators, parameters were assumed to occur at maximum proposed levels. For example, impact assessments assume that all proposed wells would be productive (no dry holes).

**Regulatory Authority.** Air pollution impacts are limited by state and federal regulations, standards, and implementation plans established under the Clean Air Act and administered by the applicable air quality regulatory agency (WDEQ/AQD and EPA). The states of Utah, Colorado, and Idaho have similar jurisdiction over potential air pollutant emissions sources in those states, which can have a cumulative impact when combined with WDEQ/AQD regulated sources. The applicable air quality regulatory agencies have the primary authority and responsibility to review permit applications and to require emission permits, fees, and control devices prior to construction and/or operation. The U.S. Congress (through the Clean Air Act Section 116) also authorizes local, state, and tribal air quality regulatory agencies to establish air pollution control requirements of equal or greater stringency than federal requirements. Proposed emission sources are required to undergo a permit review by applicable air quality regulatory agencies (including state, tribal, and/or EPA) before construction can begin. The agencies review the proposed air pollutant emission sources and, depending upon the magnitude of emissions and other factors, the air quality regulatory agencies may require additional site-specific air quality analysis and/or additional emission control measures. The measures may include a Best Available Control Technology (BACT) analysis and determination to ensure protection of air quality.

Although WDEQ has the regulatory authority for air quality in Wyoming, BLM also has responsibility in regard to air quality. For example, under the Federal Land Policy Management Act (FLPMA) and the Clean Air Act, BLM cannot authorize activities that do not conform to all applicable local, state, tribal, and federal air quality laws, statutes, regulations, standards, and implementation plans. An extensive air quality impact assessment technical support document was prepared to analyze potential impacts from the development alternatives, as well as other

PM$_{10}$, and PM$_{2.5}$ emissions for each year of meteorology to estimate maximum potential air quality impacts. Detailed information regarding the modeling methodologies used in the analysis is provided in the Air Quality TSD.

Project emissions inventories were developed for the No Action Alternative and Alternative B. Annual emissions estimates were determined for each year over the LOP for both the No Action Alternative and Alternative B based on estimates of field development provided by the Operators. Modeling scenarios were developed for each project Alternative for the year with the maximum emissions. The maximum emissions scenarios include both construction and production activities. The maximum emissions year under the No Action Alternative is year-2007 and for Alternative B the maximum emissions are expected to occur in year-2009. For comparison purposes, an analysis of the PAPA in full production, after all construction activities have ceased (year-2026), is also presented for Alternative B. The air emissions modeled for project sources in the far-field analysis are presented in Table 4.9-1 and complete emissions inventories are provided in the Air Quality TSD (Appendices F and G).

**Table 4.9-1**
**Project and Non-Project Emissions (tpy) included in Far-field Analysis**

| Source Category | NO$_X$ | SO$_2$ | PM$_{10}$ | PM$_{2.5}$ |
|---|---|---|---|---|
| Project Sources | | | | |
| No Action Alternative | 6,253.2 | 70.8 | 1,567.0 | 521.0 |
| Proposed Action Alternative | 5,885.1 | 79.3 | 1,158.3 | 469.0 |
| Proposed Action Alternative – Maximum Field Production | 2,424.9 | 2.5 | 1,149.2 | 391.4 |
| Non-Project Sources | | | | |
| RFD[1] | 6,465.3 | 406.1 | 2,923.9 | 802.8 |
| State-permitted and RFFA[1] | -2,574.6 | 110.7 | 476.4 | 476.4 |
| [1] RFD and RFFA are described in Section 4.9.4. | | | | |

*Comparison to Ambient Air Quality Standards and PSD Increments.* The far-field analyses include impact assessments for comparison to applicable ambient air quality standards and for comparison to PSD increments. Predicted concentrations were added to the ambient background pollutant concentrations for comparison to the WAAQS and NAAQS. Ambient background concentrations were not added to modeled concentrations for comparison to PSD Class I and II increments. These comparisons are shown in Section 4.9.3.2 and in Appendix 18.

*Visibility.* Far-field analyses assess potential change to regional haze at PSD Class I and sensitive PSD Class II areas. Regional haze is caused by light scattering and light absorption by fine particles and gases. Potential changes to regional haze were calculated in terms of a perceptible "just noticeable change in visibility" when compared to background conditions, expressed in dvs. The BLM considers a 1.0 dv change to be a significance threshold for visibility impairment, although there are no applicable local, state, tribal, or federal regulatory visibility standards. Other federal agencies use a 0.5 dv change as a screening threshold for significance. The USFS and NPS compare direct project impacts to the 0.5 dv level, and those comparisons are included in the Air Quality TSD.

Predicted changes in regional haze at PSD Class I and sensitive PSD Class II areas were estimated by comparing CALPUFF modeled concentration impacts to background visibility conditions representative of each PSD Class I or sensitive PSD Class II area. At the request of the BLM, WDEQ-AQD, and USFS, three separate visibility calculation methods were performed. Two additional visibility calculation methods were also performed (VISTAS, 2006). These methods follow recent CALPUFF modeling guidance for BART analyses developed for the VISTAS RPO. The BLM and USFS requested methods that use visibility values provided in the FLAG Report for each PSD Class I area to represent natural background visibility. The WDEQ-

Chapter 4

AQD requested a method that uses representative monitoring data, for the quarterly average of the 20 percent best visibility days, collected from the IMPROVE network for the time period (2000 to 2004). This coincides with the time period that will be used to establish "baseline conditions" under the EPA Regional Haze Rule (EPA, 2003a). The two BART methods use background visibility conditions representative of each PSD Class I area as provided in the Guidance for Estimating Natural Visibility Conditions under the Regional Haze Rule (EPA, 2003b). Visibility impacts for the calculation method requested by BLM are presented in Section 4.9.3.2 and in Appendix 18. These are compared to a 1.0 dv change, the BLM's significance threshold for visibility impairment. All other visibility calculation methods and comparisons are detailed and presented in the Air Quality TSD.

*Acid Deposition.* Far-field analyses assess potential change to acid deposition and potential increase in acidification of designated acid-sensitive lakes within the PSD Class I and sensitive PSD Class II areas. The USFS (Fox et al.,1989) has defined thresholds below which no adverse impacts from acid deposition are likely; however, the USFS has concerns that these deposition thresholds are set too high (Svalberg, 2006). These thresholds (herein referred to as levels of concern), defined as 3 kg/ha-yr for nitrogen and 5 kg/ha-yr for sulfur, are used for comparison of potential impacts from direct project impacts combined with background deposition values. CALPUFF-predicted nitrogen and sulfur deposition impacts combined with background deposition values were compared to LOCs and are provided in Section 4.9.3.2 and in Appendix 18. The NPS (2001) has identified Deposition Analysis Threshold (DAT) for total nitrogen and sulfur deposition in the western U.S. as 0.005 kg/ha-year for both nitrogen and sulfur. The DAT is used as an analysis threshold for evaluating potential impacts from project-related emissions. Comparisons of deposition impacts to the DAT are provided in the Air Quality TSD. The USFS Rocky Mountain Region has developed a screening method (USFS, 2000) that identifies a LAC in lake chemistry. The LACs are 1) no more than a 10 percent change in ANC for lakes with an existing ANC greater than 25 µeq/l and 2) no more than a 1 µeq/l change for extremely acid-sensitive lakes where the existing ANC is less than or equal to 25 µeq/l. Of the seven lakes designated by the USFS as acid-sensitive, Upper Frozen and Lazy Boy lakes are considered extremely acid-sensitive. Predicted nitrogen and sulfur deposition values at acid-sensitive lakes were used to estimate change in ANC for comparison to LAC and are provided in Section 4.9.3.2 and in Appendix 18.

*In-field Modeling.* In-field analyses are additional near-field impact assessments of field-wide source emissions for comparison to applicable ambient air quality standards and to PSD increments and are provided in Section 4.9.3.2 and in Appendix 18.

*Mid-Field Modeling.* Predicted changes to regional haze resulting from project source emissions were estimated for the regional community locations (Boulder, Cora, and Pinedale). Model predicted concentration impacts and recent (year 2005-2006) background visibility data collected at Boulder were used to estimate potential visibility impairment in these residential locations. Predicted visibility impacts were compared to the BLM 1.0 dv threshold and are provided in Section 4.9.3.2 and in Appendix 18.

**Ozone Analysis.** An analysis of potential ozone formation from project Alternative sources was performed using the CAMx photochemical grid model. Maximum emissions scenarios for Alternative B and Alternative C (with Phase II mitigation) were modeled. A 12 kilometer (km) grid with a refined 4 km nested grid (12/4 km) was used for the modeling domain. The CAMx modeling system was run for the year-2002 meteorological year with the 4 km grid focused on southwestern Wyoming (Map 4.9-1). Hourly windfields developed for the modeling domain with the CALMET and MM5 meteorological models were used for the ozone modeling analysis.

# denverpost.com

**Home**   **News**   **Politics**   **Sports**   **Business**   **Entertainment**   **Lifestyle**   **Opinion**   **Outdoors**   **Travel**

Books ¦ Visual Arts ¦ Restaurants ¦ Calendar ¦ Columnists ¦ ColoradoSunday ¦ Comics ¦ Games ¦ Horoscopes ¦ Movies

Home > Denver & the West

denver and the west

🖨 Print   ✉ Email   ⚲ Share
💬 1 Comment

## Wyo. ozone alert stirs debate

**Critics say a bid to add 4,400 drills may boost air woes in rural areas.**
By Steve Lipsher
*The Denver Post*
Article Last Updated: 02/28/2008 02:41:47 AM MST

Wyoming officials issued an unprecedented health alert Wednesday in a rural gas-drilling area for a buildup of ozone — usually a summertime air pollutant in urban areas.

The Pinedale area had high ozone readings a week after the U.S. Environmental Protection Agency criticized the federal Bureau of Land Management for planning thousands of new gas wells in the area without adequate air-quality protection.

"This should be a wake-up call for the Bureau of Land Management," said Linda Baker, director of the Upper Green River Valley Coalition. "What's going to happen to our air when we have 4,400 . . . additional wells, as the BLM proposes?"

In Colorado, state regulators are targeting gas wells as a major contributor to the Denver metro area's troublesome ozone levels and are considering new restrictions on equipment and operations.

The Wyoming Department of Environmental Quality issued its first health alert for the Pinedale area, in Sublette County, after recording ozone levels nearly 50 percent higher than the federal health standard.

Ground-level ozone — a component of urban smog formed through a mixture of sunlight, heat and gases from combustion — can impair breathing.

Groups particularly at-risk include infants, the elderly and those with respiratory problems.

"We wanted to let those susceptible know that today might not be the best day to run a marathon," said Dave Finley, administrator of Wyoming's air-quality division.

Gas producers in the area were asked to limit unnecessary activities during the next several days when high ozone levels are forecast, said Andrew Bremner, director of government affairs for the Independent Petroleum Association of Mountain States.

"We are looking for ways to further lessen our emissions during this time," he said.

*Industry seeks a solution*

Industry officials say that operational activity is no different than last year and that they are working on a solution in their plans with the BLM.

Baker and other critics, however, say the rapid increase in gas exploration has occurred without adequate environmental safeguards.

"Our air may be like Los Angeles before long," she said. "Our coalition has been saying for the past six years that we need to slow the pace of development."

State officials first recognized a buildup of wintertime ozone around Pinedale in 2005 and launched a study.

That study found that ozone formed on days when strong temperature inversions, light winds and bright sunlight reflecting off the snowpack trapped the nitrous oxides and volatile organic compounds from engines and escaping gas, Finley said.

"If one of them goes away — for example, if we had cloud cover, or if we had winds pick up — we wouldn't have an ozone problem," he said.

*Ozone followed drill boom*

Finley said the ozone buildup has corresponded with the drilling boom on the nearby Jonah and Pinedale Anticline natural-gas fields.

"They're a big source . . . in that area," he said. "There is an awful lot of drilling, so there are a lot of engine emissions from drill rigs, lots of truck traffic, lots of handling of natural gas."

Last week, EPA regional administrator Robbie Roberts admonished the BLM for its plan to increase natural-gas production in the area without implementing adequate environmental protections.

"The impacts are of sufficient magnitude that the proposed action should not proceed as proposed," he wrote in a letter declaring the plan "environmentally unsatisfactory."

http://www.denverpost.com/news/ci_8385328

# Wyo. ozone alert stirs debate - The Denver Post

BLM officials in Wyoming could not be reached for comment.

*Steve Lipsher: 970-513-9495 or slipsher@denverpost.com*

Print  Email  Return to Top  Share  » Subscribe

**ARTICLE COMMENTS (1)**

» View all this article's 1 comments

```
                            Comment
```

**You must be registered to comment** (your comment will be saved for you while you register). It's quick (it takes about 30 seconds) and we only require your email and name. Comments that include any offensive material are prohibited. By using our site you agree to our terms of use.

### Quote:

"Our air may be like Los Angeles before long." she said. "Our coalition has been saying for the past six years that we need to slow the pace of development."

Linda, is the Upper Green River Valley Coalition concerned about wildlife? Recent studies have shown greater sage-grouse, big game and other wildlife actually may benefit from **expediting** the pace of development. Get in, reclaim and get out quickly could be the best strategy for reducing impacts to wildlife and their habitats.

There is no silver bullet solution. The old environmentalist mantra of stalling is not always the best thing for the environment.

 Posted by niko (aka niko)at 1:16 PM on Thursday Feb 28

Report Abuse | Report Good Comment
 |  (must be logged in to vote)

» View all this article's 1 comments
» Bookmark this article
» Subscribe to this article's comments

# Documentation and Appraisal of Known Gas Seeps within the Atlantic Rim Coal Bed Natural Gas Development Area Carbon County, Wyoming

By
Jon N. Dull
Petroleum Engineer, Rawlins Field Office

February 6, 2007

## Introduction

To date we have become aware of and located several gas seeps within the Atlantic Rim Project Area (ARPA). So far these seeps have been found in association with natural occurring water springs. Due to the physical appearance of the gas seeps they have also been referred to as gas bubblers, mud bubblers, mud pots and mud bogs. Three locations have been identified within the ARPA wherein the seeps tend to be grouped in close proximity to one another. The locations of these seeps are as follows:

- 1 seep (Bubbler #1) in the extreme southeast corner of Section 16, T16N, R91W
- 4 seeps (Bubbler #'s 2, 3, 4 & 5) within the proximity of Deep Gulch drainage
  - 3 seeps(Bubbler #'s 3, 4 & 5) located close to the center of the S/2 S/2 of Section 27, T16N, R91W
  - 1 seep (Bubbler #2) likely associated with and just SW of the 3 seeps noted above is located in the NW/4 NW/4 of Section 34, T16N, R91W
- 5 seeps (Bubbler #'s 6, 7, 8, 9 & 10) within the proximity of the Wild Cow Creek drainage in the center of the S/2 N/2 of Section 15, T15N, R91W

## History

Andy Stone provides the following historical information regarding gas seeps (aka mud volcanoes) within the Rawlins Field Office:

*The earliest reference to the mud volcanoes is Dennis Knight's book, Mountains and Plains, p. 125. He describes the small area of mud volcanoes or mud springs in the lowest part of the Great Divide Basin, the Chain of Lakes area north of Wamsutter. The conical mounds are 1-5 m high and are surrounded by mudflats or playas. At one time a mud slurry oozed from their summits, then dried.*

*Hayden visited the area in 1877, and described them in his report of 1879. At that time the mounds had pools of muddy water at the top. Bubbles of gas would periodically rise to the surface. "A rifle-ball shot down vertically into one of the openings produced a sudden eruption of the whole mass. Water and mud were thrown to a height of about 10 feet, covering the luckless experimenter from head*

1

*to foot. From a safer distance the trial was several times repeated and almost always followed by the same result..."* Crude as this test may be, it shows the presence of gas at some depth, held there under mechanical pressure.

Knight says that the mud volcanoes appear to be dormant (1994) but there is so little weathering that the springs must have become inactive recently. So maybe they have come alive again!

**Bubbler #1:**

September 2005 - Atlantic Rim field trip comprised of Jon Dull, John Ahlbrandt and Bob Lang. John Ahlbrandt had pointed out the flowing well Cherokee Creek 1-22 (aka Spitter Well & Duck Lake Well) after which he made a slight detour so that he could point out what was to become known as Bubbler #1. It was located on a knoll that was less than ¼ mile to the north west of the Cherokee Creek 1-22 well and appeared to be nothing a more than a circular pool of muddy water approximately 5 to 8 feet in diameter with a gentle rolling action in the center of the pool. Bubbler #1 also appeared to be located on an old abandoned well pad location that was void of any vegetation. The overall appearance led to the inference that the water might be coming from an improperly abandoned well.

August 2006 - The site was visited again with no apparent visual change of the spring.

September 2006 - After pointing out the location of Bubbler #1 to Anadarko, they dug into the bubbler with a backhoe to a depth of approximately 18 feet in an attempt to find any evidence of an abandoned well. Nothing was found. As a result of this lack of evidence it can be surmised that the water source was from a natural source.

October 2006 - Pat Sena and Sherri King visited the site and marked the GIS location. They also attempted to detect gas emissions with their gas monitors. No gas emissions were detected.

January 2007 - Andy Stone, Jon Dull & Ed Heffren (WSO) visit site and detect methane gas emissions. At this time the water pool had frozen over and developed a broad, low lying conical mound that was approximately 2 feet high. Low level methane emissions were detected at this time.

**Bubbler #'s 2, 3, 4 & 5:**

October 2006 - Jerry Dickenson stumbles across bubblers while on a hunting trip and identifies the approximate location. Within the approximate same time frame Andy Warren points out the location of the same bubblers to Andy Stone.

2

008800

December 2006 - Bob Lang and Andy Stone inventory the site. They identify the GIS locations and take water samples.

January 2007 - Andy Stone, Jon Dull & Ed Heffren (WSO) visit site and detect methane gas emissions.

### Bubbler #'s 6, 7, 8, 9 & 10:

October 2006 - Andy Warren points out location of bubblers to Andy Stone. No GIS identification was made at this time. Pat Sena and Sherri King visit the site and identify the GIS locations. In addition, Pat and Sherri detect methane emissions from this site with their gas monitors.

December 2006 - Bob Lang and Andy Stone inventory the site. They identify the GIS locations and take water samples.

Andy Warren has worked in the RFO for 27± years. In a recent conversation with Andy Warren, he noted that he has known about the bubblers for an amount of time approaching his time of work duration in the RFO. He further noted that the vigor of activity of the bubblers in the past was not much more than just a gentle rolling action in the center of the water pools. He further noted, in a qualitative sense, the vigor of the bubblers seems to have increased dramatically since the commencement of coal bed natural gas (CBNG) development in the immediate vicinity.

### Cause and Source of the Gas Seeps

After the early reports of the gas seeps came in it was noted that the source of the seeps might be the result of improperly abandoned core holes that were drilled by the USGS in the 1970's. The USGS drilled these core holes into the Mesaverde coals in an effort to map these coals and determine their aerial extent and resource value.

Through the efforts of Andy Stone, 201 core hole locations were found in the RFO archives. Of the 201 core hole locations, 106 of the core holes are known to have been drilled and their locations identified by north and south measurements from the section lines in the sections in which they were drilled. The locations of the remaining 95 core holes were noted only by their approximate location in the nearest section quarter quarter for the section in which they were drilled. Both the known and approximate locations of these core holes were subsequently placed on a map along with the GIS coordinates of the gas seeps to see if there was any coincidence of location. The results turned out negative. Neither the 106 known core hole locations nor the 95 core holes with approximate locations coincided with the GIS locations of the gas seeps. From this information, it can be concluded that the core holes are not the cause of known gas seeps.

008801

Upon comparing the location of the gas seeps to geologically mapped outcrops of the Lewis shale and the Mesaverde formations, it was noted that the gas seeps are located in the Lewis shale near the Lewis/Mesaverde contact. While the source and the plumbing of the gas seeps are not known with any degree of certainty, it is likely that both the water and the gas are originating from the Mesaverde coals. It should be noted there is a lack of supporting technical data and information to support this statement.

## Location of Other Gas Seeps

Further attempts were made to locate additional gas seeps through the use of aerial photography. It was originally thought that by reviewing aerial photographs of known gas seep locations that might have a typical "identity pattern" (IDP) that might be extrapolated or compared with other areas to identify sites with the same or similar IDP. The gas seep locations were reviewed on aerial photos taken in 2001. While the gas seeps could be seen in the photos, the resolution of the photos was not great enough to make an IDP let alone extrapolate that IDP to other areas. Thus, this method of gas seep location identification proved fruitless.

Ed Heffren (WSO) suggested that it may be possible to locate other seep locations through the use of more sophisticated methods. These methods might possibly include the use of other aerial photographs or satellite photos that see the light spectrums of infrared and near infrared or possibly other identifying wave lengths within the light spectrum. To date this idea has not been explored.

It is likely that the only way that other gas seeps will be located is by actual boots on the ground exploration.

## Concerns

A primary concern about the gas seeps is that there is a high degree of likelihood that the amount of gas being emitted will increase and that the amount of water emitted from the seeps will decrease as CBNG development increases within the ARPA. The primary process by which natural gas is produced from the coals is through a dewatering process where the hydrostatic head (pressure) is reduced, within the coal beds, below the gas adsorption pressure of the coals. This is accomplished by pumping water from the coal beds, which in turn allows the adsorbed gases to be released from the coals and then produced through the same well bore that water is being produced from.

The same process is likely to occur in the gas seeps.

### Cause:
The ground water model that was run for ARPA predicts the drying up of natural water springs in the ARPA (dewatering). We have yet to see any evidence of this

4

008802

at the gas seeps. However, if the ground water model is correct, there exists a good likelihood for this happening.

**Effect:**

As with controlled CBNG production, increased CBNG production is likely to occur from the gas seeps.

This already seems to be occurring as noted by Andy Warren's statement that the vigor of the bubblers seems to have increased dramatically since the commencement of CBNG development. It could very well happen that the water being emitted from the seeps completely dries up. Thus, allowing CBNG to be emitted unhampered and unchecked from the seeps.

Other concerns that precipitate from the likely increase gas seep emissions are:

- Potential damage to the atmosphere by elevated emission of coal bed gases. All of the constituents of the coal bed gases are considered to be greenhouse gases and incompatible with the well being of the earth's atmosphere.
- Potential danger to human and animal safety:
  - Accidental ignition by an unaware tourist/hunter could result in someone being seriously burned. Natural ignition via lightening or spontaneous combustion of exposed coal bed could cause wild fires that would be a danger to human life, wildlife and vegetation.
  - Some of the potential constituents of coal gases like hydrogen sulfide and carbon dioxide are poisonous to humans and wildlife. They are also heavier than air and can settle in low lying basin areas and can create potential traps for the unknowing and unwary.
- Potential danger to vegetation:
  - Some of the coal gas constituents like methane and hydrogen sulfide are incompatible with plant life and can result in vegetation die off in the adjacent vicinity of the seeps. In the San Juan Basin of Colorado there have been extensive vegetation kills adjacent to gas seeps associated with the coal bed outcrops that are being developed for CBNG.

## Monitoring

### Soil Monitoring

All of the above concerns pose potential liability to federal government if they are not somehow addressed. It would be through some sort of a monitoring process that the BLM would be able to come to grips with this liability conundrum. To date we have only been able to qualitatively observe the gas seeps, i.e. Andy Warren's previously noted statement. If any monitoring is to be done it should be primarily of a quantitative nature supplemented by qualitative observation.

5

Towards this end, the BLM's field offices in Buffalo, Wyoming and Durango, Colorado were consulted to see if they had any coal gas seeps in their areas of jurisdiction and if so, what they were doing about it. In speaking with various people in these BLM field offices the name of Ed Heffren of the Wyoming State Office finally arose. Ed had been instrumental in developing a program for monitoring methane in the soils near coal gas seeps for both the Powder River Basin (PRB) and the San Juan Basin (SJB).

There are essentially two quantitative methods that are being used in both the PRB and SJB, which will be referred to herein as Gas Monitoring Method 1 (GMM1) and Gas Monitoring Method 2 (GMM2).

GMM1 consists of taking periodic gas flow and gas composition measurements from collection tubes that have been planted in the ground to a depth of approximately 2 feet. The tubes are open ended below ground level and closed above ground allowing gas to collect within the tubes and to be later sampled at a desired time interval.

GMM2 is somewhat more sophisticated. It consists of a 4-sided pyramidal flux chamber (3 feet x 3 feet at the base and 3 feet high) that sits on the ground. Gas is collected through the open base of the pyramid and the gas flux rate and composition is continuously measured as it exits through an orifice at the top of the pyramid. Permanently installed electronic measurement equipment is the means by which the gas properties are measured as it exits the top of the flux chamber.

Both GMM1 and GMM2 have been employed in both the PRB and the SJB with GMM2 being used to a greater extent in the SJB. At first glance it would seem that GMM2 would furnish more information by being able to continuously monitor gas flux and composition changes over time. However, Dave Swanson in the Durango Field Office, who has been overseeing the gas monitoring in the SJB, is of the opinion that GMM2 needs too much fine tuning and tweaking of the electronic equipment that is incorporated into the system. He says that when they are working they work fine, but their reliability for working on a continuous basis is not very good. Dave further recommends the use of GMM1 due to the reliability of the method and the lack of need to be continually messing with electronics incorporated into the system.

**Monitoring Wells**

In addition to monitor gas in the soil near the gas seeps the RFO has already taken measures to monitor the aquifers overlaying the coal beds. This will be done by requiring Anadarko to drill a cluster of 3 ground water monitoring wells through the authority of the proposed federal unit agreements for the Black Pearl Unit and Jack Sparrow Unit. By drilling these ground water monitoring wells we will be able to monitor the aquifer pressure, gas pressure and composition and water flow rate if the water flux into the well bore is of an artesian nature.

6

## Mitigation and Remediation

Should results of the monitoring described above indicate the need to mitigating or remediate the gas flux from these seeps, there exist a couple of possible alternatives.

### Encapsulation

One method would be to encapsulate the gas seep on the surface and capture the gas and sell it. This could be accomplished by enclosing the area around the gas seep with a concrete footing and sealing the top with a metal dome or possibly an enclosure that would resemble half of a cylindrical steel tank lying on its side. The structure would be fitted with the appropriate control equipment to allow for the capture of the gas and allow for any associated water to be put back onto the ground.

### Remediation Well(s)

The other method would be to drill one or more remediation wells into the top of the Mesaverde formation in close proximity to and down dip from the gas seeps. After the well(s) reach total depth casing would be run and cemented in place. The shoe of the casing would be drilled out and a cement slurry would be pumped into the surrounding formation in an attempt to block the surface flux of gas and water from the seeps. This is similar to what is sometimes done when a gas or oil well blows out and an attempt is made to bring the well under control. However, with a well blow out, the underground point source for the oil and gas fluxing at the surface is known while the underground point source for the gas seep flux is an unknown. Due to this uncertainty of the below ground gas flux point source, the potential for the success of this type of operation is unknown.

## Conclusion and Recommendations

As previously discussed, there exist some fairly severe safety and environmental concerns and potential liability concerns for the federal government that are associated with the gas seeps in the ARPA. At this point in time there is no scientific data available to prove or disprove that CBNG development within the ARPA has caused or will cause increased gas flux from the known gas seeps. However, it is likely that future CBNG development may cause increased quantities of gas to be emitted from the known seeps. It is also possible that there exist other seeps within the ARPA that are yet to be discovered. As a result of the forgoing the following recommendations are presented:

1. Known gas seeps should be posted and possibly fenced so as to alert any unwary pedestrians of the potential dangers.

008805

2. Identify on the ground all the known and approximate locations of the core holes that were drilled in the early 1970's in order to give credence to the assumption that none of these locations have somehow turned into gas seeps.

3. Due to the fact that Anadarko and their partners are the primary CBNG developers within the ARPA, they should play a major financial role in the backing of any future monitoring, mitigation and remediation measures that are herein recommended.

4. A soil gas monitoring program should be designed and implemented to monitor soil gas emissions in the immediate vicinity of the known gas seeps and any seeps that may be discovered in the future. The monitoring program should be carried out by a nonbiased third party, paid for by Anadarko and supervised by the BLM. The program should consist of using the GMM1 that was previously described herein and gas samples taken on 1 to 3 month intervals in order to establish base line data and identify any gas flux increases associated with the seeps. Qualitative visual monitoring should also be incorporated as part of the monitoring site visits for GMM1. This should include field notes that incorporate the observed physical vigor of the seeps along with digital video and digital still photographs.

5. Require that Anadarko drill and complete the three well cluster of aquifer monitoring wells irrespective of being required by the Black Pearl and Jack Sparrow unit agreements. Require the drilling of additional ground water monitoring well clusters should future need for this type of monitoring be indicated from historical data that is collected.

6. In the event that mitigation or remediation is deemed necessary, the amount of water being emitted from the seeps needs to be determined so that water volume replacement alternatives can be considered and implemented if necessary.

7. Should the results of the monitoring program indicate that gas emissions from the seeps are increasing and that mitigation or remediation measures need to be implemented, Anadarko should pay for any associated costs.

## Acknowledgements

Special thanks and acknowledgement is given to the individuals who have contributed to the development of this paper. Andy Stone and Bob Lang have contributed substantially through their efforts of archival research, mapping input, field inspections and data gathering. Thanks to Pat Sena and Sherri King for their early field inspection and gas detection efforts. Thanks to Brian Robeson for his assimilation of the GIS data and mapping. Thanks to Jerry Dickinson for initially locating some of the gas seeps. Thanks to Ed Heffren of the Wyoming State Office and Dave Swanson of the Durango Field Office for their input of information regarding soil gas monitoring techniques.

008806

Thanks to Andy Warren for locating the seeps and his historical reference and knowledge of the gas seeps reviewed. Thanks to Andy Skordas for his CAD input.



008807

# RFO Wells of Critical Concern in the Atlantic Rim Area









**RFO Wells of Critical Concern**

**Type**

◇    **Bubbler**

     **Flowing Gas/Water Well**

•—    **Flowing Wells (Bob's)**

⊹    **Proposed Core Hole Locations**

★    **CarbonWells09052006**

008808



# WYOMING OUTDOOR COUNCIL

262 Lincoln Street, Lander, Wyoming 82520
ph. (307) 332-7031 ~ fax (307) 332-6899



April 25, 2007

David Simons
Atlantic Rim Project Lead
BLM
Rawlins Field Office
P. O. Box 2407
Rawlins, WY 82301

Dear Mr. Simons:

I am writing on behalf of Wyoming Outdoor Council with regard to the Atlantic Rim Project, for which the Environmental Impact Statement is complete, but for which your office has not yet issued a Record of Decision.

Yesterday I attended meeting hosted by the Wyoming Department of Environmental Quality, in Rawlins, concerning the recent appearance of mud pots in the Atlantic Rim area. In attendance were representatives of the Department of Environmental Quality, the Wyoming Oil and Gas Conservation Commission, Anadarko, and the Bureau of Land Management. I believe it was Debbie Johnson representing the Bureau of Land Management.

As you know, there has been increasing concern about reports that new and unexplained mud pots have been occurring in the Atlantic Rim area, within the last year or two. This coincides with the drilling and development of coal bed methane wells in this area, due to a pilot project that the BLM approved. The drillers are Anadarko and Double Eagle Petroleum. The report are that new mud pots, which have been tested to have methane gas escaping from them, (also referred to as "methane springs") are appearing in this area, and their location is in relatively close proximity to the CBM wells.

While we believe that the Department of Environmental Quality made a good case that the appearance of these mud pots is not due to the reinjection of produced water (a produced water disposal method being employed by Anadarko and Double Eagle), this does not solve the mystery of the mud pots. While there was some claim by the DEQ that these new mud pots could be simply naturally occurring phenomena, this is not the most likely explanation, given the rapid and substantial increase in these methane springs since the CBM drilling has started in the area.

*Protecting Wyoming's Natural Resources and Environment Since 1967*

The evidence suggests that coal seam dewatering is causing this increase in mud pot activity in the area. The methane is appearing at the surface because it is being liberated by the dewatering of the coal seams that is occurring as part of the CBM development already taking place and being conducted by Double Eagle and Anadarko Petroleum. The most likely source that DEQ offered for these mud pots (at the meeting yesterday) are "near surface coals and/or abandoned gas wells that penetrate the coals." This is really two sides of the same coin. As explained at the meeting, there are many abandoned oil, gas and other wells in the area that may not be properly abandoned and plugged, and as such they are serving as conduits for the escaping methane gas that is leaving the coal seams (due to the dewatering of the seams). This is a very serious problem and, we believe, something that merits further investigation and analysis before the BLM can go forward with its Atlantic Rim proposal at this time.

As you know, the BLM is required to give a "hard look" to environmental impacts in any EIS in order to comply with NEPA. NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 553 (1978). Given what you now know about these mud pots, and their likely connection to the CBM drilling that has already been allowed as part of the pilot project, this problem cannot be ignored or postponed to be addressed after the project has already begun, through adaptive management. It is a very real impact and should be addressed and analyzed as part of the EIS before you allow this project to proceed.

Where "new circumstances present a seriously different picture of the environmental impact of the proposed project from what was previously envisioned," a supplemental EIS is necessary. Sierra Club v. Froehlke, 816 F.2d 205, 210 (5th Cir. 1987) (emphasis in original). In numerous cases where new information or new circumstances regarding the environmental impact of a project have come to light, courts have ordered agencies to perform a supplemental environmental review. See, e. g. Louisiana Wildlife Federation v. York, 761 F.2d 1044, 1051 (5th Cir. 1985) (holding agency failed to consider adequately supplemental information that raised "new concerns of sufficient gravity").

These mud pots, or methane springs, phenomena are (at least quite possibly) a major and disturbing impact of CBM drilling in the Atlantic Rim area. They are a serious concern and are of sufficient gravity, such that a supplemental EIS to analyze and address this issue is warranted. What impact will they have if you permit 2000 additional wells, and the number of mud pots and methane springs grows exponentially as well? Can the surface lands really stand this kind of impact? Will additional mud pots and methane springs result in hazards to wildlife, and people? Will damage be caused to plant production in the area? Will they be, especially cumulatively, a human health hazard that must be addressed and mitigated? These are all questions that need to be addressed as part of your Environmental Impact Statement before you issue a Record of Decision. To ignore such a looming impact would be a significant mistake. It is like driving with your eyes closed.

RECEIVED

APR 30 2007

BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE

At the hearing, Tom Clayson, representing Anadarko, mentioned that there might be a way to mitigate this damage, by installing wells near these mud pots that would create a "sink" to draw the methane away from the mud pots and into the wells. There may be ways to mitigate the impacts of these mud pots so that the project can go forward. But it would not be a small adjustment, i. e. something that the BLM could handle through adaptive management. It is, or at least has the potential to be, a major impact and needs to be addressed by the BLM through a supplemental EIS process. This is something that the BLM should formally analyze and consider, as a mitigation effort, to reduce or eliminate these mud pot formations.

Wyoming Outdoor Council is very concerned about BLM going forward with and approving the Atlantic Rim project, involving 2000 wells, considering the lack of knowledge that currently exists about these mud pots. There is enough evidence to suggest the increased mud pot and methane spring activity occurring in the area could be caused by the newly drilled CBM wells. It warrants BLM taking a further look at the impacts of this drilling before BLM approves this project.

The BLM should not issue a Record of Decision in this matter until the mud pot / methane spring issue has been analyzed and addressed as part of the EIS process. The information about these mud pots is new and, given the increasing rate of occurrence of these mud pots, alarming, and must be addressed in a supplemental EIS. We respectfully ask that BLM thoroughly analyze this problem and supplement its findings set forth in the EIS already completed for the Atlantic Rim Project, before it proceeds with the issuance of any Record of Decision in this matter.

Thank you very much for your careful attention to this matter.

Sincerely,

Steve Jones
Watershed Protection Program Attorney
Wyoming Outdoor Council

cc: Robert Bennett

RECEIVED
APR 30 2007
BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE

# DECLARATION OF WALTER R. MERSCHAT

I, Walter Merschat, declare under penalty of perjury that:

1.  I live at 6670 Coates Road in Casper, Wyoming where I have lived since 1994. Prior to that I lived at 732 South Grant Street, Casper, Wyoming since 1976.

2.  I am a geologist specializing in geochemistry and president of Scientific Geochemical Services, a consulting firm which that does both exploration and environmental geochemistry world wide. I have conducted soil gas surveys over many parts of the United States as well as internationally including Panama, Mexico, Argentina, Chile, Egypt, Yemen, Ethiopia, Namibia, Oman, for major oil companies.

3.  I earned a B.S. and M.S. degree in Geology from Ohio University, Athens, Ohio.

4.  From 1976 through 1984, I worked for Gulf Oil Research Department locating buried deposits of oil and gas by seeking out light hydrocarbon vapor seeps including methane at the near surface. Through these methods, I was able to direct Gulf Oil Company towards areas favorable for hydrocarbon accumulations and further exploration efforts

5.  I visited a number of methane seeps on March 27, 2007 together with geologist Dr. Jay Lillegraven and Erik Molvar of Biodiversity Conservation Alliance. During this trip, we visited methane seeps along Cow Creek, Deep Gulch, and Wild Cow Creek Global Positioning System locations for each seep are provided in attached Table 1.

6.  At each methane seep, gas levels above the seep were measured with an ITX four-gas monitor to measure the Lower Explosive Limit (LEL) for any hydrocarbons escaping. LEL levels are expressed in percentage of gas concentration needed to sustain explosive levels, so an LEL of 100 would be the lower limit where explosive conditions would occur. LEL levels are provided in Table 1; four of the eight methane seeps measured showed LEL levels in excess of 100, indicating that explosive conditions existed at the time of measurement.

7.  At selected methane seeps, water samples were also taken using specially prepared 120ml glass serum bottles. The water samples were analyzed at Exploration Technologies, Inc. laboratory in Houston, Texas. Proper sampling methodology and appropriate Chain of Custody documentation was followed. Based on these data, gases emitted at seeps were virtually pure methane, with trace quantities of other hydrocarbons. Methane concentrations in water samples ranged from 7 to 100,918 parts per million, and volume of methane as a percentage of the total sample ranged from trace to 17.1%.

Attachment 5

8.      Some of the methane seeps along Deep Gulch and Wild Cow Creek take the form of mud volcanoes, with a buildup of terraces from sediment, indicating that they may have been present for many years. While very little water issued from these features, some of these mud volcanoes were discharging a large volume of gases, measurable in hundreds if not thousands of cubic feet per minute. Some of these mud volcanoes are among the largest-volume methane seeps I have ever seen in the world.

9.      Because no baseline data exists for methane volumes at pre-existing mud volcanoes prior to the onset coalbed methane exploratory operations, one can only speculate whether current volumes of methane output reflect historical volumes or have increased due to coalbed methane production activities nearby.

10.     At least one major methane seep, in the bed of Cow Creek about 20 meters downstream of its confluence with Deep Gulch, over steepened banks indicate that this methane seep is very recent in origin (within the past year or two, in my professional judgment). This methane seep is among the largest I've ever seen measuring approximately 8 feet in diameter and showed evidence of three major vents.

11.     Geologically, each of the seeps occurred in the Lewis shale, very close to its lower contact with the Almond sandstones and coals, the target for dewatering and coalbed methane production at exploratory pods of the Atlantic Rim coalbed methane project located approximately 3 miles to the west.

12.     During coalbed methane production, the target coal seam is dewatered to reduce the head pressure. Once the pressure is reduced, the methane separates from the coal, much like bubbles in a soda bottle once the lid is popped and the pressure released. Once the methane separates from the coal, it is free to diffuse toward the well bore, or toward faults or cracks in the bedrock, or toward the outcrop.

13.     The most likely explanation for the large volume of methane bubbling up at previously established mud volcanoes and for the formation of major new methane seeps is that the dewatering of the Almond coals at the nearby Atlantic Rim exploratory coalbed methane pods is releasing large quantities of methane gas which is escaping at or near the outcrop, possibly with the aid of mapped joints or faults in the bedrock that are present in the vicinity of the seeps.

14.     With the planned expansion of coalbed methane drilling in the immediate vicinity from a few score wells to 1,800, with the accompanying increase in large-scale dewatering of the Almond coals, it is likely that existing methane seeps along the outcrop will increase in their volume and danger level beyond what is seen today, and that new seeps will form.

15.     Methane is colorless, odorless, and tasteless. The only reason that the methane seeps were detected was that the large boils of bubbles indicated the escaping gas. On land, methane seeps of similar size are possible, but would not be

detectable visually. Such land-based seeps would only be detectable through intensive field survey with gas detecting equipment, or if vegetation was killed by the seep.

16. We also detected a methane seep on dry land approximately 20 m west from the seep described in paragraph 11. This demonstrates that at least some methane is seeping upward through the soil.

17. Methane seeps of this type potentially pose a serious threat to the health and safety of visitors, particularly hunters and other recreationists who might camp, build fires, or cook over small stoves in this area. A camper who pitched a tent over a methane seep could have the tent fill up with methane in the night, asphyxiating the victim or leading to an explosion if a spark or flame was lit.

18. Methane is also a global warming gas 12 to 20 times as potent as carbon dioxide, and thus causes significant impacts to global climate change independent of the health and safety threats to the public, to wildlife, and to vegetation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed on June 19, 2007, in Casper, Wyoming.



Walter Merschat



**Figure 1 (Above):** Newly formed methane seep near confluence of Deep Gulch and Cow Creek. **Figure 2 (Below):** Mud volcano of older origins along Deep Gulch.





Mud volcano at Wild Cow Creek; note nominal amount of water outflow (above); scale approx. 15 feet in diameter (below)



**Table 1**

**07-2829B Merschat - Atlantic Rim**

| Sample | Lat/Long | High LEL level | File name | Methane | Ethane | Ethylene | Propane | Propylene | i-Butane | Butane | n-Butane | Methane % | CO2 % | Ethene % | Ethane % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 41°19.528 107°37.373 | 24 | 154116 | 56616.863 | 4.831 | 0.024 | 0.064 | 0.003 | 0.037 | | 0.082 | 6.022 | 0.31 | | |
| 2 | 41°19.488 107°37.543 | 25 | 154118 | 7.235 | 0.037 | 0.008 | 0.05 | 0.029 | 0.038 | | 0.084 | 0 | 0.27 | | |
| 3 | 41°19.426 107°37.555 | 47 | 154119 | 20031.418 | 0.272 | 0.014 | 0.052 | 0.045 | 0.14 | | 0.268 | 1.276 | 0.93 | | |
| 4 | 41°19.495 107°37.388 | 108 | | | | | | | | | | | | | |
| 5 | 41°19.426 107°37.224 | no data | | | | | | | | | | | | | |
| 6 | location unrecorded | 119 | 155088 | MUD | | | | | | | | | | | |
| 7 | 41°19.417 107°37.195 | 3 | | | | | | | | | | | | | |
| 7a | 41°19.416 107°37.208 | 174 | | | | | | | | | | | | | |
| 8 | 41°19.372 107°37.214 | 268 | | | | | | | | | | | | | |
| 9 | 41°16.456 107°37.205 | 44 | 155089 | 100918.25 | 0.008 | 0.004 | 0.012 | 0.002 | 0.013 | | 0.05 | 17.101 | 0.24 | | |

Z:\wicki_temp\
07-2829B_data.xls

079105

May 4, 2007

**DECISION MEMORANDUM FOR THE STATE DIRECTOR**

**FROM: Marty Griffith**

**SUBJECT: Atlantic Rim mud pots**

I.     **STATEMENT OF THE ISSUE** In light of the high level of interest in the
Atlantic Rim project and the pending release of a Record of Decision dated
Marchxx2007, new information and a concern about potential consequences of
mud pot changes may not have been adequately addressed in the FEIS. There is a
3 day window of opportunity to address the information in the ROD before its
Notice of availability is published in the Federal Register.

II.    **BACKGROUND**
Naturally occurring mud pots have been known to exist within the ARim project
area. Their existence and some possible consequences are documented in the
FEIS. The BLM received a letter from WOC stating their concerns about
perceived changes in the mud pots and alleging that the environmental
consequences including health hazards to people and wildlife from the mud pots
must be addressed by the BLM. They also expressed their concern that continued
oil and gas development could potentially accelerate the change in mud pots. The
BLM has been working locally on understanding the mud pots and possible
relationship with CBNG development with WY DEQ and others. The mud pot
phenomenon has received recent media attention. Considering that the ROD has
not been released to the public, how BLM responds to WOC may cause additional
attention on a project that has already been elevated to the Department. How
BLM responds to the letter may also influence the defensibility of the NEPA
process should an appeal be filed.

III.   **OPTIONS**
        1. Do nothing, continue with release of the ROD as is;
        2. Prepare an errata sheet to the ROD that acknowledges the new information
           and concerns, and concludes that the BLM is taking action with State;
        3. Prepare an errata sheet for the new information/concern as above, and
           include a new signature page dated after the WOC letter was received, or
        4. Include only a new signature page as an errata sheet.

IV.    **PRO/CON ANALYSIS by options**
        **Option 1:** <u>Pros</u>: keeps project on track without any additional work; <u>Cons</u>: does
        not acknowledge public comment received during NEPA process, does not match
        the administrative record, increases risk of appeal by WOC and diminishes the
        defensibility of NEPA process and the "hard look".

        **Option 2:** <u>Pros</u>: acknowledges new information and public comment submitted
        by WOC. Lessens risk of appeal based on NEPA process, increases defensibility
        of NEPA process if appeal. <u>Cons</u>: Additional administrative work to prepare and

**009467**



**Debbie**
**Johnson**/RFO/WY/BLM/DOI

05/04/2007 07:31 AM

To  Marty Griffith/WYSO/WY/BLM/DOI@BLM, Janet
     Kurman/WYSO/WY/BLM/DOI@BLM, Brenda
     Neuman/WYSO/WY/BLM/DOI@BLM, Ken
cc  David Simons/RFO/WY/BLM/DOI@BLM, Dennis
     Carpenter/RFO/WY/BLM/DOI@BLM, Clare
     Miller/RFO/WY/BLM/DOI@BLM, Mark
bcc

Subject  Fw: Summary of Atlantic Rim EIS on Groundwater
         Resources

I asked Bob L. to put this together last night for today's discussion. It should help as a reference
that we (the BLM) has addressed methane springs in the FEIS and the letter from WOC is NOT
new information. The briefing paper is NOT an accurate description of th issue. I advise we do not
use it this morning for our discussion with Don and Bob. --Debbie

Debbie Johnson
Assistant Field Manager for Resources
BLM, Rawlins Field Office
Office: (307) 328-4363
Fax: (307) 328-4373
----- Forwarded by Debbie Johnson/RFO/WY/BLM/DOI on 05/04/2007 07:27 AM -----



**Bob**
**Lange**/RFO/WY/BLM/DOI

05/03/2007 10:13 PM

To  Debbie Johnson/RFO/WY/BLM/DOI@BLM
cc  Andy Stone/RFO/WY/BLM/DOI@BLM

Subject  Summary of Atlantic Rim EIS on Groundwater Resources

Hi Debbie,

Here is the summary of all the places I could find in the document that we talked about changes in
springs, seeps and flowing wells due to CBNG development. The impacts we described were observed
in the San Juan Basin and therefore could be expected here. Andy Stone and I talked before the
draft went out about putting in a scenario of diminishing water and increased gas production in
these features. We decided at the time not to do this because we are still not sure the gas
production in these springs and wells is coming from the Mesaverde. Although we know more now,
we are still not positive that this is the source of the methane in these springs and wells If I were
to write this analysis today, I would have gone into more detail about gas migration and made the
point that project activities and drought can cause this phenomenon.



Summary of Groundwater Issues Covered in the Atlantic Rim EIS.doc

Regards,

Bob Lange - Hydrologist
Rawlins Field Office - BLM
(307) 328-4268



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE

**Ecological Services**
**4000 Airport Parkway**
**Cheyenne, Wyoming 82001**

JAN 2 6 2006

In Reply Refer To:
ES-61411/W.02/WY10031

FM
AFM-SC
AFM-RES          RA
AFM-M&I          EPS
                 P&EC
                 LEO

Memorandum

JAN 3 0 2006

PAO

To:        Mark Storzer, Field Manager, Bureau of Land Management, Rawlins Field Office,
           Rawlins, Wyoming

From:      Brian T. Kelly, Field Supervisor, U.S. Fish and Wildlife Service, Wyoming
           Field Office, Cheyenne, Wyoming

Subject:   Atlantic Rim Natural Gas Project Draft Environmental Impact Statement

This is regarding the December 2005 Draft Environmental Impact Statement (DEIS), for the
proposed Atlantic Rim Natural Gas Project located in T13-20N, R89-92W, in Carbon County,
Wyoming. Anadarko Petroleum Corporation (proponent) proposes to drill 1800 coal bed natural
gas wells and 200 deep conventional wells on 270,080 acres of combined federal, state and
private lands. The wells are proposed at 80-acre spacing and will be developed over a 20-year
period with an estimated life of project of 30 to 50 years. The U.S. Fish and Wildlife Service
(Service) has reviewed the DEIS and we are providing you with the following comments.

## General Comments

The Service has responsibility, under a number of federal laws, treaties, Executive Orders, and
memoranda of agreement, for the conservation and management of fish and wildlife resources.
Some of these same authorities also require other federal agencies to consider, avoid, or prevent
adverse impacts to fish, wildlife, and wetland resources. We provide comments on (1)
threatened, endangered and candidate species, (2) migratory birds, (3) wetlands and riparian
areas, and (4) sensitive species. The Service provides recommendations for protective measures
for threatened and endangered species in accordance with the Endangered Species Act (Act) of
1973, as amended (16 U.S.C. 1531 et seq.). Protective measures for migratory birds are provided
in accordance with the Migratory Bird Treaty Act (MBTA), 16 U.S.C. 703 and the Bald and
Golden Eagle Protection Act (BGEPA), 16 U.S.C. 668. Wetlands are afforded protection under
Executive Orders 11990 (wetland protection) and 11988 (floodplain management), as well as
section 404 of the Clean Water Act. Other fish and wildlife resources are considered under the
Fish and Wildlife Coordination Act, 48 Stat. 401, as amended, 16 U.S.C. 661 et seq, and the Fish
and Wildlife Act of 1956, as amended, 70 Stat. 1119, 16 U.S.C. 742a-742j.

The DEIS states that drilling is proposed on nine Plan of Development (POD) areas. However, six of the PODs are currently partially developed under an Interim Drilling Policy established by the Bureau of Land Management (Bureau) in January 2002. The Interim Drilling Policy allowed up to 200 exploration coal bed natural gas wells within the project area while the Environmental Impact Statement was being prepared. National Environmental Policy Act (NEPA) analysis of this interim development was documented in an individual Environmental Assessment (EA) for each POD.

The Service previously reviewed the six individual EAs and provided comments to the Bureau expressing our concern that the cumulative effects of full field development would not be adequately analyzed with individual EAs. We recommended that the Bureau complete the EIS before any drilling was permitted to ensure that decisions made by the Bureau considered the consequences of the full field development; however, to date, 116 wells have been drilled under the Interim Drilling Policy.

During our review, the DEIS indicates that the project area's vegetation composition consists of nearly 95 percent sagebrush species. It also states that the project may have significant effects on sagebrush obligates such as greater sage-grouse, pygmy rabbit, Baird's sparrow, sage thrasher, Brewer's sparrow, and sage sparrow. The Service is concerned that the effects to habitats important to the above species may be irreversible and no amount of mitigation can restore or replace what is lost. As several of these species are known to be in decline from loss of habitat, the Service recommends that the Bureau not authorize an action that may exacerbate their decline and possibly result in listing of one or more of these species under the Act.

**Specific Comments**

1. Page 2-1, section 2.2.1, The Proposed Action, Bullets 5 & 6: The DEIS states that initial (short-term) disturbance will total approximately 15,800 but with reclamation the disturbance may be reduced by 9,500 acres for a total long term disturbance of 6,241 acres. *The Service is concerned that the long term distur*ʰ*ance figures may not reflect on-the-ground difficulties with reclamation as are discussed on page 3-48 of the DEIS (current POD conditions). The DEIS states that several of the PODs where drilling has taken place are experiencing hampered reclamation due to poor soils and poor vegetation, ineffective seeding due to wind erosion and lack of moisture, riling and gullying, excessive erosion due to inadequate road design, and well pads developed too close to drainages. Additionally, Appendix M (map 13) indicates that the soils within the project area have high run off potential which may further hinder reclamation. The Service recommends that the Bureau consider phasing in the completion of each POD based on the reclamation success of the previous POD. The Bureau should also work closely with the project proponent during the siting of well pads, roads and other facilities to minimize erosion problems.*

2. Page 3-72, Greater Sage-grouse Page 4-65, Upland Game Birds: Page 3-72 of the DEIS states that there are 88 lek locations in and within two miles of the project area. It also states that 85 percent of the project area consists of Wyoming and mountain big sagebrush habitat which sage-grouse are dependant on year-round. The DEIS goes on to state that the Bureau protects sage-grouse by requiring a 0.25-mile controlled surface use

2

003255

buffer around identified leks as well as a 2-mile seasonal buffer around leks to protect nesting habitat. Page *4-65* states that sage-grouse are abundant within the project area with approximately 92 percent of the area consisting of nesting habitat. *The Service is very concerned that authorization of this project, as proposed, will significantly affect the population of greater sage-grouse that occurs in this area of Wyoming. Adverse affects to sage-grouse may occur through the long-term loss of sagebrush habitat, fragmentation of habitat, and noise associated with project activities. The Service does not support a 0.25-mile protective buffer around sage-grouse leks as a mitigation measure, nor do we support a 2-mile buffer to protect nesting habitat. As you know, Lyon et al. (2003) found that disturbance can increase the distance from leks to nest sites and that the majority of hens from disturbed leks (as may be the case here), nested greater than 2-miles from the lek, while the majority of hens from undisturbed leks nested within 2-miles of the lek.*

*Additionally, recent information from a doctoral dissertation on the impacts of oil and gas development to greater sage-grouse in the Pinedale Anticline found that as development increased, lek activity declined up to 100 percent (Holloran 2005). Negative impacts to active leks extended to a distance of 5 km from an active drilling rig. Similarly, juvenile male recruitment to impacted leks also fell. Nesting females also avoided areas with high well densities, although site fidelity to previous nesting locations may result in delayed population response to the habitat changes associated with development. While some birds were displaced by the disturbance, Holloran (2005) also found that many sage-grouse discontinued breeding attempts, and others died at a higher rate than birds from unaffected areas. His conclusions suggest that natural gas field development contributes to local sage-grouse extirpations. Additionally, Holloran concluded that stipulations placed on oil and gas development in the Pinedale Anticline, which are identical to those proposed for the Atlantic Rim development, were insufficient to maintain sage-grouse breeding populations in natural gas fields.*

*The Service strongly recommends minimum protection measures as described by Connelly et al. (2000). The Service also encourages the Bureau to use its authority and not grant exceptions to protection measures for sage-grouse.*

*Finally, the Service would like to remind the Bureau of the 2001 Memorandum of Understanding (MOU) that the U.S. Forest Service, the Bureau, and the Service signed on with the Western Association of Fish and Wildlife Agencies to conserve the greater sage-grouse and its habitat. This MOU outlined the participation of Federal and State wildlife agencies, including the Wyoming Game and Fish Department, in greater sage-grouse conservation, and these commitments should be considered in project planning in sage-grouse habitat.*

3. Page *3-83*, Sensitive Wildlife Species, Page *4-61* and Page *4-68*, General Wildlife Species, Page *4-73*, Impacts Summary, Page *4-81*, Sagebrush Obligate Songbirds, and Page *4-89*, Sensitive Species: The pages of the DEIS listed above briefly discuss sagebrush obligate songbird species and state how impacts from this project would significantly affect nesting and foraging habitats <u>exceeding</u> the significance criteria as established in the Draft Resource Management Plan for the Rawlins Field Office. *The Service is concerned that the DEIS does not discuss the Bureau's obligation to protect*

3



*migratory birds under the MBTA. Although the DEIS states that the effects exceed the established criteria threshold, it does not state what measures will be implemented to directly protect migratory birds, especially Brewer's sparrow, sage sparrow, sage thrasher and Baird's sparrow, all known to occur within the project area. To avoid further decline of sagebrush obligate songbirds we recommend that the Bureau identzfi habitats within the project area important to migratory birds and clearly identify measures that will be implemented to reduce the effects so that they fall below the Bureau's significant effects criteria.*

4. <u>Page 4-77, Proposed Action:</u> The DEIS states that blowout penstemon and Ute ladies'-tresses would not be impacted by the project. However, the biological assessment (Appendix G) states that the project "may affect, but is not likely to adversely affect" both species. *The Service recommends that the final EIS clarify whether these species may be affected by the project. In the event that listed species may be affected, the Bureau should initiate section 7 consultation under the Act and request Service concurrence their determinations.*

5. ~~Pane 5-16, Greater Sage-grouse and Columbian Sharp-tailed Grouse:~~ The DEIS's cumulative effects analysis for the greater sage-grouse states that direct and indirect impacts from habitat fragmentation, dust, noise and long term loss of sagebrush habitat would be cumulatively significant leading to long-term decline in the population of sage-grouse. *Please see comment #2 above. The Service reminds the Bureau of their commitment to conserve the greater sage-grouse and its habitat.*

We encourage the Bureau to ensure the conservation of endangered, threatened, and candidate species, migratory birds and sensitive species. If you have further questions regarding our comments or your responsibilities under the Act, please contact Kathleen Erwin of my staff at the letterhead address or phone (307)772-2374, extension 28.

**References**

Connelly J.W., M.A. Schroeder, A.R. Sands, and C.E. Braun. 2000. Guidelines to manage sage grouse populations and their habitats. Wildlife Society Bulletin 28(4): 967 - 985.

Holloran M.J. 2005. Greater sage-grouse (*Centrocercus urophasianus*) population response to natural gas field development in western Wyoming. Ph.D. Dissertation, University of Wyoming, Laramie, WY. 115 pp., plus appendices.

Lyon A.G., S.H. Anderson. 2003. Potential gas development impacts on sage grouse nest initiation and movement. Wildlife Society Bulletin 31(2): 486-491.

cc:  BLM, State Office, State Director, Cheyenne (B. Bennett)
    FWS, Regional Office R6, Energy Coordinator, Lakewood, Colorado (B. Dach)
    WGFD, Statewide Habitat Protection Coordinator, Cheyenne (V. Stelter)
    WGFD, Non-Game Coordinator, Lander (B. Oakleaf)

4

003257



United States Department of the Interior

FISH AND WILDLIFE SERVICE

Ecological Services
5353 Yellowstone Road, Suite 308A
Cheyenne, Wyoming 82009

JAN 0 5 2007

In Reply Refer To:
ES-61411/02/WY07FA0080

Memorandum

To:         Mark Storzer, Field Manager, Bureau of Land Management, Rawlins Field
            Office, Rawlins. Wyoming

From:       Brian T. Kelly, Field Supervisor, U.S. Fish and Wildlife Service, Wyoming
            Field Office, Cheyenne, Wyoming

Subject:    Atlantic Rim Natural Gas Project Final Environmental Impact Statement

Thank you for providing the U.S. Fish and Wildlife Service (Service) with a copy of the Final
Environmental Impact Statement (FEIS) for the Atlantic Rim Natural Gas Development Project
(Project) and soliciting our comments. Your November 27, 2006, letter submitting the FEIS was
received in our office on December 4. Anadarko E & P Company, LP, and other natural gas
operators propose to drill 1,800 coal bed natural gas wells and 200 deep conventional natural gas
wells on 270,080 acres of combined Federal, state, and private lands in T13-20N, R89-92W, in
Carbon County, Wyoming. The wells are proposed at 80-acre spacing and will be developed
over a 20-year period with an estimated 30 to 50 year life of project. The Service has reviewed
the FEIS and provides the following comments pursuant to the Endangered Species Act (Act) of
1973, as amended (16 U.S.C. 1531 et seq.), Migratory Bird Treaty Act (16 U.S.C. 703), Bald and
Golden Eagle Protection Act (16 U.S.C. 668), Executive Orders 11990 (wetland protection) and
11988 (floodplain management), section 404 of the Clean Water Act, Fish and Wildlife
Coordination Act (16 U.S.C. 661 et seq.) and the Fish and Wildlife Act of 1956, as amended (16
U.S.C. 742a-742j).

The Service previously provided comments on the Draft Environmental Impact Statement
(DEIS) on January 26, 2006 and also commented on the individual Environmental Assessments
for each Plan of Development under the Bureau of Land Management's (Bureau) Interim
Drilling Policy. Some of the Service's previous comments also apply to the FEIS. Most
importantly, the Service continues to be concerned with the potential for significant impacts this
project may have on fish and wildlife resources within the Project area. We remain concerned
that Project impacts to greater sage-grouse and other sagebrush obligate species may be
significant and possibly irreversible, especially in a landscape where these species currently
thrive. Proposed development may alter the future size, distribution and existence of local

277 0110.

populations. The Service reiterates its recommendation that the Bureau not authorize an action that may exacerbate the decline of fish and wildlife species and possibly result in listing under the Act.

In the FEIS, the Bureau expressed its preference for Alternative D; however, the Service believes that Alternative C may provide enhanced protection for fish and wildlife resources. The Service encourages the Bureau to incorporate as many of the protective measures, outlined in Appendix L, as are practical into the final action. In regard to Alternative D, the Service commends the Bureau for requiring interim reclamation as this may reduce some of the impacts that will occur across the Project area. The Service believes the reclamation criteria in Appendix B form a reasonable basis for measuring reclamation success. However, regardless of the limits to disturbance in the Project area, habitat fragmentation will occur, which may have widespread and long-term effects on species present. Therefore, the reclamation success criteria should be followed strictly and enforced to ensure its effectiveness. Additionally, the Bureau should implement measures to reduce habitat fragmentation.

The Service requests continued involvement in the Project as the Bureau develops a Record of Decision and during the implementation process. The Service is particularly interested in working cooperatively to develop mitigation and conservation measures that would help conserve fish and wildlife, especially those dependent on sagebrush ecosystems. We encourage the Bureau to ensure the conservation of endangered, threatened, and candidate species, and migratory birds and species of concern. If you have further questions regarding our comments or your responsibilities under the various authorities mentioned, please contact Dan Blake of my staff at (307) 328-4333.

cc:    BLM, State Office, State Director, Cheyenne (B. Bennett)
       FWS, NEPA Coordinator, Denver, CO (C. Young-D)
       FWS, Fish and Wildlife Biologist, Rawlins Field Office, Rawlins (D. Blake)
       WGFD, Non-Game Coordinator, Lander (B. Oakleaf)
       WGFD, Statewide Habitat Protection Coordinator, Cheyenne (V. Stelter)

2

# ATLANTIC RIM FINAL EIS MAP
## Seasonal Elk Ranges and Migrations Routes



Map M-24

**003189**

# ATLANTIC RIM FINAL EIS MAP
## Seasonal Pronghorn Ranges and Migrations Routes



# ATLANTIC RIM FINAL EIS MAP
## Seasonal Mule Deer Ranges and Migrations Routes



Form 3160-3
(August 1999)

FORM APPROVED
OMB NO. 1004-0136
Expires: November 30, 2000

# UNITED STATES
# DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT
## APPLICATION FOR PERMIT TO DRILL OR REENTER

5. Lease Serial No.

W-131275

6. If Indian, Allottee or Tribe Name

POSTED
SEP 2 6 2005
BUREAU OF LAND MANAGEMENT
RLS FIELD OFFICE

1a. Type of Work    [X] DRILL    CBNG    [ ] REENTER

1b. Type of Well    [ ] Oil Well    [X] Gas Well    [ ] Other    [ ] Single Zone    [ ] Multiple Zone

2. Name of Operator

Double Eagle Petroleum Company

3a. Address

P.O. Box 766, Casper, Wyoming 82602    307-237-9330

7. If Unit or CA Agreement, Name and No.
Catalina Unit 50dA

8. Lease Name and Well No.
1691-33-7

9. API Well No.

10. Field and Pool, or Exploratory

4. Location of well *(Report location clearly and in accordance with any State requirements.*)
At surface

At proposed prod. zone

11. Sec., T., R., M., or Blk. And Survey or Area

NW¼SE¼ of Sec. 7, T. 16 N., R. 91 W.

14. DISTANCE IN MILES AND DIRECTION FROM NEAREST TOWN OR POST OFFICE*

28 (Baggs, WY)

12. County or Parish
Carbon

13. State
Wyoming

15. Distance from proposed* location to nearest property or lease line, ft. (Also to nearest drlg unit line, if any)    660' +/-

16. No. of Acres in lease
1,270.24

17. Spacing Unit dedicated to this well

18. Distance from proposed location* to nearest well, drilling, completed, applied for, on this lease, ft.    1500'+/-

19. Proposed Depth

20. BLM/ BIA Bond No. on file
WY-3323

21. Elevations (Show whether DF, RT, GR, etc.)

6660' Ground

22. Approximate date work will start*
1-Jul-06

23. Estimated Duration

24. Attachments

The following, completed in accordance with the requirements of Onshore Oil and Gas Order No. 1 shall be attached to this form:

1. Well plat, certified by a registered surveyor.
2. A Drilling Plan.
3. A Surface Use Plan ( if the location is on National Forest System Lands, the SUPO shall be filed with the appropriate Forest Service Office).

4. Bond to cover the operations unless covered by existing bond on file(see item 20 above).
5. Operator certification.
6. Such other site specific information and/ or plans as may be required by the authorized officer.

25. Signature    Name (Printed/ Typed)    Date
Stph H Hollis    Stephen H. Hollis    8/1/2005

Title
President

Approved By (Signature)    Name (Printed/ Typed)    Date

REPLACED
FEB 1 4 2007
BUREAU OF LAND MANAGEMENT
RLS FIELD OFFICE

Title    Office

Application approval does not warrant or certify that the applicant holds legal or equitable title to those rights in the subject lease which would entitle the applicant to conduct operations thereon.
Conditions of approval, if any, are attached.

Title 18 U.S.C. Section 1001 and Title 43 U.S.C. Section 1212, make it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

* (Instructions on reverse)

RECEIVED
SEP 2 6 2005
BUREAU OF LAND MANAGEMENT
RLS FIELD OFFICE

Form 3160-3
(August 1999)

FORM APPROVED
OMB NO. 1004-0136
Expires: November 30, 2000

# UNITED STATES
## DEPARTMENT OF THE INTERIOR
### BUREAU OF LAND MANAGEMENT
## APPLICATION FOR PERMIT TO DRILL OR REENTER

| | | |
|---|---|---|
| 1a. Type of Work: [X] DRILL  [ ] CBNG  [ ] REENTER | 5. Lease Serial No. | W-131275 |
| | 6. If Indian, Allottee or Tribe Name | |
| 1b. Type of Well: [ ] Oil Well  [X] Gas Well  [ ] Other  [ ] Single Zone  [ ] Multiple Zone | 7. If Unit or CA Agreement, Name and No. | Catalina Unit Pod B |
| | 8. Lease Name and Well No. | 1691-11-6 |
| 2. Name of Operator: Double Eagle Petroleum Company | 9. API Well No. | |

POSTED
SEP 2 6 2005
RAWLINS FIELD OFFICE

| | | |
|---|---|---|
| 3a. Address: P.O. Box 766, Casper, Wyoming 82602    307-237-9330 | 10. Field and Pool, or Exploratory Area | Cow Creek |
| 4. Location of well (Report location clearly and in accordance with any State requirements.) | 11. Sec., T., R., M., or Blk. And Survey or Area | |
| At surface: | | |
| At proposed prod. zone: Same | Lot 18 of Sec. 6, T. 16 N-R. 91 W. | |

| | | |
|---|---|---|
| 14. DISTANCE IN MILES AND DIRECTION FROM NEAREST TOWN OR POST OFFICE*  28 (Baggs, WY) | 12. County or Parish  Carbon | 13. State  Wyoming |
| 15. Distance from proposed* location to nearest property or lease line, ft. (Also to nearest drlg unit line, if any)  660' +/- | 16. No. of Acres in lease  1,270.24 | 17. Spacing Unit dedicated to this well |
| 18. Distance from proposed location* to nearest well, drilling, completed, applied for, on this lease, ft.  1300'+/- | 19. Proposed Depth | 20. BLM/ BIA Bond No. on file  WY-3323 |
| 21. Elevations (Show whether DF, RT, GR, etc.)  6684.0' Ground | 22. Aproximate date work will start*  1-Jul-06 | 23. Estimated Duration |

24. Attachments

The following, completed in accordance with the requirements of Onshore Oil and Gas Order No. 1 shall be attached to this form:

1. Well plat certified by a registered surveyor.
2. A Drilling Plan.
3. A Surface Use Plan ( if the location is on National Forest System Lands, the SUPO shall be filed with the appropriate Forest Service Office).
4. Bond to cover the operations unless covered by existing bond on file(see item 20 above).
5. Operator certification.
6. Such other site specific information and/ or plans as may be required by the authorized officer.

| | | |
|---|---|---|
| 25. Signature  *Stephen H. Hollis* | Name (Printed/ Typed)  Stephen H. Hollis | Date  8/1/2005 |
| Title  President | | |
| Approved By (Signature) | Name (Printed/ Typed) | Date  FEB 14 2007 |
| Title | Office | |

REPLACED

BUREAU OF LAND MANAGEMENT

RECEIVED
SEP 2 6 2005
FIELD OFFICE

Application approval does not warrant or certify that the applicant holds legal or equitable title to those rights in the subject lease which would entitle the applicant to conduct operations thereon.

Conditions of approval, if any, are attached.

Title 18 U.S.C. Section 1001 and Title 43 U.S.C. Section 1212, make it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

* (Instructions on reverse)



**Double Eagle Petroleum Company**
**Catalina Unit – Pod "B"**

**Sections 6 & 7 (16N-91W)**
**Section 1 (16N-92W)**
**Sections 31 & 32 (17N-91W)**
**Section 36 (17N-92W)**
**Carbon County, Wyoming**

Form 3160-3
(April 2004)

**P O S T E D**

AUG - 2 2006

BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE

FORM APPROVED
OMB NO. 1004-0137
Expires: March 31, 2007

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
**APPLICATION FOR PERMIT TO DRILL OR REENTER**

5. Lease Serial No.

WYW-116679

6. Indian, Allottee or Tribe Name

Case 1:07-cv-01709-RJL    Document 12-3    Filed 10/12/2007    Page 5 of 8

| | | |
|---|---|---|
| 1a. Type of Work: | X DRILL | ☐ REENTER | 7. If Unit or CA Agreement, Name and No. Sun Dog (CBM)     152954X |

1b. Type of Well:   ☐ Oil Well   X Gas Well   ☐ Other   X Single Zone   ☐ Multiple Zone

8. Lease Name and Well No.
AR Federal 1001                    6-9

2. Name of Operator

Anadarko E&P Co., LP

9. API Well No.

3a. Address
2515 Foothill Blvd.
Rock Springs, WY 82901

3b. Phone No. *(include area code)*
(307) 352-3328

10. Field and Pool, or Exploratory
Atlantic Rim - Mesa Verde Coal

4. Location of well *(Report location clearly and in accordance with any State requirements.*)*
At surface

At proposed prod. zone

11. Sec., T., R., M., or  Blk. and  Survey  or  Area

9         T16N         R91W

14. Distance in miles and direction from the nearest town or post office*
25 miles Northeast of Baggs, WY

12. County or Parish
Carbon

13. State
Wyoming

15. Distance from proposed*
location to nearest
property or lease line, ft.
(Also to nearest drlg. unit line, if any)                 1728'

16. No. of acres in lease

17. Spacing Unit dedicated to this well

18. Distance from proposed location*
to nearest well, drilling, completed,
applied for, on this lease, ft.                 1512'

19. Proposed Depth

20. BLM/ BIA Bond No. on file
WYB-000269  2291

21. Elevations (Show whether DF, RT, GR, etc.)

6656.6'     GR          6669'     KB

22. Approximate date work will start*
3rd quarter 2007

23. Estimated duration

24. Attachments

The following, completed in accordance with the requirements of Onshore Oil and Gas Order No. 1 shall be attached to this form:

1. Well plat certified by a registered surveyor.
2. A Drilling Plan.
3. A Surface Use Plan ( if the location is on National Forest System Lands, the SUPO shall be filed with the appropriate Forest Service Office).

4. Bond to cover the operations unless covered by existing bond on file(see item 20 above).
5. Operator certification.
6. Such other site specific information and/ or plans as may be required by the authorized officer.

| 25. Signature *Gary Sundberg* | Name *(Printed/ Typed)*  Gary Sundberg | Date  3/8/06 |
|---|---|---|
| Title  Permit Agent for Anadarko E&P Co., LP | | |

| Approved By *(Signature)*  /S/ Deborah K. Johnson | Name *(Printed/ Typed)*  /S/ Deborah K. Johnson | Date  AUG 16 2007 |
|---|---|---|
| Title  ACTING Rawlins Field Manager | Office  RAWLINS FIELD OFFICE | |

Application approval does not warrant or certify that the applicant holds legal or equitable title to those rights in the subject lease which would entitle the applicant to conduct operations thereon.

Conditions of approval, if any, are attached.

Title 18 U.S.C. Section 1001 and Title 43 U.S.C. Section 1212, make it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

* *(Instructions on page 2)*

**"See Conditions of Approval"**

RECEIVED

AUG - 2 2006

BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE



Case 1:07-cv-01709-RJL    Document 12-3    Filed 10/12/2007    Page 6 of 8

QUADRANGLES:
BLUE GAP
DOTY MOUNTAIN
SULPHUR SPRINGS
GARDEN GULCH

ROAD DISTURBANCE = 2.0 ACRES±

INSTALL CMP: c

**GRIFFIN & ASSOCIATES, INC.**

1414 ELK ST., SUITE 202
ROCK SPRINGS, WY 82901
(307) 362-5028

| SCALE: 1" = 2000' | TOTAL PROPOSED LENGTH: 1744'± | |
| JOB No. 13883 | EXISTING ROAD ———————— | EXHIBIT |
| DATE: 3/21/06 | PROPOSED ROAD – – – – – – | 4 |

**PROPOSED ROAD FOR
ANADARKO E&P CO., LP
AR FEDERAL 1691 6-9**

POSTED MAY 2 2006

Form 3160-3
(April 2004)

**UNITED STATES
DEPARTMENT OF THE INTERIOR**
BUREAU OF LAND MANAGEMENT

**APPLICATION FOR PERMIT TO DRILL OR REENTER**

BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE

FORM APPROVED
OMB NO. 1004-0137
Expires: March 31, 2007

5. Lease Serial No.
WYW-116679

6. If Indian, Allottee or Tribe Name

7. If Unit or CA Agreement, Name and No.
Sun Dog (CBM)        152954X

8. Lease Name and Well No.   SunDog Unit 34-4
ART 34-4 (4D)

| 1a. Type of Work: | X DRILL | | REENTER |
|---|---|---|---|

| 1b. Type of Well: | | Oil Well | X Gas Well | | Other |
|---|---|---|---|---|

2. Name of Operator
Anadarko E&P Co., LP

9. API Well No.
49-007-23034

3a. Address
2515 Foothill Blvd.
Rock Springs, WY 82901

3b. Phone No. *(include area code)*
(307) 352-3328

10. Field and Pool, or Exploratory
Atlantic Rim - Mesa Verde Coal

4. Location of well *(Report location clearly and in accordance with any State requirements.)*
At surface
At proposed prod. zone

11. Sec., T., R., M., or Blk and Survey or Area
8    T16N    R91W

14. Distance in miles and direction from the nearest town or post office*
25 miles Northeast of Baggs, WY

| 12. County or Parish | 13. State |
|---|---|
| Carbon | Wyoming |

15. Distance from proposed*
location to nearest
property or lease line, ft.
(Also to nearest drlg. unit line, if any)
660'

16. No. of acres in lease

17. Spacing Unit dedicated to this well

18. Distance from proposed location*
to nearest well, drilling, completed,
applied for, on this lease, ft.
1900'

19. Proposed Depth

20. BLM/BIA Bond No. on file
WYB-000269 - 291

21. Elevations (Show whether DF, RT, GR, etc.)
6672'    GR.        KB

22. Aproximate date work will start*
4th quarter 2006

23. Estimated duration

24. Attachments

The following, completed in accordance with the requirements of Onshore Oil and Gas Order No. 1 shall be attached to this form:

1. Well plat certified by a registered surveyor.
2. A Drilling Plan.
3. A Surface Use Plan (if the location is on National Forest System Lands, the SUPO shall be filed with the appropriate Forest Service Office).

4. Bond to cover the operations unless covered by existing bond on file(see item 20 above).
5. Operator certification.
6. Such other site specific information and/or plans as may be required by the authorized officer.

| 25. Signature | Name (Printed / Typed)    Gary Sundberg | Date |
|---|---|---|
| *Gary Sundberg* | | 5/02/06 |
| Title   Permit Agent for Anadarko E&P Co., LP | | |

| Approved By (Signature) | Name (Printed/Typed)   S/ Deborah K. Johnson | Date |
|---|---|---|
| *Deborah K Johnson* | | AUG 16 2007 |
| Title   **ACTING** Rawlins Field Manager | Office    RAWLINS FIELD OFFICE | |

Application approval does not warrant or certify that the applicant holds legal or equitable title to those rights in the subject lease which would entitle the applicant to conduct operations thereon.

Conditions of approval, if any, are attached.

Title 18 U.S.C. Section 1001 and Title 43 U.S.C. Section 1212, make it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

* (Instructions on page 2)

**"See Conditions of Approval"**

RECEIVED
MAY - 2 2006
BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE



Case 1:07-cv-01709-RJL    Document 12-3    Filed 10/12/2007    Page 8 of 8