IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, BIODIVERSITY CONSERVATION ALLIANCE, WYOMING OUTDOOR COUNCIL, WESTERN WATERSHEDS PROJECT, and WYOMING WILDERNESS ASSOCIATION | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civ. No. 07-cv-01709-RJL |
| v. | ) ) | |
| DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States Department of Interior, U. S. DEPARTMENT OF INTERIOR, and U. S. BUREAU OF LAND MANAGEMENT | ) ) ) ) ) | |
| Defendants, | ) ) | |
| STATE OF WYOMING, ANADARKO PETROLEUM COPRORATION, WARREN RESOURCES, INC., and DOUBLE EAGLE PETROLEUM CO. | ) ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

**DEFENDANT-INTERVENOR STATE OF WYOMING'S
RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF ACRONYMS ...................................................................................................... iv

INTRODUCTION ...............................................................................................................1

FACTUAL AND LEGAL BACKGROUND ..........................................................................2

STANDARD OF REVIEW .................................................................................................6

ARGUMENT ......................................................................................................................8

    I.     The BLM took the required "hard look" at environmental
          consequences under NEPA ...............................................................................8

          A.     The BLM took a "hard look" at air quality impacts ................................9

          B.     The BLM took a "hard look" at methane leak impacts .........................15

          C.     The BLM took a "hard look" at greater sage-grouse
                  impacts ...............................................................................................19

                1.     The BLM addressed FWS's comments concerning
                      the greater sage-grouse .............................................................19

                2.     The BLM's discussion of mitigation measures is
                      supported by the record.............................................................23

                  3.     The BLM thoroughly discussed mitigation
                      measures for the greater sage-grouse .........................................25

    II.    The BLM adequately assessed the cumulative impacts to big game.................28

    III.   The BLM adequately involved the public in the NEPA process.......................32

CONCLUSION...................................................................................................................34

CERTIFICATE OF SERVICE .............................................................................................36

## <u>TABLE OF CASES AND AUTHORITIES</u>

**Cases**

*Airport Impact Relief, Inc.  v. Wykle*, 192 F.3d 197 (1st Cir. 1999) ................................29

\* *Alaska v. Andrus*, 580 F.2d 465 (D.C. Cir. 1978)........................................9, 10, 11, 12, 24

*Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027 (D.C. Cir. 2008) .............................32

*Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096 (8th Cir. 2005) ..........29

\* *Baltimore Gas & Elec. v. NRDC*, 462 U.S. 87 (1983)......................................................8, 9

*Carolina Envtl. Study Group v. United States*, 510 F.2d 796 (D.C. Cir. 1975)................18

*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) .....................25

*Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257 (10th Cir. 2004)...........................33

*Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362 (5th Cir. 2006).....29, 30

\* *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346 (D.C. Cir. 1981) ..............8, 9, 14, 19

*Klamath-Siskiyou Wildlands Ctr. v. Medford Dist. of the BLM*, 400 F. Supp. 2d
    1234 (D. Or. 2005)................................................................................................21

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976)................................................................28, 32

*Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193 (D.C. Cir. 2000)....................................7

*Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30 (D.D.C. 2003) ...................................7

*Mo. Pub. Serv. Comm'n v. FERC*, 215 F.3d 1 (D.C. Cir. 2000)........................................7

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463
    U.S. 29 (1983)........................................................................................................7

\* *Natural Res. Def. Council v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988)....................28, 29, 32

\* *Nevada v. Dep't of Energy*, 457 F.3d 78 (D.C. Cir. 2006) .................................7, 9, 13, 34

\* *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004)........................................20, 21

*Olmsted Falls v. FAA*, 292 F.3d 261 (D.C. Cir. 2002) ...................................................7, 8

*Pennaco Energy, Inc. v. U.S. Dep't of the Interior*, 377 F.3d 1147 (10th Cir. 2004)........21

\* *Pub. Utils. Comm'n of the State of Cal. v. FERC*, 900 F.2d 269 (D.C. Cir. 1990) .....29, 32

\* *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)..........8, 12, 14, 25, 28

*Shell Oil Co. v. FERC*, 47 F.3d 1186 (D.C. Cir. 1995) ....................................................7

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985)............................................................28

\* *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) ............................................................................................29, 32, 33

*Trout Unlimited v. Morton*, 509 F.2d 1276 (9th Cir. 1974)...............................................18

*Vill. of Bensenville v. FAA*, 457 F.3d 52 (D.C. Cir. 2006).................................................12

*Wis. Valley Improvement v. FERC*, 236 F.3d 738 (D.C. Cir. 2001)...................................7

## Federal Rules

FED. R. CIV. P. 56..................................................................................................6, 7, 35

## Federal Statutes

5 U.S.C. § 706(2)(A)...........................................................................................................7

42 U.S.C. § 4332(2)(C)(i)-(iii)............................................................................................9

43 U.S.C. § 1732(a) ...........................................................................................................20

## Federal Regulations

40 C.F.R. § 1500.1(b) .......................................................................................................32

40 C.F.R. § 1501.4(e)(2)....................................................................................................33

40 C.F.R. § 1502.20 ....................................................................................................13, 34

40 C.F.R. § 1503.1(a)(4)....................................................................................................33

40 C.F.R. § 1506.6(a).........................................................................................................32

40 C.F.R. § 1508.7.................................................................................................28, 29, 32

43 C.F.R. § 1610.5-3(a) .....................................................................................................20

## Federal Register Notices

71 Fed. Reg. 10,989 (Mar. 3, 2006)...................................................................................30

71 Fed. Reg. 52,571 (Sept. 6, 2006) ..................................................................................30

## TABLE OF ACRONYMS

APA ...................................................................................Administrative Procedure Act

APD ................................................................................ Application for Permits to Drill

ARPA ...................................................................................Atlantic Rim Project Area

BLM ...................................................................................Bureau of Land Management

CBNG ...................................................................................Coalbed Natural Gas

EA ................................................................................... Environmental Assessments

EIS ...................................................................................Environmental Impact Statement

EPA ...................................................................................Environmental Protection Agency

FLPMA ................................................................... Federal Land Policy Management Act

FONSI.................................................................... Finding of No Significant Impact

FWS ................................................................... United States Fish and Wildlife Service

MOU ...................................................................................Memorandum of Understanding

NEPA ...................................................................................National Environmental Policy Act

NOA ................................................................................... Notice of Availability

NOI ...................................................................................... Notice of Intent

$NO_x$ ...................................................................................Oxides of Nitrogen

NSD ................................................................................... No Surface Disturbance

$O_3$ ...................................................................................................... Ozone

POD ...................................................................................Plan of Development

RFO ...................................................................................Rawlins Field Office

RMP ...................................................................................Resource Management Plan

ROD ................................................................................... Record of Decision

VOC ................................................................... Volatile Organic Compound

WDEQ-AQD ........ Wyoming Department of Environmental Quality Air Quality Division

## INTRODUCTION

The Atlantic Rim Natural Gas Field Development Project in Carbon County, Wyoming involves drilling approximately 2,000 natural gas wells within the 270,000-acre Atlantic Rim Project Area ("ARPA") to recover energy resources.  This project is consistent with the President's National Energy Policy and the Energy Policy Act of 2005 as it will increase domestic energy supply and help to reduce the country's dependence on foreign sources of oil and gas.  The proposed project will produce nearly 1,350 billion cubic feet of natural gas, which will provide enough gas to heat 19.3 million homes for one year and will generate approximately $958 million in total taxes and royalties.  The Bureau of Land Management ("BLM") determined after analyzing various options for oil and gas recovery and resource mitigation that limiting surface disturbance to a maximum of 7,600 acres or 2.8 percent of the ARPA at any given time will minimize surface disturbance while optimizing natural gas recovery.

Plaintiffs bring this action in an attempt to prohibit the Federal Defendants from implementing a project that will result in production of nationally significant natural gas resources.  More importantly to the State of Wyoming, Plaintiffs' unfounded action interferes with Wyoming's right to protect its sovereign and economic interests.  While Plaintiffs have cited evidence in support of some of their claims, a careful review of this evidence reveals that Plaintiffs claims are wholly unfounded or not supported by the record.  Plaintiffs have failed to satisfy their burden of proving that the Federal Defendants acted arbitrarily and capriciously in adopting the Atlantic Rim environmental impact statement ("EIS") and record of decision ("ROD") and the Catalina and Sun Dog environmental assessments ("EAs") and findings of no significant impact ("FONSIs").

As a matter of law, therefore, Plaintiffs are not entitled to summary judgment on any of the claims which they assert in their First Amended Complaint for Declaratory and Injunctive Relief ("Complaint").

## FACTUAL AND LEGAL BACKGROUND

On May 24, 2001, the Petroleum Development Corporation and Warren Resources Incorporated notified the BLM Rawlins Field Office ("RFO") in Wyoming that they intended "to explore for and potentially develop coalbed methane wells in south-central Wyoming." (AR 2128, 9484). The operators initially proposed to drill a maximum of 3,880 coalbed methane wells, which involved the construction of associated facilities, roads, well pads, pipelines, and compressor stations. (AR 9484).

In response to this notification, the BLM published a Notice of Intent ("NOI") to prepare an EIS and to conduct scoping for the Atlantic Rim Coalbed Methane Project, later renamed the Atlantic Rim Natural Gas Development Project. (AR 9483). The draft EIS was released in December 2005. (AR 1438). The BLM defined the ARPA as including 270,000 acres of federal, state, and private surface ownership, noting that within the ARPA there were already 116 natural gas wells completed to coal formations. (*Id*.). The BLM analyzed four alternatives in the draft EIS and articulated a proposed action, which consisted of drilling up to 2,000 additional natural gas wells with a spacing of 80 acres per well. (*Id*.). The development included pipelines, roads, and ancillary facilities, and water produced from coalbed natural gas ("CBNG") wells would be re-injected below the land surface. (*Id*.). Under Alternative A, the "no action" alternative, the BLM would reject the project proposed by the operators but would allow all existing wells to continue to operate. (AR 1439). Under Alternatives B and C, the BLM would

2

allow the same number and types of wells as the proposed action. However, construction activities under Alternative B would be concentrated into one of three zones within the ARPA at a time, and the use of special protection measures under Alternative C would limit surface disturbance for sensitive resources. (*Id.*).

The BLM opened up a 60-day comment period for the draft EIS, resulting in over 59,400 individual comments from state, federal, and local agencies; environmental advocacy groups; landowners; leaseholders; oil and gas companies; and the general public. (AR 4816). The final EIS was released to the public and a notice of availability ("NOA") was published in the Federal Register on December 1, 2006. (AR 9564-65). Based on responses received during the comment period, the BLM developed Alternative D as its preferred alternative. (AR 4796, 4816). The goal of Alternative D is to minimize surface disturbance while optimizing natural gas recovery. (AR 2089). Alternative D involves drilling approximately 2,000 gas wells within the ARPA but limits "total new surface disturbance from the drilling program across the ARPA (federal, state and fee minerals) to a maximum of 7,600 acres, at any given time, and a 6.5-acre/well site short-term (less than 6 years) disturbance goal." (AR 2090, 4796). Additionally, areas with sensitive fish populations, crucial wildlife habitats, and unique vegetation communities (about 72,200 acres) would have a short-term disturbance goal of *less* than 6.5 acres per well pad. (AR 2090).

The BLM received approximately 85 comments on the final EIS, to which it responded in the ROD. (AR 4817). The ROD was released to the public and a NOA was published in the Federal Register on May 21, 2007. (AR 9574-75). In the ROD, the BLM selected Alternative D as its preferred alternative with modifications based on

comments received, stating that "[w]hile the development is expected to adversely impact certain resource values and limit opportunities for other uses in the short-term, the long-term goal is to return these lands to a condition approximate to that which existed before developments proposed in Alternative D were implemented."    (AR 4799).    The modifications include the requirement that operators use performance goals and the option to consider additional protective measures that are not in conflict with the ROD. (AR 4796).  The BLM estimates that the total disturbance from natural gas development activities in the ARPA, including disturbance from existing wells and infrastructure, will be 13,600 acres during the 30 to 50 year life of the project.  (AR 4798).

The BLM will manage drilling development and reclamation activities in the ARPA through a "performance-based, adaptive management process," which includes a requirement that the operators submit an annual operating plan to the BLM RFO.  (*Id*.). Reclamation will be required after completion of the drilling activities and before the next growing season, which will reduce impacts to 5,000 acres or 1.5 percent of the ARPA by the end of the development phase of the project.  (*Id*.).  Adaptive management techniques will be used to modify reclamation criteria as necessary, and a mitigation process will be developed to provide quantifiable criteria to review performance goals. (AR 3069, 4798).  Additionally, the BLM will review each component of the project involving federal lands or minerals on a site-specific basis, including review of annual or multi-year development plans, applications for permits to drill ("APDs"), right-of-way grants, Sundry Notices, and applications for special use permits.  (AR 4798).

In June 2007, the BLM released an EA and FONSI for the Catalina A & B plans of development ("PODs"), which are tiered to the Atlantic Rim EIS.  (AR 73492-505).

4

In the APDs, Double Eagle Petroleum Company ("Double Eagle") proposed to drill 37 CBNG wells and three produced water re-injection wells. (AR 73494). The BLM stated in the FONSI that the potential environmental impacts contained in the EA are "not expected to be significant, and that an EIS is not required." (AR 73502). The BLM authorized a total of 39 APDs, denying the APD for one well because of potential effects to sage grouse. (*Id.*). In August 2007, the BLM released a tiered EA and FONSI for the Sundog A & B PODs. (AR 74063-74). In the APDs, Anadarko E & P Company ("Anadarko") proposed to drill 48 CBNG wells and three produced water re-injection wells. (AR 74064-65). Similarly, the BLM found that an EIS was not required and authorized all 51 APDs proposed by Anadarko. (AR 74073).

Subsequent to the release of these EAs and FONSIs, Natural Resources Defense Council, Biodiversity Conservation Alliance, Wyoming Outdoor Council, Western Watersheds Project, and Wyoming Wilderness Association (collectively "Plaintiffs") filed their Complaint on September 25, 2007, stating that Federal Defendants Dirk Kempthorne, in his official capacity as Secretary of the United States Department of the Interior, the United States Department of the Interior, and the United States BLM (collectively "Federal Defendants") violated the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA") in developing the EIS and ROD for the ARPA and the EAs and FONSIs for the Catalina and Sundog PODs. (Pls.' Compl., at 19-20).

Shortly thereafter, in October 2007, the BLM released tiered EAs and FONSIs for the Sun Dog C and Sun Dog D & E PODs. (AR 75019-33, 75173-89). In the Sun Dog C POD, Anadarko proposed to drill 13 CBNG wells and one produced water re-injection

well.  (AR 75021).  The BLM authorized all 14 APDs proposed by Anadarko.  (AR 75029).  In the Sun Dog D & E PODs, Anadarko proposed to drill 31 CBNG wells and four produced water re-injection wells.  (AR 75176).  The BLM authorized a total of 34 APDs, denying the APD for one well because of unresolved archaeological resource concerns.  (AR 75185).  Plaintiffs amended their complaint on October 26, 2007, to include review of the tiered EAs and FONSI related to these additional PODs.  (Pls.' First Am. Compl., at 2).

Plaintiffs ask this Court to: (1) declare that the BLM violated the NEPA and the APA; (2) direct the BLM to rescind the APDs for the Catalina and Sun Dog PODs; and (3) prohibit the BLM from approving any further APDs, or other ground-disturbing activity, tied to the Atlantic Rim EIS.  (Pls.' First Am. Compl., at 19-20).

The State of Wyoming intervened as defendant in this action to: (1) defend the validity of the BLM's approval of the final EIS and ROD and the Catalina and Sun Dog EAs and FONSI; (2) protect the State of Wyoming's sovereign and economic interests; and (3) move for summary judgment against the plaintiff and in favor of the BLM's decision to allow oil and gas development in the ARPA according to the agency's preferred alternative.

## STANDARD OF REVIEW

This case consists of Plaintiffs' submission of a motion for summary judgment based on the administrative record.  "Summary judgment, pursuant to Federal Rule of Civil Procedure 56, shall be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Because this court's review is based upon the administrative record, summary judgment is especially appropriate."

*Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 36 (D.D.C. 2003), *citing* FED. R. CIV.

P. 56.

Plaintiffs allege that the Federal Defendants acted arbitrarily and capriciously by

adopting the final EIS and ROD and the Catalina and Sun Dog EAs and FONSIs.  As the

party challenging agency action, Plaintiffs bear the burden of proving that these NEPA

documents are arbitrary and capricious.  *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193,

1198 (D.C. Cir. 2000).  Section 706 of the APA governs judicial review of a final agency

action.  *Shell Oil Co. v. FERC*, 47 F.3d 1186, 1197 (D.C. Cir. 1995).  The standard of

review under the APA is whether an agency decision is " 'arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law.' "  *Shell Oil Co.*, 47 F.3d at 1197,

*quoting* 5 U.S.C. § 706(2)(A).  In order to satisfy this standard, the agency must "

'consider the relevant factors and draw a rational connection between the facts found and

the choice made.' "  *Wis. Valley Improvement v. FERC*, 236 F.3d 738, 748 (D.C. Cir.

2001), *quoting Mo. Pub. Serv. Comm'n v. FERC*, 215 F.3d 1, 3 (D.C. Cir. 2000).

According to the Supreme Court of the United States,

> [A]n agency rule would be arbitrary and capricious if the agency has relied
> on factors which Congress has not intended it to consider, entirely failed
> to consider an important aspect of the problem, offered an explanation for
> its decision that runs counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in view or the
> product of agency expertise.

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

43 (1983).

The APA also governs judicial review of agency decisions under NEPA.  *See*

*Nevada v. Dep't of Energy*, 457 F.3d 78, 87 (D.C. Cir. 2006) ("[W]e apply the APA's

arbitrary and capricious standard to a NEPA challenge."); *Olmsted Falls v. FAA*, 292

F.3d 261, 269 (D.C. Cir. 2002) (stating that the arbitrary and capricious standard is applied to review compliance with NEPA and to determine the adequacy of an EIS).

Under NEPA, the " 'role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.' " *Olmsted Falls*, 292 F.3d at 269, *quoting Baltimore Gas & Elec. v. NRDC*, 462 U.S. 87, 97-98 (1983). "In making these determinations the courts must be governed by a 'rule of reason.' They should not substitute their judgment for that of the agency. In particular, they should not attempt to resolve conflicting scientific opinions. So long as the agency's conclusions have a substantial basis in fact, the mandate of NEPA has been satisfied." *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 371-72 (D.C. Cir. 1981) (internal citations omitted). Moreover, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs. . . . NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989).

## ARGUMENT

### I.     The BLM took the required "hard look" at environmental consequences under NEPA.

The Supreme Court of the United States has established an agency's requirements under NEPA:

> NEPA has twin aims. First, it "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process. Congress in enacting NEPA, however, did not

> require agencies to elevate environmental concerns over other appropriate
> considerations. Rather, it required only that the agency take a "hard look"
> at the environmental consequences before taking a major action.

*Baltimore Gas & Elec.*, 462 U.S. at 97 (internal citations omitted). Additionally, the D.C.

Circuit has stated that in order for an agency to comply with its "procedural" obligations

under NEPA, the agency must prepare a " 'detailed statement . . . [on] the environmental

impact of the proposed action, any adverse environmental effects which cannot be

avoided should the proposal be implemented, [and] alternatives to the proposed action.' "

*Nevada*, 457 F.3d at 87, *quoting* 42 U.S.C. § 4332(2)(C)(i)-(iii). The EIS must "contain

sufficient discussion of the relevant issues and opposing viewpoints to enable the

decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned

decision." *Izaak Walton League of Am.*, 655 F.2d at 371. Plaintiffs argue that the BLM

did not take the requisite "hard look" at (1) air quality impacts; (2) methane leak impacts;

and (3) greater sage-grouse impacts.

**A.    The BLM took a "hard look" at air quality impacts.**

NEPA requires that the BLM take a "hard look" at the environmental

consequences of its actions. In *Alaska v. Andrus*, the D.C. Circuit described in detail the

scope of the obligation that an agency is required to seek out information concerning

environmental consequences:

> As a preliminary matter, we note that NEPA does, unquestionably, impose
> on agencies an affirmative obligation to seek out information concerning
> the environmental consequences of proposed federal actions. Indeed, this
> is one of NEPA's most important functions. . . . The question in each case
> is, "How much information is enough?" And that is not a question to
> which NEPA provides a clear, firm answer. Certainly, NEPA cannot be
> read as a requirement that complete information concerning the
> environmental impact of a project must be obtained before action may be
> taken. If we were to impose a requirement that an impact statement can
> never be prepared until all relevant environmental effects were known, it

> is doubtful that any project could ever be initiated. . . . NEPA simply does not specify the quantum of information that must be in the hands of a decisionmaker before that decisionmaker may decide to proceed with a given project.

*Alaska v. Andrus*, 580 F.2d 465, 473 (D.C. Cir. 1978), *vacated in part on other grounds*, 439 U.S. 922 (1978) (internal citations omitted).    The Court also noted that environmental agencies are not "empowered to substitute their judgment for that of the responsible agency official," and more importantly, that "the courts may not substitute their judgment for that of the decisionmaker and insist that the project be delayed while more information is sought." *Id.* at 473-74, 474 n.40.

Plaintiffs argue that the BLM failed to take a "hard look" at air quality impacts, stating that the BLM "relied on a 1988 method that BLM itself acknowledged was insufficient – the 'Scheffe method' – to determine the levels of ozone resulting from the project development." (Pls.' Mem. Supp. Mot. Summ. J., at 8). Plaintiffs' argument, however, is not supported by the record. The air quality analysis in the final EIS is based on a study entitled *Air Quality Technical Support Document, Atlantic Rim Natural Gas Project and the Seminoe Road Gas Development Project, Wyoming* ("Air Quality Report"), which was prepared by TRC Environmental Corporation ("TRC") in July 2006. (AR 2634). As part of the study, TRC performed an air quality impact analysis for ozone ("$O_3$") impacts within and near the ARPA. (AR 2645). $O_3$ is formed through the chemical reactions of oxides of nitrogen ("$NO_x$") and volatile organic compounds ("VOCs") within the atmosphere in the presence of sunlight. (AR 2328). Importantly, all modeling analyses were performed with input from the BLM, the Environmental Protection Agency ("EPA"), the United States Department of Agriculture Forest Service, and the Wyoming Department of Environmental Quality Air Quality Division ("WDEQ-

AQD"). (AR 2645). "$O_3$ impacts were estimated from a screening methodology developed by Scheffe (1988) that utilizes $NO_x$ and VOC emissions ratios to calculate $O_3$ concentrations." (*Id.*).

At the time the $O_3$ analysis was being performed for the ARPA, the Scheffe model "was considered by the inter-agency air quality team to be a reasonable tool and an acceptable ozone method," and was used by the BLM to analyze $O_3$ impacts for several other projects that were involved in the NEPA process. (AR 2334, 8666). When the BLM was presented with comments alleging that the Scheffe model was "obsolete," the BLM developed a strategic plan in August 2006 to address the proper air quality model to estimate effects of $O_3$ production. (AR 8666). Because the preliminary review of the Atlantic Rim final EIS had already been completed, and the NEPA process for the ARPA was near the end, the BLM used its discretion in going ahead with the project using the Scheffe model. *See Alaska*, 580 F.2d at 473 (stating that NEPA imposes on agencies "an affirmative obligation to seek out information concerning the environmental consequences of proposed federal actions" but "does not specify the quantum of information that must be in the hands of a decisionmaker before that decisionmaker may decide to proceed with a given project").[1]

Importantly, the BLM noted in the final EIS the adverse effects of increased levels of $O_3$ and implemented a monitoring plan:

---

[1] Moreover, Plaintiffs are not "empowered to substitute their judgment for that of the responsible agency official." *Alaska*, 580 F.2d at 474 n.40 (noting that even though the council on environmental quality ("CEQ") urged the Secretary to delay the sale of oil and gas leases to await the results of ongoing studies, the CEQ recognized that the responsible agency official, and not the environmental agency, "must decide whether the environmental benefits gained by such delay outweigh the costs of postponing potential oil and gas production and revenues.' "). *Id.* (internal citations omitted).

> In cooperation with WDEQ, the Operators would finance and operate additional air quality concentration monitoring, including $O_3$, in the RFO area. BLM would work cooperatively with WDEQ, EPA and the operators to maintain and enhance concentration monitoring in the RFO area, including monitoring required to represent impacts due to emission from the Atlantic Rim field.

(AR 2334). The BLM also adopted mitigation measures for air quality impacts related to $O_3$: "If in the future air monitoring were to show $O_3$ exceedances that were attributable at least in part to sources in the Atlantic Rim field, BLM would consult with WDEQ and EPA to determine whether adaptive management would be needed to mitigate impacts." (AR 2335).

Even though Plaintiffs may not agree with BLM's air quality model, the BLM used the information it had available to it at the time, and this Court may not "substitute [its] judgment for that of the decisionmaker and insist that the project be delayed while more information is sought." *Alaska*, 580 F.2d at 473-74; *see also Vill. of Bensenville v. FAA*, 457 F.3d 52, 71 (D.C. Cir. 2006) (holding that the agency's method of using the best information available at the time of its analysis was reasonable); *Robertson*, 490 U.S. at 351 ("NEPA merely prohibits uninformed—rather than un-wise—agency action."). The BLM complied with NEPA by taking the requisite "hard look" at the environmental consequences of its actions, and its decision was not arbitrary and capricious.

Plaintiffs contend, though, that "[e]ven if the Court finds that the project EIS was too far along to require BLM to supplement it with new modeling, BLM has no excuse for failing to complete accurate modeling before approving the Catalina and Sun Dog drilling permits." (Pls.' Mem. Supp. Mot. Summ. J., at 15). However, the EAs and FONSIs for the Catalina and Sun Dog PODs are tiered to the final EIS—a fact with which Plaintiffs agree. (*Id*. at 13). Because these EAs are tiered to the final EIS, and the

BLM took a "hard look" at $O_3$ impacts in the final EIS as discussed above, the BLM also took the required "hard look" at $O_3$ impacts for the site-specific PODs.  *See Nev. v. Dep't of Energy*, 457 F.3d 78, 91 n.9 (D.C. Cir. 2006) (noting that tiering is appropriate for certain proposed actions, including "when the sequence of statements or analyses" is from an EIS to a site-specific statement or analysis); *see also* 40 C.F.R. § 1502.20 (providing that when tiering is used, "the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the boarder statement by reference").  Therefore, Plaintiffs contention that the EAs for the Catalina and Sun Dog PODs "do not contain mitigation measures to limit the impacts of the approved exploration and production on ozone concentrations" is unfounded.  (Pls.' Mem. Supp. Mot. Summ. J., at 19).

Plaintiffs also argue that the BLM failed to take a "hard look" at air quality impacts because the BLM "used an invalid background ozone level to justify the agency's conclusion that the project development would not violate the ozone [National Ambient Air Quality Standards]."  (Pls.' Mem. Supp. Mot. Summ. J., at 8).  This argument is incorrect.  As Plaintiffs' note, in order to calculate the total predicated impact of $O_3$, "[b]ackground air quality concentrations are combined with modeled project-related air quality impacts of the same averaging time periods, and the total predicted impacts are compared to applicable air quality standards."  (Pls.' Mem. Supp. Mot. Summ. J., at 16; *see also* AR 2183).  According to Plaintiffs, the "correct" background concentration to use in this calculation is 147 ug/m$^3$ (an 8-hour value), which is listed in Table 3-6 of the final EIS.  (AR 2181).  This number is based on background data collected at the Green River Basin Visibility Study site in Green River, Wyoming, during

the period June 10, 1998, through December 31, 2002. (*Id.* (noting that 147 ug/m$^3$ is the "4th highest daily 8-hour value")). This number, however, is the 8-hour *maximum* background concentration and not the *average* background concentration that is required when the Scheffe model is used. (AR 2688). The *average* background concentration, as articulated in TRC's Air Quality Report, is 75.2 ug/m$^3$. (*Id.*). TRC stated that in using the Scheffe model to predict O$_3$ impacts, "it was determined that pairing a screening modeled concentration with a *maximum* background concentration monitored over the period of record results in an overestimate of potential O$_3$ concentrations." (*Id.*) (emphasis added). In other words, using the *maximum* background concentration (147 ug/m$^3$) would produce an inaccurate result. Therefore, the BLM's use of 75.2 ug/m$^3$ to calculate the total predicted impact is indeed correct. Using this number, the total predicted impact from O$_3$ is 91.3 ug/m$^3$, which is lower than both the National and the Wyoming Ambient Air Quality Standards for an 8-hour averaging period. (AR 2332, 2688).

Even if the BLM did use an inaccurate number in calculating total predicted O$_3$ impacts, the BLM still took the "hard look" that is required by NEPA. The BLM noted in the final EIS that O$_3$ exceedences could occur and therefore implemented monitoring and mitigation plans to address these impacts. (AR 2334-35). Therefore, the BLM "adequately identified and evaluated" the harmful effects of O$_3$ in its decisionmaking process and allowed the decision maker to make a reasoned decision. *See Robertson*, 490 U.S. at 350 ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."); *Izaak Walton League of Am.*, 655 F.2d at 371

(stating that the EIS must "contain sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision"). Either way, the BLM complied with NEPA, and its decision is not arbitrary and capricious.

**B.      The BLM took a "hard look" at methane leak impacts.**

Plaintiffs argue that the BLM's discussion of methane seeps in the final EIS is "woefully inadequate" because the BLM (1) did not consult its own expert's analysis of the issue; and (2) "fails to disclose or analyze the 'fairly severe safety and environmental concerns.' " (Pls.' Mem. Supp. Mot. Summ. J., at 25-26). These arguments, however, are not supported by the record.

In its analysis of environmental consequences in the final EIS, the BLM discussed the possibility of methane seeps:

> Methane seeps could possibly develop in the outcrop region of the Mesaverde Group as a result of this project. These seeps could contaminate shallow groundwater sources and may also cause the death of vegetation in limited areas. The number or location of these seeps is impossible to predict, therefore monitoring would be established to evaluate this impact. These seeps have been documented with CBNG development in the San Juan Basin along with other areas of CBNG development. In the San Juan Basin many of these seeps, even before production, occurred in the outcrop regions of the producing formations.

(AR 2351). Because of this possibility, the BLM stated in the final EIS that it would implement extra mitigation measures by establishing "additional monitoring wells in the upper Mesaverde Group . . . to quantify potential impacts from methane seeps where the Mesaverde Group outcrops." (AR 2368). Moreover, should the operators or the BLM discover issues with methane seeps in the future, the BLM has articulated that a

mitigation measure or design feature may be approved on a case-by-case basis when appropriate. (*Id*.).

After the release of the final EIS, the BLM received a draft report entitled *Documentation and Appraisal of Known Gas Seeps within the Atlantic Rim Coal Bed Natural Gas Development Area Carbon County, Wyoming* prepared by Jon N. Dull, a Petroleum Engineer for the BLM RFO in Wyoming. (AR 8799-8808). This report identified gas seeps within the ARPA, discussed causes of these seeps, and provided recommendations. (*Id*.). The report indicated that the gas seeps within the ARPA are *naturally* occurring, stating that "these seeps have been found in association with natural occurring water springs." (AR 8799). The report ultimately concluded that "there is no scientific data available to prove or disprove that CBNG development within the ARPA has caused or will cause increased gas flux from the known gas seeps." (AR 8805).

The BLM subsequently received comments from Plaintiffs and other public entities expressing concerns with methane springs in the ARPA. (*See* AR 8840-42, 9447, 79100-105). In response to these comments, and based on Mr. Dull's report, the BLM implemented additional "performance-based monitoring and best management practices" in the ROD to address methane seeps. (AR 4844-45). One of the additional requirements includes "drilling, completing, and equipping one set of three shallow groundwater-monitoring wells completed in water-bearing sandstone units stratigraphically above the principle producing coal beds in the upper Mesaverde Group." (AR 4844). The BLM also responded directly to Plaintiffs comments in the ROD, stating that "BLM is looking into reports of mud pots and geysers and how they may be related to current operations. Given that produced water is injected into geologic formations

below the coal seams being dewatered, BLM currently speculates that the mud pots and geysers are not likely related to injection of produced water." (AR 4870).

As shown above, the BLM did indeed use its own expert's analysis. Mr. Dull's report listed recommendations for addressing methane seeps in the ARPA, including implementing a soil gas monitoring program, requiring the operators to drill a three well cluster of aquifer monitoring wells, and identifying future monitoring, mitigation, and remediation measures. (AR 8805-06). The final EIS identifies the adverse consequences of methane seeps and implements several of these recommendations, including future monitoring and mitigation plans. (AR 2351, 2368). Moreover, the ROD necessitates the implementation of new requirements in order to address issues not included in the final EIS. For example, the ROD incorporates Mr. Dull's recommendation that the operators should "drill and complete the three well cluster of aquifer monitoring wells" by requiring this exact measure as a "performance-based monitoring and best management practice." (AR 4844, 8806). Additionally, the final EIS requires that operators submit a "Water Management Plan" annually as part of a soil and water monitoring program, and the ROD describes in detail the requirements of this monitoring program. (AR 3088, 4840-45). Therefore, in contrast to Plaintiffs' argument, the BLM actually used and incorporated its own expert's analysis in addressing the impacts of methane seeps.

Additionally, Plaintiffs' contention that the BLM did not adequately analyze safety and environmental concerns associated with methane seeps is inaccurate. The BLM recognized the possibility of adverse impacts associated with methane seeps, stating that "[t]hese seeps could contaminate shallow groundwater sources and may also cause the death of vegetation in limited areas." (AR 2351). This possibility was based on

the fact that seeps have been documented in the San Juan Basin of Colorado where "there have been extensive vegetation kills adjacent to gas seeps associated with the coal bed outcrops that are being developed for CBNG." (AR 8803).

Nevertheless, Plaintiffs state that the BLM should have addressed other *potential* concerns, including danger to humans and animals and danger to the atmosphere, as articulated in Mr. Dull's report. (AR 8803). However, the BLM is not required to "discuss remote and highly speculative consequences." *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974); *see also Carolina Envtl. Study Group v. United States*, 510 F.2d 796, 799 (D.C. Cir. 1975) ("Because each statement on the environmental impact of a proposed action involves educated predictions rather than certainties, it is entirely proper, and necessary, to consider the probabilities as well as the consequences of certain occurrences in ascertaining their environmental impacts. *There is a point at which the probability of an occurrence may be so low as to render it almost totally unworthy of consideration*.") (emphasis added). Not only did Mr. Dull state in his report that "there is no scientific data available to prove or disprove that CBNG development within the ARPA has caused or will cause increased gas flux from the known gas seeps," his list of "concerns that precipitate from the likely increase gas seep emissions" are just that—a mere list of potential concerns which are not backed by any data and are, at best, remote. (AR 8805).[2]

---

[2] Besides Mr. Dull's report, Plaintiffs' only authority that potential methane seeps in the ARPA will be dangerous to the atmosphere is a comment from the EPA that the "Atlantic Rim project will generate greenhouse gases, including methane and $CO_2$." (AR 3481). Plaintiffs present no authority, and there is none in the record, that methane seeps are dangerous to humans.

Based on the BLM's discussion of methane seeps in the final EIS and ROD, and its incorporation of its own expert's analysis, the BLM adequately identified and analyzed the adverse effects of these seeps, enabling "the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision." *Izaak Walton League of Am.*, 655 F.2d at 371. Accordingly, the BLM's decision was not arbitrary and capricious.

## C.     The BLM took a "hard look" at greater sage-grouse impacts.

Plaintiffs claim that the BLM did not take the required "hard look" at greater sage-grouse impacts by (1) failing to adequately respond to the United States Fish and Wildlife Service's ("FWS") concerns that the project may lead to the need to list the greater sage-grouse as threatened or endangered; (2) discussing mitigation measures that are not supported by the record; and (3) failing to provide a detailed or reasonably complete discussion of mitigation measures. (Pls.' Mem. Supp. Mot. Summ. J., at 28-37). These claims are unfounded.

### 1.     The BLM addressed FWS's comments concerning the greater sage-grouse.

With regard to the FWS's comment concerning the need to list the sage grouse, Plaintiffs assert that the BLM contravenes "its own Special Status Species policy, as well as the [Resource Management Plan] and [Memorandum of Understanding], without any analysis or explanation." (*Id.*). The BLM's special status species policy states that the BLM may not "contribute to the need for [a sensitive] species to become listed as a threatened or endangered species," and the Memorandum of Understanding ("MOU") between the BLM and the FWS (among others) states that the BLM must "provide for

19

habitat protection, conservation and restoration, as appropriate." (AR 5237-38, 86104; *see also* Pls.' Mem. Supp. Mot. Summ. J., at 32).

As Plaintiffs note, the BLM stated in the final EIS that "[t]he sage-grouse is a BLM sensitive species, listed as such on 04/09/2001. Because of this status no actions that might jeopardize the future existence or viability of this species may occur." (AR 4405). Plaintiffs fail, however, to appreciate that the BLM went on to explain *how* it will protect the greater sage-grouse:

> The Great Divide Resource Management Plan (RMP) in appendix I lists sage-grouse in several areas of the Wildlife Mitigation Guidelines including 2b and 2c. 2c provides for the prohibition of surface activities or use within important habitat areas for the purpose of protecting sage-grouse breeding grounds and habitat where timing stipulations are not appropriate. The purposes of the Guidelines are (1) to reserve for the BLM the right to modify the operations of all surface and other human presence disturbance activities as part of the statutory requirements for environmental protection, and (2) to inform a potential lessee, permittee, or operator of the requirements that must be met when using BLM-administered lands. The Guidelines in the RMP are not specific as to the distance an action must be moved to mitigate impacts of a proposal on sage-grouse. Literature reviews show that requirements for no surface disturbance (NSD) from a lek generally run in the quarter-mile to 2-mile ranges. The quarter-mile NSD mitigation is generally a minimum distance.

(*Id.*).

The Federal Land Policy Management Act ("FLPMA") requires that the Secretary of the Interior "shall manage the public lands . . . in accordance with the land use plans" and states that "[a]ll future resource management authorizations and actions . . . and subsequent more detailed or specific planning, shall conform to the approved plan." 43 U.S.C. § 1732(a), *see* 43 C.F.R. § 1610.5-3(a). The Supreme Court of the United States has stated that this requirement prevents BLM from taking actions inconsistent with the provisions of a land use plan. *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 69

(2004). "Unless and until the plan is amended, such actions can be set aside as contrary to law pursuant to [the APA]." *Id.*; *see also Pennaco Energy, Inc. v. U.S. Dep't of the Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004) ("In the context of oil and gas development, the BLM is initially charged with determining whether the issuance of a particular oil and gas lease is consistent with the RMP."); *Klamath-Siskiyou Wildlands Ctr. v. Medford Dist. of the BLM*, 400 F. Supp. 2d 1234, 1241 (D. Or. 2005) ("Failure of a project to comply with the requirements of the RMP is a violation of FLPMA and its implementing regulations.").

The Great Divide RMP was prepared under FLPMA and manages approximately four million acres of public land surface and five million acres of federal mineral estate administered by the BLM in the Great Divide Resource Area in Wyoming.  (AR 650). The RMP covers management of federal lands within the ARPA and is therefore the governing RMP.  (AR 2136).  The Great Divide RMP's management objective with regard to oil and gas is to "provide opportunity for leasing, exploration, and development of oil and gas while protecting other resource values."  (AR 679).  The RMP indicates that the "entire planning area is open to oil and gas leasing.  Leases will be issued with needed restrictions to protect resources" such as sage grouse leks.  (AR 679, 681).

The Great Divide RMP lists the following general management objectives for wildlife habitat management decisions:

> To provide habitat quality (food, cover, space, and water) adequate to support a natural diversity of wildlife and fisheries, including big game, upland game, waterfowl, non-game species, game fish, sensitive, threatened, and endangered species, species of special management interest in Wyoming, as well as to assist in meeting goals of recovery plans.

(AR 690). The RMP also discusses management objectives in regard to the greater sage-grouse, stating that "[s]age grouse and sharp-tailed grouse strutting/dancing grounds and nesting habitat will be protected." (AR 694).

Contrary to Plaintiffs' argument that the BLM has "contravened" the governing RMP (Pls.' Mem. Supp. Mot. Summ. J., at 32), the final EIS and ROD conform to the Great Divide RMP's wildlife management objectives for sage grouse. The final EIS discusses several adverse effects that drilling and developing in the ARPA will have on the greater sage-grouse. The BLM recognized these adverse effects in the final EIS and in response implemented in the ROD a "performance-based, adaptive management process." (AR 4798). This process includes the use of performance goals for the greater sage-grouse. (AR 4835-38). Drilling and development and reclamation activities in the ARPA will be managed through this adaptive management process to "avoid and/or minimize adverse impacts to wildlife by monitoring wildlife population trends and developing mitigation during the course of project development and operation." (AR 4847). In other words, the BLM did just what the RMP directed—it performed an examination of drilling and development in the ARPA, described the adverse effects, and determined appropriate mitigation measures. Furthermore, the BLM will perform the RMP's required "case-by-case" examination for approval of individual APDs and apply the appropriate mitigation measures on a site-specific basis. (AR 4835).

More importantly, the final EIS and ROD use substantially the same mitigation measures laid out as "guidelines" in the Great Divide RMP for greater sage-grouse nesting and breeding habitat. (*See* AR 696-98). The RMP indicates that "activities or surface use" will not be allowed from February 1 to July 31 in habitat areas and from

November 15 to April 30 for greater sage-grouse concentration areas.  (AR 697).
Similarly, the Atlantic Rim final EIS does not allow surface disturbing and disruptive
activities "within two miles of an occupied greater sage-grouse lek or in nesting and early
brood-rearing habitat associated with individual leks . . . from March 1 to July 15" and
"between November 15 and March 15 in delineated winter concentration areas."  (AR at
2626).  Not only does the final EIS and ROD for the ARPA conform to the Great Divide
RMP's management objectives for the greater sage-grouse, the BLM abides by the exact
mitigation guidelines in the RMP for the greater sage-grouse nesting and breeding
habitats.

Therefore, the BLM acknowledged that "no actions that might jeopardize the
future existence or viability of this species may occur" (AR 4405), and set out and
thoroughly analyzed the measures that the BLM will take to protect the greater sage-
grouse from becoming listed, thus complying with BLM's sensitive species policy, the
MOU between the BLM and the FWS, and the Great Divide RMP.

**2.    The BLM's discussion of mitigation measures is supported by the record.**

Plaintiffs also argue, however, that the BLM's discussion of mitigation measures
for the greater sage-grouse is not supported by the record, specifically stating that the
BLM "failed to point to any studies, or to provide any evidence or analyses, that support
its contention that the quarter-mile 'no surface disturbance' zone around leks is a
scientifically-accepted mitigation measure."  (Pls.' Mem. Supp. Mot. Summ. J., at 34).
Once again, Plaintiffs' argument is incorrect.

Plaintiffs state that the BLM should have abided by a report entitled *Guidelines to
manage sage grouse populations and their habitats* prepared by John W. Connelly et al.

("Connelly Guildines") (AR 86083-101), which they contend "recommends that non energy-related facilities be located within 3.2 kilometers (two miles) of an active lek." (Pls.' Mem. Supp. Mot. Summ. J., at 34).  In fact, the BLM does follow these guidelines.  The Connelly Guidelines recommend that during *sage-grouse breeding activities*, energy-related facilities should be located two miles from active leks whenever possible.  (AR 86,094).  In the "Wildlife Monitoring and Protection Plan" set forth in the final EIS, the BLM states that "[s]urface disturbing and disruptive activities will not be allowed within two miles of an occupied greater sage-grouse lek or in nesting and early brood-rearing habitat associated with individual leks (when identified and delineated), from March 1 to July 15."  (AR 2626).  In other words, during the breeding season, no activities will be allowed within two miles of an active lek – exactly what the Connelly Guidelines recommend.  Therefore, Plaintiffs' argument is unfounded.

Additionally, contrary to Plaintiffs' statement that the BLM failed to point to any studies to support its greater sage-grouse mitigation measures, the BLM relied on and cited to several references concerning the greater sage-grouse in the final EIS, including reports by the Western Association of State Fish and Wildlife Agencies, the Wildlife Society Bulletin, the Colorado BLM, the Forest Service, the Journal of Range Management, the Hayden-Wing Association, the Wildlife Biology Program at the University of Montana, and the Thorne Ecological Institute.  (AR 2516-44, 5693-5739, 5923-72, 6223-27, 6237-53, 6398-6773, 7063-7178, 7357-66, 7371-7420).[3]

---

[3]  Plaintiffs also argue that the BLM should have taken into account the FWS's recommendations in its draft EIS comments regarding greater sage-grouse protections. (Pls.' Mem. Supp. Mot. Summ. J., at 33).  However, the D.C. Circuit has noted that when deciding whether to go forward with agency action, the agency has the discretion to "reject the advice that had been offered to [it]."  *Alaska*, 580 F.2d at 474.

### 3. The BLM thoroughly discussed mitigation measures for the greater sage-grouse.

Contrary to Plaintiffs' contention that the BLM's "discussion of possible mitigation measures lacks any detail, analysis or evidentiary support" (Pls.' Mem. Supp. Mot. Summ. J., at 37), the BLM thoroughly discussed mitigation measures for the greater sage-grouse. The Supreme Court of the United States has discussed NEPA's requirement that an agency identify possible mitigation measures, stating that "one important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences." *Robertson*, 490 U.S. at 351. The Court noted that "omission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA." *Id*. at 352. However, the Court defined the scope of an agency's requirement to discuss possible mitigation measures:

> There is a fundamental distinction, however, between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other. . . . Even more significantly, it would be inconsistent with NEPA's reliance on procedural mechanisms— as opposed to substantive, result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act.

*Id*. at 352-53. The Supreme Court noted that the Ninth Circuit erred by requiring that an EIS contain " 'a detailed explanation of specific measures which *will* be employed to mitigate the adverse impacts of a proposed action.' " *Id*. at 353 (citations omitted). The D.C. Circuit has also discussed the scope of an EIS, stating that "NEPA not only does *not* require agencies to discuss any particular mitigation plans that they might put in place, it does *not* require agencies—or third parties—to effect any.'" *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 206 (D.C. Cir. 1991) (emphasis added).

In the instant case, the ROD has specific mitigation measures built into the BLM's preferred alternative where the BLM not only explains the mitigation process but describes how each mitigation measure will minimize the associated environmental impact. In other words, the BLM describes the *substance* of the mitigation measure. For example, the BLM acknowledges that surface disturbance associated with further development of the ARPA affects many resources, including wildlife and wildlife habitat. (AR 4799). Because of the effects of this disturbance, the BLM chose Alternative D, which reduces the amount of initial and long-term disturbance by approximately 18 percent from the proposed action. (AR 4799-4800). This reduction is done through limiting the number of roads by transportation planning, requiring smaller operational footprints, and using accelerated reclamation efforts, which the BLM describes as "the most practical alternative for mitigating environmental impacts while maximizing natural gas recovery." (AR 4800).

The BLM also acknowledged in the final EIS that wildlife habitat impacts will be significant due to development in the ARPA and therefore set out a mitigation strategy in Alternative D that includes limiting the allowable surface disturbance, accelerating reclamation by the operators, using remote monitoring, and enforcing timing stipulations. (AR 4804). These mitigation measures will effectively "reduce direct disturbance to wildlife" and facilitate the long-term return of habitat function. (*Id*.).

In addition to the mitigation measures already required by the ROD, drilling and development and reclamation activities in the ARPA will be managed through a "performance-based, adaptive management" process. (AR 4798). This process includes the development of additional mitigation measures by a review team consisting of the

BLM, cooperating and interested agencies, and the operators, and will include modifying an operator's development and drilling proposal based on site-specific factors such as greater sage-grouse lek locations. (AR 4798, 4813). In Appendix H of the final EIS, the BLM lists specific resource concerns that could occur in a development area and requires that specific mitigation measures take place to remedy the concern. For areas with greater sage-grouse leks, the BLM will require: (1) directional drilling; (2) drilling multiple wells from a single pad; (3) seasonal restriction of public vehicular access; (4) noise reduction techniques and designs; (5) use of low profile well facilities and tanks; (6) burying of power lines to avoid use of poles and other tall structures; (7) transportation planning to align roads out of sight and sound of leks, and to schedule traffic to avoid greater sage-grouse activity periods; (8) design of roads to minimum safe standard for intended use; and (9) partial reclamation of resource roads needed for project construction to lower standards necessary for maintenance operations. (AR 3093).

Moreover, in Appendix L, the BLM lists over 30 additional resource concerns above and beyond the ones listed in Appendix H, which are accompanied by the specific mitigation measure that the BLM will require the operator to implement. (AR 3149-62). With regard to the greater sage-grouse, the operator will have to limit the initial disturbance total to less than 20 acres per section for nesting and brood rearing habitat, as recommended by the Wyoming Game and Fish Department. (AR 3152). Importantly, the BLM will monitor all these mitigation measures, including the ones already set out in the ROD and the ones that will be required depending on the specifics of the development area, through an operating plan that the operators must submit annually to the BLM. (AR 4798).

The record demonstrates that not only did the BLM include a "reasonably complete discussion of possible mitigation measures" in the EIS and ROD, it actually set out "a detailed explanation of specific measures which *will* be employed to mitigate the adverse impacts of a proposed action," an action which the Supreme Court has found is not required under NEPA. *Robertson*, 490 U.S. at 352-53. Therefore, the BLM took the required "hard look" at the mitigation measures for the greater sage-grouse.

## II.    The BLM adequately assessed the cumulative impacts to big game.

NEPA's implementing regulations require that an EIS evaluate any cumulative impacts of agency action. 40 C.F.R. § 1508.7. A cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency . . . undertakes such other actions." *Id*. The Supreme Court of the United States has discussed this requirement, holding that "when several proposals . . . that will have a cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together. Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976).

The D.C. Circuit expanded on the Supreme Court's holding, finding that the purpose of a cumulative impacts requirement "is to prevent agencies from dividing one project into multiple individual actions 'each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.' " *Natural Res. Def. Council v. Hodel*, 865 F.2d 288, 297-98 (D.C. Cir. 1988), *quoting Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985). The Court further described the function of

a cumulative impacts analysis, stating that NEPA's implementing regulations refer to those cumulative impacts "*outside* of the project in question; it is a measurement of the effect of the current project along with any other past, present or likely future actions in the same geographic area." *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006). The D.C. Circuit also noted that the point of a cumulative impacts analysis is to "equip a decisionmaker to make an informed decision about alternative courses of action." *Natural Res. Def. Council*, 865 F.2d at 298.

However, an agency need only include cumulative impacts of "reasonably foreseeable future actions." 40 C.F.R. § 1508.7. "An impact is reasonably foreseeable if it 'is sufficiently likely to occur that a person of ordinary prudence would take it into account.' " *Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1102 (8th Cir. 2005). The D.C. Circuit has discussed this requirement, stating that there is "no need to consider the cumulative impacts" of an action if it is not reasonably foreseeable. *Pub. Utils. Comm'n of the State of Cal. v. FERC*, 900 F.2d 269, 283 (D.C. Cir. 1990); *see also Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 370-71 (5th Cir. 2006) (deferring to the agency's decision that an action was not reasonably foreseeable because "the occurrence of any one of a number of contingencies could cause the plans to build the ports to be cancelled or drastically altered"); *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 206 (1st Cir. 1999) (finding that an airport expansion was not reasonably foreseeable because it was "contingent on several events that may or may not occur over an eight-year span").

Plaintiffs argue that the BLM's cumulative analysis "failed to include two projects with thousands of new wells that the agency was planning for at the same time it

was preparing the Atlantic Rim EIS." (Pls.' Mem. Supp. Mot. Summ. J., at 39). These projects are the Continental Divide-Creston Natural Gas Project ("Continental Divide-Creston Project") and the Hiawatha Regional Energy Development Project ("Hiawatha Project"). (*Id.*). However, these projects were only in the initial stages when the BLM was engaging in the NEPA process for the Atlantic Rim EIS. The Atlantic Rim final EIS was released to the public in December 2006, and the ROD was released to the public in May 2007. (AR 9564-65, 9574-75). During this time, the *draft* EISs for the Continental Divide-Creston and Hiawatha Projects were still being prepared. *See* 71 Fed. Reg. 10,989 (Mar. 3, 2006) (issuing a notice of intent to prepare an EIS for the Continental Divide-Creston Project and to conduct public scoping); 71 Fed. Reg. 52,571 (Sept. 6, 2006) (issuing a notice of intent to prepare an EIS for the Hiawatha Project and to conduct public scoping). Therefore, the BLM concluded that these projects were "not reasonably foreseeable" and did not include them in the cumulative impacts analysis. [4] (AR 9772-73).

Because these projects were only in the initial stages of the NEPA process and were contingent on several events, the projects were not reasonably foreseeable, and the BLM was not required to include them in its cumulative impacts analysis. *See Gulf Restoration Network*, 452 F.3d at 369 (finding that the agency's decision that an action was not reasonably foreseeable because a draft EIS was not yet available was not arbitrary or capricious).

---

[4] In contrast, the BLM did include in its cumulative impacts analysis seven other natural gas development areas surrounding the ARPA, all of which were finished with the NEPA process. (AR 2484-85).

Plaintiffs also argue that the BLM "unreasonably limited its cumulative impacts analysis to a calculation of surface acres disturbed." (Pls.' Mem. Supp. Mot. Summ. J., at 38). This contention, however, is not supported by the record. In its cumulative impacts analysis, the BLM noted that in general, the combined effects of oil and gas development in several other projects in Sweetwater and Carbon counties together with the proposed development in the ARPA will impact wildlife, resulting in a large area of increased fragmentation, loss of refuge areas, competition with livestock, competition with other species, and reduced carrying capacity and juvenile survival. (AR 2496-97).

The BLM then discussed specific impacts that would occur in regard to big game. (AR 2497-99). The BLM calculated the total disturbance in acres that would occur for big game species such as pronghorn, mule deer, and elk. For example, 83.1 percent of the Baggs herd unit of pronghorn is located within one or more of the several oil and gas projects surrounding the ARPA. (AR 2498). Under Alternative D, 5,000 acres of pronghorn seasonal range would be disturbed after reclamation. (*Id.*). The BLM added these 5,000 acres to 5,804 acres of existing surface disturbance in other oil and gas projects and 743 of potential future acres of disturbance to get a total of 11,547 acres of surface disturbance within the pronghorn crucial winter range. (*Id.*).

Similarly, for elk, 25 percent of the Sierra Madre Herd Unit has its crucial winter range located within the ARPA. (AR 2499). Under Alternative D, 5,000 acres of elk seasonal range would be disturbed after reclamation. (AR 2498). The BLM added these 5,000 acres to 883 acres of existing surface disturbance to get a total of 5,883 acres of surface disturbance within the elk crucial winter range. (*Id.*). Importantly, the BLM noted that in addition to this surface disturbance, elk may be displaced up to 1.2 miles

based on their sensitivity to human activities, and stated that activities in the ARPA will likely "disturb elk to a degree that they may move to new areas outside the ARPA." (AR 2499). In other words, the BLM not only calculated the surface disturbance that would occur, it also articulated other impacts to big game that would likely crop up.

As shown above, the BLM performed a "meaningful cumulative impact analysis" of the ARPA and the surrounding oil and gas development on big game and its habitat by identifying and discussing the "incremental impact" on the environment (*e.g.*, the total amount of disturbed elk crucial winter range) which resulted from the combined effects of oil and gas development in the ARPA and the surrounding areas. 40 C.F.R. § 1508.7. Accordingly, the BLM carried out the NEPA-mandated "comprehensive consideration of pending proposals" (*Kleppe*, 427 U.S. at 410), and its analysis "equip[ed] a decisionmaker to make an informed decision about alternative courses of action." *Natural Res. Def. Council*, 865 F.2d at 298.

## III.    The BLM adequately involved the public in the NEPA process.

The D.C. Circuit has discussed NEPA's requirement regarding public participation, stating that agencies must make " 'diligent efforts to involve the public in preparing and implementing their NEPA procedures.' " *Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1035 (D.C. Cir. 2008), *quoting* 40 C.F.R. § 1506.6(a). " 'NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken.' " *Pub. Utils. Comm'n of the State of Cal.*, 900 F.2d at 282, *quoting* 40 C.F.R. 1500.1(b). However, the D.C. Circuit has noted that " 'NEPA's public involvement requirements are not as well defined when an agency prepares only an EA and not an EIS.' " *TOMAC*, 433 F.3d at 861,

*quoting Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1279 (10th Cir. 2004). The Court reiterated that NEPA only "obligates agencies to 'involve . . . the public, *to the extent practicable*, in preparing [EAs]' " which "suggests that the agency has significant discretion in determining when public comment is required with respect to EAs."[5] *TOMAC*, 433 F.3d at 861, *quoting* 40 C.F.R. § 1501.4(e)(2) (emphasis added).

In the instant case, Plaintiffs argue that the BLM prepared and approved EAs and FONSIs for the Catalina and Sun Dog PODs without providing the documents to the public to comment. Their argument, however, is not supported by the record. The APDs for the Catalina and Sun Dog PODs were posted for 30 days in the RFO Information Access Center (Public Room) for review. (AR 73494, 74065, 75020, 75175). Additionally, notification of preparation of the EAs was provided on the Wyoming BLM internet NEPA register. (*Id.*). Indeed, Biodiversity Conservation Alliance, a Plaintiff in this case, actually commented on the EAs for the Sun Dog C and the Sun Dog D & E PODs. (AR 75031-33, 75187-89). Therefore, the BLM involved the public "to the extent practicable," as dictated by NEPA's implementing regulations, and its decision is not arbitrary and capricious in violation of the APA. *Contrast* 40 C.F.R. § 1501.4(e)(2) (requiring involvement of the public "to the extent practicable" in preparing EAs) *with* 40 C.F.R. § 1503.1(a)(4) (requiring the agency to request comments from the public in preparation of a final EIS).

---

[5] The BLM's NEPA handbook also demonstrates the discretion the agency has in regard to EAs: "The manager responsible for authorizing the action must determine if the EA and FONSI should be made available for public review (usually a 30-day review period) before making a final determination on the action." (AR 4936).

Moreover, the EAs and FONSIs were tiered to the final EIS, in which the BLM engaged in extensive public participation.  *See Nevada*, 457 F.3d at 91 (noting that "tiering" is appropriate for certain proposed actions as articulated in NEPA's implementing regulations).[6]  During the NEPA process for the ARPA, the BLM opened up a 60-day comment period for the draft EIS, resulting in over 59,400 individual comments from state, federal, and local agencies; environmental advocacy groups; landowners; leaseholders; oil and gas companies; and the general public.  (AR 4816).  The BLM accepted comments on the final EIS from November 30, 2006, to January 4, 2007, and received approximately 85 comments.  (AR 4817).  Plaintiffs submitted comments on both the draft EIS and the final EIS.  (Pls.' First Am. Compl., at 15; AR 9941-10131, 70538-71095).  Ultimately, the BLM allowed the public to participate in each step of the NEPA process—the BLM solicited comments from the public on both the draft EIS and the final EIS, posted the individual APDs for the Catalina and Sundog PODs in a public room at the BLM RFO for public review, and notified the public of the preparation of the Catalina and Sun Dog EAs online.  Therefore, the BLM adequately involved the public in the NEPA process, and its decision is not arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, Plaintiffs have not shown that the Federal Defendants acted arbitrarily or capriciously in adopting the Atlantic Rim final EIS and ROD and the

---

[6]  NEPA's implementing regulations state that agencies are encouraged to tier their environmental impact statements and indicate that a subsequent environmental assessment "need only summarize the issues discussed in the broader statement."  40 C.F.R. § 1502.20.

Catalina and Sundog EAs and FONSIs.  In accordance with FED. R. CIV. P. 56(c), this

Court should deny Plaintiffs' Motion for Summary Judgment on all claims.

DATED this 30th day of May, 2008.

DEFENDANT-INTERVENOR,
STATE OF WYOMING


 /s/ Teresa R. Nelson
Teresa R. Nelson
Assistant Attorney General

Jay A. Jerde
Deputy Attorney General
Wyoming Attorney General's Office
123 Capitol Building
Cheyenne, WY  82002
(307) 777-6946
(307) 777-3542 – Facsimile
jjerde@state.wy.us

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of May, 2008, the foregoing DEFENDANT-INTERVENOR STATE OF WYOMING'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT was electronically filed through the CM/ECF system, which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing to the following:

Sharon Buccino
Benjamin Longstreth
Natural Resources Defense Council
1200 New York Avenue, NW
Suite 400
Washington, D.C. 20005
sbuccino@nrdc.org
blongstreth@nrdc.org

Robert Charles Mathes
Bjork Lindley Little, PC
1600 Stout Street, Suite 1400
Denver, CO 80202-3110
rmathes@bjorklindley.com

Lori Caramanian
U.S. Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80294
lori.caramanian@usdoj.gov

Michael B. Wigmore
Sandra P. Franco
Bingham McCutchen, LLP
2020 K Street, NW
Washington, D.C. 20006
michael.wigmorebingham.com
s.franco@bingham.com

I further certify that I served a copy of the foregoing by placing a copy in the U.S. Mail, postage pre-paid to the following:

Aaron Bloom
Natural Resources Defense Counsel
40 West 20th Street
New York, NY 10011

_____
/s/ Teresa R. Nelson
Wyoming Attorney General's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, BIODIVERSITY CONSERVATION ALLIANCE, WYOMING OUTDOOR COUNCIL, WESTERN WATERSHEDS PROJECT, and WYOMING WILDERNESS ASSOCIATION | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civ. No. 07-cv-01709-RJL ) |
| DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States Department of Interior, U. S. DEPARTMENT OF INTERIOR, and U. S. BUREAU OF LAND MANAGEMENT | ) ) ) ) ) |
| Defendants, | ) ) |
| STATE OF WYOMING, ANADARKO PETROLEUM COPRORATION, WARREN RESOURCES, INC., and DOUBLE EAGLE PETROLEUM CO. | ) ) ) ) ) |
| Defendant-Intervenors. | ) ) |

**[Proposed]**
**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs have filed a Motion for Summary Judgment and Defendant-Intervenor State of

Wyoming has filed a response thereto pursuant to Fed. R. Civ. P. 56. The Court, having reviewed

the record and having considered all pleadings and arguments of the parties, and being otherwise

fully advised, finds that Federal Defendants have not acted arbitrary or capriciously in violation of

the Administrative Procedures Act, and hereby:

**ORDERS** that Plaintiffs' Motion for Summary Judgment is **DENIED.**


**DATE:** _____        _____

                                           **UNITED STATED DISTRICT JUDGE**