IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, BIODIVERSITY CONSERVATION ALLIANCE, WYOMING OUTDOOR COUNCIL, WESTERN WATERSHEDS PROJECT, and WYOMING WILDERNESS ASSOCIATION<br><br>                  Plaintiffs,<br><br>v.<br><br>DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States Department of Interior, U. S. DEPARTMENT OF INTERIOR, and U. S. BUREAU OF LAND MANAGEMENT<br><br>                  Defendants,<br><br>STATE OF WYOMING, ANADARKO PETROLEUM COPRORATION, WARREN RESOURCES, INC., and DOUBLE EAGLE PETROLEUM CO.<br><br>                  Defendant-Intervenors. | Civ. No. 07-cv-01709-RJL |

**DEFENDANT-INTERVENOR STATE OF WYOMING'S
STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to LCvR 7(h), Defendant-Intervenor State of Wyoming submits the following statement of material facts as to which it contends there is no genuine issue:

1. On September 26, 2001, the Bureau of Land Management ("BLM") published a Notice of Intent ("NOI") to prepare an environmental impact statement ("EIS") and to conduct scoping for the Atlantic Rim Coalbed Methane Project, later renamed the Atlantic Rim Natural Gas Development Project. (AR 9483).

2. The draft EIS was released in December 2005. (AR 1438).

3. The BLM analyzed four alternatives in the draft EIS and articulated a proposed action, which consisted of drilling up to 2,000 additional natural gas wells with a spacing of 80 acres per well. (AR 1438).

4. Under Alternative A, the "no action" alternative, the BLM would reject the project proposed by the operators but would allow all existing wells to continue to operate. (AR 1439).

5. Under Alternative B, construction activities would be concentrated into one of three zones within the ARPA at a time. (AR 1438).

6. Under Alternative C, the use of special protection measures would limit surface disturbance for sensitive resources. (AR 1438).

7. On December 1, 2006, the BLM published in the Federal Register a Notice of Availability ("NOA") of the final EIS. (AR 9564-65).

8. The BLM developed Alternative D as its preferred alternative. (AR 2089).

9. Alternative D involves drilling approximately 2,000 gas wells within the APPA but limits "total new surface disturbance from the drilling program across the ARPA (federal, state and fee minerals) to a maximum of 7,600

10. Under Alternative D, areas with sensitive fish populations, crucial wildlife habitats, and unique vegetation communities (about 72,200 acres) would have a short-term disturbance goal of less than 6.5 acres per well pad. (AR 2090).

11. On May 21, 2007, the BLM published a NOA of the record of decision ("ROD"). (AR 9574-75).

12. In the ROD, the BLM selected Alternative D as its preferred alternative with modifications based on comments received, including the requirement that operators use performance goals and the option to consider additional protective measures that are not in conflict with the ROD. (AR 4796, 4799).

13. The BLM estimates that the total disturbance from natural gas development activities in the ARPA, including disturbance from existing wells and infrastructure, will be 13,600 acres during the 30 to 50 year life of the project. (AR 4798).

14. The BLM will manage drilling development and reclamation activities in the ARPA through a "performance-based, adaptive management process," which includes a requirement that the operators submit an annual operating plan to the BLM Rawlins Field Office ("RFO"). (AR 4798).

15. Reclamation will be required after completion of the drilling activities and before the next growing season, which will reduce impacts to 5,000 acres or 1.5 percent of the ARPA by the end of the development phase of the project. (AR 4798).

16. Adaptive management techniques will be used to modify reclamation criteria as necessary, and a mitigation process will be developed to provide quantifiable criteria to review performance goals. (AR 3069, 4798).

17. The BLM will review each component of the project involving federal lands or minerals on a site-specific basis, including review of annual or multi-year development plans, applications for permits to drill ("APDs"), right-of-way grants, Sundry Notices, and applications for special use permits. (AR 4798).

18. In June 2007, the BLM released an environmental assessment ("EA") and finding of no significant impact ("FONSI"), tiered to the final EIS, for site-specific plans of development ("PODs") in the ARPA entitled Catalina A & B PODs. (AR 73492-505).

19. In August 2007, the BLM released a tiered EA and FONSI for the Sundog A & B PODs. (AR 74063-74).

20. In October 2007, the BLM released tiered EAs and FONSIs for the Sun Dog C and Sun Dog D & E PODs. (AR 75019-33, 75173-89).

## AIR QUALITY

21. The air quality analysis in the final EIS is based on a study entitled *Air Quality Technical Support Document, Atlantic Rim Natural Gas Project and the Seminoe Road Gas Development Project, Wyoming*, which was prepared by TRC Environmental Corporation ("TRC") in July 2006. (AR 2634).

22. As part of the study, TRC performed an air quality impact analysis for ozone ("$O_3$") impacts within and near the Atlantic Rim Project Area ("ARPA"). (AR 2645).

23. $O_3$ is formed through the chemical reactions of oxides of nitrogen ("$NO_x$") and volatile organic compounds ("VOCs") within the atmosphere in the presence of sunlight. (AR 2328).

24. All modeling analyses were performed with input from the BLM, the Environmental Protection Agency ("EPA"), the United States Department of Agriculture Forest Service, and the Wyoming Department of Environmental Quality Air Quality Division ("WDEQ-AQD"). (AR 2645).

25. $O_3$ impacts were estimated from a screening methodology developed by Scheffe (1988) that utilizes $NO_x$ and VOC emissions ratios to calculate $O_3$ concentrations. (AR 2645).

26. At the time the $O_3$ analysis was being performed for the ARPA, the Scheffe model was considered by the air quality team to be an acceptable ozone method, and was used by the BLM to analyze $O_3$ impacts for several other projects that were involved in the NEPA process. (AR 2334, 8666).

27. The BLM developed a strategic plan in August 2006 to address the proper air quality model to estimate effects of $O_3$ production. (AR 8666).

28. The BLM noted in the final EIS the adverse effects of increased levels of $O_3$, implemented a monitoring plan, and adopted mitigation measures for air quality impacts related to $O_3$. (AR 2334-35).

29. In order to calculate the total predicated impact of $O_3$, "[b]ackground air quality concentrations are combined with modeled project-related air quality impacts of the same averaging time periods, and the total predicted impacts are compared to applicable air quality standards." (AR 2183).

30. The BLM used the average background concentration of 75.2 ug/m$^3$ to calculate the total predicted impact on $O_3$, as articulated in TRC's Air Quality Report. (AR 2688).

31. The total predicted impact from $O_3$ is 91.3 ug/m$^3$, which is lower than both the National and the Wyoming Ambient Air Quality Standards for an 8-hour averaging period. (AR 2332, 2688).

## METHANE SEEPS

32. In the final EIS, the BLM recognized the possibility of adverse impacts associated with methane seeps, stating that "[t]hese seeps could contaminate shallow groundwater sources and may also cause the death of vegetation in limited areas." (AR 2351).

33. The BLM stated in the final EIS that it will implement extra mitigation measures to quantify potential impacts from methane seeps and will approve a mitigation measure or design feature on a case-by-case basis if the operators or the BLM discovers issues with methane seeps in the future. (AR 2368).

34. The final EIS requires that operators submit a "Water Management Plan" annually as part of a soil and water monitoring program, and the ROD describes in detail the requirements of this monitoring program. (AR 3088, 4840-45).

35. After the final EIS was released, the BLM received a draft report entitled *Documentation and Appraisal of Known Gas Seeps within the Atlantic Rim Coal Bed Natural Gas Development Area Carbon County, Wyoming* prepared

by Jon N. Dull, a Petroleum Engineer for the BLM RFO in Wyoming (dated Feb. 6, 2007). (AR 8799-8808).

36. Mr. Dull's report identified gas seeps within the ARPA, discussed causes of these seeps, and provided recommendations. (AR 8799-8808).

37. Mr. Dull concluded that "there is no scientific data available to prove or disprove that [coalbed natural gas] development within the ARPA has caused or will cause increased gas flux from the known gas seeps." (AR 8805).

38. The ROD incorporates Mr. Dull's recommendation that the operators should "drill and complete the three well cluster of aquifer monitoring wells" by requiring this exact measure as a "performance-based monitoring and best management practice." (AR 4844, 8806).

39. The BLM received comments from Plaintiffs and other public entities expressing concerns with methane seeps in the ARPA. (AR 8840-42, 9447, 79100-105).

40. The BLM responded to Plaintiffs comments in the ROD, stating that "BLM is looking into reports of mud pots and geysers and how they may be related to current operations. Given that produced water is injected into geologic formations below the coal seams being dewatered, BLM currently speculates that the mud pots and geysers are not likely related to injection of produced water." (AR 4870).

41. The BLM implemented additional "performance-based monitoring and best management practices" in the ROD to address methane seeps. (AR 4844-45).

42. Aside from Mr. Dull's report, Plaintiffs' only authority that potential methane seeps in the ARPA will be dangerous to the atmosphere is a comment from the EPA that the "Atlantic Rim project will generate greenhouse gases, including methane and $CO_2$." (AR 3481).

43. Aside from Mr. Dull's report, Plaintiffs present no authority, and there is none in the record, that methane seeps are dangerous to humans. (AR 2351, 2368, 4844-45, 8840-42, 9447, 79100-105).

## GREATER SAGE-GROUSE

44. The BLM's special status species policy states that the BLM may not "contribute to the need for [a sensitive] species to become listed as a threatened or endangered species." (AR 5237-38).

45. The Memorandum of Understanding ("MOU") between the BLM and the Fish and Wildlife Service (among others) states that the BLM must "provide for habitat protection, conservation and restoration, as appropriate." (AR 86104).

46. The BLM stated in the final EIS that "[t]he sage-grouse is a BLM sensitive species, listed as such on 04/09/2001. Because of this status no actions that might jeopardize the future existence or viability of this species may occur." (AR 4405).

47. The Great Divide RMP was prepared under the Federal Land Policy Management Act ("FLPMA") and manages approximately four million acres of public land surface and five million acres of federal mineral estate administered by the BLM in the Great Divide Resource Area in Wyoming. (AR 650).

48. The RMP covers management of federal lands within the ARPA and is the governing RMP. (AR 2136).

49. The Great Divide RMP states that with regard to oil and gas, the management objective is to "provide opportunity for leasing, exploration, and development of oil and gas while protecting other resource values." (AR 679).

50. The Great Divide RMP lists the following general management objectives for wildlife habitat management decisions: "To provide habitat quality (food, cover, space, and water) adequate to support a natural diversity of wildlife and fisheries, including big game, upland game, waterfowl, non-game species, game fish, sensitive, threatened, and endangered species, species of special management interest in Wyoming, as well as to assist in meeting goals of recovery plans." (AR 690).

51. The RMP indicates that "activities or surface use" will not be allowed from February 1 to July 31 in greater sage-grouse habitat areas and from November 15 to April 30 for greater sage-grouse concentration areas. (AR 697).

52. A report entitled *Guidelines to manage sage grouse populations and their habitats* prepared by John W. Connelly et al. recommends that during sage-grouse breeding activities, energy-related facilities should be located two miles from active leks whenever possible. (AR 86094).

53. In the "Wildlife Monitoring and Protection Plan" set forth in the final EIS, the BLM states that "[s]urface disturbing and disruptive activities will not be allowed within two miles of an occupied greater sage-grouse lek or in nesting

9

        and early brood-rearing habitat associated with individual leks (when identified and delineated), from March 1 to July 15." (AR 2626).

54. The BLM relied on and cited to several references concerning the greater sage-grouse in the final EIS, including reports by the Western Association of State Fish and Wildlife Agencies, the Wildlife Society Bulletin, the Colorado BLM, the Forest Service, the Journal of Range Management, the Hayden-Wing Association, the Wildlife Biology Program at the University of Montana, and the Thorne Ecological Institute. (AR 2516-44, 5693-5739, 5923-72, 6223-27, 6237-53, 6398-6773, 7063-7178, 7357-66, 7371-7420).

55. Drilling and development and reclamation activities in the ARPA will be managed through a "performance-based, adaptive management" process, which includes modifying an operator's development and drilling proposal based on site-specific factors such as greater sage-grouse lek locations. (AR 4798, 4813).

56. In the final EIS, the BLM set out a mitigation strategy in Alternative D that includes limiting the allowable surface disturbance, accelerating reclamation by the operators, using remote monitoring, and enforcing timing stipulations. (AR 4804).

57. Mitigation measures will effectively "reduce direct disturbance to wildlife" and facilitate the long-term return of habitat function. (AR 4804).

58. In Appendix H of the final EIS, the BLM lists specific resource concerns that could occur in a development area, such as greater sage-grouse leks, and

        requires that specific mitigation measures take place to remedy the concern. (AR 3093).

59. For areas with greater sage-grouse leks, the BLM will require: (1) directional drilling; (2) drilling multiple wells from a single pad; (3) seasonal restriction of public vehicular access; (4) noise reduction techniques and designs; (5) use of low profile well facilities and tanks; (6) burying of power lines to avoid use of poles and other tall structures; (7) transportation planning to align roads out of sight and sound of leks, and to schedule traffic to avoid greater sage-grouse activity periods; (8) design of roads to minimum safe standard for intended use; and (9) partial reclamation of resource roads needed for project construction to lower standards necessary for maintenance operations. (AR 3093).

60. In Appendix L, the BLM lists over 30 additional resource concerns above and beyond the ones listed in Appendix H, which are accompanied by the specific mitigation measure that the BLM will require the operator to implement. (AR 3149-62).

61. With regard to the greater sage-grouse, the operator will have to limit the initial disturbance total to less than 20 acres per section for nesting and brood rearing habitat, as recommended by the Wyoming Game and Fish Department. (AR 3152).

62. The BLM will monitor mitigation measures, including the ones already set out in the ROD and the ones that will be required depending on the specifics of

the development area, though an operating plan that the operators must submit annually to the BLM. (AR 4798).

## BIG GAME

63. The BLM's cumulative impacts analysis included seven natural gas development areas surrounding the ARPA, all of which had a completed final EIS or EA. (AR 2484-85).

64. The Continental Divide-Creston Natural Gas Project and the Hiawatha Regional Energy Development Project were in the initial stages of the NEPA process when the BLM was engaging in the NEPA process for the Atlantic Rim EIS. 71 Fed. Reg. 10,989 (Mar. 3, 2006); 71 Fed. Reg. 52,571 (Sept. 6, 2006).

65. The BLM concluded that the Continental Divide-Creston and Hiawatha Projects were "not reasonably foreseeable" and did not include them in the cumulative impacts analysis. (AR 9772-73).

66. In its cumulative impacts analysis, the BLM noted that the combined effects of oil and gas development in several other projects in Sweetwater and Carbon counties together with the proposed development in the ARPA will impact wildlife. (AR 2496-97).

67. The BLM discussed cumulative impacts that would occur in regard to big game. (AR 2497-99).

68. The BLM calculated the total disturbance in acres that would occur for big game species such as pronghorn, mule deer, and elk. (AR 2498).

69. Under Alternative D, the BLM added 5,000 acres of pronghorn seasonal range that would be disturbed after reclamation to 5,804 acres of existing surface disturbance in other oil and gas projects and 743 of potential future acres of disturbance to get a total of 11,547 acres of surface disturbance within the pronghorn crucial winter range. (AR 2498).

70. Under Alternative D, the BLM added 5,000 acres of elk seasonal range that would be disturbed after reclamation to 883 acres of existing surface disturbance to get a total of 5,883 acres of surface disturbance within the elk crucial winter range. (AR 2499).

71. The BLM noted that in addition to surface disturbance, elk may be displaced up to 1.2 miles based on their sensitivity to human activities, and stated that activities in the ARPA will likely disturb elk to a degree that they may move to new areas outside the ARPA. (AR 2499).

## PUBLIC PARTICIPATION

72. The BLM opened up a 60-day comment period for the draft EIS, resulting in over 59,400 individual comments from state, federal, and local agencies; environmental advocacy groups; landowners; leaseholders; oil and gas companies; and the general public. (AR 4816).

73. The BLM accepted comments on the final EIS from November 30, 2006, to January 4, 2007, and received approximately 85 comments. (AR 4817).

74. Plaintiffs submitted comments on both the draft EIS and the final EIS. (AR 9941-10131, 70538-71095).

75. The APDs for the Catalina and Sun Dog PODs were posted for 30 days in the RFO Information Access Center (Public Room) for review. (AR 73494, 74065, 75020, 75175).

76. Notification of preparation of the EAs was provided on the Wyoming BLM internet NEPA register. (AR 73494, 74065, 75020, 75175).

77. Plaintiff Biodiversity Conservation Alliance commented on the EAs for the Sun Dog C and the Sun Dog D & E PODs. (AR 75031-33, 75187-89).

DATED this 30th day of May, 2008.

                DEFENDANT-INTERVENOR, STATE OF WYOMING

                /s/ Teresa R. Nelson
                Teresa R. Nelson
                Assistant Attorney General

                Jay A. Jerde
                Deputy Attorney General
                Wyoming Attorney General's Office
                123 Capitol Building
                Cheyenne, WY 82002
                (307) 777-6946
                (307) 777-3542 - Facsimile
                jjerde@state.wy.us

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of May, 2008, the foregoing DEFENDANT-INTERVENOR STATE OF WYOMING'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE was electronically filed through the CM/ECF system, which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing to the following:

Sharon Buccino
Benjamin Longstreth
Natural Resources Defense Council
1200 New York Avenue, NW
Suite 400
Washington, D.C. 20005
sbuccino@nrdc.org
blongstreth@nrdc.org

Lori Caramanian
U.S. Department of Justice
1961 Stout Street, 8th Floor
Denver, CO  80294
lori.caramanian@usdoj.gov

Robert Charles Mathes
Bjork Lindley Little, PC
1600 Stout Street, Suite 1400
Denver, CO  80202-3110
rmathes@bjorklindley.com

Michael B. Wigmore
Sandra P. Franco
Bingham McCutchen, LLP
2020 K Street, NW
Washington, D.C.   20006
michael.wigmorebingham.com
s.franco@bingham.com

I further certify that I served a copy of the foregoing by placing a copy in the U.S. Mail, postage pre-paid to the following:

Aaron Bloom
Natural Resources Defense Counsel
40 West 20th Street
New York, NY  10011
abloom@nrdc.org

          /s/ Teresa R. Nelson
Wyoming Attorney General's Office