**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Avenue, NW, Suite 400
Washington, DC 20005, *et al.,*

      Plaintiffs,

          v.

DIRK KEMPTHORNE, in his official capacity
as the Secretary of the United States
Department of the Interior
1849 C Street, NW
Washington, DC 20240, *et al.,*

      Defendants.

ANADARKO PETROLEUM CORPORATION
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

DOUBLE EAGLE PETROLEUM CO.
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

      and

STATE OF WYOMING
123 Capitol Building
Cheyenne, WY 82002,

      Defendant-Intervenors.

Civ. No. 1:07-cv-01709-RJL

**DEFENDANT-INTERVENORS ANADARKO PETROLEUM CORPORATION,
WARREN RESOURCES, INC. AND DOUBLE EAGLE PETROLEUM CO.'S
CROSS-MOTION FOR SUMMARY JUDGMENT AND
<u>OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendant-Intervenors Anadarko Petroleum Company, Warren Resources, Inc. and Double Eagle Petroleum Co. (collectively, "Defendant-Intervenors") respectfully move this Court for summary judgment on claims asserted by the Plaintiffs in their First Amended Complaint dated October 26, 2007. Defendant-Intervenors also oppose Plaintiffs' Motion for Summary Judgment, which was filed on April 28, 2008.

As shown in the accompanying Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendant-Intervenors' Cross-Motion for Summary Judgment, Plaintiffs' claims have no merit. Defendant-Intervenors should be allowed to continue work under their already-issued permits to drill, to submit new applications for permits to drill, and to conduct other surface-disturbing activities in the Atlantic Rim Project Area because, under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, the Bureau of Land Management (i) provided adequate public participation in the NEPA review process and (ii) took a "hard look" at environmental impacts.[1]

---

[1]  In their motion for summary judgment, Plaintiffs waived their Federal Land Policy and Management Act and Clean Water Act claims.  Pls'. Mem. in Support of Mot. for Summ. J. at 4.

Defendant-Intervenors respectfully request oral argument under Local Rule 7(f).

Respectfully submitted,


/s/ Michael B. Wigmore
_____
Michael B. Wigmore (DC Bar #436114)
Sandra P. Franco (DC Bar #467091)
Bingham McCutchen LLP
2020 K Street, NW
Washington, DC  20006-1806
(202) 373-6000 (tel)
(202) 373-6001 (fac)

*Counsel for Anadarko Petroleum Corporation*
*Warren Resources, Inc., and Double Eagle*
*Petroleum Co.*


Robert C. Mathes (DC Bar #484255)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO  80202
(303) 892-1400 (tel)
(303) 892-1401 (fac)

*Counsel for Double Eagle Petroleum Co.*


Dated: May 30, 2008


A/72552065.1

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Avenue, NW, Suite 400
Washington, DC 20005, *et al.,*

       Plaintiffs,

            v.

DIRK KEMPTHORNE, in his official capacity
As the Secretary of the United States
Department of the Interior
1849 C Street, NW
Washington, DC 20240, *et al.,*

       Defendants.

---

ANADARKO PETROLEUM CORPORATION
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

DOUBLE EAGLE PETROLEUM CO.
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

       and

STATE OF WYOMING
123 Capitol Building
Cheyenne, WY 82002,

       Defendant-Intervenors.

Civ. No. 1:07-cv-01709-RJL

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND IN SUPPORT OF DEFENDANT-INTERVENOR ANADARKO
PETROLEUM CORPORATION, WARREN RESOURCES, INC. AND DOUBLE EAGLE
PETROLEUM CO.'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

LIST OF EXHIBITS ................................................................................................ iii

TABLE OF AUTHORITIES ................................................................................... iv

GLOSSARY ............................................................................................................ ix

INTRODUCTION .....................................................................................................1

FACTUAL BACKGROUND .....................................................................................2

    I.     History of Proposal for Development ...........................................................2

    II.    History of the NEPA Process .......................................................................4

          A.    The Atlantic Rim Project Environmental Impact Statement. .............4

          B.    Plans of Development .........................................................................7

    III.   Procedural History - Administrative Appeal and Preliminary
          Injunction ......................................................................................................9

APPLICABLE LAW AND STANDARD OF REVIEW .................................................10

ARGUMENT ...........................................................................................................13

    I.     BLM Took the Required "Hard Look" at Environmental Impacts............13

          A.    The EIS Fully Considered the Environmental Impacts of
               the Atlantic Rim Project.....................................................................13

          B.    BLM Took a Hard Look at Potential Air Quality Impacts ...............14

               1.    BLM appropriately analyzed potential ozone impacts
                    associated with the Atlantic Rim Project ..................................15

               2.    BLM appropriately tiered its analysis in the Catalina
                    and Sun Dog EAs to the Atlantic Rim EIS .............................20

               3.    BLM used appropriate estimates of background
                    measurements for ozone levels .................................................21

i

4.  BLM developed appropriate mitigation measures for the Atlantic Rim Project..............................................23

5.  BLM adequately considered the potential impacts of methane seeps ......................................................24

C.  BLM Adequately Considered Impacts to Sage Grouse ..................29

1.  BLM considered numerous mitigation measures for the protection of the sage grouse ...............................................30

2.  Disagreement over BLM's choice of mitigation measures does not render the analysis inadequate or the decision arbitrary and capricious .......................................31

a.  BLM responded to FWS's comments on the sage grouse.................................................32

b.  BLM was not required to establish the effectiveness of the mitigation measures ...................36

c.  The choice of mitigation measures complied with BLM's policy.......................................37

D.  BLM Appropriately Considered Potential Cumulative Impacts to Big Game Species .......................................39

II.  BLM Satisfied Its Public Participation Requirements Under NEPA .................................................................43

CONCLUSION...................................................................45

## LIST OF EXHIBITS

Exhibit 1    *Theodore Roosevelt Conservation P'ship, et al.,* No.
IBLA 2007-208, *et al.* (Sept. 5, 2007) ("IBLA Decision")

Exhibit 2    BLM, Draft Supplemental Environmental Impact
Statement for the Pinedale Anticline Oil and Gas
Exploration and Development Project (Dec. 2006)

Exhibit 3    Golder Associates Inc., Atlantic Rim Air Monitoring
Program Quarterly Data Report October - December
2007 (Apr. 2008)

Exhibit 4    *Biodiversity Conservation Alliance,* 174 IBLA 1
(Mar. 3, 2008)

## TABLE OF AUTHORITIES

## FEDERAL CASES

*Ad Hoc Metals Coal. v. Whitman*, 227 F. Supp. 2d 134 (D.D.C. 2002) ............................12

*Alliance to Protect Nantucket Sound, Inc. v. U.S. Department of the Army*,
398 F.3d 105 (1st Cir. 2005) ........................................................................................43

*American Petroleum Institute v. EPA*, 540 F.2d 1023 (10th Cir. 1976) ...........................24

*Amfac Resorts, LLC v. Department of Interior*, 143 F. Supp. 2d 7 (D.D.C. 2001) ...........12

*Biodiversity Conservation Alliance v. BLM*, 404 F. Supp. 2d 212 (D.D.C. 2005) ............44

*Border Power Plant Working Group v. Department of Energy*,
260 F. Supp. 2d 997 (S.D. Cal. 2003) ..........................................................................17

*Cady v. Morton*, 527 F.2d 786 (9th Cir. 1975) .................................................................27

*Center for Biological Diversity v. NHTSA*, 508 F.3d 508 (9th Cir. 2007) ........................28

*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) ........30, 31, 35

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ...........................12

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004) ..............................................36

*Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60 (D.C. Cir. 1987) .......................13, 26

*Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914 (D.C. Cir. 1998) ............................20

*Corel Corp. v. United States*, 165 F. Supp. 2d 12 (D.D.C. 2001) .....................................12

*Cronin v. U.S. Dep't of Agriculture*, 919 F.2d 439 (7th Cir. 1990) ...................................45

*Custer County Action Association v. Garvey*, 256 F.3d 1024 (10th Cir. 2001) ........32, 35

*Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004) .............................25

*Deukmejian v. Nuclear Regulatory Comm'n*, 751 F.2d 1287 (D.C. Cir. 1984)) ...............28

*Domestic Sec., Inc. v. SEC*, 333 F.3d 239 (D.C. Cir. 2003) ..............................................16

*Environmental Defense v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69
(D.D.C. 2007) ..........................................................................................................36, 37

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30
(D.D.C. 2000) ..........................................................................................36

*Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976 (9th Cir. 1985) ..........12, 17

*Fund for Animals v. Hall*, 448 F. Supp. 2d 127 (D.D.C. 2006)...................................13, 42

*Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257 (10th Cir. 2004)....................43, 44

*Gulf Restoration Network v. U.S. Department of Transport*, 452 F.3d 362
(5th Cir. 2006)..........................................................................................42

*Hammond v. Norton*, 370 F. Supp. 2d 226 (D.C. Cir. 2005) ......................................25, 28

*Hudson v. Federal Aviation Admin.*, 192 F.3d 1031 (D.C. Cir. 1999) .............................17

*Kern v. BLM*, 284 F.3d 1062 (9th Cir. 2002)...................................................................20

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976).............................................................10, 42

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989) ....................................11, 17, 25

*Mayo Foundation v. Surface Transport Board*, 472 F.3d 545 (8th Cir. 2006).................28

*Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983) .........25

*Mid States Coal. for Progress v. Surface Transport Board*, 345 F.3d 520
(8th Cir. 2003)..........................................................................................28

*Motor Vehicles Manufacturers Association of U.S. Inc., v. State Farm*,
463 U.S. 29 (1983)....................................................................................37

*N. Alaska Environmental Ctr. v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006) ..................36

*NRDC v. Daley*, 209 F.3d 747 (D.C. Cir. 2000) ..............................................................20

*NRDC v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988).........................................................35, 36

*NRDC v. Kempthorne*, 525 F. Supp. 2d 115 (D.D.C. 2007)....10, 13, 25, 30, 31, 33, 44, 45

*N. Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980) ...........................................11

*Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059 (9th Cir. 2002) ..................42

*No Gwen Alliance of Lane County, Inc. v. Aldridge*, 855 F.2d 1380
(9th Cir. 1988)..........................................................................................28

*Ocean Mammal Institute v. Gates*, __ F. Supp. 2d ___, 2008 WL. 564664 (D. Hawaii Feb. 29, 2008)...................................................................................44

*\*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).................10, 30, 35

*S. Utah Wilderness Alliance v. Norton*, 237 F. Supp. 2d 48 (D.D.C. 2002).........11, 15, 30

*Sierra Club v. Marita*, 46 F.3d 606 (7th Cir. 1995).........................................................11

*Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209 (11th Cir. 2002)....................26

*Sierra Club v. U.S. Department of Transportation*, 753 F.2d 120 (D.C. Cir. 1985)...11, 17

*Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772 (10th Cir. 2006) .............29

*\*Taxpayers of Mich. Against Casinos ("TOMAC") v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) ...............................................................................................18, 43

*TOMAC v. Norton*, 240 F. Supp. 2d 45 (D.D.C. 2003) ....................................................27

*Tribal Village of Akutan v. Hodel*, 869 F.2d 1185 (9th Cir. 1988)...................................12

*\*Twp. Of Lower Alloways Creek v. Public Serv. Electric & Gas Co.*, 687 F.2d 732 (3rd Cir. 1982) ...........................................................................12

*\*Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978) .............12, 29, 43

*W. Branch Valley Flood Prot. Association v. Stone*, 820 F. Supp. 1 (D.D.C. 1993).........26

*W. Watersheds Project v. BLM*, __ F. Supp. 2d __, 2008 WL. 1806194 (D. Nev. Apr. 18, 2008)...........................................................................................33

*Wright v. Inman*, 923 F. Supp. 1295 (D. Nev. 1996).......................................................31

## FEDERAL STATUTES

5 U.S.C. § 706(2) ..............................................................................................................11

30 U.S.C. § 21a....................................................................................................................1

30 U.S.C. § 182....................................................................................................................1

30 U.S.C. § 226(f)..........................................................................................................8, 45

42 U.S.C. § 4332................................................................................................................11

42 U.S.C. § 7407(a) ...........................................................................................................19

42 U.S.C. § 7410 .................................................................................................19

42 U.S.C. § 7475(e)(3)(D) ..................................................................................18

43 U.S.C. §§ 1701-1785 .......................................................................................1

43 U.S.C. § 1701(a)(12) ........................................................................................1

43 U.S.C. § 1702(1) ...............................................................................................1

## FEDERAL ADMINISTRATIVE
## MATERIALS

40 C.F.R. § 50.10(b) ...........................................................................................22

40 C.F.R. pt. 50, App.I .......................................................................................22

40 C.F.R. pt. 51 ...................................................................................................19

40 C.F.R. § 52.2620 ............................................................................................19

40 C.F.R. § 52.2622 ............................................................................................19

40 C.F.R. § 1501.4(e)(1) .....................................................................................44

40 C.F.R. § 1501.4(e)(2) .....................................................................................44

40 C.F.R. § 1502.14(f) ........................................................................................30

40 C.F.R. § 1502.16(h) ........................................................................................30

*40 C.F.R. § 1502.20 ................................................................................8, 11, 20

*40 C.F.R. § 1502.22 ...........................................................................................41

40 C.F.R. § 1502.24 ............................................................................................36

40 C.F.R. § 1506.6 ..............................................................................................44

40 C.F.R. § 1508.20 ............................................................................................30

40 C.F.R. § 1508.7 .........................................................................................39, 40

40 C.F.R. § 1508.8 ..............................................................................................25

43 C.F.R. § 3162.3-1 ......................................................................................8, 45

66 Fed. Reg. 33,975 (June 26, 2001). ...............................................................3, 4

70 Fed. Reg. 68,218 (Nov. 9, 2005) .................................................................................18

70 Fed. Reg. 73481 (Dec. 12, 2005) ...............................................................................5

71 Fed. Reg. 10,989 (Mar. 3, 2006) ..................................................................12, 41, 42

71 Fed. Reg. 52,571 (Sept. 6, 2006) ..............................................................................12

71 Fed. Reg. 69,582 (Dec. 1, 2006). ................................................................................5

73 Fed. Reg. 16,436 (March 27, 2008) ...............................................................12, 22, 23

## ADMINISTRATIVE CASES

*Biodiversity Conservation Alliance*, 174 IBLA 1 (Mar. 3, 2008) .....................................35

*Theodore Roosevelt Conservation P'ship, et al.*, No. IBLA 2007-208, *et al.*
    (Sept. 5, 2007) ("IBLA Decision"). ......................................................................10, 38

## STATE STATUTES

Wyo. Stat. Ann. § 35-11-202 ..........................................................................................19

## MISCELLANEOUS

Atlantic Rim Air Monitoring Program Quarterly Data Report October –
    December 2007 ........................................................................................................24

BLM, *About BLM*, http://www.blm.gov/wo/st/en/info/About_BLM.2.html......................1

BLM, Supplemental Draft EIS Pinedale Anticline Oil and Gas Exploration and
    Development Project.......................................................................................19, 20, 23

Richard D. Scheffe, VOC/NOx Point Source Screening Tables (EPA Sept. 1988)
    (hereafter "Scheffe Method") *available at*
    http://www.blm.gov/pgdata/etc/medialib/blm/wy/nepa/pfodocs/jonah.Par.785
    2.File.dat/28FAQTSDvolI.pdf .............................................................................15, 16

Authorities chiefly relied upon are indicated by an asterisk (*).

# GLOSSARY OF
# ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| APD | Applications for a Permit to Drill |
| ARPA | Atlantic Rim Project Area |
| Atlantic Rim Project | Atlantic Rim Natural Gas Field Development Project |
| BLM | Bureau of Land Management |
| CAA | Clean Air Act |
| CBM | Coalbed Methane |
| CBNG | Coalbed Natural Gas |
| CD-C | Continental Divide/Creston Natural Gas Development Project |
| CEQ | Council on Environmental Quality |
| CIA | Cumulative Impact Analysis |
| CO | Carbon Monoxide |
| COAs | Conditions of Approval |
| DEIS | Draft Environmental Impact Statement |
| EAs | Environmental assessments |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |

| | |
|---|---|
| FWS | U.S. Fish and Wildlife Service |
| Great Divide RMP | Great Divide Resource Area Record of Decision and Approved Resource Management Plan |
| MOU | Memorandum of Understanding |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| $NO_x$ | Nitrogen Oxides |
| NOI | Notice of Intent |
| NOS | Notice of Staking |
| NPS | National Park Service |
| NSD | No Surface Disturbance |
| NSO | No Surface Occupancy |
| $O_3$ | Ozone |
| PAPA | Pinedale Anticline Oil and Gas Exploration and Development Project |
| $PM_{2.5}$ and $PM_{10}$ | Particulate Matter |
| POD | Proposed Plans of Development |
| ppm | Parts Per Million |
| PSD | Prevention of Significant Deterioration |
| ROD | Record of Decision |
| SDEIS | Supplemental Draft EIS |
| SIP | State Implementation Plans |
| $SO_2$ | Sulfur Dioxide |

| STB | Surface Transportation Board |
| USFS | U.S. Forest Service |
| VOC | Volatile Organic Compound |
| WAAQS | Wyoming Ambient Air Quality Standards |
| WGFD | Wyoming Game and Fish Department |

# INTRODUCTION

The Bureau of Land Management ("BLM") is responsible for managing approximately 258 million surface acres of federal lands in the United States pursuant to its authority under the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1785, among other statutes. BLM, *About BLM*, http://www.blm.gov/wo/st/en/info/About_BLM.2.html. Congress has declared development of domestic minerals, including natural gas, to be a continuing policy of the federal government. 30 U.S.C. § 21a. FLPMA and the Mineral Leasing Act of 1920 promote mineral exploration and production, including natural gas development, as principal uses of the federal public lands. 30 U.S.C. § 182; 43 U.S.C §§ 1701(a)(12), 1702(l).

Coalbed natural gas ("CBNG"), also referred to as coalbed methane ("CBM"), has increasingly become an important source of energy in the United States. Consistent with this country's energy policy to reduce our dependence on foreign sources of oil and gas, the Atlantic Rim Natural Gas Field Development Project ("Atlantic Rim Project") will develop CBNG in Carbon County, Wyoming.

Pursuant to the National Environmental Policy Act ("NEPA"), BLM undertook an extensive analysis of the potential environmental impacts of the Atlantic Rim Project. BLM's analysis, which Plaintiffs cavalierly refer to as "rush[ed]" (Pls. Mem. in Support of Mot. for Summ. J. at 1 ((Pls. Mem.")), took over six years to complete and provided numerous opportunities for public participation. This effort culminated in a Record of Decision ("ROD"), signed on March 23, 2007, which authorized a project that provided for substantially reduced development and environmental impacts when compared to the Proposed Action. The ROD imposed numerous, strict requirements on the project to limit potential impacts to the extent possible, including a surface disturbance limitation, mitigation measures and adaptive

management to monitor environmental impacts, and required ongoing interim reclamation of the areas disturbed.

Ultimately, Plaintiffs' NEPA challenge reflects their disagreement with BLM's decision to allow CBNG development in the Atlantic Rim Project Area ("ARPA").[1]  NEPA, however, does not dictate any particular outcome, but only requires that BLM consider a proposed action's environmental impacts.  The record, in this case, compiled over a six-year period, amply demonstrates BLM's compliance with its obligations under NEPA.

## FACTUAL BACKGROUND

### I.    HISTORY OF PROPOSAL FOR DEVELOPMENT

The ARPA is located within the Great Divide Resource Area.  AR2088 (FEIS at ES-1), AR2136 (FEIS at 1-9), AR2149 (FEIS at 2-1).  BLM opened the Great Divide Resource Area to oil and gas leasing in November of 1990, when it issued the Great Divide Resource Area Record of Decision and Approved Resource Management Plan ("Great Divide RMP").  AR645, AR652, AR679-AR681.  (Great Divide RMP at 3, 30-32).  Pursuant to the Great Divide RMP, leasing would be subject to stipulations to protect various resources, including wildlife.  AR679-AR681 (*Id.* at 30-32).  And consistent with the Great Divide RMP, BLM leased federal minerals within the entire ARPA.  AR2135 (FEIS at 1-8).[2]

On May 24, 2001, the project proponents, which now include Anadarko, Warren, and Double Eagle, proposed to explore and develop CBNG resources located in the ARPA.  AR2128 (FEIS at 1-1).  The original proposal was for a maximum of 3,880 CBNG wells, developed

---

[1]  Although Plaintiffs' asserted claims under the FLPMA and the Clean Water Act in their Amended Complaint, Plaintiffs' have waived those claims and thus they are not addressed here.  Pls. Mem. at 4.
[2]  The BLM Rawlins Field Office manages more mineral estate than surface estate within the ARPA -- 179,438 acres federal mineral estate (66%), 12,384 acres state mineral estate (5%), and 78,258 acres private mineral estates (29%).  AR4796 (ROD at 1).

within approximately 310,335 acres of federal, state, and private lands, in order to efficiently recover the natural gas resource.  AR2128 (FEIS at 1-1); AR9483 (66 Fed. Reg. 33,975).

In February of 2005, the boundary of the ARPA was redrawn, reducing the size of the project area by approximately 40,000 acres to 270,080 acres.  AR9483 (66 Fed. Reg. 33,975); AR2082 (FEIS, Dear Reader Letter); AR2132-2133 (FEIS at 1-5 to 1-6).  The Proposed Action was also reduced to 2,000 wells -- approximately 1,800 CBNG wells and 200 conventional natural gas wells.  AR2088 (FEIS at ES-1).  This proposal included certain voluntary committed measures to address potential environmental impacts.  AR3142-AR3146 (FEIS at K-20 to K-24).

The ROD authorized the project, but limited total new surface disturbance from development to a maximum of 7,600 acres at any given time (2.8% of the ARPA) and imposed a 6.5-acre/well site short-term (less than 6 years) disturbance goal.  AR4796, AR4817 (ROD at 1, 22).  In more sensitive areas, identified as "Category A" areas (management areas with sensitive fish populations, crucial wildlife habitats and unique vegetation), the 6.5-acre short-term disturbance would be further minimized.  AR4807 (ROD at 12).  Appendix C of the ROD includes at least 38 mandatory requirements for all permit holders, such as prohibition of off-road vehicle activity; location of buried pipelines close to roads to minimize disturbance; and requirements for erosion control.  AR4816 (ROD at 21); AR4859-AR4863 (ROD at C-3 to C-7).  BLM also required annual planning between BLM and the operators.  AR4807 (ROD at 12).

In addition, the ROD provides for site-specific mitigation measures to minimize surface disturbance through appropriate conditions of approval ("COAs"), best management practices ("BMPs"), and other measures.  AR4807 (ROD at 12).  *See also* AR4835-AR4855 (ROD, App. B).  Operators must engage in monitoring "to measure the degree of success the performance requirements have in achieving Performance Goals."  AR4836 (ROD at B-2).  Operators must

also adopt additional mitigation or adaptive management techniques to achieve the Performance

Goals where needed.  *Id.*  The ROD also included a Reclamation Plan outlining criteria for

reclamation of disturbed areas.  AR4796 (ROD at 1); AR4822-AR4833 (ROD, App. A).  Once

disturbed, a site stays within the 7,600-acre disturbance cap until reclaimed.  AR4798, AR4813

(ROD at 3, 18).  Successful reclamation is defined as having achieved 80 percent of

predisturbance ground cover, with 90 percent dominant species.  AR4827 (ROD at A-6).

## II.    HISTORY OF THE NEPA PROCESS

### A.    The Atlantic Rim Project Environmental Impact Statement

BLM's decision was made after the culmination of an extensive public environmental

analysis process that began in June of 2001, when BLM issued a Notice of Intent ("NOI") to

Prepare an Environmental Impact Statement ("EIS") for the Atlantic Rim Project.  AR9483-

AR9484 (66 Fed. Reg. 33,975).  The EIS would assess the potential environmental impacts of

the Proposed Action, including the cumulative impacts of other oil and gas projects in the

vicinity of the ARPA.  AR9484 (*Id.* at 33,976).  A scoping notice and information materials

regarding the proposed project were also mailed to potentially interested parties.  AR7632

(Scoping Letter); AR2088 (FEIS at ES-1).  BLM held two public scoping meetings in Baggs and

Rawlins, Wyoming.  AR7644-AR7645 (Materials from Scoping Meetings); AR2141 (FEIS at 1-

14).  Public comments helped determine key issues, resource conflicts and concerns, alternatives,

and the scope of BLM's analysis.  AR2141-AR2147 (FEIS at 1-14 to 1-20).

In January of 2002, BLM developed an interim drilling policy to allow for exploratory

drilling designed to obtain additional geologic information needed for the EIS.  AR2131-

AR2132 (FEIS at 1-4 to 1-5); *see also* AR2565-AR2573 (Interim Drilling Policy).  Under this

policy, a maximum of 200 exploratory CBNG wells within nine proposed plans of development

("POD") could be drilled.  AR2132 (FEIS at 1-5).  Environmental assessments ("EAs") for the

interim PODs were prepared and decision records were issued and implemented, although not all 200 of the interim wells were approved. *Id.*

In December of 2005, BLM released a Draft EIS, providing for a 60-day comment period. AR9515 (70 Fed. Reg. 73481 (Dec. 12, 2005); AR2141 (FEIS at 1-14). The Final EIS was noticed in the Federal Register on December 1, 2006. AR9564 (71 Fed. Reg. 69,582). Additional public comments were submitted on the Final EIS, including some by Plaintiffs. AR4817 (ROD at 22); AR4868-AR4881 (ROD, Appendix E).

The Final EIS found that the purpose of and need for the project is "to develop, produce, and market natural gas products." AR2136 (FEIS at 1-9). Based on input from the public, experts, and other agencies, BLM identified a range of alternatives to the Proposed Action (AR2149), including: (a) Alternative A, which was the no action alternative (AR2151); (b) Alternative C, where approximately 95% of the federal lands within the ARPA would be assigned one or more resource protection measures to be applied to development activities (AR2151-AR2152); and (c) Alternative D, the Preferred Alternative, which would minimize surface disturbance while optimizing natural gas recovery (AR2155). Additional alternatives, including the initial 2001 proposal and an Alternative B (phased development), were considered and eliminated from detailed study. AR2159 (FEIS at 2-1).

The EIS reviewed potential impacts to geology/minerals/paleontology, air quality, soils, water resources (impacts to Muddy Creek, salinity loading, etc.), groundwater (impacts to wells, seeps, and springs emanating from upper Mesaverde Group, etc.), range and other land uses, vegetation (impacts from erosion and runoff, long-term loss of shrubs, etc.), wildlife (impacts to greater sage-grouse, big game, threatened and endangered fishes, etc.), recreation, visual resources, cultural resources, socioeconomics, transportation, health and safety, and noise. *See*

*generally* AR2090-AR2094 (FEIS at ES-3 to ES-7); *see also* AR3050-AR3079 (FEIS, App. G, Biological Assessment, reviewing potential effects on threatened, endangered, and proposed species under Endangered Species Act, including BLM sensitive species). BLM also analyzed the cumulative impacts on these resources, considering the Atlantic Rim Project with current and reasonably foreseeable projects. AR2482-AR2508 (FEIS, Ch. 5).

As part of the review of both direct and cumulative impacts, BLM prepared an extensive Air Quality Technical Support Document. AR2634-AR3049 (FEIS, App. F). BLM performed a near-field and far-field air impact assessment to quantify potential emissions of and formation of criteria pollutants (carbon monoxide (CO), sulfur dioxide ($SO_2$), nitrogen oxides ($NO_x$), ozone ($O_3$), and particulate matter ($PM_{2.5}$ and $PM_{10}$)) and hazardous air pollutants related to the Atlantic Rim Project. AR2327-AR2328, AR2331-AR2334, AR2709-AR2735. BLM's air analyses indicated that the approval of the Atlantic Rim Project will not cause adverse health impacts and will not lead to violations of the National Ambient Air Quality Standards ("NAAQS") or Wyoming Ambient Air Quality Standards ("WAAQS"). AR2331-AR2334, AR2683, AR2686-AR2688, AR2691-AR2693, AR2728-AR2729. BLM's analyses were developed in conjunction with the Environmental Protection Agency ("EPA") and the Wyoming Department on Environmental Quality ("WDEQ"), neither of which disputed the methodology used.

In addition, BLM reviewed numerous mitigation measures, including: (a) voluntary measures proposed by the project proponents to mitigate surface disturbance and environmental impacts under the Proposed Action (AR3122-AR3147, FEIS, App. K); (b) a Wildlife Monitoring and Protection Plan, which outlines proposed inventory, monitoring, and protection measures (AR2617-AR2632, FEIS, App. E); (c) a program to inventory, evaluate, and manage cultural resources (AR3097-AR3108, FEIS, App. I); (d) BMPs for reducing non-point source pollution

(AR3109-AR3121, FEIS, App. J); and (e) protection measures proposed for Alternative C (AR3148-AR3162, FEIS, App. L). BLM developed mandatory BMPs where the Proposed Action conflicted with identified resources, including, but not limited to, vegetation resources, visual resources, water and soil management, and wildlife. AR3081-AR3096 (FEIS, App. H).

After this extensive NEPA review, BLM chose Alternative D as the Preferred Alternative, which placed limits on total surface disturbance in the ARPA at any one time. AR2089-AR2090, AR2147 (FEIS at ES-2 to ES-3, 1-20). BLM recognized that "[t]he proposed development . . . require[s] surface-disturbing activities that are likely to result in major adverse impacts to certain resource values, as outlined in the FEIS." AR4799 (ROD at 4). Nonetheless, BLM concluded that, "[w]hile the development is expected to adversely impact certain resource values and limit opportunities for other uses in the short-term, the long-term goal is to return these lands to a condition approximate to that which existed before [the proposed] developments . . . were implemented." *Id.* Moreover, BLM found that "[i]mplementation of this decision will result in production of nationally significant natural gas resources consistent with the National Energy Policy (May 2001) and the National Energy Policy Act of 2005." *Id.*

EPA commended BLM for its work, noting that BLM "properly analyzed and disclosed to the public the potential environmental impacts of the project, which are significantly greater with the Proposed Action versus BLM's Preferred Alternative." AR3474. The U.S. Fish & Wildlife Service ("FWS") also "commend[ed] the Bureau for requiring interim reclamation as this may reduce some of the impacts that will occur across the Project area." AR10135.

B.    Plans of Development

Drilling and other surface-disturbing activity in the ARPA require separate permits. AR4798 (ROD at 3). For site-specific PODs, operators submit applications for a permit to drill ("APD"), which contain detailed proposals for on-the-ground operations, "at least 30 days before

commencement of operations is desired."  43 C.F.R. § 3162.3-1(d).  Upon receipt of an APD, the

BLM office is required to post certain information concerning the application (*although not the*

*application itself*) for public inspection.  30 U.S.C. § 226(f); 43 C.F.R. § 3162.3-1(g).  Within 5

days after the end of the 30-day posting period, BLM must act on the application or advise the

applicant in writing why final action will be delayed.  *Id.* § 3162.3-1(h).  These APDs are

approved by BLM only after site-specific reviews and additional NEPA documentation.

After the ROD issued, BLM approved PODs located in the Catalina and Sun Dog Units.

AR73502 (Catalina A&B EA/DR); AR74073 (Sun Dog A&B EA/DR); AR75029 (Sun Dog C

EA/DR); AR 75185 (Sun Dog D&E EA/DR).  For each POD, BLM prepared an EA, which was

tiered to the Atlantic Rim EIS.  AR73492 (Catalina A&B); AR74063 (Sun Dog A&B); AR75019

(Sun Dog C); AR75173 (Sun Dog D&E); 40 C.F.R. § 1502.20.  The EAs for the PODs at issue

implement the mitigation measures identified in the EIS as necessary, based on on-site

inspections.  AR73499-AR73500 (Catalina A&B EA at 8-9); AR74069-AR74071 (Sun Dog

A&B EA at 7-9); AR75025-AR75026, AR75030 (Sun Dog C EA at 7-8, 12); AR75180-

AR75182 (Sun Dog D&E EA at 8-10).[3]  These measures are also incorporated in the lengthy

COAs for each POD.  AR74074-AR74091 (Sun Dog A&B); AR73506-AR73517 (Catalina

A&B), AR75034-AR75049 (Sun Dog C), AR75190-AR75207 (Sun Dog D&E).

Given the 6.5-acre cap per well on land disturbance, these initial 138 wells approved by

BLM could have disturbed 897 acres -- 0.33% of the 270,080 total acreage of the ARPA.  In fact,

the 138 approved wells disturbed only 629 acres.  AR73497 (Catalina A&B EA at 6); AR74067

---

[3]  To prepare each EA, BLM conducted on-site inspections to evaluate site-specific circumstances.  For example,
BLM determined that one of the proposed wells in the Catalina A&B POD was to be located within the 1/4 mile
buffer zone for a sage grouse lek (breeding area) and "can not be situated to adequately mitigate the potential effects
to grouse at the adjacent lek."  AR73499 (Catalina A&B EA at 8).  "As a result, authorization of this APD will be
deferred until additional mitigation measures have been developed to reconsider the proposal."  *Id.*  In the Sun Dog
A&B POD, the potential presence of prairie dogs required a survey for black-footed ferrets, which subsequently
found none in the area.  AR74071 (Sun Dog A&B EA at 9).  One well in Sun Dog POD D was not approved due to
"unresolved archaeological resource concerns."  AR75176 (Sun Dog D&E EA at 4).

(Sun Dog A&B EA at 5); AR75023 (Sun Dog C EA at 5); AR75178 (Sun Dog D&E EA at 6).[4]

The EAs concluded "the impacts are not expected to be significant, and that an EIS is not

required." AR73502 (Catalina A&B EA/DR at 11); AR74073 (Sun Dog A&B EA/DR at 11);

AR75029 (Sun Dog C EA/DR at 11); AR75185 (Sun Dog D&E EA/DR at 13).

In addition to the substantial public involvement with the Atlantic Rim EIS, the public

had an opportunity to comment on the site-specific proposals. "The NOSs[5] or APDs for the

proposed action were posted for 30 days in the Rawlins Field Office Information Access Center

(Public Room) for review. Notification of preparation of this EA was provided on the Wyoming

BLM internet NEPA register." AR73494 (Catalina A&B EA at 3); AR74065 (Sun Dog A&B

EA at 3); *see also* AR75020 (Sun Dog C EA at 2); AR75175 (Sun Dog D&E EA at 3).

Plaintiffs did not request copies of the APDs or EAs until September 19, 2007, weeks

after the EAs for Catalina PODs A&B and Sun Dog PODs A&B were completed. Molvar Decl.,

Pls. Mot. for Prelim. Inj., ¶20. After receiving a request from the Plaintiffs, BLM provided

Plaintiffs a copy of the draft EAs for Sun Dog PODs C, D and E (AR79066), and Plaintiff

Biodiversity Conservation Alliance submitted comments (AR79078). BLM responded to those

comments, but found that they did not include any project-specific comments. AR75031 (Sun

Dog C EA/DR); AR75187 (Sun Dog D&E EA/DR).

III.    PROCEDURAL HISTORY - ADMINISTRATIVE APPEAL AND PRELIMINARY INJUNCTION

Several of the Plaintiffs in this action filed an administrative appeal of the EIS and ROD

for the Atlantic Rim Project to the Interior Board of Land Appeals ("IBLA") and asked for a stay

pending appeal. On September 5, 2007, the IBLA denied the stay, finding the appellants had not

---

[4]  The average short-term disturbances for these projects ranged from 3.5 and 5.2 acres for the approved Sun Dog
PODs and 5.2 and 6.1 acres for Catalina PODs A & B. AR73497 (Catalina A&B EA at 6); AR74067 (Sun Dog
A&B EA at 5); AR75023 (Sun Dog C EA at 5); AR75178 (Sun Dog D&E EA at 6).
[5]  NOS refers to a Notice of Staking when an on-site inspection is required prior to APD approval. Regardless of
whether a NOS is filed, on-site inspections are always conducted prior to APD approval. AR5663.

shown a likelihood of success on appeal. *Theodore Roosevelt Conservation P'ship, et al.*, No. IBLA 2007-208, *et al*. (Sept. 5, 2007) ("IBLA Decision") at 11 (Attached as Exhibit 1).

In denying the stay, the IBLA affirmed BLM's decision to defer site-specific impacts until specific permit applications were filed.  IBLA Decision at 13-14.  The IBLA also found appellants were not likely to succeed on their claims that:  (1) BLM failed to analyze adequately potential mitigation measures, including measures to protect sage-grouse; (2) BLM violated NEPA by not adopting mitigation measures advocated by the appellants; or (3) BLM had not adequately considered the likely cumulative impacts on wildlife associated with other projects that were under review or already approved.  *Id.* at 14-15, 20-21.  The IBLA also rejected the contention that BLM failed to adequately consider the potential impact of methane seeps.  *Id.* at 17-18.  Thus, the IBLA specifically considered Plaintiffs' objections, including those raised here, and determined they were not likely to succeed.

In November of 2007, this Court largely agreed with the IBLA, denying Plaintiffs' motion for preliminary injunction, finding Plaintiffs "have failed to demonstrate a violation of . . . NEPA . . . by the BLM."  *NRDC v. Kempthorne*, 525 F. Supp. 2d 115, 120 (D.D.C. 2007).

## APPLICABLE LAW AND STANDARD OF REVIEW

NEPA imposes a procedural requirement that agencies take a "hard look" at environmental consequences associated with federal actions.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n.21 (1976)).  "Although these procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process."  *Id.* (citations omitted).  NEPA does not constrain an agency "from deciding that other values outweigh the environmental costs." *Id.* (citations omitted).

These procedures are most often accomplished through an EA or EIS. An EIS is a detailed written statement that evaluates the environmental impacts of a proposed action. 42 U.S.C. § 4332. NEPA requires an agency to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." *Id.* In fulfilling NEPA's requirements, an agency may rely on and incorporate prior analyses. Regulations issued by the Council on Environmental Quality ("CEQ") "encourage" agencies "to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." 40 C.F.R. § 1502.20 (citing 40 C.F.R. § 1508.28). Providing a phased environmental review with respect to oil and gas development is consistent with BLM policy. AR5322 (BLM Instruction Mem. 2004-110).

Judicial review of agency actions under NEPA is governed by the Administrative Procedure Act ("APA"). Under the APA, an agency's decision will not be set aside unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 126 (D.C. Cir. 1985). Because NEPA's requirements are "essentially procedural," "[a]s long as the agency's decision is 'fully informed' and 'well-considered,' it is entitled to judicial deference, and a court must not substitute its own policy judgment for that of the agency." *S. Utah Wilderness Alliance v. Norton*, 237 F. Supp. 2d 48, 52 (D.D.C. 2002) (quoting *N. Slope Borough v. Andrus*, 642 F.2d 589, 599 (D.C. Cir. 1980)). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court may find contrary views more persuasive." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). *See also Sierra Club v. Marita*, 46 F.3d 606, 623 (7th Cir. 1995) ("'NEPA does not require that [courts] decide whether an [EIS] is based on the best scientific

methodology available, nor does NEPA require [courts] to resolve disagreements among various scientists as to methodology."') (second alteration in text) (quoting *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985); *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1192 (9th Cir. 1988).

Under the APA, judicial review is limited to the administrative record.  "Review of agency action 'is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision."  *Ad Hoc Metals Coal. v. Whitman*, 227 F. Supp. 2d 134, 136 (D.D.C. 2002) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)) (alterations in text).  Limiting judicial review to the administrative record comports with the well-established rule that the court should not substitute its judgment for that of the agency. *See Citizens to Preserve Overton Park*, 401 U.S. at 416.  *See also Amfac Resorts, LLC v. Dep't of Interior*, 143 F. Supp. 2d 7, 11 (D.D.C. 2001).[6]

A plaintiff cannot merely "baldly assert[], without supporting proof or evidence, that significant effects will accompany a proposed action -- particularly when such an assertion is made without even addressing or confronting the detailed and comprehensive analyses and studies compiled by the agency which arrive at a contrary conclusion."  *Twp. Of Lower Alloways Creek v. Pub. Serv. Elec. & Gas Co.*, 687 F.2d 732, 747 (3rd Cir. 1982).  *See also Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553-54 (1978) ("[A]dministrative

---

[6]  Although the record rule has some exceptions, such exceptions to the general prohibition against extra-record review are narrowly defined.  *Corel Corp. v. United States*, 165 F. Supp. 2d 12, 31 (D.D.C. 2001) ("[T]hese exceptions should not be construed to swallow the rule that extrinsic evidence is generally inadmissible, particularly when the extrinsic evidence is argumentative as opposed to explanatory.").  Plaintiffs cite to numerous sources that are not in the administrative record and ask that this Court take judicial notice of such documents, but they fail to explain how the documents fall under an exception to the generally applicable record rule.  Hence, this evidence, and Plaintiffs' arguments based thereon, should not be considered.  Extra-record documents cited by Plaintiffs include:  (a) Declarations of Erik Molvar; (b) EPA, Fact Sheet: Ground-Level Ozone Health and Environment; (c) studies listed in footnote 4 of Plaintiffs' Memorandum; (d) 73 Fed. Reg. 16,436 (March 27, 2008); (e) Draft Supplemental Environmental Impact Statement for the Pinedale Anticline Oil and Gas Exploration and Development Project (Dec. 2006); (f) WDEQ health advisories; (g) a Denver Post article; (h) 71 Fed. Reg. 10,989 (Mar. 3, 2006); and (i) 71 Fed. Reg. 52,571 (Sept. 6, 2006).

proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider [the matters presented]."). As this Circuit, and this Court, has recognized: "The NEPA process 'involves an almost endless series of judgment calls' and the line-drawing decisions 'are vested in the agencies, not the courts.'" *NRDC*, 525 F. Supp. 2d at 123 (quoting *Coal. on Sensible Transp., Inc. v.* Dole, 826 F.2d 60, 66 (D.C. Cir. 1987)). *See also Fund for Animals v. Hall*, 448 F. Supp. 2d 127, 132 (D.D.C. 2006).

## ARGUMENT

## I.     BLM TOOK THE REQUIRED "HARD LOOK" AT ENVIRONMENTAL IMPACTS.

### A.     The EIS Fully Considered the Environmental Impacts of the Atlantic Rim Project.

BLM's comprehensive environmental review of the Atlantic Rim Project, which took six years, satisfies NEPA's requirement that an agency take a "hard look" at the potential environmental impacts of a project. BLM's review involved consideration of issues raised during the scoping process and public comment periods, including, but not limited to, potential impacts on air quality, groundwater (impacts to wells, seeps, and springs emanating from upper Mesaverde Group, etc.), vegetation (impacts from erosion and runoff, long-term loss of shrubs, etc.), wildlife (impacts to greater sage-grouse, big game, threatened and endangered fishes, etc.), health and safety, and noise. *See generally* AR2090-AR2094. BLM's team included numerous experts on air quality, wildlife, soils, fisheries, and natural resources, and its review involved several federal and state agencies as well. AR2510-AR2514.

Pursuant to NEPA, BLM considered a range of alternatives, consistent with the purpose for and need of the proposed project, and reviewed the environmental impacts of those alternatives. AR2151-AR2156. BLM also considered the project's cumulative impacts on

13

resources, including air quality, wildlife, vegetation, and fisheries. AR2483-AR2508. Moreover, BLM considered *and imposed* numerous mitigation measures to address the potential environmental impacts. *See, e.g.,* AR4834-AR4863. This comprehensive and detailed environmental review resulted in a substantially reduced proposal and lessened environmental impacts. AR2147, AR2155-AR2156. BLM considered all the information before it, and made an informed decision. BLM further provided for ongoing monitoring and adaptive management to ensure appropriate mitigation measures are implemented as part of the site-specific reviews for individual POD approvals. Although Plaintiffs clearly disagree with the substance of BLM's decision to allow development of natural gas resources in the ARPA, BLM's actions here more than complied with NEPA's procedural mandate.

      B.     <u>BLM Took a Hard Look at Potential Air Quality Impacts</u>.

BLM thoroughly analyzed the potential air quality impacts associated with oil and gas development in the ARPA, as required by NEPA. In order to assess the potential air quality impacts associated with the Atlantic Rim Project, BLM utilized two separate EPA-approved modeling techniques. First, BLM used AERMOD to perform the near-field ambient air impact assessment in order to quantify potential maximum pollutant impacts for CO, $SO_2$, $NO_x$, $PM_{2.5}$ and $PM_{10}$, and hazardous air pollutants (benzene, toluene, ethylbenzene, xylene, n-hexane, and formaldehyde) in the vicinity of the project area resulting from construction and production emissions. AR2327-AR2328, AR2331-AR2332, AR2674, AR2767-AR2774, AR1644, AR1648-AR1650.

Second, BLM utilized the EPA-approved CALMET/CALPUFF modeling system to predict potential air quality impacts of the Atlantic Rim Project at far-field Prevention of Significant Deterioration ("PSD") Class I and Sensitive Class II areas. AR2328-AR2331, AR2333-AR2334, AR2709. The CALPUFF modeling system was used to quantify potential

pollutant emissions of $NO_x$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ and to assess potential lake acidification from acid deposition impacts. AR2709-AR2735. BLM's near-field and far-field analyses indicated that the approval of the Atlantic Rim Project will not cause adverse health impacts and will not lead to any violations of the NAAQS or WAAQS. AR2331-AR2334, AR2683, AR2686-AR2688, AR2691-AR2693, AR2728-AR2729. BLM's air quality analysis was prepared in conjunction and cooperation with agencies that have air quality authority in Wyoming -- EPA and WDEQ -- as well as other interested agencies including the National Park Service ("NPS") and the U.S. Forest Service ("USFS"). AR2645.

Plaintiffs dispute BLM's methodology, and seek to have this Court substitute its judgment for that of BLM and other federal and state agencies. This the Court may not do. *See, e.g., S. Utah Wilderness Alliance*, 237 F. Supp. 2d at 52. Plaintiffs also argue that BLM should have further studied greenhouse gas emissions from methane seeps, but provide no evidence to rebut BLM's findings that the methane seeps are not caused by the Atlantic Rim Project. On both of these points, the Court should defer to BLM's analyses and judgment.

    1.  BLM appropriately analyzed potential ozone impacts associated with the Atlantic Rim Project.

BLM analyzed the potential ozone impacts associated with the Atlantic Rim Project using the VOC/$NO_x$ Point Source Screening Tables developed by Richard D. Scheffe in 1988 (Scheffe Method).[7] AR2328 (FEIS at 4-9), AR2533 (FEIS at R-18), AR2674 (AQTSD at 30). The Scheffe Method was evaluated and its use approved by BLM, EPA, NPS, USFS, and WDEQ for the Atlantic Rim EIS. "Potential $O_3$ concentrations were estimated by the Scheffe Method, which was considered by the inter-agency air quality team to be a reasonable tool and an

---

[7] *See* Richard D. Scheffe, *VOC/$NO_x$ Point Source Screening Tables* (EPA Sept. 1988) (hereafter "Scheffe Method"). The Scheffe Method is a publicly available document included in many BLM NEPA documents. *http://www.blm.gov/pgdata/etc/medialib/blm/wy/nepa/pfodocs/jonah.Par.7852.File.dat/28FAQTSDvolI.pdf.*

acceptable ozone method at the time the air quality analyses was conducted."   AR2334 (FEIS at

4-15).  *See also* AR2645 (AQTSD at 1); AR4608 (FEIS at O-212), AR4877 (ROD at E-9).  The

Scheffe Method conservatively calculates potential ozone increments due to a volatile organic

compound ("VOC") dominated point source (VOC emissions greater than $NO_x$) using a series of

applications of the Reactive Plume Model-II, a Langrangian-based photochemical model.[8]  The

ozone increment estimates produced using the Scheffe Method are conservative predictions,

meaning they likely overestimate the actual ozone formed.[9]

 BLM's air quality specialist, with full support from EPA and WDEQ, determined that the

Scheffe Method was an appropriate tool to estimate the potential ozone impacts associated with

the Atlantic Rim Project.  *See* AR2645 (stating that the methodology used in the Atlantic Rim

EIS was developed with input from BLM, EPA, NPS, USFS, and WDEQ); AR2686-AR2688

(describing modeled potential ozone impacts); AR4877 (noting the Scheffe Method was

considered by the interagency air quality team to be a reasonable tool for estimating ozone

impacts at the time air quality analysis for Atlantic Rim EIS was prepared); AR4608 ("The

ozone estimates are based on a model developed and reviewed by air quality stakeholders.").

 Despite these agencies' approval of BLM's method of estimating ozone impacts,

Plaintiffs seek to have this Court conclude otherwise.  But the Court may not substitute its

judgment for that of the agencies, particularly in highly technical areas where deference to an

agency is at its greatest.  *Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 248 (D.C. Cir. 2003) ("[W]e

have long held that '[a]gency determinations based upon highly complex and technical matters

are entitled to great deference.'") (alteration in original) (citations omitted).

---

[8]  *See* Scheffe Method, *supra* note 7, at 3.
[9]  *Id.*  Moreover, the Air Quality Technical Support Document notes that the modeled ozone concentrations for the Atlantic Rim Project are likely overestimates of the actual ozone impacts that would occur because the estimates were developed using meteorological conditions more conducive to forming ozone than those found in southwestern Wyoming.  AR2688.

The fact that Dr. Scheffe later expressed concerns regarding the use of the screening table is of no import.[10]  "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."  *Hudson v. Fed. Aviation Admin.*, 192 F.3d 1031, 1037 (D.C. Cir. 1999) (quoting *Marsh*, 490 U.S. at 378).  *See also Sierra Club*, 753 F.2d at 129 ("The agency is entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances."). "The Court need not resolve disagreements among scientists as to methodology or to decide whether the method employed by an agency in its analysis is the best available."  *Border Power Plant Working Group v. Dep't of Energy*, 260 F. Supp. 2d 997, 1021-22 (S.D. Cal. 2003) (citing *Friends of Endangered Species, Inc.*, 760 F.2d at 986).  In the *Border* case, the court was specifically asked to review whether the methodology employed by the Department of Energy was adequate to assess potential ozone impacts in a NEPA document.  Similar to the approach used by the BLM in this case, the Department of Energy used NOx emissions to estimate potential ozone levels.  *Id.* at 1021.  The court determined that "NEPA does not provide the Court with authority, however, to disagree with the agencies' specialized knowledge and determination that the particular methodology" utilized was appropriate.  *Id.* at 1022.  This rule is particularly applicable here, because neither EPA nor WDEQ commented upon or disagreed with the use of the Scheffe Method when reviewing and approving the air quality modeling protocol for the Atlantic Rim Project.  AR8133-AR8135 (EPA Comments on Atlantic Rim EIS); AR9850 (same); AR9777 (WDEQ Comments on Air Quality Aspects of Atlantic Rim EIS).

---

[10]  The text of the letter cited by Plaintiffs states that the method "never achieved a level of EPA certification *associated with EPA guideline models* and consequently were not endorsed by the Agency" (AR9881) (emphasis added), and does not make clear whether Dr. Scheffe's concerns apply when his method is used as a screening tool for NEPA purposes, or whether those concerns relate to its use by EPA as a modeling technique under the Clean Air Act ("CAA").  *See discussion infra* at 18.

Plaintiffs also argue BLM's utilization of the Scheffe Method was inappropriate because "it does not meet the regulatory standards established by EPA for air quality modeling." Pls. Mem. at 11. But BLM is performing a NEPA analysis -- it is not tasked with performing air quality modeling under the CAA and is not subject to those regulatory standards. Although both the AERMOD and CALPUFF modeling systems utilized by BLM for the Atlantic Rim EIS have been approved by EPA,[11] the EPA Guidance does not govern air quality modeling used for NEPA analyses. The EPA Guidance "recommends air quality modeling techniques that should be applied to State Implementation Plan (SIP) revisions" under the CAA, 70 Fed. Reg. at 68,229, and applies only to regulatory analyses performed under that statute. 42 U.S.C. § 7475(e)(3)(D). The EPA Guidance concedes:

> Other federal agencies have also developed specific modeling approaches for their own regulatory or other requirements. Although such regulatory requirements and manuals may have come about because of EPA rules or standards, the implementation of such regulations and the use of the modeling techniques is under the jurisdiction of the agency issuing the manual or directive.

70 Fed. Reg. at 68,237. Hence, the EPA Guidance does not apply to the NEPA analyses prepared by BLM. As the D.C. Circuit recognized, "[t]he CAA, and not NEPA, is the primary force guiding states and localities into NAAQS compliance." *Taxpayers of Mich. Against Casinos ("TOMAC") v. Norton*, 433 F.3d 852, 863 (D.C. Cir. 2006).

Were the Court to accept Plaintiffs' arguments, it would effectively impose CAA permitting obligations on BLM in the course of conducting a NEPA analysis. BLM is not enforcing or interpreting the CAA, nor does it have the authority to do so. Under the CAA, Congress vests each State with the primary responsibility for assuring air quality, including

---

[11] EPA, Revision to the Guidelines on Air Quality Models, 70 Fed. Reg. 68,218, 68,232-35 (Nov. 9, 2005) (hereafter "EPA Guidance") (recognizing AERMOD as an appropriate modeling technique); *Id.* at 68,237 (recognizing CALPUFF as an appropriate modeling technique).

compliance with NAAQS, within the entire geographic area comprising the State, including federal lands.  42 U.S.C. § 7407(a).  The State of Wyoming, through the WDEQ Air Quality Division, has authority over state and federal air quality standards in Wyoming.  *See* 42 U.S.C. § 7410; 40 C.F.R. pt. 51; 40 C.F.R. § 52.2620 (Wyoming SIP); WYO. STAT. ANN. § 35-11-202. Wyoming implements its responsibility by submitting a SIP to EPA specifying what emission reductions and other control measures it will use to attain the NAAQS.  Once EPA approves the SIP, it is codified and enforceable as federal law.[12]

Finally, Plaintiffs briefly suggest that BLM's decision to utilize a different modeling technique for the NEPA analysis of a separate project somehow undermines the use of the Scheffe Method for the Atlantic Rim Project.  BLM's decision to use a different technique in a supplemental draft EIS ("SDEIS") for separate and independent project -- the Pinedale Anticline Oil and Gas Exploration and Development Project ("PAPA") -- does not demonstrate that the Scheffe Method was not appropriate for the Atlantic Rim Project.[13]  The sentence from the PAPA SDEIS referenced by the Plaintiffs merely states that the "CALGRID model for ozone impacts analysis is the most appropriate method *for estimating ozone impacts from the PAPA*." PAPA SDEIS at 4-62 (emphasis added) (Excerpts attached as Exhibit 2).[14]  This statement

---

[12]  EPA has approved the relevant provisions of Wyoming's SIP.  *See* 40 C.F.R. § 52.2622.

[13]  Plaintiffs ask this Court to take judicial notice of the PAPA SDEIS.  Even if this Court took judicial notice of the existence of the PAPA SDEIS, it is extra-record evidence.  Defendant-Intervenors also disagree with Plaintiffs' claim that the "accuracy" of the document is not disputed.  Pls. Mem. at 15 n.10.  As is clear from this case, the accuracy of contents of EISs is often hotly disputed.  Moreover, some of the pages included in Plaintiffs' exhibit come from a revised PAPA SDEIS, issued in December of 2007, after BLM's ROD was issued in this case, and in which BLM again revised its air quality modeling.

[14]  The project analyzed in the PAPA SDEIS is very different from the Atlantic Rim Project, and a decision with regard to one project simply does not dictate any decision or methodology for the other.  The PAPA SDEIS analyzes the impacts of up to 4,399 additional wells (over the 700 wells currently approved), compared to the 2,000 wells analyzed in the Atlantic Rim EIS.  *See* PAPA SDEIS at 1-5, 1-8 (Ex. 2).  The proposed development in the PAPA involves drilling to far deeper formations (14,000 feet) on 10-acre downhole spacing as compared to vertical drilling to shallower formations (6,000 feet) on 80-acre spacing anticipated in the ARPA.  *See* PAPA SDEIS, Dear Reader Letter, App. C at C-3 (Ex. 2); AR2128.  The drilling in the PAPA is much denser (10-acre compared to 80-acre downhole density) and takes far longer (50 days per well) compared to operations in the ARPA (7-10 days per well),

provides no support for Plaintiffs' argument that the use of the Scheffe Method was inappropriate for the Atlantic Rim EIS.

BLM, EPA, and WDEQ all determined that the Scheffe Method was an appropriate means to analyze potential air quality impacts for the Atlantic Rim EIS. The cases cited by Plaintiffs, in which courts purportedly "rejected[ed] scientific judgments made by an agency," are inapposite as they involved substantive requirements under other federal laws, not NEPA. *See, e.g., NRDC v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000) ("The real issue in this case is whether the 1999 TAL satisfied the conservation goals of the Fishery Act, the management plan, and the Service's regulations."); *Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 923 (D.C. Cir. 1998) (regarding challenge to treatment standards issued under RCRA). Plaintiffs' arguments to have this Court substitute its judgment for the reasoned decision of those agencies must be rejected.[15]

> 2.   BLM appropriately tiered its analysis in the Catalina and Sun Dog EAs to the Atlantic Rim EIS.

Plaintiffs briefly suggest that BLM's analysis in the EAs for the Catalina A and B PODs and the Sun Dog A-E PODs was inappropriate because it tiered to BLM's air quality analysis in the Atlantic Rim EIS. Tiering from a project level EIS to a site-specific EA, such as those for the Catalina and Sun Dog PODs, is not only appropriate, it is encouraged by the CEQ regulations implementing NEPA. 40 C.F.R. § 1502.20. Even the case cited by the Plaintiffs recognizes that EAs need not restate cumulative impacts analyses when an EIS has been prepared. *Kern v. BLM*, 284 F.3d 1062, 1078 (9th Cir. 2002) (holding that "[i]n the *absence* of an EIS analyzing the

---

which leads to greater air quality impacts. *See* PAPA SDEIS, App. C at C-3 (Ex. 2); *see also* AR2128 (noting development in Atlantic Rim on 80-acre spacing).

[15]  The Court need not consider Plaintiffs' citations to extra-record evidence regarding the effects of ozone (Pls. Mem. at 7 n.3-5), and recent health alerts issued in other areas of Wyoming, not the ARPA (Pls. Mem. at 18). Moreover, the latter document is irrelevant here.

impact of reasonably foreseeable" future actions an EA must include cumulative impacts

analysis) (emphasis added).  Here, the Atlantic Rim EIS contained appropriate air quality

analysis, and BLM need not prepare duplicative analyses in the site-specific EAs.

> 3.    BLM used appropriate estimates of background measurements for ozone levels.

Plaintiffs arguments relating to the potential effect of the Atlantic Rim Project on ozone

levels are based on misinterpretations of both the CAA and the relevant data presented in the

EIS.

First, Plaintiffs erroneously contend that background ozone levels in the ARPA are

already at 94% of the allowable NAAQS.  Pls. Mem. at 6.  As BLM makes clear in the FEIS, at

the time the EIS was prepared there were *no* ambient background data available for the ARPA.

AR2181 (FEIS at 3-17) ("specific air quality monitoring has not been conducted within the

project area").  Consequently, BLM used available data from Green River, Wyoming, which is

located more than 80 miles from the closest point of the ARPA.  AR2129 (FEIS at 1-2, Map M-

1).  As discussed further below, the actual measured ozone levels in the ARPA are much less,

and confirm BLM's analysis.

Moreover, Plaintiffs' arguments misrepresent how compliance with the ozone NAAQS is

demonstrated, apparently resulting from their confusion reading the applicable regulations.

Table 3-6 of the Atlantic Rim EIS reflects the second-highest 1-hour ozone level and the fourth-

highest daily 8-hour ozone level that occurred at the Green River monitoring site during the three

and one-half years for which data was available.  AR2181.[16]  Plaintiffs erroneously state that the

value reflected on this table -- the fourth-highest daily 8-hour average of 147 µg/m$^3$ -- is the

parameter used to determine NAAQS attainment.  Pls. Mem. at 17 (citing 40 C.F.R. § 50.10(b)).

---

[16]  As Plaintiffs note, the one-hour ozone NAAQS has been revoked.  Pls. Mem. at 17 n.12; AR2183.

In fact, this regulation provides that attainment must be demonstrated using *the three-year average* of the annual fourth-highest daily maximum 8-hour average.  40 C.F.R. § 50.10(b) (directing attainment to be "determined in accordance with appendix I to this part");  40 C.F.R. pt. 50, App. I.  It is Plaintiffs, not BLM, mixing apples and oranges and using fuzzy math.  Even had BLM used the approach Plaintiffs advocate, it would not demonstrate noncompliance with the ozone NAAQS.  BLM simply disclosed a concentration of ozone measured at a single point in time, which is not the three-year average of measured ozone concentrations used for NAAQS determinations.[17]  AR2181.

Moreover, BLM adequately explained its decision to use average hourly background ozone concentrations rather than the maximum background concentration as the baseline for analyzing potential ozone impacts.  BLM determined, with the support of EPA and WDEQ, that "pairing a screening modeled concentration with a maximum background concentration monitored over the period of record results in an overestimate of potential $O_3$ concentration." AR2688.  BLM further determined that its approach was more appropriate because:

> Adding NOx and VOC emissions to the ambient air, where some amount of $O_3$ has already formed, is not necessarily an indication that the potential for $O_3$ formation has increased.  In fact, it could decrease, since the ambient background conditions that caused $O_3$ formation have changed, and the new mixture of chemical species in the atmosphere may not be conducive to $O_3$ formation.  In addition, the concentrations shown in Table 3.7 are likely overestimates of the actual $O_3$ impacts that would occur, since the RPM nomograph used to derive these estimates was developed using meteorological conditions more conducive to forming $O_3$ than that found in south-western Wyoming.

---

[17]  One year after the ROD was issued in this case, EPA finalized revisions to the ozone NAAQS lowering the 8-hour standard from 0.08 parts per million ("ppm") to 0.075 ppm, although compliance with the new standard is not required until approximately 2013 based on specific timeframes in the CAA and its accompanying regulations.  73 Fed. Reg. 16,436, 16,503 (Mar. 27, 2008).

*Id.* BLM notes in its response to the Plaintiffs' comments on the Atlantic Rim Draft EIS that the interagency air quality team specifically agreed to use the background ozone concentration of 75.2 µg/m$^3$.  AR2331-AR2332; AR2181; AR4608.[18]

> 4.    BLM developed appropriate mitigation measures for the Atlantic Rim Project.

BLM's conservative analysis using the Scheffe Method indicated that oil and gas development in the ARPA would not result in a violation of either the NAAQS or the WAAQS for ozone.  AR2332, AR2686-AR2688.  Nonetheless, BLM developed and implemented a mitigation and monitoring program for ozone in the ARPA, pursuant to which the operators in the ARPA agreed to finance and operate additional air quality monitoring in the area, including ozone monitoring.  AR4839.  If the air monitoring were to show elevated ozone concentrations attributable at least in part to sources in the Atlantic Rim Field, BLM will consult with WDEQ and EPA to determine whether adaptive management is needed to mitigate the impacts.  *Id.*  The monitoring and mitigation imposed on a project can be taken into consideration in determining whether the environmental review of the potential impacts of the project have been fairly evaluated so as to satisfy NEPA.[19]  *See* AR4980 (BLM NEPA Manual).

The results of the air quality monitoring station installed by the operators demonstrates continued compliance with the ozone NAAQS/WAAQS, and validates BLM's ozone analysis in the EIS.  Monitoring results from the fourth quarter of 2007 -- the only period for which data exists at this time -- indicate that the maximum daily 8-hour average ozone concentration

---

[18]  Finally, Plaintiffs' arguments that BLM should have used 8-hour averages instead of hourly averages, Pls. Mem. at 17-18, is misplaced and ultimately leads them nowhere.  The hourly average used by BLM was a more conservative approach, because the hourly average is by definition higher than the 8-hour average.  AR2687 (AQTSD at 43) (noting 8-hour average is equivalent to 0.7 times the hourly average).

[19]  Plaintiffs reference no controls suggested by the public in the administrative record with respect to emissions from the Atlantic Rim Project.  Instead, Plaintiffs cite to measures in an SPDEIS for a separate project that was not before the BLM in this case.  Pls. Mem. at 19.  In that case, BLM found *visibility impairment* associated with the PAPA:  "The objective for mitigation is based on impact reduction (reduction in predicted visibility impairment) rather than reduction in specific emissions, such as NOx."  PAPA SDEIS at 4-74 (Ex. 2).

(measured for each month of the quarter) was 0.051 ppm (October), well below the ozone

NAAQS/WAAQS of 0.080 ppm.[20]  *See* Atlantic Rim Air Monitoring Program Quarterly Data

Report October – December 2007, at 13 (Attached as Exhibit 3).[21]  The fourth highest daily

maximum 8-hour value was only 0.047 ppm, or approximately 92 µg/m$^3$, again well below the

applicable ozone NAAQS/WAAQS.  *Id.*  Thus, monitoring of actual ambient air levels in the

ARPA supports BLM's conclusion in the FEIS, and confirms that the Atlantic Rim Project will

not cause the elevated ozone levels Plaintiffs speculate.

         5.     BLM adequately considered the potential impacts of methane seeps.

     Plaintiffs assert that BLM failed to adequately disclose the potential harms "the project

will trigger by causing methane gas to be released through dry seeps and as part of springs."  Pls.

Mem. at 19-20.  This entire argument, however, assumes that the project will cause new or

increased methane seeps, a result which BLM has not determined will occur.  Again, Plaintiffs

simply disagree with BLM's conclusions, and ask this Court to substitute its judgment for that of

the agency, conclude that the project will cause additional methane seeps, and then find the EIS

insufficient for failing to analyze these impacts.  The Court should reject this invitation.

     Although BLM found no causal link between CBNG development and methane seeps, it

nonetheless required monitoring in order to further evaluate this issue.  BLM determined "[t]he

number or location of these seeps is impossible to predict, therefore monitoring would be

established to evaluate this impact."  AR2351.  BLM required groundwater monitoring wells to

further evaluate methane springs in the ARPA.  AR4844 (ROD at B-10).  The collection of

---

[20]  Ozone concentrations are usually presented in micrograms per cubic meter (µg/m$^3$) or parts per million (ppm). Comparison between µg/m$^3$ and ppm depend on pressure and temperature, but at normal room temperature and pressure 0.051 ppm equates to 100 µg/m$^3$.  The NAAQS of 0.080 ppm equates to approximately 157 ug/m$^3$.

[21]  These reports were developed as the direct result of monitoring required by the ROD, and "events indicating the truth or falsity of agency predictions should not be ignored."  *Am. Petroleum Inst. v. EPA*, 540 F.2d 1023, 1034 (10th Cir. 1976) (considering data developed after agency action to show validity of EPA action).

isotopic data will help "quantify potential impacts from methane seeps where the Mesaverde

Group outcrops."  AR2368 (FEIS at 4-49).

　　　None of the documents Plaintiffs cite counter BLM's findings that, at present, there is

insufficient evidence linking the methane seeps to the Atlantic Rim Project.  NEPA requires

analysis of the direct and indirect impacts "*caused by the action*."  40 C.F.R. § 1508.8 (emphasis

added).  The Supreme Court has found that "NEPA requires a 'reasonably close causal

relationship' between the environmental effect and the alleged cause."  *Dep't of Transp. v. Pub.*

*Citizen*, 541 U.S. 752, 767 (2004) (quoting *Metro. Edison Co. v. People Against Nuclear Energy*,

460 U.S. 766, 774 (1983)).  The evidence in the record does not show that such impacts are

"reasonably foreseeable environmental effects of the action."  *NRDC*, 525 F. Supp. 2d at 122

(citing *Hammond v. Norton*, 370 F. Supp. 2d 226, 245-46 (D.C. Cir. 2005)).

　　　There is support in the record that these methane seeps are naturally occurring and have

been present long before CBNG drilling in the ARPA, including the Memorandum relied on by

Plaintiffs.  AR8799 (noting "bubbles" of gas observed in 1877).  *See also* AR8862.  BLM noted

the activity fluctuated on and off even prior to interim drilling.  AR9453.  Moreover, BLM is

actively addressing the situation by requiring monitoring and adaptive management.  AR9452-

AR9454.  *See also* AR9455-AR9457 (draft memorandum describing WDEQ actions).

　　　Plaintiffs attempt to undercut BLM's approach by citing to information provided to the

agency only after the EIS was completed.  None of this information, however, would render

BLM's analysis inadequate.  "[A]n agency need not supplement an EIS every time new

information comes to light after the EIS is finalized.  To require otherwise would render agency

decisionmaking intractable, always awaiting updated information only to find the new

information outdated by the time a decision is made."  *Marsh*, 490 U.S. at 373.  A supplement is

necessary if the changes will have a significant impact on the environment "that has not previously been covered by the [original] EIS." *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002) (alteration in text) (citations omitted); *see also W. Branch Valley Flood Prot. Ass'n v. Stone*, 820 F. Supp. 1, 6 (D.D.C. 1993) ("The supplementation process is triggered when new information presents a '*seriously* different picture of the environmental landscape' such that another in-depth look at the environment is necessary.") (emphasis in original) (citation omitted). Plaintiffs' information presents no new evidence of the causes of methane seeps not already considered in the EIS. *See, e.g.,* AR9460.

For example, Plaintiffs cite to a March 27, 2007 e-mail that alleges "new activity" of methane seeps. Pls. Mem. at 22 (citing AR9432). This e-mail, however, does not connect this alleged "new activity" to recent drilling. AR9432. Correspondence from Plaintiff Wyoming Outdoor Council to BLM also does not provide sufficient evidence to tie any alleged new activity to recent drilling. AR9450-AR9451; AR8840. In fact, Plaintiffs admit that WDEQ "made a good case that the appearance of these mud pots is not due to the reinjection of produced water (a produced water disposal method being employed by Anadarko and Double Eagle) . . . ." AR8840. Plaintiffs apparently reject WDEQ's finding that "these new mud pots could be simply naturally occurring phenomena," and speculate they must be caused by CBNG dewatering. AR8840. *See Coal. on Sensible Transp.*, *Inc*. 826 F.2d at 68 (rejecting claim that agency was arbitrary where plaintiffs contested "findings solely with generalities . . . [and] truisms").

Likewise, comments on the EAs for Sun Dog PODs C, D and E provide no evidence to demonstrate drilling activities are causing the methane seeps. AR79082, AR79100-AR79109. Plaintiffs continue to rely on an affidavit by Merschat (AR79100-AR79105) that has been found

by the IBLA and this Court as not being sufficient to show BLM's analysis in the EIS was

inadequate.[22]  Plaintiffs also submitted an exhibit (apparently for the first time during BLM's

consideration) that actually confirms BLM's findings:

> While scientists aren't sure what caused the drop in water pressure,
> or even how long the mud pots have been active, they can say one
> thing with absolute certainty.  Reinjection of CBM produced water
> is not related to mud pot activity.  . . .

> [BLM studies being conducted] should help clarify the
> complicated, interconnected web of water resources sustaining the
> mud pots.

AR79109.  BLM was not required to wait for further study to approve the project.  *See Cady v.*

*Morton*, 527 F.2d 786, 796 (9th Cir. 1975) ("If we were to impose a requirement that an impact

statement can never be prepared until all relevant environmental effects were known, it is

doubtful that any project could ever be initiated."); *TOMAC v. Norton*, 240 F. Supp. 2d 45, 49-50

(D.D.C. 2003) ("A court may not secondguess an agency's determination that the costs of delay

outweigh the benefits of further study. . . .") (citations omitted).

Plaintiffs also refer to a draft memorandum by a BLM scientist.  Pls. Mem. at 20 (citing

AR8799-8808).  This draft memorandum notes, however:

> While the source and the plumbing of the gas seeps are not known
> with any degree of certainty, it is likely that both the water and the
> gas are originating from the Mesaverde coals.  *It should be noted
> there is a lack of supporting technical data and information to
> support this statement*."

AR8802 (emphasis added).  Further, additional documentation from Andy Stone and Bob Lange,

both of whom are referenced in the memorandum, indicate they also determined there was still

insufficient information to tie the proposed drilling activities to methane seeps:

> [W]e are still not sure the gas production in these springs and wells
> is coming from the Mesaverde.  Although we know more now, we

---

[22]  This affidavit was brought before the IBLA and was not submitted to BLM during consideration of the ROD.

> are still not positive that this is the source of the methane in these
> springs and wells.  If I were to write this analysis today, I would
> have gone into more detail about gas migration and made the point
> that project activities and drought can cause this phenomenon."

AR9460.  "Environmental impact statements need not address 'remote and highly speculative

consequences.'"  *Hammond*, 370 F. Supp. 2d at 246 (quoting *Deukmejian v. Nuclear Regulatory*

*Comm'n*, 751 F.2d 1287, 1300 & n.63 (D.C. Cir. 1984)).  BLM considered the potential impacts

of methane seeps in the ARPA, based on the information it had before it.  AR2351, AR2368-

AR2369, AR1682; *see also* AR8863-AR8870.

Plaintiffs also argue that the EIS was required to address potential greenhouse gas

emissions resulting from the methane seeps, but this argument fails for the same reasons -- BLM

determined there is insufficient evidence that the methane seeps are being caused by the

Proposed Action.  The "NEPA requirement that the agency activity be causally related to an

environmental impact is not overcome simply because the exact effect of the project is, for

example, controversial or unique."  *No Gwen Alliance of Lane County, Inc. v. Aldridge*, 855 F.2d

1380, 1387 (9th Cir. 1988).  *Center for Biological Diversity v. NHTSA*, 508 F.3d 508 (9th Cir.

2007), cited by Plaintiffs, is inapposite.  In that case, the agency did not dispute that the

challenged action "will have an effect on global warming due to an increase in greenhouse gas

emissions."  *Id.* at 549.  The court rejected the agency's claim that it need not consider the

cumulative impact of its rule on climate change because Congress, not the agency, was the cause

of the increase.  *Id.*[23]  Here, BLM found insufficient evidence that the Atlantic Rim Project

---

[23]  A rehearing has been requested in this case.  Plaintiffs also cite to *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520 (8th Cir. 2003).  In that case, the Eighth Circuit found that the Surface Transportation Board ("STB") failed to adequately consider the impacts associated with increased coal consumption as a result of the proposed action, a rail line.  The STB had identified this issue in scoping for the EIS, and the court faulted STB for not considering the impacts *of increased coal consumption from rail line*, including impacts to air quality.  *Id.* at 549-50.  This case does not indicate that greenhouse gases must be considered in all cases.  Moreover, after the case was remanded, the STB found that the impacts of the project on coal consumption and resulting air emissions would be small and that any potential local air quality impacts were speculative and ultimately unforeseeable, and

would cause the methane seeps, but provided for monitoring and adaptive management to further consider this issue.

Moreover, Plaintiffs' comments on the Draft EIS regarding greenhouse gases referenced flaring and venting only, and provided no analysis. AR9954. The air quality impact analysis conducted by BLM found, "Methane gas may be flared or vented during the testing period at natural gas wells; no gas would be flared or vented at coalbed methane wells." AR2649 (FEIS, App. F, at 5). Plaintiffs attempt to cure their failure to raise the issue before the BLM by citing to comments submitted by EPA. Pls. Mem. at 22 (citing AR3481). EPA's comments, however, do not reference methane seeps. AR3481. Further, evidence in the record shows the benefits of CBNG with respect to reducing greenhouse gas emissions over the use of coal. AR4235 (American Gas Association Comments); AR4288 (Warren Comments, at 2).

Based on the evidence in the record, BLM properly concluded that emissions of greenhouse gases were not a significant impact requiring detailed review in the EIS. Plaintiffs cannot now, after merely referencing greenhouse gases, fault BLM for not analyzing speculative impacts on climate change. *Vermont Yankee Nuclear Power Corp.*, 435 U.S. at 553-54.

C.    BLM Adequately Considered Impacts to Sage Grouse.

It is clear Plaintiffs disagree with BLM's chosen mitigation measures with respect to the sage grouse. But while NEPA requires agencies to consider mitigation, it imposes no substantive duties. "[O]nce environmental concerns are adequately identified and evaluated by the agency, NEPA places no further constraint on agency actions." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006) (citation omitted). NEPA does not require agencies to mitigate adverse effects, and does not require a detailed explanation of the mitigation

---

concluded that it was not necessary to impose additional mitigating conditions on the project. *Mayo Found. v. Surface Transp. Bd.*, 472 F.3d 545, 556 (8th Cir. 2006). The Eighth Circuit upheld STB's decision, finding STB "extensively discuss the potential impacts on air quality that may result from the implementation of the project." *Id.*

measures that will actually be employed.  *Robertson*, 490 U.S. at 353.  *See also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 206 (D.C. Cir. 1991); *S. Utah Wilderness Alliance*, 237 F. Supp. 2d at 54-55.  Nonetheless, here BLM considered and *imposed* mitigation measures for the sage grouse.  Plaintiffs' claims are easily dismissed.

      1.      BLM considered numerous mitigation measures for the protection of the sage grouse.

CEQ regulations require agencies to analyze, but not implement, means to mitigate potential impacts of a proposed action.  40 C.F.R. §§ 1502.14(f), 1502.16(h).  Mitigation is not limited to actions that avoid impacts altogether (e.g., no action), but includes actions that minimize impacts by limiting the degree or magnitude of the action and reducing or eliminating impacts over time.  40 C.F.R. § 1508.20.

As this Court has already found, "the record reflects that the BLM considered several alternatives which offered varying degrees of protection to the sage-grouse population in the Atlantic Rim area."  *NRDC*, 525 F. Supp. 2d at 121.  These alternatives were addressed in (a) the proponent's Proposed Action with minimal protections for the sage grouse,[24] (b) the no-action plan that would bar development (Alternative A), (c) a limited development plan (based, in part, on recommendations from the Wyoming Game and Fish Department ("WGFD")) that would allow for fewer wells and would provide strict protections for the sage grouse (Alternative C), and (d) BLM's chosen alternative (Alternative D).  *Id.*  BLM's consideration of each alternative outlined the potential impacts to the sage grouse.  AR2398 (proposed action), AR2399-AR2404 (Alternatives C and D).  BLM also considered BMPs for the greater sage-grouse and Columbian sharp-tailed grouse, such as using directional drilling, seasonal restrictions of public vehicular

---

[24]  Wildlife protections noted in the Plan of Development/Detailed Proposed Action included establishing a variety of forage species useful to resident herbivores by specifying the seed mixes during reclamation and discouraging unnecessary off-site activities of operational personnel in the vicinity of the drill sites.  AR3146 (FEIS at K-24).

access, noise reduction techniques and designs, burying power lines, and transportation planning. AR2159, AR3093 (FEIS at 2-11, H-13).

BLM ultimately chose Alternative D, which included surface limitations requiring reclamation of disturbed areas and resulted in mitigation measures not included in the Proposed Action.  AR4796.[25]  BLM found that Alternative D would reduce direct habitat loss by 20% as compared to the Proposed Action (8.1% of available nesting habitat as compared to 10%), and that the mitigation measures were intended to address indirect loss of habitat and reduce the stress to greater sage-grouse in proximity to leks on public lands.  AR2402 (FEIS at 4-83). "[BLM] went beyond merely satisfying the procedural requirements of NEPA and adopted numerous mitigation measures to avoid or minimize the adverse environmental effects of the [project]."  *Wright v. Inman*, 923 F. Supp. 1295, 1304 (D. Nev. 1996).

   2. Disagreement over BLM's choice of mitigation measures does not render the analysis inadequate or the decision arbitrary and capricious.

Plaintiffs fault BLM for not choosing what they believe to be the "best" mitigation measures for the sage grouse.  Plaintiffs ask this Court to substitute its judgment for that of the agency, to ignore BLM's extensive analysis of mitigation measures, and to impose obligations on BLM not required by NEPA.

   a. BLM responded to FWS's comments on the sage grouse.

Plaintiffs claim that BLM was arbitrary because it ignored the comments of the FWS. Contrary to Plaintiffs' claims, BLM adequately considered and responded to the comments of the FWS.  *See Citizens Against Burlington, Inc.*, 938 F.2d at 201 ("[U]nder the rule of reason, a lead

---

[25]  Sage grouse mitigation measures include:  (a) limiting surface disturbances within 1/4 mile of the perimeter of occupied leks; (b) providing a two-mile buffer from March 1 to July 15; (c) prohibiting *any human activity* within 1/4 mile of occupied leks from 6 p.m. to 9 a.m. from March 1 to May 20; (d) limiting construction of permanent and high-profile structures within 0.25 to 1 mile of the perimeter of leks; (e) prohibiting surface disturbances between November 15 and March 14 in delineated winter concentration areas; (f) requiring noise reduction techniques, including using hospital-style mufflers on compressor stations and generators; and (g) requiring annual inventory and monitoring for the sage-grouse.  *NRDC*, 525 F. Supp. 2d at 121-22; AR2091-AR2094 (FEIS at E-4, E-7).

agency does not have to follow the [other agency's] comments slavishly -- it just has to take

them seriously.") (citation omitted); *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1038

(10th Cir. 2001) ("We begin by noting that [NEPA] requires agencies preparing environmental

impact statements to consider and respond to the comments of other agencies, not to agree with

them.").

FWS expressed concerns over the potential impacts to the sage grouse and noted

alternative mitigation measures.  The EIS is replete with discussion of potential impacts that may

be associated with the proposed action and alternatives.  AR2235-AR2237, AR2258-AR2260,

AR2280-AR2281, AR2394-AR2395, AR2398 (proposed action), AR2399-AR2404 (Alternatives

C and D), AR2499-AR2450 (cumulative impacts).  BLM also considered the Holloran study

cited by the FWS and Plaintiffs, and discussed the potential impacts beyond the 2-mile buffer

zone.[26]  AR2260, AR2499 (FEIS at 3-96, 5-17).  BLM requested studies on the potential impacts

on the sage grouse.  *See, e.g.,* AR7383 (Vegetation and Habitat Analysis of Critical Wintering

Areas for Greater Sage-Grouse).  Indeed, BLM found that the impacts to the sage grouse would

be significant even under Alternative C, which provided more stringent protections.  AR2092.

Apparently, the real dispute Plaintiffs have is over the 1/4-mile no surface occupancy

("NSO") area around leks adopted by BLM and BLM's decision not to impose a 2-mile NSO

area around leks based on the comments of the FWS, which reference Connelly *et al*. (2000).

---

[26]  The mitigation measures at issue in the Holloran study -- a PhD dissertation relating to the PAPA -- differ from those at the ARPA.  AR7131.  For example, there were restrictions on human activity within 1/2 mile of a lek from March to May, but only from midnight to 9 a.m. in the PAPA, rather than from 6 p.m. to 9 a.m.  AR7131.  Mitigation measures for the ARPA also include sound muffling and seasonal restrictions for winter concentration areas.  *Compare* AR4850 *with* AR7131-7132.  More significantly, the surface disturbance and well-spacing limitations for the ARPA are more restrictive - 8 well sites per 640 acres (80-acre spacing), AR4805 (ROD at 10), compared to 10-acre spacing in the PAPA, *supra* note 14.  Holloran also stated that the cause of sage grouse decline "remain[s] elusive" and that it was "difficult, if not impossible," to implicate any particular factor or factors.  AR7091, AR7085.

Pls. Mem. at 34.  As an initial matter, Connelly *et al.* (2000) does not suggest strict adherence to

a 2-mile NSO area, and instead recommended:

> Adjust timing of energy exploration, development, and
> construction activity to minimize disturbance of sage grouse
> breeding activities.  Energy related facilities should be located >3.2
> km [(2 miles)] from active leks *whenever possible*.  Human
> activities within view of or <0.5 km from leks should be
> minimized during the early morning and late evening when birds
> are near or on leks.

AR86094 (emphasis added).  BLM's mitigation measures include timing restrictions on surface

disturbance and human activities and limit placement of facilities within 1/4 mile.  They also

prohibit activities within 2 miles of leks during a significant portion of the year.  *NRDC*, 525 F.

Supp. 2d at 121-22.

Moreover, BLM responded to the FWS's comments.  AR4405.  In particular, BLM noted

that "Literature reviews show that requirements for no surface disturbance (NSD) from a lek

generally run in the quarter-mile to 2-mile range.  The quarter-mile NSD mitigation is generally

a minimum distance."  *Id.*  Plaintiffs claim that BLM's response was insufficient because it

included no citations, but the EIS contains a long list of references with numerous references to

studies related to the sage grouse.  AR2516-AR2544.  In addition, BLM noted in response to

similar comments that the 1/4-mile NSO was consistent with the RMP and with the Wyoming

Sage Grouse Plan.  AR4678.  The WGFD recommendations on oil and gas development also

lists the 1/4-mile NSO as mitigation for the sage grouse and lists numerous studies on the sage

grouse that were reviewed (including the Connolly study referenced by the FWS).  AR6564,

AR6544, AR6630-AR6658.  *See W. Watersheds Project v. BLM*, __ F. Supp. 2d __, 2008 WL

1806194, at *12 (D. Nev. Apr. 18, 2008) (finding "EA, as a whole, adequately references the data it relied on" and "meets the minimum requirement necessary").[27]

Also, as noted above, Alternative C included more restrictive mitigation measures for the protection of the sage grouse.  The FWS commented that Alternative C would provide enhanced protection, and encouraged BLM to incorporate as many of the protective measures outlined in Appendix L "as are practical into the final action."  AR10135.  FWS further "commend[ed] the Bureau for requiring interim reclamation as this may reduce some of the impacts that will occur across the Project area."[28]  *Id.*  BLM noted, however, that more stringent restrictions were "likely not economically feasible nor capable of maximizing recovery of the natural gas resource."  AR2147 (FEIS at 1-20); *see also* AR4719 (FEIS at O-324) ("The BLM will not apply measures that are in conflict with resource goals of the Great Divide Resource Management Plan.  BLM will not apply measures that are not feasible.").  In fact, BLM's map outlining the known leks in the project area with a 2-mile buffer (AR3191 (FEIS, Map M-26)) illustrates the unreasonableness of Plaintiffs' proposal.  Sage-grouse nesting habitat covers 92% of the ARPA.

---

[27]  Plaintiffs also contend that BLM failed to respond to FWS's comments because it failed to consider whether the project would lead to the sage grouse being listed under the Endangered Species Act.  Although Plaintiffs cite to the Holloran study that "predicted the complete extinction of the studies sage grouse population within 19 years," Pls. Mem. at 33 (citing AR7131), that study found "[t]hese conclusions suggest that natural gas field development contributes to localized greater sage-grouse extirpations but that regional population levels although negatively impacted are not as severely influenced."  AR7085.  *See also* AR6226 (study on mining impacts on sage grouse, finding:  "It is reassuring that within the limits of the analysis, overall sage grouse populations were apparently not reduced").  Moreover, the population of sage grouse has stabilized in Wyoming.  AR2258.  Evidence in the record also shows that the sage grouse return to sites disturbed by energy activities, although not at pre-disturbance levels.  AR6240; AR86090.  Recognizing that habitat loss was a potentially significant impact of the project on the sage grouse, BLM restricted the total amount of disturbance in the ARPA to 7,600 acres, or 2.8% of the entire area at any one time.  AR4796.  BLM also required reclamation.  *See, infra* note 28.  Thus, the evidence in the record indicates that BLM considered the potential impacts of the project on the sage grouse's survival.

[28]  *See also* AR5972 ("The high degree of motility and extensive knowledge of regional habitat exhibited by the sage grouse during the 2-year study are strong indicators of their versatility and their considerable capacity for responding quickly and effectively to changing environmental conditions.  Since reclamation of the Caballo Rojo site will proceed concurrently with mining the duration and magnitude of any impacts will be substantially reduced."); AR6227 ("Prompt revegetation with native plant species including sagebrush subspecies that occur in the area should progress as mining disturbance of each site is terminated."); AR6240-AR6241 ("It is reasonable to conclude that as oil/gas developments mature and disturbed areas are reclaimed, similar to mined areas, sage grouse will repopulate the area.").

AR2395 (FEIS at 4-76). Restricting activity beyond the 2-mile buffer would virtually eliminate all development within the ARPA. This would be contrary to the purposes and need of the project. The FWS encouraged BLM to use protective measures "as practical," which BLM did.

Even if there was disagreement between BLM and FWS, nothing in NEPA requires BLM to chose one measure over another, or, in this case, the maximum value cited in literature. *Citizens Against Burlington, Inc.*, 938 F.2d at 206 (citing *Robertson*, 490 U.S. at 353, n.16). Disagreement over recommended mitigation measures does not render BLM's analysis inadequate, particularly when BLM was aware of the mitigation measures and studies advocated by the Plaintiffs.[29] *See, e.g., Custer County Action Ass'n*, 256 F.3d at 1036 ("[T]he mere presence of contradictory evidence does not invalidate the [a]gencies' actions or decisions.") (alteration in text) (citation omitted). For example, in *Biodiversity Conservation Alliance*, 174 IBLA 1 (Mar. 3, 2008), the IBLA rejected these same arguments in affirming a ROD for the Desolation Flats Natural Gas Field Development Project. (Attached as Exhibit 4). In that case, BLM imposed similar mitigation requirements, although not those advocated by the plaintiffs, and included a policy to adapt to and develop new data. *Id.* at 23. The IBLA found BLM adequately responded to comments on sage grouse and properly attempted to protect the sage grouse. *Id.*

BLM's detailed analysis and response here is far different from those found inadequate in response to concerns raised by other agencies in cases cited by Plaintiffs. In *NRDC v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988), the court found that the Department of the Interior did not adequately address issues raised by EPA "over the lack of any consideration in the DEIS of inter-regional cumulative impacts," listing numerous omissions from the EIS. *Id.* at 298. Unlike the

---

[29] The recommendations of WGFD noted the recommendation of Connelly to locate "all energy related facilities at least 2 miles from active leks whenever possible." AR6565 (WGFD, *Recommendations for Development of Oil and Gas Resources within Crucial and Important Wildlife Habitats*, at 19).

detailed analysis BLM conducted here, the draft EIS in that case contained no analysis of cumulative impacts.  That court found the EIS merely repeated "the same boilerplate for each area" and lacked an "analysis" of the impacts cited by the agencies.  *Id.* at 299, n.6.  Similarly, in *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, other agencies commented that analyses of various issues in the EA being challenged were omitted, and requested that the Corps complete an EIS instead.  109 F. Supp. 2d 30 (D.D.C. 2000).  The court found the Corps' analysis of these issues inadequate, because the EA provided "only conclusory statements" and the Corps "conced[ed]" that it "disregard[ed]" the issues raised by these other agencies.  *Id.* at 38-39.  As described above, BLM considered the concerns raised by the FWS regarding impacts to and potential mitigation for the sage grouse, but reached a different conclusion, which NEPA permits.

> **b.**    BLM was not required to establish the effectiveness of the mitigation measures.

Plaintiffs also claim that BLM was required to establish the "scientific viability of its mitigation measures."  Pls. Mem. at 34.  The CEQ regulations cited by Plaintiffs impose no such requirement.  40 C.F.R. § 1502.24.  *See also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1213 (9th Cir. 2004).  NEPA does not require BLM to analyze the effectiveness of mitigation measures.  *See N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 979 (9th Cir. 2006) (rejecting claim that agency violated NEPA by only listing "general mitigation measures" and not analyzing effectiveness of each measure).

The case cited by Plaintiffs is inapposite, because it addresses mitigation requirements imposed under the Clean Water Act.  *Environmental Defense v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69 (D.D.C. 2007), involved a challenge to the Corps' authorization of a flood control project that would have affected fish access to a floodplain.  The Corps' "mitigation analysis

[was] a major component of the project's compliance with the Clean Water Act," which prohibits the Corps from issuing permits to projects that will have a "significant adverse impact on the environment." *Id.* at 77. While the court in that case found the mitigation inadequate, the Clean Water Act, not NEPA, imposed the requirement to mitigate impacts to insignificant levels. *Id.* at 81. There is no such requirement here.

> c.     The choice of mitigation measures complied with BLM's policy.

Apparently recognizing that NEPA is a procedural statute, Plaintiffs attempt to impose substantive requirements on BLM by claiming BLM's choice of mitigation measures are contrary to the Great Divide RMP, BLM's Sensitive Species Policy, and a Memorandum of Understanding ("MOU") between BLM and various parties. Notwithstanding BLM's conclusions to the contrary, Plaintiffs assume an inconsistency exists, and then attack BLM's "decision-making process," by arguing that BLM failed to explain why it allegedly did not follow these policies. Pls. Mem. at 32. Plaintiffs' bootstrapping arguments are premised on a faulty assumption and seek to impose obligations not required under NEPA. *Cf. Motor Vehicles Mfrs. Ass'n of U.S. Inc., v. State Farm*, 463 U.S. 29, 34 (1983) (involving challenge to agency's rescinding a regulation with no explanation in violation of APA). BLM's actions here are consistent with its policies.

The mitigation measures imposed by BLM are consistent with the RMP. AR4678 (FEIS at O-283). The Great Divide RMP addresses the sage grouse in its Wildlife Mitigation Guidelines. AR697-AR698 (Great Divide RMP at 48-49).[30] As BLM noted:

> The purposes of the Guidelines are (1) to reserve for the BLM the
> right to modify the operations of all surface and other human
> presence disturbance activities as part of the statutory requirements

---

[30] Unlike other resource areas addressed in the Great Divide RMP, the discussion of the Atlantic Rim area does not specifically list mitigation for the sage grouse. AR712-AR713, AR715-AR716 (Great Divide RMP at 64-65, 67-68).

for environmental protection, and (2) to inform potential lessee, permittee, or operator of the requirements that must be met when using BLM-administered lands.  *The Guidelines in the RMP are not specific as to the distance an action must be moved to mitigate impacts of a proposal on sage-grouse.*

AR4405 (FEIS at O-9) (emphasis added).

Further, BLM considered whether the approval of the Atlantic Rim Project may contribute to the need to list the sage grouse pursuant to the Endangered Species Act under its Sensitive Species Policy.  BLM's significance criterion 1 in the EIS addressed whether an alternative would result in losses that would make a species eligible for listing under the Endangered Species Act.  AR2388.  None of the alternatives met this criterion.  Thus, BLM determined the Atlantic Rim Project was not likely to contribute to listing the sage grouse.  In addition, as the IBLA recognized, the Sensitive Species Policy does "not have the force and effect of law."  IBLA Decision at 23.  In any event, the IBLA rejected the notion that finding a species to be significantly impacted for purposes of NEPA is a violation of the policy.  *Id.* at 22-23.  The IBLA noted that FWS and WGFD "caution" BLM, but found that BLM is complying with its Sensitive Species Policy in requiring management plans (i.e., mitigation) to minimize those effects.  *See* IBLA Decision at 22-23.  Again, while Plaintiffs may disagree with those plans, this does not constitute a violation of the Sensitive Species Policy or of NEPA.

Finally, the MOU cited by Plaintiffs merely requires BLM to provide for habitat protection, conservation and restoration, "as appropriate, consistent with [NEPA] and *other applicable laws, regulations, directives and policies.*"  AR86104 (emphasis added).  BLM's actions here are consistent with applicable BLM policies.  *See, e.g.,* AR79130-AR79135 (BLM's Instruction Memorandum No. WY-030-2006-001).  The Draft EIS for the Rawlins RMP, which is intended to amend the Great Divide RMP, outlines the same mitigation measures considered

38

for the Atlantic Rim Project, which are consistent with the recommendations of the WGFD. AR733, AR1310-AR1311 (DEIS for Rawlins RMP at ES-14, A15-1 to A15-2).[31]

Moreover, nothing in NEPA or the documents on which Plaintiffs attempt to rely requires BLM to elevate environmental considerations above all other considerations. As BLM has consistently recognized, "National mineral leasing policies and regulations by which they are enforced recognize the statutory right of leaseholders to develop mineral resources to meet continuing national needs and economic demands as long as undue environmental degradation is not incurred." AR7650 (Scoping Presentation). BLM balanced consideration of environmental impacts with its other obligations, as required by its policies. That the Plaintiffs may weigh these factors differently is of no import.

    D.    <u>BLM Appropriately Considered Potential Cumulative Impacts to Big Game Species.</u>

BLM analyzed the potential cumulative impacts of oil and gas operations in the ARPA in Chapter Five of the Atlantic Rim EIS. Cumulative impacts are "impact[s] on the environment which resul[t] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. BLM considered the potential impacts of development in the ARPA, and the specific PODs at issue in this case, in connection with other reasonably foreseeable projects. BLM specifically identified the potential cumulative impacts of operations to a variety of resources, including: geology and paleontology; climate and air quality; soils; water resources; vegetation and wetlands; range resources; wildlife and fish; recreation resources; visual resources; cultural resource; socioeconomics; transportations; health and safety; and noise. AR1792-AR1814, AR2482-AR2508. In the Atlantic Rim EIS, BLM also considered past, existing, and reasonably foreseeable future actions, as required by 40 C.F.R.

---

[31] The Final Environmental Impact Statement for the Rawlins RMP was issued December 26, 2007.

§ 1508.7, including those located in (a) the ARPA, (b) the Southeastern Sweetwater County/Southwestern Carbon County cumulative impact analysis ("CIA") area, (c) the Watershed CIA area, and (d) the Regional CIA area. AR2483. The Atlantic Rim EIS also contains a discussion of how the Atlantic Rim Project relates to and interacts with other oil and gas projects in the region, including the Continental Divide/Creston Natural Gas Field Development Project, the Greater Wamsutter Area II Natural Gas Development Project, the Continental Divide/Wamsutter II Natural Gas Development Project, the Creston/Blue Gap Natural Gas Project, the Hay Reservoir Unit Natural Gas Infill Development Environmental Assessment, the South Baggs Area Natural Gas Development Project, and the Vermillion Basin Natural Gas Exploration and Development Project Environmental Assessment. AR2137-AR2138, AR2484-AR2485 (map of other development projects in the vicinity of the ARPA).

Contrary to Plaintiffs' contentions, BLM disclosed estimates of potential surface disturbance for each alternative in the Atlantic Rim EIS in relation to the cumulative surface disturbance from oil and gas activities in the CIA for big game. AR2498. Table 5-2 specifically discloses surface disturbance for each big game species, by unit, and includes estimates for initial and life-of-project disturbance, as well as existing and potential future cumulative surface disturbance. *Id.* With respect to wildlife habitat specifically, BLM also noted that "it was not possible to specifically determine where future impacts would occur within CIA areas," and "estimates of total disturbance were made based upon the location of past, present, and known future projects within the CIA areas and the expected amount of disturbance associated with each project." AR2496. In particular, BLM estimated big game habitat disturbances for the ARPA and adjacent oil and gas project EIS boundaries. AR2496-AR2499. Although BLM analyzed potential migration routes, BLM found the cumulative effects on migration routes were

unknown.  *Id.*; *see also* AR4660 (agreeing with assertion that fragmentation and barriers to movement and migration can be effectively analyzed "only when the actual location of well pads, facilities, and roads are known").  NEPA does not preclude BLM from issuing its EIS when such information is not available.  *See* 40 C.F.R. § 1502.22.

Finally, Plaintiffs contend the Atlantic Rim EIS is deficient because it did not specifically address two proposed projects located in Wyoming -- the Continental Divide/Creston Natural Gas Development Project ("CD-C") and the Hiawatha Project.  The CD-C involves a proposal for up to 7,700 natural gas wells in the Continental Divide/Wamsutter II area, which was combined with a proposal for 1,250 natural gas wells proposed in the Creston/Blue Gap II Natural Gas Project area for purposes of the NEPA review.  71 Fed. Reg. 10,989, 10,989 (Mar. 3, 2006).  These combined proposals partially overlay and would further develop natural gas fields under the EISs and RODs for Continental Divide/Wamsutter II (2000) and Creston/Blue Gap (1994).[32]  AR2137.  The EIS recognized the pending review of the CD-C.  AR2137-AR2138 (FEIS at 1-10, Map M-5 -Mineral Development Projects in the Vicinity).  To date, however, BLM has still not issued a draft EIS for the project.  The Hiawatha Project is a 4,207-well natural gas development project located southwest of, but not adjacent to, the Atlantic Rim Project.  71 Fed. Reg. 25,751, 25,752 (Sept. 6, 2006).  Review of the project is not complete and BLM has not even issued a draft EIS at this time.

Although Plaintiffs argue the impacts from the above projects were foreseeable at the time the Catalina and Sun Dog PODs were approved, BLM was not required to consider these projects because they are still only at the beginning stages of their NEPA review.[33]  As noted,

---

[32]  Both the Continental Divide/Wamsutter II (2000) and Creston/Blue Gap (1994) projects were included in the cumulative impact analysis in the EIS, among others.  AR2485.

[33]  The wells proposed for the CD-C were not initially included in the Continental Divide/Wamsutter II and Creston/Blue Gap EISs and RODs.  71 Fed. Reg. at 10,989-90.

BLM has not issued a draft EIS for either project, making it virtually impossible for the agency to estimate or quantify potential impacts. The U.S. Court of Appeals for the Fifth Circuit approved this approach and upheld an agency decision to consider only those projects for which "an approved public Draft NEPA document [was] available for review at the time of the Draft EIS" for the challenged action. *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368-69, 371 n.15 (5th Cir. 2006) (alteration in text). The Fifth Circuit affirmed the agency's determination that such analysis would involve too many uncertainties as to whether the projects would be approved or conditions that may be imposed. *Id.* For example, here, the Atlantic Rim Project dropped from 3,880 proposed wells to approximately 2,000. Likewise, the CD-C and Hiawatha Projects could undergo changes during the NEPA process, and thus were not reasonably foreseeable future actions requiring BLM review in the Atlantic Rim EIS.

"Because the NEPA process 'involves an almost endless series of judgment calls … [t]he line drawing decisions . . . are vested in the agencies, not the courts. . . . Therefore, the 'role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its action and that its decision is not arbitrary or capricious.'" *Fund for Animals*, 448 F. Supp. 2d at 132 (alteration and omissions in text) (citations omitted). *See also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002) ("Although [plaintiff] argues that it was insufficient to analyze only the cumulative effects of the west side of the forest, under NEPA we defer to the agency's determination of the scope of its cumulative effects review.") (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 413-14 (1976)). In this case, BLM was not arbitrary and capricious in its determination that these two early-stage projects were not sufficiently reasonably foreseeable to be included in the cumulative impacts analysis in the Atlantic Rim EIS.

## II.     BLM SATISFIED ITS PUBLIC PARTICIPATION REQUIREMENTS UNDER NEPA.

Plaintiffs' claims that BLM failed to satisfy its public participation requirements under NEPA with respect to site-specific impacts are meritless.  Here, BLM provided more than ample opportunity for the public to participate during the six-year decision-making process.

First, BLM prepared an EIS for the entire project, which fully explored the environmental issues pertaining to the project as a whole.  Plaintiffs do not dispute that "BLM provided significant opportunity for public comment on the project-wide Atlantic Rim EIS."  Pls. Mem. at 43.  Plaintiffs argue, however, that because BLM deferred some environmental decisions until after actual development operations were proposed, each subsequent EA for a specific permitting decision also required a special public notice and comment period.  Such a special comment period is not required by statute or regulation, and Plaintiffs' contention is plainly barred by *Vermont Yankee Nuclear Power Corp.*, 435 U.S. at 525, where the Supreme Court "caution[ed] reviewing courts against engrafting their own notions of proper procedures" upon administrative agencies.

In fact, BLM complied with all of NEPA's public participation requirements.  "A plain reading of the CEQ regulations reveals that an agency is *not* expressly required to circulate a draft EA for public comment before adopting its final decision, except in limited circumstances that do not apply here."  *Biodiversity Conservation Alliance v. BLM*, 404 F. Supp. 2d 212, 220 (D.D.C. 2005) (emphasis in original) (citing 40 C.F.R. § 1501.4(e)(2)).  *See also TOMAC*, 433 F.3d at 861 ("[T]wo of our sister Circuits have found that public input during the EA process is not required.") (citing *Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of the Army*, 398 F.3d 105, 115 (1st Cir. 2005); *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1279 (10th Cir. 2004)).  The D.C. Circuit also concluded that, "[a]t a minimum, [the CEQ regulations] suggest that the agency has significant discretion in determining when public comment is

required with respect to EAs." *Id.* at 861. *Compare Biodiversity Conservation Alliance*, 404 F.

Supp. 2d at 220 (rejecting contention that BLM was required to notify public and take comment

on draft EA before allowing 69-square-mile expansion of previously approved project for oil and

gas exploration for which an EIS had been prepared), *with Ocean Mammal Inst. v. Gates*,

__ F. Supp. 2d ___, 2008 WL 564664, at *10 (D. Hawaii Feb. 29, 2008) (finding, in case

involving EA only, that public comment provided after EA and FONSI was prepared and "well

after a significant portion . . . of the proposed exercises had already occurred" was inadequate to

satisfy NEPA).

Here, BLM prepared an EA and made a finding of no significant impact with respect to

each individual permitting decision. In such cases, the CEQ regulations only require that the

agency provide notice to interested parties. 40 C.F.R. §§ 1501.4(e)(1), 1506.6. BLM satisfied

the requirements of NEPA by posting notice that it was preparing the EAs on its web site.

*NRDC*, 525 F. Supp. 2d at 120-21.[34] *See also* AR73494 (Catalina A&B EA at 3); AR74065 (Sun

Dog A&B EA at 3); AR75020 (Sun Dog C EA at 2); AR75175 (Sun Dog D&E EA at 3). Only

"in certain limited circumstances" not relevant here is the agency required to make its finding of

no significant impact available for public review before it takes action. 40 C.F.R. § 1501.4(e)(2).

These circumstances are: (i) "The proposed action is, or is closely similar to, one which

normally requires the preparation of an environmental impact statement," or (ii) "[t]he nature of

the proposed action is one without precedent." *Id.* Plaintiffs have not even attempted to show

that the individual permitting decisions in this case meet those criteria, nor could they.

Instead, Plaintiffs reference BLM's procedures relating to APDs under a wholly separate

statutory scheme, and attempt to argue, notwithstanding controlling case law to the contrary, that

---

[34] Moreover, in response to specific requests, BLM did provide draft EAs for the Sun Dog PODs C, D and E to Plaintiffs. AR79066.

NEPA requires public notice and comment of the draft EAs in this case. Pls. Mem. at 40-42.

The regulations governing public notice of APDs, however, only require that BLM make certain

information concerning the permit application (but not the permit application itself) available for

30 days before the permit decision. 30 U.S.C. § 226(f); 43 C.F.R. § 3162.3-1(g). This posting is

"for information purposes only." *NRDC*, 525 F. Supp. 2d at 119 n.5. (citing 43 C.F.R. § 3162.3-

1(g)). In this case, BLM posted the required notice for Catalina PODs A&B and Sun Dog PODS

A, B, C, D&E. *Id*. at 120; AR75020 (Sun Dog C EA at 2); AR75175 (Sun Dog D&E EA at 3).

If Plaintiffs' contention that individual public notice and comment is required for *any*

site-specific EA tired to an EIS is accepted, further development of the Atlantic Rim Project (or

any other project utilizing this procedure favored by the CEQ regulations) would grind to a halt.

"[T]he project could never be completed." *Cronin v. U.S. Dep't of Agriculture*, 919 F.2d 439,

447 (7th Cir. 1990). Nothing in NEPA requires such a result.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion for Summary

Judgment and grant summary judgment in favor of defendants.

Respectfully submitted,


/s/ Michael B. Wigmore
_____
Michael B. Wigmore (DC Bar #436114)
Sandra P. Franco (DC Bar #467091)
Bingham McCutchen LLP
2020 K Street, NW
Washington, DC  20006-1806
(202) 373-6000 (tel)
(202) 373-6001 (fac)

*Counsel for Anadarko Petroleum Corporation*
*Warren Resources, Inc., and Double Eagle*
*Petroleum Co.*

Robert C. Mathes (DC Bar #484255)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO  80202
(303) 892-1400 (tel)
(303) 892-1401 (fac)

*Counsel for Double Eagle Petroleum Co.*

Dated:  May 30, 2008

A/72550322.2

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Avenue, NW, Suite 400
Washington, DC 20005, *et al.,*

       Plaintiffs,

            v.

DIRK KEMPTHORNE, in his official capacity
as the Secretary of the United States
Department of the Interior
1849 C Street, NW
Washington, DC 20240, *et al.,*

       Defendants.

---

ANADARKO PETROLEUM CORPORATION
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

DOUBLE EAGLE PETROLEUM CO.
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

       and

STATE OF WYOMING
123 Capitol Building
Cheyenne, WY 82002,

       Defendant-Intervenors.

Civ. No. 1:07-cv-01709-RJL

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANT-INTERVENOR ANADARKO PETROLEUM CORPORATION,
WARREN RESOURCES, INC. AND DOUBLE EAGLE PETROLEUM CO.'S
<u>CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Local Rule 7(h), Defendant-Intervenors Anadarko Petroleum Corporation ("Anadarko"), Warren Resources, Inc. ("Warren"), and Double Eagle Petroleum Corporation ("Double Eagle") submit the following statement of material facts to which there is no genuine issue in support of its cross-motion for summary judgment.

## A.    Background

1.    In the Mining and Minerals Policy Act of 1970, Congress declared that it is the continuing policy of the Federal Government to foster and encourage private development of domestic minerals, including gas.  30 U.S.C. § 21a.  The Mineral Leasing Act of 1920 encourages and authorizes mineral development, including oil and gas development, on federal lands.  30 U.S.C. § 182.

2.    The United States Bureau of Land Management ("BLM") manages resources on public lands in the United States pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1731, 1732.  FLPMA requires that public lands be managed under the principle of multiple use.  43 U.S.C. § 1732(a).

3.    FLPMA recognizes that public lands should be managed "in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands including implementation of the Mining and Minerals Policy Act of 1970 (84 Stat. 1876, 30 U.S.C. 21a) as it pertains to public lands."  43 U.S.C § 1701(a)(12).  FLPMA identifies mineral exploration and production as a "principal or major use[]" of the federal public lands. *Id.* at § 1702(l).

4.    BLM has found that "[e]xploration and development of federal oil and gas leases by private industry are an integral part of the BLMs oil and gas leasing program under authority of the Mineral Leasing Act of 1920 as amended, the Mining and Minerals Policy Act of 1970,

the Federal Land Policy and Management Act of 1976 (FLPMA), the National Materials and

Minerals Policy, Research and Development Act of 1980, and the Federal Onshore Oil and Gas

Leasing Reform Act of 1987."  AR2135 (FEIS at 1-8).

### B.    History of the Proposal For Development

5.    The Atlantic Rim Project Area ("ARPA") at issue in this case is located in

southwestern Carbon County, Wyoming, within the Great Divide Resource Area.  AR2088

(FEIS at ES-1), AR2136 (FEIS at 1-9), AR2149 (FEIS at 2-1).  There are about 12.5 million

acres within the general administrative boundary of the Great Divide Resource Area, which

includes federal, state and privately owned lands.  AR652 (Great Divide RMP at 3).  The Great

Divide Resource Area includes approximately 4 million acres of public lands, which are

managed by BLM.  AR650 (Great Divide RMP at 1).  The ARPA (270,080 acres total, with

173,672 acres of federal lands, AR2082 (FEIS, Dear Reader Letter)) composes approximately

2.2 percent of total lands within the boundary of the Great Divide Resource Area and 4.3 percent

of the federal lands in the Great Divide Resource Area.  AR2331-AR2332 (FEIS at 4-12 to 4-

13).

6.    In November of 1990, BLM issued the Great Divide Resource Area Record of

Decision and Approved Resource Management Plan ("Great Divide RMP"), opening portions of

the Great Divide Resource Area to oil and gas leasing.  AR645 (Great Divide RMP), AR652

(Great Divide RMP at 3), AR679-AR681 (Great Divide RMP at 30-32).

7.    BLM determined that leasing in the Great Divide Resource Area would be subject

to stipulations to protect various resources, including habitat for the greater sage-grouse, elk, and

various other big game species.  AR679-AR681 (Great Divide RMP at 30-32).

8.      Pursuant to its authority under the Great Divide RMP, BLM leased federal minerals within the entire ARPA.  AR2135 (FEIS at 1-8).

9.      On May 24, 2001, the Atlantic Rim project proponents, which now include Anadarko, Warren, and Double Eagle, proposed to explore and develop coalbed natural gas ("CBNG") resources located in the ARPA.  The proposal projected a maximum of 3,880 CBNG wells would be needed to efficiently recover the natural gas resource ("Proposed Action"). AR2128 (FEIS at 1-1).

10.      Under the proposal, the project would have been developed within approximately 310,335 acres of federal, state and private lands.  AR9483 (66 Fed. Reg. 33,975 (June 26, 2001)).

11.      The proposal included certain voluntary committed measures to avoid or mitigate impacts to natural resources.  AR3142-AR3146 (FEIS at K-20 to K-24).

### C.      BLM Begins NEPA Scoping Process

12.      In June of 2001, BLM issued a Notice of Intent ("NOI") to Prepare an Environmental Impact Statement ("EIS") for the Atlantic Rim Project pursuant to the National Environmental Policy Act ("NEPA").  AR9483-AR9484 (66 Fed. Reg. 33,975 (June 26, 2001)).

13.      The NOI stated that the EIS would assess the potential environmental impacts of the Proposed Action, including the cumulative impacts of other oil and gas projects in the vicinity of the ARPA.  AR9484 (66 Fed. Reg. at 33,976).

14.      In addition to the NOI published in the Federal Register, BLM mailed a scoping notice and informational materials regarding the proposed project to potentially interested parties.  AR7632 (Scoping Letter); AR2088 (FEIS at ES-1).

15.      BLM also held two public scoping meetings in Baggs and Rawlins, Wyoming. AR7644-AR7645 (Materials from Scoping Meetings); AR2141 (FEIS at 1-14).

16.     BLM received 57 comments from the public, including citizens, interested federal, state, and local agencies, advocacy groups, and various corporations.  AR7672 (Scoping Letters); AR2141 (FEIS at 1-14).

17.     BLM used the public comments it received to determine key issues, resource conflicts and concerns, alternatives, and the scope of BLM's analysis.  AR2141-AR2147 (FEIS at 1-14 to 1-20).

18.     In January of 2002, BLM developed an interim drilling policy to allow for exploratory drilling that would help obtain additional information that would be used to support the geologic information needed for the Atlantic Rim EIS.  AR2131-AR2132 (FEIS at 1-4 to 1-5); *see also* AR2565-AR2573 (Interim Drilling Policy).

19.     Under this policy, a maximum of 200 exploration CBNG wells in nine proposed plan of development ("POD") locations could be drilled.  AR2132 (FEIS at 1-5).  For six of the proposed interim drilling PODs, BLM prepared environmental assessments ("EAs"), issued decision records, and implemented those decisions.  *Id.*  The project proponents did not submit proposals for the remaining three PODs.

20.     In February of 2005, the boundary of the ARPA was redrawn, reducing the size of the project area by approximately 40,000 acres to 270,080 acres.  AR9483 (66 Fed. Reg. 33,975 (June 26, 2001); AR2132-AR2133 (FEIS at 1-5 to 1-6).  This area composes approximately 2.2 percent of the total lands within the boundary of the Great Divide Resource Area (12.5 million acres, AR652 (Great Divide RMP at 3)).

21.     The Proposed Action was also reduced to 2,000 wells (1,800 CBNG wells and 200 conventional natural gas wells).  AR2088 (FEIS at ES-1).

**D.    The Atlantic Rim Environmental Impact Statement**

22.    In December 2005, BLM released a Draft EIS, providing for a 60-day comment period.  AR2141 (FEIS at 1-4); AR9515 (70 Fed. Reg. 73481 (Dec. 12, 2005)).

23.    BLM received over 60,000 comments on the DEIS.  AR9564 (71 Fed. Reg. 69,582 (Dec. 1, 2006)).

24.    BLM published a notice of availability for the Final EIS in the Federal Register on December 1, 2006.  *Id.*

25.    Additional public comments were submitted on the Final EIS, including some by Plaintiffs.  AR4817 (ROD at 22); AR4868-AR4881 (ROD, Appendix E).

26.    In the EIS, BLM stated that the purpose and need for the project was "to develop, produce, and market natural gas products."  AR2136 (FEIS at 1-9).

27.    BLM developed the EIS with a team including numerous experts on air quality, wildlife, soils, fisheries, natural resources, and other issues, as well as several federal and state agencies.  AR2510-AR2514 (FEIS at 6-1 to 6-5).

28.    In the EIS, BLM identified a range of alternatives to the Proposed Action, including: (a) Alternative A, the no action alternative; (b) Alternative C, where approximately 95 percent of the federal lands within the ARPA would be assigned one or more resource protection measures to be applied to development activities; and (c) Alternative D, the Preferred Alternative, which would minimize surface disturbance while optimizing natural gas recovery.  *See* AR2149-55 (FEIS at 2-1 to 2-7).  BLM reviewed the potential environmental impacts of each of these alternatives.  AR2151-AR2156 (FEIS at 2-3 to 2-8).

29.    Additional alternatives, including the initial 2001 proposal and Alternative B (phased development), were considered and eliminated from detailed study in the FEIS.

AR2149 (FEIS at 2-1).  Alternative B was, however, analyzed in detail in the Draft EIS.

AR1489-AR1490 (DEIS at 2-2 to 2-4).

30.     The EIS reviewed potential impacts to geology/minerals/paleontology, air quality,

soils, water resources (impacts to Muddy Creek, salinity loading, etc.), groundwater (impacts to

wells, seeps, and springs emanating from upper Mesaverde Group, etc.), range and other land

uses, vegetation (impacts from erosion and runoff, long-term loss of shrubs, etc.), wildlife

(impacts to greater sage-grouse, big game, threatened and endangered fishes, etc.), recreation,

visual resources, cultural resources, socioeconomics, transportation, health and safety, and noise.

*See generally* AR2090-AR2094 (FEIS at ES-3 to ES-7); *see also* AR3050-AR3079 (FEIS, App.

G, Biological Assessment).

31.     BLM analyzed the cumulative impacts of operations to a variety of resources

including: geology and paleontology; climate and air quality; soils; water resources; vegetation

and wetlands; range resources; wildlife and fish; recreation resources; visual resources; cultural

resources; socioeconomics; transportation; health and safety; and noise.  AR1792-AR1814

(DEIS, Ch. 5), AR2482-AR2508 (FEIS, Ch. 5).

32.     In analyzing cumulative impacts, BLM considered past, existing, and reasonably

foreseeable future actions, including those located in (a) the ARPA, (b) the Southeastern

Sweetwater County/Southwestern Carbon County Cumulative Impact Analysis ("CIA") area,

(c) the Watershed CIA area, and (d) the Regional CIA area.  AR2483 (FEIS at 5-1).

33.     The EIS discusses how the Atlantic Rim Project relates to and interacts with

several other oil and gas projects in the region, including the Continental Divide/Creston Natural

Gas Field Development Project, the Greater Wamsutter Area II Natural Gas Development

Project, the Continental Divide Wamsutter/II Natural Gas Development Project, the

Creston/Blue Gap Natural Gas Project, the Hay Reservoir Unit Natural Gas Infill Development

Environmental Assessment, the South Baggs Area Natural Gas Development Project, and the

Vermillion Basin Natural Gas Exploration and Development Project Environmental Assessment.

AR2137-AR2138 (FEIS at 1-10 to 1-11), AR2484-AR2485 (FEIS at 5-2 to 5-3).

      34.     BLM also reviewed numerous mitigation measures, including:  (a) voluntary

measures proposed by the project proponents to mitigate surface disturbance and environmental

impacts under the Proposed Action (AR3122-AR3147, FEIS, App. K); (b) a Wildlife Monitoring

and Protection Plan, which outlines proposed inventory, monitoring and protection measures

(AR2617-AR2632, FEIS, App. E); (c) a program to inventory, evaluate, and manage cultural

resources (AR3097-AR3108, FEIS, App. I); (d) Best Management Practices ("BMPs") for

reducing non-point source pollution (AR3109-AR3121, FEIS, App. J); and (e) protection

measures proposed for Alternative C (AR3148-AR3162, FEIS, App. L).

      35.     BLM then developed mandatory BMPs where the Proposed Action conflicted

with identified resources, including, but not limited to, vegetation resources, visual resources,

water and soil management, and wildlife.  AR3081-AR3096 (FEIS, App. H).

      36.     BLM chose Alternative D as the Preferred Alternative in the EIS, which placed

limits on total surface disturbance in the ARPA at any one time.  AR2089-AR2090 (FEIS  ES to

ES-3); AR2147 (FEIS at 1-20).  Under Alternative D, total new surface disturbance from the

drilling program across the ARPA was limited to a maximum of 7,600 acres at any given time

(representing less than 3 percent of the land area in the ARPA and less than 0.20 percent of the

public lands within the Great Divide Resource Area) and short-term (less than 6 years)

disturbances were limited to 6.5-acre/well site.  AR4796 (ROD at 1), AR4807 (ROD at 12).

More sensitive areas, identified as "Category A" areas (management areas with sensitive fish

populations and crucial wildlife habitats), have a short-term disturbance goal of less than 6.5 acres per well pad.  AR4807 (ROD at 12).

37.    With respect to Alternative D, BLM recognized that "[t]he proposed development . . . require[s] surface-disturbing activities that are likely to result in major adverse impacts to certain resource values, as outlined in the FEIS," but concluded, considering the imposition of mitigation measures, that, "[w]hile the development is expected to adversely impact certain resource values and limit opportunities for other uses in the short-term, the long-term goal is to return these lands to a condition approximate to that which existed before [the proposed] developments . . . were implemented."  AR4799 (ROD at 4).  As a result, BLM's environmental review process resulted in a substantially reduced development and lessened environmental impacts.  AR2147 (FEIS at 1-20), AR2155 (FEIS at 2-7).

38.    The U.S. Environmental Protection Agency ("EPA") commended BLM for its environmental review, noting that BLM "properly analyzed and disclosed to the public the potential environmental impacts of the project, which are significantly greater with the Proposed Action versus BLM's Preferred Alternative."  AR3474 (EPA's comments on the DEIS).

39.    The U.S. Fish & Wildlife Service ("FWS") also "commend[ed] the Bureau for requiring interim reclamation as this may reduce some of the impacts that will occur across the Project area."  AR10135 (FWS's comments on the FEIS).

### 1.    BLM's Consideration of Impacts to Air Quality

40.    As part of its review of direct and cumulative impacts, BLM prepared an extensive Air Quality Technical Support Document ("AQTSD").  AR2634-AR3049 (FEIS, App. F).  BLM's air quality analysis was prepared in conjunction and cooperation with the EPA or the

Wyoming Department of Environmental Quality ("WDEQ"), the National Park Service ("NPS") and the U.S. Forest Service ("USFS").  AR2645 (AQTSD at 1).

41.     BLM used the EPA-approved AERMOD model to perform a near-field ambient air impact assessment to quantify potential maximum impacts from emissions of criteria pollutants (carbon monoxide (CO), sulfur dioxide ($SO_2$), nitrogen oxides ($NO_x$), and particulate matter ($PM_{2.5}$ and $PM_{10}$)) and of hazardous air pollutants (benzene, toluene, ethylbenzene, xylene, n-hexane, and formaldehyde) resulting from construction and production emissions activities associated with the Atlantic Rim Project.  AR2327-AR2328 (FEIS at 4-8 to 4-9), AR2331-AR2332 (FEIS at 4-12 to 4-13), AR2674 (AQTSD at 30), AR2767-AR2774 (Appendix A to the AQTSD, Air Quality Impact Assessment Protocol, at 22-29), AR1644 (DEIS at 4-9), AR1648-AR1650 (DEIS at 4-13 to 4-15).

42.     BLM utilized the EPA-approved CALMET/CALPUFF modeling system to predict potential air quality impacts of the Atlantic Rim Project at far-field Prevention of Significant Deterioration ("PSD") Class I and Sensitive Class II areas.  AR2328-AR2331 (FEIS at 4-9 to 4-12), AR2333-AR2334 (FEIS at 4-14 to 4-15), AR2709 (AQTSD at 65).

43.     BLM also used the CALPUFF modeling system to quantify potential emissions of $NO_x$, $SO_2$, $PM_{10}$, and $PM_{2.5}$, and to assess potential lake acidification from acid deposition impacts.  AR2709-AR2735 (AQTSD at 65-91).

44.     BLM analyzed the potential ozone impacts associated with the Atlantic Rim Project using the VOC/$NO_x$ Point Source Screening Tables developed by Richard D. Scheffe in 1988 (Scheffe Method).  AR2328 (FEIS at 4-9), AR2533 (FEIS at R-18), AR2674 (AQTSD at 30).  BLM's air quality specialist determined that the Scheffe Method was an appropriate tool to

estimate the potential ozone impacts associated with the Atlantic Rim Project. *See* AR2686-AR2688 (AQTSD at 42-44).

45.    BLM's near-field and far-field analyses indicated that the approval of the Atlantic Rim Project will not cause adverse health impacts and will not lead to any violations of the National Ambient Air Quality Standards ("NAAQS") or Wyoming Ambient Air Quality Standards ("WAAQS").  AR2331-AR2334 (FEIS at 4-12 to 4-15), AR2683 (AQTSD at 39), AR2686-AR2688 (AQTSD at 42-44), AR2691-AR2693 (AQTSD at 47-49), AR2728-AR2729 (AQTSD at 84-85).

46.    EPA has recognized AERMOD and CALPUFF as appropriate modeling techniques.  EPA, Revision to the Guidelines on Air Quality Models, 70 Fed. Reg. 68,218, 68,232-35, 68,237 (Nov. 9, 2005).

47.    The Scheffe Method was evaluated and its use to estimate ozone emissions was approved for the Atlantic Rim EIS by BLM and its inter-agency air quality team, consisting of members of EPA, NPS, USFS, and WDEQ.  AR2334 (FEIS at 4-15).  *See also* AR2645 (AQTSD at 1); AR4608 (FEIS at O-212), AR4877 (ROD at E-9).

48.    Neither EPA nor WDEQ commented upon or disagreed with the use of the Scheffe Method when reviewing and approving the air quality modeling protocol for the Atlantic Rim Project.  AR8133-AR8135 (EPA Comments on Air Quality Assessment Protocol for Atlantic Rim Project); AR9850 (EPA Comments on FEIS); AR9777 (WDEQ Comments on FEIS).

49.    Using the Scheffe Method, BLM estimated ozone impacts from the Proposed Action and then added that estimate to the hourly average regional ozone background concentration of 75.2 $\mu g/m^3$, which BLM used as a baseline or background for analysis purposes

in the Air Quality Technical Support Document and the FEIS  AR2331-AR2332 (FEIS at 4-12 to 4-13), AR2181 (FEIS at 3-17).  This hourly average regional ozone level (75.2 µg/m$^3$) is less than half the NAAQS for ozone (157 µg/m$^3$) at the time the Atlantic Rim ROD was approved. AR2331-AR2332 (FEIS at 4-12 to 4-13), AR2181 (FEIS at 3-17), AR4608 (FEIS at O-212).

50.    BLM also disclosed the maximum modeled concentration of ozone at a single point in time, which naturally differs from and can be higher than the three-year average ozone concentrations used for NAAQS determinations.  AR2686-AR2688 (AQTSD at 42-44).  The FEIS disclosed the second-highest 1-hour ozone background level and the fourth-highest daily 8-hour value.  AR2181 (FEIS at 3-17).  As BLM explained in the Atlantic Rim ROD, the background concentrations presented in Table 3-6 are maximum 8-hour values and are, therefore, higher than the average hourly values expressed in Table 4-2.  AR4877 (ROD at E-9). BLM determined that "pairing a screening modeled concentration [developed pursuant to the Scheffe Method]with a maximum background concentration monitored over the period of record results in an overestimate of potential $O_3$ [ozone] concentration."  AR2688 (AQTSD at 44).

51.    BLM determined that its approach was appropriate because:

> Adding NOx and VOC emissions to the ambient air, where some amount of $O_3$ [ozone] has already formed, is not necessarily an indication that the potential for $O_3$ formation has increased.  In fact, it could decrease, since the ambient background conditions that caused $O_3$ formation have changed, and the new mixture of chemical species in the atmosphere may not be conducive to $O_3$ formation.  In addition, the concentrations shown in Table 3.7 are likely overestimates of the actual $O_3$ impacts that would occur, since the RPM nomograph used to derive these estimates was developed using meteorological conditions more conducive to forming $O_3$ than that found in south-western Wyoming.

*Id.*

52.    The interagency air quality team specifically agreed to use the background ozone concentration of 75.2 µg/m$^3$.  AR4608 (FEIS at O-212).

53.    BLM's analysis using the Scheffe Method indicated that oil and gas development in the ARPA would not result in a violation of either the NAAQS or the WAAQS for ozone. AR2332 (FEIS at 4-14), AR2686-AR2688 (AQTSD at 42-44).

54.    Notwithstanding this finding, BLM developed and implemented a monitoring and mitigation program for ozone in the ARPA.  AR4839 (ROD at B-5).  Under that program, the operators in the ARPA have agreed to finance and operate additional air quality monitoring in the area, including ozone monitoring.  *Id.*  If the air monitoring shows elevated ozone concentrations that are attributable at least in part to sources in the Atlantic Rim Field, BLM will consult with WDEQ and EPA to determine whether adaptive management is needed to mitigate the impacts.  *Id.*

55.    For the State of Wyoming, WDEQ implements the Clean Air Act and the comparable state statute, including those measures necessary to demonstrate compliance with NAAQS and WAAQS.  42 U.S.C. § 7410; 40 C.F.R. pt. 51; 40 C.F.R. § 52.2620 (Wyoming State Implementation Plan); WYO. STAT. ANN. § 35-11-202.  As such, WDEQ has jurisdiction to regulate air emissions in the ARPA.  AR1204-AR1205 (Rawlins DEIS at A4-6 to A4-7).

56.    Conditions of approval ("COAs") for the PODs approved to date require that all lease exploration development construction production operations and reclamation activity be conducted in manner which conforms to all applicable federal state and local laws and regulations.  AR73507 (Catalina A&B COA at 2); AR74075 (Sun Dog A&B COA at 2); AR75035 (Sun Dog C COA at 2); AR75191 (Sun Dog D&E COA at 2).

13

2.    BLM's Consideration of Methane Seeps

57.    BLM analyzed and disclosed the potential for methane seeps in the Atlantic Rim EIS.  AR2351 (FEIS at 4-32); *see also* AR2368-AR2369 (FEIS 4-49 to 4-50); AR1682 (DEIS at 4-47).

58.    Methane seeps in the ARPA are naturally occurring and have been present long before CBNG drilling in the ARPA.  *See* AR8862 (Methane Seeps Talking Points).  BLM noted that methane seep activity fluctuated on and off even prior to interim drilling.  AR9453 (Internal BLM E-mail).

59.    BLM also analyzed the potential impacts of pyrophoricity (spontaneous combustion) in dewatered coal formations and determined, based on existing studies, that spontaneous combustion of coal beds during CBNG development is unlikely because insufficient oxygen is present for oxidation and combustion.  AR2172 (FEIS at 3-8).

60.    BLM found that "[t]he number or location of these seeps is impossible to predict, therefore monitoring would be established to evaluate this impact."  AR2351 (FEIS at 4-32).  In the Atlantic Rim ROD, BLM required groundwater monitoring wells to further evaluate methane springs in the ARPA.  AR4844 (ROD at B-10).

61.    BLM concluded that data collection will help "quantify potential impacts from methane seeps where the Mesaverde Group outcrops."  AR2368 (FEIS at 4-49).

62.    BLM and WDEQ continue to plan and implement additional monitoring and adaptive management to address methane seeps in the ARPA.  AR9452-AR9454 (internal BLM E-mail).  *See also* AR9455-AR9457 (draft memorandum describing actions being taken by WDEQ).

3.    BLM's Analysis of Impacts to Sage Grouse

63.    The ARPA contains sage grouse habitat.  AR3191 (FEIS, Map M-26).  Potential

sage-grouse nesting habitat covers 92 percent of the ARPA.  AR2395 (FEIS at 4-76).

64.    In its NEPA review process, BLM reviewed numerous studies and

recommendations on management of the sage grouse and their habitat.  *See, e.g.,* AR5693 (BLM

Habitat Requirements and Management Recommendations for Sage Grouse); AR5732 (Braun

Guidelines for Maintenance of Sage Grouse Habitats); AR5923 (Forest Service Sage Grouse

Habitats Paper); AR5953 (Hayden-Wing Associates Sage Grouse Study), AR7371 (Hayden-

Wing Associates Sage Grouse Final Report).

65.    The EIS contained an extensive list of references, with at least 14 references to

studies specifically related to the sage grouse and Columbia sharp-tailed grouse.  AR2516-

AR2544 (FEIS at R-1 to R-29).

66.    The FEIS discusses the potential impacts on sage grouse and their habitat that

may be associated with the proposed action and the alternatives.  AR2235-AR2237 (FEIS at 3-71

to 3-73), AR2258-AR2260 (FEIS at 3-94 to 3-96), AR2280-AR2281 (FEIS at 3-116 to 3-117),

AR2394-AR2395 (FEIS at 4-75 to 4-76), AR2398-2404 (FEIS at 4-79 to 4-85), AR2499-

AR2450 (FEIS at 5-17 to 5-18).  BLM recognized that impacts to the greater sage-grouse would

be significant from a NEPA perspective under all action alternatives, including Alternative C.

AR2092 (FEIS at ES-5).

67.    The alternatives considered offered varying degrees of protection to the sage

grouse, including: (a) the Proposed Action, with few explicit protections for the sage grouse,

(b) the no-action plan, which would bar development (Alternative A), (c) a limited development

plan based, in part, on recommendations from the Wyoming Game and Fish Department

("WGFD"), that would allow for fewer wells and would provide strict protections for the sage grouse (Alternative C), and (d) BLM's chosen alternative, which provides limitations on surface disturbance, mitigation measures, and reclamation to minimize impacts on the sage grouse (Alternative D).  AR2398-AR2404 (FEIS at 4-79 to 4-85).

68.    BLM considered additional BMPs for the greater sage-grouse and Columbian sharp-tailed grouse, including directional drilling, seasonal restrictions on public vehicular access, noise reduction techniques and designs, burying of power lines, and transportation planning.  AR2159 (FEIS at 2-11), AR3093 (FEIS at H-13).

69.    BLM found that Alternative D, its Preferred Alternative, would reduce direct habitat loss by 20 percent as compared to the Proposed Action (8.1 percent of available nesting habitat as compared to 10 percent), and that mitigation measures were intended to address the indirect loss of habitat and reduce stress to the greater sage-grouse in proximity to leks on public lands.  AR2402 (FEIS at 4-83).

70.    With respect to Alternative D, the FEIS contains specific mitigation measures to reduce impacts on the sage grouse, including:  (a) limiting surface disturbance within 1/4 mile of the perimeter of occupied leks; (b) providing a two-mile buffer from March 1 to July 15; (c) prohibiting any human activity within 1/4 mile of occupied leks from 6 p.m. to 9 a.m. from March 1 to May 20; (d) limiting construction of permanent and high-profile structures within 0.25 to 1 mile of the perimeter of leks; (e) prohibiting surface disturbances between November 15 and March 14 in delineated winter concentration areas; (f) requiring noise reduction techniques, including using hospital style mufflers on compressor stations and generators; and (g) requiring annual inventory and monitoring for the sage-grouse.  AR2091-AR2094 (FEIS at E-4 to E-7).

16

71.    BLM noted that more stringent restrictions were "likely not economically feasible nor capable of maximizing recovery of the natural gas resource."  AR2147 (FEIS at 1-20); *see also* AR4719 (FEIS at O-324).

72.    Evidence in the record shows that the sage grouse return to sites disturbed by energy activities, although not at pre-disturbance levels.  AR6240 (Braun Study); AR86090 (Connelly Guidelines, at 974).

73.    Accordingly, BLM required reclamation, which BLM determined may reduce some of the impacts to sage grouse. AR4798 (ROD at 3).  *See also* AR5972 (Hayden-Wing Study at 226); AR6227 (Remington Study at 132); AR6240-AR6241 (Braun Study).  FWS "commend[ed] the Bureau for requiring interim reclamation as this may reduce some of the impacts that will occur across the Project area."  AR10135 (FWS Comments on FEIS, at 2).

4.    BLM's Analysis of Impacts on Big Game

74.    The ARPA provides habitat and migration routes for several big game species.  AR2249-AR2257 (FEIS at 3-85 to 3-93); AR2497-AR2499 (FEIS at 5-15 to 5-17).

75.    BLM analyzed the potential impacts of the Atlantic Rim Project on big game species in general, and under each alternative.  AR2391-AR2394 (FEIS at 4-72 to 4-75); AR2397-AR2402 (FEIS at 4-78 to 4-83).

76.    BLM also analyzed potential cumulative impacts to big game species from the Atlantic Rim Project and past, present, and reasonably foreseeable future actions.  AR2497-AR2499 (FEIS at 5-15 to 5-17).

77.    BLM disclosed estimates of potential surface disturbance for each alternative in the Atlantic Rim EIS in relation to the cumulative surface disturbance from oil and gas activities in the CIA for big game.  AR2498 (FEIS at 5-16).

78.    In particular, BLM estimated big game habitat disturbances for the ARPA and adjacent oil and gas project EIS boundaries.  AR2496-AR2499 (FEIS at 5-14 to 5-17).

79.    The Atlantic Rim EIS (Table 5-2) specifically discloses surface disturbance for each big game species, by unit, including estimates for initial and life-of-project disturbance, as well as existing and potential future cumulative surface disturbance.  AR2498 (FEIS at 5-16)

80.    Although BLM did analyze potential big game migration routes, BLM found the cumulative effects on migration routes were unknown.  AR2496-AR2499 (FEIS at 5-14 to 5-17), *see also* AR4660 (FEIS at O-64).

81.    BLM concluded that the potential impacts of the Atlantic Rim Project on big game species were significant from a NEPA perspective under all action alternatives.  AR2092 (FEIS at ES-5).

## E.    The Atlantic Rim Record of Decision

82.    On March 23, 2007, BLM signed the Record of Decision ("ROD") for the Atlantic Rim Project.  AR4796 (ROD at 1), AR4817 (ROD at 22).  BLM ultimately chose Alternative D, which included surface limitations requiring reclamation of disturbed areas and resulted in mitigation measures not included in the Proposed Action.  AR4796 (ROD at 1), AR2402 (FEIS at 4-83).

83.    Appendix C of the ROD includes at least 38 "mandatory requirements" for all permit holders, such as prohibition of off-road vehicle activity; location of buried pipelines close to roads to minimize the area of disturbance; and requirements for run-off and erosion control, among others.  AR4816 (ROD at 21); AR4859-AR4863 (ROD at C-3 to C-7).

84.    BLM also requires annual planning between BLM and the operators.  AR4807 (ROD at 12).

85.    The ROD requires interim reclamation to reduce impacts, and includes a Reclamation Plan that outlines criteria for reclamation of the disturbed areas.  AR4796 (ROD at 1), AR4822-AR4833 (ROD, App. A).  Operators must engage in monitoring "to measure the degree of success the performance requirements have in achieving Performance Goals."  AR4836 (ROD at B-2).  Where needed, operators must adopt additional mitigation or adaptive techniques to achieve the Performance Goals.  *Id.*

86.    Once a site has been disturbed, it stays within the 7,600-acre disturbance cap until it has been successfully reclaimed.  AR4798, AR4813 (ROD at 3, 18).  Successful reclamation is defined as having achieved 80 percent of pre-disturbance ground cover, with 90 percent dominant species.  AR4827 (ROD at A-6).

87.    Drilling and other surface-disturbing activity in the ARPA require separate site-specific review and authorization.  AR4798 (ROD at 3).  The ROD provides for the application of site-specific mitigation measures to minimize surface disturbance through appropriate COAs, BMPs, and other measures deemed necessary.  AR4807 (ROD at 12).  *See also* AR4835-AR4855 (ROD, App. B).

88.    BLM found that "[i]mplementation of this decision will result in production of nationally significant natural gas resources consistent with the National Energy Policy (May 2001) and the National Energy Policy Act of 2005."  AR4799 (ROD at 4).

### F.    Site-Specific NEPA Review for PODs

89.    Pursuant to the Atlantic Rim ROD, Anadarko and Double Eagle submitted applications for permits to drill ("APDs") for a number of PODs in the ARPA.  *See, e.g.,* AR75507 (APD for Catalina POD A).

90.     On June 28, 2007, BLM approved Catalina PODs A&B for 39 new wells (36 development wells and 3 produced water injection wells) and associated infrastructure. AR73494 (Catalina A&B EA at 3); AR73502 (Catalina A&B EA/DR).

91.     On August 16, 2007, BLM approved Sun Dog PODs A&B for 51 new wells (48 development wells and 3 injection wells) and associated infrastructure.  AR74073 (Sun Dog A&B EA/DR).

92.     On October 23, 2007, BLM approved Sun Dog POD C for 14 new wells (13 development wells and 1 injection well) and Sun Dog PODs D&E for 34 new wells (30 development wells and 4 injection wells) and associated infrastructure.  AR75021 (Sun Dog C EA at 3); AR75029 (Sun Dog C EA/DR); AR 75176 (Sun Dog D&E EA at 4); AR 75185 (Sun Dog D&E EA/DR).

93.     For each POD, BLM prepared an EA, which was tiered to the Atlantic Rim EIS. AR73492 (Catalina A&B EA), AR74063 (Sun Dog A&B EA), AR75019 (Sun Dog C EA), AR75173 (Sun Dog D&E EA).

94.     The average short-term disturbances for these projects ranged from 3.5 and 5.2 acres for the approved Sun Dog PODs and 5.2 and 6.1 acres for Catalina PODs A & B. AR73497 (Catalina A&B EA at 6); AR74067 (Sun Dog A&B EA at 5); AR75023 (Sun Dog C EA at 5); AR75178 (Sun Dog D&E EA at 6).  The 138 approved wells in these PODs involve a total of only 629 disturbed acres, which represents approximately 0.2 percent of the ARPA and 0.015 percent of the federal lands in the Great Divide Resource Area.  AR73497 (Catalina A&B EA at 6); AR74067 (Sun Dog A&B EA at 5); AR75023 (Sun Dog C EA at 5); AR75178 (Sun Dog D&E EA at 6).

95.     BLM conducted site inspections for each POD.  AR73496 (Catalina A&B EA at 5); AR74066 (Sun Dog A&B EA at 4); AR75022 (Sun Dog C EA at 4).  Based on these inspections, the EAs for the PODs at issue identify and implement the mitigation measures deemed necessary, including those outlined in the EIS.  AR4798, AR4807, AR4813 (ROD at 3, 12, 18); AR73499-AR73500 (Catalina A&B EA at 8-9); AR74069-AR74071 (Sun Dog A&B EA at 7-9); AR75025-AR75026, AR75030 (Sun Dog C EA at 7-8, 12); AR75180-AR75182 (Sun Dog D&E EA at 8-10).  These measures include restrictions to protect sage grouse, big game, and other wildlife.  *Id.*  The mitigation measures outlined in the EAs are also incorporated in the lengthy COAs for each POD.  AR74074-AR74091 (Sun Dog A&B); AR73506-AR73517 (Catalina A&B), AR75034-AR75049 (Sun Dog C), AR75190-AR75207 (Sun Dog D&E).

96.     Based on a site inspection, BLM determined that one of the proposed wells in the Catalina A&B POD was to be located within the 1/4 mile buffer zone for a sage grouse lek (breeding area) and "can not be situated to adequately mitigate the potential effects to grouse at the adjacent lek."  AR73499 (Catalina A&B EA at 8).  "As a result," BLM stated that "authorization of this APD will be deferred until additional mitigation measures have been developed to reconsider the proposal."  *Id.*

97.     In the Sun Dog A&B POD, the potential presence of prairie dogs required a survey for black-footed ferrets, which subsequently found none in the area.  AR74071 (Sun Dog A&B EA at 9).

98.     One well in Sun Dog POD D was not approved due to "unresolved archaeological resource concerns."  AR75176 (Sun Dog D&E EA at 4).

99.     For each POD, the EAs concluded "the impacts are not expected to be significant, and that an EIS is not required."  AR73502 (Catalina A&B EA/DR at 11); AR74073 (Sun Dog

21

A&B EA/DR at 11); AR75029 (Sun Dog C EA/DR at 11); AR75185 (Sun Dog D&E EA/DR at 13).

100.    Notices of the APDs for the proposed action were posted for 30 days in the Rawlins Field Office Information Access Center (Public Room) for review.  AR73494 (Catalina A&B EA at 3); AR74065 (Sun Dog A&B EA at 3); AR75020 (Sun Dog C EA at 2); AR75175 (Sun Dog D&E EA at 3).

101.    Notification of preparation of each EA was provided on the Wyoming BLM internet NEPA register.  AR73494 (Catalina A&B EA at 3); AR74065 (Sun Dog A&B EA at 3); AR75020 (Sun Dog C EA at 2); AR75175 (Sun Dog D&E EA at 3).

102.    After receiving a request from the Plaintiffs, BLM provided Plaintiffs a copy of the draft EAs for Sun Dog PODs C, D and E.  AR79066 (E-mail transmitting draft EAs to Plaintiffs).

103.    Plaintiff Biodiversity Conservation Alliance submitted comments on the draft

EAs.  AR79078 (Biodiversity Conservation Alliance's comments on the draft EAs).  BLM

responded to those comments, but found that they did not include any project-specific comments.

AR75031 (Sun Dog C EA/DR); AR75187 (Sun Dog D&E EA/DR).

Respectfully submitted,

/s/ Michael B. Wigmore

_____
Michael B. Wigmore (DC Bar #436114)
Sandra P. Franco (DC Bar #467091)
Bingham McCutchen LLP
2020 K Street, NW
Washington, DC  20006-1806
(202) 373-6000 (tel)
(202) 373-6001 (fac)

*Counsel for Anadarko Petroleum Corporation*
*Warren Resources, Inc., and Double Eagle*
*Petroleum Co.*

Robert C. Mathes (DC Bar #484255)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO  80202
(303) 892-1400 (tel)
(303) 892-1401 (fac)

*Counsel for Double Eagle Petroleum Co.*

Dated: May 30, 2008

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Avenue, NW, Suite 400
Washington, DC 20005, *et al.,*

      Plaintiffs,

          v.

DIRK KEMPTHORNE, in his official capacity
as the Secretary of the United States
Department of the Interior
1849 C Street, NW
Washington, DC 20240, *et al.,*

      Defendants.

---

ANADARKO PETROLEUM CORPORATION
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

DOUBLE EAGLE PETROLEUM CO.
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

      and

STATE OF WYOMING
123 Capital Building
Cheyenne, WY 82002,

      Defendant-Intervenors.

Civ. Action No. 1:07-cv-01709-RJL

## DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendant-

Intervenors Anadarko Petroleum Corporation, Warren Resources, Inc., and Double Eagle

Petroleum Co. (collective referred to as "Defendant-Intervenors") respectfully submit this

Response to Plaintiffs' Statement of Material Facts As To Which There Is No Genuine Dispute, dated April 28, 2008.

## **GENERAL OBJECTIONS**

1.      Defendant-Intervenors object to Plaintiffs' references to material not contained in the administrative record before the Bureau of Land Management ("BLM") and therefore not properly before this court.  Declarations, exhibits and other references outside the record and not before the agency at the time of its decision did not contribute to the agency's decision-making process and should not be considered to determine whether BLM's decision was arbitrary and capricious.

Review of an agency's decision based on alleged violations of the National Environmental Policy Act ("NEPA"), as in this case, is based on the Administrative Procedure Act ("APA").  The APA provides that a court shall review agency action based on a review of the "whole record."  5 U.S.C. § 706.  The court's review is limited to "the full administrative record *before the agency at the time the decision was made*."  *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981) (emphasis added).  Despite this rule, many of the Plaintiffs' statements of undisputed facts rely, in whole or in part, on statements made in declarations, exhibits, and other references that were not before the agency at the time of the decision-making process.

This objection is referred to below as "General Objection No 1."  To the extent that a response is required to any statements of fact that are supported by references to evidence not contained in the administrative record, such statements are denied as they are not material to this record review case.

2.      Defendant-Intervenors object to any and all statements of fact proffered by

Plaintiffs that consist of opinions and characterizations.  Such statements are not statements of

material fact, and therefore, are denied.  This objection is referred to below as "General

Objection No. 2."

## RESPONSES TO PLAINTIFFS' PROFFERED MATERIAL FACTS

**1.      Plaintiffs' Proffered Material Fact:**      The Atlantic Rim area of Wyoming's
Red Desert is a place of stunning beauty with rolling hills, canyons, dune fields and diverse
sagebrush communities.  Declaration of Erik Molvar, ¶ 3, attached as Exh. A. to Plaintiffs'
Motion for Preliminary Injunction.

*Response:*      Denied.  Defendant-Intervenors deny and object to Plaintiffs'

proffered material fact 1 because it is based solely on extra-record evidence that was not

before BLM during the administrative process and does not fall under any exception to

the record rule.  Moreover, Plaintiffs' proffered material fact 1 constitutes opinion not

fact, and is therefore denied.  Defendant-Intervenors incorporate by reference General

Objections 1 and 2.

**2.      Plaintiffs' Proffered Material Fact:**      On May 21, 2007, BLM issued the
Record of Decision ("ROD") and accompanying Final Environmental Impact Statement
("FEIS") approving the Atlantic Rim Natural Gas Development Project.  72 Fed. Reg. 28518
(May 21, 2007).  The ROD authorized up to 2,000 new wells.  AR 4796.

*Response***:**      Admitted in part and denied in part.  Defendant-Intervenors admit

that BLM noticed availability of the Record of Decision ("ROD") authorizing the

Atlantic Rim Natural Gas Development Project on May 21, 2007, which may include up

to 2,000 wells developed over 20 years.  AR9574 (72 Fed. Reg. 28,518 (May 21, 2007)).

*See also* AR4796 (ROD at 1).  Defendant-Intervenors deny that BLM issued the

accompanying FEIS on May 21, 2007.  BLM noticed availability of the FEIS for the

Atlantic Rim Natural Gas Development Project on December 1, 2006.  AR9564 (71 Fed.

Reg. 69,582 (Dec. 1, 2006)).  Plans of development ("PODs") for individual well sites

are approved through application for permits to drill ("APD").  *See, e.g.,* AR4798-99

(ROD at 3-4 ).  BLM approval of any APDs authorizing development requires additional

analysis under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-

4370f, in order to consider environmental impacts not addressed in the FEIS.  AR4798-

AR4799, AR4872 (ROD at 3-4, E-4).

> **3.    Plaintiffs' Proffered Material Fact:**        The agency did not include site-specific analysis of the specific wells or accompanying infrastructure in the project FEIS.  AR 4483, AR 4561, AR 4570, AR 4578, AR 4580, AR 4588.

> ***Response:***       Denied.  Defendant-Intervenors deny and object to Plaintiffs'

proffered material fact 3 because it cites to comments submitted by the public and BLM's

responses, which are in the Administrative Record and speak for themselves.  Defendant-

Intervenors incorporate by reference General Objection No. 2.  Without waiving this

objection, Defendant-Intervenors admit that BLM's FEIS deferred only that analysis that

could not be done until site-specific proposals were submitted to BLM.

The FEIS addresses overall environmental impacts of the Project, based on the

general locations of wells and associated facilities.  AR4570 (FEIS at O-174).  As BLM

explained, "[c]onsistent with its regulations, once annual work plans, APDs or other

applications for specific site activities are submitted, BLM will conduct more site-

specific analysis of the potential environmental impacts, tiered to the Project-level EIS."

AR4561 (FEIS at O-165), AR4570 (FEIS at O-174).

In accordance with 43 C.F.R. § 3162-1(d), operators submit APDs, which

contained detailed proposals for on-the-ground operations, at least 30 days before they

wish to commence operations.  *See, e.g.,* AR75507 (APD in Catalina POD A).  For each

POD approved to date, BLM has prepared an Environmental Assessment ("EA"), which

was tiered to the Atlantic Rim EIS.  AR73492 (Catalina A&B EA); AR74063 (Sun Dog

A&B EA); AR75019 (Sun Dog C EA); AR75173 (Sun Dog D&E EA). For each POD,

BLM conducted site inspections to determine site-specific impacts to potential resources

and alternatives. AR73496 (Catalina A&B EA at 5); AR74066 (Sun Dog A&B EA at 4);

AR75020-AR75022 (Sun Dog C EA at 2-4); AR75175-AR75176 (Sun Dog D&E EA at

3-4).

    **4.**    **Plaintiffs' Proffered Material Fact:**    The large area covered by the
Atlantic Rim project has provided critical habitat and migration routes for numerous wildlife
species, including sage grouse, elk, mule deer, and pronghorn antelope. *See, e.g.,* AR 2391-
2394, AR 10322-10327.

    ***Response:***    Denied. Defendant-Intervenors object to the terms "large area"

and "numerous wildlife species" as undefined and vague. Defendant-Intervenors also

object to the term "critical habitat" because it is defined in the Endangered Species Act

("ESA") as areas that are essential to the conservation of species that are listed as

threatened or endangered under the ESA. 16 U.S.C. § 1532(5). None of those species

identified by Plaintiffs are federally listed as endangered, threatened, or candidate species

under the ESA and its implementing regulations. To the contrary, the U.S. Fish &

Wildlife Service has not designated <u>any</u> of the Atlantic Rim Project Area ("ARPA") as

"critical habitat" for those species.

    Without waiving these objections, Defendant-Intervenors note that the ARPA is

composed of 270,080 acres of federal, state and privately owned lands. AR2088 (FEIS at

ES-1). The ARPA does contain habitat and migration routes for the pronghorn, mule

deer, and elk. AR2392-AR2394 (FEIS at 4-73 - 4-75). The ARPA also contains suitable

habitat for the greater sage-grouse. AR2394 (FEIS at 4-75).

    Defendant-Intervenors note that the document at AR10322-AR10327 does not

support Plaintiffs' proffered material fact 4. AR10322-AR10327 are Wyoming Game

and Fish Department's ("WGFD") recommendations for what impacts need to be

addressed in the Atlantic Rim Project ROD.  *See* AR10322-AR10327 (WGFD's

Comments on the DEIS at 1-5).  Those pages do not contain statements of fact, but

instead contain WGFD's opinions on what impacts need to be addressed in the Atlantic

Rim.  *Id.*  Those opinions do not make any factual statements about what parts of the

ARPA are or are not "critical habitat" for the sage grouse, elk, mule deer or pronghorn

antelope.  *Id.*

**5.    Plaintiffs' Proffered Material Fact:**        On June 28, 2007, BLM approved
the first plans of development submitted by Double Eagle in the Catalina unit for 39 new wells
and the roads, pipelines and other infrastructure to go with them.  AR 73502.  Fourteen of the
wells were in Catalina Plan of Development ("POD") A and 25 were in POD B.  AR 73492.

> ***Response:***        Admitted.  The APDs for PODs A&B in the Catalina Unit were for
>
> 37 coal bed natural gas ("CBNG") development wells and three injection wells.  After
>
> site inspections of the Catalina POD B, BLM deferred approval of one of the proposed
>
> wells in Catalina POD B because it was to be located within the 1/4-mile buffer zone for
>
> a sage grouse lek (breeding area) and "can not be situated to adequately mitigate the
>
> potential effects to grouse at the adjacent lek."  AR73499 (Catalina A&B EA at 8).

**6.    Plaintiffs' Proffered Material Fact:**        On August 16, 2007, BLM approved
plans of development submitted by Anadarko in the Sun Dog unit for 51 new wells and the
roads, pipelines, and other infrastructure to go with them.  AR 74073.  Twenty-eight of the wells
were in Sun Dog POD A and 23 were in POD B.  AR 74163.

> ***Response:***        Admitted.  Sun Dog PODs A&B consist of 48 CBNG development
>
> wells and 3 injection wells.  AR74073 (Sun Dog A&B DR).

     **7.    Plaintiffs' Proffered Material Fact:**    Although BLM knew of the interest of the Biodiversity Conservation Alliance ("BCA") and other plaintiffs in the Atlantic Rim Development Project, the Agency did not involve the BCA or the public in the environmental review process for either the Catalina A and B PODs or the Sun Dog A and B PODs.  Second Molvar Decl., at ¶¶ 20, 21, attached as Exh. 1 to Plaintiffs' Motion for Summary Judgment.

     *Response:*    Denied.  Defendant-Intervenors object to the use of the Second Molvar Declaration, which is extra-record evidence.  Defendant-Intervenors incorporate by reference General Objection No. 1.

     Defendant-Intervenors deny Plaintiffs' proffered material fact 7 because BLM provided opportunity for public participation in the NEPA process at both the Atlantic Rim EIS level and at the project permitting level.  On June 14, 2001, BLM issued a scoping notice announcing its initiation of analysis of the Atlantic Rim Project and requesting public comment.  AR7632 (Scoping Notice).  On June 20, 2001, BLM issued a press release announcing its scoping notice and requesting public comment.  AR7640 (Press Release).  On June 26, 2001, BLM published a notice of intent to prepare the Atlantic Rim EIS in the Federal Register.  AR9483-84 (66 Fed. Reg. 33,975 (June 26, 2001)).  On July 10 and 11, 2001, BLM held another round of public meetings in Baggs and Rawlins, Wyoming, through which it solicited public comments.  AR7644 (Agenda for July 10 and 11, 2001 Scoping Meetings), AR7645 (PowerPoint presentation from July 10 and 11, 2001 Scoping Meetings), AR7667-68 (List of Issues and Concerns from July 10, 2001 Scoping Meeting), AR7669-71 (List of Issues and Concerns from July 11, 2001 Scoping Meeting).  On December 12, 2005, BLM announced the availability of the Draft EIS ("DEIS") in the Federal Register and again requested public comment.  AR9515-16 (70 Fed. Reg. 73,481 (Dec. 12, 2005)).  BLM received over 60,000 comments on the DEIS.  AR9564 (71 Fed. Reg. 69,582 (Dec. 1, 2006)).  On December 1, 2006, BLM

published notice of the availability of the FEIS in the Federal Register and accepted

additional public comments through January 4, 2007.  *Id.*

BLM then provided an opportunity for public involvement in the site-specific

environmental analysis process by posting notices of the APDs for 30 days in the

agency's public room at its Rawlins office, consistent with BLM's regulations.  AR73494

(Catalina A&B EA at 3); AR74065 (Sun Dog A&B EA at 3); AR75020 (Sun Dog C EA

at 2); AR75175 (Sun Dog D&E EA at 3); 43 C.F.R. § 3162.3-1(g).  BLM later posted

notice of the Catalina and Sun Dog EAs on BLM's NEPA register website.  AR73494

(Catalina A&B EA at 3); AR74065 (Sun Dog A&B EA at 3); AR75020 (Sun Dog C EA

at 2); AR75175 (Sun Dog D&E EA at 3).  There is no evidence in the record that

Plaintiffs requested copies of the APDs or EAs prior to September 2007.[1]  In addition,

BLM provided copies of the draft EAs for Sun Dog C, D, and E to Plaintiffs when

requested.  AR79066 (e-mail forwarding draft EAs to Plaintiffs).  Subsequently, Plaintiff

BCA submitted comments.  AR79078 (Plaintiff BCA's comments on the EAs).

**8.    Plaintiffs' Proffered Material Fact:**    On October 13, 2007, BLM
approved three additional Plans of Development (C, D, and E) in the Sun Dog unit.  AR 75029,
75185.  These PODs contained 48 new wells.  AR 75019, 75173.

*Response:*    Denied in part.  BLM approved the Sun Dog C, D & E PODs on

October 23, 2007.  AR75029 (Sun Dog C EA/DR), AR75185 (Sun Dog D&E EA/DR).

Defendant-Intervenors admit that these PODs contained 48 new wells (43 CBNG

development wells and five injection wells).  AR75019 (Sun Dog C EA at 1); AR75173

---

[1]  To the extent this Court considers the Molvar Declarations, the Molvar Declaration submitted in support of
Plaintiffs' motion for a preliminary injunction indicates that Plaintiffs did not request a copy of the APDs or EAs
until September 19, 2007, after the EAs for Catalina A&B and Sun Dog A&B were completed.  Molvar Decl., Pls.
Mot. for Prelim. Inj. ¶20.

(Sun Dog E&F EA at 1)  These PODs were approved after BLM prepared draft EAs for

these PODs, and one of the Plaintiffs submitted comments on the draft EAs.  AR79066

(e-mail forwarding draft EAs to Plaintiffs); AR79078 (Plaintiff BCA's comments on the

EAs).

**9.**    **Plaintiffs' Proffered Material Fact:**        Ozone forms through the chemical reaction of nitrogen oxides ("NO$_x$") and volatile organic compound ("VOC") emissions in the presence of sunlight.  AR2328.

> *Response:*       Admitted.  Ozone formation depends on atmospheric conditions.

**10.**    **Plaintiffs' Proffered Material Fact:**        Breathing ground level ozone can cause a variety of health problems including chest pain, coughing, throat irrigation, and congestion.  Epidemiologic studies have linked ground level ozone to total mortality, cardiovascular mortality and respiratory mortality.  USEPA, <u>Fact Sheet: Ground-Level Ozone Health and Environment</u>, available at <u>http://www.epa.gov/air/ozonepollution/health.html</u>.

> *Response:*       Defendant-Intervenors object to the use of the cited USEPA Fact
>
> Sheet, which is extra-record evidence that was not before the agency.  Defendant-
>
> Intervenors incorporate by reference General Objection No. 1.  Without waiving this
>
> objection, Defendant-Intervenors admit that the cited fact sheet states that "[b]reathing
>
> ozone can trigger a variety of health problems including chest pain, coughing, throat
>
> irritation and congestion."  USEPA, <u>Fact Sheet: Ground-Level Ozone Health and
>
> Environment</u>.  Defendant-Intervenors note, however, that the cited fact sheet does not
>
> support Plaintiffs' proposition that epidemiologic studies have linked ground level ozone
>
> to total mortality, cardiovascular mortality and respiratory mortality; in fact, the cited
>
> material does not even mention mortality.  *See id.*

**11.    Plaintiffs' Proffered Material Fact:**        Increased levels of ozone can damage the leaves of trees and other plants, degrading the appearance of vegetation in recreation areas.  Id.

>    ***Response:***        Defendant-Intervenors object to the use of the cited USEPA Fact
>
>    Sheet, which is extra-record evidence that was not before the agency and is irrelevant to
>
>    the issues before this Court.  Defendant-Intervenors incorporate by reference General
>
>    Objection No. 1.  Without waiving this objection, Defendant-Intervenors admit that the
>
>    cited fact sheet states that the effects of ground-level ozone include "damaging the leaves
>
>    of trees and other plants, negatively impacting the appearance of urban vegetation, as
>
>    well as vegetation in national parks and recreation areas."  *Id.*

**12.    Plaintiffs' Proffered Material Fact:**        When BLM approved the Atlantic Rim project ROD/FEIS, the federal and Wyoming air quality standard for ozone was 157 µg/m$^3$. AR 2181.  In March 2008, USEPA tightened the ozone standard to 147 µg/m$^3$.  73 Fed. Reg. 16436 (March 27, 2008).  The agency concluded that the previous standard was not low enough to protect public health.  Id.

>    ***Response:***        Defendant-Intervenors object to the use of 73 Fed. Reg. 16,436,
>
>    which was issued after BLM's decision and, therefore, is extra-record evidence that was
>
>    not before the agency.  Defendant-Intervenors incorporate by reference General
>
>    Objection No. 1.  Without waiving its objection, Defendant-Intervenors admit that when
>
>    BLM approved the Atlantic Rim project ROD/FEIS, the federal and Wyoming 8-hour air
>
>    quality standard for ozone was 157 µg/m$^3$.  AR2181.
>
>    Defendant-Intervenors also admit that EPA promulgated a revised ozone standard
>
>    one year after the ROD was issued in this case, lowering the standard from 0.08 parts per
>
>    million to 0.075 ppm.[2]  73 Fed. Reg. 16,436, 16,503 (Mar. 27, 2008).  However, the 2008

---

[2]  Comparison between µg/m$^3$ and ppm depend on pressure and temperature, but at normal room temperature and pressure 0.051 ppm equates to 100 µg/m$^3$.  The NAAQS of 0.075 µg/m$^3$ equates to approximately 147 µg/m$^3$.

revised ozone standard will not be implemented until well into the future.  First, States

must submit designations of areas that are not in attainment with the new standard by

March 12, 2009.  73 Fed. Reg. at 16,503.  Then, EPA must promulgate those designations

by March 12, 2010, which may be extended until March 12, 2011.  *Id.*  Second, State

implementation plans ("SIPs") outlining the measures each State will take to attain the

standards would be required within three years of the designation, which EPA must then

approve.  *Id.*  Sources in Wyoming must then comply with the EPA-approved Wyoming

SIP.  "Depending on the classification of an area, the SIP must provide for attainment

within 3 years (for areas classified marginal) to 20 years (for areas classified extreme)

after final designations."  *Id.*  In addition, several petitions for review have been filed in

the D.C. Circuit challenging EPA's revised standard.

**13.    Plaintiffs' Proffered Material Fact:**        A variety of activities approved by
BLM as part of the Atlantic Rim project produce $NO_x$ and VOC emissions.  AR 2327.  During
well construction, drilling rigs and vehicle exhaust would produce $NO_x$ and VOC emissions.  Id.
During production, compressor stations, dehydrator heaters, dehydrator gas processing
operations, and diesel combustion in haul trucks would produce $NO_x$ and VOC emissions.
AR 2661.

> ***Response:***        Admitted.

**14.    Plaintiffs' Proffered Material Fact:**        Combining production and
construction emissions, BLM estimates that the Atlantic Rim project would produce 674.88 tons
per year of $NO_x$ and 5,869.44 tons per year of VOCs.  AR 2663.

> ***Response:***        Admitted in part, denied in part.  BLM's estimates were based on
>
> the Proposed Action, which did not include surface disturbance limits.  In the EIS, BLM
>
> noted that "air impacts from each of these three alternatives [Alternatives A, C and D]
>
> would be less than or equivalent to the Proposed Action." AR2334 (FEIS at 4-15).  The
>
> surface limitation will reduce the extent of operations that can occur at any one time,
>
> thereby reducing potential emissions.

**15.     Plaintiffs' Proffered Material Fact:**          The FEIS does not contain any controls to limit the project's impact on ozone concentrations.  AR 2335, 4839.

> *Response:*          Denied.  Defendant-Intervenors object to the use of the term
>
> "controls," which is undefined and vague.  Without waiving these objections, Defendant-
>
> Intervenors note that the FEIS states, "[i]f in the future air monitoring were to show $O_3$
>
> exceedances that were attributable at least in part to sources in the Atlantic Rim field,
>
> BLM would consult with Wyoming Department of Environmental Quality ("WDEQ")
>
> and EPA to determine whether adaptive management would be needed to mitigate
>
> impacts."  AR2335 (FEIS at 4-16).  The ROD states that in coordination with WDEQ,
>
> operators will finance and operate air quality monitoring in the Rawlins Field Office
>
> ("RFO") area including $NO_x$ and $O_3$.  AR4839 (ROD at B-5).  The ROD further states
>
> that "[i]f future air monitoring shows ozone exceedances attributable at least in part to
>
> sources in the ARPA, BLM will consult with WDEQ-AQD, USEPA, USDA-FS, and
>
> NPS to determine whether adaptive management will be needed to mitigate impacts."  *Id.*
>
> Further, the State of Wyoming, through the WDEQ Air Quality Division ("AQD"), not
>
> the BLM has the authority to regulate air emissions and the obligation to achieve and
>
> maintain state and federal air quality standards in Wyoming.  *See* 42 U.S.C. § 7410;
>
> 40 C.F.R. pt. 51 (2007); 40 C.F.R. § 52.2620 (Wyoming's State Implementation Plan);
>
> WYO. STAT. ANN. § 35-11-202 (LexisNexis 2007).  The Atlantic Rim Project must
>
> comply with applicable laws, including regulations issued by WDEQ.  *See* Response to
>
> Plaintiffs' Proffered Material Fact Number 16.

**16.    Plaintiffs' Proffered Material Fact:**    The Conditions of Approval for the Catalina and Sun Dog Plans of Development also do not contain mitigation measures to limit the impacts of the approved exploration and production on ozone concentrations.  AR 73506-19, AR 74074-99, AR 75034-50, AR 75190-210.

   ***Response:***  Denied.  The Conditions of Approval ("COAs") for each POD require that "[a]ll lease exploration, development, construction, production, operations, and reclamation activity shall be conducted in a manner which conforms to all applicable federal, state, and local laws and regulations."  AR73507 (Catalina A&B COAs at 2); AR74075 (Sun Dog A&B COAs at 2); AR74035 (Sun Dog C COAs at 2); AR75191 (Sun Dog D&E COAs at 2).  The State of Wyoming, through the WDEQ AQD has authority to regulate air emissions as necessary to achieve and maintain state and federal air quality standards in Wyoming.  *See* 42 U.S.C. § 7410; 40 C.F.R. pt. 51; 40 C.F.R. § 52.2620 (Wyoming's State Implementation Plan); WYO. STAT. ANN. § 35-11-202.

   Further, the COAs for the Catalina and Sun Dog Plans PODs state that "[t]he Operator is subject to the mandatory monitoring & reporting requirements and annual planning participation as provided for in the Atlantic Rim ("AR") EIS Record of Decision (ROD), including, (but not limited to) those contained in Appendix A of the ROD."  AR73510 (Catalina A&B COAs at 5), AR74081 (Sun Dog A&B COAs at 8), AR75042 (Sun Dog C COAs at 9), AR75199 (Sun Dog D&E COAs at 10).  Appendix B to the ROD requires Operators to finance and operate ozone air quality monitoring. AR4839 (ROD at B-5).  Appendix B further states that if future air monitoring shows ozone exceedances attributable at least in part to sources in the ARPA, BLM will consult with the WDEQ-AQD, EPA, the U.S. Department of Agriculture-Forest Service, and the National Park Service to determine whether adaptive management will be needed to mitigate impacts.  *Id.*

**17.    Plaintiffs' Proffered Material Fact:**    For applications involving multiple sources of ozone precursor chemicals, EPA's "Guideline on Air Quality Models" recommends a photochemical grid model, the Community Multiscale Air Quality model (CMAQ).  40 C.F.R. Part 51, App. W, as revised (70 Fed. Reg. 68,218 (Nov. 9, 2005)) (hereafter "EPA Guideline") at ¶ 5.2.1a.

*Response:*    Defendant-Intervenors object to the use of 40 C.F.R. Part 51, App. W on the grounds that it is irrelevant.  Defendant-Intervenors also object to the term "multiple sources" as undefined and vague.  The cited section of the EPA Guideline applies to "multi-source applications."  The term "multi-source applications" is not defined in the EPA Guideline, nor is it defined elsewhere in Part 51.  Thus, ¶ 5.2.1a's relevance to the Atlantic Rim Project is questionable.

Without waiving its objection, Defendant-Intervenors admit that the EPA Guideline states that for "multi-source applications," "[c]ontrol agencies with jurisdiction over areas with ozone problems are encouraged to use photochemical grid models, such as the Models-3/Community Multi-scale Air Quality (CMAQ) modeling system, to evaluate the relationship between precursor species and ozone."  40 C.F.R. Part 51, App. W ¶ 5.2.1a.  The Guideline applies, however, to "State Implementation Plan (SIP) revisions for existing sources and new source reviews (NSR), including prevention of significant deterioration (PSD)," and is "intended for use by EPA Regional Offices in judging the adequacy of modeling analyses performed by EPA, State and local agencies and by industry" regarding regulatory actions under the Clean Air Act.  40 C.F.R. Part 51, App. W ¶ 1.0a.  The guidance is not mandatory for federal agencies without air quality responsibilities under the Clean Air Act.  *Id.*  BLM does not have such responsibility in Wyoming and is not conducting analysis under the Clean Air Act, but under NEPA.

14

In any event, BLM did use models approved under the guidelines.  AR2327-AR2334 (FEIS at 4-8 - 4-15), AR2674 (Appendix F to FEIS, Air Quality Technical Support Document ("AQTSD") at 30), AR2709 (AQTSD at 65), AR2767-2774 (Appendix A to AQTSD, Air Quality Impact Assessment Protocol at 22-29), AR1644 (DEIS at 4-9), AR1648-1650 (FEIS at 4-13 to 4-15).

**18.     Plaintiffs' Proffered Material Fact:**        The Atlantic Rim project involves multiple sources of $NO_x$ and VOCs.  AR 2327, 2660, 2661.

*Response:*        Defendant-Intervenors object to the use of the term "multiple sources" as undefined and vague.  Without waiving this objection, Defendant-Intervenors admit that some of the activities associated with the Atlantic Rim Project may result in emissions of nitrogen oxides ("$NO_x$") and volatile organic compounds ("VOCs"), but that BLM found these emissions would not exceed the NAAQS or WAAQS in place at the time the decision was made.  AR2332 (FEIS at 4-13), AR2683-88 (Appendix F to FEIS, AQTSD at 39-44).  Further, the COAs for the PODs require compliance with any future revisions to applicable air laws and regulations.  AR73507 (Catalina A&B COAs at 2); AR74075 (Sun Dog A&B COAs at 2); AR74035 (Sun Dog C COAs at 2); AR75191 (Sun Dog D&E COAs at 2).

**19.     Plaintiffs' Proffered Material Fact:**        BLM used the Scheffe method of [sic] instead of the CMAQ model without demonstrating that the Scheffe model complies with the EPA Guideline.  AR 2328, AR 2687, AR 2703.

*Response:*        To the extent it states that BLM did not demonstrate that the Scheffe method complies with the EPA guideline, Defendant-Intervenors deny and object to Plaintiffs' proffered material fact 19 on the grounds that it is not relevant (*see* Response to Plaintiff's Proffered Material Fact 17), unsupported by the referenced sources, and without factual basis.  Without waiving these objections, Defendant-

15

Intervenors admit that BLM used the Scheffe Reactive Plume Model, which was

considered by the inter-agency air quality team to be a reasonable tool and an acceptable

ozone method at the time the air quality analyses was conducted for purposes of

complying with NEPA, to estimate the maximum ozone potential impacts based on $NO_x$

and VOC emissions generated from the project.  AR2334 (FEIS at 4-15), AR2328 (FEIS

at 4-9), AR2687 (AQTSD at 43), AR2703 (AQTSD at 59).

**20.    Plaintiffs' Proffered Material Fact:**        In a July 28, 2006 letter, Dr. Scheffe
noted that his method "was deemed 'not adequate' in 1989 [and is] even less adequate today."
AR 9881.  In the letter, Dr. Scheffe wrote that the tables he developed in 1988 "never achieved a
level of EPA" [end of sentence missing].  Id.

> *Response:*        Defendant-Intervenors object to Plaintiffs' proffered material fact

20 because the document cited is in the Administrative Record and speaks for itself.

Defendant-Intervenors incorporate by reference General Objection No. 2.  Without

waiving this objection, Defendant-Intervenors admit that the quotations in this proffered

material fact are accurate quotations.  However, BLM's inter-agency air quality team,

including BLM, EPA, NPS, USFS, and WDEQ, evaluated the Scheffe method and

approved its use for the Atlantic Rim EIS in order to comply with the requirements of

NEPA.  AR2334 (FEIS at 4-15); AR2645 (AQTSD at 1).  BLM's air quality specialist,

with full support from EPA and WDEQ, determined that the Scheffe Method was an

appropriate tool to estimate the potential ozone impacts associated with the Atlantic Rim

Project.  AR2334 (FEIS at 4-15); AR2645 (AQTSD at 1); AR4877 (ROD at E-9).

The Scheffe model had been developed to estimate the contribution to ambient

ozone associated with increased non-methane organic carbon ("NMOC") emissions

arising from new or modified point sources.  AR9881 (Scheffe Letter).  These estimates

were necessary for permitting purposes under the Clean Air Act, which requires an

impact analysis to issue a permit under the Clean Air Act's Prevention of Significant

Deterioration ("PSD") program.  42 U.S.C. § 7475(a).  The letter does not indicate

whether or not the method was appropriate for purposes of estimating emissions for

NEPA purposes and, therefore, is irrelevant.

**21.    Plaintiffs' Proffered Material Fact:**        Plaintiff BCA criticized BLM's
reliance on the Scheffe model in comments on the Atlantic Rim Draft EIS dated February 17,
2006.  AR 70538, 70599.

> *Response:*        Denied.  Defendant-Intervenors deny Plaintiffs' proffered material
>
> fact 21 as unsupported by the referenced sources, and without factual basis.  The cited
>
> source does not criticize BLM's reliance on the Scheffe model itself.  AR70599 (BCA's
>
> Comments on the DEIS at 62).

**22.    Plaintiffs' Proffered Material Fact:**        BCA and other plaintiffs criticized
BLM's reliance on the Scheffe model in comments on other projects being considered by
Wyoming BLM.  These comments included the protest of the Jack Morrow Hills Coordinated
Activity Plan dated August 2004 (AR 86126); comments on the draft Rawlins Resource
Management Plan dated March 11, 2005 (AR 86150); comments on the Jonah Infill Draft
Environmental Impact Statement dated April 9, 2005 (AR 86169); comments by plaintiff
Wyoming Outdoor Council on the Jonah Infill Air Quality Impact Analysis dated September 26,
2005 (AR 86203); comments by Vickie Stamper on the Jonah Infill Air Quality Impact Analysis
dated October 5, 2005 (AR 86230); comments by Robert Yuhnke on the Jonah Infill Air Quality
Impact Analysis dated October 7, 2005 (AR 86264); and Yuhnke comments on the Rawlins
Resource Management Plan Air Quality Impacts (AR 86286).

> *Response:*        Denied.  Contrary to Plaintiffs' Proffered Fact, several of the cited
>
> documents do not even mention the Scheffe model.  *See* AR86126 (protest of the Jack
>
> Morrow Hills Coordinated Activity Plan dated August 2004); AR86150 (Vicki Stamper's
>
> comments on the draft Rawlins Resource Management Plan ("RMP") dated March 11,
>
> 2005); 86286 (Yuhnke comments on the Rawlins RMP Air Quality Impacts).  Other cited
>
> documents mention the Scheffe model, but do not criticize the model itself.  *See*
>
> AR86169 (comments on the Jonah Infill DEIS dated April 9, 2005); AR86230 (Vicki

Stamper's comments on the Jonah Infill Air Quality Impact Analysis dated October 5, 2005). To the extent comments suggested that the Scheffe model may be outdated, BLM's inter-agency air quality team found the Scheffe model sufficient for purposes of NEPA review for the Atlantic Rim Project. *See* Response to Plaintiff's Proffered Material Fact 20.

**23.    Plaintiffs' Proffered Material Fact:**        BLM recognized as early as August 2006 that the Scheffe method was obsolete. AR 8666, AR 8667.

> ***Response:***        Admitted in part and denied in part. Defendant-Intervenors admit that the cited memorandum states that, "[i]n addition to preparing a response to the specific complaints about the BLM's use of the Scheffe model now deemed obsolete, for the JIDPA FEIS/ROD the following EISs in progress were considered: Atlantic Rim, PAPA SEIS, Seminoe Road, Moxa Arch, Continental Divide-Creston, Hiawatha Field." AR8666 (Aug. 30, 2006 Mem. for State Director). Defendant-Intervenors note that BLM determined that for complete and pending projects, including the Atlantic Rim, "BLM should state that the Scheffe method was the best available ozone method at the time." AR8667 (Sept. 8, 2006 Notes from BLM to EPA). For the Atlantic Rim project, BLM determined that it would present the results of its Scheffe method analysis and that "WDEQ and operators would work together to install regulatory ozone monitoring in and/or near the Atlantic Rim field." *Id.* With no objection from WDEQ or EPA, BLM's inter-agency air quality team approved the Scheffe model for purposes of the Atlantic Rim NEPA review. *See* Response to Plaintiff's Proffered Material Fact 20.

**24.    Plaintiffs' Proffered Material Fact:**    The Scheffe method has not been scientifically peer-reviewed.  AR 9881.

> *Response:*    Defendant-Intervenors admit that the cited document states that "[a]fter publication (non peer reviewed literature) of the tables in 1989, the American Petroleum Institute enlisted renowned atmospheric modeling experts, Drs. John Seinfeld and Panos Georgopoulous of the California Institute of Technology, to review the technique."  AR9881 (Scheffe letter).  Based on that review, EPA declined to use it for its intended purpose of Clean Air Act permitting, but the letter does not address whether it is appropriate for NEPA analysis.  *Id.*  BLM's inter-agency air quality team approved the Scheffe model for purposes of the Atlantic Rim NEPA review.  *See* Response to Plaintiff's Proffered Material Fact 20.

**25.    Plaintiff's Proffered Material Fact:**    BLM identified the background concentration level for ozone in the Atlantic Rim project area according to the 8-hour average as 147 µg/m$^3$.  AR2181.

> *Response:*    Denied.  Table 3-6 in the Atlantic Rim EIS contains regional ambient air quality data from the Green River Basin Visibility Study site, Green River, Wyoming, because specific air quality data was not available for the ARPA.  AR2181 (FEIS at 3-17).  While Table 3-6 titled the column of the table listing these regional ambient air quality data "Measured Background Concentration," footnotes to the table further explain the source of the data.  *Id.*  For ozone, the data presented under this column are the second-highest measured 1-hour ozone level and the fourth-highest measured daily 8-hour value.  *Id.*  As BLM explained in the Atlantic Rim ROD, the ambient air quality concentrations presented in Table 3-6 are *maximum* 8-hour values and are, therefore, higher than the *average* hourly values expressed in Table 4-2.  AR4877 (ROD at E-9).  As BLM explained on page 4-13 of the EIS, for purposes of analyzing

ozone impacts, it used the average hourly value (75.2 µg/m$^3$) as a baseline for both the 1-hour and 8-hour analyses to be conservative.  AR2331-AR2332 (FEIS at 4-12 to 4-13).  (By definition, the 1-hour average must be higher than the 8-hour average.)  BLM notes that this baseline concentration is higher than the background ozone concentration level (62.6 µg/m$^3$) used for purposes of the screening level air quality modeling, which is itself conservative.  AR2688 (AQTSD at 44); *see also* AR2331 (FEIS at 4-12).  Finally, BLM explains that it would be overly conservative to add the predicted ozone impacts from the project calculated from the Scheffe method to *maximum* measured concentrations (*i.e.*, the second highest 1-hour value and the 4th highest 8-hour value included in Table 3.6).  *Id.*  The average hourly ozone levels (75.2 µg/m$^3$) used as an average baseline value in the Atlantic Rim EIS is less than half the NAAQS for ozone (157 µg/m$^3$) in effect at the time the Atlantic Rim ROD was approved.  AR2332 (FEIS at 4-13).

   **26.    Plaintiffs' Proffered Material Fact:**        BLM's modeled "Maximum Predicted" ozone impact for the project is 16.1 µg/m$^3$.  AR2332 (FEIS at 4-13).

        ***Response:***        Admitted.  BLM's modeled impacts are conservative.  *See, e.g.,* Response to Plaintiffs' Proffered Material Fact Numbers 25, 27.

   **27.    Plaintiffs' Proffered Material Fact:**        BLM used the average of 75.2 µg/m$^3$ instead of the 8-hour average background level to determine the project's total predicted impact on ground level ozone.  AR2331.

        ***Response:***        Admitted in part.  Defendant-Intervenors incorporate by reference their response to Plaintiffs' proffered material fact 25, which explains that BLM conservatively used the hourly average from both 1-hour and 8-hour average background concentrations.  Defendant-Intervenors admit that the FEIS states:  "O$_3$ maximum predicted concentrations were added to the average hourly background O$_3$ conditions monitored as part of the Green River Basin Visibility Study (ARS 2002) versus second

high maximum values as presented in table 3-6." AR2331 (FEIS at 4-12). The FEIS

further states: "The average value (75.2 μg/m$^3$) is consistent with (slightly higher than)

the background ozone concentration of 62.6 μg/m$^3$ that was used in the RPM modeling to

derive the Scheffe nomograph." *Id.* The FEIS notes that "the Scheffe method is a

screening level modeling tool, and as such, it is overly conservative to add highest,

second highest measured concentrations to screening level estimates." *Id.*

**28.     Plaintiffs' Proffered Material Fact:**          BLM combined the 75.2 μg/m$^3$
measurement with the "maximum predicted impact" of 16.1 μg/m$^3$ due to the Atlantic Rim
project, to calculate a "total predicted impact" of 91.3 μg/m$^3$. AR 2332.

> ***Response:***     Admitted. Defendant-Intervenors incorporate by reference their
>
> response to Plaintiffs' proffered material facts 25 and 27. This measurement is for
>
> impacts "of all phases" of the Atlantic Rim Project, which is contemplated to be
>
> developed over 20 years. AR2332 (FEIS at 4-13); AR4807 (ROD at 12).

**29.     Plaintiffs' Proffered Material Fact:**          Wyoming officials have issued
several health alerts in rural gas-drilling areas due to a substantial buildup of ozone. Wyoming
Department of Environmental Quality health advisories, available at [h]ttp://deq.state.wy.us/
outreachpressrelease.htm.

> ***Response:***     Defendant-Intervenors object to the use of the WDEQ health
>
> advisories, which are extra-record evidence, and are irrelevant. Defendant-Intervenors
>
> incorporate by reference General Objection No. 1. Defendant-Intevernors also object to
>
> the terms "rural gas-drilling areas" and "substantial buildup" as undefined and vague.
>
> Without waiving these objections, Defendant-Intervenors deny Plaintiffs'
>
> proffered material fact 29 to the extent that it states that the health alerts were "due to a
>
> substantial buildup of ozone," as unsupported by the referenced sources, and without
>
> factual basis. Defendant-Intervenors note that the cited advisories were for the Upper

Green River Basin in Sublette County, Wyoming, which is not in or near the ARPA.  *See*

WDEQ health advisories, available at http://deq.state.wy.us/out/outreachpress

release.htm; *see also* AR2129 (FEIS at 1-2).  Defendant-Intervenors note that the cited

news releases state that "[p]redictions of elevated ozone are based on evaluation of

weather forecasts, and are therefore only as reliable as those forecasts."  *See, e.g.,* March

9, 2008 press release, available at http://deq.state.wy.us/out/downloads/ozonealert

3.10.08.pdf.

**30.     Plaintiffs' Proffered Material Fact:**        In a BLM document dated February 6, 2007, a BLM Petroleum Engineer, Jon N. Dull, evaluated known methane seeps in the Atlantic Rim area and wrote that "it is likely that future CBNG [coal bed natural gas] development may cause increased quantities of gas to be emitted from the known seeps.  It is also possible that there exist other seeps within the ARPA that are yet to be discovered." AR 8805.

        ***Response:***        Denied.  Although the quotation from the cited document is an

accurate quotation, the document is in draft form and there is no evidence in the record

that it was made final.  AR8805 (Draft Dull Memorandum at 7).  Defendant-Intervenors

further note that the cited document states: "At this point in time there is no scientific

data available to prove or disprove that CBNG development in the ARPA has caused or

will cause increased gas flux from the known gas seeps."  *Id.*

**31.     Plaintiffs' Proffered Material Fact:**        BLM's engineer Dull identified the following: "fairly severe safety and environmental concerns" from the increase in methane seeps: (1) Potential damage to the atmosphere; (2) Potential damage to human and animal safety; and (3) Potential damage to vegetation.  AR 8803, 8805.

        ***Response:***        Defendant-Intervenors incorporate by reference their response to

Plaintiffs' proffered material fact 30.  Defendant-Intervenors admit that the cited

document lists as "other concerns that precipitate from the likely increase[d] gas seep

22

emissions" potential damage to the atmosphere, potential danger to human and animal

safety, and potential damage to vegetation.  AR8803 (Draft Dull Memorandum at 5).

**32.    Plaintiffs' Proffered Material Fact:**        None of the NEPA documents for the project -- final EIS, draft EIS, and ROD -- mention the BLM document written by Dull.  AR 1436-4881.

> ***Response:***        Defendant-Intervenors incorporate by reference their response to
>
> Plaintiffs' proffered material fact 30.  Defendant-Intervenors admit that the FEIS, DEIS, and
>
> ROD do not mention the draft document written by Dull.  Defendant-Intervenors note, however,
>
> that Mr. Dull is listed as an interdisciplinary reviewer in the FEIS.  AR2512 (FEIS at 6-3).
>
> Further, BLM considered the potential impacts of methane seeps in the ARPA, based on the
>
> information it had before it.  AR2351, AR2368-AR2369 (FEIS at 4-32, 4-49 to 4-50); AR1682
>
> (DEIS at 4-47).

**33.    Plaintiffs' Proffered Material Fact:**        Comments from EPA and Plaintiffs raised concerns over the project's impacts from methane seeps, including global warming impacts.  AR 3481, AR 8840.

> ***Response:***        Denied.  Defendant-Intervenors deny Plaintiffs' proffered material
>
> fact 33 to the extent that it is unsupported by the referenced sources, and without factual
>
> basis.  Although EPA's comments do reference greenhouse gas emissions, those
>
> comments do not raise concerns over methane seeps.  AR3481 (EPA's Comments on
>
> DEIS at 6).  Defendant-Intervenors admit that an April 25, 2007 letter from Wyoming
>
> Outdoor Council ("WOC"), sent after the EIS was completed and the ROD signed, raised
>
> concerns over potential methane seeps in the ARPA.  AR8840 (WOC's comments on
>
> FEIS).  However, the letter provides no new information and does not provide any
>
> evidence to link those methane seeps to the proposed activity.  *See id.*; AR9460 (May 4,
>
> 2007 internal BLM e-mail).

**34.    Plaintiffs' Proffered Material Fact:**        Testing of new and previously existing methane springs in the Atlantic Rim project area by Walter Merschat, the results of

which were brought to BLM's attention, found "exceptionally high methane concentrations." AR 9450.  See also AR 9447, AR 79100.

       *Response:*  Denied.  The documents referenced are dated after the EIS was completed and the ROD signed.  The ROD became effective when it was signed.  AR4799 (ROD at 4).  Although an April 7, 2007 BCA news release forwarded to BLM discusses Mr. Merschat's testing of methane springs in the Atlantic Rim area and is subtitled "Tests Indicate Exceptionally High Methane Concentrations," it appears to be in draft form.  AR9446-AR9447 (e-mail discussing Mr. Merschat's testing); AR9450 (draft BCA News Release).  The document contains question marks, questions, and suggested additions, such as "'something like: These are the biggest methane seeps I've ever seen in my life . . . .'"  AR9450 (draft BCA News Release).  BLM found this was not new information and was already considered in the EIS.  AR9460 (May 4, 2007 internal BLM e-mail).  A declaration of Walter Merschat, dated June 19, 2007, does note detection of methane emissions.  AR79100 (Walter Merschat Decl.).  This declaration was submitted to the IBLA, however, after the ROD was issued, and the IBLA found it insufficient to render BLM's analysis of methane seeps inadequate.  *Theodore Roosevelt Conservation P'ship, et. al,* No. IBLA 2007-208, et.al (Sept. 5, 2007) at 18 (Exh. __ to Mem. in Opp'n to Pl's. Mot. for Summ. J. and in Support of Def.-Intervenors' Cross-Mot. for Summ. J.) .  Plaintiffs again submitted this affidavit in support of their motion for a preliminary injunction, and the court found that Plaintiffs failed to demonstrate that BLM's analysis of methane seeps was inadequate.  *NRDC v. Kempthorne*, 525 F. Supp. 2d 115, 125-26 (D.D.C. 2007).  This declaration provides no evidence to tie the emissions to the Atlantic Rim Project.  *See* AR79100 (Merschat Declaration).

**35. Plaintiffs' Proffered Material Fact:**    BLM issued its Record of Decision without any errata discussing the methane concerns that the public had brought to the agency's attention.  AR 4817-4819.

                **Response:**    Denied.  Defendant-Intervenors incorporate by reference their

response to Plaintiffs' proffered material fact 34, and again note that the documents cited

by Plaintiffs above are dated after the ROD was signed.

**36. Plaintiffs' Proffered Material Fact:**    BLM has listed the sage grouse as a "Sensitive Species."  AR 4405.

                **Response:**    Admitted.  The BLM State Office in Cheyenne, Wyoming

identified the greater-sage grouse as a BLM Wyoming Sensitive Species.

**37. Plaintiffs' Proffered Material Fact:**    Under BLM's Manual, 6840 - Special Status Species Management, BLM-authorized actions may not "contribute to the need for [a sensitive] species to become listed as a threatened or endangered species."  AR 5237-38.

                **Response:**    Defendant-Intervenors object to Plaintiffs' proffered material fact

37 because the documents cited are in the Administrative Record and speak for

themselves.  Defendant-Intervenors admit that the quotation in this proffered material fact

is an accurate quotation.  Without waiving this objection, Defendant-Intervenors note that

the cited BLM manual states that BLM sensitive species receive the same protection as

candidate species.  AR5238 (BLM Manual at .06E).  Defendant-Intervenors admit that

the manual further states that "*[c]onsistent with existing laws*, the BLM shall implement

management plans that conserve candidate species and their habitats and shall ensure that

actions authorized, funded, or carried out by the BLM do not contribute to the need for

the species to become listed."  AR5237 (BLM Manual at .06C) (emphasis added).

Further, as required by its Sensitive Species policy, the BLM determined that the

approval of the Atlantic Rim Project was not likely to contribute to the need to list the

sage grouse under the ESA.  AR2398 (FEIS at 4-79), AR2401-AR2404 (FEIS at 4-82 to

4-85) (noting that significance criterion 1 is not anticipated under any alternative, which

is the need to list a species under the ESA, AR2388 (FEIS at 4-69)).

**38.    Plaintiffs' Proffered Material Fact:**          Nearly half of all sage grouse habitat
is on BLM-managed land.  AR 5497.

> ***Response:***          Denied.  Defendant-Intervenors object to the statement as
>
> undefined and vague because it does not define where "half" of all sage grouse habitat is
>
> located; that is, within the ARPA, the State of Wyoming, or the United States.

**39.    Plaintiffs' Proffered Material Fact:**          Sage grouse are prevalent throughout
the Atlantic Rim project area.  AR 2394.

> ***Response:***          Denied.  Defendant-Intervenors object to the term "prevalent" as
>
> undefined and vague.  Without waiving this objection, Defendant-Intervenors admit that
>
> greater sage-grouse are present in the ARPA.  AR2394 (FEIS at 4-75).

**40.    Plaintiffs' Proffered Material Fact:**          Sage grouse will be significantly
harmed by this project, even after the application of mitigation measures.  AR 2092, 2404.

> ***Response:***          Denied.  Defendant-Intervenors object to the term "significantly
>
> harmed" as undefined and vague.  Without waiving this objection, Defendant-Intervenors
>
> note that the FEIS states: "Impacts to greater sage-grouse and Columbian sharp-tailed
>
> grouse would be significant under all the action alternatives."  AR2092 (FEIS at ES-5).
>
> BLM imposed mitigation to minimize these impacts.  *See, e.g.,* AR2626 (FEIS at E-7);
>
> AR4848 (ROD at B-14), AR4850 (ROD at B-16).  Further, as required by its Sensitive
>
> Species policy, the BLM determined that the approval of the Atlantic Rim Project was
>
> not likely to contribute to the need to list the sage grouse under the ESA.  AR2398 (FEIS
>
> at 4-79), AR2401-AR2404 (FEIS at 4-82 to 4-85) (noting that significance criterion 1 is
>
> not anticipated under any alternative, which is the need to list a species under the ESA,
>
> AR2388 (FEIS at 4-69)).

**41.    Plaintiffs' Proffered Material Fact:**    The project's mitigation measures for sage grouse include a 0.25-mile no surface disturbance zone around sage grouse leks and seasonal restrictions on surface disturbing activities within two miles of a lek (to protect nesting habitat).  AR 2626.

>    ***Response:***    Admitted.  Defendant-Intervenors admit that, among other
>
>    mitigation measures for the greater sage-grouse, the FEIS states that "[s]urface
>
>    disturbance or occupancy will be prohibited with[in] one-quarter mile of the perimeter of
>
>    occupied leks . . ." and that "[s]urface disturbing and disruptive activities will not be
>
>    allowed within two miles of an occupied greater sage-grouse lek or in nesting and early
>
>    brood-rearing habitat associated with individual leks (when identified and delineated),
>
>    from March 1 to July 15 . . . ."  AR2626 (FEIS at E-7).  Other mitigation measures for
>
>    sage grouse include: (1) human activity must be avoided between 6:00 p.m. and 9:00 a.m.
>
>    from March 1 to May 20 within one-quarter mile of the perimeter of occupied leks;
>
>    (2) surface disturbance and other actions that create permanent and high-profile
>
>    structures, such as buildings, storage tanks and overhead power lines, will not be
>
>    constructed within 0.25 to 1.0 mile of the perimeter of leks, as determined on case-by-
>
>    case basis; (3) surface disturbing and disruptive activities will not be allowed between
>
>    November 15 and March 14 in delineated winter concentration areas; and (4) noise
>
>    disturbances to strutting or dancing grouse will be minimized by using hospital-style
>
>    mufflers on compressor stations and generators.  *Id.*  The FEIS states that additional noise
>
>    reduction techniques may be required if research shows that current techniques are not
>
>    adequate.  *Id.*

**42.    Plaintiffs' Proffered Material Fact:**        In its January 26, 2006 comments on the draft EIS, and in its January 5, 2007 comments on the final EIS, the United States Fish and Wildlife Service ("the Service") raised a concern that the anticipated impacts of the project might lead to the need to list sage grouse as endangered or threatened under the Endangered Species Act ("ESA"). AR 3255, AR 10134-10135.

    *Response:*        Denied. The Service's comments state, "[t]he Service is concerned

    that the effects to habitats important to the above species [including the greater sage-

    grouse] may be irreversible and no amount of mitigation can restore or replace what is

    lost." AR3255 (FWS Comments on DEIS at 2). The comments recommend, "[a]s

    several of these species are known to be in decline from loss of habitat, the Service

    recommends that the Bureau not authorize an action that may exacerbate their decline

    and possibly result in listing of one or more of these species under the Act." *Id.* The

    Service also commended BLM for requiring interim reclamation to reduce some of the

    project's impacts. AR10135 (Service's comments on FEIS at 2).

**43.    Plaintiffs' Proffered Material Fact:**        In its January 26, 2006 letter, the Service also stated that it "does not support a 0.25-mile protective buffer around sage-grouse leks as a mitigation measure, nor do we support a 2-mile [seasonal] buffer to protect nesting habitat" and that it "strongly recommends minimum protection measures as described by Connelly et al. (2000)." AR 3256.

    *Response:*        Admitted.

**44.    Plaintiffs' Proffered Material Fact:**        In a 2000 Memorandum of Understanding between BLM and the Western Association of Fish and Wildlife Agencies, U.S. Forest Service, and the U.S. Fish and Wildlife Service, the BLM committed specifically to consider the Connelly guidelines, referenced in the Service's letter, in its planning process. AR 86104.

    *Response:*        Denied. The cited 2000 Memorandum of Understanding ("MOU")

    states that in providing habitat protection, conservation and restoration consistent with

    NEPA, "the BLM, FS and FWS will consider the WAFWA Guidelines for Management

    of Sage Grouse Populations and Habitats, State and Local Conservation Plans, and other

appropriate information in their respective planning processes."  AR86104 (2000 MOU at

3).  Furthermore, BLM considered those guidelines because the FEIS considered

"Alternative C," which was developed based on recommendations of the WGFD, which

in turn were based, in part, on the Connelly guidelines.  *See* AR1492 (DEIS at 2-5);

AR2089 (FEIS at ES-2); AR6565 (WGFD Recommendations at 19), AR6638 (WGFD

Recommendations at 92).

     **45.**    **Plaintiffs' Proffered Material Fact:**    The Atlantic Rim FEIS does not cite
the Connelly guidelines.  AR 2516-2544.

     ***Response:***    Denied.  Although the EIS does not specifically list the Connelly

guidelines as a reference, the FEIS considered "Alternative C," which was developed

based on recommendations of the WGFD, which in turn were based, in part, on the

Connelly guidelines.  *See* AR1492 (DEIS at 2-5); AR2089 (FEIS at ES-2); AR6565

(WGFD Recommendations at 19), AR6638 (WGFD Recommendations at 92).

     **46.**    **Plaintiffs' Proffered Material Fact:**    A zone from 0.6 to 1.2 miles
surrounding an area of surface disturbance such as a well pad tends not to be used by elk due to
human activity.  AR 2389.

     ***Response:***    Admitted in part and denied in part.  Defendant-Intervenors admit

that the FEIS states that elk tend not to use a zone surrounding man-made constructions

such as well pads and roads due to increased human activity, which can extend "from 0.6

to 1.2 miles for elk *depending upon the season*."  AR2389 (DEIS at 4-70) (emphasis

added).

     **47.**    **Plaintiffs' Proffered Material Fact:**    BLM issued a Notice of Intent to
Prepare an Environmental Impact Statement for the Continental Divide-Creston Natural Gas
Project on March 3, 2006.  71 Fed. Reg. 10989-01.

     ***Response:***    Defendant-Intervenors object to the use of 71 Fed. Reg. 10,989-01,

which is extra-record evidence.  Defendant-Intervenors incorporate by reference General

Objection No. 1.  Without waiving this objection, Defendant-Intervenors admit that BLM

issued a Notice of Intent to Prepare an EIS for the Continental Divide-Creston Natural

Gas Project on March 3, 2006, at which time that project was still in the early proposal

stage.  71 Fed. Reg. 10,989-01 (March 3, 2006).  A draft EIS for the Continental Divide-

Creston Natural Gas Project has not yet been issued by the BLM.

**48.     Plaintiffs' Proffered Material Fact:**     BLM issued a <u>Notice of Intent to</u>
<u>Prepare an Environmental Impact Statement -- Hiawatha Regional Energy Development Project</u>
on September 6, 2006.  71 Fed. Reg. 52571-01.

**_Response:_**     Defendant-Intervenors object to the use of 71 Fed. Reg. 52,571-01,

which is extra-record evidence.  Defendant-Intervenors incorporate by reference General

Objection No. 1.  Without waiving these objections, Defendant-Intervenors admit that

BLM issued a Notice of Intent to Prepare an EIS for the Hiawatha Regional Energy

Development Project on September 6, 2006, at which time that project was still in the

early proposal stage.  71 Fed. Reg. at 52,571-01 (Sept. 6, 2006).  A draft EIS for the

Hiawatha Regional Energy Project has not yet been issued by the BLM.

**49.     Plaintiffs' Proffered Material Fact:**     BLM did not consider either the
approximately 9,000 new wells proposed as part of the Continental Divide-Creston project or the
4,208 new wells being considered as part of the Hiawatha project in its list of Reasonably
Foreseeable Future Action.  AR 2484-85.

**_Response:_**     Admitted in part.  Because the projects were in the early proposal

stage, BLM did not include the Continental Divide-Creston project or the Hiawatha

project in its list of Reasonably Foreseeable Future Actions in the EIS.  AR2484-AR2485

(FEIS at 5-2 to 5-3).  The EIS did, however, recognize the pending review of the

Continental Divide/Creston project, which was an outgrowth of the Continental

Divide/Wamsutter II and Creston/Blue Gap projects, both of which were included in the

EIS Review.  AR2137-2138 (FEIS 1-10 - 1-11).  Defendant-Intervenors also note that in

the Great Divide RMP, to which the Atlantic Rim EIS was tiered, BLM analyzed the

potential impacts of opening the entire Great Divide Resource Area for oil and gas

leasing.  *See, e.g.,* AR499-AR500 (Great Divide RMP FEIS at 102-103); AR679-AR681

(Great Divide ROD at 30-32).  Further, in the Atlantic Rim FEIS, BLM considered the

cumulative impacts from past, existing, and reasonably foreseeable future actions,

including those in the ARPA, the Southeastern Sweetwater County/Southwestern Carbon

County Cumulative Impact Analysis ("CIA") area, the Watershed CIA area, and the

Regional CIA area.  *See* AR2483-AR2486 (FEIS at 5-1 to 5-4).  The FEIS discusses how

the Atlantic Rim Project relates to and interacts with the Continental Divide/Creston

Natural Gas Field Development Project, the Desolation Flats Natural Gas Field

Development Project, the Continental Divide/Wamsutter II Natural Gas Development

Project, the Greater Wamsutter Area II Natural Gas Development Project, the

Creston/Blue Gap Natural Gas Project, the Hay Reservoir Natural Gas Infill

Development EA, the South Baggs Area Natural Gas Development Project, and the

Vermillion Natural Gas Exploration and Development Project EA.  AR2137-38 (FEIS at

1-10 to 1-11), AR2484-85 (FEIS at 5-2 to 5-3).

**50.  Plaintiffs' Proffered Material Fact:**        BLM posted notices of applications
for permits to drill in the Atlantic Rim project area in September 2005 well over a year before the
agency issued its ROD/FEIS authorizing the project.  Exh. V attached to Plaintiffs' Reply to
Opposition for Motion for Preliminary Injunction.

*Response:*        Admitted in part.  Defendant-Intervenors admit that APDs attached

as Exhibit V have stamps dated September 2005.  However, the APDs also have stamps

indicating they were replaced in February of 2007, after further on-site consultations with

BLM.  Further, neither of those APDs is signed as having been approved.  Exh. V

31

attached to Pls'. Reply in Opp'n for Mot. for Prelim. Inj.  BLM's posting of the APDs is

in compliance with BLM regulations.  43 C.F.R. § 3162.3-1(g).

**51.    Plaintiffs' Proffered Material Fact:**        The notices that BLM posted for
public notice pursuant to 43 C.F.R. 3162.3-1(g) did not contain the actual applications for
permits to drill that it had received.  Exh. V attached to Plaintiffs' Reply to Opposition to Motion
for Preliminary Injunction.

*Response:*        Admitted in part.  The required information related to the APDs

were posted for 30 days in the RFO public reading room.  AR73494 (Catalina A&B EA

at 3); AR74065 (Sun Dog A&B EA at 3); AR75020 (Sun Dog C EA at 2); AR75175

(Sun Dog D&E EA at 3).  BLM regulations do not require complete copies of the

applications to be posted.  43 C.F.R. § 3162.3-1(g).

**52.    Plaintiffs' Proffered Material Fact:**        BLM did not provide draft
Environmental Assessments to plaintiffs or the public prior to approving the 39 wells in the
Catalina A & B Plans of Developments [sic].  Declaration of Erik Molvar ¶ 15, attached as
Exh. A to Plaintiffs' Motion for Preliminary Injunction.

*Response:*        Admitted in part.  Defendant-Intervenors Object to the use of the

Declaration of Erik Molvar, which is extra-record evidence.  Defendant-Intervenors

incorporate by reference General Objection No. 1.

NEPA regulations do not require draft EAs to be circulated for comment.

40 C.F.R. § 1501.4.  Moreover, although BLM did not provide draft EAs directly to

Plaintiffs prior to approving the 39 wells in the Catalina A&B PODs, BLM posted notice

of the APDs for the Catalina A&B PODs in the RFO public reading room and of the

Catalina EA on BLM's NEPA register website.  AR73494 (Catalina A&B EA at 3).

There is no evidence in the record that Plaintiffs requested copies of draft EAs for the

Catalina A&B PODs or any other documents related to the Atlantic Rim Project until

after the PODs were approved.  BLM provided draft EAs on subsequent approvals for the

Sun Dog C, D and E PODs.  AR79066 (e-mail transmitting copies of Sun Dog C, D, and

E draft EAs to Plaintiffs), AR79078 (Plaintiff BCA's comments on Sun Dog C, D, and E

draft EAs).

**53.    Plaintiffs' Proffered Material Fact:**    BLM did not provide draft
Environmental Assessments to plaintiffs or the public prior to approving the 51 wells in the Sun
Dog A & B Plans of Development.  Id.

*Response:*    Admitted in part.  Defendant-Intervenors Object to the use of the

Declaration of Erik Molvar, which is extra-record evidence.  Defendant-Intervenors

incorporate by reference General Objection No. 1.

NEPA regulations do not require draft EAs to be circulated for comment.

40 C.F.R. § 1501.4.  Moreover, although BLM did not provide draft EAs directly to

Plaintiffs prior to approving the 51 wells in the Sun Dog A&B PODs, BLM posted notice

of the APDs for the Sun Dog A&B PODs in the Rawlins Field Office public reading

room and of the Sun Dog A&B EAs on BLM's NEPA register website.  AR74065 (Sun

Dog A&B EA at 3).  There is no evidence that Plaintiffs requested copies of draft EAs for

the Sun Dog A&B PODs or any other documents related to the Atlantic Rim Project until

after the PODs were approved.  BLM provided draft EAs on subsequent approvals for the

Sun Dog C, D and E PODs. AR79066 (e-mail transmitting copies of Sun Dog C, D, and

E draft EA to Plaintiffs), AR79078 (Plaintiff BCA's comments on Sun Dog C, D, and E

draft EAs).

**54.    Plaintiffs' Proffered Material Fact:**    BLM provided counsel for plaintiffs
draft Environmental Assessments seven days before approving the 48 new wells in the Sun Dog
C, D, and E Plans of Development.  AR 79066-67.

*Response:*    Admitted.

**55.    Plaintiffs' Proffered Material Fact:**        BLM did not include site-specific analysis of the wells in the Atlantic Rim FEIS.  AR 4483, 4561, 4570, 4578, 4588.

> *Response:*        Denied.  Defendant-Intervenors incorporate by reference, as if fully set forth herein, their response to Plaintiffs' proffered material fact 3.

**56.    Plaintiffs' Proffered Material Fact:**        Information related to the site-specific environmental impacts of the applications for permits to drill and the conditions of approval to address the impacts were made available to the public for the first time in BLM's Environmental Assessments that accompanied each plan of development approval.  See, e.g., AR73492-AR73501.

> *Response:*        Denied.  Defendant-Intervenors incorporate by reference as if fully restated herein their responses to Plaintiffs' Proffered Material Facts 52 and 53.

Respectfully submitted,


/s/ Michael B. Wigmore
_____
Michael B. Wigmore (DC Bar #436114)
Sandra P. Franco (DC Bar #467091)
Bingham McCutchen LLP
2020 K Street, NW
Washington, DC  20006-1806
(202) 373-6000 (tel)
(202) 373-6001 (fac)

*Counsel for Anadarko Petroleum Corporation
Warren Resources, Inc., and Double Eagle
Petroleum Co.*


Robert C. Mathes (DC Bar #484255)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO  80202
(303) 892-1400 (tel)
(303) 892-1401 (fac)

*Counsel for Double Eagle Petroleum Co.*


Dated: May 30, 2008

A/72549219.2

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Avenue, NW, Suite 400
Washington, DC 20005, *et al.,*

       Plaintiffs,

         v.

DIRK KEMPTHORNE, in his official capacity
as the Secretary of the United States
Department of the Interior
1849 C Street, NW
Washington, DC 20240, *et al.,*

       Defendants.

---

ANADARKO PETROLEUM CORPORATION
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

DOUBLE EAGLE PETROLEUM CO.
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

       and

STATE OF WYOMING
123 Capitol Building
Cheyenne, WY 82002,

       Defendant-Intervenors.

Civ. No. 1:07-cv-01709-RJL

**CERTIFICATE OF SERVICE**

    I hereby certify that on this 30th day of May, 2008, the foregoing Cross-Motion for

Summary Judgment, Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment

and in Support of Defendant-Intervenor Anadarko Petroleum Corporation, Warren Resources,

Inc. and Double Eagle Petroleum Co.'s Cross-Motion for Summary Judgment, Statement of

Undisputed Material Facts in Support of Cross-Motion for Summary Judgment, Response to

Plaintiffs' Statement of Material Facts as to Which There is no Genuine Issue, and Proposed

Order were electronically filed through the CM/ECF system, which caused the following parties

to be served by electronic means, as more fully reflected on the Notice of Electronic Filing, to

the following:

| | |
|---|---|
| Sharon Buccino<br>Benjamin Longstreth<br>Natural Resources Defense Council<br>1200 New York Avenue, NW<br>Suite 400<br>Washington, D.C. 20005<br><br>sbuccino@nrdc.org<br>blongstreth@nrdc.org | Lori Caramanian<br>U.S. Department of Justice<br>1961 Stout Street, 8th Floor<br>Denver, CO 80294<br><br>lori.caramanian@usdoj.gov |
| Jay A. Jerde<br>Teresa R. Nelson<br>John S. Burbridge<br>Deputy Attorney General<br>Wyoming Attorney General's Office<br>123 Capitol Building<br>Cheyenne, WY 82002<br><br>jjerde@state.wy.us<br>tnelso@state.wy.us<br>jburb1@state.wy.us | |

and that the following were served by first class mail:

| | |
|---|---|
| Aaron Bloom<br>Natural Resources Defense Counsel<br>40 West 20th Street<br>New York, NY 10011 | |

/s/ Michael B. Wigmore

Michael B. Wigmore

**Exhibits in Support of Defendant-Intervenor
Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle
Petroleum Co.'s Memorandum in Opposition to Plaintiff's Motion for Summary
Judgment and in Support of Their Cross-Motion for Summary Judgment**

Ex. 1        *Theodore Roosevelt Conservation P'ship, et al.,* No.
             IBLA 2007-208, *et al.* (Sept. 5, 2007) ("IBLA Decision")

Ex. 2        BLM, Draft Supplemental Environmental Impact
             Statement for the Pinedale Anticline Oil and Gas
             Exploration and Development Project (Dec. 2006)

Ex. 3        Golder Associates Inc., Atlantic RIM Air Monitoring
             Program Quarterly Data Report October - December
             2007 (Apr. 2008)

Ex. 4        *Biodiversity Conservation Alliance,* 174 IBLA 1
             (Mar. 3, 2008)

**Exhibit 1**

*Theodore Roosevelt Conservation P'ship, et al.*, No. IBLA 2007-208, *et al.* (Sept. 5, 2007)
("IBLA Decision")



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
Interior Board of Land Appeals
801 N. Quincy St. Suite 300
Arlington, VA  22203

703 235 3750                            703 235 8349 (fax)

September 5, 2007

| | |
|---|---|
| IBLA 2007-208, et al. | )  BLM/WY/PL-07/011+1310 |
| | )  |
| THEODORE ROOSEVELT | )  Atlantic Rim Natural Gas Field |
| CONSERVATION PARTNERSHIP, | )  Development Project |
| ET AL. | )  |
| | )  |
| | )  Motions to Intervene Granted; |
| | )  Motions to Dismiss IBLA 2007-208 |
| | )  For Lack of Standing Denied; |
| | )  Motions to Dismiss IBLA 2007-226 |
| | )  For Lack of Standing Granted in |
| | )  Part; |
| | )  Motion to Dismiss IBLA 2007-226 as |
| | )  Untimely Denied; |
| | )  Petitions for Stay Denied |

## ORDER

The Theodore Roosevelt Conservation Partnership (TRCP) and others have
appealed from a March 23, 2007, Record of Decision (ROD) of the Wyoming State
Director, Bureau of Land Management (BLM), approving the Atlantic Rim Natural
Gas Field Development Project (ARP or Project). BLM published notice of the
availability of the ROD in the *Federal Register* on May 21, 2007 (72 Fed.
Reg. 28518).[1]

Four appeals were filed from the ROD, and docketed as follows:
IBLA 2007-208 (TRCP); IBLA 2007-210 (Biodiversity Conservation Alliance,
Wyoming Outdoor Council, Center for Native Ecosystems, Western Watersheds

---

[1] In December 2006, BLM offered to the public for comment the ARP Final
Environmental Impact Statement (FEIS), which had been prepared in accordance
with section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA),
42 U.S.C. § 4332(2)(C) (2000), to analyze the potential significant environmental
impacts of oil and gas drilling and associated activity in the Project area, under the
proposed action and alternatives thereto.

Project, Colorado Environmental Coalition, The Wilderness Society, and Wyoming Wilderness Association (collectively, BCA)); IBLA 2007-226 (Environmental Preservation Foundation (Foundation) and Habitat for Wildlife (HFW) (collectively, EPF)); and IBLA 2007-227 (National Wildlife Federation and Wyoming Wildlife Federation (collectively, NWF)).[2]

The Project currently authorizes the drilling of 2,000 natural gas wells, including 1,800 coalbed methane (CBM) and 200 conventional gas wells, within the Atlantic Rim Project Area (ARPA or Project area). The Project area encompasses 270,080-acres of Federal, State, and private lands in Ts. 18 through 20 N., R. 89 W., Ts. 13 through 20 N., R. 90 W., Ts. 13 through 19, R. 91 W., and Ts. 15 through 17, R. 92 W., Sixth Principal Meridian, Carbon County, Wyoming.[3] All of the public lands in the Project area are subject to existing Federal oil and gas leases, within the administrative jurisdiction of BLM's Rawlins Field Office. All of the wells will be drilled at 80-acre spacing, or a maximum of 8 wells per 640-acre section. The CBM wells will be drilled in the Mesaverde Group, which consists of the Almond, Ericson, Rock Springs, and Blair formations, and the conventional gas wells will generally be drilled in deeper formations.

No more than 7,600 acres of Federal, State, and private lands will be disturbed at any one time, and the total cumulative surface disturbance will not exceed 13,600 acres over the life of the Project. Short-term disturbance will be limited to 6.5 acres per well site. Wastewater produced by CBM extraction will be reinjected into subsurface formations. Reclamation of disturbed areas will begin after the completion of drilling activities, and conclude once the well sites are no longer needed for any operations or production. New access roads and natural gas

---

[2] By three orders dated June 28, and July 26, 2007, we granted motions by the following proponents of the Project to intervene in the respective pending appeals: Anadarko E&P Company LP and Warren Resources, Inc. (collectively, Anadarko) (IBLA 2007-208, 2007-210, and 2007-227); and Double Eagle Petroleum Co. (Double Eagle) (IBLA 2007-208 and 2007-210). We hereby grant their motions to intervene in the remaining pending appeals: Anadarko (IBLA 2007-226); and Double Eagle (IBLA 2007-226 and 2007-227). In addition, by order dated July 18, 2007, we granted motions by the State of Wyoming to intervene in all four appeals.

[3] Under a 2001 Interim Drilling Policy (IDP), BLM approved, following the completion of environmental assessments and issuance of decision records/findings of no significant impact, the drilling of CBM wells and related activity in several Plan of Development (POD) areas within the ARPA in order to test the feasibility of development therein and to gather data for further environmental analysis. A total of 132 CBM wells had been drilled under the IDP at the time of issuance of the ARP FEIS.

IBLA 2007-208, *et al.*

pipelines, each totaling close to 1,000 miles, as well as compressors and other facilities, will be constructed in connection with the drilling and development activities. The overall life of the Project is expected to be from 30 to 50 years, although most drilling and related roadbuilding and facility construction will occur in the first 6 to 8 years.

TRCP and BCA each petitioned the Board to stay the effect of the ROD during the pendency of their appeals. The stay petitions are opposed by BLM and all of the intervenors. No stay petition was filed by EPF or NWF, although EPF filed a document styled "Concurrence and Joinder in Petition for Stay," stating that it was joining in the petition for stay earlier filed by BCA.

In this order, we first address motions to dismiss. We deny the motions to dismiss IBLA 2007-208 for lack of standing to appeal and grant the motions to dismiss IBLA 2007-226 for lack of standing to appeal only as to HFW. BLM's motion to dismiss IBLA 2007-226 as untimely is denied.

### I. Standing to Appeal in IBLA 2007-208 (TRCP) and IBLA 2007-226 (EPF)

Anadarko, Double Eagle, the State, and BLM move to dismiss IBLA 2007-208 and IBLA 2007-226, alleging that none of the appellants has demonstrated standing to appeal, in accordance with 43 C.F.R. § 4.410(a).

In order to have standing under 43 C.F.R. § 4.410(a) to appeal from a BLM decision, an appellant must demonstrate that it is both a "party to a case" and "adversely affected" by the decision within the meaning of 43 C.F.R. § 4.410(b) and (d). As we said in *Southern Utah Wilderness Alliance*, 140 IBLA 341, 346 (1997) (*quoting Mark S. Altman*, 93 IBLA 265, 266 (1986)): "If either element is lacking, an appeal must be dismissed." Further, it is the responsibility of the appellant to demonstrate the requisite elements of standing. *Colorado Open Space Council*, 109 IBLA 274, 280 (1989).

First, under 43 C.F.R. § 4.410(b), an appellant is considered to be a "party to a case," when it is "one who has taken action that is the subject of the decision on appeal, is the object of that decision, or has otherwise participated in the process leading to the decision under appeal, *e.g.*, . . . by commenting on an environmental document, or by filing a protest to a proposed action." *See The Coalition of Concerned National Park [Service] Retirees*, 165 IBLA 79, 81-82 (2005), and cases cited.

Second, under 43 C.F.R. § 4.410(d), a party to a case is "adversely affected" by a BLM decision, "when that party has a legally cognizable interest, and the decision on appeal has caused or is substantially likely to cause injury to that

3

interest." *See The Coalition of Concerned National Park [Service] Retirees*, 165 IBLA at 81-82, and cases cited. When an appellant is a membership organization, it must demonstrate that one or more of its members has a legally cognizable interest, which is germane to the purposes of the organization as a whole, and which is or may be adversely affected by the decision being appealed. *Id.* at 86.

### A. IBLA 2007-208

Anadarko, Double Eagle, the State, and BLM do not question whether TRCP is a "party to a case;" rather they assert that TRCP is not "adversely affected" by the ROD. Initially, although TRCP claimed that its members visited Project area lands for aesthetic and recreational pursuits, lived and worked in neighboring communities, enjoyed the wildlife found there, and/or made their living on public lands in the vicinity of Project area lands, TRCP did not identify any such members or provide any declarations or other statements of any members attesting to such activities or the likely effect of the Project on such activities.

In response to the motions to dismiss, TRCP filed affidavits of two members, Steven R. Belinda and Rollin D. Sparrowe, who attest to the fact that TRCP is "a non-profit organization representing outdoor enthusiasts who engage in hunting, fishing and outdoor recreation;" that its "mission is to preserve hunting and fishing by conserving fish and wildlife and the habitats necessary to sustain them for its members and for the public;" that they personally have hunted elk, mule deer, and/or sage grouse within the Project area; and that, given the negative impacts to such species, such activity would be harmed by allowing the Project to go forward. TRCP Consolidated Response to Motions to Dismiss at 4 (citing attached Ex. A (Affidavit of Belinda, dated July 18, 2007) and Ex. B (Affidavit of Sparrowe, dated July 20, 2007)).

Based on the affidavits of TRCP's members, we conclude that TRCP has offered specific facts demonstrating that its members have a legally cognizable interest in the Project area, which is germane to the purposes of the organization, and which may be adversely affected by BLM's decision to go forward with drilling and development in the Project area. Therefore, we deny the motions to dismiss TRCP's appeal (IBLA 2007-208) for lack of standing to appeal.

### B. IBLA 2007-226

Turning to the motions to dismiss EPF's appeal, we note that HFW has not taken action that is the subject of the decision on appeal, and HFW is not the object of that decision. While the Foundation participated in the public scoping and comment process, HFW did not. *See* ROD, Appendix E, at E-11 to E-13;

FEIS, Appendix N (Draft EIS Comment Letters), at N-12 to N-15. In a consolidated response to the motions to dismiss, EPF asserts at page 1 that "[t]he intent was that comments were to represent both" the Foundation and HFW. While in hindsight that may have been the intent, there is no independent evidence in the record that HFW participated, at any point, in the NEPA review or decisionmaking process that led to the ROD. We conclude that HFW cannot be considered a "party to a case," and, for this reason alone, lacks standing to appeal. *See Edwin H. Marston*, 103 IBLA 40, 42 (1988).

Although both the Foundation and HFW claim that their members, who recreate, observe wildlife, and hunt in the Project area, will be negatively impacted by drilling and development, only the Foundation provides the declaration of a member in support of those assertions, the August 9, 2007, declaration of Asa S. Nielson, the Chairman of the Foundation. Through that declaration the Foundation has offered specific facts establishing that Nielson has a legally cognizable interest in the Project area, which is germane to the purposes of the Foundation, and which may be adversely affected by BLM's approval of the Project. Thus, the Foundation has established that it has standing to appeal the ROD.

Accordingly, we grant the motions to dismiss IBLA 2007-226 for lack of standing to appeal only as to HFW.[4]

## II. Timeliness of Appeal in IBLA 2007-226

BLM requests that the Board dismiss EPF's appeal as untimely. It states that EPF made two attempts at filing a notice of appeal, one filed initially with the Field Office and forwarded to the State Office, and the other filed directly with the State Office. BLM asserts that neither notice of appeal satisfies the filing requirements of 43 C.F.R. § 4.411(a), or can take advantage of the waiver provision of 43 C.F.R. § 4.401(a).

Both assertions hinge on the fact that a notice of appeal had to be filed, as provided by 43 C.F.R. § 4.411(a), 30 days after the May 21, 2007, date of publication of notice of the availability of the ROD in the *Federal Register, i.e.,* on or before June 20, 2007, "in the office of the officer who made the decision."

EPF initially filed a notice of appeal with the Rawlins Field Office on June 20, 2007, the deadline for filing. However, BLM correctly notes that the filing did not comport with 43 C.F.R. § 4.411(a), because it was not filed "in the office of the

---

[4] Hereinafter, references to EPF will be solely to the Environmental Preservation Foundation and not to that organization and HFW collectively.

IBLA 2007-208, *et al.*

officer who made the decision," within the 30-day appeal period. In the present case, that "office" was the Wyoming State Office of the Wyoming State Director, who issued the ROD.[5] Filing with the Rawlins Field Office did not satisfy the regulation. *See William R. Smith*, 149 IBLA 358, 362 (1999).

BLM also correctly observes that this notice of appeal was forwarded to the Wyoming State Office, and received there on June 26, 2007. Therefore, the proper BLM office received the notice of appeal within the 10-day grace period provided by 43 C.F.R. § 4.401(a). That regulation states that a failure to file a document in the proper office within the required time period

> will be waived if the document is filed not later than 10 days after it was required to be filed *and* it is determined that the document was transmitted or probably transmitted to the office in which the filing is required before the end of the period in which it was required to be filed. [Emphasis added.]

*See, e.g., Southern California Sunbelt Developers, Inc.*, 154 IBLA 115, 116-17 (2001).[6]

BLM argues that, although the notice of appeal was transmitted to BLM on June 19, 2007, before the filing deadline, and was received by the proper BLM office on June 26, 2007, within the 10-day grace period, it was not "transmitted or probably transmitted to the office in which the filing is required" before the end of the 30-day appeal period, since the office to which it was initially transmitted was not the proper BLM office. It concludes that EPF's failure to comply with 43 C.F.R. § 4.411(a) cannot be waived under 43 C.F.R. § 4.401(a).

We have long held that, if a notice of appeal is misdirected to the incorrect BLM office, and then forwarded to the correct BLM office, the notice will be considered, for purposes of 43 C.F.R. § 4.401(a), to have been "transmitted or probably transmitted to the office in which the filing is required" on the date the notice was forwarded to the correct BLM office. *Ida Mae Rose*, 73 IBLA 97, 99 (1983). In the present case, while we know that the original notice of appeal was

---

[5] The ROD expressly stated at page 22: "If an appeal is filed, your notice of appeal must be filed in this office (Bureau of Land Management, State Director, P.O. Box 1828, Cheyenne, Wyoming 82003) within 30 days of the date BLM publishes its notice of decision in the *Federal Register*."

[6] The copy of the notice of appeal filed directly with the Wyoming State Office is untimely. It was transmitted on June 29, 2007, after the expiration of the appeal period, and received on July 2, 2007. The waiver provision of 43 C.F.R. § 4.401(a) does not apply to that filing.

IBLA 2007-208, *et al.*

received by the State Office on June 26, 2007, we do not know when it was
forwarded to that office, but it is possible that it was forwarded on June 20, 2007,
before the end of the 30-day appeal period.[7] Therefore, we must conclude that the
requirements for invoking the waiver provision of 43 C.F.R. § 4.401(a) were satisfied,
and we consider the appeal to have been timely filed. BLM's motion to dismiss
IBLA 2007-226 as untimely is denied.

### III. Factual Background

BLM based its ROD on a December 12, 2005, Draft EIS (DEIS) and the FEIS,
which were prepared to address the proposed action and alternatives thereto.[8] BLM
tiered those documents to the June 1988 Medicine Bow-Divide EIS prepared in
conjunction with promulgation of the applicable land use plan, the November 1990
Great Divide Resource Management Plan (RMP). BLM incorporated in the DEIS and
the FEIS a Draft Air Quality Technical Support Document (AQTSD) and a Final
AQTSD (FEIS, Appendix F). BLM also consulted with the Fish and Wildlife Service
(FWS), U.S. Department of the Interior, concerning the potential adverse effects of
the proposed Project to listed and candidate threatened and endangered (T&E)
species, protected by the Endangered Species Act of 1973 (ESA), *as amended,*
16 U.S.C. §§ 1531-1543 (2000).

In the DEIS, BLM considered the Proposed Action,[9] a No Action Alternative
(Alternative A), a Phased Development Alternative (Alternative B), and a Special
Protection for Crucial or Sensitive Resources Alternative (Alternative C). Alternative
B was eliminated from further study in the FEIS due to comments received on the

---

[7] While the case record contains a copy of a fax transmission from the Rawlins Field
Office to the Wyoming State Office, dated June 22, 2007, showing that a copy of the
notice of appeal was transmitted to the State Office on that date, there is no evidence
in the case record of the date on which the Rawlins Field Office transmitted the
original notice of appeal.

[8] The FEIS is a 2-volume document, consisting of the FEIS itself (Volume 1) and
15 appendices (Volume 2). Since the FEIS and each of the appendices contains
distinctive pagination, citations will use the title of the basic document and the
relevant page.

[9] Under the Proposed Action, 2,000 (1,800 CBM and 200 conventional) gas wells
would be drilled at 80-acre spacing (but potentially 160-acre spacing, if suitable for
the recovery of natural gas). No limit was placed on surface disturbance, but it was
expected to be a total of 16,400 acres (or 7.9 acres per well) in the short term, falling
to a total of 6,200 acres, after interim reclamation, for the remainder of the life of the
Project.

DEIS. In its FEIS, BLM also considered a Natural Gas Development with Surface Disturbance Limitations Alternative (Alternative D), which was BLM's preferred alternative: "The objective of this alternative is to minimize surface disturbance while optimizing natural gas recovery."[10] FEIS at 2-7.

In his ROD, the State Director approved a modified preferred alternative (Alternative D) for the Project, subject to a performance-based, adaptive management process, and "the option to consider protective measures described in Alternative C that are not in conflict with this Decision."[11] ROD at 1; *see id.* at 19. He concluded that the approved drilling and development conformed with BLM's applicable land use plan, which had opened public lands in the Rawlins Resource Area to oil and gas leasing and development, and also adequately protected other resources: "Alternative D [with modifications] provides a good balance between oil and gas recovery and resource protection and provides for long-term reclamation and re-establishment of native vegetation and wildlife communities." ROD at 10.

BLM's approval of the Project did not authorize drilling or other surface-disturbing activity. ROD at 3-4. A Review Team, composed of representatives of BLM, other Federal and State agencies, and the operators, will evaluate annual and site-specific development proposals and establish required best management practices (BMPs), conditions of approval (COAs), or other protective measures to mitigate potential environmental impacts. *Id.* at 16.

---

[10] Alternative D limited total surface disturbance at any one time to 7,600 acres, with a cumulative limit of 13,600 acres ("2,000 wells x 6.5 acres/well, plus approximately 600 acres existing disturbance under the Interim Drilling Policy"): "If the disturbance limit [applicable during the Project] should be reached, further disturbance activities would be halted pending successful reclamation." FEIS at 2-8. In addition, BLM would designate "Category 'A' Mitigation Areas," containing a total of approximately 72,200 acres, which "would be managed more intensely . . . to reduce the extent of disturbance below an average of 6.5 acres/well." *Id.* at 2-8, 2-9. Such areas would include areas "with sensitive fish populations, and crucial wildlife habitats, including areas of critical environmental concern, special management areas (SMA), elk crucial winter range and silver sage/bitterbrush communities." *Id.* at 2-8.

[11] Alternative C encompassed the same number of wells as the Proposed Action, but imposed additional measures outlined in Appendix L (Resource Concerns and Associated Protection Measures Proposed under Alternative C), to protect crucial or sensitive resources: "Generally, constraints would focus on surface disturbance limits, limited operating periods, modification of drilling and construction practices, and, in some cases, no surface occupancy." DEIS at 2-4.

BLM recognized that Project approval would convert the "natural setting" of the Project area "to an industrialized setting," significantly impacting the environment by degrading the scenery, introducing traffic and noise, and otherwise adversely affecting wildlife and wildlife habitat, and associated recreational use, in the form of hunting and sightseeing. FEIS at 4-102. However, despite surface-disturbing activities that were likely to result in major adverse impacts to certain resource values in the short term, BLM's long-term goal is to return Project area lands to a condition approximate to that which existed before developments proposed in Alternative D were implemented. ROD at 4.

In approving a modified Alternative D, BLM adopted various measures, set forth in Appendix B (Performance-Based Monitoring and Best Management Practices) and Appendix C (Operator-Committed Practices) of the ROD. Appendix C practices became "mandatory requirements" upon issuance of the ROD. ROD at 21. On the other hand, Appendix B requirements "will be considered during site-specific, environmental review." *Id.*

In Appendix B, at B-2, BLM described the "performance-based, adaptive management process" as consisting of four primary elements: (1) the Project would proceed subject to an extensive list of BMPs, COAs, and protective measures (termed "Performance Requirements"); (2) the environmental effects of the Project would be monitored (termed "Performance-Based Monitoring"); (3) monitoring results would be assessed to determine whether resource management objectives (termed "Performance Goals") were being met; and (4) where necessary, "additional" mitigation measures or techniques (termed "Adaptive Management") would be adopted, in conjunction with the approval of specific surface-disturbing activity to ensure achievement of the Performance Goals.[12] BLM stated that "Operators are responsible for demonstrating successful achievement of Performance Goals," which would bear on BLM's approval of future Project activities. ROD at 20.

For wildlife, BLM expected that Project activities would significantly adversely affect big game, such as pronghorn antelope, elk, and mule deer, and upland game birds, such as Greater sage-grouse, and Columbian sharp-tailed grouse, by displacing them and eliminating and fragmenting their habitat, particularly big game crucial winter range and grouse nesting and brood-rearing habitat. ROD at 7, 9; FEIS at 4-69 to 4-77, 4-82 to 4-83, 4-85. BLM provided for implementing "four strategies" for minimizing significant adverse impacts:

---

[12] "The specific measures . . . that are best suited for reducing adverse effects will vary by site, based on conditions found at the specific site, such as the presence of sensitive soils, wildlife issues, aspect, slope, nature of the specific action proposed, and many other factors." *Id.* at B-3.

9

(1) reduce the initial disturbance footprint as much as possible,
(2) restore habitat function in the shortest time possible,
(3) perform timely site reclamation and limit unreclaimed surface
disturbance, and
(4) institute a monitoring and adaptive management process to ensure
reclamation and mitigation measures are effective and initiate
corrective action when it is not.

ROD at 8.

In addition to limiting surface disturbance and providing for interim
reclamation, BLM provided for adopting a Wildlife Monitoring and Protection Plan,
as outlined at Appendix E of the FEIS, the goal of which is to avoid and/or minimize
adverse impacts to wildlife by monitoring wildlife population trends and developing
appropriate mitigation during the course of Project development and operation.
ROD, Appendix B, at B-13. Under the plan, BLM and/or the Wyoming Game and
Fish Department (WGFD) would monitor the impacts of Project activities on Greater
sage-grouse and Columbian sharp-tailed grouse leks, big game crucial winter range,
and other important wildlife areas, and specified mitigation measures would be
adopted in connection with the approval of applications for permit to drill (APDs),
rights-of-way (ROWs), and other land-use authorizations. ROD, Appendix B, at B-14,
B-15; FEIS, Appendix E, at E-4, E-6, E-12. These measures include spatial and/or
temporal restrictions on drilling and other activity. ROD, Appendix B, at B-16, B-17;
FEIS, Appendix E, at E-7, E-9 to E-10. BLM stated that "these measures may be
modified on a site-specific basis as deemed appropriate by the BLM after completion
of APD and ROW application field reviews." FEIS, Appendix E, at E-6.

BLM also provided for assessing the need for additional mitigation measures or
techniques, based on the success in achieving Performance Goals related to wildlife.
These Goals include providing an adequate amount of suitable undisturbed crucial
winter range and maintaining functional migration routes for big game through the
Project area, and providing well-dispersed breeding, nesting, brood-rearing, and
winter habitat for upland game birds. ROD at 19; ROD, Appendix B, at B-2.

For air quality, BLM expected that Project emissions would not exceed
National Ambient Air Quality Standards (NAAQS) or Wyoming Ambient Air Quality
Standards (WAAQS), or violate Prevention of Significant Deterioration (PSD)
requirements. ROD at 7; FEIS at 4-12 to 4-15. BLM also noted that, before
undertaking any Project activities, the operators were required to obtain the
appropriate air quality permits for drilling and other activity from the applicable State
agency (Wyoming Department of Environmental Quality (WDEQ)), and thereafter
comply with all Federal and State air quality laws. FEIS at 1-12 to 1-13, 3-19, 4-6.

IBLA 2007-208, *et al.*

BLM stated that air quality would be monitored following Project approval, and appropriate regulatory action would be taken by WDEQ to resolve any subsequent violations of air quality standards by Project activities. ROD at 7; FEIS at 4-6, 4-15; FEIS, Appendix B, at B-5. The impacts of Project emissions on air quality, specifically concentrations of nitrogen dioxide ($NO_2$), carbon monoxide, (CO), ozone ($O_3$), sulfur dioxide ($SO_2$), and particulate matter less than 2.5 and 10 micrograms in diameter ($PM_{2.5}$ and $PM_{10}$), in the Project and surrounding areas would be monitored by the operators, as well as BLM, WDEQ, and the Environmental Protection Agency (EPA).

### IV. Petitions for Stay in IBLA 2007-208 and IBLA 2007-210

The regulation at 43 C.F.R. § 3165.4(c) provides that a decision of a BLM State Director concerning onshore oil and gas operations shall remain effective pending appeal, unless the Board determines otherwise, and that an appellant who petitions for a stay of the effect of such a BLM decision pending a determination by the Board of the merits of its appeal bears the burden of demonstrating sufficient justification for the stay, based on the following four standards: (1) the relative harm to the parties if the stay is granted or denied; (2) the likelihood of the appellant's success on the merits; (3) the likelihood of irreparable harm to the appellant or resources if the stay is not granted; and (4) whether the public interest favors granting the stay. *See Colorado Environmental Coalition*, 135 IBLA 356, 357-58 (1996), *aff'd, Colorado Environmental Coalition v. BLM*, 932 F. Supp. 1247 (D. Colo. 1996).

TRCP and BCA contend that they are likely to succeed on the merits of their appeals and satisfy the other requirements for a stay.[13]

Based on a preliminary review of the case record, the petitions for stay filed by TRCP and BCA, and their subsequent pleadings, as well as the responsive pleadings of BLM, Anadarko, Double Eagle, and the State, we conclude that TRCP and BCA have failed to justify staying the effect of the ROD because they have failed to show a likelihood of success on the merits of their arguments that BLM erred in issuing the ROD. For the following reasons, the Board denies their petitions for stay.

---

[13] TRCP's arguments that it is likely to succeed on the merits of its appeal are set forth on less than two pages of its NA/Petition. More importantly, such arguments are conclusory in nature, and fail to carry its burden to demonstrate a likelihood of success. Nevertheless, TRCP has since filed a statement of reasons (SOR), which we consider in determining whether it has carried that burden. BCA filed a 107-page NA/Petition, adopting the 89-page discussion regarding their likelihood of success as their SOR.

IBLA 2007-208, *et al.*

### A. Analysis

TRCP and BCA contend that the ROD is violative of the environmental review requirements of section 102(2)(C) of NEPA and the multiple-use management and land use plan conformance requirements of section 302(a) of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1732(a) (2000). We turn first to their arguments that BLM violated section 102(2)(C) of NEPA.

### 1. National Environmental Policy Act of 1969

When BLM considers the likely environmental impacts of approving large-scale natural gas drilling and related activity in an EIS, the adequacy of the EIS, under section 102(2)(C) of NEPA, must be judged by whether it constituted a detailed statement, which took a hard look at all of the potential significant environmental consequences of the proposed action and reasonable alternatives thereto, considering all relevant matters of environmental concern. *Center for Biological Diversity,* 162 IBLA 268, 275 (2004), and cases cited. In deciding whether an EIS promotes informed decisionmaking, we have held that a "rule of reason" will be employed. *Forest Guardians,* 170 IBLA 80, 95 (2006); *see, e.g., Utahns for Better Transportation v. U.S. Department of Transportation,* 305 F.3d 1152, 1163 (10th Cir. 2002) ("We apply a rule of reason standard . . . in deciding whether claimed deficiencies in a[n] FEIS are merely flyspecks, or are significant enough to defeat the goals of informed decisionmaking and informed public comment"). Thus, an EIS will be upheld when it has set forth sufficient information to allow the decision maker to consider fully the environmental effects involved and to make a reasoned choice among alternatives after balancing the risks of harm to the environment against the benefits of the proposed action. *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1375 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064 (1978).

"[W]hether BLM is able to know and quantify precisely the 'ultimate effects' of development . . . is a very different question from whether BLM adequately considered and made a reasoned assessment of environmental impacts." *National Wildlife Federation,* 150 IBLA 385, 396 (1999).

An appellant challenging a BLM decision to approve oil and gas development, following preparation of an EIS, must carry its burden to demonstrate by a preponderance of the evidence, with objective proof, that BLM failed to give adequate consideration to a substantial environmental question of material significance to the proposed action, or otherwise failed to abide by section 102(2)(C) of NEPA. *Colorado Environmental Coalition,* 142 IBLA 49, 52 (1997). "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the

IBLA 2007-208, *et al.*

environmental costs," in deciding to go forward with the proposed action. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989).[14] Section 102(2)(C) of NEPA does not require BLM to take any particular action in a given set of circumstances, and it does not prohibit action when environmental degradation will inevitably result. "Rather, it merely mandates that whatever action BLM decides upon be initiated only after a full consideration of the environmental impact of such action." *Oregon Natural Resources Council,* 116 IBLA 355, 361 n.6 (1990).

In assessing significant impacts, when BLM relies on the professional opinion of its technical experts concerning matters within the realm of their expertise, and that reliance is reasonable and supported by record evidence, an appellant challenging such reliance must demonstrate, by a preponderance of the evidence, error in the data, methodology, analysis, or conclusion of the expert. *Salinas Ramblers Motorcycle Club,* 171 IBLA 396, 400 (2007); *Fred E. Payne,* 159 IBLA 69, 77-78 (2003). A mere difference of opinion, even of expert opinion, will not suffice to show that BLM failed to fully comprehend the nature or scope of the significant impacts. 170 IBLA at 400; 159 IBLA at 78.

### a. Failure to Identify Site-Specific Impacts

BCA contends that BLM failed to consider the likely impacts of the Project because it did not specify the situs of the wells, roads, and pipelines, asserting that the location of impacts is the key determinant of their impact. NA/Petition at 58.

BLM may properly defer consideration of the site-specific impacts of such development until it has concrete proposals for APDs, ROWs, and other land use authorizations. *See Biodiversity Conservation Alliance,* 171 IBLA 218, 231-32 (2007); *Fred E. Payne,* 159 IBLA at 81. BLM is unable to evaluate impacts at specific well sites because the operators have not yet identified specific well locations. According to BLM, specific impacts will be evaluated based on site-specific proposals before any drilling is approved. FEIS at 1-1; *see also* ROD at 3-4; FEIS, Appendix O, at O-165, O-174.

---

[14] An EIS should contain "a reasonably complete discussion of possible mitigation measures," which means that such measures must be "discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated[.]" *Robertson v. Methow Valley Citizens Council,* 490 U.S. at 352. However, "NEPA imposes no substantive requirement that mitigation measures actually be taken," or that they be completely "formulated and adopted[.]" *Id.* at 352, 353 n.16.

13

Such a system of evaluation is not violative of section 102(2)(C) of NEPA, because the project-level of environmental analysis is entirely commensurate with the nature of the activity that is being considered for approval. *See Blue Mountains Biodiversity Project*, 139 IBLA 258, 266 (1997); *Southern Utah Wilderness Alliance*, 123 IBLA 302, 305-07 (1992). There is no impermissible irreversible or irretrievable commitment of resources at this project-level stage, since the basic decision to permit drilling and development was made, consistent with the Great Divide RMP, at the time of lease issuance. Further, no surface-disturbing activity will occur at all until a decision is made to authorize that activity, after required site-specific environmental review, at which time BLM has "the authority to impose reasonable measures to minimize adverse impacts on other resource values," including restricting "the siting or timing of lease activities." *National Wildlife Federation*, 169 IBLA 146, 164 (2006).

While BCA believes that BLM will give "short shrift" to site-specific impacts when, or if, it undertakes environmental review of proposals for specific wells, roads, and pipelines (NA/Petition at 58), such a concern is speculative at this point and does not support BCA's argument that site-specific impacts must be considered in the FEIS.[15]

BCA has failed to show that it has a likelihood of success in prevailing on the merits of its argument regarding site-specific impacts.

*b. Failure to Give Adequate Consideration to the Likely Cumulative Impacts to Fish and Wildlife*

TRCP and BCA argue that BLM failed to consider the likely cumulative impacts of the Project on resident native populations of Bluehead sucker, Flannelmouth sucker, and Roundtail chub in Muddy Creek and/or on elk, mule deer, and pronghorn antelope throughout the Project and surrounding areas. TRCP SOR at

---

[15] BCA notes that BLM stated that "'[m]any of the subsequent actions in the ARPA . . . may be eligible for categorical exclusion [CX] under [section 390 of] the Energy Policy Act of 2005,'" 42 U.S.C.A. § 15942 (Supp. 2007), which, BCA asserts, would mean the absence of any site-specific environmental analysis at the APD, ROW, or other specific land-use authorization stage. NA/Petition at 62-63 (*quoting* ROD, Appendix E, at E-7). However, the next sentence in Appendix E, at E-7, after that quoted by BCA is: "In all cases, the action will be subject to onsite investigation, cultural reviews, T&E consultation and environmental reviews." Moreover, a CX is only applicable where there is no need for site-specific environmental analysis. 40 C.F.R. § 1508.4; *Vulcan Power Co.*, 143 IBLA 10, 18 (1998). Further, "site-specific approvals and review" are still required, as a matter of BLM policy, for APDs. BLM Opposition (IBLA 2007-210) at 22.

18-19; BCA NA/Petition at 74-82. They refer to the cumulative impacts likely to be associated with several approved or pending major oil and gas projects, particularly the Continental Divide/Creston (8,950 wells) and Hiawatha (4,207 wells), which are currently undergoing NEPA review, and the Continental Divide/Wamsutter II (2,130 wells), South Baggs (50 wells), and Desolation Flats (385 wells), which are already approved. BCA NA/Petition at 78, 80.

BLM considered the cumulative impacts of the Project and other oil and gas development projects in the region, including the Continental Divide/Wamsutter II, Creston/Blue Gap, South Baggs, and Desolation Flats, to soils, vegetation, water resources, fish, and big game wildlife. FEIS at 5-2 to 5-4, 5-9 to 5-19; BLM Opposition (IBLA 2007-210) at 31. It recognized the existence of other projects, including the Continental Divide/Creston, which was an outgrowth of the Continental Divide/Wamsutter II and Creston/Blue Gap. *See* FEIS at 1-10, 1-11 (Map M-5 (Mineral Development Projects in the Vicinity)). BLM's decision not to include the proposed Continental Divide/Creston and Hiawatha projects is properly explained by the fact that they were not approved or fully defined, and were still undergoing NEPA review, which will take into account the cumulative impacts of those projects, as well as the ARP. *See Wyoming Outdoor Council,* 151 IBLA 260, 270 (1999); BLM Opposition (IBLA 2007-210) at 31-32.

In order to demonstrate a deficiency in BLM's cumulative impacts analysis, "it is not sufficient merely to note the existence of other gas fields and gas development projects . . . without concretely identifying the adverse impacts caused by such other fields and projects to which the action being scrutinized will add." *National Wildlife Federation,* 150 IBLA at 399. Nor is it sufficient to merely refer to geographic proximity or some other factor likely to give rise to a cumulative impact. *Wyoming Outdoor Council,* 159 IBLA 388, 406-07 (2003). Therefore, BCA cannot simply state that the Project area and other project areas cover parts of the same watershed or are traversed by the same big game wildlife herds. *See* BCA NA/Petition at 79-81; BCA Reply at 24-26.

TRCP and BCA have failed to show that they are likely to succeed in establishing that BLM failed to give adequate consideration to the likely cumulative impacts of the Project.[16]

---

[16] The EIS contains baseline information regarding the water quality of representative perennial, intermittent, and ephemeral surface waters (FEIS at 3-48 to 3-52), mule deer (*id.* at 3-86, 3-89 to 3-90), Greater sage-grouse and Columbian sharp-tailed grouse (*id.* at 3-94 to 3-97, 3-99), raptors (*id.* at 3-97 to 3-98, 3-100), sensitive wildlife species (*id.* at 3-110 to 3-112), and roads (*id.* at 3-58, 3-146

(continued...)

### c. Failure to Give Adequate Consideration to the Likely Impacts to Air Quality

BCA argues that BLM failed to give adequate consideration to the likelihood that Project emissions will cause ozone concentrations in the Project area, which are already at $147\mu g/m^3$, averaged over an 8-hour period, to exceed the NAAQS of $157\mu g/m^3$, averaged over an 8-hour period.[17] It asserts that BLM has misjudged the background levels of ozone and used the "scientifically discredited 'Scheffe method'" to assess the effects of Project emissions on future ozone levels in the Project area.[18] NA/Petition at 68.

Arguments similar to those raised by BCA were advanced by several organizations in support of their petition to stay the effect of a March 14, 2006, ROD of the Wyoming State Director, approving the Jonah Infill Drilling Project in southwestern Wyoming. We considered these arguments in the June 28, 2006, order in *Wyoming Outdoor Council*, IBLA 2006-155, denying the stay petition, and a March 30, 2007, order, denying reconsideration of that order. We concluded that the appellants had failed to show a likelihood of success on their arguments. *See* Order, dated June 28, 2006, at 17-21, 23-24; Order, dated Mar. 30, 2007, at 2-7. We find no reason to deviate from that conclusion at this stage of review in this case, especially since the circumstances are essentially the same regarding the ARP and the Jonah Infill Drilling Project.[19] *See* BCA Reply at 15-19. Moreover, BLM developed

---

[16] (...continued)
to 3-148). Additional information is being or will be gathered, and will be incorporated in the design and analysis of specific proposed surface-disturbing activities. *See* FEIS at 4-74 (mule deer migration patterns); ROD, Appendix B, at B-14 to B-15 (upland game bird, raptor, and sensitive wildlife species inventories).

[17] NAAQS are violated only when the 3-year average of the fourth highest maximum daily concentration of ozone exceeds the NAAQS 8-hour standard for ozone. *See* 40 C.F.R. § 50.10(b); 40 C.F.R. Part 50, Appendix I, 2.3.

[18] As we stated at page 17, n.18, of our June 28, 2006, order in *Wyoming Outdoor Council*, IBLA 2006-155, "the Scheffe method was developed by an EPA employee (Richard D. Scheffe), and was published by EPA in a September 1988 document entitled "VOC/NO$_x$ Point Source Screening Tables" (Scheffe Paper)[.]" The method "utilizes NO$_x$ and VOC emissions ratios to estimate O$_3$ concentrations," since ozone is formed as a result of a chemical reaction in the atmosphere between the two emissions, triggered by sunlight. FEIS, Appendix F, at 43; *see* FEIS at 4-9.

[19] While BLM determined in the December 2006 Draft Supplemental EIS for the Pinedale Anticline Oil and Gas Exploration and Development Project at 4-62 that the
(continued...)

IBLA 2007-208, *et al.*

and implemented a mitigation and monitoring program for ozone in the ARPA, and the operators have agreed to operate additional air quality monitoring in the area, including ozone monitoring. *See* Double Eagle Opposition, Ex. 1; ROD, Appendix B, at B-5. If the air quality monitoring were to show elevated ozone concentrations that are attributable at least in part to Project activities, agencies will confer to determine the propriety of additional mitigation measures, and, if necessary, enforcement action will be taken. *See* BLM Opposition (IBLA 2007-210) at 29; State Opposition (IBLA 2007-210) at 21; Double Eagle Opposition (IBLA 2007-210) at 42.

BCA has failed to show a likelihood of success on the merits of its argument that BLM failed to give adequate consideration to air quality impacts of approval of the Project.

### d. Failure to Give Adequate Consideration to Likely Impacts Related to Methane Seeps

BCA argues that BLM failed to give adequate consideration to the likelihood that coalbed dewatering associated with the drilling of CBM wells would exacerbate dangerous seeps of methane gas, which can kill plants, wildlife, and even people visiting the Project area, and that new information regarding the likely increase in the number and severity of methane seeps requires BLM to now supplement the EIS.[20] It asserts that, when new circumstances present a seriously different picture of a

---

[19] (...continued)
CALGRID model, rather than the Scheffe method, was the most appropriate method for estimating ozone impact for that project, Double Eagle states that such a determination does not demonstrate that the methodology used for the ARPA was inappropriate because the Atlantic Rim and Pinedale Anticline Projects are "very different." Opposition (IBLA 2007-210) at 38. It states that the Pinedale Anticline Project involves more wells (4,399 wells), all directionally drilled, much denser spacing (10-acre spacing), far deeper (14,000 feet) formations, and longer drilling periods (50 days per well) as opposed to 2,000 wells vertically drilled for 7 to 10 days per well at 80-acre spacing to shallower (6,000 feet) formations, resulting in "greater air quality impacts" for the Pinedale Anticline Project. *Id.* at 39.

[20] BCA offers a June 19, 2007, Declaration of Walter R. Merschat (Attachment 5 to NA/Petition), a private geochemist working for the oil and gas industry, who visited a total of eight methane seeps along Cow Creek, Deep Gulch, and Wild Cow Creek, within the Project area, on Mar. 27, 2007. Merschat Declaration at 1, ¶5. In Merschat's opinion these seeps are "likely the result" of nearby CBM wells, which were approved as part of the interim drilling effort in the Project area, and that increased CBM activity will likely result in increased volume from existing methane seeps and creation of new ones. Merschat Declaration at 2, ¶¶8, 14.

17

proposed action than originally envisioned, a supplemental EIS must be prepared. NA/Petition at 15, 67.

The Merschat Declaration presents an opinion that is not shared by WDEQ. According to WDEQ, methane seeps are a natural phenomenon that predates oil and gas development in the region and the seeps are not geologically connected to the producing CBM formations or to the formations into which produced water is being disposed. Double Eagle Opposition, IBLA 2007-210, Ex. 6. Nevertheless, in the FEIS, BLM acknowledged that methane seeps could possibly develop in the outcrop region of the Mesaverde Group as a result of the Project, and that those seeps could potentially contaminate shallow groundwater sources and could cause the death of vegetation in limited areas. FEIS at 4-32. BLM noted that the number and location of such seeps was impossible to predict, but that operators would be required to monitor for methane seep detection purposes. *Id.* at 4-32, 4-49; ROD, Appendix B, at B-10 to B-11. In addition, BLM is working in cooperation with the University of Wyoming, the Wyoming State Geological Survey, and the Wyoming Oil and Gas Conservation Commission to inventory and model methane seeps.

BCA has failed to show a likelihood of success on its argument that BLM failed to give adequate consideration to likely impacts related to methane seeps or that new information on methane seeps requires completion of a supplemental EIS.

### e. Failure to Consider a Full Range of Reasonable Alternatives

BCA argues that BLM violated section 102(2)(C) of NEPA because it failed to consider a full range of reasonable alternatives to the proposed Project, noting that, since all of the action alternatives provided for drilling a total of 2,000 wells in the Project area, BLM did not consider any alternatives which would limit or reduce the environmental consequences of the proposed Project. NA/Petition at 3. BCA asserts that BLM should have considered "a true phased development alternative," under which one section of the Project area would be drilled, produced, and reclaimed before drilling in the next section could be initiated, and an alternative that provides for natural gas development across a smaller area. *Id.* at 24.

TRCP challenges BLM's consideration of reasonable alternatives solely on the basis that BLM improperly rejected Alternative B because of the operators' concerns that it would delay lease development.

BLM is required by section 102(2)(C) of NEPA and its implementing regulations to rigorously explore and objectively evaluate, in an EIS, all *reasonable* alternatives to the proposed action, which will accomplish its intended purpose, are

IBLA 2007-208, *et al.*

technically and economically feasible, and yet have a lesser or no impact.[21]  42 U.S.C.
§ 4332(2)(C) (2000); 40 C.F.R. §§ 1500.2, 1501.2, 1502.1, and 1502.14; *City of
Carmel-by-the-Sea v. U.S. Department of Transportation,* 123 F.3d 1142, 1155
(9th Cir. 1997); *Dubois v. U.S. Department of Agriculture,* 102 F.3d 1273, 1286-87
(1st Cir. 1996), *cert. denied,* 521 U.S. 1119 (1997); *Southern Utah Wilderness
Alliance,* 163 IBLA 142, 159 (2004). Consideration of all reasonable alternatives
ensures that the decisionmaker "has before him and takes into proper account all
possible approaches to a particular project." *Calvert Cliffs' Coordinating Committee,
Inc. v. United States Atomic Energy Commission,* 449 F.2d 1109, 1114 (D.C. Cir.
1971).

BLM declined to afford Alternative B detailed study because it would not
accomplish the purpose of the Proposed Action, which was to permit the operators
and the United States to realize the benefit of existing Federal leases, by developing,
producing, and marketing natural gas. *See* FEIS at 1-8 to 1-9, 2-12 to 2-13; ROD
at 14; BLM Opposition (IBLA 2007-210) at 9. While TRCP finds nothing in
Alternative B contrary to that purpose, delay in lease development for 7 to 14 years,
which was contemplated under Alternative B, conflicts with the purpose of the
Proposed Action to permit such development. *See Northern Alaska Environmental
Center v. Kempthorne,* 457 F.3d 969, 978 (9th Cir. 2006) ("An agency need not . . .
discuss . . . alternatives which are 'infeasible, ineffective, or inconsistent with the
basic policy objectives for the management of the area,'" *quoting Headwaters, Inc. v.
BLM,* 914 F.2d 1174, 1180-81 (9th Cir. 1990)).

The "true phased development alternative" offered by BCA does not satisfy the
purpose of the proposed Project, which is to promote lease development. *See* FEIS
at 1-8 to 1-9. Indeed, it would prevent development of a substantial part of the
Project area for a considerable portion, perhaps even all, of the 30- to 50-year life of
the Project.

BCA also argues that BLM should have considered an alternative providing for
less natural gas development. NA/Petition at 27, 28. BLM responds that it
considered an alternative (Alternative C) which provided for less surface disturbance
at any one time than the Proposed Action, but that alternative provided for drilling at
160-acre spacing, which was determined by BLM's Reservoir Management Group,
based on the results of the exploratory drilling, not to promote the maximum
recovery of natural gas from the Project area, and, as such, it would not serve the

---

[21]  Alternatives that fail to accomplish the purpose of an action are not reasonable
and need not be studied in detail by the agency. *Citizens' Comm. to Save Our
Canyons v. United States Forest Serv*ice, 297 F.3d 1012, 1030 (10th Cir. 2002);
*Northern Alaska Environmental Center,* 153 IBLA 253, 256 (2000).

purpose of the Proposed Action. Opposition (IBLA 2007-210) at 11 (citing ROD at 16). BLM concludes that any alternative which provides for less natural gas development, based on comparable or greater well spacing, would not serve the purpose of the Proposed Action.

BCA and TRCP have failed to show a likelihood of succeeding on the merits of their arguments that BLM failed to consider a full range of reasonable alternatives to the proposed Project.

### f. *Failure to Give Adequate Consideration to Mitigation Measures*

In conjunction with its basic argument that BLM failed to consider a full range of reasonable alternatives, BCA repeatedly asserts that BLM failed to consider reasonable alternatives to mitigate or avoid significant impacts. TRCP challenges BLM's use of adaptive management as a mitigation measure, arguing that such mitigation is, by its nature, violative of section 102(2)(C) of NEPA, because it is not discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated.

BLM considered a panoply of mitigation measures in connection with the proposed Project and alternatives thereto, in an effort to avoid or mitigate the significant impacts of the Project. It was not required, however, to adopt particular measures in order to avoid or minimize significant impacts. *See Western Exploration Inc.*, 169 IBLA 388, 398-99 (2006). As we said in *Legal & Safety Employer Research Inc.*, 154 IBLA 167, 185 (2001): "The fact that Appellant . . . prefers that BLM take another course of action does not establish that BLM violated the procedural requirements of NEPA. *See San Juan Citizens Alliance*, 129 IBLA 1, 14 (1994)." BLM considered the prospect of mitigating significant adverse impacts in sufficient detail to ensure that it fairly evaluated the environmental consequences of the Project.

We have long held, in "cases involving unknown future impacts of a proposed action," that section 102(2)(C) of NEPA permits adoption of a mitigation plan "in which BLM identified the type of mitigation but rendered implementation contingent on assessment of whether and to what extent that mitigation was warranted, given the uncertain results of possible future activity." *Colorado Environmental Coalition*, 169 IBLA 137, 143 (2006); *see Great Basin Mine Watch*, 159 IBLA 324, 354 (2003); *Powder River Basin Resource Council*, 144 IBLA 319, 323-24 (1998). Adaptive management is consistent with that approach. When the impacts that will be mitigated are uncertain, and will only become known by monitoring the effects of the Project, the particular mitigation to be applied will necessarily be uncertain. Such a process comports with section 102(2)(C) of NEPA. *See Northern Alaska*

*Environmental Center v. Kempthorne*, 457 F.3d at 979; *Biodiversity Conservation Alliance*, 169 IBLA 321, 341-43 (2006).

BCA and TRCP have failed to show a likelihood of success on their argument that BLM did not give adequate consideration to mitigation measures.

We next turn to TRCP's and BCA's arguments that BLM violated section 302(a) of FLPMA, 43 U.S.C. § 1732(a) (2000).

### 2. Section 302(a) of the Federal Land Policy and Management Act of 1976

#### a. Failure to Comply with the Multiple-Use Mandate

TRCP argues that BLM's approval of the Project violates the multiple-use mandate of section 302(a) of FLPMA, because BLM failed to engage in a reasoned and informed decision making process, which balanced competing resource values in the ARPA to best meet the present and future needs of the American people. SOR at 2 (citing *National Wildlife Federation v. BLM*, 140 IBLA 85, 101 (1997)). It asserts that BLM's decision to convert the natural setting of the Project area to an industrialized setting, which results in significant adverse impacts to hunting, sightseeing, and other recreational use of the Project area for more than one generation of recreational users, by diminishing the presence of wildlife, degrading scenery, and introducing traffic and noise, violates FLPMA's multiple-use mandate. SOR at 35.

In managing the public lands, BLM must strike a balance among the many competing uses to which the land may be put. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004). BLM analyzes appropriate uses of the public lands during its land use planning process and makes decisions thereon. In this case, BLM determined in the Great Divide RMP to allow oil and gas leasing in the entire Rawlins Resource Area, thereby providing the opportunity for oil and gas exploration and development "while protecting other resource values." FEIS at 1-9 (*quoting* ROD and Approved RMP for the Great Divide Resource Area, dated Nov. 8, 1990 (RMP ROD), at 30). BLM required the protection of specified resources, including sage grouse leks and big game crucial winter range, recognizing that its authority was unlimited in the case of new leases, but limited in the case of existing leases: "These restrictions or requirements may only be included as reasonable measures or as conditions of approval (COA) in authorizing applications for permit to drill (APD), sundry notices, or plans of development." RMP ROD at 30. BLM was also permitted to authorize exploration and development, subject to whatever restrictions BLM deemed appropriate to render such activity compatible with recreation and other competing uses of the public lands.

Selection of one use of the public lands over another competing use, even when the selected use will adversely affect a competing use, is not a violation of BLM's FLPMA mutiple-use mandate. *See Native Ecosystems Council*, 139 IBLA 209, 212 (1997); *Friends of the Bow*, 139 IBLA 141, 143-44 (1997).

TRCP has not shown a likelihood of success on its argument that BLM violated the multiple-use mandate of section 302(a) of FLPMA.

*b. Failure to Conform to the Reasonably Foreseeable Development Scenario of the RMP*

TRCP and BCA argue that BLM's approval of the Project violates the land use plan conformance requirement of section 302(a) of FLPMA by authorizing the drilling and development of wells and related surface disturbance, which together with activity already approved, greatly exceeds the Reasonably Foreseeable Development (RFD) scenario set forth in the Great Divide RMP.

In *Wyoming Outdoor Council*, 164 IBLA 84, 99 (2004), we disagreed with the argument that the RFD scenario establishes a point past which further exploration and development is prohibited. *See Southern Utah Wilderness Alliance*, 159 IBLA 220, 234 (2003). The RFD scenario is utilized for identifying the potential direct, indirect, and cumulative impacts of oil and gas development. *Id.* In this case, BLM does not deny that the RFD scenario will be exceeded by the Project activities approved in the ROD. However, BLM states that the fact that the total number of wells projected in an RFD scenario may be exceeded "does not automatically mean that . . . a revision or amendment to the RMP is necessary." BLM Opposition (IBLA 2007-210) at 38 (citing Instruction Memorandum (IM) No. 2004-089, dated Jan. 16, 2004).

We have stated that the question, which must be addressed on a case-by-case basis, is "whether . . . [the] exceeded RFD scenario demonstrates that further environmental analysis is required[.]" *Wyoming Outdoor Council*, 164 IBLA at 102. In this case, further environmental analysis was completed in the DEIS and FEIS.

TRCP and BCA have failed to show a likelihood of success on their argument that BLM's approval of the Project violates the land use plan conformance requirement of section 302(a) of FLPMA.

### 3. BLM Policy

#### a. Failure to Adhere to Sensitive Species Management Policy

BCA argues that BLM's decision to approve the Project violates the policy directive, set forth in BLM Manual § 6840.06 (Rel. 6-121 (1/19/01)), that actions

22

IBLA 2007-208, *et al.*

approved by BLM not contribute to the need to designate a sensitive species as a T&E
species under the ESA. NA/Petition at 92-93. It refers to the Greater sage-grouse,
Columbian sharp-tailed grouse, Bluehead sucker, Flannelmouth sucker, and
Roundtail chub as such species.

While not binding on the Board, since it does not have the force and effect of
law, the Board has stated that it will nevertheless consider whether BLM abided by its
own Manual. *Native Ecosystems Council*, 139 IBLA at 219. It is true that BLM
concluded that the Project is likely to significantly impact the Greater sage-grouse
and Columbian sharp-tailed grouse and the Bluehead sucker, Flannelmouth sucker,
and Roundtail chub. FEIS at 4-83, 4-85, 4-94, 4-96, 4-97. BLM attributed the
significant impacts to the substantial loss of habitat function or disruption of life
history requirements that would *preclude improvement* of the status of the special
status species. *Id.* at 4-69, 4-86. Such a significant impact does not necessarily mean
that any of the upland game birds and sensitive fish species is likely to be designated
as a T&E species, or that BLM has otherwise failed in its duty to avoid contributing to
the need to designate a species as a T&E species. As Double Eagle points out: "Such
a position would necessarily lead to the absurd result that every time the BLM
determines to prepare an EIS . . ., the BLM is violating its Manual." Double Eagle
Opposition (IBLA 2007-210) at 57.

While BCA cites statements from FWS and WGFD in support of its argument
that the Project is likely to contribute to the need to list a species as a T&E species
(*see* BCA NA/Petition at 92-99; BCA Reply at 27-300), those statements merely
caution that BLM should not authorize activity that might exacerbate the decline of a
species. BLM states that, through consultation, it considered concerns expressed by
FWS and WGFD, including their "preference" for BLM's adoption of Alternative C, as
well as the incorporation of protective measures from Appendix L of the FEIS, and
decided that it would consider adopting protective measures taken from Appendix L
at the time of approval of APDs, ROWs, and other surface-disturbing activity.
Opposition (IBLA 2007-210) at 39.

BLM also states that it adopted a Wildlife Monitoring and Protection Plan,
which will be implemented, with the assistance of FWS and WGFD, "with the specific
goal of avoiding or minimizing potential impacts to wildlife." Opposition
(IBLA 2007-210) at 39; *see* FEIS, Appendix E, at E-1 to E-3, E-12, E-13; FEIS,
Appendix O, at O-14; ROD, Appendix B, at B-13 to B-15.

BCA has failed to show a likelihood of success on the merits of its argument
that Project approval violates BLM's sensitive species management policy.

23

IBLA 2007-208, *et al.*

To the extent TRCP and BCA raise other substantive arguments, they have
failed to show a likelihood of success on the merits of those arguments, and
therefore, those arguments do not support granting a stay.

Accordingly, pursuant to the authority delegated to the Board of Land Appeals
by the Secretary of the Interior, 43 C.F.R. § 4.1, motions to intervene are granted as
discussed *supra.* Anadarko's, Double Eagle's, the State's, and BLM's motions to
dismiss IBLA 2007-208 for lack of standing to appeal are denied. Anadarko's, Double
Eagle's, the State's, and BLM's motions to dismiss IBLA 2007-226 are granted in part
as to HFW. BLM's motion to dismiss IBLA 2007-226 as untimely is denied. TRCP's
and BCA's stay petitions are denied.

_____
Bruce R. Harris
Deputy Chief Administrative Judge

APPEARANCES:

Thomas R. Wilmoth, Esq.                   **FAX:  402-458-1510**
Donald G. Blankenau, Esq.
Theresa D. Koller, Esq.
Blackwell Sanders LLP
206 South 13th Street, Suite 1400
Lincoln, NE 68508-2019
For Theodore Roosevelt Conservation Partnership

Suzanne H. Lewis, Esq.                    **FAX:  307-742-7989**
Biodiversity Conservation Alliance
P.O. Box 1512
Laramie, WY 82073
For Biodiversity Conservation Alliance, *et al.*

E. Craig Smay, Esq.                       **FAX:  801-539-8544**
E. Craig Smay, P.C.
174 East South Temple
Salt Lake City, UT 84111-1102
For Environmental Preservation Foundation and Habitat for Wildlife

24

IBLA 2007-208, *et al.*

Michael A. Saul, Esq.                    **FAX:  303-786-8911**
National Wildlife Federation
Rocky Mountain Natural Resource Center
2260 Baseline Road, Suite 100
Boulder, CO 80302
For National Wildlife Federation and Wyoming Wildlife Federation

Laura Lindley, Esq.                      **FAX:  303-892-1401**
Robert C. Mathes, Esq.
Kathleen S. Corr, Esq.
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202-3110
For Double Eagle Petroleum Co.

Natalie Eades, Esq.                      **FAX:  832-636-8034**
Anadarko Petroleum Corporation
P.O. Box 1330
Houston, TX 77251-1330
For Anadarko E&P Company LP and Warren Resources, Inc.

Patrick J. Crank, Esq.                   **FAX:  307-777-3542**
Jay Jerde, Esq.
Ursula P. Schultz, Esq.
Office of the Attorney General
123 State Capitol
Cheyenne, WY 82002
For the State of Wyoming

Arthur R. Kleven, Esq.                   **FAX:  303-231-5363**
Office of the Regional Solicitor
U.S. Department of the Interior
755 Parfet Street, Suite 151
Lakewood, CO 80215
For the Bureau of Land Management

**Exhibit 2**

BLM, Draft Supplemental Environmental Impact Statement for the Pinedale Anticline Oil and Gas Exploration and Development Project (Dec. 2006)



**DRAFT**
**Supplemental Environmental Impact Statement
for the Pinedale Anticline Oil and Gas
Exploration and Development Project**
Sublette County, Wyoming

BLM

Pinedale Field Office



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Wyoming State Office
P.O. Box 1828
Cheyenne, Wyoming 82003-1828



In Reply Refer To:

1793 (930)
1610

Dear Reader:

This Draft Supplemental Environmental Impact Statement (SEIS) for the proposed long-term development of natural gas resources in the Pinedale Anticline Project Area (PAPA) is submitted for your review and comment. The Draft SEIS has been prepared to analyze the potential impacts from drilling and production operations of natural gas wells and associated access roads, pipelines, and production facilities proposed by Ultra Resources, Inc. (Ultra), Shell Exploration & Production Company (Shell), Questar Market Resources including Wexpro Company (Questar), BP America Production Company, Stone Energy Corporation, Yates Petroleum Corporation, and others who agree to participate, collectively referred to as the Operators. The PAPA is located entirely within Sublette County, Wyoming.

An Air Quality Impact Analysis Technical Support Document (TSD) has been prepared in conjunction with the Draft SEIS. The Air Quality Impact Analysis TSD contains detailed technical information used for air quality modeling. A limited number of the Air Quality Impact Analysis TSDs are available upon request. A supplement to the Air Quality Impact Analysis TSD will be published subsequent to the release of the Draft SEIS. The Draft SEIS and the Air Quality Impact Analysis TSD will be available for review at the Bureau of Land Management (BLM) offices listed below. All of these documents may be viewed or downloaded from the BLM website at http://www.wy.blm.gov/pfo/nepa.htm.

| Bureau of Land Management | Bureau of Land Management |
|---|---|
| Wyoming State Office | Pinedale Field Office |
| 5353 Yellowstone Road | 432 East Mill Street |
| Cheyenne, Wyoming 82009 | Pinedale, Wyoming 82941 |

Public scoping was conducted in 2005 and 2006 after the Operators requested increased access to the PAPA in the winter. The PAPA includes 198,034 acres, of which approximately 158,000 acres (80 percent) is Federal surface ownership, 9,800 acres (5 percent) is State surface ownership and 29,800 acres (15 percent) is private surface ownership. Currently, there are approximately 460 producing natural gas wells in the PAPA with associated infrastructure. Well field development (drilling and construction of well pads, roads, pipelines, and ancillary facilities) in the PAPA was approved in the 2000 Record of Decision for the Pinedale Anticline Oil and Gas Exploration and Development Project.

Three alternatives are analyzed in the Draft SEIS. Under the No Action alternative (Alternative A), the Operators' proposal (Alternative B) would be rejected.

The Proposed Action Alternative (Alternative B) includes development of the natural gas resource by drilling up to 4,400 additional wells, achieving a bottom hole spacing of approximately 10 acres per well along the crest of the anticline. Multiple wells would be directionally drilled from a single well pad. Under the Proposed Action Alternative, year-round development would mostly occur in three Consolidated Development Areas within a core area defined by the Operators. This would limit year-round development (including winter drilling within crucial winter ranges) and associated disturbance and impacts to the Concentrated Development Areas. Alternative B includes mitigation to offset impacts to other resources, particularly air quality and wildlife.

BLM's Preferred Alternative (Alternative C) is similar to the Proposed Action Alternative in that it includes the same project components (number of wells, well pads, ancillary facilities). However, it is different from the Proposed Action, spatially. That is, rather than only specifying certain areas of development where year-round drilling could occur, Alternative C specifies areas where year-round drilling would not occur. It includes a core area boundary that is different from the core area defined by the Operators in the Proposed Action Alternative. The overall objective of Alternative C is to control spatial disturbance over time maximizing development in some areas while minimizing development in other areas, especially in portions of big game crucial winter ranges. Alternative C includes additional air mitigation to further reduce impacts to nearby sensitive areas and performance-based objectives to further reduce impacts to other resources. Additional information acquired during public comment periods and BLM internal review may result in the selection of an alternative, or combination of alternatives to provide the best mix of operational requirements, mitigation measures and best management practices to reduce environmental harm.

If you wish to submit comments on the Draft SEIS, we request that you make them as specific as possible. Comments are more helpful if they include suggested changes, sources, or methodologies. Comments that contain only opinions or preferences will not receive a formal response from the BLM. However, they will be considered and included as part of the BLM decision making process.

The BLM can best use your comments if they are submitted within 60 days after the Environmental Protection Agency (EPA) publishes its Notice of Availability in the Federal Register. Please submit written comments to:

Matt Anderson, Project Lead
Bureau of Land Management
Pinedale Field Office
P.O. Box 768
Pinedale, Wyoming, 82941

You may also submit comments electronically at the following address: WYMail_PAPA_YRA@blm.gov. Please include "Pinedale Anticline SEIS" in the subject line.

Approximately 30 days following the publication of the EPA's Federal Register notice, the BLM will host a public meeting to receive comments on the Draft SEIS. This meeting will be announced at least 14 calendar days in advance through public notices, media news releases, and mailings.

The Draft SEIS was prepared pursuant to the National Environmental Policy Act and other regulations and statues to address the environmental and socioeconomic impacts which could result from the project. The Draft SEIS is not a decision document. Its purpose is to inform the public and interested agencies of impacts associated with implementing the Operators' long-term development proposal, to evaluate alternatives to the proposal, and to solicit comments. The Draft SEIS conforms to the current Pinedale Resource Management Plan as well as to the Pinedale Draft Resource Management Plan revision that is currently under way.

Freedom of Information Act Considerations: Public comments submitted for the Draft SEIS, including the names and street addresses of respondents, will be made available for review after the comment period closes. Comments may be examined at the Pinedale Field Office during regular business hours (8:00 a.m. to 4:30 p.m.), Monday through Friday, except holidays. Public comments will be published as part of the Final SEIS. Individual respondents may request confidentiality. If you wish to withhold your address from public review or from disclosure under the Freedom of Information Act, you must state this prominently at the beginning of your written comment. Such request will be honored to the extent allowed by law. All submissions from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be made available for public inspection in their entirety.

The Draft SEIS has been sent to affected Federal, State, and local government agencies, and to individuals who commented during scoping.

If you have questions or need additional information, please contact Matt Anderson, Project Lead, at the Pinedale Field Office, address shown above, or by phone (307) 367-5328.

Sincerely,

Robert A. Bennett
State Director

## 1.3    PAPA EIS AND ROD

In the PAPA ROD (BLM, 2000b), BLM's Preferred Alternative is the *Resource Protection Alternative on Federal Lands and Minerals*, as modified from the PAPA DEIS (BLM, 1999a). It is important to summarize the level of natural gas development approved by the BLM in the PAPA ROD because this document supplements the information and analyses in the PAPA DEIS. Collectively, the DEIS and the FEIS are the PAPA EIS.

If any one word could characterize the PAPA EIS, it would be *"uncertainty"* (e.g., see PAPA DEIS, page 1-2). Potential development evaluated in the PAPA EIS was a maximum of 900 initial well pads and 700 producing well pads over 10 to 15 years, which some participants considered optimistic (PAPA DEIS, page 2-2). BLM asserted, *"it is possible that development within the PAPA could go beyond the levels of development considered in this EIS, although few would consider such a level of development as reasonably foreseeable"* (PAPA DEIS, page 2-2).

To allow implementation of the Preferred Alternative, BLM required a supplemental environmental analysis if any approved levels of development in the PAPA ROD (BLM, 2000b) were exceeded. Project components approved in Section 2 of the PAPA ROD include:

- 900 initial well pad locations on all lands and minerals within the PAPA,
- 700 producing wells and/or well pads on all lands and minerals within the PAPA,
- 700 production facilities at individual well locations,
- central production facilities,
- 4 compressor facility sites,
- water wells for drilling/completion,
- 1 BP Amoco Field Office,
- ~121.5 miles of sales pipeline corridor for multiple pipelines,
- ~276.0 miles of access road (including collector, local, and resource roads), and
- ~280.0 miles of gathering pipeline system.

Section 2 also states, *"This ROD authorizes the construction and drilling of up to 900 wells and the completion, testing, and production of up to 700 producing natural gas well pads within the PAPA".*

In addition to expressing *"uncertainty"*, the PAPA ROD is ambiguous. In Section 2 alone, it is evident that, from the bulleted list and the statement above, it is not clear whether the PAPA ROD is authorizing "700 wells" or "700 producing well pads", and "900 well pad locations" or "900 wells". Furthermore, in Section 1 - Introduction of the PAPA ROD the following statements occur:

- *"BLM approves the Pinedale Anticline Operators proposal for 700 producing well pads"*,

- *"The ROD recognized that in order to develop 700 productive well pads in the PAPA, as many as 900 well pads may need to be constructed"*, and

- *"Monitoring for project consistency with the scope of EIS analysis will be based on the total of 700 producing well pads."*

When the PAPA ROD (BLM, 2000b) was issued in July 2000, the extent to which directional drilling would be implemented in the PAPA was uncertain. There was allowance in the PAPA ROD for multi-well pads, although it was generally assumed at the time that most well pads would contain a single well. It was not the intent of the PAPA ROD to limit wells but rather to

- ASU Year-Round Drilling Demonstration Project - EA Number WY-100-EA05-254, September 2005. Anschutz, Shell and Ultra submitted a proposal to BLM for a year-round demonstration project. In September 2005, BLM issued a Decision Record (BLM, 2005b) that approved drilling operations between November 15, 2005 and July 31, 2006 within big game crucial winter ranges. It allowed completion operations beginning May 1, 2006. The Decision Record allowed up to two drilling rigs on each of three well pads between November 15, 2005 and July 31, 2006.

- Questar Year-Round Drilling Proposal, Addendum - EA Number WY-100-EA06-043, November 2005. BLM issued a Decision Record (BLM, 2005c) that allowed for accelerated winter development on the Mesa, including well completions and the addition of a third drilling rig.

## 1.5    EXISTING DEVELOPMENT IN THE PAPA

Since 2000, most natural gas development in the PAPA has been along the Anticline Crest, which is approximately 2 to 3 miles wide centered along the length of the PAPA. The Operators are proposing long-term development within the Anticline Crest as well as continued exploration off the Anticline Crest. As of December 31, 2005, there were approximately 457 producing wells on 322 well pads in the PAPA. Of these, 428 producing wells on 266 well pads were drilled after issuance of the PAPA ROD (BLM, 2000b). An additional 205 producing wells on 26 well pads are projected for 2006. There were 33 drilling rigs operating during August 2005 in the PAPA, the most during any month since the PAPA ROD was issued. Twenty-three rigs were operating in December 2005.

## 1.6    PROPOSED ACTION

The Operators have proposed a long-term plan for continued development of the PAPA. Their proposal includes up to 4,399 new producing wells that would be drilled from 250 new well pads and from expansion of existing well pads. The Operators are requesting temporary relaxation of seasonal wildlife stipulations in big game crucial winter range and in sage grouse seasonal habitats. The Operators have defined a "core area" within which they propose several Concentrated Development Areas (CDAs). They propose to drill and complete wells during winter (November 15 through April 30) within the CDA portions that coincide with big game crucial winter habitats.

It is estimated that surface disturbance would continue through 2023 and would consist of 12,278 acres of initial disturbance with a life-of-project (LOP) disturbance of 4,093 acres. This disturbance would be in addition to the current existing wellfield disturbance in the PAPA of 5,049 acres. Project components consist of new well pads, expansion of existing well pads, production equipment, gas gathering pipelines, access roads and other ancillary facilities. The Operators are proposing to install additional liquids gathering systems resulting in most of the producing wells being connected to a liquids gathering system. This would result in a reduction of truck traffic that is currently required to haul the condensate and produced water. The Operators are proposing to implement Tier 2 equivalent emission controls on 60 percent of the drilling rig engines operating in the PAPA by 2009, thereby reducing impacts to air quality and air quality related values (AQRVs) in nearby wilderness areas. Two gas sales pipelines are proposed that would transport natural gas from the PAPA to gas processing plants in southwestern Wyoming. BLM has identified three new pipeline corridors that would contain the gas sales pipelines. An expansion of the Granger Gas Plant is also proposed.

Pollutants emitted from these activities include $NO_x$, CO, $SO_2$, $PM_{10}$, and $PM_{2.5}$, VOCs, and HAPs.

Ozone may develop from $NO_x$ and VOC emissions. The EPA screening methodology (Scheffe, 1998) for ozone analysis was planned for inclusion in this Draft SEIS. However, BLM, with the agreement of the Air Quality Stakeholder Group, has determined that the CALGRID model for ozone impact analysis is the most appropriate method for estimating ozone impact from the PAPA. Results from the CALGRID modeling analysis will be released as a supplement to the Air Quality TSD for this Draft SEIS.

In the PAPA, greenhouse gases are emitted from three main sources: internal combustion engines, combustion of fuel or waste gases, and vented gases. Carbon dioxide is the main emission from internal combustion engines (diesel, gasoline, natural gas), the combustion of fuel gas in various production process burners/heaters, and the combustion of waste gases for safety or WDEQ-AQD requirements. Currently, WDEQ-AQD does not have specific rules regulating greenhouse gas emissions, and although greenhouse gas emissions are a concern they were not analyzed in this Draft SEIS.

This air quality impact assessment is based on the operations and engineering data and assumptions available at the time of the analysis, the best available meteorology data, and currently accepted dispersion modeling procedures, as well as professional and scientific judgment. Assumptions representing most likely operating conditions were incorporated into the analysis whenever possible. For example, compression in the field was assumed to operate at 90 percent of fully permitted capacity, and drilling rig engines were assumed to operate at an average of 42 percent of maximum capacity. In cases where operating projections were not provided by the Operators, parameters were assumed to occur at maximum proposed levels. For example, impact assessments assume that all proposed wells would be productive (no dry holes).

**Regulatory Authority.** Air pollution impacts are limited by state and federal regulations, standards, and implementation plans established under the Clean Air Act and administered by the applicable air quality regulatory agency (WDEQ/AQD and EPA). The states of Utah, Colorado, and Idaho have similar jurisdiction over potential air pollutant emissions sources in those states, which can have a cumulative impact when combined with WDEQ/AQD regulated sources. The applicable air quality regulatory agencies have the primary authority and responsibility to review permit applications and to require emission permits, fees, and control devices prior to construction and/or operation. The U.S. Congress (through the Clean Air Act Section 116) also authorizes local, state, and tribal air quality regulatory agencies to establish air pollution control requirements of equal or greater stringency than federal requirements. Proposed emission sources are required to undergo a permit review by applicable air quality regulatory agencies (including state, tribal, and/or EPA) before construction can begin. The agencies review the proposed air pollutant emission sources and, depending upon the magnitude of emissions and other factors, the air quality regulatory agencies may require additional site-specific air quality analysis and/or additional emission control measures. The measures may include a Best Available Control Technology (BACT) analysis and determination to ensure protection of air quality.

Although WDEQ has the regulatory authority for air quality in Wyoming, BLM also has responsibility in regard to air quality. For example, under the Federal Land Policy Management Act (FLPMA) and the Clean Air Act, BLM cannot authorize activities that do not conform to all applicable local, state, tribal, and federal air quality laws, statutes, regulations, standards, and implementation plans. An extensive air quality impact assessment technical support document was prepared to analyze potential impacts from the development alternatives, as well as other

### 4.9.5  Alternative Impact Mitigation

Air quality impact assessment modeling was conducted for existing conditions in the PAPA and the results are summarized in Chapter 3. The modeling analysis was based on Year-2005 actual emissions. Impact modeling results show 45 days of visibility impairment over 1.0 dv at Bridger Wilderness Area (see Appendix I).

Year-2009 (the maximum emissions year) for the Proposed Action Alternative was modeled for visibility impacts. Impact modeling results predict 67 days of visibility impairment over 1.0 dv at Bridger Wilderness Area.

Alternative C Phase I Mitigation would begin immediately after issuance of the ROD. Within 1 year of issuance of the ROD, Operators would be required to show a reduction in modeled visibility impacts to 2005 actual impact levels. This modeling would be based on modeling of Year-2009 Proposed Action emissions mitigated to 2005 actual emissions levels – a prediction of 40 days of visibility impairment over 1.0 dv at Bridger Wilderness Area. Modeled reductions are based on future year models, which include expanded development activities and development areas beyond what occurred during Year-2005. Therefore, modeling emissions levels that are reduced to 2005 levels shows modeling results (40 days over 1.0 dv) that are different from what was modeled for the PAPA during year 2005 (45 days over 1.0 dv). The reduction of modeled air quality impacts to 2005 levels would effectively mitigate the potential increase in visibility impacts for the Proposed Action Alternative. This reduction would be the starting point for further mitigation of the modeled visibility impacts of development that occurred in the PAPA since issuance of the PAPA ROD (BLM, 2000b) through 2005.

The objective for Alternative C Phase II Mitigation would be to achieve minimal days of predicted visibility impairment over 1.0 dv at Bridger Wilderness Area, with a goal of 0 days. Operators would be required to reduce visibility impact levels associated with modeling 20 percent drilling rig emissions reductions each year for the next 4 years after 2005 impact levels are achieved, within 1 year of issuance of the ROD. Modeling results using the BLM FLAG test for the Bridger Wilderness Area show that in Year 1, with 20 percent mitigation, impacts would be reduced to 35 days of visibility impairment over 1.0 dv. Further emissions reductions of 20 percent per year for the next 3 years would result in 23, 17, and 10 days, respectively, of modeled visibility impairment over 1.0 dv at Bridger Wilderness Area. The predicted impact levels are a result of reducing only drilling rig emissions by 20, 40, 60, and 80 percent, respectively. Reductions in compression and fugitive (well site, including well completions, and traffic) emissions as well as drilling rig emissions would further reduce predicted visibility impacts, however, there are limitations to obtain reductions in compression and fugitive emissions. Existing compression in the PAPA is BACT (best available control technology) as permitted through WDEQ-AQD. Most of the engines used in portable equipment during well completions have Tier 2 equivalent emissions. BLM modeled future emissions with the assumption that future compression would also use BACT. However, in order to achieve the goal of 0 days of visibility impairment, further emission reductions in these and other areas, in addition to the drilling rig emission reductions, may be required.

Predicted impact reduction by modeling is based on a reduction in drilling rig emissions, however, Operators would be able to reduce emissions from any source. The objective for mitigation is based on impact reduction (reduction in predicted visibility impairment) rather than reduction in specific emissions, such as $NO_x$. Implementation of one or more of the following examples would result in reduction of predicted visibility impact:

- natural gas-fired drilling rig engines;
- fuel additives;
- gas turbines rather than internal combustion engines for compressors;

# APPENDIX C

Development Procedures for Wellfield Activities

**(Includes Operator-Prepared Plans)**

**Attachment 1 – Transportation Plan**
**Attachment 2 – Reclamation Plan**
**Attachment 3 – Hazardous Materials Plan**
**Attachment 4 – Wildlife and Habitat Mitigation Plan**

pit (if such pit is approved) would be stockpiled adjacent to the reserve pit and used to backfill the pit during reclamation.

The area required for drilling and completion of each well would vary depending upon the total number of wells to be developed from the pad, and whether new development would occur from an existing pad.  In general, single well pads would require 5 to 10-acre pads, and directional well pads with multiple wells would require from 6 to 28 acres.

Erosion control would be maintained through prompt revegetation and by constructing surface water drainage controls such as berms, diversion ditches, and sediment ponds as necessary at each well location. All diversion ditches and other surface water and erosion control structures at each location would be shown on topographic relief maps provided with each APD.  Storm Water Pollution Prevention Plans (SWPPPs) would be prepared by each Operator for all wells, access roads, and other disturbances of more than 1 acre, in compliance with the Wyoming Department of Environmental Quality (WDEQ) Water Quality Division requirements.

Roads

New resource road construction would average approximately 0.44 mile for each new well pad. With the inclusion of an adjacent gathering pipeline, 5.35 acres of disturbance would be required initially (100-foot initial disturbance width) and 1.89 acres of disturbance would be required for the LOP (35-foot LOP disturbance width).

Roads would be designed by a licensed professional engineer if deemed necessary by the BLM (i.e., in problem areas such as steep slopes, unsuitable soils), and all roads would be built in accordance with guidelines established for oil and gas exploration and development activities in *BLM Manual* Section 9113.  On completion of construction activities, the engineer would certify that the road was constructed in accordance with the approved road construction design, if deemed necessary by the BLM.  Any deficiencies would be corrected to ensure compliance with both the approved Road Construction Plan and the APD. Once resource road construction is complete, all but 35 feet of the ROW (road surface area and portions of borrow ditch) would be reclaimed and revegetated.

Aggregates used for road and well location construction would be acquired from commercial sources in and adjacent to the PAPA.  Prior to aggregate extraction, appropriate permits would be obtained from the BLM and/or WDEQ/Land Quality Division (LQD) and WDEQ/Air Quality Division (AQD), as appropriate. Aggregates would be free of noxious weeds.

Drilling Operations

Up to 48 drilling rigs rated for drilling to depths of 14,000 feet or more may be employed simultaneously during project development to accommodate development of approximately 300 wells per year.  All drilling operations and other well site activities would be conducted in compliance with applicable BLM, Wyoming Oil and Gas Conservation Commission (WOGCC), WDEQ, and other federal, state, and county rules and regulations.  Including rig-up and rig-down activities, drilling each well would take an average of approximately 50 days.

Directional drilling provides for the construction of a single well pad that may accommodate as many as 32 wells (consolidated well pad).  The initial and LOP disturbance required for each consolidated well pad is increased over that for a pad with a single well, however, there are fewer total pads for a given number of wells.  Consolidated well pads may be serviced by one

**Exhibit 3**

Golder Associates Inc., Atlantic RIM Air Monitoring Program Quarterly Data Report
October - December 2007 (Apr. 2008)

**Golder Associates Inc.**
2625 Midpoint Dr., Suite F
Fort Collins, CO 80525
Telephone: (970) 484-3857
Fax: (303) 985-2080
www.golder.com



# ATLANTIC RIM AIR MONITORING PROGRAM
# QUARTERLY DATA REPORT
# OCTOBER – DECEMBER 2007

*Submitted to:*

*WYOMING DEPARTMENT OF ENVIRONMENTAL QUALITY*
*AIR QUALITY DIVISION*
*122 WEST 25TH STREET*
*HERSCHLER BUILDING*
*CHEYENNE, WYOMING 82002*

*Prepared for:*

*ANADARKO PETROLEUM CORPORATION*
*1099 18TH STREET*
*DENVER, COLORADO 80202*

*Prepared by:*

*Golder Associates Inc.*
*2625 Midpoint Dr., Suite F*
*Fort Collins, CO 80525*

Distribution:

1 copy – Wyoming Department of Environmental Quality, Air Quality Division
2 copies – Anadarko Petroleum Corporation
1 copy – Golder Associates Inc. – Denver
2 copies – Golder Associates Inc. – Fort Collins

April 2008                                                           073-81528OP

**EXECUTIVE SUMMARY**

This report summarizes data collected from the Atlantic Rim Air Monitoring Program (ARAMP) during the final quarter of the calendar year 2007.  The ARAMP Station is operated for Anadarko Petroleum Corporation (Anadarko) by Golder Associates Inc. (Golder).  It was established as a voluntary program to address air quality resource management concerns raised by stakeholders associated with planned exploration and production of the Atlantic Rim Energy Development Area. The ARAMP Station is sited in a well exposed, remote location in south central Wyoming approximately 20 miles southwest of Rawlins.

ARAMP is designed to meet quality assurance and data recovery requirements of the United States Environmental Protection Agency (USEPA) Prevention of Significant Deterioration (PSD) program as administered by the Wyoming Department of Environmental Quality (WDEQ).  Protocols used to collect data by ARAMP are detailed in the project monitoring plan approved by WDEQ in 2007.

The ARAMP is currently equipped to continuously measure:

- Nitrogen oxides (NO, $NO_2$, and $NO_x$);

- Ozone ($O_3$);

- 20 meter wind speed, wind direction, and wind direction standard deviation ($\sigma_\theta$);

- 20 meter vertical wind speed and wind speed standard deviation ($\sigma_w$);

- 10 meter wind speed, wind direction, and wind direction standard deviation ($\sigma_\theta$);

- Total solar radiation;

- 2, 10 and 20 meter ambient temperature; and

- 20-2 and 10-2 meter ambient temperature difference.

Data collection for the quarter exceeded PSD requirements of 90% valid data capture for meteorology data and 80% for air quality data. Meteorological data recovery was 99.4% for the quarter. Air quality data recovery for the quarter was 96.2 percent for $O_3$ and 89.5 percent for nitrogen dioxide ($NO_2$).  These statistics reflect consideration for electrical power supply failures beyond the control of the operators.

All data presented are based on valid measurements only. Table 1 summarizes $NO_2$ and $O_3$ concentrations measured during the quarter. Measured concentrations of $NO_2$ and $O_3$ were well below Wyoming Ambient Air Quality Standards (WAAQS), which are equivalent to the National Ambient Air Quality Standards (NAAQS).

**TABLE 1**

**ATLANTIC RIM AIR MONITORING PROGRAM**
**MEASURED GASEOUS POLLUTANT CONCENTRATIONS COMPARED TO**
**WYOMING AMBIENT AIR QUALITY STANDARDS**
**OCTOBER – DECEMBER 2007**

| Pollutant | Averaging Period | Maximum Period Average Concentration (ppm) | WAAQS (ppm) | Percent of WAAQS |
|-----------|------------------|---------------------------------------------|-------------|------------------|
| $NO_2$ | Annual | 0.001[1] | 0.05 | 1.9 |
| $O_3$ | 8-hour | 0.051 | 0.08[2] | 68 |
| | 1-hour | 0.058 | 0.12[3] | 48 |

[1]    Quarter average.
[2]    3-year average of annual fourth-highest daily 8-hour average.
[3]    The 1-hour average standard is no longer an AAQS, but is provided for comparison.

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................................ES-1

1.0    INTRODUCTION ........................................................................................................1
    1.1    Background ........................................................................................................1
    1.2    Project Implementation .....................................................................................2
        1.2.1    Site Location and Description ...............................................................2
        1.2.2    Monitoring Plan ....................................................................................6

2.0    PERFORMANCE SUMMARY ...................................................................................7
    2.1    Significant Events ..............................................................................................7
    2.2    Missing, Invalid, and Adjusted Data .................................................................7
        2.2.1    Nitrogen Oxides and Ozone Data .........................................................8
        2.2.2    Meteorological Data ..............................................................................9
    2.3    Network Data Recovery .....................................................................................9
    2.4    Precision Statistics ...........................................................................................10
    2.5    Data Accuracy ..................................................................................................11
        2.5.1    Instrument Calibration ........................................................................11
        2.5.2    Independent Quality Assurance Audits ...............................................11

3.0    DATA SUMMARY ...................................................................................................13
    3.1    Air Quality Data ..............................................................................................13
        3.1.1    Nitrogen Dioxide ................................................................................13
        3.1.2    Ozone ...................................................................................................13
    3.2    Meteorological Data .........................................................................................13
        3.2.1    Wind Speed and Direction ..................................................................14
        3.2.2    Temperature .........................................................................................17

4.0    REFERENCES ...........................................................................................................19

# LIST OF TABLES

Table 1        Measured Gaseous Pollutant Concentrations Compared to Wyoming Ambient Air Quality Standards
Table 1-1     Instrumentation and Measurement Methodology
Table 2-1     Significant Project Events
Table 2-2     Continuous Air Quality and Meteorological Data Recovery Statistics
Table 2-3     Air Quality Instrument Precision Statistics
Table 3-1     Measured $NO_2$ and $O_3$ Concentrations

## LIST OF FIGURES

Figure 1-1     Regional Map
Figure 1-2     Topographical Map
Figure 3-1     Quarterly Wind Rose – 20 Meters
Figure 3-2     Quarterly Wind Rose – 10 Meters
Figure 3-3     Average Daily Temperature Comparison

## LIST OF APPENDICES

Appendix A     Data Processing Specifications and Statistical Formulae
Appendix B     Minimum Accuracy and Completeness Goals
Appendix C     Initial Calibration Data Forms
Appendix D     Quality Assurance Audit Report
Appendix E     Monthly Hourly Data

## 1.0    INTRODUCTION

This document summarizes the operation of the Atlantic Rim Air Monitoring Program (ARAMP) for the fourth quarter of 2007.  A summary of the station performance and significant events are provided in Chapter 2.0.  Chapter 3.0 summarizes the meteorological and air quality data collected.

Report appendices contain additional information related to station operation and data reduction. Appendix A contains various statistical formulae used to determine data precision, accuracy, and recovery statistics.  Appendix B contains minimum precision, accuracy, and completeness goals for the monitoring network.  Appendix C contains copies of calibration data forms from the initial calibration and equipment certification.  Appendix D contains the fourth quarter 2007 audit report.  Appendix E presents hourly validated data collected during the quarter.

### 1.1    Background

Anadarko is a major energy developer on the Atlantic Rim located in south-central Wyoming and currently operates numerous production wells and multiple natural gas-fired compressor stations with collocated power generation in the area.  Anadarko has proposed to increase their operations in the Atlantic Rim through the Atlantic Rim Energy Development Program.

Guidance provided by the United States Department of the Interior, Bureau of Land Management and Wyoming Department of Environmental Quality, Air Quality Division (WDEQ) associated with the proposed development led Anadarko to voluntarily establish the ARAMP.  Since there is little representative air quality and dispersion meteorology data collected for the remote Atlantic Rim area of Wyoming, Anadarko has agreed to collect this supplemental information.  The program is intended to aid in WDEQ management of regional air quality resources.

Anadarko retained the services of Golder Associates Inc. (Golder) to establish and operate ARAMP.  The program consists of an ambient air quality and dispersion meteorology monitoring station within the Atlantic Rim, with operations and management, data analysis and reporting provided from the Golder Air Resources Laboratory in Fort Collins, Colorado.  The station was built in summer 2007, and continuous air quality and meteorological data collection began in late September 2007.

**1.2     Project Implementation**

The specific objectives of ARAMP as detailed in the monitoring plan are to:

- Collect baseline ambient air quality data representative of cumulative impacts from area development for assessment of regional air quality resources.

- Collect representative atmospheric dispersion meteorology data suitable for air quality modeling of potential impacts from area development.

- Provide a long term monitoring platform for WDEQ to use as needed to manage the regional air quality resources.

To meet these objectives, the Atlantic Rim Station is instrumented and equipped to continuously measure the parameters listed in Table 1-1. Table 1-1 also details the methods and instruments used for measurement. A complete description of the program including the quality assurance plan is contained in the WDEQ-approved monitoring plan (Golder 2007).

1.2.1         Site Location and Description

The monitoring station is located in a remote area approximately 20 miles [~32 kilometers (km)] southwest of Rawlins, Wyoming at the end of County Road 605 (20 Mile Road) between highways 789 and 71. It has been sited at a production well that is tied to the Jolly Roger Compressor Station located approximately 1.5 miles (2.5 km) to the northwest for electricity supply. Figure 1-1 depicts the general location of the monitoring site relative to the Atlantic Rim Operating Area (AROA). A topographical map of the AROA can be found in Figure 1-2.

Care was taken siting the station at a location suitable for collecting ambient background pollutant data while minimizing potential impacts of near-field emissions from the AROA equipment. An important driver for ARAMP is characterization of area baseline levels for ozone; therefore, the station location was chosen to be sufficiently downwind of ozone precursor sources to allow photochemical conversion of area emissions.

April 2008                                      -3-                                      073-81528OP

**TABLE 1-1**

**ATLANTIC RIM AIR MONITORING PROGRAM
INSTRUMENTATION AND MEASUREMENT METHODOLOGY**

| Parameter | Manufacturer/Model | Sample Frequency | Averaging Period | Measurement Range | Lower Detection Limit | Method |
|---|---|---|---|---|---|---|
| Ozone (O₃) | Thermo Fisher Scientific Model 49i | Continuous | 1-Hour | 0-200 ppb | 0.5 ppb | Ultraviolet Photometer (EPA EQ EQOA-0880-047) |
| Nitrogen Oxides (NO, NO₂,NOₓ) | Thermo Fisher Scientific Model 42i | Continuous | 1-hour | 0-200 ppb | 0.5 ppb | Chemiluminescence (EPA RM RFNA-1289-074) |
| Wind Speed (10- and 20-meter) | Climatronics F460 Wind Speed Sensor Model 100075 | Continuous | 1-hour | 0 to 50 m/s | 0.2 m/s | LED Photo Chopper |
| Sigma-u (σᵤ) (10 and 20-meter) | Campbell Scientific Model CR3000 Datalogger | Continuous | 1-hour | 0 to 50 m/s | N.A. | Standard Deviation |
| Wind Direction (10- and 20-meter) | Climatronics F460 Wind Direction Sensor Model 100076 | Continuous | 1-hour | 0 to 360° | N.A. | Vane/Potentiometer |
| Sigma-Theta (σ₀) (10-and 20-meter) | Campbell Scientific Model CR3000 Datalogger | Continuous | 1-hour | 0 to 103.9° | N.A. | Yamartino Single Pass Estimator of σ₀ (Yamartino 1984) |
| Vertical Wind Speed (20-meter) | R.M. Young Anemometer Model 27106T | Continuous | 1-hour | -35 m/s to 35 m/s | ±0.25 m/s | Four Blade Helicoid Propeller/ Alternating Current |
| Sigma-w (σ_w) (20-meter) | Campbell Scientific Model CR3000 Datalogger | Continuous | 1-hour | N.A. | N.A. | Standard Deviation |
| Total Solar Radiation (1-meter) | Eppley 8-48 | Continuous | 1-hour | 0 to 1,400 W/m² | < 1 W/m² | Differential Thermopile |
| 10m–2m / 20m-2m T° Lapse Rate (ΔT) | Campbell Scientific Model CR3000 Datalogger | Continuous | 1-hour | -100°C to 100°C | N.A. | Numerical Subtraction |
| Temperature (2m, 10m,  20m) | RM Young 41342 | Continuous | 1-hour | -50°C to 50°C | N.A. | Motor Aspirated/Platinum-RTD Temperature Sensor |
| Barometric Pressure (2-meter) | Climatronics Model 102270-G0 | Continuous | 1-hour | 600 to 1,100 hPa | < 1 mb | Aneroid Barometer/ Capacitive Transducer |

April 2008                                    -4-                                    073-81528OP

**FIGURE 1-1**

**ATLANTIC RIM AIR MONITORING PROGRAM
REGIONAL MAP**



🔴 Monitoring Site
🔵 Atlantic Rim Operating Area Facility

Atlantic Rim Operating Area

**FIGURE 1-2**

**ATLANTIC RIM AIR MONITORING PROGRAM
TOPOGRAPHICAL MAP**



🔴 Monitoring Site

🔵 Rawlins

1.2.2      Monitoring Plan

The ARAMP Monitoring Plan describes protocols used to collect meteorology and ambient air quality data at the Atlantic Rim station.  ARAMP follows established quality assurance (QA) requirements of the United States Environmental Protection Agency (USEPA) as administered by WDEQ included in the following guidelines:

- Ambient Monitoring Guidelines for Prevention of Significant Deterioration (USEPA 1987),

- Quality Assurance Handbook for Air Pollution Measurement Systems.  Volume II: Ambient Air Specific Methods (Interim Edition) (USEPA 1994),

- Quality Assurance Handbook for Air Pollution Measurement Systems.  Volume IV: Meteorological Measurements (USEPA 1995), and

- Meteorological Monitoring Guidance for Regulatory Modeling Applications (USEPA 2000).

Equipment was chosen based on USEPA guidance for Prevention of Significant Determination (PSD) monitoring programs.  Dispersion meteorology data is expected to be used as input to the American Meteorological Society/Environmental Protection Agency Regulatory Model (AERMOD) air quality dispersion modeling system.  The ARAMP system exceeds the minimum model requirements.

## 2.0    PERFORMANCE SUMMARY

This chapter summarizes ARAMP performance and events affecting data completeness, precision, and accuracy.  Methods for determining data completeness, precision, and accuracy are included in Appendix A.  Specific goals for data completeness, precision, and accuracy established in the monitoring plan are listed in Appendix B.  Valid data recovery for the quarter exceeded PSD requirements of 90% data capture for meteorology parameters and 80% for air quality parameters.  Data accuracy and precision goals for all parameters were also met during the reporting period.

### 2.1    Significant Events

The installation of the station was completed in late September 2007.  Continuous air quality and meteorological data collection for reporting began formally on October 1, 2007.  Since this was the first full quarter of operation for the Atlantic Rim station, several minor issues surfaced that were quickly resolved.  These are discussed in Table 2-1 which summarizes significant events for the quarter.

### 2.2    Missing, Invalid, and Adjusted Data

The Jolly Roger Compressor Station, which supplies electrical power to the ARAMP station, suffered a generator failure beginning the evening of December 19, 2007.  Loss of power to the station caused immediate shutdown of the nitrogen oxides ($NO_x$) and ozone ($O_3$) analyzers.  The data logger has an internal battery that allows meteorological data to be collected until the battery looses charge, which occurred on December 21, 2007.  Anadarko personnel were able to restore the generators on December 22, 2007.  However, due to unacceptable shelter conditions (i.e., temperature too low) when power was restored, the $NO_x$ and $O_3$ analyzers were unable to operate correctly.  These did not come back online until December 26, 2007, when Anadarko personnel were able to enter the shelter and restart the analyzers.

The following sub-sections provide details pertaining to non-routine data losses for each specific portion of the monitoring network.  Additional data losses for the quarter include those due to routine network operation and maintenance, calibrations, audits, and precision checks.

## TABLE 2-1

### ATLANTIC RIM AIR MONITORING PROGRAM
### SIGNIFICANT PROJECT EVENTS
### OCTOBER - DECEMBER 2007

| Dates | Event/Comment |
|-------|---------------|
| September 19, 22-23 | Station start-up calibrations. |
| October 1 | Data collection for reporting began. |
| October 4 | Manual on-site calibration. |
| October 15 | Manual on-site calibration. |
| October 23 and 24 | Start-up performance and system audit. |
| November 2 | Manual on-site calibration. |
| November 7 | Manual on-site calibration. |
| November 7 – 12 | Programming errors caused invalid data for a few hours. |
| November 27 | Manual on-site calibration. |
| December 18 | Manual on-site calibration. |
| December 19 | Jolly Roger Compressor Station generators shutdown.  All $NO_x$ and $O_3$ data missing. |
| December 21 | Data logger battery back-up charge drained resulting in lost meteorological data. |
| December 22 | Jolly Roger Compressor Station generators restarted. Collection of meteorological data resumed. |
| December 26 | Circuit breaker manually reset.  Collection of air quality data resumed. |

2.2.1        Nitrogen Oxides and Ozone Data

As previously discussed, the electric power generators at the Jolly Roger Compressor Station shut down on December 19, 2007 which caused loss of power to the station.   The generators were restarted December 22, 2007, but the power loss and unacceptable shelter temperature (too low) caused the internal computers for the analyzers to fail restart.   Discussions with the manufacturer verified that this is an expected response to unstable power supply, and is remedied by cycling the power.   Anadarko personnel were able to restart the instruments on December 26, 2007.   As a consequence, all $NO_x$ and $O_3$ data between 17:00 on December 19, 2007 and 18:00 on December 26, 2007 are missing or invalid.

2.2.2        Meteorological Data

As discussed above, generators at the Jolly Roger Compressor Station shut down on December 19, 2007. However the data logger has an internal battery that operated through December 21, 2007, thus meteorological data did not suffer the same loss as air quality data.   When power was restored on December 22, 2007, the data logger regained operation and meteorological data collection resumed.

**2.3    Network Data Recovery**

Data recovery percentages for each continuous air quality and meteorological parameter have been calculated according to the procedure discussed in Appendix A, Section A-1.   Data recovery for all meteorological parameters exceeded the minimum project goal of 90 percent per quarter.   Data recovery for all ambient air quality parameters exceeded the minimum project goal of 80 percent per quarter. Table 2-2 provides a summary of both monthly and quarterly data recovery for each parameter. Because of the remote setting of this monitoring station, these statistics reflect consideration for electrical power supply losses beyond the control of the operators.

**TABLE 2-2**

**ATLANTIC RIM AIR MONITORING PROGRAM
CONTINUOUS AIR QUALITY AND METEOROLOGICAL
DATA RECOVERY STATISTICS
OCTOBER – DECEMBER 2007**

| Parameter | October 2007 % | November 2007 % | December 2007 % | Quarter 4 2007 % |
|---|---|---|---|---|
| **Meteorological** | | | | |
| 20-m Horitzontal Wind Speed | 99.3 | 99.0 | 100.0 | 99.4 |
| 20-m Horizontal Wind Direction | 99.3 | 99.0 | 100.0 | 99.4 |
| 20-m Vertical Wind Speed | 99.3 | 99.0 | 100.0 | 99.4 |
| 10-m Horizontal Wind Speed | 99.3 | 99.0 | 100.0 | 99.4 |
| 10-m Horizontal Wind Direction | 99.3 | 99.0 | 100.0 | 99.4 |
| Total Solar Radiation | 99.3 | 99.0 | 100.0 | 99.4 |
| Barometric Pressure | 99.3 | 99.0 | 100.0 | 99.4 |
| 20-m Temperature | 99.3 | 99.0 | 100.0 | 99.4 |
| 10-m Temperature | 99.3 | 99.0 | 100.0 | 99.4 |
| 2-m Temperature | 99.3 | 99.0 | 100.0 | 99.4 |
| 20m-2m Temperature Difference | 99.3 | 99.0 | 100.0 | 99.4 |
| 10m-2m Temperature Difference | 99.3 | 99.0 | 100.0 | 99.4 |
| **Air Quality** | | | | |
| Nitric Oxide | 83.9 | 91.5 | 94.1 | 89.5 |
| Nitrogen Dioxide | 83.9 | 91.5 | 94.1 | 89.5 |
| Oxides of Nitrogen | 83.9 | 91.5 | 94.1 | 89.5 |
| Ozone | 98.3 | 95.0 | 94.1 | 96.2 |

Data recovery percentages are calculated out of possible hours accounting for power loss. Total possible hours are 744 for October and 720 for November. December possible hours are 711 for meteorological and 575 for air quality. Total possible hours for the quarter are 2175 meteorological and 2039 air quality.

**2.4    Precision Statistics**

Precision statistics have been calculated for the $NO_x$ and $O_3$ analyzers based on the method outlined by USEPA (1994) and summarized in Appendix A, Section A-2 of this report. The nitrogen dioxide ($NO_2$), nitrous oxide (NO), and ozone ($O_3$) precision results, shown in Table 2-3, indicate that the air quality

analyzers operated within project quality assurance tolerances listed in Appendix B, Table B-2. Individual results from each precision check conducted are listed in Appendix A, Table A-1.

## 2.5    Data Accuracy

Meteorological and ambient air quality monitoring systems are subjected to periodic calibrations and independent quality assurance performance audits.  All calibration and audit equipment is traceable to authoritative standards.  The purpose of calibration and audit checks is to challenge monitoring systems with known inputs, verifying that each instrument response is accurate to within US EPA-established tolerances listed in Appendix B.

### 2.5.1        Instrument Calibration

Meteorological and air quality instruments were calibrated at start-up on September 19, 2007 and September 21 - 22, 2007, respectively.  The calibrations showed that all components of the monitoring system were operating within accuracy limits.  A complete copy of these calibration records can be found in Appendix C.

Manual calibrations were also performed during site visits on October 4 and 15; November 2, 7, and 27; and December 18, 2007.  A routine scheduled quarterly air quality calibration was also conducted on January 24, 2008.  Results of that calibration will be presented in the first quarter 2008 data report.

### 2.5.2        Independent Quality Assurance Audits

Air Monitoring Services and Technology (AMSTech) conducted the quarterly independent quality assurance systems and performance audit of ARAMP on October 23 and 24, 2007.  The audit is designed to independently determine whether all instrumentation is operating within acceptable limits.

Results of the systems and performance audit showed all components of ARAMP were operating within accuracy limits.  A complete copy of the audit report is included in Appendix D.

**TABLE 2-3**

**ATLANTIC RIM AIR MONITORING PROGRAM**
**AIR QUALITY INSTRUMENT PRECISION STATISTICS**
**OCTOBER – DECEMBER 2007**

| Analyzer | Number of Precision Checks (N) | Average Percent Difference ($\overline{d}_j$) | Standard Deviation ($S_j$) | Upper 95% Probability Limit ($U_{95}$) | Lower 95% Probability Limit ($L_{95}$) |
|---|---|---|---|---|---|
| NO | 9 | 2.84 | 1.43 | 2.82 | -2.77 |
| NO$_2$ | 10 | 5.15 | 3.14 | 6.21 | -6.11 |
| O$_3$ | 10 | 0.44 | 0.81 | 1.58 | -1.57 |
| Goal | 6 | ±15 | NA | 15 | -15 |

## 3.0   DATA SUMMARY

This chapter provides a summary and analysis of air quality and meteorology data collected at the ARAMP Station during the quarter.  Summaries of validated hourly $NO_x$, $O_3$, and meteorological data for each month of the quarter are provided in Appendix E.

## 3.1     Air Quality Data

Criteria pollutants measured as part of ARAMP are nitrogen dioxide ($NO_2$) and ozone ($O_3$).  Criteria pollutants are those air pollutants for which WDEQ has established standards that provide a threshold above which risk to public health and welfare becomes an issue.  These standards are referred to as the Wyoming Ambient Air Quality Standards (WAAQS), and are the same as the national standards. Applicable WAAQS and ambient concentrations measured at the Atlantic Rim Station for the quarter are presented in Table 3-1 and summarized by pollutant below.

### 3.1.1        Nitrogen Dioxide

The measured quarterly average $NO_2$ concentration was 1.1 ppb as shown in Table 3-1.  Concentrations were often near instrument detection limit and well below the annual WAAQS for $NO_2$ of 0.054 parts per million (ppm; 54 ppb).

### 3.1.2        Ozone

Table 3-1 lists the measured maximum daily 8-hour rolling average $O_3$ concentrations for each month of the quarter.  The maximum daily 8-hour average was 50.8 ppb, which occurred in October.  Three years of data are necessary to exceed the WAAQS standard, but all measured 8-hour averages were below the standard of 0.08 ppm.

## 3.2     Meteorological Data

Temperature, wind speed, and wind direction data collected at the Atlantic Rim Station during the quarter are summarized in the following subsections.  Vertical wind speed, barometric pressure and solar radiation data are also collected at the ARAMP Station and are presented in Appendix E.

3.2.1      Wind Speed and Direction

The quarterly ARAMP bivariate wind frequency distributions (wind roses) are presented in Figure 3-1 and Figure 3-2 for the 10-meter and 20-meter height, respectively.  The data presented show a prevailing south to southwesterly wind dominating approximately 70 percent of the distribution.  This is consistent with expectations based on the Rock Springs and Cow Creek data presented in the monitoring plan (Golder 2007).  The mean 10-meter and 20-meter wind speeds for the quarter were 6.7 meters per second (m/s) and 7.4 m/s, respectively.  Peak hourly averaged wind speeds were 22.2 m/s and 23.4 m/s at 10 and 20 meters, respectively, both occurring in December.

**TABLE 3-1**

**ATLANTIC RIM AIR MONITORING PROGRAM
MEASURED $NO_2$ AND $O_3$ CONCENTRATIONS
OCTOBER – DECEMBER 2007**

| Parameter | Measured Value (ppm) | | | | Standard (ppm) | |
|---|---|---|---|---|---|---|
| | Period: | October | November | December | Quarter 4 | Value | Period |
| Nitrogen Dioxide | Period Average: | 0.0012 | 0.0005 | 0.0015 | 0.0011 | 0.054 | Annual Average |
| Ozone[a] | Highest Daily Max: | 0.051 | 0.047 | 0.047 | 0.051 | 0.08 | Rolling 8-hour Average |
| | 4th Highest Daily Max: | 0.047 | 0.045 | 0.046 | 0.047 | | |

[a]Applicable ozone NAAQS is the 4th highest rolling 8-hour average.

April 2008                              -15-                              073-81528OP

**FIGURE 3-1**

## ATLANTIC RIM AIR MONITORING PROGRAM
## QUARTERLY WIND ROSE – 20 METERS
## OCTOBER – DECEMBER 2007



**FIGURE 3-2**

**ATLANTIC RIM AIR MONITORING PROGRAM
QUARTERLY WIND ROSE – 10 METERS
OCTOBER – DECEMBER 2007**



3.2.2      Temperature

During the quarter, the hourly average near-surface ambient temperature (2 meter) reached a maximum of 19°C (66.2°F) in the afternoon of October 10, and a minimum of -22°C (-7.2°F) in the early morning of December 28.  Temperature data for the quarter are summarized in Figure 3-3, which displays Atlantic Rim temperatures compared to the Rawlins Airport climatology from the National Climatic Data Center.

**FIGURE 3-3**

**ATLANTIC RIM AIR MONITORING PROGRAM**
**AVERAGE DAILY TEMPERATURE COMPARISON**
**OCTOBER – DECEMBER 2007**



## 4.0   REFERENCES

Golder Associates, Inc. (Golder).  2007.  Atlantic Rim Air Monitoring Program: Anadarko Petroleum Corporation.  Golder 073-81528.  May 2007.

United States Environmental Protection Agency (USEPA).  1987.  Ambient Monitoring Guidelines for Prevention of Significant Deterioration.  Office of Air Quality Planning and Standards, Research Triangle Park, North Carolina.  EPA-450/4-87-007.  May 1987.

_____.  1994.  Quality Assurance Handbook for Air Pollution Measurement Systems.  Volume II: Ambient Air Specific Methods (Interim Edition).  Office of Research and Development, Research Triangle Park, North Carolina.  EPA-600/R-94/038b.  April 1994.

_____.  1995.  Quality Assurance Handbook for Air Pollution Measurement Systems.  Volume IV: Meteorological Measurements.  Office of Research and Development, Research Triangle Park, North Carolina.  EPA-600/R-94/038d.  Revised March 1995.

_____.  1998.  Quality Assurance Handbook for Air Pollution Measurement Systems Volume II:  Part 1.  Ambient Air Quality Monitoring Program Quality System Development.  Office of Air Quality Planning and Standards, Research Triangle Park, North Carolina.  EPA-454/R-98-004.  August 1998.

_____.  2000.  Meteorological Monitoring Guidance for Regulatory Modeling Applications.  Office of Air Quality Planning and Standards, Research Triangle Park, North Carolina.  EPA-454/R-99-005.  February 2000.

**TABLES**

**FIGURES**

**APPENDIX A**

**DATA PROCESSING SPECIFICATIONS AND STATISTICAL FORMULAE**

**APPENDIX B**

**MINIMUM ACCURACY AND COMPLETENESS GOALS**

**APPENDIX C**

**INITIAL CALIBRATION DATA FORMS**

**APPENDIX D**

**QUALITY ASSURANCE AUDIT REPORT**

**APPENDIX E**

**MONTHLY HOURLY DATA**

**Golder Associates**

**Exhibit 4**

*Biodiversity Conservation Alliance*, 174 IBLA 1 (Mar. 3, 2008)





BIODIVERSITY CONSERVATION ALLIANCE, *ET AL.*

174 IBLA 1                              Decided March 3, 2008



# United States Department of the Interior
## Office of Hearings and Appeals
### Interior Board of Land Appeals
801 N. Quincy St., Suite 300
Arlington, VA 22203

BIODIVERSITY CONSERVATION ALLIANCE, *ET AL.*

IBLA 2004-316, 2005-3                    Decided March 3, 2008

Appeals from a Record of Decision of the Wyoming State Director, Bureau of Land Management, authorizing the Desolation Flats Natural Gas Field Development Project.  BLM/WY/PL-04/029+1310.

Affirmed in part; affirmed as modified in part.

1.      Federal Land Policy and Management Act of 1976: Generally--Oil and Gas Leases: Generally--Oil and Gas Leases: Stipulations

        When BLM issues a Record of Decision to approve an oil and gas development project, BLM's decision will not be found to constitute unnecessary or undue degradation of the public lands if its conclusions have a rational basis in the record, even if it does not (1) adopt appellants' proffered alternative to make specific decisions regarding directional drilling or co-locating wells; (2) delay drilling until after consideration of citizens' proposals to change the designation of land open to oil and gas leasing to wilderness or areas of critical environmental concern; or (3) adopt appellants' positions regarding mitigation to protect sage grouse leks and big game winter range,.

2.      Federal Land Policy and Management Act of 1976: Generally-- Federal Land Policy and Management Act of 1976: Land Use

        Where BLM establishes a reasonably foreseeable development scenario for purposes of land use planning and environmental review, that scenario is not a land use decision establishing a binding maximum to which BLM must conform.  A subsequent decision to exceed such a scenario does not violate the land use plan, FLPMA, or the rules at 43 C.F.R. Subpart 1610.

174 IBLA 1

3.    Environmental Policy Act--Environmental Quality:
Environmental Statements--National Environmental
Policy Act of 1969: Generally

BLM may prepare a programmatic or project-level
environmental impact statement for exploration and
development of an oil and gas field, deferring site-specific
environmental analysis of individual well sites until
applications for permits to drill wells are submitted.

APPEARANCES:  Mike Chiropolos, Esq., Boulder, Colorado, for Biodiversity
Conservation Alliance, *et al.*; Johanna H. Wald, Esq., San Francisco, California, for
Natural Resources Defense Council; Michael Saul, Esq., Boulder, Colorado, for
National and Wyoming Wildlife Federations; Terri L. Debin, Esq., Office of the
Regional Solicitor, U.S. Department of the Interior, Lakewood, Colorado, for the
Bureau of Land Management; and Laura Lindley, Esq., and Robert C. Mathes, Esq.,
Denver, Colorado, for Cabot Oil & Gas Corp., EOG Resources, Inc., and Sampson
Resources Company.

OPINION BY ADMINISTRATIVE JUDGE HEMMER

On July 27, 2004, the Wyoming State Director, Bureau of Land Management
(BLM), issued a Record of Decision (ROD) authorizing the "Desolation Flats Natural
Gas Field Development Project" (Project) on leased Federal lands in Ts. 13-16 N.,
Rs. 93-96 W., Sixth Principal Meridian, Sweetwater and Carbon Counties, Wyoming
(Project Area).  Two groups of environmental associations appealed the decision,
arguing that it violates sections 202 and 302 of the Federal Land Policy and
Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1712 and 1732 (2000), and
section 102(2)(C) and (E) of the National Environmental Policy Act of 1969 (NEPA),
42 U.S.C. § 4332(2)(C) and (E) (2000).

Biodiversity Conservation Alliance, Wyoming Outdoor Council, Center for
Native Ecosystems, The Wilderness Society, and Wyoming Wilderness Association
(collectively, BCA) appealed and petitioned for a stay of the decision in an appeal
docketed as IBLA 2004-316, alleging numerous violations of FLPMA and NEPA.  We
denied BCA's petition for a stay by order dated October 26, 2004.  In that order, and
in an order dated September 20, 2004, we granted requests to intervene filed by
Cabot Oil & Gas Corporation (Cabot), EOG Resources, Inc. (EOG), proponents of the
Project, and Samson Resources Company (Samson), a successor-in-interest to a
proponent of the Project (collectively, Intervenors).

Natural Resources Defense Council, National Wildlife Federation, and
Wyoming Wildlife Federation (collectively, NRDC) filed an appeal, IBLA 2005-3, in

IBLA 2004-316, 2005-3

which they allege similar violations of NEPA and FLPMA.  By order dated
November 22, 2004, we granted requests from Intervenors to intervene in this appeal
as well.  We consolidate the appeals to consider the merits.

*Background – The Desolation Flats Project*

In 1999, several operators, including Cabot, EOG, and Sampson's predecessor-
in-interest, submitted to BLM a proposal for an exploratory drilling and development
project involving 592 gas wells to be drilled over a 20-year period on leased Federal
lands in the Desolation Flats area of Wyoming.  ROD at 1.  Over 93% of this area is
subject to Federal oil and gas leases.  BLM Response to Petition for Stay,
IBLA 2004-316, at 4; BCA Reply at 1.  The operators later modified the proposal to
reduce to 385 the number of potential gas wells to concentrate exploration and
development in the most economically and technically feasible parts of the Project
Area.  *Id.*  The area encompasses approximately 233,542 acres, 224,434 of which are
Federally-owned.  Final Environmental Impact Statement for the Desolation Flats
Natural Gas Field Development Project, May 2004 (FEIS) at 1-1.  Approximately 94%
of the Project Area is within the administrative jurisdiction of BLM's Rawlins Field
Office, governed by the November 1990 Great Divide Resource Management Plan
(RMP)[1]; the remainder (6%) is managed by BLM's Rock Springs Field Office under
the August 1997 Green River RMP.  ROD at 1.

On May 18, 2000, BLM published a notice of intent to prepare an EIS for the
Project.  ROD at 4.  It completed the Draft EIS (DEIS) in April 2003, analyzing three
alternatives in detail:  the Proposed Action, described below; Alternative A, which
involved expanding the project to 592 wells in the event the economic environment
changed to make drilling in additional locations feasible; and the No-Action
Alternative.  In this case, because the subject land is generally subject to oil and gas
leases which give lessees the right to exploit oil and gas, the no-action alternative was
not a "no development" alternative.  Rather, taking "no action" (that is, *not*
undertaking to consider development of the Project under a single EIS) would reject
the operators' proposal but would nonetheless result in consideration of individual
Applications for Permits to Drill (APDs) submitted by lessees or operators on a case-
by-case basis.  DEIS at S-2 and S-3.

The Proposed Action included 385 wells to be drilled at 361 locations.  FEIS at
1-2.  Assuming a forecasted success rate of 65%, the project would encompass
250 producing wells at 235 well sites, supplementing 89 wells already existing in the
Project Area.  *Id.*  (Of the wells predicted to be successful, 237 would be located in
the Rawlins Resource Area; 13 would be in the area managed by the Rock Springs

_____
[1]  The Great Divide RMP is currently being revised and updated, and also renamed
the Rawlins RMP.

174 IBLA 3

Field Office.)  Development was scheduled to begin in 2004 and continue for 20 years.  The total projected life of the Project was 30 to 50 years.  *Id.*  BLM estimated that the new, short-term surface disturbance caused by the Project would be 4,923 acres:  1,444 acres for wells, 2,624 acres for new road construction or road upgrades, 758 acres for new pipelines, and 97 acres for ancillary facilities (4 compressor stations, one gas processing plant, three water evaporation ponds, two disposal wells, and ten water wells).  *Id.*  In total, approximately 2.1% of the Project Area would be disturbed in the short term.  *Id.*  BLM forecasted that total long-term surface disturbance, after rehabilitation, would be reduced to 2,139 acres, or 0.92% of the Project Area:  336 acres for wells (235 well sites with an average of 1.43 acres of long-term disturbance per site); 1,706 acres for roads (assuming reclamation of roads leading to unsuccessful well sites); and 97 acres for ancillary facilities.  *Id.*

The DEIS describes two alternatives considered but rejected from detailed study:  the Expanded Wilderness Alternative and the Directional Drilling Alternative, both proposed by BCA.  DEIS at 2-42 to 2-43; ROD at 6.  After receiving and considering public comment, BLM issued the FEIS in May 2004.  Both the FEIS and the DEIS were tiered to the EISs prepared in connection with BLM's land use planning documents governing the Project Area; these are the November 1990 Great Divide RMP for the Rawlins Field Office and the August 1997 Green River RMP for the Rock Springs Field Office.  DEIS at S-1; FEIS at 1-1.  The applicable NEPA documents for the Great Divide RMP are the April 1987 Medicine Bow-Divide (Great Divide Resource Area) Draft Environmental Impact Statement (1987 Great Divide DEIS) and a 1990 Final EIS (together the Great Divide RMP/EIS).

On July 27, 2004, the Wyoming State Director issued an ROD adopting the Proposed Action, thereby authorizing up to 385 gas wells to be drilled on up to 361 drill sites, and construction or improvement of 542 miles of roads, 361 miles of natural gas pipelines, four compressor stations, and one natural gas processing plant over 20 years.  ROD at 5.  The ROD did not approve specific sites for the 385 wells, or provide site-specific analysis of potential well sites.  BLM deferred that level of detailed analysis to NEPA documentation to be prepared in association with APDs submitted by the project proponents.  ROD at 2 ("Prior to issuing any permit or authorization to implement these activities on the BLM-administered lands, the BLM must analyze each component of the Proposed Action on a site-specific basis and subject to NEPA."); FEIS at 3-4, 5-38 to 5-41; DEIS at 2-4, 2-6 to 2-7.

*Analysis*

I.  *FLPMA*.

Appellants' allegations that the ROD violates FLPMA fall into two general categories.  They argue that the ROD (i) fails to avoid unnecessary or undue

degradation to the environment, and (ii) impermissibly authorizes development in excess of the Reasonably Foreseeable Development scenario (RFD) established in the Great Divide RMP/EIS.

### A. Unnecessary or Undue Degradation

Section 302(b) of FLPMA, 43 U.S.C. § 1732(b) (2000), extends protection to the administration of the public lands: "In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." The Department has issued no regulation defining what might constitute "unnecessary or undue degradation" in the context of onshore oil and gas development, an activity where some level of environmental degradation is to be expected. As we recently explained:

> As the Board has noted, "[n]either FLPMA nor implementing regulations defines the term 'undue or unnecessary degradation.'" *Colorado Environmental Coalition*, 165 IBLA 221, 229 (2005); *see* 43 U.S.C. § 1702 (2000). In other contexts, BLM has promulgated regulations defining the term. *See, e.g.*, . . . 43 C.F.R. § 3809.5 (surface management). No similar definition appears in the onshore oil and gas regulations. *Compare* 43 C.F.R. § 3100.0-5 (definitions for Onshore Oil and Gas Leasing: General) and 3160.0-5 (definitions for Onshore Oil and Gas Operations). However, those [latter] regulations provide that the right of a lessee to
>
>> explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold [is] subject to: Stipulations attached to the lease, restrictions deriving from specific, nondiscretionary statutes, and such reasonable measures as may be required by the authorized officer to minimize adverse impacts to other resource values, land uses or users not addressed in the lease stipulations at the time operations are proposed.

*Wyoming Outdoor Council*, 171 IBLA 108, 121 (2007), *quoting* 43 C.F.R. § 3101.1-2.

Nonetheless, FLPMA coexists with mineral leasing statutes and recognizes the need for multiple use management, which includes taking into account the nation's need for nonrenewable resources such as minerals, 43 U.S.C. § 1702(c) (2000), and "domestic sources of minerals . . . from the public lands," 43 U.S.C. § 1701(a)(12) (2000). Congress thus recognized that the mere act of approving oil and gas development does not constitute unnecessary or undue degradation under FLPMA, and that something more than the usual effects anticipated from such development,

subject to appropriate mitigation, must occur for degradation to be "unnecessary or undue." *See also* BCA Ex. CC, Instruction Memorandum No. (IM) 92-67 at 2 (Dec. 3, 1991) (standard "implies that there is also *necessary and due degradation*").

BCA argues that BLM has failed to meet its duty to avoid unnecessary or undue degradation on public lands because BLM did not adopt BCA's suggestions of "specific ways to avoid altogether or lessen the environmental impacts associated with additional development of the [Project Area], such as employing directional drilling, locating multiple wells per pad, . . . and implementing more stringent and scientifically supportable protections for sage grouse leks and winter-range." BCA Petition for Stay (BCA PS) at 32. We disagree with BCA that BLM's choice not to adopt BCA's mitigation recommendations constitutes, by law or rule, unnecessary or undue degradation.

[1] The question remaining is whether BLM's decision was, as BCA argues, without rational foundation because BLM failed to minimize adverse impacts where possible, and, if so, whether that failure logically would constitute unnecessary or undue degradation. *See* BCA PS at 32.[2] BLM responded to BCA's comment letter with 59 pages of explanation, addressing each suggestion and explaining why BLM chose not to adopt it. *See* FEIS at 5-43, 5-53 (directional drilling, multiple wells per pad); 5-43 to 5-44, 5-61 (sage grouse); 5-51 to 5-52, 5-55 to 5-58 (winter range). With respect to BCA's specific allegations of failures amounting to unnecessary or undue degradation, the record shows as follows:

1. *BCA's complaints that BLM did not adopt BCA's suggestions for employing directional drilling or locating multiple wells per pad.* BCA suggested that BLM consider an alternative of "directional drilling only." DEIS at 2-43. BLM responded in considerable detail, (a) explaining that BLM anticipated that such drilling methods *would be considered* at the APD phase; (b) describing problems encountered by Union Pacific Resources Company in attempting to drill 17 diagonal wells at the nearby Wamsutter Field, which showed that a hard and fast rule was not technically feasible; and (c) discussing the economic and mechanical limits associated with standard drilling equipment that make diagonal drilling impossible at some sites. *Id.* at 2-43 to 2-44. BLM noted this answer in responding to BCA's comments. FEIS at 5-43. We find no error in BLM's explanation, let alone a lack of rational basis that could compel

---

[2] BCA argues that BLM's decisions were "arbitrary, capricious, and an abuse of discretion." BCA PS at 32. This standard derives from the Administrative Procedure Act (APA) which provides that Federal courts must set aside actions of an agency found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000). As an administrative tribunal, we review a BLM decision to determine whether it is supportable on a rational basis. *Southern Utah Wilderness Alliance,* 160 IBLA 225, 233 (2003).

a finding of unnecessary or undue degradation. BCA's position is, ultimately, that "BLM failed to recognize that protecting other resources might sometimes *require* conditioning drilling approvals on such technologies." BCA Reply at 8 (emphasis BCA's). Nothing BLM has done precludes such a requirement at the stage when BLM considers an APD, and BLM has reasonably explained why it will not adopt such requirements at the stage of preparing the FEIS for the development project.

2. *BCA's complaints that BLM did not adopt BCA's proposals to delay drilling to protect wilderness character or proposed ACECs to be addressed in the revision of the Great Divide RMP.* At the time of the ROD, at most, BLM had stated its intention to update the Great Divide RMP; the Rawlins Draft RMP had not been completed at that time. BCA proposed that various portions of the Desolation Flats Project Area be designated as wilderness in a 2001 Citizen's Wilderness Proposal. DEIS at 2-42. BCA also proposed that some portions be designated as ACECs. BLM considered the possibility of an Expanded Wilderness Alternative, but rejected it. *Id.* BLM explained that it would consider relevant citizens' proposals through appropriate NEPA documentation, and that, to the extent "proposed development activities were found to impair wilderness values, [an APD] would be denied until completion of the Great Divide RMP revision." *Id.* at 2-43. We find BLM's conclusion to be founded in logic.

Further, BLM has already issued oil and gas leases for the vast majority of the Project Area. We have refused to reverse BLM land use decisions on grounds that appellants have asked BLM to change prior land use commitments. In *Biodiversity Conservation Alliance*, 171 IBLA 313, 318 (2007), we stated:

> We have repeatedly rejected the notion that BLM must manage the public lands in light of proposals by the public to designate lands as wilderness. *Colorado Environmental Coalition*, 162 IBLA 293, 301-02 (2004), *Colorado Environmental Coalition*, 161 IBLA 386, 393-94 (2004); *Colorado Environmental Coalition*, 149 IBLA 154, 156 (1999); *Colorado Environmental Coalition*, 142 IBLA 49, 53-54 (1997); *see also Southern Utah Wilderness Alliance*, 163 IBLA 14, 25-27 (2004). We have applied similar principals in the context of ACECs. *E.g., Southern Utah Wilderness Alliance*, 141 IBLA 85, 90 (1997).

*See also Colorado Environmental Coalition,* 171 IBLA 256, 268 (2007); *Southern Utah Wilderness Alliance*, 160 IBLA 225, 230-32 (2003), and cases cited. Given this precedent, we are unable to find BLM's decision to go forward with the Desolation Flats Project an action that causes unnecessary or undue degradation.

3. *BCA's complaints that BLM did not adopt BCA's proposals to implement "more stringent and scientifically supportable protections for sage grouse leks and winter-range."* BCA PS at 32. In comments, BCA challenged BLM for setting a ¼-mile buffer

around sage grouse leks.  In response, BLM acknowledged that scientific literature shows that no-surface-disturbance requirements for the sage grouse "generally run in the .25 to 2 mile range"; that therefore the ROD had established ¼ mile as a minimum distance; and that BLM reserved the right to increase the no-surface-disturbance buffer.  FEIS at 5-44.[3]  BLM also responded in considerable detail to BCA's complaints that BLM's protections of the winter range for various species were inadequate.  In particular, BLM explained the difference between stipulations attached to leases that had already been issued, as opposed to conditions of approval (COAs) attaching to APD decisions, and detailed situations in which exceptions could be granted on site-specific bases, noting that exception requests result in interdisciplinary review and consultation with the Wyoming Game and Fish Department.  FEIS at 5-52.  BLM explained, in response to BCA's complaints that waivers are "almost always approved on request," that the reason for this is that operators generally discuss such requests informally to determine if such a waiver is possible, and do not submit formal requests if BLM advises that a waiver cannot be approved.  *Id.* at 5-51 to 5-52; *see also id.* at 5-53, 5-54.  We find that BLM's conclusions have a rational basis, and do not violate FLPMA's unnecessary or undue degradation standard.  *Cf. Wyoming Outdoor Council*, 171 IBLA at 121-22 (failure to incorporate Wyoming Fish and Game policy for winter range not unnecessary or undue degradation under FLPMA).

We reject BCA's FLPMA argument.  We will not disturb BLM's discretion to balance the competing uses mandated by FLPMA where BLM has provided a reasoned explanation for its decision.

### B.  Development Beyond the RFD Scenario

BCA and NRDC argue that the BLM has exceeded the RFD scenario for the Great Divide Resource Area, both in number of wells drilled and in number of acres disturbed.  BCA PS at 32-36; NRDC SOR at 5-20.  They base this conclusion on the Great Divide RMP/EIS and DEIS, which considered an RFD scenario for oil and gas in the 20-year planning period projecting 1,440 wells.  Great Divide RMP/DEIS at 220.

BLM points out that the Great Divide RFD scenario envisioned that the anticipated 1,440 wells would disturb "approximately 34,355 acres" in the 20-year planning period, at the end of which an estimated 18,263 acres would be reclaimed, leaving a total estimated long-term disturbance of 16,092 acres.  Great Divide RMP/DEIS at 220.  BLM explains that the 40 acres of disturbance anticipated per well in 1987 exceeds subsequent gains in drilling efficiency.  BLM analyzed 26 wells drilled under an interim drilling program at Desolation Flats, and concluded that the

---

[3]  As explained in addressing NEPA below, we affirm the ROD as modified to incorporate the sage grouse policy set forth in IM 2004-057 (Aug. 16, 2004).

"long-term disturbance has averaged 6.3 acres/well."  FEIS at 2-2.  BLM concluded that, at the time of the ROD, existing long-term disturbance in the Rawlins Resource Area amounted to 10,767 acres for existing or authorized wells.  At a 65% success rate for the 385 wells in the Proposed Alternative, and accounting for wells in the Rawlins Resource Area (totaling 237 out of 250 successful wells), BLM projected long-term impacts of approved and successful wells (237 x 6.<u>5</u> (rounding up)) at 1,541 acres, a total falling reasonably within the RFD disturbance scenario in the Great Divide RMP/EIS (10,767 + 1,541 < 16,092).  *See* FEIS at 2-2 through 2-4.

Appellants object to this approach and argue that BLM may permit no more than the number of wells projected for the RFD scenario in 1987.  They claim that BLM's experience with 26 wells in the Desolation Flats interim program, leading to disturbance of 6.3 acres/well, is unworthy of consideration, and that BLM should be compelled to follow the previous projection of 9 acres of disturbance per well employed in the 2000 EIS for the Continental Divide/Wamsutter II Natural Gas Project.  NRDC SOR at 16-17 and n.6.  They dispute BLM's calculation based on a 65% well success rate, stating that "[n]o data is provided to support this assumption."  *Id.* at 19 n.11.[4]  They dispute the calculated disturbance of 10,767 acres for existing or authorized wells; they argue that BLM should have increased projections of disturbed acreage per future wells and that BLM improperly discounted the number of wells authorized for other projects.  They complain that, whether counted in numbers of wells or acres to be disturbed, by approving the ROD, BLM has authorized wells in the Rawlins Resource Area vastly in excess of the RFD scenario considered in the Great Divide RMP/EIS.

[2]  We have already rejected these arguments in other appeals involving appellants represented in the cases before us, including a case involving the Great Divide RFD scenario.  We find no reason to reconsider outcomes already reached.

In *Wyoming Outdoor Council*, 164 IBLA 84, 96-97 (2004), appellants contended that BLM had violated FLPMA by approving development of wells in excess of the number of wells anticipated in the RFD scenario for the Pinedale RMP.[5]  BLM conceded in that case that the RFD scenario had been exceeded.  Nonetheless, we rejected appellants' characterization of the RFD as a "point past which further exploration and development is prohibited."  *Id.* at 99.  We adopted the characterization of the RFD found in BLM's IM No. 2004-89 (Jan. 16, 2004), as merely a "tool prepared by an interdisciplinary group of technical and scientific

---

[4]  In fact, the Great Divide RMP discusses the history of oil and gas wells in the Rawlins Resource Area.  Between 1911 and 1985, 3,671 wells were drilled; 1,896 (more than 50%) were dry and abandoned.  Great Divide RMP/DEIS at 220.

[5]  Wyoming Outdoor Council, Wyoming Wildlife Federation, The Wilderness Society, and NRDC, all appellants in the cases before us, participated in the case.

IBLA 2004-316, 2005-3

specialists," which "serves as an analytical baseline for identifying and quantifying direct, indirect, and cumulative impacts, which provide the premise for formulating alternatives to a proposed action and strategies for mitigating adverse impacts." *Id.*

Subsequently, in *National Wildlife Federation*, 170 IBLA 240 (2006), BLM argued that the RFD for the Great Divide RMP had not been exceeded because, despite the number of wells anticipated in the RFD scenario, the number of acres of long-term disturbance envisioned in the RFD had not been exceeded.[6]  We explained:

> On the question of whether the RFD scenario has been exceeded, NWF takes a different tack than that argued in *WOC*, 164 IBLA 84.  In *WOC*, appellants argued that the number of authorized and drilled wells was greater than that projected in the RFD and, therefore, that BLM was required to amend or revise the RMP before further leasing occurred. *Id.* at 101-102.  Here, NWF objects to BLM's method of determining the status of the RFD scenario, specifically the fact that BLM has altered its calculation method.

*National Wildlife Federation*, 170 IBLA at 249.  We rejected the argument that BLM's method for calculating the status of the RFD scenario was flawed:

> [W]e perceive no fault in a calculus that presumes that the number of wells that can be drilled in an RFD scenario is properly a function of reduced surface disturbance resulting from achievements in increased efficiencies, better management practices and techniques, technological advances, reclamation, and so on . . . .  [A]lthough it plainly objects to the impact on the RFD scenario to the extent it leads to more development . . . , NWF challenges the propriety of revising the method at all.  We find nothing in FLPMA or NEPA, or implementing regulations, that plausibly requires us to hold that BLM cannot revise its method of calculating the number of wells remaining to be drilled under an RFD scenario based upon, among other things, the degree of short- and long-term surface disturbance resulting from oil and gas activities.  Even if we believed that there was a different or better approach to quantifying the degree of development remaining under an RFD scenario, however, as an appellate tribunal, the Board of Land Appeals does not exercise supervisory authority over BLM, outside the context of deciding an appeal over which the Board has jurisdiction.

170 IBLA at 250-51 (footnotes and citations omitted).

---

[6]  The four appellants in *National Wildlife Federation*, National Wildlife Federation, BCA, Wyoming Outdoor Council, and Wyoming Wildlife Federation, appear here.

Appellants here similarly fail to make the showing that was absent in *National Wildlife Federation*. Although they plainly disagree with BLM, the many claims appellants (in particular, NRDC) make with respect to the types of wells BLM should or should not have included in its consideration, or the types of acres of disturbance properly or improperly considered, these arguments are not probative of appellants' contention that BLM has exceeded *its* discretion with respect to assessing and interpreting the RFD scenario it previously established.[7] The many permutations raised by appellants as options for calculating the RFD scenario and determining whether it has been exceeded only verify that there are different ways to consider the degree and impact of surface disturbance attributable to oil and gas development in the Rawlins Resource Area; they do not compel us to reject BLM's approach and choose one of appellants' options for calculating wells or acreage. BLM established the RFD scenario in the first place; we will defer to BLM in interpreting its meaning.

But even if we were to parse through NRDC's averments regarding the wells and acreage BLM properly should have considered in calculating whether the 1987 Great Divide RFD scenario has been exceeded, we still would not find a violation of FLMPA. We thus address, at NRDC's invitation, the issue we declined to reach definitively in *Wyoming Outdoor Council* – whether the RFD "can or should be deemed to constitute a land use plan decision within the meaning of" BLM's regulations at 43 C.F.R. Subpart 1610. NRDC Reply at 6-7, *quoting Wyoming Outdoor Council*, 164 IBLA at 102. To the extent NRDC's query is whether an RFD scenario is a land use decision constituting a binding maximum to which BLM must "conform," we find that it is not.

BLM has the delegated authority of the Secretary under section 202(a) of FLPMA, 43 U.S.C. § 1712(a) (2000), to establish land use plans. Under 43 C.F.R. § 1610.5-3(a), all subsequent decisions "shall conform to the approved plan." *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004). While an important tool in the land use planning process, RFD scenarios do not constitute fixed or maximum limits on development in RMPs under FLPMA such that exceeding them constitutes a violation of that statute. Rather, they spring from the NEPA review process, deriving from the Council on Environmental Quality (CEQ) regulations requiring analysis of reasonably foreseeable events, and permit NEPA analysis of impacts of projected development. As we explained in *Wyoming Outdoor Council*, 164 IBLA at 91 n.11:

---

[7] Though appellants argue various conclusions regarding the number of wells authorized, depending on whether the wells are productive, dry holes, or reclaimed, NRDC settles on 2,227 as the number of wells BLM will have authorized in the Rawlins Resource Area with the Desolation Flats Project. NRDC SOR at 12. Without agreement on parameters, a precise number is evidently not possible to verify.

The phrase appears in CEQ regulations at 40 C.F.R. §§ 1501.2, 1502.16, and 1502.22, and in the CEQ's definitions of *cumulative impact*, 40 C.F.R. § 1508.7; *effects*, 40 C.F.R. § 1508.8(b); *scope*, 40 C.F.R. § 1508.25(a)(3); and *significantly*, 40 C.F.R. § 1508.27(b)(7). The concept of projecting reasonably foreseeable future actions or impacts, or, as it is more popularly termed, "reasonably foreseeable development," originates in two regulations. The CEQ defines the scope of an EIS as consisting of the "range of actions, alternatives, and impacts to be considered," 40 C.F.R. § 1508.25, and these include direct, indirect, and cumulative effects, 40 C.F.R. § 1508.25(c).

Thus, the RFD scenario is a tool used to define and consider the significant impacts on the environment as required by NEPA, when undertaking to establish an RMP, which by law and rule requires accompanying NEPA review. BLM's goals for operating within the confines of an RFD scenario in an EIS for an RMP derive from NEPA's strictures.

The Great Divide RMP explicitly opened the entire planning area to oil and gas leasing with appropriate restrictions to protect listed resources; it states with respect to oil and gas that "[a]ll lands open to oil and gas leasing" are open to exploration and development. Great Divide RMP at 17. Even assuming that it has been exceeded, we do not find that use of the RFD scenario for analysis in the underlying EIS led to a violation of the RMP, FLPMA, or the rules at 43 C.F.R. Subpart 1610.

We find confirmation of our view in Supreme Court analysis of FLPMA RMPs:

Quite unlike a specific statutory command requiring an agency to promulgate regulations by a certain date, a land use plan is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them. It would be unreasonable to think that either Congress or the agency intended otherwise . . . .

Of course, an action called for in a plan may be compelled when the plan merely reiterates duties the agency is already obligated to perform, or perhaps when language in the plan itself creates a commitment binding on the agency. But allowing general enforcement of plan terms would lead to pervasive interference with BLM's own ordering of priorities.

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. at 71.

We find no evidence in the RMP of "language in the plan [which] creates a commitment binding on the agency" limiting the number of oil and gas wells to

1,440, or long-term disturbance due to oil and gas development to 16,092 acres in the 20-year planning period, let alone in the subsequent decades covered by the Desolation Flats Project. BLM established an RFD scenario for purposes of considering effects on the environment of its projected planning under NEPA.

The parties present a wealth of information regarding the planning process in making their arguments, including the *BLM Manual*, Planning for Fluid Mineral Resources, H-1624-1, May 7, 1990; BLM reports to Congress; and IM 2004-89 (Jan. 16, 2004), which set a "Policy for [RFD] Scenario for Oil and Gas." BLM undoubtedly employs RFD scenarios as a planning tool incorporated into the BLM land use planning handbook, which merges FLPMA and NEPA obligations. "The baseline RFD scenario provides the mechanism to analyze the effects that discretionary management decisions have on oil and gas activity. The RFD also provides basic information that is analyzed in the [NEPA] document under various alternatives." Intervenors' Ex 9, IM 2004-89, Attachment 1-1. That BLM has coordinated its planning and evaluation responsibilities for multiple use management is both laudable and obligatory. But it also understands that the RFD is not "a planning decision." *Id.* However BLM has intertwined the RFD scenario in accomplishing its statutory goals, on review we do not see it as a maximum limitation on development for purposes of considering conformance with the RMP under 43 C.F.R. § 1610.5-3(a). Were we to find that BLM authorized development in excess of the RFD scenario, this would constitute an issue of compliance with NEPA, not FLPMA.[8] And so, we turn to NEPA.

*II. NEPA*

NEPA is a procedural statute designed to "insure a fully informed and well-considered decision." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558 (1978). NEPA does not bar actions which affect the environment, even adversely. Rather, the process assures that

_____

[8] This view is consistent with materials attached as Document 6 to NRDC's SOR. BLM, *Budget Justifications and Annual Performance Plan, Fiscal Year 2001*, "Report to the Congress: Land Use Planning for Sustainable Resource Decisions – Oil and Gas." In that report, BLM explained that many of its RMPs were insufficient to meet today's needs, and were "in varying stages of decline and will continue to degenerate in usability as they continue to age." *Id.* at last page, Strategy to Address Identified Planning and NEPA Deficiencies. With respect to oil and gas, BLM explained that demand exceeded many RFD scenarios, and thus that environmental analysis may be out-of-date. "This means that [land use plans] in many areas of high industry interest for leasing and development no longer *adequately analyze the full effects of such projected activities on the environment and socio-economic conditions." Id.* at III-99, Justification of 2001 Program Changes (emphasis added).

decisionmakers are fully apprised of likely effects of alternative courses of action so that selection of an action represents a fully informed decision. *In re Bryant Eagle Timber Sale*, 133 IBLA 25, 29 (1995). When BLM has satisfied the procedural requirements of section 102(2)(C) of NEPA, it will be deemed to have complied with NEPA, regardless of whether a different substantive outcome would be reached by appellants, this Board, or a reviewing court. *National Wildlife Federation*, 169 IBLA 146, 155 (2006).

An EIS is judged by whether it constitutes a "detailed statement" that takes a "hard look" at the potentially significant environmental consequences of the proposed Federal action and reasonable alternatives thereto, considering all relevant matters of environmental concern. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976); *Western Exploration Inc.*, 169 IBLA 388, 399 (2006); *Southwest Center for Biological Diversity*, 154 IBLA 231, 236 (2001); *see* 40 C.F.R. § 1502.2(a). We are guided by a "rule of reason." *IMC Chemical, Inc.*, 155 IBLA 173, 195 (2001). The EIS must contain a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the proposed action and alternatives. *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982), *quoting Trout Unlimited, Inc. v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974). Significant impacts are expected when an agency prepares an EIS. *Western Exploration Inc.*, 169 IBLA at 399, *citing* 40 C.F.R. § 1502.16 (EIS must include discussion of "adverse environmental effects which cannot be avoided"); 42 U.S.C. § 4332(2)(C) (2000) (EIS required when significant impacts are found).[9]

Excluding their arguments that fall into the category of challenging a FONSI, appellants' attacks on the sufficiency of the EIS supporting the ROD generally fall into four categories. They allege that the FEIS (i) does not constitute the requisite hard look, because BLM did not choose locations of potential wells and therefore did not consider site-specific impacts; (ii) fails adequately to consider the cumulative impacts of the Project combined with other oil and gas development in the region; (iii) does not address the many opposing views set forth in appellants' comments regarding

---

[9]  Appellants claim that BLM erred for failing to acknowledge that impacts of the project would be significant or to reduce such impacts to insignificance with mitigation. *E.g.*, BCA Statement of Reasons (BCA SOR) at 3; NRDC SOR at 2. These are challenges to a finding of no significant impact (FONSI) based on an environmental assessment (EA). An EA allows an agency, *inter alia*, to determine whether impacts of a proposed action warrant a FONSI or instead are significant enough that an EIS is required. *Wilderness Watch*, 168 IBLA 16, 35 (2006). A FONSI is upheld on the basis of an EA if the record justifies such a finding or a conclusion that required mitigation measures will reduce effects to insignificance. Appellants' claims that the Project will cause impacts that are significant or that BLM's mitigation will be ineffective to permit what is in effect a FONSI are not redressable here.

habitat fragmentation or the efficacy of proposed mitigation; and (iv) does not adequately consider alternatives.

1. *The FEIS's Failure To Undertake Site-Specific Analysis*

[3]  BCA argues that BLM failed to take the "hard look" mandated by NEPA because BLM did not undertake site-specific analysis of each potential well location. BCA SOR at 2-3; BCA PS at 14-16.  BCA thus challenges the scope of the EIS as insufficient.  BLM and Intervenors contend that the specificity demanded by BCA not only is unnecessary at this point, but also would be counterproductive and result in overstating environmental impacts by projecting events unlikely to occur.  They explain that, like all oil and gas developers, the project proponents reasonably should be permitted to employ geological and natural gas reservoir knowledge gained from early wells to more strategically site future wells.  Intervenors Answer to SOR, IBLA 2004-316, at 7-11; BLM Answer to SOR, IBLA 2004-316, at 2-5.

In the ROD, BLM explained that it chose to defer well-site selection and the accompanying analysis as follows:

At this time the location of all future well sites and other disturbance cannot be determined with 100% accuracy by any process the proponents or BLM are aware of.  "Setting in stone" well locations in the EIS would require predicting well locations with information in hand, and ignoring the fact that each well provides additional information that is utilized to help determine future actions, including the number of wells and well site locations.  Currently, generalized areas of interest are being explored through the interim drilling process to further develop our knowledge of the geology and potential of the [Project Area].  Adaptive management of oil and gas resource development is very much a reality in that utilization of new information from drilling produces more effective drilling programs with correspondingly reduced effects upon the environment.  The number of wells, well locations, timing of drilling, and construction is controlled in part by the location of gas and oil resources as they are found and developed . . . .

ROD at Errata 1, BLM Response to Comments from Ken Kreckle.

We disagree with BCA that, by choosing to consider in an EIS impacts of the oil and gas development project proposed here, BLM bore the obligation to expand the scope of the Project to include final decisions on site location, particularly when such decisions would be predictably inaccurate.  Such specificity is not compelled by the requirement that BLM properly identify the scope of the project, lest we define

"scope" in a way that requires agencies to conduct environmental analysis they know will not be relevant. While it is true that when "an agency has an obligation to prepare an EIS, the scope of its analysis of environmental consequences in that EIS must be appropriate to the action in question," *Kern v. BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002), it is also true that scope cannot be expanded so as to defeat the meaningfulness of review altogether. The Supreme Court described this problem in *New York v. Kleppe*: "EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible." 429 U.S. 1307, 1311 (1976), *quoting Natural Resources Defense Council v. Callaway*, 524 F.2d 79, 88 (2d Cir. 1975).

Moreover, BCA errs in presuming that an EIS supporting a large-scale action must be as site-specific as an EIS or an EA to support the site-specific action. The Ninth Circuit has stated with regard to a programmatic EIS that the issue is not *whether* but *when* site-specific analysis is required:

> The critical inquiry in considering the adequacy of an EIS prepared for a large scale, multi-step project is not whether the project's site-specific impact should be evaluated in detail, but when such detailed evaluation should occur. NEPA requires that the evaluation of a project's environmental consequences take place at an early stage in the project's planning process. This requirement is . . . *tempered by the preference to defer detailed analysis until a concrete development proposal crystallizes the dimensions of a project's probable environmental consequences. When a programmatic EIS has already been prepared, we have held that site-specific impacts need not be fully evaluated until a "critical decision" has been made to act on site development.*

*'Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1095-96 (2006), *quoting California v. Block*, 690 F.2d 753 (9th Cir. 1982) (emphasis added); *see also Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003); *Northern Alaska Environmental Center v. Lujan*, 961 F.2d 886, 890-91 (9th Cir. 1992).

Similarly, this Board has approved NEPA documents for reviewing large-scale projects the implementation of which will be subject to further critical decisionmaking. *See Fred E. Payne*, 159 IBLA 69, 81 (2003) ("exact position of the [353] wells and related facilities will be determined by BLM, only upon submission by the lessee/operator of an APD and further decisionmaking by BLM, following site-specific environmental review"); *William E. Love*, 151 IBLA 309, 320 (2000) ("further analysis will fix the exact location of [601 coal-bed methane] wells, compressors, pipelines, powerlines, and other facilities in the project area").

Although the Project Area lands are for the most part already leased, and thereby committed to oil and gas development, the particular location of each well has not been decided.  Thus, the threshold at which site-specific analysis is required has not been reached.  Well locations will be decided at the time BLM considers APDs for wells.  *See* IM 2003-152 (comprehensive drilling planning).  We will not reverse BLM for preparing an EIS at this point in the process, as a matter of pure practicality.  The consequence of agreement with BCA's position with respect to this EIS would be that BLM would be obligated to choose the "no action" alternative and conduct environmental review on a case-by-case basis as APDs are submitted.  This could subject BLM to the claim of improper segmentation antithetical to NEPA.  *See Stewart Park & Reserve Coalition v. Slater*, 352 F.3d 545, 559 (2d Cir. 2003).

Finally, federal regulations and our case law establish that BLM may "tier" subsequent, site-specific NEPA analysis to earlier, broad, programmatic NEPA analysis.  40 C.F.R. § 1502.20; *see, e.g.*, *Klamath Siskiyou Wildlands Center*, 157 IBLA 322, 331 (2002); *Blue Mountains Biodiversity Project*, 139 IBLA 258, 266 (1997).  BLM explains its expectation that necessary NEPA review of specific APDs will be tiered to the Desolation Flats FEIS.  Tiering is a permissible method of conducting NEPA review and we will not reverse BLM for announcing its intention to employ it.

Having established that BLM may defer site-specific analysis at the broad project or programmatic level, we find that it did so appropriately in this case.  BLM's explanation fully justifies the conclusion that later location of well sites is in order.

This conclusion, even if undermined, is not ultimately undone by BLM's subsequent approvals of APDs in the Desolation Flats Project Area pursuant to the ROD.  In its SOR and in its later submitted Supplemental Information, BCA submits EAs and Statements of Categorical Exclusion prepared for those APDs.[10]  BCA SOR Exs. R-W; Supplemental Information Exs. C1-C10.  BLM and the Intervenors object to these submissions on grounds that they impermissibly expand the scope appeal.  Intervenors' Answer, IBLA 2004-316, at 11-13; BLM Answer, IBLA 2004-316, at 5-10.  But BCA clarifies its position:

> *Appellants are not asking this Board to invalidate the APDs, as suggested by BLM*.  Rather, Appellants submitted the APDs are relevant probative evidence to support Appellants' contention that the [Project] would be used to violate NEPA by excluding the public from site-specific decision-making—notwithstanding the empty assurances in the FEIS that BLM

---

[10]  For three of the APDs cited by BCA, BLM relied on statutory categorical exclusions created by section 390 of the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594, foregoing further NEPA analysis before approving the APDs.  42 U.S.C. § 15942 (West Supp. 2007).

would meet its legal obligation to allow public comment on such
decisions.  This Board should consider the APDs to establish BLM's
course of conduct as it proceeds with the site-specific stage of the
[Project]—exposing a fundamental legal deficiency of the FEIS.

BCA Reply to BLM and Operators' Responses to SOR at 8 (emphasis added).

We acknowledge BCA's concern that BLM could avoid site-specific analysis
altogether if it refuses to address drill sites in the FEIS, defers consideration until the
APD phase, and then refuses to conduct appropriate review at that time on the basis
of the recent categorical exclusions authorized by the 2005 Energy Policy Act enacted
after the ROD.  We agree that subsequent BLM actions could be problematic or rise to
the level of legal error.  But the deficiency, if one exists, is not with the FEIS.  To the
extent BCA's information is probative, it relates to BLM action subsequent to the
ROD, which is neither before us in this appeal nor does it constitute evidence of BLM
expectations when it prepared the ROD.

In any event, BCA's critique that BLM's assurances that it would allow public
comment when approving the APDs have proven to be "empty" is based on its claim
that there has been no opportunity for comment prior to approval of the APDs.  BCA's
Exhibits C2, C3, and C4 (to its Supplemental Information), however, include EAs
with responses to BCA's comments on the proposed APDs.  BLM denies a lack of
opportunity with respect to other EAs cited by BCA, noting that notice of all APDs it
considers is posted in BLM field offices 30 days before approval.  30 U.S.C. § 226(f)
(2000); 43 C.F.R. § 3162.3-1(g) (2005).  BCA does not allege that BLM violated this
statutory responsibility when it approved the APDs for which BCA provided
documentation.  Regardless of whether BCA had an opportunity to comment on any
particular APD, however, if there is a violation to be found, it arises from BLM's
actions with respect to a particular APD, not the FEIS.

BCA does not seek reversal of any decision to grant a particular APD.
Whatever BCA's strategy may be with respect to the FEIS, we nonetheless note that
we may not resolve *sua sponte* alleged deficiencies in BLM's NEPA procedures for
approving an APD because this appeal from the ROD and FEIS is not the appropriate
forum for doing so.  Any party adversely affected by BLM's decision to grant an APD
may request State Director Review of that decision and ultimately appeal to this
Board pursuant to 43 C.F.R. §§ 3165.3 and 3165.4.  *Southern Utah Wilderness
Alliance,* 144 IBLA 70, 81 (1998); *Wyoming Wildlife Federation*, 123 IBLA 392, 393
(1992).[11]  BCA did not avail itself of such administrative relief.

_____

[11]  In any event, we find deficiencies in BCA's particular allegations.  BCA complains
that BLM conducted site-specific analysis supporting particular EAs before BLM

(continued...)

### 2. *Cumulative Impacts*

NRDC argues that BLM's cumulative impacts analysis is flawed because the baseline environmental information used to prepare it was incorrectly calculated. NRDC argues that BLM incorrectly calculated the number of existing wells and the number of acres already disturbed. This flawed baseline, NRDC argues, undermines BLM's entire cumulative impacts analysis and will prevent BLM from accurately monitoring ongoing impacts. NRDC SOR at 21-26. As NRDC states: "Both of these flaws flow directly from BLM's machinations regarding the RFD." *Id.* at 23.

As we concluded above, if an agency exceeds the RFD scenario, a NEPA issue is presented and the question is whether the agency has authorized a Proposed Action without fully considering its effects in violation of NEPA section 102(2)(C). The remedy for that violation is to direct the agency to prepare or supplement an EIS considering those impacts. BLM prepared an EIS here. Therefore, the question for us is ultimately whether NRDC has shown that BLM failed properly to consider the baseline RFD scenario, and thus failed adequately to address cumulative impacts as required by NEPA.

As described above, NRDC has presented a number of options for interpreting the baseline that it believes BLM should have considered in terms of wells drilled and acreage disturbed, the effects of which were analyzed in the Great Divide RMP/EIS. While NRDC contends that these various options show that BLM's baseline was in error, in fact, they demonstrate to us NRDC's failure to meet its burden of showing error. Faced with a few sentences in the 1987 Great Divide DEIS, at page 220, projecting development at 1,440 wells, presuming 40 acres disturbance/well, NRDC contends that the meaning of this language decades later is such that we must find BLM's analysis of that baseline in the Desolation Flats FEIS to lack rational foundation. The certainty that NRDC demands of us, however, is undermined by its own arguments acknowledging that by 2000 the Wamsutter EIS recognized that

---

[11] (...continued)
approved the ROD. We do not see the violation of NEPA BCA finds in this allegation. BCA argues that BLM failed to prepare site surveys of BLM sensitive species before approving particular APDs. But BLM responded to BCA's comments to EAs on this point explaining what surveys had been conducted for several species. *See, e.g.*, Supplemental Information, Exs. C2, C3, C4, "Determination of Need for T&E Conference/Consultation and Biological Evaluation on Other Wildlife Species," prepared for each EA (including information on endangered, threatened, and sensitive species). Finally, BCA argues that the EAs do not contain site-specific additions to the mitigation and cumulative impacts addressed in the FEIS. BCA fails, however, to show that any site has a unique character that would prevent BLM from tiering to the FEIS for its analysis of these issues.

updated information from drilling showed disturbance per well to be reduced by more than 75%, to 9 acres/well.  Elsewhere, NRDC acknowledges that "[a]t best, BLM's new projection of 6.5 acres per well can be applied only to forecast the disturbance resulting from the 385 wells authorized in this EIS."  NRDC SOR at 18. NRDC's NEPA/RFD argument does nothing more than criticize BLM for the same lack of certainty seemingly recognized by NRDC.  NRDC SOR at 25, *see also* at 24.  While NRDC presents statistical options to substitute for BLM's, we will not undertake the supervisory role of deciding the RFD's meaning in 1987, when it is obviously ephemeral on today's data.

We therefore turn to BCA's cumulative impacts arguments.  BLM is required by NEPA section 102(2)(C) to consider potential cumulative impacts of a proposed action, together with any other past, present, and reasonably foreseeable future actions.  40 C.F.R. § 1508.7; *see Park County Resource Council, Inc. v. United States Department of Agriculture*, 817 F.2d 609, 623 (10th Cir. 1987); *Forest Guardians*, 170 IBLA 80, 97 (2006); *Howard B. Keck, Jr.*, 124 IBLA 44, 53 (1992), *aff'd, Keck v. Hastey*, No. Civ. S-92-1670-WBS-PAN (E.D. Cal. Oct. 4, 1993); Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed. Reg. 18026 (Mar. 23, 1981). BCA bears the burden of showing that BLM's cumulative impacts analysis, tiered to analysis performed for RMPs governing the Project Area, does not constitute "a reasonably thorough discussion of . . . significant aspects of the probable environmental consequences" of the proposed action.  *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974); *Biodiversity Conservation Alliance*, 169 IBLA 321, 333 (2006).

BCA challenges BLM's cumulative impacts analysis because the FEIS allegedly did not consider impacts on wildlife resources, all of the potential development BCA believes should have been addressed, or cumulative impacts within the region.  Such arguments are unsubstantiated.  In a fairly extensive cumulative impacts analysis in the FEIS and DEIS, BLM conducted a thorough review, weighing impacts of the Project with those from other projects over four "Cumulative Impact Areas" (CIAs), the Project Area, the watersheds that contain the Project Area, southeastern Sweetwater County and southwestern Carbon County, and southwest Wyoming and northwest Colorado.  The CIAs studied, and thus the sources of impacts, vary, as appropriate, by the resources affected, including, *inter alia*, air quality, water quality, and wildlife.  Not surprisingly, the projects potentially impacting a watershed were different from those potentially affecting an air region, or habitat, and so on.  In considering these CIAs, BLM analyzed impacts from two preexisting oil and gas projects within the Project Area and seven adjacent projects for which NEPA analysis was available.  Moreover, the NEPA documents were tiered to EISs prepared for the Great Divide RMP and the Green River RMP, which analyzed overall impacts of oil and gas leasing in the jurisdictions of the Rawlins and Rock Springs Field Offices before opening the regions to oil and gas development.

BCA's argument that BLM did not consider cumulative impacts on wildlife in the FEIS is unwarranted.  The DEIS contains extensive analysis in Chapter 5 of cumulative impacts on range resources; wildlife; big game (including pronghorn, mule deer, and elk); wild horses; greater sage grouse; raptors (broken down by nesting and foraging habitats); and special status plant, wildlife, and fish species (including threatened, endangered, and sensitive species of plants and animals).  DEIS at 5-15 to 5-25.  BCA's complaint appears to be that this extensive analysis was not duplicated in the FEIS document, an argument we will not consider further.

BCA presents a list of projects BLM allegedly should have considered in its cumulative impacts analysis.  BCA PS at 29-30; *see also* BCA Ex. P (map).  BCA's complaint is that BLM did not consider four of seven projects raised by BCA.  One of these, the Bitter Creek coalbed methane project, was proposed for scoping several months after the challenged ROD.  BLM noted in the FEIS that several projects, including two of the projects raised by BCA that were not included in the analysis, had been proposed but not yet analyzed, and thus could not be included in the numerical well count.  FEIS 2-69.  It is unclear whether BCA's argument is that BLM was compelled by 40 C.F.R. § 1508.7 to halt consideration of development, and ultimate approval of the activity, until plans for other development had coalesced into numerical quantification.  We do not read the rule this way.  BLM acknowledged the cumulative impacts from accelerated development occurring in the region as a result of world events and national demand and recognized that new projects will be developed in the future; BLM acknowledged that cumulative impacts of this Project with others could be significant.  FEIS at 1-16 to 1-17.[12]  Ultimately, it is not a failure of consideration that BCA sustains, but rather a result BCA objects to.  We do not grant relief for that.

### 3. Opposing Views

BCA argues that BLM failed adequately to respond to opposing scientific views.  BCA SOR at 5-10.  In *Biodiversity Conservation Alliance*, we held that, "[t]he fact that BCA cites experts who agree with its position is not dispositive."  169 IBLA at 343, citing *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999).  In making its argument, BCA has provided a bibliography of scientific studies it claims oppose BLM's position, and, based on this list, BCA demands that BLM respond to each study.  BCA SOR at 8-9.  We do not believe the burden placed on BLM to respond to opposing views is so broad.  Nor do we believe it is our burden or

---

[12]  BLM estimated that the potential cumulative impacts of these future projects to "visibility and atmospheric deposition may exceed significance criteria, although violations of Wyoming or federal pollutant concentrations standards are unlikely."  FEIS at 2-69 to 2-70.

within our authority to oversee BLM's function by absorbing the substance of material represented by that bibliography and deciding ourselves what science is "right." To be successful on its arguments, BCA must establish that BLM committed a "clear error of law or demonstrable error of fact, or that the analysis failed to consider a substantial environmental question of material significance to the proposed action." *Missouri Coalition for the Environment,* 172 IBLA 226, 239 (2007); *see also Southern Utah Wilderness Alliance*, 164 IBLA 33, 36 (2004).  BLM responded to the two issues BCA raises as examples of BLM's failure to respond to opposing views:  protections for the sage grouse and big game.  We thus examine the record to determine whether BLM committed a "demonstrable error of fact" or failed to consider a substantial environmental question of material significance in reaching its conclusions.

*Sage grouse.*  The record shows both that BCA and NRDC are correct to say that the scientific community is moving in a different direction on the issue of sage grouse protections and also that BLM has recognized this in a new policy with respect to sage grouse in IM 2004-057.  Thus, as explained below we affirm BLM's decision in the ROD and FEIS, as modified by that policy.

 BCA and NRDC both recommended that BLM adopt a 3-mile buffer of no-surface activity around active sage grouse leks, on the advice of Dr. Clait Braun.  BCA SOR at 6-7; NRDC SOR at 29-30; *see* NRDC Ex. 10 (Braun report).  NRDC argues that BLM has not presented a scientific study to establish the efficacy of the ¼-mile buffer.  NRDC SOR at 29-32; NRDC Reply at 13-15.  As noted above, BLM responded, FEIS at 5-44 and 5-61, that the ¼-mile buffer it established for the Project "is generally a minimum distance," and acknowledged that BLM may be compelled to increase the buffer in areas of "quality nesting habitat."  FEIS at 5-44, 5-62.  BLM anticipated using site-specific review and targeted COAs at the APD stage to review the status of the leks identified in the Project Area in the FEIS and DEIS.  *Id.* at 4-65.  BCA and NRDC correctly noted that BLM's sister agency, U.S. Fish and Wildlife Service (FWS), expressed concern about the drifting state of science about sage grouse protection and questioned BLM's adherence to the notion of a ¼-mile buffer.  FEIS at 4-96.

After completing the FEIS, however, BLM issued IM 2004-057, "Statement of Policy Regarding Sage-Grouse Management Definitions, and Use of Protective Stipulations and Conditions of Approval (COAs)" (Aug. 16, 2004).  BLM Response, IBLA 2004-316, Att. 2.  This IM catalogs the history of scientific thought regarding protections for sage grouse habitat, leks, and nesting areas from the 1970s to the present.  It acknowledges a severe decline in population, public calls for listing the species under the Endangered Species Act, and the possibility that 1970s-era protections and mitigation measures might not serve intended purposes.  The IM requires BLM to coordinate with the State of Wyoming to map existing sage grouse leks and to undertake analysis to determine which populations are migratory, a factor that may make areal radiuses around leks either obsolete or inaccurate on a case-by-

case basis.  The IM pursues a site-specific policy for sage grouse management which maintains minimum requirements for buffers, a 2-mile radius as a "flagging device" for stipulations and COAs, diurnal timing limitations, and seasonal restrictions.  *Id.* at 5.  But, it also imposes a policy of case-by-case mapping of sage grouse habitat, including nesting habitat, to better protect nests that are beyond a 2 mile radius "regardless of distance from leks" while allowing disturbance in areas within such a radius that do not provide suitable habitat.  *Id.* at 5.

NEPA requires BLM to "consider and respond to the comments . . . , not to agree with them."  *Utahns for Better Transportation v. U.S. Department of Transportation*, 305 F.3d 1152, 1174-75 (10th Cir. 2002).  Nonetheless, the record shows a general agreement in the relevant community of experts that sage grouse science is changing and in need of development and supplementation.  BLM must and is evidently attempting to adapt to available data and derive new data.  This is not inconsistent with Dr. Braun's contentions regarding data "too limited to conclusively demonstrate the health of the sage-grouse population(s) and trends" in the Great Divide Resource Area, and the need for long-term monitoring efforts and research studies.  NRDC Ex. 10, "Sage-Grouse Scoping Issues for Revision of the BLM's Great Divide [RMP]," Clait E. Braun, at 4-5.  The IM which BLM has committed to adopt for the Desolation Flats Project reflects BLM's acceptance that its data was outdated, and we therefore affirm as modified to incorporate the IM into the ROD.  NRDC objects to the IM as "exactly the same inadequate protection that experts have criticized in the Desolation Flats Project."  NRDC Reply at 14.  Nonetheless, as we have described above, we see it as a sufficient departure that both moots the argument that BLM did not respond to comments on sage grouse and also prohibits us from finding that BLM is not attempting to protect the grouse.  NRDC is free to challenge specific decisions if it perceives that decisions made on APDs are devoid of the kind of site-specific consideration envisioned in the policy.

*Big game winter range.*  BCA and NRDC complain that BLM did not accurately consider their comments about big game winter range within the Desolation Flats Project Area.[13]  We have examined the material in the record on this topic, one which has proven in a number of cases before us to be scientifically controversial within the State of Wyoming.  *E.g., Biodiversity Conservation Alliance*, 171 IBLA 218 (2007); *Wyoming Outdoor Council*, 171 IBLA 108; *National Wildlife Federation*, 169 IBLA 146 (2006).  These cases generally address the sufficiency of mitigation measures BLM has imposed on oil and gas leasing or development to protect the winter range.

---

[13]  NRDC contends that BLM did not adequately consider the impacts of habitat fragmentation on the sage grouse and other wildlife, citing the FWS comment letter to the DEIS which critiqued BLM's analysis of indirect impacts on the sage grouse. NRDC SOR at 28-29, citing FEIS at 4-96.  As we have responded regarding the sage grouse by modifying the ROD, we address this argument no further.

In this case, however, the import of BCA's argument is that BLM erred by incorporating various mitigation techniques for development on the big game winter range at all, *see* DEIS at 4-59 to 4-64, because "winter range areas should be withdrawn from the surface disturbance associated with oil and gas development." BCA comment letter at 28 (FEIS at 4-116). We have not overstated BCA's comments; in its SOR BCA explains that seasonal timing restrictions would be insufficient, and that "disturbance on winter ranges should be avoided at all costs," and "oil and gas production facilities and access roads must never be sited on crucial winter ranges." BCA SOR at 12. As explanation for this contention, BCA reiterates in its SOR the contention repeated in its comments that BLM has not sufficiently analyzed the effectiveness of its mitigation measures. *Id.* at 13. We presume BCA's view is that the Board's alternatives are to (a) set aside and direct BLM to complete analyses of mitigation measures to BCA's satisfaction before the ROD is issued; or (b) reverse and direct BLM to establish that no oil and gas activity can occur on winter range.

BLM acknowledged that allowing development during non-winter months and limited traffic and recreation year-round would have impacts on big game, but concluded that such impacts would not be significant. FEIS at 5-55. BLM analyzed the impacts development would have on pronghorn antelope, deer, and elk. DEIS at Chapter 4. BLM concluded that the pronghorns and deer would adapt to some disruption, and anticipated that elk would adapt less easily, but, with appropriate mitigation, would not be significantly affected. *Id.*; *see also* at 4-72 (additional mitigation measures). BLM responded to BCA's comments regarding winter range, habitat fragmentation, and particular species. FEIS at 5-50 through 5-58.

The record shows that the majority of the Desolation Flats Project Area is classified as winter/yearlong range for big game species. *See* DEIS at 4-60 (219,930 acres of "DFPA" in pronghorn winter/yearlong range); *id.* at 4-58 (Figure 4-7). We have examined the DEIS, FEIS, BCA's comments, and BLM's analysis and response, as well as our recent precedent on this topic. We find that the BCA's arguments are premised on its position that BLM has not sufficiently analyzed the impacts of oil and gas development on winter range for particular species and must do so before proceeding. We do not find such arguments sufficient to demonstrate error in BLM's failure to acquiesce in BCA's contention, effectively, that BLM "withdraw" the Desolation Flats area from oil and gas development.

### 4. Alternatives

BCA claims that BLM failed to consider adequate alternatives to the proposed action because BLM did not consider BCA's suggested "directional drilling, multiple wells per pad and closed loop drilling alternatives," as alluded to above. BCA PS at 21. BCA argues that BLM's failure to address such alternatives constitutes a violation of NEPA section 102(2)(E), 42 U.S.C. § 4332(2)(E) (2000), and CEQ regulations at

40 C.F.R. § 1502.14. BLM is obligated to consider reasonable alternatives which accomplish the intended purpose of a proposed action, are technically and economically feasible, and have a lesser impact. 40 C.F.R. § 1500.2(e); *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1180-81 (9th Cir. 1990); *Western Exploration Inc.*, 169 IBLA at 406; *see also* 43 C.F.R. §§ 1501.2, 1502.14, 1508.9. To show a failure to consider sufficient alternatives, an appellant must posit an alternative that would meet the test described above. *Great Basin Mine Watch*, 159 IBLA 324, 354 (2003).

BCA has not met its burden. As described above in addressing FLPMA, BLM has explained that it is not possible to make the particular decisions BCA would demand of it in adopting an alternative that addresses some method of co-locating wells. BLM explained why: certain locations present technical, feasibility, and economic problems which would make such options impossible, and certainly impossible to choose at this time; and the technical and geophysical data gathered with early wells will necessarily define subsequent well placement decisions. Thus, while BLM concedes the value of the kind of drilling options BCA demands, it did not choose to consider them as an alternative because it was technically not feasible to do so for the overall Project, and because optimal well configurations will be determined as Project action progresses. BCA has appended IM 2003-152 (Apr. 14, 2003), by which the BLM Director established a policy for BLM field offices to work with oil and gas operators to engage in comprehensive drilling planning. BCA Ex. BB. This IM, however, establishes this policy for "APD process improvements." We do not find that BLM has impeded its ability to follow that policy by failing to consider a directional drilling alternative in the FEIS. BCA has failed to show error in that conclusion, or to proffer a sensible proffered alternative that is technologically feasible or environmentally preferable to BLM's decision to defer siting until the APD phase, implemented in a manner consistent with IM 2003-152.

Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the decision appealed from is affirmed in part, and affirmed and modified in part as identified herein.

_____/s/_____
Lisa Hemmer
Administrative Judge

I concur:

_____/s/_____
James F. Roberts
Administrative Judge

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Avenue, NW, Suite 400
Washington, DC 20005, *et al.,*

       Plaintiffs,

          v.

DIRK KEMPTHORNE, in his official capacity
as the Secretary of the United States
Department of the Interior
1849 C Street, NW
Washington, DC 20240, *et al.,*

       Defendants.

ANADARKO PETROLEUM CORPORATION
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

DOUBLE EAGLE PETROLEUM CO.
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

       and

STATE OF WYOMING
123 Capitol Building
Cheyenne, WY 82002,

       Defendant-Intervenors.

Civ. No. 1:07-cv-01709-RJL

**[PROPOSED] ORDER**

This matter having come before the Court on the parties' motions and cross-motions for

summary judgment and upon oral argument,

It is hereby ORDERED that

1)      Plaintiffs' Motion for Summary Judgment is denied;

2)      Defendant-Intervenors' Cross-Motion for Summary Judgment is granted;

3)      Plaintiffs' First Amended Complaint, which was filed on October 26, 2007, is

dismissed with prejudice;

4)      each party shall bear its own costs.

It is SO ORDERED.


_____       _____

Date                      Richard J. Leon
                         United States District Judge

A/72552095.1