## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 07-cv-01709-RJL |
| DIRK A. KEMPTHORNE, in his official capacity, THE UNITED STATES DEPARTMENT OF THE INTERIOR, and THE BUREAU OF LAND MANAGEMENT, | ) ) ) ) ) | |
| Defendants, | ) ) | |
| ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC., and DOUBLE EAGLE PETROLEUM CO., and STATE OF WYOMING, | ) ) ) ) ) ) | |
| Defendant-Intervenors. | ) ) ) | |

## FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF COMBINED CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       A.     Public Involvement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.   LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       A.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       B.     The Federal Land Policy and Management Act . . . . . . . . . . . . . . . . . . . . . . 8

       C.     The National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       A.     BLM Took a Hard Look at Air Quality Impacts . . . . . . . . . . . . . . . . . . . . . 11

       B.     BLM Appropriately Relied on the Scheffe Model to
              Assess Ozone Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       C.     BLM's Analysis of Background Ozone Levels Was
              Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       D.     BLM Took A Hard Look at Methane Impacts . . . . . . . . . . . . . . . . . . . . . . . 22

       E.     BLM Properly Evaluated the Impacts on Wildlife . . . . . . . . . . . . . . . . . . . . 27

       F.     BLM's Analysis of Impacts on Big Game Satisfies NEPA . . . . . . . . . . . . . . 28

       G.     BLM Properly Assessed Impacts on Sage Grouse . . . . . . . . . . . . . . . . . . . . 34

              1.     BLM Properly Responded to the FWS' Comments
                     on Sage Grouse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

              2.     BLM Adequately Examined Mitigation Measures
                     for Sage Grouse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

       H.     BLM Satisfied NEPA's Public Participation
              Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

I.      BLM Is Entitled to Summary Judgment on Plaintiffs'
        Claim that BLM Violated NEPA by Failing to Take A
        Hard Look at the Impacts of Site-Specific Approvals . . . . . . . . . . . . . . . . . . . . . 43

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

## CASES

Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. DOT,
524 F. Supp. 2d 642 (D. Md. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Biodiversity Conservation Alliance v. BLM, 404 F. Supp. 2d 212 (D.D.C. 2005) . . . . . . . 28, 43

Board of Regents v. EPA, 86 f3d 1214 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190 (D.C. Cir. 1991) . . . . . . . . . . 34, 38, 45

City of Williams v. Dombeck, 151 F. Supp. 2d 9 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . 10

Corridor H Alternatives, Inc. v. Slater, 166 F.3d 368 (D.C. Cir.1999) . . . . . . . . . . . . . . . . . . . . 2

Dep't of Transp. v. Public Citizen, 541 U.S. 752 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Deukmejian v. Nuclear Regulatory Comm'n, 751 F.2d 1287 (D.C. Cir.1984) . . . . . . . . . . . . . 25

El Conejo Americano of Texas, Inc. v. DOT, 278 F.3d 17 (D.C. Cir. 2002) . . . . . . . . . . . . . . . 7

Envtl. Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d 1005 (9th Cir. 2006) . . . . . . . . . . . . . . . . 44

Friends of the Earth v. Corps of Engineers, 109 F. Supp.2d 30 (D.D.C. 2000) . . . . . . . . . . 34-35

Hammond v. Norton, 370 F. Supp. 2d 226 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Headwaters, Inc. v. BLM, 914 F.2d 1174 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

J.A. Jones Mgmt. Servs. v. FAA, 225 F.3d 761 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 7

Karst Envtl. Educ. & Prot., Inc. v. EPA, 475 F.3d 1291 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . 6

Kern v. BLM, 284 F.3d 1062 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Kleppe v. Sierra Club, 427 U.S. 390 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Marsh v. Oregon Natural Res. Council, 490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Mid States Coalition for Progress v. Surface Transportation Board,
345 F.3d 520 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Milk Indus. Found. v. Glickman, 132 F.3d 1467 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 8

Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29 (1983) . . . . . . . . . . . . . 7

Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233 (9th Cir.2005) . . . . . . . . . . . 11

Natural Resources Defense Council v. Hodel, 865 F.2d 288 (D.C. Cir.1988) . . . . . . . . . . . . . 34

Natural Resources Defense Council v. Kempthorne, 525 F. Supp. 2d 115
(D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Nevada v. Department of Energy, 457 F.3d 78 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 44

North Carolina Fisheries Ass'n v. Gutierrez, 518 F. Supp. 2d 62 (D.D.C. 2007) . . . . . . . . . . . 7

Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55 (2004) . . . . . . . . . . . . . . . . . . . . . . 1

Ocean Conservancy v. Gutierrez, 394 F. Supp. 2d 147 (D.D.C. 2005) . . . . . . . . . . . . . 18, 19, 28

Okanogan Highlands Alliance v. Williams, 236 F.3d 468 (9th Cir. 2000) . . . . . . . . . . . . . . . . 12

Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989) . . . . . . . . . . . . . . . . passim

Rocky Mountain Oil and Gas Ass'n v. Watt, 696 F.2d 734 (10th Cir. 1982) . . . . . . . . . . . . 8-9

Sierra Club v. Adams, 578 F.2d 389 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Sierra Club v. U.S. Dep't of Transp., 753 F.2d 120 (D.C. Cir.1985) . . . . . . . . . . . . . . . . . . . . . 14

TOMAC v. Norton, 433 F.3d 852 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519 (1978) . . . . . . . . . . . . . . . 16, 17

Village of Bensenville v. FAA, 457 F.3d 52 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Western Coal Traffic League v. ICC, 735 F.2d 1408 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . 17

iv

**STATUTES**

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 U.S.C. § 4321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 U.S.C. § 4332(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

43 U.S.C. § 1701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

43 U.S.C. § 1702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

43 U.S.C. § 1712 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**REGULATIONS**

40 C.F.R. § 50.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

40 C.F.R. § 52.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

40 C.F.R. § 1501.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

40 C.F.R. § 1501.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

40 C.F.R. § 1502.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 38

40 C.F.R. § 1502.16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 38

40 C.F.R. § 1502.20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

40 C.F.R. § 1508.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

40 C.F.R. § 1508.25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

40 C.F.R. § 1508.28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

43 C.F.R. 1601.0-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 44

43 C.F.R. § 1610.5-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

70 Fed. Reg. 68,218 (Nov. 9, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

71 Fed. Reg. 10,989 (Mar. 3, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# I.  INTRODUCTION

Guided by a concept embodied in the Federal Land Policy and Management Act (FLPMA) called "multiple use management," the Bureau of Land Management (BLM) manages nearly 260 million acres of federal surface lands and 700 million acres of subsurface mineral estate.  As the Supreme Court has described it "'[m]ultiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put . . ."  Norton v. Southern Utah Wilderness Alliance (SUWA), 542 U.S. 55, 58 (2004) (citation omitted).  The crux of this case is the appropriate balance between the Nation's need to develop domestic sources of energy, such as clean-burning natural gas, and the need to maximize protection of other important resource values, like wildlife and air and water quality.  In making the decision to approve development of approximately 2,000 gas wells in the Atlantic Rim Natural Gas Field Development Project (Project), BLM struck a careful balance between development of natural gas resources and protection of those other values through minimization of surface disturbance and an emphasis on mitigation, reclamation and monitoring.  Plaintiffs argue that BLM failed to take a hard look at the impacts on air quality, sage grouse and big game, but their criticisms amount to policy disagreement or mere "flyspecking" that has been consistently rejected by the Court of Appeals for D.C. Circuit as grounds for finding a NEPA violation.  Seven years of study went into BLM's evaluation and approval of the Atlantic Rim Natural Gas Field Development Project (Project).  In addition to BLM, the Environmental Protection Agency (EPA), the Fish and Wildlife Service, the Wyoming Department of Environmental Quality (WDEQ), and the Wyoming Game and Fish Department all contributed their expertise to the analysis.

The Project carries out the purposes of the National Energy Policy and the Energy Policy Act of 2005 by increasing domestic sources of energy and thereby reducing the country's dependence

1

on foreign sources of oil and gas.  While there will undeniably be adverse environmental impacts, those impacts were evaluated in the two-volume Final Environmental Impact Statement (FEIS) and thousands of pages of supporting analysis.  As the Supreme Court has stated, "it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process. If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (citations omitted). All that is required is that the agency "identify the reasonable alternatives to the contemplated action" and "look hard at the environmental effects of [its] decision[]." Corridor H Alternatives, Inc. v. Slater, 166 F.3d 368, 374 (D.C. Cir.1999) (internal quotation and citation omitted). "Although plaintiffs may object to these impacts, NEPA does not constrain an agency from deciding that certain values outweigh the environmental costs as long as these costs are identified and evaluated." Natural Resources Defense Council v. Kempthorne, 525 F. Supp. 2d 115, 122 (D.D.C. 2007) (NRDC I).  Federal Defendants are entitled to summary judgment.

## II.  FACTUAL BACKGROUND

Extraction of oil and gas is not only an essential component of the Nation's energy strategy, but is among the resources BLM is required to balance as it manages the public lands under FLPMA's multiple use mandate. 43 U.S.C. § 1701.  BLM manages oil and gas resources, and, following appropriate environmental analysis, it issues permits to develop those resources, thereby reducing U.S. dependence on foreign sources of energy.  Many of the relevant facts are laid out in this Court's November 2007 decision denying Plaintiffs' motion for a preliminary injunction. NRDC I, 525 F. Supp. 2d at 117-118.  The Atlantic Rim Coalbed Methane Project is a proposal by oil and gas companies to drill and develop up to 2,000 coalbed natural gas (CBNG) wells in south-

central Wyoming.  FEIS at ES-1 (AR 2088).  Contrary to Plaintiffs' assertion that oil and gas resources in the Atlantic Rim area are "relatively undeveloped," Plfs Br. at 2, Carbon County, where the project is located, "has a relatively long history of oil and gas development."  FEIS at 4-139 (AR 2458).  The project area and adjacent areas "have produced significant quantities of oil and natural gas" from 11 fields.  FEIS at 3-12 (AR 2176).  The cumulative impact analysis also explains that the project "is located in a region of extensive natural gas development" including some 3,600 wells existing or which are reasonably foreseeable future development.  FEIS at 5-2-5-5 (AR 2484-85).

The Record of Decision (ROD) for the Atlantic Rim Project sets forth the plan for future management of federally-controlled minerals and surface within the Atlantic Rim Project Area.  The project area includes a mix of contiguous public lands, inholdings of private lands, and a mix of public and private lands in the checkerboard pattern of ownership.  Approximately 64% of the project area (173,672 acres) is federal surface estate, approximately 31% (82,348 acres) is private surface estate, and the remaining 5% (14,060 acres) is state-owned surface.  ROD at 1 (AR 4796). The federal mineral estate within the Project area (approximately 66% of the project area) encompasses 179,438 acres.  Id.  Approximately 1,800 of the potential 2,000 wells would develop coalbed natural gas resources (CBNG) from Mesaverde Group coals.  Id.  The Project is expected to produce nearly 1,350 billion cubic feet of natural gas, providing enough gas to heat 19.3 million homes for a year.  ROD at 1 (AR 4796).  CBNG is a clean-burning fuel.  FEIS at 1-8 (AR 2135). Developing domestic sources of CBNG also helps reduce U.S. reliance on foreign energy sources. ROD at 1, FEIS at 1-8 (AR 4796, 2135).  The project will have beneficial socio-economic impacts, including generating $958 million in total taxes and royalties.  Id.  Wyoming receives a share of the federal royalties, which it uses to fund local governments and schools.  FEIS at 4-137.  BLM

3

estimated that the project would generate 5 million annually for those purposes. Id. The project will also add nearly 1,500 jobs at the peak of production. FEIS at ES-6, 4-130 (AR 2093, 2449).

The FEIS analyzed four alternatives in detail, including the action as proposed by the oil and gas proponents, the no action alternative, and Alternative C (special protections). FEIS at 2-3 to 2-11 (AR 2151-59). Included in the FEIS was a new preferred alterative, Alternative D, developed in part to address concerns raised by federal agencies and others, Natural Gas Development with Disturbance Limitations, intended to minimize surface disturbance while optimizing natural gas recovery. Id. at 2-7, 1-20 (AR 2155, 2147). Under Alternative D, development within the Project area is proposed at 80-acre well spacing, with the potential for reduced development at 160-acre spacing. FEIS at ES-1 (AR 2088). Operators are required to initiate reclamation after completion of drilling activities and before the next growing season. ROD at 3 (AR 4798). Surface disturbance from development activities is limited to a maximum of 7,600 acres (approximately 3% of project area) at any given time, with an expected total surface disturbance limited to 13,600 acres (approximately 5%). Id. at 2-3 (AR 4797-98). Disturbance is limited to an average of 6.5 acres per well. Id. at 4 (AR 4199). The expected life of the project is 30–50 years. Id. at 12 (AR4807). If the disturbance cap is reached during development, further disturbance activities would be halted pending successful reclamation. FEIS at 2-8 (AR 2156). BLM will manage approximately 72,200 acres (27% of the project area) as Category A mitigation areas. Id. at 2-8--2-9; ROD at 12 (AR 2156-57, 4807). Category A areas have sensitive fish populations and crucial wildlife habitats, such as crucial elk winter range. Id. at 2-8; ROD at 12 (AR 2156, 4807). BLM will manage those areas to reduce the extent of disturbance below 6.5 acres per well. Id.

Development activities will be managed through a performance-based, adaptive management process. Id. Operators will submit annual operating plans to the BLM. Id. After submission of

annual operating plans, site-specific monitoring and mitigation processes will be developed by a Review Team (included but not limited to BLM, cooperating agencies, and interested agencies). ROD at 3, 12 (AR 4798, 4807); see also id. at App. B (AR 4836-55). Monitoring data will be evaluated at least annually to determine if mitigation is effective and meeting performance goals. Id. Based on those results, mitigation measures, conditions of approval, best management practices, reclamation criteria, and other protective measures may be modified. ROD at 3 (AR 4798); see also ROD at E-1 (planning process allows for more frequent meetings if necessary). Additional protective measures may be applied to site-specific proposals. ROD at 21 (AR 4816). Further, the ROD for the Atlantic Rim Project EIS is not the final review or approval of development activities within the Project area. Site-specific approvals, including appropriate environmental analysis, are required for such actions as Applications for Permit to Drill (APDs), Sundry Notices, rights-of-way grants, and applications for Special Use Permits. ROD at 3-4 (AR 4798-99). In the ROD, BLM also emphasized that monitoring, reporting and adaptive management are key components of the decision. ROD at 20 (AR 4815). That means BLM will continue to monitor trends and the effectiveness of reclamation efforts and mitigation, that it will identify areas requiring modification, and that it will implement adapted techniques, including additional mitigation, to resolve problems observed during monitoring. Id. Ultimately, BLM's long-term goal is to return the lands to approximately the same condition they were in before development. ROD at 4 (AR 4799).

BLM approved Findings of No Significant Impact (FONSI) for the four challenged environmental assessments (EA) in 2007. The Catalina A and B Plan of Development (POD) decision and FONSI was made on June 28, 2007, with a supporting Environmental Assessment. AR 73502, 73492. BLM issued the decision and FONSI for the Sun Dog A and B PODs on August 15, 2007, also supported by an EA. AR 74063, 74073. BLM approved the Sun Dog C POD, with

supporting EA, on October 23, 2007.  AR 75029, 75019.  The Sun Dog D and E PODs and

supporting EA were completed on October 23, 2007.  AR 75185, 75173.

A.    **Public Involvement**

There was substantial opportunity for public involvement in BLM's decision-making process

for the EIS.  BLM initiated scoping on June 26, 2001.  ROD at 21 (AR 4816).  Four years later, in

December 2005, BLM issued the Draft EIS.  Id.  It held a 60-day public comment period, which

resulted in the submission of nearly 60,000 comments from state, federal and local agencies,

environmental advocacy groups, landowners, leaseholders, oil and gas companies and the general

public.  BLM reviewed and responded to the comments.  Id.  The FEIS was released in November

2006, and BLM accepted comments through January 4, 2007.  ROD at 22 (AR 4817).  Those

comments were also reviewed and BLM responded to them in the March 23, 2008 ROD.  Id.

As this Court found in NRDC I, BLM also provided opportunities for public comment during

the site-specific approval process for the Catalina A and B PODs and the Sun Dog A and B PODs.

525 F. Supp. 2d at 120-21.  Plaintiffs provided no comments during those processes.  BLM also

offered an opportunity for public comment during the approval process for the Sun Dog C, D and

E PODs.  AR 79066-67.  Plaintiffs provided comments on the EAs.  AR 79078.  BLM considered

and responded to the comments before making a decision.  AR 75031-033; 75187-189.

### III.  LEGAL BACKGROUND

A.    **Standard of Review**

"Because NEPA creates no private right of action, challenges to agency compliance with the

statute must be brought pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 et seq., which

requires 'final agency action for which there is no other adequate remedy in a court.'"  Karst Envtl.

Educ. & Protection, Inc. v. EPA, 475 F.3d 1291, 1295 (D.C. Cir. 2007) (citation omitted).  While

6

the parties are moving for summary judgment pursuant to Federal Rule of Civil Procedure 56, "[i]n

a case involving review of a final agency action under the APA . . . the standard set forth in Rule

56(c) does not apply because of the limited role of a court in reviewing the administrative record."

North Carolina Fisheries Ass'n v. Gutierrez, 518 F. Supp. 2d 62, 79 (D.D.C. 2007), citing Sierra

Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006).  The North Carolina Fisheries court

explained, "[u]nder the APA, it is the it is the role of the agency to resolve factual issues to arrive

at a decision that is supported by the administrative record, whereas 'the function of the district court

is to determine whether or not as a matter of law the evidence in the administrative record permitted

the agency to make the decision it did.'" 518 F. Supp. 2d at 79, quoting Occidental Eng'g Co. v.

INS, 753 F.3d 766, 769-70 (9th Cir. 1985) and citing Northwest Motorcycle Ass'n v. U.S. Dept. of

Agric., 18 F.3d 1468, 1472 (9th Cir. 1994 ("[T]his case involves review of a final agency

determination under the [APA]; therefore, resolution of th[e] matter does not require fact finding on

behalf of this court.").  Therefore, summary judgment simply "serves as the mechanism for deciding,

as a matter of law, whether the agency action is supported by the administrative record and

otherwise consistent with the APA standard of review."  518 F. Supp. 2d at 79, citing Richards v.

INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), cited in Bloch v. Powell, 227 F. Supp. 2d 25,

31 (D.D.C. 2002), aff'd 348 F.3d 1060 (D.C. Cir. 2003).

This Court's review is governed by the "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law" standard of the Administrative Procedure Act (APA). See 5

U.S.C. § 706(2)(A). This standard is "narrow and a court is not to substitute its judgment for that

of the agency." Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983).

This Court should uphold BLM's decision if it finds "adequate support in the record." J.A. Jones

Mgmt. Servs. v. FAA, 225 F.3d 761, 765 (D.C. Cir. 2000); see also El Conejo Americano of Texas,

Inc. v. DOT, 278 F.3d 17, 20 (D.C. Cir. 2002).  Under "familiar and well-established principles,"

no agency decision is arbitrary and capricious "as long as [the agency] 'examine[d] the relevant data

and articulate[d] a satisfactory explanation for its action including a "rational connection between

the facts found and the choice made.'" Milk Indus. Found. v. Glickman, 132 F.3d 1467, 1476 (D.C.

Cir. 1998) (citations omitted).

## B.    The Federal Land Policy and Management Act

BLM manages the public lands under FLPMA using a multi-step planning and decision

process.  BLM first develops a Resource Management Plan (RMP) that sets forth long-term goals

and objectives for management of resources on BLM administered lands.  43 U.S.C. § 1712(a).  The

RMP generally establishes, among other things, lands to be opened or closed to leasing of federal

oil and gas resources, and the conditions under which development of each resource should occur

within a particular resource planning area.  43 C.F.R. 1601.0-5(n); see also SUWA, 542 U.S. at 71.

Generally, an RMP does not constitute a decision to undertake any particular site-specific action.

43 C.F.R. 1601.0-5.   At the second tier of decisionmaking, BLM implements the RMP through

project-specific decisions, which must conform to the RMP.  See 43 U.S.C. § 1712(e); 43 C.F.R.

§ 1610.5-3.  See Headwaters, Inc. v. BLM, 914 F.2d 1174, 1178 (9th Cir. 1990).

BLM is guided by the principles of "multiple-use management," which means that it must

manage "the public lands and their various resource values so that they are utilized in a combination

that will best meet the present and future needs of the American people . . . a combination of

balanced and diverse resource uses that takes into account the long-term needs of future generations

for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber,

minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values . . . ."  43

U.S.C. § 1702(c).  As the Tenth Circuit cogently explained in Rocky Mountain Oil and Gas Ass'n

8

v. Watt, 696 F.2d 734, 738 (10th Cir. 1982), multiple use management means that "BLM need not permit all resource uses on a given parcel of land."  The court further observed that

> "If all the competing demands reflected in FLPMA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied.  A parcel of land cannot both be preserved in its natural character and mined.  Thus, it would be impossible for BLM to carry out the purposes of the Act if each particular management decision were evaluated separately.  It is only by looking at the overall use of the public lands that one can accurately assess whether or not BLM is carrying out the broad purposes of the statute."

Id. at 738-39, n.4, quoting Utah v. Andrus, 486 F. Supp. 995, 1003 (D. Utah 1979).

## C.    The National Environmental Policy Act

The purpose and intent of NEPA is to focus the attention of the federal government and the public on a proposed action so that the consequences of the action can be studied before the action is implemented and potential negative environmental impacts can be avoided. 42 U.S.C. § 4321; 40 C.F.R. § 1501.1(c); Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1989).  To that end, NEPA requires the preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  In contrast to an EIS, an EA need only include brief discussions of the need for a proposal, alternatives, and of the environmental impacts of the proposed action and alternatives.  40 C.F.R. § 1508.9(b).  See also 40 C.F.R. §§ 1508.9(a), (a)(1) (An environmental assessment is a "concise public document" that "[b]riefly provides sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.").  NEPA mandates the procedures by which agencies must consider the environmental impacts of their actions, but does not dictate the substantive results.  Robertson, 490 U.S. at 350.

A narrow, deferential standard also applies to judicial review of agency NEPA compliance. Marsh, 490 U.S. at 375. The "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary

9

or capricious." Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87, 97-98 (1983). In a case like this, where an agency is "making predictions within its area of special expertise" as "opposed to simple findings of fact," a "reviewing court must generally be at its most deferential." Id. at 103. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." Marsh, 490 U.S. at 378.

## IV. ARGUMENT

Although Plaintiffs "cherry pick" information and data out of the administrative record to support their argument that BLM's decision to approve the Atlantic Rim Project violated NEPA, the record shows that BLM took a hard look at the various impacts of the Project, developed over the seven-year decision making process. This Court's role is to "to determine whether the EIS was compiled with objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors." Sierra Club v. Adams, 578 F.2d 389, 393 (D.C. Cir. 1978) (internal quotations omitted) ("full, fair, bona fide compliance with NEPA" does not authorize the courts to "fly speck" the EIS nor substitute its judgment for the agency's); see also City of Williams v. Dombeck, 151 F.Supp.2d 9, 23 (D.D.C. 2001) (same).

BLM satisfied that standard in its detailed EIS. While Plaintiffs object to BLM's analysis of a few issues, they do not quarrel with the majority of BLM's conclusions. BLM analyzed in detail impacts on geology, mineral and paleontology resources, air quality, soils, water resources, vegetation and wetlands, wildlife, including special status plant, wildlife and fish species, rangeland, recreation, visual resources, cultural resources, socioeconomics, transportation, health and safety, noise, wild horses, and on special management areas. FEIS at 4-2--4-162 (AR 2321-2481). BLM also analyzed cumulative impacts on each of these resources. FEIS at 5-1--5-26 (AR 2483-2508).

10

Nor do Plaintiffs object to BLM's analysis of alternatives, which is the "heart of the environmental impact statement." 40 C.F.R. § 1502.14. BLM analyzed a range of reasonable alternatives in the FEIS, including the action as proposed by the operators, the no action alternative, alternative C (additional protections), and Alternative D, the Preferred Alternative. FEIS at 2-14--15 (AR 2162-63). Finally, Plaintiffs stated in their opening brief that they have abandoned their Clean Water Act and FLPMA claims, Plfs. Br. at 4, and BLM is entitled to summary judgment on those issues.

"Simply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean" that the agency's analysis was arbitrary or capricious. Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1240 (9th Cir. 2005). The record shows that BLM took the requisite "hard look" that NEPA requires at the relevant environmental impacts and that the Court should grant summary judgment in favor of Federal Defendants.

## A.    BLM Took a Hard Look at Air Quality Impacts

At the outset, Plaintiffs' arguments that BLM violated NEPA in its air quality impact analysis ignore the important roles played by the State of Wyoming and the EPA. WDEQ has delegated authority to implement the federal Clean Air Act (CAA) within Wyoming. FEIS at 4-6 (AR 2325). Under the CAA, the State monitors air quality and prepares plans for controlling air pollution to ensure compliance with the Act. Id. Before the State grants a CAA permit, it performs additional site-specific air quality analysis, and may require emission control measures to ensure protection of air quality. Id. By contrast to an analysis conducted pursuant to the CAA, an EIS is required to identify and consider the significant environmental effects of a proposed federal action. 40 C.F.R. § 1502.16(a); Baltimore Gas & Electric Co, 462 U.S. at 97. The EIS must inform the public of an agency's consideration of environmental concerns during the decisionmaking process, and reflect the agency's "hard look" at the environmental consequences of the proposed action. Id.

The EIS and associated ROD must identify mitigation for potentially unacceptable environmental impacts, but may acknowledge coordination of the selection of necessary mitigation measures with those government agencies with the exclusive regulatory authority and obligation to establish those measures.  See Okanogan Highlands Alliance v. Williams, 236 F.3d 468, 477 (9th Cir. 2000).

BLM took a hard look at potential air quality impacts in the FEIS and supporting technical documentation.  BLM concluded that the potential air quality impacts from the Proposed Action would not cause exceedences of air quality standards.  FEIS at 4-12-4-13 (AR 2331-32).  It also found that the adverse air quality impacts associated with Alternative D "are expected to be short-term and minor.  Any long-term change in air quality or visibility impairment is not likely to be significant."  ROD at 7 (AR 4802).  Focusing on ozone, and on BLM's reliance on a model they claim EPA rejected, Plaintiffs argue that BLM failed to take a hard look at air quality impacts.  In particular, Plaintiffs claim the analysis was flawed because BLM relied, in part, on the Scheffe method to evaluate the impacts, and because BLM supposedly did not accurately set a background concentration for ozone.  Plfs. Br. at 6-13.  The record shows that their allegations are without merit and that EPA, which worked closely with BLM to assess potential impacts on air quality, supported BLM's methodology.   BLM's analysis is supported by 416 pages of study contained in the Air Quality Technical Support Document (AQTSD) for the Project.  AR at 2634-3049.

Plaintiffs' overly simplified arguments that BLM's air quality analysis was flawed present an incomplete picture of the detailed examination that BLM undertook.  The thorough analysis in the AQTSD explains that the study area encompassed four states (Wyoming, northwestern Colorado, northeastern Utah, and southeastern Idaho), and included analyzed impacts on air quality and air quality values (such as visibility or haze) from project sources and from non-project sources.  AR at 2645-2648.  BLM's "near-field analysis" estimated potential impacts near the proposed project

12

from direct and indirect sources; the far-field analysis estimated potential impacts from direct, indirect and cumulative sources. AR 2651-52. A regional emissions inventory of existing and proposed emissions sources within the study area was developed for use with this and other projects. It includes an up-to-date identification of all permitted sources using data from the States of Wyoming, Colorado, Utah, Idaho, BLM and other agencies, including the most current visibility and $NO_x$ background data. AR 2760, 2762 (map showing cumulative study area).

In addition to ozone, BLM inventoried criteria pollutant[1] emissions for construction and production activities. BLM also inventoried hazardous air pollutant (HAP) emissions for the same activities.[2] Id. at 2657. The largest portion of emissions is associated with construction of the well and associated traffic. AR 2661. Once a well is in production, there continue to be impacts from traffic, but the well itself does not produce any emissions from criteria pollutants or HAPs. AR 2661-62. The Project also contemplates twelve compressor stations, which would be a source of $NO_x$, CO, VOCs and formaldehyde. AR 2661. BLM's near-field analysis analyzed direct project impacts from the twelve compressor stations and the maximum of 2000 developed wells. FEIS at 4-8 (AR 2327). BLM concluded that the predicted impacts from emissions of the full project would be below the applicable WAAQS and NAAQS. FEIS at 4-13 (AR 2332); see also AR 2676-93. Likewise, HAP impacts are also below applicable health-based guidelines. Id.

## B.    BLM Appropriately Relied on the Scheffe Method to Assess Ozone Impacts

Contrary to Plaintiffs' assertions, BLM also properly exercised its discretion in using the

---

[1] EPA sets National Ambient Air Quality Standards (NAAQS) for six common air pollutants. See 40 U.S.C. § 7409; 40 C.F.R. Part 50. Wyoming sets state air quality standards known as Wyoming Ambient Air Quality Standards (WAAQS). The standards are health-based criteria for the maximum acceptable concentrations of common air pollutants found in the region: particulate matter, nitrogen oxides ($NO_x$), carbon monoxide (CO), sulfur dioxides ($SO_2$), volatile organic compounds (VOCs) (also known as "criteria pollutants"). FEIS at 3-17-3-19, 4-8 (AR 2181-83, 2657).

[2] HAPs include n-hexane, benzene, toluene, ethylbenzene, xylene and formaldehyde. AR 2657.

Scheffe method to assist it in evaluating ozone impact.  See Sierra Club v. U.S. Dep't of Transp.,

753 F.2d 120, 129 (D.C. Cir.1985) (agency has "responsibility of considering the various modes of

scientific evaluation and theory and choosing the one appropriate for the given circumstances").

Significantly, EPA was involved in the air quality analysis from the outset.  Prior to beginning the

air quality analysis, in June 2004, the contractor that prepared the AQTSD, TRC Environmental

Corporation, finalized a protocol to identify the appropriate methodologies to use in the analysis.

AR 2746.  The Protocol was prepared with input from BLM, EPA, the National Park Service and

the WDEQ.  Id.  The purpose of developing a protocol was to allow stakeholders, such as EPA, an

"opportunity to review the Protocol and provide input before the [air quality] study is initiated."  AR

2746.  The team decided to use a model called AERMOD to model the near field impacts of $NO_x$,

CO, $PM_{10}$, $PM_{2.5}$ $SO_2$ and HAPs.  AR 2767, 2769, 2771; FEIS at 4-8 (AR 2327).  The "far-field" or

cumulative impact analysis used the CALMET/CALPUFF modeling system.  AR 2775-76.

Plaintiffs do not object to use of these models or BLM's conclusions based on the models.

        And, while Plaintiffs object to the Scheffe method, the record shows that model was selected

early in the process and also only after coordination with EPA.  The Protocol plainly states "ozone

impacts will be estimated from $NO_x$ and VOC emissions using screening methodology developed

by Scheffe (1988)."  AR 2769.  As BLM State Director Robert Bennett explained in the ROD, the

Scheffe method "was considered by the inter-agency air quality team to be a reasonable tool and an

acceptable ozone estimation method at the time the air quality analysis was conducted."  ROD at

7 (AR 4802).  Plaintiffs wrongly suggest that EPA guidance required that BLM use a specific

model.[3] Further, their assertions that BLM failed to obtain formal EPA approval to use the Scheffe

---

[3] Plaintiffs argue at length that BLM erred because it supposedly ignored EPA regulatory standards
applicable to air quality modeling. Plfs. Br. at 11-13.  This argument is without merit for several
reasons. First, Plaintiffs admit, by quoting the relevant guideline language, that the guideline applies
"to new source reviews," and does not impose requirements for the type of NEPA analysis at issue

14

method, and similarly failed to ensure the scientific integrity of its methodology are without merit.

Plfs. Br. at 8-15.  The record shows that BLM conducted an in-depth evaluation of the appropriate

scientific methodology, pursuant to which it developed a Protocol for evaluating the impacts, and

that EPA *agreed* that use of the Scheffe method was appropriate.  EPA's comments on the Protocol

and on the draft and final EIS also show that EPA did not identify any concerns with BLM's use of

the Scheffe methodology.  AR 8133-8135; 3472-3484; 9851-9856.

Moreover, while Plaintiffs claim that "BLM knew at the time" that the Scheffe methodology

lacked scientific integrity, Plfs. Br. at 10, what the record actually shows is that no one--including

Plaintiffs--raised any questions about the appropriateness of BLM's use of the Scheffe method until

the decision-making process was nearly complete.[4]  Importantly, the record shows that once this

_____

here.  Plfs. Br. at 11, quoting EPA Guideline at ¶ 1.0.a.  New source reviews are  conducted by
WDEQ-Air Quality Division.  FEIS 1-13; 3-19 (AR 2140; 2183) (NEPA analysis is intended to
"evaluate a threshold of concern" and is separate from the New Source Review Process, which is
the responsibility of the state agency.).  Second, as quoted language also shows, the guideline
"*recommends*," but does not require, any specific model.  Plfs. Br. at 11, quoting Guideline at 1.0.a
(emphasis added).  Third, Plaintiffs argue that the Guideline recommends a photochemical grid
model, the Community Multiscale Air Quality model, to model multiple sources of ozone.  Plfs. Br.
at 12.  Actually, the Guideline uses the Community Multiscale Air Quality Model as an example,
not as a limitation, and states that "[c]ontrol agencies with jurisdiction over areas with ozone
problems are encouraged to use photochemical grid models, *such as* the Models-3/Community
Multi-scale Air Quality (CMAQ) modeling system."  Guideline at 5.2.1.a.  70 Fed. Reg. 68,218,
68,235 (Nov. 9, 2005).  BLM recognized the need to account for photochemical reactions, which
is one of the reasons why it relied on the Scheffe method instead of a conventional dispersion model.
AR 2703.  Finally, it should be noted that the air quality protocol for the Atlantic Rim project was
completed prior to the promulgation of the Guidelines in 2005.

[4] Plaintiffs argue that they raised concerns about BLM's assessment of ozone impacts in their
February 2006 comments.  Plfs. Br. at 9.  However, they admit that they did not directly raise these
concerns in the context of the Atlantic Rim project.  Id.  Instead, they complained that BLM's
analysis of the impacts of the Jonah Infill Project improperly relied on Scheffe.  Id.  As Plaintiffs
also concede, they did not actually provide their comments on the Jonah Infill Project to BLM, but
that Biodiversity Conservation Alliance (a plaintiff here) "incorporated [the comments] by
reference" in their comments here Wyoming Outdoor Council's comments on the Jonah Infill
project.  Plfs. Br. at 9.  Likewise, Dr. Scheffe never advised BLM that his method--which EPA
Region 10 agreed was appropriate--should not be used.  His comments about his model are
contained in a letter responding to an inquiry from Abigail Dillen, an attorney for Earthjustice.  AR
9881.  The Supreme Court has made clear that "[a]dministrative proceedings should not be a game

15

information was raised with BLM, it took another look at whether it was appropriate for it to rely on the Scheffe method in making the final decision. Although Plaintiffs criticize BLM, the two documents they cite in their brief, Plfs. Br. at 10-11, show that BLM carefully evaluated the issue. For example, the August 31, 2006 memorandum Plaintiffs cite shows that BLM considered whether it was appropriate to continue to rely on the Scheffe method in light of the new information. AR 8666. Contrary to Plaintiffs' assertion, the document they refer to as "Ozone: What's Next" does not broadly state that the Scheffe method is inappropriate for estimating ozone impacts. Plfs. Br. at 10. Read in context, it states that Dr. Scheffe "recently wrote the Scheffe method was not appropriate for this purpose," but that BLM regarded the Scheffe method as "the best available ozone method at the time." AR 8667. The document also shows that BLM discussed the issue with EPA and WDEQ on August 24, 2006. Id. And, as we have previously shown, EPA submitted comments on the FEIS on December 19, 2006. AR 9851-56. It obviously was fully cognizant of the issue, and it still did not object to BLM's reliance on Scheffe. Id.

The Court of Appeals for the D.C. Circuit addressed a similar situation in Village of Bensenville v. FAA, 457 F.3d 52 (D.C. Cir. 2006). Petitioners, who challenged an airport expansion, contended that the agency's analysis was arbitrary because it used the 2002 forecasting data rather than 2003 data in its computer modeling. The court stated that the 2002 data was "the most recent available at the time the FAA began its work." Id. at 71. The agency explained in the ROD that it the information was the best available at the time, that it had the ability to account for

---

or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that "ought to be" considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters "forcefully presented." Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 554 (1978); Dep't of Transp. v. Public Citizen, 541 U.S. 752, 764-65 (2004) (respondents "forfeited any objection" where they failed to identify issues the agency should have considered).

16

new information by other means, and that its conclusions remained valid, even without the new data. Id. The court agreed that the analysis was adequate, stating that "[h]owever desirable it may be for agencies to use the most current and comprehensive data available when making decisions," the agency was "reasonably concerned that an unyielding avalanche of information might overwhelm an agency's ability to reach a final decision." Id. Likewise, here the State Director recognized that use of the Scheffe method was a concern, but nevertheless expressed confidence in the analysis, concluding that "[p]otential air quality impacts from the Atlantic Rim project were estimated to be below applicable air quality standards." ROD at 7 (AR 4802). The State Director likewise set out a mechanism to deal with new information, stating that if monitoring shows that ozone exceedences are attributable, even in part, to sources from the Atlantic Rim project, BLM will consult with WDEQ and EPA to determine whether adaptive management is needed to mitigate impacts. Id.

While Dr. Scheffe expressed concerned about the use of his model "to estimate the contribution to ambient ozone associated with increased non-methane organic carbon (NMOC) emissions arising from new or modified point sources," i.e., to conduct an analysis pursuant to the Clean Air Act, he did not address the propriety of its use as a tool to estimate impacts in the NEPA context. AR 9881. Moreover, the fact remains the EPA Region 10 agreed that the model was appropriate for use to estimate ozone contributions for the Atlantic Rim project. Significantly, there is no evidence in the record showing that Dr. Scheffe objected to any of the analysis in the AQTSD or in the FEIS, or to any of BLM's conclusions about ozone impacts. An agency must be able to rely on the record before it and cannot be expected to "behave like Penelope, unravelling each day's work to start the web again the next day." Western Coal Traffic League v. ICC, 735 F.2d 1408, 1411 (D.C. Cir. 1984); see also Vermont Yankee, 435 U.S. at 543. BLM relied on the best available information at the time. The Court should defer to its decision because it is "supported in the record

and reflect[s] reasoned decision making, especially where, as here, the dispute involves technical issues that implicate substantial agency expertise." Ocean Conservancy v. Gutierrez, 394 F. Supp. 2d 147, 157 (D.D.C. 2005), citing Sierra Club, 753 F.2d at 129.

**C.    BLM's Analysis of Background Ozone Levels Was Appropriate**

Plaintiffs argue that BLM did not fully disclose ozone impacts, charging that BLM obfuscated the analysis and supposedly skewed it in order to avoid an outcome that predicted a violation. Plfs. Br. at 17-18. Specifically, Plaintiffs object to the background level of ozone that BLM used as the basis for estimating predicted impact. Plfs. Br. at 17. They take no issue, however, with BLM's conclusions that the maximum predicted ozone impact of the project is 16.1 $\mu g/m^3$. FEIS at 4-13 (AR 2332). At the outset, it should be significant to the Court's analysis that WDEQ and EPA, which have primary and oversight authority for ensuring compliance with the CAA, also agreed with BLM's approach to analyzing ozone. AR 4608. BLM found that the total predicted impact, when added to the background concentration of 75.2 $\mu g/m^3$, would not exceed the ozone air quality standard of 157 $\mu g/m^3$. This is exactly the type of scientific analysis involving the application of agency expertise to which the Court should defer. The Court should reject Plaintiffs' argument that BLM violated NEPA by failing to disclose air quality impacts.

Moreover, Plaintiffs blur the distinction between a NEPA analysis, which is intended to identify potential impacts, and an analysis conducted pursuant to the CAA. Federal air quality regulations adopted and enforced by WDEQ pursuant to the CAA limit incremental emissions increases to specific levels. The Prevention of Significant Deterioration (PSD) program is designed to limit the incremental increase above a legally defined baseline level. FEIS at 3-19 (AR 2183). The limitations are quantified as PSD increments. Id. A regulatory PSD increment consumption analysis is a modeling exercise used by the regulatory agencies, such as WDEQ, that are responsible

18

for issuing permits to air emission sources and for ensuring compliance with ambient air quality standards. <u>See</u> 40 C.F.R. § 52.21(a)(1). A regulatory PSD increment consumption analysis uses a "baseline" level of air pollution, as defined in state and federal regulations. <u>Id.</u> § 52.21(a)(2). This type of analysis compares the actual emissions from major and minor sources, as defined in the regulations, that come on-line after the baseline date with the permissible incremental increase in pollutants established by regulation for the Class of air quality designated for particular areas. <u>Id.</u> § 52.21(c). Ultimately, the State bears the responsibility for permitting site-specific evaluations when a new major source is proposed. AR 2140, 2325.

Indeed, Plaintiffs betray their true intent with their argument that "EPA's regulations specify that 8-hour concentration levels are determined by the annual fourth-highest daily maximum average." Plfs. Br. at 17, citing 40 C.F.R. § 50.10(b). Section 50.10(b) is applicable to Clean Air Act analyses, and, contrary to Plaintiffs' characterization, it says that "[t]he 8-hour primary and secondary ozone ambient air quality standards are met at an ambient air quality monitoring site when the average of the annual fourth-highest daily maximum 8-hour average ozone is less than or equal to 0.08 ppm, as determined in accordance with appendix I to this part." In turn, Appendix I explains that this is a three-year average, 40 C.F.R. Part 50, App. I, § 2.3, not simply a one-time daily maximum average determined on an annual basis, as Plaintiffs suggest. All of this is basically irrelevant to the Court's analysis of whether BLM took a hard look pursuant to NEPA, but it serves to emphasize two points: (1) what Plaintiffs are really seeking is a PSD analysis under the CAA, which BLM is not authorized to undertake; and (2) this is a complex and technical topic, and the agency's experts, which included EPA and WDEQ, are entitled to great deference. <u>Ocean Conservancy</u>, 394 F. Supp. 2d at 162 ("Deference is particularly warranted in cases such as this involving complex scientific or technical matters where the agency's expertise is clear."), citing

<u>Izaak Walton League of America v. Marsh</u>, 655 F.2d 346, 372 (D. C. Cir.1981).

By contrast to a regulatory CAA analysis, a NEPA analysis is simply intended to disclose potential impacts and identify areas of concern. FEIS at 3-19 (AR 2183). The record shows that BLM appropriately modeled background levels of ozone at 75.2 µg/m3, and evaluated potential impacts against that background level. FEIS at 4-13 (AR 2332). Ozone, unlike the other pollutants analyzed in the FEIS, is not directly emitted from a point source. Rather, ozone "is formed in the atmosphere as a result of photochemical reactions involving ambient concentrations of $NO_2$ and VOC." AR 2686. As the AQTSD explains, because of the "complex photochemical reactions" involved, conventional dispersion models cannot be used to estimate ozone impacts. <u>Id.</u> at 2686-87. Therefore, the inter-agency air resources team determined that it would be appropriate to use a nomograph (a chart used to show the relationship between three variable quantities) derived from the Scheffe method to predict maximum ozone impacts. AR 2687. This methodology uses $NO_x$ and VOC emission ratios to estimate ozone impacts. <u>Id.</u>

Importantly, BLM took a conservative approach here. $NO_x$ and VOC emissions are greatest during production activities, and these maximum levels were used to estimate the impacts for all phases of development. <u>Id.</u> BLM used actual emissions from a production area for the largest compressor station in the project area. <u>Id.</u> The impacts "represent the amount of $O_3$ that could *potentially* form within and nearby the [project area] as a result of the ration of direct project emissions of $NO_x$ and VOC." <u>Id.</u> at 2687-88 (emphasis added). But, that does not mean that those impacts will necessarily occur. The AQTSD explains that ozone formation "varies greatly due to meteorological conditions," which chemicals might be present in the ambient air, and in what concentrations. <u>Id.</u> at 2688. Even if $NO_x$ or VOC are added to ambient air that already contains ozone concentrations, that does not compel the conclusion that the potential for ozone formation has

increased.  The AQTSD explains that the potential may actually *decrease* because the ambient background conditions that caused ozone formation in the first place may have changed and the "new mixture of chemical species" may not be conducive to ozone formation.  Id.  BLM concluded that the predicted ozone concentrations "are likely overestimates of the actual $O_3$ impacts that would occur," since the model used to derive the estimates was developed using meteorological conditions more conducive to forming ozone than conditions found in south-central Wyoming.  Id.

Also important, given NEPA's informational purposes, BLM explained its reasoning in the FEIS and ROD.  Plaintiffs complain that BLM did not use the background ozone level of 147 µg/m$^3$, based on the 8-hour standard, set out in table 3-6 of the FEIS.  Plfs. Br. at 16.  Table 3-6 shows the background data at the Green River Basin Visibility Study site, and sets out the second highest 1-hour value (measured background concentration) and the fourth highest daily 8-hour value.  FEIS at 3-17 (AR 2181).  BLM determined that using the 8-hour level would result in an overestimate of impacts.  AR 2704.  Therefore, in order to derive a more realistic estimate of the background concentration of ozone, the air quality team concluded that it was more appropriate to use the average hourly background ozone conditions obtained through monitoring in the Green River Basin Visibility Study.  FEIS at 4-12 (AR 2331), AR 2688.  The FEIS also explains that 75.2 µg/m$^3$ background level is consistent with the background ozone level of 62.6 µg/m3 that was used to derive the Scheffe method in the first place.  Id.

Further, Plaintiffs misconstrue the purpose of the NEPA analysis.  Even assuming that BLM had predicted a potential violation of ozone, that would not mean that BLM violated NEPA, because, as explained above, the purpose of NEPA is to ensure that the decisionmaker and the public are fully informed.  In this case, BLM evaluated the impacts as the experts on the air quality team, including EPA and DEQ, deemed appropriate, and it also evaluated Plaintiffs' claim that a different

methodology should have been used.  AR 4608.  In addition, the State Director recognized that ozone is an issue of concern, and further addressed the question of appropriate background ozone levels in the ROD.  ROD at 6-7, E-9 (AR 4801-02, 4877).  Plaintiffs also argue that the "FEIS does not contain any controls to limit the project's impact on ozone concentrations."  Plfs. Br. at 19, citing FEIS at 2335.   But, Plaintiffs again mis-state BLM's role, because WDEQ, not BLM, is responsible for addressing air quality concerns through specific controls.  FEIS at 1-13, 4-6  (AR 2140, 2325).  As the State Director explained, BLM will "work cooperatively with WDEQ, USEPA, and the operators to maintain and enhance concentration monitoring in the RFO management area, including monitoring required to represent impacts due to emissions from the Atlantic Rim field." ROD at 7 (AR 4802).  Operators are required to finance and operate air quality monitoring in the project area, including ozone monitoring.  ROD at B-5 (AR 4839).  And, as explained above, the State Director committed to work with EPA and WDEQ if monitoring showed that adaptive management is needed to mitigate impacts.  ROD at 7 (AR 4802).  In sum, BLM appropriately disclosed air quality impacts, and the Court should defer to its conclusions.

## D.     BLM Took a Hard Look at Methane Impacts

Plaintiffs argue that BLM violated NEPA because it supposedly failed to take a hard look at the potential environmental harm from methane gas seeps, including global warming impacts. Plfs. Br. at 19-27.  In denying Plaintiffs' motion for a preliminary injunction, this Court correctly determined that Plaintiffs were not likely to succeed on the merits of their arguments that BLM failed to analyze the potential impacts of methane seeps.  NRDC I, 525 F. Supp. 2d at 122.  As the Court observed, in the EIS "BLM noted that the project *could* increase the risk of methane seeps that might contaminate groundwater and destroy vegetation."  Id., citing FEIS at 4-32 (AR 2351).  And it required monitoring to address those issues as they arise.  Id., citing ROD at B-10; FEIS at 4-49

(AR 4844; 2368). Plaintiffs' new arguments that BLM failed to account for methane impacts, which rely largely on EPA's comments on the draft EIS, a draft analysis prepared by BLM engineer Jon Dull just prior to BLM's March 23, 2007 approval of the ROD, and a May 2007 email exchange between BLM hydrologist and the Assistant Field Manager for the Rawlins Field Office (post-dating the decision), do not change the outcome. Plfs. Br. at 19-22; 24-27.

At the outset, Plaintiffs cite several documents of dubious probative value, submitted late in the NEPA process, or after it was complete, in an apparent effort to argue that BLM ignored methane impacts.[5] However, the record shows that the issue is one that continues to evolve. The sum total of Plaintiffs' comments on methane seeps during the public process was that "[c]oalbed methane production is associated with lowering of water tables, wells and springs drying up, and increases in methane gas seeps, which kills vegetation and is a hazard to humans and wildlife." AR 4562. If they had further concerns, such as those they identify in their post-decisional information, they had an obligation to bring them to BLM's attention in a timely fashion.

---

[5] NRDC also complains that BLM did not consider a March 2007 email transmitting a hearsay within hearsay statement from Barbara Parsons, who was in turn forwarding an email from Wyoming Outdoor Council (WOC) attorney Steve Jones. Plfs. Br. at 22, citing AR 9447 (Parsons' email states: "This was forwarded to me from Steve Jones WOC, Watershed Attorney"). Likewise, Plaintiffs complain that BLM failed to consider an April 2007 letter from Steve Jones, and an April 27, 2007 press release from Biodiversity Conservation Alliance concerning methane springs. Plfs. Br. at 22. Setting aside the questionable probative value of these documents, the ROD was signed on March 23, 2007, and BLM had no obligation to consider comments submitted after the close of the comment period. See, e.g., Board of Regents of the Univ. of Washington v. EPA, 86 F.3d 1214, 1222 (D.C.Cir.1996). This was a seven-year long process, and Plaintiffs had ample opportunity to submit the information during the ample opportunities BLM provided for public participation. BCA submitted comments to the Sun Dog C and D/E POD EAs (AR 79078-79117). BCA mentioned methane seeps, but only to indicate that additional information was available ("Additional information regarding the potential for dangerous methane seeps is now available to BLM than when it completed the [EIS]… We have attached some of this information.") AR 79082. Likewise, it is entirely improper for Plaintiffs to rely on the Merschat declaration, which is dated June 17, 2007 and submitted to the Court to support their preliminary injunction motion, because it obviously was not before the decisionmaker when the ROD was signed in March 2007. Plaintiffs provide no explanation as to why this information could not have been provided in a timely fashion.

In any event, citing a single page of John Dull's draft report, Plaintiffs claim they "documented" the "serious environmental effects" posed by releases of methane from the Atlantic Rim project. Plfs. Br. at 20, citing AR 8803. Plaintiffs seriously over-state the record evidence. First, the February 6, 2007 Dull report is a draft. AR 8799. As we explained above, it was appropriate for BLM to rely on the data it had before it at the time. Second, while Plaintiffs argue that the draft Dull report is conclusive evidence of the impacts, Plfs. Br. at 20, Dull himself cautions that "[a]t this point in time there is no scientific data available to prove or disprove that CBNG development in the [project area] has caused or will cause increased gas flux from the known gas seeps." AR 8805.

Third, the record shows that Dull's main concern was examined in the FEIS. Dull identifies as a "primary concern" the likelihood that the amount of gas being emitted from seeps will increase. AR 8802. BLM took a "hard look" at this issue in the Atlantic Rim EIS. BLM stated that methane seeps could develop in the area as a result of the project. FEIS at 4-32 (AR 2351). It recognizes that such seeps could contaminate groundwater or cause the death of vegetation." Id. However, the occurrence of seeps "is impossible to predict." Id. Therefore, BLM stated that it would establish monitoring wells to quantify the potential impacts from methane seeps. Id. at 4-49 (AR 2368). While Dull identifies as "other concerns" potential danger from greenhouse gases, potential danger to human and animal safety, and potential danger to vegetation, he does not explain these concerns in any detail, except to opine that they "pose potential liability." AR 8803. He does not recommend further study, but instead concludes that these issues should be addressed through monitoring. AR 8805-06. Likewise, the Bob Lange email and attachment detail coverage of the methane seep issue in the FEIS. AR 9460--66. In hindsight, while Mr. Lange states he might have gone into more detail if writing the analysis today, he emphasizes that he is still unsure whether the methane seeps

24

are the result of increased gas production.  Id. at 9460.  As this Court concluded, BLM required

monitoring in the ROD.  ROD at B-10 (AR 4844).  Ultimately, the documents Plaintiffs cite support

BLM's position, not Plaintiffs, because they illustrate that BLM is carrying out its commitment to

"assess the status of the Performance Goals measure and detect trends or detect any other undesired

effects."  ROD at 20 (AR 4815).  Through monitoring, BLM can determine whether adaptive

management is needed to  resolve observed problems.  Id.  The Atlantic Rim FEIS's consideration

of the impacts of methane seeps was reasonably thorough.

Plaintiffs also claim that BLM violated NEPA because it did not consider the effects of

methane seeps on global warming.  As BLM explained in response to a comment that it should

devote further attention to greenhouse gases, "[p]roject emissions of various gases is detailed in the

air quality portion" of the FEIS.  AR 4547.  As this Court concluded, that discussion included

analysis of methane seeps.  NRDC I, 525 F. Supp. 2d at 122.  Audubon Naturalist Soc'y of the

Central Atlantic States, Inc. v. U.S. DOT, 524 F. Supp. 2d 642 (D. Md. 2007) is instructive.  In that

case, the agency explained that it was not useful to consider greenhouse gas emissions in its NEPA

analysis since there are no national or state standards or thresholds for greenhouse gas emissions or

concentrations that have been established through law or regulation.  Id. at 708.  However, the

agency had addressed air quality impacts in its analysis.  Id.  The court concluded that the agency

had adequately examined adverse environmental impacts.  Id.  Likewise, here, BLM explained that

it had evaluated project emissions of various gases in the FEIS and that further analysis was beyond

the scope of the EIS.  AR 4547.  BLM's conclusion was consistent with NEPA, which does not

require agencies to address "remote and highly speculative consequences," such as the possibility

that emissions from isolated and "impossible to predict" methane seeps, FEIS at 4-32 (AR 2351),

might somehow contribute to global warming.  Deukmejian v. Nuclear Regulatory Comm'n, 751

F.2d 1287, 1300 & n.63 (D.C.Cir.1984) (EIS need not address "remote and highly speculative consequences"); see also Hammond v. Norton, 370 F. Supp. 2d 226, 246 (D.D.C. 2005) (same).

Citing AR 9941 and 3481, Plaintiffs also argue that BLM ignored a comment by EPA that it should address the impacts of greenhouse gases. Plfs. Br. at 22. AR 9941 is Biodiversity Conservation Alliance's comments on the FEIS, and therefore does not state EPA's opinion. AR 3481 is EPA's comments on the *draft* EIS. As Plaintiffs observe, in its comments on the draft, EPA stated that BLM should evaluate greenhouse gases consistent with the Eighth Circuit Court of Appeals decision in Mid States Coalition for Progress v. Surface Transportation Board, 345 F.3d 520 (8th Cir. 2003). But, Mid States Coalition is inapposite. In that case, the petitioners challenged a decision of the Surface Transportation Board (STB) giving approval to the construction of 280 miles of new rail line and the improvement of 600 miles of existing rail line. The purpose of the rail line was to facilitate the transport of coal from mines in Wyoming's Powder River Basin. Mid States, 345 F.3d at 520. Importantly, the STB had committed to analyzing air quality impacts early in the NEPA process and then failed do so. Id. at 550. Calling this commitment a "significant" factor, id., the court found that the approval of the rail lines would lead to an increased demand for coal and, thus, to a degradation in air quality from the burning of the coal, an impact which the STB had failed to adequately review in the EIS. Id. at 549-550. There were a number of possible pollutants at issue and the decision does not separately analyze greenhouse gas emissions or climate change or consider whether these latter issues standing alone could have required NEPA review. The court made no finding, however, that the agency was required to broadly assess the impacts of global warming. Thus, the case merely stands for the unremarkable proposition that an agency's analysis does not comply with NEPA if it fails to assess the reasonably foreseeable impacts of the proposed action.

Here, unlike <u>Mid States Coalition</u>, BLM analyzed the reasonably foreseeable air quality impacts in detail. EPA made no mention of any problems with BLM's analysis of air quality impacts in its comments on the *final* EIS, which it made "[i]n accordance with our responsibility and authority under the National Environmental Policy Act (NEPA) and Section 309 of the Clean Air Act. . ." AR 9851. Therefore, EPA was satisfied that BLM's analysis of air quality impacts in the FEIS reasonably evaluated the probable environmental consequences of the proposed action. The Court should reject Plaintiffs' argument that more was required.

**E.    BLM Properly Evaluated the Impacts on Wildlife**

BLM identified impacts on wildlife, including impacts on big game and sensitive species, as a key issue and concern during the scoping period. FEIS at 1-18 (AR 2145). Plaintiffs take issue with only a small fraction of BLM's analysis of the impacts, complaining only about the analysis of impacts on sage grouse, and the cumulative impacts on elk. Plfs. Br. at 28-40. The FEIS analyzes impacts on numerous species, including other big game species like pronghorn antelope and mule deer. FEIS at 4-72-4-74 (AR 2391-93). In addition to impacts on the greater sage grouse, BLM examined impacts on the Columbian sharp-tailed grouse and raptors. FEIS at 4-78 (AR 2397). It also analyzed impacts on fish, FEIS at 4-26, 4-87-88, 4-90-95, and impacts on threatened and endangered species, including the bald eagle, blackfooted ferret, Colorado pikeminnow, bonytail, humpack chub and the pallied sturgeon. FEIS at 4-96-97 (AR 2145). Importantly, the ROD includes a wildlife mitigation strategy to address the potential wildlife impacts. The strategy has four components: (1) reduce the initial disturbance footprint as much as possible; (2) restore habitat function in the shortest time possible; (3) perform timely reclamation; and (4) institute adaptive management to ensure reclamation and mitigation are effective and initiate corrective action when it is not. ROD at 7-8 (AR 4802-03).

27

**F.    BLM's Analysis of Impacts on Big Game Satisfies NEPA**

Plaintiffs argue that BLM failed to properly assess cumulative impacts on big game because it did not include in its cumulative impacts analysis two proposals called the Continental Divide-Creston Natural Gas Project and the Hiawatha Regional Energy Development project. The Court already addressed this issue in its preliminary injunction ruling, where it concluded that BLM did not violate NEPA by excluding those projects from its cumulative impact analysis because "these projects had only begun to work their way through the NEPA process when the FEIS was compiled." 525 F. Supp. 2d at 123. As the Court also observed, the cumulative impact analysis included "45 past, present and future projects and assessed their impact on, *inter alia*, the region's wildlife, air and water quality." Id. at 122-23.

Plaintiffs offer no explanation why this Court should deviate from its ruling, which was correct. As the Court concluded in Ocean Conservancy, 394 F. Supp.2d at 164, the "rule of reason" governs a court's analysis of cumulative impacts. The Court found that while the agency "*could have* conducted a more comprehensive cumulative impacts analysis" the fact that it did not "does not render its analysis violative of NEPA." Id. (emphasis original), citing Southern Utah Wilderness Alliance v. Norton, 326 F. Supp. 2d 102 (D.D.C. 2004). The court explained that "'NEPA does not mandate that every *conceivable* possibility which someone might dream up must be explored in an EIS.'" 394 F. Supp. 2d at 164 (emphasis supplied by district court), quoting Concerned About Trident v. Rumsfeld, 555 F.2d 817, 829 (D.C. Cir. 1977); see also Biodiversity Conservation Alliance v. BLM, 404 F. Supp. 2d 212, 218 (D.D.C. 2005) ("to satisfy their obligations under NEPA, the BLM must only provide a '*realistic* evaluation of the total impacts.'" (quoting Grand Canyon Trust v. FAA, 290 F.3d 339, 342 (D.C. Cir. 2002) (emphasis by district court)). Finally, the Court correctly held that the "task of identifying the 'cumulative impacts' is 'committed "to the

28

special competency" of the agency preparing the EIS.'" <u>Ocean Conservancy</u>, 294 F. Supp. 2d at 164

citing <u>Hammond</u>, 370 F. Supp.2d at 24, in turn quoting <u>Kleppe v. Sierra Club,</u> 427 U.S. 390, 413

(1976).

 Plaintiffs add nothing new to their argument about these two projects except a mis-statement

of fact. Plaintiffs claim that BLM's notice of intent (NOI) to prepare an EIS for the Continental

Divide-Creston project was issued "months before BLM even issued its <u>Draft</u> Atlantic Rim EIS.

Plfs. Br. at 39 (emphasis Plaintiffs'). But, the draft Atlantic Rim EIS was issued December 5, 2005.

AR 1436. The Continental-Divide Creston NOI was issued March 3, 2006, months *after* the draft,

not before. Indeed, Plaintiffs' brief illustrates the uncertainty surrounding the proposed project.

Citing BCA's comments at AR 70570, Plaintiffs assert that they urged BLM to consider the

cumulative impacts of 9,000 new wells proposed in the Continental Divide-Creston project, Plfs.

Br. at 39, but what they actually said was that BLM "failed to acknowledge or study the impacts of

an additional 2,000-3,000 natural gas wells called for by BP in the Continental Divide-Wamsutter

field, or the additional 1,250 wells proposed under the Creston-Blue Gap II project. . ." AR 70570.

In the March 2006 Federal Register notice, BLM explained that the projects proposed a combined

9000 wells and that "the best way to analyze these actions and identify their cumulative impacts

adequately is to treat them in a single impact statement. The combined proposals, henceforth known

as the Continental Divide--Creston (CDC) Natural Gas Project, will be considered in one EIS." 71

Fed. Reg. 10,989 (March 3, 2006). In other words, the Continental Divide-Creston project was

continuing to evolve, and, as the Court properly concluded, BLM's decision to exclude it from its

cumulative impacts analysis was not arbitrary. 525 F. Supp. 2d at 123.

 The NOI for the Hiawatha Regional Energy Development Project was published in

September 2006, 71 Fed. Reg. 52571 (Sept. 6, 2006) only one month prior to completion of the FEIS

in November 2006.  AR 2080.  As the Interior Board of Land Appeals (IBLA) observed in denying

the motion for an administrative stay in this action, "BLM's decision not to include the proposed

Continental Divide/Creston and Hiawatha projects is properly explained by the fact that they were

not approved or fully defined, and were still undergoing NEPA review..."[9]  Ex. 9 to Fed. Def. Opp.

to PI Mot. at 15.  BLM has yet to circulate a draft EIS for either action.  Ultimately, as the Court

concluded, "the NEPA process 'involves an almost endless series of judgment calls' and the line-

drawing decisions 'are vested in the agencies, not the courts.'"  525 F. Supp.2d at 123, citing

Coalition on Sensible Transp. Inc. v. Dole, 826 F.2d 60, 66 (D.C. Cir. 1987).

Although Plaintiffs cite Kleppe v. Sierra Club, 427 U.S. 390 (1976), Plfs. Br. at 37-38, the

case supports BLM's position.  There the Supreme Court made it clear that the agency has broad

discretion to determine the scope of analysis in an EIS.   In Kleppe, the Court emphasized:

> The determination of the region, if any, with respect to which a comprehensive statement is
> necessary requires the weighing of a number of relevant factors, including the extent of the
> interrelationship among proposed actions and practical considerations of feasibility.
> Resolving these issues requires a high level of technical expertise and is properly left to the
> informed discretion of the responsible federal agencies.

Id. at 412.  Significantly, although the Sierra Club contended that various coal-related projects

would produce a variety of region-wide cumulative impacts, the Court again stressed that "[e]ven

if environmental interrelationships could be shown conclusively to extend across basins and

drainage areas, *practical considerations of feasibility might well necessitate restricting the scope

of comprehensive statements.*"  Id. at 414 (emphasis supplied).   As the IBLA observed, BLM has

not attempted to avoid analysis of cumulative impacts; rather, the cumulative impacts will be

examined in the EISs for the Continental Divide-Creston project and for the Hiawatha project.  Ex.

---

[9] Plaintiffs (excluding NRDC), filed a Notice of Appeal and Petition for Stay of the Atlantic Rim
Project FEIS/ROD with the IBLA.  The IBLA denied the petition on September 5, 2007, but the
appeal is still pending.

9 to Fed. Def. Opp. to PI Mot. at 15. Plaintiffs have not shown that BLM drew the line in the wrong place, and the Court should not disturb its finding that BLM adequately addressed cumulative impacts.

Plaintiffs also assert that BLM improperly assessed cumulative impacts on big game by limiting its analysis of the cumulative impacts on elk to a calculation of surface disturbance. Plfs. Br. at 38. As a starting point, the Wyoming elk population is significantly above desired population levels. Table 3-32 in the FEIS shows that the Sierra Madre herd population of 11,200 elk is nearly three times the desired population of 4,200 elk. FEIS at 3-90 (AR 2254). "Liberal" hunting seasons are in effect to reduce elk populations to more sustainable levels. Id. at 3-91 (AR 2255). Moreover, contrary to Plaintiffs' argument that BLM failed to account for impacts on big game, including elk, as they themselves concede, Plfs. Br. at 38, in the FEIS BLM discussed impacts to big game, including impacts that may extend beyond the actual project site, such as direct impacts from habitat modification, displacement due to increased human activities, increased potential for vehicular collisions, and increased potential for greater harvest due to easier access. FEIS at 4-72 (AR 2391). The FEIS further explains that much of the crucial winter range is on steeper slopes that would be avoided during development. Id. at 4-75 (AR 2394). The FEIS acknowledges, however, that displacement of elk would occur during all phases of development, and that there may be increased stress on the animals including decreased reproductive rates. Id.

The cumulative impacts analysis builds on that analysis and discloses that "[i]t is likely that project activities will disturb elk to a degree that they may move to new areas outside the [Atlantic Rim Project Area]. Elk are more sensitive to human activities than Mule Deer or Pronghorn Antelope and may be displaced up to 1.2 miles depending on the season." FEIS 5-17 (AR 2499). Plaintiffs claim that BLM erred in analyzing the cumulative impacts because it did not look at

potential impacts on all acres of seasonal range for the Sierra Madre elk herd,[7] Plfs. Br. at 38, but the FEIS explains that 25% of the Sierra Madre herd's seasonal range is within the Project area, and that "[n]o additional acreage of this herd unit's crucial winter range lies within other oil and gas project EIS boundaries adjacent to [the Project area]."  FEIS at 5-17 (AR 2499).  In addition, the analysis adequately considers cumulative habitat losses on big game, as presented in Table 5-2, which shows that Alternative D, the alternative BLM adopted, will disturb 11,547 acres of pronghorn habitat, 46,287 acres of mule deer habitat, and 5,883 acres of elk habitat.  FEIS at 5-15-5-17 (AR 2497-99).   The record also shows that BLM is following through on its commitments to address these issues at the project level.  For example, in site-specific decisionmaking that implicated mule deer crucial winter range, BLM applied seasonal restrictions that prohibit construction, drilling, and other activities during critical periods.  AR 73499, 73511-73512, 74070.

## G.    BLM Properly Assessed Impacts on Sage Grouse

Plaintiffs argue that BLM failed to adequately discuss impacts on sage grouse, but their argument, which includes a detailed rendition of the analysis in the FEIS, merely underscores that BLM adequately discussed the impacts, and that Plaintiffs simply object to the outcome.  Plfs. Br. at 29.   The greater sage grouse (*centrocercus urophasianus*) is an upland game bird species managed by the Wyoming Game and Fish Department.  FEIS at 3-94 (AR 2258).  Potential impacts to sage grouse--and the need to mitigate those impacts--were identified as a key issue at the outset, during the scoping period.  FEIS at 1-18 (AR 2145).  BLM recognized the importance of Wyoming as "one of the last strongholds for greater sage-grouse in the western United States," and the FEIS

---

[7] Plaintiffs also complain that the cumulative impact analysis does not address impacts on the Petition elk herd, Plfs. Br. at 38 n.22, but the FEIS explains that there is no crucial winter habitat for the Petition herd in the project area.  FEIS at 4-81 (AR 2400).  Map M-24 further illustrates the lack of merit to Plaintiffs' argument.  It shows that the Project area intrudes only marginally on the range of the Petition Herd Unit, which lies to the west of, and almost entirely outside the Project boundaries.  FEIS at 3-92 (AR 2256).

reflects that the agency gave considerable attention to the issue.  FEIS at 3-94 (AR 2258).  BLM

identified 88 sage-grouse leks in and around the project area.  Id.; see also FEIS at 3-95 (map) (AR

2259).  Twenty of 88 leks are on private lands.  Id. at 3-96 (AR 2260).  BLM protects sage grouse

breeding grounds on federal lands by imposing a 1/4 mile buffer around the edge of leks.  Id.

     As Plaintiffs point out, BLM acknowledged that there will be significant impacts on sage

grouse as a result of the project.  Plfs. Br. at 29, citing FEIS at ES-5  (AR 2092).  Sage grouse

nesting habitat covers 92% of the project area.  FEIS at 4-76 (AR 2395).  The FEIS recognizes that

the sage grouse may be affected by noise, which interferes with bird communication during mating

periods, by disruptive human activities, which may cause nest abandonment or dispersion of birds

into less desirable habitat, and by construction, which creates habitat loss and fragmentation.  Id.

BLM acknowledges that these impacts lead to lower productivity and long-term population declines.

Id.  It also recognizes that there will be a long-term loss of nesting habitat.  Id.  However, Plaintiffs

mis-state the impacts, claiming that "[m]uch of [the sage grouse's] habitat will be either permanently

or temporarily lost due to the Atlantic Rim project."  Plfs. Br. at 29, citing FEIS 4-83 (AR 2402).

In fact, the page Plaintiffs cite in the FEIS concludes that habitat disturbance from the project

"would equate to a maximum direct loss of 10 percent of the available nesting habitat..."  FEIS at

4-79 (AR 2398).  Moreover, the buffer around leks covers 8,440 acres or 3.1 percent of the project

area, and the buffer around nests covers 17,846 acres or 6.6 percent of the project area.  Most of

these areas "would remain undisturbed for the life of the project."  FEIS at 4-71 (AR 2390).

     BLM recognized that the indirect loss of habitat was also a great concern, and that while

avoidance and mitigation measures would help reduce the loss of habitat and stress, the indirect

impacts during the drilling and production phases would nevertheless be significant.  Id.  Plaintiffs'

policy-based objections do not demonstrate that BLM failed to "weigh[] the relevant data and

33

articulate[] an explanation that establishes a 'rational connection between the facts found and the choice made.'" <u>NRDC I</u>, 525 F. Supp. 2d at 120, citing <u>Bowen v. Am. Hosp. Ass'n</u>, 476 U.S. 610, 626 (1986). BLM appropriately disclosed the impacts on sage grouse.

### 1.    BLM Properly Responded to the FWS' Comments on Sage Grouse

Next, Plaintiffs argue that the analysis fails to take a hard look because BLM supposedly failed to address concerns raised by the FWS as to impacts on sage grouse. Plfs. Br. at 30-33. Plaintiffs also raised this argument in their preliminary injunction brief where they claimed that BLM's decision was arbitrary because it did not consider in detail a more protective alternative proposed by the FWS and others. Plfs. PI Br. at 19-21. They now argue that BLM failed to respond in sufficient detail to the FWS' comments on the draft and final EIS. Plfs. Br. at 30. But, as we explained in our preliminary injunction response, BLM is not required to make every change suggested by its sister agencies because it has the expertise in managing public lands and bears "the ultimate statutory responsibility for preparing the environmental impact statement." <u>Citizens Against Burlington, Inc. v. Busey</u>, 938 F.2d 190, 201 (D.C. Cir. 1991). In other words, the BLM did "not have to follow [its sister agencies'] comments slavishly, it just ha[d] to take them seriously," which it did. <u>Id.</u> Plaintiffs' claim that BLM violated NEPA's hard look requirement because it responded only in a "conclusory" fashion, citing <u>NRDC v. Hodel</u>, 865 F.2d 288, 298 (D.C. Cir. 1988) and <u>Friends of the Earth v. Corps of Engineers</u>, 109 F. Supp. 2d 30, 38-42 (D.D.C. 2000) but the cases they cite are inapposite. In both cases, the courts concluded that there was no evidence in the record showing that the agency had addressed the concerns of its sister agencies. <u>See</u> <u>NRDC v. Hodel</u>, 865 F.2d at 298 (Secretary said he had responded to EPA's letter but "nothing in the FEIS provides the requisite analysis"); <u>Friends of the Earth</u>, 109 F. Supp.2d at 38 (the record "does not reveal any consideration of this issue by the Corps"). As the <u>Friends of the Earth</u> court

34

remarked, "[t]he FWS brought the concern to the Corps' attention as one of its primary concerns. It at least merited analysis." Id. at 39. The record shows that BLM provided that analysis here by thoroughly addressing FWS' concerns in the FEIS and in Appendix O of the FEIS. AR 4404-06.

First and foremost, in response to the comments of the FWS and others on the draft EIS, BLM developed alternative D as its preferred alternative in the FEIS. FEIS at 1-20 (AR 2147); see also ROD at 4 (AR 4799). Alternative D is intended to be responsive to impacts on a variety of resources, including sensitive plant and wildlife species. Id. In Alternative D, BLM emphasized reduction of impacts by limiting initial disturbance and emphasizing timely reclamation. Id. Likewise, contrary to Plaintiffs' assertion that BLM failed to respond to the FWS' comment on the draft EIS about the extent of the direct impact on the sage grouse, Plfs. Br. at 30-31, as described in detail above, BLM recognized that there would be significant impacts on the sage grouse and acknowledged that 10 percent of the grouse's habitat could be lost. While the FWS may have preferred an alternative with fewer impacts on wildlife, Plfs. Br. at 31, BLM explained that "there is no way to fully develop the oil and gas resources within the project area without these effects, although site-specific review at the annual work planning stage would allow for the use of best management practices to reduce adverse effects." AR 4404.

Contrary to Plaintiffs' assertion, BLM did not ignore the question of whether impacts on sage grouse might possibly lead to a need to list the species under the Endangered Species Act, Plfs. Br. at 31, but identified it as a criteria to be considered in the assessment of impacts (criteria 1). FEIS at 4-68-4-69 (AR 2387-88). BLM recognized the potential for a "long-term decline in the population of this species," FEIS at 4-76 (AR 2395), but it did not find there would be a "substantial loss of habitat function or disruption of life history requirements" that would make the sage grouse eligible for listing under the ESA. Id. at 4-69 (AR 2388). Rather, the agency found that the impacts

35

were significant under criteria 4, FEIS at 4-83 (AR 2042), which states that substantial loss of habitat function "would preclude improvement of their status."  FEIS at 4-69 (AR 2388).

And, although Plaintiffs denigrate BLM's commitment, BLM highlighted its obligation to protect the sage grouse as a sensitive species, stating that "no actions that might jeopardize the future existence or viability of this species may occur."  AR 4405, Plfs. Br. at 31.  BLM emphasized in the ROD that one of its performance goals is to "provide well-dispersed sage-grouse breeding, nesting, brood rearing and winter habitat."  ROD at 19 (AR 4814).  Appendix B of the ROD provides that BLM and WGFD will conduct sage grouse lek inventories at least every five years.  ROD at B-14 (AR 4848).  The Wildlife Mitigation and Monitoring Plan further provides for annual monitoring of selected leks within one to two miles of existing and proposed disturbance areas.  AR 2623, 2631.

In its comments on the FEIS, while the FWS again expressed its preference for an alternative with fewer impacts on wildlife and stated that it remained concerned that there was the potential for significant impacts, it did not identify any flaws in BLM's analysis.  AR 10134-35.  It simply observed that "[p]roposed development may alter the future size, distribution and existence of local populations."  Id.  As we have explained herein, those impacts were discussed in detail in the FEIS. FEIS at 4-75-76 (AR 2394-95).  In its FEIS comments, the FWS emphasized the importance of reclamation.  AR 10135.  Significantly, it "commend[ed] BLM for requiring interim reclamation as this may reduce some of the impacts that will occur across the Project area."  It also stated that it "believes that the reclamation criteria in Appendix B form a reasonable basis for measuring reclamation success."[9]  Id.  As we stated briefly above, BLM emphasized reclamation in developing Alternative D.  The ROD also explains that the final decision "emphasizes limiting surface disturbance and performing interim reclamation, cooperative air quality monitoring with the state

---

[9] The Reclamation Plan the FWS referred to as Appendix B is incorporated in the ROD as Appendix A.  AR 4822-33.

of Wyoming and continued resource monitoring and consultation with federal and state agencies [such as the FWS]." ROD at 1 (AR 4796). Thus, under Alternative D, BLM limited total new surface disturbance to a maximum of 7,600 acres at any given time, and established a goal of 6.5 acres for short-term disturbance associated with each well site. Id. The ROD explains that Alternative D reduces initial and long-term disturbance by approximately 18 percent over the Proposed Action. Id. at 4. In sum, the record shows that BLM fully considered and responded to the FWS' comments. NEPA requires nothing more. As this Court stated in its ruling on preliminary injunction, "[i]n the final analysis . . . an agency action is 'entitled to a presumption of regularity. . .'" NRDC I, 525 F. Supp. 2d at 120, quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415–16 (1971) (noting the court cannot substitute its judgment for that of the agency).

### 2. BLM Adequately Examined Mitigation Measures for Sage Grouse

Plaintiffs also argue that BLM's discussion of mitigation does not satisfy NEPA because it supposedly lacks evidentiary support. Plfs. Br. at 33-37. Plaintiffs made this same argument in their preliminary injunction brief, including arguing that the analysis was arbitrary and capricious because BLM allegedly disregarded contrary conclusions by the FWS, a paper entitled "Western Association of Fish and Wildlife Agency Guidelines for Management of Sage-Grouse Populations and Habitats" ("the Connelly study"), and the Holloran study. Plfs. PI Br. at 18-19, and Plfs. Br. at 33-34. Plaintiffs do not address the Court's prior conclusions, much less provide any reason for the Court to disturb its findings. As the Court previously explained, NEPA states only that the agency must include in the EIS "'appropriate mitigation measure[s] not already included in the proposal or alternatives.'" NRDC I, 525 F. Supp. 2d at 121, quoting § 1502.14(f). It does not "require agencies to mitigate the adverse effects and does not require a detailed explanation of the mitigation measures that will actually be employed.'" Id., quoting Southern Utah Wilderness

Alliance v. Norton, 237 F. Supp. 2d 48, 54 (D.D.C. 2002).  In Citizens Against Burlington, 938 F.2d

at 206, the court interpreted 40 C.F.R. §§ 1502.14(f), 1502.16(h), 1505.2(c) and 1508.25(b), the

NEPA regulations addressing mitigation (which Plaintiffs cited in their brief for the proposition that

an agency must consider a "reasonable range of alternatives," (Plfs. PI Br. at 18)).  In the context

of an EIS, the D.C. Circuit has held that NEPA does not require a "flawless" examination of

mitigation, only one that is "reasonably complete."  Citizens Against Burlington, 938 F.2d at 206.

NEPA does not require agencies to mitigate adverse effects by adopting a mitigation plan and does

not require a detailed explanation of the mitigation measures that will actually be employed.

Robertson, 490 U.S. at 353.

        Here, the Court found that BLM considered several alternatives which offered varying

degrees of protection to the Atlantic Rim sage grouse population.  NRDC I 525 F. Supp. 2d at 121,

citing FEIS at 2-1--2-9.  The Court also found that

> In addition to limiting the total amount of surface disturbance to 2.8% of the total area at one
> time, BLM has: (1) prohibited surface disturbance or occupancy within one-quarter mile of
> the perimeter of occupied leks (sage-grouse breeding grounds) and within two miles of
> occupied leks between March 1 and July 15; (2) barred all human activity within one-quarter
> mile of the leks between 6:00 p.m. and 9:00 a.m. from March 1 to May 20; (3) limited
> construction of permanent, high-profile structures within one-quarter mile of leks; (4)
> prohibited surface disturbances between November 15 and March 14 in delineated winter
> concentration areas; and (5) required muffling of generator noise in order to minimize
> dancing and strutting grouse . . .

Id. at 121-22, citing FEIS at 2-8, E-7.   We also explained in our response to Plaintiffs' motion for

preliminary injunction that BLM responded to the FWS' statement (which in turn relied on Holloran

and Connelly) that it did not support a quarter-mile buffer around leks or a 2-mile buffer to protect

nesting habitat, but instead preferred a more extensive buffer.  AR 4405.   BLM explained that it

retained the discretion to impose additional mitigation, and that the quarter-mile no surface

disturbance mitigation is generally a minimum distance.   Id.

Indeed, as Plaintiffs themselves admit, BLM considered the Holloran study in the FEIS. AR 2260, 2499. While they now fault BLM for supposedly failing to discuss Holloran's conclusions with regard to what they refer to as "very similar" mitigation measure associated with development at a CBNG development project known as the Pinedale project, Plfs. Br. at 33, the record shows that there are important distinctions between the mitigation adopted for Pinedale and the mitigation here. Holloran states that the Pinedale project provides that operators will "avoid surface disturbance" within 1/4 mile of a lek, AR 4042; the Atlantic Rim project states that surface disturbance or occupancy is "prohibited." AR 2626. The Pinedale project prohibits surface use from March 1-May 15 between midnight and 9 a.m., AR 4042; the Atlantic Rim project expands the timeframe to May 20 and requires avoidance of human activity between 6 p.m. and 9 a.m. AR 2626. The Pinedale project established a 1 mile buffer around active leks restricting construction and drilling activities from March 1 through May 15, and a 2-mile buffer from March 1 through July 31 for suitable nesting habitat within 2 miles of a lek. AR 4042. By contrast, the Atlantic Rim project states that "surface disturbing and disruptive activities will not be allowed within two miles of an occupied greater sage-grouse lek or in nesting and early brood-rearing habitat associated with individual leks (when identified and delineated) from March 1 to July 15." AR 2626. Holloran also emphasized the need to reduce noise from sources such as compressor stations. AR 4043. BLM accounted for noise impacts in the Atlantic Rim project, requiring "hospital style mufflers" on compressor stations and generators in order to minimize noise disturbances. AR 2626.

Plaintiffs' insistence that BLM must adhere to the Connelly study, and explain why his recommendations "are not being followed," Plfs. Br. at 35, is also without merit. The Memorandum of Understanding Plaintiffs cite simply provides that BLM "will consider" Connelly in its planning processes. AR 86104. BLM did take Connelly into account, because, as Plaintiffs point out, the

FWS relied on Connelly in its comments. Plfs. Br. at 34. Also, while Plaintiffs also cite BLM's National Sage Grouse Habitat Conservation Strategy (which observes that the Connelly provides a good overview as to sage grouse habitat needs), they conveniently omit any mention of that fact that it specifically excludes Connelly's quantitative specifications for protective buffer distances for leks, "in order to promote development of local site-specific prescriptions." AR 5542-43. Connelly generally described sage grouse populations and habitat throughout the West, and the information contained in his 2000 study in large part summarizes earlier studies, AR 86098 (citing Braun 1977 and 1998 studies), many of which BLM relied on. See AR 5732, 6237 (same studies). In addition, the FEIS includes more recent studies on sage grouse, including a 2006 study (Naugle 2006) specifically examining the impacts of CBNG development in Wyoming. AR 7357.

Finally, relying in part on Holloran, BLM found that 45 percent of nests occur within an approximately 2-miles of a lek and 64 percent of the nests occurred within approximately 3 miles. FEIS at 3-96 (AR 2260). In other words, adopting the Plaintiffs' and Connelly's recommendation that "no energy related facilities be located within 3.2 kilometers (2 miles) of an active lek," Plfs. Br. at 34, would essentially shut down development in the Atlantic Rim project area. See, e.g., FEIS at 3-95 (map). In fact, as documented by the sage grouse restrictions applied to the Catalina A/B PODs (AR 73499, 73511-73512), new leks not mapped on the FEIS Map (FEIS at 3-95) (AR 2259) have been discovered and protected during site-specific analysis/review, leading to even less area within the project that is not within 2 miles of a lek. Adopting Connelly's recommendation would be inconsistent with the Purpose and Need (AR 2136) of allowing leaseholders to exercise their rights under existing oil and gas leases (ROD at 4), since it would essentially shut off development within the majority of the project area. Ultimately, what the record reflects is not that BLM's conclusions are unsupported, or run counter to the evidence in the record, Plfs. Br. at 36, but

that BLM recognized that the mitigation measures will not eliminate the impacts on sage grouse, and that those impacts will be significant. While Plaintiffs may disagree with BLM's policy choice, the agency satisfied NEPA by disclosing the impacts in the EIS. "NEPA merely prohibits uninformed-rather than unwise-agency action." Robertson, 490 U.S. at 351.

As this Court concluded in rejecting Plaintiffs' motion for preliminary injunction, "although the plaintiffs are dissatisfied with the level of protection provided under the current mitigation plan, the record clearly reflects that BLM analyzed and considered various alternatives and put in place measures far more stringent than those included in the original proposal. . . . Accordingly, the Court sees no reasonable likelihood of success based on this argument." 525 F. Supp. 2d at 122. Plaintiffs simply re-hash the same arguments they made previously, and the Court should find that BLM adequately considered and discussed mitigation measures in the FEIS.

## H.    BLM Satisfied NEPA's Public Participation Requirements

Finally, although they again inexplicably omit any mention of this Court's preliminary injunction decision, Plaintiffs re-argue their claim that BLM violated NEPA because it did not circulate the challenged EAs for public comment. Plfs. Br. at 40. As they must, Plaintiffs now "concede," Plfs. Br. at 41, that "'whether the public was adequately involved is a fact-intensive inquiry made on a case-by-case basis.'" Id., citing Biodiversity Conservation Alliance v. BLM, 404 F. Supp. 2d 212, 219 (D.D.C. 2005). What they fail to recognize is that the Court has already conducted that inquiry. Citing 43 C.F.R. § 3162.3-1, the Court observed that federal regulations require BLM to "post certain information relating to a pending APD (i.e. the operator's name, the well name and its location) for public inspection." 525 F. Supp.2d at 120. Plaintiffs do not argue that BLM failed to comply with this regulation. Nor do they dispute the Court's conclusion that the Sun Dog and Catalina permit applications were posted in BLM's public reading room in September

41

2005 and August 2006.  Id.  Likewise, it is undisputed that BLM posted notice that it was preparing

the EAs on its website.  Id.  On these facts, this Court found that Plaintiffs "clearly had a substantial

opportunity to comment on the proposals before they were approved."  Id. at 120-121.

Plaintiffs now contend that BLM violated NEPA because "[i]information related to the site-

specific environmental impacts of the APDs and the conditions of approval to address the impacts

were made available to the public for the first time in BLM's environmental assessments that

accompanied each plan of development approval."  Plfs. Br. at 42 (emphasis Plaintiffs').  Plaintiffs

argue that BLM was required to circulate this information prior to approving the challenged PODs.

But, the Court already rejected this argument as well, finding that "neither the applicable

regulations, nor relevant caselaw, require such notice and comment."  525 F. Supp. 2d at 121.

Plaintiffs make no mention of their challenge to the two EAs and FONSIs for the Sun Dog

C and Sun Dog D and E PODs, likely because the facts show that their claims that BLM shut them

out of the process are without merit.  Plaintiffs alleged in their amended complaint that "BLM

prepared and approved EAs/FONSIs for Sun Dog C, D and E PODs without providing documents

to the public at large and without providing Plaintiffs a meaningful opportunity to comment on the

EAs."  Plfs. Am. Complaint at ¶ 82.  Plaintiffs failed to support this claim, and Defendants are

therefore entitled to summary judgment.  But, their omission serves to illustrate that the process

works exactly as BLM explained it would in our response to Plaintiffs' motion for preliminary

injunction.  That is, APDs are posted for 30 days in the public reading room, and notice that EAs

are being prepared is posted on BLM's website.  That gives the Plaintiffs the opportunity to request

additional information, to provide comments, or to request that the EAs be circulated for public

comment.  The process has worked as intended.  Plaintiffs slept on their rights with regard to the

Catalina and Sun Dog A and B PODs, though they attempt to excuse their negligence by accusing

BLM of excluding them from the process. Plaintiffs requested an opportunity to comment on the EAs, AR 79066, and it was provided. Plaintiffs provided detailed comments on EAs for those actions, AR 79078-79084, and BLM responded in the FONSIs. AR 75187--189.

Thus, while Plaintiffs seek to distinguish <u>Biodiversity Conservation Alliance</u> and <u>TOMAC v. Norton</u>, 433 F.3d 852, 861 (D.C. Cir. 2006), Plfs. Br. at 42-43, the Court need not address the facts of those cases because it has already directly addressed the facts in this case. The significant holding from <u>TOMAC</u>, which this Court applied in ruling on the preliminary injunction motion, is the D.C. Circuit's finding that "the agency has significant discretion in determining when public comment is required with respect to EAs." <u>Tomac</u>, 433 F.3d at 861. NEPA only requires that the agency shall involve the public "to the extent practical." <u>Id.</u>; <u>see also</u> 40 C.F.R. § 1501.4(b). BLM fully complied with NEPA by providing Plaintiffs an opportunity to comment on proposed actions, including draft EAs, and Plaintiffs showed themselves fully capable of availing themselves of the opportunity by submitting lengthy comments on the EAs. The Court should reject their argument that BLM failed to provide an opportunity for public comment.

I.    **BLM Is Entitled to Summary Judgment on Plaintiffs' Claim that BLM Violated NEPA by Failing to Take A Hard Look at the Impacts of Site-Specific Approvals**

Finally, in their third cause of action, Plaintiffs argue that BLM violated NEPA with regard to its analysis in the four EAs and FONSIs they challenge in their complaint. Plfs. Am. Compl. at ¶¶ 100-103. They alleged that BLM failed to address in the EAs the "risk of methane seeps triggered by the new coalbed methane wells in the area, impacts to big game habitat, impacts to BLM sensitive species, impacts to water quality, and impacts to the air quality." <u>Id.</u> at ¶ 100. BLM's site-specific analysis in the EAs tiers to the more extensive analysis in the programmatic EIS. <u>See</u>, <u>e.g.</u>, AR 73492. "Tiering" allows an agency to cover issues in a broad, programmatic EIS, with narrower environmental analysis in a site-specific statement that incorporates by reference

43

general discussions and focuses on issues specific to the proposal.  40 C.F.R. § 1508.28.  Pursuant

to NEPA's implementing regulations, agencies are "encouraged to tier their environmental impact

statements to eliminate repetitive discussions of the same issues and to focus on the actual issues

ripe for decision at each level of environmental review."  40 C.F.R. § 1502.20.  This regulation

explains that whenever a broad EIS, such as the Atlantic Rim EIS, is prepared, a subsequent

environmental assessment for a site-specific action "need only summarize the issues discussed in

the broader statement" and "shall concentrate on the issues specific to the subsequent action."  Id.;

see also Nevada v. Dep't of Energy, 457 F.3d 78, 91 (D.C. Cir. 2006).

Plaintiffs do not support their claims that the EAs failed to take a hard look at the site-

specific impacts of development, and BLM is therefore entitled to judgment on these issues.  Envtl.

Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d 1005, 1009 n.2 (9th Cir. 2006) ("issues raised in a brief

which are not supported by argument are deemed abandoned").  Nor could Plaintiffs prevail because

BLM adequately examined the impacts of site-specific development in each of the relevant EAs.

Taking as an example the EA for Sun Dog POD D and E, the record shows that BLM took a hard

look at the predicted impacts.  AR 75173-184.  The interdisciplinary team included a wildlife

biologist, an archaeologist, a hydrologist, a civil engineer, a rangeland management specialist, and

a natural resource specialist.  AR 75173.  The proposed action includes construction of access roads

and well pads, along with 30 CBNG wells and 4 produced water re-injection wells.  AR 75176.  Of

significance, BLM concluded that portions of the proposed action were located within two miles of

sage grouse leks, within one mile of nesting raptors, and within crucial winter range for mule deer.

AR 75180.  In order to mitigate those impacts, BLM imposed  stipulations to protect the impacted

species.  AR 75181; AR 75200-75201.

The Court should also reject Plaintiffs' cursory argument that BLM violated NEPA in its

analysis of air quality impacts in the EAs.  Plfs. Br. at 13-14.  Plaintiffs cite <u>Kern v. BLM</u>, 284 F.3d 1062, 1078 (9th Cir. 2002), as support for their argument that the EAs are deficient because they do not include an adequate air quality analysis, but <u>Kern</u> supports BLM's position.  As we have explained in detail herein, the FEIS provides a reasonably thorough discussion of the potential air quality impacts.  In <u>Kern</u>, the court explained that an EA must contain a discussion of the relevant impacts, in that case cumulative impacts, or "tier to an EIS that has conducted such an analysis." <u>Id.</u> at 1076.  Here, BLM determined in the challenged EAs that the air quality impacts had been disclosed in the programmatic EIS.  <u>See, e.g.</u>, AR 73498.  Thus, its analysis satisfied NEPA.

## CONCLUSION

"NEPA is not a green Magna Carta, [and] federal judges are not the barons at Runnymede. Because the statute directs agencies only to look hard at the environmental effects of their decisions, and not to take one type of action or another, federal judges correspondingly enforce the statute by ensuring that agencies comply with NEPA's procedures, and not by trying to coax agency decisionmakers to reach certain results." <u>Citizens Against Burlington</u>, 938 F.2d at 194.  The Court need only ensure that the BLM's decision–which was made subject to NEPA's procedural requirements–considered the environmental consequences of the decision.  <u>Id.</u>  The record demonstrates that BLM complied with NEPA.

Respectfully submitted this 30th day of May, 2008.

RONALD J. TENPAS
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

    /s/ Lori Caramanian
Lori Caramanian

United States Department of Justice
Environment and Natural Resources Division
Environment & Natural Resources Division
1961 Stout Street, 8th Floor
Denver, CO 80294
Phone: (303) 844-1499
Fax: (303) 844-1350
Email: lori.caramanian@usdoj.gov

Attorneys for Federal Defendants

Arthur R. Kleven
Attorney-Advisor
U.S. Department of the Interior
Office of the Solicitor, Rocky Mtn. Region