IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                               )
NATURAL RESOURCES DEFENSE COUNCIL,*et al*,     )
                                               )
        Plaintiffs,                            )     Civ. No. 07-1709 (RJL)
                                               )
            v.                                 )
                                               )
DIRK KEMPTHORNE, *et al.*,                     )
                                               )
        Defendants.                            )
_____)
ANADARKO PETROLEUM CORPORATION, *et al*,       )
                                               )
        Defendant-Intervenors,                 )
                                               )
STATE OF WYOMING,                              )
                                               )
        Defendant-Intervenor.                  )
_____)

**<u>PLAINTIFFS' COMBINED REPLY AND OPPOSITION TO CROSS MOTIONS
FOR SUMMARY JUDGMENT OF DEFENDANTS AND INTERVENORS</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

I.      BLM's Fundamental Errors Concerning Ozone Pollution .........................2

        A.      BLM Had Time to Update and Correct its Air Quality Analysis
                Before it Issued its Decision and FEIS for the Project ...................3

        B.      BLM Had Even More Time to Update and Correct its Air
                Quality Analysis Before it Approved Drilling Permits for the
                Project .............................................................................................4

        C.      Monitoring Later Does Not Excuse BLM's Failure to Accurately
                Analyze Ozone Impacts Before Approving the Project. ................5

        D.      BLM Failed First-Grade Math When Calculating Future Ozone
                Concentrations ................................................................................7

II.     BLM's Fundamental Errors Concerning Methane Leaks ...........................9

III.    BLM's Fundamental Errors Concerning Sage Grouse .............................16

        A.      Analysis of Whether the Project Will Lead to the Listing of Sage
                Grouse as Threatened or Endangered is Missing from the
                Record ...........................................................................................17

        B.      Scientifically Defensible Analysis of the Sage Grouse Mitigation
                 Measures is Missing from the Record .........................................21

IV.     BLM's Fundamental Errors Concerning Big Game .................................26

V.      BLM Did Not Provide the Public the Opportunity to Comment on the
        Site-Specific Analysis Prepared for the Drilling Permits .........................27

CONCLUSION.................................................................................................31

# TABLE OF AUTHORITIES

**Federal Cases**

Am. Bird Conservancy v. Fed'l Commc'n Comm'n, 516 F.3d 1027
(D.C. Cir. 2008) ...................................................................13

Balt. Gas & Elec. Co. v. NRDC, 462 U.S. 87 (1993)............................................12

Biodiversity Conservation Alliance v. BLM, 404 F.Supp.2d 212
(D.D.C. 2005) ....................................................................28

Citizens Against Burlington v. Busey, 938 F.2d. 190 (D.C. Cir. 1991) ................17

City of Williams v. Dombeck, 151 F. Supp. 2d 9, 17 (D.D.C. 2001)......................3

*Columbia Falls Aluminum Co. v. E.P.A., 139 F.3d 914 (D.C. Cir. 1998)............7

*Earth Island Institute v. US Forest Service, 442 F.3d 1147 (9th Cir. 2006).....4, 22

Ecology Ctr., Inc. v. Austin, 430 F.3d 1057 (9th Cir. 2005) ..................................20

*Environmental Defense v. U.S. Army Corps of Engineers, 515 F.Supp.2d 69
(D.D.C. 2007) .....................................................3, 6, 7, 16, 20, 21, 22

Foundation for North American Wild Sheep v. U.S.D.A., 681 F.2d 1172
(9th Cir. 1982).............................................................................6

Friends of the Earth v. U.S. Army Corps of Engineers, 109 F. Supp. 2d. 30
(D.D.C. 2000) ....................................................................17

League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren,
309 F.3d 1181 (9th Cir. 2002) ..............................................17

*Marsh v. Oregon Natural Resources Council, 490 U.S. 360 (1990) .........6, 13, 17

Mid States Coalition for Progress v. Surface Transp. Bd., 345 F.3d 520
(8th Cir. 2003)..............................................................14, 15

*Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,
463 U.S. 29 (1983)...................................................................16, 22

NRDC v. Daley, 209 F.3d 747 (D.C. Cir. 2000) .......................................7

NRDC v. Hodel, 865 F.2d 288 (D.C. Cir. 1988) ............................................12, 21

Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989) ............13, 21

Village of Bensenville v. FAA 457 F.3d 52 (D.C. Cir. 2006) .................................5

**Administrative Decisions**

Biodiversity Conservation Alliance, 174 IBLA 1 (Mar. 3, 2008) ........................25

**Federal Statutes**

30 U.S.C. § 226(f) ....................................................................................................29

**Federal Regulations**

40 C.F.R. § 1500.1(b) ........................................................................................7, 13

40 C.F.R. § 1500.1(c) ...............................................................................................4

40 C.F.R. 1502.22 .................................................................................................13

40 C.F.R. § 1502.24 ................................................................................2, 3, 7, 21, 22

43 C.F.R. § 3162.3-1(g) .........................................................................................29

**Federal Register Notices**

73 Fed. Reg. 881 (Jan. 4, 2008) ............................................................................27

## TABLE OF ACRONYMS

| | |
|---|---|
| APD | Application for Permit to Drill |
| AREIS | Atlantic Rim Project Final Environmental Impact Statement |
| BLM | Bureau of Land Management |
| CBM | Coalbed Methane |
| DR | Decision Record |
| DEIS | Draft Environmental Impact Statement |
| ESA | Endangered Species Act |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FLPMA | Federal Land Policy Management Act |
| FEIS | Final Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| IBLA | Interior Board of Land Appeals |
| NEPA | National Environmental Policy Act |
| NSD | No Surface Disturbance |
| POD | Plan of Development |
| PI | Preliminary Injunction |
| ROD | Record of Decision |
| RMP | Resource Management Plan |
| The Service | U.S. Fish and Wildlife Service |
| WGFD | Wyoming Game and Fish Department. |

**INTRODUCTION**

Defendants and Intervenors mislead this Court in two critical ways.  First, they suggest that the Court has already done the bulk of the work it needs to do to resolve this case at the preliminary injunction stage.  This is incorrect.  Neither Plaintiffs nor the Court had the benefit of the record during the preliminary injunction proceedings.  The record revealed key documents showing that the Bureau of Land Management ("BLM") ignored the advice of its own experts in approving the Atlantic Rim Project Final Environmental Impact Statement ("FEIS") and the drilling permits that followed.

Second, Defendants and Intervenors suggest that what BLM did right can excuse what the agency did wrong.  This is also incorrect.  Plaintiffs agree that the task of balancing the multiple uses of the public lands is a challenging one.  BLM cannot hope to fulfill this task without the thorough analysis required by the National Environmental Policy Act ("NEPA").  While BLM spent several years considering the Atlantic Rim project, the agency failed to complete the job required by NEPA.  BLM failed to work through the complexities of three critical issues – ozone pollution, methane leaks, and declining sage grouse populations – before approving the Atlantic Rim project and subsequent drilling permits.

BLM has stuck its head in the sand, refusing to complete the informed decision-making that NEPA requires of it.  An agency cannot rely on analysis that it knows is inadequate when there is time to correct it.  Yet, that is what BLM did in refusing to update and correct its analysis of ozone pollution before approving numerous drilling permits in the Atlantic Rim area.  An agency cannot ignore its own experts.  Yet, that is

1

what BLM did in refusing to analyze and disclose the potential harm from methane emissions.  Finally, an agency cannot rely on mitigation measures that it has failed to analyze and that the record demonstrates do not work.  Yet, that is what BLM did in relying on sage grouse protections that are taking the species toward listing as threatened or endangered.  What BLM may have done right in preparing for drilling in the Atlantic Rim cannot excuse the fundamental things that it did wrong.

## I.    BLM's Fundamental Errors Concerning Ozone Pollution

BLM relied on an ozone analysis that the agency itself acknowledged was inadequate in violation of NEPA.  Federal NEPA regulations require that agencies "shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements."  40 C.F.R. § 1502.24.  See also Environmental Defense v. U.S. Army Corps of Engineers, 515 F.Supp.2d 69, 78 (D.D.C. 2007) (court found that agency had not "consistently compl[ied] with NEPA's requirement that the agency insure the accuracy and scientific integrity of the analyses contained in its environmental impact statements").  Contrary to the suggestions of the Intervenors, this is not a case where the Court is asked to substitute its own judgment for that of the agency.  Here, BLM itself acknowledges that the Scheffe method it used lacks the "professional integrity" required by 40 C.F.R. § 1502.24.

BLM's attempt to justify its reliance on the Scheffe method fails.  Defendants argue that it was too late in the environmental review process to update and correct the air quality analysis.  Fed. Def. Br. at 15.  The record does not support this claim.  BLM acknowledged the problems with the Scheffe method months before it issued its Decision Record and FEIS for the project.  The agency had even more time to update the air

quality analysis before it proceeded to approve drillings permits in the Catalina and Sun Dog units. Yet, BLM chose to stick its head in the sand and proceed, relying on the same air quality analysis that it had previously recognized was inadequate.

### A. BLM Had Time to Update and Correct its Air Quality Analysis Before it Issued its Decision and FEIS for the Project.

BLM's own documents show that the agency was aware of the problems with the Scheffe model that it used to analyze ozone pollution well before the agency finalized its decision approving the project. AR 8666 (BLM information memorandum for State Director, dated August 31, 2006, states that "BLM's use of the Scheffe method now deemed obsolete") (attached as Exh. 10 to NRDC Br.). This memorandum was written over eight months before the Atlantic Rim Decision Record/ FEIS was issued on May 21, 2007. AR 4796. Another document in the record dated September 8, 2006, contains BLM's notes to EPA regarding "Ozone: What's Next?" This document states that the Scheffe method was not appropriate for the purpose of "estimat[ing] potential ozone impacts from proposed projects." AR 8867 (attached as Exh. 11 to NRDC Br.).[1]

Rather than updating and correcting its ozone analysis, the agency blindly pushed forward to approve numerous new oil and gas wells knowing that its analysis of the ozone impacts was inadequate. This is precisely the kind of uninformed decision-making that courts have consistently found violates NEPA. See, e.g., City of Williams v. Dombeck, 151 F. Supp. 2d 9, 17 (D.D.C. 2001) (court held that Forest Service violated

---

[1] Given BLM's own acknowledgment of the inadequacy of the Scheffe method over eight months before it issued its decision and FEIS, the Court need not decide exactly how much earlier BLM had reason to know of the problems with the Scheffe method. Plaintiffs explained how BLM had reason to know about the inadequacy of the Scheffe method as early as February 2006 – over a year before the Atlantic Rim decision was made. NRDC Br. at 8-10. Defendants attempt to diffuse the significance of this earlier knowledge. Fed. Def. Br. at 15 n. 4. Such dispute is not relevant given that the agency itself acknowledged the inadequacy of the Scheffe method in plenty of time to update and correct it before issuing its decision and FEIS.

NEPA where it failed to conduct analysis of use of water during construction); Earth Island Institute v. US Forest Service, 442 F.3d 1147, 1159-60 (9th Cir. 2006) ("The primary purpose of an FEIS is to allow for informed public participation and informed decision making."). See also 40 C.F.R. § 1500.1(c) (NEPA was enacted "to help public officials make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore and enhance the environment.").

### B. BLM Had Even More Time to Update and Correct its Air Quality Analysis Before it Approved Drilling Permits for the Project.

BLM's excuse of lack of time is even less persuasive when applied to the agency's subsequent NEPA process for the drilling permit approvals. Following the agency's approval of the FEIS, BLM engaged in a separate NEPA process to approve numerous drilling permits in the Catalina and Sun Dog units in June, August and October 2007. The agency continued to rely on the Scheffe method even though it had acknowledged its inadequacy months earlier. AR 8666 (August 31, 2006 BLM memo stating "BLM's use of the Scheffe method now deemed obsolete"). BLM did not complete any new air quality analysis in the Environmental Assessments prepared for the various drilling permits that the agency approved. See, e.g. AR 73498 (EA for Catalina A & B PODs) ("Air quality impacts are disclosed and analyzed in the AREIS."). Instead, BLM proceeded ahead blindly relying on air quality analysis that it knew was inadequate.

BLM loses even under its own standard. Defendants argue that the agency's decision should be upheld because it "relied on the best available information at the time." Fed. Def. Br. at 17. Yet, BLM did not use the best information available when it approved the numerous APDs at issue. BLM began approving drilling permits in late

June 2007.[2]  The agency recognized that approving the APDs was a new federal action requiring NEPA compliance.  AR 4798 (ROD at 3).  The Scheffe method was not the "best available information" in June 2007 when BLM began approving Atlantic Rim drilling permits.  BLM acknowledged in August 2006 that the Scheffe method was "obsolete" and began pursuing alternatives.  AR 8668.  Nevertheless, the agency did not update or correct its out-dated ozone analysis as part of the new NEPA process conducted prior to BLM's approval of the various plans of development (PODs).  See supra at 4 (EAs indicated that no new air quality analysis was performed).  Instead, BLM continued to rely on analysis that the agency itself had determined was inadequate.[3]

> ### C.  Monitoring Later Does Not Excuse BLM's Failure to Accurately Analyze Ozone Impacts Before Approving the Project.

BLM's reliance on monitoring and possible mitigation later cannot excuse its failure to adequately analyze and disclose potential impacts before approving the drilling permits at issue.  Defendants suggest that monitoring can address any gaps in the air quality analysis.  Fed. Def. Br. at 17 ("[I]f monitoring shows that ozone exceedences are attributable, even in part, to sources from the Atlantic Rim project, BLM will consult

---

[2] BLM approved the first plans of development ("PODs") submitted by Double Eagle in the Catalina unit for 39 new wells and the roads, pipelines and other infrastructure to go with them on June 28, 2007.  AR 73502.  Fourteen of the wells were in Catalina POD A and 25 were in POD B.  BLM approved more APDs on August 16, 2007 – 28 new wells were in Sun Dog POD A and 23 wells were in Sun Dog POD B.  AR 74073.  The agency approved still more APDs in the Sun Dog C, D and E PODs on October 23, 2007.  AR 75029, 75185.  Plaintiffs have challenged these APD approvals as well as the adequacy of the FEIS for the project.  In fact, BLM continues to approve APDs without correcting its air quality analysis.  The agency approved PODs C and D in the Catalina unit on April 3, 2008, using the same air quality analysis based on the Scheffe method.  Moreover, BLM informed Plaintiffs on June 17, 2008, that it planned to approve 14 more wells and the associated infrastructure in POD B of the Doty Mountain unit.  Even though BLM acknowledged the inadequacy of the Scheffe method almost two years ago, the agency continues to rely on it to approve drilling permits.

[3] The Village of Bensenville v. FAA case cited by Defendants does not help BLM here as the facts are quite different.  Here, BLM itself acknowledged that the Scheffe model was inadequate yet persisted in relying on it.  In Village of Bensenville, the FAA used 2002 instead of 2003 data for its computer modeling.  457 F.3d 52, 71 (D.C. Cir. 2006).  The FAA "conducted analyses to determine how significantly variations in the 2003 and 2004 TAFs [Terminal Area Forecasts] would affect its modeling and . . . determined the variations would not affect its conclusions."  Id.  BLM did not conduct any such comparison.

with WDEQ and EPA to determine whether adaptive management is needed to mitigate impacts."). This approach conflicts with NEPA's objective to ensure informed decision-making. As the U.S. Supreme Court has said, the fundamental objective of NEPA is to ensure that an "agency will not act on incomplete information only to regret its decision after it is too late to correct." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 371 (1990); see also Foundation for North American Wild Sheep v. U.S.D.A., 681 F.2d 1172, 1181 (9th Cir. 1982) ("NEPA expresses a Congressional determination that procrastination on environmental concerns is no longer acceptable. . . . [A]n agency decision to act now and deal with environmental consequences later is plainly inconsistent with the broad mandate of NEPA."); Environmental Defense, 515 F.Supp.2d at 84-85 (finding that agency assurances that it will "implement, monitor, and adjust mitigation techniques" cannot "paper over the flaws in the [agency's] mitigation analysis, and noting that such an approach "would effectively gut the environmental safeguards that Congress enacted in . . . NEPA"). A promise to do something at the back-end after problems occur does not excuse the failure to adequately analyze potential impacts at the front-end. See 40 C.F.R. § 1500.1(b) ("NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken.") (emphasis added).

There is no issue as to whether a better method existed than the Scheffe method. By at least August 2006 – over eight months before approving the Atlantic Rim project – BLM acknowledged that there was a better method. Better science was available than the Scheffe method; BLM simply refused to use it. EPA's silence does not excuse BLM's continued reliance on air quality analysis that it knew was inadequate. Such stubborn

refusal to correct and update its analysis violates BLM's affirmative obligation under NEPA to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." Environmental Defense, 515 F.Supp.2d at 78, quoting 40 C.F.R. § 1502.24. In Environmental Defense, the court found that the U.S. Army Corps of Engineers' approval of flood control project on the Mississippi River violated NEPA because the agency failed to present a complete analytic defense of its fish habitat model. Id. See also Columbia Falls Aluminum Co. v. E.P.A., 139 F.3d 914, 923 (D.C. Cir. 1998) (record must demonstrate that an agency's model accurately represents reality and is based on accurate assumptions); NRDC v. Daley, 209 F.3d 747, 755 (D.C. Cir. 2000) (court struck down conclusion by National Marine Fisheries Service that fishing quota was sufficient to meet statutory conservation goals because it was not supported by "meaningful data" or analysis). Here, BLM not only failed to explain how the Scheffe model accurately predicted ozone impacts, but the agency itself acknowledged that it did not.

###   D.    BLM Failed First-Grade Math When Calculating Future Ozone Concentrations.

Regardless of whether the Court finds BLM's reliance on the Scheffe method reasonable, the agency made a fundamental math error when calculating future ozone concentrations that dooms its analysis. Once the modeling is complete, calculating "total predicted impacts" on ozone levels is a matter of simple addition according to BLM's own stated method in the Atlantic Rim FEIS. The predicted project-related ozone impacts are added to the background concentration. AR 2183 (FEIS at 3-19) ("[b]ackground air quality concentrations are combined with modeled project-related air quality impacts of the same averaging time periods"). Defendants do not dispute the use

of this method.  Fed. Def. Br. at 18.  There is also no dispute over the predicted ozone

impact of the project.  For purposes of this argument, Plaintiffs do not contest BLM's

estimate that the project will result in ozone impacts of 16.1 µg/m$^3$.  AR 2332 (FEIS at 4-

13).  The sole issue is the number that BLM used for the background concentration of

ozone.  BLM got it wrong.

BLM attempts to add apples to oranges.  The project's predicted ozone impacts

are measured based on an 8-hour averaging period.  AR 2332 (FEIS at 4-13).  Yet, BLM

chose to add this to a background concentration based on an hourly average rather than

an 8-hour average.  AR 2331 (FEIS at 4-12) ("O$_3$ [ozone] maximum predicted

concentrations were added to the average hourly background O$_3$ conditions monitored as

part of the Green River Basin Visibility Study").  The agency used an hourly background

number of 75.2 µg/m$^3$, rather than the 8-hour average background of 147 µg/m$^3$

specifically listed in the FEIS.  AR 2181 (FEIS at 3-17); AR 2332 (FEIS at 4-13).  BLM

itself stated that ozone impacts should be calculated by combining measurements "of the

same averaging period."  AR 2183 (FEIS at 3-19).   Yet, BLM ignored this requirement.

BLM fails to offer a persuasive reason for ignoring its own rules.  The agency

simply asserts that "using the 8-hour level would result in an overestimate of impacts."

Fed. Def. Br. at 21 (citing AR 2704).  BLM does not explain why the 8-hour level of 147

µg/m$^3$ listed as the background concentration level in the FEIS is an overestimate.  Even

assuming that it is an overestimate, BLM does not explain why the hourly average is the

right number.  In fact, BLM's analysis explicitly acknowledges that EPA has revoked the

1-hour ozone standard for all areas of Wyoming.  AR 2183 (FEIS at 3-19).[4]  The agency

---

[4] BLM makes no attempt whatsoever to justify the use of the hourly average, rather than the 8-hour
average.  See AR 2704.  Instead, the only explanation that BLM attempts to make to justify the 75.2 µg/m$^3$

makes no attempt to quantify how much of an overestimate the 8-hour level represents.

BLM's arbitrary choice of a background ozone concentration produces a distorted picture

of the air impacts. Such an inaccurate picture of the potential ozone problems violates

NEPA's purpose to ensure that the decisionmaker and the public are fully informed.[5]

## II.   BLM's Fundamental Errors Concerning Methane Leaks

With the benefit of the record, Plaintiffs demonstrated in their summary judgment

brief that the discussion and disclosure of potential effects from releases of methane fell

far short of what is required by NEPA. Remarkably, the record shows that the FEIS fails

to disclose the views of BLM's own scientists, as well as other scientists, concerning the

potential effects from project-induced methane releases. Nor did the FEIS heed

comments from EPA and others to consider the project's effects on climate change from

methane releases. The FEIS is deficient because it presented only the most cursory and

general statements and entirely failed to discuss important dimensions of the problem

such as the potential greenhouse gas contribution from methane releases. Defendants

offer several arguments in their attempt to defend the adequacy of the discussion of

methane in the FEIS. None of these defenses have merit.

First, Defendants contend that the Court has already rejected Plaintiffs' arguments

in its preliminary injunction decision, suggesting that the Court need not closely examine

Plaintiffs' arguments. Fed. Def. Br. at 22. However, Defendants fail to acknowledge that

---

figure is to explain why it used the average hourly figure, rather than the second highest 1-hour value of
169 µg/m³. Compare AR 2181 (measured background concentrations) with AR 2704 (explanation
justifying average hourly number).
[5] Defendants mistakenly suggest that Plaintiffs argue that an ozone violation violates NEPA. Fed. Def. Br.
at 21. This is not what Plaintiffs argue. Plaintiffs' point is that BLM did not conduct the reasoned analysis
that NEPA requires. See NRDC Br. at 16. BLM did not follow the methodology that the agency itself laid
out. BLM did not use the "same averaging period" when adding the predicted ozone impacts of the project
to the background concentration. Instead of adding the 8-hour background average to the 8-hour average
estimated for the project emissions, BLM used a one-hour average. The agency's fundamental math error
prevented BLM from conducting the hard look at potential environmental impacts that NEPA requires.

Plaintiffs' motion for summary judgment is based on a wealth of documents from the administrative record to which Plaintiffs did not previously have access and which provide strong support for Plaintiffs' position. For example, at the preliminary injunction stage, Plaintiffs were not able to present to the Court the report on methane releases by BLM's own expert John Dull, which documented his view that interim coalbed methane ("CBM") production had most likely already caused an increase in methane releases and that continued expansion raised "fairly severe safety and environmental concerns," including "potential damage to the atmosphere"; "danger to human life [and] wildlife" from "accidental ignition" and poisoning; and damage to vegetation. AR 8803, 8805.

In their summary judgment brief, Plaintiffs have also presented record evidence regarding the comments from local ranchers and Plaintiffs' organizations pointing out the concerns of scientists such as Venable Barclay, "a geologist who has done a lot of work in this area" and who confirmed that, following the commencement of interim drilling, there was "new activity" at the area's methane springs. AR 9432.

Finally, Plaintiffs presented record documents concerning additional information which arrived in the spring of 2007, before the record of decision ("ROD") had been released to the public and thus when the administrative record was, in BLM's own words, "still open for this kind of information." AR 9452. BLM staff recognized that "[i]f I were to write this analysis today, I would have gone into more detail about gas migration and made the point that project activities and drought can cause" methane seeps. AR 9460. Yet, BLM declined to improve the level of public disclosure and instead adopted a "do nothing" approach. AR 9476. In sum, the evidence before the Court now is substantially

stronger than the evidence Plaintiffs were able to present at the preliminary injunction stage, before they had access to the administrative record.

Defendants' second defense is to argue that the few sentences about methane seeps in the FEIS are adequate. Fed. Def. Br. at 24. However, a comparison of the significant concerns discussed in the record and the cursory discussion of methane presented in the FEIS shows that BLM failed to properly disclose the potential effects in the FEIS. As Plaintiffs demonstrated in their opening brief, the FEIS contains just a few sentences on methane and mentions only the potential to contaminate groundwater or cause vegetation to die.[6] NRDC Br. at 25; AR 2351. This generalized discussion does not disclose the "fairly severe safety and environmental effects" that Dull identified. AR 8805.

As Dull and others indicate, expansion of CBM production risks significant releases of methane which can affect both local conditions and climate. As BLM's engineer explains, "[a]ccidental ignition [of methane] by an unaware tourist/hunter could result in someone being seriously burned." AR 8803. In addition, some of the gases emitted are "poisonous to humans and wildlife" and "can settle in low lying basin areas and can create potential traps for the unknowing and unwary." Id. BLM's expert Dull also explains that because methane is a powerful greenhouse gas, an increase in gas seeps could lead to "damage to the atmosphere." Id. Finally, Dull concluded that the interim CBM development had already caused methane seeps to increase and that there was a

---

[6] Wyoming also claims that BLM appropriately responded to comments about methane seeps in the ROD. WY Interv. Br. at 17. To the contrary, the discussion in the ROD is non-responsive and misleading because it knocks down the straw man argument regarding the role of the reinjection of produced water and thus suggests that CBM production is not responsible for increased methane seeps. AR 4870. As Dull's report and Plaintiffs' record comments make clear, it is the withdrawal of water, not the reinjection that causes methane to be released to the atmosphere. AR 8802-8803; 8840-8841; see also NRDC Br. at 21, 23, 24.

"high degree of likelihood that the amount of gas being emitted will increase . . . as CBNG development increases within the ARPA."  AR 8802-03.

The FEIS, however, does not disclose the concerns expressed by Dull and others. Specifically, the EIS fails to disclose (a) the observations in Dull's report and corroborated by geologist Venable Barclay that interim drilling had already caused increased methane releases; (b) the potential global warming implications of releasing methane, which is twenty-two times more potent a greenhouse gas than carbon dioxide, as EPA and others urged; (c) any information on the amount of methane that might be released, notwithstanding the fact that Walt Merschat's tests revealed high concentrations of methane in seeps; or (d) any information on the "potential danger to human and animal safety" that Dull identified in his report.  In short, the FEIS fails to adequately "disclose the environmental impact of [BLM's] actions." Balt. Gas & Elec. Co. v. NRDC, 462 U.S. 87, 97-98 (1993); NRDC v. Hodel, 865 F.2d 288, 299 (D.C. Cir. 1988).

Defendants also contend that BLM was not required to include any more disclosure than it did because Dull noted in his report that there was an absence of "technical data and information" to confirm aspects of the connection between CBM extraction and the methane seeps, such as whether the gas originated in the Mesaverde coals.[7]  AR 8802; see Fed. Def. Br. at 24.  However, this uncertainty does not absolve BLM of the duty to properly disclose the potential effects in the FEIS.[8]

---

[7] BLM also suggests that because Dull's report is marked "draft," the Court should not accord it significant weight.  Fed. Def. Br. at 24.  However, BLM may not ignore its own report, which represents BLM's only technical analysis of the issue of methane seeps in the record and was not superceded by a final report, simply because it is labeled draft.

[8] Intervenors attempt to confuse the issue and add to the uncertainty surrounding the relationship between CBM and methane seeps by raising again the straw man argument that water reinjection is connected to methane seeps.  Industry Interv. Br. at 27; WY Interv. Br. at 17.  However, as explained supra, n.6, the record shows that both Dull and Plaintiffs indicated that it was the withdrawal of water that caused methane releases. AR 8802-8803; 8840-8841.

Federal NEPA regulations provide that when "there is incomplete or unavailable information, the agency shall always make clear that such information is lacking." 40 C.F.R. § 1502.22; see also Am. Bird Conservancy v. Fed'l Commc'n Comm'n, 516 F.3d 1027, 1034 (D.C. Cir. 2008) (holding that a "precondition of certainty" before effects must be disclosed "would jeopardize NEPA's purpose to ensure that agencies consider environmental impacts before they act").  Moreover, if the information is essential to a reasoned decision and the costs of obtaining it are not "exorbitant," the agency must collect the needed data.  40 C.F.R. § 1502.22(a).  Thus, NEPA does not allow an agency to disregard an issue because there may be a degree of uncertainty surrounding it.

There is likewise no merit to Defendants' claim that the small amount of monitoring that BLM is requiring makes the level of disclosure in the FEIS sufficient. Fed. Def. Br. at 25.  BLM's approach conflicts with the central purpose of NEPA, which is to disclose the potential environmental effects of an action to the decision-maker and the public before they make their decision.  See Marsh, 490 U.S. at 371 (noting that the objective of NEPA is to ensure that an "agency will not act on incomplete information only to regret its decision after it is too late to correct") (citing Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989)).  As with BLM's approach to ozone analysis, a promise to do monitoring or analysis later cannot excuse the failure to adequately analyze the serious potential of methane leaks before the agency approved the Atlantic Rim project.  See 40 C.F.R. § 1500.1(b).

Defendants also suggest that Plaintiffs did not sufficiently comment on the potential effects from methane seeps in their comments on the FEIS.  Fed. Def. Br. at 23. This argument misses the mark entirely.  It is the fact that BLM failed to disclose the

13

views of its own scientists that is its worst omission.  Plaintiffs' comments do in fact

adequately raise concerns about methane seeps.  But even if they did not, an FEIS cannot

withstand review where it fails to disclose the views of the agency's own scientists.

Indeed, the entire premise of the NEPA process is that agencies should study the potential

environmental effects of an action and present those effects to the public and decision-

maker, who may not have the expertise to identify all of those effects.  Marsh, 490 U.S. at

371.

      Defendants also suggest that several of the comments Plaintiffs cite arrived too

late in the administrative process to be considered.  Fed. Def. Br. at 23 n.5.  Defendants

are mistaken.  BLM itself acknowledged that "until the ROD is released to the public,"

the administrative record "is still open for this kind of information."  AR 9452.  The

Atlantic Rim ROD and FEIS was issued and released to the public on May 21, 2007.  72

Fed. Reg. 28518.  Contrary to the arguments Defendants now make for purposes of

litigation, BLM itself understood that it was required to consider and respond to the

documents received prior to its decision.  The comments that Defendants criticize in their

brief are not extra-record materials.  Defendants included them in the administrative

record provided to the Court.  Consequently, it is appropriate for the Court to consider the

record documents submitted before the ROD was released, the email exchanges among

agency personnel, and BLM's decision to "do nothing."

      Finally, Defendants attempt to distinguish the cases such as Mid States Coalition

for Progress v. Surface Transp. Bd., 345 F.3d 520, 550 (8th Cir. 2003), which required

that agencies consider a project's effect on global warming.  Defendants suggest that

BLM is not required to discuss global warming because those effects are too remote and

speculative.  Fed. Def. Br. at 26.  However, as EPA indicated in its comments, AR 3481,

there is nothing speculative about the fact that methane is a potent greenhouse gas and

nothing remote about the methane seep emissions that the project may cause.[9]  Indeed,

this is precisely the claim that the Eight Circuit rejected in <u>Mid States Coalition</u>.  345

F.3d at 549.  Defendants suggest that the rail project at issue in <u>Mid States Coalition</u> will

have a more direct and foreseeable effect on global warming than the Atlantic Rim

project.  Fed. Def. Br. at 26.  To the contrary, as Dull explains in his report, AR 8803, the

methane releases are the direct and immediate result of the Atlantic Rim project:  The

"same process" of dewatering that releases methane for capture by production wells also

permits methane to escape into the atmosphere.  AR 8802.  In contrast, in <u>Mid States</u>

<u>Coalition</u>, the Court required discussion of greenhouse gas emissions that would result

from a more extenuated chain-of-events, namely the potential increased use of coal for

electric generation plants that could result if transportation costs were reduced due to

construction of a more direct rail line.  Accordingly, as the Eighth Circuit held and EPA

as well as Plaintiffs indicated in their comments, BLM must disclose the estimated

greenhouse gas impact caused by the project's potential to increase emissions of

methane, particularly because methane is such a potent greenhouse gas.

    In sum, the defenses presented by Defendants and Intervenors are unavailing.

The FEIS fails to disclose the concerns over methane releases that are documented in the

record, including the "fairly severe safety and environmental concerns" identified by

engineer John Dull.  The record presents a very different picture than Defendants left the

Court with at the preliminary injunction stage.  BLM's own expert identified the real

---

[9] To be clear, neither EPA nor Plaintiffs suggested that BLM must predict precisely how climate will be
affected by this release of methane.  However, BLM is required to explain the nature of the problem of
global warming and the increase in emissions that are expected from this project.

risks of harm from methane emissions.  Yet, BLM failed to adequately analyze these

risks or even disclose Dull's comments to the public.  Accordingly, the Court should find

that the FEIS failed to properly disclose potential effects from methane releases that the

project may cause.

**III.    BLM's Fundamental Errors Concerning Sage Grouse**

BLM failed to complete the reasoned analysis of evidence before the agency

related to sage grouse that NEPA requires.  See Environmental Defense, 515 F.Supp.2d

at 76 (citing Marsh, 490 U.S. at 371).  As Plaintiffs explained in their opening brief, the

record lacks a "satisfactory explanation" for BLM's conclusion that the project will not

"jeopardize the future existence or viability of  [sage grouse]" and for its choice of

mitigation measures.  Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,

463 U.S. 29, 43 (1983);  AR 4405.  Instead, BLM's conclusions "run[] counter to the

evidence before the agency" in violation of NEPA.  Motor Vehicles, 463 U.S. at 43.  .

Specifically, BLM failed to discuss with analysis and evidence two critical

questions relating to the project's impacts on sage grouse, both of which were raised as

concerns by the U.S. Fish and Wildlife Service (the "Service").  First, the BLM failed to

analyze whether the project will lead to the need to list sage grouse as an endangered or

threatened species under the Endangered Species Act ("ESA").  Second, BLM failed to

provide a scientific defense of its proposed mitigation measures for sage grouse.

Although Defendants and Intervenors attempt to distract attention from the absence of

analysis of these issues in the record by supplying post-hoc analysis or by pointing to

other issues BLM did discuss, they fail to show that BLM in fact conducted the requisite

analysis supported by evidence.

The absence of such analysis, especially in response to specific issues raised by BLM's sister agency, violates NEPA.  See, e.g., League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren, 309 F.3d 1181, 1192 (9th Cir. 2002) (finding failure to take a "hard look" where discussion of mitigation measures did not provide analysis or rationale to support chosen measures that were criticized by sister agency); Friends of the Earth v. U.S. Army Corps of Engineers, 109 F. Supp. 2d. 30, 38-42 (D.D.C. 2000) (finding corps' failure to address certain issues raised in comments of sister agencies and "lack of analysis" of others did not satisfy NEPA's "hard look" requirement).

### A. Analysis of Whether the Project Will Lead to the Listing of Sage Grouse as Threatened or Endangered is Missing from the Record.

As noted in Plaintiffs' opening brief, the U.S. Fish and Wildlife Service repeatedly raised concerns that the project's impacts on sage grouse "may be irreversible" and warned against authorizing an action that "may exacerbate their decline and possibly result in listing" under the ESA.  AR 3255 (Service Comments on DEIS, at 2) and 10134-35 (Service Comments on FEIS, at 1-2), attached to NRDC Br. as Exs. 20 and 21. Defendants do not appear to dispute that the question of whether the Atlantic Rim project would lead to the need to list sage grouse under the ESA was significant and warranted a serious response including analysis.[10]  Rather, Defendants and Intervenors claim that BLM provided the required analysis of this issue.  The record, however, fails to bear this out.

---

[10] See Fed. Def. Br. at 32-33 (stating that "BLM recognized the importance of Wyoming as 'one of the last strongholds for greater sage-grouse in the western United States,'" quoting FEIS AR 2258 (3-94)). See also Fed. Def. Br. at 34-35 (noting that Service's comments "merited analysis" and BLM had to take them "seriously", quoting Citizens Against Burlington v. Busey, 938 F.2d. 190, 201 (D.C. Cir. 1991); Friends of the Earth v. Army Corps of Eng'rs, 109 F. Supp. 2d at 39).

Defendants mischaracterize the Service's comments and what is in the record. BLM argues that it responded to the Service's comments by developing Alternative D as its preferred alternative in the FEIS. Fed. Def. Br. at 35. This alternative, however, does not include changes that respond to the Service's specific objections and concerns. The quarter-mile no surface disturbance zone around leks and the seasonal stipulations are exactly the same in the FEIS as they were in the DEIS. The Service continued to warn of "possible irreversible" impacts and recommend "that the Bureau not authorize an action that may exacerbate the decline of fish and wildlife species and possibly result in listing under the [Endangered Species] Act." AR 10134-35 (Service Comments on FEIS, at 1-2). Nothing in the text of the FEIS or BLM's Response to Comments (FEIS, App. O) contains an analysis of whether the project will lead to the listing of the sage grouse as threatened or endangered.

Defendants cite to BLM's response to the Service's comments as evidence that the agency provided the required analysis. Fed. Def. Br. at 35. Yet, BLM's response (AR 4404-06) does not contain any analysis. The agency acknowledges that "[s]ignificant effects to several species of wildlife [including sage grouse] are expected," but nowhere assesses whether these effects could lead to ESA listing for sage grouse. AR 4404. BLM's response to comments contains: (1) no discussion of the current numbers of sage grouse in the area affected by the project; (2) no discussion of the changes in population that could result from project activities; and (3) no discussion of how estimated reductions in population could affect the viability of the species. BLM simply dropped the ball when it came to analyzing a critical question regarding the impacts of the Atlantic Rim drilling project.

What Defendants cite to in the FEIS does not constitute analysis either. Both Defendants and Intervenors cite to the identification of four "significance criteria" for the project's impacts on wildlife. The first of these criteria addresses potential listing under the ESA: "Substantial loss of habitat function or disruption of life history requirements of a species or population segment that would make them eligible for listing under the ESA." AR 2388 (FEIS 4-69). Defendants and Intervenors argue that BLM did not find that the project's impacts on sage grouse met this criterion. Fed. Def. Br. at 35; Industry Interv. Br. at 38. In fact, BLM simply did not mention this criterion in discussing sage grouse impacts. Instead, BLM found that the project's impacts to sage grouse met the fourth significance criterion: "Substantial loss of habitat function or disruption of life history requirements of special status species that would preclude improvement of their status." AR 2388 (FEIS 4-69); AR 2402 (FEIS 4-83).

Contrary to Defendants' suggestion, merely mentioning the possibility of ESA listing as a significance criterion does not constitute the requisite analysis. Defendants' argument appears to be that BLM's choice of the fourth significance criterion – and implicit rejection of the first – constitutes the required discussion and analysis of whether the project's impacts would lead to the need to list sage grouse under the ESA. It does not. And it would not, even if BLM's rejection of the first significance criterion were explicit. Indeed, the opposite is the case. BLM's findings – that the project's impacts on sage grouse will "preclude improvement of their status" and "lead to lower productivity and long-term decline in the population of this species," AR 2395, AR 2500 (FEIS 4-76, 5-18) – along with the sage grouse's precarious status[11] and dependence on the project

---

[11] See NRDC Br. at 29, 32-33.

area[12] – practically cry out for analysis of the question:  Will this project lead to the need

to list the species as endangered?  When the Service expressed exactly this concern and

cited a study by Holloran (2005), the conclusions of which suggested that "natural gas

field development contributes to local sage-grouse extirpations" AR 3256 (Service

Comments on DEIS, at 3), there was even more reason to analyze the issue.  BLM,

however, never presented any such analysis.

The absence of this analysis is particularly egregious given that BLM's own

Special Status Species policy explicitly states that BLM-authorized actions may not

"contribute to the need for [a sensitive] species to become listed as a threatened or

endangered species." AR 5237-38.  BLM concludes that "no actions that might

jeopardize the future existence or viability of this species [sage grouse] may occur."  AR

4405 (FEIS at O-9).  Yet, this conclusion lacks any analysis or evidence to support it.

Such conclusory statements are exactly the kind of agency failures that courts have

consistently found violate NEPA.  See, e.g., Ecology Ctr., Inc. v. Austin, 430 F.3d 1057,

1067 (9th Cir. 2005) (EIS statement "without meaningful explanation" that a post-fire

salvage project would have a negative impact on black-backed woodpeckers but would

not result in a trend toward federal ESA listing did not constitute a "hard look");

Environmental Defense, 515 F. Supp. 2d at 81 (D.D.C. 2007) (finding agency's

discussion of mitigation inadequate where it "failed to identify evidence supporting its

determination");  NRDC v. Hodel, 865 F.2d at 298 ("conclusory remarks . . . do not equip

---

[12] See NRDC Br. at 29, 32-33; see also AR 2258 (FEIS at 3-94) ("Wyoming is one of the last strongholds for greater sage-grouse in the western United States and contains more grouse than all other states combined.  Greater sage-grouse are common throughout Wyoming because their habitat remains relatively intact compared to other states.  In south-central Wyoming, this is even more accentuated due to the harsh climate that has limited past habitat loss . . . .  In the past, disturbance to upland habitats was restricted to livestock grazing and vegetation treatments (primarily at higher elevations).  More recent disturbance to grouse habitat has come with development of energy resources.")

a decisionmaker to make an informed decision . . . or a court to review the

[decisionmaker's] reasoning").

**B. Scientifically Defensible Analysis of the Sage Grouse Mitigation Measures is Missing from the Record.**

The second critical issue that BLM failed to analyze is whether BLM's proposed

mitigation measures – in particular, a quarter-mile no-surface-disturbance buffer around

leks and a two-mile seasonal buffer around leks for nesting habitat – were appropriate

and scientifically defensible.  Plaintiffs agree with Defendants that NEPA does not

mandate specific substantive results.  Yet, agencies such as BLM are not free to make

arbitrary choices.  NEPA requires that an agency "articulate a satisfactory explanation for

its action, including a rational connection between the facts found and the choice made."

Motor Vehicles, 463 U.S. at 43.  NEPA also imposes on agencies "an affirmative duty to

'insure the professional integrity, including scientific integrity, of the discussions and

analyses in environmental impact statements.'"  Environmental Defense, 515 F.Supp.2d

at 78 (quoting 40 C.F.R. § 1502.24).  BLM has failed on both counts.[13]

BLM fails to cite any specific scientific study in the record to support its choice of

a quarter-mile buffer.  In its comments on the DEIS, the U.S. Fish and Wildlife Service

stated that it could not support such a small buffer, citing studies by Holloran (2005),

Lyon (2003) and Connelly (2000) (the "Connelly guidelines").  In response to the

Service's comments, BLM stated that "[l]iterature reviews show that requirements for no

surface disturbance (NSD) from a lek generally run in the quarter-mile to 2-mile range."

---

[13] Contrary to Defendants' characterizations, Fed. Def. Br. at 38, Plaintiffs do not argue that NEPA requires a "flawless" examination of mitigation.  Similarly, Plaintiffs do not argue that NEPA requires the BLM to detail the mitigation measures as they will actually be employed on the ground (which will of course depend on the specific APDs).  However, NEPA's requirement that the EIS include a "detailed" and "reasonably complete discussion of possible mitigation measures," Robertson, 490 U.S. at 351, 352, does not supplant or obviate the requirements that an agency make rationally-explained choices and insure the professional integrity of the EIS, including choices and discussions relating to mitigation.

AR 4405 (FEIS at O-9).  However, BLM did not actually identify or cite those literature

reviews, any of the studies that were included in them, or studies that otherwise support a

quarter-mile buffer.  Intervenors' argument that the EIS "contains a long list of references

with numerous references to studies related to sage grouse" is unavailing.  Industry

Interv. Br. at 33.  BLM does not name any of these studies in support of the quarter-mile

no-surface-disturbance buffer or the two-mile seasonal buffer.[14]  Further, BLM made no

attempt to explain why the studies cited by the Service do not undermine the propriety

and scientific defensibility of the proposed mitigations.

BLM has simply not met its obligation "to insure the professional integrity,

including scientific integrity, of the discussions and analyses" in the Atlantic Rim

environmental impact statement as required by 40 C.F.R. § 1502.24.  See, e.g., Earth

Island Institute, 442 F.3d at 1159-60 (agency discussion of tree mortality did not satisfy

NEPA's scientific integrity requirement); Environmental Defense, 515 F.Supp.2d at 78,

81 (fish mitigation determinations did not comply with scientific integrity requirement).

Plaintiffs concede that NEPA does not prohibit BLM from taking an action that sacrifices

sage grouse.  But NEPA does prohibit making such a decision without solid science and

analysis to support it.  Earth Island Institute, 442 F.3d at 1160 ("If an agency has failed to

---

[14] Intervenors make two additional half-hearted and unsuccessful attempts to fill the absence of scientific
support that BLM has left.  First, Intervenors note that the "WGFD recommendations on oil and gas
development also lists the 1/4 –mile NSO as mitigation" and cites the Connelly guidelines in its
bibliography.  Industry Interv. Br. at 33.  However, Intervenors fail to note that the WGFD
recommendations cite the Connelly guidelines in support of its further recommendation, not included in
BLM's proposed measures, that construction sites not disturb "suitable nest cover or brood-rearing habitats
within 2 mi. of an occupied lek, or within identified nesting and brood rearing habitat outside the 2-mile
perimeter."  AR 6565.  Second, Intervenors note that, in response to other comments, BLM stated that the
quarter-mile no-surface-disturbance mitigation was consistent with the RMP and the "Wyoming Sage
Grouse Plan."  Industry Interv. Br. at 33.  However, this does not constitute any sort of analysis or evidence
or an adequate disclosure of sources.  As BLM and Intervenors acknowledge, the RMP "is not specific as
to the distance an action must be moved to mitigate impacts" on sage grouse.  Id. at 38, quoting AR 4405
(FEIS at O-9).  The other "source" – the "Wyoming Sage Grouse Plan" – is not included in the FEIS' list of
references or in the administrative record in this case.

make a reasoned decision based on an evaluation of the evidence, we may properly

conclude that an agency has acted arbitrarily and capriciously.") (citations omitted);

Environmental Defense, 515 F.Supp.2d at 78, 81.  The record lacks such analysis here.

In fact, the evidence in the record contradicts BLM's choice of sage grouse mitigation

measures.

    Defendants and Intervenors' briefs try to sidestep the issue of whether BLM

supported its proposed mitigation measures with reasoned analysis and evidence.

Defendants argue that Plaintiffs failed to address this Court's findings in its preliminary

injunction decision.  Fed. Def. Br. at 37.  However, the Court's decision did not address

this issue.  Instead, the Court found Plaintiffs unlikely to succeed on the merits of the

"reasonable alternatives" NEPA claim.  Memorandum Opinion (Nov. 30, 2007)

(hereafter "PI Opinion"), at 10-11.  The Court did not address the adequacy of the

analysis to support the choice of sage grouse mitigation measures that BLM made.  Both

Plaintiffs and the Court now have the benefit of the record.  Consequently, the Court can

now evaluate Plaintiffs' "hard look" claim in a way that was not possible at the

preliminary injunction stage.  The availability of the record has exposed the unsupported

and arbitrary nature of the mitigation choice for sage grouse that BLM made.  It is not the

choice that BLM made that violates NEPA, but BLM's failure to conduct the analysis

necessary to support its choice.

    Unable to point to any record evidence or analysis to support its choice of sage

grouse mitigation, Defendants attempt to construct such analysis post-hoc.  Defendants

point to the fact that BLM considered a study of the impacts of coalbed methane

development on sage grouse (Naugle, 2006) that is more recent than the 2000 Connelly

guidelines. Fed. Def. Br. at 40. However, BLM did not discuss the effect of the Naugle study on its choice of proposed mitigation measures anywhere in the record or in its brief. Indeed, if anything, the Naugle study undermines BLM's choice of proposed mitigation measures and further demonstrates that BLM's choice is unsupported by, and runs counter to, the evidence in the record. See AR 7357, 7362 (Naugle (2006)) (finding substantially lower population trends for leks with coalbed methane development within two miles).

In an attempt to justify the agency's choice now after the decision was made, both Defendants and Industry Intervenors argue that the Holloran study relied upon by the U.S. Fish and Wildlife Service is not relevant to the Atlantic Rim area because Holloran looked at impacts in a different CBM project in Wyoming – the Pinedale Anticline project. Fed. Def. Br. at 39; Industry Interv. Br. at 32, n.26. In its comments on the DEIS, the Service characterized the Pinedale mitigation measures as "identical to those proposed for the Atlantic Rim development," citing Holloran to show that these measures were "insufficient to maintain sage-grouse breeding populations" and would contribute to local extinctions. AR 3256 (Service Comments on DEIS, at 3). Defendants and Intervenors argue that there are differences between the mitigation measures employed in the Pinedale Anticline and Atlantic Rim projects. Fed. Def. Br. at 39; Industry Interv. Br. at 32, n.26. However, it is unclear whether Defendants' and Intervenors' list of differences is accurate,[15] and even less clear whether these alleged distinctions meaningfully affect the applicability of Holloran's conclusions to the Atlantic Rim project. What is clear is that nothing in the record shows that BLM engaged with

---

[15] For instance, Intervenors claim that the Pinedale Anticline used 10-acre well-spacing, Industry Interv. Br. at 32, n. 26, whereas the Study Area description in the Holloran study indicates 16 ha (approximately 40 acre) spacing (AR 7092).

Holloran's conclusions regarding the effectiveness of BLM's sage grouse mitigation measures in the Pinedale Anticline project or made the arguments regarding their applicability to the Atlantic Rim project that Defendants and Intervenors now make.

The final post-hoc rationalization that Defendants' offer for their choice is that adopting Connelly's recommendation of locating no energy-related facilities within two miles of leks "would essentially shut down development in the Atlantic Rim project area." Fed. Def. Br. at 40. This argument fundamentally mistakes Plaintiffs' claim, which is not that BLM failed to adopt the recommendations of the Connelly guidelines, but that BLM failed to support the mitigation measures that it did adopt with analysis or evidence. Because the Service explicitly recommended that BLM use Connelly's protection measures, and because BLM committed, in a 2000 interagency Memorandum of Understanding, to consider the Connelly guidelines in its planning processes (AR 86104, Fed. Def. Br. at 39), BLM should have, at a minimum, explicitly addressed the Connelly guidelines in the Atlantic Rim FEIS as a part of its analysis of the propriety of its proposed mitigation measures.

The recent decision by the Interior Board of Land Appeals ("IBLA") cited by Anadarko (Biodiversity Conservation Alliance, 174 IBLA 1 (Mar. 3, 2008) (Ex. 3 to Industry Interv. Br.)) highlights the absence of, and need for, analysis of BLM's proposed mitigation measures for sage grouse. In that case, involving the Desolation Flats project, the petitioners argued that BLM had not cited a study supporting its proposed quarter-mile buffer and the Fish and Wildlife Service "questioned BLM's adherence to the notion of a ¼ mile buffer." 174 IBLA 1, 22. The IBLA found that the petitioners were "correct to say that the scientific community is moving in a different direction on the issue of sage

25

grouse protections" and that a 2004 BLM policy memorandum, issued after the ROD, "reflects BLM's acceptance that its data was outdated." Id. at 23. The IBLA expressly conditioned its approval of the BLM's decision on BLM's incorporation of the 2004 memorandum into the ROD and found the 2004 memorandum a "sufficient departure" from the EIS and ROD so as to moot petitioners' arguments that the BLM had failed to adequately address sage grouse impacts and mitigation measures in the EIS and ROD. Id. at 23. In the present case, by contrast, BLM did not present any analysis of its proposed mitigation measures.

In sum, neither Defendants nor Intervenors point to any analysis or evidence presented by BLM in support of the propriety and scientific integrity of its proposed mitigation measures for sage grouse. BLM's failure to provide such analysis and evidence constitutes a failure to take a "hard look" at the project's impacts to sage grouse and renders the BLM's decision to approve the project and the site specific APDs arbitrary and capricious.

## IV.    BLM's Fundamental Errors Concerning Big Game

BLM excluded two large, nearby development projects from its evaluation despite evidence in the record that the agency had the information needed to evaluate them. BLM was preparing an EIS for the Continental Divide-Creston Natural Gas Project at the same time that it was working on the Atlantic Rim environmental analysis. See 71 Fed. Reg. 10989-01 (March 3, 2006). The agency's conclusion that this project was "not reasonably foreseeable" (AR 9772) is simply not supported by the record. BLM itself included the project on its map of "Rawlins Field Office – Mineral and Lands Projects," dated June 9, 2006. AR 86298 (map attached as Exh. 22 to NRDC Br.). The Court did

not have the benefit of this map or other record evidence when reviewing Plaintiffs'
claim at the preliminary injunction stage.[16]  Almost 9,000 new wells were proposed as
part of this project located directly east and extending north of the Atlantic Rim project
area.  71 Fed. Reg. at 10989.  Given the size of this nearby project, BLM could not
accurately assess the cumulative impacts to big game without addressing it.

BLM also unreasonably excluded the Hiawatha Regional Energy Development
Project from its cumulative impact analysis.  The agency was preparing an EIS for this
project and should have incorporated the project's potential impacts in its assessment of
cumulative impacts before approving the Atlantic FEIS and the drilling permits that
followed.  See 71 Fed. Reg. 52571-01 (Sept. 6, 2006).  This project provided for 4,208
new wells in an area just southwest of the Atlantic Rim project.   Rather than take a hard
look at the information needed to inform its decision approving the Atlantic Rim project
and drilling permits, BLM chose to stick its head in the sand.  The agency approved the
project without getting an accurate picture of what the project would do to valuable big
game resources in the area when evaluated together with the significant development
happening nearby.

**V.     BLM Did Not Provide the Public the Opportunity to Comment on the Site-
        Specific Analysis Prepared for the Drilling Permits.**

Contrary to what Federal Defendants may have led the Court to believe, the 30-
day comment period on the APD notices did not provide Plaintiffs an opportunity to
comment on the environmental analysis prepared for the drilling permits.  Plaintiffs have

---

[16] In its decision denying a preliminary injunction in this case, the Court stated:  "absent some evidence that
the ultimate extent of these projects, as well as their ultimate approval, was reasonably foreseeable, this
Court will not overturn the BLM's decision to exclude them from its cumulative impact analysis."  PI
Decision, at 13.  BLM's own map provided in the record that the agency submitted after the preliminary
injunction was denied provides the required evidence.  AR 86298.  The agency itself was planning on the
development of the Continental Divide/ Creston project, yet ignored it when completing the cumulative
impact analysis for the Atlantic FEIS and the subsequent drilling permits.

not changed positions or ignored the Court's preliminary injunction decision.  The Court

based its earlier decision on the understanding that BLM had provided the public the

opportunity to comment on the drilling permit applications before they were approved.

PI Opinion at 8.  The record and the opportunity for more thorough briefing demonstrate

that this was not the case.  See NRDC Br. at 42-44.  BLM never made the drilling permit

applications – nor the environmental analysis prepared to accompany them – available to

the public prior to approving the Catalina A & B APDs or the Sun Dog A & B APDs.

     Defendants' attempt to have the Court simply rely on its earlier preliminary

injunction decision is misguided.  See Fed. Def. Br. at 41-43.  The dispute is not about

the applicable legal standard.  Plaintiffs agree that the issue of "whether the public was

adequately involved is a fact-intensive inquiry made on a case-by-case basis."

Biodiversity Conservation Alliance v. BLM, 404 F.Supp.2d 212, 219 (D.D.C. 2005).[17]

Defendants criticize Plaintiffs for "fail[ing] to recognize . . . that the Court has already

conducted that [fact-intensive] inquiry."  Fed. Def. Br. at 41.   This position ignores the

fact that neither Plaintiffs nor the Court had the record in this case when evaluating

Plaintiffs' motion for preliminary injunction.

     Plaintiffs simply did not have the opportunity to comment that the Court was led

to believe that they did.  Without the benefit of the record or the more thorough summary

judgment briefing, the Court concluded that Plaintiffs "had a substantial opportunity to

comment on the [Catalina and Sun Dog drilling permit] proposals before they were

approved."  PI Opinion at 8.  Based on the preliminary injunction proceedings, the Court

believed that "the Catalina and Sun Dog drilling permit applications were posted in the

---

[17] NRDC agreed to this standard in one of its very first briefs.  See Plaintiffs' Reply to Opposition to Motion for Preliminary Injunction (Oct. 12, 2007), at 3.

public reading room of the BLM's regional office in September 2005 and August 2006." Id. Yet, this is incorrect. All that was ever posted or made publically available were "notices" of the pending APDs. See NRDC Br. at 42 (citing Declaration of Erik Molvar (September 21, 2007), at ¶ 15, attached as Exh. A to Plaintiffs' Motion for Preliminary Injunction). BLM never provided the public the actual drilling permit applications or environmental analysis that accompanied them prior to the agency's approval of the Catalina A & B and Sun Dog A & B APDs. Industry intervenors acknowledge that BLM only posts a notice of the drilling permit applications, "not the permit application itself." Industry Interv. Br. at 45 (citing 30 U.S.C. § 226(f); 43 C.F.R. § 3162.3-1(g)).

Industry's claim that providing for public comment on the site-specific analysis prepared for each plan of development would cause the Atlantic Rim project to "grind to a halt" is unfounded. See Industry Interv. Br. at 45. In fact, the Federal Defendants' brief contradicts industry's claim. Defendants highlight the fact that BLM has provided some opportunity for comment on draft EAs for the plans of development that the agency has approved after Plaintiffs filed their suit. Fed. Def. Br. at 42. This opportunity for comment has not brought development of the Atlantic Rim project to a halt. BLM has continued to approve drilling PODs, approving 55 new wells and the accompanying roads and other infrastructure in Catalina C & D PODs on April 3, 2008. The agency recently stated that it plans to approve 14 new wells and the accompanying roads and other infrastructure in Doty Mountain B POD on June 25, 2008.[18]

_____

[18] As Plaintiffs noted in their amended complaint, BLM sent Plaintiffs copies of the EAs for the Sun Dog C POD and Sun Dog D and E PODs on October 16, 2007. First Amended Complaint for Declaratory and Injunctive Relief (October 26, 2007) at ¶ 68. BLM indicated it was providing copies of the EAs as "a courtesy and for your convenience." Id. BLM further indicated that it would review comments from Plaintiffs if those comments were received "within expected project processing timelines." Id. BLM then stated that it "expect[ed] to make a decision on the Projects by Monday, October 22, 2007." Id. BLM thus provided Plaintiffs three business days in which to provide comments. Id. BLM has continued to provide

The "courtesy copies" of EAs that BLM has provided Plaintiffs after they filed suit does not justify granting summary judgment for defendants.  First, BLM has indicated that it is under no obligation to provide such copies for comment.  A decision by the Court in Plaintiffs' favor is necessary to clarify BLM's legal obligation.  A decision by this Court that BLM abused its discretion in not providing Plaintiffs a chance to comment on the draft EAs is completely consistent with the precedent of this Court.  In Biodiversity Conservation Alliance, the Plaintiffs had the opportunity to comment on the specific project at issue.  In that case, the court explicitly found that "BLM advised the public of Veritas's proposal, allowed a thirty-day public comment period, and did not issue the DR/FONSI until after considering the issues raised during that period."  Biodiversity Conservation Alliance , 404 F.Supp.2d at 220.  The same cannot be said of BLM here.  Moreover, the fact that BLM provided public comment on subsequent draft EAs after it was sued does not excuse its failure to provide public comment on the draft environmental analysis for the first five PODs that the agency approved.

---

"courtesy copies" of the draft EAs for subsequent plans of development that it has approved.  These PODs are Catalina C & D and most recently Doty Mountain B.

**CONCLUSION**

For the reasons stated herein as well as in their opening brief, Plaintiffs request

that this Court grant their motion for summary judgment and deny the cross-motions of

Defendants and Intervenors.  Specifically, Plaintiffs request that this Court declare that

BLM has violated the National Environmental Policy Act, vacate BLM's approval of the

drilling permits issued for the Atlantic Rim project area, and enjoin further approvals.


Respectfully submitted,

_____/s/  Sharon Buccino_____
Sharon Buccino (D.C. Bar #432073)
Ben Longstreth (DC Bar # 974015)
Aaron Bloom
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
(202) 289-6868


Dated: June 30, 2008