IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL <br> 1200 New York Avenue, NW, Suite 400 <br> Washington, DC  20005,          *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> DIRK KEMPTHORNE, in his official capacity <br> As the Secretary of the United States <br> Department of the Interior <br> 1849 C Street, NW <br> Washington, DC  20240,          *et al.* <br><br> Defendants. <br>_____ <br> ANADARKO PETROLEUM CORPORATION, <br> WARREN RESOURCES, INC., and DOUBLE <br> EAGLE PETROLEUM CO., <br><br> Defendant-Intervenors, <br><br> STATE OF WYOMING, <br><br> Defendant-Intervenor. | Civ. No. 07-1709 (RJL) |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' AND INTERVENORS'
STATEMENTS OF MATERIAL FACTS AS TO WHICH THERE IS NO
GENUINE ISSUE**

Pursuant to Local Civil Rule 7(h), Plaintiffs hereby respond to the Defendants'

and Defendant-Intervenors' "Statements of Material Facts as to Which There is No

Genuine Issue."  Defendants rely on the administrative record and do not enumerate any

specific material facts in their "statement of material facts."  Defendants' Combined

1

Statement of Facts as to Which There is No Genuine Issue and Response to Plaintiffs' Statement of Material Facts as to Which There is No Genuine Issue (May 30, 2008), at 2.

Plaintiffs respond herein to the Statement of Material Facts submitted by Intervenors, Anadardo et al. and the State of Wyoming. Each paragraph number is preceded by "Ind" or "WY" to distinguish responses to the "statements of material facts" from Industry Intervenors and Intervenor State of Wyoming. Plaintiffs generally dispute characterizations of the record by Intervenors that are inconsistent with the text of the documents themselves. In addition, Plaintiffs specifically dispute the following assertions:

WY 24: "All modeling analyses were performed with input from the BLM, the Environmental Protection Agency ("EPA"), the United States Department of Agriculture Forest Service, and the Wyoming Department of Environmental Quality Air Quality Division ("WDEQ-AQD"). (AR 2645)."

*Response:* Plaintiffs dispute that all modeling analyses were performed with inter-agency input. EPA and other agencies helped develop the monitoring protocol before the initial air quality analysis was done for the Atlantic Rim Environmental Impact Statement ("EIS"). No evidence in the record indicates that EPA or WDEQ-AQD signed off on the decision to rely on the old analysis based on the Scheffe model for approval of the Catalina and Sun Dog drilling permits.

WY 28: "The BLM noted in the final EIS the adverse effects of increased levels of $O_3$, implemented a monitoring plan, and adopted mitigation measures for air quality impacts related to $O_3$. (AR 2334-35)."

*Response*: Plaintiffs dispute that BLM "adopted mitigation measures." The FEIS states: "If in the future air monitoring were to show exceedances that were attributable at least in part to sources in the Atlantic Rim field BLM would consult with

2

WDEQ and EPA to determine whether adaptive management would be needed to mitigate impacts." AR 2335 (FEIS 4-16).

WY 42:   "Aside from Mr. Dull's report, Plaintiffs' only authority that potential methane seeps in the ARPA will be dangerous to the atmosphere is a comment from the EPA that the "Atlantic Rim project will generate greenhouse gases, including methane and $CO_2$." (AR 3481)."

   *Response*:   This assertion is an argument regarding Plaintiffs' submissions in this case and is not appropriate for a "statement of material facts."

WY 43:   "Aside from Mr. Dull's report, Plaintiffs present no authority, and there is none in the record, that methane seeps are dangerous to humans. (AR 2351, 2368, 4844-45, 8840-42, 9447, 79100-105)."

   *Response*:   This assertion includes an argument regarding Plaintiffs' submissions in this case which is not appropriate for a "statement of material facts." Plaintiffs dispute that the record contains no authority that methane seeps are dangerous to humans.   E.g. AR 9451.

WY 52:   "A report entitled *Guidelines to manage sage grouse populations and their habitats* prepared by John W. Connelly et al. recommends that during sage-grouse breeding activities, energy-related facilities should be located two miles from active leks whenever possible. (AR 86094)."

   *Response*:   The report referenced in WY 52 does not limit its recommendation that "[e]nergy should be located >3.2 km [two miles] from active leks whenever possible" to "during sage grouse breeding activities." AR 86094.

WY 57:   "Mitigation measures will effectively 'reduce direct disturbance to wildlife' and facilitate the long-term return of habitat function. (AR 4804)."

   *Response*:   Plaintiffs dispute this statement, but acknowledge that the BLM makes this claim in its Record of Decision.

WY 58:   "In Appendix H of the final EIS, the BLM lists specific resource concerns that could occur in a development area, such as greater sage-grouse leks,

3

    and requires that specific mitigation measures take place to remedy the concern. (AR 3093)."

 *Response*: This statement is incorrect. BLM will only require these measures if it incorporates them into Conditions of Approval (COAs) for specific Plans of Development (PODs). AR 3081. BLM has failed to include many of these measures in relevant COAs. See Response to WY 59.

WY 59: "For areas with greater sage-grouse leks, the BLM will require: (1) directional drilling; (2) drilling multiple wells from a single pad; (3) seasonal restriction of public vehicular access; (4) noise reduction techniques and designs; (5) use of low profile well facilities and tanks; (6) burying of power lines to avoid use of poles and other tall structures; (7) transportation planning to align roads out of sight and sound of leks, and to schedule traffic to avoid greater sage-grouse activity periods; (8) design of roads to minimum safe standard for intended use; and (9) partial reclamation of resource roads needed for project construction to lower standards necessary for maintenance operations. (AR 3093)."

 *Response*: BLM has not required many of these measures in Conditions of Approval for the PODs it has approved, despite the presence of sage grouse leks. For instance, directional drilling and the drilling of multiple wells from a single pad have not been required for any of the approved PODs. AR 74074-74091 (Sun Dog A&B); AR 73506-73517 (Catalina A&B), AR 75034-75049 (Sun Dog C), AR 75190-75207 (Sun Dog D&E).

WY 60: "In Appendix L, the BLM lists over 30 additional resource concerns above and beyond the ones listed in Appendix H, which are accompanied by the specific mitigation measure that the BLM will require the operator to implement. (AR 3149-62)."

 *Response*: The measures listed in Appendix L are those proposed in Alternative C, which was not chosen by BLM. BLM has not committed to require operators to implement these measures. AR 3149, 4796.

WY 61: "With regard to the greater sage-grouse, the operator will have to limit the initial disturbance total to less than 20 acres per section for nesting and

4

>   brood rearing habitat, as recommended by the Wyoming Game and Fish Department. (AR 3152)."

*Response*: The measures listed in Appendix L are those proposed in Alternative C, which was not chosen by BLM. BLM has not committed to require operators to implement these measures. AR 3149, 4796.

WY 75: "The APDs for the Catalina and Sun Dog PODs were posted for 30 days in the RFO Information Access Center (Public Room) for review. (AR 73494, 74065, 75020, 75175)."

*Response*: These APDs were never posted in the stated location. BLM only posts a notice of the drilling permit applications, not the APDs themselves. See 30 U.S.C. § 226(f); 43 C.F.R. § 3162.3-1(g)); see also Plaintiffs' Exhibit 25 (APD Posting Notice dated September 26, 2005); Declaration of Erik Molvar (September 21, 2007), at ¶ 15, attached as Exh. A to Plaintiffs' Motion for Preliminary Injunction. Industry's brief, in fact, contradicts this statement by the State of Wyoming. See Ind. Interv. Br. at 45.

IND 71: "BLM noted that more stringent restrictions were 'likely not economically feasible nor capable of maximizing recovery of the natural gas resource.' AR2147 (FEIS at 1-20); see also AR4719 (FEIS at O-324)."

*Response*: The cited passage refers specifically to Alternative C, as opposed to "more stringent restrictions" generally.

5

Respectfully submitted,

   /s/  Sharon Buccino
Sharon Buccino (DC Bar # 432073)
Ben Longstreth (DC Bar # 974015)
Aaron Bloom
Natural Resources Defense Council
1200 New York Ave., NW, Suite 400
Washington, DC  20005
T:  202-289-6868
F:  202-289-1060
sbuccino@nrdc.org

*Counsel for Plaintiffs*

Dated:  June 30, 2008