IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, BIODIVERSITY CONSERVATION ALLIANCE, WYOMING OUTDOOR COUNCIL, WESTERN WATERSHEDS PROJECT, and WYOMING WILDERNESS ASSOCIATION <br><br> Plaintiffs, <br><br> v. <br><br> DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States Department of Interior, U. S. DEPARTMENT OF INTERIOR, and U. S. BUREAU OF LAND MANAGEMENT <br><br> Defendants, <br><br> STATE OF WYOMING, ANADARKO PETROLEUM COPRORATION, WARREN RESOURCES, INC., and DOUBLE EAGLE PETROLEUM CO. <br><br> Defendant-Intervenors. | Civ. No. 07-cv-01709-RJL |

**DEFENDANT-INTERVENOR STATE OF WYOMING'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

TABLE OF ACRONYMS ................................................................................................................iii

INTRODUCTION ........................................................................................................................... 1

ARGUMENT................................................................................................................................... 2
     I.     The BLM took a "hard look" at potential ozone impacts associated with
           the Atlantic Rim Project................................................................................................ 2
           A.     The BLM Properly relied on the Scheffe Model ..................................... 2
           B.     The BLM Analyzed Ozone Impacts......................................................... 3
           C.     The BLM did not have to complete any new air quality analysis for
                 the Sun Dog or Catalina EAs .................................................................... 5
     II.    The BLM took a "hard look" at methane seeps ................................................... 5
     III.   The BLM took a "hard look" at greater sage-grouse impacts ............................ 8
     IV.   The BLM adequately assessed the cumulative impacts to big game.................. 9
     V.    The BLM adequately involved the public when formulating the Sun Dog
           and Catalina EAs........................................................................................................ 11

CONCLUSION............................................................................................................................. 12

# **TABLE OF CASES AND AUTHORITIES**

**Cases**

*Alaska v. Andrus,* 580 F.2d 465 (D.C. Cir. 1978) ................................................................... 3, 4

*Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs,* 431 F.3d 1096 (8th Cir. 2005) ...................... 11

*Baltimore Gas & Elec. v. NRDC,* 462 U.S. 87 (1983) ................................................................... 2

*Custer County Action Ass'n v. Garvey,* 256 F.3d 1024 (10th Cir. 2001) ...................................... 9

*Deukmejian v. Nuclear Regulatory Comm'n,* 751 F.2d 1287 (D.C. Cir. 1984) ............................ 8

*Hammond v. Norton,* 370 F.Supp.2d 226 (D.C. Cir. 2005) .......................................................... 8

*Izaak Walton League of America v. Marsh,* 655 F.2d 346 (D.C. Cir. 1981) ................................ 5

*Nevada v. Dep't of Energy,* 457 F.3d 78 (D.C. Cir. 2006) .................................................... 6, 12

*Ocean Conservancy v. Gutierrez,* 394 F.Supp.2d 147  (D.D.C 2005) .......................................... 4

*Olmsted Falls v. FAA,* 292 F.3d 261 (D.C. Cir. 2002) ................................................................. 2

*Pub. Utils. Comm'n of the State of Cal. V. FERC,* 900 F.2d 269 (D.C. Cir. 1990) ..................... 11

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332 (1989) ........................................... 4

*Sierra Club v. U.S. Department of Transportation,* 753 F.2d 120 (D.C. Cir. 1985) .................... 4

*Taxpayers of Mich. Against Casinos v. Norton,* 433 F.3d 852 (D.C. Cir. 2006) ........................ 12

*Village of Bensenville v. FAA,* 457 F.3d 52 (D.C. Cir. 2006) ................................................. 3, 4

**Federal Regulations**

40 C.F.R. § 1502.20 ................................................................................................................ 6, 12

40 C.F.R. § 1508.7 ...................................................................................................................... 11

**Federal Register Notices**

71 Fed. Reg. 10 (Mar. 3, 2006) ................................................................................................... 11

**Federal Rules**

FED. R. CIV. P. 56(c) .................................................................................................................. 13

**TABLE OF ACRONYMS**

| | |
|---|---|
| APD | Application for Permits to Drill |
| ARPA | Atlantic Rim Project Area |
| BLM | Bureau of Land Management |
| CBNG | Coalbed Natural Gas |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FONSI | Finding of No Significant Impact |
| FWS | Fish and Wildlife Service |
| NEPA | National Environmental Policy Act |
| NPS | National Park Service |
| POD | Plan of Development |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| USFS | United States Forest Service |
| WDEQ | Wyoming Department of Environmental Quality |

## INTRODUCTION

In their response to Wyoming's cross-motion for summary judgment, Plaintiffs reiterate that the Bureau of Land Management ("BLM") failed to satisfy the procedural requirements of the National Environmental Policy Act ("NEPA") when it adopted the Atlantic Rim environmental impact statement ("EIS") and record of decision ("ROD"). They argue that the BLM did not take a "hard look" at the environmental consequences of its actions. Specifically, they accuse the BLM of falling short in its analysis of the project's potential effects on ozone levels, sage grouse, and methane seeps. They further allege that the BLM failed to adequately analyze the cumulative effects that the Atlantic Rim CBNG projects would have on big game. Finally, they contend that the BLM violated NEPA by failing to solicit adequate public involvement in the environmental assessments ("EAs") for the Sun Dog and Catalina plans of development ("PODs"), which are located within the project area covered by the Atlantic Rim EIS.

The record clearly shows that Plaintiffs have failed to meet their burden of showing that the BLM acted arbitrarily or capriciously in adopting the Atlantic Rim EIS, ROD, and Sun Dog and Catalina EAs. The BLM adequately considered the potential environmental impact of its actions with respect to ozone, sage grouse, methane seeps, and big game, and included the public in that consideration. *Olmsted Falls v. FAA,* 292 F.3d 261, 269 (D.C. Cir. 2002), *quoting Baltimore Gas & Elec. v. NRDC,* 462 U.S. 87, 97-98 (1983). If this Court were to reverse the agency process in this case, it would exceed the scope of its review under NEPA and insert its own opinion on the merits of those issues in place of the conclusions of the decisionmaking agency. This Court should grant summary judgment in favor of Defendant-Intervenor State of Wyoming.

# ARGUMENT

I.  **The BLM took a "hard look" at potential ozone impacts associated with the Atlantic Rim Project**

First, Plaintiffs argue that the BLM violated NEPA by using the Scheffe Method for its ozone analysis in the EIS. (Pl. Mem. Supp. Mot. Summ J., at 8). Plaintiffs further argue that BLM used incorrect numbers to compare the potential ozone levels to the Wyoming and National Ambient Air Quality Standards. *Id.* at 16. Finally, Plaintiffs argue that the BLM improperly tiered the Sun Dog and Catalina EAs to the Atlantic Rim EIS for purposes of its ozone analysis. *Id.* at 13. Plaintiffs contentions regarding potential ozone impacts all fail a fair review of the administrative record.

A.  **The BLM Properly relied on the Scheffe Model**

The BLM used the Scheffe model to analyze the potential ozone impacts from the Atlantic Rim project. (AR 2328). At that time, the model's use was approved by the BLM, EPA, NPS, USFS, and WDEQ for the project. In fact, the Scheffe model "was considered by the inter-agency air quality team to be a reasonable tool and an acceptable ozone method." (AR 2334, 8666). Near the completion of the NEPA process for the Atlantic Rim EIS, the BLM received comments alleging that the Scheffe model was "obsolete." (AR 70538, 70598). Rather than start anew with a different method at the eleventh hour, the BLM chose to reject the comments and continue using the Scheffe model. Such an exercise of agency discretion has been upheld by the courts. *Alaska v. Andrus,* 580 F.2d 465, 473 (D.C. Cir. 1978). (NEPA "does not specify the quantum of information that must be in the hands of a decisionmaker before that decisionmaker may decide to proceed with a given project").

2

An agency must rely on the best information available to it at the time, and does not violate NEPA because better information becomes available after the decision. *Village of Bensenville v. FAA,* 457 F.3d 52, 71 (D.C. Cir. 2006). If the agency makes an honest effort to employ the model that it thinks will produce the best information, then it is seeking the best information, regardless of whether a later consensus develops that there is a better model to produce the best information. *Id.* Here, the record shows that the BLM made an honest and diligent effort to choose a reliable method. Instead of delaying the project to conduct a new analysis using a different model, the BLM met with EPA and WDEQ to determine whether it would be appropriate to continue to rely on the Scheffe method. From this meeting, the BLM adopted mitigation measures for air quality impacts related to ozone should exceedance attributable at least in part to the Atlantic Rim project be discovered in the future. (AR 2335).

The BLM relied on the best available information at the time it conducted the ozone analysis. Whether Plaintiffs agree with the method used is irrelevant. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 351 (1989) ("NEPA merely prohibits uninformed—rather than unwise—agency action.") This Court should defer to the BLM's decision because it is supported in the record and reflects reasoned decision making. *Ocean Conservancy v. Gutierrez,* 394 F.Supp.2d 147, 157 (D.D.C. 2005), citing *Sierra Club v. U.S. Dep't of Transp.,* 753 F.2d 120, 129 (D.C. Cir. 1985). This court should not substitute its judgment for that of the decisionmaker and insist that the project be delayed while more information is sought. *Alaska v. Andrus,* 580 F.2d 465, 473-74 (D.C. Cir. 1978).

**B.    The BLM Analyzed Ozone Impacts**

Plaintiffs suggest that the BLM's analysis of potential impacts caused by ozone is deficient because it "failed first grade math" in its analysis to avoid an outcome that would

3

predict a violation of National and Wyoming Ambient Air Quality Standards. (Pl. Opp. Cr. Mot. Summ J., at 7).  The record clearly shows that the BLM's analysis satisfied its NEPA requirements, and that Plaintiffs' accusations are unfounded.

In fact, the BLM did disclose the potential impacts of ozone.  The BLM found that the total predicted impact, when added to the background concentration of $75.2\mu g/m^3$, would not exceed the ozone air quality standard of $157\mu g/m^3$.  (AR 2332, 2688).  As the Federal Defendants correctly noted, "this is exactly the type of scientific analysis involving the application of agency expertise to which the Court should defer."  (Fed. Def. Mem. Supp. Mot. Summ J., at 18).

It appears then that Plaintiffs' primary concern is with the method used to arrive at the figure.  Plaintiffs assert that the BLM's formula is akin to adding apples to oranges.  In reality, the record shows that it is Plaintiffs' reasoning, not the BLM's, that is illogical. The BLM explained that "pairing a screening model concentration with a maximum background concentration monitored over the period of record [8-hour level] results in an overestimate of the potential ozone concentrations."  (AR 2704).  To arrive at a more realistic estimate, the air quality team chose to use the average hourly background ozone conditions.  This is a complex and technical topic, and the agency experts are entitled to great deference.  *Ocean Conservancy,* 394 F.Supp.2d at 162. ("Deference is particularly warranted in cases such as this involving complex scientific or technical matters where the agency's expertise is clear."). The BLM adequately identified and evaluated the harmful effects of ozone to make a reasoned decision on that issue.  *See Izaak Walton League of America v. Marsh,* 655 F.2d 346, 371 (D.C. Cir. 1981). (stating that the EIS must "contain sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to

make a reasoned decision"). The BLM took the requisite "hard look" at the environmental consequences of its actions, and its decision was not arbitrary and capricious.

C. **The BLM did not have to complete any new air quality analysis for the Sun Dog or Catalina EAs**

Plaintiffs suggest that the BLM's analysis of the Catalina and Sun Dog EAs violated NEPA because the BLM tiered those EAs to the air quality analysis in the Atlantic Rim EIS. (Pl. Pl. Res. Mot. Summ. J. Br., at 5). However, tiering is appropriate for certain actions "when the sequence of statements or analysis" is from an EIS to a site-specific statement or analysis. *See Nevada v. Dep't of Energy,* 457 F.3d 78, 91 n.9 (D.C. Cir. 2006); *see also* 40 C.F.R. § 1502.20 (providing that when tiering is used, "the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference").

The Sun Dog and Catalina EAs summarized the issues that were fully developed in the Atlantic Rim EIS and incorporated by reference the analysis from the EIS. (AR 73498) Because the Catalina and Sun Dog EAs are tiered to the final EIS, and the BLM took a "hard look" at ozone impacts in the final EIS, the BLM also took the required "hard look" at ozone impacts for the site-specific PODs.

II. **The BLM took a hard look at methane seeps**

Plaintiffs selectively harvest language from the administrative record to support their position that the BLM violated NEPA by failing to adequately address the potential impacts of methane seeps in the project area. However, when read in its entirety, the record document upon which plaintiffs chiefly rely supports the proposition that the BLM acted in accordance with NEPA and provided a satisfactory evaluation of methane seeps.

5

Plaintiffs criticize the BLM for not relying on a report of the BLM's own employee, John Dull, which states in places that methane releases from seeps raise "fairly severe safety and environmental concerns," including "potential damage to the atmosphere", "danger to human life [and] wildlife" from "accidental ignition" and poisoning; and damage to vegetation. (Pl. Res. Mot. Summ. J. Br., at 10); (AR 8803, 8805). The Dull report does not undermine the BLM's process for several reasons.

First, as Plaintiffs admit, the report was only a draft. (Pl. Res. Mot. Summ. J. Br., at 12 n 7). They claim that even though the report was a *draft,* this Court should accord it significant weight and that the BLM "may not ignore its own report. . . simply because it is labeled draft." *Id.* Plaintiffs offer no authority to support this proposition. On the contrary, it would be illogical for the Court to obligate an agency to rely on a draft report that was never finalized. Such a rule would dissuade agencies from engaging in studies for fear that a predecisional draft would be used against the agency.

Second, even if this Court chooses to rely on Mr. Dull's draft report, Plaintiffs ignore the conclusion of the report when Mr. Dull explained that "at this time there is no scientific data available to prove or disprove that CBNG development within the ARPA has caused or will cause increased gas flux from the known gas seeps." (AR 8805).

Finally, Plaintiffs posit that Mr. Dull's report addresses the potential environmental impacts that the seeps might produce and that the BLM violated NEPA by failing to adequately address those impacts. This proposition overstates Mr. Dull's report. The report principally identifies known seeps that existed prior to the planning of the project. While Mr. Dull generally identifies impacts from methane seeps, not once does he write that such impacts would be likely

6

in the ARPA. In fact, he reported that no evidence existed to analyze that proposition. (AR 8805).

Contrary to Plaintiffs' position, the BLM did not disregard the issue of methane seeps. The BLM responded to Mr. Dull's general observations about methane seeps as well as concerns raised by Plaintiffs and others, and established a monitoring program for existing and any future methane seeps in the ARPA. (AR 4844-45). The BLM also responded directly to Plaintiffs' comments in the ROD by agreeing to look into "reports of mud pots and geysers" and work to identify how those concerns may be related to the operations within the ARPA. (AR 4870).

In the final EIS, the BLM identified the adverse consequences of methane seeps and considered the potential impacts of methane seeps based on the information it had while formulating the EIS. (AR 2351, AR 2368-69, AR 1682). However, the BLM does not have to disclose estimated greenhouse gas impact caused by the project's potential methane emissions because, as explained above, there was no basis for the BLM to conclude that methane seeps would result from the project. *See Hammond v. Norton,* 370 F.Supp.2d 226, 246 (D.D.C. 2005) (*quoting Deukmejian v. Nuclear Regulatory Comm'n,* 751 F.2d 1287, 1300 & n.63 (D.C. Cir. 1984)). The BLM elected to mitigate against this possibility by incorporating Mr. Dull's recommendations for addressing methane seeps in the ARPA, including implementing a soil gas monitoring program, requiring the operators to drill a three-well cluster of aquifer monitoring wells, and identifying future monitoring, mitigation, and remediation measures. (AR 8805-06).

Through its discussion of methane seeps in the final EIS and ROD, and its incorporation of Mr. Dull's analysis in its mitigation procedures, the BLM adequately identified and analyzed the adverse effects of methane seeps, thereby taking a " 'hard look' at environmental factors,"

7

and making a reasoned decision. *Izaak Walton League,* 655 F.2d at 371. The BLM's handling of methane seeps was not arbitrary and capricious under NEPA.

**III.   The BLM took a "hard look" at greater sage grouse impacts**

Plaintiffs make two arguments with respect to sage grouse. First, they contend that the BLM failed to ensure that the project will not cause the sage grouse to be listed as threatened or endangered under the ESA. (Pl. Res. Mot. Summ. J. Br., at 17). Second, they contend that their preferred mitigation measures should be chosen over those selected by the BLM. *Id.* at 33. Neither of these arguments is viable.

The BLM began its analysis of the effects of the proposed development on sage grouse by incorporating by reference its own special status species policy which states that the BLM may not "contribute to the need for species to become listed as a threatened or endangered species." (AR 5237-38). It also acknowledged in its final EIS that the sage grouse would suffer several adverse effects as a result of the ARPA. (AR 2395, 2398, 2402). With this in mind, the BLM explained in detail in the final EIS how it would protect the sage grouse through the prohibition of surface activities within important habitat areas. (AR 2626). Also, in the ROD the BLM implemented a "performance-based, adaptive management process." (AR 4405, AR 4798).

Plaintiffs charge that the BLM did not adequately respond to FWS comments and recommendations about what type of mitigation procedures would be necessary to ensure the viability of the species. However, NEPA does not require that the BLM adhere to another agency's recommendations. It only requires that it take them seriously. *Custer County Action Ass'n v. Garvey,* 256 F.3d 1024, 1038 (10th Cir. 2001) ("We begin by noting that [NEPA] requires agencies preparing environmental impact statements to consider and respond to the

8

comments of the other agencies, not to agree with them."). That is exactly what occurred here, as explained by Defendant Intervenors in their brief. (Def. Inv. Mem. Supp. Mot. Summ. J., at 32). The BLM even went so far as to develop an alternative D in response to FWS comments, and adopted that alternative to reduce the disturbance associated with the proposed action by almost 18 percent. (AR 4799-4800).

Plaintiffs also argue that the BLM failed to provide a scientific defense of its proposed mitigation measures for sage grouse. (Pl. Res. Mot. Summ. J. Br., at 21). In reality, Plaintiffs simply disagree with the quarter-mile no surface occupancy area around leks that the BLM adopted as opposed to the two-mile area recommended by the FWS. To support this claim, Plaintiffs suggest that the BLM ignored studies cited by the FWS and others and failed to cite to any studies supporting its position. This could not be further from the truth. The EIS cites numerous studies relating to sage grouse. (AR 2516-2544). Further, the BLM stated that its proposed quarter-mile no occupancy area was consistent with the Great Divide Resource Management Plan ("RMP") and the Wyoming Sage Grouse Plan. (AR 4678).

Plaintiffs want this Court to substitute its judgment for that of the agency even though the record shows that the BLM took the required "hard look" at the mitigation measures to protect greater sage grouse populations and seriously considered the recommendations of the FWS. Ultimately, the BLM asserted its discretion and best judgment to settle on its preferred mitigation measures for sage grouse. The BLM did not act arbitrarily or capriciously and thus did not violate NEPA.

### IV. The BLM adequately assessed the cumulative impacts to big game

Plaintiffs' argument that two nearby projects were reasonably foreseeable and thus should have been included in the BLM's cumulative impact evaluation is misplaced. Plaintiffs

fail to mention that the cumulative impact analysis did include seven other projects in the region, including the Continental Divide/Creston Natural Gas Field Development Project, the Greater Wamsutter Area II Natural Gas Development Project, the Continental Divide/Wamsutter II Natural Gas Development Project, the Creston/Blue Gap Natural Gas Project, the Hay Reservoir Unit Natural Gas Infill Development Environmental Assessment, the South Baggs Area Natural Gas Development Project and the Vermillion Basin Natural Gas Exploration and Development Project Environmental Assessment. (AR 2137-2138, AR 2482-2485). In spite of the plethora of adjoining projects included in the cumulative analysis, Plaintiffs contend that the BLM's failure to include the Continental Divide-Creston Natural Gas Project and the Hiawatha Project renders the analysis insufficient and in violation of NEPA.

It is well established that an agency only has to include "reasonably foreseeable future actions" in cumulative impact analysis. 40 C.F.R. § 1508.7; *See also Pub. Utils. Comm'n of the State of Cal. v. FERC,* 900 F.2d 269, 283 (D.C. Cir. 1990). To be reasonably foreseeable, it must be "sufficiently likely to occur" so "a person of ordinary prudence would take it into account" *Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs,* 431 F.3d 1096, 1102 (8th Cir. 2005). Under this standard, neither the Continental Divide/Creston Natural Gas Development nor the Hiawatha Project was reasonably foreseeable.

Plaintiffs' assertion that the BLM was preparing an EIS for the Continental Divide-Creston Natural Gas Project at the same time it was working on the Atlantic Rim environmental analysis is a stretch. While the BLM was engaging in the NEPA process for the Atlantic Rim EIS, the Continental Divide-Creston Project was in its infancy stage. In fact, at the time the Atlantic Rim final EIS was released to the public in December 2006, the BLM had just issued a notice of intent to prepare an EIS for the Continental Divide-Creston Project and to conduct

public scoping. *See* 71 Fed. Reg. 10,989 (Mar. 3, 2006). By the time the ROD for the Atlantic Rim was released in May of 2007, the Continental Divide-Creston Project *draft* EIS was still being prepared. Similarly, BLM had not issued a *draft* EIS for the Hiawatha Project at the time of the Atlantic Rim ROD. In fact, today the BLM has still not released a *draft* EIS for either project. In no way do these projects constitute reasonably foreseeable projects.

The BLM correctly identified the seven projects with a finalized EIS or EA to include in its cumulative impact assessment and rightfully excluded two projects that no person of ordinary prudence could confidently say would be reasonably foreseeable. The BLM did not violate NEPA and did not act arbitrarily or capriciously in assessing the cumulative impacts to big game from the proposed project.

## V.     The BLM adequately involved the public when formulating the Sun Dog and Catalina EAs

The Plaintiffs misunderstand the public participation requirements of NEPA when they suggest that the BLM violated NEPA by failing to provide Plaintiffs an opportunity to comment on the EA prepared for the drilling permits. The D.C. Circuit has determined that agencies have significant discretion to determine when public comment is required with respect to EAs. *TOMAC, Taxpayers of Mich. Against Casinos v. Norton,* 433 F.3d 852, 861 (D.C. Cir. 2006).

Here, the BLM opted to solicit public comment. Applications for a Permit to Drill ("APDs") for the Catalina and Sun Dog PODs were posted for 30 days in the Regional Field Office ("RFO") Information Access Center (Public Room) for review. (AR 73494, 74065, 75020, 75175). Further, the BLM gave public notice that EAs for Sun Dog and Catalina were being prepared through the Wyoming BLM internet NEPA register (*Id.)*

Further, as explained in Wyoming's opening brief, the EAs were tiered to the Atlantic Rim EIS as allowed in certain proposed actions, including environmental assessments subsequent to the final EIS. 40 C.F.R. § 1502.20; *Nevada v. Dep't of Energy,* 457 F.3d 78, 91 (D.C. Cir. 2006). The public involvement in the NEPA process produced thousands of comments, including comments from Plaintiffs on the draft EIS, final EIS, and EAs for Sun Dog C and Sun Dog D & E Plans of Development ("PODs"). (AR 4816, AR 4817, AR 9941-10131, AR 70538-71095, AR75031-33, 75187-89). Clearly, the BLM met its obligations under NEPA and involved the public in the process, and therefore its decision is not arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Federal Defendants did not act arbitrarily or capriciously in adopting the Atlantic Rim final EIS and ROD and the Catalina and Sun Dog EAs and FONSIs. In accordance with FED. R. CIV. P. 56(c), this Court should grant Defendant-Intervenor State of Wyoming's Cross-Motion for Summary Judgment on all claims.

DATED this 17th day of July, 2008.

                        DEFENDANT-INTERVENOR, STATE OF WYOMING

                        /s/ David J. Willms
                        David J. Willms
                        Assistant Attorney General

                        Jay A. Jerde
                        Deputy Attorney General
                        Wyoming Attorney General's Office
                        123 Capitol Building
                        Cheyenne, WY 82002
                        (307) 777-6946
                        (307) 777-3542 – Facsimile
                        jjerde@state.wy.us
                        dwillms@state.wy.us

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of July, 2008, the foregoing DEFENDANT-INTERVENOR STATE OF WYOMING'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT was electronically filed through the CM/ECF system, which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing to the following:

Sharon Buccino
Benjamin Longstreth
Natural Resources Defense Council
1200 New York Avenue, NW
Suite 400
Washington, D.C. 20005
sbuccino@nrdc.org
blongstreth@nrdc.org

Lori Caramanian
U.S. Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80294
lori.caramanian@usdoj.gov

Michael B. Wigmore
Sandra P. Franco
Bingham McCutchen, LLP
2020 K Street, NW
Washington, D.C. 20006
michael.wigmorebingham.com
s.franco@bingham.com

Robert Charles Mathes
Bjork Lindley Little, PC
1600 Stout Street, Suite 1400
Denver, CO 80202-3110
rmathes@bjorklindley.com

I further certify that I served a copy of the foregoing by placing a copy in the U.S. Mail, postage pre-paid to the following:

Aaron Bloom
Natural Resources Defense Counsel
40 West 20th Street
New York, NY 10011

                                         /s/ David J. Willms
                                         Wyoming Attorney General's Office