**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL<br>1200 New York Avenue, NW, Suite 400<br>Washington, DC 20005, *et al.,*<br><br>       Plaintiffs,<br><br>          v.<br><br>DIRK KEMPTHORNE, in his official capacity<br>As the Secretary of the United States<br>Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240, *et al.,*<br><br>       Defendants. | |
| ANADARKO PETROLEUM CORPORATION<br>P.O. Box 1330<br>Houston, TX 77251-1330,<br><br>WARREN RESOURCES, INC.<br>489 Fifth Avenue, 32nd Floor<br>New York, NY 10017,<br><br>DOUBLE EAGLE PETROLEUM CO.<br>777 Overland Trail, Suite 208<br>P.O. Box 766<br>Casper, WY 82602-0766,<br><br>      and<br><br>STATE OF WYOMING<br>123 Capitol Building<br>Cheyenne, WY 82002,<br><br>       Defendant-Intervenors. | Civ. No. 1:07-cv-01709-RJL |

**REPLY IN SUPPORT OF DEFENDANT-INTERVENOR ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC., AND DOUBLE EAGLE PETROLEUM CO.'S CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS............................................. vi

I.    NRDC HAS PROVIDED NO NEW INFORMATION TO OVERTURN
      BLM'S REASONED DETERMINATION THAT THE FINAL EIS
      ADEQUATELY ADDRESSED THE ISSUE OF METHANE SEEPS..................1

II.   BLM IS ENTITLED TO SUBSTANTIAL DEFERENCE IN MAKING
      SCIENTIFIC JUDGMENTS AS IT DID IN THIS CASE.....................................9

      A.    BLM Adequately Explained and Supported its Choice of
            Methodology to Estimate Ozone Impacts....................................10

            1.    BLM's use of the Scheffe Method was not arbitrary and
                  capricious ........................................................................10

            2.    BLM adequately explained its background Ozone levels..............14

      B.    BLM's Chosen Mitigation for the Sage Grouse is Supported by
            the Record ...................................................................................17

III.  NRDC PRESENTS NO EVIDENCE TO CONTRADICT BLM'S
      DETERMINATION THAT OTHER NATURAL GAS PROJECTS IN
      EARLY PROPOSAL STAGES WERE NOT "REASONABLY
      FORESEEABLE" FOR PURPOSES OF NEPA'S CUMULATIVE
      IMPACT ANALYSIS............................................................................21

IV.   NRDC PRESENTS NO EVIDENCE THAT BLM WAS REQUIRED
      TO CIRCULATE DRAFT ENVIRONMENTAL ASSESSMENTS FOR
      INDIVIDUAL PLANS OF DEVELOPMENT .....................................22

V.    CONCLUSION....................................................................................23

# TABLE OF AUTHORITIES

## FEDERAL CASES

*American Bird Conservancy, Inc. v. Federal Communications Commission*,
516 F.3d 1027 (D.C. Cir. 2008).................................................................3

*American Wildlands v. Kempthorne*, -- F.3d ----, 2008 WL 2651091
(D.C. Cir. July 8, 2008) .......................................................................23

*Ark. Wildlife Federation v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096
(8th Cir. 2005)....................................................................................5

*\*Baltimore Gas & Electric Co. v. NRDC*, 462 U.S. 87 (1983) ...........................3

*City of Grapevine, Tex. v. Department of Transportation*, 17 F.3d 1502
(D.C. Cir. 1994) ................................................................................13

*City of Williams v. Dombeck*, 151 F. Supp. 2d 9 (D.D.C. 2001) ...................................8, 11

*Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914 (D.C. Cir. 1998)......................11, 14

*\*Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004)............................3

*Deukmejian v. Nuclear Regulatory Commission*, 751 F.2d 1287 (D.C. Cir. 1984) ...........6

*Earth Island Institute v. U.S. Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006).......................13

*Earthlink, Inc. v. FCC*, 462 F.3d 1 (D.C. Cir. 2006) ...........................................9

*Ecology Center, Inc. v. Austin*, 430 F.3d 1057 (9th Cir. 2005), *cert. denied*,
127 S. Ct. 931 (2007), *overruled on other grounds*, *Lands Council v. McNair*,
--- F.3d ----, 2008 WL 2640001 (9th Cir. July 2, 2008) ..............................18

*Environmental Defense v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69
(D.D.C. 2007) ...............................................................................11, 18

*Foundation for N. America Wild Sheep v. USDA*, 681 F.2d 1172 (9th Cir. 1982)............11

*Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976 (9th Cir. 1985) .................9

*Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115
(8th Cir. 1999)..................................................................................14

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30
(D.D.C. 2000) ...............................................................................18, 19

*Fund for Animals v. Hall*, 448 F. Supp. 2d 127 (D.D.C. 2006)............................................8

*\*Gulf Restoration Network v. U.S. Department of Transportation*, 452 F.3d 362
    (5th Cir. 2006)........................................................................................................21

*\*Hammond v. Norton*, 370 F. Supp. 2d 226 (D.D.C. 2005) ............................................4, 6

*Lands Council v. McNair*, --- F.3d ----, 2008 WL 2640001
    (9th Cir. July 2, 2008) ....................................................................................9, 17, 18

*League of Wilderness Defenders/Blue Mountains Diversity Project v. Forsgren*,
    309 F.3d 1181 (9th Cir. 2002) .................................................................................18

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989)..................................6

*Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520
    (8th Cir. 2003)............................................................................................................4

*Midwater Trawlers Cooperative v. Department of Commerce*, 393 F.3d 994
    (9th Cir. 2004)..........................................................................................................17

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile
    Insurance Co.*, 463 U.S. 29 (1983) ..........................................................................23

*NRDC v. Daley*, 209 F.3d 747 (D.C. Cir. 2000)..........................................................11, 13

*\*NRDC v. EPA*, --- F.3d ----, 2008 WL 2310951 (D.C. Cir. June 6, 2008) ......................3

*\*NRDC v. Kempthorne*, 525 F. Supp. 2d 115 (D.D.C. 2007)...................................4, 6, 23

*\*National Association of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518
    (2007)....................................................................................................................7, 16

*National Committee for the New River Inc. v. FERC*, 373 F.3d 1323
    (D.C. Cir. 2004) .........................................................................................................5

*Nevada v. Department of Energy*, 457 F.3d 78 (D.C. Cir. 2006) .....................................16

*Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147 (D.D.C. 2005), *aff'd*,
    488 F.3d 1020 (D.C. Cir. 2007)................................................................................21

*Oregon Environmental Council v. Kunzman*, 817 F.2d 484 (9th Cir.1987)......................9

*PDK Laboratories, Inc. v. U.S. Drug Enforcement Admin.*, 362 F.3d 786
    (D.C. Cir. 2004) .......................................................................................................16

*Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1990)...................................17

*Reytblatt v. U.S. Nuclear Regulatory Commission*, 105 F.3d 715 (D.C. Cir. 1997) ...........4

*Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*,
  10 F.3d 1563 (11th Cir. 1994) .......................................................................................5

*\*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).............................15

*Sierra Club v. Adams*, 578 F.2d 389 (D.C. Cir. 1978) ........................................................8

*\*Sierra Club v. EPA*, 356 F.3d 296 (D.C. Cir. 2004) ........................................................12

*Sierra Club v. U.S. Department of Transportation*, 753 F.2d 120 (D.C. Cir. 1985) ...........9

*TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852
  (D.C. Cir. 2006) ...........................................................................................................6

*Walker v. Pharm. Research and Mfrs. of Am.*, 461 F. Supp. 2d 52 (D.D.C. 2006).............5

*Xcel Energy Servs. Inc. v. FERC*, 510 F.3d 314 (D.C. Cir. 2007).......................................5

*\*Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978) ...............2, 17, 22

## FEDERAL STATUTES

5 U.S.C. § 706 .....................................................................................................................16

## FEDERAL ADMINISTRATIVE MATERIALS

40 C.F.R. § 1500.1...............................................................................................................21

40 C.F.R. § 1500.1(c)...........................................................................................................16

40 C.F.R. § 1502.9(c)(1)(ii) ...................................................................................................5

*40 C.F.R. § 1502.22 ..............................................................................................................2

40 C.F.R. § 1508.8.................................................................................................................4

*Biodiversity Conservation Alliance*, 174 IBLA 1 (Mar. 3, 2008)......................................18

## STATE ADMINISTRATIVE MATERIALS

Nevada Division of Environmental Protection, *Permit Guidance*,
  http://ndep.nv.gov/bapc/permitg.html (last visited July 18, 2008) .............................13

Iowa Department of Natural Resources, *Air Dispersion Modeling Guidelines for
  PSD Projects*, http://www.iowadnr.gov/air/prof/progdev/files/
  psd_modeling_guideline.pdf (last visited July 18, 2008) .............................................13

City of Albuquerque, *Air Dispersion Modeling Guidelines for Air Quality Permitting* (June 1, 2007), http://www.cabq.gov/airquality/pdf/coaaqdmodelguidelinesjune2007.pdf (last visited July 18, 2008). ............................13

## COURT RULES

D.D.C. Civ. R. 7(h) ...............................................................................................1

Authorities chiefly relied upon are indicated by an asterisk (*).

# GLOSSARY OF
# ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| APD | Application for Permit to Drill |
| ARPA | Atlantic Rim Project Area |
| Atlantic Rim Project | Atlantic Rim Natural Gas Field Development Project |
| BLM | Bureau of Land Management |
| CBNG | Coalbed Natural Gas |
| CEQ | Council on Environmental Quality |
| EA | Environmental Assessments |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FCC | Federal Communications Commission |
| FWS | U.S. Fish and Wildlife Service |
| IBLA | Interior Board of Land Appeals |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NRDC | Natural Resources Defense Council, *et al.* |
| NSO | No Surface Occupancy |
| $O_3$ | Ozone |
| ROD | Record of Decision |
| WDEQ | Wyoming Department of Environmental Quality |
| WGFD | Wyoming Game and Fish Department |

NRDC raises the same NEPA claims it raised before the Interior Board of Land Appeals ("IBLA") and before this Court in seeking a preliminary injunction halting all actions related to the Atlantic Rim Project. Both the IBLA and this Court declined the request, finding that NRDC was not likely to succeed on the merits of its NEPA claims. Although NRDC asserts that this Court now has the benefit of the entire record to rule on its claims, NRDC has provided no evidence in the record to counter the IBLA and this Court's prior determinations. In particular, NRDC presents no evidence that indicates BLM's actions in this case were arbitrary and capricious. Instead, NRDC seeks to impose requirements on BLM that are simply not required by NEPA.

In fact, as outlined in Defendant's and Defendant-Intervenors' briefs, the record establishes that, pursuant to NEPA, BLM considered the potential environmental impacts of the Atlantic Rim Project. NRDC's mere disagreements with BLM's determinations do not constitute a violation of NEPA. Based on the weight of the evidence in the record, this Court must defer to BLM's reasoned decisions and grant summary judgment in favor of Defendants.[1]

## I.    NRDC HAS PROVIDED NO NEW INFORMATION TO OVERTURN BLM'S REASONED DETERMINATION THAT THE FINAL EIS ADEQUATELY ADDRESSED THE ISSUE OF METHANE SEEPS.

NRDC, as it did in its preliminary injunction motion, asserts that BLM failed to adequately address the issue of methane seeps in its environmental impact statement ("EIS") for the Atlantic Rim Project. Pls.' Combined Reply and Opp'n to Cross Mot. for Summ. J. of Defs. and Intervenors ("NRDC Reply") at 9. While NRDC does not dispute that the Supreme Court in

---

[1] The Local Rules of this Court provide: "In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." D.D.C. Civ. R. 7(h). NRDC only specifically controverted one statement of fact that Defendant-Intervenors submitted in support of its cross-motion, and that was limited to a clarification that the statement of fact related solely to Alternative C, which Defendant-Intervenors do not dispute. *See* Pls.' Resp. to Defs.' and Intervenors' Statements of Material Facts as to Which There is No Genuine Issue, at 5. Hence, all of Defendant-Intervenors statements of fact have been admitted.

1

*Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553-54 (1978), required

challengers of agency action to submit meaningful comments to the agency prior to crying foul

under NEPA, NRDC continues to claim that BLM's analysis was inadequate.  In its opposition

and reply brief, however, NRDC fails to provide any evidence that the public "meaningful[ly]"

raised the issue of methane seeps, including their potential for greenhouse gas emissions, in

comments on the EIS.  NRDC Reply at 13-14.

Apparently recognizing that BLM did not ignore any issues adequately raised during the

comment period, NRDC now claims that BLM chose to "do nothing," ignoring the "advice of its

own experts."  NRDC Reply at 1, 14.  BLM, however, did not "do nothing."  Instead, it

identified and considered in the EIS the potential for development of methane seeps.  AR2351.

BLM noted that "[t]he number or location of these seeps is impossible to predict therefore

monitoring would be established to evaluate this impact."  AR2351.  The monitoring was

required in order to gather more information and determine whether mitigation would be

necessary.  AR4844 (ROD at B-10); AR2368 (FEIS at 4-49); AR9452-AR9454 (BLM Staff e-

mail).  In identifying this uncertainty and, moreover, taking actions to address that uncertainty,

BLM complied with CEQ regulations.  40 C.F.R. § 1502.22.

NRDC, in fact, admits that CEQ regulations allow decisions to continue in light of

uncertain or incomplete information.  NRDC Reply at 13 (citing 40 C.F.R. § 1502.22).  As the

D.C. Circuit recently affirmed in *NRDC v. EPA*, BLM has the discretion to determine whether it

may act based on incomplete information:

> [An agency] typically has wide latitude in determining the extent
> of data-gathering necessary to solve a problem.  We generally
> defer to an agency's decision to proceed on the basis of imperfect
> scientific information, rather than to invest the resources to
> conduct the perfect study."  . . .  In other words, the sole question

> before us is whether [the agency] has acted reasonably, not
> whether it has acted flawlessly.

--- F.3d ----, 2008 WL 2310951, at *8 (D.C. Cir. June 6, 2008) (citation omitted).[2]

NEPA only requires analysis of impacts *proximately caused* by the federal action at issue. *See Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004). The dispute here revolves around NRDC's *assumption* that the Atlantic Rim Project will cause or exacerbate methane seeps, while BLM concluded that causation has not been established. AR2351 (methane seeps "could possibly" develop); AR9460 ("Andy Stone and I talked before the draft went out about putting in a scenario of diminishing water and increased gas production in these features. We decided at the time not to do this because we are still not sure the gas production in these springs and wells is coming from the Mesaverde. Although we know more now, we are still not positive that this is the source of the methane in these springs and wells."). BLM's determination is entitled to deference. *See Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983) ("[A] reviewing court must remember that the [agency] is making predictions, within its area of special expertise, at the frontiers of science. When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.") (citation omitted). NRDC, however, bootstraps its argument that the EIS is deficient in failing to address methane seeps adequately based on its *assumption* that the project will cause the methane seeps. This it may not do.

The record citations NRDC identifies, while listing potential harms associated with methane emissions, provide no evidence that such harms are caused by the proposed action. CEQ regulations require an EIS to consider direct and indirect effects "caused by the action."

---

[2] *American Bird Conservancy, Inc. v. Federal Communications Comm'n ("FCC")*, 516 F.3d 1027, 1033 (D.C. Cir. 2008), cited by NRDC, is inapposite. In that case, the FCC applied a categorical exclusion and declined to conduct either an EA or EIS. Here, BLM conducted an extensive and comprehensive EIS.

40 C.F.R. § 1508.8.  NRDC so recognizes in its reply.[3]  NRDC Reply at 15, n.9.  Thus, as this Court already recognized, the evidence NRDC cites to in the record does not show that such impacts are necessarily "reasonably foreseeable environmental effects of the action."  *NRDC v. Kempthorne*, 525 F. Supp. 2d 115, 122 (D.D.C. 2007) (citing *Hammond v. Norton*, 370 F. Supp. 2d 226, 245-46 (D.D.C. 2005)).  In short, NRDC has not met its burden to establish a sufficient causal connection to the Atlantic Rim Project such that BLM was required to analyze the impacts from methane seeps, including global warming impacts, in the FEIS.  *See id.* ("[P]laintiff cannot demonstrate that methane seeps are *likely* to cause injury and plaintiffs are unable to demonstrate that the BLM erred by not studying the potential of combusting seeps more closely.") (emphasis in original).

In any event, NRDC relies on information in the record dated months *after* the final EIS was completed (and dated months after the close of the public comment period on the final EIS).  Defendant-Intervenors' do not assert that the evidence is "extra-record" as stated by NRDC, NRDC Reply at 14.  Rather, because the evidence constitutes new information submitted *after completion of the EIS*, it cannot be used to show whether the EIS was inadequate.[4]  Def.-Intervenors' Mem. in Support of Mot. for Summ. J. at 25-26.

Properly framed, NRDC's claim should be that the "new information" it submitted after the close of the public comment period required supplementation of the EIS.  CEQ regulations

---

[3]  Thus, as Defendant-Intervenors' explained in their opening brief, contrary to NRDC contention, this case is substantially different from the findings in *Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520 (8th Cir. 2003).  *See* Mem. in Opp'n to Pls.' Mot. for Summ. J. and in Support of Def.-Intervenor Anadarko Petroleum Corp., Warren Resources, Inc. and Double Eagle Petroleum Co.'s Cross-Mot. for Summ. J. (Document Number 59) ("Def.-Intervenors' Mem. in Support of Mot. for Summ. J.") at 28-29 n.23.  In any event, the Eighth Circuit in that case subsequently did not require analysis of greenhouse gas emissions.  *See id.*

[4]  Contrary to NRDC's assertion that BLM found the record was "still open" to comments, BLM was only required to consider comments submitted during the public comment period under the Administrative Procedure Act ("APA").  *See, e.g., Reytblatt v. U.S. Nuclear Regulatory Comm'n*, 105 F.3d 715, 723 (D.C. Cir. 1997) ("We have previously determined that '[a]gencies are free to ignore . . . late filings.'") (alteration and omission in original) (citation omitted).

provide, however, that supplementation may be warranted only where new information is

discovered that constitutes "significant new circumstances or information relevant to

environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R.

§ 1502.9(c)(1)(ii).  *See, e.g., Nat'l Comm. for the New River Inc. v. FERC*, 373 F.3d 1323, 1330

(D.C. Cir. 2004) (The D.C. Circuit has "explained that a 'supplemental EIS is only required

where new information 'provides a *seriously* different picture of the environmental landscape.'

. . . Under the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A), the Commission's

determination that the new information was not significant enough to warrant preparation of a

supplement to the DEIS, is entitled to deference.") (emphasis in text) (citations omitted); *Ark.*

*Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1103-1104 (8th Cir. 2005)

(affirming agency decision not to supplement EIS based on new information that "merely

updates material already contained in the FEIS and does not alter the overall picture of the

environment").  NRDC has not raised this argument in its motion papers, however, and it is

therefore waived.  *See, e.g., Xcel Energy Servs. Inc. v. FERC*, 510 F.3d 314, 318 (D.C. Cir.

2007) (finding petitioner waived claim raised for first time in reply brief); *Walker v. Pharm.*

*Research and Mfrs. of Am.*, 461 F. Supp. 2d 52, 58 n.9 (D.D.C. 2006) (same); *Road Sprinkler*

*Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994)

(finding district court could properly treat claim as abandoned when not raised in summary

judgment papers).

     Regardless, BLM determined that the information obtained after the EIS was completed

was not "new information" that was not already considered in the EIS.  BLM found the

information "raises an issue the Field Office believes has been adequately addressed."  AR9468.

NRDC makes no such showing to dispute this finding.  Again NRDC ignores the guidance of the

Supreme Court: "[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 373 (1989). *See also TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 863 (D.C. Cir. 2006) ("[R]eassessments must end at some point, or NEPA simply becomes a tool to stall new projects indefinitely, 'render[ing] agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made.'") (second alteration in original) (citations omitted).[5]

To support its arguments that BLM erred in concluding that causation has not been established, NRDC first relies on a "draft" memorandum, dated approximately 3 months *after* the final EIS was issued. The draft memorandum, however, acknowledges, among other things, that: (1) seeps identified in the Atlantic Rim Project Area ("ARPA") were associated with naturally occurring springs, AR8799; (2) methane seeps in the ARPA were identified as early as 1877, AR8799; (3) BLM had yet to see any evidence of dewatering at methane seeps, AR8802-AR8803; and (4) "[a]t this point in time there is no scientific data available to prove or disprove that CBNG development within the ARPA has caused or will cause increased gas flux from the known gas seeps," AR8805.[6] BLM's determination of a lack of causation is supported by the record and is entitled to substantial deference. That is the end of the matter.

---

[5] As already noted, and as discussed in Defendants and Defendant-Intervenors' opening briefs, BLM analyzed the potential impacts of methane seeps and is requiring monitoring to further consider the issue. AR2351; AR4844; AR2368.

[6] Despite the fact that these methane seeps have been in existence for well over 100 years, NRDC does not cite to any actual impacts caused by these methane seeps, just speculation. As this Court recognized in this case, NEPA does not require the agency "to consider 'every conceivable possibility,' but only those effects that are 'reasonably foreseeable.'" *NRDC*, 525 F. Supp. 2d at 122 (quoting *Hammond*, 370 F. Supp. 2d at 245-46). *See also Hammond*, 370 F. Supp. 2d at 246 ("[EIS] need not address 'remote and highly speculative consequences.'") (quoting *Deukmejian v. Nuclear Regulatory Comm'n*, 751 F.2d 1287, 1300 & n.63 (D.C. Cir. 1984)).

In any event, NRDC ignores that BLM had already imposed the monitoring recommended in the draft memorandum. AR8806. Thus, this draft memorandum does not dispute BLM's findings and, even if it did, is insufficient to overturn BLM's decision, which is otherwise supported by the record. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2530 (2007) (finding that selectively highlighting potentially inconsistent discrete statements in record is insufficient to render an agency's decision arbitrary and capricious).

Similarly, NRDC's reliance on an e-mail and letter sent to BLM by members of the public after the EIS and the Record of Decision ("ROD") were completed is also unavailing. NRDC Reply at 10, 11 n.6. These documents, at best, merely confirm BLM's identification *in the EIS* of the existence of methane seeps within the ARPA. The first is an e-mail that merely notes a geologist confirms that the mud pots in pictures forwarded constitutes "new activity." AR9432. The e-mail does not identify where in the over 270,000 acre ARPA the "new activity" was found, much less that the alleged "new activity" was caused by the interim drilling. AR9432. BLM had found that the methane seeps are more likely due to abandoned wells.[7] AR8862. Finally, the letter from Wyoming Outdoor Council states, without any support whatsoever, that "evidence suggests" dewatering is causing the seeps, but the only "evidence" referenced is WDEQ's statement that "[t]he most likely source . . . for these mud pots . . . are 'near surface coals and/or abandoned gas wells that penetrate the coals.'" AR8841. Again, this evidence does not contradict BLM's findings.

---

[7]  The individuals submitting this e-mail (Pat and Sharon O'Toole) had raised issues to BLM regarding reinjection of water as the source of the methane seeps. AR9453. BLM, noting that it had been looking at the issue well before the public raised any concerns, indicated that the Wyoming Department of Environmental Quality ("WDEQ") found reinjection of water was not the cause of the methane seeps. *Id. See also* AR8862. NRDC does not dispute this finding. NRDC Reply at 11 n.6.

NRDC's claims that this evidence shows BLM failed to consider the potential effect of dewatering from the project is also incorrect. BLM did consider the potential impacts of dewatering on springs and seeps in the EIS. AR2200, AR2224, AR2227, AR2230, AR2340, AR2347-AR2349, AR2351, AR2368, AR2371. As BLM explained, the final EIS revised BLM's findings in the draft EIS, which found that the potential impacts to groundwater would not be significant, based on monitoring during interim drilling. AR8863-AR8870 (BLM Mem.). Thus, BLM in fact considered the information identified by NRDC. Moreover, while NRDC argues that the discussion on methane seeps in the EIS "could have" been better, this does not constitute a violation of NEPA. *See, e.g., City of Williams v. Dombeck*, 151 F. Supp. 2d 9, 23 (D.D.C. 2001) ("The D.C. Circuit, like other circuits that have considered NEPA challenges, has concluded that 'full, fair, bona fide compliance with NEPA,' does not authorize the courts to 'fly speck' the EIS, nor substitute their judgment for that of the agency.") (quoting *Sierra Club v. Adams*, 578 F.2d 389, 393 (D.C. Cir. 1978)).

NRDC attempts to manufacture a NEPA violation with respect to methane seeps based on its *assumption* of causation, which has not been established. Thus, its arguments that the EIS is inadequate on those grounds must fail. That BLM nonetheless chose to consider late-filed information and include it in the record does not establish that the EIS is inadequate, but instead demonstrates that BLM considered the evidence and determined that it did not rise to the level of significance requiring supplementation. BLM's decision is entitled to deference. *See, e.g., Fund for Animals v. Hall*, 448 F. Supp. 2d 127, 132 (D.D.C. 2006) ("Because the NEPA process 'involves an almost endless series of judgment calls … [t]he line drawing decisions . . . are vested in the agencies, not the courts.") (alteration and omissions in text) (citations omitted).

## II.    BLM IS ENTITLED TO SUBSTANTIAL DEFERENCE IN MAKING SCIENTIFIC JUDGMENTS AS IT DID IN THIS CASE.

Although NRDC attempts to shroud its NEPA arguments as alleged procedural violations, NRDC, in sum, questions BLM's scientific determinations, claiming BLM violated the "scientific integrity" requirement of CEQ regulations.  A court is "most deferential" to agencies when they are "making predictions, within its [area of] special expertise, at the frontiers of science."  *Lands Council v. McNair*, --- F.3d ----, 2008 WL 2640001, at *9 (9th Cir. July 2, 2008) (alteration in original) (citations omitted).  *See also Earthlink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006).  "Though the [agency] must explain the methodology it used . . ., NEPA does not require [the Court] to 'decide whether an [EIS] is based on the best scientific methodology available."  *Lands Council*, 2008 WL 2640001, at *19 (quoting *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985)).  *See also Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 496 (9th Cir.1987) (same); *Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 129 (D.C. Cir. 1985) ("When a court considers the sufficiency of an agency's environmental analysis, 'the court is not to rule on the relative merits of competing scientific opinion.' . . . The agency is entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances.  The court's responsibility lies in assuring that the agency had before it all the data to make an informed decision that adequately took account of the important environmental concerns.") (citations omitted).  NRDC's disagreements with BLM's scientific judgments are not sufficient to show violations of NEPA.[8]

---

[8]  As discussed above, even NRDC's arguments relating to the adequacy of the EIS's discussion of methane seeps is premised on this Court substituting its judgment for that of BLM on a scientific issue, *i.e.*, causation.

    A.      BLM Adequately Explained and Supported its Choice of Methodology to Estimate Ozone Impacts.

        1.      BLM's use of the Scheffe Method was not arbitrary and capricious.

It is beyond dispute that BLM is not tasked with conducting modeling for permitting purposes under the Clean Air Act, but instead must identify potential environmental impacts pursuant to NEPA. Here, NRDC disagrees with BLM's choice of using a screening method to analyze those potential impacts. NEPA, however, only requires identification and consideration of impacts. Based on the information BLM had available to it, the EIS adequately discloses potential ozone impacts caused by the Atlantic Rim Project.[9]

NRDC complains that BLM moved "blindly" forward in using the Scheffe Method in analyzing the project's potential air quality impacts related to ozone, and further argues that BLM concluded the method was "obsolete." NRDC Reply at 3. Neither argument has merit.

First, BLM did not "blindly" move forward. As explained in Defendant-Intervenors' initial memorandum, BLM's experts, in consultation with EPA and WDEQ, considered the appropriate protocol to model air quality impacts and determined the Scheffe Method was acceptable as a screening method for NEPA purposes. Def.-Intervenors' Mem. in Support of Mot. for Summ. J. at 16. BLM further required monitoring, noting that, in the event potential exceedances of the Clean Air Act's National Ambient Air Quality Standards ("NAAQS") are deemed to be caused by the Project, WDEQ had authority to regulate those emissions. *Id.* at 19; AR2335. In fact, NRDC cites to no NEPA requirement that BLM must determine whether there may be exceedances of a NAAQS or, if there is such exceedances, to reject the project.

---

[9] Unlike BLM's review under NEPA, which was based on information available at the time, Clean Air Act permitting requires emission modeling based on specific parameters of the project that were not known at the time of the EIS.

Regulation by WDEQ under the Clean Air Act (and the Wyoming Environmental Quality Act) governs any such potential exceedances.

In response, NRDC claims that BLM's "reliance on monitoring and possible mitigation later cannot excuse its failure to adequately analyze and disclose potential impacts." NRDC Reply at 5. Here, it is clear BLM is not relying on possible mitigation to avoid NEPA review. To the contrary, BLM prepared an EIS and conducted an extensive analysis of potential ozone impacts of the entire project. NRDC can hardly dispute that the EIS considered ozone impacts; instead it disputes the scientific basis of that analysis. NRDC Reply Br. at 8. Thus, this case is unlike those cited by NRDC.[10] *Cf. City of Williams*, 151 F. Supp. 2d at 18-20 (finding Forest Service committed error in failing to consider impacts of water transportation proposals "clearly 'connected'" to the chosen agency action)[11]; *Found. for N. Am. Wild Sheep v. USDA*, 681 F. 2d 1172, 1181-82 (9th Cir. 1982) (finding environmental assessment ("EA") inadequate and proposed mitigation insufficient to support agency's finding that an EIS was not required).

Second, NRDC's claim that BLM's methodology was arbitrary because it, in NRDC's view, "acknowledged that there was a better method" prior to issuance of the final EIS and the ROD is misplaced. NRDC Reply at 6. In support of this claim, NRDC cites to two BLM

---

[10]  NRDC continues to rely erroneously on cases that involve *substantive requirements* not required under NEPA. *See, e.g., NRDC v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000) ("The real issue in this case is whether the 1999 TAL satisfied the conservation goals of the Fishery Act, the management plan, and the Service's regulations."); *Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 923 (D.C. Cir. 1998) (regarding challenge to treatment standards issued under RCRA); *Envtl. Def. v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69 (D.D.C. 2007) (involving mitigation requirements under Clean Water Act).

[11]  This case illustrates the deficiency in NRDC's argument. While finding that the Forest Service erred in not considering impacts to an activity connected to the proposed action at issue, it also rejected another claim by the plaintiffs that the Forest Service failed to consider direct, indirect and cumulative impacts because the EIS did not fully analyze the "socioeconomic" impacts of the proposed action, relying on agency policy statements. *City of Williams*, 151 F. Supp. 2d at 21-22. In that case, the Forest Service, as BLM did here, considered the indirect economic impacts of all of the Alternatives, "but merely used a different methodology than that which is preferred by Plaintiffs." *Id.* at 22. This Court found that "[b]ecause the thrust of Plaintiffs' argument boils down to a mere disagreement with the Forest Service over the methodology used to evaluate the direct effects of Alternative H, and because Plaintiffs have failed to show that the Forest Service acted irrationally, their NEPA claims in this regard cannot be sustained." *Id.* at 23.

memoranda dated August and September 2006 that recognize potential issues with using the

Scheffe Method. NRDC Reply at 3. As an initial matter, NRDC misstates that these memoranda

were written over eight months before the ROD and EIS were issued. In fact, the EIS was

completed in November 2006, and made available to the public on December 1, 2006. AR2080;

AR9562; AR9564. The air quality monitoring was completed even earlier in July of 2006, prior

to both of these memoranda.[12] AR2635. The protocol for the analysis was done in June of 2004,

over two years earlier. AR2740.

In any event, an air quality analysis is not a simple undertaking, and it requires the

scientific judgment of the lead (BLM) and cooperating (WDEQ and EPA) agencies. The D.C.

Circuit rejected an analogous challenge by plaintiffs to the modeling methodology used under

the Clean Air Act in a case where there was an advance in modeling techniques prior to the time

the challenged agency action become final. *See Sierra Club v. EPA*, 356 F.3d 296, 308

(D.C. Cir. 2004) (affirming EPA decision to not require revised modeling to approve state

implementation plan because "[t]o require states to revise completed plans every time a new

model is announced would lead to significant costs and potentially endless delays in the approval

processes"). And that case involved substantive, and not merely procedural, requirements.

Even if there was sufficient time for BLM to conduct new air quality modeling prior to

issuing the ROD, this is irrelevant. BLM found that revised modeling was not necessary.

Contrary to NRDC's assertion, BLM did not acknowledge in either of the cited memoranda that

---

[12] Citing to its initial brief, NRDC implies that BLM was aware of the "inadequacy of the Scheffe method as early as February 2006." NRDC Reply at 3 n.1. In its initial brief, however, NRDC references comments submitted on the Draft EIS that, contrary to NRDC's position, do not outline the inadequacies with the Scheffe Method that NRDC now claims, but allege inadequacies with BLM's background numbers. AR70598-AR70599. While the comments reference comments submitted on other projects, the comments on the draft Atlantic Rim EIS merely note that BLM's methodologies for these projects should be the same. *Id. See also* Def.-Intervenors' Resp. to Pls.' Statement of Material Facts, ¶ 22 (Document Number 59). In any event, these other comments, to the extent they even mention the Scheffe Method, merely dispute BLM's choice of methodology.

there was a better method *for purposes of NEPA review* of the project's impacts to ozone, but simply that claims have been made that the method is obsolete.[13]  AR8666; AR8667.  BLM considered these claims and determined that the Scheffe Method was appropriate for its NEPA review of the Atlantic Rim Project.  This determination was approved by EPA and WDEQ. BLM met with both EPA and WDEQ regarding its decision to retain its analysis using the Scheffe Method for the Atlantic Rim Project, and neither objected.[14]  AR8666; AR8667.

The cases cited by NRDC do not support NRDC's claim that BLM violated CEQ's "scientific integrity" regulation.  Although most of the cases NRDC cites involve substantive requirements, as noted above, even in those cases, the plaintiff did not challenge the agency's choice of methodology, but rather its implementation of that methodology, such as the assumptions incorporated into the models.  *See, e.g., NRDC*, 209 F.3d at 755-56 (finding National Marine Fisheries Service double counted positive effects of incidental catch recommendation as part of fish quota analysis); *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1161-67 (9th Cir. 2006) (finding Forest Service used percentages not found in study it purportedly relied on to estimate tree mortality, thereby resulting in a misleading analysis

---

[13]  Indeed, BLM committed to convene an inter-agency air quality team to consider how to estimate ozone impacts for new projects. AR8668.  *See, e.g., City of Grapevine, Tex. v. Dep't of Transp.*, 17 F.3d 1502, 1507-08 (D.C. Cir. 1994) (affirming agency's noise analysis where agency was evaluating other methods of evaluating noise pollution).

[14]  NRDC's suggestion that the Scheffe Method is no longer valid is further contradicted by the fact that some government authorities continue to reference the Scheffe Method as a screening tool.  *See, e.g.,* Nevada Division of Environmental Protection, *Permit Guidance*, http://ndep.nv.gov/bapc/permitg.html (last visited July 18, 2008); Iowa Department of Natural Resources, *Air Dispersion Modeling Guidelines for PSD Projects*, at 5, http://www.iowadnr. gov/air/prof/progdev/files/psd_modeling_guideline.pdf (last visited July 18, 2008); City of Albuquerque, *Air Dispersion Modeling Guidelines for Air Quality Permitting*, at 3 (June 1, 2007), http://www.cabq.gov/airquality/pdf/ coaaqdmodelguidelinesjune2007.pdf (last visited July 18, 2008).  In fact, NRDC itself, among others, recently filed a complaint challenging BLM's ozone analysis with respect to a leasing decision, claiming the agency should have at least used a screening method (*i.e.*, the Scheffe Method like that used for the Jonah Infill EIS) to anticipate potential ozone impacts.  *See* Compl. at ¶¶93-96, *Colo. Envtl. Coal. v. Kempthorne*, No. 08-1460 (D. Colo. filed July 11, 2008).  BLM had declined to use a screening method, which EPA proposed as an alternative for conducting an analysis for ozone impacts pursuant to NEPA in that case, as being too conservative.  *Id.* at ¶ 95.

supporting agency action).[15]  NRDC does not provide any evidence that BLM used faulty

assumptions or did not follow the Scheffe Method properly.  Thus, BLM's reasoned choice in

methodology was not arbitrary and capricious.

2.    BLM adequately explained its background Ozone levels.

NRDC complains that BLM failed to do "first-grade math" in calculating ozone emission

impacts.  NRDC Reply at 7.  NRDC does not dispute that BLM presented background

information for ozone (which was the only available data at the time).  NRDC Reply at 8 (citing

AR2181).  Nor does NRDC dispute the predicted ozone impacts of the Proposed Action.[16]  *Id.*

(citing AR2332).  NRDC claims, however, that it was error for BLM to use 75.2 $\mu g/m^3$ for

background levels in estimating the total ozone impacts for the ARPA, rather than 147 $\mu g/m^3$.

*Id.*  Contrary to NRDC's claims, BLM adequately explained its reasoning, and NRDC points to

nothing in the record that calls this decision into question.  *See, e.g., Friends of the Boundary

Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1130 (8th Cir. 1999) ("It is not for this court . . .

to scrutinize the scientific value of the computerized model.  We are satisfied that the agency

followed proper procedures, accumulated data, and explained the information in ways that

permitted a reasoned analysis of the evidence for all concerned.").

BLM explained why the background level of 147 $\mu g/m^3$ was overly conservative to

support its use of 75.2 $\mu g/m^3$.  *See* Def.-Intervenors' Mem. in Support of Mot. for Summ. J. at

---

[15]  In *Columbia Falls Aluminum Co. v. EPA*, the court found fault with EPA's continued reliance on a test to
establish compliance with treatment standards under RCRA required prior to disposal of wastes that was empirically
shown to inaccurately estimate the presence of hazardous constituents:  "The treatment standard is in fact a model
intended to predict the degree to which these constituents will leach following disposal.  The problem, as EPA has
admitted, is that the model does not work. The leachate 'generated from actual disposal of the treatment residues is
more hazardous than initially anticipated.'"  139 F.3d at 922 (citation omitted).  BLM is not using the model to show
compliance with a cleanup standard, but to assess potential impacts under NEPA.  Moreover, unlike the case in
*Columbia Falls*, which underestimated the amount of hazardous substances left after disposal, BLM determined the
model it used was overly conservative and, thus, appropriate to use in this case.  NRDC presents no empirical data to
dispute BLM's reasoned decision relying on these estimates, and the record evidence is to the contrary.

[16]  The predicted impacts were for the Proposed Action; "air impacts from each of [the] three alternatives would be
less than or equivalent to the Proposed Action."  AR2334.

22-23 (citing AR2688).  The 147 µg/m$^3$ was initially used as background in the air quality modeling protocol.  AR2770.  Upon further consideration, however, "it was determined that pairing a screening modeled concentration [(derived from the Scheffe Method)] with a maximum background concentration monitored over the period of record results in an overestimate of potential O$_3$ concentrations."  AR2688.  The 75.2 µg/m$^3$ background was subsequently deemed to be the "most representative monitored regional background concentrations available" by all the stakeholders, which included EPA and WDEQ.  AR2676-AR2677; AR2674.  In fact, NRDC admits that BLM explained why it used an average hourly figure rather than the second highest 1-hour value.[17]  NRDC Reply at 8-9 n.4.  BLM also explained that the 75.2 µg/m$^3$ was higher than the background used in the Scheffe Method, which is already conservative.  AR2331.  Moreover, the 147 µg/m$^3$ value was not based on background levels in the ARPA, but on the only monitoring available, which was for a different area in Wyoming that has conditions more conducive to ozone formation.  AR2181, AR2688.  Ozone formation is complex and depends on various factors.  AR2686-AR2688.  Thus, BLM attempted to be conservative, but realistic in assessing the potential ozone impacts of the project.[18]

NRDC then claims that BLM did not adequately explain why it used for its background level an *hourly* average rather than the 8-hour average.  NRDC Reply at 8.  The monitoring upon which BLM based its estimates were done, however, prior to the 8-hour standard being implemented, and BLM used the information it had available.  Moreover, BLM provided the public with EPA's approved conversion factor (0.7), which it used to estimate 8-hour ozone

---

[17]  The 147 µg/m$^3$ NRDC claims BLM should have used represents the fourth highest daily 8-hour value measured over 80 miles away from the Atlantic Rim Project, which was the only data available at the time.  AR2181, AR2129 (map).  The same rationale applies.

[18]  NEPA does not require an analysis of the worst-case scenario.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 354-55 (1989).

levels based on 1-hour levels. AR2687. Finally, the *1-hour average is more conservative than the 8-hour average* (because the 8-hour average can *never* be higher than the 1-hour average), and so NRDC's arguments would result in a *lower* predicted ozone impact. Converting the 1-hour average to 8-hour average would have been less than the 75.2 µg/m$^3$ that BLM used.[19] Again, BLM was being conservative in its analysis. NRDC has not presented any evidence to dispute these findings or to require a revised analysis in the subsequent EAs.

In any event, BLM disclosed to the public the background levels NRDC claims should have been used. In addition, BLM provided for monitoring "to represent impacts due to emissions from the Atlantic Rim field." AR2334. BLM further provided that, "[i]f in the future air monitoring were to show $O_3$ exceedances that were attributable at least in part to sources in the Atlantic Rim field, BLM would consult with WDEQ and EPA to determine whether adaptive management would be needed to mitigate impacts." AR2335. This comports with NEPA:

> Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.

40 C.F.R. § 1500.1(c). BLM's analysis does just that, identifying the potential environmental impacts and requiring monitoring and further mitigation, if necessary, to ensure the protection of the environment.[20]

---

[19] Contrary to NRDC's contention, the 147 µg/m$^3$ is not "the 8-hour *average* background." NRDC Reply at 8 (emphasis added). As previously noted, it is the fourth highest daily 8-hour value (compared to 169 µg/m$^3$, which is the second highest 1-hour value). AR2181.

[20] Even assuming for purposes of argument that NRDC's claims have merit, BLM's actions would constitute harmless error. The APA requires the Court take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. *See also Nat'l Ass'n of Home Builders*, 127 S. Ct. at 2530 (citing *PDK Labs., Inc. v. U.S. Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("In administrative law, as in federal civil and criminal litigation, there is a harmless error rule.")); *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006) ("We have applied the prejudicial error rule in the NEPA context where the proposing agency engaged in significant environmental

B.    BLM's Chosen Mitigation for the Sage Grouse is Supported by the Record.

NRDC again takes issue with BLM's expert determination, based on its review of the record, as to the appropriate mitigation for the protection of sage grouse.  Claiming that it is not attacking BLM's scientific judgments, which are entitled to deference, NRDC alleges procedural deficiencies in BLM's analysis in an attempt to impose requirements on BLM that are beyond NEPA.  This argument contravenes the Supreme Court's holding in *Vermont Yankee*, 435 U.S. at 525, that courts not impose additional requirements not imposed by the statute.  *See also Lands Council*, 2008 WL 2640001, at *10 ("Nor may we impose 'procedural requirements [not] explicitly enumerated in the pertinent statutes.'") (alteration in original) (citations omitted); *Midwater Trawlers Coop. v. Dep't of Commerce*, 393 F.3d 994, 1006 (9th Cir. 2004) ("[T]he Supreme Court has held that 'courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA.'") (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990)).  NRDC's arguments must fail.

NRDC continues to rely on comments of the U.S. Fish & Wildlife Service ("FWS") to support its claim that BLM was required to conduct a scientific analysis as to whether the Atlantic Rim Project would result in listing of the sage grouse under the Endangered Species Act.  BLM, however, is not the agency with authority to make listing decisions under the Endangered Species Act.  NRDC apparently would have BLM conduct a scientific analysis of the potential effects of energy development to the overall population of the sage grouse that, to

---

analysis before reaching a decision but failed to comply precisely with NEPA procedures.").  BLM disclosed the information NRDC claims was necessary to ensure an informed decision, allowing, as NRDC claims, a first grader to "do the math" BLM is alleged to have failed to do.  In addition, "correcting" BLM's use of an *hourly* average rather than an 8-hour average of the available monitoring data would result in a *lower* estimate of ozone impacts.  As such, NRDC's arguments cannot withstand scrutiny.

date, no one has been able to determine.[21]  This goes beyond the disclosure requirements of

NEPA.[22]

The FWS, however, did not find fault with BLM's analysis of impacts to the sage grouse,

but rather that it recommended that BLM not take any action that would so affect the sage grouse

as to require listing.  AR3255; AR10134-AR10135.  Moreover, BLM identified and discussed

the findings of the recent studies identified by FWS and NRDC, noting the potential continued

impacts even with the mitigation measures it is imposing.[23]  AR2260, AR2395, AR2402,

AR2404, AR2499-AR2500.  As such, this is not like those cases that NRDC relies on where the

agency ignored comments from other agencies.  *League of Wilderness Defenders/Blue*

*Mountains Diversity Project v. Forsgren*, 309 F.3d 1181, 1192 (9th Cir. 2002) (agency did not

address impacts of spray drift identified by sister agency); *Friends of the Earth, Inc. v. U.S. Army*

---

[21]  NRDC does not dispute that the Holloran study, relied on by NRDC, stated that the cause of sage grouse decline "remain[s] elusive" and that it was "difficult, if not impossible," to implicate any particular factor or factors. AR7091, AR7085.  Nor does NRDC dispute the evidence in the record that shows the sage grouse can adapt to and repopulate disturbed areas.  Def.-Intervenors' Mem. in Support of Mot. for Summ. J. at 34, n.27, n.28.

[22]  NRDC recognizes that BLM did not identify potential listing of the sage grouse under the Endangered Species Act as a significance criteria for the sage grouse in the EIS.  NRDC Reply at 19.  NRDC attempts to minimize this important fact by noting that BLM simply "*did not mention this criterion.*"  *Id.* (emphasis in original).  BLM, however, recognized the potential loss for habitat and, with all of the information it reviewed regarding the sage grouse, determined that the project did not present sufficient impacts to trigger a potential listing.  Thus, BLM did consider the issue.  That is all NEPA requires.  Precisely because it recognized these potential impacts, BLM imposed mitigation for the protection of the sage grouse.  This goes beyond what NEPA requires.

[23]  NRDC fails to identify any authority to require BLM to conduct an analysis of the proposed mitigation measures for the sage grouse.  *Cf. Ecology Center, Inc. v. Austin*, 430 F.3d 1057, 1067 (9th Cir. 2005), *cert. denied*, 127 S. Ct. 931 (2007), *overruled on other grounds*, *Lands Council v. McNair*, --- F.3d ----, 2008 WL 2640001 (9th Cir. July 2, 2008) (finding agency failed to explain why it changed prior determination that proposed action would result in listing of black-backed woodpeckers); *Envtl. Def.*, 515 F. Supp. 2d at 78, 81 (finding Army Corps used faulty assumptions to manipulate required cost-benefit analysis to support decision that Clean Water Act mitigation requirements would be met, including failure to incorporate known access issues into mitigation calculation and to identify evidence supporting its determination that reduced access will be insignificant amounts).  NRDC also misconstrues the findings of the IBLA in *Biodiversity Conservation Alliance*, 174 IBLA 1 (Mar. 3, 2008) (Ex. 4 to Defendant-Intervenors' Mem. in Support of Mot. for Summ. J.), cited in NRDC Reply at 25.  Neither the instruction manual nor IBLA's decision in that case required such an analysis and, moreover, the 1/4 mile no surface occupancy ("NSO") was upheld in that case.  Further, the record in this case has a similar Instruction Memorandum relied on in that case - IM WY-030-2006-001, Statement of Policy Regarding Greater Sage-Grouse Management Definitions and Use of Protective Stipulations and Conditions of Approval (COAs)" (Dec. 8, 2005).  AR79130-AR79135.

*Corps of Eng'rs*, 109 F. Supp. 2d 30, 41-42 (D.D.C. 2000) (Army Corps made only conclusory statements in response to cumulative impacts identified by sister agency).

Further, BLM's choice of mitigation is supported by the record. NRDC continues to fault BLM for not expressly identifying the specific literature it relied on for the 1/4-mile NSO restriction. NRDC Reply at 21-22. However, the record does identify specific studies BLM relied on. First, the EIS expressly lists the WGFD Recommendations for Development of Oil and Gas Resources within Crucial and Important Wildlife Habitats as a reference. AR2542. These recommendations, which also included a significant review of the literature, list the 1/4-mile NSO. AR6564. Second, the 1/4-mile NSO referenced in the "Wyoming Sage Grouse Plan," which is short for the "Wyoming Greater Sage-Grouse Conservation Plan," is also included in the record. The WGFD recommendations list this as part of its discussion of the literature. AR6615, AR6657. Moreover, BLM referenced the specific page of the Plan in its response to comments, which is a publicly available document prepared by the WGFD,[24] that identified the 1/4-mile NSO.[25] AR4678. Finally, NRDC does not dispute that the Connelly guidelines do not impose a strict 2-mile NSO, but recognizes that such limitation be imposed "whenever possible."

Instead, NRDC accuses defendants of making post-hoc rationalizations to support BLM's decision. NRDC Reply at 23-25. Each of these accusations is meritless. For example, NRDC

---

[24] The document is available at http://gf.state.wy.us/wildlife/wildlife_management/sagegrouse.asp.

[25] NRDC also claims that the WGFD recommendations do not support BLM's decision because BLM did not include all of the possible mitigation identified, citing to a recommendation that construction sites be selected that would not disturb outside suitable nest cover or brood-rearing habitats. NRDC Reply at 22 n.14. That BLM chose different additional mitigation measures is irrelevant. NRDC takes issue with the 1/4-mile NSO and has made no argument that the numerous additional measures imposed by BLM are inadequate. In any event, BLM has imposed seasonal restrictions within 2 miles of nesting habitat, limited construction of structures within 1/4 mile and 1 mile of the perimeter of a lek, and required monitoring of leks, including mapping of nesting and brood-rearing habitat. AR2623, AR2626, AR4678. Further, as BLM noted it is working with the WGFD toward the protection of the sage grouse, but that it would not impose WGFD recommendations that were not feasible. AR4674; AR4719. Hence, NRDC again simply challenges BLM's decision on the appropriate mitigation measures to be imposed.

argues that pointing out BLM's consideration of the Naugle study is a post-hoc rationalization. NRDC Reply at 23.  However, NRDC claims that the EIS is inadequate due to BLM's failure to address the Naugle study in relation to its choice of mitigation.[26]  As BLM discusses at length in the EIS, the Naugle study describes potential, localized impacts of oil and gas operations on the sage grouse.  AR2395.  The Naugle study does not recommend specific mitigation.  AR7357-AR7366.  Thus, BLM properly disclosed the results of this study, and considered that study in the context of the other evidence in the record.  NEPA required BLM to do no more.

Second, NRDC claims that pointing out the distinctions identified between this project and that studied by Holloran is a post-hoc rationalization.  This argument is misplaced—pointing out these distinctions makes clear that NRDC is challenging the *substance* of BLM's decision, not whether the issues were in fact considered.  Moreover, NRDC cites to FWS comments on the *DRAFT* EIS that references the Holloran study, claiming that the project in that study used the same mitigation.  AR3256, cited in NRDC Reply at 24.  These comments were submitted prior to BLM imposing surface disturbance limitations on the Atlantic Rim Project.  BLM found that these surface disturbance limitations will reduce the impacts on the sage grouse, as BLM found that the loss of habitat would be substantially reduced.[27]  Again, these distinguishing factors highlight that NRDC disputes the substance of BLM's reasoned determination.  Comparing the measures proposed by NRDC against those imposed by BLM in context of the project's purpose

---

[26]  NRDC then complains that the Naugle study disputes BLM's choice of mitigation.  This, of course, is a substantive disagreement with BLM's decision, to which BLM is entitled to deference.

[27]  NRDC attempts to create some dispute as to whether the measures imposed at the Pinedale project were different from those for the Atlantic Rim Project, though does not address the actual Pinedale documents referenced.  NRDC Reply at 24.  While the Pinedale project anticipated some 40-acre spacing, as noted by the Holloran Study, it is generally using 10-acre spacing.  *See* Dear Reader Letter (Ex. 2 to Defendant-Intervenors' Mem. in Support of Mot. for Summ. J.).  Regardless, even considering some use of 40-acre spacing, NRDC Reply at 24 n.15, this is still more dense than the general 80-acre spacing for the Atlantic Rim Project.

and need is not a post-hoc rationalization, but necessary for the Court to understand the agency's decision.

NRDC apparently faults BLM for not expressly referencing the FWS's comments or Connelly guidelines in the main text of the EIS. However, the purpose of NEPA is to make better decisions. 40 C.F.R. § 1500.1. Here, BLM did so, imposing more stringent requirements on the project for the protection of wildlife than the Proposed Action, as well as requiring ongoing monitoring and adaptive management. BLM's failure to specifically cite to the FWS's comments or the Connelly guidelines does not render this decision arbitrary and capricious. This is particularly so where, as NRDC does not dispute, NEPA does not require any mitigation be imposed.

### III.    NRDC PRESENTS NO EVIDENCE TO CONTRADICT BLM'S DETERMINATION THAT OTHER NATURAL GAS PROJECTS IN EARLY PROPOSAL STAGES WERE NOT "REASONABLY FORESEEABLE" FOR PURPOSES OF NEPA'S CUMULATIVE IMPACT ANALYSIS.

NRDC repeats in its opposition and reply its argument that BLM erred in failing to analyze two pending projects as part of its cumulative impacts analysis. As NRDC recognizes, this Court has already held that "absent some evidence that the ultimate extent of these projects, as well as their ultimate approval, was reasonably foreseeable, this Court will not overturn the BLM's decision to exclude them from its cumulative impact analysis." NRDC Reply at 27 n.16 (citing PI Decision at 13). There is no draft EIS to date for either project (Def.-Intervenors' Mem. in Support of Mot. for Summ. J. at 40-42), and NRDC fails to address the case law supporting BLM's decision not to consider projects for which no draft EIS is prepared. *See Gulf Restoration Network v. U.S. Dep't of Transp.,* 452 F.3d 362, 368-70, 371 n.15 (5th Cir. 2006). *See also Ocean Conservancy v. Gutierrez,* 394 F.Supp.2d 147, 164 (D.D.C. 2005), *aff'd,* 488 F.3d 1020 (D.C. Cir. 2007) ("That NMFS *could have* conducted a more comprehensive

cumulative impacts analysis does not render its analysis violative of NEPA. . . . To the contrary, as our Circuit Court has observed, an agency need only consider those environmental effects that are '*reasonably foreseeable*.' . . . Indeed, 'NEPA does not mandate that every *conceivable* possibility which someone might dream up must be explored in an EIS.' . . . Thus, having found that NMFS adequately identified the cumulative impacts in the final SEIS, this Court defers to its cumulative impacts analysis, … .") (emphasis in original) (citations omitted).

Instead, NRDC claims that the record shows BLM "had the information needed to evaluate them." NRDC Reply at 26. The only additional evidence NRDC cites to, however, is a map that identifies locations of projects that includes the Continental Divide-Creston Natural Gas Project, which NRDC asserts establishes that BLM's determination was unreasonable. AR86298. As previously explained, however, the location of the Continental Divide-Creston Natural Gas Project could be discerned as it is an extension of two projects already in existence, which were considered as part of BLM's cumulative analysis. The Map provides no details as to "the ultimate extent of these projects," but simply consolidates the two project locations. *Compare* AR86298 *with* AR2138. This Map does not even identify the Hiawatha Regional Energy Development Project. As such, these claims are easily dismissed.

## IV.    NRDC PRESENTS NO EVIDENCE THAT BLM WAS REQUIRED TO CIRCULATE DRAFT ENVIRONMENTAL ASSESSMENTS FOR INDIVIDUAL PLANS OF DEVELOPMENT.

Neither the applicable BLM regulations nor NEPA requires BLM to provide copies of the applications for permits to drill ("APDs") or draft EAs. NRDC cannot dispute the Supreme Court's admonition in *Vermont Yankee*, 435 U.S. at 525, that courts may not impose additional procedural requirements not required by statute. Yet, NRDC does just that here in asking this Court to require BLM to provide even more opportunities for public comment than was already

provided.  BLM posted the notices of APDs, as that is all its regulations require.  NRDC Reply at

29.  NRDC's reply ignores, however, that BLM also posted notices that it was preparing EAs for

each plan of development at issue.  NRDC declined to request copies of those EAs until close to

the start of this litigation.  Moreover, NRDC's comments on the EAs raise no new issues that

could not have been addressed in comments on the EIS, and instead seek to require BLM to re-

conduct analyses related to the entire project that it has already conducted.  Thus, its arguments

related to BLM's failure to provide adequate public comment are easily dismissed.[28]

## V.    CONCLUSION

The D.C. Circuit recently reaffirmed the standard of review under the APA for review of

agency action based on an administrative record.  A plaintiff challenging agency action has the

burden to demonstrate that:

> [BLM] has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter
> to the evidence before the agency, or is so implausible that it could
> not be ascribed to a difference in view or the product of agency
> expertise.

*Am. Wildlands v. Kempthorne*, -- F.3d ----, 2008 WL 2651091, at *5 (D.C. Cir. July 8, 2008)

(quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

For the foregoing reasons, and the reasons outlined in Defendant-Intervenors' initial

memorandum, none of these instances is present in this case.  Therefore, this Court should deny

Plaintiffs' Motion for Summary Judgment and grant summary judgment in favor of defendants.

---

[28]  Indeed, NRDC cites to the same case this Court found supported BLM's actions in this case.  *NRDC*,
525 F. Supp. 2d at 120-21.

Respectfully submitted,


/s/ Michael B. Wigmore

_____
Michael B. Wigmore (DC Bar #436114)
Sandra P. Franco (DC Bar #467091)
Bingham McCutchen LLP
2020 K Street, NW
Washington, DC  20006-1806
(202) 373-6000 (tel)
(202) 373-6001 (fac)

*Counsel for Anadarko Petroleum Corporation*
*Warren Resources, Inc., and Double Eagle*
*Petroleum Co.*


Robert C. Mathes (DC Bar #484255)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO  80202
(303) 892-1400 (tel)
(303) 892-1401 (fac)

*Counsel for Double Eagle Petroleum Co.*


Dated:  July 22, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of July, 2008, the foregoing Reply In Support Of

Defendant-Intervenor Anadarko Petroleum Corporation, Warren Resources, Inc., And Double

Eagle Petroleum Co.'s Cross-Motion For Summary Judgment was electronically filed through

the CM/ECF system, which caused the following parties to be served by electronic means, as

more fully reflected on the Notice of Electronic Filing:


Sharon Buccino                             Lori Caramanian
Benjamin Longstreth                        U.S. Department of Justice
Aaron M. Bloom                             1961 Stout Street, 8th Floor
Natural Resources Defense Council          Denver, CO 80294
1200 New York Avenue, NW                   lori.caramanian@usdoj.gov
Suite 400
Washington, D.C. 20005
sbuccino@nrdc.org
blongstreth@nrdc.org
abloom@nrdc.org


Jay A. Jerde
John S. Burbridge
David James Willms
Deputy Attorney General
Wyoming Attorney General's Office
123 Capitol Building
Cheyenne, WY 82002
jjerde@state.wy.us
jburb1@state.wy.us
dwillm@state.wy.us


                          /s/ Michael B. Wigmore
                          Michael B. Wigmore


A/72597328.1

1