# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | 07-cv-01709-RJL |
| ) | |
| DIRK A. KEMPTHORNE, in his official capacity, ) | |
| THE UNITED STATES DEPARTMENT OF THE ) | |
| INTERIOR, and ) | |
| THE BUREAU OF LAND MANAGEMENT, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| ANADARKO PETROLEUM CORPORATION, ) | |
| WARREN RESOURCES, INC., and DOUBLE ) | |
| EAGLE PETROLEUM CO., ) | |
| and ) | |
| STATE OF WYOMING, ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |

## FEDERAL DEFENDANTS' REPLY

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.    BLM Took a Hard Look at Air Quality Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B.    BLM's Use of the Scheffe Method Was Within Its Discretion . . . . . . . . . . . . . . . . . . . . 2

C.    BLM Was Not Required to Begin Anew With a Different Method  . . . . . . . . . . . . . . . . 7

D.    BLM Properly Calculated Ozone Concentrations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

E.    BLM Adequately Addressed Methane Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

F.    BLM Adequately Considered Impacts on Sage Grouse  . . . . . . . . . . . . . . . . . . . . . . . 15

G.    BLM Adequately Examined Mitigation Measures for Sage Grouse . . . . . . . . . . . . . . . 19

H.    BLM's Analysis of Impacts on Big Game Satisfies NEPA . . . . . . . . . . . . . . . . . . . . . . 22

I.    BLM Satisfied NEPA's Public Participation Requirements . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# CASES

American Bird Conservancy, Inc. v. FCC, 516 F.3d 1027 (D.C. Cir. 2008) . . . . . . . . . . . . 14, 25

American Wildlands v. Kempthorne, -- F.3d --, 2008 WL 2651091
    (D.C. Cir. July 8, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190 (D.C. Cir. 1991) . . . . . . . . . . . . . 5, 15

Citizens Concerned About Jet Noise v. Dalton, 48 F. Supp. 2d 582 (E.D. Va. 1999) . . . . . . 6, 7

City of Williams v. Dombeck, 151 F. Supp. 2d 9 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . 2, 3, 17

Coalition on Sensible Transp. Inc. v. Dole, 826 F.2d 60 (D.C. Cir. 1987) . . . . . . . . . . . . . 23, 24

Envtl. Defense v. U.S. Army Corps of Engr's, 515 F. Supp. 2d 69 (D.D.C. 2007) . . . . . . 5, 6, 10

Forest Guardians v. Animal & Plant Health Inspection Serv.,
    309 F.3d 1141 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Friends of the Earth v. Corps, 109 F. Supp. 2d 30 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . 15, 16

Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275 (9th Cir. 1973) . . . . . . . . . . . . . 14

Kleppe v. Sierra Club, 427 U.S. 390 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Lands Council v. McNair, __ F.3d __, 2008 WL 2640001 (9th Cir. July 2, 2008) . . . . . . . passim

League of Wilderness Defenders v. Forsgren, 309 F.3d 1181 . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Mid States Coalition v. Surface Transp. Bd., 345 F.3d 520 (8th Cir. 2003) . . . . . . . . . . . . 13, 14

Nevada v. Dep't of Energy, 457 F.3d 78 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Northern Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969 (9th Cir. 2006) . . . . . . . . . . . . . 19, 20

NRDC v. Kempthorne, 525 F. Supp. 2d 115 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . 19, 23, 25

Oceana, Inc. v. Gutierrez, 488 F.3d 1020 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ONRC v. Goodman, 505 F.3d 884 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Oregon Envt'l Council v. Kunzman, 817 F.2d 484 (9th Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . 3

Reed v. Avis Rent-A-Car, 29 F. Supp.2d 1121 (N.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . . . . 17

<u>TOMAC v. Norton</u>, 433 F.3d 852 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

<u>Village of Bensenville v. FAA</u>, 457 F.3d 52 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## REGULATIONS

40 C.F.R. § 1502.24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

## INTRODUCTION

Relying on misconstructions of the law and misleading excerpts of the administrative record, Plaintiffs point to a handful of alleged inadequacies in the FEIS related to BLM's analysis of the impacts on air quality, sage grouse and big game. As set forth in our opening brief, BLM examined these impacts as part of a comprehensive analysis that satisfied NEPA. The court should decline Plaintiffs' invitation to "'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor." See Nevada v. Dep't of Energy, 457 F.3d 78, 93 (D.C. Cir. 2006) (citation omitted). BLM is entitled to summary judgment.

## A.     BLM Took a Hard Look at Air Quality Impacts

In their reply, Plaintiffs continue to object to BLM's use of the Scheffe method, and to its analysis of the background levels of ozone, but they do not dispute several key points. First, Plaintiffs admit that, except for ozone, BLM adequately examined the impacts of the project on air quality in the FEIS and Air Quality Technical Support document (AQTSD). Fed. Def. SJ Br. at 11-18. Second, Plaintiffs do not dispute that EPA and air quality experts from the Wyoming Department of Environmental Quality (WDEQ), were involved in the air quality analysis from the outset, and that these agencies agreed that BLM's reliance on the Scheffe method was appropriate. Third, Plaintiffs do not dispute that BLM's analysis of the air quality impacts is entitled to a deferential standard of review. See, e.g., Fed. Def. SJ Br. at 19-20. Plaintiffs also now concede that their argument that a specific model was required was wrong.[1] Plfs. SJ Br. at 11-13.

Therefore, Plaintiffs' only remaining objection to the analysis of air quality impacts is their

---

[1] Plaintiffs argued at length in their opening brief that BLM's reliance on the Scheffe method was arbitrary because "it does not meet the regulatory standards established by EPA for air quality modeling," i.e., EPA's Guideline on Air Quality Models. Plfs. SJ Br. at 11. Plaintiffs even went so far as to assert that EPA's Guideline required BLM to use a specific model or to obtain EPA approval to use an alternative model. Id. at 12-13. We previously explained that Plaintiffs' interpretation of the EPA Guideline was wrong because the Guidelines do not apply here, Fed. Def. SJ Br. at 14 n.3; without explanation, Plaintiffs abandon that argument in their reply.

contention that BLM did not properly assess impacts related to ozone, an argument that is founded on the claim that BLM should have used a more current method of examining ozone impacts than the Scheffe method. Plfs. SJ Reply at 3. Plaintiffs' argument is premised entirely on their pervasive and incorrect contention that BLM admitted that the Scheffe method was inadequate but relied on it anyway. Plfs. SJ Reply at 2, 3, 4, 5, 6. Plaintiffs make several arguments that are variations on this theme, including that BLM should have updated its analysis before making site-specific decisions; that BLM "failed first grade math" in calculating ozone concentrations; and that BLM may not rely on monitoring to address gaps in the analysis.[2] Plfs. SJ Reply at 3-9. However, BLM never admitted that the Scheffe method was "obsolete." Plfs. SJ Reply at 5. Rather, BLM "expressed confidence in the analysis, concluding that '[p]otential air quality impacts from the Atlantic Rim project were estimated to be below applicable air quality standards." ROD at 7 (AR 4802).

**B.    BLM's Use of the Scheffe Method Was Within Its Discretion**

Plaintiffs have not met their burden of demonstrating that BLM's reliance on the Scheffe method was irrational because the record shows that BLM adequately examined the ozone impacts. Indeed, Plaintiffs do not contend that the outcome would have been any different had BLM used a different method. Nor do they identify any specific flaws in the Scheffe method that skewed the analysis. In City of Williams v. Dombeck, 151 F. Supp. 2d 9, 23 (D.D.C. 2001), the plaintiffs

---

[2] Plaintiffs wrongly claim that BLM argued in its opening brief that "monitoring can address any gaps in the air quality analysis." Plfs. SJ Reply at 5. What we stated was that "[t]he State Director likewise set out a mechanism to deal with new information, stating that if monitoring shows that ozone exceedances are attributable, even in part, to sources from the Atlantic Rim project, BLM will consult with WDEQ and EPA to determine whether adaptive management is needed to mitigate impacts." Fed. Def. SJ Br. at 17, citing ROD at 7 (AR 4802). The point is that NEPA is predictive. As the D.C. Circuit observed in Oceana, Inc. v. Gutierrez, 488 F.3d 1020, 1025 (D.C. Cir. 2007), "[a]gencies, like legislators, make predictive judgments like this all the time. Sometimes the predictions are realized; sometimes they are not and adjustments must be made. So long as the agency's judgment is within the bounds of reason courts will uphold it." That is the case here.

challenged the agency's methodology for evaluating economic impacts. Finding that the plaintiffs had not shown that the methodology was "beyond agency discretion," the court rejected their NEPA challenge "[b]ecause the thrust of Plaintiffs' argument boils down to a mere disagreement" with the agency's experts. Id. Quoting Oregon Envt'l Council v. Kunzman, 817 F.2d 484, 496 (9th Cir.1987), the court observed that "'NEPA does not require that we decide whether an [EIS] is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology.'" 151 F. Supp. 2d at 23. Thus, the question before the Court is not whether a "better method existed than the Scheffe method." Plfs. Reply at 6. Instead, it is whether BLM's reliance on the Scheffe method was reasonable, and the record shows that it was.

On July 8, 2008, in American Wildlands v. Kempthorne, -- F.3d --, 2008 WL 2651091, at *8 (D.C. Cir. 2008), a challenge brought pursuant to the Endangered Species Act (ESA), the D.C. Circuit affirmed that "'[t]he rationale for deference is particularly strong when the [agency] is evaluating scientific data within its technical expertise: "[I]n an area characterized by scientific and technological uncertainty[,] . . . this court must proceed with particular caution, avoiding all temptation to direct the agency in a choice between rational alternatives."'" Quoting Int'l Fabricare Inst. v. EPA, 972 F.2d 384, 389 (D.C. Cir. 1992) (quoting Envtl. Def. Fund v. Costle, 578 F.2d 337, 339 (D.C. Cir. 1978)). In addition, just three weeks ago, on July 2, 2008, the Ninth Circuit issued a major decision, Lands Council v. McNair, __ F.3d __, 2008 WL 2640001, at *1 (9th Cir. 2008), clarifying its environmental jurisprudence in the NEPA context. Ruling unanimously *en banc*, the court re-affirmed that while an agency must explain its methodology, "NEPA does not require [the reviewing court] to 'decide whether an [EIS] is based on the best scientific methodology available.'" Id. at *19, quoting Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 986 (9th Cir. 1985) (citations omitted). The court also agreed with the D.C. Circuit that courts should "conduct a

'particularly deferential review' of an 'agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable.'" Id. at *9, quoting Earthlink, Inc. v. FCC, 462 F.3d 1, 12 (D.C. Cir. 2006) (citations and internal quotations omitted); See also ONRC v. Goodman, 505 F.3d 884, 897 (9th Cir. 2007) ("the question is whether the FEIS adequately disclosed the model's potential weakness."). Thus, because NEPA did not require BLM to use the best scientific methodology available, and because BLM forthrightly addressed potential weaknesses in the method, the court should uphold BLM's reliance on the Scheffe method.

Plaintiffs denigrate BLM's reevalaution of the method in the August 31, 2006 information memorandum, and the September 8, 2006 notes from a meeting with EPA and WDEQ, Plfs. Reply at 3, which they argue shows that BLM conceded the inadequacy of the Scheffe method. However, as stated above, Plaintiffs misleadingly excerpt quotes from the documents. The August 31, 2006 memorandum does *not* state that BLM concluded that its use of the Scheffe method was obsolete, as Plaintiffs suggest. Plfs. SJ Reply at 3. It states that BLM was responding to a complaint by Wyoming Outdoor Council (WOC), a plaintiff here, that the Scheffe method was obsolete. AR 8666. Likewise, Plaintiffs also wrongly characterize the September 8, 2006 EPA meeting notes to argue that BLM found the Scheffe method was "not appropriate for the purpose of 'estimat[ing] potential ozone impacts," Plfs. SJ Reply at 3, quoting AR 8667. BLM made no such finding. Rather, it disclosed that Dr. Scheffe had recently written that the method was not an appropriate tool for estimating ozone impacts. AR 8667. Ultimately, the two documents show that BLM considered the information and evaluated whether it was appropriate to continue to rely on the Scheffe method. In conjunction with EPA and WDEQ air quality experts, BLM concluded that it was appropriate to "present potential ozone concentrations as estimated by Scheffe method," the best method available

at the time the FEIS was completed.[3]  AR 8667; ROD at 7, E-7 (AR 4802, 4877).

Thus, Plaintiffs' conclusion in their reply that BLM "relied on an ozone analysis that the agency itself acknowledged was inadequate in violation of NEPA" and that BLM acknowledged that the Scheffe method "lacks the 'professional integrity' required by 40 C.F.R. § 1502.24" is flatly contradicted by the record.  Plfs. SJ Reply at 2.  Contrary to their assertion, BLM determined in the ROD that the Scheffe method provided an adequate analysis of the potential impacts.  Fed. Def. SJ Br. at 17.  The FEIS explains that the method "was considered by the inter-agency air quality team to be a reasonable tool" for estimating air quality impacts.  FEIS at 4-15 (AR 2334).  BLM explained that the Scheffe method uses NOx and VOC emissions to estimate maximum ozone concentrations, and details how the analysis was conducted.  Id. at 4-9 (AR 2328); AR 2687-88.  Applying the rule of reason to BLM's choice of scientific methodology, Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195 (D.C. Cir. 1991), the Court should uphold BLM's analysis.

Plaintiffs parenthetically cite Envtl. Defense v. U.S. Army Corps of Engineers, 515 F. Supp. 2d 69 (D.D.C. 2007) in support of their argument that BLM's analysis violated NEPA's scientific integrity requirement, which is contained in 40 C.F.R. § 1502.24.  Plfs. SJ Reply at 2.  However, the case is more supportive of BLM's position.  There, the court stated that § 1502.24 contains an "affirmative mandate to 'insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements[,] identify any methodologies used and . . . make explicit reference by footnote to the scientific and other sources relied upon for conclusions[.]'" 515 F. Supp. 2d at 78, quoting 40 C.F.R. § 1502.24.  It concluded that the agency had deliberately manipulated its model in multiple respects in order to achieve a specific result.  515

---

[3] Another point Plaintiffs do not dispute is that in his letter to one of Earthjustice's attorneys regarding the use of the method, Dr. Scheffe did not address the applicability of the method in the NEPA context, and also did not opine on the appropriateness of its use for this project.  Def SJ Br. at 15, n.4; AR 9881.  Nor did he discuss the adequacy of the analysis in the FEIS at issue here.

F. Supp. 2d at 85. Significantly, the court found that the agency had failed to incorporate known issues and to identify the evidence supporting its conclusions, and that omission resulted in a failure to provide a "'complete analytic defense of its [habitat] model,'" which violated NEPA's scientific integrity requirement. Id. at 81 (citation omitted). Also significant, the court found that the agency's decision to leave an important parameter "out of the calculation entirely, . . . and against the recommendations of FWS and Missouri Department of Conservation HEP team members, arbitrarily manipulates the model." Id. at 83. The court held that the agency had "demonstrated its willingness to do whatever it takes to proceed with this project--change definitions, abandon core assumptions--even if it means ignoring serious environmental impacts." Id. at 85. Based on these egregious manipulations of the model, the court found the analysis was scientifically unsound. Id.

That is not the case here. Unlike Environmental Defense, BLM provided an explanation for its decision to rely on the Scheffe method. Moreover, the decision was made with the input of EPA and WDEQ's air quality experts, not against their recommendations. Likewise, there is no evidence that the agency purposely skewed the analysis to achieve a specific result or that it ignored serious environmental impacts. The facts of this case are more in line with Citizens Concerned About Jet Noise v. Dalton, 48 F. Supp. 2d 582 (E.D. Va. 1999), aff'd, 217 F.3d 838 (4th Cir. 2000), where the court considered a similar challenge to a Navy air quality analysis. Relevant here, the court distinguished between the agency's compliance with NEPA and its compliance with the CAA, holding that "[i]n the air quality context, as long as the FEIS reasonably describes the change in pollutants that will result from a proposed action, and does so without any significant errors, the FEIS is adequate." Id. at 601. The court found that the Navy had made an "extensive effort to ensure the correctness of its air emissions analysis" over the two-year period leading to publication of the FEIS. Id. at 602. It concluded that the "fact that there were changes in assumptions and

6

model input data" was not dispositive because the "burden on plaintiff is not just to point out possible errors in the agency's assumptions and methodology, but to demonstrate how and why the FEIS was erroneous." Id. Likewise, although Plaintiffs object to BLM's reliance on the Scheffe method, they have failed to meet their burden of demonstrating that BLM's analysis is clearly erroneous.

**C.    BLM Was Not Required to Begin Anew With a Different Method**

Plaintiffs seek paralysis through analysis with their arguments that BLM was required to undertake a new air quality assessment after the FEIS was completed because BLM supposedly had ample time prior to the ROD to do a new study. Plfs. SJ Reply at 3. But, Plaintiffs misconstrue the facts and the law. First, as discussed above, the Scheffe method adequately examined the potential impacts on air quality. Therefore, while Plaintiffs may prefer that BLM use a different methodology, because BLM took a hard look at ozone impacts, it was not required to conduct a lengthy reexamination using a different model. Second, Plaintiffs' underscored, but incorrect, contention that there were "eight months" between the August and September 2006 memoranda discussing the propriety of continuing to rely on the Scheffe method, and the time the "Atlantic Rim Decision Record/FEIS was issued on May 21, 2007" seriously skews the sequence of events. Plfs. SJ Reply at 3 (emphasis Plaintiffs'). The ROD explains that "the FEIS was released to the public and a Notice of Availability (NOA) published in the Federal Register on November 30, 2006." ROD at 22 (AR 4817). BLM accepted comments on the FEIS through January 4, 2007. Id. It considered the comments and responded to them in the ROD, which was signed on March 23, 2007. Id. The ROD was released to the public on May 21, 2007. 72 Fed. Reg. 28,518 (May 21, 2007).

In addition, Plaintiffs' facile claim that BLM "blindly pushed forward" with an "inadequate" analysis completely disregards the extensive effort involved in the air quality analysis. Plfs. SJ

Reply at 3.   BLM began working with the contractor that prepared the air quality assessment in

2000.  AR 7850.  The Protocol for assessing air quality impacts was finally finished in 2004 (AR

2740), and the AQTSD was completed in July 2006.  AR 2636.  In other words, following extensive

analysis, the FEIS was released only two months after BLM met with EPA and WDEQ air quality

experts to discuss the implications of Plaintiffs' comments that the Scheffe method was obsolete.

BLM gave the issue serious consideration, and ultimately concluded that the analysis was adequate.

Thus, while Plaintiffs attempt to distinguish <u>Village of Bensenville v. FAA</u>, 457 F.3d 52

(D.C. Cir. 2006) in a footnote, claiming that the "facts are quite different," because BLM did not

conduct a comparison between the Scheffe method and some other method which they do not

identify, Plfs. SJ Reply at 5 n.3, their efforts are unavailing.  The case made clear that an agency acts

within its discretion by "creating its models with the best information available when it began its

analysis and then checking the assumptions of those models as new information became available,

[as] a reasonable means of balancing those competing considerations, particularly given the many

months required to conduct full modeling with new data."  457 F.3d at 71.  BLM was not required

to conduct a full comparison of the results using the Scheffe method and another method,

particularly given the many months it would take to do so.  What is important is that it checked the

assumptions of its analysis given the questions raised about the Scheffe method and concluded that

the method was a reasonable tool that adequately disclosed the impacts.  <u>See also</u> <u>TOMAC v.</u>

<u>Norton</u>, 433 F.3d 852, 863 (D.C. Cir. 2005) (agency properly "undertook an extensive analysis of

the air quality impacts likely to occur based on the regime with which it was faced, which is all that

can reasonably be expected").  NEPA did not require BLM to use the best available methodology,

only a method that reasonably disclosed the anticipated impacts.  BLM relied on the Scheffe method

as a "reasonable tool" to undertake that analysis.  ROD at 7, E-9 (AR 4802, 4877).  EPA and WDEQ

agreed with BLM's experts that the use of the Scheffe method was a reasonable tool for evaluating impacts, and the Court should defer to that determination.

Plaintiffs' argument that BLM was required to conduct an entirely new analysis for its site-specific decisions therefore also fails. Plaintiffs admit that it is appropriate for BLM to tier its analysis to a programmatic EIS. Plfs. SJ Br. at 13. Essentially, their argument would mean that BLM was required to prepare a programmatic study for a site-specific decision, an absurd result. BLM adequately analyzed the air quality impacts in the FEIS, and appropriately relied on that analysis for its site-specific decisions. Nothing further was required.

**D.     BLM Properly Calculated Ozone Concentrations**

Next, Plaintiffs argue that BLM "made a fundamental math error when calculating future ozone concentrations. . ." Plfs. SJ Reply at 7. As explained in our opening brief, however, BLM did not make a math error. Rather, it altered the protocol for assessing ozone concentrations because it determined that the original protocol would result in an overestimate of the impacts. Importantly, it did so with the agreement of the two agencies that have primacy over air quality impacts in Wyoming, the WDEQ and the EPA. The AQTSD explains that the inter-agency air quality team deviated from using the 8-hour monitored concentration because, "[a]fter further consideration, it was determined that pairing a screening model concentration with a maximum background concentration monitored over the period of record results in the overestimate of the potential $O_3$ concentrations" AR 2704.

Moreover, Plaintiffs undercut their own argument by admitting that "[t]here is no dispute over the predicted ozone impact of the project." Plfs. SJ Reply at 8. If Plaintiffs agree that BLM's analysis of the ozone impacts is accurate, then they necessarily concede that BLM took the requisite hard look at those impacts, and their argument that the agency "failed first grade math" is irrelevant

9

because the alleged error was harmless.[4/]  Plaintiffs rely heavily on Environmental Defense, but the case supports BLM's position.  In that case, the plaintiffs "identif[ied] a math error in defendants' application" of its model.  515 F. Supp. 2d at 85.  The agency countered that "even if it committed this error, the error was harmless."  Id. at 86.  Even though the court concluded that the agency's analysis was "complicated and unclear," because the agency had consulted with other experts in developing its mitigation plan (which was based on the model), it found that the plaintiffs' assertion that the plan lacked expert support was without merit.  Id.  The court held that "[s]ince 'agency determinations based upon highly complex and technical matters are entitled to great deference,'" it would not disturb the agency's decision.  Id., citing Appalachian Power Co. v. EPA, 249 F.3d 1032, 1051-52 (D.C. Cir. 2001) (internal quotations omitted).  Here, BLM's analysis involves a "highly complex and technical matter," and the inter-agency air quality team (which included WDEQ and EPA) agreed with BLM's approach.  AR 4608.  BLM's analysis adequately examined potential ozone impacts.

**E.     BLM Adequately Addressed Methane Impacts**

Plaintiffs make two arguments in their reply in support of their claim that BLM erred in its analysis of methane impacts.  First, claiming that BLM argued the Court's decision on preliminary injunction was dispositive and that "the Court need not closely examine Plaintiffs' arguments"--

---

[4/] Plaintiffs concede that a predicted ozone violation does not violate NEPA. Plfs. SJ Reply at 9. Therefore, all they need do to derive the result they desire is to take the information already set forth in the FEIS, ozone impacts of 16.1 ug/m3, and an 8-hour background ozone level of 147 ug/m3 to find that the predicted ozone impacts add up to a total predicted impact of 163.1 ug/m3, a potential exceedence of the NAAQS/WAAQS. EPA, WDEQ and BLM all believed that Plaintiffs' method overestimated the impacts. But, the FEIS also set forth the requisite data for Plaintiffs to reach their own conclusions about the impact simply by reading the FEIS. Thus, the FEIS served its purpose of informing both the decisionmaker and the public about the potential effects of the proposed action.

arguments we did not make--Plaintiffs needlessly devote two pages to distinguishing the decision.[5/]

Plfs. SJ Reply at 9-10.  Second, rather than address the points made in our opening brief, Plaintiffs

simply re-hash the same arguments they made in their opening brief, alleging that BLM ignored

risks raised in a February 2007 draft report by Jon Dull that was produced just weeks before the

ROD was signed and a May 2007 email exchange between BLM hydrologist Lange and the Field

Manager.  Id. at 10-11.  Their failure to address several key points shows that their claim is hollow.

For example, they disregard that Dull did not suggest that further study was needed before approving

CBNG development; rather, he recommended monitoring to address the issue.  Id., citing AR 8805-

06.  And, while Plaintiffs speculate at length about the possibilities raised in Dull's draft report about

other issues such as the potential for accidents and greenhouse gas contributions, they also fail to

address the fact that Dull did not explain the basis for his concerns, except as "potential liability to

the federal government."  Id., citing AR 8803.  Likewise, they ignore our observation that while

hydrologist Lange observed in an email that he might have gone into more detail about gas

migration, his "Summary of Groundwater Issues," explains where the issue is covered in the EIS.

Fed. Def. SJ Br. at 24, citing AR 9460-66.

Instead, further illustrating the weakness of their argument, they continue to cite an email

contained in the record at AR 9432, which they claim purports to show that a scientist named

Venable Barclay had concerns about methane seeps.[6/]  Plfs. SJ Br. at 10.  Plaintiffs drastically

---

[5/] What we stated in our opening brief was that the Court had already partially addressed Plaintiffs'
arguments about BLM's analysis of methane in its preliminary injunction decision, and that its new
arguments "do not change the outcome."  Fed. Def. SJ Br. at 22-23.

[6/] Plaintiffs argue that BLM acknowledged that comments received late in the process were required
to be considered and responded to because the administrative record contains an email from a BLM
staffer opining that, until the decision is made, the administrative record is "still open for this kind
of information."  Plfs. SJ Reply at 14, citing AR 9452.  They extrapolate from this statement an
unsupportable conclusion; namely that "BLM itself understood that it was required to consider and
respond to the documents received prior to the decision."  Plfs. SJ Reply at 14.  Plaintiffs overreach.
Contrary to their assertion, we did not argue that the documents were extra-record materials.  What

overstate their case.[7]  The entire communication as to Venable Barclay, whose credentials are not

provided, is a hearsay communication about a mudpot (seep) stating, "We spoke today with Venable

Barclay, a geologist who has done a lot of work in this area. He confirmed that this is new activity."

AR 9432.  Contrary to Plaintiffs' assertion, the email simply is not "corroborat[ion] by geologist

Venable Barclay that interim drilling had already caused methane releases."  Plfs. SJ Br. at 12.

Plaintiffs admit that Dull himself stated that the evidence was inconclusive, but they

nevertheless continue to claim that BLM did not disclose the impacts in the EIS.[8]  While Plaintiffs

may have preferred that the issue of methane seeps be discussed in more detail, the FEIS adequately

disclosed the likely potential impacts.  FEIS at 4-32 (AR 2351).  Thus, although Plaintiffs argue that

---

we said was that if Plaintiffs wanted BLM to consider these issues, they should have submitted them
during one of the comment periods offered over the years' long process. Fed. Def. SJ Br. at 23 n.5
While the record may have been "open" in terms of including documents received prior to the
decision, the staffer's email says nothing about a legal duty to respond to these belatedly submitted
comments.  As we stated in our opening brief, and Plaintiffs do not dispute that the case is still good
law, BLM had no obligation to consider comments submitted after the close of the comment period.
Id. at 23, citing Board of Regents of the Univ. of Washington v. EPA, 86 F.3d 1214, 1222 (D.C.
Cir.1996).  And, even though BLM was under no obligation to do so, contrary to Plaintiffs'
assertion, it did not "do nothing."  It considered the belatedly provided information on methane
seeps and concluded that it was not "an accurate description of the issue as this is not new and has
been addressed in the EIS."  AR 9458.

[7] Plaintiffs also state that "Walt Merschat's tests revealed high concentrations of methane in seeps."
Plfs. SJ Reply at 12.  They provide no support for the assertion.  In their opening brief, they cited
AR 9450, a press release dated April 27, 2007, that purports to contain quotes from Merschat.  Plfs.
SJ Br. at 23.  It is evidence of nothing except the fact that Plaintiffs apparently issued a press release.
Interestingly, the release, which appears to have been drafted by Eric Molvar, seems to be in draft
form.  AR 9448.  The draft, attached to an email communication between Molvar and WOC attorney
Steve Jones, AR 9448, states in parentheses that Merschat should say "(something like: These are
the biggest methane seeps I've ever seen in my life and probably some of the biggest in the world.)".
AR 9450.  On page two of the press release, Molver suggests additional language for Merschat.  AR
9451.  Plaintiffs' reliance on this "evidence" dismantles, rather than bolsters, their argument.

[8] Dull's draft report is titled "Documentation and Appraisal of Known Gas Seeps" in the Atlantic
Rim area.  AR 8799.  It does not address new information.  The FEIS discloses the presence of
springs and seeps in the area.  FEIS at 3-36, 3-66 (AR 2200, 2230).  Compare also Dull at 8802 ("it
was noted that the gas seeps are located in the Lewis shale near the Lewis/Mesaverde contact.") with
FEIS at 2351 ("Artesian conditions in the upper Mesaverde Group may be responsible for the
surface expression of springs and seeps located along the Mesaverde and Lewis Shale contact.");
see also FEIS at 4-49 (AR 2368) (discussing potential groundwater impacts from seeps).

BLM violated NEPA because the Act "does not allow an agency to disregard an issue because there may be a degree of uncertainty surrounding it," Plfs. SJ Reply at 13, the record shows that BLM did not disregard the issue, and did acknowledge the uncertainty, "stating that "[t]he number or location of these seeps is impossible to predict." FEIS at 4-32 (AR 2351). Plaintiffs also suggest that BLM should have obtained the information prior to proceeding, "a Catch-22" argument that the Court should reject, since without the project proceeding (and thereby potentially causing impacts), BLM cannot obtain any information about how and where seeps might develop. Ultimately, both Dull's draft report and Lange's Summary of Groundwater issues are included in the administrative record, which shows that BLM considered the issue in the FEIS, and was continuing to evaluate methane seep questions, as it stated it would in the FEIS. FEIS at 4-32. Indeed, BLM considered the methane seeps issue to be of enough importance that it raised the issue to the State Director, just prior to signing the ROD. AR 9467. On April 27, 2007, (after the ROD was signed, but before it was released), BLM met with a team comprised of experts from Wyoming's State Geological Survey, WDEQ, Wyoming Oil and Gas Conservation Commission, and Anadarko to review and address issues raised by the public, and to set out near term and long term activities. AR 9455-57.

Next, repeating their reliance on EPA comments and the Eighth Circuit's decision in Mid States Coalition v. Surface Transportation Board, 345 F.3d 520 (8th Cir. 2003), Plaintiffs re-argue their claim that BLM was required to assess the impacts of global warming. They allege there is "nothing remote about the methane seep emissions that the project may cause," and in turn claim that BLM therefore had a duty to evaluate the impacts of seeps on global warming. Plfs. SJ Reply at 15. It is telling that instead of responding, Plaintiffs again ignore key facts that undercut their arguments. One, as we showed in our opening brief, the EPA comments Plaintiffs cite were comments on the draft EIS (AR 3481); in its comments on the FEIS, EPA made no mention of any

flaws in BLM's analysis of air quality impacts.  AR 9851.  Two, contrary to Plaintiffs' assertion, in Mid States Coalition, the Eight Circuit said nothing about the necessity of separately evaluating greenhouse gas emissions; rather, it simply concluded that the construction of rail lines to transport coal could ultimately lead to degradation in air quality from the burning of the coal, an impact which was not adequately addressed in the EIS.  345 F.3d at 549.

The Ninth Circuit's recent decision in Lands Council is also instructive on this issue. Addressing the question of uncertainty,[9] the Ninth Circuit explained

> We have previously faulted the Forest Service for not addressing uncertainties relating to a project "in any meaningful way" in an EIS.  But none of NEPA's statutory provisions or regulations requires the Forest Service to affirmatively present every uncertainty in its EIS. Thus, we hold that to the extent our case law suggests that a NEPA violation occurs every time the Forest Service does not affirmatively address an uncertainty in the EIS, we have erred.  After all, to require the Forest Service to affirmatively present every uncertainty in its EIS would be an onerous requirement, given that experts in every scientific field routinely disagree; such a requirement might inadvertently prevent the Forest Service from acting due to the burden it would impose.

2008 WL 2640001 at *17 (internal citations and parenthetical omitted).  See also Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1280 (9th Cir. 1973) ("If we were to impose a requirement that an impact statement can never be prepared until all relevant environmental effects were known, it is doubtful that any project could ever be initiated.").  Plaintiffs have not shown that BLM's analysis of the methane seeps issue was irrational.  The Court should uphold BLM's analysis.

---

[9] Plaintiffs parenthetically cite American Bird Conservancy, Inc. v. FCC, 516 F.3d 1027, 1034 (D.C. Cir. 2008) for the proposition that NEPA does not require a "precondition of certainty" before effects must be disclosed.  Plfs. SJ Reply at 13.  But, Plaintiffs misconstrue American Bird.  The language they quote addresses the agency's decision to rely on a categorical exclusion.  In contravention of its own NEPA regulations, the FCC "demand[ed] evidence of significant effects" from the plaintiffs as a precondition to undertaking analysis in an EA or EIS.  Id. at 1033.  Under such circumstances, the court concluded that "a precondition of certainty before initiating NEPA procedures would jeopardize NEPA's purpose to ensure that agencies consider environmental impacts before they act . . ."  Id.  The case is wholly irrelevant here because BLM did not require a precondition of certainty; it prepared an EIS.

14

**F.      BLM Adequately Considered Impacts on Sage Grouse**

Plaintiffs continue to argue that BLM erred in its analysis of impacts on sage grouse because, in Plaintiffs' view, BLM did not modify the project as the FWS had suggested and because BLM supposedly did not assess whether the project will lead to the listing of the sage grouse as threatened or endangered.  Plfs. SJ Reply at 17-20.  At the outset, Plaintiffs continue to ignore the correct standard.  As we explained in our opening brief, BLM was required to take FWS' comments seriously; it was not required to adopt its suggestions because it has the ultimate responsibility for managing the public lands.  Fed. Def. SJ Br. at 34, citing Citizens Against Burlington, Inc., 938 F.2d 190 at 201.[10]  Likewise, Plaintiffs continue to rely on Friends of the Earth v. Corps, 109 F. Supp. 2d 30, 38-42 (D.D.C. 2002), which they cited in their opening brief, but as we have already explained (a point they do not address), their reliance is misplaced because it stands for the same proposition as Citizens Against Burlington: namely, when a sister agency brings an issue to the lead agency's attention, "[i]t at least merit[s] analysis."  Id. at 39.  BLM did that here.

Thus, Plaintiffs' complaint that BLM's development of Alternative D is inadequate because it "does not include changes that respond to the Service's specific objections and concerns," Plfs. SJ Reply at 18, seeks to hold BLM to a higher standard than this Circuit requires.  BLM was not required to make every change the FWS suggested.  It was required to take its comments seriously and it did.  Developing an entirely new alternative "in response to comments received on the Draft EIS," in order to reduce surface disturbance and therefore minimize impacts on soils, vegetation,

---

[10] Ignoring Citizens Against Burlington, Plaintiffs cite the Ninth Circuit's decision in League of Wilderness Defenders v. Forsgren, 309 F.3d 1181, 1192 (9th Cir. 2002) for the proposition that the failure to respond to "specific issues raised by BLM's sister agency, violates NEPA," but their reliance is misplaced.  First, the D.C. Circuit has already spoken to the issue.  Second, contrary to their assertion, the Ninth Circuit did not find that an agency's analysis violated NEPA where it failed to address a sister agency's concerns.  Instead, it held that "the apparently unanswered concern of a sister agency that [an issue] was not adequately addressed weighs as a factor pointing toward the inadequacy of the EIS."  309 F.3d 1192.

and wildlife, shows that BLM took FWS' comments seriously. ROD at 4. Significantly, Plaintiffs do not dispute that, as we showed in our opening brief, while the FWS observed the impacts would be "significant," and disagreed with the decision to authorize Alternative D, it did not identify any flaws in BLM's analysis. AR 10134-35. BLM itself stated that the impacts would be significant. FEIS at 4-75-76 (AR 2394-95). It is also telling that Plaintiffs completely ignore the fact that the FWS' comments on the FEIS emphasized reclamation, and "commend[ed] BLM for requiring interim reclamation" as a measure for reducing impacts. Fed. Def. SJ Br. at 36-37, citing AR 10135; see also AR 4404 (responding to FWS' concerns about reclamation, BLM explained it revised appendix B of the FEIS to include several elements intended to improve the success of its reclamation efforts, such as "geospatial tracking of disturbance areas, annual monitoring and tracking of reclamation efforts, and an adaptive management approach allowing for modification of reclamation procedures based on the monitoring results"). The record shows that BLM took the issues identified by the FWS seriously, and that it addressed them in the FEIS and ROD.

Plaintiffs' assertion that BLM failed to analyze whether the project would lead to listing of the sage grouse under the ESA is meritless because it ignores the clear record evidence to the contrary. Plfs. SJ Reply at 18. Plaintiffs assert that BLM should have discussed current sage grouse numbers and how changes in population could affect the viability of the species. Id. Unsurprisingly, Plaintiffs fail to provide any support for their claim that such analysis is required. NEPA simply requires a "hard look" at the impacts; it does not mandate any particular form of analysis. The Ninth Circuit's decision in Lands Council is again instructive. Lands Council argued that the project ran afoul of NEPA because the Forest Service allegedly had not discussed the scientific uncertainty associated with its strategy for maintaining species viability. 2008 WL 2640001, at *19. The court held that the Forest Service may "use habitat as a proxy when the [agency] concludes, in its

16

expertise, that it is reasonable to assume that a project will maintain a species' viability if the project will maintain suitable habitat for the species." Thus, evaluating Lands Council's National Forest Management Act challenge, the court held that it should "defer to the Forest Service as to what evidence is, or is not, necessary to support wildlife viability analysis." Id. at *9. With regard to its analysis of the NEPA question, the court held that the agency simply must explain is methodology. Id. at *19. To "grant less deference" would be contrary to the "APA's arbitrary and capricious standard of review." Id. at *9.

One key difference between Lands Council and this case is that in Lands Council, the Forest Plan contained a requirement that the Forest Service manage species "to prevent further declines in populations which could lead to federal listing under the Endangered Species Act." Id. at *6. The current RMP contains no such requirement; it simply states that BLM should provide "habitat quality (food, cover, space, and water) adequate to support a natural diversity of wildlife. . ." FEIS at 4-68 (AR 2387). Therefore, contrary to Plaintiffs' assertion, Plfs. SJ Reply at 17, BLM had no enforceable duty to conduct a specific analysis of whether the project was likely to lead to listing under the ESA.[11] But, also contrary to Plaintiffs' assertion, BLM undertook that analysis.

Plaintiffs again fail to refute several dispositive facts set forth in our opening brief that show BLM undertook the appropriate analysis. (1) BLM concluded that sage grouse nesting habitat covers 92% of the project area. FEIS at 4-76 (AR 2395); see also FEIS at O-69 (AR 4465) (explaining scientific support). (2) The buffer around leks covers 8,440 acres or 3.1 percent of the

---

[11] The statement that BLM ensure that actions that it implements "do not contribute to the need for the species to become listed" is found in the BLM Manual. See AR 5238 (stating sensitive species shall be managed in the same manner as candidate species) and AR 5237 (explaining objective for managing candidate species). The BLM Manual is merely a statement of policy, and does not create enforceable obligations. See Forest Guardians v. Animal & Plant Health Inspection Service, 309 F.3d 1141, 1143 (9th Cir. 2002); (Forest Service Manual, which is akin to BLM Manual, "does not have the force of law and does not bind the agency."); Reed v. Avis Rent-A-Car, 29 F. Supp.2d 1121, 1126 (N.D. Cal. 1998) (BLM Manual does not have force of law); City of Williams, 151 F. Supp. 2d at 23 (Forest Service Manual and Handbook do not have the "weight of law").

project area, and the buffer around nests covers 17,846 acres or 6.6 percent of the project area. (3) Most of these areas "would remain undisturbed for the life of the project." FEIS at 4-71 (AR 2390). (4) Habitat loss "would equate to a maximum direct loss of 10 percent of the available nesting habitat. . ." FEIS at 4-79 (AR 2398). See Fed. Def. SJ Br. at 33. BLM also explained that leks on the boundaries of CBNG development are much more likely to be active than leks within the development. FEIS at 4-76 (AR 2395). It concluded that sage grouse may re-populate an area following development, even though it may not attain the same population levels that existed prior to development. Id. In other words, avoiding human activity, sage grouse may disperse to the edges of a project while development is ongoing, and then repopulate the area following reclamation. BLM had ample basis to find that the loss of habitat would implicate its significance criterion 4, meaning that the project "would preclude improvement" of the status of the sage grouse." FEIS at 4-79; 4-69 (AR 2388).

Plaintiffs complain that because BLM did not explicitly state that the project would not implicate criterion 1 (substantial loss of habitat function that would lead to listing of a population under the ESA), FEIS at 4-69, it failed to conduct the required analysis. Plfs. SJ Reply at 19. This argument takes "fly-specking" to new heights; the FEIS makes it clear that BLM concluded that the impacts would not lead to listing under the ESA. Plaintiffs' conclusory assertion to the contrary ignores the discussion set forth above, and the additional analysis in the FEIS. FEIS at 4-75-76, 79, 84 (AR 2394-95, 2398, 2403). BLM also stated in the response to comments that because the sage grouse is listed as a sensitive species, it would not undertake actions that "might jeopardize the future existence or viability of this species . . ." FEIS at 4-74 (AR 4570). BLM evaluated whether the project would lead to the need to list sage grouse under the ESA and Plaintiffs' argument

therefore must be rejected.[12]

## G.    BLM Adequately Examined Mitigation Measures for Sage Grouse

Plaintiffs continue to argue that BLM violated NEPA because the mitigation measures it adopted to minimize impacts on sage grouse supposedly do not comply with NEPA's scientific integrity requirements.  Plfs. Br. at 21.  Plaintiffs doggedly continue to ignore record evidence showing that BLM appropriately disclosed the impacts, even though they now admit in a footnote that NEPA does not require a "flawless" examination of mitigation.  They also admit that NEPA does not require a fully developed mitigation plan before the agency may act.  Plfs. SJ Reply at 21 n.13.  Plaintiffs weakly attempt to distinguish this Court's decision in NRDC v. Kempthorne, 525 F. Supp. 2d 115 (D.D.C. 2007) (NRDC I), claiming that the Court did not address the adequacy of mitigation for sage grouse, but only considered whether BLM had considered "reasonable alternatives."  Plfs. SJ Reply at 23.  Plaintiffs' position is untenable.  The Court correctly stated that NEPA does not "require agencies to mitigate the adverse effects and does not require a detailed explanation of the mitigation measures that will actually be employed.'"  NRDC I, 525 F. Supp. 2d at 121, quoting SUWA v. Norton, 237 F. Supp. 2d 48, 54 (D.D.C. 2002).[13]

In a recent decision, Northern Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969, 979 (9th Cir. 2006), the Ninth Circuit evaluated a plaintiffs' claim that BLM violated NEPA because it did not analyze the effectiveness of each mitigation measure in the EIS.  Similar to the standard in the D.C.

---

[12] Plaintiffs rely on Ecology Center v. Austin, 430 F.3d 1057, 1067 (9th Cir. 2005), in support of their argument that an EIS must analyze whether a project will result in a trend toward listing under the ESA.  Plfs. SJ Reply at 20.  The Ninth Circuit's decision in Lands Council specifically overruled Ecology Center, 2008 WL 2640001 at *6-*10.

[13] Notwithstanding the case law, which makes it clear that an agency's obligations to evaluate mitigation need only be "reasonably complete," Plaintiffs continue to argue that the Court should hold BLM to a higher standard, arguing that NEPA "prohibits" the agency from adopting mitigation "without solid science and analysis to support it."  Plfs. SJ Reply at 22, citing Earth Island Institute v. U.S. Forest Service, 442 F.3d 1147, 1160 (9th Cir. 2006).  But, Plaintiffs' reliance on Earth Island Institute is misplaced because the Court was not addressing mitigation.  Id.

19

Circuit, the court explained that "mitigation must 'be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated.'" Id., quoting City of Carmel-By-The-Sea v. U.S. DOT, 123 F.3d at 1142, 1154 (9th Cir.1997).   There, BLM set forth stipulations and operating procedures for each alternative, and outlined their purpose and effectiveness based on its "knowledge of the resources in the planning area and current industry standards."  457 F.3d at 979. BLM also stated that additional protective measures could be developed as part of its evaluations in site-specific decisionmaking.  Id.  The court found that BLM's analysis of mitigation was not arbitrary or capricious.  Id.

The situation before this Court is closely analogous.  BLM explained that, based on its research, the avoidance and mitigation measures would not be completely effective because they would not fully protect sage grouse nesting habitat and habitat loss would continue outside the 1/4 mile buffer.  FEIS at 4-79, 4-84 (AR 2398, 2403); see also AR 79130-35 (explaining use of protective stipulations).  Inventory and monitoring requirements are included, and additional mitigation may be required if necessary. ROD at B-14 (AR 4848); AR 4405.  The mitigation is also consistent with the Great Divide RMP for sage grouse, which provides that "[s]age grouse and sharp-tailed grouse strutting/dancing grounds and nesting habitat will be protected."  AR 694. Plaintiffs argue that these stipulations are inconsistent with current science, Plfs. SJ Reply at 22, but in fact the mitigation and reclamation requirements included in the ROD are consistent with current standards as described in the RMP, which provides management direction for the area.  FEIS at O-9 (AR 4405).  The mitigation is also consistent with WGFD's "Recommendations for Development of Oil and Gas Resources in Crucial and Important Wildlife Habitats," a 2004 Study.  ROD at 8 (AR 4803) (BLM considered 2004 WGFD Recommendations during preparation of the FEIS and ROD); AR 6557, 6563-64, 6566 (suggesting seasonal use restrictions and avoidance of surface disturbance

within 1/4-mile of the perimeter of occupied leks).[14] Likewise, as we explained in our opening brief,

BLM has adopted performance goals (ROD at 19, AR 4814), and an adaptive management regime

to inventory and monitor impacts so that it can continue to assess and respond to new information.

ROD at B-14 (AR 4848). Moreover, we showed in our opening brief that BLM considered recent

studies on the impacts of CBNG development, including the Holloran and Naugle studies.[15]

Plaintiffs argue that BLM is attempting to support its decision with "*post hoc*" analysis, Plfs. SJ

Reply at 23, but the record shows that the studies were cited in the FEIS. FEIS at 4-76 (AR 2395).

Next, Plaintiffs claim that the Naugle study "undermines BLM's choice of proposed

mitigation measures and further demonstrates that BLM's choice is unsupported by, and runs

counter to, the evidence in the record." Plfs. SJ Reply at 24. Plaintiffs' argument, however, exposes

that, contrary to their assertion, id. at 25, their aim is not to ensure the discussion of relevant impacts

that NEPA requires, but to obtain a substantive result, which NEPA does not permit. BLM

concluded that "there is no way to fully develop the oil and gas resources within the project area

without these effects, although site-specific review at the annual work planning stage would allow

for the use of best management practices to reduce adverse effects." AR 4404.

Finally, Plaintiffs rely on a recent Interior Board of Land Appeals (IBLA) decision,

Biodiversity Conservation Alliance, 174 IBLA 1 (March 3, 2008) (BCA) in support of their

---

[14] Plaintiffs attempt to distinguish the WGFD recommendations on the grounds that, based on Connelly, WGFD recommended that construction sites "not disturb suitable nest cover or brood-rearing habitats within 2 mi. of an occupied lek," Plfs. SJ Reply at 22 n.14, quoting AR 6565, but they ignore that the document includes Connelly's recognition that may not be possible. AR 6565. In addition, as explained herein, BLM has the discretion to impose additional mitigation.

[15] Plaintiffs argue that BLM claimed that "the Holloran study relied upon by the U.S. Fish and Wildlife Service is not relevant to the Atlantic Rim area" because it considered mitigation in the Pinedale project. Plfs. Reply at 24, citing Fed. Def. SJ Br. at 39. This argument misconstrues our opening brief, which stated that "BLM considered the Holloran study in the FEIS." Fed. Def. SJ Br. at 39, citing AR 2260, 2499. We pointed out that the FWS' statement that the mitigation adopted for the Pinedale project was "identical" to that for the mitigation for the Atlantic Rim project was not correct, Fed. Def. SJ Br. at 39, a conclusion that Plaintiffs make no effort to dispute.

21

argument that BLM's analysis of mitigation is arbitrary. Plfs. SJ Reply at 25-26. Plaintiffs' claims

that the decision supports their argument are without merit; in fact, the IBLA directly rejected the

same claims they make here. In that case, involving the Desolation Flats project, BCA argued that

BLM's analysis was arbitrary because it failed to address opposing scientific viewpoints and had

not presented a scientific study evaluating the efficacy of the 1/4 mile buffer. 174 IBLA at *21-22.

After completing the Desolation Flats FEIS, BLM issued Instruction Memorandum (IM) 2004-057,

"Statement of Policy Regarding Sage-Grouse Management Definitions, and Use of Protective

Stipulations and Conditions of Approval (COAs)" (Aug. 16, 2004), which cataloged "the history of

scientific thought regarding protections for sage grouse habitat, leks, and nesting areas from the

1970s to the present." Id. at *22. Plaintiffs suggest that the IM in BCA provided the requisite

analysis, and state that "[i]n the present case, by contrast, BLM did not present any analysis of its

proposed mitigation measures." Plfs. SJ Reply at 26. But, the record shows that here BLM relied

on a similar IM, "Statement of Policy Regarding Sage-Grouse Management Definitions, and Use

of Protective Stipulations and Conditions of Approval (COAs)," dated a year after the IM cited in

BCA, and incorporating the same analysis, i.e., the later version of the same IM at issue in BCA.

See AR 79130, 79133-35. Based on Plaintiffs' own analysis, BCA compels rejection of its claim.

Thus, taking into its knowledge of the resource area, current standards, and taking into account

recent studies, BLM provided a "reasonably detailed" discussion of mitigation in the FEIS and

disclosed that its mitigation would not eliminate impacts on sage grouse. NEPA does not require

more.

## H.   BLM's Analysis of Impacts on Big Game Satisfies NEPA

Plaintiffs continue to argue that BLM made fundamental errors in its analysis of impacts on

big game because the agency excluded from its analysis two projects, the Continental Divide-

Creston Natural Gas Project and the Hiawatha Regional Energy Project. Plfs. SJ Reply at 26-27. But, it is telling that several key points are again unrebutted by Plaintiffs.[16] As a legal matter, they do not dispute BLM has broad discretion to make the "line-drawing decisions," associated with the scope of its cumulative impacts analysis. See Fed. Def. SJ Br. at 30, citing NRDC I, 525 F. Supp.2d at 123, citing Coalition on Sensible Transp. Inc. v. Dole, 826 F.2d 60, 66 (D.C. Cir. 1987); see also Kleppe v. Sierra Club, 427 U.S. 390, 414 (1976) ("practical considerations of feasibility" are a proper basis for restricting the scope of analysis). With regard to the facts, they do not dispute that the Continental Divide-Creston project was continuing to evolve from two separate projects totaling around 4,250 wells to the current proposal of 9,000 wells. Fed. Def. SJ Br. at 30, citing AR 70570. They abandon their claim that the notice of intent (NOI) for the Continental Divide-Creston project was issued "months before" BLM issued its Draft EIS, Plfs. SJ Br. at 39 (we showed the allegation was false because the draft EIS *preceded* the notice of intent). Fed. Def. SJ Br. at 29. Plaintiffs also admit that the NOI for the Hiawatha Regional Energy Project was published only one month prior to the release of the EIS. Id. at 29-30.

Thus, the only new evidence Plaintiffs present that the Court has not already addressed is that the Continental Divide-Creston project was reasonably foreseeable because it was identified on a June 9, 2006 map entitled "Mineral and Lands Projects." Plfs. SJ Reply at 26-27. But, the June 2006 map, which says nothing about the extent of the project or its ultimate approval, does not change the analysis. As this Court explained in its preliminary injunction decision, "absent some evidence that the ultimate extent of these projects, as well as their ultimate approval, was reasonably foreseeable, this Court will not overturn the BLM's decision to exclude them from its cumulative impact analysis." 525 F. Supp. 2d at 123. BLM appropriately examined the cumulative impacts of

---

[16] Plaintiffs also argued in their opening brief that BLM's analysis of the cumulative impacts of disturbance on the Sierra Madre elk herd was erroneous, Plfs. SJ Br. at 38-39, but now abandon it. We explained in our opening brief that the argument lacked merit. Fed. Def. SJ Br. at 31-32.

"45 past, present and future projects and assessed their impact on, *inter alia*, the region's wildlife, air and water quality." Id. at 122-23. BLM adequately addressed the potential impacts on big game.

## I.    BLM Satisfied NEPA's Public Participation Requirements

Although this Court has already largely rejected Plaintiffs' arguments that BLM violated NEPA's public participation requirements, Plaintiffs attempt to distinguish the preliminary injunction decision by arguing that "neither Plaintiffs nor the Court had the record in this case when evaluating Plaintiffs' motion for preliminary injunction." Plfs. SJ Reply at 28. But, in support of this argument, they cite their summary judgment brief, id. at 29, which in turn cites documents attached to their preliminary injunction brief: "Exh. 25 (APD Posting Notice dated September 26, 2005), attached as Exh. V to Plaintiffs' Reply to Opposition to Motion for Preliminary Injunction;" Plfs. SJ Br. at 41, 42; the "Declaration of Erik Molvar (September 21, 2007), at ¶ 15, attached as Exh. A to Plaintiffs' Motion for Preliminary Injunction," Plfs. SJ Br. at 42; and Exhibit 12 to their summary judgment brief, the EA for the Catalina A and B PODs. Id. That is, their argument here relies on very same documents that this Court already rejected when it denied the motion for preliminary injunction.

Plaintiffs attempt to resuscitate their claim by now arguing that BLM violated NEPA because it has only provided "courtesy copies" of the Sun Dog C, D, and E EAs for comment. Plfs. SJ Reply at 29 n.18. Plaintiffs assert that "BLM has indicated that it is under no obligation to provide such copies for comment [and a] decision by the Court in Plaintiffs' favor is necessary to clarify BLM's legal obligation."[17] Plfs. SJ Br. at 30. But, Plaintiffs' argument that "BLM abused its discretion in

_____

[17]Although Plaintiffs failed to take advantage of their opportunities to participate in the process with regard to the Sun Dog A and B and Catalina A and B PODs, we showed in our opening brief that BLM has continued to provide opportunities for public comment, and that Plaintiffs have taken advantage of those opportunities. Fed. Def. SJ Br. at 43, citing AR 79066, 79078-79084. Plaintiffs concede that this is an "opportunity for comment." Plfs. SJ Reply at 29. Further, they also do not dispute that BLM responded to their comments in the FONSIs. AR 75187--189.

not providing Plaintiffs a chance to comment on the draft EAs," Plfs. SJ Reply at 29, inexplicably disregards this Court's ruling that BLM has no duty to offer a comment period for draft EAs. NRDC I, 525 F. Supp. 2d at 121.

The D.C. Circuit's decision in American Bird, 516 F.3d at 1035, handed down after the Court's decision on preliminary injunction, is also instructive. In that case, the FCC's practice was to post public notice that an application had been filed "only *after*" it had already approved the application. Id. The Court found that allowing comment only after a decision had already been made provided a "hollow opportunity to participate in NEPA procedures." Id. The court stated that "[i]nterested persons cannot request an EA for actions they do not know about," and observed that "[i]t was suggested during oral argument that a simple solution would be for the Commission to update its website when it receives individual tower applications; Petitioners stated that such a step would address their NEPA notice claim." Id. That is similar to BLM's practice of posting APDs for 30 days in the public reading room, and providing notice that EAs are being prepared on BLM's website. NRDC I, 525 F. Supp. 2d at 121. Further, notwithstanding the fact that BLM stated that it was providing the EAs as a "courtesy," Plaintiffs do not dispute that BLM provided them with an opportunity to comment on the Sun Dog C, D, and E, and that they took advantage of that opportunity. Plfs. SJ Reply at 30. BLM provided adequate opportunity for public participation.

## CONCLUSION

For the foregoing reasons, Federal Defendants' motion for summary judgment should be granted and Plaintiffs' complaint should be dismissed with prejudice.

Respectfully submitted this 22nd day of July, 2008.

RONALD J. TENPAS
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

25

   s/ Lori Caramanian

Lori Caramanian
United States Department of Justice
Environment & Natural Resources Division
1961 Stout Street, 8th Floor
Denver, CO 80294
Phone: (303) 844-1499
Fax: (303) 844-1350

Attorneys for Federal Defendants

Arthur R. Kleven
Attorney-Advisor
U.S. Department of the Interior
Office of the Solicitor, Rocky Mtn. Region